**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  |  |
|---|---|
| | § |
| | § Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** | |
| | § |
| vs. | § |
| | |
| **Highland Capital Management, L.P.** | |
| **Et al-** Appellee | |
| | §            **3:25-cv-02072-S** |
| | § |

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 11

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.  **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.  **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.  **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.  **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.  **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.  **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001* 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023* 2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039* 3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol 5*
*003493*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

| | | | |
|---|---|---|---|
| *Vol. 5*<br>003504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 003519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 003521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 003530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>003544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 003909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6* <br><br> *003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7* <br><br> *003936* <br> *Thru END of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15* <br><br> *011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| Vol 15 | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| 011877 | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| 012039 | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| N/A NO PDF AVAILABLE | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomerantz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| 012047 | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

*O12050*

*O12077*

*Vol. 16*

*O12079*

*O12357*

| | | | |
|---|---|---|---|
| *Vol. 16*<br>*012361* | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| *Vol. 17*<br>*012363* | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| *012641* | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| *Vol. 18*<br>*012697*<br>*Thru End of Vol. 21* | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| *Vol. 22*<br>*016732* | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| *016737* | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| *016773* | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| *016809* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

*Vol. 22*

| | | | |
|---|---|---|---|
| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255 (to be submitted to Clerk on flash drive) | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

*016827*

*016830*

*016855*

*016863*

*016865*

*Vol. 23*

*016867*

*Thru end of Vol. 25*

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27* *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28* *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| VOl. 28 | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| 020266 | | | |
| VOl. 29 | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| 020267 | | | |
| | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| 020271 | | | |
| | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020282 | | | |
| | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020289 | | | |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

Handwritten notations in left margin: *Vol. 29*, 020296, 020298, 020300, 020309, 020311, *Vol. 30*, 020407

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025        Respectfully submitted,

**WINSTON & STRAWN LLP**

By: /s/ Geoffrey S. Harper

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1135
Case 3:25-cv-02072-S Document 15-11 of 180410/06/25 Page 18 of 1017 PageID 8765
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1134 of 1803 PageID 11880
Case 18-30265-sgj11 Doc 1239-6 GBS13 Part 45 Filed 06/01/21/19 Desc Exhibit 50 of 54 Page 20 of
24

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06 <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07 <u>No Waiver</u>. The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10 <u>No Partnership or Joint Venture</u>. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11 <u>Independent Contractor</u>. Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Appellee Appx. 01128
Appx. 03993
007936

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.    The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.    The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.    This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.    Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

Acis Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01129

007937

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:  President


**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

**Appellee Appx. 01130**

**Appx. 03995**

**007938**

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1139
Case 3:25-cv-02072-S    Document 15-11    of 1804 10/06/25    Page 22 of 1017    PageID 8769
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1138 of 1803   PageID 11884

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture<br><br>Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01132

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1140
Case 3:25-cv-02072-S    Document 15-11   of 1804 10/06/25    Page 23 of 1017   PageID 8770
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1139 of 1803   PageID 11885

Case 19-12239-CSS    Doc 159-6    Filed 11/21/19    Page 1 of 76

# EXHIBIT F

**Appellee Appx. 01133**
**Appx. 93098**
007941

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1141
Case 3:25-cv-02072-S    Document 15-11    of 1804 10/06/25    Page 24 of 1017    PageID 8771
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1140 of 1803    PageID 11886
Case 18-30264-sgj11 Doc 159-8    Entered 11/21/18 Page 23 of 76 Page 1 of 12

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

### HIGHLAND CAPITAL MANAGEMENT, L.P.'s APPLICATION FOR
### ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(b)

Highland Capital Management, L.P. ("**Highland**"), hereby files this *Application for Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)* (the "**Application**") and requests this Court's approval of an administrative expense claim for the actual and necessary costs and expenses for services to Acis Capital Management, LP and Acis Capital Management GP, LLC (the "**Debtors**") rendered post-petition in the current known amount of **$3,554,224.29**, as well as such other amounts that may arise, as referenced herein, related to Highland's indemnity rights and other potential claims that may be asserted against the estates, as applicable.  In support of the Application, Highland respectfully states as follows:

### JURISDICTION & VENUE

1.    This Court has jurisdiction over the subject matter of this Application pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Application is a core proceeding within

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1142

Case 3:25-cv-02072-S Document 15-11 of 1804/06/25 Page 25 of 1017 PageID 8772

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1141 of 1803 PageID 11887

Case 18-30264-sgj11 Doc 897-2 Filed 12/15/18 Entered 11/21/18 Page 23 of 76 Page 2 of 12

the meaning of 28 U.S.C. § 157(b)(2)(A) and (B). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## **BACKGROUND**

**A.      The Contracts**

2.      Debtor Acis Capital Management, L.P. ("**Acis LP**") was formed in 2011 as an affiliated investment advisor to manage Highland's collateralized loan obligations. Acis LP and Highland are parties to a number of different agreements. Debtor Acis Capital Management GP, LLC ("**Acis GP**") is the general partner of Acis LP.

*(a)      The PMAs and the CLOs*

3.      Prior to the Petition Date (defined below), Acis LP had contractual obligations to provide portfolio management services to five collateralized loan obligation entities known as Acis CLO 2013-1 Ltd., Acis CLO 2014-3 Ltd., Acis CLO 2014-4 Ltd., Acis CLO 2014-5 Ltd., and Acis CLO 2015-6 Ltd. (the "**CLOs**") through certain portfolio management agreements (the "**PMAs**") with the CLOs. For those services, Acis LP was entitled to certain portfolio management fees pursuant to the PMAs.

4.      Each CLO holds a portfolio of diversified syndicated leveraged commercial loans through the private placement of rated secured notes (the "**Secured Notes**") and unsecured subordinated securities (the "**Equity Notes**," together with the Secured Notes, the "**Notes**"). Highland CLO Funding, Ltd. ("**HCLOF**") is the holder of the Equity Notes. Each Note is subject to an indenture (the "**Indenture**") that establishes the rights of the noteholders and indenture trustee investment criteria. Neither of the Debtors are a party to any of the Indentures. Rather, the Indentures are between each CLO entity, as issuer, and U.S. Bank, N.A. as indenture trustee (the "**Indenture Trustee**").

**PAGE 2**

**Appellee Appx. 01135**

Appx. 04009

007943

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1143
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 26 of 1017 PageID 8773
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1142 of 1803 PageID 11888
Case 18-30264-sgj11 Doc 2089-7 Filed 12/15/18 Entered 11/21/18 00:29:31 Page 3 of 12

5.     Pursuant to the Indentures, the CLOs can redeem the Secured Notes under certain conditions, including at the written direction of 66 2/3% of the aggregate outstanding amount of the Equity Notes.  Through this right of redemption, the Equity Noteholders can restructure the CLOs when they no longer meet their investment objectives.  Because changes in interest rates affect the return on the CLOs' investments, HCLOF has the contractual right to "reset" the CLOs, which is a process of refinancing the existing collateral loan obligations.

### (b)     The Outsourcing Agreement

6.     Also prior to the Petition Date, Acis LP was party to an Agreement for the Outsourcing of the Asset Management (the "**Outsourcing Agreement**") with Universal-Investment-Luxembourg S.A. ("**Universal**") whereby Universal outsourced to Acis LP the asset management of an entity called BAYVK R2 Lux S.A., SICAV-FS – Highland (the "**Sub-Fund**"), which is a sub-fund of an entity called BAYVK R2 Lux S.A., SICAV-FIS.  A copy of the Outsourcing Agreement is attached hereto as **Exhibit A**.  In return for Acis LP's management services, Universal paid Acis LP management fees, which were ultimately charged to the Sub-Fund, as provided by section 5.3 of the Outsourcing Agreement.  Section 2.6 of the Outsourcing Agreement provided that, subject to the prior consent of Universal, Acis LP was permitted to utilize the asset management services of third parties.  Pursuant to that provision, Acis LP engaged Highland to provide sub-advisory services with respect to the management of the Sub-Fund.[1]

7.     Acis LP does not have, nor has it ever had, any employees.  All employees who have ever provided services to Acis LP were Highland employees, which were provided to Acis LP through shared and sub-advisory services agreements.  Acis LP has always essentially

---

[1] The Sub-Fund is funded indirectly by an entity called Bayerische Versogungskammer ("**BVK**").  In the case, the term "BVK" has been used by the parties as shorthand to refer to the Sub-Fund arrangement under the Outsourcing Agreement.

**PAGE 3**

**Appellee Appx. 01136**
**007944**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1144

Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 27 of 1017    PageID 8774

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1143 of 1803    PageID 11889

Case 18-30264-sgj11 Doc 879-2 Filed 02/15/18    Entered 11/21/18 09:53:31 Page 4 of 12

subcontracted its CLO managerial function out to Highland. As a result, independently, Acis LP was not able to provide the services necessary to fulfill the contractual obligations under the PMAs or the Outsourcing Agreement. Since the inception of Acis LP until August 2, 2018, Highland provided all front, middle, and back-office services to Acis LP through sub-advisory and shared services agreements.

### (c)    The Shared Services Agreement

8.    Prior to being replaced on August 2, 2018 (as described below), Highland provided back- and middle-office services to Acis LP pursuant to the Fourth Amended and Restated Shared Services Agreement, executed on March 17, 2017, (as amended and restated from time to time, the "**Shared Services Agreement**"). A copy of the Shared Services Agreement is attached hereto as **Exhibit B** and incorporated herein by reference. The multitude of services provided by Highland are set forth in Article II of the Shared Services Agreement.

9.    Highland provided these shared services in exchange for management fees, currently averaging 15 basis points ("**bps**") of the total balances of the CLO accounts. *See* Exhibit 1 at Section 3.01 and Appendix A. The management fees were due to be paid to Highland approximately every quarter.

### (d)    The Sub-Advisory Agreement

10.    Highland also provided front-office services to Acis LP pursuant to the Third Amended and Restated Sub-Advisory Agreement, executed March 17, 2017 (as amended and restated from time to time, the "**Sub-Advisory Agreement**," collectively with the Shared Services Agreement, the "**Contracts**"). A copy of the Sub-Advisory Agreement is attached hereto as **Exhibit C** and incorporated herein by reference.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1145

Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 28 of 1017    PageID 8775

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1144 of 1803   PageID 11890

Case 18-30264-sgj11 Doc 97-23 Filed 02/15/18   Entered 02/15/18 Page 29 of 76 Page 5 of 12

11.     The Sub-Advisory Agreement appointed Highland "as Sub-Advisor to the Management Company [Acis LP] for the purpose of assisting the Management Company [Acis LP] in managing the Portfolios of each Account . . . ." *See* Sub-Advisory Agreement at Section 1(a)). The Sub-Advisory Agreement directs Highland to perform a multitude of investment advisory services set forth in Section 1(b) of the agreement.

12.     Highland was the sole provider of these services to Acis LP.  *See id* at § 5(6) ("So long as this [Sub-Advisory] Agreement or any extension, renewal or amendment of this [Sub-Advisory] Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.").  Given that Acis LP has no employees, Highland therefore was the sole provider of these services to the CLOs and the BVK Sub-Fund.

13.     For these investment advisory services, Highland received a sub-advisory fee that averaged 20 bps of the total average 40 bps Acis LP received as portfolio manager.  *See id.* at § 2(a) and Appendix A. The sub-advisory fees were due to be paid to Highland approximately every quarter.  Acis LP has not made a payment to Highland for sub-advisory services since November of 2017.

**B.     The Bankruptcy Cases**

14.     On January 30, 2018 (the "**Petition Date**"), Joshua N. Terry ("**Terry**") filed involuntary petitions (the "**Involuntary Petitions**") for relief under Chapter 7, Title 11 of the United States Code (the "**Bankruptcy Code**") against Acis LP and Acis Capital Management GP, LLC (the "**Debtors**").

15.     The Debtors filed answers to the Involuntary Petitions and moved to dismiss the petitions, asserting among other defenses that the Court lacked subject matter jurisdiction.

16.     A five-day contested trial on the Involuntary Petitions was held in late March 2018.  On April 13, 2018, the Court entered orders for relief (the "**Orders for Relief**").  Diane Reed was thereafter appointed as the Chapter 7 trustee (the "**Chapter 7 Trustee**").

17.     On April 17, 2018, the Chapter 7 Trustee filed her Expedited Motion to Operate the Debtors' Business in Chapter 7 [Doc. No. 127] (the "**Motion to Operate**").  By the Motion to Operate, the Chapter 7 Trustee determined there was "an immediate need to obtain authorization to continue the business operations of the Debtors by the [Chapter 7] Trustee continuing Acis LP's performance of the Sub-Advisory Agreement and the Shared Services Agreement."  Motion to Operate at ¶ 5.

18.     During this time period, HCLOF evaluated the situation and determined that having a bankrupt portfolio manager was an untenable situation.  HCLOF therefore decided to take action related to redeeming the CLOs.  Accordingly, on April 30, 2018, HCLOF instructed the Indenture Trustee and Acis LP to initiate an optional redemption (the "**Optional Redemption Notices**").  Pursuant to the terms of the Indentures, there was a 45-day notice period prior to the occurrence of the redemption.  Thus, the redemption was scheduled to occur on June 14, 2018.

19.     Highland, which had related responsibilities as sub-manager, was well-aware of the timeline related to the Optional Redemption Notices and was operating under the assumption that the Debtors would no longer be operating as of June 14, 2018.  As such, on May 3, 2018, Highland filed its *Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts* [Doc. No. 169] ("**Motion to Reject**").  By the Motion to Reject, Highland sought an order compelling the Debtors to reject the Contracts. Highland's intention was to file the Motion to Reject on a timeline such that any order granting

**Appellee Appx. 01139**

**Appx. 04064**

**007947**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1147
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 30 of 1017 PageID 8777
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1146 of 1803 PageID 11892
Case 18-30264-sgj11 Doc 2897-23 Filed 11/21/18 Entered 11/21/18 09:29:31 Page 7 of 12 Page 7 of 12

the Motion to Reject would be on or about the same time as the optional redemption on June 14, 2018.

20.    On May 4, 2018, the Chapter 7 trustee filed an *Expedited Motion to Convert Cases to Chapter 11* [Doc. No. 171] (the "**Motion to Convert**").  Also on May 4, 2018, Terry filed an *Emergency Motion for an Order Appointing Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Doc. No. 173] (the "**Motion to Appoint Chapter 11 Trustee**").

21.    On May 6, 2018, following an expedited hearing on the matter, the Court entered an order granting the Motion to Operate [Doc. No. 178] (the "**Operation Order**").[2]  The Operation Order authorized the Chapter 7 Trustee to operate the Debtors, explicitly pursuant to the terms of the Contracts with Highland.  The Operations Order did not contemplate long-term operations of the Debtors as illustrated by the fact that the Court set a further status conference for June 25, 2018 to "consider the status of the cases and any modifications to the relief granted" in the Operations Order.  *See* Operations Order at p. 3.

22.    Thereafter, on May 11, 2018, after a hearing on the matter, the Court entered orders granting the Motion to Convert [Doc. No. 205] and the Motion to Appoint Chapter 11 Trustee [Doc. No. 206]. On May 17, 2018, the Court entered an order granting appointment of Robin Phelan as Chapter 11 Trustee (the "**Chapter 11 Trustee**").

23.    The Chapter 11 Trustee refused to authorize the process to allow Highland, as sub-manager, to take the actions necessary to effectuate the noticed optional redemptions.  The Chapter 11 Trustee, Highland, and HCLOF exchanged a number of letters related to that issue in late May 2018.

---

[2] The Operations Order was preceded by an interim order entered by the Court on April 18, 2018 [Doc. No. 130] pending a hearing on the Motion to Operate.

**Appellee Appx. 01140**
Appx. 04095
007948

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1148
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 31 of 1017 PageID 8778
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1147 of 1803 PageID 11893
Case 18-30264-sgj11 Doc 1189-72 Filed 12/15/18 Entered 11/21/19 09:29:31 Page 8 of 12

24.     On May 24, 2018, the Chapter 11 Trustee filed his *Objection to the Motion of Highland Capital Management, L.P. for Order Compelling Chapter 7 Trustee to Reject Certain Executory Contracts and Request for Expedited Hearing* [Doc. 237] ("**Trustee's Objection**"). By the Trustee's Objection, the Chapter 11 Trustee argued that rejection of the Contracts was premature, given the conversion of the cases to Chapter 11. The Chapter 11 Trustee made clear his intention to continue to bind Highland to the terms of the Contracts, and to enjoy the services provided by Highland that made Acis LP's operations possible.

25.     On May 31, 2018, the Court held a status conference and entered a *sua sponte* temporary restraining order (the "**TRO**") staying the optional redemption process. In recognition of this fact, HCLOF subsequently withdrew the Optional Redemption Notices.

26.     On June 11, 2018, Highland filed a withdrawal [Doc. No. 273] of its Motion to Reject. The conversion of the case and the entry of the TRO made it perfectly clear that the Debtors' business would continue to operate past the late June time period Highland originally contemplated when it filed the Motion to Reject. Thus, Highland continued to perform the sub-advisory and shared services it provided the Debtors pre-petition, throughout the involuntary, and post-petition pursuant to the terms of the Contracts.

27.     On July 30, 2018, less than a month after the Chapter 11 Trustee complained about Highland's attempts to free itself of the obligations under the Contracts, the Chapter 11 Trustee filed his *Emergency Motion to Approve Replacement Sub-Advisory and Shared Services Providers, Brigade Capital Management, LP and Cortland Capital Markets Services LLC* [Doc. No. 448] (the "**Replacement Motion**"). By the Replacement Motion, the Chapter 11 Trustee sought to replace Highland with Brigade Capital Management, LP ("**Brigade**") based on vague

4817-3498-0226.1

allegations by the Chapter 11 Trustee that Highland was "mismanaging" and "overcharging" the
Debtors.

28.     The Court held a hearing on the Replacement Motion on August 1, 2018.  At the
hearing, counsel for the Chapter 11 Trustee stated that the issue of mismanagement was "not the
issue" for the hearing and reserved rights.[3]  Rather, the issue related solely to whether the
Chapter 11 Trustee's business judgment supported the relief sought in the Replacement Motion.
As such, the Court never took up the mismanagement issue.

29.     On August 1, 2018, the Court entered an order [Doc. 464] granting the Chapter 11
Trustee's Replacement Motion, thereby replacing Highland with Brigade Capital Management,
LP as service provider to Acis LP.  Highland provided transitional services through August 2,
2018.

## C.     Highland's Post-Petition Services Under the Contracts

30.     Highland provided Acis LP with uninterrupted services during three legally-
distinct time periods: (i) the period prior to the filing of the Involuntary Petitions; (ii) the "gap"
period between the filing of Involuntary Petitions and the entry of the Orders for Relief; and (iii)
the post-petition period following the entry of the Orders for Relief until Highland's replacement
on August 2, 2018 (the "**Post-Petition Period**").  Highland has filed a proof of claim asserting
its pre-petition unsecured claim and its priority gap claim pursuant to Bankruptcy Code section
507(a)(3).[4]  This Application seeks an administrative expense claim relating solely to the Post-
Petition Period and Highland reserves all rights related to any other period.

---

[3] See Hr'g Tr (Aug. 1, 2018) at 154:17-24 (MS. PATEL: "And with respect to these – to issues surrounding
mismanagement, et cetera, as I said sort of at the opportunity to cross-examine Mr. Covitz, it's just not an issue
today.  That's why we would want to reserve our rights at a later date to the extent that that is an actual material
issue in dispute.  That's when that needs to be brought up, but that's it.  We reserve our rights, Your Honor.  It's just
not an issue for today.  Thank you."

[4] See Proof of Claim [No. 27] filed on August 1, 2018 (the "**Proof of Claim**") whereby Highland asserts an
unsecured claim in the amount of $4,672,140.38, constituting $2,622,576.03 for the pre-petition period and

**Appellee Appx. 01142**

**Appx. 04807**

**007950**

## RELIEF REQUESTED

31.     By this Application, Highland seeks allowance of an administrative expense claim for services rendered under the Contracts during the Post-Petition Period.  The total accrued amount for such services is $3,554,224.29, as set forth in the summary attached hereto as **Exhibit D**, composed of $3,007,678.41 for sub-servicing and sub-advisory fees and $543,545.88 for expenses.

32.     Section 503(b) provides for an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate" as well as "the actual, necessary expenses" incurred by a creditor "in making a substantial contribution" in a Chapter 11 case.  *See* 11 U.S.C. §§ 503(b)(1); *see also In re ASARCO, LLC*, 650 F.3d 593, 601 (5th Cir. 2011) (providing that administrative expense claims under 503 "generally stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate.") (internal citation omitted). "A prima facie case under section 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the [debtor]; and (2) the goods or services supplied enhanced the ability of the [debtor's] business to function as a going concern." *Matter of TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).  The burden then shifts to the objector to put on sufficient evidence to rebut the movant's prima facie case.  *Id.*  Mere allegations, unsupported by evidence, are insufficient to rebut the movant's prima face case.  *Id.*

33.     It is undisputed that Highland provided services under the Contracts during the Post-Petition Period and that Highland has not been paid for such services.  Because Acis LP has

---

$2,049,564.35 for the gap period.  In the Proof of Claim, Highland specifically reserves its right to seek an administrative expense claim, and also related to contingent claims for indemnification pursuant to Section 6.03 of the Shared Services Agreement and Section 4(c) of the Sub-Advisory Agreement.  *See id.* at Proof of Claim Exhibit A.

**PAGE 10**

**Appellee Appx. 01143**

Appx. 04808

**007951**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1151
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 34 of 1017 PageID 8781
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1150 of 1803 PageID 11896
Case 18-30264-sgj11 Doc 897-23 Filed 02/15/18 Entered 11/21/19 Page 11 of 12 Page 11 of 12

no employees, it is self-evident that Highland's services benefited the estates because, absent such services, Acis LP would have been completely incapable of operating. In addition, while the Chapter 11 Trustee apparently has furthered a theory that Highland overcharged the Debtors (despite the fact that the terms of the Contracts are not in dispute), the Chapter 11 Trustee is required to provide evidence, not simply allegations, to rebut the prima facie case that Highland is entitled to an administrative expense claim. To date, the Chapter 11 Trustee has provided no such evidence. Rather, the Contracts speak for themselves and are the best evidence of the validity of the claim asserted by Highland.

34. In addition, Highland reserves all indemnity rights against the Debtors pursuant to section 6.03 of the Shared Services Agreement and section 4(c) of the Sub-Advisory Agreement. This includes, but is not limited to, in relation to the thirty-for (34) causes of action (the "**Causes of Action**") asserted against Highland by the Chapter 11 Trustee in the *Amended Answer, Counterclaims (Including Claims Objections) and Third Party Claims* filed by the Chapter 11 Trustee on November 13, 2018 in Adversary Proceeding No. 18-03078 [Adv. Proc. Doc. No. 84]. Many – if not all – of such Causes of Action appear to arguably fall within the coverage of the applicable indemnity provisions of the Contracts.

WHEREFORE, Highland respectfully requests that the Court enter an order: (i) awarding it an administrative expense claim at least in the amount of $3,554,224.29; (ii) awarding an administrative expense for any indemnity claims payable to Highland under the Contracts; and (iii) providing any such other relief the Court deems just and proper.

4817-3498-0226.1

**Appellee Appx. 01144**

**Appx. 04009**

007952

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1152
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 35 of 1017 PageID 8782
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1151 of 1803 PageID 11897
Case 18-30264-sgj11 Doc 897-23 Filed 12/11/18 Entered 12/11/18 Page 131 of 76 Page 12 of 12

Dated: December 11, 2018

Respectfully submitted,

*/s/ Jason B. Binford*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

and

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com
bbarnes@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT, L.P.**

### CERTIFICATE OF SERVICE

This is to certify that on December 11, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Jason B. Binford*
Jason B. Binford

4817-3498-0226.1

**Appellee Appx. 01145**
**Appx. 04819**
**007953**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1153
Case 3:25-cv-02072-S   Document 15-11   of 1804   10/06/25   Page 36 of 1017   PageID 8783
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1152 of 1803   PageID 11898

Case 18-30264-sgj11 Doc 3972-3 Filed 02/19/18   Entered 02/19/18 09:24:31 Page 1 of 14

# EXHIBIT A

Appellee Appx. 01146

007954

**Agreement**
**for the Outsourcing of the Asset Management (the "Agreement") of**

**BayVK R2 Lux S.A., SICAV-FIS (the "Fund")**

entered into between

Universal-Investment-Luxembourg S.A.,

with registered office at 15, rue de Flaxweiler, L-6776 Grevenmacher and registered with the Luxembourg Trade and Companies Register under number B75014

(hereinafter referred to as "**Management Company**")

and

**Acis Capital Management, L.P.**

**with its principal office at 300 Crescent Court, Suite 700, Dallas, Texas, 75201**

(hereinafter referred to as "**Acis**" or "**Asset Manager**")

– referred to individually as the "Party" and jointly as the "Parties" –

### RECITALS

(1) Universal-Investment-Luxembourg S.A. is a management company within the meaning of Chapter 15 of the Luxembourg Law of 17 December 2010 on undertakings for collective investment, as amended (hereinafter the "**Law of 2010**") which manages, amongst others, investment funds according to part I and part II of the Law of 2010 and specialised investment funds according to the Luxembourg law of 13 February 2007 on specialised investment funds (hereinafter the "**Law of 2007**") as last amended by the Law of 12 July 2013 on alternative investment fund managers.

(2) Acis is an investment advisor registered with the U.S. Securities and Exchange Commission.

1



UNIVERSAL INVESTMENT
LUXEMBOURG



Appellee Appx. 01147
Appx. 04812
007955

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1155
Case 3:25-cv-02072-S Document 15-11 of 18004/06/25 Page 38 of 1017 PageID 8785
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1154 of 1803 PageID 11900
Case 18-30264-sgj11 Doc 397-2 Filed 12/19/18 Entered 12/19/18 22:38:31 Page 3 of 14

(3)   Under an agreement dated 8 October 2014 (the "**Fund Management Agreement**"), the Fund has appointed the Management Company as its management company in accordance with the Law of 2010 and the Law of 2007. Under the Fund Management Agreement, the Management Company is, among other things, responsible for the asset management of the Fund. Under the Fund Management Agreement, the Management Company may, under its own responsibility and supervision, delegate its functions to third parties.

(4)   By virtue of this Agreement, the asset management of the sub-Fund(s) specified in **ANNEX A** (hereinafter referred to as the "**Sub-Funds**") is to be outsourced by the Management Company to Acis in accordance with Luxembourg legislation, the issuing document of the Fund, as amended from time to time (the "**Issuing Document**"), the articles of association of the Fund, as amended from time to time (the "**Articles**"), attached hereto as **ANNEX B1**, as well as directions by the regulatory authority in Luxembourg, the *Commission de Surveillance du Secteur Financier* (hereinafter referred to as "**CSSF**"). Additional Sub-Funds may be included herein provided that the attached **ANNEXES** (if and to the extent necessary) are amended and signed by both parties and **ANNEX A** is supplemented accordingly.

(5)   In view of the Asset Manager's skills and abilities in asset management and the representations made and obligations assumed by it hereunder, the Management Company intends to engage the Asset Manager for the management of the Sub-Funds listed in **ANNEX A**.

(6)   Therefore, the Parties agree to the following:

### Section 1
### Appointment of the Asset Manager

1.   The Management Company hereby appoints the Asset Manager to perform the asset management of the Sub-Funds upon the terms hereinafter contained and in accordance with the applicable laws and regulations, the Articles, the Issuing Document or as otherwise determined by the Management Company in accordance with Article 42ter lit. g) of the Law of 2007 from time to time. The Asset Manager hereby accepts its appointment and agrees to assume the obligations set forth herein.

2.   The Asset Manager represents and warrants that it is duly authorised to carry out the activities stipulated in this Agreement and that due to its professional infrastructure and human resources it is capable of providing its services on a secure and permanent basis. Furthermore it represents and warrants that it is familiar with the statutory investment restrictions as well as any other requirements relating to the management of funds in general and in particular with the requirements of the Luxembourg Law of 2007, the relevant circulars issued by the CSSF and all other applicable Luxembourg legislation. The Asset Manager represents and warrants that adequate risk management procedures have been put in place for the management of the relevant Sub-Funds. The Asset Manager will keep itself continuously informed about any amendments or changes in the statutory investment restrictions or other requirements. In particular, the Asset Manager will ensure sufficient professional competence of those employees who are entrusted with the performance of the Asset Manager's duties according to this Agreement, as well as establish and continuously maintain, at


UNIVERSAL
INVESTMENT
LUXEMBOURG



007956

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1156
Case 3:25-cv-02072-S Document 15-11 of 1804 10/06/25 Page 39 of 1017 PageID 8786
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1155 of 1803 PageID 11901
Case 18-3026-sgj11 Doc 397-2 Filed 12/19/18 Entered 12/19/18 09:31:76 Page 4 of 14

least for the term of this Agreement, the necessary infrastructure, especially for the purpose of monitoring compliance with investment restrictions.

3. Neither the regulatory and supervisory responsibility of the Management Company nor the liability of the Management Company under civil law towards the shareholders of the respective Sub-Funds will be affected by the appointment of the Asset Manager.

4. This Agreement shall not confer any right on the part of the Asset Manager to conduct advertising or distribution activities of any kind.

5. The appointment of the Asset Manager does not create any legal relationship between the Asset Manager and the shareholders of the Fund, but between the Parties only.

6. The Asset Manager may provide similar asset management services to other clients and may execute transactions which differ from the transactions executed hereunder.

## Section 2
### Duties of the Asset Manager

1. The Asset Manager will make all asset management decisions on behalf of the Sub-Funds. The Asset Manager shall be entitled and obligated to perform the asset management services of the respective Sub-Funds listed in **ANNEX A** (subject to the approval and supervision of the Management Company).

2. Management tasks include, where applicable, purchasing and selling of assets, securities transactions, futures transactions, entering into and closing out of derivative positions both for investment and hedging purposes, managing cash and implementing corporate actions in accordance with the Issuing Document and the Articles and as applicable to one or more Sub-Funds (please refer to **ANNEX B1**).

   However, these tasks do not include the exercise of any proxy voting rights attached to securities contained in the Sub-Funds, which is reserved to the Management Company itself. Business days in the sense of this Agreement are defined as stock exchange days on which banks would be open for general business in Luxembourg and Frankfurt am Main.

3. When performing its management tasks, the Asset Manager will duly observe the provisions of the Law of 2007, the Issuing Document and the Articles, as well as specific instructions/investment guidelines of the Management Company, if any, attached hereto in **ANNEX B2**. The Management Company is obligated to inform the Asset Manager of changes in the investment limits and rules as contained in the **ANNEX B1 and ANNEX B2**.

   When rendering management services, the Asset Manager will observe the principle of risk spreading as defined by the Law of 2007, the statutory investment restrictions, the provisions of the code of conduct, conflict of interest, organisational measures and the prohibition of insider trading according to the applicable law, the administrative customs of relevant supervisory authorities and their directives and circulars, as set out in the valid version of the Issuing Document and the Articles as attached hereto as **ANNEX B1**.

UNIVERSAL
INVESTMENT
LUXEMBOURG

47

Appellee Appx. 01149
Appx. 04814
007957

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1157
Case 3:25-cv-02072-S Document 15-11 of 1804 10/06/25 Page 40 of 1017 PageID 8787
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1156 of 1803 PageID 11902
Case 18-30264-sgj11 Doc 397-25 Filed 12/19/18 Entered 12/19/18 20:31:76 Page 5 of 14

The Management Company reserves the right to give comprehensive instructions to the Asset Manager and any sub-manager, if applicable, in connection with the management of the Sub-Funds, as far as legally required.

4. Brokers and counterparties will be selected by the Asset Manager at its sole discretion, taking into account all laws and regulations applicable to the Asset Manager and always in accordance with the Asset Manager's best execution policy, which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX H**. However, the Asset Manager's right to select brokers and counterparties at its sole discretion is limited to the list of brokers and the list of counterparties respectively attached hereto as **ANNEX C**. The Management Company's prior consent has to be obtained for the selection of brokers or counterparties not included in **ANNEX C**. The Asset Manager will issue at all times prompt and complete instructions to the Fund's custodian bank (hereinafter referred to as "**Custodian Bank**") to enable the Custodian Bank to settle transactions with brokers and counterparties. In this regard the Asset Manager is responsible for the careful choice, instruction and monitoring of the brokers or other counterparties.

5. The Asset Manager may provide similar asset management services to other customers and may effect transactions which differ from the transactions executed hereunder. Furthermore the Asset Manager may consolidate portfolio management measures hereunder with asset or portfolio management measures to be taken on behalf of other customers and aggregate customer orders without prior communication with the Management Company if and to the extent that this is consistent with the fiduciary duties imposed upon it under applicable law and this Agreement as well as the Asset Manager's conflicts of interests policy (the "**Conflicts of Interest Policy**"), which has been communicated to, and is hereby approved by, the Management Company and which is attached hereto as **ANNEX G**.

6. When fulfilling its obligations hereunder, the Asset Manager may contract the services of third parties if and to the extent that this is permitted under applicable law, particularly in accordance with the Law of 2007. Principally the Asset Manager is entitled to sub-delegate portions of its asset management function to an affiliate of the Asset Manager which consent shall also extend specifically to the modalities of the sub-delegation as defined in a separate sub-delegation agreement. For the avoidance of doubt, the Management Company's prior consent must be obtained for the sub-delegation of asset management services, which will not be unreasonably withheld. The Asset Manager will ensure that any sub-delegation will be in accordance with this Agreement and in particular with Law of 2007. In any case of sub-delegation to third parties the Asset Manager remains the sole party responsible to the Management Company for compliance with the duties pursuant to this Agreement.

7. The Asset Manager does not guarantee and the Management Company acknowledges and agrees that the Asset Manager does not guarantee, the future performance or any specific level of performance for the Sub-Funds, the success of any investment decision or strategy that the Asset Manager may use, or the success of the Asset Manager's overall management of the Sub-Funds. The Management Company understands that investment decisions made for the Sub-Funds by the Asset Manager are subject to various risks, including but not limited to, market, interest rate, foreign currency, equity, credit, counterparty, economic, political, legal and operational risks and that investment decisions will not always be profitable and may result in significant loss or depreciation in the value of the Sub-Funds.

8. The Asset Manager shall provide for adequate arrangements for the handling of both avoidable and unavoidable conflicts of interest. The Asset Manager shall be obliged to

4

UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01150

007958

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1158
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 41 of 1017 PageID 8788
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1157 of 1803 PageID 11903
Case 18-30264-sgj11 Doc 1263-72 Filed 02/19/18 Entered 02/19/18 22:31:76 Page 6 of 14

identify conflicts of interest in conjunction with the asset management services and to establish, respect and maintain a conflict of interest policy. This policy has to take into consideration conflicts of interest which may arise between the Asset Manager, including its employees and the Management Company and the persons who are directly or indirectly linked with the Asset Manager and its clients or between its clients. The Asset Manager further undertakes to make its conflict of interest policy available to the Management Company. The Asset Manager shall review its conflict of interest policy on an on-going basis, however at least in yearly intervals, and inform the Management Company of material changes to the policy as soon as reasonably practicable.

To the extent that the organisational arrangements of the Asset Manager are not suitable for the prevention of conflicts of interest, the Asset Manager shall be obliged to document the general nature and source of the remaining conflicts of interest, to promptly disclose these conflicts of interest to the Management Company and to initiate corrective measures in consultation with the Management Company.

9. The Asset Manager has, as of the date hereof, and shall maintain for the term of this Agreement, insurance; the relevant documents have been provided to the Management Company within the due-diligence process. .

10. The Asset Manager shall at all times observe and comply with the applicable laws and regulations, the Articles and with the applicable provisions of the Issuing Document or any such document relating to the Fund and its Sub-Funds distributed from time to time on behalf of the Fund and all lawful resolutions of the Management Company and other lawful orders and directions given to it from time to time by the Management Company. All activities engaged in by the Asset Manager shall at all times be subject to the control, approval and review by the Management Company.

### Section 3
### <u>Own dispositions of the Management Company, Authorisations</u>

1. To avoid contradicting dispositions with respect to the Sub-Funds' assets, the Management Company will refrain from any direct dispositions of the Sub-Funds' assets without prior consultation with the Asset Manager. This applies in particular to the cash management required to meet liabilities incurred by the Asset Manager on behalf of the Management Company for the account of the respective Sub-Funds. However, if it is deemed imperative by the Management Company, in its sole discretion and under own responsibility, to take its own management measures to protect the shareholders of the Sub-Funds, the Management Company reserves the right to immediately implement its own measures without prior notification of the Asset Manager. In this case the Management Company has to fully inform the Asset Manager either in advance or, as soon as reasonably possible after execution of the relevant management measure.

2. For the purpose of the asset management of the Sub-Funds, the Management Company will grant the Asset Manager all authorisations as required, in particular, the power to instruct the respective Custodian Bank to settle and accept settlement of transactions for the respective Sub-Fund. These authorisations are restricted to the accounts opened for the respective Sub-Fund. They do not include the Asset Manager's right to debit its remuneration or eventual expenses directly to the Sub-Fund concerned.


UNIVERSAL
INVESTMENT
LUXEMBOURG

42

Appellee Appx. 01151
Appx. 04816
007959

## Section 4
### Reporting

1.  The Asset Manager will report to the Management Company each transaction concluded by the Asset Manager on the trading day or in the case of transactions executed after the Management Company's business hours on the following business day to enable the Management Company to duly include the relevant transaction in its Fund accounts.

2.  The Asset Manager will ensure that the Custodian Bank will receive settlement instructions for all transactions according to the Custodian Bank's deadlines. The Asset Manager will also ensure that the Custodian Bank for the relevant Sub-Fund is informed of trades in financial instruments not being settled through a stock exchange or a recognised organised market.

3.  The Asset Manager will inform the Management Company as soon as reasonably practicable after becoming aware of any determined breaches of investment restrictions, whether caused actively or passively, and communicate all essential information and data relating thereto to the Management Company.

## Section 5
### Fees and Reimbursement of Expenses

1.  The Asset Manager is entitled to receive a fee for its services rendered under this Agreement which is set out in the fee schedule attached as **ANNEX D**. The Asset Manager's fee is understood as inclusive any statutory VAT or other duties and taxes where applicable.

2.  The Asset Manager is not entitled to reimbursement of any expenses incurred in connection with the performance of its obligations hereunder unless any such reimbursement of expenses has been agreed upon with the Management Company in advance in writing or is stated in the Issuing Document of the Fund.

3.  The Asset Manager's fees will be paid by the Management Company and ultimately charged to the respective Sub-Fund.

## Section 6
### Liability and Risk Considerations

1.  The Asset Manager shall act in compliance with the duties stated in this Agreement and in the relevant Service Level Agreement attached hereto as **ANNEX I** and shall be liable for the violation of investment restrictions and the conduct of unpermitted transactions caused by wilful misconduct, bad faith or negligence of the Asset Manager and shall compensate the Management Company for any losses or damages accordingly. The Asset Manager will not be liable for any action taken, omitted or suffered to be taken by it in its reasonable judgment, in good faith and believed by it to be authorised or within the discretion or rights or powers conferred upon it by this Agreement, or in accordance with (or in the absence of) specific directions or instructions from the Management Company. Notwithstanding anything to the contrary



UNIVERSAL
INVESTMENT
LUXEMBOURG

42

Appellee Appx. 01152

007960

contained herein, the Asset Manager shall not be liable to the Management Company, the Sub-Fund or any other party for any losses due to the performance of the Sub-Fund's investments so long as the Asset Manager acted in accordance with the investment guidelines contained in Annex B2.

The Asset Manager is liable in the same manner for its agents of vicarious liability including commissioned third parties. If a transaction executed by the Asset Manager is, at the time of that transaction, in conflict with the provisions hereof, the Asset Manager will, upon the Management Company's request, arrange for the Management Company or the relevant Sub-Fund or the shareholder to be in a position as if, on demand of the Management Company, the transaction had not been executed for the relevant Sub-Fund or alternatively been concluded in accordance with this Agreement.

2.   The Asset Manager shall not be liable for losses and/or financial damages arising from transactions initiated by the Management Company (in particular pursuant to Section 3.1) with regard to the assets of the Sub-Funds and/or from transactions executed in accordance with instructions of the Management Company except in case (and to the extent) the Asset Manager materially breached this Agreement and (i) the transactions so initiated and/or instructions given by the Management Company were required and suitable to correct such material breach, and (ii) the Management Company acted with due care and diligence when initiating such transactions and/or giving or implementing such instructions.

3.   The Management Company shall indemnify the Asset Manager against any loss sustained or incurred by the Asset Manager in connection with the performance of its duties under this Agreement except to the extent that such losses are due to the wilful misconduct, bad faith or negligence of the Asset Manager.

4.   The Asset Manager is expressly authorized to rely upon any and all instructions, approvals and notices given on behalf of the Management Company by any one or more of those persons designated as representatives of the Management Company whose names, titles and specimen signatures appear in ANNEX E attached hereto and incorporated herein by reference.

5.   It is mutually understood and agreed that in providing services pursuant to this Agreement, the Asset Manager is at all times performing services as an independent contractor and its employees are at all times performing services as independent contractors and not as agents or employees of Management Company.  Nothing contained in this Agreement is intended nor shall be construed to create an employer/employee relationship or to allow Management Company to exercise control or direction over the manner or method by which the Asset Manager performs services which are the subject matter of this Agreement; provided, however that the services to be rendered hereunder shall be rendered in a manner consistent with the standards governing such services, the provisions of this Agreement and all applicable provisions of law and other rules and regulations of any and all governmental authorities relating thereto.

6.   Statutory or contractual examination duties of the Management Company or the Custodian Bank do not diminish the Asset Manager's duties of due care.



UNIVERSAL
INVESTMENT
LUXEMBOURG

42

Appellee Appx. 01153

Appx 04916

007961

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1161
Case 3:25-cv-02072-S Document 15-11 of 1804 10/06/25 Page 44 of 1017 PageID 8791
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1160 of 1803 PageID 11906
Case 18-30264-sgj11 Doc 3397-25 Filed 12/19/18 Entered 12/19/18 22:31:76 Page 9 of 14

7. Force majeure, as such term is interpreted by Luxembourg courts, which seriously impedes or renders temporarily impossible delivery or performance for one of the parties prolongs the time for fulfilment of the duties by the duration of the impediment and the time necessary to restore normal working conditions. Force majeure is among others defined as lawful labour dispute measures, emergency measures taken by the state or other circumstances for which the affected party is not responsible.

### Section 7
### Confidentiality

1. It is understood by the parties that - except as otherwise provided in this Section 7 - the conditions hereof must neither be disclosed nor notified to any third parties. For the avoidance of doubt, the Fund shall not be considered as being a third party. This Section 7 does not apply to any legally required disclosure of information or the disclosure of information to shareholder(s) of the Fund, relevant governmental or regulatory authorities, the employees of the parties (on a need-to-know-basis), independent auditors and independent legal advisors. Entities and persons that are affiliated with or a contractual partner of the Asset Manager in accordance with this Agreement for the purpose of performing its obligations hereunder, are not deemed to be third parties within the meaning of this Section 7.

2. In the event that submission of any information relating to this Agreement, including its **ANNEXES**, is requested by a supervisory authority or other governmental or regulatory authority, the party to which the respective request is addressed shall, to the extent practicable, notify the other party thereof prior to submitting any such information unless the party to which the request is addressed is prohibited to notify the other party thereof under any applicable statutory or administrative regulations or in accordance with any instructions contained in the request of the respective supervisory authority.

3. Each party undertakes to keep confidential any and all information in its possession which relates to data processing systems and know-how of the other party as well as any and all general information relating to the affairs of the other party and its clients which is not publicly known; in addition, each party agrees to neither use nor disclose any such data except for the purposes hereof, subject to the prior written consent of the other party, or if and to the extent that it is subject to a statutory, regulatory or legal disclosure obligation.

4. The Asset Manager undertakes to observe the confidentiality rules owed by the Management Company with regard to all data relating to customers of the Management Company; the Management Company will inform the Asset Manager of such confidentiality rules in advance and the Management Company undertakes to only convey data to the Asset Manager which it may lawfully convey under such confidentiality rules; moreover, the Asset Manager agrees to make available any such data in connection herewith only to those employees of the Asset Manager or a sub-manager who are subject to comparable rules of confidentiality owed by the Management Company or any data protection obligations, and to do so only to the extent as is absolutely necessary to perform the management tasks in accordance herewith.

8



UNIVERSAL
INVESTMENT
LUXEMBOURG

42

5.  The Asset Manager will take technical, personnel-related and organisational measures so as to ensure that the confidentiality of all confidential information of the Management Company and the Fund is maintained as provided in Section 7 hereof not only towards any third parties, but also between various other outsourcing institutions on behalf of which the Asset Manager is acting as a service provider and other clients of the Asset Manager.

### Section 8
### Notices and Instructions

1.  All notices and instructions are only binding upon the receiving party if given by representatives of the performing units, whose names and specimen signatures are listed in the attached **ANNEX E** hereto. The parties will inform the respective other party immediately of any changes in the list. Each party shall appoint a head co-ordinator for all service areas.

2.  Notices and instructions given by telephone must be confirmed in writing or by fax as soon as practical.

3.  The parties may record all telephone calls between the Asset Manager and the Management Company. Both parties hereby agree to the recording and storage of such conversations and will inform their employees hereof.

### Section 9
### Duration

1.  This Agreement is concluded for an indefinite period of time. It may be terminated (i) by the Management Company – in respect of one or more of the Sub-Funds – at any time upon providing written notice to the Asset Manager whereupon notwithstanding Section 10 (3) the asset management authorisation is immediately revoked for the relevant Sub-Fund(s) or (ii) by the Asset Manager upon providing 30 (thirty) calendar days' notice to expire at the end of a calendar quarter.

2.  The right to terminate this Agreement immediately for cause is given if

    a)  the other party seriously violates its duties pursuant hereto and such a violation – insofar as it can be remedied or reversed – is not remedied or reversed within 10 (ten) calendar days following receipt of written notice hereof from the respective other party;

    b)  the other party has become the subject of insolvency proceedings opened against it, or said party has applied for insolvency or composition proceedings, or if the opening of insolvency proceedings is refused due to lack of assets sufficient to cover the costs of such proceedings;

    c)  the CSSF orders or demands the ending of this Agreement;

    d)  the other party discontinues its main business operation, pursues liquidation or is dissolved;

    e)  the CSSF or a court of law orders the appointment of an administrator or liquidator or a supervisor for a party;

UNIVERSAL
INVESTMENT
LUXEMBOURG



Appellee Appx. 01155



007963

f) a significant change of the participation or control circumstances occurs at the other party (except as a result of restructuring for economic reasons within the corporate group and which does not foresee distribution or other pay-outs of the company capital to shareholders, unit holders, partners, creditors, or a capital decrease).

3. In case of a notice of termination of this Agreement (a "**Termination Notice**") being served for whatever reason, all acts, deeds and dealings carried out or instructed prior to the date of receipt of the Termination Notice (the "**Notice Date**") shall be valid and legally binding upon the parties. Transactions instructed by the Asset Manager after the Notice Date must be settled according to the instructions of the Management Company. The parties will co-operate to ensure an orderly transition to another asset manager or to enable the Management Company to take over the asset management itself. The Asset Manager will continue to perform the asset management tasks until the transition is completed regardless of termination of this Agreement. Such a transition must be accomplished within an appropriate timeframe and may not be impeded or postponed without cause. So long as the Asset Manager conducts asset management activities it is entitled to the fee according to this Agreement. This notwithstanding, the Management Company is entitled at any time to terminate the Asset Manager's assignment with immediate effect and without awaiting conclusion of the transition.

4. If a Sub-Fund under this Agreement is transferred to another management company or is dissolved, the Management Company's contractual relationship under this Agreement in respect of this relevant Sub-Fund shall terminate as per the date of the transfer or dissolution of this Sub-Fund. There is no requirement for a separate notice of termination, but the Management Company is obliged to inform the Asset Manager within a reasonable time frame before such transfer or dissolution of a Sub-Fund.

5. Section 6 and Section 7 shall survive termination hereof.

### Section 10
### Miscellaneous

1. This Agreement shall be governed by Luxembourg law. Exclusive place of jurisdiction for any disputes arising from or in connection with this Agreement shall be Luxembourg, Grand Duchy of Luxembourg.

2. No rights under this Agreement shall be assigned by either party to any third parties in whole or in part without the prior written consent of the other party.

3. In the event that, for whatever reason, any provision hereof is ineffective, unlawful or impracticable, any such ineffectiveness, unlawfulness or impracticability shall not affect the remaining provisions hereof. Any such ineffective, unlawful or impracticable provision shall be replaced by an effective, lawful and practicable provision corresponding to the economic interests of the parties. The same shall apply for any gaps in this Agreement.



UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01156

007964

4.   The **ANNEXES** in their current versions are each an integral part of this Agreement. These contain any and all agreements between the parties concerning the services to be performed according to this Agreement.

5.   Any amendment hereto, including to this Section 10 (5), must be made in writing.

6.   Executed in duplicate. This Agreement will come into effect on 27 February 2015.

*(Signature page follows)*

UNIVERSAL
INVESTMENT
LUXEMBOURG



Appellee Appx. 01157

Appx. 04822

007965

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1165
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 48 of 1017 PageID 8795
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1164 of 1803 PageID 11910
Case 18-30264-sgj11 Doc 397-2 Filed 02/15/18 Entered 02/15/18 16:22:31 Page 13 of 14

Grevenmacher, _26 February 2015_     Dallas, _3 March 2015_

**Universal-Investment-Luxembourg S.A.**     **Acis Capital Management, L.P.**

By: _Rainer Krenz_   _Dirk Schmidt_     By: _[signature]_

Name: Rainer Krenz   Dirk Schmidt     Name: _Joshua N Terry_

Title: Senior Manager   Authorized Signatory     Title: _Portfolio Manager_

12

UNIVERSAL
INVESTMENT
LUXEMBOURG

Appellee Appx. 01158
Appx. 04923
007966

## ANNEXES

A:  **List of Sub-Funds**
B:  **B1: Issuing Document and articles of incorporation of the Fund**
    **B2: Investment Guidelines**
C:  **Lists of Brokers and Counterparties**
D:  **Fee Schedule**
E:  **Lists of Authorised Signatories**
F:  **intentionally omitted**
G:  **Conflicts of interest policy of the Asset Manager**
H:  **Best execution policy of the Asset Manager**
I:  **Operating Memorandum / Service Level Agreement**





**Appellee Appx. 01159**

**007967**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1167
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 50 of 1017    PageID 8797
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1166 of 1803    PageID 11912

Case 18-3026 sgj11 Doc 397-2 Filed 12/59/68 Entered 12/01/11 Page 28 31 76 Page 1 of 25

# EXHIBIT B

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1168
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 51 of 1017 PageID 8798
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1167 of 1803 PageID 11913

**EXECUTION VERSION**

**FOURTH AMENDED AND RESTATED SHARED SERVICES AGREEMENT**

by and between

**ACIS CAPITAL MANAGEMENT, L.P.**

and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

Dated March 17, 2017

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1169
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 52 of 1017 PageID 8799
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1168 of 1803 PageID 11914
Case 18-30264-sgj11 Doc 1279-22 Filed 12/19/18 Entered 12/19/18 20:31:76 Page 3 of 25

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ........................................................................................ 2

    Section 1.01    Certain Defined Terms..................................................... 2

    Section 1.02    Interpretation................................................................ 3

ARTICLE II SERVICES ........................................................................................... 4

    Section 2.01    General Authority. .......................................................... 4

    Section 2.02    Provision of Services. ..................................................... 4

    Section 2.03    Shared Employees........................................................... 6

    Section 2.04    Applicable Asset Criteria and Concentrations. .................. 8

    Section 2.05    Compliance with Management Company Policies and
                        Procedures. ................................................................... 8

    Section 2.06    Authority. ...................................................................... 8

    Section 2.07    Third Parties. ................................................................. 9

    Section 2.08    Management Company to Cooperate with the Staff and
                        Services Provider. .......................................................... 9

    Section 2.09    Power of Attorney........................................................... 9

ARTICLE III CONSIDERATION AND EXPENSES.................................................. 9

    Section 3.01    Consideration ................................................................ 9

    Section 3.02    Costs and Expenses ....................................................... 10

    Section 3.03    Deferral ........................................................................ 10

ARTICLE IV REPRESENTATIONS AND COVENANTS ......................................... 10

    Section 4.01    Representations ............................................................. 10

ARTICLE V COVENANTS........................................................................................ 10

    Section 5.01    Compliance; Advisory Restrictions. ................................ 10

    Section 5.02    Records; Confidentiality. ................................................ 11

ARTICLE VI EXCULPATION AND INDEMNIFICATION....................................... 12

    Section 6.01    Standard of Care ........................................................... 12

    Section 6.02    Exculpation. .................................................................. 12

    Section 6.03    Indemnification by the Management Company................. 13

    Section 6.04    Other Sources of Recovery etc ....................................... 14

    Section 6.05    Rights of Heirs, Successors and Assigns ......................... 14

    Section 6.06    Reliance........................................................................ 14

i

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1170
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 53 of 1017 PageID 8800
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1169 of 1803 PageID 11915
Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18 Entered 12/19/18 09:31:76 Page 4 of 25

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE VII TERMINATION ................................................. 14

    Section 7.01    Termination........................................................ 14

ARTICLE VIII MISCELLANEOUS .......................................... 15

    Section 8.01    Amendments ..................................................... 15

    Section 8.02    Assignment and Delegation. ............................ 15

    Section 8.03    Non-Recourse; Non-Petition............................ 15

    Section 8.04    Governing Law. ................................................ 16

    Section 8.05    WAIVER OF JURY TRIAL.............................. 17

    Section 8.06    Severability ...................................................... 17

    Section 8.07    No Waiver ........................................................ 17

    Section 8.08    Counterparts..................................................... 17

    Section 8.09    Third Party Beneficiaries ................................. 17

    Section 8.10    No Partnership or Joint Venture ....................... 17

    Section 8.11    Independent Contractor.................................... 17

    Section 8.12    Written Disclosure Statement .......................... 18

    Section 8.13    Headings .......................................................... 18

    Section 8.14    Entire Agreement ............................................. 18

    Section 8.15    Notices ............................................................. 18

Appellee Appx. 01163

Appx. 04928

007971

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1171
Case 3:25-cv-02072-S Document 15-11 of 1804 10/06/25 Page 54 of 1017 PageID 8801
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1170 of 1803 PageID 11916

Case 18-30264-sgj11 Doc 1239-25 Filed 12/19/18 Entered 12/19/18 Page 32 of 76 Page 5 of 25

## FOURTH AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

This Fourth Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Parties entered into that certain Third Amended and Restated Shared Services Agreement dated effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company;

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee") is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time); and

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1172
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 55 of 1017 PageID 8802
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1171 of 1803 PageID 11917
Case 18-30264-sgj11 Doc 1239-2 Filed 12/19/18 Entered 12/19/18 09:29:31 Page 6 of 25

# ARTICLE I

# DEFINITIONS

Section 1.01   <u>Certain Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Advisers Act</u>" shall have the meaning set forth in the Recitals to this Agreement.

"<u>Advisory Restriction</u>" shall have the meaning set forth in <u>Section 5.01(b)</u>.

"<u>Affiliate</u>" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble to this Agreement.

"<u>Applicable Asset Criteria and Concentrations</u>" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more CLOs or Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"<u>Applicable Law</u>" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof, including the Risk Retention Rules, of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"<u>CLO or Account</u>" shall mean a collateralized loan obligation transaction, including any type of short-term or long-term warehouse or repurchase facility in connection therewith, or a fund or account advised by the Management Company, as applicable.

"<u>Covered Person</u>" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"<u>Governmental Authority</u>" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission,

Appellee Appx. 01165
Appx. 04939
007973

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1173
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 56 of 1017 PageID 8803
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1172 of 1803 PageID 11918
Case 18-30264-sgj11 Doc 1397-2 Filed 12/19/18 Entered 12/19/18 23:31:76 Page 7 of 25

corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"<u>Highland</u>" shall have the meaning set forth in the preamble to this Agreement.

"<u>Indebtedness</u>" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) with respect to the Management Company, all indebtedness relating to the acquisition by the EU Originator Series of a collateral obligation that failed to settle (including any ineligible or defaulted collateral obligation) into a CLO; (e) all capital lease obligations; (f) all indebtedness guaranteed by such Person or any of its subsidiaries; (g) all capital lease obligations; (h) all indebtedness guaranteed by such Person or any of its subsidiaries.

"<u>Management Company</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Operating Guidelines</u>" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a CLO or Account.

"<u>Parties</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Portfolio</u>" means the Management Company's portfolio of collateral loan obligations, debt securities (including equity investments or subordinated securities in a CLO such as a Retention Interest), other similar obligations, preferred return notes, financial instruments, securities or other assets held directly or indirectly by, or on behalf of, the Management Company from time to time;

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended.

"<u>Staff and Services Fee</u>" shall have the meaning set forth in <u>Section 3.01</u> of this Agreement.

"<u>Staff and Services Provider</u>" shall have the meaning set forth in the <u>preamble</u> to this Agreement.

"<u>Shared Employee</u>" shall have the meaning set forth in the <u>Recitals</u> to this Agreement.

Section 1.02 <u>Interpretation</u>. The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are

Appellee Appx. 01166
App. 04931
007974

not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01  General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02  Provision of Services.  Without limiting the generality of Section 2.1 and subject to Section 2.4 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)  *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance;

(b)  *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, compliance support and implementation and general risk analysis;

(c)  *Management of Collateral Obligations and CLOs and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any CLO or Account from time to time.

(d)  *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such

Appellee Appx. 01167

Appx. 04932

007975

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1175
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 58 of 1017 PageID 8805
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1174 of 1803 PageID 11920
Case 18-30264-sgj11 Doc 1239-72 Filed 12/19/18 Entered 12/19/18 00:36:31 Page 9 of 25

valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(e) *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a CLO or Account managed by the Management Company, CLO transactions involving the Management Company, and any other rights and obligations of the Management Company;

(f) *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified CLOs or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(g) *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any CLO or Account, including reports relating to (i) purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(h) *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by the Management Company from time to time;

(i) *Shared Employees.* The provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(j) *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

(k) *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any CLO or Account or similar securitization, (c) the substantive investment management decisions with respect to any CLO or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Appellee Appx. 01168
Appx. 04838
007976

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1176
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 59 of 1017 PageID 8806
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1175 of 1803 PageID 11921
Case 18-30264 Case 19-02397-CS Filed 12/15/18 Entered 12/15/18 Document 73 Page 10 of 25

Section 2.03   <u>Shared Employees</u>.

(a)     The Staff and Services Provider hereby agrees and consents that each Shared Employee shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  The name, location and such other matters as the Parties desire to reflect with respect to each Shared Employee shall be identified on the books and records of each of the Management Company and the Staff and Services Provider, which may be amended in writing from time to time by the Parties to add or remove any Shared Employee to reflect the employment (or lack thereof) of such employee.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  If at any time any Shared Employee (or any other person employed by the Staff and Services provider who also provides services to the Management Company) shall be terminated from employment with the Staff and Services Provider or otherwise resigns or is removed from employment with the Staff and Services Provider, then such person may only serve as a separate direct employee of the Management Company upon the approval of the Management Company.  The Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)     Notwithstanding that the Shared Employees shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate

Appellee Appx. 01169
Appx. 04934
007977

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1177
Case 3:25-cv-02072-S    Document 15-11    of 1804 10/06/25    Page 60 of 1017    PageID 8807
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1176 of 1803    PageID 11922
Case 18-30264-sgj11 Doc 2397-2 Filed 12/15/18    Entered 12/17/18 09:29:31 of 76 Page 11 of 25

with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any CLO or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

7

Appellee Appx. 01170
App. 04935
007978

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1178
Case 3:25-cv-02072-S Document 15-11 of 1804 10/06/25 Page 61 of 1017 PageID 8808
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1177 of 1803 PageID 11923
Case 18-30264 Case 19-12239-CSS Filed 12/15/18 Filed 12/19/18 Page 2933 of 76 Page 12 of 25

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a CLO or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a CLO or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   <u>Applicable Asset Criteria and Concentrations</u>.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with <u>Section 2.2</u> above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   <u>Compliance with Management Company Policies and Procedures</u>.  The Management Company will from time to time provide the Staff and Services Provider and the Shared Employees with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   <u>Authority</u>.  The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Appellee Appx. 01171
App7-04936
007979

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1179
Case 3:25-cv-02072-S Document 15-11 of 1804 10/06/25 Page 62 of 1017 PageID 8809
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1178 of 1803 PageID 11924
Case 18-30264 Case 19-12237-CSS Filed Doc 215948 Entered 12/19/18 12/19/18 Page 2401 of 76 Page 13 of 25

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a CLO or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive the Staff and Services Fee payable thereto. The "Staff and Services Fee" shall be payable in accordance with Appendix A attached hereto, as such appendix may be amended by the Parties from time to time.

From time to time, the Management Company may enter into shared services agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such shared services agreements, the Management Company shall pay 100% of such fees to the Staff and Services Provider.

Appellee Appx. 01172
Appx. 04935
007980

Section 3.03    <u>Costs and Expenses</u>.  Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.04    <u>Deferral</u>.  Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    <u>Representations</u>.  Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    <u>Compliance; Advisory Restrictions</u>.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider.  Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable

Appellee Appx. 01173

Appx. 04938

007981

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1181
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 64 of 1017 PageID 8811
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1180 of 1803 PageID 11926
Case 18-30264 Case 19-12239-CSS Doc 2159-43 Filed 11/21/19 Page 15 of 25

access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)     This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any CLO or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any CLO or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such

Appellee Appx. 01174
Appx. 04939
007982

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1182
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 65 of 1017 PageID 8812
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1181 of 1803 PageID 11927
Case 18-3026 Case 19-12397-CSS Doc 2159-8 Filed 11/21/19 Page 24331 76 Page 16 of 25

information as is routinely disclosed to the trustee, custodian or collateral administrator of any CLO or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such CLO or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the CLOs or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Management Vehicles, the CLOs or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To

12

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1183
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 66 of 1017 PageID 8813
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1182 of 1803 PageID 11928
Case 18-30264 Case 19-12297-CSS Filed 2115 1/63 Entered 12/09/18 Page 2431 of 75 Page 17 of 25

the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03  Indemnification by the Management Company.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be

Appellee Appx. 01176
007984

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1184
Case 3:25-cv-02072-S Document 15-11 of 1804 0/06/25 Page 67 of 1017 PageID 8814
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1183 of 1803 PageID 11929
Case 18-3026 Case 19-D2237-CSFiled Doc120/15/21 8 Filed 12/09/1 Page 2453 of 76 Page 18 of 25

determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the CLOs or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

Appellee Appx. 01177
App. 04042
007985

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1185
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 68 of 1017 PageID 8815
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1184 of 1803 PageID 11930
Case 18-30264 Case 19-03377-cv-23 Filed Doc 2153-46 Filed 12/11/18 Page 2463 of 76 Page 19 of 25

# ARTICLE VIII

## MISCELLANEOUS

Section 8.01    <u>Amendments</u>.  This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    <u>Assignment and Delegation</u>.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence.  Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    <u>Non-Recourse; Non-Petition</u>.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations

Appellee Appx. 01178
Appx. 04945
007986

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1186
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 69 of 1017 PageID 8816
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1185 of 1803 PageID 11931
Case 18-30264 Case 19-DC2397-C-25 Filed 02/15/18 Filed 02/11/18 Page 2073 of 76 Page 20 of 25

and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)     Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)     The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)     The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04     Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)     The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum

16

App. 01044
007987

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1187
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 70 of 1017 PageID 8817
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1186 of 1803 PageID 11932
Case 18-30264 Case 19-02239-2-S Filed Doc 2159-3 Entered 12/01/18 Page 24 of 76 Page 21 of 25

and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06 <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07 <u>No Waiver</u>. The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, CLO or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10 <u>No Partnership or Joint Venture</u>. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11 <u>Independent Contractor</u>. Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as

Appellee Appx. 01180
007988

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1188

Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 71 of 1017 PageID 8818

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1187 of 1803 PageID 11933

Case 18-30264-sgj11 Doc 2397-25 Filed 12/21/18 Entered 12/21/18 Page 4933 of 76 Page 22 of 25

expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any CLO or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    <u>Written Disclosure Statement</u>.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    <u>Headings</u>.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    <u>Notices</u>.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

    (a)    If to the Management Company:

           Acis Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201


    (b)    If to the Staff and Services Provider:

           Highland Capital Management, L.P.
           300 Crescent Court
           Suite 700
           Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

Appellee Appx. 01181

007989

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: James Dondero
Title:  President


ACIS CAPITAL MANAGEMENT, L.P.,
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By:_____
Name: James Dondero
Title:  President

*Signature Page to Fourth Amended and Restated Shared Services Agreement*

## Appendix A

The Management Company shall pay to the Staff and Services Provider a Staff and Services Fee for the services for the CLOs or Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such CLOs or Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such CLOs or Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table. Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such CLOs or Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such CLOs or Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder. Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank.*]

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Staff and Services Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 15 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 15 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 15 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 15 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 15 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 15 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 15 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 15 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01184

Appx. 04049

007992

# EXHIBIT C

Appellee Appx. 01185

Appx. 04959

007993

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1193
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 76 of 1017 PageID 8823
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1192 of 1803 PageID 11938

**EXECUTION VERSION**

# THIRD AMENDED AND RESTATED SUB-ADVISORY AGREEMENT

by and between

## ACIS CAPITAL MANAGEMENT, L.P.

and

## HIGHLAND CAPITAL MANAGEMENT, L.P.

Dated March 17, 2017

**Appellee Appx. 01186**

**Appx 04954**

007994

# TABLE OF CONTENTS

Page

1. Appointment; Limited Scope of Services ........................................................ 1
2. Compensation ........................................................................................... 3
3. Representations and Warranties.................................................................. 3
4. Standard of Care; Liability; Indemnification. .............................................. 4
5. Limitations on Employment of the Sub-Advisor; Conflicts of Interest. .......... 7
6. Termination; Survival ............................................................................... 8
7. Cooperation with Management Company ...................................................... 8
8. Management Agreements and Related Agreements ........................................ 8
9. Amendments; Assignments ......................................................................... 9
10. Advisory Restrictions.................................................................................. 9
11. Records; Confidentiality............................................................................ 10
12. Notice ...................................................................................................... 11
13. Governing Law ......................................................................................... 11
14. WAIVER OF JURY TRIAL ......................................................................... 11
15. Severability .............................................................................................. 11
16. No Waiver ................................................................................................ 11
17. Counterparts ............................................................................................ 12
18. Third Party Beneficiaries .......................................................................... 12
19. No Partnership or Joint Venture ................................................................ 12
20. Entire Agreement ..................................................................................... 12

Appellee Appx. 01187

007995

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1195
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 78 of 1017 PageID 8825
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1194 of 1803 PageID 11940
Case 18-30264-sgj11 Doc 1397-2 Filed 12/19/18 Entered 12/19/18 20:36:31 Page 4 of 22

**THIRD AMENDED AND RESTATED**
**SUB-ADVISORY AGREEMENT**

This Third Amended and Restated Sub-Advisory Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated as of March 17, 2017, is entered into by and between Acis Capital Management, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the sub-advisor hereunder (in such capacity, the "Sub-Advisor" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Parties entered into that certain Second Amended and Restated Sub-Advisory Agreement dated July 29, 2016 to be effective January 1, 2016 (the "Existing Agreement");

WHEREAS, the Management Company from time to time has entered and will enter into portfolio management agreements, investment management agreements and/or similar agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Management Agreement") and related indentures, credit agreements, collateral administration agreements, service agreements or other agreements (each such agreement as amended, modified, waived, supplemented or restated, subject in each case to the requirements of Section 8, a "Related Agreement"), in each case as set forth on Appendix A hereto, as amended from time to time, pursuant to which the Management Company has agreed to provide portfolio and/or investment management services to certain funds and accounts and to certain collateralized loan obligation issuers and to borrowers in certain short-term or long-term warehouse or repurchase facilities in connection therewith (any such transaction, a "Transaction", any fund, account, issuer, warehouse borrower or repurchase agreement seller in respect of any such Transaction, an "Account", and the assets collateralizing each such Transaction and/or comprising the portfolio of such Account, a "Portfolio");

WHEREAS, the Management Company and the Sub-Advisor desire to enter into this Agreement in order to permit the Sub-Advisor to provide certain limited services to assist the Management Company in performing certain obligations under the Management Agreements and Related Agreements;

WHEREAS, the Parties now desire to amend and restate the Existing Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, and the receipt of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree that the Existing Agreement is hereby amended, restated and replaced in its entirety as follows:

1. Appointment; Limited Scope of Services.

(a) Highland is hereby appointed as Sub-Advisor to the Management Company for the purpose of assisting the Management Company in managing the Portfolios of each Account

**Appellee Appx. 01188**
**App7 04053**
**007996**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1196
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 79 of 1017 PageID 8826
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1195 of 1803 PageID 11941
Case 18-30264-sgj11 Doc 1972-53 Filed 12/19/18 Entered 12/19/18 20:31:16 Page 5 of 22

pursuant to the related Management Agreement and Related Agreements, in each case that have been included in the scope of this Agreement pursuant to the provisions of <u>Section 8</u>, subject to the terms set forth herein and subject to the supervision of the Management Company, and Highland hereby accepts such appointment.

(b)     Without limiting the generality of the foregoing, the Sub-Advisor shall, during the term and subject to the provisions of this Agreement:

(i)     make recommendations to the Management Company in its capacity as portfolio manager, investment manager or any similar capacity for any applicable Account as to the general composition and allocation of the Portfolio with respect to such Account among various types of securities, the nature and timing of the changes therein and the manner of implementing such changes, including recommendations as to the specific loans and other assets to be purchased, retained or sold by any such Account;

(ii)     place orders with respect to, and arrange for, any investment by or on behalf of such Account (including executing and delivering all documents relating to such Account's investments on behalf of such Account or the Management Company, as applicable), upon receiving a proper instruction from the Management Company;

(iii)     identify, evaluate, recommend to the Management Company, in its capacity as portfolio manager for such Account, and, if applicable, negotiate the structure and/or terms of investment opportunities within the specific investment strategy of the Management Company for such Account;

(iv)     assist the Management Company in its capacity as portfolio manager for such Account in performing due diligence on prospective Portfolio investments by such Account;

(v)     provide information to the Management Company in its capacity as portfolio manager for such Account regarding any investments to facilitate the monitoring and servicing of such investments and, if requested by the Management Company, provide information to assist in monitoring and servicing other investments by such Account

(vi)     assist and advise the Management Company in its capacity as portfolio manager for such Account with respect to credit functions including, but not limited to, credit analysis and market research and analysis; and

(vii)     assist the Management Company in performing any of its other obligations or duties as portfolio manager for such Account.

The foregoing responsibilities and obligations are collectively referred to herein as the "<u>Services</u>."

Notwithstanding the foregoing, all investment decisions will ultimately be the responsibility of, and will be made by and at the sole discretion of, the Management Company.  Furthermore, the

Appellee Appx. 01189
App7 04954
007997

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1197
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 80 of 1017 PageID 8827
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1196 of 1803 PageID 11942
Case 18-30264-sgj11 Doc 2397-3 Filed 12/59/68 Entered 12/21/91 Page 28 31 76 Page 6 of 22

parties acknowledge and agree that the Sub-Advisor shall be required to provide only the services expressly described in this Section 1(b), and shall have no responsibility hereunder to provide any other services to the Management Company or any Transaction, including, but not limited to, administrative, management or similar services.

(c)     The Sub-Advisor agrees during the term hereof to furnish the Services on the terms and conditions set forth herein and subject to the limitations contained herein. The Sub-Advisor agrees that, in performing the Services, it will comply with all applicable obligations of the Management Company set forth in the Management Agreements and the Related Agreements. In addition, with respect to any obligation that would be part of the Services but for the fact that the relevant Management Agreement or Related Agreement does not permit such obligation to be delegated by the Management Company to the Sub-Advisor, the Sub-Advisor, upon request in writing by the Management Company, shall work in good faith with the Management Company and shall use commercially reasonable efforts to assist the Management Company in satisfying all such obligations.

2.     <u>Compensation</u>.

(a)     As compensation for its performance of its obligations as Sub-Advisor under this Agreement in respect of any Transaction, the Sub-Advisor will be entitled to receive the Sub-Advisory Fee payable thereto. The "<u>Sub-Advisory Fee</u>" shall be payable in accordance with <u>Appendix A</u> attached hereto, as such appendix may be amended by the Parties from time to time.

(b)     Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Sub-Advisor for any and all costs and expenses that are properly Company Expenses or that may be borne by the Management Company under the Management Company LLC Agreement.

(c)     Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any and all amounts payable to the Sub-Advisor pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

(d)     From time to time, the Management Company may enter into sub-advisory agreements with certain management companies on similar terms to this Agreement. Promptly following the receipt of any fees pursuant to such sub-advisory agreements, the Management Company shall pay 100% of such fees to the Sub-Advisor.

3.     <u>Representations and Warranties</u>.

(a)     Each of the Management Company and the Sub-Advisor represents and warrants, as to itself only, that:

(i)     it has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1198
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 81 of 1017 PageID 8828
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1197 of 1803 PageID 11943
Case 18-30264-sgj11 Doc 2397-25 Filed 12/59/68 Entered 12/91/18 29:38:76 Page 7 of 22

(ii)     this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(iii)     no consent, approval, authorization or order of or declaration or filing with any government, governmental instrumentality or court or other person or entity is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(iv)     neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (A) its constituting and organizational documents; (B) the terms of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound; (C) any statute applicable to it; or (D) any law, decree, order, rule or regulation applicable to it of any court or regulatory, administrative or governmental agency, body of authority or arbitration having or asserting jurisdiction over it or its properties, which, in the case of clauses (B) through (D) above, would have a material adverse effect upon the performance of its duties hereunder.

(b)     The Sub-Advisor represents and warrants to the Management Company that it is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act").

(c)     The Management Company acknowledges that it has received Part 2 of Highland Capital Management, L.P.'s Form ADV filed with the Securities and Exchange Commission. The Sub-Advisor will provide to the Management Company an updated copy of Part 2 of its Form ADV promptly upon any amendment to such Form ADV being filed with the Securities and Exchange Commission.

4.     Standard of Care; Liability; Indemnification.

(a)     Sub-Advisor Standard of Care. Subject to the terms and provisions of this Agreement, the Management Agreements and/or the Related Agreements, as applicable, the Sub-Advisor will perform its obligations hereunder and under the Management Agreements and/or the Related Agreements in good faith with reasonable care using a degree of skill and attention no less than that which the Sub-Advisor uses with respect to comparable assets that it manages for others and, without limiting the foregoing, in a manner which the Sub-Advisor reasonably believes to be consistent with the practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Portfolios, in each case except as expressly provided otherwise under this Agreement, the Management Agreements and/or the

Appellee Appx. 01191
App 7 04956
007999

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1199
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 82 of 1017 PageID 8829
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1198 of 1803 PageID 11944
Case 18-30264-sgj11 Doc 1273-5 Filed 12/19/18 Entered 12/19/18 20:31:16 Page 8 of 22

Related Agreements. To the extent not inconsistent with the foregoing, the Sub-Advisor will follow its customary standards, policies and procedures in performing its duties hereunder, under the Management Agreements and/or under the Related Agreements.

(b)      Exculpation. To the fullest extent permitted by law, none of the Sub-Advisor, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)) (each a "Covered Person") will be liable to the Management Company, any Member, any shareholder, partner or member thereof, any Account (or any other adviser, agent or representative thereof), or to any holder of notes, securities or other indebtedness issued by any Account (collectively, the "Management Company Related Parties"), for (i) any acts or omissions by such Covered Person arising out of or in connection with the provision of the Services hereunder, for any losses that may be sustained in the purchase, holding or sale of any security or debt obligation by any Account, or as a result of any activities of the Sub-Advisor, the Management Company or any other adviser to or agent of the Account or any other sub-advisor appointed by the Management Company to provide portfolio management services to any other delegatee of the Management Company or any other person or entity, unless such act or omission was made in bad faith or is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of the Sub-Advisor, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of the Sub-Advisor with reasonable care, or (iii) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to any Management Company Related Party, no Covered Person acting under this Agreement shall be liable to such Management Company Related Party for its good-faith reliance on the provisions of this Agreement.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to any Management Company Related Party solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to any such Management Company Related Party, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to any Management Company Related Party in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care

Appellee Appx. 01192
Appx. 04957
008000

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1200
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 83 of 1017 PageID 8830
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1199 of 1803 PageID 11945
Case 18-30264-sgj11 Doc 3972-3 Filed 12/19/18 Entered 12/19/18 20:33:16 Page 9 of 22

    (c)    <u>Indemnification</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the Services, the activities of the Management Company Related Parties, or activities undertaken in connection with the Management Company Related Parties, or otherwise relating to or arising out of this Agreement, any Management Agreement and/or the Related Documents, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "<u>Proceeding</u>"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "<u>Damages</u>"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons.

    Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder may be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

    Notwithstanding any provision of this Agreement to the contrary, the provisions of this <u>Section 4(c)</u> shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 4(c)</u> to the fullest extent permitted by law

    (d)    <u>Other Sources of Recovery etc</u>. The indemnification rights set forth in <u>Section 4(c)</u> are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or

6

Appellee Appx. 01193
Appx. 04958
008001

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1201
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 84 of 1017 PageID 8831
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1200 of 1803 PageID 11946
Case 18-30264 Case 19-12237-CSS Doc 2159-48 Filed 12/21/18 Page 2231 of 76 Page 10 of 22

indemnification from any Person in which any of the Transactions has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained

(e)     Rights of Heirs, Successors and Assigns.  The indemnification rights provided by Section 4(c) shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person

(f)     Reliance.  A Covered Person shall incur no liability to any Management Company Related Party in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge.  Each Covered Person may act directly or through his, her or its agents or attorneys.

(g)     Rights Under Management Agreements and Related Agreements.  The Management Company will ensure that the Sub-Advisor is provided substantially similar indemnification and exculpation rights as are afforded to the Management Company in its role as portfolio manager under any future Management Agreement or Related Agreement encompassed within the Services hereunder, and it is expressly acknowledged by the Parties that the Sub-Advisor may not consent to including a Management Agreement and the related Transaction and Related Agreements within the scope of this Agreement pursuant to Section 8 if such indemnification and exculpation rights are not reasonably acceptable to it.

5.     Limitations on Employment of the Sub-Advisor; Conflicts of Interest.

(a)     The services of the Sub-Advisor to the Management Company are not exclusive, and the Sub-Advisor may engage in any other business or render similar or different services to others including, without limitation, the direct or indirect sponsorship or management of other Transactions, investment-based accounts or commingled pools of capital, however structured, having investment objectives similar to those of the Management Company or the Accounts. Moreover, nothing in this Agreement shall limit or restrict the right of any manager, partner, officer or employee of the Sub-Advisor to engage in any other business or to devote his or her time and attention in part to any other business, whether of a similar or dissimilar nature to the Management Company or any Account, or to receive any fees or compensation in connection therewith.

(b)     So long as this Agreement or any extension, renewal or amendment of this Agreement remains in effect, the Sub-Advisor shall be the only portfolio management sub-advisor for the Management Company.  The Sub-Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder.  It is understood that directors, officers, employees, members and managers of the Management Company are or may become interested in the Sub-Advisor and its Affiliates as directors, officers, employees, partners, stockholders, members, managers or otherwise, and that the Sub-Advisor and directors, officers, employees,

Appellee Appx. 01194
Appx. 04959
008002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1202
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 85 of 1017 PageID 8832
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1201 of 1803 PageID 11947
Case 18-30264 Case 19-12237-CSS Doc 2159-13 Filed 11/21/19 Page 2631 of 76 Page 11 of 22

partners, stockholders, members and managers of the Sub-Advisor and its Affiliates are or may become similarly interested in the Management Company as members or otherwise.

(c)     The Management Company acknowledges that various potential and actual conflicts of interest may exist with respect to the Sub-Advisor as described in the Sub-Advisor's Form ADV Part 2A and as described in Appendix B hereto, and the Management Company expressly acknowledges and agrees to the provisions contained in such Appendix B, as amended from time to time with mutual consent of the Parties.

6.     Termination; Survival.

(a)     This Agreement may be terminated, in its entirety or with respect to any Management Agreement, at any time without payment of penalty, by the Management Company upon 30 days' prior written notice to the Sub-Advisor.

(b)     This Agreement shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated (and, if required thereunder, a successor portfolio manager has been appointed and accepted) or discharged; or (ii) the Management Company is no longer acting as portfolio manager, investment manager or in a similar capacity (whether due to removal, resignation or assignment) under such Management Agreement and the Related Agreements. Upon the termination of this Agreement with respect to any Management Agreement the Management Company shall provide prompt notice thereof to the Sub-Advisor, and Appendix A hereto shall be deemed to be amended by deleting such Management Agreement and the Related Agreements related thereto.

(c)     All accrued and unpaid financial and indemnification obligations with respect to any conduct or events occurring prior to the effective date of the termination of this Agreement shall survive the termination of this Agreement.

7.     Cooperation with Management Company. The Sub-Advisor shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Sub-Advisor. Specifically, the Sub-Advisor agrees that it will provide the Management Company with reasonable access to information relating to the performance of Sub-Advisor's obligations under this Agreement.

8.     Management Agreements and Related Agreements. The Sub-Advisor's duty to provide Services in connection with any Management Agreement shall not commence until (a) Appendix A to this Agreement has been amended by mutual agreement of the Parties to include such Management Agreement and the related Account, fund and/or account and Related Agreements and (b) the Sub-Advisor acknowledges receipt of such Management Agreement and each Related Agreement. The Sub-Advisor shall not be bound to comply with any amendment, modification, supplement or waiver to any Management Agreement or any Related Agreement until it has received a copy thereof from the Management Company. No amendment, modification, supplement or waiver to any Management Agreement or Related Agreement that, when applied to the obligations and rights of the Management Company under such Management Agreement or Related Agreement, affects (i) the obligations or rights of the Sub-Advisor hereunder; (ii) the amount of priority of any fees or other amounts payable to the Sub-Advisor hereunder; or (iii) any

8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1203
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 86 of 1017 PageID 8833
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1202 of 1803 PageID 11948
Case 18-3026 Case 19-1223702-SS Filed Doc 2155468 Filed 01/20/19/18 age 2943 1 76 Page 12 of 22

definitions relating to the matters covered in clause (i) or (ii) above, will apply to the Sub-Advisor under this Agreement unless in each such case the Sub-Advisor has consented thereto in writing (such consent not to be unreasonably withheld or delayed unless the Sub-Advisor determines in its reasonable judgment that such amendment, modification, supplement or waiver could have a material adverse effect on the Sub-Advisor).

9. <u>Amendments; Assignments</u>.

(a) Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in <u>clauses (b)</u> and <u>(c)</u> of this <u>Section 9</u>, without the prior written consent of the other Party and (ii) in accordance with the Advisers Act and other applicable law.

(b) Except as otherwise provided in this <u>Section 9</u>, the Sub-Advisor may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with the Advisers Act and other applicable law.

(c) The Sub-Advisor may, without satisfying any of the conditions of <u>Section 9(a)</u> other than clause (ii) thereof (so long as such assignment does not constitute an assignment within the meaning of Section 202(a)(1) of the Advisers Act), (1) assign any of its rights or obligations under this Agreement to an affiliate; *provided* that such affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Sub-Advisor pursuant to this Agreement and (ii) has the legal right and capacity to act as Sub-Advisor under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Sub-Advisor under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Sub-Advisor in another corporate or similar form and has substantially the same staff; provided, further, that the Sub-Advisor shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Sub-Advisor will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

10. <u>Advisory Restrictions</u>. This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any Management Agreement or any part thereof. It is the express intention of the parties hereto that (i) the Services are limited in scope; and (ii) this Agreement complies in all respects with all applicable (A) contractual provisions and restrictions contained in each Management Agreement and each Related Agreement and (B) laws, rules and regulations (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the Services to be provided under this Agreement shall automatically without action by any person or entity be limited, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Appellee Appx. 01196
Appx. 04964
008004

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1204
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 87 of 1017 PageID 8834
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1203 of 1803 PageID 11949
Case 18-30268-sgj11 Doc 2397-2 Filed 12/15/18 Entered 12/01/18 09:29:31 Page 13 of 22

11.  <u>Records; Confidentiality</u>.

(a) The Sub-Advisor shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; provided, that the Sub-Advisor shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

(b) The Sub-Advisor shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Sub-Advisor hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its rating of notes issued in connection with a Transaction or supplying credit estimates on any obligation included in the Portfolios, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Account for which the Management Company serves as portfolio manager, (iv) as required by (A) applicable law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Sub-Advisor or any of its affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Sub-Advisor on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Sub-Advisor may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Transaction, or (ix) information relating to performance of the Portfolios as may be used by the Sub-Advisor in the ordinary course of its business. Notwithstanding the foregoing, it is agreed that the Sub-Advisor may disclose without the consent of any Person (1) that it is serving as Sub-Advisor to the Management Company and each Account, (2) the nature, aggregate principal amount and overall performance of the Portfolios, (3) the amount of earnings on the Portfolios, (4) such other information about the Management Company, the Portfolios and the Transactions as is customarily disclosed by Sub-Advisors to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Sub-Advisor, the Management Company, the Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

Appellee Appx. 01197
Appx. 04982
008005

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1205
Case 3:25-cv-02072-S Document 15-11 of 180 10/06/25 Page 88 of 1017 PageID 8835
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1204 of 1803 PageID 11950
Case 18-30264 Case 19-12379-CSS Filed Doc 215-13 Filed 11/12/19 11/18/19 Page 2963 of 76 Page 14 of 22

12.   <u>Notice</u>.  Any notice or demand to any party to this Agreement to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail, facsimile or email transmission or by delivering it by hand as follows (or to such other address, email address or facsimile number as shall have been notified to the other parties hereto):

      (a)   If to the Management Company:

          Acis Capital Management, L.P.
          300 Crescent Court
          Suite 700
          Dallas, TX 75201

      (b)   If to the Sub-Advisor:

          Highland Capital Management, L.P.
          300 Crescent Court
          Suite 700
          Dallas, TX 75201

13.   <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas.  The parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

14.   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

15.   <u>Severability</u>.  The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties.

16.   <u>No Waiver</u>.  The performance of any condition or obligation imposed upon any party hereunder may be waived only upon the written consent of the parties hereto.  Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other party under this Agreement.  Any failure by any party to this Agreement to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Appellee Appx. 01198
Appx. 04983
008006

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1206
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 89 of 1017 PageID 8836
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1205 of 1803 PageID 11951
Case 18-30264-sgj11 Doc 2397-2 Filed 12/19/18 Entered 12/19/18 09:30:17 Page 15 of 22

17. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

18. <u>Third Party Beneficiaries</u>. Nothing in this Agreement will be construed to give any person or entity other than the parties to this Agreement, the Accounts and any person or entity with indemnification rights hereunder any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. Except as provided in the foregoing sentence, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

19. <u>No Partnership or Joint Venture</u>. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the parties. Except as expressly provided herein or in any other written agreement between the parties, no party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other party.

20. <u>Entire Agreement</u>. This Agreement, together with each Management Agreement and Related Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the parties with respect to such subject matter.

[Remainder of Page Intentionally Left Blank]

Appellee Appx. 01199
Appx. 04964
008007

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as the Sub-Advisor

By:  Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title:  President

**ACIS CAPITAL MANAGEMENT, L.P.,**
as the Management Company

By: Acis Capital Management GP, LLC, its General Partner

By: _____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Sub-Advisory Agreement*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1208
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 91 of 1017   PageID 8838
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1207 of 1803   PageID 11953

### **Appendix A**

The Management Company shall pay to the Sub-Advisor a Sub-Advisory Fee for the Services for the Accounts in an amount equal to the aggregate management fees that would be received by the Management Company for such Accounts if such management fees were calculated in exact conformity with the calculation of management fees for such Accounts, except that the management fee rates applied in such calculation were replaced by the fee rate set forth in the following table.  Such fees shall be payable promptly (or at such time as is otherwise agreed by the parties) following the Management Company's receipt of management fees for such Accounts, it being understood that none of the foregoing shall prohibit the Management Company from waiving or entering into side letters with respect to management fees for such Accounts; provided that any such waived or reduced amounts shall not be recognized for purposes of calculating the fees payable by the Management Company hereunder.  Notwithstanding the foregoing, the parties may agree to a different allocation from that set forth during any period in order to reflect the then current fair market value of the Services rendered.

[*Remainder of Page Intentionally Left Blank*]

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1209
Case 3:25-cv-02072-S Document 15-11 of 1804 10/06/25 Page 92 of 1017 PageID 8839
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1208 of 1803 PageID 11954
Case 18-3026 Case 19-1223702-SS Filed Doc 2159 46 Filed 11/21/19 Page 2030 of 76 Page 18 of 22

| Issuer / Borrower / Fund / Account | Management Agreement | Related Agreements | Date of Management Agreement | Annualized Sub-Advisory Fee Rate (bps) |
|---|---|---|---|---|
| Hewett's Island CLO I-R, Ltd. | Management Agreement | Indenture | November 20, 2007 | 20 |
| Acis CLO 2013-1 Ltd. | Portfolio Management Agreement | Indenture | March 18, 2013 | 20 |
| Acis CLO 2013-2 Ltd. | Portfolio Management Agreement | Indenture | October 3, 2013 | 20 |
| Acis CLO 2014-3 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | February 25, 2014 | 20 |
| Acis CLO 2014-4 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | June 5, 2014 | 20 |
| Acis CLO 2014-5 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | November 18, 2014 | 20 |
| Acis CLO 2015-6 Ltd. | Portfolio Management Agreement | Indenture Collateral Administration Agreement | April 16, 2015 | 20 |
| BayVK R2 Lux S.A., SICAV-FIS | Agreement for the Outsourcing of the Asset Management | Service Level Agreement | February 27, 2015 | 20 |
| Acis Loan Funding, Ltd. | Portfolio Management Agreement | | August 10, 2015 | 0 |

Appellee Appx. 01202

Appx. 04007

008010

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1210
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 93 of 1017 PageID 8840
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1209 of 1803 PageID 11955
Case 18-3026 Case 19-12397-CSS Filed 12/15/18 Entered 12/19/18 Page 2013 of 76 Page 19 of 22

## APPENDIX B

Purchase and Sale Transactions; Brokerage

The Management Company acknowledges and agrees that the Sub-Advisor or any of its affiliates may acquire or sell obligations or securities, for its own account or for the accounts of its customers, without either requiring or precluding the acquisition or sale of such obligations or securities for the account of any Account. Such investments may be the same or different from those made by or on behalf of the Management Company or the Accounts.

Additional Activities of the Sub-Advisor

Nothing herein shall prevent the Sub-Advisor or any of its clients, its partners, its members, funds or other investment accounts managed by it or any of its affiliates, or their employees and their affiliates (collectively, the "Related Entities"), from engaging in other businesses, or from rendering services of any kind to the Management Company, its affiliates, any Account or any other Person or entity regardless of whether such business is in competition with the Management Company, its affiliates, such Account or otherwise. Without limiting the generality of the Sub-Advisor and its Related Entities may:

(a)      serve as managers or directors (whether supervisory or managing), officers, employees, partners, agents, nominees or signatories for the Management Company or any affiliate thereof, or for any obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof, to the extent permitted by their respective organizational documents and underlying instruments, as from time to time amended, or by any resolutions duly adopted by the Management Company, any Account, their respective affiliates or any obligor or issuer in respect of any of the Portfolio Assets (or any affiliate thereof) pursuant to their respective organizational documents;

(b)      receive fees for services of whatever nature rendered to the obligor or issuer in respect of any of the Portfolio Assets or any affiliate thereof;

(c)      be retained to provide services unrelated to this Agreement to the Management Company, any Account or their respective affiliates and be paid therefor, on an arm's-length basis;

(d)      be a secured or unsecured creditor of, or hold a debt obligation of or equity interest in, the Management Company, any Account or any affiliate thereof or any obligor or issuer of any Portfolio Asset or any affiliate thereof;

(e)      sell any Portfolio Asset to, or purchase or acquire any Portfolio Asset from, any Account while acting in the capacity of principal or agent; *provided, however*, that any such sale or purchase effected by the Sub-Advisor shall be subject to applicable law and any applicable provisions of this Agreement, the related Management Agreement and Related Agreements, as applicable;

(f)      underwrite, arrange, structure, originate, syndicate, act as a distributor of or make a market in any Portfolio Asset;

Appellee Appx. 01203
Appx. 04068
0080111

(g)    serve as a member of any "creditors' board", "creditors' committee" or similar creditor group with respect to any Portfolio Asset; or

(h)    act as portfolio manager, portfolio manager, investment manager and/or investment adviser or sub-advisor in collateralized bond obligation vehicles, collateralized loan obligation vehicles and other similar warehousing, financing or other investment vehicles.

As a result, such individuals may possess information relating to obligors and issuers of Portfolio Assets that is (a) not known to or (b) known but restricted as to its use by the individuals at the Sub-Advisor responsible for monitoring the Portfolio Assets and performing the Services under this Agreement. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Management Company and/or any Account and otherwise create conflicts of interest for the Management Company and/or any Account. The Management Company acknowledges and agrees that, in all such instances, the Sub-Advisor and its affiliates may in their discretion make investment recommendations and decisions that may be the same as or different from those made by the Management Company with respect to the investments of any Account and they have no duty, in making or managing such investments, to act in a way that is favorable to any Account.

The Management Company acknowledges that there are generally no ethical screens or information barriers between the Sub-Advisor and certain of its affiliates of the type that many firms implement to separate Persons who make investment decisions from others who might possess applicable material, non-public information that could influence such decisions. The officers or affiliates of the Sub-Advisor may possess information relating to obligors or issuers of Portfolio Assets that is not known to the individuals at the Sub-Advisor responsible for providing the Services under this Agreement. As a result, the Sub-Advisor may from time to time come into possession of material nonpublic information that limits the ability of the Sub-Advisor to effect a transaction for the Management Company and/or any Account, and the Management Company and/or such Account's investments may be constrained as a consequence of the Sub-Advisor's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Management Company and/or such Account.

Unless the Sub-Advisor determines in its sole discretion that such Transaction complies with the conflicts of interest provisions set forth in the applicable Management Agreement and Related Agreements, he Sub-Advisor will not direct any Account to acquire or sell loans or securities entered into or issued by (i) Persons of which the Sub-Advisor, any of its affiliates or any of its officers, directors or employees are directors or officers, (ii) Persons of which the Sub-Advisor or any of its respective affiliates act as principal or (iii) Persons about which the Sub-Advisor or any of its affiliates have material non-public information which the Sub-Advisor deems would prohibit it from advising as to the trading of such securities in accordance with applicable law.

It is understood that the Sub-Advisor and any of its affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Management Company with respect to the Portfolio Assets and which may own securities or obligations of the same class, or which are of the same type, as the Portfolio Assets or other securities or obligations of the obligors or issuers of the Portfolio Assets. The Sub-Advisor and its affiliates will be free, in their sole discretion, to

Appellee Appx. 01204

Appx. 04069
008012

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1212
Case 3:25-cv-02072-S Document 15-11 of 10/06/25 Page 95 of 1017 PageID 8842
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1211 of 1803 PageID 11957
Case 18-3026 Case 19-12237 CSS Filed 12/13/18 Filed 12/13/19 Page 2831 of 76 Page 21 of 22

make recommendations to others, or effect transactions on behalf of themselves or for others, which may be the same as or different from those effected with respect to the Collateral. Nothing in this Agreement, in the Management Agreements or in the Related Agreements shall prevent the Sub-Advisor or any of its affiliates, acting either as principal or agent on behalf of others, from buying or selling, or from recommending to or directing any other account to buy or sell, at any time, securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same obligor or issuer, as those directed by the Sub-Advisor to be purchased or sold on behalf of an Account. It is understood that, to the extent permitted by applicable law, the Sub-Advisor, its Related Entities, or any of their owners, directors, managers, officers, stockholders, members, partners, partnership committee members, employees, agents or affiliates or the other Covered Persons or any member of their families or a Person or entity advised by the Sub-Advisor may have an interest in a particular transaction or in securities or obligations of the same kind or class, or securities or obligations of a different kind or class of the same issuer, as those that may be owned or acquired by an Account. The Management Company agrees that, in the course of providing the Services, the Sub-Advisor may consider its relationships with other clients (including obligors and issuers) and its affiliates.

The Management Company agrees that neither the Sub-Advisor nor any of its affiliates is under any obligation to offer any investment opportunity of which they become aware to the Management Company or any Account or to account to the Management Company or any Account for (or share with the Management Company or any Account or inform the Management Company or any Account of) any such transaction or any benefit received by them from any such transaction. The Management Company understands that the Sub-Advisor and/or its affiliates may have, for their own accounts or for the accounts of others, portfolios with substantially the same portfolio criteria as are applicable to the Accounts. Furthermore, the Sub-Advisor and/or its affiliates may make an investment on behalf of any client or on their own behalf without offering the investment opportunity or making any investment on behalf of the Management Company or any Account and, accordingly, investment opportunities may not be allocated among all such clients. The Management Company acknowledges that affirmative obligations may arise in the future, whereby the Sub-Advisor and/or its affiliates are obligated to offer certain investments to clients before or without the Sub-Advisor offering those investments to the Management Company or any Account.

The Management Company acknowledges that the Sub-Advisor and its affiliates may make and/or hold investments in an obligor's or issuer's obligations or securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's obligations or securities made and/or held by the Management Company or any Account, or in which partners, security holders, members, officers, directors, agents or employees of the Sub-Advisor and its affiliates serve on boards of directors, or otherwise have ongoing relationships or otherwise have interests different from or adverse to those of the Management Company and the Accounts.

<u>Defined Terms</u>

For purposes of this <u>Appendix B</u>, the following defined terms shall have the meanings set forth below:

"<u>Portfolio</u>" shall mean, with respect to any Account and/or Transaction, the assets held by or in the name of the Account or any subsidiary of the Account in respect of such Transaction,

Appellee Appx. 01205
Appx. 04079
008013

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1213
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 96 of 1017 PageID 8843
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1212 of 1803 PageID 11958
Case 18-30264-sgj11 Doc 2397-2 SS Filed 12/19/18 Entered 12/19/18 Page 22 of 22

whether or not for the benefit of the related secured parties, securing the obligations of such Account.

"Portfolio Asset" shall mean any loan, eligible investment or other asset contained in the Portfolio.

"Transaction" shall mean any action taken by the Sub-Advisor on behalf of any Account with respect to the Portfolio, including, without limitation, (i) selecting the Portfolio Assets to be acquired by the Account, (ii) investing and reinvesting the Portfolio, (iii) amending, waiving and/or taking any other action commensurate with managing the Portfolio and (iv) instructing the Account with respect to any acquisition, disposition or tender of a Portfolio Asset or other assets received in respect thereof in the open market or otherwise by the Account.

Appellee Appx. 01206
Appx. 04074
008014

Case 18-30264-sgj11 Doc 97-2 Filed 12/21/18 Entered 01/29/11/29:29:36 Page 1 of 2

# EXHIBIT D

Appellee Appx. 01207

Appx. 04072

008015

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1215
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 98 of 1017 PageID 8845
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1214 of 1803 PageID 11960
Case 18-30264-sgj11 Doc 697-CSS Filed 12/19/18 Entered 12/19/11/Page 29 of 176 Page 2 of 2

**HIGHLAND CAPITAL MANAGEMENT, LP**
**POST-PETITION FEE ACCRUAL UNDER THE**
**SUB-ADVISORY AND SHARED SERVCIES AGREEMENTS**

Period:  April 13, 2018 to August 2, 2018

| Management Contact | Sub-Advisory Agreement | Shared Services Agreement | Expense Reimbursement | Subtotal |
|---|---|---|---|---|
| Acis CLO 2013-1, Ltd. | $196,144.32 | $147,108.24 | $62,252.97 | $405,505.53 |
| Acis CLO 2014-3, Ltd. | $238,710.43 | $179,032.82 | $81,545.25 | $499,288.50 |
| Acis CLO 2014-4, Ltd. | $290,184.32 | $217,638.24 | $101,087.78 | $608,910.34 |
| Acis CLO 2014-5, Ltd. | $299,518.82 | $224,639.11 | $107,246.57 | $631,404.50 |
| Acis CLO 2015-6, Ltd. | $340,546.52 | $255,409.89 | $125,264.41 | $721,220.82 |
| BVK | 353,568.97 | $265,176.73 | $66,148.90 | $684,894.60 |
| | | | | |
| **TOTAL** | | | | **$3,551,224.29** |

# EXHIBIT G

**Appellee Appx. 01209**

**Appx. 04074**

008017

Debtor   Acis Capital Management, L.P.                          Case number *(if known)*  18-30264

3. **Certain payments or transfers to creditors within 90 days before filing this case**
List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer Check all that apply |
|---|---|---|---|---|
| 3.1. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75208 | 11/2/2017 | $234,013.63 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
| 3.2. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75208 | 11/3/2017 | $941,958.57 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
| 3.3. | Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75208 | 12/8/2017 | $89,655.14 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
| 3.4. | David Simek 31 Woodacres Road Brookville, NY 11545 | 11/15/2017 | $2,068.13 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
| 3.5. | David Simek 31 Woodacres Road Brookville, NY 11545 | 11/30/2017 | $24,266.71 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
| 3.6. | David Simek 31 Woodacres Road Brookville, NY 11545 | 12/12/2017 | $1,718.79 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |
| 3.7. | David Simek 31 Woodacres Road Brookville, NY 11545 | 12/29/2017 | $25,000.00 | ☐ Secured debt ☐ Unsecured loan repayments ☐ Suppliers or vendors ■ Services ☐ Other___ |

Appellee Appx. 01210

Appx. 04075
008018

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1218
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 101 of 1017 PageID 8848
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1217 of 1803 PageID 11963
Case 18-30264-sgj7 Doc 285-5 Filed 02/30/69-7 Entered 04/30/18 17:43:13 Page 3 of 13

| Debtor | Acis Capital Management, L.P. | | | Case number (if known) 18-30264 |
|---|---|---|---|---|

| | Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|---|
| 3.8. | **FINRA**<br>1735 K Street, NW<br>Washington, DC 20006 | 11/22/2017 | $70.00 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☑ Suppliers or vendors<br>☐ Services<br>☐ Other__ |
| 3.9. | **Highland CLO Management, Ltd.**<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104, Cayman<br>Islands | 12/19/2017 | $2,830,459.22 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☐ Other__ |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**
List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,425. (This amount may be adjusted on 4/01/19 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☐ None.

| | Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $976,688.47 | Contractual payment |
| 4.2. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/1/2017 | $1,096,033.37 | Services |
| 4.3. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/2/2017 | $3,574.80 | Expense reimbursement |
| 4.4. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 2/14/2017 | $67.44 | Expense reimbursement |
| 4.5. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/17/2017 | $315,574.30 | Services |
| 4.6. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $438,497.51 | Services |
| 4.7. | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 4/18/2017 | $375,855.91 | Contractual payment |

Appellee Appx. 01211

Appx. 04076
008019

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1219
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 102 of 1017   PageID 8849
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1218 of 1803   PageID 11964
Case 18-30264-sgj7 Doc 365-5 Filed 04/30/18   Entered 04/30/18 Page 4 of 5 Page 4 of 13

Debtor  Acis Capital Management, L.P.                                    Case number (if known)  18-30264

| Insider's name and address Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|
| 4.8. Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 4/19/2017 | $330,249.69 | Services |
| 4.9. Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Services |
| 4.10 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/1/2017 | $974,426.41 | Contractual Payment |
| 4.11 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $2,809,518.47 | Unsecured loan repayments incl interest |
| 4.12 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 5/31/2017 | $581,036.15 | Services |
| 4.13 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 7/18/2017 | $373,167.08 | Contractual payment |
| 4.14 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/1/2017 | $971,603.02 | Contractual payment |
| 4.15 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/7/2017 | $1,339,422.12 | Services |
| 4.16 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 8/16/2017 | $53.41 | Expense reimbursement |
| 4.17 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $372,872.82 | Contractual payment |
| 4.18 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/18/2017 | $728,702.26 | Services |
| 4.19 Highland Capital Management, L.P. 300 Crescent Court Suite 700 Dallas, TX 75201 | 10/24/2017 | $501,979.18 | Unsecured loan repayments including interest |

Appellee Appx. 01212

Appx. 04975
008020

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1220
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 103 of 1017 PageID 8850
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1219 of 1803 PageID 11965
Case 18-30264-sgj7 Doc 365-3 Filed 04/30/18 Entered 04/30/18 Page 5 of 5 Page 5 of 13

| Debtor | Acis Capital Management, L.P. | | Case number (if known) 18-30264 |
|---|---|---|---|

| | Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.20 | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 10/25/2017 | $46,648.82 | Expense reimbursement |
| 4.21 | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 10/25/2017 | $67,966.85 | Expense reimbursement |
| 4.22 | Highland Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201 | 11/1/2017 | $967,223.91 | Contractual payment |

5. **Repossessions, foreclosures, and returns**
List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

6. **Setoffs**
List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

**Part 3: Legal Actions or Assignments**

7. **Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**
List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | Joshua N. Terry v. Acis Capital Management, L.P. and Acis Capital Management GP, LLC<br>DC-17-15244 | Petition to confirm arbitration award | 44th District Court<br>Hon. Bonnie Lee Goldstein, Presiding<br>George L. Allen, Sr. Courts Building<br>600 Commerce Street, 5th Floor New Tower<br>Dallas, TX 75202 | ☐ Pending<br>■ On appeal<br>☐ Concluded |

Appellee Appx. 01213

Appx. 04978

008021

# EXHIBIT H

Appellee Appx. 01214

Appx. 04979

008022

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1222
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 105 of 1017 PageID 8852
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1221 of 1803 PageID 11967
Case 18-30264-sgj11 Doc 388 Filed 07/09/19 Entered 07/09/19 09:48:05 Page 1 of 4

Holland N. O'Neil (TX 14864700)  Michael K. Hurst (TX 10316310)
Jason B. Binford (TX 24045499)    David S. Coale (TX 00787255)
Melina N. Bales (TX 24106851)     Ruben A. Garcia (TX 24101787)
FOLEY GARDERE                     LYNN PINKER COX & HURST, LLP
FOLEY & LARDNER LLP               2100 Ross, Suite 2700
2021 McKinney Avenue, Ste. 1600   Dallas, Texas 75201
Dallas, Texas 75201               Tel: 214.981.3800
Tel: 214.999.3000                 Fax: 214.981.3839
Fax: 214.999.4667                 mhurst@lynnllp.com
honeil@foley.com

CO-COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 18-30264-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P., and | § | Case No. 18-30265-SGJ-11 |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly administered under |
| | § | Case No. 18-30264-SGJ-11) |
| Debtors. | § | |
| | § | Chapter 11 |
| | § | |

## STATEMENT OF ISSUES BY APPELLANT
## HIGHLAND CAPITAL MANAGEMENT, L.P.

Appellant Highland Capital Management, L.P. states the following issues for the

appeal of the *Order (I) Approving the Application to Employ Winstead PC as Special*

*Counsel to the Chapter 11 Trustee and (II) Denying the Motion to Disqualify Winstead*

*PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* [Doc. No. 313];

*Order Approving in Part and Denying in Part the Supplemental Application Regarding*

*the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee*

Appellee Appx. 01215
Appx. 04989
008023

[Doc. No. 703]*; and Findings of Fact, Conclusions of Law, and Order Granting Winstead PC's Fee Application for Compensation and for Reimbursement of Expenses* [Doc. No. 999]:

1. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead represents interests adverse to the estates and is not "disinterested," as required by the Bankruptcy Code?

2. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given that Winstead PC has an actual conflict of interest?

3. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's appointment as special counsel, given the broad scope of Winstead PC's actual representation in the case?

4. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's expanded scope of representation as special counsel?

5. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the impropriety of its appointment as special counsel?

6. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the lack of benefit to the estates?

7.  Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application given the duplication of effort between Winstead PC and Forshey & Prostok LLP?

8. Did the bankruptcy court commit any error or any abuse of discretion in granting the amount of fees as reasonable in Winstead PC's final fee application given that the fees were disproportionate to the size of the bankruptcy case?

9. Did the bankruptcy court commit any error or any abuse of discretion in granting Winstead PC's final fee application, even if retention of Winstead PC was otherwise proper?

10. Were fact findings supporting these rulings clearly erroneous?

Appellee Appx. 01216

Appx. 04984

008024

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1224
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 107 of 1017 PageID 8854
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1223 of 1803 PageID 11969
Case 18-30264-sgj11 Doc 2390-58 Filed 07/09/19 Entered 07/09/19 00:44:05 Page 3 of 4

Respectfully submitted,

/s/ Jason B. Binford _____      /s/ Michael K. Hurst _____
Holland N. O'Neil                    Michael K. Hurst
Texas Bar No. 14864700               Texas Bar No. 10316310
Jason B. Binford                     David S. Coale
Texas Bar No. 24045499               Texas Bar No. 00787255
Melina N. Bales                      Ruben A. Garcia
Texas Bar No. 24106851               Texas Bar No. 24101787
Foley Gardere                        Lynn Pinker Cox & Hurst LLP
Foley & Lardner LLP                  2100 Ross Avenue, Ste. 2700
2021 McKinney, Suite 1600            Dallas, Texas 75201
Dallas, Texas 75201                  Tel:  214.981.3800
Tel:  214.999.3000                   Fax: 214.981.3839
Fax: 214.999.4667                    mhurst@lynnllp.com
honeil@foley.com
jbinford@foley.com
mbales@foley.com                     **Co-Counsel for:**
                                     **Highland Capital Management, L.P.**

**Appellee Appx. 01217**
**Appx. 04982**
008025

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1225
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 108 of 1017 PageID 8855
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1224 of 1803 PageID 11970
Case 18-30264-sgj11 Doc 3905-15 Filed 07/09/19 Entered 07/09/19 09:45:40 Page 4 of 4

## CERTIFICATE OF SERVICE

I certify that on July 1, 2019, a copy of this document was served through the court's ECF system on all counsel and on all others who registered for electronic notice.

*/s/ Jason B. Binford*
Jason B. Binford

4818-4512-8603.2

Appellee Appx. 01218
Appx. 04983
008026

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1226
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 109 of 1017 PageID 8856
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1225 of 1803 PageID 11971

Case 19-12239-CSS Doc 159-9 Filed 11/21/19 Page 1 of 34

# EXHIBIT I

Appellee Appx. 01219

Appx. 04984

008027

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1227
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 110 of 1017 PageID 8857
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1226 of 1803 PageID 11972
Case 18-30264-sgj11 Doc 209-6 Filed 06/06/19 Entered 05/30/18 Page 73 Page 1 of 16

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

**PROPOSED SPECIAL COUNSEL FOR**
**ROBIN PHELAN, CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

### APPLICATION TO EMPLOY WINSTEAD PC
### AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

TO THE HONORABLE STACEY G. C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

Robin Phelan (the "Trustee"), the Chapter 11 trustee of Acis Capital Management, L.P.

("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the

"Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the

"Cases"), files this his *Application to Employ Winstead PC as Special Counsel to the Chapter 11*

*Trustee* (the "Application"), and in support thereof, respectfully states as follows:

---

APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Page 1 of 16
**Appellee Appx. 01220**

**Appx. 04985**
**008028**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1228
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 111 of 1017 PageID 8858
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1227 of 1803 PageID 11973
Case 18-30264-sgj11 Doc 911 Filed 06/30/19 Entered 06/30/19 08:31:34 Page 2 of 16

## I.      JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334. This Application constitutes a "core" proceeding within the meaning of the provisions of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are §§ 105, 327, and 328 of title 11 of the United States Code, § 101 *et seq.* (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), as well as Rule 2014-1 of the Local Rules of Bankruptcy Procedure for the Northern District of Texas ("Local Rules").

## II.      RELEVANT PROCEDURAL BACKGROUND

2.      On January 30, 2018 (the "Petition Date"), Joshua N. Terry ("Mr. Terry"), as petitioning creditor, filed the *Involuntary Petition Against a Non-Individual* [Case No. 18-30264, Docket No. 1] (the "Acis LP Petition"), thereby initiating the Acis LP bankruptcy case.

3.      On the Petition Date, Mr. Terry, as petitioning creditor, also filed the *Involuntary Petition Against a Non-Individual* [Case No. 18-30265, Docket No. 1] (the "Acis GP Petition," together with the Acis LP Petition, the "Involuntary Petitions"), thereby initiating the Acis GP bankruptcy case.

4.      On April 13, 2018, after six days of testimony and argument, this Court entered its *Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265, Docket No. 113] and the *Order for Relief in an Involuntary Case* [Case No. 18-30264, Docket No. 119 & Case No. 18-30265, Docket No. 114] (the "Order for Relief").

5.      Also on April 13, 2018, Diane Reed was appointed as interim Chapter 7 trustee (the "Chapter 7 Trustee") for the Debtors' bankruptcy estates (the "Estates"). *See* Case No. 18-30264, Docket No. 120 & Case No. 18-30265, Docket No. 115.

6.      On April 18, 2018, this Court entered its *Order Directing Joint Administration* [Docket No. 137],[1] ordering that the Cases be jointly administered under Case No. 18-30264.

7.      On May 4, 2018, the Chapter 7 Trustee filed the *Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 171].

8.      Also on May 4, 2018, Mr. Terry filed his *Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 173] (the "Trustee Motion").

9.      On May 11, 2018, this Court entered the *Order Granting Trustee's Expedited Motion to Convert Cases to Chapter 11* [Docket No. 205] (the "Conversion Order"), which converted these Cases to Cases under Chapter 11 of the Bankruptcy Code.

10.     Also on May 11, 2018, this Court entered the *Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 206] (the "Trustee Order").

11.     On May 14, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Docket No. 213] (the "Trustee Notice"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis LP.

12.     On May 16, 2018, this Court entered the *Order Supplementing Order Granting the Emergency Motion for an Order Appointing a Trustee for the Chapter 11 Estates of Acis Capital Management, L.P. and Acis Capital Management GP, LLC Pursuant to Bankruptcy Code Section 1104(a)* [Docket No. 219] (the "Supplemental Trustee Order"), by which the Court

---

[1] Hereinafter, unless otherwise specified, any docket numbers referenced are under Case No. 18-30264.

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                    **Page 3 of 16**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1230
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 113 of 1017 PageID 8860
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1229 of 1803 PageID 11975
Case 18-30265-sgj11 Doc 224-5 Filed 05/30/18 Entered 11/25/30/18 Page 5 of 34 Page 4 of 16

directed that the United States Trustee "appoint only one Chapter 11 Trustee for the Debtors' estates[.]"

13. Also on May 16, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Docket No. 220] (the "Trustee Application"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

14. On May 17, 2018, this Court entered its *Order Approving Appointment of Chapter 11 Trustee* [Docket No. 221], thereby approving of the Trustee's appointment as Chapter 11 Trustee of Acis LP.

15. Also on May 17, 2018, the Trustee filed his *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Docket No. 222] (the "F&P Application"), requesting authority to retain Forshey & Prostok, LLP ("Forshey & Prostok") as general counsel to the Trustee.

16. On May 29, 2018, the United States Trustee filed the *Chapter 11 Notice of Appointment of Trustee and of Amount of Bond* [Case No. 18-30265, Docket No. 182] (the "Second Trustee Notice"), which provided notice to the Trustee of his appointment as Chapter 11 Trustee of Acis GP.

17. On May 30, 2018, the United States Trustee filed the *Application of the United States Trustee to Approve the Appointment of Trustee* [Case No. 18-30265, Docket No. 183] (the "Second Trustee Application"), requesting the Court's approval of the Trustee's appointment as Chapter 11 Trustee of Acis GP.

### III. RELIEF REQUESTED

18. By this Application, the Trustee seeks to employ and retain Winstead PC ("Winstead") as his special counsel to perform certain legal services during the course of the

---

Cases. Accordingly, the Trustee requests the entry of an order, pursuant to § 327(a) and (c) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure, permitting him to employ and retain Winstead as his special counsel for the limited purposed described below.[2]

**A.**     **Basis for Selection of Counsel**

19.     As the Court knows, Winstead represented Mr. Terry in connection with the trial on the Involuntary Petitions.  Indeed, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry.  In addition, due to the need for the Trustee to take immediate action on a variety of fronts after his appointment, as well as the substantial fees that new counsel would incur to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that his engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

20.     The Trustee has also selected Winstead as special counsel because of Winstead's extensive experience and knowledge in the field of debtor and creditor rights and business reorganizations under Chapter 11 of the Bankruptcy Code, as well as Winstead's experience and expertise in providing legal services related to all aspects of the investment management and private funds industry, including formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.  Accordingly, the Trustee believes that his retention of Winstead as special counsel for the limited purposes described below is in the best interests of the Estates and their creditors.

---

[2] To the extent, however, that the Court finds Winstead's proposed retention more appropriate under section 327(e) of the Bankruptcy Code, the Trustee reserves its rights to seek approval for such retention under section 327(e).

---

**APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

**Appellee Appx. 01224**

**Appx. 04989**

**008032**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1232
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 115 of 1017    PageID 8862
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1231 of 1803    PageID 11977
Case 18-30264-sgj11 Doc 945 Filed 06/16/19    Entered 11/25/30/18 Page 97.13 Page 6 of 16

21.     Importantly, upon the Trustee's retention of Winstead as set forth in this Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "Appeals") and that Mr. Terry would have to retain new counsel for representation in these Cases.[3]  Mr. Terry has consented to such limited representation by Winstead.  Further, both the Trustee and Winstead believe that such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

22.     The Trustee believes the employment of Winstead is appropriate and necessary to enable the Trustee to execute faithfully his duties under the Bankruptcy Code, and the Trustee further believes that Winstead and its attorneys are fully qualified to perform the specified legal services referenced below.

23.     Winstead maintains its principal offices at 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.  The Trustee and Winstead have designated Rakhee Patel, a shareholder of Winstead who offices in Winstead's Dallas office, to serve as the attorney in charge with respect to the representation.

24.     In support of this Application, the Declaration of Rakhee V. Patel (the "Declaration") is attached hereto as Exhibit "A" and is incorporated herein for all purposes.

---

[3] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Application, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                    **Page 6 of 16**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1233
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 116 of 1017 PageID 8863
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1232 of 1803 PageID 11978
Case 18-30264-sgj11 Doc 92-65 Filed 05/30/19 Entered 05/30/18 Page 816 3 34 Page 7 of 16

**B.** <u>**Services to be Rendered**</u>

25.    The Trustee has requested that Winstead provide legal services to the Trustee for matters specifically involving the:

a)  management, liquidation, disposition, and monetization of the CLO assets;

b)  Investment Advisers Act;

c)  operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

d)  certain other litigation matters related to or arising in these Cases, as requested by the Trustee.

26.    Subject to this Court's approval of the Application, Winstead is willing to serve as the Trustee's special counsel in the Cases to perform the services described above.

27.    Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

**C.** <u>**Compensation and Reimbursement**</u>

28.    The Trustee proposes to retain Winstead on a customary hourly rate basis, subject in all respects to this Court's authorization for payment.  Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

29.    Winstead's rates are adjusted on a periodic basis.  Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

---

Appellee Appx. 01226
Appx. 04991
008034

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1234
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 117 of 1017   PageID 8864
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1233 of 1803   PageID 11979
Case 18-30264-sgj11 Doc 2089-2 Filed 06/06/19   Entered 11/30/18 Page 8 of 16

30.     Winstead's billing rates are consistent with rates charged by other professionals in

the Northern District of Texas with similar experience.  These rates are set at a level designed to

compensate Winstead for the work of its attorneys and paralegals and to cover fixed and routine

overhead expenses.  Winstead's hourly rates for the attorneys who it anticipates will most likely

be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

31.     The attorneys who will provide services to the Trustee are duly licensed to

practice in the State of Texas and are admitted to practice law in the Northern District of Texas.

As necessary, certain other attorneys and/or paraprofessionals may provide services in

connection with the engagement.

32.     Subject to this Court's approval, the Trustee has also agreed to the reimbursement

of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses include, but

are not limited to, costs for long-distance telephone charges, facsimile charges, photocopying,

travel, parking, business meals, computerized research, UCC searches, messengers, couriers,

postage, filing fees and other fees related to trials and hearings. Winstead will charge for all such

actual and necessary expenses in a manner and at rates consistent with charges made generally to

Winstead's other clients and consistent with the applicable Local Rules of the Court.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1235
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 118 of 1017 PageID 8865
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1234 of 1803 PageID 11980
Case 18-30264-sgj11 Doc 3245-5 Filed 05/30/18 Entered 05/30/18 Page 9 of 16

33.     Winstead will apply to the Court for compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local Rules of this District and Court.

34.     As set forth in the Declaration: (i) Winstead has no agreement with any other entity to share any compensation received and no such agreement will be made, except as permitted under section 504(b)(1) of the Bankruptcy Code; and (ii) no attorney at Winstead is related to any United States Bankruptcy Judge or United States District Court Judge for the Northern District of Texas or to the United States Trustee. Winstead has received no prior consideration to act as special counsel for the Trustee.

35.     Winstead has not received a retainer in connection with this engagement.

**D.     Disinterestedness of Winstead**

36.     To the best of Winstead's knowledge, other than as set out below, the shareholders and associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor |

**Appellee Appx. 01228**
**Appx. 04993**
**008036**

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| | | parties-in-interest; such current representations are not adverse to the Debtors or their Estates.[4] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC*, DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

37.    As set forth in the herein, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee.  Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, Winstead does not hold an adverse interest to the Debtors or their Estates.  Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants,

---

[4] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

---

APPLICATION TO EMPLOY WINSTEAD PC
AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Page 10 of 16

Appellee Appx. 01229

Appx. 04991

008037

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1237
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 120 of 1017 PageID 8867
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1236 of 1803 PageID 11982
Case 18-30264-sgj11 Doc 894-55 Filed 05/16/19 Entered 05/16/19 18:21:07 Page 11 of 16
Case 18-30264 Doc 911-2 Filed 06/19/19 Page 23 of 34

financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases. Winstead will not represent any such entities in the Cases.

38.     As set forth in the Declaration, Winstead has conducted a comprehensive conflict search regarding the creditors and parties-in-interest as provided by the Debtors on their schedules and disclosures. Winstead will supplement its conflicts check as additional creditors are disclosed and shall promptly disclose to the Court any other connections that Winstead discovers it has or has had with any such creditors of the estate pursuant thereto.

39.     Winstead began performing services for the Trustee on May 14, 2018, when he agreed to retain Winstead, subject to the Court's approval, as his special counsel. Accordingly, the Trustee respectfully requests that the approval of this Application be effective as of May 14, 2018. As set forth in Local Rule 2014-1(b)(1), such timing renders this Application contemporaneous with the initiation of services.

## IV.    **AUTHORITIES**

40.     Under the Bankruptcy Code, "the trustee with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties[.]" 11 U.S.C. § 327(a).

41.     Further, a "disinterested person" is defined under the Bankruptcy Code as a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor." *Id.* § 101(14)(C).

42.     The Fifth Circuit has commented that the phrases under sections 101(14)(C) and 327(a) of the Bankruptcy Code, regarding whether a party has an "adverse interest," are "nearly

identical." *I.G. Petroleum, L.L.C. v. Fenasci (In re W. Delta Oil Co.)*, 432 F.3d 347, 356 (5th Cir. 2005)**.** Thus, "with an eye to the specific facts of each case," to determine whether a proposed professional holds an adverse interest under section 327(a), the Fifth Circuit examines whether they:

> (1) [] possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or

> (2) [] possess a predisposition under circumstances that render such a bias against the estate.

*Id.*; *accord Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 461-62 (5th Cir. 2012).

43.    Still, in these Cases, "a person is not disqualified for employment under [section 327] solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an *actual conflict of interest*." 11 U.S.C. § 327(c) (emphasis added).

44.    To determine whether a proposed professional should be disqualified pursuant to sections 327(a) and (c), courts look to the nature of any purported conflict of interest: (i) if there is an *actual* conflict, the professional is *per se* disqualified; (ii) if there is a *potential* conflict, the court may use its discretion to determine whether the professional should be disqualified; and (iii) if there is only an *appearance* of a conflict, the court may not disqualify the professional. *In re AGE Ref., Inc.*, 447 B.R. 786, 802-06 (Bankr. W.D. Tex. 2011) (citing *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 476 (3rd Cir. 1998)).

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1239
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 122 of 1017    PageID 8869
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1238 of 1803    PageID 11984
Case 18-30264-sgj11 Doc 2465 Filed 05/30/19    Entered 05/30/18 Page 13 of 34 Page 13 of 16

45.    In evaluating whether an "actual conflict" exists, courts examine the specific circumstances of the proposed retention and whether there would be a direct conflict between the interests of estate and the creditor that was previously represented by proposed counsel:

> Generally, when an actual conflict exists there is "active competition between two interests, in which one interest can only be served at the expense of another." Actual conflicts arise when (1) the interests of the trustee and the creditor are in direct conflict or (2) the creditor is receiving a preference denied to the other creditors. The conflict must be direct and actual; a court should not disqualify an attorney solely because there is an appearance of a conflict. The burden of proving an actual conflict lies on the objecting party.

*In re Hanckel*, 517 B.R. 609, 614 (Bankr. D.S.C. 2014) (internal citations omitted); *see also In re Humble Place Joint Venture*, 936 F.2d 814, 819 (5th Cir. 1991) (finding an actual conflict when "counsel's loyalty to . . . the debtor's estate would be tested at every turn by the very real, continuing interest of his client [in the prior representation]").

46.    Additionally, to determine whether Winstead has an adverse interest under section 327(a), the Court should examine whether Winstead has such an adverse interest "with respect to the specific [services] for which the Trustee seeks to hire the firm." *In re AGE Ref., Inc.*, 447 B.R. at 802; *see also Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 621-30 (2d Cir. 1999) (holding that, under sections 327(a) and (c), proposed special counsel was not disqualified from representing the trustee for limited purposes, including to pursue Chapter 5 claims against a certain creditor, when proposed counsel had previously represented another creditor).

47.    Here, the issue is whether Winstead's prior representation of Mr. Terry should preclude the Trustee from retaining Winstead as special counsel for the limited purposes set forth herein.  With Winstead's ongoing representation of Mr. Terry related to these Cases being limited only to his representation in connection with the Appeals, the Trustee believes Winstead

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

0008040

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1240
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 123 of 1017 PageID 8870
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1239 of 1803 PageID 11985
Case 18-30264-sgj11 Doc 2865 Filed 05/30/19 Entered 05/30/19 18:07:53 Page 14 of 16

has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a result of Winstead's limited representation of Mr. Terry, the Trustee believes Winstead does not possess any economic interest that would tend to lessen the value of the Estates or that would create either an actual or potential dispute in which either Estate is a rival claimant. *See W. Delta Oil Co.*, 432 F.3d at 356. Moreover, Winstead has no bias against the Estates due to its representation of Mr. Terry. *See id.* Indeed, the Trustee submits that Mr. Terry's interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of the Estates, which inures to the benefit of all creditors, including Mr. Terry.

48. As set forth above, the Trustee requests to employ Winstead to provide legal services only regarding matters involving the (i) management, liquidation, disposition, and monetization of the CLO assets; (ii) Investment Advisers Act; and (iii) operation of the portfolio management agreement and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and (iv) certain other litigation matters related to or arising in these Cases, as requested by the Trustee. With respect to these specified purposes, the Trustee submits that Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same. Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code. With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Appellee Appx. 01233
Appx. 04098
00804-1

49.     In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, the Trustee believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

50.     In accordance with section 327(c) of the Bankruptcy Code, the Trustee submits that Winstead has no actual conflict of interest in these Cases resulting from Winstead's prior representation of Mr. Terry or from Winstead's limited representation of Mr. Terry in connection with the Appeals.

51.     Therefore, the Trustee submits that the employment of Winstead as special counsel is permissible under section 327(a) of the Bankruptcy Code, is advisable, and is in the best interests of the Estates and their creditors.

52.     In addition, Winstead's fees and expenses incurred as special counsel to the Trustee would be subject to such interim and final fee applications as are otherwise appropriate under sections 330 and 331 of the Bankruptcy Code, and under applicable local rules and standing orders.

## V.     **PRAYER**

WHEREFORE, the Trustee respectfully requests that the Court enter an order: (i) approving this Application; (ii) authorizing the Trustee's retention of Winstead as special counsel in accordance with this Application, effective as of May 14, 2018; (iii) providing for the

---

**APPLICATION TO EMPLOY WINSTEAD PC**
**AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

**Appellee Appx. 01234**

Appx. 04099

008042

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1242
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 125 of 1017    PageID 8872
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1241 of 1803    PageID 11987
Case 18-30264-sgj11 Doc 3445-8 Filed 05/30/18    Entered 05/30/18 Page 173 of 34 Page 16 of 16

compensation of Winstead pursuant to sections 330 and 331 of the Bankruptcy Code; and (iv)

granting the Trustee such other and further relief to which he may be entitled.

**DATED: May 30, 2018**


Respectfully submitted,


*/s/ Robin Phelan*
Robin Phelan, Chapter 11 Trustee
SBT #15903000
PHELANLAW
4214 Woodfin Drive
Dallas, Texas 75220
Phone: (214) 704-0222

**ROBIN PHELAN, CHAPTER 11 TRUSTEE**
**FOR ACIS CAPITAL MANAGEMENT L.P.**


## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this the 30th day of May, 2018, true and correct
copies of this document were electronically served by the Court's ECF system on parties entitled
to notice thereof, and that, additionally, on the same date he caused true and correct copies of this
document to be served by U.S. first class mail, postage prepaid, on the parties listed on the
Service List attached hereto.

*/s/ Jason A. Enright*
One of Counsel

**Appellee Appx. 01235**
**Appx. 04409**
**008043**

Case 18-30264-sgj11 Doc 1243-5 Filed 05/30/18 Entered 05/30/18 23:03:34 Page 1 of 11

EXHIBIT "A"

Appellee Appx. 01236

Appx. 04494

0008044

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1244
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 127 of 1017    PageID 8874
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1243 of 1803    PageID 11989
Case 18-30264-sgj11    Doc 5-3    Filed 05/30/18    Entered 05/30/18 20:13:34    Page 2 of 11

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| **Debtors.** | § | **Chapter 11** |

### DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION TO EMPLOY WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

I, Rakhee V. Patel, hereby declare the following and hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that it is true and correct to the best of my knowledge and belief:

1.    "My name is Rakhee V. Patel, I am over the age of 18 years, and I am competent and otherwise qualified to make this Declaration.  I am a shareholder in the law firm of Winstead PC ("Winstead"), proposed special counsel for Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the "Cases").[1]   I submit this Declaration (the "Declaration") in support of the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Application") for the purposes of making all of the required disclosures pursuant to 11 U.S.C. §§ 327 and 328, and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, and to advise this Court of Winstead's qualifications.

2.    "I have personal knowledge of each of the facts stated in this Declaration, except for those facts stated on information and belief, and, as to those facts, I am informed and I

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 1 of 10**

**Appellee Appx. 01237**

**Appx. 04492**

**008045**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1245
Case 3:25-cv-02072-S Document 15-11 Filed 04/06/25 Page 128 of 1017 PageID 8875
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1244 of 1803 PageID 11990
Case 18-30264-sgj11 Doc 3245-3 Filed 05/30/18 Entered 05/30/18 20:13:34 Page 3 of 11

believe them to be true. If called as a witness, I would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below. To the extent that I obtain additional information, which requires further disclosure or modification of the Application or this Declaration, a supplemental declaration will be submitted to this Court.

3.      "I am admitted and in good standing to practice before the State Courts of the State of Texas, the United States District and Bankruptcy Courts for the Northern, Eastern, Southern and Western Districts of Texas, and the Fifth Circuit Court of Appeals. The other attorneys of Winstead who are designated as most likely to appear in this representation are also admitted to practice in the State of Texas and are admitted to the U.S. District Court for the Northern District of Texas.

4.      "My office address is 2728 N. Harwood Street, Suite 500, Dallas, Texas 75201; Telephone: (214) 745-5400; Facsimile: (214) 745-5390.

## QUALIFICATIONS OF COUNSEL

5.      "As set forth in the Application, on May 14, 2018, the Trustee requested to retain Winstead, subject to the Court's approval, as his special counsel in these Cases. Winstead immediately began rendering services to and for the Trustee for the limited purposes set forth in the Application.

6.      "Winstead maintains offices in Dallas, Fort Worth, Austin, San Antonio, The Woodlands, and Houston, Texas, as well as in Charlotte, North Carolina. Winstead currently has approximately three-hundred fifty (350) lawyers, and its client base includes many public and private corporations, partnerships, governmental entities, banks, insurance companies, non-profit organizations, and individuals. Winstead has expertise in many fields of law including bankruptcy, business reorganization, restructuring, complex litigation, and creditors' rights, as

DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE          Page 2 of 10

Appellee Appx. 01238
Appx. 04498
008046

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1246
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 129 of 1017 PageID 8876
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1245 of 1803 PageID 11991
Case 18-30264-sgj11 Doc 324-5 Filed 05/30/18 Entered 05/30/18 21:03:34 Page 4 of 11

well as in the investment management and private funds industry, including with respect to fund formation, advisor/manager mergers and acquisitions, portfolio transactions, and regulatory and compliance matters.

7. "Winstead has substantial experience in Chapter 11 bankruptcy cases and trustee representations. I and other attorneys at Winstead have represented debtors, committees, trustees, secured and unsecured creditors, and significant stakeholders in numerous other bankruptcy cases, locally and nationally. I and other attorneys at Winstead have received various awards and recognition for our reorganization services, have published numerous scholarly reorganization articles, and have spoken at multiple professional seminars.

8. "In addition, the Trustee's selection of Winstead is based, in part, upon the fact that Winstead has gained significant familiarity with, and considerable knowledge of, the unique factual circumstances and complex legal issues in the Cases through its representation of Mr. Terry in connection with the trial on the Involuntary Petitions. Once the Court entered orders for relief in the Cases, and the Trustee was appointed, there was an immediate need for the Trustee to seek counsel and advice regarding the various intricate issues impending in the Cases related to the business of the Debtors, for which the Trustee needed to take action. If the Trustee were to retain new counsel for the purposes set forth below, the Estates would incur substantial fees as new counsel would need to familiarize itself with such factual background and legal issues in the Cases, with which Winstead is already familiar. Thus, the engagement of Winstead for the limited purposes described below would lead to efficiencies that would be lost if the Trustee were forced to employ different counsel.

9. "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1247
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 130 of 1017 PageID 8877
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1246 of 1803 PageID 11992
Case 18-30264-sgj11 Doc 2245-5 Filed 05/30/18 Entered 05/30/18 22:21:03 Page 5 of 11

connection with the pending appeals related to the Involuntary Petitions (the "Appeals"), and that Mr. Terry would have to retain new counsel for representation in these Cases.[2] Mr. Terry has consented to such limited representation by Winstead. Further, such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

10. "Accordingly, I believe the employment of Winstead is appropriate and necessary to enable the Trustee to execute faithfully his duties under the Bankruptcy Code and that Winstead and its attorneys are fully qualified to perform the specified legal services referenced below.

## SERVICES TO BE RENDERED

11. "The Trustee has requested that Winstead provide special counsel services to the Trustee for matters specifically involving the:

  a) management, liquidation, disposition, and monetization of the CLO assets;

  b) Investment Advisers Act;

  c) operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

  d) certain other litigation matters related to or arising in these Cases, as requested by the Trustee.

12. "Subject to this Court's approval of the Application, Winstead is willing to serve as the Trustee's special counsel in the Cases to perform the services described above.

---

[2] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed later in this Declaration, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**    **Page 4 of 10**

**Appellee Appx. 01240**
**Appx. 04405**
**008048**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1248
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 131 of 1017 PageID 8878
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1247 of 1803 PageID 11993
Case 18-30264-sgj11 Doc 3245 Filed 05/30/18 Entered 05/30/18 23:13:34 Page 6 of 11

13. "Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

14. "With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same. Accordingly, except to the extent necessary to effectuate the specific services outlined above, Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code. With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

## COMPENSATION AND REIMBURSEMENT

15. "Winstead has agreed to perform such legal services on an hourly fee basis at its customary hourly rates for cases of the size and complexity as these Cases. Winstead's customary hourly rates of attorneys and paralegals for a representation of this nature are presently in a range up to: $785 for shareholders, $485 for associates, and $290 for paralegals.

16. "Winstead's rates are adjusted on a periodic basis. Winstead will not charge the Trustee at a rate for its services greater than the standard rates Winstead charges to its clients, generally, for similar engagements.

17. "Winstead's billing rates are consistent with rates charged by other professionals in the Northern District of Texas with similar experience. These rates are set at a level designed to compensate Winstead for the work of its attorneys and paralegals and to cover fixed and

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          **Page 5 of 10**

**Appellee Appx. 01241**
**Appx. 04186**

**008049**

routine overhead expenses. Winstead's hourly rates for the attorneys who it anticipates will most likely be working on the Cases are:

| | |
|---|---|
| Rakhee Patel, Shareholder | $585.00 per hour |
| Philip Lamberson, Shareholder | $655.00 per hour |
| Joseph Wielebinski, Shareholder | $655.00 per hour |
| Toby Galloway, Shareholder | $550.00 per hour |
| Andrew Rosell, Shareholder | $585.00 per hour |
| Annmarie Chiarello, Associate | $380.00 per hour |
| Jason Enright, Associate | $390.00 per hour |
| Courtney Mitchell, Associate | $485.00 per hour |
| Laura Thetford, Associate | $385.00 per hour |

18. "Winstead will maintain detailed, contemporaneous records of time and any actual and necessary expenses incurred in connection with the rendering of the legal services for the Trustee as described in the Application and in accordance with the rules of this Court.

19. "Subject to this Court's approval, the Trustee has also agreed to the reimbursement of Winstead for all out-of-pocket expenses incurred by Winstead. These expenses include, but are not limited to, costs for long-distance telephone charges, facsimile charges, photocopying, travel, parking, business meals, computerized research, UCC searches, messengers, couriers, postage, filing fees and other fees related to trials and hearings. Winstead will charge for all such actual and necessary expenses in a manner and at rates consistent with charges made generally to Winstead's other clients and consistent with the applicable Local Rules of the Court.

20. "Winstead will apply to the Court for compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code and the Local Rules of this District and Court.

21. "Winstead has no agreement with any other entity to share any compensation received and no such agreement will be made, except as permitted under section 504(b)(1) of the

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**  **Page 6 of 10**

**Appellee Appx. 01242**

**Appx. 04197**

**008050**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1250
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 133 of 1017   PageID 8880
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1249 of 1803   PageID 11995
Case 18-30264-sgj11 Doc 32-45 Filed 05/30/18   Entered 05/30/18 22:35:13 Page 8 of 11

Bankruptcy Code; and no attorney at Winstead is related to any United States Bankruptcy Judge or United States District Court Judge for the Northern District of Texas or to the United States Trustee.  Winstead has received no prior consideration to act as special counsel for the Trustee.

22. "Winstead has not received a retainer in connection with this engagement.

### DISINTERESTEDNESS OF PROFESSIONALS

23. "To the best of my knowledge, other than as set out below, the shareholders and associates of Winstead: (i) do not have any connection with the Trustee, the Debtors, their creditors, or any other party-in-interest or their respective attorneys and accountants; (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons," pursuant to §§ 101(14) and 327(c) of the Bankruptcy Code; and (iv) do not hold or represent any interest adverse to the Estates:

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| Joshua N. Terry | Creditor | Winstead previously represented Mr. Terry in connection with the Involuntary Petitions and in connection with governmental investigations of certain non-debtor parties; as of May 14, 2018, Winstead represents Mr. Terry in connection with only the appeals related to the Involuntary Petitions and, as necessary, in connection with governmental investigations of certain non-debtor parties-in-interest; such current representations are not adverse to the Debtors or their Estates.[3] |
| U.S. Bank National Association | Counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |
| BNP Paribas | Affiliate of counter-party to executory contract | Winstead represents this entity in matters unrelated to the Debtors. |

---

[3] With respect to Winstead's representation of Mr. Terry in connection with such governmental investigations, Winstead is engaged pursuant to a hybrid fee arrangement.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**        **Page 7 of 10**

**Appellee Appx. 01243**

**008051**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1251
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 134 of 1017 PageID 8881
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1250 of 1803 PageID 11996
Case 18-30264-sgj11 Doc 2245-5 Filed 05/30/18 Entered 05/30/18 26:13:34 Page 9 of 11

| Party-In-Interest | Relationship to Debtors | Relationship to Winstead |
|---|---|---|
| The Bank of New York Mellon Trust Co., N.A. | Counter-party to executory contract | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Andrews & Kurth LLP | Creditor | Winstead previously represented this entity in matters unrelated to the Debtors. |
| Highland Capital Management, L.P. | Creditor/Affiliate | Winstead is a party to certain litigation, which is wholly unrelated to these Cases, styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC,* DC-15-01816, in the 193rd Judicial District Court of Dallas County, Texas, stemming from Winstead's prior representation of Highland Capital Management, L.P., in connection with a foreclosure. |

24. "Due to the diversity of Winstead's practice areas, Winstead may have rendered, or may now be rendering, legal services to certain creditors or other parties-in-interest, or may have been, or may now be involved, in projects in which attorneys or accountants for these creditors or parties-in-interest were involved and in matters unrelated to the Debtors and the Trustee. Except as otherwise indicated herein, none of the services provided include any matters related to the Cases and none constitute an interest materially adverse to the Trustee. Accordingly, I believe that Winstead does not hold an adverse interest to the Debtors or their Estates. Moreover, as part of its practice, Winstead appears in cases, proceedings, and transactions involving many different attorneys, accountants, financial consultants, and investment bankers, some of whom now, or may in the future, represent creditors and parties-in-interest in the Cases. Winstead will not represent any such entities in the Cases.

25. "Importantly, upon the Trustee's retention of Winstead as set forth in the Application, Winstead has advised Mr. Terry that Winstead may represent Mr. Terry only in connection with the pending appeals related to the Involuntary Petitions (the "Appeals") and that

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION**
**TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**     **Page 8 of 10**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1252
Case 3:25-cv-02072-S Document 15-11 of 180 04/06/25 Page 135 of 1017 PageID 8882
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1251 of 1803 PageID 11997
Case 18-30264-sgj11 Doc 2946-5 Filed 05/30/18 Entered 05/30/18 21:37:16 Page 10 of 11

Mr. Terry would have to retain new counsel for representation in these Cases.[4] Mr. Terry has consented to such limited representation by Winstead. Further, I believe that such limited representation of Mr. Terry by Winstead in these Cases—only in connection with the pending Appeals—is entirely consistent with the Trustee's interests and would eliminate potential conflicts of interest presented by the Trustee's retention of Winstead as special counsel.

26. "In addition, with Winstead's ongoing representation of Mr. Terry related to these Cases being limited only to his representation in connection with the Appeals, I believe Winstead has no *actual* conflict of interest with the Estates as a result of such representation. Further, as a result of Winstead's limited representation of Mr. Terry, Winstead does not possess any economic interest that would tend to lessen the value of the Estates or that would create either an actual or potential dispute in which either Estate is a rival claimant. Moreover, Winstead has no bias against the Estates due to its representation of Mr. Terry. Indeed, I believe that Mr. Terry's interests and the Estate's interests are aligned with the Trustee's goal of maximizing the value of the Estates, which inures to the benefit of all creditors, including Mr. Terry.

27. "Winstead has conducted a comprehensive conflict search regarding the creditors and parties-in-interest as provided by the Debtors on their schedules and disclosures. Winstead will supplement its conflicts check as additional creditors are disclosed and shall promptly disclose to the Court any other connections that Winstead discovers it has or has had with any such creditors of the Estates pursuant thereto.

28. "I have reviewed the results of the foregoing efforts of Winstead to determine the existence of any interests adverse to the Trustee or which would otherwise create a conflict of interest in connection with its engagement in this matter. Based on this review, I believe

---

[4] The Trustee has been advised that Brian Shaw of Rogge Dunn Group, PC will represent Mr. Terry in these Cases. Also disclosed above, Winstead continues to represent Mr. Terry in connection with governmental investigations of certain non-debtor parties-in-interest; however, such representation is not adverse to the Debtors or their Estates.

---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE** Page 9 of 10

Appellee Appx. 01245
Appx. 04119
008053

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1253
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 136 of 1017    PageID 8883
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1252 of 1803   PageID 11998
Case 18-30264-sgj11 Doc 3946-15 Filed 05/30/18   Entered 05/30/18 21:32:10   Page 11 of 11

Winstead does not have any interest adverse to the Trustee or which would otherwise create a conflict of interest in connection with its limited engagement in this matter.

29.    "In sum, based on Winstead's familiarity with the unique factual circumstances and complex legal issues in the Cases (particularly with respect to the CLO assets, the portfolio management agreement, indentures, and related structures), Winstead's bankruptcy expertise and considerable experience and knowledge in handling such matters, the need for immediate action by the Trustee on a variety of fronts related to these specific matters, as well as the substantial expense the Estates would incur as a result of new counsel needing to familiarize itself with the intricate and impending legal issues in the Cases, I believes that Winstead's engagement as special counsel for the limited purposes described herein in is in the best interests of the Estates and their creditors.

30.    "In light of the foregoing, I believe that the employment of Winstead as counsel for the Trustee is appropriate and in the best interests of the Estates, pursuant to sections 327 and 328 of the Bankruptcy Code, and should be approved.

31.    "I reserve the right to supplement this Declaration.

DECLARED under penalty of perjury this 30th day of May, 2018.


                                                    /s/ Rakhee V. Patel
                                                    Rakhee V. Patel


---

**DECLARATION OF RAKHEE V. PATEL IN SUPPORT OF APPLICATION
TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**          Page 10 of 10
4813-4254-0390v.2 61588-3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | Chapter 11 |

ORDER APPROVING THE APPLICATION TO EMPLOY
WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE

Came on for consideration the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Application"), filed by Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above styled and numbered bankruptcy cases (the "Cases"),[1] and having considered the Application, the Declaration of Rakhee V. Patel in support of the Application, arguments of counsel, and any

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application.

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE** **Page 1 of 3**

Appellee Appx. 01247

Appx. 04112

008055

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1255
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 138 of 1017    PageID 8885
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1254 of 1803    PageID 12000
Case 18-30264-sgj11 Doc 2405-3 Filed 05/30/18 Entered 05/30/18 Page 307 of 334 Page 2 of 3

timely filed objections to the Application, the Court finds that (a) the proposed employment of Winstead PC ("Winstead") as special counsel for the Trustee, for the limited purposes set forth in the Application, is appropriate and in the best interest of the Debtors' Estates and creditors, (b) the Trustee and Winstead have represented to the Court that Winstead and its shareholders and associates do not represent or hold any interest adverse to the Debtors' Estates such that Winstead would be disqualified from representing the Trustee in these Cases, and (c) the Trustee and Winstead have represented to the Court that Winstead and each of its shareholders and associates is a "disinterested person" pursuant to 11 U.S.C. §§ 101(14) and 327(c). Accordingly, the Court finds that the Application should be approved. Therefore, pursuant to 11 U.S.C. § 327(a) and (c), it is hereby:

**ORDERED** that the Application is **APPROVED**. It is further

**ORDERED** that the Trustee is authorized to retain and employ Winstead as his special counsel, effective as of May 14, 2018, to perform the services more particularly set forth in the Application. It is further

**ORDERED** that Winstead shall be compensated for services rendered and for expenses incurred, subject to the Court's interim and final approval and in accordance with the provisions of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of this Court.

**ORDERED** that that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

**# # # END OF ORDER # # #**

008056

**SUBMITTED BY**:

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*PROPOSED SPECIAL COUNSEL FOR ROBIN PHELAN,*
*CHAPTER 11 TRUSTEE*

---

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**                                                          **Page 3 of 3**
   4812-2677-1046v.1

61588-3 5/30/2018

Appellee Appx. 01249

Appx. 04114
008057

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1257
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 140 of 1017    PageID 8887
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1256 of 1803    PageID 12002
Case 18-30241-sgj11 Doc 92-65 Filed 05/30/18    Entered 05/30/18 21:37:13 Page 1 of 3

SERVICE

| | | |
|---|---|---|
| Acis Capital Management Gp, LLC<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 | Acis Capital Management, L.P.<br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201-7849 | Acis CLO 2013- 1, Ltd.<br>c/o Appleby Trust<br>Attn : The Directors Clifton House 75 Fort St.,<br>P. 0. Box 13<br>Grand Cayman, Cayman Islands KY1-1108 |
| Acis CLO 2013-1 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2013-2 Ltd.<br>c/o MaplesFS Limited, Attn: Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO 2014- 3 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 |
| Acis CLO 2014-3 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-4 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-4 Ltd .<br>c/o MapleFS Limited<br>Attn : The Director<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq.<br>Grand Cayman, Cayman Islands KY1-1102 |
| Acis CLO 2014-5 Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO 2014-5 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO 2015-6 Ltd .<br>c/o MapleFS Limited<br>Attn: The Directors<br>P.O. Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman , Cayman Islands KY1 -1102 |
| Acis CLO 2015-6<br>Chemical Holdings, LLC<br>1209 Orange Street<br>Wilmington , DE 19801-1120 | Acis CLO 2017-7 Ltd.<br>c/o MapleFS Limited<br>Attn: The Directors<br>PO Box 1093<br>Boundary Hall, Cricket Sq<br>Grand Cayman, Cayman Islands KY1-1102 | Acis CLO Management, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 |
| Acis CLO Value Fund II (Cayman), L.P.<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis CLO Value Fund II GP, LLC<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis CLO Value Fund II, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 |
| Acis CLO Value GP, LLC<br>1209 Orange Street<br>Wilmington, DE 19801-1120 | Acis CLO Value Master Fund II, L.P.<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1104 | Acis Funding GP, Ltd.<br>c/o Maples Corporate Service Limited<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands FY1-1104 |
| Acis Funding L.P.<br>c/o Maples Corporate Services Limited<br>P.O. Box 309<br>Ugland House<br>Grand Cayman, Cayman Islands KY1-1101 | Acis Loan Funding, Ltd.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201-7849 | Andrews Kurth Kenyon LLP<br>600 Travis, Suite 4200<br>Houston, TX 77002-2929 |
| BayVK R2 Lux S.A.,<br>SICAV-FIS<br>15 Rue de Flaxweiler<br>L-6776 Grevenmacher<br>Luxembourg | BNP Paribas Securities Services<br>Luxembourg Branch<br>60 Avenue John F. Kennedy<br>1855 Luxembourg | Case Anywhere LLC<br>218 60 Burbank Boulevard, Suite 125<br>Woodland Hills, CA 91367-7447 |
| CLO Holdco, Ltd.<br>c/o Intertrust Corp. Srvs. (Cayman) Ltd.<br>190 Elgin Ave, George Town<br>Grand Cayman, Cayman Islands KY1-9005 | CLO Holdco, Ltd.<br>Scott R. Larson<br>BELL NUNNALLY & MARTIN LLP<br>3232 McKinney Ave., #1400<br>Dallas, TX 75204-7422 | CSI Global Deposition Services<br>4950 N. O'Connor Road, Suite 152<br>Irving, TX 75062- 2778 |

Appellee Appx. 01250

Appx. 04415

008058

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1258
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 141 of 1017 PageID 8888
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1257 of 1803 PageID 12003
Case 18-30264-sgj11 Doc 2405-5 Filed 05/30/18 Entered 05/30/18 21:37:03 Page 2 of 3

CT Corporation
P. O. Box 4 34 9
Carol Stream, IL 60197-4349

David Langford
1321 Indian Creek
DeSoto, TX 75115-3652

Drexel Limited
309 23rd Street 340
Miami Beach, FL 33139-1700

Highland Capital Management, L. P.
1209 Orange Street
Wilmington, DE 19801-1120

Highland CLO Funding
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave., #1400
Dallas, TX 75204-7422

Jones Day
2727 N. Harwood Street
Dallas, TX 75201-1568

Joshua N. Terry
c/o Winstead PC
Attn: Rakhee V. Patel
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201-1516

KPMG LLP
2323 Ross Avenue, Suite 1400
Dallas, TX 75201-2721

McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201-6970

Neutra, Ltd.
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave., #1400
Dallas, TX 75204-7422

Dallas County
Linbarger, Goggan, Blair & Sampson LLP
c/o Laurie Spindler
2777 N Stemmons Frwy, No 1000
Dallas, TX 75207-2328

David Simek
31 Woodacres Road
Brookville, NY 11545-2911

Elite Document Technology
4 00 N. Saint Paul Street Suite 1300
Dallas, TX 75201-6881

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201-7849

Highland CLO Funding
Scott R. Larson
BELL NUNNALLY & MARTIN LLP
3232 McKinney Ave, #1400

Joshua N. Terry
25 Highland Park Village, Suite 100- 848
Dallas, TX 75205-2726

Joshua Terry
25 Highland Park Village
Suite 100-848
Dallas, TX 75205-2789

KPMG LLP
Aon Center
200 E. Randolph Street, Suite 5500
Chicago, IL 60601-6607

Michael D. Warner
Cole Schotz P.C.
1700 City Center Tower II
301 Commerce St.
Fort Worth, TX 76102-4140

O. S. Bank National Association
Attn: Michael Zak
60 Livingston Avenue
EP-MN-WS3D
Saint Paul, MN 55107-2292

Dallas County
Linebarger Goggan Blair & Sampson, LLP
c/o Sherrel K Knighton
2777 N. Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

Diane G. Reed
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, TX 75165-3361

Highfield Equities, Inc.
3131 McKinney Avenue, Suite 215
Dallas, TX 75204-2421

Highland Capital Management, L.P.
c/o Foley Gardere
Holland O'Neil, Jason Binford
2021 McKinney Avenue, Ste. 1600
Dallas, TX 75201-3340

JAMS, Inc.
18881 Von Karman Avenue, Suite 350
Irvine, CA 92612-6589

Joshua N. Terry
350 9 Princeton Ave
Dallas, TX 75205-3246

KPMG LLP (USA)
Two Financial Center
60 South Street
Boston, MA 02111-2759

Lackey Hershman LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, TX 75219-4259

Mizuho Securities USA Inc.
320 Park Avenue
12th Floor
New York, NY 10022-6848

Rakhee V. Patel
WINSTEAD PC
2728 N. Harwood Street
Suite 500
Dallas, TX 75201-1743

Appellee Appx. 01251
Appx. 04416
008059

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1259
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 142 of 1017 PageID 8889
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1258 of 1803 PageID 12004

Case 18-30264-sgj11 Doc 2292-5 Filed 05/30/18 Entered 05/30/18 14:37:11 Page 3 of 3

Reid Collins & Tsai, LLP
1301 S. Capital of Texas Highway
Building C, Suite 300
Austin, TX 78746-6500

Robin Phelan
4214 Woodfin Drive
Dallas, TX 75220-6416

Robin Phelan
Chapter 11 Trustee
c/o Matthias Kleinsasser
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Robin Phelan, Chapter 11 Trustee
c/o Suzanne K. Rosen
Forshey & Prostok, LLP
777 Main St., Suite 1290
Fort Worth, TX 76102-5316

Stanton Advisors LLC
300 Coles Street Apartment 802
Jersey City, NJ 07310-1047

Stanton Law Firm
9400 North Central Expressway
Suite 1304
Dallas, TX 75231-5047

State Street (Guernsey) Limited
First Floor Dorey Court
Admiral Park
St. Peter Port, Guernsey
The Bank of N.Y. Mellon Trust Co., N.A.
225 Liberty Street New York, NY 10286-0001

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
1100 Commerce Street Room 1254
Dallas, TX 75242-1305

Texas Comptroller of Public Accounts
John Stern
P.O. Box 12548
Austin, TX 78711-2548

The Dugaboy Investment Trust
300 Crescent Court, Suite700
Dallas, TX 75201-1876

The TASA Group, Inc.
1166 DeKalb Pike
Blue Bell, PA 19422- 1853

U.S. Attorney General
Department of Justice
Washington, DC 20001

U.S. Attorney
1100 Commerce, 3rd Floor
Dallas, TX 75242-1074

United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242-0996

Universal-Investment-Luxembourg S.A.
15, rue de Flaxweiler
L-6776 Grevenmacher
Luxembourg

US Bank National Association
Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court. Ste 350
Dallas, TX 75201-2348

US Bank National Association
Mark D. Kotwick
One Battery Park Plaza
New York, New York 10004-1405

US Bank
P. O. Box 5229
Cincinnati, OH 45201-5229

Warren A. Usatine
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601-7189

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1260
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 143 of 1017 PageID 8890
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1259 of 1803 PageID 12005

# EXHIBIT J

Appellee Appx. 01253

Appx. 04118

008061

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1261
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 144 of 1017 PageID 8891
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1260 of 1803 PageID 12006
Case 18-30264-sgj11 Doc 893-13 Filed 06/25/18 Entered 06/21/18 Page 1 of 5 Page 1 of 5



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 21, 2018**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| Debtors. | § | **Chapter 11** |

**ORDER (I) APPROVING THE APPLICATION TO EMPLOY**
**WINSTEAD PC AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**
**AND (II) DENYING THE MOTION TO DISQUALIFY WINSTEAD PC AS**
**PROPOSED SPECIAL COUNSEL TO ROBIN PHELAN, CHAPTER 11 TRUSTEE**

On June 14, 2018, the Court heard: (1) the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Docket No. 246] (the "Application"), filed by Robin Phelan, Chapter 11 trustee (the "Trustee") of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," and together with Acis LP, the "Debtors" or "Acis"), the debtors in the above captioned and jointly administered bankruptcy cases (the

---

ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE                                                                    Page 1 of 5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1262
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 145 of 1017 PageID 8892
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1261 of 1803 PageID 12007
Case 18-30264-sgj11 Doc 289 Filed 06/29/18 Entered 06/29/18 Page 2 of 5Page 2 of 5

"Cases")[1] and (2) the *Motion to Disqualify Winstead P.C. as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Docket No. 244]. Having considered the Application, the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplement") [Docket No. 266], Rakhee V. Patel's Declaration and Supplemental Declaration in support of the Application, the Motion to Disqualify, the *Objection of Highland Capital Management, L.P. to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Docket No. 267], the *United States Trustee's Objection to Application to Employ Winstead as Special Counsel to the Chapter 11 Trustee* [Docket No. 279], the arguments of counsel and evidence admitted at the hearing on the Application and the Motion to Disqualify, the Court read its findings of fact and conclusions of law into the record in accordance with Fed. R. Bankr. P. 7052(a). For the reasons stated, the Court, pursuant to 11 U.S.C. § 327(a) and (c), **ORDERS AS FOLLOWS:**

1. The Motion to Disqualify is **DENIED**.

2. The Application is **APPROVED** to the extent set forth herein.

3. The Trustee is authorized to retain and employ Winstead as his special counsel, effective as of May 14, 2018, to provide legal services to the Trustee for matters specifically involving:

   a) management, liquidation, disposition, and monetization of the CLO assets;

   b) the Investment Advisers Act of 1940, as amended; and

   c) operation of the portfolio management agreements and the indentures, issues arising therefrom,[2] and, specifically including, litigation related thereto or arising therefrom.

---

[1] Any capitalized term not otherwise defined herein shall have the meaning ascribed to it in the Application or the Supplement, as applicable.

[2] For the avoidance of doubt, such issues may include issues related to securities laws, including the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended.

---

ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE                                                                        Page 2 of 5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1263
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 146 of 1017 PageID 8893
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1262 of 1803 PageID 12008
Case 18-30264-sgj11 Doc 339-1 Filed 05/23/18 Entered 05/23/18 Page 3 of 5

4.      If the Trustee wishes to retain Winstead to provide legal services in any capacity other than in the three items identified in paragraph 2, the Trustee must obtain Court approval by application with the Court.

5.      Winstead may not provide legal services to Joshua Terry or to the Trustee in connection with the preparation or defense of, or any objection to, Joshua Terry's proofs of claim,[3] or such claims as may be amended.

6.      Winstead will establish an ethical wall between any of Winstead's attorneys engaged in these Cases and those of Winstead's attorneys involved in that certain litigation styled *NexBank SSB and Highland Capital Management, L.P. v. Winstead PC,* DC-15-01816, pending in the 193rd Judicial District Court of Dallas County, Texas. Notwithstanding the foregoing, the Winstead attorneys engaged in these Cases may seek counsel from Don Campbell, in his capacity as Winstead's general counsel, as they deem necessary regarding issues related to any potential conflicts or other ethics issues that may arise during these Cases.

7.      With respect to those certain Appeals pending in the District Court for the Northern District of Texas, specifically under case numbers 3:18-cv-01056-D, 3:18-cv-01057-D, 3:18-cv-01073-D, and 3:18-cv-01084-D, any parties to such Appeals may not seek agreed dismissal of any such Appeals by compromise or settlement without providing proper notice to parties-in-interest in these Cases, as required under the Federal Rules of Bankruptcy Procedure or as otherwise required under applicable law.

8. Winstead shall be compensated for services rendered and for expenses incurred, subject to the Court's interim and final approval and in accordance with the provisions of sections 330 and 331 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy

---

[3] Joshua Terry has filed two claims in these Cases: Claim No. 1 in the Claims Register for Case No. 18-30264 and Claim No. 1 in the Claims Register for Case No. 18-30265.

Appellee Appx. 01256
Appx. 04121
008064

Procedure, the Local Bankruptcy Rules, and such other procedures as may be fixed by order of this Court.

9.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

**# # # END OF ORDER # # #**

---

**SUBMITTED BY**:

Rakhee V. Patel – SBT #00797213
Phillip Lamberson – SBT #00794134
Joe Wielebinski – SBT #21432400
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:  (214) 745-5390
Email: rpatel@winstead.com
Email: achiarello@winstead.com
Email: plamberson@winstead.com
Email: jwielebinski@winstead.com

*SPECIAL COUNSEL FOR ROBIN PHELAN,*
*CHAPTER 11 TRUSTEE*

**ORDER APPROVING APPLICATION TO EMPLOY WINSTEAD AS SPECIAL COUNSEL TO THE**
**CHAPTER 11 TRUSTEE**                                                  **Page 5 of 5**
4846-6789-0026v.2

62112-1 6/15/2018

**Appellee Appx. 01258**

**Appx. 04128**
**008066**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1266
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 149 of 1017   PageID 8896
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1265 of 1803   PageID 12011

# APPENDIX 14

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1267
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 150 of 1017 PageID 8897
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1266 of 1803 PageID 12012

Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 1 of 10

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)**

## DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

Highland Capital Management, L.P., the debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), files this application (the "Application"), pursuant to section 327(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order authorizing the Debtor to retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") as Special Texas Litigation Counsel in this Chapter 11 Case, *nunc pro tunc* to the Petition Date (defined below). In support of the Application, the Debtor relies upon and incorporates by reference the Declaration of Michael K. Hurst the ("Hurst Declaration"), a copy of which is attached hereto as **Exhibit A**. In further support of the Application, the Debtor respectfully states as follows:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appellee Appx. 01260

008068

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1268
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 151 of 1017 PageID 8898
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1267 of 1803 PageID 12013

Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 2 of 10

## Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 327(e) and 328 of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1.

## Background

4.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition"). The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case.

5.      As of the date of the filing of this Application, the Office of the United States Trustee (the "U.S. Trustee") has yet to appoint an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code.

6.      A more detailed description of the business and operations of the Debtor, and the events leading to the commencement of this chapter 11 case, is provided in the *Declaration of Frank Waterhouse in Support of First Day Motion*, [Docket No. 9] (the "First Day Declaration") and incorporated herein by reference.[2]

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Declaration.

2

Appellee Appx. 01261

Appx. 04126

008069

**Relief Requested**

7.     By this Application, the Debtor seeks entry of an order authorizing the employment

of the Firm as its Special Texas Litigation Counsel, *nunc pro tunc* to the Petition Date. The Debtor

requests that the Firm be retained to perform the services described in this Application.

**Basis for Relief**

8.     Section 327(e) of the Bankruptcy Code authorizes a debtor, with court approval, to

retain

> for a specified special purpose, other than to represent the trustee in
> conducting the case, an attorney that has represented the debtor, if
> in the best interest of the estate, and if such attorney does not
> represent or hold any interest adverse to the debtor or to the estate
> with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

9.     Section 327(e) of the Bankruptcy Code authorizes the retention of an attorney who

represented a debtor prior to the bankruptcy petition date, provided: (a) such retention is for a

special purpose; (b) the purpose of the retention is not to conduct the case; (c) the retention is in

the best interests of the estate; and (d) the attorney does not hold any interest adverse to the debtor

with respect to the subject of its retention. The Firm's retention as the Debtor's Special Texas

Litigation Counsel falls within the scope of section 327(e) of the Bankruptcy Code.

**The Firm's Qualifications**

10.    The Debtor believes that the attorneys at the Firm are well qualified to act as Special

Texas Litigation Counsel on behalf of the Debtor in this Chapter 11 Case. The Firm is a boutique

trial litigation firm and the specific attorneys engaged to represent the Debtor have substantial

experience and expertise in trial litigation, including in complex commercial bankruptcy cases

such as this case.

3

Appellee Appx. 01262

Appx. 04425

008070

11.     The Firm has provided legal services to the Debtor in at least six separate matters since March 2016. In particular, and in regard to active litigation, the Firm acts as trial litigation counsel to the Debtor as it relates to the lawsuit captioned *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, and various appeals related thereto (the "Pending Acis Proceedings"). The Debtor expects that the Firm, in its role as Special Texas Litigation Counsel, will continue to provide services to the Debtor with regard to matters that were handled by the Firm before the Petition Date. The Firm also represents entities related to the Debtor in the Pending Acis Proceedings including Highland HCF Advisor, Ltd., Highland CLO Management, Ltd., Highland CLO Holdings, Ltd. (collectively, the "Cayman Defendants").

12.     The Firm also acts as trial litigation counsel to the Debtor in a Texas State court litigation captioned *Joshua N. Terry, Individually and on Behalf of IRAs #1467711 and 1467721, and Jennifer G. Terry, on Behalf of IRAs #1467511 and 1467521 and as the Trustee of the Terry Family 401-K Plan v. Highland Capital Management, L.P., James D. Dondero, and Thomas J. Surgent* Cause No. DC-16-11396 (the "Texas Lawsuit"). In the Petition, the Debtor identified an unsecured claim arising from the Texas Lawsuit. Certain disputed matters in the Texas Lawsuit were scheduled to proceed for resolution in a bench trial, scheduled to occur in November 2019. The Firm continues to represent the Debtor in the Texas Lawsuit, albeit that proceeding is currently subject to the automatic stay as to the Debtor.[3]

---

[3] The Firm also represents a related entity, the Charitable Donor Advised Fund, L.P. ("the Charitable DAF"), in a separate lawsuit in the Southern District of New York, case number 1:19-cv-09857-NRB, which is unrelated to the Debtor and this Chapter 11 Case, and unrelated to the Texas Lawsuit and the Pending Acis Proceedings. *See* Hurst Declaration.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1271
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 154 of 1017 PageID 8901
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1270 of 1803 PageID 12016
Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 5 of 10

13.     Among other services provided to the Debtor in the Texas Lawsuit and/or in the Pending Acis Proceedings, the Firm counsels the Debtor on trial strategy, general litigation strategy, represents the Debtor at oral argument in various hearings, conducts research, conducts motion practice, and during discovery, manages discovery efforts when ongoing.

14.     The Firm's partners Mr. Hurst and Mr. David Coale both provide services to the Debtor in the above-referenced matters. Mr. Hurst, lead counsel for the Debtor within the Firm, is Board Certified in Civil Trial Law by the Texas Board of Legal Specialization. Mr. Coale, lead appellate counsel for the Debtor within the Firm, is Board Certified in Civil Appellate Law by the Texas Board of Legal Specialization.

15.     For these reasons, the Debtor believes that the Firm possesses the requisite expertise to serve as Special Texas Litigation Counsel in this case, and can do so in an efficient and cost-effective manner.

16.     In light of the Firm's relationship with the Debtor and the extensive work it has performed for the Debtor prior to the Petition Date, the Debtor believes that the Firm's retention is in the best interests of its estate and creditors. Since its engagement, the Firm has become intimately familiar with the Debtor's business and operations as they pertain to the Pending Acis Proceedings and to the Texas Lawsuit, and to obtain new counsel now would result in the additional and unnecessary expenditure of both time and money. For example, the Firm represents the Debtor in an appeal that is pending at the Fifth Circuit Court of Appeals and another appeal that is pending at the District Court in the Northern District of Texas. The Firm continues to represent the Debtor in a pending adversary proceeding in the Pending Acis Proceedings, albeit that proceeding is currently subject to the automatic stay as to the Debtor. The Firm, and co-

5

Appellee Appx. 01264
Appx. 04429
008072

litigation counsel, Foley Gardere, Foley & Lardner LLP ("Foley Gardere")[4] have worked cooperatively on the Pending Acis Proceedings and have endeavored to avoid unnecessary duplication of services to the Debtor. The Firm is uniquely qualified to handle the representation in a most efficient and timely manner. As such, the Firm should be retained as the Debtor's Special Texas Litigation Counsel.

### Services to Be Provided By the Firm

17. The Firm's proposed retention pursuant to section 327(e) of the Bankruptcy Code is for the limited purpose of representing the Debtor as Special Texas Litigation Counsel. Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above.

18. The Firm's proposed retention is for the discrete matters referenced above, and the Firm will not be rendering services typically performed by a debtor's bankruptcy counsel. Among other things, the Firm ordinarily will not be involved in interfacing with this Court or be primarily responsible for the Debtor's general restructuring efforts. By delineating the Firm's role, the Debtor has ensured there will be no duplication of services.

### Compensation and Fee Applications

19. As required by Bankruptcy Code section 329 and Bankruptcy Rule 2016, the Hurst Declaration discloses that, in the one year period preceding the Petition Date, the Firm received payments from the Debtor totaling $1,110,508.49 (the "Prepetition Payments") with respect to

---

[4] The Debtor is simultaneously filing a request to employ the Foley Gardere firm as Special Texas Counsel.

6

Appellee Appx. 01265

Appx. 04139

008073

services rendered to the Debtor. The Prepetition Payments were paid by, and the sources of such funds were, the Debtor. According to the Hurst Declaration, as of September 30, 2019,[5] the Firm submits that it has earned fees and incurred reimbursable expenses on account of its services to Debtor in the amount of $1,419,928.07 (the "Aggregate Amounts"). As of September 30, 2019, approximately $319,419.58 of the Aggregate Amounts was outstanding and unpaid.

20.     The Firm intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the guidelines promulgated by the United States Trustee, and pursuant to any additional procedures that may be established by the Court in this Chapter 11 Case. The Firm's fees for professional services are based upon its hourly rates, which are periodically adjusted. The hourly rates are currently $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

21.     The Firm will maintain records in support of any actual and necessary costs and expenses incurred in connection with the rendering of its services in this Chapter 11 Case. Subject to application for and allowance by the Court, the Firm will receive reimbursement for reasonable and documented out-of-pocket expenses incurred in connection with the services rendered to the Debtor.

22.     All compensation and expenses will be sought in accordance with section 328(a) of the Bankruptcy Code, as incorporated in sections 329 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of the Court.

---

[5] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system. The Firm will supplement the Hurst Declaration with those additional sums once available.

DOCS_NY:39760.1 36027/002

Appellee Appx. 01266

Appx. 04434

008074

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1274
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 157 of 1017 PageID 8904
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1273 of 1803 PageID 12019

Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 8 of 10

23.     The Debtor believes that the compensation arrangements with the Firm are reasonable and at market rates, and similar to the rates charged to other clients in similar circumstances.

### Disinterestedness and Disclosure of Connections

24.     To check and clear potential conflicts of interest in this Chapter 11 Case, the Firm researched its client database to determine whether it had any relationships with the following entities in its engagement as Special Texas Litigation Counsel (collectively, the "Interested Parties"):

    a.    the Debtor and its non-debtor affiliates;

    b.    the Debtor's secured creditors;

    c.    the Debtor's directors, officers and board members;

    d.    the Debtor's equity security holders;

    e.    the creditors of the Debtor holding the 20 largest unsecured claims; and

    f.    any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware.

25.     To the extent that the Firm's research of its relationships with the Interested Parties indicates that the Firm has represented, or currently represents any of these entities in matters *unrelated* to this Chapter 11 Case, the identities of such entities and, for current clients, a brief description of the type of work performed by the Firm for these clients are set forth in Schedule 1 to the Hurst Declaration.

26.     In reliance on the Hurst Declaration, the Debtor believes that (a) the Firm has no connection with the Debtor, its creditors, the U.S. Trustee, any person employed in the office of

8

Appellee Appx. 01267
Appx. 04132
008075

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1275
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 158 of 1017 PageID 8905
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1274 of 1803 PageID 12020
Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 9 of 10

the U.S. Trustee or any Bankruptcy Judge currently serving on the United States Bankruptcy Court for the District of Delaware, or any other party with an actual or potential interest in this Chapter 11 Case or their respective attorneys or accountants, except as set forth in the Hurst Declaration; (a) the Firm is not and has not been an investment banker for any outstanding securities of the Debtor; and (b) the Firm neither holds nor represents any interest adverse to the Debtor or its estate with respect to the matter on which the Firm is to be employed. Accordingly, the Debtor believes that the Firm's representation of the Debtor is permissible under section 327(e) of the Bankruptcy Code and is in the best interest of the Debtor's estate.

27. Where, as here, there is no conflict concerning the subject matter of the proposed special engagement, an application to employ Special Texas Litigation Counsel should be granted. "[Section] 327(e) bars engagement of special counsel only in the presence of an actual conflict of interest concerning the subject matter of the engagement." *In re Carla Leather, Inc.*, 44 B.R. 457, 474 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985) (citations omitted); *see also In re Polaroid Corp.*, 424 B.R. 446, 453 (Bankr. D. Minn. 2010) (section 327(e) only disqualifies counsel when they have conflicts related to the matter on which the attorney is to be employed); *In re J.S. II, LLC*, 371 B.R. 311 (Bankr. N.D. Ill. 2007) (section 327(e) has more relaxed conflict of interest standard than section 327(a)); *In re EBW Laser, Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) (counsel not disqualified under section 327(e) because it holds prepetition claim).

28. Finally, the Debtor notes that the Firm will have no involvement with respect to actually conducting the Debtor's Chapter 11 Case. The Debtor has filed an application to retain Pachulski Stang Ziehl & Jones LLP ("PSZ&J") as bankruptcy counsel. The Debtor is specifically retaining PSZ&J, subject to court approval, to conduct its Chapter 11 Case. Although PSZ&J and

9

Appellee Appx. 01268
Appx. 04128
008076

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1276
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 159 of 1017 PageID 8906
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1275 of 1803 PageID 12021
Case 19-12239-CSS Doc 70 Filed 10/29/19 Page 10 of 10

the Firm may coordinate on matters that generally concern the Debtor, the Firm will not conduct the Debtor's bankruptcy case.

## Notice

29.　　Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any statutory committee appointed in the case; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

30.　　No prior application or motion for the relief requested herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:　　October 29, 2019　　　　　　HIGHLAND CAPITAL MANAGEMENT, L.P.

　　　　　　　　　　　　　　　　　　　*/s/ Frank Waterhouse*
　　　　　　　　　　　　　　　　　　　By Strand Advisors, Inc., its Sole General Partner
　　　　　　　　　　　　　　　　　　　Frank Waterhouse, Treasurer

DOCS_NY:39760.1 36027/002

Appellee Appx. 01269
Appx. 04434
008077

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

Objection Deadline: November 12, 2019 at 4:00 p.m. (ET)
Hearing Date: November 19, 2019 at 12:00 p.m. (ET)

**NOTICE OF DEBTOR'S APPLICATION FOR AN ORDER
AUTHORIZING THE RETENTION AND EMPLOYMENT
OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS
LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

TO: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the District of Delaware; (c) the Debtor's principal secured parties; (d) counsel to any statutory committee appointed in the case; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that on October 29, 2019, the above-captioned debtor and debtor in possession (collectively, the "Debtor"), filed the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court"). A copy of the Application is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that any response or objection to the Application must be filed with the Bankruptcy Court on or before **November 12, 2019 at 4:00 p.m. (Eastern Time)**.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_DE:226022.1 36027/002

Appellee Appx. 01270

Appx. 04435

008078

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1278
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 161 of 1017   PageID 8908
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1277 of 1803   PageID 12023

Case 19-12239-CSS   Doc 70-1   Filed 10/29/19   Page 2 of 3

**PLEASE TAKE FURTHER NOTICE** that at the same time, you must also serve a copy of the response or objection upon: (i) proposed counsel for the Debtor: Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn: James E. O'Neill, Esq. (joneill@pszjlaw.com) and Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, Attn: Jeffrey N. Pomerantz, Esq. (jpomerantz@pszjlaw.com); and (ii) the Office of the United States Trustee: 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jane M. Leamy, Esq. (jane.m.leamy@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE** THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE APPLICATION WITHOUT FURTHER NOTICE OR HEARING.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER THE RELIEF SOUGHT IN THE APPLICATION WILL BE HELD ON **NOVEMBER 19, 2019 AT 12:00 P.M. (EASTERN TIME)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, CHIEF UNITED STATES BANKRUPTCY COURT JUDGE, AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE 19801.

DOCS_DE:226022.1 36027/002

Appellee Appx. 01271

008079

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1279
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 162 of 1017 PageID 8909
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1278 of 1803 PageID 12024

Case 19-12239-CSS Doc 70-1 Filed 10/29/19 Page 3 of 3

Dated: October 29, 2019

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
Richard M. Pachulski (CA Bar No. 62337)
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:     rpachulski@pszjlaw.com
            jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            mlitvak@pszjlaw.com
            joneill@pszjlaw.com

Proposed Counsel for the Debtor and Debtor in
Possession

DOCS_DE:226022.1 36027/002

Appellee Appx. 01272

008080

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1280
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 163 of 1017 PageID 8910
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1279 of 1803 PageID 12025
Case 19-12239-CSS Doc 70-2 Filed 10/29/19 Page 1 of 7

**<u>EXHIBIT A</u>**

**Hurst Declaration**

DOCS_NY:39760.1 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1281
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 164 of 1017 PageID 8911
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1280 of 1803 PageID 12026

Case 19-12239-CSS Doc 70-2 Filed 10/29/19 Page 2 of 7

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

## DECLARATION OF MICHAEL K. HURST IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST, LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

I, Michael K. Hurst, declare under penalty of perjury as follows:

1. I am a partner with the law firm of Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), located in Dallas, Texas. I am submitting this declaration ("Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2]

2. Neither I, the Firm, nor any partner, of counsel or associate thereof, insofar as I have been able to ascertain, has any connection with Highland Capital Management, L.P., the above-captioned debtor (the "Debtor" or "Highland"), its creditors or any other parties in interest herein, or their respective attorneys, except as set forth below.

3. The Firm has represented the Debtor since March 2016. Since that time, the Firm has also represented certain other entities related to the Debtor, including the Cayman Defendants in the Pending Acis Proceedings, the defendants in the Texas Lawsuit who are executives of the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Appellee Appx. 01274
Appx. 04439
008082

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1282
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 165 of 1017 PageID 8912
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1281 of 1803 PageID 12027
Case 19-12239-CSS Doc 70-2 Filed 10/29/19 Page 3 of 7

Debtor. The Firm also represents the Charitable DAF in case pending before the Southern District of New York, case number 1:19-cv-09857-NRB, a case that is unrelated to the Debtor, this Chapter 11 Case, the Texas Lawsuit, and the Pending Acis Proceedings.

4.      The Firm has, as of September 30, 2019, received $1,110,508.49 in payments from Highland during the year before the Petition Date.

5.      With respect to all matters, the Debtor has, subject to Court approval, agreed to compensate the Firm on an hourly basis at rates that do not (and will not) exceed the rates that the Firm customarily charges to its other clients for work of this type.  As of the Petition Date, the applicable hourly rates for timekeepers for the matters that the Firm is engaged to perform legal services ranged from $365 to $800 for attorneys and $180 to $235 for paraprofessionals.

6.      It is the Firm's policy to charge its clients for certain expenses incurred in connection with providing certain client services, including, without limitation, travel, lodging, vendor charges, delivery services and other expenses incurred in providing professional service, and for other services actually provided, including word processing and other charges, excluding secretarial overtime.

### Disclosures

7.      The Firm maintains a database containing the name of each current and former client of the Firm, the name of the parties who are or were related or adverse to such client, and the names of the Firm personnel who are or were responsible for the matters.  The Firm has searched its database to determine potential conflicts with the Debtor and its non-debtor affiliates, the Debtor's secured creditors, the Debtor's directors, officers and board members, the Debtor's equity security holders, the creditors of the Debtor holding the 20 largest unsecured claims, and any person employed in the office of the U.S. Trustee or any Bankruptcy Judge currently serving

2

Appellee Appx. 01275
Appx. 04149
008083

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1283
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 166 of 1017 PageID 8913
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1282 of 1803 PageID 12028

Case 19-12239-CSS Doc 70-2 Filed 10/29/19 Page 4 of 7

on the United States Bankruptcy Court for the District of Delaware relating to its limited engagement by Debtor as Special Texas Litigation Counsel (collectively, the "Searched Parties"). Using such database, the Firm assessed the Searched Parties to ascertain the Firm's current relationship with parties that may be adverse to the Debtor in this Chapter 11 Case.

8. Except as disclosed herein or in the attached Schedule 1, the Firm does not represent the Searched Parties or any other known creditor or party-in-interest of the Debtor with respect to the matters for which the Debtor seeks to retain the Firm pursuant to the Application and, therefore the Firm holds no material adverse interest to the Debtor or the Debtor's estate. Accordingly, the Firm is eligible for retention.

9. The Firm may have performed services in the past, may currently perform services, and may perform services in the future, in matters unrelated to this Chapter 11 Case, for persons that are parties-in-interest in the Debtor's Chapter 11 Case. Except as set forth herein, I am not aware of the Firm performing any services for any such person or entity in connection with this case, or having any relationship with any such person or entity, their attorneys or accountants that we understand are adverse to the Debtor or its estate.

10. From time to time, the Firm may have provided, and/or may currently provide, services to certain other parties-in-interest, or affiliates thereof, in all instances on matters in which such party does not or did not hold or represent an interest adverse to the Debtor or its estate with respect to the services for which the Firm is being retained.

11. That said, the Debtor has and will retain various professionals during the pendency of this Chapter 11 Case. The Firm has previously worked with and will continue to work with these professionals on various representations. Further, the Firm and certain of its partners, of counsel, and associates may have in the past represented, may currently represent, and may in the

DOCS_NY:39760.1 36027/002

Appellee Appx. 01276

Appx. 01414

008084

future represent stockholders and creditors of the Debtor and other parties of interest in connection with matters unrelated to the Debtor and this Chapter 11 Case. At this time, the Firm is not aware of such representations except as noted above. If the Firm identifies any further such representations, the Firm shall make further disclosures as may be appropriate at that time.

12. To my knowledge, neither the Firm nor any of its members have any connections with the United States Trustee or any person employed in the Office of the United States Trustee and/or the U.S. Bankruptcy Court for the District Of Delaware.

13. The Firm intends to apply for compensation for professional services rendered and associated costs in connection with this Chapter 11 Case, subject to approval of this Court and compliance with applicable provisions of the Bankruptcy Code, as set forth in the Application.

14. Pursuant to the Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under United States Code by Attorneys in Larger Chapter 11 Case (the "2013 UST Guidelines"), the Firm makes certain disclosures herein.

15. Pursuant to Part D1 of the 2013 UST Guidelines, the Firm is seeking employment as Special Texas Litigation Counsel for the Debtor under section 327 of the Bankruptcy Code and it hereby provides the following responses set forth below:

| Questions required by Part D1 of 2013 UST Guidelines: | Answer: | Further explanation: |
|---|---|---|
| Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement? | No | N/A |
| Do any of the professionals included in this engagement vary their rate based on the geographic location of the bankruptcy case? | No | N/A |

4

Appellee Appx. 01277

Appx. 04142

008085

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1285
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 168 of 1017 PageID 8915
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1284 of 1803 PageID 12030
Case 19-12239-CSS Doc 70-2 Filed 10/29/19 Page 6 of 7

| If you represented the client in the 12 months prepetition, disclose your billing rates and material financial terms for the prepetition engagement, including any adjustments during the 12 months prepetition. If your billing rates and material financial terms have changed postpetition, explain the difference and reasons for the difference. | LPCH's rates are adjusted on an annual basis within the ranges previously disclosed. | Standard annual hourly rate adjustments. |
| --- | --- | --- |
| Has your client approved your respective budget and staffing plan, and, if so, for what budget period? | The Debtor and the Firm expect to develop a prospective budget and staffing plan. | In accordance with the 2013 UST Guidelines, the budget may be amended as necessary to reflect changed circumstances or unanticipated developments. |

16.     No promises have been received by the Firm or by any member, of counsel, or associate thereof as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code. The Firm has no agreement with any other entity to share with such entity any compensation received by the Firm in connection with this Chapter 11 Case, except among the members, of counsel, and associates of the Firm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 29, 2019

_____

Michael K. Hurst, Partner

5

Appellee Appx. 01278

008086

## SCHEDULE 1

### Disclosures

**None**

DOCS_NY:39760.1 36027/002

**EXHIBIT B**

**Proposed Order**

DOCS_NY:39760.1 36027/002

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Re docket No. ___** |

### ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

Upon consideration of the application (the "Application")[2] of Highland Capital Management, L.P., debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case") for entry of an order (this "Order"), authorizing the Debtor to retain and employ Lynn Pinker Cox & Hurst LLP (the "Firm") as Special Texas Litigation Counsel in this Chapter 11 Case; and upon the *Statement Under Rule 2016 of the Federal Rules of Bankruptcy Procedure* (the "Statement"), the *Declaration of Michael K. Hurst in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Hurst Declaration"), and the *Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Waterhouse Declaration") that were submitted concurrently with the Application; and the Court being satisfied based on the representations made in the Application, the Statement, the Hurst Declaration, and the Waterhouse

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms, unless otherwise defined herein, shall have the meanings ascribed to them in the Application.

Appellee Appx. 01281

Appx. 04116

008089

Declaration that the Firm holds no interest materially adverse to the Debtor or the Debtor's estate with respect to the matters upon which it is to be engaged, and that the employment of the Firm as Special Texas Litigation Counsel to the Debtor is necessary and in the best interests of the Debtor and its estate; and it appearing that the Court has jurisdiction to consider the Application; and it appearing that due notice of the Application has been given and no further notice need be given; and upon the proceedings before the Court; and after due deliberation and good and sufficient cause appearing; it is hereby ORDERED that:

7.    The Application is GRANTED as set forth herein.

8.    Pursuant to section 327(e) of the Bankruptcy Code, the Debtor is authorized to retain and employ the Firm as Special Texas in this Chapter 11 Case, *nunc pro tunc* to the Petition Date, pursuant to the terms set forth in the Application.

9.    The Firm shall apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtor's Chapter 11 Case in compliance with sections 330 and 331 of the Bankruptcy Code and applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any other applicable procedures and orders of the Court.  The Firm also intends to make a reasonable effort to comply with the U.S. Trustee's requests for information and additional disclosures as set forth in the Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases Effective as of November 1, 2013 (the "Revised UST Guidelines"), both in connection with this Application and any interim and final fee application to be filed by the Firm in these Chapter 11 Case.

10.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

1

Appellee Appx. 01282

Appx. 04147

008090

Dated: _____, 2019

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

DOCS_NY:39760.1 36027/002

Appellee Appx. 01283

Appx. 04148

008091

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1291
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 174 of 1017 PageID 8921
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1290 of 1803 PageID 12036

Case 19-12239-CSS Doc 70-4 Filed 10/29/19 Page 1 of 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |

### STATEMENT UNDER RULE 2016 OF THE
### FEDERAL RULES OF BANKRUPTCY PROCEDURE

Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH"), pursuant to Rule 2016 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and section 329 of chapter 11

of title 11 of the United States Code (the "Bankruptcy Code"), hereby makes this statement in

support of the *Debtor's Application for an Order Authorizing the Retention and Employment of*

*Lynn Pinker Cox & Hurst LLP, as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition*

*Date* (the "Application").[2]

1. The Debtor has agreed to pay the Firm for the legal services rendered or to be

rendered by its various attorneys and paralegals, and to reimburse the Firm for its actual and

necessary expenses in connection with the matters described in the Application.

2. In the one year period preceding the Petition Date, the Firm received payments from

the Debtor totaling $1,110,508.49 (the "Prepetition Payments") with respect to services rendered

to the Debtor. As of September 30, 2019,[3] the Firm submits that it has earned fees and incurred

reimbursable expenses on account of its services to the Debtor in the amount of $1,419,928.07 (the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.
[3] Due to the timing of the bankruptcy filing, fees and expenses for October 2019 were not fully reflected in LPCH's accounting system. The Firm will supplement the Hurst Declaration with those additional sums once available.

"<u>Aggregate Amounts</u>").  As of September 30, 2019, approximately $319,419.58 of the Aggregate Amounts was outstanding and unpaid on account of services rendered.  The Prepetition Payments were paid by, and the source of such funds were, the Debtor.

3.    The Firm will seek approval of the payment of compensation for its hourly services and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the District of Delaware, and orders of this Court.

4.    The Firm further states that it has neither shared nor agreed to share (a) any compensation it has received or may receive with another party or person, other than with the members, of counsel and associates of the Firm, or (b) any compensation another person or party has received or may receive.

Dated:  October 29, 2019

_____
Michael K. Hurst, Partner

DOCS_NY:39760.1 36027/002

Appellee Appx. 01285

Appx. 04159

008093

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1293
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 176 of 1017 PageID 8923
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1292 of 1803 PageID 12038

Case 19-12239-CSS Doc 70-5 Filed 10/29/19 Page 1 of 4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
|  | ) |  |
| Debtor. | ) |  |

## DECLARATION OF FRANK WATERHOUSE IN SUPPORT OF DEBTOR'S APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

I, Frank Waterhouse, hereby declare under penalty of perjury:

1.     I am the Treasurer of Strand Advisors, Inc., the sole General Partner of Highland Capital Management, L.P., the above-captioned debtor and debtor in possession (the "Debtor").

2.     I submit this declaration (the "Declaration") in support of the *Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* (the "Application").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein.

### The Debtor's Selection of the Firm as Special Texas Litigation Counsel

3.     Lynn Pinker Cox & Hurst LLP (the "Firm" or "LPCH") began representing the Debtor in March 2016.   The Firm has provided legal services related to the bankruptcy proceedings, *In re Acis Capital Management, L.P. and Acis Capital Management GP, LLC*, jointly administered under Case No. 18-30264-SGJ-11 in the United States Bankruptcy Court for the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

Appellee Appx. 01286
Appx. 04151
008094

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1294
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 177 of 1017 PageID 8924
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1293 of 1803 PageID 12039

Case 19-12239-CSS Doc 70-5 Filed 10/29/19 Page 2 of 4

Northern District of Texas, Dallas Division, and various appeals related thereto. Ultimately, the Debtor retained the Firm because of its extensive experience trial litigation in such proceedings and its prepetition representation of the Debtor. Thus, I believe that the Firm is well qualified to represent the Debtor in this Chapter 11 Case as Special Texas Litigation Counsel in an efficient and timely manner.

### Rate Structure

4. In my capacity as Chief Financial Officer of the Debtor and Treasurer of the General Partner of the Debtor, I am involved in supervising outside counsel retained by the Debtor in the ordinary course of business along with other executives of the Debtor. The Firm has informed the Debtor that its rates listed in the Application are comparable to non-bankruptcy representations. As discussed below, I am also responsible for reviewing the invoices regularly submitted by the Firm, and can confirm that the rates the Firm charged the Debtor in the prepetition period are the same as the rates the Firm charged the Debtor in the post-petition period. The Firm has informed the Debtor that the Firm's standard hourly rates are subject to periodic adjustment in accordance with the Firm's practice.

### Cost Supervision

5. The Debtor and the Firm expects to develop a prospective budget and staffing plan, recognizing that in the course of a large chapter 11 case like this Chapter 11 Case, it is possible that there may be a number of unforeseen fees and expenses that will need to be addressed by the Debtor and the Firm. The Debtor recognizes that it is its responsibility to closely monitor the billing practices of its counsel to ensure the fees and expenses paid by the estate remain consistent with the Debtor's expectations and the exigencies of the Chapter 11 Case. The Debtor will

2

Appellee Appx. 01287
Appx. 04152
008095

continue to timely review the invoices that the Firm regularly submits, and periodically amend the budget and staffing plans, as the case develops.

6.     While every chapter 11 case is unique, the budgets will provide guidance on the periods of time involved and the level of the attorneys and professionals that will work on various matters, as well as projections of average hourly rates for the attorneys and professionals for various matters.

*[remainder of page intentionally left blank]*

DOCS_NY:39760.1 36027/002

Appellee Appx. 01288

Appx. 04158

008096

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:    October 29, 2019

/s/ Frank Waterhouse

Frank Waterhouse

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I, James E. O'Neill, hereby certify that on the 29th day of October, 2019, I caused

a copy of the following document(s) to be served on the individual(s) on the attached service

list(s) in the manner indicated:

> **Notice of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, *Nunc Pro Tunc* to the Petition Date**
>
> **Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, *Nunc Pro Tunc* to the Petition Date**
>
> **Statement Under Rule 2016 of the Federal Rules of Bankruptcy Procedure**
>
> **Declaration of Frank Waterhouse in Support of Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, *Nunc Pro Tunc* to the Petition Date**

*/s/ James E. O'Neill*
James E. O'Neill (Bar No. 4042)

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appellee Appx. 01290

Appx. 04155

008098

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1298
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 181 of 1017   PageID 8928
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1297 of 1803   PageID 12043

Case 19-12239-CSS   Doc 70-6   Filed 10/29/19   Page 2 of 7

Highland Capital 2002 Service List FCM
Case No. 19-12239 (CSS)
Document No. 225797
01 – Interoffice Mail
09 – Hand Delivery
51 – First Class Mail

*([Proposed] Counsel for the Debtor and
Debtor in Possession)*
James O'Neill, Esquire
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19899 (Courier 19801)

**INTEROFFICE MAIL**
*([Proposed] Counsel for the Debtor and
Debtor in Possession)*
Richard M. Pachulski, Esquire
Jeffrey N. Pomerantz, Esquire
Ira D. Kharasch, Esquire
Maxim B. Litvak, Esquire
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA  90067

**HAND DELIVERY**
(United States Trustee)
Jane M. Leamy, Esquire
Office of the U.S. Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

**HAND DELIVERY**
(State Attorney General)
Kathy Jennings, Esquire
Delaware Department of Justice
Carvel State Office Building, 6th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
Zillah A. Frampton
Bankruptcy Administrator
Delaware Division of Revenue
Carvel State Office Building, 8th Floor
820 N. French Street
Wilmington, DE  19801

**HAND DELIVERY**
(United States Attorney)
David C. Weiss
c/o Ellen Slights
US Attorney's Office
District of Delaware
Hercules Building, Suite 400
1313 N. Market Street
Wilmington, DE  19801

**HAND DELIVERY**
(Top 20 Unsecured Creditor)
Ryan P. Newell, Esquire
Connolly Gallagher LLP
1201 N. Market Street, 20th Floor
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Sean M. Beach, Esquire
Jaclyn C. Weissgerber, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street, Rodney Square
Wilmington, DE  19801

**HAND DELIVERY**
(Counsel to the Redeemer Committee of the
Highland Crusader Fund)
Curtis S. Miller, Esquire
Morris, Nichols, Arsht & tunnel LLP
Kevin M. Coen, Esquire
1201 North Market Street, Suite 1600
Wilmington, DE 19801

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1299
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 182 of 1017 PageID 8929
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1298 of 1803 PageID 12044

Case 19-12239-CSS Doc 70-6 Filed 10/29/19 Page 3 of 7

**HAND DELIVERY**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
John E. Lucian, Esquire
Josef W. Mintz, Esquire
Blank Rome LLP
1201 N Market Street, Suite 800
Wilmington, DE 19801

**HAND DELIVERY**
(Counsel to Patrick Daugherty)
Michael L. Vild, Esquire
Cross & Simon, LLC
1105 N. Market Street, Suite 901
Wilmington, DE 19801

**FIRST CLASS MAIL**
(Counsel to Acis Capital Management GP
LLC and Acis Capital Management, L.P.)
Rakhee V. Patel, Esquire
Phillip Lamberson, Esquire
Winstead PC
2728 N. Harwood Street, Suite 500
Dallas, TX 75201

**FIRST CLASS MAIL**
(United States Attorney General)
William Barr, Esquire
Office of the US Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW,
Room 4400
Washington, DC 20530-0001

**FIRST CLASS MAIL**
State of Delaware
Division of Corporations - Franchise Tax
PO Box 898
Dover, DE 19903

**FIRST CLASS MAIL**
Delaware Secretary of Treasury
820 Silver Lake Blvd, Suite 100
Dover, DE 19904

**FIRST CLASS MAIL**
Office of General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

**FIRST CLASS MAIL**
Office of General Counsel
Securities & Exchange Commission
100 F Street, NE
Washington, DC 20554

**FIRST CLASS MAIL**
Sharon Binger, Regional Director
Philadelphia Regional Office
Securities & Exchange Commission
One Penn Center, Suite 520
1617 JFK Boulevard
Philadelphia, PA 19103

**FIRST CLASS MAIL**
Andrew Calamari, Regional Director
New York Regional Office
Securities & Exchange Commission
Brookfield Place, Suite 400
200 Vesey Street
New York, NY 10281

**FIRST CLASS MAIL**
Office of the General Counsel
Michael I. Baird, Esquire
Pension Benefit Guaranty Corporation
1200 K Street, NW
Washington, DC 20005-4026

**FIRST CLASS MAIL**
Internal Revenue Service
Centralized Insolvency Operation
PO Box 7346
Philadelphia, PA 19101

**Appellee Appx. 01292**

**Appx. 04157**

008100

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1300
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 183 of 1017 PageID 8930
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1299 of 1803 PageID 12045

Case 19-12239-CSS Doc 70-6 Filed 10/29/19 Page 4 of 7

**FIRST CLASS MAIL**
BBVA
Michael Doran
8080 N. Central Expressway
Suite 1500
Dallas, TX 75206

**FIRST CLASS MAIL**
NexBank
John Danilowicz
2515 McKinney Avenue
Suite 1100
Dallas, TX 75201

**FIRST CLASS MAIL**
KeyBank National Association
as Administrative Agent
225 Franklin Street, 18th Floor
Boston, MA 02110

**FIRST CLASS MAIL**
KeyBank National Association
as Agent
127 Public Square
Cleveland, OH 44114

**FIRST CLASS MAIL**
Prime Brokerage Services
Jefferies LLC
520 Madison Avenue
New York, NY 10022

**FIRST CLASS MAIL**
Office of the General Counsel
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Director of Compliance
Re: Prime Brokerage Services
Jefferies LLC
520 Madison Avenue, 16th Floor
New York, NY 10022

**FIRST CLASS MAIL**
Frontier State Bank
Attn: Steve Elliot
5100 South I-35 Service Road
Oklahoma City, OK 73129

**FIRST CLASS MAIL**
Strand Advisors, Inc.
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Dugaboy Investment Trust
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Mark K. Okada
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #1
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
The Mark and Pamela Okada Family
Trust – Exempt Trust #2
300 Crescent Court
Suite 700
Dallas, TX 75201

**FIRST CLASS MAIL**
Hunter Mountain Investment Trust
c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

Appellee Appx. 01293
Appx. 04158
008101

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Acis Capital Management, L.P.
 and Acis Capital Management GP, LLC
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
American Arbitration Association
Elizabeth Robertson, Esquire
120 Broadway, 21st Floor,
New York, NY 10271

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Andrews Kurth LLP
Scott A. Brister, Esquire
111 Congress Avenue, Ste 1700
Austin, TX 78701

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Bates White, LLC
Karen Goldberg, Esquire
2001 K Street NW
North Bldg Suite 500
Washington, DC 20006

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
CLO Holdco, Ltd.
Grant Scott, Esquire
Myers Bigel Sibley & Sajovec, P.A.
4140 Park Lake Ave, Ste 600
Raleigh, NC 27612

**FIRST CLASS MAIL**
Cole, Schotz, Meisel, Forman & Leonard,
P.A.
Michael D. Warner, Esquire
301 Commerce Street, Suite 1700
Fort Worth, TX 76102

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Debevoise & Plimpton LLP
Michael Harrell, Esquire
c/o Accounting Dept 28th Floor
919 Third Avenue
New York, NY 10022

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
DLA Piper LLP (US)
Marc D. Katz, Esquire
1900 N Pearl St, Suite 2200
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Duff & Phelps, LLC
c/o David Landman
Benesch, Friedlander, Coplan & Aronoff
LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Foley Gardere
Holly O'Neil, Esquire
Foley & Lardner LLP
2021 McKinney Avenue Suite 1600
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Joshua & Jennifer Terry
c/o Brian P. Shaw, Esquire
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, TX 75201

Appellee Appx. 01294
Appx. 04159
008102

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1302
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 185 of 1017 PageID 8932
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1301 of 1803 PageID 12047

Case 19-12239-CSS Doc 70-6 Filed 10/29/19 Page 6 of 7

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Lackey Hershman LLP
Paul Lackey, Esquire
Stinson LLP
3102 Oak Lawn Avenue, Ste 777
Dallas, TX 75219

**FIRST CLASS MAIL**
Lynn Pinker Cox & Hurst, L.L.P.
Michael K. Hurst, Esquire
2100 Ross Avenue, Ste 2700
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
McKool Smith, P.C.
(Top 20 Unsecured Creditor)
Gary Cruciani, Esquire
300 Crescent Court, Suite 1500
Dallas, TX 75201

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Meta-e Discovery LLC
Paul McVoy
Six Landmark Square, 4th Floor
Stamford, CT 6901

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
NWCC, LLC
c/o of Michael A. Battle, Esquire
Barnes & Thornburg, LLP
1717 Pennsylvania Ave N.W. Ste 500
Washington, DC 20006-4623

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Patrick Daugherty
c/o Thomas A. Uebler, Esquire
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Rd #401
Wilmington, DE 19808

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Redeemer Committee of the Highland
Crusader Fund
c/o Terri Mascherin, Esquire
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Reid Collins & Tsai LLP
William T. Reid, Esquire
810 Seventh Avenue, Ste 410
New York, NY 10019

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
UBS AG, London Branch and UBS
Securities LLC
c/o Andrew Clubock, Esquire
Latham & Watkins LLP
555 Eleventh Street  NW Suite 1000
Washington, DC 20004-130

**FIRST CLASS MAIL**
(Top 20 Unsecured Creditor)
Scott E. Gant, Esquire
Boies, Schiller & Flexner LLP
1401 New York Avenue, NW
Washington, DC  20005

**FIRST CLASS MAIL**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Marshall R. King, Esquire
Michael A. Rosenthal, Esquire
Alan Moskowitz, Esquire
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10066

Appellee Appx. 01295
Appx. 04109
008103

**FIRST CLASS MAIL**
(Counsel to California Public Employees'
Retirement System ("CalPERS")
Louis J. Cisz, III, Esquire
Nixon Peabody LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA 94111

**FIRST CLASS MAIL**
(Counsel to Alvarez & Marsal CRF
Management, LLC)
Matthew G. Bouslog, Esquire
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612

**FIRST CLASS MAIL**
(Counsel to Redeemer Committee of the
Highland Crusader Fund)
Marc B. Hankin, Esquire
Richard Levin, Esquire
Jenner & Block LLP
919 Third Avenue
New York, New York 10022-3908

**FIRST CLASS MAIL**
(Counsel to Coleman County TAD, et al.)
Elizabeth Weller, Esquire
Linebarger Goggan Blair & Sampson, LLP
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207

**FIRST CLASS MAIL**
(Counsel to Jefferies)
Lee S. Attanasio, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

Appellee Appx. 01296

Appx. 04164

008104

# APPENDIX 15

**Appellee Appx. 01297**

**Appx. 04192**
008105

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1305
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 188 of 1017 PageID 8935
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1304 of 1803 PageID 12050
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 1 of 9

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Case No. 19-12239 (CSS) |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| LP,[1] | § | |
| | § | **Re: Docket Nos. 69, 70** |
| Debtor. | § | |

**Objection Deadline: November 12, 2019 at 4:00 p.m. (Eastern time)**
**Hearing Date: November 19, 2019 at 12:00 p.m. (Eastern time)**

### LIMITED OBJECTION TO THE DEBTOR'S: (I) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AS SPECIAL TEXAS COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE; AND (II) APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF LYNN PINKER COX & HURST LLP AS SPECIAL TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE

Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC (collectively "Acis"), creditors and parties-in-interest, object on a limited basis to the Debtor's: (i) *Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 69] (the "Foley Application"); and (ii) *Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date* [Docket No. 70] (the "Lynn Pinker Application" and together with the Foley Application, the "Applications").

### Statement of Facts

1. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1

2. On October 29, 2019, the Debtor filed the Foley Application, seeking to employ the law firm of Foley Gardere, Foley & Lardner LLP ("Foley") as special Texas litigation counsel pursuant to 11 U.S.C. §327(e).

3. Also on October 29, 2019, the Debtor filed the Lynn Pinker Application, seeking to employ the law firm of Lynn Pinker Cox & Hurst LLP ("Lynn Pinker") as special Texas litigation counsel pursuant to 11 U.S.C. § 327(e).

4. Foley and Lynn Pinker are both being hired to represent the Debtor in connection with Acis' post-confirmation bankruptcy case (the "Acis Bankruptcy Case"),[2] two appeals from the Acis Bankruptcy Case (both initiated by the Debtor as an appellant)[3] and an adversary proceeding pending in the Acis Bankruptcy Case.[4]

<u>Objection</u>

**A. <u>The Applications Lack Important Disclosures.</u>**

5. The Applications disclose that Foley and Lynn Pinker represent and have performed work in the Acis Bankruptcy Case for clients related to the Debtor – clients they identify as Neutra and the Cayman Defendants. The Foley Application also admits that, before the Petition Date, Foley billed the Debtor for work performed for Neutra and the Cayman Defendants.[5] There is no disclosure from Lynn Pinker on this point, but presumably its payment arrangements were similar because Lynn Pinker represents many, if not all, of the same clients as

---

[2] Jointly administered Case Nos. 18-30264 and 18-30265 in the United States Bankruptcy Court for the Northern District of Texas.

[3] *Highland Cap. Mgmt, L.P. v. Phelan*, Case No. 19-10847 in the United States Court of Appeals for the Fifth Circuit; *Highland Cap. Mgmt, L.P. v. Winstead PC*, Case No. 3:19-cv-01477-D in the United States District Court for the Northern District of Texas

[4] Adversary No. 18-03078 in the United States Bankruptcy Court for the Northern District of Texas.

[5] See ¶ 3 of Declaration of Holland O'Neil attached as Exhibit A to the Foley Application [Docket No. 69-2] ("The Firm billed Highland for all services as to the related other parties since there was significant overlap among legal issues for Highland, Neutra and the Cayman Defendants.").

2

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1307
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 190 of 1017    PageID 8937
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1306 of 1803   PageID 12052
Case 19-12239-CSS    Doc 116    Filed 11/12/19    Page 3 of 9

Foley in the Acis Bankruptcy Case.  While the Applications disclose the amounts paid by the Debtor to each of Foley and Lynn Pinker during the year prior to the Petition Date, the Applications do not disclose the proportionate amounts billed to and paid by the Debtor for work performed for Neutra and the Cayman Defendants.  Acis reserves its rights to compel disclosure of this information including under Fed. R. Bankr. P. 2017(a).[6]

6.     This structure creates significant fraudulent transfer concerns and highlights the multifarious nature of the Debtor's operations including its pervasive use of offshore shadow companies controlled by James Dondero.   As both District Judge Sidney Fitzwater and Bankruptcy Judge Stacey Jernigan found in published opinions arising from the Acis Bankruptcy Case, Neutra and the Cayman Defendants are actually offshore companies that were created around the time Joshua Terry obtained a judgment against Acis in order receive transfers of Acis' assets and Acis' equity.  *Neutra, Ltd. v. Terry (In re Acis Cap. Mgmt. L.P.)*, 604 B.R. 484, 501-02 (N.D. Tex. 2019); *In re Acis Cap. Mgmt. L.P.*, 584 B.R. 115, 127-31 (Bankr. N.D. Tex. 2018).  Even more, the business justification proffered by the Debtor for these transfers from Acis was found to be "a seemingly manufactured narrative to justify prior actions" and that "the evidence established overwhelmingly that there is a substantial likelihood that the transfers were part of an intentional scheme to keep assets away from [Terry]."  *Neutra,* 604 B.R. at 502 *(*citing *In re Acis Cap. Mgmt. L.P.*, 2019 Bankr. Lexis 292 (Bankr. N.D. Tex. January 31, 2019)).  It was clear to everyone in the Acis Bankruptcy Case that Neutra and the Cayman Defendants were simply fronts for Dondero's machinations.

---

[6]  Fed. R. Bankr. P. 2017(a) provides:  "Payment or Transfer to Attorney Before Order for Relief.  On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive."

Appellee Appx. 01300
Appx. 04185
008108

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1308
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 191 of 1017 PageID 8938
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1307 of 1803 PageID 12053
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 4 of 9

7. The Debtor's Schedules and Statement of Financial Affairs will not be filed by the time parties must object to the Foley Application and Lynn Pinker Application, or by the time the Court will hold a hearing on the Applications.[7] Thus, the scope of these payments and liabilities (or other connections) will not be disclosed until well after the engagement of Foley and Lynn Pinker.

8. The Applications also do not disclose whether the Debtor intends to continue to be billed and pay Foley and Lynn Pinker for work performed for Neutra and the Cayman Defendants once Foley and Lynn Pinker are engaged by the Debtor pursuant to the Applications. If this is the Debtor's intent, it should be specifically disclosed and approval of such employment should be requested in accordance with the Bankruptcy Code and the applicable rules. For example, Bankruptcy Rule 2017(b) specifically requires disclosure of payments made by a debtor to *any attorney* for services *in any way related to the case.* Fed. R. Bankr. P. 2017(b).[8] In any event, if the Debtor does intend to pay Neutra and the Cayman Defendants' legal expenses, Acis would oppose this relief. The fact that Neutra and the Cayman Defendants are sham entities created only to receive fraudulent transfers and, thus, have no substance does not change, and in fact compels, this result.[9]

---

[7] The Debtor has requested an additional 30-day extension of time to file its Schedules and Statement of Financial Affairs [Docket No. 4]. If granted, this would make such disclosures due December 13, 2019.

[8] For example, Fed R. Bankr. P. 2017(b) provides: "Payment or Transfer to Attorney After Order for Relief. On motion by the debtor, the United States trustee, or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the case."

[9] To be clear, Neutra and the Cayman Defendants' are entitled to hire counsel to represent them and Dondero or some other non-debtor entity that he controls are certainly welcome to pay the litigation costs. But this is not a cost the Debtor should bear.

4

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1309
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 192 of 1017 PageID 8939
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1308 of 1803 PageID 12054
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 5 of 9

9.     Further, the Foley engagement letter[10] discloses a conflict with Foley's representation of HRA Holdings, LLC that required the consent of the parties in order for Foley to proceed with its initial representation of the Debtor.  This conflict, or potential conflict, is not disclosed or discussed anywhere in the Foley Application or the various disclosure affidavits that accompany it.  Thus, the nature of the conflict is unclear, and it is unknown how it might limit Foley's representation of the Debtor.

10.     The Debtor did not attach Lynn Pinker's engagement letter to the Lynn Pinker Application, so this Court and the creditors in this case do not know the full terms of the Lynn Pinker engagement.  However, Acis is aware of various connections between Lynn Pinker and the Debtor and its related parties that are not disclosed or are only partially disclosed in the Lynn Pinker Application.  For example, Lynn Pinker hired the Debtor's General Counsel, Scott Ellington, as an expert witness in a case tried in Dallas just last year.[11]  It is unclear if this is a regular occurrence or what compensation Mr. Ellington receives for providing these services to Lynn Pinker and its clients.

11.     Further, in a footnote the Lynn Pinker Application discloses that it represents the Charitable Donor Advised Fund, L.P. (the "DAF") in "unrelated" litigation.  However, this is only the tip of the iceberg in describing this allegedly "unrelated" litigation.

12.     On August 6, 2019, Lynn Pinker, at that time representing NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund and Highland Income Fund (collectively, the "Highland Retail Funds"),[12] sent nearly identical letters to Moody's Investor Services and

---

[10] Attached as Exhibit B to the Foley Application [Docket No. 69-3].

[11] See attached **Exhibit A** found at https://www.pettitfirm.com/legacytexas.  Highlighting has been added to some exhibits.

[12] The Highland Retail Funds are affiliates of, or are managed by affiliates of, the Debtor and Dondero.  *See* attached **Exhibits B, C** and **D** found at https://www.highlandcapital.com/nexpoint-strategic-opportunities-fund-announces-the-regular-monthly-dividend-2/ (NexPoint Strategic Opportunities Fund); https://www.highlandfunds.com/global-

Appellee Appx. 01302
Appx. 04105
008110

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1310
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 193 of 1017 PageID 8940
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1309 of 1803 PageID 12055
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 6 of 9

S&P Global.[13] In essence, these letters request a ratings downgrade or withdrawal on certain Acis CLO securities which the Highland Retail Funds purport to own. Obviously, it is highly unusual for an investor to request a ratings downgrade for its own investment. Curiously, when Lynn Pinker filed the litigation it threatened in these letters, Lynn Pinker no longer represented the Highland Retail Funds, but now represented the DAF.[14]

13. In its current form, the DAF litigation seeks: (i) damages from US Bank, as indenture trustee for various Acis CLOs, for failing to take what the DAF believes was appropriate action in the Acis Bankruptcy Case and otherwise failing to perform its obligations as indenture trustee; and (ii) damages from Moody's for refusing to downgrade the Acis CLO securities or withdraw the ratings altogether as demanded in Lynn Pinker's letters.[15] A downgrade or ratings withdrawal in the Acis CLO securities or the resignation of US Bank as indenture trustee may precipitate liquidation of the Acis CLOs, which would violate the plan injunction entered as part of Acis's bankruptcy plan since it was clearly procured by the Debtor and its affiliates (and their proposed counsel).[16] None of this tangled web is disclosed in the Lynn Pinker Application, rather it is simply written off in a footnote as "unrelated."

---

allocation-fund/ (Highland Global Allocation Fund); https://www.highlandfunds.com/income-fund/ (Highland Income Fund).

[13] Copies of these letters are attached hereto as **Exhibits E** and **F**. Other letters were later sent to Moody's and S&P, but Acis does not have copies of these later letters.

[14] The Highland Retail Funds are publicly traded closed end funds. Further, one of the Highland Retail Funds, Highland Global Allocation Fund, and its advisors are already being sued by an investor for self-dealing and conflicts of interest with other funds affiliated with the Debtor. *See Lanotte v. Highland Capital Mgt. Fund Adv., L.P., et al.*, Case No. 18-cv-02360, in the United States District Court for the Northern District of Texas. Thus, the Highland Retail Funds may have realized that publicly acknowledging that they inexplicably requested a ratings downgrade or withdrawal for their own investment is not a helpful fact in this or future litigation, and Dondero and Lynn Pinker then simply donned another hat to file the lawsuit.

[15] Amended Complaint attached hereto as **Exhibit G**.

[16] *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 292 * 30-32 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation opinion from Acis Bankruptcy Case); *In re Acis Cap. Mgmt., L.P.*, 2019 Bankr. LEXIS 294 * 59-62 (Bankr. N.D. Tex., Jan. 31, 2019) (confirmation order and confirmed plan from Acis Bankruptcy Case). Acis reserves all rights in this regard and obviously has been monitoring the situation.

Appellee Appx. 01303
Appx. 04468
008111

**B. Acis Reserves the Right to Seek Disqualification and Disgorgement of Foley and Lynn Pinker Based on Conflict Of Interest Allegations the Debtor Made and is Appealing in the Acis Bankruptcy Case.**

14. In the Acis Bankruptcy Case, the Debtor has alleged an actual conflict of interest prohibiting employment of special counsel for Acis' Chapter 11 trustee (Winstead) and requiring disgorgement of all fees paid to counsel. The Debtor's objection to counsel's employment and payment has been rejected and overruled multiple times. The issue is currently being appealed in the Northern District of Texas, and this is one of the matters for which Foley and Lynn Pinker are to be engaged.

15. The alleged conflict is based on Winstead's engagement as special counsel by the Chapter 11 trustee for Acis (then a debtor in the Acis Bankruptcy Case) when Winstead represented a creditor of Acis (Josh Terry) and Winstead was retained to be adverse to another creditor of Acis (the Debtor).[17] Per the Debtor's argument, engagement as counsel to be adverse to a creditor while concurrently representing a different creditor creates a *per se* actual conflict of interest under 11 U.S.C. § 327(c).[18] Indisputably, Foley represents CLO Holdco, Ltd., which is one of the Debtor's largest creditors.[19] And in fact, Foley is *itself* one of the Debtor's ten largest creditors, and Lynn Pinker is likewise a significant creditor of the Debtor.[20] Foley and Lynn Pinker will also be engaged as special counsel to litigate with (and be adverse to) Acis and Mr.

---

[17] *See* ¶ 24 and 25 of Objection of Highland Capital Management, L.P. to Supplemental Application Regarding the Scope of Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee filed in the Acis Bankruptcy Case and attached hereto as **Exhibit H**.

[18] Although neither the Foley Application nor the Lynn Pinker Application reference § 327(c), that section is clearly applicable to their retention. As outlined below, the Foley and Lynn Pinker attorneys that will be engaged by the Debtor are employed by creditors of the Debtor and represent at least one known creditor of the Debtor.

[19] *See* Notice of Appearance filed by Foley in the Acis Bankruptcy Case and attached hereto as **Exhibit I**; *see also* Foley engagement letter attached as Exhibit B to the Foley Application [Docket No. 69-3].

[20] *See* Docket No. 1 disclosing that Foley is owed $1,398,432.44 by the Debtor. Although it is not listed on the top 20 creditor list, according to its Rule 2016 statement Lynn Pinker is owed $319,419.58 by the Debtor. *See* Docket No. 70-4.

Appellee Appx. 01304

Appx. 04109

008112

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1312
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 195 of 1017 PageID 8942
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1311 of 1803 PageID 12057
Case 19-12239-CSS Doc 116 Filed 11/12/19 Page 8 of 9

Terry, also creditors of the Debtor. Thus, Foley and Lynn Pinker now have the exact "conflict" that they alleged disqualified Winstead and required disgorgement from Winstead in the Acis Bankruptcy Case.

16.    All rights are reserved to raise this as an issue for disqualification and disgorgement of fees by Foley and Lynn Pinker if the Debtor prevails on its argument on appeal.[21]

*[Remainder of page intentionally left blank]*

---

[21] To be clear, Acis believes this argument and related appeal are frivolous, and all rights are reserved to seek sanctions against the Debtor, Foley and Lynn Pinker in the appropriate forum.

Appellee Appx. 01305

008113

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1313
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25    Page 196 of 1017    PageID 8943
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1312 of 1803   PageID 12058
Case 19-12239-CSS   Doc 116   Filed 11/12/19   Page 9 of 9

WHEREFORE, Acis respectfully (i) requests Foley and Lynn Pinker provide full and complete disclosure of all connections with the Debtor as required under the Bankruptcy Code, Bankruptcy Rules and Local Rules in order to assess their employment Applications; (ii) objects to the employment of Foley and Lynn Pinker to the extent that the Debtor intends to be responsible for fees and expenses incurred by other Foley and Lynn Pinker clients, including the Cayman Defendants and Neutra; (iii) reserves all rights to seek disqualification and disgorgement of fees from Foley and Lynn Pinker based on conflicts of interest that may become apparent as this case moves forward; and (iv) requests such other further relief as is just and proper.

**BLANK ROME LLP**

Dated: November 12, 2019
Wilmington, Delaware

*/s/ Josef W. Mintz*
John E. Lucian (*pro hac vice*)
Josef W. Mintz (DE No. 5644)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464
Email:      lucian@blankrome.com
            mintz@blankrome.com

**WINSTEAD PC**
Rakhee V. Patel (*pro hac vice*)
Phillip Lamberson (*pro hac vice*)
Annmarie Chiarello (pro hac pending)
2728 N. Harwood Street, Suite 500
Dallas, Texas 75201
Telephone: (713) 650-8400
Facsimile: (713) 650-2400
Email:      rpatel@winstead.com
            plamberson@winstead.com
            achiarello@winstead.com

*Attorneys for Acis Capital Management GP
LLC and Acis Capital Management, L.P.*

9

**Exhibit A**

Press Release re: Scott Eillington





## The Pettit Law Firm and Lynn Pinker Cox Hurst Secure a $4.2 Million Fraud and Breach of Fiduciary Duty Judgment Against LegacyTexas Bank

### December 28, 2018

The judgment was signed on December 28, 2018 following a 2-week trial earlier this fall before Judge Dale Tillery in the 134th District Court in Dallas County, Texas.

Co-lead counsel Julie Pettit and Michael K. Hurst represent Plaintiff Robert Imel, an oil and gas entrepreneur in a suit against LegacyTexas bank for fraud, breach of fiduciary duty, declaratory judgment, conspiracy, and breach of contract.

LegacyTexas Bank, through its head of energy finance, Chris Parada, represented to Imel that it would release Imel from a personal guaranty related to his oil and gas company's financing agreement if certain oil and gas assets were sold and a loan by LegacyTexas was paid off by a time certain. LegacyTexas then acted as a broker and persuaded Imel to negotiate the sale of the assets to Energy Reserves Group, LLC ("ERG"). Meanwhile, LegacyTexas Bank and ERG secretly negotiated a sale of the note and Imel's personal guaranty to ERG so that ERG could pursue Imel under the guaranty and force Imel to surrender the assets as well as valuable non-collateral oil and gas assets.

The Court found Legacy liable for its tortious conduct for $3.6 million in actual damages and over $636,000 in attorneys' fees. The Court also found ERG liable in the amount of $159,000 in attorneys' fees.

"We are pleased with the decision," said Julie Pettit, co-lead counsel for Imel. "The judgment affirms our position regarding LegacyTexas' misrepresentations and fraudulent conduct toward its own borrower."

"This important judgment underscores that in business, no one has a license to hide the truth, steal and double deal– especially from those who they are entrusted to protect," said Michael K. Hurst, co-lead counsel for Imel.

Along with Pettit and Hurst, the trial team included David Urteago and Jane Cherry of The Pettit Law Firm.

Trial Days: 10

Settlement Negotiations: Nothing meaningful

Expert for Imel: Scott Ellington, Chief Legal Officer, General Counsel and Secretary, Highland Capital Management L.P.

The case is Robert A. Imel v. LegacyTexas Bank and Energy Reserves Group, case number DC-16-01372, in the 134th District Court in Dallas County, Texas. LegacyTexas was represented by John Leininger, Steve Shapiro, and Alexis Reller of Shapiro Bieging Barber Otteson LLP. ERG was represented by Marty Brimmage, Molly Whitman, and Keertan Chauhan of Akin Gump Strauss Hauer & Feld LLP.

A copy of the judgment can be found here.

Appellee Appx. 01308

Appx. 04173

008116

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1316
of 1804
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 199 of 1017    PageID 8946
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1315 of 1803    PageID 12061

Victory Against Legacy Texas-Pettit Law Firm    Case 19-12239-CSS    Doc 116-1    Filed 11/12/19    Page 3 of 3    Page 2 of 4



THE PETTIT LAW FIRM

HOME    FIRM    SERVICES    NEWS    TESTIMONIALS    CONTACT US

## CONTACT US

The Pettit Law Firm
2101 Cedar Springs Rd, Suite 1540
Dallas, TX 75201
Phone: 214.329.0151
Fax: 214.329.4076

Name *

Email *

Subject

Message

Send

© 2019 by The Pettit Law Firm.

The principal offices of Pettit Rice PC dba The Pettit Law Firm are located in Dallas, Texas. Attorney responsible for the content of
this homepage: Julie Pettit. Pettit Rice PC Phone: 214.329.0151 All Rights Reserved. Member of the Texas State Bar.

Appellee Appx. 01309
Appx. 04174
008117

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1317
Case 3:25-cv-02072-S     Document 15-11    Filed 06/06/25   Page 200 of 1017    PageID 8947
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1316 of 1803   PageID 12062

**Exhibit B**

NexPoint Strategic Opportunities Fund



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES ∨    LOG IN

# NexPoint Strategic Opportunities Fund Announces the Regular Monthly Dividend

July 3, 2018    Nexpoint Advisors, Nexpoint Funds, Sites

DALLAS, July 2, 2018 /PRNewswire/ — NexPoint Strategic Opportunities Fund (NYSE: NHF) ("NHF" or the "Fund") today announced its regular monthly dividend on its common stock of **$.20** per share. The dividend will be payable on July 31, 2018 to shareholders of record at the close of business July 23, 2018.

The Fund is a closed-end fund managed by NexPoint Advisors, L.P. (the "Manager"), an affiliated adviser of Highland Capital Management, L.P. The Fund invests primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Manager attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund indices in a transparent, registered fund format consistent with monthly dividends.

| Total Returns as of 06/30/18 | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 13.63% | 4.71% | 15.21% | 7.07% | 5.17% |
| NexPoint Strategic Opportunities Fund (Market Price) | 16.06% | 4.60% | 14.76% | 6.72% | 3.80% |

Appellee Appx. 01311

Appx 04176

008119

🐦 f  Total Returns as of 03/31/18    1-year HLAND 3-year    15-year FUNDS 10-  AFFILIAT Since  LOG IN

# HIGHLAND CAPITAL
## MANAGEMENT
### EXPERIENCED. DISCIPLINED. BOLD.

| | 1-year | 3-year | 5-year | 10-year | Since Inception (6/29/06) |
|---|---|---|---|---|---|
| NexPoint Strategic Opportunities Fund (NAV) | 17.20% | 3.65% | 16.21% | 7.19% | 5.13% |
| NexPoint Strategic Opportunities Fund (Market Price) | 14.95% | 3.97% | 15.30% | 7.16% | 3.72% |

Total operating expenses as of the most recent fund annual report are 2.21%. Performance data represents past performance, which does not guarantee future results. Current performance may be higher or lower than the figures shown. Investment return and principal value will fluctuate with market conditions, and you may have a gain or loss when you sell your shares. For most recent month-end performance please visit www.nexpointadvisors.com or call 866-351-4440.

**Investors should consider the investment objectives, risks, charges and expenses of the NexPoint Strategic Opportunities Fund carefully before investing. This and other information can be found in the Fund's prospectus, which may be obtained by calling 1-866-351-4440 or visiting www.nexpointadvisors.com. Please read the prospectus carefully before you invest.**

**Interest Rate Risk.** Interest rate risk is the risk that debt securities, and the Fund's net assets, may decline in value because of changes in interest rates. Generally, fixed rate debt securities will decrease in value when interest rates rise and increase in value when interest rates decline.

**Leverage Risk.** The Fund uses leverage through borrowings from notes and a credit facility, and may also use leverage through the issuances of preferred shares. The use of leverage magnifies both the favorable and unfavorable effects of price movements in the investments made by the Fund. Insofar as the Fund employs leverage in its investment operations, the Fund will be subject to substantial risks of loss.

**Appellee Appx. 01312**

**Appx. 04175**

**008120**

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed primarily for long-term investors and not as a trading vehicle.  No assurance can be given that a shareholder will be able to sell his or her shares on the NYSE when he or she chooses to do so, and no ...ch any such sale may be effected.

...st invest at least 25% of the value of its total assets at the time of purchase in securities of issuers conducting their principal business activities in the real estate industry.  The Fund may be subject to greater market fluctuations than a fund that does not concentrate its investments in a particular industry.  Financial, economic, business, and other developments affecting issuers in the real estate industry will have a greater effect on the Fund, and if securities of the real estate industry fall out of favor, the Fund could underperform, or its NAV may be more volatile than, funds that have greater industry diversification.

**Credit Risk.** Investments rated below investment grade are commonly referred to as high-yield, high risk or "junk debt." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and/ or interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the asset experiencing non-payment and a potential decrease in NAV of the Fund.

**Illiquidity of Investments Risk.** The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

**About NexPoint Strategic Opportunities Fund**

NexPoint Strategic Opportunities Fund (formerly known as NexPoint Credit Strategies Fund) is a closed-end fund managed by NexPoint Advisors, L.P. The Fund's investment objectives are to provide both current income and capital appreciation. The Fund is invested primarily in below investment grade debt, equity securities and real estate and has the ability to hedge risk. The Fund's investment adviser attempts to deliver consistent returns in excess of the Dow Jones Credit Suisse Hedge Fund and the HFRX Global Hedge Fund indices in a transparent, registered fund format consistent with monthly dividends. No assurance can be given that the Fund will achieve its investment objectives.

Shares of closed-end investment companies frequently trade at a discount to net asset value. The price of the Fund's shares is determined by a number of factors, several of which are

Appellee Appx. 01313

008121

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1321
of 1804
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 204 of 1017   PageID 8951
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1320 of 1803   PageID 12066

NexPoint Strategic Case 19-12239-CSS Anuc Doc 116-2 R Filed 11/12/19 Di Page 5 of 5nl... Page 4 of 6

beyond the control of the Fund. Therefore, the Fund cannot predict whether its shares will trade at, below or above net asset value. Past performance does not guarantee future results.

HIGHLAND CAPITAL   HIGHLAND FUNDS   AFFILIATES ⌄   LOG IN



+1 (972) 419-2555

Recent Posts

Adviser on Highland Capital Management Investment Platform Plans Reorganization, Initiates Voluntary Bankruptcy Proceedings October 16, 2019

CNBC | FA 100: CNBC ranks the top-rated financial advisory firms of 2019 October 10, 2019

Mark Okada to Retire from Highland Capital Management September 30, 2019

NexPoint Selects IHG® as Operator for New InterContinental® Hotel at Cityplace Tower August 14, 2019

Appellee Appx. 01314
Appx. 04179
008122

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1322
Case 3:25-cv-02072-S     Document 15-11   Filed 06/06/25     Page 205 of 1017     PageID 8952
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1321 of 1803   PageID 12067

**<u>Exhibit C</u>**

Highland Global Allocation Fund

Appellee Appx. 01315

Appx. 04189

008123



HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
## M A N A G E M E N T

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

> > > >

# Global Allocation Fund

### PORTFOLIO MANAGER



JAMES DONDERO, CFA
Co-Founder,
President

BIO >

### FACTS

## Fund Overview

Appellee Appx. 01316

Appx. 04184

008124

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1324
of 1804
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 207 of 1017 PageID 8954
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1323 of 1803 PageID 12069

Global Allocation Case 19-1223 he Css ds Doc 116-3 Filed 11/12/19 Page 3 of 11 Page 2 of 7

### Investment Objective

The Global Allocation Fund, managed by James Dondero, invests primarily in U.S. and foreign equity and debt securities that the portfolio manager considers to be undervalued by the market but have solid growth prospects. Undervalued securities are those securities that are undervalued relative to the market, their peers, their historical valuation or their growth rate.

### Low Correlation to Domestic Equity Markets

The Fund seeks above-average risk-adjusted total returns by investing in U.S. and foreign equities and fixed income securities, along with select alternative investments in the pursuit of long-term capital growth and future income.

- Rigorous top down allocation process
- Collaborative management structure where highly experienced portfolio managers in six disciplines bring their best ideas to the fund
- Global thematic investment style
- Extensive analytical support
- Relative value discipline
- May complement a portfolio of only U.S. securities as well as one of only stocks or fixed income

**Fund NAV** (As of Nov 07, 2019)

| SYMBOL | NAV |
|---|---|
| HGLB | $12.03 |

**Fund AUM** (As of Nov 07, 2019)

| | AUM |
|---|---|
| Total Net Assets | $271.77 M |

VIEW FULL PERFORMANCE

| Symbol | HGLB |
|---|---|

Appellee Appx. 01317
Appx. 04182
008125

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1325
Case 3:25-cv-02072-S Document 15-11 of 1804 Filed 10/06/25 Page 208 of 1017 PageID 8955
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1324 of 1803 PageID 12070

Global Allocation Case 19-12239-CSS Doc 116-3 Filed 11/12/19 Page 4 of 11 Page 3 of 7

| | |
|---|---|
| Inception | 01/05/98 |
| Gross Expense Ratio | 2.67% |
| Net Expense Ratio[1] | 2.67% |

## PERFORMANCE

## LITERATURE

## INSIGHTS

The performance data quoted here represents past performance and is no guarantee of future results. Investment returns and principal value will fluctuate so that an investor's shares when redeemed may be worth more or less than their original cost. Current performance may be lower or higher than performance data quoted.

Note: Effective April 9, 2013, Highland Core America Equity Fund was renamed Highland Global Allocation Fund. At the same time, Highland Capital Management Fund Advisors, L.P. became the sole Adviser to the Fund and the Fund no longer utilizes a sub-adviser. In addition to these changes, the Fund's investment strategies were revised and the Fund will no longer invest at least 80% of its assets in domestic equity securities. For more information, please view the Fund's prospectus which can be found under the "Literature" tab above or by calling 877-665-1287.

Please consider the investment objectives, risks, charges and expenses of Highland Funds carefully before investing. A prospectus with this and other information about Highland's mutual funds can be found on the Literature tab above. You may also obtain a prospectus for our mutual funds by calling 877-665-1287. Please read the prospectus carefully before investing.

Appellee Appx. 01318
Appx. 04188
008126

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1326
of 1804
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 209 of 1017 PageID 8956
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1325 of 1803 PageID 12071

Global Allocation Case 19-12239-CSS Doc 116-3 Filed 11/12/19 Page 5 of 11 Page 4 of 7

1. Performance results reflect the contractual waivers and/or reimbursements of fund expenses by the Advisor. Absent this limitation, performance results would have been lower. The Advisor has contractually agreed to limit the total annual operating expenses through at least January 31, 2019.

*The maximum sales charge for Class A shares is 5.75%.

**Securities Market Risk.** The value of the securities may go up or down, sometimes rapidly or unpredictably, due to factors affecting particular companies or the securities market generally. A general downturn in the securities market may cause multiple asset classes to decline in value simultaneously, although equity securities generally have greater price volatility than fixed income securities.

**Illiquid and Restricted Securities Risk.** Certain investments made by the Funds are, and others may be, illiquid, and consequently the Funds may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Funds. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale and other factors. Furthermore, the nature of the Funds' investments, especially those in financially distressed companies, may require a long holding period prior to profitability. Restricted securities (i.e., securities acquired in private placement transactions) and illiquid securities may offer higher yields than comparable publicly traded securities. The Funds, however, may not be able to sell these securities when the Investment Adviser considers it desirable to do so or, to the extent they are sold privately, may have to sell them at less than the price of otherwise comparable securities. Restricted securities are subject to limitations on resale which can have an adverse effect on the price obtainable for such securities. Also, if in order to permit resale the securities are registered under the Securities Act at a Fund's expense, the Fund's expenses would be increased. A high percentage of illiquid securities in a Fund creates risk that such a Fund may not be able to redeem its shares without causing significant dilution to remaining shareholders.

**Focused Investment Risk** is the risk that although the Fund is a diversified fund, it may invest in securities of a limited number of issuers in an effort to achieve a potentially greater investment return than a fund that invests in a larger number of issuers. As a result, price movements of a single issuer's securities will have a

Appellee Appx. 01319
Appx. 04184
008127

greater impact on the Fund's net asset value, causing it to fluctuate more than that of a more widely diversified fund.

**MLP Risk** is the risk of investing in MLP units, which involves some risks that differ from an investment in the equity securities of a company. The Fund currently holds and may in the future hold a significant investment in MLP units. Holders of MLP units have limited control and voting rights on matters affecting the partnership. Holders of units issued by an MLP are exposed to a remote possibility of liability for all of the obligations of that MLP in the event that a court determines that the rights of the holders of MLP units to vote to remove or replace the general partner of that MLP, to approve amendments to that MLP's partnership agreement, or to take other action under the partnership agreement of that MLP would constitute "control" of the business of that MLP, or a court or governmental agency determines that the MLP is conducting business in a state without complying with the partnership statute of that state. Holders of MLP units are also exposed to the risk that they will be required to repay amounts to the MLP that are wrongfully distributed to them. Additionally: • A sustained reduced demand for crude oil, natural gas and refined petroleum products could adversely affect MLP revenues and cash flows. • Changes in the regulatory environment could adversely affect the profitability of MLPs. Investments in MLP units also present special tax risks. See "MLP Tax Risk" in the prospectus.

**Value Investing Risk.** The risk of investing in undervalued stocks that may not realize their perceived value for extended periods of time or may never realize their perceived value. Value stocks may respond differently to market and other developments than other types of stocks.

**Foreign Investment Risk.** The risk that investing in foreign (non-U.S.) securities may result in the Fund experiencing more rapid and extreme changes in value than a fund that invests exclusively in securities of U.S. companies, due to smaller markets, differing reporting, accounting and auditing standards, nationalization, expropriation or confiscatory taxation, currency blockages and political changes of diplomatic developments. The cost of investing in many foreign markets are higher than the U.S. and investments may be less liquid.

**Currency Risk.** The risk that the values of foreign investments may be affected by changes in the currency rates or exchange control regulations. If a foreign currency

Appellee Appx. 01320

Appx. 04185

008128

weakens against the U.S. dollar, the value of a foreign investment denominated in that currency would also decline in dollar terms.

**Credit Risk.** The risk that the Fund could lose money if the issuer or guarantor of a fixed income security, or the counterparty of a derivatives contract or repurchase agreement, is unable or unwilling (or is perceived to be unable or unwilling) to make a timely payment of principal and/or interest, or to otherwise honor its obligations.

**Interest Rate Risk.** The risk that fixed income securities will decline in value because of changes in interest rates. A fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

**Derivatives Risk.** The risk that an investment in derivatives may not correlate completely to the performance of underlying securities and may be volatile, and may result in a loss greater than the principal amount invested. Equity derivatives may also be subject to liquidity risk as well as the risk the derivative may be different than what would be produced through the use of another methodology or if it had been priced using market quotations.

**Glossary:** Click for important terms and definitions

Source: State Street Bank and Trust Company

Highland Funds' mutual funds are distributed by Highland Capital Funds Distributor

FUND DOWNLOADS

Fund Fact Sheet

Appellee Appx. 01321

Appx. 04186

008129



Summary Prospectus

Annual Report



 View all Literature & Forms

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement

Privacy - Terms

https://www.highlandfunds.com/global-allocation-fund/                        11/8/2019

Appellee Appx. 01322

Appx. 04187

008130

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1330
of 1804
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 213 of 1017 PageID 8960
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1329 of 1803 PageID 12075
Highland Global Allocation Fund Completes Conversion from Open-End Fund to Closed-End ... Page 1 of 3

# Highland Global Allocation Fund Completes Conversion from Open-End Fund to Closed-End Fund



NEWS PROVIDED BY
**Highland Capital Management Fund Advisors, L.P.** →
Feb 13, 2019, 19:26 ET

DALLAS, Feb. 13, 2019 /PRNewswire/ -- Highland Capital Management Fund Advisors, L.P. (together with its affiliates "Highland") announced today that the Highland Global Allocation Fund, a series of Highland Funds II (the "Fund") successfully converted from an open-end fund to a closed-end fund (the "Conversion"). The Conversion was approved by shareholders during the November 8, 2018 special meeting. The Fund expects to list its shares for trading on the New York Stock Exchange (the "NYSE") on or about February 19, 2019.

As a result of the Conversion, the Fund will effect a reverse stock split of Class A, Class C and Class Y shares of the Fund and will combine such shares into a single class of common shares under the CUSIP 43010T104 with an initial net asset value of $15.00 per share.

Conversion ratios will be available on February 14, 2019.

Appellee Appx. 01323
Appx. 04188
008131

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1331
of 1804
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 214 of 1017 PageID 8961
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1330 of 1803 PageID 12076

Highland Global Allocation Fund Completes Conversion to a Closed-End Fund... Page 2 of 3

Shareholders will not receive fractional shares because of the Conversion, but instead will receive a number of shares, rounded down to a whole number. Shareholders will receive a cash-in-lieu check related to the fractional portion of their shares shortly after the Conversion.

The shares will be listed under the ticker "HGLB" and at an initial listing price of $15.00. Any shareholder seeking to move shares to a brokerage account will need an adviser or broker dealer to transfer the shares through the Depository Trust Company's ("DTC") Profile System. Shares of the Fund are DTC Eligible.

Effective February 14, 2019, American Stock Transfer & Trust Company, LLC ("AST") will serve as the Fund's transfer agent and dividend disbursing agent. All shareholder records have been transferred to AST. Shareholders may obtain more information on the shareholder services to be offered to the converted Fund by calling AST at the Fund's dedicated toll free number 1-800-357-9167.

Additional details regarding the Conversion are available on the Fund's website at www.highlandfunds.com/global-allocation-fund/.

**About Highland Capital Management Fund Advisors, L.P.**

Highland Capital Management Fund Advisors, L.P. is the retail arm of Highland Capital Management, L.P., a multibillion-dollar global alternative investment manager founded in 1993 by Jim Dondero and Mark Okada. A pioneer in the leveraged loan market, the firm has evolved over 25 years, building on its credit expertise and value-based approach to expand into other asset classes. Today, Highland operates a diverse investment platform, serving both institutional and retail investors worldwide. In addition to high yield credit, Highland's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built round

Appellee Appx. 01324
Appx. 04189
008132

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1332
of 1804
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 215 of 1017    PageID 8962
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1331 of 1803    PageID 12077
Highland Global Allocation Fund Completes Conversion to Non-Diversified and Closed-...    Page 3 of 3
Case 19-12239-CSS    Doc 116-3    Filed 10/12/19    Page 1 of 11

specialized teams. Highland is headquartered in Dallas, Texas and maintains offices in New York, Buenos Aires, Rio de Janeiro, Singapore, and Seoul. For more information visit www.highlandfunds.com.

*Before investing, you should carefully consider the Fund's investment objectives, risks, charges and expenses. For a copy of a prospectus or summary prospectus, which contains this and other information, please visit our website at www.high-landfunds.com or call 1-877-665-1287. Please read the fund prospectus carefully before investing.*

### CONTACTS

**Media Relations:**
Lucy Bannon
lbannon@highlandcapital.com
1-972-419-6272

**Fund Transfer Agent:**
American Stock Transfer & Trust Company, LLC
1-800-357-9167

SOURCE Highland Capital Management Fund Advisors, L.P

Related Links

https://www.highlandfunds.com

Appellee Appx. 01325
Appx. 04199
008133

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1333
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 216 of 1017 PageID 8963
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1332 of 1803 PageID 12078

**Exhibit D**

Highland Income Fund

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1334
of 1804
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 217 of 1017 PageID 8964
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1333 of 1803 PageID 12079
Income Fund | Highland Funds Case 19-12239-CSS Doc 116-4 Filed 11/12/19 Page 2 of 9 Page 1 of 8



f   y   ▶   in   ✉

HIGHLAND CAPITAL    HIGHLAND FUNDS    AFFILIATES    FINRA'S BROKERCHECK    LOG IN

# HIGHLAND CAPITAL
## M A N A G E M E N T

🔍

HOME    ABOUT    FUNDS    ETF    RESOURCE LIBRARY    NEWS CENTER

# Income Fund



### JAMES DONDERO, CFA
Co-Founder, President

Bio »



### JON POGLITSCH, CFA
Head of Credit Research

Bio »

Appellee Appx. 01327
Appx. 04192
008135

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1335
of 1804

Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 218 of 1017    PageID 8965

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1334 of 1803    PageID 12080

Income Fund | Highland Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 3 of 9    Page 2 of 8

## Oct. 4, 2019 - Update on the Claymore Holdings LLC v. Credit Suisse AG Case Related to the Highland Income Fund

October 4, 2019 – The Texas Supreme Court released an order today on the case against Credit Suisse, AG, Cayman Islands Branch, and Credit Suisse Securities (USA), LLC ("Credit Suisse"), which granted a hearing of the case. The case was filed in 2013 by Claymore Holdings LLC, the Highland and NexPoint affiliate (together "Highland") that pursued the collective claims on behalf of the Highland Income Fund (formerly, Highland Floating Rate Opportunities Fund) (NYSE:HFRO) ("HFRO") and the NexPoint Strategic Opportunities Fund (NYSE:NHF) ("NHF") (together the "Funds").

Per the order, the Texas Supreme Court will review the case at a hearing scheduled for January 8, 2020. While this prolongs the legal process, it does not affect Highland's conviction in our claims against Credit Suisse or our commitment to recovering damages for investors.

The total aggregate award stands at $393.2 million today; it is comprised of the $287.5 million judgment initially awarded by the trial court and now twice confirmed on appeal, plus $105.7 million in accrued interest. The award will continue to accrue interest in the event that the judgment becomes final.

Any final judgment amount would be reduced by attorney's fees and other litigation-related expenses. The net proceeds would then be allocated to the Funds based on respective damages (approximately 82% to HFRO and 18% to NHF).

We do not know the exact timing of the Texas Supreme Court's decision following the January hearing; however, the decision should be issued by the end of the Court's term in June 2020 at the latest.

We knew this would be a long process but have been committed to recovering damages for our investors since day one.

Appellee Appx. 01328

Appx. 04198

008136

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1336
of 1804
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 219 of 1017 PageID 8966
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1335 of 1803 PageID 12081

Income Fund | Hi Case 19-12239-CSS Doc 116-4 Filed 11/12/19 Page 4 of 9 Page 3 of 8

## FACTS

**Effective May 20, 2019, the Highland Floating Rate Opportunities Fund is named the Highland Income Fund. For more information, please read the press release from March 20, 2019.**

## Fund Overview

### Investment Objective

The investment objective of the closed-end Highland Floating Rate Opportunities Fund is to provide a high level of current income, consistent with the preservation of capital.

### Attractive Alternatives for Income-Oriented Investors

- High income potential in all markets
- Yields that reset when short-term interest rates move, which may mitigate price declines in a rising short-term interest rate environment
- Low correlation to other asset classes
- Access to one of the largest and most experienced senior loan managers
- Most fixed rate securities experience price declines when interest rates rise. Floating Rate Senior loans are different.

They are short-duration, floating-rate securities. So, as interest rates rise, yields on bank loans increase, while their short duration helps keep prices relatively stable.

**Fund NAV** (As of Nov 07, 2019)

| SYMBOL | NAV |
|---|---|
| HFRO | $13.65 |

**Fund AUM** (As of Nov 07, 2019)

| | AUM |
|---|---|
| Total Net Assets | $982.33 M |

Appellee Appx. 01329
Appx. 04194
008137

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1337
of 1804
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 220 of 1017    PageID 8967
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1336 of 1803    PageID 12082

Income Fund | Highland Capital Case 19-12239-CSS    Doc 116-4    Filed 11/12/19    Page 5 of 9    Page 4 of 8

Fund AUM (As of Nov 07, 2019)

AUM

VIEW FULL PERFORMANCE

| Symbol | HFRO |
| Inception | 01/13/00 |
| Gross Expense Ratio | 1.26% |
| Net Expense Ratio[1] | 1.26% |

PERFORMANCE

LITERATURE

THOMSON REUTERS

Lipper Award Winner - Loan Participation Funds

2014 Best Fund Over 3 Years
2015 Best Fund Over 3 Years
2015 Best Fund Over 5 Years
2016 Best Fund Over 3 Years

Appellee Appx. 01330
Appx. 04195
008138

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1338
of 1804
Case 3:25-cv-02072-S   Document 15-11  Filed 10/06/25   Page 221 of 1017   PageID 8968
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1337 of 1803  PageID 12083

Income Fund | HCase 19-12239-CSS   Doc 116-4   Filed 11/12/19  Page 6 of 9   Page 5 of 8

The performance data quoted here represents past performance and is no
guarantee of future results. Investment returns and principal value will fluctuate
so that an investor's shares when redeemed may be worth more or less than
their original cost. Current performance may be lower or higher than
performance data quoted.

Effective shortly after close of business on November 3, 2017, the Highland Floating
Rate Fund converted from an open-end fund to a closed-end fund, and began
trading on the NYSE under the symbol HFRO on November 6, 2017. The
performance data presented above reflects that of Class Z shares of the Fund when
it was an open-end fund, HFRZX. The closed-end Fund pursues the same
investment objective and strategy as it did before its conversion.

¹ The expense ratio shown is reported in the Fund's Semi-annual Report dated
December 31, 2017.

Closed-end funds, unlike open-end funds, are not continuously offered. There is a
one-time public offering and once issued, shares of closed-end funds are sold in the
open market through a stock exchange and frequently trade at prices lower than
their net asset value, which may increase an investor's risk of loss. Net Asset Value
(NAV) is total assets less total liabilities, which includes preferred shares, divided by
the number of common shares outstanding. At the time of sale, your shares may
have a market price that is above or below NAV, and may be worth more or less
than your original investment. For additional information, please contact your
investment adviser or visit our website www.highlandfunds.com.

Please consider the investment objectives, risks, charges and expenses of Highland
Floating Rate Opportunities Fund carefully before investing. A prospectus with this
and other information about Highland Floating Rate Opportunities Fund can be
found on the Literature tab above.

**Closed-End Fund Risk.** The Fund is a closed-end investment company designed
primarily for long-term investors and not as a trading vehicle. No assurance can be
given that a shareholder will be able to sell his or her shares on the NYSE when he
or she chooses to do so, and no assurance can be given as to the price at which any
such sale may be effected.

**Non-Payment Risk.** Senior Loans, like other corporate debt obligations, are subject
to the risk of non-payment of scheduled interest and/or principal. Non-payment

Appellee Appx. 01331
Appx. 04196
008139

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1339
of 1804
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 222 of 1017   PageID 8969
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1338 of 1803   PageID 12084
Income Fund | Highland Funds   Case 19-12239-CSS   Doc 116-4   Filed 11/12/19   Page 7 of 9   Page 6 of 8

would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund.

**Credit Risk.** The Fund may invest all or substantially all of its assets in Senior Loans or other securities that are rated below investment grade and unrated Senior Loans deemed by Highland to be of comparable quality. Securities rated below investment grade are commonly referred to as "high yield securities" or "junk securities." They are regarded as predominantly speculative with respect to the issuing company's continuing ability to meet principal and interest payments. Non-payment of scheduled interest and/or principal would result in a reduction of income to the Fund, a reduction in the value of the Senior Loan experiencing non-payment and a potential decrease in the NAV of the Fund. Investments in high yield Senior Loans and other securities may result in greater NAV fluctuation than if the Fund did not make such investments.

**Senior Loans Risk.** The risks associated with senior loans are similar to the risks of below investment grade securities in that they are considered speculative. In addition, as with any debt instrument, senior loans are also generally subject to the risk of price declines and to increases in prevailing interest rates. Senior loans are also subject to the risk that, as interest rates rise, the cost of borrowing increases, which may also increase the risk and rate of default. In addition, the interest rates of floating rate loans typically only adjust to changes in short-term interest rates; long term interest rates can vary dramatically from short term interest rates. Therefore, senior loans may not mitigate price declines in a rising long-term interest rate environment.

**Illiquidity of Investment Risk.** The investments made by the Fund may be illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their value or the amount originally paid for such investments by the Fund.

**Ongoing Monitoring Risk.** On behalf of the several Lenders, the Agent generally will be required to administer and manage the Senior Loans and, with respect to collateralized Senior Loans, to service or monitor the collateral. Financial diffiulties of Agents can pose a risk to the Fund.

**Glossary:** Click for important terms and definitions

Appellee Appx. 01332
008140

Source: State Street Bank and Trust Company

FUND DOWNLOADS

Fund Fact Sheet



Summary Prospectus

Annual Report



Fund Commentary



📁 View all Literature & Forms                                                    ∧

Appellee Appx. 01333

Appx. 04498

008141

© 2018 Highland Capital Management, LP. | All Rights Reserved

Disclosure Statement



Privacy - Terms

Appellee Appx. 01334

Appx. 04199

008142

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1342
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 225 of 1017    PageID 8972
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1341 of 1803   PageID 12087
Case 19-12239-CSS    Doc 116-5    Filed 11/12/19   Page 1 of 9

**Exhibit E**

Letter to Moody's re U.S. Bank

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1343
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 226 of 1017 PageID 8973
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1342 of 1803 PageID 12088
Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 2 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL:** Shana.Sethi@moodys.com
Shana Sethi
Vice President- Senior Credit Officer
Moody's Investors Service

**Re:** **Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Sethi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with Moody's to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1344
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 227 of 1017 PageID 8974
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1343 of 1803 PageID 12089

Ms. Sethi
Moody's Investors Service
August 6, 2019
Page 2

We look forward to engaging with you on this serious matter.

Yours very truly,

Michael K. Hurst

MKH/ceb

Enclosure

cc:    David Coale (*of the Firm*)
       Chisara Ezie-Boncoeur (*of the Firm*)

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1345
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 228 of 1017 PageID 8975
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1344 of 1803 PageID 12090

Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 4 of 9

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**Via Email: dnovakov@fbtlaw.com**
Daniel P. Novakov
Frost Brown Todd LLC
100 Crescent Court, Suite 350
Dallas, Texas 75201
Tel: (214) 580-5840
Fax: (214) 545-3473

Re:     US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and (2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care. US Bank's wrongful conduct is actionable under New York law, and has caused the Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6" means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis CLOs" and each, an "Acis CLO" or "CLO" herein.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1346
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 229 of 1017 PageID 8976
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1345 of 1803 PageID 12091
Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 5 of 9

US Bank
August 6, 2019
Page 2

I. **US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.**

Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

*First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1347
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 230 of 1017 PageID 8977
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1346 of 1803 PageID 12092
Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 6 of 9

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

*Second*, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1348
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 231 of 1017 PageID 8978
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1347 of 1803 PageID 12093
Case 19-12239-CSS Doc 116-5 Filed 11/12/19 Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ⟶ 2678
CLO 4: 2680 ⟶ 2941
CLO 5: 2673 ⟶ 3004
CLO 6: 2627 ⟶ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of **zero** cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/11/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

**II.  US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.**

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

Case 19-34054-sgj11   Doc 3445-8   Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1349
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 232 of 1017   PageID 8979
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1348 of 1803   PageID 12094
Case 19-12239-CSS   Doc 116-5   Filed 11/12/19   Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] See e.g., Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] See e.g., the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] See e.g., the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] See id.

[8] See e.g., the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] See e.g., the Adversary Proceeding at Dkt. Nos. 499-505.

[10] See e.g., the Adversary Proceeding at Dkt. No. 505 ¶ 3.

US Bank
August 6, 2019
Page 6

### III. The Highland Retail Funds are not limited to filing contract claims against US Bank.

In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it should resign as Indenture Trustee.

The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **August 15, 2019** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

You are advised to review this letter carefully. Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

Your immediate attention to this matter is appreciated.

Sincerely,

Michael K. Hurst

MKH/sb

cc: David Coale (*of the Firm*)
Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

**Appellee Appx. 01343**

Appx. 04208

**008151**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1351
Case 3:25-cv-02072-S      Document 15-11      Filed 10/06/25      Page 234 of 1017      PageID 8981
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1350 of 1803   PageID 12096

Case 19-12239-CSS      Doc 116-6      Filed 11/12/19   Page 1 of 9

**Exhibit F**

Letter to S&P Global re U.S. Bank

Appellee Appx. 01344

Appx. 04209

008152

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**VIA EMAIL: lauren.fastiggi@spglobal.com**
Lauren Fastiggi
Director and Lead Analyst
S&P Global

**Re:     Mismanagement of the Acis CLOs, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Ms. Fastiggi:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis Indentures dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

For your reference, enclosed to this correspondence is a copy of the demand letter served by the Highland Retail Funds on August 6, 2019 to U.S. Bank National Association, the Trustee of the Acis Indentures. The demand letter puts U.S. Bank on notice of its material violations of the terms of the Acis Indentures, by among others, mismanaging and allowing the impermissible gaming of the Acis Indentures by the portfolio manager thereof, and failing to perform required tasks with due care. The Highland Retail Funds are prepared to take all actions necessary to protect their rights from further deterioration.

Representatives of the Highland Retail Funds are available to meet with S&P Global to discuss whether U.S. Bank's wrongful conduct has caused a default, such that the ratings on some or all rated tranches should be reconsidered or withdrawn.

---

[1] The Acis Indentures collectively include: that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1353
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 236 of 1017   PageID 8983
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1352 of 1803   PageID 12098

Ms. Fastiggi
S&P Global
August 6, 2019
Page 2


We look forward to engaging with you on this serious matter.


Yours very truly,


Michael K. Hurst

MKH/ceb

Enclosure

cc:     David Coale (*of the Firm*)
        Chisara Ezie-Boncoeur (*of the Firm*)

# LYNN PINKER COX HURST

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839

mhurst@lynnllp.com

Lynn Pinker Cox & Hurst, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

August 6, 2019

**Via Email:** dnovakov@fbtlaw.com

Daniel P. Novakov

**Frost Brown Todd LLC**

100 Crescent Court, Suite 350

Dallas, Texas 75201

Tel: (214) 580-5840

Fax: (214) 545-3473

Re: **US Bank's mismanagement of the Acis Indentures, in violation of the rights of Secured Note Holders NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund.**

Dear Mr. Novakov:

My Firm represents NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and Highland Income Fund (collectively, the "Highland Retail Funds"), in connection with the enforcement and protection of their rights as Holders of Secured Notes under certain Acis CLOs dated as of February 25, 2014, June 5, 2014, November 18, 2014, and April 16, 2015 (collectively, the "Acis Indentures").[1]

This letter provides formal notice that your client, U.S. Bank National Association ("US Bank" or "Indenture Trustee"), has: (1) materially violated the terms of the Acis Indentures, and (2) failed to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care. US Bank's wrongful conduct is actionable under New York law, and has caused the Highland Retail Funds to sustain significant damages, discussed below.

---

[1] The Acis Indentures are abbreviated herein as follows: "Indenture 3" means that certain Indenture dated as of February 25, 2014 issued by ACIS CLO-2014-3 Ltd. as Issuer, ACIS CLO 2014-3 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 4" means that certain Indenture dated as of June 5, 2014 issued by ACIS CLO-2014-4 Ltd. as Issuer, ACIS CLO 2014-4 LLC as Co-Issuer, and US Bank as Indenture Trustee; "Indenture 5" means that certain Indenture dated as of November 18, 2014 issued by ACIS CLO-2014-5 Ltd. as Issuer, ACIS CLO 2014-5 LLC as Co-Issuer, and US Bank as Indenture Trustee, and; "Indenture 6" means that certain Indenture dated as of April 16, 2015 issued by ACIS CLO-2015-6 Ltd. as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and US Bank as Indenture Trustee. Together, such CLOs are referred to "Acis CLOs" and each, an "Acis CLO" or "CLO" herein.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1355
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 238 of 1017 PageID 8985
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1354 of 1803 PageID 12100
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 5 of 9

US Bank
August 6, 2019
Page 2

    **I.    US Bank's allowance of continued failure of the collateral quality test, as well as rampant portfolio mismanagement, violates the Acis Indentures.**

    Every purchase or sale made under the Acis Indentures must satisfy the collateral quality test imposed by each Acis Indenture.[2] As such, US Bank is required to ensure that every purchase or sale made under the Acis Indentures maintains or improves any failing collateral quality test. US Bank failed to satisfy this requirement by, among others, allowing transactions to be effectuated that do not maintain or improve the failing Weighted Average Life Test ("WAL") for trades made under the Acis Indentures.

    *First*, US Bank violated its obligation to seek best execution on trades reasonably available to the Acis CLOs. By allowing multiple same day trades, US Bank has disregarded the obligation in the Acis Indentures requiring maintenance or improvement of the collateral quality test in each respective Acis CLO for each individual trade made. US Bank has allowed a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, in so doing, creating the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by US Bank cannot maintain or improve the WAL test on an individual basis. US Bank cannot perform its duties by allowing such Acis CLOs to act as a market taker, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures. Indeed, the value destruction of this forced "bunched trading" is clear when prices at trade date vs. prices on the day before trade date are compared. For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

---

[2] *See e.g.*, Indenture 3 at p. 16 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.17, and 12; Indenture 4 at p. 15 (*see* definition of "Collateral Quality Test"), p. 37 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 5 at p. 14 (*see* definition of "Collateral Quality Test"), p. 36 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12; Indenture 6 at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1356
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 239 of 1017 PageID 8986
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1355 of 1803 PageID 12101
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 6 of 9

US Bank
August 6, 2019
Page 3

What's more, this artificial trading philosophy, disguised as "responsible management", has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors. For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

Tellingly, the transaction history authorized by US Bank makes clear that it appreciates the import of trading on specific days. In connection with Indenture 5, US Bank allowed the sale of varying amounts of the same term loan, Doncasters, over three different days: June 28, 2019, July 3, 2019, and July 8, 2019. US Bank allowed this because these selected dates positively impacted the collateral quality of the term loan sold. However, US Bank cannot ensure that the Acis CLOs enjoy best execution on purchases under the Acis Indentures if it turns a blind eye to the date on which purchases are made.

An analysis of the individual trades made under US Bank's approval further underscores the Trustee's failure to adhere to the respective indenture's collateral quality requirements. On July 12, 2019, in connection with Indenture 5, US Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024. But, to maintain or improve the WAL test for Indenture 5, US Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. US Bank facilitated similar misconduct across the Acis Indentures.

*Second*, the Weighted Average Rating Factor ("WARF") of each of the Acis CLO's portfolios has steadily increased this year, further demonstrating US Bank's facilitating the mismanagement of the Acis Indentures' collateral. On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). Plan D approved Brigade Capital Management, LP ("Brigade") to perform certain services related to the Acis Indentures, previously provided by Highland Capital Management.[3] Since the entry of Plan D, and Brigade's "management" of the Acis Indentures, US Bank allowed the collective WARF of the Acis CLO's portfolios to change from one of the cleanest pools in the market, to one of the dirtiest pools in

---

[3] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1357
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 240 of 1017 PageID 8987
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1356 of 1803 PageID 12102
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 7 of 9

US Bank
August 6, 2019
Page 4

the market in a matter of months. As of August 2019, since Brigade's involvement with the Acis Indentures, the WARF of each Acis CLO has dramatically increased, as follows:

CLO 3: 2522 ➝ 2678
CLO 4: 2680 ➝ 2941
CLO 5: 2673 ➝ 3004
CLO 6: 2627 ➝ 2917

*Third*, US Bank failed to protect the cash flow levels of its equity holders. Since the entry of Brigade, equity holders under Indentures 3-5 have received a total of **zero** cash flows. This damage has metastasized into the secured tranches of the CLOs and created direct harm to the Highland Retail Funds. The value decline of the equity positions is obvious:

| ACIS Equity Positions | CUSIP | 1/31/2019 | 2/28/2019 | 3/31/2019 | 4/30/2019 | 5/31/2019 | 6/30/2019 |
|---|---|---|---|---|---|---|---|
| ACIS 2014-3A 0.0000% - 2/2026 - SUB - 00100GAE3 @0.0000 02/11/2026 | 00100GAE3 | 14.5000 | 16.5000 | 17.3333 | 15.8333 | 13.0000 | 11.8333 |
| ACIS 2014-4A 0.0000% - 5/2026 - SUB - 00100HAE1 @0.0000 05/01/2026 | 00100HAE1 | 24.8333 | 22.1667 | 22.0000 | 22.1667 | 21.0000 | 19.8333 |
| ACIS 2014-5A 0.0000% - 11/2026 - SUB - 00101WAC1 @0.0000 11/01/2026 | 00101WAC1 | 34.2500 | 33.2500 | 32.7500 | 31.7500 | 31.0000 | 30.0000 |
| ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | 004524AD6 | 36.5000 | 36.5000 | 35.6667 | 35.0000 | 33.6667 | 32.0000 |

*Fourth*, US Bank has allowed the Acis CLOs to incur exorbitant expenses under its watch, at levels which exceed market standards.

In sum, US Bank's facilitation and approval of extensive portfolio mismanagement, and failure to require trades in accordance with industry standards and contrary to the best interests of its investors, violates the express terms of the Acis Indentures. US Bank's wrongful conduct has diluted the value of the Highland Retail Funds' Secured Notes and deteriorated the credit profile of the Acis CLOs. The Highland Retail Funds cannot allow US Bank to shirk its contractual obligations under the Acis Indentures. As Holders of Secured Notes, the Highland Retail Funds negotiated for superior rights under the Acis Indentures with the expectation that at a minimum, their collateral would remain protected in accordance with industry standards. *Indeed, US Bank must explain how this blatant gaming and chicanery in the name of artificially maximizing management fees is not a default under the Acis Indentures or a clear, actionable conflict of interest.*

## II. US Bank Failed to reserve rights, or otherwise protect the Highland Retail Funds' rights affected by Plan D.

The Acis Indentures do not permit US Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**, or to authorize the Trustee to vote in respect of the claim of any Secured Noteholders, as applicable, in any such

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1358
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 241 of 1017 PageID 8988
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1357 of 1803 PageID 12103
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 8 of 9

US Bank
August 6, 2019
Page 5

Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person." (emphasis added).[4] Despite these express terms, US Bank tacitly accepted or adopted the entry of Plan D, which contains provisions that directly affect the Secured Notes that the Highland Retail Funds hold. Among others, Plan D imposes an injunction that adversely affects the Highland Retail Funds' rights by prohibiting beneficial trading activity that would serve to protect Noteholder interests. In addition to other restrictions, Plan D impedes the ability of Noteholders under the Acis Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each Acis CLO.[5]

US Bank did not reserve any Noteholders' rights, or otherwise object to the entry of Plan D. US Bank's election to take no action regarding the entry of Plan D amplified the exposure, and overall risk that the Highland Retail Funds face during the pendency of the Plan D injunction. In fact, the Bankruptcy Court set a deadline for all parties, including US Bank, to submit any objections to the final approval of the Disclosure Statement and/or confirmation of Plan D.[6] As recognized by the Bankruptcy Court, US Bank failed to file objections to Plan D.[7] In fact, the Bankruptcy Court explicitly identified US Bank's failure to oppose the Plan in its opinion, making clear that notably, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting to the Plan."[8] What's more, US Bank previously filed prior reservations of rights and/or objections in the Adversary Proceeding.[9] In relation to Plan B and Plan C (previously implemented as part of the Chapter 11 Trustee's First Amended Joint Plan), which each proposed re-writing the Acis Indentures to protect Acis' management fee stream for several years, US Bank acknowledged that the Plans "adversely affect[ed] the rights of Noteholders."[10] The same holds true for Plan D. US Bank is not excused from failing to protect the Highland Retail Funds' rights affected by Plan D, and the Adversary Proceeding.

---

[4] See e.g., Indenture 3 at § 5.3; Indenture 4 at § 5.3; Indenture 5 at § 5.3; Indenture 6 at § 5.3.

[5] See e.g., the Adversary Proceeding at Dkt. No. 830 p. 75, Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC, as Modified Findings of Fact and Conclusions of Law.

[6] See e.g., the Adversary Proceeding at Dkt. No. 829 ¶ W ("The following objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Objections") were timely filed in accordance with the Solicitation Order [identifying three Objections filed, none of which filed by US Bank].) (emphasis original).

[7] See id.

[8] See e.g., the Adversary Proceeding at Dkt. No. 827 p. 5.

[9] See e.g., the Adversary Proceeding at Dkt. Nos. 499-505.

[10] See e.g., the Adversary Proceeding at Dkt. No. 505 ¶ 3.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1359
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 242 of 1017 PageID 8989
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1358 of 1803 PageID 12104
Case 19-12239-CSS Doc 116-6 Filed 11/12/19 Page 9 of 9

US Bank
August 6, 2019
Page 6

**III.** **The Highland Retail Funds are not limited to filing contract claims against US Bank.**

In addition to contract claims based on US Bank's violations of the Acis Indentures, US Bank's failure to perform all basic, non-discretionary, ministerial tasks under the Acis Indentures with due care subjects it to additional tort liability. *See e.g.*, *Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015) ("Prior to an Event of Default, an indenture trustee's duty is governed solely by the terms of the indenture, with two exceptions: **a trustee must still** '(1) avoid conflicts of interest, and (2) **perform all basic, non-discretionary, ministerial tasks with due care**.'") (emphasis added). And, consistent with the Trust Indenture Act, US Bank is not relieved "from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct…"[11] Succinctly, US Bank appears unwilling or unable to fulfill its duties to the Noteholders. The four corners of each Indenture create a framework of Noteholder protections, and such investors deserve an Indenture Trustee that will enforce the spirit and the letter of the Indentures. If US Bank cannot do its duty, it should resign as Indenture Trustee.

The Highland Retail Funds are prepared to take all action necessary to preserve their rights, and remedy their losses sustained to date due to US Bank's misconduct. The Highland Retail Funds demand that US Bank provide written assurances by **August 15, 2019** detailing: (1) the specific measures that US Bank will take, effective immediately, to remediate the wrongful conduct described herein, and (2) US Bank's offer to resolve this matter and make the Highland Retail Funds whole.

You are advised to review this letter carefully. Nothing in this letter shall constitute a waiver of any of the Highland Retail Funds' rights and/or remedies at law and at equity, all of which they expressly reserve should this matter proceed to litigation.

Your immediate attention to this matter is appreciated.

Sincerely,

Michael K. Hurst

MKH/sb

cc: David Coale (*of the Firm*)
Chisara Ezie-Boncoeur (*of the Firm*)

---

[11] *Compare* Indenture 3 at § 6.1(c), Indenture 4 at § 6.1(c), Indenture 5 at § 6.1(c), and Indenture 6 at § 6.1(c) with 15 U.S.C. § 77ooo (d).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1360
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 243 of 1017    PageID 8990
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1359 of 1803   PageID 12105

Case 19-12239-CSS    Doc 116-7    Filed 11/12/19   Page 1 of 18

**Exhibit G**

Complaint, *The Charitable Donor Advised Fund, L.P. v. U.S. Bank National Association, et al.*

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1361
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 244 of 1017    PageID 8991
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1360 of 1803   PageID 12106
Case 1:19-cv-09857-CSS-RBD Document 116-7 Filed 11/12/19 Page 2 of 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **THE CHARITABLE DONOR ADVISED FUND, L.P.,** | |
| *Plaintiff*, | **CASE NO.: 1:19-CV-09857-NRB** |
| **v.** | |
| **U.S. BANK NATIONAL ASSOCIATION and MOODY'S INVESTORS SERVICE, INC.,** | **PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| *Defendants*. | |

TO THE HONORABLE COURT:

Plaintiff The Charitable Donor Advised Fund, L.P. ("The Charitable DAF"), by and through its attorneys of record, files this First Amended Complaint against Defendants U.S. Bank National Association ("U.S. Bank") and Moody's Investors Service, Inc. ("Moody's"), and in support thereof, respectfully states and alleges as follows:

### NATURE OF LAWSUIT

The Charitable DAF files this lawsuit to enforce and protect its rights.  U.S. Bank, which serves as Trustee of certain indentures, has severely compromised The Charitable DAF's rights thereunder through its misconduct and failure to act.  The Charitable DAF, a Holder of Secured Notes under those ACIS indentures, possesses beneficial interests in the collateral that U.S. Bank has mismanaged and failed to protect.  U.S. Bank's wrongful and negligent conduct has diluted the value of The Charitable DAF's Secured Notes, deteriorated the credit profile of the collateralized loan obligations ("CLOs"), and caused The Charitable DAF to incur other direct damages.  To protect its rights, The Charitable DAF seeks two things through this lawsuit.

---

**Appellee Appx. 01354**
Appx. 04219
**008162**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1362
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 245 of 1017 PageID 8992
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1361 of 1803 PageID 12107
Case 19-12395-CSS Doc 116-7 Filed 11/12/19 Page 3 of 18

*First*, it seeks to recover the losses it sustained in connection with U.S. Bank's negligence and breach of its extra-contractual duties to The Charitable DAF, including the duties to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

*Second*, The Charitable DAF seeks judicial intervention to protect its interests before U.S. Bank commits or facilitates any further wrongful conduct. The Charitable DAF cannot allow U.S. Bank to continue to shirk its duties as indenture Trustee.

## PARTIES

1. Plaintiff The Charitable Donor Advised Fund, L.P. is a limited partnership, with its principal place of business at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

2. Defendant U.S. Bank National Association is a national banking association that is Trustee of the ACIS Indentures, as defined further herein. Pursuant to the ACIS Indentures, Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, Illinois 60603.

3. Defendant Moody's Investors Service, Inc., is a Delaware corporation registered to do business in New York State. Moody's may be served through its registered agent CT Corporation System, located at 28 Liberty Street, New York, New York 10005. Moody's is a nationally recognized statistical rating organization ("NRSRO").

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen of a foreign state.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1363
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 246 of 1017 PageID 8993
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1362 of 1803 PageID 12108
Case 19-12395-CSS-RBD Document 16-7 Filed 11/12/19 Page 4 of 18

5.      Jurisdiction and venue over Moody's are proper in this District because Moody's is registered to do business in New York, and the transactions and occurrences that are the subject of The Charitable DAF's claims against Moody's took place in New York, New York.

6.      Jurisdiction and venue over US Bank are proper in this District because, pursuant to Section 14.10 of the ACIS Indentures, as defined further herein, each party to such indentures, including U.S. Bank:

> [H]ereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of . . . the United States District Court of the Southern District of New York . . . in any action or proceeding arising out of or relating to the notes or th[ese] indenture[s] . . .

7.      Venue is also proper because U.S. Bank waived any objection to venue in this District under the ACIS Indentures, as defined further herein. Section 14.10 specifically provides that:

> Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to th[ese] indenture[s] in any court referred to in the previous paragraph. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

8.      New York law governs the claims in this lawsuit.

## STATEMENT OF FACTS

### A.  U.S. Bank is Trustee of certain ACIS collateralized loan obligations.

9.      Between 2014 and 2015, U.S. Bank agreed to serve as the Trustee of three indentures governing CLOs to which The Charitable DAF holds beneficial interests as a Holder of Secured Notes, including: (i) the Indenture dated June 5, 2014 among ACIS CLO 2014-4 LTD., as Issuer, ACIS CLO 2014-4 LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 4"); (ii) the Indenture dated November 18, 2014 among ACIS CLO 2014-5 LTD., as Issuer, ACIS CLO 2014-5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1364
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 247 of 1017 PageID 8994
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1363 of 1803 PageID 12109
Case 19-12395-CSS RBD Document 16-7 Filed 11/12/19 Page 5 of 18

LLC, as Co-Issuer, and U.S. Bank as Trustee ("Indenture 5"); and (iii) the Indenture dated April 16, 2015 among ACIS CLO 2015-6 LTD., as Issuer, ACIS CLO 2015-6 LLC as Co-Issuer, and U.S. Bank as Trustee ("Indenture 6", and together with Indenture 4 and Indenture 5, the "ACIS Indentures"). The ACIS Indentures impose a number of obligations on U.S. Bank in connection with its role as Trustee.

10.    *First,* the ACIS Indentures provide that U.S. Bank shall hold in trust, for the "benefit and security" of the noteholders, all "Collateral Obligations" that secure the Co-Issuers' financial obligations to the noteholders. In connection therewith, the ACIS Indentures also provide that, for future purchases and sales of collateral obligations, the Trustee shall only consummate these transactions where certain investment criteria are satisfied. One such criterion is that, for all purchases, "either (A) each requirement . . . of the . . . Collateral Quality Test will be satisfied or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment." *See, e.g.,* Indenture 4 § 12.2(a)(iv). The ACIS Indentures define "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

*Id.* at 15.

11.    These tests are defined, in turn, as follows:

> "Maximum Moody's Rating Factor Test": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[1] of the Collateral Obligations is

---

[1] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1365
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 248 of 1017 PageID 8995
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1364 of 1803 PageID 12110
Case 19-12395-CSS RBD Doc 116-7 Filed 11/12/19 Page 8 of 18

less than or equal to the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Rating Factor Adjustment Amount.

<u>Weighted Average Life Test</u>": A test that is satisfied if the Aggregate Weighted Average Life[2] on such date of determination is not later than June 5, 2022.

*See, e.g.*, Indenture 4 at 37-38, 66.

12.     These provisions seek to maintain the integrity of the collateral securing the Co-Issuers' obligations by requiring certain parties, including the Trustee, to ensure that any purchase or sale of such collateral complies with detailed, industry-recognized, and bargained-for tests.

13.     ***Second***, the ACIS Indentures provide that, in performing its duties as Trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof". Like the provisions concerning collateral quality, these provisions also seek to ensure that the Trustee does not prejudice the rights of any secured noteholder under the ACIS Indentures, like The Charitable DAF.

---

as having been updated by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 4 at 66.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id*.

[2] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (a) the number of years following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such tie of all Collateral Obligations *plus* (B) such date of determination. *Id*. at 6.

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1366
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 249 of 1017 PageID 8996
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1365 of 1803 PageID 12111
Case 19-12239-CSS-RBD Document 16-7 Filed 11/12/19 Page 7 of 18

14.     The ACIS Indentures do more than require that U.S. Bank observe certain safeguards – they also grant U.S. Bank the broad power to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys".

### ii.     U.S. Bank must also satisfy extra-contractual obligations owed to The Charitable DAF.

15.     U.S. Bank must satisfy certain extra-contractual obligations in connection with its role as Trustee, and the broad powers associated therewith. These pre-default extra-contractual obligations include the duty to perform all basic, non-discretionary, ministerial tasks with due care, and to avoid conflicts of interest.

16.     For example, U.S. Bank was required to perform all basic, non-discretionary, ministerial tasks with due care, including, but not limited to, the following extra-contractual tasks: reserving noteholder rights impacted by active litigation, such as bankruptcy proceedings; exercising due care in connection with the payment of expenses; collecting and distributing the interest and dividends due on the portfolio securities; and providing noteholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio.

17.     Notably, no provisions of the ACIS Indentures "shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct".

### B.    U.S. Bank fails to reserve or otherwise protect The Charitable DAF's rights in connection with bankruptcy proceedings.

18.     The Charitable DAF's rights as a secured noteholder under the ACIS Indentures have been compromised by certain proceedings and judicial rulings in a consolidated Chapter 11 bankruptcy proceeding, and related adversary proceeding, pending before the United States

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1367
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 250 of 1017    PageID 8997
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1366 of 1803    PageID 12112
Case 19-12239-CSS-RBD Doc 116-7 Filed 11/12/19 Page 8 of 18

Bankruptcy Court for the Northern District of Texas, jointly administered under case number 18-30264-SGJ-11 (the "Bankruptcy Proceeding").[3]

19.    On July 29, 2018, the Chapter 11 Trustee in the Bankruptcy Proceeding filed a First Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management, GP, LLC (the "First Amended Plan").

20.    The First Amended Plan provided for certain amendments to the ACIS Indentures that would be effected through a certain Plan B and Plan C.  These proposals concerned, among other things, re-writing the ACIS Indentures to protect Acis' management fee stream for several years.

21.    In full recognition that the First Amended Plan encroached on the rights of noteholders under the ACIS Indentures like The Charitable DAF, the Trustee filed a Reservation of Rights and Limited Objections to the First Amended Plan in the Bankruptcy Proceeding. The Trustee took prompt measures to protect noteholder rights, filing these pleadings only fifteen days after the filing of the First Amended Plan.

22.    Among other infringements on the rights of noteholders under the ACIS Indentures, the Trustee explained that: "In other words, both Plan B and Plan C purport to ignore the express terms of the Indenture and the rights of the Noteholders with respect to amending the Indenture."[4]

23.    On January 31, 2019, a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC was entered in the Bankruptcy Proceeding ("Plan D").

---

[3] The two case numbers in the consolidated Bankruptcy Proceeding include case numbers 18-30264-SGJ-11 and 18-30265-SGJ-11.

[4] *See* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. Nos. 500, 501, and 500; *see id.* at Dkt. No. 505.

Appellee Appx. 01360
Appx. 04225
008168

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1368
Case 3:25-cv-02072-S Document 15-11 Filed 04/06/25 Page 251 of 1017 PageID 8998
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1367 of 1803 PageID 12113
Case 19-12239-CSS-RBD Document 16-7 Filed 11/12/19 Page 9 of 817

24. Like Plan B and C, Plan D also substantially impacted the rights of noteholders under the ACIS Indentures, including The Charitable DAF.

25. Among other infringements, Plan D imposes an injunction that adversely affects The Charitable DAF's rights by prohibiting beneficial trading activity that would serve to protect noteholder interests.

26. In addition to other restrictions, Plan D impedes the ability of noteholders under the ACIS Indentures to make optional redemptions, which restriction has decimated the value of such investments across the capital stack of each CLO covered by the ACIS Indentures.

27. Moreover, Plan D conflicts with the express terms of the ACIS Indentures. Specifically, the ACIS Indentures do not permit U.S. Bank to "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, **any plan** of reorganization, arrangement, adjustment or composition **affecting the Secured Notes or any Holder thereof**". (emphases added).

28. Tellingly, in its Reservation of Rights filed in 2018, U.S. Bank acknowledged that the specific plans "adversely affect[ed] the rights of Noteholders."[5] The same holds true for Plan D.

29. Notwithstanding its ability to do so, U.S. Bank did not reserve any noteholders' rights, or otherwise object to the entry of Plan D.

30. Instead, as noted by the court's ruling approving confirmation of Plan D on January 31, 2019, "[t]he indenture trustee has retained and appeared through its own separate counsel during the Chapter 11 Bankruptcy Cases **and is not currently objecting to the Plan**."[6] (emphasis added).

---

[5] *See e.g.,* Bankruptcy Proceeding at Dkt. No. 505 ¶ 3; *see also,* Bankruptcy Proceeding at Dkt. Nos. 499-505
[6] *See e.g.,* Bankruptcy Proceeding, case number 18-30264-SGJ-11 at Dkt. No. 827 p. 5.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1369
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 252 of 1017 PageID 8999
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1368 of 1803 PageID 12114
Case 19-12239-CSS RE Doc 116-7 Entered Filed 11/12/19 Page 10 of 17

31.     U.S. Bank's election to take no action regarding the entry of Plan D amplified the exposure of The Charitable DAF and the overall risk that it faces during the pendency of the Plan D injunction. Though U.S. Bank has a duty to avoid conflicts of interest, its election to take no action regarding the entry of Plan D underscores the Trustee's self-serving conduct.

**C.  U.S. Bank fails to ensure that certain transactions satisfy the collateral quality tests.**

32.     As set forth above, U.S. Bank must ensure that every purchase made under the ACIS Indentures satisfies the collateral quality tests, including the Weighted Average Life Test ("WAL test") and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM test"), or maintains or improves any failing collateral quality tests.  U.S. Bank failed to satisfy these obligations in at least two ways.

33.     ***First***, U.S. Bank allowed the "Portfolio Manager" under the ACIS Indentures to effectuate certain transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.  Specifically, U.S. Bank allowed the Portfolio Manager to make multiple same-day trades and to consolidate the weighted average maturity date for these trades.  In so doing, U.S. Bank permitted the Portfolio Manager to create the false appearance of a maintained or improved WAL test.  Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL tests on individual bases.

34.     The value destruction of this forced "bunched trading" is clear when one compares the prices at trade date against the prices from the previous day.  For example:

| CLO | Trade | Issuer | Commitment | Date | Trade Px | Day Before | Close Mid Price | 2 Day Before | Close Mid Price | Change | P&L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 4 | Purchase | Diebold Inc - Diebold DD T/L A | 2,430,000.00 | 3/15/2019 | 98.00 | 3/14/2019 | 94.50 | 3/13/2019 | 94.5 | -3.50 | (85,050.00) |
| CLO 6 | Purchase | Diebold Inc - Diebold DD T/L A | 1,578,541.42 | 3/26/2019 | 99.00 | 3/25/2019 | 95.50 | 3/22/2019 | 95.5 | -3.50 | (55,248.95) |
| CLO 4 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 5 | Purchase | Diebold Nixdorf Incorporated - Diebold T/L B New Dollar | 4,985,751.99 | 5/23/2019 | 96.75 | 5/22/2019 | 95.75 | 5/21/2019 | 95.75 | -1.00 | (49,857.52) |
| CLO 4 | Purchase | Air Medical Group Holdings Inc - Air Medical T/L B | 2,200,000.00 | 1/8/2019 | 96.50 | 1/7/2019 | 94.45 | 1/4/2019 | 93.839 | -2.05 | (45,177.00) |

Appellee Appx. 01362

Appx. 04225

008170

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1370
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 253 of 1017 PageID 9000
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1369 of 1803 PageID 12115
Case 19-12239-CSS RBDoc116-7nt Filed 11/12/19 Page 11 of 18

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 3 | Purchase | MA FinanceCo LLC - MA FinanceCo T/L B2 | 2,000,000.00 | 1/7/2019 | 98.50 | 1/4/2019 | 96.63 | 1/3/2019 | 96 | -1.88 | (37,500.00) |
| CLO 6 | Purchase | Team Health Holdings Inc - Team Health Holdings T/L | 1,279,236.64 | 3/26/2019 | 88.50 | 3/25/2019 | 86.13 | 3/22/2019 | 86.9375 | -2.38 | (30,381.87) |

35.    What is more, this artificial trading philosophy, disguised as "responsible management," has resulted in myriad poorly conceived and timed buys, which positions have plummeted, destroying value for the investors.  For example:

| Issuer | Buy/Sell | Row Labels | Sum of 8/2/19 P&L | Cost | 8/2/19 Mark |
|---|---|---|---|---|---|
| Lumileds Holding | Buy | LX171142 | (3,603,604.17) | 99.00 | 61.60 |
| Libbey Glass | Buy | LX136370 | (2,773,860.00) | 99.29 | 77.40 |
| KCA Deutag UK Finance PL | Buy | LX172320 | (1,172,068.16) | 84.89 | 69.58 |
| Doncasters | Buy | LX128948 | (1,532,695.82) | 95.51 | 75.00 |
| Envision Healthcare | Buy | LX175867 | (1,172,343.58) | 94.14 | 85.30 |

36.    The transaction history of the ACIS Indentures makes clear that U.S. Bank appreciates the import of trading on specific days.  In connection with one such indenture, U.S. Bank authorized the purchase of a term loan in Capital Automotive 1st Lien with a maturity date of March 25, 2024.  But, to maintain or improve the WAL test for this indenture, U.S. Bank should have required the CLOs to purchase assets with a maturity date of April 4, 2023 or earlier. U.S. Bank facilitated similar misconduct across the ACIS Indentures.

37.    *Second*, the Weighted Average Moody's Rating Factor" ("WARF") a factor on which the WAM test turns, has steadily increased this year for each portfolio of the ACIS Indentures.

38.    U.S. Bank turned a blind eye to The Charitable DAF's collateral quality, which has suffered under Plan D's new management. Plan D, which was implemented in the Bankruptcy Proceeding on January 31, 2019, appointed Brigade Capital Management, LP ("Brigade") to

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1371
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 254 of 1017    PageID 9001
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1370 of 1803    PageID 12116
Case 19-12395-CSS-RBD Document 116-7 Filed 11/12/19 Page 21 of 1817

perform certain services related to the ACIS Indentures, previously performed by Highland Capital Management, L.P.[7]

39.     Since the entry of Plan D, and Brigade's "management" of the ACIS Indentures, U.S. Bank has allowed the collective Weighted Average Moody's Rating Factor" ("WARF") of the portfolios to become one of the dirtiest pools in the market in a matter of months. As of October 2019, and since Brigade's involvement with the ACIS Indentures, the WARF of each such indenture has dramatically increased, as follows:

|        |        |      |
|--------|--------|------|
| CLO 4: | ~~2680~~ | 2941 |
| CLO 5: | ~~2673~~ | 3004 |
| CLO 6: | ~~2627~~ | 2917 |

40.     U.S. Bank is not excused from failing to protect The Charitable DAF's rights affected by Plan D or by the Bankruptcy Proceeding generally.

**D.   U.S. Bank's conduct has damaged The Charitable DAF substantially.**

41.     U.S. Bank's conduct, described herein, has resulted in myriad damage to The Charitable DAF, including, but not limited to, the following.

42.     U.S. Bank's failure to ensure that transactions under the ACIS Indentures comply with the collateral quality tests set forth therein constitute violations of U.S. Bank's contractual and extra-contractual obligations to The Charitable DAF. By facilitating extensive portfolio mismanagement, U.S. Bank has further violated its contractual and extra-contractual obligations to The Charitable DAF.   These violations have compromised, among other things, the credit profile of the ACIS Indentures and the value of The Charitable DAF's secured notes thereunder.

43.     Under its watch, since the appointment of Brigade, U.S. Bank has allowed the ACIS Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF

---

[7] *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1372
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 255 of 1017 PageID 9002
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1371 of 1803 PageID 12117
Case 19-12395-CSS RB Document 116-7 Filed 11/12/19 Page 31 of 1817

owns indirectly pursuant to the ACIS Indentures. Specifically, because of the payment of uncharacteristically high fees, equity holders under certain ACIS Indentures have received **zero** cash flows.

44.      Further, as Trustee, U.S. Bank owed a duty to The Charitable DAF to avoid conflicts of interest. It shirked this duty by, among other things, facilitating trades that did not comply with the collateral test in order to artificially maximize certain management fees. Likewise, despite U.S. Bank's duty to avoid conflicts of interest, in failing to object or otherwise reserve **any** noteholder rights impacted by Plan D, U.S. Bank further demonstrated its inability to prioritize or protect the rights of noteholder The Charitable DAF.

### E.   Moody's knowingly or recklessly published false ratings of the ACIS Indentures.

45.      Moody's is a nationally recognized statistical rating organization ("NRSRO").  As an NRSRO, Moody's "evaluate[s] a debt offering based on public, and sometimes nonpublic, information regarding the assets of an issuer and assign[s] the debt offering a rating to convey information to a potential creditor/investor about the creditworthiness of the issuer's debt."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 164 (S.D.N.Y. 2009). This rating is important to issuers and investors because, among other things, a "[debt offering]'s success depends on the credit quality of the [underlying] assets," and "[i]f stable [assets] comprise the [debt offering], then []investors are much less likely to suffer a loss."  *Id.* at 165; *see also In re Fitch, Inc.*, 330 F.3d 104, 106 (2d Cir. 2003) ("[Moody's] endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO ratings.")

46.      Between June and November 2014, Moody's gave both Indenture 4 and Indenture 5 a AAA rating.  This is a top rating, and the "same as those usually assigned by the Rating

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1373
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 256 of 1017 PageID 9003
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1372 of 1803 PageID 12118
Case 19-12395-CSS RBD Document 116-7 Filed 11/12/19 Page 141 of 817

Agencies to bonds backed by the full faith and credit of the United States Government, such as Treasury Bills." *Abu Dhabi Commercial Bank*, 651 F. Supp. 2d at 165. The rating is "commonly understood in the marketplace to [indicate an investment is] stable, secure, and safe." *Id*.

47. Still, depending upon the circumstances, an NRSRO like Moody's can downgrade a particular rating to reflect new information. To that end, on August 6, 2019, certain ACIS noteholders provided Moody's with written notice of U.S. Bank's misconduct, including its practice of bunched trading under the ACIS Indentures by effectuating multiple same day transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.

48. The same noteholders provided Moody's with a supplemental notice of U.S. Bank's trading misconduct on September 13, 2019.

49. Nevertheless, and since that time, Moody's has continued to publish false ratings of those assets. Indeed, Moody's has continued to rate Indenture 4 and Indenture 5 as AAA investments, notwithstanding its notice of the facts set forth in more detail above.

50. This, in turn, has allowed U.S. Bank and the portfolio manager to continue disregarding their obligations under the ACIS Indentures, further compromising the value of the assets securing the Co-Issuers' obligations thereunder. Moody's wrongful conduct has therefore diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

### COUNT I: BREACH OF THE DUTY TO PERFORM ALL BASIC, NON-DISCRETIONARY, MINISTERIAL TASKS WITH DUE CARE

51. The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

52. As Trustee, U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the ACIS Indentures with due care. This duty subjects U.S. Bank to tort liability.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1374
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 257 of 1017 PageID 9004
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1373 of 1803 PageID 12119
Case 19-12395-CSS RBD Document 116-7 Filed 11/12/19 Page 151 of 817

53.     U.S. Bank breached this duty in at least two ways.

54.     First, it breached this duty by permitting the ACIS Indentures to incur exorbitant expenses, which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

55.     Second, U.S. Bank breached its duty by negligently failing to act, and by accepting the entry of "Plan D" in the Bankruptcy Proceeding, which directly affects the secured noteholders. Among other things, Plan D adversely impacts the rights of The Charitable DAF by imposing an injunction that prohibits beneficial trading activity, and impeding the ability of noteholders to make optional redemptions.

56.     U.S. Bank's omission to act was not in good faith. In 2018, U.S. Bank filed multiple pleadings in the Bankruptcy Proceeding, including, but not limited to, a Reservation of Rights, and Limited Objections to the entry of the predecessor plans to Plan D. U.S. Bank failed to take any action whatsoever in regard to Plan D.

57.     These breaches were the proximate cause of damages to Charitable DAF.

58.     Based on investigation to date, such damages include, but are not limited to, The Charitable DAF's inability to make certain trades or redemptions, which restriction has decreased the value of The Charitable DAF's investment across the capital stack of each contract. They also include the diminished value of the collateral securing the issuer and co-issuer's financial obligations to The Charitable DAF. U.S. Bank's failure to reserve or otherwise protect The Charitable DAF's rights impacted by the Bankruptcy Proceeding has caused it to suffer damages.

### COUNT II: BREACH OF THE DUTY TO AVOID CONFLICTS OF INTEREST

59.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

---

**Appellee Appx. 01367**
**Appx. 04232**
**008175**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1375
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 258 of 1017 PageID 9005
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1374 of 1803 PageID 12120
Case 19-12395-CSS RBDocument 116-7 Filed 11/12/19 Page 161 of 1817

60.     As Trustee, U.S. Bank has an extra-contractual duty to avoid conflicts of interest. This duty subjects U.S. Bank to tort liability.

61.     Under this duty, U.S. Bank is prohibited from advancing its own interests at the expense of The Charitable DAF.

62.     U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests in order to artificially maximize management fees. Such facilitation of noncompliant trades gives rise to an inference of bad faith.

63.     U.S. Bank also breached this duty by allowing the ACIS Indentures to incur exorbitant fees which have diminished the equity that The Charitable DAF owns indirectly pursuant to the ACIS Indentures.

64.     U.S. Bank's breaches were the proximate cause of damages to The Charitable DAF.

65.     These breaches were the proximate cause of damages to Charitable DAF.

66.     Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Charitable DAF.

67.     U.S. Bank's breaches, set forth herein, have damaged The Charitable DAF in not less than $5,000,000.00.

## COUNT III: DEFAMATION (AGAINST MOODY'S)

68.     The Charitable DAF hereby alleges and incorporates the preceding allegations as if fully set forth herein.

69.     On August 6, 2019, certain ACIS noteholders provided Moody's with credible information regarding U.S. Bank's wrongful trading conduct and portfolio mismanagement, as

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1376
Case 3:25-cv-02072-S  Document 15-11  Filed 10/06/25  Page 259 of 1017  PageID 9006
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1375 of 1803  PageID 12121
Case 19-12395-CSS RBDocument 16-7  Filed 11/12/19  Page 17 of 18

described in more detail above. Since that date, Moody's has had actual or constructive notice of US Bank's wrongful trading conduct.

70.　　Notwithstanding such notice, Moody's has continued to publish a false rating of AAA for Indenture 4 and Indenture 5 to investors.

71.　　Moody's published these ratings with knowledge of their falsity or with reckless disregard thereto.

72.　　In so doing, Moody's has caused The Charitable DAF to suffer special damages. Specifically, by continuing to provide an AAA rating for Indenture 4 and Indenture 5, Moody's has enabled U.S. Bank and the portfolio manager to compromise the value of the assets securing the Co-Issuer's obligations under the ACIS Indentures.  Since August 2019, when Moody's first learned of U.S. Bank's misconduct, these assets have continued to decrease in value.

## <u>CONDITIONS PRECEDENT</u>

73.　　Pursuant to Federal Rule of Civil Procedure 9(c), Charitable DAF hereby pleads that all conditions precedent have occurred or been performed.  Although the ACIS Indentures contain "no-action" clauses that require certain noteholders to make written request to U.S. Bank to institute any judicial proceedings in its own name, the Second Circuit has held that noncompliance with a no-action provision is excused in a suit against the indenture trustee.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the 'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture Trustees . . . This construction of [the limitation on suits provision] obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself.").

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1377
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 260 of 1017 PageID 9007
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1376 of 1803 PageID 12122
Case 19-12239-CSS RBDocument Filed 11/12/19 Page 18 of 18

## DEMAND FOR ATTORNEYS' FEES

74.     Pursuant to Section 5.15 of the ACIS Indentures, Charitable DAF hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff The Charitable Donor Advised Fund, L.P. respectfully requests that judgment be entered in its favor and against Defendants U.S. Bank and Moody's as follows:

A.      An award of damages sustained as a result of U.S. Bank National Association's activities in not less than $5,000,000.00;

B.      An award of damages sustained as a result of Moody's conduct in an amount to be determined at trial;

C.      An award of reasonable attorneys' fees and court costs;

D.      An award of pre-judgment and post-judgment interest on all sums awarded; and

E.      For such other and further relief as the Court may deem just, equitable and appropriate.

DATED: November 1, 2019                    Respectfully submitted,

                                           */s/ V. Chisara Ezie-Boncoeur*
                                           Michael K. Hurst (*pro hac admission pending*)
                                           Texas State Bar No. 10316310
                                           *mhurst@lynnllp.com*
                                           V. Chisara Ezie-Boncoeur
                                           New York Bar No. 5333224
                                           *cezie-boncoeur@lynnllp.com*
                                           John R. Christian (*pro hac admission pending*)
                                           Texas State Bar No. 24109727
                                           *jchristian@lynnllp.com*
                                           **LYNN PINKER COX & HURST, LLP**
                                           2100 Ross Avenue, Suite 2700
                                           Dallas, Texas 75201
                                           214-981-3800 – Telephone
                                           214-981-3839 – Facsimile
                                           **ATTORNEYS FOR THE CHARITABLE
                                           DONOR ADVISED FUND, L.P.**

Appellee Appx. 01370
Appx. 04235
008178

Case 19-12239-CSS Doc 116-8 Filed 11/12/19 Page 1 of 16

**Exhibit H**

Highland Objection to Supplemental Application re Winstead PC's Retention

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1379
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 262 of 1017   PageID 9009
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1378 of 1803   PageID 12124
Case 18-30264-sgj11 Doc 685 Filed 12/05/18   Entered 12/05/18 Page 259 of 15 Page 1 of 15

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

Michael K. Hurst (TX 10316310)
Ben A. Barnes (TX 24092085)
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Ste. 2700
Dallas, Texas 75201
Telephone: (214) 981.3800
Facsimile: (214) 981.3839
mhurst@lynnllp.com

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 18-30264-SGJ-11 |
| | § | Case No. 18-30265-SGJ-11 |
| ACIS CAPITAL MANAGEMENT, L.P. and | § | |
| ACIS CAPITAL MANAGEMENT GP, LLC, | § | (Jointly Administered Under Case No. |
| | § | 18-30264-SGJ-11) |
| | § | |
| Debtors. | § | Chapter 11 |

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE**

Highland Capital Management, L.P., party-in-interest and creditor ("Highland") to Acis

Capital Management, L.P. and Acis Capital Management GP, LLC (collectively the "Debtors"),

files this objection (the "Objection") to the *Supplemental Application Regarding the Scope of*

*Winstead PC's Retention as Special Counsel to the Chapter 11 Trustee* [Docket No. 669] (the

"Supplemental Application").  In support of the Objection, Highland states as follows:

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1380
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 263 of 1017    PageID 9010
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1379 of 1803   PageID 12125
Case 18-30264-sgj11 Doc 968-35 Filed 11/05/18    Entered 11/05/18 Page 359 16  Page 2 of 15

## BACKGROUND

**A.    The Bankruptcy Case and the Winstead Application**

1.    On May 30, 2018, after weeks of protesting Winstead's purported representation of the Chapter 11 Trustee in light of Winstead's ongoing representation of Josh Terry – the sole involuntary petitioning creditor who forced the Debtors into bankruptcy – Highland filed the *Motion to Disqualify Winstead PC as Proposed Special Counsel to Robin Phelan, Chapter 11 Trustee* (the "Motion to Disqualify") [Doc. No. 244].

2.    After the Motion to Disqualify was filed to compel the conflict issues to be brought before the Court, later that evening on May 30, 2018, the Chapter 11 Trustee filed the *Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 246] (the "Winstead Application").  The Chapter 11 Trustee had already sought the employment of Forshey & Prostok, LLC ("Forshey & Prostok") to serve as counsel to the estates pursuant to 11 U.S.C. § 327(a), via the *Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc. No. 222] (the "Forshey & Prostok Application").  The Forshey & Prostok Application was later approved on June 18, 2018 without contest.  *See Order Granting Application for Order Authorizing the Employment and Retention of Forshey & Prostok, LLP as Counsel to the Chapter 11 Trustee* [Doc No. 296] (the "Forshey & Prostock Retention Order").  Notably, the Forshey & Prostok Application sought the firm's representation for, among other things, "[p]reparing on behalf of the Trustee all necessary and appropriate motions, pleadings, proposed orders, and other documents that are necessary in connection with these chapter 11 cases, including in connection with any adversary proceedings or appeals associated therewith," and "[i]nvestigating and prosecuting chapter 5 causes of action and other potential litigation that may be brought by the Trustee."  *See* Forshey & Prostock

OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 2

Appellee Appx. 01373
Appx. 04238
008181

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1381
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 264 of 1017    PageID 9011
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1380 of 1803    PageID 12126
Case 18-30264-sgj11 Doc 456-5 Filed 11/05/18    Entered 11/05/18 Page 3459 of 16 Page 3 of 15

Application at ¶¶ 9(b), (c) (emphasis added).  The Forshey & Prostock Retention Order so provided.  *See* Forshey & Prostok Retention Order at ¶ 2 (granting the Forshey & Prostok Application "on the terms and conditions, set forth in the Application.").

3.      By the Winstead Application, the Chapter 11 Trustee sought to distinguish his retention of Winstead from that of Forshey & Prostok by presenting them as special counsel under 11 U.S.C. § 327(a) and (c)[1] to provide legal services for the following "limited" purposes:

   a.  Management, liquidation, disposition, and monetization of the CLO assets;

   b.  Investment Advisors Act;

   c.  Operation of the portfolio management agreements and the indentures, issues arising therefrom, and, specifically including, litigation related thereto or arising therefrom; and

   d.  <u>Certain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee</u> (emphasis added).

*See* Winstead Application at ¶ 25(d).   The Winstead Application was supported by the *Declaration of Rakhee Patel in Support of Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "<u>Patel Declaration</u>").

4.      Notably, the Patel Declaration stated:

   Further, Winstead will confer with the Trustee and Forshey & Prostok on a regular basis to ensure that the services provided by Winstead do not overlap with, and are not otherwise duplicative of, services provided by Forshey & Prostok, as proposed general counsel, to the Trustee.

   With respect to these specified purposes, Winstead's representation will not conflict with Forshey & Prostok's role as general counsel to the Trustee in the Cases, and Winstead will confer regularly with the Trustee and Forshey & Prostok to ensure the same.  Accordingly, except to the extent necessary to effectuate the specific services outlined above,

---

[1] The Winstead Application also provided that the Trustee "reserves its rights to seek approval for such retention under Section 327(e)."  Winstead Application at fn. 2.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 3**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1382
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 265 of 1017 PageID 9012
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1381 of 1803 PageID 12127
Case 18-30264-sgj11 Doc 968-8 Filed 11/05/18 Entered 11/05/18 Page 359 of 16 Page 4 of 15

Winstead will not represent the Trustee with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters arising purely under the Bankruptcy Code. With respect to the various Appeals, the underlying issues are discrete, and will not affect Winstead's representation of the Trustee in the Cases.

5.     On June 9, 2018, the Trustee filed the *Supplement to Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* [Doc. No. 266] (the "Supplement"). The Supplement acknowledged that Winstead would continue to represent Josh Terry, but asserted that the representation did not conflict with Winstead's representation of the Trustee. The Supplement was supported by the *Supplemental Declaration of Rakhee Patel in Support of the Application to Employ Winstead PC as Special Counsel to the Chapter 11 Trustee* (the "Supplemental Patel Declaration"). Again, the Supplement and the Supplemental Patel Declaration reiterated that "Winstead will not represent the estate with respect to plan negotiations or formulation; business or bankruptcy restructuring or reorganization; or otherwise in matters purely under the Bankruptcy Code." *See* Supplement at ¶ 6; Supplemental Patel Declaration at ¶ 14.

6.     In addition to its pending Motion to Disqualify, on June 11, 2018, Highland filed its objection to the Winstead Application [Doc. No. 267] (the "Highland Objection"). By the Highland Objection, Highland asserted that retention of Winstead as special counsel was impermissible and inappropriate because: (1) the delineated services proposed to encompass the scope of services operated as Winstead's *de facto* general representation of the Trustee; (2) retention under Bankruptcy Code section 327(a) was improper because Winstead was not disinterested; and (3) Winstead had an actual conflict of interest relating to certain state court litigation with Highland (the "Winstead Litigation").

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 4**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1383
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 266 of 1017    PageID 9013
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1382 of 1803    PageID 12128
Case 18-30264-sgj11 Doc 368-5 Filed 01/05/18    Entered 11/12/05/18 Page 350 of 16 Page 5 of 15

7.      Likewise, on June 11, 2018, the Office of the United States Trustee filed its objection to the Winstead Application [Doc. No. 279] (the "U.S. Trustee Objection").  By the U.S. Trustee Objection, the U.S. Trustee asserted substantively similar objections as in the Highland Objection, including that the relief sought in ¶ 12(d) of the Winstead Application was "too broad a delegation of the Court's retention authority" and that "given Winstead's prior retention of Terry, any employment should be cabined and specifically defined, with any necessary supplemental disclosures."  U.S. Trustee Objection at ¶ 23.

8.      The Court held a hearing on the Winstead Application on June 14, 2018.  The following representations were made by the Trustee:

> Winstead is going to do a lot of the CLO stuff.  But Forshey & Prostok, he's doing the real bankruptcy stuff.  For example, they're drafting the plan.  They're doing the turnover stuff.  They will do the claim objections. . . . They're doing the bankruptcy stuff in this Chapter 11 case, but they aren't CLO experts, they'll readily admit that.[2]

9.      After considering the arguments of counsel for Highland and the U.S. Trustee, the Court approved the Winstead Application, in part, but not without materially paring back the scope.  Specifically, the Court did not authorize part (d) of the proposed scope of services, thus rejecting Winstead's employment by the Trustee as to "[c]ertain other litigation matters related to or arising in these Chapter 11 cases, as requested by the Chapter 11 Trustee."  The Court stated:

> We're going to scratch D, Certain Other Litigation Matters.  Anything beyond those three tasks [A, B, and C], Mr. Phelan, you'll have to file another application on notice to creditors and parties in interest, and we'll have a hearing deciding whether an expanded scope is appropriate or not.[3]

---

[2] June 14, 2018 Hr'g Tr. at 63:11-19 (testimony of Trustee, emphasis added).  Excerpts of the hearing transcript are attached hereto as **Exhibit A**.
[3] *Id.* at 68:16-21.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 5**

10.     On June 21, 2018, the Court entered its order consistent with its ruling [Doc. No. 313] (the "Winstead Employment Order").[4]

## B.    The Court's Limitations Have Been Ignored

11.     From the inception of these bankruptcy cases and despite the Court's limitations on the scope of Winstead's employment (and Winstead's own representations in the Winstead Application and the Supplement), Winstead has appeared on every pleading filed by the Trustee, appeared at every hearing in this case, and has *de facto* served as lead counsel to the Trustee. The Court need only review the record in this case as evidence that Winstead has ignored the limits of the Court's ruling. In short, it has proceeded in these cases unrestrained.

12.     As an example, representation of the Trustee during the prior failed Plan process was dominated by Winstead.[5] In addition, Winstead has taken the lead role in the Adversary Proceedings and in every one of the Appeals, each as defined and described below.

13.     As the Court is aware, the Trustee is currently in the process of seeking confirmation of "Plan D." Once again, any reasonable review of Winstead's role in the plan process to-date demonstrates that neither Winstead nor the Trustee are taking seriously their responsibility to adhere to the Court's limits on Winstead's role.

## C.    The Adversary Proceedings

14.     There are currently two adversary proceedings pending in this case that involve Highland and Highland related entities: Adversary Case No. 18-03078, and Adversary Case No.

---

[4] Highland sought leave to appeal this interlocutory order to the District Court, but was denied leave to appeal. Highland reserves the rights to appeal and, at this time, intends to pursue the appeal of the Trustee's retention of Winstead when the matter is otherwise deemed final and appealable.

[5] Winstead attorney Rakhee Patel examined Trustee witness Zach Alpern and cross examined witnesses Daniel Castro, Hunter Covitz and Isaac Leventon. Winstead attorney Joseph Wielebinski examined Trustee witness Richard Klein. Winstead attorney Rakhee Patel was the only Trustee attorney to make closing arguments. Notably, no fee applications reflecting time expended in the failed Plan endeavor have been filed.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 6**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1385
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 268 of 1017    PageID 9015
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1384 of 1803    PageID 12130
Case 18-30264-sgj11 Doc 865-5 Filed 11/05/18    Entered 11/05/18 Page 359 16 Page 7 of 15

18-03212 (collectively referred to herein as the "Adversary Proceedings").  Adversary Case No. 18-03078 was originally filed by Highland and HCLOF against the Trustee, seeking an injunction related to a June 14, 2018 optional redemption.  The Trustee thereafter filed counterclaims and third party claims against Highland and HCLOF, including a fraudulent transfer claim that the Trustee has alleged is fundamental to this bankruptcy case.

15.    Given the passage of time and circumstances that mooted the original relief sought by Highland and HCLOF, the parties in case no. 18-03078 agreed to the form of agreed order dismissing Highland and HCLOF's claims without prejudice and allowing the Trustee to amend his answer.  The order was entered on November 1, 2018.

16.    Adversary Case No. 18-03212 was brought by the Trustee against Highland, HCLOF, Neutra, Ltd. and the CLOs seeking a temporary restraining order and preliminary injunction preventing optional redemptions and also seeking related declaratory judgments.

17.    In both Adversary Proceedings, Winstead has taken a lead role, despite the limits of the Court's Order.[6]

18.    Discovery in the Adversary Proceedings and in the bankruptcy case is governed by an *Agreed Protective Order* entered by this Court on August 21, 2018 [Doc. No. 535] (the "Protective Order").

**D.    The Appeals**

19.    There are a number of appeals to the District Court currently pending in relation to this bankruptcy case and the Adversary Proceedings (the "Appeals").  Once again, despite the

---

[6] The Court need only consider one of the most recent hearings on the adversaries held October 9, 2018, where Winstead attorney Phil Lamberson presented all of the arguments on behalf of the Trustee.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 7**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1386
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 269 of 1017 PageID 9016
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1385 of 1803 PageID 12131
Case 18-30264-sgj11 Doc 968-8 Filed 11/05/18 Entered 11/05/18 Page 359 of 16 Page 8 of 15

limits of this Court's Order, Winstead has consistently taken the lead in such "other litigation matters related to or arising in these Chapter 11 cases."[7]

## E.    The Supplemental Application

20.    After almost 4½ months of ignoring the limitations prescribed by the Court's ruling (and contradicting prior representations to the Court), on October 28, 2018, the Trustee filed the Supplemental Application.  The basis provided for expanding the scope of Winstead's retention includes:

    a.    The need of Winstead to "reference . . . and [have] a comprehensive understanding of <u>all agreements and documents underlying Acis's business</u> . . . ."  Application at ¶ 2 and ¶ 11 (emphasis added).

    b.    The need for Winstead to continue "evaluating the estates' numerous claims, counterclaims, third-party claims and defenses . . . ."  Application at ¶ 9.

21.    The Trustee is seeking to employ Winstead in relation to "[a]ny litigation against Highland Capital and/or any of its affiliates, including Highland CLO Funding, Ltd., Highland CLO Management, Ltd. and Highland CLO Holdings, Ltd."  Application at ¶ 13(a).  The Supplemental Application also identifies the pending Adversary Proceedings and appeals involving Highland and Highland-related entities.  Application at ¶ 13(b) and (c).  But, practically speaking, the all-inclusive scope of "any litigation" in Application paragraph 13(a) would make paragraphs 13(b) and (c) superfluous.

---

[7] *See, e.g., Robin Phelan, Chapter 11 Trustee's Response to Emergency Motion of Appellants Highland and HCLOF to Consolidated Appeals and Expedited Briefing and Brief in Support, filed by Winstead* (signed by Rahkee Patel) on behalf of the Trustee on July 30, 2018 in District Court Case No. 3:18-cv-01822 (Highland CLO Funding Ltd. v. Robin Phelan, Chapter 11 Trustee, et al.); *see also Notice of Appearance and Designation of <u>Lead Counsel</u>* (emphasis added, each signed by Rahkee Patel) in Case Nos. 3:18-cv-01822-B, 3:18-cv-01810-S, and 3:18-cv-01817-G.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 8**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1387
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 270 of 1017 PageID 9017
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1386 of 1803 PageID 12132
Case 18-30264-sgj11 Doc 1289635 Filed 11/05/18 Entered 11/05/18 Page 9 of 15

22.     On October 29, 2018, the Trustee filed a motion seeking to expedite the hearing

on the Supplemental Application [Doc. No. 672] (the "Motion to Expedite").  The Trustee stated

in the Motion to Expedite that the hearing on the Application will be "merely a rehashing of the

hearing on the [original] Application."  Motion to Expedite at ¶ 4.  Whether or not that is the

case, it would be for good reason, since the Trustee and Winstead have demonstrably ignored the

Court's Order.

## OBJECTION

**A.     The Circumstance of the Case Clearly Demonstrate that Winstead Has a Conflict of Interest**

23.     As noted above, Highland's appeal of the Order was dismissed by the District

Court as interlocutory.  As such, there is nothing preventing the Court at this point from

reconsidering issues that were previously asserted by the parties in this matter.  Both Highland

and the U.S. Trustee asserted that Bankruptcy Code section 327(c) prohibited Winstead's

retention because it has an actual conflict of interest related to the Winstead Litigation and

related to Winstead's on-going representation of Terry.  As to the Winstead Litigation, the Court

ordered Winstead to erect an ethical wall.[8]

24.     The issue of Winstead's representation of Terry, however, remains and constitutes

an unwaivable, actual conflict of interest.  At the June 14, 2018 hearing on the Application, both

Highland and the U.S. Trustee expressed concerns to the Court of various ways Winstead's

concurrent representation was problematic.  Subsequent events have proven the point.  The lead

law firm in the Adversary Proceedings (Winstead) currently represents Highland's principal

adversary (Terry).  The parties are currently engaged in discovery related to the Adversary

---

[8] June 14, 2018 Hr'g Tr. at 71:19-25.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 9**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1388
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 271 of 1017    PageID 9018
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1387 of 1803    PageID 12133
Case 18-30264-sgj11 Doc 3445-8 Filed 05/15/18    Entered 11/12/15 Page 359 of 18 Page 10 of 15

Proceedings and Highland has designated certain of the documents "Confidential," and a much smaller portion of the documents "Attorneys Eyes Only," as is permitted under the Protective Order.  Notably, the Trustee has directed Winstead to handle the recent discovery, including documents currently in the process of being produced by Highland to Winstead.   One of Highland's principal concerns is that sensitive documents or information dealing with Highland's business operations will fall into the hands of Terry, who is a current adversary <u>and a potential future competitor</u>.[9]  It simply has to be the case that some of the attorneys at Winstead who are reviewing the produced documents will be the very same attorneys advising Terry in the related appeals.  What if certain Confidential Information reviewed by Winstead has nothing to do with maximizing value for the estate, but would be helpful for Terry to compete against Highland and/or to advance his appeal?  As it stands, Winstead will be under Court order not to discuss or otherwise reveal that information.  Winstead attorneys are in the impossible positon of parsing every piece of information to determine whether it falls under the Trustee's duty to maximize value, as opposed to merely being useful information for an adversary and competitor of Highland.  Furthermore, Winstead attorneys must keep track of exactly where they obtained every piece of information they discuss with their client Terry when prosecuting his appeal.  For that reason alone, it is not possible for Winstead to simultaneously maintain confidences for both the Trustee and Terry.   In addition, Winstead's duty of loyalty is being violated because Winstead is in the position of affirmatively protecting Confidential Information available to one client (the Trustee) against the other client (Terry).

---

[9] The prior Plans attempted, and the current Plan D is attempting again, to put into place a mechanism where Terry will be a direct competitor of Highland.  Terry thus is not motivated simply to recover on his claim.  Terry has a non-creditor interest that is furthered by learning as much non-public information about Highland's recent actions and investment activities as possible.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 10**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1389
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 272 of 1017 PageID 9019
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1388 of 1803 PageID 12134
Case 18-30264-sgj11 Doc 968-8 Filed 11/12/18 Entered 11/12/18 Page 11 of 15

25.     This is untenable situation and there is no good reason to permit it.  As previously stated in this matter by the U.S. Trustee, these circumstances directly challenge Winstead's ethical duty of loyalty and duty to maintain confidences.  *See* U.S. Trustee Objection at ¶ 15 (citing *In re American Airlines*, 972 F.2d 605, 618 (5th Cir. 1992) and *Humble Place Joint Venture v. Fory (In re Fory)*, 936 F.2d 814, 819 (5th Cir. 1991)).   Winstead is conflicted and Bankruptcy Code section 327(c) prohibits its retention in this case.

## B.     Winstead Cannot Maintain the Façade: It Has Represented, and is Seeking to Represent, the Chapter 11 Trustee Without Any Meaningful Limitation

26.     This Court chose to limit the scope of Winstead's retention to exclude the broadly-worded "certain other litigation matters."   The Court did that to put into place "prophylactic measures" to ensure that the Trustee's goal of maximizing value lines up with Terry's goal of recovering as a creditor in the case.[10]  The Court recognized that the Application, as originally requested, was not tied in any way to Winstead's alleged CLO expertise and giving Winstead free reign to litigate such matters could create problems relating to changing "bedfellows" and "crossway" motivations.[11]

27.     Since the entry of the Order, a critical point seems to have gotten lost in the various litigation fronts among the parties: Winstead was retained as <u>special</u> counsel based on the Trustee's assertion that Winstead had unique expertise <u>related to CLOs</u>.  The hearing on the Supplemental Application provides the Court with an opportunity to address whether Winstead and the Trustee actually complied with the limitation imposed by the Court.  To that end, at hearing on this matter, the Court should: (1) review the evidence related to the scope of Winstead's representation since being retained, and (2) consider whether the role Winstead

---

[10] June 14, 2018 Hr'g Tr. at 68:4-6.
[11] *Id.*

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 11**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1390
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 273 of 1017 PageID 9020
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1389 of 1803 PageID 12135
Case 18-30264-sgj11 Doc 968-8 Filed 11/12/18 Page 12 of 15

proposes going forward has any realistic tie to the concept of "special counsel." To the first
point, as noted above, Winstead clearly did not limit its role to CLO related matters following its
retention. There was absolutely no meaningful distinction between Winstead and Forshey &
Prostok during the failed contested Plan process. Moreover, any assertion by Winstead that it
worked to limit duplication of effort with Forshey & Prostok is not relevant to the <u>scope</u> of
employment point before the Court. *See In re Polaroid Corp.*, 424 B.R. 446, 452 (Bankr. D.
Minn. 2010) (holding that special counsel should not provide general advice to a debtor); *see
also In re Abrass*, 250 B.R. 432, 455 (Bankr. M.D. Fla. 2000); *In re Running Horse, L.L.C.*, 371
B.R. 446, 452 (Bankr. E.D. Cal. 2007). Special counsel requires retention based on specialized
knowledge and, naturally, the firm should limit itself to matters involving such knowledge.
Winstead's demonstrated track record fails that test. This is especially problematic given that
every representation by the Trustee and Winstead to this Court was that Winstead would be
taking on such a limited role.

28.     On the second point, after months of violating the Court's Order requiring
limitations on its representation, Winstead has now explicitly dispensed with any pretense of
special counsel and is requesting to be involved in <u>any</u> litigation involving Highland and to allow
Winstead to review and provide analysis on <u>any</u> agreement and document of the Debtors. Any
pretext that Winstead is in this case because of its CLO expertise has been cast aside.

29.     The Trustee has also chosen to challenge Highland's motivations related to this
Objection. Specifically, the Trustee suggests improper motive in the Supplemental Application
by stating that Highland and HCLOF opposed the original Application because they were
"highly motivated to attempt to hamstring and otherwise limit the Trustee's ability to litigate
effectively with them." Supplemental Application at ¶ 6. This is simply inaccurate. Highland is

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 12**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1391
Case 3:25-cv-02072-S Document 15-11 Filed 04/06/25 Page 274 of 1017 PageID 9021
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1390 of 1803 PageID 12136
Case 18-30264-sgj11 Doc 3685-8 Filed 11/05/18 Entered 11/05/18 Page 13 of 15

one of the largest creditors in this case and it has valid concerns that enforcing no meaningful limits on purported special counsel is an impermissible use of estate funds. The Trustee and Winstead have ignored the limitations put into place by this Court. The Court should refuse to grant the Supplemental Application.

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 13**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1392
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 275 of 1017   PageID 9022
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1391 of 1803   PageID 12137
Case 18-30264-sgj11 Doc 3445-8 Filed 11/05/18   Entered 11/12/05/18 Page 159 of 15 Page 14 of 15

**WHEREFORE**, Highland respectfully requests that the Court deny the relief sought in the Supplemental Application and provide such other and further relief that this Court deems just and proper.

Dated:  November 5, 2018                  Respectfully submitted,

                                          */s/ Jason B. Binford*
                                          Holland N. O'Neil (TX 14864700)
                                          Jason B. Binford (TX 24045499)
                                          Shiva D. Beck (TX 24086882)
                                          Melina N. Bales (TX 24106851)
                                          **FOLEY GARDERE**
                                          **FOLEY & LARDNER LLP**
                                          2021 McKinney Avenue, Ste. 1600
                                          Dallas, Texas  75201
                                          Telephone:  (214) 999.3000
                                          Facsimile:  (214) 999.4667
                                          honeil@foley.com
                                          jbinford@foley.com
                                          sbeck@foley.com
                                          mbales@foley.com

                                          and

                                          Michael K. Hurst (TX 10316310)
                                          Ben A. Barnes (TX 24092085)
                                          **LYNN PINKER COX & HURST, LLP**
                                          2100 Ross Avenue, Ste. 2700
                                          Dallas, Texas 75201
                                          Telephone: (214) 981.3800
                                          Facsimile: (214) 981.3839
                                          mhurst@lynnllp.com
                                          bbarnes@lynnllp.com

                                          **COUNSEL FOR HIGHLAND CAPITAL**
                                          **MANAGEMENT, L.P.**

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION
REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE
CHAPTER 11 TRUSTEE – Page 14**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1393
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 276 of 1017    PageID 9023
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1392 of 1803   PageID 12138
Case 18-30264-sgj11 Doc 958-8 Filed 11/05/18   Entered 11/05/18 Page 15 of 15

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 5, 2018, a true and correct copy of the foregoing was served electronically via the Court's ECF system on those parties registered to receive such service.

*/s/ Jason B. Binford*
Jason B. Binford

**OBJECTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. TO SUPPLEMENTAL APPLICATION REGARDING THE SCOPE OF WINSTEAD PC'S RETENTION AS SPECIAL COUNSEL TO THE CHAPTER 11 TRUSTEE – Page 15**

Appellee Appx. 01386

008194

**Exhibit I**

Foley Notice of Appearance for Highland CLO Funding, Ltd.,
CLO Holdco, Ltd. and Neutra, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1395
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 278 of 1017 PageID 9025
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1394 of 1803 PageID 12140
Case 18-30264-sgj11 Doc 21-8 Filed 04/18/18 Entered 04/18/18 Page 206 of 4 Page 1 of 3

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
**FOLEY GARDERE**
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING,
LTD., CLO HOLDCO, LTD. AND NEUTRA, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 18-30264-SGJ7** |
| | § | |
| **Alleged Debtor.** | § | |

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, GP,** | § | **Case No. 18-30265-SGJ7** |
| **L.L.C.,** | § | |
| | § | |
| **Alleged Debtor.** | § | |

## NOTICE OF APPEARANCE AND
## REQUEST FOR SERVICE OF PAPERS

PLEASE TAKE NOTICE that Holland N. O'Neil, Jason B. Binford, Shiva D. Beck,

Melina N. Bales and the law firm of Foley Gardere, Foley & Lardner LLP, attorneys for

Highland CLO Funding, Ltd., CLO Holdco, Ltd. and Neutra, Ltd. (collectively, the "**Equity**

**Holders**"), parties-in-interest in the above-referenced matter, and pursuant to Rules 2002, 3017,

and 9010 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 1109(b), request that all

notices given or required to be given in this case and all papers served or required to be served in

this case be given to and served upon them at the following address:

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1396
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 279 of 1017 PageID 9026
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1395 of 1803 PageID 12141
Case 18-30264-sgj11 Doc 891-855 Filed 04/18/18 Entered 04/18/18 Page 306 Page 2 of 3

Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina N. Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

Please take further notice that the foregoing request includes notices and papers referred to in the Federal Rules of Bankruptcy Procedure and includes, without limitation, any plans of reorganization, objections, notices of hearings, orders, pleadings, motions, applications, complaints, demands, requests, petitions, disclosure statements, memoranda, briefs and any other documents brought before this Court with respect to these proceedings, whether formal or informal, whether written or oral, whether transmitted or conveyed by mail, hand delivery, telephone, telecopier, telegraph, or telex.

This Notice of Appearance and Request for Notices shall not be deemed or construed to be a waiver of the rights of the Equity Holders (i) to have final orders in non-core matters entered only after de novo review by a District Judge, (ii) to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to this case, (iii) to have a District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (iv) respecting in personam jurisdiction, or (v) any other rights, claims, actions, setoffs, or recoupments to which the Equity Holders are or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

**NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF PAPERS** **Page 2**
4840-5970-3906.1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1397
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 280 of 1017 PageID 9027
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1396 of 1803 PageID 12142
Case 18-30264-sgj11 Doc 891-8 Filed 04/18/18 Entered 04/18/18 Page 296 of 4 Page 3 of 3

Dated: April 18, 2018

Respectfully submitted,

*/s/ Holland N. O'Neil*
Holland N. O'Neil (TX 14864700)
Jason B. Binford (TX 24045499)
Shiva D. Beck (TX 24086882)
Melina Bales (TX 24106851)
FOLEY GARDERE
FOLEY & LARDNER LLP
2021 McKinney Avenue, Ste. 1600
Dallas, Texas 75201
Telephone: (214) 999.3000
Facsimile: (214) 999.4667
honeil@foley.com
jbinford@foley.com
sbeck@foley.com
mbales@foley.com

**COUNSEL FOR HIGHLAND CLO FUNDING, LTD., CLO HOLDCO, LTD. AND NEUTRA, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Notice of Appearance and Request for Service of Papers was served electronically by the Court's PACER system on April 18, 2018.

*/s/Melina N. Bales*
Melina N. Bales

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1398
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 281 of 1017 PageID 9028
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1397 of 1803 PageID 12143
Case 19-12239-CSS Doc 116-10 Filed 11/12/19 Page 1 of 1

## CERTIFICATE OF SERVICE

I, Josef W. Mintz, hereby certify that on November 12, 2019, I served or caused to be served the *Limited Objection to Debtor's: (I) Application for an Order Authorizing the Retention and Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel,* Nunc Pro Tunc *to the Petition Date; and (II) Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel,* Nunc Pro Tunc *to the Petition Date* upon the following persons listed in the manner indicated and upon all subscribed parties via CM/ECF.

Via Email and Hand Delivery:

    Pachulski Stang Ziehl &Jones LLP
    919 N. Market Street, 17th Floor
    Wilmington, DE 19801
    Attn: James E. O'Neill, Esq.
    joneill@pszjlaw.com

    Office of the United States Trustee
    844 King Street, Suite 2207, Lockbox 35
    Wilmington, DE 19801
    Attn: Jane M. Leamy, Esq.
    jane.m.leamy@usdoj.gov

Via Email and First Class Mail:

    Pachulski Stang Ziehl &Jones LLP
    10100 Santa Monica Blvd., 13th Floor
    Los Angeles, CA 90067
    Attn: Jeffrey N. Pomerantz, Esq.
    jpomerantz@pszjlaw.com

                              /s/Josef W. Mintz
                              Josef W. Mintz (DE No. 5644)

Appellee Appx. 01391
Appx. 04356
008199

# APPENDIX 16

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1400
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 283 of 1017 PageID 9030
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1399 of 1803 PageID 12145
Case 19-12239-CSS Doc 120 Filed 11/12/19 Page 1 of 6

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-12239 (CSS) |
| Debtor. | ) | **Hearing Date: Nov. 19, 2019, at 12:00 p.m. (ET)** |
| | ) | **Obj. Deadline: Nov. 12, 2019, at 4:00 p.m. (ET)** |
| | ) | **Docket Ref. Nos. 69 & 70** |

**LIMITED OBJECTION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS TO THE DEBTOR'S
APPLICATION FOR AN ORDER AUTHORIZING THE RETENTION
AND EMPLOYMENT OF FOLEY GARDERE, FOLEY & LARDNER LLP AND
LYNN PINKER COX & HURST AS SPECIAL TEXAS COUNSEL AND SPECIAL
TEXAS LITIGATION COUNSEL, *NUNC PRO TUNC* TO THE PETITION DATE**

The official committee of unsecured creditors (the "Committee") of Highland Capital

Management, L.P. (the "Debtor" or "Highland"), hereby submits this limited objection (this

"Limited Objection") to the Debtors' applications, pursuant to Sections 327(e), 328(a), and 330

of the Bankruptcy Code, for entry of orders authorizing the retention and employment of Foley

Gardere, Foley & Lardner LLP ("Foley") and Lynn Pinker Cox & Hurst LLP ("Lynn Pinker,"

and together with Foley, the "Proposed Special Counsel") as Special Texas Litigation Counsel

and Special Texas Litigation Counsel, respectively, *nunc pro tunc* to the Petition Date

(collectively, the "Applications") [Docket Nos. 69 & 70].[2] In support of this Objection, the

Committee respectfully states as follows:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Citations to "Foley Application" are to Docket No. 69 and citations to "Lynn Pinker Application" are to Docket No. 70. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Applications.

## INTRODUCTION

1.    Proposed Special Counsel have represented the both the Debtor and non-debtor defendants – including Mr. James Dondero, the founder of the Debtor – in various matters since 2016.[3]  The Committee was formed two weeks ago, on October 29, 2019,[4] and is in the process of gathering information and familiarizing itself with the Debtor's opaque and complex organizational structure, business operations, and assets under management.  Importantly, the Committee has requested relevant information, but as of yet has not been able to fully familiarize itself with the Debtor's web of contractual relationships and transaction histories with its many non-debtor affiliates.[5]  Without the benefit of a full understanding of the Debtor's relationships and prepetition transactions with its affiliates, the Committee is unable to determine the appropriateness of Proposed Special Counsel representing both the Debtor and non-debtors in matters going forward, and whether it is appropriate for the costs of such non-debtor representation, especially in matters wholly unrelated to the Debtor, to be borne by the Debtor.[6]

2.    The Committee recognizes that Proposed Special Counsel have developed knowledge and expertise from their pre-petition representation of the Debtor.  The Committee

---

[3]    See Lynn Pinker Application Ex. A ¶ 3.

[4]    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief commencing this chapter 11 case, and the United States Trustee appointed the Committee nearly two weeks later on October 29, 2019 [Docket No. 65].  The Committee moved quickly following its appointment to bring in Sidley Austin LLP ("Sidley") as its proposed counsel on October 30, 2019 and FTI Consulting Inc. ("FTI") as its proposed financial advisor on November 6, 2019.  Sidley and FTI quickly engaged the Debtor's advisors to get up to speed on this chapter 11 case, but there has not yet been sufficient time for the Committee to even familiarize itself with the Debtor's prepetition transactions.

[5]    The Committee and its advisors intend to closely scrutinize all prepetition transactions involving the Debtor to determine whether any are avoidable and/or give rise to claims against affiliated entities.

[6]    Relatedly, both the Foley Application and the Lynn Pinker Applications disclose large sums of unpaid fees and expenses that have been billed to the Debtor but remain unpaid as of the Petition Date.  See Foley Application ¶ 16; Lynn Pinker Application ¶ 19.  The Committee is uncertain whether such amounts should be borne by the Debtor and reserves the right to challenge such unsecured claims at the appropriate time.

25579780.1

Appellee Appx. 01394

Appx. 008202

therefore has no objection to the Proposed Special Counsel continuing to represent the Debtor in matters which provide a benefit to the Debtor's estate. The Committee does object, however, to any continuation of Proposed Special Counsels' joint representation of Debtor and non-debtor defendants without certainty of reimbursement for such fees and costs and with no justifying benefit to the Debtor's estate.

## **OBJECTION**

3. The principal concern the Committee has with respect to the Applications is the lack of clear delineation of the Proposed Special Counsel's proposed engagements and representation, and the Debtor's obligation to pay for the same. For example, the Hurst Declaration discloses Lynn Pinker's representation of Mr. Dondero in the Texas Lawsuit,[7] and within the application itself describes the services to be provided by Lynn Pinker as "Subject to approval by the Bankruptcy Court, the services that the Debtor proposes that the Firm render, and the Firm has agreed to provide, include advising the Debtor in connection with all aspects of the Pending Acis Proceedings and the Texas Lawsuit, and performing the range of services normally associated with matters such as this as the Debtor's Special Texas Litigation Counsel, which the Firm is in a position to provide in connection with the matter referred to above."[8] It is unclear whether Lynn Pinker's proposed retention is limited to representing the Debtor, or includes representation of non-debtors, including Mr. Dondero. It is also unclear if Lynn Pinker will be limited to representing the Debtor (and others) in connection with the Acis Proceedings and the Texas Lawsuit, or if these are just two matters which have been mentioned in the Lynn

---

[7] *See* Lynn Pinker Application Ex. A ¶ 3.

[8] *See* Lynn Pinker Application ¶ 17

Appellee Appx. 01395

008203

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1403
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 286 of 1017 PageID 9033
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1402 of 1803 PageID 12148
Case 19-12239-CSS Doc 120 Filed 11/12/19 Page 4 of 6

Pinker Application.[9]   As the proposed order approving the Lynn Pinker Application merely approves the retention of Lynn Parker as Special Texas Litigation Counsel "pursuant to the terms set forth in the Application,"[10]  the Committee is unsure which parties Lynn Pinker proposes to represent, and in what matters, and whether the Debtor has agreed to pay for such representations.

4.      The Committee also notes that the Applications do not provide for an allocation of attorneys' fees and expenses among the Debtor and non-debtor defendants.[11]  The Committee is concerned that the Debtor may be bearing the cost for representations of non-debtors without any justifiable benefit to the Debtor's estate, and without any regard for whether such representations may cause a conflict of interest.   Courts have found that such arrangements where the Debtor pays all fees of non-debtor defendants without explicitly justifying such arrangement in the application are improper under Section 327(e).   *See In re Perez*, 389 B.R. 180, 184 (Bankr. D. Colo. 2008) (denying application pursuant to Section 327(e) where bankruptcy estate alone was to pay attorneys' fees of special counsel representing debtor and non-debtor co-defendants in appeal of a state court judgment; that "arrangement *may* have been benign enough and 'all in the family' before the Debtor's bankruptcy was filed, but once the bankruptcy case was filed, things changed" and "Debtor became a fiduciary and others had a stake") (emphasis in original).

---

[9] The Lynn Pinker Application also mentions representation of non-debtor related entity Charitable Donor Advised Fund, L.P. in an unrelated matter.

[10] *See* Lynn Pinker Application Ex. B ¶ 8.

[11]  The absence of such an allocation is alone grounds to deny any fee request submitted by Proposed Special Counsel.  *See In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 234 (Bankr. E.D. Cal. 1988) (finding proposed special counsel under Section 327(e) retained to represent debtors and non-debtors in lawsuit not entitled to recovery of fees because "[t]here [was] no allocation of the bill among the various clients" and "[s]ome services were rendered for the ultimate benefit of persons other than the debtor").  In the event this Court authorizes the retention of Proposed Special Counsel to represent Debtor and non-debtor defendants, the Committee reserves its right to contest fee applications for failure to properly allocate fees and expenses among clients.

Appellee Appx. 01396
Appx. 04384
008204

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1404
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 287 of 1017   PageID 9034
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1403 of 1803   PageID 12149
Case 19-12239-CSS   Doc 120   Filed 11/12/19   Page 5 of 6

5.      Without greater clarity into the proposed representations included in the Applications, the Committee must request that the Court reject the Applications to the extent that they seek authorization for the Proposed Special Counsel to represent both the Debtor and non-debtor parties and, to the extent the Court is otherwise inclined to approve the Applications, the Court should require the non-debtor entities to deposit on a monthly basis the highest amount incurred in a single month in the prior 12 months to ensure the Debtor's estate will be reimbursed for the fees and costs incurred in connection with the representation of the non-debtor entities.

*       *       *       *       *

*[Remainder of Page Intentionally Left Blank]*

**Appellee Appx. 01397**
**Appx. 04392**
008205

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1405
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 288 of 1017    PageID 9035
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1404 of 1803   PageID 12150
Case 19-12239-CSS    Doc 120   Filed 11/12/19   Page 6 of 6

WHEREFORE, the Committee respectfully requests that the Court deny the relief requested in the Applications to the extent they seek authorization for the Proposed Special Counsel to represent both the Debtor and non-debtor parties and provide such other and any further relief as the Court may deem just and proper.

Date:  November 12, 2019
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jaclyn C. Weissgerber*
Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Sean M. Beach, Esq. (No. 4070)
Jaclyn C. Weissgerber, Esq. (No. 6477)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600

-and-

SIDLEY AUSTIN LLP

Bojan Guzina, Esq. (*admitted pro hac vice*)
Matthew Clemente, Esq. (*admitted pro hac vice*)
Alyssa Russell, Esq. (*admitted pro hac vice*)
One South Dearborn Street
Chicago, IL 60603
Telephone:  (312) 853-7000

- and –

Jessica Boelter, Esq.
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 839-5300

- and –

Penny P. Reid, Esq. (*admitted pro hac vice*)
Paige Holden Montgomery, Esq. (*admitted pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 74201
Telephone: (214) 981-3300

*Proposed Counsel for the Official Committee of Unsecured Creditors*

25579780.1

6

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1406
of 1804
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 289 of 1017    PageID 9036
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1405 of 1803   PageID 12151

# APPENDIX 17

**Appellee Appx. 01399**

**Appx. 04364**

008207

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1407
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 290 of 1017 PageID 9037
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1406 of 1803 PageID 12152
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 1 of 2

Docket #2590 Date Filed: 07/20/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

## DECLARATION OF JOHN A. MORRIS IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019 AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Appellee Appx. 01400

Appx. 04205

008208

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1408
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 291 of 1017    PageID 9038
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1407 of 1803   PageID 12153
Case 19-34054-sgj11 Doc 2590 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 2 of 2

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP (the "Firm"), counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for Entry of an Order Approving Settlement Pursuant to Bankruptcy Rule 9019 and Authorizing Actions Consistent Therewith* (the "Motion").  Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

2      Attached as **Exhibit 1** is a true and correct copy of that certain Settlement Agreement dated as of July 16, 2021 (the "Settlement Agreement"), by and among the Parties (as that term is defined in the Settlement Agreement).

Dated: July 20, 2021.

*/s/ John A. Morris*
John A. Morris

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 1 of 20

# **EXHIBIT 1**

Appellee Appx. 01402

Appx. 04205

008210

## SETTLEMENT AGREEMENT

This settlement agreement (the "Agreement") by and between Highland Capital Management, L.P., as debtor-in-possession (the "Debtor"), on the one hand, and Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA" and together with HCMFA, the "Advisors"), Highland Income Fund ("HIF"), NexPoint Strategic Opportunities Fund ("NSOF"), and NexPoint Capital, Inc. ("NCI" and together with HIF and NSOF, the "Funds," and together with the Advisors, the "Defendants," and the Defendants and the Debtor, together the "Parties"), on the other hand.

### RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is managing and operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtor's chapter 11 case is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, the Debtor manages certain collateralized loan obligations ("CLOs") pursuant to the terms of certain portfolio management and servicing agreements (collectively, the "CLO Management Agreements");[1]

WHEREAS, on January 6, 2021, the Debtor commenced an adversary proceeding (the

---

[1] The CLOs managed by the Debtor include ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., and Valhalla CLO, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1411
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 294 of 1017 PageID 9041
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1410 of 1803 PageID 12156
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 3 of 20

"<u>Adversary Proceeding</u>") against Defendants by filing its complaint (the "<u>Complaint</u>") [Docket No. 1][2] (the "<u>Complaint</u>");

WHEREAS, on January 8, 2021, the Court issued its *Order Regarding Adversary Proceedings Trial Setting and Alternative Scheduling Order* [Docket No. 12] (the "<u>Alternative Scheduling Order</u>");

WHEREAS, on January 13, 2021, the Court entered that certain *Agreed Order Granting Defendant's Motion for a Temporary Restraining Order Against Certain Entities Owned and/or Controlled by Mr. James Dondero* [Docket No. 20] (the "<u>Consensual TRO</u>");

WHEREAS, on January 24, 2021, the Advisors and Funds moved to dismiss the Complaint [Docket No. 43] (the "<u>Motion to Dismiss</u>");

WHEREAS, on January 26, 2021, the Debtor and CLO Holdco, Ltd. filed that certain *Notice of Settlement* pursuant to which the Debtor and CLO Holdco, Ltd. resolved their disputes and CLO Holdco, Ltd. was dismissed from this Adversary Proceeding [Docket No. 50];

WHEREAS, on January 26, 2021, the Court held an evidentiary hearing on the Debtor's motion for a preliminary injunction (the "<u>Preliminary Injunction Hearing</u>"), and such hearing has been continued;

WHEREAS, on February 10, 2021, the Court entered that certain *Agreed Order Extending Temporary Restraining Order* [Docket No. 64], pursuant to which the Consensual TRO was extended;

WHEREAS, on February 24, 2021, the Court entered that certain *Agreed Order Further Extending Temporary Restraining Order* [Docket No. 76], pursuant to which the Consensual TRO was further extended;

WHEREAS, on March 1, 2021, the Debtor filed its opposition to the Motion to Dismiss

---

[2] Refers to the docket number maintained in the above-captioned Adversary Proceeding.

Appellee Appx. 01404
Appx. 04209
008212

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1412
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 295 of 1017 PageID 9042
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1411 of 1803 PageID 12157
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 4 of 20

and a memorandum of law in support thereof [Docket Nos. 79, 80] (the "Debtor's Opposition");

WHEREAS, on March 17, 2021, the Defendants filed their reply to the Debtor's Opposition [Docket No. 85];

WHEREAS, on April 21, 2021, the Parties entered into that certain *Stipulation Regarding Agreed (I) Scheduling Order and (II) Order Further Extending Temporary Restraining Order* [Docket No. 91] (the "Scheduling Stipulation") pursuant to which, among other things, the Parties agreed to: (a) dispense with the completion of the Preliminary Injunction Hearing and move to the trial on the merits, (b) hold a single trial on all of the Debtor's claims asserted in this Adversary Proceeding, including the claim for a permanent injunction, (c) entered into a schedule set forth therein, and (d) continued the Consensual TRO until the Court enters an order determining the Debtor's claim for permanent injunctive relief against the Defendants;

WHEREAS, on June 29, 2021, the Parties entered into that certain *Stipulation Converting Trial Dates to Status Conference* [Docket No. 101] ("Second Stipulation") which the Court adopted by its *Order Approving Stipulation Converting Trial Dates to Status Conference* {Docket No. 102] on June 30, 2021;

WHEREAS, the Parties have agreed to settle and resolve all claims and disputes that were brought or that could have been brought in the Adversary Proceeding on the terms set forth in the Second Stipulation as memorialized herein:

### AGREEMENT

**NOW, THEREFORE**, after good faith, arms-length negotiations, in consideration of the foregoing, it is hereby stipulated and agreed that:

1. Restrictions and Limitations on Termination of CLO Management Agreements.

    a. Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the

3

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1413
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 296 of 1017    PageID 9043
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1412 of 1803    PageID 12158
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 5 of 20

portfolio manager thereunder where termination or removal is permissible on a "no cause" basis[3] for a period of twelve (12) months beginning June 1, 2021 and ending May 31, 2022.

b. Each of the Funds agrees that no action will be taken to terminate any CLO Management Agreement to which the Debtor is a party or to remove the portfolio manager thereunder where termination or removal is only permitted on a "for cause" basis,[4] except that a Fund may seek termination or removal by moving for a determination from the Bankruptcy Court that such claim "for cause" is colorable (which means proving to the Bankruptcy Court by a preponderance of the evidence that it has a good faith basis to assert that "cause" exists for termination or removal) for a period that ends on the later of (i) May 31, 2022 or (ii) a decision by the Fifth Circuit Court of Appeals reversing the confirmation order, confirming of the Debtor's Plan of Reorganization, or otherwise eliminating the Gatekeeper provision from the Plan.

2. <u>Representations and Warranties</u>.

a. To the best of their knowledge after due inquiry, including inquiring of the Advisors, each of the Funds represents and warrants that (i) their ownership interests in any CLO managed by the Debtor as of December 1, 2020, is as set forth on **<u>Exhibit A</u>** hereto, and none of the Funds owned any other interests in

---

[3] The CLOs in which termination is arguably permissible on a "no cause" basis are Liberty CLO, Ltd., Southfork CLO Ltd., Gleneagles CLO, Ltd., Highland Legacy Limited, Jasper CLO, Ltd., Valhalla CLO, Ltd., and ACIS CLO 2017-7 Ltd.

[4] The CLOs in which termination is arguably only permitted on a "for cause" basis are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Westchester CLO, Ltd., Grayson CLO, Ltd., Stratford CLO Ltd., Greenbriar CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Eastland CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Red River CLO, Ltd., PamCo Cayman Ltd.,

**Appellee Appx. 01406**

**Appx. 04274**

**008214**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1414
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 297 of 1017 PageID 9044
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1413 of 1803 PageID 12159
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 6 of 20

any CLO managed by the Debtor as of that date, (ii) they have not sold, transferred, participated, or assigned any ownership interest in any CLO managed by the Debtor since December 1, 2020, and (iii) their respective percentage ownership interests in the CLOs managed by the Debtor are as set forth on **Exhibit B** hereto on the date of the execution of this Agreement and none of the Funds own any other interests in any CLO managed by the Debtor on the date of the execution of this Agreement.

b.  Each of the Funds represents and agrees that it will not transfer any interest in any CLO identified on Exhibits A and B ("Debtor-Managed CLO" or together, "Debtor Managed CLOs") to any current or former Debtor employee or any entity in which any current or former Debtor employee has any direct or indirect interest whatsoever, including, without limitation, (i) a direct or indirect ownership interest (regardless of whether such interest is passive, provides a control right, or is de minimis), (ii) a board seat or management position (regardless of whether such board seat or management position is at the entity, a direct or indirect parent of the entity, or a beneficial owner of such entity), and (iii) any other interest that confers upon such current or former Debtor employee any right to control or the ability to influence management of such entity (collectively, "Prohibited Transferee"). For the avoidance of doubt, Prohibited Transferee includes the Charitable Donor Advised Fund, L.P. and any of its direct and indirect parents and subsidiaries, including CLO Holdco, Ltd. Notwithstanding the foregoing, each of the Funds may transfer (a "Permitted Transfer") any interest in a Debtor-Managed CLO

Appellee Appx. 01407
Appx. 04272
008215

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1415
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 298 of 1017    PageID 9045
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1414 of 1803   PageID 12160
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 7 of 20

where no change in beneficial ownership would result from such transfer (such as a transfer between a Fund and its subsidiary or among a Fund's subsidiaries) or where a transfer occurs between the Funds (such as resulting from a Fund merger, reorganization, or similar transaction, to the extent permitted by applicable law) (the recipient of a Permitted Transfer, a "Permitted Transferee").

Further, and notwithstanding the foregoing, each of the Funds may transfer and shall not be prohibited from transferring any interest in any of the Debtor-Managed CLOs to a Prohibited Transferee if such transfer is necessary for a Fund's compliance with tax or other applicable regulatory needs (any such transfer, a "Subject Transfer").

Notwithstanding anything else contained herein, in the event of a Permitted Transfer or a Subject Transfer, the Fund shall (a) notify the Debtor of such Transfer and the Permitted Transferee or Prohibited Transferee, as applicable, shall agree to be bound by the terms of Paragraph 1 and this Paragraph 2(b) of this Agreement by executing an undertaking in the form set forth on **Exhibit C** to this Agreement (the "Undertaking") and (b) deliver the Undertaking to the Debtor before the Transfer becomes effective.

c.  Each of the Advisors represents and warrants that it is (a) controlled by James Dondero, and (b) is a "Related Entity" (as that term is defined in section I.D(ii) of Exhibit D to the *Preliminary Term Sheet* (filed at Docket No. 354-1)) for purposes of paragraph 9 of the January 9, 2020 Order (Docket No. 339).

6

**Appellee Appx. 01408**
**Appx. 04273**
**008216**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1416
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 299 of 1017    PageID 9046
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1415 of 1803   PageID 12161
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 8 of 20

3.      This Agreement shall become binding and effective on the date an order approving this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Order") is entered by the United States Bankruptcy Court for the Northern District of Texas (the "Agreement Effective Date"), irrespective of whether the 9019 Order is subject to appeal.   If no appeal of the 9019 Order is timely filed in accordance with Bankruptcy Rule 8002, then the Parties shall thereafter cooperate to take all steps reasonably necessary to dismiss the Adversary Proceeding with prejudice with all Parties bearing their own costs.

4.      Except for the representations and warranties set forth in Section 2 hereof, which shall bind each of the Parties hereto, this Agreement is without prejudice to the Parties' respective positions in connection with all pending appeals arising out of the Bankruptcy Case and each party hereby reserves any and all rights, positions, arguments, claims and defenses in connection with all such appeals, including without limitation, the Defendants' respective appeals of the Confirmation Order and requests for stay pending appeal of the Confirmation Order.

5.      This Agreement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties relating thereto.

6.      This Agreement may not be modified other than by a signed writing executed by the Parties.

7.      Each person who executes this Agreement represents that he or she is duly authorized to do so on behalf of the respective Party and that each Party has full knowledge and has consented to this Agreement.

8.      To the extent a notice is required or appropriate under this Agreement such

Appellee Appx. 01409
Appx. 04274
008217

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1417
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 300 of 1017    PageID 9047
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1416 of 1803   PageID 12162
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 9 of 20

notice shall be deemed delivered upon the following business day if sent via email as follows:

> If to the Debtor:  By email to James P. Seery, Jr, the Debtor's Chief Executive officer, at jpseeryjr@gmail.com with a copy to Jeffrey N. Pomerantz via email at Jpomerantz@pszjlaw.com.

> If to the Advisor: By email to legalnotices@nexpoint.com with a copy to DC Sauter by email at DSauter@Nexpoint.com and Davor Rukavina by email at drukavina@munsch.com.

> If to the Funds: By email to legalnotices@nexpoint.com  with a copy to A. Lee Hogewood III via email at lee.hogewood@klgates.com.

9.    This Agreement may be executed in counterparts, each of which will be deemed an original but all of which together constitute one and the same instrument, and it constitutes sufficient proof of this Agreement to present any copy, copies, or faxes signed by the Parties to be charged.

10.    This Agreement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Texas without regard to its conflicts of law principles, and all claims relating to or arising out of this Agreement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Texas, excluding Texas conflicts of law principles.

11.    The Court shall retain exclusive jurisdiction over all disputes arising out of or otherwise concerning the interpretation and enforcement of this Agreement.

[*Remainder of Page Intentionally Blank*]

Appellee Appx. 01410
Appx. 04275
008218

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1418
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 301 of 1017   PageID 9048
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1417 of 1803   PageID 12163
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 10 of
20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

Its: General Partner

By: _____

James P. Seery

**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**
By: Strand Advisors XVI, Inc., its
general partner

By: _____

Name:   Frank Waterhouse

Title:   Treasurer

**NEXPOINT ADVISORS, L.P.**
By: NexPoint Advisors GP, LLC, its
general partner

By: _____

Name:   Frank Waterhouse

Title:   Treasurer, Principal
Accounting Officer &
Principal Financial Officer

**HIGHLAND INCOME FUND**

By: _____

Name: Dustin Norris

Title:   Executive Vice President

Appellee Appx. 01411

008219

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1419
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 302 of 1017    PageID 9049
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1418 of 1803   PageID 12164
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21   Entered 07/20/21 14:01:55   Page 11 of
20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:


**HIGHLAND  CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

   Its: General Partner

By: _____

   James P. Seery


**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**

By: Strand Advisors XVI, Inc., its
general partner

By: _____

Name:   Dustin Norris

Title:     Executive Vice President

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its
general partner


By: _____

Name:    James Dondero

Title:     President




**HIGHLAND INCOME FUND**

By: _____

   Name:  Dustin Norris

   Title:   Executive Vice President

Appellee Appx. 01412

Appx. 04275

008220

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1420
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 303 of 1017    PageID 9050
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1419 of 1803    PageID 12165
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 12 of 20

Dated: July 16, 2021

AGREED TO AND EXECUTED AS OF THE DATE ABOVE:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,** as debtor-in-possession,

By: _____

    Its: General Partner

By: _____

    James P. Seery

**HIGHLAND CAPITAL
MANAGEMENT FUND
ADVISORS, L.P.**

By: Strand Advisors XVI, Inc., its
general partner

By: _____

Name:   Dustin Norris

Title:    Executive Vice President

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its
general partner

By: _____

Name:   James Dondero

Title:    President

**HIGHLAND INCOME FUND**

By: _____

    Name: Dustin Norris

    Title:   Executive Vice President

Appellee Appx. 01413

Appx. 04378

008221

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1421
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 304 of 1017 PageID 9051
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1420 of 1803 PageID 12166
Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21 Entered 07/20/21 14:01:55 Page 13 of 20

NEXPOINT STRATEGIC
OPPORTUNITIES FUND

By:

Name: James Dondero
Title: President and
Principal Executive Officer

NEXPOINT CAPITAL, INC.

By:

Name: James Dondero
Title: President and
Principal Executive Officer

APPROVED AS TO FORM BY COUNSEL DESIGNATED BELOW:

MUNSCH HARDT KOPF & HARR, P.C.

Davor Rukavina
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
E-mail: drukavina@munsch.com

*Counsel for Highland Capital Management Fund
Advisors, L.P. and NexPoint Advisors, L.P.*

K&L GATES LLP

A. Lee Hogewood III (w/ permission)
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, NC 27609
Telephone: (919) 743-7306

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Telephone: (214) 939-5659

*Counsel for Highland Income Fund, NexPoint Strategic
Opportunities Fund, Highland Global Allocation Fund,
and NexPoint Capital, Inc.*

10

- and -

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569) 10100 Santa
Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
E-mail: jpomerantz@pszjlaw.com ikharasch@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908 MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075 ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

11

Appellee Appx. 01415

Appx. 04389

008223

## EXHIBIT A

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS
AS OF DECEMBER 1, 2020**

Appellee Appx. 01416

Appx. 04581

008224

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1424 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1423 of 1803   PageID 12169

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 16 of 20

**Exhibit A to Settlement Agreement**

**CLO Equity as of December 1, 2020**

| CLO | Global Equity | CLO Equity Held by NexPoint Strategic Opportunities Fund | CLO Equity Held by Highland Income Fund | CLO Equity Held by NexPoint Capital, Inc. | Total | Ownership % |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

Appellee Appx. 01417

Appx. 04282

008225

## EXHIBIT B

**FUNDS' INTERESTS IN DEBTOR-MANAGED CLOS
AS OF THE DATE OF THIS AGREEMENT**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1426 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1425 of 1803    PageID 12171

Case 19-34054-sgj11 Doc 2590-1 Filed 07/20/21    Entered 07/20/21 14:01:55    Page 18 of 20

**Exhibit B to Settlement Agreement**

**CLO Equity as of Date of Settlement Agreement**

| CLO | Global Equity | CLO Equity Held by NexPoint Strategic Opportunities Fund | CLO Equity Held by Highland Income Fund | CLO Equity Held by NexPoint Capital, Inc. | Total | Ownership % |
|---|---|---|---|---|---|---|
| Aberdeen | 48,000,000 | 14,500,000 | - | | 14,500,000 | 30.2% |
| Brentwood | 71,400,000 | 28,600,000 | - | | 28,600,000 | 40.1% |
| Eastland | 123,500,000 | 13,006,000 | 38,480,000 | | 51,486,000 | 41.7% |
| Grayson | 127,500,000 | 13,700,000 | 62,600,000 | 800,000 | 77,100,000 | 60.5% |
| Greenbriar | 80,000,000 | 42,750,000 | - | | 42,750,000 | 53.4% |
| Red River | 81,000,000 | 8,500,000 | - | | 8,500,000 | 10.5% |
| Stratford | 63,000,000 | 43,500,000 | - | | 43,500,000 | 69.0% |
| Westchester | 80,000,000 | 35,507,000 | - | | 35,507,000 | 44.4% |
| Rockwall | 78,600,000 | 10,500,000 | - | | 10,500,000 | 13.4% |
| Rockwall 2 | 86,200,000 | 4,871,000 | 12,553,000 | | 17,424,000 | 20.2% |
| Gleneagles | 91,000,000 | 7,750,000 | 8,860,000 | | 16,610,000 | 18.3% |
| Jasper | 70,000,000 | 5,000,000 | - | | 5,000,000 | 7.1% |
| Liberty | 94,000,000 | 10,000,000 | - | | 10,000,000 | 10.6% |
| Southfork | 82,000,000 | 6,000,000 | - | | 6,000,000 | 7.3% |
| Valhalla | 82,000,000 | 1,500,000 | - | - | 1,500,000 | 1.8% |
| | | | | | | |
| **TOTALS** | 1,258,200,000 | 245,684,000 | 122,493,000 | 800,000 | | |

Appellee Appx. 01419

Appx. 94284

008227

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1427
of 1804
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 310 of 1017 PageID 9057
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1426 of 1803 PageID 12172

**EXHIBIT C**

**PROHIBITED TRANSFEREE UNDERTAKING**

Appellee Appx. 01420

Appx. 04385

008228

**<u>Exhibit C to Settlement Agreement</u>**

**UNDERTAKING TO BE BOUND TO PARAGRAPH 1 AND PARAGRAPH 2(b) OF SETTLEMENT AGREEMENT DATED JULY 16, 2021 ("Agreement")**

**[Prohibited Transferee], upon receipt of a transfer of an interest in one of the Debtor-Managed CLOs (as defined in the Agreement) from one of the Funds (as defined in the Agreement), is and shall forever be bound by the terms of Paragraph 1 and Paragraph 2(b) of the Agreement.**

**This __ day of _____ 202_**

**[Prohibited Transferee]**
**By:  [Authorized signatory]**

**Appellee Appx. 01421**

**Appx. 04386**

008229

# APPENDIX 18

**Appellee Appx. 01422**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1430
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 313 of 1017   PageID 9060
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1429 of 1803   PageID 12175
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 1 of 8

Docket #1661  Date Filed: 01/05/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

## JAMES DONDERO'S OBJECTION TO FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

James Dondero ("<u>Respondent</u>"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this objection (the "<u>Objection</u>") to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "<u>Plan</u>").[1] In support thereof, Respondent respectfully represents as follows:

### PRELIMINARY STATEMENT

1.    On October 16, 2019, Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") initiated a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Case was subsequently transferred to this Court. The case was

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

JAMES DONDERO'S OBJECTION TO PLAN CONFIRMATION

1934054210105000000000007

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1431
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 314 of 1017 PageID 9061
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1430 of 1803 PageID 12176
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 2 of 8

commenced with the expectation that Highland would emerge from Chapter 11 as a going concern. However, during the case and leading up to the confirmation hearing on the Plan, Highland's assets have been liquidated at below value prices. Under the Plan, Highland's assets will continue to be liquidated for less than optimal prices, with a view to ultimately terminating Highland's existence.

2. Confirmation of the Plan should be denied due to numerous deficiencies and improprieties. The problems with the Plan as drafted include, but are not limited to, exculpation and injunction provisions that extend far beyond permissible limits, a lack of transparency following confirmation, inappropriate post-confirmation jurisdictional terms, and the wrongfully obtained votes of certain affiliates of HarbourVest Partners, LLC (collectively, "HarbourVest"). The Plan severs Respondent's rights and fails to comply with the Bankruptcy Code and applicable case law. Therefore, confirmation of the Plan should be denied.

**OBJECTION**

**I.** **Both the Exculpation and Injunction Sections Violate Fifth Circuit Precedent.**

3. The proposed exculpatory and injunction provisions are simply impermissible. Both contravene established case law in the Fifth Circuit regarding the proper boundaries of such provisions and merit denial of Plan confirmation.

4. First, Article IX.D proposes to exculpate each and every "Exculpated Party" for all post-petition liability relating to the Debtor's bankruptcy case. The term "Exculpated Party" includes not just the Debtor but also, among others, the Debtor's Employees, the Independent Directors, the CEO/CRO, and the Related Persons of such parties. These exculpations in favor of the Exculpated Parties are prohibited under Fifth Circuit precedent. *See, e.g., In re Pacific Lumber, Co.*, 584 F.3d 229 (5th Cir. 2009); *Dropbox Inc. v. Thru Inc.*, Case No. 17-1958-G, 2018 U.S. Dist.

---

Appellee Appx. 01424
Appx. 04389
008232

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1432
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 315 of 1017   PageID 9062
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1431 of 1803   PageID 12177
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 3 of 8

LEXIS 179769 * 66-68 (N.D. Tex. Oct. 19, 2018) (finding that the scope of an exculpation clause provided insulation to nondebtor third parties in contravention of Fifth Circuit law).

5.  In *Pacific Lumber*, the Fifth Circuit made clear that section 524(e) prohibits the exoneration of nondebtors such as a debtor's management and professionals, but excluding official committees and their members acting within the scope of their official duties, from negligence during the course of their participation in the bankruptcy. The Fifth Circuit in *Pacific Lumber* stated: "[T]he essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pacific Lumber*, 584 F.2d at 252. Despite these clear limits, the exculpation provisions in the Plan go far beyond what is permissible through the Bankruptcy Code's intended "fresh start" to encompass virtually all acts or omissions taken in connection with the Debtor's bankruptcy case by a wide range of parties, thus effectively exculpating an unknown number of individuals.

6.  Second, Article IX.F creates a channeling injunction with respect to certain "Protected Parties." The injunction requires Bankruptcy Court approval to pursue any claims related to the Debtor brought by any entity, including claims arising from a Protected Party's post-confirmation conduct. Much like the overbroad definition of "Exculpated Parties", the definition for "Protected Parties" includes a wide swath of individuals and entities beyond simply the Debtor. As a result, the channeling injunction would bring into the Bankruptcy Court all claims against such Exculpated Parties by any party who happens to have a claim or interest in the Debtor. The proposed injunction is effectively a non-consensual third-party release, which is expressly prohibited. *See Dropbox*, 2018 U.S. Dist. LEXIS 179769 * at 65 (disallowing similar injunction). Moreover, the Fifth Circuit has held that a permanent injunction cannot be justified under the broad

**Appellee Appx. 01425**
**Appx. 04399**
008233

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1433
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 316 of 1017 PageID 9063
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1432 of 1803 PageID 12178
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 4 of 8

equity powers of Bankruptcy Code section 105 "if it effectively discharges a nondebtor." *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995) (overturning permanent injunction effectively discharging a nondebtor because such an injunction violates section 524 of the Bankruptcy Code, which was designed only to discharge the debtor, not nondebtor parties).

7.      Furthermore, the channeling injunction in Article IX.F limits the jurisdiction to hear claims against Protected Parties to only the Bankruptcy Court. In doing so, the Plan would improperly disregard parties' rights to bring claims even in courts with exclusive jurisdiction and would ignore those courts with specialized jurisdiction to hear certain types of cases. Respondent therefore objects to isolating (and potentially even providing) jurisdiction of any and all claims against Protected Parties in the Bankruptcy Court through this channeling injunction.

8.      In addition, the proposed injunction in Article IX.F is impermissibly vague and broad and, as noted, applies to post-confirmation conduct and claims.

9.      FED. R. BANKR. P. 3016(c) requires that, "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." The Debtor fails to provide such "specific and conspicuous language" about the proposed injunction here. The Plan instead issues a blanket prohibition on entities from:

> (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the

**Appellee Appx. 01426**
**008234**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1434
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 317 of 1017    PageID 9064
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1433 of 1803   PageID 12179
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 5 of 8

> Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, . . . ; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at IX.F. Much like the overbroad exculpation and channeling injunction provisions, this vague and potentially limitless injunction is improper. As a result, the Plan should not be confirmed.

**II.    The Plan Fails to Meet Section 1129(a)(7) due to Lack of Appropriate Sale Procedures for Post-Confirmation Operations.**

10.    The Plan envisions the liquidation of the Debtor's assets by the Reorganized Debtor and the Claimant Trust. This wind down, however, is subject to no oversight or predetermined procedures to ensure that the process is both value-maximizing and transparent. This is critically important because, during the course of the Debtor's bankruptcy case, Respondent would allege on information and belief that the Debtor has sold a number of assets of significant value outside the ordinary course of the Debtor's business as it was conducted prepetition without notice to parties in interest or a complete marketing plan.

11.    The proposed Plan's lack of appropriate marketing and the resulting dampening of competitive bidding requirements for the Reorganized Debtor's assets indicates that the Debtor's creditors and equity holders could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sales procedures are governed by the Bankruptcy Court to ensure maximization of value through auction or other market-testing means. As it is, for the Debtor to meet its burden to establish all elements of 11 U.S.C. § 1129, specifically including the best interest test of section 1129(a)(7), the Debtor must detail why the proposed liquidation process will test the market as fully as would be the case in Chapter 7.

12.    Moreover, Respondent believes that notice and an opportunity for other potential bidders to come forward will not only provide transparency to the process but also will result in

**Appellee Appx. 01427**
**Appx. 04292**
**008235**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1435
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 318 of 1017 PageID 9065
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1434 of 1803 PageID 12180
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 6 of 8

competitive bidding, increasing the value received by the beneficiaries of the Debtor's liquidation. An asset sale without transparency, on the other hand, will presumptively be done without comprehensive market exposure. Courts have long recognized the need for competitive bidding when approving sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52 B.R. 353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H. 1984). Competitive bidding yields higher offers and thus benefits the estate. The objective is "to maximize the bidding, not to restrict it." *In re The Ohio Corrugating Company,* 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d 624, 637 (2d Cir. 1979)). Additionally, because the Plan states that equity will receive some recovery under the Plan— Article III.F states that there are no Classes deemed to reject the Plan or being excluded from recovery—equity holders as well as all creditors should receive, *inter alia,* notice and an opportunity to be heard on all significant liquidations and other transactions performed by the Reorganized Debtor.

### III.  Post-Confirmation Jurisdiction under the Plan is Improper.

13.     The various jurisdictional provisions of the Plan are overbroad and mandate that the Bankruptcy Court hear any matter involving the Debtor or its operations post-Effective Date. First, as noted above, the injunction with respect to "Protected Parties" requires that "the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted." Plan at Art. IX.F. There is no legal basis for barring recourse to other courts with exclusive jurisdiction—possibly providing the Bankruptcy Court with jurisdiction it does not legally have, especially post-confirmation. *See, e.g., Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and

**Appellee Appx. 01428**
Appx. 04293
**008236**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1436
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 319 of 1017   PageID 9066
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1435 of 1803   PageID 12181
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 7 of 8

thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."). Second, the Bankruptcy Court's jurisdiction should not encompass claims and causes of action arising from the Reorganized Debtor's post-confirmation operations.

## IV.   The Subordination Provisions are Improper.

14.    The elimination of vacant Classes pursuant to Article IV.I would potentially eliminate certain Classes on the Effective Date and any recovery for such Classes, including Class 9 for Subordinated Claims (assuming the HarbourVest claim in Class 9 is disallowed), despite the later re-allocation of claims into such eliminated Classes.

15.    The Plan contemplates subordination of Claims and Equity Interests yet provides no mechanism, hearing requirement, or deadlines for such subordination. Instead, the Debtor reserves in Article III.J the right to subordinate any Claim and the Claimant's resulting Plan treatment apparently without hearing.

## V.   Any Acceptance of the Plan by HarbourVest Should be Disallowed.

16.    HarbourVest agreed to accept the Plan pursuant to the settlement with the Debtor submitted to the Court pursuant to FED. R. BANK. P. 9019. If that settlement is approved by the Court, HarbourVest will have, under the Plan, a Class 8 claim of $45 million and a Class 9 claim of $35 million. Respondent would allege on information and belief that the Debtor's CEO/CRO has stated on multiple occasions that HarbourVest has no valid claim against the Debtor and that its dispute with the Debtor could be settled for $5 million or less.

17.    By including in the settlement agreement the requirement that HarbourVest vote both its Class 8 and Class 9 claim to accept the Plan, the settlement agreement, on its face, reflects the exchange of HarbourVest's acceptance of the Plan for the vastly inflated claims agreed to by

Appellee Appx. 01429
Appx. 04294
008237

the Debtor. In other words, the Debtor **purchased** HarbourVest's acceptance. This constitutes a violation of Bankruptcy Code section 1129(a)(3) in that HarbourVest's acceptance and the payment for it were not in good faith.

<u>**CONCLUSION**</u>

For the foregoing reasons, Respondent respectfully requests that the Bankruptcy Court enter an order (i) denying confirmation of the Plan, and (ii) granting Respondent such other and further relief to which he may be justly entitled.

Dated: January 5, 2021          Respectfully submitted,

         */s/ D. Michael Lynn*
         D. Michael Lynn
         State Bar I.D. No. 12736500
         John Y. Bonds, III
         State Bar I.D. No. 02589100
         Joshua N. Eppich
         State Bar I.D. No. 24050567
         J. Robertson Clarke
         State Bar I.D. No. 24108098
         BONDS ELLIS EPPICH SCHAFER JONES LLP
         420 Throckmorton Street, Suite 1000
         Fort Worth, Texas 76102
         (817) 405-6900 telephone
         (817) 405-6902 facsimile
         Email: michael.lynn@bondsellis.com
         Email: john@bondsellis.com
         Email: joshua@bondsellis.com
         Email: robbie.clarke@bondsellis.com

         **ATTORNEYS FOR JAMES DONDERO**

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that, on January 5, 2021, a true and correct copy of the foregoing document was served via the Bankruptcy Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

         */s/ J. Robertson Clarke*
         J. Robertson Clarke

**Appellee Appx. 01430**

Appx. 04295

**008238**

# APPENDIX 19

**Appellee Appx. 01431**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1439
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 322 of 1017    PageID 9069
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1438 of 1803    PageID 12184
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 1 of 34

Docket #1667  Date Filed: 01/05/2021

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**OBJECTION TO CONFIRMATION OF THE
DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The Dugaboy Investment Trust and Get Good Trust (jointly, "Movants"), submit this

Objection for the purpose of objecting to the *Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P.* [Dkt. 1472] (the "Plan") submitted by Highland Capital Management,

L.P. ("Debtor").  The Dugaboy Investment Trust is an equity owner of the Debtor and has filed

proofs of claim.  See Claim Numbers 131 and 177. The Get Good Trust has filed proofs of claim

in this case.  See Claim Numbers 120, 128 and 129.  If the Claims[1] filed by Movants are allowed,

---

[1] Capitalized terms not defined in this Objection are taken from the Plan and shall have the meanings given to them
in the Plan.

{00374857-13}                    1

1934054210105000000000013

Appellee Appx. 01432

Appx. 04295

008240

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1440
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 323 of 1017 PageID 9070
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1439 of 1803 PageID 12185
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 2 of 34

Claimants possess claims in Class 7 or 8. The Dugaboy Investment Trust is a member of Class 11 of the Plan.

Movants assert that the Plan does not meet the requirements contained in the Bankruptcy Code, Rules, and applicable case law to be confirmed.

**The Plan Violates 11 U.S.C. § 1129(a)(1)**

In order to confirm a plan, the plan must meet the requirements set forth in 11 U.S.C. §§ 1122, 1123 and 1129. The Plan proposed by the Debtor fails to meet the requirements set forth in the Bankruptcy Code and, as such, confirmation of the Plan must be denied. 11 USC § 1129(a) (1) requires that the Plan comply with the applicable provisions of this title. The cases interpreting this section have held that a plan must meet the requirements of 11 U.S.C. §§ 1122 and 1123. See *In re Star Ambulance Service*, 540 B.R. 251, 260 (N.D.Tex. 2015); *In re Save Our Springs,* 632 F.3d 168 174 5th Cir. 2011); *In Re Counsel of Unit Owners of 100 Harborview Drive Condo*, 572 B.R. 131, 137-139 (Bankr.D.Md. 2017).

**The Plan Contains an Impermissible Claim Subordination Provision**

Article III.J of the Plan contains the following provision:

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or seek to subordinate, any Claim. . . .

The section gives the named parties the discretion upon "notice" to either subordinate a Claim or re-characterize a Claim whether or not a legal basis exists to either re-characterize the Claim or subordinate it. The term "notice" is nowhere defined, and any time the Bankruptcy Code uses the term notice, it is always accompanied by the words "and a hearing". 11 U.S.C. §§ 1112, 707 and 554 are examples of Bankruptcy Code sections that require both notice and a hearing prior to a party obtaining the relief sought in a pleading. Nowhere in the Bankruptcy

**Appellee Appx. 01433**
**Appx. 04296**
**008241**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1441
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 324 of 1017    PageID 9071
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1440 of 1803    PageID 12186
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 3 of 34

Code can a debtor obtain relief without affording the parties affected by the requested relief an opportunity for a hearing.

Under Bankruptcy Rule 7001(8), the subordination of a claim, as a general rule, requires the filing of an adversary proceeding.  However, an exception to the rule is that a subordination of a claim can occur through a Plan.  The Plan provision, as written, allows the designated parties the ability to subordinate a claim or re-characterize a claim merely by sending a letter.

The Plan, Plan Supplements and Disclosure Statement do not identify any specific Claim for which subordination is sought.  Rather, in the recent Plan Supplement that was filed on January 4th (Dkt. No. 1656), retained claims are lumped in with all other possible claims and a laundry list of possible targets.    (See Plan Supplement Dkt. No. 1656-1 Exhibit L.) Notwithstanding the conflicting 5th circuit case law concerning the necessary designation for the retention of claims (See *In re SI Restructuring*, 714 F.3d 860 (5th Cir. 2013) and *In re Texas Wyoming Drilling,* 647 F.3d 547, 549 and 551 (5th Cir 2011) and *In re United Operating,* LLC, 540 F.3d 351 (5th Cir. 2008), the cases do require some notice to the creditor of the potential for the subordination of such creditor's claim.  Bankruptcy Rule 7001 (8) cannot be read to allow a complex "equitable subordination claim" that requires evidence and findings consistent with *In Re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977) to occur with only written notice immediately prior to a confirmation hearing.   The  provision, as written, does not provide any party subject to the so-called notice with due process and violates 11 U.S.C. § 1129(a)(1).

**The Plan is Not Final and Contains an Impermissible Plan Modification Provision**

In addition to the Plan, the Debtor must file a Plan Supplement which will include various documents that will 1) govern the operations of the Highland Claimant Trust and the

Appellee Appx. 01434
Appx. 04299
008242

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1442
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 325 of 1017 PageID 9072
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1441 of 1803 PageID 12187
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 4 of 34

Litigation Trust, 2) identify retained causes of action; and 3) list the executory contracts and leases that will be assumed by the Debtor and Plan Documents.

The problem with the Plan Supplement is that, as of the writing of this Objection and possibly even after the hearing on the confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan. Article IV.J on page 36 of the Plan states:

> The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the Order Directing Mediation entered on August 3, 2020 [D.I. 912].

It is clear that no requirement exists in the Plan that the Plan Documents be finalized prior to hearing on the confirmation of the Debtor's Plan so that creditors can object if any terms of the Plan Documents filed in the Plan Supplement adversely impact a creditor's rights or are inconsistent with the Bankruptcy Code and Rules.

The Plan contains a provision allowing modification of the Plan. It is not clear from the language of the modification section the extent of judicial oversight that exists with respect to a Plan modification and whether this Court will have the ability to determine if the proposed plan modification is material or an immaterial. Article XII.B (p. 55) of the Plan provides that the Debtor reserves the right in accordance with the Bankruptcy Code and Rules to amend or modify the Plan prior to the entry of the Confirmation Order with the "consent" of the Committee. The provision does not require compliance with 11 U.S.C. § 1127(a) which specifically provides that the proposed modification prior to confirmation must meet the requirements of 11 U.S.C. §1122 and 11 U.S.C. §1123. In contrast to the Plan provision concerning modification prior the entry of the Confirmation Order, Article XII.B of the Plan does recognize that any modification after the entry of the Confirmation Order must meet the requirements set forth in 11 U.S.C. §§

1127(b).  From a textual point of view, modifications of the Plan both before and after the entry of the Confirmation Order must meet the requirements of 11 U.S.C. §§ 1122 and 1123.

**The Plan violates 11 U.S.C. § 1129(a)(7)**

Under 11 U.S.C. § 1129(a)(7), in order for a plan to be confirmed, each creditor as of the effective date of the plan will receive or retain under the plan on account of claim or interest an amount that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7.

While the Debtor's Plan is a liquidation plan, creditors from a valuation point of view are receiving an amount less than they would receive if the Debtor were liquidated under chapter 7. The amount received by creditors under the Debtor's Plan cannot be viewed solely in the dollars they receive but, rather, the amount actually received must be discounted by two provisions in the Debtor's Plan that reduce the present value of the creditors' recovery under the Plan.  The two discounting factors are the following provisions in the Highland Claimant Trust:

a)  The  Reorganized Debtor has  no affirmative obligation to report any activity or results to the holders of beneficial interests in the Claimant Trust or potential holders of beneficial interests; and

b)  The holders of beneficial interests in the Claimant Trust are required to agree to a standard of liability for the Claimant Trustee that only allows claims against the Claimant Trustee for acts that constitute "fraud, willful misconduct or gross negligence" (See Article 8 of the Highland Claimant Trust).  A notable omission from the standard of liability is a breach of fiduciary duty.  This omission is contrary to the statement contained in the Plan "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duty as a Chapter 7 trustee." (See Plan Page 28)

**Appellee Appx. 01436**

Appx. 04804

**008244**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1444
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 327 of 1017   PageID 9074
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1443 of 1803   PageID 12189
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 6 of 34

c)  A Chapter 7 trustee, if it attempted to sell assets, would have to obtain Court authority for the sale and would provide Notice to creditors of the sale.  Under the Plan no such requirement exists.

**The Plan And Related Documentation Provide For Impermissible Non-debtor Exculpation, Releases and Injunctions That Are Not Allowed Under Applicable 5th Circuit Case Law**

**A.  Exculpation and Releases**

Article IX of the Plan contains extensive exculpation and release provisions that far exceed those allowed in the Fifth Circuit.

Article IX.C (the "Exculpation Clause") exculpates each "Exculpated Party" from, *inter alia*, any liability for conduct occurring **on** or after the Petition Date in connection with or arising out of the filing and administration of the case, the funding, consummation and implementation of the Plan, and any negotiations, transactions and documents pertaining to same that could be asserted in their own name or on behalf of any holder of a claim or interest excluding acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.

The term "Exculpated Parties" is defined[2] in Article I.B.61 of the Plan to include:

1. The Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the "Managed Funds," which is defined in Article I.B.83 of the Plan to include Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to the executory contracts assumed under the Plan;

2. Strand Advisors, Inc., the Debtor's general partner ("Strand");

---

[2] The definition of "Exculpated Parties" includes references to numerous other defined terms that also are defined in Article I.B, some of which are summarized here.  For the sake of brevity, the definition of each defined term contained in the definition of Exculpated Parties is not reproduced here *verbatim*.

{00374857-13}                                        6

**Appellee Appx. 01437**

**Appx. 04802**

**008245**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1445
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 328 of 1017 PageID 9075
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1444 of 1803 PageID 12190
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 7 of 34

3. John S. Dubel, James P. Seery, Jr. and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors appointed between then and the effective date of the Plan (collectively, the "Independent Directors");

4. The Official Committee of Unsecured Creditors appointed in the case (the "Committee");

5. The members of the Committee in their official capacities;

6. Professionals retained by the Debtor and the Committee in the case (the "Professionals");

7. James P. Seery, Jr., the Debtor's chief executive office and chief restructuring officer (the "CEO/CRO"); and

8. "Related Persons" of the Independent Directors, the Committee, the members of the Committee, the Professionals and the CEO/CRO, which is defined to include, *inter alia*, predecessors, successors, assigns, officers, directors, employees, managers, attorneys, consultants, subsidiaries thereof.

The definition does expressly exclude from the definition certain named individuals and entities.

In addition to Article IX of the Plan, the Claimant Trust Agreement [Dkt. 1656-2, Exhibit M] for which approval is sought as part of the Plan confirmation, also provides in Section 8.1 for a reduced standard of care by the parties described therein as the Claimant Trustee, the Delaware Trustee, and the Oversight Board, any individual member thereof, by limiting their liability to that for fraud, willful misconduct, or gross negligence.[3]

---

[3] With respect to the Claimant Trustee, this appears to contradict Plan Article IV.B.5 (p. 28), which provides: "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee."

Appellee Appx. 01438
Appx. 04803
008246

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1446
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 329 of 1017 PageID 9076
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1445 of 1803 PageID 12191
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 8 of 34

The scope of the Exculpation Clause is ambiguous because it does not specify a time frame to which the exculpation applies. Rather than stating that it applies for actions during a definite time period, such as occurring between the petition date and the effective date of the plan, it runs from the petition date through "implementation of the Plan." The word "implementation" is not defined, which leaves the term subject to interpretation. Does it mean the execution of documents to be executed pursuant to the Plan or the actual implementation of the Plan through administration of assets and payment of claims? The ambiguity is exacerbated by the introduction to the Exculpation Clause, which provides for its effect "to the maximum extent permitted by applicable law". Thus, one could expect that Debtor intends the Exculpation Clause to apply to actions of exculpated parties for actions taken far into the future.

Article IX.D (the "Release Clause") provides that each Released Party is deemed released by the Debtor and the Estate, including the trusts created by the Plan (the Claimant Trust and Litigation Sub-Trust) release each Released Party from, *inter alia*, any and all Causes of Action that the Debtor or its estate could legally assert, except for obligations of the party under the Plan certain other agreements, confidentiality and noncompetition agreements, avoidance actions, or acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.[4]

The term "Released Parties" is defined in Article I.B.111 of the Plan to include:

1. The Independent Directors

2. Strand, solely from the date of the appointment of the Independent Directors through the effective date of the Plan;

3. The CEO/CRO;

4. The Committee;

5. The members of the Committee;

---

[4] There are some additional limitations specific to "Senior Employees."

{00374857-13}                              8

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1447
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25    Page 330 of 1017    PageID 9077
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1446 of 1803   PageID 12192
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 9 of 34

6.   The Professionals; and

7.   The "Employees," which is defined as the employees of the Debtor set forth in the

plan supplement.

The term "Causes of Action" is an 18 line definition in Article I.B.19 to include just

about any type of cause of action, whether arising before or after the commencement of the

bankruptcy case.

The Release Clause applies to causes of action having no relationship to the case. The

Release Clause also waives claims of the newly created Claimant Trust and Litigation Sub-Trust

"existing or hereafter arising," which means that these entities, which have conducted no

business as of the confirmation of the Plan, are releasing future, unknown claims against the

Released Parties, such as a future negligent breach of fiduciary duty claim.

The Exculpation Clause, the Release Clause and the Claimant Trust Agreement clearly

bestow protection from liability upon numerous non-debtor parties.  Some of the parties covered

by the Exculpation Clause as Exculpated Parties, namely Managed Funds Highland Multi-

Strategy Credit Fund, L.P. and Highland Restoration Capital Partners, L.P., and possibly by the

use of "catch-all phrasing, SSPI Holdings, Inc., recently were argued to be outside the scope of

this Court's oversight but for an agreement reached by the Debtor with the Committee allowing

for some notice protocols.  *See* Debtor's Response to Mr. James Dondero's Motion For Entry of

An Order Requiring Notice And Hearing For Future Estate Transactions Occurring Outside The

Ordinary Course Of Business [Dkt. 1546]¶ 12

The Fifth Circuit decision in *In re Pacific Lumber Co*. 584 F.3d 229 (5th Cir. 2009) is

dispositive.   In that case, the plan proposed to release the plan proponents and post-

reorganization owners of the reorganized debtor, the two new entities created by the plan, and

{00374857-13}                                          9

**Appellee Appx. 01440**
**Appx. 04885**
**008248**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1448
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 331 of 1017   PageID 9078
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1447 of 1803   PageID 12193
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 10 of 34

the creditor's committee (and their personnel) from liability—other than for willfulness and gross negligence—related to proposing, implementing and administering the plan. *Pacific*, 584 F.3d at 251. This language is similar to the language of the Exculpation Clause. The *Pacific* court cited the principle of 11 U.S.C. § 524(e), which states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." *Id.* The court noted that: "We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization." Pacific, 584 F.3d at 252. It went on to cite other Fifth Circuit authority establishing that 11 U.S.C. 524(e) only releases the debtor, not co-liable third parties, and that the cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. *Pacific*, 584 F.3d at 252, citing *In re Coho Resources, Inc.,* 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.,* 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993), *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995). Finally, the court stated:

> There are no allegations in this record that either [plan proponents/owners of reorganized debtors] or their or the Debtors' officers or directors were jointly liable for any of [debtors'] pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Pacific,* 584 F.3d at 252-253.

The *Pacific* court struck down all of the non-debtor releases except those in favor of the creditor's committee and its members. The rationale for allowing the exculpation of the creditor's committee and its members is that the law effectively grants them qualified immunity for actions within the scope of their duties. *Pacific*, 584 F.3d at 253. The court also noted that the creditor's committee and its members were the only disinterested volunteers among those among the parties sought to be released, and reasoned that it would be extremely difficult to find

Appellee Appx. 01441
Appx. 04806
008249

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1449
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 332 of 1017   PageID 9079
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1448 of 1803   PageID 12194
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 11 of 34

members to serve on the committee if they can be sued by persons unhappy with the committee's performance or the outcome of the case. *Id.*

The Fifth Circuit noted the continuing viability of the rule of *Pacific* in *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1059 (5th Cir. 2012) (". . . a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief," citing *Pacific.*)  Lower courts from within the Fifth Circuit have strictly followed the precedent and struck down various plan clauses dealing with releases and exculpation. *See In re Thru, Inc.*, 2018 WL 5113124, *22 (D.C.N.D.Tex 2018), affirmed 782 Fed.Appx. 339 (5th Cir. 2019) (exculpation provision and injunction); *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court may not confirm a plan that provides "non-consensual non-debtor releases.""); *In re National Truck Funding LLC*, 588 B.R. 175, 177 (Bankr. S.D. Miss. 2018) ("At hearing, the parties agreed that the Release and Exculpation . . . of the Plan . . . will be further amended by language protecting only the Official Committee of Unsecured Creditors and its representatives, as the Court has previously approved."); *In re LMCHH PCP LLC*, 2017 WL 4408162, at *16 (Bankr. E.D. La. Oct. 2, 2017) ("The modification [to the plan] filed was done to ensure that the exculpation provision complied with [*Pacific*] which held that a plan could not exculpate outside of the Debtors, the Official Unsecured Creditors Committee, and those who act for them, where 'the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy.'"); *In re Patriot Place, Ltd.*, 486 B.R. 773, 823–24 (Bankr. W.D. Tex. 2013) (Non-debtor releases and exculpation clauses struck down as violative of Fifth Circuit precedent and render the plan unconfirmable.).

Appellee Appx. 01442
Appx. 04307
008250

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1450
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 333 of 1017    PageID 9080
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1449 of 1803   PageID 12195
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 12 of 34

All parties exculpated and released other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed from the Plan and the Claimant Trust Agreement, or the Plan is not confirmable.

**B. Injunction Provisions**

Article IX.F of the Plan contains extensive injunction provisions (the "Injunction Provisions") that far exceed those allowed in the Fifth Circuit.  Although not broken down into sections, the Article contains multiple separate and distinct provisions, as follows:

1. The first paragraph enjoins claimants and equity holders from interfering with plan implementation of consummation;

2. The second paragraph **permanently** enjoins entities with claims or equity interests and their related persons from, with respect to such interests, *inter alia*, commencing actions, enforcing judgments, creating or enforcing encumbrances, setting off against or affecting the Debtor, the Independent Directors, the Reorganized Debtor created by the Plan or the Claimant Trust created by the Plan, except as otherwise provided by the Plan or other order of this Court;

3. The third paragraph extends the injunctions of the Article to any successors of the Debtor, the Reorganized Debtor and the Claimant Trust and their respective property and interests in property; and

4. The fourth paragraph provides that no "Entity[5]" may commence or pursue a claim or cause of action against a "Protected Party"[6] that arose from or is related to the

---

[5] Defined as any "entity" as defined in 11 U.S.C. § 101(15) and also includes any "Person" or any other entity.

[6] The Plan does not define the term "Protected Party."  It defines "Protected Parties" as follows:

"*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the

**Appellee Appx. 01443**
**Appx. 04306**
**008251**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1451
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 334 of 1017 PageID 9081
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1450 of 1803 PageID 12196
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 13 of 34

bankruptcy case, the negotiation of the Plan, the administration of the Plan, the wind down of the business, the administration of the Claimant Trust, or transactions in furtherance of the foregoing, without this Court first finding that the claim or cause of action represents a colorable claim of bad faith, criminal misconduct, fraud or gross negligence against the Protected Party, and specifically authorizes such Entity to bring a claim against the Protected Party.[7] It further provides that this Court has the sole jurisdiction to adjudicate any such claim for which approval to pursue the claim has been granted.

Even the most cursory reading of the language of Article IX.F, especially the fourth paragraph, reveals that it goes farther than the exculpation and release provisions in terms of the parties protected by the permanent injunctions.

Although the Court in *Pacific* did not appear to expressly deal with an injunction, as noted above the court concluded that its own cases ". . . seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Pacific*, 584 F.3d at 252. In addition, the Fifth Circuit in *Vitro*, *supra*, construed *Pacific* as denying a non-debtor permanent injunction, wherein it cited *Pacific* and added: "(discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction.)" *Vitro*, 701 F.3d at 1059. The logic for applying the same principle to both releases/exculpations and injunctions is simple to understand—if a non-debtor cannot be released from claims but

---

Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

[7] The provision is expressly limited as to Strand and Employees to the period from the date of appointment to the effective date of the Plan.

Appellee Appx. 01444
Appx. 04309
008252

claimants can be enjoined by the bankruptcy court from prosecuting them against the non-debtor, the exclusion of a release *ab initio* or the striking of a release from a plan is meaningless. For example, the fourth paragraph effectively releases from negligence claims a broad category of persons and entities not entitled to exculpation or releases under *Pacific,* because the paragraph only allows an aggrieved party to proceed after this court has determined that their allegations represent a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud or gross negligence. As noted by the Fifth Circuit in *Zale, supra,* "Accordingly, we must overturn a § 105 injunction if it effectively discharges a nondebtor."  *Zale*, 62 F.3d at 760, citing *In re Vitek*, 51 F.3d 530, 536, n. 27, as follows: "('[N]on-debtor property thus should not ordinarily be shielded by the powers of the bankruptcy court.')" *Id. See also In re Thru, Inc.*, 2018 WL 5113124, *21-22 (striking down a plan injunction that "would effectively discharge numerous non-debtor third parties").

All parties protected by the Injunction Provisions other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed or the Plan is not confirmable.

### C. The Claims Released Do Not Meet the Few Exceptions Allowing Release or Injunctions in Favor of Third Parties

There are a few situations where it may be *possible* to argue that third party releases are permissible within the Fifth Circuit, but none are applicable here.  The *Pacific* court distinguished one set of cases cited by the plan proponents by saying that they concerned global settlements of mass claims.  *Pacific*, 584 F.3d at 252.  Another has cited *Pacific* for the proposition that, absent a **meaningful** contribution by the released party, the release would probably be invalid under *Pacific*.  *In re Texas Rangers Baseball Partners*, 431 B.R. 706, 717 FN 29 (Bankr. N.D. Tex. 2010); *See also Zale*, 62 F.3d at 762 (holding that one plan provision temporarily enjoining certain contract claims was valid as an unusual circumstance because it

**Appellee Appx. 01445**

**Appx. 04519**

**008253**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1453
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25   Page 336 of 1017   PageID 9083
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1452 of 1803   PageID 12198
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 15 of 34

involved a settlement providing substantial consideration being paid into to the estate). Another referred to a narrowly tailored release of the type found in § 363(f) sales of property free and clear of liens. _In re Patriot Place, Ltd.,_ 486 B.R. 773, 821-822 (Bankr. W.D. Tex. 2013). Such releases and injunctions are entered to ensure that the purchaser of the debtor's property (as well as the debtor's property being sold) is insulated from claims that creditors might have against the debtor and the property being sold by the debtor to the purchaser. _Id_.

The court in _Zale_ indicated that a **temporary** injunction **may** be proper when unusual circumstances exist. _Zale_, 62 F.3d at 761. These conditions are when the non-debtor and the debtor party enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor and when the third party action will have an adverse impact upon the debtor's ability to accomplish reorganization. _Id._ Even in such cases, neither of which is applicable here, an injunction would not be permanent, but would only delay the actions.

None of the foregoing exceptions are applicable in the instant case.

**D. Jurisdiction**

Even if the Bankruptcy Code were to permit some exculpation, releases and injunctions protecting non-debtor parties, this Court does not have the power to retain exclusive, indefinite, post-confirmation jurisdiction to determine whether actions against Protected Parties may proceed or, thereafter, to adjudicate claims pertaining thereto.

The fourth paragraph of the Injunction Provisions prohibits the commencement of certain actions against any Protected Party with respect to claims or causes of action that arose from or are related to the case, administration of the case, the wind down of the business of the Debtor or Reorganized Debtor, and the administration of the Claimant Trust. It also channels claims by requiring that any such claims or causes of action be first brought to this Court to determine that

**Appellee Appx. 01446**

**008254**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1454
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 337 of 1017   PageID 9084
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1453 of 1803   PageID 12199
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 16 of 34

the claims are outside the scope of protection granted a Protected Party, and to obtain an express authorization from this Court allowing the action to proceed.  It then provides that this Court has sole jurisdiction to adjudicate the claim. Because the Reorganized Debtor and the Claimant Trust have engaged in no activity as of the confirmation of the Plan, this provision clearly is intended to extend to unknown, future conduct by Protected Parties in addition to pre-confirmation Protected Parties.

As noted by the Fifth Circuit in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores)*, 266 F.3d 388, 389 (5th Cir. 2001), bankruptcy court jurisdiction does not last forever.  Under 28 U.S.C. § 1334, a federal district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." *In re Superior Air Parts, Inc.*, 516 B.R. 85, 92 (Bankr.N.D.Tex. 2014). The district court is authorized under 28 U.S.C. § 157 to refer to the bankruptcy court "any or all proceedings arising under title 11 or arising in or related to a case under title 11." *Id.*  By virtue of an order adopted on August 3, 1984, this Court has jurisdiction over any or all proceedings arising under title 11 or arising in or related to a case under title 11.  *Id.*

"Arising Under" jurisdiction involves causes of action "created or determined by a statutory provision of title 11."  *Wood v. Wood (Matter of Wood)*, 825 F.2d 90, 96 (5th Cir. 1987); *Superior*, 516 B.R. at 93.  Nothing involved in the exculpations, releases or injunctions on non-debtor parties involves such a cause of action.  By their nature, negligence claims and intentional tort claims arise by operation of law generally applicable to all persons and entities regardless of whether or not they are in bankruptcy.  They could exist totally outside a bankruptcy context.

Appellee Appx. 01447
Appx. 04312
008255

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1455
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 338 of 1017   PageID 9085
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1454 of 1803   PageID 12200
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 17 of 34

"Arising in" jurisdiction involves those actions "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood*, 825 F.2d at 97; *Faulkner v. Eagle View Capital Mgmt. (In re Heritage Org., LLC)*, 454 B.R. 353, 360 (Bankr.N.D.Tex. 2011); *Superior*, 516 B.R. at 94-95.  The example given the by the *Wood* court is "'administrative' matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 97 (emphasis supplied by the court).  Again, negligence claims and intentional torts against non-debtors obviously do not meet these criteria.

The final category, "related to" jurisdiction, involves the issue of "'whether the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy.'" *Wood*, 825 F.2d at 93, citing *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (emphasis supplied by the court).  Because it is obvious that the non-debtor claims being released, exculpated and enjoined do not "arise under" or "arise in" a bankruptcy case, the only possibly arguable basis for jurisdiction is "related to" jurisdiction.  The fourth paragraph of the Injunction Provisions contemplates application to any claim or cause of action "that arose from or is related" to the case.

Initially, it should be noted that there simply is no way that even a massive judgment against the non-debtors could have any impact whatsoever on the estate.  Considering that there will be no **estate** being administered **in bankruptcy** post-confirmation, it is inconceivable how releases of non-debtor parties could possibly impact the administration of a now defunct bankruptcy estate of the Debtor.  The court in *Craig's* appeared to recognize this principle when it adopted the view that confirmation of a plan changes bankruptcy court jurisdiction. *Craig's*, 266 F.3d at 390.  Expansive bankruptcy court jurisdiction is no longer "required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id.*

**Appellee Appx. 01448**
**Appx. 04313**
**008256**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1456
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 339 of 1017 PageID 9086
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1455 of 1803 PageID 12201
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 18 of 34

In *Craig's,* the Fifth Circuit was dealing with a fact pattern that differs from the instant case in two ways. First, the case involved a dispute between the aggrieved party and the reorganized debtor, not totally non-debtor parties. Second, it only partially involved the fact pattern of the instant case, because it only dealt with claims characterized as post-confirmation rather than the mix of pre- and post-confirmation claims against the non-debtor parties protected by the Exculpation Clause, Release Clause and Injunction Provisions. The case involved a pre-confirmation contract that had been assumed, and a post-confirmation dispute involving state law for damages that at least partially arose post-confirmation.[8] The court held that there was no jurisdiction over a claim that "principally dealt with post-confirmation relations between the parties." *Craig's*, 266 F.3d at 390.

The later Fifth Circuit case of *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008) also involved the issue of post-confirmation jurisdiction.[9] The court summarized the *Craig's* decision as one dealing with the post-confirmation relations between the parties, where there was no antagonism between the parties as of the date of the reorganization, and no facts or law deriving from the plan were necessary to the claim. *Enron*, 535 F.3d at 335.

Under the general principles of *Craig's*, there should be not "related to" jurisdiction involving the claims involved in this case, which purely involve non-debtor parties and non-bankruptcy related claims with no potential impact upon the pre- or post-confirmation estates.

---

[8] The facts are not totally clear. They indicate that the plan was confirmed in December 1994, and that the claims for damages arose in 1994 and 1995. *Craig's*, 266 F.3d at 389. Therefore, at least the 1995 claims arose post-confirmation.

[9] The *Enron* case involved lawsuits against non-debtors that had been removed prior to the commencement of the case, that were dismissed with prejudice after the confirmation of the plan. *Enron*, 535 F.3d at 333. The plaintiffs alleged that there was no jurisdiction to dismiss the case because "related to" jurisdiction had ceased after the plan was confirmed. 535 F.3d at 334. However, the parties did not dispute whether the federal courts had "related to" bankruptcy jurisdiction over the cases at the time of removal, so the court framed the question as whether the court, after confirming Enron's plan, maintained "related to" jurisdiction. 535 F.3d at 334-335. Therefore, the case stands for the proposition of whether "related to" jurisdiction, once conferred, continues post-confirmation. 535 F.3d at 335-336.

Appellee Appx. 01449
Appx. 04314
008257

This is especially true with respect to post-confirmation future releases of non-debtor parties involved with as yet uncreated entities.

The case of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594 (2011), decided after *Wood*, *Craig's* and *Enron*, adds additional jurisdictional barriers to confirmation of a Plan containing the language of Article IX.(C), (D) and (F).   In *Stern*, Pierce had filed a proof of claim in Marshall's bankruptcy proceedings, alleging a right to recover damages as a result of alleged defamation on the part of Marshall.   *Stern*, 131 S.Ct. at 2601. Marshall filed a counterclaim against Pierce alleging tortious interference with a gift that Marshall had expected to receive from her husband, who was Pierce's father.   *Id.* The claim was classified by the Supreme Court as a common law tort claim.   *Id.* The Supreme Court found that Pierce had consented to resolution of the counterclaim by the Bankruptcy Court.   131 S.Ct. at 2606.   After being cast in judgment by the Bankruptcy Court in the amount of over $425 Million, Pierce argued that the Bankruptcy Court did not have jurisdiction over the counterclaim.   131 S.Ct. at 2601.   The Supreme Court agreed with Pierce, holding that Article III of the U.S. Constitution did not permit the Bankruptcy Court to enter a final judgement on Marshall's counterclaim.   131 S.Ct. at 2608.

Some claims involved in the instant case are simple tort claims against non-debtors. They occupy the same category as the defamation suit in *Stern*.   Movants are entitled to an actual adjudication of their claims, which would mean an adjudication by a state court or an Article III federal court of competent jurisdiction and venue.   This Court's submission of a report and recommendation on confirmation to the District Court would not constitute an actual adjudication. Because the Plan provision at issue provides that this Court will **actually adjudicate** the claims, it runs afoul of *Stern* on its face.   Similarly, the provision literally would

**Appellee Appx. 01450**

**Appx. 04315**

**008258**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1458
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 341 of 1017 PageID 9088
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1457 of 1803 PageID 12203
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 20 of 34

preclude Movants from seeking to withdraw the reference to have the case actually decided by an Article III court. Because this Court could not adjudicate the case, the Plan's attempt to grant to this Court sole jurisdiction to adjudicate the claims renders the Plan nonconfirmable.

Even if jurisdiction *could* exist for the purpose of determining whether a claim could go forward against a Protected Party, it does not follow that this Court would have jurisdiction to adjudicate the claim. At the point at which this Court determines that a claim could proceed, the action no longer involves any interpretation of either bankruptcy law or the Plan, nor could it have any impact upon the pre- or post-confirmation estate.[10]

**The Plan Prohibits Claimants From Asserting Rights Under The Plan Rendering the Plan Not Confirmable**

Aside from protecting parties not entitled to protection, the Exculpation, Release Injunction Provisions contain provisions that far exceed the scope permitted by bankruptcy law.

The second paragraph of the Injunction Provisions is broad enough to permanently preclude claimants from pursing their rights under the Plan against the Reorganized Debtor and the Claimant Trust because it precludes any attempt to enforce rights, many of which are created pursuant to the Plan, and the third paragraph of the Injunction Provisions goes even farther by extending the injunctions to any successors of the Reorganized Debtor and the Claimant Trust. Under the Plan, the Class 2 claimant is to be given a new promissory in treatment for its claim, the Class 3 claimants have the option to retain collateral, and Class 5 claims are reinstated. If the Reorganized Debtor defaults under any of its obligations, the Injunction Provisions literally prevent any attempt to enforce their rights under the Plan.

---

[10] Movants are aware of *In re Pilgrim's Pride*, 2010 WL 200000 (Bankr.,N.D.Tex 2010) and *In re Camp Arrowhead, Ltd.*, (Bankr.W.D.Tex 2011). Movants believe that these cases blatantly disregard the letter and spirit of *Pacific* and are, therefore, wrongfully decided. In addition, they were decided before *Stern v. Marshall.*

{00374857-13}                    20

Appellee Appx. 01451
Appx. 04516
008259

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1459
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 342 of 1017 PageID 9089
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1458 of 1803 PageID 12204
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 21 of 34

The best way to demonstrate this issue is to cite a different plan. Although the injunction

in *In re Thru, Inc.*, *supra*, was struck down on the basis that it impermissibly released third

parties, the injunction contained language that the second paragraph in the instant case is

missing. It starts out:

> Except as otherwise expressly provided in this Plan or in the Confirmation Order
> **and except in connection with the enforcement of the terms of this Plan**
> **(including the payment of Distributions hereunder) or any documents**
> **provided for or contemplated in this Plan**, all entities . . . are permanently
> enjoined from. . . .
>
> *Thru*, 2018 WL 5113124, *21

Compare this language to the second paragraph of the Injunction Provisions, which

provides:

> Except as expressly provided in the Plan, the Confirmation Order, or a separate
> order of the Bankruptcy Court, all Entities . . . are permanently enjoined. . . .

The Plan literally would require a claimant to come back to this Court for an order if the

Reorganized Debtor or the Plan-created trusts default. This goes against the concept espoused

by the Fifth Circuit in *Craig's*, indicating that confirmation allows the debtor to go about its

business without further supervision or approval, but also without the protection of the

bankruptcy court. *Craig's*, 266 F.3d at 390, citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122

(7th Cir. 1991).

**The Plan Contains a DeFacto Channeling Injunction**

As noted earlier, paragraph 4 of the Injunction Provisions in the Plan provide that no

Entity may commence or pursue a claim or cause of action against a Protected Party without this

Court:

> (i) first determining, after notice, that such claim or cause of action represents
> a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud,
> or gross negligence against a Protected Party and (ii) specifically authorizing
> such Entity to bring such claim against any such Protected Party; . . . .

Appellee Appx. 01452
Appx. 04345
008260

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1460
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 343 of 1017    PageID 9090
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1459 of 1803   PageID 12205
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 22 of 34

Plan, Article IX.F, fourth unnumbered paragraph.

Thereafter, the Plan provides that this Court retains sole jurisdiction to adjudicate the claim. *Id.*

The above provisions have the effect of channeling all post-petition claims against the Reorganized Debtor, the Creditor Trust and others into the Bankruptcy Court to determine whether a claim can be asserted and then as the forum with the "exclusive jurisdiction" to adjudicate the claim. The provisions are not authorized under the Bankruptcy Code.

Congress, when it enacted 11 U.S.C. § 524(g), provided a limited channeling injunction for asbestos and in some mass tort cases. Section 524(g) was not created to shield parties that are liquidating a debtor and its reach does not extend to garden variety unsecured creditors or serve as a barrier to claims that arose after the Effective Date of the Plan. The impact of Section 524(g) is to address pre-petition claims and future claims arising out of pre-petition activity where the claims have yet to manifest.

In addition, 11 USC 524 § (g) is only applicable to a Debtor that obtains a discharge pursuant to 11 USC § 1141. The Debtor in its approved Disclosure Statement [See DKT 1473, pp. 8-9] classifies the Debtor's post confirmation activities as one of "wind down" of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. In addition, the Claimant Trust formed pursuant to the Plan is a "liquidation trust" [See DKT 1656-2 section 2.2], which makes the Plan a Plan that " liquidates all or substantially all of the property of the estate". Pursuant to 11 U.S.C. § 1141(d)(3), a Debtor whose Plan is none that liquidates all or substantially all of the property of the estate is not eligible for a discharge. 11 U.S.C. § 524(g) cannot authorize any channeling injunction for the Debtor in its Plan.

**Conclusion**

For the reasons set forth herein, confirmation of the Plan must be denied.

Appellee Appx. 01453
Appx. 04818
008261

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1461
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 344 of 1017   PageID 9091
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1460 of 1803   PageID 12206
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 23 of 34

January 5, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*

### CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of January, 2021, a copy of the above and foregoing *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com,kjohnson@joneswalker.com,sbuchanan@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com ;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com

**Appellee Appx. 01454**
**Appx. 04519**
**008262**

- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com,
  gpronske@spencerfane.com;jkathman@spencerfane.com;lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@d
  entons.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com

Appellee Appx. 01455

Appx. 04329

008263

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1463
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 346 of 1017    PageID 9093
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1462 of 1803    PageID 12208
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 25 of 34

- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com

Appellee Appx. 01456
Appx. 04324
008264

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1464

Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 347 of 1017 PageID 9094

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1463 of 1803 PageID 12209

Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 26 of 34

- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

I also caused same to be served on January 5, 2021, by Docusource via U.S. First Class Mail,
postage prepaid upon the following parties who are **not** on the list to receive email notice/service
for this case (who therefore require manual noticing/service):

Paul N. Adkins
11 Mount Emily Road #07-27
Singapore, 228493

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Jeffrey E. Bjork
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100

**Appellee Appx. 01457**

**Appx. 04322**

**008265**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1465
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 348 of 1017   PageID 9095
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1464 of 1803   PageID 12210
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 27 of 34

Los Angeles, CA 90071

Jessica Boelter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Matthew G. Bouslog
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612

William P. Bowden
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

Candace C. Carlyon
CARLYON CICA CHTD.
265 e. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Joseph L. Christensen
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Louis J. Cisz
Nixon Peabody LLP
One Embarcadero Center, 32nd Fl
San Francisco, CA 94111

Kevin M. Coen
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Debra A. Dandeneau
Baker & McKenzie LLP
425 5th Ave.
New York, NY 10018

Deloitte Tax LLP
1111 Bagby Street, Ste. 4500

{00374857-13}                              27

Appellee Appx. 01458
Appx. 04323
008266

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1466
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 349 of 1017 PageID 9096
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1465 of 1803 PageID 12211
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 28 of 34

Houston, TX 77002

Mark. L. Desgrosseilliers
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Development Specialists, Inc.
333 South Grand Ave., Ste. 4070
Los Angeles, CA 90071

Fair Harbor Capital, LLC
Ansonia Finance Station
PO Box 237037
New York, NY 10023

Bojan Guzina
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd. Ste. 300
McKinney, TX 75069

Hain Capital Group, LLC
301 Route 17, 6th Floor
Rutherford, NJ 07070

Marc B. Hankin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Michelle Hartman
Baker & McKenzie LLP
1900 N. Pearl, Ste. 1500
Dallas, TX 75201

Hayward & Associates PLLC
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

William A. Hazeltine

Appellee Appx. 01459
Appx. 04334
008267

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1467
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25   Page 350 of 1017   PageID 9097
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1466 of 1803   PageID 12212
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 29 of 34

Sullivan Hazeltine Allinson LLC
901 North Market Street
Suite 1300
Wilmington, DE 19801

Kuan Huang
Latham & Watkins LLP
855 Third Avenue
New York, NY 10022

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Marshall R. King
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
Suite 1400
New York, NY 10066

Alan J. Kornfeld
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067

Kurtzman Carson Consultants LLC
Attn: Drake Foster
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

Kurtzman Carson Consultants, LLC
222 N. Pacific Coast Highway, Ste. 300
El Segundo, CA 90245

M. Natasha Labovitz
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Richard B. Levin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Maxim B Litvak

Appellee Appx. 01460
Appx. 04325
008268

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1468
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 351 of 1017 PageID 9098
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1467 of 1803 PageID 12213
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 30 of 34

Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111

John E. Lucian
Blank Rome LLP
1201 N. Market Street, Sutie 800
1000 North King Street
Wilmington, DE 19801

Lauren Macksoud
1221 Avenue of the Americas
New York, NY 10020-1089

Mark M. Maloney
King & Spalding LLP
191 Peachtree St.
Suite 4900
Atlanta, GA 30303-1763
mmaloney@kslaw.com, pwhite@kslaw.com

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Steet, NE
Atlanta, GA 30309

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

Patrick C. Maxcy
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

R. Stephen McNeill
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Mercer (US) Inc.
155 N. Wacker Drive, Ste. 1500
Chicago, IL 60606

{00374857-13}                          30

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1469
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 352 of 1017 PageID 9099
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1468 of 1803 PageID 12214
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 31 of 34

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
one Rodney Square
920 North King Street
Wilmington, DE 19801

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
1000 North King Street
Wilmington, DE 19801

Joseph T. Moldovan
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Alan A. Moskowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Michael R. Nestor
YOUNG CONAWAY STARGATT & TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801

James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801

Tracy M. O'Steen
CARLYON CICA CHTD.
265 E. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP

Appellee Appx. 01462
Appx. 04325
008270

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1470
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 353 of 1017 PageID 9100
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1469 of 1803 PageID 12215
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 32 of 34

10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Kathleen Preston
Winston & Strawn LLP
800 Capitol Street, Ste. 2400
Houston, TX 77002

Michael A. Rosenthal - DO NOT USE
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Jeremy W. Ryan
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

James P. Seery
795 Columbus Ave., 12A
New York, NY 10025

Sally T. Siconolfi
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Sarah E. Silveira
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

D. Ryan Slaugh
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Tracy K. Stratford
Jones Day
North Point

Appellee Appx. 01463
Appx. 04326
008271

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1471
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 354 of 1017 PageID 9101
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1470 of 1803 PageID 12216
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 33 of 34

901 Lakeside Ave.
Cleveland, OH 44114

Daniel E. Stroik
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304

Stephen G. Topetzes
K&L Gates LLP
1601 King St., N.W.
Washington, DC 20006

Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Michael L. Vild
CROSS & SIMON, LLC
1105 N. Market Street, Suite 901
1000 North King Street
Wilmington, DE 19801

Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003

Erica S. Weisgerber
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Wright
K&L Gates LLP

Appellee Appx. 01464
Appx. 04329
008272

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1472
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 355 of 1017   PageID 9102
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1471 of 1803   PageID 12217
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 34 of 34

State Street Financial Center
One Lincoln St.
Boston, MA 02111

Sean M. Young Conway Stargatt & Taylor, LLP
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801


_/s/Douglas S. Draper_
Douglas S. Draper, LA Bar No. 5073

Appellee Appx. 01465
Appx. 04330
008273

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1473
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 356 of 1017 PageID 9103
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1472 of 1803 PageID 12218

# APPENDIX 20

Appellee Appx. 01466

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1474
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 357 of 1017 PageID 9104
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1473 of 1803 PageID 12219
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 1 of 42

Docket #1670 Date Filed: 01/05/2021

| | |
|---|---|
| K&L GATES LLP<br>Artoush Varshosaz (TX Bar No. 24066234)<br>1717 Main Street, Suite 2800<br>Dallas, TX 75201<br>Tel: (214) 939-5659<br>artoush.varshosaz@klgates.com<br><br>Stephen G. Topetzes (*pro hac vice*)<br>1601 K Street, NW<br>Washington, DC 20006-1600<br>Tel: (202) 778-9328<br>stephen.topetzes@klgates.com<br><br>A. Lee Hogewood, III (*pro hac vice*)<br>4350 Lassiter at North Hills Ave., Suite 300<br>Raleigh, NC 27609<br>Tel: (919) 743-7306<br>Lee.hogewood@klgates.com<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* | Davor Rukavina, Esq.<br>Texas Bar No. 24030781<br>Julian P. Vasek, Esq.<br>Texas Bar No. 24070790<br>MUNSCH HARDT KOPF & HARR, P.C.<br>3800 Ross Tower<br>500 N. Akard Street<br>Dallas, Texas 75202-2790<br>Telephone: (214) 855-7500<br>Facsimile: (214) 978-4375<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF
## REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.



1934054210105000000000016

Appellee Appx. 01467
Appx. 04332
008275

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1475
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 358 of 1017 PageID 9105
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1474 of 1803 PageID 12220
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 2 of 42

Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"), Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund (each, a "**Fund**," and collectively, the "**Funds**," and together with the Advisors, the "**Funds and Advisors**" or "**Objectors**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1472], together with that certain Plan Supplement [Dkt. No. 1648] filed December 30, 2020 (the "**Fifth Amended Plan**").[1]  In support of the Objection, the Funds[2] and Advisors respectfully submit to the Court as follows:

## SUMMARY OF OBJECTION

The Debtor owes strict statutory and contractual fiduciary obligations to manage the billions of dollars of other peoples' money that it manages.  No actual or hypothetical conflict of interest is allowed.  Yet, the Fifth Amended Plan, by purporting to assume various agreements pursuant to which the Debtor manages portfolios of assets, places the interests of the Debtor's creditors ahead of the interests of the beneficial interest holders in those portfolios,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The Funds are investment companies and a business development company registered under the Investment Company Act of 1940 as open-end or "mutual" funds, closed end funds or a business development company. None of the Funds are private or hedge funds.

Appellee Appx. 01468
Appx. 04333
008276

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1476
Case 3:25-cv-02072-S Document 15-11 Filed 04/06/25 Page 359 of 1017 PageID 9106
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1475 of 1803 PageID 12221
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 3 of 42

thereby representing a clear conflict of interest and breach of fiduciary duty in violation of the Advisers Act (defined below) and the 1940 Act (defined below).

This is because the Plan provides for the assumption of numerous management agreements in connection with, among other investments, interests in collateralized loan obligations ("**CLOs**") owned in part by the Funds and/or Advisors, together with other investors. In some cases, either the Funds, the Advisors or these entities in conjunction with other objecting creditor(s) own or manage a majority of the remaining beneficial interests in such CLOs. To be clear, the CLO -- not the Funds nor the Advisors nor the Debtor -- is the issuer of these interests. Nevertheless, it is the Funds and Advisors who hold the beneficial and economic interests and who, pursuant to the underlying agreements, in many instances have the ability to control who the servicer or manager of the portfolios is. However, the Plan reveals that the Debtor intends to dismiss its investment management employees by the end of January 2021 and to employ a subagent to perform its current portfolio manager/servicer role. The Debtor intends to effectively wind-down and liquidate the CLOs' assets within two years—an arbitrary proposition having nothing to do with what is in the best interests of the CLOs. The Debtor also intends to strip the Funds and the Advisors of their contractual and statutory rights, and to improperly insulate itself from potential future liabilities that it may incur on account of its portfolio management.

The Plan cannot be confirmed so long as it provides for the assumption of these agreements. First, these agreements cannot be assigned under the Advisers Act or the 1940 Act, meaning that they cannot be assumed pursuant to section 365(c) of the Bankruptcy Code. Second, these agreements cannot be assumed under section 365(b) of the Bankruptcy Code because the Debtor cannot adequately assure its future performance under the agreements.

Appellee Appx. 01469
Appx. 04334
008277

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1477
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 360 of 1017 PageID 9107
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1476 of 1803 PageID 12222
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 4 of 42

Third, these agreements cannot be assumed if the Plan purports to change their provisions or relieve the Debtor from its fiduciary obligations and resulting potential liabilities. Fourth, the Plan is not feasible and is illusory so long as it depends on future income from these non-assumable agreements. Fifth, the Plan fails to comply with applicable law by seeking to relieve the Debtor of the strict duties imposed on it by the Advisers Act and 1940 Act. Indeed, the Plan is an invitation for future litigation against the Debtor for future breaches by the Debtor of its contractual obligations and violations by the Debtor of federal law.

The Plan is not merely a disagreement between the Debtor, on the one hand, and the Funds and Advisers, on the other hand, as to how to manage the CLOs. The Plan instead represents an attempt by the Debtor to strip beneficial interest holders of their contractual and statutory rights, to improperly insulate itself against its future actions and liabilities, to avoid the dictates of the Advisers Act, and to use assets that it manages—assets that do not belong to the Debtor—to benefit the Debtor's creditors at the expense of the actual owners of those assets. It is one thing for the Debtor to liquidate and to seek to repay its creditors, but it is another thing entirely for the Debtor to do this on the backs, and at the expense, of those investors whose interests the Debtor is charged with serving first.

For these and other reasons argued below, the Objectors object to the confirmation of the Plan.

The purported contract assumption is also illusory in that the Debtor's plan is premised upon the liquidation of assets in which the Debtor has no interest and which a majority of the beneficial owners has expressed, and continue to express, a desire for a different portfolio management strategy than the one the Debtor intends to continue to employ. The contracts the Debtor proposes to assume contain provisions requiring the maximization of the return to or

Appellee Appx. 01470
Appx. 04335
008278

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1478
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 361 of 1017 PageID 9108
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1477 of 1803 PageID 12223
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 5 of 42

preservation of the value of the collateral for the preference shareholders; these parties prefer that the assets not be liquidated, but maximized or preserved. Moreover, the Advisers Act[3] requires the Debtor to comply with the portfolio management contracts for the protection of the investors in the Funds, CLOs and other products. The Debtor's purported assumption of these agreements, while other provisions of the Fifth Amended Plan make clear key provisions of the assumed contracts will be ignored and rejected in this context, is a similar form of "cherry picking" that section 365 does not countenance.[4]

## BACKGROUND

### A. *General Background on Funds and Advisors*

1. Each Advisor is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment adviser under the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-1 *et. seq.* (the "**Advisers Act**").

2. Each of the Funds is a registered investment company or business development company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.* (the "**1940 Act**") and is advised by one of the Advisors.

3. As an investment company or business development company, each Fund is managed by an independent board of trustees subject to 1940 Act requirements. That board determines and contracts with one of the Advisors for each Fund. As is typical for nearly all

---

[3] The Advisers Act and the 1940 Act (defined in numbered paragraph 2 below) are two separate acts, both adopted in 1940, and provide the essential statutory and regulatory structure for the Debtor's business, as well as the Advisors and the Funds, to operate legally and transparently for the benefit of the public.

[4] The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis.

Appellee Appx. 01471
Appx. 04336
008279

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1479
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25   Page 362 of 1017   PageID 9109
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1478 of 1803   PageID 12224
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 6 of 42

investment companies, the Funds do not have employees. Instead, pursuant to the 1940 Act, each Fund's board oversees the Advisor and the Advisor, acting pursuant to the advisory agreements, provides the services necessary to the Fund's operations.[5]   The Funds are each managed by one of the two Advisors.  The Advisors have some employees, but they also rely heavily on the Debtor to provide a variety of services.  Further, certain individuals employed or affiliated with the Debtor also hold roles for the Advisors and/or the Funds, and some of these roles are fiduciary in nature (the "**Fiduciaries**"). The Fiduciaries are privy to confidential commercial information about the Funds and Advisors, including data relating to the Funds' investment holdings and investment strategies.

### B.   *Shared Services and Payroll Reimbursement Agreements with the Debtor*

4.     Each Advisor is party with the Debtor to a shared services agreement. Specifically, NexPoint Advisors, L.P. ("**NexPoint**") and the Debtor are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (as amended, the "**NexPoint SSA**"), and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and the Debtor are parties to a Second Amended and Restated Shared Services Agreement dated February 8, 2013 (as amended, the "**HCMFA SSA**," and collectively with the NexPoint SSA, the "**Shared Services Agreements**").[6]

5.     Under the Shared Services Agreements, the Debtor provides a variety of services, including operational, financial and accounting, human resources, information technology, legal, tax, and compliance services, to the Advisors.  As part of its provision of

---

[5] Each of the Funds' respective boards meets quarterly and, consistent with statutory requirements, each is advised by independent counsel.

[6] Copies of the Shared Services Agreements and the Payroll Reimbursement Agreements (as defined below) are attached to the proofs of claim filed by the Advisors at Claim Nos. 95, 104, 108 and 119.

Appellee Appx. 01472
Appx. 04325
008280

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1480
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 363 of 1017    PageID 9110
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1479 of 1803   PageID 12225
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 7 of 42

services, the Debtor maintains books and records (the "**Books and Records**") on behalf of the Advisors.

6.      Under the HCMFA SSA, the costs of the Debtor's services are allocated on a percentage of use basis.  The Debtor submits quarterly expense statements to HCMFA to reconcile amounts due to the Debtor.  In addition, with respect to certain taxes related to the Shared Services, the Debtor collects those taxes from HCMFA on the same basis as with the Debtor's other customers.  To the extent of a related tax refund, the Debtor is obligated to submit the refund to HCMFA.

7.      Under the NexPoint SSA, NexPoint pays the Debtor a fixed monthly fee for the provision of services.

8.      The Advisors and the Debtor are also parties to separate payroll reimbursement agreements (as amended, the "**Payroll Reimbursement Agreements**").  The Payroll Reimbursement Agreements address the splitting of costs for certain employees that are "dual employees" of the Debtor and an Advisor and who provide advice to funds, such as the Funds, advised by the Advisors.  The Payroll Reimbursement Agreements provide for the subject Advisor to reimburse the Debtor at a set cost.

9.      The Advisors also participate in the Debtor's self-insured healthcare plan (the "**Self-Insured Plan**"), which provides employee healthcare coverage.  Depending on the contributions made and the claims submitted to the Self-Insured Plan at any given time, an Advisor may be owed money by, or owe additional contributions to, the Self-Insured Plan.

10.      The Plan proposes to reject those executory contracts [Fifth Am. Plan, Dkt. No. 1472 at p. 37] that are not otherwise listed for assumption in a plan supplement.  The Debtor has filed its Plan Supplement listing executory contracts to be assumed [Dkt. No. 1648], which

**Appellee Appx. 01473**
**Appx. 04338**
**008281**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1481
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 364 of 1017    PageID 9111
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1480 of 1803   PageID 12226
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 8 of 42

Plan Supplement does not include the foregoing executory contracts.  Accordingly, it appears that the Plan proposes to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan.  The Advisors will therefore have potentially sizable rejection damages claims, on account of which they are preparing to file corresponding proofs of claim.

### C.    *The CLOs*

11.    The Funds also have economic interests in certain collateralized loan obligations (the "**CLOs**") (the Fifth Amended Plan refers to the CLOs as "Issuers"), for which the Debtor serves as portfolio manager.

12.    The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC,[7] and Westchester CLO, Ltd.

13.    The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations.  They also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations.  The notes issued by the CLOs are paid according to a contractual priority of payments, or waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preferred shares.

14.    The CLOs were created many years ago.  Most of the CLOs have, at this point, paid off all the tranches of notes or all but the last tranche.  Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preferred

---

[7] The portfolio management agreements with Loan Funding VII, LLC is not proposed to be assumed.

**Appellee Appx. 01474**
**Appx. 04329**
**008282**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1482
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 365 of 1017    PageID 9112
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1481 of 1803    PageID 12227
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 9 of 42

shares.

15.     Further, such ownerships represent in many cases the total remaining
outstanding interests in such CLOs, the noteholders otherwise having been paid.  In others, the
remaining noteholders represent a small percentage only of remaining interests. Thus, the
economic ownership of the registered investment companies, business development company,
and CLO Holdco represent a majority of the investors in the CLOs as follows:

> a.  CLOs in which NexPoint or HCMFA manage owners of a majority of
>     the preference shares:  Stratford CLO, Ltd. 69.05%, Grayson CLO, Ltd.
>     60.47% and Greenbriar CLO, Ltd. 53.44%.
>
> b.  CLOs in which a combination of NexPoint and HCMFA managed funds
>     and CLO Holdco hold all, a supermajority or majority of preference
>     shares:  Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%*[8],
>     Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*,
>     Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%,
>     Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%*

16.     The issuer of each CLO has separately contracted with the Debtor for the Debtor
to serve as the CLO's portfolio manager or servicer (the "**Servicing Agreements**").[9]  In this
capacity, the Debtor is responsible for, among other things, making decisions to buy or sell the
CLOs' assets in accordance with the indenture and its obligations under the Servicing
Agreements.  Although the Servicing Agreements vary, they generally impose a duty on the

---

[8] CLOs marked with an asterisk (*) appear in the foregoing list as well.

[9] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Objection, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

Appellee Appx. 01475
Appx. 04349
008283

Debtor when acting as portfolio manager to maximize the value of the CLOs' assets for the benefit of the CLOs' noteholders and preferred shareholders.  In particular, the Servicing Agreements contain language providing for the maximization or preservation of value for the benefit of the preference shares as shown in the following examples:

> In performing its duties hereunder, the Portfolio Manager shall seek to maximize the value of the Collateral for the benefit of the Noteholders and the Holders of the Preference Shares taking into account the investment criteria and limitations set forth herein and in the Indenture and the Portfolio Manager shall use reasonable efforts to manage the Collateral in such a way that will (i) permit a timely performance of all payment obligations by the Issuer under the Indenture and (ii) subject to such objective, maximize the return to the Holders of the Preference Shares; provided, that the Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Portfolio Manager performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Portfolio Manager with respect to the Notes or the Preference Shares.

Liberty Portfolio Management Agreement, Sec. 2(b) containing language above.

> In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

Aberdeen Servicing Agreement, Sec. 2(b).

Appellee Appx. 01476

Appx. 94344

008284

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1484
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 367 of 1017    PageID 9114
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1483 of 1803    PageID 12229
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 11 of 42

17.    Moreover, each of the Servicing Agreements contain express language that the portfolio manager's obligations thereunder are for the benefit of and "shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture of the Preference Share Paying Agency Agreement, as applicable."  Servicing Agreement Sec. 9.

18.    The Servicing Agreements also generally allow the holders of preference shares to remove the portfolio manager for cause, while their affirmative consent is required to an assignment of the agreements.  Cause includes the anticipated "ipso facto" provisions related to insolvency and bankruptcy, but cause is not so limited and includes material breach of the Servicing Agreement which would clearly include the failure to maximize value or the failure to preserve collateral. Servicing Agreement, Sec. 14.  However, certain Servicing Agreements provide for a certain percentage of holders of preference shares to remove the portfolio manager without cause. *See, e.g.*, Gleneagles CLO , Ltd., Portfolio Management Agreement, Sec. 12(c).

### E.    *The Fifth Amended Plan and Disclosure Statement*

19.    On November 24, 2020, the Debtor filed the Fifth Amended Plan and the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1473] (the "**Disclosure Statement**").

11

20.    The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries.   The Debtor's rights to manage investment vehicles managed by the Debtor pursuant to executory contracts that are assumed pursuant to the Fifth Amended Plan, defined as the "Managed Funds," are to remain with the Reorganized Debtor, which, in turn, is to be managed by New GP LLC, a wholly-owned subsidiary of the Claimant Trust.  The Disclosure Statement states that "[t]his structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets."  Dkt. No. 1473 at 11.  Ultimately, however, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets."  *Id.*  More specifically, the Reorganized Debtor will manage the wind down of the Managed Funds in addition to any other remaining Assets.  Moreover, the Financial Projections attached as Exhibit C to the Disclosure Statement make clear that, assuming confirmation of the Plan in its current form, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

21.    The Disclosure Statement further states that the Debtor does not anticipate either the Reorganized Debtor or the Claimant Trust assuming or assuming and assigning the contracts between the Debtor and certain of its Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services relating to such Related Entities.  Dkt. No. 1473 at 42.  Accordingly, it appears that the Debtor's intent is to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan.

---

[10] Footnote 10 to the Disclosure Statement clarifies that the Debtor does not consider any of the Issuers to be a Related Entity.

Appellee Appx. 01478

Appx. 04343

008286

22.     With respect to the Shared Services Agreements, the Disclosure Statement provides that the cost of staffing to fulfil the agreements has historically resulted in a net loss to the Debtor and is not beneficial to the estate.  The Disclosure Statement further states that the agreements contain anti-assignment provisions which it believes to be enforceable under section 365(c) of the Bankruptcy Code, and moreover, are terminable at will by either party.  In light of these considerations, the Debtor apparently does not believe that the agreements may be assumed or assumed and assigned, and even if they could, there would not be any corresponding benefit to the estate.  Notwithstanding the foregoing, the Disclosure Statement indicates that the Debtor is still assessing whether to assume and assign the agreements with a Related Entity. Dkt. No. 1473 at 42.

23.     The Disclosure Statement also discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

> The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

24.     The Debtor's Supplement to the Plan, filed on December 30, 2020 at Dkt. No. 1648, indicates that the Debtor intends to assume the Servicing Agreements with all of the CLOs except Loan Funding VII, LLC.  *See* Dkt. No. 1648, Sched. A.

Appellee Appx. 01479

Appx. 04844

008287

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1487
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 370 of 1017 PageID 9117
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1486 of 1803 PageID 12232
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 14 of 42

## OBJECTION

**A.** ***The Debtor Cannot Assume the Servicing Agreements Pursuant to Section 365(c)(1) of the Bankruptcy Code***

25.     The Objectors object to the assumption of the Servicing Agreements for the fundamental reason that the Debtor will not manage the CLOs' assets appropriately in order to maximize value for the CLOs and the Objectors, but will instead breach its fiduciary duties by managing a winding-down those CLOs and assets in order to provide a recovery for its creditors, in what is an obvious and irreconcilable conflict of interest.

26.     As explained below, the Debtor and the Servicing Agreements which it seeks to assume are subject to the Advisers Act. As the Supreme Court has repeatedly held, it is a fundamental purpose of the Advisers Act to impose strict fiduciary duties on investment advisors and to "eliminate conflicts of interest between the investment adviser and the clients." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963). This extends to any "conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Id*. "[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations." *Transamerica Mort. Advisors v. Lewis*, 444 U.S. 11, 17 (1979).

27.     Under the Plan, the Debtor would be owned by its creditors. The Debtor and the Claimant Trust would be managed by a person holding fiduciary duties to the Debtor's creditors. The Debtor would manage and presumably wind-down and liquidate the assets of the CLOs within a span of two years, not for the benefit of the CLOs and their beneficial interest holders, but for the benefit of the Debtor's creditors. And, it would do this without employees or resources, or by impermissibly delegating its duties to yet a different party—something that it is not permitted to do under applicable law and the governing contracts. In sum, the Debtor

Appellee Appx. 01480
Appx. 04345
008288

would manage the CLOs and their assets for the benefit of the Debtor's creditors, which it is fundamentally impossible to do without simultaneously violating the Debtor's strict fiduciary duties to others and which represents a clear conflict of interest under the Advisers Act.

28.    This inescapable conclusion is precisely why the Bankruptcy Code prohibits an assumption of personal service contracts like the Servicing Agreements.  The Bankruptcy Code provides that:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

29.    The first question is whether "applicable law" excuses the counterparties to the Servicing Agreements from accepting performance from the Debtor.  In this respect, both the Advisers Act and the 1940 Act represent "applicable law" that provides for precisely that.

30.    The Advisers Act governs "investment advisors."  The Advisers Act defines an investment advisor as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

31.    There is no question that the Debtor receives compensation under the Servicing Agreements.  The only question is whether, under the Servicing Agreements, and in connection

15

Appellee Appx. 01481

008289

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1489
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 372 of 1017    PageID 9119
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1488 of 1803    PageID 12234
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 16 of 42

with managing the investments and securities of the CLOs, the Debtor satisfies the remaining element(s).    Case law confirms that, in providing investment services and investment management under the Servicing Agreements, is acting as an "investment advisor" under the Advisers Act.  The Second Circuit authoritatively considered and decided the issue of whether a portfolio manager is an investment advisor in *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977).  The case concerned general partners who managed various investments on behalf of limited partners.  *See id*. at 866.  Regarding whether the general partners were investment advisors on account of managing the investments, the court concluded that they were "on two independent grounds":

> First, the monthly reports which contained the alleged fraudulent representations were reports which provided investment advice to the limited partners.  The general partners' compensation depended in part upon the firm's net profits and capital gains.  These in turn were affected by the size of the total funds under their control.  The monthly reports were an integral part of the general partners' business of managing the limited partners' funds.  In deciding whether or not to withdraw their funds from the pool, the limited partners necessarily relied heavily on the reports they received from the general partners.

> Second, wholly aside from the monthly reports, we believe that the general partners as persons who managed the funds of others for compensation are 'investment advisers' within the meaning of the statute.  This is borne out by the plain language of Section 202(a)(11) and its related provisions, by evidence of legislative intent and by the broad remedial purposes of the Act.

*Id*. at 870.  Thus, by virtue of managing the underlying investments and related activities, the general partners were providing investment advice and were therefore investment advisors subject to the Advisers Act.

32.    The court in *SEC v. Smith*, 1995 U.S. Dist. LEXIS 22352 (E.D. Mich. 1995), considered a similar issue.  In that case, the SEC sought summary judgment that the defendant was an investment adviser under the Advisers Act.  The defendant argued that he was not an investment adviser merely by virtue of managing a portfolio of accounts on behalf of third

16

parties. *See id*. at \*12-\*13. Specifically, the defendant argued that he was not giving investment advice, but that he was instead "a professional trustee who exercises sole discretionary control over trust investments. . . I am the trustee. I have absolute full power and authority to make all buy, hold and sell decisions. And, therefore, I am the one that receives information and research and I make the decisions." *Id*. at \*13. In other words, because he had sole discretion and control over how to manage the invested assets, he was not giving "advice" within the meaning of the Advisers Act. The court rejected this argument: "Smith is clearly an investment advisor under the Advisers Act." *Id*. at \*15.

33.     The court in *SEC v. Saltzman*, 127 F. Supp. 2d 660 (E.D. Pa. 2000) reached the same conclusion with respect to a portfolio manager:

> Saltzman maintained exclusive control over the investment portfolio, brokerage accounts, and bank account of Saltzman Partners, L.P. He made all investment decisions for the portfolio. As the Act intended to embrace those who wield power over their clients' money, as Saltzman did over the investments of the limited partners, the facts alleged qualify Saltzman as an investment adviser.

*Id*. at 669. Therefore, the Debtor, by virtue of managing the CLO assets, and even though it has the sole control and authority over that management, is providing investment advice and is therefore an investment advisor with respect to the Servicing Agreement.

34.     More particularly, the Servicing Agreements, because they provide for investment advice, are "Investment Advisory Contracts" under the Advisers Act. This is further confirmed by the language of the Advisers Act with respect to the definition of Investment Advisory Contract:

> any contract or agreement whereby a person agrees to act as investment adviser to <u>or to manage any investment</u> or trading account <u>of another person</u> other than an investment company registered under title I of this Act.

15 U.S.C. § 80b-5(d) (emphasis added). Managing the investments of others is of course

**Appellee Appx. 01483**

**008291**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1491
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 374 of 1017    PageID 9121
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1490 of 1803    PageID 12236
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 18 of 42

precisely what the Debtor does under the Servicing Agreements.

35.    There should therefore be no question that the Servicing Agreements are "investment advisory contracts" subject to the Advisers Act.  Should there be any doubt, the Servicing Agreements in multiple places reference the Advisers Act and subject the agreements to the requirements of the Advisers Act.

36.    The Advisers Act prohibits an assignment of an investment advisory contract without consent.  The Advisers Act defines "assignment" as including "any direct or indirect transfer or hypothecation of an investment advisory contract."  15 U.S.C. § 80b-2(a)(1).  With respect to an assignment, the Advisers Act provides as follows:

> No investment adviser registered or required to be registered with the Commission shall enter into, extend, or renew any investment advisory contract, or in any way perform any investment advisory contract entered into, extended, or renewed on or after the effective date of this title, if such contract—
>
> (2) fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract.

15 U.S.C. § 80b-5(a)(2).

37.    Each of the Servicing Agreements contain substantially similar provisions related to any assignment:

> any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares.

38.    Accordingly, the Advisers Act represents "applicable law" under section 365(c)(1) that excuses the counterparty to an investment advisory contract from accepting performance from an assignee.  As such, because the agreement cannot be assigned, it cannot

**Appellee Appx. 01484**

**Appx. 04649**

**008292**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1492
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 375 of 1017 PageID 9122
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1491 of 1803 PageID 12237
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 19 of 42

be assumed by the Debtor without consent.

39.     It is true that courts in this District construe section 365(c)(1) such that, where the applicable law is merely a general prohibition on assignment, the section does not prevent an assumption.  *See, e.g., In re Lil' Things*, 220 B.R. 583, 590-91 (Bankr. N.D. Tex. 1998). Here, however, the Advisers Act is not a general law that would prohibit an assignment; it is a very specific law, applicable to a very narrow set of persons, and one which prohibits only the assignment of an investment advisory agreement.

40.     Even so, this District recognizes that section 365(c)(1) becomes paramount "where the identity of the party rendering performance under the contract is material to the contract, and the contract is non-delegable under applicable non-bankruptcy law." *Id.* at 591. This is certainly true where, as here, a party has contracted with someone to manage that party's property and investments: that is a fiduciary relationship of the highest trust where the identity of the person providing the services is absolutely paramount.  The Fifth Circuit recognized this fundamental principle the highly analogous situation of an attorney retention agreement: the contract was not assumable under otherwise applicable law because the contract was a highly personal one involving elements of trust, legal, and ethical considerations. *See In re Tonry*, 724 F.2d 467, 468-69 (5th Cir. 1984).

41.     In *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), this Court concluded that the debtor-in-possession may assume a contract even if section 365(c) would prevent a trustee from being able to assume the contract.  In large part, the Court construed the addition, in 1984, of the term "debtor-in-possession" into the statute as evidence that Congress intended for a debtor-in-possession to be able to assume its contracts even if section 365(c) would otherwise prohibit a trustee from assuming the contract. *See id.* at 333.  "The specific

Appellee Appx. 01485
Appx. 04859
008293

use of the words 'the debtor or the debtor in possession' leads the court to conclude that a contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject to assumption whether or not applicable law limits its assignability. *Id.* However, the Fifth Circuit has not adopted this view and the logic of *In re Mirant Corp.* is not correct.

42.     The statute begins by providing that the "trustee may not assume or assign any executory contract . . ." 11 U.S.C. § 365(c)(1). That "trustee" must include a debtor-in-possession, for it is the same "trustee" as in section 365(a) which provides that a "trustee . . . may assume or reject any executory contract." *Id.* at § 365(a). Thus, the section 365(c)(1) prohibition on a trustee must also extend to a "debtor-in-possession," unless the Court concludes that the use of the word "trustee" in the same statute means two different things. Rather, what *In re Mirant Corp.* was referring to was the following language in section 365(c)(1):

> applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession.

*Id.* at § 365(c)(1).

43.     The addition of the term "debtor-in-possession" to this statute does not change the result; *i.e.* it does not mean that a debtor-in-possession, unlike a trustee, may assume, but not assign, its own contracts. The question is whether applicable law excuses a party from accepting performance from an entity other than the debtor-in-possession. The Debtor is a debtor-in-possession and, if the counterparty is excused by applicable law from accepting performance from anyone else, then the contract may not be assumed by the Debtor. *In re Mirant Corp.* was simply wrong in concluding that the 1984 amendment somehow excepted a debtor-in-possession's assumption of its own contracts from the operation of section 365(c)(1).

44.     The Fifth Circuit's opinion in *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392

**Appellee Appx. 01486**

**Appx. 04551**

**008294**

(5th Cir. 2001) is on point.  That opinion was rendered after the 1984 amendment at issue in *Mirant*, and that opinion concerned a Chapter 11 debtor.  The question was whether a non-assignable partnership agreement could be assumed under section 365(c)(1).  The Fifth Circuit held that "the agreement was *not* assumable under § 365(c)(1)."  *Id*. at 402 (emphasis in original).  And, as here, the confirmed plan provided for a postconfirmation liquidating trust.  *See id*. at 396.  The only difference was that, in *In re O'Connor*, a Chapter 11 trustee proposed the confirmed plan.  This difference does not matter because the Fifth Circuit held that the agreement itself was not assumable; not that one person may assume it while a second not.  *See id*. at 402 and 404 (twice holding that the "agreement is *not* assumable" (emphasis in original)).[11]  Only one person may assume an executory contract, and that person is the trustee, even if the debtor-in-possession is exercising the powers of a trustee.  Thus, if the contract itself is not assumable, then it is not assumable period.  This difference also does not matter because the identity of the plan proponent is immaterial: the question is still whether it is the debtor-in-possession, or the estate, that can assume the executory contract.

45.    The Debtor will respond that the Fifth Circuit, in *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006), rejected the so-called "hypothetical test" and adopted instead the "actual test" regarding the assignment of an executory contract or lease.  In *Mirant*, the issue concerned section 365(e)(2) of the Bankruptcy Code and whether an *ipso facto* clause was enforceable against a debtor-in-possession because the executory contract was not assignable.  The

---

[11] In *Strumpf*, the Fifth Circuit held that, because the agreement was not assumable, it passed through the Chapter 11 unaffected.  However, *Strumpf* itself concluded that this "pass-through" principle does not apply in a liquidating plan, as further confirmed by *In re Tex. Rangers Baseball Partners*, 521 B.R. 134,183 (Bankr. N.D. Tex. 2014). Even if the agreements could pass through unaffected to the reorganized debtor, even though it is liquidating, the Plan cannot limit the ability to terminate the agreements in the future based on the change in control and other facts that are present.  Otherwise, the agreements would be affected by the Plan, meaning that they would have to first be assumed, as recognized in *Strumpf* by holding that a plan effect on the executory contract means that it cannot pass through bankruptcy unaffected.  *Strumpf,* 258 F.3d at 405.

Appellee Appx. 01487

Appx. 04552

008295

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1495
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 378 of 1017   PageID 9125
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1494 of 1803   PageID 12240
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 22 of 42

"hypothetical test" required a court to review whether a hypothetical assignment was prohibited by applicable law; if it was, then the *ipso facto* clause could be enforced even though no assignment was proposed. *See id*. at 246-47. The Fifth Circuit rejected this approach and instead applied the "actual test," which looked at whether an assignment was actually being proposed. *See id*. at 249-50. The Debtor will argue that this same logic should apply to section 365(c)(1) such that, when no actual assignment is being proposed, the section is not implicated.

46.     *Mirant* and its logic, however, do not apply to section 365(c)(1). First, and most obviously, the Fifth Circuit stated that "[a]lthough this Circuit has addressed § 365(c)(1), we have yet to address § 365(e)," and then it cited to its *In re O'Connor* and *In re Braniff Airways* precedent. *See id*. at 248-49. The circuit, in analysing this prior precedent, noted that it was the contract itself that was not assumable ("declaring the contract unassumable," *id*.) and reaffirmed the holdings of both prior opinions notwithstanding the change in the language of section 365(c)(1). Thus, and having been afforded the opportunity to revisit its prior precedent or to find that the added "debtor-in-possession" language to section 365(c)(1) compelled a different result, the circuit instead reaffirmed its prior precedent holding that the contract itself was not assumable. More precisely, the "actual test" cannot apply to section 365(c)(1) because that section provides that a trustee may not "assume <u>or</u> assign" an executory contract. If the test were an actual one, *i.e.* whether an actual assignment was being proposed, then the section would simply provide that the trustee may not "assume and assign" the executory contract. But, in preventing an assumption even without a proposed assignment, section 365(c)(1) necessarily applies the "hypothetical test" such that, even though no assignment is proposed, if an assignment is prohibited then so is an assumption.

47.     Thus, were the Fifth Circuit presented with the precise issue with respect to

Appellee Appx. 01488
Appx. 04553
008296

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1496
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 379 of 1017 PageID 9126
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1495 of 1803 PageID 12241
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 23 of 42

section 365(c)(1), to the extent it was not in *In re O'Connor*, the Objectors submit that the Fifth

Circuit would join its sister circuits in concluding that, so long as even a hypothetical

assignment would be prohibited, so too is an assumption, whether by a trustee, debtor, or debtor-

in-possession. *See In re Catapult Entertainment*, 165 F.3d 747, 750 (9th Cir. 1999) ("a debtor

in possession may not assume an executory contract . . . if applicable law would bar assignment

to a hypothetical third party, even where the debtor in possession has no intention of assigning

the contract in question to any such third party"); *In re James Cable Partners L.P.)*, 27 F.3d

534, 537 (11th Cir. 1994); (holding that debtor-in-possession may not assume executory

contract under section 365(c)(1) notwithstanding that no assignment was proposed); *In re

Catron*, 1994 U.S. App. LEXIS 14585 (4th Cir. 1994) (affirming holding that "agreement was

the type of executory contract that could not be assumed by Catron, a debtor-in-possession,

absent consent of the nondebtor parties as required by § 365(c)(1)(B)"); *In re West Electronics

Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) ("the relevant inquiry is not whether [applicable law] would

preclude an assignment from West as a debtor to West as a debtor in possession, but whether it

would foreclose an assignment by West to another defense contractor");[12] *but see Institut

Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997).

    48.    The result may not be to the liking of the Debtor and, in other circumstances, the

result may be harsh on a debtor-in-possession. But this case aptly demonstrates why the section

---

[12] In fact, as recognized in *West*, the addition of the term "debtor-in-possession" into section 365(c)(1)
demonstrates Congress's intent to prevent a debtor-in-possession from assuming its own personal services
contracts:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1)
> Congress anticipated an argument like the one here made and wanted that section to reflect its
> judgment that in the context of the assumption and assignment of executory contracts, a solvent
> contractor and an insolvent debtor in possession going through bankruptcy are materially distinct
> entities.

*In re West Electronics*, 852 F.2d at 83.

Appellee Appx. 01489
Appx. 94554
008297

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1497
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 380 of 1017 PageID 9127
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1496 of 1803 PageID 12242
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 24 of 42

exists and why the result is fair. Many innocent parties have entrusted billions of dollars of their property to the Debtor to manage, for their benefit. Now, the Debtor wants to manage that property for the benefit of its creditors, and with insufficient experience, resources, and employees at that. This is not a case where the debtor is a person, who holds investment management contracts. That person is the same before, during, and after a Chapter 11 case. But here the Debtor is the same entity in name only: no reasonable fund would contract with the postconfirmation Debtor here to manage a penny, let alone life savings and the investments of many. That is the whole point of why personal services contracts cannot be assumed without consent.

49.    Moreover, the Court should not permit the Debtor to place form over substance, especially when the rights of innocent, third party funds and investors are concerned. While technically the post-confirmation Debtor will still be the same corporate shell, it will have been gutted of everything that made the Debtor the Debtor. It is in substance and in every real and practical consideration an assignment of the contracts. Indeed, it appears that the only reason why the Debtor will even maintain a corporate existence after confirmation is an attempt to obviate the prohibition on assumption under section 365(c)(1), as all other property of the Debtor is transferred to the Claimant Trust. On this point, the Plan expressly provides that the "Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees." Plan at p. 32-33. If the intent of this provision is to provide services required by the Servicing Agreements, then this is a blatant violation of the Servicing Agreements' and the Advisers Act's anti-assignment and anti-delegation provisions. In other words, this admission in the Plan may well be precisely the type of assignment, or subsequent assignment, that would be prohibited by section 365(c)(1) regardless of any

Appellee Appx. 01490
Appx. 04455
008298

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1498
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 381 of 1017 PageID 9128
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1497 of 1803 PageID 12243
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 25 of 42

discussion between the "hypothetical test" and the "actual test."

50.     Separate and apart from the above discussion, and understand that there is uncertainty in the law as to the interplay between sections 365(f) and 365(c)(1), it is clear that a "personal services contract" falls squarely within the protection of section 365(c)(1). As the Fifth Circuit has held, a personal services contract is subject to section 365(c)(1): "Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy." *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983). A personal services contract is one which "involves a matter of personal trust and confidence between the original contracting parties." *In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996). "A personal services contract has been defined as a contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability." *In re Wofford*, 608 B.R. 494, 496 (Bankr. E.D. Tex. 2019) (internal quotation omitted).

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, the <u>debtor-in-possession or trustee</u> is unable to assume or assign the rights of the bankrupt in such contract.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (emphasis added).

51.     The Service Agreements are clearly personal service contracts: the Debtor's position is one of trust and that of a fiduciary, the Debtor's performance requires personal confidence and high skill and knowledge, the agreements provide that the Debtor's duties are not delegable, and no person entrusting another with managing billions of dollars in assets would want the underlying contract to be assumable by a trustee or a liquidating debtor. Indeed, the Supreme Court has recognized the "personalized character of the services of investment advisors." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963). This Court

25

Appx. 04456
008299

has characterized financial advisory and brokerage contracts as personal services contracts. *See In re Consolidated Capital Equities Corp.*, 157 B.R. 280, 283 (Bankr. N.D. Tex. 1993). Other courts have held that the Investors Act imposes a trust relationship. *See e.g. In re Peterson*, 96 B.R. 314, 323 (Bankr. D. Colo. 1988). The strict fiduciary and anti-assignment provisions of the Advisor Act and the 1940 Act further confirm Congress' strong view that these contracts are in the nature of personal service contracts.

52.     Even if the Court is inclined to adopt the "actual test" under section 365(c)(1) such that an assumption is possible where there is no assignment, and recognizing that section 365(c)(1) is broader in application than to only personal services contracts, the law overwhelmingly confirms that a personal services contract is not assumable in the first instance. *See, e.g., In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

53.     The final issue concerning section 365(c)(1) is consent. Assuming that the CLOs do not object to the assumption of the Servicing Agreements, the statute requires affirmative consent to the assumption. The statute prohibits the assumption if "such party does not consent to such assumption." 11 U.S.C. § 365(c)(1)(B). The plain meaning of this language is that consent is required, as opposed to merely the absence of an objection. In *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392 (5th Cir. 2001), the issue concerned an executory contract that was neither expressly assumed nor assigned under a Chapter 11 plan. The Fifth Circuit held that the contract was not assumable under section 365(c)(1) and concluded that the counterparty "did not consent" to an assumption. *See id*. at 402. If the absence of an objection was all that was required, then the Fifth Circuit would not have so held. In fact, the Fifth Circuit expressly rejected the argument that the "Appellees consented to the assumption by failing to object to the Plan." *Id*. at 400. This is in line with the case law, which requires affirmative, or actual,

Appellee Appx. 01492

Appx. 04357

008300

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1500
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 383 of 1017 PageID 9130
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1499 of 1803 PageID 12245
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 27 of 42

consent to the assumption. *See In re Allentown Ambassadors Inc.*, 361 B.R. 422, 448 n. 60 (Bankr. E.D. Pa. 2007).

54.    Finally, there is the issue of the Objectors' standing to make the foregoing arguments. The Objectors have standing for at least four reasons. First, as creditors and parties in interest,[13] they have the right to object to the Plan. 11 U.S.C. § 1109(b). Insofar as it is the Fifth Amended Plan that provides for assumption of the Servicing Agreements, the Objectors may object to said assumption, especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole. Second, the Objectors have standing and the right to object to confirmation of the Fifth Amended Plan under sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code. Insofar as the Fifth Amended Plan and the Debtor propose to impermissibly assume the Servicing Agreements in violation of the law, the Objectors may object to such assumption on those bases. Third, in several of the Servicing Agreements, the Objectors have the right to remove the Debtor or to control who the servicer under the agreements is. They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements. Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the Objectors have standing to object to their rights being limited or eliminated. Likewise, under the 1940 Act, an investment adviser must be approved by a majority of the voting securities, and the Servicing Agreements cannot continue in effect for more than two years without the consent of either the CLOs' boards of directors or a majority of the outstanding voting securities--i.e., the Objectors. 15 U.S.C. § 80a-15(a)(2). Insofar as the Fifth Amended Plan purports to limit the

---

[13] "The term 'party in interest' is not defined in the Bankruptcy Code." *Khan v. Xenon Health, LLC (In re Xenon Anesthesia of Tex., PLLC)*, 698 Fed. Appx. 793, 794 (5th Cir. 2017) (quoting *In re Megrelis*, No. 13-35704-H3-7, 2014 Bankr. LEXIS 3905, at *2 (Bankr. S.D. Tex. Sept. 12, 2014)). "It generally 'means anyone who has a legally protected interest that could be affected by the bankruptcy case.'" *Id.*

Appellee Appx. 01493
Appx. 04558
008301

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1501
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25    Page 384 of 1017    PageID 9131
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1500 of 1803    PageID 12246
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 28 of 42

Objectors' right to withhold their consent or influence the CLOs' boards of directors, the Objectors have standing to challenge any modification of those rights.  Fourth, in several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the Objectors.  The Objectors have similar rights under the Indentures.  Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the Objectors.

55.    The Fifth Amended Plan does not comply with section 1129(a)(1) of the Bankruptcy Code because it violates a fundamental principal of contract assumption under section 365 of the Bankruptcy Code.  Contracts must be assumed or rejected; there is no such thing as a partial assumption.  *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*--the debtor accepts both the obligations and the benefits of the executory contract."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("An executory contract cannot be rejected in part and assumed in part; the debtor must assume both the benefits and the burdens on the contract.").

56.    The Fifth Amended Plan contravenes established law with respect to the proposed treatment of the CLOs and the Debtor's obligations under the portfolio management agreements.

57.    First, the Fifth Amended Plan reveals that the Debtor, while claiming to assume the various Servicing Agreements, also intends to deprive the counterparties to those agreements from exercising their rights to change management.

Appellee Appx. 01494
Appx. 04559
008302

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1502

Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 385 of 1017    PageID 9132

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1501 of 1803   PageID 12247

Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 29 of 42

58.     Under the Servicing Agreements at issue, either a majority, or in some cases, a supermajority of owners may initiate a change in management.  See attached Exhibit A.

59.     The Debtor's Plan makes clear, however, that it intends to engage a subagent to perform the management and servicing function and, implicitly to deprive the CLOs as issuers from exercising contractual rights with respect to making a change in management.

60.     Second, the Debtor's duties under the Servicing Agreements, which themselves have been adopted under the Advisers Act, subject to Rule 206(4)-8 thereunder as noted below, are owed to, and provide the rights of, the preference shareholders under the portfolio management agreements.  The Debtor's proposed liquidation of Managed Assets (which it does not own) is contrary to the performance of its contractual and statutory duties under the portfolio management agreements.

61.     The preference shareholders, as the only remaining owners of the Managed Assets of many of the CLOs, contend that the Debtor's (i) sales of  Managed Assets and  (ii) continued management of the Managed Assets, notwithstanding the Debtor's stated intention to wind down and liquidate all assets, violates the provisions of Section 2(b) of the portfolio management agreements.

62.     These violations are detrimental to the counterparties to the assumed contracts because:

      a.  liquidation sales of Managed Assets the Debtor does not own are unlikely to maximize the value of the Managed Assets when compared to the long term investment horizon of the beneficial owners of the Managed Assets;

      b.   liquidation sales of Managed Assets are likely to subtract value when duress sales occur based on the short term horizon and liquidation

Appellee Appx. 01495

Appx. 04309

008303

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1503

Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 386 of 1017    PageID 9133

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1502 of 1803   PageID 12248

Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 30 of 42

strategy of the Debtor;

c.   the Debtor has announced the termination of its personnel, resulting in loss of knowledgeable portfolio managers; and

d.   any potential consultant engaged by the Debtor in the absence of its terminated personnel will be subservient to the Debtor's short-term objective of liquidation in violation of the assumed contracts and applicable securities law.

63.    Manifestly, where the investors in a pooled vehicle state to the manager both that their objectives and desires differ from those of the portfolio manager, and that the portfolio manager's actions are contrary to the manager's duties to maximize returns for the benefit of the investors established under the agreement, that portfolio manager is not acting reasonably under or in accordance with its agreement.  The owners of the Managed Assets, in requisite majority or supermajority,[14] have expressly requested that the Managed Assets not be liquidated as contemplated by the Debtor's business plan.  In that context, the Debtor is unreasonably acting contrary to the required contractual objective and therefore statutory obligation to maximize value for the preference shareholders.   In implementing the Fifth Amended Plan, the Debtor is likely to violate its duty of reasonableness under Section 2(b) under these circumstances, because the Debtor is not "perform[ing] its duties under [the] Agreement in the manner provided for" in the Agreement.

64.    As the Debtor is an investment management firm familiar with established securities laws, the Fifth Amended Plan's violations of such laws is blatant and should not be permitted.

---

[14] Objectors acknowledge that they do not hold a majority in all of the CLOs, for example, Jasper.

Appellee Appx. 01496

Appx. 04861

008304

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1504
Case 3:25-cv-02072-S Document 15-11 Filed 04/06/25 Page 387 of 1017 PageID 9134
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1503 of 1803 PageID 12249
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 31 of 42

65.     Based upon the Fifth Amended Plan's attempt to assume contracts partially, and not fully, the Court should find that the Fifth Amended Plan fails to satisfy section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed

66.     Moreover, as discussed below, with respect to the injunction and release provisions of the Fifth Amended Plan, the Plan purports to release the Debtor from its contractual and statutory obligations with respect to the Servicing Agreements. As explained above, those agreements require the Debtor to preserve and to maximize the value of the CLOs assets, for the benefit of the CLOs and the holders of beneficial interests in them. The Advisers Act requires the same. The Fifth Amended Plan purports to enjoin parties from "taking any actions to interfere with the implementation or consummation of this Plan." Plan at p. 50. This is an unprecedented, overbroad injunction that does not comport with fundamental due process, as what "interference," "implementation," or "consummation" mean is not specified. Are the Objectors to be enjoined from enforcing future rights under the Servicing Agreements even if the Debtor commits future malfeasance?

67.     The Fifth Amended Plan likewise enjoins all creditors and other parties, and their "Related Persons" (who may not even have notice of the injunction) from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor." Plan at p. 51. Read literally, this means that the Objectors and the CLOs will not be able to assert any claims, or seek any relief, against the Debtor or Reorganized Debtor for any present or future actionable wrongs under the Servicing Agreements and the Advisers Act. Again, so broad an injunction, not limited in time, is unprecedented, legally impermissible, violates due

Appellee Appx. 01497
Appx. 04882
008305

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1505
Case 3:25-cv-02072-S    Document 15-11   Filed 10/06/25    Page 388 of 1017    PageID 9135
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1504 of 1803   PageID 12250
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 32 of 42

process, and seeks to strip parties of their contractual and Advisers Act rights—even as the
Debtor purports to assume the Servicing Agreements which, as is black letter law, means that
the Debtor is requiring to provide full future performance (and suffer potential future obligations
and liabilities).

68.     The balance of the Plan injunction is equally fatally defective.  If there are future
obligations and defaults, and even if there are present ones, under the Servicing Agreements
and applicable law, affected parties have to have the right to seek legal redress, enforce awards
and injunctions, and assert setoff rights.  On this last basis in particular, if there are setoff rights
under the CLOs or other agreements, those rights cannot be permanently enjoined.  And, the
same injunction applies to any "successors" of the Debtor and its property interests, meaning
that, if the Debtor assigns or delegates its duties under the Servicing Agreements, some future
and unknown party may claim protections under these injunctions without any protection to the
Objectors or the CLOs.

69.     The Plan's channeling injunction is similarly improper and defective, at least
with respect to post-confirmation actions.  *See* Plan at p. 51.  That injunction requires *anyone*
with any complaint against a "Protected Party" that is "related to the Chapter 11 Case," or to
the "wind down of the business of the Debtor or the Reorganized Debtor," to first seek relief
from this Court, including by proving that a colourable claim exists and obtaining leave.  The
same section then purports to grant "sole jurisdiction" to this Court to "adjudicate" any such
dispute.  Read literally, this means that the Objectors and the CLOs will have to first seek leave
from this Court before enforcing any right under the Servicing Agreements and the Advisers
Act, which is unprecedented and is incompatible with respect to the assumption of those
agreements for post-assumption claims, and then this Court would adjudicate the claims.  This

Court will have no jurisdiction to adjudicate such post-confirmation claims, however, and the channeling injunction is am impermissible attempt to confer such jurisdiction where none exists.

70.    All of the foregoing affects, limits, and eviscerates future rights under the assumed Servicing Agreements—something that defeats the whole purpose of an assumption of an executory contract and that contradicts the established law that an executory contract, and its future obligations, must be assumed *in toto*.

### B.    *Other objections to the Fifth Amended Plan*

The Debtor's Fifth Amended Plan is objectionable for other reasons as well.  Those Objections are discussed briefly below.  The Funds and Advisors reserve the right to object upon any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. The Funds and Advisors also reserve the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### *Section 1129(a)(5)*

71.    In order to be confirmed, the Debtor must satisfy the following non-waiveable requirements:

> (i) the proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

11 U.S.C. § 1129(a)(5).

72.    This is of particular importance here, where the Debtor proposes to manage billions of dollars of other entities' assets, and ties in as well to section 362(b)'s requirement of

**Appellee Appx. 01499**

**Appx. 04864**

**008307**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1507
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 390 of 1017    PageID 9137
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1506 of 1803    PageID 12252
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 34 of 42

demonstrating adequate assurance of future performance. Yet, the Debtor fails completely with respect to even an attempt to satisfy these requirements.

73.     In this respect, the sole disclosure in the Plan and Disclosure Statement with respect to who will manage these billions of dollars in assets is as follows:

> Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

Plan at p. 32-33.

74.     Neither the identity nor the compensation of the people who will control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer. While Mr. Seery is disclosed as the Claimant Trustee who will be responsible for "winding down the Reorganized Debtor's business operations," this is insufficient. All the more so because, without additional disclosures and facts, not only can adequate assurance of future performance not be proven, but the Debtor cannot prove that the employment and compensation of these unnamed officers and managers of the Reorganized Debtor is "is consistent with the interests of creditors and equity security holders and with public policy." Public policy in particular, given the dictates of the Advisers Act, is implicated.

Accordingly, the Plan is fatally defective with respect to section 1129(a)(5) and cannot be confirmed on that basis alone.

### *The Fifth Amended Plan is not feasible*

75.     Section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by liquidation or the need for further reorganization. "Establishing a likelihood that a plan itself will be successful is a question of feasibility." *In re Dernick*, Case No. 18-32417,

Appellee Appx. 01500
Appx. 04305
008308

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1508
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 391 of 1017 PageID 9138
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1507 of 1803 PageID 12253
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 35 of 42

2020 WL 6833833, at *17 (Bankr. S.D. Tex. Nov. 20, 2020). Feasibility contemplates whether the plan is workable and offers a reasonable assurance of success. *Id.*; *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007). "An obvious illegality . . . exposes the plan on feasibility grounds." *In re Food City*, 110 B.R. at 813 n. 12; *see also In re McGinnis*, 453 B.R. at 773 (chapter 13 plan premised on illegal activity could not be confirmed); *In re Frascella*, 360 B.R. at 445, 456 (citing *Food City*, 110 B.R. at 812 n. 10) (debtor failed to establish plan was feasible where it rested on questionable legal basis).

76.     As discussed above, the proposed treatment with respect to the portfolio management agreements and the CLOs contravenes section 365 of the Bankruptcy Code and the Adviser Act. This illegality hampers the feasibility of the Fifth Amended Plan, and accordingly, the Court should find that it is not feasible and deny confirmation.

### *The Debtor's proposed assumption of the Servicing Agreements is improper under section 365 because there is no adequate assurance of future performance*

77.     Under section 365(b) of the Bankruptcy Code, an executory contract may only be assumed if the Debtor "provides adequate assurance of future performance under such contract[.]" 11 U.S.C. § 365(b)(1)(C).

78.     Although the Fifth Amended Plan provides for the assumption of the Servicing Agreements with many of the CLOs, it does not offer any assurance with respect to the Debtor's ability to perform under such agreements. Indeed, given the Debtor's plan to wind down and liquidate its remaining assets, and in light of the contractual and statutory breaches discussed above, the Debtor cannot possibly provide such assurance. Furthermore, it is uncertain whether sufficient employees will be retained by the Debtor to fulfil its obligations under the portfolio management agreements, even its most significant duties are delegated to a Sub-Advisor. Accordingly, assumption is improper and must be disallowed under section 365(b).

Appellee Appx. 01501
Appx. 04586
008309

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1509
Case 3:25-cv-02072-S  Document 15-11  Filed 06/06/25  Page 392 of 1017  PageID 9139
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1508 of 1803  PageID 12254
Case 19-34054-sgj11  Doc 1670  Filed 01/05/21  Entered 01/05/21 16:42:55  Page 36 of 42

79.     Equally important, the Debtor's failure to offer or provide adequate assurance is intensified because the purported assumption is, in reality, a *sub rosa* assumption *and assignment* to an as yet unnamed third party.  This unidentified third party has also not offered adequate assurance of future performance as required in the context of such assignments.

### *The Release and Exculpation Provisions of the Fifth Amended Plan are overly broad and extend beyond the Effective Date*

80.     In the Fifth Circuit, permanent injunctions against nondebtors are not permissible.  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995).  In fact, and quite to the contrary, the case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions."  *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009).  Such permanent injunctions would "improperly insulate nondebtors in violation of section 524(e)," and "without any countervailing justification of debtor protection."  *Id.* at 760 (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990)); *see also In re Pac. Lumber*, 584 F.2d at 252 (noting that costs that the released parties might incur defending against suits are unlikely to swamp such parties or the reorganization).

81.     Indeed, courts within this District have found that injunctions and release provisions substantively identical to that proposed in Fifth Amended Plan, and which purport to release causes of action against non-debtor third parties, violate Fifth Circuit precedent and are impermissible.  *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018) (finding that bankruptcy court erred by approving injunction that would have effectively discharged non-debtor third parties); *In re Pac. Lumber*, 584 F.3d at 251-53 (striking release provision purporting to release non-

Appellee Appx. 01502

Appx. 04307
008310

debtor third parties from liability relating to the proposal, implementation, and administration of the plan).

82.    The injunction contained in Article XI.F of the Fifth Amended Plan is almost identical to that struck down in *In re Thru*.  Like the injunction provision in *In re Thru*, the Debtor's proposed injunction would bar the Debtor's creditors "from pursuing causes of action against a number of non-debtor third parties, if those causes of action relate to the creditors' claims against the debtor."  2018 WL 5113124, at *21.  The Fifth Amended Plan purports to release creditors' claims against not only the Debtor, but also the Independent Directors.  Dkt. No. 1472 at 56-57.  Not only that, but the Fifth Amended Plan purports to release creditors' claims stemming from the bankruptcy case, as well as the negotiation, administration and implementation of the Plan, as against many of the specific third parties that the courts in this Circuit have found to be impermissible, including, but not limited to, employees, officers and directors, and professionals retained by the Debtor, among others.  *Id.*; *In re Thru*, 2018 WL 5113124, at *21 (concluding it was "clearly erroneous" for the bankruptcy court to approve an injunction covering causes of action against such parties); *In re Pac. Lumber*, 584 F.3d at 252-53.

83.    Furthermore, the exculpation provision contained in Article XI.C of the Fifth Amended Plan is incompatible with Fifth Circuit precedent, as explained by the court in *In re Thru*.  The court in *In re Thru* found that it was clear error for the bankruptcy court to approve an exculpation provision that exculpated non-debtor third parties, including the debtor's employees, officers, directors, advisors, affiliates and professionals, from liability in connection with formulating, implementing, and consummating the plan of reorganization.  2018 WL 5113124, at *22.  The exculpation provision in the Fifth Amended Plan provides the "same

Appellee Appx. 01503

Appx. 04868

008311

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1511
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 394 of 1017    PageID 9141
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1510 of 1803    PageID 12256
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 38 of 42

insulation" as the impermissible provision in the *In re Thru* plan, and as such, it cannot be approved. *See also In re Pac. Lumber*, 584 F.3d at 252 ("We see little equitable [sic] about protecting the released non-debtors from negligence suits arising out of the reorganization.").

84. In sum, the Fifth Amended Plan impermissibly seeks to exculpate certain non-debtor third parties from a broad array of claims relating to such entities' pre- and post-petition conduct. The Funds and Advisors submit there is no authority that would permit such broad exculpatory and/or injunctive language in favor of third parties.

### *The Fifth Amended Plan appears to eliminate the right of setoff*

85. The Funds and Advisors object to the extent that the Plan purports to divest them of their rights of setoff against the Debtor.

### *The Fifth Amended Plan violates section 365(d)(2) by impermissibly allowing the Debtor to assume or reject executory contracts and unexpired leases after confirmation*

86. Section 365(d)(2) of the Bankruptcy Code provides that, in a case under chapter 11, the debtor may assume or reject an executory contract or unexpired lease "at any time *before confirmation of a plan* . . . ." 11 U.S.C. § 365(d)(2) (emphasis added).

87. Notwithstanding this clear language, the Fifth Amended Plan authorizes the Debtor to amend the Plan Supplement by adding or removing a contract or lease from the list of contracts to be assumed, or assign an Executory Contract or Unexpired Lease, at any time up until the Effective Date. Dkt. No. 1472 at 43. Further, the Disclosure Statement indicates that the Debtor is still evaluating whether to assume and assign the Shared Services Agreements. This is contrary to the explicit language of the Bankruptcy Code.

88. Accordingly, the Advisors object to the Fifth Amended Plan to the extent that it purports to reserve the Debtor's right and ability to assume or assume and assign the Shared

Appellee Appx. 01504
Appx. 04869
008312

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1512
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 395 of 1017 PageID 9142
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1511 of 1803 PageID 12257
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 39 of 42

Services Agreements or the Payroll Reimbursement Agreements post-confirmation. Furthermore, the Funds object to the Fifth Amended Plan to the extent it purports to reserve the Debtor's right and ability to alter the proposed treatment of the Servicing Agreements.

### *The Debtor is not entitled to a discharge*

89.     Although section 1141(d) of the Bankruptcy Code discharges a debtor from most pre-confirmation debt, it expressly <u>does not</u> discharge a debtor if:

> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

90.     Here, the Plan provides for liquidation of all of the Debtor's property over a period of time. Although the Debtor may technically continue business for a brief period of time, its ultimate goal is liquidation. Further, the Debtor would be denied a discharge under section 727(a)(1) because it is not an individual. Accordingly, the Court should find that the Debtor is not entitled to a discharge under section 1141 of the Bankruptcy Code.

### *The Fifth Amended Plan may violate the absolute priority rule*

91.     Section 1129(b)(2)(B)(ii) provides that the holder of any claim or interest that is junior to the claims of unsecured creditors may not retain any property unless general unsecured creditors are paid in full. 11 U.S.C. § 1129(b)(2)(B)(ii). The "absolute priority rule is a bedrock principle of chapter 11 practice." *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013). "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009) (comparing subordination

Appellee Appx. 01505
Appx. 04879
008313

under section 510 to absolute priority rule) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002)).

92. In the event the unsecured creditor classes (Class 7 and 8) vote against the Fifth Amended Plan, the absolute priority rule prohibits the retention of equity in the Reorganized Debtor by existing equity holders in the absence of a new investment and opportunity for competitive bidding for that investment opportunity.

## **CONCLUSION**

93. For the reasons set forth above, the Funds and Advisors respectfully request that the Court deny confirmation of the Fifth Amended Plan and grant such other and further relief as the Court deems just and proper.

Dated: January 5, 2020

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

- and -

K&L GATES LLP

Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600

Appellee Appx. 01506

Appx. 04874

008314

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1514
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 397 of 1017    PageID 9144
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1513 of 1803    PageID 12259
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 41 of 42

Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management
Fund Advisors, L.P., NexPoint Advisors,
L.P., Highland Funds I and its series
Highland Healthcare Opportunities Fund,
Highland/iBoxx Senior Loan ETF,
Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund,
Highland Funds II and its series Highland
Small-Cap Equity Fund, Highland Socially
Responsible Equity Fund, Highland Fixed
Income Fund, and Highland Total Return
Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland
Income Fund, Highland Global Allocation
Fund, and NexPoint Real Estate Strategies
Fund, and NexPoint Latin America
Opportunities Fund*

Appellee Appx. 01507
Appx. 04872
008315

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 5th day of January, 2021, and in addition to electronic service on parties entitled to notice thereon through the Court's ECF system, the undersigned caused the foregoing document to be served, by U.S. first class mail, postage prepaid, on the following:

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Hayward & Associates PLLC
Attn: Melissa S. Hayward and Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Sidley Austin LLP
Attn: Matthew A. Clemente and Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603

Office of the United States Trustee
U.S. Department of Justice, Region 6: Northern District of Texas
1100 Commerce Street, Room 976
Dallas, TX 75242

and, on the same day, by e-mail, on the following:

jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
mclemente@sidley.com
Alyssa.russell@sidley.com
Lisa.L.Lambert@usdoj.gov

/s/  Davor Rukavina
Davor Rukavina

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1516 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1515 of 1803    PageID 12261
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 1 of 8

**Highland Capital Management Fund Advisors, L.P.**

**CLOs Review**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Aberdeen Loan Funding, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Shares Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Brentwood CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4



Exhibit A

Appellee Appx. 01509
Appx. 94874

008317

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1517
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1516 of 1803    PageID 12262
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 2 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Eastland CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Gleneagles CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c). The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c). For cause removal may be effected in connection with the Portfolio Manager | 66 2/3% of Preference Shares Holders. PMA § 12(c). |

2

Appellee Appx. 01510
Appx. 04875
008318

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1518
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1517 of 1803    PageID 12263
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 3 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Grayson CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Greenbriar CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture.  SA § 9. The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

3

Appellee Appx. 01511
Appx 94876
008319

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1519
of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1518 of 1803   PageID 12264
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 4 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|-----|-------------------|--------------------------------|----------------|---------------------------------------|
| **Jasper CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(a).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 15% IRR since the Closing Date).  PMA § 12(a).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 66 2/3% of Preference Shares Holders. PMA § 12(a). |
| **Liberty CLO, Ltd.** | Requisite percentage of Class E Certificates Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Class E | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Class E Certificates holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Class E Certificates Holders (excluding Class E Certificates held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c). | 66 2/3% of Class E Certificates Holders. PMA § 12(c). |

4

308393059.4

Appellee Appx. 01512
Appx. 94477
008320

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1520 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1519 of 1803   PageID 12265

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 5 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|-----|--------------------|---------------------------------|----------------|-----------------------------------------|
| | Certificates Paying Agency Agreement. PMA § 9. | | The Portfolio Manager may avoid removal by purchasing all Class E Certificates voting for removal (and Class E Certificates not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Red River CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

5

Appellee Appx. 01513

Appx. 94978

008321

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1521
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1520 of 1803    PageID 12266
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 6 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Rockwall CDO Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |
| **Rockwall CDO II Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |

6

Appellee Appx. 01514
Appx. 04979
008322

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1522
of 1804
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1521 of 1803   PageID 12267
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 7 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | | |
| **Southfork CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 63% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c). The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c). For cause removal may be effected upon the Portfolio Manager authorizing or filing a voluntary petition in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 63% of Preference Shares Holders. PMA § 12(c). |
| **Stratford CLO Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Servicer | 66 2/3% of Preference Shares Holders. SA § 14. |

308393059.4

**Appellee Appx. 01515**

Appx. 94589

008323

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1523 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1522 of 1803    PageID 12268
Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 8 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Servicer, as provided in the Indenture.  SA § 9.  The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions--Preference Share Documents). | | and affiliates, or for which they have discretionary voting authority, but HFP may vote Preference Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | |
| **Valhalla CLO, Ltd.** | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | |
| **Westchester CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

8

308393059.4

Appellee Appx. 01516
Appx. 94581
008324

# APPENDIX 21

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1525
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 408 of 1017 PageID 9155
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1524 of 1803 PageID 12270
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 1 of 7

Docket #1673 Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC
F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Case No.: 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## NEXPOINT REAL ESTATE PARTNERS LLC'S OBJECTION
## TO DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.      On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

1934054210105000000000020
Appellee Appx. 01518
Appx. 04383
008326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1526
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 409 of 1017 PageID 9156
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1525 of 1803 PageID 12271
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "Fifth Amended Plan").

2.     The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "Confirmation Hearing") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.     The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.     NREP filed a proof of claim in this case. *See* Claim Number 146. The Debtor has objected to NREP's claim. If NREP's claim is allowed, NREP possesses a claim in Class 7 or Class 8 under the Fifth Amended Plan.

5.     The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NREP respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

6.     A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its

---

Appellee Appx. 01519
Appx. 04384
008327

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1527
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 410 of 1017 PageID 9157
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1526 of 1803 PageID 12272
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 3 of 7

plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160 (5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty to determine whether a plan has met all the requirements for confirmation, whether specifically raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253 (5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.  The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

7.  The Fifth Amended Plan provides for a class of subordinated claims, which claims may be subordinated to the general unsecured claims or both the general unsecured claims and convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor, the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

8.  In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121 (5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the harm which the creditors have suffered as a result of the inequitable conduct. *Id.*

9.  However, section 510 of the Bankruptcy Code only allows equitable subordination of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally

Appellee Appx. 01520
Appx. 04585
008328

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1528
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 411 of 1017    PageID 9158
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1527 of 1803   PageID 12273
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21   Entered 01/05/21 16:48:48   Page 4 of 7

requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor must at least satisfy its burden of demonstrating such claim should be subordinated under equitable subordination principles. Fed. R. Bankr. P. 7001(8).

10.    Here, the Fifth Amended Plan does not provide for the subordination of any specific claims but, instead, provides for a procedure to subordinate claims that fails to comply with the statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth Amended Plan provides no notice of the potential targets of such subordination, the basis upon which such subordination of claims may be justified, or any evidence supporting equitable subordination principles. Nor does the Fifth Amended Plan provide any means for due process, adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**B.    The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

11.    Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides that:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim…. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

Appellee Appx. 01521
Appx. 04586
008329

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1529
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 412 of 1017 PageID 9159
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1528 of 1803 PageID 12274
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 5 of 7

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise providing notice to the Holder of such Allowed Claim and without providing any support for or evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution Agent.

12. However, setoff is only available in bankruptcy when the opposing obligations arise on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*, 973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right should be preserved in bankruptcy under section 553. *Id.*

13. Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not

Appellee Appx. 01522
Appx. 04385
008330

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**C.    The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

14.    In addition, the Fifth Amended Plan provides for broad releases and permanent injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would "improperly insulate nondebtors in violation of section 524(e)…without any countervailing justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from a broad array of claims relating to such entities' post-petition conduct and would bar creditors from pursing claims against various non-debtor parties if such claims relate to their claims against the Debtor. In addition, the language purports to release creditors' claims arising not only from the bankruptcy case but also the administration and implementation of the Fifth Amended Plan and the period of time covered by the release and exculpation provisions extend beyond the effective date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release, and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the Bankruptcy Code or applicable case law and the Court should deny confirmation.

---

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1531
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 414 of 1017 PageID 9161
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1530 of 1803 PageID 12276
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 7 of 7

**D.** **Reservation of Rights**

15.     NREP reserves the right to amend or supplement this Objection to add any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. In addition, NREP reserves the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### III.  CONCLUSION

For these reasons, the NREP respectfully requests that the Court deny confirmation of the Fifth Amended Plan and grant NREP such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
             lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

### CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

---

**Appellee Appx. 01524**
**Appx. 04389**
**008332**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1532
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 415 of 1017 PageID 9162
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1531 of 1803 PageID 12277

# APPENDIX 22

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1533
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 416 of 1017    PageID 9163
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1532 of 1803   PageID 12278
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 1 of 6

Docket #1671  Date Filed: 01/05/2021

United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(202) 834-4233

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| | § | |
| Debtors-in-Possession. | § | |

---

### United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization (Docket Entry No. 1472)

---

**To the Honorable Stacey J. Jernigan,**
**United States Bankruptcy Judge:**

The United States Trustee for Region 6 files this Limited Objection (the "**Objection**") to the Debtor's Fifth Amended Plan of Reorganization (the "Plan" -- docket entry [D.E.] 1472, filed 11/24/2020).  In support of the relief requested, the United States Trustee respectfully submits as follows:

<u>**Summary**</u>

The United States Trustee objects to confirmation of the Plan because the releases exceed the scope permitted by Fifth Circuit precedent.  The United States Trustee has resolved other objections with the Debtors, and these resolutions will be announced and incorporated in the confirmation order.

**United States Trustee's Confirmation Objection**

1934054210105000000000017

Appellee Appx. 01526
Appx. 04391
008334

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1534
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 417 of 1017 PageID 9164
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1533 of 1803 PageID 12279
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 2 of 6

### Facts: Relevant Plan Provisions

**Salient Definitions:**

1. The Plan defines exculpated and released parties as follows:

a. "Exculpated Parties" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

b. "Released Parties" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

Plan, D.E. 1472; definitions 61, 111, p. 16.

**Releasing Third Parties:**

2. The Plan releases third parties who would share liability with the Debtor:

Appellee Appx. 01527
Appx. 04392
008335

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1535
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 418 of 1017 PageID 9165
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1534 of 1803 PageID 12280
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 3 of 6

"[E]ach Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, D.E. 1472, p. 48.

3. The releases for Released Parties exclude "any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction." Plan, D.E. 1472, pp. 48-49.

4. The Plan releases do not contemplate any type of channeling injunction.

**Exculpating Third Parties:**

5. The exculpation provisions broadly cover third parties:

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements,

Appellee Appx. 01528

008336

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1536
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 419 of 1017 PageID 9166
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1535 of 1803 PageID 12281
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 4 of 6

instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## **Argument and Authority**

**Plan Contains Non-Consensual Third-Party Releases and Exculpation in Contravention of Fifth Circuit Precedent.**

6. The Plan contains non-consensual third-party releases that should be stricken under Fifth Circuit precedent.

7. The Plan's exculpation provisions are similarly overbroad.

8. While the Plan specifies that the releases and exculpation are allowed to "the maximum extent allowed by law," the law in the Fifth Circuit is that they are not allowed.

9. Like the Highland Capital Plan, the *Pacific Lumber* plan contained exculpation and release provisions that carved out willful or intentional conduct. *Scotia Pacific Co., LLC v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.),* 584 F.3d 229

**United States Trustee's Confirmation Objection** **Page 4 of 6**

(5th Cir. 2009).  Reviewing four prior Fifth Circuit bankruptcy cases, the *Pacific Lumber* court

concluded these cases "seem broadly to foreclose non-consensual non-debtor releases and

permanent injunctions." *Id.* at 252 (citations omitted). The Fifth Circuit struck these non-

consensual provisions as to parties who were co-liable with the debtor but noted that committee

members and committee professionals received qualified immunity.  *Id.*

        10.     The *Pacific Lumber* court disallowed the exculpation and releases of the

debtors' officers, directors, and professionals because there was no evidence that they "were

jointly liable for any . . . pre-petition debt.  They are not guarantors or sureties, nor are they

insurers.  Instead, the essential function of the exculpation clause . . . is to absolve the released

parties from any negligent conduct that occurred during the course of the bankruptcy.  The fresh

start § 524(e) provides to debtors is not intended to serve this purpose."  *Id.* at 252-53.

        11.     Bankruptcy Courts in the Northern District of Texas have resolved

objections to exculpation or release provisions by replacing such provisions with channeling

injunctions.  *See* Memorandum Opinion and Order, Docket Entry No. 4614, *In re Pilgrim's*

*Pride Corporation, et al.*, Case No. 08-45664-DML-11 (January 14, 2010); Fourth Amended

Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), Docket Entry

No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11, United States Bankruptcy Court

for the Northern District of Texas, Dallas Division (February 16, 2017).

        12.     The Plan release and exculpation provisions should be limited.  Unless

they exclude the Debtors' professionals, the Debtors' officers and directors, and others not

protected by quasi-immunity, confirmation should be denied.

**Appellee Appx. 01530**

**Appx. 04395**

**008338**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1538
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 421 of 1017 PageID 9168
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1537 of 1803 PageID 12283
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 6 of 6

### Conclusion

Wherefore, the United States Trustee requests that the Court deny approval of the Plan and grant to the United States Trustee such other and further relief as is just and proper.

DATED: January 5, 2021                Respectfully submitted,

WILLIAM T. NEARY
UNITED STATES TRUSTEE

*/s/ Lisa L. Lambert*
Lisa L. Lambert
Asst. U.S. Trustee, TX 11844250
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242
(202) 834-4233

### Certificate of Service

There undersigned hereby certifies that on January 5, 2020, a copy of the foregoing pleading was served via ECF to parties requesting notice via ECF.

*/s/ Lisa L. Lambert*
Lisa L. Lambert

**United States Trustee's Confirmation Objection**                **Page 6 of 6**

**Appellee Appx. 01531**

**Appx. 04386**

**008339**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1539
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 422 of 1017 PageID 9169
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1538 of 1803 PageID 12284

# APPENDIX 23

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1540
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 423 of 1017 PageID 9170
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1539 of 1803 PageID 12285
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 1 of 68

Docket #1814 Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

## DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FIFTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:104703.16 36027/002



1934054210122000000000019

Appellee Appx. 01533
Appx. 04898
008341

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1541
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 424 of 1017    PageID 9171
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1540 of 1803    PageID 12286
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 2 of 68

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................. 1

Background ................................................................................................................. 4

    I.     Procedural Background .................................................................................. 4

    II.    Solicitation and Notification Process ............................................................ 6

Argument .................................................................................................................. 13

    III.   The Plan Satisfies Each Requirement for Confirmation. ............................. 13

        A.    The Plan Complies with the Applicable Provisions of the
              Bankruptcy Code (Section 1129(a)(1)). ....................................... 13

        B.    The Debtor Has Complied with the Applicable Provisions of the
              Bankruptcy Code (Section 1129(a)(2)). ....................................... 23

        C.    The Debtor Proposed the Plan in Good Faith and Not by Any
              Means Forbidden by Law (Section 1129(a)(3)). ........................... 26

        D.    The Debtor is Seeking to Pay Certain Professional Fees and
              Expenses Subject to Bankruptcy Court Approval (Section
              1129(a)(4). ..................................................................................... 28

        E.    The Debtor Has Complied with the Bankruptcy Code's
              Governance Disclosure Requirement (Section 1129(a)(5)). .......... 29

        F.    The Plan Does Not Require Government Regulatory Approval of
              Rate Changes (Section 1129(a)(6)). .............................................. 34

        G.    The Plan Is in the Best Interests of Holders of Claims and Interests
              (Section 1129(a)(7)). ..................................................................... 34

        H.    The Plan Complies with the Requirements of Section 1129(a)(8) of
              the Bankruptcy Code. .................................................................... 40

        I.    The Plan Complies With Statutorily Mandated Treatment of
              Administrative and Priority Tax Claims (Section 1129(a)(9)). ...... 40

        J.    At Least One Impaired Class of Claims Has Accepted the Plan,
              Excluding the Acceptances of Insiders (Section 1129(a)(10)). ...... 42

Appellee Appx. 01534

Appx. 04899

008342

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1542

Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 425 of 1017    PageID 9172

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1541 of 1803    PageID 12287

Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 3 of 68

K.   The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)). ................. 43

L.   The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ...................................................................... 44

M.   The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code. ......................................................................................................... 44

N.   Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. .......................................... 45

O.   The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ...... 45

P.   The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code. .................................................................................... 48

Q.   The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)). ......................................... 51

IV.   The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply. ........................................................ 51

A.   The Debtor Complied with Section 1129(d) of the Bankruptcy Code. ......................................................................................................... 52

B.   Modifications to the Plan. ........................................................................ 52

Conclusion ................................................................................................................ 56

DOCS_SF:104703.16 36027/002

Appellee Appx. 01535

008343

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1543
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 426 of 1017    PageID 9173
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1542 of 1803   PageID 12288
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 4 of 68

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 n.13 (1999) ................................................................................... 34, 46, 48

*Boullion v. McClanahan*,
639 F.2d 213 (5th Cir. 1981) ................................................................................... 39

*In re Acis Capital Management*,
2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) ...................... 38

*In re Ambanc La Mesa Ltd. P'ship*,
115 F.3d 650 (9th Cir. 1997) ................................................................................ 47, 48

*In re American Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ..................................................................... 53

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................. 47

*In re Block Shim Dev. Company-Irving*,
939 F.2d 289 (5th Cir. 1991) ................................................................................. 26

*In re Bowles*,
48 B.R. 502 (Bankr. E.D. Va. 1985) ....................................................................... 47

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ......................................................... 13, 23, 26

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................. 47

*In re Friendship Dairies*,
2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ......................... 54

*In re Global Safety Textiles Holdings LLC*,
No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) .................... 53

*In re J T Thorpe Co.*,
308 B.R. 782 (Bankr. S.D. Tex. 2003) ................................................................... 13

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...................................................................... 47

*In re Joint E. & S. Dist. Asbestos Litig.*,
982 F.2d 721 (2d Cir. 1992) ................................................................................... 18

*In re Kolton*,
No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) ............... 47

*In re Landing Assocs., Ltd.*,
157 B.R. 791 (Bankr. W.D. Tex. 1993) ............................................................. 29, 43

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) ....................................................................... 40

iii

*In re Mirant Corp.*,
   348 B.R. 725 (Bankr. N.D. Tex. 2006)................................................................. 46

*In re Neff*,
   60 B.R. 448 (Bankr. N.D. Tex. 1985)................................................................. 40

*In re Quigley Co., Inc.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007)................................................................. 18

*In re Sentry Operating Co. of Tex., Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) ................................................................. 14

*In re Sentry Operating Co. of Texas, Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) ................................................................. 53

*In re Star Ambulance Service, LLC*,
   540 B.R. 251 (Bankr. S.D. Tex. 2015) ................................................................. 43

*In re Sun Country Dev., Inc.*,
   764 F.2d 406 (5th Cir. 1985) ................................................................................. 26

*In re Tex. Extrusion Corp.*,
   844 F.2d 1142 n. 23 (5th Cir. 1988) ..................................................................... 34

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ................................................................................. 43

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d. Cir 2013) ................................................................................. 18

*In re Wilson Metal Fabricators*,
   No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020) ................................ 38

*John Hancock*,
   987 F.2d at 157 n.5 ................................................................................................ 48

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988) ................................................................................. 47

*Mabey v. Sw. Elec. Power Co.*
   *(In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ................................................................................. 28

*Matter of Cajun Elec. Power Co-op., Inc.*,
   150 F.3d 503 (5th Cir. 1998) ................................................................................. 24

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners*
   *(In re Tex. Rangers Baseball Partners)*,
   521 B.R. 134 (Bankr. N.D. Tex 2014)................................................................... 54

*Pub. Fin. Corp. v. Freeman*,
   712 F.2d 219 (5th Cir. 1983) ................................................................................. 26

### STATUTES

11 U.S.C. § 101.................................................................................................. 22, 51

11 U.S.C. § 1114.................................................................................................. 44

11 U.S.C. § 1123.......................................................................................... 17, 21, 23, 51

Appellee Appx. 01537

Appx. 04492

008345

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1545
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 428 of 1017   PageID 9175
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1544 of 1803   PageID 12290
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 6 of 68

11 U.S.C. § 1125 ................................................................................................................. 23

11 U.S.C. § 1126 .......................................................................................................... 6, 25

11 U.S.C. § 1129 ...................................................................................................... passim

## OTHER AUTHORITIES

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977),
*reprinted in* 1978 U.S.C.C.A.N. 5936, 6368 ............................................................ 13

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978),
*reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 .......................................................... 13

Appellee Appx. 01538

Appx. 04403

008346

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1546
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 429 of 1017   PageID 9176
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1545 of 1803   PageID 12291
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 7 of 68

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>") files this memorandum of law (this "<u>Memorandum</u>") in support of confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (as Modified) (the "<u>Plan</u>").[2] Concurrently herewith, the Debtor has filed its *Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Omnibus Reply</u>"), which addresses and responds to the each of objections to confirmation of the Plan.[3]

**Preliminary Statement**

1.     After fourteen long months in a chapter 11 process that has often times been contentious between the Debtor, the Committee, and the estate's largest creditors, the Debtor seeks confirmation of its Plan that enjoys the support of the Committee and virtually all of its non-affiliated creditors.  As the Debtor told the Court when it approved the installation of the Independent Board on January 9, 2020, the new Board intended to change the culture of litigation that was the Debtor's trademark prepetition.  While the negotiations have been difficult and testy at times, the Debtor successfully resolved its disputes with the Redeemer Committee, Acis and HarbourVest and has reached settlements in principal with UBS—an accomplishment that seemed impossible a few months ago.  In fact, the Plan is supported by the holders of approximately 95% of creditors who collectively hold $345 million in claims against the estate that voted on the Plan.  In accomplishing these goals, the Independent Board has resolved litigation that has been pending in some cases for over a decade and in several courts, including

---

[2] Unless otherwise noted, capitalized terms used in this Memorandum have the meanings ascribed in the Plan.

[3] To the extent that a party has raised a specific objection to the statutory provisions set forth in 1123 and 1129 of the Bankruptcy Code, those objections are addressed herein as part of the Debtor's *prima facie* showing that it has satisfied the statutory requirements to confirm the Plan.

Appellee Appx. 01539
Appx. 04484
008347

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1547
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 430 of 1017 PageID 9177
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1546 of 1803 PageID 12292
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 8 of 68

this Court in the Acis bankruptcy case, has positioned the Debtor to be able to put contentious litigation with legitimate creditors behind it and promptly monetize its assets and make distributions to general unsecured creditors. The Debtor worked extremely hard during the bankruptcy case to develop a "grand bargain" plan that would achieve a global resolution of all disputes between the Debtor, its creditors and Mr. Dondero. Unfortunately, such a plan was not attainable.

2. What stands in the Debtor's way to confirmation of the Plan is a series of objections filed by Mr. Dondero and entities owned and/or controlled by him (collectively, the "Dondero Entities") and certain of the Debtor's current and ex-employees, two of whom the Debtor recently terminated for cause and others whose blind fealty to Mr. Dondero led them to vote against the Plan for no apparent economic reason. The common theme in all of the objections is not a desire for better treatment of creditors, which is not surprising since the objectors' economic interests in the Debtor are tenuous at best. Rather, the focus of the objections are challenges to Plan provisions, including the injunction, release and exculpation provisions, which will limit the Dondero Entities' ability to continue their litigation crusade against anyone who dared stand in Mr. Dondero's way long after the Plan has been confirmed. As the Court is aware from its experience, according to Mr. Dondero, no claim is too frivolous to be brought, no appeal too impossible to succeed and no court too far away in which to commence litigation. As will be discussed herein, the Court has the authority and jurisdiction to approve provisions in the Plan which will minimize the Dondero Entities' ability to harass parties with vindictive litigation designed to interfere with post-confirmation efforts. For the

DOCS_SF:104703.16 36027/002

Appellee Appx. 01540
Appx. 04495
008348

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1548
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 431 of 1017    PageID 9178
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1547 of 1803   PageID 12293
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01    Page 9 of 68

Court's convenience, attached as **Exhibit A** hereto is a chart that sets for the relationships between the various Dondero Entities.

3.      As more fully set forth in the Omnibus Reply, and as summarized on **Exhibit B** hereto, the Dondero Entities' interests in this case arise primarily from their direct and indirect equity interests in the Debtor.  While certain of the Dondero Entities assert claims against the Debtor, those claims either arise out of their equity interests that the Debtor will seek to subordinate under Section 510 of the Bankruptcy Code or are frivolous claims that target certain conduct of the Independent Directors.  Other Dondero Entities object to the Debtor's attempt to assume certain executory contracts to which they are not a party and lack standing to do so.  Accordingly any objections to the Plan based upon the treatment of claims or the manner in which assets are proposed to be monetized post-confirmation are a smokescreen.

4.      Moreover, any argument that the Dondero Entities are seeking to protect the value of their equity interests is specious.  Mr. Dondero has told the Court on numerous occasions that his so-called "pot plan" proposal to acquire substantially all of the assets of the Debtor for $160 million (which is really $130 million because the proposal acquires approximately $30 million of the Debtor's cash) fairly values the Debtor's assets.  Accordingly, under Mr. Dondero's own assumptions, equity is out of the money as the total amount of allowed claims in this case exceeds Mr. Dondero's valuation by a factor of more than two.  The only way creditors in the Debtor's estate will receive full payment on account of their claims—a prerequisite to any distributions to the Dondero Entities' indirect equity interests and related claims arising from such interests—would be for the Estate to monetize its multiple claims against the Dondero

Appellee Appx. 01541
Appx. 04406
008349

Entities for well in excess of $100 million. It is through this lens that the Court should view the Dondero Entities' confirmation objections.

5. The hard-fought victories obtained by the Debtor in negotiating the settlement of substantially all of the litigation that has plagued it for years should not be singularly undone by the Dondero Entities and his army of loyal employees and ex-employees. Mr. Dondero should not be allowed to use this Court and his frivolous litigation to upend the settlements achieved to date by the Debtor. The Plan should be confirmed to allow the Reorganized Debtor and the Claimant Trustee to complete the process of winding down the Debtor's assets, satisfying creditor claims, and implementing the other wind-down provisions of the Plan without interference by the Dondero Entities.

## **Background**

### **I. Procedural Background**

6. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7. On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

8. On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[4]

---

[4] All docket numbers refer to the docket maintained by this Court.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01542

Appx. 04497

008350

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1550
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 433 of 1017    PageID 9180
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1549 of 1803   PageID 12295
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 11 of 68

9.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case. However, on January 9, 2020, the Court entered its *Order Approving Settlement With Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] pursuant to which the Court approved the appointment of an Independent Board of Directors for Strand Advisors, Inc., the general partner of the Debtor (the "Settlement Order").  On July 16, 2020, the Court entered its *Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(A) and 363(B) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 854], pursuant to which James Seery, Jr., was approved as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.

10.     On November 24, 2020, the Bankruptcy Court entered the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling a Hearing to Confirm the Fifth Amended Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; And (E) Approving Form and Manner of Notice* [D.I. No. 1476] (the "Disclosure Statement Order").  The Disclosure Statement Order approved the Disclosure Statement as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code

Appellee Appx. 01543
Appx. 04406
008351

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1551
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 434 of 1017    PageID 9181
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1550 of 1803  PageID 12296
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 12 of 68

and also approved, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

11.      The deadline for all Holders of Claims and Equity Interests entitled to vote on the Plan to cast their ballots and the deadline to file objections to confirmation of the Plan was January 5, 2021, at 5:00 p.m. (prevailing Central Time) subject to extension by the Debtor, in its discretion (the "Voting Deadline").  On January 19, 2021, the Debtor filed the Voting Report, which is summarized below.  The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled for January 26, 2021, at 9:30 a.m. (prevailing Central Time).[5]

**II. Solicitation and Notification Process.**

12.      In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Equity Interests in Impaired Classes receiving or retaining property on account of such Claims or Equity Interests were entitled to vote to accept or reject the Plan.[6] Holders of Claims and Equity Interests were not entitled to vote if their rights are Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code).[7]  The voting results, as reflected in the Voting Report, are summarized as follows:

---

[5] The Confirmation Hearing was initially scheduled to take place on January 13, 2021, but was continued by the Bankruptcy Court at the Debtor's request.

[6] *See* 11 U.S.C. § 1126.

[7] There were no Impaired Classes of Claims or Equity Interests conclusively deemed to reject the Plan pursuant section 1126(g) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01544
Appx. 04409
008352

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1552
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 435 of 1017 PageID 9182
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1551 of 1803 PageID 12297
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 13 of 68

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount/Shares Voting) | NUMBER (% of Number Voting) |
|---|---|---|---|---|
| Class 2 Frontier Secured Claim | $5,209,963.62 (100%) | 1 (100%) | $0 (0%) | 0 (0%) |
| Class 7 Convenience Claims | $2,765,906.51 (100%) | 14 (100%) | $0 (0%) | 0 (0%) |
| Class 8 General Unsecured Claims[8] | $301,826,418.36 (93.54%) | 12 (27.9%) | $20,833,059.67 (6.46%) | 31 (72.10%) |
| Class 9 Subordinated Claims | $35,000,000 (100%) | 6 (100%) | $0 (0%) | 0 (0%) |
| Class 10 B/C Limited Partnership Interests | None | None | None | None |
| Class 11 Class A Limited Partnership Interests | 0% | 0% | $100% | 100% |

13.  <u>Class 2</u>.  Class 2 consists of one member (Frontier Secured Claim) and this creditor voted to accept the Plan.

14.  <u>Class 7</u>.  Class 7 consists of the Convenience Claims.  100% of the fourteen valid members of Class 7 each voted to accept the Plan.[9]  The votes of the Senior Employees—Mr. Ellington and  Mr. Leventon—who attempted to partially vote certain Claims in Class 7 and

---

[8] The Debtor recently settled the objections filed by Senior Employees Thomas Surgent and Frank Waterhouse, who previously were included in the Senior Employee Objection.  Mssrs. Surgent and Waterhouse have each agreed to execute the Senior Employee Stipulation and to vote their Class 7 and Class 8 Claims to accept the Plan.  This chart reflects the results of the voting report filed with Court on January 19, 2021 [D.I. 1772] and does not reflect the subsequent settlements with Mssrs. Surgent and Waterhouse and their acceptance of the Plan.

[9] In accordance with the Voting Procedures Order, the Debtor accepted the late vote of Siepe Systems (which was cast on the Voting Deadline, but after the 5:00 Central Time cut off).  The Debtor also accepted the late votes of each of: (i) Stinson Leonard Street, who also voted to accept the Plan on January 14, 2021, and (ii) the HarbourVest entities, who were entitled to both Class 8 General Unsecured Claims and Class 9 Subordinated Claims pursuant to the Court's allowance of these claims at a hearing conducted on January 14, 2021 [D.I. 1788] with respect to the compromise of HarbourVest's claims against the Debtor, as explained below.

7

Appellee Appx. 01545
Appx. 04410
008353

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1553
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 436 of 1017    PageID 9183
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1552 of 1803   PageID 12298
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 14 of 68

other Claims in Class 8—should be disallowed for the reasons more specifically addressed in the Omnibus Reply.  However, regardless of the invalid votes cast by the Senior Employees are counted, Class 7 Convenience Claims have accepted the Plan in both requisite dollar amount and voting number.  First, each of these two "Senior Employees"[10] filed unliquidated proofs of claim with the Bankruptcy Court, yet are attempting to split their claims between Class 7 and Class 8 without having executed the Senior Employee Stipulation and in violation of the Plan, the Voting Procedures Order, and applicable law.  Second, even if the Senior Employees were deemed to hold separate, liquidated claims on account of their asserted annual bonus and deferred compensation claims that could be split from their Class 8 Claims, the Plan's Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim for voting purposes.  A valid election of the Convenience Class Election would only entitle the electing creditor to receive the treatment under Class 7, not to vote its claim in that class.  *See* Plan, §1.B.43.

15.    Class 8.  Over 93% of the dollar amount of Class 8 Claims voted to accept the Plan.  However, more than 50% of the holders of Class 8 Claims did not accept the Plan as a result of the votes cast by approximately 27 employees holding contingent claims (including the split Class votes cast by Mssrs. Ellington and Leventon[11]) to reject the Plan.  The contingent claims of the Debtor's other employees that voted against the Plan are (i) in respect to the

---

[10] As the Court is aware, the Debtor terminated the employment of both Mssrs. Ellington and Leventon on January 5, 2021 and these individuals are no longer employees of the Debtor.

[11] As noted above, the Debtor has agreed to a settlement of the Senior Employee Objection with respect to Mr. Surgent and Mr. Waterhouse, each of whom will vote their claims to accept the Plan.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01546
Appx. 04414
008354

unvested claims under the Debtor's deferred compensation bonus plan[12] for amounts that would not be payable, if at all, until May 2021 and May 2022 and would only be payable if such employees were employed as of those vesting dates, which they will not be; and (ii) PTO Claims, which are unimpaired and treated by either Class 4 (PTO Claim) or Class 6 (Priority Non-Tax Claims).

16.    <u>Class 9</u>.  Class 9 consists of the subordinated claims of HarbourVest that were allowed pursuant to the Court's granting of the *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "<u>Motion</u>") at a hearing conducted on January 14, 2021, pursuant to which HarbourVest was granted both allowed Class 9 Claims in the aggregate amount of $35 million and Allowed Class 8 Claims in the amount of $45 million with respect to the claims filed by HarbourVest.[13]  The HarbourVest Subordinated Claims are the only current members of Class 9.  Although Class 9 has unanimously accepted the Plan, the Debtor is not asserting that Class 9 constitutes the accepting impaired class of claims,

---

[12] On January 14, 2021, the Debtor terminated its annual bonus plan.  The Debtor's employees previously held contingent claims under the annual bonus plan for amounts that would have vested in February 2021 and August 2021 (subject to the employee remaining employed as of those dates and other conditions) and replaced it with a proposed retention plan that is subject of the Debtor's *Motion of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief* filed on January 20, 2021.  These employees (except for Mssrs. Surgent, Waterhouse, Ellington and Leventon, who were not paid any postpetition amounts with respect to either bonus plan) were paid the vested amounts owed to them under the annual bonus plan and deferred bonus plan, as applicable, in the ordinary course of business and in accordance with *the Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related relief* [D.I. 380] entered on January 22, 2020.  Thus, the Debtor's non-Senior Employees no longer have any contingent claims under the now-terminated annual bonus plan because they have already been paid their vested amounts.

[13] The $345 million claims estimate includes the claim of UBS Securities, LLC which has been allowed in the amount of $94,761,076 for voting purposes only.  As the Debtor has informed the Court, the Debtor has reached an agreement in principal with UBS to resolve its claims which agreement is subject to internal approvals at UBS and documentation.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1555
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 438 of 1017 PageID 9185
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1554 of 1803 PageID 12300
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 16 of 68

exclusive of insiders, required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, as discussed below in the cramdown section of the Memorandum.

17. Several objections address the mechanics of how Class 9 Claims may be subordinated and the scope of any such subordination. Mr. Dondero, Dugaboy, NexBank, and NexPoint each argue that section III.J of the Plan provides "no mechanism, hearing requirement or deadline" to subordinate claims. Dondero Objection, at IV; NexPoint Objection, at 7; NexBank Objection at II.A.

18. Section III.J of the Plan does not categorically subordinate claims. Rather, Class 9 provides that holders of Subordinated Claims will receive the treatment provided to General Unsecured Claims unless they are subordinated either pursuant to an order of the Court upon notice to the relevant party or otherwise consensually. In other words, the Debtor, Reorganized Debtor or Claimant Trustee must obtain an order from the Bankruptcy Court subordinating the subject Claim. To the extent the Bankruptcy Court orders subordination of the Claim, it will receive the treatment provided for Class 9 Subordinated Claims. If no subordination order is obtained, then the Claim will receive the treatment afforded to Class 8 General Unsecured Claims. To illustrate this point, the vote cast by Raymond Joseph Dougherty as a Class 9 Subordinated Claim should be tabulated in Class 8 because there is no order or agreement with this creditor to subordinate his claims to those of Class 8 General Unsecured Claims. As discussed below, the Plan is being amended to clarify this treatment. Thus, the Plan does not afford the Debtor (or any other party) with the discretion to subordinate claims on their own. This determination will be made by the Court.

10

Appellee Appx. 01548
Appx. 04413
008356

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1556
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 439 of 1017 PageID 9186
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1555 of 1803 PageID 12301
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 17 of 68

19.     In order to clarify the treatment and procedure to subordinate claims, the Debtor

has made the following amendments to the Plan.  Section III.J of the Plan has been amended

with the bolded language below to clarify the requirement of an opportunity for a hearing with

respect to any proceeding to subordinate any claims:

> Under section 510 of the Bankruptcy Code, upon written notice **and
> hearing,** the Debtor the Reorganized Debtor, and the Claimant Trustee
> reserve the right to **seek entry of an order by the Bankruptcy Court** to
> re-classify or to ~~seek to~~ subordinate any Claim in accordance with any
> contractual, legal, or equitable subordination relating thereto, and the
> treatment afforded any Claim under the Plan.

20.     In addition, the Debtor has amended the treatment of Subordinated Claims in

Section III.H.9 of the Plan to only treat claims that are or have been subordinated under section

510 of the Bankruptcy Court order entered by the Bankruptcy Court and which fall within the

Plan definition of Subordinated Claims:

> *Treatment*:  On the Effective Date, Holders of Subordinated Claims shall
> receive either (i) their Pro Rata share of the Subordinated Claimant Trust
> Interests or, (ii) such other less favorable treatment as to which such Holder
> and the Claimant Trustee may agree upon in writing.
>
> ~~*Treatment*:  On or as soon as reasonably practicable after the Effective Date,
> each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement,
> discharge and release of, and in exchange for, such Claim shall receive either
> (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed
> Class 9 Claim is subordinated to the Convenience Claims and General
> Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the
> Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust
> Interests or (ii) such other less favorable treatment as to which such Holder
> and the Claimant Trustee shall have agreed upon in writing.~~

21.     In response to Mr. Dondero's objection asserting the lack of a time period to

commence proceedings to subordinate Claims, the Debtor has amended the Plan to clarify that

the timing by which parties in interest may object to the allowance of a potentially Subordinated

Appellee Appx. 01549
Appx. 04414
008357

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1557
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 440 of 1017 PageID 9187
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1556 of 1803 PageID 12302
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 18 of 68

Claim and seek to have the claim treated as a Class 9 Subordinated Claim is now included in the

Claims Objection Deadline by the addition of the bolded language to Section VII.B of the Plan.

> Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, **request the Bankruptcy Court subordinate any Claims to Subordinated Claims**, or any other appropriate motion or adversary proceeding with respect ~~thereto which shall be litigated to Final Order~~ **to the foregoing by the Claims Objection Deadline**, or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court…

22.     Finally, the limited objection to the Plan filed by Jack Yang and Brad Borud [D.I.

1666] and joined by Deadman, Travers and Kaufmann [D.I. 1674, 1679] also objects to the Plan

definition of "Subordinated Claims" and asserts that the Plan is not permissible under

Bankruptcy Code section 510 to the extent it intends to subordinate any and all claims of partners

of the Debtor, including claims "solely in respect of compensation owed to such person for their

services as an employee." The Plan does not intend to categorically subordinate these claims or

expand the reach of section 510 of the Bankruptcy Code. However, in order to clarify this

treatment and address the concerns raised by these individuals, the Plan has been amended as set

forth below.

> "Subordinated Claim" means any claim that ~~(i)~~ is ~~or may be~~ subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or order entered by ~~Final Order of~~ the Bankruptcy Court ~~or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest~~.

23.     <u>Class 10 and Class 11</u>. Class 10 and 11 consist of the separate classes of Equity

Interests in the Debtor owned by affiliates of Mr. Dondero. Class 10 did not cast a vote to accept

or reject the Plan. Class 11 voted to reject the Plan.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1558
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25    Page 441 of 1017    PageID 9188
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1557 of 1803    PageID 12303
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 19 of 68

24.     As explained more fully below, the Debtor may confirm the Plan pursuant to the cram down provisions of 1129(b) of the Bankruptcy Code notwithstanding the rejection and/or non-acceptance of the Plan by Classes 8, 10 and 11.

<u>**Argument**</u>

25.     To confirm the Plan, the Bankruptcy Court must find that the Debtor has satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[14]  As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.  The Plan is supported by voting creditors holding $345 million in claims consisting of approximately 95% of the claims in this case.  As set forth in this Memorandum and based upon the evidence that will be presented at the Confirmation Hearing, the Debtor will satisfy the evidentiary requirements necessary to confirm the Plan.  The Debtor thus respectfully requests that the Bankruptcy Court confirm the Plan.

**III.    The Plan Satisfies Each Requirement for Confirmation.**

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

26.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.[15]  The principal goal of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[16]  Accordingly, the determination of

---

[14] *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).

[15] 11 U.S.C. § 1129(a)(1).

[16] *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

**Appellee Appx. 01551**
Appx. 04416
**008359**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1559
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 442 of 1017 PageID 9189
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1558 of 1803 PageID 12304
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 20 of 68

whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

27.     Section 1122 of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Because claims only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining how to classify claims.[17]

28.     The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Equity Interests into a number of separate Classes, with each Class differing from the Claims and Equity Interests in each other Class in a legal or factual nature or based on other relevant criteria.[18] Specifically, the Plan provides for the separate classification of Claims and Equity Interests into the following Classes:

Class 1: Jefferies Secured Claim;

Class 2: Frontier Secured Claim

Class 3: Other Secured Claims;

Class 4: Priority Non-Tax Claims;

---

[17] *See In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that section 1122 is broadly permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be separately classified where separate classification has a basis independent of the plan proponent's efforts to secure a class of claims that will accept the plan).

[18] Plan, Art. III.

14

Appellee Appx. 01552
Appx. 04417
008360

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1560
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 443 of 1017    PageID 9190
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1559 of 1803   PageID 12305
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 21 of 68

Class 5: Retained Employee Claims;

Class 6: PTO Claims;

Class 7: Convenience Claims;

Class 8: General Unsecured Claims;

Class 9: Subordinated Claims;

Class 10: Class B/C Limited Partnership Interests; and

Class 11: Class A Limited Partnership Interests.

29.    Claims and Equity Interests assigned to each particular Class described above are substantially similar to the other Claims or Equity Interests in such Class.  Valid business, legal, and factual reasons justify the separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Equity Interests.  For example, the PTO Claims in Class 6 relate solely to claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims.  The treatment of the unsecured Convenience Claims in Class 7 is to allow holders of eligible and liquidated claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's claim or such holders *pro rata* share of the Convenience Claims Cash Pool.  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01553

Appx. 04416

008361

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1561
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 444 of 1017 PageID 9191
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1560 of 1803 PageID 12306
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 22 of 68

30.     Section III.C of the Plan provides for the elimination of classes that do not have a least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for purposes "of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class." Plan, § III.D.  The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan.

31.     Mr. Dondero objects to the elimination of the "vacant" Class provision in Article III.C because such elimination would not provide for treatment of a Claim that may be later classified in vacant class.  Dondero Objection, at IV.14.  However, the reference to vacant Classes in Article III.C refers only to the tabulation of votes cast to accept or reject the Plan, not to the treatment of claims that may later be classified in a class even if there were no voting members as of the Confirmation Hearing.  For example, Class 5 (Retained Employee Claims) does not have any voting members because the existence of any Claims in this Class would not arise except for any current employees of the Debtor who will be employed on the Effective Date.  Plan, § I.B.116.  Thus, Class 5 is disregarded solely for purposes of determining whether or not the Plan has been accepted or rejected under Section 1129(a)(8) of the Bankruptcy Code because there are no current members in that Class.  However, the Plan may treat Claims that may eventually become members of Class 5 post-confirmation.

32.     The Debtor submits that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.  Each of these categories of Claims and Equity Interests have distinct

DOCS_SF:104703.16 36027/002

Appellee Appx. 01554
Appx. 04419
008362

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1562
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 445 of 1017 PageID 9192
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1561 of 1803 PageID 12307
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 23 of 68

rights under the Plan (and applicable non-bankruptcy law), and the Debtor has a valid business justification for the respective treatments of the Classes of Claims and Equity Interests. The Plan's classifications not only serve the purpose of facilitating ease of distributions on the Effective Date but also acknowledge the fundamental differences between those types of Claims and Equity Interests. For the foregoing reasons, the Plan satisfies section 1122 of the Bankruptcy Code.

### 2. The Plan Satisfies the Seven Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

33. The applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan. The Plan satisfies each of these requirements.

34. Specification of Classes, Impairment, and Treatment. The first three requirements of section 1123(a) are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the plan.[19] The Plan sets forth these specifications in detail in satisfaction of these three requirements in Article III.[20]

35. Equal Treatment. The fourth requirement of section 1123(a) is that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." The Plan meets this

---

[19] 11 U.S.C. § 1123(a)(1)-(3).

[20] Plan, Art. III.A–B.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01555

Appx. 04429

008363

requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such Holders' respective Class.  Thus, the Plan satisfies section 1123(a)(4).[21]

36.    Mr. Daugherty and the Senior Employees each argue that the Plan does not satisfy Bankruptcy Code section 1123(a)(4).  Mr. Daugherty asserts that the Plan provides for different treatment of Disputed Claims versus Allowed Claims, and therefore provides disparate treatment in violation of Section 1123(a)(4) of the Bankruptcy Code.  This is not correct because the Plan provides for the same <u>treatment</u> of claims within a particular class.  The Disputed Claims Reserve shall reserve funds for the potential allowance of Claims that are not allowed at the time the Claimant Trustee makes distributions.[22]  The Disputed Claims Reserve also does not allow the Debtor to unilaterally determine the amount of any reserve; that will be decided by the Bankruptcy Court absent agreement by the relevant parties.  The Debtor—or any holder of a Disputed Claim—may file a motion with the Bankruptcy Court and request that the Claimant Trustee set aside a specific amount in the Disputed Claims Reserve pending the ultimate allowance/disallowance of the Claim.

---

[21]  *See In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("[s]ection 1123(a)(4) does not require precise equality, only approximate equality"; and"); *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d. Cir 2013) (same); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) ("[T]he 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money.").

[22]  The Plan provides that the Disputed Claims Reserve amount is either (1) the amount set forth on either the Schedules or applicable Proof of Claim; (2) the amount agreed by the Holder of the Disputed Claim and the Reorganized Debtor or Claimant Trustee; (3) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim, or (4) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.  *See* Plan, § 1.B.49.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01556

Appx. 01421

008364

37.     Mr. Daugherty's suggestion that the Bankruptcy Court's estimation of disputed claims for purposes of establishing a Disputed Claims Reserve somehow constitutes disparate treatment of similarly classified claims is also devoid of merit.  Mr. Daugherty's argument would effectively mean that the Debtor would have to set aside the asserted amount of any Disputed Claim, regardless of how specious it may be, until the claim is ultimately resolved pursuant to a final order.  Such a requirement would essentially provide a creditor with a stay pending appeal of the ultimate of allowance of the claim.  Moreover, such a requirement would effectively prevent the Debtor from distributing any portion of the reserved funds to holders of Allowed Claims until the Disputed Claim is litigated to final order of the Supreme Court or such other applicable court of last resort—a process that could take years, and as evidenced by the length of time of the pending litigation in this case already waged by Mr. Daugherty, Mr. Dondero and others.  If Mr. Daugherty—or any creditor—believes the Debtor's proposed estimate for its Disputed Claim is insufficient, Mr. Daugherty has an adequate remedy under the Plan and can request that the Bankruptcy Court estimate a sufficient amount for deposit into the Disputed Claims Reserve to satisfy his Claim to the extent it is ultimately Allowed.

38.     The Senior Employees argue that the Plan violates section 1123(a)(4) because the Senior Employees are treated differently than other employees in that they are required to sign the Senior Employee Stipulation in order to obtain the benefit of the Debtor's release provided in Section IX.D.  This assertion is patently false and conflates treatment of claims within a Class with the Debtor's voluntary release of its own claims and causes of action.  First, the treatment of all Class 8 Claims for the Debtor's employees is the same and nothing in the Plan provides for

Appellee Appx. 01557

Appx. 04422

008365

any disparate or different treatment.  Any affirmative claims that belong to the Debtor against the Senior Employees (and other parties) are irrelevant to the claims held by creditors against the Debtor and treated by the Plan.  The Plan provides that in order to obtain the benefit of the Debtor release, the Debtor's employees must provide sufficient consideration to obtain this release.  They do not get it for free—this issue was substantially argued before this Court at prior hearings.[23]  One of the conditions of obtaining the Debtor release for the Senior Employees is that they would be required to execute the Senior Employee Stipulation (in addition to the fulfilling the other Plan requirements of the Debtor's release of employee claims) to provide consideration for the release of claims against these high level Senior Employees, two of whom were recently terminated for cause.  As the Debtor's counsel explained at the Disclosure Statement Hearing conducted on November 23, 2020, the decision to purchase the Debtor release and execute the Senior Employee Stipulation (or not) rested with each Senior Employee, but has no nexus to the treatment of claims of the Senior Employee against the Debtor.[24]

---

[23] The limitations on the release of all Employees (including the Senior Employees) is also intended to address the Bankruptcy Court's concerns on this issue articulated at the first Disclosure Statement Hearing on October 27, 2020, and at a hearing held on October 28, 2020.

"With regard to these releases—and they are, I'll just be clear, Debtor releases, not third parties releasing third parties.  But nevertheless, you know, I think there's an issue thereof they would need to be fair and equitable, in the best interest of creditors, and in the paramount interest of creditors would be something the Court would focus on there . . .  This is not your normal case where this is the type of provision you see in many, many, many Chapter 11 plans."  Transcript of Proceedings Conducted on October 27, 2020; pg 32, lines 10-20.

[24] As explained at the Disclosure Statement Hearing by Debtor's counsel:

"With respect to senior employees—who include Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent—if they want to obtain a release, and there's no requirement that they agree, they must also execute what we refer to as the Senior Employee Stipulation, which is included in the supplement, in order to receive their release.  If they execute that stipulation, they would receive their release.  If they don't execute that stipulation, they wouldn't."  Transcript of Proceedings Conducted on November 23, 2021, pg 9, lines 12-19.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01558

Appx. 04423

008366

39.     Thus, there is no disparate treatment of Claims within each Class and the Plan does not violate section 1123(a)(4) of the Bankruptcy Code.

40.     <u>Adequate Means for Implementation</u>.  The fifth requirement of section 1123(a) is that a plan must provide adequate means for its implementation.[25]  The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan.  Essentially, the Plan's various mechanisms provide for the Debtor's continued operation after the Effective Date, the monetization of the Debtor's remaining assets, and payment of the Claims of the Debtor's creditors.  Upon full payment of Allowed Claims, any residual value would then flow to the Debtor's equity security holders in accordance with the Bankruptcy Code's priority scheme.

41.     Article IV of the Plan, in particular, sets forth the means for implementation of the Plan with the establishment of:  (i) the Claimant Trust, (ii) the Litigation Sub-Trust; and (iii) the Reorganized Debtor.  The Claimant Trust Agreement provides for the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust and which will manage the Reorganized Debtor).[26]  The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets and the management of the

---

[25] 11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.  *Id.*

As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor they are no longer eligible to execute the Senior Employee Stipulation.

[26] For the avoidance of doubt, the Reorganized Debtor's general partner will not be named "New GP LLC."  That name is simply a placeholder.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01559

Appx. 04424

008367

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1567
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 450 of 1017 PageID 9197
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1566 of 1803 PageID 12312
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 28 of 68

Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee.

42.     The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.  The Litigation Trustee is charged with pursuing any Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan.  Finally, the Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.  The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub Trust Agreement, and the Schedule of Retained Causes of Action.[27]  Thus, the Plan satisfies section 1123(a)(5).

43.     <u>Non-Voting Stock</u>.  The sixth requirement of section 1123(a) is that, with respect to a corporate debtor, a plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.  The Debtor is a limited partnership and there not a corporation.[28]

44.     <u>Selection of Officers and Directors</u>.  Finally, section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity

---

[27] *See* Notices of Filing Plan Supplements [Docket Nos. 1389, 1606, 1656 and on January 22, 2021] (as modified, amended, or supplemented from time to time, the "<u>Plan Supplements</u>").

[28] *See* 11 U.S.C. § 101(9) (B) ("The term 'corporation' . . . does not include limited partnerships").

Appellee Appx. 01560
Appx. 04425
008368

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1568

Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 451 of 1017    PageID 9198

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1567 of 1803    PageID 12313

Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 29 of 68

security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[29]  The disclosure of the individuals to provide services to the Reorganized Debtor and entities created under the Plan and qualifications of these individuals is discussed below in section I.E of this Memorandum in conjunction with the Debtor's satisfaction of the provisions of section 1125(a)(5) of the Bankruptcy Code which overlap and address similar issues.

**B.     The Debtor Has Complied with the Applicable Provisions
of the Bankruptcy Code (Section 1129(a)(2)).**

45.     Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. Case law and legislative history indicate this section principally reflects the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code,[30] which prohibits the solicitation of plan votes without a court-approved disclosure statement.[31]

**1.     The Debtor Complied with Section 1125 of the Bankruptcy Code.**

46.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[32]  Section

---

[29] 11 U.S.C. § 1123(a)(7).

[30] *See Cypresswood*, 409 B.R. at 424 ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

[31] 11 U.S.C. § 1125(b).

[32] *Id.*

Appellee Appx. 01561

Appx. 04426

008369

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1569
Case 3:25-cv-02072-S   Document 15-11   Filed 04/06/25   Page 452 of 1017   PageID 9199
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1568 of 1803   PageID 12314
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 30 of 68

1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[33]

47.     Section 1125 of the Bankruptcy Code is satisfied here.   Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order.[34]   The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[35]   The Debtor, through the Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.   The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.   The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan.[36]

48.     Based on the foregoing, the Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

---

[33] *See Matter of Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[34] *See* Disclosure Statement Order [Docket No. 576].

[35] *See id.*

[36] *See id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01562
Appx. 04425
008370

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1570
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 453 of 1017 PageID 9200
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1569 of 1803 PageID 12315
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 31 of 68

## 2. The Debtor Complied with Section 1126 of the Bankruptcy Code.

49. Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[37] Accordingly, the Debtor did not solicit votes on the Plan from the following Classes:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claims | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |

50. The Debtor solicited votes only from Holders of Allowed Claims in Classes 2, 7, 8 and 9 and Equity Interests in Classes 10 and 11 (collectively, the "Voting Classes") because each of these Classes is Impaired and entitled to vote to accept or reject the Plan.[38] The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[39] Based on the foregoing, the Debtor has satisfied the requirements of section 1129(a)(2).

---

[37] *See* 11 U.S.C. § 1126.

[38] *See* Plan, Art. III. A–B.

[39] A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of section 1126, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of section 1126, that have accepted or rejected such plan. 11 U.S.C. § 1126(c). A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan. 11 U.S.C. §1126(d).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01563
Appx. 04426
008371

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 2 | Frontier Secured Claim | Impaired | Entitled To Vote |
| 7 | Convenience Claims | Impaired | Entitled To Vote |
| 8 | General Unsecured Claims | Impaired | Entitled To Vote |
| 9 | Subordinated Claims | Impaired | Entitled To Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled To Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled To Vote |

**C.     The Debtor Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

51.     Section 1129(a)(3) of the Bankruptcy Code requires that the proponent of a plan propose the plan "in good faith and not by any means forbidden by law."[40]  In assessing the good faith standard, courts in the Fifth Circuit consider whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[41]  A plan must also achieve a result consistent with the Bankruptcy Code.[42]  The purpose of chapter 11 is to enable a distressed business to reorganize and achieve a fresh start.[43]  Whether a plan is proposed in good faith must be determined in light of the totality of the circumstances of the case.[44]

52.     During the last several months, the Debtor has negotiated extensively with the Committee regarding all aspects of the Plan.  Such negotiations have been hard fought and intense. As the Court will recall, the Committee objected to approval of the Disclosure Statement

---

[40] 11 U.S.C. § 1129(a)(3).

[41] See In re Sun Country Dev., Inc., 764 F.2d 406, 408 (5th Cir. 1985).

[42] See In re Block Shim Dev. Company-Irving, 939 F.2d 289, 292 (5th Cir. 1991).

[43] See Sun Country Dev., 764 F.2d at 408 ("The requirement of good faith must be viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start.").

[44] See id.; see also Pub. Fin. Corp. v. Freeman, 712 F.2d 219 (5th Cir. 1983); Cypresswood, 409 B.R. at 425.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01564

Appx. 04429

008372

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1572
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 455 of 1017 PageID 9202
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1571 of 1803 PageID 12317
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 33 of 68

at the initial Disclosure Statement hearing which objection resulted in a continuance of that hearing. In the subsequent weeks the Debtor and the Committee continued their negotiations and ultimately reached substantial agreement on the terms of the Plan prior to the November 23, 2020 Disclosure Statement hearing. The parties continued their negotiations over the subsequent weeks which resulted in the Plan currently before the Court for confirmation. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of Section 1129(a)(3).

53. Moreover, the mechanical distributions contemplated under the Plan were proposed in good faith, are not prohibited by applicable law, and were crafted to efficiently monetize the Debtor's assets and pursue Causes of Action while bestowing the Claimant Trustee Oversight Committee with ultimate oversight over this process. The Plan provides for the transfer of the majority of the Debtor's Assets to the Claimant Trust. The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor. The Reorganized Debtor will be managed by New GP LLC—a wholly-owned subsidiary of the Claimant Trust. This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets. The Claimant Trust, the Litigation Sub-Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant

DOCS_SF:104703.16 36027/002

Appellee Appx. 01565
Appx. 04439
008373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1573
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 456 of 1017    PageID 9203
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1572 of 1803   PageID 12318
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 34 of 68

Trust Agreement, or the Reorganized Limited Partnership Agreement.  The Plan also provides for the reconciliation and potential objection to Claims filed against the Debtor and a procedure to administer Disputed Claims.  Thus, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

> **D.     The Debtor is Seeking to Pay Certain Professional Fees and Expenses Subject to Bankruptcy Court Approval (Section 1129(a)(4)).**

54.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be approved by the Bankruptcy Court as reasonable or subject to approval by the Bankruptcy Court as reasonable.  The Fifth Circuit has held this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[45]  As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[46]

55.     In general, the Plan provides that the Claims held by professionals retained by the Debtor or the Committee (the "<u>Professionals</u>") for their services and related expenses are subject to prior Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code.  Moreover, Article II.B of the Plan provides that Professionals shall file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective

---

[45] *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517-18 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[46] *Id.* at 517.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01566
Appx. 04434
008374

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1574
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 457 of 1017 PageID 9204
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1573 of 1803 PageID 12319
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 35 of 68

Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.[47] The Plan also provides for the establishment of the Professional Fee Escrow Account by the Claimant Trustee to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims. Plan, § I.B.101. For the foregoing reasons, the Debtor submits that the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### E. The Debtor Has Complied with the Bankruptcy Code's Governance Disclosure Requirement (Section 1129(a)(5)).

56. The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[48] It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[49] Lastly, it requires that the plan proponent has disclosed the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.[50] Courts have held that these provisions ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[51]

57. The Plan provides that James P. Seery, Jr., the Debtor's current Chief Executive Officer, Chief Financial Officer and Foreign Representative, shall serve as the Claimant Trustee

---

[47] Plan. Art. II.B.

[48] 11 U.S.C. § 1129(a) (5)(A)(i).

[49] 11 U.S.C. § 1129(a)(5)(A)(ii).

[50] 11 U.S.C. § 1129(a)(5)(B).

[51] *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors").

Appellee Appx. 01567
Appx. 04432
008375

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1575
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 458 of 1017 PageID 9205
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1574 of 1803 PageID 12320
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 36 of 68

and Marc S. Kirschner shall serve as the Litigation Trustee. *See* Plan Supplement at Exhibits M and O. Mr. Seery currently serves as the Debtor's Chief Executive Officer and Chief Restructuring Officer and also serves as one of the Independent Directors. Mr. Seery shall be paid $150,000 per month, for services rendered after the Effective Date and for his services as Claimant Trustee, plus a success fee that shall be the subject of negotiation between him and the Claimant Trust Oversight Committee post-Effective Date, which negotiation shall take place within forty-five (45) days after the Effective Date. Finally, the Claimant Trust Agreement discloses the five members of the Claimant Trust Oversight Committee, which consists of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Josh Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-e Discovery; and (5) David Pauker. *See* Plan Supplement at Exhibits A, M, and N.

58. HCMFA's objection asserts that "neither the identity nor the compensation of the people who control and manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer." HCMFA Objection ¶ 74. The identity of the individuals who will manage the Reorganized Debtor, the Claimant Trust, and Litigation Sub-Trust are set forth above, along with the proposed compensation for any insider. Moreover, the Claimant Trust Agreement provides that the Claimant Trustee "shall engage professionals from time to time in conjunction with the services provided hereunder. Claimant Trustee's engagement of such professionals shall be approved by a majority of the Oversight Committee as set forth in Section 3.3(b) [of the Claimant Trust Agreement]." Claimant Trust Agreement, § 3.13(b).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01568
Appx. 04423
008376

59.     In addition to satisfying the disclosure requirements of Bankruptcy Code section 1125(a)(5), the appointment of Messrs. Seery, Kirschner and the members of the Claimant Trust Oversight Committee is consistent with the interests of creditors and equity security holders and with public policy pursuant to section 1123(a)(7) of the Bankruptcy Code.  As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020.  As set forth in the CEO/CRO Motion, Mr. Seery has extensive management and restructuring experience.  Mr. Seery recently served as a Senior Managing Director at Guggenheim Securities, LLC, where he was responsible for helping direct the development of a credit business.  Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, where he was responsible for originating, executing, and managing stressed and distressed credit investments.  Mr. Seery is also a long-time attorney licensed to practice in New York who has run corporate reorganization groups and numerous restructuring matters.  He also served as a Commissioner of the *American Bankruptcy Institute's Commission to Study the Reform of Chapter 11*.  Mr. Seery was also a Managing Director and the Global Head of Lehman Brothers' Fixed Income Loan business where he was responsible for managing the firm's investment grade and high yield loans business, including underwriting commitments, distribution, hedging, trading and sales (including CLO manager relationships), portfolio management and restructuring.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout businesses with responsibility for the management of distressed corporate debt investments and was a key member of the small team that successfully sold Lehman Brothers to Barclays in 2008.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01569

Appx. 04454

008377

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1577
Case 3:25-cv-02072-S    Document 15-11    Filed 06/05/25    Page 460 of 1017    PageID 9207
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1576 of 1803   PageID 12322
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 38 of 68

60.     In addition to his ample qualifications, as the Court is aware from the numerous times Mr. Seery has testified before the Court, Mr. Seery has made substantial demonstrative contributions to the success of this chapter 11 case through both the resolution of the Debtor's pending litigation claims and the development of the Plan.  In his roles with the Debtor, he is familiar with the Debtor's operations and its business as well as the Claims that will be treated under the Plan.  Accordingly, it is reasonable to continue his employment post-emergence as the Claimant Trustee, subject to the supervision of the Claimant Trust Oversight Committee, which is comprised of several of the largest creditors of the Debtor, including UBS, Redeemer Committee and Acis, as well as Meta-e, all of whom currently serve on the Committee.

61.     Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particular with respect to his prior experience as a litigation trustee.  He serves as the trustee for:  the Tribune Litigation Trust; Millennium Health Corporate Claim and Lender Claims Trusts; and the Nine West Trust.  He is currently a Senior Managing Director at Goldin Associates, LLC specializing, among other things in, restructuring advisory, valuation, solvency/fraudulent conveyance issues.  He is also a member of the American College of Bankruptcy.  Mr. Kirschner was also a partner and the former head of the New York Restructuring of the global law firm of Jones Day.  Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter.[52]  In addition, Mr. Kirchner

---

[52] Mr. Kirschner will receive support services from his consulting firm, Teneo.  Teneo will provide services at a 10% discount from their rates. Teneo has agreed to freeze their rates in effect for 2021 through the end of 2022. Teneo shall also be entitled to reimbursement of expenses.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01570
Appx. 04435
008378

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1578
Case 3:25-cv-02072-S Document 15-11 Filed 06/05/25 Page 461 of 1017 PageID 9208
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1577 of 1803 PageID 12323
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 39 of 68

will receive a 1.50% fee of any "Net Litigation Trust Proceeds"[53] up to $100 million, and an additional 2% fee of any Net Litigation Trust Proceeds in excess of $100 million.

62.     As noted above, four of the members of the Claimant Trust Oversight Committee are the holders of most of the largest Claims against the Debtor and current members of the Committee. Each of these creditors have actively participated in the Debtor's case both through their roles as Committee members and in their separate capacities as individual creditors. They are therefore familiar with the Debtor, its operations and assets.

63.     The fifth member of the Clamant Trustee Oversight Committee, David Pauker, is a restructuring advisor and turnaround manager with more than 25 years of experienced advising public and private companies and their investors. Mr. Pauker is a fellow of the American College of Bankruptcy. Mr. Pauker has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies and private investor parties, including Lehman Brothers, Monarch Capital, Government Development Bank Debt Recovery Authority of Puerto Rico, MCorp, Refco, and Residential Capital. Mr. Pauker, who will be the only paid member of the initial Claimant Trust Oversight Board, will be paid $250,000 for the first year of his service and $150,000 per year thereafter. The Plan therefore satisfies the requirements of Bankruptcy Code

---

[53] Net Litigation Trust Proceeds is defined as gross Litigation Trust proceeds, less Teneo and Litigation Trust counsel hourly fees, expert witness, e-discovery, court and discovery expenses. Gross recoveries are not to be reduced by the cost of insurance, tax accounting work which would be outsourced, potential contingency fees, or litigation funding financing and/or related contingent fee charges.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01571
Appx. 04426
008379

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1579
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 462 of 1017 PageID 9209
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1578 of 1803 PageID 12324
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 40 of 68

sections 1129(a)(5) and 1123(a)(7) with respect to the individuals responsible for the post-confirmation administration and oversight of the Reorganized Debtor.

**F. The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).**

64. Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan. No such rate changes are provided for in the Plan. Thus, section 1129(a)(6) of the Bankruptcy Code is inapplicable to this chapter 11 case.

**G. The Plan Is in the Best Interests of Holders of Claims and Interests (Section 1129(a)(7)).**

65. The best interests of creditors test requires that, "[w]ith respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation.[54] The best interests test applies to each non-consenting member of an impaired class, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[55]

66. As demonstrated in the liquidation analysis and financial projections attached to the Disclosure Statement as Exhibit C (the "Liquidation Analysis"), which was prepared by the

---

[54] 11 U.S.C. § 1129(a) (7).

[55] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n. 23 (5th Cir. 1988) (stating that under section 1129(a)(7) of the Bankruptcy Code a bankruptcy court was required to determine whether impaired claims would receive no less under a reorganization than through a liquidation).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01572
Appx. 04437
008380

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1580
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 463 of 1017 PageID 9210
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1579 of 1803 PageID 12325
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 41 of 68

Debtor with the assistance of its advisors, all Holders of Claims and Equity Interests in all Impaired Classes will recover at least as much under the Plan as they would in a hypothetical chapter 7 liquidation.[56] Specifically, the projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims estimates a 92.51% distribution to holders of general unsecured claims under the Plan compared to an estimated 66.14% distribution under a hypothetical liquidation of the Debtor.[57]

67. Mr. Dondero argues that the Plan fails to satisfy the requirements of Bankruptcy Code section 1129(a)(7) due to "lack of appropriate sale procedures for post-confirmation operations" and because there is no oversight or predetermined procedures to ensure that the liquidation of the Debtor's assets is both value maximizing and transparent. *See* Dondero Objection, ¶10. Dugaboy—Mr. Dondero's family trust—filed a similar objection and asserts that the absence of reporting requirements to the beneficial holders of Claimant Trust, lack of oversight on the Claimant Trustee's ability to liquidate assets violates section 1129(a)(7) and that a chapter 7 trustee would require to obtain court approval to effect the same sales. Dugaboy also argues that the Claimant Trustee's limitation of liability only applies to gross negligence and willful misconduct, so that the Claimant Trustee cannot be held liable for breach of fiduciary duty and, therefore, derives great protections than a hypothetical chapter 7 trustee would have.

---

[56] *See* Disclosure Statement Ex. C.

[57] *See* Disclosure Statement Ex C. With respect to the other impaired classes of Claims and Equity Interests, the Liquidation Analysis projects a 100% distribution on account of the Class 2 Frontier Secured Claim under either scenario and projects no distributions holders of Class 9 Subordinated Claims, Class 10 Class B/C Limited Partnership Interests and Class 11 Class A Limited Partnership Interests either under the Plan or under a hypothetical liquidation of the Debtor.

Appellee Appx. 01573
Appx. 04438
008381

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1581
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 464 of 1017 PageID 9211
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1580 of 1803 PageID 12326
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 42 of 68

68.     This objection is being made by parties with virtually no economic interest in the Debtor.  Neither Dugaboy nor Mr. Dondero have any legitimate claims against the Debtor and based upon Mr. Dondero's "pot plan" proposal their equity is completely out of the money. Moreover, as discussed below, the argument that increased reporting obligations to creditor beneficiaries (who they are not), a requirement to seek Court approval of sales and the establishment of a standard of care for the Claimant Trustee somehow translates into creditors doing better in a chapter 7 makes no sense, and, in any event, is not an argument supported by any creditor not related to Mr. Dondero..

69.     As set forth above, the Liquidation Analysis filed with the Disclosure Statement provides a side by side comparison of distributions to creditors under a hypothetical chapter 7 liquidation and under the Plan and clearly demonstrates that creditors will receive at least as much under the Plan as they would in a chapter 7 proceeding.  None of the objectors provide any arguments to refute the analysis in the Liquidation Analysis or how a hypothetical chapter 7 trustee would liquidate the Debtor's remaining assets that would definitively provide a greater distribution to creditors in chapter 7 liquidation rather than in chapter 11. To the contrary, Mr. Dondero suggests (without any factual basis) that the Debtor's creditors and equity holders "could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sale procedures are governed by the Bankruptcy Court to ensure maximization or value through auction or other market-testing means."  Dondero Objection ¶ 11.

70.     Nothing in the opposition suggests that the Claimant Trustee (subject to supervision by the Claimant Trust Oversight Committee) will not undertake the same value

DOCS_SF:104703.16 36027/002

Appellee Appx. 01574
Appx. 04429
008382

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1582
Case 3:25-cv-02072-S Document 15-11 Filed 06/05/25 Page 465 of 1017 PageID 9212
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1581 of 1803 PageID 12327
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 43 of 68

maximizing measures suggested by Mr. Dondero in order to maximize the value of the Reorganized Debtor's assets. The only difference is that the Claimant Trustee would be able to consummate these sales in the ordinary course of business compared to a trustee, who would have to negotiate (and presumably discount) every sale with the caveat that it is subject to court approval and a period of time by which parties, such as Mr. Dondero has throughout this case, can object and potentially frustrate any proposed sale. Mr. Dondero also assumes that the chapter 7 trustee could operate the Debtor's business in chapter 7.[58] Aside from the complete lack of institutional knowledge of the Debtor and its business, it is doubtful that a chapter 7 trustee would be able to operate the Debtor's business without the benefit of the executory contracts and unexpired leases that the Reorganized Debtor seeks to assume in order to monetize the remaining assets. There is no factual basis to conclude that a hypothetical chapter 7 trustee could monetize the Debtor's remaining assets any better than the Claimant Trustee, who has both the expertise and institutional knowledge of the Debtor and who is subject to an oversight committee consisting of the largest creditors in the Debtor's case.

71.     Second, it is standard for a chapter 11 plan to allow the post confirmation administrators (in this case, the Claimant Trustee, the Litigation Trustee, and Reorganized Debtor) to monetize a debtor's assets without having to first obtain court approval or otherwise condition any sales on the consent to the holders of claims or interests. It is neither novel nor unusual for chapter 11 plans to allow the post-confirmation vehicle to sell assets, compromise

---

[58] Even if a hypothetical trustee were appointed under Mr. Dondero's argument, the trustee would be subject to election pursuant 11 U.S.C. § 702. The largest creditors of the Debtor (most of whom are serving on the Claimant Trust Oversight Committee) would control the selection of the trustee of the Debtor after conversion. Yet these creditors support confirmation of the Plan and the structure by which they, as members of the Claimant Trust Oversight Committee, will oversee the Claimant Trustee's monetization of assets.

Appellee Appx. 01575
Appx. 04449
008383

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1583
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 466 of 1017 PageID 9213
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1582 of 1803 PageID 12328
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 44 of 68

controversies and employ professionals without mandatory application to the Court to approve these standard post-confirmation transactions, including chapter 11 cases confirmed by this Court. *See, e.g. In re Acis Capital Management*, 2019 Bankr. LEXIS 294, *116 (Bankr. N.D. Tex. January 31, 2019) (plan providing "[o]n and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order."); *In re Wilson Metal Fabricators,* No. 19-31452,**9-10 (Bankr. N.D. Tex. SGJ May 18, 2020), ECF No. 92 (Order confirming plan providing that reorganized debtor "may deal with its assets and property and conduct its affairs without any supervision by, or permission from, the Court or the Office of the United States Trustee, and free of any restriction imposed on the Debtor by the Bankruptcy Code or by the Court during the case.").

72.     Finally, Dugaboy's argument that the standard of liability for the Claimant Trustee provided in the Claimant Trust Agreement is not appropriate and confers greater protections those applicable to a chapter 7 trustee is wrong. This objection is yet another example of the Dondero Entities' efforts to place as many roadblocks as possible to halt post-confirmation asset sales and maintain the ability to litigate (or threaten to litigate) against the entities charged with implementing the monetization of assets required under the Plan.

73.     The standard of liability imposed on the Claimant Trustee pursuant to the Clamant Trust Agreement is appropriately limited to gross negligence and willful misconduct and Dugaboy and the Dondero Entities do not describe how the standard of liability has any impact

DOCS_SF:104703.16 36027/002

Appellee Appx. 01576
Appx. 04414
008384

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1584
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 467 of 1017    PageID 9214
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1583 of 1803   PageID 12329
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 45 of 68

on the distributions creditors will receive under the Plan.  First, the Claimant Trustee does have fiduciaries duties to the trust beneficiaries under the terms of the Claimant Trust Agreement, but claims against the Claimant Trustee are limited to acts of gross negligence and willful misconduct.[59]   Second, Dugaboy misstates the standard of liability that would otherwise be imposed on a chapter 7 trustee.   A chapter 7 trustee would actually have a more relaxed standard of liability than that imposed on the Claimant Trustee because it is well established that trustees have qualified immunity for acts taken within the scope of their appointment.  *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981) ("The question in this case is whether a trustee acting at the direction of a bankruptcy judge is clothed with absolute immunity against tort actions grounded on his conduct as trustee …. In the instant case, the court-approved trustee was acting under the supervision and subject to the orders of the bankruptcy judge.  We hold that since [the trustee], as an arm of the Court, sought and obtained court approval of his actions, he is entitled to derived immunity.")  Thus, a chapter 7 trustee's qualified immunity would protect it from heightened negligent breach of fiduciary duty claims whereas the Claimant Trust Agreement provides that the Claimant Trustee is only protected from simple negligent breach of fiduciary claims.

---

[59] *See, e.g.* Claimant Trust Agreement Section 2.3(b)(vii).  "The  Claimant Trust shall be administered by the Claimant Trustee, in accordance with this Agreement, for the  following purpose …  (viii) to oversee the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement, in its capacity as the sole member and manager of New GP LLC pursuant to the terms of the New GP LLC Documents, all with a view toward maximizing value in a reasonable time in a manner consistent with the Reorganized Debtor's fiduciary duties as investment adviser to the Managed Funds.  The Debtor has amended the Plan to conform with the Claimant Trust Agreement.

Appellee Appx. 01577

Appx. 04442

008385

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1585
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 468 of 1017 PageID 9215
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1584 of 1803 PageID 12330
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 46 of 68

74.     Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.[60]

### H.     The Plan Complies with the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

75.     The Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[61]  Each of the non-Voting Classes that were not entitled to vote on the Plan are Unimpaired and conclusively deemed to accept the Plan.

### I.     The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).

76.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.   Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—which generally include domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must

---

[60] *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) aff'd, 785 F.2d 1033 (5th Cir. 1986) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the Plan"); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[61] 11 U.S.C. § 1129(a) (8).

Appellee Appx. 01578
Appx. 04443
008386

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1586
Case 3:25-cv-02072-S Document 15-11 Filed 06/05/25 Page 469 of 1017 PageID 9216
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1585 of 1803 PageID 12331
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 47 of 68

receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—i.e., priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim

77.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  First, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time as defined in Article II.A of the Plan.  Second, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[62]  Finally, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it specifically provides that each Holder of an Allowed Priority Tax Claim shall receive payment in an amount equal to the amount of the Allowed Priority Tax Claim unless otherwise agreed between such holder and the Debtor. .[63]  Thus, the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

---

[62] *See* Plan, Art. III.B.

[63] As noted below in the discussion on Plan modifications, the Debtor has clarified the treatment of priority tax claims in accordance with 11 U.S.C. §1129(a)(9)(C) pursuant to the objection raised on this point by the Internal Revenue Service ("IRS").

DOCS_SF:104703.16 36027/002

Appellee Appx. 01579
Appx. 04454
008387

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1587
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 470 of 1017 PageID 9217
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1586 of 1803 PageID 12332
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 48 of 68

78.     The IRS and certain Texas taxing authorities (the "Texas Taxing Authorities") each filed objections to the Plan. The Debtor is in the process of negotiating "neutrality" language with the Texas Taxing Authorities concerning the application of the Plan injunction and other provisions to the claims asserted by this creditor. The Debtor expects to consensually resolve the Texas Taxing Authorities' objection with agreeable language in the Confirmation Order. As more fully explained in the Omnibus Reply in response to the IRS's plan objection, the IRS has rejected the Debtor's Plan neutrality language and is insisting on the modification of the Plan to contain litany of provisions that are ambiguous, overbroad and, most importantly, attempt to pre-determine the IRS's rights and remedies as opposed to having these issues determined in accordance with nonbankruptcy law with each parties' rights and defenses preserved.

### J.     At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders (Section 1129(a)(10)).

79.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider." As detailed herein and in the Voting Report, Class 2 (Frontier Secured Claim) and Class 7 (Convenience Claims) are impaired classes of claims and each voted to accept the Plan, exclusive of any acceptances by insiders. Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. However, as explained below, even though not all of the Voting Classes accepted the Plan, the Plan may still be confirmed by cram down because the requirements of section 1129(b) are satisfied.

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1588
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 471 of 1017 PageID 9218
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1587 of 1803 PageID 12333
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 49 of 68

**K.** **The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).**

80. Feasibility refers to the Bankruptcy Code's requirement that plan confirmation must not be "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan."[64] To satisfy this standard, the Fifth Circuit has held that a plan need only have a "reasonable probability of success."[65] Indeed, a relatively low threshold of proof will satisfy section 1129(a)(11) so long as adequate evidence supports a finding of feasibility.[66] In particular, according to Fifth Circuit law, "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible."[67]

81. The Plan provides for the Reorganized Debtor to manage the wind down of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. As set forth in the Liquidation Analysis, the projections prepared by the Debtor show that it will be able to meet its obligations under the Plan. The Plan also does not provide any guaranty as to what holders of Class 8 General Unsecured Claims will receive; they will receive their *pro rata* payment of whatever net funds realized from the asset monetization process reflected in the projections. Therefore, the Plan is feasible. Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code under Fifth Circuit law.

---

[64] 11 U.S.C. § 1129(a)(11).

[65] *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (quoting *In re Landing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993)).

[66] *In re Star Ambulance Service, LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015).

[67] *T-H New Orleans*, 116 F.3d at 802.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01581
Appx. 04146
008389

**L.    The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

82.    The Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[68]  The Plan includes an express provision requiring payment of all such fees.[69]  In addition, at the request of the United States Trustee, the Debtor has added language to the Confirmation Order that makes the Reorganized Debtor, the Claimant Trustee and Litigation Trustee jointly and severally liable for payment of statutory fees owed to the United States Trustee.  The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code.

**M.    The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.**

83.    The Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  Section 1114(a) of the Bankruptcy Code defines retiree benefits as medical benefits.[70]  Article IV.K of the Plan provides for the assumption of the Pension Plan (to the extent that this plan is governed under section 1114 of the Bankruptcy Code) as well as additional language requested by the Pension Benefits Guaranty Corporation.    Accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

---

[68] 11 U.S.C. § 1129(a) (12).

[69] Plan, Art. XIII.D.

[70] Section 1114(a) defines "retiree benefits" as: ". . . payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained in whole or in part by the debtor prior to filing a petition commencing a case under this title."  11 U.S.C. § 1114(e) (emphasis added).

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1590
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 473 of 1017 PageID 9220
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1589 of 1803 PageID 12335
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 51 of 68

**N.      Sections 1129(a)(14) through Sections 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

84.     A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code does not apply because the Debtor is not subject to any domestic support obligations.[71] Section 1129(a)(15) of the Bankruptcy Code is inapplicable because the Debtor is not an "individual" as defined in the Bankruptcy Code.[72] Section 1129(a)(16) of the Bankruptcy Code is inapposite because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[73]

**O.      The Plan Satisfies the Cramdown Requirements (Section 1129(b)).**

85.     If an impaired class has not voted to accept the plan, the plan must be "fair and equitable" and not "unfairly discriminate" with respect to that class.[74] The Plan has been accepted by Voting Classes 2, 7, and 9.[75] Voting Classes 8 (General Unsecured Claims) and Class 11 (Class A Limited Partnership Interests) voted to reject the Plan and Class 10 (Class B/C Limited Partnership Interests), did not vote. However, the Plan still satisfies the "cramdown" requirements with respect to non-accepting Classes of Claims and Equity Interests.

---

[71] *See* 11 U.S.C. § 1129(a) (14).

[72] *See* 11 U.S.C. § 1129(a)(15).

[73] *See* 11 U.S.C. § 1129(a)(16).

[74] *See* 11 U.S.C. § 1129(b)(1).

[75] As noted below, Class 9 has also accepted the Plan, but the Debtor is not including Class 9 as one of the accepting impaired classes to satisfy the cram down requirements of section 1129(b)(1) of the Bankruptcy Code.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01583

00839 1

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1591
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25   Page 474 of 1017   PageID 9221
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1590 of 1803   PageID 12336
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 52 of 68

### 3.  The Plan Is Fair and Equitable.

86.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan (or is deemed to reject the plan) if it follows the "absolute priority rule."[76]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[77]  The Plan satisfies section 1129(b) of the Bankruptcy Code.  The objecting parties' arguments that the Plan is not "fair and equitable" ignore this standard.

87.    As explained earlier, all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification mechanics rests on a legally acceptable rationale.  To the extent any impaired rejecting class of claims or interests is not paid in full, no class junior to the impaired rejecting class will receive any distribution under the Plan on account of its junior claim or interest.  Therefore, the Plan satisfies the "fair and equitable" requirement.

### 4.  The Plan Does Not Unfairly Discriminate Against the Rejecting Classes.

88.    The Bankruptcy Code does not provide a standard for determining "unfair discrimination."  Rather, courts typically examine the facts and circumstances of the particular

---

[76] *Bank of Am. Nat'l Tr. & Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42 (1999) ; *In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006).

[77] *Id.*

Appellee Appx. 01584
Appx. 04449
008392

case to determine whether unfair discrimination exists.[78]    At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[79]    The unfair discrimination requirement, which involves a comparison of classes, is distinct from the equal treatment requirement of section 1123(a)(4), which involves a comparison of the treatment of claims within a particular class.    A plan does not unfairly discriminate where it provides different treatment to two or more classes which are comprised of dissimilar claims or interests.[80]    Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[81]

89.    The Plan's treatment of these Classes is proper because all similarly situated holders of Claims and Equity Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.    Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

---

[78] *See In re Kolton*, No. 89-53425-C, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (quoting *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . ")); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[79] *See Idearc Inc.*, 423 B.R. at 171, ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[80] *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) ; *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom., Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[81] *Aztec Co.*, 107 B.R. at 590.

DOCS_SF:104703.16 36027/002

P.     **The Plan satisfies the "Cramdown" Requirements of the Bankruptcy Code.**

90.     Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied. To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[82]

91.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[83] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[84] The Debtor submits that the Plan satisfies the "fair and equitable" requirement notwithstanding the non-acceptance of the Plan by Classes 8, 10 and 11.

92.     With respect to Class 8 General Unsecured Claims, there is no Class of equal priority receiving more favorable treatment and no classes that are junior to Class 8 will receive or retain any property under the Plan unless Class 8 creditors receive or retain, on account of

---

[82] *See John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[83] *See Bank of Amer.*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

[84] *See id.*

DOCS_SF:104703.16 36027/002

their claims, a value as of the Effective Date equal to the amount of such Claim, plus interest as provided under the Plan.  Thus, Holders of Class 9 Subordinated Claims will not receive any distributions unless and until Class 8 Claims are fully paid pursuant to section 1129(b)(2)(B) of the Bankruptcy Code.  Holders of Equity Interests in Class 10 and 11 will not receive any distributions absent full payment to holders of Allowed Class 8 General Unsecured Claims and Allowed Class 9 Subordinated Claims.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Therefore, the Plan is fair and equitable as to Equity Interests in Class 10 and 11 because no class junior to equity will receive or retain any property under the Plan.  11 U.S.C. § 1129(b)(2)(C).

93.    Moreover, while Class 8 did not accept the Plan, requiring the Debtor to resort to "cram down" under Section 1129(b), over 93% of the dollar amount of claims in Class 8 voted to accept the Plan.  Those votes included the votes of Redeemer, Acis, UBS, and the HarbourVest entities.  Similarly, the Committee, as the fiduciary for all Class 8 General Unsecured Claims, also enthusiastically supports the Plan. As discussed above, the only reason Class 8 General Unsecured Claims voted to reject the Plan was because of (i) 24 employees holding contingent $1.00 claims with respect to unvested amounts under the Debtor's deferred compensation program voted against the Plan;[85] yet these employees ultimately will not have any General Unsecured Claims because the Debtor will terminate their employment before their entitlement to such amounts will vest, thereby eliminating the contingent claims and (ii) certain other employees, including Scott Ellington and Isaac Leventon who are loyal to Mr. Dondero and who

---

[85] As noted above, the Debtor resolved the confirmation objection of Mr. Surgent and Mr. Waterhouse, each of whom voted to reject (Waterhouse) or voted to abstain (Surgent) with respect to the Plan.

Appellee Appx. 01587

Appx. 04152

008395

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1595
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 478 of 1017 PageID 9225
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1594 of 1803 PageID 12340
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 56 of 68

also rejected the Plan. Based upon the foregoing, the Plan may satisfy the cram down requirements and can be confirmed notwithstanding the non-acceptance of the Plan by Class 8, Class 10 and Class 11.

94. NPA argues that Plan violates the absolute priority rule with respect to unsecured creditors to the extent that it provides equity in the Reorganized Debtor to existing equity holders. NPA Objection, ¶ 92. This assertion is incorrect. As explained above, Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan until Allowed Claims in Class 8 and Class 9 are paid in full (with appropriate interest) pursuant to the terms of the Plan. The Contingent Claimant Trust Interests granted to Equity Interests in Classes 10 and 11 will not vest unless and until the Claimant Trustee files a certification that all Holders of Allowed unsecured claims have been indefeasibly paid, inclusive of interest. *See* Plan, § I.B.44. Thus, the absolute priority rule is not violated by because the treatment of Class 8 and Class 9 Claims satisfies section 1129(b)(2)(B).[86] Indeed, the failure to provide a mechanism for the potential distribution of Equity Security Interests after payment of all senior Claims would violate the treatment of the equity security interests in the Debtor because such senior Claims would be receiving more than the full amount of their Claims. *See* 11 U.S. § 1129(b) (2)(C)(i).

---

[86] The absolute priority rule is also satisfied with respect to Class 7 Convenience Claims. First, Class 7 has accepted the Plan. Second, even if Class 7 were not to have accepted the Plan, the members of Class 7 were afforded the option on their ballots to accept the treatment provided under Class 8 if they so elected.

Appellee Appx. 01588
Appx. 04453
008396

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1596
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 479 of 1017 PageID 9226
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1595 of 1803 PageID 12341
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 57 of 68

Q.     **The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)-(e)).**

95.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed Plan.[87]

96.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

97.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because the Debtor's chapter 11 case is not a "small business case."[88]

98.     In sum, the Plan satisfies all of the Bankruptcy Code's mandatory chapter 11 plan confirmation requirements.

IV.     **The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code for the Reasons Articulated in the Omnibus Reply.**

99.     The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[89]  Among other discretionary provisions, the Plan contains certain Debtor releases,[90] an exculpation provision, and an injunction provision.[91]

---

[87] 11 U.S.C. § 1129(c).

[88] 11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,000,000 (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101 (51D)(B)(i).

[89] 11 U.S.C. § 1123 (b)(1)-(6).

[90] Plan, Art. IX

DOCS_SF:104703.16 36027/002

Appellee Appx. 01589
Appx. 04454
008397

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1597
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 480 of 1017   PageID 9227
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1596 of 1803   PageID 12342
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21   Entered 01/22/21 19:25:01   Page 58 of 68

Notably, the Plan does <u>not</u> contain a mechanism typically included in chapter 11 plans, which contain broad third party releases by creditors or other parties in interest, unless they opt out of the release.  While certain objectors argue that the Plan nonetheless contains inappropriate third party releases in disguise, such arguments lack merit as set forth in the Omnibus Reply.  These provisions are the product of extensive good faith, arms'-length negotiations and comply with the Bankruptcy Code and prevailing law.  The Debtor has separately responded to the objections filed by certain parties to these provisions in the Omnibus Reply, which also addresses the proposed modifications made to the Plan injunction provision.  Accordingly, the Debtor respectfully requests that the Bankruptcy Court approve the Plan's Debtor release, exculpation, and injunction provisions for the reasons set forth in the Omnibus Reply.

### A. The Debtor Complied with Section 1129(d) of the Bankruptcy Code.

100.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.

### B. Modifications to the Plan.

101.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed

---

[91] *Id.*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01590
Appx. 04455
008398

accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[92]

102. The Senior Employees argue that the Debtor and the Committee seek "carte blanche to make amendments to the Plan post-confirmation without complying with § 1127 of the Bankruptcy Code." Senior Employee Objection, at p. 15.

103. These arguments are baseless and are contradicted by Article XII of the Plan, which explicitly requires that modifications to the Plan be in compliance with section 1127.

> After the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Plan, Art. XII.B.

104. Dugaboy objects that the Plan does not comply with section 1127(a) of the Bankruptcy Code and asserts that the Plan is not "final" and "as of the writing of this Objection and possibly even after the hearing on confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan." Dugaboy Objection, page 4.

---

[92] *See, e.g.*, *In re American Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) (finding that nonmaterial modifications that do not adversely impact parties who have previously voted on the plan do not require additional disclosure or resolicitation); *In re Sentry Operating Co. of Texas, Inc.*, 264 B.R. 850, 857 (Bankr. S.D. Tex. 2001) (same). *See also In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation).

DOCS_SF:104703.16 36027/002

Appellee Appx. 01591

Appx. 04456

008399

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1599
Case 3:25-cv-02072-S Document 15-11 Filed 06/05/25 Page 482 of 1017 PageID 9229
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1598 of 1803 PageID 12344
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 60 of 68

105.     As noted earlier in the Memorandum, the Debtor has already filed three Plan Supplements and will file a fourth Plan Supplement prior to the Confirmation Hearing.  The Plan Supplements filed to date already contain the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Trust Agreement that Dugaboy complains are lacking.  The Debtor has also filed three notices of executory contracts and unexpired leases to be assumed under the Plan.   Thus, the Plan will be "final" will contain final version of all of the post-confirmation documents and executory contracts to be assumed in advance of the Confirmation Hearing, in compliance with section 1127(a) of the Bankruptcy Code.  *See, e.g., In re Friendship Dairies*, 2012 Bankr. LEXIS 13, **22-23 (Bankr. N.D. Tex. Jan. 3, 2014) ("Section 1127(a) of the Code allows a plan proponent, the Debtor here, to modify its plan at any time before confirmation. In addition, '[a]fter the proponent of a plan files a modification of such plan with the court, the plan as modified becomes *the plan*.'") (quoting 11 U.S.C. §1127(a) emphasis in original); *Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521 B.R. 134, 176 (Bankr. N.D. Tex 2014) ("As a modified plan becomes the confirmed plan pursuant to section 1127(a) of the Bankruptcy Code, this maxim applies equally to plans as modified").   As Dugaboy concedes, the Plan appropriately restates the standards for post-confirmation plan modifications under section 1127(b), which would require notice and a hearing, among other requirements.  *See* Plan, §XII.B.

106.     As noted in this Memorandum, the Debtor has made certain modifications to the Plan in order to both (1) clarify language in response to certain of the objections raised by the Objectors and (2) additional modifications to the Plan.  These modifications comply with section

Appellee Appx. 01592
Appx. 04457
008400

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1600
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 483 of 1017 PageID 9230
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1599 of 1803 PageID 12345
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 61 of 68

1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019. A summary of the Plan

modifications is set forth in the chart below:

| **Plan Modification and Applicable Plan Section** |
|---|
| Treatment of Subordinated Claims Treatment Procedural Requirements. Modifications that are responsive to the objections to the definition and treatment of Subordinated Claims, including (1) the definition of Subordinated Claims to eliminate categorical subordination of claims relating to limited partnership interests and replacement of Final Order to order entered by the Bankruptcy Court (Section I.B.129); (2) the classification and treatment of Subordinated Claims in Class 9 is only to the extent an order subordinating the claim is entered (Section III.H.9); (3) the addition of requirement of a hearing, in addition to notice, with respect to any subordination proceeding and subject to entry of order of the Bankruptcy Court (Section III.J); and (4) a requirement to bring subordination proceedings by Claims Objection Deadline and the ability to request that the Bankruptcy Court subordinate claims by the Claims Objection Deadline (Section VII.B). |
| Priority Tax Claims. Modification in response to IRS Objection to provide that the payment of Allowed Priority Tax Claims to be in accordance with section 1129(a)(9)(C) unless such Allowed Claim is either paid in full on the Initial Distribution Date or otherwise agreed by the parties (Section II.C). |
| Assumption/Rejection of Executory Contracts. Modifications in response to objections to require assumption/rejection of contracts to be determined by Confirmation Hearing, rather than the Effective Date (Section V.A-C). |
| Claimant Trust and Related Provisions. Modification to permit Claimant Trustee to set aside a reserve for potential indemnification claims (Section IV.B.5); modification to conform Claimant Trustee's fiduciary duties to Claimant Trust Agreement (Section IV.B.5). |
| Issuance of New Partnership Interests. Clarifications that Reorganized Limited Partnership Agreement not providing indemnification obligations (Section IV.C.3). |
| Conditions to Effective Date. Modifications to conditions to effectiveness of Plan to require (1) Confirmation Order must be become a Final Order; (2) obtaining acceptable directors and officers insurance coverage which coverage is acceptable to the Debtor, Committee, the Oversight Committee Board, Claimant Trustee, and Litigation Trustee (Section VIII.A); (3) deletion of section VIII.C of Plan regarding effect of non-occurrence of conditions to effectiveness. |
| Retention of Jurisdiction. Modification in response to objections to clarify existing language that provides that the Bankruptcy Court shall retain jurisdiction "to the maximum extent" legally permissible (Section XI). |
| Injunction and Related Provisions. Modifications to the Plan injunction, term of injunction and continuance of January 9 Order provisions (Sections IX.F, G and H). Inclusion of additional Plan |

DOCS_SF:104703.16 36027/002

Appellee Appx. 01593
Appx. 04458
008401

> definitional changes/additions for "Affiliate" (Section I.B.5, "Enjoined Parties" (Section I.B.56) and "Related Entity" (Section I.B.110); "Related Entity List" (Section I.B.111) and "Related Persons" (Section I.B.112). Also, Injunction language highlighted pursuant to Bankruptcy Rule 3016 (Section IX.F).

107. Accordingly, the Debtor submits that no additional solicitation or disclosure is required on account of the Plan modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## **Conclusion**

108. For the reasons set forth herein, the Debtor respectfully requests that the Bankruptcy Court confirm the Plan and enter the Confirmation Order.

DOCS_SF:104703.16 36027/002

Appellee Appx. 01594

Appx. 04459

008402

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104703.16 36027/002

Appellee Appx. 01595

Appx. 04400

008403

**EXHIBIT A**

DOCS_SF:104703.16 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1604 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1603 of 1803    PageID 12349

Case 19-34054-sgj11 Doc 1814 Filed 01/22/21    Entered 01/22/21 19:25:01    Page 65 of 68

## Plan Objections from Dondero-Related Entities: Organizational Charts



Appellee Appx. 01597

Appx. 04402

008405

**EXHIBIT B**

DOCS_SF:104703.16 36027/002

| **Objector** | **Objection** | **Claim** | **Status** |
|---|---|---|---|
| James Dondero | D.I. 1661 | Claim No. 138 | Withdrawn with prejudice [D.I. 1510] |
| | | Claim No. 141 | Arises from equity; subject to subordination |
| | | Claim No. 142 | Arises from equity; subject to subordination |
| | | Claim No. 145 | Arises from equity; subject to subordination |
| | | Claim No. 188 | Withdrawn with prejudice [D.I. 1510] |
| | | Indirect Equity Interest | Represents an indirect interest in Class A interests. Subordinated to Class B/C. Structurally subordinate. Represents 0.25% of total equity. |
| Get Good Trust | D.I. 1667 | Claim No. 120 | Arises from equity; subject to subordination |
| | | Claim No. 128 | Arises from equity; subject to subordination |
| | | Claim No. 129 | Arises from equity; subject to subordination |
| Dugaboy Investment Trust | D.I. 1667 | Claim No. 113 | Arises from equity; subject to subordination |
| | | Claim No. 131 | Objection filed and in litigation. Seeks to pierce the veil and hold the Debtor liable for subsidiary debts. Debtor believes claim is frivolous. |
| | | Claim No. 177 | Objection filed and in litigation. Seeks damages for postpetition management of estate. Debtor believes claim is frivolous. |
| | | Class A Interests | Subordinated to Class B/C. Represents 0.1866% of total equity. |
| Highland Capital Management Fund Advisors, L.P. | D.I. 1676 | Claim No. 95 | Expunged [D.I. 1233] |
| | | Claim No. 119 | Expunged [D.I. 1233] |
| Highland Fixed Income Fund | D.I. 1676 | Claim No. 109 | Expunged [D.I. 1233] |
| Highland Funds I and its series | D.I. 1676 | Claim No. 106 | Expunged [D.I. 1233] |
| Highland Funds II and its series | D.I. 1676 | Claim No. 114 | Expunged [D.I. 1233] |
| Highland Global Allocation Fund | D.I. 1676 | Claim No. 98 | Expunged [D.I. 1233] |
| Highland Healthcare Opportunities Fund | D.I. 1676 | Claim No. 116 | Expunged [D.I. 1233] |
| Highland Income Fund | D.I. 1676 | Claim No. 105 | Expunged [D.I. 1233] |
| Highland Merger Arbitrate Fund | D.I. 1676 | Claim No. 132 | Expunged [D.I. 1233] |
| Highland Opportunistic Credit Fund | D.I. 1676 | Claim No. 100 | Expunged [D.I. 1233] |
| Highland Small-Cap Equity Fund | D.I. 1676 | Claim No. 127 | Expunged [D.I. 1233] |
| Highland Socially Responsible Equity Fund | D.I. 1676 | Claim No. 115 | Expunged [D.I. 1233] |
| Highland Total Return Fund | D.I. 1676 | Claim No. 126 | Expunged [D.I. 1233] |
| Highland/iBoxx Senior Loan ETF | D.I. 1676 | Claim No. 122 | Expunged [D.I. 1233] |
| NexPoint Advisors, L.P. | D.I. 1676 | Claim No. 104 | Expunged [D.I. 1233] |
| | | Claim No. 108 | Expunged [D.I. 1233] |
| NexPoint Capital, Inc. | D.I. 1676 | Claim No. 107 | Expunged [D.I. 1233] |
| | | Claim No. 140 | Expunged [D.I. 1233] |
| NexPoint Real Estate Strategies Fund | D.I. 1676 | Claim No. 118 | Expunged [D.I. 1233] |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1607
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 490 of 1017 PageID 9237
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1606 of 1803 PageID 12352
Case 19-34054-sgj11 Doc 1814 Filed 01/22/21 Entered 01/22/21 19:25:01 Page 68 of 68

| NexPoint Strategic Opportunities Fund | D.I. 1676 | Claim No. 103 | Expunged [D.I. 1233] |
|---|---|---|---|
| CLO Holdco, Ltd. | D.I. 1675 | Claim No. 133 | Claim voluntarily reduced to $0.00 |
| | | Claim No. 198 | Claim voluntarily reduced to $0.00 |
| NexBank Title, Inc. | D.I. 1676 | None | N/A |
| NexBank Securities, Inc. | D.I. 1676 | None | N/A |
| NexBank Capital, Inc. | D.I. 1676 | None | N/A |
| NexBank | D.I. 1676 | Claim No. 178 | Expunged [D.I. 1155] |
| NexPoint Real Estate Finance Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Capital, LLC | D.I. 1677 | None | N/A |
| NexPoint Residential Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Hospitality Trust | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners, LLC | D.I. 1677 | None | N/A |
| NexPoint Multifamily Capital Trust, Inc. | D.I. 1677 | None | N/A |
| VineBrook Homes Trust, Inc. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors II, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors III, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors IV, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors V, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VI, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Advisors VIII, L.P. | D.I. 1677 | None | N/A |
| NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC | D.I. 1673 | Claim No. 146 | Objection filed and in litigation. Debtor believes claim is frivolous. |
| Scott Ellington | D.I. 1669 | Claim No. 187 | Terminated for cause. Debtor exploring options. |
| | | Claim No. 192 | Terminated for cause. Debtor exploring options. |
| Isaac Leventon | D.I. 1669 | Claim No. 184 | Terminated for cause. Debtor exploring options. |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1608
Case 3:25-cv-02072-S      Document 15-11     Filed 10/06/25     Page 491 of 1017     PageID 9238
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1607 of 1803   PageID 12353

# APPENDIX 24

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1609
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25    Page 492 of 1017    PageID 9239
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1608 of 1803    PageID 12354
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 1 of 106

Docket #1807  Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S OMNIBUS REPLY TO OBJECTIONS
TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P. (WITH
TECHNICAL MODIFICATIONS)**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:104855.7 36027/002

1934054210122000000000012

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1610
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 493 of 1017    PageID 9240
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1609 of 1803   PageID 12355
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 106

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

OBJECTIONS ............................................................................................................... 3

    I.      Objections Addressed in the Memorandum ............................................... 3

    II.     The Plan Impermissibly Allows for Set Off ........................................... 4

    III.    The Plan Impermissibly Allows Assumption or Rejection After
           Confirmation .......................................................................................... 6

    IV.    The Attack on the Plan's Release Is Baseless ......................................... 6

           A.     Debtor Release Provisions ............................................................ 6

           B.     Objections and Responses ............................................................ 7

    V.     The Court Has Already Exculpated the Independent Directors and their
           agents For Negligence Pursuant to the January 9, 2020 Settlement Order
           and, to the Extent Not Covered Therein, the Plan's Exculpation Provisions
           Effectuate Essential Protections for Estate Fiduciaries and their agents,
           and Are Fully Supported by the Bankruptcy Code and Applicable Law. ........... 11

           A.     The Settlement Order Already Exculpates the Independent
                    Directors and Their Agents from Claims of Negligence and Those
                    Protections Should Be Continued Post-Confirmation ........................... 12

           B.     Plan Exculpation Provisions ........................................................ 14

           C.     Pacific Lumber .............................................................................. 16

           D.     Exculpation of the Exculpated Parties Is Permissible and Not
                    Prohibited by *Pacific Lumber*. ..................................................... 19

           E.     Approval of the Exculpation Provisions Is a Legitimate Exercise of
                    the Court's Powers and Follows Directly from the Findings and
                    Conclusions the Court Must Make to Confirm a Plan ........................... 24

    VI.    The Plan Injunction Is Appropriate and is Narrowly Tailored to Effectuate
           the Plan and related provisions of the bankruptcy code. ........................ 28

           A.     Plan Injunction Provisions ........................................................... 29

           B.     Objections ..................................................................................... 32

           C.     An Injunction against Interfering with the Implementation and
                    Consummation of the Plan Is Both Common and Appropriate. ............... 33

           D.     The Injunction Is Not a Disguised Non-Debtor Third-Party
                    Release. ......................................................................................... 35

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1611
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25   Page 494 of 1017   PageID 9241
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1610 of 1803   PageID 12356
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 3 of 106

E.      The Injunction Does Not Prevent the Holders of Claims or Equity
        Interests from Enforcing Rights Arising under the Plan or
        Confirmation Order ............................................................................ 37

VII.    The Gatekeeper Provision Is Necessary and Appropriate, and Supported
        by Applicable Law. .......................................................................................... 38

        A.      The Gatekeeper Provision ................................................................. 38

        B.      The Gatekeeper Provision Is Permissible under Sections 105,
                1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code. ............... 39

        C.      The Gatekeeper Provision Is not an Impermissible Extension of the
                Post-Confirmation Jurisdiction of the Bankruptcy Court. ...................... 44

        D.      The Gatekeeper Provision Is Consistent with the Barton Doctrine. ........ 51

        E.      The Gatekeeper Provision Is a Necessary and Appropriate Shield
                against the Actions of Dondero and his Related Entities ........................ 54

VIII.   the exception to discharge does not apply ........................................................... 55

IX.     The Senior Employee Objection ........................................................................ 57

        A.      The Senior Employee Objection Should Be Overruled ........................... 57

        B.      Background Related to Senior Employees ............................................. 58

        C.      Treatment of Senior Employee Claims Under Plan ................................ 62

        D.      Plan Solicitation ............................................................................. 63

        E.      The Plan Does Not Violate Section 1123(a)(4) ...................................... 64

        F.      The Senior Employees Are Not Permitted to Make Convenience
                Class Election ................................................................................. 66

        G.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Applicable
                Bankruptcy Law .............................................................................. 66

        H.      Convenience Class Election Is Unavailable Because Senior
                Employee's GUC Claims Cannot Be Split Under Disclosure
                Statement Order for Voting Purposes ................................................... 68

        I.      Even if Convenience Claim Election Were Available, Convenience
                Claim Election Does Not Impact Voting ............................................... 69

X.      The HCMFA/NPA Gates Objection ................................................................... 70

        A.      The HCMFA/NPA Objection, the CLO Holdco Objection, and
                NREP Joinder Should Be Overruled .................................................... 72

        B.      The CLO Objectors Cannot Override the CLOs' Consent to
                Assumption .................................................................................... 74

        C.      The CLO Objectors Lack Standing to Object to the Plan ......................... 76

DOCS_SF:104855.7 36027/002

**Appellee Appx. 01604**

**Appx. 04469**

**008412**

D.     Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit ................................ 82

E.     Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable .................... 86

F.     The Inadequate Assurance of Future Performance Objection is Meritless ....................................................................................................... 90

G.     The "Impermissible Partial Assignment" Objection is Meritless ............ 92

XI.     State Taxing Authority Objection ........................................................................ 92

XII.     IRS Objection ........................................................................................................ 93

CONCLUSION .......................................................................................................................... 99

DOCS_SF:104855.7 36027/002

**Appellee Appx. 01605**

**Appx. 04479**

**008413**

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp.*
  *(In re Peabody Energy Corp.)*,
  933 F.3d 918 (8th Cir. 2019) .................................................................. 65

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
  *(In re Pac. Lumber Co.)*,
  584 F.3d 229 (5th Cir. 2009) .................................................................. 64

*Bonneville Power Admin. v. Mirant Corp.*
  *(In re Mirant Corp.)*,
  440 F.3d 238 (5th Cir. 2006) .................................................................. 83

*Cajun Elec. Members Comm. v. Mabey*
  *(In re Cajun Elec. Power Coop., Inc.)*,
  230 B.R. 693 (Bankr. M.D. La. 1999) .............................................. 84, 85

*Cargill, Inc. v. Nelson (In re LGX, LLC)*,
  2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) ............................... 75

*Concord Square Apartments v. Ottawa Properties*
  *(In re Concord Square Apartments)*,
  174 B.R. 71 (Bankr. S.D. Ohio 1994) ..................................................... 67

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*,
  2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018) ............. 88

*Figter Ltd. v. Teachers Ins. Annuity Ass'n  (In re Figter Ltd.)*,
  118 F.3d 635, 640-641 (9th Cir. 1997) ................................................... 67

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ................................................................ 71

*Hertz Corp. v. ANC Rental Corp.*
  *(In re ANC Rental Corp.)*,
  278 B.R. 714 (Bankr. D. Del. 2002) ........................................ 74, 75, 80

*Hertz Corp. v. ANC Rental Corp.*
  *(In Re ANC Rental Corp.)*,
  280 B.R. 808 (D. Del. 2002) ................................................................... 75

*In re Acequia, Inc.*,
  787 F.2d 1352 (9th Cir. 1986) ................................................................ 65

*In re ANC Rental Corp.*,
  277 B.R. 226 (Bankr. D. Del. 2002) ....................................................... 89

*In re Gilbert*,
  104 B.R. 206 (Bankr. W.D. Mo. 1989) ................................................... 67

*In re Hartec Enters., Inc.*,
  117 B.R. 865 (Bankr. W.D. Tex. 1990) ................................................... 85

iv

Appellee Appx. 01606

Appx. 04474

008414

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1614
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 497 of 1017 PageID 9244
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1613 of 1803 PageID 12359
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 6 of 106

*In re Irwin Yacht Sales, Inc.*,
   164 B.R. 678 (Bankr. M.D. Fla. 1994) ............................................................... 75

*In re Jacobsen*,
   465 B.R. 102 (Bankr. N.D. Miss. 2011) ............................................................. 84

*In re Jones*,
   2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) ........................................ 67

*In re Latham Lithographic Corp.*,
   107 F.2d 749 (2d Cir. 1939) ............................................................................. 67

*In re Lil' Things, Inc.*,
   220 B.R. 583 (Bankr. N.D. Tex. 1998) ............................................................. 84

*In re Lindell Drop Forge Co.*,
   111 B.R. 137 (Bankr. W.D. Mich. 1990) ........................................................... 66

*In re Riverside Nursing Home*,
   43 B.R. 682 (Bankr. S.D.N.Y. 1984) ............................................................... 75

*In re Virgin Offshore USA, Inc.*,
   No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013) ......... 84

*In re Visser*,
   232 B.R. 362 (Bankr. N.D. Tex. 1999) ............................................................. 66

*Mabey v. Sw. Elec. Power Co.*
   *(In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ............................................................................. 65

*Riemer & Braunstein LLP v. DeGiacomo*
   *(A & E 128 North Corp.)*,
   528 B.R. 190, 199 (1st Cir. B.A.P. 2015) ........................................................... 66

*Texaco Inc. v. Louisiana Land & Exploration Co.*,
   136 B.R. 658 (Bankr. M.D. La.1992) ........................................................... 84, 85

## STATUTES

11 U.S.C. § 365 ................................................................................................ 83, 86

## OTHER AUTHORITIES

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
   (12/23/1997) ................................................................................................... 89

Investment Management Staff Issues of Interest,
   http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] .................. 89

DOCS_SF:104855.7 36027/002

Appellee Appx. 01607

Appx. 04472

008415

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1615
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 498 of 1017    PageID 9245
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1614 of 1803   PageID 12360
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 7 of 106

The above-captioned debtor and debtor-in-possession (the "<u>Debtor</u>") files this omnibus reply to the objections (this "<u>Reply</u>") to the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)*[2] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").    Concurrently herewith, the Debtor has filed its *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "<u>Memorandum</u>").    To the extent the Debtor is unable to consensually resolve the Objections, the Debtor respectfully requests that the Bankruptcy Court overrule any remaining or pending Objections as of the Confirmation Hearing and confirm the Plan.

## <u>INTRODUCTION</u>

1.    The Debtor received twelve objections to confirmation of the Plan, inclusive of joinders (collectively, the "<u>Objections</u>" and each objecting party, an "<u>Objector</u>").    As discussed in greater detail in the Memorandum, seven of the twelve objections were filed by Mr. Dondero either individually or via his related entities (collectively, the "<u>Dondero Entities</u>").    **Exhibit A** lists the Dondero Entities and their relationships to each other.[3]    The following are the Objections filed by the Dondero Entities:

- *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661];

- *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667] (the "<u>Dugaboy Objection</u>");

---

[2] Unless otherwise noted, capitalized terms used in this Reply have the meanings ascribed in the Plan.

[3] As set forth in the Memorandum, none of the Dondero Entities, including the NexPoint RE Entities (defined below), has an actual economic interest in the Estate.

Appellee Appx. 01608

Appx. 04473

008416

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1616
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 499 of 1017 PageID 9246
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1615 of 1803 PageID 12361
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 8 of 106

- *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669] (the "Senior Employee Objection");[4]

- *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670] (the "NPA/HCMFA Objection");[5]

- *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673] (the "NREP Objection");

- *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675] (the "CLOH Objection"); and

- *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676] (the "NexBank Objection").

2.      That leaves the following as the only non-Dondero related Objections:

- *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662] (the "State Taxing Authority Objection");

---

[4] Subsequent to the filing of the Senior Employee Objection, Mr. Waterhouse and Mr. Surgent reached an agreement with the Debtor and will withdraw their objections to the Plan.

[5] The NPA/HCMFA Objection is joined (1) by CLO Holdco, Ltd., through the CLOH Objection, and (2) by the following Dondero-controlled entities: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing (collectively, the "NexPoint RE Entities") [Docket No. 1677] (the "NPRE Joinder").

Appellee Appx. 01609
Appx. 04474
008417

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1617
Case 3:25-cv-02072-S   Document 15-11   Filed 06/25   Page 500 of 1017   PageID 9247
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1616 of 1803   PageID 12362
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 9 of 106

- *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666];

- *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668] (the "IRS Objection");

- *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671] (the "UST Objection"); and

- *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].

As of the date hereof, the Date is working to resolve certain of the non-Dondero related Objections.

3.      To avoid duplication, this Reply does not address each objection individually. Rather, it is organized by substantive objection where possible because of the cross-over in the issues raised in the Objections.  Also, as discussed below, where the Debtor has addressed an Objection in the Memorandum, the response is not repeated here.  However, parts of the Senior Employee Objection, the NPA/HCMFA Objection, State Taxing Authority Objection, and the IRS Objection, are addressed individually below.  A summary chart addressing each Objection and the Debtor's response thereto is attached as **Exhibit B**.

<u>**OBJECTIONS**</u>

**I.      OBJECTIONS ADDRESSED IN THE MEMORANDUM**

4.      The Memorandum addresses the Debtor's compliance with the statutory requirements of sections 1123 and 1129 of the Bankruptcy Code.  As part of the analysis in the Memorandum, the Debtor addresses the portions of the Objections alleging that the Debtor failed to comply with and/or violated the statutory provisions set forth in sections 1123 and 1129 of the Bankruptcy Code.  Specifically, the Debtor addresses the arguments that (i) the Plan provides for

improper subordination; (ii) the Disputed Claims Reserve violates due process; (iii) the Plan does not satisfy the "best interests test;" (iv) the Plan impermissibly provides no Bankruptcy Court oversight of post-effective date transactions; (v) the elimination of vacant classes does not allow for post-Effective Date reclassification of Claims; (vi) the Plan violates the absolute priority rule; (vii) the Plan does not disclose the insiders or the compensation of insiders retained post-Effective Date; (viii) the Plan impermissibly allows modifications to the Plan without Bankruptcy Court approval; and (ix) the Plan is not final because the Plan Supplement is not final.

## II.   THE PLAN IMPERMISSIBLY ALLOWS FOR SET OFF

5.   The NREP Objection and the NexBank Objection erroneously contend that Article VI.M of the Fifth Amended Plan provides for "improper set-off of unidentified claims." NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  The challenged language in the NREP Objection and the NexBank Objection is as follows:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim….  Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

Plan, Art. VI.M.

6.   Article VI.M of the Plan accords with Bankruptcy Code section 558 (formerly section 541(e)), which provides that "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes

Appellee Appx. 01611

Appx. 04476

008419

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1619
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 502 of 1017    PageID 9249
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1618 of 1803    PageID 12364
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 11 of 106

of frauds, usury, and other personal defenses." 11 U.S.C. § 558; *see In re Braniff Airways, Inc.*,

42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) (a debtor in possession may exercise setoff rights

pursuant to Bankruptcy Code section 558 (then section 541(e)); *In re Circuit City Stores, Inc.*,

2009 Bankr. LEXIS 4011 (Bankr. E.D. Va. Dec. 3, 2009) (same); *In re Women First Healthcare,*

*Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) (same); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr.

D. Del. 2002) (same); *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft*

*Corp.)*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) (same).

      7.    In support of the argument that the provision is improper, the NREP Objection

and the NexBank Objection contend that Bankruptcy Code section 553 and cases construing that

provision limit parties' right of setoff in bankruptcy only to prepetition claims. NREP Obj. ¶¶

11-13; NexBank Obj. ¶¶ 10-12. However, the issue of the scope of the Distribution Agent's

setoff rights and the application of section 553 is not even adjudicated by the Plan.[6] Rather, on

its face, the Plan states that the Distribution Agent may exercise setoff rights only "to the extent

permitted by law." Thus, it does not purport to expand setoff rights of the Distribution Agent

beyond what is permitted by the Bankruptcy Code but only preserves whatever setoff rights the

estate has – no more and no less. Moreover, as quoted above, it expressly preserves the right of

creditors to challenge any setoff that the Distribution Agent seeks to take.

      8.    Accordingly, whether the Distribution Agent may take any specific setoffs is

reserved by the Plan for another day. The NREP Objection and the NexBank Objections on this

issue are not well-taken, and both such objections should be overruled.

---

[6] The Debtor reserves its rights with respect to the applicability of section 553 to the Distribution Agent's preserved rights of setoff, if any.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1620
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 503 of 1017    PageID 9250
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1619 of 1803    PageID 12365
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 12 of 106

### III.    THE PLAN IMPERMISSIBLY ALLOWS ASSUMPTION OR REJECTION AFTER CONFIRMATION

9.      The NPA/HCMFA Objection contends that the Plan violates section 365(d)(2) because it allows the Debtor to assume or rejection executory contracts or unexpired leases on or prior to the Effective Date.  While the Debtor believes that the original language in the Plan is defensible, the Debtor has elected to amend the Plan to clarify that all executory contracts and leases must be assumed or rejected on or prior to the Confirmation Date.

### IV.    THE ATTACK ON THE PLAN'S RELEASE IS BASELESS.

#### A.    Debtor Release Provisions

10.      Article IX of the Plan provides for releases only by the Debtor, its Estate, and the Reorganized Debtor (including their successors, the Claimant Trust and the Litigation Sub-Trust) of any and all Causes of Action, including any derivative claims that might be asserted on behalf of, or in the name of, the Debtor, that the Debtor or the Estate could otherwise assert against the Released Parties[7] (the "<u>Debtor Release</u>").  The Debtor Release is the product of extensive good faith, arm's-length negotiations and complies fully with the Bankruptcy Code and prevailing law. The Debtor Release provides:

> On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged ***by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust*** from any and all Causes of Action, including any derivative claims, ***asserted on behalf of the Debtor,*** whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise,

---

[7] The "Released Parties" under the Plan are: (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities); (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.  Plan, Art. I.B., Def. 111.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01613

Appx. 04178

008421

*that the Debtor or the Estate would have been legally entitled to assert in their own right* (whether individually or collectively) *or on behalf of* the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, Art. IX.D (emphasis added.)

11.    The Debtor Release releases, among others, the Independent Directors (each of whom was appointed by the Bankruptcy Court post-petition), Strand (solely from January 9, 2020, the date of the appointment of the Independent Directors, through the Effective Date), the CEO/CRO (who is also an Independent Director and whose role was expanded to include the CEO/CRO role on July 16, 2020), the Committee and its members in their official capacities, the Professionals retained with this Court's approval by the Debtor or by the Committee and, to a more limited extent, the Employees.[8]

12.    The Debtor Release is a release of the Released Parties by the Debtor, the Estate and their successors on account of Causes of Action that belong to the Debtor or the Estate, whether directly or derivatively.  *The Debtor Release does not release any Causes of Action of any person other than the Debtor, the Estate and their successors and does not release any claims that could not have been asserted by the Debtor or the Estate prior to the Effective Date.*

B.    <u>Objections and Responses</u>

13.    Three parties in interest have objected to the Debtor Release.  The Dugaboy Objection objects to the Debtor Release under the mistaken view that the Claimant Trust and Litigation Sub-Trust are (in Dugaboy's view) granting releases of claims that have not yet arisen,

---

[8] The Debtor Release contains restrictions on the releases of the Employees, as may be determined by the Claimant Trust Oversight Committee.  Plan, Art. IX.D.

7

Appellee Appx. 01614

Appx. 04479

008422

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1622
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 505 of 1017 PageID 9252
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1621 of 1803 PageID 12367
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 14 of 106

*i.e.,* causes of action of the Claimant Trust and Litigation Sub-Trust that arise after the Effective Date against the Released Parties. *See Dugaboy Objection* at p. 9. The U.S. Trustee Objection erroneously argues the Debtor Release is an impermissible non-consensual third-party release. *See UST Objection* at pp. 2-3. The Senior Employee Objection objects to the Debtor Release because the Senior Employees believe that the Debtor should not be able to condition a release of the Senior Employees on concessions not required of other Employees obtaining a release. *See Senior Employee Objections* at p. 3.

14. Both Dugaboy and the U.S. Trustee misread the Debtor Release provision. The Claimant Trust and Litigation Sub-Trust are included solely in their capacity as "successors, assigns and representatives" of the Debtor and the Estate, and the Debtor Release applies solely to Causes of Action that ***the Debtor or the Estate*** themselves would have against the Released Parties (whether a direct claim or a derivative claim, but in either case, only Causes of Action owned by the Debtor or the Estate). By its express terms, the Debtor Release does not apply to any future claims or Causes of Action that the Claimant Trust or the Litigation Sub-Trust would have in its own right, based on post-Effective Date acts or omissions, rather than as a successor to or assignee of Causes of Action of the Debtor and the Estate.

15. The U.S. Trustee's contention that the Debtor Release provision includes a third-party release is incorrect. The Debtor Release applies only to claims held by the Debtor and the Estate, on behalf of themselves and each of their successors, assigns and representatives in favor of the Released Parties. Any direct claims and causes of action owned by any other person are not released by the Debtor Release, and nothing in the language of the provision implicates any

DOCS_SF:104855.7 36027/002

Appellee Appx. 01615
Appx. 04489
008423

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1623

Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 506 of 1017    PageID 9253

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1622 of 1803   PageID 12368

Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 15 of 106

non-derivative claims or causes of action that any third party might have against any of the Released Parties.

16.    The Senior Employees' objection to the proposed Debtor Release also is devoid of merit.  As discussed at length, in Section IX, herein, Employees are not entitled, either contractually or legally, to any release.  Nor does a release given to one Employee entitle any other employee to a similar release.  Releases are discretionary and can be provided, in an exercise of discretion, to persons who have provided consideration to the Debtor and the Estate. Unlike the other Released Parties, the Senior Employees have not yet fully provided that consideration.  As the Court is aware, the Committee and the Court have consistently voiced concerns regarding the potential release of the Employees, and specifically, the Senior Employees.  The Plan resolves these concerns by imposing significant restrictions and affirmative requirements for any Employee to obtain the benefit of the Debtor Release and additional requirements for the Senior Employees to do so.  *See* Plan, Art. IX.D.

17.    The Bankruptcy Code explicitly provides for and sanctions the inclusion of debtor releases in plans.  Section 1123(b)(3)(A) of the Bankruptcy Code states clearly that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  The Debtor Release is an essential *quid pro quo* for the Released Parties' significant contributions to the Debtor's restructuring, which has been highly complex and contentious.  There are multiple precedents in which courts have approved releases by a debtor's estate of its own claims against a far more extensive group of persons than those

9

Appellee Appx. 01616

Appx. 04484

008424

included here.[9] The Committee and its members (who are Released Parties), who have had over a year to investigate potential claims against the Employees, among others, fully support the Debtor Release as to the other identified Released Parties.

18.     It is also important to bear in mind that the Debtor Release applies to claims *of the Debtor or the Estate* against the Released Parties that others might purport to assert derivatively on behalf of the Debtor or the Estate.  To the extent that Released Parties have indemnification rights against the Debtor, the assertion of such derivative claims – no matter how specious – would trigger claims for indemnification that would deplete the assets available for distribution to creditors. Moreover, regardless of such rights of indemnification, the assertion of such purported derivative claims on behalf of the Debtor would subject the Debtor to the costs – both economic, in terms of legal fees, and of the time and distraction of personnel – that would result from becoming embroiled in such derivative litigation – again, no matter how specious the claim.

19.     Both the U.S. Trustee and Dugaboy erroneously cite *Pacific Lumber*[10] for the proposition that releases of third parties – even by the debtor – are always impermissible. *Pacific Lumber*, however, did not involve the release of claims by a debtor.  The issue addressed in *Pacific Lumber* was whether a bankruptcy court could approve injunction and exculpation provisions in a plan that effectively mandated that **holders of claims** release, or be precluded

---

[9] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provisions were acceptable settlement under § 1123(b)(3) because the debtors and the estate were releasing claims that were property of the estate); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[10] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 251-253 (5th Cir. 2009) ("*Pacific Lumber*")

DOCS_SF:104855.7 36027/002

Appellee Appx. 01617

Appx. 04182

008425

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1625
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 508 of 1017 PageID 9255
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1624 of 1803 PageID 12370
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 17 of 106

from imposing liability on, **non-debtor third parties**. Nothing in *Pacific Lumber* prevents a debtor or its estate on its own behalf and on behalf of assignees and successors created pursuant to a plan, from releasing its own claims against third parties. Indeed, any such ruling would be directly contrary to the express provisions of section 1123(b)(3)(A).

20. The Debtor Release is a customary plan provision consistent with the business judgement rule, is fair and equitable and in the best interest of the Estate and its creditors and should be approved. No party that has objected to it has cited any case or statutory basis for preventing a debtor and its successors from releasing the debtor's own claims against third parties, or has demonstrated any basis for believing that any claims of the Debtor or the Estate even exist against the Released Parties.

V.     **THE COURT HAS ALREADY EXCULPATED THE INDEPENDENT DIRECTORS AND THEIR AGENTS FOR NEGLIGENCE PURSUANT TO THE JANUARY 9, 2020 SETTLEMENT ORDER AND, TO THE EXTENT NOT COVERED THEREIN, THE PLAN'S EXCULPATION PROVISIONS EFFECTUATE ESSENTIAL PROTECTIONS FOR ESTATE FIDUCIARIES AND THEIR AGENTS, AND ARE FULLY SUPPORTED BY THE BANKRUPTCY CODE AND APPLICABLE LAW.**

21. Exculpation provisions effectuate the entitlement of court-supervised fiduciaries to qualified immunity for their actions. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *In re A.P.I., Inc.*, 331 B.R. 828, 868 (Bankr. D. Minn. 2005), *aff'd sub nom., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 U.S. Dist. LEXIS 34297 (D. Minn. May 25, 2006); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). Such provisions also allow the parties to a chapter 11 case "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any

Appellee Appx. 01618
Appx. 04483
008426

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1626
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25    Page 509 of 1017    PageID 9256
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1625 of 1803    PageID 12371
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 18 of 106

potentially negligent actions in those proceedings" and, on that rationale, have even been approved when necessary to protect non-fiduciary participants in the chapter 11 process. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020).

22.    As discussed in detail below, the Settlement Order[11] previously entered by this Court has already exculpated the Independent Directors and their agents from potential negligence claims. Accordingly, as it relates to the Independent Directors and their agents, the Plan's Exculpation Provisions simply respect the integrity of the Settlement Order.  Moreover, it would be a mistake to construe *Pacific Lumber as* categorically prohibiting exculpation provisions.  In fact, *Pacific Lumber* itself expressly endorsed a plan provision exculpating the committee and its members.  For the reasons set forth below, exculpating the Exculpated Parties in respect of their post-petition services for the Estate is entirely consistent with *Pacific Lumber*, other applicable law, and the purposes and policies of chapter 11.  Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue.

> **A.**    **The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation**

23.    The Objectors challenge the Exculpation Provisions on the grounds that they constitute an impermissible third-party release that is prohibited by *Pacific Lumber*.  What the

---

[11] *See, Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* entered January 9, 2020 [D.I. 339] (the "Settlement Order") and *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* entered July 16, 2020 [D.I. 854].

Appellee Appx. 01619
Appx. 04484
008427

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1627
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 510 of 1017    PageID 9257
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1626 of 1803    PageID 12372
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 19 of 106

Objectors ignore, however, is that this Court has ***already*** exculpated the Independent Directors and their agents for negligence pursuant to the terms of the Settlement Order – a final order to which Dondero agreed as a means of avoiding the appointment of a chapter 11 trustee, and which has been in place for over a year and was never appealed by any of the Objectors, all of whom had notice of it.[12]  Accordingly, the Court should reject Objectors challenge to exculpation of the Independent Directors and their agents as a collateral attack on the Settlement Order which is indisputably a final order of this Court.[13]

      24.      Paragraph 10 of the Settlement Order expressly provides:

> ***No entity may commence or pursue a claim or cause of action of any kind*** against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of <u>willful misconduct or gross negligence</u> against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Settlement Order, ¶ 10 (emphasis added).  Thus, as to the Independent Directors and their agents, they have already been exculpated for negligence, and the Plan Exculpation Provisions simply preserve the necessary protections and standard of liability already established by the Court for these court-appointed fiduciaries by final order which continues in effect pursuant to the plan.[14]

---

[12] *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation and was now collaterally attacking the release).

[13] *See Miller v. Meinhard-Commercial Corp*., 462 F.2d 358, 360 (5th Cir. 1972) ("[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

[14] *See* Plan, Art. IX.H (Paragraphs 9 and 10 of the Settlement Order remain in effect post-Confirmation).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01620
Appx. 04485
008428

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1628
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 511 of 1017 PageID 9258
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1627 of 1803 PageID 12373
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 20 of 106

25. Unlike in *Pacific Lumber*, the Independent Directors (which include the CEO/CRO) are not prepetition officers and directors of the Debtor. The Independent Directors were appointed post-petition by the Court pursuant to the Settlement Order as an urgent measure to address serious concerns raised by the Committee as to extensive breaches of fiduciary duty and lack of disinterestedness by the Debtor's prepetition management. In recognition of the extraordinarily complex, litigious and volatile situation the Independent Directors were getting into, the Court expressly exculpated the Independent Directors (including the CEO/CRO) and their agents from claims for negligence in connection with their actions in the case.

### B. Plan Exculpation Provisions

26. Article IX.C of the Plan addresses the exculpation of certain Exculpated Parties[15] and provides that each Exculpated Party shall be exculpated from any Cause of Action arising out of acts or omissions in connection with this chapter 11 case and certain related transactions, except for any acts or omissions that are determined by Final Order to have constituted bad faith, fraud, willful misconduct, criminal misconduct, or gross negligence (the "Exculpation Provisions"). Although the Exculpation Provisions apply to Strand and certain Employees, the Exculpation Provisions apply solely with respect to actions taken by Strand and such Employees

---

[15] The Plan defines the "Exculpated Parties" as: (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO, and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

DOCS_SF:104855.7 36027/002

Appellee Appx. 01621
Appx. 04486
008429

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1629
Case 3:25-cv-02072-S    Document 15-11   Filed 06/06/25   Page 512 of 1017   PageID 9259
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1628 of 1803   PageID 12374
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 21 of 106

from and after the date of the post-petition appointment of the Independent Directors, through

the Effective Date of the Plan, and expressly exclude James Dondero and a number of other

specified entities.[16]   The provision provides:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent
> permitted by applicable law, no Exculpated Party will have or incur, and each
> Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment,
> damage, demand, debt, right, Cause of Action, remedy, loss, and liability for
> conduct occurring on or after the Petition Date in connection with or arising out of
> (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and
> pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or
> confirmation of, the Plan; (iii) the funding or consummation of the Plan
> (including the Plan Supplement) or any related agreements, instruments, or other
> documents, the solicitation of votes on the Plan, the offer, issuance, and Plan
> Distribution of any securities issued or to be issued pursuant to the Plan, including
> the Claimant Trust Interests, whether or not such Plan Distributions occur
> following the Effective Date; (iv) the implementation of the Plan; and (v) any
> negotiations, transactions, and documentation in connection with the foregoing
> clauses (i)-(v); *provided*, *however,* the foregoing will not apply to (a) any acts or
> omissions of an Exculpated Party arising out of or related to acts or omissions that
> constitute bad faith, fraud, gross negligence, criminal misconduct, or willful
> misconduct or (b) Strand or any Employee other than with respect to actions taken
> by such Entities from the date of appointment of the Independent Directors
> through the Effective Date. This exculpation shall be in addition to, and not in
> limitation of, all other releases, indemnities, exculpations, any other applicable
> law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2,
> protecting such Exculpated Parties from liability.

27.    An exculpation provision differs from a release.[17]  An exculpation provision sets a

standard of liability that absolves a person from liability for ordinary negligence, but not from

liability for more egregious conduct.  In this respect, it is consistent with the duty of care and

duty of loyalty standards of the business judgment rule that protects business entities and

---

[16] To the extent there is any conflict between the descriptions of the Exculpation Provisions herein and the Plan, the
Plan shall control.

[17] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is
apparently a commonplace provision in Chapter 11 plans," does not affect the liability of these parties, but rather
states the standard of liability under the Code, and as it exculpated the named parties for actions during the course of
the case did not implicate section 524(e).)

DOCS_SF:104855.7 36027/002

Appellee Appx. 01622
Appx. 04487
008430

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1630
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 513 of 1017 PageID 9260
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1629 of 1803 PageID 12375
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 22 of 106

individual fiduciaries from liability when their actions are taken within their authority and good faith.[18]

28.      Various objections have been raised to the inclusion of the Exculpation Provisions in the Plan.  Each of the Objectors argues that, except with regard to the Committee and its Professionals, the Exculpation Provisions are impermissible based upon their misunderstanding and overly-broad reading of the opinion of the Fifth Circuit in *Pacific Lumber*.[19]

### C.      Pacific Lumber

29.      Because every argument relied upon by the Objectors as to the permissibility of the Exculpation Provisions is premised on *Pacific Lumber*, it is important to analyze exactly what the Fifth Circuit actually held based on the appeal and the briefing before it.  The portion of the *Pacific Lumber* opinion addressing non-debtor exculpation and releases is less than two pages long and, when appropriately construed, is inapposite to this case, except insofar as it approved the exculpation of the creditors' committee and its members.

30.      In *Pacific Lumber*, a prepetition secured creditor joined with a competitor of one of the debtors to propose a chapter 11 plan (the "MRC/Marathon Plan").  The MRC/Marathon Plan included a provision that exculpated the plan proponents, the reorganized debtors, the unsecured creditors' committee and each of their respective professionals, officers and directors from liability (other than for willful misconduct and gross negligence) relating to proposing, implementing and administering the chapter 11 plan.  The bankruptcy court approved the

---

[18] *See* Bernard S. Sharfman, *Importance of the Business Judgement Rule*, Harvard Law School Forum on Corporate Governance, posted at https://corpgov.law.harvard.edu/2017/01/19/the-importance-of-the-business-judgment-rule/

[19] The Objectors acknowledge the Fifth Circuit expressly held that the exculpation of the unsecured creditors' committee and its members and professionals was appropriate.  Therefore, the Exculpation Provisions as applied to these parties will not be discussed further herein.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01623

Appx. 04488
008431

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1631
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 514 of 1017   PageID 9261
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1630 of 1803   PageID 12376
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 23 of 106

discharges, releases, exculpations and injunctions pursuant to sections 105, 524, 1123(a)(5) and 1129.

31.    The appellants were an indenture trustee and certain bondholders who had voted against the MRC/Marathon Plan and were the unsuccessful proponents of a competing plan which, incidentally, contained non-debtor third-party releases and exculpation provisions identical in scope to those in the MRC/Marathon Plan.[20] On appeal, the Fifth Circuit either affirmed or dismissed on mootness grounds in respect of every issue raised on appeal, other than the release and exculpation provisions.  While the issues on appeal had been broadly worded,[21] the only issue in respect of the release and exculpation provisions actually briefed by the appellants was the impropriety of the release and exculpation provisions for the benefit of the non-debtor plan proponents and the committee.[22]

32.    The Fifth Circuit relied **_exclusively_** on section 524(e) of the Bankruptcy Code for its observation that non-consensual releases or exculpations of non-debtors are not allowed, even for actions taken during the case.  _Id._ at 252-3.  Section 524 is entitled "Effect of discharge" and subsection 524(e) provides that a "discharge of a debt of a debtor does not affect the liability of

---

[20] _See First Amended Chapter 11 Plan for Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (as modified on April 28, 2008)_ [_In re: Scotia Development LLC, et al._, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 2774], Sections 10.1, 10.3 and 10.4.

[21] _See The Indenture Trustee's Statement of Issues on Appeal of the Order Confirming the MRC/Marathon Plan_ [_In re: Scotia Development LLC, et al._, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 3431] at p. 4, Issue No. 18.

[22] _See Brief of Appellants_ [_Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee,_ Case No.08-40746, U.S. Court of Appeals for the Fifth Circuit, August 25, 2008], at pp. 55-56 ("The Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against numerous non-debtors, including "officers, directors, professionals, members, agents and employees" of MRC, Marathon and the Committee. . . . **_Having obtained confirmation of the Plan through the erroneous means set forth above, the Plan Proponents propose to use this overbroad release language to exonerate_** themselves.") (emphasis added; record cites omitted)

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1632
Case 3:25-cv-02072-S  Document 15-11  Filed 06/06/25  Page 515 of 1017  PageID 9262
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21  Page 1631 of 1803  PageID 12377
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21  Entered 01/22/21 18:52:03  Page 24 of 106

any other entity on . . . such debt." Thus, on its face, section 524(e), only prohibits a plan from discharging obligations of third parties who are liable with the debtor on its debts. The Fifth Circuit focused on co-liability for "pre-petition debts,"[23] yet applied the prohibition to causes of action for "any negligent conduct that occurred during the course of the bankruptcy."[24]

33.     Notably, the briefing on the issue presented to the Fifth Circuit had dealt with the impropriety of the exculpation of the non-debtor plan proponents and the committee, <u>but not</u> with the officers and directors of the Debtor. Thus, to the extent the Fifth Circuit included the debtor's officers and directors in its discussion, that discussion constituted mere *dicta*.

34.     Although the Fifth Circuit ruled that section 524(e) did not support exculpation for certain persons, such as the non-debtor plan proponents in that case, the Court did not treat section 524(e) as an absolute bar to exculpation provisions in a plan that were supportable by other sections of the Bankruptcy Code, by other applicable law or by legitimate policy considerations relating to the chapter 11 process. In approving the exculpation as to the committee and its members, the court cited to the qualified immunity of committees under section 1103(c) of the Bankruptcy Code and to an important policy concern regarding the effect of denying exculpation on the chapter 11 process: "actions 'against committee members in their capacity as such should be discouraged. If members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee.' The

---

[23] *Id.* at 252.

[24] *Id.*

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1633
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 516 of 1017 PageID 9263
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1632 of 1803 PageID 12378
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 25 of 106

Creditors' Committee and its members are the only disinterested volunteers among the parties sought to be released here." *Id.,* at 252 (cites omitted).

35.     The Debtor is, of course, not asking this court to override the Fifth Circuit's holding in *Pacific Lumber*. Rather, as discussed below, the facts of this case are such that the rationale applied by the Fifth Circuit to permit exculpation of the committee and its members fully supports the Plan Exculpation Provisions. The need for exculpation has already been recognized by this Court in the Settlement Order. Furthermore, as the *Pacific Lumber* ruling was based solely on section 524(e), nothing in that opinion precludes approval of the Exculpation Provisions pursuant to other provisions of the Bankruptcy Code or other applicable law.

**D.     Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*.**

36.     The propriety of the Plan Exculpation Provisions should be considered as they apply to each respective Exculpated Party.

37.     <u>The Debtor</u>. The Debtor and its successors and assigns are entitled to the relief embodied in the Exculpation Provision. With exceptions not applicable here, the Debtor, as debtor in possession, has all the rights and powers of a trustee. 11 U.S.C. § 1107(a). Accordingly, the Debtor's right to qualified immunity is co-extensive with that of a trustee. Moreover, granting the Debtor such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code. *See* 11 U.S.C. §§ 524 and 1141. The Claimant Trust and Litigation Sub-Trust are successors to and assigns of the Debtor, and thus, to the extent applicable to the scope of the Exculpation Provisions, should be similarly protected. In the context of this Plan, the Claimant Trust and Litigation Sub-Trust are court-approved fiduciaries

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1634
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 517 of 1017 PageID 9264
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1633 of 1803 PageID 12379
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 26 of 106

whose sole purpose is to operate the Debtor's business for a limited period of time to effectuate an orderly monetization of the Debtor's assets and pay the claims of creditors. Post-Confirmation, the Debtor and its successors are entitled to exculpation.

38.     The Independent Directors.   Even if the Settlement Order did not plainly provide the Independent Directors with exculpation, in the context of this case, the Independent Directors are akin to committee members and the same rationale the Fifth Circuit used in *Pacific Lumber* to uphold the exculpation of committee members applies to the Independent Directors. The use of independent directors has become commonplace in large complex commercial cases, both on the eve of bankruptcy[25] and post-petition,[26] especially where there are allegations of mismanagement, breaches of fiduciary duty or other conflicts that cast shadows on the relationship between the debtor in possession and its creditors, who question whether existing officers and directors can faithfully perform their fiduciary duties as the face of the debtor in possession.[27]   Independent directors tend to be either experienced restructuring professionals

---

[25] Some examples of major bankruptcy cases in which independent directors have been appointed just prior to bankruptcy, usually due to accounting  irregularities and other events that resulted in distrust of management by major creditor constituencies, include: *Neiman Marcus Group, Inc.* (S.D. Tex); *WorldCom* (S.D. N.Y.); *Sears* (S.D. N.Y.); *California Pizza Kitchen* (S.D. Tex.); *PG&E Corp.* (N.D. Cal.); *Adelphia Communication Corp.* (S.D. N.Y.); Station Casinos (D. Nev.); and *Cengage Learning Centers* (E.D. N.Y.).

[26] *See* Regina Kelbon and Michael DeBaecke, *Appointment of Independent Directors on the Eve of Bankruptcy: Why the Growing Trend*, paper prepared for the Penn. Bar Institute 19th Annual Bankruptcy Institute, June 27, 2014, at pp. 17-23, available at
https://www.blankrome.com/siteFiles/publications//B3795676DF921A7E3BED8A9F15E7FDF3.pdf (discussing use of independent directors both pre- and post-petition and certain cases utilizing same).

[27] *See, e.g., In re Natrol, Inc*., Case No. 14-22446 (Bankr. D. Del.) Motion and Order Appointing Independent Directors [Docket Nos. 248 and 305] (independent directors appointed to settle motion for appointment of trustee by large creditor); *In re 4 West Holdings, Inc.,* Case No. 18-30777 (Bankr. N.D. Tex) Motion and Order Appointing Independent Directors [Docket Nos. 311 and 383] (independent director appointed to review propriety of certain settlements and business and marketing plan); *In re Synergy Pharmaceuticals, Inc*., Case No. 18-14010 (Bankr. S.D.N.Y.) Motion and Stipulation and Order Appointing Independent Directors [Docket Nos. 373 and 553] (independent directors appointed because of pending shareholder derivative actions against prepetition board members); *In re Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) Order Appointing Independent Director [Docket No. 267] (independent director appointed as part of a mediated settlement over sale of a portfolio of financial services entity debtor]; *In re Interlogic Outsourcing, Inc.*, Case No. 19-31444 (Bankr. N.D. Ind.) Motion

DOCS_SF:104855.7 36027/002

Appellee Appx. 01627
Appx. 04492
008435

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1635
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 518 of 1017 PageID 9265
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1634 of 1803 PageID 12380
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 27 of 106

(attorneys or financial advisors) or seasoned industry professionals with immaculate corporate records. Reliance on the use of independent directors has thus become a critical tool in proper corporate governance and restoring creditor confidence in management in modern day corporate restructurings. Failure to protect independent directors from claims of ordinary negligence will discourage sophisticated restructuring personnel from accepting appointment to such roles and will have a substantial negative effect on the efficacy of the chapter 11 process and the efficient realization of its purposes and goals.

39. The Independent Directors appointed in this case are persons of such stature, as they include a former bankruptcy judge, former commercial bankruptcy practitioners and a person with expertise in hedge fund operations. As indicated by the Fifth Circuit in *Pacific Lumber*, if estate fiduciaries who are "disinterested volunteers" can be sued for actions taken during the course of a case pursuant to the Bankruptcy Code and under judicial supervision, qualified people would not serve, and the integrity of the chapter 11 process would be compromised. This policy concern is particularly acute where, as here, the Independent Directors undertook their duties in the midst of a highly contentious and litigious case.

40. In this case, the Independent Directors also are analogous to bankruptcy trustees. Section 1107(a) of the Bankruptcy Code provides that a debtor in possession has all of the rights and powers, and substantially all of the duties, of a bankruptcy trustee, and the case law makes it clear that the debtor in possession and its officers and directors serve in the same fiduciary capacity as a trustee. The Independent Directors were approved by the court to serve as post-

_____

and Order Appointing Independent Directors [Docket Nos. 198 and 394] (independent director appointed for general corporate oversight).

Appellee Appx. 01628
Appx. 04493
008436

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1636
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 519 of 1017 PageID 9266
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1635 of 1803 PageID 12381
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 28 of 106

petition fiduciaries in this case in order to resolve insistent and urgent demands for the appointment of a trustee to supplant the prepetition directors and senior officers. In fact, the Court denied the U.S. Trustee's motion seeking appointment of a chapter 11 trustee based primarily on its approval of the Independent Directors to act as court-supervised fiduciaries for the Debtor and the Estate – the functional equivalent of a chapter 11 trustee. It is well established that trustees have qualified immunity for acts taken within the scope of their appointment. *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981). Like trustees, the Independent Directors are estate fiduciaries. *In re Houston Regional Sports Network, L.P.*, 505 B.R. 468, 481-82 (Bankr. S.D. Tex. 2014) (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)

41.     For the same reasons that the Fifth Circuit upheld the exculpation of committee members in *Pacific Lumber*, and <u>pursuant</u> to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code and the related applicable non-bankruptcy law governing the immunity and exculpation of fiduciaries, none of which were actually addressed in *Pacific Lumber*, the Exculpation Provisions should be approved as to the Independent Directors and CEO/CRO.

42.     <u>Professionals.</u> The Debtor's Professionals are entitled to exculpation. *See, In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990 (5th Cir. 2019) (protecting counsel for trustee from suit when acting pursuant to direction of its client within the scope of its employment); *Harris v. Wittman (In re Harris)*, 590 F.3d 730 (9th Cir. 2009)(same). There is no distinction in the Bankruptcy Code between counsel for a trustee and counsel for a debtor in possession – both are

DOCS_SF:104855.7 36027/002

Appellee Appx. 01629
Appx. 04494
008437

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1637
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 520 of 1017 PageID 9267
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1636 of 1803 PageID 12382
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 29 of 106

subject to court approval of their retention, both serve as counsel to estate fiduciaries and both are subject to their actions and compensation being reviewed and approved by the Court.[28]

43.    Additionally, under applicable Texas law, attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation.  *See Cantey Hanger, LLP v. Byrd, 467 S.W.3d 477, 481* (Tex. 2015); *see also Troice v. Proskauer Rose, L.L.P.,* 816 F.3d 341 (5th Cir. 2016) (dismissing securities fraud litigation brought by third parties against counsel for certain companies related to Ponzi scheme perpetrator Allen Stanford).

44.    <u>Strand.</u>  It is appropriate to include Strand in the Exculpation Provisions.  Strand is the Debtor's general partner, and the Independent Directors are the directors of Strand.  Strand should be protected to the same extent as the Debtor and the Independent Directors, and for the same reasons.  *See In re Houston Reg'l Sports Network, L.P.,* (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)  In regard to Strand, the Exculpation Provisions apply solely with respect to actions taken by Strand from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

45.    <u>Employees.</u>  The Employees, as agents of the Independent Directors, are already covered by the Settlement Order's exculpation provision for acts taken in furtherance of and

---

[28] *See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),* 200 F.3d 382  (5th Cir. 2000) (order approving final fee application of court-appointed professional was *res judicata* in respect of subsequent lawsuit by trustee alleging malpractice and negligence where potential claims were known to trustee at the time of final fee hearing.).  *See also, Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925 at 931 (5th Cir.), *cert. denied,* 527 U.S. 1004 (1999) (judgment in bankruptcy court lawsuit brought by reorganized debtor seeking fee disgorgement against accountant for debtor for failure to disclose relationship with potential litigant was *res judicata* in respect of subsequent state court lawsuit by debtor for malpractice).

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1638
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 521 of 1017 PageID 9268
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1637 of 1803 PageID 12383
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 30 of 106

under the direction and supervision of the Independent Directors in administering, managing and operating the Debtors. However, even if the Employees were not already covered by the Settlement Order, it would be appropriate to include the Employees in the Exculpation Provisions. The Exculpation Provisions apply to the Employees solely with respect to actions taken by the Employees from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

**E.      Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan**

46.      The Debtor is seeking approval of the Exculpation Provisions in its Plan pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code; the qualified immunity of bankruptcy trustees and their agents, and the correlative qualified immunity of debtors in possession; the related applicable non-bankruptcy law on immunity and exculpation of fiduciaries; and the strong policy reasons offered by the Fifth Circuit as to committee members, which apply to the Independent Directors in the same way as the Fifth Circuit applied them to committee members. The Bankruptcy Code makes it clear that "any appropriate provision not inconsistent with the applicable provisions of this title" may be included in a chapter 11 plan.[29]

47.      The Fifth Circuit's *Pacific Lumber* ruling denying exculpation to certain parties was based on section 524(e). Some recent court decisions approving exculpation provisions have held, however, that in dealing with complex and litigious bankruptcy cases, section 524(e)

---

[29] 11 U.S.C. § 1123(b)(6).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01631
Appx. 04406
008439

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1639
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 522 of 1017 PageID 9269
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1638 of 1803 PageID 12384
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 31 of 106

is not a bar to setting a standard of liability that limits liability for negligence for acts taken during the course of the case in furtherance of the purpose of chapter 11. For example, in *Blixseth*,[30] the Ninth Circuit (which generally does not permit third-party releases in plans) determined that the exculpation clause at issue did not implicate section 524(e) because it related to post-petition actions that occurred during the bankruptcy process, and did not implicate any potential liability on prepetition debts of the debtor. The Court further explained that, despite prior Ninth Circuit decisions disproving third-party releases relating to such prepetition debts of the debtor, exculpation provisions with third-party releases are permissible because chapter 11 cases are often "highly litigious" where "oxes [sic] are gored" and such releases limited in time and scope "allow the settling parties. . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id*. at 1084. Finally, the court held, as many of its sister circuits have held, that under sections 105(a) and 1123 "the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id*. Significantly, the creditor whose exculpation was at issue in *Blixseth* was not even an estate fiduciary. *Id*. at 1081.

48.     Another court recently dealing with exculpation issues discussed the need for an appropriately-constructed exculpation of estate fiduciaries and exculpation relating to court approved transactions in order to preserve the basic integrity of the chapter 11 process. In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y 2019), the bankruptcy

---

[30] 961 F.3d 1074 (9th Cir. 2020)

DOCS_SF:104855.7 36027/002

Appellee Appx. 01632
Appx. 04497
008440

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1640
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 523 of 1017 PageID 9270
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1639 of 1803 PageID 12385
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 32 of 106

court was presented with a broad exculpation clause in a plan that protected not only court-supervised fiduciaries, but also entities such as the acquirer, the acquirer's professionals, the pre- and post-petition lenders and the indenture trustees. As here, the exculpation provision pertained to acts and omissions taken in connection with and during the bankruptcy case, but excluded acts of fraud, willful misconduct or gross negligence.

49. The court declined to approve the exculpation provision as written, holding that it was overly broad, but nevertheless provided significant guidance on what an appropriate exculpation provision should provide:

> *I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.* If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do. *Cf. Airadigm Commc'ns., Inc. v. FCC (In Re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of the Plan, except for willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation.").

599 B.R. at 720-721 (emphasis added). The Exculpation Provisions in the Plan here are consistent with the policy-based and chapter 11 process-based guidelines provided by Judge Wiles in *Aegean Marine*, in that they apply to court-supervised fiduciaries and transactions entered into under the auspices of the court.

50.     Additionally, the bankruptcy court's power to approve an exculpation provision in a chapter 11 plan flows naturally from the fact that it cannot confirm a chapter 11 plan unless it finds that the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code and the plan has been proposed in good faith.[31]  The plan is the culmination of the chapter 11 case.  By confirming a plan and making the "good faith" finding, the court is determining that the plan proponent (usually, the debtor) and its officers and directors have acted appropriately throughout the case, consistent with their fiduciary duties and have been administering, managing and operating the debtor in accordance with the provisions of the Bankruptcy Code and applicable law.[32]  Once the court makes its good faith finding, it is appropriate to set the standard of liability of the fiduciaries (and, as in *Blixseth*, other parties) involved in the formulation of that chapter 11 plan.[33]

51.     An exculpation provision appropriately prevents future collateral attacks against fiduciaries of the debtor's estate.  Here, the Exculpation Provisions are appropriate because they provide protection to those parties who served as post-petition court-approved fiduciaries during the restructuring process – relief that in this litigious case, as all participants are painfully aware, is indispensable.  The Exculpation Provisions are in consideration for services rendered, hard work, and perseverance in the face of threats to professional reputation and bodily harm.  The Exculpation Provisions should be approved, and the objections, asserted for the most part by the

---

[31] *See* 11 U.S.C. § 1129(a)(2) and (3).

[32] *See* 11 U.S.C. § 1129(a).

[33] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

DOCS_SF:104855.7 36027/002

Appellee Appx. 01634

Appx. 04499

008442

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1642
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 525 of 1017 PageID 9272
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1641 of 1803 PageID 12387
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 34 of 106

very individual and entities that have created the need for such provisions by turning this case into a war zone, should be overruled.

VI.  **THE PLAN INJUNCTION IS APPROPRIATE AND IS NARROWLY TAILORED TO EFFECTUATE THE PLAN AND RELATED PROVISIONS OF THE BANKRUPTCY CODE.**

52.     The Court should approve the injunction provisions (the "Injunction" or "Injunction Provisions"), set forth in Article IX.F of the Plan.  This is because the Injunction Provisions are necessary and appropriate to enable the Debtor and its successors to carry out, and obtain the benefits of, the provisions of the Bankruptcy Code relating to the Plan and the proper implementation and consummation of the Plan.  Approval of the requested Injunction Provisions is well within this Court's powers.

53.     The Objectors have objected to the Injunction Provisions on several grounds.  The Debtor has reviewed the Injunction Provisions and revised them to address certain of the Objectors' concerns as follows:

- The Injunction and Gatekeeper Provisions have been narrowed to apply only to Enjoined Parties.[34]

- The Independent Directors are no longer included in the second paragraph of the Injunction.

- The Reorganized Debtor and the Claimant Trust have been deleted from the second paragraph of the Injunction in order to eliminate any potential confusion that they were included in any capacity other than as successors to the Debtor, which is now clarified in the third paragraph of the Injunction.

---

[34] "Enjoined Parties" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.  Plan, Art. I.B., Def. 56 (new definition in the Plan (as amended)).

28

**Appellee Appx. 01635**
Appx. 04609
**008443**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1643
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 526 of 1017 PageID 9273
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1642 of 1803 PageID 12388
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 35 of 106

- The Injunction is subject to parties' rights to set off to the extent permitted post-confirmation under sections 553 and 1141 of the Bankruptcy Code.

- The Gatekeeper Provision has been amended to clarify the actions for which parties must first seek the approval of the Bankruptcy Court to pursue.

- The grant of exclusive jurisdiction over the merits previously contained in the Gatekeeper Provision has been removed, and the Gatekeeper Provision has been modified to provide that if the Bankruptcy Court, as gatekeeper, decides an action can be brought, the Bankruptcy Court will adjudicate that action on the merits *only* to the extent the court has jurisdiction to do so.

- Articles IX.G and H of the Plan have been modified to clarify the duration of the automatic stay and other injunctions which are either currently in effect or contained in the Plan.

54. The Injunction Provision, as modified, merely implement and enforce the Plan's discharge, release, and Exculpation Provisions and related provisions of the Bankruptcy Code and enjoin the Enjoined Parties from commencing or maintaining actions to interfere with the implementation or consummation of the Plan. The Injunction Provisions are a necessary part of the Plan because they protect the Plan implementation provisions required to monetize the Debtor's assets and pursue the Causes of Action, all of which has been vociferously and continually opposed and litigated by Dondero and his numerous Related Entities, with such vexatious opposition likely to continue post-confirmation. Several parties – principally Dondero, Dugaboy and his Related Entities – have objected to the Injunction, which is not surprising because Dondero and his Related Entities undoubtedly intend to continue their litigation crusade against the Debtor and its successors after confirmation of the Plan.

A.    **Plan Injunction Provisions**

55. Section IX.F of the Plan is entitled "Injunction" and applies post-Effective Date. The Injunction contains three distinct provisions:

DOCS_SF:104855.7 36027/002

Appellee Appx. 01636
Appx. 04594
008444

56.    Paragraph 1, as amended, provides:

**Upon entry of the Confirmation Order, all** ~~holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons,~~ **Enjoined Parties are and shall be** ~~permanently~~ **enjoined,** <u>on and after the Effective Date,</u> **from taking any actions to interfere with the implementation or consummation of the Plan.**

57.    As revised, paragraphs 2 and 3 provide:

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all** ~~Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are~~ **Enjoined Parties are and shall be** permanently enjoined, on and after the Effective Date, with respect to ~~such~~ <u>any</u> **Claims and Equity Interests, from** <u>directly or indirectly</u> **(i) commencing, conducting, or continuing in any manner** ~~directly or indirectly~~ **any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor** ~~the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering,** <u>enforcing, or attempting to recover or enforce,</u> **by any manner or means** ~~whether directly or indirectly~~ **, any judgment, award, decree, or order against the Debtor** ~~the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (iii) creating, perfecting, or otherwise enforcing in any manner,** ~~directly or indirectly~~ **any** <u>security interest, lien or</u> **encumbrance of any kind against the Debtor** ~~the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (iv) asserting any right of setoff, directly or indirectly, against any obligation due** ~~from~~<u>to</u> **the Debtor** ~~Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or against property or interests in property of** ~~any of the Debtor, Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ <u>the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code,</u> **and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to**<u>, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding</u>

DOCS_SF:104855.7 36027/002

Appellee Appx. 01637

Appx. 04692

008445

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1645
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 528 of 1017 PageID 9275
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1644 of 1803 PageID 12390
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 37 of 106

> **paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

Plan, Art. IX.F.

58.     As amended, paragraph 4 of Section IX.F contains a gatekeeper provision (the

"Gatekeeper Provision") which provides:

> **Subject in all respects to ARTICLE XII.D, no ~~Entity~~ Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of ~~this~~ the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such ~~Entity~~ Enjoined Party to bring such claim or cause of action against any such Protected Party; provided, however, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such ~~Entities~~ Employee from the date of appointment of the Independent Directors through the Effective Date. ~~As set forth in ARTICLE XI, the~~ The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate ~~any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted~~ the underlying colorable claim or cause of action.**

Plan, Art. IX.F.

59.     To the extent an Enjoined Party believes it has any claims against a Protected

Party, such Enjoined Party must first seek permission of the Bankruptcy Court to file such action

and demonstrate that the claims it seeks to assert are colorable claims. Subject to certain carve

outs, Protected Parties are defined collectively as:

31

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1646
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 529 of 1017    PageID 9276
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1645 of 1803   PageID 12391
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 38 of 106

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); . . . .

Plan, Art. I.B. Def. 105.   If the Bankruptcy Court determines a claim is colorable, the Bankruptcy Court will make a separate determination as to whether it has jurisdiction to adjudicate such claim on its merits in accordance with the terms of the Plan and applicable law.

### B.    Objections

60.    A number of parties, including Dondero and many of his affiliated, controlled or influenced entities, object to the Injunction Provisions (as identified in the chart of objections attached as Exhibit B).  The Objectors all raise similar arguments and allege:

- The Injunction is ambiguous and overly-broad because the meaning of the phrase "implementation and consummation of the plan" is unclear.

- The Injunction operates post-effective date and enjoins post-confirmation claims against non-debtor third parties for post confirmation conduct.

- The Injunction is a disguised non-debtor third party release.

- The Injunction Provisions prevent holders of Claims and Equity Interests from enforcing rights created by the Plan after the Effective Date.

- The Gatekeeper Provision effectuates an impermissible extension of the jurisdiction of the Bankruptcy Court.

61.    As summarized above and discussed more fully below, the Injunction Provisions, as amended, have addressed certain of these arguments.  The remaining objections, however,

DOCS_SF:104855.7 36027/002

Appellee Appx. 01639
Appx. 04584
008447

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1647
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 530 of 1017 PageID 9277
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1646 of 1803 PageID 12392
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 39 of 106

lack merit and are based on either a misreading of the actual Injunction Provisions or a misstatement of applicable law. Each objection will be addressed below.

**C.     An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate.**

62.     Certain objectors argue that the first paragraph of the Plan Injunction, which enjoins all holders of Claims or Equity Interests and other parties in interest, along with their Related Persons, from taking any action to interfere with the "implementation or consummation of the Plan," is overly-broad and ambiguous because the meaning of the phrase "implementation and consummation of the plan" is somehow unclear. These objections are specious.

63.     An injunction in aid of the effectuation of a confirmed plan is typically included in a plan and confirmation order to prevent actions to impede or frustrate the plan proponent's necessary and appropriate actions after confirmation to effectuate the plan and carry out the court's confirmation order. The Injunction is supported by the express provisions of sections 1123(a)(5), 1123(b)(6), 1141(a), 1141(c), and 1142. The Injunction effectuates the purposes of plan confirmation and chapter 11 and preserves and protects the integrity of the chapter 11 process and the court's orders.

64.     The terms "implementation" and "consummation" are neither vague nor overly-broad; they are both terms found in the text of chapter 11 of the Bankruptcy Code and are well understood – and injunctions against interfering with them are common features of plans confirmed throughout the country, including in this District.[35]   Section 1123(a)(5) expressly

---

[35] *See, e.g., In re Tuesday Morning Corp.* (Case No. 20-31476, Bankr. N.D. Tex.) *Debtor's Second Amended Plan of Reorganization* [D.I. 1913-1] attached to *Order Confirming the Revised Second Amended Joint Plan of Reorganization,* at pp. 90-91/137; *In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States*

DOCS_SF:104855.7 36027/002

Appellee Appx. 01640
Appx. 04505
008448

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1648
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 531 of 1017 PageID 9278
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1647 of 1803 PageID 12393
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 40 of 106

mandates that "a plan <u>shall</u> . . . provide adequate means for the plan's <u>implementation</u>" (emphasis added) and contains a non-exclusive list of what means that could include. In compliance with section 1123(a)(5), this Plan expressly sets out the means for its "implementation." *See* Plan, Article IV: Implementation of Plan. *See also* 11 U.S.C. § 1142. The Injunction would enjoin any interference with these implementation steps.

65. The word "consummation" is also found in the Bankruptcy Code and has been discussed by numerous courts. For example, section 1101(2) defines "substantial consummation" of a plan to be (A) the transfer of the assets to be transferred under the plan; (B) the assumption by the debtor or the successor to the debtor of the management of all of the property dealt with by the plan; and (C) commencement of distribution under the plan. Of course, the term "consummation," without the qualifier "substantial," is more expansive and would extend, for example, to the completion of distributions under the Plan and the disposition of all of the property dealt with by the Plan. *See, e.g., United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (distinguishing "substantial consummation" of a plan from final consummation of a plan, which occurs after the effective date when the plan distributions are concluded.)

66. This portion of the Injunction merely prevents holders of Claims or Equity Interests and other Enjoined Parties from interfering with the actions the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust must take

---

*Bankruptcy Code* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, Sec. 10.5.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01641
Appx. 04586
008449

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1649
Case 3:25-cv-02072-S Document 15-11 Filed 04/06/25 Page 532 of 1017 PageID 9279
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1648 of 1803 PageID 12394
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 41 of 106

to effectuate the terms of the Plan after the Plan is confirmed by the Court. There is nothing nefarious or unusual about this provision and it should be approved.

### D. The Injunction Is Not a Disguised Non-Debtor Third-Party Release.

67. The Injunction does not contain a non-debtor third-party release. As set forth in the Plan, as amended, the Debtor has provided clarification to address the concerns of the Objectors who interpreted the prior provision to effectuate a non-debtor third-party release. The amended second and third paragraphs of the Injunction prevent the Enjoined Parties from taking the enumerated actions on or after the Effective Date against the Debtor or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, except as set forth in the Plan or in the Confirmation Order. The Debtor has eliminated the Independent Directors from these provisions of the Injunction. As revised, nothing in this section of the Injunction does anything more than prevent the Enjoined Parties from taking actions that do not comply with or conform to the provisions of the Plan, and limit holders of Claims and Equity Interests with respect to such Claims and Equity Interests to the recoveries provided under the Plan, all as contemplated by sections 1123(b)(6) and 1141 in respect of claims or interests arising either prepetition or post-petition. The ultimate goal of a chapter 11 case is for a debtor to confirm a plan which, after confirmation, effectively channels all claims and interests of creditors and interest holders to the treatment provided for the pre- and post-petition claims and interests under the plan, and limits the liability of the debtor (including the

DOCS_SF:104855.7 36027/002

Appellee Appx. 01642
Appx. 04587
008450

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1650
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 533 of 1017    PageID 9280
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1649 of 1803   PageID 12395
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 42 of 106

"reorganized debtor") and any successor that receives property of the debtor dealt with by the plan (such as a plan trust) to the liability imposed by that treatment.

68.     Sections 1123 and 1129 of the Bankruptcy Code require a plan to describe how it will treat the claims of creditors and the interests of equity holders, both those that existed prepetition and those that arise during the course of a case.  The purpose of the Injunction is to protect the Debtor and its successors under the Plan – the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust –against litigation to pursue the very same prepetition and post-petition claims and interests that are being treated under the Plan.  As described below, providing the protection of the Injunction to all of such entities is both legal and appropriate.

69.     As to the Debtor, the Injunction is appropriate, because it implements the injunctive relief the Bankruptcy Code affords the Debtor, whether or not it gets a discharge, as a result of plan confirmation.  If the Debtor is entitled to the discharge as contemplated by the Plan, then it is accorded the injunction provided by sections 1141(d) and 524(a).  But even if the Debtor does not receive a discharge then, pursuant to section 362(c)(2)(A), the automatic stay will remain in effect until the case is closed, and the Injunction is in aid of that stay.  Moreover, pursuant to section 1141(c) of the Bankruptcy Code, because **all** of the Debtor's property is "dealt with by the plan," all of that property will be "free and clear of all claims and interests . . . .," both as to property retained by the Debtor, and property transferred to its successors.  Accordingly, the Injunction is an appropriate means of enforcing section 1141(c).

70.     Nothing in the Injunction effectuates a third-party release in contravention of section 524(e) of the Bankruptcy Code.  As to the "Reorganized Debtor," this term simply means

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1651
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 534 of 1017    PageID 9281
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1650 of 1803    PageID 12396
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 43 of 106

the Debtor on and after the Effective Date. *See* Plan, Art. I.B., Definition 112. The Reorganized Debtor, therefore, should be entitled to the same injunctive relief as the Debtor. To hold otherwise would be illogical.

71.      The Claimant Trust and Litigation Sub-Trust are successors to the Debtor – both in structure and in assets. Neither the Claimant Trust nor the Litigation Sub-Trust come into existence until the Effective Date, and thus, the only liability they could have to the holders of Claims and Equity Interests would be the liability to treat such Claims and Equity Interests as set forth in the Plan. All of the property of the Claimant Trust and Litigation Sub-Trust is property of the Debtor and the Estate that these Trusts will receive from the Debtor and the Estate pursuant to the Plan on the Effective Date and is "dealt with" by the Plan. Accordingly, under section 1141(c), that property will be received and held by the Claimant Trust and the Litigation Sub-Trust "free and clear of all claims and interests of creditors and equity security holders." Paragraph 2 of the Injunction is in aid of this provision and, in the words of section 105, is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code, *i.e.,* section 1141(c).

### E.      The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.

72.      The Injunction does not prevent holders of Claims or Equity Interests from enforcing, after the Effective Date, rights arising under the Plan or the Confirmation Order. The scope of the Injunction is specifically subject to the Plan, the Confirmation Order and any other order of the Court. Thus, the right of the holder of a Claim or Equity Interest to receive its plan distributions, as set out in the Plan, is not impacted – such persons are merely enjoined from

Appellee Appx. 01644
Appx. 04509
008452

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1652
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 535 of 1017    PageID 9282
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1651 of 1803   PageID 12397
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 44 of 106

taking the enumerated actions to enforce their Claims or Equity Interests outside of the Plan process and treatment.  If, for example, the Claimant Trust made distributions to certain creditors but not others, those who did not receive their distribution, would be free to enforce the provisions of the Plan contract.  This is clear from the language of the Injunction, which begins "[e]xcept as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . ."  Plan, Art. IX.F.

73.    The Injunction is not a third-party release, does not prevent enforcement of the provisions of the Plan itself, and is neither vague nor overly-broad.  The Court should overrule the objections and approve the Injunction in aid of the consummation and administration of the Plan as appropriate and consistent with sections 362, 1123 and 1141 of the Bankruptcy Code.

## VII.    THE GATEKEEPER PROVISION IS NECESSARY AND APPROPRIATE, AND SUPPORTED BY APPLICABLE LAW.

### A.    The Gatekeeper Provision

74.    Paragraph 4 of Section IX.F contains neither a release nor an injunction.  Rather, Paragraph 4 contains a provision that requires any Enjoined Party that believes it has any claims against a Protected Party "**that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing**" to first seek leave from the Bankruptcy Court to pursue such alleged claims and present evidence as to why it believes it has a colorable claim against the

**Appellee Appx. 01645**
**Appx. 04519**
**008453**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1653
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 536 of 1017 PageID 9283
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1652 of 1803 PageID 12398
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 45 of 106

Protected Person. As discussed below, provisions such as this one, which have been referred to as "gatekeeper" or "channeling" provisions, are neither uncommon nor impermissible.

75. It should come as no surprise that Dondero and his cohorts are the only ones who object to the Gatekeeper Provision. The last thing they want is for a court that has had the misfortune of familiarizing itself with their antics to pass on the *bona fides* of any new tactics and lawsuits they may conjure up to stymie this case. However, as set forth below, their challenges to this Court's power and jurisdiction to pre-screen if their new lawsuits are colorable represent wishful thinking.

**B. The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code.**

76. The Gatekeeper Provision is a legitimate exercise of this Court's powers under sections 105,[36] 1123(b)(6),[37] and 1141(a), (b) and (c).[38] The Bankruptcy Court serves as the literal guardian at the gate – determining whether a litigant has a colorable claim and may pass

---

[36] Section 105 is entitled "Power of court" and provides: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[37] Section 1123(b)(6) provides: (b) Subject to subsection (a) of this section, a plan may— (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

[38] Section 1141 is entitled "Effect of confirmation" and provides, in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

Appellee Appx. 01646
Appx. 04514
008454

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1654
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 537 of 1017    PageID 9284
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1653 of 1803   PageID 12399
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 46 of 106

through the gate to the applicable clerk of court and file a lawsuit.  The Debtor recognizes that a Gatekeeper Provision is not found in every chapter 11 plan.  However, this case is not a typical case.  Indeed, recognizing the need for, and importance of, this role under the facts of this case, the Court previously entered the Settlement Order (agreed to by Dondero) which itself contains a gatekeeper provision protecting the Independent Directors.  The purpose of the Gatekeeper Provision in the Plan is to insulate the Protected Persons, many of whom will be either successors to the Debtor or the fiduciaries charged with continuing the administration of the Debtor's property and causes of action post-Effective Date (which essentially involves the wind-down of the business, the monetization of the Debtor's assets and the distribution of the proceeds of same to pay the Claims of legitimate creditors), from non-stop, vexatious litigation in multiple jurisdictions over every conceivable action they take to implement and consummate the Plan.

77.    Based upon the history and record of this case – including increased activity during the past several weeks – this Court is well aware of the reality of that threat and risk in this case.  During the course of this case, many of the significant actions taken by the Independent Directors have been challenged, litigated and appealed.  Moreover, Dondero has interfered with the Debtor's business operations, resulting in the Court's entry of a Temporary Restraining Order and Preliminary Injunction against him.[39]  A hearing on the Debtor's Motion to Hold Dondero in Contempt is scheduled for February 5, 2021.  The Independent Directors, CEO/CRO, Employees, Committee and its members, and the Professionals of the Debtor and the

---

[39] *Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P)*, Adv. No. 20-03190 (Bankr. N.D. Tex), December 10, 2020 *Order Granting Debtor's Motion for Temporary Restraining Order against James D. Dondero* [D.I. 10] and January 11, 2021 *Order Granting Debtor's Motion for Preliminary Injunction against James D. Dondero* [D.I. 59].

40

Appellee Appx. 01647
Appx. 04512
008455

Committee have been harassed and threatened by Dondero and his Related Entities.  There is no reason to believe these litigious tactics, threats and intimidation will cease post-Confirmation and post-Effective Date; and their unchecked continuance will seriously impair the ability of the Claimant Trust and the Litigation Sub-Trust to implement and effectuate the Plan and carry out the orders of this Court.  The Gatekeeper Provision is essential to the confirmation of this Plan and the efficient effectuation and consummation of the Plan post-Effective Date.

78.    The need for the Gatekeeper Provision is illustrated by the fact that the Independent Directors would not have been able to obtain Directors' & Officers' insurance coverage, upon their appointment, in the absence of the Settlement Order.  Insurers were unwilling to underwrite coverage without a broad exclusion restricting any type of coverage for the Independent Directors if the Settlement Order did not contain the exculpation and gatekeeper provision found in Paragraph 10 of the Settlement Order.  Similarly, the Claimant Trustee, the Litigation Trustee and the Claimant Trust Oversight Board will not be able to obtain coverage for the period of time after the Effective Date without a similar gatekeeper provision.  Accordingly, the failure to approve the Gatekeeper Provision as part of the Plan will completely frustrate the Debtor's ability to carry out the Plan and Confirmation Order.

79.    Gatekeeper provisions are not some new creative attempt to circumvent limitations on bankruptcy court jurisdiction or restrictions on non-consensual third-party releases.  They are utilized by many courts to provide a single clearing court to determine whether a claim is colorable or appropriate under the applicable facts of the main case.  For example, in the *Madoff* cases, the bankruptcy court has served as the gatekeeper for determining

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1656
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 539 of 1017 PageID 9286
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1655 of 1803 PageID 12401
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 48 of 106

whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust.)[40] In the *General Motors* cases, certain issues arose post-effective date in regard to defects in ignition switches. Questions arose as to whether the causes of action arising from those defects were such that "New GM" had liability for them, notwithstanding that it had purchased the assets of the debtor "Old GM" free and clear. The bankruptcy court serves as a gatekeeper for this litigation, determining whether a lawsuit can go forward against New GM or is more properly dealt with as a claim against Old GM.[41]

80. Gatekeeper or channeling provisions similar to this one, and in some instances, more extensive than the proposed Gatekeeper Provision in this Plan, have been approved by other courts in this district. In *In re Pilgrim's Pride Corp.*, 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. January 14, 2010), Judge Lynn, after concluding that *Pacific Lumber* precluded the court from granting certain requested releases and exculpations, determined that nothing in *Pacific Lumber* prevented the court from retaining exclusive jurisdiction over some of the suits against third parties which might otherwise have been covered by the third party protections. *Id.* at *16-17. Judge Lynn then expressly held that the bankruptcy court would "channel to itself any claims that may be asserted against Debtors' management (including their boards of directors and Chief Restructuring Officer) and the professionals based upon their conduct in pursuit of

---

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussion of court's gatekeeper function).
[41] *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing court's gatekeeper function); *In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same).

Appellee Appx. 01649
Appx. 04514
008457

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1657
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 540 of 1017    PageID 9287
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1656 of 1803   PageID 12402
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 49 of 106

their responsibilities during the Chapter 11 Cases." *Id.* at *18, 20-21. In furtherance of this, the confirmation order provided that the court "shall retain **exclusive** jurisdiction over any suit brought on any claim or causes of action related to the Chapter 11 Cases that exists as of the Effective Date against a Committee; any member of a Committee; any Committee's Professionals; Debtors; Reorganized Debtors; or any Protected Person for conduct pertaining to Debtors during the Chapter 11 Cases, and that any entity wishing to bring such suit shall do so in this court;" *Id.* (emphasis added). Thus, in *Pilgrim's Pride*, the court approved a broad retention of exclusive jurisdiction to adjudicate the ultimate merits of certain types of suits against protected parties, rather than merely a gatekeeper provision.

81.     Other courts in this district have agreed with Judge Lynn and ordered similarly. *See, e.g., In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*], Section 10.8(b) at p. 57 (court retained **exclusive** jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added).

82.     In regard to the Independent Directors, the proposed Gatekeeper Provision is a continuation of the provision set forth in Paragraph 10 of the Settlement Order, which, by its terms never expires and is expressly to remain in effect after the Effective Date under the Plan. Moreover, because of the Independent Directors' rights of indemnification against the Debtor,

DOCS_SF:104855.7 36027/002

Appellee Appx. 01650
Appx. 04515
008458

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1658
Case 3:25-cv-02072-S Document 15-11 Filed 06/05/25 Page 541 of 1017 PageID 9288
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1657 of 1803 PageID 12403
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 50 of 106

the Gatekeeper Provision serves the important function of protecting assets that would otherwise be available for distribution to creditors from being depleted by indemnification claims resulting from the assertion of frivolous claims against the Independent Directors.

83.     As to the remaining Protected Parties, the Gatekeeper Provision is a valid exercise of the Court's authority under sections 105 and 1123(b)(6) to prevent the Protected Parties from being embroiled in frivolous litigation designed to derail implementation of the Plan. Importantly, if, in the exercise of its gatekeeper role, the Bankruptcy Court were to determine that a colorable claim exists, then it would allow the prosecution of such claim and the filing of the lawsuit in the court with applicable jurisdiction.[42]

### C.     The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court.

84.     Nor is the Gatekeeper Provision an impermissible extension of the post-confirmation jurisdiction of the bankruptcy court. As discussed above, the Debtor modified the Gatekeeper Provision to eliminate the provision that granted the Bankruptcy Court exclusive jurisdiction to hear any claim that the Court allows to pass through the gate. The Gatekeeper Provision requires a putative plaintiff to obtain Bankruptcy Court approval prior to bringing an action and is in aid of the Court's enforcement of the Confirmation Order and the Plan. It is supported by sections 1141(a), (b) and (c), and thus, by section 105. As amended, nothing in the Gatekeeper Provision is determinative of the jurisdiction of the Court over any particular claim or cause of action. The Gatekeeper Provision only requires the court to determine <u>if a claim is</u>

---

[42] *Texas & P. R. Co. v. Gulf, C. & S. F. R. Co*., 270 U.S. 266, 274 (1926) (Court always has jurisdiction to determine its own jurisdiction).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01651
Appx. 04516
008459

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1659
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 542 of 1017 PageID 9289
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1658 of 1803 PageID 12404
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 51 of 106

colorable.   This is a determination commonly made by bankruptcy courts in the analogous context of determining whether a creditors' committee should be granted standing to file litigation on behalf of a recalcitrant debtor.   *See, e.g., Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).   Thus, the Bankruptcy Court has the jurisdiction to determine if a claim is colorable.

85.     Section 1142(b) provides that post-confirmation, the bankruptcy court may direct any parties to "perform any act" necessary for the consummation of the plan).   *See United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (holding that bankruptcy court had jurisdiction to determine whether arbitration could be used to liquidate claims post-effective date; while the plan had been substantially consummated, it had not been fully consummated, the dispute related directly to the plan, the outcome would affect the parties' post confirmation rights and responsibilities and the proceeding would impact compliance with, or completion of the plan; specifically referencing section 1142(b)).

86.     Several objectors attempt to rely on *Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir.  2001) to argue that the bankruptcy court cannot exercise a gatekeeper role and adjudicate matters related to the administration of the case and the plan.   In fact the opposite is true.   In *Craig's Stores*, the Fifth Circuit expressly recognized that post-confirmation bankruptcy jurisdiction ***continues to exist for "matters pertaining to the implementation or execution of the plan*****.**"   *Id.* at 390 (*citing In re*

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1660
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 543 of 1017 PageID 9290
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1659 of 1803 PageID 12405
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 52 of 106

*Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993) (emphasis added).

87. *Craig's Stores* did not involve a gatekeeper provision necessary to enable the debtor to implement its plan.[43]  In contrast to *Craig's Stores*, the Plan provision that Dondero and other Objectors are challenging pertains to the Court's jurisdiction over matters specifically in aid of the implementation and effectuation of the Plan – acting as gatekeeper – and does not implicate an improper extension of bankruptcy court jurisdiction.  As previously explained, the Gatekeeper Provision is necessary to obtain insurance coverage for the Claimant Trustee, the Litigation Trustee, and the members of the Claimant Trust Oversight Board – all of whom will play critical roles in the implementation of the Plan.  Moreover, unchecked rampant litigation against the Protected Persons, many of whom have indemnification rights against the Debtor, Reorganized Debtor or Claimant Trust would predictably engulf the Reorganized Debtor and Claimant Trust negatively impacting their ability to effectuate and implement the Plan and wasting valuable resources.  *See, In re Farmland Industries, Inc.,* 567 F.3d 1010, 1020 (8th Cir. 2010) (bankruptcy court had "related to" jurisdiction over a claim by a disgruntled bidder against the post-effective date liquidating trustee because the estate was actually paying legal fees of the non-debtor defendants under the estate's indemnification obligations.); *see also Buffets, Inc. v.*

---

[43] In *Craig's Stores*, the issue was whether the court could hear a post-confirmation action brought by the debtor for damages against a bank that was administering the debtor's post-confirmation private label credit card program under an agreement that had been assumed by the debtor in its chapter 11 plan.  On appeal, the Fifth Circuit held that the bankruptcy court did not have jurisdiction to hear the dispute, reasoning that (1) the debtor's claim principally dealt with post-confirmation relations between the parties, (2) no facts or law derived from the reorganization or the plan were necessary to the claim, and (3) the claim did not bear on the interpretation or execution of the debtor's plan.  *Id.* at 391.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01653
Appx. 04518
008461

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1661
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 544 of 1017 PageID 9291
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1660 of 1803 PageID 12406
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 53 of 106

*Leischow*, 732 F.3d 889 (8th Cir. 2013) (related-to jurisdiction existed where bankruptcy estate was obligated to indemnify non-debtor defendants for attorney's fees and other amounts).

88.      In addition, *Craig's* Stores did not involve a liquidating chapter 11 plan, and this case does involve such a plan.  There is persuasive case law, including this Court's decision in *TMXS Real Estate* (discussed below) and circuit-level authority, holding that the scope of the bankruptcy court's post-confirmation jurisdiction in the case of a liquidating chapter 11 plan is broader than that in the case of a chapter 11 plan that is not a liquidating plan.

89.      In *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005), the debtor, a charitable hospital, brought an adversary proceeding against a testator trust, seeking to compel payment from the trust of an amount allegedly due to the hospital as a residual beneficiary under the trust.  The testator had died prepetition, but before the estate's assets were distributed, and the litigation was filed after confirmation of the debtor's liquidating plan of reorganization because the hospital had been unaware it was a beneficiary under the trust.  The trustee had argued that the bankruptcy court had no residual jurisdiction over the debtor's lawsuit against the trustee because the plan had been confirmed, but the bankruptcy court found it had "related to" jurisdiction.

90.      The First Circuit first analyzed the long line of cases (including *Craig's Stores*) which hold that after a debtor emerges from bankruptcy, it enters the marketplace and is no longer under the aegis of the bankruptcy court.  *Id.* at 106-107.  The court did not end its analysis there, however, but dug deeper into the significant distinctions between a liquidating plan and a true reorganization.   Under a liquidating plan, the debtor is not really re-entering the

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1662
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 545 of 1017 PageID 9292
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1661 of 1803 PageID 12407
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 54 of 106

marketplace; rather its "sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Id.* at 107. Thus, while a reorganized debtor may have litigation that clearly is outside the scope of its prior bankruptcy proceeding, that is generally not the case with a liquidating debtor. The court determined that 28 U.S.C. § 1334 had to be applied in conjunction with the applicable facts of the case, and jurisdiction was appropriate. *Id.* A "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11." *Id.*

91. This Court has also recognized the jurisdictional distinction between liquidating plans and operational reorganizations. In *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 2020 Bankr. LEXIS 3205 (Bankr. N.D. Tex. Nov. 12, 2020), this Court held it had jurisdiction to hear a post-confirmation dispute concerning the ability of a liquidating trust, which had been formed pursuant to the plan, to liquidate the stock of the reorganized debtor it received under the plan which involved the issue of whether such action would effectuate a "change in control" that would constitute a default under a lease that had been assumed by the reorganized debtor pursuant to the plan. This Court held that (i) the liquidating trust had been formed for the purpose of liquidating the assets transferred to it pursuant to the plan and distributing the proceeds of those assets to creditors; (ii) the litigation at issue was an attempt to limit the ability of the liquidating trust to effectuate the very purpose for which it had been formed and had to be resolved prior to full consummation of the plan; (iii) resolution of the dispute would require the review of the plan, the confirmation order and possibly other orders of

DOCS_SF:104855.7 36027/002

the court; (iv) the litigation would impact compliance with, or completion of the plan; and (v) the litigation directly related to the plan's implementation or execution.  *Id.* at *21-23.

92.    Just as in the *TXMS Real Estate* and *Boston Regional* cases, the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor exist solely for the purpose of operating the Debtor's business and properties to monetize its assets and pay creditors.  Any "post-confirmation operations" of the Reorganized Debtor will, therefore, be directed towards that monetization process and, furthermore, properly subject to the Court's purview to ensure consummation of the Plan and creditor distributions pursuant to section 1142 of the Bankruptcy Code.  Any prospective, but baseless, litigation over the acts taken by these entities in effectuating the Plan will have a significantly negative impact on the ability of the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor to effectuate the Plan and will deplete the assets otherwise available for distribution to creditors.  The Gatekeeper Provision simply ensures that any such prospective litigation is colorable before it can be filed.

93.    The Fifth Circuit's decision in *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266-67 (5th Cir. 2005), is instructive.  In *Stonebridge*, the liquidating trustee under a confirmed chapter 11 plan sued a landlord in connection with the landlord's draw on a letter of credit that had been provided as security in connection with a real property lease the debtor had rejected during its bankruptcy case, where the trustee was assigned the issuing bank's claim against the landlord for alleged misrepresentation.  Although the Fifth Circuit had concerns over jurisdiction of the bank's assigned claim to the trustee, the court went on to opine that "[u]pon closer review, however,

DOCS_SF:104855.7 36027/002

Appellee Appx. 01656

Appx. 04521

008464

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1664
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 547 of 1017   PageID 9294
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1663 of 1803   PageID 12409
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 56 of 106

additional effects on the estate are evident: a claim by the Bank against [the landlord] affects the need for the Bank to seek reimbursement from Stonebridge's bankruptcy estate. [The landlord's] draw on the Letter of Credit triggered [the debtor's] contractual responsibility to reimburse the Bank for the draw on the Letter of Credit. . . . If the Bank is successful against [the landlord] on its negligent misrepresentation claims, the need for reimbursement from [the bankruptcy] estate is alleviated." *Id.* at 266-267. Accordingly, the court held that the negligent misrepresentation claims of the bank against the landlord fell within bankruptcy jurisdiction. The court noted other cases that involved litigation between third parties that have been found to have an effect on the administration of the bankruptcy estate, including suits by creditors against guarantors and a suit by creditors of a debtor against defendants that allegedly perpetrated a fraud. *Id.* at 267 (*citing* 3 *Collier on Bankruptcy* ¶ 3.01 (15th ed. rev. 2005)).

94.    Based on the reasoning of *Stonebridge*, other courts, including this Court, have held that contingent indemnification rights trigger "related to" subject-matter jurisdiction of state law disputes between two non-debtors in the pre-confirmation context. *See, e.g.*, Principal *Life Ins. Co. v. JP Morgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) (contingent right of indemnity in pre-confirmation litigation between two non-debtors triggers bankruptcy court's pre-confirmation "related to" jurisdiction (*citing Stonebridge*)). In *In re Farmland Industries, Inc.*, the Eighth Circuit has similarly held that it had <u>post</u>-confirmation subject-matter jurisdiction over state law claims between non-debtors where the liquidating trustee was paying the legal fees incurred to defend individuals (former officers and directors) in the dispute.

95.    In sum, in light of the proposed amendments to the Plan and under the circumstances here, Dondero's objection to this Court's jurisdiction to serve as a gatekeeper is not well-taken and should be overruled.  The retention of the *de minimis* jurisdiction to perform the gatekeeper function is clearly supported by Fifth Circuit law.

### D.    The Gatekeeper Provision Is Consistent with the Barton Doctrine.

96.    Support for the Gatekeeper Provision can be found in the Barton Doctrine, which by analogy, should be applied to many of the Protected Parties identified in the Gatekeeper Provision.  The Barton Doctrine is based on the U.S. Supreme Court case, *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881) dealing with receivers.  As this Court has recognized, the Barton Doctrine:

> provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.*, the bankruptcy court) must be obtained. The *Barton* doctrine is ***not*** an immunity doctrine but – strange as this may sound – has been held to be a ***jurisdictional*** provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee ***unless and until*** the bankruptcy court has granted leave for the lawsuit to be filed).

Baron v. Sherman (In re Ondova Ltd. Co.), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, Baron v. Sherman (In re Ondova Co.), 2018 U.S. Dist. LEXIS 13439 (N.D. Tex., Jan. 26, 2018), aff'd., In re Ondova Ltd., 2019 U.S. App. LEXIS 3493 (5th Cir. Tex., Feb. 4, 2019).  The Barton Doctrine originated as a protection for federal receivers, but courts have applied the concept to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including trustees,[44] debtors in

---

[44] *Id.*

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1666
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 549 of 1017    PageID 9296
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1665 of 1803   PageID 12411
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 58 of 106

possession,[45] officers and directors of a debtor,[46] the general partner of the debtor,[47] employees,[48] and attorneys retained by debtors and trustees.[49]  The Barton Doctrine has also been applied to non-court appointed agents who are retained by the trustee for purposes relating to the administration of the estate.[50]  The Barton Doctrine continues to protect those who are within its scope post-Confirmation and post-Effective Date.[51]

97.    The Fifth Circuit has expressly recognized the continuing viability of the Barton Doctrine, notwithstanding the jurisdictional issues raised by *Stern v. Marshall*.[52]  Since the Barton Doctrine is jurisdictional only as to the ability of the prospective plaintiff to file the lawsuit, it does not implicate the issue of expansive post-effective date bankruptcy court jurisdiction as to the actual underlying lawsuit.  Thus, the gatekeeper court can determine if a

---

[45] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also*, 11 U.S.C §§ 1107(a) of the Bankruptcy Code, providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity.

[46] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[47] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

[48] *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (affirming dismissal of lawsuit under the Barton Doctrine due to the plaintiff's failure to seek leave in the bankruptcy court to file an action against the trustee and other parties assisting the trustee in carrying out his official duties).

[49] *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[50] *See, e.g., Wells Fargo Fin. Leasing, Inc. v. Jones*, 2015 WL 1393257, at *3-*5 (W.D. Ky. Mar. 25, 2015) (holding that because defendant acted as bankruptcy trustee's agent in performing duties at the direction of and in furtherance of the trustee's responsibilities, claims asserted against defendant were essentially clams against trustee, and court lacked jurisdiction over the claims under *Barton* Doctrine); *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 817 (E.D. Mo. 2012) (property management company engaged by receiver).

[51] *Helmer v. Pogue* at *15, *citing Carter*, 220 F.3d at 1252-53.  *See also, Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972-73 (9th Cir. 2005) (Barton Doctrine applies to trustee of a post-confirmation liquidating trust formed pursuant to a plan of liquidation); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004) (doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands; suit was for malfeasance of trustee in performing his duties filed after estate was closed.)

[52] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (holding that a litigant must still seek authority from the bankruptcy court that appointed the trustee before filing suit even if the bankruptcy court might not have jurisdiction over the suit itself.)

52

Appellee Appx. 01659
Appx. 04524
008467

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1667
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 550 of 1017 PageID 9297
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1666 of 1803 PageID 12412
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 59 of 106

proposed lawsuit asserts colorable claims, and, if it does, the gatekeeper court can then turn to the separate issue of whether it has jurisdiction over the merits of the lawsuit.

98.     The Barton Doctrine requires a litigant to obtain approval of the appointing or approving court before commencing a suit against court-appointed or court approved officers and their agents – which arguably encompasses most, if not all, of the Protected Parties. The Gatekeeper Provision preserves the integrity of the process, and prevents valuable estate resources from being spent on specious litigation, without impairing the rights of legitimate prospective litigants with potentially valid causes of action. The Gatekeeper Provision is not only a prudent use of the Court's authority under section 105 and is within the spirit of the protections afforded fiduciaries and their agents under the Barton Doctrine – it is also critical to ensuring the success of the Plan.

99.     The Gatekeeper Provision does not effectuate a non-consensual third-party release. It merely requires potential litigants to first vet their alleged causes of action with a single court – the bankruptcy court – before they can be prosecuted. If there has ever been a case where a Gatekeeper Provision is appropriate it is this case. As the Court is well aware, Dondero appears to thrive on litigation. This Court has remarked on many occasions during this case that prepetition, the Debtor operated under a culture of litigation under the control of Dondero. It was the years of sharp practices by the Debtor and an avalanche of litigation against it that resulted in the Debtor commencing a chapter 11 case and the ultimate appointment of the Independent Directors. Faced with impending confirmation and the loss of his company forever, Dondero has turned the tables and the Debtor and the Protected Parties have become his target

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1668
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 551 of 1017 PageID 9298
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1667 of 1803 PageID 12413
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 60 of 106

for litigation. Left unchecked, there is no doubt that Dondero will continue his litigation crusade after the Effective Date and attempt to thwart implementation of the Plan at every turn by commencing baseless lawsuits. Requiring this Court, which approved the appointment of the Independent Directors and has extensive familiarity with the Debtor and this case to first determine whether alleged claims are colorable is prudent and within this Court's authority. Moreover, centralizing the gatekeeper function in one court puts that court in a unique position to ascertain whether there is a pattern of spurious litigation by certain entities and their related parties.

### E. The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities.

100. The Fifth Circuit has recognized that in appropriate circumstances, a federal court can enjoin or issue other appropriate sanctions against vexatious litigants – persons who have a history of filing repetitive and spurious litigation for the purposes of harassment and intimidation. *See* All Writs Act, 28 U.S.C. §1651. In *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017), the Fifth Circuit held that a bankruptcy court could properly sanction certain debtors as vexatious litigants when the debtors and their various family members continually filed litigation to prevent the bankruptcy trustee from performing his duties. When considering whether to enjoin future filings, the court must consider the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01661
Appx. 04526
008469

*Id.* at 815, *citing Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (*quoting*

*Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).

101.    In some circumstances where courts feel that enjoining all future litigation by a

vexatious litigant may be too difficult to articulate or have potential due process implications,

courts essentially issue a gatekeeper injunction.  *See, e.g., Baum v. Blue Moon Ventures, LLC,*

513 F.3d at 189 (after the bankruptcy court and district court were able to piece together that the

Baums interjected themselves in various bankruptcy proceedings by filing vexatious, abusive and

harassing litigation, an injunction was entered preventing the Baums from filing litigation

without the consent of the district court judge.); *Safir v. United States Lines, Inc.,* 792 F.2d 19,

25 (2d Cir. 1986) (Second Circuit agreed the litigant's conduct warranted a pre-filing injunction,

but narrowed the scope such that the litigant had to seek permission from the district court before

filing certain types of additional actions.)

102.    Dondero and his Related Entities are the quintessential vexatious litigants, and the

Gatekeeper Provision is a legitimate tool for the Bankruptcy Court, properly within the

jurisdiction of the Bankruptcy Court, and less burdensome on Dondero and his Related Entities

than a full injunction – which the Debtor believes would be justied in seeking in this case.

**VIII.    THE EXCEPTION TO DISCHARGE DOES NOT APPLY**

103.    The exception to discharge contained in 11 U.S.C. § 1141(d)(3) does not apply.

Section 1141(d)(3) provides that:

> Confirmation of a plan does not discharge a debtor if --
>
> > (A) The plan provides for the liquidation of all or substantially all
> > of the property estate;

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1670
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 553 of 1017 PageID 9300
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1669 of 1803 PageID 12415
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 62 of 106

(B) The debtor does not engage in business after consummation of the plan; and

(C) The debtor would be denied a discharge under section 727(a) of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3).

104.    Since the provisions of § 1141(d)(3) are in the conjunctive, if any one of the three prongs of the test is lacking, confirmation of a plan results in the discharge of debt. House Rep. No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6374-75 ("if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, *and* if the debtor would be denied a discharge under section 727 … then the Chapter 11 discharge is not granted.") (emphasis added); *Financial Sec. Assur. v. T-H New Orleans Lt. Pshp. (In re T-H New Orleans Lt. Pshp.)*, 116 F.3d 790, 804 (5th Cir. 1997) ("[T]his section requires that all three requirements be present in order to deny the debtor a discharge."); *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (the provisions of § 1141(d)(3) are in the conjunctive).

105.    Here, only subpart C of § 1141(d)(3) clearly applies.[53]  With respect to the subpart A of § 1141(d)(3), here, the Plan clearly provides for a gradual liquidation of all or substantially all the estate's assets.  However, a discharge is nonetheless appropriate because an orderly wind down is anticipated to last for up to two years, and the Reorganized Debtor will continue to manage various funds during that period.  Under similar circumstances, at least one court has suggested that the plan would fall outside the policies of § 1141(d)(3)(A).  *In re Enron Corp.*,

---

[53] As a corporate debtor, the Debtor would not receive a discharge under section 727(a) in a Chapter 7.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01663
Appx. 04528
008471

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1671
Case 3:25-cv-02072-S Document 15-11 Filed 04/06/25 Page 554 of 1017 PageID 9301
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1670 of 1803 PageID 12416
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 63 of 106

2004 Bankr. LEXIS 2549, **215-17 (Bankr. S.D.N.Y. July 15, 2004) ("[T]the indeterminate period of retention of the assets after the Effective Date and the clear need for ongoing business operations to maximum value for all creditors in liquidating the assets necessitates the application of the section 1141 discharge to the Reorganized Debtors."). Moreover, even if subpart A of § 1141(d)(3) is met, subpart B of § 1141(d)(3) – engaging in business – is lacking. *T-H New Orleans Lt. Pshp.*, 116 F.3d at 804, n. 15 (holding that the reorganized entity's likelihood of conducting business for two years following plan confirmation satisfies § 1141(d)(3)(B)); *In re River Capital Corp.*, 155 B.R. at 387 (discharge warranted where current management stated its intention to continue to engage in business after consummation of the plan).

## IX. THE SENIOR EMPLOYEE OBJECTION

### A. The Senior Employee Objection Should Be Overruled

106. Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent (collectively, the "Senior Employees")[54] filed the Senior Employee Objection. Subsequent to its filing, Mr. Waterhouse and Mr. Surgent executed a Senior Employee Stipulation (as discussed below) and will withdraw their support of the Senior Employee Objection. The only remaining Senior Employees objecting to the Plan are Mr. Ellington and Mr. Leventon. Mr. Ellington and Mr. Leventon argue, among other previously addressed objections, that the Plan is not confirmable because (1) the Plan violates section 1123(a)(4)'s requirement that claims in the same class be treated the same, and (2) the Debtor has prevented the Senior Employees from

---

[54] Although Mr. Ellington and Mr. Leventon are included in the definition of Senior Employees, they were both terminated for cause and are no longer employees of the Debtor.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1672
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 555 of 1017 PageID 9302
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1671 of 1803 PageID 12417
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 64 of 106

making the Convenience Class Election. These objections are meritless, and the Senior Employee Objection should be overruled.

### B. Background Related to Senior Employees

107. The Debtor's employees, including the four Senior Employees, were eligible to receive compensation under two separate bonus plans: an annual bonus plan and deferred compensation plan. Both of these plans required the employee to remain employed as of the applicable vesting date to receive the bonus. On December 4, 2019, the Debtor filed a motion seeking authorization to pay bonuses under these plans, to which the Committee objected to the inclusion of the Senior Employees. At a hearing on the motion, the Debtor agreed to remove the Senior Employees (*see* 1/21/2019 Hearing Tr., Docket No. 393 at 119:21-22), and the motion was granted as presented at the hearing [Docket No. 380]. Accordingly, the rank and file employees were paid on account of their bonuses that vested in 2020, with the exception of the Senior Employees who have vested bonus claims.

108. On May 26, 2020, each of the Senior Employees filed a single proof of claim against the Debtor in an unliquidated amount.[55] *See* Proof of Claim Nos. 192 (claim of Ellington claiming "not less than $7,604,375"); 184 (claim of Leventon claiming "not less than $1,342,379.68"); (collectively, the "Proofs of Claim"). The Proofs of Claim did not provide any calculations or breakdown of amounts to support the minimum claimed.

---

[55] An amended proof of claim was filed by Mr. Ellington on July 16, 2020. Each Senior Employee asserted that a portion thereof, in a liquidated amount pursuant to the statutory cap of section of section 507(a)(4), is entitled to priority under the Bankruptcy Code. In addition, the portion of the claim related to PTO was classified in Class 6 under the Plan.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1673
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 556 of 1017    PageID 9303
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1672 of 1803    PageID 12418
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 65 of 106

109.    Each Proof of Claim sets forth the following with respect to "compensation"

owed:

> Claimant is owed compensation for his services, including, without limitation, (i)
> all salaries and wages; benefits; (ii) bonuses (including performance bonuses,
> retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv)
> retirement contributions, pensions and deferred compensation.  The amount of the
> Claim for such compensation includes both liquidated and unliquidated amounts.

*See* Claim Nos. 192, 182, 184, 183, each at Attachment ¶3.

110.    The official claims register maintained by KCC lists the general unsecured claim

amount for each Senior Employee as "UNLIQUIDATED."  The claim of each Senior Employee

not requiring separate classification under the Plan (*i.e.*, the priority and PTO portions), was

classified as a General Unsecured Claim in Class 8 (each, a "GUC Claim").

111.    On October 27, 2020, during a hearing on the Debtor's then-existing disclosure

statement, this Court and the Committee were highly critical of the proposed plan provisions

concerning employee releases and strongly suggested that the plan was unlikely to be confirmed

as drafted.  As a result, the Debtor began negotiating with the Committee concerning the terms

on which Senior Employees would be permitted to obtain a release.  Ultimately, the Debtor and

the Committee agreed that the Senior Employee would be required to execute a stipulation with

the Debtor providing for the resolution and payment of deferred compensation at reduced rates

and other consideration in exchange for a Plan release.  Specifically, the Senior Employee

Stipulation, if approved by this Court and signed by the Senior Employee, would allow the

"Earned Bonus" (as defined in the Senior Employee Stipulation) portion of the Senior

Employees' to be treated as a separate Convenience Claim (subject to reduction as set forth in

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1674
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 557 of 1017 PageID 9304
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1673 of 1803 PageID 12419
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 66 of 106

the Senior Employee Stipulation). In exchange for this reduction, and together with the Senior Employee's agreement to (a) cooperate with the Claimant Trustee and Reorganized Debtor, (b) refrain from taking certain actions against those parties, and (c) support and vote in favor of the Plan, the Senior Employee would receive a Plan release and the treatment provided with respect to the "Earned Bonus" in the Plan and Senior Employee Stipulation.

112. As part of its settlement discussions with the Senior Employees, the Debtor provided the Senior Employees with a chart outlining how the reduction of the "Earned Bonus" would work if the Senior Employees executed the Senior Employee Stipulation. This chart was the same chart provided to the Committee in connection with the negotiation of the Senior Employee Stipulation. This chart was never publicly-filed and did not contain "representations" or promises. It was a chart provided to the Senior Employees to illustrate how a portion of the Senior Employees' total claims would be treated if they signed the Senior Employee Stipulation and to describe the consideration that the Senior Employee would provide in exchange for the release contained in the Plan. Notably, the Disclosure Statement included the same calculation that was set forth in the chart provided to the Senior Employees.[56]

113. In no world was the chart – provided in settlement discussions and for substantive purposes – a promise to pay.

---

[56] *See* Disclosure Statement, page 71, which states:

> In addition to the obligations set forth in Article IX.D. of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million. That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01667
Appx. 04532
008473

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1675
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 558 of 1017 PageID 9305
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1674 of 1803 PageID 12420
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 67 of 106

114.    Despite this, the Senior Employee Objection argues that such chart "shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it separately shows the reduced recovery" if they sign the Senior Employee Stipulation.  The Senior Employees further argue that the chart evidences the Debtor's intent that the Senior Employees could elect Convenience Class treatment of their "Earned Bonus" whether or not they executed the Senior Employee Stipulation.  As set forth above, nothing in the chart supports that argument.  The chart was simply a illustration of how the Senior Employee Stipulation would work if executed and the consideration that would be given by each Senior Employee for the release.[57]

115.    Finally, the Senior Employees' comments were solicited on all but the economic terms of the Senior Employee Stipulation.  The Senior Employees were also encouraged to raise any issues they had with the Senior Employee Stipulation to the Committee and/or this Court.  The Senior Employees' counsel at Winston & Straw provided comments on the Senior Employee Stipulation, which both the Debtor and the Committee accepted.  The Senior Employees themselves, however, refused to comment despite having the opportunity to do so and instead demanded that the Debtor retract the Senior Employee Stipulation because it did not reflect an agreement between the Senior Employees and the Debtor. On information and belief,

---

[57] As part of the Plan negotiations, Mr. Seery engaged in multiple conversations with all or some of the Senior Employees. Some of these conversations were with counsel; some were not. In each case, however, the conversations were part of a broader settlement discussion. During these discussions, the Senior Employees asked questions about how the Senior Employee Stipulation would work but also made blatant threats about how they would react if they were not treated in the manner they deemed appropriate.  Mr. Seery made no promises to the Senior Employees during these conversations.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1676
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 559 of 1017    PageID 9306
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1675 of 1803    PageID 12421
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 68 of 106

the Senior Employees never approached the Committee to discuss the Senior Employee Stipulation.  The only communication with this Court has been the Senior Employee Objection.

116.    None of the Senior Employees elected to sign the Senior Employee Stipulation. Subsequent to the filing of the Senior Employee Objection, Mr. Seery discussed with Mr. Waterhouse and Mr. Surgent the possibility of signing the Senior Employee Stipulation, and Mr. Waterhouse and Mr. Surgent elected to sign the Senior Employee Stipulation (with certain revisions).  However, as Mr. Ellington and Mr. Leventon are not currently employed by the Debtor, they are no longer eligible to sign the Senior Employee Stipulation.

### C.    Treatment of Senior Employee Claims Under Plan

117.    The Plan provides the following treatment to the Class 8 GUC Claims of the Senior Employees:

> Treatment:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

Plan, III.H.8.

118.    The Plan provides that a Holder of a General Unsecured Claim may make a "Convenience Class Election" as follows:

> "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim *that is a liquidated Claim as of the Confirmation Date on their Ballot* to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.[58]

---

[58] A "Convenience Claim" is defined as:

DOCS_SF:104855.7 36027/002

Appellee Appx. 01669
Appx. 04534
008477

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1677
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 560 of 1017 PageID 9307
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1676 of 1803 PageID 12422
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 69 of 106

Plan, I.B.43 (emphasis added).

119. As discussed above, the Senior Employees' claims are unliquidated and were disclosed as unliquidated on the official claims register maintained by KCC. As unliquidated and unsecured claims, the Senior Employees' claims are, in each case, Class 8 (General Unsecured Claims), and, as holders of unliquidated GUC Claims, none of the Senior Employees were entitled to make the Convenience Class Election.

120. Irrespective of their claims, the Senior Employees are not entitled to a release under of the Plan unless they execute a Senior Employee Stipulation. *See* Article IX.D.

**D. Plan Solicitation**

121. Although each of the Senior Employee's GUC Claim was classified *in toto* as Class 8 (General Unsecured Claims), the Senior Employees erroneously received both a Class 7 (Convenience Class) and Class 8 (General Unsecured) Ballot. Except for Mr. Surgent, each of the Senior Employees voted their Class 8 (General Unsecured Claim) ballot to reject the Plan, and each of the Senior Employees voted their erroneously Class 7 (Convenience Class) ballot to reject the Plan. Mr. Surgent abstained from voting on the Plan. Because they have now executed the Senior Employee Stipulation, Mr. Waterhouse and Mr. Surgent's votes will be cast to accept the Plan.

---

any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

Plan, I.B.41.

DOCS_SF:104855.7 36027/002

**Appellee Appx. 01670**
**Appx. 04535**
**008478**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1678
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 561 of 1017    PageID 9308
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1677 of 1803    PageID 12423
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 70 of 106

**E.     The Plan Does Not Violate Section 1123(a)(4)**

122.     Section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

123.     The Senior Employees argue that the Plan does not treat them the same as other Employees in the same class because the Senior Employees are not automatically being granted a release under the Plan, whereas other Employees are being granted a release automatically upon confirmation. However, the Senior Employees conflate treatment of their claims with the decision not to automatically provide them a release. The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided. The releases under the plan are not part of the "treatment" of Class 7 or Class 8 claims.

124.     Indeed, the releases granted under the Plan are part of an entirely different section of the Plan (Article IX). Debtors are not required to grant releases to anyone nor are they required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees.[59] Nonetheless, the Debtor, after extensive negotiations with the Committee (which did not want to provide *any* release to the Senior Employees) presented the Senior Employees with a mechanism by which the Senior Employees could obtain a release *if* they agreed to the conditions of the Senior Employee

---

[59] Indeed, the grant of third party releases is heavily scrutinized and could not be granted to all general unsecured creditors across the board as part of the Plan's treatment of general unsecured claims. *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01671
Appx. 04536
008479

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1679
Case 3:25-cv-02072-S Document 15-11 Filed 06/25 Page 562 of 1017 PageID 9309
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1678 of 1803 PageID 12424
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 71 of 106

Stipulation.[60] But just as the Senior Employees were not required to sign the stipulation,[61] the Debtor cannot be forced to provide a release to each Senior Employee just because it has provided releases to other Employees. Nor would this Court or the Committee have allowed the Debtor to provide releases to the Senior Employees without those Senior Employees providing additional consideration to the Debtor's estate. As the Court will recall, at the October 28, 2020, the Court specifically told the Debtor that it would be hard-pressed to approve releases to certain of the Debtor's employees if such employees did not provide consideration for the releases.[62] The Senior Employee Stipulation was crafted to address the Court's concerns by conditioning the release of *certain* of the Debtor's employees on the provision of other consideration.

125. Finally, the Senior Employees devote considerable time arguing that the proposed Senior Employee Stipulation suffers from numerous defects and that the terms are too harsh. But

---

[60] As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor, they are not eligible to sign the Senior Employee Stipulation. Accordingly, they are not entitled to a release regardless of the Senior Employee Stipulation.

[61] While voluntary agreement is expressly excepted from section 1123(a)(4) anyway, debtors are permitted to treat one set of claim holders more favorably than another so long as the treatment is not on account of the claim but for distinct, legitimate rights or contributions from the disparately-treated group separate from the claim. *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019). The Ninth Circuit, for instance, upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest. *See In re Acequia, Inc.*, 787 F.2d 1352, 1362-63 (9th Cir. 1986) ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998) (plan proponent's payments to certain members of power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]"). Here, too, the release consideration required from the Senior Employees *solely in order for the Senior Employees' to obtain a release* relates to their positions as senior employees rather than their position as general unsecured creditors.

[62] *See* Hearing Transcript, Oct. 28, 2020, at 30:17-22:

> So, and I'll just throw in one last bit of food for thought. . . the Debtor has had a year now, close to a year now, to knock some of these out, you know, maybe reach some compromises with some of the related Highland parties and officers, to maybe participate in the plan with some sort of contribution, and it's just not happening. It's not happening. . . . So, at this point, I would be hard-pressed to protect any nondebtor defendants who aren't ponying up something to the whole plan reorganization process.

Appellee Appx. 01672
Appx. 04527
008480

those objections are irrelevant to confirmation. If the Senior Employees believed that the cost of the release was too high, they had no obligation to sign the Senior Employee Stipulation.

**F.    The Senior Employees Are Not Permitted to Make Convenience Class Election**

126.    The Senior Employees next argue that the Debtor has improperly prevented the Senior Employees from electing Convenience Class treatment for a portion of their Claims. Under applicable bankruptcy law, the Plan, and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.[63]    Further, even if the Senior Employees were entitled to elect a Convenience Class Election for a *portion* of their Class 8 Claims for distribution purposes, as discussed below, their Claims are only entitled to be voted in Class 8 for voting and numerosity purposes.

**G.    Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law**

127.    The Senior Employees argue that the "Earned Bonus" portion of each GUC Claim is "liquidated"[64] and therefore eligible for the Convenience Class Election.[65]    The "Earned

---

[63] The Senior Employees claim the Debtor's statements contradict the plan; however, any purported contradiction stems from the Senior Employees' misstatement of the Debtor's position.  Indeed, even if the Debtor had made contradictory statements, it is irrelevant.  The Plan says what it says and the Debtor cannot unilaterally change the terms of the Plan with respect to a select group of creditors.  While a Class 7 Ballot was mistakenly sent to the Senior Employees, the Senior Employees cannot make the Convenience Class Election under the Plan because they each hold a single, unliquidated Class 8 Claim.

[64] The Plan did not need to define the term "liquidated."  Generally, a debt is liquidated if the amount due and the date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2) to a simple mathematical formula.  *In re Visser*, 232 B.R. 362, 364-65 (Bankr. N.D. Tex. 1999).  However, even if the Earned Bonus *portion* is liquidated in that the amount is capable of being ascertained, it is not considered liquidated for purposes of voting where the amount owed or formula for calculation are missing from the proof of claim.  *See In re Lindell Drop Forge Co.*, 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990); *see also Riemer & Braunstein LLP v. DeGiacomo (A & E 128 North Corp.)*, 528 B.R. 190, 199 (1st Cir. B.A.P. 2015) (court looks to proof of claim forms to determine if they sufficiently demonstrate liquidated claims).

[65] None of the Senior Employees' Proofs of Claim contains any liquidated amount with respect to any component of

---

Bonus" portion, even if liquidated, is not a standalone claim entitled to make a Convenience

Class Election, nor can the Senior Employees split their GUC Claim after filing a single proof of

claim. The Senior Employees do not cite any law to support their contention that claims of a

single creditor in a given class, set forth in a single proof of claim, may be split into multiple

claims.[66]  Indeed, case law holds the opposite. Courts have found that where a claimant files a

single proof of claim, even if it covers multiple debts, he is not entitled to split his claims. *In re*

*Jones*, 2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) (noting that the creditor could have

filed multiple proofs of claim to avoid the issue); *see also In re Latham Lithographic Corp.*, 107

F.2d 749 (2d Cir. 1939) (claimant cannot split claim into multiple claims for the purpose of

creating multiple creditors who could vote in a trustee election). The Senior Employees each

filed a single proof of claim: they cannot split their GUC Claim in order to make the

Convenience Class Election under the Plan and applicable bankruptcy law. And the Plan is clear

on this; no other Holder of an unliquidated or partially liquidated Class 8 claim attempted to split

its claim or make the Convenience Class Election.

---

the GUC Claim, including the "Earned Bonus." The Senior Employees appear to make the stunning assertion that the Debtors' books and records establish whether a claim is liquidated and the amount of such claim, even when the proof of claim lists no such amounts. There is no proof of claim on file listing a liquidated amount, no executed stipulation agreeing on a liquidated amount, and no order of the Court setting a liquidated amount. The Senior Employees' assertion that any portion of their GUC Claims is liquidated is untenable.

[66] The cases the Senior Employees cite only support that separate claims, each covered by a separate proof of claim, **_purchased_** from other creditors, are entitled to be counted as separate claims. *See Figter Ltd. v. Teachers Ins. Annuity Ass'n (In re Figter Ltd.)*, 118 F.3d 635, 640-641 (9th Cir. 1997) (claimant entitled to vote multiple claims where it "purchased a number of separately incurred and separately approved claims (each of which carried one vote) from different creditors"); *Concord Square Apartments v. Ottawa Properties (In re Concord Square Apartments)*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) ("purchaser of claims is entitled to a vote for each separate claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (purchased claim arose out of a separate transaction, evidencing a separate obligation for which a separate proof of claim was filed). Notably, in each of these cases a separate proof of claim had been filed for each separate claim, evidencing an entirely separate obligation, and owed to a different party. Here in contrast, each single Senior Employee filed a single proof of claim, and the "Earned Bonus" is a mere *component* of an overall compensation claim stemming from obligations under an employment contract.

Appellee Appx. 01674

Appx. 04539

008482

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1682

Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 565 of 1017   PageID 9312

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1681 of 1803   PageID 12427

Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 74 of 106

**H.      Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes**

128.    Even if splitting claims contained in a single proof of claim were allowed under applicable case law (which it is not) and the Senior Employees were entitled to make the Convenience Claim Election with respect to a portion of their GUC Claim, this Court's Disclosure Statement Order prohibits the splitting of claims within a given class for voting purposes:

> Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

Disclosure Statement Order ¶ 25.b.

129.    Similarly, paragraph 23 provides:

> For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

*Id*. ¶ 23.h.

130.    Read together, these provisions clearly establish that there can be no claim splitting within a class, and no claim splitting between Class 7 and Class 8.  Accordingly, even if claims classified in a given class set forth in a single proof of claim could be split and the Senior Employee were entitled to make the Convenience Class Election, the Disclosure Statement Order precludes the Senior Employees from splitting their claims for voting purposes.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01675

Appx. 04549

008483

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1683
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 566 of 1017 PageID 9313
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1682 of 1803 PageID 12428
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 75 of 106

I.  **Even if Convenience Claim Election Were Available, Convenience Claim
    Election Does Not Impact Voting**

131.  Even if the Senior Employees were deemed to hold separate, liquidated claims on

account of their "Earned Bonuses" that could be split from the remainder of their GUC Claims, a

Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim *for voting*

*purposes*.  Specifically, the Class 8 Ballot, approved by the Disclosure Statement Order,

provides:

> If you check the box below and elect to have your Class 8 General Unsecured
> Claim treated as a Class 7 Convenience Claim; *(i) your vote on this Ballot to*
> *accept or reject the Plan will still be tabulated as a vote in Class 8 with respect*
> *to the Plan, but your Claim (as reduced) will receive the treatment afforded to*
> *Class 7 Convenience Claims;*

Disclosure Statement Order, Exhibit A at 26 (emphasis added).[67]  Accordingly, at most, the

Convenience Class Election only impacts the Senior Employees' treatment for distribution

purposes.  Moreover, even if the Court finds that Mr. Leventon has a liquidated claim that was

entitled to be classified in Class 7 and vote in that class, Mr. Ellington's claim, which exceeds $1

million could not vote in Class 7.  Mr. Ellington would only be entitled to reduce his Class 8

Claim and elect treatment in Class 7 but his claim would otherwise be included in Class 8 for

voting purposes.

132.  For each of the foregoing, independent reasons, each Senior Employee holds a

single, unliquidated claim in Class 8.  No Senior Employee is entitled to split his GUC Claim

under applicable bankruptcy law, and such an action is further prohibited by the Disclosure

Statement Order.  Even if any GUC Claim could be split and the Convenience Class Election

---

[67] The Plan itself is also clear that the Convenience Class Election only impacts *treatment*, and does not impact
*voting*.  *See* Plan, I.B.43; III.H.8.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1684
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 567 of 1017 PageID 9314
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1683 of 1803 PageID 12429
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 76 of 106

was made, the Convenience Class Election only impacts treatment but does not impact voting. Finally, the Senior Employees' argument that their entitlement to make the Convenience Class Election stems from an erroneously mailed ballot is misplaced. As set forth above, the mailing of the Class 7 Ballot was an administrative error and cannot entitle the Senior Employees to rights that contradict the Plan and the Disclosure Statement Order.

**X.      THE HCMFA/NPA GATES OBJECTION**

133.     The Debtor manages fifteen collateralized loan obligations ("CLOs") pursuant to certain agreements, which are referred to sometimes as portfolio management agreements and sometimes as servicer agreements (the "Management Agreements"). Each CLO is a Cayman-domiciled entity that owns a portfolio of loans. They are passive single purpose entities with no ability to self-manage. The CLOs have no employees; however, they do have Cayman-based boards of directors, which have limited duties under Cayman law and which do not actively manage the CLOs. Each CLO contracted with the Debtor as a third-party "Portfolio Manager" to manage the loan portfolio pursuant to the terms of the various Management Agreements. As discussed below, the only parties to the Management Agreements are the Debtor and the respective CLO.

134.     To finance its acquisition of the loans, each CLO issued notes to third party investors. Those notes come in different tranches with different payment priorities. The lowest in priority are called "preference shares," which receive the available residual cash flow after the CLO has made the required payments on the notes. Although called equity, the preference shares are not common equity. The CLOs themselves are purely creatures of contract, and

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1685
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 568 of 1017   PageID 9315
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1684 of 1803   PageID 12430
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 77 of 106

investor rights are governed by the terms of the indentures governing the CLOs (collectively, the "<u>Indentures</u>"), the preference share paying agency agreements, and in certain cases the Management Agreements.[68]   The Indentures define the procedures for buying, managing, and selling the CLOs' assets.   *See generally* Indenture § 12.1; Management Agreement § 2. Fiduciary duties under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>") are owed solely to the CLOs and not their investors.[69]   Nothing in the Indentures or the Management Agreements gives any investor in the CLOs the right to block, interfere with, influence, control, or otherwise direct the asset sale process.   The Management Agreements set forth the Portfolio Manager's duties and obligations and the requirements for removing the Portfolio Manager if investors are not satisfied.

135.   By agreement with CLOs, which are the sole counterparties to the Management Agreements, the Debtor will assume the Management Agreements pursuant to the Plan.   The Debtor and the CLOs have agreed, in summary, that in full satisfaction of the Debtor's cure obligations under section 365(b)(1) of the Bankruptcy Code, the CLOs will receive a total of $525,000, comprising $200,000 within five days of the Effective Date and $325,000 in four equal quarterly payments of $81,250, and that the Debtor and the CLOs will exchange mutual releases.   The Debtor and the CLOs agreed to seek approval of this compromise by adding

---

[68] The Debtor's role is referred to as either the Servicer or Portfolio Manager.  All of the Management Agreements and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all material respects across the CLOs at issue.

[69] The Debtor's fiduciary duties under the Advisers Act are owed to the CLO, not to its investors.  *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006) (under Section 206 of the Investment Advisers Act of 1940 and other provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.").  The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed by contract.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01678
Appx. 04543
008486

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1686
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 569 of 1017 PageID 9316
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1685 of 1803 PageID 12431
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 78 of 106

language to the Confirmation Order. A copy of that language is attached hereto as Exhibit C and will be included in the Confirmation Order.

    **A.**    **The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled**

136.    As the Court is well aware, Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA" and, together with HCMFA, the "Advisors"), are controlled by Mr. James Dondero. Mr. Dondero is also the portfolio manager of each of the investment funds objecting to the Debtor's assumption of the Management Agreements (the "Funds").[70] The Advisors and three of the Funds have actively interfered in the Debtor's management of the CLOs and sought to exercise management authority over the CLOs. This Court ruled on these issues in connection with the Advisors and Funds' *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] (the "CLO Motion").

137.    Now, the Funds and Advisors have objected to confirmation of the Plan and are joined only in their objection by other Dondero-controlled entities – the NexPoint RE Partners and CLO Holdco, Ltd. ("CLO Holdco" and, together with the Funds and the Advisors, the "CLO Objectors"). Although the NPA/HCMFA Objection makes different arguments than those contained in the CLO Motion, the goal of the NPA/HCMFA Objection is the same. It seeks to use this Court to transfer control of the CLOs away from the Debtor and back to Mr. Dondero.

---

[70] The Funds are Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund.

**Appellee Appx. 01679**
**Appx. 04544**
**008487**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1687
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 570 of 1017 PageID 9317
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1686 of 1803 PageID 12432
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 79 of 106

138.   The CLO Objectors contend that the Advisers Act prohibits assignment of the Management Agreements and/or that they are non-assignable personal service contracts.  From this, the CLO Objectors argue that the Management Agreements may not be assumed by the Debtor under Section 365(c) because the "*hypothetical test*" applies in the Fifth Circuit.  They also contend that there is inadequate assurance of future performance because of staff reductions and that the contracts are being modified and thus are being only partially (and so impermissibly) assumed.  The CLO Objectors also speculate that they may be harmed by future investment decisions made by the Debtor because the time-frame contemplated by the Plan for disposition of assets may be shorter than what they believe is optimal to maximize the value of the preference shares.  The objections should be overruled on several grounds:

- The contract counterparties – the CLOs – consent to assumption and will release the Debtor from all claims.

- The CLO Objectors are non-contracting parties with no standing to object on behalf of the CLOs and have pointed to no contractual basis for their assertion of management authority over the CLOs.

- The CLO Objectors cannot create standing by asserting they are creditors of the estate.  Each CLO Objector agreed to the expungement of its claims or has no claims.

- Even if the CLO Objectors were creditors, their standing to object to assumption would be limited to whether it benefits the Estate, and they would *still* lack standing to assert rights belonging to the contracting parties.

- Even if the CLO Objectors had the right to object to assignment, that does not give them the standing to object to the Debtor's assumption of the Management Agreements.

- Even if the Management Agreements were non-assignable, the Debtor could still assume the Management Agreements without consent because the *actual test* applies in the Fifth Circuit.

- Even if the *hypothetical test* applies, "applicable law" does not prevent assignment of the Management Agreements.

- There is no detriment to the Estate in assuming the Management Agreements, and there is no mismatch in investing timelines between the Debtor and the CLOs' investors.

### B.    The CLO Objectors Cannot Override the CLOs' Consent to Assumption

139.    The Debtor and its counterparties (the CLOs) agreed to the assumption of the Management Agreements.  Any objections were waived.  Hence the CLO Objectors' argument is *not* that there is no consent to assume the Management Agreements; it is that the *correct* party has not consented.  In other words, the CLO Objectors are arguing that the CLO Objectors (and therefore Mr. Dondero) have the authority and prerogative to dictate the actions of the CLOs and whether the CLOs should consent to assumption.  This has to be the CLO Objectors' argument because unless the CLO Objectors have such right, they have no standing as non-contracting parties to object under section 365 to the assumption of the Management Agreements.

140.    Only parties to contracts have standing to object to assumption, even when the objector claims that assumption will result in a breach of that contract or violate the law.  *See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.*), 278 B.R. 714, 718-19 (Bankr. D. Del. 2002), *aff'd*, 280 B.R. 808 (D. Del. 2002), 57 F. App'x 912 (3d Cir. 2003).  As the district court explained:

> The language of section 365 is clearly intended to protect the rights of those persons or entities who share contractual relationships with the debtors. In other words, in order to invoke the protections provided in section 365, an entity must be a party to a contract with the debtor.
>
> *    *    *
>
> Although section 365 does confer the right to refuse assignment where excused by applicable law, that right is nevertheless conferred only upon parties to the

Appellee Appx. 01681

Appx. 04546

008489

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1689
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 572 of 1017 PageID 9319
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1688 of 1803 PageID 12434
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 81 of 106

contracts at issue. It creates no separate right of enforcement for other creditors of the estate who are not parties to the contract. Therefore, even if the appellants feel that the alleged violation of the law may effect them, they have not demonstrated that they have the legal right to enjoin such a violation.

*Hertz Corp. v. ANC Rental Corp. (In Re ANC Rental Corp.)*, 280 B.R. 808, 817-18 (D. Del. 2002); *see also Cargill, Inc. v. Nelson (In re LGX, LLC)*, 2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) (creditor had standing on whether court should approve settlement between trustee and another creditor, but no standing under § 365 on whether quitclaim license from trustee to that creditor violated applicable patent law because it was not party to contract); *In re Riverside Nursing Home*, 43 B.R. 682, 685 (Bankr. S.D.N.Y. 1984) (assignee of rents is not "party to such contract or lease" so as to confer standing under section 365); *In re Irwin Yacht Sales, Inc*., 164 B.R. 678 (Bankr. M.D. Fla. 1994) (denying standing to co-owner notwithstanding her economic interest since she was not party to the lease); *see also ANC Rental*, 57 F. App'x at 916 (citations omitted) ("Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.")

141.     The only parties to the Management Agreements are the Debtor and the respective CLOs. Consequently, the CLO Objectors are effectively asking the Court to treat them as the contracting parties, so that they, rather than the CLOs, may decide whether to oppose assumption. But an adjudication of the CLO Objectors' rights vis-à-vis the CLOs is not before the Court. Regardless, this assertion of management authority over the CLOs was already

DOCS_SF:104855.7 36027/002

Appellee Appx. 01682
Appx. 04567
008490

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1690
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 573 of 1017 PageID 9320
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1689 of 1803 PageID 12435
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 82 of 106

rejected by Court as "almost Rule 11 frivolous." In the CLO Motion, the movants sought to restrict sales of the CLOs' assets on terms that they believed might be disadvantageous to the holders of preference shares, but they could not substantiate any contractual basis for the exercise of such management authority.[71]

142. The only acknowledgement of this Court's ruling in the NPA/HCMFA Objection is offered in a footnote, in which the CLO Objectors suggest that the issues are different "in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed."[72] In all honesty, the Debtor has no idea what the Objector's statement means, but whatever it means, the underlying issue and rationale are the same here as in the CLO Motion. As before, the issue is who has the right to make business decisions for the CLOs, and in both the CLO Motion and here, the proffered justification is a nonspecific risk that investment decisions may be made with which the CLO Objectors disagree.

**C.    The CLO Objectors Lack Standing to Object to the Plan**

       **1.    The CLO Objectors Rights Under the Management Agreements Are Not Affected by the Plan**

---

[71] 12/16/20 Tr. of Proceedings at 64:1-10.

> This is almost Rule 11 frivolous to me. You know, we're -- we didn't have a Rule 11 motion filed, and, you know, I guess, frankly, I'm glad that a week before the holidays begin we don't have that, but that's how bad I think it was, Mr. Wright [of K&L Gates] and Mr. Norris. This is a very, very frivolous motion. Again, no statutory basis for it. No contractual basis. You know, you didn't even walk me through the provisions of the contracts. I guess that would have been fruitless. But you haven't even shown something reasonable, some lack of reasonable business judgment.

[72] The CLO Objectors state: "The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis." Obj. at 5, n. 4.

76

Appellee Appx. 01683
Appx. 04548
008491

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1691
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 574 of 1017    PageID 9321
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1690 of 1803    PageID 12436
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 83 of 106

143.    The CLO Objectors offer four bases for standing in the Objection.  The first is that "in several of the Servicing Agreements, the CLO Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the CLO Objectors have standing to object to their rights being limited or eliminated."  Obj. at 27.  Elsewhere they state that the Management Agreements "generally allow the holders of preference shares to remove the portfolio manager for cause" and may provide for a certain percentage of holders of Preference Shares to remove a manager without cause. Obj. at 11.

144.    As an initial matter, nowhere in the NREP Joinder do any of the NexPoint RE Partners allege or state that they have any interest in the CLOs.  Without an interest in the CLOs, the NexPoint RE Partners cannot allege that any of their rights are affected.  Further, nowhere in the NPA/HCMFA Objection is there any attempt to establish any basis on which the CLO Objectors are presently entitled to replace the Debtor as the Portfolio Manager or authorized to decide for the CLOs whether the CLOs should consent to the Debtor's assumption of the Management Agreements.  This is telling.

145.    As set forth in the Management Agreements, the Debtor can only be removed as Portfolio Manager *for cause* by a majority of the preference shares that are *not* held by affiliates of the Debtor.   By the CLO Objectors own admission, they only hold a majority of the preference shares in eight of the fifteen CLOs at issue.  That means that the CLO Objectors have

77

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1692
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 575 of 1017 PageID 9322
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1691 of 1803 PageID 12437
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 84 of 106

*no* right to remove the Portfolio Manager in approximately half of the Management Agreements. However, even with respect to the CLOs in which they hold a majority of the preference shares, the CLO Objectors cannot remove the Debtor unless cause exists – and cause does not exist. Moreover, the CLO Objectors, under the Management Agreements, are prohibited from replacing the Debtor because each of the CLO Objectors should be considered an affiliate of the Debtor for purposes of the Management Agreements and therefore be prohibited from exercising removal rights. Finally, on January 9, 2020, this Court entered an order (the "January Order"), which, in pertinent part, stated that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor." [Docket No. 339] It is beyond dispute that each of the CLO Objectors is for all intents and purposes Mr. Dondero, and Mr. Dondero should not be allowed to do by proxy what he was prohibited by this Court from doing directly.

146. However, whether the CLO Objectors have the right to remove and replace the Debtor as Portfolio Manager is not a question that will be decided by the Plan nor will the CLO Objectors' rights to remove the Debtor – whatever they are – be impacted by the Plan. On January 6, 2021, the Debtor filed that certain *Debtor's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero*, Adv. Proc. No. 20-03000-sgj, Docket No. 6] (the "Adversary Complaint"). In the Adversary Complaint, the Debtor seeks a declaratory judgment that the CLO Objectors have no right to replace the Debtor under the Management Agreements for the reasons set forth above, among others. The CLO Objectors should assert their rights, if any, at the hearing on the Adversary Complaint, not through an objection to

DOCS_SF:104855.7 36027/002

Appellee Appx. 01685
Appx. 04559
008493

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1693
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 576 of 1017    PageID 9323
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1692 of 1803    PageID 12438
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 85 of 106

assumption.  Consequently, the CLO Objectors' rights, if any, under the Management Agreement will be determined by this Court in a separate hearing, and will not be impacted by the Plan.

### 2.  The CLO Objectors Lack Standing to Object to Assumption as Creditors or Parties in Interest

147.    Two of the CLO Objectors' four claimed bases for standing are that they are creditors, or at least parties in interest, and as such have standing to object to assumption of the Management Agreements "especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole," and under sections 1129(a)(1)-(3) because assumption of the Management Agreements purportedly violates the law. Obj. at 27.  These arguments fail for numerous reasons.

148.    First, these arguments for standing are circular.  If a party lacks standing to object to assumption of a contract because it has no protected interest in the contract under section 365, it cannot argue that a plan should not be confirmed because of the assumption of such contract. A party cannot use an objection to a plan to create standing under section 365.

149.    Second, the CLO Objectors are not creditors.  As set forth in the Memorandum, each of the Advisors, the Funds, and CLO Holdco filed claims in this Case; however, each of those parties voluntarily agreed to have their Claims expunged or reduced to $0.00.  None of the NexPoint RE Entities filed claims.  As such, the CLO Objectors are barred from asserting that they have prepetition claims against the Debtor or its Estate.  The CLO Objectors also cannot create claims by asserting that they will have claims arising from the rejection of the shared services agreements with the Debtor.  *None* of the shared services agreements are being rejected. Each of the shared services agreements is freely terminable.  In November 2020, the Debtor

Appellee Appx. 01686
Appx. 04554
008494

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1694
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 577 of 1017 PageID 9324
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1693 of 1803 PageID 12439
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 86 of 106

provided notice that the shared services and other agreements were being terminated. Such agreements will terminate no later than January 31, 2021, which is prior to the anticipated Effective Date of the Plan. Because none of the shared services agreements are being rejected, none of the CLO Objectors will have a rejection damages claim.

150. Third, *even if* any of the CLO Objectors were creditors: "[E]ven creditors do not have standing to raise the rights of a landlord or contract party under section 365. . . While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another." *In re ANC Rental*, 278 B.R. at 718-19 (citations omitted). As the bankruptcy court held in *ANC Rental*, the CLO Objectors cannot usurp the CLO's standing to object to assumption.

151. Fourth, as set forth below, there is no "applicable law" prohibiting assumption and/or assignment for purposes of Section 365(c) and therefore no argument under section 1129(a). Each of the Management Agreements can be assumed and could be assigned without the consent of any party (although the CLOs have consented to assignment). Therefore, there is no violation of law.

152. Finally, the CLO Objectors cannot boot strap into standing by arguing that the assumption of the Management Agreements will not benefit the estate. First, it is anticipated that the Debtor's chief executive officer and chief restructuring officer will testify as to how assumption benefits the estate. Second, granting the relief requested by the CLO Objectors would be catastrophic to the Debtor's estate. The Debtor's inability to assume the Management

Appellee Appx. 01687
Appx. 04552
008495

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1695
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 578 of 1017    PageID 9325
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1694 of 1803  PageID 12440
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 87 of 106

Agreements does not mean that the CLO Objectors will be magically installed as Portfolio Manager. It means that the Management Agreements will be rejected and that *none* of the CLOs will have a Portfolio Manager following the Confirmation Date. Any damage to the CLOs will presumably be part of the claims asserted by the CLOs against the Debtor in connection with that rejection. Those claims are currently incalculable. The Debtor also has exposure to each of the CLOs and any loss in value caused by having no Portfolio Manager would directly impact the Reorganized Debtor's and Claimant Trust's assets. Even assuming the CLO Objectors can appoint themselves Portfolio Manager in the CLOs in which they hold a majority of the preference shares (which is contested and which in no event would happen by the Confirmation Date), that still leaves approximately half of the CLOs without a manager. It is beyond disingenuous for the CLO Objectors to argue that there is no benefit to the estate in assuming the Management Agreements while at the same time arguing that those same agreements should be rejected with the Debtor suffering the consequences.

### 3. The Contractual Right to Object to Assignment of the Management Agreements Does Not Create Standing to Object to Their Assumption

153. The fourth and final basis for standing is: "[I]n several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the CLO Objectors. The CLO Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the CLO Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the CLO Objectors." Obj. at 28.

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1696
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 579 of 1017 PageID 9326
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1695 of 1803 PageID 12441
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 88 of 106

154.    For purposes of standing, the CLO Objectors asserted contractual right to object to assignment of the Management Agreements is irrelevant, for three reasons.  First, there is no assignment here.  The Debtor is assuming the Management Agreements with the consent of the CLOs.  Second, even if it were correct that (a) the CLO Objectors have a contractual right to object to assignment, and (b) the *hypothetical test* applies, they still have no interest in the contract that would permit them to enforce section 365's protections for their benefit in derogation of the rights of the actual contracting parties.  Third, as discussed immediately below, the *actual test* applies in the Fifth Circuit, and thus the Management Agreements would be assumable even if they were not assignable.

### D.    Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit

155.    As the CLO Objectors recognize, there is a split of authority among the circuits regarding the appropriate test to apply to determine whether:

- a contract that is otherwise non-assignable under applicable non-bankruptcy law  can be assumed by a debtor  under Bankruptcy Code section 365(c)(1); and

- whether the same contract can be terminated if it contains an "ipso facto" clause pursuant to Bankruptcy Code section 365(e)(2)(A).

The Fifth Circuit has ordered lower courts to apply the so-called *actual test* in considering whether an ipso facto termination clause can be enforced under Bankruptcy Code section 365(e)(2)(A).  For the reasons set forth below, even though the Fifth Circuit has not ruled on the issue directly, the *actual test* has been applied by every bankruptcy court that has considered the issue in the Fifth Circuit to assumption of contracts under Bankruptcy Code section 365(c)(1).

82

Appellee Appx. 01689
Appx. 04554
008497

Accordingly, the *actual test* should be applied in this Case to conclude that the Management Contracts can be assumed by the Reorganized Debtor without the consent of any party.

156. The Fifth Circuit's decision in *Bonneville Power Administration v. Mirant Corporation* applied the *actual test* to a determination of whether a contract can be terminated as a result of the filing of a bankruptcy case under Bankruptcy Code section 365(e)(2). *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006). The reasoning in *Mirant* also supports application of the *actual test* to Bankruptcy Code section 365(c)(1). Specifically, in *Mirant,* a non-debtor counterparty sought to terminate its executory contract with the chapter 11 debtor based on an ipso facto clause after the debtor filed for bankruptcy. In support of its argument, the non-debtor counterparty relied on section 365(e)(2)(A) and asserted that, under applicable law, the Anti-Assignment Act, 41 U.S.C. § 15 (which generally prohibits the transfer of contracts to which the United States is a party), it was excused from accepting performance from or rendering performance to the trustee or an assignee. Critically, in reaching its conclusion that the *actual test* applied, the Fifth Circuit relied on cases analyzing section 365(c)(1).

157. While the CLO Objectors would like this Court to believe there is some risk that if faced with the direct question of whether the *actual* test also applies under section 365(c)(1), the Fifth Circuit would reach a different result, that argument strains credibility. Notwithstanding the technical language differences[73] between the two statutes, the same test

---

[73] Subsection (e)(2) provides that the invalidation of ipso facto clauses does not apply to an executory contract where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties[.]" 11 U.S.C. § 365(e)(2). This language is very similar—but not identical—to the language employed by subsection (c)(1), which speaks to excusing

Appellee Appx. 01690

Appx. 04555

008498

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1698
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 581 of 1017 PageID 9328
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1697 of 1803 PageID 12443
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 90 of 106

must apply to both the assumption of a contract under section 365(c)(1) and the termination of a

contract under section 365(e)(2)(A). There is no logical reading of these two subsections that

would support application of different tests. The language of section 365(e)(2)(A) is intended to

allow the counterparty to a contract that cannot be assumed or assigned to enforce its remedy of

termination so that it is not in limbo while the bankruptcy case proceeds. Section 365(c) cannot

be read in isolation from the other subsections. It would make no sense for a court to hold that a

contract cannot be assumed because the *hypothetical test* applies, but nonetheless cannot be

terminated because the *actual test* applies. For this reason, every lower court in the Fifth Circuit

that has considered the issue has held that the *actual test* applies to a debtor's assumption of

contracts under section 365(c). *See In re Virgin Offshore USA, Inc.*, No. 13-79, 2013 U.S. Dist.

LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013):

> Though the *Mirant* court used the actual test in the context of § 365(e), which was
> not amended in the same way as § 365(c) and thus is not subject to the same
> circuit split, the Court nonetheless finds this decision to be an indicator of the way
> that the Fifth Circuit would undertake an analysis under § 365(c). Further, in *In
> re O'Connor*, the Fifth Circuit appears to have applied an actual test to determine
> that a partnership interest was strictly personal under Louisiana law, thus not
> assumable under § 365(c). The court did not expressly adopt the actual test
> because, regardless of the test applied, the partnership interest would have been
> unassumable under § 365(c); however, the language used in the opinion indicated
> a predilection for the actual test.

*See also In re Jacobsen*, 465 B.R. 102, 105-06 (Bankr. N.D. Miss. 2011); *Cajun Elec. Members*

*Comm. v. Mabey (In re Cajun Elec. Power Coop., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La.

1999); *In re Lil' Things, Inc.,* 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v.*

*Louisiana Land & Exploration Co.,* 136 B.R. 658, 669 (Bankr. M.D. La.1992); *In re Hartec*

---

performance from, or rendering performance to, "an entity other than the debtor or the debtor in possession" as
opposed to just "the trustee or [] an assignee." Compare *id*. § 365(c)(1) with § 365(e)(2).

Appellee Appx. 01691

Appx. 04556

008499

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1699

Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 582 of 1017 PageID 9329

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1698 of 1803 PageID 12444

Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 91 of 106

*Enters., Inc.,* 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990), *vacated by settlement,* 130 B.R. 929

(W.D.Tex. 1991).

158. Moreover, other bankruptcy courts within the Fifth Circuit have expressly

rejected the *hypothetical test,* concluding that:

> If the court were to adopt the [hypothetical test] and focus primarily upon
> assignability, a chapter [sic] 11 filing would have the virtual effect of rejecting
> executory contracts covered by section 365(f). As suggested by the court in
> *Texaco,* this analysis would extend section "365(c) beyond its fair meaning and
> intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's
> enterprise."

*Cajun Elec.,* 230 B.R.at 705 (Bankr. M.D. La. 1999)  (quoting *Texaco,* 136 B.R. at 670).

159. The CLO Objectors prediction that the Fifth Circuit would apply a different test

under subsection 365(c) than it does under 365(e) is based solely on the use of the word "or"

rather than "and" in subsection 365(c).  However, the language cited by the CLO Objectors in

the statute is the same language that was considered by each of the lower courts in the Fifth

Circuit; each of those courts nonetheless applied the *actual test.*  The CLO Objectors reading is

overly simplistic and imposes a literal reading that, as noted by the *Cajun Electric* Court above,

is "beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation

of the debtor's enterprise."  *Id.*  Accordingly, the argument that assumption of the Management

Contracts must be evaluated using the *hypothetical test* is unavailing and contrary to this

Circuit's case law.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01692

Appx. 04557

008500

E.    **Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable**

160.    The CLO Objectors, assuming the *hypothetical test* applies, contend the Management Agreements cannot be assigned or assumed under section 365(c)(1) without the consent of the contracting party because they are non-assignable personal services contracts and because Section 205(a)(2) of the Advisers Act proscribes assignment of such contracts without consent.  Under these circumstances, the CLO Objectors argue that "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor. . . ."  11 U.S.C. § 365(c)(1)(A).

161.    This Court has previously (and correctly) rejected both of these arguments – at that time made by the Debtor under the control of Mr. Dondero – in *In re Acis Capital Management, L.P., et al*, Case No. 18-30264-sgj, Docket No. 549 (Bankr. N.D. Tex. Aug. 30, 2018) (the "<u>Acis Order</u>").  In the Acis Order, this Court held that: (a) the portfolio management agreements at issue were not personal services contracts; and (b) Section 205(a)(2) of the Advisers Act is not "applicable law" precluding assignment under section 365.  Specifically, this Court ruled as follows:

> The court overrules any objection that there is some applicable law that excuses the counterparties to the PMAs [portfolio management agreements] (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. . . . [I]n order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule – any prudent party contracting for another's services considers the other party's skill, expertise, and reputation – and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party

DOCS_SF:104855.7 36027/002

providing services is skilled and reputable – it is whether such services are unique in nature. *See Compass Van & Storage Corp.*, 65 B.R. at 1011. . . . Here. . . [p]ursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique – as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers. Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii). And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." *Id.* § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." . . . As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." . . . Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2).

Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision – the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs. Indeed, in the Southern District of New York, the court held:

> "Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an

DOCS_SF:104855.7 36027/002

investment adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.  Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2)."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 2018 U.S. Dist. LEXIS 90174, at \*12 (S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent.

162.    For the exact reasons found by this Court in the Acis Order, the CLO Objectors' argument that "applicable law" prevents assignment under 11 U.S.C. § 365(c) should be overruled.  First, the Management Agreements are on all fours with the management agreements discussed in the Acis Order.  The Management Agreements have the same delegation provisions, the same assignment provisions, and the same provisions on merger, consolidation, and amalgamation.[74]  The Court has already ruled on these exact agreements and found that they preclude a finding that the Management Agreements are personal services contracts.

---

[74] *See, e.g.,* Servicing Agreement, dated as of November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. ("Grayson Agreement"):

> In providing services hereunder the Servicer may employ third parties including its Affiliates to render advice including advice with respect to the servicing of the Collateral and assistance provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.

(*Id.*, § 2(d))

> In addition any successor Servicer must be an established institution which has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder

(*Id.*, § 12(e))

> Any corporation partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated or any corporation partnership or limited liability company resulting from any merger conversion or consolidation to which the Servicer shall be party or any corporation partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer shall be the successor to the Servicer without any further action by the Servicer the Co-Issuers the Trustee the

Appellee Appx. 01695

Appx. 04569

008503

163.    Second, as this Court ruled, the Advisers Act does not prohibit assignment without consent.  It simply requires that an advisory agreement contain certain language and that any failure to obtain consent is a breach, not a nullification of the assignment.  If the CLO Objectors had done their diligence, they would have realized that the Acis Order is not unique. The SEC has expressly stated that:

> Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2).

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter (12/23/1997); *see also* Investment Management Staff Issues of Interest, http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ("In particular, the staff previously has clarified that Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.").

164.    As such, there is no applicable law prohibiting the assignment – let alone the assumption – of the Management Agreements.  "[F]or section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."  *In re ANC Rental Corp.*, 277 B.R. 226, 236 (Bankr. D. Del. 2002).

---

Noteholders or any other person or entity

(*Id.*, § 31)

DOCS_SF:104855.7 36027/002

Appellee Appx. 01696

008304

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1704
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 587 of 1017    PageID 9334
Case 3:21-cv-00879-K  Document 21  Filed 07/28/21    Page 1703 of 1803  PageID 12449
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 96 of 106

### F.  The Inadequate Assurance of Future Performance Objection is Meritless

165.   The CLO Objectors contend that the reorganized Debtor will have inadequate resources to perform its obligations under the Management Agreements, and so has not given adequate assurance of future performance.  The CLO Objectors also allege that there is a mismatch between the Debtor's investment timeline and the timeline expected by the investors in the CLOs.  Both of those arguments fail.  First, assurance of future performance is a protection conferred by section 365 on contracting parties, which the CLO Objectors are not.  They lack standing to invoke it when the actual contracting parties – the CLOs – are satisfied.  Second, even if they had standing, the objection is without merit.  The CLO Objectors argue (i) because the Debtor is terminating all of its employees, it will not be able to manage the CLOs post-Effective Date and (ii) the Debtor cannot hire a Sub-Servicer to manage the CLOs without violating the Management Agreements.  As an initial matter, the Debtor is not retaining a Sub-Servicer to manage the CLOs, and, although the Debtor will terminate a number of employees, it will retain sufficient and appropriate staff to manage the CLOs post-Effective Date.  However, even if the Debtor were terminating all employees, the Management Agreements *expressly* allow the Debtor to retain a Sub-Servicer to manage the CLOs.[75]

166.   Similarly, the CLO Objectors' contention that the Debtor's timeline for monetizing the assets in the CLOs is contrary to the timeline expected by the CLOs' investors also ignores the facts.  As disclosed in the CLOs' offering memoranda, the notes and preference shares issued by the CLOs have come due or will, with two exceptions, come due shortly.

---

[75] *See* Grayson Agreement, § 2(d) ("In providing services hereunder *the Servicer may employ third parties* including its Affiliates *to render advice including advice with respect to the servicing of the Collateral and assistance* provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.") (emphasis added).

DOCS_SF:104855.7 36027/002

Appellee Appx. 01697

Appx. 04502

008505

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1705
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 588 of 1017    PageID 9335
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1704 of 1803   PageID 12450
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 97 of 106

| CLO | Note Maturity | Preference Share Redemption |
|---|---|---|
| Aberdeen | November 2018 | November 2018 |
| Brentwood | February 2022 | February 2022 |
| Eastwood | May 2022 | May 2022 |
| Gleneagles | November 2017 | November 2017 |
| Grayson | November 2021 | November 2021 |
| Greenbriar | November 2021 | November 2021 |
| Highland Legacy Limited | June 2011 | N/A |
| Highland Loan Funding V | August 2014 | August 2014 |
| Highland Park CDO I | November 2051 | November 2051 |
| Jasper | August 2017 | August 2017 |
| Pam Capital | May 2010 | N/A |
| PamCo | August 2009 | N/A |
| Red River | July 2018 | July 2018 |
| Rockwall | August 2021 | N/A |
| Rockwall II | August 2021 | N/A |
| Southfork | February 2017 | February 2017 |
| Stratford | November 2021 | November 2021 |
| Valhalla | April 2038 | April 2038 |
| Westchester | August 2022 | August 2022 |

As such, there is no mismatch between the expectations of the CLOs' investors and the Debtor. With the exception of the CLO Objectors who presumably want the CLOs to stay extant forever, the expectations of the CLOs' investors are set by the offering memoranda, which clearly disclose the expected timeline for the CLOs.

167.    Finally, the disingenuousness of the CLO Objectors' arguments on future performance cannot be overstated.  The CLO Objectors are arguing that the Debtor must *reject* the Management Agreements because – in their estimation – the Reorganized Debtor will not be able to satisfactorily manage the CLOs.  The CLO Objectors' argument is therefore that it is

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1706
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 589 of 1017    PageID 9336
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1705 of 1803    PageID 12451
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 98 of 106

better for the CLOs to have no manager at all.  The CLO Objectors arguments are an abject

danger to the Estate and could create potential liability in the millions of dollars.

### G.    The "Impermissible Partial Assignment" Objection is Meritless

168.    The CLO Objectors contend that their rights are being modified by the Debtor's

assumption of the Management Agreements, effectively resulting in an impermissible "partial

assumption" of the contracts.  Once again, they are not contracting parties with standing to object

on this basis.  But even if they were, the factual predicate is missing.  The Management

Agreements are being assumed *in toto*.  There is no modification of any contract rights of the

CLO Objectors.  And, as set forth above, the Debtor filed the Adversary Complaint in which it

sought a declaratory judgment on the CLO Objectors' rights to replace the Debtor as Portfolio

Manager under the Management Agreements.  Regardless of whether the Plan is confirmed, the

CLO Objectors will have their rights under the Management Agreements as those rights are

determined by this Court in connection with the adjudication of the Adversary Complaint.

### XI.    STATE TAXING AUTHORITY OBJECTION

169.    Following the filing of the State Taxing Authority Objection, the Debtor reached

out to Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County

(collectively, the "State Authorities") to see whether the State Taxing Authority Objection could

be resolved consensually.  Although the Debtor and the State Taxing Authority have not yet

reached resolution, the Debtor is optimistic that the State Taxing Authority Objection will be

resolved and will continue working with the State Authorities.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01699
Appx. 04564
008507

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1707
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 590 of 1017    PageID 9337
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1706 of 1803    PageID 12452
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 99 of 106

### XII.    IRS OBJECTION

170.    The Internal Revenue Service ("IRS") raises three objections to the Plan in the
IRS Objection, two of which are not controversial, and the Debtor has amended the plan to
address these points.

171.    First, in paragraph 1 of the IRS Objection, the IRS requests that the Debtor
provide it with interest on account of its Allowed Claim as required under 11 U.S.C.
1129(a)(9)(C).  The Plan previously provided for payment of the full amount of the Allowed
Priority Tax Claims (which would include any applicable interest on account of such Allowed
Claim) on the Initial Distribution Date in order to fully satisfy these tax claims and avoid the
incurrence of any unnecessary interest.  To clarify this issue and resolve this first objection, the
Debtor has amended the Plan to provide for an additional treatment mechanism that provides that
Allowed Claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy
Code in the event the entirety of the IRS's Allowed Claims (inclusive of any interest pursuant to
which such claims are entitled to) are not paid on the Initial Distribution Date, as provided in
section II.C of the Plan.

172.    Second, in paragraph 3 of the IRS Objection, the IRS argues that its claims should
not be "fixed" unless and until any required tax returns are filed.  The Debtor does not dispute
this contention and believes that the proposed language that was provided to the IRS and
reprinted below addresses this concern because it provides that the IRS's claims shall survive the
bankruptcy as if the cases had not yet been filed, which is standard in chapter 11 confirmation
orders.  Further, the Debtor believes that it has filed all applicable returns but, in an effort to
resolve the IRS Objection, proposes the language below.

DOCS_SF:104855.7 36027/002

173.    In paragraph 2 of the IRS Objection, the IRS asserts that it has no record of the Debtor having filed its Form 720 with respect to its self-insured health plan for the June 30, 2014, June 30, 2016 and June 30, 2018 tax periods.  Because of this alleged non-compliance, the IRS proposes certain default provisions detailed in the chart below (the "Default Provisions").  The Debtor asserts that the Default Provisions are not warranted because that Debtor has filed all applicable tax returns.  Specifically, with respect to Form 720, on April 22, 2020, the Debtor responded to an IRS inquiry about the forms and provided an explanation about forms which were not required and provided the IRS with Form 720 for the 2015, 2016 and 2017 tax periods.  Further the Default Provisions are not warranted because the IRS has adequate collection and enforcement remedies available through applicable law and should not be granted additional remedies through the Plan.  Finally, the Default Provisions are vague and contain undefined terms which will result in confusion if enforcement is ever attempted.  Certain examples of these problems are discussed below.

174.    Default Provision (1) provides certain remedies to the IRS in the event of certain failures to pay taxes or timely file returns by the Debtor, the Reorganized Debtor or any successor in interest.  The Debtor asserts that the Default Provisions are unnecessary since the Debtor has provided all applicable returns.  Default Provisions (2) and (3) are not needed and are problematic because of their vagueness.  The Debtor would agree to Default Provision (1) provided that it is clarified to state that nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that

DOCS_SF:104855.7 36027/002

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1709
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 592 of 1017 PageID 9339
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1708 of 1803 PageID 12454
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 101 of 106

the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States.

175. Default Provision (2), presumably intended to provide remedies in addition to those provided under Default Provision (1), would allow the IRS to declare the Debtor to be in **"default"** if the certain failures were not cured within fourteen (14) days and then the **"entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, an/or any successor in interest."** The term **"entire imposed liability"** is not defined in the proposed Default Provision. The ability of the IRS to unilaterally declare the Debtor to be in default and the imposition of a fourteen (14) day deadline is inappropriate and the IRS should rely on applicable law without imposing additional requirements through the confirmation process. Further, if this provision is intended to cut off the Debtor's right to challenge any obligation that is asserted against it by the IRS, it goes beyond applicable law and would deprive the Debtor of valuable rights to legitimately challenge such asserted amounts, including applicable appeal rights. Further, to the extent that the Debtor may legitimately dispute certain tax obligations, acceleration of payment of other tax obligations is not appropriate and not in accordance with applicable law.

176. Default Provision (3) requires full payment of the entire imposed liability, together with an unpaid current liabilities within fourteen (14) days of demand and also purports to extend the collection statute expiration date again attempting to augment remedies available to the IRS. Such remedies are not warranted. Again, the IRS has adequate remedies available to it

Appellee Appx. 01702
Appx. 04507
008510

under applicable law and should not seek to augment them through the bankruptcy plan confirmation process.

177. Aside from the fact that the pre-determination of the parties' applicable rights and defenses under applicable non-bankruptcy law does not belong in a chapter 11 plan or confirmation order, the IRS's language is problematic for another reason. By grafting these requirements to a chapter 11 plan and or a court order, the IRS is creating additional remedies that it would otherwise not be entitled to under non-bankruptcy law because it could then use the Confirmation Order to hold the Debtor in contempt, and potentially foreclose any applicable defenses or other substantive rights in a later proceeding that contravene the IRS's Court-ordered default language.

178. The Debtor has proposed (and the IRS has rejected) the standard "neutrality" language that protects the parties' respective rights and defenses and places them in the "the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated if the bankruptcy case had not been commenced" which is where they belong.

179. The Debtor believes that the Court should not pre-adjudicate either the Debtor's or the IRS's applicable rights and remedies with respect to any unfiled tax returns or claims asserted by the IRS and these issues should be preserved for adjudication in the appropriate forums post-confirmation. The Debtor believes that its neutrality language initially proposed is consistent with language approved by this Court and in other cases without pre-adjudicating the parties' substantive rights. While the Debtor does not believe that any of the proposed Default Provisions are warranted because it has complied with applicable filing requirements, the Debtor

Appellee Appx. 01703

Appx. 04668

008311

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1711
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 594 of 1017   PageID 9341
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1710 of 1803   PageID 12456
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 103 of 106

would agree to include Default Provision (1) as modified below.  The Debtor believes that the language proposed to the IRS for insertion to the Confirmation Order[76] preserves each party's respective rights and defenses and adequately protects the IRS form enforcing any statutory claims or rights it may possess.

| Proposed Resolution of Objection of United States of America. | Default Provision - IRS. Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): |
|---|---|
| **Default Provision - IRS.**  Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): | (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: |
| (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: | (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; |
| (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; | (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may |
| (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire | |

---

[76] The Debtor discussed its concerns with IRS counsel provided it with certain neutrality language to resolve the IRS objection.  The IRS responded that it could not agree to such language and would stand on its objection and its requested default language

DOCS_SF:104855.7 36027/002

Appellee Appx. 01704
Appx. 04609
008512

imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed; and

(3) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service;

(4) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States; and

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2) If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, **shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest**. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3) **If full payment is not made within fourteen (14) days of such demand**, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. **The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan.**

(4) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and

98

Appellee Appx. 01705

Appx. 04679

008513

| | after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. |
|---|---|

## **CONCLUSION**

For the reasons set forth herein and in the Memorandum, the Debtor respectfully requests that the Bankruptcy Court overrule the Objections for the reasons set forth herein and confirm the Plan as requested by the Debtor.

DOCS_SF:104855.7 36027/002

Appellee Appx. 01706

Appx. 04674

008514

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1714
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 597 of 1017   PageID 9344
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1713 of 1803   PageID 12459
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 106 of 106

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
               ikharasch@pszjlaw.com
               gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104855.7 36027/002

Appellee Appx. 01707
Appx. 04672
008515

Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 1 of 2

# **EXHIBIT A**

Appellee Appx. 01708

Appx. 04573

008316

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1716 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1715 of 1803    PageID 12461

Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21    Entered 01/22/21 19:52:03    Page 2 of 2



Appellee Appx. 01709
008317

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1717
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 600 of 1017    PageID 9347
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1716 of 1803   PageID 12462

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 1 of 14

# **EXHIBIT B**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1718
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1717 of 1803    PageID 12463
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 14

## OBJECTION SUMMARY[1]

| Objecting Party | Objection | Response |
|---|---|---|
| U.S. Trustee | The release is overbroad and releases non-debtors in violation of Pacific Lumber | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The exculpation is overbroad and releases non-debtors in violation of Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| Internal Revenue Service | Plan does not state that the Debtor will pay IRS priority tax claims on the Effective Date. | The Plan provides that Allowed Priority Claims would be paid on the Initial Distribution Date.  In response to this objection, the Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The plan does not provide for statutory interest on the IRS claims under Section 511 | Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The IRS asserts that the Debtor failed to file tax Form 720 returns related to its self-insured health plan for 2014, 2016, and 2017 and requests that the Plan be amended to include certain "Default Provisions" that, among other things, allow the IRS to declare defaults, demand that the "entire imposed liability" become due and payable, and the ability to collect unpaid liabilities upon 14 days' notice of demand for payment | The Debtor has provided all applicable tax forms and the proposed Default Provisions are unwarranted.  The Debtor would agree, however, to modified Default Provisions.

The IRS' proposed Default Provisions graft the IRS' potential non-bankruptcy and arguably additional rights and remedies into the Plan, including the IRS' unilateral rights to declare defaults, impose successor liability, and to require payments of "entire imposed liabilities" upon 14 days' notice of demand.  The Debtor does not think it is appropriate for the Plan or Confirmation Order to dictate these rights and they should be determined under applicable non bankruptcy law. |

---

[1] The following are summaries only.  Parties should read the entirety of the Debtor's Reply.

DOCS_LA:335197.6 36027/002

Appellee Appx. 01711
Appx. 04679
008519

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1719
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1718 of 1803    PageID 12464
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 3 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County | Plan does not appropriately apply for treatment of postpetition and effective date interest on tax claims, Plan does not provide for continued security interest and Plan does not provide that failure to pay tax claims is a default under the plan | The Debtor is currently negotiating language with these taxing authorities to resolve the issues raised in their objection through insertion of language in the Confirmation Order in order to consensually resolve this objection. |
| Jack Yang and Brad Borud (joined by Deadman, Travers, Kauffman [D.I. 1674; 1679]) | Subordinated Claims are defined overly broad as not just claims subordinated under § 510 but also claims arising from Class A/B/C Limited Partnership interests in a way that impermissibly broadens § 510(b) | The Plan has been amended to clarify that it does not provide for categorical subordination of claims relating to partnership interests to address this objection |
| Patrick Daugherty | The Disputed Claims Reserve allows the Debtor to estimate claims for distribution, which provides for impermissible disparate treatment under § 1123(a)(4) | The Plan does not provide for disparate treatment of claims. The Plan provides for a mechanism for the Debtor or Mr. Daugherty (or any creditor) to file a motion to estimate any Disputed Claim for purposes of establishing the amount of the Disputed Claims Reserve pending the allowance or disallowance of his claim. Neither Daugherty or any other creditor is entitled to a reserve for the full amount of a disputed claim. This procedure does not constitute disparate treatment of claims under section 1123(a)(4) |
| Dugaboy Investment Trust and Get Good Investment Trust | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan is not complete as it doesn't list final documents governing the claimant trust/litigation trust/reorg debtor, retained causes of action, executory contracts | Dugaboy's reference to documents still under negotiation with the Committee was a vestige from a prior draft. Three Plan Supplements have been filed that contain those documents. An additional Plan Supplement is being filed concurrently herewith. |
| | Plan violates 1129(a)(7) because it doesn't provide the value that would be received in a chapter 7 liquidation because: (i) Reorg Debtor has no affirmative obligation to report to holders of beneficial interests in the Claimant Trust, (ii) Claimant Trustee is only liable for fraud, willful misconduct, or gross negligence and not breach of fiduciary duty; and (iii) a chapter 7 trustee would need to get court authority to sell assets and no such requirement exists for Claimant Trustee<br><br>[ | The Liquidation Analysis provides that creditors will receive distributions under the Plan that are not less than the value they would receive under a hypothetical distribution under chapter 7. This objection does not contest the conclusions set forth in the Liquidation Analysis.<br><br>The Plan, consistent with other plans including ones confirmed in this court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. Moreover, a chapter 7 trustee would enjoy qualified immunity for its actions. |

Appellee Appx. 01712

Appx. 08457

008520

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1720 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1719 of 1803    PageID 12465

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 4 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Exculpation provisions are overbroad as (i) they do not relate to a specific time period (just apply from Petition Date through implementation), especially when read in connection with the exculpation provision in the Claimant Trust Agreement, (ii) cover non-Debtors, and (iii) violates Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The CTA includes standard language limiting liability and is not an improper exculpation. |
| | Release provision (i) is overbroad and releases claims not related to the BK; (ii) waives future claims of the Claimant Trust | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and the LST only as successors to the Debtor, not any claims the CT or LST might subsequently have of their own.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The injunction provisions in Article IX.F are overbroad and arguably violates Pacific Lumber as an improper release and In re Zale and Thru, which prevents a non-debtor injunction if it effectively discharges a no debtor | The Injunction Provisions have been modified to address these concerns.  The Injunction Provision, as modified, merely implements the Plan's discharge, release, and Exculpation Provisions by enjoining the Enjoined Parties from commencing or maintaining any actions to interfere with the implementation or consummation of the Plan.  Implementation and consummation are words used in the Code and have meanings known by practitioners and the Court.  The injunction is only applicable to the Debtor and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust – none of whom are non-debtor third parties as the debtor has eliminated the Independent Directors from these provisions. |
| | The release provided to released parties does not meet the standards for a release as there is no meaningful contribution to the BK and is not necessary to protect non-debtor entities that are essentially the debtor | Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The consideration provided by the Released Parties will be presented.  The Released Parties are only being released by the Debtor and its successors. |

Appellee Appx. 01713

Appx. 04576

008521

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22     Entered 08/15/22 16:45:41     Page 1721 of 1804

Case 3:21-cv-00879-K     Document 21     Filed 07/28/21     Page 1720 of 1803     PageID 12466

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21     Entered 01/22/21 18:52:03     Page 5 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | The "channeling injunction" and retention of jurisdiction is improper because it expands the BK court's jurisdiction to actions not arising under, related to, or arising in the BK.  This is especially so since there is no post-effective date Reorganized Debtor | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the Court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. |
| | The injunction prevents parties from enforcing the rights created by the plan post-effective date | Art. IX.F starts with "Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . . " It does not prevent enforcement of rights created under the Plan |
| | The "channeling injunction" is not a proper channeling injunction under Section 524(j) and even if it were, 524(j) only applies to debtors that are eligible for a discharge under 1141 and HCMLP is not eligible for a discharge because it is a liquidation plan. | The Gatekeeper Provision has nothing to do with Section 524(j).  Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| James Dondero | The exculpation provision in IX.D is overbroad as it relates to non-debtors under Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | The "channeling injunction" in Article IX.F includes post-confirmation conduct and non-debtors and is effectively a third party release prohibited under Dropbox. | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the Court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed |

4

Appellee Appx. 01714

Appx. 04579

008522

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1722
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1721 of 1803    PageID 12467
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 6 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. There is no "release" in the Gatekeeper Provision as it does not prevent claims from being brought – it merely requires that the Bankruptcy Court determine the claim is colorable before it can be brought. |
| | The "channeling injunction" limits jurisdiction to the Bankruptcy Court and ignores other courts with exclusive jurisdiction and specialized jurisdiction | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. |
| | The "channeling injunction" is impermissibly vague under FRBP 3016(c) | The Gatekeeper Provision is not vague and, to the extent FRBP 3016(c) is applicable, expressly complies with the rule in that the Gatekeeper Provision describes in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identifies the entities that would be subject to the injunction |
| | The Plan does not provide appropriate mechanisms for oversight of post-confirmation sales and would allow impermissible sales similar to that which occurred during the BK | This is the same objection filed by other Dondero Entities to prevent the post-confirmation monetization of assets. The Plan, consistent with other plans including ones confirmed in this Court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. |
| | The jurisdictional provisions are overbroad and would require all claims to be heard in the BK without regard to whether they arise in connection with implementation of the plan or otherwise | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. The Bankruptcy Court has jurisdiction to determine if a claim is colorable |
| | The elimination of vacant classes on the effective date would impermissibly limited later re-allocation of claims | The elimination of the only vacant class (Class 5 (Retained Employees)) is for voting tabulation purposes only. This provision permissibly provides for the treatment of any claims that may arise or become Allowed as a Class 5 Claim post-confirmation. |
| | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| NexPoint Real Estate Partners LLC, f/k/a HCRE Partners, LLC | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |

Appellee Appx. 01715

Appx. 04589

008523

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1723
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1722 of 1803    PageID 12468
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 7 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The "channeling injunction" improperly insulates non-debtors under s. 524(e). | The Gatekeeper Provisions do not implicate section 524(e). There is no insulation of any non-debtor. The Gatekeeper Provision simply requires the Bankruptcy Court to determine if a claim is colorable before it can be brought. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | Period of time covered by the release and exculpation provisions impermissibly extends post-effective date. Cf. Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexPoint Advisors, Highland Capital Management Fund Advisors, and related funds<br><br>(joined by CLO Holdco)<br><br>(joined by NexPoint RE Entities [D.I. 1677] | Investment Advisers Act is "applicable law" that prohibits assumption/assignment of the Portfolio Management Agreements ("PMAs") under 365(c) | As this Court has ruled in Acis, and as SEC No Action Letters advise, the Investment Advisers Act does not prohibit assignment. The "actual test" applies and thus even if the PMAs were nonassignable, they would still be assumable. |
| | PMAs are "personal services contracts" and cannot be assigned under 365(c) | As this Court ruled in Acis, the PMAs are not nonassignable personal services contracts. Further, the counterparties have consented, and under the "actual test" the PMAs would be assumable even if nonassignable. |

Appellee Appx. 01716
Appx. 08584
008524

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1724 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1723 of 1803    PageID 12469

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 8 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Fifth Circuit applies the hypothetical test under Section 365(c), not the actual test | Fifth Circuit has applied the actual test under §365(e) and lower courts within the Fifth Circuit have applied the actual test to §365(c). |
| | Even if "actual" test applies, the Reorg Debtor is not the Debtor because of slimmed down staff and use of subservicers | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | There is no consent to assumption under 365(c) | CLO issuers are the counterparties and they consent.  The objectors have no contract right to object to assumption. |
| | The objectors have standing because they have claims against the estate or will have large rejection claims under shared services agreements. | The Funds, Advisors and CLO Holdco are not creditors and will not be creditors.  They agreed to expungement of their claims or reduction to zero.  There will be no rejection damages because the contracts are freely terminable upon notice and are being terminated, not rejected.  Even if objectors were creditors, that would give them standing only as to whether assumption benefits the estate, not their particular interests. |
| | The objectors have standing because the plan violates 1129 because it provides for assumption of contracts in violation of law. | The objectors have no standing as creditors, they have no standing to object to assumption of contracts to which they are not parties and to which the counterparties have consented, and assumption of the PMAs does not violate any law. |
| | The objectors have standing because the plan seeks to limit their right to remove the manager | The Plan does not limit their removal rights. |
| | Debtor should take direction from the majority of the preference shareholders in the CLOs | The objectors have no contractual right to control the management of the CLOs. |
| | The injunction and release provisions are overbroad because they do not appropriately define their scope and prevent the movants from suing for future malfeasance | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims.  The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The injunction prevents the objectors and the CLOs from seeking relief against the | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan |

**Appellee Appx. 01717**

008325

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1725 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1724 of 1803   PageID 12470

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 9 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | debtor/reorg debtor from any present or future actionable wrongs under the servicing agreements and advisers act | and attempts to collect the claims and interests dealt with by the Plan. |
| | Injunction prevents set off or other damages under the servicing agreements and to seek legal redress | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | "Channeling Injunction" is defective with respect to post-confirmation actions and is overly broad | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable.  The Bankruptcy Court has jurisdiction to determine if a claim is colorable. |
| | Plan does not disclose who will be operating the reorganized debtor and claimant trust or their comp as required under s 1123(a)(7) or insider compensation under 1129(a)(5) | The Plan Supplement discloses the identity of the Claimant Trustee, Litigation Trustee and Oversight Committee members. The Debtor discloses in the Confirmation Brief the compensation of insiders pursuant 1129(a)(5) under the Plan who will serve post-confirmation in their Confirmation Brief |
| | The plan is not feasible because the treatment of the CLO management agreements is illegal and violates s. 365 | The Plan does not impact any party's rights under the CLO management agreements, and applicable law does not prohibit the Debtor's assumption of the CLO management agreements. |
| | The plan does not provide assurance of future performance with respect to the assumption of the CLO management agreement as required by 365(b) | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | Release and injunction provisions are overbroad under Pacific Lumber because they release third parties | Neither the Release nor the Injunction Provisions release non-debtor third parties. |
| | Exculpation provisions are overbroad under Thru | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |

Appellee Appx. 01718

Appx. 04583

008326

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1726
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1725 of 1803    PageID 12471
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 10 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The plan divests movants from their set off rights | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The plan provides that contracts can be assumed until the Effective Date in violation of 365(d)(2) | The Plan has been amended to address this objection. |
| | Debtor is not entitled to a discharge under 1141 because it's a liquidating plan | Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| | The plan violates the absolute priority rule because equity gets to keep assets while senior creditors may not be paid in full | This assertion is false.  Equity Interests will not receive any property on account of the their interests pursuant to the Plan unless and until the claims of creditors are full paid, inclusive of interests, as provided in the Plan. |
| CLO Holdco Ltd. | CLO Holdco has standing to object because of its interests in the CLOs | As set forth above, CLO Holdco has no standing to assert the rights of the contracting parties to the PMAs.  It is also not a creditor, having reduced its claim to zero and having no rejection claim.  Even if it was a creditor it would not have standing to object to assumption on the basis of rights held by contracting parties. |
| | Joined NPA/HCMFA objection | NPA/HCMFA objection responses are set forth above. |
| | Plan provides for impermissible "partial assumption" because it cherry picks provisions of the CLO management agreements that are going to be assumed by preventing removal of the CLO manager by the preference shares | For the reasons set forth above, CLO Holdco has no standing to assert objections to assumption held by the contracting parties, who consent to assumption. Further, the Plan does not deprive preference shareholders of removal rights. |
| | Injunction and exculpation prohibits creditors from interfering with implementation or consummation of the plan and would prevent the movants from removing the Debtor as the CLO manager | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The plan impermissibly modifies the movants' rights under the CLO management agreements without their consent | The Plan does not modify CLO Holdco's rights under the PMAs |
| | Exculpation and indemnification provisions are third party releases in violation of applicable law under Pacific Lumber | The Plan does not contain an" indemnification provision." The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity |

9

Appellee Appx. 01719

Appx. 04584

008527

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1727 of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1726 of 1803    PageID 12472
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 11 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | The Debtor amended Plan section III.J of the Plan to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | |
| | The exculpation and release provisions violate Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The Release is only a release of claims owned by the Debtor and its estate and does not implicate Pacific Lumber which had nothing to do with debtor released which are permitted under section 1123(b)(3). |
| Senior Employees | The Plan violates § 1123(a)(4) because it treats the Senior Employees differently than similarly situated employees by requiring the Senior Employees to sign a Senior Employee Stipulation and reduce a portion of their claim to obtain a release. | The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The potential Debtor release of its own claims against employees or ex-employees under the Plan does not constitute "treatment" of Class 7 or Class 8 claims. |

10

Appellee Appx. 01720

Appx. 04585

008528

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1728
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1727 of 1803    PageID 12473
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 12 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | The Senior Employee Stipulation was not approved by the Senior Employees and contains material problems. | Whether or not the Senior Employees voluntary elect to sign the Senior Employee Stipulation does not constitute a valid basis to object to Plan confirmation. The voluntary decision to execute the Senior Employee Stipulation was at the option of the employee. Moreover, the Debtor has settled this objection with respect to Mr. Surgent and Mr. Waterhouse. |
| | The Debtor has improperly prevented the Senior Employees from making the Convenience Class Election because, as reflected in the chart prepared by the Debtor, the Senior Employees have liquidated claims which are not in dispute. | Under applicable bankruptcy law, the Plan and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.

Each Senior Employee filed a single proof of claim and the Senior Employees have not cited any authority supporting the proposition that a claimant may split claims listed in a single proof of claim; to the contrary, courts have stated that claim splitting is impermissible when covered by a single proof of claim. Further, the Plan and Disclosure Statement Order prohibit claim splitting for voting purposes. Finally, as explicitly set forth on the ballots approved by the Disclosure Statement Order, even if a Senior Employee could split his claims in order to elect Convenience Class treatment, the Convenience Class Election only impacts *treatment*, and explicitly does not impact voting. |
| | The Plan provides that a Class 8 Creditor can make the Convenience Class Election for a liquidated claim. Since a portion of each Senior Employee's claim is liquidated, the Senior Employees have a right to make the Convenience Class Election under the Plan.

The Debtor has contradicted the Plan in how in its conversations with the Senior Employees. Each Senior Employee received two ballots (one Class 7 and one Class 8) and this confusion justifies the Senior Employees review of the Plan.

The fact that the Plan splits employee claims into PTO claims and other claims is evidence that the Plan allows Claim splitting.  The | As set forth directly above, each Senior Employee would have to split his claim in order to also retain the remainder of his Class 8 claim.  This is impermissible under applicable case law and the Plan.

The Debtor's statements have been consistent with the Plan.  In any event, the Plan governs.  The Senior Employee's receipt of two ballots was an administrative error and cannot override the express terms of the Plan and Disclosure Statement Order.

As to the PTO Claims, those were separately classified *by the Plan*. The Senior Employees seek to split claims *within the same class*.  It is splitting claims within the same class that is prohibited by applicable case law and the Plan and Disclosure Statement Order. |

Appellee Appx. 01721

Appx. 04586

008529

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1729
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1728 of 1803    PageID 12474
Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of
14

| Objecting Party | Objection | Response |
|---|---|---|
| | exhibit is a representation that the Senior Employee claims have the right to a split claim because it discusses a Convenience Class claim. | |
| | The Plan identifies no basis for disparate and unfair treatment of the Senior Employees. | Debtors are not required to grant releases to anyone nor are their required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees. |
| | The Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the Claimant Trustee the unfettered power to "reclassify" any claim as a Subordinated Claim. | Section III.J of the Plan has been amended to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan allows the Debtor to make changes to the Plan without Court approval, including changes to the plan supplement documents. | To the contrary, Article XII of the Plan explicitly requires that modifications to the Plan be in compliance with section 1127. |

Appellee Appx. 01722

Appx. 004585

008530

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1730 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1729 of 1803    PageID 12475

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 14 of 14

Appellee Appx. 01723

Appx. 04586

008531

Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 3

# EXHIBIT C

Appellee Appx. 01724

Appx. 04589

008532

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1732
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 615 of 1017   PageID 9362
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1731 of 1803   PageID 12477
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 2 of 3

On the Effective Date, the Debtor will assume the agreements set forth on Appendix [_] hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan.  In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[1] a cumulative amount of $525,000 (the "Cure Amount") as follows:

- $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

- $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and this Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

Effective as of the Effective Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the

---

[1] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1733
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 616 of 1017 PageID 9363
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1732 of 1803 PageID 12478
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 3

"<u>Debtor Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "<u>Issuer Released Claims</u>").

Effective as of the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe, (xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "<u>Issuer Released Parties</u>"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "<u>Debtor Released Claims</u>"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.

Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs [___] hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

Appellee Appx. 01726
Appx. 04591
008334

# APPENDIX 25

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1735
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 618 of 1017 PageID 9365
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1734 of 1803 PageID 12480
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 1 of 13

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |

**DEBTOR'S WITNESS AND EXHIBIT LIST WITH RESPECT TO
<u>CONFIRMATION HEARING TO BE HELD ON JANUARY 26, 2021</u>**

Highland Capital Management, L.P. (the "<u>Debtor</u>") submits the following witness and

exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of Reorganization of

Highland Capital Management, L.P.* [Docket No. 1472] which the Court has set for hearing at

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000028

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1736
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 619 of 1017 PageID 9366
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1735 of 1803 PageID 12481
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 2 of 13

9:30 a.m. (Central Time) on January 26, 2021 (the "Hearing") in the above-styled bankruptcy

case (the "Bankruptcy Case").

    **A.**    **Witnesses:**

        1.    James P. Seery, Jr.;

        2.    John S. Dubel;

        3.    James Dondero;

        4.    Marc Tauber, a representative of Aon plc;

        5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

        6.    Any witness identified by or called by any other party; and

        7.    Any witness necessary for rebuttal.

    **B.**    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01729
Appx. 04594
008537

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1737
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 620 of 1017    PageID 9367
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1736 of 1803    PageID 12482
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01730
Appx. 04595
008538

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1738
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 621 of 1017 PageID 9368
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1737 of 1803 PageID 12483
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01731
Appx. 04586
008339

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1739
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 622 of 1017 PageID 9369
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1738 of 1803 PageID 12484
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 5 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Appellee Appx. 01732
Appx. 04597
008340

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1740
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 623 of 1017 PageID 9370
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1739 of 1803 PageID 12485
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Appellee Appx. 01733
Appx. 04598
008341

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1741
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 624 of 1017 PageID 9371
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1740 of 1803 PageID 12486
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation [TO BE OFFERED UNDER SEAL] | | |
| IIII. | Highland CLO Funding Members Agreement [TO BE OFFERED UNDER SEAL] | | |
| JJJJ. | Highland CLO Funding Offering Memorandum [TO BE OFFERED UNDER SEAL] | | |

Appellee Appx. 01734
008342

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1742
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 625 of 1017    PageID 9372
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1741 of 1803   PageID 12487
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21    Entered 01/22/21 21:50:07    Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 | | |

**Appellee Appx. 01735**
**Appx. 04609**
**008343**

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1743
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 626 of 1017 PageID 9373
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1742 of 1803 PageID 12488
Case 19-34054-sgj11 Doc 1822 Filed 01/22/21 Entered 01/22/21 21:50:07 Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01736

Appx. 04604

008344

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1744

Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 627 of 1017    PageID 9374

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1743 of 1803   PageID 12489

Case 19-34054-sgj11 Doc 1822 Filed 01/22/21   Entered 01/22/21 21:50:07   Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01737

Appx. 04602

008345

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01738

Appx. 04608

008346

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| BBBBBBB. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| CCCCCCC. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| DDDDDDD. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01739

008347

Dated:  January 22, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01740

Appx. 04695

008348

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1748
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 631 of 1017 PageID 9378
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1747 of 1803 PageID 12493

# APPENDIX 26

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1749

Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 632 of 1017 PageID 9379

Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1748 of 1803 PageID 12494

Case 19-34054-sgj11 Doc 1866 Filed 01/29/21 Entered 01/29/21 18:30:16 Page 1 of 13

Docket #1866 Date Filed: 01/29/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

**DEBTOR'S AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT TO**
**CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021**

Highland Capital Management, L.P. (the "Debtor") submits the following amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court has

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210129000000000012

Appellee Appx. 01742

008550

set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "<u>Hearing</u>") in the above-styled bankruptcy case (the "<u>Bankruptcy Case</u>").

    **A.**   <u>**Witnesses**</u>:

1. James P. Seery, Jr.

2. John S. Dubel

3. James Dondero

4. Marc Tauber, a representative of Aon plc

5. Patrick M. Leathem (by certification filed at Docket No. 1772)

6. Any witness identified by or called by any other party; and

7. Any witness necessary for rebuttal.

    **B.**   <u>**Exhibits**</u>:

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1751
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 634 of 1017   PageID 9381
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1750 of 1803   PageID 12496
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 3 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01744
Appx. 04609
008552

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1752
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 635 of 1017    PageID 9382
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1751 of 1803    PageID 12497
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 4 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

**Appellee Appx. 01745**
**Appx. 04619**
008553

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Appellee Appx. 01746

Appx. 04814

008554

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1754
Case 3:25-cv-02072-S   Document 15-11   Filed 06/06/25   Page 637 of 1017   PageID 9384
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1753 of 1803   PageID 12499
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 6 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May31,2007 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1755
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 638 of 1017 PageID 9385
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1754 of 1803 PageID 12500
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21 Entered 01/29/21 18:30:16 Page 7 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Appellee Appx. 01748

008556

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1756
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 639 of 1017 PageID 9386
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1755 of 1803 PageID 12501
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21 Entered 01/29/21 18:30:16 Page 8 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Appellee Appx. 01749
Appx. 04614
008557

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1757
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 640 of 1017 PageID 9387
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1756 of 1803 PageID 12502
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21 Entered 01/29/21 18:30:16 Page 9 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1758
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 641 of 1017    PageID 9388
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1757 of 1803   PageID 12503
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21    Entered 01/29/21 18:30:16    Page 10 of 13

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01751
Appx. 04616
008559

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01752

Appx. 04617

008560

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| GGGGGGG. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| HHHHHHH. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| IIIIIII. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01753

Appx. 04618

008561

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1761
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 644 of 1017    PageID 9391
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1760 of 1803   PageID 12506
Case 19-34054-sgj11 Doc 1866 Filed 01/29/21   Entered 01/29/21 18:30:16   Page 13 of 13

Dated:  January 29, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01754
Appx. 04619
008362

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1762
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 645 of 1017    PageID 9392
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1761 of 1803   PageID 12507

# APPENDIX 27

Appellee Appx. 01755

Appx. 04629
008563

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1763
Case 3:25-cv-02072-S    Document 15-11    Filed 06/25    Page 646 of 1017    PageID 9393
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1762 of 1803    PageID 12508
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 1 of 14

Docket #1877  Date Filed: 02/01/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S SECOND AMENDED WITNESS AND EXHIBIT LIST WITH RESPECT**
**TO CONFIRMATION HEARING TO BE HELD ON FEBRUARY 2, 2021**

Highland Capital Management, L.P. (the "Debtor") submits the following second

amended witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan*

*of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which the Court

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054212021000000000011

Appellee Appx. 01756

008564

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1764
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 647 of 1017    PageID 9394
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1763 of 1803    PageID 12509
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 2 of 14

has set for hearing at 9:30 a.m. (Central Time) on February 2, 2021 (the "Hearing") in the above-styled bankruptcy case (the "Bankruptcy Case").

   A.    **Witnesses:**

      1.    James P. Seery, Jr.;

      2.    John S. Dubel;

      3.    James Dondero;

      4.    Marc Tauber, a representative of Aon plc;

      5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

      6.    Any witness identified by or called by any other party; and

      7.    Any witness necessary for rebuttal.

   B.    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01757
Appx. 04622
008565

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1765
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 648 of 1017 PageID 9395
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1764 of 1803 PageID 12510
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01758
Appx. 04623
008566

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1766
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 649 of 1017 PageID 9396
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1765 of 1803 PageID 12511
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01759
Appx. 04624
008567

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

Appellee Appx. 01760

Appx. 04625

008568

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1768
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 651 of 1017 PageID 9398
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1767 of 1803 PageID 12513
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May 31, 2007 | | |

Appellee Appx. 01761
Appx. 04626
008569

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1769
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 652 of 1017 PageID 9399
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1768 of 1803 PageID 12514
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Appellee Appx. 01762
Appx. 04825
008570

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1770
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 653 of 1017    PageID 9400
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1769 of 1803   PageID 12515
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21    Entered 02/01/21 18:22:33    Page 8 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Appellee Appx. 01763
Appx. 04828
008371

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1771
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 654 of 1017 PageID 9401
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1770 of 1803 PageID 12516
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01764
Appx. 04829
008572

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1772
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 655 of 1017 PageID 9402
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1771 of 1803 PageID 12517
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Appellee Appx. 01765
Appx. 04639
008573

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01766

Appx. 04631

008574

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1774
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 657 of 1017 PageID 9404
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1773 of 1803 PageID 12519
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket*, In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Appellee Appx. 01767
Appx. 04632
008373

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1775
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 658 of 1017 PageID 9405
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1774 of 1803 PageID 12520
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21 Entered 02/01/21 18:22:33 Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Amended Liquidation Analysis/Financial Projections [Docket No. 1875-1] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 383] | | |
| RRRRRRR. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| SSSSSSS. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| TTTTTTT. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| UUUUUUU. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01768

Appx. 04633

008376

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1776
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 659 of 1017    PageID 9406
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1775 of 1803   PageID 12521
Case 19-34054-sgj11 Doc 1877 Filed 02/01/21   Entered 02/01/21 18:22:33   Page 14 of 14

Dated: February 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01769
Appx. 04651
008577

# APPENDIX 28

Appellee Appx. 01770

Appx. 04635

008578

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1778
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 661 of 1017   PageID 9408
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1777 of 1803   PageID 12523
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 1 of 14

Docket #1895  Date Filed: 02/04/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |

## DEBTOR'S THIRD AMENDED WITNESS AND EXHIBIT LIST WITH
## RESPECT TO CONFIRMATION HEARING HELD ON FEBRUARY 3, 2021

Highland Capital Management, L.P. (the "Debtor") submits the following third amended

witness and exhibit list with respect to the hearing to confirm the *Fifth Amended Plan of*

*Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] which was set for

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210204000000000004

Appellee Appx. 01771
Appx. 04836
008379

hearing at 9:30 a.m. (Central Time) on February 3, 2021 (the "Hearing") in the above-styled

bankruptcy case (the "Bankruptcy Case").

**A.    Witnesses:**

1.    James P. Seery, Jr.;

2.    John S. Dubel;

3.    James Dondero;

4.    Marc Tauber, a representative of Aon plc;

5.    Patrick M. Leathem (by certification filed at Docket No. 1772);

6.    Any witness identified by or called by any other party; and

7.    Any witness necessary for rebuttal.

**B.    Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| A. | Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [Docket No. 1528] | | |
| B. | Transcript of 12/16/20 Hearing | | |
| C. | Order Denying Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [dkt 1605] | | |
| D. | Email from James Romey dated September 29, 2020 | | |
| E. | Structural and Steel Products UCC Presentation dated September 29, 2020 | | |
| F. | Aberdeen Loan Funding Offering Memorandum dated as of March 27, 2008 | | |
| G. | Aberdeen Loan Funding Indenture dated as of March 27, 2008 | | |
| H. | Aberdeen Loan Funding Supplemental Indenture No. 1 dated as of March 27, 2008 | | |

Appellee Appx. 01772

Appx. 04537

008580

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1780
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 663 of 1017 PageID 9410
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1779 of 1803 PageID 12525
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 3 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| I. | Aberdeen Loan Funding Preference Shares Paying Agency Agreement dated as of March 27, 2008 | | |
| J. | Aberdeen Loan Funding Servicing Agreement dated as of March 27, 2008 | | |
| K. | Brentwood CLO Offering Memorandum dated as of December 18, 2006 | | |
| L. | Brentwood CLO Indenture dated as of December 21, 2006 | | |
| M. | Brentwood CLO Preference Shares Paying Agency Agreement Dated as of December 21, 2006 | | |
| N. | Brentwood CLO Servicing Agreement dated as of December 21, 2006 | | |
| O. | Eastland CLO Offering Memorandum dated as of March 13, 2007 | | |
| P. | Eastland CLO Indenture dated as of March 13, 2007 | | |
| Q. | Eastland CLO Preference Shares Paying Agency Agreement Dated as of March 13 2007 | | |
| R. | Eastland CLO Servicing Agreement dated as of March 13, 2007 | | |
| S. | Gleneagles CLO Offering Memorandum dated as of October 7, 2005 | | |
| T. | Gleneagles CLO Indenture dated as of October 13, 2005 | | |
| U. | Gleneagles CLO Portfolio Management Agreement dated as of October 13, 2005 | | |
| V. | Gleneagles CLO Preference Shares Paying Agency Agreement Dated as of October 13, 2005 | | |
| W. | Grayson CLO Offering Memorandum dated as of November 28, 2006 | | |
| X. | Grayson CLO Indenture dated as of November 30, 2006 | | |

Appellee Appx. 01773
Appx. 04638
008581

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1781
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 664 of 1017 PageID 9411
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1780 of 1803 PageID 12526
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 4 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| Y. | Grayson CLO Preference Shares Paying Agency Agreement dated as of November 30, 2006 | | |
| Z. | Grayson CLO Servicing Agreement dated as of November 30, 2006 | | |
| AA. | Grayson CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| BB. | Greenbriar CLO Offering Memorandum dated as of December 18, 2007 | | |
| CC. | Greenbriar CLO Indenture dated as of December 20, 2007 | | |
| DD. | Greenbriar CLO Preference Shares Paying Agency Agreement Dated as of December 20, 2007 | | |
| EE. | Greenbriar CLO Servicing Agreement dated as of December 20, 2007 | | |
| FF. | Jasper CLO Offering Memorandum dated as of June 27, 2005 | | |
| GG. | Jasper CLO Amended and Restated Portfolio Management Agreement dated as of November 30, 2005 | | |
| HH. | Jasper CLO Indenture dated as of June 29, 2005 | | |
| II. | Jasper CLO Preference Shares Paying Agency Agreement dated as of June 29,2005 | | |
| JJ. | Liberty CLO Offering Memorandum dated as of December 7, 2005 | | |
| KK. | Liberty CLO Indenture dated as of December 8, 2005 | | |
| LL. | Liberty CLO Class E Certificate Paying Agency Agreement dated as of December 8, 2005 | | |
| MM. | Liberty CLO Portfolio Management Agreement dated as of December 8, 2005 | | |
| NN. | Red River CLO Offering Memorandum dated as of July 31, 2006 | | |

Appellee Appx. 01774
Appx. 04639
008582

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1782
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 665 of 1017 PageID 9412
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1781 of 1803 PageID 12527
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 5 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| OO. | Red River CLO Indenture dated as of August 3, 2006 | | |
| PP. | Red River CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| QQ. | Red River CLO Preference Shares Paying Agency Agreement dated as of August 3, 2006 | | |
| RR. | Red River CLO Servicing Agreement dated as of August 3, 2006 | | |
| SS. | Red River CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| TT. | Rockwall CLO Offering Circular (Notes) dated May 8, 2006 | | |
| UU. | Rockwall CLO Offering Circular (Preferred Share) dated May 8, 2006 | | |
| VV. | Rockwall CLO Indenture dated as of May 10, 2006 | | |
| WW. | Rockwall CLO Amendment No. 1 to Indenture dated as of October 2, 2007 | | |
| XX. | Rockwall CLO Preference Shares Paying and Agency Agreement dated as of May 10, 2006 | | |
| YY. | Rockwall CLO Servicing Agreement dated as of May 10, 2006 | | |
| ZZ. | Rockwall CLO Amendment No. 1 to Servicing Agreement dated as of October 2, 2007 | | |
| AAA. | Rockwall CLO II Offering Circular (Notes) dated May 8, 2007 | | |
| BBB. | Rockwall CLO II Offering Circular (Preferred Share) dated May 8, 2007 | | |
| CCC. | Rockwall CLO II Indenture dated as of May 9, 2007 | | |
| DDD. | Rockwall CLO II Preference Shares Paying and Agency Agreement dated as of May 9, 2007 | | |

**THIRD AMENDED WITNESS AND EXHIBIT LIST FOR HEARING HELD ON FEBRUARY 3, 2021**          **PAGE 5 OF 14**
DOCS_NY:42031.4 36027/002

Appellee Appx. 01775
Appx. 04549
008583

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1783
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 666 of 1017 PageID 9413
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1782 of 1803 PageID 12528
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 6 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| EEE. | Rockwall CLO II Servicing Agreement dated as of May 9, 2007 | | |
| FFF. | Southfork CLO Offering Memorandum dated as of March 9, 2005 | | |
| GGG. | Southfork CLO Indenture dated as of March 15, 2005 | | |
| HHH. | Southfork CLO Portfolio Management Agreement dated as of March 15, 2005 | | |
| III. | Southfork CLO Preference Shares Paying Agency Agreement dated as of March 15, 2005 | | |
| JJJ. | Stratford CLO Offering Memorandum dated as of October 22, 2007 | | |
| KKK. | Stratford CLO Indenture dated as of October 25, 2007 | | |
| LLL. | Stratford CLO Preference Shares Paying and Agency Agreement dated as of October 25, 2007 | | |
| MMM. | Stratford CLO Servicing Agreement dated as of October 25, 2007 | | |
| NNN. | Valhalla CLO Offering Circular dated as of August 17, 2004 | | |
| OOO. | Valhalla CLO Indenture dated as of August 18, 2004 | | |
| PPP. | Valhalla CLO Supplemental Indenture dated as of July 25, 2016 | | |
| QQQ. | Valhalla CLO Reference Portfolio Management Agreement dated as of August 1, 2016 | | |
| RRR. | Westchester CLO Offering Memorandum dated as of May 30, 2007 | | |
| SSS. | Westchester CLO Indenture dated as of May 31, 2007 | | |
| TTT. | Westchester CLO Preference Shares Paying Agency Agreement dated as of May 31, 2007 | | |

Appellee Appx. 01776
Appx. 04544

008584

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1784
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 667 of 1017    PageID 9414
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1783 of 1803    PageID 12529
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21    Entered 02/04/21 13:25:35    Page 7 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| UUU. | Westchester CLO Servicing Agreement dated as of May 31, 2007 | | |
| VVV. | NexPoint Strategic Opportunities Fund, Form N-2 Registration Statement, filed August 27, 2019 | | |
| WWW. | NexPoint Strategic Opportunities Fund, Form DEF-14A Proxy Statement, filed July 10, 2020 | | |
| XXX. | NexPoint Capital, Inc., Form 497 Prospectus Supplement, filed March 14, 2018 | | |
| YYY. | NexPoint Capital, Inc. Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| ZZZ. | Highland Income Fund, Form 497 Prospectus Supplement, filed July 29, 2019 | | |
| AAAA. | Highland Income Fund, Form DEF-14A Proxy Statement, filed April 22, 2020 | | |
| BBBB. | Written Consent of the General Partner of Highland Capital Management, L.P., Effective September 21, 2020 | | |
| CCCC. | List of Board Memberships | | |
| DDDD. | Response to K&L Gates LLP dated December 22, 2020 [Dondero Deposition Exhibit 12] | | |
| EEEE. | Response to K&L Gates LLP dated December 23, 2020 [Dondero Deposition Exhibit 13] | | |
| FFFF. | Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| GGGG. | Response to Letter from K&L Gates to J. Pomerantz dated December 31, 2020 | | |
| HHHH. | Highland CLO Funding Articles of Incorporation **[TO BE OFFERED UNDER SEAL]** | | |
| IIII. | Highland CLO Funding Members Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| JJJJ. | Highland CLO Funding Offering Memorandum **[TO BE OFFERED UNDER SEAL]** | | |

Appellee Appx. 01777
Appx. 04542
008585

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| KKKK. | Highland CLO Funding Portfolio Management Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| LLLL. | Highland CLO Funding Subscription and Transfer Agreement **[TO BE OFFERED UNDER SEAL]** | | |
| MMMM. | Liquidation Analysis [Docket No. 1473] | | |
| NNNN. | AVYA Stock Price Data | | |
| OOOO. | SKY Stock Price Data | | |
| PPPP. | HCMLP - Previous Day Trades 01/29/20 **[REDACTED]** | | |
| QQQQ. | HCMLP - Previous Day Trades 02/10/20 **[REDACTED]** | | |
| RRRR. | HCMLP - Previous Day Trades 02/14/20 **[REDACTED]** | | |
| SSSS. | HCMLP - Previous Day Trades 04/15/20 **[REDACTED]** | | |
| TTTT. | HCMLP - Previous Day Trades 04/17/20 **[REDACTED]** | | |
| UUUU. | HCMLP - Previous Day Trades 08/27/20 **[REDACTED]** | | |
| VVVV. | HCMLP - Previous Day Trades 09/02/20 **[REDACTED]** | | |
| WWWW. | HCMLP - Previous Day Trades 10/07/20 **[REDACTED]** | | |
| XXXX. | HCMLP - Previous Day Trades 10/08/20 **[REDACTED]** | | |
| YYYY. | HCMLP - Previous Day Trades 10/09/20 **[REDACTED]** | | |
| ZZZZ. | HCMLP - Previous Day Trades 11/24/20 **[REDACTED]** | | |

Appellee Appx. 01778

Appx. 04543

008586

Case 19-34054-sgj11  Doc 3445-8  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1786
Case 3:25-cv-02072-S    Document 15-11    Filed 04/06/25    Page 669 of 1017    PageID 9416
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21    Page 1785 of 1803   PageID 12531
Case 19-34054-sgj11  Doc 1895  Filed 02/04/21    Entered 02/04/21 13:25:35    Page 9 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| AAAAA. | Jefferies Trade Confirmations 12/18/20 | | |
| BBBBB. | Jefferies Trade Confirmations 12/21/20 | | |
| CCCCC. | Jefferies Trade Confirmations 12/22/20 | | |
| DDDDD. | Jefferies Trade Confirmations 12/30/20 | | |
| EEEEE. | Jefferies Trade Confirmations 12/31/20 | | |
| FFFFF. | Strand Advisors Bylaws | | |
| GGGGG. | Strand Advisors First Amendment to Bylaws | | |
| HHHHH. | Strand Advisors Certificate of Ownership | | |
| IIIII. | Strand Advisors Written Consent | | |
| JJJJJ. | Strand Advisors Stock Certificate No. 1 | | |
| KKKKK. | Strand Advisors Broker/Agent's Letter of Authorization | | |
| LLLLL. | Strand Advisors – James Seery Director Agreement | | |
| MMMMM. | Strand Advisors – John Dubel Director Agreement | | |
| NNNNN. | Strand Advisors – Hon Russell Nelms Director Agreement | | |
| OOOOO. | Final Operating Protocols [Docket No. 354-1] | | |
| PPPPP. | Article: Highland Capital Says Ch. 11 Trustee Worst Possible Option (Law360 January 16, 2020) | | |

Appellee Appx. 01779
Appx. 04544
008587

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1787
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 670 of 1017   PageID 9417
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1786 of 1803   PageID 12532
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 10 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| QQQQQ. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 339] | | |
| RRRRR. | Acis Capital Management , L.P. - Court's Ruling on Plan Confirmation (August 30, 2018) | | |
| SSSSS. | Highland – Dondero Related Entities Demonstrative | | |
| TTTTT. | Schedule of receivables for the identified objecting entities (as of 11.30.20) | | |
| UUUUU. | Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| VVVVV. | Notice of Termination of Highland Capital Management Fund Advisors, L.P. Second Amended and Restated Shared Services Agreement | | |
| WWWWW. | NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| XXXXX. | Notice of Termination of NexPoint Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| YYYYY. | NexBank Third Amended and Restated Shared Services Agreement | | |
| ZZZZZ. | Notice of Termination of NexBank Third Amended and Restated Shared Services Agreement | | |
| AAAAAA. | NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| BBBBBB. | Notice of Termination of NexPoint Real Estate Advisors, L.P. Amended and Restated Shared Services Agreement | | |
| CCCCCC. | Notice of Termination of NexBank Sub-servicing Agreement | | |
| DDDDDD. | Legal Entities List (Q2 2020) **[REDACTED]** | | |
| EEEEE. | Highland - Demonstrative on Post-Effective Date Org Chart | | |
| FFFFFF. | HCMLP Deferred Bonus Plan | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 1788
Case 3:25-cv-02072-S Document 15-11 Filed 06/06/25 Page 671 of 1017 PageID 9418
Case 3:21-cv-00879-K Document 21 Filed 07/28/21 Page 1787 of 1803 PageID 12533
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21 Entered 02/04/21 13:25:35 Page 11 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| GGGGGG. | HCMLP Template agreement for awards under the plan | | |
| HHHHHH. | HCMLP Annual Bonus Plan | | |
| IIIIII. | Seery Handwritten Note | | |
| JJJJJJ. | Marketing Summary | | |
| KKKKKK. | Strand D&O Proposal | | |
| LLLLLL. | Disclosure Statement Order [Docket No. 1476] | | |
| MMMMMM. | Order Appointing James Seery as CEO [Docket No. 854] | | |
| NNNNNN. | Voting Certification [Docket No. 1772] | | |
| OOOOOO. | Plan Supplement [Docket Nos. 1389, 1606, 1656] | | |
| PPPPPP. | Motion to Appoint Trustee [Docket No. 271] | | |
| QQQQQQ. | Order Denying Motion to Appoint Trustee [Docket No. 428] | | |
| RRRRRR. | Transcript of 01/09/20 Hearing | | |
| SSSSSS. | Transcript of 10/27/20 Hearing | | |
| TTTTTT. | Transcript of 10/28/20 Hearing | | |
| UUUUUU. | Transcript of 12/10/20 Hearing | | |
| VVVVVV. | Isaac D. Leventon Proof of Claim No. 184 | | |

Appellee Appx. 01781
Appx. 04565
008589

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1789
Case 3:25-cv-02072-S    Document 15-11    Filed 06/06/25    Page 672 of 1017    PageID 9419
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1788 of 1803   PageID 12534
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 12 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| WWWWWW. | Scott B. Ellington Proof of Claim No. 192 | | |
| XXXXXX. | James P Seery Curriculum Vitae [Docket No. 281-2] | | |
| YYYYYY. | John Dubel Curriculum Vitae [Docket No. 281-2] | | |
| ZZZZZZ. | Hon Russell Nelms Resume | | |
| AAAAAAA. | Highland Multi Strategy Credit Fund, Ltd. Statement of Value and Activity (10.01.20 – 10.31.20) **[REDACTED]** | | |
| BBBBBBB. | Highland Income Fund Semi-Annual Report (06.30.20) | | |
| CCCCCCC. | Legal Entities List (12.24.19) **[REDACTED]** | | |
| DDDDDDD. | Plan Projections | | |
| EEEEEEE. | Plan Analysis | | |
| FFFFFFF. | Docket, *Joshua and Jennifer Terry v. Highland Capital Management, L.P., James Dondero and Thomas Surgent* (Case No. DC- 16-11396) | | |
| GGGGGGG. | Docket, *NWCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018) | | |
| HHHHHHH. | Docket, *In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex.) | | |
| IIIIIII. | Docket, *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) | | |
| JJJJJJJ. | Docket*, In re Highland Capital Management, L.P.,* Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) | | |
| KKKKKKK. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650097/2009 | | |
| LLLLLLL. | Docket, *UBS Securities vs. Highland Capital Management, L.P.*, Index No. 0650752/2010 | | |

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1790
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 673 of 1017   PageID 9420
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1789 of 1803   PageID 12535
Case 19-34054-sgj11 Doc 1895 Filed 02/04/21   Entered 02/04/21 13:25:35   Page 13 of 14

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| MMMMMMM. | Docket, *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 12533-VCG) | | |
| NNNNNNN. | Docket, *Daugherty v. Highland Capital Management, L.P.* (Chancery Court, Delaware, C.A. No. 2017-0488-MTZ) | | |
| OOOOOOO. | Court Admitted Exhibits for January 21, 2020 Hearing | | |
| PPPPPPP. | Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1875] | | |
| QQQQQQQ. | Stipulation in Support of Settlement with Committee Regarding Governance and Procedures [Docket No. 338] | | |
| RRRRRRR. | Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital L.P. (With Technical Modifications) [Docket No. 1807] | | |
| SSSSSSS. | Email exchange between Gregory Demo, Amy Anderson, and Joseph Bain re HCM Issuers  **[REDACTED]** | | |
| TTTTTTT. | Statement of Financial Affairs, with any amendments, filed in 19-34054 [Docket No. 248] | | |
| UUUUUUU. | Schedules filed in 19-34054, with any amendments [Docket No. 247] | | |
| VVVVVVV. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| WWWWWWW. | Any document entered or filed in the Debtor's chapter 11 bankruptcy case, including any exhibits thereto | | |
| XXXXXXX. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| YYYYYYY. | All exhibits identified by or offered by any other party at the Hearing | | |

Appellee Appx. 01783

008591

Dated:  February 4, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appellee Appx. 01784
Appx. 04549
008592

# APPENDIX 29

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1793
Case 3:25-cv-02072-S     Document 15-11    Filed 10/06/25     Page 676 of 1017     PageID 9423
Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1792 of 1803   PageID 12538
Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 546 of 852   PageID 2451

# EXHIBIT 5

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1794 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1793 of 1803    PageID 12539

Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 547 of 852    PageID 2452

## UPDATED SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

### In re Highland Capital Management, L.P., Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

| | | | | |
|---|---|---|---|---|
| 9/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith [D.I. 1087]* | | | |
| | **Objectors:** | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal is being briefed. |
| 11/18/20 | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements [D.I. 1424]* | | | |
| | **Objectors:** | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459] | N/A |
| 11/19/20 | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course [D.I. 1439]* | | | |
| | **Movant:** | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [D.I. 1522]* | | | |
| | **Movants:** | Advisors Funds | Movants argued that the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters.  Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact.  The Debtor reserves all rights that it may have whether in law or in equity.**

DOCS_NY:42718.10 36027/002
000544

Appellee Appx. 01787

008595

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1795 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1794 of 1803    PageID 12540

Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 548 of 852    PageID 2453

| | | | | |
|---|---|---|---|---|
| 12/23/20 | **_Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith [D.I. 1625]_** | | | |
| | **Objectors:** Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal is being briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | **_Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c) [D.I. 1752]_** | | | |
| | **Movants:** Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | **_James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith [D.I. 1784]_** | | | |
| | **Objector:** Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

2

Appellee Appx. 01788

Appx. 08588

008596

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1796
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1795 of 1803    PageID 12541
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 549 of 852    PageID 2454

| 1/22/20 | *Objections to Fifth Amended Plan of Reorganization* [D.I. 1472] | | | | |
|---|---|---|---|---|---|
| | **Objectors:**[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | *Application for Allowance of Administrative Expense Claim* [D.I. 1826] | | | | |
| | **Movants:** | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | *NexBank's Application for Allowance of Administrative Expense Claim* [D.I. 1888] | | | | |
| | **Movant:** | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

3

Appellee Appx. 01789

Appx. 08554

008597

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1797
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1796 of 1803    PageID 12542
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 550 of 852    PageID 2455

| 2/8/21 | _James Dondero Motion for Status Conference_ **[D.I. 1914]** | | | |
|---|---|---|---|---|
| | **Movant:** | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |
| 2/28/21 | _Motions for Stay Pending Appeal_ | | | |
| | **Movants:** | | The only parties requesting a stay pending appeal were the Dondero Entities.  They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| | Dondero [D.I. 1973] | Advisors [D.I. 1955] | | |
| | Funds [D.I. 1967] | Trusts [D.I. 1971] | | |

| 3/18/21 | _James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455_ **[D.I. 2060]** | | | |
|---|---|---|---|---|
| | **Movants:** | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. |
| | | Advisors | | |
| | | Trusts | | |
| | | HCRE | | |

| 4/15/21 | _Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith_ **[D.I. 2199]** | | | |
|---|---|---|---|---|
| | **Movants:** | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "<u>UBS</u>") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008.  The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293].  The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308].  UBS also filed a reply [D.I. 2310].  The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors have until June 7 to appeal. |

000547

Appellee Appx. 01790
Appx. 08585
008598

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1798 of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1797 of 1803    PageID 12543

Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 551 of 852    PageID 2456

| | | | | |
|---|---|---|---|---|
| 4/23/21 | **_Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders_ [D.I. 2247]** | | | |
| | **Movants**: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |
| 4/23/21 | **_Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction_ [D.I. 2242]** | | | |
| | **Movants**: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | The Court denied DAF and CLOH have appealed. [D.I. 2513] |
| 4/20/21 | **_Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief_ [D.I. 2229]** | | | |
| | **Movants**: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

5

Appellee Appx. 01791

Appx. 08599

008599

| 4/29/21 | **Motion to Compel Compliance with Bankruptcy Rule 2015.3 [D.I. 2256]** | | | |
|---|---|---|---|---|
| | Movants: | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

**Highland Capital Management, L.P. v. James D. Dondero, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)**

| 12/7/20 | **Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero [D.I. 2]** | | | |
|---|---|---|---|---|
| | Movant: | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

000549

Appellee Appx. 01792

008600

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1800 of 1804

Case 3:21-cv-00879-K   Document 21   Filed 07/28/21   Page 1799 of 1803   PageID 12545

Case 3:21-cv-00842-B   Document 43   Filed 07/13/21   Page 553 of 852   PageID 2458

| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* [D.I. 48] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

**Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd., Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)**

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* [D.I. 2] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor believes it has reached an agreement in principle with the Funds and Advisors that will settle this matter. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

7

Appellee Appx. 01793
Appx. 04656
008601

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1801
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1800 of 1803    PageID 12546
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 554 of 852    PageID 2459

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.***, Adv.
Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the action was moot. | N/A |

***Highland Capital Management, L.P. v. James Dondero***, Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | | |
| **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. | N/A |

8

Appellee Appx. 01794

Appx. 04669

008602

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1801 of 1803    PageID 12547
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 555 of 852    PageID 2460

**_Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P._, Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ **[D.I. 1]** | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 20]** | | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 52]. | N/A |

**_Highland Capital Management, L.P. v. NexPoint Advisors, L.P._, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ **[D.I. 1]** | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note. NPA did not pay the note when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 4/13/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 19]** | | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a report and recommendation on July 9 [D.I. 42].. | N/A |

**_Highland Capital Management, L.P. v. Highland Capital Management Services, Inc._, Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ **[D.I. 1]** | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("HCMS"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 19]** | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

000552

Appellee Appx. 01795
Appx. 04689
008603

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1803
of 1804

Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1802 of 1803    PageID 12548

Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 556 of 852    PageID 2461

**Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)**, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)

| 1/22/21 | _Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate_ [D.I. 1] | | |
|---|---|---|---|
| **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. | N/A |
| 6/3/21 | _Defendants Motion to Withdraw the Reference_ [D.I. 20] | | |
| **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court is preparing a report and recommendation on the motion to withdraw. | |

**Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd.**, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)

| 4/12/21 | _Original Complaint_ | | |
|---|---|---|---|
| **Movants**: | DAF<br><br>CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26] | N/A |
| 4/19/21 | _Plaintiff's Motion for Leave to File First Amended Complaint in the District Court_ | | |
| **Movants**: | DAF<br><br>CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

10

Appellee Appx. 01796

008604

Case 19-34054-sgj11 Doc 3445-8 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1804
of 1804
Case 3:21-cv-00879-K    Document 21    Filed 07/28/21    Page 1803 of 1803    PageID 12549
Case 3:21-cv-00842-B    Document 43    Filed 07/13/21    Page 557 of 852    PageID 2462

*PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, **Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

4/12/21      *Original Complaint*

| | | | | |
|---|---|---|---|---|
| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous.  The Debtor will take all appropriate actions. | The Complaint was recently filed and is currently in litigation. | N/A |

*The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, **Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

4/12/21      *Original Complaint*

| | | | | |
|---|---|---|---|---|
| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

000554

Appellee Appx. 01797
Appx. 04582
008605

# EXHIBIT 9

Appx 04603

008606

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Debtor | § | |
| _____ | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") Notice of Appeal was filed in this Court on April 18, 2021. *See* Doc. No. 1. Appellants appeal an order of the Bankruptcy Court denying Appellants' motion to recuse. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16). Intervenor/Debtor Highland Capital Management, L.P. filed its Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23).

ORDER – PAGE 1

Case 19-34054-sgj11 Doc 3445-9 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 5
Case 3:25-cv-02072-S     Document 15-11     Filed 10/06/25     Page 690 of 1017     PageID 9437
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 2 of 4   PageID 12589

Until a final judgment is issued, the bankruptcy court's denial of the motion to recuse "is not an appealable order, not subject to the collateral order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)." *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012) (citing *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 86 & n.3 (5th Cir. 1992) ("We decline to review the court's denial of the City's motion to recuse, however, because the judge's decision is not an appealable interlocutory order . . . . the City must await a final judgment to appeal the judge's refusal to recuse himself.")); *accord Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001) ("The denial of a recusal motion is not an appealable interlocutory order or an appealable collateral order."); *see also United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995) ("An order denying a motion for the recusal of a district judge is not immediately appealable."). Moreover, "despite the more flexible definitions of finality accorded to bankruptcy orders, denial of a motion to disqualify is not recognized as an exception to the rule requiring finality of judgment of appeal." *In re Global Marine, Inc.*, 108 B.R. 1007, 1008 (S.D. Tex. 1988) (citing *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368 (1981); *In re Delta Servs. Indus., Etc.*, 782 F.2d 1267 (5th Cir. 1986)).

The bankruptcy court's ruling on a motion to recuse must "conclusively and permanently decide the existence of a conflict of interest" for it to come within the collateral doctrine exception. *In re Global Marine*, 108 B.R. at 1008. In this case, the

ORDER – PAGE 2

Case 19-34054-sgj11 Doc 3445-9 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 5
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 691 of 1017 PageID 9438
Case 3:21-cv-00879-K Document 28 Filed 12/10/21 Page 3 of 4 PageID 12590

Bankruptcy Court expressly "reserve[d] the right to supplement or amend this ruling" in the Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"). R. on Appeal, Vol. 1 (Doc. No. 9-1) at 42; *see In re Global Marine*, 108 B.R. at 1008 ("Rather, the Bankruptcy Court reserved the right to review the issue should a conflict appear to arise in the future."). If the bankruptcy court's order denying recusal is "not a final order appealable by right," leave of the district court is required to bring an interlocutory appeal. 28 U.S.C. § 158(a); *cf. In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ.) ("Generally, interlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.").

In this appeal, it is not apparent from the Bankruptcy Court Record on Appeal that jurisdiction lies over this appeal, nor have Appellants clearly established this Court's jurisdiction over the appeal of this order. Accordingly, the Court **ORDERS** Appellants to file a brief on this discrete issue of the Court's appellate jurisdiction. This jurisdictional brief shall be no more than ten (10) pages in length and may cite only to the Bankruptcy Court Record on Appeal already transmitted in this case. **The brief must be filed on or before December 15, 2021**. Appellee may file a responsive brief, no more than ten (10) pages in length, **on or before December 20, 2021**. There shall be no reply brief unless otherwise ordered by the Court.

ORDER – PAGE 3

Case 19-34054-sgj11 Doc 3445-9 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of 5
Case 3:25-cv-02072-S      Document 15-11      Filed 10/06/25      Page 692 of 1017      PageID 9439
Case 3:21-cv-00879-K   Document 28   Filed 12/10/21   Page 4 of 4   PageID 12591

Appellants' failure to timely file this jurisdictional brief will result in the immediate dismissal of this appeal without further notice.

**SO ORDERED.**

Signed December 10th, 2021.

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 4

008610

Appx 04687

# EXHIBIT 10

Appx. 04668

008611

**IN THE UNITED STATES DISTICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-00879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

**APPELLANTS' RESPONSE TO THE COURT'S DECEMBER 10, 2021
MEMORANDUM OPINION AND ORDER**

James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P.,

NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real

Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company

(collectively, "Appellants") file this Response to the Court's December 10, 2021 Memorandum

Opinion and Order [Dkt. 28]:

1.      Appellants recognize that, ordinarily, an order denying recusal is not a final,

appealable order in civil litigation under 28 U.S.C. § 1291 and 1292, at least in the District Court,

until "completion of the entire case, *i.e.*, when the decision terminates the action or ends the

litigation on the merits and leaves nothing for the court to do but execute the judgment."[1]

---

[1] *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) (In civil litigation generally, 28 U.S.C. §
1291 governs appeals from "final decisions." Under that provision, a party may appeal to a court of appeals as of right
from "final decisions of the district courts." The provision on appeals to U. S. district courts from decisions of

Page 1

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 695 of 1017 PageID 9442
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 2 of 10 PageID 12593

2. However, "[a] bankruptcy case embraces an aggregation of individual controversies," and "[o]rders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."[2] It is therefore common for a bankruptcy court to resolve discrete disputes, thereby allowing separate appeals "from discrete, controversy-resolving decisions," even "while the umbrella bankruptcy case remains pending."[3]

3. In other words, bankruptcy is not one dispute susceptible to one final judgment, but rather a series of discrete disputes. When a bankruptcy order puts a discrete dispute to rest, it is therefore a final order for appellate purposes. Accordingly:

> This circuit has long rejected adoption of a rigid rule that a bankruptcy case can only be appealed as a single judicial unit at the end of the entire bankruptcy proceeding. Instead, an appealed bankruptcy order must constitute either a 'final determination of the rights of the parties to secure the relief they seek,' or a final disposition 'of a discrete dispute within the larger bankruptcy case for the order to be considered final.'[4]

4. This standard is "a lower threshold" for meeting the finality requirement than that which is ordinary applicable to District Court practice.[5] Thus, the rule for bankruptcy finality is considered "more liberally or flexibly."[6]

5. The reasoning for a more flexible finality standard in bankruptcy is demonstrated by the facts of this case: if the Court must await the Final Decree in a Chapter 11 case (the technical instrument that closes a Chapter 11 case) to determine an appeal of an order denying recusal, and the appeal is determined in favor of the appellants, then each and every subset of the Chapter 11

---

bankruptcy courts is 28 U.S.C. § 158(a). Under that provision, an appeal of right lies from "final judgments, orders, and decrees" entered by bankruptcy courts "in cases and proceedings." By providing for appeals from final decisions in bankruptcy "proceedings," as distinguished from bankruptcy "cases," Congress made "orders in bankruptcy cases ... immediately appeal[able] if they finally dispose of discrete disputes within the larger [bankruptcy] case.").

[2] *Id.*

[3] *Ritzen Grp.*, 140 S. Ct. at 586–87.

[4] *In re Bartree*, 212 F.3d 277, 282 (5th Cir. 2000) (internal quotations and citations omitted).

[5] *See In re Orr*, 180 F.3d 656, 659 (5th Cir. 1999).

[6] *In re Bartree*, 212 F.3d at 282.

Appx. 04679
008613

proceeding will be subject to reversal. This could cause massive uncertainty and burden on
bankruptcy courts and the parties. As the Fifth Circuit has explained:

> a determination that appellate jurisdiction arises only when the bankruptcy judge
> enters an order which ends the entire bankruptcy case, leaving nothing for the court
> to do but execute the judgment, would substantially frustrate the bankruptcy
> system. This is so particularly when, as here, one independent decision materially
> affects the rest of the bankruptcy proceedings. Separate and discrete orders in many
> bankruptcy proceedings determine the extent of the bankruptcy estate and influence
> creditors to expend or not to expend effort to recover monies due them. The reversal
> of such an order would waste exorbitant amounts of time, money, and labor and
> would likely require parties to start the entire bankruptcy process anew. This
> potential waste of judicial and other resources has influenced this Court and other
> courts of appeals to view finality in bankruptcy proceedings in a more practical and
> less technical light.[7]

6. Consequently, the question is whether the Bankruptcy Court's Recusal Order is a
"final determination of the rights of the parties to secure the relief they seek,' or a final disposition
'of a discrete dispute within the larger bankruptcy case.'"[8] The United States Supreme Court has
held that bankruptcy court rulings are final if the motion was: (1) a distinct proceeding which the
bankruptcy court fully and unequivocally disposed of all issues and relief requested; and (2)
separate from the adversary claims-adjudication process.[9]

7. Here, both elements are met. *First*, Appellants moved to recuse. The Bankruptcy
Court denied Appellants' motion and the requested relief in its entirety.[10] There is nothing left for
the Bankruptcy Court to do or to consider on the issue. Instead, there is a final disposition of the
recusal dispute. Stated differently, the Recusal Order is "an order which ends a discrete judicial
unit in the larger case concludes a bankruptcy proceeding and is a final judgment."[11] *Second*, the
Motion to Recuse was separate from the adversary claims-adjudication process. As a result, the

---

[7] *In re England*, 975 F.2d 1168, 1171 (5th Cir. 1992).
[8] *In re Bartree*, 212 F.3d at 282.
[9] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.
[10] R 31.
[11] *In re England*, 975 F.2d at 1172.

Appx 08614

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 697 of 1017 PageID 9444
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 4 of 10 PageID 12595

Recusal Order is final and appealable, and this Court has jurisdiction.

8.      Moreover, the Bankruptcy Court's reservation in the Recusal Order to supplement or amend its ruling does not change this conclusion. Similar to *Ritzen*, the Recusal Order "ended the [motion to recuse adjudication] and left nothing more for the Bankruptcy Court to do in that proceeding",[12] and "conclusively resolved the movant's entitlement to the requested relief."[13] Importantly, allowing catch-all reservation language in an order that conclusively ended the recusal adjudication to prevent finality would unnecessarily delay the appeal of a fully adjudicated issue. This is especially true here, where it is undisputed that the Recusal Order fully resolved all issues presented and relief requested in the Motion to Recuse.

9.      In fact, the Recusal Order itself suggests an expectation that Appellants would immediately appeal it (…"*if a movant appeals a decision not to disqualify and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record*.").[14] This indicates that the Bankruptcy Court intended for the Recusal Order to be a final order and, perhaps, included its catch-all reservation language in the event of remand (since the Bankruptcy Court did not conduct a hearing on the recusal motion).

10.     Moreover, there is a question as to the Bankruptcy Court's ability to amend the Recusal Order after this appeal was perfected, since "the filing of a notice of appeal is an event of jurisdictional significance –it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."[15] In a similar bankruptcy

---

[12] *Ritzen Grp., Inc.*, 140 S. Ct. at 592.
[13] *Id.* at 591.
[14] R 37 (Recusal Order at p. 7).
[15] *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). As the Fifth Circuit has held, "[t]his rule applies with equal force to bankruptcy cases." *In re Transtexas Gas Corp.*, 303 F.3d 571, 579 (5th Cir. 2002).

Appx 04672
008615

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 698 of 1017 PageID 9445
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 5 of 10 PageID 12596

appeal, this Court concluded that the Bankruptcy Court lacked jurisdiction to enter supplemental findings of fact and conclusions of law after the appeal of the underlying order had been perfected, holding: "[a]s a timely notice of appeal from the sanctions order had been filed, Judge Tillman was powerless—after December 1, 1987—to supplement, amend, or modify his November 17 sanctions order with additional findings of fact or conclusions of law."[16] Thus, if the Bankruptcy Court's reservation language had any application before this appeal, it no longer does, since the Bankruptcy Court is now without jurisdiction to supplement or amend the Recusal Order.

11. The cases cited in the December 10, 2021 Memorandum Order and Opinion do not change this analysis. For example, *In re Global Marine Inc.* involved a dispute regarding whether a debtor's counsel had a conflict of interest warranting a denial of interim compensation.[17] In that case, the bankruptcy court denied the motion to disqualify the law firm because: (1) it found that, at that time, there was not yet a conflict of interest (but reserved the right to review the issue should a conflict appear to arise in the future); and (2) the interim orders on professional compensation were subject to full review in the context of a final order awarding or denying compensation.[18] The *Global Marine* court effectively denied the motion to disqualify without prejudice.

12. Here, unlike in *Global Marine*, the Recusal Order is not an "interim" recusal ruling that is subject to a "final recusal application." While the Bankruptcy Court reserved the right to "supplement and amend" the Recusal Order, there are no adjustments of future awards, amendments, or anything for the court to supplement with respect to any relief requested in the Motion to Recuse.

13. The case *In re Dorsey*, which was also cited in the Recusal Order, involved an

---

[16] *Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 360 (N.D. Tex. 1988).

[17] *In re Global Marine, Inc.*, 108 B.R. 1007 (S.D. Tex. 1988).

[18] *See id.* at 1008. *See also In re Teraforce Tech. Corp.*, 347 B.R. 838, 850 (Bankr. N.D. Tex. 2006) ("an interim fee award is interlocutory in nature and can be reexamined and adjusted by the awarding court").

Appx. 04673
008616

appeal from the district court to the Fifth Circuit Court of Appeals under 28 U.S.C. § 1291.[19] In

that case, the bankruptcy court denied a motion to recuse.[20] The order denying the recusal was

appealed to the district court, which found error and remanded the case back to the bankruptcy

court.[21] On remand, the bankruptcy court again denied the motion to recuse, and another appeal

followed.[22] The district court dismissed the appeal as moot because, at that time, the judge at issue

no longer presided over the bankruptcy. However, the district court did not rule on a separate

appeal of a "gatekeeper" injunction, which remained pending in the district court.[23] The district

court's dismissal of the appeal on the motion to recuse was appealed to the Fifth Circuit. The Fifth

Circuit expressly considered the "final order" requirement under 28 U.S.C. § 1291 and *not* the

bankruptcy appellate statute of 28 U.S.C. § 158(a), which applies the more liberal and flexible

standard discussed above.[24] Because the proceeding before the district court had not been

concluded, the Fifth Circuit found that it lacked jurisdiction over the recusal decision under section

1291.[25]

14.    In *Dorsey* or elsewhere, the Fifth Circuit has not addressed the question of the

finality of an order denying recusal under the bankruptcy appellate statutes, *i.e.*, 28 U.S.C. § 158(a)

(applicable to the district courts) or § 158(d) (applicable to the courts of appeal). The general rule

for finality in the bankruptcy context should therefore control, especially considering the

---

[19] *In re Dorsey*, 489 Fed. Appx. 763 (5th Cir. 2012).

[20] *Id.* at 763-64 ("In a lengthy order from the bench, Judge Hunter denied the motion to disqualify without hearing any evidence. He then orally ruled on the § 727 objection and the injunction, leaving his previous decision on those issues unchanged. Friendly Finance appealed the decision on the injunction and § 727 objection and moved for rehearing of the motion to disqualify. After Judge Hunter denied rehearing, Friendly Finance appealed that decision as well. On appeal, Judge Robert G. James ruled that Judge Hunter erred in failing to give Friendly Finance an opportunity to present evidence to support its motion to disqualify. As a result, Judge James vacated Judge Hunter's order on disqualification and remanded the case for reconsideration.").

[21] *Id.*

[22] *Id.* at 764.

[23] *Id.*

[24] *Id.*

[25] *Id.*

Appx. 04674
008617

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 700 of 1017 PageID 9447
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 7 of 10 PageID 12598

potentially drastic consequences for all involved, including Debtor, if Appellants prevailed on appeal *after* the close of the bankruptcy case.[26] As the Supreme Court noted in *Ritzen*, the appropriate "judicial unit" in a bankruptcy case is not the overall case but the discrete issue.[27]

15.     Alternatively, if the Recusal Order is not a final order, then the collateral order doctrine should apply. Under that doctrine, appellate jurisdiction lies "when an order: (1) conclusively determined the disputed question; (2) resolved an important issue separate from the merits of the case; and (3) is effectively unreviewable on appeal from a final judgment."[28] The collateral order doctrine has been applied to bankruptcy appeals,[29] and the elements of this doctrine, which are similar to the elements governing the finality of bankruptcy orders, are met here. ***First***, the Recusal Order fully determined the disputed question of recusal. ***Second***, the issue of a court's impartiality is certainly an important one and is separate from the merits of the underlying disputes. ***Third***, if the Recusal Order cannot be reviewed until the bankruptcy case itself is final and closed, the appeal might be years in the future. At that time, Debtor and others are certain to argue the doctrine of equitable mootness bars appellate review, as the Debtor will have already implemented its plan, paid its creditors, etc. (the estate being fully administered being the standard for the entry of a final decree).[30]

16.     If the Court disagrees with the foregoing arguments and concludes that the Recusal

---

[26] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

[27] *Ritzen Grp., Inc.*, 140 S. Ct. at 586.

[28] *In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015).

[29] *See, e.g., In re Tullius*, 500 Fed. Appx. 286, 291-92 (5th Cir. 2012) (applying collateral order doctrine to bankruptcy order, but denying application of the doctrine under the facts of the appeal).

[30] *See* FED. R. BANKR. P. 3022.

Appx. 04675
008618

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 701 of 1017 PageID 9448
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 8 of 10 PageID 12599

Order is an interlocutory order, then the Court nevertheless can and should review the Recusal

Order either: (1) pursuant to its original jurisdiction (by withdrawing the reference of the recusal

motion *sua sponte*);[31] (2) by granting a permissive appeal; or (3) by treating the appeal as a petition

for a writ of mandamus.[32] The factors normally applicable to a permissive withdraw of the

reference include: "the goals of promoting uniformity in bankruptcy administration, reducing

forum shopping and confusion, fostering the economical use of the debtors' and creditors'

resources, and expediting the bankruptcy process."[33] These factors support a withdrawal of the

reference here. Appellants are not forum shopping. Appellants are seeking this Court's review of

the Recusal Order. In addition, a prompt review of the Recusal Order would conserve the parties'

and the bankruptcy court's resources and expedite the bankruptcy process, as opposed to the

inevitable future proceedings that would occur if Appellants were forced to wait to appeal until

the conclusion of the bankruptcy case.

17.     With respect to a permissive appeal, this Court may treat Appellants' Notice of

Appeal as a motion for leave to appeal.[34] Permissive appeals generally involve the following

factors: "(1) a controlling issue of law must be involved; (2) the question must be one where there

is substantial ground for difference of opinion; and (3) an immediate appeal must materially

advance the ultimate termination of the litigation."[35] Here, while not be a controlling issue of law

in the traditional sense, judicial disqualification is solely an issue of law.[36] And, when a recusal

---

[31] *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 *2 (5th Cir. 2003) (*sua sponte* vacating judgment and ordering recusal and reassignment).

[32] *In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984) (The question of disqualification is reviewable on a petition for writ of mandamus, but a writ will not lie in the absence of exceptional circumstances.).

[33] *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985).

[34] *See, e.g., Midwest Props. No. Two v. Big Hill Inv. Co.*, 93 B.R. 357, 359-60 (N.D. Tex. 1988) (treating notice of appeal of interlocutory order as a motion for permissive appeal and granting same). *See also* FED. R. BANKR. P. 8003(a)(2).

[35] *In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991).

[36] *Njie v. Lubbock County, Tex.*, 999 F.Supp. 858, 860 (N.D. Tex. 1998)

Appx. 04676
008619

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 702 of 1017 PageID 9449
Case 3:21-cv-00879-K Document 29 Filed 12/15/21 Page 9 of 10 PageID 12600

motion is based upon section 455 (as here), a failure to disqualify is reviewed by looking to whether it was an "abuse of sound judicial discretion."[37] A litigant's right to an impartial judge is fundamental. Here, there appears to be grounds for difference of opinion, and an immediate appeal will advance the ultimate termination of this discrete dispute. Indeed, there is nothing else that can.

18. With respect to a writ of mandamus, Appellants have presented the Court with a substantial case for recusal of the Bankruptcy Court. At present, the Bankruptcy Court is presiding over a dozen or more proceedings in which Debtor and a post-confirmation trustee are seeking hundreds of millions of dollars from Appellants and entities related to Mr. Dondero. As set forth above and in *Ritzen*, the inefficiencies that would result if Appellants prevailed on appeal *after* the close of the bankruptcy case create exceptional circumstances that warrant mandamus.[38]

19. Issues and concerns of such magnitude, made in good faith and with an extensive evidentiary record, merit this Court's review through whatever process is appropriate and available—and there are several. This review is not only to protect Appellants but to protect the integrity of this Court, whose jurisdiction its adjunct exercises.

## CONCLUSION

FOR THE FOREGOING REASONS, Appellants respectfully request the Court determine that the Recusal Order is a final and appealable order; reverse the Bankruptcy Court's order denying the motion to recuse; order that the Bankruptcy Court is recused from the Adversary Proceedings and any future contested matters involving Appellants or any entity connected to Mr.

---

[37] *Id.* at 861.

[38] *See In re England*, 975 F.2d at 1171; *see also Ritzen Grp., Inc.*, 140 S. Ct. at 591 ("Finally, Ritzen protests that the rule we adopt will encourage piecemeal appeals and unduly disrupt the efficiency of the bankruptcy process. As we see it, classifying as final all orders conclusively resolving stay-relief motions will avoid, rather than cause, 'delays and inefficiencies.' Immediate appeal, if successful, will permit creditors to establish their rights expeditiously outside the bankruptcy process, affecting the relief sought and awarded later in the bankruptcy case. The rule Ritzen urges 'would force creditors who lose stay-relief motions to fully litigate their claims in bankruptcy court and then, after the bankruptcy case is over, appeal and seek to redo the litigation all over again in the original court.'").

Appx. 04577
008620

Case 19-34054-sgj11 Doc 3445-10 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 703 of 1017    PageID 9450
Case 3:21-cv-00879-K    Document 29    Filed 12/15/21    Page 10 of 10    PageID 12601

Dondero; and grant Appellants all other further relief, at law or equity, to which they are justly

entitled.

Dated: December 15, 2021                              Respectfully submitted,


                                                     By: */s/ Michael J. Lang*
                                                     Michael J. Lang
                                                     Texas State Bar No. 24036944
                                                     <u>mlang@cwl.law</u>
                                                     CRAWFORD, WISHNEW & LANG PLLC
                                                     1700 Pacific Ave, Suite 2390
                                                     Dallas, Texas 75201
                                                     Telephone: (214) 817-4500

                                                     *Counsel for Appellants*

## CERTIFICATE OF SERVICE

        The undersigned certifies that on December 15, 2021, a true and correct copy of the above

and foregoing document was served on all parties of record via the Court's e-filing system.


                                                     */s/ Michael J. Lang*
                                                     Michael J. Lang

Appx 04678
008621

# EXHIBIT 11

Appx 04579

008622

**Case No. 3:21-cv-00879-K**

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

### JAMES DONDERO, et al.,

### <u>Appellants,</u>

### v.

### HON. STACEY G. C. JERNIGAN,

### <u>Appellee.</u>

---

**On Appeal from the United States Bankruptcy Court
Northern District of Texas, Dallas Division
The Honorable Stacey G. C. Jernigan, United States Bankruptcy Court**

**In re: Highland Capital Management, L.P.
Case No. 19-34054**

---

## DEBTOR'S RESPONSE TO APPELLANTS' BRIEF REGARDING THE COURT'S DECEMBER 10, 2021 MEMORANDUM OPINION AND ORDER

---

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 706 of 1017 PageID 9453
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 2 of 12 PageID 12609

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 707 of 1017 PageID 9454
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 3 of 12 PageID 12610

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "HCMLP")[1]

in the above-captioned chapter 11 case and intervenor in this appeal (the "Appeal") from an order

of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the

"Bankruptcy Court"), by and through its undersigned counsel, hereby files this response to the

*Appellants' Response to the Court's December 10, 2021 Memorandum Opinion and Order* filed

on December 15, 2021 [Docket No. 29] (the "Appellants' Brief") pursuant to this Court's

*Memorandum Opinion and Order* [Docket No. 28] (the "Memorandum Opinion")[2] issued on

December 12, 2021. In support of this response, the Debtor respectfully states as follows:

**A.    The Recusal Order Is Not an Appealable Interlocutory
        Order under Controlling Fifth Circuit Law**

1.    The Memorandum Opinion correctly sets forth the long-standing rule in the Fifth

Circuit that "the denial of a recusal motion is not an appealable interlocutory order or appealable

collateral order."   *Willis v. Kroger*, 2001 U.S. App LEXIS 31841 (5th Cir. June 13, 2001)

(unpublished); *United States v. Henthorn*, 1995 US. App LEXIS 42268 (5th Cir. Aug. 23, 1995)

(unpublished); *Nobby Lobby, Inc. v. Dallas*, 970 F.2d. 82, 86 n.3 (5th Cir. 1992) ("We decline to

review the court's denial of the City's motion to recuse, however, because the judge's opinion is

not an appealable interlocutory order under 28. U.S.C. § 1292(a)"); *Friendly Fin. Serv. - Eastgate

Inc. v Dorsey (In re Dorsey)*, 489 F. App'x 763 (5th Cir. Oct. 12, 2012) ("The denial of a motion

to disqualify is not an appealable final order under 28 U.S.C. § 1291, is not subject to the collateral

order doctrine, and is not an appealable interlocutory order under 28 U.S.C. § 1292(a)."); *Steering*

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of
Reorganization (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943], which confirmed the *Fifth
Amended Plan of Reorganization of Highland Capital Management, L.P.*, as modified (the "Plan"). The Plan became
effective on August 11, 2021.

[2] Unless otherwise noted, (i) capitalized terms used herein have the same meanings ascribed in the Memorandum
Opinion, and (ii) statutory references herein refer to title 28 of the United States Code.

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 708 of 1017 PageID 9455
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 4 of 12 PageID 12611

*Comm. v Mead Corp. (In re Corrugated Container Antitrust Litig.)*, 614 F.2d 958, 960-61 (5th Cir.
1980) ("Disqualification questions are fully reviewable on appeal from final judgment"); *In re
Schweitzer*, 2007 Bankr. LEXIS 75033, *2 (E.D. La. Oct.9, 2007) ("the law is quite clear that an
order denying disqualification of a judge is an interlocutory order for which no appeal lies prior to
final judgment in the case"); *Moerbe v. U.S. Horticultural Supply, Inc. (In re Moerbe)*, 2005 U.S.
Dist. LEXIS 32468, *8 (W.D. Tex. September 1, 2005) ("Because an 'order denying a motion to
recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable,' it would
seem to follow that the order in this case granting the recusal but denying its permanency is
likewise interlocutory") (quoting *In re Am. Ready Mix*, 14 F.3d 1497, 1499 (10th Cir. 1994)).
Thus, the rule in the Fifth Circuit is crystal clear: denial of a recusal motion is not an appealable
interlocutory order or an appealable collateral order.

2.     Appellants do not dispute these holdings. Rather, Appellants urge the Court to
simply disregard the long line of Fifth Circuit authority holding that orders denying a judge's
recusal are interlocutory orders. Instead, Appellants propose that the Court apply section 158(a)
and then determine that the Recusal Order is a final order because the rule for bankruptcy finality
should be "considered more liberally or flexibly."[3] This argument should be rejected. First, as
noted above, the law in the Fifth Circuit is clear that appeals of orders denying recusal orders are
*interlocutory orders*. Those decisions apply to the recusal of both bankruptcy and district court
judges, as section 455(a) applies to "justices, judges, and magistrate judges."[4] Therefore, section

---

[3] Appellants' Brief ¶ 4.

[4] Section 455(a) does not distinguish between bankruptcy judges, district court judges, or appellate judges and broadly
states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in
which his impartiality may be questioned." 28 U.S.C. § 455(a). Appellants acknowledge that section 455(a) applies
to bankruptcy judges because they characterize the issues on appeal as "[w]hether the Bankruptcy Court abused its
discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely" and "[w]hether the
Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the
merits." *Appellants' Brief* [Docket 16] at 1 ("Appellants' Opening Brief").

Appx. 04583
008626

158(a)(1) (which grants district courts appellate jurisdiction over final judgments, orders, and decrees)[5] and section 1291(a) (which grants courts of appeals jurisdiction over final orders of district courts) are completely inapplicable to the issues raised in the Memorandum Opinion. Appellants' references to the finality of orders under either section 158(a)(1) or section 1291 are irrelevant because those statutes do not apply to interlocutory orders. The only available avenues to appeal the interlocutory Recusal Order are if it: (1) falls into any of the enumerated subsections of section 1292(a)[6] allowing for appellate jurisdiction over certain categories of interlocutory appeals (which it does not); (2) falls within the collateral order exception doctrine articulated by the Supreme Court[7] (which it does not, for the reasons discussed below); or (3) if this Court, in its discretion, finds that the appeal should be granted by leave only if Appellants can satisfy the applicable stringent standards for discretionary appeals (which they do not, as discussed below).

    3.     Appellants acknowledge that the Fifth Circuit has not addressed the finality of an order denying a recusal order under section 158(a), as they request this Court to do.[8] Appellants primarily rely on two cases to support their attempted end-run around applicable Fifth Circuit law

---

[5] Section 158(a)(1) provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals . . . from final judgements, orders and decrees . . . ." 28 U.S.C. § 158(a)(1).

[6] Section 1292(a) governs the court's jurisdiction of appeals from interlocutory orders and provides as follows:

  (a)  Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

    (1)  Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

    (2)  Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

    (3)  Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

28 U.S.C. § 1292(a).

[7] *See Cohen v. Beneficial Indus. Loan Corp.*, 69 S. Ct. 1221 (1949).

[8] Appellants' Brief ¶ 14.

Appx 04684

008627

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 710 of 1017 PageID 9457
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 6 of 12 PageID 12613

but neither even addresses the issue of recusal. The narrow issue in *Bartee v Tara Colony Homeowners Ass'n (In re Bartee)*[9] was an appeal of an order sustaining a creditor's objection to a chapter 13 bankruptcy plan.[10] The Fifth Circuit prefaced its analysis by noting "[s]ince this case *does not involve interlocutory orders*, injunctions, or any other orders specified in § 1292, we have jurisdiction over this case only to the extent that the judgments below are considered 'final' within the meaning of § 158 or § 1291."[11] Yet this Appeal *does* involve an interlocutory order, so *Bartee* is inapplicable (in addition to being factually inapposite because it addressed the finality of a chapter 13 plan).

4. Appellants also heavily rely on *Ritzen Grp. v. Jackson Masonry, LLC*, 140 S. Ct. 582 (2020). However, *Ritzen* is also legally and factually inapposite to the instant Appeal. *Ritzen* addressed another narrow issue regarding the finality of a bankruptcy court's order denying a creditor's request for relief from the automatic stay.[12] The Supreme Court held that the adjudication of a motion for relief from stay "forms a discrete procedural unit within the embracive bankruptcy case. That unit yields a final, appealable order when the bankruptcy court *unreservedly* grants or denies relief."[13] The Supreme Court therefore relied on the bankruptcy court's order "conclusively denying that the motion is 'final' and that the "order ended the stay relief adjudication and left nothing more for the Bankruptcy Court to do in that proceeding."[14]

---

[9] 212 F.3d 277 (5th Cir. 2000).

[10] *Id.* at 280.

[11] *Id.* at 282 (emphasis added).

[12] *Ritzen*, 140 S. Ct. at 586 ("The precise issue the Court today decides: Does a creditor's motion for relief from the automatic stay initiate a distinct proceeding in a final appealable order when the bankruptcy court rules dispositively on the motion?")

[13] *Id.* (emphasis added).

[14] *Id.* at 592.

Appx. 04585
008628

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 711 of 1017 PageID 9458
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 7 of 12 PageID 12614

5. *Ritzen* is not applicable to the case *sub judice* for several reasons. **First**, even in the limited context of the appeal of a relief-from-stay order that *Ritzen* addressed, the Supreme Court held that the order had to "conclusively" deny the motion as "final" in order for it to be immediately appealable. On this critical issue, the Supreme Court stated it did "not decide whether finality would attach to an order denying stay relief if the bankruptcy court enters it 'without prejudice' because further developments might change the stay calculus"[15] This is precisely the issue identified by this Court in the Memorandum Opinion by which Judge Jernigan "reserve[d] the right to supplement or amend this ruling" in the Recusal Order.[16] The Recusal Order is not final because, as noted in *Ritzen*, Judge Jernigan's potential future supplementation or amendment of the Recusal Order "might change the calculus" of the order.

6. **Second**, the Supreme Court expressly limited its decision to the issue of whether the conclusive denial of a motion for relief from the automatic stay was a final order capable of immediate appeal. *Ritzen* does not address the standard for the appeal of recusal orders, which are interlocutory orders in this Circuit.[17]

7. **Third**, Appellants' attempt to equate a court's final adjudication of a relief-from-stay order with the denial of a recusal motion misstates the holding of *Ritzen*. Unlike a relief-from-stay order, recusal of a judge is not a "procedural unit" separate from the remaining case.[18] A relief-from-stay proceeding constitutes a discrete dispute within the larger context of the general bankruptcy case. The basis for the *Ritzen* holding is that the adjudication of the stay-relief motion "determines whether a creditor can isolate its claim from those of other creditors and go it alone

---

[15] *Id.* n.4.

[16] ROA Vol.1 (Doc No. 9-1) at 42.

[17] *See supra* n.5.

[18] *Ritzen*, 140 S. Ct. at 591.

Appx 04586
008629

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 712 of 1017 PageID 9459
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 8 of 12 PageID 12615

outside of bankruptcy."[19] However, the Recusal Order is not a discrete issue within the larger case. It affects the entire case as Appellants seek to recuse Judge Jernigan from presiding over all matters arising under the chapter 11 case, including the more than fifteen pending adversary proceedings that are currently before her.

8. None of the cases cited by Appellants rebut the authorities cited in the Memorandum Opinion demonstrating that the Recusal Order is interlocutory. Appellants' attempt to evade the Fifth Circuit law holding that orders denying recusal are interlocutory should be rejected.

**B. Fifth Circuit Law Provides that Recusal Orders Do Not Fall Within the Collateral Order Doctrine**

9. Appellants next argue that if the Recusal Order is not a final order (which it is not), the collateral-order doctrine should apply.[20] But as noted above, the Fifth Circuit has already ruled that orders denying recusal motions are not appealable collateral orders.[21] In addition, the bankruptcy court's ruling on a motion to recuse must "conclusively and clearly decide the existence of a conflict of interest" for the collateral-doctrine exception to apply.[22] The Recusal Order does not conclusively and clearly decide this issue because Judge Jernigan reserved the right to supplement or amend the Recusal Order. Finally, the collateral-order doctrine does not apply to this Appeal because the Recusal Order is not "effectively unreviewable on appeal." As the Fifth Circuit explained, "[d]isqualification questions are *fully reviewable on appeal from final judgment*.

---

[19] *Id*. at 590.

[20] To fall within *Cohen's* collateral order doctrine, an "order must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment." *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 171 (5th Cir. 2009).

[21] *Willis*, 2021 U.S. App. LEXIS 31841, at *1 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Bank of Am. v. Weil Gotshal & Manges (In re Global Marine)*, 108 B.R. 1007, 1008 (S.D. Tex. 1988); *Dorsey*, 489 F. App'x 763 (denial of a motion to disqualify is not subject to the collateral-order doctrine).

[22] *Global Marine*, 108 B.R. at 1008.

Appx 04587
008630

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 713 of 1017 PageID 9460
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 9 of 12 PageID 12616

Precisely because disqualification issues are reviewable following entry of judgment, as a threshold matter the *Cohen* doctrine is unavailing."[23] Therefore, the collateral-order doctrine is not applicable to the Appeal.

**C.    Appellants Never Filed a Motion for Leave to Appeal the Recusal Order as an Interlocutory Order and Have Not Satisfied the Standards for Discretionary Appeal**

10.    Appellants' final argument is that the Recusal Order may be immediately appealable as an interlocutory order through leave of this Court pursuant to section 1292(b).[24] Interlocutory appeals are, as noted by Judge Fish, "'sparingly granted' and reserved for 'exceptional cases.'"[25] Appellants have never moved for an interlocutory appeal as required under Rule 8004(a) of the Federal Rules of Bankruptcy Procedure. Even if the Court were willing to treat the notice of appeal as a motion for leave to appeal, the standards governing interlocutory appeals cited in Appellants' Brief are not satisfied in this case. First, there is no "controlling issue of law involved" here. Appellants want Judge Jernigan recused because they allege her to have an "undeniable animus against Mr. Dondero and the resulting prejudicial effect that animus has on the due process rights of Mr. Dondero, the Trusts and the Affected Entities."[26] This Appeal therefore does not involve any controlling issue of law. Second, there is no substantial ground for difference of opinion in this Appeal. A substantial ground for difference of opinion exists when "'a trial court rules in manner which appears contrary to the rulings of all Court of Appeals which

---

[23] *Corrugated Container*, 614 F.2d at 960-61 (emphasis added; citations omitted).

[24] The determination of whether to grant leave to appeal an interlocutory order from a bankruptcy court is the standard used under section 1292(b). *In re Bernardi & Assocs. v. I. Kunik Co. (In re Delta Produce)*, 2013 U.S. Dist. LEXIS 91579 (W.D. Tex. June 28, 2013). The standard consists of the following elements: (1) a controlling issue of law must be involved; (2) the question must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of litigation. *Id*. at **5-6.

[25] *Balestri v. Hunton & Williams LLP (In re Hallwood Energy)*, 2013 U.S. Dist. LEXIS 18165 at *6 (N.D. Tex. Feb. 11, 2013).

[26] *See* Appellants' Opening Brief ¶ 31.

Appx. 04588
008631

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 714 of 1017 PageID 9461
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 10 of 12 PageID 12617

have reached the issue.'"[27] There is nothing in the record of this Appeal that demonstrates that the Recusal Order is contrary to the rulings of the Fifth Circuit. Rather, the Recusal Order extensively cites controlling authorities in the Fifth Circuit governing a motion to recuse.[28] As to the third factor, immediate appeal will not advance the ultimate termination of litigation. Appellants, along with their related entities, have filed several civil actions and appeals of orders of the Bankruptcy Court, including an appeal of the order confirming the Debtor's Plan which is currently pending before the Fifth Circuit. The resolution of this Appeal will (unfortunately) not advance the termination of the morass of litigation that has enveloped the Debtor's chapter 11 case, which litigation addresses many substantive issues unrelated to Appellants' request to recuse Judge Jernigan from the bankruptcy case.[29]

## Conclusion

For the reasons set forth herein and in the Memorandum Opinion, Appellants have not established that the Court has appellate jurisdiction to directly review the Recusal Order because it is an interlocutory order, the collateral doctrine exception is not applicable to this case, and Appellants cannot satisfy the standards for a discretionary appeal to the extent that the Court is even willing to consider that relief.

---

[27] *Bernardi*, 2013 U.S. Dist. LEXIS 91579 at *10 (quoting *In re Cent. Grain Co-op*, 489 B.R. 403, 412 (Bankr. M.D. La. 2013)).

[28] ROA Vol.1 (Doc No. 9-1) at 5-10 (Judge Jernigan's reliance on among other cases, *United States v. Jordan*, 49 F.3d 152 (5th Cir. 1995); *Davis v. Board of School Comm'rs*, 517 F.2d 1044 (5th Cir. 1975); and *Chitmacha Tribe of La. v. Harry L. Laws Co*, 690 F.2d 1157 (5th Cir. 1982), with respect to standards governing recusal).

[29] Appellants also request that the Court treat the Appeal as a petition for a writ of mandamus. The Memorandum Opinion required briefing "on the discrete issue of the Court's appellate jurisdiction." The Debtor submits this request is not appropriate under the terms of the Memorandum Opinion, should be denied, and in any event, is not appropriate for the reasons articulated herein. *See In re City of Houst*on, 745 F.2d 925, 927 (5th Cir. 1984) (petition for writ of mandamus will not lie in the absence of extraordinary circumstances with respect to appeal of denial of recusal motion); *Corrugated Container Antitrust Litig.*, 614 F.2d at 961 ("In addition to their claim that the decision of the district court is immediately appealable . . . defendants 'out of an abundance of caution' also petition for a writ of mandamus. The contention does not merit extended discussion. We refuse issuance of the writ").

Appx. 04589
008632

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-11    Filed 10/06/25    Page 715 of 1017    PageID 9462
Case 3:21-cv-00879-K    Document 31    Filed 12/20/21    Page 11 of 12    PageID 12618

Dated:  December 20, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

Appx. 04599

008633

Case 19-34054-sgj11 Doc 3445-11 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 716 of 1017 PageID 9463
Case 3:21-cv-00879-K Document 31 Filed 12/20/21 Page 12 of 12 PageID 12619

## CERTIFICATE OF SERVICE

I hereby certify that, on December 20, 2021, a true and correct copy of the foregoing response was served electronically upon all parties registered to receive electronic notice in this case via the Court's CM/ECF system.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

Appx. 04591
008634

**EXHIBIT 12**

Appx. 04692
008635

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 718 of 1017 PageID 9465
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 1 of 14 PageID 12647

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Debtor | § | |
| ———————————————— | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") appeal the Bankruptcy Court's Order Denying [Appellants'] Motion to Recuse Pursuant to 28 U.S.C. § 455 which was entered March 23, 2021. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16). Because the Court lacks jurisdiction over this appeal, the Court hereby **dismisses** this appeal.

ORDER – PAGE 1

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 719 of 1017 PageID 9466
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 2 of 14 PageID 12648

### I.      Relevant Background

Appellants filed a Motion to Recuse under § 455 with the Bankruptcy Court, asking United States Bankruptcy Judge Stacey G. C. Jernigan (the "Bankruptcy Judge") to recuse herself from presiding over the bankruptcy proceeding of Debtor Highland Capital Management, L.P.  In an 11-page Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"), the Bankruptcy Judge denied the Motion while also reserving the right to supplement or amend the ruling.  *See* Am. Notice of Appeal (Doc. No. 1-1) at 5-15.  The Bankruptcy Court entered the Recusal Order on March 23, 2021.  *See id.*; Appellants' Br. (Doc. No. 16).  On April 18, 2021, the Clerk of the Bankruptcy Court transmitted the Notice of Appeal filed by Appellants on April 6, 2021.  *See generally* Doc. No. 1.  It is the Recusal Order that forms the basis of this appeal.  *See id.*  Appellants designated the Bankruptcy Judge as "Appellee".  *See id.*

Before appellate briefing began, Debtor Highland Capital Management, L.P. moved the Court for leave to intervene in this appeal.  *See* Mot. to Intervene (Doc. No. 2).  Debtor Highland Capital Management, L.P. argued that it is the real party-in-interest, not the Bankruptcy Judge.  Mot. to Intervene at 3.  After the Motion to Intervene was fully briefed and ripe, the Court granted the Motion and allowed Debtor Highland Capital Management, L.P. ("Debtor/Intervenor") to file a responsive brief as accorded to an appellee under the bankruptcy rules.  *See generally* Order (Doc. No. 10).

Appx. 04594
008637

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 720 of 1017 PageID 9467
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 3 of 14 PageID 12649

Appellants then filed their Appellants' Brief identifying and arguing two issues on appeal: (1) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely; and (2) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits. Appellants' Br. at 1. Intervenor/Debtor filed an Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23). The Bankruptcy Record on Appeal does not reflect that a final judgment has been entered by the Bankruptcy Court in this matter.

Upon an initial review of the appellate briefing, the Court *sua sponte* questioned its jurisdiction over this appeal. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."). The Court issued an Order (Doc. No. 28) directing the parties to file briefs, respectively, addressing this Court's jurisdiction over an appeal of the Bankruptcy Judge's order denying a motion to recuse when final judgment has not yet been entered. The parties timely filed their respective jurisdictional briefs, and the Court has carefully considered the arguments, the applicable and binding law, and relevant portions of the record. The Court turns now to this threshold jurisdictional issue.

ORDER – PAGE 3

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 721 of 1017 PageID 9468
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 4 of 14 PageID 12650

## II.     Applicable Law

Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
>   (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

28 U.S.C. § 455(a) & (b)(1).  Bankruptcy Rule 5004(a) provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FED. R. BANKR. P. 5004(a).

District courts have jurisdiction over appeals from the following entered by a bankruptcy judge:

> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court , from other interlocutory orders and decrees.

28 U.S.C. § 158(a).

Appx. 04586
008639

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 722 of 1017 PageID 9469
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 5 of 14 PageID 12651

### III. Analysis

#### A. Recusal Order is an Interlocutory Order and Not Immediately Appealable as a Matter of Right

It is well-established law in the Fifth Circuit that a court's order denying a recusal motion is not a final order, is not an appealable interlocutory order, and is not an appealable collateral order, therefore it is reviewable on appeal only from final judgment. *Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001); *United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1164 n.3 (5th Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 614 F.2d 958, 960 (5th Cir. 1980); *Martin v. Driskell*, 2021 WL 4784756, at *1 (5th Cir. July 12, 2021); *In re Gordon*, 2019 WL 11816606, at *1 (5th Cir. Apr. 10, 2019); *Stancu v. Hyatt Corp./Hyatt Regency Dallas*, Civ. Action No. 3:18-CV-1737-E-BN, 2020 WL 853859, at *2 (N.D. Tex. Jan. 30, 2020), *adopted by* 2020 WL 833645 (Feb. 20, 2020)(Brown, J.); *Prather v. Dudley*, Civ. Action No. 9:06cv100, 2006 WL 3317124, at *2 (E.D. Tex. Oct. 18, 2006); *Hardy v. Fed. Express Corp.*, No. Civ.A 97-1620, 1998 WL 104686, at *1 (E.D. La. Mar. 6, 1998). Moreover, both the Fifth Circuit and district courts in this Circuit have applied this very clear, decades-old law in appeals taken from a bankruptcy court's order denying a motion to recuse. *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012); *In re Schweitzer*, Civ. Action No. 07-4036, 2007 WL

Appx. 04687
008640

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 723 of 1017 PageID 9470
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 6 of 14 PageID 12652

2965045, at *1 (E.D. La. Oct. 9, 2007); *In re Moerbe*, No. 03-57260-LMC/04-5043-LMC/SA-04-CA-801-FB, 2005 WL 3337634, at *3 (W.D. Tex. Sept. 1, 2005).

In this case, the Bankruptcy Record on Appeal does not establish that a final judgment has been entered. The law in the Fifth Circuit specifies that a court's order on a motion to disqualify the judge "is not an appealable final order" and "a party 'must await final judgment to appeal [a] judge's refusal to recuse.'" *In re Dorsey*, 489 F. App'x at 764 (holding court was without jurisdiction to review bankruptcy court's decision on motion to recuse because, although final judgment had been entered, the appeal of it had not yet been resolved). Appellants attempt to get around this law by arguing that the courts have considered the "finality" of an order on a motion to recuse only under 28 U.S.C. § 1291 (which applies to jurisdiction of courts of appeals over appeals from final orders of district courts) and not § 158(a) (which applies to jurisdiction of district court over appeals from bankruptcy court orders). Appellants contend this is crucial because the bankruptcy appellate statute, § 158(a), applies here and that statute contemplates the more liberal and flexible "finality" standard accorded to bankruptcy courts, rather than the finality standard under § 1291 pertaining to district court orders. Resp. Br. (Doc. No. 31) at 2-7.

The Court rejects Appellants' suggestion that the Court should or even can construe this Recusal Order under a different "finality" standard mere because the

ORDER – PAGE 6

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 724 of 1017 PageID 9471
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 7 of 14 PageID 12653

Bankruptcy Court entered it. There is nothing in the Court's own research, nor anything provided by Appellants, to suggest that the Court should ignore this binding precedent and apply a more liberal and flexible "finality" standard to this appeal of the Recusal Order merely because it is an order of the Bankruptcy Court. Indeed, courts in this Circuit have not hesitated in applying this well-settled law to an appeal of a bankruptcy court order on a motion to recuse. *See, e.g., In re Schweitzer*, 2007 WL 2965045, at *1 (court found jurisdiction lacking over appeal from bankruptcy court's order denying motion to recuse because "the law is quite clear that an order denying a motion to disqualify a judge is an interlocutory order from which no appeal lies prior to final judgment in the case."); *In re Moerbe*, 2005 WL 3337634, at *3 ("Because an order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable, it would seem to follow that the [the bankruptcy court's] order in this case granting recusal but denying its permanency is likewise interlocutory."). The Court finds no justification for straying from the well-settled law in the Fifth Circuit and finds that the Bankruptcy Court's Recusal Order is not a final appealable order.

The Court also finds that the Recusal Order is not subject to the collateral order doctrine and it is not an interlocutory order that is not immediately appealable. Appellants ask the Court to treat the Recusal Order as subject to the collateral order

ORDER – PAGE 7

Appx. 04699
008642

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 725 of 1017 PageID 9472
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 8 of 14 PageID 12654

doctrine. The Court rejects this request as there is no legal basis for doing so. Appellants again ignore very clear Fifth Circuit law that a court order denying a recusal motion is not an appealable collateral order. *Willis*, 263 F.3d at 163 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Henthorn*, 68 F.3d at 465; *Chitimacha Tribe of La.*, 690 F.2d at 1164 n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960; *In re Dorsey*, 489 F. App'x at 764; *Martin*, 2021 WL 4784756, at *1; *In re Gordon*, 2019 WL 11816606, at *1. There is no justification to stray from this well-settled law. Moreover, the Recusal Order is not an appealable interlocutory order under § 1292(a). *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Dorsey*, 489 F. App'x at 764.

For these reasons, the Court finds, as it must, that the Recusal Order is an interlocutory order from which no appeal lies prior to the Bankruptcy Court entering a final judgment. *See Willis*, 263 F.3d at 163; *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960. Therefore, the Court lacks jurisdiction over this appeal.

### B. Leave to Bring an Interlocutory Appeal

Appellants' last hope for their appeal is securing leave of this Court to bring an interlocutory appeal of the Recusal Order. 28 U.S.C. § 158(a)(3) (district courts may hear appeals "with leave of the court, from other interlocutory orders" of the bankruptcy court). Appellants were required to file a motion for leave to appeal

ORDER – PAGE 8

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 726 of 1017 PageID 9473
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 9 of 14 PageID 12655

contemporaneously with their notice of appeal. FED. R. BANKR. P. 8004(a). The motion for leave to appeal must also include certain contents. *Id.* 8004(b). Despite these unambiguous requirements of the Bankruptcy Rules, Appellants did not comply with them. Their failure, however, does not foreclose the appeal entirely because Bankruptcy Rule 8004(d) permits the Court to "treat the notice of appeal as a motion for leave and either grant it or deny it." FED. R. BANKR. P. 8004(c). In their jurisdictional brief, Appellants ask the Court to treat their Notice of Appeal as a motion for leave to appeal should the Court find the Recusal Order is an interlocutory order. Appellants' Resp. (Doc. No. 29) at 8. The Court turns now to this analysis.

Section 158(a)(3) does not articulate the standard a district court must use in deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit . . . have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals generally." *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ) (citing *In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991); *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, at *3 (N.D. Tex. Feb. 14, 2011)(Kinkeade, J.)); *accord Rivas v. Weisbart*, 2019 WL 5579726, at *2 (E.D. Tex. Oct. 28, 2019); *Celadon Trucking Servs., Inc. v. Moser*, 2019 WL 4226854, at *2 (E.D. Tex. Sept. 4, 2019). There are three elements of the § 1292(b) standard: "(1) a controlling issue of law must be involved; (2) the question

008644
Appx 04704

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 727 of 1017 PageID 9474
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 10 of 14 PageID 12656

must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of the litigation." *In re Ichinose*, 946 F.2d at 1177. An appeal of an interlocutory order is appropriate only where all three elements are satisfied. *See In re Genter*, Civ. Action No. 3:19-CV-1951-E, 2020 WL 3129637, at *2 (N.D. Tex. June 12, 2020)(Brown, J.) (citing *Arparicio v. Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)). "The Fifth Circuit disfavors interlocutory appeals and leave to appeal is sparingly granted." *Id.* (internal citations omitted); *In re Hallwood Energy*, 2013 WL 524418, at *2 ("[I]nterlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.") (internal citations omitted). The decision whether to grant an interlocutory appeal is firmly within the district court's discretion. *Panda Energy Int'l*, 2011 WL 610016, at *3.

In this case, there is no controlling question of law with substantial grounds for disagreement for which resolution would materially advance the end of the bankruptcy litigation. It is well-settled that a recusal motion under § 455 is left to the sound discretion of the judge. *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982); *see In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018) (citing *Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999)). "[C]ontrolling issue of law is one that has 'the potential for substantially accelerating the disposition of the litigation' and does not concern 'matters that are entrusted to the discretion of the bankruptcy

Appx. 04792
008645

court.'" *In re Moerbe*, 2005 WL 3337634, at *4 (W.D. Tex. Sept. 1, 2005) (quoting *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (S.D.N.Y. 1996)). The Recusal Order was an exercise of the Bankruptcy Judge's discretion, so there is no controlling issue of law presented. *Cf. In re Tullius*, 2011 WL 5006673, at *3 (W.D. Tex. Oct. 20, 2011). Appellants also cannot satisfy the second factor because the Court cannot find there exists substantial ground for difference of opinion as to the Recusal Motion.

> [C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006)(Boyle, J.) (internal citation omitted). The Recusal Order does not fall within any of those categories. Simply because Appellants believe the Bankruptcy Court ruled incorrectly does not demonstrate substantial ground for disagreement. *Id.* at 724. Finally, the third element eludes Appellants as well. An interlocutory appeal of the Recusal Order will in no way materially advance the ultimate end to this bankruptcy matter.

The Fifth Circuit strongly disfavors interlocutory appeals and, accordingly, they are rarely granted and reserved for "exceptional cases". *See, e.g., In re Genter*, 2020 WL 3129637, at *2. Appellants failed to satisfy any of the three § 1292(b) criteria. *Id.*

ORDER – PAGE 11

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 729 of 1017 PageID 9476
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 12 of 14 PageID 12658

Therefore, in its discretion, the Court **denies** Appellants leave to take an interlocutory appeal of the Bankruptcy Court's Recusal Order.

Finally, the Court turns to the remaining arguments Appellants assert. First, the Court declines to *sua sponte* withdraw the reference of Appellants' motion for the bankruptcy judge to recuse herself. The case Appellants cite in support of this suggestion is inapposite here. In the unpublished Fifth Circuit opinion, *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 (5th Cir. 2003), the appellant sought leave to appeal the dismissal of his 28 U.S.C. § 2254 petition. *See generally Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958. The magistrate judge recommended dismissal the § 2254 petition and the district judge adopted the recommendation and dismissed the petition. *See id.* at \*1-2. The Fifth Circuit did not address the merits of the dismissal, but, instead, *sua sponte* vacated the district court's final judgment and remanded with instructions to assign the case to a different district judge. *Id.* at \*2. The Fifth Circuit's reasoning—the district judge was the spouse of the magistrate judge and the *pro se* prisoner likely did not know nor could he have reasonably known this. *Id.* Unlike the unusual and exceptional facts in *Maddox*, the Court does not find this appeal to justify *sua sponte* withdrawing the reference of and ruling on Appellants' motion to recuse.

The Court also finds no justification for treating Appellants' notice of appeal as a petition for writ of mandamus, which Appellants also request. A question of recusal

ORDER – PAGE 12

Appx 04704
008647

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 730 of 1017 PageID 9477
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 13 of 14 PageID 12659

is reviewable on a petition for writ of mandamus. *United States v. Gregory*, 656 F.2d 1132, 1136 (5th Cir. 1981); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *In re Cameron Int'l Corp.*, 393 F. App'x 133, 134-35 (5th Cir. 2010). "However, the writ will not lie in the absence of exceptional circumstances, and the party seeking the writ has the burden of proving a clear and indisputable right to it." *In re Placid Oil Co.*, 802 F.2d at 786 (citing *Gregory*, 656 F.2d at 1136); *accord In re Cameron Int'l Corp.*, 393 F. App'x at 134-35. Appellants fail to make the required showing. The Court refuses to construe Appellants' appeal as a petition for writ of mandamus.

### C. Conclusion

The well-established precedent in the Fifth Circuit is that no jurisdiction lies over an appeal of a motion to recuse until final judgment has been entered. Appellants make arguments about potential inefficiency and wasted resources if they must wait to appeal the Recusal Order until the final judgment has been entered. But these arguments are not novel. The Court is certain those same arguments have been advanced in other courts considering this same issue and those courts have rejected them, as this Court does here. Appellants would have this Court carve out an exception to the well-settled law for them without any justifiable basis other than because they think the Bankruptcy Judge was wrong. Appellants must await final judgment, or other

008648

Case 19-34054-sgj11 Doc 3445-12 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 731 of 1017 PageID 9478
Case 3:21-cv-00879-K Document 39 Filed 02/09/22 Page 14 of 14 PageID 12660

final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order.
This Court has no jurisdiction to hear this appeal.

### IV.    Conclusion

The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292(a) and the Court is **without jurisdiction** over this appeal of the Bankruptcy Court's Recusal Order.  The Court further **denies** Appellants leave to appeal the Recusal Order under § 1292(b), **denies** Appellants' request to withdraw the reference of their motion to recuse, and **denies** Appellants' request to construe their appeal as a petition for writ of mandamus.  Accordingly, the Court **dismisses** this appeal for lack of jurisdiction.

**SO ORDERED.**

Signed February 9th, 2022.

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 14

008649

# EXHIBIT 13

008650

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )     Case No. 19-34054-sgj-11
 3    In Re:                        )     Chapter 11
                                    )
 4    HIGHLAND CAPITAL              )     Dallas, Texas
      MANAGEMENT, L.P.,             )     Thursday, June 10, 2021
 5                                  )     9:30 a.m. Docket
              Debtor.              )
 6                                  )     MOTION TO COMPEL COMPLIANCE
                                    )     WITH BANKRUPTCY RULE 2015.3
 7                                  )     FILED BY GET GOOD TRUST AND
                                    )     THE DUGABOY INVESTMENT TRUST
 8                                  )     (2256)
                                    )
 9    _____)
                                    )
10    HIGHLAND CAPITAL              )     Adversary Proceeding 21-3006-sgj
      MANAGEMENT, L.P.,             )
11                                  )
              Plaintiff,            )     DEFENDANT'S MOTION FOR LEAVE
12                                  )     TO FILE AMENDED ANSWER AND
      v.                            )     BRIEF IN SUPPORT [15]
13                                  )
      HIGHLAND CAPITAL              )
14    MANAGEMENT SERVICES, INC.,    )
                                    )
15            Defendant.           )
      _____)
16                                  )
      HIGHLAND CAPITAL              )     Adversary Proceeding 21-3007-sgj
17    MANAGEMENT, L.P.,             )
                                    )
18            Plaintiff,            )     DEFENDANT'S MOTION FOR LEAVE
      TO                            )     TO AMEND ANSWER TO PLAINTIFF'S
19    v.                            )     COMPLAINT [16]
                                    )
20    HCRE PARTNERS, LLC            )
      N/K/A NEXPOINT REAL           )
21    ESTATE PARTNERS, LLC,         )
                                    )
22            Defendant.           )
      _____)
23
                      TRANSCRIPT OF PROCEEDINGS
24            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.
25
```

```
 1    WEBEX APPEARANCES:

 2    For the Get Good Trust        Douglas S. Draper
      and Dugaboy Investment        HELLER, DRAPER & HORN, LLC
 3    Trust:                        650 Poydras Street, Suite 2500
                                    New Orleans, LA  70130
 4                                  (504) 299-3300

 5    For the Debtor:               Jeffrey Nathan Pomerantz
                                    PACHULSKI STANG ZIEHL & JONES, LLP
 6                                  10100 Santa Monica Blvd.,
                                       13th Floor
 7                                  Los Angeles, CA  90067-4003
                                    (310) 277-6910
 8
      For the Debtor:               John A. Morris
 9                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    780 Third Avenue, 34th Floor
10                                  New York, NY  10017-2024
                                    (212) 561-7700
11
      For the Official Committee    Matthew A. Clemente
12    of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                                    One South Dearborn Street
13                                  Chicago, IL  60603
                                    (312) 853-7539
14
      For James Dondero:            Clay M. Taylor
15                                  BONDS ELLIS EPPICH SCHAFER
                                       JONES, LLP
16                                  420 Throckmorton Street,
                                       Suite 1000
17                                  Fort Worth, TX  76102
                                    (817) 405-6900
18
      For the NexPoint              Lauren K. Drawhorn
19    Parties:                      WICK PHILLIPS
                                    3131 McKinney Avenue, Suite 100
20                                  Dallas, TX  75204
                                    (214) 692-6200
21
      Recorded by:                  Michael F. Edmond, Sr.
22                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
23                                  Dallas, TX  75242
                                    (214) 753-2062
24

25
```

3

1    Transcribed by:            Kathy Rehling
                               311 Paradise Cove
2                              Shady Shores, TX  76208
                               (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

25

Appx. 04710
008653

4

1          DALLAS, TEXAS - JUNE 10, 2021 - 9:44 A.M.

2          THE COURT:  All right.  Let me change my stacks here.

3     I will now hear what was Matter No. 1 on the docket, Highland

4     Capital, Case No. 19-34054.  We have a motion from the Dugaboy

5     and Get Good Trusts seeking compliance with Bankruptcy Rule

6     2015.3.

7         Who do we have appearing for the trusts this morning?

8          MR. DRAPER:  Douglas Draper, Your Honor.

9          THE COURT:  All right.  And for the Debtor this

10    morning?

11         MR. POMERANTZ:  Good morning, Your Honor.  Jeffrey

12    Pomerantz; Pachulski Stang Ziehl & Jones; on behalf of the

13    Debtor.

14         THE COURT:  All right.  Do we have any other parties

15    wishing to make an appearances?  These are the only parties

16    who filed pleadings, but I'll go ahead and ask if anyone wants

17    to appear for any reason.

18         MR. CLEMENTE:  Good morning, Your Honor.  It's Matt

19    Clemente at Sidley on behalf of the Committee.  I'm here.

20         THE COURT:  All right.  Thank you, Mr. Clemente.

21        All right.  Mr. Draper, how did you want to proceed?

22         MR. DRAPER:  I'd just -- I think the issue is

23    primarily a legal issue, Your Honor.

24         THE COURT:  Uh-huh.

25         MR. DRAPER:  So we've filed with the Court our

5

 1   response to the Debtor's opposition, I have some comments I'd

 2   I like to make, and just leave it at that.  I think -- as I

 3   said, I believe the issue is purely a legal issue --

 4          THE COURT:  Uh-huh.  Okay.

 5          MR. DRAPER:  -- and can go from that.

 6          THE COURT:  All right.

 7          MR. DRAPER:  All right.  We are here -- thank you,

 8   Your Honor.  Can I start?

 9          THE COURT:  Yes, you may.

10          MR. DRAPER:  Thank you.  We're here before the Court

11   today on what should be a rather routine matter.  All I'm

12   asking the Court to do is to require the Debtor to do what it

13   should have done when the case was filed and is required

14   pursuant to Bankruptcy Rule 2015.3.

15      2015.3 uses the term "shall" and requires the Debtor to

16   file an official form -- and this is important, because I'm

17   going to come back to the official form -- with respect to the

18   value, operations, and profitability of each entity in which

19   the Debtor has a substantial or controlling interest.

20      The reports, the Rule says, shall be filed seven days

21   before the first meeting of creditors and every six months

22   thereafter.

23      Under 2015.3(d), I recognize a court may, after notice and

24   a hearing, modify the reporting requirement.  No request has

25   been made by counsel for the Debtor, who I will stipulate

6

1    knows the Rules, are experienced, and understand that the rule

2    existed the day they came into the case.  And quite frankly,

3    what we have now is, from what I can see, an intentional

4    decision not to file the report.

5       As the Court knows, this matter was brought before this

6    Court in February, when the confirmation hearing was held.

7    And if the Court will recall, Mr. Seery's comment was (a) it

8    slipped through the cracks; and (b) he implied that it would

9    be done.  That was February.  I had hoped, and I think

10   everybody had hoped, that Mr. Seery, Highland, and Debtor's

11   counsel would be so embarrassed by the fact that they didn't

12   file [sic] the rule that they would have either (a) filed

13   [sic] the rule; or (b) sought -- sought a waiver of the rule.

14   They did neither.

15      Now, let's -- let's go through the 2015.3(d).  There are

16   two items that are not exclusive, and so I recognize it.  The

17   first is that they can't do it, and second is with respect to

18   the information is publicly available.  If you look at the

19   cases that the Debtor has cited in support of their position

20   that courts have waived compliance with the rule, you'll note

21   that three of the four cases deal with first day motions when

22   in fact they ask for extensions of time to file their

23   schedule, Statement of Financial Affairs, and other things.

24   These are normal first day motions.  I understand the

25   extension in that case.  And quite frankly, those extensions

7

 1 │ are -- fall into the "I can't do it."

 2 │     The only excuse the Debtor has offered, other than their

 3 │ response to date, was, oh, I forgot, or it slipped through the

 4 │ cracks.  That is not a legitimate excuse.  It never has been

 5 │ and never will be, and should not be countenanced by the

 6 │ Court.

 7 │     And so let's start with the after-the-fact excuses offered

 8 │ by the Debtor.  The first is the bad guy defense -- *i.e.*,

 9 │ Dugaboy is a Dondero entity; they're asking for this

10 │ information for nefarious purposes.  That has to -- that

11 │ should be completely disregarded by the Court.  This is a

12 │ systematic issue that neither you nor I nor the Debtor's

13 │ counsel put in the Code or put in the Rules.  It is a

14 │ requirement, it's systematic, and we, as counsel and people

15 │ acting on behalf of the estate and sort of people who oversee

16 │ the system, should insist that this be filed.  The bad guy

17 │ defense is not an excuse.  And quite frankly, this is

18 │ information that is required.

19 │     So what I'm asking for today is not gamesmanship.  I don't

20 │ think it is ever gamesmanship when you ask for the compliance

21 │ with a rule that says shall.  Again, it's systematic, and we

22 │ are here -- and I don't know why -- either the U.S. Trustee

23 │ was asleep at the switch or anybody else was asleep at the

24 │ switch -- that this matter hadn't been brought to the Court's

25 │ attention.

8

1        So the word "shall" is not strained in any fashion.  It's

2   not limited in any fashion.  The word "shall" is absolute.

3        So, again, had -- was there some secret deal between the

4   Trustee -- U.S. Trustee and the Debtor?  I don't know.  That

5   may have been.  But quite frankly, --

6            THE COURT:  A secret deal?

7            MR. DRAPER:  -- the Code, in 2015 --

8            THE COURT:  Did you just use the term "a secret

9   deal"?

10           MR. DRAPER:  Well, some --

11           THE COURT:  What --

12           MR. DRAPER:  I'm not using the term.  What I --

13           THE COURT:  That's highly charged, that --

14   =      MR. DRAPER:  No, --

15           THE COURT:  -- choice of words.

16           MR. DRAPER:  What I mean, what I really mean is

17   sometimes we go to the U.S. Trustee and say, look, can we have

18   an extension?  Can we have -- can we do this a little bit

19   later?  And the U.S. Trustee, in fairness to them, basically

20   says, okay, you can do this or that.  I don't know if that

21   occurred in this case.  But quite frankly, what we have are 20

22   months of noncompliance.  And so I don't know if they said,

23   look, --

24           THE COURT:  Okay.

25           MR. DRAPER:  -- you don't have to file it now.

9

```
 1          THE COURT:  So you meant an informal deal, not secret

 2    deal?

 3          MR. DRAPER:  Yes.

 4          THE COURT:  A secret deal, that sounds like something

 5    nefarious.  Okay?  So, --

 6          MR. DRAPER:  No, it is not intended in that -- it's

 7    --

 8          THE COURT:  Okay.

 9          MR. DRAPER:  Judge, it's not intended in that

10    fashion.

11          THE COURT:  Okay.

12          MR. DRAPER:  This goes to my issue that it's

13    systematic.  It's a systematic compliance.

14       And let's also go the fact that the Bankruptcy Code

15    requires complete and open disclosure.  It does not matter who

16    or why compliance is requested.

17       The next objection is I waited too long.  And they offer

18    an excuse, Judge, we're going to go effective.  Let's look at

19    what the Code requires -- the rule requires.  It says it shall

20    be filed, it has to be filed at certain points, through the

21    effective date of a plan.  It doesn't say after the effective

22    date of a plan is filed or after the effective date of a -- of

23    a plan occurs, your compliance is not required.

24       And I'll point out something where you ruled against me,

25    and we've contrasted that in our motion -- in our opposition.
```

10

1    If you look at the examiner statute, which I know the Court

2    has looked at and completely disagreed with my reading of it,

3    it basically says after confirmation you don't have to do it.

4    This statute doesn't say that.  This statute says you have to

5    file these through the effective date of a plan.

6        And so, you know, that "You waited too long" is really not

7    a legitimate excuse.

8        The next issue is -- and --

9            THE COURT:  Well, on that point, --

10            MR. DRAPER:  And let's look at the cases.

11            THE COURT:  On that point, can I just ask, what is

12    the utility?  I mean, let's say we're one -- okay.  Let's say

13    we're one month away from the effective date.  Let's say we're

14    three months away from the effective date.  What is the

15    utility at this point?  There's a confirmed plan.  Now,

16    granted, it's on appeal.  But, you know, what -- what would

17    you --

18            MR. DRAPER:  Well, --

19            THE COURT:  What would you do with this information

20    at this point?  We have a confirmed plan.

21            MR. DRAPER:  Well, there are two responses to that.

22    First of all, the rule says you have to file it through the

23    effective date of a plan.  Somebody in rulemaking authority

24    made that determination.  And so it's not for you or I to

25    question.  That's the rule.

11

1     The second is the utility may be for further actions in

2   the case that occur after the effective date.  We just don't

3   know.

4     And so the rule is designed to require things to be filed

5   --

6           THE COURT:  Wait.  What did that last statement mean,

7   --

8           MR. DRAPER:  -- through the effective date.

9           THE COURT:  -- for actions that might occur after the

10  effective date?

11          MR. DRAPER:  It may be --

12          THE COURT:  What does that mean?

13          MR. DRAPER:  After the effective date of a plan.

14  There may be some -- some matter that comes up before the

15  Court.  And I'll give you the best example --

16          THE COURT:  Well, --

17          MR. DRAPER:  -- of all of them.

18          THE COURT:  Okay.

19          MR. DRAPER:  If you look -- if you look at the form,

20  all right, and what I'd ask the Court to look at is -- I think

21  it's Exhibit E that's required on the form.  And what Exhibit

22  E requires is disclosure of information where one of the

23  subsidiaries has either paid or has decided -- has incurred a

24  liability to somebody who would have an administrative expense

25  against the Debtor.

Appx. 04718
008661

12

```
 1        The utility of that post-effective date is important,
 2   because post-effective date you'll be dealing with fee
 3   applications and other things.  So the rule envisions
 4   disclosure --
 5             THE COURT:  Okay, I -- say that again for me slowly.
 6   How --
 7             MR. DRAPER:  Okay.
 8             THE COURT:  How could there be an administrative
 9   expense --
10             MR. DRAPER:  If you'll --
11             THE COURT:  -- claim against the estate in your
12   scenario, again?
13             MR. DRAPER:  Well, my scenario, if you look at
14   Exhibit E that's required in the form, --
15             THE COURT:  Do I have that, Nate?
16             MR. DRAPER:  -- it basically requires a disclosure.
17             THE COURT:  Okay.  I don't know if I have it in my
18   stack of paper.  I --
19             MR. DRAPER:  Well, let me read it to -- I can read it
20   to you, Your Honor.  It's easy.  Let me pull it up.
21        Exhibit E, "Describe any payment by the controlled
22   nondebtor entity of any claim, administrative expense, or
23   professional fee that have been paid or could be asserted
24   against the Debtor or the incurrence of any obligation to make
25   such payments, together with the reason for the entity's
```

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 745 of 1017 PageID 9492

13

1  payment thereof or the incurrence of any obligation with

2  respect thereof."

3      That is clearly a post-effective date issue that the Court

4  should be concerned about, all parties should be concerned

5  about, and so if that occurred, then everybody needs to know

6  about it.

7      So E envisions something that is absolutely after the

8  effective date that will be -- has a utility after the

9  effective date.

10     Let's look at B.  Again, something that may have something

11 to do with after the effective date.  That deals with tax-

12 sharing agreements and tax-sharing attributes.

13     So -- and then C, which also has something to do with

14 after the effective date and how things sort out through the

15 liquidation, is described claims between controlled debtor,

16 controlled nondebtor entity and any other controlled nondebtor

17 entity.

18     So there needs to be a disclosure of due-to's and due-

19 from's between the entities.  This is -- this is not secret

20 stuff.  This is stuff that transcends the effective date of a

21 plan.

22     And so when I focused on the rule, what I think the Court

23 really needs to look at for the utility of this is exactly

24 what the -- is required by a 2015.3 disclosure.

25     Does that answer the Court's question?

14

1          THE COURT:  Yes.

2          MR. DRAPER:  Now, my favorite excuse that's been

3   offered is really what I'll call the secret sauce dispute --

4   excuse, or the former lawyers for the Debtor.  Again, let's

5   break this down and let's look at the form.

6       What the form requires is there's nothing the Debtor's

7   former lawyers did or who were working for Mr. Dondero.  If

8   you look at Exhibit A that's required, is contains the most

9   readily-available balance sheet.  That's not a legal issue.

10  Statement of income or loss.  That's -- that's just an

11  accounting concept.  Statement of cash flows.  That's also an

12  accounting concept.  And statement of changes in shareholders

13  or partners equity for the period covered by the entire

14  report.

15      B again has nothing to do with the lawyers, is describe

16  the controlled nondebtor business entity's business

17  operations.

18      So the information that's here is purely accounting

19  information and it is not secret.

20      Let's, again, let's focus on A, which -- which I think

21  just deals with financial information.  The first one is

22  balance sheet.  All right.  They've argued that this tells

23  what the value -- what we think the value of an asset is.

24  That's not true.  A balance sheet may have a fair market

25  value.  A balance sheet may have a book value.  I don't know

15

```
 1    what they have here.  But quite frankly, if you or I sell my
 2    house, our house, we go to our agent and we say, hey, look,
 3    agent, you know, this is my listing price.  That's my opinion
 4    as to value.  It may not be somebody else's opinion as to
 5    value.  And quite frankly, when somebody asks or wants to buy
 6    an asset, what they come to, don't they ask, hey, what do you
 7    want for it?
 8        You know, book value does not equal value.  And I know the
 9    Court has held -- has had before it many clients or many
10    debtors, and I've represented a lot of debtors, who think a
11    Bic pen that they have is not worth ten cents but is worth a
12    gazillion dollars.
13        So that issue doesn't go to any secret information.  The
14    statement of income doesn't go to secret information.
15    Statement of cash flows does not.  And changes in shareholders
16    does not.  There's no secret information.  The only person who
17    this may be kept away from, possibly, and that -- that, I
18    don't think applies, is a competitor who may want to look at
19    these.  And a court can fashion that relief and say, okay,
20    let's put this under seal.  If somebody signs a
21    confidentiality agreement, they can have access to this.
22        But this is purely accounting information.  It's nothing
23    more.
24        And the reference to trade secrets that the Debtor
25    attempts to make is just not true.  This is not a trade
```

16

1  secret.  There's no confidential research or development or

2  commercial information that's being disclosed.  And 9018 that

3  they cite is truly an evidentiary rule.  We're not -- this --

4  this requirement does not go to customers.  It does not go to

5  pricing.  It does not go to business processes.  It just goes

6  to financial information.

7      So the global argument that they're making is undercut

8  significantly by the -- by what is required under the rule.

9  I'm just asking for mere compliance with the rule, nothing

10 more.

11     And so, you know, what -- I still don't understand what

12 the issue is, why it hadn't been done.  And quite frankly,

13 again, this is systematic.  It has nothing to do with who is

14 requesting it, what is requesting it.  It should have been

15 done.  It should have been done probably by the U.S. Trustee.

16 You know, somebody -- you know, and quite frankly, I've been

17 in this case since December.  It was raised in February.  You

18 know, I don't understand why, from February to the time I

19 filed this motion, they didn't come in and either (a) file the

20 reports, which on their face appear to be benign; or (b) ask

21 for some reason other than, oops, I forgot.

22     And so I'd ask the Court to require compliance.  I don't

23 think the information here falls into any category of for

24 cause.  They can do it.  This -- and the cases -- any case

25 they cite does not support their proposition that it shouldn't

17

1  be done.

2      Does the Court have any questions for me?

3          THE COURT: Well, I do. My brain just constantly

4  goes to standing. And remind me again, the trusts you

5  represent have each filed proofs of claim, correct?

6          MR. DRAPER: Yes. And they're objected to, --

7          THE COURT: They are objected to.

8          MR. DRAPER: -- just so the Court's aware.

9          THE COURT: Okay. Remind me again what the substance

10  of the claim is about.

11          MR. DRAPER: The substance of the claim is I have a

12  -- I have a $17 million debt owed to me by Highland Select.

13  And it is our position that this Debtor is also liable for the

14  Highland Select debts through its general partner status,

15  through its comingling of things, and how these assets fit

16  together, between Highland Select, which is a hundred percent

17  owned by the -- ultimately owned by this Debtor. So I'd --

18  again, the standing issue --

19          THE COURT: And the debt is --

20          MR. DRAPER: And I am also an equity holder.

21          THE COURT: And the debt is pursuant to a note?

22          MR. DRAPER: It's pursuant to a loan agreement

23  between my client and Highland Select.

24          THE COURT: All right. And was an administrative

25  expense filed by your client?

18

1          MR. DRAPER:  Not by my client.  No.  And I'm also an

2    equity holder in the Debtor that, when the plan goes

3    effective, I ultimately have, at best, a residual interest

4    when the Star Trek Enterprise returns.

5          THE COURT:  Okay.  And what is that residual

6    interest?  Remind me again.  Isn't it less than one percent --

7          MR. DRAPER:  After the --

8          THE COURT:  -- of a subordinated --

9          MR. DRAPER:  After all the class --

10          THE COURT:  Go ahead.

11          MR. DRAPER:  Right.  Well, after all the classes are

12    paid in full plus a hundred cents on the dollar -- get a

13    hundred cents on the dollar plus some interest factor, and the

14    -- there's another party who has an equity interest that's

15    ahead of me get paid, I get some -- some money.

16      Again, I have a residual interest.  It's very tangential.

17    And I'll be very frank to the Court and honest, I think

18    ultimately I will receive nothing under that residual

19    interest.

20      However, my -- the standing is not really an issue here.

21    Honestly, this is a systematic issue.  I've tried to make that

22    clear for the Court.  It's something that should be employed,

23    and who is asking for it is irrelevant.  The Code requires --

24    the Rules require it.  There is no excuse that they've given

25    that should absolve them of that.  And whatever excuse they've

19

1  given basically falls in -- falls in the face of what the rule

2  -- the official form requires.

3      I'm not asking for a variance of the official form.  I'm

4  asking that this Court not allow a "Oops, I forgot" or "It

5  slipped through the cracks" excuse.

6          THE COURT:  All right.  And who is the current

7  trustee of these trusts now?

8          MR. DRAPER:  My trusts?  Nancy Dondero is the trustee

9  of the Dugaboy Trust, and I think Grant Scott is the trustee

10 of the Get Good Trust.

11         THE COURT:  Okay.  I'm asking because we heard

12 earlier this week that Grant Scott has resigned from certain

13 roles.

14     All right.  Mr. Pomerantz, do you have evidence, --

15         MR. POMERANTZ:  Yes, Your Honor.

16         THE COURT:  -- or argument only?

17         MR. POMERANTZ:  Argument only, Your Honor.

18         THE COURT:  Okay.

19         MR. POMERANTZ:  As with -- as with many of the other

20 motions that have been filed with this -- in this case and has

21 burdened the Court's docket over the last several months, I

22 really can't help to wonder why we are here.

23     Eighteen months after the case was filed, after plan

24 confirmation, and with the effective date that's set to occur

25 soon, Dugaboy and Get Good, the family trusts, ask the Court

20

```
 1  to compel the Debtor's compliance with 2015.3.  It reminds me
 2  of the motion that Mr. Draper mentioned that he filed on the
 3  eve of confirmation, the eve of confirmation, fourteen months
 4  after the case had been filed, seeking an examiner.  And the
 5  Court denied that motion without a hearing.
 6      Now they're back again with, as Your Honor mentioned and
 7  I'll get to in a little bit, with the same tangential
 8  connection to the bankruptcy case and the same tenuous
 9  standing that the Court has alluded to on several occasions,
10  including just a couple minutes ago.
11      It's clear that the motion, which is not supported by any
12  other creditor in the case and is actually opposed by the
13  Official Unsecured Creditors' Committee, is not about
14  financial transparency, as Mr. Draper would like Your Honor to
15  believe, but it's filed as a further litigation tactic to gain
16  access to information that Mr. Dondero would not be able to
17  obtain through discovery, who has tried to obtain through
18  other means, and that the Debtor believes will be used for
19  improper purposes.
20      One of the Movants, Dugaboy, is actually the holder of two
21  claims against the Debtor.  I guess Mr. Draper forgot about
22  his administrative claim, which really goes to the validity of
23  it.  One is the claim against the Select Fund, a subsidiary of
24  the Debtor, for which Mr. Draper says they should be liable,
25  including under an alter ego theory.
```

21

1    Yes, Your Honor heard me right.  Dugaboy is saying that

2 the Debtor is an alter ego with a nondebtor entity.  One would

3 think that, given the recent disclosures and commencement of

4 litigation -- and I'm talking about the UBS litigation -- that

5 Mr. Dondero would be the last one to raise alter ego.  In any

6 event, that claim is disputed.

7    The second claim is an administrative claim that Mr.

8 Draper filed on account of their 1.71 percent interest in

9 Multistrat, saying they were damaged by decisions Mr. Seery

10 made by selling certain life insurance policies in the spring

11 of 2020.

12    There is a theme here, Your Honor:  Claims that Mr. Seery

13 made decisions that harmed -- in this case -- Dugaboy's 1.71

14 percent interest.

15    The claim has no merit.  The Debtor will contest it.  But

16 even if it was allowed, the claim would be paid a hundred

17 cents on the dollar under the plan.  And accordingly, the

18 information under 2015.3 is not relevant.

19    Get Good filed a claim which alleges they may have a claim

20 from its limited partnership interest in the Debtor.  But for

21 the record, Get Good is not a limited partner of the Debtor.

22    So, how did we get here, Your Honor?  The Dondero entities

23 sandbagged the Debtor by raising the issue for the first time

24 during the confirmation trial.  Not in their briefs, not in

25 communications to the Debtor in advance of the confirmation,

22

1    but while the Debtor had its witness on the stand.

2        And why did they do it that way?  Because they wanted to

3    be able to argue, and they did argue to Your Honor, that the

4    Court couldn't confirm the plan because the Debtor did not

5    comply with Rule 2015.3, was in violation of 1129(a)(2), and

6    the Court could not confirm the plan.

7        Of course, the Court rejected that argument.  And when the

8    Debtor entity -- when the Dondero entities raised it as a

9    reason for Your Honor to enter a stay pending appeal, Your

10   Honor commented that that claim bordered on frivolous.  And of

11   course, that issue has been raised to the Fifth Circuit as one

12   of the reasons to overturn Your Honor's confirmation order.

13       And why are the Dondero entities persisting now in their

14   effort to obtain disclosure?  It's because they're desperate

15   to obtain financial information about the Debtor because they

16   want to become involved in the Debtor's future asset

17   dispositions at the nondebtor affiliates and they want to get

18   information.

19       As Your Honor will recall, Mr. Dondero filed a motion in

20   January asking for this Court to require the Debtor to bring

21   affiliated -- affiliated entity asset sales to the Court.  The

22   Debtor opposed the motion, and before the hearing it was

23   withdrawn.

24       Your Honor has heard testimony from Mr. Seery throughout

25   the case that Mr. Dondero previously interfered with the

23

1   Debtor's asset sales and that -- and on that basis, the Debtor

2   was not comfortable including Mr. Dondero in sale processes.

3   And I'm not talking about the AVYA and the SKY stock from the

4   CLO funds, but rather certain transactions regarding SSP and

5   OmniMax which were subject to a motion made by, I believe, the

6   Funds or the Advisors -- I get them confused sometimes --

7   accusing the Debtor of mismanaging the CLOs.  And if Your

8   Honor recalls, Your Honor denied that motion based upon a

9   directed verdict.

10      So, having been rebuffed by the Debtor in its attempts to

11  obtain financial information that they're not entitled to, the

12  trusts have one last effort.  Press 2015.3 arguments, because,

13  of course, they're very interested in the integrity of the

14  process, in the institution, in the following of the

15  Bankruptcy Code.  That is exactly what their motivation is.

16      But there's yet another reason, Your Honor, the Debtor

17  believes Mr. Dondero, through the trusts, is pursuing this

18  motion.  As Your Honor is aware, the Debtor recently

19  discovered some extremely troubling information regarding a

20  massive fraud involving a previous --

21      (Audio cuts out.)

22          THE COURT:  Uh-oh.

23          THE CLERK:  He froze up.

24      (Pause.)

25          THE COURT:  All right.  Mr. Pomerantz, you're frozen.

24

```
 1   Is everybody frozen, or is it just him?

 2           MR. POMERANTZ:  There'll be some judicial estoppel.

 3           THE COURT:  Okay.  Mr. Pomerantz?

 4           MR. POMERANTZ:  Yes.

 5           THE COURT:  You were frozen for about one minute.  So

 6   I am sorry, --

 7           MR. POMERANTZ:  Uh-huh.

 8           THE COURT:  -- you're going to need to repeat the

 9   past minute for me.

10           MR. POMERANTZ:  Just to check if you were listening,

11   Your Honor, what was the last thing you remember me saying?

12           THE COURT:  I was listening.

13           MR. POMERANTZ:  Okay.  So I will -- did you hear me

14   talk about Mr. Seery's testimony throughout the case?

15           THE COURT:  No.  No.

16           MR. POMERANTZ:  Okay.  I'll go back a paragraph

17   before.  Okay.  Okay.

18       And why are the Debtor -- why are the Dondero entities

19   persisting now in their effort to obtain disclosure?  It's

20   because the Dondero entities are desperate to try to obtain

21   financial information, information they would not otherwise be

22   entitled to under discovery rules, because they want to become

23   involved, he wants to become involved in the Debtor's asset

24   dispositions in the future regarding affiliated nondebtor

25   entities.
```

25

1    If Your Honor will recall, Mr. Dondero made a motion in

2  January seeking an order from this Court requiring the Debtor

3  to bring to this Court asset sales from nondebtor affiliates.

4  The Debtor opposed the motion, and before the hearing on the

5  motion it was withdrawn.

6    Your Honor has heard testimony from Mr. Seery throughout

7  the case that Mr. Dondero previously interfered or tried to

8  interfere with the Debtor's asset sales, and on that basis the

9  Debtor was not comfortable inviting Mr. Dondero into its asset

10  sale processes.

11    And I'm not talking about the AVYA and SKY stock from the

12  CLOs, but rather certain transactions regarding SSP and

13  OmniMax, which were closed for fair value, which were subject

14  of a motion that the Advisors or the Funds -- and I often get

15  them confused -- that they made, accusing the Debtor of

16  mismanaging the CLOs.  And I'm sure Your Honor recalls.  Your

17  Honor denied that motion on a directed verdict basis.

18    So, having been rebuffed in their attempts to try to get

19  the information that they weren't entitled to, they're now

20  proceeding under 2015.3.  And, of course, Mr. Draper say he is

21  a protector of the process, the integrity of the system

22  demands it.  It has nothing to do with Mr. Dondero's

23  interests, of course, because Mr. Draper is just there to make

24  sure everything runs on time and everything is done according

25  to the law, notwithstanding the fact that the U.S. Trustee

26

1  hasn't brought this motion, notwithstanding the fact that the

2  Unsecured Creditors' [Committee] supports our position, and

3  notwithstanding the fact that not one creditor, not one

4  unaffiliated creditor, has asked this Court for that

5  information and relief.

6      There's yet another reason, Your Honor, the Debtor

7  believes that the trusts are pursuing this motion.  As Your

8  Honor is aware, the Debtor recently discovered some extremely

9  troubling information regarding a massive fraud involving a

10  previously-unknown entity called Sentinel Reinsurance.  And

11  that information is the subject of an adversary proceeding

12  filed by UBS, which Your Honor heard substantial information

13  about both in connection with hearings on that motion practice

14  and also at the UBS 9019 motion.

15      The Debtor believes that the 2015.3 motion is a veiled or

16  pretty transparent effort of Dondero trying to find out what

17  the Debtor knows and what the Debtor doesn't know and trying

18  to get the Debtor to go on record with information that later

19  in litigation they will use as a judicial estoppel.

20      Your Honor, that's not an appropriate predicate for the

21  motion.  Mr. Draper will deny that that's the reason, of

22  course, but I leave it for Your Honor to look at the

23  circumstances and make your own conclusions.

24      As the Court has mentioned many times, context matters,

25  and the Court should take this context into account in looking

27

1   at the motion and the requested relief.

2       In our opposition, we argue that the Court should either

3   waive the 2015.3 compliance, given the anticipated effective

4   date, or continue the hearing to September 1 for a further

5   status conference if the effective date doesn't occur.

6       The burden on the estate if it was required to comply with

7   2015.3 is significant, and this goes to the issue Your Honor

8   mentioned, that, really, what's the point at this stage of the

9   case?  There are more than 150 entities that arguably meet the

10  definition of substantial or controlling interest for which

11  the Debtor would be required to file reports under 2015.3.  As

12  the Court knows, the Debtor is down to 12 staff, 13 if you

13  include Mr. Seery.  And if those employees working with the

14  Debtor's financial advisors were required to devote the

15  necessary time and effort to prepare the reports, the time and

16  the cost it would take would be substantial.  The Debtor just

17  doesn't have the bandwidth to comply.

18      More importantly, Your Honor, as we mention in our

19  opposition, Mr. Seery and the board are extremely concerned

20  with the quality of information it has received from the

21  Debtor's employees who have since been terminated by the

22  Debtor and now most of them are working for Mr. Dondero and

23  his related entities in one form or another.  It's not just

24  the lawyers, as Mr. Draper says.  It's the financial advisors,

25  who, in other contexts, and you'll hear a little later, are

28

1  coming up with new information, new defenses on notes, et

2  cetera.  The Debtor has no confidence that the information in

3  its records is accurate from a financial perspective or from a

4  legal perspective.

5      As I mentioned, the Court is aware of the Sentinel cover-

6  up.  And uncovering just the facts regarding Sentinel was a

7  very difficult process and required the Debtor to essentially

8  conduct discovery against itself.  It just couldn't rely on

9  its information.  So conducting the diligence that would be

10  required to provide accurate information for 150 entities,

11  intercompany claims, administrative claims, back and forth,

12  due-to's, due-from's, tax issues, all the stuff required by

13  the forms would be an extremely arduous task.  It would take

14  millions of dollars of forensic accounting.  And it wouldn't

15  -- and for what purpose?  There is no purpose.

16      In addition, Your Honor, to waiving filing the reports,

17  2015.3 also allows the Court to modify the reports requirement

18  for cause when the debtor is not able, in making a good faith

19  effort, to comply with the requirements.  Your Honor, in this

20  case, cause is clearly established under 2015.3.

21      Dugaboy spends a lot of time in their reply attacking the

22  cases that the Debtor cites in its opposition.  While the

23  facts in those cases are different from the case here, they

24  all share something in common which is the key point:  All of

25  the cases involve a waiver of the 2015.3 requirement for plans

29

 1   that will be confirmed or will soon become effective.

 2       Mr. Draper doesn't contest that this Court has the power

 3   to waive.  He says, well, those requests were made in the

 4   first 30 days of the case or in the initial part of the case.

 5   But they all granted relief where the effective date -- where

 6   either the confirmation date occurred and they were waiting

 7   for the effective date, or the confirmation case was -- was

 8   pending.

 9       And Your Honor, we would ask the Court to treat the

10   Debtor's opposition as a motion to waive the requirement under

11   2015.3.  We could file a separate motion after this hearing.

12   It would be a waste of time.  But we would ask Your Honor,

13   treat our opposition as a motion.

14       Dugaboy spends the rest of its time, in the papers and its

15   argument that Mr. Draper made, challenging several arguments,

16   other arguments the Debtor makes in its opposition.  First,

17   they argue that there is no deadline for seeking compliance

18   and that the insinuation that we made that this is

19   gamesmanship is off base.  I'll acknowledge, Your Honor,

20   2015.3 does not contain a deadline for a party seeking

21   compliance.  But as I said before, context matters.  And given

22   how this motion has come to be before your court, I will leave

23   it for Your Honor to determine which party is the true one

24   playing games here.

25       Second, Dugaboy argues that there's nothing confidential

30

 1  in any of the information required to be filed in the 2015.3

 2  reports and that the disclosure of information will facilitate

 3  interest in the assets and maximization of the Debtor's

 4  assets.  Twenty months into this case, Your Honor, no party

 5  other than Mr. Dondero or his related entities has complained

 6  to the Court that the Debtor is not being transparent or

 7  forthcoming.

 8       And there's good reason for that.  Even during the early

 9  stages of this case, when the Debtor and the Committee had

10  their differences, the Debtor was entirely forthcoming with

11  information about its assets, nondebtor affiliates, and

12  strategy for maximizing assets of the Debtor and its

13  affiliated entities.  That collaborative effort continues

14  today, and I suspect is one of the reasons that the Committee

15  has joined in the Debtor's opposition here.

16       Similarly, the Debtor's nondebtor affiliates have

17  transacted business with third parties postpetition.  The

18  Debtor has provided information to those parties as

19  appropriate, subject to nondisclosure agreement, and several

20  successful processes have been run that have maximized value.

21       And just to make clear, Your Honor, we do not believe that

22  Mr. Dondero or his related entities signed a nondisclosure

23  agreement that they would comply with the obligations.  So we

24  have no interest and no desire, unless ordered by the Court,

25  either in this context or another context, to provide Mr.

Appx 04737
008680

31

 1   Dondero or his related entities with information that the

 2   Debtor believes would prejudice its ability to monetize

 3   assets.

 4        The alleged transparency that Mr. Draper and the trusts

 5   seek is not borne out of a desire to open the playing field

 6   and make it level and put financial information in the public

 7   domain for the good of the case.  It's about getting access to

 8   information that the Debtor, in the exercise of its business

 9   judgment -- should not be disclosed.

10        Lastly, Mr. Draper again, during oral argument, harped on

11   Mr. Seery's testimony that the reason the reports were not

12   filed is that they fell through the cracks.  It's misleading.

13   He also stated that Mr. Seery said they would file the

14   reports.  I've looked at the testimony.  That's not what he

15   said.  But he did say at confirmation that it slipped through

16   the cracks.  No doubt.  That's in the transcript.

17        And yes, the Debtor stands behind the fact that, in the

18   months leading to the confirmation hearing, neither Mr. Seery

19   nor the Debtor's professionals even thought about 2015.3.

20        But Your Honor, it's what has happened since that

21   justifies the Debtor's request for a waiver.  The plan is soon

22   to become effective.  As I said, the Debtor is down to 12

23   employees, who could not possibly prepare this information

24   without substantial time and effort.  Their effort and their

25   time should be focused on monetizing assets that will put

32

1    money in creditors' pockets, hopefully sooner than later.

2         And on top of that, given the massive fraud that

3    management has uncovered, and continues to uncover information

4    to this day, Your Honor, on matters separate from the Sentinel

5    matter -- every week, we are finding out new information that

6    has not been made public that causes us real concern, and at

7    the appropriate time that information will be brought before

8    the Court -- the Debtors simply can't rely on that

9    information.  And to be required to go through the effort to

10   put that information out in the public record so Mr. Dondero

11   can later say that the Debtor was judicially estopped, or use

12   that information for an ulterior purpose or a litigation

13   strategy, just does not make sense.

14        Based upon the foregoing, Your Honor, we would ask that

15   the Court deny the motion and grant the Debtor a waiver of the

16   2015.3 requirements.

17        Does Your Honor have any questions?

18             THE COURT:  I do not think so.  Well, I just -- am I

19   correct in remembering the Debtor had somewhere around 75

20   employees at the beginning of this case?  And I didn't know it

21   was down to 12.  I knew it was down very low.  But that's what

22   we're talking about?

23             MR. POMERANTZ:  Yeah, that -- that sounds about

24   right, Your Honor.

25             THE COURT:  Okay.

1          MR. POMERANTZ:  And I should mention, you know, I was

2    there at the beginning.  I was there before the board.  The

3    first couple months of the case, it was extremely difficult to

4    get the Debtor's employees focused on trying to get the

5    information for the 2015.3.  They did not want that

6    information disclosed.  And it's sort of a -- sort of a little

7    ironic that now they're here asking for disclosure.

8       But, look, we're not going to walk away from the fact

9    that, yeah, it slipped through the cracks.  After the board

10   took over, Your Honor has heard many times what they did, the

11   efforts they went to.  If the U.S. Trustee had approached us,

12   if Mr. Dondero had approached us early on, we would have

13   figured out a way to address that and deal with that.  The

14   fact of the matter, it wasn't.  The fact of the matter, it was

15   brought up as a litigation tactic on confirmation, to defeat

16   confirmation of the plan.  And as I mentioned, for the

17   reasons, it's being used as a tactic now as well.

18          THE COURT:  All right.  Thank you.

19          MR. DRAPER:  Your Honor, I -- can I -- can I make a

20   few comments?

21          THE COURT:  No, not --

22          MR. DRAPER:  I'll be short.

23          THE COURT:  Not yet.  Mr. Clemente, --

24          MR. DRAPER:  Okay.

25          THE COURT:  -- I neglected to mention when I was

34

1    taking appearances, you filed a joinder on behalf of the

2    Committee with regard to --

3              MR. CLEMENTE:  That's correct, Your Honor.

4              THE COURT:  So I need to hear from you next, and then

5    I'll circle back to Mr. Draper.

6              MR. CLEMENTE:  That's correct, Your Honor.  And just

7    for the record, Matt Clemente from Sidley Austin.

8              THE COURT:  I should say, a joinder in the

9    opposition.  That was a confusing statement I just made.

10             MR. CLEMENTE:  Yeah, that's correct, Your Honor.

11             THE COURT:  Uh-huh.

12             MR. CLEMENTE:  And so I will be very brief, because

13   Mr. Pomerantz was obviously very thorough.  But just to echo

14   what he said, you know, the Committee is comfortable with the

15   information that it has received.  And as Your Honor knows, we

16   haven't been and won't be shy about coming to the Court if we

17   felt that that was not the case.

18        You know, we obviously had our issues early on in the

19   case, including with respect to getting information from the

20   Debtor.  But, again, the Committee, you know, has been

21   comfortable with the information that it's received from the

22   Debtor.

23        Therefore, at this point, Your Honor, from the Committee's

24   perspective, there doesn't seem to be any bona fide purpose to

25   making the Debtor go through the cost and the expensive effort

35

 1   that Mr. Pomerantz said would be required to create the Rule

 2   2015.3 reports.  And, again, I -- without casting aspersions,

 3   it would suggest, based on previous activity, that there's

 4   really only a nefarious purpose for what is being pressed

 5   before Your Honor today.

 6       So, Your Honor, again, we support the Debtor's position.

 7   I absolutely agree with Mr. Pomerantz's arguments.  We would

 8   request that Your Honor, you know, enter the relief that the

 9   Debtor is requesting today.

10           THE COURT:  All right.  And Mr. Clemente, I just --

11           MR. CLEMENTE:  Yes?

12           THE COURT:  I just want to seal in my brain the

13   context that I think applies here.  The January 2020 corporate

14   governance settlement order.  In there, we all know there were

15   lots of protocols about lots of things, but one of them or a

16   set of the protocols dealt with transfers of assets in these

17   nondebtor subs or entities controlled by the Debtor.  And, of

18   course, Mr. Pomerantz alluded to this, but I'm just going to

19   make sure I'm crystal clear on what I remember.  You know, the

20   whole -- well, it was a protocol that the Committee would have

21   to be consulted on transfers of assets of those nondebtor

22   subs, those nondebtor controlled entities, and, you know,

23   there was a discussion that 363 doesn't apply, of course, to

24   nondebtor assets, and you could really argue all day, even if

25   it did apply, about whether these are ordinary course or non-

36

1  ordinary course because of the business Highland is in.  But

2  the Debtor negotiated with you and your clients:  We're going

3  to have full transparency to let you all get notice of

4  transfers of assets of these subs, and you could even object

5  and bring a motion.  I mean, you can file some sort of

6  pleading, even though we were not so sure 363 under any

7  stretch might apply.

8      Am I correctly restating the context that -- you know, Mr.

9  Pomerantz alluded to it, but I just want to make sure I'm

10  clear and the record is clear.

11          MR. CLEMENTE:  Your Honor, you are -- you are

12  absolutely correct.  There's a very complex set of protocols

13  that we painstakingly negotiated with the Debtor that had

14  different categories depending upon the asset --

15          THE COURT:  Uh-huh.

16          MR. CLEMENTE:  -- and the Debtor's ownership and its

17  relationship with respect to the nondebtor entities or the

18  related parties.  That required the Debtor to come to the

19  Committee in certain sets of circumstances and explain a

20  potential transaction and get the input from the Committee,

21  and either the Committee could consent to the transaction, or

22  if the Committee did not consent to the transaction, the

23  Debtor could seek relief from the Court.

24      Your Honor will remember that, in fact, one of the

25  hearings we had with respect to the monies that were placed in

37

1    the Court registry arose out of the protocols.  So the

2    protocols worked from that perspective in requiring the Debtor

3    to come to the Committee, allow the Committee to make an

4    evaluation, and then the Debtor would make a decision from the

5    perspective of how it wished to proceed.

6        So, Your Honor is absolutely correct.  That was all part

7    of the governance settlement that was negotiated back in

8    January.  And from the Committee's perspective, again, it

9    hasn't always been lemon water and rose petals, but we believe

10   that those protocols worked, and worked to provide the

11   Committee with information so it could appropriately evaluate

12   what the Debtor was doing.

13           THE COURT:  All right.  So I'm correct, you would

14   say, in thinking there was a lot of transparency built in?  It

15   didn't always work smoothly in the beginning, and as we know,

16   there were document production requests, many of them from the

17   Committee.  That all came to a head last July, with more

18   protocols put in place.  But lots of transparency was

19   negotiated by the Committee with regard to all of these

20   controlled entities and subs?

21           MR. CLEMENTE:  That was a critical, Your Honor, that

22   was a critical component of the governance settlement.

23           THE COURT:   Okay.

24           MR. CLEMENTE:  Because that was obviously the impetus

25   for us wanting that governance settlement, so we could get

38

1  that transparency.

2      So, to answer your question, Your Honor, yes, the

3  protocols served that function of providing the Committee with

4  information on transactions that the Debtor was proposing to

5  enter into.

6          THE COURT:  Okay.  And of course, there was a waiver

7  of the privilege -- I don't know if that's the word; I guess

8  that is the right word -- with regard to possible estate

9  causes of action.  Maybe I'm getting into something unrelated.

10  Maybe I'm not.  But that was part of the protocol, too, right,

11  the Debtor would waive its --

12          MR. CLEMENTE:  That's correct, Your Honor.

13          THE COURT:  -- privilege with regard to --

14          MR. MORRIS:  Your Honor, I apologize for

15  interrupting.  This is John Morris from Pachulski Stang.  I

16  just want to recharacterize that a bit.

17          THE COURT:  Okay.

18          MR. MORRIS:  It's not a waiver of the privilege.  We

19  agreed to share the privilege --

20          THE COURT:  Share the privilege.  Okay.

21          MR. MORRIS:  -- with the Debtor.  The Debtor --

22          MR. CLEMENTE:  I --

23          MR. MORRIS:  I'm sorry to -- sorry to correct you,

24  but it's a --

25          THE COURT:  Well, no, --

39

    1          MR. MORRIS:  -- very important point.

    2          THE COURT:  -- that's why I hesitated on that word.

    3   I wasn't sure if that was the word, the concept.

    4          MR. MORRIS:  There's no waiver.

    5          THE COURT:  Okay.  Okay.  I'm not always --

    6          MR. CLEMENTE:  That is -- and that is correct, Your

    7   Honor.

    8          THE COURT:  Okay.

    9          MR. CLEMENTE:  Mr. Morris is correct.  As are you.

   10          THE COURT:  Okay.  So I'm asking you, is all of this

   11   protocol that was in place, I mean, is it reasonable for me to

   12   think maybe that's the reason you all never pressed the 2015.3

   13   issue, because you were getting a full look, as best you could

   14   tell, and more?  You were getting more information, perhaps,

   15   than these reports would have provided, even.  Is that fair

   16   for me to think?

   17          MR. CLEMENTE:  It is fair for you to think that, Your

   18   Honor.  We viewed the protocols as our mechanism to get the

   19   information that was necessary for the Committee to evaluate

   20   the transactions that the Debtor wanted to engage in.  And so

   21   we were looking to the protocols, and in fact, I think the

   22   protocols were very broad in certain respects, and we were not

   23   thinking about the Rule 2015 reports, nor would we have said

   24   that that would have been a substitute for negotiating those

   25   protocols and implementing them.

1          THE COURT:  Uh-huh.

2          MR. CLEMENTE:  So that's how the Committee was

3  looking at it, Your Honor.

4          THE COURT:  Okay.  All right.  Well, okay.  Mr.

5  Draper, I'm going to come back to you.  You get the last word

6  on that.

7          MR. DRAPER:  Thank you.  First of all, the answer is

8  yes, there are extensive protocols between the Debtor and the

9  Committee.  I one hundred percent agree with you.  And the

10  other point I'd make with that is this information is a

11  scaled-down version of what they're giving the Committee on a

12  regular basis.  So the argument that it would take hundreds of

13  man hours and millions of dollars to do that is absolutely not

14  true.  This information, in large measure, even vaster

15  portions of it have already been given to the Committee.

16  Number one.

17     Number two, we as lawyers are literalists --

18          THE COURT:  But I presume not in this format.  I

19  presume not in the format of filling out the form A through E

20  exhibits.  I mean, maybe it's an email.

21          MR. DRAPER:  Well, --

22          THE COURT:  Maybe it's a phone call.

23          MR. DRAPER:  -- it's not in a form -- no, there is --

24  there is -- they both have financial advisors who I'm sure

25  you're going to see whopping fee applications from who have

41

1   pored through all of this.  My bet, and I'd bet big dollars on

2   this, is that financial -- balance sheets are given to them on

3   a regular basis, statements of financial information for

4   subsidiaries and changes in cash flow are given to them.

5   Otherwise, there's no way the Creditors' Committee could

6   monitor what's going on and what's happening.

7       So, really, this is -- this is not a phone call thing.

8   There is real financial data that's being given that is

9   available and can be given on a scaled-down basis.

10      My real point of this is we as lawyers are literalists

11  until it suits our purposes not to be literalists.  There is

12  no exception in 2015.3 for information being given to a

13  creditors' committee.  In fact, when you look at 2015.3, it

14  basically figures there is information going to a creditors'

15  committee.  This is for the others who don't have access to

16  that information.

17      And the interesting part of that is, as the Court's aware,

18  the Bankruptcy Code was amended that if I had gone to the

19  Creditors' Committee and made a request as a creditor, I

20  probably have a right to get even more information than 2015.3

21  allows me to get.

22      Next, which is the giant smokescreen.  We're basically

23  dealing now with the gee, Mr. Dondero's a bad guy; gee, they

24  want this information because they want to uncover what we

25  know.  That's just not true with respect to these reports.  If

42

```
 1   you look at what the reports do, the reports start from the
 2   day that the case was filed and ask for changes in financial
 3   condition from the day the case was filed going forward.  It
 4   is all postpetition in its effect.  And to the extent they've
 5   uncovered things that are incorrect in the Debtor's schedules,
 6   the truth is the amendment of the schedules is warranted.
 7   2015.3 does not deal with prepetition activity in any way,
 8   shape, or form.  They are balance sheets that ask for -- or
 9   changes in financial condition that go from the filing of the
10   case, or seven days before, and require reports every six
11   months.
12       So this giant smokescreen that there's a massive fraud,
13   there's all this other stuff that's been uncovered, is just
14   not true.  It is an attempt to cover up or give an excuse that
15   is unwarranted with respect to why they haven't done the
16   2015.3.
17       Next point.  There is no secret stuff that's being done.
18   There's no valuation that we're asking for.  2015.3 asks for
19   balance sheet information.  So, in fact, if they own ten
20   pieces of property, 2015.3 would bind them together in a
21   balance sheet and say, this is the total real estate that we
22   have.  If an entity has 15 entities under its umbrella, it
23   would have a balance sheet entry.  Assets and liabilities.
24   It's not broken down.  The assets are probably at book value
25   or some sort of mark to market.
```

43

1        But honestly, this is -- there is no way that this

2    information gives anybody any benefit in terms of any bidding.

3        And the other point that's problematic is anybody who

4    wants to buy these assets would walk in and say, look, I want

5    a data room, let me look at this.  If what Mr. Pomerantz is

6    saying, which I don't understand, is that we're not going to

7    let a Dondero entity buy an asset, notwithstanding the fact

8    that they may pay more for the asset than somebody else would,

9    I think that's -- I have a huge problem with that.  We're here

10   for monetization of assets.  We're here to maximize the value.

11   And if, in fact, somebody walks in that may be a tangentially-

12   related Dondero entity and is willing to pay more, they should

13   be thrilled with that fact, not jettison it or disregard it.

14   That is -- their job is to maximize value, not minimize value

15   through a controlled sale process.

16       Again, I'm looking at the Code section.  I'm looking at

17   2015.3.  It basically says what it says.  It's designed to

18   give basic financial information.  It has nothing to do and

19   offers no disclosures of anything Mr. Pomerantz has thrown up

20   before the Court or that Mr. Dondero or any of his entities or

21   people are alleged to have done.

22       And the last is, if in fact there's financial information

23   that's incorrect in any of these entities, I question what the

24   Debtor's financial advisors have been doing for the last

25   months.  Honestly, they should be poring over these books.  If

44

```
 1   they find a problem, they should correct 'em and address them.
 2   And so there's no basis under the Code.  We've -- what's been
 3   given to you and what their argument is is an excuse for not
 4   doing something they should have done.  It can't be couched as
 5   to who's asking.  It is systematic in nature.  And what's been
 6   thrown up before the Court in Mr. Pomerantz's arguments are
 7   just not true when you look at what the form requires.
 8           THE COURT:  You know, I can't remember ever being in
 9   a contested matter involving this rule.  And I was kind of
10   pondering before coming out here, I wonder why that is.  And,
11   you know, I'm thinking the vast majority of our complex
12   Chapter 11s that involve many, many, many entities, they all
13   file.  Okay?  You know, they're kind of a different animal, if
14   you will, from Highland.
15       You know, we know how it normally works.  You've got maybe
16   the mothership, holding company, and many, many subs, and
17   you've got asset-based lending, right, where, you know, maybe
18   the majority of the entities in the big corporate complex are
19   liable, so you just put them all in.  Okay?
20       We don't have -- I have not experienced a lot of Chapter
21   11s where you have basically just the mothership and then you
22   keep subs and lots of affiliates out.  Okay?  So I'm thinking
23   that's one reason.
24       Another thing, I can't remember how old this rule is.
25   Does anyone -- can anyone educate me?  How long has this rule
```

45

1  been around?

2         MR. DRAPER:  Your Honor, this is Douglas.  I think it

3  came in after Lehman Brothers.  And it came --

4         THE COURT:  Uh-huh.

5         MR. DRAPER:  It was put in to deal with off-balance

6  sheet items.

7         THE COURT:  Uh-huh.

8         MR. POMERANTZ:  2008, Your Honor.

9         THE COURT:  2008?

10        MR. DRAPER:  Which is exactly right.  It --

11        THE COURT:  Okay.

12        MR. DRAPER:  Yep.

13        THE COURT:  Okay.  So that, that's another reason.

14  Because I was thinking like *Enron* days.  You know, that's a

15  big giant, a gazillion entities, and, of course, a whole huge

16  slew of them were all put in.

17     So, there's not a lot of case law.  And you know, maybe

18  there are other situations where a judge ruled on this issue

19  but without issuing an opinion.  So, anyway, that's neither

20  here nor there.

21     Mr. Draper, you've urged me to focus on the literal

22  wording of the rule.  It's "shall" language.  You've talked

23  about essentially the integrity of the system as being the

24  reason for the rule.  You've told me not to accept the

25  Debtor's "bad guy" defense, you know, as an excuse.  This is

46

1   just Dondero, you know, wanting the information, and therefore

2   I should discount the motivations here.

3       But let me tell you something that is nagging very, very

4   much at me, and I'll hear whatever response you want to give

5   to this.  I just had an all-day hearing a couple of days ago,

6   and this involved the Charitable DAF entities and a contempt

7   motion the Debtor filed because those entities went into the

8   U.S. District Court upstairs in April and filed a lawsuit that

9   was all about Mr. Seery's alleged mismanagement with regard to

10  HarbourVest.

11      So what I'm really worried about is the idea that your

12  client wants this information to cobble together a new

13  adversary alleging mismanagement.  How can I not be worried

14  about that?

15          MR. DRAPER:  It's real simple.  Because the

16  information that's here doesn't go to management decisions.

17  The information that's requested here has balance sheet items.

18  It has to do with changes in cash flow.  It is not something

19  that you can cobble together a claim, because it doesn't deal

20  with discrete transactions.  It deals with only transactions

21  between affiliated entities.  It only deals with disclosure of

22  administrative expenses that are incurred by a subsidiary for

23  which the Debtor is liable.  It only deals with changes in

24  condition on a go-forward basis and a balance sheet.  It

25  doesn't say, gee, we have to disclose that, with respect to

47

1    HarbourVest or with respect to the MGM stock or whatever,

2    we're doing A, B, or C.  It doesn't go there.

3        That's why I asked the Court in my opening, look at the

4    form.  Because the form is what I'm asking for adherence to.

5    I'm not asking the form to be varied.  I'm just asking the

6    form to be approved -- to be addressed.  And the form

7    controls.  It is not something you can cobble together a

8    complaint with.

9            THE COURT:  Well, you left out when I asked, you

10   know, did your client have an administrative expense claim in

11   this case, and Mr. Pomerantz corrected the record on that.

12   Your client, while it's not a lawsuit in another court, has

13   filed an administrative expense that there was mismanagement

14   of a nondebtor sub or nondebtor controlled entity, --

15           MR. DRAPER:  That -- that's --

16           THE COURT:  -- Multistrat.

17           MR. DRAPER:  No, that's not -- if -- if I understand

18   the claim -- again, I didn't file it, and I forgot, that's an

19   oops on me as opposed to an oops on Mr. Seery for not filing,

20   and I apologize for the Court for that.  But if I understand

21   that claim, is when he acquired whatever he acquired, he

22   should have offered it to the other -- to the other members of

23   the -- that group.  Again, I'm not -- that's not -- I'm a

24   bankruptcy lawyer, as the Court's well aware.  This other

25   stuff is beyond me.

1           But the truth is, my understanding of the claim, it goes

2      to who should have benefited by the transaction and whether

3      the Debtor got CLO interests or got cash for it is irrelevant

4      and that it should have been offered.  That's what I

5      understand the claim.

6                  THE COURT:  Okay.  So the same sort of theory --

7                  MR. DRAPER:  So, the claim --

8                  THE COURT:  -- as HarbourVest?  The same sort of

9      theory as HarbourVest?

10                 MR. DRAPER:  No.  No.  Well, no, I'm just saying,

11     that's -- that's what -- again, you're asking me for something

12     that's outside my expertise.

13                 THE COURT:  Okay.

14                 MR. DRAPER:  Yes, we may have filed a claim.

15                 THE COURT:  Who filed a proof of claim?

16                 MR. DRAPER:  And the point I'm making --

17                 THE COURT:  Who filed the proof of claim?

18                 MR. DRAPER:  What?  I did not -- I have not filed the

19     proof of claims that were asserted by Dugaboy.

20                 THE COURT:  I mean, --

21                 MR. DRAPER:  I think that was --

22                 THE COURT:  -- request for administrative expense.

23     Who filed this?  You say you don't -- you didn't file it.

24                 MR. DRAPER:  I did -- I don't think I did.

25                 MR. POMERANTZ:  Your Honor, to clarify, it was filed

49

1   as a proof of claim, but it related to postpetition actions.

2   And, again, I don't have it before me.  This has been raised

3   --

4              MR. DRAPER:  I --

5              MR. POMERANTZ:  -- several times in the confirmation

6   hearing when Mr. Draper was there, so I guess he must have

7   just forgotten about it.  But I don't know who actually filed

8   it.  But it is -- it is -- it is a proof of claim that is on

9   the record.

10             MR. DRAPER:  Mr. Pomerantz, God forbid that I should

11  forget something.  I'm sure you never have.

12             THE COURT:  Okay.  Well, here's what I'm going to do.

13  I'm not going to grant the relief being sought today, but I

14  will continue the hearing to a date in early September.  And

15  Mr. Draper, you can coordinate with my courtroom deputy, Traci

16  Ellison, with regard to a setting in early September.

17    I can assure you it's not going to be until after Labor

18  Day.  I think Labor Day falls on the 6th, maybe, and I plan to

19  be far away the first few days of September, far away from

20  this country.

21    But here are a few things I want to say.  First, I care

22  about transparency, and I tend to strictly construe a rule

23  like this.  I think, you know, it should be very clear for

24  anyone who's appeared before me that I really like -- I say

25  open kimono.  I probably shouldn't use that expression, but I

50

1    use that expression a lot.  You know, when you're in Chapter

2    11, the world changes and you have to be very transparent.

3        But while I generally feel that way, we have -- as I also

4    always say, facts matter, contexts matter -- and here we are

5    twenty months into a case and we're post-confirmation.  This

6    motion was filed post-confirmation.  So I acknowledge that the

7    Rule 2015.3(b) has the requirement of filing reports as to

8    these nondebtor controlled entities until the effective date

9    of a plan.  We're so -- we're presumably so very close to the

10   effective date that I think I should exercise my discretion

11   under Subsection (d) of this rule to, after notice and a

12   hearing, vary the reporting requirements for cause.  I think

13   there's cause, and that cause is I think we're oh so close to

14   the effective date.  That's number one.  Number two, we're

15   down to 12 staff members.  And I've heard that 150 entities

16   may be implicated, and I don't think that is a necessary and

17   reasonable use of staff members at this extremely late

18   juncture of the case.

19       And my third reason for cause under Subsection (d) of this

20   rule is we have had an active, a very active Creditors'

21   Committee in this case with sophisticated members and

22   sophisticated professionals who negotiated getting more

23   information, I think more useful information than this rule

24   even contemplates with the various form blanks.

25       Now, obviously, I'm continuing this to September because,

51

 1    if we don't have an effective date by early September, well,

 2    context matters, maybe that causes me to view this in a whole

 3    different light.  But that is the ruling of the Court.

 4         You know, I just want to say on behalf of the U.S.

 5    Trustee, I don't know if anyone's listening in, but it was an

 6    unfortunate use of words earlier, I think, saying, you know,

 7    secret deal with them.  And I use unfortunate words all the

 8    time.  I'm not being critical.  But I just want to defend

 9    their honor here.  Oh my goodness, they --

10         (Phone ringing.)

11              THE COURT:  -- exercise integrity in every case I see

12    to the utmost degree, and I suspect they were satisfied that

13    the Committee was getting so much access to the Debtor, with

14    the sharing of the privilege and the protocols, that it just

15    didn't seem necessary in the facts and circumstances of this

16    case to require strict compliance with 2015.3.

17         So I'm going to ask Mr. Pomerantz to upload a form of

18    order reflective of my ruling.  And, again, if --

19         Whose phone is ringing?  Is there something going on with

20    our equipment?

21              THE CLERK:  No.

22              THE COURT:  I don't know where that phone ringing is

23    coming from.

24              THE CLERK:  I can hear it.

25              THE COURT:  Okay.  So, you'll get a day from Ms.

52

1   Ellison in -- after labor day, and we'll see where we are.

2   This will be a moot matter as far as I'm concerned if we've

3   had an effective date at that point.

4       (Continued phone ringing.)

5           MR. POMERANTZ:  Your Honor, one clarification I would

6   ask to have.  I don't think -- I think Your Honor intends that

7   to be a status conference, so to save the Debtor from, you

8   know, spending time in doing a pleading, and Mr. Draper as

9   well, and Your Honor from reading them, I would say that there

10  should be no pleadings filed in advance.  We will appear

11  before Your Honor with a status conference.  And to the extent

12  Your Honor determines there's further briefings or further

13  issues that need to be decided, you could decide at that

14  point.  But no further briefing.

15          THE COURT:  Okay.  I think that is a fair request.

16      (Ringing stops.)

17          THE COURT:  And so that -- that is the way we'll set

18  this up.  Status conference.  No further pleading.

19          MR. DRAPER:  Your Honor?

20          THE COURT:  All right?  Mr. Draper?

21          MR. DRAPER:  Can I make a request, Your Honor?  Can I

22  change -- can I make a comment about the Court's ruling?

23  Because I want to be transparent about this.  And I think the

24  Court's ruling, I would request that you shapeshift it a

25  little bit.

1    If, in fact, you're going to take the position that if the

2  plan goes effective, this issue -- this -- this motion is moot

3  and will be denied, I think, quite frankly, why don't we enter

4  that order now, rather than waiting.  Because that at least

5  gives me the ability to address the issue.

6    I don't think the rule has a waiver of it on the effective

7  date.  Let's -- let's get the issue before the -- before

8  everybody.  Because, again, as I said, if in fact your

9  position is that if it goes effective I'm going to deny the

10  relief and claim it's -- and assert it's moot in a ruling, I'm

11  fine, let's get the ruling now.  Because -- because my

12  position is that that waiver -- there is no basis for that

13  waiver due to time.  The rule requires being filed through a

14  point.

15    And, look, again, that way I'm not wasting the Court's

16  time.  We're not rearguing it.  If we're not having new

17  pleadings, let's get it over with.

18        MR. POMERANTZ:  Your Honor, I would reject that.

19  It's pretty transparent what Mr. Draper wants.  He wants

20  another appeal --

21        THE COURT:  Uh-huh.

22        MR. POMERANTZ:  -- because he wants to go to another

23  court, and he's unhappy that Your Honor has essentially given

24  an interlocutory order that he will be stuck with.

25    So we have, I think, close to a dozen appeals.  We're

54

1  spending millions of dollars.  And I find -- I find Mr.

2  Draper's request, quite honestly, offensive, that it would

3  require us to -- a lot more time and money on an issue we

4  shouldn't.  So, I would ask Your Honor to reject Mr. Draper's

5  request.

6          THE COURT:  All right.  I do --

7          MR. DRAPER:  And again, my --

8          THE COURT:  -- reject it.  That's exactly where my

9  brain went, Mr. Draper.  This is an order continuing your

10  motion.  Okay?  And we'll have a status conference in early

11  September on your motion.

12      And you know, again, I'm just letting you know my view it

13  will be moot if the effective date has occurred, and then

14  we'll get some sort of order to that effect issued at that

15  time.  And then I guess you'll have your final order that you

16  can appeal if you want at that point.

17      The last thing I'm going to say is this.  Mr. Draper, as

18  I'm sure you remember, at some point many weeks back -- I

19  think it was in January, actually -- I ordered that Mr.

20  Dondero should be on the WebEx, or if we're live in the court

21  for a hearing, live in the court, any time there's a hearing

22  where he, his lawyers, have taken a position, filed an

23  objection or filed the motion himself.  If he and his lawyers

24  are requesting relief or --

25          MR. DONDERO:  I'm here.

55

1          THE COURT: -- objecting to relief, that he has to be

2     in the courtroom.

3        I am now going to make the same requirement with regard to

4     the trusts. Any time the trusts file a pleading seeking

5     relief, object to a pleading seeking relief, file any kind of

6     position paper, I'm going to require a trust representative to

7     be in court.

8        Now, I don't know if that's the trustee, Nancy Dondero. I

9     don't know if that's Mr. Dondero's wife, a sister, who that

10    is. But it'll either be her or whoever the trustee is or Mr.

11    Dondero as beneficiary. But it has gotten to that point.

12    Okay? And --

13          MR. DRAPER: Your Honor?

14          THE COURT: And it's not -- it's not personal. I

15    have said this before. I've done this in many cases. If we

16    have a party who feels so invested in what's going on that

17    they're waging litigation, litigation, litigation, at some

18    point very often I will make this order. Like, okay, we're

19    all spending a lot of time on what you want, so you need to

20    show you're invested in it and be here with the rest of us.

21    And, you know, potentially we're going to want testimony in

22    certain contexts. Okay?

23        So I don't know who that human being is for the trusts,

24    but I'm now to the point where I'm making that same order that

25    I did with regard to Mr. Dondero personally. All right?

56

1          MR. POMERANTZ:  Your Honor?

2          THE COURT:  Yes?

3          MR. POMERANTZ:  Your Honor, just to clarify, that's

4    Mr. Dondero and the trustee.

5      And I would also ask Your Honor, I know Mr. Dondero will

6    say that he was on, and that's what Mr. Taylor is going to

7    say, he was on audio.  I think, in order to have them actively

8    participating, they should be on the video the entire hearing.

9    Because if they're just on the phone on mute, Your Honor is

10   not able to really tell if they are really listening.  So I

11   would ask Your Honor to clarify to both Mr. Draper and Mr.

12   Taylor that, for both the trustee and Mr. Dondero, they should

13   be on video.

14         THE COURT:  All right.

15         MR. DRAPER:  Your Honor, Mr. Dondero is on.  You can

16   see him down in the lower screen.

17         THE COURT:  All right.  Just so you know, I mean, the

18   screen I'm looking at is not quite the same screen you're

19   looking at.  We have this Polycom.  And I show that there are,

20   you know, thirty-something people, but I only see the people

21   who have most recently talked.  Okay?  So, I see you, Mr.

22   Draper.  I see Mr. Pomerantz.  I see Mr. Clemente.  A few

23   minutes ago, I saw Mr. Morris.  But, you know, we've set it up

24   where I'm not overwhelmed with blocks; I'm just seeing the

25   people when they speak.

57

1      MR. POMERANTZ:  Your Honor, and those were the only

2 four people whose videos were on during the entire hearing.

3      THE COURT:  Oh, okay.

4      MR. POMERANTZ:  So I hope Mr. Draper is not going to

5 say that Mr. Dondero was on video, because he was not.

6      THE COURT:  Okay.

7      MR. DRAPER:  No, you can see -- Mr. Pomerantz, what I

8 said is you can see him on the screen here.  You can see that

9 he has dialed in.  I don't see him jumping up and down or his

10 person.

11      THE COURT:  Oh, okay.

12      MR. DRAPER:  But it is clear that somebody dialed in

13 on his behalf.

14      MR. POMERANTZ:  Well, --

15      MR. DRAPER:  Or he dialed in.  He is -- he is

16 present.

17      MR. POMERANTZ:  Exactly.  That's my point, Your

18 Honor, that someone may have dialed in on his behalf.  And I

19 think Mr. Dondero, for them to have active, meaningful

20 participation, because I think that's what Your Honor is

21 getting at, that they should be here, engaged.  And if we were

22 in court like we were the other day, Mr. Dondero would have

23 had to sit in Your Honor's courtroom.  And if he is going to

24 take up the time of Your Honor and all the parties, he and the

25 trustee should be really engaged, which you cannot be if

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 790 of 1017 PageID 9537

58

1    you're only on the phone.

2            THE COURT:  Okay.  All right.  Well, --

3            MR. DRAPER:  Your Honor?

4            THE COURT:  Go ahead, Mr. Draper.

5            MR. DRAPER:  Mr. Dondero just talked a few moments

6    ago, so Mr. Pomerantz heard him.  This is -- this is truly

7    unwarranted.  He's appeared, he's here, and he's made a

8    comment to the Court.  So, again, we are invested.  He was

9    present at this hearing.  He heard the hearing.  And so, you

10   know, I just don't know where this is coming from.  I

11   understand he missed a hearing before, but he is here for this

12   one.

13           THE COURT:  Okay.  Well, I'm not going to get bogged

14   down in this issue.  I am going to issue an order, though,

15   that is going to be reflective of what I said, and we'll just

16   -- we'll make sure we have him check in or whoever the

17   representative is of the trusts in future hearings and turn

18   the video on and we'll make sure.

19       Again, this is -- I used the word frustrated the other

20   day.  I'm very frustrated.  This is just -- this is -- it's

21   out of control.  Okay?  I ordered mediation earlier in this

22   case.  I believed that an earnest effort was put in.  But if

23   we're not going to have settlement of issues, you know, I'll

24   address these issues, but everyone who files a pleading,

25   whether it's Mr. Dondero personally or the trusts, the family

Case 19-34054-sgj11 Doc 3445-13 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 791 of 1017 PageID 9538

59

1  trusts, and, of course, we're going to get -- I'm going to go

2  the same direction, actually, with all these other entities.

3  You know, it's -- I've gotten to where I had my law clerk the

4  other day prepare me basically what was like a program from a

5  sports event, you know, who represents which entities, because

6  it's gotten overwhelming.  And --

7          MR. POMERANTZ:  Your --

8          THE COURT:  And I mentioned the other day, I'm very

9  close to requiring some sort of disclosures about the

10  ownership of each of these entities, because I -- you know,

11  the standing is just so tenuous, so tenuous with regard to

12  certain of these entities.  And I've erred on the side of

13  being conservative and, you know, okay, we maybe have

14  prudential standing, constitutional standing, even if it's

15  kind of hard finding statutory standing under the Bankruptcy

16  Code.  But it's gotten to the point where it's just costing

17  too much time and expense for me to not press some of these

18  issues and hold people accountable.

19     So, Mr. Pomerantz, were you about to say something?  I

20  know that we had talked at another hearing about the Court

21  maybe requiring some sort of disclosures for me to really

22  understand party in interest status maybe better than I do.

23          MR. POMERANTZ:  That, Your Honor, was where I was

24  going to go before Your Honor made the comment.  Your Honor

25  made that comment a few weeks ago.  I think, since then, quite

60

```
 1    honestly, nothing really has changed.  And I think it would be

 2    helpful -- it would be helpful for the Debtor, and more

 3    importantly, I think it would be helpful to the Court to have

 4    a list that you can refer to every time we are in a hearing of

 5    every entity that has appeared that Mr. Dondero has a

 6    relationship with, who the lawyers are, what the claims they

 7    filed, what the status of the claims they filed, and maybe

 8    even what litigation they are in pending with the Debtor.

 9        We're happy with -- part of it we could prepare.  But I

10    would think Your Honor should order that from Mr. Dondero's

11    related entities, because it might cut through a lot of it,

12    and give Your Honor the information Your Honor needs and the

13    context and perspective as you're hearing a lot of these

14    motions.

15            THE COURT:  All right.  Well, is there anything else

16    before we move on to the other matter?  I'm about to close the

17    loop on this by saying I am --

18            MR. TAYLOR:  Your Honor?  Your Honor?

19            THE COURT:  Who is that speaking?

20            MR. TAYLOR:  This is Clay -- this is Clay Taylor,

21    Your Honor, --

22            THE COURT:  All right.

23            MR. TAYLOR:  -- representing Jim Dondero

24    individually.

25            THE COURT:  Okay.
```

61

1          MR. TAYLOR:  And I just wanted to be heard.  I've

2    just listened in, even though Mr. Dondero was not the movant,

3    because sometimes issues like this do come up where his name

4    is thrown about.

5        First of all, Jim Dondero was indeed, as Mr. Draper said,

6    was indeed present.  He did indeed try to speak.  I kind of

7    overrode him.  And because, you know, he needs to speak

8    through his lawyer most of the time and shouldn't address the

9    Court directly.  But I wanted to let you know that Mr. Dondero

10   was indeed on the line, was actively listening, and was

11   participating.

12       As far as additional disclosures, it would be, I would

13   just note, somewhat ironic if the Court denies the motion for

14   what appears to be mandatory disclosures under Rule 2015.3 but

15   then imposes additional disclosure requirements on somebody --

16   on another party, without any rule stating that there is such

17   disclosures.  It just -- it strikes me as ironic, and I would

18   like Your Honor to consider that, at least, as Your Honor

19   says, context matters.

20       You know, that's the context in which this arises.  And we

21   would just ask Your Honor to reflect upon that before she

22   imposes additional duties upon my client.

23       But there is -- and the Debtor has asked for the response

24   to be taken as a motion for leave to not comply with a rule,

25   but yet Mr. Seery is not here.  The UCC regularly

62

 1   participates.  Its members are not here.  And so I just, to

 2   the extent Your Honor is going to impose duties upon certain

 3   parties, then what's good for the goose is good for the

 4   gander, Your Honor.

 5              THE COURT:  All right.

 6              MR. POMERANTZ:  Your Honor, I would point out that

 7   Mr. --

 8              THE COURT:  I respect your argument.  I always

 9   respect your arguments, Mr. Taylor.

10      By the way, you aren't wearing a jacket.  You know, next

11   time you need to wear a jacket.  And forgive me if I seem

12   nagging, but I'm letting you all know, if you all are soon

13   going to be having lots of litigation in the District Court, I

14   promise you the district judges are way more formal than me

15   and sticklers for every rule.  You'll also be doing everything

16   live in the courtroom, too.  I'm just letting you know that.

17      But while I respect your argument, apples and oranges.  I

18   mean, the 2015.3 rule, not only is it not -- not -- I wouldn't

19   say mandatory, since the Court has discretion for cause to

20   waive the requirement.  But it's a very onerous set of forms

21   that would have to be filled out for 150 entities by 12 staff

22   members.  I don't really consider that the same as the

23   disclosure that I'm now going to require.

24      But my law clerk and I will -- we'll craft a form of order

25   that will be specific as far as what I'm going to require.

63

```
 1      And, again, I think it's way beyond the point of this
 2  being necessary.  And just so -- again, I'm wanting to explain
 3  this thoroughly.  You know, standing -- for the nonlawyers; I
 4  don't know how many nonlawyers are on the phone, WebEx -- it's
 5  a subject matter jurisdiction thing.  Okay?  And, you know, if
 6  there's a dispute and someone involved in a dispute
 7  technically doesn't have standing, that means the Court didn't
 8  have subject matter jurisdiction to be adjudicating it.  Okay?
 9  That's first year law school concept.
10      And it's been mentioned we have lots and lots of appeals,
11  and I can promise you, if you've never been through the
12  appellate process, that's the very first thing they'll look at
13  -- you know, District Court, Fifth Circuit, any Court of
14  Appeals -- because they have an overwhelming docket.  And if
15  there's a reason to push out this appeal before then because
16  of lack of subject matter jurisdiction, which would include
17  lack of standing, of course they are going to quickly get it
18  off their plates because they have other things to get to,
19  like criminal matters that are, you know, their top priority
20  because of the Constitution.
21      So this has been an evolving thing with me.  At some
22  point, I feel like the Courts of Appeals that are involved
23  with all of these appeals, they might be really, really
24  zeroing in on the standing of parties more than perhaps even I
25  have.  So I want to do my job and I want it clear on the
```

64

```
 1  record, this is why this person has standing or doesn't have
 2  standing.  Okay?  I just feel like we've gotten to that point.
 3  And so we'll issue an order in that regard, and it will, I
 4  promise you, be crystal clear.
 5      Anything else?
 6          MR. POMERANTZ:  Your Honor, one last point.  Mr.
 7  Taylor insinuated that the board is not present here, which is
 8  incorrect.  A member or two members or three members of the
 9  board have been present at every hearing before Your Honor.
10  And that's without an order requiring them to do so, because
11  they are -- they are interested, they are engaged.  Mr. Dubel
12  is on the phone.  He has been on the phone.  I think this may
13  have been only the second hearing that Mr. Seery has missed,
14  felt it wasn't necessary to take him away from his running the
15  company.  So the Debtor has been, through its board members,
16  fully engaged, and I just wanted Your Honor to know that, that
17  we would never have a hearing before Your Honor without at
18  least one member of the independent board listening in and
19  participating as necessary.
20          THE COURT:  All right.  Thank you.
21      All right.  Well, let's move on to the other contested
22  matters, or adversary proceeding matters, I should say.  And
23  they're Adversary 21-3006 and 21-3007.  We have Motions for
24  Leave to Amend Answers.  And do we have Ms. Drawhorn appearing
25  for that motion or those motions?
```

65

```
 1              MS. DRAWHORN:  Yes, Your Honor.  Lauren Drawhorn with

 2    Wick Phillips on behalf of Highland Capital Management

 3    Services, Inc. and NexPoint Real Estate Partners, LLP,

 4    formerly known as HCRE Partners, LLC.

 5              THE COURT:  All right.  And who will be making the

 6    argument for the Debtor on this one?

 7              MR. MORRIS:  John Morris, Your Honor; Pachulski Stang

 8    Ziehl & Jones; for the Debtor.

 9              THE COURT:  All right.  Are there any other

10    appearances on this?

11         Okay.  Ms. Drawhorn?

12              MS. DRAWHORN:  Yes, Your Honor.  We are -- so, my

13    clients are seeking leave to amend the answer to add two

14    affirmative defenses.  As you know, under Rule 15(a), there is

15    a bias towards granting leave, and leave should be freely

16    granted unless there's a substantial reason to deny it.

17         The main factors that are considered in determining

18    whether there is a substantial reason to deny a motion for

19    leave to amend are prejudice, bad faith, and futility.

20         Here, there is no prejudice to the Plaintiff.  Under the

21    case law, if the -- as long as a proposed amendment is not

22    presented on the eve of trial, continuing deadlines or

23    reopening discovery does not constitute sufficient prejudice

24    to deny leave.

25         Here, discovery does not close until July 5th for Highland
```

66

 1    Capital Management Services, and it does not close until July

 2    26th for NexPoint Real Estate Partners.

 3        The Plaintiff has not -- neither party has taken any

 4    depositions in this case.  And we are open and willing to

 5    extend the discovery deadlines if necessary.  We think that

 6    discovery can be extended as necessary without extending any

 7    dispositive motion deadline or the docket call which are set

 8    in August.  Dispositive motions are August 16th for Highland

 9    Capital Management and September 6th for NexPoint Real Estate

10    Partners, with docket call in those cases being October and

11    November.

12        So there's significant time.  If the -- if the party just

13    wants to conduct additional written discovery, I think that

14    that -- they would be easily be able to do that.

15        We're also open to continuing all the deadlines in this

16    case, and practically speaking, those -- the deadlines may be

17    continued depending on what happens with the pending motion to

18    withdraw the reference and the motion to stay.

19        So we don't think -- we don't see any reason why our

20    amended additional affirmative defenses will result in any

21    prejudice to the Plaintiff, and don't see that as a reason --

22    a substantial reason to deny the motion for leave.

23        There is no bad faith here.  The motion for leave was

24    filed two months after our original answer.  Again, this is

25    not a situation where we're trying to add a new defense on the

67

1   eve of trial. We're not even waiting until after discovery is

2   closed to try and add this new defense. And it's not after

3   one of our prior defenses failed. Instead, we've been

4   conducting additional investigations, preparing for written

5   discovery. And as set forth in more detail in the Sauter

6   declaration that was filed yesterday, we discovered these

7   additional defenses through that additional investigation.

8      So there's certainly no bad faith here in adding these two

9   defenses. We are just trying to make sure that we can prove

10   up our defenses and prove up our case on the merits, as we

11   need to.

12      And then the last factor, the new affirmative defenses

13   we're seeking to add, they're not futile. I cited some cases

14   in the pleadings. There are some judges in the Northern

15   District of Texas that refrain from even evaluating futility

16   at this stage, at a motion for leave to amend stage,

17   preferring to address those on a motion for summary judgment

18   situation. But even when it is considered, futility looks

19   more at is there a statute of limitations that prevents the

20   claim from being successful, or does the court lack subject

21   matter on its face, based on this defense? And that's not the

22   case here.

23      The Debtor -- the Plaintiff tries to argue on the merits

24   of our affirmative defenses, and a motion for leave to amend

25   is not a basis for that. This isn't a motion for summary

68

1  judgment.  This is just -- just a motion for leave to add
2  these defense, and they can certainly address the merits later
3  on in the case.

4      So we think we provided sufficient notice in our proposed
5  amendment.  I mean, our proposed amended answer.  To the
6  extent we need to add any specifics, we are certainly open to.
7  We've noted them in our reply.  The ambiguity is -- is to the
8  notes as a whole.  We noted the Highland Capital Management,
9  there's two notes that are signed by Frank Waterhouse without
10 indication of corporate capacity, which creates some
11 ambiguity.  The notes reference other related agreements,
12 which create some ambiguity.  So we think there's sufficient
13 pleading of these new defenses to support leave to amend and
14 address those on the merits.

15     And then the condition subsequent defenses, while we --
16 the schedules and the SOFAs, the notes related to that
17 reference that some loans between parties and related -- to
18 affiliates and related entities may not be enforceable, we
19 think that supports our position and this defense here, now
20 that we've furthered our investigation and heard about this
21 additional subsequent agreement that supports the condition
22 subsequent.

23     And the opposition, the Plaintiff's opposition notes that
24 there has been some discovery on this defense.  It's similar
25 to one that's asserted in a related note adversary.  And

69

1   while, again, they try to assert the merits and the

2   credibility of certain testimony, that's -- that's a decision,

3   credibility of a witness is a decision for a fact finder and

4   not for this stage of the proceedings and not for a motion for

5   leave to amend.

6       So we don't believe there's a substantial reason to deny

7   leave.  Again, under Rule 15, leave should be granted freely.

8   And so we would request that the Court grant our motion for

9   leave to amend so that we can have our amended answer and

10  affirmative defenses in this case.

11          THE COURT:  All right.  Well, Mr. Morris, you know,

12  the law is not too much in your favor on this one.  So what do

13  you have to say?

14          MR. MORRIS:  I have to say a few things first, Your

15  Honor.  The notes are one of the most significant assets of

16  the estate.  As the Court will recall at the confirmation

17  hearing, Mr. Dondero and all of his affiliated entities

18  objected to confirmation on the ground -- challenging, among

19  other things, both the liquidation analysis as well as the

20  projections on feasibility going forward.

21      One of the assumptions in those projections and in the

22  liquidation analysis was indeed the collection of these notes

23  in 2021.  They all sat on their hands, attacked the

24  projections, attacked the liquidation analysis, but never on

25  the grounds that the notes wouldn't be collectable in 2001

70

1  [sic], never informing the Court that there was some agreement

2  by which collection would be called into question, never ever

3  disclosing to anybody that the plan might not be feasible or

4  the liquidation analysis might not be accurate because these

5  notes were uncollectable.

6      So what happened after that, Your Honor?  We commenced

7  these actions.  Actually, before the hearing.  We actually

8  commenced these actions before the confirmation hearing, when

9  they sat silently on this.

10     And Mr. Dondero's first answer, because this is all very

11  important because they say that they're -- they're

12  piggybacking on Mr. Dondero.  Mr. Dondero's first answer to

13  the complaint said, I don't have to pay because there is an

14  agreement by which the Debtor said they would not collect.

15  It's in the record.  It's attached to my declaration.  And

16  that was it.  Full stop.  I don't have to pay because the

17  Debtor agreed that I would not have to collect.

18     So we served a request for admission.  Admit that you

19  didn't pay taxes.  He realized, okay, that defense doesn't

20  work, so he changes it completely and he amends his answer.

21  Now the amended answer says, I don't -- the Debtor agreed that

22  I wouldn't have to pay based on conditions subsequent.

23     And we said, what are those conditions subsequent?  Please

24  tell us in an interrogatory response.  And under oath, Mr.

25  Dondero said, I don't have to pay if the Debtor sells their

71

1    assets in the future.  At a favorable price, I think it says.

2    Again, this is in the record.  And we asked him under oath,

3    who made that agreement on behalf of the Debtor?  And he said,

4    I did.

5        And Your Honor will recall that we had a hearing on that

6    very defense, on the motion to compel, where they said Mr.

7    Seery has to come in and testify to the defense that Mr.

8    Dondero made this agreement with himself.  And then the

9    following week, on a Tuesday, we had the hearing on the motion

10   to withdraw the reference, and Your Honor said finish

11   discovery, because we told you discovery was going to be

12   concluded on Friday with Mr. Dondero's deposition.  You know

13   what they did, Your Honor?  The night before the hearing, they

14   amended Mr. Dondero's interrogatory.  Again, these are sworn

15   statements.  They amended it again to say he didn't enter the

16   agreement on behalf of the Debtor; Nancy Dondero, his sister,

17   did.

18       And then I took his deposition.  And we're going to get to

19   that in a moment, because I'm going to put it up on the screen

20   so you can see these answers, Your Honor.  And I say this by

21   way of background because it goes to both good faith -- or,

22   actually, bad faith -- as well as the lack of a bona fide

23   affirmative defense here.

24       This is -- there are five notes litigation.  One against

25   Mr. Dondero.  So that's package number one.  And they're

72

1   represented by the Stinson firm, who is signing all of these

2   things.  The Stinson firm is out there claiming that in good

3   faith each of these -- each of these amendments, each of these

4   amendments to the interrogatories, are in good faith.  They're

5   not in good faith, Your Honor.  They're just not.

6        And the Bonds firm.

7        Then bucket two is what we have here today.  That's HCRE

8   and Highland Capital Management Services.  They're represented

9   by Ms. Drawhorn.  I think the Stinson firm has now also

10  entered an appearance in those two adversary proceedings.

11       And the other two are against the two Advisors.  More

12  entities controlled by Dondero.  And Mr. Rukavina, I believe,

13  last night filed his motion to amend to add these same

14  defenses.

15       Okay?  Is this good faith?  I don't think this is good

16  faith.

17       Let's look at Mr. Dondero's testimony so that the Court

18  has an understanding of what we're talking about here.  I

19  think I have Ms. Canty on the phone, and I'd ask her to go to

20  Page 178.  3.  Just going to read (garbled) so you can see.

21  This was Mr. Dondero's testimony the day after telling me that

22  he amended his interrogatory -- sworn interrogatory answer to

23  say that he didn't enter the agreement on behalf of the Debtor

24  but Ms. -- but Ms. Dondero, his sister, did.

25       Question.  Are we -- 178, please.

73

 1          MS. DRAWHORN:  Your Honor, I would --

 2          MR. MORRIS:  Question.  Please --

 3          MS. DRAWHORN:  This is not testimony in this

 4   adversary and I was not -- my clients were not present at this

 5   deposition that Mr. Morris is referring to, so I --

 6          MR. MORRIS:  Your Honor, with all due respect, she's

 7   interrupting me, and I would ask her to allow me to finish my

 8   presentation and then she can make whatever comments she

 9   wants.  Because -- because --

10          MS. DRAWHORN:  Well, I'm objecting to this testimony

11   --

12          THE COURT:  Okay.

13          MS. DRAWHORN:  -- coming into evidence.

14          THE COURT:  Okay.  So your objection is -- if you

15   could just articulate your objection for the record, please,

16   Ms. Drawhorn.

17          MS. DRAWHORN:  I would object to this -- this

18   deposition is not in this proceeding, this adversary

19   proceeding, either of these two the adversary proceedings, and

20   my client was not present at this deposition, so I would

21   object to it as hearsay.

22          THE COURT:  Response?

23          MR. MORRIS:  Your Honor, if I may, I think this --

24   this points to just one of the fundamental problems that we

25   have here.  As we pointed out in our objection, the Debtor, as

74

1    we sit here right now, still has no notice of the facts and

2    circumstances surrounding this alleged agreement.  We still

3    don't know who entered into the agreement on behalf of the

4    Debtor.  We don't know what the terms of the agreement were.

5    We don't know when the agreement was entered into.  We don't

6    -- right?

7        If they're going to assert that there's an agreement --

8    and they seem to be piggybacking on this conversation between

9    Mr. Dondero and his sister.  If there's a different one, they

10   need to say that right now.  They need to put their cards on

11   the table and they need to inform the Debtor who entered the

12   agreement on behalf of the Debtor pursuant to which the Debtor

13   agreed to waive millions and millions of dollars without

14   telling anybody.

15            THE COURT:  Okay.  I overrule the objection.  We can

16   go through the transcript.

17            MR. MORRIS:  So, I'm just going to use part of it,

18   Your Honor.  But on Lines 3 to 7:

19       "Q   Did anybody else participate -- did anybody

20       participate in any of the conversations other than you

21       and your sister?

22       "A   I don't believe it was necessary.  It didn't

23       include anybody else."

24       Go down to Line 19, please.

25       "Q   Was the agreement subject to any negotiation?  Did

75

1    she make any kind of -- any counterproposal of any
2    kind?
3    "A   No."
4    Page 179, Line 2.
5    "Q   Do you know if she sought any independent advice
6    before entering into the agreement that you have
7    described?
8    "A   I don't know."
9    Line 23, please.
10   "Q   Do you know if there were any resolutions that
11   were adopted by Highland to reflect the agreement
12   that's referred to in the -- in the answer?
13   "A   Resolutions that -- no.  Not that I'm aware of."
14   Page 180, Line 5.
15   "Q   Did you give Nancy a copy of the promissory notes
16   that were a subject of the agreement?
17   "A   No."
18   Continue.
19   "Q   Did she ask to see any documents before entering
20   into the agreement that's referred to?
21   "A   I don't remember."
22   Page 181, Line 19.
23   "Q   Under the agreement that you reached with Nancy
24   that's referred to in Paragraph 40, was it your
25   understanding that Highland surrendered its right to

Appx 04582
008725

76

1      make a demand for payment of unpaid principal and

2      interest under the notes?

3      "A   Essentially, I think so."

4      Page 219.  I'll just summarize 219, Your Honor.  Mr.

5   Dondero has no recollection of telling Mr. Waterhouse, the

6   chief financial officer, or any other employee of Highland

7   that he'd entered into this agreement with his sister pursuant

8   to which the Debtor agreed to not collect almost $10 million

9   of principal and interest.

10     Now let's -- let's go -- I think it's really -- because it

11  took me an awfully long time to get there.  On Page 214 at

12  Lines 16 through 24.  This is what the agreement was, because

13  this is -- this is -- this is his third try to describe the

14  agreement.  Right?  The first time -- it's just his third try,

15  and this is what the agreement is, Your Honor.

16     "Q   Did you and Nancy agree in January or February

17      2019 that if Highland sold either MGM or Cornerstone or

18      Trussway for an amount that was equal to at least one

19      dollar more than cost, that Highland would forgive your

20      obligations under the three notes?

21     "A   I believe that is correct."

22     That's -- that's the agreement.  It took him three times

23  to get there, but look at -- look at that.  He and his sister

24  did that.

25     And I do want to point out, Your Honor, that in their

77

1   opposition that they filed last night, the Defendants claim

2   that Ms. Dondero was authorized because she was -- she was the

3   trustee of Dugaboy and Dugaboy holds the majority of the

4   limited partnership interests in the Debtor and therefore she

5   had the authority to enter into the agreement on behalf of the

6   Debtor.

7        There is that flippant -- there is just that unsupported

8   statement out there.  Section 4.2(b) of the limited

9   partnership agreement says, and I quote, "No limited partner

10  shall take part in the control of the partnership's business,

11  transact any business in the partnership's name, or have the

12  power to sign documents for or otherwise bind the partnership,

13  other than as specifically set forth in the agreement."

14       So I look forward to hearing what basis there was to

15  submit a document to this Court that Nancy Dondero had the

16  authority to bind the Debtor in an agreement with her brother

17  pursuant to which tens of millions of dollars was apparently

18  forgiven.

19       Can we go to Page 238?  This is the last piece, Your

20  Honor.  The Debtor's outside auditors were

21  PricewaterhouseCoopers.  There's management representation

22  letters signed by both Mr. Dondero and Mr. Waterhouse

23  attesting that they had given their auditors all of the

24  information necessary to conduct the audit.  We will get to

25  that in due course, but these are very important questions

78

 1  right here.

 2     What page are we on?  Is it 238?  Okay.  So, Line 16, I

 3  believe.

 4     "Q   You knew at the time -- you knew at the time the

 5     audited financials were finalized that Highland was

 6     carrying on its balance sheet notes and other amounts

 7     due from affiliates?

 8     "A   Yep."

 9     And if we could just keep going, Your Honor, you will see:

10     "Q   Did    you    personally    tell    anybody    at

11     PricewaterhouseCoopers   in   connection   with   the

12     preparation  of  the  audited  financial  statements  for

13     2018 that you and your sister had entered into the

14     agreement with your sister Nancy in January or February

15     of 2019?

16     "A   Not that I recall."

17     There's a lot more here, Your Honor.  I'm really just

18  touching the surface.  I am going to take Nancy's deposition

19  later this month.  But there is -- this is wrong.  This is

20  just all so wrong.  For three different reasons.  At least.

21  This is not a viable defense and will never be a viable

22  defense.

23     The audited financial statements carry these loans as

24  assets on the books, without qualification, and they were

25  subject to Mr. Dondero and Mr. Waterhouse's representations.

79

1    There is partial performance.  These entities that we're

2  talking about today, they made payments on these notes.  How

3  do you make payments on the notes and then come to this Court

4  and say the notes are ambiguous?  How do you -- how do you

5  make payments on the notes and come to this Court and tell

6  this Court, I just learned that there was an agreement by

7  which I don't have to pay, subject to conditions precedent in

8  the future.

9    Mr. Sauter submits a declaration in support of this

10  motion.  He has no personal knowledge.  He states in Paragraph

11  14 that his review of the Defendants' books and records did

12  not reveal any background facts regarding the notes.  Mr.

13  Dondero is the maker on all of the notes except for two of

14  them.  Mr. Dondero owns and controls the Defendants.  Mr.

15  Dondero was not employed or otherwise affiliated with the

16  Debtor after these actions were commenced.  Mr. Sauter takes

17  Mr. Seery to task for telling the Debtor's employees not to

18  take actions that were adverse, and he uses that as his excuse

19  for not knowing these facts.  He is the general counsel.  He

20  was served with a complaint that alleged that his clients were

21  liable for millions and millions of dollars.  His boss is

22  James Dondero.  He had unfettered access to James Dondero.

23  Mr. Dondero is the one who signed the notes, except for two of

24  them.  There is absolutely no excuse for not doing the

25  diligence to find out from Mr. Dondero that this defense

80

1   existed.

2       And you know why it didn't happen?  Because the defense is

3   not real.  It is completely fabricated.  It continues to

4   change and evolve every single time I -- every single time I

5   talk about these note cases, it's a new defense, it's a

6   different defense, the contours change, somebody else is

7   involved.  This is an abuse of process, Your Honor.  It is bad

8   faith.  It just really is.  And somebody's got to start to

9   take responsibility and say, I won't do this.  I won't do

10  this.

11      Somebody's got to stand up and say that, because, I'm

12  telling you, it's not enough, Your Honor, that the Debtor is

13  going to collect all of its fees under the notes at the end of

14  this process.  It's not enough, because we're now giving an

15  interest-free loan.  These are -- these are notes that are

16  part of the Debtor's plan that nobody objected to, that nobody

17  suggested were the subject of some condition subsequent.

18      This is not your normal, you know, gee, I'd like leave to

19  amend the complaint.  They're simply following what Mr.

20  Dondero did.  And I would really ask the Court to press the

21  Defendants to identify specifically who made the agreement on

22  behalf of the Debtors, when was the agreement made, is there

23  any document that they know of today that reflects this

24  agreement, and what were the terms of the agreement?  Is it

25  really that he would sell -- if he sells MGM for a dollar over

81

 1   cost, $70 million of notes get forgiven?  How is that

 2   possible?  How is that possible?  It doesn't pass the good

 3   faith test.  The Court should deny the motion.

 4        Thank you, Your Honor.

 5           THE COURT:  Mr. Morris, in all of your listing of

 6   allegedly problematic things, one trail my brain was going

 7   down is this:  Is this adversary going to morph even further

 8   to add fraudulent transfer allegations?  I mean, if notes --

 9           MR. MORRIS:  Here's the --

10           THE COURT:  -- were forgiven or agreements were made

11   --

12           MR. MORRIS:  Yeah, I --

13           THE COURT:  -- that they would be forgiven if, you

14   know, assets are sold at a dollar more than cost, is the

15   Debtor going to say, well, okay, if this is an agreement,

16   there was a fraudulent transfer?

17           MR. MORRIS:  Your Honor, that is an excellent

18   question, one which I was discussing with my partners just

19   this morning.  You know, we have to -- we're balancing a

20   number of things on our side, including the delay that that

21   might entail; including, you know, what happens if we go down

22   that path.  You know, the benefit of suing under the notes, of

23   course, is that he's contractually obligated to pay all of our

24   fees.

25        And so we're balancing all of those things as these -- as

82

1   these defenses metastasize.  But it's something that we're

2   considering, and we reserve the right to do exactly that, as

3   these defenses continue to get -- and it would be fraudulent

4   transfer, it would be breach of fiduciary duty against Nancy

5   Dondero, it would be breach of fiduciary duty against Jim

6   Dondero.  I'm sure that there are other claims, Your Honor.

7   But if they want to -- if I'm forced to go down that path, I'm

8   certainly going to use every tool that I have available to

9   recover these amounts from the -- for the Debtor and their

10  creditors.  This is just an abuse of process.

11      How do you -- how does one enter into agreements of this

12  type without telling your CFO, without telling your auditors,

13  without putting it in writing?  And I asked Mr. Dondero, what

14  benefit did the Debtor get from all of this?  And you know

15  what his answer was, Your Honor?  Because it's really -- it's

16  appalling.  It was going to give him heightened focus on

17  getting the job done because of this agreement that he entered

18  into with his sister, Nancy, acting on behalf of the Debtor,

19  with no information, with no documents, with no notes, with no

20  advice, with no corporate resolutions.  The Debtor was going

21  to get Mr. Dondero's heightened focus to sell MGM, Trussway,

22  or Cornerstone for one dollar above cost.

23      I think the fraudulent transfer claim is probably a pretty

24  solid one.  But why do we have to do this?  Why do we have to

25  do this?

1          THE COURT:  Well, one of the reasons I'm asking is I

2     would not set the motion to withdraw the reference status

3     conference on an expedited basis, which I was asked to do a

4     few days ago in these two adversary proceedings, and I can't

5     remember when I've set it, but now I'm even worried, if I

6     grant this motion, is it going to be premature to have that

7     status conference in a month or so, whenever I've set it,

8     because if I grant this motion I'm wondering, am I going to

9     have your motion to amend to add fraudulent transfer claims?

10    It's -- you know, I want to give as complete a package to the

11    District Court as I can whenever I have that motion to

12    withdraw the reference.

13        All right.  Ms. Drawhorn, back to you.  As I said --

14          MS. DRAWHORN:  Yes.

15          THE COURT:  -- before inviting Mr. Morris to make his

16    argument, I know the law is very much on your clients' favor

17    as far as the law construing Rule 15(a).  But my goodness, I'm

18    wondering if your client needs -- your client needs to be

19    careful what they're asking for here, after what I've just

20    heard.

21        Anyway, what -- you get the last word on this.

22          MS. DRAWHORN:  Yes.  Thank you, Your Honor.  My

23    response is that Mr. Morris's argument was all on the merits

24    of the defenses, and certainly he is free to argue on the

25    merits, but that's not a determination for today and that's

84

 1    not a determination for the motion for leave to amend.  That's

 2    a determination for if he files a dispositive motion.

 3        Like I said, we are still in the discovery phase.  Mr.

 4    Morris mentioned at least three parties that will be -- likely

 5    be deposed and potentially give us the additional information

 6    that he's asking for to support this defense.  He mentioned

 7    PricewaterhouseCoopers; Nancy Dondero, who he's already got

 8    scheduled in a different adversary; Frank Waterhouse.

 9        So it's too early, as you know, to look at the merits.

10    That's not -- that's not what's the focus of a motion for

11    leave to amend.

12        As to the -- the what amendment, what agreement, what are

13    the conditions subsequent, I believe we provided sufficient

14    information in our reply.  And if the Court would like us to

15    update our proposed amended answer, if the Court is inclined

16    to grant our motion, we can certainly do that.  But I think

17    the Plaintiff seems to be well aware of what the defenses are,

18    especially after his argument today on why he thinks it's not

19    a valid defense.

20        And then, on the due diligence, we did -- we did do due

21    diligence.  That's why we're seeking to amend the answer,

22    obviously, and add these claims.

23        If the Court -- if the Plaintiff wants to file a motion to

24    amend later, then we can address those amendments then.

25        But I think, on the Rule 15 standard, we have met our

1   burden and there's no substantial reason to deny the motion to

2   amend to add these defenses.

3          THE COURT: All right. By the way, have your

4   clients, have they filed proofs of claim? And I'm asking for

5   a different reason than maybe I was asking earlier. NexPoint

6   Real Estate Partners?

7          MS. DRAWHORN: They're -- NexPoint Real Estate

8   Partners, LLC, formerly known as HCRE Partners, does have a

9   proof of claim on file. It's unrelated to the notes. And it

10  is subject to a contested matter that's pending -- that's a

11  separate matter that's before the Court being addressed.

12     And then HCMS initially filed a proof of claim that was

13  objected to in the Debtor's first omnibus objection and then

14  was disallowed. There was no response to that omnibus

15  objection, so there's no longer a proof of claim for Highland

16  Capital Management Services.

17         THE COURT: Okay. Again, I'm just thinking ahead to

18  this report and recommendation I'm eventually going to have to

19  make on the motions to withdraw the reference. And as I

20  alluded to, if this morphs to the point of including

21  fraudulent transfer claims, that certainly --

22         MS. DRAWHORN: And Your Honor, one --

23         THE COURT: It's going to affect the report and

24  recommendation. And, you know, proofs of claim affect that,

25  too. So, --

86

1    MS. DRAWHORN: Uh-huh. Yes. And I understand that,

2  Your Honor. And the issue, I think, with you -- we need to

3  have this motion resolved, because it -- unless the Court is

4  going to continue discovery or stay. You know, one of the

5  reasons why we had initially requested the expedited hearing

6  was because of the discovery is continued -- continuing to --

7  discovery deadlines are continuing to move. And obviously

8  whatever the Court decides on this motion for leave to amend

9  will determine what the scope of that discovery is.

10    Similarly, if the Debtor decides to amend, that could

11 change the scope of discovery as well.

12    So we are open to continuing deadlines, and I think, you

13 know, might end up filing a motion to continue. I haven't

14 conferred with Mr. Morris yet. I suspect he's opposed, based

15 on our prior conversations. But that's something that might

16 be helpful, especially if the Court is concerned on how it

17 will affect the motion to withdraw the reference, to -- maybe

18 we continue some of these upcoming deadlines, and that might

19 appease, you know, solve some of your concerns.

20    THE COURT: All right. Well, Rule 15(a), of course,

21 is the governing rule here, and the case law is abundant that

22 courts "should freely give leave when justice so requires."

23 And the law is also abundantly clear that the rule "evinces a

24 bias in favor of granting leave to amend." And again and

25 again, cases say that leave should be granted unless there's

87

1   substantial reason to deny leave, and courts may consider

2   factors such as delay or prejudice to the non-movant, bad

3   faith or dilatory motives on the part of the movant, repeated

4   failure to cure deficiencies, or futility of the amendment.

5       While the Debtor has presented arguments that there might

6   be bad faith here on the part of the Movants and there might

7   be futility in allowing the amendments because of various

8   strong arguments and defenses the Debtor believes it has to

9   this issue of agreements with regard to the notes that

10  allegedly provide affirmative defenses, the Court believes the

11  rule requires me to allow leave to amend the answer.

12      Now, a couple of things.  I am going to require, though,

13  that the amended answer be more specific than has been

14  suggested.  I am going to agree that if new affirmative

15  defenses are made that there was this agreement to forgive

16  when certain conditions happened, then there does need to be

17  identification of who the human beings were that were involved

18  in making the agreement, the date of any agreement or

19  agreements, and disclose what documents substantiate the

20  agreement or reflect the agreement.  All right?  So if that

21  could --

22          MR. MORRIS:  Your Honor?

23          THE COURT:  Yes?

24          MR. MORRIS:  John Morris.  I apologize for

25  interrupting, but just a fourth thing is what is the

88

1  agreement?  I mean, what is the agreement?

2          THE COURT:  Well, okay.  That's fair enough.  What is

3  the agreement?  I guess --

4          MR. MORRIS:  And -- and --

5          THE COURT:  -- that needs to be spelled out.  I mean,

6  I guess I was assuming that that would be spelled out in --

7  but maybe it's not.  So we'll go ahead and add that.

8      As far as extension of the discovery, Ms. Drawhorn has

9  offered that.  I think it would be reasonable if the Debtor or

10  Plaintiff wants that.  Do you want an extension of discovery?

11          MR. MORRIS:  What I really want, Your Honor, is a

12  direction for them to serve this amended answer within 24 or

13  48 hours and grant leave to the Debtor to promptly file

14  written discovery.  We've got Nancy Dondero -- if it turns out

15  -- and maybe Ms. Drawhorn can just answer the question right

16  now.  Who entered the agreement on behalf of the Debtor?

17  Because I'm already taking Nancy Dondero's deposition on the

18  28th.  And it seems to me, if they would just answer the

19  question of whether Ms. Dondero is the person who did that, I

20  could just add a notice of deposition and take the deposition

21  on that date, too, and it would be, really, more efficient for

22  everybody.

23          THE COURT:  Ms. Drawhorn, who was the human being?

24          MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25  entered into the -- the subsequent agreement.

89

1           MR. MORRIS:  Okay.  Super.

2           THE COURT:  All right.  You said you've already --

3           MR. MORRIS:  So, --

4           THE COURT:  -- got a depo scheduled of her?

5           MS. DRAWHORN:  Well, what's the date --

6           MR. MORRIS:  I do --

7           MS. DRAWHORN:  -- Mr. Morris?

8           MR. MORRIS:  I believe it's the 28th.  Your co-

9    counsel can confirm, but I think it's the 28th.

10      And I'll just get another deposition notice for that one,

11   and we'll figure out a time to take Mr. Sauter's deposition,

12   too.

13      But I don't think that there is a need, frankly, for --

14   having been told by Mr. Dondero that there's no documents

15   related to this, having the Court just ordered the Defendants

16   to disclose the identity of any documents that relate to this

17   agreement, I don't think we need to extend the discovery

18   deadline at all.  I can take Ms. Dondero's deposition, I can

19   take Mr. Dondero's deposition, and I can take Mr. Sauter's

20   deposition in due course over the next four weeks.

21          THE COURT:  All right.  Well, Ms. Drawhorn, we'll say

22   that this amended answer needs to be filed by midnight Friday

23   night, 11:59.  That gives you a day and a half to get it done.

24   All right.  If you could please --

25          MS. DRAWHORN:  Yes, Your Honor.

90

1        THE COURT:  Please upload an order, Ms. Drawhorn,

2   granting your motion with these specific requirements that

3   I've orally worked in.

4      I think clients need to be careful what they ask for.  I'm

5   very concerned.  And I know it was just argument and I'll hear

6   evidence, but of all of the things that I guess -- well, I'm

7   concerned about a lot of things, but do we have audited

8   financial statements that didn't disclose these agreements

9   with regard to --

10        MR. MORRIS:  Yes, Your Honor.

11        THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15        THE CLERK:  All rise.

16      (Proceedings concluded at 11:58 a.m.)

17                        --oOo--

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21   above-entitled matter.

22   **/s/ Kathy Rehling**                    **06/12/2021**

23   _____        _____

     Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25

91

INDEX

1

PROCEEDINGS                                                          4

2

WITNESSES

3

-none-

4

EXHIBITS

5

-none-

6

RULINGS

7

19-34054-sgj

8

Motion to Compel Compliance with Bankruptcy Rule 2015.3  49/54
filed by Get Good Trust, The Dugaboy Investment Trust
(2256)

9

10

21-3006-sgj

11

Motion for Leave to File Amended Answer and Brief in      86
Support filed by Defendant Highland Capital Management
Services, Inc. (15)

12

13

14

21-3007-sgj

15

Motion for Leave to Amend Answer to Plaintiff's           86
Complaint filed by Defendant HCRE Partners, LLC (n/k/a
NexPoint Real Estate Partners, LLC) (16)

16

17

END OF PROCEEDINGS                                        90

18

INDEX                                                     91

19

20

21

22

23

24

25

008741

**EXHIBIT 14**

Appx. 04799
008742

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    December 10, 2020
 5                                  )    9:30 a.m. Docket
             Debtor.                )
 6   _____)
                                    )
 7   HIGHLAND CAPITAL               )    Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,              )
 8                                  )
             Plaintiff,             )    - MOTION FOR PRELIMINARY
 9                                  )      INJUNCTION
     v.                             )    - MOTION FOR TEMPORARY
10                                  )      RESTRAINING ORDER
     JAMES D. DONDERO,              )
11                                  )
             Defendant.             )
12   _____)

13                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                    UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX/TELEPHONIC APPEARANCES:

16   For the Plaintiff:         Jeffrey N. Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              10100 Santa Monica Blvd.,
                                 13th Floor
18                              Los Angeles, CA  90067-4003
                                (310) 277-6910
19
     For the Plaintiff:         John A. Morris
20                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
21                              New York, NY  10017-2024
                                (212) 561-7700
22
     For the Official Committee Matthew A. Clemente
23   of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                                One South Dearborn
24                              Chicago, IL  60603
                                (312) 853-7539
25
```

2

1   APPEARANCES, cont'd.:

2   For the Defendant:          D. Michael Lynn
                                John Y. Bonds, III
3                               BONDS ELLIS EPPICH SCHAFER JONES,
                                  LLP
4                               420 Throckmorton Street,
                                  Suite 1000
5                               Fort Worth, TX 76102-5304
                                (817) 405-6903
6
    For the NexPoint Parties:   James A. Wright, III
7                               K&L GATES
                                State Street Financial Center
8                               One Lincoln Street
                                Boston, MA 02111
9                               (617) 261-3193

10  For the CLOs/Issuer Group:  James E. Bain
                                JONES WALKER, LLP
11                              811 Main Street, Suite 2900
                                Houston, TX 77002
12                              (713) 437-1820

13  Recorded by:               Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
14                              1100 Commerce Street, 12th Floor
                                Dallas, TX 75242
15                              (214) 753-2062

16  Transcribed by:            Kathy Rehling
                                311 Paradise Cove
17                              Shady Shores, TX 76208
                                (972) 786-3063
18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.

3

```
 1            DALLAS, TEXAS - DECEMBER 10, 2020 - 9:58 A.M.

 2            THE COURT:  We only have left today the Highland

 3   matter.  There may be people on the line for the RE Palm

 4   Springs matter, but if you're on the line for that, the Court

 5   granted a motion for continuance that was filed by SR

 6   Construction, Inc. a few days ago.  So if you were on the line

 7   for that, that's been continued at the Movant's request.  Or

 8   the Objector's request, I should say.  And it's to be reset at

 9   such point in time as the lawyers seek that.

10       All right.  So, with that, I am going to turn to Highland

11   and our emergency motion for a temporary restraining order

12   against James Dondero that was filed by the Debtor.  First,

13   for the Debtor team, who do we have appearing?

14            MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

15   Pomerantz, also with John Morris.  John Morris will be handling the

16   hearing today on behalf of the Debtor.

17            THE COURT:  All right.  Thank you.  For Mr. Dondero, who

18   do we have appearing?

19            MR. BONDS:  Your Honor, John Bonds and Michael Lynn.

20            THE COURT:  All right.  Thank you.  The Committee, I know,

21   is interested in this.  Who do we have appearing for the Committee?

22            MR. CLEMENTE:  Good morning, Your Honor.  Matthew

23   Clemente; Sidley Austin; on behalf of the Committee.

24            THE COURT:  All right.  I'm going to ask, do we have

25   anyone appearing for certain parties who filed another emergency
```

4

1   motion yesterday, I think involving what seemed like very

2   overlapping issues.  The parties that I'm talking about are Highland

3   Fixed Income Fund; NexPoint Advisors, LP; NexPoint Capital, Inc.;

4   and NexPoint Strategic Opportunities Fund.  Do we have anyone -- I

5   think it was the K&L Gates firm who filed an emergency motion

6   yesterday on, like I said, what I think are some overlapping issues

7   with what we're going to hear about today.  Anyone here on the line

8   for those entities?

9          MR. WRIGHT:  Yes.  Good morning, Your Honor.  It's James

10  Wright, K&L Gates.  I wasn't expecting this matter to be on today,

11  so I need to apologize for not having a coat and a tie.

12         THE COURT:  Okay.  Well, I realize I picked you out.  But

13  could you, for the court reporter, say your last name again?  It was

14  a little garbley.

15         MR. WRIGHT:  Yes.  It's James Wright, W-R-I-G-H-T.

16         THE COURT:  Okay.  Thank you.  Well, we have a lot of

17  other folks on the line, so I'll just ask:  Is there anyone else out

18  there who desires to appear?  This was obviously set very expedited,

19  so maybe people did not file a pleading to weigh in, but maybe

20  they're wanting to appear.  If so, go ahead.  (No response.)  All

21  right.  Hearing no others, I will go to you, I guess, Mr. --

22         MR. BAIN:  Your Honor?

23         THE COURT:  Oh, go ahead.

24         MR. BAIN:  Your Honor?

25         THE COURT:  Yes?

5

1            MR. BAIN:  I'm sorry.  I was on mute.  This is Joseph Bain

2    of the law firm of Jones Walker.  I represent the CLOs.  And Your

3    Honor, at the appropriate time, if Your Honor doesn't mind, I have a

4    few comments that may help inform the Court on kind of what's going

5    on.  But I'm happy to wait until the appropriate time.

6            THE COURT:  Okay.  Very good.  Well, and the reason why I

7    picked out Mr. Wright regarding that newest emergency motion is, you

8    know, I know they've asked for an emergency setting next Tuesday,

9    and I have not -- I've not made a decision on that.  I kind of

10   wanted to see what I hear about today and figure out if there's

11   really, you know, a need for that or not.

12      So, thank you, Mr. Bain.  We'll talk to you at some point

13   today.

14           MR. BAIN:  Thank you, Your Honor.

15           THE COURT:  Any other appearances?

16      All right.  Well, I was about to go back to or go to Mr.

17   Morris.  But let me ask Mr. Bonds or Mr. Lynn:  Did you file a

18   responsive pleading?  When I left here yesterday afternoon, I

19   did not see one.  But was there one filed late at night, by

20   chance, that I just haven't seen?

21           MR. BONDS:  No, Your Honor, we have not.

22           THE COURT:  Okay.  Thank you.

23           MR. BONDS:  (garbled)

24           THE COURT:  All right.  Mr. Morris, go ahead.

25           MR. MORRIS:  Thank you, Your Honor.  John Morris;

6

 1  Pachulski, Stang, Ziehl & Jones; for the Debtor.

 2      Let me begin by thanking Your Honor for hearing us on such

 3  shortened notice.  What I thought I'd do is spend a few

 4  minutes, Your Honor, talking about why we're here, summarizing

 5  the facts, and then summarizing for the Court the relief that

 6  we're seeking.

 7      As Your Honor, I presume, is aware, we filed this motion

 8  on Monday, together with a declaration from Jim Seery, the

 9  Debtor's CEO and CRO, with 29 separate exhibits.  And if it

10  pleases the Court, I'd like to proceed in that manner.

11          THE COURT:  All right.  You may.

12          MR. MORRIS:  Okay.  Your Honor, we do regret that

13  we're here, frankly.  The Debtor has worked very hard during

14  the course of this case to get to where we are.  We have a

15  plan on file that calls for the monetization of the Debtor's

16  assets for distribution to holders of allowed claims, we have

17  an approved disclosure statement, and confirmation is just

18  five weeks away.

19      Unfortunately, in the last couple of weeks, Mr. Dondero

20  has engaged in what we firmly believe is wrongful conduct and

21  can't really be credibly disputed or justified.  As Mr. Seery

22  lays out in his declaration and as Mr. Dondero's own written

23  words show, Mr. Dondero recently interfered with the Debtor's

24  operations and decisions and made some rather explicit

25  threats.

7

1    We're not here to punish Mr. Dondero.  We're not here

2  seeking sanctions for violation of the automatic stay.

3  Rather, we're here to simply set some very clear and firm

4  ground rules on a go-forward basis so the Debtor can get

5  across the finish line without interference or coercion by Mr.

6  Dondero or anyone acting on his behalf.  That's all we're here

7  to do today.

8    We tried to work with Mr. Dondero's counsel on a

9  stipulation, but regrettably were unable to do so.

10    So let me describe for the Court the facts that support

11  the motion, and at the end of that I will offer our exhibits

12  into evidence.

13    I do want to provide some context into how we got here.

14  The facts are pretty simple.  As Your Honor will recall, back

15  in January, with this Court's approval, Mr. Dondero

16  surrendered control of the Debtor to an independent board of

17  directors, including Mr. Seery.  As Your Honor knows, though,

18  Mr. Dondero was retained as a portfolio manager and as an

19  unpaid employee of the Debtor.

20    Pursuant to the Court's order and the term sheet entered

21  into with the Unsecured Creditors' Committee, Mr. Dondero's

22  responsibilities were to be determined by the board, and he

23  agreed to resign at the board's request.

24    Over the summer, as Your Honor will recall, Mr. Seery was

25  appointed the Debtor's CEO and CRO.  Throughout this time, Mr.

8

1  Seery worked closely with Mr. Dondero.  And one of the things

2  they worked on was trying to come up with a so-called pot

3  plan, the goal of which was to come to a consensual resolution

4  of this case.  Mr. Seery's goal, the (garbled) goal, the

5  Debtor's goal, was to try to give the estate an alternative to

6  the monetization of the Debtor's assets, and Mr. Seery worked

7  hard and in good faith in that regard.

8      As Your Honor will also recall, in late summer the Debtor

9  and certain litigation creditors agreed to mediate these

10 disputes.  In September, the Debtor announced that it had

11 reached an agreement with Josh Terry and Acis to resolve their

12 claims.  I don't need to remind the Court of the nature of the

13 disputes between Mr. Dondero and Mr. Terry, but suffice it to

14 say that Mr. Dondero made clear that he opposed not only the

15 settlement that was reached at the mediation, but, really, any

16 settlement at all with Mr. Terry.

17     At around the same time, while still trying to get to the

18 pot plan and a consensual resolution, the Debtor did present

19 its plan of reorganization that provides for the monetization

20 of the assets for the benefit of creditors.  By the end of

21 September, Mr. Dondero made it clear that he would oppose both

22 the Acis settlement and the Debtor's plan.

23     He has every right to do that, Your Honor.  Well, those

24 steps are contrary to the interests of the Debtor.  In

25 addition, it also became clear that Mr. Dondero, through

9

1   (garbled) trust, has continued to press his claims that the

2   Debtor had -- that the Debtor had mismanaged Multi-Strat

3   during the case.

4        For these reasons, I think on October 2nd the board asked

5   Mr. Dondero to resign, and he did so on October 9th.

6        With confirmation on the horizon, in the last couple of

7   weeks, regrettably, Mr. Dondero has, in fact, interfered with

8   the Debtor's business.  There's no dispute that the Debtor

9   serves as the manager of certain CLOs.  There's no dispute

10  that Mr. Dondero and certain of his affiliates hold a portion

11  of the preferred notes in the CLOs managed by the Debtors.  I

12  don't think there's any dispute that the Debtor's duty is to

13  the CLOs and not to any particular holder of CLO interests.

14       In late November, in furtherance of his duties, Mr. Seery

15  directed that certain assets held by the CLOs be sold.  Mr.

16  Dondero and certain entities he controls, the ones that we

17  mentioned earlier, Your Honor, the ones that are the

18  (garbled), apparently disagreed with Mr. Seery's business

19  judgment, and that happens.

20       I do want to point out, I don't know if Your Honor has had

21  a chance to read the competing TRO, --

22            THE COURT:  I have.

23            MR. MORRIS:  -- but what's notable -- okay.  What's

24  notable in there, Your Honor, is that they expressly admit,

25  and I'm quoting, the Debtor is responsible for making

10

 1   decisions to sell the CLOs' assets.  They admit that in their

 2   request for a TRO.

 3       So there's no dispute that Mr. Seery has the right to do

 4   what he set out to do.  Nevertheless, Mr. Dondero intervened

 5   and personally stopped the trades that Mr. Seery authorized.

 6   It's in writing.  It can't be disputed.  In fact, it's set

 7   forth in Exhibit 8, which is attached to Mr. Seery's

 8   declaration, which can be found at Docket 4 to the adversary

 9   proceeding.

10       Not only did Mr. Dondero cause the trades to halt, he told

11   certain people, including the Debtor's chief compliance

12   officer, not to do it again, and (inaudible) that they would

13   face personal liability if they did so.

14       The Debtor sent cease-and-desist letters to Mr. Dondero

15   and his affiliated entities.  Those letters are attached as

16   Exhibits 9 and 10 to Mr. Seery's declaration.  And the fact

17   is, Your Honor, for this particular part of the episode, Mr.

18   Seery's conduct is simply unacceptable and was one of the

19   events that precipitated the filing of this motion.

20           THE COURT:  You said Mr. Seery.  I think you meant

21   Mr. Dondero.

22           MR. MORRIS:  I apologize, Your Honor.  I certainly

23   did, yes.

24           THE COURT:  Okay.

25           MR. MORRIS:  The other event that caused the Debtor

11

1   to file this motion was a rather explicit written threat that

2   Mr. Dondero made to Mr. Seery promptly after the Debtor acted

3   to fulfill its fiduciary duties to the estate.

4        As the Court may generally be aware, Mr. Dondero and

5   certain of his affiliates are the makers under a series of

6   promissory notes in favor of the Debtor.  The notes are

7   attached as Exhibits 11 through 23 to Mr. Seery's declaration.

8   Certain of these notes are demand notes, meaning that they

9   don't have a term, they don't expire at some defined point in

10  the future, they're payable upon demand by the holder.  The

11  Debtor is the holder of these notes.

12       Last week, the Debtor exercised its right to make a demand

13  for payment of all unpaid principal and accrued interest,

14  estimated to be approximately $30 million in the aggregate.

15  Those demands are set forth in Exhibits 24 through 27 in Mr.

16  Seery's declaration.

17       The demand notes are property of the Debtor's estate,

18  collection of the notes is part of the Debtor's liquidity

19  plan, and the proceeds are expected to be used to pay

20  creditors' claims.

21       Shortly after the demand for payment on the notes was

22  made, Mr. Seery [sic] sent a short text that can be found at

23  Exhibit 28, saying simply, Be careful what you do.  Last

24  warning.

25       To Mr. Seery's surprise, Mr. Dondero called him the

12

```
 1   following morning, ostensibly to talk about his pot plan.  As
 2   laid out in his declaration, Mr. Seery expressed considerable
 3   concern over the threat, expressed his view that he thought it
 4   was unlawful, and was surprised, really, at the nature of the
 5   conversation.
 6       Mr. Dondero didn't apologize during that call.  He didn't
 7   express regret.  Instead, he suggested that the lawyers would
 8   handle that issue.  And only at the end of the call, when Mr.
 9   Seery pressed, did Mr. Dondero begrudgingly say that he didn't
10   mean any physical harm.
11       Your Honor, we're five weeks away from confirmation.  The
12   Debtor is laser-focused on getting there.  We are -- continue
13   -- we have resolved substantial claims.  We continue to
14   resolve substantial claims.  And though if there was a viable
15   pot plan the Debtor would still pursue it, the Debtor is
16   seeking a smooth transition into its post-bankruptcy state.
17   We continue to negotiate with creditors who have outstanding
18   claims.  And we need peace.  We need the freedom to get there.
19       As a result of the foregoing, the Debtor seeks the entry
20   of a temporary restraining order in the form of Exhibit A
21   attached to the motion, which is on Docket #2 in the adversary
22   proceeding.  In substance, the form is intended to prevent Mr.
23   Dondero from interfering with the Debtor's business, engaging
24   in threatening or coercive conduct, and using his affiliates
25   or others acting on his behalf to do the same.
```

1        In our discussions with Mr. Dondero's counsel, it became

2   clear that Mr. Dondero was not interested at this time in

3   resolving the entirety of the dispute.  We wanted to get this

4   whole adversary proceeding open and closed and put this behind

5   us.  But regrettably, we're here today to press the motion

6   because we were unable to come to that agreement.

7        So, in addition to the entry of the order attached to the

8   motion, the Debtor also requests that the Court hold an

9   evidentiary hearing on the Debtor's request for a preliminary

10  injunction on January 4th, when we already have time on the

11  Court's calendar.

12       And so that there's no misunderstanding, if the parties

13  cannot resolve this matter beforehand, the Debtors do intend

14  to take discovery during the intervening period.  We will be

15  prepared on January 4th, and we would expect, if forced to, to

16  call Mr. Dondero as a witness at that hearing.

17       I have nothing further, Your Honor.  Oh, actually, I do

18  have something further.  The Debtor moves for the entry into

19  evidence of the declaration of Mr. James P. Seery, Jr.

20  (muffled).

21           THE COURT:  Okay.  You got a little garbley.  I think

22  someone unmuted their device during your --

23           THE CLERK:  Mr. Bonds --

24           THE COURT:  Okay.  But the request was that the Court

25  admit into evidence the declaration of Mr. Seery at Docket

14

1  Entry #4, along with the 29 exhibits that were attached to

2  that declaration.  Any objection?  (No response.)  All right.

3  Those will be admitted into evidence.

4       (Debtor's 29 exhibits are received into evidence.)

5       THE COURT:  All right.  Mr. Bonds, what does Mr.

6  Dondero wish to tell the Court?  All right.  I think you put

7  yourself back on mute when I made the comment.  Please unmute

8  your device.

9       MR. BONDS:  I'm sorry, Your Honor.  Can you hear me?

10      THE COURT:  I can.

11      MR. BONDS:  Your Honor, I would first like to

12  apologize for Mr. Dondero's email to Mr. Seery.  It should not

13  have been sent.  It is unfortunate that Mr. Dondero had

14  several good points to make, but the message he was trying to

15  send to the Debtor seems to have been lost, and for that I

16  apologize.

17      Mr. Dondero had serious concerns about the way in which

18  the Debtor's employees have been treated in this case.  As the

19  Court knows, the employees who built this company will be

20  terminated either on December 31st or upon confirmation of the

21  Debtor's most recent plan.  Mr. Dondero does not agree to such

22  termination or the financial treatment of the employees,

23  especially the treatment over the last few months, in which

24  they have seen their claims be substantially reduced.

25      Your Honor, Mr. Dondero is further concerned with the

15

1   Debtor's lack of sale of assets, especially the lack of

2   competitive bidding.  Mr. Dondero may want to bid on some of

3   those assets, and under the Debtor's procedure, he is being

4   precluded from bidding, even if the sale is outside of the

5   ordinary course of business.

6       Mr. Dondero is further frustrated by the Debtor's sale of

7   certain CLOs under applicable law.  Is this an attempt around

8   the hearing on the 16th?  I don't know, Your Honor, but we are

9   set for the 16th on the issue of whether or not the sales are

10  being made outside the ordinary course of business.  Is the

11  Debtor trying to sell its assets without competitive business

12  -- bidding?  Why is that?

13      And what the Debtor would like you to sign is as an overly

14  broad TRO written, I suspect, with a peppering of anger

15  throughout.  The relief requested is basically in the

16  declaration of Jim Seery.  It contains a number of acts which

17  the Debtor seeks to have this Court determine are prohibited

18  conduct.  That term is defined in the Debtor's motion for TRO.

19  We assert that such language is overly broad and its

20  (inaudible) behavior which Debtor seeks to prohibit is not

21  justified, inapplicable, or simply does not make common sense.

22      Your Honor, in the second paragraph of the proposed TRO,

23  there are five general concepts that are listed as prohibited

24  conduct.  The first category of prohibited conduct which we

25  have issues with relates to Mr. Dondero communicating with the

1  Debtor's employees except as it relates to the shared services

2  provided by or controlled by Mr. Dondero.  Such a prohibition

3  is unreasonably broad and seemingly may well violate the First

4  and the Fourth Amendments.

5       Your Honor, we ask the question:  Can Mr. Dondero

6  communicate something as basic as an employment contract with

7  an employee who is going to be let go without violating the

8  TRO?

9       The second category of prohibited conduct relates to

10  allegedly interfering or otherwise impeding, directly or

11  indirectly, the Debtor's business concerning its operations,

12  management, treatment of claims, disposition of assets owned

13  or controlled by the Debtor, and pursuit of the plan or any

14  alternative to the plan.  Your Honor, what does the word

15  indirectly mean?  Does such prohibition prohibit the Debtor

16  from pursuing -- or Mr. Dondero from pursuing his Acis 9019

17  motion or appeal?  What does the language mean with regard to

18  pursuit of the plan or any plan alternative?  Has the Debtor

19  turned the shield into a sword?  Can the Debtor -- can Mr.

20  Dondero try to sell his pot plan which he and the mediators

21  have worked so diligently on?  Does Mr. Dondero violate the

22  terms of the TRO simply by voting against the plan?

23       Is this really what the Debtor wants, or does the Debtor

24  want to return the most money that it can to the Debtor's

25  creditors?

17

1       Can Mr. Dondero even (inaudible) in the organization

2  without violating the TRO?

3       Finally, the proposed order provides that Mr. Dondero is

4  further temporarily causing -- temporarily enjoined and

5  restrained from causing, encouraging, or conspiring with (a)

6  an entity owned or controlled by him and/or any person or any

7  entity acting on his behalf from directly or indirectly

8  engaging in any prohibited conduct.  Again, what does the word

9  causing mean?  What about the word encouraging?  Does that

10  mean that the Debtor simply cannot do any action to protect

11  himself -- Mr. Dondero cannot take any action to protect

12  himself?  Are we setting up Mr. Dondero to fail?

13       Your Honor, what we would ask, what we would ask the Court

14  to do is either deny the TRO as being overly broad or order

15  the Debtor to come up with some reasonable restrictions going

16  forward.  We are happy to consider anything reasonable, but

17  the proposed TRO is anything but reasonable.

18       In summary, we ask the Court how the status quo would be

19  altered by a TRO.

20       Your Honor, I think Mr. Morris has indicated that the

21  Debtor intends to be able to confirm a plan on the 5th -- or

22  the 12th, excuse me, of January.  Your Honor, we don't believe

23  that that's appropriate.  Is Mr. Dondero prohibited from

24  trying to get his plan confirmed?  Is he -- I mean, it seems

25  to me that he basically is.

18

```
 1      Your Honor, with regard to two arguments made by Mr.

 2  Morris, or at least one, we deny that any demand notes

 3  precipitated Mr. Dondero's email.  It had absolutely nothing

 4  to do with it.  But we're not here to talk about Mr. Dondero's

 5  demand notes at this point.

 6      I don't think I have anything further.

 7          MR. MORRIS:  If I may respond very briefly, Your

 8  Honor?

 9          THE COURT:  You may.  Go ahead.

10          MR. MORRIS:  Okay.  Your Honor, we are cognizant, and

11  we don't mean, with all due respect to Mr. Bonds, to infringe

12  on any way Mr. Dondero's right to make applications to this

13  Court, to file motions.  I think I heard mention of, you know,

14  questions as to whether Mr. Dondero could pursue his motion

15  against Acis, his appeal of the Acis, about whether or not or

16  he could file things in this Court.  We expressly put in a

17  footnote, in order to try to make it clear, that Mr. Dondero

18  has and will continue to have a right to make any application

19  he wants to this Court, to object to any motion that's made.

20  That's not the point of the exercise.  The point of the

21  exercise is to protect the Debtor from interference -- to

22  protect the Debtor (echoing) from interference, coercion, and

23  from threats.  It's really that simple.  I don't know why

24  words that we use in common language every day, such as

25  causing or conspiring or encouraging, should be deemed to be
```

19

```
 1   ambiguous.  I think, given the importance of these issues, one

 2   ought to be able to stay on the right side of that line

 3   without questioning whether or not they're actually conspiring

 4   with somebody or encouraging somebody to do something that

 5   they're otherwise prohibited from doing.

 6        What the Debtor will not tolerate, Your Honor, is play

 7   whack-the-mole, where we get an order against Mr. Dondero,

 8   only to have one of his affiliated entities or somebody acting

 9   on his behalf attempt to say, oh, no, I'm here acting on my

10   own independent behalf, and they're going to do exactly what

11   Mr. Dondero is prohibited from doing.  So that's all.

12        Again, Your Honor, we're not here with hysteria.  I don't

13   think our papers were intended to nor did they project any

14   hysteria.  I think, with counsel, as provided for in the

15   proposed order, we would be delighted to continue to work with

16   Mr. Dondero constructively.  If he's got ideas on his pot

17   plan, we're not precluding him from doing that at all.  All

18   we're saying is that he's got to participate with counsel and

19   that he's not going to make any further direct communications

20   to the Debtor's officers, directors, or employees.  That's

21   all, Your Honor.  We think it's really quite reasonable under

22   the circumstances.

23        I have nothing further.

24             THE COURT:  All right.  Well, --

25             MR. BAIN:  Your Honor?
```

20

```
 1              THE COURT:  Who just spoke up?

 2              MR. BAIN:  (garbled)  Yes.  Joseph Bain on behalf of

 3      the CLOs, if I may be heard.

 4              THE COURT:  Okay.  Everybody else mute their line.

 5      Okay.  Go ahead, Mr. Bain.

 6              MR. BAIN:  Yes, Your Honor.  And can you hear me

 7      okay?

 8              THE COURT:  I can.

 9              MR. BAIN:  Wonderful.  Your Honor, for the record,

10      Joseph Bain of the law firm of Jones Walker on behalf of the

11      CLOs.

12          Our role in this is obviously very sensitive, given the

13      nature and relationships that exist.  One of the things I did

14      want to let Your Honor know, though, is that -- two things.

15      One, one of the most outstanding issues, at least in my

16      opinion, regarding confirmation of the plan is essentially

17      what to do with the CLOs and collateral management agreements.

18      That's still an open issue.  If that's not resolved, there are

19      significant rejection damages that could come from that.  So

20      that's the bad news.

21          The good news, however, is, up until this week, we've been

22      negotiating with the Debtors and we have calls set for

23      NexPoint -- with NexPoint to negotiate what all parties kind

24      of refer to as a soft landing for the CLOs, which, to a large

25      extent, involve the issues that are before you today.
```

21

```
 1    I just, I just wanted to provide that context because the
 2   parties are talking and we are kind of taken aback by kind of
 3   the most recent event this week, because from an outsider's
 4   perspective, the current issues that are currently kind of at
 5   dispute here, we thought everyone was working towards a deal.
 6   And I think it is a little ironic that -- and as Your Honor
 7   knows, I was involved in the *Hoactzin* case, and I thought that
 8   that was a very -- I represented Mac Murray (phonetic) in that
 9   case, and I thought Ms. Byrnes and Mr. Hendricks did an
10   excellent job of pulling all the parties together.
11        And Your Honor, I don't want to stray too far outside of
12   my lane to suggest that that same approach is what is needed
13   here, but I just want to raise for Your Honor to let you know
14   that we are here.  We're kind of the party stuck in the
15   middle.  And we're hoping and we're -- remain willing to
16   negotiate all the outstanding issues.  But obviously, given
17   the nature of some of the allegations, it's more complicated
18   right now.
19             THE COURT:  Okay.
20             MR. BAIN:  And that's all I have, Your Honor.
21             THE COURT:  All right.  Well, I appreciate you
22   speaking up.  And you may or may not remember that the Court
23   ordered mediation last July, global mediation, including Mr.
24   Dondero, mediation among the Debtor, Mr. Dondero, UBS, Acis,
25   the Crusader Redeemer Committee, and we had a co-mediation
```

22

1  team.  Retired Bankruptcy Judge Allan Gropper and former Weil

2  Gotshal partner Sylvia Mayer.  And while I don't communicate

3  with mediators, I fully believe from the parties' reports that

4  was mediation that the parties and lawyers tried very, very

5  hard in to get to some settlements, and in fact, they did get

6  to a settlement with Acis and the Redeemer Committee.

7       So, I have a heck of a lot of thoughts here, and I'll

8  refrain from sharing every one of them, but I'm going to share

9  a few of them.  While I appreciate Mr. Bonds doing what was an

10  honorable thing and apologizing on behalf of his client for

11  the written communications that were worded in such a way

12  where someone might think they were threatening or a violation

13  of the stay, it wasn't an apology from Mr. Dondero directly.

14  I think the really, really honorable thing might have been if

15  Mr. Dondero came here, hat in hand, willing to go under oath

16  and explain himself.  You can share that with him, that's what

17  this judge thinks, that the apology through counsel fell a

18  little short, although I definitely appreciate counsel

19  expressing the apology.

20       You know, I've been going back and forth looking at my

21  computer screen today, and, you know, it's rather shocking to

22  see in writing, you know, with the photo shot of a text where

23  Dondero says, "Be careful what you do-last warning."  I mean,

24  that's just pretty shocking.

25            MR. BONDS:  Your Honor?  Your Honor?

1          THE COURT:  Yes.

2          MR. BONDS:  Can I have a second?  Mr. Dondero did

3    apologize to counsel and to Mr. Seery as well, and so the idea

4    that Mr. Dondero has not apologized is not entirely correct.

5          THE COURT:  Okay.  Well, if I misunderstood, I

6    apologize.  But I guess what I was really trying to convey is,

7    in a situation like this, I think coming into court and taking

8    his lumps and saying things under oath might have been a

9    better way to proceed.

10        I guess the second thing I want to say is I wish Mr.

11   Dondero was here, because maybe I'm reading this wrong, but I

12   think he needs to hear and know he is not in charge anymore of

13   Highland.  It may have been his baby.  He may have created its

14   wealth.  But when he and the board made the decision to file

15   Chapter 11, number one, that changed everything.  And then

16   number two, when the Committee was formed and was threatening

17   "We think we need a Chapter 11 trustee because of conflicts of

18   interest of Mr. Dondero and others," and when the Committee

19   negotiated something short of that with the Debtor in January

20   2020, you know, a settlement that involved Mr. Dondero no

21   longer being in charge, no longer being CEO, no longer having

22   any role except portfolio manager with the Debtor, and when

23   various protocols were negotiated, heavily negotiated, for

24   weeks, detailed, complex protocols, life changed even further.

25   It changed when he filed Chapter 11, when he put his baby,

24

1   Highland, in Chapter 11, and then it changed further in

2   January 2020 when this global corporate governance settlement

3   was reached.  As we know, it involved independent new board

4   members coming in and eventually a new CEO.  He's not in

5   charge.

6       Now, that doesn't mean he's not a party in interest, and

7   he can certainly weigh in with pleadings in the bankruptcy

8   court.  But these communications that I've admitted into

9   evidence, and the declaration, the sworn declaration of Mr.

10  Seery, suggest to me that he's not fully appreciating that,

11  sorry, you're not in charge.  And when you chose to put the

12  company in bankruptcy because of the overwhelming debt, it

13  started a cascade of events, so that now I'm depending on a

14  debtor-in-possession with a new board and a new CEO and a

15  Committee of very sophisticated members and professionals who

16  are working in tandem with the Debtor to be in charge,

17  basically.  All right?  So that's another thing I just feel

18  compelled to say for Mr. Dondero's benefit.

19      I guess another thing is there was a little bit of a

20  theme, Mr. Bonds, in your comments that Mr. Dondero is just

21  concerned, more than anything else, about the way employees

22  are being treated, or at least that's a major concern.  And I

23  don't find that to be especially compelling.  I mean, maybe if

24  he was sworn under oath and testified, I would believe that,

25  but it doesn't feel like what's really going on here.  Again,

25

 1    he took the step of deciding that the company should file

 2    Chapter 11.  We had the change in corporate governance in

 3    January.  And he has the ability -- everyone, I think, would

 4    very much be interested in a plan that he supports.  You know,

 5    he wants to get the company back.  That has been made clear in

 6    hearings from time to time, and I believe, from Seery's

 7    declaration and Highland's lawyers, that they've been and will

 8    remain receptive to Mr. Dondero's ideas for a different type

 9    of plan that might allow him to get back into control of

10    Highland, if he puts in adequate consideration that makes the

11    Committee and others happy.

12        But we're in a proverbial the-train-is-leaving-the-station

13    posture right now.  Okay?  We've got confirmation coming up

14    the second week of January or something like that.  Okay.  So

15    the train is leaving the station, so we're running out of time

16    to hear what Dondero might want to do as far as an alternative

17    plan.

18        So, as far as the requested TRO, I appreciate that Mr.

19    Dondero and his counsel are worried about some ambiguity, but

20    I'm looking through the literal wording that has been

21    proposed, and the wording proposed is that Dondero is

22    temporarily enjoined and restrained for communicating, whether

23    orally, in writing, or otherwise, directly or indirectly, with

24    any board member, unless Mr. Dondero's counsel and counsel for

25    the Debtor are included in such communications.  Not ambiguous

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S   Document 15-11   Filed 10/06/25   Page 850 of 1017   PageID 9597

26

1   at all to me, and not unreasonable.  Okay?  Time to have

2   counsel involved in these conversations because, you know, we

3   can't have businesspeople-to-businesspeople sending texts that

4   look like threats to me.

5       Second, making any express or implied threats of any

6   nature against the Debtor or any of its directors, officers,

7   employees, professionals, or agents.  I don't think that's too

8   much to ask.  Please don't let him make threats to us anymore.

9       C, communicating with any of the Debtor's employees,

10  except as it specifically relates to shared services currently

11  provided to affiliates owned or controlled by Mr. Dondero.

12  That seems reasonable to me because of the evidence in front

13  of me.

14      Then D, interfering with or otherwise impeding, directly

15  or indirectly, the Debtor's business, including but not

16  limited to the Debtor's decisions concerning its operations,

17  management, treatment of claims, disposition of assets owned

18  or controlled by the Debtor, and pursuit of the plan or any

19  alternative to the plan.

20      Now, I guess maybe you're confused or feel like that is

21  ambiguous.  I will just say, for the sake of any doubt, and I

22  think I heard Mr. Morris saying precisely this, that, you

23  know, Dondero can file pleadings.  Okay?  He can file

24  pleadings asking for relief.  He can object to the plan.  He

25  can vote against the plan.  And they are completely still open

27

 1  to hearing about -- and I think they would have a fiduciary

 2  duty -- to hear about a pot plan that might be more favorable

 3  than what's on the table right now.  But Mr. Morris, have I

 4  put words into your mouth?  Isn't that exactly what you were

 5  saying?

 6          MR. MORRIS:  That is exactly right, Your Honor.  And

 7  if you look, I think there's a footnote there that expressly

 8  provides -- gives Mr. Dondero the right --

 9          THE COURT:  Okay.

10          MR. MORRIS:  -- confirms his right to do exactly what

11  you just described.

12      (Echoing.)

13          THE COURT:  Okay.  Thank you for that.  And I should

14  say exclusivity is still in place, right?  We don't -- I mean,

15  I'm not inviting him to file a plan right now in violation of

16  the exclusivity provisions, but I'm just saying discussions

17  among lawyers, I think, are not only not prohibited but

18  encouraged here.

19      And then, last, otherwise violating Section 362 of the

20  Bankruptcy Code.  Okay, the sky is blue.  That is obviously

21  not problematic.

22      Okay.  So the next paragraph, James Dondero is further

23  temporarily enjoined and restrained from causing, encouraging,

24  or conspiring with any entity owned or controlled by him

25  and/or any person or entity acting on his behalf from directly

28

 1    or indirectly engaging in any prohibited conduct.

 2        You know, I don't -- I understand that indirectly, you

 3    know, there might be some concern about the ambiguity, but it

 4    looks like to me just sort of a catchall, okay, to the extent

 5    we didn't explicitly say it in the preceding paragraph, we

 6    don't want Dondero causing some employee of an affiliate he

 7    controls to do exactly what Dondero himself is prohibited from

 8    doing.

 9        I don't think it's ambiguous.  And if it is, if someone

10    runs in here, he's violated Paragraph 3 of the TRO, well,

11    obviously we would have a contested hearing where I'm not

12    going to hold him in contempt of court unless I've got an

13    evidentiary showing that would convince me of that.

14        So, I guess, on balance, I'm overruling the objections and

15    I am granting the TRO.

16        And just to be clear, I'll make a record that bankruptcy

17    courts certainly under Section 105 can issue a TRO, and courts

18    are usually bound by the traditional factors of Rule 65 --

19    that is, looking at has there been a showing of immediate and

20    irreparable harm?  Is there a probability of success on the

21    merits that the Debtor will be entitled to this when we have a

22    later more fulsome hearing on the preliminary injunction

23    request?  Would the balance of equities favor the Movant

24    Debtor here?  And would the injunction serve the public

25    interest?

29

1      I find from the evidence, the declaration of Mr. Seery,

2 and the supporting documents, that all four prongs for a TRO

3 are met here, so I am ordering it.

4      A couple of remaining things. We'll come back on January

5 4th to consider whether extension of this relief in a

6 preliminary injunction is appropriate. I don't have at my

7 fingertips the time of day where it's set on the 4th. Is it

8 -- I think that's the Monday after the New Year's Day holiday.

9 So I'm guessing we're set at 1:30.

10     Traci, if you're out there, can you confirm it's 1:30 on

11 January 4th?

12     Okay. I'm not hearing a response from her. But Nate,

13 maybe you can double-check that.

14     (Echoing.)

15     All right. Well, let's talk a minute about what is going

16 to happen next week.

17     Mr. Bonds, I set -- okay, back on November -- please take

18 your phone off mute when I am talking. Or put it on mute when

19 I'm talking, please.

20     On November 19th, you filed the motion, basically -- I

21 can't remember the wording of it -- but something like wanting

22 to change the protocol for non-ordinary-course sales of

23 assets. And you asked for an emergency hearing, and I denied

24 that. And I was very concerned that it looked like an attempt

25 to renegotiate the January protocol order that the Committee

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 854 of 1017 PageID 9601

30

1   had worked so hard to negotiate on.  But it's set, finally.  I

2   think it's this next Thursday, a week from today.

3        But meanwhile, you know, again, I feel like the issues

4   raised in that are very much overlapping with what we talked

5   about today, as well as I feel like the January protocol order

6   controls here, and it's an attempt to revisit that a month

7   before confirmation.

8        But this newest emergency motion filed by Mr. Wright's

9   client, it feels like, as I think I mentioned, the same type

10  of motion dressed a little bit differently from entities

11  controlled by Dondero rather than Dondero directly.  And

12  meanwhile, Mr. Wright has asked for a hearing next Tuesday.

13  I'm not going to have three hearings on the same issue.  So I

14  guess I'll hear first from Mr. Dondero's counsel.  I mean,

15  what do you think I'm going to hear next Thursday that is

16  going to change my mind about this was all covered in the

17  January protocol order and I'm not going to revisit it a month

18  before confirmation?  Mr. Lynn, are you here to address that

19  one?

20        MR. LYNN:  Yes, Your Honor.  First of all, I think

21  the hearing is actually set for next Wednesday.

22        THE COURT:  Okay.

23        MR. LYNN:  Secondly, the motion filed by Mr. Wright,

24  as I understand it, has to do with sales of assets by the CLOs

25  that the Debtor manages as portfolio manager and not -- and

31

1   does not have to do with any sales of assets by the Debtor or

2   its estate.  So they're two different issues.

3        As I understand Mr. Wright's pleading, he is arguing that

4   under the Advisers Investment Act, if I have that name right,

5   that Mr. Seery, on behalf of the Debtor, ought not to ignore

6   directions from or suggestions, requests, as they actually

7   are, from investors in the CLOs with respect to the assets of

8   the CLOs.  That's entirely different from the concern that we

9   are expressing with respect to sales of assets by the Debtor.

10       Secondly, while Mr. Dondero may have some influence on the

11  CLOs, it is my understanding that the investors that Mr.

12  Wright represents are governed by an independent board of

13  directors, which Mr. Dondero may be on.  I don't know whether

14  he is or not.

15       Third, we are not trying to change the protocols.  We do

16  not believe anything in the protocols at all -- we've

17  identified nothing in the protocols at all that says that the

18  Debtor, and, by extension, Mr. Seery and the independent

19  board, may take actions outside the ordinary course of

20  business without notice and an opportunity for hearing before

21  this Court.

22       We have asked in the alternative that if somehow the

23  protocols authorize these actions, that the Court alter the

24  protocols.

25       What triggered this, Your Honor, was a sale of an entity

32

1   known as SSP, which belonged to Trussway, which in turn

2   belongs to the Debtor.  We believe but we do not know for sure

3   that the sale is below the price that could have been

4   obtained.  However, the sale was undertaken, as we understand,

5   without competitive bidding, without notice -- certainly,

6   there was no notice to Mr. Dondero -- and without an

7   opportunity for anyone to be heard.

8        We do not think that the intention of the protocols was

9   for this Court to abdicate its authority to oversee the

10  Debtor's operations and to limit the authorities entitled to

11  participate in decisions involving disposition of assets of

12  major value, to limit the decision-makers to the independent

13  board -- in particular, Mr. Seery -- and to limit it to the

14  members of the Creditors' Committee, rather than providing

15  notice generally to creditors, rather than providing a method

16  for competitive bidding, rather than letting people know what

17  is going on.

18       Your Honor has often stated, not just in this case, your

19  concern that the process should be transparent.  We believe

20  that at this point the Debtor is attempting to use the

21  protocols in an effort to avoid the transparency that

22  creditors, equity interest owners, and most of all, this

23  Court, are entitled to.

24            THE COURT:  All right.  Well, I don't know if anyone

25  wants to respond to that, but --

33

```
 1              MR. MORRIS:  If I may, Your Honor.

 2              THE COURT:  Go ahead, Mr. Morris.

 3              MR. MORRIS:  Just very briefly.  I think I heard

 4   Judge Lynn say that there's nothing in the protocols that

 5   authorizes the Debtor to sell assets outside the ordinary

 6   course of business.  And if he made that admission, I still

 7   don't see the point of this motion next week.  All they're

 8   doing is questioning the Debtor's business judgment.  They

 9   don't really have a right to do that.  Mr. Dondero doesn't

10   have a right to participate in the sale of those assets.  The

11   Debtor -- you know, there's no evidence before the Court,

12   there will be no evidence before the Court, as to how the

13   Debtor decided, what factors they considered when deciding to

14   sell these assets.  This is just completely improper.

15        (Echoing.)

16        Mr. Dondero personally participated in the corporate

17   governance resolution last January.  There has been no

18   complaint by him or anybody else about the protocols, about

19   the Debtor having operated outside the protocols.  The Debtor

20   is transparent.  Every single month, we file monthly operating

21   reports.  You can see what's happening with assets, right?  We

22   work with the Committee.  The Committee's not here joining in

23   this motion.  The Committee hasn't complained about the

24   process.  It's just Mr. Dondero.  He's simply trying to

25   exercise -- this is just another attempt to further exercise
```

34

```
 1   control.  He can make his motion.  It will be denied because
 2   the facts simply don't support it.
 3           THE COURT:  Mr. Clemente, is it wrong of me to assume
 4   that you and your clients are very vigilant in paying
 5   attention to trades, transfers, outside the ordinary course?
 6   I assume since, again, you have a committee of sophisticated
 7   parties who are owed hundreds of millions of dollars, and you
 8   so heavily negotiated the January protocol order, that you're
 9   following it meticulously and paying attention to what's
10   happening.  Do you care to comment?
11           MR. CLEMENTE:  Thank you, Your Honor.  I do.  Matt
12   Clemente, for the record, on behalf of the Committee.
13       You're exactly right, Your Honor, and Your Honor actually
14   touched on several things that I would have said earlier.
15       First of all, the Committee is made up of very
16   sophisticated members, which makes my job sometimes easy and
17   sometimes challenging, because they are very hands-on and they
18   do understand the business of Highland and we did heavily
19   negotiate the protocols early in the case, Your Honor, and
20   they were designed with exactly these types of transactions in
21   mind, so that the Debtor had to come to the Committee and lay
22   out its case for a particular transaction.
23       With respect to the transaction at issue, that's exactly
24   what happened, Your Honor.  We're not going to get into,
25   obviously, Committee deliberations, but I can tell you that
```

35

1    the protocols have been followed.

2        As Your Honor knows, when we've had an issue under the

3    protocols, I remember several months ago when we argued about

4    certain distributions being made, the Committee certainly was

5    not shy about bringing it to Your Honor's attention.

6        So we have been very vigilant and very diligent in holding

7    the Debtor accountable under the protocols.  And we believe

8    that -- although, again, when we've had an issue, we've come

9    to Your Honor.  We believe that the protocols have worked as

10   they were intended to and as they were designed, Your Honor.

11       So I can assure you that the Committee has been very

12   vigilant and the Committee will continue to be very vigilant.

13   These issues were all raised in the context of negotiating the

14   protocols.  That was before Your Honor.  Mr. Dondero was

15   involved with that.  It was very difficult negotiations, Your

16   Honor.

17       But this does seem like somebody now trying to renegotiate

18   what it was that the parties agreed to and Your Honor approved

19   early on in this case.

20       So, Your Honor, rest assured, the Committee has been very

21   vigilant and will continue to be very vigilant.

22           THE COURT:  All right.  And I guess the last thing

23   I'll say on that point is, while of course we always want

24   transparency --

25       (Interruption.)

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 860 of 1017 PageID 9607

36

1          THE COURT:  While we, of course, always want

2   transparency and notice and opportunity to object, I mean,

3   these are not your typical run-of-the-mill assets.  They're

4   not a parcel of real property or a building somewhere or

5   inventory somewhere or intellectual property.  I mean, these

6   are -- you know, again, we have a unique business here.  And I

7   think that was very much recognized in the process of

8   negotiating the protocols, that this is not the type of

9   business where you do a 363 motion on 21 days' notice any time

10  you feel like, oh, today's a great day to trade this or that

11  in whatever fund.

12       Well, we will go forward on this motion, because Mr.

13  Dondero is entitled to his day in court to make his argument,

14  put on his evidence, and try to convince me that this is not

15  just trying to renegotiate something Mr. Dondero agreed to 11

16  months ago on the eve of confirmation.  But I want to make

17  sure -- oh, we're getting --

18       (Echoing.)

19       (Clerk advises Court.)

20          THE COURT:  Okay.  You're on mute.  You're on mute,

21  Mr. Lynn.

22          MR. LYNN:  Your Honor, may I explain briefly?  This

23  is very distressing.  Mr. Morris says that it is the ordinary

24  course of this Debtor's business to sell a subsidiary.  This

25  is not the ordinary course of the Debtor's business.  There is

37

```
 1   nothing in the protocols that says that the independent board
 2   and just the creditors on the Creditors' Committee may make
 3   decisions concerning major sales.  We will present evidence to
 4   that effect when it occurs, and we believe strongly -- and I
 5   want to state, Your Honor, I didn't participate in
 6   negotiations of those protocols.  I wasn't involved.  And I've
 7   looked at them.  There's nothing that says that this can occur
 8   without going to a hearing.  And there is nothing in the
 9   protocols that defines ordinary course of business to involve
10   this.
11       This motion was not filed because Mr. Dondero wanted to
12   get in the way.  It was filed because I thought it was the
13   right thing to do because I thought that this was contrary to
14   the way bankruptcy and Chapter 11 should work.  And it was
15   reasoned by me, with Mr. Dondero's consent.  And I very, very
16   much am upset to hear things people say that he's trying to
17   get in the way with this.  He is not.  He's asking for
18   something that is very, very, very reasonable.  If they have
19   nothing to hide, and I hope they don't and don't believe they
20   do, but if the Debtor has nothing to hide, what is wrong with
21   notice and a chance for hearing?
22           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.
23   If I briefly may be heard.
24           THE COURT:  Go ahead.
25           MR. POMERANTZ:  I actually did negotiate the
```

38

1    protocols.  And I think what Mr. Lynn is conflating is the

2    Debtor selling Debtor assets and the Debtor acting in its

3    management capacity to sell assets of entities it manages.

4         We will also present the case law that basically an entity

5    that is not a debtor whose assets are being sold by the Debtor

6    acting as a manager is not within the purview of this Court.

7         So Mr. Lynn can be frustrated, could be upset with what's

8    happening, but we dealt with these issues last year.  Because

9    as Your Honor mentioned, this Debtor is not the typical

10   debtor.  And we had long negotiations with the Committee on

11   what is ordinary course and what is not ordinary course.  And

12   as I mentioned to you the last time we were here, Your Honor,

13   as I mentioned to you in January when we had this approved, we

14   were not seeking to get authority to sell assets out of the

15   ordinary course of business or do any transactions out of the

16   ordinary course of business.

17        Mr. Lynn thinks that what's happening is out of the

18   ordinary course of the business.  This Court has said it's

19   not.  So we are prepared to go forward with the hearing.

20   We've also spoken to the affiliated entities about putting

21   their hearing on for the same date, because we also agree they

22   -- both motions raise similar issues.  And I think we're close

23   to an agreement on having both of those motions heard at the

24   same time on the 16th.

25        Thank you, Your Honor.

39

1          THE COURT:  All right.  So it's the 16th, Wednesday.

2    Did we look that up, Nate?

3          THE CLERK:  It's at 1:30.

4          THE COURT:  It's at 1:30?  All right.  So we will go

5    forward with the Dondero motion Wednesday, December 16th, at

6    1:30, and we will go ahead and set the what I consider closely

7    overlapping motion filed by the NexPoint entities and Highland

8    Fixed Income Fund by Mr. Wright, we'll go ahead and set that

9    at the same time.

10         Let me say this as clearly as I can.  If there's going to

11   be a challenge to the Debtor's business judgment, Mr. Dondero,

12   he needs to be present at the hearing on video and he needs to

13   testify, okay?  I understand what Mr. Lynn said, that this was

14   his idea, he thought the January protocol order violated the

15   Bankruptcy Code, blah, blah, blah, but I am going to order

16   that Mr. Dondero be present December 16th at 1:30 and testify.

17   Okay?

18         So I've kind of modified that.  I said if the business

19   judgment of the Debtor is being challenged, but no, I'm

20   broadening that.  I think Mr. Dondero just needs to provide

21   testimony on Wednesday.  Given everything I heard today with

22   the TRO request, and given that, in substance, he's -- he is

23   challenging the Debtor's business judgment and the mechanism

24   where the Committee oversees it, he just needs to testify.

25   All right?  So please convey that to him.

40

1      Now, Mr. Wright, I'm first going to ask, I know you

2  weren't -- you were just listening in today, but do you want

3  to say anything?  I see you put your jacket on now.  Thank

4  you.

5          MR. WRIGHT:  I did.  I did find a jacket.  I'm sorry,

6  Your Honor.

7          THE COURT:  Okay.  Go ahead.

8          MR. WRIGHT:  (muffled)  So I, you know, I can address

9  why we're asking for limited relief.  I can also address the

10 underlying motion, which (inaudible) some of -- in the

11 underlying motion --

12         THE COURT:  Okay.  Your sound is very difficult to

13 hear.  Could you repeat what you just said?  I didn't get it.

14         MR. WRIGHT:  Yes, Your Honor.  I'm happy to address

15 our motion for an emergency hearing.  I'm also happy to

16 address the underlying motion we're asking be heard on an

17 emergency basis.  I didn't know, do you want me to address

18 both or just the motion for why we're asking for emergency

19 relief?

20         THE COURT:  Well, I've gone ahead and said I will set

21 it next Wednesday.  It sounds like the Debtor saw the

22 efficiencies maybe in having this one heard at the same time

23 as the Dondero motion.

24     I have a couple of things I want to say for the benefit of

25 you and your client, but I was giving you the chance to say

41

1 something first.

2      Here's what I'm thinking, going into this, so you can be

3 prepared to address this next Wednesday.  Your motion feels to

4 me exactly like what we litigated *ad nauseam* in the Acis case.

5 Now, if any of the Acis lawyers are on the line or Mr. Terry

6 is on the line, I wonder if they are chuckling.  And what I

7 mean is -- I heard a chuckle.  I don't know if that was Ms.

8 Patel.  We had hearings --

9           MS. PATEL:  It was, Your Honor.

10           THE COURT:  Okay.  We had hearings in the Acis case.

11 Remember, Acis was a portfolio manager for CLOs.  And the

12 party that was in the bottom tranche of the CLOs, okay, the

13 equivalent, I think, to your clients here, the NexPoint

14 entities and Highland Fixed Income Fund, we sometimes called

15 them the subordinated debtholders or the equity-holders, that

16 party -- it was a party named HCLOF -- began during the *Acis*

17 case trying to do a call, trying -- redemption notice.  Acis,

18 liquidate these CLOs.  We are -- we're done.  We're tired.

19 You know, we're outside the reinvestment period.  We want you

20 to liquidate.  And started to kind of force that issue.

21 Highland was the sub-manager of Acis at that time.  So, guess

22 what, the Chapter 11 trustee filed an adversary proceeding

23 asking for TROs, saying, you know, this is the portfolio

24 manager's discretion.  And not only that, what they're doing

25 isn't a reflection of reasonable business judgment because,

Appx. 94849
008783

42

1   you know, we don't think it's the right time actually to

2   liquidate these CLOs, they're just trying to deprive the

3   portfolio manager of his stream of revenue for managing this.

4        So we had multiple hearings about this.  I issued a TRO

5   saying stop it, bottom tranche of the CLOs.  It seems

6   transparent you're just trying to deprive Acis, the portfolio

7   manager, of value.  And you know, irony, irony, it's like the

8   backwards situation here.  They were saying, but we're so late

9   in the life of these CLOs, it makes sense to liquidate them.

10  Why would you want to keep these things going?  We're not

11  violating the stay.  We're not jacking with the estate value

12  and trying to deprive Acis of its revenue stream.  Anybody

13  knows it makes sense to liquidate these late-in-life CLOs.

14  Very ironic to me, although maybe it's not the situation,

15  apples to apples, but here, you see what I'm saying, it feels

16  like same situation, only flip-flopped.  The portfolio manager

17  here, Highland, is going to be engaged in liquidating the

18  CLOs, and your client, bottom tranche of equity, is saying no,

19  don't do that.  You know, there's still value there.

20       Now, I will say, in my Acis case, the equity tranche, they

21  kind of -- their theory evolved over time.  They were like,

22  well, we actually just want CLOs managed by Highland, a

23  Highland entity, and Acis isn't a Highland entity.

24       So, bottom line, I issued a TRO.  Stop it, equity tranche.

25  This is not your call, it's the portfolio manager, and I think

Appx. 34844
008784

43

```
 1   you're just jacking with the portfolio manager to screw up the
 2   reorganization.  And guess what, we even had then a
 3   preliminary injunction and then a plan injunction.  And of
 4   course, there were bells and whistles on what would evaporate
 5   the injunction.  But that's now on appeal to the Fifth
 6   Circuit.
 7        So, you know, at my confirmation hearing at least in Acis,
 8   if not previous hearings, we even had expert witnesses and we
 9   pored through the language of the portfolio management
10   agreements.  And I don't know if here we have the same
11   situation, but it was complicated in Acis because we had the
12   portfolio management agreements between the CLO manager and
13   the CLO issuers, but then there was a separate management
14   agreement between the equity tranche and, I don't know, I
15   can't remember who the counterparty to that one was.  But
16   there, there were multiple agreements, and you had to parse
17   through it, and we had experts testifying about, you know,
18   discretion of the equity-holder versus not, or portfolio
19   manager, da, da, da, da, da.  And I ruled as I ruled.  I
20   granted the injunction, to the detriment of the equity
21   tranche.  And maybe the Fifth Circuit one day will tell me I
22   was wrong.  You know, I really think it's a hard, hard, hard
23   issue.
24        But I'm just telling you, that's how I ruled on, I think,
25   three occasions.
```

1        Maybe the portfolio management agreements are worded

2   differently here.  You know, maybe -- maybe it's a different

3   issue.  But I will say I read your motion yesterday with

4   frustration.  I'm like, haven't I ruled on this like three

5   times in the Acis case?  And then, you know, maybe I haven't.

6   Again, maybe, maybe the portfolio management agreements in

7   this case would convince me differently.  But were you aware

8   of how I ruled in Acis?

9        MR. WRIGHT:  Your Honor, I'm aware of the Acis case,

10  but no, I wasn't aware that this particular issue was

11  addressed in such depth.

12        THE COURT:  Okay.

13        MR. WRIGHT:  (muffled)  I will, of course, go take a

14  look at all those hearings.  I anticipate that I'm going to

15  try to draw some distinctions between my situation and the

16  situations there, but I certainly will be prepared to address

17  that next week.

18        I think the thing that I would say just very broadly is

19  that we are not -- I think our request is very limited in what

20  we're asking for.  All we are asking for is that there is a

21  temporary pause on the Debtor exercising its right as

22  portfolio manager to direct sales that we don't agree with for

23  a ten-day period.  And we would then use that period of time

24  to explore, either consensually or through rights that we

25  (inaudible).  And then in the process of looking at this, Your

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 869 of 1017 PageID 9616

45

1   Honor, under the documents effecting a transfer of portfolio

2   management, you know, these documents, they're based on the

3   rights of the preference holders.

4       You know, my client's concern is really about the, you

5   know, the investment time window of claim today versus the

6   funds, the relevant -- again, Mr. Macur (phonetic) -- my

7   clients include two advisors that are, you know, that are

8   ultimately I think controlled by a vehicle that Mr. Dondero

9   controls, but also I have a few clients that are funds that

10  are required by SEC rules, as I understand it, to have a

11  majority independent board.  So I dispute that they're a

12  Dondero-controlled entity, but I understand that that's

13  testimony (inaudible).  But I -- that's -- that's not right.

14      And so the funds, --

15              THE COURT:  Who are the board members?

16              MR. WRIGHT:  I can have that for you next week, Your

17  Honor.

18              THE COURT:  Okay.

19              MR. WRIGHT:  I don't have it in front of me.  But

20  they're required by SEC rules to have a majority independent

21  board.  And so we -- the funds that are an advisor of my

22  clients, they have a much longer-term investment horizon.  So,

23  you know, in my mind, I probably overly-simplistically

24  analogize it to the difference between saving money for a

25  house you intend to buy in a year and how you might invest

46

1    that versus saving money for retirement that you might do in

2    20 years.  And I think any investment advisor will tell you

3    you're going to -- you're going to do that differently,

4    because with a long horizon you can accept (inaudible) and

5    bucket changes and stuff like that.  When they go out a long

6    time, you know, it'll be okay.  And on a short horizon, you

7    know, you need to sort of make sure you're holding onto what

8    you have and just approach it differently.

9        Highland, under its plan, is intending to liquidate at the

10   end of 2022, which that's -- that's fine.  That's what they're

11   intending to do.  But that's a very different investment time

12   horizon than my clients, and so we -- you know, and they're --

13   they're proceeding to run, you know, their liquidations that

14   way.  I don't think that there's anything wrong with that.

15   You know, that's their discretion.  But we think that we'd be

16   better served with a portfolio manager that is taking a long-

17   term time horizon, which once was Highland but now not, given

18   the bankruptcy case.  And so, you know, we'd like to ask that

19   -- and we're just -- we're really not -- we're not asking for

20   a TRO.  I think Mr. Morris (inaudible) a TRO.  I understand

21   that's their position.  But I dispute it.

22       Highland is in bankruptcy, and so it's subject to the, you

23   know, it's subject to the bankruptcy system and subject to the

24   control of the Court.  What we are asking would be for the

25   Court to use its power under 363 and 1107 and 105 to tell

47

1    Highland rough -- for 30 -- within 30 days to figure out if
2    they can replace you under the documents or if there can be a
3    deal, as Mr. -- Mr. Bain mentions, there will be discussion of
4    a (inaudible) to reach a consensual resolution in which the
5    portfolio manager would change that would have to involve the
6    CLOs and probably my clients and also the Debtor, probably, to
7    see if we can get there.  And, you know, if we can't, we
8    can't.  That's really the limited nature of what we're asking
9    for now.  It may be different than what you were describing in
10   the Acis case.  But again, I will go and read those cases and
11   I will be prepared to address that more fully next week.

12           MR. POMERANTZ:  I mean, Your Honor, this is Jeff
13   Pomerantz, if I may briefly respond.

14           THE COURT:  Go ahead.

15           MR. POMERANTZ:  I think there's a fundamental problem
16   with the argument that Mr. Wright just made.  First of all,
17   there are other investors and other people with interests in
18   those CLOs.  It's not Mr. Wright's clients only.

19       And also, the premise that the decisions that are being
20   made in terms of liquidating those assets have to do with the
21   Debtor's timeline on liquidation, just, you'll hear from Mr.
22   Seery next week, is fundamentally incorrect.  Mr. Seery is
23   making decisions on behalf of Highland that he believes are
24   within his fiduciary duty to the funds to maximize value.

25       So the whole premise of the argument that this is between

48

 1   a long-term horizon and a short-term horizon is just

 2   incorrect.  And there are other people that Mr. Seery has to

 3   worry about.  He has a duty to the CLO, and just because one

 4   set of investors wanted to do certain things, they don't have

 5   that right.  It's -- it's -- it wasn't lost on us that, in Mr.

 6   Wright's motion, he did not point to any language in any

 7   agreements that in any way give him that right.

 8       So while we appreciate that these CLOs have to be

 9   addressed, and we have engaged in discussions with Mr.

10   Wright's client and Mr. Bain's client to try to have a soft

11   landing, they have not occurred yet.  And in the interim, the

12   Debtor has to do what it is obligated to do and act in a

13   fiduciary manner and act consistent with the agreements.

14   That's why we objected and we will be objecting to any

15   moratorium on any of those efforts.

16       THE COURT:  Okay.  All right.  So, Mr. Wright, I am

17   also going to direct that you have a client witness to testify

18   about these things.  And I do want to understand, you know,

19   who you're taking instructions from and who is on the board on

20   these entities.

21       You know, we had a hearing before I think you were

22   involved where the Committee was seeking discovery of

23   documents, and a lot of the what I'm going to call Highland

24   affiliates -- and I know people sometimes cringe when I use

25   that word affiliates; you know, it may or may not meet the

49

1    Bankruptcy Code 101 definition of affiliate.  But entities in

2    the Highland umbrella, many of them resisted production of

3    documents from the Committee.  And I got concerned at that

4    point in time of who is instructing the lawyers, because I

5    felt like, in many instances -- not all, but in several

6    instances -- you know, I was concerned it's in the estate's

7    best interest to get these documents.  You know, the Committee

8    was the one seeking the documents, but we've got entities in

9    the Highland umbrella resisting.  And so it felt like there

10   was a conflict.  And if the same human beings were employees

11   of the Debtor, and --

12       Anyway, I think we got through a lot of that, but I

13   remember, in connection with all of that, looking at the list

14   of Highland entities who filed proofs of claim in the

15   bankruptcy case.  And I remember asking, in some cases, like,

16   who filed the proof of claim, and I was told that Mr.

17   Dondero's counsel prepared a lot of these proofs of claim of

18   the different entities.  And at least signatories, I saw that

19   Frank Waterhouse has signed the proofs of claim at least for

20   NexPoint Advisors, NexPoint Capital, Inc., NexPoint Strategic

21   Opportunities Fund.

22       Anyway, we had a discussion about my concerns about

23   conflicts back around that time, but here's what I'm getting

24   at.  I'm worried all over again about do we have any human

25   beings involved calling the shots for your client, Mr. Wright,

50

 1   that have fiduciary duties to the Debtor, and maybe this is

 2   getting in conflict with that.  I just don't know.  I just

 3   don't know.  But it's concerning to the Court.  So, what would

 4   help is if we have a human being testify for your clients so

 5   we can clear the air on that one.  Okay?

 6       So, next Wednesday, December 16th, at 1:30, we'll have a

 7   hearing on the Dondero motion and on these NexPoint motions of

 8   your client, Mr. Wright.  And we're going to have a witness

 9   for Mr. Wright's client and we're going to have a witness --

10   and we're going to have Dondero being a witness.  And Mr.

11   Morris is going to upload your TRO, and we're going to have a

12   follow-up hearing on January 4th on the preliminary injunction

13   request.

14       All right.  So, anything else?

15           MR. MORRIS:  Yes, Your Honor.  It's John Morris for

16   the Debtor.  I've got Mr. Seery on the phone, the Debtor's CEO

17   --

18           THE COURT:  Okay.

19           MR. MORRIS:  -- and CRO.  And if it pleases the

20   Court, he would just like to spend a moment giving the Court

21   an update as to where he is in the process.

22           THE COURT:  Thank you.  He may.

23           MR. MORRIS:  Is that okay?

24           THE COURT:  Uh-huh.

25           MR. MORRIS:  Okay.

51

1           MR. SEERY:  Thank you, Your Honor.  Can you hear me?

2           THE COURT:  Yes.

3           MR. SEERY:  I appreciate the Court's time.  I think

4    with the overlapping motions it would be useful just to tick

5    through very quickly, not to take too much of your time, where

6    we are and why some of these things have come before you in

7    the last couple days.

8       First, as you're aware, we have a plan out for a vote.  We

9    believe we're going to get confirmed.  We believe we'll get

10   the votes.  We're still waiting on the votes.  And we're still

11   working on claims.  So, as we speak, including even this

12   morning, trying to resolve certain of the other open claims.

13      The Debtor is still managing its assets.  And what that

14   means is we're addressing financing with underlying assets

15   that are in portfolio companies.  We are addressing our own

16   debtor-owned assets, some of which we are selling in the

17   ordinary course.  So, for example, securities.  Where we have

18   securities in an account, we have been selling those where we

19   think the market opportunity was ripe.

20      Up until mid-March, Mr. Dondero controlled those accounts.

21   He was the portfolio manager.  We took them away after they

22   lost considerable amounts of money, about ninety million

23   bucks.  Real money.  So we took over control of those accounts

24   since then, and we've been managing to sell them down to

25   create cash where we think the market opportunity is correct.

Case 19-34054-sgj11 Doc 3445-14 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S Document 15-11 Filed 10/06/25 Page 876 of 1017 PageID 9623

52

1      With respect to subsidiaries, we don't have any plans to

2   sell any PV assets now.  These are companies that are part-

3   owned, either directly or indirectly, through subsidiaries,

4   with a number of other (inaudible) who are interest holders.

5      SSP, for example, there's been a lot of noise this

6   morning, no real facts.  I will tell you that we did sell SSP.

7   We did it in conjunction, as Mr. Clemente indicated, with the

8   Committee.  We looked at number of bids.  That entity was a

9   private-equity-owned asset.  We believe that it was sold

10  appropriately.  It wasn't selling an asset of the estate.  It

11  was actually a thrice-removed asset, also with other interest

12  holders, including mostly completely independent, including

13  SIBC -- SBIC owners who wanted to choose off that asset as

14  well.  We believe we got a very good price and executed that

15  well.  Happy to litigate and defend that at any time.

16     The CLOs, we're the manager of the CLOs.  What we're

17  trying to do in our plan is assign CLOs back to NexPoint

18  Advisors.  The reason for that is, while they do generate

19  income, we didn't believe that the income was enough to

20  justify us maintaining them.  They would not be assets that we

21  would continue to hold through the case.  Or through the

22  liquidation.  Unclear whether NexPoint wants those assets now

23  back or not.  We have been working, as Mr. Bain indicated,

24  closely with the Issuers and the Issuers' counsel, because

25  there's very particular, specific ways to deal with those

53

```
 1    assets under the documents that protect the various investors.

 2    As Mr. Morris pointed out, entities related, controlled by,

 3    managed by Mr. Dondero are not the only investors in these

 4    CLOs.  Our duty is to the CLOs.  We believe that we are

 5    adhering to that duty.  We are happy to at some day litigate

 6    that.

 7         With respect to asset sales, the Debtor has a team that

 8    manages these assets.  The team came to me to sell certain

 9    assets.  Mr. Dondero, NexPoint Advisors, they don't monitor

10    these assets.  They don't know anything about them.  The

11    assets we're talking about are loans, though the Debtor hasn't

12    sold any of those, or securities that trade, equity securities

13    that trade in the liquid markets.  These are securities, you

14    can go on the screen, you can go on Yahoo Finance and see how

15    they trade.

16         Our team came to us and suggested that we sell some.  I

17    sat down with the analyst and the analyst suggested we sell.

18    The manager of the day-to-day operations of CLOs suggested we

19    sell.  We set the sell notice within the context of the

20    market.  This wasn't a dumping.  We thought that the market

21    would support what we were doing, and it did.

22         Another asset that we were going to sell is an asset we

23    don't have an analyst on.  Haven't had one for years,

24    apparently.  It's not very much money.  Mr. Dondero's related

25    entities don't hold very much of the interests in the CLOs
```

54

1  that have that.  They have debt which is owned by third

2  parties.  It's a good trade, in our opinion.  Our analysis was

3  it made sense to sell it within the context of the market.

4  The Equity has no decision as to whether we do that.  We're

5  the manager.

6     Mr. Wright's example and his offer is, frankly, silly.  If

7  those public funds want to indemnify the Debtor and CLOs for

8  any potential losses, that would be great, we can do that, we

9  can talk about that, how to arrange that.

10    As to the pot plan, nobody has worked harder on the pot

11 plan -- and I include Mr. Dondero -- than I have.  Nobody.  I

12 didn't do it because I was trying to help Mr. Dondero.  I

13 thought it would be in the best interest of the estate, which

14 means the creditors, the employees, and the investors whose

15 funds we manage, to try to get a consensual deal done.  So

16 far, we've been unable to do that.  In my declaration, there's

17 a footnote.  Not only did I help work on the idea, I actually

18 drafted the term sheet.  (inaudible) to do it, I presented it

19 to the Creditors' Committee.  Not that I wanted to do it.  I

20 thought they should do it.  I did it.  No one has worked

21 harder for that.

22    The employees, unbelievably frustrated to hear that.  Mr.

23 Dondero put this company into bankruptcy.  Our management of

24 this estate has required that we fight with a lot of folks

25 about keeping the team together.  Again, we did it, not so

55

```
1    much for the individual team members, but we thought that
2    would be the best way to enhance value for the estate and it
3    would encourage an alternative plan that could be value-
4    maximizing.
5        The employees have deferred compensation.  That was all
6    set up by Mr. Dondero.  The money that was taken out and used
7    in this -- by this company for other things rather than paying
8    employees cash on a regular basis was used by Mr. Dondero well
9    before I ever came into this case.  If there are repercussions
10   to employees because we are liquidating this entity or
11   monetizing these assets, and because we have to do it through
12   this vehicle, Mr. Dondero can stay in the mirror and not
13   abort.  It's very insulting and frustrating to hear that from
14   counsel, who doesn't understand a thing about what we've done
15   to try to keep the business together.
16       The CLO part of the business, we'd like to assign.  We
17   would like to assign as many of the employees over to help
18   manage the business and have those go to Mr. Dondero's
19   entities.  And that's fine with us.  You know, that is a
20   concrete benefit to him, because it's also beneficial to the
21   estate.  We're not in the anger business.  We are independent.
22   The only thing that makes us angry is that when somebody just
23   makes up noise, not facts, just statements that have no basis
24   in reality of what's happened in this case, when we're trying
25   to hold it together and come to a conclusion.
```

Appx. 04854

008797

56

1    Sorry if I sound frustrated, Your Honor, because I really

2  am, and I thought you should see that going forward before we

3  go into next week.  If the NexPoint entities want the CLOs,

4  let's just work on that transfer.  We have Mr. Bain and his

5  clients.  They are very good.  They are CLO specialists.  His

6  co-counsel at Schulte is renowned in this space.  We will work

7  through it and make sure it works for the Issuers, make sure

8  it works for NexPoint, and of course make sure it works for

9  the estate.

10    Thank you, Your Honor.

11        THE COURT:  All right.  Mr. Seery, I really

12  appreciate these comments.  They've been very helpful to my

13  thinking.  In fact, I want to make sure it's under oath in

14  case I ever want to take judicial notice of anything you've

15  said just now.  Do you solemnly swear or affirm that the

16  statements you made were true and correct today, so help you

17  God?

18        MR. SEERY:  I do, Your Honor.

19        THE COURT:  All right.

20        MR. SEERY:  And just to be clear, if I ever make a

21  statement to the Court, I consider it under oath.

22        THE COURT:  Okay.  Thank you.  I appreciate that.

23    All right.  So, again, I feel like that was so very

24  helpful.  And, you know, this is a precise example of why I am

25  directing, if Mr. Dondero is going to urge a position with the

57

```
1   Court next Wednesday, he needs to testify.  And if NexPoint,

2   through whoever their decision-maker is, is wanting to urge a

3   position to the Court, they need a human being to testify.

4   And I'll hear Seery and I'll hear Dondero and I'll hear

5   whoever that person is, and that's what's going to matter, you

6   know, most to me.  Yeah, we have some legal issues, certainly,

7   but I like to hear business people explain things, no offense

8   to the lawyers.  But it's always very helpful to hear the

9   business people in addition to the lawyers.  All right.  So,

10  Mr. Morris, you're going to upload that TRO for me.

11          MR. MORRIS:  Yes, Your Honor.

12          THE COURT:  Mr. Wright, you can upload your order

13  setting your motion for hearing next Wednesday at 1:30.  And I

14  think we have our game plan for now.  Anything else?  All

15  right.  We're adjourned.

16          THE CLERK:  All rise.

17      (Proceedings concluded at 11:33 a.m.)

18                          --oOo--

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
22  the proceedings in the above-entitled matter.

23  /s/ Kathy Rehling                        12/11/2020

24  _____      _____

25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber
```

58

INDEX

PROCEEDINGS                                              3

WITNESSES

-none-

EXHIBITS

Debtor's Exhibits                          Received 14

RULINGS                                      21/36/39/48

END OF PROCEEDINGS                                     57

INDEX                                                  58

# EXHIBIT 15

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Thursday, January 14, 2021
 5                                  )    9:30 a.m. Docket
                                    )
 6              Debtor.             )
                                    )    - MOTION TO PREPAY LOAN
 7                                  )      [1590]
                                    )    - MOTION TO COMPROMISE
 8                                  )      CONTROVERSY [1625]
                                    )    - MOTION TO ALLOW CLAIMS OF
 9   _____)      HARBOURVEST [1207]

10                        TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                   UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:           Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
14                             10100 Santa Monica Blvd.,
                                 13th Floor
15                             Los Angeles, CA  90067-4003
                               (310) 277-6910
16
     For the Debtor:           John A. Morris
17                             Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
18                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
19                             (212) 561-7700

20   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:    SIDLEY AUSTIN, LLP
21                             One South Dearborn Street
                               Chicago, IL  60603
22                             (312) 853-7539

23   For CLO Holdco, Ltd.:     John J. Kane
                               KANE RUSSELL COLEMAN LOGAN, P.C.
24                             901 Main Street, Suite 5200
                               Dallas, TX  75202
25                             (214) 777-4261
```

2

```
1   APPEARANCES, cont'd.:

2   For James Dondero:        John T. Wilson
                              D. Michael Lynn
3                             John Y. Bonds, III
                              Bryan C. Assink
4                             BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
5                             420 Throckmorton Street,
                                 Suite 1000
6                             Fort Worth, TX  76102
                              (817) 405-6900
7
    For Get Good Trust and    Douglas S. Draper
8   Dugaboy Investment Trust: HELLER, DRAPER & HORN, LLC
                              650 Poydras Street, Suite 2500
9                             New Orleans, LA  70130
                              (504) 299-3300
10
    For HarbourVest, et al.:  Erica S. Weisgerber
11                            M. Natasha Labovitz
                              Daniel E. Stroik
12                            DEBEVOISE & PLIMPTON, LLP
                              919 Third Avenue
13                            New York, NY  10022
                              (212) 909-6621
14
    For Highland CLO Funding, Rebecca Matsumura
15  Ltd.:                     KING & SPALDING, LLP
                              500 West 2nd Street, Suite 1800
16                            Austin, TX  78701
                              (512) 457-2024
17
    Recorded by:             Michael F. Edmond, Sr.
18                           UNITED STATES BANKRUPTCY COURT
                             1100 Commerce Street, 12th Floor
19                           Dallas, TX  75242
                             (214) 753-2062
20
    Transcribed by:          Kathy Rehling
21                           311 Paradise Cove
                             Shady Shores, TX  76208
22                           (972) 786-3063

23

24
          Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

3

1          DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6   right.  We're a little late getting started because we had

7   lots of reading material for the Court today.  All right.

8   This is Judge Jernigan, and we have a couple of Highland

9   settings.  The HarbourVest matters are the primary thing we

10  have set today, and then we also have a Debtor's motion

11  pursuant to protocols for authority for Highland Multi-Strat

12  to prepay a loan.

13     All right.  Well, let's get a few appearances.  First, for

14  the Debtor team, who do we have appearing this morning?

15          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

16  Pomerantz, John Morris, and Greg Demo here on behalf of the

17  Debtor.

18          THE COURT:  Okay.  Thank you.

19     All right.  We have objections on HarbourVest.  Who do we

20  have appearing for Mr. Dondero this morning?

21          MR. WILSON:  Your Honor, it's John Wilson, and I'm

22  also joined by Michael Lynn, John Bonds, and Bryan Assink.

23          THE COURT:  Okay.  I'm sorry.  Could -- the court

24  reporter does yeoman's work in this case.  Let me just make

25  sure we got all three of those names.  Say again, Mr. Wilson.

4

1          MR. WILSON:  John Bonds and Michael Lynn and Bryan

2    Assink.

3          THE COURT:  Oh, okay.  So, see, I thought I heard

4    somebody Wilson in all of that, which was why I was pressing

5    the issue.

6       All right.  Is Mr. Dondero present on the video for

7    today's hearing?

8          MR. WILSON:  I believe he is, Your Honor.

9          THE COURT:  Mr. Dondero, could you confirm that you

10   are out there?  (No response.)  Okay.  My court reporter says

11   he sees the name out there.  Is he in your office?

12         MR. WILSON:  Your Honor, he is appearing remotely

13   from my office.  I'm not sure exactly where he's appearing

14   from.

15         THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16   there and you're speaking up to confirm you're present, we're

17   not hearing you.  Maybe your device is on mute.  So please

18   unmute yourself.

19      (No response.)

20         THE COURT:  All right.  I'm going to take some other

21   appearances and you -- you need to try to communicate with

22   your client and let him know I need to confirm he's present.

23   Okay?

24      All right.  Meanwhile, let's go to our other Objectors.

25   CLO Holdco.  Who do we have appearing today?

5

1          MR. KANE:  John Kane; Kane Russell Coleman & Logan;
2    on behalf of CLO Holdco.
3          THE COURT:  All right.  Thank you, Mr. Kane.
4      We had an objection from Dugaboy Investment Trust and Get
5    Good Trust.  Who do we have appearing?
6          MR. DRAPER:  Douglas Draper, Your Honor, for -- for
7    Draper.
8          THE COURT:  All right.  Thank you, Mr. Draper.
9      All right.  I think those were the only written objections
10   we had.  Mr. Pomerantz, do you confirm, we don't have any
11   other objectors for the motions set, correct?
12         MR. POMERANTZ:  Your Honor, there was those three.
13         THE COURT:  I'm sorry.  I didn't catch your full
14   sentence.
15         MR. POMERANTZ:  That is correct, Your Honor.  There
16   were three objections to the motion.
17         THE COURT:  Okay.  Mr. Clemente, you're there for the
18   Creditors' Committee?
19         MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt
20   Clemente on behalf of the Official Committee of Unsecured
21   Creditors.
22         THE COURT:  All right.  Good morning.  Thank you.
23   All right.  We have a lot of other folks on the video.  I'm
24   not going to go ahead and take a roll call of other lawyers.
25         MS. WEISGERBER:  Your Honor?

6

1              THE COURT:  Yes?

2              MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

3    Weisgerber from Debevoise on behalf of HarbourVest.

4              THE COURT:  Okay.

5              MS. WEISGERBER:  And I'm joined by Natasha Labovitz

6    and Dan Stroik --

7              THE COURT:  Okay.

8              MS. WEISGERBER:  -- from Debevoise as well.

9              THE COURT:  Thank you.  I was neglectful in not

10   getting your appearance, because, of course, you're at the

11   front and center of this motion to compromise, and I did see

12   that you filed a reply brief yesterday afternoon.  Okay.

13   Thank you.

14       All right.  Do we have -- do we have Mr. Dondero on the

15   line?  I'm going to check again.

16       (No response.)

17             THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18   so please unmute your device.

19             MR. WILSON:  Your Honor, it appears to me that Mr.

20   Dondero's device was unmuted as soon as you asked if he was

21   available.  I sent him a communication a second ago asking if

22   he's having technical difficulties.  I have not received a

23   response, so I --

24             MR. DONDERO:  Hello.  Can anybody hear me?

25             THE COURT:  Oh.

7

1          MR. WILSON:  Okay.  I hear him.

2          THE COURT:  Mr. Dondero?

3          MR. DONDERO:  Hello?

4          THE COURT:  Is that you?

5          MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6    everything since the beginning.  It's just we've had technical

7    difficulties.  I couldn't use the Highland offices.  We've

8    been trying to set up something else.

9          THE COURT:  All right.

10          MR. DONDERO:  But I'm on now, if -- yes.

11          THE COURT:  All right.  Very good.  Well, I'm glad

12    we've got you.

13       All right.  Well, Mr. Pomerantz, how did you want to

14    proceed this morning?

15          MR. POMERANTZ:  Your Honor, we could take up the

16    HarbourVest motion first, and I will turn it over to John

17    Morris.  He and Greg Demo will be handling that.  And then

18    after that we can handle the other motion, which is unopposed.

19          THE COURT:  All right.  Mr. Morris?

20          MR. KANE:  Your Honor, this is -- sorry.  This is

21    John Kane for CLO Holdco.  Just very briefly, if I may.  And

22    this will affect, I think, the Debtor's case in chief, so I'll

23    expedite things a little bit, I believe.

24       CLO Holdco has had an opportunity to review the reply

25    briefing, and after doing so has gone back and scrubbed the

8

```
 1    HCLOF corporate documents.  Based on our analysis of Guernsey

 2    law and some of the arguments of counsel in those pleadings

 3    and our review of the appropriate documents, I obtained

 4    authority from my client, Grant Scott, as Trustee for CLO

 5    Holdco, to withdraw the CLO Holdco objection based on the

 6    interpretation of the member agreement.

 7            THE COURT:  All right.  Well, thank you for that, Mr.

 8    Kane.  I think that -- that eliminates one of the major

 9    arguments that we had anticipated this morning.  So, thank you

10    for that.

11        Any other housekeeping matters that maybe someone had that

12    I didn't ask about?

13            MS. MATSUMURA:  Yes, Your Honor.  This is Rebecca

14    Matsumura from King & Spalding representing Highland CLO

15    Funding, Ltd.  I just wanted to put on the record, we -- our

16    client had requested that some of its organizational documents

17    be filed under seal.  But we have given permission for the

18    parties to present the relevant excerpts, to the extent it's

19    still relevant after Mr. Kane's announcement, in court.  And

20    we'd just ask that the underlying documents remain sealed, but

21    we're not going to object if they show them on a PowerPoint or

22    anything like that.

23        So, to the extent that you had that on your radar, I just

24    wanted to clear that up for the proceedings.

25            THE COURT:  All right.  Well, I did sign an order
```

9

 1   late last night.  I don't know if it's popped up on the

 2   docket.

 3            MS. MATSUMURA:  Yes, Your Honor.  That's what this

 4   referred to.  That was what -- these are the documents that

 5   were being sealed.  And so I just wanted to note, if you --

 6   you know, if the Debtor puts up an excerpt of those documents

 7   and you're like, wait a minute, didn't I seal those, that we

 8   were the party that requested them be under seal and we're

 9   fine with them being shown in court, as long as the underlying

10   documents aren't publicly accessible.

11            THE COURT:  Okay.  Got you.  Thank you.

12        All right.  Any other housekeeping matters?

13            MR. MORRIS:  Yes, Your Honor.  This is John Morris

14   from Pachulski Stang for the Debtor.  Good morning.

15            THE COURT:  Good morning.

16            MR. MORRIS:  The only other matter that I wanted to

17   raise, and I can do it now or I can do it later, or Your Honor

18   may tell me that it's not appropriate to do at this time, is

19   to schedule the Debtor's motion to hold Mr. Dondero in

20   contempt for violation of the TRO.

21            THE COURT:  All right.  Well, let's do that at the

22   conclusion today.  And please make sure I do it.  I think I

23   was going to address this last Friday, and we went very late

24   and it slipped off my radar screen.  But I did see from my

25   courtroom deputy that you all were reaching out to her

10

 1   yesterday to get this set, and then Mr. Dondero's counsel

 2   reached out to her and said, We're going to file an objection

 3   to a setting next Wednesday, or I think you had asked for a

 4   setting next Tuesday or Wednesday.

 5          MR. MORRIS:  I did.

 6          THE COURT:  And I don't -- I don't know if that

 7   response/objection was ever filed last night.  I haven't seen

 8   it if it was.  So, we'll -- please, make sure I don't forget.

 9   We'll take that up at the end of today's matters.  All right.

10   Well, --

11          MR. MORRIS:  All right.  So, --

12          MS. WEISGERBER:  Your Honor, one last housekeeping

13   item from -- I'm joined this morning by Michael Pugatch of

14   HarbourVest, who will present some testimony this morning.  I

15   just want to confirm he's on the line and confirm no

16   objections to him sitting in for the rest of the hearing.

17          THE COURT:  All right.  Mr. Pugatch, this is Judge

18   Jernigan.  Could you respond?  Are you there with us?

19          MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20   Pugatch from HarbourVest here.

21          THE COURT:  All right.  Very good.  I think we had

22   you testify once before in the Acis matter, if I'm not

23   mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24   I can't remember.

25      All right.  So, we're going to let Mr. Pugatch sit in on

11

1    this.  Anyone want to say anything about that?  I consider him

2    a party representative, so I don't -- I don't think anyone

3    could invoke the Rule.

4         All right.  Very good.  Well, let's go forward if there

5    are no more housekeeping matters.

6              MR. MORRIS:  Okay.

7              THE COURT:  Mr. Morris?

8              MR. MORRIS:  Thank you.  Thank you very much, Your

9    Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10   Debtor.

11        It's a rather straightforward motion today.  It's a motion

12   under Rule 9019, pursuant to which the Debtor requests the

13   Court's authority and approval to enter into a settlement

14   agreement with HarbourVest that will resolve a number of

15   claims that HarbourVest has filed against the Debtor.

16        What I -- the way I propose to proceed this morning, Your

17   Honor, is to give what I hope is an informative but relatively

18   brief opening statement.  I'll defer to HarbourVest and its

19   counsel as to whether they want to make a presentation in

20   advance of the offer of evidence.  Any objecting party, I

21   suppose, should then be given the opportunity to present their

22   case to the Court.  Then the Debtor will call Jim Seery, the

23   Debtor's CEO and CRO.  We will offer documents into evidence.

24   I would propose then that the objecting parties take the

25   opportunity to ask Mr. Seery any questions they'd like on the

12

1 | matter.

2 | After the Debtor rests, I think HarbourVest would like to

3 | put Mr. Pugatch on the stand to offer some testimony on their

4 | behalf. And I think that that will conclude the case. We can

5 | finish up with some closing arguments as to what we believe

6 | the evidence showed, but that's the way that I'd like to

7 | proceed, if that's okay with the Court.

8 | THE COURT: All right. That sounds fine.

9 | OPENING STATEMENT ON BEHALF OF THE DEBTOR

10 | MR. MORRIS: Okay. So, as I said, Your Honor, this

11 | is a -- this should be a very straightforward motion under

12 | Rule 9019. The standard is well-known to the Court. There

13 | are four elements to a 9019 motion. The Debtor clearly has

14 | the burden of proof on each one. And we easily meet that

15 | burden, Your Honor.

16 | The standard, just to be clear, the first part is that we

17 | have to establish a probability of success, with due

18 | consideration for uncertainty of law and fact. The second one

19 | is the complexity, likely duration, expense and inconvenience

20 | of the litigation. The third part of the test is the

21 | paramount interest of creditors. And the fourth part of the

22 | test is whether or not the proposed settlement was reached

23 | after arm's-length negotiations.

24 | The Debtor believes that it easily meets this standard,

25 | and frankly, is a little bit frustrated that it's being forced

13

1    to incur the expense by Mr. Dondero in going through this

2    process.

3        A plain reading, a fair reading of the economics here

4    relative to the claim shows that this is a very reasonable

5    settlement.  I don't need to go beyond that, Your Honor.  I

6    don't even need to use the word reasonable.  It surely meets

7    the lowest standard.

8        We've prepared a couple of demonstrative exhibits, Your

9    Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10   just put one up on the screen now, if I may.

11       Ms. Canty, can you please put up Demonstrative Exhibit #3?

12       Demonstrative Exhibit #3 is an outline of the economics of

13   the settlement.  It includes the various pieces, the

14   components that the parties have agreed to.  And it shows, at

15   least from the Debtor's perspective, just what HarbourVest is

16   being given here.

17       Up on the screen is a demonstrative exhibit.  It has

18   citations to the evidence that will be admitted by the Court.

19   The first line shows that HarbourVest will receive a $45

20   million allowed general unsecured nonpriority claim.  And that

21   -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22   Page 2.

23       That claim is discounted by the expected recovery that

24   general unsecured creditors are supposed to get.  As of

25   November, in the liquidation analysis that was part of the

14

1   disclosure statement -- that's the citation in the footnote --

2   the Debtor believed that unsecured creditors were estimated to

3   recover approximately eighty-seven and a half cents on the

4   dollar. And so we just did the arithmetic there to get to the

5   net economic value of the proposed general unsecured claim.

6       And from that, we reduced $22-1/2 million because that is

7   the net asset value of HarbourVest's interest in HCLOF, which,

8   pursuant to the settlement agreement, it will transfer back to

9   the Debtor, so that the net economic value is approximately

10  $16.8 million.

11      You will hear testimony from Mr. Seery that this number

12  is, in fact, overstated, and it's overstated because, since

13  the time the disclosure statement was filed in November, a

14  number of events have occurred that will -- that have caused

15  the estimated recovery percentage to be reduced from

16  approximately 87-1/2 percent to something lower than that. We

17  don't have the exact number, Your Honor, but Mr. Seery will --

18  and the evidence will show that there's been more expenses,

19  that there's been some resolution of certain claims. There's

20  been some positive issues, too. But that number is probably

21  in the 70s somewhere.

22      And in any event, I think the point here is, Your Honor,

23  HarbourVest invested $80 million in HCLOF, which was going to

24  participate in the investment in CLOs. They filed a claim for

25  $300 million, through treble damages and other claims. But

15

1  the net economic impact of this is going to be somewhere

2  probably in between $12 and $14 million.  I'll let Mr. Seery

3  give more precision to that.  And it represents less than -- a

4  less than five percent recovery on the total claim.

5      And we think it's important for the Court to keep that in

6  mind.  What are the economics here?  Are we overpaying?  Is

7  this an unreasonable settlement?  And I think the evidence

8  will show that the Debtor is not, but that this settlement

9  that you see before you was the product of arm's length, and

10 I'm going to go in reverse order of the four-part test under

11 9019.

12      So, the last part is whether or not the settlement, the

13 proposed settlement was the product of arm's-length

14 negotiation.  You'll hear lots of evidence that this

15 settlement that's up on the screen right now very much was the

16 product of arm's-length negotiation.

17      The third part of the test, Your Honor, is whether it

18 meets the paramount interest of creditors.  You know,

19 regrettably, Mr. Dondero is the only purported creditor who is

20 objecting here.  He may have done so through different

21 vehicles, but every objecting party here is a debtor [sic]

22 owned and controlled by Mr. Dondero.  No other creditor -- not

23 the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty

24 -- nobody is objecting to this settlement except for Mr.

25 Dondero.  And we believe that that highlights the Debtor's

16

1    ability to meet the third prong of the test, and that is these

2    are -- this settlement is in the paramount interest of

3    creditors.

4         Again, going in reverse, the second part of the test is

5    the complexity, duration, and expense of litigation.  There

6    will be no disputed evidence that we meet -- the Debtor easily

7    meets this prong of the test.  The evidence is going to show

8    that HarbourVest's claim is based on fraud, fraud in the

9    inducement, fraudulent statements and omissions, the kind of

10   case, Your Honor, that I'm sure you're familiar with that is

11   incredibly fact-intensive, that will be incredibly difficult

12   to navigate through.  It will be prolonged, it will be

13   expensive, because you're necessarily relying on he said/she

14   said, basically.  And so we're going to have to get testimony

15   from every person that spoke in connection with the events

16   leading up to the transaction.  So we think the second prong

17   will be easily met, Your Honor.

18        And then the last prong -- the first prong, if you will --

19   is the likelihood of success on the merits.  We think that the

20   settlement, the economic recovery that's up on the screen

21   here, which ultimately will be less than five percent of the

22   claimed amount, in and of itself shows that the settlement is

23   consistent with the Debtor's perception of its likely success

24   on the merits.  I'm certain that HarbourVest disagrees, but

25   that's okay, we're here today and that's the Debtor's view,

17

1   and the Court is here to assess the Debtor's business judgment

2   and whether the Debtor has properly analyzed the issues and

3   gone through the process.  And the evidence will show

4   conclusively that it will.  That it has.

5       Mr. Seery will testify at some length as to the risks that

6   he saw.  I think that you'll hear counsel for Mr. Dondero ask

7   both Mr. Seery and Mr. Pugatch a number of questions designed

8   to elicit testimony about this defense or that defense.  And

9   it's a little -- it's a little ironic, Your Honor, because,

10  really, every defense that they're going to try to suggest to

11  the Court was a valid defense is a defense that the Debtor

12  considered.  In fact, it's, you know, it's a little spooky,

13  how they've -- how they've been able to identify kind of the

14  arguments that the Debtor had already considered in the

15  prosecution of their objections here.

16      But be that as it may, the evidence will conclusively show

17  that the Debtor acted consistent with its fiduciary duties,

18  acted in the best interests of the Debtor's estate, acted

19  completely appropriately here in getting yet another very

20  solid achievement for the Debtor, leaving very few claims that

21  are disputed at this point, all but one of which I believe are

22  in the hands of Mr. Dondero.

23      So, that's what we think that the evidence will show.

24      I do want to express my appreciation to Mr. Kane for

25  reflecting on the arguments that we made with respect to the

18

1    ability of the Debtor to engage in the transfer or the

2    acquisition of the asset from HarbourVest.  I would -- I would

3    respectfully request that we just enter into a short

4    stipulation on the record reflecting that the Debtor's

5    acquisition of HarbourVest's interests in HCLOF is compliant

6    with all of the applicable agreements between the parties.

7         And with that, Your Honor, I look forward to putting Mr.

8    Seery on the stand and presenting the Debtor's case.

9              THE COURT:  All right.  Other opening statements?

10             OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11             MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12   behalf of CLO Holdco.

13        In response to Mr. Morris, I'm not going to enter into a

14   stipulation on behalf of my client, but the Debtor is

15   compliant with all aspects of the contract.  We withdrew our

16   objection, and we believe that's sufficient.

17             THE COURT:  All right.  Well, I'm content with that.

18        Other opening statements?

19             OPENING STATEMENT ON BEHALF OF HARBOURVEST

20             MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21   behalf of HarbourVest.

22        HarbourVest joins in Mr. Morris's comments in support of

23   the settlement, and we believe that the question of whether

24   the settlement between HarbourVest and the Debtor satisfies

25   the Rule 9019 standard is not even a close one.

19

```
 1      Some Objectors have made arguments about the merits of
 2  HarbourVest's claims, which is why we're here.  As Your Honor
 3  will hear this morning, HarbourVest has meaningful and
 4  meritorious claims against Highland, but made the business
 5  decision to avoid the time, expense, and inherent risk of
 6  litigation in the interest of preserving value, both for
 7  itself and for the estate.
 8      Today, Michael Pugatch, a managing director of
 9  HarbourVest, will testify before the Court.  He'll explain
10  that HarbourVest claims against Highland arise out of certain
11  misrepresentations and omissions by Highland to HarbourVest in
12  connection with HarbourVest's purchase of an interest in
13  HCLOF, one of Highland's managed funds.  Those
14  misrepresentations and omissions, as Your Honor will hear,
15  relate to Highland's litigation with its former employee,
16  Joshua Terry, and transfers that were conducted in 2017 to
17  strip Acis of value and prevent Mr. Terry from collecting on
18  an $8 million judgment.
19      Mr. Pugatch will further explain that HarbourVest would
20  not have invested in HCLOF had it known the underlying facts
21  about those Acis transfers.
22      Mr. Pugatch will also testify that not only did
23  HarbourVest not know about those transfers, it learned about
24  those transfers when it was accused of orchestrating the
25  transfers itself in the Acis bankruptcy.  Your Honor will hear
```

20

 1   that the Acis trustee sought extensive discovery from

 2   HarbourVest after numerous accusations that HarbourVest was

 3   behind the transfers.

 4       Mr. Pugatch will also testify that Highland charged legal

 5   fees for itself and its affiliates to HCLOF, essentially

 6   forcing HCLOF to fund the litigation involving the Acis

 7   bankruptcy and Mr. Terry.

 8       In total, HarbourVest's claims for damages are over a

 9   hundred million dollars in investment-related losses, lost

10   profits, legal fees inappropriately charged to HCLOF, its own

11   legal fees.  And that's before interest or trebling damages.

12       But HarbourVest stands ready to litigate its claims, but

13   following hard-fought and extensive negotiations with the

14   Debtors, the parties reached the settlement that's now before

15   the Court.  Mr. Pugatch's testimony regarding the strong

16   factual bases for HarbourVest's claims against Highland and

17   its recoverable damages will further underscore the risks that

18   the Debtors faced if they chose to litigate these claims, and

19   why this settlement is fair, equitable, and in the best

20   interest of the estate.

21           THE COURT:  All right.  Thank you, Counsel.

22       Other opening statements?

23     OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24           MR. DRAPER:  Your Honor, this is Douglas Draper on

25   behalf of one of the Objectors.  I'd like to just make a few

Appx 04878
008821

21

1   comments with respect to what I've heard and what the Court is

2   going to hear.

3       The first issue I'd like to address is the comment by

4   counsel for the Debtor that no other party has objected.  The

5   9019 motion is one of the issues that this Court has to rule

6   on, whether or not there was an objection or not.  So the fact

7   that this may be -- bankruptcy is not a popularity contest and

8   not an issue of who votes for what and doesn't vote.  This,

9   along with the 1129(a) tests, are clearly within your

10  province, and you need to listen carefully because you'll have

11  to make your own independent analysis whether my objection is

12  correct or incorrect.

13      Two other points I'd like to make that I think are very

14  salient.  Number one is, if you look at the Debtor's

15  disclosure statement, it basically took the position that the

16  HarbourVest claim is of little or no value.  And lo and

17  behold, thirty days later, there's a settlement that brings

18  about a significant recovery to HarbourVest.  The timing is

19  interesting, and I think the Court needs to pay careful

20  attention to what transpired between the two dates.

21      And then the last point I'd like to make is, as you listen

22  to the evidence, and what I learned abundantly clear from

23  hearing the depositions, is that the claim of HarbourVest, if

24  there is a claim at all, is probably one hundred percent --

25  should be subordinated in that it appears to arise out of the

22

```
 1   purchase or sale of a security.  And, again, I would ask the

 2   Court to listen carefully to this because that's what it

 3   appears to be and that's what the evidence is going to show to

 4   the Court.

 5           THE COURT:  All right.  Mr. Draper, let me clarify

 6   something I'm not sure if I heard you say or not.  Were you

 7   saying that the Court still needs to drill down on the issue

 8   of whether the Debtor can acquire HarbourVest's interest in

 9   HCLOF?

10           MR. DRAPER:  No.

11           THE COURT:  Okay.  I was confused whether you were

12   saying I needed to take an independent look at that, now that

13   the objection has been withdrawn of Holdco.  You are not

14   pressing that issue?

15           MR. DRAPER:  No, I am not.  Basically, I think it's

16   the fairness of the settlement.  I think the transferability

17   of the interest is separate and apart from the fairness of the

18   settlement itself.  I think the fairness -- the

19   transferability was a contractual issue between two parties

20   that the Court does not have to drill down on.

21           THE COURT:  All right.  I have another question for

22   you.  I want to clarify your client's standing.  Tell me --

23   I'm looking through a chart I printed out a while back.  I

24   guess Dugaboy Investment Trust filed a couple of proofs of

25   claim; is that right?
```

23

1           MR. DRAPER:  Yes.

2           THE COURT:  Okay.  What --

3           MR. DRAPER:  And objections are pending.

4           THE COURT:  Pardon?

5           MR. DRAPER:  Objections to those claims are pending

6    before the Court, Your Honor, --

7           THE COURT:  Okay.

8           MR. DRAPER:  -- and have not been litigated.

9           THE COURT:  And what about Get Good Trust?

10          MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12          THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16          MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22      And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25      The second part to the Dugaboy ownership is we own an

24

1    interest in the Debtor.  And so we are, in fact, a party in

2    interest.

3              THE COURT:  Okay.

4              MR. DRAPER:  It may be a small interest, but it is an

5    interest.

6              THE COURT:  It has a limited partnership interest in

7    the Debtor?

8              MR. DRAPER:  Yes.

9              THE COURT:  Is that correct?

10             MR. DRAPER:  Yes.

11             THE COURT:  Okay.  Well, I'll move forward.  Thank

12   you.

13        Does that cover -- any other opening statements?  I think

14   that covered everyone who was -- who filed some sort of

15   pleading today.  No.

16             MR. WILSON:  Your Honor, John Wilson on behalf of --

17             THE COURT:  I'm sorry.  I'm sorry.

18             MR. WILSON:  -- Mr. Dondero.

19             THE COURT:  I missed Mr. Dondero's counsel.  I knew

20   we had visited at some point this morning.  I just got

21   confused there.  Go ahead, Mr. Wilson.

22             MR. WILSON:  No problem, Your Honor.  I was just

23   going to say that we will reserve our comments until after the

24   conclusion of the testimony.

25             THE COURT:  All right.  Very well.

25

1     Mr. Morris, you may call your first witness.

2          MR. MORRIS:  Thank you, Your Honor.  Before I do,

3   just two very, very quick points.

4          THE COURT:  Okay.

5          MR. MORRIS:  To be clear, Dugaboy's interest in the

6   Debtor is 0.1866 percent.  Less than two-tenths of one

7   percent.

8     Secondly, the argument that Mr. Draper just made with

9   respect to subordination is one that appears in nobody's

10  papers.  And, in fact, not only doesn't it appear in anybody's

11  papers, but Mr. Dondero, I believe, specifically took issue

12  with the fact that a portion of the consideration that

13  HarbourVest would receive would be on a subordinated basis,

14  and he would -- and I think he took the position there is no

15  basis to give them a subordinated claim.

16    So, I just wanted to point those items out to the Court,

17  not that I think either one makes a large difference today,

18  but I do want to deal with the facts.

19          THE COURT:  Thank you.

20          MR. MORRIS:  The Debtor would call -- you're welcome,

21  Your Honor.  The Debtor calls Mr. James Seery.

22          THE COURT:  All right.  Mr. Seery, welcome back to

23  virtual court.  If you could say, "Testing, one, two" so I can

24  see you and swear you in.

25          MR. SEERY:  Testing, one, two.

                              Seery - Direct                    26

1          THE COURT:  All right.  I heard you but I'm not yet

2    seeing your video.  Is your video turned on?

3          MR. SEERY:  Video is on.  Yes, Your Honor.

4          THE COURT:  Okay.  I see you now.  Please raise your

5    right hand.

6                JAMES SEERY, DEBTOR'S WITNESS, SWORN

7          THE COURT:  Thank you.  Mr. Morris?

8          MR. MORRIS:  Thank you, Your Honor.

9                       DIRECT EXAMINATION

10   BY MR. MORRIS:

11   Q    Good morning, Mr. Seery.  Can you hear me?

12   A    I can.  Thank you, Mr. Morris.

13   Q    Okay.  Let's just cut to the chase here.  Are you familiar

14   with HarbourVest's claims filed against the Debtor?

15   A    I am, yes.

16   Q    And did you personally review them?

17   A    I did, yes.

18   Q    Do you recall that over the summer the Debtor objected to

19   HarbourVest's claim?

20   A    Yes, we did.

21   Q    Why -- can you explain to the judge why Harbour -- why the

22   Debtor objected to HarbourVest's claim last summer?

23   A    Sure.  The HarbourVest claims, I believe there are about

24   six of them, initially were filed, and they were -- they were

25   relatively vague in terms of what the specifics of the claims

Seery - Direct                          27

1   were.

2       So, we saw the claims but didn't, frankly, pay a lot of

3   attention to the underlying transaction that was referred to

4   in the proofs of claim and the losses that HarbourVest had

5   claimed to suffer -- to suffer with respect to their purchase

6   of securities related to HCLOF and the damages caused by the

7   Acis case.  So we filed a pretty pro forma objection.  I

8   believe it was a simply stated objection that we didn't have

9   any record that there was anything in the Debtor's books and

10  records that they had a valid claim for any amount against the

11  Debtor.

12  Q   Are you aware that HarbourVest subsequently filed a

13  response to the Debtor's objection to their claims?

14  A   Yes.  Yes, I am aware.

15  Q   And did you familiarize yourself with that particular

16  response?

17  A   I did indeed.  It was a pretty extensive response, really

18  developing the full panoply of their claims, which included

19  claims for expenses relating to the Acis case, which

20  HarbourVest viewed as being improperly charged to HCLOF by its

21  manager, which is effectively Highland.  Those expenses,

22  HarbourVest took the view, were excessive, had nothing to do

23  with the investment, and were simply a pursuit of a personal

24  vendetta against Mr. Terry and his interests by Mr. Dondero,

25  and using HCLOF's money to actually pursue those interests.

Appx 04885
008828

Seery - Direct                    28

1      In addition, and this was the first time we saw that,

2   HarbourVest brought forth its claims that it was entitled to

3   effectively rescind the transaction.  And I say rescind the

4   transaction:  In security parlance, they claim that they were

5   induced by fraud, I think as most are -- to enter into the

6   transaction.

7      As most are aware, the liability limitations in the OMs

8   and the exculpation in the documents are pretty broad, and

9   HarbourVest's position was that they weren't going to be

10  subject to those limitations because the actual transaction

11  that they entered into was a fraud on them, designed by Mr.

12  Dondero, Mr. Ellington, and the Highland team.

13  Q   All right.  Let's talk about your understanding, the

14  Debtor's understanding of the factual background to

15  HarbourVest's claim.  What is your understanding of the

16  investment that HarbourVest made?

17  A   Well, HarbourVest made an investment in the Highland CLO

18  business.  The Highland CLO business was -- was Acis.  And

19  effectively, the business had been separated, but in name

20  only.  Acis was just a shell, with a few partners --

21  obviously, Mr. Terry as well -- but it was all Highland

22  personnel doing all the work.

23      And what they were trying to do with Acis was, in essence,

24  resuscitate a business that had been in a bit of a decline

25  from its pre-crisis heyday.

Seery - Direct                    29

1      They were looking to take additional outside capital.

2   They would -- they would pay down or take money out of the

3   transaction, Highland would, or ultimately Mr. Dondero, and

4   they would -- they would seek to invest in Acis CLOs,

5   Highland's 1.0 CLOs. And then with respect to the Acis CLOs,

6   and potentially new CLOs, but with the Acis CLOs, they'd seek

7   to reset those and capture what they thought would be an

8   opportunity in the market to -- to really use the assets that

9   were there, not have to gather assets in the warehouse but be

10  able to use those assets to reset them to market prices for

11  the liabilities and then make money on the equity.

12  Q   Do you have an understanding --

13  A   Then --

14  Q   I'm sorry. Go ahead.

15  A   Why don't I continue? So, the transaction, they found

16  HarbourVest as a potential investor, and the basis of the

17  transaction was that they would make an investment into Acis.

18      Shortly before the transaction, and while they were doing

19  diligence, Mr. Terry received his arbitration award. I

20  believe that was in October of 2017. The transaction with

21  HarbourVest closed in mid- to late November of 2017. But Mr.

22  Terry was not an integral part. Indeed, he wasn't going to be

23  a key man. He had been long gone from Highland by that time.

24      What the -- I think you asked me originally what the basis

25  of their claim was. The transaction went forward, and the

Seery - Direct                          30

 1    basis of their claim is that they really were never -- nothing

 2    was disclosed to them about the nature of the dispute with Mr.

 3    Terry other than in the highest-level terms; the animosity

 4    with respect to which that dispute was held by Highland and

 5    potentially Mr. Terry; and really, how those costs would be

 6    borne and risks be borne by the investment that they were

 7    making.

 8        That was, in essence, the transaction and the high-level

 9    view of their claim.

10    Q    Okay.  Just a few very specific facts.  Do you have an

11    understanding as to how much HarbourVest invested and what

12    they got in exchange for that investment?

13    A    Yeah.  HarbourVest invested in a couple tranches, and I

14    forget the exact dates, but approximately $75 million

15    originally, and then they added another five.  Some

16    distributions were made in the first half of 2018, putting

17    their net investment in the mid-seventies on the investment,

18    which now is worth about 22-1/2 million bucks.

19    Q    And what percentage interest in HCLOF did HarbourVest

20    acquire, to the best of your knowledge?

21    A    They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22    -- the Court is, I think, well aware of this, but to refresh,

23    is a Guernsey entity.  Not -- not atypical for structures of

24    this type to use offshore jurisdictions and sell the

25    securities under -- at least to U.S. -- can't sell them to

Seery - Direct                          31

1    U.S. investors unless they qualify, and these are sold under

2    Reg S to -- to investors that otherwise qualify.  And

3    HarbourVest was investing in that transaction through the

4    Guernsey structure.

5    Q    And do you have an understanding as to who owned the 50-

6    plus percent of HCLOF that HarbourVest was not going to

7    acquire?

8    A    Yeah.  There's -- you can tell by the name.  HCLOF is

9    Highland CLO Funding.  This is a Highland vehicle.  So

10   Highland owned and controlled the vehicle.  The DAF, which is

11   -- which is Dondero-controlled trusts, have the -- 49 percent.

12   Highland has, I believe, around .63-65 percent directly.  And

13   then Highland employees at the time who were involved in the

14   business owned another small percentage.

15        So the majority was going to be controlled by Highland

16   through its control of DAF and its control of the employees

17   that worked for it.  HarbourVest would be a minority investor.

18   Q    Okay.  And I believe you testified that the investment was

19   made in mid-November; is that right?

20   A    That's correct.  I think it was the 15th, may have been

21   the 17th of November.

22   Q    And do you recall when in October the Terry arbitration

23   award was rendered?

24   A    It was about a month before.  I think it was right around

25   the 20th, the 17th to the 20th.  I may be slightly wrong on

Seery - Direct                          32

1  each of those dates.

2  Q   Okay.  What is your understanding as to what happened

3  after the issuance of the award that is the basis or at least

4  one of the bases for HarbourVest's claim?

5  A   I don't think there's -- I don't think there's any

6  dispute.  And there certainly are judicial findings.  Dondero

7  and Highland went about stripping Acis of all of its assets.

8  So, remember that Acis is not a separate standalone company,

9  in any event.  It's controlled and dominated completely by

10 Highland at the time.  But it did have contracts.  And those

11 contracts had value.

12     So the first idea was to strip out the management contract

13 and put it into a separate vehicle, which we called HCF

14 Advisor, which Highland still owns.  The second piece was to

15 strip out some valuable assets, the risk retention piece,

16 which was a loan that in essence was equity that Highland had

17 put into Acis but structured as a loan, as many of the

18 transactions we'll see down the road are, in order to deal

19 with some -- avoid taxes in any way possible.  And that

20 structure, that value moved value out of Acis for the express

21 purpose of trying to run, in essence, the Highland business

22 back in Highland.

23     Remember, as I said, Acis is just a Highland business

24 moved to a separate shell.  When Mr. Terry got his arbitration

25 award against Acis and was seeking to enforce it, it was

Seery - Direct                                    33

1    pretty straightforward, let's take all the assets -- Dondero

2    scheme -- let's take all the assets and move them back into

3    Highland so Terry can't get anything.

4    Q    And how does that scheme relate to the HarbourVest claim,

5    to the best of your knowledge?

6    A    Well, HarbourVest -- HarbourVest's position is that they

7    invested in Acis and -- and whether Acis was called Acis or

8    called Highland, it doesn't really matter; there were valuable

9    assets in the -- in the entity that they were going to be

10   investing in through the equity in these CLOs and some of the

11   debt securities in those CLOs.

12        And then the stripping out and the fraudulent conveyances

13   out of Acis caused them damages because that's what left the

14   damage to Mr. Terry.

15        The quick math on Acis, by the way, is Acis has probably

16   lost, total damages, 175 million bucks.  And that's pretty

17   easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of

18   fees charged to HCLOF.  Another five million of fees, at

19   least, incurred by Mr. Terry.  Ten million that went to Mr.

20   Terry, 15 to Highland fees, another five, plus Mr. Terry's

21   settlement in this case, over eight million bucks.

22        So HarbourVest's position, which, on a factual basis, you

23   know, is problematic for the estate, is, wait a second, we

24   invested in this vehicle with Highland.  That was supposed to

25   invest in Highland CLOs.  They were called Acis, but they were

Seery - Direct                                      34

1   Highland CLOs.  And then you went about causing tremendous

2   damage to that vehicle that we ultimately were investing in,

3   and then charge us for the pleasure.

4   Q    You used the phrase earlier "OM," I believe.

5   A    Offering memorandum.

6   Q    Offering memorandum?  Can you just explain to the Court

7   your understanding of what an offering memorandum is?

8   A    Typically, under U.S. law, and foreign jurisdictions have

9   similar laws, you have to have a document that explains the

10  securities that you're selling.  And it goes into extreme

11  detail about the securities and the risks related to those

12  securities.

13       And the idea is not to have a document that tells you

14  whether it's a good investment or a bad investment, but it's a

15  document that discloses to the potential investor all of the

16  risks with respect to that security or related to the

17  investment over the duration of the security.  It doesn't

18  predict the future, but it's supposed to make sure that it

19  gives you a very clean view of the past and a very clean view

20  of what the facts from the past are and how they would

21  implicate the future of the investment.

22  Q    And in the course of its diligence, did the Debtor have an

23  opportunity to review the offering memorandum in the context

24  of the claims that were being asserted by HarbourVest?

25  A    Oh, absolutely.  It was originally effectively -- it's an

Seery - Direct                                    35

1   HCLOF offering memorandum.  But as I said, HCLOF was managed

2   and controlled by Highland, and Highland originally prepared

3   it.  And then, of course, in connection with -- with this

4   dispute and these claims, we reviewed it, both myself and my

5   legal team.

6   Q   All right.

7            MR. MORRIS:  Your Honor, the offering memorandum is

8   on the Debtor's exhibit list, and I think this is an

9   appropriate time to move into evidence Debtor's Exhibits A

10  through EE, all of which appear at Docket No. 1732.

11           THE COURT:  1732?

12           MR. MORRIS:  It's the Debtor's Second Amended Witness

13  and Exhibit List.

14           THE COURT:  All right.  Any objection to admission of

15  A through EE?

16           MR. DRAPER:  Douglas Draper.  No objection, Your

17  Honor.

18           THE COURT:  All right.  Mr. --

19           MR. MORRIS:  May I proceed?

20           THE COURT:  Yeah.  Mr. Wilson, did you want to

21  confirm no objection?

22       (Echoing.)

23           THE COURT:  All right.  Hearing no objection,

24  Debtor's A through EE are admitted.

25       (Debtor's Exhibits A through EE are received into

                                    Seery - Direct                        36

 1  evidence.)

 2              THE COURT:  Go ahead, Mr. Morris.

 3              MR. MORRIS:  Thank you, Your Honor.  The offering

 4  memorandum itself is one of the documents that we filed under

 5  seal, and we did so at the request of counsel to HCLOF.  But

 6  HCLOF has consented to our sharing up on the screen certain

 7  very limited provisions of the document, without waiving the

 8  request that the agreement otherwise be maintained under seal.

 9              THE COURT:  All right.

10              MR. MORRIS:  So may I proceed on that basis, Your

11  Honor?

12              THE COURT:  You may.  Uh-huh.

13              MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14  on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15  is there a way to just expand that just a bit, Ms. Canty?

16  Thank you very much.  And if we could just scroll it up?

17  Thank you very much.  Perfect.

18     Okay.  So, Your Honor, this, as the footnote says, is an

19  excerpt from the offering memorandum that can be found at

20  Debtor's Exhibit AA.  Double A.  And this particular portion

21  of the offering memorandum is at Page 35.

22              THE COURT:  Okay.

23  BY MR. MORRIS:

24  Q   Mr. Seery, have you seen this portion of the offering

25  memorandum before?

Seery - Direct                                    37

1   A    Yes, I have.  But before I continue, I just -- I should

2   have checked.  Are you able to hear me clearly?  Am I speaking

3   too quickly or am I cutting out?  I just want to make sure.

4   I'm using a different set of audio today.

5              THE COURT:  All right.

6              MR. MORRIS:  That's fine.

7              THE COURT:  I hear you very well.

8              MR. MORRIS:  Yeah.

9              THE COURT:  So I think we're good right now.  Thank

10  you.

11             THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13             THE COURT:  Okay.

14             THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q    Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A    Yes, I did.

20  Q    Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A    With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

Seery - Direct                    38

1   is very high-level.  And if there were no other litigation

2   going on, it might serve to suffice.  It basically says, In

3   our business, because we invest in distressed loans, there's a

4   lot of litigation around distressed investments, and that's

5   what we have.  And then it says, We've talked with the

6   investor about other things and we're -- we think that's

7   enough.

8   Q    Is there anything in this portion or anywhere in the

9   offering memorandum that you're aware of that disclosed to

10  HarbourVest that in the weeks leading up to the investment

11  Highland was engaged in the fraudulent transfer of assets away

12  from Acis?

13  A    No.  And I apologize, because I think it's -- I've

14  conflated two provisions.  This one only deals with the very

15  high-level nature of the business.  It doesn't give any

16  indication that there's any material litigation going on

17  elsewhere with respect to Acis.

18       I believe there's another provision that says, We -- we

19  have talked to -- oh, here -- I'm sorry.  It is here.

20  Shareholders have had an opportunity to discuss with Highland

21  to their satisfaction all litigation matters against Highland

22  and its affiliates unrelated to its distressed business.

23       That, in my opinion, is wholly inadequate.

24  Q    Okay.

25       MR. MORRIS:  And let's put up -- actually, let's just

                          Seery - Direct                    39

 1   move on.

 2   BY MR. MORRIS:

 3   Q    Let's go to the settlement itself.

 4           MR. MORRIS:  Can we put back up Demonstrative Exhibit

 5   #3?

 6   BY MR. MORRIS:

 7   Q    Mr. Seery, can you see that?

 8   A    Yes, I can.

 9   Q    Does this generally describe the net economic recovery of

10   the HarbourVest settlement based on estimated recoveries for

11   general unsecured creditors as of November 2020?

12   A    As of November 2020, it does.  And you alluded to this in

13   your opening, but to be clear, the numbers have shifted.

14   Costs have increased.  The -- so the -- effectively, the

15   numerator, in terms of distributable value that we estimate,

16   is lower.  And settlements, the denominator, have also

17   increased.  So the claims against the estate that have been

18   recognized have increased.  And that, that probably takes it

19   down closer, in our view, to about seventy cents distribution,

20   a number closer to nine to ten million, maybe a little bit

21   less.

22           However, there's also some additional value that we -- we

23   believe we will recover directly.  There are north of $150

24   million of intercompany notes owed by Dondero entities to

25   Highland.  A number of those notes are demand notes, and we've

Seery - Direct                    40

1   already made demand.  We'll be initiating actions next week.

2   So those are -- those value, we believe, we'll recover

3   directly from Mr. Dondero and from related entities.

4       To the extent those related entities don't have value, we

5   feel very strongly about our ability to pierce the veil and

6   reach in to Mr. Dondero.  And then his assets, either his

7   personal assets or the assets that he claims are in trusts.

8       In addition, there are a significant amount of notes that

9   were extended in two -- I believe around 2017, for no

10  consideration.  Those notes were demand notes, I believe, and

11  then extended it 30 years.  So they have 2047 maturities.

12  Those were probably going to have to be subject to fraudulent

13  conveyance type actions or -- or some sort of sale at a very

14  discounted value because third parties wouldn't want long-

15  dated notes with Mr. Dondero as the counterparty for very much

16  money.

17      Those -- they defaulted on some of those parties, so we

18  effectively turned them into demand notes.  We've accelerated,

19  and we'll be bringing actions against those entities next week

20  as well.

21      So I think (garbled) have come up, so I apologize.  One

22  way of saying I think the sixteen and a half is a bit high

23  right now, based upon what we know, but the value is going to

24  be higher than our estimate a couple of weeks ago because we

25  do believe we'll be able to recover on the notes.

Seery - Direct                          41

1    One additional caveat, just to be fully transparent here.

2  This summary with the 16.8 doesn't include the subordinated

3  piece of this -- of this claim and our resolution. That --

4  recovery of that piece will be dependent upon the success of

5  litigations.

6    In order for the subordinated piece to get paid, all

7  general unsecured claims in Class -- Classes 7 and 8 will have

8  to be paid in full. And then -- and then the subordinated

9  class in Class 9, which we believe UBS will have a piece of,

10 and HarbourVest will have a piece of by this settlement, those

11 will be able to recover, and those will be based upon other

12 claims of action against -- primarily against related parties.

13 Q   And then that last point, is that what's reflected in

14 Footnote 3 on this page?

15 A   That's correct, yes.

16 Q   Okay. And just for the record, there's a reduction in

17 value of $22-1/2 million. Do you see that?

18 A   Yes.

19 Q   And can you just explain to the Court what that is and how

20 that value was arrived at?

21 A   Yes. I may be getting slightly ahead of you, Mr. Morris.

22 But to give the Court a reflection of the transaction -- and

23 we can go into the details in a moment -- ultimately, the

24 transaction we structured we think is very fair both

25 economically to the Debtor, but there -- there is some

Seery - Direct                    42

 1   complexity to it to satisfy some of HarbourVest's concerns

 2   that they be able to effectively rescind the transaction, at

 3   least from an optical perspective.  Value was important, but

 4   optics were as well.  The twenty-two and a half is the current

 5   -- actually, the November value of HCL -- the HarbourVest

 6   interests in HCLOF.  And that's based upon Highland's

 7   evaluation of those interests.

 8       So we do believe that that is a fair value as of that

 9   date.  It has not gone done.  It hasn't gone up explosively,

10   either, but it hasn't gone down.  We think that's good, real

11   value.  That value is in the Acis CLOs, the equity in those

12   CLOs, which is 2 through 6, that we -- we will be working with

13   the HCLOF folks to get Mr. Terry to monetize those assets and

14   those longer-dated CLOs.

15       In addition, I think it's 85 percent of the equity in Acis

16   7 -- Acis 7 is managed by Highland -- that is also beyond its

17   reinvestment period.  And in talking to the directors -- and

18   they're new directors, and I'll get to that in a minute, for

19   HCLOF -- they'll seek to push Highland, which is the

20   reorganized Highland, to monetize that asset, with due regard

21   to fair value.

22       In addition, Harbour -- HCLOF owned a significant amount

23   of the preferred or equity pieces, if you will, in the

24   Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25   really CLOs.  Those are effectively closed-end funds with

Seery - Direct                                     43

1    illiquid assets, primarily illiquid assets in them.  We've had

2    some dispute in front of the Court about selling the liquid

3    assets in them, which we can go into it another time.  Those

4    are being liquidated in the market at fair value.

5        But HCLOF also is a significant holder of those preferred

6    shares, and those directors would -- have indicated to me that

7    they would like to see those interests also monetized.

8    Q    All right.  Let's shift gears for a moment to talk about

9    the diligence that the Debtor did before entering into this

10   agreement.  Can you just describe for the Court generally the

11   diligence that was undertaken at your direction?

12   A    Well, when we first received the reply to our objection,

13   we dug into that reply and the specifics in it very

14   aggressively.  So we reviewed all of the underlying documents

15   related to the original transaction.  We discussed with

16   counsel the legal basis for the HarbourVest claims.  We

17   interviewed our own HCMLP employees who were involved in the

18   transaction and tested their recollection, specifically around

19   who dealt with HarbourVest, who had the discussions with

20   HarbourVest, what was disclosed to HarbourVest with respect to

21   the Terry dispute and the Acis litigation.

22       We also had done, as I think the Court is well aware from

23   prior 9019 testimony, extensive work around the transfers and

24   the issues related to Acis.  So we were familiar with their

25   impact on HCLOF.

Seery - Direct                    44

1    We also did extensive work valuing the remaining HCLOF

2    interests to get a good feel of not only how much HarbourVest

3    originally invested, but how much they actually lost in this

4    transaction.  And as I said, their original investment was

5    around, in total, in two tranches, about $80 million, of which

6    they got about $5 million back, and they've lost $22 million.

7    So it -- I mean, remaining with $22 million.  So they've lost,

8    you know, in excess of $50 million.

9    Q    Do you recall whether the Debtor reviewed and analyzed all

10   of the documents that were cited in HarbourVest's response to

11   the Debtor's objection to the HarbourVest proofs of claim?

12   A    Yeah.  I think -- I forget, to be honest, which -- exactly

13   what documents were in there.  But we went through their

14   objection with a fine-toothed comb, not only with respect to

15   the issues related to the Acis case, but also their references

16   to Guernsey law, other U.S. law, any of the documents between

17   the parties.  And obviously, as I mentioned before, the

18   offering memorandum.

19        MR. MORRIS:  Your Honor, I would just note for the

20   record that Debtor's Exhibits I through X are all of the

21   documents that are cited in HarbourVest's response to the

22   Debtor's objection to the HarbourVest proofs of claim, and

23   those are the documents that Mr. Seery just referred to.

24        THE COURT:  All right.

25        MR. MORRIS:  Just, they're in evidence now, and I

                          Seery - Direct                45

1   just wanted the Court to understand why they're in evidence.

2            THE COURT:  Okay.  Thank you.

3            MR. MORRIS:  You're welcome.

4   BY MR. MORRIS:

5   Q   Let's talk about the Debtor and whether or not it had or

6   has any viable defenses.  Did the Debtor form any views as to

7   whether or not it had any defenses to the HarbourVest claims?

8   A   Yes, we did.

9   Q   Can you describe for the Court the defenses that were

10  reviewed and analyzed by the Debtor?

11  A   Yeah.  I think we -- we had very significant defenses.

12  So, first and foremost, with respect to the original proof of

13  claim, as I mentioned earlier, it alluded to the expenses and

14  the overcharge.  And I think with respect to the 15 million of

15  fees that were charged to HCLOF by Highland, we didn't have a

16  lot of defenses to that claim.

17       It's pretty clear, by any fair view of the Acis case, that

18  HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19  had no real responsibility for fighting with Acis and Josh

20  Terry and shouldn't have been charged those fees.  I don't --

21  I don't think there's a legitimate investor that would

22  actually think that that was an appropriate amount to be

23  charged to a fund.

24       However, the claim was not as broad -- the proof of claim

25  was not as fulsome in terms of discussing and only vaguely

Seery - Direct                    46

1    referred to other damages.  So we did -- we did, as a

2    threshold matter, think about whether we could argue that it

3    was time-barred because they had not met their obligations to

4    fully disclose under the proof of claim.

5        Secondly, we considered the defenses to the overall claim

6    of fraudulent inducement.  Our perspective was that if we

7    could stop the claim of fraudulent inducement, the damages

8    would likely be limited to the 15 and maybe some -- some other

9    damages.  With respect to the 15, again, the problem that we

10   had when we got past -- past motions for summary judgment is

11   the factual predicate for our defense was going to be that we

12   divulged these things to HarbourVest and that they did not

13   reasonably -- it was -- reasonably rely on some failure to

14   divulge because they're a sophisticated investor.

15       The problem with that defense is that our witnesses, which

16   really would have primarily been Mr. Dondero and Mr.

17   Ellington, and one other employee who runs the CLO business,

18   Mr. Covitz, would not be pretty good.  They've been -- two of

19   them have been in front of this Court and they're not viewed

20   favorably and their testimony would be challenged and

21   potentially suspect.

22       So that gave us a real focus on trying to make sure that

23   we could, if we had to litigate, that we would litigate around

24   the fraudulent inducement.

25       As I said, reasonable reliance, what was disclosed, lack

Seery - Direct                    47

1  of digging into the public record, because you don't have to

2  go far on Google to find "fraud" within two words of

3  "Highland," and the tremendous, you know, litigious nature of

4  Highland.  You know, even at that point, when this investment

5  was made, aside from Mr. Terry's arbitration, which by that

6  point, at least by the time (inaudible) was public, there was,

7  you know, significant public disclosure around the Credit

8  Strat and the litigation, the Crusader litigation, the UBS

9  litigation, the, gosh knows, the Daugherty litigation.

10      So our defense was going to be that you should have

11 figured this out, you're a sophisticated investor, and you

12 should have been able to figure out that there was significant

13 risk that, with respect to Mr. Terry, that Mr. Dondero would

14 not stop litigating and that those costs would put significant

15 risk on the investment.

16      The problem with that, as I mentioned earlier, is that the

17 OM is wholly deficient.  If you have a typical risk factor in

18 the offering memorandum, you would have disclosed that there

19 was a litigation with Mr. Terry, a former partner in the

20 business, and that the Debtor had no intention of settling it.

21 There was no intention of settling.  That litigation would go

22 on.  It could go on for years and it could result in

23 bankruptcy or attachments and other risks to the business, and

24 that the investor should be fully aware that the Offeror does

25 not intend to be involved in any -- or the manager, in any

Seery - Direct                48

1   settlement with Mr. Terry, and the fact it undermined the

2   investment.  That wasn't there.

3       But that was our preliminary focus, to try to stop fraud

4   in the inducement.  And then we -- we had specific facts

5   related to that.  You know, once they knew about the

6   bankruptcy in HarbourVest of -- I'm sorry, of Acis,

7   HarbourVest made a second funding, which was there was a -- it

8   was an initial $75 million draw, and then a second, I believe,

9   about a $5 million draw, which was in -- I believe in

10  February.  And they made it without -- without objection, and

11  that was after the commencement of the bankruptcy.

12      In addition, they were -- they were active in the

13  bankruptcy, so the -- some of the things that happened in the

14  bankruptcy, there were many opportunities to settle that case,

15  from our examination, all of which were turned down to -- by

16  Mr. Dondero.  But you don't see HarbourVest pounding the table

17  to settle, either, either with respect to the Oaktree

18  transaction or any other transaction.

19      Now, HarbourVest's defense to that is, well, we were

20  taking advice and all of our information from Highland, and we

21  were getting that information directly from senior folks at

22  Highland why -- what the value was and why we shouldn't do

23  those things.  We thought that that would mitigate some of the

24  arguments that -- some of the damages that we might have, I'm

25  sorry, if we -- if we lost.

Seery - Direct                         49

1    But the focus at that point, you know, our legal strategy,

2  was can we stop HarbourVest at the very forefront to say,

3  You've got to come into the factual realm and get out of the

4  fraud in the inducement realm.  And then the defenses and the

5  exculpations and the liability limitations in the documents

6  would also come into play.

7    So that -- those are some of the defenses that we focused

8  on and our analytical thinking around them.

9  Q   So, if the Debtor had viable defenses, why is it settling?

10 A   Well, this is a significant claim.  And we -- we looked at

11 it with respect to both the impact on the case, but, really,

12 the merits of the claim.

13   As I said, there's really little dispute that the legal

14 fees should not have been charged to HarbourVest.  We think

15 based upon the testimony in Acis, the suspect credibility of

16 those who would have been our witnesses, and the experience in

17 Acis that the Court has had in terms of the completely hell-

18 bent on litigation, it would be hard for anyone to justifiably

19 defend those fees being charged.  So, as an initial matter, we

20 had exposure there.

21   In addition, if HarbourVest got by our defense of -- was

22 able, for example, to claim fraud in the inducement, then we

23 were open to significant damages.

24   We really didn't put much value, frankly, on the RICO part

25 of it.  We think that that's waved around often to show treble

Seery - Direct                    50

 1   damages.  Although in this case certainly somebody could lay

 2   out the predicate acts and put forth a RICO-type argument, we

 3   just didn't think that that had real merit in this commercial

 4   dispute, even with a fraud claim.

 5       But even without the trebling of the damages, there's no

 6   dispute that HarbourVest lost more than $50 million in this

 7   investment.  You know, we -- we thought about that risk as

 8   well.

 9       In addition, because the case would really be fact-based,

10   even if we had a high degree of confidence based upon our

11   discussions with our employees and the factual testimony, it

12   was going to be expensive to litigate this case, and time-

13   consuming.

14       And so we looked at the economic value, the potential

15   risks, and the actual value that we were giving up, and found

16   this to be an extremely, extremely reasonable settlement.

17       Importantly, and I think what drove it, you -- one of --

18   one of the things that drove it is another one of our defenses

19   on why, notwithstanding their -- what they held out as

20   meritorious claims, I don't think HarbourVest really wanted to

21   publicly litigate this claim.  And we were aggressive in our

22   discussions with HarbourVest of how we would litigate it,

23   which would be quite publicly.

24       Now, that may or may not be fair, but that does put risk

25   on the counterparty.  And so I think that helped drive the

Seery - Direct                              51

 1  settlement.

 2      In addition, the structure of the settlement we think is

 3  extremely favorable to the Debtor and to the estate because,

 4  rather than taking the full claim and putting it into a senior

 5  unsecured position, we have bifurcated it.  We did think about

 6  whether this was a claim that could be subordinated under 510.

 7  There won't be any arguments, I would be surprised if there's

 8  arguments today that we didn't actually give to the Highland

 9  employees who have given them to Mr. Dondero's respective

10  counsel.

11      We did structure it in a way that we thought gave

12  HarbourVest the opportunity to effectively claim a rescission,

13  even though that's not really what it is, and then be able to

14  claim that their recovery is based on the bankruptcy, which it

15  is, but not really dilute all the other stakeholders in the

16  case.

17      (Pause.)

18          THE COURT:  Mr. Morris?  Anything else?

19          MR. MORRIS:  I can hear you, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  I can hear you.

22          THE COURT:  Okay.  Now can you --

23          MR. MORRIS:  I got cut off from Mr. Seery for a

24  moment.

25          THE COURT:  Okay.

                                Seery - Direct                         52

1   BY MR. MORRIS:

2   Q    Okay.  I appreciate that.  Are you done giving the

3   Debtor's basis for entering into this settlement, Mr. Seery,

4   if you can hear me?

5   A    I think so, but I think as the Court has probably seen, I

6   can go on.

7   Q    Yes.

8   A    So I will try to be -- I'll try to be more concise.  But

9   this was a -- this was a difficult settlement.  We felt good

10  about our defenses.  Felt that we could -- we could try them.

11  But it would be extremely expensive, time-consuming, and there

12  would be a lot of risk.  And settling at a level which we

13  believe is actually below the damages that were clearly caused

14  only by the fees was a -- was a -- is a -- is a very

15  reasonable settlement.

16  Q    Okay.  Let's just talk about the process by which we got

17  to the settlement.  Do you recall generally when the

18  settlement negotiations have -- were commenced?

19  A    I believe it was -- was late summer, early -- early fall.

20  Q    Okay.  Before I move on, I just want to go back to the

21  Acis matter that you were talking about, one last issue.  Do

22  you know how, if at all, the injunction that was entered in

23  the Acis bankruptcy impacted or related to the HarbourVest

24  claims?

25  A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

Seery - Direct                            53

1    think there's an argument, and we analyzed it thoroughly, that

2    the injunction effectively caused a lot of the damages.

3    Because if you look at the values of the equity that

4    HarbourVest had, the -- and HCLOF had in the CLOs, it went

5    down dramatically after the Trustee in the Acis case took over

6    and then subsequently, when the case was reorganized and Mr.

7    Terry took over, you know, with Brigade as the sub-advisor.

8         Now, that would -- you know, we would -- we could

9    certainly attempt to throw, in our defense, the causation at

10   Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11   retort is that none of this would have occurred but for the

12   burn-it-down litigation that Mr. Dondero engaged in with

13   Highland.

14        In addition, in Mr. Terry's defense, you know, he did try

15   multiple times with HCLOF, tried to petition, if you will, the

16   HCLOF entity to -- and directors, former directors, to reset

17   the CLOs to make them more economically viable, based upon the

18   current level of asset returns versus the debt costs in the

19   CLOs.  And that was rejected by the HCLOF and the Debtor as

20   the controlling party of HCLOF.  So, we thought about those

21   risks.

22        You know, similarly, the economic values in Acis 7 went

23   down pretty significantly from that date as well.  So I think

24   there's -- there are some defenses, but that's really Mr.

25   Terry's issue, not our issue.  So we thought about those

Seery - Direct                     54

1   issues, we analyzed them, and we certainly did all the work

2   around month-to-month reductions in NAVs and how different

3   events in the Acis case might have -- might have caused those

4   and was that some sort of break from the original

5   transgression that HarbourVest claims, which was the

6   fraudulent inducement.

7   Q    Do you recall that in November HarbourVest's motion under

8   3018 was scheduled to be heard?

9   A    Yes.

10  Q    And can you just tell the Court your understanding of what

11  the 3018 motion was about?

12  A    Well, the 3018 motion was going to be on voting.  And we

13  took the view that it really was not -- it shouldn't have been

14  that big an issue and HarbourVest should have been content

15  with just taking their actual losses of roughly a $50-$60

16  million claim for voting purposes and then we would move on.

17       HarbourVest was very insistent that they have a $300

18  million claim, because they took the position -- and with

19  extensive documentation; not only the pleadings they filed,

20  but also detailed decks that were prepared by their counsel,

21  which they had presented to us on the merits of their claim --

22  that they were going to litigate for -- the 3018 and for the

23  full $300 million value.

24       And that became the genesis, if you will, of the

25  negotiations to settle.

Seery - Direct                          55

1      So, we started talking about the 3018.  It was very

2  contentious.  My apologies to Ms. Weisgerber and her counsel,

3  her partners, because it was a significant and contentious

4  negotiating call.  But the reasons for that I think were that

5  -- their insistence on litigating the 3018 and our view that

6  this was just, you know, another -- another of a series of

7  delays and costs in this case that we really were hoping to

8  avoid.

9      That led to Mr. Pugatch and I stepping away from counsel,

10 no offense to counsel, you know, ours and his, to begin

11 negotiations around the potential for a settlement.  First, it

12 started with a 3018, and then, you know, argued that we would,

13 if we got past the 3018, we were going to litigate this,

14 because we effectively had -- thought we could get everyone

15 else done at -- in and around that time.  And I think we were

16 also probably a little bit optimistic about UBS at that time

17 and the mediation, which subsequently we have settled.  But

18 that was the genesis of those settlements.

19 Q   And how did the structure, how did the Debtor and

20 HarbourVest derive at the structure whereby there is a general

21 unsecured claim, there is a subordinated piece, and there's

22 the takeback of the HCLOF interest?

23 A   Well, as I outlined, we -- we aggressively set forth our

24 various defenses.  Their position was that they -- they should

25 never have been in this transaction before.  And they --

Seery - Direct                              56

1   HarbourVest is, in essence, a fund of funds, and they have

2   investors, and it certainly wouldn't be their, I'm sure, the

3   best-performing asset in their portfolio, to have made this

4   investment and lost $50 million over this period of time.  So

5   they felt strongly that they should never have been in this

6   investment, and but for the failure to disclose and the

7   improper disclosures, they would not have been in this

8   investment.

9        So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12       Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16       So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q    Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

Seery - Direct                          57

1   any agreement in principle with HarbourVest?

2   A    If we had, it would have been reflected, so I don't -- I

3   don't think we were agreed by then.  I don't recall the

4   specific dates, but if we had, it would have -- it would have

5   been reflected.

6   Q    If I can refresh your recollection that the motion was

7   filed on December 24th, does that help form your understanding

8   or refresh your recollection that there was no agreement in

9   principle on November 24th?

10  A    Yeah.  Well, I'm quite sure there was no agreement in

11  principle or we would have reflected it minimally by a

12  footnote.  There's -- there's no chance.  It's a material

13  reduction in the claims pool that we were previously telling

14  people that, at least for purposes of distribution, like UBS

15  and a couple others we said we thought we would get to zero

16  on.  So we didn't calculate in that amount.  So I'm quite sure

17  we didn't have a deal when we filed the disclosure statement.

18      In terms of the timing, anyone who's done this business

19  for any degree of time knows that the crucible of bankruptcy

20  brings people to the settlement when they see something

21  happening in the case, and not before.  I think HarbourVest

22  looked at our -- this is my supposition -- HarbourVest looked

23  at our plan, our ability to get this done, our settlement with

24  Redeemer, our settlement with Mr. Terry and Acis, and saw that

25  this plan was coming together, and if they didn't think about

Seery - Direct                              58

1   the settlement, they were going to think about not only the

2   risks that we laid forth for them with respect our defenses,

3   but also the opportunity to litigate with the Claimant Trustee

4   over a long period of time, which couldn't have been

5   particularly appetizing.

6   Q    Can you describe for the Court the role played by the

7   independent board of Strand, the general partner of the

8   Debtor, in analyzing and participating in the approval

9   process?

10  A    Yes.  I think, as the Court is aware and I've testified

11  before, Mr. Russell Nelms and Mr. John Dubel are fellow

12  independent directors with me, appointed pursuant to the Court

13  order.  They are kept abreast of every detail, and -- along

14  the way, not just in a summary form at the end.  We have

15  reviewed and analyzed collectively each of the issues.  Mr.

16  Dubel has extensive experience in these types of litigation

17  matters.  Obviously, Mr. Nelms, from his -- both his practice

18  and his time on the bench, has a keen insight into how to

19  resolve and what the risks and benefits are from settling

20  litigation.  So I consult them every step of the way.

21  Q    And as part of this process, did the Debtor reach out to

22  the directors of HCLOF?

23  A    Yes, we did.  So, we reached out and we've had several

24  conversations on video chats with the directors.  The

25  directors of HCLOF are two new gentlemen, Mr. Richard Boleat

Seery - Direct                                    59

 1  and Mr. Dicky Burwood.  They are extremely professional.  They

 2  are exceptionally well-informed.  They are truly careful, and

 3  I would say very experienced professional not only directors,

 4  but experienced in -- in these matters, both in respect of

 5  structured finance as well as these types of vehicles and

 6  litigation.

 7       They were appointed by the old directors, Scott and

 8  Bestwick, and they have been in control.  They have outside

 9  counsel, which is King & Spalding in the U.S.  They have

10  Guernsey counsel.  They have accountants and professional

11  advisors, and are being, in my opinion, exceptionally careful.

12  I've got -- very quickly developed a lot of respect for them,

13  and we consulted with them on this settlement and how it would

14  work.

15       They've been very clear that they represent HCLOF and they

16  work for the benefit of the equity, whomever owns it, and

17  taking a view that they would like to see these assets

18  monetized swiftly, with due regard to value, for the benefit

19  of the equity.

20  Q   And is it your understanding that the directors of HCLOF

21  approved of this transaction?

22  A   They -- I don't know that their approval was required.

23  It's really -- there are a number of hoops to jump through

24  under the documentation, including opinion of outside counsel

25  that we received from WilmerHale in terms of the effectiveness

Seery - Direct                          60

1  of the transfer under the documents.  We had a negotiation

2  with -- with those directors, and making sure that we did

3  everything correct -- correctly, excuse me -- with respect to

4  the requirements for the transfer under the documents.  And

5  they've indicated their support and acknowledgement that we're

6  doing it correctly.

7      I don't know if it's fair to say they approved it.  I'd

8  just have to go check the documents.  But they certainly

9  support it.  And I think they generally support our position

10 with respect to how to move forward with the assets.

11 Q   I appreciate that.  I guess I meant approval with a small

12 a and not a capital A.

13     You mentioned WilmerHale.  Who do they represent in all of

14 this?

15 A   WilmerHale is the Debtor's outside corporate counsel, in

16 particular with respect to the fund issues that we don't

17 handle in-house.  We have significant support for fund issues

18 from the expertise of Mr. Surgent, who's been the CCO, and he

19 is also a lawyer, with respect to, you know, some of the

20 difficult fund issues that Highland has.  But when we use

21 outside counsel, we use WilmerHale for that, and they've been

22 -- they've been exceptional.

23 Q   Okay.  Just the last two points that were made in Mr.

24 Dondero's objection, I believe.  Did the Debtor overpay in

25 this settlement in order to gain the support of HarbourVest in

                          Seery - Direct                    61

 1   connection with its -- with the Debtor's attempt to get its

 2   plan confirmed?

 3   A    Not in any way.  My -- I believe the settlement is

 4   extremely reasonable.  As I testified, it's -- it's less than

 5   the -- the actual value going out, depending on unless there's

 6   successful litigation, and there well could be, is less than

 7   on a pro forma basis the fees that were taken and charged to

 8   HCLOF.  We didn't do this for votes.  We will have Class 2,

 9   Class 7, Class 8, and Class 9.  So I don't think that's a --

10   there's no vote purchasing, I think you called it.  No, not at

11   all.

12   Q    Yeah.  Well, on that topic, I think the phrase that was

13   used was gerrymandering.  Are you aware of the argument that's

14   been made that the subordinated claim was dropped in there in

15   order to gerrymander a positive vote for the impaired class of

16   Class 9, I believe?

17   A    In a word, I would say that's preposterous.  The -- as I

18   said, we have a number of classes that will vote for the plan.

19   The plan is -- the plan is a monetization plan.  And if -- if

20   the creditors determine that they don't want to pursue this

21   plan, we'll go forward with another -- we'll try to get

22   another plan.  We tried to have a grand bargain plan.  We

23   tried to have a pot plan, as I've testified previously.  I'm

24   quite certain that I've done more work on that than anyone

25   else, including Mr. Dondero and anybody who works for him.

Seery - Direct                          62

1  And he hasn't been willing to do that.

2       This is a -- this is a plan that's come together.  We

3  think it's going to be in the best interests of the estate.

4  That'll be confirmation next week.  Or two weeks, I guess.

5  But I don't see how this is any way related -- this settlement

6  is not any way related to the voting on that -- on that -- on

7  that plan.

8  Q   Just to put the finest point on it, is the Debtor relying

9  on Class 9 to be the impaired consenting class?

10 A   No.  I think -- I think what I've -- as I said, I believe

11 we already have the votes in Class -- I think it's 2 or 3, 7,

12 8, and -- and 9 will vote in favor as well.  So that won't be

13 an issue.

14         MR. MORRIS:  Your Honor, I have no further questions

15 of Mr. Seery.

16         THE COURT:  All right.  Pass the witness.  I'll ask

17 HarbourVest counsel first:  Do you have any questions of Mr.

18 Seery?

19         MS. WEISGERBER:  No, Your Honor.

20         THE COURT:  All right.  Thank you.

21      What about cross-examination?  Mr. Dondero's counsel?

22                     CROSS-EXAMINATION

23 BY MR. WILSON:

24 Q   Mr. Seery, how are you doing today?

25 A   I'm well, thank you.

Seery - Cross                              63

1   Q    I'm John Wilson, and I represent Jim Dondero.  I have a

2   few questions for you today.

3        Now, the HarbourVest proof of claims were filed on April

4   8th, 2020; is that your recollection?

5   A    I believe that's correct.  I don't recall the specific

6   date.

7   Q    Okay.  And do you know when you first became aware of the

8   HarbourVest claims?

9   A    I believe it was early in the summer when we filed the

10  omnibus objection.  It may have been in late spring, shortly

11  after that.  I don't recall the specific date of the filing.

12  Q    And before the time of the filing of the omnibus

13  objection, did Highland educate itself regarding the

14  HarbourVest proof of claims?

15  A    I'm sorry, could you say that again?  I didn't quite

16  understand it.

17  Q    Before the omnibus objection was filed, did HarbourVest --

18  I'm sorry, did Highland educate itself on the HarbourVest

19  proof of claims?

20  A    Not especially, no.

21  Q    Okay.  And -- but at some point, Highland did investigate

22  those proofs of claim, correct?

23  A    That's correct.

24  Q    And when would you -- when do you recall that that

25  investigation began?

Seery - Cross                           64

1   A    I don't recall the date, but the triggering event was

2   HarbourVest's response to our omnibus objection.

3   Q    Okay.  And that would have been filed September 11th of

4   2020?

5   A    I'll take your representation.  I don't -- I don't recall

6   the specific date.

7   Q    Okay.  And so when you began to investigate the

8   HarbourVest claims, what was your initial reaction?

9   A    My initial reaction was that the -- the larger claims that

10  they were asserting -- the fraud in the inducement, the RICO

11  -- that those claims were, in my view, attorney-made and that

12  when we dug in and did the work, we saw that HarbourVest

13  clearly lost north of $50 million on the investment.  We had

14  just started to uncover the fee issue and saw the risk we had

15  there.

16      But I thought the bulk of those claims were attorney-made.

17  Clever, but attorney-made, as opposed to what I would think

18  are more legitimate.  And so we started to develop our

19  defenses around that.

20  Q    And was your initial reaction that the HarbourVest claims

21  were largely worthless?

22  A    I think with respect to the claim around the fees, I

23  believed there was significant risk.  With respect to the

24  other claims, I thought our defenses would make them

25  worthless, yes.

Appx 04922

008865

Seery - Cross                        65

1   Q    And did you ever represent to any party that the

2   HarbourVest claim was worth, at most, $5 million?

3   A    I think I represented often, including to HarbourVest,

4   that it was worth nothing.  I don't recall if I specifically

5   said $5 million.  $5 million would have been a nominal amount

6   to -- which is litigation costs.  So it may -- it may have

7   been in my models that I put in that as a settlement amount,

8   but I -- I thought that there were valid and good defenses to

9   those larger claims.

10  Q    And you recognize that HarbourVest was a large,

11  sophisticated investor, correct?

12  A    Yes.  I think they manage north of -- right around a

13  hundred billion dollars.

14  Q    And you recognize that HarbourVest routinely structured

15  complex customized investments, correct?

16  A    I believe that -- I don't know the intricate part of their

17  businesses, but as a fund of funds who does creative

18  investments, I think that they do do quite a bit of that.

19  This, I believe, was their first investment in the CLO space.

20  Q    And it was not -- or I should say, you did not believe

21  that HarbourVest was simply a passive investor in HCLOF,

22  correct?

23  A    I don't think that that's true, no.

24  Q    You don't -- you don't believe that you denied their claim

25  to be a passive investor?

Seery - Cross                          66

1   A    Oh, I think -- I'm sure that in defense of their claims I

2   would argue that they were -- they were more than a passive

3   investor.  But it was pretty clear when you look at the

4   structure of what they invested that there was an intent that

5   they be passive on their part.  They didn't take a majority

6   interest.

7        In fact, Highland made it clear in the structure of the

8   deal that they couldn't -- it would be hard for them to get a

9   majority interest because Highland entities would control that

10  and Dondero-controlled entities or individuals would control

11  the majority.

12       I think that they -- they had hoped to be a passive

13  investor.

14  Q    But was it not your position that HarbourVest was actually

15  an active, involved investor?

16  A    I think our defense was going to be that they knew exactly

17  what was going on, that they participated, that they were

18  active, and that, indeed, that they were in and around some of

19  the subsequent issues in the Acis case.

20  Q    And you understood that HarbourVest played a material role

21  in the various outcomes in the Acis bankruptcy case, correct?

22  A    I don't believe that to be correct, no.

23  Q    Have you ever made that representation to anyone before?

24  A    Not -- not that I recall.

25  Q    Well, do you recall giving statements to a reporter named

Seery - Cross                                  67

1  Syed Khaderi?

2  A   I've never spoken to a reporter named Syed Khaderi in my

3  life.

4  Q   Well, did you participate in the preparation of statements

5  to be given to Syed Khaderi?

6  A   I've never heard of Syed Khaderi, nor have I participated

7  in any preparation of statements.  I don't know who that is.

8          MR. WILSON:  All right.  I'm going to have Bryan

9  Assink put on the screen a document.

10     And Bryan, can you go to Page 7?  Bottom of -- the top of

11  Page 7.  Well, actually, before you do that, go to the very

12  top of the document.

13  BY MR. WILSON:

14  Q   Now, Mr. Seery, are you familiar with Lucy Bannon?

15  A   Yes.

16  Q   And who is Lucy Bannon?

17  A   She is the Highland public relations person.

18          MR. WILSON:  Okay.  Now go back to Page 7.

19  BY MR. WILSON:

20  Q   Now, do you -- do you see on your screen an email of

21  September 14th from Syed Khaderi that says, Hi, Lucy, how are

22  you?

23  A   Yes.

24  Q   Have you seen this email before?

25  A   Not that I recall, no.

Seery - Cross                          68

1    Q   All right.  It continues on that, I saw the filing on

2    Friday about HarbourVest claims against Highland for a CLO

3    investment, and I'm looking to put out a report tomorrow

4    morning London time.  Ahead of that, I wanted to check if

5    Highland would like to comment on the matter.

6             MR. MORRIS:  Your Honor, this is -- the Debtor

7    respectfully objects.  A, this document is not in evidence.

8    B, it's rank hearsay.

9             THE COURT:  Response, Mr. Wilson?

10            MR. WILSON:  Your Honor, I am attempting to

11   authenticate this document, but I'm using it in rebuttal to

12   the testimony that Mr. Seery just offered.

13            THE COURT:  All right.  I'll allow it.  Overrule the

14   objection.

15            MR. WILSON:  All right.  Thank you, Your Honor.

16   BY MR. WILSON:

17   Q   All right.  Now, if we -- and oh, that September 14th

18   date, that was three days after the September 11th date that

19   we discussed was the date that HarbourVest filed its response

20   to the omnibus objection, correct?

21   A   Yes.  If that's the date that they filed it, then I -- if

22   you're representing that, I concede that the 14th is three

23   days after the 11th.

24   Q   All right.  And if you go back to the first page of this,

25   it looks like, on the following day, Lucy Bannon sends an

Seery - Cross                                    69

1    email to you, and is that your email address,

2    jpseeryjr@gmail.com?

3    A    That's correct, yes.

4    Q    And do you recall receiving this email from Lucy Bannon?

5         MR. MORRIS:  Your Honor, I renew my objection that

6    this is hearsay.  He's not rebutting anything that Mr. Seery

7    testified to.  He testified that he'd never heard of the

8    gentleman at the bottom of the document.  There's nothing in

9    this document that rebuts Mr. Seery's testimony at all.

10        THE COURT:  Response, Mr. Wilson?

11        MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12   his statement that he hadn't -- that he hadn't heard of Syed

13   Khaderi.  My rebuttal is attempted to -- attempting to show

14   that he has made various statements that he denied.

15        THE COURT:  I'll overrule the objection.

16   BY MR. WILSON:

17   Q    All right.  So, back to this exhibit, Mr. Seery.  You

18   recall receiving this email from Lucy Bannon on Tuesday,

19   September 15, 2020?

20   A    Not specifically.  But to be clear, I recall talking to

21   Lucy Bannon about the HCMLP dispute with HarbourVest.

22   Q    Okay.  And --

23        MR. WILSON:  Bryan, can you go down to the next page?

24   Scroll down to where -- the James Seery email.

25   BY MR. WILSON:

Seery - Cross                                  70

1  Q    Do you see this email on your screen that's dated

2  September 15, 2020 at 10:33 p.m.?

3  A    Yes, I do.

4  Q    And do you recall sending this email to Lucy?

5  A    Not specifically, no.

6  Q    Well, do you deny that you sent this email to Lucy?

7  A    It appears to be my email.

8         MR. WILSON:  Your Honor, we would move to admit this

9  document into evidence as Dondero Exhibit Letter N.

10        THE COURT:  Any objections?

11        MR. MORRIS:  I would consent to the admission of Mr.

12 Seery's email, but the balance of it ought to be excluded as

13 hearsay.

14        THE COURT:  What about that?

15        MR. WILSON:  Well, Your Honor, I think that this

16 document -- and I'll get into this in a little more detail in

17 a second -- but I think this document is a combination of the

18 work product of Lucy Bannon and Mr. Seery in preparing a

19 response for the reporter who requested comment from Highland.

20        THE COURT:  Okay.  I --

21        MR. MORRIS:  Your Honor, um, --

22        THE COURT:  Go ahead.

23        MR. MORRIS:  I just -- I do question how they got

24 this document, but that's for another day.  That's number one.

25 Number two, in addition to the hearsay argument, I just --

Seery - Cross                        71

1   relevance grounds.

2           THE COURT:  Okay.  I'll allow the portion that is the

3   communication of Seery, that portion of Exhibit N.  All right?

4           MR. WILSON:  Okay.  With due -- thank you, Your

5   Honor.  With due respect, I -- to use that portion, I need to

6   refer to the portion below it, because he says, Good to submit

7   with your final edit/revisions.  And so we need to know what

8   those final edit/revisions are, which are contained in the

9   email directly below that on the document that was four

10  minutes earlier in time.

11          THE COURT:  All right.  Fair enough.  That'll be

12  allowed.

13          MR. WILSON:  All right.  Thank you, Your Honor.

14      (James Dondero's Exhibit N is received into evidence as

15  specified.)

16          MR. WILSON:  So, Bryan, now can you scroll to the

17  next page?  Oh, actually, let's just -- let's just stop at the

18  top -- at the bottom of the page.  What's this statement?

19  BY MR. WILSON:

20  Q   So, to be clear, Mr. Seery, when -- in response to Mr.

21  Khaderi's request for information and comment, you prepared

22  actually two responses, and one of those was a statement on

23  the record attributed to a spokesperson for HCMLP or something

24  along those lines.  And then --

25          MR. WILSON:  Can you scroll down to that next page?

Seery - Cross                           72

1   BY MR. WILSON:

2   Q    And this says -- I think part of this got cut off for some

3   reason, but it looks like the official statement is in

4   quotation marks.  It says, "We dispute the allegations made in

5   the filing and believe the underlying claims are invalid and

6   will be found to be without merit.  Our focus continues to be

7   treating all valid claims in a transparent, orderly, and

8   equitable manner, and vigorously disputing meritless in the

9   court.  That focus will assure that HCMLP's reorganization

10  process -- progress is towards an efficient and equitable

11  resolution."

12       And then below that there's another section of this email

13  that says, Background/Clarification, Not for Attribution.  And

14  do you know the purpose of this second section of the

15  response?

16  A    Do I know the purpose of that?  Yes.

17  Q    And what would that purpose be?

18  A    Ms. Bannon was speaking on background to reporters.  As I

19  said earlier, I've -- I never heard of the gentleman from

20  London.  If he's at the bottom of the email, I didn't pay any

21  mind, never heard of him.  Nor have I heard it since.  Ms.

22  Bannon didn't ever reference the specific person.

23       But she is the public relations person.  So, as I

24  testified earlier, she does communicate with the press.  And

25  as I previously testified when Mr. Morris questioned me, one

Seery - Cross                          73

1    of our tactics and our defenses for HarbourVest was going to

2    be that we were going to be very public and aggressive about

3    the investment and it would have a negative impact or negative

4    perspective for viewers, in our opinion, about HarbourVest's

5    investment.

6    Q    All right.  Well, look with me in the middle of that

7    paragraph right after the closed parenthetical, where it says,

8    "But it's important to note the background of HarbourVest's

9    active and deep involvement in the investment of which it now

10   complains."

11       And so it was your position that HarbourVest had an active

12   and deep involvement in the investment, correct?

13   A    No.  I don't think that's correct.  Ms. Bannon prepared

14   the statement, it was a litigation defense on background, and

15   that's our -- that was our position for this purpose.  It was

16   not my view that they were active and deeply involved.  They

17   were certainly involved.  There's no doubt about it.  But they

18   got all their information, in our estimation and our research,

19   from Highland.

20   Q    But in any event, you would agree with me that four

21   minutes after receiving this email, you approved this

22   statement to go out to the reporter, correct?

23   A    No, that's not correct.  That's -- this portion is on

24   background.  That statement doesn't go out.  The previous

25   statement was the official statement.  This is the background

Seery - Cross                    74

1   discussion that she would have.  So, no, she was not

2   authorized in any way whatsoever to send that out.  She was

3   authorized to have conversations with those general facts.

4            MR. WILSON:  Okay.  Bryan, go to the top, or the

5   bottom of the page immediately preceding that.  That's it.

6   Yes, that's it right there.

7   BY MR. WILSON:

8   Q   Now, you'll see that this email from Lucy Bannon on

9   September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10  what you think of the below.  And, again, the first would be

11  on the record and the second will be sent for information

12  purposes to ensure accuracy, not for attribution."

13       So the intent was that this -- that this entire statement

14  be sent to the reporter, correct?

15  A   I don't believe that's correct.  I think when she goes on

16  background she doesn't send them a written doc.  It's got to

17  be clear to the reporter, at least my understanding is that

18  what on background means -- I've been involved with this

19  before -- is that typically that's done orally.  I don't know

20  if she's done it in a written statement before.  I have never

21  seen that done in a written statement before.  You give the

22  official statement and then you walk the reporter through your

23  other views on background.  And you're not quoted.  And it's

24  usually attributed to a source with knowledge.

25  Q   Okay.  We'll come back to that in a minute.  The next

Seery - Cross                          75

1   sentence after the one I just read to you --

2           MR. WILSON:  Go back to where we were on the

3   background.

4   BY MR. WILSON:

5   Q   Now, we just read you the sentence that starts with, "Then

6   it's important."  The following sentence says, "HarbourVest

7   was not simply invested in HCLOF as an ignorant,

8   unsophisticated, passive investor, but was an active and

9   informed participant in the inception of its investment

10  through all of the Acis bankruptcy proceedings, and

11  HarbourVest played a material role in various outcomes related

12  to that case and its impact on HCLOF."

13      And is it -- did you not just tell me before we

14  investigated this document that HarbourVest did not play a

15  material role in the various outcomes of the Acis bankruptcy?

16  A   I don't know exactly what I said, but I think that's

17  correct, after we'd done the research on it, yeah.

18  Q   But you took the position in this email that you approved

19  to go out to a reporter that says that -- that HarbourVest was

20  an active and informed participant in the inception of -- of

21  its investment through all of the Acis bankruptcy proceedings

22  and played a material role in various outcomes related to that

23  case and its impact on HCLOF.  Can we agree with that?

24  A   Yes.

25  Q   And then the final sentence of this paragraph says that,

Seery - Cross                                      76

 1  We believe that neither the facts nor the law support

 2  HarbourVest's, quote, We-were-too-lazy-to-know allegations.

 3      Whose words were those, "We-were-too-lazy-to-know

 4  allegations"?

 5  A   I don't recall.  They may be mine.  It's aggressive the

 6  way I am, so that -- that may well be the case.

 7          MR. WILSON:  All right.  Go -- go down to the next

 8  page.

 9  BY MR. WILSON:

10  Q   And with respect your comment that that second paragraph

11  would not have gone to the reporter, look at this email in the

12  middle of the page from Lucy Bannon to Syed Khaderi, September

13  16, 2020, at 1:51 a.m.  And --

14          MR. MORRIS:  Your Honor, this I will object to as

15  hearsay.  There is no witness here to testify to anything on

16  this document.

17          THE COURT:  All right.  How about that?

18          MR. WILSON:  Well, it's -- well, scroll up just a

19  little bit.  This email at the top of the page is three

20  minutes after the one in the middle of the page, where Lucy

21  Bannon is forwarding this to James Seery, saying, See below

22  for responses sent to *Creditflux*.  Will follow up with the

23  story when it runs or with any other updates.

24          MR. MORRIS:  Your Honor, these --

25          MR. WILSON:  So I think this --

Seery - Cross                          77

1          MR. MORRIS:  These documents don't appear on the

2     witness list.  They're not being offered to impeach anything.

3     They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5     trying to rebut the statements that Mr. Seery made.  In fact,

6     he told me just a minute ago that that second paragraph would

7     not have gone out to the reporter.  However, this email from

8     Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10    questioning, with an undisclosed document, is to rebut the

11    earlier testimony he gave before you even put this exhibit in

12    front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14    that Mr. Seery has made today, and I think it -- you know, if

15    he's going to testify that this information did not go out to

16    a reporter, I think I'm allowed to rebut that to demonstrate

17    that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19    in advance?  It's feeling less and less like an impeachment

20    document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22    actually have this document at the time we filed our witness

23    and exhibit list, but I would also say that I didn't have any

24    purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

Seery - Cross                                78

1    disclose all exhibits you anticipate using except those for

2    purposes of impeachment.  Okay?  Not rebuttal, to be

3    technical.

4         So, if you didn't disclose this exhibit, the only way you

5    can use it, subject to other possible objections, is if you're

6    impeaching a statement.  And I'm just saying I think we're

7    going beyond trying to impeach the original statement and now

8    we're trying to impeach statements he's made after seeing

9    portions of the document.

10        What did you mean, you didn't have this document in time

11   to disclose it?

12             MR. WILSON:  Well, I actually just received this

13   document this morning, Your Honor.

14             THE COURT:  Where did you receive it from?

15             MR. MORRIS:  From who?

16             MR. WILSON:  I -- I honestly do not know the source

17   of this document, although it was provided to me by my client.

18             MR. MORRIS:  Your client being Mr. Dondero?

19             THE COURT:  Could you answer that, Mr. Wilson?

20             MR. WILSON:  Yes, that's -- yes, that's correct.

21             THE COURT:  All right.  I will -- that's --

22             MR. MORRIS:  Your Honor, I'd like to --

23             THE COURT:  That's a different can of worms.  But for

24   now, I sustain the objection.  You're done questioning on this

25   document.

Seery - Cross                                79

1          MR. WILSON:  That's fine, Your Honor.  I can move on.

2     BY MR. WILSON:

3     Q    Now, Mr. Seery, you would agree with me that whether or

4     not HarbourVest played an active role in the Acis bankruptcy,

5     it was kept apprised of the -- of the ongoings in the

6     bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?

7     A    Yes.  My understanding is that -- that they were.

8     Q    And in fact, did Highland have weekly conference calls

9     with HarbourVest during the Acis bankruptcy to discuss what

10    was going on in the bankruptcy?

11    A    I don't know if they were weekly.  I've been told that

12    they had regular calls updating HarbourVest, yes.

13    Q    Okay.  And did Highland produce over 40,000 pages of

14    documents to HarbourVest related to the Acis bankruptcy?

15    A    I'm not aware of that, no.

16    Q    Have those documents been provided to you?

17    A    I hope not.

18    Q    So, in your role --

19    A    I'm sorry.  I don't -- I didn't receive 40,000 documents

20    from anybody.

21    Q    Well, did you receive any number of documents that were

22    provided by Highland to HarbourVest during the Acis

23    bankruptcy?

24    A    I wasn't involved in this during the Acis bankruptcy.  I'm

25    sorry.

Seery - Cross                              80

1    Q    Well, I'm referring to, after you became involved in this

2    Highland bankruptcy, whether you were provided with these

3    documents that were sent from Highland to HarbourVest.

4    A    I don't -- I don't know what the documents are.  I've

5    reviewed tons of documents with respect to the HarbourVest

6    claims, but I don't know of the documents to which you're

7    referring.

8    Q    Okay.  And after you performed your investigation into the

9    HarbourVest claim, what was your opinion as to the cause in

10   the reduction in value of HarbourVest's investment in HCLOF?

11   A    I think the main cause of the reduction in the investment

12   was the imposition of the Trustee and the failure of Highland

13   HCLOF and then subsequently with the injunction to reset the

14   CLOs.

15        You know, these are -- these are some of the worst-

16   performing CLOs in the market because they weren't reset.  And

17   when the liabilities of the CLOs are set at a level to match

18   assets, and then liability -- the assets run off, and the

19   asset financings or the new deals come in at much lower

20   levels, and the obligations of the CLO are not reset, the

21   arbitrage that is the CLO shrinks.  And that's what happened

22   to these CLOs.

23   Q    And during the course of the Acis bankruptcy, Acis and

24   Brigade were given management responsibilities over the CLOs

25   and HCLOF, correct?

Seery - Cross                          81

1   A    I believe that the Trustee had the overall, and then

2   subsequently, with the confirmation of the plan, they took it

3   over.  So I think that ultimately Mr. Terry had the management

4   authority, full management authority, and some advice through

5   Brigade.  But I think technically it wasn't actually during

6   the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7   Phelan had the actual authority.

8        (Echoing.)

9   Q    I'm sorry.  And so your testimony is that Mr. Phelan had

10  the actual authority but he delegated that authority to Josh

11  Terry and Brigade?

12  A    I think that's fair, yes.

13  Q    And do you know when that occurred?

14  A    I believe that the control of the CLOs was in July of

15  2018, and then the ultimate confirmation of the case was at

16  the very beginning of '19.

17  Q    So, after being instituted as portfolio manager, and

18  during the time when Acis and Brigade were working under the

19  direction of the Trustee, who would have receive the fees for

20  managing those portfolios?

21  A    I believe -- I don't know.  I believe the -- that the Acis

22  estate would have received those fees.

23  Q    And who -- and so is that your testimony, that prior to

24  confirmation the Acis estate would have received the

25  management fees?

Seery - Cross                          82

1   A    I believe that -- I believe they would have if they were

2   the manager, yeah.

3   Q    Okay.  And who would have received the fees after

4   confirmation?

5   A    Acis.

6   Q    Okay.  And who would have had the discretion to set the

7   amount of those management fees?

8   A    They would be agreed to in the -- in the investment

9   management agreement.

10  Q    They would be agreed to?

11  A    Yes.  As far as I've seen, I've -- I haven't seen

12  unilateral ability of a manager to set fees at its -- at its

13  whim.

14  Q    So is it your understanding that Acis and Brigade ended up

15  charging substantially more fees than Highland had charged

16  when it was under Highland's management?

17  A    I think the fees were -- the fees were -- the fees were

18  set by the agreement.

19        MR. MORRIS:  Your Honor, I just object to the line of

20  questioning on relevance grounds.  This is a 9019 hearing,

21  Your Honor.  How -- I just don't think this has any relevance

22  at all.

23        THE COURT:  All right.  Mr. Wilson, what is the

24  relevance?

25        MR. WILSON:  The relevance is that Mr. Seery has

Seery - Cross                        83

1    testified that these Acis CLOs were among the worst-performing

2    in the market, and frankly, we would agree with that, and I'm

3    trying to get his understanding as to why, because I think

4    there's direct relevance in the reason that the value of the

5    HarbourVest investment diminished.

6            MR. MORRIS:  I don't think that was his testimony,

7    Your Honor.  But at the end of the day, Your Honor has heard

8    the litany of reasons why the Debtor is entering into this

9    agreement.  I just, I just think it's irrelevant, Your Honor.

10           THE COURT:  All right.  Mr. Wilson, I barely think

11   this is relevant.  I mean, I'm going to give you some benefit

12   of the doubt on that because of, you know, the testimony that

13   HarbourVest lost $50 million of value and --

14       (Echoing.)

15           THE COURT:  -- maybe that shouldn't, you know, lie at

16   the feet of Highland.  I think the compromise reflects that

17   they don't -- it doesn't lie entirely at the feet of Highland.

18   But, you know, maybe two or three more questions.

19           MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20   didn't have very much more on this point.  But to be a hundred

21   percent honest, I can't remember my question right before the

22   objection.

23           THE WITNESS:  I think you were asking me about the

24   fees and somehow alluding or implying that the manager could

25   unilaterally set fees.

                              Seery - Cross                      84

1        The fees are set in the investment management contract.

2   The manager doesn't get to wake up on Wednesday and say, you

3   know, I'd like another half a basis point.  It doesn't work

4   that way.

5   BY MR. WILSON:

6   Q    But you would agree with me that the fees and expenses

7   charged to an investment would impact the performance of that

8   investment in the market?

9   A    Absolutely.

10  Q    Would you also agree with me that there was one CLO -- and

11  I think you referred to it in your direct testimony -- but CLO

12  7, which continued to be managed by Highland?

13  A    That's correct.

14  Q    And is it fair to say that CLO 7 exceeded the performance

15  of the CLOs that were managed by Acis and Brigade?

16  A    I think that's fair.  I don't -- I don't recall the

17  magnitude, but I think it's outperformed those -- those CLOs,

18  yes.

19  Q    All right.  Well, thank you.  I want to turn your

20  attention to the portion of the settlement agreement that

21  deals with voting of the HarbourVest claim.  How did

22  HarbourVest's commitment to vote for the plan become a part of

23  the settlement?

24  A    Pretty straightforward negotiation.  We -- in negotiating

25  the settlement, one of the key factors was the cost and

Seery - Cross                          85

 1   expense of the litigation, in addition to the risk on the --

 2   on the fees, and whether we could wrap this up in a global

 3   settlement now.  So in my experience, it's fairly typical, we

 4   would try to do this in every settlement, have the settling

 5   party, be that the claimant, agree to support the case and the

 6   plan.

 7       You know, we did not do that with the Committee members,

 8   although we wanted to.  (Echoing) I frankly still wish I had.

 9   Those little -- little bits that have been difficult

10   (echoing).  The Committee members have a different interest in

11   (echoing) than their more global interest for creditors at

12   large, which is more difficult than traditionally in

13   bankruptcy cases, less likely to have a Committee member, a

14   sitting Committee member, actually support the (echoing) of

15   the plan.

16           THE COURT:  Mr. Wilson, could you be careful to put

17   your device on mute every time you're not talking?  Because

18   we're getting some feedback loop from you when Mr. Seery

19   answers your questions.  Okay?

20       (Echoing continues.)

21           THE COURT:  Like right now.  I'm hearing feedback of

22   my own voice through your speakers.

23       Right, Mike?  Isn't that what --

24           A VOICE:  I am, too.

25           THE COURT:  Yes.  Okay.  So please be sure you put

Seery - Cross                          86

1   your device on mute whenever you are not speaking.  All right.

2   Go ahead.

3   BY MR. WILSON:

4   Q    I mean, I think you just answered this question, but there

5   was -- there was no similar voting provision in the Acis or

6   the Redeemer settlements, correct?

7   A    There is not, no.  And just as a -- by way of explanation,

8   if it's okay, the reason was my counsel advised against it.  I

9   did ask for it.

10  Q    Your counsel advised against putting that voting

11  requirement in the Acis and Redeemer settlements?

12  A    For the reasons I stated.  And in my experience, that's

13  consistent, where sitting members of Committees don't

14  generally sign up to resolve their own claims and support the

15  plan because of their larger fiduciary duties to the creditor

16  body as a whole.

17  Q    And during the settlement negotiations of the HarbourVest

18  claim, was this commitment to vote a topic of discussion?

19  A    Not -- not particularly, no.  It was pretty clear that

20  HarbourVest, if they were going to agree to the settlement and

21  the numbers, could see structure.  Obviously, it wanted to

22  understand what the potential distributions would be under the

23  plan, but this was not a hotly-negotiated point.

24  Q    And would you consider HarbourVest's commitment to vote

25  for the plan an important part of the settlement?

Seery - Cross                           87

1   A   I think it's an important part of the settlement, that the

2   part of the settlement is the subordinated claim.  We could

3   put that into presumably any plan.  But our plan does -- does

4   have a Class 9 for that.  So I think it's a -- it's a part of

5   the settlement that is important or we wouldn't have included

6   it.  It clearly wraps everything up and moves us towards

7   confirmation.

8   Q   And would you have made the deal with HarbourVest if they

9   had pushed back on the commitment to vote for the plan?

10  A   Yeah, I would have.

11  Q   All right.  Thank you.

12          MR. WILSON:  No further questions.

13          THE COURT:  All right.  Mr. Draper, anything from

14  you?

15          MR. DRAPER:  Yes, Your Honor.

16                  CROSS-EXAMINATION

17  BY MR. DRAPER:

18  Q   Mr. Seery, I may not understand the settlement, and I

19  apologize, but the way I think the settlement reads, the

20  interest that you're acquiring, you have the right to place in

21  any entity.  Is that my -- is that correct?

22  A   I don't recall the -- the specifics, but just from a

23  structural standpoint, we wanted to be able to put it into a

24  subsidiary as opposed to putting it directly in HCMLP.  If we

25  couldn't do that, we would -- we would put it into HCMLP.  So

Seery - Cross                                      88

 1   there wasn't a -- I don't recall the actual specifics, but we
 2   certainly thought about holding that interest in a -- in a
 3   subsidiary, just to have a cleaner hold.
 4   Q    Why aren't you putting it into the Debtor so the Court and
 5   the estate have jurisdiction over that?
 6   A    I think the Court certainly has jurisdiction over an
 7   entity that the estate owns a hundred percent of.  I don't
 8   think that's -- that's even a close call.  So the important --
 9   Q    Now, --
10   A    Can I finish?
11   Q    Sure.
12   A    You asked me why.  To the extent that somebody thinks that
13   problematic, I will consent to the Court having complete
14   jurisdiction over it, since I control it a hundred percent.
15   Q    No.  The real reason is, if I remember correctly, Mr.
16   Dondero and Judge Lynn filed a motion to have some say or some
17   information as to sales by subsidiaries, and I think you took
18   the position that they weren't entitled to it.  And so my
19   concern was that putting this in a subsidiary in a sense gave
20   you unfettered control without any review of the item.
21   A    I don't -- I don't think that's the case where we --
22   there's a directly-held subsidiary where we own a hundred
23   percent of it.  I don't think that that's the case.
24   Q    Okay.  But you're willing to (a) put this into the Debtor,
25   number one; and number two, have the estate and have the Court

Seery - Cross                                        89

 1  have complete control over the disposition of it and its

 2  actions, correct?

 3  A    That's not correct, no.

 4  Q    What -- what is incorrect about my statement?

 5  A    The debtor-in-possession has control of its assets.  The

 6  Court doesn't have complete control over its assets.  There's

 7  --

 8  Q    Well, --

 9  A    -- issues -- hold on a second.  This is not -- this is not

10  a game and a trap.  We put it in a subsidiary for specific

11  reasons.  You asked why.  I'm giving you the why.  It's not to

12  hide it from anybody.  We're not going to sell the asset

13  unless somebody comes up with a great price for it.  We're

14  going to monetize the assets.  We're going to control HCLOF by

15  a majority.

16  Q    But, again, the issue is, if it's in the estate, the Court

17  has supervision over it.  If it's not in the estate, the Court

18  has no supervision of it.

19  A    I don't think that's correct, because the Court has

20  supervision over the estate, which owns a hundred percent of

21  the special-purpose entity that will own the shares.

22  Q    Okay.  All right.  Now, let's talk about the $15 million

23  that you discussed and the legal fees that were incurred.  Is

24  that the total amount that was spent, or is -- or is that --

25  was the total amount $30 million and HarbourVest was only

Seery - Cross                                    90

1   responsible for one half of it or functionally took the brunt

2   of one half of it?

3   A   I think the total amount is between $15 and $20 million.

4   I don't have the exact numbers.

5   Q   So, in fact, the HarbourVest loss due to its ownership

6   would have been one half of that, not $15 million?

7   A   Well, the vehicle lost the money.  HarbourVest owned 49.98

8   percent of it, and Highland controlled the rest.  So if you

9   allocate it that way, I suppose that would be a -- that's how

10  you would divide it, in -- roughly in half, yes.

11  Q   And so HarbourVest's actual dollar loss due to the legal

12  fees is really the 49-point-whatever percent of $15 million,

13  not $15 million?

14  A   I don't know if -- I certainly would argue that.  I don't

15  think that HarbourVest has that position.

16  Q   Okay.  Now, in connection -- you were asked a question

17  about the documentation that was provided by Highland to

18  HarbourVest both during the bankruptcy of Acis and before.

19  You have control over the Harbour -- over the Highland server,

20  correct?

21  A   I'm sorry.  Can -- can we do two things?  One is, Mr.

22  Draper, I can't see you, so it would be better if I could see

23  you during the questioning.

24  Q   Okay.

25  A   And could you repeat the question?

Seery - Cross                              91

1  Q   All right.  I'll be happy to.  You were asked a question

2  about the documentation that was provided by Highland to

3  HarbourVest during the Acis bankruptcy and meetings that took

4  place between the parties.  Correct?

5  A   Yes.

6  Q   And you stated you were unaware of the material that was

7  sent over?

8  A   I think I testified that I didn't receive the 40,000

9  documents that were mentioned.

10 Q   Did you do any search or order a search of the Highland

11 server to see what material was sent over by any party to

12 HarbourVest to analyze what -- what information they had

13 available to them and what was provided to them?

14 A   Yes, we did a search.

15 Q   And did you review the documentation that was sent over?

16 A   The -- the documentation that we looked at was very

17 specific to the investment and to the OM.  So we didn't look

18 for the -- the supposed 40,000 documents, no.

19 Q   Did you look for the material that was provided to them

20 during the Acis bankruptcy and the periodic meetings that you

21 discussed?  Or that you testified to earlier?

22 A   The answer is no.

23 Q   One last question.  I think, and just so I understand your

24 testimony, you've broken out the HarbourVest claim into two

25 pieces.  One is the legal fee amount that we've just

Seery - Cross                              92

1  discussed, and I gather the other piece of that is the fraud

2  in the inducement to enter into the CLO purchase?

3  A   It's -- it's more -- it's much more than that.

4  Q   Okay.  Well, let me say it in a different way.  The other

5  part of it is the losses as a result of the fraud in the

6  inducement to purchase the interest?

7  A   I don't think that's -- that's fair.  If I could explain?

8  Q   Sure.

9  A   Yeah.  The legal fee piece is pretty clear.  The other

10 piece starts with fraud in the inducement, but it's extensive

11 fraud claims.  Fraud in the inducement, as I testified

12 earlier, would get them around the exculpation and liability

13 limitations in the OM.  You don't get around all of those with

14 just the fraud.  And so that's -- that's the split of that

15 claim.  So the fraud in the inducement contains fraud

16 allegations.  Even if you didn't have inducement, you'd have

17 other potential fraud claims.

18 Q   But let me state it in a different fashion.  But for the

19 investment, the fraud that you allege wouldn't have occurred?

20 A   I -- HarbourVest alleges it.

21 Q   No, I'm just -- in your analysis of the claim, but for the

22 inducement, the rest of the damages wouldn't have flowed?

23 A   That's HarbourVest's position, yes.  But for the fraud,

24 they wouldn't have made the investment.

25 Q   All right.

Seery - Redirect                                93

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  Any redirect, Mr. Morris?

3          MR. MORRIS:  Just a few very questions, Your Honor.

4   Just a very few questions.

5                    REDIRECT EXAMINATION

6   BY MR. MORRIS:

7   Q   Mr. Seery,  you were asked about that document that Lucy

8   prepared.  Do you remember that?

9   A   Yes, I do.

10  Q   In your experience, don't defendants often deny liability

11  before entering into settlements, or even worse, getting

12  adverse judgments entered against them?

13  A   Of course.  Yes.

14  Q   Okay.  And in response to Mr. Draper's questions, isn't

15  the Guernsey claim another claim that the Debtor took into

16  account in assessing the potential risks of this settlement?

17  A   There's a number of claims contained in it.  As I

18  mentioned earlier, I mentioned the RICO claim.  But there is a

19  Guernsey shadow director claim, which is not dissimilar to

20  U.S. claims that somebody effectively controls an enterprise,

21  notwithstanding them not having the official role.

22  Q   Okay.

23          MR. MORRIS:  I have nothing further, Your Honor.

24          THE COURT:  All right.  Any recross on that redirect?

25  All right.

1          MR. WILSON:  No, Your Honor.

2          MR. DRAPER:  No, Your Honor.

3          THE COURT:  Thank you.  Mr. Seery, that concludes

4  your testimony.  Thank you.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  We need to take a bathroom break.  Before

7  we do, I just want to be clear with what we have left.  As I

8  understood it, we were having Mr. Pugatch from HarbourVest.

9  Mr. Morris, will that conclude the Debtor's evidence?

10 (Pause.)  Okay.  You were on mute, but I think you were saying

11 yes.

12         MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13 going to be putting their witness on the stand.

14         THE COURT:  Okay.

15         MR. MORRIS:  But it's part of the evidence in support

16 of the motion.

17         THE COURT:  All right.  Do the Objectors have any

18 witnesses today?

19         MR. WILSON:  Your Honor, Mr. Dondero intends to

20 examine Mr. Pugatch, but if he's going to be called by his

21 counsel, then we will do that as a cross-examination.

22         THE COURT:  All right.

23         MR. DRAPER:  This is Douglas Draper.  I have no

24 witnesses.

25         THE COURT:  Okay.  All right.  Well, I'm asking --

95

```
 1   well, I do want to ask:  Can we get a time estimate
 2   potentially for Mr. Pugatch?
 3            MS. WEISGERBER:  For my examination, Your Honor,
 4   twenty minutes, perhaps.
 5            THE COURT:  Okay.
 6            MS. WEISGERBER:  Or less.
 7            THE COURT:  All right.  Well, let me tell you what
 8   we're going to do.  We're going to take a ten-minute bathroom
 9   break.  But I have a 1:30 hearing and I have a 2:00 o'clock.
10   Well, I have a 1:30 docket, multiple matters, and a 2:00
11   o'clock docket.  So, you know, I'm really intending that we
12   get finished in time to give me and my staff a little bit of a
13   lunch break before launching into the 1:30 docket, so I'm
14   hopeful we can get done around 1:00-ish.  If I can't, then
15   we're going to have to reconvene, I'm going to say probably
16   3:00-ish Central time.  So let's hope we can get through
17   everything.  All right?  Ten-minute break.
18            THE CLERK:  All rise.
19       (A recess ensued from 11:58 a.m. until 12:08 p.m.)
20            THE CLERK:  All rise.
21            THE COURT:  All right.  Please be seated.  We're
22   going back on the record in the Highland matters.  Do we have
23   everyone?  It looks like we do.  Ms. Weisgerber is going to
24   call the next witness; is that correct?
25            MS. WEISGERBER:  Yes, Your Honor.  We call Michael
```

                          Pugatch - Direct                    96

1    Pugatch of HarbourVest to the stand.

2              THE COURT:  All right.  Mr. Pugatch, if you could

3    turn on your video and say, "Testing one, two."

4              MR. PUGATCH:  Two.

5              THE COURT:  All right.  There you are.  Please raise

6    your right hand.

7              MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

8              THE COURT:  Thank you.  You may proceed.

9              MS. WEISGERBER:  Thank you, Your Honor.

10                          DIRECT EXAMINATION

11   BY MS. WEISGERBER:

12   Q    Good morning.  Can you please state your name for the

13   record?

14   A    Sure.  It's Michael Pugatch.

15   Q    And where do you work, Mr. Pugatch?

16   A    HarbourVest Partners.

17   Q    And what is your title?

18   A    I'm a managing director in our secondary investment

19   group.

20   Q    Did HarbourVest file claims in the Highland bankruptcy,

21   Mr. Pugatch?

22   A    We did, yes.  Several claims, in fact.

23   Q    What was the basis for those claims?

24   A    Yeah.  Among other things, fraudulent inducement based on

25   misrepresentations and omissions on the part of Highland in

Pugatch - Direct                          97

1    connection with our original investment, mismanagement at the

2    HCLOF level, including inappropriate fees that were charged

3    to investors, among a number of other items as well.

4    Q    Can you explain what you mean by misrepresentations made

5    to HarbourVest by Highland?

6    A    Yeah, sure.  So, you know, based on a number of

7    statements that were made to us around the litigation

8    involving Mr. Terry, some of the intentions found, the

9    structural changes that came to light with respect to HCLOF

10   and our investment, as well as the fact that the arbitration

11   award specifically against Mr. Terry would have no impact or

12   implication on Highland's sale or business.

13   Q    And can you explain what you mean by omissions made by

14   Highland to HarbourVest?

15   A    Sure.  So I would say, really, the implications behind

16   the structural changes that were made at the time of our

17   investment into HCLOF.  Also, the intention, clear intentions

18   that Highland had to never, in fact, pay the arbitration

19   award that came to light during our due diligence period to

20   Mr. -- to Mr. Terry as part of the investment.  And

21   ultimately the -- what Highland went about doing in terms of

22   stripping assets of Acis that led to the material value

23   declines and destruction of value that we've experienced

24   since our investment.

25   Q    You mentioned a diligence period.  Did HarbourVest

Pugatch - Direct                    98

1   conduct diligence on the investment?

2   A    We did.  We conducted very detailed due diligence, as we

3   do for all of our investments.  That diligence period lasted

4   several months ahead of our investment decision.

5   Q    And did HarbourVest conduct that diligence by itself?

6   A    No.  So, in addition to internal investment professionals

7   at HarbourVest, we engage with outside advisors, both

8   consultants as well as legal advisors, in connection with

9   that due diligence.

10  Q    And did Highland answer all of HarbourVest's questions

11  during that diligence period?

12  A    They did.  And they were numerous.  But yes, they

13  answered all the questions that we had for them.

14  Q    Was the Terry dispute part of HarbourVest's diligence?

15  A    It was.  That came up as one of the outstanding items of

16  litigation as part of our due diligence.

17  Q    I'm going to ask my colleague to pull up on the screen an

18  exhibit that was on our exhibit list as Items -- Exhibits 34

19  and 35.  It's an August 15, 2017 email from Brad Eden to

20  Dustin Willard.  Mr. Pugatch, do you recognize this document?

21  A    I do, yes.

22  Q    And what is it?

23  A    This was an email sent to us during our due diligence

24  period in response to a request for more information on the

25  outstanding litigation that Highland was involved with.

Pugatch - Direct                                99

1          MS. WEISGERBER:  And if my colleague can just scroll

2     to the attachment to that email.

3     BY MS. WEISGERBER:

4     Q    And do you recall the attachment as well, Mr. Pugatch?

5     A    Yes, I do.

6          MS. WEISGERBER:  And if you can scroll back up to the

7     first email.

8     BY MS. WEISGERBER:

9     Q    Who is Dustin Willard?

10    A    Yes.  Dustin is a colleague of mine at HarbourVest who

11    worked closely with me on this investment.

12    Q    And you said that this document was shared with

13    HarbourVest during the diligence period before the HCLOF

14    investment?

15    A    It was, correct.

16    Q    Is it typical during diligence to receive a description

17    of litigation such as this?

18    A    It is.  It's a question that we always ask.  Certainly a

19    component of our diligence to understand any outstanding

20    litigation on the part of our counterparty or manager that

21    we're investing in.

22         MS. WEISGERBER:  Your Honor, I'd move to offer this

23    exhibit into evidence.

24         THE COURT:  Any objection?

25         MR. DRAPER:  No objection, Your Honor.

Pugatch - Direct                                     100

 1              MR. MORRIS:  No objection from the Debtor, Your

 2    Honor.

 3              THE COURT:  All right.  What is the letter or number

 4    for this exhibit?

 5              MS. WEISGERBER:  It's HarbourVest Exhibit 34.

 6              THE COURT:  All right.  So HarbourVest Exhibit 34 is

 7    admitted.

 8         (HarbourVest's Exhibit 34 is received into evidence.)

 9              THE COURT:  And I need to be clear where it appears

10    on the docket.  Can someone tell me?

11              MS. WEISGERBER:  So, it's identified on our exhibit

12    list, not -- it's not attached to the exhibits.  It is on the

13    docket.  We were -- when we initially filed the exhibit list,

14    we were working out confidentiality issues.  But it was

15    subsequently filed with our reply last night.  It's at Docket

16    No. 1735 --

17              THE COURT:  All right.

18              MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19              THE COURT:  All right.  Very well.  Thank you.

20    BY MS. WEISGERBER:

21    Q    Mr. Pugatch, we'll just scroll down to the second page of

22    the attachment.  Can you describe generally what the

23    litigation says regarding the Terry dispute?

24    A    Yes.  Generally speaking, this dispute was described as

25    an employee dispute, employment agreement dispute, with Mr.

Pugatch - Direct                    101

1   Terry, who was a former employee of Highland involved in

2   their CLO business, and is described by Highland to us really

3   having to do with a series of false claims, in their opinion,

4   but having to do with a disgruntled former employee.

5   Q    And did it strike you as an unusual or significant

6   dispute?

7   A    No.  I would say we often -- we'll see, you know, former

8   employees with, you know, claims against a former employer in

9   connection with wrongful termination.  I wouldn't say it's

10  extremely common, but certainly not entirely out of the

11  ordinary.  And based on the explanations that we'd received

12  from Highland, seemed to be more of an ordinary-course type

13  former employee litigation suit.

14  Q    Based on what you now know about the Terry dispute, do

15  you believe that this was an adequate disclosure regarding

16  the dispute?

17  A    I would say very clearly not, you know, based on the

18  facts that came to light subsequently, the various rulings in

19  connection with the Acis bankruptcy case.  What was very

20  clearly not stated are the actual facts and implications of

21  the ongoing litigation with Mr. Terry.

22       MS. WEISGERBER:  I'd ask my colleague to put up the

23  next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24  list, which is Document No. 1723.  It's Exhibit 36 on that.

25  Same issue with respect to initially not filed, but it is on

Pugatch - Direct                           102

1    the docket at our response last evening at ECF No. 1735 at

2    Page A351.

3            THE COURT:  Page what?

4            MS. WEISGERBER:  A351.

5            THE COURT:  A351.  Thank you.

6            MS. WEISGERBER:  You're welcome.

7    BY MS. WEISGERBER:

8    Q    Mr. Pugatch, I just put up a November 29, 2017 email from

9    Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10   Bellisario.  Do you recall this document?

11   A    I do, yes.

12   Q    And what is this document?

13   A    This was an email sent to us by Highland a couple weeks

14   after we closed on our investment on the (inaudible) in

15   response to a *Wall Street Journal* article that had come out

16   regarding Highland, a number of actions that they had taken,

17   and what Highland was articulating to us, a number of false

18   claims that had been made about Highland's prior actions, and

19   specifically trying to explain some of that and also share

20   with HarbourVest a letter that was being sent to the editor

21   of the *Wall Street Journal* highlighting, in their view, some

22   of the inaccuracies around the reporting.

23   Q    And did you receive this document?

24   A    We did, yes.

25           MS. WEISGERBER:  I'd move to offer this, so

Pugatch - Direct                        103

 1  HarbourVest Exhibit 36, into evidence.

 2          THE COURT:  Any objections?

 3          MR. WILSON:  Your Honor, John Wilson.  I would object

 4  as to the relevance of this document.

 5          THE COURT:  All right.  What's your response?

 6          MS. WEISGERBER:  Your Honor, it shows

 7  misrepresentations that the witness will testify how it

 8  relates back to prior representations prior to HarbourVest's

 9  investment, as well as misrepresentations at that time.

10          THE COURT:  Okay.  I overrule the objection.  I'm

11  going to admit it.

12      (HarbourVest's Exhibit 36 is received into evidence.)

13  BY MS. WEISGERBER:

14  Q   Mr. Pugatch, can you describe generally -- we spoke about

15  this a little bit -- just what this communication from

16  Highland was conveying to HarbourVest at the time?

17  A   Yes.  Specifically, again, responding to this *Wall Street*

18  *Journal* article that had been published, trying to defend,

19  again, Highland's own views why there were inaccuracies in

20  the reporting.  But importantly, from our perspective, trying

21  to reassure us as to the fact that, you know, these

22  accusations would have no bearing and any results from it

23  would have no bearing on their ongoing business or

24  partnership or the investment that we had made in HCLOF.

25          MS. WEISGERBER:  And if you can scroll to the second

Pugatch - Direct                              104

1    page.

2    BY MS. WEISGERBER:

3    Q    We'll just look at the last paragraph of another email

4    from Mr. Covitz.  Can you just read that first sentence of

5    the last paragraph?

6    A    Sure.  (reading)  While the dispute has no impact on our

7    investment activities, as always, we welcome any questions

8    you may have.

9    Q    Mr. Pugatch, was this email and the discussion regarding

10   the Terry dispute consistent with the representations made to

11   you prior to HarbourVest's investment into HCLOF?

12   A    It was, yes.  Both the message, the lack of any impact

13   that ultimately the dispute with Mr. Terry, the arbitration

14   award would have around Highland's ongoing CLO business, or

15   HCLOF specifically, was all, you know, very clear in this

16   document, but all consistent with the representations that

17   had been made to us leading up to our investment in the

18   middle of November 2017 as well.

19   Q    Thank you.

20        MS. WEISGERBER:  And you can take down the exhibit,

21   Emily.  Thank you.

22   BY MS. WEISGERBER:

23   Q    You mentioned, Mr. Pugatch, an arbitration award to Mr.

24   Terry.  How did you learn about that arbitration award?

25   A    That was initially disclosed to us by Highland as we were

Pugatch - Direct                        105

 1   in the late stages of our diligence and closing process on

 2   the investment into HCLOF.

 3   Q   And generally, what did Highland tell you about the

 4   arbitration award?

 5   A   We were aware of its existence.  We were aware of the

 6   quantum of the award, I think it was around an $8 million

 7   arbitration award in the favor of Mr. Terry, and that was

 8   following the litigation around the wrongful termination and

 9   employee dispute that Highland had described to us

10   previously.

11   Q   Did you ask to see a copy of the arbitration award?

12   A   No, we did not.

13   Q   Why not?

14   A   Ultimately, we -- you know, the explanations that

15   Highland had provided to us all seemed very reasonable.  We

16   relied on their representations that this was, again, nothing

17   more than a dispute with a former disgruntled employee, in

18   their words, that had no bearing or, you know, would not have

19   any bearing on our investment in HCLOF or their ongoing CLO

20   business, which all very clearly was not the case, as

21   we've -- as we've learned over the last several years.

22   Q   Following learning about the arbitration award, did

23   HarbourVest do other diligence?

24   A   We did.  So, in addition to asking questions related to

25   the arbitration award and any impact that it would have, we

Pugatch - Direct                              106

 1   also spent some time diligencing a couple of structural

 2   changes that were proposed by Highland, and, in fact, ended

 3   up delaying the closing of our investment by about two weeks

 4   as we vetted some of those structural changes that Highland

 5   had proposed.  Vetted those both, you know, internally with

 6   Highland directly and with external counsel in order to make

 7   sure that those structural changes were in fact legally sound

 8   in ultimately making our investment.

 9   Q    And were those changes proposed following the arbitration

10   award?

11   A    They were, yes.

12   Q    Did Highland tell you the reason for the structural

13   changes?

14   A    Yeah.  So, so some of this -- and specifically, this

15   involved a change of the portfolio manager at the HCLOF level

16   that was really in connection with a rebranding as Highland

17   was going through a rebuild of its CLO business and wanting

18   to align, from a brand perspective, their business on an

19   ongoing basis with the Highland brand as opposed to the Acis

20   brand.  But more specifically, in the case of a late change

21   from a structured standpoint, the -- part of the intention

22   and the investment thesis of HCLOF was to pursue a reset, a

23   refinancing of all the underlying CLOs as they approached the

24   end of their investment period or came out of their

25   investment period.

Pugatch - Direct                    107

1       And in connection with that, in light of the arbitration

2   award, Highland's view was that there may be difficulties in

3   the market in resetting certain of those Acis CLOs with the

4   Acis brand associated with them, given, again, the existence

5   of the arbitration award and concerns in the market around

6   the Acis brand reputation.

7   Q    And what did they tell you was the market view of Acis,

8   or the Acis brand?

9   A    Yeah.  Their view or their concern was that the, you

10  know, because of the existence of that arbitration award, the

11  brand would be viewed as toxic.

12  Q    Didn't this put you on notice that perhaps there was

13  something wrong with the structural changes?

14  A    I mean, we -- I mean, short answer, no.  We ultimately

15  asked questions, we diligenced the legal structure, but

16  relied on the representations that were made to us by

17  Highland around the rationale for the structural changes,

18  that these are all changes that were within a Highland-

19  managed vehicle or sat below the vehicle that we were

20  investing in, and so ultimately were in Highland's purview,

21  was the representations that we relied on.

22  Q    And did HarbourVest alone do that diligence of the

23  structural changes?

24  A    So, no.  I mean, in connection with the diligence that we

25  did internally and with Highland directly, we engaged with

1    outside counsel who was working with us at the time to vet

2    those structural changes as well.

3    Q    Did HarbourVest rely on Highland's representations

4    regarding the arbitration award and the structural changes in

5    making its investment in HCLOF?

6    A    We did, absolutely.

7    Q    If Highland had disclosed the nature of the structural

8    changes, of removing Acis as the portfolio manager and

9    related transfers, would HarbourVest have proceeded with its

10   investment?

11   A    Definitively, no, we would not have.

12   Q    Why not?

13   A    I think the reality is if we had understood the intent,

14   you know, that Highland was ultimately undertaking here, we

15   would not have wanted to be any part of this, and certainly

16   getting dragged into all of this, the hassle, the value

17   destruction that we've seen on behalf of the investors and

18   the funds that we manage.  And I would say, lastly, we just

19   full stop would not have done business with a firm who

20   engages with this type of behavior, had we actually known the

21   truth.

22   Q    Mr. Pugatch, are you familiar with the bankruptcy that

23   followed of Acis?

24   A    Yes.

25   Q    And what was your -- or, did HarbourVest participate in

Pugatch - Direct                                        109

1   that bankruptcy?

2   A    So, initially, no.  Subsequently, we ended up getting

3   dragged into that on account of a number of misstatements by

4   Highland about the role that HarbourVest had played as part

5   of our investment into HCLOF and some of that structure and

6   the structural changes that I alluded to.

7   Q    How did HarbourVest learn about those misstatements in

8   the bankruptcy about HarbourVest's role?

9   A    So, ultimately, those came to light on -- you know, on

10  account of the ongoing proceedings within the Acis bankruptcy

11  process, and specifically brought to light to us by the Acis

12  trustee at the time, who decided to pursue, you know, further

13  diligence or discovery around the claims that Highland had

14  made around HarbourVest's involvement in those changes.

15  Q    And what is your understanding of what the allegations

16  were that caused the Acis trustee to investigate HarbourVest?

17  A    Sure.  So, you know, our understanding was that Highland

18  had made statements, again, false statements that HarbourVest

19  had actually instructed some of those structural changes,

20  that we were the ones that had said that we would not do

21  business with Acis and had ordered some of the underlying

22  transfer of assets or, again, structural changes, that, you

23  know, very clearly I would say were not the case.  Also, that

24  HarbourVest was -- was calling the shots as it relates to any

25  of the ongoing management or future resets of the CLOs.

Pugatch - Direct                110

1    Q    Did HarbourVest instruct any of those structural changes

2    or transfers to occur?

3    A    We did not.  Absolutely not.

4    Q    Why didn't HarbourVest itself appear in the Acis

5    bankruptcy and file a claim?

6    A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7    passive investor in a Highland-managed company.  We had no

8    direct interaction with or relationship with Acis.  There was

9    really no reason for us to be directly involved until we were

10   subsequently dragged into involvement on account of those

11   misstatements.  And then at that point our focus really

12   pivoted to, you know, whether we needed to defend ourselves

13   against those accusations that had been made by Highland and

14   after a request for further information in discovery by the

15   Acis trustee.

16   Q    Did HCLOF participate in the Acis bankruptcy?

17   A    They did, yes.

18   Q    Did HCLOF incur fees for participating in the Acis

19   bankruptcy?

20   A    Yes.  In fact, very meaningful fees, to the tune of well

21   in excess of $15 million of legal fees, as we understand it,

22   that have been incurred, largely in connection with the

23   ongoing Acis bankruptcy and Highland's continued pursuit of

24   and in connection with the litigation with Mr. Terry, which

25   we firmly believe was entirely inappropriate that HCLOF and

Pugatch - Direct                         111

1   ultimately investors in HCLOF bear those expenses, which were

2   not just expenses of HCLOF but of Highland and a number of

3   other Highland affiliates.

4   Q    Do those expenses form a basis of separate claims filed

5   by HarbourVest against Highland?

6   A    They do, yes.  One of the multiple claims that we had

7   filed against Highland.

8   Q    And a few more questions, just for the record, Mr.

9   Pugatch.  How much did HarbourVest initially invest in HCLOF?

10  A    Sure.  So, our initial investment in November of 2017 was

11  right about $73-1/2 million, I believe.

12  Q    Did HarbourVest invest any additional money in HCLOF?

13  A    We did.  There was a subsequent capital call investment

14  of about $5 million, bringing our total investment to just

15  under $80 million in aggregate.

16  Q    When HarbourVest initially made the investment, did it

17  anticipate making a profit on it?

18  A    We did, yes.

19  Q    How much did HarbourVest anticipate earning from the

20  investment?

21  A    Yeah.  So, our -- based on the original $73-1/2 million

22  investment, we had expected a total return of about $137

23  million on that -- on that investment.

24  Q    What was that projection based on?

25  A    So, that projection was based on materials that we had

1  received from Highland, their internal projection models on

2  the future performance of the underlying CLOs that we were

3  acquiring exposure to through our investment in HCLOF, and

4  was one of the inputs or formed the basis in connection with

5  our diligence that we ultimately ran different sensitivities

6  -- projections around and helped employ -- helped inform our

7  investment thesis.

8  Q    Do you know the current value of HarbourVest's investment

9  in HCLOF?

10 A    Yes.  The current value is right around $22-1/2 million.

11 Q    So roughly how much has the investment itself decreased

12 from HarbourVest's initial investment?

13 A    So, net of what was about $4-1/2 million of distributions

14 that we received early on in the investment, we've lost, to

15 date, in excess of $50 million on our original investment.

16 Q    And just for -- to close out, Mr. Pugatch, knowing all

17 that you know, if HarbourVest had known that -- about the

18 nature of the transfers by Acis or Highland's intent with

19 respect to the arbitration award, would HarbourVest have made

20 this investment?

21 A    No.  The reality is, had we known the truth, or even had

22 a sense of the truth, the true intentions behind some of

23 those transfers and ultimately what would have happened, we

24 never would have made this investment, full stop.

25 Q    Thank you, Mr. Pugatch.

Pugatch - Cross                        113

1          THE COURT:  All right.  I didn't hear you, Ms.

2    Weisgerber.  Do you pass the witness?

3          MS. WEISGERBER:  Yes, I pass the witness.

4          THE COURT:  All right.  Thank you.

5       Mr. Morris, any examination from you?

6          MR. MORRIS:  No, thank you, Your Honor.

7          THE COURT:  All right.

8       (Interruption.)

9          THE COURT:  All right.  I'm not sure whose voice that

10   was, but please, again, mute your devices when you're not

11   talking.

12      Any cross-examination of Mr. Pugatch?  I'll start with

13   you, Mr. Wilson.

14         MR. WILSON:  Yes, Your Honor.

15         THE COURT:  Okay.

16                    CROSS-EXAMINATION

17   BY MR. WILSON:

18   Q    How are you -- I guess we're afternoon now.  How are you

19   this afternoon, Mr. Pugatch?

20   A    I'm doing well.  Yourself?

21   Q    I'm doing well as well.  Do you recall that on Monday of

22   this week I took your deposition?

23   A    Yes, I do.

24   Q    And so you understand that my name is John Wilson and I

25   represent Jim Dondero, who has filed an objection to the 9019

Pugatch - Cross                                    114

 1  motion filed by the Debtor?

 2      I've got a few questions for you today.  Has HarbourVest

 3  been around for over 35 years?

 4  A    We have, yes.

 5  Q    And does HarbourVest have ten offices around the world?

 6  A    Correct, yes.

 7  Q    And does HarbourVest employ over 150 investment

 8  professionals?

 9  A    Yes.

10  Q    Does HarbourVest have over $74 billion in assets under

11  management?

12  A    Correct, yes.

13  Q    And is HarbourVest's client base largely comprised of

14  institutional investors?

15  A    Also correct.

16  Q    And you would agree with me that HarbourVest is a

17  sophisticated investor, right?

18  A    I would, yes.

19  Q    How long have you worked for HarbourVest?

20  A    I've been employed by HarbourVest for 17 years now.

21  Q    And how long have you been a managing director?

22  A    I've been a managing director for approximately six

23  years.

24  Q    And you were, in fact, the managing director for the

25  investment that HarbourVest made in Highland CLO Funding,

Pugatch - Cross                          115

1   Ltd., which has been referred to today as HCLOF, correct?

2   A   I was, correct.

3   Q   And HarbourVest, I think you just testified, invested

4   approximately $73 million as its initial investment in HCLOF?

5   A   Yes, correct.

6   Q   And before HarbourVest made that investment, it had made

7   many investments of this type, correct?

8   A   Yeah.  We've made hundreds of investments into

9   partnerships over our history, correct.

10  Q   So HarbourVest was well-experienced in evaluating and

11  deciding whether to invest in large investments, correct?

12  A   It was, yes.

13  Q   Now, in your -- and by your, I mean HarbourVest -- in the

14  response to the Debtor's omnibus objection, it says that by

15  summer 2017 HarbourVest was engaged in preliminary

16  discussions with Highland regarding the investment.  Is that

17  a correct statement?

18  A   Correct, yes.

19  Q   And, in fact, those talks began in the second quarter of

20  2017, correct?

21  A   Yes.

22  Q   And so the investment closed ultimately on November 15th,

23  2017?

24  A   Yes, that's correct.

25  Q   So it's fair to say that HarbourVest considered and

Pugatch - Cross                    116

1  evaluated this transaction for over six months before

2  investing its $73 million, right?

3  A    From the time of the initial conversations that we had

4  with Highland, yes.

5  Q    And one of the reasons that it took over six months to

6  complete the investment is that HarbourVest performs due

7  diligence before it makes an investment, correct?

8  A    Correct.

9  Q    And when you're performing due diligence -- well, first

10 off, you would agree with me that that's a common practice

11 amongst sophisticated investors such as HarbourVest, correct?

12 A    To perform due diligence?

13 Q    Yes.

14 A    Yes.

15 Q    And describe -- describe what HarbourVest does in a

16 general sense when it performs its due diligence.

17 A    Sure.  So, we spend time with the manager -- in this

18 case, Highland -- certainly around the investment thesis, the

19 opportunity, receive materials around the underlying assets.

20 We take that and perform our own independent due diligence

21 around the value of those assets, perform due diligence on

22 the manager itself, the go-forward opportunity.  In many

23 cases, and certainly in this case, engage with outside

24 advisors to assist with that due diligence.  It's a very

25 robust and thorough process.

Pugatch - Cross                        117

1    Q    And by outside advisors, are you referring to the outside

2    counsel that you testified about earlier?

3    A    Yes.  Both outside counsel and outside consultants.

4    Q    Okay.  And so did you say that it's typical to engage

5    outside counsel when performing due diligence?

6    A    Yes.

7    Q    And which outside counsel did you retain with respect to

8    this due diligence?

9    A    Debevoise and Plimpton as well as Milbank.

10   Q    And during the course of HarbourVest's due diligence, did

11   it identify some items of concern?

12   A    As with any investment, there are always items that are

13   identified that require further diligence, risks that are

14   identified that we look to mitigate through our due

15   diligence, et cetera.

16   Q    And if Harbour -- I'm sorry, did you say something else?

17   A    No.

18   Q    You were finished?  Okay.  Now, if HarbourVest identifies

19   an item of concern, is it typical to request additional

20   information regarding those items of concern?

21   A    It is, yes.

22   Q    And so that actually happened with respect to the HCLOF

23   investment, correct?

24   A    In certain cases, yes.

25   Q    HarbourVest identified several litigation matters that it

Pugatch - Cross                                118

1   had questions about, correct?

2   A    Correct.  As we would with any investment.

3   Q    And it went back to Highland and asked them to explain

4   their position on those litigation matters?

5   A    Correct.

6   Q    And one of those litigation matters was the Joshua Terry

7   litigation, correct?

8   A    Yes.

9   Q    And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A    Correct.

14  Q    And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A    Are you referring to the document that we looked at

21  earlier?

22  Q    I am.  And I can put it on the screen if we need to.

23  A    No.  Right, I recall that, and yes, that's correct.

24  Q    Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

Pugatch - Cross                                    119

 1  litigation, was issued months before the arbitration award to

 2  Josh Terry, correct?

 3  A   I don't remember the exact timing, but it was certainly

 4  during our due diligence period and prior to the arbitration

 5  award, yes.

 6  Q   Well, it seems to me that that email that you -- your

 7  counsel admitted as an exhibit was issued in August of 2017.

 8  Does that sound right to you?

 9  A   If that's what the email said, yes.

10  Q   And if the Terry arbitration award came out in October,

11  then you would agree with me that that is several months

12  prior to the -- or at least two months prior to the

13  arbitration award?

14  A   Yes.

15  Q   And so when HarbourVest made requests of Highland to

16  provide information regarding its items of concern, Highland

17  complied with those requests, correct?

18  A   It did, correct.

19  Q   And was there ever a time when HarbourVest requested

20  Highland to provide information and that information was not

21  provided?

22  A   Our requests for information, or at least, you know,

23  responses or color to a question, were always met either

24  with, you know, written or verbal communication back to us,

25  yeah.

Pugatch - Cross                          120

1    Q    And you would agree with me that, in fact, HarbourVest

2    delayed the closing of the investment by two weeks to

3    continue its due diligence, correct?

4    A    Correct, related to the structural changes that were made

5    close to closing.  That's right.

6    Q    And after conducting that due diligence, HarbourVest

7    satisfied itself that the investment was sound?

8    A    That the legal structure that had been put in place in

9    connection with those proposed changes by Highland was -- was

10   legally sound, yes, and on the back of, again, statements and

11   misrepresentations on the part of Highland around the nature

12   and potential impact to their ongoing CLO business and HCLOF.

13          MR. WILSON:  Well, I'm going to object to the latter

14   part of your response as nonresponsive.

15          THE COURT:  Sustained.

16   BY MR. WILSON:

17   Q    Now, after you conducted the due diligence, HarbourVest

18   made the investment of $73 million on November 15th, 2017,

19   correct?

20   A    Correct.

21   Q    And so I think you testified earlier that prior to that

22   investment HarbourVest had become aware that that Josh Terry

23   litigation had resulted in an arbitration award, correct?

24   A    Yes.

25   Q    But I think you've also testified that HarbourVest did

Pugatch - Cross                                      121

1    not request that Highland provide a copy of the arbitration

2    award, correct?

3    A    That's correct.

4    Q    And you further testified that you were represented by

5    outside counsel at the time, correct?

6    A    Correct.

7    Q    And as of Monday of this week, you had not reviewed that

8    arbitration award; is that correct?

9    A    That's correct.

10   Q    Have you reviewed that arbitration award since Monday of

11   this week?

12   A    I have not.

13   Q    But in any event, you testified that Highland told you

14   about the award?

15   A    Yes.

16   Q    And they told you the amount of the award?

17   A    Yes.

18   Q    And then they told you that the award had been converted

19   to a judgment?

20   A    When you say the award had been converted to a judgment,

21   can you be more specific?

22   Q    Well, I don't know how familiar you are with the

23   litigation process, but in this instance, that award was

24   taken to a court and the court entered a judgment on the

25   arbitration award.  Did you -- were you aware of that?

Pugatch - Cross                                    122

1  A    I don't recall the specific legal terms of judgment

2  against it.  I was award of the existence of the arbitration

3  award and the -- and the obligation for Highland to comply

4  with that arbitration award.

5  Q    And HarbourVest did not make an appearance in the Acis

6  bankruptcy, right?

7  A    We did not.

8  Q    But you were aware of the Acis bankruptcy, correct?

9  A    Yes.

10  Q    And you were kept apprised of the Acis bankruptcy by

11  Highland individuals, correct?

12  A    We had conversations with a couple of Highland

13  individuals throughout the Acis bankruptcy process, yes.

14  Q    Right.  And in fact, you testified that you participated

15  in regular conference calls with Highland regarding that

16  bankruptcy?

17  A    That's correct, yes.

18  Q    And do you recall having been provided with over 40,000

19  documents by Highland related to the Acis bankruptcy?

20  A    I do not recall that, no.

21  Q    Would those documents have been provided to your outside

22  counsel, had you received them?

23  A    I don't know the answer to that.

24  Q    Did the outside counsel that represented you in the due

25  diligence continue to represent you throughout the Acis

Pugatch - Cross                    123

1  bankruptcy?

2  A    They did.  One of the counsels did, correct.

3  Q    And which counsel was that?

4  A    Debevoise.

5  Q    So was your counsel actively involved with monitoring the

6  Acis bankruptcy?

7  A    They were, yes, particularly after we were ultimately

8  accused of having something to do with the original structure

9  and -- as a result of misstatements by Highland.

10 Q    Did your counsel attend hearings in the Acis bankruptcy?

11 A    I don't recall.

12 Q    Are you familiar with the PACER system?

13 A    I am not.

14 Q    Now, I think that HarbourVest has been described as a

15 passive investor.  You recall that description of HarbourVest

16 in this instance?

17 A    Yes.

18 Q    But, in fact, HarbourVest invested substantial assets

19 such that it owned a 49.98 percent share of HCLOF.  Would you

20 agree with that?

21 A    That's correct.

22 Q    And in fact, the next largest investor was CLO Holdco,

23 which owned 49.02 percent of the shares, correct?

24 A    That sounds right.

25 Q    And there was an advisory board that was created pursuant

Pugatch - Cross                               124

1   to the formation documents of this investment, correct?

2   A    That's correct.

3   Q    And in fact, that advisory board only had two members,

4   and one was a representative of HarbourVest and one was a

5   representative of CLO Holdco, correct?

6   A    Correct.

7   Q    And the advisor -- I'm sorry, the portfolio manager was

8   not allowed to disregard the recommendations of the advisory

9   board, correct?

10  A    With respect to the limited set of items that the

11  advisory board could opine on, that is correct.

12  Q    All right.  I want to go over a couple of the

13  misrepresentations that HarbourVest has identified in its

14  filings related to its claim.  The first one is -- and just

15  for the record, I'm reading from Docket No. 1057 filed on

16  September 11, 2020, HarbourVest Response to Debtor's First

17  Omnibus Objection.

18       But the first misrepresentation identified in that

19  document says that Highland never informed HarbourVest that

20  Highland had no intention of paying the arbitration award.

21  And was -- was Highland obligated to pay the Josh Terry

22  arbitration award against Acis?

23       MR. MORRIS:  Objection to the question to the extent

24  it calls for a legal conclusion.

25       THE COURT:  Sustained.

Pugatch - Cross                          125

 1          MS. WEISGERBER:  Join in that objection.

 2          THE COURT:  Sustained.  I think --

 3   BY MR. WILSON:

 4   Q    Your understanding was --

 5          MR. WILSON:  I'm sorry, Judge?

 6          THE COURT:  I sustained the objection as calling for

 7   a legal conclusion.  So, next question.

 8          MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

 9   Honor.

10   BY MR. WILSON:

11   Q    In your understanding, was Highland responsible for

12   paying the arbitration award to Josh Terry?

13   A    My understanding is on the account of the fact that Acis

14   --

15          MS. WEISGERBER:  Objection, Your Honor.  Objection,

16   Your Honor, same basis.

17          THE COURT:  Sustained.  It was essentially the same

18   question.

19          MR. WILSON:  Well, Your Honor, I didn't ask --

20          THE COURT:  It was essentially the same question, Mr.

21   Wilson.  Move on.

22          MR. WILSON:  Okay.

23   BY MR. WILSON:

24   Q    The next misrepresentation identified by HarbourVest said

25   that Highland did not inform HarbourVest that it undertook

Pugatch - Cross                        126

1   the transfers to siphon assets away from Acis, LP and that

2   such transfers would prevent Mr. Terry from collecting on the

3   arbitration award.  So the basis for that allegation would be

4   that Highland was siphoning assets from Acis to avoid having

5   Acis pay the arbitration award, correct?

6   A    That -- that would be the implication, yes.

7   Q    Okay.  And then that misrepresentation continues on and

8   says that Highland represented to HarbourVest that it was

9   changing the portfolio manager because Acis was toxic.  And

10  do you recall that representation being made to you?

11  A    Yes, I do.

12  Q    And would you agree with me that whether or not Acis is

13  toxic in the industry would be an opinion?

14  A    I suppose it would be an opinion, but by the manager of

15  the vehicle responsible for managing the HCLOF investment and

16  the underlying CLOs.  Yeah, we viewed the Acis name and the

17  Highland name as synonymous, if you will.  I mean, Acis was a

18  subsidiary of Highland.  For all intents and purposes, it was

19  the same from our perspective as we made the investment into

20  HCLOF.

21  Q    So did HarbourVest have an independent understanding of

22  whether or not the Acis name was toxic in the industry?

23  A    We did not, no.  We relied on Highland's views of that as

24  manager of HCLOF.

25          MR. WILSON:  Your Honor, just a brief housekeeping

Pugatch - Cross                    127

 1  item.  Did you say that we need to be done at 1:00 o'clock?

 2         THE COURT:  Well, I said I really wanted you to be

 3  done by 1:00 o'clock because I have a 1:30 docket and a 2:00

 4  o'clock docket and I'd rather not have to hang up 70-

 5  something people and reconnect them again at 3:00 o'clock.

 6  How close are you to being finished?

 7         MR. WILSON:  Well, --

 8         THE COURT:  This is going at a very slow pace.

 9         MR. WILSON:  Well, I apologize for that, Your Honor.

10  I think I've got at least ten more minutes, but -- but I know

11  we also have closing remarks.  And I was just going to ask if

12  Your Honor had a preference of --

13         THE COURT:  Keep going.

14         MR. WILSON:  -- of breaking now --

15         THE COURT:  Keep -- let's --

16         MR. WILSON:  -- or keep going?  Okay.

17         THE COURT:  Let's talk fast and try to get through.

18  You know, even if I'm sacrificing lunch today, I don't want

19  to inconvenience 75 people this way.  So we'll just probably

20  start our 1:30 hearing a little late and inconvenience those

21  people.

22      All right.  Go ahead.

23         MR. WILSON:  All right.  Thank you, Your Honor.

24  BY MR. WILSON:

25  Q   Did Acis form its -- I can't recall if you answered this

Pugatch - Cross                    128

 1   question, but did Acis form its own opinion on whether or not

 2   -- I'm sorry, strike that.  Did HarbourVest form its own

 3   opinion on whether or not the Acis name was toxic in the

 4   industry?

 5          MS. WEISGERBER:  Objection, --

 6          THE WITNESS:  We did not.  We didn't have a basis.

 7          THE COURT:  I'm sorry, did I have an objection?

 8   BY MR. WILSON:

 9   Q   You did not --

10          THE COURT:  Did I have an objection?

11          MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,

12   asked and answered, Your Honor.

13          THE COURT:  Overruled.  He can answer.

14   BY MR. WILSON:

15   Q   Okay.  But --

16   A   We did not.

17   Q   Did Highland have the ability to investigate the Acis

18   name and make its own determination of whether that name was

19   toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.

20   A   HarbourVest had the ability to do that, yes.

21   Q   I apologize I misspoke.  I meant HarbourVest.  Did

22   HarbourVest have the ability to investigate that name and

23   determine if it was toxic?

24   A   It was irrelevant to our investment thesis.  And as I

25   said before, Acis was a subsidiary of Highland.  We viewed

Appx 04986

008929

Pugatch - Cross                               129

1   them as interchangeable in the context of our investment.

2   Q    Okay.  The next misrepresentation that you refer to says

3   that Highland indicated to HarbourVest that the dispute with

4   Mr. Terry would have no impact on its investment activities.

5   Would you agree with me that that is also an opinion?

6   A    It was a statement that --

7        MS. WEISGERBER:  Your Honor, I'm going to object to

8   the extent these questions are seeking a legal conclusion

9   regarding, you know, if something's an opinion or not.

10       THE COURT:  Okay.  Overruled.  He can answer.

11       THE WITNESS:  It was -- it was a statement that was

12  made to us by Highland and represented in multiple different

13  formats as fact.  And a representation that we relied on in

14  connection with our investment.

15  BY MR. WILSON:

16  Q    And finally, the misrepresentation, the last

17  misrepresentation identified, is that Highland expressed

18  confidence in the ability of HCLOF to reset or redeem the

19  CLOs.  Would you agree with me that that statement is an

20  opinion?

21  A    On the basis that it was the core investment thesis of

22  the -- of the investment of HCLOF.  Again, whether that's

23  legally viewed as an opinion or a fact, it  was -- it was

24  certainly the investment thesis that we made the investment

25  predicated upon.

Appx 04987
008930

Pugatch - Cross                                      130

1   Q   And you just testified that you thought that Acis and

2   Highland were interchangeable from the perspective of the

3   investment opportunity, correct?

4   A   Correct.

5   Q   But you also accepted Highland's recommendation because

6   HarbourVest agreed that the change in the -- to a Highland

7   manager made commercial sense, correct?

8   A   We took at face value what Highland recommended because

9   this all had to do with the structuring of an entity that

10  they fully managed with respect to multiple underlying

11  subsidiaries that weren't managed by Highland.

12  Q   But would you agree that, at the time, you -- HarbourVest

13  thought that made commercial sense?

14  A   It did not seem unreasonable to us based on the

15  explanation we were given.

16  Q   Okay.

17          MR. WILSON:  I want to refer to HarbourVest Exhibit

18  39.

19      (Pause.)

20          THE COURT:  What are we waiting on?  What are we

21  waiting on?

22          MR. WILSON:  I'm trying to get the document on the

23  screen, Your Honor.

24      (Pause.)

25          THE COURT:  We can't hear you.  We can't hear you.

                          Pugatch - Cross                    131

1              MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2     speaking with my --

3              THE COURT:  Okay.

4              MR. WILSON:  -- co-counsel here.

5              THE COURT:  All right.

6         (Pause.)

7              MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8     you're referring to?

9              MR. WILSON:  39.   HarbourVest 9019 motion on the

10    main -- on the Dondero file.  And then there's the -- it's --

11    it's John  -- and then there's the HarbourVest, and then the

12    exhibits are all in one file.

13             MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14    was subject to confidentiality based on HCLOF's request.

15    HCLOF's counsel is present.  I think they know it's an

16    excerpt.  But I'd just -- that for HCLOF's counsel.

17             MR. WILSON:  Well, is there an objection to showing

18    this document on the screen?  Yes.  All right.  We're not

19    going to put Document 39 on the screen.

20             A VOICE:  Yes.

21             MR. WILSON:  All right.  Scroll down to the next

22    page.

23    BY MR. WILSON:

24    Q    This is a -- this is a document that was produced to us

25    this week, the Highland production.  It appears to be a

Pugatch - Cross                                    132

1    Highland CLO Funding, Ltd. Statement of Operations for the

2    Year Ended 31 December 2017.  Do you see at the top of that --

3    at the top of that document where it says total investment

4    income of $26 million?

5    A    I do, yes.

6    Q    And total expenses were roughly $1.8 million?

7    A    Yes.

8    Q    And then net change and unrealized depreciation on

9    investments and net realized loss on investments was $4.26

10   million cumulative, resulting in a net increase in net assets

11   resulting from operations of $20.224 million.  Do you agree

12   with that?

13   A    Yes.

14   Q    Okay.

15              MR. WILSON:  Go to the next one.

16   BY MR. WILSON:

17   Q    And you understand that, in the course of the Acis

18   bankruptcy, the portfolio managers for certain of the CLOs

19   were changed by the Trustee, correct?

20   A    Yes, around the underlying CLOs.  That's -- that's my

21   understanding, yes.

22   Q    And, in fact, Mr. Seery testified earlier today that that

23   occurred in the summer of 2018, correct?

24              MR. WILSON:  Scroll.

25              THE WITNESS:  I don't recall the timing, but that's

Pugatch - Cross                    133

1   what he testified to.

2   BY MR. WILSON:

3   Q   Well, this document is HarbourVest Exhibit 40, and this is

4   the statement of operations for the financial year ended 31

5   December 2018.  Here, the total investment income is only

6   $11.1 million.  Do you see that?

7   A   I do.

8   Q   And do you see where the expenses have increased to $13.6

9   million?

10  A   I do, yes.

11        MR. WILSON:  Okay.  Scroll down some more.

12  BY MR. WILSON:

13  Q   And do you see where it says net change and unrealized

14  loss on investments of $48.47 million?

15  A   Yes.

16  Q   And so after Acis and Brigade took over the managements of

17  these CLOs, we had a net decrease in net assets resulting from

18  operations of $52.483 million in the year 2018, correct?

19        MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20  fact not in evidence.

21        THE COURT:  Overruled.  He --

22        MR. WILSON:  Your Honor, --

23        THE COURT:  We're just looking at this statement and

24  testifying about it says, so I overrule the objection.

25        MR. WILSON:  Thank you, Your Honor.  Thank you, Your

Pugatch - Cross                           134

1    Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

2    right.  I'll --

3    BY MR. WILSON:

4    Q    Did you answer the question, Mr. Pugatch?

5    A    No, I -- I would agree with the second part of your

6    statement that for the year 2018 the -- the loss was $52

7    million.  I don't -- I don't believe that jives with the first

8    part of your statement that that was after Acis and Brigade

9    took over.  As I understand, that was in the middle of the

10   year.

11   Q    But in any event, Acis and Brigade had been managing this

12   for at least six months of 2018 when that loss occurred,

13   correct?

14   A    They had been managing a portion of the underlying CLO

15   portfolio held by Highland CLO Funding.

16   Q    All right.  We're now looking at Exhibit #41, which is the

17   Draft Unaudited Statement of Comprehensive Income, 31 December

18   2019.  Total income has now dropped to $4.664 million.

19          MR. WILSON:  And scroll down.

20   BY MR. WILSON:

21   Q    Expenditures are at $3.645 million.  And then it says

22   investment gains and losses net out to $11.493 million, a

23   negative $11.493 million.  And --

24          MR. WILSON:  Scroll down to the --

25   BY MR. WILSON: