**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§
§   Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust et al- Appellant**

§
vs.                                                              §

**Highland Capital Management, L.P.**
**Et al-** Appellee

§                          **3:25-cv-02072-S**
§

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 12

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.   **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.   **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.   **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.   **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.   **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.   **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001* 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023* 2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039* 3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru vol. 5*

*Vol 5*
*003493*

2

| | | | |
|---|---|---|---|
| *Vol. 5*<br>*003504* | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| *003519* | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| *003521* | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| *003530* | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>*003544* | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| *003909* | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
|---|---|---|---|
| | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

Handwritten annotations in left margin:
Vol 6  003912
Vol. 7  003936  Thru END of Vol 14
Vol 15  011840

4

| | | | |
|---|---|---|---|
| *vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

Vol 15

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| 011877 | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| 012039 | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3406 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| NO PDF AVAILABLE | 8/31/2022 | 3478 N/A | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| 012047 | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*vol. 15*

*012050*

*012077*

*vol. 16*

*012079*

*012357*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | | | |
|---|---|---|---|
| | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

Handwritten annotations in left margin:
- Vol. 16  012361
- Vol. 17  012363
- 012641
- Vol 18
- 012697 Thru END of Vol. 21
- Vol. 22  016732
- 016737
- 016773
- 016809

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery)) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*Vol. 26*

*019524*

*019527*

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27*  *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Professional Highland Claimant Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28*  *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 (Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28* *020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29* *020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30*  *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: /s/ Geoffrey S. Harper

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment
Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Pugatch - Cross                          135

1   Q    And so would you agree with me that in the year 2019,

2   HCLOF showed a net loss of $10.476 million?

3   A    Yes, that's what the financial statements say.

4   Q    And in this year, the Acis CLOs were solely managed by

5   Acis and Brigade, correct?

6   A    The Acis CLOs were.  Yes, correct.

7   Q    All right.

8        MR. WILSON:  Now, go to 42.

9   BY MR. WILSON:

10  Q    Now, this is HarbourVest #42.

11       MR. WILSON:  Go down to the next page.

12  BY MR. WILSON:

13  Q    And this is the Highland CLO Funding, Ltd. Unaudited

14  Condensed Statement of Operations for the Financial Period

15  Ended 30 June 2020.  And so this is just half a year of

16  operations.  And would you -- and this actually has a

17  comparison between 2019 and 2020.  But do you see where it

18  says investment income has dropped from a million dollars in

19  the first half of 2019 to $381,000 in the first half of 2020?

20  A    Yes.

21       MR. WILSON:  Okay.  Scroll down.

22  BY MR. WILSON:

23  Q    And do you see where, in the first half of 2019, total

24  expenses were $1.85 million, and then in the first half of

25  2020 total expenses were $2.16 million?  Do you see that?

Pugatch - Cross                      136

1    A    I do.

2    Q    And if you go down below that, where it says Net Realized

3    and Unrealized Gain/Loss on Investments, the first half of

4    2019 HCLOF lost $12 million, and in the first half of 2020 it

5    lost $39.472 million?

6              MR. MORRIS:  Your Honor, I'm going to object.  It's

7    John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8    he can offer this document into evidence.  There's no

9    foundation that Mr. Pugatch has any particularized knowledge

10   about any of the numbers behind this.  All he's asking him to

11   do is to confirm what the document says.  It says what it

12   says.  But this -- I'll object on that basis, Your Honor.

13             THE COURT:  All right.  Mr. Wilson, what about it?

14   You're just getting him to read numbers off of these exhibits.

15             MR. WILSON:  Well, --

16             THE COURT:  Shall we just --

17             MR. WILSON:  -- I understood --

18             THE COURT:  -- by stipulation get them into evidence?

19             MR. WILSON:  Well, --

20             MR. MORRIS:  No objection, Your Honor.

21             MS. WEISGERBER:  No objection.

22             THE COURT:  All right.  So these are exhibits what?

23   We've gone through 39, 41, and I don't know what else.  40,

24   maybe?

25             MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Pugatch - Cross                    137

1   were on the HarbourVest exhibit list.

2           THE COURT:  All right.  Those will be admitted, and

3   we've already discussed what docket entry number they appear

4   at.

5       (HarbourVest's Exhibits 39 through 42 are received into

6   evidence.)

7           THE COURT:  All right.  Anything else?  You told me

8   you had 10 more minutes about 15 minutes ago.

9           MR. WILSON:  Well, I'm sorry if I -- I think I had

10  said I had at least ten more minutes, and I was looking at the

11  -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12  have longer than that.  I'm sorry, Your Honor.

13          THE COURT:  Well, --

14          MR. WILSON:  But --

15          THE COURT:  -- I feel like I'm being --

16          MR. WILSON:  -- I'll try to proffer --

17          THE COURT:  Okay, Mr. Wilson, let me just tell you

18  something.  I feel like I'm being disrespected now, and the

19  parties are.  We really need to pick up the pace.  I've told

20  you I've got a 1:30 docket -- with four or five matters on it,

21  by the way.  I've got a 2:00 o'clock docket.  I'm starting

22  them late.  No one advised my courtroom deputy that we were

23  going to need all day today for this, okay?  So you've got

24  five more minutes to wrap it up, and then, of course, I have

25  to go to Mr. Draper and see if he has cross.  All right?  So

Appx 04995

008938

                         Pugatch - Cross                    138

 1    please don't test my patience any more.  Five minutes to

 2    finish.

 3           MR. DRAPER:  Judge, I have no questions.

 4           THE COURT:  I didn't hear you, Mr. Draper.  What did

 5    you say?

 6           MR. DRAPER:  I have no questions.

 7           THE COURT:  All right.  Very good.

 8           MR. WILSON:  I apologize, Your Honor.  I was actually

 9    trying to be respectful of your time when I informed you that

10    I had at least ten more minutes left at 12:50, but I will try

11    to be as expedient as I can as I finish up.

12    BY MR. WILSON:

13    Q   And I don't see you on my screen.

14           MR. WILSON:  You can take that document down.

15           THE WITNESS:  Here.

16    BY MR. WILSON:

17    Q   Mr. Pugatch, do you have an opinion as to what caused

18    these incredible losses of value at HCLOF?

19           MS. WEISGERBER:  Objection to the extent it calls for

20    a legal conclusion.

21           THE COURT:  Overruled.  He can answer.

22           THE WITNESS:  I would say that there's no one cause

23    for the decline in value.  I can point to a number of

24    different things, including the exorbitant fees that were

25    charged to HCLOF, including the inability to be able to re --

Pugatch - Cross                                    139

1   refinance the CLOs on the part of HCLOF, all of which stems

2   from the actions that Highland took prior to our investment in

3   HCLOF.

4   BY MR. WILSON:

5   Q    And you've -- I think it's been referenced several times

6   in HarbourVest's arguments that -- that the reset was a

7   fundamental -- the inability to get a reset was a fundamental

8   cause of the loss in value.  Is that -- is that HarbourVest's

9   position?

10  A    That -- that is a part of the -- the cause in the

11  declining value of the CLOs, yes.

12  Q    And you would agree with me that a reset is fundamentally

13  a reset of interest rates, correct?

14  A    Of the interest rates of the liabilities of the -- the

15  timing for repayment of those liabilities, yes.

16  Q    Now, just say with -- for the sake of a hypothetical

17  example.  If you had a home that was valued at $5 million, or

18  let's just say $500,000, let's make it more realistic.  If you

19  had a $500,000 home and you had a mortgage on that home at

20  five percent interest, your inability to refinance that home

21  at a lower interest rate would not affect the underlying value

22  of that home, correct?

23          MS. WEISGERBER:  Objection, Your Honor.  Hypothetical.

24  And objection to relevance as well.

25          THE COURT:  Sustained.

Appx 04037

008940

Pugatch - Cross                            140

 1              MS. WEISGERBER:  Calls for speculation.

 2              THE COURT:  Sustained.

 3    BY MR. WILSON:

 4    Q    Is there any reason to believe that the change in the

 5    interest rate would have prevented the massive losses of

 6    investment value that occurred in HCLOF?

 7              MS. WEISGERBER:  Object on the same grounds.

 8              THE COURT:  Sustained.

 9              THE WITNESS:  The short -- the short answer is yes,

10    with a -- with the amount of leverage --

11              MS. WEISGERBER:  I --

12              THE WITNESS:  -- that exists.  Oh, sorry.

13              MS. WEISGERBER:  The objection was sustained.

14              THE COURT:  Yeah, I sustained the objection.  That

15    means you don't answer.

16              THE WITNESS:  I'm sorry, Your Honor.

17    BY MR. WILSON:

18    Q    So, would you agree with me that if the expenses and the

19    fees charged by the portfolio manager increased dramatically,

20    that would -- that would impact the value of the investment,

21    correct?

22              MS. WEISGERBER:  Objection on the same grounds, and

23    relevance.  This is a 9019 hearing, Your Honor.  We are not

24    here to try every minutia.  And in fact, we're trying to avoid

25    a trial on the merits.  And it feels like we're getting a bit

Pugatch - Cross                     141

1    far afield now.

2           THE COURT:  I sustain.

3           MR. WILSON:  All right.  I'll pass the witness.

4           THE COURT:  All right.  Mr. Draper said he had no

5    cross.  So, any redirect, Ms. Weisgerber?

6           MS. WEISGERBER:  No, Your Honor.

7           THE COURT:  All right.  Mr. Morris, did you have any

8    redirect?

9           MR. MORRIS:  I do not, Your Honor.  I have a very

10   brief closing and then some additional remarks if -- if we

11   finish.

12          THE COURT:  All right.  So, Mr. Pugatch, that

13   concludes your testimony.  Thank you.  You're excused if you

14   want to be.

15      All right.  So, as I understood it, there would be no more

16   evidence after this.

17          MR. WILSON:  Well, Your Honor, along those lines, as

18   a housekeeping measure, I think everything on my exhibit list

19   is included on someone else's exhibit list, but just for belt

20   and suspenders I would move to admit all of the exhibits on

21   the -- on Mr. Dondero's exhibit list.

22          THE COURT:  Well, is that agreed or not?  Because we

23   didn't have a witness to get them in.

24          MR. MORRIS:  No objection, Your Honor.

25          THE COURT:  Any objection?  All right.  If there's no

142

1   objection, I'll --

2            MR. MORRIS:  Your Honor, --

3            THE COURT:  I'm sorry.  Was there an objection?  I

4   will admit Dondero Exhibits A through M, and those appear at

5   Docket Entry 1721, correct, Mr. Wilson?

6            MR. WILSON:  That is correct, Your Honor.

7            THE COURT:  All right.

8            MR. WILSON:  That is correct, Your Honor.

9       (James Dondero's Exhibits A through M are received into

10  evidence.)

11           MR. WILSON:  And one final matter is, during the

12  examination of Mr. Seery, you at least partially admitted

13  Dondero's Exhibit N, and I was wondering if we need to -- how

14  we'd need to submit that for the record.

15           THE COURT:  Okay.  First, I'm confused.  I think you

16  said Mr. Terry's testimony.  You --

17           MR. WILSON:  I said Seery.  I'm sorry.

18           THE COURT:  Oh, Seery?

19           MR. WILSON:  Or I may have said Terry, but I meant to

20  say Seery.

21           THE COURT:  Okay.  Maybe you said it.  Okay.  During

22  Mr. Seery's testimony -- oh, the email that I admitted a

23  portion of?

24           MR. WILSON:  That is -- that's correct, Your Honor.

25           THE COURT:  What -- what are you asking?  It's not in

143

1   your notebook.  Are you asking do you need to separately

2   submit it or what?

3           MR. WILSON:  Yeah, I was just asking what the Court's

4   preference on how we submit that for the -- put it in the

5   record.

6           THE COURT:  Okay.  That was so garbled I didn't hear

7   you.  You need to file that on the docket as a supplemental

8   exhibit that was admitted, okay?

9           MR. WILSON:  Okay.  Thank you, Your Honor.

10          THE COURT:  All right.  Closing arguments?  Mr.

11  Morris?

12              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13          MR. MORRIS:  Yes, very briefly, Your Honor.  The

14  Debtor easily meets the standard here.  The settlement

15  consideration relative to the claim establishes and reflects

16  the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18  deposition the other day, but I otherwise haven't heard from

19  him.  I found him to be incredibly credible, Your Honor, and I

20  regret the fact that he and HarbourVest are being blamed twice

21  here.  The fact that they got 40,000 documents or didn't read

22  the arbitration award, it's just -- it's a shame that they're

23  being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25  made the disclosures that HarbourVest claims -- complains

144

1    about.  They just don't.  The fraudulent transfers led to the

2    bankruptcy, led to the appointment of a trustee, led to --

3    right?  So, so it's -- that's why -- but they're getting

4    something for their claim.

5        It was a hard negotiation, Your Honor.  There is no

6    dispute that if we litigated this it would be complex.  It

7    would fact-intensive.  The Debtor would be forced to rely upon

8    witnesses who are no longer employed by it.  That it would be

9    expensive, for sure.  There's no dispute about any of that.

10   There's no dispute that the creditor body has spoken loudly

11   here by unanimously refraining from objecting except for Mr.

12   Dondero and the entities controlled by him.

13       And you heard Mr. Seery's testimony.  I think he

14   exhaustively informed the Court as to the process by which the

15   transaction was analyzed and negotiated, and there's no

16   evidence to the contrary that this was an arm's-length

17   negotiation.

18       Unless Your Honor has any questions, we would request that

19   the motion be granted.

20       THE COURT:  Thank you.  Ms. Weisgerber, your closing

21   argument?

22          CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23       MS. WEISGERBER:  Sure.  Thank you, Your Honor.  I'll

24   also be brief.  We again join in Mr. Morris's arguments and

25   comments.

145

1      The Court has now heard testimony from Mr. Pugatch

2   regarding the factual detail underlying HarbourVest's claims.

3   The Court has also heard about the significant damages that

4   HarbourVest stands to recover for those claims.  And

5   HarbourVest came to this Court ready to litigate.  It would --

6   it's ready to do so if needed.  It believes it would prevail

7   on its claims if it had to do so.

8      But the Court also heard from Mr. Seery about his

9   understanding of HarbourVest's claims, his calculus, and his

10  decision to settle them.  And we submit that nothing further

11  is needed by this Court in order to approve the settlement.

12  This is a question of the Debtor's business judgment.  We're

13  not here to have a trial on the merits of HarbourVest's

14  claims.  The Objectors have made various arguments, including

15  about the cause of HarbourVest's damages.  But even the nature

16  of the legal claims that HarbourVest is asserting, some do not

17  require a loss causation.  So we submit that's not even

18  relevant to the merits of the claims.

19      The settlement is clearly in the best interest of the

20  estate, and we respectfully request that the Court approve it.

21          THE COURT:  Thank you.  All right.  Mr. Wilson, your

22  closing argument?

23          MR. LYNN:  Michael Lynn.  I will give the closing

24  argument, if that's satisfactory to the Court.

25          THE COURT:  All right.  Go ahead.

146

```
1            CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO
2            MR. LYNN:  Good afternoon, Your Honor.  I just want
3    to make a few points, and I'll try to do it as quickly as
4    possible.
5       First, I feel compelled to address the argument of the
6    Debtor that Mr. Dondero is repeating his litigious behavior
7    from the Acis case.  I don't know about the Acis case.  I
8    wasn't involved except very, very peripherally.  But with
9    respect to this case, we have only taken positions in court
10   that we believed -- that is, his lawyers -- believed were
11   warranted by law, facts as we knew them, and that are
12   consistent with professionalism.  I'd be glad to explain any
13   position we took.
14      Often, through the Debtor's very persuasive powers, we
15   never had the chance to explain our position previously to the
16   Court.  In fact, for the most part, as today, we have been
17   reactive rather than commencing proceedings.  In fact, during
18   the first seven months of this case, we only appeared in court
19   a few times, when we felt we had to -- for example, when
20   discovery was being sought by the Creditors' Committee that we
21   feared might invade privilege.  Then, much to the Debtor's
22   fury, we opposed the Acis 9019.  We did so because we thought
23   it was too much.
24      Since, as the Court can see, the principal instigators of
25   litigation have been the Debtor, and to a lesser extent, the
```

147

1   Committee.

2       Indeed, in an apparent effort to drown Mr. Dondero and his

3   counsel in litigation, the Debtor has repeatedly sought court

4   action on a very short fuse, claiming need for expedited

5   hearing.

6       Perhaps the most startling example of this is the recent

7   contempt motion, for which there is no good reason for a quick

8   hearing.  Resolution of that motion is not necessary to reach

9   the confirmation hearing.  The motion could be heard after the

10  confirmation hearing.  There is no need to put Mr. Dondero and

11  his professionals in a position where they have to respond in

12  a couple of days, two business days, and then will have two

13  days to prepare for trial.

14      Second, Your Honor, Mr. Seery has repeatedly asserted,

15  contrary to today's motion, that the HarbourVest claim was of

16  no merit.  That is why, when he came in to settle for tens of

17  millions of dollars, we opposed this motion.  It appears that

18  the motion is occurring without any cross-party discovery.

19  There is no consideration, apparently, of trying dispositive

20  -- dispositive motions first.  There is no consideration for

21  junior classes of equity, which Mr. Seery has previously

22  opined were in the money.  This, even though there's no reason

23  that this settlement is necessary pre-confirmation, unless Mr.

24  Seery wants HarbourVest's vote.

25      Third, for whatever reason, that seems to be the driving

148

1   factor for settling.  On its face, the vote seems to be a key

2   factor of the settlement.  About the longest provision of the

3   settlement agreement relates to voting.  The motion itself --

4   in the motion itself, five of seven bullet points cited by the

5   Debtor for approval of the settlement deal with and emphasize

6   support of the plan or the vote that is to be cast for the

7   plan.

8       If the settlement is a good deal, it didn't need to have

9   as one of its parts the requirement that HarbourVest vote for

10  the plan.

11      Your Honor, I'll stop there.  I know Your Honor would like

12  to get just a few minutes before your 1:30 docket.  I've been

13  there and I understand that, and I do apologize for taking the

14  time we have, but I think that responsibility is shared with

15  the Debtor and HarbourVest.

16      Thank you, Your Honor.

17          THE COURT:  All right.  Thank you for that.

18      Mr. Draper, any closing argument from you?

19   CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20          MR. DRAPER:  Yes, I have three comments.  The first

21  is the claim -- the loss claim, absent the fraud claim, is, at

22  best, $7 million.  I think Mr. Seery's argument that a hundred

23  -- one hundred percent is attributable to there is just wrong.

24  If he and I both invested in a company 50-50 and it goes

25  broke, we only lost 50 cents each.

149

1     Number two, I think the Court heard the evidence.  I think

2  this is, at best, a subordinated claim under 5 -- under the

3  Bankruptcy Code.  It's really a "But for the

4  misrepresentations, we wouldn't have invested."

5     And the last one is the -- Judge Lynn represented the

6  voting, so I won't deal with that.  But the one that troubles

7  me the most is the fact that this asset that is ultimately

8  being paid for in claim dollars that's being transferred over

9  to the Debtor and being put it outside the estate, outside the

10  purview of this Court, and placed in some subsidiary, this --

11  this transaction, if it is approved, must -- should contain a

12  provision that the asset that's being acquired come into the

13  Debtor and be owned by the Debtor.

14          THE COURT:  All right.

15          MR. DRAPER:  I have nothing further, Your Honor.

16          THE COURT:  Thank you, Mr. Draper.

17     Mr. Morris, you get the last word since it's your motion.

18          MR. MORRIS:  Very quickly, Your Honor.  The

19  subordination argument doesn't hold water.  This is not a

20  claim against the Debtor for the security; it's a claim for

21  fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,

22  that might make sense, but this is a claim against the Debtor.

23  And it's a Debtor -- it's a claim for fraud.  That's number

24  one.

25     Number two, we need to keep this exactly as it's been

150

 1  structured in order to avoid litigation. Mr. Seery told the

 2  Court. I'm sure the Court can make its own assessment as to

 3  Mr. Seery's credibility as to whether or not the Debtor is

 4  intending to somehow get this asset beyond the Court.

 5      But there are reasons why we've done this, Your Honor.

 6  They could have made an objection on that basis. In fact, if

 7  they did, it would be overruled, because there's no -- there's

 8  no basis for this Court to find that somehow the Debtor and

 9  Mr. Seery are doing something untoward to get assets away from

10  this Court's jurisdiction.

11      You know, I don't know what to say about Mr. Lynn's

12  commentary. Much of it had nothing to do with any evidence in

13  the record.

14      The fact remains, Your Honor, that this settlement is

15  fair. It's reasonable. It's in the best interest of the

16  estate. And we would respectfully request that the Court

17  grant the motion.

18          THE COURT: All right. Thank you. Well, I

19  appreciate all the arguments and evidence I have heard today.

20  I'm going to be brief in my ruling here, but I reserve the

21  right to supplement in a more fulsome written order, which I'm

22  going to instruct Mr. Morris to submit. I am approving the

23  motion to compromise the HarbourVest claim today, and I guess

24  subsumed in that is granting the motion to allow their claim

25  for 3018 voting purposes.

151

1        I in all ways find this compromise to meet the required

2   legal standard set forth in such cases as *TMT Trailer Ferry*,

3   *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4   cases.

5        First, I'm going to specifically say for the record that I

6   found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7   very credible.  Very credible testimony and meaningful

8   testimony was provided to the Court today.  And based on that

9   testimony, I find, first, that this compromise was the product

10  of arm's-length negotiations.  It was a hard-fought

11  negotiation, as far as I'm concerned.  The Debtor objected to

12  these numerous HarbourVest proofs of claim.  The Debtor did

13  not want to allow HarbourVest a significant claim for voting

14  purposes.  I duly note the statements made in the disclosure

15  statement before this compromise was reached suggesting, you

16  know, the Debtor didn't think HarbourVest should have a large

17  claim.

18       That is consistent with everything I typically see in a

19  bankruptcy case when there's a claim objection.  The objector

20  vehemently denies the claimant should have a proof of claim,

21  and then people sit down and think about the risks and rewards

22  of litigating things.  And I believe very fervently that's

23  what happened here.  There were good-faith, arm's-length

24  negotiations that resulted in this proposed compromise.

25       I find the compromise -- and I'll add to that point, on

1   the good-faith point, I find nothing sinister or improper

2   about the fact that the compromise includes a commitment of

3   HarbourVest to vote in favor of the plan. Again, we see this

4   a lot. You know, there's even a buzz word that doesn't even

5   exist in the Bankruptcy Code: "plan support agreement." You

6   know, we see those a lot -- you know, oftentimes negotiated

7   before the case, but sometimes after. You know, it may be

8   improper in certain situations, but there was nothing here

9   that troubles me about that component of the compromise.

10      I find the compromise to meet the paramount interest of

11  creditors here. Notably, we have very large creditors in this

12  case who have not objected. The *Foster Mortgage* case from the

13  Fifth Circuit tells me I am supposed to consider support or

14  opposition of creditors. No opposition of UBS. No opposition

15  of the Redeemer Committee Crusader Fund. No opposition from

16  Josh Terry or Acis. No opposition from Daugherty.

17      But moreover, when considering the paramount interest of

18  creditors, I find this compromise to be in all ways fair and

19  equitable and in the best interest of the estate, and

20  certainly within the range of reasonableness. The evidence

21  showed that HarbourVest asserted over $300 million. Over $300

22  million. Granted, that was based on all kinds of legal

23  theories that would be contested and expensive to litigate,

24  but the evidence also showed that they invested over $70

25  million. You know, close to $75 million. I forget the exact

Case 19-34054-sgj11 Doc 3445-15 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 154
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 36 of 1017 PageID 9800

153

1  number. $75 or $80 million, somewhere in that range. And now

2  the credible evidence is that investment is worth about $22

3  million.

4      So, certainly, while the claim may not have, at the

5  ultimate end of the day in litigation, resulted in a $300

6  million proof of claim, certainly, certainly there were strong

7  arguments for a very sizeable claim, more than this compromise

8  amount. So it's certainly fair and equitable and reasonable

9  when considering the complexity and duration of further

10 litigation, the risks and rewards, the expense, delay, and

11 likely success.

12     A couple of last things I'm going to say are these. I

13 understand, you know, there is vehement disagreement on the

14 part of our Objectors to the notion that Highland might have

15 caused a $50 million loss to HarbourVest. But I will tell

16 you, for what it's worth -- I want the record clear that this

17 is part of my evaluation of the reasonableness of the

18 settlement -- my reaction is that, indeed, Highland's

19 litigation strategy in the Acis case caused HCLOF to lose a

20 huge portion of its value, to the detriment of HarbourVest.

21 You know, whether all evidence at the end of the day would

22 convince me of that, I don't know, but that's -- that is

23 definitely this judge's impression.

24     I'm very sympathetic to HarbourVest. It appears in all

25 ways from the record, not just the record before me today, but

154

 1   the record in the Acis case that I presided over, that

 2   Highland back then would have rather spent HarbourVest's

 3   investment for HCLOF legal fees than let Josh Terry get paid

 4   on his judgment.  They were perfectly happy to direct the

 5   spending of other people's money, is what the record suggested

 6   to me.

 7        And then, you know, I have alluded to this very recently,

 8   as recently as last Friday:  I can still remember Mr.

 9   Ellington sitting on the witness stand over here to my left

10   and telling the Court, telling the parties under oath, that

11   HarbourVest -- he didn't use its name back then, okay?  For

12   the first phase of the Acis case, or most of the Acis case, we

13   were told it was an investor from Boston.  And at some point

14   someone even said their name begins with H.  I mean, it seemed

15   almost humorous.  But Mr. Ellington said it was they,

16   HarbourVest, the undisclosed investor, who was insistent that

17   the Acis name was toxic, and so that's what all of this had

18   been about:  the rebranding, the wanting to extract or move

19   things away from Acis.

20        So, you know, I have heard for the -- well, at least the

21   second time today, from Mr. Pugatch, what I perceive to be

22   very credible testimony that that's just not the way it

23   happened.

24        And I guess the last thing I want to say here today, and

25   you know, I guess I have multiple reasons for saying this, not

Appx 05812

008955

155

 1   just in connection with approving the settlement, you know,

 2   I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

 3   you know, a crazy amount of value, that they underperform in

 4   the market, that, you know, during the Acis/Brigade tenure

 5   and, you know, they should have been reset.  You know, I hope

 6   those who have not been around as long as some of us in this

 7   whole saga know that the -- Mr. Terry, Mr. Phelan, I think

 8   Brigade, they all desperately wanted to reset these things,

 9   but it was HCLOF, I believe directed by Highland, that wanted

10   to redeem, wanted to liquidate, take the pot of money,

11   warehouse it, and then do their own thing.

12       And there was, I think, from my vantage point, a

13   monumental effort to try to get everyone to the table to do

14   reasonable resets that would be good for the stakeholders at

15   HCLOF and be good for the creditors of Acis, including Josh

16   Terry.  That was always the balancing act that most of us were

17   focused on during the Acis bankruptcy.  But Highland, I

18   believe, directing HCLOF's strategy, just did not want the

19   resets to happen.

20       So, again, part of me, I suppose, just wants to make the

21   record clear on something that I fear not everyone is clear

22   about.  And I say that because the comment was made that the

23   injunctions, the preliminary injunctions sought by the Acis

24   trustee caused the plummet in value, and I think that's just

25   not an accurate statement.  I think litigation strategies are

156

1   what caused the plummet in value, and that's why I think

2   ultimately HarbourVest would potentially have a meritorious

3   claim here in a significant amount if this litigation were to

4   go forward.

5       So, I approve this under 9019. And again, Mr. Morris,

6   you'll upload an order.

7       It is now 1:41, so let's as quickly as possible hear the

8   other motion that I don't think had any objections. Mr.

9   Morris?

10          MR. MORRIS: Your Honor, just -- yes, just very

11  quickly, just four things.

12      With respect to the order, I just want to make it clear

13  that we are going to include a provision that specifically

14  authorizes the Debtor to engage in -- to receive from

15  HarbourVest the asset, you know, the HCLOF interest, and that

16  that's consistent with its obligations under the agreement.

17      The objection has been withdrawn, I think the evidence is

18  what it is, and we want to make sure that nobody thinks that

19  they're going to go to a different court somehow to challenge

20  the transfer. So I just want to put the Court on notice and

21  everybody on notice that we are going to put in a specific

22  finding as to that.

23          THE COURT: All right. Fair --

24          MR. MORRIS: Number two is --

25          THE COURT: Fair enough. I do specifically approve

157

1  that mechanism and find it is appropriate and supported by the

2  underlying agreements.

3      And just so you know, I spent some time noodling this

4  yesterday before I knew it was going to be settled, so I'm not

5  just casually doing that.  I think it's fine.

6      Okay.  Next?

7          MR. MORRIS:  Thank you very much, Your Honor.  Number

8  two, with respect to the motion to pay, there is no objection.

9  If we can just submit an order.  Or if Your Honor has other

10  guidance for us, we're happy to take it.

11         THE COURT:  Okay.  Does anyone have anything they

12  want to say about that motion?

13      Again, I looked at it.  I didn't see any objections.  I

14  didn't see any problem with it.  It's -- you know, you're

15  going through this exercise because of the earlier protocol

16  order.

17         MR. MORRIS:  Correct.

18         THE COURT:  All right.  Well, if there's nothing,

19  then, I will approve that, finding there is good cause to

20  grant that motion.

21         MR. MORRIS:  Okay.

22         THE COURT:  All right.  Is the only other

23  housekeeping matter --

24         MR. MORRIS:  I --

25         THE COURT:  -- we have the contempt motion?

1          MR. MORRIS:  It is, and I do -- I do have to point

2     out how troubled the Debtor is to learn that Mr. Dondero was

3     still receiving documents from Highland as late as this

4     morning.  It's got to be a violation of both the TRO -- I

5     guess it's now the preliminary injunction.

6          I would respectfully request -- I know that time is what

7     it is -- but maybe Mr. Dondero can answer now where he got the

8     document, who he got the document from, what other documents

9     he's gotten from the Debtor since Your Honor ordered him not

10    to communicate with the Debtor's employees.

11         This is not saying hello in the hallway.  I mean, this is

12    just -- it is really troubling, Your Honor, and it's why we

13    need the contempt motion heard as soon as possible.

14         THE COURT:  Well, Mr. Wilson, do you want to address

15    that?  I think the words I heard were that you just got the

16    document this morning, and you got it from Mr. Dondero, but we

17    don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18    you there?

19         MR. LYNN:  I'm afraid I'm back, Your Honor.

20         THE COURT:  Okay.

21         MR. LYNN:  I am not sure whether Mr. Dondero had it

22    in his files from some -- from back before he was asked not to

23    communicate with members or with employees of the Debtor.  I

24    believe -- I believe he's with us, though I don't think he's

25    available by video.

159

1      Are you there, Mr. Dondero?

2              THE COURT:  We can't hear you, Mr. Dondero.

3              MR. DONDERO:  Judge?

4              THE COURT:  Oh, go ahead.

5              MR. DONDERO:  Can you hear me now?

6              THE COURT:  Yes.

7              MR. DONDERO:  Yes, I -- I -- when I moved offices, I

8      found it in a stack of paper, and --

9              MR. LYNN:  I understand it shows that his microphone

10     is working.

11             THE COURT:  Okay.  Go ahead.

12             MR. DONDERO:  Can you hear me?

13             THE COURT:  Yes, go ahead.

14             MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15     I've got everything in boxes.  I was going through everything

16     yesterday, and I found those emails in a stack of papers and I

17     sent them over because I thought they would be relevant

18     relative to Seery's initial impression.

19             THE COURT:  Okay.  Well, let's talk about the timing

20     of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21     you why --

22             MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23     waste the Court's time.  We have not made available anything

24     to the Court objecting to the expedited hearing on the

25     contempt motion.  We've been here.

160

1    I would say to Your Honor that if Mr. Dondero is indeed in

2    contempt, or was in contempt toward the motion, which has

3    nothing to do with the document that was presented as Dondero

4    Exhibit N, there is no need to hear this on an expedited

5    basis.

6        Every time we turn around, Your Honor, the Debtor is

7    asking that something be heard on an expedited basis.  And we

8    have not opposed that.  We have not fought that, to speak of,

9    to date.  But this is getting a little ridiculous.  We're

10   within days of confirmation of the Debtor's plan, and it is

11   simply a means of causing pain and suffering to Mr. Dondero

12   and those who are working with him and for him.  And he does

13   have employees at NexPoint who are assisting him.

14       So we most strongly object to being put on a schedule

15   where we are expected to get a response to the contempt motion

16   on file by Monday, today being Thursday, and a weekend

17   intervening.  And we strongly object to any setting of this

18   contempt motion on Tuesday or Wednesday.  It is absurd, and it

19   is done solely, solely, Your Honor, to cause pain.

20           THE COURT:  All right.

21           MR. MORRIS:  Your Honor, if I may?

22           THE COURT:  Please.

23           MR. MORRIS:  Just very briefly, we had a hearing the

24   other day.  The evidence is the exact same.  The evidence is

25   crystal clear that the violations are meaningful, they're

161

1   substantial, and they are repeated.

2       After the TRO was entered into, Mr. Dondero and only Mr.

3   Dondero chose to interfere with the Debtor's business.  Mr.

4   Dondero and only Mr. Dondero chose to communicate with the

5   Debtor's employees, not about saying hello in the hallway but

6   about coordinating a legal defense strategy against the

7   Debtor.

8       The need is immediate, Your Honor, and I would

9   respectfully request that the hearing be set for Tuesday or

10  Wednesday.  They've had this motion now since the 7th of

11  January.  They had a full evidentiary hearing, so they know

12  most of the evidence that's going to be presented.  They have

13  a whole team of -- they have an army of lawyers, Your Honor,

14  and half a dozen firms working on behalf of Mr. Dondero and

15  his interests.  For him to cry here, for him to cry that this

16  is too much is really -- it's obscene.  It just is.

17              THE COURT:  All right.  I'm going to say a couple --

18              MR. LYNN:  That is absurd.

19              THE COURT:  I'm going to say a couple of things.  One

20  is that I -- well, the one time I remember getting reversed

21  for holding someone in contempt of court, the District Court

22  felt like I had not given enough notice of that.  The District

23  Courts, what they think is reasonable notice, is sometimes

24  very different from what the bankruptcy judges think.  We're

25  used to going very lickety-split fast in the bankruptcy

162

1   courts.  And the Courts of Appeals, District Court, Courts of

2   Appeals obviously, for good reason, are very concerned about

3   due process in this kind of context.  So I'm sensitive to

4   that.

5      I'm also sensitive to the fact that it is monetary damages

6   that are being sought here to purge the contempt.  Okay?  The

7   shifting of attorneys' fees is basically what I understand is

8   being sought at this point.  You know, we have a preliminary

9   injunction halting behavior at this point, and so I think

10  that's another reason I'm hesitant to give an emergency

11  hearing.  I feel like monetary damages can wait and we can

12  give 21-plus days' notice of the hearing.

13     But I'm going to throw this out there as well.  If I do

14  feel like there is a showing of contempt, if I do feel like

15  the phone -- as I told you the other day, I'm very, very

16  fixated on the phone that may have been destroyed or thrown

17  away, maybe at Mr. Dondero's suggestion.  I mean, the

18  potential monetary sanction here may be very, very large if

19  the evidence plays out in the way I fear it might play out.

20  So I need to make sure everybody has adequate time to prepare

21  for that hearing and make sure I get all the evidence I need

22  to see.  All right?  Contempt of court is very, very, very,

23  very serious, and I don't think anyone would deny that.

24     So, with that, it was filed what day?  January 4th?  Is

25  that what I heard?  Or --

1          MR. MORRIS:  January 7th, I believe, Your Honor.

2          THE COURT:  January 7th?  All right.  Well, Traci,

3  are you there?  Hopefully, you're not in a hunger coma at this

4  point.

5          THE CLERK:  I am here.

6          THE COURT:  Okay.  We have -- we're going to have to

7  go to that first week of February, right?  Because we've got

8  the confirmation hearing that, you know, late in January, and

9  then --

10          THE CLERK:  Yes.  Uh-huh.

11          THE COURT:  Okay.  Do you have an available date to

12  give right now?

13          THE CLERK:  How about -- if you're willing to hear

14  them on Friday, February 5th.

15          THE COURT:  Okay.  I can do that.  February 5th at

16  9:30.  Any -- anybody want to argue about that?

17          MR. MORRIS:  Thank you, Your Honor.  That's

18  acceptable to the Debtor.

19          THE COURT:  Okay.  Mr. Lynn, is that good with you?

20          MR. LYNN:  We'll do that, Your Honor.  I would say,

21  by the way, that I'll be happy to buy Mr. Seery, out of my own

22  pocket, five cell phones, which ought to make up for the one

23  that was lost, though I recognize that those cell phones will

24  not have on them the privileged information, the conversations

25  between his lawyers and Mr. Dondero that I imagine he was

164

 1 | looking forward to seeing.

 2 |         THE COURT:  Well, I wouldn't want him to see that

 3 | information, but I do think he's entitled to any nonprivileged

 4 | information, texting, or calls that are on that phone.  So,

 5 | again, I'm either going to hear good explanations for that or

 6 | not, but it's something very concerning to me.

 7 |     All right.  So we have a game plan.

 8 |     I'm going to ask, Did we have good-faith negotiations

 9 | between Dondero and the Committee and anything positive to

10 | report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11 |         MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12 | Honor.  Mr. Lynn and I have exchanged several emails over the

13 | weekend, and the message that I sent to Mr. Lynn was very

14 | clear.  There had been a term sheet that Mr. Seery had sent

15 | back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16 | out and be very specific as to what it was Mr. Dondero was

17 | prepared to do in connection with the pot plan.  I instructed

18 | him that some of the issues that the Committee still has is

19 | obviously the overall value, along with the concept that's

20 | signing up to a promise from Mr. Dondero to comply with

21 | (indiscernible) as part of that value.  As Your Honor may

22 | understand, the Committee is obviously very skeptical of Mr.

23 | Dondero's future performance under an agreement that he enters

24 | into.

25 |     Those are but a couple of issues, Your Honor, that I

008965

165

1  advised Mr. Lynn were very concerning to the Committee. And I

2  suggested to him that if he wanted to move things forward, the

3  best way to do it would be to come to us with a fulsome term

4  sheet that explained exactly what it was in clear and precise

5  detail that Mr. Dondero was proposing, and that would be the

6  best way to move the process forward, Your Honor.

7          THE COURT: All right. Mr. Lynn, anything to add to

8  that?

9          MR. LYNN: Well, Your Honor, my experience in

10  negotiations is that it is useful to agree on substantive

11  terms, or at least be in the ballpark, before term sheets are

12  exchanged. Long ago, a term sheet was prepared and presented

13  to the Committee. Ultimately, I think it was rejected, though

14  I don't know if we ever received a formal rejection.

15     I explained in my emails, which I'm happy to share with

16  the Court if Your Honor wants to see them, why I was reluctant

17  to try to put into a term sheet form the proposal that I

18  suggested to Mr. Clemente. As I said, I'm more than happy to

19  provide you with that email chain and let you form your own

20  judgment, Your Honor, as to whether we're proceeding in good

21  faith.

22          THE COURT: All right. Well I'm not going to ask --

23          MR. POMERANTZ: Your Honor? Your Honor, this is Jeff

24  Pomerantz.

25          THE COURT: -- to see any of that. Mr. Pomerantz?

1           MR. POMERANTZ:  May I just be heard real quickly?

2           THE COURT:  Sure.

3           MR. POMERANTZ:  Your Honor, we also took Your Honor's

4    comments to heart.  We, Mr. Seery and I, had an over-an-hour

5    conversation with Mr. Lynn and with Mr. Bonds.  We provided

6    them with our thoughts as to what they needed to do in order

7    to move forward.  Of course, it's not really the Debtor to

8    agree.  It's the creditors to agree.  But as Mr. Seery has

9    testified many times before and as I have told the Court, we

10   would support a plan that the Committee and Mr. Dondero could

11   get behind.

12      So we again -- I'm not going to divulge the nature of

13   those communications, but we suggested several things that Mr.

14   Dondero could do in order to move the ball forward, and

15   unfortunately, we have not seen any of those things done thus

16   far.  So we are, at this point, not optimistic that there will

17   be a grand bargain plan.

18           THE COURT:  All right.

19           MR. DONDERO:  Your Honor, could I comment for a

20   second?  This is Mr. Dondero.

21           THE COURT:  If you and your counsel want you to

22   comment, you can comment.

23           MR. DONDERO:  I'd love to do a pot plan.  I would

24   love to reach some kind of settlement and everybody move on

25   with their lives.  The estate started with $360 million of

167

1    third-party assets and $90 million of notes.  The $360 million

2    of third-party assets are down to $130 million.

3            MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4    I did this at the last hearing, and it's not my practice to

5    interrupt, but issues regarding what the value is or not, it's

6    going to require a response, and that's not really before Your

7    Honor.  I think before Your Honor is --

8            MR. DONDERO:  Okay.

9            MR. POMERANTZ:  -- have there been negotiations?

10   Have they been in good faith?  If Mr. Dondero wanted to

11   address that, that's fine, but I object to having any

12   discussion at this point, especially with Mr. Dondero not even

13   under oath, on what the nature of the value of the assets and

14   why they have changed and what not.

15           THE COURT:  Well, --

16           MR. POMERANTZ:  It's just not appropriate.

17           THE COURT:  I understand --

18           MR. DONDERO:  Okay.  Can I --

19           THE COURT:  Stop.

20           MR. DONDERO:  Can I -- can I finish?

21           THE COURT:  Let me please respond to that.  I

22   understand your concern, but I've heard from Mr. Seery

23   testimony many months ago about the value plummeting during

24   the case.  And I asked why, and I got some explanations.  This

25   is not evidence.  This is just, you know, this is not going to

Appx 05025
008968

168

1    be binding in any way.  Mr. Dondero can speak as to what he

2    thinks, you know, the situation is.

3        Go ahead, Mr. Dondero.

4            MR. DONDERO:  Okay.  I'm not trying to fixate on the

5    numbers.  And as far as the third-party assets are, we would

6    be willing to pay -- I would be willing to pay for those.  I'd

7    be willing to pay more, and even some value for the affiliate

8    notes that were really part of compensation agreements

9    throughout the history of Highland and avoid the POC

10   arguments.  I'd be willing to pay for the assets and I'd be

11   willing to pay even more than that.

12       I have no transparency in terms of what the assets are,

13   and there's no fulsome discussion in terms of, well, here are

14   the assets, here are the notes, here's what we think the

15   values are, can you get to this number?  It's just a -- you --

16   the -- it -- I don't view there is good-faith negotiations

17   going on because it's always just a:  You need to put a big

18   number on a piece of paper; otherwise, you're going to get run

19   over.

20       And there's no back and forth going on, but it's not due

21   to a lack of willingness on my part.  And maybe there needs to

22   be a committee set up.  Maybe there needs to be, I don't know,

23   a mediator or an examiner or somebody to try and push through

24   the pot plan, but there's nothing happening.  People are not

25   returning the judge's calls, I mean, Mr. Lynn's calls, or my

Appx 05926

008969

169

```
 1   calls.  They're -- there's -- despite efforts of our -- of my
 2   own and a willingness of my own, there's no negotiations of
 3   any sort going on at the moment.
 4           THE COURT:  All right.  I don't want anyone to
 5   respond to that.  I know people have different views of what's
 6   going on.  But let me just say a couple of things, and then
 7   we're done.
 8       We do have a Committee in this case.  We have a Committee
 9   with very sophisticated members and very sophisticated
10   professionals.  Okay?  That's who I wanted you to be talking
11   to before the end of the day Tuesday.
12       We have had co-mediators in this case.  Okay?  And, you
13   know, I identified very sophisticated human beings for that
14   role.  Okay?  And in fact, there ended up being settlements
15   that flowed out of the co-mediator process.
16       We're now 15 months into the case.  There are major,
17   significant compromises now:  HarbourVest, UBS, Acis, Terry,
18   and Redeemer Committee.  I hate to use a worn-out metaphor,
19   but the train is leaving the station.  We've got confirmation.
20   I've pushed out two weeks.  I mean, you all are either going
21   to get there in the next few days or we're just going to go
22   forward with I think what everyone, you know, would rather be
23   a pot plan, but if we can't get there, we're just going to
24   have to consider the plan that's on the table now.  Okay?
25           You know, the Committee, again, they're sophisticated.
```

Appx 05827
008970

170

 1  They can compare apples to oranges and decide whether the plan

 2  on the table, with its risks of future litigation and

 3  recoveries, whether it's better or worse than whatever

 4  consideration you're offering, Mr. Dondero.

 5      And you know, as we all know, there is distrust here,

 6  there, and everywhere among these parties.  So I can totally

 7  understand them, you know, taking a hard line:  We either get

 8  all cash or we're just not going to mess with it.  We don't

 9  want to risk broken promises.  We'd rather just do litigation.

10      So, anyway, that's as much as I'm going to say except I am

11  going to further direct good-faith negotiations.  It sounds

12  like to me a written term sheet might be the appropriate next

13  step, given where I've heard things are at the moment.  But,

14  you know, I guess we don't have any hearings between now and

15  the 26th, right?  No Highland hearings that I can think of

16  between now and the 26th.

17          MR. POMERANTZ:  I don't think so.

18          MR. MORRIS:  I think that's correct, Your Honor.

19          THE COURT:  So you have all this time --

20          MR. MORRIS:  At the moment.

21          THE COURT:  You have all this time to negotiate and

22  simultaneously get ready for the confirmation hearing without

23  any other battles.  So I know you will use the time well.

24      All right.  We're adjourned.

25          THE CLERK:  All rise.

171

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 2:04 p.m.)

3                       --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21       I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **01/16/2021**

24   _____        _____
     Kathy Rehling, CETD-444                         Date
25   Certified Electronic Court Transcriber

008972

172

                                    INDEX

PROCEEDINGS                                                        3

OPENING STATEMENTS

- By Mr. Morris                                                   12
- By Mr. Kane                                                     18
- By Ms. Weisgerber                                              18
- By Mr. Draper                                                   20

WITNESSES

Debtor's Witnesses

James Seery
- Direct Examination by Mr. Morris                              26
- Cross-Examination by Mr. Wilson                               62
- Cross-Examination by Mr. Draper                               87
- Redirect Examination by Mr. Morris                           93

HarbourVest's Witnesses

Michael Pugatch
- Direct Examination by Ms. Weisgerber                         96
- Cross-Examination by Mr. Wilson                             113

EXHIBITS

Debtor's Exhibits A through EE               Received  35

James Dondero's Exhibits A through M         Received 142
James Dondero's Exhibit N (as specified)     Received  71

HarbourVest's Exhibit 34                     Received 100
HarbourVest's Exhibit 36                     Received 103
HarbourVest's Exhibits 39 through 42         Received 137

CLOSING ARGUMENTS

- By Mr. Morris                                                  143
- By Ms. Weisgerber                                             144
- By Mr. Lynn                                                    146
- By Mr. Draper                                                  148

173

```
 1                              INDEX
                               Page 2
 2

 3     RULINGS

 4     Motion to Compromise Controversy with HarbourVest 2017      150
       Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
 5     HarbourVest Dover Street IX Investment L.P., HV
       International VIII Secondary L.P., HarbourVest Skew Base
 6     AIF L.P., and HarbourVest Partners L.P. filed by Debtor
       Highland Capital Management, L.P. (1625)
 7
       Motion to Allow Claims of HarbourVest Pursuant to Rule      150
 8     3018(a) of the Federal Rules of Bankruptcy Procedure for
       Temporary Allowance of Claims for Purposes of Voting to
 9     Accept or Reject the Plan filed by Creditor HarbourVest
       et al. (1207)
10
       Debtor's Motion Pursuant to the Protocols for Authority     157
11     for Highland Multi-Strategy Credit Fund, L.P. to Prepay
       Loan (1590)
12
       END OF PROCEEDINGS                                          171
13
       INDEX                                                  172-173
14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 16

Annex 05932

008973

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: ) | Case No. 19-34054-sgj11 |
| ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., ) | |
| ) | |
| Debtor. ) | |
| —————————————————— ) | |
| ) | |
| OFFICIAL COMMITTEE OF UNSECURED ) | Adv. Proc. No. 20-03195-sgj |
| CREDITORS, ) | |
| ) | PLAINTIFF'S MOTION for |
| Plaintiff, ) | CONTINUANCE |
| ) | |
| v. ) | |
| ) | |
| CLO HOLDCO, LTD., et al., ) | |
| ) | |
| Defendants. ) | |
| —————————————————— ) | |
| ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., ) | Adv. Proc. No. 21-03003-sgj |
| ) | |
| Plaintiff, ) | |
| ) | DEFENDANT DONDERO'S MOTION |
| v. ) | to COMPEL DISCOVERY, the |
| ) | TESTIMONY of JAMES P. |
| JAMES DONDERO, ) | SEERY, JR. |
| ) | |
| Defendant. ) | May 20, 2021 |
| —————————————————— ) | Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

For Plaintiff Highland      John A. Morris
Capital Management,         Pachulski Stang Ziehl & Jones LLP
                            10100 Santa Monica Boulevard, 13th Floor
                            Los Angeles, California  90067

For Defendant-Movant        Michael P. Aigen
James Dondero:              Stinson, L.L.P.
                            3102 Oak Lawn Avenue, Suite 777
                            Dallas, Texas  75219

                            Bryan C. Assink
                            Bonds Ellis Eppich Schafer Jones LLP
                            420 Throckmorton Street, Suite 1000
                            Forth Worth, Texas  76102

                Appearances continued on next page.

Appx. 05923
008976

2

Appearances in 20-3195:

| | |
|---|---|
| For the Official<br>Committee of<br>Unsecured Creditors: | Paige Holden Montgomery<br>Sidley Austin LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas  75201 |
| | Matthew A. Clemente<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois  60603 |
| For Defendants<br>Highland Dallas<br>Foundation and<br>CLO Holdco Ltd.: | Louis M. Phillips<br>Kelly Hart & Pitre<br>301 Main Street, Suite 1600<br>Baton Rouge, Louisiana  70801 |
| | Amelia L. Hurt<br>Kelly Hart & Pitre<br>400 Poydras Street, Suite 1812<br>New Orleans, Louisiana  70130 |
| For Defendants The<br>Dugaboy Investment<br>Trust and The Get<br>Good Nonexempt Trust: | Douglas S. Draper<br>Heller, Draper, Patrick & Horn, L.L.C.<br>650 Poydras Street, Suite 2500<br>New Orleans, Louisiana  70130-6103 |
| For Grant James:<br>Scott, III: | John J. Kane<br>Kane Russell Coleman Logan<br>Bank of America Plaza<br>901 Main Street, Suite 5200<br>Dallas, Texas  75202 |
| For UBS Securities<br>LLC: | Andrew Clubok<br>Latham & Watkins, LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, D.C.  20004-1304 |
| For Scott Ellington,<br>Jean Paul Sevilla,<br>Isaac Leventon, and<br>others: | Frances Smith<br>Ross & Smith, PC<br>Plaza of the Americas<br>700 North Pearl Street, Suite 1610<br>Dallas, Texas  75201 |
| Digital Court<br>Reporter: | United States Bankruptcy Court<br>Michael F. Edmond Sr., Judicial<br> Support Specialist<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242 |
| Certified Electronic<br>Transcriber: | Susan Palmer<br>Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Appx. 05934
008977

3

<u>I N D E X</u>

Adversary Proceeding 21-3003,
 Defendant Dondero's Motion to Compel:        page   5
      The Ruling of the Court:                page  33


Adversary Proceeding 20-3195:
      Committee's Motion for Continuance:     page  35
      The Ruling of the Court:                page  78


        Witnesses:
                         Direct   Cross   Redirect   Recross

        Marc Kirschner
          Declaration:          61
          By Mr. Phillips:            62
          By Ms. Montgomery:                    65



        Exhibits Received in Evidence:

            Defendants' 1 - 6:                   page  70

*Adversary 21-3003, Motion to Compel Discovery*                    4

1    Thursday, May 20, 2021                    9:40 o'clock a.m.

2                    P R O C E E D I N G S

3          THE COURT:  — settings in Highland Capital adversary

4    proceedings.

5          Before I start with that, I want to let anyone who is

6    on the line for a different case, RE Palm Springs II, LLC, that

7    the hearing we had on that matter was continued.  Certain of the

8    parties filed an agreed motion to continue, and so I continued

9    that to June 9th at 9:30.  So to the extent you are on the line

10   only for the Palm Springs matter, that matter is not going

11   forward today.

12         All right.  So turning to Highland, I will start with

13   the first-filed emergency motion.  It was in Highland versus

14   Dondero, Adversary 21-3003.  Counsel for Dondero filed a motion

15   to compel testimony of James Seery.  So who do we have appearing

16   for Mr. Dondero this morning?

17         All right.  So —

18         MR. [SPEAKER]:  I think he's on mute, Your Honor.

19         THE COURT:  Sir, you are on mute.  Try again.

20         MR. AIGEN:  Ah, I apologize, Your Honor.  Is this

21   better?

22         THE COURT:  Yes.

23         MR. AIGEN:  Okay.  Good morning, Your Honor.  Michael

24   Aigen from Stinson, representing Mr. Dondero.  I apologize for

25   that.

1    THE COURT:  All right.  So you are now co-counsel with

2  Bond Ellis, perceive?

3    MR. AIGEN:  That is correct.  The lead counsel from

4  our firm is Ms. Deborah Deitsch-Perez.  She unfortunately has

5  medical emergencies going on with her family and is

6  unfortunately unable to be here for this hearing.

7    THE COURT:  All right.  Thank you.

8    For Highland, who do we have appearing on this matter?

9    MR. MORRIS:  Good morning, Your Honor.  It's John

10  Morris From Pachulski Stang Ziehl and Jones for the debtor.

11    THE COURT:  All right.  Thank you.  I presume those

12  are the only appearances on this discovery dispute.

13    MR. AIGEN:  That's correct.

14    THE COURT:  All right.  Well, Ms. — Mr. Aigen, you're,

15  I guess, new on the scene in the Highland matters.  And let me

16  just tell you I've read all the pleadings.  So I am aware that

17  of our numerous adversary proceedings, this is the one only

18  involving Dondero as a defendant and only involving three notes.

19  So, to help you find your argument, I'm going to say this.  I

20  remember when I was in law school — here comes a story — one of

21  our law professors said a suit on a note is the simplest kind of

22  lawsuit there is.  And probably when you are a young lawyer and

23  if you go to a civil business practice type law firm, this is

24  probably where you're going to get your feet wet.

25    And so, with that in my brain and having read the

Appx. 05937
008980

*Adversary 21-3003, Motion to Compel Discovery* 6

1  pleadings, I'm asking:  Why is this going to be complicated

2  where we need extensive discovery from the CRO/CEO who came on

3  the scene post bankruptcy two plus years after the notes?

4          So that's what's in my brain having read the

5  pleadings.  And so convince me why I'm totally misreading the

6  situation.

7          MR. AIGEN:  Thank you, Your Honor.  I appreciate that.

8  One thing I want to make sure we understand is this is we're

9  seeking to compel deposition testimony for Mr. Seery in his

10 corporate rep capacity.  We're not specifically asking for Mr.

11 Seery.  We sent corporate rep depo topics over.  They told us

12 Mr. Seery would be the corporate rep but they objected to

13 certain topics, as is their right.  The specific topics, as you

14 know, we're seeking discovery on, there's Numbers 9, 14 through

15 17 go together, Number 20.  In that sense what we're seeking

16 discovery on is a defense that we have asserted in this

17 proceeding that's currently pending.

18         As I'm sure you know from reading the pleadings, one

19 of Mr. Dondero's defenses is that there was a subsequent oral

20 agreement that the home would be discharged based upon certain

21 conditions being met.  Highland, as is their right, believes

22 that this oral agreement never happened.  And, as a result, it

23 contends that the defense has no merit.  In their motion, I

24 think it was, or in their response, paragraph 4, they

25 specifically say that this defense has no basis in fact.  That's

Appx 05938
008981

*Adversary 21-3003, Motion to Compel Discovery*                    7

 1  their right.  The problem, however, is just taking this

 2  position, based on this position they're also saying, well, we

 3  don't get discovery on this event.

 4        And although we're talking about six different

 5  requests, it really comes down to three different areas, and

 6  I'll jump into those and explain each one.  The first one, which

 7  I think is the most straightforward, is topic nine, which asks

 8  for testimony regarding Mr. Dondero's defenses.  Initially we

 9  got a response saying that the objection wasn't relevant and

10  then they filed a response.  And I think they realized that

11  might not have made a lot of sense saying it wasn't relevant, so

12  they said it was vague or invalid.

13        Counsel's well aware, as you are, what are defenses in

14  this case.  They served discovery on these defenses.  We

15  responded.  They never complained that they're inadequate.  They

16  know that our defense, at least one of them, is there had been

17  oral agreement on the loan, that it would be forgiven if certain

18  conditions occur, and that's what we want to take discovery on.

19        I'm confident counsel has interviewed Highland

20  employees to see who knows anything about this agreement.  I'm

21  sure it's very possible that no one knows anything about this

22  agreement, and that's fine.  But we certainly have a right to

23  ask the corporate rep about this and find out if anyone's going

24  to talk about this oral agreement at trial.  This isn't

25  burdensome discovery —

Appx. 05939
008982

*Adversary 21-3003, Motion to Compel Discovery* 8

```
 1              THE COURT:  Can I — can I — let me ask a question

 2    right there.  The defense is based on an oral agreement.  I mean

 3    your client is the payee on the notes — excuse me — excuse me —

 4    the maker.  It's easy to get confused here.  He's the maker on

 5    the notes, but he was the CEO of the payee on the notes.  So

 6    this is not Bank of America makes a loan to Joe, the plumber,

 7    or, you know, I mean this is — he's on both sides of the

 8    transaction.  So he knows who the oral agreement was made with,

 9    right?

10              MR. AIGEN:  Correct, Your Honor.

11              THE COURT:  So, again, I'm trying to understand —

12              MR. AIGEN:  May I follow up —

13              THE COURT:  — the depth of the discovery needed.

14    Presumably, I think I read in here, that you're deposing — or I

15    don't know if it's agreed or not — you're deposing various other

16    Highland former employees.  But — but I don't understand why the

17    current CEO that was not around before the bankruptcy would have

18    any personal knowledge about oral agreements.  I mean this would

19    all be in Mr. Dondero's head, right?

20              MR. AIGEN:  Your Honor, I absolutely agree.  And there

21    are, I guess, two parts to that answer.  One is we aren't taking

22    other Highland employees' depositions.  We've asked for them,

23    and they have refused to give them to us and said they're

24    irrelevant.  We're trying to work that issue out.  And we may

25    get one of their depositions.  If they go give us one for a
```

*Adversary 21-3003, Motion to Compel Discovery* 9

1  couple hours and drop off, but this is — right now this is the

2  only discovery we're getting.  Their doc requests, they're not

3  going to give us any documents related to these topics.  So this

4  is our chance to get discovery on it.

5       As to his personal knowledge, he's their corporate

6  rep.  As a corporate rep, he can go figure out what other people

7  know.  But they're going to put someone on the stand — and I

8  think it's important, Your Honor, obviously they're going to

9  make a defense in this case — or, sorry — which stops our

10 defense with legal arguments saying even if this oral agreement

11 occurred and took place, it's not legally enforceable.  I

12 understand.

13      THE COURT:  Yeah, and what about —

14      MR. AIGEN:  I mean this is —

15      THE COURT:  — what about that?  What about that?  I

16 mean it's hard not to separate the need for discovery from that,

17 so what about that?

18      MR. AIGEN:  Well, your — yeah.  No, that's — if they

19 file a summary judgment on a legal issue, then we will address

20 that in our summary judgment legal issue, but right now we have

21 a pending defense.  And, Your Honor, one of their responses to

22 our defense, as they put in their response in paragraph 4, they

23 specifically state that this oral agreement never occurred.  So

24 I need to know how they know that, who are they going to put on

25 the stand.  I don't know which people are saying that.  So we

*Adversary 21-3003, Motion to Compel Discovery*                10

 1   ask for — to put it down into corporate rep topic.  They could

 2   have given us anyone.  They decided to give us Mr. Seery.  But,

 3   yes, he may not have personal knowledge, but that's who they

 4   chose for their corporate rep to testify on this topic.

 5         He's the only one I'm able to get this information

 6   from.  And he may come up and say no one knows anything about

 7   that.  That's fine.  But they have already said:  We're taking

 8   the position that this oral agreement never occurred.  I don't

 9   know how they know that, I don't know who they're going to put

10   on the stand, but they are taking a factual position on that.

11   So we should have a right to take discovery on it.  Whether they

12   don't think this is a legally-valid defense, well, that's fine,

13   they could have moved for summary judgment on day one.  They

14   didn't.  As of now, this defense is still pending.

15         We have less than two months until trial.  I don't

16   know when the summary judgment's going to come, so there's not

17   going to be a chance to wait until the legal aspects of these

18   defenses are heard and then take discovery.  This is our one

19   opportunity to do it.

20         THE COURT:  Okay.  So this is topic number nine.  And

21   you say why not, let us ask a few questions, it may be five

22   minutes of questioning if he doesn't really know anything.  Is

23   that a summary of your position?

24         MR. AIGEN:  Well, yeah, he may not know anything and

25   they may not know anything, or they may, yes.  I don't know how

Appx 05942
008985

*Adversary 21-3003, Motion to Compel Discovery*                    11

1  much time it's going to take.  The fact that they put in writing

2  that this agreement never occurred makes me think that someone

3  must know something, but I don't know.  It could be on that.

4  that —

5           THE COURT:  All right.

6           MR. AIGEN:  — it's certainly possible, Your Honor.

7           THE COURT:  All right.

8           MR. AIGEN:  That — and then the second topic or

9  second, I guess, group is 14 through 17 where we ask about

10  information about loans made by Highland or the debtor that were

11  particular to other people.  And the reason these requests are

12  relevant is, once again, — well, not once again — but it's our

13  position that Highland commonly entered into these types of

14  agreements.  They're saying:  Hey, this never happened, this

15  agreement didn't take place.

16           So the fact that Highland entered into other similar

17  type loan agreements with similar type business group

18  provisions, although maybe not dispositive, it certainly leads

19  to evidence that this agreement did in fact take place in the

20  situation where they're telling you and putting a pleading and

21  writing in the pleading, hey, this never — this agreement never

22  took place.  So this is relevant —

23           THE COURT:  So — so — so —

24           MR. AIGEN:  — and, like I said, —

25           THE COURT:  — on topics 14 through 17 you're saying

*Adversary 21-3003, Motion to Compel Discovery* 12

1  it's relevant if loans were made to other employees or officers

2  besides Mr. Dondero and it's relevant if those loans were

3  forgiven or not as to these three notes?

4       MR. AIGEN:  Correct, Your Honor.  Because they are

5  challenging that this agreement took place, for the —

6       THE COURT:  Well, —

7       MR. AIGEN:  — fact that other similar —

8       THE COURT:  — what if they did do this with another

9  employee, why is that relevant these three notes?

10       MR. AIGEN:  Well, because they're challenging that our

11  oral agreement took place.  The fact that oral agreements like

12  this were routine at Highland would make it more believable and

13  factual that our agreement took place, in light of their

14  challenge to the fact that the agreement took place.

15       Like I said, if they were just making legal challenges

16  to whether the agreement is enforceable, that would be one

17  thing.  So instead they're also taking the position, hey, we

18  don't think this actually took place.  So all — if Highland

19  routinely entered into agreements like this for other employees,

20  like I said, I understand that wouldn't be dispositive, but that

21  would tend to show that this pattern and practice of Highland

22  did include oral agreements like this.

23       THE COURT:  Okay.  I don't mean to get off on a

24  tangent here, but, you know, are there going to be a lot of

25  fraudulent-transfer lawsuits if in fact there was debt forgiven

*Adversary 21-3003, Motion to Compel Discovery* 13

1    in the couple of years or four years leading up to bankruptcy?

2    And are we going to have — well, I just don't understand, you

3    know, the obvious big tax exposure to your client and other

4    human beings if your — if your argument prevails, but I guess I

5    shouldn't — I shouldn't second guess legal strategy, but my

6    brain can't help to go there.

7            All right.  But, again to the relevance, your defense

8    is:  There was an agreement to forgive these notes.  It was oral

9    and we're entitled to discovery regarding other loans to other

10   employees for which there might have been oral forgiveness

11   because that will help establish our defense; that's the sum and

12   substance of categories 14 through 17?

13           MR. AIGEN:  That's correct, Your Honor.

14           THE COURT:  Okay.

15           MR. AIGEN:  And obviously I don't think there's any

16   need to try the ultimate legal issues here, but we're well aware

17   of these tax issues and we've worked into it, and so there are

18   different tax consequences depending on how conditions are

19   structured and it's my understanding that in situations like

20   this there wouldn't be sort of tax consequences, but that's an

21   issue for another day.  But because you raised it, Your Honor, I

22   want to make sure that you know we are aware of that issue and

23   that is something we're prepared to address when it — when it

24   comes before this.

25           So should I move on to the last — last topic, Your

 1  Honor?

 2        THE COURT:  Okay.

 3        MR. AIGEN:  The last topic is Request Number 20 which

 4  asks for testimony regarding compensation paid by Highland to

 5  Mr. Dondero.  And I know this might be a little unusual because

 6  someone should know what they were paid, but obviously in a

 7  situation like this where we don't have control of all the

 8  records and the pay structure is complicated, we don't have all

 9  of that, so it's a little different than your usual situation.

10  And the reason this is relevant, obviously this goes to the

11  forgiveness aspect of it, and basically information regarding

12  Mr. Dondero's compensation will be helpful or relevant because

13  it shows part of the story here is that if you look at his

14  compensation as a whole, he was underpaid and the notes were

15  forgiven as part of this compensation which goes along with the

16  underpaid.  In other words, it puts this oral agreement into

17  context and explains why it is thus.  Again, they're saying this

18  never happened, so as part of our presentation of our case,

19  we're going to explain why this was done and why it makes sense.

20  And to put that into context, we want information related to Mr.

21  Dondero's compensation.  We're not asking for other people's

22  compensation on this, we said information related to Mr.

23  Dondero's own compensation.

24        And, again, I understand that counsel thinks that

25  these defenses have no merit.  That's their right.  That makes

008989

*Adversary 21-3003, Motion to Compel Discovery*                    15

 1   sense.  And I assume they will file a summary judgment on these,

 2   but they haven't done it.  These defenses are currently pending.

 3   We're going to trial in less than two months.  We may not be

 4   getting anyone else's depositions.  They're not giving us

 5   documents on this topic.  And I understand it may be a little

 6   unique to have Mr. Seery testify on this, but that's because we

 7   just presented them with topics.  That's the witness they are

 8   putting forward, which is their right.  I have no problem with

 9   that.  But this is our one opportunity to get discovery on this

10   and that's why we're before the Court today.  Thank you for your

11   time.

12          THE COURT:  Okay.  Just to clarify, I think I heard

13   you saying Mr. Dondero doesn't have access to the records.  Mr.

14   Dondero doesn't have records regarding the compensation paid by

15   Highland to him and any agreements related to that?

16          MR. AIGEN:  He — he had some but not all.

17          THE COURT:  Okay.  Well, I don't understand that.  Why

18   would that be?  He's the founder, he was the CEO of this company

19   until three months after the bankruptcy was filed.  He — I mean

20   it sounds inconceivable to me that he wouldn't have everything

21   he needs as far as what he was paid in the agreements regarding

22   what he was paid by his company Highland.

23          MR. AIGEN:  Well, Your Honor, fortunately or

24   unfortunately I have not been involved what I understand is sort

25   of disagreements between the parties here on Mr. Dondero's

Appx 05947
008990

*Adversary 21-3003, Motion to Compel Discovery*                16

```
 1   access to certain documents of Highland, but my understanding is

 2   he — Highland now has possession of all its documents.  And he —

 3   I know there were requests between counsels on Dondero to get

 4   particular documents in other matters and other situations going

 5   on.  But he — Highland is the one that has possession of those

 6   documents now, not — not Mr. Dondero.

 7           THE COURT:  Okay.  He'd at least have his tax returns,

 8   right, and files regarding his tax returns?

 9           MR. AIGEN:  Correct, correct.  Correct.  Yes.  Yes,

10   Your Honor.

11           THE COURT:  All right.  Well, Mr. Morris, now for your

12   responses in — I'm playing devil's advocate with you.  If y'all

13   have named Mr. Seery as a 30(b) corporate rep and out of these

14   20 topics you agree to — two, three, four, five, six — I guess

15   13 of the subject matters, what's the big deal about a few extra

16   questions?

17           MR. MORRIS:  A few — a few issues.

18           First, Your Honor, is Mr. Dondero on the line?

19           THE COURT:  Well, that's a good question.  I forgot to

20   check that because I have ordered him in the past to be at every

21   hearing.

22           Mr. Dondero, are you with us this morning?

23           Mike, did you see him —

24           MR. ASSINK:  No, Your Honor.  This is —

25           THE REPORTER:  I haven't seen Mr. Dondero.
```

*Adversary 21-3003, Motion to Compel Discovery*                    17

 1         THE COURT:  Okay.  Well, Mr. Aigen, what do you know

 2    about that?  Or I see Mr. Bryan Assink is out there as well.

 3    What do y'all know about that?

 4         THE REPORTER:  He's on mute, Your Honor.

 5         THE COURT:  You're on mute, sir.

 6         MR. ASSINK:  Your Honor, I apologize.  This is Bryan

 7    Assink of Bonds Ellis.  I'm just trying to — I'm just trying

 8    to —

 9         THE COURT:  Okay.  It sounds like someone's speaking,

10    but I can't hear it.

11         THE REPORTER:  Bryan Assink, his voice is low.  He's —

12         THE COURT:  Okay.  Mr. Assink, please turn your volume

13    up.  We can barely, barely, barely hear you.

14         Mr. Assink.

15         MR. ASSINK:  Your Honor, is that — is that better?

16    I'm sorry.  I tested this before —

17         THE COURT:  Okay, it's better now.  Go ahead.

18         MR. ASSINK:  — I joined and —

19         THE COURT:  Go ahead.

20         MR. ASSINK:  Your Honor, this was set on an emergency

21    basis, and we just didn't coordinate with Mr. Dondero.  We

22    didn't think he needed to attend these kind of nonevidentiary

23    hearings and —

24         THE COURT:  Mr. Assink, you asked for the emergency

25    hearing.  And you filed your motion Friday afternoon.  We were

*Adversary 21-3003, Motion to Compel Discovery*                    18

 1   in court Tuesday.  And I was happy that you resolved our

 2   disputes Tuesday.  And I remember saying:  Preview of coming

 3   attractions, I guess I'll see y'all Friday, right.  Right,

 4   nobody said anything about, uh, we have an emergency setting,

 5   we're hoping to have.

 6            But, anyway, be that as it may, an hour or two after I

 7   got out of court Tuesday, my Courtroom Deputy was telling me

 8   that you were wanting the hearing this week.  And I first said

 9   it'll have to be Monday.  I mean we're — we've got a backlog of

10   stuff in our queue that we're really trying to get out.  And —

11   and I understood that you really pressed for having this hearing

12   today.  I didn't see the — all the emails, but my Courtroom

13   Deputy said you all really wanted this hearing today, not

14   Monday.

15            So, with that, why would you press for today if Mr.

16   Dondero wasn't available, number one?  And, number two, why

17   would you think he wasn't needed?  I mean it was a couple of

18   hearings ago that I said someone pull out my order and see what

19   I said, because I couldn't remember the exact wording —

20            MR. ASSINK:  No, Your Honor, I apologize.  I'm sorry,

21   Your Honor.  I apologize.  There's been a lot going.  I think it

22   — the coordination might have just slipped.  I'm not sure, Your

23   Honor, I wasn't sure what order required him to be here today

24   with the preliminary injunction dissolves but, you know, it

25   wasn't our intention that he would not — he would not appear.

008993

*Adversary 21-3003, Motion to Compel Discovery* 19

1   We — it was more just a coordination thing.  We intend that he

2   will be at all hearings before, Your Honor, you know, Friday's

3   hearing and substantive hearings.  I just — I think this is more

4   of a coordination issue, Your Honor, and I apologize.

5          THE COURT:  Okay.

6          MR. ASSINK:  There has been a lot going on.

7          THE COURT:  Oh, don't I know.  There's two of us, me

8   and my Law Clerk working on this, and there are a bunch of

9   y'all.  So, yes, I feel — I feel absolutely what you feel and

10  more as far as a lot going on.

11         So let me clarify.  My language that ordered Mr.

12  Dondero to be at every hearing was in the preliminary injunction

13  that's now superseded by the agreed order y'all announced

14  Tuesday.  So are you telling me you thought now that mandate

15  didn't apply?  Is that one of the things —

16         MR. ASSINK:  Not — not specifically, Your Honor, —

17         THE COURT:  — I'm hearing?

18         MR. ASSINK:  Not specifically, Your Honor.  We thought

19  perhaps the formal mandate in the order was no longer applying,

20  but our understanding was you would want Mr. Dondero at

21  substantive hearings going forward, and that has been our

22  understanding.  And we would expect him to be before Your Honor

23  at all such hearings.  Part of the basis, the reasoning he's not

24  here today was perhaps as an oversight on my part due to the

25  scheduling, and I had a lot of deadlines yesterday and I think

*Adversary 21-3003, Motion to Compel Discovery*                    20

1   it just maybe fell through the cracks, and I apologize, Your

2   Honor.

3            THE COURT:  All right.

4            MR. ASSINK:  You know, we — Your Honor, —

5            THE COURT:  Well, I'm going to say a couple of things.

6   You know this could have been raised Tuesday, when we were here

7   on the adversary proceeding, in which the preliminary injunction

8   was issued, okay, it would have been — it would have been wise,

9   it would have been very wise to raise the issue.

10           Second, it screams irony, if nothing else, that at a

11  time when I have under advisement a motion to hold Mr. Dondero

12  in contempt of Court that there would be a trip-up, the

13  second-recent trip-up, by the way, where he didn't appear at a

14  hearing.  There was a time a few weeks ago, two or three weeks

15  ago, can't remember what hearing it was then, but he wasn't

16  here.

17           Okay.  The —

18           MR. ASSINK:  Well, Your Honor, I just want to say —

19           THE COURT:  — the third thing I'm going to say — the

20  third thing I'm going to say is I guess I'll issue an order in

21  the main case now, you know, a one- or two-sentence order in the

22  main case saying repeating the sentence that was in the

23  preliminary injunction, that he's going to show up at every

24  hearing.  I never said only at substantive hearings.  The only

25  thing I hesitated on at all, because I've done this in other

Appx 08995

*Adversary 21-3003, Motion to Compel Discovery* 21

1  cases, is sometimes I'll say any hearing at which, you know, the

2  person is taking a position, okay, an opposition, an objection,

3  you know, even if you file a pleading taking a neutral stand, if

4  he's going to file a pleading that requires the Court and all

5  the lawyers' attention to some extent, he's going to need to be

6  in court.  So that's something I thought about doing, but then I

7  was reminded, that I said, no, he's just going to be at all

8  hearings in the future.

9          And procedural, substantive, I never made that

10 distinction and I never would because — because it's taking up

11 time, it's taking up time of the Court, lawyers, parties.  And

12 if he is going to use the offices of this Court or, you know,

13 take up the time of any lawyers, then he needs to be a part of

14 it, okay?

15         MR. ASSINK:  Your Honor, yes, I —

16         THE COURT:  So I thought I made that very clear the

17 last time he didn't show up, but I think —

18         MR. ASSINK:  Your Honor, I apologize.  You know that's

19 certainly not our intention here.  We've been rushing around.  I

20 think this is more — this is more on — on me and just the fast

21 pace with everything.  We would intend that he would be here at

22 all hearings.  We're not trying to make any exception.  We're

23 not trying to say that the preliminary injunction got rid of his

24 obligation to be before, Your Honor.  You know, we weren't clear

25 exactly what the directive was for these kinds of hearings, or

*Adversary 21-3003, Motion to Compel Discovery* 22

1   at least perhaps I wasn't fully, and — but, nevertheless, Your

2   Honor, we would — we would have had him be here.  I think the

3   fast pace with the hearing settings and just everything going

4   on, it might have slipped through the cracks.  It's not — there

5   was no ill will with him not being here, Your Honor.  I

6   apologize.  It's just an oversight on our part.  We would

7   anticipate that he will be here for all future hearings.  You

8   know it's no disrespect to the Court.  It was not an intentional

9   thing.  We apologize, Your Honor.  So I understand the Court's

10  comments.  It's — but I just want to make clear it's we're not

11  trying to be cute, we're not trying to say that, oh, the

12  preliminary injunction is gone, he doesn't have to be here.

13  That's not our intention, Your Honor.  It was I think just an

14  oversight and a scheduling issue this time, but Mr. Dondero will

15  of course appear before Your Honor in all matters going forward,

16  so I apologize.

17          THE COURT:  All right.  Well, again, you're

18  scheduling.  You sought the scheduling, you sought the emergency

19  hearing, and this is the second time we've had this discussion

20  in less than a month.

21          All right.  So, Mr. Morris, back to you.  I think —

22          MR. MORRIS:  Yeah.

23          THE COURT:  — you were about to answer the question of

24  if Mr. Seery is going to be produced and talk about 13 different

25  topics, why is it a big deal to talk about these other seven

 1   topics.

 2          MR. MORRIS:  Because there is no way to prepare a

 3   witness for the vague statements that are being offered by

 4   counsel.  I'll point out that Mr. Aigen is yet another former —

 5   a lawyer who formerly represented Highland and is now suing us,

 6   but we'll dispense with the disqualification motion right now.

 7          Your Honor, here is the deal.  There have to be some

 8   limits, there have to be some reasonable limits.  As you

 9   started, Your Honor, in law school you're taught that a

10   collection case under demand notes is the simplest thing there

11   is.  In fact, in New York there's a special provision in state

12   law that permits a plaintiff to file a motion for summary

13   judgment in lieu of a complaint when they have an instrument

14   such as a note, which is exactly what we have here.

15          Mr. Dondero has already admitted in his answer, in his

16   interrogatories, and in his answers to several requests to admit

17   that the notes are valid, that he received the money

18   contemporaneously with the notes.  When he signed the note, he

19   received the money.  The debtor has made demand and he hasn't

20   paid, so we will be moving for summary judgment on that basis.

21          So let's look at what the defenses are and why we just

22   feel like it's a burden on the debtor to even entertain these

23   concepts.  His first answer, Your Honor, said that the notes

24   were forgiven based on an agreement.  So we asked him in the

25   interrogatory or request to admit, I forget which, show us your

*Adversary 21-3003, Motion to Compel Discovery* 24

1   tax returns that you paid the taxes.  Of course he didn't pay

2   taxes because of course the note wasn't forgiven.  So instead he

3   amends his answers, he amends the affirmative defense to add the

4   words:  Pursuant to a condition subsequent.  Okay, he didn't say

5   that the first time.

6          The first time it was — it was forgiven and now it's

7   not forgiven but it's basically deferred until a condition

8   subsequent.  So he is not even contending.  If you look at his

9   amended answer, he's not even contending that it was forgiven,

10  he's simply saying that the obligation to repay has been

11  deferred pursuant to an oral agreement under which he does have

12  to pay until the debtor completes the liquidation of his assets,

13  basically, if you read it.  That's what it says.  And that's how

14  we got here.

15         I don't know if you picked up on it, Your Honor, but

16  in response to an interrogatory, when we said who made the

17  agreement on behalf of the debtor, Mr. Dondero said that he did.

18  Okay, this isn't an oral agreement unless he was talking to

19  himself.  This is something that happened, according to him, in

20  his head; that somehow he, as the maker of the note, had a

21  discussion with himself in his capacity as the chief executive

22  officer of the debtor, and the two of them, in his head, agreed

23  that he wouldn't have to pay.  Initially wouldn't have to pay at

24  all and now apparently doesn't have to pay until the debtor

25  completes its sale of assets.  That is what the defense is here,

008999

*Adversary 21-3003, Motion to Compel Discovery* 25

1  so let's be very, very clear about it.

2          It's not an oral agreement, it's something that he's

3  making up in his head that he didn't make up the first time,

4  that he changed the second time, and that he — that he can't

5  describe at all.  One of the interrogatories said:  When did

6  this take place.  He didn't answer that part of the

7  interrogatory.  He hasn't told us.

8          And here is the interesting thing, Your Honor.  He's

9  partially performed.  He has admitted in response to — I forget

10 if it was an interrogatory or a request to admit, it's in our

11 papers — he has admitted that in December 2019, after the

12 petition date, and while he was still in control of the debtor,

13 that he made a payment to the debtor, a portion of which was

14 used to pay principal and interest on one or more of the notes,

15 so.  So either he made that payment after he made his agreement

16 in his head that it would be deferred, which makes no sense, or

17 he entered the agreement in his head after the time that he made

18 the payment, which would be in violation of the automatic stay,

19 because how did he just get to forgive or to defer payment of an

20 obligation to the debtor without seeking permission from the

21 Bankruptcy Court.  Those are the only two possibilities here,

22 okay.

23         So I don't want to have to prepare my client for such

24 nonsense.  I don't think we should be required to prepare my

25 client for such nonsense.  And if you take a look at the other

009000

*Adversary 21-3003, Motion to Compel Discovery* 26

 1  so-called affirmative defenses, he's got waiver, but he doesn't

 2  know — he doesn't identify how we waived, when we waived, who

 3  waived.  And, in fact, it's completely contradicted from the

 4  evidence that's already in the record.  Every single monthly

 5  operating report, all of the debtor's contemporaneous books and

 6  records, they're in the record.  I actually submitted them in

 7  opposition to his first request for an adjournment of this

 8  proceeding because I wanted — I put my cards on the table, Your

 9  Honor.  I really don't — I don't like to play games.  I put my

10  cards on the table.  They see all of that.  All of that is

11  there.  The debtor has — can see them.  So how could we have

12  waived everything.

13          Consideration, I'm supposed to prepare my client to

14  answer questions on his defense of lack of consideration, when

15  Mr. Dondero has already admitted that he received the face

16  amount of each note at the time the note was executed?  What —

17  we should not be entertaining this.

18          And let's talk about topics 14 to 17, the so-called

19  other loans that were forgiven.  Mr. Dondero was the president

20  and chief executive officer of this company for decades.  Has he

21  identified one single person who received a forgiven loan?

22  Nope.  Has he identified one loan that was ever forgiven?  Nope.

23  Has he ever contended that he had a forgivable loan?  Nope.

24  He's got this vague and ambiguous defense that somehow — it's

25  not even a defense, frankly.  His defense is that he had an oral

Annex 05058
009001

*Adversary 21-3003, Motion to Compel Discovery*                    27

1    agreement with himself, either he did or he didn't, right.

2    We've got document requests outstanding.  They were due weeks

3    ago.  Mr. Aigen has promised me in writing tomorrow, tomorrow,

4    Friday.  May 21st, he's going to complete his document

5    production.

6              We've gotten two documents so far, two bank statements

7    that show his receipt of the loan proceeds, right.  We don't

8    have — there is no evidence for this.  We don't have the

9    identification of a loan that was ever forgiven.  We don't have

10   the identification of a person whose loan was forgiven.  We have

11   nothing.  How can we possibly prepare?

12             Rule 30(b)(6) actually requires them to describe with

13   reasonable particularity the matters for examination.  How do I

14   prepare my client on — on these things?  What he's trying to do,

15   I think what they're trying to do is be cute, of course, and

16   they're trying to — they want to ask Mr. Seery and Mr. Seery

17   will say, 'I don't have any knowledge of this.'  And then

18   they're going to show up to trial and they're going to put on a

19   case and say, 'Mr. Seery didn't have any knowledge of it, so he

20   can't rebut,' or something — something silly like — I mean I

21   don't really know what they're doing.  This is just such bad

22   faith.

23             Your Honor, you heard counsel say that the loan was

24   forgiven or deferred, but it's not even forgiven.  So — so it

25   doesn't even make sense, but you heard him say that he was

009002

*Adversary 21-3003, Motion to Compel Discovery* 28

1   underpaid, that Mr. Dondero was underpaid and that there's some

2   connection not with forgiveness because he's admitted that he's

3   now changed his story, it hasn't been forgiven.  It was

4   originally forgiven, now it's just deferred, and that that

5   happened because he was underpaid.  Does that make any sense at

6   all?

7           The guy who was in control of this enterprise from day

8   one, and I'm supposed to prepare my client to provide a history

9   of Mr. Dondero's compensation.  He doesn't know what he was —

10  did he not pay his taxes?  Should we go down that path and

11  should I now start subpoenaing his tax returns?  Because I think

12  that's appropriate.  If you want to ask what I have, I want to

13  know what you have.  So maybe Mr. Aigen can agree on the record

14  that I can have Mr. Dondero's tax returns.  If he'll do that

15  maybe I'll reconsider, because this is nonsense, Your Honor.

16  And that's really the point.  And I want to nip this in the bud

17  now because this is the first of five note cases for entities

18  owned and controlled by Mr. Dondero, and the same thing is

19  happening in some of these other cases, Your Honor.  It is.

20          And — and if we go down this path, you know you're the

21  Judge, you make the call, but we're going to be having a lot of

22  these because I'm not volunteering putting my client through

23  this process.  It's not right.  It's just not right.

24          He made an oral agreement with himself?  Please.  You

25  either violated the automatic stay or you partially performed,

009003

*Adversary 21-3003, Motion to Compel Discovery*      29

 1  thereby proving it never happened.  Mr. Aigen says, oh, we

 2  contest it.  We don't sit here and contest it.  The proof is in

 3  the record.  The proof is his client's own words.  The proof of

 4  the documents that we've already put before the Court.  (Briefly

 5  garbled audio) — never happened.

 6        And I just — I just want to nip this in the bud.

 7  That's really our point, Your Honor.  To put forth a client in —

 8  in a notes action, the simplest form of action there could

 9  possibly be, to answer questions on 13 different topics, but

10  there's a limit to what we'll do, and this is our limit.  And

11  that's why we won't — we won't do it in the absence of a court

12  order.

13        THE COURT:  Okay.

14        MR. MORRIS:  Thank you, Your Honor.

15        THE COURT:  All right.  So I will give the last word

16  to you, Mr. Aigen.  What would you like to say in rebuttal?

17        All right.  You must be on mute.

18        MR. [SPEAKER]:  He's on mute.

19        MR. AIGEN:  Sorry.

20        THE COURT:  Okay.

21        MR. AIGEN:  A few quick points, Your Honor.  Number

22  one, counsel has referred to New York procedure on how he could

23  file a quick summary judgment.  Well, he can file summary

24  judgment here too.  They didn't do it.  These defenses are

25  pending, we have a right to take discovery on it.  I think

009004

*Adversary 21-3003, Motion to Compel Discovery* 30

1   that's pretty straightforward.

2          Number two, counsel has repeatedly stated, as he

3   states in his pleading, that we changed our position and that

4   first answer it said that the notes were forgiven.  It doesn't

5   say that.  I'm reading from their pleading at paragraph 16 where

6   they quote our answer, the original one where it says,

7   "Defendant asserts that plaintiff's claim should be barred

8   because it was previously agreed by plaintiff that plaintiff

9   would not collect on the note."  There's no change in the

10  position.  It wasn't asserted before these notes were actually

11  forgiven, so that's just not true, and his own pleadings reflect

12  that.

13          We also heard a lot of conversation about what we have

14  given them.  We have answered their interrogatories.  They

15  didn't ask about other people who may have loans forgiven.  They

16  had never asked about that.  That's why we haven't told them.

17  They could get that information.  They could serve discovery.

18  They're the one that wanted this case on a fast track.  So keep

19  talking about discovery or answers he doesn't have because those

20  are answers to questions he never asked.  There is no discovery

21  out there where they said to us identify the individual who you

22  believe received loans that are forgiven.  They never asked

23  that.  That's why they don't —

24          THE COURT:  Let me —

25          MR. AIGEN:  — that answer, so I don't think that's

009005

*Adversary 21-3003, Motion to Compel Discovery* 31

1    right.

2            THE COURT:  Let me ask you this.  If Bank of America

3    loaned money to Mr. Dondero and he defaulted and they sued him

4    on the note, do you think Mr. Dondero could get discovery

5    regarding all other borrowers or any other borrower that Bank of

6    America may have lent money to and did they forgive some of

7    their indebtedness, did they have special arrangements?  Do you

8    think in a million years a state court judge would allow

9    discovery on this?

10           MR. AIGEN:  Not under that hypothetical, but I would —

11   what I would say, Your Honor, if there was an oral condition as

12   part of that loan and it turns out that everyone knew that Bank

13   of America provided those same oral conditions to a subset other

14   group of lenders — or borrowers, for whatever reason, and the

15   parties disputed that, then I think it would be discoverable.

16   So I think the situation here is —

17           THE COURT:  Oral agreements —

18           MR. AIGEN:  — different from your situation.  I agree

19   with the hypothetical.

20           THE COURT:  I mean again I — you know, oral

21   agreements.  I mean give me examples of case law where oral

22   agreements somehow prevailed at the end of the day.  I mean I

23   just...

24           MR. AIGEN:  And, Your Honor, at summary judgment, when

25   we have to present our case, we'll present our case.  Like I

*Adversary 21-3003, Motion to Compel Discovery*                    32

 1  said, they could have filed the summary judgment on day one,

 2  just like they could do in New York, and said, you know, on the

 3  defenses, but we're doing this and we're doing it on a fast

 4  track obviously with trial in less than two months.  So this is

 5  our one opportunity to get discovery.  And when they filed their

 6  summary judgment, we'll respond with the law.  But until they

 7  do, for whatever reason they have waived it.  They have told you

 8  that it would be burdensome to allow him to answer a few other

 9  questions.  I don't — for one thing, burden was not an objection

10  they made, so he's talking about how it's burdensome and he

11  doesn't want to do it.  But this is our one opportunity to get

12  this information.  And if they file summary judgment, and, you

13  know, these defenses go away, obviously it won't be an issue

14  later, but this is our one opportunity to get this discovery.

15          THE COURT:  Okay.

16          MR. MORRIS:  Your Honor, if I may?  Just one last

17  point.  There is zero chance, zero chance that if any loan was

18  ever forgiven by the debtor that it was on the same terms on

19  which Mr. Dondero now claims his loan would be forgiven or

20  deferred.  And how do I know that?  Because if you look at his

21  response to the interrogatory, the condition subsequent, by

22  them.  And Mr. Aigen is just wrong, he did change his answer.

23  His original answer was that he wouldn't have to pay.  And then

24  his new answer, his amended answer is that he wouldn't have to

25  pay until a condition subsequent.  And when we asked him what

009007

*The Court's Ruling on the Motion to Compel* 33

1    that condition subsequent was, it was the liquidation of certain

2    assets.  Since the liquidation of those assets has not been

3    completed, by definition, no other maker could have had a note

4    or an oral agreement or an agreement of any kind of the type

5    that Mr. Dondero has.  So yet another reason why it fails to

6    meet the burden, they fail to meet the burden under Rule 26.

7    Nobody could have ever had the same note forgiven or agreement,

8    because the condition subsequent hasn't been met yet.

9              <u>THE COURT'S RULING ON THE MOTION TO COMPEL</u>

10             THE COURT:  All right.  Well, I'm going to deny the

11   motion to compel.  I don't think that the burden has been met to

12   establish the relevance of these, I guess it's — one, two,

13   three, four, five — six topics that are now at issue, topics 9,

14   14 through 17, or 20, and, you know, I don't think the

15   proportionality standard is met here.

16             I do think it would be not proportionate to the needs

17   of the case for the CEO, who came in place in 2020,

18   postpetition, two years after these notes were executed, to have

19   to go do research about any loans made by Highland to any

20   officers and employees over the years and, you know, I don't

21   know who he's going to question, what policy he is going to look

22   into that might be some substance or evidence as to oral

23   agreements or forgiveness.  I don't think he should have any

24   obligation to search files and interview people to figure out

25   what the affirmative defenses and Mr. Dondero are all about or

*The Court's Ruling on the Motion to Compel* 34

```
 1   based in.  And, again, no one would have better information

 2   about his own compensation than Mr. Dondero himself.

 3            I mean I want to stress that this comes against a

 4   backdrop of — well, it seems like some antagonism, to say the

 5   least, on the part of Mr. Dondero where Mr. Seery's concerned.

 6   It seems like it's always a fight with Mr. Seery.  And you say,

 7   well, we didn't handpick him as the 30(b)(6) witness, but, you

 8   know, the motion to compel names him by name.  It just — it

 9   feels like another antagonistic move.

10            You've got him for a deposition next Monday on 13 or

11   so different topics.  I think it is appropriate to draw the line

12   on these six or so topics that again just don't seem relevant or

13   proportional to the needs of the case.

14            All right.  So, Mr. Morris, would you please upload

15   just a simple order reflecting the Court's ruling?

16            MR. MORRIS:  I would be happy to, Your Honor.

17            THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18   to do it.  I'm sorry.  I need to be thinking about attorney's

19   fees and who should bear the costs of what.

20            So, Mr. Aigen, would you please electronically submit

21   an order?

22            MR. AIGEN:  Yes.

23            THE COURT:  All right.  Thank you.

24            All right.  Well, if there's nothing else on this

25   particular adversary, let me just double check.  Any
```

Appx 05006
009009

*Adversary 20-3195, Committee's Motion to Stay*          35

1   housekeeping matters before I move onto the other adversary?

2            MR. AIGEN:  Not from the debtor, Your Honor.

3            MR. CLUBOK:  Your Honor, —

4            THE COURT:  All right.

5            MR. CLUBOK:  I don't know if you're about to move on.

6   Your Honor, can you hear me?

7            THE COURT:  I'm sorry, Mr. Clubok?

8            MR. CLUBOK:  Your Honor, —

9            THE COURT:  Were you weighing in on —

10           MR. CLUBOK:  Yeah, I'm — I'm sorry.  It's not about

11  that proceeding, but are you about to move on beyond — beyond

12  the Highland matters?

13           THE COURT:  No, no, no.

14           MR. CLUBOK:  There was another Highland matter —

15           THE COURT:  I was next — I was next going to go to the

16  other adversary, the dispute between the committee and seven or

17  so defendants.  And, yes, I know we have UBS I guess all day

18  tomorrow unless anything has changed.  So we'll — we'll hear

19  before we're done any previews about tomorrow.

20           All right, so moving on —

21           MR. CLUBOK:  Thank you.

22           THE COURT:  — the Committee versus CLO Holdco,

23  20-3195.  We have a committee motion to basically stay the

24  adversary proceeding for 90 days.  So I will get lawyer

25  appearances on that.

009010

*Adversary 20-3195, Committee's Motion to Stay*                                    36

```
 1              Who do we have appearing for the committee, the
 2   movant?
 3              MS. MONTGOMERY:  Yes, Your Honor.  Paige Montgomery
 4   for the committee.
 5              THE COURT:  All right.  And for the defendants, who do
 6   we have appearing?
 7              MR. PHILLIPS:  Good morning, Your Honor.  Louis M.
 8   Phillips on behalf of Highland Dallas Foundation and CLO Holdco
 9   Ltd., along with my associate Amelia Hurt.
10              THE COURT:  All right.  I saw your —
11              MR. DRAPER:  Good morning, Your —
12              THE COURT:  — pleading filed at 9:00 something last
13   night.
14              Any other defendant appearances?
15              MR. KANE:  Yes, Your Honor, —
16              MR. DRAPER:  Yes, Your Honor.  Douglas Draper on
17   behalf of the Dugaboy Investment Trust —
18              THE COURT:  All right.  Thank you.
19              MR. DRAPER:  — and Get Good.
20              THE COURT:  Oh, okay.  Thank you.
21              Other appearances?
22              MR. KANE:  Yes, Your Honor.  John Kane on behalf of
23   Grant James Scott, III.
24              THE COURT:  Okay.  Mr. Kane, your volume was very low.
25   You're — you're Mr. Scott's counsel as trustee for these trusts?
```

Appx 05068
009011

1          MR. KANE:  In — in a sense, Your Honor, and in his

2    individual capacity.  I no longer represent CLO Holdco.

3          THE COURT:  Okay.  I don't know if you got that at

4    all, Michael.  It was so faint.

5          THE REPORTER:  Yeah, I got a little of it, but it —

6          THE COURT:  Okay. you're no longer representing CLO

7    Holdco, Ltd., but you're representing Grant Scott in his trustee

8    capacity for these two trusts?

9          MR. KANE:  Your Honor, Grant Scott is no longer the

10   acting director or trustee of CLO Holdco, but he was a named

11   defendant in this action based on his time as trustee or

12   director of CLO Holdco, and I represent him in that capacity.

13         THE COURT:  Okay.  Any other defendant appearances?

14         MR. ASSINK:  Good morning, Your Honor.  This is Bryan

15   Assink for Mr. Dondero.

16         THE COURT:  Okay.  Any other appearances?

17         All right.  Well, Ms. Montgomery, you may make your

18   argument.

19         MS. MONTGOMERY:  Thank you, Your Honor.  And thank you

20   for taking the time to consider our motion so quickly.

21         I'd like to just briefly address how we plan to

22   proceed today.  To make more time, we'd like to give a brief

23   opening statement.  I'm not sure who among the defendants

24   intends to be heard specifically today in opening, but at the

25   conclusion of that we would like to proceed to testimony.  We

009012

*Adversary 20-3195, Committee's Motion to Stay*                    38

1   have Mr. Kirschner, who you can see on the screen, Your Honor,

2   and he's here today. We plan, for efficiency sake, to put him

3   on by proffer to the extent that that is acceptable to the

4   Court. And then he will be available to answer any questions

5   that the Court or the defendants may have.

6              THE COURT: All right.

7              MS. MONTGOMERY: As you can see in our motion, we're

8   requesting a 90-day stay of the adversary proceeding. And the

9   purpose for that stay is to allow Mr. Kirschner and his firm,

10  Teneo, the time they need to get up to speed on this case.

11             Stepping back for a moment, it was always the

12  committee's intention have these claims prosecuted by the

13  ultimate litigation trustee. However, due to a disagreement

14  about certain funds that are held in the Court's registry, the

15  clock started ticking on the committee's time to bring this

16  adversary proceeding. So but for the order that the committee

17  commenced an adversary proceeding by a date certain, this action

18  would have been brought at a later time by a litigation trustee

19  post effective date as part of a comprehensive litigation

20  strategy related to all estate claims.

21             For a variety of reasons the effective date of the

22  plan has been repeatedly delayed, which has necessarily delayed

23  the formation of the litigation subtrust. We're coming up on

24  two years since the filing of the bankruptcy proceeding and

25  there's limited time available for the trust to be formed and

*Adversary 20-3195, Committee's Motion to Stay*                    39

1    the trustee to develop a comprehensive litigation strategy.

2              As the Court may have noted, as we are wrapping things

3    up, two of our four committee members have also recently

4    retired/withdrawn from the committee.  So as a result last

5    Friday, the committee filed an application —

6              THE COURT:  Just inquiring minds want to know.  I mean

7    did they — did they by chance sell their claims or they just

8    were tired of the committee role?

9              MR. CLEMENTE:  Your Honor, if I may?  It's Matt

10   Clemente.  I'll just jump in on that, Your Honor, —

11             THE COURT:  Um-hum.

12             MR. CLEMENTE:  — very quickly.  I don't know how

13   anybody could be tired of being on the committee, but the answer

14   is, Your Honor, that they both sold their claims and

15   claim-transfer notices have been placed on the docket.  The

16   United States Trustee is aware and the trustee's position at

17   this point is to keep the committee at the two members, which

18   are Meta E and UBS, as we continue forward here through the case

19   and hopefully to an effective date in the near future.

20             THE COURT:  All right.  Thank you.

21             All right.  Ms. Montgomery, continue.

22             MS. MONTGOMERY:  Thank you, Your Honor.

23             So as a result, last Friday the committee filed an

24   application to retain Mr. Kirschner and his firm as litigation

25   advisor to the committee until the plan goes effective and the

Trustee 05074
009014

*Adversary 20-3195, Committee's Motion to Stay* 40

 1   litigation subtrust is formed.  At that point Mr. Kirschner will

 2   become the litigation trustee under the plan and he'll be

 3   responsible for all claims brought seeking recovery on behalf of

 4   the estate.  So obviously under the terms of the plan, our

 5   client, the committee, will cease to exist at that point and

 6   responsibility for the adversary proceeding that we're currently

 7   being heard in will pass to the litigation trustee.  And there

 8   will be a new oversight committee, which has not been formed yet

 9   either as of the effective date.

10        So because this adversary proceeding will transfer to

11   the litigation subtrust upon the effective date of the plan,

12   it's imperative that Mr. Kirschner be involved in the

13   prosecution of the adversary proceeding immediately and the

14   development of legal strategy for all of the estate claims as a

15   whole.  For a number of reasons, the 90-day stay of the

16   adversary proceeding will provide Mr. Kirschner with the

17   necessary time he needs to get up to speed.

18        Mr. Kirschner needs to familiarize himself with the

19   Byzantine structure of the debtor and the relationships among

20   the debtor and its thousands of related entities and insiders.

21   The corporate structure, as you have noted on several occasions,

22   is highly complicated.  And the ownership and beneficial

23   ownership of entities is confusing enough even before you

24   consider the variety of transfers of estate assets between and

25   among those entities — entities.  We've heard these

1  relationships described as tentacles.  I tend to think of them

2  as a web, and the allegations of this adversary proceeding

3  represent only a small section of strands.

4         Mr. Kirschner also needs time to familiarize himself

5  with the pending motions to withdraw the reference and the

6  motions to dismiss, and to develop the strategy which could

7  significantly change the trajectory of the adversary proceeding

8  and future adversary proceedings.  Mr. Kirschner's decisions

9  regarding how to respond to these motions may change the course

10 of the litigation in ways that are material to the pending

11 motions.  For example, he could determine to amend the complaint

12 or he could bring additional claims that the committee does not

13 have standing to bring on its own.  For example, breach of

14 fiduciary duty.  Importantly, there could be arguments

15 surrounding the motion to withdraw the reference and have

16 impacts on the other actions that may be brought by Mr.

17 Kirschner in his role as litigation trustee.

18        The strategy surrounding plaintiff's response to the

19 motion to withdraw the reference may also depend on facts that

20 have not yet been developed.  Mr. Kirschner should be given at

21 least some time to develop that strategy.

22        It's also worth noting that the notice period on Mr.

23 Kirschner's retention application does not end until June 7th,

24 which is after the current hearing date for the motions to

25 withdraw the reference, which are set for June 3rd.  Given his

Appx 05073

009016

*Adversary 20-3195, Committee's Motion to Stay*      42

1  proposed role as litigation advisor and his future role as

2  litigation trustee, he will be responsible for this adversary

3  proceeding, he should be involved in the strategy to oppose the

4  motions to withdraw the reference.

5         As you know, Your Honor, the Highland entities have an

6  extremely complex structure involving obscure relationships and

7  ownership structures. Mr. Kirschner not only has to get up to

8  speed with those facts, but he also needs to wrap his hands

9  around the transfer of information obtained from both the debtor

10  and the committee over the course of these proceedings. So this

11  adversary proceeding is just one part of the complexity that is

12  the estate claims, but it's an important part and he should have

13  time to ensure that he's proceeding in the most efficient way

14  and in the way that's best for the debtor's estate.

15         In addition to needing to get up to speed on the facts

16  giving rise to this case, Mr. Kirschner is also — will be

17  working on a comprehensive strategy for all estate claims. As

18  pointed out in the response that was filed last night, since he

19  is familiar with the adversary proceeding, obviously, we filed

20  it, and we did so after tedious review of thousands of

21  documents, and it took us months to put together a picture of

22  the transactions that are underlying the complaint, and those

23  months were after we had been actively involved in these

24  proceedings for over a year, so it's a very complicated —

25  there's some pretty complicated stuff going on there.

Appx. 05074
009017

*Adversary 20-3195, Committee's Motion to Stay*                    43

1          We also believe that we provide competent

2    representation, which is at least tangentially challenged in

3    that response, but we're the lawyers that represent the

4    committee.  We're not the party that's responsible for the

5    decisions of the underlying management of the litigation.

6    Obviously lawyers take direction from their clients and ours as

7    of the effective date will no longer exist, and Mr. Kirschner

8    will be the person who's responsible for making those decisions.

9          So to put it slightly differently, we may be driving

10   the car but we're not deciding, you know, where the car is

11   going.  That's the client's decision.

12         I am at least somewhat offended by opposing counsel's

13   implication that the motion to stay was brought in bad faith

14   because it smelled that there might be some litigation

15   advantage.  All I can do in response to that, Your Honor, is

16   assure the Court that the stay is not being sought for such a

17   purpose.  To the extent that there's any gamesmanship occurring

18   in these proceedings, it's not us that's engaging in it.

19         Mr. Kirschner is entitled to gain his own

20   understanding of the issues underlying this adversary and of the

21   litigation landscape as a whole, and to have an orderly

22   transition of responsibilities from the committee, the debtor,

23   and counsel for both before he's asked to make important

24   strategic decisions that could have long-lasting implications on

25   his work.

Annex 05075
009018

*Adversary 20-3195, Committee's Motion to Stay*                    44

1          In short, Your Honor, there is no rush to have the

2    pending motions heard and no prejudice to defendants by a stay

3    of proceedings.  As they point out in their response, the Court

4    has delayed the hearing on the motion to dismiss until after

5    consideration on the motion to withdraw the reference.

6    Additionally, as they make clear in their response, discovery is

7    not underway at this point.  We still haven't effectuated

8    service as to all defendants.  We have some defendants that are

9    foreign entities and we're still working through the service of

10   process.  We're not entirely sure how much longer that's going

11   to take, but it has proven to be a lengthy process to date, and

12   we don't really have an estimated time for when that will be

13   done.  So, if anything, there is an ideal time for a pause on

14   proceedings that won't prejudice any party.

15          The only purported harm our opponents have identified

16   is the delay itself, and I have to admit, Your Honor, that this

17   is the first time I've ever heard a defendant argue that they're

18   prejudiced by litigation against them not proceeding.  In fact,

19   we reviewed the cases that are cited in the response that

20   purport to support a right of good — to a determination of

21   rights and liabilities without undue delay.  Unsurprisingly,

22   both involve instances of a defendant seeking to delay

23   prosecution of a plaintiff's case rather than the reverse, as we

24   see here.  And in those cases, the stays that were sought were

25   either indefinite or extremely long.  They were not a brief

Annex 005076
009019

*Adversary 20-3195, Committee's Motion to Stay* 45

1  90-day extension of the sort recognize requested here.  There's

2  simply no prejudice to the defendant in the adversary by staying

3  the proceeding for 90 days.

4       On the other hand, the 90-day stay of the adversary

5  proceeding will provide Mr. Kirschner with the time that he

6  needs to develop an understanding of this adversary proceeding

7  and the litigation strategy as a whole.  And moving forward

8  without the stay may very well prejudice the future litigation

9  subtrust and harm the debtor's estate.

10      That's all I have for now, Your Honor.

11      THE COURT:  All right.  A couple of questions.  You

12  said there's been no service on certain defendants, and I know

13  that certain of these defendants are said to be Cayman Island

14  entities, these various Charitable — Charitable Daf (phonetic),

15  maybe CLO Holdco Ltd, Charitable Daf Fund, those three in

16  particular, right, right foreign entities?  Okay, so they have

17  gone —

18      MS. MONTGOMERY:  Yes, Your Honor.

19      THE COURT:  — they have not — those are the three, I

20  presume, that have not been served?

21      MS. MONTGOMERY:  CLO Holdco has been served, the

22  others have not.

23      THE COURT:  Okay, okay.  Thank you.  I'm sorry, I'm

24  getting a little mixed up.  So there's been money in the

25  registry of the Court and I remember that was why early on I

009020

*Adversary 20-3195, Committee's Motion to Stay*      46

1  sort of created a quick time table for you all getting this

2  filed.  How much money is still in the registry of the Court?  I

3  remember there were agreed orders that some of it could be paid

4  over, I think, to Mr. Rocatta (phonetic).  I can't remember who

5  — who all.  But is there still a substantial fund in the

6  registry of the Court without me going online and looking that

7  up?

8           MS. MONTGOMERY:  I'm going to have to look and get the

9  exact numbers as well, Your Honor, but it's the portion of the

10  moneys that were purportedly payable to CLO Holdco are still in

11  the Court's registry.

12           THE COURT:  Okay.  So it's just that defendant's

13  funds.  And am I also correct that now the debtor ultimately has

14  a majority interest in CLO Holdco, the debtor itself, because of

15  that Harbor Vest (phonetic) settlement?

16           MR. PHILLIPS:  No, Your Honor.

17           THE COURT:  Oh, that's not right?

18           MR. PHILLIPS:  I don't think so, no.

19           MR. KANE:  Your Honor, this is John Kane.  I can

20  actually provide some clarity on that.  The Harbor Vest

21  acquisition by the debtor's affiliate relates to HCLOF, Highland

22  CLO Funding, not CLO Holdco.  CLO Holdco is the 49-percent

23  interest owner in HCLOF.

24           THE COURT:  Okay.

25           MR. DEMO:  And this is Greg Demo, Your Honor, from the

*Adversary 20-3195, Committee's Motion to Stay*     47

1   debtor.  I can confirm what Mr. Kane just said.

2         THE COURT:  Okay, okay.  So CLO Holdco is just

3   strictly in that line of the Charitable Daf and as far as who

4   owns — who owns it —

5         MS. MONTGOMERY:  That is — that's my understanding,

6   Your Honor.

7         THE COURT:  Okay, okay, so I — once again I have

8   flipped the organizational structure.

9         All right.  And then my last question for you, Ms.

10   Montgomery, is the effective date of the plan has not occurred.

11   There's obviously an appeal now at the Fifth Circuit, a direct

12   appeal of the confirmation order.  Is there still a stay pending

13   appeal — a motion for a stay pending appeal pending out there

14   either at the District Court or Fifth Circuit, or have those

15   been ruled on one way or the other?

16         MS. MONTGOMERY:  Mr. Demo, could you — were you

17   popping on to answer that question?

18         MR. DEMO:  Yes, Ms. Montgomery.

19         This is Greg Demo, Your Honor, from Highland Capital

20   Management.  We still intend to try to go effective after the

21   hearing on the exit financing, which has been postponed until

22   June 25th.  That's counsel to NexPoint Advisors, and counsel to

23   Highland Capital Management Fund Advisors filed a motion last

24   night with the Fifth Circuit seeking a further stay of the — of

25   the effective date, pending the resolution of their appeal.  So

Appx 05979
009022

*Adversary 20-3195, Committee's Motion to Stay*          48

 1  we don't know how that's going to shake out, but the debtor does

 2  anticipate trying to go effective following June 25th.

 3          THE COURT:  All right.  So has there been a stay of

 4  the confirmation order?

 5          MR. DEMO:  We've agreed to a short administrative

 6  stay —

 7          THE COURT:  Okay.

 8          MR. DEMO:  — as all this stuff has been going on.  I

 9  believe the administrative stay — actually I can't remember when

10  it expires, but we have agreed to a short administrative stay.

11          THE COURT:  Okay.  And so it's —

12          MR. DRAPER:  Your Honor, this is Douglas Draper.

13          THE COURT:  Okay, go ahead.

14          MR. DRAPER:  Just to give the Court some background, —

15          THE COURT:  Go ahead.

16          MR. DRAPER:  — there were two — you denied the stay

17  pending appeal.  There were two appeals taken from your ruling.

18  One by myself on behalf of Dugaboy and one by Devor (phonetic)

19  on behalf of other entities.  They both went up to Judge Godbey.

20  He has never ruled on the stays pending appeal.  So what was

21  done is inasmuch as the motion — the appeal of the confirmation

22  order is up in the Fifth Circuit, last night Devor filed a

23  motion for a stay pending appeal in the Fifth Circuit, and

24  that's pending.  So that's the procedural background of what's

25  gone on.

*Adversary 20-3195, Committee's Motion to Stay* 49

1    THE COURT:  All right.  Thank you, Mr. Draper.

2    All right.  Well, I'll hear opening statements from

3  our defendants.  And I ask you please not to be duplicative of

4  each other.  So who wants to go first for the defendants?

5    MR. PHILLIPS:  Your Honor, Louis M. Phillips on behalf

6  of Highland Dallas Foundation and CLO Holdco Ltd.  We filed a

7  response in opposition to the motion to stay.  And we are the

8  ones who, my firm and I, and I'm the one that filed, that sent

9  messages across to counsel for the committee in response to the

10  request for consent or notice of opposition.  So I guess since

11  we filed the response we ought to go forward.

12    We have reviewed the — we laid out a time line in our

13  response.  We've laid out communications between counsel and our

14  response.  We laid out what we think the burden is.  And we've

15  laid out the case law that we think establishes the burden for a

16  stay.

17    What we are concerned about is the — first of all, the

18  90-day stay, it might even come around as far as further

19  activity in the lawsuit because we don't know what the Court

20  would do on June 3rd.  We know that the Local Rules require that

21  — or set forth that the Court will issue a report after the

22  conference on June 3rd about — to the District Court concerning

23  the motion to withdraw reference.  We filed a motion to withdraw

24  reference.  We filed a first response to the litigation, A, a

25  motion to withdraw reference; and, B, a motion to dismiss under

009024

*Adversary 20-3195, Committee's Motion to Stay*                    50

1    Rule 12(b)(6) and a motion for a more definite statement as

2    well.  Both our filings were followed by other defendants who

3    sought withdrawal of the reference and also dismissal.

4           This Court has pushed aside the motion to dismiss

5    pending resolution of the — of the motion to withdraw reference,

6    which we think is entirely appropriate and we're fine with, so

7    where we are, Your Honor, —

8           THE COURT:  And let me — let me just interject there.

9    That is always 100 percent of the time my practice, and I think

10   the other bankruptcy judges here.  It's out of deference to the

11   District Court.  If the District Court ends up withdrawing the

12   reference, they may want to say, 'I want to withdraw the whole

13   darn thing.  We don't even want you doing pretrial matters,' so

14   we don't want to get ahead of them by considering a pretrial

15   matter.  So I did what I do in every case and will take the next

16   steps —

17          MR. PHILLIPS:  And we agree a hundred percent with

18   that approach, Your Honor.  We didn't really know how we were

19   going to proceed on the motions to dismiss.  But we had

20   deadlines to filing and we got very brief extensions for one of

21   our clients to file a response to the complaint after service.

22   On the other client, we didn't get any extension to file a

23   response.  So we filed timely responses and we didn't know how

24   the Court was going to handle the motion to dismiss.  And the

25   way the Court just handled them is entirely what we — we agreed

009025

 1   that that was the way to do it, because the District Court has

 2   several alternatives if it determines to withdraw the reference.

 3   And we know the courts, we've looked at the Court's Local Rule.

 4   We just don't know how long, and we have no control and we're

 5   fine with having no control over how long the Court would —

 6   would have to take, given its docket, to issue its report to the

 7   District Court.  And we have no control over what the District

 8   Court would do.

 9            Our problem with the motion for a stay is that we know

10   that the only things really pending now are motions to withdraw

11   reference.  Those are subject to being brought before Your Honor

12   at either kind of a hearing/conference where the parties will

13   put forth their legal arguments and any evidence, but the

14   evidence will basically be the nature of a litigation and the

15   situation of the docket.  So there's no real factual issues in

16   dispute.  We have a lawsuit, we have a motion to withdraw

17   reference that's been briefed.  We grant an extension of the

18   response deadline to May 21st in connection with the request by

19   counsel.  And we purposely asked the Court for the June 3rd

20   date, all with agreement of all counsel.  And then two days we

21   get the emergency motion — or last night, yesterday we get the

22   emergency motion to stay when the litigation assistant was, in

23   fact, retained on the day or two after we filed our responses.

24   And there was no mention in any way, shape, or form of a need to

25   stay at that time.

*Adversary 20-3195, Committee's Motion to Stay*                        52

1          So we have one thing pending:  Motions to withdraw the

2    reference.  We have reviewed and set forth in our response the

3    scope of services for which Teneo was being retained.  It does

4    look to us like it is — it looks like litigation support and

5    litigation analysis.

6          And I hear what counsel for the plaintiff is saying,

7    but there have been — she's — we agree that there has been

8    months and months and months of analysis, there have been

9    millions and millions and millions of dollars spent on U.S. —

10   UCC counsel fees.  They have gone through thousands and

11   thousands of documents.  They came up with this piece of

12   litigation.  This is the one I know about.  This is the one

13   pending before the Court.  And there might be — there is a

14   suggestion that there is an overarching litigation strategy

15   being employed, but this is what we have right here.  And that's

16   speculation that we have no idea about and we assume the Court

17   has no idea about.

18         So we have one thing that we want decided and it's

19   easy for a plaintiff to say — and, look, we're chastised for

20   being defendants who want to move the lawsuit.  One of our

21   clients didn't even ask for an extension of the deadline to

22   respond.  We have — we asked for one extension for one of

23   clients.  And that extension dovetailed into the response date

24   for the other client so that we could file a single response for

25   both clients.  That was granted.  We appreciate that.  And when

Amex 05984
009027

1    the committee asked for an additional time, we granted it with

2    the proviso that we get the June 3rd date so that if we need to

3    file a reply, we'd have three or four days to file the reply.

4            We have been — we have not been the ones asking for

5    any delay and we're not going to ask for any delay.  And so I

6    don't care what other cases say, I don't care what the

7    plaintiff's lawyer says about defendants always want to delay.

8    We're not asking for any kind of delay.  We want to move

9    forward.  And we think we have the right to figure out and find

10   out what court is going to be handling our litigation.  That's

11   what we're asking for.

12           We've already said in the communications that we've

13   listed on our witness and exhibit list that we'll be more than

14   happy to talk about some type of stay about motions — you know,

15   discovery, whatever, whatever, if there — if the litigation

16   advisor needs to get up to speed on what documents are out

17   there, what documents it would have to review, that's fine.

18   We're probably going to do some discovery.  But we're only going

19   to discovery if our motion to dismiss under 12(b) are not

20   granted, because if they are there doesn't need to be any

21   litigation advice or any analysis about alternatives or

22   objectives or overarching strategy to deal with the motion to

23   dismiss under Rule 12(b).  That's a legal issue.  And the

24   counsel is very adept — we say counsel's adept.  We know they're

25   adept.  That's why we know that they are ready to proceed in

Appx 05985
009028

```
 1    response to our motion to withdraw reference.

 2            And then if the District Court takes it after Your

 3    Honor gives her report, then we'll bring the motions, we'll get

 4    with the lawyers for the plaintiff and we'll make — bring our

 5    motion to dismiss before the District Court on some kind of

 6    agreed schedule, but those are legal issues.  There is no advice

 7    needed for a motion to withdraw reference.  There's no advice

 8    needed for a motion to dismiss under 12(b).  Those are legal

 9    questions and — and the idea that Sidley and Austin needs

10    assistance from an advisor as to how to approach a legal issue,

11    we don't think is meritorious.

12            So, Your Honor, we have put — we have a witness and

13    exhibit list of six documents.  One is — Document 1 is the

14    application to employ the Teneo firm.  2 is the — 2, 3, 4, 5,

15    and 6 are email communications we have provided them.  They are

16    between counsel that are before the Court here today, just to

17    show that we granted extension for them to respond, then they

18    ask, and we responded, and so that they were on notice that we

19    opposed the requested stay.  And we would like for the motion to

20    withdraw reference to go forward.

21            The parties will have plenty of time to work out

22    discovery, Rule 26 issues, motion for relief — motion to dismiss

23    under 12(b) in front of whichever court is going to handle it.

24    Certainly this Court is — if the motion to withdraw reference is

25    denied, this Court will be in full control of when we have
```

1   hearings on the motion to dismiss. And we understand that. So

2   will the District Court if the District Court grants the motion

3   to withdraw the reference. The District Court will determine

4   hearings on the motion to dismiss under Rule 12(b). And then we

5   have those two things to get past. And those are legal

6   questions, legal questions that are already before the Court or

7   already there. So we don't see how additional time is necessary

8   with respect to that.

9       We think by the time the stay — quote stay expires

10  we'll have a determination at least on the withdrawal motions.

11  And we can probably have a setting on the dismissal motions.

12  And if there — if the plaintiffs survive dismissal, then we'll

13  have discovery that all litigants will be involved in and

14  agreeing to and with scheduling orders, et cetera, from whatever

15  court is going to try this case.

16       And I'd like to say also that once we have — CLO

17  Holdco has been involved in the bankruptcy case. We recognize

18  that. I was not the lawyer for CLO Holdco, but I'm representing

19  CLO Holdco now. The Highland Dallas Foundation has not been.

20  And the Highland Dallas Foundation is a charitable organization

21  that has institutional people on the board, has one donor seat

22  on the board, but it's — it's being sued for twenty something

23  million dollars. And the idea that it has no interest in

24  getting this resolved is not correct. It wants to get it

25  resolved and that's why we're opposing this stay. Thank you,

Appx 05987
009030

1   Your Honor.

2           THE COURT:  All right.  A couple of follow-up

3   questions.  I'm struggling a bit with the fact that we have a

4   couple of defendants, two or three defendants that have not even

5   been served yet.  So is it appropriate for this Court to be

6   going forward on a motion to withdraw the reference when I don't

7   know what's going to happen with those two defendants.  Are they

8   going to be served?  If so, what sort of position are they going

9   to have with regard to the reference being withdrawn?

10          And, in any event, ultimately I'm going to have to

11  slice and dice this in a report to the District Court saying,

12  you know, these entities filed proofs of claim and that may

13  affect the authority of the Court, you know, maybe it does.  I

14  mean a part of me thinks what's going on here and should we just

15  wait till they have been served so we have the ability to report

16  to the District Court:  Here is every defendants' position on

17  this.

18          MR. PHILLIPS:  Your Honor, I can't answer the

19  question.  I don't — I mean it seems to me like we have — we

20  have — CLO Holdco was served.  And it is a foreign entity.  We

21  don't know why the other two have not been served.  I'm not — we

22  just don't know.  So I mean does that mean if we — I mean we had

23  to go forward, we had to answer, we had to respond.  We had a

24  deadline to do it.  It didn't matter that two hadn't been

25  served.  And so we — you know, if we hadn't responded, given our

1    service, we would have had a default entered against us and a

2    request for a default judgment.  So I don't know the answer to

3    the question because I can't imagine that a plaintiff can file a

4    lawsuit and then the lawsuit was filed months ago and not serve

5    two people and keep the defendants hung up.

6            I don't know if there is a problem of service.  There

7    was one entity that got served that is a foreign entity.  I

8    don't know why the other ones haven't been served.  The Highland

9    Dallas Foundation was served.  The other parties who have

10   appeared were served.  So we have no control over that because

11   we're not serving anybody.  And I would think that the part — I

12   did some looking in the — in the record and it seems to me like

13   we don't have — you know, I can't tell you whether we have —

14   what the arguments would be for the parties who have not been

15   served.

16           I would assume given that everybody has — my two

17   clients have filed what they filed.  CLO Holdco filed a proof of

18   claim, but it was in effect disallowed and converted to a claim

19   for zero.  My other client, Highland Dallas Foundation, has not

20   made any appearance in this case.  So all I can say is we think

21   two — I think the two clients that I'm currently representing,

22   we know they have been served.  We had a deadline to respond.

23   We have responded.  And we think we're entitled to a jury trial

24   and withdrawal of the reference.

25           MS. MONTGOMERY:  Your Honor, if I can answer the

*Adversary 20-3195, Committee's Motion to Stay*                                58

1    question.  CLO Holdco was served through its counsel, whereas

2    the other two foreign entities require domestication of the

3    subpoena in the Caymans.  And it's our understanding that may

4    take as long as — just having heard — as another two months for

5    that process to be complete.

6              THE COURT:  All right.  My other question I guess is

7    maybe more rhetorical than something you could really answer.  I

8    — you know — on the one hand, you know, what Ms. Montgomery is

9    arguing:  Our true plaintiff contemplated for this lawsuit isn't

10   in place yet because the plan hadn't gone effective and, you

11   know, some — some of the defendants here or affiliates of

12   defendants are wanting to delay, delay, delay further when the

13   plan can go effective.  You know last night a motion for stay

14   pending appeal with the Fifth Circuit was filed.  So it's like,

15   no, don't let the plan go forward, let's not get Mr. Kirschner

16   in place.  But, oh, don't issue a stay on this lawsuit.  It just

17   feels a little bit inconsistent, the two positions.  What — do

18   you have anything to say to that?

19             MR. PHILLIPS:  I have — all I have to say, all I can

20   say, Your Honor, and that is CLO Holdco, as I understand it, is

21   not an appealing party.  My other client that's been served,

22   Highland Dallas Foundation, is not an appealing party.  We're a

23   defendant in — in this lawsuit.  And so we don't see — we're not

24   in a position to be inconsistent about anything.  We're not an

25   appellant.  We're not seeking any kind of relief on appeal.  And

009033

*Adversary 20-3195, Committee's Motion to Stay*                    59

1   we — but we are defendants who have been served and who have

2   filed motions to withdraw reference.  So you will have to ask

3   other people about that.  I'm completely consistent in my

4   position.

5          MR. DRAPER:  Your Honor, this is Douglas Draper on

6   behalf of Dugaboy, who has both —

7          THE COURT:  All right.

8          MR. DRAPER:  — appealed your decision —

9          THE COURT:  Okay.

10         MR. DRAPER:  — and has asked for a stay pending

11  appeal.

12         THE COURT:  Okay.

13         MR. DRAPER:  It's not an inconsistent position because

14  two reasons.  Number one, you gave the committee authority to

15  file this suit.  The committee took that authority and filed the

16  suit within the time period.  So whether the case is going

17  forward or — the stay — the case is stayed and the confirmation

18  order is stayed or not, this action and this entity and this

19  proceeding is going to go forward.

20         And so all we're talking about here, just so we — it's

21  all clear, we're just talking about who is going to try this

22  suit.  We're not talking about a master litigation strategy.

23  We're talking about a location.  And, quite frankly, it would

24  surprise the hell out of me if — if the new person, or whoever,

25  says, look, I want to go to the District Court.

009034

*Adversary 20-3195, Committee's Motion to Stay*                60

1          This is just a location issue, nothing more.  You can

2    sift through each one of these defendants who have been served

3    as to whether we have a right to a jury trial or not.  And each

4    one, as the Court recognized, is on a — on a defendant-by-

5    defendant basis.  I did file a proof of claim.  Whether I have a

6    right to a jury trial, you're going to have to look at to see if

7    in fact my proof of claim relates to this claim.

8          Mr. — Mr. Phillips is a defendant set of facts.  And

9    these other defendants may be a different set of facts.  So all

10   we're talking about is location.  It is purely procedural.  And

11   I don't think the stay at the district — of the confirmation

12   order or not is — is in any way impacts this whatsoever.  This

13   is a location question.

14         THE COURT:  All right.  Any other opening statements

15   from defendants?

16         All right.  Ms. Montgomery, you may put on your

17   witness.  And I'm fine with the proffer, but we'll then swear

18   him in and see if there cross-examination from the others.  All

19   right, you may proceed.

20         MS. MONTGOMERY:  Yes, Your Honor.  At this point we'd

21   like to proffer Mr. Kirschner's declaration that was submitted

22   in support of our motion for the stay as the content of his

23   proposed testimony.  Mr. Kirschner is obviously here to answer

24   any questions you have or on cross-examination after he's been

25   sworn in.  And, Your Honor, we would just reserve our right to a

009035

1    brief redirect should that prove necessary.

2            THE COURT:  All right.  So I have in front of me the

3    Declaration of Marc S. Kirschner.  It was actually attached to

4    the committee's motion for stay.  It's about four pages long.

5            Let me ask:  Are there lawyers who are going to want

6    to cross-examine Mr. Kirschner?

7            Going once, going twice, no one wishes to

8    cross-examine him?

9            THE REPORTER:  He's on mute.

10           THE COURT:  Oh, Mr. Phillips, —

11           MR. PHILLIPS:  Your Honor, I'm sorry.  I was on mute.

12    I'm on mute, as I probably already muted, but I was on mute and

13    I apologize.

14           Your Honor, this — this is — this declaration, there's

15    no way to cross-examine a declaration that speaks in conclusory

16    language.  The declaration, it was mimicked and mirrors —

17    mirrors exactly as the party looking into the mirror, not as the

18    reverse of the party looking into the mirror, argument by —

19    opening statement by counsel.  I would ask a couple of questions

20    of Mr. Kirschner, please.

21           THE COURT:  All right.  Mr. Kirschner, I need to swear

22    you in.  Would you speak up, say, "testing one, two."

23           MR. KIRSCHNER:  Yes.  Testing one, two.

24           THE COURT:  All right.

25           MR. KIRSCHNER:  Coming through?

*Kirschner - Cross/Phillips* 62

| | |
|---|---|
| 1 | THE COURT: I — I hear you, I don't see — |
| 2 | MR. KIRSCHNER: Okay. |
| 3 | THE COURT: There you are. Please raise your right |
| 4 | hand. |
| 5 | MR. KIRSCHNER: I can. |
| 6 | <u>MARC S. KIRSCHNER, COMMITTEE'S WITNESS, SWORN/AFFIRMED</u> |
| 7 | THE WITNESS: I do. |
| 8 | THE COURT: All right. Thank you. |
| 9 | Mr. Phillips, go ahead. |
| 10 | MR. PHILLIPS: Yes, Your Honor. Thank you. Just a |
| 11 | couple of questions. |
| 12 | <u>CROSS-EXAMINATION</u> |
| 13 | BY MR. PHILLIPS: |
| 14 | Q. Mr. Kirschner, in paragraph 7 of your declaration, if you |
| 15 | could find it. Just let me know when you're there. |
| 16 | A. I'm there. Thank you. |
| 17 | Q. Okay. Thanks. You say that it's important for your firm to |
| 18 | gain an understanding of the complex transactions described in |
| 19 | the adversary proceeding, particularly in connection with the |
| 20 | motion to dismiss and motions to withdraw reference and complex |
| 21 | issues before the Court. What does that mean? |
| 22 | A. That means that, as Ms. Paige indicated in her opening |
| 23 | statement and as the Court and all the defendants understand, I |
| 24 | was — when I was designated as litigation trustee in January, |
| 25 | there has been delay after delay after delay in the effective |

Avenatti_95994
009037

*Kirschner - Cross/Phillips*                                          63

 1   date of the plan, and now we're even at the Fifth Circuit, so

 2   the trust and my role as subtrustee has not yet gone into

 3   effect.  Prior to April 15th, I had no access to the debtor, to

 4   the committee, or any of the attorneys, no access through any

 5   protected information.  I had no input on the complaint.

 6            I became worried as the passage of time went on about

 7   the possible running of statute of limitations later on this

 8   year in October.  And it was I who suggested to Mr. Clemente to

 9   come up with what is an extremely unusual procedure, to permit

10   the committee retain me on an interim basis until the

11   effectiveness of the trust, and then to flip my work effectively

12   into the trust.

13            This is very unusual.  It's not even yet approved by

14   the Court.  Nevertheless, I and my firm have worked very

15   diligently since April 15th to get up to speed on this entire

16   complex factual and legal situation.  I cannot just look at the

17   Holdco adversary in a vacuum.

18            There has been as the Court and all the parties here

19   know much better than I, there has been ongoing litigation on

20   many fronts for quite a long time.  There has been supplied a

21   Byzantine web of some 1400 entities —

22            MR. PHILLIPS:  Your Honor, Your Honor, —

23            THE WITNESS:  — to accomplish —

24            MR. PHILLIPS:  Your Honor, could I interrupt?  He

25   needs to answer the question.

Appx 05095
009038

*Kirschner - Cross/Phillips*                                          64

```
 1   BY MR. PHILLIPS:
 2   Q.  What does — what does — what does the understanding about
 3   the motion to withdraw reference mean?  What do you need to get
 4   up to date on the motion to withdraw reference?
 5   A.  I'm responding to your question.
 6           THE WITNESS:  If I may, Your Honor, I'm responding to
 7   the question.  I'm almost done —
 8           MR. PHILLIPS:  Your Honor, a narrative, a preexisting
 9   narrative —
10           THE COURT:  Ah, —
11           MR. PHILLIPS:  We just — I just want to know.  We have
12   legal issues.
13           THE COURT:  Okay, I sustain the objection —
14           MR. PHILLIPS:  I want to know what he —
15           THE COURT:  If you could reask the question and we'll
16   see if we can get an answer —
17           MR. PHILLIPS:  All right.  I'll reask the question,
18   Your Honor.  I'm sorry.  I apologize.
19           Your Honor, I'm going to withdraw any questions.  I'm
20   — this is — this is going to turn into just an argument.  His
21   declaration and conclusory and it's just going to be more
22   conclusion.  So I'm — I'm willing to argue from his declaration
23   in closing.
24           THE COURT:  All right.  Any other questions?
25           No other —
```

*Kirschner - Redirect/Montgomery*                    65

1          MR. DRAPER:  None, Your Honor, from Dugaboy.

2          THE COURT:  Okay.  Anyone else?

3          Ms. Montgomery, do you have any redirect on that brief

4    cross?

                    REDIRECT EXAMINATION

6          MS. MONTGOMERY:  Yes.  I think, Your Honor, I would

7    just ask if there is anything else that Mr. Kirschner feels the

8    Court should be aware of before reaching a decision on today's —

9    on today's motion?

10         MR. PHILLIPS:  Your Honor, we object to that question.

11   That's not even a question.

12         THE COURT:  I overrule.  He can answer.

13         THE WITNESS:  Okay.  Thank you very much, Your Honor.

14         As I was saying, there is a Byzantine web here of over

15   1400 entities, many moving intertwined parts.  I have literally

16   and my firm has literally had to triage the monumental amount of

17   work that is necessary to get my hands on this overall

18   situation.  There's allegations that money's been flying all

19   over the world —

20         MR. PHILLIPS:  Your Honor, this is not — this is not

21   appropriate testimony.  This is — that's hearsay.  There's

22   allegations all — money flowing all over the world.  This is —

23   this is a narrative that has nothing to do with the pending

24   motion to withdraw reference and is, in essence, an

25   assassination piece.  This is — what we —

009040

*Kirschner - Redirect/Montgomery* 66

1      THE COURT:  I overrule.  He's trying to explain why he

2    needs 90 days at bottom here, so I think it's relevant.

3      MR. PHILLIPS:  Well, the long —

4      THE COURT:  And I understand everything's an

5    allegation subject to evidence.

6      MR. PHILLIPS:  Well, we're talking about

7    allegations, —

8      MR. [SPEAKER]:  Right.

9      MR. PHILLIPS:  — we're talking about — we just heard

10   they're allegations about money flying all over the world.

11   That's not an acceptable testimony.  You know that and everybody

12   on this call knows that.  That's absolute abject hearsay and the

13   idea that you could — you could buttress a motion for stay after

14   you've had 30 days to review a legal analysis about a motion to

15   withdraw reference, because there are allegations of money

16   flowing all over the world is ridiculous.  Your Honor, we — we

17   firmly and in this way object —

18     THE COURT:  Overruled.  I understand you don't like

19   the emotional, if you want to call it, emotional language.  You

20   think it's hyperbole, you think it's hearsay, but he didn't — he

21   didn't offer an out-of-court statement.  He's just saying the

22   allegations — you know, they're in pleadings, they're

23   allegations in many different adversaries, and so I overrule the

24   objection.

25     You can complete your answer, Mr. Kirschner.

Annex 05098
009041

*Kirschner - Redirect/Montgomery* 67

1        THE WITNESS:  Thank you very much, Your Honor.

2        All of these complexities in my view potentially

3   impact on the motions to withdraw.  I recently realized that I

4   cannot properly perform my fiduciary duty to all creditors by

5   the deadline for a response to the motion to withdraw and the

6   motions to dismiss.  I am in fact considering potential

7   amendments to the existing Holdco adversary to possibly other

8   issues that may impact the withdrawal motion.

9        Your Honor said this morning that it's important to

10  take into consideration both procedural and substantive matters.

11  I am worried about potential impacts of whatever I do.  And bear

12  in mind, as Ms. Paige indicated, I am — (brief garbled audio) —

13  no process plan.  All of this was supposed to have been put in

14  the litigation trust under my auspices.  I am now litigation

15  advisor, not yet approved by the Court.  It is the client, I,

16  who direct, after consultation, all strategy by lawyers.

17       I have a long history, as Your Honor has seen from my

18  C.V., of directing complex billions of dollars of litigations.

19  I rely on lawyers, but I am very involved in every aspect of the

20  case.  This is very confusing, not just the CLO Holdco itself

21  but the entire complexity of all of the potential matters here

22  that I need to study in a very short period of time.  I'm

23  concerned that dealing just with this in this couple of days is

24  going to be harmful to creditors ultimately and respectfully

25  request the Court to grant the 90-days adjournment.

009042

*Committee's Motion for Continuance*                                         68

1          Maybe I'm being overly cautious and I apologize for

2   that, but I feel strongly about my fiduciary duty and want to do

3   the best I can to understand everything that's going on before

4   we have to respond both to the withdrawal motion and the motion

5   to dismiss.  So thank you, Your Honor.

6          THE COURT:  Thank you.

7          Anything else, Ms. Montgomery, as far as examination?

8          MS. MONTGOMERY:  No, Your Honor.  I have no further

9   questions.

10          THE COURT:  All right.  Mr. Phillips, or anyone else,

11  any recross on that redirect?

12          No?  All right.  Thank you.

13          All right.  This —

14          MR. PHILLIPS:  No, Your Honor.  I muted myself again.

15  No, Your Honor.

16          THE COURT:  Okay.  Is that all of the evidence you're

17  going to present, Ms. Montgomery?

18          MS. MONTGOMERY:  It is, Your Honor.

19          THE COURT:  All right.  Well, I'll turn to our

20  objectors —

21          MR. PHILLIPS:  We —

22          THE COURT:  I'm sorry?

23          MR. PHILLIPS:  We'd like the enter and offer — we'd

24  like to offer and introduce our exhibits that we put on our

25  witness and exhibit list, Your Honor.

009043

*Committee's Motion for Continuance*      69

1      THE COURT: Okay.

2      MR. PHILLIPS: And we've submitted them to the Court,

3 Exhibit 1 through 6, as itemized in our witness and exhibit

4 list.

5      THE COURT: All right. This is Docket Number 52 in

6 the adversary, correct?

7      MR. PHILLIPS: Yes. Yes, ma'am.

8      THE COURT: All right. So let me pull it up here.

9 Okay, we've got the application to employ Teneo and different

10 emails.

11      Any objection, Ms. Montgomery, to this?

12      MS. MONTGOMERY: I have no objection to Exhibit 1,

13 Your Honor, the application, and obviously it's a pleading that

14 we filed. I have questions about the relevance of the other

15 exhibits, but I have no objection to their admission. They're

16 emails that went back and forth between the parties.

17      THE COURT: All right. Well, do you want to address

18 that relevance? I'm not sure if it was an objection or — was it

19 an objection ultimately? Was it —

20      MR. PHILLIPS: I didn't hear an objection, Your Honor.

21      THE COURT: Ms. Montgomery.

22      MS. MONTGOMERY: Your Honor, for purposes of today's

23 hearing, I have — I have no concerns about their admission for

24 your consideration.

25      THE COURT: Oh, okay, so —

 1          MS. MONTGOMERY:  We're not contesting the history of

 2   the back-and-forth between the parties.

 3          THE COURT:  Okay.  I will admit 1 through 6.

 4      (Defendants' Exhibits 1 through 6 received in evidence.)

 5          THE COURT:  All right.  Any — any other evidence from

 6   our defendants?

 7          MR. PHILLIPS:  No, Your Honor.

 8          THE COURT:  All right.  Well, anything in the way of

 9   closing argument?  Ms. Montgomery, you are the movant.  You go

10   first.

11          MS. MONTGOMERY:  Yes, Your Honor, just very briefly to

12   address a couple of points.  First of all, I think that there's

13   been some sort of misconstruing of Mr. Kirschner's role as the

14   litigation advisor and ultimately the litigation trustee.  He —

15   functionally, the litigation advisor — we're in a very unique

16   situation here.

17          The parties never expected that the effective date

18   would be delayed in the way that it has been.  We're coming up

19   on the two-year anniversary of the filing of the proceedings.

20   There are a number of claims that need to be investigated and

21   decisions make about how they will be pursued in the next couple

22   of months.  And so this litigation advisor role, as Mr.

23   Kirschner testified, is somewhere unique in that we're trying to

24   work around the constraints that have been created by the way

25   that these proceedings have moved forward.

009045

1          The litigation advisor is really functionally a proxy

2     for the role that Mr. Kirschner will have upon the effective

3     date of the plan as litigation trustee.  He's not acting in the

4     capacity of a law firm or like and FTI or a DSI, or any of the

5     other professionals that have been specifically retained in the

6     bankruptcy to date because the role isn't the same traditional

7     role.  Right, he is functioning in a way that will allow him

8     access that he needs to the data to get up to speed to make the

9     decisions that have to be made so that he can, you know, proceed

10    in the way that is best for meeting his fiduciary duties to the

11    ultimate litigation subtrust.

12          So to the extent that there is any sort of argument

13    that, you know, he — that his role is duplicative or any of the

14    other things that we've heard today or that we've seen in the

15    response, I think that those are just a misunderstanding of what

16    he will actually be doing.  He is going to be the client, Your

17    Honor.  He is not going to be the lawyer.

18          The other thing I think that we talked about a bit is,

19    you know, this argument that Mr. Kirschner has been involved in

20    the case since April 15th and therefore he's had plenty of time

21    to understand everything that he needs to know to be able to

22    move forward.  Technically, Your Honor, I think it goes without

23    saying he's not officially retained until after the return date

24    on the motion to withdraw.  And even so, just based on the years

25    now that we've spent in this case, I can — I can argue to you

*Committee's Motion for Continuance*                                      72

 1   and I think Your Honor will feel the same way, there's too much

 2   learn in that short a time period to be able to say that you are

 3   proceeding in the way that is going to be best for the estate in

 4   that short timeframe.

 5           We're working to get Mr. Kirschner up to speed, the

 6   debtor is working to get Mr. Kirschner up to speed, but there is

 7   a lot that has happened here and that continues to change on a

 8   daily basis, including the stay that was filed just last night.

 9           And then, finally, Your Honor, I would argue that

10   there has been no harm established by virtue of the stay.  And,

11   in fact, all of the things we've heard today established the

12   fact that there may be harm if the stay is denied.  So, for

13   example, Your Honor you know very correctly pointed out that we

14   have two international defendants who haven't even appeared at

15   this proceeding yet, right.  We may not effectuate service for

16   another two months.  It may be another 60 of these 90 days that

17   we're requesting for a stay may be required just to get them

18   properly served and into this proceeding.

19           And, you know, I agree, Your Honor, that there may be

20   issues that surround those two defendants that, you know, we

21   won't be able to take into consideration until they're properly

22   here in the Court and able to file their own motion to withdraw,

23   if that's what they want, or state their position with regard to

24   it.

25           You know, Your Honor, moreover, there is a lot going

009047

1   on here and Mr. Kirschner does realistically need time to be

2   able to develop his approach and make decisions about whether or

3   not there will be amendments to the complaint that could impact

4   the motion to withdraw.  He needs to make decisions about other

5   claims that may be brought.  There are a lot of moving parts.

6   It's a unique situation.  And we would urge the Court to allow

7   him the time that he needs to be able to effectuate his duties

8   in the way that he sees fit.

9          THE COURT:  And I know I have it right in front of me,

10  but the employment application for Mr. Kirschner and his firm to

11  potentially be litigation advisor until the plan goes effective,

12  when is that set for hearing?

13         MS. MONTGOMERY:  It's set for June 7th, Your Honor,

14  and the motion to withdraw is currently set for June 3rd.  And

15  that — that motion to retain Mr. Kirschner was only filed on

16  Friday of last week, and our motions that you're hearing today

17  were filed on Tuesday.

18         THE COURT:  Okay.

19         MS. MONTGOMERY:  So it's a very short delay of time

20  between the two.

21         THE COURT:  All right.  I'll hear other closing

22  arguments.

23         MR. PHILLIPS:  Your Honor, thank you.  As far as harm,

24  we have one — we have one client, Highland Dallas Foundation,

25  who has made no appearance in this case, as has very — and

Appx. 05195
009048

1   assume they're being sued for $24 million, and that's not a

2   problem.

3          Under the argument structure we're hearing today, we

4   could never really get until a plaintiff has said, 'I have no

5   further ability to amend the complaint,' a hearing on a motion

6   to withdraw reference. Look, we didn't file the complaint. The

7   complaint was filed four or five months ago. And very able

8   counsel looked, and as counsel has argued, has looked at

9   thousands and thousands of documents, have been paid millions

10   and millions of dollars for its work, and it came up with this

11   lawsuit that was filed — I've forgotten the filing date, but it

12   was filed at least four and a half months ago, January of this

13   year I believe. Ms. Montgomery — counsel for plaintiff can say

14   the exact date.

15          But we've got two defendants who haven't been served,

16   but I've got one — I've got two that have been served. And we

17   have established a basis upon which we can get — we have a right

18   to a jury trial and a right to withdrawal of the reference. And

19   that motion has been filed. And the idea that I'm going to

20   bring — I'm going to change clients — and it's really

21   complicated. After we've done millions and millions and

22   millions of dollars worth of work, looked at thousands and

23   thousands and thousands of documents, that we may come in and do

24   a different lawsuit that pleads around a motion to withdraw

25   reference is no basis for a stay.

Appx 05406
009049

*Committee's Motion for Continuance*                    75

1       That — that — the narrative about, you know, the

2   hearsay, the narrative about the aspersions, the this and the

3   that, this is really complicated, this is really hard, well, we

4   have a lawsuit in front of you, Your Honor, and it's been

5   pending for months. And it was filed by the committee that had

6   authority to file it and it was filed by the law firm for the

7   committee that had authority to represent the client who filed

8   it. And that's what they came up with after months and months

9   and months of years of looking at stuff and looking at documents

10   and deciding what to bring as far as claims of this nature

11   against these defendants. I'm worried about two of them.

12       I'm worried about — particularly worried with respect

13   to the stay, I'm worried about both of them for — with respect

14   to the stay, but one of my clients, Highland Dallas Foundation,

15   has had no involvement in this bankruptcy case. And now let's

16   just wait around. It's got a $24 million cloud hanging over its

17   head and it's expected to continue to try to raise money and try

18   to act as a charity while — while Mr. Kirschner gets familiar —

19   refamiliarized and gets familiar with the situation where

20   counsel and the committee have been working for, what, a year

21   and a half, two years, to get ready, and here's what the lawsuit

22   — here's the lawsuit they came up with.

23       So no harm has been alleged. In fact, harm will be —

24   all you heard about the potential harm to the estate is that

25   notwithstanding millions and tens of millions of dollars of fees

App. 05107
009050

1  paid to professionals to determine litigation claims and we have

2  barely, what, two months left to bring them?  That's 22 months

3  worth of looking into things, millions and millions of fees.

4  The estate might be irretrievably harmed if a motion to withdraw

5  reference moves forward, when the committee and counsel were

6  responsible and filed this complaint, and they were responsible

7  to file the complaint under the transaction and occurrences,

8  standards such that whatever they haven't pled, whatever they

9  haven't pled by the time to plead is gone.  And the idea that we

10 need another 22 months for Mr. Kirschner to get up to speed or

11 some other to come up with additional litigation and additional

12 amendments to postpone a withdrawal of reference means that you

13 can never get a hearing on a withdrawal of reference.

14         We think the pleadings are there.  They have been —

15 they have been investigated, we assume.  They're subject to

16 motions to dismiss, which are legal questions.  They're subject

17 to motions to withdraw reference, which are legal questions.

18 And we're ready for a decision on what court's going to handle

19 this.  And by the time that's done, Mr. Kirschner will have

20 whatever rights he has, as if he has any.  The plan will either

21 be confirmed and effective or it won't be, but that's not our

22 problem.  Thank you.

23         THE COURT:  Any other closing arguments?

24         Going once, going twice.

25         MR. ASSINK:  Your Honor, I apologize.  Just for the

*Committee's Motion for Continuance*                    77

1    record, this is Bryan Assink for Mr. Dondero.  And Mr. Dondero

2    joins in the objections made by defendants in this proceeding

3    and adopts the arguments made by Mr. Phillips.  That is all,

4    Your Honor.  Thank you.

5              MR. DRAPER:  Your Honor, can the Court hear me?

6              THE COURT:  Yes.

7              MR. DRAPER:  This is Douglas — okay.  What I'd like to

8    make, a short comment.  The argument that there are unserved

9    parties is a red herring and it's a red herring for the

10   following reason.  The Court has to go through each defendant to

11   determine if they have a right to — a right to withdraw a

12   reference.  The facts with respect to Mr. Phillips' clients are

13   different than the facts with respect to my clients.  So the two

14   unserved parties may have a right to do it, they may not, but it

15   doesn't affect your ruling with respect to Mr. Phillips' clients

16   or mine because we have either waived or didn't waive our right

17   to a jury trial.  And so this argument that there's two other

18   parties out there, again, is a red herring.  They have their own

19   right and it will not affect Mr. Phillips' right or mine.  So I

20   think that needs to be taken into account.

21             And, again, all we're talking about is location.  The

22   — if they want to amend their suit at a later point, that's

23   fine, but we are just talking about who's going to hear the

24   case.  And, quite frankly, Mr. Phillips is right, I don't think

25   the Court can in a very short period of time unpack these

Appx 05109
009052

*The Ruling of the Court on the Motion to Continue* 78

1  withdrawal issues.  And so you may be looking at a

2  recommendation that you make that takes 30 or 60 days.  We don't

3  know what the District Court's going to do with it.  And, quite

4  frankly, you know we may be 90 or 120 days down the road before

5  the location is even determined.

6         That's all I have to say, Your Honor.

7         THE COURT:  All right.  Anyone else?

8              <u>THE RULING OF THE COURT</u>

9         THE COURT:  All right.  I'll just be honest, I've

10 tried hard to understand where everyone is coming from here, but

11 this has been yet another hearing where I just frankly don't

12 understand why the big fight, why all the papers, and why all

13 the Court time used.

14        I mean I think I hear everyone agreeing that the

15 plaintiff is essentially going to get its/his 90-day stay here.

16 I mean if I were to go forward on the motions, plural, motions

17 to withdraw the reference, let's be real, it's going to take:

18 This Court two or three or four weeks to get a report and

19 recommendation to the District Court, given the complexity here

20 of the parties and, you know, we try to do a very clear roadmap

21 for the District Court, what's this lawsuit about, who are the

22 parties; and then it's going to take a few weeks for the

23 District Court to rule on that.  So I mean optimistically, the

24 most optimistic thing I can imagine is 60 days from now you have

25 an order from the District Court saying where the lawsuit's

*The Ruling of the Court on the Motion to Continue* 79

1  going to go forward.

2         I mean so we're fighting, to me, over a big nothing

3  burger.  I think the stay is, in effect, going to happen.  So

4  all we're talking about here is pushing a plaintiff to go

5  forward, who at this point is working for free because the plan

6  hadn't gone effective and he hadn't been appointed.  I mean it

7  seems like from my perspective the defendants — again I'm trying

8  to understand the practicalities here, but I'm going to be

9  honest, it almost feels like defendants tweaking with the future

10 litigation trustee, 'We're going to make you go forward and work

11 for free when at the end of the day you're probably going to get

12 a stay anyway,' because there's no way a district judge is going

13 to rule on this in much sooner than 90 days.  It's like you're

14 just forcing him to work for free and move fast on the motion to

15 withdraw the reference.

16        And it is a red herring?  I don't know, maybe.  I

17 think likely this is ultimately going to be tried in the

18 District Court since certain parties haven't filed proofs of

19 claim.  But if the District Court does what it always does, in

20 my experience, I've never had, I can't remember ever having a

21 district court say, 'I'm withdrawing the whole darn thing.'

22 They almost always use the — they almost always use the

23 bankruptcy judges as their magistrates in a case when they

24 withdraw the reference.

25        Bankruptcy judge, handle all the pretrial stuff, the

009054

*The Ruling of the Court on the Motion to Continue*                    80

1    discovery disputes, the motions to dismiss, motions for summary

2    judgment.  If you were on a motion to dismiss or a motion for

3    summary judgment in a way that would finally dispose of any

4    claims, well, you have to do that in a report and recommendation

5    to me.  So I feel like we all know that's likely where this is

6    heading, so I don't know why we had to have an hour fight.

7              I don't know why it's any big shakes to just stay the

8    whole darn thing for 90 days, especially when we have the whole

9    reason the plaintiff, liquidating trustee is not in place yet,

10   because of a stay, that some of these defendants or their

11   affiliates have wanted.  It just seems silly to me.

12             And I do want to address one other thing.  There has

13   been an argument that Sidley and Austin and the committee have

14   had months to get up to speed on the issues in the lawsuit, they

15   had months to bring it.  It's been pending months.  But I'll say

16   something for the benefit of those who have not been around for

17   this whole case, in July of last year, July 2020, which by that

18   point was about 10 months into the case, it was front and center

19   to this Court the difficulty the committee was having getting

20   discovery.  They had served four requests for production, going

21   back to before this case was even pending before me.  When the

22   case was in Delaware, they were already filing, serving requests

23   for production of documents, wanting to get a protocol in place

24   for ESI, and then finally it all kind of came to a head in July.

25             And I remember saying, 'I'm sure there's a transcript

009055

*The Ruling of the Court on the Motion to Continue* 81

1   out there you can access.'  Gee, I may not have pressed the

2   issue so much on this lawsuit being filed involving CLO Holdco.

3   I may not have pressed the committee's feet to the fire so much

4   on getting that filed if I had been fully aware at all of these

5   efforts going on outside of the Court to get documents, to get

6   documents, four requests for production, and then finally the

7   protocol order, if you will, that the committee filed, asking

8   this Court to put in place some protocol to get ESI from like

9   nine different custodians of debtor records.  So my point is

10  those who have not lived with this case for the whole time, they

11  don't know that I kind of live to regret pressing the committee

12  to get this lawsuit on file.  You know I was worried because of

13  Holdco.  I had like ordered money to be put in the registry of

14  the Court before I had, you know, litigation pending.  So that's

15  why I put pressure.  But then I learned and had a multi-hour

16  hearing on what the committee had gone through trying to get

17  documentation.  So that's very much in the back of my mind here

18  in my ruling.

19          And my ruling is going to be that I grant the 90-day

20  continuance.  Again, I hope that in 90 days, we — I don't know

21  if we'll know something from the Fifth Circuit on the plan or

22  not, but at least we'll be closer to that point.  And, again,

23  we're looming, you know October 16th, 2021 as a deadline for

24  bringing claims, and I think that's relevant here.  There's a

25  lot to be focused on that may or may not impact the way this

009056

*The Ruling of the Court on the Motion to Continue* 82

1  lawsuit ultimately is mapped out.  I think the fact that we have

2  two unserved defendants, I think it does matter.

3       I think a district court may be a little hesitant,

4  really want to see the complete picture on each defendants'

5  position before it rules.  So the 90-day stay is granted.

6       All right.  So please upload the order, Ms.

7  Montgomery.

8       Thank you, all, for your arguments.

9       Before we wrap it up, Mr. Clubok, if you're still with

10  us, I think you were hoping to raise something that might

11  pertain to tomorrow's hearing on the UBS debtor compromise.  If

12  you're still there, you may speak to whatever it was you wanted

13  to present.

14       MR. CLUBOK:  Good morning, Your Honor.  Still — still

15  the morning.  Hopefully you can hear me.

16       THE COURT:  I can.

17       MR. CLUBOK:  Your Honor, I'm really just previewing an

18  issue.  In light of the comment that you made earlier today

19  about having this motion, discovery, and then folks not

20  previewing it, I just wanted to alert you to the fact that in

21  our adversary proceeding we have sought discovery against five

22  third parties, Scott Ellington, Isaac Ellington, three other

23  folks, all of whom are represented by Ms. Smith, who is here,

24  you can see.  And we first sought —

25       MS. SMITH:  This is Frances Smith.  Your Honor,

009057

*The Ruling of the Court on the Motion to Continue* 83

1   Frances Smith on behalf of Mr. Ellington, J.P. Sevilla, Mr.

2   Isaac Leventon, Matt VRO, and Mary Catherine Lucas (phonetics).

3           I just received an email earlier this morning from Mr.

4   Clubok that he was going to do this preview for you.  To the

5   extent he gets into the substance of any motions that are not

6   filed, that's inappropriate.  And so —

7           THE COURT:  Okay.

8           MS. SMITH:  — if he wants to take Your Honor offer of

9   a preview to say what he is going to file, I'm fine with that.

10  But if he's going to start going into the substance, that is not

11  appropriate.

12          THE COURT:  Okay.  We'll let Mr. Clubok get a little

13  further into what he was going to say, and then we'll decide do

14  we need to cut it off.

15          Mr. Clubok, go ahead.

16          MR. CLUBOK:  Thank you, Your Honor.  I was about to

17  say that there were five — there's the five individuals that Ms.

18  Smith represents, we sought discovery from in April 2nd, and,

19  namely, depositions.  After a long period of time culminating in

20  a meet-and-confer last week, Ms. Smith filed a motion to quash

21  on behalf of these five individuals on Monday and set a hearing

22  date for July 29th.

23          All I'm — all I'm previewing, Your Honor, is to alert

24  you that in response to that motion to quash, a hearing date set

25  for July 29th, so effectively will end up being, you know,

*The Ruling of the Court on the Motion to Continue* 84

1   months and months of delay to these individuals who are needed

2   to move this conjunctive-relief proceeding forward, we are

3   filing our response today to Ms. Smith's motion and a

4   countermotion to compel.  And I'm merely flagging this issue for

5   Your Honor because we are going to ask either Your Honor or Ms.

6   Ellison, we're going to style our motion as an expedited

7   request, we would just simply love to have a hearing as early as

8   reasonably practicable on these issues.  And I have no intention

9   of getting into the merits now, but happy to do so.  I think it

10  will all be familiar to you from their discussions in the

11  Dondero deposition dispute, but we just — or simply I'm just

12  flagging for you, because you raised it this morning, you know,

13  why didn't people tell me, so we just are going to ask the

14  hearing, the soonest-possible hearing, and I don't think it has

15  to be a very long hearing, on whether or not we get third-party

16  discovery, depositions of Mr. Ellington, Mr. Leventon, and the

17  other three individuals that Ms. Smith represents; subject to

18  one of them is on maternity leave, and we're going to be

19  pursuing discovery of that while she's in that state, but —

20          THE COURT:  All right.

21          MR. CLUBOK:  — but other than that we just ask that a

22  hearing to be scheduled.  And I'm just alerting you that we're

23  going to be making that request.

24          THE COURT:  Okay.  Well, I have been forewarned.  I

25  have been forewarned.  And I'll wait to see the motion for

*The Ruling of the Court on the Motion to Continue*                    85

1   expedited hearing and decide if I think it's appropriate to give

2   an expedited hearing, okay?  I'll look at the pleadings and

3   likely just rule on the pleadings on the timing, okay?

4           Thank you.

5           MR. CLUBOK:  Your Honor, —

6           MS. SMITH:  Your Honor, since we're previewing, we

7   will be filing a response to that as well.

8           THE COURT:  All right.

9           MS. SMITH:  Thank you, Your Honor.

10          COURT SECURITY OFFICER:  All rise.

11      (The hearing was adjourned at 11:45 o'clock a.m.)

12                          —o0o—

13

14

15

16

17

18

19

20

21

22

23

24

25

009060

```
State of California          )
                             )    SS.
County of San Joaquin        )
```

   I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

   I further certify that I am not a party to nor in any way interested in the outcome of this matter.

   I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

```
Susan Palmer
Palmer Reporting Services

Dated May 22, 2021
```

**EXHIBIT 17**

Appx. 05119
009062

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION
 2
                                 )    Case No. 19-34054-sgj-11
 3   In Re:                      )    Chapter 11
                                 )
 4   HIGHLAND CAPITAL            )    Dallas, Texas
     MANAGEMENT, L.P.,           )    Monday, May 10, 2021
 5                               )    1:30 p.m. Docket
                                 )
 6           Debtor.            )
     _____ )
                                 )
 7   HIGHLAND CAPITAL            )    Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,           )
 8                               )
                                 )
 9           Plaintiff,          )    - TRIAL DOCKET CALL
                                 )    - DEFENDANT'S EMERGENCY MOTION
10   v.                          )      TO STAY PROCEEDINGS PENDING
                                 )      RESOLUTION OF DEFENDANT'S
11   JAMES D. DONDERO,           )      PETITION FOR WRIT OF
                                 )      MANDAMUS [154]
12           Defendant.          )
     _____ )

13                       TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                   UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX APPEARANCES:

16   For the Plaintiff:         John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
18                              (212) 561-7700

19   For the Plaintiff:         Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
20                              10100 Santa Monica Blvd.,
                                 13th Floor
21                              Los Angeles, CA  90067-4003
                                (310) 277-6910

22

23

24

25
```

2

```
 1   APPEARANCES, cont'd.:

 2   For the Defendant:        John T. Wilson
                               Clay M. Taylor
 3                             BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
 4                             420 Throckmorton Street,
                                 Suite 1000
 5                             Fort Worth, TX  76102
                               (817) 405-6900
 6
     Recorded by:             Michael F. Edmond, Sr.
 7                             UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
 8                             Dallas, TX  75242
                               (214) 753-2062
 9
     Transcribed by:          Kathy Rehling
10                             311 Paradise Cove
                               Shady Shores, TX  76208
11                             (972) 786-3063

12

13

14

15

16

17

18

19

20

21

22

23

24

25            Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.
```

3

```
 1              DALLAS, TEXAS - MAY 10, 2021 - 1:40 P.M.
 2         THE COURT:  All right.  The other matter we have set
 3    on this docket is Highland Capital Management, LP versus
 4    Dondero, Adversary 20-3190.  We had docket call, trial docket
 5    call set, as well as Defendant's emergency motion to stay the
 6    proceedings.  So I'll ask, first for Plaintiff Highland, who
 7    do we have appearing today?
 8         MR. MORRIS:  Good afternoon, Your Honor.  It's John
 9    Morris from Pachulski Stang Ziehl & Jones on behalf of the
10    Debtor.
11         THE COURT:  All right.  And for Mr. Dondero, who do
12    we have appearing today?
13         MR. WILSON:  John Wilson and Clay Taylor.
14         THE COURT:  All right.  And I assume we have Mr.
15    Dondero out there listening in?
16         MR. TAYLOR:  Yes, Your Honor.  He's next to me.
17         THE COURT:  Okay.  Thank you.  All right.  Thank you.
18    Well, we'll start with the motion to stay proceedings.  Mr.
19    Taylor, will you be making that argument, or Mr. Wilson?
20         MR. WILSON:  I will, Your Honor.
21         THE COURT:  Okay.  You may proceed.
22         MR. WILSON:  Well, Your Honor, this motion to stay
23    is, as you've seen in our papers, it's largely based on the
24    pending proceeding at the Fifth Circuit on a writ of mandamus.
25    And as you are probably aware, that motion or that writ was
```

4

1    filed on the 8th of March.  The -- late in the evening,

2    actually.  The next morning, shortly after business hours

3    opened, the Fifth Circuit requested a response from the Debtor

4    by March 16th.  The Debtor timely filed that response, and we

5    are awaiting a ruling from the Court.

6        And due to all of the overlapping issues between the

7    preliminary injunction and the permanent injunction that's

8    sought by the Debtor, we thought it would be appropriate to

9    stay the trial on the permanent injunction for reasons of, you

10   know, potential inconsistent rulings or, you know, judicial

11   economy.  It only seems to make sense to, you know, give the

12   Fifth Circuit a little bit longer to consider these issues and

13   see what they're planning to do.

14       And I've got the -- Your Honor, my brief covers the

15   factors that the -- for a stay pending appeal.  Some courts

16   say that you have to apply those factors in this situation.

17   Other courts say that the Court -- the Fifth Circuit's

18   mandamus jurisdiction, there's inherent power to stay.  But in

19   any event, you know, we think that that factors are met here.

20       The four factors would be the showing of a likelihood of

21   success on the merits, and the courts, you know, are uniform

22   in saying that that doesn't mean the showing of a probability

23   of a success, just a likelihood.

24       I think the fact that the Fifth Circuit could have easily

25   denied this without an opinion quickly but instead has

5

```
 1   requested a response and is now -- I think tomorrow will be
 2   eight weeks since it's had full briefing in front of it -- you
 3   know, we believe that we meet that test because obviously the
 4   Fifth Circuit is considering the merits of this.
 5       And this is, of course, a serious legal question, because
 6   it's the entire issue in this case, is the appropriateness of
 7   the injunctive relief that the Debtor seeks.
 8       Of course, the second issue, irreparable injury, I think
 9   anytime that you're dealing with an injunction, whether, you
10   know, you grant an injunction or are seeking to overturn one
11   or whatever, I mean, irreparable injury to one or the other
12   parties is always at issue.
13       You know, I think that we've raised some serious concerns
14   about Mr. Dondero's constitutional rights and his First
15   Amendment rights specifically.  You know, and being under a --
16   being under an order, a permanent order, is, of course -- you
17   know, exacerbates the seriousness of those matters.
18       Substantial harm to the debtor.  We believe there is none
19   to pushing this proceeding back.  As has been stated, there is
20   a preliminary injunction in place that runs until the
21   effective date of the plan.  That was the way the Debtor chose
22   to seek that relief.  And we think that, you know, the
23   Debtor's rights, if, you know, if they are potentially going
24   to be infringed on, are protected by the preliminary
25   injunction and the plan injunction itself.
```

6

```
 1       And then finally, Your Honor, you know, this would stay --
 2   granting of a stay would serve the public interest due to just
 3   consistency and judicial economy.  You know, it's going to be
 4   a lengthy trial with multiple witnesses.  You know, those
 5   witnesses have to give up time out of their schedule to attend
 6   the trial.  You know, there's going to be a lot of attorney
 7   time involved.  And, of course, the Court's time.
 8       So we just think that a, you know, a brief, appropriate
 9   stay or continuance to allow the Fifth Circuit to issue a
10   ruling on this matter would be appropriate.
11           THE COURT:  All right.  Well, I have several
12   questions for both sides.
13       My first question is this.  You've -- with your last
14   comment, you know, we think there's going to be a lengthy
15   trial and whatnot, it's really a judicial efficiency and
16   judicial economy, economy of the parties argument, right?  I
17   mean, that's really what I'm hearing.  Right?
18           MR. WILSON:  Yes, Your Honor.  I mean, that's
19   certainly -- that's certainly a big part of this.  And, you
20   know, we're respectful of the Court's time and, you know, we
21   appreciate that the witnesses would have to give their time as
22   well.  So, --
23           THE COURT:  Okay.  Well, here is a question I have.
24   I'm trying to think through the ifs -- if we do go forward, if
25   we don't go forward -- and here's how I come out on this one.
```

7

```
 1  If we do go forward, doesn't that lead to judicial efficiency?
 2  And here's why I ask.  Because then you've got a permanent
 3  order.  A final order, I should say.  There is either a
 4  permanent injunction or no injunction.  It's final.  Somebody
 5  can appeal it without the procedural problems of, oh, it's
 6  only interlocutory, need motion for leave.  And, in fact, if I
 7  rule, the Fifth Circuit petition for mandamus becomes moot,
 8  right?  Because now --
 9          MR. WILSON:  Well, I don't know --
10          THE COURT:  -- forget about that preliminary
11  injunction, good, bad, or indifferent.  Now we have a final
12  order that someone can appeal without needing leave.  And so
13  what -- you know, my brain gravitates towards efficiency:  If
14  I just rule on a final basis in this adversary, then people
15  can go on about their way and appeal the final ruling,
16  whatever it is.
17          MR. WILSON:  Well, Your Honor, it's hard to know if
18  the Fifth Circuit's consideration of the former injunction
19  would be moot without -- without knowing, you know, how
20  they're going to rule.  You know, they could -- you know, as I
21  said, the underlying issues in the preliminary injunction and
22  the permanent are, you know, largely if not wholly
23  overlapping.  And you know, I just can't -- I can't speak for
24  the Fifth Circuit what, you know, what they're intending to do
25  with this thing and how they're intending to rule.  And, you
```

8

1  know, I think that their -- you know, they do have

2  jurisdiction over this and they can protect their

3  jurisdiction.

4      So, you know, I just can't really -- I can't really agree

5  that a trial on the permanent injunction would moot the

6  preliminary in this case, given the issues that are on

7  mandamus at this point.

8          THE COURT:  Well, I'm going to ask you to be more

9  specific on that, because I'm not -- I'm not on the same page

10  at all.  I mean, two ways I can rule.  I can say, grant a

11  permanent injunction.  Okay?  And so then you have a final

12  ruling of this Court that, if you appeal, the District Court

13  has to hear it because it's final.  And then if you appeal

14  beyond that, the Fifth Circuit has to hear it because it's

15  final.

16      On your -- meanwhile, on your petition for writ of

17  mandamus, what you have asked is:  Fifth Circuit, make the

18  District Court hear our appeal of an interlocutory order.

19  Okay?  They didn't grant leave.  It was interlocutory and they

20  wouldn't grant leave to hear the appeal.  Well, at that point,

21  the preliminary injunction that you wanted the District Court

22  to review on appeal has been replaced by a permanent

23  injunction.

24      So, what am I missing?  There's nothing --

25          MR. WILSON:  Well, I --

009070

9

```
 1          THE COURT:  At that point, it's moot.  Isn't that
 2   classic mootness?
 3          MR. WILSON:  Well, that's the second part of the
 4   relief that we asked for that you just described, Your Honor,
 5   at the Fifth Circuit.
 6     So, the primary focus of the mandamus was on an order
 7   dissolving the preliminary injunction on the issues that are
 8   -- you know, were raised in this brief.  And they -- the
 9   issues that we've raised in this Court before, but -- the
10   overbreadth and the constitutional concerns and vagueness and
11   those types of things.  And to the extent that the exact same
12   relief is sought in the permanent injunction, while the Fifth
13   Circuit is, you know, considering -- you know, I can't speak
14   for them because they haven't -- they haven't spoken yet, but
15   to the extent that they are considering that aspect of the
16   mandamus, and that's the primary relief we sought, then that's
17   where I have a problem saying that the -- that the preliminary
18   injunction would become moot or the issues related to the
19   preliminary injunction would become moot when a final
20   injunction is issued.
21     And then I would, if Your Honor was to say that, you know,
22   no final injunction will issue and Your Honor was to say that
23   the preliminary injunction is over and ended, then I would
24   agree that the issues would be mooted.  But that's only one
25   scenario that would result from this -- that could result from
```

Appx. 05128
009071

10

1  this trial.

2         THE COURT:  Okay.  So it will be moot if I deny the

3  permanent injunction, but it might be useful to wait, you're

4  saying, because the Fifth Circuit may say, you know,

5  Subsection (d) of the preliminary injunction -- you know,

6  2(d), let's say, hypothetically; I'm just plucking one out of

7  the year -- that went too far.  We're ordering in mandamus

8  fashion for you to vacate that order as to, you know, whatever

9  provisions they may say went too far.  And then we would have

10  a hearing on the permanent injunction, and you would say,

11  well, that could be guidance to the Court.  You know you can't

12  do this.  They've already said that goes too far.  Is that

13  what you're saying?

14         MR. WILSON:  So, I think that's -- you know, that's

15  certainly part of it, Your Honor.

16         THE COURT:  All right.  My next question is I assume

17  you've told me everything you know as far as what you've heard

18  from the Fifth Circuit?  You know, the petition for writ of

19  mandamus was filed March 8th.  You said the next day they

20  asked Debtor to respond by March 16th.  The Debtor responded.

21  And it's just been silence since then?

22         MR. WILSON:  That is -- that is correct, Your Honor.

23  I mean, we -- we've actually called the Clerk's Office and,

24  you know, just made a generic inquiry as to the matter in

25  connection with filing this writ -- or, I'm sorry, this motion

11

1    for stay.  But we -- you know, of course, there was no -- you

2    know, no response other than the Court is still considering

3    it.

4            THE COURT:  Okay.  So your view is I ought to stay

5    this until the sooner of the Fifth Circuit ruling one way or

6    another or 60 days?  You're saying at 60 days, well, --

7            MR. WILSON:  Well, that --

8            THE COURT:  -- holy cow, who knows how they're going

9    to rule, so we'll just go forward?

10           MR. WILSON:  I think that was just -- well, yeah, and

11   I don't -- I don't know if there's any -- anything behind that

12   60 days.  I think that was just -- just an example of what,

13   you know, the Court could do that we gave in our brief.

14       But, you know, I think that -- I think that probably the

15   most appropriate way to handle it would be to say that it's

16   going to be set, you know, for docket call, you know, say, 30

17   days after the Fifth Circuit's ruling, you know, if

18   appropriate.  Something like that.  But, you know, I -- 60

19   days wasn't like a magic number.

20           THE COURT:  My next question is, what would a trial

21   look like if we do go forward next week or whenever?  You said

22   it would be a "lengthy" trial.  The pretrial order says, "no

23   more than two days."  I'm just trying to figure out why it

24   would be a lengthy trial.

25           MR. WILSON:  Oh, I mean, I -- I agree that probably

12

 1  two days is in the realm of where it will be.  I thought that

 2  the joint order actually said two and a half days.  But I kind

 3  of considered -- kind of, you know, estimated that between the

 4  witnesses that we wanted to call and then the Debtor's

 5  witnesses and then the cross-examinations and all that, that

 6  we would have about two days of testimony, and then -- and

 7  then argument after that.

 8            THE COURT:  Okay.  Well, --

 9            MR. WILSON:  And so when I say lengthy, I mean, I was

10  -- I was considering that to be lengthy.

11            THE COURT:  Okay.  Well, this is maybe more of a

12  question for Mr. Morris, but maybe you have an answer as well.

13  I am wondering what a potential permanent injunction would

14  even look like at this point.  Again, this is probably more of

15  a Mr. Morris question, but I'll ask you.

16       I presume the shared services agreements are terminated at

17  this point, so, looking at the preliminary injunction, Columns

18  2C and 2D I'm guessing might go out the window.  You know,

19  maybe, maybe not.  But, again, I'm -- maybe this ties in to

20  why such a lengthy trial.  I'm guessing that the Debtor is

21  probably going to have a skinnied-down request at this point,

22  but maybe not.  What -- have you talked to Debtor's counsel

23  about that?  Do you have a response to that?

24            MR. WILSON:  The Debtor is not telling us any

25  different than what they've put in their papers at this point,

13

1   Your Honor.

2          THE COURT:  Okay.  Well, thank you.  I will turn to

3   Mr. Morris now.  Mr. Morris?

4          MR. MORRIS:  Good afternoon, Your Honor.  John

5   Morris; Pachulski Stang Ziehl & Jones.

6       Let me just start by pointing out several things that Mr.

7   Wilson overlooked in terms of what's been told to the Fifth

8   Circuit.

9       At Page 5 of their petition, which was filed on March 9th,

10  two months ago, the Fifth Circuit was told, "The trial

11  concerning the Debtor's request for a preliminary injunction

12  is currently set for the week of May 17th, 2021."  So the

13  Fifth Circuit knows exactly when this trial is being

14  conducted.

15      Indeed, the Fifth Circuit was told by Mr. Dondero and the

16  Bonds Ellis law firm on March 9th that the Court was going to

17  hold a contempt hearing on March 22nd, and the Fifth Circuit

18  took no action to intervene to stop that.  I think that is a

19  much better indicator of their lack of interest in this

20  petition for writ of mandamus.  It's been sitting there for

21  two months.  They didn't act, despite having knowledge of the

22  contempt motion and the hearing that was going to be held.

23  They know exactly when this hearing is going to happen next

24  week.

25      And you know why they know that?  It's been -- they've

14

1   been told that again, because Mr. Wilson didn't tell you that

2   he also filed a motion in the Fifth Circuit for a stay of

3   these proceedings.  We responded to that this morning, Your

4   Honor, but I don't understand how you can ask him the question

5   of what the Fifth Circuit knows and Mr. Wilson forget to tell

6   you that he has made the exact same motion in the Fifth

7   Circuit.

8       Now let's talk about what their petition for writ of

9   mandamus really is.  There is two parts.  Your Honor focused

10  on one part, and that is they're trying to get the Fifth

11  Circuit to order the District Court to exercise its discretion

12  to hear an interlocutory appeal.  I ask you, Your Honor:  What

13  is the likelihood of success on that?

14      The second thing they're asking the Court to do, the Fifth

15  Circuit Court of Appeals, they're asking the Fifth Circuit to

16  simply throw out the preliminary injunction.  We argued very

17  strongly in our opposition to the petition that the Fifth

18  Circuit doesn't even have jurisdiction to do that.  Yet in

19  their plea for a stay, a last-minute stay of this permanent

20  injunction proceeding, Mr. Dondero doesn't refute that

21  argument at all.

22      In fact, he doesn't address it.  He proffers no facts in

23  support of his position.  He gives no argument as to why the

24  Fifth Circuit is likely to direct the District Court to

25  exercise its discretion to hear an interlocutory appeal.  They

15

1    make no argument at all.  There's no factual, legal, or

2    equitable basis upon which this Court can find that Mr.

3    Dondero is likely to succeed on the merits.

4        The second prong, the harm.  You know exactly what the

5    harm is going to be to the Debtors here, Your Honor.  They

6    asked for 60 days.  What happens if the Fifth Circuit hasn't

7    responded in 50 days?  Are you going to conduct the trial

8    then?  Why would you do that?  You would have to wait longer.

9        What if the Fifth Circuit actually rules and they direct

10   the District Court to exercise its direction [sic] to hear the

11   interlocutory appeal, and the District Court hears it and

12   overrules the appeal?  Then what?  They're going to say we

13   have to wait further so that they can appeal the District

14   Court's rejection of the interlocutory order to the Fifth

15   Circuit.  We will be here for years, and that is exactly what

16   the game is.

17       Your Honor had it exactly right.  It was in our brief,

18   it's never been rebutted by the Bonds Ellis law firm, that if

19   we simply have a trial next week and the Court -- if the Court

20   rules in Mr. Dondero's favor, everything's gone.  If the Court

21   issues the permanent injunction, he will have a final order.

22   There will be no waste of time, no waste of money, no waste of

23   effort dealing with judicial discretion, dealing with issues

24   of interlocutory orders.  He will have a final order.  And

25   what we have asked for is set forth very clearly in our

16

```
 1    proposed findings of fact and conclusions of law.  The order

 2    that we're asking for is set forth in Paragraphs 11, 12, and

 3    13, and they largely mirror what's in the preliminary

 4    injunction.

 5        One tweak is exactly what Your Honor picked up on, and

 6    that is there's no longer any shared services agreements so

 7    there's no longer any exception for talking to the Debtor's

 8    employees about shared services because there are no such

 9    things anymore.  So we took that out.  Okay?

10        So, likelihood of success on the merits, I've addressed.

11        Irreparable injury.  You know, the Debtor is going to be

12    forced into a quagmire of Mr. Dondero's own making, and it

13    should not be required to do that.  Mr. Dondero, ironically,

14    if he was really here for justice, if he was really here for

15    justice, he would want the quickest possible trial he could

16    get in order to vindicate himself, or, if there's an adverse

17    judgment, to get that judgment reversed as soon as possible.

18    And the best way to do that is to have a speedy trial.

19        If he was honest, if their motives were pure, they would

20    be asking you for the quickest trial possible.  And that, Your

21    Honor, would be consistent with the public interest.  The

22    public interest is served by the speedy administration of

23    justice, and that's what we're looking for here.  Consistent

24    with ample Fifth Circuit precedent, trial courts are permitted

25    to proceed with trials on permanent injunctive relief,
```

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 161 of 1017 PageID 9925

17

1    notwithstanding a pending appeal of an interlocutory order on

2    a preliminary injunction.  We've cited a legion of cases.

3    Silence from the Bonds Ellis law firm.  Silence.  For good

4    reason.   There is nothing to say about it.  That is the law.

5    And we urge the Court to deny the motion.

6        Thank you, Your Honor.

7             THE COURT:  All right.  Mr. Morris, so just to

8    clarify, I do have up on the screen your proposed findings and

9    conclusions, but it might be a little easier for me to just

10   focus on the preliminary injunction that is dated January

11   12th.  I'm looking at Paragraph 2, decretal Paragraph 2, which

12   is where most of the injunction language is.  Are you saying

13   that you would seek the very same sort of permanent

14   injunction, only at Subsection (c) you would cross out the

15   "except as it specifically relates to shared services

16   currently provided to affiliates owned or controlled by Mr.

17   Dondero"?  Everything else would remain --

18             MR. MORRIS:  I don't have a -- yes.

19             THE COURT:  Okay.  So I'm looking --

20             MR. MORRIS:  As would the next paragraph, you know,

21   using his affiliated entities or other people who are acting

22   on his behalf.  That would be enjoined as well.  And from the

23   preliminary injunction, we would also adopt -- actually, it

24   should say permanently enjoined, so there's a typo there.  But

25   it should be permanently enjoined from entering the Highland

18

1  offices.

2      I think the only two things that -- the only changes that

3  we made were to delete the requirement that he appear at all

4  hearings.  That was something that I think Your Honor very

5  appropriately included, but I'll leave that to the Court.  We

6  also deleted the reference to shared services, as I indicated.

7  And frankly, we've eliminated the reference to Ellington and

8  Leventon because they're no longer employees of ours.

9          THE COURT:  Okay.

10         MR. MORRIS:  And we think that that prohibition ought

11 to stay in effect until further order of the Court.  But until

12 there's a -- when there's a further order of the Court, that's

13 not a particular piece that we'll be seeking going forward.

14         THE COURT:  Okay.  I got a little lost.  So,

15 Paragraph 4, you would propose comes out?  Or no?

16         MR. MORRIS:  Is that -- I'm sorry, I don't have it in

17 front of me.

18         THE COURT:  That's the --

19         MR. MORRIS:  Is that Ellington and Leventon?

20         THE COURT:  -- Scott Ellington/Isaac Leventon

21 paragraph.

22         MR. MORRIS:  Yeah.  Right.  Now, they, of course,

23 would still be bound by their -- by their ethical and legal

24 obligations with respect to attorney-client privilege and they

25 couldn't disclose, because we hold the privilege.  So it

19

1  doesn't matter that Mr. Dondero is the former CEO.  We have

2  the privilege.  And so obviously they are duty-bound not to

3  disclose privileged information.

4      But other than that, given that they're no longer

5  employees of the Debtor, we'd rather not get tied into the

6  morass of that.  It's going to be very difficult to police, in

7  any event.

8          THE COURT:  Okay.  All right.  So my next question

9  is, what do you think a trial will look like?  Two days?  A

10 lengthy trial?  I mean, I'm baffled --

11         MR. MORRIS:  I'll be perfectly honest.  I am, too,

12 Your Honor.  Because we've had this trial twice already.  Your

13 Honor, at -- I think our proposed findings of fact and

14 conclusions of law are at Docket 156 of the adversary

15 proceeding.  And I don't know if you've had a chance to look

16 at that yet, Your Honor, but from Paragraph -- I think it's

17 one -- Paragraph 30 to Paragraph 149 -- so, 120 paragraphs

18 long -- we set forth the evidence that was adduced at the

19 preliminary injunction hearing and at the contempt hearing.

20 We have a citation to every single exhibit and every single

21 page and line that we rely upon from the testimony.  And

22 because of that, Your Honor, we plan on relying on that.  I

23 wouldn't anticipate more than 30 or 45 minutes for an opening

24 statement, perhaps an hour of direct testimony from Mr. Seery

25 and Mr. Dondero, which will cover, I promise you, I promise

20

1    you, only topics that have not been previously covered. And

2    then an hour for closing. I could do this in two and half

3    hours, Your Honor.

4           THE COURT: Okay. You've named Seery and Dondero as

5    potential witnesses. And Mr. Dondero has named Seery,

6    Dondero, Ellington, Leventon, Jason Post, Dustin Norris, and

7    JP Sevilla as potential witnesses.

8           MR. MORRIS: Sure.

9           THE COURT: Well, let me ask you this.

10          MR. MORRIS: Can I address that issue first, Your

11   Honor?

12          THE COURT: Okay. Go ahead.

13          MR. MORRIS: Because back in March, we actually

14   served an interrogatory that asked the Bonds Ellis firm to

15   identify the witnesses that Mr. Dondero intended to call at

16   trial. And we were told that because we had served the

17   interrogatory near the end of the discovery deadline and they

18   didn't have 30 days, they had no obligation to answer.

19       I reached out to the Bonds Ellis firm and asked them, if

20   they needed more time, I had no problem with that. I believe

21   I offered to accept the exact same interrogatory and to serve

22   it three days after they did, and they agreed. Hadn't heard

23   from them again until I got their witness list and I saw this

24   litany of people on it. And I wrote to them last week and I

25   expressed considerable concern about that list, witness list.

21

1    And I pointed out that Mr. Dondero has a history of including

2    a laundry list of people on a witness list and never calling

3    them.

4        Specifically, at Docket 83 and Docket 85, they identified

5    Ellington, Leventon, and Rothstein, and never called them.

6    But meanwhile, I have to prepare for all of that, right?  At

7    Docket 106, they put down Ellington, Leventon, and Post, and,

8    again, never called the people associated with that hearing.

9        Now we've got Ellington, Leventon, Post, Norris, and

10   Sevilla for this.  So I said, what are you doing?  Can't you

11   just tell me who you intend to call?  This isn't a case, for

12   example, where you're having a trial for the first time and

13   you're a defendant and you say, gee, I want to see how the

14   evidence comes in.  I can't really tell you for sure because I

15   have to see what the plaintiff's case looks like.

16       Mr. Dondero knows what the Plaintiff's case looks like

17   because we had a trial on January 8th.  We had another trial

18   on March 22nd and March 24th.  And he has my proposed findings

19   of fact and conclusions of law, which go into more detail than

20   you probably wanted to see.

21       And so I asked them again, can you just tell me who you

22   intend to call?  And they declined to tell me.

23       So I will just say at this point, and I will speak more

24   about this in my opening statement, whoever is called at this

25   point on the third try of these issues by definition has no

22

1  credibility.  Their credibility has to be called into

2  question.  Where were they the first time?  Where were they

3  the second time?  And why are they just being called now,

4  after you see the proposed findings of fact and conclusions of

5  law?

6      And if you look at Mr. Dondero's exhibit list, you will

7  not find any documents that are going to support any testimony

8  by any of these people who are now employed, directly or

9  indirectly, by Mr. Dondero.

10     So I really think you asked the perfect question.  How

11  could this possibly be a lengthy trial and why are all these

12  people on the witness list?  And I would ask Mr. Wilson to

13  answer those questions.

14         THE COURT:  My last question for you is I presume the

15  plan has not gone effective yet?

16         MR. MORRIS:  No.  The plan has not gone effective

17  yet.  And I'll address that by just saying I'm not the right

18  person to answer that, but I will say, while there is no basis

19  -- the Debtor believes there is no basis to grant a stay here,

20  if Your Honor disagreed and the plan went effective, the order

21  specifically says that the preliminary injunction terminates

22  upon the effective date unless otherwise ordered by the Court.

23  And before -- before that effective date happens, I assure you

24  Mr. Dondero is not getting to -- not getting the benefit of a

25  stay and being unburdened by the preliminary injunction.  That

23

```
 1   will never happen.  Okay?

 2       So I don't think there's any basis to grant a stay.  I

 3   think for purposes of judicial economy we should just get this

 4   over with already and let the -- let him take his appeal

 5   wherever he wants to take his appeal.  But if Your Honor

 6   disagrees and the effective date occurs before there is a

 7   final order on the interlocutory appeal of the preliminary

 8   injunction, we'll be back with a motion to extend the

 9   preliminary injunction until that happens.

10           THE COURT:  Okay.  All right.  Thank you.

11       All right.  Mr. Wilson, first, what would you like to say

12   in reply to Mr. Morris?

13           MR. WILSON:  Well, I really want to make a few

14   comments in reply.  I mean, the first thing that struck me was

15   that Mr. Morris stated that the Fifth Circuit did nothing to

16   halt the contempt hearing proceeding, which I would agree

17   with, but on the other hand, no one ever asked them to.  We

18   did not make that request to the Fifth Circuit and they did

19   not do it on their own accord.

20       With respect to the motion to stay filed in the Fifth

21   Circuit, we did make a -- I don't think I improperly answered

22   your question.  I think your question was directed to what

23   have we heard about the mandamus.  We have not heard anything

24   about the mandamus.

25       We did file a kind of companion motion to this in the
```

24

1  Fifth Circuit after receiving the setting for this -- for this

2  hearing today.  Just in the interest of time, we -- we did

3  tell the Fifth Circuit the entire situation, that we filed

4  this motion, when it's set, and let them know that, you know,

5  we were seeking this stay.  But we also believe that the Fifth

6  Circuit has inherent authority to grant a stay in any event,

7  and so we just wanted to keep them, you know, in the loop, in

8  the interest of time.  And so -- but they have not responded,

9  though.  The Debtor has filed a response to that motion, but

10  the Fifth Circuit has not given us any --

11            THE COURT:  When --

12            MR. WILSON:  -- guidance on that, either.

13            THE COURT:  When did you file the motion for stay --

14            MR. WILSON:  I believe it was on --

15            THE COURT:  -- with the Fifth Circuit?

16            MR. WILSON:  I believe it was on Thursday of last

17  week, Your Honor.

18            THE COURT:  And let me be clear about the

19  jurisdictional basis for that?

20            MR. WILSON:  Well, there is a -- there is a rule, I

21  think it's Federal Appellate Rule 8, that deals with stays

22  pending appeal.  And like I said, there's a difference in

23  interpretation of whether that applies to mandamus or not and

24  whether you have to go through the step of moving in the trial

25  court first.  And -- but in an abundance of caution, just

25

 1   given the timing of all this, we went ahead and made that

 2   filing in the Fifth Circuit, telling them that we've made this

 3   filing but that it would not be heard until today, and told

 4   them that -- that they had the jurisdiction to issue that

 5   stay, should they want to, under their inherent authority, but

 6   also they have the freedom to wait and see what Your Honor

 7   does with it first, which they've apparently chosen to do.

 8           THE COURT:  You know, if I had known you filed that,

 9   I might have canceled this hearing.  Let the Fifth Circuit

10   rule.  He's asked for someone, you know, with higher authority

11   than me for a stay.  Why should I spend my time?

12           MR. WILSON:  Well, Your Honor, like we said, we filed

13   this motion -- I don't recall the date.  But we filed it well

14   over a week ago, and we -- we sought an emergency hearing, to

15   which the Debtor did not object.  And it wasn't until we found

16   that this hearing would not be until the 10th that we -- that

17   we decided that we needed to notify the Fifth Circuit --

18           THE COURT:  You filed it April 30th.  And you decided

19   I didn't --

20           MR. WILSON:  Okay.

21           THE COURT:  -- move fast enough by setting it ten

22   days out, --

23           MR. WILSON:  No, --

24           THE COURT:  -- so you'd go to the Fifth Circuit?

25           MR. WILSON:  Well, no, it was -- the timing is more

Case 19-34054-sgj11 Doc 3445-17 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 170 of 1017 PageID 9934

26

1  about the -- about the relation to the trial date than -- than

2  the date we filed the motion.

3        THE COURT:  All right.  Well, just so you know, I

4  think you should have told me you filed that.  I don't know

5  how I phrased my question about what have you heard from the

6  Fifth Circuit, but, again, if I had known you had filed that,

7  --

8        MR. WILSON:  Well, --

9        THE COURT:  -- I would have just canceled the

10  hearing.  Just let them rule at this point.

11        MR. WILSON:  I apologize for that, Your Honor.  I

12  honestly thought you were aware of this, but --

13        THE COURT:  Why would I be aware of it?

14        MR. WILSON:  Well, --

15        THE COURT:  Just FYI, the Fifth Circuit doesn't

16  notify the lower courts, oh, by the way, this pleading was

17  filed in an appeal or something affecting you.  That's not the

18  way it works.

19        MR. WILSON:  I apologize, Your Honor.  And like I

20  said, we -- we fully intended to give this Court the

21  opportunity to rule on this first, but in the interest of

22  time, we wanted to go ahead and get the process rolling at the

23  Fifth Circuit.

24     So, like I said, we hadn't heard anything from them in two

25  months, so we, you know, we didn't know if maybe that would

```
 1   prompt a quick opinion or what, and maybe just, you know, end

 2   the need for this whole proceeding today.

 3          THE COURT:  That's really not the way these things

 4   work.  I will just let you know, that's really not the way

 5   these things work.  Anyway, I don't know why I'm telling you

 6   that.  It isn't going to have repercussions on me.  But I

 7   don't know if you know, you know, they have death -- execution

 8   appeals and, you know, all kinds of really serious life-and-

 9   death things.  So, you know, the fact that they haven't ruled

10   --

11          MR. WILSON:  Well, I understand, Your Honor.

12          THE COURT:  -- in two months on something involving a

13   bankruptcy injunction is not shocking, really.

14          MR. WILSON:  I understand, Your Honor.  It's just

15   that this -- it's a mandamus proceeding, and, you know, there

16   was quick action by the Court right off the bat, and, you

17   know, and, you know, a quick briefing schedule.  So, you know,

18   it's a little different than your standard Fifth Circuit

19   procedure.

20          THE COURT:  All right.  Well, address this length of

21   trial thing again.  You know, I had a hearing on or about

22   December 10th on the TRO.  That wasn't a really lengthy all-

23   day hearing, but we heard evidence then.  Then we had the

24   preliminary injunction hearing in the second week of January.

25   Lots of evidence that day.  I think that was all day.  We have
```

28

```
 1   had the contempt motion on March 22nd and 24th.  And I have
 2   pulled up the proposed findings and conclusions of the Debtor,
 3   and it is a lot of cross-referencing the evidence I've already
 4   heard.
 5        So, again, I'm really, really, really trying to understand
 6   why we would have a lengthy hearing.  I'm just telling you
 7   right now, I'm leaning towards setting this for trial next
 8   week, and I'm leaning towards setting it for Friday.  Okay?
 9   Partly because we have lots of Highland stuff Monday and
10   Tuesday next week, and so that's just what I'm leaning towards
11   doing.  But I'm trying to understand why Friday, an all-day
12   Friday, we could start at 9:00 o'clock, why wouldn't that be
13   plenty of time?  Maybe three hours of evidence each, plus
14   argument.  That's just where my brain is leaning right now.
15        So, again, help me to understand why that wouldn't be
16   enough time.
17             MR. WILSON:  Well, I think that, you know, as Mr.
18   Morris mentioned earlier, we've had witnesses on exhibit and
19   witness lists for prior hearings, and for various reasons they
20   did not end up being called.
21        I mean, you may recall at the contempt hearing that the
22   Debtor decided to release Ellington and Leventon and not call
23   them, on an agreement with their counsel, and we subsequently
24   decided that we could -- we could go without calling them as
25   well.  However, at the end of that hearing, we'd wished we'd
```

29

1   had their testimony in there, and we asked you to reopen the

2   evidence and allow them to testify.

3       My point is, is that this is a permanent trial --

4           THE COURT:  To be exact, it was not at the end of the

5   day of evidence.  It was when we came back two days later that

6   you wanted to reopen the evidence, after we made it very

7   crystal clear the evidence had closed.  Okay?  I just -- I

8   don't like things to get incorrectly in the record.

9           MR. WILSON:  I mean, you stated that correctly, Your

10  Honor.  It was -- it was on March 24th that we asked you to

11  allow those witnesses to testify.

12      But in any event, you know, we deserve an opportunity to

13  put on our evidence and to make our record, which, you know,

14  as Mr. Morris told you, has not been done.  And I think Mr.

15  Dondero has that right.  And, you know, we're currently

16  evaluating the relief the Debtor is seeking, and of course

17  we're taking into consideration the comments Mr. Morris just

18  made.  We haven't had an opportunity to talk to my client

19  about that.

20      But, you know, we -- we should have a right to call

21  witnesses.  They've been on the witness and exhibit list, you

22  know, now for the appropriate amount of time.  Mr. Morris has

23  been aware of them.  And, in fact, he's deposed nearly all of

24  them, if not taken them on examination in a hearing as well.

25  And I don't think there's any surprise or whatnot to Mr.

30

1   Morris if any of these guys testify.

2       But, you know, I think that Mr. Dondero has the right to

3   evaluate, you know, what these witnesses could say and to put

4   on their testimony to the extent that we need to to rebut what

5   the Debtor is trying to -- what the -- the case the Debtor is

6   trying to make.

7           THE COURT:  All right.  So, Seery, Dondero,

8   Ellington, Leventon, Jason Post, Dustin Norris, JP Sevilla?

9   Your current plan --

10          MR. WILSON:  And I may be --

11          THE COURT:  Your current plan is to call seven

12  witnesses?

13          MR. WILSON:  I would say up to seven, but my current

14  plan is to call more than just Mr. Dondero and Mr. Seery, as

15  Mr. Morris intends to do.

16          THE COURT:  All right.  I think you were alluding to

17  this, but let me double-check.  Now that you've heard Mr.

18  Morris explain how the permanent injunction he would be

19  requesting is skinnied-down from the preliminary injunction,

20  and that is, you know, taking out references to shared

21  services agreements because those aren't in place anymore and

22  taking out the prohibition on Dondero communicating with Scott

23  Ellington and Isaac Leventon, does this impact the trial at

24  all, from your standpoint?

25      I mean, I know a big issue has been, you know, First

31

 1  Amendment, prohibiting him from talking.  But with Paragraph 4

 2  coming out, the Ellington/Leventon prohibition, and with the

 3  fact that there's no shared services agreement in place, so,

 4  you know, I don't know why he would need potentially to be

 5  talking to Debtor personnel, is this -- does this skinny down

 6  the trial, at least, in your view?

 7          MR. WILSON:  I think it -- I think it very well may,

 8  Your Honor.  I mentioned that a minute ago.  Unfortunately, I

 9  haven't had the opportunity to visit with my client about that

10  so I can't commit to anything at this moment.  But I think you

11  may very well be right on that.

12          THE COURT:  All right.  Well, I'd like you to have

13  good faith discussions with Mr. Morris in the next 24 hours.

14  You know, Mr. Dondero is there in your office, so I would

15  think you all could caucus and get back with him in 24 hours

16  on that point.

17          MR. WILSON:  Well, yeah, with due respect, Your

18  Honor, Mr. Dondero is in the middle of a deposition with Mr.

19  Taylor, and they're at a separate office than I am at this

20  moment.  They took a break from their deposition to attend

21  this hearing.

22          THE COURT:  Okay.  They're not in your office?  I see

23  Mr. Taylor.  He's in some other office.  Mr. Dondero is

24  waving.

25          MR. TAYLOR:  Yes.  I'm in Dallas, Your Honor.

32

1      THE COURT:  I thought they were all there at Bonds
2  Ellis, but they're not all there at Bonds Ellis.
3      MR. TAYLOR:  Your Honor, Clay Taylor on behalf of Mr.
4  Dondero.  Just so that you know, we've been in depositions for
5  -- where Mr. Dondero was subpoenaed as a third-party witness
6  in the UBS versus Highland Capital case where we moved for a
7  protective order on that but that was denied.  And so we are
8  appearing pursuant to that -- to that notice, and we're going
9  right back to it after this.  Mr. Clubok has, as counsel for
10  UBS, has indicated that it might be a lengthy day today.  I'm
11  hoping that that doesn't turn out to be the case.  But it's --
12  we've already been going at it for some time, and he indicates
13  that he has quite a bit more to ask.  So, just so you know.
14  And then we do have -- Mr. Wilson does indeed need to talk
15  with Mr. Dondero about a few things that we heard that we
16  weren't totally anticipating from Mr. Morris that might --
17  might skinny this down.
18      THE COURT:  Okay.  All right.  Well, thank you, Mr.
19  Taylor.
20      Here's what I'm going to do.  I'm going to deny the motion
21  for a stay.  I just don't think there is the required showing
22  here to stay trial in this adversary proceeding pending the
23  mandamus ruling.  You know, at this point, it's been over two
24  months since the petition for mandamus was filed.  I don't
25  know what that means, just like none of you know what that

33

1   means.  But particularly with a stay pending mandamus pending

2   before the Fifth Circuit right now, I mean, they'll do what

3   they feel is appropriate to do, but I think it's appropriate

4   for this Court to move forward in this trial until ordered

5   otherwise.

6       Again, when looking at the four prongs here, I think one

7   of the most significant prongs here on evaluating should we

8   stay this or not is the, does the stay serve the public

9   interest?

10      And, again, I view the argument largely to be about

11  judicial economy and efficiency of the parties.  And at this

12  point, however I rule at trial, I feel like the mandamus

13  becomes moot and it's much more efficient for everyone to --

14  if someone wants to appeal my final ruling in this adversary,

15  there are not going to be the impediments of needing to seek

16  leave of needing to get mandamus.  It'll be a final ruling one

17  way or another.  That's the only way I can view this.

18      And, again, looking at the other prongs for a stay pending

19  appeal, likelihood of success on the merits.  You know, is

20  there a significant legal issue on a serious legal question?

21  I just don't see that prong having been met.  It's important

22  to people.  I know this litigation is important to people.

23  But it doesn't, in my estimation, meet that high hurdle.

24      So, the stay is denied.  I don't find the other prongs met

25  here.

34

1      I am, as I suggested, going to go ahead and set this for

2   trial a week from Friday.  So what's that, the 21st?

3           MR. WILSON:  Your Honor?

4           THE COURT:  Yes?  Who's speaking?

5           MR. WILSON:  Yes, Your Honor.  Is Friday the only day

6   next week where trial is available?

7           THE COURT:  Do you have a conflict?

8           MR. WILSON:  Well, I just got asked to participate in

9   a proceeding out in Midland on Friday, that we have to go

10  Thursday night.  If -- you know, if that -- if there's another

11  day around there that would work better, that would work

12  better for me personally.

13          THE COURT:  There's really not.  I'm looking at next

14  week, and I have Highland all day on Monday.  As far as I

15  know, a full-day setting is what I have down for the UBS

16  settlement.  Anyone disagree with that going all day?

17          MR. MORRIS:  We haven't gotten objections yet, Your

18  Honor, but that's what we're going to plan for.

19          THE COURT:  Okay.

20          MR. MORRIS:  It's John Morris.  John Morris for the

21  Debtor.

22          THE COURT:  Okay.  So, Tuesday at 9:30, I have

23  Highland matters.  Motion to disqualify Wick Phillips and then

24  various fee applications.  I show a three-hour time estimate

25  on the Wick Phillips matter.  Is that --

35

1                MR. MORRIS:  You know, Your Honor, this is John

2      Morris.  And I know that they're not here, or at least I don't

3      think they're on, I don't think there's representatives, so I

4      want to caveat what I'm about to say.  We received their

5      objection to the motion the other day, and I think it's going

6      to require discovery, and so I do intend to reach out to them

7      before the hearing to see if we could simply have a status

8      conference on Tuesday and just set a scheduling order that

9      will allow us to take some discovery, because we're a little

10     surprised at some of the positions that they're taking and

11     we're certainly not prepared to have an evidentiary hearing.

12         So, you know, I don't have their agreement to say that.

13     I'm just saying that that's what our intention is.  I don't

14     know what the Court's calendar looks like for the balance of

15     the day, but if the balance of the day is free, it's

16     conceivable we could be prepared to try this on Tuesday as

17     well.

18                THE COURT:  All right.  Well, I would be willing to

19     do that.  If the Wick Phillips thing comes off, that leaves

20     one, two, three fee applications.  So we could set the trial

21     for 9:30 and do the fee applications first on Tuesday and then

22     roll into this trial.

23         How does that sound?  Mr. Wilson, does that work better

24     for you?

25                MR. WILSON:  Is there time to roll into Wednesday if

36

1    that becomes necessary?

2           THE COURT:  There is actually some time to roll into

3    Wednesday, if that happens.  All right?  I still want you all

4    to talk about limiting your evidence.  I kind of spit-balled a

5    minute ago three hours each side of evidence, plus opening,

6    plus closing.  I want you to think about is that doable, but I

7    will commit to give you Wednesday morning next week as well if

8    we don't finish on Tuesday.  All right?  Work for everyone?

9           MR. MORRIS:  That's fine with the Debtor, Your Honor.

10   That's fine with the Debtor.

11      I do have one other issue to raise, if I may.  I don't

12   know if there's anything else on your agenda, Your Honor.

13          THE COURT:  Well, there is something else on my

14   agenda, but I'll let you go first.  But just to make the

15   record clear, trial is set on this matter next Tuesday at

16   9:30, and then I'll give you a half a day Wednesday, Wednesday

17   morning as well, if you need it.

18      So, could I ask -- I'll split up the job.  Mr. Wilson, if

19   you could upload an order denying your motion for stay.  And

20   then, Mr. Morris, if you could upload an order setting this

21   for trial next week at 9:30.

22      All right.  So what is your issue, before I get to mine?

23          MR. MORRIS:  Sure.  Just prior to this hearing, the

24   Bonds Ellis firm filed on behalf of Mr. Dondero objections to

25   the Debtor's exhibits.  We had filed our witness and exhibit

37

```
1   list a couple weeks ago, I believe.  Maybe it was just a week
2   ago.  And every -- I think maybe all but two or three of the
3   exhibits on our exhibit list are exhibits that were previously
4   admitted into evidence, mostly without objection, maybe a
5   couple over their objections.  But they've all been admitted
6   into evidence in this case in either the temporary restraining
7   order proceeding, the preliminary injunction proceeding, or
8   the contempt proceeding.  So all of it's happened in this
9   adversary case with these lawyers representing the Defendant.
10  And nevertheless, they filed objections to almost every single
11  exhibit.  On authentication grounds.  On relevance grounds.
12  And I just -- I was struck by that because I've never seen
13  anything like that before, Your Honor.  And I was looking at
14  Rule 11.  Rule 11(b)(2) requires anybody filing a paper with
15  the Court to represent that the legal contentions are
16  warranted by existing law or by a non-frivolous argument for
17  extending, modifying, or reversing existing law.  And I just,
18  I just don't understand what existing law there is that would
19  allow a party to object to evidence that has already been
20  admitted in the adversary proceeding.  And before the Debtor
21  pays me money that it shouldn't, I think -- I think -- I'd
22  like to just raise this issue with the Court because they've
23  objected literally -- they've objected, for example, to one of
24  our exhibits that they cite in their proposed findings of fact
25  and conclusions of law.  Now, mind you, they have a totality
```

38

1   of four citations to the record in their proposed findings of

2   fact and conclusions of law, but two of them are to the

3   January 26th transcript.  Now, it is on our exhibit list, but

4   as Your Honor may recall, that hearing didn't have to do with

5   this adversary proceeding.  It actually had to do with the

6   injunction proceeding against the Advisors.

7       But so they've included -- some of the stuff there --

8   included in their proposed findings, they're objecting to the

9   exhibit on our exhibit list that has it.

10      But that's just, that's just kind of a funny fact.  What's

11  really not so funny is I don't understand how they can object

12  to evidence that's already been admitted in this adversary

13  proceeding.  And it would take -- this trial would be very

14  lengthy if I had to bring in a witness to authenticate

15  documents or to prove relevance for documents and evidence

16  that have already been admitted.

17      Not only has it been admitted, Your Honor, it's been

18  relied upon by the Debtor, as set forth in our proposed

19  findings of fact and conclusions of law.

20      Not only has it been only relied upon by the Debtor, it's

21  been relied upon by the Court in issuing the preliminary

22  injunction order.

23      And moreover, I just -- yeah, so -- so it's out there.

24  It's been out there forever, and I just don't understand how,

25  consistent with Rule 11, somebody could object to that

39

1   evidence now, because I don't know of an existing law and I

2   would really -- you know, it's going to create -- I don't

3   think this is done in good faith.  I really think it's, you

4   know, pursuant to Rule 11(b)(1), it's actually being presented

5   -- these objections are being presented for an improper

6   purpose and to needlessly increase the cost of litigation.

7   And I just -- I look for guidance from the Court, because I

8   don't want to do this unless the Court says I really need to

9   respond.

10         THE COURT:  First off, what time was this filed?

11   Because I thought my law clerk and I checked the docket right

12   before coming in here.  What time was this filed?

13         THE CLERK:  12:50 this afternoon.

14         THE COURT:  12:50?

15         THE CLERK:  Yes.

16         THE COURT:  Okay.  Shame on us for preparing early,

17   because we prepared before 12:50 for the 1:30 hearing.  This

18   was filed at 12:50.  And it shows Brian Assink filed it, Mr.

19   Wilson.  What do you have to say?  I'm looking at it.  This is

20   really the darnedest thing I've ever seen.  You have objected

21   to every exhibit except Exhibit #1, whatever #1 was.  You

22   didn't object to that.  You objected to Exhibits 2 through 65,

23   and most of them are, quote, hearsay, lack of foundation, lack

24   of authentication, relevance.  That's most of them.  Sometimes

25   you have merely hearsay, relevance.  Or relevance.

40

1      What are you doing?  I've already admitted most of these.

2  And, by the way, you stipulated to the admissibility of a lot

3  of these.

4          MR. WILSON:  Well, Your Honor, if I may, I understand

5  that, you know, a permanent injunction trial is a separate

6  proceeding, and that everything that may have been admitted

7  for a different purpose during the adversary or even some

8  other adversary proceedings, you know, is not part of the

9  record unless it's admitted in this proceeding.  And the way

10 we understood the requirements --

11         THE COURT:  Wait.  We're not talking about other

12 adversary proceedings.  We're talking about this adversary

13 proceeding.

14         MR. WILSON:  Well, we are, Your Honor, because --

15         THE COURT:  And the whole adversary proceeding is

16 about an injunction.  A TRO, preliminary, and now permanent.

17         MR. WILSON:  Well, but Your Honor, as Mr. Morris

18 mentioned, he's trying to also incorporate some testimony and

19 evidence from a separate adversary proceeding, the -- I think

20 it was the January 26th hearing.  But, you know, we understood

21 that --

22         THE COURT:  What hearing?  What hearing is that?  I

23 don't know.

24         MR. WILSON:  That was the hearing on the preliminary

25 injunction against the Funds and Advisors.

41

1          MR. MORRIS:  Your Honor, I don't believe there's one

2     citation in our proposed findings of fact and conclusions of

3     law to that transcript.  It's actually Mr. Dondero who cites

4     to that transcript twice in his proposed findings of fact and

5     conclusions of law.  At the same time, they're trying to

6     exclude the transcript from evidence.

7          THE COURT:  Mr. Wilson, got that one wrong?

8          MR. WILSON:  Well, no.  It's on their exhibit list so

9     it's one of the things that we noted an objection to.

10         But my point was, is that, you know, to the extent these

11    -- some of these items or maybe most of these items have been

12    admitted for one purpose or another in a different proceeding,

13    that was for a different purpose.  And, you know, we -- we

14    kind of thought we were starting with a clean record for our

15    permanent injunction trial and that we would, you know, make

16    more objections because there's a different purpose.  There's

17    more at stake and there's different issues.  And so that

18    doesn't mean that we're going to object to every single one,

19    but --

20         THE COURT:  What do you mean, there are different

21    issues?  Elaborate on that.

22         MR. WILSON:   Well, the whole --

23         THE COURT:  They're slightly narrower, I think is

24    what we established earlier.  What's new and different?

25         MR. WILSON:  Well, the whole preliminary versus

42

 1   permanent.  I mean, I understand the -- well, right, I mean,

 2   with respect to the relief being sought, but with respect to

 3   preliminary (garbled) in attendance at the preliminary

 4   injunction hearing.

 5         THE COURT:  Okay.  Unfortunately, you have

 6   connectivity issues suddenly.

 7         MR. WILSON:  You know, I've got -- I've got a

 8   different view on those things.  I mean, the contempt hearing

 9   has some things --

10         THE COURT:  Mr. Wilson, I don't know if --

11         MR. WILSON:  And I think we lost Mr. Morris on the

12   screen.  Can you hear --

13         THE COURT:  -- you can hear me, but we suddenly have

14   very bad connectivity.

15         MR. WILSON:  Can you hear me?

16         THE COURT:  Your screen is frozen, your video is

17   frozen, and I really didn't get any of the last two minutes.

18         MR. WILSON:  Is it better now, Your Honor?

19         THE COURT:  Well, I heard you say, "Is it better

20   now?"

21         MR. WILSON:  I'm going to log off and log back on.

22         THE COURT:  Okay.  We're going to have to -- we're

23   going to have to cut this --

24         MR. WILSON:  I'm going to try to log off and log on.

25         THE COURT:  No.  I'm ready to be finished with this

43

1   hearing.  You need to go back and look at this, because I am

2   leaning towards what Mr. Morris is arguing, and that is that

3   this is really bad faith.  Okay?  There is no change of

4   issues.  It's been the same issue at the TRO hearing, at the

5   preliminary injunction hearing.  Okay.  The motion for

6   contempt, we were looking backwards a little at behavior.  But

7   the issues are not expanded.  Okay?  It's just duration of the

8   injunction.  And now a slightly skinnied-down injunction.

9        So, of course, I am willing to consider evidence I've

10  heard at the TRO hearing and the preliminary injunction

11  hearing.  And I would note that on many, many, many of these

12  exhibits, you didn't object.  Or if you did, you argued it and

13  I overruled it.

14       So you need to go back and look at this and think hard

15  whether you're really going to press these issues at the

16  trial.  Okay?  This is -- again, *Dondi*, we require counsel to

17  work in good faith to streamline trials and work with people.

18  If you can agree, if you can stipulate to evidence, that's

19  what you need to do.  And this looks like -- I don't know what

20  it looks like.  But if this is any guidance to you, it should

21  be, if I admitted it at the TRO hearing, if I admitted it at

22  the preliminary injunction hearing, it's fair game to consider

23  it now.

24       Here's the last thing I want to say, and this is very big-

25  picture, not unique to this adversary proceeding.

44

1      Can everyone hear me okay?  I don't know if we're having

2 connectivity issues.  Can everyone hear me?

3           MR. MORRIS:  Yes, Your Honor.

4           THE COURT:  Can you hear me, Mr. Wilson?

5           MR. MORRIS:  Yes, Your Honor.

6           MR. WILSON:  Yes, Your Honor.

7           THE COURT:  Okay.  I have been pondering something

8 the past few days.  And I haven't figured out how I want to

9 address it, but maybe Mr. Dondero's counsel and counsel from

10 some of the Dondero-controlled entities, maybe they can listen

11 to what I'm about to say and figure out a solution.

12      As you all know, there are so many law firms, so many

13 lawyers involved now that are basically singing the same tune

14 at a lot of these hearings as far as objections, me too, me

15 too, me too.  And so just quickly eyeballing what we have, we

16 obviously have Mr. Dondero represented by Bonds Ellis.  There

17 is another firm that represents Mr. Dondero that filed a

18 motion asking that I recuse myself.  I can't remember the name

19 of that firm, but I think they appealed my denial of that

20 motion.  So, I can't remember who that was.  Then we have the

21 various affiliates.  We have -- well, I'll just start

22 chronologically.  Highland CLO Funding, Ltd. has historically

23 been represented by King & Spalding.  I don't know if that's

24 -- I know there were some changes there with the ownership of

25 that entity, so maybe they're gone.  But then we have NexPoint

45

```
 1    Advisors and Highland Capital Management Fund Advisors.  We

 2    call them the Advisors and then the Funds.  Originally, they

 3    were all represented by K&L Gates, but now they've divvied it

 4    up and Munsch Hardt is representing, I guess, the Advisors,

 5    and the Funds are represented by K&L Gates.  CLO Holdco, Ltd.,

 6    it was Kane Russell Coleman & Logan representing them, but I

 7    now think I'm seeing Kane Russell is representing Grant Scott

 8    and -- individually.  I'm not sure if Kane Russell is still

 9    representing CLO Holdco.  We have Dugaboy and Get Good Trusts

10    represented by Doug Draper, Heller Draper.  We have now Louis

11    Phillips representing the Charitable DAFs, Highland Dallas

12    Foundation.  We have NexPoint Real Estate Partners represented

13    by Wick Phillips, although there's the motion to disqualify

14    them.  And then I guess I'll just throw in we've had Baker &

15    McKenzie and Ross & Smith representing certain groups of

16    employees, but now I guess those proofs of claim have been

17    bought by Dondero entities and so I'm not sure who's

18    representing who there.

19        I'm not even sure I got everyone just now, but here's what

20    I'm getting at.  You talk about judicial efficiency and

21    judicial economy and economy of the partners.  We can't go on

22    efficiently with 12 law firms or whatever I just named filing

23    the very same type of motion or objection.  You know, I almost

24    -- if we were in different circumstances, I'd say we need to

25    have an ad hoc committee of these Dondero-controlled
```

46

 1  affiliates, something like that.

 2     But I've been thinking about this for a few days because I

 3  see, like in one adversary, I think we now have three motions

 4  to withdraw the reference.  And I haven't studied them all,

 5  but I'm pretty sure they're going to tell me the exact same

 6  thing.  And again, I'm just doing some predictions that the

 7  UBS settlement, I wouldn't be surprised if I get eight or ten

 8  or twelve objections that say the very same thing.

 9     We're going to have to work something out.  Okay?  This is

10  not efficient.  It's not useful.  I would think a person such

11  as Mr. Dondero would want to rein in legal fees, but maybe

12  not.

13     Do you all have any ideas, Mr. Taylor, Mr. Wilson?  How

14  can we rein this in?  There's got to be a better way --

15          MR. TAYLOR:  Your Honor?

16          THE COURT:  -- than twelve different law firms filing

17  almost identical pleadings.

18          MR. TAYLOR:  Your Honor, I understand what you're

19  saying, on the one hand.  On the other hand, each of these

20  entities do have -- are separate corporations.  They have

21  different duties to various stakeholders, and they are

22  controlled by different stakeholders.  And that is one of the

23  things that has been a consistent, at least from what I

24  understand from my limited understanding and length of time in

25  the case, that that is one thing that is very important to Mr.

47

1    Dondero and those related entities, is that those duties do

2    run to different parties.  So each party has to preserve its

3    individual rights.

4         Sure.  Could it be more efficient?  Of course.  But Mr.

5    Dondero has a different set of duties than do the Advisor,

6    than do the Funds, than do the Trusts that are controlled by a

7    separate trustee.  And while of course there's some

8    interrelated cooperation amongst them, amongst the joint

9    defense agreement, it is very important that they maintain

10   their separate corporate identities and act independently from

11   each other, because they truly do have to act independently

12   from each other in many different circumstances.  They don't

13   want to lose sight of that.

14        So that is my initial explanation.  Of course, I can talk

15   with my client about it further, about seeing what can be

16   done, because he does indeed want to make it more efficient.

17   Has been hammering on me and my firm every month to try to do

18   so, and I'm sure he has with the other professionals.

19        But we do hear Your Honor, but we do want to make sure

20   that that -- those different separate corporate identities of

21   these entities is both recognized and laid out in this case.

22   It is very important to us and just integral to a lot of the

23   things that we've done in this case.

24            THE COURT:  You know what would help me understand

25   that better?  Is if in every case I had this entity is owned

48

1  by, you know, 25 percent by this, this. If I knew the owners,

2  if I knew the equitable owners. But I don't. That's just all

3  kind of glossed over. And so that's how perceptions get

4  created that Dondero, Dondero, Dondero, Dondero. You know

5  what I'm saying?

6            MR. DONDERO: Your Honor?

7            THE COURT: And I don't know if you want to share

8  that information or not, but that's why I can't just accept a

9  generalization that, oh, we have very different stakeholders

10 behind --

11           MR. TAYLOR: Your Honor? Wait, hold on a second.

12 Your Honor, --

13           THE COURT: -- this entity versus this one versus

14 this one.

15           MR. TAYLOR: Your Honor, if you would allow my

16 client, he would like to very briefly address the Court on

17 those points, if he may.

18           THE COURT: Okay.

19           MR. DONDERO: Your Honor, just a brief history from

20 my perspective, okay? We filed with $450 million of assets

21 and $110 million of estimated, as presented by the independent

22 board and Pachulski to the Court, trying to do a quick

23 settlement the first three or four months into bankruptcy.

24 The claims, the awards, the Class 8, the Class 9 awards, the

25 people who didn't even have standing, have all of a sudden

49

1   ballooned to $300-some-odd million.  And the assets in the

2   estate, which we haven't had an examiner go through all these

3   no-process asset sales at a loss, when I would have bought

4   them for more, has driven the estate value down to less than

5   $250 million.

6       We made an offer to try and settle this thing a few months

7   ago at 20 percent more than the estimated value in the

8   recoveries.  But Seery and the UCC are emboldened because they

9   feel in this Court there's going to be no respect of third-

10  party investors, no respect of other Dondero entities, and

11  they've been told that they can get more than a hundred cent

12  recovery by going after me and all my other entities going

13  back ten or twelve years.

14      So there's no chance that this case ever settles.  And

15  what you're going to see is there's a half a dozen or more --

16              MR. POMERANTZ:  Your Honor, I have to -- I have to --

17              MR. DONDERO:  -- there's a half a dozen more law

18  firms coming --

19              THE COURT:  Just a moment.

20              MR. DONDERO:  -- and there's a half a dozen -- there

21  are a half a dozen more --

22              MR. POMERANTZ:  Your Honor, this --

23              THE COURT:  Mr. Morris?

24              MR. POMERANTZ:  This is Jeff Pomerantz.

25              THE COURT:  Mr. Morris?

50

1          MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

2          THE COURT:  Oh, Mr. Pomerantz?

3          MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

4          THE COURT:  Uh-huh.

5          MR. POMERANTZ:  You know, I think what Mr. Dondero is

6  doing is totally inappropriate.  We're not here to relitigate

7  the history of the case.  We're not here to relitigate or

8  determine why a settlement hasn't been reached.  Your Honor

9  raised some important questions, (garbled) gave an answer, you

10  pushed him, but what Mr. Dondero is doing is just

11  inappropriate, and we shouldn't -- don't think he should be

12  doing this in this manner.

13      If he wants to at some point be put on to testify, he

14  could be cross-examined.  But he's testifying about things

15  that actually just happen not to be true and it's totally

16  inappropriate for this context.

17          THE COURT:  Okay.  Well, I understand --

18          MR. DONDERO:  But Your Honor, there's going to a half

19  dozen --

20          THE COURT:  -- that -- I understand, you know, Mr.

21  Pomerantz is concerned because I asked a specific question

22  aimed at how do we rein in all the lawyers, and the answer

23  was, well, they all are separate entities with separate

24  interests and separate stakeholders.  And my question was,

25  well, could I maybe see a list, a breakdown on all of these

51

1    entities?  Because, you know, in so many cases, --

2         MR. DONDERO:  But Your Honor, --

3         THE COURT:  -- in almost every case I have, I get a

4    big giant what I call spaghetti chart at the beginning of the

5    case where I get a breakdown of debtor affiliates and who owns

6    what.  And this hasn't been clear to me with all of these

7    affiliates.

8         But I do very much have the impression, Mr. Dondero, that

9    all roads lead back to you.  So I let you speak to this, and

10   we've kind of gone down a different trail.  And I want you to

11   know, I know --

12        MR. DONDERO:  Right.

13        THE COURT:  I know where you stand on this because

14   you have told me before.  You have huge concern that Highland

15   had $x$ hundred million dollars of assets at the beginning of

16   the case and now it's a lot lower.  I know you have concerns

17   with liquidation at what you think were very inappropriate

18   times.  I know you have all kinds of beefs, beefs about the

19   settlement with Acis, and probably UBS and the Redeemer

20   Committee.  I understand that.  But what I'm talking about

21   right now is going forward.  Going forward, how do we rein

22   this in where we don't --

23        MR. DONDERO:  But going forward, there's going to be

24   more lawyers.  There's going to be more defense.  Because the

25   Debtor is just going to keep trying to broaden, because they

**009113**

52

 1   feel empowered and enabled to go after anything related to

 2   Highland, me, et cetera.  But there's probably half a dozen

 3   more attorneys coming into this case.  I don't know what to

 4   tell you.  It's a circus.

 5        THE COURT:  Okay.  Well, I'm going to let you all

 6   think about this out of court.  Is there a way you can

 7   streamline?  I mean, I know -- I almost chuckle at myself at

 8   saying ad hoc committee of Dondero-controlled entities.  I

 9   know that that sort of sounds, I don't know, unworkable,

10   maybe.  Maybe not.  I'm not going to read 14 different

11   objections to the UBS settlement that say the very same thing.

12   I'm not going to read a different motion to withdraw the

13   reference by every single defendant in every single adversary

14   that gets filed.  This is just not an efficient way to go

15   forward.

16      So I want you all to think about how you can make this

17   more efficient.  You know, it -- a perception could exist that

18   you're trying to carpet-bomb us all with paper, the Court

19   included.  I mean, it's my job.  I'm going to read everything

20   that's put before me.  That's what I do.  That's what I'm

21   supposed to do.  But it's out of control.  So you all think of

22   a way to get it in control or I might impose something.  The

23   wheels are turning.  What could I do?  You know, page limits.

24        MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

25   One suggestion might be, following up on what Your Honor made

53

```
 1    some comments about, and Your Honor has used the word ad hoc

 2    committees, and obviously it's sort of a different animal

 3    here.  But as Your Honor knows, that every time an ad hoc

 4    committee comes in, they have to file a 2019 statement.  So I

 5    think it would at least provide Your Honor with information,

 6    as it would provide all of us with information, to really

 7    understand and know, when people are appearing, is it all

 8    roads leading back to Dondero, or, as Mr. Taylor says, what

 9    are the different constituents?  Who are the different people?

10        As Your Honor has heard from us, we lump them all together

11    because we believe the evidence has shown throughout this case

12    that it all leads -- the road leads back to Dondero.  But Your

13    Honor may consider asking them to file sort of the equivalent

14    of a 2019 statement to provide Your Honor with that

15    information under oath that Your Honor could then see, when

16    you get several objections to the same thing, whether you

17    really need to be dealing with them as seven different matters

18    or whether dealing with them as one.

19            THE COURT:  Okay.  All right.  Well, I'm giving this

20    thought.  And again, I'll let you all think about it and make

21    a proposal.  But I may or may not accept any proposal you

22    make.  And I am leaning towards requiring information to be

23    filed of who owns what, who are the stakeholders.  That'll

24    help me understand, is it necessary to have this entity filing

25    a separate objection or motion from this other entity or not?
```

54

1  Can we just have an hoc committee each time?

2     I don't even think I listed all the law firms.  I know a

3  new law firm filed a lawsuit in front of Judge Jane Boyle

4  recently.  We've got a hearing on that coming up in June.  I

5  mean, and now you're -- I'm hearing there are going to be

6  more.  Well, if you don't figure out a way to rein it in, then

7  I'm just going to have to get that list of who are the

8  stakeholders in these entities, under oath, because I don't

9  understand it.  I don't understand why we need these many

10  lawyers filing position papers.

11     So, all right.  Well, we're going to adjourn, and I guess

12  I'll see you next Monday, right?

13          MR. MORRIS:  Thank you, Your Honor.  Yes.

14          THE COURT:  Okay.  Thank you.

15          THE CLERK:  All rise.

16     (Proceedings concluded at 3:07 p.m.)

17                    --oOo--

18

19

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23  **/s/ Kathy Rehling**                    05/11/2021

24  _____    _____

25  Kathy Rehling, CETD-444                    Date
   Certified Electronic Court Transcriber

55

INDEX

PROCEEDINGS                                                            3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Defendant's Emergency Motion to Stay Proceedings Pending    32
Resolution of Defendant's Petition for Writ of Mandamus
or, Alternatively, Motion to Continue Trial Setting (154)
- *Denied*

END OF PROCEEDINGS                                                    54

INDEX                                                                 55

# EXHIBIT 18

Amex_05175
009118

```
 1                IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3                                  )   Case No. 19-34054-sgj-11
         In Re:                     )   Chapter 11
 4                                  )
         HIGHLAND CAPITAL           )   Dallas, Texas
 5       MANAGEMENT, L.P.,          )   Friday, June 25, 2021
                                    )   9:30 a.m. Docket
 6            Debtor.               )
                                    )   EXCERPT:  MOTION FOR
 7                                  )   MODIFICATION OF ORDER
                                    )   AUTHORIZING RETENTION OF JAMES
 8                                  )   P. SEERY, JR. DUE TO LACK OF
                                    )   SUBJECT MATTER JURISDICTION
 9   _____       )   (2248)
                                    )

10               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11              UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:        Jeffrey Nathan Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
14                          10100 Santa Monica Blvd.,
                              13th Floor
15                          Los Angeles, CA  90067-4003
                            (310) 277-6910
16
     For the Debtor:        John A. Morris
17                          PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
18                          New York, NY  10017-2024
                            (212) 561-7700
19
     For CLO Holdco, Ltd. and   Jonathan E. Bridges
20   The Charitable DAF Fund,   Mazin Ahmad Sbaiti
     LP:                        SBAITI & COMPANY, PLLC
21                              JP Morgan Chase Tower
                                2200 Ross Avenue, Suite 4900 W
22                              Dallas, TX  75201
                                (214) 432-2899
23
     For Get Good Trust and     Douglas S. Draper
24   Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
                                650 Poydras Street, Suite 2500
25                              New Orleans, LA  70130
                                (504) 299-3300
```

2

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:      SIDLEY AUSTIN, LLP
 3                                One South Dearborn Street
                                  Chicago, IL  60603
 4                                (312) 853-7539

 5   Recorded by:                 Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
 6                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
 7                                (214) 753-2062

 8   Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
 9                                Shady Shores, TX  76208
                                  (972) 786-3063
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

3

1           <u>DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.</u>

2       (Transcript excerpt begins at 11:33 a.m.)

3           THE CLERK:  All rise.

4           THE COURT:  All right.  Please be seated.  We are

5   back on the record, and our last motion this morning is the

6   Motion to Reconsider filed by CLO Holdco and the DAF.  Do we

7   have Mr. Bridges and Mr. Sbaiti back with us now?

8           MR. BRIDGES:  Yes, Your Honor.  I have changed seats

9   because of audio problems we're having here, but we're both

10  here.

11          THE COURT:  Okay.  Well, I think we heard an

12  agreement that you all have agreed that you're going to have

13  an hour and a half each, and I presume that means everything:

14  opening statements, arguments, evidence.  So, we'll start the

15  clock.  Nate, it's 11:35.  So, Mr. Bridges, your opening

16  statement?

17   OPENING STATEMENT ON BEHALF OF CLO HOLDCO AND THE CHARITABLE

18                         DAF, LP

19          MR. BRIDGES:  Thank you, Your Honor.  We're here on a

20  motion to modify an order that we'd submit has already been

21  modified by the plan confirmation order, although that order

22  has not yet become effective.

23       The modification there was to add the phrase "to the

24  extent legally permissible" to the Court's assertion of

25  jurisdiction in what is essentially the same gatekeeper

4

1    provision that's at issue here.  We submit that change is an

2    admission or at least a strong indication that the unmodified

3    order, at least as applied in some instances, contains

4    legally-impermissible provisions.  The entire argument today

5    from our side is about what's not legally permissible in that

6    order.

7        And that starts with our concerns regarding the

8    application of 28 U.S.C. § 959(a).  As Your Honor knows well,

9    959(a) is a provision of law that the Fifth Circuit and

10   *Collier on Bankruptcy* call an exception to the *Barton*

11   doctrine.  I know from the last time we were here that the

12   Court is already aware of what 959(a) says.  It's the second

13   sentence, I understand, which the Court pointed to in our

14   previous hearing that creates general equity powers or

15   authorizes the Court to use its general equity powers to

16   exercise some jurisdiction, some control over actions that

17   fall within the first sentence of 959(a).  But that second

18   sentence also prohibits explicitly the Court's using general

19   equity powers to deprive a litigant of his right to trial by

20   jury.

21       Here, we're not under *Barton*, the statutory exception to

22   *Barton* applies, because Mr. Seery is a manager of hundreds of

23   millions of third-party investor property.  Instead, we're

24   here under the Court's general equity powers, as authorized by

25   959(a).  And those equity powers cannot deprive the right to

5

1  trial by jury.

2      But the order does deprive trials by jury, first by

3  asserting sole jurisdiction here, where jury trials are

4  unavailable, and secondly, by abolishing any trial rights for

5  claims that do not involve gross negligence or intentional

6  misconduct.

7      Movants' third cause of action in the District Court case

8  is for ordinary negligence. It comes with a Seventh Amendment

9  jury right. But it's barred by the order because the order

10 only allows colorable claims involving gross negligence or

11 intentional conduct, not ordinary negligence.

12     Movants' second cause of action in the District Court case

13 is for breach of contract. That comes with a Seventh

14 Amendment jury right, but it's barred by the order because the

15 order only allows colorable claims of gross negligence or

16 intentional misconduct, not negligent or faultless breaches of

17 contractual obligations.

18     Movants' first cause of action in the District Court case,

19 breach of Advisers Act fiduciary duties, comes with a jury

20 right. It's also barred by the order because the order only

21 allows colorable claims involving gross negligence or

22 intentional misconduct.

23     You see there what I mean. Congress couldn't have been

24 clearer. Courts cannot deprive litigants of their day in

25 court before a jury of their peers by invoking general equity

6

1  powers.  Those powers don't trump the constitutional right to

2  a jury trial.

3      Yet this Court's order purports to do precisely that, not

4  only for the Movants, but also for future potential litigants

5  who may have claims that have not even accrued yet.  If those

6  claims are for ordinary negligence or breach of contract or

7  breach of fiduciary duties and don't rise to the level of

8  gross negligence or intentional misconduct, this order says

9  that those claims are barred, and it would deprive them of

10  their day in court.

11      The Court's general equity powers are simply not broad

12  enough to uphold such an order.

13      This issue is even more problematic when the causes of

14  action at issue fall within the mandatory withdrawal of the

15  reference provisions of 28 U.S.C. § 157(d).  As this Court

16  knows, it lacks jurisdiction over proceedings that require

17  consideration of non-bankruptcy federal law regulating

18  interstate commerce.  Some such claims -- Movants' Advisers

19  Act claim, for instance -- do not involve culpability rising

20  to the level of gross negligence or intentional misconduct,

21  but the order purports to bar them nonetheless, despite this

22  Court's lacking jurisdiction over the subject matter of those

23  claims.

24      Even if there is gross negligence or intentional

25  misconduct, the order states that this Court will have sole

7

```
 1   jurisdiction over such claims.  And that can't be right if

 2   withdrawal of the reference is mandatory.

 3       Opposing counsel will tell you that 157(d) is inapplicable

 4   here because they think our claims in the District Court won't

 5   require substantial consideration of the Advisers Act or any

 6   other federal laws regulating interstate commerce.  But their

 7   cases don't come anywhere close to making that showing, as the

 8   briefing demonstrates.

 9       And in any case, that argument is beside the point.  This

10   order is contrary to 157(d) because it asserts jurisdiction

11   over claims that 157(d) does not apply -- I'm sorry, does

12   apply to.  And that's true regardless of whether Movants'

13   claims are among those.

14       The idea that there's no substantial consideration of

15   federal law, however, in the District Court case is undermined

16   by Mr. Seery's testimony in support of his appointment in

17   which he confirmed that the Advisers Act applies to him and

18   that he has fiduciary duties under that Act to the investors

19   of the funds he manages.

20       Your Honor, importantly, the Advisers Act isn't the

21   typical federal statute with loads of case law under it.  It's

22   actually an underdeveloped, less-relied-upon statute, and most

23   -- most of the law under that Act is promulgated by regulation

24   and supervised by the SEC.  As a registered investment

25   advisor, Mr. Seery is bound by that Act, which he admits, he
```

8

```
 1    agrees to.  But to flesh out what his duties are requires a

 2    close exam of more than three dozen regulations under 17

 3    C.F.R. Part 275.

 4        The obligations include robust duties of transparency and

 5    disclosure, as well as duties against self-dealing and the

 6    necessity of obtaining informed consent, none of which are

 7    waivable, these duties.

 8        The proceedings here in this Court reflect an effort to

 9    have those unwaivable duties waived.  The allegations in the

10    District Court are essentially insider trading allegations

11    that the Debtor and Mr. Seery knew or should have known

12    information that they had a duty under the Advisers Act to

13    disclose to their advisees.  Both under the Act and

14    contractually, they had those duties.  And, instead, they did

15    not disclose and consummated a transaction that benefited

16    themselves nonetheless.

17        In considering those claims, the presiding court will have

18    to consider and apply the Advisers Act and the many

19    regulations promulgated under it, in addition to other federal

20    laws regulating interstate commerce.  For that reason,

21    withdrawal of the reference on the District Court action is

22    mandatory.  That's the two major -- that's two major problems

23    out of four with the order that we're here on today.

24        First, it deprives litigants of their right to trial, to a

25    jury trial, when Section 959(a) says that can't be done.  And,
```

9

1   two, the order asserts jurisdiction -- sole jurisdiction, even

2   -- over proceedings in which withdrawal of the reference is

3   mandatory under 157(d).

4        The fourth major problem is what the Court called

5   specificity at the previous hearing.  The Fifth Circuit's

6   *Applewood Chair* case holds that the rule from *Shoaf* does not

7   apply without a "specific discharge or release," and that that

8   release has to be enumerated and approved by the Bankruptcy

9   Court.  Thus, the order here can't exculpate Mr. Seery of

10  liability for ordinary negligence and the like in a blanket

11  fashion.  The claims being released must be identified.

12       That's what happened in *Shoaf*.  Shoaf's guaranty

13  obligation was explicitly released.  That's also what happened

14  in *Espinosa*.  Espinosa's plan listed his student loan as his

15  only specific indebtedness.  But it's not what happened here.

16  And it couldn't happen here, because the ordinary negligence

17  and similar claims being discharged by the order had not yet

18  accrued and thus were not even in existence at the time the

19  order issued.

20       Instead, what we have here is a nonconsensual, nondebtor

21  injunction or release that's precisely what the Fifth Circuit

22  refused to enforce in the *Pacific Lumber* case.

23       So, lack of specificity is the third major problem with

24  the order.  And that brings us to the fourth problem, which is

25  the *Barton* doctrine.  *Barton* is the only possible basis for

10

 1   this Court to assert exclusive or sole jurisdiction over

 2   anything.  Outside of *Barton*, it's plain black letter law that

 3   the District Court's jurisdiction is equal to and includes

 4   anything that this Court's derivative jurisdiction would also

 5   reach.

 6       But the exception to the *Barton* doctrine in 959(a) plainly

 7   applies here, leaving no basis for exclusivity with regards to

 8   jurisdiction and the District Court.  That's because Mr. Seery

 9   is carrying on the business of a debtor and managing the

10   property of others, rather than merely administering the

11   bankruptcy estate.  The exclusive jurisdiction function of the

12   *Barton* doctrine has no applicability because 959(a) creates

13   that exception here.

14       Under its general equity powers, yes, 959(a) still

15   authorizes this Court to exercise some control over actions

16   against Mr. Seery, but short of depriving litigants of their

17   day in court.  And nothing in 959(a), that exception to

18   *Barton*, says that the Court can nonetheless exercise

19   exclusivity in that jurisdiction.  Those general equity powers

20   do not create exclusive or sole jurisdiction.  They do not

21   deprive the District Court of its Congressionally-granted

22   original jurisdiction.

23       Moreover, Mr. Seery is not an appointed trustee entitled

24   to the protections of the *Barton* doctrine in any case.  His

25   appointment was a corporate decision that the Court was asked

11

1   not to interfere with.  The Court was asked to defer under the

2   business judgment rule to the Debtor's appointment of Mr.

3   Seery.  And the Court did so.

4       As we asserted last time, no authority that we can find

5   combines these two unrelated doctrines, the *Barton* doctrine

6   and the business judgment rule.  And they don't go together.

7   None of the testimony or the briefing or argument, in the July

8   order, in the January order that preceded it, none of that

9   indicated that Mr. Seery would be a trustee or the functional

10  equivalent of a trustee.  The word "trustee" does not appear

11  in any of those briefs or transcripts.

12      Opposing -- and because of that, the District Court suit

13  is not about -- well, not because of that.  The District Court

14  suit simply is not about any trustee-like role that Mr. Seery

15  may have played anyway.  Opposing counsel will try to convince

16  you otherwise, will tell you that the District Court case is a

17  collateral attack on the settlement, but it's not.  Wearing

18  his estate administrator hat, Mr. Seery can settle claims in

19  this court.  Wearing his advisor hat, he has to fulfill his

20  Advisers Act duties and properly advise his clients.

21      He doesn't have to wear both hats, and it seems highly

22  unusual that he would choose to fill both of those roles

23  simultaneously.  But he has chosen both roles.  And the

24  District Court case is a hundred percent about his role as an

25  advisor.  Did he comply with the Act?  Did he do the things

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 212 of 1017 PageID 9976

12

1  that his advisor role obligated him to do as a manager of that

2  property?

3     The District Court suit really is only being used to

4  illustrate the issues that we're raising here. It's

5  important, it's timely to address those issues now because of

6  the District Court action, but that's an illustration of the

7  problems with the order. It is not exclusively that that

8  action is what we're attempting to address. Rather, the order

9  exculpating Mr. Seery from ordinary negligence liability and

10  similar liability is problematic, is contrary to the law. On

11  top of that, the Court is asserting jurisdiction over gross

12  negligence and intentional misconduct claims. To the extent

13  that 157(d) applies, it is problematic and contrary to law as

14  well.

15        THE COURT: Okay. We're occasionally getting some

16  breakup of your sound. So please -- I don't know what you can

17  do to adjust, but it was just now, and intermittently we get a

18  little bit of garbly. So if you could just say your last

19  sentence one more time, and we'll see if it improves.

20        MR. BRIDGES: Your Honor, I'm not sure I can say this

21  last sentence again.

22        THE COURT: Okay.

23        MR. BRIDGES: I was -- I was mentioning that the

24  District Court case is an illustration of our argument. Our

25  argument is not merely that the District Court case should be

13

exempted or excepted from the order. Our argument is that the
order is legally infirm and that the District Court case and
the claims there illustrate some of those infirmities, but
that the infirmities go beyond just what's at issue in the
District Court case.

In sum, there are four problems with the order that render
parts of it legally infirm. It deprives the right of a jury
trial -- in fact, of any trial -- in contravention of 959(a)
for some causes of action.

It asserts jurisdiction -- two, it asserts jurisdiction
over claims that are subject to the mandatory withdrawal of
the reference provision (garbled) 157(d).

And three, it lacks the specificity required to discharge
future claims under *Applewood*.

Finally, Your Honor, number four, the order relies on the
*Barton* doctrine, which doesn't apply and which 959(a) creates
an exception to.

Movants respectfully submit the order should be modified
for those reasons.

MR. SBAITI: Tell him Mark Patrick is here, for the
record.

THE COURT: All right. I have a couple of follow-up
questions for you. I want to drill down on the issue of your
client not having appealed the July 2020 order. Or the
HarbourVest settlement order, for that matter. Tell me as

14

```
 1    directly as possible why you don't view that as a big problem.

 2    Because it's high on my list of possible problems here.

 3            MR. BRIDGES:  I understand, Your Honor.  The

 4    Applewood Chair case is our -- our defense to that argument,

 5    that without providing specifics as to the claims being

 6    discharged in the July order, that Shoaf cannot apply to

 7    create a res judicata effect from the failure to appeal that

 8    order.

 9            THE COURT:  But is that really what we're talking

10    about, a discharge of certain claims?  We're talking about a

11    protocol that the Court established which wasn't appealed.

12            MR. BRIDGES:  Your Honor, your order does many

13    things.  We're talking about a few of them in one paragraph of

14    the order.  And in that order -- in that paragraph, yes, it

15    creates a protocol for determining the colorability of some

16    claims, claims that rise to the level of gross negligence or

17    intentional misconduct.  It does not create a protocol for

18    claims that fall below that threshold, claims for ordinary

19    negligence, as an example.

20            THE COURT:  Okay.

21            MR. BRIDGES:  For breach of contract that's not

22    intentional, is not grossly negligent, it's just a breach of

23    contract.  It can even be faultless.  There's still liability.

24    There's still a jury right under the Seventh Amendment for

25    faultless breach of contract.
```

15

 1      The protocols in the order do not address such claims

 2   other than to bar them.  To discharge them.  And thus, yes,

 3   it's a release, it's a discharge of those claims.  It can be

 4   viewed as a permanent injunction against bringing such claims.

 5   It's what's -- it's what's not allowed by the *Applewood Chair*

 6   case and by *Pacific Lumber*.

 7          THE COURT:  All right.  So you're arguing that was --

 8   the wording of the order was not specific enough to apprise

 9   affected parties of what they were releasing, they're

10   releasing claims based on ordinary negligence against Mr.

11   Seery?  That's not specific enough?

12          MR. BRIDGES:  Correct.  Future unproved claims, the

13   factual basis for which has not happened yet.  Those cannot be

14   and were not disclosed with any specificity in this order.

15      If we compare it to *Shoaf* and to *Espinosa*, in *Shoaf* what

16   we had was a guaranty, Shoaf's guaranty on a transaction that

17   was listed in the actual release, describing what the

18   transaction was that was being -- that the guaranty was being

19   released for.

20      In *Espinosa*, what we had was a student loan --

21          THE COURT:  Right.

22          MR. BRIDGES:  -- that was listed in the plan

23   specifically, as the only specific indebtedness.

24      Here, we don't have any of that specificity.  What we have

25   is a notice to the entire world, Your Honor, that for an

16

1   unlimited period of time any claim for ordinary negligence,

2   for ordinary breach of contract or fiduciary duty against Mr.

3   Seery is barred if it relates to his CEO role.  And his CEO

4   role means as a manager of property, exactly precisely what

5   959(a) is talking about.

6       Those jury rights (garbled) claims cannot be released,

7   discharged, expunged, done away with, in an order that isn't

8   explicit.

9       On top of that, even in an explicit order, 959(a) tells

10  the Court it cannot deprive a litigant of its jury trial

11  right.

12          THE COURT:  Well, as anyone knows who's been around a

13  while in this case, my brain sometimes goes down an unexpected

14  trail, and maybe this one is one of those situations.  Are

15  there contracts that your clients would rely on in potential

16  litigation?

17          MR. BRIDGES:  Yes, Your Honor.

18          THE COURT:  What are those contracts?

19          MR. BRIDGES:  It is a management contract.  I don't

20  think I can give you the specifics at this moment, but I

21  probably can before we're done here today.  A management

22  contract in which the Debtor provides advisory and management

23  services to the DAF --

24          THE COURT:  Well, you know, the shared services

25  agreements that we heard so much about in this case?  A shared

17

1    service agreement?  I can't remember, you know, which entities

2    have them and which do not at times.  So, --

3            MR. BRIDGES:  The shared services agreement is one of

4    those contracts, Your Honor.

5            THE COURT:  Okay.

6            MR. BRIDGES:  It's not the only one.

7            THE COURT:  And what are the others?

8            MR. BRIDGES:  There's -- the other is the investment

9    advisory agreement.

10           THE COURT:  Those two?

11           MR. BRIDGES:  (no response)

12           THE COURT:  Those are the only two?

13           MR. BRIDGES:  There may be one other, Your Honor.

14    I'm not sure.

15           THE COURT:  Are they in evidence?

16           MR. BRIDGES:  I can find out shortly.

17           THE COURT:  Are they in evidence?  We haven't talked

18    about evidence yet, but are they going to be in evidence,

19    potentially?

20           MR. BRIDGES:  They are referenced in the District

21    Court case, the complaint, which is in evidence.

22           THE COURT:  I'm asking, are --

23           MR. BRIDGES:  But those contracts I don't believe are

24    listed as exhibits here in this motion, no.

25           THE COURT:  They are not?  Okay.

18

1      Well, what my brain is thinking about here is, of the

2   umpteen agreements I've seen -- more than umpteen -- of the

3   many, many agreements I've seen over time in this case, so

4   often there's a waiver of jury trial rights, as I recall, as

5   well as an arbitration clause.  I just was curious, hmm, you

6   know, you talked a lot about your clients' jury trial rights:

7   do we know that these agreements have not waived those?

8            MR. BRIDGES:  Your Honor, I think I can answer that

9   by the end of our hearing.  I don't have an answer off the top

10  of my head.  What I can tell you is a jury right has been

11  demanded in the federal court complaint, which is in evidence,

12  and that opposing counsel has brought no evidence indicating

13  that they have the defense of our having waived the right to a

14  jury trial here.

15           THE COURT:  Okay.  Well, I just --

16           MR. BRIDGES:  Or arbitra...

17           THE COURT:  -- would think that you would know that.

18  Does anyone know that on the Debtor's side off the top of your

19  head?

20           MR. POMERANTZ:  I do not, Your Honor.

21           THE COURT:  Uh-huh.

22           MR. POMERANTZ:  And to Mr. Bridges' last point, we

23  have filed a motion to dismiss.  We have not answered the

24  complaint.  So any time to object to their jury trial right

25  would be in the context of the answer.  So the implication

19

1  that we have not raised the issue and therefore it doesn't

2  exist is just not a correct implication and connection he's

3  trying to draw.

4          THE COURT:  Okay.  All right.

5      Well, let me also ask you about this.  I'm obsessing a

6  little over the *Barton* doctrine and your insistence that it

7  does not provide authority or an analogy here.

8      Well, for one thing, is there anything in the Fifth

9  Circuit case *Sherman v. Ondova* that you think either helps you

10  or hurts you on that point?  I'm intimately familiar with it,

11  although I haven't read it in a while, because it was my

12  opinion that the Fifth Circuit affirmed.  And I spent a lot of

13  time thinking about that.  It was a trustee, a traditional --

14  well, no, a Chapter 11 trustee and his counsel.  But anything

15  from that case that you think is worthy of pointing out here?

16          MR. BRIDGES:  No, Your Honor.  I'm not -- nothing

17  comes to mind.  That case is not fresh on my mind.

18      What I would tell you is that *Barton* doctrine and the

19  business judgment rule are incompatible, and the appointment

20  of a trustee never involves application of the business

21  judgment rule or deference to the Debtor or another party in

22  terms of making that appointment.

23      The *Barton* doctrine, as it applies to trustees, is viewed

24  as an extension, to some extent, of judicial immunity to the

25  trustee, who is chosen by, selected by the Court and assigned

20

1 by the Court to carry out certain functions. That --

2 THE COURT: Well, let me --

3 MR. BRIDGES: -- quasi-immunity --

4 THE COURT: -- stop you there. You say it's an

5 extension of immunity. But isn't it, by nature, really a

6 gatekeeping provision? It's a gatekeeping provision, right?

7 Before you even get to immunity, maybe, in a lawsuit, it's a

8 gatekeeping function that the Supreme Court has blessed, you

9 know, obviously in the context of a receiver, but appellate

10 courts have blessed it in the bankruptcy context. The

11 Bankruptcy Court can be the gatekeeper on whether the trustee

12 or someone I think in a similar position can get sued or not.

13 And then we had that Fifth Circuit case after *Ondova*. It

14 begins with a V, *Villegas* or something like that. Didn't

15 that, I don't know, further ratify, if you will, the whole

16 *Barton* doctrine by saying, oh, just because they're noncore

17 claims, state law or non-bankruptcy law claims, doesn't mean,

18 after *Stern*, the Bankruptcy Court still cannot serve the

19 gatekeeper function.

20 Tell me what you disagree. That's my kind of combined

21 reading of all of that.

22 MR. BRIDGES: Your Honor, I have to parse it out.

23 There's a lot to unpack there. If I can make sure to get in

24 the follow-ups, I can start with saying it's okay for the

25 Court in many instances to act as a gatekeeper.

21

 1           THE COURT:  Okay.

 2           MR. BRIDGES:  Both under *Barton* -- under *Barton*, or

 3    when the *Barton* exception in 959(a) applies, under the Court's

 4    general equitable powers, that gatekeeping functions are not

 5    across-the-board prohibited, --

 6           THE COURT:  Okay.

 7           MR. BRIDGES:  -- and we aren't trying to argue that

 8    they're prohibited across the board.

 9           THE COURT:  Okay.

10           MR. BRIDGES:  Now, to try to dig into that a little

11    deeper, the order does two things:  gatekeeping as to some

12    claims, and, frankly, discharging or barring other claims.

13    Those are two separate functions.

14       The first one, the gatekeeping, may be, in some

15    circumstances, which we'll come to, many circumstances, may be

16    allowable, may be even mandatory under *Barton*, not even

17    requiring an order from this Court, for the gatekeeping of

18    *Barton* to apply.  But nonetheless, allowable in many instances

19    under the Court's general equity powers under 959(a).  That

20    part is right about gatekeeping.

21       It does not create jurisdiction in this Court where 157(d)

22    deprives this Court of jurisdiction.  Just because it's

23    related to bankruptcy isn't enough to say that the Court

24    therefore has jurisdiction if, one, if mandatory withdrawal of

25    the reference is required.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 222 of 1017    PageID 9986

22

1    Furthermore, Your Honor, that gatekeeping function, under

2    the equity powers authorized by 959(a), will not allow a court

3    to discharge or -- or deprive, is the word I'm looking for --

4    deprive a litigant of their right to a trial -- a specific

5    kind of trial, a jury trial -- but a trial.  And by crafting

6    an order that says certain kinds of claims that do (garbled)

7    jury rights are barred, rather than just providing a

8    gatekeeper provision, flat-out bars them, that doesn't -- that

9    doesn't comply with 959.

10          THE COURT:  Okay.

11          MR. BRIDGES:  Your Honor, if I could add one last

12    thing.

13          THE COURT:  Go ahead.

14          MR. BRIDGES:  The Supreme Court's *Stern* case points

15    out that -- that it's -- well, actually, it's the *Villegas*

16    case from the Fifth Circuit --

17          THE COURT:  The one I mentioned.

18          MR. BRIDGES:  -- points out that *Stern* -- *Stern* --

19    yes, you did.  *Stern* did not create an exception to the *Barton*

20    doctrine.  And that gives -- that endorses a *Barton* court's

21    ability to perform gatekeeping, even over claims that *Stern*

22    says there would not be jurisdiction over.

23    Contrast that with 959(a), which *Collier on Bankruptcy* and

24    the Fifth Circuit have held is an exception to the *Barton*

25    doctrine.  Because of that exception, *Barton* no longer

009140

23

```
 1   applies, and what you're using in invoking a gatekeeper order
 2   is the Court's inherent equitable powers, its general powers
 3   in equity.  And those equity powers are cabined.  They're
 4   broad, but they're cabined by 959(a)'s prohibition of doing
 5   away with a litigant's right to a trial, a jury trial.
 6        Now, I also -- counsel is telling me I should note for the
 7   record that Mr. Mark Patrick is here as a representative of
 8   our clients.  But Your Honor, I'll -- I will quit now unless
 9   you have further questions for me.
10            THE COURT:  All right.  I do not at this time.  Mr.
11   Morris or Mr. Pomerantz, who's going to make the argument?
12            MR. POMERANTZ:  It's me, Your Honor.
13             OPENING STATEMENT ON BEHALF OF THE DEBTOR
14            MR. POMERANTZ:  And I'll start with the jury trial
15   right.  In the last few minutes, we have been able to
16   determine that the Second Amended and Restated Investment
17   Advisory Agreement between the DAF and the Debtor has a broad
18   jury trial waiver under 14(f).  And in addition, as I will
19   include in my discussion, there is no private right of action
20   under the Investment Advisers Act.
21        I think those two points are fatal to Movants' argument,
22   and probably I can get away with not even responding to the
23   others.  But since I prepared a lengthy presentation to
24   address the issues that were raised today, and also the half
25   hour that Mr. Bridges spent with Your Honor on June 8th in
```

24

1    which was his first opening statement on the motion for

2    reconsideration, I'll now proceed.

3              THE COURT:  All right.

4              MR. POMERANTZ:  The arguments that the Movants made

5    in the original motion essentially boil down to one legal

6    proposition, that the Court did not have jurisdiction to enter

7    the July 16th order because those orders impermissibly

8    stripped the District Court from jurisdiction, in violation of

9    (inaudible) Supreme Court precedent and 28 U.S.C. Section

10   157(d).

11       As with all things Dondero, the arguments continue to

12   morph, and you heard argument at the contempt hearing on June

13   8th and further argument today that now the prospective

14   exculpation for negligence in the order is also unenforceable

15   and should be modified.

16       Movants continue to try to distance themselves from the

17   January 9th order and argue that it is not relevant because

18   they seek to pursue claims against Mr. Seery as CEO and not as

19   an independent director.  Movants ignore, however, that the

20   January 9th order not only protects Mr. Seery in his role as

21   the independent director, but also as an agent of the board.

22   I will walk the Court through my arguments on that issue in a

23   few moments.

24       Of course, the Movants had no explanation, Your Honor, for

25   the question of why it took them until May of 2021, 10 months

25

1  after the entry of the July 16th order that appointed Mr.

2  Seery as CEO and CRO, and 16 months after the Court appointed

3  the independent board, with Mr. Dondero's blessing and

4  consent, as a substitute for what would have surely been the

5  imminent appointment of a Chapter 11 trustee.

6      Movants try to distance themselves from the prior orders

7  by essentially arguing that the DAF is a newcomer to the

8  Chapter 11 and is not under Mr. Dondero's control but is

9  rather managed separately and independently by Mr. Patrick,

10  who recently replaced Mr. Scott.

11      The Movants admit, as they must, that the DAF is the

12  parent and the sole shareholder of CLO Holdco and conducts its

13  business through CLO Holdco, and both entities conduct their

14  business through one individual.  It was Grant Scott then;

15  it's Mark Patrick now.  So even if Mr. Dondero does not

16  control the DAF and CLO Holdco, which issue was the subject of

17  lengthy testimony in connection with the DAF hearing, both the

18  DAF and the CLO Holdco are bound by the Debtor's res judicata

19  argument, which I will discuss shortly.

20      In any event, I really doubt the Court is convinced that

21  the DAF operates truly independently of Mr. Dondero any more

22  than the Court has been convinced that the Advisors, the

23  Funds, Dugaboy and Get Good, all operate independently from

24  Mr. Dondero.  The only explanation for the delay is that Mr.

25  Dondero has been and continues to be unhappy with the Court's

26

1   rulings and has now hired a new set of lawyers in a desperate

2   attempt to evade this Court's jurisdiction.  Having failed in

3   their attempt to recuse Your Honor from the case, this is

4   essentially their last hope.

5       And these new lawyers, Your Honor, have not only filed

6   this DAF lawsuit in the District Court which is the subject of

7   the contempt motion and today's motion, but they also filed

8   another lawsuit in the District Court on behalf of an entity

9   called PCMG, another Dondero entity, challenging yet another

10  of Mr. Seery's postpetition decisions.

11      And there's no doubt that this is only the beginning.  Mr.

12  Dondero recently told Your Honor at a hearing that there were

13  many more sets of lawyers waiting in the wings.  And as the

14  Court remarked at the hearing on the Trusts' motion to compel

15  compliance with Rule 2015.3, the Trusts were trying through

16  that motion to obtain information about the Debtor's control

17  entities so that they could file more lawsuits against the

18  Debtor, a concern that Mr. Draper unconvincingly denied.

19      I would like to focus the Court preliminarily on exactly

20  what the January 9th and July 16th orders do, because Movants

21  try to confuse things by casting the entire order with a broad

22  brush of their jurisdictional overreach arguments, and they

23  misinterpret Supreme Court and Fifth Circuit precedent.

24      I would like to put up on the screen the language of

25  Paragraph 10 of the January 9th order and Paragraph 35

27

 1  (garbled) of the July 16th.

 2      Your Honor is very familiar with these orders, I'm sure,

 3  having dealt with them in connection with confirmation and in

 4  prior proceedings.  But to recap, the orders essentially do

 5  three things.

 6      First, they require the parties to first come to the

 7  Bankruptcy Court before commencing or pursuing a claim against

 8  certain parties.

 9      Second, they provided the Court with the sole jurisdiction

10  to make a finding of whether the party has asserted a

11  colorable claim of negligence -- of willful misconduct or

12  gross negligence.

13      And lastly, the orders provided the Court with exclusive

14  jurisdiction over any claims that the Court determined were

15  colorable.

16      The protected parties under the January 9th order are the

17  independent directors, their agents and advisors, which, as I

18  mentioned earlier, includes Mr. Seery -- who, at least as of

19  March 2020, was acting as the agent on the board's behalf as

20  the CEO -- for any actions taken under their direction.

21      The protected parties under the July 16th order are Mr.

22  Seery, as the CEO and CRO, and his agents and advisors.

23      Movants spend a lot of time in their moving papers and

24  reply arguing that the Court may not assert exclusive

25  jurisdiction over any claims that pass through the gate.  They

1    also spend a lot of time arguing that the Bankruptcy Court

2    does not even have jurisdiction at all to assert -- to

3    adjudicate claims against Mr. Seery because such claims are

4    subject to mandatory withdrawal under Section 157(d).

5        The Debtor doesn't agree, and has briefed why mandatory

6    withdrawal of the reference is inapplicable.  The Debtor has

7    also filed in the District Court a motion to enforce the

8    reference in effect in this district which refers cases in

9    this district arising under, arising in, or related to Chapter

10   11 to the Bankruptcy Court.

11       The motion to enforce the reference, Your Honor, which

12   extensively briefs this issue, is contained in Exhibit 3 of

13   the Debtor's exhibits.

14       We were somewhat surprised that the complaint filed in the

15   District Court wasn't automatically referred to this Court

16   under the standing order in effect in this district, given the

17   related bankruptcy case, the Court's prior approval of the

18   HarbourVest settlement, and the appeal in the District Court

19   of the HarbourVest settlement.

20       When we dug a little further, we found out that Movants

21   filed a civil case cover sheet accompanying the complaint in

22   the District Court.  They neglected in that initial filing to

23   point out that there was any related case to the lawsuit they

24   filed.

25       Mr. Bridges fell on his sword at the contempt hearing on

Case 19-34054-sgj11  Doc 3445-18  Filed 08/15/22  Entered 08/15/22 16:45:41  Page 30 of
Case 3:25-cv-02072-S  Document 15-12  Filed 10/06/25  Page 229 of 1017  PageID 9993

29

1    June 8th and took complete responsibility for the oversight.

2    I commend him for not trying to argue that the bankruptcy

3    case, the HarbourVest settlement, and the District Court

4    appeal are not related cases that would require disclosure, an

5    argument that surely would have been unsupportable.

6         But as I said at the contempt hearing, I find it curious

7    that such an important issue was overlooked, an issue which

8    would have likely changed the entire trajectory of the

9    proceedings and landed the DAF lawsuit in this Court rather

10   than the District Court.

11        And this Tuesday, Your Honor, Movants filed a revised

12   civil cover sheet with the District Court.  Although they

13   referenced the bankruptcy case as a related case, they didn't

14   bother to mention the appeal already pending in the District

15   Court regarding the HarbourVest settlement -- surely, a

16   related case.

17        Your Honor also asked Mr. Bridges at the June 8th hearing

18   whether it was an oversight or intentional that he didn't

19   mention 28 U.S.C. Section 1334 as a basis for jurisdiction in

20   his complaint.  Mr. Bridges had no answer for Your Honor then,

21   and has given no answer now.  His only comment at the hearing

22   last time was that it must have been Ms. Sbaiti that wrote it

23   because he had no recollection of it.

24        So, Your Honor, it's no surprise that Movants conveniently

25   found themselves in the District Court, which was their

30

1  ultimate strategy from the get go.

2      In any event, Your Honor, we have briefed the withdrawal

3  of the reference issue.  A response by the Movants is due --

4  CLO Holdco and DAF is due on June 29th.  And we hope the

5  District Court will decide soon thereafter whether to enforce

6  the reference.

7      While I'm happy to argue why Movants' mandatory withdrawal

8  of the reference argument is [not] persuasive, I don't think

9  it's necessary, but I do, again, want to highlight that there

10  is no private right of action under the Investment Advisers

11  Act.

12      Your Honor, it's not really relevant to today's hearing,

13  since we have argued in opposition to the motion before Your

14  Honor that resolving the issue of the Bankruptcy Court's

15  jurisdiction to adjudicate claims contained in the complaint

16  as they relate to Mr. Seery is premature at this point.  The

17  January 9th and July 16th orders first require the Court to

18  determine whether a claim is colorable.  It's not until this

19  Court determines if a claim is colorable that the decision on

20  where the lawsuit should be tried is relevant.

21      Having said that, Your Honor, we read the Movants' reply

22  brief very carefully and noticed in Footnote 6 that the

23  Movants state that modifying the exclusive grant of

24  jurisdiction to adjudicate any claims that pass through the

25  gate to include the language "to the extent permissible by

31

1  law," in the same way the Debtor modified the plan, would

2  resolve the motion.  So let's look at the provision as it

3  exists in the plans.

4       Ms. Canty, if you can put up the next demonstrative,

5  please.

6       This provision provides that the Bankruptcy Court will

7  have sole and exclusive jurisdiction to determine whether a

8  claim or cause of action is colorable, and, only to the extent

9  legally permissible and provided in Article XI, shall have

10  jurisdiction to determine -- to adjudicate the underlying

11  colorable claim or cause of action.

12       The Movants request in their reply brief in Footnote 6

13  that the July 16th order be given the plan treatment.  That

14  treatment:  sole authority to determine colorability and

15  jurisdiction, and, to the extent legally permissible, to

16  adjudicate underlying claim, only if jurisdiction existed.

17       After reviewing the reply brief and prior to the June 8th

18  hearing, we decided that we would agree to modify both the

19  January 9th and the July 16th orders to provide that the

20  Bankruptcy Court would only have jurisdiction to adjudicate

21  claims that pass through the colorability gate to the extent

22  permissible by law.

23       Prior to the June 8th hearing, Mr. Morris and I had a

24  conversation with Mr. Bridges.  We conferred about a potential

25  resolution and a proposed modification.  Mr. Bridges indicated

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 232 of 1017 PageID 9996

32

1  they were interested in exploring a resolution and wanted to

2  --

3         MR. BRIDGES:  Objection, Your Honor.

4         THE COURT:  There's an objection?

5         MR. BRIDGES:  Objection, Your Honor.  There's a Rule

6  408 settlement discussion.  He's welcome to talk about the

7  results, but he shouldn't be talking about what was -- what

8  was proposed by opposing counsel in a settlement conversation.

9         THE COURT:  Okay.  I overrule.

10        MR. POMERANTZ:  Your Honor, this was not --

11        THE COURT:  I don't think this is a 408 issue.

12 Continue.

13        MR. BRIDGES:  Thank you.

14        MR. POMERANTZ:  The stipulation and order which we

15 provided to counsel is attached to my declaration, which is

16 found at Document 2418, and it was filed in connection with a

17 Notice of Revised Proposed Orders that we filed at Docket

18 2417.  And I would like to put up on the screen the relevant

19 paragraphs of the order that we provided to the Movants.

20     So, you see, we agreed to modify each of the orders at the

21 end to do what the plan says.  The Court would only have

22 jurisdiction for claims passing through the gate if the Court

23 had jurisdiction and it was legally permissible.

24     Movants' counsel, however, responded with a mark-up that

25 went beyond -- went beyond what Movants proposed in Footnote 6

33

1   and sought to fundamentally change the January 9th and July

2   16th orders in ways that were not acceptable to the Debtor and

3   not even contemplated by the original motion.

4       Ms. Canty, can you put up on the screen the relevant

5   paragraphs of the response we received?

6       Specifically, Your Honor, you see at the first part they

7   wanted to provide that the only -- the order only applied to

8   claims involving injury to the Debtor, presumably as opposed

9   to alleged injuries to affiliated funds or third parties.

10  They also provided that the Court's ability to make the

11  initial colorability determination was also qualified by "to

12  the extent permissible by law" in the way that the Court --

13  that the Debtor agreed to modify the ultimate adjudication

14  jurisdiction provision.

15      Your Honor, Movants haven't even talked about this back

16  and forth.  They haven't talked about their about-face.  And

17  I'll leave it for Your Honor to read their Footnote 6 that

18  said it would resolve their motion, the back and forth, our

19  proposal, and now Mr. Bridges' modified, morphed arguments

20  that now point out other issues.

21      In any event, Your Honor, we made the change, and we think

22  it should resolve the motion, or at least it resolves part of

23  the motion.  There can't be any argument that the Court is

24  trying to exert exclusive jurisdiction on claims that pass

25  through the gate.

Appx 05208
009151

34

1      What apparently remains from the arguments raised by the

2   Movants is the argument that the Court does not even have

3   jurisdiction to act as a gatekeeper in the first place because

4   it doesn't have jurisdiction of the underlying lawsuit.  And

5   on June 8th and today, they've added a new argument, that the

6   orders impermissibly exculpate Mr. Seery and others, violate

7   their jury trial rights, and are contrary to the Fifth Circuit

8   precedent.

9      Movants claims that the orders are a jurisdictional

10  overreach, a violation of constitutional proportions, a

11  violation of due process, and inconsistent with several U.S.

12  Supreme Court cases.  But, of course, they cite no cases whose

13  facts are even remotely similar to this one.  Instead, they

14  are content to rely on general statements regarding bankruptcy

15  jurisdiction, how it is derived from district court

16  jurisdiction and is constitutionally limited, legal

17  propositions which are not terribly controversial or even

18  applicable to these facts.

19      There are several arguments -- I mean, there are several

20  reasons, Your Honor, why Movants' arguments fail.  Initially,

21  Movants have not cited any authority, any statute, or any rule

22  which would allow this Court to revisit the January 9th and

23  July 16th orders.  As I will discuss in a moment, Your Honor,

24  *Republic v. Shoaf*, a case the Court is very familiar in and

25  relied on in connection with plan confirmation, bars a

35

1    collateral attack on these orders under the doctrine of res

2    judicata.

3        Similarly, as the Court remarked on June 8th, the Supreme

4    Court's *Espinosa* decision, which rejected an attack based upon

5    Federal Rule of Civil Procedure 60(b)(4) to a prior order that

6    may have been unlawful, prohibits the Court from now

7    reconsidering the January 9th and July 16th orders.

8        But even if Your Honor rules that res judicata does not

9    apply, there are two independent reasons why the orders were

10   not an unlawful extension of the Court's jurisdiction.  The

11   first is because the Court had jurisdiction to enter both of

12   those orders as the ability to determine the colorability of

13   claims is within the jurisdiction of the Court.  The second is

14   because the orders are justified by the *Barton* doctrine.

15       Lastly, Your Honor, Movants' argument that the Court may

16   not act as a gatekeeper to determine the colorability of a

17   claim for which it may not have jurisdiction is incorrect, and

18   as Your Honor has mentioned and as Mr. Bridges unconvincingly

19   tried to distinguish, the Fifth Circuit *Villegas v. Schmidt*

20   case is a case on point and resolves that issue.

21       Turning to res judicata, Your Honor, it prevents the Court

22   from revisiting these governance orders.  CLO Holdco had

23   formal notice of the Seery CEO motion and the opportunity to

24   respond.  It failed to do so.  It is clearly bound.

25       As reflected on Debtor's Exhibit 4, CLO Holdco is a

36

1   wholly-owned subsidiary of the DAF.  The DAF is its sole

2   shareholder.  There is no dispute about that.  Importantly, at

3   the time of both the January and July orders, Grant Scott was

4   the only human being authorized to act on behalf of CLO Holdco

5   and the DAF.  The DAF did not respond to the Seery CEO motion,

6   either.

7       And why is that important, Your Honor?  It's because

8   Movants argue in their reply that the DAF cannot be bound by

9   res judicata because they did not receive notice of the July

10  16th order.  However, Your Honor, that is not the law.  Res

11  judicata binds parties to the dispute and their privies, and

12  the DAF is bound to the prior orders even though it did not

13  receive notice.

14      There are several cases, Your Honor, that stand for this

15  unremarkable proposition.  First I would point Your Honor to

16  the Fifth Circuit's opinion of *Astron Industrial Associates v.*

17  *Chrysler*, found at 405 F.2d 958, a Fifth Circuit case from

18  1968.  In that case, Your Honor, the Fifth Circuit held that

19  the appellant was barred by the doctrine of res judicata from

20  bringing a claim because its parent, which was its sole

21  shareholder, would have been bound by res judicata.

22      *Astron* is consistent with the 1978 Fifth Circuit case of

23  *Pollard v. Cockrell*, 578 F.2d 1002 (1978).  And the Northern

24  District of Texas in 2000 case of *Bank One v. Capital*

25  *Associates*, 2000 U.S. Dist. LEXIS 11652, found that a parent

1    and a sole shareholder of an entity couldn't assert res

2    judicata as a defense when those claims could have been

3    brought against its wholly-owned subsidiary.

4        And lastly, Your Honor, the 2011 Southern District of

5    Texas case, *West v. WRH Energy Partners*, 2011 LEXIS 5183, held

6    that res judicata applied with respect to a partnership's

7    general partner because the general partner was in privity

8    with the partnership.

9        These cases are spot on and make sense.  DAF is CLO

10    Holdco's parent.  Grant Scott was the only live person to

11    represent these entities in any capacity at the relevant

12    times.  Accordingly, just as CLO Holdco is bound, DAF is

13    bound.

14        Allowing DAF to assert a claim when its wholly-owned and

15    controlled subsidiary is barred would allow entities to

16    transfer claims amongst their related entities in order to

17    relitigate them and they would never be finality.  And, of

18    course, Jim Dondero, as we know, consented to the January 9th

19    order, which provided Mr. Seery protection in a variety of

20    capacities.

21        And as Your Honor has pointed out, and as Mr. Bridges

22    didn't have an answer for, neither CLO Holdco nor the DAF or

23    any other party appealed any of the governance orders.  And

24    nobody challenged the validity of these orders at the

25    confirmation hearing, where the terms of these orders were

1  front and center.

2     And importantly, Your Honor, the orders are clear and

3  unambiguous.  They require a Bankruptcy Court [sic] to seek

4  Bankruptcy Court approval before they commence or pursue an

5  action against the independent board, the CEO, CRO, or their

6  agents.  And they clearly and unambiguously set the standard

7  of care for actions prospectively:  gross negligence or

8  willful misconduct.

9     The Bankruptcy Court had jurisdiction to enter the

10  governance orders, which, as expressly indicated in the

11  orders, were core proceedings dealing with the administration

12  of the estate.  No one challenged this finding of core

13  jurisdiction.  And as I will discuss later, the failure to

14  challenge core jurisdiction is waived under applicable Supreme

15  Court and Fifth Circuit precedent.

16     Your Honor, the Court [sic] does not argue that Movants

17  have waived their right to seek adjudication of a lawsuit that

18  passes through the colorability gate by an Article III Court.

19  The issue is not before the Court, but the changes to the

20  order that the Debtor agreed to make clearly -- clearly will

21  provide Mr. Bridges' clients the ability to make that

22  determination.

23     The Debtor is, however, arguing that the Movants have

24  waived their right to contest the core jurisdiction of the

25  Bankruptcy Court to make the determination that the claims are

39

1    colorable in the first place, and to challenge the exculpation

2    provisions provided to the beneficiaries of those orders.

3         Accordingly, Your Honor, the elements of res judicata are

4    satisfied.  Both proceedings involve the same parties.  The

5    prior judgment was entered by a court of competent

6    jurisdiction.  The prior order was a final judgment on its

7    merits.  And they involved the same causes of action.

8         Importantly, the members of the independent board,

9    including Jim Seery, relied on the protections contained in

10   the January 9th and July 16th orders and would not have

11   accepted these appointments if the protections weren't

12   included.  And how do we know this?  Because each of them,

13   both Mr. Seery and Mr. Dubel, both testified at the

14   confirmation hearing on this very topic.

15        And I would like to put up on the screen an excerpt from

16   Mr. Seery's testimony at confirmation, which is testimony

17   included in the February 2nd, 2021 transcript, which is

18   Exhibit 2 of the Debtor's exhibits.

19            THE COURT:  Okay.

20            MR. POMERANTZ:  And I would like to just read this,

21   Your Honor.

22        "Q   Okay.   You mentioned that there were certain

23        provisions of the January 9th order that were important

24        to you and the other independent directors.  Do I have

25        that right?"

40

1          MR. POMERANTZ:  A little bit later on, Mr. Seery

2    testifies:

3      "A   And then ultimately there'll be another provision

4       in the agreement here, I don't see it off the top of my

5       head, but a gatekeeper provision.  And that provision"

6       --

7      "Q   Hold on one second, Mr. Seery."

8          MR. POMERANTZ:  Please scroll.

9      "Q   So, Paragraph 4 and 5, were those -- were those --

10      were those provisions put in there at the insistence of

11      the prospective independent directors?

12     "A   Yes.

13     "Q   Okay.  Can we go to Paragraph 10, please?  There

14      you go."

15     Mr. Morris:  Is this the other provision that you were

16   referring to?

17     "A   This is -- it's become to be known as the

18      gatekeeper provision, but it's a provision that I

19      actually got from other cases -- again, another very

20      litigious case -- that I thought it was appropriate to

21      bring it into this case.  And the concept here is that

22      when you are dealing with parties that seem to be

23      willing to engage in decade-long litigation and

24      multiple forums, not only domestically but even

25      throughout the world, it seemed important and prudent

1    to me and a requirement that I set out that somebody

2    would have to come to this Court, the Court with

3    jurisdiction over these matters, and determine whether

4    there was a colorable claim. And that colorable claim

5    would have to show gross negligence and willful

6    misconduct -- i.e., something that would not otherwise

7    be indemnifiable" --

8         MR. POMERANTZ: Hold on one second.

9    "A   So, basically, it set an exculpation standard for

10   negligence.    It   exculpates   the   directors   from

11   negligence, and if somebody wants to bring a cause

12   against the directors, they have to come to this Court

13   first to get a finding that there's a colorable claim

14   for gross negligence or willful misconduct."

15   "Q   Would you have accepted the engagement as an

16   independent director without the Paragraphs 4, 5, and

17   10 that we just looked at?

18   "A   No, these were very specific requests.    The

19   language here has been smithed, to be sure, but I

20   provided the original language for Paragraph 10 and

21   insisted on the guaranty provisions above to ensure

22   that the indemnity would have some support.

23   "Q   And ultimately did the Committee and the Debtor

24   agree to provide all the protections afforded by

25   Paragraphs 4, 5, and 10?

42

1    "A    Yes."

2         MR. POMERANTZ:  So, Your Honor, these -- this

3    testimony also applied to as well as the CEO.

4        The testimony was echoed by Mr. Dubel, another member of

5    the board.  And I'm not going to put his testimony on the

6    screen, but it can be found at Pages 272 to 281 of Exhibit 2,

7    which is the February 2nd transcript.

8        Movants argue, however, that res judicata doesn't apply

9    because the Court didn't have jurisdiction to enter these

10   orders.  And they argue that the order stripped the District

11   Court of this jurisdiction.  As I previously described, the

12   Debtor is prepared to modify the governance orders to provide

13   that the Court shall retain jurisdiction to -- on claims that

14   pass through the gate only to the extent legally permissible.

15   The modification does not appear to be good enough for the

16   Movants.  They continue to argue that the Bankruptcy Court

17   can't even act as the exclusive gatekeeper to determine

18   whether such actions are colorable as a prerequisite for

19   commencing or pursuing an action.

20       The problem Movants run into is the Fifth Circuit's

21   opinion of *Republic v. Shoaf* and various Supreme Court

22   decisions, including *Espinosa*.

23       In *Shoaf*, the Fifth Circuit held that a party cannot

24   subsequently challenge a confirmed plan that clearly and

25   unambiguously released a third party, even if the Bankruptcy

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 243 of 1017 PageID 10007

43

1    Court lacked jurisdiction to approve the release in the first

2    place.  Movants' proper recourse was to appeal the governance

3    orders, not to seek to collaterally attack them.

4        In *Shoaf*, the Fifth Circuit held that the confirmed plan

5    was res judicata with respect to a suit by the creditor

6    against the guarantor.  And in so ruling, the Fifth Circuit

7    says that the prong of res judicata standard that requires an

8    order, prior order to be made by a court of competent

9    jurisdiction is satisfied regardless of whether the issue was

10   actually litigated.  This is because whenever a court enters

11   an order, it does so by implicitly making a finding of its

12   jurisdiction, a determination that can't be attacked.  And in

13   fact, in the January 9th and the July 16th orders, it wasn't

14   implicit, the Court's jurisdiction; it was set out that the

15   Court had core jurisdiction.

16       Movants try to brush *Shoaf* aside, arguing that is the only

17   case the Debtor cites to support res judicata argument and is

18   a narrow opinion that has been questioned and distinguished.

19   That's just not correct, Your Honor.  Movants ignore that we

20   have cited two United States Supreme Court cases, *Stoll v.*

21   *Gottleib* and *Chicot County Drainage District*, upon which the

22   Fifth Circuit based its *Shoaf* decision.  In each case, the

23   U.S. Supreme Court gave res judicata effect to a Bankruptcy

24   Court order that made a ruling party -- that a ruling party

25   later claimed was beyond the Court's jurisdiction to do so.

44

 1  In *Stoll*, it was a release of guaranty without jurisdiction,

 2  like *Shoaf*.  In *Chicot*, it was an extinguishment of a bond

 3  claim without jurisdiction.

 4       Similarly, Your Honor, the U.S. Supreme Court held in

 5  *Espinosa* that a party was not entitled to reconsideration of a

 6  Bankruptcy Court order under Federal Rule of Civil Procedure

 7  60(b)(4) discharging a student loan without making the

 8  required statutory finding of undue hardship in an adversary

 9  proceeding.  And the Supreme Court reasoned in that opinion as

10  follows:  A judgment is not void, for example, simply because

11  it may have been erroneous.  Similarly, a motion under

12  60(b)(4) is not a substitute for a timely appeal.  Instead,

13  60(b)(4) applies only in the rare instance where a judgment is

14  premised either on a certain type of jurisdictional error or a

15  violation of due process that deprives a party of notice or

16  the opportunity to be heard.

17       Federal courts considering Rule 60(b)(4) motions that

18  assert a judgment is void because of a jurisdictional defect

19  generally have reserved it only for the exceptional case in

20  which the court that rendered the judgment lacked even an

21  arguable basis for jurisdiction.  This case is not the

22  exceptional -- exceptional circumstance that was referred to

23  by *Espinosa*.

24       In addition, we argue in our brief, and I'll get to in a

25  few moments, that both of the orders are justified under the

45

1    *Barton* doctrine.

2        Actually, before I go to that, Your Honor, I think Movants

3    are really trying to distinguish *Espinosa* by arguing that the

4    Court's order exculpating Mr. Seery for negligence liability

5    did not provide people, mom-and-pop investors, with the due

6    process informing them that they would not be able to assert

7    duty claims based upon mere negligence.  I think that's the

8    core of Mr. Bridges' argument, that, hey, you entered an

9    order, you gave this exculpation, it was inappropriate, and it

10   couldn't be done.

11       There are several problems with Movants' argument.  First,

12   Movants mischaracterize both the facts and the law in

13   connection with the Debtor's relationship with its investors.

14   The Debtor is the registered investment advisor for HCLOF as

15   well as approximately 15 to 18 CLOs.  The only investor in

16   HCLOF other than the Debtor is CLO Holdco.  The investors in

17   the CLOs are the retail funds advised by the Dondero advisors

18   and the other -- and other institutional investors.

19   Accordingly, the thousands of investors, the mom-and-pop

20   investors whose due process rights have allegedly been

21   trampled by the January 9th and July 16th orders, are not

22   investors in any funds managed by the Debtor.

23       And, of course, I have mentioned, as I've mentioned

24   before, no non -- non-Dondero investor, be it a mom-and-pop

25   investor, another institutional investor, anyone unrelated to

46

1   Mr. Dondero, has ever appeared in this Court to challenge the

2   Debtor's activities.

3       But more fundamentally, Your Honor, the Debtor does not

4   owe fiduciary duties to investors in any of the funds that the

5   Debtor advises.  The fiduciary duty that the Debtor owes is to

6   the funds themselves, not the investors in the funds.

7       And while Movants point to Mr. Seery's prior testimony to

8   support the argument that the Debtor owes a duty to investors,

9   Mr. Seery was not testifying as a lawyer and his testimony

10  just cannot change the law.

11      As to each of the funds that the Debtor manages, HCLOF and

12  the CLOs, they were each provided with actual notice of the

13  January 16th -- the July 16th order and didn't object.  And as

14  Your Honor will recall, the Trustees for the CLOs, the party

15  that could potentially have claims for breach of fiduciary

16  duty, they participated in the January 9th hearing.  They came

17  to the Court and were concerned about the protocols that the

18  Debtor was agreeing to with the Committee.  We revised them.

19  The Trustees didn't object.  They didn't object then; they

20  didn't object now.  And, in fact, they consented to the

21  assumption of the contracts between the Debtor and the CLOs.

22      So the argument that the orders, by having this

23  exculpation for future conduct, violated due process rights of

24  anyone and is the type -- essentially, the type of order that

25  *Espinosa* would have contemplated could be attacked, is --

47

1    relies on faulty legal and factual premises.  No duty to

2    investors.  No private right of action.  And both -- and all

3    the funds received due process.

4        In addition, Your Honor, as we argue in our brief and I'll

5    get to in a few moments, both of the orders are justified

6    under the *Barton* doctrine, as Mr. Seery is entitled to

7    protection based upon how courts around the country have

8    interpreted the *Barton* doctrine.  As such, Mr. Seery is

9    performing his role both as an agent of the independent board

10   under the January 9th order, as a CEO under the July 16th

11   order, as a quasi-judicial officer.  And as Your Honor

12   examined in the *Ondova* opinion which you mentioned, trustees

13   are entitled to qualified immunity for damage to third parties

14   resulting from simple negligence, provided that the trustee is

15   operating within the scope of his duties and is not acting in

16   an *ultra vires* manner.

17       So, exculpating the independent directors, their agents,

18   and the CEO in the January 9th and July 16th orders was a

19   recognition by this Court that they would be entitled to

20   qualified immunity, much in the same way trustees are.

21       No doubt that Movants contend that this was error and that

22   the Court overreached.  However, the remedy for that overreach

23   was an appeal, not a reconsideration 16 months later.  The

24   Court's orders based upon the determination that in this

25   highly contentious case that these court officers needed to be

Appx 05222

009165

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 248 of 1017 PageID 10012

48

1   protected from negligence suits is not the exceptional case

2   where the Court lacked any arguable basis for jurisdiction.

3   Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

4   and *Chicot* and reject the attack on the prior court orders.

5       The only case Movants cite to challenge the Supreme

6   Court's decision -- to challenge the Supreme Court precedent I

7   mentioned and the Fifth Circuit's *Shoaf* decision is the

8   *Applewood* case. *Applewood* is totally consistent with *Shoaf*.

9   *Applewood* also involved a plan that purported to release a

10  guaranty claim that the guarantor argued was res judicata in

11  subsequent litigation regarding the guaranty. The Fifth

12  Circuit held in that case that the plan was not res judicata.

13  It made that ruling because the plan did not contain clear and

14  unambiguous language releasing the guaranty. In that way, the

15  Fifth Circuit distinguished *Shoaf*.

16      *Applewood* and *Shoaf* are consistent. A Bankruptcy Court

17  order will be given res judicata effect, even if the Court

18  didn't have jurisdiction to enter it, if the order was clear

19  and unambiguous. In *Shoaf*, the release was. In *Applewood*, it

20  wasn't.

21      Movants argued on June 8th and argue now that the

22  *Applewood* case really argues -- really deals with prospective

23  exculpation of claims. I went back and read Mr. Bridges'

24  comments carefully of June 8th. He said *Applewood*,

25  exculpation. Well, that's just not correct. *Applewood* is all

49

 1   about requiring specificity of a (garbled) to give it res

 2   judicata effect.  Claims that existed at that time, were they

 3   described clearly and unambiguously?  Yes?  *Shoaf* applies.

 4   No?  *Applewood* does -- applies.

 5       So how should the Court apply these principles here?  The

 6   Court approved a procedure for certain claims in the

 7   governance orders.  The procedure:  come to Bankruptcy Court

 8   before pursuing a claim against the independent directors and

 9   Seery or their agents so that the Court can make a

10   colorability determination.  Clear and unambiguous.  The

11   governance orders each provide that the Bankruptcy Court had

12   jurisdiction to enter the orders, and the orders were not

13   appealed.

14       Movants attempt to confuse the Court and argue *Applewood*

15   is on point because the January 9th and July 16th orders do

16   not clearly identify specific claims that Movants now have

17   that are being released.  And because they're not specific,

18   then basically it's an ambiguous release and *Applewood*

19   applies.

20       The problem with the Movants' argument is that neither the

21   January 9th or July 16th orders released claims that existed

22   at that time.  If they did, and if there wasn't an adequate

23   description, I might agree with Mr. Bridges that *Applewood*

24   applied.  But there were no claims.  It was prospective.  It

25   was a standard of care.  The Court clearly and unambiguously

50

1  said what the standard of care would be going forward.

2  Clearly, under *Shoaf* and Supreme Court precedent, they are

3  entitled to res judicata because it's a clear and unambiguous

4  provision.  *Applewood* just simply doesn't apply.

5      Mr. Phillips at the last hearing made an impassioned plea

6  to the Court for a narrow interpretation of the exculpation

7  provisions in the January 9th and July 16th orders, and he

8  argued that the Court could not possibly have intended for the

9  exculpation for negligence to apply on a go forward basis.  He

10 thus argued to the Court that the Court should construe the

11 exculpation narrowly and only apply it to potential claims of

12 harm caused to the Debtor, as opposed to harm caused to third

13 parties, which he said included thousands of innocent

14 investors.

15     Of course, Mr. Phillips made those arguments unburdened by

16 the actual facts and the prior proceedings which led to the

17 entry of these orders, because, as he was the first to admit,

18 he only became involved in the case a month ago.

19     As the Court recalls, and as reinforced by Mr. Seery's and

20 Mr. Dubel's testimony I just mentioned, the exculpation

21 provisions were included precisely to prevent Mr. Dondero,

22 through any one of the entities he's owned and controlled, the

23 Movants being two of those, from asserting baseless claims

24 against the beneficiaries of those orders, exactly the

25 situation Mr. Seery now finds himself in.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 251 of 1017 PageID 10015

51

1       And, again, it bears emphasizing:  throughout this case,

2   not one of the purported public investors Mr. Phillips

3   lamented would be prevented from holding Mr. Seery responsible

4   for his conduct has ever appeared in this case to object about

5   anything.  And none of the directors of the funds, the funds

6   where the Debtor acts as an investment adviser, have ever

7   stepped foot in this court, either.

8       Even if the Court declines to apply res judicata, Your

9   Honor, to prevent challenges to the governance orders, the

10  Court has the jurisdiction, had the jurisdiction to include

11  the gatekeeping provisions in those orders.  The Bankruptcy

12  Court derives its jurisdiction from 28 U.S.C. Section 157, and

13  bankruptcy jurisdiction is divided into two parts:  core

14  matters, which are those arising in or arising under Title 11,

15  and noncore matters, those matters which are related to a

16  Chapter 11 case.

17      Bankruptcy Courts may enter final orders in core

18  proceedings, and with the consent of parties, noncore

19  proceedings.  If a party does not consent to a final judgment

20  in the noncore matters or waives its right to consent, then

21  the Bankruptcy Court -- or does not waive its right to

22  consent, then the Bankruptcy Court issues a report and

23  recommendation to the District Court.

24      The seminal Fifth Circuit case on bankruptcy court

25  jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

Appx 05226
009169

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 252 of 1017 PageID 10016
202

52

1    There, the Fifth Circuit held that the Bankruptcy Court has

2    related to jurisdiction over matters if the outcome of that

3    proceeding could conceivably have any effect on the estate

4    being administered in the bankruptcy.

5        More recently, the Fifth Circuit, in the 2005 case, in

6    *Stonebridge Tech's*, elaborated on when a matter has a

7    conceivable effect on the estate such as to confer Bankruptcy

8    Court jurisdiction.  There, the Fifth Circuit held that an

9    action is related to bankruptcy if the outcome could alter the

10   debtor's rights, liabilities, options, or freedom of action,

11   either positively or negatively, and which in any way impacts

12   upon the handling and the administration of the bankruptcy

13   estate.  It is against this backdrop, Your Honor, that the

14   Court should evaluate its jurisdiction to have entered the

15   orders.

16       So, again, what did the orders do?  They established

17   governance over the Chapter 11 debtor with new independent

18   directors being approved.  They established the procedures and

19   protocols of how transactions were going to be presented to

20   and approved by the Committee.  They vested in the Committee

21   certain related-party claims, and they provided for the

22   procedures parties would have to follow to assert any claims

23   against the independent directors and the CRO and the agents

24   and advisors.

25       Your Honor, it's hard to imagine that there is a more core

Appx. 05227
009170

53

```
 1   order than the entry of these orders.  At the time the orders
 2   were entered, the Court was well aware of the potential for
 3   acrimony from Mr. Dondero and his related entities, and
 4   included the gatekeeper provisions to prevent the Debtor's
 5   estate from being embroiled in frivolous litigation against
 6   the board and the CEO.
 7        Such protections were clearly within the Court's
 8   jurisdiction, both to protect the administration of the estate
 9   but also under applicable Fifth Circuit law dealing with
10   vexatious litigants, as set forth in the *Baum* and *Carroll*
11   cases that the Court cited in its confirmation order.
12        Not that it was hard to predict, but the last several
13   months have reinforced how important the gatekeeping
14   provisions in the order are and how important similar
15   provisions in the plan are.
16        The Court heard extensive testimony at the confirmation
17   hearing regarding the havoc continued litigation by Mr.
18   Dondero and his related entities would cause, which
19   predictions have unfortunately been borne out by the
20   unprecedented blizzard of litigation involving Mr. Dondero and
21   his related entities that has consumed the Court over the last
22   several months and caused the estate to incur millions of
23   dollars in fees that could have been used to pay its
24   creditors.
25        And these attacks are continuing.  As I mentioned before,
```

54

1    in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2    against the Debtor on behalf of PCMG, another related entity,

3    alleging postpetition mismanagement of the Select Fund.

4         And to complete the hat trick, they are the lawyers

5    seeking to sue Acis in the Southern District of New York for

6    allegedly post-confirmation matters.

7         The Court knew then and certainly knows now that the

8    potential for sizable indemnification claims could consume the

9    estate.  The Court used that as the potential basis for

10   determining that the orders were within its jurisdiction, just

11   as it used that potential to justify the exculpation

12   provisions in the plan as being consistent with *Pacific*

13   *Lumber*.

14        Movants also ignore the cases -- and we cited in our

15   opposition -- where courts in this district, including Judge

16   Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17   *Group* in 2016, approved gatekeeper provisions that provided

18   the Bankruptcy Court with exclusive jurisdiction to adjudicate

19   claims against postpetition fiduciaries.

20        Movants also ignore cases outside this district, including

21   *General Motors* and *Madoff*, which we cited in our brief as

22   examples of cases where Bankruptcy Courts have been used as

23   gatekeepers to determine if claims are colorable or being

24   asserted against the correct entity.

25        And there's another reason, Your Honor, why Movants may

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 255 of 1017 PageID 10019

55

1  now not contest the Court's jurisdiction to have entered those

2  orders.  Each of those orders, as I said before, include a

3  finding that the Court had core jurisdiction to enter the

4  orders.  No party contested that finding or refused to consent

5  to the core jurisdiction.

6      Under well-established Supreme Court precedent, parties

7  can waive their right to challenge the Bankruptcy Court's

8  jurisdiction, core jurisdiction, by failing to object.  In

9  *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10  that Article III was not violated if parties knowingly and

11  voluntarily consented to adjudication of *Stern v. Marshall*-

12  type alter ego claims, and that the consent need not be

13  express, so long as it was knowing and voluntary.

14      And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15  Circuit in the 1995 *McFarland* case, which held that a person

16  who fails to object to the Bankruptcy Court's assumption of

17  core jurisdiction is deemed to have consented to the entry of

18  a final order by the Bankruptcy Court.

19      Your Honor, I'd now like to turn to the *Barton* doctrine.

20  The Court also has jurisdiction to have entered the orders

21  based upon the *Barton* doctrine.  The *Barton* doctrine dates

22  back to an old United States Supreme Court case and provides

23  as a general rule that, before a suit may be brought against a

24  trustee, consent from the appointing court must be obtained.

25      Movants essentially make two arguments why the *Barton*

56

1  doctrine doesn't apply.

2      First, Movants, without citing any authority, argue that

3  it does not apply to Mr. Seery because he is not a trustee or

4  receiver and was not appointed by the Court.  Although the

5  doctrine was originally applied to receivers, it has been

6  extended over time to cover various court-appointed

7  fiduciaries and their agents in bankruptcy cases, including

8  debtors in possession, officers and directors of the debtor,

9  and the general partner of the debtor.  And although Mr.

10  Bridges says he couldn't find one case that applied the *Barton*

11  doctrine to a court-retained professional, I will now talk

12  about several such cases.

13      In *Helmer v. Pogue*, a 2012 case cited in our brief, the

14  District Court for the Northern District of Alabama

15  extensively analyzed the *Barton* doctrine jurisprudence from

16  the Eleventh Circuit and beyond and concluded that it applied

17  to debtors in possession.  The *Helmer* Court relied in part on

18  a prior 2000 decision of the Eleventh Circuit in *Carter v.*

19  *Rodgers*, which held that the doctrine applies to both court-

20  appointed and court-approved officers of the debtor, which is

21  consistent with the law in other circuits.

22      And subsequently, the Eleventh Circuit again considered --

23  and in that case, the distinction of a court-appointed as a

24  court-retained professional was -- was not persuasive to the

25  Court, and the Court held that a court-retained professional

1    can still have *Barton* protection, notwithstanding that he

2    wasn't appointed, the argument that Mr. Bridges tries to make.

3         And subsequently, --

4              THE COURT:  I wonder, was that -- was that Judge

5    Clifton Jessup, by chance?  Or maybe Bennett?

6              MR. POMERANTZ:  Your Honor, this was -- this was the

7    Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

8    was --

9              THE COURT:  Oh, I thought you were still talking

10   about the Alabama case.  No?

11             MR. POMERANTZ:  Yeah, the Alabama -- well, the

12   Alabama case referred to the Eleventh Circuit case, *Carter v.*

13   *Rodgers*, --

14             THE COURT:  Okay.

15             MR. POMERANTZ:  -- and the appointment and -- or

16   retention issue was discussed in the *Carter v. Rodgers* case.

17             THE COURT:  Okay.

18             MR. POMERANTZ:  And subsequently, the Eleventh

19   Circuit again considered the contours of the *Barton* doctrine

20   in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718.  In that

21   case, which Your Honor referenced in your *Ondova* opinion,

22   which I will discuss in a few moments, the Eleventh Circuit

23   held that a debtor's general counsel who had been approved by

24   the Court, who was appointed by a chief restructuring officer

25   who was also approved by the Court, was covered by the *Barton*

58

1    doctrine for acts taken in furtherance of the administration

2    of the estate and the liquidation of the assets.

3        And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

4    F.3d 204, reaffirmed that court-approved counsel who function

5    as the equivalent of court-appointed officers are entitled to

6    protection under *Barton*.  While the Court in that case

7    ultimately ruled that counsel could be sued without first

8    going to the Bankruptcy Court, it did so because it determined

9    that the suit between two sets of lawyers would not have any

10   effect on the administration of the estate.

11       So, Your Honor, not only is there authority, there is

12   overwhelming authority that Mr. Seery is entitled to the

13   protections.

14       In *Gordon v. Nick*, a District -- a case from 1998 from the

15   Fourth Circuit, the Court that the *Barton* doctrine applied to

16   a lawsuit against a general partner who was responsible for

17   administering the bankruptcy estate.

18       And as I mentioned, Your Honor, and as Your Honor

19   mentioned, Your Honor had reason to look at the *Barton*

20   doctrine in length and in depth in the 2017 *Ondova* opinion.

21   And in the course of the opinion, Your Honor discussed one of

22   the policy rationales for the doctrine, which you took from

23   the Seventh Circuit's *Linton* opinion, and you said as follows:

24   "Finally, another policy concern underlying the doctrine is a

25   concern for the overall integrity of the bankruptcy process

1    and the threat of trustees being distracted from or

2    intimidated from doing their jobs.  For example, losers in the

3    bankruptcy process might turn to other courts to try to become

4    winners there by alleging the trustee did a negligent job."

5        Here, the independent board was approved by the Court as

6    an alternative to the appointment of a Chapter 11 trustee.

7    And it and its agent, including Mr. Seery as the CEO, even

8    before the July 16th order, were provided protections in the

9    form of the gatekeeper order and exculpation.

10       I'm sure the Court has a good recollection of the January

11   9th hearing -- we've talked about it a lot in the proceedings

12   before Your Honor -- where the Debtor and the Committee

13   presented the governance resolution to Your Honor.  And as

14   Your Honor will recall, the appointment of the board was a

15   hotly-contested issue among the Debtor and the Committee and

16   was heavily negotiated.  And the appointment of the

17   independent board was even contested by the United States

18   Trustee at a hearing on January 20th, 2020.

19       I refer the Court to the transcripts of the hearings on

20   January 9th and January 20th of 2020, which clearly

21   demonstrate that appointing this board and giving it the

22   rights and protections and its agents the rights and

23   protections was not your typical corporate governance issue,

24   but it was essentially the Court's alternative to appointing a

25   trustee.  And recognizing that the members of the independent

1    board were essentially officers of the Court, the Court

2    approved the gatekeeper provision, requiring parties first to

3    come and seek the Court's permission before suing them, in

4    order to prevent them from being harassed by frivolous

5    litigation.

6        And the independent board was given the responsibility in

7    the January 9th order to retain a CEO it deemed appropriate,

8    and it did so by retaining Mr. Seery.

9        Recognizing the *Barton* doctrine as it applies to Mr. Seery

10   is consistent with a legion of cases throughout the United

11   States, and Movants' argument that Mr. Seery is not court-

12   appointed is just wrong.

13       Second, Your Honor, Movants cite without any authority,

14   argue that even if the *Barton* doctrine applied there is an

15   exception which would allow it to pursue a claim against Mr.

16   Seery without leave of the Court.

17       The Debtor agrees the 28 U.S.C. § 959 is an exception to

18   the *Barton* doctrine. Section 959(a) provides that trustees,

19   receivers, or managers of any property, including debtors in

20   possession, may be sued without leave of the court appointing

21   them with respect to any of their acts or transactions in

22   carrying on business connected with such property.

23       As the Court also pointed out at the June 8th hearing, and

24   Mr. Bridges alluded to in his argument, the last sentence of

25   959(a) provides that such actions -- clearly referring to

61

1    actions that may be pursued without leave of the appointing

2    court -- shall be subject to the general equity power of such

3    court, so far as the same may be necessary to the ends of

4    justice.

5        And Mr. Bridges made a plea, saying you can't take away my

6    jury trial right there.  You just cannot do that.  Well, I

7    have two answers to that, Your Honor.  One, they relinquished

8    their jury trial right.  We've established that.  Okay?

9        The second is allowing Your Honor to act as a gatekeeper

10   has nothing to do with their jury trial right.  Allowing Your

11   Honor to act as a gatekeeper allows you to determine whether

12   the action could go forward, and it'll either go forward in

13   Your Honor's court or some other court.

14       And the argument that the exculpation was essentially a

15   violation of 959 is just -- is just -- it just is twisting

16   what happened.  You have an exculpation provision.  We already

17   went through the authority the Court had to give an

18   exculpation.  With respect to these litigants who are before

19   Your Honor -- we're not talking about anyone else who's coming

20   in to try to get relief from the order; we're talking about

21   these litigants -- we've already established that they were

22   here, they're bound by res judicata.  So their 959 argument

23   goes away.

24       And as the Court -- and separate and apart from that, the

25   issue at issue in the District Court litigation is -- is not

62

1  even subject to 959.

2      Mr. Bridges says, well, of course it is because it deals

3  with the administration of the estate.  I'd like to refer to

4  what the Court said -- this Court said in its *Ondova* opinion:

5  The exception generally applies to situations in which the

6  trustee is operating a business and some stranger to the

7  bankruptcy process might be harmed, such as a negligence claim

8  in a slip-and-fall case, and is inapplicable to suits based

9  upon actions taken to further the administering or liquidating

10  the bankruptcy estate.

11      And your *Ondova* opinion is consistent with the Third and

12  Eleventh Circuit opinions Your Honor cited in your opinion, as

13  well as numerous other --

14      (Interruption.)

15          MR. POMERANTZ:  -- from the -- from around the

16  country, including cases from the First, Second, Sixth,

17  Seventh, and Ninth Circuits.  And I'm not going to give all

18  the cites to those cases, but it's not a -- it's not a

19  remarkable proposition that Your Honor relied on in *Ondova*.

20      In addition, several of these cases, including the

21  Eleventh Circuit's *Carter* opinion, have been cited with

22  approval by the Fifth Circuit in *National Business Association

23  v. Lightfoot*, a 2008 unpublished opinion for this very point.

24  The *Barton* exception of 959 does not apply to actions taken in

25  the administration of the case and the liquidation of assets

63

1   in the estate.

2        Suffice it to say that it's clear that the Section 959

3   exception to *Barton* has no applicability in this case.

4   Movants, hardly strangers to the bankruptcy case, want to sue

5   Mr. Seery for acts taken relating to a settlement of very

6   complex and significant claims against the estate.  They want

7   to sue a court-appointed fiduciary for doing his job,

8   resolving claims against the estate and his management of the

9   bankruptcy estate.  And they want to do this outside of the

10  Bankruptcy Court.

11       Settlement of the HarbourVest claim, which is where this

12  claim arises under -- whether it's a collateral attack now or

13  not, and we say it is, is for another issue -- but it clearly

14  arises in the context of settlement of the HarbourVest claim,

15  is the quintessential act to further the administration and

16  liquidation of the bankruptcy estate, and certainly doesn't

17  fall within the 959 exception.

18       Movants seem to be arguing that 959(a) makes a distinction

19  between claims against Mr. Seery that damaged the Debtor and

20  claims against Mr. Seery that damaged third parties.  However,

21  the Movants make up that distinction, and it's not in the

22  statute, it's not in the case law.  The focus is not on who

23  the conduct damages, but it's rather on whether the conduct

24  was taken in connection with the administration or the

25  liquidation of the estate.

64

1    And even if the Debtor is wrong, Your Honor, which it's

2    not, the savings clause allows the Court to determine whether

3    leave to be -- sue will be granted.  Given that these claims

4    are asserted by Dondero-related entities, if not controlled

5    entities, no serious argument exists that the equities do not

6    permit this Court to determine if leave to sue is appropriate.

7    Accordingly, Movants' argument that the orders create this

8    tension with 959 is simply an over-dramatization.  And in any

9    event, Your Honor, there's a basis independent of *Barton* that

10   supports the jurisdiction to enter the orders, as I mentioned.

11   But even if the orders only relied on *Barton*, there is an

12   easy fix to Movants' concerns:  let them come to court and

13   argue that the type of suit they are bringing allegedly falls

14   within the exception of 959.

15   Your Honor, Movants argue that the Bankruptcy Court may

16   not act as a gatekeeper if it would not have jurisdiction to

17   deal with the underlying action.  They essentially argue that

18   an Article I judge may not pass on the colorability of a

19   claim, that it should be decided by an Article III judge.

20   This is the same argument, Your Honor, that Your Honor

21   rejected in connection with plan confirmation and which I

22   touched on earlier.

23   And the reason why Your Honor rejected it is because

24   there's no law to support it.  In fact, there is Fifth Circuit

25   law that holds to the contrary.  And we talked about a little

65

1  bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

2  2015.  And *Villegas* is a simple case.  Schmidt was appointed

3  trustee over a debtor and liquidated its estate and the

4  Bankruptcy Court approved his final fees.  Four years later,

5  Villegas and the prior debtor sued Schmidt in District Court,

6  the district in which the Bankruptcy Court was pending,

7  arguing that he was negligent in the performance of his

8  duties.  The District Court dismissed the case because

9  Villegas failed to obtain Bankruptcy Court approval to bring

10 the suit under the *Barton* doctrine.

11     On appeal, Villegas argued *Barton* didn't apply for two

12 reasons.  First, that *Stern v. Marshall* created an exception

13 to the *Barton* doctrine for claims that the Bankruptcy Court

14 would not have the jurisdiction to adjudicate.  And second,

15 that *Barton* did not apply if the suit is brought in the

16 District Court, which exercises supervisory authority over the

17 Bankruptcy Court that appointed the trustee.  Pretty much the

18 argument that was made by Movants at the contempt hearing.

19     The Fifth Circuit rejected both arguments.  It held that

20 the existence of a *Stern* claim does not impact the Bankruptcy

21 Court's authority because *Stern* did not overrule *Barton* and

22 the Supreme Court had cautioned circuit courts against

23 interpreting later cases as impliedly overruling prior cases.

24     More importantly, the Fifth Circuit pointed to a post-

25 *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

66

1   (2014), which held that *Stern* does not decide how a Bankruptcy

2   Court or District Courts should proceed when a *Stern* creditor

3   is identified, as support for the argument that *Barton* is

4   still good law, even dealing with a *Stern* claim.

5       Second, the Fifth Circuit, joining every circuit to have

6   addressed the issue, ruled that the District Court and the

7   Bankruptcy Court are distinct from one another and the

8   Bankruptcy Court has the exclusive authority to determine the

9   colorability of *Barton* claims and that the supervisory

10  District Court does not.

11      Movants didn't address *Villegas* in their reply.  Briefly

12  tried to distinguish it, unconvincingly, today.  The bottom

13  line is *Villegas* is directly applicable.  Your Honor cited it

14  in the *Ondova* opinion for precisely the proposition that

15  *Barton* applies whether or not the Court has authority to

16  adjudicate the claim.

17      Accordingly, Your Honor, it was within the Court's

18  jurisdiction to require a party to seek approval of Your Honor

19  on the colorability of a claim before an action may be

20  commenced or pursued against the protected parties, even if

21  Your Honor wouldn't have authority to adjudicate the claim at

22  the end of the day.

23      In fact, some courts have even addressed the proper

24  procedure for doing so, requiring the putative plaintiff to

25  not only seek leave of Bankruptcy Court but also to provide a

009184

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 267 of 1017 PageID 10031

67

1    draft complaint and a basis for the Court to determine if the

2    claim is colorable.

3        Movants have done neither, and they should not be

4    permitted to modify the final orders of the Court as a

5    workaround.

6        Your Honor, that concludes my presentation. I'm happy to

7    answer any questions Your Honor may have.

8            THE COURT: All right. Not at this time. All right.

9    I'm going to figure out, do we need a break or not, depending

10   on what Mr. Bridges tells me. I assume we're just doing this

11   on argument today. I think that's what I heard. No witnesses

12   or exhibits.

13           MR. BRIDGES: That is correct, Your Honor.

14           THE COURT: Okay. Mr. Bridges, how long do you

15   expect your rebuttal to take so I can figure out does the

16   Court need a break?

17           MR. BRIDGES: Fifteen minutes plus whatever it takes

18   to submit agreed-to exhibits.

19           THE COURT: Okay. Let's take a five-minute bathroom

20   break. We'll come back. It's -- what time is it? It's 1:11

21   Central time. We'll come back in five minutes.

22           THE CLERK: All rise.

23       (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24           THE CLERK: All rise.

25           THE COURT: All right. Please be seated. We're

68

1  going back on the record in the Highland matters.

2      Mr. Bridges, time for your rebuttal.  I want to ask you a

3  question right off the bat.  Mr. Pomerantz pointed out

4  something that was on my list that I forgot to ask you when

5  you made your initial presentation.  What is the authority

6  you're relying on?  You did not cite a statute or a rule *per*

7  *se*, but I guess we can probably all agree that Bankruptcy Rule

8  9024 and Federal Rule 60 is the authority that would govern

9  your motion, correct?

10          MR. BRIDGES:  I don't agree, Your Honor.  I don't

11  believe this is a final order that we're contesting here.  And

12  I think that's demonstrated by the Court's final confirmation

13  -- plan -- plan confirmation order that seeks to modify this

14  order or will modify this order upon being -- being effective.

15  So I don't think so.

16      In the alternative, if we are challenging a final order,

17  then I think you're right as to the rules that would be

18  controlling.

19          THE COURT:  All right.  Well, let me back up.  Why

20  exactly do you say this would be an interlocutory order as

21  opposed to a final order?

22          MR. BRIDGES:  Because of its nature, Your Honor.

23  While the appointment in the order or the approval of the

24  appointment in the order might, as a separate component of the

25  order, have -- have finality, the provisions -- the provisions

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 70 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 269 of 1017 PageID 10033

69

1   in it relating to gatekeeping and exculpation are, we think,

2   by their very nature, quite obviously interlocutory and not

3   permanent.  They don't seem to indicate an intention by any of

4   the parties that, 30 years from now, if Mr. Seery is still CEO

5   at Highland, long after the bankruptcy case has ended, that

6   nonetheless parties would be prohibited from bringing claims,

7   strangers to this action would be prohibited from bringing

8   claims related to his CEO role.

9       I think the nature of it demonstrates that, the

10  modifications to it, and even the inclusion of it in the final

11  plan confirmation, as well as -- can't read that.

12          THE COURT:  Can you give me some authority?  Because

13  as we know, there's a lot of authority out there in the

14  bankruptcy universe on what discrete orders are interlocutory

15  in nature that a bankruptcy judge might routinely enter and

16  which ones are final.  You know, it would just probably, if I

17  flipped open *Collier's*, I could -- you know, it would be mind-

18  numbing.

19      So what authority can you rely on?  I mean, is there any

20  authority that says an employment order is not a final order?

21  That would be shocking to me if you have cases to that effect,

22  but, I mean, of course, sometimes we do interim on short

23  notice and then final.  But this would be shocking to me if

24  there is case authority to support the argument this is not a

25  final order.  But I learn something new every day, so maybe I

70

1    would be shocked and there is.

2            MR. BRIDGES:  Your Honor, I'd point you to *In re*

3    *Smyth*, 207 F.3d 758, and *In re Royal Manor*, 525 B.K. 338

4    [sic], for the proposition that retaining a bankruptcy

5    professional is an interlocutory order.

6            THE COURT:  Okay.  Stop for a moment.  The *Smyth*

7    case.  Which court is that?

8            MR. BRIDGES:  Fifth Circuit.

9            THE COURT:  Okay.  So tell me the facts.  I'm

10   surprised I don't know about this case.  But, again, I don't

11   know every case.  So, it held that an employment order is an

12   interlocutory order?

13           MR. BRIDGES:  Appointing counsel.  A professional in

14   the bankruptcy context, Your Honor.

15           THE COURT:  Counsel for a debtor-in-possession?  An

16   order approving counsel was an interlocutory order?

17           MR. BRIDGES:  Yes, or the Trustee's counsel.

18           THE COURT:  Or the Trustee's counsel?  Okay.  What

19   were the circumstances?  Was this on an expedited basis and

20   there wasn't a follow-up final order, or what?

21           MR. BRIDGES:  Your Honor, I don't have -- I don't

22   have that at the tip of my memory.  I'm sorry.

23           THE COURT:  Okay.  And the other one, 525 B.R. 338,

24   what court was that?

25           MR. BRIDGES:  It's a Bankruptcy Court within the

71

 1   Sixth Circuit.  I'm not certain which district.

 2          THE COURT:  All right.  Well, maybe one of you two

 3   over there can look them up and give me the context, because

 4   that is surprising authority.  Or other lawyers on the WebEx

 5   maybe can do some quickie research.

 6      Okay.  We'll come back to that.  But assuming that this

 7   was a final order, which I have just been presuming it was,

 8   Rule 60 is the authority you're going under?  9024 and Rule

 9   60, correct?

10          MR. BRIDGES:  Your Honor, we have not invoked those

11   rules.  Alternatively, I think you're right that they would

12   control if we are wrong about the interlocutory nature of the

13   order.

14          THE COURT:  Well, you have to be going under certain

15   -- some kind of authority when you file a motion.  So I'm --

16          MR. BRIDGES:  As an alternative --

17          THE COURT:  I'm approaching this exactly, I assure

18   you, as the District Court or a Court of Appeals would.  You

19   know, you start out, what is the legal authority that is being

20   invoked here?

21          MR. BRIDGES:  Well, --

22          THE COURT:  So I just assume Rule 60.  I can't, you

23   know, come up with anything else that would be the authority.

24          MR. BRIDGES:  Yes, Your Honor.  You also have

25   inherent power to modify orders that are in violation of the

72

1 law.  And we pointed you to --

2          THE COURT:  Now, is that right?  Is that really

3 right?  Why do we have Rule 60 if I can just willy-nilly, oh,

4 I feel like I got that wrong two years ago?  I can't do that,

5 can I?  Rule 60 is the template for when a court can do that.

6 Parties are entitled to rely on orders of courts.  And that's

7 why we have Rule 60, right?  So, --

8          MR. BRIDGES:  Your Honor, I think -- I think that

9 we're miscommunicating.  I'm trying not to rely on Rule 60 in

10 the first instance because in the first instance we view this

11 as not a final order.  So, in the first instance, --

12          THE COURT:  I got that.  And I've got my law clerks

13 looking up your cases to see if they convince me.  But I'm

14 asking you to go to layer two.  Assuming I don't agree with

15 you these are final orders, what is your authority for the

16 relief you're seeking?

17          MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18 in the alternative.

19          THE COURT:  All right.

20          MR. BRIDGES:  That's correct.

21          THE COURT:  So, which provision?  Which provision of

22 Rule 60?  (b) what?

23          MR. BRIDGES:  Your Honor, I'm not prepared to concede

24 any of them.  I don't have the rule in front of me.

25          THE COURT:  You're not prepared to concede what?

73

1          MR. BRIDGES:  Any of the provisions of Rule 60.  Just

2    (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our

3    basis, as is the particulars (b)(1), (2), (6) --

4        (Garbled audio.)

5          THE COURT:  Okay.  You're breaking up.  Can you

6    restate?

7          MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as

8    any other provision, Your Honor, of Rule 60.

9          THE COURT:  Okay.  Well, so (1), mistake,

10   inadvertence, surprise, excusable neglect.  Which one of

11   those?

12         MR. BRIDGES:  All of the above, Your Honor.

13         THE COURT:  Surprise?  Who's surprised?

14         MR. BRIDGES:  Your Honor, I think every potential

15   litigant who discovers that your order purports to bar

16   prospective unaccrued claims at the time the order issued

17   would be surprised.

18      Frankly, I think Mr. Seery would be surprised, given his

19   testimony that he owes fiduciary duty -- duties that he must

20   abide by and that he appears to have, as I continue to

21   represent to clients, to advisees, and to the SEC, that those

22   duties are owing.

23         THE COURT:  Okay.  I'm giving you one more chance

24   here to make clear on the record what provision of Rule 60(b)

25   are you relying on, okay?  I need to know.  It's not in your

74

```
 1   pleading.
 2              MR. BRIDGES:  Your Honor, --
 3              THE COURT:  So tell me specifically.  I can only --
 4              MR. BRIDGES:  -- (b)(1) --
 5              THE COURT:  -- come up with a result here if I know
 6   exactly what's being presented.
 7              MR. BRIDGES:  Your Honor, (b)(1), (b)(2), and (b)(6)
 8   --
 9              THE COURT:  Which, okay, there are multiple parts to
10   (1).  You're saying somebody's surprised by the ruling.  I
11   don't know who.  Really, all that matters is your client, the
12   Movants.  You're saying, even though they participated, --
13              MR. BRIDGES:  Yes, Your Honor.
14              THE COURT:  -- got notice, they're somehow surprised?
15   Why are they surprised?
16              MR. BRIDGES:  Yes, Your Honor.
17              THE COURT:  Do you have evidence of their surprise?
18              MR. BRIDGES:  Your Honor, our brief shows the
19   intentions of all involved were not the interpretation of that
20   order being advanced at this -- at this point in time.  And
21   so, yes, I believe that is evidence.  The transcripts of the
22   hearings I believe evidence that as well, that the
23   understanding of everyone involved was not that future --
24   unspecified future claims that had not accrued yet would be
25   released under (b)(1).  Yes, Your Honor.
```

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 275 of 1017    PageID 10039
202

75

1          THE COURT:  Okay.

2          MR. BRIDGES:  Under (b)(2), --

3          THE COURT:  I don't have any evidence of that.  All I

4     have is the clear wording of the order.  Okay.  Let me just --

5     just let me go through this.

6         Assuming Rule 60 (1) through (6) are what you're arguing

7     here, what about Rule 60(c):  a motion under Rule 60(b) must

8     be made within a reasonable time?  We're now 11 months --

9          MR. BRIDGES:  Your Honor, --

10         THE COURT:  We're now 11 months past the July 2020

11    order.  What is your authority for this being a reasonable

12    time?

13         MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14    step before answering your question.  Under (b)(2), we're

15    relying on newly-discovered evidence that was discovered in

16    late March and caused both the filing of this motion and the

17    filing of the District Court action.

18        Under (b)(4), we believe that the order is --

19         THE COURT:  Let me stop.  Let me stop.  What is my

20    evidence that you're putting in the record that's newly

21    discovered?

22         MR. BRIDGES:  The evidence is detailed in the

23    complaint that is in the record.  You know, --

24         THE COURT:  That's not evidence.

25         MR. BRIDGES:  -- honestly, Your Honor, --

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 276 of 1017 PageID 10040

76

1        THE COURT:  That is not evidence.  Okay?  A lawyer-

2   drafted complaint in another court is not evidence.  Okay?

3        MR. BRIDGES:  Your Honor, I think, to be technical,

4   that there is not a record yet, that we have evidence yet to

5   be admitted on our exhibit list.  I believe in this

6   circumstance -- I understand that, in general, allegations in

7   a pleading are not evidence.  In this instance, when we're

8   talking about whether or not new facts led to the filing of a

9   lawsuit, I do believe that the allegations in the lawsuit are

10  evidence of those new facts.

11        THE COURT:  All right.  Go on.

12        MR. BRIDGES:  Under (b)(4), we believe the order is,

13  in part, void.  It is void because of the jurisdictional and

14  other defects noted in our argument.

15    And also, under (b)(6) (garbled) ground for relief that

16  we're appealing to the equitable powers of this Court to

17  correct errors and manifest injustice towards not just the

18  litigants here but to correct the order of the Court to make

19  it comply with -- with the law, with the statutes promulgated

20  by Congress and to respect the jurisdiction of the District

21  Court.

22        THE COURT:  All right.  Do you agree with Mr.

23  Pomerantz that the case law standard for Rule 60(b)(4) is

24  exceptional circumstances?  It's only applied so that a

25  judgment is voided in exceptional circumstances.  Do you

77

1  disagree with that case authority?

2      MR. BRIDGES:  I would -- I would agree, in part, that

3  unusual circumstances is not the ordinary case.  I'm not

4  entirely sure what you mean by exceptional, but I think we're

5  on the same page.

6      THE COURT:  Okay.  It's not what I mean.  That's just

7  the case law standard.  And I'm asking, do you agree with Mr.

8  Pomerantz that that is the standard set forth in case law when

9  applying 60(b)(4)?  There have to be some sort of exceptional

10 circumstances where there's just basically no chance the Court

11 had authority to do what it did.

12     MR. BRIDGES:  Out of the ordinary would be the phrase

13 I would use, Your Honor.

14     THE COURT:  Okay.  So I guess then I'll go from

15 there.  Is it your argument that gatekeeping provisions in the

16 bankruptcy world are out of the ordinary?

17     MR. BRIDGES:  The exculpation of Mr. Seery for

18 liability falling short of gross negligence or intentional

19 wrongdoing in connection with his continuing to conduct the

20 business of the Debtor as an investment advisor subject to the

21 Advisers Act, yes, I would say that is out of the ordinary,

22 that it is extraordinary, that it is --

23     THE COURT:  Okay.  What is your authority or evidence

24 on that?  Because this Court approves exculpation provisions

25 regularly in connection with employment orders, and pretty

78

1    much every judge I know does.  In fact, I'm wondering why this

2    isn't just a term of compensation.  You know, he's going to do

3    x, y, z in the case.  His compensation is going to be a, b, c,

4    d, e.  And by the way, we're going to set a standard of

5    liability for his performance as CEO or investment banker,

6    financial advisor, whatever, so that no one can sue him

7    regarding his performance of his job duties unless it rises to

8    the level of gross negligence, willful misconduct.

9        It's a term of employment that, from my vantage point,

10   seems to be employed all the time.  So it would be anything

11   but exceptional circumstances.  Do you have authority or

12   evidence --

13            MR. BRIDGES:  Your Honor, frankly, --

14            THE COURT:  -- to the contrary?

15            MR. BRIDGES:  Your Honor, frankly, I'm astonished at

16   your view of that situation, that it would merely be a term of

17   his employment, that vitiates the entire fiduciary duty

18   standard created by the Advisers Act that tells him, with

19   hundreds of millions of dollars of assets under management for

20   people he's advising as a registered investment advisor,

21   people he's advising who believe that he has a fiduciary duty

22   to them and that it's enforceable, that the SEC, who monitors,

23   believes he has an enforceable fiduciary duty to those people,

24   and that he's testified that he has fiduciary duties to those

25   people, and that Your Honor is saying no, just as a regular

79

1  term of employment we have undone the Advisers Act's

2  imposition of an unwaivable fiduciary duty.

3       Your Honor, the order is void to the extent that it

4  attempts to do so.

5       This is not an ordinary employment agreement, Your Honor.

6  This is an attempt to exculpate someone from the key thing

7  that our entire investment system depends upon, regulation by

8  the SEC and the requirement in investment advisors to act as

9  fiduciaries when they manage the money of another.

10      It would be the equivalent of telling lawyers who are

11 appointed in a bankruptcy proceeding that they don't have any

12 duties to their client, or at least not fiduciary duties.

13 That the lawyers merely owe a duty not to be grossly negligent

14 to their clients.  That's not an ordinary term of employment,

15 Your Honor.

16         THE COURT:  All right.  So I guess we're back to my

17 question, was this brought within a reasonable time under Rule

18 60(c)?

19         MR. BRIDGES:  It was brought very quickly after the

20 new evidence was discovered at the end of March, Your Honor,

21 yes.

22         THE COURT:  Okay.  Well, I guess I'll just ask you

23 one more question before you continue on with your rebuttal

24 argument.  I mean, again, I want your best argument of why

25 *Villegas* doesn't absolutely permit the gatekeeping provisions

80

```
 1   that you're challenging.  And many cases were cited by Mr.
 2   Pomerantz in his brief where courts have extended the Barton
 3   doctrine to persons other than trustees.  And so what is your
 4   best rebuttal to that?
 5           MR. BRIDGES:  Your Honor, we've already given it.
 6   I'm afraid --
 7           THE COURT:  Okay.  If you don't want to say more, --
 8           MR. BRIDGES:  -- what I have is not --
 9           THE COURT:  -- I'm not going to make you say more.
10           MR. BRIDGES:  I --
11           THE COURT:  I'm just telling you what's on my brain.
12           MR. BRIDGES:  I do.  I want to -- I am apologizing in
13   advance for repeating, but yes, Villegas, Villegas, however
14   that case is pronounced, says that Stern is not an exception
15   to the Barton doctrine.
16           THE COURT:  Uh-huh.
17           MR. BRIDGES:  959(a) is an exception to the Barton
18   doctrine.  You are not operating under the Barton doctrine
19   here.  Even counsel's brief, the Debtor's brief, doesn't say
20   Barton applies.  It says it's consistent with Barton.
21       Your Honor, in our previous hearing, you directed me to
22   the second sentence of 959(a) because you believe it's what
23   empowers you to do the gatekeeping.  It limits the gatekeeping
24   that you can do by protecting jury rights, the right to trial,
25   says you cannot discharge, undo, deprive a litigant of their
```

81

```
 1   right to a trial, a jury trial.
 2           THE COURT:  Well, you mentioned it again, jury trial
 3   rights.  Do you have any argument --
 4           MR. BRIDGES:  Yes, Your Honor.
 5           THE COURT:  -- of why that hasn't flown out the
 6   window?
 7           MR. BRIDGES:  Yes, Your Honor.  I am told that
 8   Section 14(f) that counsel for the Debtor referred to is not a
 9   waiver of jury rights at all.  It is an arbitration agreement.
10   Your Honor is probably familiar how arbitration agreements
11   work, is that they need not be elected.  They need not be
12   invoked by the parties.  When they are, they create a
13   situation where arbitration may be required.  But a waiver of
14   a jury right outside of arbitration is not part of this
15   arbitration clause, or of any.  The issue is not briefed or in
16   evidence before the Court.  We're relying on representations
17   of counsel as to what that provision contains.  That Mr. Seery
18   wasn't even a party to that agreement, the advisory agreement,
19   with the Charitable DAF.  The arbitration agreement is subject
20   to defenses that are not at issue here before the Court.  That
21   Movants' rights, their contractual rights to invoke the
22   arbitration clause, also appear to be terminated by the
23   orders' assertion of sole jurisdiction in this matter.
24       Your Honor, yes, our jury rights survive Section 14(f) in
25   the advisory agreement with the DAF for all of those potential
```

82

 1  reasons.

 2      On top of that, it doesn't go to all of our causes of

 3  action.  It goes to the contract cause of action.  And to the

 4  extent they can argue that the other claims are subject to

 5  arbitration, that also is a defense and -- defensible and

 6  complex issue requiring the application of the Federal

 7  Arbitration Act, requiring consideration of the Federal

 8  Arbitration Act, which this Court doesn't have jurisdiction to

 9  do under 157(d).

10          THE COURT:  What?  Repeat that.

11          MR. BRIDGES:  Yes.  This Court does not have

12  jurisdiction to determine whether or not arbitration --

13  arbitration is enforceable due to the mandatory withdrawal of

14  the reference provisions of 157(d).

15          THE COURT:  That's just not consistent with Fifth

16  Circuit authority.  *National Gypsum*.  What are some of these

17  other arbitration cases?  I've written an article on it.  I

18  can't remember them.  That's just not right.  Bankruptcy

19  courts look at arbitration clauses all the time.  Motions to

20  compel arbitration.

21          MR. BRIDGES:  Your Honor, under 157(d), in the

22  circumstances of this case, if the Court is going to take into

23  consideration an arbitration clause under the Federal

24  Arbitration Act, when that clause is not in evidence and is

25  not before the Court, then Movants respectfully move to

83

1  withdraw the reference of your consideration of that issue and

2  of any proceeding and ask that you would issue only a report

3  and recommendation rather than an order on that issue.

4          THE COURT:  Okay.  I regret that we even got off on

5  this trail.  I'm sorry.  So just proceed with your rebuttal

6  argument as you had envisioned it, Mr. Bridges.

7          MR. BRIDGES:  Thank you, Your Honor.

8      Debtor's counsel says there's no private right of action

9  under the Advisers Act.  That is both inaccurate and

10 misleading.  The Advisory Act creates, imposes fiduciary

11 duties that state law provides the cause of action for.  It is

12 a state law breach of fiduciary duty claim regarding --

13 regarding fiduciary duties imposed as a matter of law by the

14 Investment Advisers Act that is Count One in the District

15 Court action.

16     Furthermore, that Act does create a private right of

17 action for rescission.  That would be rescission of the

18 advisory agreement with the Charitable DAF, not rescission of

19 the HarbourVest settlement.

20     Second, Your Honor, the notion that this Court has related

21 to jurisdiction is irrelevant and beside the point.  I would

22 like to note for the record that the District Court civil

23 cover sheet that omitted to state that this was a related

24 action has been corrected, has been amended, and that that has

25 taken place.

1      Counsel for the Debtor also appears to agree with us that

2   the order ought to be modified for having asserted exclusive

3   jurisdiction over colorable claims to the extent it's not

4   legally permissible to do.  And in trying to invoke the

5   discussions between us as to how the orders might be fixed,

6   what counsel does is tries to cabin the legally-permissible

7   caveat to just the second half of the paragraph at issue.  It

8   is both -- both portions, the gatekeeping and the subsequent

9   hearing of the claims, that should be limited to the extent it

10  would be impermissible legally for this Court to make those

11  decisions.

12      On top of that, Your Honor, merely stating "to the extent

13  legally permissible" would result in a considerable amount of

14  ambiguity in the order that would lead it, I fear, to be

15  unenforceable as a matter of law.

16      Next, Your Honor, when Debtor's counsel talks about the

17  authority in this case, it feels like we're ships passing in

18  the night.  He says that we're wrong in asserting that no case

19  we can find involves both the *Barton* doctrine and the

20  application of the business judgment rule where the Court is

21  asked to defer, and he mentions cases that apply the *Barton*

22  doctrine to an approval rather than an appointment.  The Court

23  is asked to --

24      (Garbled audio.)

25          THE COURT:  I lost you for a moment.  Could you

85

1  repeat the last 30 seconds?

2      MR. BRIDGES: Thank you, Your Honor. Yes. He points

3  -- opposing counsel points us to case law where the *Barton*

4  doctrine has been applied despite the Bankruptcy Court having

5  merely approved rather than appointed the trustee or the, I'm

6  sorry, the professional. But in doing so, he doesn't

7  reference any case that has done so in the context of business

8  judgment rule deference. It's like we're ships passing in the

9  night.

10     What we're saying isn't that a mere approval can never

11  rise to the level of the *Barton* doctrine. What we're saying

12  is that, in combination with the business judgment rule

13  deference, the two cannot go together. There's no authority

14  for saying that they do.

15     We -- I further feel like we're ships passing in the night

16  when he talks about *Shoaf*. Counsel says that in *Shoaf* there

17  was a confirmed final plan and it specifically identified the

18  released guaranty. And yeah, that distinguishes it from this

19  case, just as it distinguished -- just as the *Applewood Chair*

20  case distinguished it when there's not that specific

21  identification. And here, we don't even have a final plan

22  confirmation at the time these orders are being issued.

23  Without that express -- express notion of what the claims are

24  being discharged, *Shoaf* doesn't apply.

25     There, there was a guaranty to a party on a specific

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 286 of 1017 PageID 10050
20

86

1    indebtedness that was listed, identified with specificity, and

2    disappeared as a result of the judgment, as a result of the

3    judgment in the underlying case.  Here, we're talking about

4    any potential claim that might arise in the future.  As of the

5    July order's issuance, it didn't apply on its -- either it

6    didn't apply to future claims that had not yet accrued or else

7    in violation of *Applewood Chair*, it was releasing claims

8    without identifying them.

9        Who does Seery owe a fiduciary duty to?  Is it, as

10    Debtor's counsel says, only to the funds and not to the

11    investors, or does he also owe those duties to the investors

12    as well?  Your Honor, that is going to be a hotly-contested

13    issue in this litigation, and it involves -- it requires

14    consideration of the Advisers Act and the multitude of

15    accompanying regulations.  To just state that his fiduciary

16    duties are limited in a way that couldn't affect anyone that

17    is -- whose claims are precluded by the July order is both

18    wrong on the law and is invoking something that will be a

19    hotly-contested issue that falls under 157(d), where, again,

20    this Court doesn't have the jurisdiction to decide that, other

21    than in a report and recommendation.

22        The order is legally infirm because it's issued without

23    jurisdiction for doing that as well.

24        Finally, Your Honor, I think (garbled) wrong direction

25    with a statement that suggests that Mr. Seery is an agent of

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 88 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 287 of 1017 PageID 10051

87

1    the independent directors under the January order. He is, in

2    fact, not an independent agent -- not an agent of any of the

3    independent directors, but, at most, of the company that is

4    controlled by the board, not -- not of individual directors

5    who could confer on him -- who could confer on him any

6    immunity that they have obtained from the January order just

7    by having appointed him.

8        The proposed order from the other side failed to address

9    either the ambiguity in the order or its attempt to exculpate

10   Mr. Seery from the liability, including liability for which

11   there is a jury trial right, and it is not a fix to the

12   problem for that reason.

13       In order to make the order enforceable and to fix its

14   infirmities, the Court would have to do significantly more.

15   It would have to both apply the caveat from the final

16   confirmation plan order, rope that caveat to the first part of

17   the relevant paragraph, as well as the second part, and it

18   would have to provide directive clarity to be enforceable

19   rather than too vague.

20       Your Honor, I think that's all I have.

21           THE COURT: Okay. Just FYI, my law clerk pulled the

22   *Smyth* case from 21 years ago from the Fifth Circuit. And

23   while it more prominently deals with the issue of whether

24   trustees -- in this case, it was a Chapter 11 trustee -- could

25   be subjected to personal liability for damages to the

88

 1  bankruptcy estate --

 2      (Echoing.)

 3          THE COURT:  Someone, put your phone on mute.  I don't

 4  know who that is.

 5      It dealt with, you know, the standard of liability, that

 6  the trustee could not be sued for matters not to the level of

 7  gross negligence.

 8      But it does say, in the very last paragraph, to my shock

 9  and amazement, that -- it's just one sentence in a 10-page

10  opinion -- orders appointing counsel -- and it was talking

11  about the trustee's lawyer he hired to handle appeals to the

12  Fifth Circuit -- orders appointing counsel under the

13  Bankruptcy Code are interlocutory and are not generally

14  considered final and appealable.  And it cites one case from

15  1993, the Middle District of Florida.  Live and learn.  There

16  is one sentence in that opinion that says that.  But I don't

17  know that it's hugely impactful here, but I did not know about

18  that opinion and I'm rather surprised.

19      All right.  You were going to walk me through evidence,

20  you said?

21          MR. BRIDGES:  Well, do I -- Your Honor, do you want

22  to do that first before I submit --

23          THE COURT:  Yes, please.

24          MR. BRIDGES:  -- my rebuttal argument?

25          THE COURT:  Please.

89

 1           MR. BRIDGES:  Okay.

 2           THE COURT:  Uh-huh.

 3           MR. BRIDGES:  Your Honor, we would submit and offer

 4   Exhibits 1 through 44, with the exception of those that have

 5   been withdrawn, that are 2, 13 --

 6           THE COURT:  Okay.  Slow down.  Slow down.  I need to

 7   get to the docket entry number we're talking about.  Are we

 8   talking -- are your -- the Debtor's exhibits are at 2412.  But

 9   Nate, I misplaced my notes.  Where are Charitable DAF and

10   Holdco's?

11           THE CLERK:  I have 2411.

12           THE COURT:  2411?  Is that it?

13           MR. BRIDGES:  2420, Your Honor.

14           THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15   2420?

16           MR. BRIDGES:  Yes, Your Honor.

17           THE COURT:  Okay, I'm there.  And it's which

18   exhibits?

19           MR. BRIDGES:  It's Exhibits 1 through 44, Your

20   Honor, with four exceptions.  We have agreed to withdraw

21   Exhibit 2, 13, 14, and 29.

22           THE COURT:  All right.

23           MR. BRIDGES:  Also, Your Honor, we'd like to submit

24   Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25   would be anything offered by the other side.  But we'd like

009207

90

 1   to make sure that Debtor's Exhibit 1 gets in the record as

 2   well.

 3          THE COURT:  Let me back up.  When I pull up the

 4   docket entry you just told me, I have Exhibits 44, 45, and 46

 5   only.  Am I misreading this?

 6          MR. BRIDGES:  I have a chart showing Exhibits 1

 7   through 49 titled Docket 2420 filed 6/7/21.

 8          THE COURT:  Okay.  The docket entry number you told

 9   me, 2420, it only has three exhibits: 44, 45, and 46.  So,

10   first off, I understand -- are you offering 45 and 46 or not?

11          MR. BRIDGES:  No, Your Honor.

12          THE COURT:  Okay.  So you said you were offering 1

13   through 44 minus certain ones.  44 is here.

14          MR. BRIDGES:  Yes.

15          THE COURT:  But I've got to go back to a different

16   docket number.

17          THE CLERK:  It's actually 2411.

18          THE COURT:  It's at 2411.  That has all the others?

19          THE CLERK:  Yes.

20          THE COURT:  Okay.

21      So, Mr. Pomerantz, do you have any objection to Exhibits

22   1 through 44, which he's excepted out 2, 13, 14, and 29, and

23   then he's added Debtor's Exhibit 1?  Any objection?

24          MR. POMERANTZ:  I don't believe so.  I just would

25   confirm with John Morris, who has been focused on the

91

1  exhibits, just to confirm.

2          THE COURT:  Mr. Morris?

3          MR. MORRIS:  No objection, Your Honor.  It's fine.

4          THE COURT:  Okay.  They're admitted.

5      (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

6  through 44 are received into evidence.  Debtor's Exhibit 1 is

7  received into evidence.)

8          THE COURT:  So, any --

9          MR. BRIDGES:  Thank you, Your Honor.

10         THE COURT:  Anything you wanted to call to my

11  attention about these?

12         MR. BRIDGES:  Your Honor, the things that we

13  mentioned in the argument, for sure, but especially that the

14  word "trustee" is not used in the January hearing's

15  transcript, nor is it under discussion in that transcript

16  that it would be a trustee-like role being played by the

17  Strand directors, as well as the transcript of the July

18  hearing on the order at issue here, Your Honor, where you are

19  asked to defer both in that transcript and in the motion, the

20  motion that was at issue in that hearing, you are asked to

21  defer to the business judgment of the company.

22     And finally, Your Honor, I'd ask you to look at the

23  allegations in the District Court complaint.

24         THE COURT:  All right.

25     Mr. Pomerantz or Morris, let's see what exhibits you're

92

```
 1    wanting the Court to consider.  Your exhibits, it looks like,
 2    are at Docket Entry 2412.
 3             MR. MORRIS:  As subsequently amended at 2423.
 4             THE COURT:  Oh.  All right.  So which ones are you
 5    offering?
 6             MR. MORRIS:  We're offering all of the exhibits on
 7    2423, which is 1 through 17.
 8        (Echoing.)
 9             THE COURT:  Whoops.  We got some distortion there.
10    Say again?
11             MR. MORRIS:  Yeah.  All of the exhibits that are on
12    2423, which are Exhibits 1 through 17.  But I want to make
13    sure that, as I did earlier, that that has the exhibits that
14    we're relying on.  Does that --
15        (Pause.)
16             THE COURT:  Okay.  Let me make sure I know what's
17    going on here.  You're double-checking your exhibits, Mr.
18    Morris?
19             MR. MORRIS:  Yes, Your Honor.
20             THE COURT:  Okay.
21        (Pause.)
22             MR. MORRIS:  Your Honor, we start with Docket No.
23    2419, --
24             THE COURT:  Okay.
25             MR. MORRIS:  -- which was the amended exhibit list.
```

93

 1   And that actually had Exhibits 1 through 17.  And then that

 2   was amended at Docket 2423.  So, the exhibits on both of

 3   those lists.

 4            THE COURT:  Well, they're one and the same, it looks

 5   like, right?

 6            MR. MORRIS:  Yes.

 7            THE COURT:  Okay.  So you're offering those?

 8            MR. MORRIS:  I think -- yeah.

 9            THE COURT:  Any objection?

10            MR. BRIDGES:  No objection.

11            THE COURT:  All right.  They're admitted.

12       (Debtor's Exhibits 1 through 17 are received into

13   evidence.)

14            MR. POMERANTZ:  Your Honor, if I may take a few

15   moments to respond to Mr. Bridges' reply?

16            THE COURT:  All right.  Is he still within his hour

17   and a half?

18            THE CLERK:  At an hour and one minute.

19            THE COURT:  Okay.  All right.  You have a little

20   time left, so go ahead.

21            MR. POMERANTZ:  Thank you, Your Honor.

22       So look, I -- it sort of was really not fair to us.  Mr.

23   Bridges was really making things up on the fly.  He was

24   changing the theories of his case and responding to Your

25   Honor.  But I'm going to do my best to respond to the

94

1      arguments made, many of which I sort of anticipated.

2          I'll first start with the issue that Your Honor raised,

3      which was whether this is under Rule 60 or not.  Mr. Bridges

4      identified a couple of cases, said that the order was

5      interlocutory, said that somehow the orders have anything to

6      do with a plan confirmation order.  They do not.  Your Honor

7      didn't hear that argument at the plan confirmation.  The

8      January 9th and July 16th orders are old and cold.  There's

9      an exculpation provision in the plan.  There's a gatekeeper

10     in the plan.  The provisions do not overlap entirely.  The

11     gatekeeper applies prospectively.  The exculpation provision

12     includes additional parties.

13         So the arguments that basically the plan had anything to

14     do -- and the fact that the plan is not a final order -- has

15     anything to do with the January 9th and July 16th orders is

16     just wrong.  It's just wrong.

17         More fundamentally, Your Honor, as Your Honor pointed

18     out, the *Smyth* case is a professional employment order.  And

19     ironically, if you abide by the *Smyth* case, that order is

20     never appealable because it's interlocutory.

21         But more fundamentally, Your Honor, that's dealing with

22     327 professionals.  And again, there's not much analysis in

23     the *Smyth* case, but we're not dealing with a 327

24     professional.  We're dealing with orders that were approved

25     under 363.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 295 of 1017 PageID 10059

95

1     So the premise of the argument that Rule 60(b) -- 60

2  doesn't apply and they have other arguments just doesn't make

3  any sense.

4     Okay.  So now that gets us to Rule 60.  And Your Honor,

5  Your Honor hit the nail on the head.  They haven't presented

6  any evidence.  Allegations in a complaint aren't evidence.

7  They can't stand up there and say surprise evidence.  They

8  had the opportunity -- and this hearing's been continued a

9  few weeks -- they had the opportunity to bring it up, and

10  it's -- they had the opportunity to claim that there was

11  surprise, but they just didn't.  Okay?

12     So to go on to the Rule 60 arguments.  Surprise.

13  Surprise and reasonable delay are really -- go hand in hand

14  with Mr. Bridges' argument.  He says, well, we didn't find

15  out that -- months after the order was entered that he

16  violated a duty to us, so we are surprised by that, and it's

17  a reasonable time.  Well, Your Honor, the order provided for

18  an exculpation.  CLO Holdco and DAF knew that it applied to

19  an exculpation.  They were bound.  They knew based upon that

20  order that they would not be able to bring claims for normal

21  negligence.  There is no surprise.

22     If you take Mr. Bridges' argument to its conclusion, he

23  could wait until the end of the statute of limitations after

24  an order and have come in four years from now and say, Your

25  Honor, we just found out facts so we should go back four

96

1  years before.  That, Your Honor, that's not how the surprise

2  works.  That's not how the reasonable time works.

3     Mr. Bridges did not contest that they're bound by res

4  judicata.  He did not contest that the exculpation itself was

5  clear and unambiguous.  Of course he argued Your Honor

6  couldn't enter an order saying there was exculpation, again,

7  with no authority.  And he seemed surprised, as I suspect he

8  should, since he's not a bankruptcy lawyer, that retention

9  orders, whether it's investment bankers, financial advisors,

10 include exculpations all the time.  So there's no grounds

11 under surprise.

12    There's no grounds -- the motions are late under 60(c).

13    And they're not void.  I went through a painstaking

14 analysis, Your Honor, and I described in detail what the

15 *Espinosa* case held, and the exceptional circumstances which

16 Mr. Bridges tried to get away from as much as he could.

17 Maybe he can try to get away from language in a district

18 Court opinion, in a Bankruptcy Court opinion, in a Circuit

19 Court opinion.  You can't get away from language in a Supreme

20 Court opinion.  The Supreme Court opinion said exceptional

21 circumstances, where there was arguably no basis for

22 jurisdiction for what the Court did.  They have not even come

23 close to convincing Your Honor that there was absolutely no

24 basis.

25    Now, they disagree.  We granted, we think it's a good-

97

1   faith disagreement, but they haven't come close to

2   establishing the *Espinosa* standard, so their motion under 60

3   does not -- it fails.

4       And I don't think -- look, these are good lawyers.  Mr.

5   Bridges and Mr. Sbaiti are good lawyers.  They didn't just

6   inadvertently not mention Rule 60.  They never mentioned it

7   because they knew they had no claim under Rule 60.

8       Your Honor, Mr. Bridges has made comments about the

9   fiduciary duty of Mr. Seery, about what the Investor's Act

10  provides.  He's just wrong on the law.  Now, Your Honor

11  doesn't have to decide that.  Whichever court adjudicates the

12  DAF lawsuit will have to decide it.  But there is no private

13  cause of action for damages.  There are no fiduciary duties to

14  the investors.

15      And what Mr. Bridges doesn't even mention, in that the

16  investment agreement that's so prominent in his complaint,

17  they waived claims other than willful misconduct and gross

18  negligence against Highland.  They waived those claims.  So

19  for Mr. Bridges to come in here and argue that there's some

20  surprise, when he hasn't even bothered to look at the document

21  that's underlying the contractual relationship between the DAF

22  and the Debtor, is -- you know, I'll just say it's

23  inadvertence.

24      Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25  not a beneficiary of the January 9th order.  He's not an

1   agent. Well, again, Your Honor, Mr. Bridges wasn't there.

2   Your Honor and we were. On January 9th, an independent board

3   was picked, and at the time Mr. Dondero ceased to become the

4   CEO. So you have three gentlemen coming in -- Mr. Seery, Mr.

5   Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6   chaotic time. They had to act through their agents. There

7   was no expectation that this board was going to actually run

8   the day-to-day operations of the Debtor. Of course not. They

9   needed someone to run. And they picked Mr. Seery. And the

10   argument that well, he's an agent of the company, he's not an

11   agent of the board, that just doesn't make sense. The

12   independent board had to act. The directors had to act. And

13   the directors, how do they deal with that? They acted through

14   Mr. Seery. So he is most certainly governed by the January

15   9th order.

16     Your Honor, I want to talk about the jury trial right.

17   Mr. Bridges said that Paragraph 14 is an arbitration clause

18   and not a jury trial waiver. Now, again, I will forgive Mr.

19   Bridges because I assume he didn't read the provision, okay,

20   and he -- somebody told him that, and that person just got it

21   wrong. But what I would like to do is read for Your Honor

22   Paragraph 14(f). It doesn't have to do with arbitration.

23   It's a waiver of jury trial. 14(f), Jurisdiction Venue,

24   Waiver of Jury Trial. The parties hereby agree that any

25   action, claim, litigation, or proceeding of any kind

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 100
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 299 of 1017 PageID 10063

99

1  whatsoever against any other party in any way arising from or

2  relating to this agreement and all contemplated transactions,

3  including claims sounding in contract, equity, tort, fraud,

4  statute defined as a dispute shall be submitted exclusively to

5  the U.S. District Court for the Northern District of Texas, or

6  if such court does not have subject matter jurisdiction, the

7  courts of the State of Texas, City of Dallas County, and any

8  appellate court thereof, defined as the enforcement court.

9  Each party ethically and unconditionally submits to the

10  exclusive personal and subject matter jurisdiction of the

11  enforcement court for any dispute and agrees to bring any

12  dispute only in the enforcement court.  Each party further

13  agrees it shall not commence any dispute in any forum,

14  including administrative, arbitration, or litigation, other

15  than the enforcement court.  Each party agrees that a final

16  judgment in any such action, litigation, or proceeding is

17  conclusive and may be enforced through other jurisdictions by

18  suit on the judgment or in any manner provided by law.

19      And then the kick, Your Honor, all caps, as jury trial

20  waiver always are:  Each party irrevocably and unconditionally

21  waives to the fullest extent permitted by law any right it may

22  have to a trial by jury in any legal action, proceeding, cause

23  of action, or counterclaim arising out of or relating to this

24  agreement, including any exhibits, schedules, and appendices

25  attached to this agreement or the transactions contemplated

1   hereby.  Each party certifies and acknowledges that no

2   representative of the owner of the other party has represented

3   expressly or otherwise that the other party won't seek to

4   enforce the foregoing waiver in the event of a legal action.

5   It has considered the implications of this waiver, it makes

6   this waiver knowingly and voluntarily, and it has been induced

7   to enter into this agreement by, among other things, the

8   mutual waivers and certifications in this section.

9        Your Honor, I will forgive Mr. Bridges.  I assume he just

10  did not read that.  But to represent to the Court that that

11  language does not contain a jury trial waiver is -- is just

12  wrong.

13            THE COURT:  All right.  I'm going to stop right

14  there.  And you were reading from the Second Amended and

15  Restated Shared Services Agreement between Highland --

16            MR. POMERANTZ:  Not shared services.  I'm reading

17  from the Second Amended and Restated Investment Advisory

18  Agreement --

19            THE COURT:  Investment --

20            MR. POMERANTZ:  -- between the Charitable DAF, the

21  Charitable DAF GP, and Highland Capital Management.  The

22  agreement whereby the Debtor was the investment advisor to the

23  Charitable DAF Fund and the Charitable DAF GP.

24            THE COURT:  All right.  Well, Mr. Bridges, I'm going

25  to bounce quickly back to you.  This is your chance to defend

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 102
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 301 of 1017 PageID 10065

101

1   your honor.

2           MR. BRIDGES:  Yeah, we're -- we're looking at a

3   different agreement, where -- where literally the words that

4   were read to you are not in the agreement in front of us and

5   it is news to me.  So, Your Honor, this is a problem --

6           THE COURT:  What is the agreement you're looking at?

7           MR. BRIDGES:  It is the Amended -- I assume that

8   means First Amended -- Restated Advisory Agreement.

9           MR. POMERANTZ:  Your Honor, we are happy to file this

10  agreement with the Court so the Court has the benefit of it in

11  connection with Your Honor's ruling.

12          THE COURT:  Okay.  I would like you to do that.  Uh-

13  huh.

14          MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15  withdraw that.

16          THE COURT:  Okay.  Go on, Mr. Pomerantz.

17          MR. POMERANTZ:  Mr. Bridges, if you could put us on

18  mute.  If you could put us on mute, Mr. Bridges, so I don't

19  hear your feedback.  Thank you.

20      Mr. Bridges also complains about the language "to the

21  extent permissible by law."  As Your Honor knows and as has

22  been my practice over 30 years, that language is probably in

23  every plan where there's a retention of jurisdiction:  to the

24  extent permissible by law.  And Mr. Bridges says that this

25  will create ambiguity in the order that couldn't be enforced.

1   There's no basis for that.  Our including the language "to the

2   extent permissible by law" in the orders, as we are prepared

3   to do, is consistent with the plan confirmation order where we

4   addressed that issue.  And we addressed that issue because we

5   didn't want to put Your Honor in a position where thereby Your

6   Honor may have an action before Your Honor that passes the

7   colorability gate that Your Honor may not be able to assert

8   jurisdiction.  And since jurisdiction can't be waived in that

9   regard, we will agree to amend that.

10       There's nothing ambiguous about that, and there's no

11  reason, though, that clause has to modify the Court's ability

12  to act as a gatekeeper, because, as we've argued *ad nauseam*,

13  gatekeeper provisions where the Court has that ability is not

14  only part of general bankruptcy jurisprudence but also part of

15  the Bankruptcy Code.

16       Counsel says that *Barton* doesn't apply because the

17  business judgment of Your Honor was used in retaining Mr.

18  Seery as opposed to in some other capacity.  There's no basis

19  for that, Your Honor.  A court-appointed -- a court-approved

20  CEO, CRO, professional, they are all entitled to protection

21  under the *Barton* act.  And the argument -- and again, this is

22  separate and apart from whether he's entitled to protection

23  under the January 9th order. But the argument that because it

24  was the business judgment -- again, business judgment in doing

25  something that Your Honor expressly contemplated under the

1    January 9th corporate governance order -- there's just no law

2    to support that.  And I guess he's trying to get around the

3    plethora of cases that deal with the situation where *Barton*

4    has been extended.

5        Your Honor, Mr. Bridges, again, in arguing that we're

6    ships passing in the night on *Shoaf* and *Applewood* and

7    *Espinosa*, no, we're not ships passing in the night.  We have a

8    difference in agreement on what these cases stand for.  These

9    cases stand for the proposition that a clear and unambiguous

10   provision, plain and simple, if it's clear and unambiguous, it

11   will be given res judicata effect.  The release in *Shoaf*,

12   clear and unambiguous.  The release in *Applewood*, not.  The

13   issue here is the exculpation language.  That was clear and

14   unambiguous.  It applied prospectively.  The argument makes no

15   sense that we didn't identify -- we didn't identify claims

16   that might arise in the future, so therefore an exculpation

17   clause doesn't apply?  That doesn't make any sense.

18       Your Honor clearly exculpated parties.  Mr. Dondero knew

19   it.  CLO Holdco knew it.  The DAF knew it.  So the issue Your

20   Honor has to decide is whether that exculpation was a clear

21   and unambiguous provision such that it should be entitled to

22   res judicata effect.  And we submit that the answer is

23   unequivocally yes.

24       That's all I have, Your Honor.

25            THE COURT:  All right.  Well, --

104

1          MR. MORRIS:  Your Honor?  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  This is John Morris.

4          THE COURT:  Yes?

5          MR. MORRIS:  I just want to, with respect to the

6   exhibits, I know there was no objection, but I had cited to

7   Docket Nos. 2419 and 2423.  The original exhibit list is at

8   Docket No. 2412.  So it's the three of those lists together.

9   2412, as amended by 2419, as amended by 2423.  Thank you very

10  much.

11         THE COURT:  All right.  Thank you.  All right.

12         MR. BRIDGES:  Your Honor, I still have no objection

13  to that, but may I have the last word on my motion?

14         THE COURT:  Is there time left?

15         THE CLERK:  Yes.

16         THE COURT:  Okay.  Go ahead.

17         MR. BRIDGES:  I just need a minute, Your Honor.  They

18  agreed to change the order.  They proposed it to us.  They

19  proposed it in a proposed order to you.  They can't also say

20  that it cannot be changed.

21     Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22  580, the Eastern District of Virginia points out that the

23  Fourth Circuit treats appointment of estate professionals as

24  interlocutory orders as well.

25     That's all.  Thank you, Your Honor.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 106
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 305 of 1017 PageID 10069

105

1    THE COURT:  All right.  Here's what we're going to

2 do.  We've been going a very long time.  I'm going to take a

3 break to look through these exhibits, see if there's anything

4 in there that I haven't looked at before and that might affect

5 the decision here.  So we will come back at 3:00 o'clock

6 Central Time -- it's 2:22 right now -- and I will give you my

7 bench ruling on this.  All right.

8   So, Mike, they can all stay on the line, right?

9   Okay.  You can stay on, and we'll be back at 3:00 o'clock.

10    THE CLERK:  All rise.

11   (A recess ensued from 2:22 p.m. to 3:04 p.m.)

12    THE CLERK:  All rise.

13    THE COURT:  All right.  Please be seated.  All right.

14 Everyone presented and accounted for.  We're going back on the

15 record.

16    MR. POMERANTZ:  Your Honor, before you start, this is

17 Jeff Pomerantz.  We had sent to your clerk, and hopefully it

18 got to you, a copy of the Second Amended and Restated

19 Investment Advisory Agreement.  We also copied Mr. Sbaiti with

20 it as well.  And we would also like to move that into

21 evidence, just so that it's part of the Court's record.

22    THE COURT:  All right.

23    MR. BRIDGES:  We would object to that, Your Honor.

24 We haven't had an opportunity to even verify its authenticity

25 yet.

106

1          THE COURT:  All right.  Well, I'll tell you what.

2   I'm going to address this in my ruling.  So it's not going to

3   be part of the record for this decision, and yet -- well, I'll

4   get to it.

5      All right.  So we're back on the record in Case Number 19-

6   34054, Highland Capital.  The Court has deliberated, after

7   hearing a lot of argument and allowing in a lot of documentary

8   evidence, and the Court concludes that the motion of CLO

9   Holdco, Ltd. and The Charitable DAF to modify the retention

10  order of James Seery, which was entered almost a year ago, on

11  July 16th, 2020, should be denied.

12     This is the Court's oral bench ruling, but the Court

13  reserves discretion to supplement or amend in a more fulsome

14  written order what I'm going to announce right now, pursuant

15  to Rule 7052.

16     First, what is the Movants' authority to request the

17  modification of a bankruptcy court order that has been in

18  place for so many months, which was issued after reasonable

19  notice to the Movants, and after a hearing, which was not

20  objected to by the Movants, or appealed, when the Movants were

21  represented by sophisticated counsel, I might add, and which

22  order was relied upon by parties in this case, most notably

23  Mr. Seery and the Debtor, and in fact was entered after

24  significant negotiations involving a sophisticated court-

25  appointed Unsecured Creditors' Committee with sophisticated

Appx 05581
009224

107

1 professionals and sophisticated members, and after negotiation

2 with an independent board of directors, court-appointed, one

3 of whose members is a retired bankruptcy judge?  What is the

4 Movants' authority?

5     Movants fumbled a little on that question, in that the

6 exact authority wasn't set forth in the motion.  But Movants'

7 primary argument is that Movants think the Seery retention

8 order was an interlocutory order and that the Court simply has

9 the inherent authority to modify it as an interlocutory order.

10     The Court disagrees with this analysis.  I do not think

11 the Fifth Circuit's *Smyth* case dictates that the Seery

12 retention order is still interlocutory.  The Seery retention

13 order was an order entered pursuant to Section 363 of the

14 Bankruptcy Code, not a Section 327 professionals to a debtor-

15 in-possession, professionals to a trustee employment order

16 such as the one involved in the *Smyth* case.

17     But even if the Seery retention order is interlocutory --

18 the Court feels strongly that it's not, but even if it is --

19 the Court believes it would be an abuse of this Court's

20 inherent discretion or authority to modify that order almost a

21 year after the fact and under the circumstances of this case.

22     Now, assuming Rule 60(b) applies to the Movants' request,

23 the Court determines that the Movants have not made their

24 motion anywhere close to within a reasonable time, as Rule

25 60(c) requires, nor do I think the Movants have demonstrated

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 109
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 308 of 1017 PageID 10072

108

1    any exceptional circumstances to declare the order or any of

2    its provisions void.  The Movants have put on no evidence that

3    constitutes surprise or constitutes newly-disputed evidence.

4    So why are there no exceptional circumstances here such that

5    the Court might find, you know, a void order or void

6    provisions of an order?

7        First, this Court concludes that there's no credible

8    argument that the Court overreached its jurisdiction with the

9    gatekeeping provisions in the order.  Gatekeeping provisions

10   are not only very common in the bankruptcy world -- in

11   retention orders and in plan confirmation orders, for example

12   -- but they are wholly consistent with the *Barton* case, the

13   U.S. Supreme Court's *Barton's* case, and its progeny that has

14   become known collectively as the *Barton* doctrine.  Gatekeeping

15   provisions are wholly consistent with 28 U.S.C. Section

16   959(a)'s complete language.

17       The Fifth Circuit has blessed gatekeeping provisions in

18   all sorts of contexts.  It has blessed them in the situation

19   of when *Stern* claims are involved in the *Villegas* case.  It

20   even blessed Bankruptcy Courts' gatekeeping functions a long

21   time ago, in 1988, in a case that I don't think anyone

22   mentioned in the briefing, but as I've said, my brain

23   sometimes goes down trails, and I'm thinking of the *Louisiana*

24   *World Exposition* case in 1988, when the Fifth Circuit blessed

25   there a procedure where an unsecured creditors' committee can

1    bring causes of action against persons, such as officers and

2    directors or other third parties, if they first come to the

3    Bankruptcy Court and show a colorable claim.  They have to

4    come to the Bankruptcy Court, show they have a colorable claim

5    and they're the ones that should be able to pursue them.  Not

6    exactly on point, but it's just one of many cases that one

7    could cite that certainly approve gatekeeper functions of

8    various sorts of Bankruptcy Courts.

9        It doesn't matter which court might ultimately adjudicate

10   the claims; the Bankruptcy Court can be the gatekeeper.

11       And the Court agrees with the many cases cited from

12   outside this circuit, such as the case in Alabama, in the

13   Eleventh Circuit, and there was another circuit-level case, at

14   least one other, that have held that the *Barton* doctrine

15   should be extended to other types of case fiduciaries, such as

16   debtor-in-possession management, among others.

17       Finally, as I pointed out in my confirmation ruling in

18   this case, gatekeeping provisions are commonplace for all

19   types of courts, not just Bankruptcy Courts, when vexatious

20   litigants are involved.  I have commented before that we seem

21   to have vexatious litigation behavior with regard to Mr.

22   Dondero and his many controlled entities.

23       Now, as far as the Movants' argument that there was not

24   just improper gatekeeping provisions but actually an improper

25   discharge in the Seery retention order of negligence claims or

110

1   other claims that don't rise to the level of gross negligence

2   or willful misconduct, again, I reiterate there's nothing

3   exceptional in the bankruptcy world about exculpation

4   provisions like this. They absolutely are a term of

5   employment very often. Just like compensation, they're

6   frequently requested, negotiated, and approved. They are

7   normal in the corporate governance world, generally. They are

8   normal in corporate contracts between sophisticated parties.

9   And most importantly of all, even if this Court overreached

10   with the exculpation provisions in the Seery retention order,

11   even if it did, res judicata bars the attack of these

12   provisions at this late stage, under cases such as *Shoaf,*

13   *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14   case from the U.S. Supreme Court, and even *Applewood*, since

15   the Court finds the language in this order was clear,

16   specific, and unambiguous with regard to the gatekeeping

17   provisions and the exculpation provisions.

18      Last, and this is the part where I said I'm going to get

19   to this agreement that has been submitted, the Second Amended

20   and Restated Investment Advisor Agreement or whatever the

21   title is. I am more than a little disturbed that so much of

22   the theme of the Movants' pleadings and arguments, and I think

23   even representations to the District Court, have been they

24   have these sacred jury trial rights, these inviolate jury

25   trial rights, and an Article I Court like this Court should

Appx 05585

111

```
 1   have no business through a gatekeeping provision impinging on

 2   the possible pursuit of an action where there's a jury trial

 3   right.

 4        I was surprised initially when I thought about this.  I

 5   thought, wow, I've seen so many agreements over the months.  I

 6   can't say every one of them waived the jury trial right, but I

 7   just remembered seeing that a lot, and seeing arbitration

 8   provisions, and so that's why I asked.  It just was lingering

 9   in my brain.  So I'm going to look at what is submitted.  I'm

10   not relying on that as part of my ruling.  As you just heard,

11   I had a multi-part ruling, and whether there's a jury trial

12   right or not is irrelevant to how I'm choosing to rule on this

13   motion.  But I do want to see the agreement, and then I want

14   Movants within 10 days to respond with a post-hearing trial

15   brief either saying you agree that this is the controlling

16   document or you don't agree and explain the oversight, okay?

17   Because it feels like a gross omission here to have such a

18   strong theme in your argument -- we have a jury trial right,

19   we have a jury trial right, by God, the gatekeeping

20   provisions, among other things, impinge on our sacred pursuit

21   of our jury trial right -- and then maybe it was very

22   conspicuous in the controlling agreement that you'd waived

23   that, the Movants had waived that.

24        So, anyway, I'm requiring some post-hearing briefing, if

25   you will, on whether omissions, misrepresentations were made
```

Appx. 05386
009229

112

1 to the Court.

2  Anyway, so I reserve the right to supplement or amend this

3 ruling with a more fulsome written order.  I am asking Mr.

4 Pomerantz to upload a form of order that is consistent with

5 this ruling, and --

6   MR. POMERANTZ:  Your Honor, we will do so.  I do have

7 one thing to bring to the Court's attention, unrelated to the

8 motion, before Your Honor leaves the bench.

9   THE COURT:  All right.  So just a couple of follow-up

10 things.  Have you -- I'm not clear I heard what you said about

11 this agreement.  Did you email it to my courtroom deputy or

12 did you file it on the docket?

13   MR. POMERANTZ:  We emailed it to your courtroom

14 deputy.  We're happy to file it on the docket.  And we also

15 provided a copy to Mr. Sbaiti.

16  I would note for the Court that it's signed both by The

17 Charitable DAFs by Grant Scott, just for what it's worth.

18   THE COURT:  Okay.  All right.  Well, I'm trying to

19 think what I want -- I do want you to file it on the docket,

20 and I'm trying to think of what you label it.  Just call it

21 Post-Hearing Submission or something and link it to the motion

22 that we adjudicated here today.  And then, again, you've got

23 10 days, Mr. Bridges, to say whatever you want to say about

24 that agreement.

25  I guess the last thing I wanted to say is we sure devoted

113

1   a lot of time to this motion today.  We have -- this is a

2   recurring pattern, I guess you can say.  We have a lot of

3   things that we devote a lot of time to in this case that I get

4   surprised, but it is what it is.  You file a motion.  I'm

5   going to give it all the attention Movants and Respondents

6   think it warrants.  I'm going to develop a full record,

7   because, you know, there's a recurring pattern of appeals

8   right now, 11 or 12 appeals, I think, not to mention motions

9   to withdraw the reference.  If we're going to have higher

10  courts involved in the administration of this case, I'm going

11  to make a very thorough record so nobody is confused about

12  what we did, what I considered, what my reasoning was.

13      So I kind of think it's unfortunate for us to have to

14  spend case resources and so much time and fees on things like

15  this, but I'm going to make sure a Court of Appeals is not

16  ever confused about what happened and what we did.  So that's

17  just the way it's going to be.  And I feel like we have no

18  choice, given, again, the pattern of appeals.

19      All right.  So, with that, Mr. Pomerantz, you had one

20  other case matter, you said?

21          MR. POMERANTZ:  Yes.  But before I get to that, Your

22  Honor, I assume that, in response to the Movants' submission

23  on the agreement, that we would have right at four or seven

24  days to respond if we deem it's appropriate?

25          THE COURT:  I think that's reasonable.  That's

114

1   reasonable.

2           MR. POMERANTZ:  Okay.  Thank you, Your Honor.

3           THE COURT:  So let me think of how I want to do this.

4   I'll just do a short scheduling order of sorts that just, it

5   says in one or two paragraphs, at the hearing on this motion,

6   the Court raised questions about the jury trial rights and the

7   Debtor has now submitted the controlling agreements, I'm

8   giving the Movants 10 days to respond to whether this is

9   indeed a controlling agreement, and why, if it is, the Movants

10  have heretofore taken the position they have jury trial

11  rights.  And then I will give you seven days thereafter to

12  reply, and then the Court will set a further status conference

13  if it determines it's necessary.  Okay?

14     So, Nate, we'll do a short little order to that effect.

15  Okay?

16          MR. POMERANTZ:  Thank you, Your Honor.

17     I -- again, before I raise the other issue, I want to pick

18  up on a comment Your Honor just made towards the end.  I know

19  the Court has been frustrated with the time and effort we've

20  been spending.  The Debtor and the creditors have been

21  extremely frustrated, because in addition to the time and

22  effort everyone's spending, we're spending millions of

23  dollars, millions of dollars on litigation that --

24          THE COURT:  It's one of the reasons you needed an

25  exit loan, right?

115

1          MR. POMERANTZ:  Right.  No, exactly.  That's

2     frivolous, that we think is made in bad faith.

3          And Your Honor, and everyone else who's hearing this on

4     behalf of Mr. Dondero, should understand we're looking into

5     what appropriate authority Your Honor would have to shift some

6     of the costs.  Your Honor did that in the contempt motion.

7     Your Honor can surely do that in connection with the notes

8     litigation.  But all this other stuff that is requiring us to

9     spend hundreds and hundreds of hours and spend millions of

10    dollars, we are clearly looking into whether it would be

11    appropriate and what authority there is.  I just wanted to let

12    Your Honor know that.

13         And in connection with that, the last point, Your Honor, I

14    can't actually even believe I'm saying this, but there was

15    another lawsuit filed -- we just found out in the break -- on

16    Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17    District Court.

18         Now, to make matters worse, Your Honor, the litigation

19    relates to alleged improper management by the Debtor of Multi-

20    Strat.  If Your Honor will recall, at many times I've told

21    this Court what Dugaboy's claims they filed in this case.

22    Dugaboy has a claim that is filed in this case for

23    mismanagement postpetition of Multi-Strat.  Now the Sbaiti

24    firm, in addition to representing CLO Holdco, in addition to

25    representing the DAF, and whatever the Plaintiffs' lawyers are

116

```
 1    in that other District Court, PCMG, and in connection with the

 2    Acis matter, they've decided they haven't had enough.  They've

 3    now filed another motion that -- you know, why they filed it

 4    in District Court and there's a proof of claim on the same

 5    issues, I don't know.  But I thought Your Honor should know.

 6    I'm not asking Your Honor to do anything about it.  But we

 7    will act aggressively, strongly, and promptly.

 8        Thank you, Your Honor.

 9           THE COURT:  All right.  Well, you've reminded me of

10    what came out earlier today about the entity -- I left my

11    notepad in my chambers -- PMC or PMG or something.

12        Mr. Bridges, we're not going to have a hearing right now

13    on me doing anything, but what are you thinking?  What are you

14    doing?

15           MR. BRIDGES:  Your Honor, I'm not trying to duck your

16    question.  I literally have no involvement with any other

17    claim, and we would have to ask Mr. Sbaiti to answer your

18    questions.

19           THE COURT:  All right.  Is he there?

20           MR. BRIDGES:  He is.

21           THE COURT:  I'll listen.

22           MR. BRIDGES:  I'll switch seats and give him this

23    chair.

24           MR. SBAITI:  Sorry, Your Honor.  We had two computers

25    going and weren't able to use the sound on one, so we ended up
```

117

1    turning that off.

2        Your Honor, I'm not sure what the question is about when

3    you say what are we thinking.  We have a client that's asked

4    us to file something, and when we're advised by bankruptcy

5    counsel that it's not prohibited for us to do so, and don't

6    know why we're precluded from doing so, and when the time

7    comes I'm sure we'll be able to explain to Your Honor --

8    someone will be able to explain to Your Honor why what we're

9    doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10   exasperation, why that wasn't improper.  It's our belief that

11   it wasn't improper or a violation of the Court's rule.

12        THE COURT:  Just give me a quick shorthand *Readers'*

13   *Digest* of why you don't think it's improper.

14        MR. SBAITI:  Sure.  My understanding is, Your Honor,

15   there's not a rule that says we can't file it against the

16   Debtor for postpetition actions.  So that, that's as -- that's

17   as much as I understand.  And I'm going to -- I'm not trying

18   to duck it, either.  And if I'm wrong about that and someone

19   wants to correct me on our side offline and if we have to

20   explain to the Court why that's so or what rule has been

21   violated, I'm sure we'll be able to put together something for

22   that.  But that's what I've been advised.

23        THE COURT:  Have you done thorough --

24        MR. POMERANTZ:  Your Honor, I think what --

25        MR. SBAITI:  (garbled), Your Honor.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 119
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 318 of 1017 PageID 10082

118

1          THE COURT:  Have you done thorough research yourself?

2    Your Rule 11 signature is on the line, not some bankruptcy

3    counsel you talked to.  Have you done the research yourself?

4          MR. SBAITI:  Well, Your Honor, I've relied on the

5    research and advice of people who are experts, and I believe

6    my Rule 11 obligations also allow me to do that, so yes.

7          MR. POMERANTZ:  Your Honor, I think we're entitled to

8    know if it's Mr. Draper's firm who has been representing

9    Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10   attorney-client privilege issue.  If Mr. Sbaiti is going to be

11   here and sort of say, hey, bankruptcy counsel said it was

12   okay, I think we would like to know and I'm sure Your Honor

13   would like to know who is that bankruptcy counsel.

14         THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15         MR. SBAITI:  Your Honor, in consultation with Mr.

16   Draper and with consultation with other counsel that we've

17   spoken to, that has been our understanding.

18         THE COURT:  Who's the other counsel?

19         MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20   some of these things for the PCMG and the Acis case.  We've

21   talked to the people who, when they tell us you can't do this

22   because they're bankruptcy counsel for our client, then we

23   don't do something.  So, and I'm not trying to throw anybody

24   under the bus, but my understanding of what goes on in

25   Bankruptcy Court is incredibly limited, so, you know, and if

119

1  it's a mistake then I'll own it, if I have a mistaken

2  understanding, but I also wasn't anticipating having to make a

3  presentation about this right here right now, so --

4          THE COURT:  Well, you're filing lawsuits that involve

5  this bankruptcy case during the hearing, so --

6          MR. SBAITI:  Oh, we didn't file it during the

7  hearing, Your Honor.  It was filed last night, I believe.

8          THE COURT:  Okay.  Well, I assume that you're going

9  to go back and hit the books, hit the computer, and be

10  prepared to defend your actions, because your bankruptcy

11  experts, they may think they know a lot, but the judge is not

12  very happy about what she's hearing.

13          MR. POMERANTZ:  Your Honor, if I may ask when Your

14  Honor intends to issue the contempt ruling in connection with

15  the June 8th hearing?  I strongly believe -- and, obviously,

16  this has nothing to do with the contempt hearing; this

17  happened after -- but I strongly believe that sending a

18  message that Your Honor is inclined to hold counsel in

19  contempt, which obviously is one of the violators we said

20  should be held in contempt, it may be important to do that

21  sooner rather than later so that people know that Your Honor

22  is serious.

23          THE COURT:  All right.  Well, I understand and

24  respect that request.  And let me tell you all, I had a seven-

25  day -- okay.  You all were here on that motion June 8th.  I

120

```
 1   had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

 2   lunch break, in-person hearing with a dozen or so live

 3   witnesses that I just finished Tuesday at 5:00 o'clock.  So

 4   you all were here on the 8th, and then -- what day was that --

 5   what was -- Tuesday, I finished.  Tuesday was the 22nd.  So I

 6   started on the 14th, okay?  So you all were here on the 8th

 7   and I had a live jury trial -- I mean, not jury trial, a live

 8   bench trial -- live human beings in the courtroom, beginning

 9   June 14th.  So you're here the 8th.  June 14th through 22nd, I

10   did my trial.  And here we are on the 25th.  And guess what, I

11   have another live human-being bench trial next week, Monday

12   through Friday.

13       So we've been working in other things like this in between

14   those two.  So I'm telling you that not to whine, I'm just

15   telling you that, that's the only reason I didn't get out a

16   quick ruling on this, okay?

17             MR. POMERANTZ:  And Your Honor, I was not at all

18   making that comment to imply anything about the Court.

19             THE COURT:  Well, --

20             MR. POMERANTZ:  The time and effort that you have

21   given to this case is extraordinary, --

22             THE COURT:  Okay.

23             MR. POMERANTZ:  -- so please don't misunderstand my

24   comment.

25             THE COURT:  Okay.  And I didn't mean to express
```

121

```
 1   annoyance or anything like that.  I guess what I'm trying to
 2   do is I don't want anyone to mistake the delay in ruling on
 3   the contempt motion to mean I'm just not that -- you know, I'm
 4   not prioritizing it, other things are more serious to me or
 5   important to me, or I'm going to take two months to get to it.
 6   It's literally been I've been in trial almost all day long
 7   every day since you were here.  But trust me, I'm about as
 8   upset as upset can be about what I heard on June 8th, and I'm
 9   going to get to that ruling, and I know what I'm going to do.
10   And, well, like I said, it's just a matter of figuring out
11   dollars and whom, okay?  There's going to be contempt.  I just
12   haven't put it on paper because I've been in court all day and
13   I haven't come up with a dollar figure.  Okay?
14       So I hope -- I don't know if that matters very much, but
15   it should.
16       All right.  We stand adjourned.
17       (Proceedings concluded at 3:35 p.m.)
18                           --oOo--
19
20                        CERTIFICATE
21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.
23   /s/ Kathy Rehling                    06/29/2021
24   _____      _____
     Kathy Rehling, CETD-444                     Date
25   Certified Electronic Court Transcriber
```

Appx. 05206
009239

122

INDEX
*Excerpt*
*11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                                          3

OPENING STATEMENTS

- By Mr. Bridges                                                     3
- By Mr. Pomerantz                                                  23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through        Received 91
28, and 30 through 44

Debtor's Exhibit 1                                   Received 91
Debtor's Exhibits 1 through 17                       Received 93

RULINGS                                                           106

END OF PROCEEDINGS                                                121

INDEX                                                             122

Amy 05297
009240

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3                              )   Case No. 19-34054-sgj-11
     In Re:                     )   Chapter 11
                                )
 4   HIGHLAND CAPITAL           )   Dallas, Texas
     MANAGEMENT, L.P.,          )   Friday, June 25, 2021
 5                              )   9:30 a.m. Docket
                                )
 6           Debtor.            )
                                )   EXCERPT:
 7                              )   - MOTION TO ENTER INTO EXIT
                                )     FINANCING AGREEMENT [2229]
                                )   - MOTION TO AUTHORIZE PAYMENT
 8                              )     OF RESTRUCTURING FEE [2395]
                                )
 9   _____)

10                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11               UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
14                              10100 Santa Monica Blvd.,
                                 13th Floor
15                              Los Angeles, CA  90067-4003
                                (310) 277-6910

16   For the Debtor:            John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
18                              (212) 561-7700

19   For Get Good Trust and     Douglas S. Draper
     Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
20                              650 Poydras Street, Suite 2500
                                New Orleans, LA  70130
21                              (504) 299-3300

22   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:    SIDLEY AUSTIN, LLP
23                              One South Dearborn Street
                                Chicago, IL  60603
24                              (312) 853-7539

25
```

2

1    APPEARANCES, cont'd.

2    For CLO Holdco, Ltd. and     Jonathan E. Bridges
     The Charitable DAF Fund,      Mazin Ahmad Sbaiti
3    LP:                           SBAITI & COMPANY, PLLC
                                   JP Morgan Chase Tower
4                                  2200 Ross Avenue, Suite 4900 W
                                   Dallas, TX  75201
5                                  (214) 432-2899

6    Recorded by:                  Michael F. Edmond, Sr.  VP
                                   UNITED STATES BANKRUPTCY COURT
7                                  1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
8                                  (214) 753-2062

9    Transcribed by:               Kathy Rehling
                                   311 Paradise Cove
10                                 Shady Shores, TX  76208
                                   (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25           Proceedings recorded by electronic sound recording;
                transcript produced by transcription service.

3

1          <u>DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.</u>

2          THE CLERK:  All rise.  United States Bankruptcy Court

3     for the Northern District of Texas, Dallas Division, is now in

4     session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6     right.  We have three motions set this morning in Highland

7     Capital, Case No. 19-34054.  I'll get lawyer appearances at

8     this time.  Who do we have appearing for the Debtor team?

9          MR. POMERANTZ:  Good morning, Your Honor.  Jeff

10    Pomerantz and John Morris appearing for the Debtor.  Also in

11    the virtual courtroom are Mr. Jim Seery, the Debtor's CEO,

12    member of the board, and Chief Restructuring Officer, and also

13    John Dubel, member of the board and chairman of the Debtor's

14    Compensation Committee.

15         THE COURT:  All right.  Good morning.

16      We have an objection to the exit financing from the

17    Dugaboy Trust.  Mr. Draper, are you appearing for Dugaboy this

18    morning?

19         MR. DRAPER:  Yes, Your Honor.  Can you hear me?

20         THE COURT:  I can.  Uh-huh.  Well, I could, but now I

21    can't.  I lost you.

22         MR. DRAPER:  Your Honor, I'm here for the Dugaboy

23    Trust, but, quite frankly, the issues in connection with the

24    exit financing have been dramatically reduced, and I've been

25    in discussion with Mr. Pomerantz and Mr. Morris, so I think

4

 1  that hearing is going to be much shorter and much easier.

 2          MR. POMERANTZ:  Your Honor, we have been in

 3  discussions with Mr. Draper.  We still intend to put on our

 4  full case.  So after Your Honor gets appearances, I will give

 5  Your Honor at least my view of how the day is going to go in

 6  connection with the three motions.

 7          THE COURT:  All right.  Well, Mr. Draper, you, of

 8  course, are aware of the order I entered a week or so ago

 9  regarding a client representative being in the virtual

10  courtroom whenever your client takes a position.  So I presume

11  you have a client representative here today?

12          MR. DRAPER:  Yes.  Nancy Dondero is in the virtual

13  courtroom.

14          THE COURT:  All right.  Ms. Dondero?

15          MS. DONDERO:  I'm present.  I'm present, Your Honor.

16  Good morning.

17          THE COURT:  Okay.  Well, I've got your audio but not

18  your video.  Can you turn on your video, please, just so we

19  can confirm?  (Pause.)  All right.

20          MS. DONDERO:  I'm right here, Your Honor.

21          THE COURT:  Okay.  Good morning.  Thank you.

22          MS. DONDERO:  Good morning.

23          THE COURT:  All right.  Well, as noted, we have three

24  matters set.  Let me see if we have CLO Holdco and The

25  Charitable DAF Fund making an appearance today.

5

1          MR. BRIDGES:  Yes, Your Honor.  Jonathan Bridges

2     here, with my colleague Mazin Sbaiti, on behalf of those

3     clients.

4          THE COURT:  All right.  I think those were our only

5     objectors.  Correct?  So, I'll ask if we have the Unsecured

6     Creditors' Committee counsel in the virtual courtroom.

7          MR. CLEMENTE:  Yes, good morning, Your Honor.  Good

8     morning, Your Honor.  Matthew Clemente from Sidley on behalf

9     of the Committee.

10         THE COURT:  All right.  Thank you.

11         MR. CLEMENTE:  Thank you.

12         THE COURT:  Anyone else who's wishing to appear?

13    Again, I think we just had the one objection on the exit

14    financing and then the one motion with regard to the July 2020

15    order that is contested.

16       All right.  Well, Mr. Pomerantz, how did you want to

17    proceed this morning?

18         MR. POMERANTZ:  Your Honor, as I mentioned, there are

19    three matters.  The first matter, the motion to approve a

20    restructuring fee to Mr. Seery has not been opposed.  We have

21    -- we do intend to proffer the testimony of John Dubel, who is

22    the chairman of the Compensation Committee.  I anticipate that

23    that presentation and proffer will take approximately 15

24    minutes, as Mr. Dubel is also on the WebEx and is available to

25    answer any questions Your Honor may have in connection with

6

1    the motion, but no parties have objected.

2        Second is the financing motion.  And while Mr. Draper has

3    indicated, we've been in discussions about certain issues, we

4    intend to put on our full case to address the issues raised in

5    the motion.  We intend to put on the testimony of Mr. Seery,

6    which will be done by my partner, John Morris.  I anticipate

7    that hearing taking an hour or less.

8        And then thirdly, Your Honor, is the motion to modify Your

9    Honor's July 16th order.  I've had discussions with Movants'

10   counsel and we have agreed to allocate an hour and a half for

11   each side.  Our understanding is that (garbled) will be the

12   only people appearing on behalf of the Movants.  And we would

13   again allocate an hour and a half each side.

14       I believe that, with those three motions, we can get

15   through all of them today, and that's how we would intend to

16   proceed if it makes sense to the Court.

17            THE COURT:  All right.  Anyone want to weigh in with

18   any comment about the sequence?

19            MR. BRIDGES:  Yes, Your Honor.  Jonathan Bridges on

20   behalf of CLO Holdco and The Charitable DAF.  Would just like

21   to know, we don't have an objection to the order, but would

22   like to know if it's acceptable for us to dial back in in a

23   couple of hours since that seems to fit the estimation of how

24   long the initial proceedings will take.

25            THE COURT:  Well, I'm happy to excuse you for a

7

```
 1   while, but by my count it's maybe going to be an hour and a
 2   half, right, Mr. Pomerantz?
 3           MR. POMERANTZ:  I suspect that's correct, Your Honor.
 4           THE COURT:  Okay.  So I would suggest you come back
 5   at 11:15-ish.
 6       (Echoing.)
 7           MR. BRIDGES:  Thank you, Your Honor.
 8           THE COURT:  All right.  Mr. Pomerantz, go ahead.
 9           MR. POMERANTZ:  I'm ready to proceed, Your Honor.
10   Can you hear me?  I'm working at a different computer today
11   because my laptop wasn't working.  I just want to make sure
12   you can hear me well.
13           THE COURT:  Well, it could be better.  You're more
14   faint than usual.  So I don't know if you can adjust the
15   volume.
16           MR. POMERANTZ:  Is this any better?
17           THE COURT:  A little.  Not a lot.
18           MR. POMERANTZ:  How about this?  Is that any better?
19           THE COURT:  We'll see if we can make do.  Mike, are
20   you hearing him okay?  Okay, the court reporter is hearing you
21   okay, so we'll try to make this work.
22           MR. POMERANTZ:  Okay.  If at any time Your Honor is
23   having trouble hearing me, I will call my IT person in.
24   Again, for some reason, my laptop wasn't connecting in my
25   office, and I'm on my desktop, which I do not usually appear
```

8

1  before Your Honor with.  So if you have any problems hearing

2  me, please let me know.

3        THE COURT:  Okay.

4        MR. POMERANTZ:  With that, Your Honor, I'll proceed

5  with the motion for order authorizing payment of restructuring

6  fee to James Seery, the Debtor's chief executive officer and

7  chief restructuring officer.

8     Pursuant to the motion, Your Honor, the Debtor requests

9  approval of a restructuring fee to Mr. Seery, which was

10  contemplated by the letter agreement dated June 23rd, 2020,

11  between the Debtor and Mr. Seery.

12     As the Court will recall, Your Honor entered an order on

13  July 16th approving the Debtor's retention of Mr. Seery as the

14  CEO and the CRO.  At the time that we filed the motion, at the

15  time of the hearing, the Committee had not agreed on the

16  payment of a restructuring fee for Mr. Seery, so the board and

17  the Debtor agreed to defer that until a later time.

18     This motion presently before Your Honor was filed on June

19  1, 2021, and now it seeks payment of the fee.  And the motion

20  describes in detail the factual and legal support for the

21  restructuring fee, the establishment of the Compensation

22  Committee headed by Mr. Dubel, and the diligence undertaken by

23  the Compensation Committee to determine if the restructuring

24  fee was appropriate.

25     With the motion, the Debtor seeks authority to pay Mr.

9

1   Seery a fee in the amount of $2.25 million, which was

2   identified as the case resolution fee in the agreement.  As

3   you'll hear from the proffer of Mr. Dubel's testimony, the

4   Compensation Committee determined that confirmation of a plan

5   and resolution of all material nondebtor claims, including the

6   claims of Redeemer, Acis, HarbourVest, UBS, (garbled)

7   occurred, and that the combination of the confirmed plan and

8   the resolution of those claims entitle Mr. Seery to the fee.

9       You'll hear that the Compensation Committee conducted

10  additional diligence to determine that the $2.25 million fee

11  was justified based on the market for restructuring fees and

12  the nature and the complexity of work performed by Mr. Seery.

13      Pursuant to the motion, Mr. Seery has earned one million

14  of the fee by virtue of the confirmation of the plan, would

15  earn additional $500,000 of the fee upon the effective date,

16  and an additional $750,000 upon completion of distribution of

17  the plan.

18      Mr. Seery has agreed to defer the first two payments of

19  this fee based upon the Debtor's liquidity position, as I will

20  summarize in a couple of moments and explain to the Court what

21  the deal is and how each of the payments will be made and the

22  time they'll be made.

23      We've received no objections to the motion, and I would

24  now like to proffer the testimony of John Dubel, who is

25  chairman of the Compensation Committee, to provide evidentiary

Dubel - Proffer                     10

1    support for the motion.  And as I indicated, Your Honor, Mr.

2    Dubel is on the WebEx if Your Honor has any questions.

3            THE COURT:  All right.  You may --

4            MR. POMERANTZ:  May I proceed?

5            THE COURT:  You may proceed with the proffer.

6            MR. POMERANTZ:  Thank you.

7            JOHN DUBEL, PROFFER OF DIRECT TESTIMONY

8            MR. POMERANTZ:  Mr. Dubel, if called to testify in

9    connection with the motion, would testify that on June -- on

10   January 9, 2020, the Court approved his employment as one of

11   the independent directors of Strand Advisors, the Debtor's

12   general partner.

13       He would testify that the other members of the board were

14   former bankruptcy judge Russell Nelms and James Seery.

15       He would testify that the employment of the board was part

16   of a broader corporate governance agreement between the

17   Debtor, the Committee, and Mr. Dondero, pursuant to which --

18   things Mr. Dondero ceded control of the Debtor in order to

19   avoid the appointment of a Chapter 11 trustee.

20       He would testify that the corporate governance agreement

21   anticipated the potential need for a full-time chief executive

22   officer, and in the spring of 2020 the independent board

23   created a Compensation Committee consisting of John Dubel and

24   Mr. Nelms.

25       He would testify that this Compensation Committee

Dubel - Proffer                    11

 1   considered Mr. Seery for the CEO position and subsequently

 2   negotiated the terms of the engagement that were ultimately

 3   approved by the Court's July 16, 2020 order, nunc pro tunc to

 4   March 15, 2020.  And that order, Your Honor, is found at

 5   Docket No. 854.

 6       He would testify that Mr. Seery's employment agreement,

 7   which was negotiated with the Compensation Committee, provided

 8   for two possibilities for the potential payment of a

 9   restructuring fee.

10       The first, which was called a case resolution fee, would

11   be paid on -- under two conditions.  One, the confirmation of

12   a plan, and second, the resolution of material claims.  It

13   would be payable $1 million at confirmation, $500,000 on the

14   effective date, and $750,000 upon completion of the

15   distributions.

16       The second fee, which was just a confirmation fee, just a

17   plan was confirmed but there wasn't any global plan and there

18   weren't material claims resolved, would be $500,000 upon

19   confirmation, $250,000 on the effective date, and then there

20   would be a potential discretionary bonus.

21       At the time, Mr. Dubel would testify, there were

22   negotiations with the Creditors' Committee with respect to the

23   payment of the restructuring fee, and that at that time the

24   Committee was not willing to support the payment of a

25   restructuring fee, so the Debtor, Mr. Seery, and the

Dubel - Proffer                    12

1    Compensation Committee agreed to defer consideration of the

2    restructuring fee to a later time.

3        Mr. Dubel would testify that starting even before his

4    March 15, 2020 appointment as the CEO, and continuing

5    thereafter, Mr. Seery spent substantial time to address and

6    resolve all the material claims against the estate.  The Court

7    is familiar with the facts and circumstances of each

8    settlement, including the mediation and the motion practice

9    that preceded the settlement, and Mr. Dubel would testify as

10   to each of those claims resolutions as follows:

11       The Redeemer Committee was resolved.  That settlement was

12   on appeal, but the appeal was subsequently withdrawn.  The

13   order approving the Redeemer Committee settlement is found at

14   Docket No. 1272.

15       Next was the Acis and Terry claims.  The Court conducted

16   an evidentiary hearing and ultimately approved the settlement.

17   That settlement is also on appeal.  The settlement order is

18   found at Docket No. 1347.

19       Then the court approved the HarbourVest settlement, after

20   an evidentiary hearing.  That settlement is on appeal, and

21   that's found -- the order is found at Docket No. 1788.

22       The UBS settlement was next.  That is found at Docket No.

23   2389.  That was also subject to an evidentiary hearing, and is

24   on appeal.

25       And lastly, the Debtor has reached an agreement with Mr.

009252

Dubel - Proffer                    13

1   Daugherty.  It's taking a little more time to document that

2   settlement, but we expect to submit a 9019 motion in the near

3   future approving that settlement.

4       Mr. Dubel would testify that Mr. Seery led the

5   negotiations in each of those matters and he testified at

6   length before the Court in support of the Debtor's motion to

7   approve each of the settlements.

8       Mr. Dubel would testify that, at the same time, under Mr.

9   Seery's leadership, the Debtor proposed a plan of

10  reorganization, and that the Debtor's fifth amended plan was

11  filed on November 24th, 2020, subsequently amended twice, and

12  then on February 2nd and 3rd Your Honor conducted confirmation

13  hearings and ultimately approved the plan and entered an order

14  confirming the plan.

15      Mr. Dubel would then testify that the Compensation

16  Committee started the process of reviewing the restructuring

17  fee for Mr. Seery in late February, shortly after confirmation

18  of the plan.  And he would testify that the Compensation

19  Committee had over a half a dozen informal telephonic meetings

20  in March, April, and May, with and without Mr. Seery, as

21  reflected in the minutes that were filed as Exhibits 1 through

22  3.  Three of the meetings that I referred to, Mr. Dubel would

23  testify were formal meetings subject to minutes and limited to

24  the record, but will be in the record.

25      Mr. Dubel would testify that as part of the Compensation

1   Committee's deliberation, Mr. Nelms and he had reviewed the

2   terms of the engagement approved by the Court on July 20th and

3   also discussed with Mr. Seery his perspectives on the possible

4   payment of a restructuring fee and sought additional

5   information from them.

6       Mr. Dubel -- Nelms would testify -- Dubel would testify

7   that he and Mr. Nelms concluded that Mr. Seery had met the

8   benchmarks for the case resolution fee in that there was a

9   confirmed plan and that all material nonaffiliated claims had

10  been resolved.

11      Mr. Dubel would further testify that while the

12  Compensation Committee concluded that these benchmarks were

13  met, they still conducted additional diligence to determine

14  that the $2.25 million restructuring fee was reasonable under

15  the circumstances.  And as part of that process, Mr. Dubel

16  would testify that they reviewed the market study for

17  compensation prepared by Mercer, the estate's compensation

18  consultant in the spring of 2020 in connection with the

19  original employment motion.

20      Mr. Dubel would testify that, to make sure that the

21  Compensation Committee took into account any changes that may

22  have occurred in market since March 2020, that the

23  Compensation Committee asked Mercer to update its analysis and

24  bring it forward, based upon events in the case and recent

25  comps and, actually, the length of the case, which has been

Dubel - Proffer                    15

1   longer than originally anticipated.

2       Mr. Dubel would testify that he and Mr. Nelms reviewed the

3   updated Mercer report and noted that, based upon the time

4   frame and the complexity of the case, that the restructuring

5   fee was well within the market for these types of services.

6       And finally, Mr. Dubel would testify that they analyzed

7   the restructuring fee in relation to what other professionals

8   would have charged if work was performed on an hourly basis,

9   both in this case and in the market globally.  He would

10  testify that the Compensation Committee's analysis showed that

11  the restructuring fee was fair and reasonable when compared to

12  what Mr. Seery would have received if paid on an hourly basis.

13  And he would testify that, while supportive of the

14  restructuring fee, the hourly rate does not take into

15  consideration the fact that the restructuring fee was designed

16  to incentivize CEO performance, and in his experience, when

17  there is a downside risk for non-performance, there is also an

18  upside risk for performance.

19      And as stated earlier, he would testify Mr. Seery's

20  performance was exemplary and deserving of the restructuring

21  fee.

22      While satisfied that Mr. Seery had earned the case

23  resolution fee and the fee was appropriate in the context of

24  the market and otherwise fair and reasonable, the Compensation

25  Committee asked Mr. Seery whether the payment of the case

1   resolution fee consistent with the terms of the agreement on

2   the dates provided in the agreement fit within the Debtor's

3   liquidity.

4       He would testify that, in response, given his liquidity

5   concerns, Mr. Seery proposed to the Compensation Committee and

6   the Compensation Committee agreed to adjust the payment of the

7   restructuring fee to defer payment, given the Debtor's

8   liquidity condition, such that it would be paid as follows:

9   The $1 million payment which was earned on confirmation

10  February 22nd of 2021 and otherwise would have been payable

11  will be deferred and will not be payable until September 30th,

12  2021.  Second, the $500,000 fee that would be payable if and

13  when the Court -- the plan goes effective will not be payable

14  until the later of the effective date or September 30th, 2021.

15  And the remaining $750,000 will be paid on the earlier of the

16  distribution of not less than 75 percent of the estimated cash

17  available for Class 8 claims, as set forth in the amended

18  liquidation analysis and financial projections that were filed

19  at Document -- Docket No. 1875-1 or the substantial completion

20  of the monetization of assets.

21      He would testify that after reaching agreement with Mr.

22  Seery on the terms of payment of the case resolution fee, that

23  the Compensation Committee and the Debtor and counsel

24  discussed the proposal with the Creditors' Committee and were

25  informed that the Creditors' Committee would not oppose the

Dubel - Proffer                    17

1  Debtor's motion.

2      And after reviewing and analyzing the services performed,

3  the market data provided by Mercer's updated report, the

4  Compensation Committee determined that the restructuring fee

5  was appropriate and authorized the filing of this motion.

6      Your Honor, that concludes my proffer.  As I mentioned,

7  Mr. Dubel is on the WebEx and is happy to answer any questions

8  Your Honor may have.

9          THE COURT:  Mr. Dubel, can you hear me and will you

10 turn on your video and audio?

11         MR. DUBEL:  Yes, Your Honor.  I can hear you.  My

12 video is -- has been on, but I think I have to speak to get it

13 to come to the forefront of your screen.

14         THE COURT:  All right.  I've got you now.  Please

15 raise your right hand.

16     (Whereupon, the witness is sworn.)

17         THE COURT:  All right.  Thank you.  Well, is there

18 anything you want to add to what Mr. Pomerantz just proffered?

19         MR. DUBEL:  No, Your Honor.

20         THE COURT:  Okay.  All right.  Well, we had no

21 objections to this motion.  I'll just ask specifically, Mr.

22 Clemente, to weigh in.  Is there anything you want to say?

23 You confirm obviously the representations that were made with

24 regard to the Committee's role in this?

25         MR. CLEMENTE:  For the record, Your Honor, yes, Matt

18

1  Clemente from Sidley on behalf of the Committee. I confirm

2  that, Your Honor, and the Committee has no objection to the

3  relief requested by the Debtor.

4        THE COURT: All right. Anything else on this motion?

5        MR. POMERANTZ: No, Your Honor. I would seek entry

6  into evidence of Exhibits 1 through 3, which are found in

7  Documents 2472, 2472, and believe that we have established,

8  through the argument, the motion, and the evidence in support

9  of the motion, that the Debtor, acting within its business

10 judgment, through Section 363 of the Bankruptcy Code, has made

11 a compelling case for the payment of the fee to Mr. Seery, and

12 we would ask Your Honor approve the motion.

13        THE COURT: All right. I will admit into evidence

14 Exhibits 1 through 3 that are found at Docket Entry 2472.

15     (Whereupon, Debtor's Exhibits 1 through 3 are entered into

16 evidence.)

17     Based on this unrefuted evidence, the Court is going to

18 approve payment of the case resolution fee in the amount of

19 $2,250,000 as having been earned by Mr. Seery here.

20     Not only does it appear to be contemplated by the defined

21 term "Case Resolution Fee" as set forth in his retention order

22 because we have a confirmed plan, we have resolution of a

23 material amount of the outstanding claims against the estate,

24 but it appears to be in all ways justified based on the

25 marketplace and the facts and circumstances of this case.

19

1        The Court is of the belief that, because we had a

2   Compensation Committee and a consultant, that certainly gave

3   some wisdom to the Debtor and board here.

4        And so under 363(b)(1) as well as Section 503(c)(3), to

5   the extent it applies, this is within the sound business

6   judgment of the Debtor and justified by the facts and

7   circumstances of the case, to use the words of 503(c)(3).  So

8   I do approve it as slightly modified, as I understand.  I

9   guess you'd call it a modification, where there's a staggering

10  of the timing.  One million is deferred until September 30,

11  2021; $500,000 is deferred to the later of the effective date

12  or 9/30/2021; and then $750,000 paid at such time as 75

13  percent of the distributions have been made to the general

14  unsecured claims or substantial completion of monetization of

15  the assets.

16       All right.  So I will be looking for an order on that.

17  Shall we move to the next motion, Mr. Pomerantz?

18            MR. POMERANTZ:  Yes.  Yes, we can, Your Honor.  Thank

19  you, Your Honor.

20            THE COURT:  Okay.

21            MR. POMERANTZ:  So the next motion, Your Honor, is

22  the Debtor's motion to approve exit financing.  And by this

23  motion, Your Honor, the Debtor seeks entry -- Court authority

24  for the Debtor to enter into a secured exit financing facility

25  contemporaneously with the occurrence of the effective date

20

 1   with Blue Torch Capital.

 2        As detailed in the motion, Your Honor, the Debtor's

 3   decision to enter the term sheet was the result of a

 4   competitive, robust process involving several lenders who had

 5   expressed an interest in providing the financing.  The terms

 6   set forth in the term sheet represent the best terms available

 7   to the Debtor to obtain the financing which not only provides

 8   the Debtor and the Claimant Trust with needed liquidity, but

 9   also results in the comprehensive restructuring of debt at the

10   Trussway entities, which, in addition to litigation claims, is

11   perhaps the most valuable asset of the estate.

12        Importantly, Your Honor, the Debtor is not asking this

13   Court to approve the terms of the financing between nondebtor

14   Trussway entities and Blue Torch.  Those entities are solvent

15   entities, they're nondebtors, and they do not require this

16   Court's approval to enter into the financing.

17        Even though the Trussway entities do not need court

18   approval, thereby rendering the majority of Dugaboy's

19   objections irrelevant, we believe it's important for the Court

20   to understand the relationship between the entities and

21   certain issues that are raised in the objection to the motion.

22        To facilitate that understanding, Your Honor, I would like

23   to put up a demonstrative, which is a construction chart.

24             THE COURT:  All right.

25             MR. POMERANTZ:  I've asked my -- Ms. Canty to do

1  that.

2      The exit financing contemplates two separate financing

3  facilities.  The first is a $32 million Term A loan, Term Loan

4  A, and the principle borrowers, which will be Trussway

5  Industries, LLC and Trussway, LLC.  And those are the two

6  orange rectangles with the red border at the bottom of the

7  middle of the chart.

8      Trussway Industries and LLC and will use the proceeds of

9  the financing to satisfy a $31.7 million loan owed by Trussway

10  Industries to certain (garbled) 1.0 CLOs which come due in

11  November 2021.

12      Entities related to Mr. Dondero will actually be paid off

13  by this refinancing at par plus accrued interest.

14      The refinancing of the Trussway Industries loan will also

15  enable Trussway, LLC, the operating entity, to refinance the

16  asset-based lending and term loan liquidity that it has on

17  advantageous terms, which, of course, this whole restructuring

18  facilitates the recovery by Mr. Dondero and his related

19  entities of the $31.7 million loan.

20      There is also a $20 million loan, Term Loan B, which will

21  be used by the Debtor and the Claimant Trust for working

22  capital and to fund obligations under the confirmed plan.  The

23  Term Loan B borrower is HCMLP, the Debtor, as reflected in the

24  green box, which is the second box from the top in the middle

25  of the chart.

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 145
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 344 of 1017 PageID 10108

22

```
 1        The Claimant Trust and the Debtor will guarantee both the

 2   Term Loan A and Term Loan B loans.

 3        Trussway Holdings, LLC, T-Way Investments, LLC, Trussway

 4   Industries, LLC, and Trussway, LLC, the four orange boxes in

 5   the middle, will guarantee both the Term A and Term B loans.

 6   And that is reflected in the red arrows to the right of the

 7   middle of the chart.

 8        And it is important to note that the trust, Trussway

 9   Holdings, currently guarantees the existing 1.0 CLO loan of

10   $31.7 million.

11        As indicated, Your Honor, the Debtor received one

12   objection to the motion filed by Mr. Dondero's trust, the

13   Dugaboy Trust. And in its objection, the Trust really only

14   raises one objection to the Debtor obtaining the financing.

15   The Trust argues that the Debtor doesn't need the financing.

16        As we have argued in the past, Your Honor, the Trust's

17   standing to object to the Debtor's actions are tenuous at

18   best, as the Trust does not have a valid claim against the

19   Debtor, and in the Debtor's estimation never will.

20        However, we are prepared to address the Trust's argument,

21   hear the testimony of Mr. Seery, as Your Honor still needs to

22   make a determination, separate and apart from the objection,

23   that the Debtor needs the financing.

24        Mr. Seery will testify that the Debtor requires the

25   financing because of several material changes in the Debtor's
```

23

1  cash flow projections from those that were put forth to the

2  Court in connection with confirmation of the plan.

3      First, the original plan projections contemplated the

4  Debtor's receipt of approximately $58 million on account of

5  demand notes payable by Mr. Dondero and his related entities.

6  And that was expected to occur in or around June 2021.  As

7  Your Honor is painfully aware, rather than satisfying the

8  objection -- their obligations in accordance with their terms,

9  Mr. Dondero and his related entities are throwing whatever

10 roadblocks they can to frustrate the Debtor's ability to

11 collect on such notes, such that they will not be paid in the

12 time frame originally projected.  Mr. Dondero's related

13 entities seem intent on dragging those litigations out as much

14 as possible, with a series of procedural maneuvers and

15 frivolous and fraudulent defenses.

16     Second, Your Honor, the Debtor anticipated that it would

17 sell Trussway in June 2021.  Trussway manufactures products

18 used in the building industry, and based upon Trussway's

19 strong performance in what was a volatile environment during

20 the pandemic, the Debtor has decided that deferring sale at

21 this time will maximize value from that asset.  Similar

22 restructuring of other assets, such as the Debtor's interest

23 in the MGM stock, will not be monetized on the timetable

24 originally contemplated, based upon events surrounding the MGM

25 stock, which the Court is aware and which was discussed at the

Appx 05329
009263

24

 1  prior hearing.

 2      Third, the burning-down-the-house litigation tactics that

 3  have been employed by the Dondero entities have significantly

 4  increased professional fees from the plan projections and has

 5  caused the Debtor to incur millions of dollars of more fees

 6  than anticipated.  While the Debtor had hoped to have some of

 7  those costs reimbursed in light of Your Honor's contempt

 8  order, Mr. Dondero has chosen to appeal and Your Honor

 9  approved the posting of a $600,000 bond.

10      While we still expect to receive that $600,000 and other

11  reimbursement of recoveries due to the litigation and our

12  costs, it will take additional time defending against the

13  litigation defenses, the contemptuous and vexatious litigation

14  that the Debtor -- that Mr. Dondero and his entities have

15  caused the Debtor to undertake.

16      Exhibit 5, Your Honor, which Mr. Seery will testify about,

17  of the Debtor's exhibit list, which can be found at Docket No.

18  2477, is the Debtor's current cash flow projection.  And Mr.

19  Seery will testify that the cash flow projection reflects the

20  Debtor's needs for exit financing to maintain liquidity and

21  comply with its obligations under the plan.

22      The balance of the Trust's arguments against the motion

23  have nothing to do with approval of the motion as being a

24  proper exercise of the Debtor's business judgment, but rather

25  whether Trussway, LLC and its related subsidiaries and

1   affiliates should be obligated under both Term Loan A and Term

2   Loan B, where $20 million of Term Loan B proceeds are funding

3   the obligations of the Reorganized Debtor and the Claimant

4   Trust.

5      As I mentioned, Your Honor, at the outset, the Debtor is

6   not seeking court approval by this motion for Trussway and its

7   related entities to enter into the exit financing, so the

8   Trust's arguments are essentially irrelevant at today's

9   hearing.

10      Nevertheless, Your Honor, to cut off what we expect could

11   be further frivolous litigation, Mr. Seery will testify as to

12   the solvency of each of the Trussway, LLC, Trussway

13   Industries, and Trussway Holdings Entities, each of the

14   entities which the Debtor directly or indirectly controls, and

15   definitively demonstrate that any objection to the proposed

16   financing is not only frivolous, but evidences bad faith.

17      After we filed our reply, Your Honor, Mr. Draper and I did

18   discuss the scope of today's hearing.  And I understand from

19   that discussion that a lot of the (inaudible) comments earlier

20   today, that in light of the Debtor's agreement that it is not

21   seeking approval of Trussway's entry into the loans, they

22   would essentially withdraw the objection related to whether

23   the exit facility is in the best interest of the Debtor's

24   estate.

25      Nevertheless, as I indicated, Your Honor, since the issues

1   were raised as part of the objection, and in order to provide

2   this Court with a complete record and answer many questions

3   this Court had after reading the Dugaboy objection, we are

4   going to present a response to each of those objections, in

5   the hope, again, that it will cut off some wasteful litigation

6   that we anticipate is on the horizon.

7        A threshold question relating to Dugaboy's Trussway

8   objection is why does Trussway's entry into the Dugaboy --

9   into the exit facility matter to Dugaboy? And the answer to

10  that question, Your Honor, turns on two purported claims that

11  Dugaboy asserts against two of the nondebtor entities. The

12  first claim is against Trussway Holdings. That is the top

13  orange rectangle in the middle of the chart. And the claim is

14  in the amount of approximately $2.8 million, when you include

15  accrued interest.

16      Trussway Holdings is not in default under that obligation,

17  and it does not mature until November 2021.

18      In our reply, we indicated that if Trussway Holdings is

19  required to pay the loan as a condition of closing the

20  financing of Blue Torch, that it will do so. Trussway will

21  have the liquidity to do so either from the proceeds of the

22  financing or otherwise. Neither the Debtor nor Trussway

23  Holdings will close the proposed financing into a potential

24  default.

25      That should resolve any concern that the Dugaboy Trust has

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 150
Case 3:25-cv-02072-S Document 15-12 Filed 02/06/25 Page 349 of 1017 PageID 10113

27

1  either in this Court or any other court with respect to

2  Trussway Holdings becoming obligated under the exit facility.

3  That claim will either be paid, or if there are defenses to

4  that claim, they will be litigated as appropriate.  There is

5  simply no risk to the payment of the Dugaboy-Trussway Holdings

6  note by entering into the exit facility.

7       The Dugaboy Trust also asserts in its opposition that it

8  has a claim of over $17 million against the Select Equity

9  Fund.  This claim arises from the loan of certain equity

10  securities that were used to shore up the Jefferies account.

11  You'll recall the Debtor had an active Jefferies account where

12  it traded stock at the beginning of the case in order to allow

13  additional borrowings or prevent a margin call.

14       As a preliminary matter, Your Honor, the Trust -- the

15  Trust is apparently now recognizing that its claim is not $17

16  million, but is actually much less.  Dugaboy filed as Exhibit

17  10 in its exhibits found at Docket No. 2475 a summary that

18  reflects that it believes now that it was -- or it believes

19  that as of September 30th the amount of the claim is actually

20  $12 million.

21       However, the amount of the claim, which fluctuates based

22  upon the value of the securities that were loaned to Select,

23  is more like $8.3 million, at most.  And there are additional

24  expenses.

25       But to be precise, which Dugaboy is not, that claim is not

28

1    against Highland Select Equity Fund, LLC, -- LP, which is the

2    light blue box in the middle of the entity and the owner of

3    the Trussway entity.  The claim actually is against Highland

4    Select Equity Master Fund of Bermuda, Limited Partnership,

5    which is the blue box on the left side of the page.  That

6    entity, which I'll refer to as the Select Master Fund, as I

7    said, is in the blue box.  It has very few assets, as its

8    trading account was seized by Jefferies while Mr. Dondero was

9    still managing it, subject to Mr. Seery's oversight, in the

10   first quarter of 2020.

11       And how do we know that this is the entity against whom

12   Dugaboy asserts its claim and that the claim is not asserted

13   against the Highland Select Equity Fund?  That is because

14   Dugaboy filed its proof of claim, which is Exhibit 8 in the

15   Debtor's exhibits, and reflects that the claim is against the

16   Select Master Fund.  And Dugaboy has included in Exhibit 9 to

17   its exhibit the underlying agreements relating to those

18   claims.  Those agreements reflect a loan of securities from

19   Dugaboy to the Select Master Fund.  Of course, Mr. Dondero

20   executed the lending agreement as the trustee of Dugaboy and

21   of course on behalf of the Select Master Fund.

22       And why does it matter?  It matters, Your Honor, because

23   the Select Master Fund does not have any interest in any of

24   the Trussway entities that are signing on to the exit

25   financing.  The Select Master Fund is neither a borrower nor a

29

 1    guarantor under the proposed exit facility.  It will not be

 2    impacted by the exit facility at all, and none of the assets

 3    related to the financing are assets of the Select Master Fund

 4    that could be used to pay whatever claim Dugaboy has.

 5        This Highland Select Equity Fund, LP, as I said, the light

 6    blue rectangle in the middle of the chart that has an interest

 7    in Trussway Holdings, it is not obligated in any way to pay

 8    the claims of the Select Master Fund.

 9        Accordingly, Your Honor, the premise of Dugaboy's

10    argument, that its interest in Trussway is prejudiced by

11    Trussway obligating itself to pay $20 million on Term Loan B,

12    which is being used at the Debtor/Claimant Trust level, is

13    just not correct, and they know it.

14        Nevertheless, Mr. Seery will testify regarding the

15    circumstances leading up to the Debtor and Trussway's

16    determination to enter into the comprehensive restructuring

17    facility.  Mr. Seery will testify that the Debtor's equity in

18    Trussway, aside from litigation claims, is probably the

19    Debtor's most valuable asset.  He will testify that the

20    Trussway equities are significantly solvent.  Trussway

21    Industries, Trussway Holdings, and the other entities' --

22    value to not only pay the exit financing, but also provide

23    meaningful recovery to the Debtor.

24        He will testify that the ABL and the term loan at Trussway

25    Industries -- Trussway, LLC have covenant issues, do not

30

1   provide Trussway with its liquidity needs, and that Trussway

2   needed to obtain a replacement ABL and term loan to finance

3   its operations.

4        He will testify that the proposed replacement ABL lender

5   at Trussway, Wells Fargo, required Trussway Industries, the

6   indirect parent of the Trussway entities, to refinance its

7   $31.7 million debt maturing in 2021 as a condition of

8   providing the asset-based lending facility.

9        He will testify that, in the first quarter of 2021,

10  Trussway ran its own financing process and explored different

11  structures to enable it to address its financing needs,

12  including separate refinancings of the ABL, the term loan, and

13  the Industries loan, and a new (inaudible) facility and a

14  first and second lien structure.

15       He will also testify that certain lenders wanted to defer

16  financing with Trussway until the market stabilized, and that

17  the failure of financing negatively impacted Trussway's

18  ability to capture profitable business.

19       Therefore, Mr. Seery will testify that he determined that

20  having the Debtor provide credit support to Trussway and

21  pursue the Blue Torch financing, which followed a robust

22  process at the Debtor's level, was in the best interest of the

23  Debtor's estate and accomplished two goals:  one, liquidity

24  for the Debtor, and two, dealing with the Trussway financing

25  needs.

31

1        He will testify that the marketing process that led to the

2   exit financing included reaching out to six parties with

3   experience in providing complex restructuring financing.

4   Included substantial diligence of five of them, three term

5   sheets, and two verbal indications of interest.  And he will

6   testify that the Debtor had each of these lenders compete

7   against each other in order to get the best offers from what

8   ended up being Blue Torch, the potential lender.  And as a

9   result of that process, Your Honor, Mr. Seery will testify

10  that he chose Blue Torch.

11       Clearly, Your Honor, the evidence will overwhelmingly

12  demonstrate that obtaining the Blue Torch financing, which

13  addresses the Debtor's liquidity needs and solidifies the

14  financing of Trussway, is a valid exercise of the Debtor's

15  business judgment under Section 363 and the Court should

16  approve the motion.

17       Before we proceed with Mr. Seery's testimony, Your Honor,

18  I wanted to let the Court know that we've reached agreement

19  with Mr. Draper on the exhibits.  The Debtor's exhibits were

20  filed at Docket No. 2477, 1 through 8.  And we understand Mr.

21  Draper does not object to the entry into evidence of any of

22  the exhibits.  Dugaboy's Exhibits 1 through 10 were filed at

23  Document Number 2 -- Docket No. 2475, and we don't object to

24  any of the Dugaboy exhibits, provided, however, that the

25  exhibit which purports to be a summary of Dugaboy's claims,

32

1  which I think is Exhibit 10, is only being admitted to

2  demonstrate Dugaboy's belief as to what the claim is and it's

3  not being admitted for evidence as to the actual amount of the

4  claim.

5      So, with that, Your Honor, and I'm sure Your Honor wants

6  to hear if Mr. Draper agrees with my agreement on the

7  exhibits, we would be prepared to turn to the testimony of Mr.

8  Seery.

9          THE COURT:  All right.  Mr. Pomerantz, --

10          MR. DRAPER:  Your Honor?

11          THE COURT:  -- it was a little hard to hear you here

12  and there, so I ask you again to maybe try to turn up your

13  volume or make some adjustments.

14      All right.  So, first, Mr. Draper, you confirm that you

15  are stipulating to the admissibility of Exhibits 1 through 8

16  of the Debtor that are found at Docket Entry 2477?

17          MR. DRAPER:  Your Honor, let me make a few comments.

18  In light of the removal of the Trussway asking the Court for

19  authority with respect to Trussway, I think some of the

20  exhibits don't need to be introduced, and I would object on

21  relevancy grounds.  And that's why I'd like to make a

22  statement --

23          THE COURT:  Okay, so you did not stipulate to these

24  after all?

25          MR. POMERANTZ:  He did stipulate yesterday.  We had a

1    conversation and he agreed.  Now he's going back on that

2    agreement.

3           THE COURT:  Okay.  Mr. Draper, --

4           MR. DRAPER:  I'm not going back on it, Your Honor.

5    Your Honor, I am not going back on it.

6           THE COURT:  Okay.  Your audio is poor as well.  I

7    mean, it sounds like you're saying, well, now that we've

8    understood that the Debtor's not seeking approval of the terms

9    or borrowing as to Trussway, you don't think he should be able

10   to make his record with regard to some of these exhibits?

11          MR. DRAPER:  No.  No, Your Honor, what I'm saying to

12   you is some of the documents are now irrelevant in connection

13   with what the Debtor is really seeking.  If they want to put

14   it on to make their record, that's fine.  I will not object to

15   authenticity.  But I will make a comment to the Court that a

16   great deal of what Mr. Seery is going to testify to should be

17   -- is not relevant in light of where we are right now.

18       Number two is hearsay.  There's no -- there's no --

19   there's no representative or witness who is either an officer

20   or director of Trussway.  And I will be making objections to

21   that with respect to those items.

22       What -- can I -- let me go through what I -- where I think

23   we are.

24          THE COURT:  Well, I don't understand --

25          MR. DRAPER:  If -- if --

34

 1          THE COURT:  Let me stop you.  I don't understand what

 2   you just said.  You said you didn't have a problem or an

 3   objection to their authenticity, and then you said we don't

 4   have a representative of Trussway to testify about them.  So I

 5   don't -- those seem inconsistent.

 6          MR. DRAPER:  No.  I didn't say -- no.  The documents

 7   can come in.  I'll agree to that, Your Honor.

 8          THE COURT:  Okay.

 9          MR. DRAPER:  What I'm stating to you --

10          THE COURT:  So Exhibits 1 through 8 at Docket 2477

11   are admitted by stipulation, and likewise the Debtor --

12          MR. DRAPER:  Yes.

13          THE COURT:  -- agrees that your Exhibits 1 through 10

14   at Docket 2475 are admitted?  Okay.  So those are admitted.

15          MR. DRAPER:  Yes.

16       (Whereupon, Debtor's Exhibits 1 through 8 and Dugaboy

17   Trust's Exhibits 1 through 10 are admitted into the record.)

18          THE COURT:  Now, what else did you want to say?

19          MR. DRAPER:  What I'd like to say is, again, I have

20   agreed and the Debtor has agreed that the issue as to the

21   Trussway entrance into the exit loan is not before the Court

22   today, that they're not seeking authority from this Court to

23   bless Trussway's entrance into that exit loan.  Trussway will

24   do what it's going to do separate and apart from a court

25   order.

Appx. 05331
009274

1      What that -- in addition, with that off the table now,

2   some of Mr. Seery's testimony with respect to both the

3   Trussway need for the exit loan as well as Mr. Seery's

4   testimony with respect to the conditions at Trussway are

5   either hearsay -- the process by which Trussway went to obtain

6   exit loans in the past are also hearsay.  I can deal with that

7   as the testimony comes up.

8      I have -- the only issue I have with respect to the exit

9   loan is both the need and are there -- is there a better way

10  to do it?  And that's it.  It's simple.  It's limited in scope

11  and appearance.  And this has now become a much more complex

12  hearing, inasmuch as this Court may be asked to address the

13  claims that Dugaboy has.  That's not before the Court today,

14  and nor is the issue with respect to Trussway and its entrance

15  into the exit loans.  That's -- that's the sole point that I'm

16  making.

17          THE COURT:  Okay.  Well, we'll address objections to

18  testimony as they may be made, but given that the Debtor is

19  asking for approval of borrowing $50 million, up to $50

20  million -- I think that was the amount, correct -- that it

21  would be obligated on even, if $30-something million is going

22  to Trussway, I think I need to hear, you know, in total the

23  facts and circumstances somewhat as to why --

24          MR. DRAPER:  I agree.

25          THE COURT:  -- Trussway is getting borrowing that the

36

1  Debtor will be on the hook for.

2       MR. DRAPER:  I have -- I understand that.  What I'm

3  really saying, though, is the adverse effect on the -- on

4  Dugaboy is not before the Court, because, quite frankly, if

5  the Debtor wants to borrow $50 million and the Debtor needs

6  it, that's -- that's for the Debtor's business decision.

7  That's not a Trussway business decision.  And that's the line

8  I'd ask the Court to understand where my position is coming

9  from.

10       THE COURT:  All right.

11       MR. POMERANTZ:  Your Honor, may I respond?

12       THE COURT:  You may.  Go ahead.

13       MR. POMERANTZ:  Your Honor, I think Your Honor hit

14  the nail on the head.  The Debtor is borrowing $52 million,

15  $32 million of which are being used at the Trussway level.

16  Independent of Trussway's -- of Dugaboy's objection, which

17  they did make -- they didn't have to oppose the motion, but

18  they did -- but independent of that, Your Honor has to make

19  findings and has to conclude that it's appropriate for the

20  Debtor to enter into that agreement and become obligated on

21  the $32 million.

22     That necessarily requires this Court having an

23  understanding.  And Mr. Seery is qualified to testify at -- at

24  Trussway.  Mr. Morris will handle any objections to his

25  testimony on any grounds of relevance or hearsay.  He will

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 160
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 359 of 1017 PageID 10123

37

1   testify on the circumstances that Your Honor needs to create

2   the record to demonstrate that what the Debtor is doing is

3   appropriate.

4       We agree.  We're not seeking approval of Trussway or

5   Trussway entities entering into the loan.  We're not doing

6   that today.  So that does not obviate his testimony.  Right?

7       And to allay Mr. Draper's concerns, we're not seeking to

8   litigate the allowability of the $17 million, now $12 million,

9   really $8 million or less claim, or the $2 million claim.  We

10  did it just to provide Your Honor with perspective that, as is

11  the case pretty much all the time when the Dondero entities

12  assert claims, (garbled) and -- and they don't really have

13  these claims that they say that -- excuse me, Your Honor.

14      So for that reason, Your Honor, I would ask the Court to

15  allow us to proceed with Mr. Seery's testimony.  We can deal

16  with any objections, evidentiary objections as they come up,

17  and then we can go to closing arguments.

18          THE COURT:  All right.  Well let's hear the evidence.

19  You call Mr. Seery at this time?

20          MR. MORRIS:  Good morning, Your Honor.  It's John

21  Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.  Can

22  you hear me?

23          THE COURT:  I can.  Loud and clear.

24          MR. MORRIS:  Okay.  Two things before I call Mr.

25  Seery.

38

1      First, I respectfully request that the Court ask all

2   people on the line to mute their lines, because I think that

3   feedback is what's causing the interference with some of the

4   sound.

5          THE COURT:  All right.  Well, could be, I guess, but

6   it doesn't hurt to say that.  So, we have 50-something people.

7   Please make sure your device is on mute until it's your turn

8   to speak.  All right?

9          MR. MORRIS:  Thank you, Your Honor.  And the second

10  thing, at the risk of reopening the door, which I don't intend

11  to do, I just want to clarify for the record the exhibits that

12  were referred to earlier.

13     The Debtor actually filed an initial exhibit list and then

14  an amended exhibit list.  And while the Exhibits 1 through 8

15  on Docket 2477 are the entirety of the exhibits that are

16  coming into evidence, the fact is that the physical exhibits 2

17  through 4 can be found at Docket 2473, and that -- that was

18  the original exhibit list, which also contained Exhibit No. 1,

19  but we're using the Exhibit No. 1 that's on the amended list

20  at 2477.

21     So, to summarize, the Exhibits 2 through 4 can be found at

22  Docket No. 2473 and Exhibits 1 and 5 through 8 can be found at

23  Docket No. 2477.

24         THE COURT:  Okay.  Thank you for clarifying.  And so

25  those are the places on the docket where 1 through 8 are

Seery - Direct                           39

1   found.

2           MR. MORRIS:  Okay.  Can I proceed?

3           THE COURT:  You can proceed.

4           MR. MORRIS:  Okay.  The Debtor calls James P. Seery,

5   Jr., please.

6           THE COURT:  All right.  Mr. Seery, let's see if we

7   can have you say, "Testing, one, two" so we pick up your video

8   here in the courtroom.

9           MR. SEERY:  Testing, one, two, Your Honor.

10          THE COURT:  All right.

11          MR. SEERY:  Testing, one, two.

12          THE COURT:  There you are.  Got you now.  Please

13  raise your right hand.

14      (Whereupon, the witness was sworn.)

15          THE COURT:  All right.  Thank you.  Mr. Morris?

16          MR. MORRIS:  Okay.

17          JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

18                  DIRECT EXAMINATION

19  BY MR. MORRIS:

20  Q   Okay.  Good morning, Mr. Seery.  Can you hear me?

21  A   I can, yes.  Thank you.

22  Q   Okay.  Mr. Seery, are you familiar with the Debtor's exit

23  financing motion?

24  A   I am, yes.

25  Q   And have you reviewed that before it was filed?

Seery - Direct                    40

1   A    I have, yes.

2   Q    And did you authorize the Debtor to file that particular

3   motion?

4   A    I did.

5   Q    Can you describe for the Court why the Debtor is seeking

6   the relief that's set forth in the exit financing motion?

7   A    Well, the plan and the trust agreement contemplated the

8   potentiality of exit financing if it was needed.  Frankly,

9   when we were going through confirmation hearing, we expected

10  that our liquidity would be sufficient that we would not need

11  to go get any financing.  If we needed it down the road

12  because we needed to defer monetizations or because our costs

13  were higher, the plan and the trust agreement both had the

14  flexibility to get it.  However, because our costs have

15  increased and because we've delayed or have had delayed for us

16  certain monetizations, our liquidity is tight when we go

17  effective.

18  Q    And did the Debtor undertake any analysis to project their

19  future cash flows?

20  A    We did.  We went through in detail, and we do it

21  regularly, our cash flow statements, our projected liquidity.

22  We considered the deferral that Mr. Pomerantz mentioned in his

23  opening of the $58 million in demand notes that we expected to

24  collect.  We considered the timing of the effective date,

25  which has been considerably delayed, based upon a number of

Seery - Direct                           41

1   litigations.  We pushed out our monetization of certain

2   assets, including MGM and Trussway, because of market

3   opportunities and conditions that we believe are better in the

4   future.  And then because of our professional fee costs.

5   We've had a considerable increase in those.

6        All of those factors are factored into our liquidity

7   analysis.

8                MR. MORRIS:  I would ask Ms. Canty to put up Debtor's

9   Exhibit No. 5.

10  BY MR. MORRIS:

11  Q   Is this the analysis that you were referring to?

12  A   This is.  This is a high-level view of our liquidity

13  forecast for the next 13 weeks.  And maybe to cut to the

14  chase, what it shows is an effective date around August 1st,

15  and anticipated financing.  That's the $19.8 million at the

16  Debtor level in the middle of the page in grey.  It's $19.8

17  million because there are some fees that will come out of

18  that.  And then it shows the liquidity that the Debtor would

19  have with and without the financing.

20       So at the bottom line, where you have it highlighted, it

21  shows our cash position less the financing.  So if we do not

22  have the financing, we would be negative in those last weeks

23  of the 13-week forecast.

24  Q   And based on this forecast, does the Debtor believe that

25  the financing provided in the proposed exit financing package

Seery - Direct                              42

1   would be sufficient to get it through this projection

2   period, --

3   A    Yes.

4   Q    -- making all of the assumptions set forth in this

5   document?

6   A    Yes.  This -- basically, we look at -- we think we've

7   captured everything in it.  The cost to go effective, the

8   payment of claims, the payment of administrative claims, the

9   reserves we have to make, and the projected expenses that we

10  have litigating, both with respect to collections like the

11  notes, other expenses.  Frankly, litigating things that we can

12  anticipate other sort of crazy objections, as the Court is

13  well aware.  And then our timing of our monetization.  So we

14  do plan on monetizing assets during this period, but we want

15  to make sure we have the flexibility to do that and do it

16  efficiently.

17          MR. MORRIS:  Your Honor, I don't know who GR is.

18  There's still a lot of background --

19          THE COURT:  Okay.  GR?

20     (Court confers with Clerk.)

21          THE COURT:  Okay.  My court reporter says everyone's

22  on mute, so --

23          MR. MORRIS:  Okay.  Somebody's dialed in from area

24  code 303.  Now they're on mute.

25          THE COURT:  Okay.

Seery - Direct                                    43

1          MR. MORRIS:  Maybe that was it.

2          THE COURT:  Okay.

3          MR. MORRIS:  They've just muted.  Okay.

4   BY MR. MORRIS:

5   Q    All right.  So, Mr. Seery, you started to mention some of

6   the factors that created the liquidity needs.  I just want to

7   make sure we've identified them all.  You mentioned the $58

8   million in notes from Mr. Dondero.  Do I have that right?

9   A    Yes.  Sorry.  I was just grabbing some water.

10  Q    That's okay.  And had that -- what changed with respect to

11  the original projections as it relates to the $58 million in

12  notes?

13  A    Well, as the Court is aware, we anticipated that those

14  notes would be collected.  We didn't anticipate that they

15  would be collected immediately, but we expected a swift

16  resolution because there, in our opinion, are no legitimate

17  defenses to them.  Those collection efforts have been dragged

18  out, both for procedural and now amendments to defenses and

19  claims of the Debtor giving away assets and things to that

20  nature, so that those collections, which we expected to take

21  place in the first half of this year, we now expect to be

22  deferred for some time.  Ultimately, we do expect full

23  collection.

24  Q    I think you mentioned the effective date.  What's

25  different about the effective date today as compared to the

Seery - Direct                                        44

1   original projections?

2   A    Well, we originally anticipated that we would go effective

3   on March 1st.  We've had a number of additional delays related

4   to both collections and litigations that have deferred our

5   ability to go effective.

6        In addition, frankly, the timing of getting the financing

7   has also extended it, as well as insurance issues that we're

8   working our way through now.  So we do anticipate an exit on

9   August 1st, and we're pretty set on that date, frankly,

10  because of certain issues related to the financing.  We want

11  to make sure that we can get that done and make sure that we

12  maintain the value of the assets.  So we do expect to exit on

13  August 1st, which puts us out from the original time frame,

14  you know, a solid five months.

15  Q    Okay.  And I believe you mentioned MGM.  How does the MGM

16  issue impact liquidity today as compared to the original

17  projections at confirmation?

18  A    Well, we -- our view coming into this year was that MGM

19  was in play.  That was publically disclosed numerous places,

20  in addition to an illegal and improper disclosure that I

21  received in December.  But, frankly, again, we can wrestle

22  with that issue later.

23       But our view was that, with the MGM transaction that's

24  been publically announced, it doesn't make sense to monetize

25  that asset now.  The transaction with Amazon, which has been

Seery - Direct                                    45

1   publically announced, we think is a very good transaction.  We

2   do anticipate that it will close.  We have a particular

3   perspective on the timing which I'd prefer not to share at

4   this time.

5   Q    Did the Debtor make any changes in its decisions regarding

6   the monetization of its Trussway asset that impacted

7   liquidity?

8   A    All of the monetizations impact liquidity to some degree,

9   because unlike an operating company, and Trussway certainly is

10  an operating company, but the Debtor, the Debtor is operating

11  with very little revenue.  So if you look at the operating

12  receipts, our cash receipts are relatively modest compared to

13  our expenditures.  Where we will generate liquidity is when we

14  sell assets.

15      We looked at Trussway last year, and I think folks are

16  aware that we engaged in a process of considerable interest,

17  even in COVID.  However, as has been bandied about

18  considerably in the popular press, there have been some

19  significant movements in pricing for some of the commodities

20  that make up a significant portion of the cost of goods sold

21  of Trussway, most predominantly lumber, but steel as well.

22  Trussway is operating exceptionally well for a company its

23  size in that environment, and we are -- we're very positive on

24  that asset.  But it doesn't make sense to sell it now while

25  it's -- while it's taking advantage of the market.  So we've

Appx 05342
009285

Seery - Direct                                46

1   deferred that sale to what we think will be a more opportune

2   time later down the road.

3   Q    Okay.  Let's talk about the efforts to identify a lender.

4   Did there come a time when the lender -- when the Debtor began

5   to seek third-party exit financing?

6   A    Yes.  In the early part of the spring, once we got -- we

7   looked up and noticed that we weren't going to make the March

8   1 date, that we were going to likely be starting to get

9   deferred on some of the note collections and that we were

10  considering pushing out some of our monetizations, we

11  considered that we would need to get financing for the Debtor,

12  and we started to investigate that opportunity.

13  Q    And can you describe for the Court the process that the

14  Debtor ran in order to identify a lender?

15  A    Well, working with each of the companies that we have, the

16  PE companies that we have, working closely with them, we

17  determined what their financing needs might be.  We worked on

18  those financings, and we also worked simultaneously on our own

19  financing.  And what we did was identify experienced -- for

20  our own financing, we identified experienced financiers who

21  would be interested in doing this type of financing.  We

22  discussed with them potential structures.  We discussed with

23  them potential costs.  We analyzed the market in terms of what

24  we thought of our situation, on the positive side, we'd be

25  able to get from various lenders.  And then we went out

Seery - Direct                                    47

1  seeking proposals from lenders.

2  Q    How many lenders -- how many potential lenders did the

3  Debtor contact, if you recall?

4  A    I believe the Debtor contacted about six lenders.  These

5  were all lenders that are experienced in this type of

6  financing.  And again, when I say this type of financing, I

7  mean a company that doesn't -- is not a typical, like the

8  Debtor, a typical operating company that generates EBITDA and

9  lenders look to a typical EBITDA leverage ratio or a coverage

10 ratio.

11      This is a financing where the financier really has to look

12 at the asset coverage and have confidence in our ability to

13 monetize the assets in accordance with our plan.

14 Q    Did the Debtor have these potential lenders execute

15 nondisclosure agreements?

16 A    Yes.  I believe we had five or six, again, lenders execute

17 NDAs.  Five of the total went into a data room that we

18 prepared which contained information relative to each of the

19 assets that the Debtor owns and the Debtor's plan.  Then we

20 sought to negotiate or work through with each of those

21 potential lenders what issues they might have around those

22 assets and how they viewed the value versus how we viewed the

23 value.  And then we began to negotiate terms.

24 Q    As part of the diligence process, did the prospective

25 lenders have access to the Debtor, its employees, and its

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 171
Case 3:25-cv-02072-S Document 15-12 Filed 06/25 Page 370 of 1017 PageID 10134

Seery - Direct                                    48

1  advisors?

2  A    Yes.  We spent considerable time with each of the lenders.

3  I spent considerable time with each of them personally, with

4  our team, walking through, again, the structure of the plan,

5  the trust structure, how the Debtor would be governed, our

6  monetization schedule, what the potential benefits to that or

7  upsides in that schedule were in respect to both timing and

8  value, and what the potential risks might be with respect to

9  both timing and value.

10 Q    At the conclusion of the due diligence process, did any of

11 the prospective lenders tender preliminary term sheets to the

12 Debtor?

13 A    Yes.  My recollection is that we got three written term

14 sheets and one detailed oral proposal that was delivered

15 directly to me.  We then took those proposals and began to

16 compete them against one another, working through with the

17 prospective lenders where their hot buttons were and things

18 that were risky to them, as well as pushing them on cost.  So,

19 a combination of structure and cost.

20 Q    Do you believe, in your capacity as the Debtor's CEO, that

21 the terms that are proposed are the best available terms for

22 the Debtor?

23 A    I do.  It's a complicated financing.  Again,

24 sophisticated, arm's-length negotiations with multiple

25 potential lenders, ultimately with their respective counsel,

Seery - Direct                                     49

1   detailed term sheets, negotiations regarding each of the

2   provisions of the term sheets.  I think we got the best of all

3   the financing we could get.

4   Q   Okay.  Let's talk about what the ultimate proposal is.

5           MR. MORRIS:  If we could put up what is actually

6   Dugaboy Exhibit 3 from Docket 2475.

7   BY MR. MORRIS:

8   Q   Can you see it, Mr. Seery?

9   A   Yes, I can.

10          MR. MORRIS:  If we could just scroll down a little

11  bit so he has a chance to see the balance of the document.

12  Okay.

13  BY MR. MORRIS:

14  Q   And is that your signature there, sir, on Page 6 of 29?

15  A   Yes, it is.

16  Q   Okay.  Can you tell the Court what this is?

17  A   This is a letter of intent from Blue Torch Capital.  Blue

18  Torch Capital is a private lender.  They have approximately $3

19  billion of their own capital they invest, and they also

20  leverage some of that capital to give them more lending power.

21  It's a -- it's probably a four-year-old entity, formed by a

22  pioneer in the direct lending business, extremely well-known

23  in the industry, and one of the -- I think one of the most

24  experienced players in the business.

25  Q   And while the document speaks for itself, can you

1   summarize for the Court your understanding of the proposed

2   terms (garbled)?

3   A    Basically, it's a $52 million exit financing broken into

4   two tranches, as has been loosely described.  There'll be a

5   $32 million tranche, which will be at Trussway Industries,

6   LLC, and then there will be a $20 million tranche, which will

7   be at the Debtor.  The Debtor and the Trust.  There'll be, in

8   essence, a combined credit for Blue Torch, but there is a

9   complicated sharing arrangement or intercreditor arrangement

10  between Blue Torch and the ABL lender at Trussway, LLC that

11  includes a standstill provision and certain other protections

12  for the ABL, to assure that if there's any issues at Highland,

13  HCMLP, or the Trust, that those won't cause any disruptions to

14  the operations of the operating company, Trussway, LLC.

15  Q    We'll talk in a few minutes about the Trussway aspect of

16  the exit financing, but can you just tell the Court generally

17  about sources and uses.  What's the use of the Tranche A

18  portion of the loan?

19  A    So the -- I hope I don't get my A's and B's mixed up.  But

20  Tranche A, I believe, is the $32 million.

21  Q    Yes.

22  A    That is going to be used to refinance seven what we call

23  1.0 CLOs that have approximately $31.7 million of an

24  outstanding term loan that sits at Trussway Industries, LLC.

25  That loan is currently 10 percent PIC.  It currently matures

Seery - Direct                          51

1   in November.  It's well, well covered, meaning that the asset

2   Trussway is worth multiples of the amount of the loan, so

3   there's not any issue with respect to its security and value.

4        It does, however, mature -- this loan is rather what's --

5   one might call it long in the tooth.  The Court may remember

6   that the original reason that Mr. Terry ended up leaving Acis

7   had to do with issues related to the Trussway loan.

8        So we -- we intend to refinance this loan in advance of

9   its maturity with this financing.  We expect to have it done

10  by August 1st.

11  Q    And can you describe for the Court what the intended use

12  of is for Tranche B, the $20 million loan?

13  A    That will be to the Debtor and to effectively the Trust.

14  It will be used to pay our exit costs, which include certain

15  creditor claims that have to be paid on exit, as well as our

16  administrative expenses that have to be either paid or

17  allocated on or around exit.  And there's some additional

18  capital that would be identified for general corporate

19  purposes that we would use for our liquidity.

20  Q    Okay.  Is it your understanding that if the Court grants

21  the motion the Debtor will be obligated to close on this exit

22  facility?

23  A    No, it won't be.  So, so this is a -- there's a letter of

24  intent.  Both Blue Torch and the Debtor are not obligated.

25  Again, we have a high degree of confidence in Blue Torch as a

Seery - Direct                                    52

1   lender.  They don't do these things easily.  They don't do

2   them cheaply.  But when they say they're going to close, they

3   will close.

4        But if we don't have to close, we won't.  So if, for

5   example, MGM closed tomorrow, we might reevaluate our needs.

6   If someone wanted to buy Trussway for what we think is the

7   proper amount, we wouldn't have to necessarily get this

8   facility.  If someone came along to buy one of the other

9   assets and we had liquidity, we might not need it.  Right now,

10  if the note litigation was settled and we received the $58

11  million that we're owed, plus the costs of collection,

12  tomorrow, we'd have to reevaluate our needs and may not need

13  it.

14       So we don't have to close the facility.  Right now, all

15  projections are that we will.

16  Q   And if the Debtor proceeds, do you have a timeline as to

17  when you expect to close?

18  A   Yes.  We expect to close by August 1st, and that's tied

19  very much to the ABL refinancing.  So we want to make sure

20  that Trussway has sufficient capital to attack what we think

21  is a really advantageous market opportunity at Trussway, and

22  they are doing that.  So the new ABL, which is from Wells

23  Fargo, it's robust, flexible, and gives Trussway Operating

24  Company sufficient capital to go out into this market and take

25  advantage of it.

Seery - Direct                                    53

1  Q    Okay.  Let's transition to the Trussway part.  Why is

2  Trussway involved in the Debtor's exit financing proposal?

3  A    Well, Trussway -- as I said, Trussway is an operating

4  company, and it's been operating in an environment right now

5  where there's a significant demand that they are meeting, but

6  there's also significant volatility in some of their material

7  costs of their operations, specifically lumber and steel, but

8  mostly lumber.  And as I mentioned earlier, the price of

9  lumber spiked tremendously during the first half of the year.

10  It's well-publicized as a potential inflation indicator.

11  While it's leveling off, that has made the business more

12  difficult to operate.  Trussway has done a great job doing it.

13  It's got price protections in its contracts.  It forward-buys

14  lumber.  But keeping up with the spike in that material has

15  been difficult.  It also created great opportunities, because

16  some of the Trussway competitors have just not been able to

17  deliver on jobs and Trussway has.

18      When we thought about the financing at Trussway with the

19  Trussway management team, and we spent considerable time

20  working with them on this and discussions that I personally

21  had with the Trussway management team, we considered the

22  opportunities for financing directly at Trussway.  Could we

23  initially -- we looked at could we do a financing of the $32

24  million plus a new ABL just at Trussway?  We thought about it

25  in respect of an ABL that was standalone with a second lien,

Seery - Direct                                    54

1  or what's sometimes referred to as a uni-tranche, where we

2  would have one financing the $32 million plus the ABL.  We

3  determined, with Trussway management, that it made much more

4  sense to have Trussway stand alone and do a standalone ABL

5  facility.  Why?  Trussway went out to 40-plus borrowers,

6  examined various term sheets from various players, and worked

7  with us --

8          MR. DRAPER:  Your Honor?

9          THE WITNESS:  -- to turn --

10          MR. DRAPER:  Your Honor?

11          MR. MORRIS:  Please don't interrupt the witness.

12          MR. DRAPER:  No, I'd like to make an objection.

13          MR. MORRIS:  You can't now.  After he's finished --

14  after he's finished his answer.  Please don't interrupt the

15  witness.

16          MR. DRAPER:  Your Honor, this is --

17          THE COURT:  I'll hear the objection.  Go ahead.

18          MR. DRAPER:  This is hearsay testimony --

19          THE COURT:  Say again?

20          MR. DRAPER:  Your Honor, this is hearsay testimony.

21  This is Douglas Draper.  This is hearsay testimony as to what

22  Trussway did.  There's not a Trussway representative.  Mr.

23  Seery is neither an officer or director of Trussway.  There's

24  been no foundation for this.

25      Now, he can testify as to what he understood, but this

Seery - Direct                                   55

1    cannot be offered for the -- for the -- for the proof of the

2    item.  It may go into his understanding or his decision, but

3    it cannot be offered for what Trussway did in the past in

4    terms of its borrowing.

5            THE COURT:  Okay.  Well, first off, there was no out-

6    of-court statement, so I overrule a hearsay objection.

7        With regard to foundation, I'll sustain that.

8        Mr. Morris, you might explain the hierarchy or give us

9    some foundation to know how Mr. Seery has the knowledge about

10   what Trussway did.  All right?  So that's my ruling.

11           MR. MORRIS:  All right.  Thank you, Your Honor.

12   BY MR. MORRIS:

13   Q   Mr. Seery, what's the basis for your knowledge?

14   A   I worked very closely with the Trussway management team,

15   the CEO and CFO, as well as directly with the bankers at

16   Trussway.  I've personally been on calls with Trussway's ABL

17   lenders.  I've personally sat with the Trussway team by video

18   and gone through their liquidity needs and their business

19   plan, along with the people on my team who deal with it every

20   day.

21   Q   Can you explain to the Court the relationship that the

22   Debtor has to Trussway?

23   A   Sure.  You know, we're here out of sometimes an abundance

24   of caution, and I think at one earlier hearing Your Honor said

25   that, you know, the Debtor's a bit damned if it does and

Seery - Direct                              56

1   damned if it doesn't.  Trussway is an indirect subsidiary of

2   the Debtor, but it's -- effectively, the Debtor controls 90

3   percent of Trussway.  And the 10 percent is owned by current

4   or former Trussway executives or current or former Highland

5   executives, none of the -- none of the folks that have been

6   sort of day-to-day involved in any of the proceedings that you

7   would have heard of.  So these are former -- former employees

8   of Highland.  None of the Dondero, Okada, or any of those

9   folks have any interest in Trussway.

10  Q    And --

11  A    We do control -- we do effectively control Trussway

12  through our 90 percent control.  And the LLC agreement at

13  Trussway at the various levels gives us complete control as

14  the managing member to direct its operations.

15            MR. MORRIS:  Your Honor, I believe that establishes a

16  sufficient foundation for Mr. Seery to testify as to what he

17  did with respect to this matter.

18            THE COURT:  All right.  I agree with that.  So any

19  pending objection is overruled.

20  BY MR. MORRIS:

21  Q    Okay.  I'm not sure where we were, Mr. Seery, but let me

22  try -- is it your understanding that Trussway has a loan

23  that's coming due later this year?

24  A    Trussway has two facilities.  One doesn't come due this

25  year but has some covenant issues, and -- that's the ABL.  And

Seery - Direct                           57

1   that's Trussway, LLC, the bottom box on the chart that we saw

2   earlier.  The intermediate loan is the Trussway Industries,

3   LLC.  That's the $32 million CLO loan that does come due in

4   November.

5   Q   Okay.  And I think you were -- I think you were describing

6   the efforts that had been made for Trussway to obtain its own

7   independent financing.  Do I have that right?

8   A   That's right.  So, when -- what I was explaining was that

9   we worked with Trussway and determined that the best

10  opportunity for Trussway was to get a very flexible ABL term

11  loan structure from one of the traditional lenders.  And they

12  competed a number of lenders in that proposal, all excellent,

13  first-rate institutions.  Ended with an agreement with Wells

14  Fargo, which is the financing that we expect to pursue and

15  expect to close at Trussway, LLC.

16      But we determined that the best way to do that was just to

17  do that standalone, for a couple reasons.  One is it's much --

18  it's difficult, particularly in a borrowing environment, for

19  management teams to operate in a leverage -- with more

20  leverage.  And so throwing the extra $32 million on the

21  shoulders and the operating day-to-day of Trussway would have

22  been a little bit more difficult and would have also made it

23  more expensive for Trussway from a working capital

24  perspective.

25      We looked at also doing a financing at -- just doing it at

Seery - Direct                                    58

1  Trussway Industries, which is the $32 million.  That, that

2  financing would have been very expensive.  Why?  Again,

3  borrowing environment, and you're only sitting secured by only

4  the Trussway assets.  So while the company's got sufficient

5  liquidity from the ABL, it's a much different financing than

6  if you -- if you have any kind of security at either Trussway

7  or collateral from the parent, from HCMLP.  And we determined

8  that the cost would be much lower, we'd have much more

9  flexibility if we used the Debtor to provide credit support to

10 Trussway Industries.

11 Q   And can you explain a little bit further how the

12 guarantees work within the total exit financing package?

13 A   In essence, the Debtor's assets stand for all of the

14 financing.  Trussway's assets effectively stand for all of the

15 financing as well, but there's a significant sharing

16 arrangement and a significant standstill that Wells Fargo

17 wanted to assure that, as I said earlier, nothing that

18 happened at the Debtor would somehow impact negatively the

19 operations, liquidity, and functionality of Trussway, LLC.

20      So the structure is that we expect to have the two

21 separate loans.  We expect that, from liquidity at Trussway,

22 we'll generally service the $32 million, which would be

23 effectively sending it up to its immediate parent.  We will --

24 we will not have any money go from Trussway's operating

25 company up to the Debtor.  We don't need it and we don't

Seery - Direct                                    59

1   expect to do that.  If we did that, we would have to satisfy

2   certain other equity holders, the 10 percent that is not held

3   by Highland directly or indirectly.  And so we don't expect to

4   need to do that.

5       But it's -- the financing is $52 million, effectively

6   guaranteed all by the Debtor and the Debtor's assets.  And we

7   do have a -- it doesn't have an amortization schedule, but we

8   do have a fairly sophisticated and well-negotiated sharing

9   arrangement in respect of, when we sell an asset, how we'll

10  use the proceeds from that asset sale to provide additional

11  liquidity to the Debtor as well as to pay down the Blue Torch

12  loan.

13  Q   Does the Debtor have a view as to whether adding Trussway

14  to the package creates any meaningful risk for the Debtor?

15  A   Oh, yeah, absolutely, it does not.  Trussway -- as I

16  testified earlier, Trussway, LLC is indisputably solvent.  The

17  company is a very valuable asset.  We believe that indirectly

18  we have over a hundred million dollars of current equity value

19  in that asset, just at our entity.

20      Trussway Industries is likewise solvent, because its only

21  asset is Trussway, LLC and its only claim is the $32 million

22  that's owed to the CLOs that we're refinancing.

23      Likewise, Trussway Holdings is indisputably solid.  It

24  owns the equity, ultimate equities in Trussway, LLC as well as

25  the equity in Targa, which is -- which is worth, we believe,

Seery - Direct                              60

1   at least $30 million, as well as it has cash on its balance

2   sheet of $4 million today.

3   Q   Okay.  Let's move to the objection at this time.  Are you

4   familiar with Dugaboy's objections?

5   A   I am, yes.

6   Q   Do you have an understanding as to the bases for these

7   objections?

8   A   I think generally, although I don't think that they're

9   well-founded.

10       So, my understanding is that Dugaboy, in essence, says,

11  I'm owed $2 million at Trussway Holdings, and although it's

12  not due, although it's not in default, although the entities

13  are solvent, I'd prefer if you didn't borrow any money.

14       Likewise, they seem to have a claim that -- the Master

15  Fund claim is, frankly, frivolous.

16  Q   All right.  Let's just take them one at a time.  Has the

17  Debtor made any assessment as to whether the proposed

18  financing will adversely impact Dugaboy's $2 million note

19  against Trussway Holdings?

20  A   Yes, it has.

21  Q   And what assessment have you made?

22  A   It won't negatively impact at all.  To the extent that we

23  close the financing and to the extent that Dugaboy is owed

24  money, and it does have covenants, we will pay that loan off.

25  We have sufficient liquidity in the facility to pay it off.

Seery - Direct                           61

 1  We would pay it off and reserve our rights.  And I can go into

 2  some detail as to what that loan actually comes from.  But,

 3  strangely, when Trussway was converted from a corp. to an LLC,

 4  that --

 5          MR. DRAPER:  Your Honor?

 6          THE WITNESS:  -- to handle appraisal rights that Mr.

 7  --

 8          MR. DRAPER:  Your Honor, let me object.

 9          THE WITNESS:  -- gentleman had that Mr. Dondero

10  didn't want to satisfy.

11          THE COURT:  Okay.  There's an objection.  Go ahead,

12  Mr. Draper.

13          THE WITNESS:  I'm sorry.

14          MR. DRAPER:  Your Honor, there's a relevancy

15  objection.  Whether there are defenses or not to the loan and

16  what he's testifying to is irrelevant in connection with this

17  hearing.  That goes to the merits of the claim between the

18  parties.  If -- and there's no reason to raise that before

19  this Court today and in connection with this hearing.

20          THE COURT:  Your response, Mr. Morris?

21          MR. MORRIS:  Your Honor, I think Mr. Seery testified

22  as to why the Debtor has concluded that the financing won't

23  impact the Dugaboy note.  The defenses, I can leave for

24  another day, Your Honor.  So it's fine.

25          THE COURT:  All right.  Well, I think you're agreeing

Seery - Direct                         62

```
 1   to withdraw certain --
 2           MR. MORRIS:  Yes.
 3           THE COURT:  -- of your line of questioning.  Okay.
 4           MR. MORRIS:  I'll -- I'll --
 5           THE COURT:  So, based on that, I think the objection
 6   is resolved.
 7           MR. MORRIS:  Right.  And I'll agree to strike the
 8   portion of the testimony after Mr. Draper's objection.
 9           THE COURT:  All right.  Very well.  You may proceed.
10           MR. MORRIS:  All right.
11   BY MR. MORRIS:
12   Q   Let's just go to the second part of the Dugaboy objection
13   at least with respect to their claims.  Has the Debtor made an
14   assessment as to whether the proposed financing will adversely
15   impact Dugaboy's purported claim against Select?
16   A   It has, yes.
17   Q   Okay.  And can you describe generally for the Court the
18   nature of the assessment?
19   A   Yes.  Let me be really clear.  Number one, neither the
20   Debtor nor Blue Torch, knowing Blue Torch, is going to close
21   into a loan that will default.  I think it's very relevant to
22   the Court as to whether there was some obligation that has to
23   be satisfied at the close.  If it does, like every other loan,
24   we will provide a representation that we're in compliance with
25   all our agreements.  If the loan has to be paid off, it will
```

Seery - Direct                              63

1  be paid off, and we have the liquidity built into the loan and

2  into our projections to do it.  We have $4 million currently

3  sitting in Trussway Holdings.  If that loan has to be paid

4  off, it will be paid off.

5      Number two, with respect to the Master Fund, it does not

6  have to be paid off.  The Select Master Fund is the obligor

7  that Dugaboy loaned securities to, and they borrowed those

8  securities in order to meet margin calls in the Jefferies

9  account that was managed by Mr. Dondero.  Mr. Dondero signed

10 for Dugaboy as the trustee -- that's interesting -- as well as

11 --

12          MR. DRAPER:  Your Honor, same objection.

13          THE WITNESS:  So there's no --

14          THE COURT:  Overruled.  Hs can continue.

15          THE WITNESS:  There's no possibility that that loan

16 is against Select, not Select Master.  There's no way Mr. --

17 I'm sure everyone's quite aware of what the requirements are

18 for piercing or alter ego.  Those would be pretty impossible

19 to meet.  Nonetheless, there is no current claim against

20 Select that is going to be in the chain of ownership of the

21 assets, and currently is in the chain of ownership of the

22 assets, and no amount could possibly be due under that note.

23 BY MR. MORRIS:

24 Q   Let's just put a finer point on this.

25          MR. MORRIS:  Can we please put up Dugaboy Exhibit 9

Appx 05309
009303

Seery - Direct                                    64

 1  from Docket 2475?

 2  BY MR. MORRIS:

 3  Q    Have you seen this before, Mr. Seery?

 4  A    Yes, I have.

 5  Q    Do you have an understanding as to what this is?

 6  A    Yes.  This is a master securities loan agreement.  It's

 7  the BMA form.  That's the Bond Market Association.  It's a

 8  pretty standard form that you see for loaning securities.

 9      This agreement was entered into by the Master Fund and the

10  Dugaboy Investment Trust in order to shore up the Jefferies

11  margin account.  Again, that account came into play early in

12  the case.  The Court may recall that while Mr. Dondero was the

13  portfolio manager of that account, it lost $54 million in

14  equity in the first quarter of 2020, as well as, from an asset

15  perspective, the $30 million of margin that had to be repaid

16  to Jefferies.

17          MR. MORRIS:  Can we go to the signature lines, just

18  to see who signed this agreement?  (Pause.)  Stop right there.

19  BY MR. MORRIS:

20  Q   Is it your understanding that Mr. Dondero signed this

21  agreement, both in his capacity as trustee of the Dugaboy

22  Investment Trust and in his capacity as the president of

23  Strand Advisors, Inc.?

24  A    Yes, it is.  I'm quite familiar with his signature and

25  I've seen it on hundreds of documents, many similar to this.

Seery - Direct                          65

1  Q   And is it your understanding that this document is the

2  basis for what was originally asserted to be a $17 million

3  obligation from Select, and then I guess in Exhibit 10 was

4  reduced to 12, that Mr. Pomerantz referred to as perhaps eight

5  or less?

6  A   In our examination of claims in the case, this was one of

7  the documents, and this is the one that that claim is

8  purportedly based on.

9  Q   Okay.  Let's just see if we can help the judge understand

10 kind of where this fits into the loan.

11         MR. MORRIS:  If we could put up Debtor's Exhibit No.

12 1 from Docket 2477.

13 BY MR. MORRIS:

14 Q   Okay.  This was the document that Mr. Pomerantz used in

15 his opening.  Do you recall that?

16 A   Yes.

17 Q   Okay.  And can you describe for the judge who the

18 borrowers are under the proposed exit financing?

19 A   So, under the proposed exit financing, the borrowers are

20 Trussway Industries, LLC.  That's where the $31.7 million,

21 call it $32 million, approximately, sits right now.  Trussway

22 Holdings, which is the intermediate holding company right

23 below the Highland Select Equity Fund, which is the domestic

24 feeder that owns actual assets, as opposed to simply a

25 securities account.  And then HCMLP and the Trust.

Seery - Direct                                        66

1  Q   Okay.  And we were just looking at the loan agreement

2  between Dugaboy and the Master Fund.  Can you just describe

3  for the Court where on this structure the Select Master Fund

4  is located?

5  A   On the left-hand side of the page, two-thirds of the way

6  down, there's a golden box that says Highland Select Equity

7  Master Fund.  It has two obligations.  It has -- it currently

8  has an asset, which is some -- some remaining securities

9  (garbled) at Jefferies, and most of them are illiquid.  They

10  don't have real value.  There's two obligations.  A $3 million

11  note to HCMLP.  That note was put in -- cash was put in the

12  first quarter of 2020 to try to shore up the margin calls that

13  Jefferies was making on a daily basis.  And the Dugaboy

14  securities loan, which was done in 2014, and those, those

15  securities were put into that master account, and very

16  importantly, directly put into the Jefferies account owned by

17  the master.  They didn't go through some circuitous route.

18  It's very clear that the Master Fund which controlled and

19  operated that account borrowed those shares, and those shares

20  have been effectively seized by Dugaboy -- I mean, by

21  Jefferies -- and the claim sits at that entity.

22      It's important to note that through all times relative to

23  -- until that seizure by Jefferies, Mr. Dondero was the

24  portfolio manager of that account.

25  Q   Does the Master Fund have any interest in any of the

Seery - Direct                           67

1   Trussway entities?

2   A    No, none at all.  Zero.

3   Q    And is that why the Debtor has concluded that this exit

4   financing will have no impact on Dugaboy's purported claim

5   against the Master Fund?

6   A    Yes.

7   Q    Okay.  Let's just finish up here, Mr. Seery.  Do you

8   believe -- withdrawn.  Has the Debtor concluded that the

9   proposed financing is in the Debtor's best interests?

10  A    We have.  It's financing that is needed.  The terms are

11  negotiated at arm's length, in good faith.  Hard-fought.  We

12  expect the documents will be cooperative, but I'm sure there

13  will be negotiated closing documents between now and closing

14  that will be hard-fought as well.

15       We have sufficient liquidity at each of the entities when

16  we get this loan to be able to satisfy any obligations,

17  including the purported $2 million, $3 million Dugaboy

18  obligation.  Trussway, LLC is solvent.  Trussway Industries is

19  solvent.  Trussway Holdings is solvent.  And when HCMLP gets

20  this loan and we do the conversion of all the creditor claims

21  to partnership interests or trust interests, HCMLP and the

22  Trusts will also be solvent.

23            MR. MORRIS:  I have no further questions, Your Honor.

24            THE COURT:  All right.  Pass the witness.  Mr.

25  Draper, questions?

Seery - Cross                                    68

1            MR. DRAPER:  Your Honor, can you hear me?

2            THE COURT:  I can now.

3            MR. DRAPER:  Okay.  Great.

4                      CROSS-EXAMINATION

5    BY MR. DRAPER:

6    Q    Mr. Seery, I just have a few questions.  In connection

7    with HC -- in connection with the Debtor, do you have certain

8    assets that are easily liquefied or easily sold?

9            MR. MORRIS:  Objection to the form of the question.

10           THE WITNESS:  There are certain assets --

11           THE COURT:  Overruled.  You can answer.

12           THE WITNESS:  Yeah.  There are certain assets that

13   can be sold more easily than others.  We don't have, in the

14   Debtor, any truly liquid securities.

15   BY MR. DRAPER:

16   Q    Well, let me ask you.  In connection with the HarbourVest

17   settlement, you acquired certain interests in CLOs, correct?

18   A    Incorrect.

19   Q    Who acquired the interests?

20   A    The Debtor acquired interest in HCLOF, which is not a CLO.

21   Q    Okay.  Let's take HC -- let's take the interest that the

22   Debtor acquired.  Where is that interest presently housed?

23   A    In the -- I believe it's in a hundred-percent owned

24   subsidiary of the Debtor.  I don't recall the name.

25   Q    Which subsidiary is that?

Seery - Cross                                    69

1  A    It's a standalone SPV.  I don't -- I don't recall the

2  name.  It's not on that chart.

3  Q    Was it created after the interest was acquired?

4  A    No.  It was created before the interest was acquired, and

5  we acquired it directly into that subsidiary.

6  Q    All right.  Now, that interest -- that entity is holding

7  that as nominee for the Debtor, correct?

8  A    I don't think it's technically a nominee.  I think it's

9  technically holding it and we own a hundred percent of it and

10 own and control the entity.

11 Q    Well, didn't the HarbourVest settlement in fact say that

12 the Debtor could acquire it or its nominee will acquire it?

13 A    I think it said -- be put into a subsidiary or it could

14 acquire it directly.

15 Q    And does the Debtor own a hundred percent of that

16 subsidiary?

17 A    Yes.

18 Q    Could that -- in fact, could that interest be easily

19 liquefied to solve the Debtor's liquidity problems?

20 A    No.

21 Q    Why not?

22 A    Doesn't have a liquid market.

23 Q    Does the Debtor -- does the SPV still own that interest?

24 A    Yes.

25 Q    So it has not been transferred?

Seery - Cross                          70

1  A   No.

2  Q   All right.  Now, let's talk about the MGM stock.  Is the

3  MGM stock restricted in terms of the Debtor's trading?

4  A   Which MGM stock?

5  Q   The MGM stock that's subject to the Amazon transaction.

6  A   Owned by the Debtor or owned by somebody else?

7  Q   That's what I'm asking you.  Is it owned by the Debtor?

8  A   The Debtor does own some, yes.

9  Q   And, just ballpark, what's the value of that MGM stock

10 that the Debtor owns?

11 A   Approximately $25 million in today's current market

12 values.

13 Q   And couldn't that asset be used to obtain a loan, as

14 opposed to what's being done here?

15 A   That asset is already liened up by Frontier Bank.

16 Q   All right.  Now, does the Debtor have a wholly-owned

17 subsidiary that has MGM stock that could be used?

18 A   No.

19 Q   Okay.  So, really, the only assets that are available for

20 the Debtor to solve its liquidity problems are, in fact, the

21 assets that are being used in the Blue -- in the loan that's

22 being proposed to the Court?

23 A   That's not correct.

24 Q   What other assets could be used that would generate, serve

25 as security for a loan?

Seery - Cross                              71

1  A   We're going to use not just the assets we've talked about

2  today but all of the estate's assets.

3  Q   No, I understand that.  What -- I guess what I'm asking is

4  I understand what this loan is and I understand what assets

5  are being used; I'm just asking, is there something that's

6  easily marketable?

7      And I'll give you an example.  When -- on my home loan, my

8  home loan is secured by my -- part of my stock portfolio, so I

9  have a lower rate.  And I'm asking, is there other collateral

10 that you could have used in order to get a better rate and

11 have a less complex transaction?

12 A   Just to be clear, we're using virtually all of the assets

13 that the Debtor owns to support the financing.  Some of it

14 will serve as collateral.  Other assets that are either more

15 difficult to transfer and put a lien on or require additional

16 time will serve as support but they won't be collateral, and

17 there'll be covenants around those assets, such that even if

18 they're not collateral, if they're sold, they'll be a sharing

19 mechanism and a sweep provision that will pay down the Blue

20 Torch facility.

21 Q   Great.

22           MR. DRAPER:  I have nothing further for this witness,

23 Your Honor.

24           THE COURT:  All right.  Redirect?

25           MR. MORRIS:  No, thank you, Your Honor.

Seery - Examination by the Court                72

1          THE COURT:  Mr. Seery, I have just one follow-up

2    question.

3                   EXAMINATION BY THE COURT

4          THE COURT:  The pertinent terms were in the motion or

5    its attachments, but just to recap, the maturity is going to

6    be three years after closing; is that correct?

7          THE WITNESS:  That's correct, Your Honor.

8          THE COURT:  Okay.  And there is a prepayment premium

9    if prepaid, and remind me what that is.

10         THE WITNESS:  I believe -- if it's okay, can I grab a

11    copy of the term sheet, which I --

12         THE COURT:  Certainly.

13         THE WITNESS:  Basically, Your Honor, there's an up-

14    front fee of a point, and then there is call protection that

15    is basically another point.  And the way the facility works,

16    that if we pay it back very quickly, the lender is still

17    entitled to receive its minimum return.  And so if -- from a

18    return perspective for the lender, as it goes longer, it

19    actually is less, the rate is effectively lower.

20         THE COURT:  Okay.

21         THE WITNESS:  But overall, it's expensive.  So the

22    facility is designed so that when we get to where we believe

23    we'll be more flush because we have been able to monetize

24    assets, we'll be paying back the lender.  The lender will have

25    received the minimum return.  But it won't be -- the call

Seery - Examination by the Court          73

1   protection, I think, is pretty advantageous.

2        And just so Your Honor is aware, each of the lenders for

3   this type of facility required this.  So, while rates are very

4   low, both absolute rates and spreads, for either high-grade

5   companies or high-yield companies, a more customized bespoke-

6   type financing like this, where the company doesn't have, as I

7   mentioned earlier, a regular EBITDA that -- and cash flow that

8   the lender could look at, it tends to be more expensive.  And

9   each of the lenders we looked at specialized in this kind of

10  financing, and Blue Torch provided the best facility of the

11  group.

12             THE COURT:  Okay.  All right.  Thank you.

13        All right.  Well, we appreciate your testimony on this,

14  Mr. Seery.  You'll be excused from that virtual witness box.

15             THE WITNESS:  Thank you, Your Honor.

16        (The witness is excused.)

17             THE COURT:  Mr. Morris, anything else?

18             MR. MORRIS:  No, Your Honor.  The Debtor rests.

19             THE COURT:  All right.

20             MR. POMERANTZ:  Your Honor, a closing -- brief

21  closing argument, if that's -- pleases the Court.

22             THE COURT:  Okay.  Well, I want to double-check with

23  Mr. Draper.  Did you have a witness or any other evidence?

24             MR. DRAPER:  No, Your Honor.

25             THE COURT:  All right.  Then I'll hear your closing

74

1    arguments.

2            MR. POMERANTZ:  Your Honor, can you hear me better

3    now?  I've changed devices.  Hopefully, --

4            THE COURT:  Yes, I can hear you much better now.  Uh-

5    huh.

6            MR. POMERANTZ:  Great.  Thank you, Your Honor.

7              CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

8            MR. POMERANTZ:  Your Honor, Mr. Seery's testimony

9    provides the necessary evidentiary basis to demonstrate that

10   the Debtor's entry into the exit facility is a proper exercise

11   of the Debtor's business judgment and should be approved by

12   Your Honor under 363 of the Bankruptcy Code.

13       The terms of the bankruptcy -- the terms of the financing,

14   as Mr. Seery testified, were reached after a competitive

15   arm's-length process negotiated among multiple unrelated

16   parties.  The Debtor and Blue Torch engaged in good-faith

17   negotiations to reach the terms in the term sheet.  And each

18   of the parties are indisputably solvent.  And Mr. Seery

19   testified that none of them will close the loan into a default

20   under any binding agreement.

21       Mr. Seery's uncontroverted testimony demonstrated that the

22   Dondero entities' failure to honor their obligations under

23   several notes and litigious strategy have adversely affected

24   the Debtor's liquidity, and that those actions, coupled with

25   the (inaudible) delays on monetizing Trussway and MGM, have

Case 19-34054-sgj11 Doc 3445-18 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 198
Case 3:25-cv-02072-S Document 15-12 Filed 06/06/25 Page 397 of 1017 PageID 10161

75

1    impacted the Debtor's liquidity, thereby requiring the exit

2    facility.

3        The cash flow projections, which were Exhibit 5 and

4    admitted into evidence, demonstrate that the Debtor needs the

5    financing to maintain liquidity and comply with its

6    obligations under the plan.

7        Accordingly, Your Honor, there can be no serious argument

8    that the Debtor does not need the liquidity for -- that is

9    provided by the financing.

10       Mr. Seery also provided uncontroverted testimony regarding

11   the robust process the Debtor ran to seek the exit financing.

12   He testified that one of the goals of the financing process

13   was to obtain financing for Trussway in order to preserve and

14   enhance value at Trussway -- other than litigation claims, the

15   most valuable asset of the Debtor.

16       As I said, he testified that the process was arm's-length

17   and involved significant negotiations, and resulted in a term

18   sheet which is the best terms available to the Debtor.

19       He also testified as to the facts and circumstances which

20   led the Debtor and Trussway to agree to the comprehensive

21   financing facilities that resolved financing issues not only

22   at the Debtor but also at Trussway. And I mention this, Your

23   Honor, not because we ask Your Honor to approve the Trussway

24   financing, we do not, and I made that clear at the closing.

25       Accordingly, for all these reasons, Your Honor, we request

76

1    that the Court overrule the objection and approve the motion.

2           THE COURT:  All right.  Thank you.

3       Mr. Draper, closing argument?

4           CLOSING ARGUMENT ON BEHALF OF THE DUGABOY TRUST

5           MR. DRAPER:  Yes, Your Honor.  I have a few comments.

6    And quite frankly, in light of both the testimony today and

7    the fact that this is -- they're not asking the Court to

8    approve the Trussway financing piece of this, I've agreed to

9    an order with Mr. Pomerantz that I have no issue with it being

10   uploaded and the Court entering the order.

11          THE COURT:  All right.  So that concludes your

12   remarks?

13          MR. DRAPER:  Yes.

14          THE COURT:  All right.  I'll just ask the Creditors'

15   Committee.  You obviously did not file a pleading to weigh in,

16   but I always like to hear from you.  Mr. Clemente, anything

17   you want to say about this?

18       CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

19          MR. CLEMENTE:  Your Honor, for the record, Matt

20   Clemente on behalf of the Committee.

21       Your Honor, the financing need has been demonstrated.  And

22   it is a complex structure, but that's necessitated by the

23   complex nature of the Debtor and its holdings.  So the

24   Committee believes it's an appropriate financing facility, and

25   the Committee believes that Your Honor should enter the order.

77

1   So we support the financing facility, Your Honor.

2          THE COURT:  All right.  Well, based on the evidence

3   I've heard, the Court is going to approve the proposed exit

4   financing for up to a $52 million facility with Blue Torch

5   Capital.

6      First, I'll say, while reasonable minds might differ

7   whether 363 applies or 364, I think probably the better-

8   reasoned authority in this post-confirmation context would be

9   that 363 applies.  But under either legal standard, I find

10  this motion has met the legal standards.  The evidence

11  supported that the exit loan is necessary to address liquidity

12  needs of the company, of Highland, due to the reorganization

13  costs, litigation expenses being higher than anticipated, --

14     (Interruption.)

15         THE COURT:  Whoever has your phone not on mute,

16  please put it on mute.

17     Second, we have heard that there's a sound business

18  justification for holding onto certain assets of the Debtor

19  longer than earlier contemplated because of market conditions.

20  So there is a need for this.  The terms appear to be

21  reasonable.  And again, there was adequate and fulsome

22  marketing.  Many entities were contacted and executed NDAs and

23  went into the data room, spent time.  And so the Court finds

24  that the Debtor and Blue Torch have negotiated in good faith.

25         Finally, in all ways, the evidence supports this being an

78

1   exercise of reasonable business judgment and there being a

2   sound business justification. I will add that there has been

3   evidence supporting these various fees and expenses that would

4   go to the lender.

5       The Court reserves the right to supplemental and amend in

6   a more detailed written order, but with this, this financing

7   is approved. So I presume a written order will be submitted

8   promptly, Mr. Pomerantz or Mr. Morris.

9       All right. Well, it's 11:25. I suggest we take a five-

10  minute break, and then we'll come back and have the last

11  motion of CLO Holdco and the DAF, the motion to reconsider.

12  All right. So, again, 11:25. We'll come back in five

13  minutes.

14          THE CLERK: All rise.

15          MR. POMERANTZ: Thank you, Your Honor.

16      (Transcript excerpt concluded at 11:25 a.m. Proceedings

17  concluded at 3:35 p.m.)

18                          --oOo--

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    06/29/2021

24  _____      _____

25  Kathy Rehling, CETD-444                       Date
    Certified Electronic Court Transcriber

79

<div align="center">
INDEX<br>
*Excerpt*<br>
*9:36 to 11:25 a.m.*
</div>

PROCEEDINGS                                            3

WITNESSES

Debtor's Witnesses

John Dubel
- Proffer of Direct Testimony                        10

James P. Seery, Jr.
- Direct Examination by Mr. Morris                   39
- Cross-Examination by Mr. Draper                    68
- Examination by the Court                           72

EXHIBITS

Debtor's Exhibits 1 through 3            Received   18
Debtor's Exhibits 1 through 8            Received   34

Dugaboy Trust's Exhibits 1 through 10    Received   34

CLOSING ARGUMENTS

- By Mr. Pomerantz                                   74
- By Mr. Draper                                      76
- By Mr. Clemente                                    76

RULINGS

Debtor's Motion for Entry of an Order Authorizing    18
Payment of a Restructuring Fee to James P. Seery, Jr.,
the Debtor's Chief Executive Officer and Chief
Restructuring Officer (2395) - *Granted*

Debtor's Motion for Entry of an Order (I) Authorizing  77
the Debtor to (A) Enter into Exit Financing Agreement
in Aid of Confirmed Chapter 11 Plan and (B) Incur and Pay
Related Fees and Expenses, and (II) Granting Related
Relief (2229) - *Granted*

END OF PROCEEDINGS                                   78

INDEX                                                79

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT 19**

Appx 05375
009320

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 403 of 1017   PageID 10167
87

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 1 of 86

```
 1                 IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3   In Re:                       )    Case No. 19-34054-sgj-11
                                  )    Chapter 11
                                  )
 4   HIGHLAND CAPITAL             )    Dallas, Texas
     MANAGEMENT, L.P.,            )    March 1, 2022
 5                                )    1:30 p.m. Docket
                                  )
 6        Reorganized Debtor.     )
                                  )    - REORGANIZED DEBTOR'S MOTION
 7                                )      FOR ENTRY OF AN ORDER
                                  )      APPROVING SETTLEMENT WITH
                                  )      PATRICK DAUGHERTY [3088]
 8                                )    - REORGANIZED DEBTOR'S MOTION
                                  )      FOR ENTRY OF AN ORDER
 9                                )      FURTHER EXTENDING THE PERIOD
                                  )      WITHIN WHICH IT MAY REMOVE
10                                )      ACTIONS [3199]
     ─────────────────────────────)
11                                )
     ELLINGTON,                   )    Adversary Proceeding 22-3003-sgj
12                                )
          Plaintiff,              )
13                                )    STATUS CONFERENCE
     v.                           )    (NOTICE OF REMOVAL)
14                                )
     DAUGHERTY,                   )
15                                )
          Defendant.             )
16   ─────────────────────────────)

17                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18               UNITED STATES BANKRUPTCY JUDGE.

19   APPEARANCES:

20   For the Debtor:          John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
21                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
22                            (212) 561-7700

23   For Scott Ellington:     Debra A. Dandeneau
                              Laura R. Zimmerman
24                            BAKER & MCKENZIE, LLP
                              452 Fifth Avenue
25                            New York, NY  10018
                              (212) 626-4875
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 404 of 1017 PageID 10168
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 2 of 86

2

```
 1   APPEARANCES, cont'd.:

 2   For Patrick Daugherty:        Thomas A. Uebler
                                   MCCOLLOM D'EMILIO SMITH UEBLER,
 3                                    LLC
                                   2751 Centerville Road, Suite 401
 4                                 Wilmington, DE  19808
                                   (302) 468-5967
 5
     For Patrick Daugherty,        Drew York
 6   Adversary Proceeding          GRAY REED & MCGRAW, LLP
     Counsel:                      1601 Elm Street, Suite 4600
 7                                 Dallas, TX  75201
                                   (469) 320-6114
 8
     Recorded by:                  Michael F. Edmond, Sr.
 9                                 UNITED STATES BANKRUPTCY COURT
                                   1100 Commerce Street, 12th Floor
10                                 Dallas, TX  75242
                                   (214) 753-2062
11
     Transcribed by:               Kathy Rehling
12                                 311 Paradise Cove
                                   Shady Shores, TX  76208
13                                 (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

3

```
 1              DALLAS, TEXAS - MARCH 1, 2022 - 1:33 P.M.

 2              THE COURT:  All right.  We have settings in Highland.

 3   We have a motion to approve a settlement with Patrick

 4   Daugherty.  We also had a status conference in a recently-

 5   removed adversary or state court action, but I'm not sure

 6   we're going to accomplish much on that one since there's a

 7   motion for remand that's set later in the month.

 8      So let's start with the Highland Motion to Approve

 9   Compromise with Mr. Daugherty.  And I'll get appearances.  Who

10   do we have appearing for the Reorganized Debtor?

11              MR. MORRIS:  Good afternoon, Your Honor.  It's John

12   Morris from Pachulski Stang Ziehl & Jones for the Reorganized

13   Debtor.

14              THE COURT:  All right.  Thank you.  For Mr.

15   Daugherty, do we have a lawyer appearance?

16              MR. UEBLER:  Good afternoon, Your Honor.  This is Tom

17   Uebler on behalf of Patrick Daugherty.  And Mr. Daugherty is

18   also attending today.

19              THE COURT:  All right.  Thank you.  That's U-E-B-L-E-

20   R, correct?

21              MR. UEBLER:  Yes.

22              THE COURT:  Okay.  All right.  We have an objection

23   from Scott Ellington, and we're going to talk about the

24   standing, but who do we have appearing for Scott Ellington?

25              MS. DANDENEAU:  Good afternoon, Your Honor.  This is
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 406 of 1017 PageID 10170
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 4 of 86

4

1    Debra Dandeneau from Baker & McKenzie. I'm appearing here on

2    behalf of Scott Ellington.

3           THE COURT: Okay. Do we have any other lawyer

4    appearances before we get started?

5       (No response.)

6           THE COURT: All right. Well, I don't mean to steal

7    your thunder, Mr. Morris, on how we proceed here today. As

8    I've already alluded to, I have a standing concern right off

9    the bat. But how did you want to proceed, Mr. Morris, before

10   we address that?

11          MR. MORRIS: Before we address that, my intention was

12   to make an opening statement, move my exhibits into evidence,

13   put Mr. Seery on the stand in order to adduce evidence that we

14   believe establishes the grounds for granting the 9019 motion,

15   and then turning it over to Ms. Dandeneau.

16          THE COURT: All right. Well, obviously, I need to

17   hear evidence and have a prove-up, whether we have a pending

18   objection or not. So I'll let you go forward in that manner,

19   and then we'll talk to Ms. Dandeneau about the standing of her

20   client to pursue to the objection and see where we go from

21   there. All right?

22          MR. MORRIS: All right. And I will mention the

23   standing issue as part of my presentation. But we thought it

24   was important, you know, the Reorganized Debtor's position, as

25   stated in the papers, is that we don't believe that Mr.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 407 of 1017 PageID 10171
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 5 of 86

5

1   Ellington has standing, but even if the Court found that he

2   did, there is no basis to sustain the objection. So we're

3   kind of prepared to proceed on that basis.

4       As Your Honor knows, the issue of standing has come up so

5   many times in this case. The Court has observed countless

6   times the tenuous nature of various individuals and entities

7   who were pursuing various relief in this Court. And

8   notwithstanding the tenuous nature, which, you know,

9   respectfully, we didn't think it existed in certain

10  circumstances, we've always gone to the merits. And so I'd

11  like to tackle both issues today in case there is an appeal,

12  in case, you know, we just want to -- we just want to button

13  down the hatches and try to get done with Mr. Daugherty and

14  notch another hole in our belt, so to speak.

15      So if I may, Your Honor, I'd like to proceed.

16          THE COURT: You may.

17          OPENING STATEMENT ON BEHALF OF THE DEBTOR

18          MR. MORRIS: Okay. So, as Your Honor pointed out,

19  we're here on a 9019 motion. The Debtor seeks the Court's

20  authority to consummate a proposed settlement that it has

21  negotiated with Mr. Daugherty. As the Court has also

22  observed, there's only one limited objection on file, the one

23  by Mr. Ellington.

24      As Your Honor may recall, just about a year ago, maybe a

25  little bit more than a year ago, actually, at confirmation, we

Appx 05382
009325

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 408 of 1017    PageID 10172
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 6 of 86

6

```
 1   had announced a settlement in principle with Mr. Daugherty.

 2   And it's taken some time to get to this point, and I'll

 3   describe some of the reasons for that, and Mr. Seery will

 4   certainly testify as to those issues.

 5       But before I get into kind of the substance, I would like

 6   to just move into evidence the documents that are listed on

 7   the Reorganized Debtor's witness and exhibit list that can be

 8   found at Docket No. 3270.  It's really a very modest set of

 9   exhibits, in contrast to some of the other hearings that we've

10   had.  It is the 3018 order that Your Honor may recall entering

11   about a year and a half ago.  It is the settlement agreement

12   itself, which is attached to my declaration so that it would

13   be admissible for evidentiary purposes.  And it's the three

14   proofs of claim that Mr. Daugherty filed initially:  Claim 67,

15   which was amended by 77, which was amended by 205.

16       So we'd move for the admission of those documents into

17   evidence.

18           THE COURT:  All right.  I presume no one has an

19   objection to that.  Okay.

20           MS. DANDENEAU:  That's correct, Your Honor.  We don't

21   -- we don't object.

22           THE COURT:  Okay.

23       (Debtor's exhibits identified in Docket 3270 are received

24   into evidence.)

25           MR. MORRIS:  Okay.  So, with that, we do intend to
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 409 of 1017    PageID 10173
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 7 of 86

7

1  call Mr. Seery.  Mr. Seery is going to testify, you know, to

2  his understanding of the nature of Mr. Daugherty's claims.

3  He'll testify to the -- to some of the litigation.  We're not

4  going to go on at length here, but we do want to make a

5  record.

6     He'll testify as to the litigation that took place in this

7  Court, because it really was very important in establishing

8  some of the strengths and weaknesses of the case.  It was

9  important because we actually received Your Honor's opinion,

10  at least with respect to voting purposes.  And we all

11  acknowledge that that was for that limited purpose at that

12  time.

13     He'll describe the negotiations, the participation of the

14  Independent Board, the reasons why it took a little bit longer

15  to get here than we had hoped a year ago.

16     And so he will -- he will give you the evidence that I

17  hope the Court finds is sufficient to approve this settlement.

18     He'll also address the two issues raised by Mr. Ellington,

19  the observer access issue as well as the transfer of HERA and

20  ERA under the proposed settlement.

21     I just want to make sure the record is clear as to what

22  claim is being compromised here and the status of the other

23  claims.  Mr. Daugherty -- and this is all laid out in the

24  settlement agreement, so I don't think that I'm saying

25  anything controversial here.  But as set forth in the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 410 of 1017   PageID 10174
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 8 of 86

8

1    settlement agreement, back in April of 2020 Mr. Daugherty

2    filed his original proof of claim.  That was denoted as Claim

3    No. 67.  A couple of weeks later, or maybe a week later, his

4    claim was -- he amended his claim and superseded his claim.

5    So Claim 67 is no longer an operable claim, and that was

6    superseded by Claim No. 77.  And then in the fall he made a

7    motion for leave to further amend his claim.  After a hearing,

8    that motion was granted and Mr. Daugherty filed another

9    superseding claim.  This one was denoted as Claim No. 205, in

10   the approximate amount of $40 million.

11       So Claim 205 is the operative claim here.  The other two

12   claims will be expunged as part of the order because they've

13   been superseded.  And that's, that's what we're here to

14   compromise today.

15       Mr. Seery is going to testify that he and the independent

16   directors, really early on in the case, familiarized

17   themselves with Mr. Daugherty.  You know, they communicated

18   with him and introduced themselves to him.  The evidence will

19   show that there's -- there's just a really voluminous record

20   that preceded the Highland bankruptcy filing.  Mr. Seery is

21   going to testify that, you know, he's somewhat familiar with

22   that record, that his lawyers became very familiar with that

23   record, and on the basis of that review he and the independent

24   directors really began to understand kind of the nature of Mr.

25   Daugherty's claims.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 411 of 1017 PageID 10175
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 9 of 86

9

1      The attachments to the proof of claim, Your Honor, as you

2   may recall from the 3018 hearing, are enormous.  And they're

3   enormous for good reason.  For probably seven or eight years

4   before I ever heard of Highland Capital, Mr. Daugherty and Mr.

5   Dondero and Highland and Mr. Ellington were engaged in very

6   lengthy, acrimonious litigation.  The litigation started in

7   Texas state court.  You know, this is a story that's been told

8   many times.  It started in state court.  There were claims.

9   There were counterclaims.  I think at the end of it Highland

10  had a $2.8 million verdict against Mr. Daugherty and Mr.

11  Daugherty had a $2.6 million verdict against Highland.  And I

12  think in a rational world, Your Honor, Mr. Daugherty would

13  have paid Highland $200,000, everybody would have said we've

14  taken our best shot, and people would have gone on with their

15  lives.

16      Regrettably, as so much happened, you know, with Highland

17  prepetition, that was not the case.  And it wasn't even close,

18  right?  During that whole litigation, you had -- you had

19  criminal contempt.  You had appeals.  And then Mr. Daugherty,

20  you know, made good on his judgment and he actually paid his

21  judgment to Highland, but Highland didn't return the favor.

22  Didn't comply, frankly, with their legal obligation.

23      And so Mr. Daugherty took the litigation from Texas up to

24  Delaware.  He sued Highland.  He sued HERA.  He sued Mr.

25  Dondero.  And he was seeking not only to collect on his

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 412 of 1017 PageID 10176
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 10 of 86

10

 1  judgment but he was also seeking to collect on assets that had

 2  been held on his behalf within HERA, which was, you know, a

 3  form of deferred compensation program that was established

 4  following the financial crisis in order to retain employees.

 5      And during the course of that litigation -- again, this is

 6  all documented in the proof of claim -- Mr. Seery can testify

 7  not on the basis of personal knowledge but on the basis of his

 8  review, the advice that he's received, and the litigation that

 9  we've had before Your Honor -- I think the record is pretty

10  clear that Mr. Daugherty then learned that Highland had not

11  only stripped HERA of its assets but had, you know, engaged in

12  other wrongful conduct, including taking the money that was in

13  an escrow account that the Texas state court, I understand,

14  was specifically told was earmarked for the benefit of Mr.

15  Daugherty.  They took that, too.

16      And so, you know, Mr. Daugherty continued to pursue his

17  litigation.  Before the petition date, the Delaware Chancery

18  Court found that there was a likelihood of a fraud.  They

19  found an exception to the attorney-client privilege under the

20  crime-fraud exception.  And, again, all of this happened

21  before Jim Seery, the independent directors, my firm, anybody

22  came on the scene.  This was the nature -- this was the life

23  that these folks were living.

24      And then, you know, we got hired.  We took Highland into

25  bankruptcy as the trial was about to begin.  The automatic

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 413 of 1017    PageID 10177

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 11 of 86

11

1    stay went into effect.  And we moved, you know, obviously, in

2    a very different direction a few months later after the

3    Independent Board was appointed and put in place.

4        So, with that, you know, Mr. Daugherty had a very

5    substantial claim, and -- and we worked very hard, and Mr.

6    Seery is going to testify that he worked very hard to

7    understand the claim and to try to get down to the strengths

8    and weaknesses of the claim itself.  And we engaged in

9    substantial motion practice, as Your Honor may recall,

10   particularly in the fall of 2020, before we had a plan

11   confirmed.

12       We had -- Mr. Daugherty had the comfort motion, where he

13   sought the Court's approval to continue to pursue his claims

14   against nondebtor individuals and entities, and that motion

15   was granted.  We had another contested hearing where he moved

16   to amend his claim again.  The Court granted Mr. Daugherty's

17   motion at that time, and that's what resulted in the

18   preparation and filing of what became Claim No. 205 that we're

19   here to compromise today.

20       Mr. Daugherty then sought permission to lift the stay so

21   that he could go -- Highland -- go after Highland in Delaware,

22   and that's where Your Honor drew the line and said no, the

23   claims against the Debtor will be determined here.

24       And then, of course, we had the very lengthy contested

25   evidentiary hearing on Mr. Daugherty's 3018 motion.  And,

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 414 of 1017    PageID 10178
87

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 12 of 86

12

1    again, that motion was brought simply to allow his claim for

2    voting purposes.  That's where the two-thousand-some-odd-page

3    appendix was, you know, first presented to the Court.  And at

4    the conclusion of that, Your Honor granted the 3018 motion and

5    allowed his claim in the approximate amount of $9.1 million.

6    I believe that's Exhibit 1 on our witness and exhibit list.

7         And so with that background, having litigated not the

8    merits but pretty much -- pretty much everything but the

9    merits, and I daresay as close to the merits as you can get,

10   and with the Debtors at that point actively pursuing a viable

11   plan, because by the time Claim No. 205 was filed the Court

12   has approved the disclosure statement and we were trying to

13   get to confirmation, negotiations with Mr. Daugherty began in

14   earnest.

15        You'll hear Mr. Seery testify that, you know, he had a lot

16   on his plate.  The Independent Board had a lot on its plate.

17   But one of the things on their plate was Mr. Daugherty and

18   trying to get a resolution of his claim.  And there was a lot

19   of back and forth, you know, between the lawyers, between the

20   principals, and we were able to announce at the commencement

21   of the hearing -- I think Mr. Ellington quoted from it in the

22   very first paragraph of his limited objection -- the

23   presentation of the terms of the agreement as they existed at

24   that time.

25        Mr. Seery will testify that, you know, it took another

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 415 of 1017 PageID 10179

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 13 of 86

13

```
 1   nine months or so to actually document the agreement.  He'll
 2   testify that, you know, Pat Daugherty's settlement wasn't the
 3   only thing that the Independent Board and that he were
 4   involved with, that they were working very hard to get to an
 5   effective date.
 6       He'll testify that Mr. Daugherty is not an easy
 7   negotiator.  And I mean this respectfully to Mr. Daugherty.
 8   But he personally engaged in negotiations directly with Mr.
 9   Seery.  We did it through lawyers.  We went through countless
10   drafts.  And Mr. Daugherty was a dogged negotiator.  He asked
11   for -- you know, the interesting thing here is we're having
12   this hearing today, Your Honor, and Mr. Ellington did not seek
13   any discovery at all.  Had he done so, he would have found out
14   that there were, you know, probably a dozen or more draft
15   settlement agreements that went back and forth.  And if you --
16   Mr. Seery will testify to some of the things that Mr.
17   Daugherty asked for that we said no to.
18       And, again, you know, Mr. Daugherty has the right to ask
19   for whatever he wants, and Mr. Seery and the Independent
20   Board, now the Oversight Board, certainly in consultation with
21   the Oversight Board, have the authority to decide what's in
22   the best interest of their estate.
23       And so it was -- it was a -- it was a difficult
24   negotiation.  And at the end of the day, we did get to yes,
25   and I think the Court will find that the settlement is very
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 416 of 1017 PageID 10180
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 14 of 86

14

1   modestly different from what was presented to the Court back

2   in February of 2021.

3        And, you know, let's just talk about the two issues.  Mr.

4   Seery -- Mr. Ellington, rather, seems to suggest in his papers

5   that somehow, you know, Mr. Seery just caved and gave him

6   these observer rights in HERA and ERA in order to enable Mr.

7   Daugherty to have more weapons to go after Mr. Ellington.

8   Ms. Dandeneau is free to ask Mr. Seery any questions she wants

9   today, subject to the attorney-client privilege, but I don't

10  think there will be a scintilla of evidence that will show

11  that Mr. Seery thought about any of these issues that Mr.

12  Ellington is apparently taking quite personally.  What Mr.

13  Seery will testify to is that he was singularly focused on

14  getting to yes, on getting a deal done with Mr. Daugherty.

15       And with respect to the observer rights, I want to just

16  focus on that for a second because I think it's -- I think Mr.

17  Ellington mistakenly characterizes what that is, because it's

18  not a right at all.  Mr. Daugherty has no rights whatsoever

19  vis-à-vis the Oversight Board.  It is a very simple and

20  uncontro... it should be a relatively uncontroversial

21  provision.  It's Paragraph 3 of the settlement agreement, and

22  it simply says that Highland will use reasonable efforts --

23  not best efforts, as Mr. Ellington's pleading says --

24  reasonable efforts to see if the Oversight Board will give him

25  access to the meetings.

 1    Mr. Daugherty has absolutely no right to be in the

 2  meeting.  The Oversight Board has the "sole discretion" to let

 3  him into the meeting.  And so they can restrict him

 4  arbitrarily.  They can restrict him for no reason.  They have

 5  the sole discretion on whether to let him in.

 6    And, importantly, Mr. Daugherty, if he's permitted to

 7  participate or listen in or observe these meetings, he will be

 8  required to abide by the Oversight Board's policies,

 9  procedures, and agreements, including agreements concerning

10  confidentiality.

11    Mr. Daugherty has no decision-making authority.  He's not

12  a member of the Oversight Board.  He has no ability to bind

13  the Oversight Board.  He would merely be given access to

14  observe Oversight Board meetings, at the discretion of the

15  Oversight Board.  And it's no more, no less.  He has no rights

16  whatsoever, no ability to control the Oversight Board, no

17  right.

18    And I was actually thinking about this earlier.  And, you

19  know, Mr. Ellington's pleadings suggest that he's very

20  concerned that, you know, he may share information or that

21  kind of thing.  You know, this is America.  There's a First

22  Amendment.  Mr. Daugherty has the right to speak with whoever

23  he wants to speak with who's willing to speak with him.  And

24  so there is nothing right now preventing Mr. Daugherty from

25  picking up the phone and calling one of the Oversight Board

Appx 05392

009335

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of 87
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 418 of 1017 PageID 10182
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 16 of 86

16

```
 1   members and say, I want to share something with you.
 2   Absolutely nothing in the trust agreement that prevents that,
 3   nor should it.  The Oversight Board should have the ability to
 4   hear views from anybody who they want to hear from.  They just
 5   should.
 6        The Oversight Board members are still going be bound by
 7   their fiduciary obligations.  They are going to be bound by
 8   their -- all of the duties that they have.  But we shouldn't
 9   sit here today and speculate that something untoward might
10   happen in the future.  It's not fair to the Oversight Board
11   members.  There is absolutely no evidence in the record to do
12   it.  And there's really no basis to suggest that this is
13   somehow a plan modification.  That's it.
14        The other piece is HERA and ERA.  You know what?  Before I
15   leave that, I did want to point out where Your Honor started,
16   and that is Mr. Ellington has no claims.  He's withdrawn every
17   single claim.  Therefore, he's not a beneficiary of the trust.
18   Therefore, the Oversight Board owes him no duty whatsoever.
19   And so he really has no standing to challenge that portion of
20   it.  I don't think he has standing, frankly, to challenge the
21   HERA/ERA portion, but that part of it is just crystal clear,
22   because he has no interest in the trust itself.
23        And so I don't understand how his interest can be -- he
24   may have a personal interest.  But that's not -- that's not
25   standing.  That's not a legally cognizable interest that would
```

 1    allow him to object to the access that might be given to him,

 2    subject to the Oversight Board's discretion.

 3        HERA and ERA, Your Honor, is very simple.  Mr. Seery will

 4    testify that, you know, Mr. Daugherty's claim itself seeks

 5    over $26 million of damages related to the dissipation of the

 6    assets from HERA, as well as Highland's acquisition of the

 7    interests of the other limited partners, his theory of the

 8    case.  And, frankly, we -- we disagree with this very hard,

 9    and that's why the numbers don't bear any relation to what the

10    claim is.  But his theory is that Highland wrongfully bought

11    out all of the limited partners.  He became the last limited

12    partner.  And since Highland is not entitled to the assets

13    that Highland took, they should be given to him.

14        Again, not a theory that we put a lot of weight on, but it

15    is a theory.  And at the end of the day, Mr. Seery is going to

16    -- and this will be the most important part of his testimony,

17    I think -- he's going to testify that the issue of HERA and

18    ERA was of great concern to the Debtor, and it was of great

19    concern because we have seen Mr. Daugherty litigate with Mr.

20    Ellington, with Mr. Leventon, with Mr. Dondero, with Highland,

21    for the better part of a decade, and we wanted to make one

22    hundred percent certain that we were done with Mr. Daugherty

23    in terms of litigation and claims.

24        And so Mr. Seery is going to testify that we tried two or

25    three different ways to address the HERA/ERA issue, and this

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 19 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 420 of 1017   PageID 10184

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 18 of 86

18

1    is what we ultimately came up with.  Let's just give it to him

2    and get that release.  Really, one of the most important

3    aspects of the -- of the settlement agreement is attached as

4    an exhibit.  It's the HERA release itself, Your Honor.  And

5    that's what gives the Debtor finality with Mr. Daugherty.

6    That is among the most important pieces of the settlement

7    agreement.  It's attached as an exhibit.  It's all signed up

8    and ready to go.

9        But that's, that's really -- you know, when Mr. Ellington

10   says in his pleading that there's no basis for doing this

11   other than to help Mr. Daugherty, respectfully, Mr. Ellington

12   has it wrong.  And if he had taken any discovery, he would

13   have found that out and maybe we could have saved today's

14   hearing.  Because the Debtor had a vital interest in resolving

15   the HERA and ERA issues because it was part and parcel of

16   getting to yes -- it was part and parcel of both getting to

17   yes as well as making sure that Mr. Daugherty had his allowed

18   claim in the manner in which we've agreed but is otherwise

19   done with the Debtor.

20       So, with that, Your Honor, I think the evidence ultimately

21   is going to establish, you know, very, very easily that this

22   settlement is fair, reasonable, and in the best interests of

23   the Debtor and its stakeholders.

24       I have nothing further unless Your Honor has any

25   questions.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 20 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 421 of 1017   PageID 10185
87

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 19 of 86

19

1      THE COURT:  All right.  First, let's be clear for the

2   record that I have admitted the Debtor's exhibits at Docket

3   Entry 3270 that were earlier mentioned.

4      And next, I guess I'll hear any opening statement from a

5   friendly party.  Mr. Daugherty's counsel, did you want to say

6   anything as far as an opening statement?

7          MR. UEBLER:  Thank you, Your Honor.

8       OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

9          MR. UEBLER: I just want to say that Mr. Daugherty

10  joins in Highland's request that the settlement be approved,

11  but otherwise we'll rely on Mr. Morris's presentation today.

12         THE COURT:  All right.  Thank you.  Ms. Dandeneau,

13  we've obviously been speculating about the standing of your

14  client.  What did you want to say as far as an opening

15  statement and addressing that?

16      OPENING STATEMENT ON BEHALF OF SCOTT ELLINGTON

17         MS. DANDENEAU:  Your Honor, I would reserve any

18  comments on the settlement until after Mr. Seery's

19  examination.

20      But with respect to standing, we acknowledge that Mr.

21  Ellington is no longer a creditor of Highland's estate.  I

22  understand the typical standing requirements to appear in

23  bankruptcy court.

24      I would note that Mr. Ellington was very careful in terms

25  of his objection to the settlement agreement.  I thought it

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 422 of 1017 PageID 10186
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 20 of 86

20

1    was interesting that I've been criticized now for not taking

2    discovery.  That's probably a first in this case.

3        But he does not -- he made it very clear.  He does not

4    object to the economic terms of the Debtor's proposed

5    settlement.  And if you look at -- if you look at the nature

6    of our objection, it was more that there are -- there are

7    issues that we thought were important and should be considered

8    by the Debtor in the exercise of its business judgment that we

9    don't think it was raised.

10       And the reason why Mr. Ellington brought that to the

11   Court's attention and to the Debtor's attention, Mr. Ellington

12   -- what's unusual about this settlement is that, after the

13   terms of the settlement were announced to this Court at the

14   confirmation hearing, now over a year ago, the settlement was

15   amended to give Mr. Daugherty observer status to the Oversight

16   Board, but it also was amended to include the HERA provision.

17   And I understand Mr. Morris's -- I hear Mr. Morris's arguments

18   about that.

19       But the effect of the observer status provision with

20   respect to -- on the Oversight Board is if the Oversight Board

21   -- and, again, we don't challenge the fact that the Oversight

22   Board, according to the settlement agreement, has the

23   discretion on whether or not to allow Mr. Daugherty access --

24   but we believe the result of this is to give Mr. Daugherty

25   access to confidential information about Mr. Ellington.

21

 1        And also, by the way, Mr. Daugherty himself has stated

 2    that one of the purposes of the transfer of the HERA shares is

 3    to enable Mr. Daugherty to have access to nonpublic

 4    information about Mr. Ellington.

 5        These are noneconomic provisions, so I would argue, Your

 6    Honor, whether Mr. Ellington is a beneficiary of the Claimant

 7    Trust or not should not be relevant to the standing issues

 8    with respect to these issues.

 9        And Your Honor knows that Mr. Ellington has filed a

10    complaint.  He filed a complaint in state court against Mr.

11    Daugherty, alleging that Mr. Daugherty has engaged in stalking

12    activities with respect to Mr. Ellington, Mr. Ellington's

13    family, including his elderly father, his sister, and her

14    minor children.  And we're not here to argue the merits of

15    those, but we do think that those allegations and what the

16    Debtor would have done with respect to those allegations and

17    what the Debtor will do in light of those allegations is

18    important to consider.

19        And Mr. Daugherty, by the way, chose to remove that action

20    to this Court, but that's the subject of a separate adversary

21    proceeding.  It's subject to a remand and abstention motion.

22        But I do think, Your Honor, in light of everything that

23    has occurred, or even allegedly has occurred, we feel that it

24    is incumbent upon this Court and the Debtor to take notice of

25    these allegations and to really not put these -- not put

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 424 of 1017 PageID 10188
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 22 of 86

22

1   themselves in a position where they could generate additional

2   claims by providing Mr. Daugherty access to information that

3   could enable the activities of Mr. Daugherty.

4        So, on that basis, I understand, Your Honor, this is an

5   unusual argument, but we would respectfully request that we be

6   able to at least make our record at the hearing and be heard

7   on these issues.

8            THE COURT:  All right.  Well, with that, as I said

9   earlier, while I find the standing to be extremely I guess I

10  should say doubtful, the Debtor has to prove up the bona fides

11  of the settlement in any event.  Put on evidence for me to

12  assess whether it's fair and equitable, in the best interest

13  of the estate, and analyze it under all of the Fifth Circuit

14  standards.

15       So I'll allow you to examine Mr. Seery on behalf of Mr.

16  Ellington to ask him anything you think is pertinent to the

17  settlement.  I would hope we don't spend too much time in

18  court on this, because, again, I'm really doubtful about

19  whether a higher court would find standing in this situation

20  where he's not a creditor, he has no pending proofs of claim,

21  and, you know, is he a party aggrieved by this proposed

22  settlement?  Again, I think it's doubtful.  But I will give

23  Mr. Ellington the benefit of the doubt and let counsel ask

24  questions that you think are pertinent to the issues here.

25       All right.  Mr. Morris, do you call Mr. Seery at this

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 425 of 1017    PageID 10189
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 23 of 86

Seery - Direct                            23

1    time?

2              MR. MORRIS:  I do, Your Honor.

3              THE COURT:  All right.  Mr. Seery, if you could say

4    "Testing, one, two; testing, one, two" so we can --

5              MR. SEERY:  Testing, one, two.  Good afternoon, Your

6    Honor.

7              THE COURT:  Good afternoon.  Please raise your right

8    hand.

9        (The witness is sworn.)

10             THE COURT:  All right.  Thank you.  Mr. Morris, go

11   ahead.

12             MR. MORRIS:  Thank you, Your Honor.  I'm going to try

13   to make this much briefer than I had originally intended.

14   JAMES P. "JIM" SEERY, JR., REORGANIZED DEBTOR'S WITNESS, SWORN

15                    DIRECT EXAMINATION

16   BY MR. MORRIS:

17   Q    Mr. Seery, can you hear me okay?

18   A    Yes, I can.

19   Q    Okay.  Can you just -- are you generally familiar with the

20   nature of Mr. Daugherty's claim against Highland?

21   A    Yes, I am.

22   Q    Can you just describe for the Court your understanding of,

23   you know, in general terms, the nature of the --

24   A    Basically, Mr. Daugherty has a claim that has one or more

25   of the components, but distilled down to the essence, there's

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 25 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 426 of 1017   PageID 10190
87

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 24 of 86

Seery - Direct                    24

 1   five major components that come out of about 12 years' worth

 2   of litigation with the Debtor.

 3       The first is the enforcement of the HERA judgment that he

 4   received in Texas state court.  This was -- I think we call it

 5   Texas Litigation 1.  Highland got a judgment, as Mr. Morris

 6   said in his opening, against Mr. Daugherty for about $2.8

 7   million.  Mr. Daugherty got a judgment against Highland for

 8   about $2.6 million.  Rather than offset, the parties appealed,

 9   and it went on from there.

10       An important component of that piece is Mr. Daugherty's

11   argument that, throughout the case in Texas, Highland and the

12   other defendants maintained that there was an escrow that was

13   going to benefit Mr. Daugherty in the event that he got his

14   judgment.

15       And that relates to the second component of his claims,

16   which is the transfer of the HERA assets.  HERA was the

17   Highland Employee Retention vehicle, it was put in place after

18   the financial crisis, and it was purportedly designed to

19   retain employees.  Mr. Daugherty maintains that the removal of

20   the assets from HERA and the transfer of those assets to

21   Highland and perhaps other places was a detriment to him

22   because not only did he not get his roughly 20 percent

23   interest in HERA, he also had a claim that the structure of

24   HERA was a last-man-standing structure, meaning that it was a

25   pool of assets designed to hold a team of employees together.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 427 of 1017    PageID 10191
87

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 25 of 86

Seery - Direct                            25

1    If you left, the pool stayed the same.  In his reading, other

2    -- other employees -- the remaining employees picked up the

3    assets that you left behind.

4        We have defenses to each of these, but that's his

5    position.

6        The third component of his -- and that was a big piece.

7    That's over $25 million.  The first piece is, with interest,

8    around four.  The next piece is the indemnity.  Mr. Daugherty

9    maintains that he was a -- as a partner, he was entitled to

10   certain indemnification for acts that he did and costs that he

11   incurred in advancing the interests of Highland, and that's

12   around a $5 million piece.

13       In addition, he's got a claim from the 2008 compensation

14   -- this is from the 2007-2008 tax audit -- for about $2.7

15   million.  He received -- Mr. Daugherty received a net loss

16   from Highland that year which gave him an economic benefit by

17   reducing his taxes.  That tax year is still under audit at

18   Highland.  Amazingly.  But maybe not for Highland.  And we

19   thought it would be resolved by now.  That's -- that's, he

20   claims, around $2.7 [million].  I think our thought, that even

21   if it was -- there are a lot of defenses to it, but it would

22   be a much lower number.  That battle is still going on.  We

23   are not addressing that piece in this settlement.

24       And the final piece of his claim, distilled down, is fees,

25   fee-shifting, fees on fees, related to mainly the Delaware

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 428 of 1017    PageID 10192
87

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 26 of 86

Seery - Direct                    26

1  action.  And I think the best support for that, for our

2  defense, is that the best support for that is when you go

3  through that materials that Mr. Daugherty received in the --

4  from production related to the Delaware judge exercising the

5  crime-fraud exception to the attorney-client privilege, it's a

6  pretty torrid tale of stripping of HERA -- HERA's assets,

7  stripping of the so-called escrow.  It actually looks like,

8  frankly, the escrow was never really an escrow and it was a --

9  it was a fraud from the beginning.  And that one's a pretty

10 disturbing one.  We think it's -- our defenses are it's very

11 hard to shift fees in the American system, but it's -- it's

12 not a bare claim.

13     And so that's the essence of his claim, distilled down.

14 Q   And -- thank you, Mr. Seery.  And just to move this along,

15 do you recall, in the fall of 2020, we had the contested 3018

16 hearing?

17 A   Yes.

18 Q   And were all of these issues analyzed, debated, and

19 presented to the Court, to the best of your recollection?

20 A   They were.  I would say that the fee-shifting one got

21 shorter shrift.  We probably had less information at the time

22 than we do now.  Mr. Daugherty clearly had the information.

23 But because it was an estimation hearing, it was a little more

24 truncated, and I think that at that time he was -- the fee

25 shifting was, at least from the Court's perspective, and I

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 28 of
87
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 429 of 1017   PageID 10193

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 27 of 86

Seery - Direct                          27

 1   think following the traditional American rule, looked on a

 2   little bit -- with a bit of a jaundiced eye in terms of its

 3   validity.  And he was going -- he was clear that he could in

 4   the future prove that up, but we didn't -- he didn't really

 5   explore that issue too often.  Or too much.

 6   Q    Can you describe for the Court what you and the

 7   Independent Board did between the end of the 3018 hearing and

 8   confirmation to negotiate the agreement in principle that was

 9   announced to the Court in early February 2021?

10   A    Sure.  As a quick prelude to that, let me just say that

11   the board, the Independent Board, along with counsel and

12   financial advisors, spent a tremendous amount of time on Mr.

13   Daugherty's claims as they evolved.

14        In addition, because the record is so voluminous, we spent

15   a tremendous amount of time deciphering the record and trying

16   to divine exactly where the risks were and where our better

17   defenses were.

18        So, coming into the 3018, we felt pretty -- pretty good

19   about where we -- where we were clearly exposed and where we

20   had good defenses.

21        Where we were clearly exposed, and we actually

22   acknowledged at the 3018, is on the HERA, the initial HERA

23   piece, which was his $2.6 million judgment plus interest.

24   There -- there really were no defenses to that.  It had been

25   affirmed on appeal.  Highland simply didn't pay the judgment.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 430 of 1017    PageID 10194
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 28 of 86

Seery - Direct                        28

1       After the 3018, we brought a new focus to trying to

2   resolve with Mr. Daugherty what the remaining components would

3   be.

4       We'd hoped to get a holistic settlement, including with

5   respect to the 2007-2008 tax piece, which is the loss

6   carryforward that he was able to use and the value of that.

7   We were not able to reach that conclusion, and I can go

8   through that a little bit more later.  But we did go through

9   each of the other components and negotiate with Mr. Daugherty

10  as we moved towards confirmation.

11  Q    And what took so long to get from February of 2021 until

12  the end of the year when you finally got signatures on the

13  page?  What was happening during that intervening period?

14  A    Well, I would say, first and foremost, while Mr.

15  Daugherty's claim was exceptionally important, he's a large

16  claim, UBS's claim was bigger, and we were in intense

17  negotiations with UBS.

18      As you'll recall, right around that time we discovered the

19  Sentinel fraud, and that was extremely problematic because it

20  upset the UBS negotiation.  That led to us focusing on the --

21  what we could divine on what happened with respect to the

22  transfers out of the Defendants of UBS and Highland's role in

23  that and the negotiations, which led to a renegotiation around

24  the terms of the UBS settlement.  That wasn't completed until

25  I believe it was March of '21.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 431 of 1017    PageID 10195
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 29 of 86

Seery - Direct                              29

1       We then turned to focus on the remaining claims, including

2   with -- obviously, other issues in terms of asset monetization

3   and trying to move towards effective date financing, indemnity

4   trust.  But we did turn to Mr. Daugherty and try to document

5   the settlement we had.

6       Mr. Daugherty took the perspective that, well, wait a

7   second, now that I see what happened with UBS and I see those

8   transfers, I think my claims regarding asset stripping are

9   even better.  Where he thought his only good third-party

10  support for asset tripping and the intentions of a personal

11  vendetta and sweeping it for personal gain was really around

12  Acis, he now -- he could now rely on both the Acis transfers

13  and the transfers that we had exposed with respect to SOHC and

14  CDO Fund, which were the two UBS defendants.  And from Mr.

15  Daugherty's perspective, that changed the nature of his claims

16  and his risk profile.  So, but I wouldn't say the negotiations

17  began in earnest again, but there was a renegotiation around

18  terms.

19  Q    Okay.  And during the negotiations, did the parties

20  exchange numerous drafts of the agreement?

21  A    It has to be at least a dozen.  And it was -- really, the

22  focus around those, after we got into negotiation, argument, I

23  don't think it's fair to call it a dispute, but certainly

24  healthy argument our respective positions, we still settled on

25  a Class 8 claim and a Class 9 claim.  I was very firm on where

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 432 of 1017 PageID 10196

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 30 of 86

Seery - Direct                    30

 1    I thought the maximum exposure was on the Class 8/9 -- Class 8

 2    claim, and then we settled on -- negotiated around the Class 9

 3    number and not wanting to move, because our cash was tight,

 4    any other kind of distribution to Mr. Daugherty.  And we had

 5    healthy arm's-length negotiations with respect to each of

 6    those components.

 7        We then focused on the other terms.  Mr. Daugherty's

 8    always been clear from the start that he was not releasing

 9    anybody who wasn't a current employee at the time we settle.

10    He didn't want to do that.  That was -- that was my

11    insistence, and I had a team that I wanted to make sure we

12    were protecting, because we also have some obligations to them

13    as current employees.  But he was -- he was certainly keeping

14    his litigations against Mr. Dondero, Mr. Ellington, some third

15    parties, as well as HERA and ERA.

16        And what he was looking for in the negotiations around the

17    terms were -- was as much flexibility around HERA and ERA,

18    because he had a judgment against HERA and ERA.  And he wanted

19    to make sure that he could -- I believe it's the only creditor

20    from our records of HERA and ERA -- that he could control that

21    entity, and he was going to try to do that through an

22    involuntary, if that's what it took.  And he wanted to be able

23    to use that in his continuing litigation against the other

24    parties that he thinks defrauded him with respect to the so-

25    called escrow.

Appx 05407
009350

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:25-cv-02072-S     Document 15-12     Filed 10/06/25     Page 433 of 1017     PageID 10197
87

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 31 of 86

Seery - Direct                    31

1      And then the other component was I think he really was

2   pushing hard on the structure of the settlement so that it

3   might provide some value to him from an evidentiary

4   perspective, even around things like the whereas clauses.

5      So we took the perspective that I can only put in the

6   whereas clause what I have personal knowledge or that I have

7   been able to decipher from our own records, and that anything

8   else would be an assertion of his.  And Mr. Daugherty took the

9   perspective that if I had -- if he has court records in

10  Delaware, why can't I simply affirm those?  And that was a

11  rather healthy negotiation around those types of items.

12  Q   Before entering into the agreement, did you consider the

13  potential costs, and I think you've described some of the

14  risks, but if you could just perhaps concisely let the Court

15  know if you considered the costs and risks of litigation as

16  the alternative to the settlement before deciding that this

17  was the right thing to do.

18  A   Absolutely.  In all of our settlements, you know, we weigh

19  the risk of winning versus the cost of settling.  We also

20  factor in the cost of litigation.

21     To describe the various litigations that have gone on here

22  as acrimonious and personal and bitter is to grossly

23  understate how vituperative and how dug-in the parties are.

24  These are exceptionally deep-cutting litigations and personal

25  issues between the respective parties.  And our objective was,

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 434 of 1017 PageID 10198
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 32 of 86

Seery - Direct                          32

1  frankly, to extricate ourselves from that at what we think is

2  a reasonable price.  If the risk-reward wasn't balancing

3  correctly, we would have litigated on the components.

4      But litigating here would have been extremely difficult.

5  And the reason I say that is because we're talking, as I

6  mentioned, about a ten-plus year litigation record.  We're

7  talking about three separate litigations that are currently

8  either outstanding or have various components that have to be

9  dealt with.  Multiple parties in each of them.  A very

10 voluminous record.  And from our perspective, our witnesses we

11 don't think would have been -- one is they're hostile to us,

12 but two, we don't think that they would have been the best

13 witnesses from a credibility perspective.  So we would have

14 been weak on witnesses, relying on docs, a giant record.  It

15 would have been exceptionally expensive.

16 Q   All right.  Let's just finish up with the issues that Mr.

17 Ellington has raised.  Are you generally familiar with the two

18 issues that Mr. Ellington is objecting to?

19 A   I am, yes.

20 Q   Can you describe for Judge Jernigan how the issue of

21 oversight access came to be and what your understanding is of

22 the Reorganized Debtor's obligation under Section 3 of the

23 proposed settlement agreement?

24 A   Sure.  Mr. Daugherty has the perspective of a senior

25 partner at Highland.  And many of the assets that we own,

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 435 of 1017 PageID 10199
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 33 of 86

Seery - Direct                                    33

 1  oddly, are still there from when he was there.

 2      Now, to be fair and to be sure, they are very different

 3  assets ten-plus years later. But it's not unusual for

 4  settlements, particularly creditors of entities that are

 5  stressed, to want to give their input into how they think an

 6  asset should be monetized, what's the best way to bring that

 7  value, because that's going to inure to their benefit as a

 8  settling creditor.

 9      Mr. Daugherty had the perspective that he could bring a

10  significant amount of expertise to that endeavor. Frankly,

11  since, as I said, he's been out for a long time, he does have

12  significant business acumen, and he put many of these

13  investments on, including MGM and Trussway, at Highland. They

14  were his. But the world has changed, but that's not an

15  unusual ask.

16      So I couldn't promise to him that I could put him on the

17  Oversight Board because I'm not on the Oversight Board. I

18  couldn't promise him that I could even give him observer

19  status, because, again, I'm not on the Oversight Board. I

20  have the -- I'm overseen by the Oversight Board in many

21  respects, and I do -- I am entitled to attend the Oversight

22  Board meetings. But he asked for observer status, and I said

23  I would ask for it, but it would be entirely up to the

24  Oversight Board to make a determination if it should be

25  granted, how it should be granted, whether it can be

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 436 of 1017 PageID 10200

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 34 of 86

Seery - Direct                                    34

 1   rescinded, how -- what the terms would be.

 2       Like any board that I've been around in these types of

 3   situations, there are often observers.  They are either

 4   contractual or granted other -- for other reasons.  And their

 5   status is limited.  If -- oftentimes, if it's anything to do

 6   with that particular creditor or anything that might be

 7   extremely sensitive, they'll usually -- the boards go into

 8   executive session without observers.

 9   Q    Does --

10   A    So I agreed -- I agreed to ask for it.

11   Q    Okay.  Before getting to that agreement, did Mr. Daugherty

12   initially demand an actual seat on the Oversight Board?

13   A    I don't recall.  It would not surprise me at all, but I

14   just don't recall.

15   Q    And I appreciate the candor.  Under the settlement

16   agreement, does Mr. Daugherty have any right to participate in

17   any Oversight Board meeting?

18   A    No.  Again, it's -- I was very specific that I'm not the

19   Oversight Board.  I can't grant observer status.  I can simply

20   ask for it in good faith and the board will make its own

21   determination.

22   Q    Okay.  Does Mr. Daugherty have -- withdrawn.  Let's move

23   to the HERA and ERA.  Can you explain to the Court how, you

24   know, the issue of the treatment of HERA and ERA evolved and

25   how you wound up at the point of actually agreeing to transfer

Seery - Direct                              35

1   those entities to Mr. Daugherty?

2   A    Yes.  So, recall that Mr. Daugherty has a judgment against

3   ERA.  And ERA is the management arm of HERA, but it has no

4   other business or assets.  And I think it has a very small few

5   hundred dollars, maybe a few thousand dollar checking account.

6   I don't recall what it is, but minimal assets.  So, really no

7   value to the estate.

8        One of the components, critical components to Mr.

9   Daugherty from the start was that he was not going to release

10  his claims against HERA and ERA, only the claims against

11  Highland, because if that Delaware -- I think we call it

12  Delaware 1 Litigation, but it might be Delaware 2 -- was still

13  outstanding, and he wanted to continue to pursue that

14  litigation with Highland severed off.

15       My concern was that if he was continuing to sue HERA and

16  ERA and he had a -- he has a judgment against HERA and ERA or

17  he has a joint and several judgment, HERA and ERA could find

18  itself in an insolvent situation, and then either Mr.

19  Daugherty or a trustee acting for Mr. Daugherty might come

20  after Highland or the estate.  I think it would be attenuated

21  and hard to do, but there was a risk of that.

22       So we initially started negotiations around a structure

23  where he would -- he could maintain his claims against HERA

24  and ERA, but if he received anything from Highland on account

25  of anything that happened to HERA and ERA, he had to turn it

Appx_05112

009355

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 438 of 1017 PageID 10202

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 36 of 86

Seery - Direct                              36

1   back over to us, so that he can use it to continue his

2   litigations with nonsettling parties but he couldn't back-door

3   that into something against the Reorganized Debtor or the

4   Highland estate.

5       The problem with that was that we were set up to

6   effectively maintain HERA and ERA as the owners of the GP and

7   the -- it effectively is a GP, but I believe it's an LLC

8   structure -- and the other membership interests.

9       He then wanted us to turn it over to him, because I think

10  he thought that was a more effective way to accomplish what he

11  wanted to anyway without having to go through the step of a

12  bankruptcy.  It was certainly more efficient for us.  But what

13  that led to was then negotiation around making it clear that,

14  once again, none of the -- since we're a settling party, we're

15  bringing those claims, none of the actions out of HERA and ERA

16  come against the former owner of HERA and ERA, either directly

17  or indirectly.

18      And so we structured it with a rather detailed and

19  extremely broad release of HCMLP and any of the Highland --

20  Highland Limited -- Capital Management Limited Partner related

21  parties.  And that's the structure of the deal that you see

22  now.

23      When the deal was originally announced in court, we had

24  not yet started to document.  We were just on the financial

25  terms.  But it was clear that these -- he wanted to maintain

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 439 of 1017    PageID 10203
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 37 of 86

Seery - Direct                              37

1    his litigations, and we were -- we were focused on the key

2    financial terms, the Class 8, the Class 9, the cash component,

3    which was really covering the expenses, some of the expenses

4    he's had, as well as the releases related to anybody who's

5    going to be a continuing employee at the Reorganized Debtor.

6          When we got into the documentation, it went to this

7    structure where he'd maintain his claims, but if he received

8    anything on account of a Highland loss, any Highland party

9    related loss, he would have to turn it over.  And then it

10   evolved to the structure where we are now, which is we'll give

11   him HERA and ERA.  They have no value to Highland.  And we

12   want to make sure that we are extricated completely from any

13   of the litigations or costs.

14   Q    And last question on this topic.  I guess last two

15   questions.  You're familiar with the HERA release that is

16   attached to the settlement agreement?

17   A    Yes.

18   Q    Okay.  Last question.  Is that an integral component of

19   the settlement agreement from the Reorganized Debtor's

20   perspective?

21   A    Essential to the transaction.  The basic terms of the deal

22   were initially approved by the Independent Board.  And that

23   included the initial deal that was announced in court as well

24   as the evolving financial terms.  But before the document was

25   done, the Independent Board -- we had the effective date, the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 440 of 1017 PageID 10204
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 38 of 86

Seery - Direct                    38

1    Independent Board is gone, and it's been approved by the

2    Oversight Board.  I believe it's a component of the trust

3    agreement that this type of settlement has to be approved by

4    the Oversight Board, that I can't do it on my own, but we're

5    running it so that I use the Oversight Board -- or rely on the

6    Oversight Board; I shouldn't say use -- as a true board of

7    directors.  This is a critical component, both to me as the

8    CEO of HCMLP, to me as the Claimant Trustee, and to the

9    Oversight Board sitting above me and observing and monitoring

10   my activities.

11            MR. MORRIS:  All right.  I have no further questions,

12   Your Honor.

13            THE COURT:  All right.  Friendly parties first.  Mr.

14   Uebler, do you have a question or questions of Mr. Seery?

15            MR. UEBLER:  I do not, Your Honor.  Thank you.

16            THE COURT:  All right.  Ms. Dandeneau, do you have

17   cross?

18            MS. DANDENEAU:  Yes, I do, Your Honor.  And thank you

19   again for your indulgence.  I will attempt to streamline my

20   examination of Mr. Seery as much as possible.

21       If I may, Your Honor, could the Court allow Laura

22   Zimmerman to share her screen for purposes of this

23   examination?

24            THE COURT:  All right.  That's fine.

25            MS. DANDENEAU:  Okay.  And so I would just ask Ms.

Seery - Cross                          39

1    Zimmerman to put on the screen what is Exhibit 1 to the

2    Debtor's Exhibit 2, which is the settlement agreement attached

3    to Mr. Morris's declaration that's been admitted into

4    evidence.  It's at Docket 3270-2.  And let's just go to Page 5

5    of the -- 5 of the PDF, which is Paragraph 3 of the settlement

6    agreement.  And if we can maybe just make it larger for some

7    of us to see.

8                        CROSS-EXAMINATION

9    BY MS. DANDENEAU:

10   Q   All right.  Mr. Seery, I just wanted to -- this is, when

11   we talk about the observer rights, this Paragraph 3, I'm not

12   going to read it out loud, but this is the document, the

13   paragraph that has the heading Observation Access, is what

14   you've been referring to with respect to the provisions

15   relating to the observer status on the Oversight Board.  Is

16   that correct?

17   A   That's correct.  Just one clarification, again.  And I

18   hope it may just be nomenclature, but to the extent that

19   there's weight to it, it's observation access.  There are no

20   rights.  The rights vest with the Oversight Board and how

21   they'll grant access or not.

22   Q   Okay.  Thank you for that clarification.  And just for

23   simplicity, can we refer to this provision when we're talking

24   as the observer provision, --

25   A   Yes.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 41 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 442 of 1017   PageID 10206

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 40 of 86

Seery - Cross                          40

 1  Q   -- or would you -- okay.  Thank you.

 2          MS. DANDENEAU:  And so, Ms. Zimmerman, if we could

 3  please turn to Page 10 of the settlement agreement, which I

 4  believe is Page 14 of the PDF, and just look at the Paragraph

 5  8.

 6  BY MS. DANDENEAU:

 7  Q   And again, I'm not going to -- I will spare everyone a

 8  dramatic reading of the provision, but is this what we would

 9  refer to as the HERA provision?

10  A   That's correct.

11  Q   Not really intending to leave ERA out, but just it's hard

12  enough to pronounce HERA.  So let's talk a little bit about

13  the changes made to the settlement agreement.

14          MS. DANDENEAU:  If we could please, Ms. Zimmerman,

15  pull up Docket -- Exhibit -- what we have marked as Exhibit

16  SE-5, which is found at Docket 3088.

17      I would note that Highland did incorporate in its witness

18  and exhibit list all pleadings in the case.  This is just

19  Highland's motion to approve the settlement agreement.  And we

20  are marking this as Exhibit SE-5.  No need, I believe, to move

21  it into evidence.  This is just as a demonstrative.

22      If we could please turn to Page 9 of the motion, which I

23  believe is Page 12 of the PDF.  And if we could just blow up

24  those bullets on Paragraph -- under Paragraph 40.  And maybe

25  move it down, just to make sure we've captured all of the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 42 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 443 of 1017   PageID 10207
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 41 of 86

Seery - Cross                         41

 1  bullets.

 2  BY MS. DANDENEAU:

 3  Q    These bullets -- in these bullets, Highland recites the

 4  material terms of the settlement.  Correct, Mr. Seery?

 5  A    I believe so, yes.

 6  Q    And the fifth bullet, okay, refers to what we call the

 7  HERA provision.  Correct?

 8  A    Yes.

 9  Q    Now, there's -- there's -- if we scroll down a little bit,

10  there is a Footnote 5.

11          MS. DANDENEAU:  And maybe we can blow that up a

12  little bit.

13  BY MS. DANDENEAU:

14  Q    And the Footnote 5, but I'll read it, says, "With two

15  exceptions, the settlement terms are materially the same as

16  those announced on the record on February 2, 2021 in

17  connection with the confirmation hearing on the Debtor's plan.

18  The two exceptions are that (a) the Class 9 claim was

19  increased by a million dollars; and (b) the Reorganized Debtor

20  agreed to transfer its interests in HERA and ERA to Mr.

21  Daugherty."

22      Did I read that correctly, Mr. Seery?

23  A    I believe so, yes.

24  Q    Okay.  And the granting of the observer provision, let's

25  say, is not within these two exceptions mentioned in this

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 444 of 1017    PageID 10208

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 42 of 86

Seery - Cross                          42

1   footnote, correct?

2   A    That's correct.

3   Q    Okay.  And in fact, nowhere in the motion itself is there

4   a reference to the observer provision, correct?

5   A    I don't know, but I'll accept that.

6   Q    Okay.  When -- I don't think you testified to this.  When

7   did Highland agree to the observer provision?

8   A    Now, remember, we agreed to ask the board to give Mr.

9   Daugherty observer access.  So the -- if it's okay, I don't

10  recall the exact date; I can elaborate on the evolution of the

11  provision.

12  Q    Well, why don't we just agree, was it prior to the

13  confirmation hearing or after the confirmation hearing?

14  A    It would have been after.

15  Q    Okay.  And so just for what it's worth, if it's after the

16  confirmation hearing, the Footnote 5 is somewhat inaccurate,

17  correct, without -- because it does not reference the observer

18  provision?

19          MR. MORRIS:  Objection to the form of the question.

20          THE WITNESS:  I would disagree with you, --

21          THE COURT:  Sustained.

22          THE WITNESS:  -- Ms. Dandeneau, because I don't think

23  it's material.

24  BY MS. DANDENEAU:

25  Q    Okay.  Thank you.  Did you review the settlement motion

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 445 of 1017 PageID 10209

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 43 of 86

Seery - Cross                                    43

1  before it was filed?

2  A    Yes.

3  Q    Okay.  And did you review any prior drafts of the

4  settlement motion?

5  A    I don't recall.  Typically, and I apologize for

6  elaborating, but typically counsel sends me a very well-

7  developed draft.  Typically, I have comments.  And so I go --

8  I review virtually every pleading that's filed, probably every

9  pleading, and I comment on virtually every pleading.

10 Q    I have no doubt, Mr. Seery, that you get a well-developed

11 draft, and I sympathize with Mr. Morris.  Did anyone request

12 -- did any of the prior drafts contain an express reference to

13 the observer provision?  To your recollection?

14 A    Not that I recall.

15 Q    And to be clear, and I believe you testified to this, Mr.

16 Daugherty is the one who requested that the observer provision

17 be included in the settlement agreement, correct?

18 A    Yes.

19 Q    And also so the record is clear, the HERA provision, and I

20 believe this is what's stated in Footnote 5, is -- was agreed

21 to post-confirmation as well.  Is that correct?

22 A    I think, the way the provision works now, in that I

23 couldn't -- that is correct.  The evolution I described

24 earlier, I don't recall, other than he wasn't going to

25 maintain his claims against HERA and ERA, if that started

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 45 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 446 of 1017    PageID 10210
87

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 44 of 86

Seery - Cross                        44

 1  before or after confirmation.  Certainly, before confirmation,

 2  there was not a written agreement.  There was only agreement

 3  in principle.

 4  Q    All right.  Thank you.  And at the time of the

 5  confirmation hearing, in accordance with the terms announced

 6  on the record, Mr. Daugherty already was going to get under

 7  his settlement a substantial claim against the estate pursuant

 8  to that settlement.  Correct?

 9  A    That's correct.

10  Q    Mr. Seery, I'd like to turn to the Claimant Trust

11  Agreement.  And this is a document that we have marked as

12  Exhibit SE-2.  It's at Docket 3265-2.  I would represent to

13  you and to the Court we were unable to locate a publicly-

14  available copy of the executed form of the Claimant Trust

15  Agreement, but this is the copy that was included in the plan

16  supplement.  I understand that there was an amendment that

17  changed, like, two provisions that are not material to what

18  we're going to discuss.

19       But I would ask, Mr. Seery, do you recognize this

20  agreement?  Or this form of agreement?

21  A    I do recognize the form, yes.

22  Q    Okay.  And you are the Claimant Trustee as that term is

23  used in this agreement, correct?

24  A    (no audible response)

25  Q    Okay.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 447 of 1017 PageID 10211
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 45 of 86

Seery - Cross                                    45

1            MS. DANDENEAU:  Your Honor, I would move for

2    admission of the document that's been marked as SE-2 into

3    evidence.

4            THE COURT:  All right.  Any objection?

5            MR. MORRIS:  No objection.

6            THE COURT:  Okay.  So, --

7            MR. MORRIS:  No, Your Honor.

8            THE COURT:  -- it's admitted, but let's be clear

9    where it's found on the docket.

10           MS. DANDENEAU:  Your Honor, it is at 3265-2.

11           THE COURT:  Okay.  So that is admitted.  Thank you.

12           MS. DANDENEAU:  Thank you, Your Honor.

13       (Scott Ellington's Exhibit SE-2 is received into

14    evidence.)

15   BY MS. DANDENEAU:

16   Q    Mr. Seery, the Claimant Trust Agreement is the

17   organizational document for the Claimant Trust, correct?

18   A    Yes.

19   Q    And you would agree with me that one of the purposes of an

20   organizational document of an entity is to govern the

21   management and operations of that entity, correct?

22   A    Yes.

23   Q    All right.

24           MS. DANDENEAU:  So let's turn, Ms. Zimmerman, please,

25   to Section 4.1.  And, again, I'm going to try to spare

Appx 05422
009365

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 448 of 1017    PageID 10212
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 46 of 86

Seery - Cross                            46

1   everybody from dramatic readings of these sections.

2   BY MS. DANDENEAU:

3   Q    So, Section -- so just so we -- before we start, Article 4

4   is the provision that sets forth the rights and

5   responsibilities of the members of the Oversight Board,

6   correct?

7   A    Essentially correct, yes.

8   Q    Okay.  And so Section 4.1 describes the initial members of

9   the Oversight Board, and I'm just going to ask you, and I'll

10  ask you this for every provision:  Is there anything in this

11  section that expressly allows the appointment of a third party

12  as an observer to the Oversight Board?

13  A    I don't believe so, no.

14  Q    And I believe you've talked about observation access as

15  opposed to observer.  And so we're clear, when I say observe

16  -- well, I can ask you, is there anything in here that allows

17  the Oversight Board to grant -- expressly allows the Oversight

18  Board to grant observation access?  So let's go with your

19  terminology with that question.

20  A    I think we can -- we can use them interchangeably.  No.

21  So, --

22  Q    Okay.

23  A    -- observation access, observer status, the concepts are

24  similar and quite common in most corporations.

25  Q    Thank you, Mr. Seery.  That will greatly ease the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 48 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 449 of 1017   PageID 10213
86
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 47 of 86

Seery - Cross                    47

 1  questioning.
 2       All right.  Well, then let's go to Section 4.2.  I will
 3  ask you the same question.  Is there anything in this Section
 4  4.2 that expressly permits the Claimant Trustee to share
 5  information with a person not associated with a member of the
 6  Oversight Board?
 7  A    I don't believe there was a -- it's not -- it's not a
 8  section dealing with sharing of information, but it does
 9  reference myself, who's not a member of the Oversight Board,
10  obviously, and the Litigation Trustee, who's not a member of
11  the Oversight Board.  We do receive quite a bit of information
12  from the Oversight Board and share information with the
13  Oversight Board.  But I don't think this provision actually
14  deals with that.
15  Q    And I believe what you're referring to is Paragraph 4.C,
16  correct, where you as the Claimant Trustee are required to
17  provide the Oversight Board with information sufficient to
18  enable the Oversight Board to meet its obligations under the
19  Claimant Trust Agreement, correct?
20  A    That's, that's part of it.  There's also -- the way that
21  the structure of the board works is -- and it was highly
22  negotiated in terms of how each of the entities or persons
23  would function -- I'm entitled to be at Oversight Board
24  meetings, but the Oversight Board can exclude me if it's in
25  their reasonable determination to do so.  I'm entitled to

Appx 05424
009367

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 49 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 450 of 1017   PageID 10214

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 48 of 86

Seery - Cross                           48

1   bring advisors, I believe is the term, and I forgot where it

2   is in the -- exactly in the section, but I certainly can bring

3   my advisors.

4   Q    Okay.  Thank you, --

5   A    The Oversight Board, once again, provided they're acting

6   reasonably, can reasonably exclude me or my advisors.

7   Q    Thank you, Mr. Seery.  And now let's go to -- I was just

8   -- Section 4.4 and 4.6, which deal with meetings of the

9   Oversight Board.  We'll start with 4.4.  Is there anything in

10  Section 4.4 that expressly permits an observer or any other

11  third party that is not acting as a representative of the

12  Claimant Trust, the Litigation Sub-Trust, or the Oversight

13  Board to participate in meetings of the Oversight Board?

14  A    Not that I recall.

15  Q    And same question, if we can move to Section 4.6.  Is

16  there anything in Section 4.6 that expressly permits an

17  observer or any other third party that is not acting as a

18  representative of the Claimant Trust, the Litigation Sub-

19  Trust, or the Oversight Board to participate in any meetings

20  of the Oversight Board?

21  A    I don't believe so.

22  Q    Okay.

23  A    Uh, --

24  Q    And to -- I'm sorry.  I did not mean to --

25  A    I apologize, because I didn't read the top section.  Some

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 50 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 451 of 1017   PageID 10215
Case 22-03003-sgj Doc 20 Filed 03/09/22  Entered 03/09/22 16:37:21  Page 49 of 86

Seery - Cross                              49

1   of the former creditors have some specific reference in there,

2   but I think that's really dealing with excluding Redeemer or

3   Acis and/or UBS, depending on what the particular issue being

4   discussed would be and how a quorum would work.  I think that

5   -- I don't think there's a specific provision that allows you

6   to bring somebody else in, and that doesn't surprise me at

7   all.  I don't know that I've ever seen one.

8   Q   Okay.  Thank you.  And just so that we're clear, at the

9   time the Claimant Trust Agreement was drafted, those specific

10  creditors who are referenced, those were contemplated to be

11  members of the Oversight Board; is that correct?

12  A   I believe that is correct, yes.

13  Q   Okay.  And by the way, when I say participate, can we

14  agree that participate includes observing?

15  A   For -- for -- if we need to distinguish, we can.

16  Q   For --

17  A   Yeah.  I mean, typically, participating one would think

18  would be someone who's active, has a vote, has a discussion.

19  Observers, in my experience, whether they be creditors,

20  whether they be regulators, whether they be large

21  shareholders, only get to watch, unless asked something.

22  Q   So, so let's talk about attend, I guess.  There's nothing

23  -- because I didn't mean to (overspoken) --

24  A   Yeah, no, I'm not trying to (overspoken) the distinction.

25  Q   Okay.

Seery - Cross                         50

1   A    There's nothing in the agreement that would say some third

2   party can come in or that the board can invite some third

3   party in, just like there's nothing in the agreement that says

4   you -- the board could serve lunch at the meetings.

5   Q    All right.  Thank you, Mr. Seery.  Let's skip to Section

6   4.9.  And, again, this section purports to allow the removal

7   of a member of the Oversight Board for cause or disability.

8   Is that -- is there anything in that section that expressly

9   permits the Oversight Board to remove someone to whom it has

10  granted some form of observer status?

11  A    No.

12  Q    Now, Section 4.10, which sets forth in detail how a

13  successor member of the Oversight Board will be appointed

14  following the removal, death, or resignation of a member, does

15  this Section 4.10 expressly contain anything that would permit

16  the Oversight Board to grant observer status to any third

17  party?

18  A    No, not that I recall.

19  Q    Okay.  And Section 4.12 requires each member of the

20  Oversight Board to hold strictly confidential and not use for

21  personal gain any confidential trust information.  Is that

22  correct?

23  A    That's correct.

24  Q    Okay.  Is there anything in this Section 4.12 that sets

25  forth the same requirements for an observer or another -- a

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 453 of 1017    PageID 10217
87

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 51 of 86

Seery - Cross                              51

1   third party attending an Oversight Board meeting?

2   A    I'm sorry, Ms. Dandeneau.  I got lost in reading the

3   section.  But I apologize; I missed the question.

4   Q    Oh, I'll repeat it.  And it was a long question.  Sorry

5   for that.  Is there anything in this Section 4.12 that sets

6   forth the same confidentiality requirements for an observer or

7   any other third party who is attending a meeting of the

8   Oversight Board?

9   A    I don't recall.  I would expect that if an Oversight Board

10  member brought a colleague, whether that be a junior colleague

11  or an outside professional because they had outside counsel or

12  expert, that that colleague or affiliate, if you will, small

13  A, will be bound by the confidentiality that binds the member.

14  But there's -- it doesn't deal with observer status.  I don't

15  think that's something in the document at all.

16  Q    Okay.  Thank you.  So, so in your view, I'd like to

17  understand how the sharing of confidential information with a

18  third party by the Oversight Board would work.  Does the

19  Oversight Board need to make a decision to share confidential

20  information with a third party, collectively, the Oversight

21  Board?

22            MR. MORRIS:  Objection, Your Honor.  This is a

23  hypothetical and it's being asked of a person who's not even a

24  member of the Oversight Board.

25            THE COURT:  Sustained.

Case 19-34054-sgj11  Doc 3445-19  Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 454 of 1017    PageID 10218
Case 22-03003-sgj  Doc 20  Filed 03/09/22    Entered 03/09/22 16:37:21    Page 52 of 86

Seery - Cross                              52

 1  BY MS. DANDENEAU:

 2  Q    Is there anything in the Claimant Trust Agreement that

 3  actually contemplates the sharing of confidential information

 4  with a third party?

 5  A    Not that I recall, except the sharing with professionals,

 6  which is clearly contemplated, and perhaps my employees.  When

 7  I mean mine, I mean the Reorganized Debtor.  It's not

 8  expressed that I recall, but employees of the Reorganized

 9  Debtor can and do attend Oversight Board meetings and they are

10  bound by confidentiality, as am I, on confidential issues.

11  There may be things that aren't particularly confidential that

12  are discussed at times.

13  Q    And Mr. Seery, I believe you testified that the Oversight

14  Board in your view would impose reasonable protections if they

15  were going to allow a third party to attend an Oversight Board

16  meeting or observe an Oversight Board meeting.  Is that

17  correct?

18  A    I apologize.  I don't recall actually saying that.  But I

19  would expect such.

20  Q    Okay.  Thank you.  Are you, sitting here today, prepared

21  to vouch to the Oversight Board that Mr. Daugherty is likely

22  to comply with confidentiality requirements imposed on him?

23  A    No.

24  Q    Now, for the sake of completeness, let's take a look at

25  Article 10 of the Claimant Trust Agreement.  Now, this allows

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 455 of 1017 PageID 10219
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 53 of 86

Seery - Cross                                    53

1   amendments to the agreement, correct?

2   A   Yes.

3   Q   Okay.  And for anything other than clarifying nonmaterial

4   provisions of the Claimant Trust Agreement, an amendment

5   requires an instrument signed in writing by you as the

6   Claimant Trustee, correct?

7   A   I haven't looked at the provision in a while, but I would

8   expect such, yes.

9   Q   Okay.  And an amendment to the Claimant Trust Agreement

10  requires the unanimous approval of the Oversight Board,

11  correct?

12  A   It -- that's -- that's what it appears to say, yes.  I

13  apologize.  I just haven't looked at the provision in a long

14  time.

15  Q   I'm not trying to rush you through this, so if you need

16  time to look at it --

17  A   No, that's okay.  I believe you're correct.

18  Q   Okay.  And then, finally, an amendment requires the

19  approval of the Bankruptcy Court, after notice and a hearing.

20  Is that correct?

21  A   A material amendment.  That's correct.  It seems a little

22  odd to me, as an aside, that, depending on when this happened,

23  whether the Court would undertake to hear that, but that's

24  what it says.

25  Q   Okay.  Well, just so we're clear, it says the Oversi...

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 456 of 1017 PageID 10220

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 54 of 86

Seery - Cross                              54

1    may amend this agreement to correct or clarify any nonmaterial

2    provisions.  And then it says, it may not otherwise be

3    amended, et cetera, without these components.  So, I believe

4    that that's -- that is how -- how it works.  I don't know if

5    that changes your answer, Mr. Seery.

6    A    No.  I believe my answer is sufficient.

7    Q    Okay.  Now, you've previously testified, and as the

8    observer provision states, whether Mr. Daugherty will be

9    granted observer access and any continuing access will remain

10   at the sole discretion of the Claimant Trust Oversight Board.

11   Correct?

12   A    Yes.

13   Q    And nothing in the observer provision actually references

14   your approval in your capacity as the Claimant Trustee for

15   granting observer -- what I'm going to say, observer status on

16   the Oversight Board to Mr. Daugherty.  Correct?

17   A    That -- that's correct.  I think it's presumed, since I'm

18   asking for it.

19   Q    Okay.  Have you signed anything in writing agreeing --

20   agreeing to grant Mr. Daugherty observer access or observer

21   status?

22            MR. MORRIS:  Objection to the form of the question.

23            THE WITNESS:  No, I've simply --

24            THE COURT:  Overruled.

25            THE WITNESS:  I'm sorry.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 457 of 1017 PageID 10221
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 55 of 86

Seery - Cross                           55

1            THE COURT:  Overruled.  You can answer.

2            THE WITNESS:  I simply -- I've simply signed the

3    settlement agreement which says that I will use my reasonable

4    efforts to request that the Oversight Board grant observer

5    status to Mr. Daugherty, and the terms, limitations,

6    provisions are for the Oversight Board, or even -- even

7    granting it.

8    BY MS. DANDENEAU:

9    Q    And as the Claimant Trustee, you have fiduciary duties to

10   the Claimant Trust and its beneficiaries, correct?

11   A    Correct.

12   Q    And nothing in the Claimant Trust Agreement or Delaware

13   trust law allows you to delegate those fiduciary duties,

14   correct?

15           MR. MORRIS:  Objection to the form of the question.

16           THE COURT:  Sustained.

17   BY MS. DANDENEAU:

18   Q    Nothing in the observer provision that's included in the

19   settlement agreement references any amendment to the Claimant

20   Trust Agreement; is that correct?

21   A    Yes.

22   Q    And nothing in the observer provision references the

23   requirement for further approval of an amendment by the

24   Bankruptcy Court after notice and a hearing; is that correct?

25   A    That's correct.

Seery - Cross                          56

1   Q    Okay.  And I know you testified to this already, but is

2   there anything in the Claimant Trust Agreement that prohibits

3   the Claimant Trust from consulting with Mr. Daugherty if he is

4   not a member of the Oversight Board or granted some kind of

5   observer status?

6   A    I believe Mr. Morris testified to that, but the answer --

7   Q    Oh, I'm sorry.  I get confused sometimes when Mr. Morris

8   testifies.

9   A    No, the answer -- the answer, there's -- there is no

10  prohibition from consulting with whomever the Oversight Board

11  wants to consult, whether they're a professional, whether

12  they're Claimant Trustee, Litigation Trustee, whether they're

13  an observer, or whether they're someone on the street.

14  Q    And is there anything in the Claimant Trust Agreement that

15  prohibits the Claimant Trust from receiving information from

16  Mr. Daugherty?

17  A    No.

18  Q    Now, Mr. Daugherty stopped being employed by Highland in

19  2011; is that correct?

20  A    That's my recollection, yes.

21  Q    Yes.  With respect to the pending actions that are being

22  -- let's start with the Reorganized Debtor -- being pursued by

23  Highland as the Reorganized Debtor, does the estate require

24  any assistance from Mr. Daugherty?

25  A    I apologize.  I missed the first part.  You said with

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 459 of 1017    PageID 10223
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 57 of 86

Seery - Cross                          57

1  respect to the pending actions that Highland has brought.

2  Meaning litigation actions?

3  Q   Yes.  Mr. Seery, let me -- let me rephrase that terrible

4  question.  With respect to whatever litigation is currently

5  pending that is being pursued by Highland as the Reorganized

6  Debtor, as opposed to a Litigation Sub-Trust, does the estate

7  require -- does Highland require any assistance from Mr.

8  Daugherty?

9  A   No.

10 Q   Okay.  And in fact, Reorganized Highland and the Claimant

11 Trust are represented by the Pachulski firm, correct?

12 A   That's correct.

13 Q   And --

14 A   Generally, yes.

15 Q   Okay.  And in your view, does the Pachulski firm require

16 any assistance from Mr. Daugherty in connection with the

17 matters on which it is representing the Reorganized Highland

18 or the Claimant Trust?

19 A   No.  Those -- those matters are all wrapped -- packed and

20 ready to go.

21 Q   Okay.  Are you familiar with the action being generally

22 commenced by Mr. Kirschner as the Trustee of the Litigation

23 Sub-Trust --

24 A   Yes.

25 Q   -- against numerous defendants, including Mr. Ellington?

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 460 of 1017 PageID 10224
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 58 of 86

Seery - Cross                        58

1  A    Yes.

2  Q    Now, I will represent to you that there are certain counts

3  -- namely, Counts 1 and 2 -- that include causes of action for

4  the recovery of equity distributions going back as far as

5  April of 2010.  But putting those aside, would you agree with

6  me with respect to the Kirschner action that nearly all of the

7  relevant facts in that action arose after 2011?

8         MR. MORRIS:  Objection to the form of the question.

9  Just relevance, Your Honor.

10        THE COURT:  Okay.  What is the relevance?

11        MS. DANDENEAU:  Your Honor, what it is going to show,

12  and I think this is consistent with what Mr. Seery has

13  testified, is that nobody really needs the advice of Mr.

14  Daugherty with respect to whatever the Reorganized Debtor is

15  doing and also with respect to whatever the Litigation Sub-

16  Trust is doing.

17        THE COURT:  What does advice of Mr. Daugherty have to

18  do with anything?  Isn't it access, observer access?

19        MS. DANDENEAU:  Well, I believe that it is also

20  having him attend -- having him attend and do whatever

21  observers do with respect to the Oversight Committee.  But I

22  do believe that there was testimony that he might be useful in

23  connection with certain facets of liquidating Highland's --

24  kind of the longstanding, long-held assets.  But I think it is

25  worth at least getting -- having it recognized that there is

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 461 of 1017 PageID 10225
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 59 of 86

Seery - Cross                              59

1   really no utility served by having the Litigation Sub-Trust or

2   even having Highland have "access" to Mr. Daugherty.

3          THE COURT:  All right.  Well, I think it's of dubious

4   relevance, but I'll allow the question.

5      Mike, how long have we been going with this cross-

6   examination, by the way?

7          THE CLERK:  Approximately 29 minutes, Judge.

8          THE COURT:  Okay.  Twenty-nine minutes.  All right.

9   You may proceed.

10         THE WITNESS:  I think I have the gist of the

11  question.  I don't purport to understand exactly what Mr.

12  Kirschner's strategy is on every point, but I don't think

13  additional information from Mr. Daugherty is required for Mr.

14  Kirschner or the Quinn Emanuel firm to pursue the cause of

15  action.  Whether he would be helpful or not for certain

16  aspects, he may be, but I don't have specific information on

17  that and that would depend on the give and take of what

18  happens in the litigation.

19     And to clarify, I said earlier that Mr. Daugherty believes

20  that he could be useful in providing advice around certain of

21  the positions that he's familiar with that he put on.  But

22  aside from public information, which is certainly his right to

23  receive, and some of it is available for some of the

24  companies, he hasn't been involved with those companies for

25  ten years, so I don't -- I don't purport to say that he is

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 61 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 462 of 1017   PageID 10226

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 60 of 86

Seery - Cross                         60

 1  necessary for me to monetize those assets.

 2  Q    Thank you, Mr. Seery.  Now, has Mr. Daugherty been

 3  assisting the bankruptcy estate through his own

 4  investigations?

 5          MR. MORRIS:  Objection to the form of the question.

 6  Your Honor, we've got -- we've got two -- we've got an

 7  objection about access and we've got an objection about HERA

 8  and ERA.  I don't think it's appropriate or relevant to try to

 9  get discovery for a different lawsuit here.

10          MS. DANDENEAU:  Your Honor, I'm -- may I respond?

11          THE COURT:  Please.

12          MS. DANDENEAU:  Your Honor, first of all, this is a

13  quote from Mr. Daugherty's joinder to the motion, where Mr.

14  Daugherty says he's been assisting the bankruptcy estate

15  through his own investigations.  And we are particularly

16  concerned, we've made no surprise about it, with respect to

17  the observer -- granting of the observer status, the potential

18  granting of the observer status, and potentially giving Mr.

19  Daugherty access to confidential information.

20      And what we'd like to establish is whether the estate --

21  and we're not -- I'm not going to go in a lot of detail, but

22  this is what Mr. Daugherty has said, and we'd like to know

23  whether he has shared information with the estate up until

24  this point, personal nonconfi... you know, personal

25  confidential information that is -- that's not public --

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 463 of 1017    PageID 10227

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 61 of 86

Seery - Cross                              61

1              MR. MORRIS:  Your --

2              MS. DANDENEAU:  -- with the estate.

3              MS. DANDENEAU:  Your Honor, if I may just briefly.

4              THE COURT:  You may.

5              MR. MORRIS:  Mr. Daugherty -- Mr. Ellington does not

6    have standing to challenge the access.  He's not a beneficiary

7    of the trust, number one.

8        Number two, to the extent that they contend that it's a

9    plan modification, make the argument that it's a plan

10   modification.  You know, what discussions were had, I don't

11   understand how this is relevant.  It's clear that Mr.

12   Ellington thinks that somehow Mr. Seery is, you know, aiding

13   and abetting, I guess, whatever wrongdoing Mr. Ellington

14   alleges Mr. Daugherty is engaged it.  It's exactly why we're

15   trying to extricate ourselves from this.  Challenge --

16   challenge the provision.  You know, we've heard the analysis

17   and the questioning on the provision itself.  But we're going

18   very far afield, and it's just -- it's not relevant.

19             THE COURT:  Okay.  I agree --

20             MS. DANDENEAU:  Mr. Morris, I mean, I do --

21             THE COURT:  I agree we're going very far afield.

22   This feels like it's discovery relevant to what I'm going to

23   call the stalking action.  So, anyway, I sustain the

24   objection.

25             MS. DANDENEAU:  All right.  Thank you.  And for

Appx 05138
009381

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 63 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 464 of 1017 PageID 10228

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 62 of 86

Seery - Cross                          62

 1   record, Your Honor, I just want to make clear that we are not

 2   trying to allege in any respect -- I mean, to the contrary --

 3   that the Debtor was somehow kind of in cahoots with Mr.

 4   Daugherty with respect to any of the allegations.  So I do

 5   want to make that clear on the record.

 6            MR. MORRIS:  I appreciate that.

 7            THE COURT:  Okay.  Anything else?

 8            MS. DANDENEAU:  Well, Your Honor, there are -- I'd

 9   like to ask some questions, and maybe I -- I will try to

10   simplify them.  But -- and then wrap up very quickly.  And

11   then Mr. Morris is free to object, obviously.

12   BY MS. DANDENEAU:

13   Q   Mr. Seery, if prior to the execution of the settlement

14   agreement somebody had told you that there were allegations

15   that Mr. Daugherty had been observed outside someone's office,

16   residence, sister's residence, father's residence, no less

17   than 143 times, often taking photographs and video recordings,

18   or that Mr. Daugherty had been observed at least eight times

19   outside the home where Mr. Ellington's sister resides with her

20   husband and children, or that Mr. Daugherty was observed at

21   least seven times outside the home of Mr. Ellington's widower

22   father, again, putting aside whether those -- just on the

23   basis of those allegations, would any of those allegations

24   have changed your view about agreeing to the inclusion of the

25   observer provision in the settlement agreement?

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 64 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 465 of 1017   PageID 10229

Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 63 of 86

Seery - Cross                           63

 1          MR. MORRIS:  Objection; calls for a hypothetical.

 2          THE COURT:  Sustained.

 3   BY MS. DANDENEAU:

 4   Q    Well, just so I can clarify for the record, let me ask

 5   this.  Have you, Mr. Seery, have you read or has somebody

 6   explained to you the allegations that were contained in the

 7   state court petition filed against Mr. -- filed by Mr.

 8   Ellington against Mr. Daugherty?

 9   A    I read enough of the -- I'm sorry.  Did I cut you off,

10   John?

11          MR. MORRIS:  I was just going to say yes or no, to

12   the extent it involves attorney-client communications.  But

13   you can --

14          MS. DANDENEAU:  I'm only asking for a yes or no.

15          THE WITNESS:  It's hard to say yes or no.  But I

16   don't -- I don't recall (inaudible) under the state court

17   proceedings that I -- that I know of.  I have read the -- at

18   least glanced at the remand -- removal and remand documents

19   that have been filed in this Court.

20   BY MS. DANDENEAU:

21   Q    Okay.  And would you agree that one of the effects of

22   giving Mr. Daugherty observer status could be that Mr.

23   Daugherty will have access to confidential information that is

24   not otherwise publicly-available?

25   A    Around the assets, I don't -- I don't know what the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 65 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 466 of 1017 PageID 10230
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 64 of 86

Seery - Cross                              64

1  limitation -- I don't know because I don't know what the

2  limitations, if any, the Oversight Board would put on access

3  for Mr. Daugherty if they grant it.  It would be up to them.

4  But I would -- I would -- if there was confidential

5  information regarding either assets or regarding litigations,

6  we would -- I would assure and I'm sure the board would assure

7  that confidentiality agreements are in place and that

8  materials like that could not be released or used otherwise.

9  Q    But as we sit here today, there's nothing in the Claimant

10  Trust Agreement or the settlement agreement that provides

11  assurance that no member of the Oversight Board will share

12  confidential personal information with Mr. Daugherty?

13  A    I don't think that's true.  I think there's a specific

14  confidentiality provision that you have in the -- in the trust

15  agreement, and the language that we included in the settlement

16  agreement, which was that I would request that the board grant

17  Mr. Daugherty observer access or status, it's subject to the

18  types of confidentiality that one would typically expect from

19  a board-type deliberation.

20       So if one were to breach that, that would be a breach of

21  the agreement, would certainly abuse whatever observer status,

22  even as limited that you might have been granted.  But it

23  would also subject somebody to potential damages for breaching

24  the agreement if it hurt the Trust.

25  Q    And Mr. Seery, sitting here today -- this is my last

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 467 of 1017    PageID 10231
Case 22-03003-sgj Doc 20 Filed 03/09/22   Entered 03/09/22 16:37:21   Page 65 of 86

Seery - Cross                          65

1    question -- are you prepared to recommend to the Oversight

2    Board that they agree to grant observer status to Mr.

3    Daugherty?

4    A    I -- I don't know if I would recommend.  I said I would

5    ask, and I'll do it in good faith, and I'll provide my views

6    as they evolve depending on the discussion we have.  I

7    certainly think a significant creditor appearing -- observing

8    board deliberations around the monetization of assets is

9    nothing unusual, having done this for it seems like

10   forever.  I have been an observer.  I've had observers at

11   boards that -- observers on boards that I've been on.  It's a

12   pretty typical construct, where you have assets that are being

13   monetized, as opposed to necessarily -- or a straight board

14   with an operating committee, although you see them as

15   well.  And I -- I don't know that the limitations we're

16   talking about, how they would pertain, but it would depend on

17   each thing.

18       Obviously, the sensitivity around confidentiality and

19   attorney-client privilege and common interest related to

20   Litigation Trustee issues and note litigation issues, et

21   cetera, is a little bit different than the sensitivity and

22   confidentiality around private companies and their operations,

23   although that is still sensitive and we want to make sure it's

24   protected.

25   Q    All right.  Thank you, Mr. Seery.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 468 of 1017 PageID 10232

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 66 of 86

Seery - Redirect                    66

1          MS. DANDENEAU:  I have no further questions at this

2     time.

3          THE COURT:  All right.  Mr. Morris, redirect?

4          MR. MORRIS:  Yeah.  Just a couple of quick questions.

5                    REDIRECT EXAMINATION

6     BY MR. MORRIS:

7     Q    Mr. Seery, in Paragraph 3, the observer access provision

8     of the proposed settlement agreement, did Mr. Daugherty agree

9     that he would be bound by all policies, procedures, and

10    agreements, including confidentiality agreements of the

11    Oversight Board, if he's given access?

12    A    I don't recall the specifics of the provision in that

13    regard, but the terms of the request would be that, if he gets

14    it, --

15    Q    All right.

16    A    -- he will be bound by whatever strictures the Oversight

17    Board puts on him.  And that -- again, this is -- I understand

18    the sensitivity by counsel, but it's a pretty common

19    provision.

20         It's also common that an observer's access is

21    circumscribed.  It's not something where it's just sit and

22    watch all the proceedings.  For example, if there's employee

23    discussions or how some -- the company, the Trust, might deal

24    with certain claims or taxes or things that may not deal with

25    or impact the observer's realization on their claim, I would

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 469 of 1017    PageID 10233

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 67 of 86

Seery - Redirect                        67

 1   expect there would be limitations.  There typically are.

 2   Q    Okay.  And can you just confirm that Paragraph 3, in

 3   Paragraph 3 Mr. Daugherty agreed that he would have absolutely

 4   no right of access to Oversight Board meetings unless the

 5   Oversight Board made that determination in its sole

 6   discretion?

 7   A    That, that is correct.  I couldn't promise him something

 8   that I can't deliver, and I wanted to make sure that I wasn't

 9   in any way limiting the rights of the Oversight Board to

10   determine who, if anyone, could observe their deliberations.

11   Q    Okay.  Ms. Dandeneau took you through certain provisions

12   of the trust agreement and asked you whether or not certain

13   things were expressly authorized.  Do you recall that?

14   A    Yes.

15   Q    And you're generally familiar with the trust document; is

16   that right?

17   A    I am, although clearly from my testimony not as sharp as I

18   need to be.

19   Q    Okay.  Do you recall that there's anything in the trust

20   agreement that expressly prohibits the granting of observer

21   status to third parties?

22   A    I'm quite certain there isn't.

23   Q    Do you recall if there's anything in the trust agreement

24   that expressly prohibits the sharing of information with third

25   parties?

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 69 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 470 of 1017    PageID 10234

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 68 of 86

Seery - Redirect                    68

1   A    I'm quite certain there isn't.

2   Q    Are you aware of anything in the trust agreement that

3   expressly prohibits the Oversight Board from deciding that it

4   doesn't want to grant observer access to third parties?

5   A    There is not.

6   Q    Okay.  Is there anything that you're aware of in the trust

7   agreement that prohibits the observer access provision in

8   Paragraph 3 of the proposed settlement agreement?

9   A    No, there isn't.  And just, again, nor would there be.

10  There are observers at boards of directors or trusts.  It's

11  common.  I've never seen, never seen a corporate

12  organizational document or trust organizational document that

13  prohibits observers if the trustee or an oversight board or a

14  board of directors wants to have them.

15         MR. MORRIS:  Okay.  I have no further questions, Your

16  Honor.

17         THE COURT:  Any recross on that redirect?

18         MS. DANDENEAU:  No, Your Honor.  Thank you.

19         THE COURT:  All right.  Thank you, Mr. Seery.

20         THE WITNESS:  Thank you, Your Honor.

21      (The witness is excused.)

22         THE COURT:  Mr. Morris, anything else?

23      CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

24         MR. MORRIS:  Just really briefly, Your Honor.  The

25  Reorganized Debtor doesn't believe that Mr. Ellington has

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 70 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 471 of 1017    PageID 10235
87

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 69 of 86

69

1    standing to prosecute his objection because he holds no claim

2    against the Debtor, the Reorganized Debtor, the Trust, or any

3    aspect of the estate.

4        We believe that we've easily met the standard under 9019.

5    We believe this settlement is fair, reasonable, and in the

6    best interests of the estate.  We believe the evidence

7    conclusively shows that the proposed settlement is the subject

8    of arm's-length negotiations; that after doing an exhaustive

9    cost-benefit analysis, that the Debtor, in an exercise of its

10   reasonable judgment, believes that the benefits of the

11   proposed settlement greatly outweigh the costs and expenses of

12   litigation.

13       We believe specifically that with respect to the two items

14   that Mr. Ellington has objected to, that there's absolutely no

15   foundation for characterizing Paragraph 3 of the settlement

16   agreement as a plan modification.  It grants absolutely no

17   rights to Mr. Daugherty whatsoever.  It simply allows the

18   Oversight Board to exercise, in its sole discretion, whether

19   to give him access.  And if he's ever given access, it will be

20   subject to the policies and procedures and agreements of the

21   Oversight Board, including confidentiality.

22       HERA and ERA was an integral part of Mr. Daugherty's

23   claim.  You heard testimony from Mr. Seery that that issue was

24   debated and morphed several times into different types of

25   resolutions before ultimately settling on the final

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 71 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 472 of 1017    PageID 10236

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 70 of 86

70

1    resolution.

2        It's clear from Mr. Ellington's papers, from Mr.

3    Daugherty's papers, that the two of them are going to continue

4    their litigation pattern in the future whether or not the

5    HERA/ERA aspect is part of the agreement or not.  I mean, if

6    somehow that were not part of the agreement, I don't think

7    there's any evidence, I don't think there's any basis, and

8    indeed, it's contrary to what both of them have said, that

9    that would somehow end litigation between them.

10        So it doesn't really matter.  What does matter, Your

11   Honor, is that the Debtor had a very rational business reason

12   for agreeing to that particular term, and that business reason

13   is reflected not just in the transfer of the asset, but most

14   importantly, in the exhibit to the settlement agreement, the

15   HERA release.

16        So, on that basis, Your Honor, we respectfully request

17   that the Court overrule the objection and grant the motion in

18   its entirety.  Thank you.

19            THE COURT:  All right.  Mr. Uebler, any closing

20   argument from you?

21            CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

22            MR. UEBLER:  Your Honor, just that Mr. Daugherty

23   requests that the motion be approved.  Thank you for your time

24   this afternoon.

25            THE COURT:  All right.  Ms. Dandeneau, what would you

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 72 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 473 of 1017    PageID 10237
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 71 of 86

71

1   like to say as far as closing argument?

2            MS. DANDENEAU:  Thank you, Your Honor.

3            CLOSING ARGUMENT ON BEHALF OF SCOTT ELLINGTON

4            MS. DANDENEAU:  We fully understand that the standard

5   for approval of a compromise under Bankruptcy Rule 9019

6   focuses on what is in the best interest of the debtor's

7   estate.  And we know that the Court typically defers to the

8   debtor's business judgment.

9        As outlined in our objection, though, Mr. Ellington has

10  two principal concerns with the proposed settlement.  The

11  first raises a legal concern.  Mr. Morris addressed that, his

12  view of it, which is that Highland incorporated the Claimant

13  Trust Agreement into its plan.  The Claimant Trust Agreement

14  is the document that governs the management and operations of

15  the Claimant Trust.  That includes the activities of the

16  Claimant Trust Oversight Board.

17       Article 4 of the Claimant Trust Agreement has extensive

18  provisions dealing with the appointment of the board, the

19  replacement of members, and their rights and responsibilities.

20  And those rights and responsibilities include fiduciary duties

21  and a duty to keep confidential information confidential and

22  not use it for personal gain.  And nowhere in the Claimant

23  Trust Agreement is the granting of observer status to a third

24  party contemplated.

25       The Claimant Trust Agreement never reserved to the

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 474 of 1017 PageID 10238
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 72 of 86

72

1    Claimant Trust the right to invite third parties, otherwise

2    unassociated with the Claimant Trust or the Oversight Board or

3    the Litigation Sub-Trust, to obtain access to confidential

4    information. And granting that kind of provision

5    substantially deviates from the terms of the Claimant Trust

6    Agreement.

7        Indeed, nothing in the Claimant Trust Agreement, other

8    provisions of the plan, or even the settlement agreement even

9    ever mentioned, much less truly defined, what an observer is.

10   That's a significant part of the problem. We have a Claimant

11   Trust that goes to great lengths to lay out the rights and

12   responsibilities of all parties and to protect the Claimant

13   Trust from breaches of confidentiality. And now what we have

14   is really Mr. Seery's word for what will happen with an

15   observer to the Claimant Trust, because those provisions are

16   not included in any document.

17       What are the duties of an observer? What are the rights?

18   What is to prevent Mr. Daugherty from accessing confidential

19   information and then using it? And why does Mr. Daugherty

20   even need access to confidential information?

21       Moreover, Highland would argue that the Claimant Trust has

22   the ability to grant observer status through an amendment.

23   Well, again, we don't believe -- I know that they're not

24   saying that, but we don't believe an amendment can be

25   accomplished through simply the exercise of the Oversight

**009392**

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 74 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 475 of 1017    PageID 10239
87
Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 73 of 86

73

1  Board's sole discretion.  Among other things, an amendment to

2  the Claimant Trust Agreement requires notice and a hearing

3  before this Court for this Court to expressly approve that

4  provision.

5      The second issue, Your Honor, goes to the issue of whether

6  Highland was fully and properly informed of the relevant facts

7  in exercising its business judgment to agree to the inclusion

8  of the observer provision and the HERA provision.  The effect

9  of both of these provisions is to give Mr. Daugherty, who has

10  been accused of stalking Mr. Ellington and family members and

11  other people closely associated with Mr. Ellington, including

12  children, of giving Mr. Daugherty access to information about

13  Mr. Ellington that is not otherwise publicly available.  And

14  there is nothing that we've heard today that provides

15  assurance that the Oversight Board will not provide that

16  access to Mr. Daugherty.

17      No one disputes, at least with respect to the observer

18  provision, that that is a -- that is a significant potential

19  effect.  And Mr. Daugherty himself has stated that he wants

20  the HERA equity so he can access otherwise-privileged

21  communications between HERA and its counsel.  Those are also

22  likely to include confidential information.

23      And I recognize Highland sits here today and says, we had

24  no idea when we signed, our hands are tied, well, this doesn't

25  really hurt Highland's estate.  Should the Court, which is a

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 75 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 476 of 1017    PageID 10240
87

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 74 of 86

74

1    court of equity, really allow a settlement to be approved when

2    one of the purposes of two provisions that were added after

3    the agreement in principle is to give an alleged stalker

4    better access to his victims?  Should the Court really allow a

5    settlement to be approved when Mr. Daugherty insisted on these

6    provisions that never disclosed to Highland what his so-called

7    investigations of Mr. Ellington and others entailed?

8        Maybe Highland decided to humor Mr. Daugherty, and maybe

9    Highland decided it just wanted to put Mr. Daugherty and all

10    his litigation against Highland behind it.  We get that.  But

11    did Highland really intend to do so in a manner that could

12    pose risk to individuals?

13        We would respectfully submit, Your Honor, that even if

14    Highland was humoring Mr. Daugherty, this is no laughing

15    matter.

16        And moreover, shouldn't this Court question why Mr.

17    Daugherty requested these provisions?  We've heard no credible

18    explanation for why Mr. Daugherty needed the observer

19    provision as a result of the so-called revelations following

20    the confirmation hearing.  I mean, we know that the only

21    effect on the estate from the Sentinel -- so-called Sentinel

22    transaction was that Highland agreed to give UBS a larger

23    claim.  But Highland also agreed to give Mr. Daugherty a

24    larger claim following those "revelations."

25        And if Mr. Daugherty, by the way, is not willing to do a

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 76 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 477 of 1017 PageID 10241
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 75 of 86

1  settlement with Highland unless the observer provision is

2  included, what does that tell us about Mr. Daugherty and his

3  motivations?

4       We would respectfully submit, Your Honor, that Mr.

5  Daugherty was less than candid with Highland Capital in

6  requesting these provisions.  Highland should have the

7  opportunity to reject those provisions in light of the

8  allegations, or at least have the opportunity to assure itself

9  and to assure the Oversight Board, by whatever means it deems

10  necessary, that the allegations are not a concern before

11  Highland is bound to the terms of this settlement agreement.

12       Accordingly, Your Honor, so long as the observer provision

13  and the HERA provision remain in the settlement agreement, we

14  would respectfully ask Your Honor to refuse to approve

15  Highland's settlement with Mr. Daugherty.

16            MR. MORRIS:  Your Honor, can I have 15 seconds?

17            THE COURT:  Fifteen seconds.  Timer's on.

18         REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

19            MR. MORRIS:  Okay.  I think the -- I think the

20  rebuttal is to simply point Ms. Dandeneau to the two questions

21  she asked Mr. Seery, and that is, is there anything that

22  prohibits the members of the Oversight Board from consulting

23  with Mr. Daugherty outside a meeting?  Mr. Seery testified no.

24       Mr. Seery was asked whether there was anything that

25  prevented Oversight Board members from receiving information

1    from third parties outside of the Oversight Board meeting.

2    Mr. Seery said no.

3        That's it.  They -- this is form over substance.  They can

4    do exactly what she's trying to stop outside of -- there's

5    just no substance here.  There's no reason for an amendment.

6    There is no plan modification.  Thank you.

7            THE COURT:  All right.  Thank you.

8        All right.  This will be the Court's ruling on the

9    Reorganized Debtor's motion for an order approving its

10    proposed settlement with Patrick Daugherty.

11        First, the Court has jurisdiction over this contested

12    matter pursuant to 28 U.S.C. Section 1334, and this is a core

13    proceeding under 28 U.S.C. § 157(b).  Bankruptcy Rule 9019 is

14    the governing rule, as well as a multitude of cases, including

15    *AWECO*, *Foster Mortgage*, *Jackson Brewing*, and *TMT Trailer* from

16    the U.S. Supreme Court.

17        What those cases dictate is that a bankruptcy court, when

18    presented with a proposed settlement, should look at is it

19    fair and equitable and in the best interest of the estate,

20    when considering the probability of success if there were to

21    be further litigation, with due consideration of uncertainty

22    of law and fact; the complexity and likely duration of the

23    litigation and any attendant expense and delay; and all other

24    factors bearing on the wisdom of the compromise, keeping in

25    view at all times the paramount interests of creditors, with

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 78 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 479 of 1017    PageID 10243
87

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 77 of 86

77

1   deference to their reasonable views.

2       Here, the Court obviously just -- well, I'm going to say

3   that reasonable notice has been given of this proposed

4   compromise.  The motion has been on file since December 8,

5   2021, so close to three months.  And during that time frame,

6   we only had the one objection of Scott Ellington, who is the

7   former general counsel of Highland and holds no claim as a

8   creditor in this case.  At one time, he had pending proofs of

9   claim, but they have been disallowed.

10      So, with regard to the Ellington objection, we've talked

11  about standing or no standing.  I am of the view that he does

12  not have standing, either statutory or constitutional.  It

13  would not appear to be that he is a person affected by the

14  settlement in that he does not have a claim that remains

15  against the estate.  He does not seem to qualify as a person

16  aggrieved under case law interpreting that standard.

17      But if I'm wrong about this, I nevertheless overrule the

18  objection as having no merit.  This Court is in a unique

19  position to evaluate the bona fides of the settlement, that

20  being that the Court has had many hours of court time in which

21  it has seen evidence and heard argument from Patrick

22  Daugherty.

23      Significant, in the fall of 2020, there was a lengthy

24  multi-hour hearing on what we call a Rule 3018 motion to

25  estimate Mr. Daugherty's claim for voting purposes, for plan

1   voting purposes.  In hindsight, I cannot remember how many

2   hundreds of pages of exhibits I looked at in that multi-hour

3   hearing, but after that multi-hour hearing this Court ruled, I

4   think much to the Debtor's dismay and maybe other party in

5   interest dismay, that Mr. Daugherty should be given a claim

6   for voting purposes in the amount of $9,134,019.

7       Of course, that was an estimation based on some evidence

8   but not all evidence.  But again, it puts the Court in a

9   unique position today to not simply look forward on how on how

10  this Court might rule if there was litigation on the remaining

11  proof of claim and how a Court of Appeals might rule; I've

12  actually seen a lot of evidence.

13      So, based on that, I do find the settlement to be

14  certainly within the range of reasonableness, and fair and

15  equitable and in the best interest of the estate.

16      Again, despite what the Court earlier ruled on the 3018

17  motion, Daugherty is going to be given an $8.25 million

18  general unsecured claim, a subordinated general unsecured

19  claim of $3.75 million, a lump sum payment of $750,000 cash in

20  the short term, and then the various releases and transfer of

21  HERA and ERA to Daugherty, as well as this new provision that

22  -- to make sure I've got the wording -- Debtor will use

23  reasonable efforts to petition the Oversight Board to give

24  Daugherty observer access.

25      I find this all, again, to be within the range of

 1    reasonableness.  The testimony was credible that there had

 2    been not just arm's length but hard-fought negotiations over a

 3    very long period of time.  Again, it's been a year, or 13

 4    months, almost, since the settlement was orally announced.

 5    The testimony was credible that there were many drafts, many

 6    written drafts of the settlement documents that have gone back

 7    and forth since the oral announcement.

 8        With regard to the modifications that are objected to

 9    here, the observer access to the Oversight Board that may or

10    may not actually happen and the transfer of Highland's

11    interests in HERA and ERA, and then I guess there was a slight

12    increase in the subordinated unsecured claim, none of these,

13    in this Court's view of the evidence and testimony, are

14    materially different from what was orally announced.  But more

15    importantly, they certainly don't rise to the level of plan

16    modifications.

17        And I will add just another word or two about this

18    observer access that has been such a trouble spot for Mr.

19    Ellington.  If this is granted, not only does it not seem

20    materially inconsistent with what might be construed to be

21    allowed under the Claimant Trust Agreement, but during the

22    hearing I couldn't help but think about a Bankruptcy Code

23    statute that I wondered if anybody was going to mention.  No

24    one did.  But it's 1102(b)(3).  Okay?

25        So the bankruptcy nerds on the WebEx will remember that in

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 482 of 1017 PageID 10246
87

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 80 of 86

80

```
1   October 2005 1102(b)(3) was added to the Bankruptcy Code.  And
2   it's a provision that deals with official committees of
3   unsecured creditors during the pendency of the Chapter 11.  So
4   it technically doesn't apply to the Oversight Board, this
5   post-confirmation Oversight Board.  But it provides,
6   1102(b)(3), in case you don't have it in front of you, that a
7   committee, meaning an official unsecured creditors committee,
8   shall, quote, provide access to information for creditors who
9   hold claims of kinds represented by that committee and are not
10  appointed to the committee.  It shall solicit and receive
11  comments from the creditors that I just described, and be
12  subject to a court order that compels any additional report or
13  disclosure to be made to creditors described in Subparagraph
14  A.
15      So I guess my point is, even though we're in a post-
16  confirmation phase, what we're dealing with is an oversight
17  board that basically substitutes in many respects for an
18  official creditors committee when you're in a post-
19  confirmation stage of a Chapter 11.  And if Mr. Daugherty is
20  given access to deliberations, meetings, information of the
21  Oversight Board, it certainly doesn't feel offensive to me,
22  because in a pre-confirmation stage we have a Bankruptcy Code
23  section that is designed to give access to creditors like Mr.
24  Daugherty.  And certainly, you know, we see protocol orders
25  all of the time in Chapter 11s where, you know, people will be
```

1   worried, okay, yes, we have to give access, but we want to

2   require this person to sign confidentiality agreements if

3   there's something confidential about the information.

4       The point is, there are workarounds to deal with concerns

5   about confidentiality and sensitive information.

6       So not only do I determine that this observer access

7   concept is not by any stretch something that should be viewed

8   as a plan modification, but it is within the spirit of the

9   Claimant Trust Agreement, it doesn't run grossly afoul, or

10  afoul, I think, of anything in there. And, again, it's just

11  observer status. And it seems to be consistent also with the

12  spirit of this provision of the Bankruptcy Code I just cited.

13      So the Court reserves the right to supplement and amend in

14  the written form of order. I direct, Mr. Morris, you to

15  submit a form of order, but I do hereby approve the compromise

16  as presented to me.

17      All right. Well, we do have one other matter on the

18  calendar, as I mentioned in the beginning. It is in the

19  adversary *Ellington v. Daugherty*, Adversary 22-3003. This was

20  a routinely-set status conference after removal. Okay? This

21  was a state court action that was removed by Mr. Daugherty's

22  counsel to the Bankruptcy Court. And we did here what we

23  always do: Roughly 30 days after removal, we set a status

24  conference to see do we need a scheduling order, what kind of

25  case matters do we need to address, and are we going to have

82

1  consent to Bankruptcy Court adjudication or are we going to

2  have a motion for remand.

3     So I don't know what we're going to attempt to accomplish

4  here because later in this month we have set a hearing on Mr.

5  Ellington's motion for remand and abstention.  So I'll ask

6  counsel, did you all view this setting as something that, you

7  know, we needed to address issues on, or is it premature

8  before we have the hearing on the motion for remand and

9  abstention?

10         MR. YORK:  Your Honor, this is Drew York from Gray

11  Reed.  I represent Mr. Daugherty in the adversary action.  And

12  I agree with the Court that it is, based upon the motion to

13  abstain and remand that was filed, it's premature.  We set the

14  status conference at the Court's request immediately after we

15  filed the removal notice.  I think we can address all of the

16  issues at the hearing at the end of the month.

17         THE COURT:  All right.  Ms. --

18         MS. DANDENEAU:  Your Honor?

19         THE COURT:  Go ahead.

20         MS. DANDENEAU:  We agree with Mr. York and the Court,

21  Your Honor.

22         THE COURT:  Okay.  Well, so I guess we will see you

23  at the end of the month.  I think, what is it, maybe March

24  28th, something like that?  March 29th?

25         MS. DANDENEAU:  I believe it's March 29th.

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 84 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 485 of 1017 PageID 10249

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 83 of 86

83

1          THE COURT: Okay. And you know that I tend to

2    sometimes share my views just to see if it will spur a fit of

3    reasonableness or encourage people to settle or walk away.

4    I'm pretty exasperated with that attempt in this case. But

5    this litigation is -- I'm going to call it the stalking

6    lawsuit. Okay? Every time -- I don't know how much longer it

7    will be in my court, but as long as it's in my court I'm going

8    to call it what it is, a stalking lawsuit. It is one grown

9    man accusing another grown man of stalking. You know, it's

10   just embarrassing to me, and it should be embarrassing to

11   those involved.

12       Now, I have read the lawsuit and I have read that Mr.

13   Ellington accuses Mr. Daugherty of driving by his house,

14   driving by his father's house, driving by his sister's house,

15   driving by his office, 143 sightings, he's taking pictures.

16   And you know, if that's true, again, that's embarrassing. If

17   -- I don't even know what to say except this is embarrassing.

18   One grown man accusing another grown man of stalking. Okay?

19   A statute, by the way, that was designed to protect, you know,

20   ex-wives, girlfriends, battered women, from abusive men. You

21   know, gender doesn't matter, but wow. It's just -- I don't

22   know what to say except people should be embarrassed, and so

23   that's what I'm going to say.

24       I don't know if it's going to make a whit of difference in

25   anyone's litigation posture. But we'll come back on March

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 486 of 1017 PageID 10250

Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 84 of 86

84

```
 1   29th and we'll do what we need to do on the motions before the

 2   Court.

 3        (Proceedings concluded at 3:41 p.m.)

 4                            --oOo--

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    /s/ Kathy Rehling                      03/07/2022

23   _____    _____
     Kathy Rehling, CETD-444                         Date
24   Certified Electronic Court Transcriber

25
```

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 487 of 1017 PageID 10251
Case 22-03003-sgj Doc 20 Filed 03/09/22 Entered 03/09/22 16:37:21 Page 85 of 86

85

INDEX

PROCEEDINGS                                                    3

OPENING STATEMENTS

By Mr. Morris                                                 5
By Mr. Uebler                                               19
By Ms. Dandeneau                                           19

WITNESSES

Reorganized Debtor's Witnesses

James P. "Jim" Seery, Jr.
- Direct Examination by Mr. Morris                         23
- Cross-Examination by Ms. Dandeneau                       39
- Redirect Examination by Mr. Morris                       66

EXHIBITS

Debtor's Exhibits at Docket 3270                  Received  6

Scott Ellington's Exhibit SE-2                    Received 45

CLOSING ARGUMENTS

By Mr. Morris                                               68
By Mr. Uebler                                               70
By Ms. Dandeneau                                            71
By Mr. Morris                                               75

RULINGS

19-34054-sgj

    Reorganized Debtor's Motion for Entry of an Order       76
    Approving Settlement with Patrick Hagaman Daugherty
    (Claim No. 205) and Authorizing Actions Consistent
    Therewith [3088] - *Granted*

    Reorganized Debtor's Motion for Entry of an Order       --
    Further Extending the Period Within Which It May
    Remove Actions [3199] - *Court Approved Motion at
    Docket 3199 in Chambers Prior to Hearing*

009405

Case 19-34054-sgj11 Doc 3445-19 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 87 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 488 of 1017    PageID 10252

Case 22-03003-sgj Doc 20 Filed 03/09/22    Entered 03/09/22 16:37:21    Page 86 of 86

86

INDEX
Page 2

RULINGS, cont'd.

22-3003-sgj

Status Conference (Notice of Removal)                    81

END OF PROCEEDINGS                                      84

INDEX                                                85-86

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 20

009407

Docket #3328 Date Filed: 04/28/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed April 28, 2022

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

## ORDER APPROVING SETTLEMENT WITH CPCM, LLC (CLAIM NO. 217) AND FRANK WATERHOUSE (CLAIM NO. 218) AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on the *Reorganized Debtor's Motion for Entry of an Order Approving Settlement with CPCM, LLC (Claim No.217) and Frank Waterhouse (Claim No. 218) and Authorizing Actions Consistent Therewith* [Docket No. 3317] (the "Motion"),[2] filed by Highland Capital Management, L.P., the above-captioned reorganized debtor

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

DOCS_NY:45342.6 36027/003


1934054220428000000000008

009408

Case 19-34054-sgj11 Doc 3445-20 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 4
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 491 of 1017 PageID 10255
Case 19-34054-sgj11 Doc 3328 Filed 04/28/22 Entered 04/28/22 17:01:50 Page 2 of 3

(the "Reorganized Debtor" or "Debtor," as applicable) in the above-captioned chapter 11 case (the

"Bankruptcy Case"); and this Court having considered the Motion; and no objections to the Motion

having been filed; and the Motion being unopposed; and this Court having jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this

proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the relief requested in the Motion is in the best interests of the

Reorganized Debtor, the Debtor's creditors, and other parties-in-interest; and this Court having

found the Stipulation fair and equitable; and this Court having analyzed (1) the probability of

success in litigating the claims subject to the Stipulation, with due consideration for the uncertainty

in fact and law, (2) the complexity and likely duration of litigation and any attendant expense,

inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise,

including: (i) the best interests of the creditors, with proper deference to their reasonable views,

and (ii) the extent to which the settlement is the product of arm's-length bargaining, and not of

fraud or collusion; and this Court having found that the Reorganized Debtor's notice of the Motion

and opportunity for a hearing on the Motion were appropriate under the circumstances and that no

other notice need be provided; and this Court having determined that the legal and factual bases

set forth in the Motion establish good cause for the relief granted herein; and upon all of the

proceedings had before this Court; and after due deliberation and good and sufficient cause

appearing therefor,

it is **HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Stipulation attached as Exhibit 1 to the Demo Dec. is approved in all respects.

DOCS_NY:45342.6 36027/003

009409

Case 19-34054-sgj11 Doc 3445-20 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 4
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 492 of 1017    PageID 10256
Case 19-34054-sgj11 Doc 3328 Filed 04/28/22    Entered 04/28/22 17:01:50    Page 3 of 3

3.     Claim 217 is **DISALLOWED** with prejudice.

4.     Claim 218 is **DISALLOWED** with prejudice.

5.     This Stipulation amends Section 5 of the Waterhouse Stipulation as follows:

    a.     The heading of Section 5 of the Waterhouse Stipulation is deleted in its entirety and replaced with the following:  "Senior Employee's Waiver of any Bonus Amount;" and

    b.     Section 5(a) of the Waterhouse Stipulation is deleted in its entirety and replaced with the following: "The Senior Employee agrees to irrevocably surrender and waive the Bonus Amount in consideration of the Employee Release and acknowledges that such agreement is an integral part of this Stipulation."

Except as specifically amended by this Order and the Stipulation, the Waterhouse Stipulation remains in full force and effect.

6.     CPCM has irrevocably and indefeasibly waived any right it may have to the CPCM Payment and has released the Reorganized Debtor from any and all obligations to make the CPCM Payment.  No amendment to the Former Employee Order is necessary to effectuate the foregoing waiver and release.

7.     The Reorganized Debtor, CPCM, and Mr. Waterhouse are authorized to take any and all actions necessary and desirable to implement the Stipulation without need of further approval or notice.

8.     To the extent applicable, the official claims register in the Debtor's Bankruptcy Case will be modified in accordance with this Order.

9.     The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

009410

# EXHIBIT 21

Appx. 05468
009411

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 5
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 494 of 1017    PageID 10258
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22    Entered 03/08/22 13:06:09    Page 1 of 4

Docket #3298  Date Filed: 3/8/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed March 8, 2022

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | §  Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |

### ORDER APPROVING
### SETTLEMENT WITH PATRICK HAGAMAN DAUGHERTY (CLAIM NO. 205)
### AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

This matter having come before the Court on the *Reorganized Debtor's Motion for Entry
of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and
Authorizing Actions Consistent Therewith* [Docket No. 3088] (the "Motion"),[2] filed by Highland
Capital Management, L.P., the above-captioned reorganized debtor (the "Reorganized Debtor") in

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357).  The headquarters and
service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.



1934054220308000000000002

009412

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 5
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 495 of 1017 PageID 10259
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22 Entered 03/08/22 13:06:09 Page 2 of 4

the above-captioned chapter 11 case (the "Bankruptcy Case"); and this Court having considered (a) the Motion; (b) *Scott Ellington's Objection to the Reorganized Debtor's Motion for Entry of an Order Approving Settlement with Patrick Daugherty* [Docket No. 3242] (the "Ellington Objection"), filed by Scott Ellington ("Mr. Ellington"); (c) the *Reorganized Debtor's Reply in Further Support of Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty* [Docket No. 3257]; (d) *Patrick Daugherty's Joinder in Reorganized Debtor's Reply in Further Support of Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205)* [Docket No. 3258], filed by Patrick Hagaman Daugherty ("Mr. Daugherty"); (e) the exhibits identified on *Highland Capital Management L.P.'s Witness and Exhibit List with Respect to Evidentiary Hearing to Be Held March 1, 2022* [Docket No. 3270], including the proposed Settlement Agreement signed by the Reorganized Debtor and Mr. Daugherty (the "Settlement Agreement"), all of which were admitted into evidence without objection; (f) Exhibit SE-2 identified on *Scott Ellington's Amended Witness and Exhibit List for Hearing Scheduled for March 1, 2022 at 1:30 pm (Prevailing Central Time)* [Docket No. 3265] ("Exhibit SE-2"), which was admitted into evidence without objection; (g) the testimony of Mr. James P. Seery, Jr. adduced during the hearing held on March 1, 2022 (the "Hearing"), including assessing Mr. Seery's credibility; and (h) the arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Reorganized Debtor, the Debtor's creditors, and other parties-in-interest; and this Court having found the Settlement Agreement fair and equitable; and this Court having analyzed

DOCS_NY:45264.3 36027/003

009413

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 5
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 496 of 1017    PageID 10260
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22    Entered 03/08/22 13:06:09    Page 3 of 4

(1) the probability of success in litigating the claims subject to the Settlement Agreement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise, including: (i) the best interests of the creditors, with proper deference to their reasonable views, and (ii) the extent to which the settlement is the product of arms-length bargaining, and not of fraud or collusion; and this Court having found that the Reorganized Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, the Court makes the following findings of fact and conclusions of law:[3]

1. At the time of the Hearing, Mr. Ellington (i) did not hold any claims against the Debtor (*see Order Approving Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims* [Docket No. 3244]); (ii) was not a Claimant Trust Beneficiary (as that term is defined in Exhibit SE-2); and (iii) because he does not hold claims against the Debtor, could not become a Claimant Trust Beneficiary.

2. Accordingly, Mr. Ellington does not have standing to object to the Motion.

3. Even if Mr. Ellington had standing, the Reorganized Debtor has met its burden of proof under Bankruptcy Rule 9019 that the settlement embodied in the Settlement Agreement

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

DOCS_NY:45264.3 36027/003

009414

Case 19-34054-sgj11 Doc 3445-21 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 5
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 497 of 1017    PageID 10261
Case 19-34054-sgj11 Doc 3298 Filed 03/08/22    Entered 03/08/22 13:06:09    Page 4 of 4

(and the exhibits annexed thereto) are fair, reasonable, and in the best interests of the Debtor, its successor(s), and all parties-in-interest.

4.  Mr. Daugherty's Proof of Claim No. 67 was superseded by Proof of Claim No. 77, and Proof of Claim No. 77 was superseded by Proof of Claim No. 205, such that Proof of Claim Nos. 67 and 77 shall be disallowed and Proof of Claim No. 205 shall be treated in the manner set forth in the Settlement Agreement.

Based on the foregoing, it is hereby **ORDERED** that:

1.  The Motion is **GRANTED** as set forth herein.

2.  The Ellington Objection is **OVERRULED** in its entirety.

3.  The Settlement Agreement is approved in all respects pursuant to Federal Rule of Bankruptcy Procedure 9019.

4.  The Reorganized Debtor and Mr. Daugherty are authorized to take any and all actions necessary and desirable to implement the Settlement Agreement without need of further approval or notice.

5.  Proofs of Claim Nos. 67 and 77 are **DISALLOWED** with prejudice.

6.  Proof of Claim No. 205 is **ALLOWED** in the amounts set forth in the Settlement Agreement.

7.  The Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

DOCS_NY:45264.3 36027/003

009413

# EXHIBIT 22

Appx. 05473

009416

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 499 of 1017 PageID 10263
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 1 of 10

Docket #3244  Date Filed: 2/17/2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 17, 2022**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

### ORDER APPROVING STIPULATION AND AGREED ORDER RESOLVING THIRD OMNIBUS OBJECTION AND CERTAIN OTHER CLAIMS

Upon consideration of the *Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims* (the "<u>Stipulation</u>")[2] filed in the above-captioned case, it is

**HEREBY ORDERED THAT:**

1.     The Stipulation, a copy of which is attached hereto as **<u>Exhibit A</u>**, is approved.

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 6725. The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] All capitalized terms used but not defined herein have the meanings given to them in the Stipulation.

DOCS_NY:45159.5 36027/003


1934054220217000000000002

¢¤¥ 05474
009417

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 500 of 1017 PageID 10264
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 2 of 10

2.      The Reorganized Debtor will pay CPCM an amount equal to $100,000.00 on the later of the day (i) five business days after this Order becomes final and non-appealable and (ii) the day the Reorganized Debtor receives wire transfer instructions from CPCM.

3.      The withdrawal of the Former Employee Claims with prejudice is approved, and the Former Employee Claims are disallowed.

4.      The withdrawal of Claim 216 with prejudice is approved, and Claim 216 is disallowed.

5.      The withdrawal of Claim 244 with prejudice is approved, and Claim 244 is disallowed.

6.      The withdrawal of Claim 251 with prejudice is approved, and Claim 251 is disallowed.

7.      To the extent the Former Employee Claims were not validly transferred by the Former Employees to CPCM, each Former Employee Claim is disallowed with prejudice and expunged on the grounds that no Former Employee responded to the Third Omnibus Objection.

8.      Nothing in this Order or the Stipulation is intended to, or will, release or affect (i) the Waterhouse Claim (and CPCM and the Reorganized Debtor expressly reserve any and all rights they may have at law or in equity with respect to the Waterhouse Claim) and (ii) any rights that CPCM, the Former Employees, or the Reorganized Debtor may have under (a) the Plan or (b) the Confirmation Order.

9.      This Order and the Stipulation are and will be binding on CPCM's, Skyview's, Mr. Ellington's, Mr. Leventon's, and the Former Employees' predecessors, successors, transferees, and assigns.

10.      To the extent applicable, the official claims register in above-captioned bankruptcy case will be modified in accordance with this Order.

DOCS_NY:45159.5 36027/003

**009418**

App. 05475

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 501 of 1017    PageID 10265
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22    Entered 02/17/22 17:31:58    Page 3 of 10

11.    This Court shall have and retain jurisdiction over all disputes arising out of or

otherwise concerning the interpretation and enforcement of this Order and the Stipulation.

### END OF ORDER ###

DOCS_NY:45159.5 36027/003

009419

# **EXHIBIT A**

009420

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 503 of 1017    PageID 10267
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22    Entered 02/17/22 17:31:58    Page 5 of 10

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

ROSS & SMITH, PC
Judith W. Ross (TX Bar No. 210010670)
Frances A. Smith (TX Bar No. 24033084)
Eric Soderlund (TX Bar No. 24037525)
700 N. Pearl St. Suite 1610
Dallas, TX 752010
Telephone:  (214) 377-7879
Facsimile:  (214) 377-9409

*Co-Counsel for CPCM, LLC, Scott Ellington, and
Isaac Leventon*

Michelle Hartmann
State Bar No. 24032402
**BAKER & McKENZIE LLP**
1900 North Pearl, Suite 1500
Dallas, TX 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

Debra A. Dandeneau (admitted *pro hac vice*)
Blaire Cahn (admitted *pro hac vice*)
**BAKER & McKENZIE LLP**
452 Fifth Avenue
New York, NY  10018
Tel: 212-626-4100
Fax: 212 310-1600
Email:  debra.dandeneau@bakermckenzie.com
          blaire.cahn@bakermckenzie.com

*Co-Counsel for CPCM, LLC, Scott Ellington and Isaac
Leventon*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § | |

### STIPULATION AND AGREED ORDER RESOLVING THIRD OMNIBUS OBJECTION AND CERTAIN OTHER CLAIMS

---

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 6725. The headquarters and service address for the Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 504 of 1017 PageID 10268
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 6 of 10

This *Stipulation and Agreed Order Resolving Third Omnibus Objection and Certain Other Claims* (the "Stipulation") is entered into between Highland Capital Management, L.P., the reorganized debtor (the "Reorganized Debtor"), CPCM, LLC ("CPCM"), Isaac Leventon ("Mr. Leventon"), Scott Ellington ("Mr. Ellington"), and Highgate Consulting, Inc., d/b/a Skyview Group ("Skyview").

## **RECITALS**

**WHEREAS,** on February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") entered an *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") pursuant to which the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* was confirmed [Docket No. 1808] (the "Plan");[2]

**WHEREAS,** in February and March 2021, the Former Employees[3] filed proofs of claim (claim numbers 219-237, 241) (the "Former Employee Claims");

**WHEREAS,** on March 18, 2021, the Debtor Filed *Debtor's Third Omnibus Objection to Certain No Liability Claims* [Docket No. 2059] (the "Omnibus Objection") objecting to, among other claims, the Former Employee Claims;

**WHEREAS,** subsequent to the filing of the Omnibus Objection, the Former Employees purportedly transferred and assigned the Former Employee Claims to CPCM [Docket Nos. 2094, 2097-2115];

**WHEREAS**, CPCM is a wholly-owned subsidiary of Skyview;

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Plan.

[3] "Former Employees" means, collectively, Lucy Bannon, Jerome Carter, Brian Collins, Matthew DiOrio, Hayley Eliason, William Gosserand, Steven Haltom, Charles Hoedebeck, Mary Irving, Helen Kim, Kari Kovelan, William Mabry, Mark Patrick, Christopher Rice, Jason Rothstein, Jean Paul Sevilla, Kellie Stevens, Ricky Swadley, Lauren Thedford, and Stephanie Vitiello.

-2-

009422

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 505 of 1017 PageID 10269
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 7 of 10

**WHEREAS**, on November 2, 2021, the Reorganized Debtor filed the *Reorganized Debtor's Amended Supplemental Objection to Certain Employee Claims* [Docket No. 2976] (the "Supplemental Objection," and together with the Omnibus Objection, the "Third Omnibus Objection");

**WHEREAS**, on January 27, 2022, CPCM filed *CPCM's Response to Debtor's Third Omnibus Objection* [Docket No. 3205];

**WHEREAS**, on February 10, 2022, the Reorganized Debtor filed *Highland Capital Management, L.P.'s Reply in Further Support of Debtor's Third Omnibus Objection to Certain No-Liability Claims, As Supplemented* [Docket No. 3230]);

**WHEREAS**, Mr. Leventon filed proofs of claim numbers 184, 214, 215, 216, and 253;

**WHEREAS**, proofs of claim 184, 214, 215, and 253 were subsequently withdrawn and expunged [Docket No. 3164];

**WHEREAS** , proof of claim 216 ("Claim 216") was transferred to CPCM and is still outstanding;

**WHEREAS**, Mr. Ellington filed proofs of claim numbers 187, 192, 244, 245, and 251;

**WHEREAS**, proofs of claim numbers 187, 192, and 245 were subsequently withdrawn and expunged [Docket No. 3164];

**WHEREAS**, proof of claim number 251 ("Claim 251") is still outstanding;

**WHEREAS**, proof of claim number 244 was transferred to CPCM and is still outstanding ("Claim 244");

**NOW, THEREFORE**, in consideration of the above recitals, and solely to avoid the cost and expense of litigating the Third Omnibus Objection, each of the Reorganized Debtor, CPCM, Skyview, Mr. Ellington, and Mr. Leventon agree and stipulate as follows:

DOCS_NY:45157.9 36027/003

009423

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 506 of 1017 PageID 10270
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 8 of 10

<u>**STIPULATION**</u>

1.      The Reorganized Debtor will pay CPCM an amount equal to $100,000.00 on the later of (i) five business days after the order approving this Stipulation becomes final and non-appealable and (ii) the day the Reorganized Debtor receives wire transfer instructions from CPCM.

2.      Skyview and CPCM represent and warrant to the Reorganized Debtor that (i) they have full and complete authority to dispose of, release, and resolve the Former Employee Claims, Claim 216, and Claim 244 and (ii) except as set forth in this Stipulation, (a) no other claims filed in this Chapter 11 case have been assigned or transferred to Skyview or CPCM and (b) CPCM and Skyview have no other claims against the Reorganized Debtor (other than claims arising in the ordinary course of business between Skyview and the Reorganized Debtor and claims arising from the Reorganized Debtor's conduct that are not known or knowable to CPCM or Skyview).

3.      The Former Employee Claims are hereby withdrawn with prejudice and disallowed.

4.      Claim 216 is hereby withdrawn with prejudice and disallowed.

5.      Claim 244 is hereby withdrawn with prejudice and disallowed.

6.      Claim 251 is hereby withdrawn with prejudice and disallowed.

7.      To the extent the Former Employee Claims were not validly transferred by the Former Employees to CPCM, each Former Employee Claim is disallowed with prejudice and expunged on the grounds that no Former Employee responded to the Third Omnibus Objection.

8.      Nothing in this Stipulation is intended to, or will, release or affect (i) proof of claim number 217 filed by Frank Waterhouse and purportedly transferred to CPCM [Docket No. 2093] or the *Senior Employee Stipulation and Tolling Agreement Extending Statutes of Limitations*, dated January 20, 2021, by and between Frank Waterhouse and the Debtor (together the "<u>Waterhouse</u>

009424

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 507 of 1017 PageID 10271
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 9 of 10

Claim") (and CPCM and the Reorganized Debtor expressly reserve any and all rights they may

have at law or in equity with respect to the Waterhouse Claim); or (ii) any rights that CPCM, the

Former Employees, or the Reorganized Debtor may have under (a) the Plan or (b) the Confirmation

Order.

9.   This Stipulation is and will be binding on CPCM's, Skyview's, Mr. Ellington's,

Mr. Leventon's, and the Former Employees' predecessors, successors, transferees, and assigns.

10.   To the extent applicable, the official claims register will be modified in accordance

with this Stipulation.

11.   This Court shall have and retain jurisdiction over all disputes arising out of or

otherwise concerning the interpretation and enforcement of this Stipulation.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:45157.9 36027/003

009425

Case 19-34054-sgj11 Doc 3445-22 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 508 of 1017 PageID 10272
Case 19-34054-sgj11 Doc 3244 Filed 02/17/22 Entered 02/17/22 17:31:58 Page 10 of 10

**IT IS SO STIPULATED:**

Dated: February 15, 2022

*/s/ Gregory V. Demo*
PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

*/s/ Frances A. Smith*
ROSS & SMITH, PC
Judith W. Ross (TX Bar No. 210010670)
Frances A. Smith (TX Bar No. 24033084)
Eric Soderlund (TX Bar No. 24037525)
700 N. Pearl St. Suite 1610
Dallas, TX 752010
Telephone: (214) 377-7879
Facsimile: (214) 377-9409

*Co-Counsel for CPCM, LLC, Scott Ellington, and
Isaac Leventon*

Michelle Hartmann
State Bar No. 24032402
**BAKER & McKENZIE LLP**
1900 North Pearl, Suite 1500
Dallas, TX 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

*/s/ Blaire Cahn*
Debra A. Dandeneau (admitted *pro hac vice*)
Blaire Cahn (admitted *pro hac vice*)
**BAKER & McKENZIE LLP**
452 Fifth Avenue
New York, NY 10018
Tel: 212-626-4100
Fax: 212 310-1600
Email: debra.dandeneau@bakermckenzie.com
        blaire.cahn@bakermckenzie.com

*Co-Counsel for CPCM, LLC, Scott Ellington and Isaac
Leventon*

009426

**EXHIBIT 23**

Amex_05484
009427

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 510 of 1017    PageID 10274
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 1 of 21



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 6, 2022**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-34054-SGJ-11** |
| HIGHLAND CAPITAL MANAGEMENT, | § | **(CHAPTER 11)** |
| L.P., | § | |
| | § | |
| **REORGANIZED DEBTOR.** | § | |
| _____ | § | |
| | § | |
| MARC S. KIRSCHNER, AS LITIGATION | § | |
| TRUSTEE OF THE LITIGATION | § | |
| SUB-TRUST, | § | |
| | § | **CIVIL ACTION NO. 3:22-CV-203-S** |
| PLAINTIFF, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 21-03076** |
| | § | |
| JAMES D. DONDERO; MARK A. OKADA; | § | |
| SCOTT ELLINGTON; ISAAC | § | |
| LEVENTON; GRANT JAMES SCOTT III; | § | |
| FRANK WATERHOUSE; STRAND | § | |
| ADVISORS, INC.; NEXPOINT ADVISORS, | § | |

1

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 511 of 1017   PageID 10275
Case 21-03076-sgj Doc 151 Filed 04/06/22   Entered 04/06/22 13:15:41   Page 2 of 21

| | |
|---|---|
| L.P.; HIGHLAND CAPITAL | § |
| MANAGEMENT FUND ADVISORS, L.P. | § |
| DUGABOY INVESTMENT TRUST | § |
| AND NANCY DONDERO, AS TRUSTEE | § |
| OF DUGABOY INVESTMENT TRUST; | § |
| GET GOOD TRUST AND GRANT JAMES | § |
| SCOTT III, AS TRUSTEE OF GET GOOD | § |
| TRUST; HUNTER MOUNTAIN | § |
| INVESTMENT TRUST; MARK & | § |
| PAMELA OKADA FAMILY TRUST – | § |
| EXEMPT TRUST #1 AND LAWRENCE | § |
| TONOMURA AS TRUSTEE OF MARK & | § |
| PAMELA OKADA FAMILY TRUST – | § |
| EXEMPT TRUST #1; MARK & PAMELA | § |
| OKADA FAMILY TRUST – EXEMPT | § |
| TRUST #2 AND LAWRENCE | § |
| TONOMURA IN HIS CAPACITY AS | § |
| TRUSTEE OF MARK & PAMELA | § |
| OKADA FAMILY TRUST – EXEMPT | § |
| TRUST #2; CLO HOLDCO, LTD.; | § |
| CHARITABLE DAF HOLDCO, LTD.; | § |
| CHARITABLE DAF FUND, LP.; | § |
| HIGHLAND DALLAS FOUNDATION; | § |
| RAND PE FUND I, LP, SERIES 1; | § |
| MASSAND CAPITAL, LLC; MASSAND | § |
| CAPITAL, INC.; SAS ASSET RECOVERY, | § |
| LTD.; AND CPCM, LLC, | § |
| | § |
| | § |
| DEFENDANTS. | § |
| | § |

---

## REPORT AND RECOMMENDATION TO THE DISTRICT COURT PROPOSING THAT IT: (A) GRANT DEFENDANTS' MOTIONS TO WITHDRAW THE REFERENCE AT SUCH TIME AS THE BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY; BUT (B) DEFER PRE-TRIAL MATTERS TO THE BANKRUPTCY COURT

2

009429

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 512 of 1017    PageID 10276
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 3 of 21

## I.    INTRODUCTION

As further explained herein, there are 23 Defendants in the above-referenced adversary proceeding (the "Adversary Proceeding")—almost all of whom have jury trial rights and desire to have the reference withdrawn from the bankruptcy court, so that a jury trial may ultimately occur in the District Court. All parties agree (even the Plaintiff) that the reference **must** ultimately be withdrawn for final adjudication to occur in the District Court, since: (a) jury trial rights exist, and (b) the Defendants do not consent to a jury trial occurring in the bankruptcy court. However, there is a question of **timing** here.

Specifically, the Plaintiff believes that the bankruptcy court should, for the time being— that is, **until the action is trial-ready**—essentially serve as a magistrate and preside over all pre-trial motions and other matters, with the District Court considering reports and recommendations with regard to any dispositive motions.

The Defendants, on the other hand, believe that the District Court should **immediately** withdraw the reference, taking the position that there is not even "related to" bankruptcy subject matter jurisdiction with regard to the 36 causes of action asserted in the Adversary Proceeding (*see* 28 U.S.C. § 1334(b))—since the Adversary Proceeding was brought **after** confirmation of a Chapter 11 debtor's plan, and the claims in the Adversary Proceeding do not require interpretation or implementation of the plan. Additionally, the Defendants argue that, even if there is "related to" bankruptcy subject matter jurisdiction, mandatory abstention applies with regard to certain of the causes of action in the Adversary Proceeding, since certain **other** federal laws—namely tax law and securities law—are implicated (*see* 28 U.S.C. § 157(d)).

The bankruptcy court disagrees with the Defendants. This Adversary Proceeding is a typical post-confirmation lawsuit being waged be a liquidating trustee, who was appointed

Appx. 05487
009430

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 513 of 1017 PageID 10277
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 4 of 21

pursuant to a Chapter 11 bankruptcy plan to pursue pre-confirmation causes of action that were owned by the bankruptcy estate, for the benefit of creditors. Despite the "post-confirmation" timing of the ***filing*** of the lawsuit, there ***is*** still "related to" bankruptcy subject matter jurisdiction. Additionally, there will be no substantial or material consideration of "other laws of the United States regulating organizations or activities affecting interstate commerce." *Id.*

Accordingly, the bankruptcy court recommends that the District Court only withdraw the reference of this Adversary Proceeding ***at such time as the bankruptcy court certifies that the action is trial-ready and defer to the bankruptcy court the handling of all pre-trial matters (as is most often the custom in this District)***. A more detailed explanation follows.

## II. PROCEDURAL CONTEXT

This Adversary Proceeding is related to the bankruptcy case (the "Bankruptcy Case")[1] of Highland Capital Management, L.P. (the "Debtor," "Highland," or sometimes the "Reorganized Debtor").

Highland filed a voluntary Chapter 11 petition on October 16, 2019, in the United States Bankruptcy Court of Delaware. That court subsequently entered an order transferring venue to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), on December 4, 2019.

On February 22, 2021, the Bankruptcy Court entered an *Order (i) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order") [Bankr. Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (as amended, the "Plan" or "Highland Plan") [Bankr. Docket No. 1808].

---

[1] Bankruptcy Case No. 19-34054.

Appx. 05188
009431

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 514 of 1017    PageID 10278
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 5 of 21

The Highland Plan went effective on August 11, 2021 (the "Effective Date").  Thus, the Bankruptcy Case is now in what is referred to as a "post-confirmation" phase.

Like many Chapter 11 plans, the Highland Plan provided for the creation of a "Claimant Trust" for the benefit of holders of Highland's creditors.  The Claimant Trust was vested with certain assets of Highland, including "all Causes of Action" and "any proceeds realized or received from such Assets." Plan §§ I.B.24, I.B.26, I.B.27. The Plan also provided for the creation of a "Litigation Sub-Trust," as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan. Plan §§ I.B.81, IV.B.1 ("[T]he Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims."), Plan § IV.B.4. The Litigation Trustee of the Litigation Sub-Trust is "responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust[.]" Plan § I.B.83. Under the Plan, proceeds from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]" Plan § IV.B.4.

On October 15, 2021, the Litigation Trustee ("Plaintiff") commenced the Adversary Proceeding for the benefit of Highland's creditors. [Adv. Proc. Docket. No. 1 (the "Complaint")].

The Complaint asserts *36 causes of action* against *23 Defendants*. The causes of action all arise from *pre-confirmation conduct* allegedly perpetrated by Highland's founder James Dondero and individuals and entities affiliated with him, which purportedly resulted in hundreds of millions of dollars in damages to Highland. It appears that all of the Defendants are owned, controlled, or related to Mr. Dondero, although some of the Defendants dispute this characterization.

009432

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 515 of 1017 PageID 10279
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 6 of 21

The 36 causes of action seek: the avoidance and recovery of intentional and constructive fraudulent transfers and obligations under Sections 544, 548, and 550 of the Bankruptcy Code; illegal distributions under Delaware partnership law; breach of fiduciary duty; declaratory judgment that certain entities are liable for the debts of others under alter ego theories, successor liability, aiding and abetting, or knowing participation in breach of fiduciary duty; civil conspiracy; tortious interference with prospective business relations; breach of contract; conversion; unjust enrichment; and the disallowance or subordination of claims under Sections 502 and 510 of the Bankruptcy Code.

As further addressed below, the Bankruptcy Court has concluded that the 36 causes of action include some statutory *core* (*i.e.,* "arising under" or "arising in") claims, some *non-core* (*i.e.,* "related to") claims, and some causes of action that are a *mixture* of both core and non-core claims. The following three tables summarize the Bankruptcy Court's determination as to which counts are core, which are non-core, and which are a mixture:

| Count No. | Core ("Arising Under") Claims | Defendants Named |
|---|---|---|
| 31 | Avoidance and Recovery of One-Year Transfers as Preferential Under 11 U.S.C. §§ 547 and 550 | James Dondero and Scott Ellington |
| 34 | Disallowance of Claims Under Sections 502(b), 502(d), and 502(e) of the Bankruptcy Code | James Dondero, Scott Ellington, Isaac Leventon, Frank Waterhouse, and CPCM, LLC |
| 35-36 | Disallowance or Subordination of Claims Under Sections 502 and 510 of the Bankruptcy Code | James Dondero, Dugaboy Trust, Get Good Trust, Mark Okada, MAP #1, MAP #2, Hunter Mountain, and CLO Holdco |

| Count No. | Non-Core ("Related to") Claims | Defendants Named |
|---|---|---|
| 3 | Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act | James Dondero, Strand Advisors, Dugaboy Trust, Hunter Mountain |

Appx. 05499
009433

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 516 of 1017 PageID 10280
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 7 of 21

| 4 | Breach of Fiduciary Duty Arising Out of Dondero's Lifeboat Scheme | James Dondero, Strand Advisors |
| 5 | Breach of Fiduciary Duty Arising Out of Conduct that Resulted in HCMLP Liabilities | James Dondero, Scott Ellington, Isaac Leventon, Strand Advisors |
| 6 | Declaratory Judgment that Strand is Liable for HCMLP's Debts in its Capacity as HCMLP's General Partner | Strand Advisors |
| 7 | Declaratory Judgment that Dondero is Liable for Strand's Debts as Strand's Alter Ego | James Dondero |
| 8 | Declaratory Judgment that Dondero and Strand are Liable for HCMLP's Debts in Their Capacities as HCMLP's Alter Ego | James Dondero, Strand Advisors |
| 9 | Declaratory Judgment that NexPoint and HCMFA are Liable for the Debts of HCMLP, Strand, and Dondero as Their Alter Egos | NexPoint Advisors, HCMFA |
| 10 | Declaratory Judgment that Dugaboy is Liable for the Debts of Dondero in Their Capacities as Dondero's Alter Ego | Dugaboy Trust |
| 13 | Successor Liability | NexPoint Advisors, HCMFA |
| 14 | Breach of Fiduciary Duty in Connection with Fraudulent Transfers and Schemes | James Dondero, Mark Okada, Scott Ellington, Strand Advisors |
| 15 | Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty Under Texas Law | Grant Scott, Strand Advisors, NexPoint Advisors, HCMFA, Get Good Trust, CLO Holdco, DAF Holdco, DAF, Highland Dallas Foundation, and SAS |
| 16 | Civil Conspiracy to Breach Fiduciary Duties Under Texas Law | James Dondero, Scott Ellington, Isaac Leventon, Grant Scott, NexPoint Advisors, HCMFA, Get Good Trust, CLO Holdco, DAF Holdco, DAF, Highland Dallas Foundation, and SAS |
| 17 | Tortious Interference with Prospective Business Relations | James Dondero, NexPoint Advisors, HCMFA |
| 24 | Breach of Contract Arising Out of Hunter Mountain Note | Hunter Mountain and Rand |
| 25 | Conversion | James Dondero, Scott Ellington |
| 26-30 | Unjust Enrichment | James Dondero, Scott Ellington, Isaac Leventon, NexPoint Advisors, HCMFA, CLO Holdco, Massand Capital, and SAS |

009434

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 517 of 1017 PageID 10281
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 8 of 21

| Count No. | Mixture of Core and Non-Core Claims | Defendants Named |
|---|---|---|
| 1 | Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law | James Dondero, Mark Okada, Strand Advisors, Dugaboy Trust, Hunter Mountain, MAP #1, and MAP #2 |
| 2 | Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law | James Dondero, Mark Okada, Strand Advisors, Dugaboy Trust, Hunter Mountain, MAP #1, and MAP #2 |
| 11 | Avoidance of Transfer of Management Agreements as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law | NexPoint Advisors and HCMFA |
| 12 | Avoidance of Transfer of Management Agreements as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law | NexPoint Advisors and HCMFA |
| 18 | Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, and Applicable State Law | James Dondero, Grant Scott, Get Good Trust, CLO Holdco, DAF Holdco, DAF, and Highland Dallas Foundation |
| 19 | Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, and Applicable State Law | James Dondero, Grant Scott, Get Good Trust, CLO Holdco, DAF Holdco, DAF, and Highland Dallas Foundation |
| 20 | Avoidance of Obligations Under Massand Consulting Agreement as Constructively Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law | Massand LLC |
| 21 | Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law | Massand Capital |
| 22 | Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law | James Dondero, Scott Ellington, Massand Capital, and SAS |
| 23 | Avoidance and Recovery of Certain Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law | James Dondero, Scott Ellington, Massand Capital, and SAS |
| 32 | Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law | James Dondero and Scott Ellington |
| 33 | Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law | James Dondero and Scott Ellington |

APPX 05492
009435

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 518 of 1017 PageID 10282
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 9 of 21

Of the 23 Defendants, **only one** has a pending, unresolved proof of claim on file in the Bankruptcy Case: CLO Holdco.[2] The rest of the Defendants have either never filed proofs of claim, have withdrawn their proofs of claim, or have had them disallowed during the pendency of the Bankruptcy Case.[3] Thus, 22 of the 23 Defendants have jury trial rights.[4] Further, none of the Defendants have consented to the Bankruptcy Court presiding over a jury trial or issuing final orders for that matter.[5]

Six motions to withdraw the reference (collectively, the "Motions to Withdraw") were subsequently filed by the following Defendants on the following dates:

• On January 18, 2022, Defendants Scott Ellington, Isaac Leventon, Frank Waterhouse, and CPCM, LLC (collectively, the "Former Employee Defendants") filed the Motion to Withdraw the Reference for Causes of Action in the Complaint Asserted Against the Former Employee Defendants [Adv. Docket No. 27] and their Brief in Support [Adv. Docket No. 28].

• On January 21, 2022, Defendants Mark A. Okada, The Mark & Pamela Okada Family Trust – Exempt Trust #1, Lawrence Tonomura in his Capacity as Trustee, The Mark & Pamela Okada Family Trust – Exempt Trust #2, and Lawrence Tonomura in his Capacity as Trustee (the "Okada Defendants") filed the Motion of the Okada Parties to Withdraw the Reference [Adv. Docket No. 36] and their Memorandum of Law in Support [Adv. Docket No. 37].

• On January 21, 2022, Defendants NexPoint Advisors L.P ("NexPoint") and Highland Capital Management Fund Advisors L.P. ("HCMFA") filed the Motion to Withdraw the Reference for the Causes of Action in the Complaint Asserted Against Defendants [Adv. Docket No. 39] and their Memorandum of Law in Support [Adv. Docket No. 40].

---

[2] CLO Holdco's claim (Claim No. 198) was objected to by the Litigation Trustee in an omnibus claims objection. CLO Holdco's has moved to ratify a second amended proof of claim. These matters are currently set for hearing on May 2, 2022.

[3] Actually, there are two withdrawals of proofs of claim that are not quite final. Specifically, those of Frank Waterhouse and CPCM. On March 24, 2022, the Reorganized Debtor filed a Bankruptcy Rule 9019 motion for the court to approve a settlement among the Litigation Trustee, Frank Waterhouse, and CPCM. Through the settlement motion, among other terms, Frank Waterhouse and CPCM have agreed to withdraw proofs of claim with prejudice. In return, the Litigation Trustee has agreed to withdraw Count 34 (the only claim asserted against Mr. Waterhouse), as to Mr. Waterhouse, with prejudice from the Complaint. The motion is currently set for hearing on May 2, 2022.

[4] See, e.g., Grandfinanciera, S.A. v. Nordberg, 109 S. Ct. 2782 (1989); Lagenkamp v. Culp, 111 S. Ct. 330 (1990).

[5] See, e.g., Stern v. Marshall, 564 U.S. 462 (2011).

App. 05493
009436

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 519 of 1017   PageID 10283
Case 21-03076-sgj Doc 151 Filed 04/06/22   Entered 04/06/22 13:15:41   Page 10 of 21

• On January 25, 2022, Defendants James Dondero, Dugaboy Investment Trust, Get Good Trust, and Strand Advisors, Inc. (the "Dondero Defendants") filed Defendants James D. Dondero, Dugaboy Investment Trust, Get Good Trust, and Strand Advisors, Inc.'s Motion to Withdraw the Reference [Adv. Docket No. 45] and their Memorandum of Law in Support [Adv. Docket No. 46].

• On January 26, 2022, Defendant Grant James Scott III filed his Motion to Withdraw the Reference [Adv. Docket No. 50] and his Memorandum of Law in Support [Adv. Docket No. 41].

• On January 26, 2022, CLO Holdco, Ltd., Highland Dallas Foundation, Inc., Charitable DAF Fund, LP, and Charitable DAF Holdco, Ltd. (the "CLO Holdco-Related Defendants") filed their Motion to Withdraw the Reference [Adv. Docket No. 59] and their Brief in Support [Adv. Docket No. 59].

• On February 1, 2022, Defendants Hunter Mountain Investment Trust ("Hunter Mountain") and Rand PE Fund I, LP, Series 1 ("Rand" and together with Hunter Mountain, the "Hunter Mountain Defendants") filed a nominal joinder.

The six different Motions to Withdraw initially created six different civil actions before six different District Judges. These six actions were administratively consolidated, by an order signed and entered on March 22, 2022, in Civil Action No. 3:22-CV-203-S [Docket No. 13], and are now pending before District Judge Karen Scholer.

After holding a status conference on the Motions to Withdraw on March 17, 2022, as required by Local Bankruptcy Rule 5011, the Bankruptcy Court now submits the following report and recommendation to the District Court. Based on the reasoning set forth below, the Bankruptcy Court recommends that the Motions to Withdraw be granted, ***but only at such time as the Bankruptcy Court certifies to the District Court that the lawsuit is trial-ready***. The Bankruptcy Court further recommends that the District Court ***defer to the Bankruptcy Court the handling of all pre-trial matters***.

## III.   LEGAL STANDARDS

### A.   *Some General Principles Regarding Discretionary Withdrawal of the Reference*

App. 05194
009437

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 520 of 1017 PageID 10284
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 11 of 21

First, some basic discussion is in order regarding discretionary or permissive withdrawal of the reference. The concept is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."

The statute does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the United States Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985). Courts in this District have placed an emphasis on the first two factors. *See Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006).

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy proceedings (*i.e.,* adversary proceedings or contested matters within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related to" a case under Title 11. 28 U.S.C. § 1334(b). *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011). Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters and those that are merely "related to" a Title 11 case are defined as "non-core" matters. The significance of the "core"/"non-core" distinction is that bankruptcy courts may statutorily enter

Appx. 05195
009438

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 521 of 1017 PageID 10285
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 12 of 21

final judgments in "core" proceedings in a bankruptcy case, while in "non-core" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157. But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the **statutory** power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is **constitutional** (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process"). *Stern*, 564 U.S. at 499.

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may only conduct the jury trial if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[6]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and the cause of action is to enforce statutory rights that are at least analogous to rights that were

---

[6] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

Appx. 05196
009439

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 522 of 1017    PageID 10286
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 13 of 21

tried at law in the late 18th century English courts. *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999). Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).  This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first." *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process. *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990). Withdrawing a claim from the claims allowance process of the bankruptcy courts prior to the commencement of an adversary proceeding can serve to preserve a right to a jury trial. *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

**B.  *Post-Confirmation Bankruptcy Subject Matter Jurisdiction***

009440

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 523 of 1017   PageID 10287
Case 21-03076-sgj Doc 151 Filed 04/06/22   Entered 04/06/22 13:15:41   Page 14 of 21

Defendants argue here that this is all more than simply a matter of "permissive withdrawal of the reference" being applicable. Specifically, the Defendants argue that bankruptcy subject matter jurisdiction is lacking with regard to the Plaintiff's various causes of action (*i.e.,* all 36 causes of action) pursuant to the Fifth Circuit's rulings in *Craig's Stores of Texas, Inc. v. Bank of Louisiana (In re Craig's Stores of Texas, Inc.)*, 266 F.3d 388 (5th Cir. 2001) and *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008).

In *Craig's Stores*, the Fifth Circuit held that a bankruptcy court could not exercise subject matter jurisdiction over a post-confirmation breach of contract claim asserted by a reorganized debtor against its bank in connection with an alleged post-confirmation breach. The Fifth Circuit stated that, following confirmation of a plan, "expansive bankruptcy court jurisdiction" is no longer "required to facilitate 'administration' of the debtor's estate," and further noted: "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Craig's Store's*, 266 F.3d at 390. *Craig's Stores* has often been cited for the notion that bankruptcy subject matter jurisdiction significantly narrows post-confirmation of a Chapter 11 plan.

The Fifth Circuit elaborated on its *Craig's Store's* holding in *Enron*, in holding that confirmation of a plan does not divest a court of bankruptcy subject matter jurisdiction with regard to an action commenced prior to confirmation. *Enron*, 535 F.3d at 335. Noting that "Section 1334 does not expressly limit bankruptcy jurisdiction upon plan confirmation," the Fifth Circuit explained that "three factors were critical to its decision" in *Craig's Stores*:

> [F]irst, the claims at issue "principally dealt with post-confirmation relations between the parties;" second, "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization;" and third, "no facts or law deriving from the reorganization or the plan [were] necessary to the

14

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 524 of 1017    PageID 10288
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 15 of 21

claim." *Craig's Stores*, 266 F.3d at 391.  Notwithstanding its statement that bankruptcy jurisdiction exists after plan confirmation only "for matters pertaining to the implementation or execution of the plan," the facts in *Craig's Stores* were narrow; they involved post-confirmation claims based on post-confirmation activities.

*Id.* (citing *Craig's Stores*, 266 F.3d at 389–91).

Thereafter, numerous courts within the Fifth Circuit have held that the exception to jurisdiction at issue in *Craig's Store's* does not arise where, as here, a trustee of a litigation trust created under a confirmed plan of reorganization for the benefit of creditors pursues post-confirmation causes of action, predicated on pre-confirmation conduct, for the creditors' benefit. *See Faulkner v. Lane Gorman Trubitt, LLC (In re Reagor-Dykes Motors, LP)*, 2021 WL 4823525, at *2–4 (Bankr. N.D. Tex. Oct. 14, 2021) (bankruptcy court had post-confirmation subject matter jurisdiction over a litigation trustee's state law claims "based on pre-petition conduct," the recoveries of which would "affect distributions to creditors under the confirmed plan"); *Dune Operating Co. v. Watt (In re Dune Energy, Inc.),* 575 B.R. 716, 725–26 (Bankr. W.D. Tex. 2017) (bankruptcy court had post-confirmation subject matter jurisdiction over lawsuit asserting state law claims brought by liquidating trustee established under Chapter 11 plan); *Brickley for Cryptometrics, Inc. Creditors' Tr. v. ScanTech Identification Beams Sys., LLC*, 566 B.R. 815, 830–32 (W.D. Tex. 2017) (holding that post-confirmation "related to" subject matter jurisdiction existed over creditors' trust's post-confirmation suit asserting pre-confirmation Chapter 5 claims and non-core state law claims where the plan vested the claims in the trust); *Schmidt v. Nordlicht*, 2017 WL 526017, at *2–3 (S.D. Tex. Feb. 9, 2017) (holding that post-confirmation "related to" subject matter jurisdiction existed over state law claims aimed at pre-confirmation conduct brought by a litigation trustee established by a confirmed plan); *Ogle v. Comcast Corp. (In re Houston Reg'l*, 547 B.R. 717, 736 (Bankr. S.D. Tex. 2016) (bankruptcy court had post-confirmation subject

009442

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 525 of 1017 PageID 10289
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 16 of 21

matter jurisdiction over lawsuit brought by litigation trustee established under confirmed Chapter 11 plan that asserted state law claims); *Kaye v. Dupree (In re Avado Brands, Inc.)*, 358 B.R. 868, 878–79 (Bankr. N.D. Tex. 2006) (bankruptcy court had post-confirmation jurisdiction over litigation trustee's pre-confirmation core and non-core claims that were transferred to the trustee for prosecution under the plan, where proceeds were to be distributed to creditors); *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*, 309 B.R. 217, 221 (Bankr. N.D. Tex. 2004) (bankruptcy court had post-confirmation jurisdiction over claims preserved under Chapter 11 plan and assigned to the creditor's trust for prosecution with recovery to be distributed to creditors).

The Bankruptcy Court agrees with these numerous holdings and believes that they are consistent with *Craig's Stores*. First, unlike the post-confirmation contract dispute at issue in *Craig's Stores*, the claims here all arise from ***pre-confirmation*** conduct. Second, "antagonism" plainly existed between the parties at the date of the reorganization. Contrary to Defendants' assertion that an action must be filed prior to confirmation, courts in the Fifth Circuit consistently hold that "where the claims are based on pre-petition conduct and the cause of action appears to have accrued before the bankruptcy, the antagonism factor is satisfied." *Faulkner*, 2021 WL 4823525, at *3; *see also Schmidt v. Nordlicht*, 2017 WL 526017, at *3 (while "no claim was pending before the bankruptcy," "antagonism existed in the relevant sense; the defendant's alleged wrongdoing harmed the company prior to the bankruptcy, and the company's cause of action appears to have accrued before the bankruptcy"); *Brickley*, 566 B.R. at 831 (confirming that "actual litigation is not necessary to find the existence of antagonism"); *Coho Oil*, 309 B.R. at 221 (finding this factor satisfied where "claims were preserved under the Plan and assigned to the creditor's trust for prosecution"). Moreover, the order confirming the Highland Plan expressly stated that "Implementation of the Plan" shall include the "establishment of" and "transfer of Estate

009443

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 526 of 1017 PageID 10290
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 17 of 21

Causes of Action" to "the Litigation Sub-Trust," the Trustee of which is charged with "investigating, pursuing, and otherwise resolving any Estate Claims." *See* Confirmation Order at ¶ 42(b); *see also* Plan § IV. A ("the Plan will be implemented through . . . the Litigation Sub-Trust"); *id.* at § I.B.4 ("The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims," the proceeds of which "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries . . . ."). Courts within the Fifth Circuit have held that, where a plan "contemplates the prosecution of the claims and the distribution of . . . recovery to creditors under the Plan, and the prosecution of the claims will thus impact compliance with, or completion of, the Plan, the *Craig's Stores* test for post-confirmation jurisdiction is satisfied." *Ernst & Young LLP v. Pritchard (In re Daisytek, Inc.)*, 323 B.R. 180, 185–86 (N.D. Tex. 2005) (bankruptcy court had post-confirmation subject matter jurisdiction over a Rule 2004 motion brought by the trustee of a creditors' trust, established under a confirmed plan, relating to potential accounting malpractice investigation); *see also First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In Re Biloxi Casino Belle Inc.)*, 368 F.3d 491, 496 (5th Cir. 2004) (a suit pertained to the implementation and execution of the plan where recovery had been assigned to a "liquidating trust . . . for the benefit of unsecured creditors").

Accordingly, the Bankruptcy Court concludes that the 36 counts in the Adversary Proceeding "[w]ithout doubt . . . 'pertain[] to implementation and execution'" of the plan and the Defendants arguments to the contrary have no merit. *See Dune Energy*, 575 B.R. at 725–26 (quoting Craig's Stores).[7]

---

[7] The court in *Schmidt* also noted that "*Craig's* turned on the idea that a reorganized debtor's confirmed plan marked the end of the bankruptcy and the emergence of a new reorganized business entity not dependent on the bankruptcy court's protection," commenting that while "that rule makes a good deal of sense in the reorganization context . . . in a liquidation case like this one there is no entity that emerges from the bankruptcy to continue

APP. 05594
009444

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 527 of 1017 PageID 10291
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 18 of 21

### C. *Mandatory Withdrawal of the Reference*

Withdrawal of the reference pursuant to 28 U.S.C. § 157(d) provides for the possibility of mandatory withdrawal of the reference from the bankruptcy court: "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Under the precedent of this District, in *Nat'l Gypsum Co.* and *Pilgrim's Pride*, mandatory withdrawal of the reference must be granted when: (1) the motion was timely filed; (2) a non-Bankruptcy Code federal law at issue has more than a *de minimis* effect on interstate commerce; and (3) the proceeding involves a substantial and material question of non-Bankruptcy Code federal law. *See U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.),* 145 B.R. 539, 541 (N.D. Tex. 1992) (stating "withdrawal must be granted if it can be established (1) that the proceeding involves a substantial and material question of both Title 11 and non-Bankruptcy Code federal law; (2) that the non-Code federal law has more than a de minimis effect on interstate commerce; and (3) that the motion for withdrawal was timely."); *see also City of Clinton, Ark. v. Pilgrim's Pride Corp.*, No. 4:09-CV-386-Y, 2009 WL 10684933, at *1 (N.D. Tex. Aug. 18, 2009).

It has been well established that "mandatory withdrawal is to be applied narrowly" and to "prevent 157(d) from becoming an 'escape hatch.'" *Manila Indus., Inc. v. Ondova Ltd. (In re Ondova Ltd.)*, 2009 U.S. Dist LEXIS 102134, at *6 (N.D. Tex. Oct. 1, 2009), *adopted in its entirety*, 2009 U.S. Dist. LEXIS 102071 (N.D. Tex. Nov. 3, 2009). Unsubstantiated assertions that

---

operations." *Schmidt*, 2017 WL 526017, at *3. Here, although the Plan is one of reorganization, it is "an 'asset monetization plan' providing for the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds." Confirmation Order at ¶ 2. Thus, as in *Schmidt*, the role of the Litigation Trust "is nothing more or less than maximizing the pot of money for distribution to creditors." *Schmidt*, 2017 WL 526017, at *3.

009445

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 528 of 1017    PageID 10292
Case 21-03076-sgj Doc 151 Filed 04/06/22    Entered 04/06/22 13:15:41    Page 19 of 21

non-bankruptcy federal law issues are substantial and material to an adversary proceeding are insufficient to warrant mandatory withdrawal. *Keach v. World Fuel Servs. Corp, (In re Montreal Me. & Atl. Ry.),* 2015 U.S. Dist. LEXIS 74006, at *21-*23 (D. Me. June 8, 2015) (insufficient basis for mandatory withdrawal where party failed to demonstrate specifically why a court would have to "engage in anything beyond routine application of current law" and the party "tries to kick up some dust to make the relevant analysis seem complicated").

  ***Why is the issue of mandatory withdrawal of the reference even being raised here***—when the Bankruptcy Court and all the parties agree that permissive withdrawal of the reference should be exercised here, since mere non-core "related to" claims are pervasive and jury trial rights exist? In other words, everyone agrees the reference should be withdrawn—it's just a matter of ***when***. Should withdrawal happen immediately or when the action is trial-ready?

  The Defendants advocate for immediate withdrawal on the grounds that the Bankruptcy Court does not have authority to preside over the "other federal law" issues present with regard to certain causes of action—so this should preclude the Bankruptcy Court from even presiding over pre-trial matters.

  The court does not agree with the Defendants. The "other federal law" issues that may be involved in this Adversary Proceeding are not pervasive or particularly complicated. There are, admittedly, one or more Tax Code provisions at issue. But bankruptcy courts routinely consider tax matters. Defendants' attempts to characterize what appear to be commonplace tax law issues here as sufficient to mandate withdrawal of the reference seem disingenuous.

  Certain of the Defendants (HCMFA and NexPoint Advisors) contend that federal securities laws are implicated by the Adversary Proceeding. But the Plaintiff has not asserted any claims that are based on federal securities law statutes. Rather, HCMFA and NexPoint Advisors have

009446

Case 19-34054-sgj11 Doc 3445-23 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 529 of 1017 PageID 10293
Case 21-03076-sgj Doc 151 Filed 04/06/22 Entered 04/06/22 13:15:41 Page 20 of 21

merely made barebone references to potential defenses that might implicate federal securities laws. While certain of the parties in the litigation are "registered investment advisors," this does not mean that the parties' alleged conduct will implicate broad questions of federal securities law. "If a party to a case is federally regulated, such as a bank or securities brokerage, but no federal regulation applies to the dispute at hand, the court need not withdraw the proceeding because no federal regulation will have to be considered." *Contemp. Lithographers, Inc. v. Hibbert*, 127 B.R. 122, 125 (M.D.N.C. 1991). The rule advanced by HCMFA and NexPoint Advisors would mean that bankruptcy courts would be unable to hear virtually any claims against any investment advisor or other financial entity regulated under the federal securities laws.

In summary, mandatory withdrawal of the reference is inapplicable here.

### D. Conclusion

In light of: (a) the non-core, related-to claims in the Complaint; (b) the jury trial rights of most Defendants; (c) the fact that only one Defendant out of 23 still has a proof of claim pending—that might arguably negate jury trial rights; and (d) the lack of consent by the Defendants to the Bankruptcy Court presiding over a jury trial or issuing final judgments, the Bankruptcy Court recommends that the District Court: refer all pre-trial matters to the Bankruptcy Court, and grant the Motions to Withdraw upon certification by the Bankruptcy Court that the parties are trial-ready.

With regard to such pre-trial matters, the Bankruptcy Court further recommends that, to the extent a dispositive motion is brought that the Bankruptcy Court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the Bankruptcy Court should submit a report and recommendation to the District Court for the District Court to either adopt or reject.

009447

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

Appx. 05595

009448

# EXHIBIT 24

Appx. 05586
009449



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND<br>ADVISORS, L.P.,<br><br>    Defendant. | Adversary No. 21-03004-sgj<br><br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO,<br>NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj<br><br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 533 of 1017 PageID 10297
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 2 of 45

| | |
|---|---|
| v. | Adversary No. 21-03003-sgj |
| JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | Civ. Act. No. 3:21-cv-01010 |
| Defendants. | **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff. | |
| v. | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | Civ. Act. No. 3:21-cv-01378 |
| | **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| Defendants. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff. | |
| v. | Adversary No.: 21-03007-sgj |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | Civ. Act. No. 3:21-cv-01379 |
| | **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| Defendants. | |

## REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS

### I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

App. 05508
009451

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 534 of 1017 PageID 10298
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 3 of 45

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] See *Stern v. Marshall*, 131 S. Ct. 2594 (2011).
[4] 28 U.S.C. § 157(c) & (e).

Appx. 05509
0009452

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 535 of 1017 PageID 10299
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

Appx. 05519
009453

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 536 of 1017 PageID 10300
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants defended the Note Actions by alleging that an **oral agreement** existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

<u>The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants</u>. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants **except** HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the ***"Alleged Agreement Defendants"*** and they are:  Mr. Dondero; NexPoint; HCMS; and HCRE.  To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry.  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003].  *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

009454

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 537 of 1017 PageID 10301
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97

in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶

99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and

directors—which was audited by one of the largest and most iconic public accounting firms in the

world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those

officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged

Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister

Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager,

or held any role with Highland, but the position of the Alleged Agreement Defendants is that she

nevertheless had authority to act for Highland, in connection with agreeing not to collect on the

Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a

family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with

his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority

of the **limited partnership interests of Highland**—which, according to the Alleged Agreement

Defendants, means Dugaboy can exert control over Highland and do things like release millions

of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted

Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

App. 0512
009455

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 538 of 1017 PageID 10302
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister
Dondero as additional defendants on new counts—the theories being that, if such an "oral
agreement" was made, it may have given rise to other causes of action on the part of the actors
involved. Highland amended its complaints in each of the four applicable Note Actions, adding
new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III
and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement
(Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty
(Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant: HCMFA. Another way in which
the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged
only with regard to the ***two notes on which Defendant HCMFA was the maker***.

The "mutual mistake" defense was articulated as follows. First, the signature on the two
notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of
HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021
(when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized.
More pointedly, it was alleged that the creation of the notes was entirely a ***mistake*** because (a)
even though funds were frequently transferred between Highland and affiliates such as HCMFA,
and (b) even though the Debtor's in-house accountants usually papered these transfers as loans,
and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the
time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds
to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

009456

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 539 of 1017 PageID 10303
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 8 of 45

transfer was allegedly supposed to be treated as **compensation** to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals. The HCMFA notes were allegedly not what **Mr. Dondero**—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes. *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

<u>Manufacturing Chaos</u>. In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes—the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes. The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a **genuine** issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses. Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11] For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

009457

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 540 of 1017    PageID 10304
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12]  The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II.    Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes.  These notes were executed between 2013 and 2019 and are described below.  These are the undisputed facts pertaining to the thirteen demand notes.

### A.    *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

Appx. 05515
009458

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 541 of 1017    PageID 10305
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 10 of 45

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl.

Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19,

Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-

1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664;

Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively,

with Dondero's First Note and Dondero's Second Note, the "Dondero Notes").  Klos Dec. ¶ 20,

Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to

RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B.    *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in

the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl.

Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at

Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the ***other*** Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized.  This allegation will be addressed later herein.

App. 0516
009459

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 542 of 1017 PageID 10306
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

> *C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

009460

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 13 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 543 of 1017   PageID 10307
Case 21-03003-sgj Doc 191 Filed 07/19/22   Entered 07/19/22 17:06:32   Page 12 of 45

D. *Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate*
   *Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

E. *The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

Appx. 05518
009461

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 544 of 1017 PageID 10308
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6. Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7. Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

F. *Demands by Plaintiff and Non-Payment.*

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020. The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes. Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Appx. 09519
009462

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 545 of 1017 PageID 10309
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 14 of 45

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III.    Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A.  The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms. One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

009463

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]

Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

B.    The Identical Provisions in Each of the Term Notes.

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141, Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities controlled by Mr. Dondero.

Appx. 09521

009464

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior

Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes

the following provisions:

2.1 Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

4. Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*C. Non-Payment/Defaults Under the Term Notes.*

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment

payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of

$1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-

outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which

reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

App. 0552
009465

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 548 of 1017    PageID 10312
Case 21-03003-sgj Doc 191 Filed 07/19/22    Entered 07/19/22 17:06:32    Page 17 of 45

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12.  Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

### IV.    Undisputed Corroborating Evidence Regarding the Sixteen Notes

#### A.    *The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC*

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Pl. Ex. 34 at p. 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

Appx. 05523
009466

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 549 of 1017 PageID 10313
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

Appx. 05524
009467

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 550 of 1017    PageID 10314
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74:8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

Appx. 05525
009468

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 551 of 1017 PageID 10315
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate. Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes." Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding. Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782. *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> ### B. *More Corroborating Evidence: During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

Appx. 05526
009469

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 552 of 1017 PageID 10316
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board. Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in October 2020, to provide information regarding any outstanding amounts currently payable or due in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP [Highland] and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

009470
Appx. 05527

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 553 of 1017 PageID 10317
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 22 of 45

C. *More Corroborating Evidence: Before and During the Highland Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records, and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively. A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger. Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger. *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

009471
Appx. 05528

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 554 of 1017 PageID 10318
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets. Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

**V.      The Note Maker Defenses**

*A. The "Oral Agreement" Defense involving Mr. Dondero's Sister*

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party. Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Appx. 05529
009472

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 555 of 1017 PageID 10319
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense. To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent. Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control. The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23] This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Appx. 05539
009473

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 556 of 1017 PageID 10320
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel. Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement." Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost. *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

009474

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 557 of 1017 PageID 10321
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether. *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Pl. Ex. 98 at 426:8-427:15, Appx. 1777. As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland. For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Pl. Ex. 100 at 51:11-22, Appx. 1887.[25] But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

009473

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 558 of 1017 PageID 10322
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

Appx. 05523
009476

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 559 of 1017 PageID 10323
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 28 of 45

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority ***limited*** partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Appx. 05531
009477

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 560 of 1017 PageID 10324
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 29 of 45

3 & 4). However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until recently and only believes that it was subject to "milestones" that he cannot identify. Pl. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B. The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion company with perhaps the world's most iconic and well-known public accounting firm serving as its auditors. As set forth below, this court does not believe any reasonable jury could reach a verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank Waterhouse wore. Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006 and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early 2021. While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive Officer of certain retail funds managed by HCMFA and NexPoint. As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other things, HCMFA's accounting and finance functions. Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that the HCMFA Notes are void or unenforceable because they were signed by mistake or without authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

Appx. 05535
009478

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 561 of 1017 PageID 10325
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 30 of 45

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to

HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA*

*from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47,

Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in

calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation

Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the

"NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various
> employees and representatives of the Plaintiff, the Defendant, and HGAF worked
> with the SEC to correct the error and to compensate HGAF and the various
> investors in HGAF harmed by the NAV Error. Ultimately, and working with the
> SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error
> to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the
> NAV Error itself, as well as rebating related advisor fees and processing costs; and
> (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the
> Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having
> caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through
> insurance or its own funds, compensated the Defendant [HCMFA] for the above
> payments by paying, or causing to be paid, approximately $7.5 million to the
> Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of

summary judgment evidence to support it. In fact, to the contrary, on May 28, 2019, HCMFA sent

a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV

Error, and HCMFA *did not mention Highland*. Pl. Ex. 182, Appx. 2978-2980. In fact, no

document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange

Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

009479

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 562 of 1017 PageID 10326
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Appx. 05527
009480

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 563 of 1017 PageID 10327
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029. There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake." If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000). The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes. At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789). As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.* In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056). Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes. *Id.* at 143:24-25, Appx. 2085. To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089. At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089. In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085. The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

Appx. 05538
009481

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 564 of 1017    PageID 10328
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there— particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C. Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration. There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration. Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made. First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults. *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries). Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default. These Note Maker Defendants had no right to cure in the loan documents. Thus, this defense fails as a matter of law. *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28] One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Appx. 05539
009482

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 565 of 1017 PageID 10329
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

### V. Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing the loan to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

Appx. 05549
009483

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 566 of 1017 PageID 10330
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI. Legal Analysis

### A. The Context Here Matters: Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

009484

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 567 of 1017   PageID 10331
Case 21-03003-sgj Doc 191 Filed 07/19/22   Entered 07/19/22 17:06:32   Page 36 of 45

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

Appx. 05542
009485

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 568 of 1017 PageID 10332
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 37 of 45

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶ 27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec. ¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶ 52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note Maker Defendants under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Appx. 05543
009486

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 569 of 1017 PageID 10333
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants'
breaches in the amounts set forth above, plus the interest that has accrued under the Notes since
those calculations, plus collection costs and attorneys' fees—which amounts Highland should
separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note
Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where
affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of
accrued interest owed, and the date of default for each of the two promissory notes," movant
"presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where
movant "has attached a copy of the note … to a sworn affidavit in which he states that the
photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and
that there is a balance due on the note … [movant] has made a prima facie case that he is entitled
to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

B.  *The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence
for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent,
Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement,"
such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes
subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral
agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal
amount of any Note subject to the alleged "oral agreement."  Mr. Dondero and Sister Dondero

App. 0544
009487

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 570 of 1017 PageID 10334
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement. Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement. The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement. There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

009488

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 571 of 1017 PageID 10335
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

App. 05546
009489

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 572 of 1017 PageID 10336
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 41 of 45

original) (citing Texas law). In other words, "[m]utual mistake of fact occurs where the parties to
an agreement have a common intention, but the written instrument does not reflect the intention of
the parties due to a mutual mistake." *Id.* (internal quotations omitted). "In determining the intent
of the parties to a written contract, a court may consider the conduct of the parties and the
information available to them at the time of signing in addition to the written agreement itself." *Id.*
(internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show
what the parties' true agreement was and that the instrument incorrectly reflects that agreement
because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-
CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted).
"The question of mutual mistake is determined not by self-serving subjective statements of the
parties' intent … but rather solely by objective circumstances surrounding execution of the
[contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959,
2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose
of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain."
*Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both
HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr.
Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being
treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities
in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes
were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes
were represented as "liabilities" to third parties at all relevant times.

009490

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 573 of 1017 PageID 10337
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual. The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney*, 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

App. 00548
009491

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 574 of 1017 PageID 10338
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

## VII. Summary Judgment.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined. Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

App. 0549
009492

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 575 of 1017 PageID 10339
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment. The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

App. 005559
009493

Case 19-34054-sgj11 Doc 3445-24 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 576 of 1017 PageID 10340
Case 21-03003-sgj Doc 191 Filed 07/19/22 Entered 07/19/22 17:06:32 Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred. The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs. The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

Appx. 05551

009494

# EXHIBIT 25

009495

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 578 of 1017 PageID 10342
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 1 of 45



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND<br>ADVISORS, L.P.,<br><br>    Defendant. | Adversary No. 21-03004-sgj<br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO,<br>NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj<br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 579 of 1017 PageID 10343
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 2 of 45

| | |
|---|---|
| v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj<br><br>Civ. Act. No. 3:21-cv-01010<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj<br><br>Civ. Act. No. 3:21-cv-01378<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj<br><br>Civ. Act. No. 3:21-cv-01379<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

## <u>REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS</u>

### I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

009497
App. 05554

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 580 of 1017 PageID 10344
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 3 of 45

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).
[4] 28 U.S.C. § 157(c) & (e).

App. 0555
009498

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 581 of 1017 PageID 10345
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

Appx. 05586
009499

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 582 of 1017 PageID 10346
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants defended the Note Actions by alleging that an **oral agreement** existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants **except** HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the **"Alleged Agreement Defendants"** and they are: Mr. Dondero; NexPoint; HCMS; and HCRE. To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003]. *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

App. 05557
009500

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 583 of 1017 PageID 10347
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97

in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶

99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and

directors—which was audited by one of the largest and most iconic public accounting firms in the

world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those

officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged

Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister

Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager,

or held any role with Highland, but the position of the Alleged Agreement Defendants is that she

nevertheless had authority to act for Highland, in connection with agreeing not to collect on the

Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a

family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with

his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority

of the **limited partnership interests of Highland**—which, according to the Alleged Agreement

Defendants, means Dugaboy can exert control over Highland and do things like release millions

of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted

Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero
Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland
could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's
affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release
obligations on the Notes as a form of "compensation" to Mr. Dondero).


009301

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 584 of 1017 PageID 10348
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister
Dondero as additional defendants on new counts—the theories being that, if such an "oral
agreement" was made, it may have given rise to other causes of action on the part of the actors
involved. Highland amended its complaints in each of the four applicable Note Actions, adding
new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III
and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement
(Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty
(Count VII) (the "Amended Complaints").

    The "Mutual Mistake" Defense of one sole Defendant:  HCMFA. Another way in which
the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged
only with regard to the **two notes on which Defendant HCMFA was the maker**.

    The "mutual mistake" defense was articulated as follows. First, the signature on the two
notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of
HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021
(when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized.
More pointedly, it was alleged that the creation of the notes was entirely a **mistake** because (a)
even though funds were frequently transferred between Highland and affiliates such as HCMFA,
and (b) even though the Debtor's in-house accountants usually papered these transfers as loans,
and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the
time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds
to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

Appx. 05559
009502

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 585 of 1017    PageID 10349
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 8 of 45

transfer was allegedly supposed to be treated as **compensation** to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals.  The HCMFA notes were allegedly not what **Mr. Dondero**—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes.  *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos.  In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes— the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes.  The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a **genuine** issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses.  Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11]  For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

009503

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 586 of 1017 PageID 10350
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the
world of commercial finance, and not as described in any evidence submitted to the court.[12] The
bankruptcy court hereby recommends that the District Court grant summary judgment in favor of
the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the
reasons set forth below.

## II.    Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the
"Notes"): (a) thirteen were demand notes; and (b) three were term notes. These notes were
executed between 2013 and 2019 and are described below. These are the undisputed facts
pertaining to the thirteen demand notes.

### A.    *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as
payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18,
Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where
there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan.
However, this happens in ***very different circumstances from the Highland case***—i.e., when all affiliates file
bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the
general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized
Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment,
found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos
Declaration" at this same DE # 133 in Adv. Proc No. 21-3003 even when referring herein to the ***other*** Note Actions
(i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each
of the Note Actions.

009504
Appx. 08564

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 587 of 1017 PageID 10351
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 10 of 45

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl.

Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19,

Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-

1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664;

Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively,

with Dondero's First Note and Dondero's Second Note, the "Dondero Notes"). Klos Dec. ¶ 20,

Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to

RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B.  *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in

the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl.

Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at

Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized. This allegation will be addressed later herein.

Appx. 05502
009505

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 588 of 1017    PageID 10352
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes").  Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

   *C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note").  Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes").  Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized.  This allegation will be addressed later herein.

Appx. 05503
009506

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 589 of 1017 PageID 10353
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 12 of 45

*D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

*E. The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2. Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5. Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of



Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 590 of 1017 PageID 10354
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.      Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.      Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

F.   *Demands by Plaintiff and Non-Payment.*

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020. The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes. Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Appx. 05505
009508

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 591 of 1017 PageID 10355
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 14 of 45

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III. Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

#### A. The Three Term Notes

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms. One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

Appx. 08586
009509

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 592 of 1017 PageID 10356
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 15 of 45

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]
Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of
$30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-
44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02
(the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos
Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51
(the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos
Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of
each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and
HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr.
Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use
of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13,
Appx. 1783, and 450:3-24, Appx. 1783.

     B.    *The Identical Provisions in Each of the Term Notes.*

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141, Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities controlled by Mr. Dondero.



Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 593 of 1017    PageID 10357
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 16 of 45

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior

Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes

the following provisions:

2.1    Annual Payment Dates.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*C.  Non-Payment/Defaults Under the Term Notes.*

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment

payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of

$1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-

outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which

reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

Appx. 05568
009511

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 594 of 1017    PageID 10358
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 17 of 45

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12. Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

## IV.    Undisputed Corroborating Evidence Regarding the Sixteen Notes

### A. *The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC*

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Pl. Ex. 34 at p. 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

Appx. 05569
009512

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 595 of 1017 PageID 10359
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

Appx. 05579
009513

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 596 of 1017 PageID 10360
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

Appx. 05571
009514

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 597 of 1017 PageID 10361
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782.  *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> **B.  *More Corroborating Evidence:  During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes***

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

Appx. 05672
009515

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 598 of 1017 PageID 10362
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board. Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in October 2020, to provide information regarding any outstanding amounts currently payable or due in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP [Highland] and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

Appx. 05573
009516

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 23 of
Case 3:25-cv-02072-S    Document 15-12   Filed 10/06/25    Page 599 of 1017   PageID 10363
Case 21-03004-sgj Doc 163 Filed 07/19/22   Entered 07/19/22 17:08:16   Page 22 of 45

*C. More Corroborating Evidence:   Before and During the Highland
Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records,
and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively.  A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan."  Ex. 39 at 1, Appx. 801.  And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary.  The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger.  *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

009517

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 600 of 1017 PageID 10364
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets. Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

## V. **The Note Maker Defenses**

### *A. The "Oral Agreement" Defense involving Mr. Dondero's Sister*

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party. Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Appx. 05675
009518

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 601 of 1017 PageID 10365
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense. To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent. Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control. The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23] This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Appx. 05676
009519

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 602 of 1017 PageID 10366
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel. Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement." Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost. *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

Appx. 05577
009320

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 603 of 1017 PageID 10367
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether. *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Pl. Ex. 98 at 426:8-427:15, Appx. 1777. As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland. For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Pl. Ex. 100 at 51:11-22, Appx. 1887.[25] But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

Appx. 05578
009321

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 604 of 1017 PageID 10368
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

Appx. 05579
009522

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 605 of 1017 PageID 10369
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 28 of 45

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority ***limited*** partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Appx. 05589
009523

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 606 of 1017    PageID 10370
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 29 of 45

3 & 4).  However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until recently and only believes that it was subject to "milestones" that he cannot identify.  Pl. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B.  The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion company with perhaps the world's most iconic and well-known public accounting firm serving as its auditors.  As set forth below, this court does not believe any reasonable jury could reach a verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank Waterhouse wore.  Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006 and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early 2021.  While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive Officer of certain retail funds managed by HCMFA and NexPoint.  As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other things, HCMFA's accounting and finance functions.  Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that the HCMFA Notes are void or unenforceable because they were signed by mistake or without authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

Appx. 08584
009324

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 607 of 1017 PageID 10371
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 30 of 45

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to

HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA*

*from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47,

Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in

calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation

Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the

"NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various
> employees and representatives of the Plaintiff, the Defendant, and HGAF worked
> with the SEC to correct the error and to compensate HGAF and the various
> investors in HGAF harmed by the NAV Error. Ultimately, and working with the
> SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error
> to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the
> NAV Error itself, as well as rebating related advisor fees and processing costs; and
> (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the
> Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having
> caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through
> insurance or its own funds, compensated the Defendant [HCMFA] for the above
> payments by paying, or causing to be paid, approximately $7.5 million to the
> Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of

summary judgment evidence to support it. In fact, to the contrary, on May 28, 2019, HCMFA sent

a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV

Error, and HCMFA *did not mention Highland*. Pl. Ex. 182, Appx. 2978-2980. In fact, no

document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange

Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

Appx. 05582
009525

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 608 of 1017 PageID 10372
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Appx. 05583
009326

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 609 of 1017 PageID 10373
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029. There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake." If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000). The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes. At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789). As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.* In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056). Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes. *Id.* at 143:24-25, Appx. 2085. To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089. At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089. In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085. The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

Appx. 05584
009527

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 610 of 1017 PageID 10374
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii)

prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there—

particularly when the defense is based on mostly self-serving conclusory statements of Mr.

Dondero and not any tangible evidence.[28]

### C. Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of

consideration. There is no summary judgment evidence in the record that supports his affirmative

defenses of waiver, estoppel, or lack of consideration. Pl. Ex. 98 at 357:24-360:14, Appx. 1760-

1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker

Defendants each also contend that they made prepayments on their Notes, such that they cannot

be deemed to have defaulted, and also assert they did not default under those loans because of

Annual Installment payments that they made. First, the unrefuted summary judgment evidence of

Plaintiff clearly dispels any argument that prepayments may have averted any defaults. *See* Klos

Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries). Moreover, the Annual Installment payments were

due on December 31, 2020, and these Note Maker Defendants did not make their Annual

Installment payments to Highland until mid-January 2021, after receiving notices of default. These

Note Maker Defendants had no right to cure in the loan documents. Thus, this defense fails as a

matter of law. *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762,

370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28] One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Appx. 05585
009328

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 611 of 1017 PageID 10375
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V.     Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing the parties to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

Appx. 05586
009329

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 612 of 1017 PageID 10376
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI.   Legal Analysis

### A.   The Context Here Matters:  Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

Appx. 05587
009530

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 613 of 1017 PageID 10377
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 36 of 45

judgment.").  To prevail on summary judgment for breach of a promissory note under Texas law,

the movant need not prove all essential elements of a breach of contract, but only must establish

(i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal

owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See*

*Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL

3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each

of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed

by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal

and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶

18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed

by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22,

Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed

by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-

26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by

HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

Appx. 05588
009531

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶ 27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec. ¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶ 52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note Maker Defendants under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Appx. 05589

009532

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 615 of 1017    PageID 10379
Case 21-03004-sgj Doc 163 Filed 07/19/22   Entered 07/19/22 17:08:16   Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants' breaches in the amounts set forth above, plus the interest that has accrued under the Notes since those calculations, plus collection costs and attorneys' fees—which amounts Highland should separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

B.  *The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement," such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal amount of any Note subject to the alleged "oral agreement."  Mr. Dondero and Sister Dondero

Appx. 05599
009533

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 616 of 1017 PageID 10380
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement. Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement. The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement. There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

009334

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 617 of 1017 PageID 10381
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

Appx. 05592
009535

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 618 of 1017 PageID 10382
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 41 of 45

original) (citing Texas law). In other words, "[m]utual mistake of fact occurs where the parties to

an agreement have a common intention, but the written instrument does not reflect the intention of

the parties due to a mutual mistake." *Id.* (internal quotations omitted). "In determining the intent

of the parties to a written contract, a court may consider the conduct of the parties and the

information available to them at the time of signing in addition to the written agreement itself." *Id.*

(internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show

what the parties' true agreement was and that the instrument incorrectly reflects that agreement

because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-

CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted).

"The question of mutual mistake is determined not by self-serving subjective statements of the

parties' intent … but rather solely by objective circumstances surrounding execution of the

[contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959,

2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose

of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain."

*Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both

HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr.

Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being

treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities

in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes

were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes

were represented as "liabilities" to third parties at all relevant times.

Appx. 05593
009536

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 619 of 1017    PageID 10383
Case 21-03004-sgj Doc 163 Filed 07/19/22    Entered 07/19/22 17:08:16    Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual. The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi,* 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney,* 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney,* 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons,* 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

Appx 05594
009537

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 620 of 1017 PageID 10384
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

### VII. Summary Judgment.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined. Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

Appx. 05595
009538

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 621 of 1017 PageID 10385
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment.** **The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

Appx. 05586
009539

Case 19-34054-sgj11 Doc 3445-25 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 622 of 1017 PageID 10386
Case 21-03004-sgj Doc 163 Filed 07/19/22 Entered 07/19/22 17:08:16 Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred. The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs. The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

Appx. 05587

009340

# EXHIBIT 26

Amex 05598
009341

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 624 of 1017 PageID 10388

Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 1 of 45



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

*United States Bankruptcy Judge*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>    Defendant. | Adversary No. 21-03004-sgj<br><br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj<br><br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

009342

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 625 of 1017 PageID 10389
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 2 of 45

| | |
|---|---|
| v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj<br><br>Civ. Act. No. 3:21-cv-01010<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj<br><br>Civ. Act. No. 3:21-cv-01378<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj<br><br>Civ. Act. No. 3:21-cv-01379<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

### REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS

## I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

Appx. 05609
009343

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).
[4] 28 U.S.C. § 157(c) & (e).

Appx. 05601

009344

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 627 of 1017 PageID 10391
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

Appx. 05602

009345

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 628 of 1017    PageID 10392
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants defended the Note Actions by alleging that an ***oral agreement*** existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants ***except*** HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the ***"Alleged Agreement Defendants"*** and they are:  Mr. Dondero; NexPoint; HCMS; and HCRE.  To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry.  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003].  *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

App. 05603
009546

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 629 of 1017 PageID 10393
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97 in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶ 99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and directors—which was audited by one of the largest and most iconic public accounting firms in the world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager, or held any role with Highland, but the position of the Alleged Agreement Defendants is that she nevertheless had authority to act for Highland, in connection with agreeing not to collect on the Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority of the **limited partnership interests of Highland**—which, according to the Alleged Agreement Defendants, means Dugaboy can exert control over Highland and do things like release millions of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

Appx. 05604
009347

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 630 of 1017 PageID 10394
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister Dondero as additional defendants on new counts—the theories being that, if such an "oral agreement" was made, it may have given rise to other causes of action on the part of the actors involved. Highland amended its complaints in each of the four applicable Note Actions, adding new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement (Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty (Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant: HCMFA. Another way in which the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged only with regard to the **two notes on which Defendant HCMFA was the maker**.

The "mutual mistake" defense was articulated as follows. First, the signature on the two notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021 (when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized. More pointedly, it was alleged that the creation of the notes was entirely a **mistake** because (a) even though funds were frequently transferred between Highland and affiliates such as HCMFA, and (b) even though the Debtor's in-house accountants usually papered these transfers as loans, and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

009348

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 631 of 1017 PageID 10395
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 8 of 45

transfer was allegedly supposed to be treated as *compensation* to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals. The HCMFA notes were allegedly not what *Mr. Dondero*—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes. *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos. In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes—the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes. The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a *genuine* issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses. Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11] For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

Appx. 05606
009349

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 632 of 1017 PageID 10396
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12] The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II. Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes. These notes were executed between 2013 and 2019 and are described below. These are the undisputed facts pertaining to the thirteen demand notes.

### A. *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.



Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 633 of 1017 PageID 10397
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 10 of 45

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl.

Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19,

Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-

1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664;

Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively,

with Dondero's First Note and Dondero's Second Note, the "Dondero Notes"). Klos Dec. ¶ 20,

Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to

RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B.  *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in

the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl.

Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at

Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized. This allegation will be addressed later herein.

Appx. 05608
009551

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 634 of 1017 PageID 10398
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

### C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

009352

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 635 of 1017 PageID 10399
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 12 of 45

   *D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

   *E. The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

   2.     Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

   5.     Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

Appx. 05619
009553

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 636 of 1017    PageID 10400
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

F.   *Demands by Plaintiff and Non-Payment.*

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020.  The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes.  Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Appx. 05614
009354

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 637 of 1017    PageID 10401
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 14 of 45

commenced these Note Actions.  Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III.    Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A.  The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms.  One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

Appx. 05612

009555

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 638 of 1017 PageID 10402
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 15 of 45

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]
Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of
$30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-
44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02
(the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos
Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51
(the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos
Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of
each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and
HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr.
Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use
of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13,
Appx. 1783, and 450:3-24, Appx. 1783.

> B. *The Identical Provisions in Each of the Term Notes*.

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141,
Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636
(NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated
between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities
controlled by Mr. Dondero.

Appx. 05613
009556

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 17 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 639 of 1017   PageID 10403
46
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 16 of 45

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes the following provisions:

2.1     Annual Payment Dates.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

4.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

   C.  *Non-Payment/Defaults Under the Term Notes.*

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of $1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

Appx. 05614

009557

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 640 of 1017 PageID 10404
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 17 of 45

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12. Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

## IV. Undisputed Corroborating Evidence Regarding the Sixteen Notes

### A. The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Pl. Ex. 34 at p. 39, Appx. 782. Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

Appx. 05615
009558

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 641 of 1017 PageID 10405
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

Appx. 05616
009559

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 642 of 1017 PageID 10406
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

Appx. 05617
009560

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 643 of 1017    PageID 10407
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782.  *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

>    B. *More Corroborating Evidence:  During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

Appx. 05618
009561

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 644 of 1017 PageID 10408
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds

themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail

Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA

and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail

Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-

1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-

2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers

of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board.

Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in

October 2020, to provide information regarding any outstanding amounts currently payable or due

in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided

services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the

questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or

due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and
> its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP
> [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint
> comes due on December 31, 2047. The earliest the Note between HCMLP
> [Highland] and HCMFA could come due is in May 2021. All amounts owed by
> each of NexPoint and HCMFA pursuant to the shared services arrangement with
> HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes
> that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

Appx. 05619
009562

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 645 of 1017 PageID 10409
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 22 of 45

*C. More Corroborating Evidence: Before and During the Highland Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records, and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively. A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger. Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger. *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

Appx. 05629
009563

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 646 of 1017 PageID 10410
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets. Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

## V.        The Note Maker Defenses

### A. The "Oral Agreement" Defense involving Mr. Dondero's Sister

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party. Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Appx. 05621
009564

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 647 of 1017 PageID 10411
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense. To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent. Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control. The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23] This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Appx. 05622
009565

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 648 of 1017 PageID 10412
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel. Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement." Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost. *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

Appx. 05623
009566

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 649 of 1017 PageID 10413
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether. *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Pl. Ex. 98 at 426:8-427:15, Appx. 1777. As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland. For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Pl. Ex. 100 at 51:11-22, Appx. 1887.[25] But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

009567
Appx. 05624

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 650 of 1017 PageID 10414
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

Appx. 05625
009568

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 651 of 1017 PageID 10415
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 28 of 45

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority *limited* partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Appx. 05626
009569

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 652 of 1017 PageID 10416
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 29 of 45

3 & 4). However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the

Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until

recently and only believes that it was subject to "milestones" that he cannot identify. Pl. Ex. 105

at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B. The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other

Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion

company with perhaps the world's most iconic and well-known public accounting firm serving as

its auditors. As set forth below, this court does not believe any reasonable jury could reach a

verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank

Waterhouse wore. Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006

and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early

2021. While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer

of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive

Officer of certain retail funds managed by HCMFA and NexPoint. As Treasurer and Principal

Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other

things, HCMFA's accounting and finance functions. Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-

15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19,

38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that

the HCMFA Notes are void or unenforceable because they were signed by mistake or without

authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

Appx. 05627
009570

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 653 of 1017 PageID 10417
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 30 of 45

HCMFA) **did not intend** for $7.4 million of funds that were transferred from the Debtor to

HCMFA in May 2019 to be loans—rather the money was intended to be **compensation to HCMFA**

**from Highland**, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47,

Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in

calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation

Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the

"NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various
> employees and representatives of the Plaintiff, the Defendant, and HGAF worked
> with the SEC to correct the error and to compensate HGAF and the various
> investors in HGAF harmed by the NAV Error. Ultimately, and working with the
> SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error
> to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the
> NAV Error itself, as well as rebating related advisor fees and processing costs; and
> (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the
> Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having
> caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through
> insurance or its own funds, compensated the Defendant [HCMFA] for the above
> payments by paying, or causing to be paid, approximately $7.5 million to the
> Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of

summary judgment evidence to support it. In fact, to the contrary, on May 28, 2019, HCMFA sent

a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV

Error, and HCMFA **did not mention Highland**. Pl. Ex. 182, Appx. 2978-2980. In fact, no

document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange

Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

009571

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 654 of 1017 PageID 10418
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Appx. 05629
009572

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 655 of 1017 PageID 10419
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029. There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake." If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000). The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes. At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789). As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.* In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056). Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes. *Id.* at 143:24-25, Appx. 2085. To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089. At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089. In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085. The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

Appx. 05630
009573

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 656 of 1017    PageID 10420
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there— particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C.  Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration.  There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration.  Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made.  First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults.  *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries).  Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default.  These Note Maker Defendants had no right to cure in the loan documents.  Thus, this defense fails as a matter of law.  *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28]    One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Appx. 05631
009374

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 657 of 1017 PageID 10421
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V.    Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

Appx. 05632
009373

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 658 of 1017 PageID 10422
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI. Legal Analysis

### A. The Context Here Matters: Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

Appx. 05623
009576

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 659 of 1017 PageID 10423
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 36 of 45

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

Appx. 05934
009577

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 660 of 1017 PageID 10424
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 37 of 45

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶
27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by
NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and
accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec.
¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS
in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but
unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶
52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE
in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but
unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations
by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note
Maker Defendants under the Term Notes breached their obligations by failing to make the Annual
Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Appx. 05635
009578

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 661 of 1017 PageID 10425
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants' breaches in the amounts set forth above, plus the interest that has accrued under the Notes since those calculations, plus collection costs and attorneys' fees—which amounts Highland should separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

B. *The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement," such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal amount of any Note subject to the alleged "oral agreement."  Mr. Dondero and Sister Dondero

Appx. 05636
009579

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 662 of 1017 PageID 10426
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement. Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement. The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement. There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

Appx. 05627
009580

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 41 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 663 of 1017   PageID 10427
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

Appx. 05638
009581

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 664 of 1017    PageID 10428
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 41 of 45

original) (citing Texas law).  In other words, "[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.* (internal quotations omitted).  "In determining the intent of the parties to a written contract, a court may consider the conduct of the parties and the information available to them at the time of signing in addition to the written agreement itself." *Id.* (internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted).  "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both HCMFA and Highland intended the HCMFA Notes to be loans.  As discussed above: (i) Mr. Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times.

Appx. 05639
009582

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 43 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 665 of 1017    PageID 10429
Case 21-03005-sgj Doc 207 Filed 07/19/22   Entered 07/19/22 17:10:16   Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes.  The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual.  The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi,* 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney,* 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney,* 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

Appx 05549
009583

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 666 of 1017 PageID 10430
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

## VII. Summary Judgment.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined. Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

Appx. 05641
009584

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 667 of 1017 PageID 10431
Case 21-03005-sgj Doc 207 Filed 07/19/22 Entered 07/19/22 17:10:16 Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment. The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

Appx. 05642
009585

Case 19-34054-sgj11 Doc 3445-26 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:25-cv-02072-S      Document 15-12      Filed 10/06/25      Page 668 of 1017      PageID 10432
Case 21-03005-sgj Doc 207 Filed 07/19/22    Entered 07/19/22 17:10:16    Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred.  The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs.  The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

Appx. 05643
009586

# EXHIBIT 27

Amex_05644
009587



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>      Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>      Defendant. | Adversary No. 21-03004-sgj<br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>      Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>      Defendants. | Adversary No.: 21-03005-sgj<br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>      Plaintiff. | |

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 671 of 1017 PageID 10435
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 2 of 45

| | |
|---|---|
| v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj<br><br>Civ. Act. No. 3:21-cv-01010<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj<br><br>Civ. Act. No. 3:21-cv-01378<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj<br><br>Civ. Act. No. 3:21-cv-01379<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

## REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS

### I.  Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

App. 05546
009589

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).

[4] 28 U.S.C. § 157(c) & (e).

009590

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 673 of 1017 PageID 10437
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 4 of 45

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

Appx. 08648
009591

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 674 of 1017 PageID 10438
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 5 of 45

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when *four* of the five Note Maker Defendants defended the Note Actions by alleging that an *oral agreement* existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants *except* HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the *"Alleged Agreement Defendants"* and they are: Mr. Dondero; NexPoint; HCMS; and HCRE. To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003]. *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

009592

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 675 of 1017 PageID 10439
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 6 of 45

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97 in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶ 99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and directors—which was audited by one of the largest and most iconic public accounting firms in the world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister Dondero"), acting on behalf of Highland. Notably, Sister Dondero was never an officer, manager, or held any role with Highland, but the position of the Alleged Agreement Defendants is that she nevertheless had authority to act for Highland, in connection with agreeing not to collect on the Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with his children as the future beneficiaries).[7] Here is the catch: Dugaboy happens to own a majority of the **limited partnership interests of Highland**—which, according to the Alleged Agreement Defendants, means Dugaboy can exert control over Highland and do things like release millions of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

Appx. 08559
009593

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 676 of 1017 PageID 10440
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 7 of 45

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister
Dondero as additional defendants on new counts—the theories being that, if such an "oral
agreement" was made, it may have given rise to other causes of action on the part of the actors
involved. Highland amended its complaints in each of the four applicable Note Actions, adding
new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III
and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement
(Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty
(Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant: HCMFA. Another way in which
the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged
only with regard to the ***two notes on which Defendant HCMFA was the maker***.

The "mutual mistake" defense was articulated as follows. First, the signature on the two
notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of
HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021
(when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized.
More pointedly, it was alleged that the creation of the notes was entirely a ***mistake*** because (a)
even though funds were frequently transferred between Highland and affiliates such as HCMFA,
and (b) even though the Debtor's in-house accountants usually papered these transfers as loans,
and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the
time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds
to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

App. 00651
009594

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 677 of 1017 PageID 10441
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 8 of 45

transfer was allegedly supposed to be treated as **compensation** to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals. The HCMFA notes were allegedly not what **Mr. Dondero**—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes. *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos. In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes—the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes. The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a **genuine** issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses. Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11] For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

App. 05552
009595

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 678 of 1017 PageID 10442
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 9 of 45

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12] The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II.    Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes. These notes were executed between 2013 and 2019 and are described below. These are the undisputed facts pertaining to the thirteen demand notes.

### A.    *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

Appx. 09596

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl. Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19, Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664; Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Dondero Notes"). Klos Dec. ¶ 20, Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B.   *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized. This allegation will be addressed later herein.

Appx. 05554

009597

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 680 of 1017 PageID 10444
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 11 of 45

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

*C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

Appx. 08555
009598

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 681 of 1017 PageID 10445
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 12 of 45

### D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

### E. The Identical Provisions in Each of the Demand Notes.

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of



Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 682 of 1017 PageID 10446
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 13 of 45

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6. Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7. Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

F. *Demands by Plaintiff and Non-Payment*.

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020. The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes. Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

Appx. 05657
009600

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 683 of 1017 PageID 10447
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 14 of 45

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III. Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A. The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms. One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.


Appx. 05658
009601

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 684 of 1017 PageID 10448
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 15 of 45

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]
Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of
$30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-
44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02
(the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos
Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51
(the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos
Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of
each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and
HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr.
Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use
of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13,
Appx. 1783, and 450:3-24, Appx. 1783.

    B.    *The Identical Provisions in Each of the Term Notes.*

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141, Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities controlled by Mr. Dondero.

Appx. 05659
009602

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 685 of 1017 PageID 10449
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 16 of 45

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior

Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes

the following provisions:

> 2.1     Annual Payment Dates.  During the term of this Note, Borrower shall pay
> the outstanding principal amount of the Note (and all unpaid accrued interest
> through the date of each such payment) in thirty (30) equal annual payments (the
> "Annual Installment") until the Note is paid in full.  Borrower shall pay the Annual
> Installment on the 31st day of December of each calendar year during the term of
> this Note, commencing on the first such date to occur after the date of execution of
> this Note.

> 4.     Acceleration Upon Default.  Failure to pay this Note or any installment
> hereunder as it becomes due shall, at the election of the holder hereof, without
> notice, demand, presentment, notice of intent to accelerate, notice of acceleration,
> or any other notice of any kind which are hereby waived, mature the principal of
> this Note and all interest then accrued, if any, and the same shall at once become
> due and payable and subject to those remedies of the holder hereof.  No failure or
> delay on the part of Payee in exercising any right, power or privilege hereunder
> shall operate as a waiver thereof.

> 5.     Waiver.  Maker hereby waives grace, demand, presentment for payment,
> notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice
> of acceleration and all other notices of any kind hereunder.

> 6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by
> acceleration or otherwise) and is placed in the hands of an attorney for collection,
> or if it is collected through a bankruptcy court or any other court after maturity, the
> Maker shall pay, in addition to all other amounts owing hereunder, all actual
> expenses of collection, all court costs and reasonable attorneys' fees and expenses
> incurred by the holder hereof.

> C.  Non-Payment/Defaults Under the Term Notes.

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment

payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of

$1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-

outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which

reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

Appx_05509

009603

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 686 of 1017    PageID 10450
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 17 of 45

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12.  Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

IV.    **Undisputed Corroborating Evidence Regarding the Sixteen Notes**

    A.    *The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC*

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Pl. Ex. 34 at p. 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

009604

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 687 of 1017 PageID 10451
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 18 of 45

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21]"Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

Appx. 05682
009605

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 688 of 1017 PageID 10452
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 19 of 45

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

Appx. 05683
009606

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 689 of 1017    PageID 10453
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 20 of 45

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782.  *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> B. *More Corroborating Evidence:  During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

009607

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 690 of 1017 PageID 10454
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 21 of 45

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds

themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail

Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA

and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail

Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-

1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-

2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers

of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board.

Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in

October 2020, to provide information regarding any outstanding amounts currently payable or due

in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided

services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the

questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or

due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and
> its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP
> [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint
> comes due on December 31, 2047. The earliest the Note between HCMLP
> [Highland] and HCMFA could come due is in May 2021. All amounts owed by
> each of NexPoint and HCMFA pursuant to the shared services arrangement with
> HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes
> that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

Appx. 05685
009608

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 691 of 1017 PageID 10455
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 22 of 45

*C. More Corroborating Evidence: Before and During the Highland
Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records,
and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively. A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger. Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger. *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

009609

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 692 of 1017 PageID 10456
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 23 of 45

control of Highland, included all of the Notes among the Debtor's assets. Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

## V. The Note Maker Defenses

### A. The "Oral Agreement" Defense involving Mr. Dondero's Sister

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party. Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Appx. 05687
009610

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 693 of 1017    PageID 10457
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 24 of 45

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense.  To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes.  Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent.  Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control.  The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23]  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.



Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 694 of 1017 PageID 10458
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 25 of 45

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel. Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement." Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost. *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

009612

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 695 of 1017 PageID 10459
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 26 of 45

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the

Notes forgiven, and remained silent about the alleged "oral agreement" altogether. *See* Pl. Ex. 201

¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex.

204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of

a material amount that Highland ever forgave. Pl. Ex. 98 at 426:8-427:15, Appx. 1777. As earlier

discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement"

on behalf of Highland. For one thing, it is undisputed that Sister Dondero had no meaningful

knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry,

(c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was

"underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-

43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero

resides in Vero Beach, Florida and represents that she owns a private investigations business.[24]

The only information Sister Dondero purported to have regarding Mr. Dondero's compensation

from Highland was that he had told her he "was not highly paid" and that, in recent years, "his

salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Pl. Ex. 100

at 51:11-22, Appx. 1887.[25] But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-

1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50,

Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl.

Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

009613
Appx. 05679

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 696 of 1017 PageID 10460
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 27 of 45

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (*i.e.*, NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

Appx. 05674
009614

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 697 of 1017 PageID 10461
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 28 of 45

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority *limited* partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

Appx. 05672
009615

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 698 of 1017 PageID 10462
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 29 of 45

3 & 4). However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until recently and only believes that it was subject to "milestones" that he cannot identify. Pl. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B. The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion company with perhaps the world's most iconic and well-known public accounting firm serving as its auditors. As set forth below, this court does not believe any reasonable jury could reach a verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank Waterhouse wore. Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006 and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early 2021. While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive Officer of certain retail funds managed by HCMFA and NexPoint. As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other things, HCMFA's accounting and finance functions. Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that the HCMFA Notes are void or unenforceable because they were signed by mistake or without authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

Appx. 05673
009616

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 699 of 1017 PageID 10463
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 30 of 45

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to

HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA*

*from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47,

Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in

calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation

Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the

"NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various
> employees and representatives of the Plaintiff, the Defendant, and HGAF worked
> with the SEC to correct the error and to compensate HGAF and the various
> investors in HGAF harmed by the NAV Error. Ultimately, and working with the
> SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error
> to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the
> NAV Error itself, as well as rebating related advisor fees and processing costs; and
> (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the
> Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having
> caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through
> insurance or its own funds, compensated the Defendant [HCMFA] for the above
> payments by paying, or causing to be paid, approximately $7.5 million to the
> Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of

summary judgment evidence to support it. In fact, to the contrary, on May 28, 2019, HCMFA sent

a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV

Error, and HCMFA *did not mention Highland*. Pl. Ex. 182, Appx. 2978-2980. In fact, no

document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange

Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

Appx. 05674

009617

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 700 of 1017   PageID 10464
Case 21-03007-sgj Doc 208 Filed 07/19/22   Entered 07/19/22 17:16:08   Page 31 of 45

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

Appx. 05675
009618

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 701 of 1017 PageID 10465
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 32 of 45

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029. There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake." If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000). The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes. At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789). As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.* In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056). Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes. *Id.* at 143:24-25, Appx. 2085. To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089. At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089. In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085. The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

Appx. 05676
009619

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 702 of 1017 PageID 10466
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 33 of 45

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there—particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C. Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration. There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration. Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made. First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults. *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries). Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default. These Note Maker Defendants had no right to cure in the loan documents. Thus, this defense fails as a matter of law. *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28] One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Appx. 05677
009620

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 703 of 1017 PageID 10467
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 34 of 45

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V. Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c)). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

Appx. 05678
009621

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 704 of 1017 PageID 10468
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 35 of 45

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI. Legal Analysis

### A. The Context Here Matters: Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

009622

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 705 of 1017 PageID 10469
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 36 of 45

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

Appx. 05689
009623

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 706 of 1017 PageID 10470
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 37 of 45

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶

27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by

NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec.

¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS

in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but

unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶

52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE

in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but

unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations

by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note

Maker Defendants under the Term Notes breached their obligations by failing to make the Annual

Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Appx. 05581
009624

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 707 of 1017 PageID 10471
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 38 of 45

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants'
breaches in the amounts set forth above, plus the interest that has accrued under the Notes since
those calculations, plus collection costs and attorneys' fees—which amounts Highland should
separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note
Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where
affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of
accrued interest owed, and the date of default for each of the two promissory notes," movant
"presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where
movant "has attached a copy of the note … to a sworn affidavit in which he states that the
photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and
that there is a balance due on the note … [movant] has made a prima facie case that he is entitled
to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

B. *The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence
for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent,
Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement,"
such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes
subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral
agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal
amount of any Note subject to the alleged "oral agreement." Mr. Dondero and Sister Dondero

Appx 05682
009625

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 708 of 1017 PageID 10472
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 39 of 45

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement. Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement. The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement. There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

009626

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 709 of 1017    PageID 10473
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 40 of 45

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

Appx. 05584
009627

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 710 of 1017 PageID 10474
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 41 of 45

original) (citing Texas law). In other words, "[m]utual mistake of fact occurs where the parties to

an agreement have a common intention, but the written instrument does not reflect the intention of

the parties due to a mutual mistake." *Id.* (internal quotations omitted). "In determining the intent

of the parties to a written contract, a court may consider the conduct of the parties and the

information available to them at the time of signing in addition to the written agreement itself." *Id.*

(internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show

what the parties' true agreement was and that the instrument incorrectly reflects that agreement

because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-

CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted).

"The question of mutual mistake is determined not by self-serving subjective statements of the

parties' intent … but rather solely by objective circumstances surrounding execution of the

[contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959,

2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose

of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain."

*Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both

HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr.

Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being

treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities

in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes

were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes

were represented as "liabilities" to third parties at all relevant times.

Appx. 05685
009628

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 711 of 1017 PageID 10475
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 42 of 45

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual. The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi,* 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney,* 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney,* 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons,* 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

009629

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 712 of 1017 PageID 10476
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 43 of 45

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

## VII. Summary Judgment.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined. Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

Appx. 05587
009630

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 713 of 1017 PageID 10477
Case 21-03007-sgj Doc 208 Filed 07/19/22 Entered 07/19/22 17:16:08 Page 44 of 45

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**Submission of Judgment. The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

Appx. 05688
009631

Case 19-34054-sgj11 Doc 3445-27 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 46 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 714 of 1017    PageID 10478
Case 21-03007-sgj Doc 208 Filed 07/19/22    Entered 07/19/22 17:16:08    Page 45 of 45

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred.  The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs.  The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*

Appx. 05689
009632

# EXHIBIT 28

Amex_05599
009633

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 716 of 1017    PageID 10480
Case 21-03007-sgj Doc 16 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 1 of 8

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| **vs.** | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC),** | § | |
| | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

### NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S MOTION FOR LEAVE TO FILE AMENDED ANSWER AND BRIEF IN SUPPORT

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP" or

"Defendant") files this Motion for Leave to File Amended Answer and Brief in Support

("Motion")[1] in response to Highland Capital Management L.P.'s ("Plaintiff" or "Debtor")

---

[1] Defendant files its brief in the same document as the motion pursuant to Local Bankruptcy Rule 7007-1(d).

**Appx. 05591**

**009634**

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 717 of 1017 PageID 10481
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 2 of 8

Complaint in the above-referenced adversary proceeding (the "Adversary Proceeding") and respectfully states as follows:

## I. RELEVANT BACKGROUND

1.      On January 22, 2021, Plaintiff filed its Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (the "Complaint"), commencing this Adversary Proceeding. Defendant's counsel accepted service of the Complaint on February 1, 2021 and the parties agreed the Defendant's deadline to answer or otherwise respond to the Complaint was March 3, 2021. On March 3, 2021, Defendant filed its Answer to Plaintiff's Complaint ("Original Answer").

2.      On March 11, 2021, Plaintiff and Defendant filed a Stipulation and Proposed Scheduling Order [ECF No. 8], setting forth a proposed joint scheduling order in lieu of the Alternative Scheduling Order issued by the Court. On March 16, 2021, the Court entered its Order Approving Stipulation Regarding Scheduling Order [ECF No. 10] (the "Scheduling Order").

3.      Under the Scheduling Order, the deadline to serve discovery requests is May 31, 2021 and responses to discovery requests are due July 5, 2021. Fact discovery closes July 26, 2017, dispositive motions must be filed by September 6, 2021, and trial docket call is November 8, 2021 at 1:30 p.m.

4.      Preparation of the defense of this adversary has been made extremely difficult by the constraints imposed by the Debtor with respect to access to witnesses and evidence. In connection with preparation of the defense, Defendant realized its affirmative defenses were not as clear as they could have been and that the additional defenses which it seeks to assert in this Adversary Proceeding should have been more fully set out as follows: (i) the Debtor's ability to make demand on the Notes was subject to a condition subsequent that has not yet become unable to be met, and (ii) the Notes are ambiguous. The original listing of affirmative defenses was

009635

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 718 of 1017 PageID 10482
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 3 of 8

intended to cover such defenses, however, in an abundance of caution, Defendant seeks leave to amend and more clearly set out its intended defenses. The Scheduling Order does not contain a deadline to amend pleadings; therefore, Defendant's Motion is governed by Federal Rule of Civil Procedure 15(a)(2), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, which favors liberal amendment of pleadings. *See* Fed. R. Civ. P. 15(a)(2); Fed. R. Bankr. P. 7015.

5.      Given the deadlines for discovery and pre-trial matters under the Scheduling Order, Defendant's proposed amendment will not delay the proceedings or otherwise prejudice the Plaintiff. Moreover, the proposed amendment is not sought in bad faith, but in furtherance of meritorious defenses based on additional investigation.

6.      Because Defendant's Motion is not sought in bad faith and will not result in undue delay or prejudice to Plaintiff, the Court should grant Defendant's Motion under the standard favoring liberal amendment of pleadings under Rule 15.

## II.  ARGUMENT AND AUTHORITY

7.      Rule 15(a) governs amendments to pleadings and provides that a party may amend its pleading with the opposing party's written consent or the court's leave. Fed. R. Civ P. 15(a). The court "should freely give leave when justice so requires." *Id.* Rule 15 "evinces a bias in favor of granting leave to amend." *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981); *Marshall v. MarOpCo, Inc.*, 223 F.Supp.3d 562, 566 (N.D. Tex. 2017) ("Since *Dussouy*, the Fifth Circuit has repeatedly held that Rule 15(a) evinces a liberal amendment policy."). "The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading." *Dussouy*, 660 F.2d at 598. Leave to amend should be granted unless there is a substantial reason for denying leave. *InternetAd Sys., LLC v. Opodo Ltd.*, 481 F.Supp.2d 596, 603 (N.D. Tex. 2007).

009636

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 719 of 1017 PageID 10483
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 4 of 8

Courts may consider the following factors in determining whether a substantial reason exists to deny leave: (i) delay or prejudice to the non-movant; (ii) bad faith or dilatory motives on the part of the movant; (iii) repeated failure to cure deficiencies; or (iv) futility of amendment. *InternetAd Sys*, 481 F.Supp.2d at 604; *Sabre, Inc. v. Lyn-Lea Travel Corp.*, No. Civ. A. 3:96-CV-2068R, 2003 WL 21339291, *4 (N.D. Tex. June 5, 2003).

8.      Here, there is no substantial reason to deny Defendant's Motion and, as such, the Court should grant Defendant leave to amend its answer. First, there is no undue delay or prejudice to Plaintiff. This is not a situation where there is an "unexplained delay" following the original answer. *See, e.g., In re Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996) (denying motion for leave to amend where the plaintiff sought to add a cause of action more than one year after the original complaint was filed and eleven months after the first amended complaint was filed with no reasonable explanation for such delay). Instead, Defendant was served with the Complaint less than three months ago and its answer was due less than two months ago. Defendant seeks to amend its answer to clarify its defense by adding two affirmative defenses based on its further investigation into the allegations of Plaintiff and in connection with its preparation for serving written discovery. Defendant determined these affirmative defenses applied in connection with its investigation and preparation for written discovery in connection with its defense of the case and within the expected timeline of this contested matter based on the Scheduling Order. Further, allowing Defendant to amend its answer will not result in prejudice to Plaintiff. Fact discovery does not close until July 26, 2021 and Plaintiff has not yet conducted any discovery. *See, e.g., Sabre, Inc.*, 2003 WL 21339291 at *4 (noting that undue prejudice arises where a new theory requires a reiteration of discovery proceedings). Accordingly, there is no undue delay or prejudice to Plaintiff.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 720 of 1017 PageID 10484
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 5 of 8

9. Nor does Defendant seek to amend in bad faith. In determining bad faith, Courts consider whether "the movant first presents a theory difficult to establish but favorable and, only after that fails, presents a less favorable theory." *Sabre*, 2003 WL 21339291 at *6. Here, Defendant is not seeking to add a new theory after the first theory failed – discovery has not yet begun, and the dispositive motion deadline is approximately four months away – and the circumstances do not give rise to an inference that Defendant is engaging in tactical maneuvers. Defendant is seeking to amend its answer, less than two months after filing it, because it determined additional defenses were applicable as it continued to investigate its defense of the Plaintiff's allegations and prepare for discovery. Accordingly, Defendant's Motion is not brought in bad faith or for dilatory motives.

10. Third, this is not a situation where Defendant has repeatedly failed to cure deficiencies with prior amendments. This is Defendant's first request for leave to amend and, if granted, will be Defendant's first amendment to its answer. As such, repeated failure to cure deficiencies is not a reason to deny Defendant's Motion.

11. Last, Defendant's proposed amendments are not futile. Amendments to defenses are futile "where they would necessarily fail or are so lacking in merit on their face." *Southpoint Condo. Ass'n Inc. v. Lexington Ins. Co.*, Case No. 19-cv-61365, 2020 WL 639400, *6 (S.D. Fla. Feb. 11, 2020). Some courts refuse to address the issue of futility in a motion for leave to amend context and instead does so in the context of a Rule 12(b)(6) or Rule 56 motion, "where the procedural safeguards are surer." *Garcia v. Zale Corp.*, 2006 WL 298156, *1 (N.D. Tex. Feb. 1, 2006) (Fitzwater, J.) ("…the court's almost unvarying practice when futility is raised is to address the merits of the claim or defense in the context of a Rule 12(b)(6) or Rule 56 motion."). Here, the

009638

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 721 of 1017 PageID 10485
Case 21-03007-sgj Doc 16 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 6 of 8

proposed affirmative defenses are not futile,[2] and Defendant expects evidence supporting such defenses will be uncovered through discovery. *See, e.g., Don Stevenson Design, Inc. v. Randy Herrera Designer, LLC*, No. 5:16-CV-1130, 2017 WL 10581124, *1 (W.D. Tex. Sept. 8, 2017) ("Finally, Defendants' Motion for Leave is not futile because additional evidence substantiating the statute of limitations defense may come forward during the remainder of discovery.").

12.    Further, "even if there is substantial reason to deny leave to amend, the court should consider prejudice to the movant, as well as judicial economy, in determining whether justice requires granting leave." *Allen v. Target Corporation*, 2007 WL 9735894, *1 (S.D. Tex. Nov 29, 2007). As a result, in considering a motion for leave to add additional affirmative defenses, Rule 8(c)'s requirement that affirmative defenses be pleaded or waived "must be applied in the context of the Federal Rules' liberal pleading and amendment policy, the goal of which is to do substantial justice." *Id.* At *1-2 (granting defendant's motion for leave to add affirmative defenses known previously because the delay did not constitute a substantial reason to deny leave and justice requires allowing the amendment).

13.    Because there is no substantial reason to deny Defendant's request, Defendant's additional affirmative defenses could be waived if not allowed, and Plaintiff is free to challenge any of Defendant's affirmative defenses under Rule 56, made applicable to this Adversary Proceeding by Bankruptcy Rule 7056. Leave to amend should be freely granted and, as such, the Court should grant Defendant's Motion.

---

[2]    Plaintiff contemplated at least some of its loans to affiliates or related entities (such as the Notes at issue in this Adversary Proceeding) "may not result in allowed or enforceable claims" by the Plaintiff. *See* Global Notes and Statement of Limitations, Methods, and Disclaimers Regarding Debtor's Amended Schedules of Assets and Liabilities, p. 3 "Intercompany Claims" [Docket No. 1082-1], Global Notes and Statement of Limitations, methods, and Disclaimer Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, p. 3 "Intercompany Claims" [Docket No. 247-1]. Defendant believes the reason some of these intercompany loans may not be allowed or enforceable is because collectability was dependent on a condition subsequent and/or they are ambiguous – the very defense Defendant now seeks to include in its Answer.

Appx. 05686
009639

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 722 of 1017    PageID 10486
Case 21-03007-sgj Doc 16 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 7 of 8

### III.  PROPOSED AMENDED ANSWER ATTACHED

14.    Defendant's proposed First Amended Answer is attached hereto as **Exhibit A**.

### IV.  CONCLUSION

The Court should liberally grant leave to file amended pleadings absent a demonstration that such amendment would result in undue delay, prejudice, or is sought in bad faith. There is no such evidence of any of the foregoing here. For these reasons, Defendant respectfully requests the Court (i) grant this Motion; (ii) deem Defendant's First Amended Answer filed as of the date of the order granting this Motion; and grant Defendant such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC)**

### CERTIFICATE OF CONFERENCE

Between April 21 and 25, 2021, I conferred with John Morris, counsel for the Plaintiff, regarding the relief requested herein and Mr. Morris indicated that the Plaintiff is opposed to the relief requested in Defendant's Motion.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

Appx. 05687

009640

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 723 of 1017   PageID 10487
Case 21-03007-sgj Doc 16 Filed 05/10/21   Entered 05/10/21 14:50:18   Page 8 of 8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT A

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 725 of 1017 PageID 10489
Case 21-03007-sgj Doc 16-1 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 2 of 10

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P. | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P. | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| HCRE PARTNERS, LLC (n/k/a | § | |
| NEXPOINT REAL ESTATE PARTNERS, | § | |
| LLC), | § | |
| | § | |
| **Defendant.** | § | |

## NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
## FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP" or

"Defendant") files this First Amended Answer in response to Highland Capital Management L.P.'s

("Plaintiff" or "Debtor") Complaint for (I) Breach of Contract and (II) Turnover of Property of the

Debtor's Estate (the "<u>Complaint</u>") in the above-referend adversary proceeding (the "<u>Adversary Proceeding</u>") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.      The first sentence of Paragraph 1 sets forth Plaintiff's objective in bringing the Complaint and does not require a response. To the extent a response is required, Defendant denies the allegations in the first sentence of Paragraph 1. The second sentence contains a legal conclusion that does not require a response. To the extent a response is required, Defendant denies the allegations in the second sentence of Paragraph 1.

2.      Paragraph 2 contains a summary of the relief Plaintiff seeks and does not require a response. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3.      Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers constitutional authority on the Bankruptcy Court to adjudicate this dispute. Defendant denies any allegations in Paragraph 3 that are not expressly admitted.

4.      Paragraph 4 states a legal conclusion that does not require a response. To the extent a response is required, Defendant admits the Bankruptcy Court has statutory jurisdiction over this Adversary Proceeding but denies that the Court has constitutional authority over this Adversary Proceeding. Defendant denies any allegations in Paragraph 4 that are not expressly admitted.

5.      Defendant denies that Plaintiff's breach of contract claim is a core proceeding. Defendant further denies that a turnover proceeding under 11 U.S.C. § 542(b) is the appropriate mechanism to collect a contested debt. Defendant admits that a turnover proceeding under 11

---

[1]    The headings herein are from Plaintiff's Complaint and are solely included for the Court's convenience.

---

**009644**

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 727 of 1017 PageID 10491
Case 21-03007-sgj Doc 16-1 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 4 of 10

U.S.C. § 542(b) is a statutorily core proceeding but denies that it is constitutionally core under *Stern v. Marshall*. Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Defendant denies any allegations in Paragraph 5 that are not expressly admitted.

6.     Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that venue is proper in this District.

### THE PARTIES

7.     Defendant admits the allegations in Paragraph 7 of the Complaint.

8.     Defendant admits the allegations in Paragraph 8 of the Complaint.

### CASE BACKGROUND

9.     Defendant admits the allegations in Paragraph 9 of the Complaint.

10.     Defendant admits the allegations in Paragraph 10 of the Complaint.

11.     Defendant admits the allegations in Paragraph 11 of the Complaint.

12.     Defendant admits the allegations in Paragraph 12 of the Complaint.

### STATEMENT OF FACTS

**A.     The Demand Notes**

13.     Defendant admits it has executed at least one promissory note under which the Debtor is the payee. Defendant denies any allegations in Paragraph 13 that are not expressly admitted.

14.     Defendant admits that it signed the document attached to the Complaint as Exhibit 1. Defendant denies any allegations in Paragraph 14 that are not expressly admitted.

15.     Defendant admits that it signed the document attached to the Complaint as Exhibit 2. Defendant denies any allegations in Paragraph 15 that are not expressly admitted.

009645

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 728 of 1017 PageID 10492
Case 21-03007-sgj Doc 16-1 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 5 of 10

16.     Defendant admits that it signed the document attached to the Complaint as Exhibit 3. Defendant denies any allegations in Paragraph 16 that are not expressly admitted.

17.     Defendant admits that it signed the document attached to the Complaint as Exhibit 4. Defendant denies any allegations in Paragraph 17 that are not expressly admitted.

18.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in Paragraph 18.

19.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in Paragraph 19.

20.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 of the Complaint in Paragraph 20.

**B.      Allegations regarding the Demand Notes**

21.     Defendant admits that Plaintiff sent it a copy of Exhibit 5. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of Paragraph 21. Defendant denies any allegations in Paragraph 21 that are not expressly admitted.

22.     To the extent Paragraph 22 asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits the allegations in Paragraph 22.

23.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 23 and, therefore, denies them.

24.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 24 and, therefore, denies them.

25.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 and, therefore, denies them.

26.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 26 and, therefore, denies them.

Appx. 05708
009646

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 729 of 1017    PageID 10493
Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 6 of 10

27.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 27 and, therefore, denies them.

28.     Defendant denies the allegations in Paragraph 28 of the Complaint.

**C.     The Term Note**

29.     Defendant admits that it has executed at least one promissory note under which Debtor is the payee. Defendant denies any allegations in Paragraph 29 that are not expressly admitted.

30.     Defendant admits it signed the document attached to the Complaint as Exhibit 6. Defendant denies any allegations in Paragraph 30 that are not expressly admitted.

31.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Complaint in Paragraph 31. Defendant denies any allegations in Paragraph 31 that are not expressly admitted.

32.     Defendant admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Complaint in Paragraph 32. Defendant denies any allegations in Paragraph 32 that are not expressly admitted.

33.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Complaint in Paragraph 33. Defendant denies any allegations in Paragraph 33 that are not expressly admitted.

34.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Complaint in Paragraph 34. Defendant denies any allegations in Paragraph 34 that are not expressly admitted.

**D.     Allegations regarding the Term Note.**

35.     To the extent Paragraph 35 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 35 of the Complaint.

Appx. 05701
009647

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 730 of 1017    PageID 10494
Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 7 of 10

36.    Defendant admits that Plaintiff sent it a copy of Exhibit 7. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of Paragraph 36 of the Complaint. Defendant denies any allegations in Paragraph 36 that are not expressly admitted.

37.    To the extent Paragraph 37 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 37 of the Complaint.

38.    Defendant is without sufficient information or knowledge to admit or deny the allegations in Paragraph 38 of the Complaint and, therefore, denies them.

39.    Defendant denies Paragraph 39 of the Complaint.

### FIRST CLAIM FOR RELIEF
#### (For Breach of Contract)

40.    Paragraph 40 of the Complaint seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

41.    Paragraph 41 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

42.    Paragraph 42 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

43.    Paragraph 43 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

Appx. 05795

009648

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 731 of 1017    PageID 10495
Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 8 of 10

44.    Paragraph 44 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

45.    Defendant denies Paragraph 45 of the Complaint.

46.    Defendant denies Paragraph 46 of the Complaint.

### SECOND CLAIM FOR RELIEF
### (Turnover Pursuant to 11 U.S.C. § 549(b))

47.    Paragraph 47 seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

48.    Paragraph 48 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

49.    Paragraph 49 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

50.    Paragraph 50 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

51.    Defendant admits that Plaintiff transmitted Exhibits 5 and 7 to the Complaint. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 51 of the Complaint and, therefore, denies them.

52.    Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 52 of the Complaint and, therefore, denies them.

53.    Defendant denies Paragraph 53 of the Complaint.

009649

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 732 of 1017    PageID 10496
Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 9 of 10

54.    Defendant denies that Plaintiff is entitled to the relief requested in the prayer of the Complaint, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

55.    Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

56.    Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

57.    Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

58.    Plaintiff's claims are barred in whole or in part because prior to the demands for payment, Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent.

59.    Defendant further asserts that each Note is ambiguous.

## JURY DEMAND

60.    Defendant demands a trial by jury of all issues so triable under Federal Rule of Civil Procedure 38 and Federal Rule of Bankruptcy Procedure 9015.

61.    Defendant does not consent to the Bankruptcy Court conducting a jury trial and therefore demands such jury trial in the District Court.

## PRAYER

For these reasons, Defendant respectfully requests that, following a trial on the merits, the Court deny the relief Plaintiffs seeks through its Complaint, enter a judgment that the Plaintiff take nothing on the Complaint, and grant Defendant such other relief at law or in equity to which it may be entitled.

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 733 of 1017    PageID 10497
Case 21-03007-sgj Doc 16-1 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 10 of 10

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
       lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## CERTIFICATE OF SERVICE

      I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

| | |
|---|---|
| Jeffrey N. Pomerantz | Melissa S. Hayward |
| jpomerantz@pszjlaw.com | MHayward@HaywardFirm.com |
| Ira D. Kharasch | Zachery Z. Annable |
| ikharasch@pszjlaw.com | ZAnnable@HaywardFirm.com |
| John A. Morris | HAYWARD PLLC |
| jmorris@pszjlaw.com | 10501 N. Central Expy, Ste. 106 |
| Gregory V. Demo | Dallas, Texas 75231 |
| gdemo@pszjlaw.com | Fax: (972) 755-7110 |
| Hayley R. Winograd | |
| hwinograd@pszjlaw.com | |
| PACHULSKI STANG ZIEHL & JONES LLP | |
| 10100 Santa Monica Blvd., 13th Floor | |
| Los Angeles, California 90067 | |
| Facsimile: (310) 201-0760 | |
| *Counsel for Highland Capital Management, L.P.* | |

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

009651

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 734 of 1017    PageID 10498
Case 21-03007-sgj Doc 16-2 Filed 05/10/21    Entered 05/10/21 14:50:18    Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a** | § | |
| **NEXPOINT REAL ESTATE PARTNERS,** | § | |
| **LLC),** | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING NEXPOINT REAL ESTATE**
**PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S MOTION FOR**
**LEAVE TO AMEND ANSWER TO PLAINTIFF'S COMPLAINT**

Case 19-34054-sgj11 Doc 3445-28 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 735 of 1017 PageID 10499
Case 21-03007-sgj Doc 16-2 Filed 05/10/21 Entered 05/10/21 14:50:18 Page 2 of 2

On this day, the Court considered Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC's ("Defendant") Motion for Leave to Amend its Answer to Plaintiff's Complaint (the "Motion"). Having considered the Motion, and finding good cause exists, the Court hereby, **GRANTS** the Motion.

IT IS THEREFORE ORDERED that Defendant's First Amended Answer to Plaintiff's Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate, is hereby **DEEMED FILED** as of the date of this Order.

### END OF ORDER ###

Appx. 05710

009653

# EXHIBIT 29

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 737 of 1017 PageID 10501
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 1 of 12



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 14, 2021**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | **CASE NO. 19-34054-SGJ-11** |
| **L.P.,** | § | **(CHAPTER 11)** |
| DEBTOR. | § | |
| _____ | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **L.P.,** | § | **ADVERSARY NO. 21-03006** |
| PLAINTIFF, | § | **(CIV. ACTION #3:21-CV-01378-N)** |
| | § | |
| **VS.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC.,** | § | |
| DEFENDANT. | § | |

_____

**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:**
**(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH**
**TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;**
**AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT**

009655

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 738 of 1017 PageID 10502
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 2 of 12

## I.  INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware. That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019. A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against the Defendant, Highland Capital Management Services, Inc. ("HCMS-Defendant").

The Adversary Proceeding pertains to five promissory notes (collectively, the "Notes") executed by HCMS-Defendant in favor of the Debtor from 2017 through 2019. The Notes consist of a term note (the "Term Note") with annual payments and four demand notes (the "Demand Notes").

On December 3, 2020, the Debtor sent HCMS-Defendant a letter demanding payment by December 11, 2020 on each of the Demand Notes, as allowed under the terms of the Demand Notes. The HCMS-Defendant failed to make payment on any of the Demand Notes. On December 31, 2020, HCMS-Defendant failed to make the annual payment due under the Term Note. On January 7, 2021, following HCMS-Defendant's failure to pay, the Debtor accelerated the Term

---

[1] Bankruptcy Case No. 19-34054.

App. 0573
009656

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 739 of 1017 PageID 10503
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 3 of 12

Note, under its terms, and demanded full payment on $6,757,248.95 outstanding and due under the Term Note.

Following HCMS-Defendant's failure to pay on the Notes in response to the demand letters, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on the Notes (as well as several other notes of parties related to HCMS-Defendant) as part of its funding to pay creditors.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court. HCMS-Defendant submitted a *Motion for Withdrawal the Reference*[3] (the "Motion") and *Brief in Support of Motion to Withdraw the Reference*[4] (the "Brief in Support") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on July 8, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03006, Dkt. 19.
[4] Adversary Case No. 21-03006, Dkt. 20.

009657

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 740 of 1017 PageID 10504
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 4 of 12

## II.  NATURE OF THE ADVERSARY PROCEEDING

### a.  The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[5] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the four Demand Notes were: (i) $150,000, executed March 28, 2018, (ii) $200,000, executed June 25, 2018, (iii) $400,000, executed May 29, 2019, and (iv) $150,000, executed June 26, 2019.  The principal amount of the Term Note was originally $20,247,628.02 and it was executed on May 31, 2017.  The Debtor now seeks combined monetary damages on the Notes totaling $7,704,768.38, plus accrued but unpaid interest and cost of collection. Because the Debtor alleges the amount due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 25, 2021, HCMS-Defendant filed its *Original Answer*[6] on March 3, 2021 and *First Amended Answer*[7] on June 11, 2021.

HCMS-Defendant filed two proofs of claim in the Bankruptcy Case, Proof of Claim Nos. 175 and 176.  Both proofs of claim were based on alleged post-petition actions or inaction of the Debtor as fund investment advisor in managing funds in which HCMS-Defendant is an investor. On October 9, 2020, the bankruptcy court entered a *First Supplemental Order Sustaining First Omnibus Claims Objection*[8], which disallowed both of HCMS-Defendant's proofs of claim. ***The disallowed proofs of claim did not relate to the Notes.***

---

[5] Adversary Case No. 21-03006, Dkt. 1.
[6] Adversary Case No. 21-03006, Dkt. 6.
[7] Adversary Case No. 21-03006, Dkt. 34.
[8] Bankruptcy Case No. 19-34054, Dkt. 1155.

009658

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 741 of 1017 PageID 10505
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 5 of 12

### b. The Motion to Withdraw the Reference, Response Opposed, and Reply

On June 3, 2021, HCMS-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. The Debtor never filed a responsive pleading to the Motion filed by the HCMS-Defendant. The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on July 8, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

#### i. The Movant's Position

HCMS-Defendant argues there is cause shown for permissive withdrawal of the reference because: (1) the Texas Constitution guarantees a party to a contract a right to a jury trial; (2) the contract claim is a purely state law, non-core claim; (3) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (4) efficiency, uniformity and forum shopping factors all favor withdrawal.[9]

Further, HCMS-Defendant contends it has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter final orders in the Adversary Proceeding or hold a jury trial. HCMS-Defendant argues it has never filed a proof of claim related to the Notes, thus negating any argument it has consented to the bankruptcy court having jurisdiction over the litigation of the Notes.

Finally, HCMS-Defendant alleges that permissive withdrawal is proper, because the turnover claim is being used as a "Trojan Horse" to attempt to make a non-core breach of contract claim become core.[10]

---

[9] Adversary Case No. 21-03006, Dkt. 20 at 6-11.
[10] *Id.* at 8-9; *see In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).

5

009659

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 742 of 1017 PageID 10506
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 6 of 12

As far as timing, HCMS-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

### III. THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE DISALLOWED PROOFS OF CLAIM OF HCMS-DEFENDANT ARE UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process.[11] Courts in this District have placed an emphasis on the first two factors.[12]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy *proceedings* (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related

---

[11] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).
[12] See *Mirant*, 337 B.R. at 115-122.

009660

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 743 of 1017    PageID 10507
Case 21-03006-sgj Doc 47 Filed 07/14/21    Entered 07/14/21 15:53:20    Page 7 of 12

to" a case under Title 11.[13]  Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters[14] and those that are merely "related to" a Title 11 case are defined as "noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157.  But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the *statutory* power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is *constitutional* (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[15]

With respect to the claims asserted against HCMS-Defendant, it might be argued that both counts asserted against it are *statutorily* core in nature.[16] While Count 1 is a breach of contract claim for collection of amounts due under promissory notes—one of the simplest forms of a state law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28

---

[13] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).
[14] *Stern*, 564 U.S. at 473-474.  Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).
[15] *Stern*, 564 U.S. at 499.
[16] 28 U.S.C. § 157(b)(2)(E), (O).

009661

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 744 of 1017 PageID 10508
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 8 of 12

U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.,* it stems from alleged defaults on pre-petition notes) and would not be resolved through the claims allowance process (***since no pending proof of claim exists related to the Notes***). In other words, the resolution of Count 1 cannot be inextricably intertwined with the resolution of HCMS-Defendant's disallowed proofs of claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due under the Notes were undisputed, it is unrefuted by HCMS-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is whether a turnover action to collect on disputed pre-petition promissory notes can be viewed as a core claim***. There is a split in authority on this issue. Authority exists that a turnover action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of whether the indebtedness is ***disputed***.[17] In contrast, HCMS-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[18]

---

[17] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert there is not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[18] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re*

App. 05719
009662

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 745 of 1017 PageID 10509
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 9 of 12

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[19] Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

## IV.    JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[20]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and

---

*Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

[19] *Satelco*, 58 B.R. at 789.

[20] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

009663

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 746 of 1017 PageID 10510
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 10 of 12

the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[21] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[22] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[23]

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[24] Thus, if both of HCMS-Defendant's proofs of claims were *pending*, it would have consented to the bankruptcy court's equitable jurisdiction and waived its right to a jury trial as to the subject matter of the *pending* proofs of claim.[25] However, as earlier noted, prior to the commencement of this Adversary Proceeding on January 22, 2021, HCMS-Defendant had both of its proofs of claim disallowed on October 9, 2020. Without a pending claim related to the Notes, the breach of contract claim is precisely the kind of action that would sound in law rather than in equity. By not having a filed proof of claim related to the Notes, HCMS-Defendant never subjected the Notes to the claims allowance process of the bankruptcy court and preserved its right to a jury trial on the Notes.[26] HCMS-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

---

[21] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).

[22] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

[23] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

[24] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).

[25] *Id.*

[26] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840,

Appx. 09721
009664

Case 19-34054-sgj11 Doc 3445-29 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 747 of 1017 PageID 10511
Case 21-03006-sgj Doc 47 Filed 07/14/21 Entered 07/14/21 15:53:20 Page 11 of 12

In summary, HCMS-Defendant's lack of waiver of its jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

## V.   PENDING MATTERS

On July 8, 2021, the bankruptcy court held a status conference with regard to the Motion.  At such time, the bankruptcy court approved, in part, *Defendant's Expedited Motion to Stay Pending the Resolution of Motion to Withdraw the Reference of Adversary Proceeding*.[27] In its oral ruling, the court granted the HCMS-Defendant's request for a stay pending resolution of the Motion as to dispositive motions in the Adversary Proceeding, but did not grant a stay as to any discovery. Under the *Agreed Scheduling Order,*[28] fact discovery concluded on July 5, 2021 and expert discovery will conclude on July 16, 2021. No dispositive motions have been filed at this time.  At this point, the parties are not trial-ready.

## VI.   RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the lack of a proof of claim or any other claim related to the Notes asserted by HCMS-Defendant; and (c) the lack of any other consent by HCMS-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

---

2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

[27] Adversary Case No. 21-03006, Dkt. 26.

[28] Adversary Case No. 21-03006, Dkt. 9.

Appx. 05722
009665

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

009666

# EXHIBIT 30

Appx 05724

009667

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 750 of 1017 PageID 10514
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 1 of 12



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 14, 2021**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | **CASE NO. 19-34054-SGJ-11** |
| **L.P.,** | § | **(CHAPTER 11)** |
| DEBTOR. | § | |
| _____ | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **L.P.,** | § | **ADVERSARY NO. 21-03007** |
| PLAINTIFF, | § | **(CIV. ACTION #3:21-CV-01379-G)** |
| | § | |
| **VS.** | § | |
| | § | |
| **NEXPOINT REAL ESTATE PARTNERS,** | § | |
| **LLC,** | § | |
| DEFENDANT. | § | |

---

**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:**
**(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH**
**TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;**
**AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT**

1

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 751 of 1017 PageID 10515
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 2 of 12

## I.    INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on October 16, 2019 in the United States Bankruptcy Court of Delaware. That court subsequently entered an order transferring venue to the Northern District of Texas, Dallas Division, on December 4, 2019. A Chapter 11 plan was confirmed by the bankruptcy court on February 22, 2021.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff, brought this Adversary Proceeding against the Defendant, NexPoint Real Estate Partners, LLC ("NREP-Defendant").

The Adversary Proceeding pertains to five promissory notes (collectively, the "Notes") executed by NREP-Defendant in favor of the Debtor from 2013 through 2019. The Notes consist of a term note (the "Term Note") with annual payments and four demand notes (the "Demand Notes").

On December 3, 2020, the Debtor sent NREP-Defendant a letter demanding payment by December 11, 2020 on each of the Demand Notes, as allowed under the terms of the Demand Notes. The NREP-Defendant failed to make payment on any of the Demand Notes. On December 31, 2020, NREP-Defendant failed to make the annual payment due under the Term Note. On January 7, 2021, following NREP-Defendant's failure to pay, the Debtor accelerated the Term

---

[1] Bankruptcy Case No. 19-34054.

Appx. 05726
009669

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 752 of 1017 PageID 10516
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 3 of 12

Note, under its terms, and demanded full payment on $6,145,466.84 outstanding and due under the Term Note.

Following NREP-Defendant's failure to pay on the Notes in response to the demand letters, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on the Notes (as well as several other notes of parties related to NREP-Defendant) as part of its funding to pay creditors.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court. NREP-Defendant submitted a *Motion for Withdrawal the Reference*[3] (the "Motion") and *Brief in Support of Motion to Withdraw the Reference*[4] (the "Brief in Support") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on July 8, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03007, Dkt. 20.
[4] Adversary Case No. 21-03007, Dkt. 21.

App. 05727
009670

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 753 of 1017 PageID 10517
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 4 of 12

## II.    NATURE OF THE ADVERSARY PROCEEDING

### a.  The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[5] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the four Demand Notes were: (i) $100,000, executed November 27, 2013, (ii) $2,500,000, executed October 12, 2017, (iii) $750,000, executed October 15, 2018, and (iv) $150,000, executed September 25, 2019.  The principal amount of the Term Note was originally $6,069,831 and it was executed on May 31, 2017.  The Debtor now seeks combined monetary damages on the Notes totaling $11,157,727.80, plus accrued but unpaid interest and cost of collection. Because the Debtor alleges the amount due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 25, 2021, NREP-Defendant filed its *Original Answer*[6] on March 3, 2021 and *First Amended Answer*[7] on June 11, 2021.

NREP-Defendant filed a proof of claim in the Bankruptcy Case, Proof of Claim No. 146. The proof of claim related to NREP-Defendant's interest in SE Multifamily Holdings, LLC.   On July 30, 2020, the Debtor filed its *First Omnibus Claims Objection*,[8] which included an objection to NREP-Defendant's pending proof of claim.   On October 19, 2020, NREP-Defendant filed *NREP's Response to Claim Objection*,[9] asserting the SE Multifamily Holdings LLC company

---

[5] Adversary Case No. 21-03007, Dkt. 1.
[6] Adversary Case No. 21-03007, Dkt. 7.
[7] Adversary Case No. 21-03007, Dkt. 34.
[8] Bankruptcy Case No. 19-34054, Dkt. 906.
[9] Bankruptcy Case No. 19-34054, Dkt. 1212.

009671

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 754 of 1017 PageID 10518
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 5 of 12

agreement improperly allocates the ownership percentages of the members due to mutual mistake, lack of consideration, and/or failure of consideration and seeking to reform, rescind, and/or modify the company agreement. The NREP Proof of Claim has not yet been resolved, but any result finding in favor of NREP would result in modification of the company agreement, not a claim or setoff against the Debtor's estate. ***Therefore, the pending proof of claim does not relate to the Notes.***

### b. The Motion to Withdraw the Reference, Response Opposed, and Reply

On June 3, 2021, NREP-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. The Debtor never filed a responsive pleading to the Motion filed by the NREP-Defendant. The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on July 8, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

#### i. *The Movant's Position*

NREP-Defendant argues there is cause shown for permissive withdrawal of the reference because: (1) the Texas Constitution guarantees a party to a contract a right to a jury trial; (2) the contract claim is a purely state law, non-core claim; (3) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (4) efficiency, uniformity and forum shopping factors all favor withdrawal.[10]

Further, NREP-Defendant contends it has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter final orders in the Adversary Proceeding or hold a jury trial. NREP-Defendant argues it has never

---

[10] Adversary Case No. 21-03007, Dkt. 21 at 6-11.

009672

filed a proof of claim related to the Notes, thus negating any argument it has consented to the bankruptcy court having jurisdiction over the litigation of the Notes.

Finally, NREP-Defendant alleges that permissive withdrawal is proper, because the turnover claim is being used as a "Trojan Horse" to attempt to make a non-core breach of contract claim become core.[11]

As far as timing, NREP-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

## III.   THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE PENDING PROOF OF CLAIM OF NREP-DEFENDANT IS UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would

---

[11] *Id.* at 8-9; *see In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).

Appx. 05739

009673

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 756 of 1017 PageID 10520
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 7 of 12

expedite the bankruptcy process.[12] Courts in this District have placed an emphasis on the first two factors.[13]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy *proceedings* (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related to" a case under Title 11.[14] Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters[15] and those that are merely "related to" a Title 11 case are defined as "noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157. But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the *statutory* power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is *constitutional* (and this turns on whether "the action

---

[12] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).
[13] See *Mirant*, 337 B.R. at 115-122.
[14] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).
[15] *Stern*, 564 U.S. at 473-474. Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).

009674

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 757 of 1017 PageID 10521
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 8 of 12

at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[16]

With respect to the claims asserted against NREP-Defendant, it might be argued that both counts asserted against it are ***statutorily*** core in nature.[17] While Count 1 is a breach of contract claim for collection of amounts due under promissory notes—one of the simplest forms of a state law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28 U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.,* it stems from alleged defaults on pre-petition notes) and would not be resolved through the claims allowance process (***since no pending proof of claim exists related to the Notes***). In other words, the resolution of Count 1 cannot be inextricably intertwined with the resolution of NREP-Defendant's pending proof of claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due under the Notes were undisputed, it is unrefuted by NREP-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is whether a turnover action to collect on disputed pre-petition promissory notes can be viewed as a core claim***. There is a split in authority on this issue. Authority exists that a turnover action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of whether the

---

[16] *Stern*, 564 U.S. at 499.
[17] 28 U.S.C. § 157(b)(2)(E), (O).

Appx. 09673

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 758 of 1017 PageID 10522
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 9 of 12

indebtedness is *disputed*.[18] In contrast, NREP-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[19]

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[20] Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

---

[18] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert they are not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").

[19] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

[20] *Satelco*, 58 B.R. at 789.

009676

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 759 of 1017 PageID 10523
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 10 of 12

## IV.   JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[21]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[22] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[23] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[24]

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[25] Thus, NREP-Defendant, by having a *pending* proof of claim, has consented to the bankruptcy court's equitable jurisdiction and waived

---

[21] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

[22] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).

[23] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

[24] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).

[25] *See Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990).

App. 0594
009677

Case 19-34054-sgj11 Doc 3445-30 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 760 of 1017 PageID 10524
Case 21-03007-sgj Doc 44 Filed 07/14/21 Entered 07/14/21 15:55:14 Page 11 of 12

its right to a jury trial as to the subject matter of the *pending* proof of claim.[26] Without a pending claim related to the Notes, the breach of contract claim is precisely the kind of action that would sound in law rather than in equity. By not having a filed proof of claim related to the Notes, NREP-Defendant never subjected the Notes to the claims allowance process of the bankruptcy court and preserved its right to a jury trial on the Notes.[27] NREP-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

In summary, NREP-Defendant's lack of waiver of its jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

## V.   PENDING MATTERS

On July 8, 2021, the bankruptcy court held a status conference with regard to the Motion. At such time, the bankruptcy court approved, in part, *Defendant's Expedited Motion to Stay Pending the Resolution of Motion to Withdraw the Reference of Adversary Proceeding*.[28] In its oral ruling, the court granted the NREP-Defendant's request for a stay pending resolution of the Motion as to dispositive motions in the Adversary Proceeding, but did not grant a stay as to any discovery. Under the *Agreed Scheduling Order,*[29] fact discovery will conclude on July 26, 2021 and expert discovery will conclude on August 23, 2021. No dispositive motions have been filed at this time. At this point, the parties are not trial-ready.

---

[26] *Id.*

[27] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840, 2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

[28] Adversary Case No. 21-03007, Dkt. 27.

[29] Adversary Case No. 21-03007, Dkt. 10.

Appx. 09678
09678

## VI.    RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the lack of a proof of claim or any other claim related to the Notes asserted by NREP-Defendant; and (c) the lack of any other consent by NREP-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

**\*\*\*END OF REPORT AND RECOMMENDATION\*\*\***

App. 05736
009679

**EXHIBIT 31**

Amex_005737

009680

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 763 of 1017 PageID 10527
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 1 of 9

Docket #2256 Date Filed: 04/29/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

## MOTION TO COMPEL COMPLIANCE WITH BANKRUPTCY RULE 2015.3

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET, RM. 1254, DALLAS, TEXAS 75242-1496 BEFORE CLOSE OF BUSINESS ON MAY 20, 2021, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

{00375628-16}

1

1934054210429000000000004

009681

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 764 of 1017   PageID 10528
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21   Entered 04/29/21 17:42:12   Page 2 of 9

Now into Court, through undersigned counsel, come The Dugaboy Investment Trust and Get Good Trust ("Movers"), who file this motion to compel Highland Capital Management, L.P. ("Debtor") to comply with Bankruptcy Rule 2015.3 ("Motion"). In support of the Motion, Movers aver as follows:

## CASE BACKGROUND

1. The Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code on October 16, 2019 in the United States Bankruptcy Court for the District of Delaware.

2. The case was subsequently transferred to this Court on the 4th day of December, 2019 [Dkt. #1].

3. On November 24, 2020, the Debtor filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* ("Fifth Amended Plan of Reorganization") [Dkt. #1472].

4. The Fifth Amended Plan of Reorganization was confirmed by this Court's *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Order") on the 22nd day of February, 2021 [Dkt. #1943].

5. The Court's Order confirming the Debtor's Fifth Amended Plan of Reorganization has been appealed by Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. [Dkt. #1957].

6. In connection with the appeal, Motions for Stay Pending Appeal have been filed by (i) Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. [Dkt. #1955] (the "Advisors"); (ii) Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. [Dkt. #1967] (the

Appx. 05739
009682

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 765 of 1017    PageID 10529
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21    Entered 04/29/21 17:42:12    Page 3 of 9

"Funds"); (iii) The Dugaboy Investment Trust and Get Good Trust [Dkt. 1971] (the "Movers"); and (iv) James Dondero [Dkt. 1973] ("Dondero").

7. This Court entered an *Order on Motions for Stay Pending Appeal* on March 23, 2021, denying the requests for a stay pending appeal ("Order Denying Requests") [Dkt. #2084].

8. Advisors, Funds, Movers and Dondero have appealed this Court's Order Denying Requests for a stay pending appeal.

9. The appeal of this Court's Order Denying Requests for stay pending appeal is presently before Judge Godbey, United States District Judge for the Northern District of Texas.

10. The Debtor has not filed any reports required by Bankruptcy Rule 2015.3 over the approximately thirty (30) months in which this case has been pending.

11. The Effective Date for the Fifth Amended Plan confirmed by this Court has yet to occur.

### OVERVIEW OF BANKRUPTCY RULE 2015.3

Rule 2015.3 requires "periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or debtor . . . in which the estate holds a substantial or controlling interest." Fed. R. Bankr. P. 2015.3(a). The purpose of Rule 2015.3 is "to assist parties in interest taking steps to ensure that the debtor's interest in any entity . . . is used for payment of allowed claims against the debtor." Pub. L. No. 109-8 § 419(b) (2005).

The term "substantial or controlling interest" is not defined, nor does it appear elsewhere in the Bankruptcy Code or Bankruptcy Rules. 9 Collier on Bankruptcy § 2015.3.07 (16th ed. 2020). In the absence of other guidance, Collier suggests that a court may turn to the definition of an "affiliate"[1] or "insider"[2] in the Bankruptcy Code, or even state law on the definition of a

---

[1] Bankruptcy Code § 102(2) defines an affiliate:
(2) The term "affiliate" means—
(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

Appx. 05749
009683

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 766 of 1017 PageID 10530
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 4 of 9

controlling or substantial interest. See 9 Collier on Bankruptcy § 2015.3.07 (16th ed. 2020)

("case law regarding the definition of 'insider' or 'affiliate' may be helpful. Additionally, there is

a substantial body of corporate case law regarding controlling interests that could be consulted.")

Under Rule 2015.3, there is a rebuttable presumption that the estate has a "substantial or

controlling interest" of an entity in which it "controls or owns at least a 20 percent interest."

Fed. R. Bankr. P. 2015.3(c).

The Court may, after notice and a hearing, vary the reporting requirement established by

subdivision (a) of this rule for cause, including that the trustee or debtor in possession is not able,

after a good faith effort, to comply with those reporting requirements, or that the information

---

(i)        in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
(C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or
(D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

[2] The Bankruptcy Code included a non-exclusive list of insiders:
(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor;
(C) if the debtor is a partnership—
(i) general partner in the debtor;
(ii) relative of a general partner in, general partner of, or person in control of the debtor;
(iii) partnership in which the debtor is a general partner;
(iv) general partner of the debtor; or
(v) person in control of the debtor[.]



Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 767 of 1017 PageID 10531
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 5 of 9

required by subdivision (a) is publicly available. The examples given for waiving cause are not exclusive. 9 Collier on Bankruptcy §2015.3.08 (16th ed. 2020).

When questioned at the confirmation hearing in connection with Bankruptcy Rule 2015.3, James Seery, on behalf of the Debtor, testified as to the following:

a) He was familiar with BR 2015.3 [Dkt. #1905, pg. 48, lines 12-15];

b) No report in compliance with BR 2015.3 has been filed by the Debtor [Dkt. #1905, pg. 48, lines 15-17]; and

c) "There was no reason for it (failure to file the 2015.3) other than we did not get it done initially and it fell through the cracks" [Dkt. #1905, pg. 49, lines 18-21].

### EXISTING CASE LAW ON BANKRUPTCY RULE 2015.3

Little case law exists on the requirements of Bankruptcy Rule 2015.3. In general, cases where parties have sought and received a waiver fall into two categories: (1) cases where the subsidiary is in the process of being sold; and (2) prepacked bankruptcies if the plan is not confirmed by a certain date. See e.g., *In re RCS Capital Corp.*, Case No. 16-102233 (Bankr. D. Del. Mar. 4, 2016) [Dkt. 714 ¶17] ("The Purchase Agreement has already been approved by the Court . . . . Therefore, within a relatively short period of time . . . , the Debtor will no longer have a substantial or controlling interest in [the subsidiary]"); *In re HCR Manorcare*, Case No. 18-10467 (Bankr. D. Del. Oct. 3, 2018) [Dkt. 8 ¶ 47] (Seeking waiver of reporting requirements if a pre-packed bankruptcy plan is not confirmed within a set period of time).

The case law as it exists does not support a waiver of Bankruptcy Rule 2015.3 and especially for the "it slipped through the cracks excuse." It has been three (3) months since the issue of Debtor's failure to comply with Bankruptcy Rule 2015.3 was raised to the Debtor and

App. 0542
009685

Debtor has not sought to remedy the failure and file the requisite 2015.3 reports for the applicable periods or seek leave of Court. The Debtor must believe the issue will simply go away and not be brought to the attention of the Court and, therefore, the Debtor will not have to disclose the financial condition of the assets in which it possesses a controlling or substantial interest. The Debtor's typical excuse in this case is the creditors committee has seen the information, however, Bankruptcy Rule 2015.3 requires a public filing and not a disclosure limited to a select few.

The Seery attempted excuse that "we were told we didn't have separate consolidating statements for every entity and it would be difficult" [Seery testimony Dkt. #1905, page 49, lines 14-20] is not credible in light of the fact that the majority of entities in which Debtor has a controlling or substantial interest are investment funds. Most of the entities listed below in which the Debtor has a substantial or controlling interest are either regulated or have third party investors and, as such, separate accounting and statements on an entity by entity basis are required. In addition, the fact that the Debtor lacked a "consolidated statement" on one entity is not a legitimate excuse for not filing a 2015.3 report for the other entities in which the Debtor has a controlling or substantial interest.

### ENTITIES IN WHICH THE DEBTOR OWNS OR MAY OWN A CONTROLLING INTEREST

There is no complete listing in any one place that identifies the entities in which the Debtor possesses a substantial or controlling interest. To assemble the list, Mover has had to parse through various documents and filings. The entities include, but are not limited, to the following:

    a) Highland Select Equity Fund [See ftn. 8, Debtor's Motion for Exit Loan Dkt. #2229].

       The Exit Loan Motion identifies Highland Select Entity Fund, L.P., Highland

Appx. 05743

009686

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 769 of 1017 PageID 10533
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 7 of 9

Restoration Capital Partners, L.P. Highland CLO Funding, Ltd., Highland Multi Strategy Credit Fund L.P., Highland Capital Management Korea Limited, Cornerstone Healthcare and Trussway Industries and Trussway Holdings, LLC.[3]

b)  The Exit Financing Motion [Dkt. #2229, pg. 7, ftn. 9] indicates that the Debtor owns additional assets that, by the literal reading of ftn. 9, are not listed in the section of the motion that identifies the collateral for the loan.  These entities should be specifically identified and reports should be filed for these entities that are not listed in the collateral section of the motion.

c) In the Deposition of James Seery taken on January 29, 2021, in addition to the entities listed above, James Seery generically identifies CCS Medical Inc., Targa International, PetroCap and JHT as entities controlled by Debtor or controlled through funds that are controlled by Debtor.  It is believed the corporate names are PetroCap LLC, PetroCap Partners II LP, PetroCap Incentive Partners II LP , Targa Resources Partners LP, Targa S.A and JHT Holding Inc.

d) SSP Holdings Inc. and Omni Max, which were sold by the Debtor without Court approval based upon the Debtor's belief that Court approval was not required, should also have been the subject of a 2015.3 report for the period between the filing and the date of the sale.

### CONCLUSION

Throughout this case the Debtor has taken the position that it does not have to seek court approval for sales of assets or report to anyone relative to assets owned by entities in which it has

---

[3] a)  On information and belief, the Debtor asserted ownership of one hundred percent (100%) of Highland Select Entity Fund LP is incorrect and Mark Okata and PCMG Trading partners XXIII L.P. own an interest.

Appx. 05741
009687

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 770 of 1017 PageID 10534
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21 Entered 04/29/21 17:42:12 Page 8 of 9

either control or a substantial interest. See Dondero *Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Dkt. #1439] and the Debtor's Objection thereto [Dkt. #1546]. In its Objection, the Debtor states in PP 9 that the sales at issue (Highland Multi Strategy Credit Fund L.P, Highland Restoration Capital Partners L.P and SSI Holdings Inc.) were not subject to Court approval and 11 USC §363. It appears, however, that this restricted view of Bankruptcy Court jurisdiction no longer suits the Debtor's new narrative and now it is seeking court authority to secure an exit loan and to use the assets of a controlled non-debtor entity (See Debtor's Motion for an Exit Loan, Dkt. # 2229) in order that the Debtor can pay its professionals and, in a second Motion, settle the UBS claim using the assets of a different non-debtor controlled entity [Dkt. #2199].

Had the Debtor followed Bankruptcy Rule 2015.3, both this Court and the creditors, large and small, of the Estate along with the creditors and minority owners of the controlled entities would have had some insight over the Debtor's actions with respect to these entities over the course of the Chapter 11. Bankruptcy Rule 2015.3 was designed to provide transparency and it should be enforced as a matter of public policy.

April 29, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

App. 05745

009688

Case 19-34054-sgj11 Doc 3445-31 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 771 of 1017    PageID 10535
Case 19-34054-sgj11 Doc 2256 Filed 04/29/21    Entered 04/29/21 17:42:12    Page 9 of 9

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*



# EXHIBIT 32

009690

Case 19-34054-sgj11 Doc 3445-32 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 3
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 773 of 1017    PageID 10537
Case 19-34054-sgj11 Doc 2812 Filed 09/07/21    Entered 09/07/21 12:56:13    Page 1 of 2



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed September 6, 2021

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Reorganized Debtor. | ) | **Re: Docket Nos. 2256, 2341 2343, 2424, and 2442** |
|  | ) |  |

---

## ORDER DENYING MOTION TO COMPEL
## COMPLIANCE WITH BANKRUPTCY RULE 2015.3

On April 29, 2021, The Dugaboy Investment Trust and Get Good Trust (collectively, the "Movant") filed its *Motion to Compel Compliance with Bankruptcy Rule 2015.3* (the "Motion") [Docket No. 2256]. On May 20, 2021, the above-captioned reorganized debtor (the "Reorganized Debtor") filed its opposition to the Motion (the "Opposition") [Docket No. 2341] and the official committee of unsecured creditors appointed in this chapter 11 case (the "Committee") filed its

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:105924.1 36027/003



Case 19-34054-sgj11 Doc 3445-32 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 3
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 774 of 1017    PageID 10538
Case 19-34054-sgj11 Doc 2812 Filed 09/07/21    Entered 09/07/21 12:56:13    Page 2 of 2

joinder to the Opposition on May 20, 2021 (the "Joinder") [Docket No. 2343].  Movant filed a reply to the Opposition on June 8, 2021 (the "Reply") [Docket No. 2424].  The Court conducted a hearing on the Motion on June 20, 2021 (the "Hearing") and, following this Hearing, issued its minute order on June 20, 2021 (the "Minute Order") [Docket No. 2442].  The Minute Order provided that (i) the Motion would be continued to another hearing in early September; (ii) if the effective date of the Debtor's Plan[2] (the "Effective Date") occurs before such hearing, the matter would be moot; and (iii) if the Effective Date had not occurred by then, the Court would consider the Motion further.  The Effective Date of the Plan occurred on August 11, 2021.[3]  The Court finds and concludes that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  After due deliberation and based on the Motion, the Opposition, the Joinder, the Reply, the record of the Hearing, and the Minute Order; it is hereby

ORDERED that the Motion is **DENIED AS MOOT;** and it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

### END OF ORDER ###

---

[2] *See Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808] and *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943].

[3] *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on August 11, 2021 [Docket No. 2700].



# EXHIBIT 33

009693

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 776 of 1017 PageID 10540
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 1 of 10 PageID 1719

CASE NO. 3:21-02268-S

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

HIGHLAND CAPITAL MANAGEMENT LP

(Debtor)

THE DUGABOY INVESTMENT TRUST AND
GET GOOD TRUST

(Appellants)

v.

HIGHLAND CAPITAL MANAGEMENT LP

(Appellee)

On appeal from the United States Bankruptcy Court for the Northern District of Texas, Dallas
Division

**APPELLANTS' RESPONSE TO
<u>APPELLEE'S MOTION TO DISMISS APPEAL AS MOOT</u>**

Filed by Heller, Draper & Horn, LLC
Douglas S. Draper
Leslie A. Collins
Michael E. Landis
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Email: ddraper@hellerdraper.com
Email: lcollins@hellerdraper.com
Email: mlandis@hellerdraper.com

009694

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 777 of 1017 PageID 10541
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 2 of 10 PageID 1720

Appellants, Dugaboy Investment Trust ("Dugaboy") and the Get Good Trust ("Get Good", in accordance with Federal Rule of Bankruptcy Procedure 8013 and Local Rule 7.1, respectfully file this Response to Appellee's Motion to Dismiss Appeal as Moot. Although Appellants may have dismissed their direct prepetition claims against the Debtor, Highland Capital Management, L.P. (the "Debtor" or "Highland"), Dugaboy still owns a significant interest in some of the very entities that would have been involved in the Rule 2015.3 Reports, had they been filed. Because one of the purposes of the Rule 2015.3 Reports, in addition to assisting prepetition creditors, is to provide a complete accounting of all transactions involving non-debtor affiliates of the Debtor to determine any *post-petition* claims that may exist, Dugaboy still has both a substantive and pecuniary interest in the production of the 2015.3 Reports.[1]

Appellee seems to take the stance that no one (not even the Bankruptcy Court) needs to see what happened behind the scenes during the bankruptcy case and that the Bankruptcy Court, the United States Trustee, and all interest holders in the non-debtor affiliates (including Dugaboy) need to just zip it and stay quiet. Although the majority of the unsecured creditors may have accepted the Plan of Reorganization, that does not mean that the Bankruptcy Court's Order denying the Motion to Compel as moot did not harm the interest holders in the non-debtor affiliates—who are also affected by the Rule 2015.3 Reports. At the very least, amount of Dugaboy's pecuniary interest in the bankruptcy estate cannot be known because the Debtor has refused to provide the Rule 2015.3 Reports as required under the Bankruptcy Code and the Bankruptcy Court has denied Dugaboy the right to examine those reports. That is the point of this appeal: to determine what claims against the estate exist which arose from transactions with

---

[1] The Appellants concede that due to the dismissal of Get Good's claim and the lack of an ownership interest in any of the non-debtor affiliates or the Debtor, it has lost standing and consents to the dismissal of Get Good **only**.

009695

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 778 of 1017 PageID 10542
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 3 of 10 PageID 1721

the non-debtor affiliates—a determination that was foreclosed because of the Bankruptcy Court's
Order rendering production of the 2015.3 Reports moot.

**Dugaboy has a Direct Pecuniary Interest in the Production of the Rule 2015.3 Reports**

As outlined in the Appellants' Brief, at the confirmation hearing before the Bankruptcy
Court, the Appellants raised the fact that the Debtor, after over a year, had not filed a single
report as required under Federal Rule of Bankruptcy Procedure 2015.3. The explanation
provided by the Debtor's Chief Restructuring Officer, James Seery, was that the reports simply
slipped through the cracks and seemed to imply that once brought to the Debtor's attention, it
would provide them. Needless to say, that did not occur, which prompted the subject Motion to
Compel Compliance with Rule 2015.3, the Bankruptcy Court's final Order rendering the issue
moot, and the instant appeal.

The Debtor's Motion to Dismiss is nothing more than an attempt to muddy the water and
confuse the issues that are actually before this Court. While the amount of Dugaboy's claim
against the estate is contingent upon the contents of the Rule 2015.3 Reports that were never
produced, the issue here is the fact that Dugaboy was denied the right to even assert a claim in
the first place due to the Bankruptcy Court's ruling that the Debtor would not be required to
produce the Rule 2015.3 Reports at all. The Bankruptcy Court's Order caused actual and direct
harm to Dugaboy by taking away that right to assert a claim based on the transactions that would
be disclosed in the Rule 2015.3 Reports.

The Debtor correctly points out that in bankruptcy matters, a more exacting standard is
applied to determine standing. That is, in order to have standing, a party must meet the "person
aggrieved" test, which requires that the appellant show that it is directly and adversely affected

Appx. 08758
009696

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 779 of 1017 PageID 10543
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 4 of 10 PageID 1722

pecuniarily by the order of the bankruptcy court.[2]   The Debtor relies, primarily, on *Matter of Technicool Sys., Inc.*, 896 F.3d 382 (5th Cir. 2018), which denied standing to the debtor's owner, Robert Furlough, who's complained grievance was that the same firm who represented one of the estate's creditors was also representing the estate's chapter 7 trustee in its effort to consolidate claims and pierce the corporate veil against several of the owner's other non-debtor companies.   The principal argument asserted by Furlough was that the firm may fail to disclose problems with the creditor's claims against the estate on account of its dual representation, which could harm the overall recovery to the unsecured creditors, which, in turn, would harm any potential recovery to him, as an equity holder.[3]   The Fifth Circuit found this too tenuous and stated that while that scenario was a possibility, "it would not be a direct result of this appeal."[4]

The same cannot be said in the instant matter.   The harm visited upon Dugaboy (as an owner of the non-debtor affiliates) is that it has *actually* been denied an opportunity to determine whether or not a claim against the estate exists.   In other words, the Bankruptcy Court's Order denying the Motion to Compel as moot directly affected Dugaboy's rights.   The extent of the pecuniary effect on Dugaboy's pocket is unknown because the Bankruptcy Court never bothered to allow proper examination through the production of the Rule 2015.3 Reports.

Other cases cited in the Debtor's Motion to Dismiss are also easily distinguished from the instant case.   In *Harriman v. Vactronic Sci, Inc. (In re Palmaz Sci., Inc.)*, 262 F.Supp 3d 428 (W.D. Tex. 2017), the appellant in that case was found to have lacked standing because she never even filed a proof of claim in the case much less made an objection to the confirmed plan.

---

[2] *See, Gibbs & Bruns LLP v. Coho Energy, Inc. (In re Coho Energy, Inc.)*, 395 F.3d 198, 202–03 (5th Cir. 2004).

[3] *Id.* at 386.

[4] *Id.*

Appx. 05754
009697

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 780 of 1017 PageID 10544
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 5 of 10 PageID 1723

"If a party fails to appear at a hearing or object to a motion or proceeding, it cannot expect or implore the bankruptcy court to address the issues raised by the motion or proceeding for a second time," and will lack standing to appeal that decision." *Id.* at 435 *quoting In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010). The Appellants, as the Debtor points out, have been active participants in the bankruptcy case and, in fact, did object to the Plan of Reorganization and raised the issue that the Rule 2015.3 Reports were not filed with the Bankruptcy Court at the confirmation hearing and in its Motion to Compel. It simply cannot be said that Dugaboy failed to make its concerns known to the Bankruptcy Court.

Similarly, in *Coho Energy*, the appellant claimed injury based on a settlement that the debtor reached in a contract dispute in which dispute the appellant had previously represented the debtor and was subsequently replaced by other counsel. The dispute at the heart of the appeal was over the fees awarded to both the appellant and subsequent counsel from the settlement. The original counsel complained that the amount of the attorneys fees awarded to the subsequent counsel was excessive and that the excessive award diminished the amount that would be available for its own fees. The settlement awarded $8.5 million to the estate.[5] Of that, $1.7 million was awarded to the former shareholders and $2.3 million was awarded to the subsequent firm, leaving approximately $4.5 million left for the appellant/original counsel's fees.[6] By the appellant's own admission, the high-end estimate of its fees was $3.4 million (substantially less than the $4.5 million left of the settlement funds). As such, the Fifth Circuit found that

---

[5] *Coho Energy*, 395 F.3d at 203.

[6] *Id.*

Appx. 05755
009698

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 781 of 1017 PageID 10545
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 6 of 10 PageID 1724

"Thomas's conjectural injury as a claimant to the fund … is too tenuous to support 'aggrieved person' standing."[7]

As stated above, Dugaboy's injury in this appeal is far from conjectural. The harm is actual in that Dugaboy (and all other interest holders in the non-debtor affiliates) was denied the opportunity to even examine whether a claim exists. Nor can the possibility of post-petition claims be considered conjectural. In fact, the United States Supreme Court considered the possibility of claims arising from transactions with non-debtor affiliates plausible enough to create a rule that requires certain disclosures that would reveal such transactions: ***Rule 2015.3***.

A case that was distinguished by the *Coho Energy* court is *Ergo Science, Inc. v. Martin*, 73 F.3d 595 (5th Cir. 1996), which is more applicable to the instant case. In *Ergo*, the appellant, ETI, was a claimant to a fund. The district court held that ETI had waived all claims against the fund in oral argument at the bankruptcy court. ETI appealed that order. At the Fifth Circuit, the standing of ETI was challenged on the grounds that its interest in the fund was too speculative. However, as the Fifth Circuit noted, the issue was not the contingent nature of the claimant's interest in the fund, rather, the issue was whether the claimant was denied its right to assert an interest in the first place.

> This dispute involves a potential claimant to the fund, not the stakeholder, and the very issue on appeal is whether ETI has waived its interest in the interpleaded funds or not. The district court's judgment decrees that ETI has no interest or right to the interpleaded funds. ETI, therefore, has standing to challenge this order because it is not faced with a hypothetical or indirect injury as in *Rohm,* but a real and immediate injury.[8]

---

[7] *Id.*

[8] *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 597 (5th Cir. 1996).

Appx. 05756
009699

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 782 of 1017 PageID 10546
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 7 of 10 PageID 1725

That is the precise scenario at issue in this appeal. By not requiring the Debtor to make the Rule 2015.3 disclosures, the Bankruptcy Court denied Dugaboy (and the non-debtor affiliates in which it owns an interest) the right to assert post-petition claims against the estate. Just as in *Ergo*, this is not a hypothetical or indirect injury. Rather, this is a real and immediate injury to Dugaboy.

### Dugaboy's Standing Has Not Gone Away

In the Motion to Dismiss, the Debtor makes much over the fact that the Appellants' claims against the estate were dismissed, but it failed to address the statement in the Appellants' Brief that Dugaboy holds an ownership interest in several of the entities for which Rule 2015.3 Reports should have been filed. As an owner of those entities, any causes of action that arose during the bankruptcy case between the Debtor and those entities would have a direct effect on Dugaboy's pocketbook. While Dugaboy's claims against the Debtor may have been dismissed, its ownership interest in the non-debtor affiliates still exists and its pecuniary interest in those entities and any claims against the estate also exists.

Furthermore, Dugaboy is a contingent beneficiary under the terms of the Plan. As a former equity interest holder in the Debtor, Dugaboy is entitled to payment after all creditors are paid in full. How can the Debtor credibly argue that a contingent beneficiary under the Plan of Reorganization has no standing to appeal an order directly affecting the implementation of the Plan?

### Conclusion

The Bankruptcy Court's Order denying the Motion to Compel as moot directly harmed Dugaboy by taking away their right to even examine whether there exists a post-petition claim against the estate by the non-debtor affiliates. The propriety of that order is what is on appeal to

Appx. 25757
009700

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 783 of 1017 PageID 10547
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 8 of 10 PageID 1726

this Court. This is an actual and direct harm to Dugaboy as an interest holder in the non-debtor affiliates. The potential amount of those claims is not at issue as that was never decided. The harm complained of is the deprivation to examine the disclosures that would have been provided by the Rule 2015.3 Reports had they been filed.

As such, Dugaboy respectfully requests that this Court deny the Motion to Dismiss Appeal as Moot as to Dugaboy and move forward with a determination of whether the Bankruptcy Court's Order was proper in the first place.

Appx. 25758
009701

Case 19-34054-sgj11 Doc 3445-33 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 784 of 1017 PageID 10548
Case 3:21-cv-02268-S Document 15 Filed 01/05/22 Page 9 of 10 PageID 1727

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with Rules 8013(f), I hereby certify that this document complies with the

type-volume limit of Fed. R. Bankr. P. 8013(f)(3) because this document contains 2000 words.


Dated January 5, 2022:

<div style="margin-left:40%">

*/s/Douglas S. Draper*

Douglas S. Draper, La. Bar No. 5073

ddraper@hellerdraper.com

Leslie A. Collins, La. Bar No. 14891

lcollins@hellerdraper.com

Michael E. Landis, La. Bar No. 36542

mlandis@hellerdraper.com


Heller, Draper & Horn, L.L.C.

650 Poydras Street, Suite 2500

New Orleans, LA 70130

Telephone: (504) 299-3300

Fax: (504) 299-3399

*Attorneys for Appellants*

*The Dugaboy Investment Trust and*

*The Get Good Nonexempt Trust*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas S. Draper, hereby certify that on January 5, 2022, this Response was served electronically upon all parties registered to receive service in this case via the Court's CM/ECF system.

<div align="right">

*/s/ Douglas S. Draper*

Douglas S. Draper

</div>

Appx. 05769

009703

# EXHIBIT 34

009704

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 7
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 787 of 1017 PageID 10551

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 1 of 6 PageID 1769

# United States District Court

### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THE DUGABOY INVESTMENT TRUST and GET GOOD TRUST, <br>     Appellants, <br>         v. <br><br> HIGHLAND CAPITAL MANAGEMENT, L.P., <br>     Appellee. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | CIVIL ACTION NO. 3:21-CV-2268-S |
| In re: <br> HIGHLAND CAPITAL MANAGEMENT, L.P., <br>     Debtor. | § <br> § <br> § <br> § <br> § | CASE NO. 19-34054-sgj11 |

### ORDER

Before the Court is Appellee's Motion to Dismiss Appeal as Moot ("Motion to Dismiss") [ECF No. 12]. The Court has reviewed and considered the Motion to Dismiss, Appellants' Response to Appellee's Motion to Dismiss Appeal as Moot ("Response") [ECF No. 15], Reply in Support of Appellee's Motion to Dismiss Appeal as Moot [ECF No. 16], Appellants' Sur-Reply to Appellee's Motion to Dismiss Appeal as Moot [ECF No. 22], the record on appeal ("Record") [ECF No. 9], and the applicable law. For the following reasons, the Court **GRANTS** the Motion to Dismiss and **DISMISSES** this appeal for lack of jurisdiction.

## I.    BACKGROUND

This bankruptcy appeal arises from the bankruptcy court's denial of the Motion to Compel Compliance with Bankruptcy Rule 2015.3 (the "Motion to Compel") filed by Appellants The Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good") (collectively, "Appellants"). R. vol. 2 at 421. Appellee Highland Capital Management, L.P. ("Appellee" or

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 7
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 788 of 1017 PageID 10552

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 2 of 6 PageID 1770

"Debtor") initiated the underlying Chapter 11 bankruptcy proceeding in October 2019. Dugaboy subsequently filed three proofs of claim in April 2020, including a proof of claim as a purported "successor in interest" to Canis Major Trust. Around the same time, Get Good also filed three proofs of claim, including two as a purported "successor in interest" to Canis Major Trust.

In the meantime, Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan") in January 2021, and the bankruptcy court held a Plan confirmation hearing in February 2021. R. vol. 1 at 290. At the hearing, Appellants raised the issue of Debtor's failure to file any reports as required under Bankruptcy Rule 2015.3, which requires debtors to file "periodic financial reports of the value, operations, and profitability" of each non-debtor entity in which the debtor "holds a substantial or controlling interest." FED. R. BANKR. P. 2015.3(a). The bankruptcy court confirmed the Plan over Appellants' objections and entered the Confirmation Order on February 22, 2021. R. vol. 1 at 290.

Three months later, Appellants filed the Motion to Compel. R. vol. 2 at 421. Debtor filed its opposition, and the bankruptcy court conducted a hearing on the Motion to Compel on June 10, 2021. R. vol 1. at 356. Following the hearing, the bankruptcy court issued a minute order providing that (1) the hearing on the Motion to Compel would be continued to September 2021; (2) if the Plan effective date occurred before the hearing, the matter would become moot; and (3) if the Plan effective date had not occurred by the hearing, the court would consider the Motion to Compel further. *Id.* at 357. However, the Plan became effective on August 11, 2021, and the bankruptcy court therefore issued its Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3 ("Order") on September 6, 2021. R. vol. 1 at 10. Appellants filed their notice of appeal of the Order on September 22, 2021. *See* Notice of Appeal [ECF No. 1].

009706

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 7
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 789 of 1017 PageID 10553

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 3 of 6 PageID 1771

After this appeal was filed, however, all of the proofs of claim filed by Dugaboy and Get Good were withdrawn with prejudice. Specifically, on October 27, 2021, with Dugaboy's consent, the bankruptcy court entered orders withdrawing two of the Dugaboy claims with prejudice, and on November 10, 2021, the bankruptcy court entered an order approving a stipulation between Dugaboy and Debtor withdrawing the third Dugaboy claim with prejudice. *See In re Highland Capital Management, L.P.*, (Bankr. N.D. Tex. Oct. 16, 2019), ECF Nos. 2965, 2966, 3007. Similarly, on November 10, 2021, all three of the Get Good claims were withdrawn with prejudice either by consent or pursuant to stipulation by Get Good. *Id.*, ECF Nos. 3008, 3009, 3010.

Shortly after all of Appellants' claims were withdrawn, Appellee filed its Motion to Dismiss, asserting that this appeal is constitutionally moot for lack of standing.

## II. LEGAL STANDARD

Standing to appeal a bankruptcy court decision is a question of law. *In re Technicool Sys., Inc.*, 896 F.3d 382, 385 (5th Cir. 2018). Compared to traditional Article III standing, "standing to appeal a bankruptcy court order is, of necessity, quite limited." *In re Dean*, 18 F.4th 842, 844 (5th Cir. 2021). The Fifth Circuit applies the "person aggrieved" test, which imposes a "more exacting standard than traditional constitutional standing." *Id.* The "person aggrieved" test "demands a higher causal nexus between act and injury," and requires an appellant to show that she is "directly and adversely affected pecuniarily by the order of the bankruptcy court." *In re Coho Energy Inc.*, 395 F.3d 198, 202-03 (5th Cir. 2004) (citations omitted). It is not enough that an appellant is directly impacted by "the proceedings more generally." *In re Dean*, 18 F.4th at 844. Rather, to have standing, the exact order being appealed must "directly affect [appellants'] wallets." *Id.* Such a narrow standing inquiry "ensur[es] that only those with a direct, financial stake in a given order can appeal it." *Technicool*, 896 F.3d at 386. As the Fifth Circuit has observed, "in bankruptcy

009707

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 7
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 790 of 1017 PageID 10554

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 4 of 6 PageID 1772

litigation, as in life, 'the more money we come across, the more problems we see.'" *Id.* (quoting NOTORIOUS B.I.G., *Mo Money Mo Problems*, on LIFE AFTER DEATH (Bad Boy/Arista 1997)).

Standing must exist both at the commencement of the litigation and throughout its existence. *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999) (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (internal alterations and quotation marks omitted)). A case becomes moot when a party loses standing, as "there are no longer adverse parties with sufficient legal interests to maintain the litigation." *Id.* (citation omitted). And when a case becomes moot, the court loses its "constitutional jurisdiction to resolve the issues it presents." *Id.* (citing *Hogan v. Miss. Univ. for Women*, 646 F.2d 1116, 1117 n.1 (5th Cir. 1981)).

### III.  ANALYSIS

Appellee asserts that while Appellants had standing at the commencement of the appeal, they lost that standing when all of their claims were withdrawn on November 10, 2021, because at that point they were no longer creditors. Appellants concede that Get Good has lost standing to pursue the appeal,[1] but contend that Dugaboy still has standing because it owns an interest in some of the entities for which Rule 2015.3 reports would have been required. Dugaboy claims that because the purpose of requiring reports under Rule 2015.3 is to "provide a complete accounting of all transactions involving non-debtor affiliates of the Debtor to determine any post-petition claims that may exist," Dugaboy still has a pecuniary interest in the production of the 2015.3 reports themselves. Resp. 2.

The Court finds that Dugaboy is not "directly and adversely affected pecuniarily" by the Order as required to establish standing. *Coho*, 395 F.3d at 203. By withdrawing its remaining

---

[1] *See* Resp. 2 n.1 ("The Appellants concede that due to the dismissal of Get Good's claim and the lack of an ownership interest in any of the non-debtor affiliates or the Debtor, it has lost standing and consents to the dismissal of Get Good only.").

009708

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 7
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 791 of 1017 PageID 10555

Case 3:21-cv-02268-S Document 21 Filed 08/08/22 Page 5 of 6 PageID 1773

claims against Debtor, Dugaboy no longer has any pecuniary interest in the bankruptcy estate and therefore is not a "person aggrieved" by the Order. *Id.* While Dugaboy does not dispute that it is no longer a creditor of the estate, it asserts that its pecuniary interest is its ownership interest in the non-debtor affiliates and a potential recovery under the Plan as one of Debtor's former equity holders. In other words, Dugaboy's primary contention is that, but for the bankruptcy court's failure to compel Debtor to file retroactive reports regarding its ownership interests in non-debtor subsidiaries as of the bankruptcy petition date, Dugaboy might have used the information in those reports to investigate whether any post-petition claims exist against Debtor's estate by any non-debtor affiliates. But such an injury is precisely the type of "hypothetical or indirect injury" that the Fifth Circuit has consistently found insufficient to confer standing. *Coho*, 395 F.3d at 203 (quoting *Ergo Science v. Martin*, 73 F.3d 595, 597 (5th Cir. 1996)).

Further, even if Dugaboy did still have some claim to the estate, "[e]ven a claimant to a fund must show a realistic likelihood of injury in order to have standing." *Id.* There is no such likelihood here. Were the Court to reverse the Order, the effect of the bankruptcy court granting the Motion to Compel is simply that Debtor would be required to file retroactive reports regarding its ownership interests in non-debtor subsidiaries. It is unclear how post-dated reports disclosing years-old facts could lead to any direct recovery by a creditor, let alone recovery by a non-creditor with a purported ownership in non-debtor affiliates. This attenuated interest in a potential future outcome is not sufficient: "the order must burden [Dugaboy's] pocket before [it] burdens the docket." *Technicool*, 896 F.3d at 386.

Dugaboy also argues that it has standing as a "contingent beneficiary" under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full. Resp. 7. This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited

5

Case 19-34054-sgj11 Doc 3445-34 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of 7
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 792 of 1017   PageID 10556

Case 3:21-cv-02268-S   Document 21   Filed 08/08/22   Page 6 of 6   PageID 1774

partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan.  As an initial matter, Dugaboy still does not demonstrate the requisite "causal nexus" between the actual Order being appealed and its purported interest in potential future recovery under the Plan.  *Coho*, 395 F.3d at 202.  But in any event, such a "speculative prospect of harm is far from a direct, adverse, pecuniary hit" as required to confer standing.  *Technicool*, 896 F.3d at 386.

While Dugaboy may have a direct interest in the "proceedings more generally," bankruptcy standing requires that there is a direct, adverse, and pecuniary effect on the appellant, and that the effect is tied to the specific order being appealed.  In the absence of any claim to Debtor's estate or direct financial injury flowing from the Order, Dugaboy simply cannot be a "person aggrieved" by the Order.  Accordingly, the Court finds that Appellants lack standing and, as a result, this appeal is constitutionally moot.

## IV.   CONCLUSION

For the reasons set forth above, Appellee's Motion to Dismiss Appeal as Moot [ECF No. 12] is **GRANTED**, and this appeal is **DISMISSED** for lack of jurisdiction.

**SO ORDERED.**

SIGNED August 8, 2022.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**

6

APPX 05705
009710

# EXHIBIT 35

009711

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 794 of 1017    PageID 10558
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 1 of 22

Docket #1731  Date Filed: 01/13/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | **Re: Docket Nos. 1625, 1697, 1706, 1707** |

## DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154), AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41952.8 36027/002



1934054210113000000000010

009712

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 795 of 1017 PageID 10559
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 2 of 22

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") in support of its *Motion for Entry of an Order Approving Settlement with HarbourVest (Claim No.143,147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1625] (the "Motion").[2]  In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      If granted, the Motion will resolve a $300 million general unsecured claim against the Debtor's estate for less than $16.8 million in actual value.[3]  The settlement is another solid achievement for the Debtor and – not surprisingly – is opposed by no one except Mr. Dondero and entities affiliated with him.

2.      As discussed in the Motion, in November 2017, HarbourVest invested $80 million in exchange for a 49.98% membership interest in HCLOF – an entity managed by a subsidiary of the Debtor.  The balance of HCLOF's interests are held by CLO Holdco, Ltd. (an entity affiliated with Mr. Dondero), the Debtor, and certain of the Debtor's employees. Subsequent to its investment in HCLOF, HarbourVest incurred substantial losses on its investment in HCLOF and filed claims against the Debtor's estate.

3.      HarbourVest asserts claims for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

[3] Under the proposed settlement, HarbourVest would receive an allowed, general unsecured claim of $45 million and an allowed, subordinated claim of $35 million.  Based on the estimated recovery for general unsecured creditors of 87.44% (which is a recovery based on certain outdated assumptions discussed *infra*), HarbourVest's $45 million general unsecured claim is estimated to be worth approximately $39.3 million and the $35 million subordinated claim, which is junior to the general unsecured claim, is currently estimated to have value only if there are litigation recoveries.  In addition, HarbourVest is transferring to an affiliate of the Debtor its interest in HCLOF, which is estimated to be worth approximately $22.5 million.  Thus, HarbourVest's estimated recovery on its general unsecured and subordinated claims is estimated at approximately $16.8 million on a net economic basis.  This estimate, however, is dated and is based on the claims that were settled as of the filing of the Debtor's plan in November 2020.

App.05779
009713

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 796 of 1017 PageID 10560
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 3 of 22

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. In furtherance of these claims, HarbourVest alleges it was misled by the Debtor and its employees, including Mr. Scott Ellington (then the Debtor's general counsel), and that subsequent to investing in HCLOF, Mr. Dondero and the Debtor used HCLOF both as a piggybank to fund the litigation against Acis Capital Management, L.P. ("Acis") and as a scapegoat for the Debtor's litigation strategy, in each case to HarbourVest's substantial detriment.

4. Specifically, HarbourVest alleges that:

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest about its intentions with respect to Mr. Terry's arbitration award against Acis and orchestrated a series of fraudulent transfers and corporate restructurings, the true purpose of which was to denude Acis of assets and make it judgment proof;

- the Debtor and its employees, including Mr. Ellington, misled HarbourVest as to the intent and true purpose of these restructurings and led HarbourVest to believe that Mr. Terry's claims against Acis were meritless and a simple employment dispute that would not affect HarbourVest's investment;

- the Debtor, through Mr. Dondero, improperly exercised control over or misled HCLOF's Guernsey-based board of directors to cause HCLOF to engage in unnecessary, unwarranted, and resource-draining litigation against Acis;

- the Debtor improperly caused HCLOF to pay substantial legal fees of various entities in the Acis bankruptcy that were unwarranted, imprudent, and not properly chargeable to HCLOF; and

- the Debtor used HarbourVest as a scapegoat in its litigation against Acis by asserting that the Debtor's improper conduct and scorched-earth litigation strategy was at HarbourVest's request, which was untrue.

5. The Debtor believed, and continues to believe, that it has viable defenses to HarbourVest's claims. Nevertheless, those defenses would be subject to substantial factual disputes and would require expensive and time-consuming litigation that would likely be resolved only after a lengthy trial all while the Debtor (or its successor) assumes the risk that the defenses might fail. The evidence will show that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the

DOCS_NY:41952.8 36027/002

App. 9714

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 797 of 1017 PageID 10561
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 4 of 22

principals and their counsel. The evidence will also show that one of HarbourVest's primary concerns in settling its claim was that part of that settlement would include the extrication of HarbourVest from the Highland web of entities and the related litigation. The proposed settlement accomplishes that and does so in compliance with HCLOF's governing agreements.

6. Pursuant to the proposed settlement, (a) HarbourVest will receive (i) an allowed, general unsecured claim in the amount of $45 million, and (ii) an allowed, subordinated claim in the amount of $35 million; (b) HarbourVest will transfer its 49.98% interest in HCLOF (valued at approximately $22.5 million) to a wholly-owned subsidiary of the Debtor; and (c) the parties will exchange mutual and general releases. The Debtor believes that the proposed settlement is reasonable and results from the valid and proper exercise of its business judgment. And the Debtor's creditors apparently agree. None of the major parties-in-interest or creditors in this case has objected to the Motion: not the Committee, the Redeemer Committee, Acis, Patrick Daugherty, or UBS.

7. In distinction, the only objecting parties are Mr. Dondero, his family trusts (the Dugaboy Investment Trust ("Dugaboy") and Get Good Trust ("Get Good," and together with Dugaboy, the "Trusts")), and CLO Holdco (a wholly-owned subsidiary of Mr. Dondero's Charitable Donor Advised Fund, L.P. (the "DAF")) (collectively, the "Objectors"). Each of the Objectors has only the most tenuous economic interest in and connection to the Debtor's settlement with HarbourVest. Each of the Objectors is also controlled directly or indirectly by Mr. Dondero who has coordinated each of the Objectors litigation strategies against the Debtor.[4] Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – should be rebuffed, and the objections overruled. The following is a brief summary of the objections.

---

[4] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8, 2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q.

009715

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 798 of 1017 PageID 10562
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 5 of 22

| Pleading | Objection/Reservation | Response |
|---|---|---|
| *Objection of James Dondero* [Docket No. 1697] (the "Dondero Objection") | Because HarbourVest was damaged by the injunction entered in Acis, the settlement seeks to revisit this Court's rulings in Acis. | Mr. Dondero is misdirecting the Court. HarbourVest's claim arises from the misrepresentations of Mr. Dondero, Mr. Ellington, and others, not this Court's rulings in Acis, including the failure to disclose the fraudulent transfer of assets. |
| | The settlement is not fair and equitable because it does not address (1) Acis's mismanagement, (2) how the Debtor is liable for HarbourVest's damages, (3) the success on the merits, (4) the costs of litigation, and (5) the Debtor's ability to realize the value of the HCLOF interests in light of the Acis injunction. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. The Debtor has assessed the value of the HCLOF interests in light of all factors, including the Acis injunction. |
| | The HarbourVest settlement represents a substantial windfall to HarbourVest. | Mr. Dondero ignores the economics of this case, which have value breaking in Class 8 (General Unsecured Claims). The value of the settlement is not $60 million; it is approximately $16.8 million against a claim of $300 million. There is no windfall. |
| | The HarbourVest settlement is improper gerrymandering because it provides HarbourVest with a general unsecured claim and a subordinated claim in order to secure votes for the plan. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| *Objection of the Dugaboy Investment Trust and Get Good Trust* [Docket No. 1706] (the "Trusts Objection") | The settlement represents a radical change in the Debtor's earlier position on the HarbourVest settlement. | Mr. Dondero ignores the dangers of the litigation and HarbourVest's claims against the estate for misrepresentation and overestimates the ability to resolve the litigation. |
| | The settlement appears to buy HarbourVest's vote. | The HarbourVest settlement provides for the resolution of HarbourVest's claim. It is nonsensical to think that the Debtor would reach a settlement with HarbourVest that would include HarbourVest's rejection of the Debtor's plan, and there is nothing wrong with requiring acceptance of a plan as part of a settlement. Further, the Debtor does not need HarbourVest's Class 9 vote to confirm a plan. |
| | No information is provided as to whether the Debtor can acquire HarbourVest's interest in HCLOF or the value of that interest to the estate. | As discussed below, the HCLOF interest will be transferred to a wholly-owned subsidiary of the Debtor. Mr. Seery will testify as to the benefit of the HCLOF interests to the estate. |
| *Objection of CLO Holdco* [Docket No. 1707] ("CLOH Objection") | HarbourVest cannot transfer its interests in HCLOF unless it complies with the right of first refusal. | CLO Holdco misinterprets the operative agreements and tries to create ambiguity where none exists. |

DOCS_NY:41952.8 36027/002

App. 05773
009716

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 799 of 1017    PageID 10563
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21    Entered 01/13/21 15:48:50    Page 6 of 22

8.    These objections are just the latest objections filed by Mr. Dondero and his related

entities to any attempt by the Debtor to resolve this case,[5] including the Debtor's settlement with

Acis [Docket No. 1087] and the seven separate objections filed by Mr. Dondero and his related

entities to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

[Docket No. 1472] (the "Plan").[6]  It will not shock this Court to hear that each of the Objectors is

also objecting to the Plan.  In contradistinction, the Debtor has heard this Court's admonishments

about old Highland's culture of litigation as evidenced by this case, Acis's bankruptcy, and

beyond.  Although the Debtor has vigorously contested claims when appropriate, the Debtor has

also sought to settle claims and limit the senseless fighting.  The Debtor has successfully

resolved the largest claims against the estate, including the claims of the Redeemer Committee,

Acis, and, as recently announced to this Court, UBS.  The Debtor would ask this Court to see

through the pretense of the Dondero-related entities' objections to the HarbourVest settlement

and approve it as a valid exercise of the Debtor's business judgment.

---

[5] As an example of Mr. Dondero's litigiousness, on January 12, 2021, Mr. Dondero filed notice that he will be
appealing the preliminary injunction entered against him earlier on January 12, 2021.

[6] (1) *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*
[Docket No. 1661]; (2) *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by
Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667]; (3) *Senior Employees' Limited Objection to
Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac
Leventon)* [Docket No. 1669]; (4) *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland
Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income
Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund,
Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland
Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund,
Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc.,
NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670]; (5) *NexPoint
Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real
Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; (6) *CLO Holdco, Ltd.'s Joinder to Objection to
Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental
Objections to Plan Confirmation* [Docket No. 1675]; and (7) *NexBank's Objection to Debtor's Fifth Amended Plan
of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)*
[Docket No. 1676].

DOCS_NY:41952.8 36027/002

App. 05777

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 800 of 1017 PageID 10564
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 7 of 22

<div align="center">

**REPLY**

</div>

**A.**    **Standing**

9.    **James Dondero.**    In the Dondero Objection, Mr. Dondero asserts he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. While that claim is ostensibly true, it is tenuous at best. On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[7] More than nine months later, Mr. Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[8]

10.    Mr. Dondero's claim as an "indirect equity security holder" is also a stretch. Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied.

11.    **Dugaboy and Get Good.**    Dugaboy and Get Good are sham Dondero "trusts" with only the most attenuated standing. Dugaboy has filed three proofs of claim [Claim Nos. 113; 131; 177]. In two of these claims, Dugaboy argues that (1) the Debtor is liable to Dugaboy

---

[7] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice. *See* Docket No. 1460.

[8] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

DOCS_NY:41952.8 36027/002

Appx. 09775

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 801 of 1017 PageID 10565
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 8 of 22

for its postpetition mismanagement of the Highland Multi Strategy Credit Fund, L.P., and (2) this Court should pierce the corporate veil and allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle. The Debtor believes that each of the foregoing claims is frivolous and has objected to them. [Docket No. 906].

12.     In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor). Similarly, Get Good filed three proofs of claim [Claim Nos. 120; 128; 129] arising from its prior ownership of limited partnership interests in the Debtor. Because each these claims arises from an equity interest, the Debtor will seek to subordinate them under 11 U.S.C. § 510 at the appropriate time. As set forth above, these interests are out of the money and are not expected to receive any economic recovery.

13.     Consequently, Mr. Dondero, Dugaboy, and Get Good's standing to object to the HarbourVest settlement is attenuated and their chances of recovery in this case are extremely speculative at best. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing). Mr. Dondero, Dugaboy, and Get Good's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity

App. 0577
009719

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 802 of 1017 PageID 10566
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 9 of 22

holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

**B.** **Mr. Dondero's Objection and his "Trusts" Objection Are Without Merit**

14. As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted). *See also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

15. **The Settlement Seeks to Revisit the Acis Orders.** In the Dondero Objection, Mr. Dondero argues that HarbourVest's claim is based on the financial harm caused to HarbourVest from Acis's bankruptcy and the orders entered in the Acis bankruptcy. Mr. Dondero extrapolates from this that HarbourVest is seeking to challenge this Court's rulings in Acis. (Dondero Obj., ¶¶ 17-20) Mr. Dondero misinterprets HarbourVest's claims and the dangers such claims pose to the Debtor's estate.

16. HarbourVest's claims are for fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty

DOCS_NY:41952.8 36027/002

009720

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 803 of 1017 PageID 10567
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 10 of 22

and unfair prejudice (under Guernsey law), violations of state securities laws, and RICO. HarbourVest is not arguing that Acis or this Court caused its damages; HarbourVest is arguing that *the Debtor* – led by Mr. Dondero – (a) misled HarbourVest as to the nature of Mr. Terry's claims against the Debtor and the litigation with Acis, (b) knowingly and intentionally failed to disclose that the Debtor was engaged in the fraudulent transfer of assets to prevent Mr. Terry from collecting his judgment, and (c) that *the Debtor* – under the control of Mr. Dondero – improperly engaged in a crusade against Mr. Terry and Acis, which substantially damaged HarbourVest and its investment in HCLOF, in each case in order to induce HarbourVest to invest in HCLOF.

17.     Again, HarbourVest does not contend that Acis caused its damages. Rather, HarbourVest contends that the fraudulent transfer of assets as part of the Debtor's crusade against Mr. Terry and Acis and the false statements and omissions about those matters caused HarbourVest to make an investment it would never have made had Mr. Dondero and the Debtor been honest and transparent. The Acis litigation – in HarbourVest's estimation – never should have happened. Acis did not cause HarbourVest's damages. Mr. Dondero's crusade against Mr. Terry and the Debtor's allegedly fraudulent statements to HarbourVest about the fraudulent transfers, Mr. Terry and Acis caused HarbourVest's damages.

18.     **The HarbourVest Claim Lacks Merit.** In their objections, Mr. Dondero and the Trusts argue that the HarbourVest settlement is not fair and equitable and not in the best interests of the estate because (a) it does not address the Debtor's arguments against the HarbourVest claims and (b) there is a lack of pending litigation seeking to narrow the claims against the estate. These arguments only summarily address the first two factors of *Cajun Electric*, which deal with success in the litigation, and, in doing so, mischaracterize the dangers to the Debtor's estate

App. 05578
009721

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 804 of 1017 PageID 10568
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 11 of 22

posed by HarbourVest's claims. (Dondero Obj., ¶¶ 21-25; Trusts Obj., ¶ 18(a))

19.     Both the Dondero Objection and – to a much lesser extent - the "Trusts"
Objection allege that (a) HarbourVest's losses were caused by Acis and its (mis)management of
HCLOF's investments (Dondero Obj.,¶ 22, 24), (b) there is no contract that supports
HarbourVest's claims (Dondero Obj. ¶ 23; Trusts Obj., ¶ 18(a)), (c) there is no causal connection
between HarbourVest's losses and the Debtor's conduct (Dondero Obj., ¶ 24), and (d) the Debtor
should litigate all or a portion of HarbourVest's claim before settling (Dondero Obj., ¶ 25).
Again, though, as set forth above, both Mr. Dondero and the "Trusts" seek to shift the cause of
HarbourVest's damages away from the Debtor's misrepresentations and to Mr. Terry's
management of HCLOF's investments. This is simple misdirection.

20.     HarbourVest's claims are that it invested in HCLOF based on the Debtor's
fraudulent misrepresentations. Fraudulent misrepresentation sounds in tort, not contract. *See,
e.g., Clark v. Constellation Brands, Inc.*, 348 Fed. Appx. 19, 21 (5th Cir. 2009) (referring to
party's claim based on fraudulent misrepresentation as a tort); *Eastman Chem. Co. v. Niro, Inc.*,
80 F. Supp. 2d 712, 717 (S.D. Tex. 2000) (noting that party had common law duty not to commit
intentional tort of fraudulent misrepresentation). There is thus no need for HarbourVest to point
to a contractual provision to support its claim.[9]  Moreover, in order to defend against
HarbourVest's claims, the Debtor would need to elicit evidence showing that its employees did
not make misrepresentations to HarbourVest. Such a defense would require the Debtor to rely
on the veracity of Mr. Ellington's testimony, among others. That is a high hurdle, and no
reasonable person would expect the Debtor to stake the resolution of HarbourVest's $300 million
claim on the Debtor's ability to convince this Court that Mr. Ellington was telling HarbourVest

---

[9] Subsequent to filing the Motion, the Objectors requested all agreements between HarbourVest, HCLOF, and the
Debtor, and such agreements were provided.

App. 05779
009722

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 805 of 1017 PageID 10569
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 12 of 22

the truth. This is especially true in light of the evidence supporting Mr. Ellington's recent termination for cause and the evidence recently provided by HarbourVest supporting its claim for fraudulent misrepresentations.

21. Finally, neither Mr. Dondero nor the "Trusts" even address the third factor analyzed by the Fifth Circuit: all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." This is telling because no creditor or party in interest has objected to the settlement. Mr. Dondero and his proxies' preference for constant litigation should not outweigh the preference of the Debtor and its creditors for a reasonable and expeditious settlement of HarbourVest's claims.

22. **The HarbourVest Settlement Is a Windfall to HarbourVest.** Both the Dondero Objection and the "Trusts" Objection argue that the HarbourVest settlement represents a substantial windfall to HarbourVest. Both Mr. Dondero and the "Trusts" ignore the facts. Specifically, Mr. Dondero argues that HarbourVest is receiving $60 million dollars in *actual* value for its claims. Mr. Dondero's contention, however, wrongly assumes that both the $45 million general unsecured claim and the $35 million subordinated claim provided to HarbourVest under the settlement will be paid 100% in full and that HarbourVest will receive $80 million in cash. From that $80 million, Mr. Dondero subtracts $20 million, which represents the value Mr. Dondero ascribes to HarbourVest's interests in HCLOF that are being transferred to the Debtor. Mr. Dondero's math ignores the reality of this case.

23. The Debtor very clearly disclosed in the projections filed with the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.,* [Docket No. 1473] (the "Projections") that general unsecured claims would receive an 87.44% recovery *only if* the claims of UBS, HarbourVest, Integrated Financial Associates, Inc., Mr.

DOCS_NY:41952.8 36027/002

009723

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 806 of 1017 PageID 10570
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 13 of 22

Daugherty, and the Hunter Mountain Investment Trust were zero. Because of the Debtor's success is settling litigation, that assumption is proving to be inaccurate. Regardless, even if general unsecured claims receive a recovery of 87.44%, because the subordinated claims are junior to the general unsecured claims, the subordinated claims' projected recovery is currently zero. As such, assuming the HCLOF's interests are worth $22.5 million,[10] the actual recovery to HarbourVest will be less than $16.8 million. This is not a windfall. HarbourVest's investment in HCLOF was $80 million and its claim against the estate was over $300 million. The settlement represents a substantial discount.

24. **Improper Gerrymandering and/or Vote Buying.** Each of Mr. Dondero and the Trusts argue in one form or another that the HarbourVest settlement is improper as it provides HarbourVest a windfall on its claims in exchange for HarbourVest voting to approve the Plan. These unsubstantiated allegations of vote buying should be disregarded. As an initial matter, and as set forth above, HarbourVest is *not* getting a windfall. HarbourVest is accepting a substantial discount in the settlement. HarbourVest's incentive to support the Plan comes from HarbourVest's determination that the Plan is in its best interests. There is also nothing shocking about a settling creditor supporting a plan. Indeed, it would be nonsensical for a creditor to settle its claims and then object to the plan that would pay those claims.

25. More importantly, HarbourVest's votes in Class 9 (Subordinated Claims) are not needed to confirm the Plan. As will be set forth in the voting declaration, Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 8 (General Unsecured Claims) have voted in favor of the Plan.[11] In brief, the Plan was approved without HarbourVest's Class 9 vote,

---

[10] It is currently anticipated that Mr. James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, will testify as to the value of the HCLOF interests to the Debtor's estate.

[11] The Debtor anticipates that Mr. Dondero and his related entities will argue that neither Class 7 nor Class 8 voted to accept the Plan because of the votes cast against the Plan in those Classes by current and former Debtor

App. 28581
009724

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 807 of 1017 PageID 10571
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 14 of 22

and the Debtor, therefore, has no need to "buy" HarbourVest's Class 9 claims. Accordingly, any claims of gerrymandering or vote buying are without merit.

## C. <u>CLOH Objection</u>

26.     CLO Holdco (and to a much lesser extent, the "Trusts") object to HarbourVest's transfer of its interests in HCLOF as part of the settlement. Currently, the settlement contemplates that HarbourVest will transfer 100% of its collective interests in HCLOF to HCMLP Investments, LLC ("<u>HCMLPI</u>"), a wholly-owned subsidiary of the Debtor. As set forth in the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd*. (which was appended as Exhibit A to the Settlement Agreement) [Docket No. 1631-1], each of the Debtor, HarbourVest, Highland HCF Advisors, Ltd. (HCLOF's investment manager) ("<u>HHCFA</u>"), and HCLOF agree that HarbourVest is entitled to transfer its interests to HCMLPI pursuant to that certain *Members Agreement Relating to the Company*, dated November 15, 2017 (the "<u>Members Agreement</u>"),[12] without offering that interest to other investors in HCLOF.

27.     The *only* party to object to the transfer of HarbourVest's interests in HCLOF to HCMLPI is CLO Holdco. CLO Holdco holds approximately a 49.02% interest in HCLOF and is the wholly-owned subsidiary of the DAF, Mr. Dondero's donor-advised fund. CLO Holdco argues that the Member Agreement requires HarbourVest to offer its interest first to the other investors in HCLOF before it can transfer its interests to HCMLPI. In so arguing, CLO Holdco attempts to create ambiguity in an unambiguous contract and to use that ambiguity to disrupt the Debtor's settlement with HarbourVest.

28.     As an initial matter, the Debtor and CLO Holdco agree that the transfer of HarbourVest's interests in HCLOF to HCMLPI is governed by Article 6 (Transfers or Disposals

---

employees, including Mr. Ellington and Mr. Isaac Leventon. The Debtor will demonstrate at confirmation that those objections are without merit and that Class 7 and Class 8 voted to accept the Plan.

[12] A true and accurate copy of the Members Agreement is attached hereto as Exhibit A.

009725

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 808 of 1017 PageID 10572
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 15 of 22

of Shares) of the Members Agreement (an agreement governed by Guernsey law). (CLOH Obj.,
¶ 3) The parties diverge, however, as to how to interpret Article 6. The Debtor, as set forth
below, believes Article 6 is clear in that it allows HarbourVest to transfer its interests in HCLOF
to any "Affiliate of an initial Member party" without requiring the right of first refusal in Section
6.2 of the Members Agreement. CLO Holdco's position appears to be that the Members
Agreement, despite its clear language, should be interpreted as limiting transfers to an "initial
Member's **own** affiliates" and that any other transfer requires the consent of HHCFA and
satisfaction of the right of first refusal. (*Id.* (emphasis added)) CLO Holdco's reading is
contrary to the actual language of the Members Agreement.

29. First, Section 6.1 of the Members Agreement provides, in pertinent part:



(Members Agmt, § 6.1 (emphasis added)) Under the Members Agreement, "Affiliate" is
defined, in pertinent part, as "████████████████████████████████████

█████████████████████████████████████████████████████████

(Id., § 1.1) A "Member" in turn is a █████████████████████." The "initial
Member[s]" are the initial Members of HCLOF listed on the first page of the Members
Agreement and include the Debtor, HarbourVest, and CLO Holdco.

30. As such, under the plain language of Section 6.1, HarbourVest is entitled –
without the consent of any party – to "Transfer" its interests in HCLOF to an "Affiliate" of any
of the Debtor, HarbourVest, or CLO Holdco. And that is exactly what is contemplated by the
settlement. HarbourVest is transferring its interests to HCMLPI, a wholly owned and controlled
subsidiary of the Debtor, and therefore an "Affiliate" of the Debtor. That transfer is indisputably

009726

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 809 of 1017 PageID 10573
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 16 of 22

allowed under Section 6.1; it is a transfer to an "Affiliate of an initial Member." CLO Holdco may, tongue in cheek, call this structure "convenient" but that sarcasm is an attempt to avoid the fact that the Members Agreement clearly allows HarbourVest to transfer its interest to HCMLPI without the consent of any party.[13] The fact that CLO Holdco does not now like the language it previously agreed to when CLO Holdco and the Debtor were both controlled by Mr. Dondero is not a reason to re-write Section 6.1 of the Members Agreement.

31. Second, Section 6.2 of the Members Agreement is also unambiguous and, by its plain language, allows HarbourVest to "Transfer" its interests in HCLOF to "Affiliates of an initial Member" (*i.e.*, HCMLPI) without having to first offer those interests to the other Members (such obligation, the "ROFO"). CLO Holdco attempts to create ambiguity in Section 6.2 by arguing that it must be read in conjunction with Section 6.1 and that interpreting the plain language of Section 6.2 to allow HarbourVest to transfer its interests to HCMLPI without restriction makes certain other language surplus and meaningless. (CLOH Obj., ¶ 11-13) Again, CLO Holdco is attempting to create controversy and ambiguity where none exists.

32. Section 6.2 of the Members Agreement provides, in pertinent part:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████

(Members Agmt., § 6.2 (emphasis added)) Like Section 6.1, Section 6.2 is clear on its face. It exempts from the requirement to comply with the ROFO two categories of "Transfers": (1) Transfers to "affiliates of an initial Member" from Members *other than* CLO Holdco and the

---

[13] Although HHCFA's consent is not necessary for HarbourVest to transfer its interests to HCMLPI, HHCFA will consent to the transfer.

DOCS_NY:41952.8 36027/002

App. 05584
009727

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 810 of 1017 PageID 10574
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 17 of 22

"Highland Principals" (*i.e.*, the Debtor and certain of its employees)[14] and (2) Transfers from CLO Holdco or a Highland Principal to the Debtor, the Debtor's "Affiliates," or another Highland Principal. The fact that a narrower exemption is provided to CLO Holdco and the Debtor than to HarbourVest (or any other Member) under Section 6.2 is of no moment; the language says what it says and was agreed to by all Members, including CLO Holdco, when they executed the Members Agreement.

33.     In addition, and although not relevant, the language of Section 6.2 makes sense in the context of the deal. Although CLO Holdco and the Debtor may have disclaimed an "Affiliate" relationship, they are related through Mr. Dondero and invest side by side with the Debtor in multiple deals.[15] The different standards in Section 6.2 serve to ensure that HarbourVest's (or any successor to HarbourVest) right to Transfer its shares without satisfying the ROFO is limited to three parties: (i) HarbourVest's Affiliates, (ii) the Debtor's Affiliates, and (iii) CLO Holdco's Affiliates. This restriction keeps the relative voting power of each Member static and ensures that CLO Holdco and the Debtor, together, will *always* have more than fifty percent of HCLOF's total interests and that HarbourVest will *always* have less than fifty percent. This counterintuitively also explains the greater restrictions placed on CLO Holdco and the "Highland Principals." The Highland Principals include certain Debtor employees. Those employees – as well as CLO Holdco and the Debtor – are prohibited from transferring their HCLOF interests outside of the Dondero family. This restriction makes sense. If, for example, a Debtor employee wanted to transfer its interests to an Affiliate of HarbourVest, HarbourVest could have more than fifty percent of the HCLOF interests because of the thinness

---

[14] "**Highland Principals**" means: ██████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████ (Members Agmt., § 1.1)
[15] There can be no real dispute that Mr. Dondero effectively controls CLO Holdco.

DOCS_NY:41952.8 36027/002

App. 05785

009728

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 811 of 1017 PageID 10575
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 18 of 22

of the Dondero-family's majority (approximately 0.2%). At the time the Members Agreement was executed, CLO Holdco and the Debtor were under common control. Section 6.2 preserves those related entities' control over HCLOF by restricting transactions that would transfer that control unless the ROFO is complied with.

34. As such, and notwithstanding CLO Holdco's protestations, Section 6.1 and Section 6.2 are consistent as written and clear on their face. This consistency is further evidenced by HCLOF's Articles of Incorporation[16] and HCLOF's offering memorandum, which each include language identical to Section 6.1 and 6.2 of the Members Agreement.[17] It seems highly unlikely, if not implausible, that sophisticated parties such as CLO Holdco would include the exact same language in six separate places over three documents without a reason for that language and without the intent that such language be interpreted as it is clearly written – not as CLO Holdco now wants it to be interpreted. Accordingly, since HarbourVest is transferring its interests to HCMLPI, an Affiliate of an initial Member, the plain language of Section 6.2

---

[16] *See* Articles of Incorporation, adopted November 15, 2017, a true and correct copy of which is attached hereto as Exhibit B.



(Articles of Incorporation, § 18.1)

(*Id.*, § 18.2)

[17] *See* Offering Memorandum, dated November 15, 2017, a true and correct copy of which is attached hereto as Exhibit C.



(Offering Memorandum, page 89)

DOCS_NY:41952.8 36027/002

Annex 005786
009729

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 812 of 1017 PageID 10576
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 19 of 22

exempts HarbourVest from having to comply with the ROFO.

35.     Third, and finally, CLO Holdco makes the nonsensical argument that because Section 6.2 provides different treatment to similarly situated Members that this Court should re-write Section 6.2.  (CLOH Obj., ¶¶ 15-17)  Contracts provide different treatment to ostensibly similarly situated parties all the time and no one objects that that creates an absurd result.  It just means that different parties bargained for and received different rights.

36.     CLO Holdco's attempt to justify why this Court should re-write the Members Agreement to correct the "disparate treatment" is also unavailing.  As an example of the absurd result caused by the "disparate treatment," CLO Holdco states:   "[B]ecause the HarbourVest Members are technically Affiliates of an initial member (each other), they could obtain control of all of the interests in HCLOF without any Member receiving a Right of First Refusal for any transfer."   (*Id.*, ¶ 16)  The scenario posited by CLO Holdco, however, is *exactly* the scenario prevented by the clear language of Section 6.2.  For HarbourVest to obtain control of HCLOF, it would – as a matter of mathematical necessity – need the interests held by CLO Holdco (49.02%) and/or the Highland Principals (1% in the aggregate).  Section 6.2, however, *expressly* prohibits CLO Holdco and the Highland Principals from transferring their interests to HarbourVest or its Affiliates without satisfying the ROFO.  As set forth above, it is Section 6.2 that prevents control from being transferred away from the Dondero family without compliance with the ROFO.  In fact, Section 6.2 would only break down if the limiting language in Section 6.2 were read out of it in the manner advocated by CLO Holdco.

37.     Ultimately, Article 6 of the Members Agreement is clear as written and expressly allows HarbourVest to transfer its interests to HCMLPI.  If CLO Holdco had an objection to the rights provided to HarbourVest under the Members Agreement, CLO Holdco

App. 25787
009730

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 813 of 1017 PageID 10577
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21 Entered 01/13/21 15:48:50 Page 20 of 22

should have raised that objection three and a half years ago before agreeing to the Members
Agreement. CLO Holdco should not be allowed to create ambiguity in an unambiguous contract
or to re-write that agreement to impose additional restrictions on HarbourVest. *See Clardy Mfg.
Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) (enforcing the
"unambiguous language in a contract as written," noting that where a contract is unambiguous, a
party may not create ambiguity or "give the contract a meaning different from that which its
language imports") (internal quotations omitted); *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407
(5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of
the document, and cannot look to extrinsic evidence to create an ambiguity.").

38.     It should go without saying, but CLO Holdco (and the other parties to the
Members Agreement) should also be required to satisfy their obligations under the Members
Agreement and execute the "Adherence Agreement" as required by Section 6.6 of the Members
Agreement in connection with the Transfer of HarbourVest's interests to HCMLPI or any other
permitted Transfer.

39.     Finally, and notably, although CLO Holdco spends considerable time arguing that
HarbourVest should be required to comply with the ROFO, nowhere in the CLOH Objection
does CLO Holdco state that it wishes to purchase HarbourVest's interests in HCLOF. This
omission is telling. CLO Holdco and the other Objectors have no interest in actually exercising
their alleged right of first refusal contained in the Members Agreement. Rather, their only
interest is in causing the Debtor to spend time and money responding to a legion of related (and
coordinated) objections.[18]

---

[18] *See Debtor's Amended Witness and Exhibit List with Respect to Evidentiary Hearing to be Held on January 8,
2021* [Adv. Pro. 20-3190-sgj, Docket No. 46], Exhibit Q; Exhibit T (email from Mr. Dondero as forwarded to Mr.
Ellington stating "Holy bananas….. make sure we object [to the HarbourVest Settlement]"); Exhibit Y.

App. 05788
009731

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 22 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 814 of 1017    PageID 10578
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 21 of 22

*[Remainder of Page Intentionally Blank]*

DOCS_NY:41952.8 36027/002

009732

Case 19-34054-sgj11 Doc 3445-35 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 23 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 815 of 1017   PageID 10579
Case 19-34054-sgj11 Doc 1731 Filed 01/13/21   Entered 01/13/21 15:48:50   Page 22 of 22

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated: January 13, 2021                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                           Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
                                           Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
                                           John A. Morris (NY Bar No. 266326) (*pro hac vice*)
                                           Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
                                           Hayley R. Winograd (NY Bar No. 5612569)
                                           10100 Santa Monica Blvd., 13th Floor
                                           Los Angeles, CA 90067
                                           Telephone: (310) 277-6910
                                           Facsimile: (310) 201-0760
                                           E-mail:    jpomerantz@pszjlaw.com
                                                      ikharasch@pszjlaw.com
                                                      jmorris@pszjlaw.com
                                                      gdemo@pszjlaw.com
                                                      hwinograd@pszjlaw.com

                                           -and-

                                           **HAYWARD PLLC**

                                           */s/ Zachery Z. Annable*
                                           Melissa S. Hayward
                                           Texas Bar No. 24044908
                                           MHayward@HaywardFirm.com
                                           Zachery Z. Annable
                                           Texas Bar No. 24053075
                                           ZAnnable@HaywardFirm.com
                                           10501 N. Central Expy, Ste. 106
                                           Dallas, Texas 75231
                                           Tel: (972) 755-7100
                                           Fax: (972) 755-7110

                                           *Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:41952.8 36027/002

009733

# EXHIBIT 36

009734

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 817 of 1017 PageID 10581
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 1 of 106

Docket #1807 Date Filed: 01/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

<div align="center">

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

<div align="center">

**DEBTOR'S OMNIBUS REPLY TO OBJECTIONS
TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P. (WITH
TECHNICAL MODIFICATIONS)**

</div>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000012

009735

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 818 of 1017    PageID 10582
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 106

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| INTRODUCTION | | 1 |
| OBJECTIONS | | 3 |
| I. | Objections Addressed in the Memorandum | 3 |
| II. | The Plan Impermissibly Allows for Set Off | 4 |
| III. | The Plan Impermissibly Allows Assumption or Rejection After Confirmation | 6 |
| IV. | The Attack on the Plan's Release Is Baseless. | 6 |
|  | A. Debtor Release Provisions | 6 |
|  | B. Objections and Responses | 7 |
| V. | The Court Has Already Exculpated the Independent Directors and their agents For Negligence Pursuant to the January 9, 2020 Settlement Order and, to the Extent Not Covered Therein, the Plan's Exculpation Provisions Effectuate Essential Protections for Estate Fiduciaries and their agents, and Are Fully Supported by the Bankruptcy Code and Applicable Law. | 11 |
|  | A. The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation | 12 |
|  | B. Plan Exculpation Provisions | 14 |
|  | C. Pacific Lumber | 16 |
|  | D. Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*. | 19 |
|  | E. Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan | 24 |
| VI. | The Plan Injunction Is Appropriate and is Narrowly Tailored to Effectuate the Plan and related provisions of the bankruptcy code. | 28 |
|  | A. Plan Injunction Provisions | 29 |
|  | B. Objections | 32 |
|  | C. An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate. | 33 |
|  | D. The Injunction Is Not a Disguised Non-Debtor Third-Party Release. | 35 |

i

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 819 of 1017 PageID 10583
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 106

| | E. | The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order................................................................................ 37 |
|---|---|---|
| VII. | | The Gatekeeper Provision Is Necessary and Appropriate, and Supported by Applicable Law.............................................................................. 38 |
| | A. | The Gatekeeper Provision .................................................................. 38 |
| | B. | The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code................. 39 |
| | C. | The Gatekeeper Provision is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court. ...................... 44 |
| | D. | The Gatekeeper Provision Is Consistent with the Barton Doctrine. ........ 51 |
| | E. | The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities........................ 54 |
| VIII. | | the exception to discharge does not apply ........................................... 55 |
| IX. | | The Senior Employee Objection ........................................................... 57 |
| | A. | The Senior Employee Objection Should Be Overruled........................... 57 |
| | B. | Background Related to Senior Employees .............................................. 58 |
| | C. | Treatment of Senior Employee Claims Under Plan................................. 62 |
| | D. | Plan Solicitation ................................................................................. 63 |
| | E. | The Plan Does Not Violate Section 1123(a)(4) ..................................... 64 |
| | F. | The Senior Employees Are Not Permitted to Make Convenience Class Election.................................................................................... 66 |
| | G. | Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law ............................................................................... 66 |
| | H. | Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes ..................................................... 68 |
| | I. | Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting ................................................ 69 |
| X. | | The HCMFA/NPA Gates Objection ....................................................... 70 |
| | A. | The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled................................................... 72 |
| | B. | The CLO Objectors Cannot Override the CLOs' Consent to Assumption ....................................................................................... 74 |
| | C. | The CLO Objectors Lack Standing to Object to the Plan........................ 76 |

009737

APPX 25794

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 820 of 1017 PageID 10584
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 4 of 106

|   | D. | Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit | 82 |
|---|----|---|---|
|   | E. | Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable | 86 |
|   | F. | The Inadequate Assurance of Future Performance Objection is Meritless | 90 |
|   | G. | The "Impermissible Partial Assignment" Objection is Meritless | 92 |
| XI. |   | State Taxing Authority Objection | 92 |
| XII. |   | IRS Objection | 93 |
| CONCLUSION |   |   | 99 |

DOCS_SF:104855.7 36027/002

Appx. 05795

009738

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 821 of 1017 PageID 10585
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 5 of 106

# TABLE OF AUTHORITIES

<div align="right">**Page(s)**</div>

## CASES

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp.*
  *(In re Peabody Energy Corp.),*
  933 F.3d 918 (8th Cir. 2019) ................................................. 65

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
  *(In re Pac. Lumber Co.),*
  584 F.3d 229 (5th Cir. 2009) ................................................. 64

*Bonneville Power Admin. v. Mirant Corp.*
  *(In re Mirant Corp.),*
  440 F.3d 238 (5th Cir. 2006) ................................................. 83

*Cajun Elec. Members Comm. v. Mabey*
  *(In re Cajun Elec. Power Coop., Inc.),*
  230 B.R. 693 (Bankr. M.D. La. 1999) ................................ 84, 85

*Cargill, Inc. v. Nelson (In re LGX, LLC),*
  2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) ................... 75

*Concord Square Apartments v. Ottawa Properties*
  *(In re Concord Square Apartments),*
  174 B.R. 71 (Bankr. S.D. Ohio 1994) ..................................... 67

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC,*
  2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018) ........... 88

*Figter Ltd. v. Teachers Ins. Annuity Ass'n (In re Figter Ltd.),*
  118 F.3d 635, 640-641 (9th Cir. 1997) .................................... 67

*Goldstein v. SEC,*
  451 F.3d 873 (D.C. Cir. 2006) ............................................. 71

*Hertz Corp. v. ANC Rental Corp.*
  *(In re ANC Rental Corp.),*
  278 B.R. 714 (Bankr. D. Del. 2002) ............................ 74, 75, 80

*Hertz Corp. v. ANC Rental Corp.*
  *(In Re ANC Rental Corp.),*
  280 B.R. 808 (D. Del. 2002) ............................................... 75

*In re Acequia, Inc.,*
  787 F.2d 1352 (9th Cir. 1986) ............................................. 65

*In re ANC Rental Corp.,*
  277 B.R. 226 (Bankr. D. Del. 2002) ....................................... 89

*In re Gilbert,*
  104 B.R. 206 (Bankr. W.D. Mo. 1989) ..................................... 67

*In re Hartec Enters., Inc.,*
  117 B.R. 865 (Bankr. W.D. Tex. 1990) .................................... 85

009739

*In re Irwin Yacht Sales, Inc.*,
   164 B.R. 678 (Bankr. M.D. Fla. 1994) ................................................................................. 75

*In re Jacobsen*,
   465 B.R. 102 (Bankr. N.D. Miss. 2011) ............................................................................... 84

*In re Jones*,
   2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) ......................................................... 67

*In re Latham Lithographic Corp.*,
   107 F.2d 749 (2d Cir. 1939) ................................................................................................ 67

*In re Lil' Things, Inc.*,
   220 B.R. 583 (Bankr. N.D. Tex. 1998) ................................................................................ 84

*In re Lindell Drop Forge Co.*,
   111 B.R. 137 (Bankr. W.D. Mich. 1990).............................................................................. 66

*In re Riverside Nursing Home*,
   43 B.R. 682 (Bankr. S.D.N.Y. 1984) ................................................................................... 75

*In re Virgin Offshore USA, Inc.*,
   No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013) ........................ 84

*In re Visser*,
   232 B.R. 362 (Bankr. N.D. Tex. 1999) ................................................................................ 66

*Mabey v. Sw. Elec. Power Co.*
   *(In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) ............................................................................................. 65

*Riemer & Braunstein LLP v. DeGiacomo*
   *(A & E 128 North Corp.)*,
   528 B.R. 190, 199 (1st Cir. B.A.P. 2015)............................................................................. 66

*Texaco Inc. v. Louisiana Land & Exploration Co.*,
   136 B.R. 658 (Bankr. M.D. La.1992)............................................................................. 84, 85

## STATUTES

11 U.S.C. § 365................................................................................................................... 83, 86

## OTHER AUTHORITIES

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
   (12/23/1997)...................................................................................................................... 89

Investment Management Staff Issues of Interest,
   http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012].................. 89

Appx. 09740

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 823 of 1017 PageID 10587
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 7 of 106

The above-captioned debtor and debtor-in-possession (the "Debtor") files this omnibus reply to the objections (this "Reply") to the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)*[2] (as modified, amended, or supplemented from time to time, the "Plan"). Concurrently herewith, the Debtor has filed its *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "Memorandum"). To the extent the Debtor is unable to consensually resolve the Objections, the Debtor respectfully requests that the Bankruptcy Court overrule any remaining or pending Objections as of the Confirmation Hearing and confirm the Plan.

## INTRODUCTION

1.      The Debtor received twelve objections to confirmation of the Plan, inclusive of joinders (collectively, the "Objections" and each objecting party, an "Objector"). As discussed in greater detail in the Memorandum, seven of the twelve objections were filed by Mr. Dondero either individually or via his related entities (collectively, the "Dondero Entities"). **Exhibit A** lists the Dondero Entities and their relationships to each other.[3] The following are the Objections filed by the Dondero Entities:

- *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661];

- *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667] (the "Dugaboy Objection");

---

[2] Unless otherwise noted, capitalized terms used in this Reply have the meanings ascribed in the Plan.

[3] As set forth in the Memorandum, none of the Dondero Entities, including the NexPoint RE Entities (defined below), has an actual economic interest in the Estate.

Appx. 25798
009741

- *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669] (the "<u>Senior Employee Objection</u>");[4]

- *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670] (the "<u>NPA/HCMFA Objection</u>");[5]

- *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673] (the "<u>NREP Objection</u>");

- *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675] (the "<u>CLOH Objection</u>"); and

- *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676] (the "<u>NexBank Objection</u>").

2.     That leaves the following as the only non-Dondero related Objections:

- *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662] (the "<u>State Taxing Authority Objection</u>");

---

[4] Subsequent to the filing of the Senior Employee Objection, Mr. Waterhouse and Mr. Surgent reached an agreement with the Debtor and will withdraw their objections to the Plan.

[5] The NPA/HCMFA Objection is joined (1) by CLO Holdco, Ltd., through the CLOH Objection, and (2) by the following Dondero-controlled entities: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing (collectively, the "<u>NexPoint RE Entities</u>") [Docket No. 1677] (the "<u>NPRE Joinder</u>").

009742

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 825 of 1017    PageID 10589
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 9 of 106

- *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666];

- *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668] (the "<u>IRS Objection</u>");

- *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671] (the "<u>UST Objection</u>"); and

- *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].

As of the date hereof, the Date is working to resolve certain of the non-Dondero related Objections.

3.      To avoid duplication, this Reply does not address each objection individually. Rather, it is organized by substantive objection where possible because of the cross-over in the issues raised in the Objections.  Also, as discussed below, where the Debtor has addressed an Objection in the Memorandum, the response is not repeated here.  However, parts of the Senior Employee Objection, the NPA/HCMFA Objection, State Taxing Authority Objection, and the IRS Objection, are addressed individually below.   A summary chart addressing each Objection and the Debtor's response thereto is attached as **Exhibit B**.

<u>**OBJECTIONS**</u>

**I.      OBJECTIONS ADDRESSED IN THE MEMORANDUM**

4.      The Memorandum addresses the Debtor's compliance with the statutory requirements of sections 1123 and 1129 of the Bankruptcy Code.  As part of the analysis in the Memorandum, the Debtor addresses the portions of the Objections alleging that the Debtor failed to comply with and/or violated the statutory provisions set forth in sections 1123 and 1129 of the Bankruptcy Code.  Specifically, the Debtor addresses the arguments that (i) the Plan provides for

App. 25800
009743

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 826 of 1017 PageID 10590
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 10 of 106

improper subordination; (ii) the Disputed Claims Reserve violates due process; (iii) the Plan does

not satisfy the "best interests test;" (iv) the Plan impermissibly provides no Bankruptcy Court

oversight of post-effective date transactions; (v) the elimination of vacant classes does not allow

for post-Effective Date reclassification of Claims; (vi) the Plan violates the absolute priority rule;

(vii) the Plan does not disclose the insiders or the compensation of insiders retained post-

Effective Date; (viii) the Plan impermissibly allows modifications to the Plan without

Bankruptcy Court approval; and (ix) the Plan is not final because the Plan Supplement is not

final.

## II.    THE PLAN IMPERMISSIBLY ALLOWS FOR SET OFF

5.      The NREP Objection and the NexBank Objection erroneously contend that

Article VI.M of the Fifth Amended Plan provides for "improper set-off of unidentified claims."

NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  The challenged language in the NREP Objection

and the NexBank Objection is as follows:

> The Distribution Agent may, to the extent permitted under applicable law, set off
> against any Allowed Claim and any distributions to be made pursuant to this Plan
> on account of such Allowed Claim, the claims, rights and causes of action of any
> nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may
> hold against the Holder of such Allowed Claim…. Any Holder of an Allowed
> Claim subject to such setoff reserves the right to challenge any such setoff in the
> Bankruptcy Court or any other court with jurisdiction with respect to such
> challenge.

Plan, Art. VI.M.

6.      Article VI.M of the Plan accords with Bankruptcy Code section 558 (formerly

section 541(e)), which provides that "[t]he estate shall have the benefit of any defense available

to the debtor as against any entity other than the estate, including statutes of limitation, statutes

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 827 of 1017 PageID 10591
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 11 of 106

of frauds, usury, and other personal defenses." 11 U.S.C. § 558; *see In re Braniff Airways, Inc.*, 42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) (a debtor in possession may exercise setoff rights pursuant to Bankruptcy Code section 558 (then section 541(e)); *In re Circuit City Stores, Inc.*, 2009 Bankr. LEXIS 4011 (Bankr. E.D. Va. Dec. 3, 2009) (same); *In re Women First Healthcare, Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) (same); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) (same); *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) (same).

7.     In support of the argument that the provision is improper, the NREP Objection and the NexBank Objection contend that Bankruptcy Code section 553 and cases construing that provision limit parties' right of setoff in bankruptcy only to prepetition claims. NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12. However, the issue of the scope of the Distribution Agent's setoff rights and the application of section 553 is not even adjudicated by the Plan.[6] Rather, on its face, the Plan states that the Distribution Agent may exercise setoff rights only "to the extent permitted by law." Thus, it does not purport to expand setoff rights of the Distribution Agent beyond what is permitted by the Bankruptcy Code but only preserves whatever setoff rights the estate has – no more and no less. Moreover, as quoted above, it expressly preserves the right of creditors to challenge any setoff that the Distribution Agent seeks to take.

8.     Accordingly, whether the Distribution Agent may take any specific setoffs is reserved by the Plan for another day. The NREP Objection and the NexBank Objections on this issue are not well-taken, and both such objections should be overruled.

---

[6] The Debtor reserves its rights with respect to the applicability of section 553 to the Distribution Agent's preserved rights of setoff, if any.

009745

App. 05892

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 828 of 1017    PageID 10592
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 12 of 106

## III.   THE PLAN IMPERMISSIBLY ALLOWS ASSUMPTION OR REJECTION AFTER CONFIRMATION

9.     The NPA/HCMFA Objection contends that the Plan violates section 365(d)(2) because it allows the Debtor to assume or rejection executory contracts or unexpired leases on or prior to the Effective Date.   While the Debtor believes that the original language in the Plan is defensible, the Debtor has elected to amend the Plan to clarify that all executory contracts and leases must be assumed or rejected on or prior to the Confirmation Date.

## IV.   THE ATTACK ON THE PLAN'S RELEASE IS BASELESS.

### A.    Debtor Release Provisions

10.     Article IX of the Plan provides for releases only by the Debtor, its Estate, and the Reorganized Debtor (including their successors, the Claimant Trust and the Litigation Sub-Trust) of any and all Causes of Action, including any derivative claims that might be asserted on behalf of, or in the name of, the Debtor, that the Debtor or the Estate could otherwise assert against the Released Parties[7] (the "Debtor Release").   The Debtor Release is the product of extensive good faith, arm's-length negotiations and complies fully with the Bankruptcy Code and prevailing law. The Debtor Release provides:

> On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged **by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust** from any and all Causes of Action, including any derivative claims, **asserted on behalf of the Debtor,** whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise,

---

[7] The "Released Parties" under the Plan are: (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities); (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.  Plan, Art. I.B., Def. 111.

DOCS_SF:104855.7 36027/002

App. 25893
009746

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 829 of 1017    PageID 10593
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of 106

> *that the Debtor or the Estate would have been legally entitled to assert in their*
> *own right* (whether individually or collectively) *or on behalf of* the holder of any
> Claim against, or Interest in, a Debtor or other Person.

Plan, Art. IX.D (emphasis added.)

11.     The Debtor Release releases, among others, the Independent Directors (each of whom was appointed by the Bankruptcy Court post-petition), Strand (solely from January 9, 2020, the date of the appointment of the Independent Directors, through the Effective Date), the CEO/CRO (who is also an Independent Director and whose role was expanded to include the CEO/CRO role on July 16, 2020), the Committee and its members in their official capacities, the Professionals retained with this Court's approval by the Debtor or by the Committee and, to a more limited extent, the Employees.[8]

12.     The Debtor Release is a release of the Released Parties by the Debtor, the Estate and their successors on account of Causes of Action that belong to the Debtor or the Estate, whether directly or derivatively.  *The Debtor Release does not release any Causes of Action of any person other than the Debtor, the Estate and their successors and does not release any claims that could not have been asserted by the Debtor or the Estate prior to the Effective Date.*

### B.     <u>Objections and Responses</u>

13.     Three parties in interest have objected to the Debtor Release.  The Dugaboy Objection objects to the Debtor Release under the mistaken view that the Claimant Trust and Litigation Sub-Trust are (in Dugaboy's view) granting releases of claims that have not yet arisen,

---

[8] The Debtor Release contains restrictions on the releases of the Employees, as may be determined by the Claimant Trust Oversight Committee.  Plan, Art. IX.D.

Appx. 05804

009747

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 830 of 1017 PageID 10594
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 14 of 106

*i.e.,* causes of action of the Claimant Trust and Litigation Sub-Trust that arise after the Effective Date against the Released Parties. *See Dugaboy Objection* at p. 9. The U.S. Trustee Objection erroneously argues the Debtor Release is an impermissible non-consensual third-party release. *See UST Objection* at pp. 2-3. The Senior Employee Objection objects to the Debtor Release because the Senior Employees believe that the Debtor should not be able to condition a release of the Senior Employees on concessions not required of other Employees obtaining a release. *See Senior Employee Objections* at p. 3.

14. Both Dugaboy and the U.S. Trustee misread the Debtor Release provision. The Claimant Trust and Litigation Sub-Trust are included solely in their capacity as "successors, assigns and representatives" of the Debtor and the Estate, and the Debtor Release applies solely to Causes of Action that ***the Debtor or the Estate*** themselves would have against the Released Parties (whether a direct claim or a derivative claim, but in either case, only Causes of Action owned by the Debtor or the Estate). By its express terms, the Debtor Release does not apply to any future claims or Causes of Action that the Claimant Trust or the Litigation Sub-Trust would have in its own right, based on post-Effective Date acts or omissions, rather than as a successor to or assignee of Causes of Action of the Debtor and the Estate.

15. The U.S. Trustee's contention that the Debtor Release provision includes a third-party release is incorrect. The Debtor Release applies only to claims held by the Debtor and the Estate, on behalf of themselves and each of their successors, assigns and representatives in favor of the Released Parties. Any direct claims and causes of action owned by any other person are not released by the Debtor Release, and nothing in the language of the provision implicates any

009748

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 831 of 1017 PageID 10595
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 15 of 106

non-derivative claims or causes of action that any third party might have against any of the Released Parties.

16.     The Senior Employees' objection to the proposed Debtor Release also is devoid of merit.  As discussed at length, in Section IX, herein, Employees are not entitled, either contractually or legally, to any release.  Nor does a release given to one Employee entitle any other employee to a similar release.  Releases are discretionary and can be provided, in an exercise of discretion, to persons who have provided consideration to the Debtor and the Estate. Unlike the other Released Parties, the Senior Employees have not yet fully provided that consideration.  As the Court is aware, the Committee and the Court have consistently voiced concerns regarding the potential release of the Employees, and specifically, the Senior Employees.  The Plan resolves these concerns by imposing significant restrictions and affirmative requirements for any Employee to obtain the benefit of the Debtor Release and additional requirements for the Senior Employees to do so.  *See* Plan, Art. IX.D.

17.     The Bankruptcy Code explicitly provides for and sanctions the inclusion of debtor releases in plans.  Section 1123(b)(3)(A) of the Bankruptcy Code states clearly that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  The Debtor Release is an essential *quid pro quo* for the Released Parties' significant contributions to the Debtor's restructuring, which has been highly complex and contentious.  There are multiple precedents in which courts have approved releases by a debtor's estate of its own claims against a far more extensive group of persons than those

DOCS_SF:104855.7 36027/002

009749

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 832 of 1017 PageID 10596
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 16 of 106

included here.[9] The Committee and its members (who are Released Parties), who have had over a year to investigate potential claims against the Employees, among others, fully support the Debtor Release as to the other identified Released Parties.

18. It is also important to bear in mind that the Debtor Release applies to claims *of the Debtor or the Estate* against the Released Parties that others might purport to assert derivatively on behalf of the Debtor or the Estate. To the extent that Released Parties have indemnification rights against the Debtor, the assertion of such derivative claims – no matter how specious – would trigger claims for indemnification that would deplete the assets available for distribution to creditors. Moreover, regardless of such rights of indemnification, the assertion of such purported derivative claims on behalf of the Debtor would subject the Debtor to the costs – both economic, in terms of legal fees, and of the time and distraction of personnel – that would result from becoming embroiled in such derivative litigation – again, no matter how specious the claim.

19. Both the U.S. Trustee and Dugaboy erroneously cite *Pacific Lumber*[10] for the proposition that releases of third parties – even by the debtor – are always impermissible. *Pacific Lumber*, however, did not involve the release of claims by a debtor. The issue addressed in *Pacific Lumber* was whether a bankruptcy court could approve injunction and exculpation provisions in a plan that effectively mandated that **holders of claims** release, or be precluded

---

[9] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provisions were acceptable settlement under § 1123(b)(3) because the debtors and the estate were releasing claims that were property of the estate); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725, 737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[10] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 251-253 (5th Cir. 2009) ("*Pacific Lumber*")

DOCS_SF:104855.7 36027/002

App. 05807
009750

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 833 of 1017 PageID 10597
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 17 of 106

from imposing liability on, **non-debtor third parties**. Nothing in *Pacific Lumber* prevents a debtor or its estate on its own behalf and on behalf of assignees and successors created pursuant to a plan, from releasing its own claims against third parties. Indeed, any such ruling would be directly contrary to the express provisions of section 1123(b)(3)(A).

20. The Debtor Release is a customary plan provision consistent with the business judgement rule, is fair and equitable and in the best interest of the Estate and its creditors and should be approved. No party that has objected to it has cited any case or statutory basis for preventing a debtor and its successors from releasing the debtor's own claims against third parties, or has demonstrated any basis for believing that any claims of the Debtor or the Estate even exist against the Released Parties.

## V. THE COURT HAS ALREADY EXCULPATED THE INDEPENDENT DIRECTORS AND THEIR AGENTS FOR NEGLIGENCE PURSUANT TO THE JANUARY 9, 2020 SETTLEMENT ORDER AND, TO THE EXTENT NOT COVERED THEREIN, THE PLAN'S EXCULPATION PROVISIONS EFFECTUATE ESSENTIAL PROTECTIONS FOR ESTATE FIDUCIARIES AND THEIR AGENTS, AND ARE FULLY SUPPORTED BY THE BANKRUPTCY CODE AND APPLICABLE LAW.

21. Exculpation provisions effectuate the entitlement of court-supervised fiduciaries to qualified immunity for their actions. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *In re A.P.I., Inc.*, 331 B.R. 828, 868 (Bankr. D. Minn. 2005), *aff'd sub nom., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 U.S. Dist. LEXIS 34297 (D. Minn. May 25, 2006); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). Such provisions also allow the parties to a chapter 11 case "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any

Appx. 05808
009751

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 834 of 1017    PageID 10598
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 18 of 106

potentially negligent actions in those proceedings" and, on that rationale, have even been approved when necessary to protect non-fiduciary participants in the chapter 11 process. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020).

22.    As discussed in detail below, the Settlement Order[11] previously entered by this Court has already exculpated the Independent Directors and their agents from potential negligence claims. Accordingly, as it relates to the Independent Directors and their agents, the Plan's Exculpation Provisions simply respect the integrity of the Settlement Order.  Moreover, it would be a mistake to construe *Pacific Lumber as* categorically prohibiting exculpation provisions.  In fact, *Pacific Lumber* itself expressly endorsed a plan provision exculpating the committee and its members.  For the reasons set forth below, exculpating the Exculpated Parties in respect of their post-petition services for the Estate is entirely consistent with *Pacific Lumber*, other applicable law, and the purposes and policies of chapter 11.  Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue.

**A.    The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation**

23.    The Objectors challenge the Exculpation Provisions on the grounds that they constitute an impermissible third-party release that is prohibited by *Pacific Lumber*.  What the

---

[11] *See*, *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* entered January 9, 2020 [D.I. 339] (the "Settlement Order") and *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* entered July 16, 2020 [D.I. 854].

DOCS_SF:104855.7 36027/002

App. 05809
009752

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 835 of 1017    PageID 10599
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 19 of 106

Objectors ignore, however, is that this Court has ***already*** exculpated the Independent Directors and their agents for negligence pursuant to the terms of the Settlement Order – a final order to which Dondero agreed as a means of avoiding the appointment of a chapter 11 trustee, and which has been in place for over a year and was never appealed by any of the Objectors, all of whom had notice of it.[12]  Accordingly, the Court should reject Objectors challenge to exculpation of the Independent Directors and their agents as a collateral attack on the Settlement Order which is indisputably a final order of this Court.[13]

24.    Paragraph 10 of the Settlement Order expressly provides:

> ***No entity may commence or pursue a claim or cause of action of any kind*** against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of <u>willful</u> misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Settlement Order, ¶ 10 (emphasis added).  Thus, as to the Independent Directors and their agents, they have already been exculpated for negligence, and the Plan Exculpation Provisions simply preserve the necessary protections and standard of liability already established by the Court for these court-appointed fiduciaries by final order which continues in effect pursuant to the plan.[14]

---

[12] *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation and was now collaterally attacking the release).

[13] *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

[14] *See* Plan, Art. IX.H (Paragraphs 9 and 10 of the Settlement Order remain in effect post-Confirmation).

App. 05819
009753

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 836 of 1017 PageID 10600
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 20 of 106

25.     Unlike in *Pacific Lumber*, the Independent Directors (which include the
CEO/CRO) are not prepetition officers and directors of the Debtor.  The Independent Directors
were appointed post-petition by the Court pursuant to the Settlement Order as an urgent measure
to address serious concerns raised by the Committee as to extensive breaches of fiduciary duty
and lack of disinterestedness by the Debtor's prepetition management.   In recognition of the
extraordinarily complex, litigious and volatile situation the Independent Directors were getting
into, the Court expressly exculpated the Independent Directors (including the CEO/CRO) and
their agents from claims for negligence in connection with their actions in the case.

### B.     Plan Exculpation Provisions

26.     Article IX.C of the Plan addresses the exculpation of certain Exculpated Parties[15]
and provides that each Exculpated Party shall be exculpated from any Cause of Action arising
out of acts or omissions in connection with this chapter 11 case and certain related transactions,
except for any acts or omissions that are determined by Final Order to have constituted bad faith,
fraud, willful misconduct, criminal misconduct, or gross negligence (the "Exculpation
Provisions").  Although the Exculpation Provisions apply to Strand and certain Employees, the
Exculpation Provisions apply solely with respect to actions taken by Strand and such Employees

---

[15] The Plan defines the "Exculpated Parties" as: (i) the Debtor and its successors and assigns, direct and indirect
majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent
Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals
retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO, and (ix) the Related Persons
of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James
Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable
Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities),
Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital
Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its
subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment
Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

009754

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 837 of 1017 PageID 10601
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 21 of 106

from and after the date of the post-petition appointment of the Independent Directors, through

the Effective Date of the Plan, and expressly exclude James Dondero and a number of other

specified entities.[16]   The provision provides:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent
> permitted by applicable law, no Exculpated Party will have or incur, and each
> Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment,
> damage, demand, right, Cause of Action, remedy, loss, and liability for
> conduct occurring on or after the Petition Date in connection with or arising out of
> (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and
> pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or
> confirmation of, the Plan; (iii) the funding or consummation of the Plan
> (including the Plan Supplement) or any related agreements, instruments, or other
> documents, the solicitation of votes on the Plan, the offer, issuance, and Plan
> Distribution of any securities issued or to be issued pursuant to the Plan, including
> the Claimant Trust Interests, whether or not such Plan Distributions occur
> following the Effective Date; (iv) the implementation of the Plan; and (v) any
> negotiations, transactions, and documentation in connection with the foregoing
> clauses (i)-(v); *provided*, *however,* the foregoing will not apply to (a) any acts or
> omissions of an Exculpated Party arising out of or related to acts or omissions that
> constitute bad faith, fraud, gross negligence, criminal misconduct, or willful
> misconduct or (b) Strand or any Employee other than with respect to actions taken
> by such Entities from the date of appointment of the Independent Directors
> through the Effective Date. This exculpation shall be in addition to, and not in
> limitation of, all other releases, indemnities, exculpations, any other applicable
> law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2,
> protecting such Exculpated Parties from liability.

27.     An exculpation provision differs from a release.[17]   An exculpation provision sets a

standard of liability that absolves a person from liability for ordinary negligence, but not from

liability for more egregious conduct.   In this respect, it is consistent with the duty of care and

duty of loyalty standards of the business judgment rule that protects business entities and

---

[16] To the extent there is any conflict between the descriptions of the Exculpation Provisions herein and the Plan, the Plan shall control.

[17] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans," does not affect the liability of these parties, but rather states the standard of liability under the Code, and as it exculpated the named parties for actions during the course of the case did not implicate section 524(e).)

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 838 of 1017 PageID 10602
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 22 of 106

individual fiduciaries from liability when their actions are taken within their authority and good faith.[18]

28.     Various objections have been raised to the inclusion of the Exculpation Provisions in the Plan. Each of the Objectors argues that, except with regard to the Committee and its Professionals, the Exculpation Provisions are impermissible based upon their misunderstanding and overly-broad reading of the opinion of the Fifth Circuit in *Pacific Lumber*.[19]

### C.     Pacific Lumber

29.     Because every argument relied upon by the Objectors as to the permissibility of the Exculpation Provisions is premised on *Pacific Lumber*, it is important to analyze exactly what the Fifth Circuit actually held based on the appeal and the briefing before it. The portion of the *Pacific Lumber* opinion addressing non-debtor exculpation and releases is less than two pages long and, when appropriately construed, is inapposite to this case, except insofar as it approved the exculpation of the creditors' committee and its members.

30.     In *Pacific Lumber*, a prepetition secured creditor joined with a competitor of one of the debtors to propose a chapter 11 plan (the "MRC/Marathon Plan"). The MRC/Marathon Plan included a provision that exculpated the plan proponents, the reorganized debtors, the unsecured creditors' committee and each of their respective professionals, officers and directors from liability (other than for willful misconduct and gross negligence) relating to proposing, implementing and administering the chapter 11 plan. The bankruptcy court approved the

---

[18] *See* Bernard S. Sharfman, *Importance of the Business Judgement Rule*, Harvard Law School Forum on Corporate Governance, posted at https://corpgov.law.harvard.edu/2017/01/19/the-importance-of-the-business-judgment-rule/

[19] The Objectors acknowledge the Fifth Circuit expressly held that the exculpation of the unsecured creditors' committee and its members and professionals was appropriate. Therefore, the Exculpation Provisions as applied to these parties will not be discussed further herein.

Appx. 25813
009756

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 839 of 1017 PageID 10603
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 23 of 106

discharges, releases, exculpations and injunctions pursuant to sections 105, 524, 1123(a)(5) and 1129.

31.    The appellants were an indenture trustee and certain bondholders who had voted against the MRC/Marathon Plan and were the unsuccessful proponents of a competing plan which, incidentally, contained non-debtor third-party releases and exculpation provisions identical in scope to those in the MRC/Marathon Plan.[20]  On appeal, the Fifth Circuit either affirmed or dismissed on mootness grounds in respect of every issue raised on appeal, other than the release and exculpation provisions.  While the issues on appeal had been broadly worded,[21] the only issue in respect of the release and exculpation provisions actually briefed by the appellants was the impropriety of the release and exculpation provisions for the benefit of the non-debtor plan proponents and the committee.[22]

32.    The Fifth Circuit relied *exclusively* on section 524(e) of the Bankruptcy Code for its observation that non-consensual releases or exculpations of non-debtors are not allowed, even for actions taken during the case.  *Id.* at 252-3.  Section 524 is entitled "Effect of discharge" and subsection 524(e) provides that a "discharge of a debt of a debtor does not affect the liability of

---

[20] *See First Amended Chapter 11 Plan for Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (as modified on April 28, 2008)* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 2774], Sections 10.1, 10.3 and 10.4.

[21] *See The Indenture Trustee's Statement of Issues on Appeal of the Order Confirming the MRC/Marathon Plan* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 3431] at p. 4, Issue No. 18.

[22] *See Brief of Appellants* [*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee*, Case No.08-40746, U.S. Court of Appeals for the Fifth Circuit, August 25, 2008], at pp. 55-56 ("The Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against numerous non-debtors, including "officers, directors, professionals, members, agents and employees" of MRC, Marathon and the Committee. . . . *Having obtained confirmation of the Plan through the erroneous means set forth above, the Plan Proponents propose to use this overbroad release language to exonerate* themselves.") (emphasis added; record cites omitted).

17

009757

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 840 of 1017    PageID 10604
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 24 of 106

any other entity on . . . such debt." Thus, on its face, section 524(e), only prohibits a plan from discharging obligations of third parties who are liable with the debtor on its debts. The Fifth Circuit focused on co-liability for "pre-petition debts,"[23] yet applied the prohibition to causes of action for "any negligent conduct that occurred during the course of the bankruptcy."[24]

33.    Notably, the briefing on the issue presented to the Fifth Circuit had dealt with the impropriety of the exculpation of the non-debtor plan proponents and the committee, <u>but not</u> with the officers and directors of the Debtor. Thus, to the extent the Fifth Circuit included the debtor's officers and directors in its discussion, that discussion constituted mere *dicta*.

34.    Although the Fifth Circuit ruled that section 524(e) did not support exculpation for certain persons, such as the non-debtor plan proponents in that case, the Court did not treat section 524(e) as an absolute bar to exculpation provisions in a plan that were supportable by other sections of the Bankruptcy Code, by other applicable law or by legitimate policy considerations relating to the chapter 11 process. In approving the exculpation as to the committee and its members, the court cited to the qualified immunity of committees under section 1103(c) of the Bankruptcy Code and to an important policy concern regarding the effect of denying exculpation on the chapter 11 process: "actions 'against committee members in their capacity as such should be discouraged. If members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee.' The

---

[23] *Id.* at 252.

[24] *Id.*

009758

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 841 of 1017 PageID 10605
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 25 of 106

Creditors' Committee and its members are the only disinterested volunteers among the parties

sought to be released here." *Id.,* at 252 (cites omitted).

35.     The Debtor is, of course, not asking this court to override the Fifth Circuit's

holding in *Pacific Lumber*.  Rather, as discussed below, the facts of this case are such that the

rationale applied by the Fifth Circuit to permit exculpation of the committee and its members

fully supports the Plan Exculpation Provisions.  The need for exculpation has already been

recognized by this Court in the Settlement Order.  Furthermore, as the *Pacific Lumber* ruling was

based solely on section 524(e), nothing in that opinion precludes approval of the Exculpation

Provisions pursuant to other provisions of the Bankruptcy Code or other applicable law.

> **D.     Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by**
> ***Pacific Lumber.***

36.     The propriety of the Plan Exculpation Provisions should be considered as they

apply to each respective Exculpated Party.

37.     <u>The Debtor</u>.  The Debtor and its successors and assigns are entitled to the

relief embodied in the Exculpation Provision.  With exceptions not applicable here, the Debtor,

as debtor in possession, has all the rights and powers of a trustee.  11 U.S.C. § 1107(a).

Accordingly, the Debtor's right to qualified immunity is co-extensive with that of a trustee.

Moreover, granting the Debtor such relief falls squarely within the "fresh start" principles

underlying the Bankruptcy Code.  *See* 11 U.S.C. §§ 524 and 1141.  The Claimant Trust and

Litigation Sub-Trust are successors to and assigns of the Debtor, and thus, to the extent

applicable to the scope of the Exculpation Provisions, should be similarly protected.  In the

context of this Plan, the Claimant Trust and Litigation Sub-Trust are court-approved fiduciaries

19

Appx. 25816
009759

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 842 of 1017 PageID 10606
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 26 of 106

whose sole purpose is to operate the Debtor's business for a limited period of time to effectuate an orderly monetization of the Debtor's assets and pay the claims of creditors. Post-Confirmation, the Debtor and its successors are entitled to exculpation.

38.  <u>The Independent Directors</u>.  Even if the Settlement Order did not plainly provide the Independent Directors with exculpation, in the context of this case, the Independent Directors are akin to committee members and the same rationale the Fifth Circuit used in *Pacific Lumber* to uphold the exculpation of committee members applies to the Independent Directors. The use of independent directors has become commonplace in large complex commercial cases, both on the eve of bankruptcy[25] and post-petition,[26] especially where there are allegations of mismanagement, breaches of fiduciary duty or other conflicts that cast shadows on the relationship between the debtor in possession and its creditors, who question whether existing officers and directors can faithfully perform their fiduciary duties as the face of the debtor in possession.[27]  Independent directors tend to be either experienced restructuring professionals

---

[25] Some examples of major bankruptcy cases in which independent directors have been appointed just prior to bankruptcy, usually due to accounting  irregularities and other events that resulted in distrust of management by major creditor constituencies, include: *Neiman Marcus Group, Inc.* (S.D. Tex); *WorldCom* (S.D. N.Y.); *Sears* (S.D. N.Y.); *California Pizza Kitchen* (S.D. Tex.); *PG&E Corp.* (N.D. Cal.); *Adelphia Communication Corp.* (S.D. N.Y.); Station Casinos (D. Nev.); and *Cengage Learning Centers* (E.D. N.Y.)

[26] *See* Regina Kelbon and Michael DeBaecke, *Appointment of Independent Directors on the Eve of Bankruptcy: Why the Growing Trend*, paper prepared for the Penn. Bar Institute 19th Annual Bankruptcy Institute, June 27, 2014, at pp. 17-23, available at https://www.blankrome.com/siteFiles/publications//B3795676DF921A7E3BED8A9F15E7FDF3.pdf (discussing use of independent directors both pre- and post-petition and certain cases utilizing same).

[27] *See, e.g., In re Natrol, Inc*., Case No. 14-22446 (Bankr. D. Del.) Motion and Order Appointing Independent Directors [Docket Nos. 248 and 305] (independent directors appointed to settle motion for appointment of trustee by large creditor); *In re 4 West Holdings, Inc.,* Case No. 18-30777 (Bankr. N.D. Tex) Motion and Order Appointing Independent Directors [Docket Nos. 311 and 383] (independent director appointed to review propriety of certain settlements and business and marketing plan); *In re Synergy Pharmaceuticals, Inc*., Case No. 18-14010 (Bankr. S.D.N.Y.) Motion and Stipulation and Order Appointing Independent Directors [Docket Nos. 373 and 553] (independent directors appointed because of pending shareholder derivative actions against prepetition board members); *In re Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) Order Appointing Independent Director [Docket No. 267] (independent director appointed as part of a mediated settlement over sale of a portfolio of financial services entity debtor]; *In re Interlogic Outsourcing, Inc.*, Case No. 19-31444 (Bankr. N.D. Ind.) Motion

Appx. 05817
009760

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 843 of 1017 PageID 10607
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 27 of 106

(attorneys or financial advisors) or seasoned industry professionals with immaculate corporate records. Reliance on the use of independent directors has thus become a critical tool in proper corporate governance and restoring creditor confidence in management in modern day corporate restructurings. Failure to protect independent directors from claims of ordinary negligence will discourage sophisticated restructuring personnel from accepting appointment to such roles and will have a substantial negative effect on the efficacy of the chapter 11 process and the efficient realization of its purposes and goals.

39. The Independent Directors appointed in this case are persons of such stature, as they include a former bankruptcy judge, former commercial bankruptcy practitioners and a person with expertise in hedge fund operations. As indicated by the Fifth Circuit in *Pacific Lumber*, if estate fiduciaries who are "disinterested volunteers" can be sued for actions taken during the course of a case pursuant to the Bankruptcy Code and under judicial supervision, qualified people would not serve, and the integrity of the chapter 11 process would be compromised. This policy concern is particularly acute where, as here, the Independent Directors undertook their duties in the midst of a highly contentious and litigious case.

40. In this case, the Independent Directors also are analogous to bankruptcy trustees. Section 1107(a) of the Bankruptcy Code provides that a debtor in possession has all of the rights and powers, and substantially all of the duties, of a bankruptcy trustee, and the case law makes it clear that the debtor in possession and its officers and directors serve in the same fiduciary capacity as a trustee. The Independent Directors were approved by the court to serve as post-

---

and Order Appointing Independent Directors [Docket Nos. 198 and 394] (independent director appointed for general corporate oversight).

DOCS_SF:104855.7 36027/002

Appx. 05818
009761

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 844 of 1017 PageID 10608
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 28 of 106

petition fiduciaries in this case in order to resolve insistent and urgent demands for the appointment of a trustee to supplant the prepetition directors and senior officers. In fact, the Court denied the U.S. Trustee's motion seeking appointment of a chapter 11 trustee based primarily on its approval of the Independent Directors to act as court-supervised fiduciaries for the Debtor and the Estate – the functional equivalent of a chapter 11 trustee. It is well established that trustees have qualified immunity for acts taken within the scope of their appointment. *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981). Like trustees, the Independent Directors are estate fiduciaries. *In re Houston Regional Sports Network, L.P.*, 505 B.R. 468, 481-82 (Bankr. S.D. Tex. 2014) (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)

41. For the same reasons that the Fifth Circuit upheld the exculpation of committee members in *Pacific Lumber*, and pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code and the related applicable non-bankruptcy law governing the immunity and exculpation of fiduciaries, none of which were actually addressed in *Pacific Lumber*, the Exculpation Provisions should be approved as to the Independent Directors and CEO/CRO.

42. Professionals. The Debtor's Professionals are entitled to exculpation. *See, In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990 (5th Cir. 2019) (protecting counsel for trustee from suit when acting pursuant to direction of its client within the scope of its employment); *Harris v. Wittman (In re Harris),* 590 F.3d 730 (9th Cir. 2009)(same). There is no distinction in the Bankruptcy Code between counsel for a trustee and counsel for a debtor in possession – both are

009762

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 845 of 1017 PageID 10609
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 29 of 106

subject to court approval of their retention, both serve as counsel to estate fiduciaries and both are subject to their actions and compensation being reviewed and approved by the Court.[28]

43.    Additionally, under applicable Texas law, attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation.  *See Cantey Hanger, LLP v. Byrd, 467 S.W.3d 477, 481* (Tex. 2015); *see also Troice v. Proskauer Rose, L.L.P.,* 816 F.3d 341 (5th Cir. 2016) (dismissing securities fraud litigation brought by third parties against counsel for certain companies related to Ponzi scheme perpetrator Allen Stanford).

44.    Strand.  It is appropriate to include Strand in the Exculpation Provisions.  Strand is the Debtor's general partner, and the Independent Directors are the directors of Strand.  Strand should be protected to the same extent as the Debtor and the Independent Directors, and for the same reasons.  *See In re Houston Reg'l Sports Network, L.P.,* (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)  In regard to Strand, the Exculpation Provisions apply solely with respect to actions taken by Strand from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

45.    Employees.  The Employees, as agents of the Independent Directors, are already covered by the Settlement Order's exculpation provision for acts taken in furtherance of and

---

[28] *See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),* 200 F.3d 382  (5th Cir. 2000) (order approving final fee application of court-appointed professional was *res judicata* in respect of subsequent lawsuit by trustee alleging malpractice and negligence where potential claims were known to trustee at the time of final fee hearing.).  *See also, Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925 at 931 (5th Cir.), *cert. denied,* 527 U.S. 1004 (1999) (judgment in bankruptcy court lawsuit brought by reorganized debtor seeking fee disgorgement against accountant for debtor for failure to disclose relationship with potential litigant was *res judicata* in respect of subsequent state court lawsuit by debtor for malpractice).

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 846 of 1017 PageID 10610
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 30 of 106

under the direction and supervision of the Independent Directors in administering, managing and operating the Debtors. However, even if the Employees were not already covered by the Settlement Order, it would be appropriate to include the Employees in the Exculpation Provisions. The Exculpation Provisions apply to the Employees solely with respect to actions taken by the Employees from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

**E. Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan**

46. The Debtor is seeking approval of the Exculpation Provisions in its Plan pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code; the qualified immunity of bankruptcy trustees and their agents, and the correlative qualified immunity of debtors in possession; the related applicable non-bankruptcy law on immunity and exculpation of fiduciaries; and the strong policy reasons offered by the Fifth Circuit as to committee members, which apply to the Independent Directors in the same way as the Fifth Circuit applied them to committee members. The Bankruptcy Code makes it clear that "any appropriate provision not inconsistent with the applicable provisions of this title" may be included in a chapter 11 plan.[29]

47. The Fifth Circuit's *Pacific Lumber* ruling denying exculpation to certain parties was based on section 524(e). Some recent court decisions approving exculpation provisions have held, however, that in dealing with complex and litigious bankruptcy cases, section 524(e)

---

[29] 11 U.S.C. § 1123(b)(6).

009764

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 847 of 1017 PageID 10611
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 31 of 106

is not a bar to setting a standard of liability that limits liability for negligence for acts taken during the course of the case in furtherance of the purpose of chapter 11. For example, in *Blixseth*,[30] the Ninth Circuit (which generally does not permit third-party releases in plans) determined that the exculpation clause at issue did not implicate section 524(e) because it related to post-petition actions that occurred during the bankruptcy process, and did not implicate any potential liability on prepetition debts of the debtor. The Court further explained that, despite prior Ninth Circuit decisions disproving third-party releases relating to such prepetition debts of the debtor, exculpation provisions with third-party releases are permissible because chapter 11 cases are often "highly litigious" where "oxes [sic] are gored" and such releases limited in time and scope "allow the settling parties. . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id*. at 1084. Finally, the court held, as many of its sister circuits have held, that under sections 105(a) and 1123 "the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id*. Significantly, the creditor whose exculpation was at issue in *Blixseth* was not even an estate fiduciary. *Id*. at 1081.

48. Another court recently dealing with exculpation issues discussed the need for an appropriately-constructed exculpation of estate fiduciaries and exculpation relating to court approved transactions in order to preserve the basic integrity of the chapter 11 process. In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y 2019), the bankruptcy

---

[30] 961 F.3d 1074 (9th Cir. 2020)

009765

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 848 of 1017 PageID 10612
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 32 of 106

court was presented with a broad exculpation clause in a plan that protected not only court-supervised fiduciaries, but also entities such as the acquirer, the acquirer's professionals, the pre- and post-petition lenders and the indenture trustees. As here, the exculpation provision pertained to acts and omissions taken in connection with and during the bankruptcy case, but excluded acts of fraud, willful misconduct or gross negligence.

49. The court declined to approve the exculpation provision as written, holding that it was overly broad, but nevertheless provided significant guidance on what an appropriate exculpation provision should provide:

> *I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.* If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do. *Cf. Airadigm Commc'ns., Inc. v. FCC (In Re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of the Plan, except for willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation.").

599 B.R. at 720-721 (emphasis added). The Exculpation Provisions in the Plan here are consistent with the policy-based and chapter 11 process-based guidelines provided by Judge Wiles in *Aegean Marine*, in that they apply to court-supervised fiduciaries and transactions entered into under the auspices of the court.

009766

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 849 of 1017 PageID 10613
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 33 of 106

50. Additionally, the bankruptcy court's power to approve an exculpation provision in a chapter 11 plan flows naturally from the fact that it cannot confirm a chapter 11 plan unless it finds that the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code and the plan has been proposed in good faith.[31] The plan is the culmination of the chapter 11 case. By confirming a plan and making the "good faith" finding, the court is determining that the plan proponent (usually, the debtor) and its officers and directors have acted appropriately throughout the case, consistent with their fiduciary duties and have been administering, managing and operating the debtor in accordance with the provisions of the Bankruptcy Code and applicable law.[32] Once the court makes its good faith finding, it is appropriate to set the standard of liability of the fiduciaries (and, as in *Blixseth*, other parties) involved in the formulation of that chapter 11 plan.[33]

51. An exculpation provision appropriately prevents future collateral attacks against fiduciaries of the debtor's estate. Here, the Exculpation Provisions are appropriate because they provide protection to those parties who served as post-petition court-approved fiduciaries during the restructuring process – relief that in this litigious case, as all participants are painfully aware, is indispensable. The Exculpation Provisions are in consideration for services rendered, hard work, and perseverance in the face of threats to professional reputation and bodily harm. The Exculpation Provisions should be approved, and the objections, asserted for the most part by the

---

[31] *See* 11 U.S.C. § 1129(a)(2) and (3).

[32] *See* 11 U.S.C. § 1129(a).

[33] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

DOCS_SF:104855.7 36027/002

Appx. 25824
009767

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 850 of 1017 PageID 10614
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 34 of 106

very individual and entities that have created the need for such provisions by turning this case

into a war zone, should be overruled.

## VI. THE PLAN INJUNCTION IS APPROPRIATE AND IS NARROWLY TAILORED TO EFFECTUATE THE PLAN AND RELATED PROVISIONS OF THE BANKRUPTCY CODE.

52.     The Court should approve the injunction provisions (the "Injunction" or

"Injunction Provisions"), set forth in Article IX.F of the Plan.  This is because the Injunction

Provisions are necessary and appropriate to enable the Debtor and its successors to carry out, and

obtain the benefits of, the provisions of the Bankruptcy Code relating to the Plan and the proper

implementation and consummation of the Plan.  Approval of the requested Injunction Provisions

is well within this Court's powers.

53.     The Objectors have objected to the Injunction Provisions on several grounds.  The

Debtor has reviewed the Injunction Provisions and revised them to address certain of the

Objectors' concerns as follows:

- The Injunction and Gatekeeper Provisions have been narrowed to apply only to Enjoined Parties.[34]

- The Independent Directors are no longer included in the second paragraph of the Injunction.

- The Reorganized Debtor and the Claimant Trust have been deleted from the second paragraph of the Injunction in order to eliminate any potential confusion that they were included in any capacity other than as successors to the Debtor, which is now clarified in the third paragraph of the Injunction.

---

[34] "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.  Plan, Art. I.B., Def. 56 (new definition in the Plan (as amended)).

Appx. 05825

009768

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 36 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 851 of 1017    PageID 10615
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 35 of 106

- The Injunction is subject to parties' rights to set off to the extent permitted post-confirmation under sections 553 and 1141 of the Bankruptcy Code.

- The Gatekeeper Provision has been amended to clarify the actions for which parties must first seek the approval of the Bankruptcy Court to pursue.

- The grant of exclusive jurisdiction over the merits previously contained in the Gatekeeper Provision has been removed, and the Gatekeeper Provision has been modified to provide that if the Bankruptcy Court, as gatekeeper, decides an action can be brought, the Bankruptcy Court will adjudicate that action on the merits *only* to the extent the court has jurisdiction to do so.

- Articles IX.G and H of the Plan have been modified to clarify the duration of the automatic stay and other injunctions which are either currently in effect or contained in the Plan.

54.    The Injunction Provision, as modified, merely implement and enforce the Plan's discharge, release, and Exculpation Provisions and related provisions of the Bankruptcy Code and enjoin the Enjoined Parties from commencing or maintaining actions to interfere with the implementation or consummation of the Plan.  The Injunction Provisions are a necessary part of the Plan because they protect the Plan implementation provisions required to monetize the Debtor's assets and pursue the Causes of Action, all of which has been vociferously and continually opposed and litigated by Dondero and his numerous Related Entities, with such vexatious opposition likely to continue post-confirmation.  Several parties – principally Dondero, Dugaboy and his Related Entities – have objected to the Injunction, which is not surprising because Dondero and his Related Entities undoubtedly intend to continue their litigation crusade against the Debtor and its successors after confirmation of the Plan.

A.    **Plan Injunction Provisions**

55.    Section IX.F of the Plan is entitled "Injunction" and applies post-Effective Date. The Injunction contains three distinct provisions:

Appx. 05826
009769

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 852 of 1017 PageID 10616
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 36 of 106

56. Paragraph 1, as amended, provides:

**Upon entry of the Confirmation Order, all** ~~holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons,~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

57. As revised, paragraphs 2 and 3 provide:

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all** ~~Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to** ~~such~~ **any Claims and Equity Interests, from** directly or indirectly **(i) commencing, conducting, or continuing in any manner** ~~directly or indirectly~~ **any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering,** enforcing, or attempting to recover or enforce, **by any manner or means** ~~, whether directly or indirectly,~~ **any judgment, award, decree, or order against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **, (iii) creating, perfecting, or otherwise enforcing in any manner,** ~~directly or indirectly,~~ **any** security interest, lien or **encumbrance of any kind against the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor** ~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust,~~ **(iv) asserting any right of setoff, directly or indirectly, against any obligation due** ~~from~~ to **the Debtor** ~~Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or against property or interests in property of** ~~any of the Debtor, Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, **and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to,** and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding

009770

**paragraph against** any successors of the Debtor, including, but not limited to, **the Reorganized Debtor,** the Litigation Sub-Trust, **and the Claimant Trust and their respective property and interests in property.**

Plan, Art. IX.F.

58.    As amended, paragraph 4 of Section IX.F contains a gatekeeper provision (the "Gatekeeper Provision") which provides:

> **Subject in all respects to ARTICLE XII.D, no** ~~Entity~~ Enjoined Party **may commence or pursue a claim or cause of action of any kind against any Protected Party that arose** or arises **from or is related to the Chapter 11 Case, the negotiation of** ~~this~~ the **Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant** Trust or the Litigation Sub-**Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice** and a hearing, **that such claim or cause of action represents a colorable claim** of any kind, including, but not limited to, negligence, **bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such** ~~Entity~~ Enjoined Party **to bring such claim** or cause of action against **any such Protected Party;** *provided, however,* **the foregoing will not apply to** a claim or cause of action against **Strand or** against **any Employee other than with respect to actions taken,** respectively, by Strand or **by such** ~~Entities~~ Employe**e from the date of appointment of the Independent Directors through the Effective Date.** ~~As set forth in ARTICLE XI, the~~ The **Bankruptcy Court will have sole** and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have **jurisdiction to adjudicate** ~~any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted~~ the underlying colorable claim or cause of action.

Plan, Art. IX.F.

59.    To the extent an Enjoined Party believes it has any claims against a Protected Party, such Enjoined Party must first seek permission of the Bankruptcy Court to file such action and demonstrate that the claims it seeks to assert are colorable claims.  Subject to certain carve outs, Protected Parties are defined collectively as:

31

App. 05828

009771

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 854 of 1017 PageID 10618
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 38 of 106

(i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); . . . .

Plan, Art. I.B. Def. 105. If the Bankruptcy Court determines a claim is colorable, the Bankruptcy Court will make a separate determination as to whether it has jurisdiction to adjudicate such claim on its merits in accordance with the terms of the Plan and applicable law.

### B.     Objections

60.     A number of parties, including Dondero and many of his affiliated, controlled or influenced entities, object to the Injunction Provisions (as identified in the chart of objections attached as Exhibit B). The Objectors all raise similar arguments and allege:

- The Injunction is ambiguous and overly-broad because the meaning of the phrase "implementation and consummation of the plan" is unclear.

- The Injunction operates post-effective date and enjoins post-confirmation claims against non-debtor third parties for post confirmation conduct.

- The Injunction is a disguised non-debtor third party release.

- The Injunction Provisions prevent holders of Claims and Equity Interests from enforcing rights created by the Plan after the Effective Date.

- The Gatekeeper Provision effectuates an impermissible extension of the jurisdiction of the Bankruptcy Court.

61.     As summarized above and discussed more fully below, the Injunction Provisions, as amended, have addressed certain of these arguments. The remaining objections, however,

Appx. 25829
009772

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 855 of 1017    PageID 10619
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 39 of 106

lack merit and are based on either a misreading of the actual Injunction Provisions or a misstatement of applicable law.  Each objection will be addressed below.

### C. An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate.

62.    Certain objectors argue that the first paragraph of the Plan Injunction, which enjoins all holders of Claims or Equity Interests and other parties in interest, along with their Related Persons, from taking any action to interfere with the "implementation or consummation of the Plan," is overly-broad and ambiguous because the meaning of the phrase "implementation and consummation of the plan" is somehow unclear.  These objections are specious.

63.    An injunction in aid of the effectuation of a confirmed plan is typically included in a plan and confirmation order to prevent actions to impede or frustrate the plan proponent's necessary and appropriate actions after confirmation to effectuate the plan and carry out the court's confirmation order.  The Injunction is supported by the express provisions of sections 1123(a)(5), 1123(b)(6), 1141(a), 1141(c), and 1142.  The Injunction effectuates the purposes of plan confirmation and chapter 11 and preserves and protects the integrity of the chapter 11 process and the court's orders.

64.    The terms "implementation" and "consummation" are neither vague nor overly-broad; they are both terms found in the text of chapter 11 of the Bankruptcy Code and are well understood – and injunctions against interfering with them are common features of plans confirmed throughout the country, including in this District.[35]  Section 1123(a)(5) expressly

---

[35] *See, e.g., In re Tuesday Morning Corp.* (Case No. 20-31476, Bankr. N.D. Tex.) *Debtor's Second Amended Plan of Reorganization* [D.I. 1913-1] attached to *Order Confirming the Revised Second Amended Joint Plan of Reorganization,* at pp. 90-91/137; *In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States*

Appx. 05839
00 9 7 7 3

mandates that "a plan _shall_ . . . provide adequate means for the plan's _implementation_" (emphasis added) and contains a non-exclusive list of what means that could include. In compliance with section 1123(a)(5), this Plan expressly sets out the means for its "implementation." _See_ Plan, Article IV: Implementation of Plan. _See also_ 11 U.S.C. § 1142. The Injunction would enjoin any interference with these implementation steps.

65.    The word "consummation" is also found in the Bankruptcy Code and has been discussed by numerous courts. For example, section 1101(2) defines "substantial consummation" of a plan to be (A) the transfer of the assets to be transferred under the plan; (B) the assumption by the debtor or the successor to the debtor of the management of all of the property dealt with by the plan; and (C) commencement of distribution under the plan. Of course, the term "consummation," without the qualifier "substantial," is more expansive and would extend, for example, to the completion of distributions under the Plan and the disposition of all of the property dealt with by the Plan. _See, e.g., United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)_, 301 F.3d 296, 305 (5th Cir. 2002) (distinguishing "substantial consummation" of a plan from final consummation of a plan, which occurs after the effective date when the plan distributions are concluded.)

66.    This portion of the Injunction merely prevents holders of Claims or Equity Interests and other Enjoined Parties from interfering with the actions the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust must take

---

_Bankruptcy Code_ [D.I. 1671-1, attached to _Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code,_ Sec. 10.5.

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 857 of 1017    PageID 10621
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 41 of 106

to effectuate the terms of the Plan after the Plan is confirmed by the Court.  There is nothing nefarious or unusual about this provision and it should be approved.

> **D.    The Injunction Is Not a Disguised Non-Debtor Third-Party Release.**

67.    The Injunction does not contain a non-debtor third-party release.  As set forth in the Plan, as amended, the Debtor has provided clarification to address the concerns of the Objectors who interpreted the prior provision to effectuate a non-debtor third-party release.  The amended second and third paragraphs of the Injunction prevent the Enjoined Parties from taking the enumerated actions on or after the Effective Date against the Debtor or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, except as set forth in the Plan or in the Confirmation Order.  The Debtor has eliminated the Independent Directors from these provisions of the Injunction.  As revised, nothing in this section of the Injunction does anything more than prevent the Enjoined Parties from taking actions that do not comply with or conform to the provisions of the Plan, and limit holders of Claims and Equity Interests with respect to such Claims and Equity Interests to the recoveries provided under the Plan, all as contemplated by sections 1123(b)(6) and 1141 in respect of claims or interests arising either prepetition or post-petition.  The ultimate goal of a chapter 11 case is for a debtor to confirm a plan which, after confirmation, effectively channels all claims and interests of creditors and interest holders to the treatment provided for the pre- and post-petition claims and interests under the plan, and limits the liability of the debtor (including the

App. 05832
009775

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 858 of 1017 PageID 10622
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 42 of 106

"reorganized debtor") and any successor that receives property of the debtor dealt with by the plan (such as a plan trust) to the liability imposed by that treatment.

68.     Sections 1123 and 1129 of the Bankruptcy Code require a plan to describe how it will treat the claims of creditors and the interests of equity holders, both those that existed prepetition and those that arise during the course of a case.  The purpose of the Injunction is to protect the Debtor and its successors under the Plan – the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust –against litigation to pursue the very same prepetition and post-petition claims and interests that are being treated under the Plan.  As described below, providing the protection of the Injunction to all of such entities is both legal and appropriate.

69.     As to the Debtor, the Injunction is appropriate, because it implements the injunctive relief the Bankruptcy Code affords the Debtor, whether or not it gets a discharge, as a result of plan confirmation.  If the Debtor is entitled to the discharge as contemplated by the Plan, then it is accorded the injunction provided by sections 1141(d) and 524(a).  But even if the Debtor does not receive a discharge then, pursuant to section 362(c)(2)(A), the automatic stay will remain in effect until the case is closed, and the Injunction is in aid of that stay.  Moreover, pursuant to section 1141(c) of the Bankruptcy Code, because *all* of the Debtor's property is "dealt with by the plan," all of that property will be "free and clear of all claims and interests . . . .," both as to property retained by the Debtor, and property transferred to its successors.  Accordingly, the Injunction is an appropriate means of enforcing section 1141(c).

70.     Nothing in the Injunction effectuates a third-party release in contravention of section 524(e) of the Bankruptcy Code.  As to the "Reorganized Debtor," this term simply means

009776

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 859 of 1017 PageID 10623
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 43 of 106

the Debtor on and after the Effective Date. *See* Plan, Art. I.B., Definition 112. The Reorganized Debtor, therefore, should be entitled to the same injunctive relief as the Debtor. To hold otherwise would be illogical.

71. The Claimant Trust and Litigation Sub-Trust are successors to the Debtor – both in structure and in assets. Neither the Claimant Trust nor the Litigation Sub-Trust come into existence until the Effective Date, and thus, the only liability they could have to the holders of Claims and Equity Interests would be the liability to treat such Claims and Equity Interests as set forth in the Plan. All of the property of the Claimant Trust and Litigation Sub-Trust is property of the Debtor and the Estate that these Trusts will receive from the Debtor and the Estate pursuant to the Plan on the Effective Date and is "dealt with" by the Plan. Accordingly, under section 1141(c), that property will be received and held by the Claimant Trust and the Litigation Sub-Trust "free and clear of all claims and interests of creditors and equity security holders." Paragraph 2 of the Injunction is in aid of this provision and, in the words of section 105, is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code, *i.e.,* section 1141(c).

**E.      The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.**

72. The Injunction does not prevent holders of Claims or Equity Interests from enforcing, after the Effective Date, rights arising under the Plan or the Confirmation Order. The scope of the Injunction is specifically subject to the Plan, the Confirmation Order and any other order of the Court. Thus, the right of the holder of a Claim or Equity Interest to receive its plan distributions, as set out in the Plan, is not impacted – such persons are merely enjoined from

App. 25834
009777

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 860 of 1017 PageID 10624
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 44 of 106

taking the enumerated actions to enforce their Claims or Equity Interests outside of the Plan

process and treatment. If, for example, the Claimant Trust made distributions to certain creditors

but not others, those who did not receive their distribution, would be free to enforce the

provisions of the Plan contract. This is clear from the language of the Injunction, which begins

"[e]xcept as expressly provided in the Plan, the Confirmation Order, or a separate order of the

Bankruptcy Court. . . ." Plan, Art. IX.F.

73.     The Injunction is not a third-party release, does not prevent enforcement of the

provisions of the Plan itself, and is neither vague nor overly-broad. The Court should overrule

the objections and approve the Injunction in aid of the consummation and administration of the

Plan as appropriate and consistent with sections 362, 1123 and 1141 of the Bankruptcy Code.

## VII.   THE GATEKEEPER PROVISION IS NECESSARY AND APPROPRIATE, AND SUPPORTED BY APPLICABLE LAW.

### A.    The Gatekeeper Provision

74.     Paragraph 4 of Section IX.F contains neither a release nor an injunction. Rather,

Paragraph 4 contains a provision that requires any Enjoined Party that believes it has <u>any</u> claims

against a Protected Party "**that arose or arises from or is related to the Chapter 11 Case, the**

**negotiation of the Plan, the administration of the Plan or property to be distributed under**

**the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the**

**administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in**

**furtherance of the foregoing**" to first seek leave from the Bankruptcy Court to pursue such

alleged claims and present evidence as to why it believes it has a colorable claim against the

009778

Appx. 05835

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 861 of 1017 PageID 10625
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 45 of 106

Protected Person. As discussed below, provisions such as this one, which have been referred to as "gatekeeper" or "channeling" provisions, are neither uncommon nor impermissible.

75. It should come as no surprise that Dondero and his cohorts are the only ones who object to the Gatekeeper Provision. The last thing they want is for a court that has had the misfortune of familiarizing itself with their antics to pass on the *bona fides* of any new tactics and lawsuits they may conjure up to stymie this case. However, as set forth below, their challenges to this Court's power and jurisdiction to pre-screen if their new lawsuits are colorable represent wishful thinking.

**B.     The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code.**

76. The Gatekeeper Provision is a legitimate exercise of this Court's powers under sections 105,[36] 1123(b)(6),[37] and 1141(a), (b) and (c).[38] The Bankruptcy Court serves as the literal guardian at the gate – determining whether a litigant has a colorable claim and may pass

---

[36] Section 105 is entitled "Power of court" and provides: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[37] Section 1123(b)(6) provides: (b) Subject to subsection (a) of this section, a plan may— (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

[38] Section 1141 is entitled "Effect of confirmation" and provides, in relevant part:

(a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

DOCS_SF:104855.7 36027/002



Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 47 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 862 of 1017    PageID 10626
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 46 of 106

through the gate to the applicable clerk of court and file a lawsuit.  The Debtor recognizes that a Gatekeeper Provision is not found in every chapter 11 plan.  However, this case is not a typical case.  Indeed, recognizing the need for, and importance of, this role under the facts of this case, the Court previously entered the Settlement Order (agreed to by Dondero) which itself contains a gatekeeper provision protecting the Independent Directors.  The purpose of the Gatekeeper Provision in the Plan is to insulate the Protected Persons, many of whom will be either successors to the Debtor or the fiduciaries charged with continuing the administration of the Debtor's property and causes of action post-Effective Date (which essentially involves the wind-down of the business, the monetization of the Debtor's assets and the distribution of the proceeds of same to pay the Claims of legitimate creditors), from non-stop, vexatious litigation in multiple jurisdictions over every conceivable action they take to implement and consummate the Plan.

77.     Based upon the history and record of this case – including increased activity during the past several weeks – this Court is well aware of the reality of that threat and risk in this case.   During the course of this case, many of the significant actions taken by the Independent Directors have been challenged, litigated and appealed.  Moreover, Dondero has interfered with the Debtor's business operations, resulting in the Court's entry of a Temporary Restraining Order and Preliminary Injunction against him.[39]  A hearing on the Debtor's Motion to Hold Dondero in Contempt is scheduled for February 5, 2021.  The Independent Directors, CEO/CRO, Employees, Committee and its members, and the Professionals of the Debtor and the

---

[39] *Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P)*, Adv. No. 20-03190 (Bankr. N.D. Tex), December 10, 2020 *Order Granting Debtor's Motion for Temporary Restraining Order against James D. Dondero* [D.I. 10] and January 11, 2021 *Order Granting Debtor's Motion for Preliminary Injunction against James D. Dondero* [D.I. 59].

Appx. 05827
009780

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 863 of 1017 PageID 10627
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 47 of 106

Committee have been harassed and threatened by Dondero and his Related Entities. There is no reason to believe these litigious tactics, threats and intimidation will cease post-Confirmation and post-Effective Date; and their unchecked continuance will seriously impair the ability of the Claimant Trust and the Litigation Sub-Trust to implement and effectuate the Plan and carry out the orders of this Court. The Gatekeeper Provision is essential to the confirmation of this Plan and the efficient effectuation and consummation of the Plan post-Effective Date.

78.  The need for the Gatekeeper Provision is illustrated by the fact that the Independent Directors would not have been able to obtain Directors' & Officers' insurance coverage, upon their appointment, in the absence of the Settlement Order. Insurers were unwilling to underwrite coverage without a broad exclusion restricting any type of coverage for the Independent Directors if the Settlement Order did not contain the exculpation and gatekeeper provision found in Paragraph 10 of the Settlement Order. Similarly, the Claimant Trustee, the Litigation Trustee and the Claimant Trust Oversight Board will not be able to obtain coverage for the period of time after the Effective Date without a similar gatekeeper provision. Accordingly, the failure to approve the Gatekeeper Provision as part of the Plan will completely frustrate the Debtor's ability to carry out the Plan and Confirmation Order.

79.  Gatekeeper provisions are not some new creative attempt to circumvent limitations on bankruptcy court jurisdiction or restrictions on non-consensual third-party releases. They are utilized by many courts to provide a single clearing court to determine whether a claim is colorable or appropriate under the applicable facts of the main case. For example, in the *Madoff* cases, the bankruptcy court has served as the gatekeeper for determining

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 49 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 864 of 1017   PageID 10628
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 48 of 106

whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust.)[40]   In the *General Motors* cases, certain issues arose post-effective date in regard to defects in ignition switches.  Questions arose as to whether the causes of action arising from those defects were such that "New GM" had liability for them, notwithstanding that it had purchased the assets of the debtor "Old GM" free and clear.  The bankruptcy court serves as a gatekeeper for this litigation, determining whether a lawsuit can go forward against New GM or is more properly dealt with as a claim against Old GM.[41]

80.     Gatekeeper or channeling provisions similar to this one, and in some instances, more extensive than the proposed Gatekeeper Provision in this Plan, have been approved by other courts in this district.  In *In re Pilgrim's Pride Corp.*, 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. January 14, 2010), Judge Lynn, after concluding that *Pacific Lumber* precluded the court from granting certain requested releases and exculpations, determined that nothing in *Pacific Lumber* prevented the court from retaining exclusive jurisdiction over some of the suits against third parties which might otherwise have been covered by the third party protections.  *Id.* at *16-17.  Judge Lynn then expressly held that the bankruptcy court would "channel to itself any claims that may be asserted against Debtors' management (including their boards of directors and Chief Restructuring Officer) and the professionals based upon their conduct in pursuit of

---

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussion of court's gatekeeper function).

[41] *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing court's gatekeeper function); *In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same).

App. 25839

009782

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 865 of 1017 PageID 10629
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 49 of 106

their responsibilities during the Chapter 11 Cases." *Id.* at *18, 20-21. In furtherance of this, the confirmation order provided that the court "shall retain **exclusive** jurisdiction over any suit brought on any claim or causes of action related to the Chapter 11 Cases that exists as of the Effective Date against a Committee; any member of a Committee; any Committee's Professionals; Debtors; Reorganized Debtors; or any Protected Person for conduct pertaining to Debtors during the Chapter 11 Cases, and that any entity wishing to bring such suit shall do so in this court;" *Id.* (emphasis added). Thus, in *Pilgrim's Pride*, the court approved a broad retention of exclusive jurisdiction to adjudicate the ultimate merits of certain types of suits against protected parties, rather than merely a gatekeeper provision.

81. Other courts in this district have agreed with Judge Lynn and ordered similarly. *See, e.g., In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors'* Fourth *Amended Joint Chapter 11 Plan of Reorganization* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*], Section 10.8(b) at p. 57 (court retained **exclusive** jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added).

82. In regard to the Independent Directors, the proposed Gatekeeper Provision is a continuation of the provision set forth in Paragraph 10 of the Settlement Order, which, by its terms never expires and is expressly to remain in effect after the Effective Date under the Plan. Moreover, because of the Independent Directors' rights of indemnification against the Debtor,

009783

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 866 of 1017 PageID 10630
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 50 of 106

the Gatekeeper Provision serves the important function of protecting assets that would otherwise be available for distribution to creditors from being depleted by indemnification claims resulting from the assertion of frivolous claims against the Independent Directors.

83. As to the remaining Protected Parties, the Gatekeeper Provision is a valid exercise of the Court's authority under sections 105 and 1123(b)(6) to prevent the Protected Parties from being embroiled in frivolous litigation designed to derail implementation of the Plan. Importantly, if, in the exercise of its gatekeeper role, the Bankruptcy Court were to determine that a colorable claim exists, then it would allow the prosecution of such claim and the filing of the lawsuit in the court with applicable jurisdiction.[42]

### C. The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court.

84. Nor is the Gatekeeper Provision an impermissible extension of the post-confirmation jurisdiction of the bankruptcy court. As discussed above, the Debtor modified the Gatekeeper Provision to eliminate the provision that granted the Bankruptcy Court exclusive jurisdiction to hear any claim that the Court allows to pass through the gate. The Gatekeeper Provision requires a putative plaintiff to obtain Bankruptcy Court approval prior to bringing an action and is in aid of the Court's enforcement of the Confirmation Order and the Plan. It is supported by sections 1141(a), (b) and (c), and thus, by section 105. As amended, nothing in the Gatekeeper Provision is determinative of the jurisdiction of the Court over any particular claim or cause of action. The Gatekeeper Provision only requires the court to determine <u>if a claim is</u>

---

[42] *Texas & P. R. Co. v. Gulf, C. & S. F. R. Co.*, 270 U.S. 266, 274 (1926) (Court always has jurisdiction to determine its own jurisdiction).

DOCS_SF:104855.7 36027/002

009784

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 867 of 1017 PageID 10631
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 51 of 106

colorable. This is a determination commonly made by bankruptcy courts in the analogous

context of determining whether a creditors' committee should be granted standing to file

litigation on behalf of a recalcitrant debtor. *See, e.g., Louisiana World Exposition v. Federal Ins.

Co.,* 858 F.2d 233 (5th Cir. 1988) (court must determine that claim is colorable before

authorizing a committee to sue in the stead of the debtor). Thus, the Bankruptcy Court has the

jurisdiction to determine if a claim is colorable.

85. Section 1142(b) provides that post-confirmation, the bankruptcy court may direct

any parties to "perform any act" necessary for the consummation of the plan). *See United States

Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305

(5th Cir. 2002) (holding that bankruptcy court had jurisdiction to determine whether arbitration

could be used to liquidate claims post-effective date; while the plan had been substantially

consummated, it had not been fully consummated, the dispute related directly to the plan, the

outcome would affect the parties' post confirmation rights and responsibilities and the

proceeding would impact compliance with, or completion of the plan; specifically referencing

section 1142(b)).

86. Several objectors attempt to rely on *Bank of La. v. Craig's Stores of Texas, Inc.

(In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001) to argue that the

bankruptcy court cannot exercise a gatekeeper role and adjudicate matters related to the

administration of the case and the plan. In fact the opposite is true. In *Craig's Stores*, the Fifth

Circuit expressly recognized that post-confirmation bankruptcy jurisdiction **continues to exist

for "matters pertaining to the implementation or execution of the plan**." *Id.* at 390 (*citing In re*

Appx. 25842

009785

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 868 of 1017    PageID 10632
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 52 of 106

*Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7

F.3d 32, 34 (2d Cir. 1993) (emphasis added).

87.     *Craig's Stores* did not involve a gatekeeper provision necessary to enable the

debtor to implement its plan.[43]  In contrast to *Craig's Stores*, the Plan provision that Dondero and

other Objectors are challenging pertains to the Court's jurisdiction over matters specifically in

aid of the implementation and effectuation of the Plan – acting as gatekeeper – and does not

implicate an improper extension of bankruptcy court jurisdiction.  As previously explained, the

Gatekeeper Provision is necessary to obtain insurance coverage for the Claimant Trustee, the

Litigation Trustee, and the members of the Claimant Trust Oversight Board – all of whom will

play critical roles in the implementation of the Plan.  Moreover, unchecked rampant litigation

against the Protected Persons, many of whom have indemnification rights against the Debtor,

Reorganized Debtor or Claimant Trust would predictably engulf the Reorganized Debtor and

Claimant Trust negatively impacting their ability to effectuate and implement the Plan and

wasting valuable resources.  *See, In re Farmland Industries, Inc.,* 567 F.3d 1010, 1020 (8th Cir.

2010) (bankruptcy court had "related to" jurisdiction over a claim by a disgruntled bidder against

the post-effective date liquidating trustee because the estate was actually paying legal fees of the

non-debtor defendants under the estate's indemnification obligations.); *see also Buffets, Inc. v.*

---

[43] In *Craig's Stores*, the issue was whether the court could hear a post-confirmation action brought by the debtor for damages against a bank that was administering the debtor's post-confirmation private label credit card program under an agreement that had been assumed by the debtor in its chapter 11 plan.  On appeal, the Fifth Circuit held that the bankruptcy court did not have jurisdiction to hear the dispute, reasoning that (1) the debtor's claim principally dealt with post-confirmation relations between the parties, (2) no facts or law derived from the reorganization or the plan were necessary to the claim, and (3) the claim did not bear on the interpretation or execution of the debtor's plan.  *Id.* at 391.

App. 05843
009786

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 869 of 1017 PageID 10633
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 53 of 106

*Leischow*, 732 F.3d 889 (8th Cir. 2013) (related-to jurisdiction existed where bankruptcy estate was obligated to indemnify non-debtor defendants for attorney's fees and other amounts).

88. In addition, *Craig's* Stores did not involve a liquidating chapter 11 plan, and this case does involve such a plan. There is persuasive case law, including this Court's decision in *TMXS Real Estate* (discussed below) and circuit-level authority, holding that the scope of the bankruptcy court's post-confirmation jurisdiction in the case of a liquidating chapter 11 plan is broader than that in the case of a chapter 11 plan that is not a liquidating plan.

89. In *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005), the debtor, a charitable hospital, brought an adversary proceeding against a testator trust, seeking to compel payment from the trust of an amount allegedly due to the hospital as a residual beneficiary under the trust. The testator had died prepetition, but before the estate's assets were distributed, and the litigation was filed after confirmation of the debtor's liquidating plan of reorganization because the hospital had been unaware it was a beneficiary under the trust. The trustee had argued that the bankruptcy court had no residual jurisdiction over the debtor's lawsuit against the trustee because the plan had been confirmed, but the bankruptcy court found it had "related to" jurisdiction.

90. The First Circuit first analyzed the long line of cases (including *Craig's Stores*) which hold that after a debtor emerges from bankruptcy, it enters the marketplace and is no longer under the aegis of the bankruptcy court. *Id.* at 106-107. The court did not end its analysis there, however, but dug deeper into the significant distinctions between a liquidating plan and a true reorganization. Under a liquidating plan, the debtor is not really re-entering the

009787

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 870 of 1017 PageID 10634
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 54 of 106

marketplace; rather its "sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Id.* at 107. Thus, while a reorganized debtor may have litigation that clearly is outside the scope of its prior bankruptcy proceeding, that is generally not the case with a liquidating debtor. The court determined that 28 U.S.C. § 1334 had to be applied in conjunction with the applicable facts of the case, and jurisdiction was appropriate. *Id.* A "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11." *Id.*

91. This Court has also recognized the jurisdictional distinction between liquidating plans and operational reorganizations. In *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 2020 Bankr. LEXIS 3205 (Bankr. N.D. Tex. Nov. 12, 2020), this Court held it had jurisdiction to hear a post-confirmation dispute concerning the ability of a liquidating trust, which had been formed pursuant to the plan, to liquidate the stock of the reorganized debtor it received under the plan which involved the issue of whether such action would effectuate a "change in control" that would constitute a default under a lease that had been assumed by the reorganized debtor pursuant to the plan. This Court held that (i) the liquidating trust had been formed for the purpose of liquidating the assets transferred to it pursuant to the plan and distributing the proceeds of those assets to creditors; (ii) the litigation at issue was an attempt to limit the ability of the liquidating trust to effectuate the very purpose for which it had been formed and had to be resolved prior to full consummation of the plan; (iii) resolution of the dispute would require the review of the plan, the confirmation order and possibly other orders of

009788

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 871 of 1017 PageID 10635
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 55 of 106

the court; (iv) the litigation would impact compliance with, or completion of the plan; and (v) the litigation directly related to the plan's implementation or execution. *Id.* at *21-23.

92. Just as in the *TXMS Real Estate* and *Boston Regional* cases, the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor exist solely for the purpose of operating the Debtor's business and properties to monetize its assets and pay creditors. Any "post-confirmation operations" of the Reorganized Debtor will, therefore, be directed towards that monetization process and, furthermore, properly subject to the Court's purview to ensure consummation of the Plan and creditor distributions pursuant to section 1142 of the Bankruptcy Code. Any prospective, but baseless, litigation over the acts taken by these entities in effectuating the Plan will have a significantly negative impact on the ability of the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor to effectuate the Plan and will deplete the assets otherwise available for distribution to creditors. The Gatekeeper Provision simply ensures that any such prospective litigation is colorable before it can be filed.

93. The Fifth Circuit's decision in *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266-67 (5th Cir. 2005), is instructive. In *Stonebridge*, the liquidating trustee under a confirmed chapter 11 plan sued a landlord in connection with the landlord's draw on a letter of credit that had been provided as security in connection with a real property lease the debtor had rejected during its bankruptcy case, where the trustee was assigned the issuing bank's claim against the landlord for alleged misrepresentation. Although the Fifth Circuit had concerns over jurisdiction of the bank's assigned claim to the trustee, the court went on to opine that "[u]pon closer review, however,

009789

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 872 of 1017 PageID 10636
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 56 of 106

additional effects on the estate are evident: a claim by the Bank against [the landlord] affects the need for the Bank to seek reimbursement from Stonebridge's bankruptcy estate. [The landlord's] draw on the Letter of Credit triggered [the debtor's] contractual responsibility to reimburse the Bank for the draw on the Letter of Credit. . . . If the Bank is successful against [the landlord] on its negligent misrepresentation claims, the need for reimbursement from [the bankruptcy] estate is alleviated." *Id.* at 266-267. Accordingly, the court held that the negligent misrepresentation claims of the bank against the landlord fell within bankruptcy jurisdiction. The court noted other cases that involved litigation between third parties that have been found to have an effect on the administration of the bankruptcy estate, including suits by creditors against guarantors and a suit by creditors of a debtor against defendants that allegedly perpetrated a fraud. *Id.* at 267 (*citing* 3 *Collier on Bankruptcy* ¶ 3.01 (15th ed. rev. 2005)).

94. Based on the reasoning of *Stonebridge*, other courts, including this Court, have held that contingent indemnification rights trigger "related to" subject-matter jurisdiction of state law disputes between two non-debtors in the pre-confirmation context. *See, e.g.*, Principal *Life Ins. Co. v. JP Morgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) (contingent right of indemnity in pre-confirmation litigation between two non-debtors triggers bankruptcy court's pre-confirmation "related to" jurisdiction (*citing Stonebridge*)). In *In re Farmland Industries, Inc.*, the Eighth Circuit has similarly held that it had <u>post</u>-confirmation subject-matter jurisdiction over state law claims between non-debtors where the liquidating trustee was paying the legal fees incurred to defend individuals (former officers and directors) in the dispute.

009790

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 873 of 1017 PageID 10637
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 57 of 106

95.     In sum, in light of the proposed amendments to the Plan and under the circumstances here, Dondero's objection to this Court's jurisdiction to serve as a gatekeeper is not well-taken and should be overruled.  The retention of the *de minimis* jurisdiction to perform the gatekeeper function is clearly supported by Fifth Circuit law.

### D.     The Gatekeeper Provision Is Consistent with the Barton Doctrine.

96.     Support for the Gatekeeper Provision can be found in the Barton Doctrine, which by analogy, should be applied to many of the Protected Parties identified in the Gatekeeper Provision.  The Barton Doctrine is based on the U.S. Supreme Court case, *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881) dealing with receivers.  As this Court has recognized, the Barton Doctrine:

> provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.*, the bankruptcy court) must be obtained. The *Barton* doctrine is ***not*** an immunity doctrine but – strange as this may sound – has been held to be a ***jurisdictional*** provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee ***unless and until*** the bankruptcy court has granted leave for the lawsuit to be filed).

Baron v. Sherman (In re Ondova Ltd. Co.), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, Baron v. Sherman (In re Ondova Co.), 2018 U.S. Dist. LEXIS 13439 (N.D. Tex., Jan. 26, 2018), aff'd., In re Ondova Ltd., 2019 U.S. App. LEXIS 3493 (5th Cir. Tex., Feb. 4, 2019).  The Barton Doctrine originated as a protection for federal receivers, but courts have applied the concept to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including trustees,[44] debtors in

---

[44] *Id.*

DOCS_SF:104855.7 36027/002

App. 25848
009791

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 59 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 874 of 1017    PageID 10638
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 58 of 106

possession,[45] officers and directors of a debtor,[46] the general partner of the debtor,[47] employees,[48] and attorneys retained by debtors and trustees.[49]   The Barton Doctrine has also been applied to non-court appointed agents who are retained by the trustee for purposes relating to the administration of the estate.[50]   The Barton Doctrine continues to protect those who are within its scope post-Confirmation and post-Effective Date.[51]

97.    The Fifth Circuit has expressly recognized the continuing viability of the Barton Doctrine, notwithstanding the jurisdictional issues raised by *Stern v. Marshall*.[52]   Since the Barton Doctrine is jurisdictional only as to the ability of the prospective plaintiff to file the lawsuit, it does not implicate the issue of expansive post-effective date bankruptcy court jurisdiction as to the actual underlying lawsuit.   Thus, the gatekeeper court can determine if a

---

[45] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also*, 11 U.S.C §§ 1107(a) of the Bankruptcy Code, providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity.

[46] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[47] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

[48] *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (affirming dismissal of lawsuit under the Barton Doctrine due to the plaintiff's failure to seek leave in the bankruptcy court to file an action against the trustee and other parties assisting the trustee in carrying out his official duties).

[49] *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[50] *See, e.g., Wells Fargo Fin. Leasing, Inc. v. Jones*, 2015 WL 1393257, at *3-*5 (W.D. Ky. Mar. 25, 2015) (holding that because defendant acted as bankruptcy trustee's agent in performing duties at the direction of and in furtherance of the trustee's responsibilities, claims asserted against defendant were essentially clams against trustee, and court lacked jurisdiction over the claims under *Barton* Doctrine); *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 817 (E.D. Mo. 2012) (property management company engaged by receiver).

[51] *Helmer v. Pogue* at *15, *citing Carter*, 220 F.3d at 1252-53.  *See also, Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972-73 (9th Cir. 2005) (Barton Doctrine applies to trustee of a post-confirmation liquidating trust formed pursuant to a plan of liquidation); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004) (doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands; suit was for malfeasance of trustee in performing his duties filed after estate was closed.)

[52] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (holding that a litigant must still seek authority from the bankruptcy court that appointed the trustee before filing suit even if the bankruptcy court might not have jurisdiction over the suit itself.)

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 875 of 1017 PageID 10639
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 59 of 106

proposed lawsuit asserts colorable claims, and, if it does, the gatekeeper court can then turn to the separate issue of whether it has jurisdiction over the merits of the lawsuit.

98.     The Barton Doctrine requires a litigant to obtain approval of the appointing or approving court before commencing a suit against court-appointed or court approved officers and their agents – which arguably encompasses most, if not all, of the Protected Parties. The Gatekeeper Provision preserves the integrity of the process, and prevents valuable estate resources from being spent on specious litigation, without impairing the rights of legitimate prospective litigants with potentially valid causes of action. The Gatekeeper Provision is not only a prudent use of the Court's authority under section 105 and is within the spirit of the protections afforded fiduciaries and their agents under the Barton Doctrine – it is also critical to ensuring the success of the Plan.

99.     The Gatekeeper Provision does not effectuate a non-consensual third-party release. It merely requires potential litigants to first vet their alleged causes of action with a single court – the bankruptcy court – before they can be prosecuted. If there has ever been a case where a Gatekeeper Provision is appropriate it is this case. As the Court is well aware, Dondero appears to thrive on litigation. This Court has remarked on many occasions during this case that prepetition, the Debtor operated under a culture of litigation under the control of Dondero. It was the years of sharp practices by the Debtor and an avalanche of litigation against it that resulted in the Debtor commencing a chapter 11 case and the ultimate appointment of the Independent Directors. Faced with impending confirmation and the loss of his company forever, Dondero has turned the tables and the Debtor and the Protected Parties have become his target

Appx. 25859
009793

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 876 of 1017 PageID 10640
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 60 of 106

for litigation. Left unchecked, there is no doubt that Dondero will continue his litigation crusade after the Effective Date and attempt to thwart implementation of the Plan at every turn by commencing baseless lawsuits. Requiring this Court, which approved the appointment of the Independent Directors and has extensive familiarity with the Debtor and this case to first determine whether alleged claims are colorable is prudent and within this Court's authority. Moreover, centralizing the gatekeeper function in one court puts that court in a unique position to ascertain whether there is a pattern of spurious litigation by certain entities and their related parties.

### E. The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities.

100. The Fifth Circuit has recognized that in appropriate circumstances, a federal court can enjoin or issue other appropriate sanctions against vexatious litigants – persons who have a history of filing repetitive and spurious litigation for the purposes of harassment and intimidation. *See* All Writs Act, 28 U.S.C. §1651. In *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017), the Fifth Circuit held that a bankruptcy court could properly sanction certain debtors as vexatious litigants when the debtors and their various family members continually filed litigation to prevent the bankruptcy trustee from performing his duties. When considering whether to enjoin future filings, the court must consider the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

009794

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 877 of 1017    PageID 10641
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 61 of 106

*Id.* at 815, *citing Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (*quoting*

*Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).

101.    In some circumstances where courts feel that enjoining all future litigation by a

vexatious litigant may be too difficult to articulate or have potential due process implications,

courts essentially issue a gatekeeper injunction.  *See, e.g., Baum v. Blue Moon Ventures, LLC,*

513 F.3d at 189 (after the bankruptcy court and district court were able to piece together that the

Baums interjected themselves in various bankruptcy proceedings by filing vexatious, abusive and

harassing litigation, an injunction was entered preventing the Baums from filing litigation

without the consent of the district court judge.); *Safir v. United States Lines, Inc.,* 792 F.2d 19,

25 (2d Cir. 1986) (Second Circuit agreed the litigant's conduct warranted a pre-filing injunction,

but narrowed the scope such that the litigant had to seek permission from the district court before

filing certain types of additional actions.)

102.    Dondero and his Related Entities are the quintessential vexatious litigants, and the

Gatekeeper Provision is a legitimate tool for the Bankruptcy Court, properly within the

jurisdiction of the Bankruptcy Court, and less burdensome on Dondero and his Related Entities

than a full injunction – which the Debtor believes would be justified in seeking in this case.

**VIII.    THE EXCEPTION TO DISCHARGE DOES NOT APPLY**

103.    The exception to discharge contained in 11 U.S.C. § 1141(d)(3) does not apply.

Section 1141(d)(3) provides that:

Confirmation of a plan does not discharge a debtor if --

(A) The plan provides for the liquidation of all or substantially all
of the property estate;

009795

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 63 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 878 of 1017 PageID 10642
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 62 of 106

(B) The debtor does not engage in business after consummation of the plan; and

(C) The debtor would be denied a discharge under section 727(a) of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3).

104.     Since the provisions of § 1141(d)(3) are in the conjunctive, if any one of the three prongs of the test is lacking, confirmation of a plan results in the discharge of debt. House Rep. No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6374-75 ("if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, *and* if the debtor would be denied a discharge under section 727 … then the Chapter 11 discharge is not granted.") (emphasis added); *Financial Sec. Assur. v. T-H New Orleans Lt. Pshp. (In re T-H New Orleans Lt. Pshp.)*, 116 F.3d 790, 804 (5th Cir. 1997) ("[T]his section requires that all three requirements be present in order to deny the debtor a discharge."); *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (the provisions of § 1141(d)(3) are in the conjunctive).

105.     Here, only subpart C of § 1141(d)(3) clearly applies.[53]  With respect to the subpart A of § 1141(d)(3), here, the Plan clearly provides for a gradual liquidation of all or substantially all the estate's assets.  However, a discharge is nonetheless appropriate because an orderly wind down is anticipated to last for up to two years, and the Reorganized Debtor will continue to manage various funds during that period.  Under similar circumstances, at least one court has suggested that the plan would fall outside the policies of § 1141(d)(3)(A).  *In re Enron Corp.*,

---

[53] As a corporate debtor, the Debtor would not receive a discharge under section 727(a) in a Chapter 7.

009796

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 64 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 879 of 1017    PageID 10643
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 63 of 106

2004 Bankr. LEXIS 2549, **215-17 (Bankr. S.D.N.Y. July 15, 2004) ("[T]the indeterminate period of retention of the assets after the Effective Date and the clear need for ongoing business operations to maximum value for all creditors in liquidating the assets necessitates the application of the section 1141 discharge to the Reorganized Debtors."). Moreover, even if subpart A of § 1141(d)(3) is met, subpart B of § 1141(d)(3) – engaging in business – is lacking. *T-H New Orleans Lt. Pshp.*, 116 F.3d at 804, n. 15 (holding that the reorganized entity's likelihood of conducting business for two years following plan confirmation satisfies § 1141(d)(3)(B)); *In re River Capital Corp.*, 155 B.R. at 387 (discharge warranted where current management stated its intention to continue to engage in business after consummation of the plan).

## IX.    THE SENIOR EMPLOYEE OBJECTION

### A.    The Senior Employee Objection Should Be Overruled

106.    Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent (collectively, the "Senior Employees")[54] filed the Senior Employee Objection. Subsequent to its filing, Mr. Waterhouse and Mr. Surgent executed a Senior Employee Stipulation (as discussed below) and will withdraw their support of the Senior Employee Objection. The only remaining Senior Employees objecting to the Plan are Mr. Ellington and Mr. Leventon. Mr. Ellington and Mr. Leventon argue, among other previously addressed objections, that the Plan is not confirmable because (1) the Plan violates section 1123(a)(4)'s requirement that claims in the same class be treated the same, and (2) the Debtor has prevented the Senior Employees from

---

[54] Although Mr. Ellington and Mr. Leventon are included in the definition of Senior Employees, they were both terminated for cause and are no longer employees of the Debtor.

009797

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 880 of 1017    PageID 10644
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 64 of 106

making the Convenience Class Election.    These objections are meritless, and the Senior

Employee Objection should be overruled.

### B.    Background Related to Senior Employees

107.    The Debtor's employees, including the four Senior Employees, were eligible to
receive compensation under two separate bonus plans: an annual bonus plan and deferred
compensation plan.  Both of these plans required the employee to remain employed as of the
applicable vesting date to receive the bonus.  On December 4, 2019, the Debtor filed a motion
seeking authorization to pay bonuses under these plans, to which the Committee objected to the
inclusion of the Senior Employees.  At a hearing on the motion, the Debtor agreed to remove the
Senior Employees (*see* 1/21/2019 Hearing Tr., Docket No. 393 at 119:21-22), and the motion
was granted as presented at the hearing [Docket No. 380].    Accordingly, the rank and file
employees were paid on account of their bonuses that vested in 2020, with the exception of the
Senior Employees who have vested bonus claims.

108.    On May 26, 2020, each of the Senior Employees filed a single proof of claim
against the Debtor in an unliquidated amount.[55]  *See* Proof of Claim Nos. 192 (claim of Ellington
claiming "not less than $7,604,375"); 184 (claim of Leventon claiming "not less than
$1,342,379.68"); (collectively, the "Proofs of Claim").  The Proofs of Claim did not provide any
calculations or breakdown of amounts to support the minimum claimed.

---

[55] An amended proof of claim was filed by Mr. Ellington on July 16, 2020.  Each Senior Employee asserted that a portion thereof, in a liquidated amount pursuant to the statutory cap of section of section 507(a)(4), is entitled to priority under the Bankruptcy Code.  In addition, the portion of the claim related to PTO was classified in Class 6 under the Plan.

DOCS_SF:104855.7 36027/002

Appx. 05655
009798

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 66 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 881 of 1017 PageID 10645
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 65 of 106

109. Each Proof of Claim sets forth the following with respect to "compensation" owed:

> Claimant is owed compensation for his services, including, without limitation, (i) all salaries and wages; benefits; (ii) bonuses (including performance bonuses, retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv) retirement contributions, pensions and deferred compensation. The amount of the Claim for such compensation includes both liquidated and unliquidated amounts.

*See* Claim Nos. 192, 182, 184, 183, each at Attachment ¶3.

110. The official claims register maintained by KCC lists the general unsecured claim amount for each Senior Employee as "UNLIQUIDATED." The claim of each Senior Employee not requiring separate classification under the Plan (*i.e.*, the priority and PTO portions), was classified as a General Unsecured Claim in Class 8 (each, a "GUC Claim").

111. On October 27, 2020, during a hearing on the Debtor's then-existing disclosure statement, this Court and the Committee were highly critical of the proposed plan provisions concerning employee releases and strongly suggested that the plan was unlikely to be confirmed as drafted. As a result, the Debtor began negotiating with the Committee concerning the terms on which Senior Employees would be permitted to obtain a release. Ultimately, the Debtor and the Committee agreed that the Senior Employee would be required to execute a stipulation with the Debtor providing for the resolution and payment of deferred compensation at reduced rates and other consideration in exchange for a Plan release. Specifically, the Senior Employee Stipulation, if approved by this Court and signed by the Senior Employee, would allow the "Earned Bonus" (as defined in the Senior Employee Stipulation) portion of the Senior Employees' to be treated as a separate Convenience Claim (subject to reduction as set forth in

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 882 of 1017 PageID 10646
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 66 of 106

the Senior Employee Stipulation). In exchange for this reduction, and together with the Senior

Employee's agreement to (a) cooperate with the Claimant Trustee and Reorganized Debtor, (b)

refrain from taking certain actions against those parties, and (c) support and vote in favor of the

Plan, the Senior Employee would receive a Plan release and the treatment provided with respect

to the "Earned Bonus" in the Plan and Senior Employee Stipulation.

112. As part of its settlement discussions with the Senior Employees, the Debtor

provided the Senior Employees with a chart outlining how the reduction of the "Earned Bonus"

would work if the Senior Employees executed the Senior Employee Stipulation. This chart was

the same chart provided to the Committee in connection with the negotiation of the Senior

Employee Stipulation. This chart was never publicly-filed and did not contain "representations"

or promises. It was a chart provided to the Senior Employees to illustrate how a portion of the

Senior Employees' total claims would be treated if they signed the Senior Employee Stipulation

and to describe the consideration that the Senior Employee would provide in exchange for the

release contained in the Plan. Notably, the Disclosure Statement included the same calculation

that was set forth in the chart provided to the Senior Employees.[56]

113. In no world was the chart – provided in settlement discussions and for substantive

purposes – a promise to pay.

---

[56] *See* Disclosure Statement, page 71, which states:

> In addition to the obligations set forth in Article IX.D. of the Plan, as additional consideration for
> the foregoing releases, the Senior Employees will waive their rights to certain deferred
> compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation
> owed to the Senior Employees was approximately $3.9 million, which will be reduced by
> approximately $2.2 million to approximately $1.7 million. That reduction is composed of a
> reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience
> Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment
> of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of
> approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.



Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 883 of 1017 PageID 10647
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 67 of 106

114.    Despite this, the Senior Employee Objection argues that such chart "shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it separately shows the reduced recovery" if they sign the Senior Employee Stipulation.  The Senior Employees further argue that the chart evidences the Debtor's intent that the Senior Employees could elect Convenience Class treatment of their "Earned Bonus" whether or not they executed the Senior Employee Stipulation.  As set forth above, nothing in the chart supports that argument.  The chart was simply a illustration of how the Senior Employee Stipulation would work if executed and the consideration that would be given by each Senior Employee for the release.[57]

115.    Finally, the Senior Employees' comments were solicited on all but the economic terms of the Senior Employee Stipulation.  The Senior Employees were also encouraged to raise any issues they had with the Senior Employee Stipulation to the Committee and/or this Court. The Senior Employees' counsel at Winston & Straw provided comments on the Senior Employee Stipulation, which both the Debtor and the Committee accepted.   The Senior Employees themselves, however, refused to comment despite having the opportunity to do so and instead demanded that the Debtor retract the Senior Employee Stipulation because it did not reflect an agreement between the Senior Employees and the Debtor. On information and belief,

---

[57] As part of the Plan negotiations, Mr. Seery engaged in multiple conversations with all or some of the Senior Employees. Some of these conversations were with counsel; some were not. In each case, however, the conversations were part of a broader settlement discussion.  During these discussions, the Senior Employees asked questions about how the Senior Employee Stipulation would work but also made blatant threats about how they would react if they were not treated in the manner they deemed appropriate.  Mr. Seery made no promises to the Senior Employees during these conversations.

DOCS_SF:104855.7 36027/002

Appx. 05858
009801

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 69 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 884 of 1017 PageID 10648
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 68 of 106

the Senior Employees never approached the Committee to discuss the Senior Employee Stipulation. The only communication with this Court has been the Senior Employee Objection.

116. None of the Senior Employees elected to sign the Senior Employee Stipulation. Subsequent to the filing of the Senior Employee Objection, Mr. Seery discussed with Mr. Waterhouse and Mr. Surgent the possibility of signing the Senior Employee Stipulation, and Mr. Waterhouse and Mr. Surgent elected to sign the Senior Employee Stipulation (with certain revisions). However, as Mr. Ellington and Mr. Leventon are not currently employed by the Debtor, they are no longer eligible to sign the Senior Employee Stipulation.

### C. Treatment of Senior Employee Claims Under Plan

117. The Plan provides the following treatment to the Class 8 GUC Claims of the Senior Employees:

> Treatment: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

Plan, III.H.8.

118. The Plan provides that a Holder of a General Unsecured Claim may make a "Convenience Class Election" as follows:

> "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim *that is a liquidated Claim as of the Confirmation Date on their Ballot* to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.[58]

---

[58] A "Convenience Claim" is defined as:

Appx. 05859
009802

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 70 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 885 of 1017 PageID 10649
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 69 of 106

Plan, I.B.43 (emphasis added).

119. As discussed above, the Senior Employees' claims are unliquidated and were disclosed as unliquidated on the official claims register maintained by KCC. As unliquidated and unsecured claims, the Senior Employees' claims are, in each case, Class 8 (General Unsecured Claims), and, as holders of unliquidated GUC Claims, none of the Senior Employees were entitled to make the Convenience Class Election.

120. Irrespective of their claims, the Senior Employees are not entitled to a release under of the Plan unless they execute a Senior Employee Stipulation. *See* Article IX.D.

### D. Plan Solicitation

121. Although each of the Senior Employee's GUC Claim was classified *in toto* as Class 8 (General Unsecured Claims), the Senior Employees erroneously received both a Class 7 (Convenience Class) and Class 8 (General Unsecured) Ballot. Except for Mr. Surgent, each of the Senior Employees voted their Class 8 (General Unsecured Claim) ballot to reject the Plan, and each of the Senior Employees voted their erroneously Class 7 (Convenience Class) ballot to reject the Plan. Mr. Surgent abstained from voting on the Plan. Because they have now executed the Senior Employee Stipulation, Mr. Waterhouse and Mr. Surgent's votes will be cast to accept the Plan.

---

any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

Plan, I.B.41.

Appx. 05809
009803

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 71 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 886 of 1017 PageID 10650
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 70 of 106

### E. The Plan Does Not Violate Section 1123(a)(4)

122.     Section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).

123.     The Senior Employees argue that the Plan does not treat them the same as other Employees in the same class because the Senior Employees are not automatically being granted a release under the Plan, whereas other Employees are being granted a release automatically upon confirmation.  However, the Senior Employees conflate treatment of their claims with the decision not to automatically provide them a release.  The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The releases under the plan are not part of the "treatment" of Class 7 or Class 8 claims.

124.     Indeed, the releases granted under the Plan are part of an entirely different section of the Plan (Article IX).  Debtors are not required to grant releases to anyone nor are they required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees.[59]  Nonetheless, the Debtor, after extensive negotiations with the Committee (which did not want to provide *any* release to the Senior Employees) presented the Senior Employees with a mechanism by which the Senior Employees could obtain a release *if* they agreed to the conditions of the Senior Employee

---

[59] Indeed, the grant of third party releases is heavily scrutinized and could not be granted to all general unsecured creditors across the board as part of the Plan's treatment of general unsecured claims.  *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

Appx. 05861
009804

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 72 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 887 of 1017 PageID 10651
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 71 of 106

Stipulation.[60]  But just as the Senior Employees were not required to sign the stipulation,[61] the Debtor cannot be forced to provide a release to each Senior Employee just because it has provided releases to other Employees.  Nor would this Court or the Committee have allowed the Debtor to provide releases to the Senior Employees without those Senior Employees providing additional consideration to the Debtor's estate.  As the Court will recall, at the October 28, 2020, the Court specifically told the Debtor that it would be hard-pressed to approve releases to certain of the Debtor's employees if such employees did not provide consideration for the releases.[62] The Senior Employee Stipulation was crafted to address the Court's concerns by conditioning the release of *certain* of the Debtor's employees on the provision of other consideration.

125.    Finally, the Senior Employees devote considerable time arguing that the proposed Senior Employee Stipulation suffers from numerous defects and that the terms are too harsh.  But

---

[60]As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor, they are not eligible to sign the Senior Employee Stipulation.  Accordingly, they are not entitled to a release regardless of the Senior Employee Stipulation.

[61] While voluntary agreement is expressly excepted from section 1123(a)(4) anyway, debtors are permitted to treat one set of claim holders more favorably than another so long as the treatment is not on account of the claim but for distinct, legitimate rights or contributions from the disparately-treated group separate from the claim.  *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019).  The Ninth Circuit, for instance, upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest.  *See In re Acequia, Inc.*, 787 F.2d 1352, 1362-63 (9th Cir. 1986) ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998) (plan proponent's payments to certain members of power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]").  Here, too, the release consideration required from the Senior Employees *solely in order for the Senior Employees' to obtain a release* relates to their positions as senior employees rather than their position as general unsecured creditors.

[62] *See* Hearing Transcript, Oct. 28, 2020, at 30:17-22:

So, and I'll just throw in one last bit of food for thought. . . the Debtor has had a year now, close to a year now, to knock some of these out, you know, maybe reach some compromises with some of the related Highland parties and officers, to maybe participate in the plan with some sort of contribution, and it's just not happening. It's not happening. . . . So, at this point, I would be hard-pressed to protect any nondebtor defendants who aren't ponying up something to the whole plan reorganization process.

65



Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 888 of 1017    PageID 10652
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 72 of 106

those objections are irrelevant to confirmation.  If the Senior Employees believed that the cost of

the release was too high, they had no obligation to sign the Senior Employee Stipulation.

> **F.    The Senior Employees Are Not Permitted to Make Convenience Class Election**

126.    The Senior Employees next argue that the Debtor has improperly prevented the

Senior Employees from electing Convenience Class treatment for a portion of their Claims.

Under applicable bankruptcy law, the Plan, and the Disclosure Statement Order, the Senior

Employees are not entitled to split their claims to create a liquidated claim for which

Convenience Class Election would even be possible.[63]   Further, even if the Senior Employees

were entitled to elect a Convenience Class Election for a *portion* of their Class 8 Claims for

distribution purposes, as discussed below, their Claims are only entitled to be voted in Class 8 for

voting and numerosity purposes.

> **G.    Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law**

127.    The Senior Employees argue that the "Earned Bonus" portion of each GUC Claim

is "liquidated"[64] and therefore eligible for the Convenience Class Election.[65]   The "Earned

---

[63] The Senior Employees claim the Debtor's statements contradict the plan; however, any purported contradiction stems from the Senior Employees' misstatement of the Debtor's position.  Indeed, even if the Debtor had made contradictory statements, it is irrelevant.  The Plan says what it says and the Debtor cannot unilaterally change the terms of the Plan with respect to a select group of creditors.  While a Class 7 Ballot was mistakenly sent to the Senior Employees, the Senior Employees cannot make the Convenience Class Election under the Plan because they each hold a single, unliquidated Class 8 Claim.

[64] The Plan did not need to define the term "liquidated."  Generally, a debt is liquidated if the amount due and the date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2) to a simple mathematical formula.  *In re Visser*, 232 B.R. 362, 364-65 (Bankr. N.D. Tex. 1999).  However, even if the Earned Bonus *portion* is liquidated in that the amount is capable of being ascertained, it is not considered liquidated for purposes of voting where the amount owed or formula for calculation are missing from the proof of claim.  *See In re Lindell Drop Forge Co.*, 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990); *see also Riemer & Braunstein LLP v. DeGiacomo (A & E 128 North Corp.)*, 528 B.R. 190, 199 (1st Cir. B.A.P. 2015) (court looks to proof of claim forms to determine if they sufficiently demonstrate liquidated claims).

[65] None of the Senior Employees' Proofs of Claim contains any liquidated amount with respect to any component of

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 889 of 1017 PageID 10653
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 73 of 106

Bonus" portion, even if liquidated, is not a standalone claim entitled to make a Convenience

Class Election, nor can the Senior Employees split their GUC Claim after filing a single proof of

claim. The Senior Employees do not cite any law to support their contention that claims of a

single creditor in a given class, set forth in a single proof of claim, may be split into multiple

claims.[66]  Indeed, case law holds the opposite.  Courts have found that where a claimant files a

single proof of claim, even if it covers multiple debts, he is not entitled to split his claims.  *In re*

*Jones*, 2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) (noting that the creditor could have

filed multiple proofs of claim to avoid the issue); *see also In re Latham Lithographic Corp*., 107

F.2d 749 (2d Cir. 1939) (claimant cannot split claim into multiple claims for the purpose of

creating multiple creditors who could vote in a trustee election).  The Senior Employees each

filed a single proof of claim: they cannot split their GUC Claim in order to make the

Convenience Class Election under the Plan and applicable bankruptcy law.  And the Plan is clear

on this; no other Holder of an unliquidated or partially liquidated Class 8 claim attempted to split

its claim or make the Convenience Class Election.

---

the GUC Claim, including the "Earned Bonus."  The Senior Employees appear to make the stunning assertion that
the Debtors' books and records establish whether a claim is liquidated and the amount of such claim, even when the
proof of claim lists no such amounts.  There is no proof of claim on file listing a liquidated amount, no executed
stipulation agreeing on a liquidated amount, and no order of the Court setting a liquidated amount.  The Senior
Employees' assertion that any portion of their GUC Claims is liquidated is untenable.

[66] The cases the Senior Employees cite only support that separate claims, each covered by a separate proof of claim, **_purchased_** from other creditors, are entitled to be counted as separate claims.  *See Figter Ltd. v. Teachers Ins.
Annuity Ass'n (In re Figter Ltd.)*, 118 F.3d 635, 640-641 (9th Cir. 1997) (claimant entitled to vote multiple claims
where it "purchased a number of separately incurred and separately approved claims (each of which carried one
vote) from different creditors"); *Concord Square Apartments v. Ottawa Properties (In re Concord Square
Apartments)*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) ("purchaser of claims is entitled to a vote for each separate
claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (purchased claim arose out of a separate
transaction, evidencing a separate obligation for which a separate proof of claim was filed).  Notably, in each of
these cases a separate proof of claim had been filed for each separate claim, evidencing an entirely separate
obligation, and owed to a different party.  Here in contrast, each single Senior Employee filed a single proof of
claim, and the "Earned Bonus" is a mere *component* of an overall compensation claim stemming from obligations
under an employment contract.

Appx. 05864
009807

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 890 of 1017 PageID 10654
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 74 of 106

**H.** **Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes**

128. Even if splitting claims contained in a single proof of claim were allowed under applicable case law (which it is not) and the Senior Employees were entitled to make the Convenience Claim Election with respect to a portion of their GUC Claim, this Court's Disclosure Statement Order prohibits the splitting of claims within a given class for voting purposes:

> Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

Disclosure Statement Order ¶ 25.b.

129. Similarly, paragraph 23 provides:

> For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

*Id.* ¶ 23.h.

130. Read together, these provisions clearly establish that there can be no claim splitting within a class, and no claim splitting between Class 7 and Class 8. Accordingly, even if claims classified in a given class set forth in a single proof of claim could be split and the Senior Employee were entitled to make the Convenience Class Election, the Disclosure Statement Order precludes the Senior Employees from splitting their claims for voting purposes.

Appx. 05885
009808

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 76 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 891 of 1017 PageID 10655
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 75 of 106

**I.** **Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting**

131. Even if the Senior Employees were deemed to hold separate, liquidated claims on account of their "Earned Bonuses" that could be split from the remainder of their GUC Claims, a Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim *for voting purposes*. Specifically, the Class 8 Ballot, approved by the Disclosure Statement Order, provides:

> If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; *(i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims;*

Disclosure Statement Order, Exhibit A at 26 (emphasis added).[67] Accordingly, at most, the Convenience Class Election only impacts the Senior Employees' treatment for distribution purposes. Moreover, even if the Court finds that Mr. Leventon has a liquidated claim that was entitled to be classified in Class 7 and vote in that class, Mr. Ellington's claim, which exceeds $1 million could not vote in Class 7. Mr. Ellington would only be entitled to reduce his Class 8 Claim and elect treatment in Class 7 but his claim would otherwise be included in Class 8 for voting purposes.

132. For each of the foregoing, independent reasons, each Senior Employee holds a single, unliquidated claim in Class 8. No Senior Employee is entitled to split his GUC Claim under applicable bankruptcy law, and such an action is further prohibited by the Disclosure Statement Order. Even if any GUC Claim could be split and the Convenience Class Election

---

[67] The Plan itself is also clear that the Convenience Class Election only impacts *treatment*, and does not impact *voting*. *See* Plan, I.B.43; III.H.8.

Amergy 005806
009809

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 77 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 892 of 1017   PageID 10656
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 76 of 106

was made, the Convenience Class Election only impacts treatment but does not impact voting. Finally, the Senior Employees' argument that their entitlement to make the Convenience Class Election stems from an erroneously mailed ballot is misplaced. As set forth above, the mailing of the Class 7 Ballot was an administrative error and cannot entitle the Senior Employees to rights that contradict the Plan and the Disclosure Statement Order.

## X.        THE HCMFA/NPA GATES OBJECTION

133.    The Debtor manages fifteen collateralized loan obligations ("CLOs") pursuant to certain agreements, which are referred to sometimes as portfolio management agreements and sometimes as servicer agreements (the "Management Agreements"). Each CLO is a Cayman-domiciled entity that owns a portfolio of loans. They are passive single purpose entities with no ability to self-manage. The CLOs have no employees; however, they do have Cayman-based boards of directors, which have limited duties under Cayman law and which do not actively manage the CLOs. Each CLO contracted with the Debtor as a third-party "Portfolio Manager" to manage the loan portfolio pursuant to the terms of the various Management Agreements. As discussed below, the only parties to the Management Agreements are the Debtor and the respective CLO.

134.    To finance its acquisition of the loans, each CLO issued notes to third party investors. Those notes come in different tranches with different payment priorities. The lowest in priority are called "preference shares," which receive the available residual cash flow after the CLO has made the required payments on the notes. Although called equity, the preference shares are not common equity. The CLOs themselves are purely creatures of contract, and

009810

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 893 of 1017 PageID 10657
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 77 of 106

investor rights are governed by the terms of the indentures governing the CLOs (collectively, the "<u>Indentures</u>"), the preference share paying agency agreements, and in certain cases the Management Agreements.[68] The Indentures define the procedures for buying, managing, and selling the CLOs' assets. *See generally* Indenture § 12.1; Management Agreement § 2. Fiduciary duties under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>") are owed solely to the CLOs and not their investors.[69] Nothing in the Indentures or the Management Agreements gives any investor in the CLOs the right to block, interfere with, influence, control, or otherwise direct the asset sale process. The Management Agreements set forth the Portfolio Manager's duties and obligations and the requirements for removing the Portfolio Manager if investors are not satisfied.

135. By agreement with CLOs, which are the sole counterparties to the Management Agreements, the Debtor will assume the Management Agreements pursuant to the Plan. The Debtor and the CLOs have agreed, in summary, that in full satisfaction of the Debtor's cure obligations under section 365(b)(1) of the Bankruptcy Code, the CLOs will receive a total of $525,000, comprising $200,000 within five days of the Effective Date and $325,000 in four equal quarterly payments of $81,250, and that the Debtor and the CLOs will exchange mutual releases. The Debtor and the CLOs agreed to seek approval of this compromise by adding

---

[68] The Debtor's role is referred to as either the Servicer or Portfolio Manager. All of the Management Agreements and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all material respects across the CLOs at issue.

[69] The Debtor's fiduciary duties under the Advisers Act are owed to the CLO, not to its investors. *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006) (under Section 206 of the Investment Advisers Act of 1940 and other provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest."). The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed by contract.

DOCS_SF:104855.7 36027/002

Appx. 05868
009811

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 79 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 894 of 1017    PageID 10658
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 78 of 106

language to the Confirmation Order.  A copy of that language is attached hereto as Exhibit C and will be included in the Confirmation Order.

### A.    The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled

136.    As the Court is well aware, Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA" and, together with HCMFA, the "Advisors"), are controlled by Mr. James Dondero.  Mr. Dondero is also the portfolio manager of each of the investment funds objecting to the Debtor's assumption of the Management Agreements (the "Funds").[70]  The Advisors and three of the Funds have actively interfered in the Debtor's management of the CLOs and sought to exercise management authority over the CLOs.  This Court ruled on these issues in connection with the Advisors and Funds' *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] (the "CLO Motion").

137.    Now, the Funds and Advisors have objected to confirmation of the Plan and are joined only in their objection by other Dondero-controlled entities –the NexPoint RE Partners and CLO Holdco, Ltd. ("CLO Holdco" and, together with the Funds and the Advisors, the "CLO Objectors").  Although the NPA/HCMFA Objection makes different arguments than those contained in the CLO Motion, the goal of the NPA/HCMFA Objection is the same.  It seeks to use this Court to transfer control of the CLOs away from the Debtor and back to Mr. Dondero.

---

[70] The Funds are Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund.

App. 05869
009812

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 80 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 895 of 1017    PageID 10659
126
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 79 of 106

138.    The CLO Objectors contend that the Advisers Act prohibits assignment of the Management Agreements and/or that they are non-assignable personal service contracts.  From this, the CLO Objectors argue that the Management Agreements may not be assumed by the Debtor under Section 365(c) because the "*hypothetical test*" applies in the Fifth Circuit.  They also contend that there is inadequate assurance of future performance because of staff reductions and that the contracts are being modified and thus are being only partially (and so impermissibly) assumed.  The CLO Objectors also speculate that they may be harmed by future investment decisions made by the Debtor because the time-frame contemplated by the Plan for disposition of assets may be shorter than what they believe is optimal to maximize the value of the preference shares.  The objections should be overruled on several grounds:

- The contract counterparties – the CLOs – consent to assumption and will release the Debtor from all claims.

- The CLO Objectors are non-contracting parties with no standing to object on behalf of the CLOs and have pointed to no contractual basis for their assertion of management authority over the CLOs.

- The CLO Objectors cannot create standing by asserting they are creditors of the estate.  Each CLO Objector agreed to the expungement of its claims or has no claims.

- Even if the CLO Objectors were creditors, their standing to object to assumption would be limited to whether it benefits the Estate, and they would *still* lack standing to assert rights belonging to the contracting parties.

- Even if the CLO Objectors had the right to object to assignment, that does not give them the standing to object to the Debtor's assumption of the Management Agreements.

- Even if the Management Agreements were non-assignable, the Debtor could still assume the Management Agreements without consent because the *actual test* applies in the Fifth Circuit.

Appx. 05879
009813

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 896 of 1017 PageID 10660
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 80 of 106

- Even if the *hypothetical test* applies, "applicable law" does not prevent assignment of the Management Agreements.

- There is no detriment to the Estate in assuming the Management Agreements, and there is no mismatch in investing timelines between the Debtor and the CLOs' investors.

**B.    The CLO Objectors Cannot Override the CLOs' Consent to Assumption**

139.    The Debtor and its counterparties (the CLOs) agreed to the assumption of the Management Agreements.  Any objections were waived.  Hence the CLO Objectors' argument is *not* that there is no consent to assume the Management Agreements; it is that the *correct* party has not consented.  In other words, the CLO Objectors are arguing that the CLO Objectors (and therefore Mr. Dondero) have the authority and prerogative to dictate the actions of the CLOs and whether the CLOs should consent to assumption.  This has to be the CLO Objectors' argument because unless the CLO Objectors have such right, they have no standing as non-contracting parties to object under section 365 to the assumption of the Management Agreements.

140.    Only parties to contracts have standing to object to assumption, even when the objector claims that assumption will result in a breach of that contract or violate the law.  *See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.)*, 278 B.R. 714, 718-19 (Bankr. D. Del. 2002), *aff'd*, 280 B.R. 808 (D. Del. 2002), 57 F. App'x 912 (3d Cir. 2003).  As the district court explained:

> The language of section 365 is clearly intended to protect the rights of those persons or entities who share contractual relationships with the debtors. In other words, in order to invoke the protections provided in section 365, an entity must be a party to a contract with the debtor.
>
> *   *   *
>
> Although section 365 does confer the right to refuse assignment where excused by applicable law, that right is nevertheless conferred only upon parties to the

App. 09587
009814

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 82 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 897 of 1017 PageID 10661
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 81 of 106

> contracts at issue. It creates no separate right of enforcement for other creditors of the estate who are not parties to the contract. Therefore, even if the appellants feel that the alleged violation of the law may effect them, they have not demonstrated that they have the legal right to enjoin such a violation.

*Hertz Corp. v. ANC Rental Corp. (In Re ANC Rental Corp.)*, 280 B.R. 808, 817-18 (D. Del. 2002); *see also Cargill, Inc. v. Nelson (In re LGX, LLC)*, 2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) (creditor had standing on whether court should approve settlement between trustee and another creditor, but no standing under § 365 on whether quitclaim license from trustee to that creditor violated applicable patent law because it was not party to contract); *In re Riverside Nursing Home*, 43 B.R. 682, 685 (Bankr. S.D.N.Y. 1984) (assignee of rents is not "party to such contract or lease" so as to confer standing under section 365); *In re Irwin Yacht Sales, Inc.*, 164 B.R. 678 (Bankr. M.D. Fla. 1994) (denying standing to co-owner notwithstanding her economic interest since she was not party to the lease); *see also ANC Rental*, 57 F. App'x at 916 (citations omitted) ("Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.")

141. The only parties to the Management Agreements are the Debtor and the respective CLOs. Consequently, the CLO Objectors are effectively asking the Court to treat them as the contracting parties, so that they, rather than the CLOs, may decide whether to oppose assumption. But an adjudication of the CLO Objectors' rights vis-à-vis the CLOs is not before the Court. Regardless, this assertion of management authority over the CLOs was already

DOCS_SF:104855.7 36027/002

Appx. 05872
009815

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 83 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 898 of 1017   PageID 10662
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 82 of 106

rejected by Court as "almost Rule 11 frivolous."  In the CLO Motion, the movants sought to restrict sales of the CLOs' assets on terms that they believed might be disadvantageous to the holders of preference shares, but they could not substantiate any contractual basis for the exercise of such management authority.[71]

142.    The only acknowledgement of this Court's ruling in the NPA/HCMFA Objection is offered in a footnote, in which the CLO Objectors suggest that the issues are different "in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed."[72]  In all honesty, the Debtor has no idea what the Objector's statement means, but whatever it means, the underlying issue and rationale are the same here as in the CLO Motion.  As before, the issue is who has the right to make business decisions for the CLOs, and in both the CLO Motion and here, the proffered justification is a nonspecific risk that investment decisions may be made with which the CLO Objectors disagree.

### C.    The CLO Objectors Lack Standing to Object to the Plan

#### 1.    The CLO Objectors Rights Under the Management Agreements Are Not Affected by the Plan

---

[71] 12/16/20 Tr. of Proceedings at 64:1-10.

This is almost Rule 11 frivolous to me. You know, we're -- we didn't have a Rule 11 motion filed, and, you know, I guess, frankly, I'm glad that a week before the holidays begin we don't have that, but that's how bad I think it was, Mr. Wright [of K&L Gates] and Mr. Norris. This is a very, very frivolous motion.  Again, no statutory basis for it. No contractual basis. You know, you didn't even walk me through the provisions of the contracts. I guess that would have been fruitless. But you haven't even shown something equitable, some lack of reasonable business judgment.

[72] The CLO Objectors state: "The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis."  Obj. at 5, n. 4.

DOCS_SF:104855.7 36027/002



Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 84 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 899 of 1017 PageID 10663
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 83 of 106

143. The CLO Objectors offer four bases for standing in the Objection. The first is that "in several of the Servicing Agreements, the CLO Objectors have the right to remove the Debtor or to control who the servicer under the agreements is. They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements. Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the CLO Objectors have standing to object to their rights being limited or eliminated." Obj. at 27. Elsewhere they state that the Management Agreements "generally allow the holders of preference shares to remove the portfolio manager for cause" and may provide for a certain percentage of holders of Preference Shares to remove a manager without cause. Obj. at 11.

144. As an initial matter, nowhere in the NREP Joinder do any of the NexPoint RE Partners allege or state that they have any interest in the CLOs. Without an interest in the CLOs, the NexPoint RE Partners cannot allege that any of their rights are affected. Further, nowhere in the NPA/HCMFA Objection is there any attempt to establish any basis on which the CLO Objectors are presently entitled to replace the Debtor as the Portfolio Manager or authorized to decide for the CLOs whether the CLOs should consent to the Debtor's assumption of the Management Agreements. This is telling.

145. As set forth in the Management Agreements, the Debtor can only be removed as Portfolio Manager *for cause* by a majority of the preference shares that are *not* held by affiliates of the Debtor. By the CLO Objectors own admission, they only hold a majority of the preference shares in eight of the fifteen CLOs at issue. That means that the CLO Objectors have

Appx. 05874
009817

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 85 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 900 of 1017    PageID 10664
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 84 of 106

*no* right to remove the Portfolio Manager in approximately half of the Management Agreements. However, even with respect to the CLOs in which they hold a majority of the preference shares, the CLO Objectors cannot remove the Debtor unless cause exists – and cause does not exist. Moreover, the CLO Objectors, under the Management Agreements, are prohibited from replacing the Debtor because each of the CLO Objectors should be considered an affiliate of the Debtor for purposes of the Management Agreements and therefore be prohibited from exercising removal rights.  Finally, on January 9, 2020, this Court entered an order (the "January Order"), which, in pertinent part, stated that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."  [Docket No. 339]  It is beyond dispute that each of the CLO Objectors is for all intents and purposes Mr. Dondero, and Mr. Dondero should not be allowed to do by proxy what he was prohibited by this Court from doing directly.

146.    However, whether the CLO Objectors have the right to remove and replace the Debtor as Portfolio Manager is not a question that will be decided by the Plan nor will the CLO Objectors' rights to remove the Debtor – whatever they are – be impacted by the Plan.  On January 6, 2021, the Debtor filed that certain *Debtor's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero*, Adv. Proc. No. 20-03000-sgj, Docket No. 6] (the "Adversary Complaint").  In the Adversary Complaint, the Debtor seeks a declaratory judgment that the CLO Objectors have no right to replace the Debtor under the Management Agreements for the reasons set forth above, among others.  The CLO Objectors should assert their rights, if any, at the hearing on the Adversary Complaint, not through an objection to

Appx. 05875
009818

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 901 of 1017 PageID 10665
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 85 of 106

assumption.  Consequently, the CLO Objectors' rights, if any, under the Management Agreement

will be determined by this Court in a separate hearing, and will not be impacted by the Plan.

> ## 2. The CLO Objectors Lack Standing to Object to Assumption as Creditors or Parties in Interest

147.    Two of the CLO Objectors' four claimed bases for standing are that they are

creditors, or at least parties in interest, and as such have standing to object to assumption of the

Management Agreements "especially because assumption of the Servicing Agreements and

future performance thereunder affect the feasibility of the Plan as a whole," and under sections

1129(a)(1)-(3) because assumption of the Management Agreements purportedly violates the law.

Obj. at 27.  These arguments fail for numerous reasons.

148.    First, these arguments for standing are circular.  If a party lacks standing to object

to assumption of a contract because it has no protected interest in the contract under section 365,

it cannot argue that a plan should not be confirmed because of the assumption of such contract.

A party cannot use an objection to a plan to create standing under section 365.

149.    Second, the CLO Objectors are not creditors.  As set forth in the Memorandum,

each of the Advisors, the Funds, and CLO Holdco filed claims in this Case; however, each of

those parties voluntarily agreed to have their Claims expunged or reduced to $0.00.  None of the

NexPoint RE Entities filed claims.  As such, the CLO Objectors are barred from asserting that

they have prepetition claims against the Debtor or its Estate.  The CLO Objectors also cannot

create claims by asserting that they will have claims arising from the rejection of the shared

services agreements with the Debtor.  *None* of the shared services agreements are being rejected.

Each of the shared services agreements is freely terminable.  In November 2020, the Debtor

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 902 of 1017 PageID 10666
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 86 of 106

provided notice that the shared services and other agreements were being terminated. Such agreements will terminate no later than January 31, 2021, which is prior to the anticipated Effective Date of the Plan. Because none of the shared services agreements are being rejected, none of the CLO Objectors will have a rejection damages claim.

150. Third, *even if* any of the CLO Objectors were creditors: "[E]ven creditors do not have standing to raise the rights of a landlord or contract party under section 365. . . While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another." *In re ANC Rental*, 278 B.R. at 718-19 (citations omitted). As the bankruptcy court held in *ANC Rental*, the CLO Objectors cannot usurp the CLO's standing to object to assumption.

151. Fourth, as set forth below, there is no "applicable law" prohibiting assumption and/or assignment for purposes of Section 365(c) and therefore no argument under section 1129(a). Each of the Management Agreements can be assumed and could be assigned without the consent of any party (although the CLOs have consented to assignment). Therefore, there is no violation of law.

152. Finally, the CLO Objectors cannot boot strap into standing by arguing that the assumption of the Management Agreements will not benefit the estate. First, it is anticipated that the Debtor's chief executive officer and chief restructuring officer will testify as to how assumption benefits the estate. Second, granting the relief requested by the CLO Objectors would be catastrophic to the Debtor's estate. The Debtor's inability to assume the Management

Appx. 05877
009820

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 88 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 903 of 1017   PageID 10667
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 87 of 106

Agreements does not mean that the CLO Objectors will be magically installed as Portfolio

Manager.  It means that the Management Agreements will be rejected and that *none* of the CLOs

will have a Portfolio Manager following the Confirmation Date.  Any damage to the CLOs will

presumably be part of the claims asserted by the CLOs against the Debtor in connection with that

rejection.  Those claims are currently incalculable.  The Debtor also has exposure to each of the

CLOs and any loss in value caused by having no Portfolio Manager would directly impact the

Reorganized Debtor's and Claimant Trust's assets.  Even assuming the CLO Objectors can

appoint themselves Portfolio Manager in the CLOs in which they hold a majority of the

preference shares (which is contested and which in no event would happen by the Confirmation

Date), that still leaves approximately half of the CLOs without a manager.  It is beyond

disingenuous for the CLO Objectors to argue that there is no benefit to the estate in assuming the

Management Agreements while at the same time arguing that those same agreements should be

rejected with the Debtor suffering the consequences.

### 3.    The Contractual Right to Object to Assignment of the Management Agreements Does Not Create Standing to Object to Their Assumption

153.    The fourth and final basis for standing is: "[I]n several of the Servicing

Agreements, it is not just the CLO that must approve an assignment, but also the CLO Objectors.

The CLO Objectors have similar rights under the Indentures. Insofar as the test under section

365(c)(1) is a hypothetical assignment, and the CLO Objectors have the right to approve or not

approve that assignment under applicable law and the agreements, that right should extend to

consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a

concurring consent by the CLO Objectors."  Obj. at 28.

DOCS_SF:104855.7 36027/002

Appx. 05378

009821

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 89 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 904 of 1017 PageID 10668
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 88 of 106

154.     For purposes of standing, the CLO Objectors asserted contractual right to object to assignment of the Management Agreements is irrelevant, for three reasons.  First, there is no assignment here.  The Debtor is assuming the Management Agreements with the consent of the CLOs.  Second, even if it were correct that (a) the CLO Objectors have a contractual right to object to assignment, and (b) the *hypothetical test* applies, they still have no interest in the contract that would permit them to enforce section 365's protections for their benefit in derogation of the rights of the actual contracting parties.  Third, as discussed immediately below, the *actual test* applies in the Fifth Circuit, and thus the Management Agreements would be assumable even if they were not assignable.

**D.     Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit**

155.     As the CLO Objectors recognize, there is a split of authority among the circuits regarding the appropriate test to apply to determine whether:

- a contract that is otherwise non-assignable under applicable non-bankruptcy law  can be assumed by a debtor  under Bankruptcy Code section 365(c)(1); and

- whether the same contract can be terminated if it contains an "ipso facto" clause pursuant to Bankruptcy Code section 365(e)(2)(A).

The Fifth Circuit has ordered lower courts to apply the so-called *actual test* in considering whether an ipso facto termination clause can be enforced under Bankruptcy Code section 365(e)(2)(A).  For the reasons set forth below, even though the Fifth Circuit has not ruled on the issue directly, the *actual test* has been applied by every bankruptcy court that has considered the issue in the Fifth Circuit to assumption of contracts under Bankruptcy Code section 365(c)(1).

DOCS_SF:104855.7 36027/002

Annex 05879
009822

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 905 of 1017 PageID 10669
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 89 of 106

Accordingly, the *actual test* should be applied in this Case to conclude that the Management

Contracts can be assumed by the Reorganized Debtor without the consent of any party.

156.     The Fifth Circuit's decision in *Bonneville Power Administration v. Mirant
Corporation* applied the *actual test* to a determination of whether a contract can be terminated as

a result of the filing of a bankruptcy case under Bankruptcy Code section 365(e)(2). *Bonneville
Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006).   The

reasoning in *Mirant* also supports application of the *actual test* to Bankruptcy Code section

365(c)(1).  Specifically, in *Mirant,* a non-debtor counterparty sought to terminate its executory

contract with the chapter 11 debtor based on an ipso facto clause after the debtor filed for

bankruptcy.    In support of its argument, the non-debtor counterparty relied on section

365(e)(2)(A) and asserted that, under applicable law, the Anti-Assignment Act, 41 U.S.C. § 15

(which generally prohibits the transfer of contracts to which the United States is a party), it was

excused  from  accepting  performance  from  or  rendering  performance  to  the  trustee  or  an

assignee.  Critically, in reaching its conclusion that the *actual test* applied, the Fifth Circuit relied

on cases analyzing section 365(c)(1).

157.     While the CLO Objectors would like this Court to believe there is some risk that

if faced with the direct question of whether the *actual* test also applies under section 365(c)(1),

the  Fifth  Circuit  would  reach  a  different  result,  that  argument  strains  credibility.

Notwithstanding the technical language differences[73] between the two statutes, the same test

---

[73] Subsection (e)(2) provides that the invalidation of ipso facto clauses does not apply to an executory contract
where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance
from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract
or lease prohibits or restricts assignment of rights or delegation of duties[.]" 11 U.S.C. § 365(e)(2). This language
is very similar—but not identical—to the language employed by subsection (c)(1), which speaks to excusing

Annex 05880
009823

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 91 of
Case 3:25-cv-02072-S Document 15-12 Filed 06/06/25 Page 906 of 1017 PageID 10670
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 90 of 106

must apply to both the assumption of a contract under section 365(c)(1) and the termination of a

contract under section 365(e)(2)(A). There is no logical reading of these two subsections that

would support application of different tests. The language of section 365(e)(2)(A) is intended to

allow the counterparty to a contract that cannot be assumed or assigned to enforce its remedy of

termination so that it is not in limbo while the bankruptcy case proceeds. Section 365(c) cannot

be read in isolation from the other subsections. It would make no sense for a court to hold that a

contract cannot be assumed because the *hypothetical test* applies, but nonetheless cannot be

terminated because the *actual test* applies. For this reason, every lower court in the Fifth Circuit

that has considered the issue has held that the *actual test* applies to a debtor's assumption of

contracts under section 365(c). *See In re Virgin Offshore USA, Inc.*, No. 13-79, 2013 U.S. Dist.

LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013):

> Though the *Mirant* court used the actual test in the context of § 365(e), which was
> not amended in the same way as § 365(c) and thus is not subject to the same
> circuit split, the Court nonetheless finds this decision to be an indicator of the way
> that the Fifth Circuit would undertake an analysis under § 365(c). Further, in *In
> re O'Connor*, the Fifth Circuit appears to have applied an actual test to determine
> that a partnership interest was strictly personal under Louisiana law, thus not
> assumable under § 365(c). The court did not expressly adopt the actual test
> because, regardless of the test applied, the partnership interest would have been
> unassumable under § 365(c); however, the language used in the opinion indicated
> a predilection for the actual test.

*See also In re Jacobsen*, 465 B.R. 102, 105-06 (Bankr. N.D. Miss. 2011); *Cajun Elec. Members*

*Comm. v. Mabey (In re Cajun Elec. Power Coop., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La.

1999); *In re Lil' Things, Inc.,* 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v.*

*Louisiana Land & Exploration Co.,* 136 B.R. 658, 669 (Bankr. M.D. La.1992); *In re Hartec*

---

performance from, or rendering performance to, "an entity other than the debtor or the debtor in possession" as
opposed to just "the trustee or [] an assignee." Compare *id.* § 365(c)(1) with § 365(e)(2).

009824

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 92 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 907 of 1017    PageID 10671
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 91 of 106

*Enters., Inc.,* 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990), *vacated by settlement*, 130 B.R. 929

(W.D.Tex. 1991).

158.    Moreover, other bankruptcy courts within the Fifth Circuit have expressly

rejected the *hypothetical test*, concluding that:

> If the court were to adopt the [hypothetical test] and focus primarily upon
> assignability, a chapter [sic] 11 filing would have the virtual effect of rejecting
> executory contracts covered by section 365(f). As suggested by the court in
> *Texaco,* this analysis would extend section "365(c) beyond its fair meaning and
> intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's
> enterprise."

*Cajun Elec.,* 230 B.R. at 705 (Bankr. M.D. La. 1999)  (quoting *Texaco,* 136 B.R. at 670).

159.    The CLO Objectors prediction that the Fifth Circuit would apply a different test

under subsection 365(c) than it does under 365(e) is based solely on the use of the word "or"

rather than "and" in subsection 365(c).  However, the language cited by the CLO Objectors in

the statute is the same language that was considered by each of the lower courts in the Fifth

Circuit; each of those courts nonetheless applied the *actual test*.  The CLO Objectors reading is

overly simplistic and imposes a literal reading that, as noted by the *Cajun Electric* Court above,

is "beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation

of the debtor's enterprise."  *Id.*  Accordingly, the argument that assumption of the Management

Contracts must be evaluated using the *hypothetical test* is unavailing and contrary to this

Circuit's case law.

DOCS_SF:104855.7 36027/002

009825

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 93 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 908 of 1017    PageID 10672
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 92 of 106

  **E.**  **Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable**

160. The CLO Objectors, assuming the *hypothetical test* applies, contend the Management Agreements cannot be assigned or assumed under section 365(c)(1) without the consent of the contracting party because they are non-assignable personal services contracts and because Section 205(a)(2) of the Advisers Act proscribes assignment of such contracts without consent. Under these circumstances, the CLO Objectors argue that "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor. . . ." 11 U.S.C. § 365(c)(1)(A).

161. This Court has previously (and correctly) rejected both of these arguments – at that time made by the Debtor under the control of Mr. Dondero – in *In re Acis Capital Management, L.P., et al*, Case No. 18-30264-sgj, Docket No. 549 (Bankr. N.D. Tex. Aug. 30, 2018) (the "Acis Order"). In the Acis Order, this Court held that: (a) the portfolio management agreements at issue were not personal services contracts; and (b) Section 205(a)(2) of the Advisers Act is not "applicable law" precluding assignment under section 365. Specifically, this Court ruled as follows:

> The court overrules any objection that there is some applicable law that excuses the counterparties to the PMAs [portfolio management agreements] (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. . . . [I]n order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule – any prudent party contracting for another's services considers the other party's skill, expertise, and reputation – and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party

009826

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 94 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 909 of 1017 PageID 10673
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 93 of 106

providing services is skilled and reputable – it is whether such services are unique in nature. *See Compass Van & Storage Corp.*, 65 B.R. at 1011. . . . Here. . . [p]ursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique – as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers. Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii). And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." *Id.* § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." . . . As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." . . . Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2).

Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision – the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs. Indeed, in the Southern District of New York, the court held:

> "Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an

Appx. 05884
009827

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 95 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 910 of 1017    PageID 10674
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 94 of 106

> investment adviser's assignment of an investment advisory contract
> without client consent.  The section merely provides that the
> contract must contain the specified provision.    Thus, the
> assignment of a non-investment company advisory contract,
> without obtaining client consent, could constitute a breach of the
> advisory contract, but not a violation of Section 205(a)(2)."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 2018 U.S. Dist. LEXIS 90174, at *12

(S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply

constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the

counterparties to the PMAs from accepting or rendering performance without such consent.

162.    For the exact reasons found by this Court in the Acis Order, the CLO Objectors'

argument that "applicable law" prevents assignment under 11 U.S.C. § 365(c) should be

overruled.  First, the Management Agreements are on all fours with the management agreements

discussed in the Acis Order.  The Management Agreements have the same delegation provisions,

the same assignment provisions, and the same provisions on merger, consolidation, and

amalgamation.[74]  The Court has already ruled on these exact agreements and found that they

preclude a finding that the Management Agreements are personal services contracts.

---

[74] *See, e.g.,* Servicing Agreement, dated as of November 30, 2006, by and among Grayson CLO Ltd., and Highland
Capital Management, L.P. ("Grayson Agreement"):

> In providing services hereunder the Servicer may employ third parties including its Affiliates to
> render advice including advice with respect to the servicing of the Collateral and assistance
> provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder
> regardless of the performance of any services by third parties.

(*Id.*, § 2(d))

> In addition any successor Servicer must be an established institution which has demonstrated an
> ability to professionally and competently perform duties similar to those imposed upon the
> Servicer hereunder

(*Id.*, § 12(e))

> Any corporation partnership or limited liability company into which the Servicer may be merged
> or converted or with which it may be consolidated or any corporation partnership or limited
> liability company resulting from any merger conversion or consolidation to which the Servicer
> shall be party or any corporation partnership or limited liability company succeeding to all or
> substantially all of the servicing and collateral management business of the Servicer shall be the
> successor to the Servicer without any further action by the Servicer the Co-Issuers the Trustee the

DOCS_SF:104855.7 36027/002

Appx. 05885
009828

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 911 of 1017 PageID 10675
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 95 of 106

163.    Second, as this Court ruled, the Advisers Act does not prohibit assignment without consent.  It simply requires that an advisory agreement contain certain language and that any failure to obtain consent is a breach, not a nullification of the assignment.  If the CLO Objectors had done their diligence, they would have realized that the Acis Order is not unique. The SEC has expressly stated that:

> Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2).

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter (12/23/1997); *see also* Investment Management Staff Issues of Interest, http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ("In particular, the staff previously has clarified that Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.").

164.    As such, there is no applicable law prohibiting the assignment – let alone the assumption – of the Management Agreements.  "[F]or section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."  *In re ANC Rental Corp.*, 277 B.R. 226, 236 (Bankr. D. Del. 2002).

---

Noteholders or any other person or entity

(*Id.*, § 31)

DOCS_SF:104855.7 36027/002

Amer 005886
009829

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 97 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 912 of 1017 PageID 10676
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 96 of 106

### F. The Inadequate Assurance of Future Performance Objection is Meritless

165.    The CLO Objectors contend that the reorganized Debtor will have inadequate resources to perform its obligations under the Management Agreements, and so has not given adequate assurance of future performance.  The CLO Objectors also allege that there is a mismatch between the Debtor's investment timeline and the timeline expected by the investors in the CLOs.  Both of those arguments fail.  First, assurance of future performance is a protection conferred by section 365 on contracting parties, which the CLO Objectors are not.  They lack standing to invoke it when the actual contracting parties – the CLOs – are satisfied.  Second, even if they had standing, the objection is without merit.  The CLO Objectors argue (i) because the Debtor is terminating all of its employees, it will not be able to manage the CLOs post-Effective Date and (ii) the Debtor cannot hire a Sub-Servicer to manage the CLOs without violating the Management Agreements.  As an initial matter, the Debtor is not retaining a Sub-Servicer to manage the CLOs, and, although the Debtor will terminate a number of employees, it will retain sufficient and appropriate staff to manage the CLOs post-Effective Date.  However, even if the Debtor were terminating all employees, the Management Agreements *expressly* allow the Debtor to retain a Sub-Servicer to manage the CLOs.[75]

166.    Similarly, the CLO Objectors' contention that the Debtor's timeline for monetizing the assets in the CLOs is contrary to the timeline expected by the CLOs' investors also ignores the facts.  As disclosed in the CLOs' offering memoranda, the notes and preference shares issued by the CLOs have come due or will, with two exceptions, come due shortly.

---

[75] *See* Grayson Agreement, § 2(d) ("In providing services hereunder **the Servicer may employ third parties** including its Affiliates **to render advice including advice with respect to the servicing of the Collateral and assistance** provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.") (emphasis added).

DOCS_SF:104855.7 36027/002

009830

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 98 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 913 of 1017 PageID 10677
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 97 of 106

| **CLO** | **Note Maturity** | **Preference Share Redemption** |
|---|---|---|
| Aberdeen | November 2018 | November 2018 |
| Brentwood | February 2022 | February 2022 |
| Eastwood | May 2022 | May 2022 |
| Gleneagles | November 2017 | November 2017 |
| Grayson | November 2021 | November 2021 |
| Greenbriar | November 2021 | November 2021 |
| Highland Legacy Limited | June 2011 | N/A |
| Highland Loan Funding V | August 2014 | August 2014 |
| Highland Park CDO I | November 2051 | November 2051 |
| Jasper | August 2017 | August 2017 |
| Pam Capital | May 2010 | N/A |
| PamCo | August 2009 | N/A |
| Red River | July 2018 | July 2018 |
| Rockwall | August 2021 | N/A |
| Rockwall II | August 2021 | N/A |
| Southfork | February 2017 | February 2017 |
| Stratford | November 2021 | November 2021 |
| Valhalla | April 2038 | April 2038 |
| Westchester | August 2022 | August 2022 |

As such, there is no mismatch between the expectations of the CLOs' investors and the Debtor.
With the exception of the CLO Objectors who presumably want the CLOs to stay extant forever,
the expectations of the CLOs' investors are set by the offering memoranda, which clearly
disclose the expected timeline for the CLOs.

167.    Finally, the disingenuousness of the CLO Objectors' arguments on future
performance cannot be overstated.  The CLO Objectors are arguing that the Debtor must *reject*
the Management Agreements because – in their estimation – the Reorganized Debtor will not be
able to satisfactorily manage the CLOs.  The CLO Objectors' argument is therefore that it is

Appx. 05888
009831

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 99 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 914 of 1017 PageID 10678
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 98 of 106

better for the CLOs to have no manager at all. The CLO Objectors arguments are an abject

danger to the Estate and could create potential liability in the millions of dollars.

      **G.**    **The "Impermissible Partial Assignment" Objection is Meritless**

168.    The CLO Objectors contend that their rights are being modified by the Debtor's

assumption of the Management Agreements, effectively resulting in an impermissible "partial

assumption" of the contracts. Once again, they are not contracting parties with standing to object

on this basis. But even if they were, the factual predicate is missing. The Management

Agreements are being assumed *in toto*. There is no modification of any contract rights of the

CLO Objectors. And, as set forth above, the Debtor filed the Adversary Complaint in which it

sought a declaratory judgment on the CLO Objectors' rights to replace the Debtor as Portfolio

Manager under the Management Agreements. Regardless of whether the Plan is confirmed, the

CLO Objectors will have their rights under the Management Agreements as those rights are

determined by this Court in connection with the adjudication of the Adversary Complaint.

**XI.**    **STATE TAXING AUTHORITY OBJECTION**

169.    Following the filing of the State Taxing Authority Objection, the Debtor reached

out to Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County

(collectively, the "State Authorities") to see whether the State Taxing Authority Objection could

be resolved consensually. Although the Debtor and the State Taxing Authority have not yet

reached resolution, the Debtor is optimistic that the State Taxing Authority Objection will be

resolved and will continue working with the State Authorities.

009832

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 100
Case 3:25-cv-02072-S Document 15-12 Filed 06/06/25 Page 915 of 1017 PageID 10679
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 99 of 106

## XII.   IRS OBJECTION

170.   The Internal Revenue Service ("IRS") raises three objections to the Plan in the IRS Objection, two of which are not controversial, and the Debtor has amended the plan to address these points.

171.   First, in paragraph 1 of the IRS Objection, the IRS requests that the Debtor provide it with interest on account of its Allowed Claim as required under 11 U.S.C. 1129(a)(9)(C).  The Plan previously provided for payment of the full amount of the Allowed Priority Tax Claims (which would include any applicable interest on account of such Allowed Claim) on the Initial Distribution Date in order to fully satisfy these tax claims and avoid the incurrence of any unnecessary interest.  To clarify this issue and resolve this first objection, the Debtor has amended the Plan to provide for an additional treatment mechanism that provides that Allowed Claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code in the event the entirety of the IRS's Allowed Claims (inclusive of any interest pursuant to which such claims are entitled to) are not paid on the Initial Distribution Date, as provided in section II.C of the Plan.

172.   Second, in paragraph 3 of the IRS Objection, the IRS argues that its claims should not be "fixed" unless and until any required tax returns are filed.  The Debtor does not dispute this contention and believes that the proposed language that was provided to the IRS and reprinted below addresses this concern because it provides that the IRS's claims shall survive the bankruptcy as if the cases had not yet been filed, which is standard in chapter 11 confirmation orders.  Further, the Debtor believes that it has filed all applicable returns but, in an effort to resolve the IRS Objection, proposes the language below.

DOCS_SF:104855.7 36027/002

Appx. 05899
009833

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 101
of 126
Case 3:25-cv-02072-S   Document 15-12   Filed 06/06/25   Page 916 of 1017   PageID 10680
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 100 of
106

173.     In paragraph 2 of the IRS Objection, the IRS asserts that it has no record of the Debtor having filed its Form 720 with respect to its self-insured health plan for the June 30, 2014, June 30, 2016 and June 30, 2018 tax periods.  Because of this alleged non-compliance, the IRS proposes certain default provisions detailed in the chart below (the "Default Provisions"). The Debtor asserts that the Default Provisions are not warranted because that Debtor has filed all applicable tax returns.  Specifically, with respect to Form 720, on April 22, 2020, the Debtor responded to an IRS inquiry about the forms and provided an explanation about forms which were not required and provided the IRS with Form 720 for the 2015, 2016 and 2017 tax periods. Further the Default Provisions are not warranted because the IRS has adequate collection and enforcement remedies available through applicable law and should not be granted additional remedies through the Plan.  Finally, the Default Provisions are vague and contain undefined terms which will result in confusion if enforcement is ever attempted.  Certain examples of these problems are discussed below.

174.     Default Provision (1) provides certain remedies to the IRS in the event of certain failures to pay taxes or timely file returns by the Debtor, the Reorganized Debtor or any successor in interest.  The Debtor asserts that the Default Provisions are unnecessary since the Debtor has provided all applicable returns.  Default Provisions (2) and (3) are not needed and are problematic because of their vagueness.  The Debtor would agree to Default Provision (1) provided that it is clarified to state that nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that

DOCS_SF:104855.7 36027/002

Appx. 09891
009834

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 102
Case 3:25-cv-02072-S Document 15-12 Filed 06/06/25 Page 917 of 1017 PageID 10681
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 101 of
106

the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States.

175.     Default Provision (2), presumably intended to provide remedies in addition to those provided under Default Provision (1), would allow the IRS to declare the Debtor to be in **"default"** if the certain failures were not cured within fourteen (14) days and then the **"entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, an/or any successor in interest."** The term **"entire imposed liability"** is not defined in the proposed Default Provision. The ability of the IRS to unilaterally declare the Debtor to be in default and the imposition of a fourteen (14) day deadline is inappropriate and the IRS should rely on applicable law without imposing additional requirements through the confirmation process. Further, if this provision is intended to cut off the Debtor's right to challenge any obligation that is asserted against it by the IRS, it goes beyond applicable law and would deprive the Debtor of valuable rights to legitimately challenge such asserted amounts, including applicable appeal rights. Further, to the extent that the Debtor may legitimately dispute certain tax obligations, acceleration of payment of other tax obligations is not appropriate and not in accordance with applicable law.

176.     Default Provision (3) requires full payment of the entire imposed liability, together with an unpaid current liabilities within fourteen (14) days of demand and also purports to extend the collection statute expiration date again attempting to augment remedies available to the IRS. Such remedies are not warranted. Again, the IRS has adequate remedies available to it

DOCS_SF:104855.7 36027/002

Appx. 05892
009835

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 103
Case 3:25-cv-02072-S Document 15-12 Filed 06/06/25 Page 918 of 1017 PageID 10682
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 102 of 106

under applicable law and should not seek to augment them through the bankruptcy plan confirmation process.

177.    Aside from the fact that the pre-determination of the parties' applicable rights and defenses under applicable non-bankruptcy law does not belong in a chapter 11 plan or confirmation order, the IRS's language is problematic for another reason.  By grafting these requirements to a chapter 11 plan and or a court order, the IRS is creating additional remedies that it would otherwise not be entitled to under non-bankruptcy law because it could then use the Confirmation Order to hold the Debtor in contempt, and potentially foreclose any applicable defenses or other substantive rights in a later proceeding that contravene the IRS's Court-ordered default language.

178.    The Debtor has proposed (and the IRS has rejected) the standard "neutrality" language that protects the parties' respective rights and defenses and places them in the "the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated if the bankruptcy case had not been commenced" which is where they belong.

179.    The Debtor believes that the Court should not pre-adjudicate either the Debtor's or the IRS's applicable rights and remedies with respect to any unfiled tax returns or claims asserted by the IRS and these issues should be preserved for adjudication in the appropriate forums post-confirmation.  The Debtor believes that its neutrality language initially proposed is consistent with language approved by this Court and in other cases without pre-adjudicating the parties' substantive rights.  While the Debtor does not believe that any of the proposed Default Provisions are warranted because it has complied with applicable filing requirements, the Debtor

Amzx 05893
009836

would agree to include Default Provision (1) as modified below. The Debtor believes that the language proposed to the IRS for insertion to the Confirmation Order[76] preserves each party's respective rights and defenses and adequately protects the IRS form enforcing any statutory claims or rights it may possess.

| **Proposed Resolution of Objection of United States of America.** | **Default Provision - IRS.** Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): |
|---|---|
| **Default Provision - IRS.** Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): | |
| (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: | (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: |
| (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; | (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; |
| (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire | (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may |

---

[76] The Debtor discussed its concerns with IRS counsel provided it with certain neutrality language to resolve the IRS objection. The IRS responded that it could not agree to such language and would stand on its objection and its requested default language



imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed; and

(3) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service;

(4) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States; and

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2) If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, **shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest**.  Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3) **If full payment is not made within fourteen (14) days of such demand**, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code.  **The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel.  The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan**.

(4) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS.  The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and

| | after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. |
|---|---|

## **CONCLUSION**

For the reasons set forth herein and in the Memorandum, the Debtor respectfully requests that the Bankruptcy Court overrule the Objections for the reasons set forth herein and confirm the Plan as requested by the Debtor.

DOCS_SF:104855.7 36027/002

Appx 05806

009839

Dated: January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
_____
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104855.7 36027/002



Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 1 of 2

# **<u>EXHIBIT A</u>**

Appx. 05898

009841

Case 19-34054-sgj11 Doc 1807-1 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 2 of 2

# Plan Objections from Dondero-Related Entities: Organizational Charts



[1] CLO Holdco, Ltd., is a wholly-owned subsidiary of the Charitable Donor Advised Fund, L.P. (the "DAF"). HCMLP has terminated its shared services agreement with the DAF. The DAF owes HCMLP past due fees and expenses.
[2] Amounts owed as of November 30, 2020.

009842

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21   Entered 01/22/21 18:52:03   Page 1 of 14

# **EXHIBIT B**

009843

## OBJECTION SUMMARY[1]

| Objecting Party | Objection | Response |
|---|---|---|
| U.S. Trustee | The release is overbroad and releases non-debtors in violation of Pacific Lumber | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The exculpation is overbroad and releases non-debtors in violation of Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| Internal Revenue Service | Plan does not state that the Debtor will pay IRS priority tax claims on the Effective Date. | The Plan provides that Allowed Priority Claims would be paid on the Initial Distribution Date.  In response to this objection, the Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The plan does not provide for statutory interest on the IRS claims under Section 511 | Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The IRS asserts that the Debtor failed to file tax Form 720 returns related to its self-insured health plan for 2014, 2016, and 2017 and requests that the Plan be amended to include certain "Default Provisions" that, among other things, allow the IRS to declare defaults, demand that the "entire imposed liability" become due and payable, and the ability to collect unpaid liabilities upon 14 days' notice of demand for payment | The Debtor has provided all applicable tax forms and the proposed Default Provisions are unwarranted.  The Debtor would agree, however, to modified Default Provisions.<br><br>The IRS' proposed Default Provisions graft the IRS' potential non-bankruptcy and arguably additional rights and remedies into the Plan, including the IRS' unilateral rights to declare defaults, impose successor liability, and to require payments of "entire imposed liabilities" upon 14 days' notice of demand.  The Debtor does not think it is appropriate for the Plan or Confirmation Order to dictate these rights and they should be determined under applicable non bankruptcy law. |

---

[1] The following are summaries only.  Parties should read the entirety of the Debtor's Reply.

DOCS_LA:335197.6 36027/002

009844

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 112 of 126

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 3 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County | Plan does not appropriately apply for treatment of postpetition and effective date interest on tax claims, Plan does not provide for continued security interest and Plan does not provide that failure to pay tax claims is a default under the plan | The Debtor is currently negotiating language with these taxing authorities to resolve the issues raised in their objection through insertion of language in the Confirmation Order in order to consensually resolve this objection. |
| Jack Yang and Brad Borud (joined by Deadman, Travers, Kauffman [D.I. 1674; 1679]) | Subordinated Claims are defined overly broad as not just claims subordinated under § 510 but also claims arising from Class A/B/C Limited Partnership interests in a way that impermissibly broadens § 510(b) | The Plan has been amended to clarify that it does not provide for categorical subordination of claims relating to partnership interests to address this objection |
| Patrick Daugherty | The Disputed Claims Reserve allows the Debtor to estimate claims for distribution, which provides for impermissible disparate treatment under § 1123(a)(4) | The Plan does not provide for disparate treatment of claims.  The Plan provides for a mechanism for the Debtor or Mr. Daugherty (or any other creditor) to file a motion to estimate any Disputed Claim for purposes of establishing the amount of the Disputed Claims Reserve pending the allowance or disallowance of his claim.  Neither Daugherty or any other creditor is entitled to a reserve for the full amount of a disputed claim.  This procedure does not constitute disparate treatment of claims under section 1123(a)(4) |
| Dugaboy Investment Trust and Get Good Investment Trust | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan is not complete as it doesn't list final documents governing the claimant trust/litigation trust/reorg debtor, retained causes of action, executory contracts | Dugaboy's reference to documents still under negotiation with the Committee was a vestige from a prior draft.  Three Plan Supplements have been filed that contain those documents.  An additional Plan Supplement is being filed concurrently herewith. |
| | Plan violates 1129(a)(7) because it doesn't provide the value that would be received in a chapter 7 liquidation because:  (i) Reorg Debtor has no affirmative obligation to report to holders of beneficial interests in the Claimant Trust, (ii) Claimant Trustee is only liable for fraud, willful misconduct, or gross negligence and not breach of fiduciary duty; and (iii) a chapter 7 trustee would need to get court authority to sell assets and no such requirement exists for Claimant Trustee

[ | The Liquidation Analysis provides that creditors will receive distributions under the Plan that are not less than the value they would receive under a hypothetical distribution under chapter 7.  This objection does not contest the conclusions set forth in the Liquidation Analysis.

The Plan, consistent with other plans including ones confirmed in this court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans.  Moreover, a chapter 7 trustee would enjoy qualified immunity for its actions. |

009845

| Objecting Party | Objection | Response |
|---|---|---|
| | Exculpation provisions are overbroad as (i) they do not relate to a specific time period (just apply from Petition Date through implementation), especially when read in connection with the exculpation provision in the Claimant Trust Agreement, (ii) cover non-Debtors, and (iii) violates Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The CTA includes standard language limiting liability and is not an improper exculpation. |
| | Release provision (i) is overbroad and releases claims not related to the BK; (ii) waives future claims of the Claimant Trust | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and the LST only as successors to the Debtor, not any claims the CT or LST might subsequently have of their own.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The injunction provisions in Article IX.F are overbroad and arguably violates Pacific Lumber as an improper release and In re Zale and Thru, which prevents a non-debtor injunction if it effectively discharges a no debtor | The Injunction Provisions have been modified to address these concerns.  The Injunction Provision, as modified, merely implements the Plan's discharge, release, and Exculpation Provisions by enjoining the Enjoined Parties from commencing or maintaining any actions to interfere with the implementation or consummation of the Plan.  Implementation and consummation are words used in the Code and have meanings known by practitioners and the Court.  The injunction is only applicable to the Debtor and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust – none of whom are non-debtor third parties as the debtor has eliminated the Independent Directors from these provisions. |
| | The release provided to released parties does not meet the standards for a release as there is no meaningful contribution to the BK and is not necessary to protect non-debtor entities that are essentially the debtor | Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The consideration provided by the Released Parties will be presented.  The Released Parties are only being released by the Debtor and its successors. |

009846

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 114 of 126

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 5 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | The "channeling injunction" and retention of jurisdiction is improper because it expands the BK court's jurisdiction to actions not arising under, related to, or arising in the BK.  This is especially so since there is no post-effective date Reorganized Debtor | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the Court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. |
| | The injunction prevents parties from enforcing the rights created by the plan post-effective date | Art. IX.F starts with "Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . . "  It does not prevent enforcement of rights created under the Plan |
| | The "channeling injunction" is not a proper channeling injunction under Section 524(j) and even if it were, 524(j) only applies to debtors that are eligible for a discharge under 1141 and HCMLP is not eligible for a discharge because it is a liquidation plan. | The Gatekeeper Provision has nothing to do with Section 524(j).  Although the Debtor will be engaging in a long term liquidating given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| James Dondero | The exculpation provision in IX.D is overbroad as it relates to non-debtors under Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | The "channeling injunction" in Article IX.F includes post-confirmation conduct and non-debtors and is effectively a third party release prohibited under Dropbox. | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the court will initially, only be determining if a claim is colorable.  Furthermore, as a liquidating plan, the Court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan.  Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed |

009847

| Objecting Party | Objection | Response |
|---|---|---|
| | | and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation.  There is no "release" in the Gatekeeper Provision as it does not prevent claims from being brought – it merely requires that the Bankruptcy Court determine the claim is colorable before it can be brought. |
| | The "channeling injunction" limits jurisdiction to the Bankruptcy Court and ignores other courts with exclusive jurisdiction and specialized jurisdiction | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. |
| | The "channeling injunction" is impermissibly vague under FRBP 3016(c) | The Gatekeeper Provision is not vague and, to the extent FRBP 3016(c) is applicable, expressly complies with the rule in that the Gatekeeper Provision describes in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identifies the entities that would be subject to the injunction |
| | The Plan does not provide appropriate mechanisms for oversight of post-confirmation sales and would allow impermissible sales similar to that which occurred during the BK | This is the same objection filed by other Dondero Entities to prevent the post-confirmation monetization of assets.  The Plan, consistent with other plans including ones confirmed in this Court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. |
| | The jurisdictional provisions are overbroad and would require all claims to be heard in the BK without regard to whether they arise in connection with implementation of the plan or otherwise | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable.  The Bankruptcy Court has jurisdiction to determine if a claim is colorable |
| | The elimination of vacant classes on the effective date would impermissibly limited later re-allocation of claims | The elimination of the only vacant class (Class 5 (Retained Employees)) is for voting tabulation purposes only.  This provision permissibly provides for the treatment of any claims that may arise or become Allowed as a Class 5 Claim post-confirmation. |
| | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| NexPoint Real Estate Partners LLC, f/k/a HCRE Partners, LLC | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |

009848

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 116 of 126

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 7 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The "channeling injunction" improperly insulates non-debtors under s. 524(e). | The Gatekeeper Provisions do not implicate section 524(e).  There is no insulation of any non-debtor.  The Gatekeeper Provision simply requires the Bankruptcy Court to determine if a claim is colorable before it can be brought. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | Period of time covered by the release and exculpation provisions impermissibly extends post-effective date.  Cf. Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexPoint Advisors, Highland Capital Management Fund Advisors, and related funds<br><br>(joined by CLO Holdco)<br><br>(joined by NexPoint RE Entities [D.I. 1677] | Investment Advisers Act is "applicable law" that prohibits assumption/assignment of the Portfolio Management Agreements ("PMAs") under 365(c) | As this Court has ruled in Acis, and as SEC No Action Letters advise, the Investment Advisers Act does not prohibit assignment.  The "actual test" applies and thus even if the PMAs were nonassignable, they would still be assumable. |
| | PMAs are "personal services contracts" and cannot be assigned under 365(c) | As this Court ruled in Acis, the PMAs are not nonassignable personal services contracts.  Further, the counterparties have consented, and under the "actual test" the PMAs would be assumable even if nonassignable. |

009849

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 117 of 126

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 8 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | Fifth Circuit applies the hypothetical test under Section 365(c), not the actual test | Fifth Circuit has applied the actual test under §365(e) and lower courts within the Fifth Circuit have applied the actual test to §365(c). |
| | Even if "actual" test applies, the Reorg Debtor is not the Debtor because of slimmed down staff and use of subservicers | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | There is no consent to assumption under 365(c) | CLO issuers are the counterparties and they consent.  The objectors have no contract right to object to assumption. |
| | The objectors have standing because they have claims against the estate or will have large rejection claims under shared services agreements. | The Funds, Advisors and CLO Holdco are not creditors and will not be creditors.  They agreed to expungement of their claims or reduction to zero.  There will be no rejection damages because the contracts are freely terminable upon notice and are being terminated, not rejected.  Even if objectors were creditors, that would give them standing only as to whether assumption benefits the estate, not their particular interests. |
| | The objectors have standing because the plan violates 1129 because it provides for assumption of contracts in violation of law. | The objectors have no standing as creditors, they have no standing to object to assumption of contracts to which they are not parties and to which the counterparties have consented, and assumption of the PMAs does not violate any law. |
| | The objectors have standing because the plan seeks to limit their right to remove the manager | The Plan does not limit their removal rights. |
| | Debtor should take direction from the majority of the preference shareholders in the CLOs | The objectors have no contractual right to control the management of the CLOs. |
| | The injunction and release provisions are overbroad because they do not appropriately define their scope and prevent the movants from suing for future malfeasance | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of  the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims.  The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The injunction prevents the objectors and the CLOs from seeking relief against the | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan |

DOCS_LA:335197.6 36027/002    7

009850

| Objecting Party | Objection | Response |
|---|---|---|
| | debtor/reorg debtor from any present or future actionable wrongs under the servicing agreements and advisers act | and attempts to collect the claims and interests dealt with by the Plan. |
| | Injunction prevents set off or other damages under the servicing agreements and to seek legal redress | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | "Channeling Injunction" is defective with respect to post-confirmation actions and is overly broad | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable.  The Bankruptcy Court has jurisdiction to determine if a claim is colorable. |
| | Plan does not disclose who will be operating the reorganized debtor and claimant trust or their comp as required under s 1123(a)(7) or insider compensation under 1129(a)(5) | The Plan Supplement discloses the identity of the Claimant Trustee, Litigation Trustee and Oversight Committee members. The Debtor discloses in the Confirmation Brief the compensation of insiders pursuant 1129(a)(5) under the Plan who will serve post-confirmation in their Confirmation Brief |
| | The plan is not feasible because the treatment of the CLO management agreements is illegal and violates s. 365 | The Plan does not impact any party's rights under the CLO management agreements, and applicable law does not prohibit the Debtor's assumption of the CLO management agreements. |
| | The plan does not provide assurance of future performance with respect to the assumption of the CLO management agreement as required by 365(b) | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | Release and injunction provisions are overbroad under Pacific Lumber because they release third parties | Neither the Release nor the Injunction Provisions release non-debtor third parties. |
| | Exculpation provisions are overbroad under Thru | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |

| Objecting Party | Objection | Response |
|---|---|---|
| | The plan divests movants from their set off rights | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The plan provides that contracts can be assumed until the Effective Date in violation of 365(d)(2) | The Plan has been amended to address this objection. |
| | Debtor is not entitled to a discharge under 1141 because it's a liquidating plan | Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| | The plan violates the absolute priority rule because equity gets to keep assets while senior creditors may not be paid in full | This assertion is false. Equity Interests will not receive any property on account of the their interests pursuant to the Plan unless and until the claims of creditors are full paid, inclusive of interests, as provided in the Plan. |
| CLO Holdco Ltd. | CLO Holdco has standing to object because of its interests in the CLOs | As set forth above, CLO Holdco has no standing to assert the rights of the contracting parties to the PMAs. It is also not a creditor, having reduced its claim to zero and having no rejection claim. Even if it was a creditor it would not have standing to object to assumption on the basis of rights held by contracting parties. |
| | Joined NPA/HCMFA objection | NPA/HCMFA objection responses are set forth above. |
| | Plan provides for impermissible "partial assumption" because it cherry picks provisions of the CLO management agreements that are going to be assumed by preventing removal of the CLO manager by the preference shares | For the reasons set forth above, CLO Holdco has no standing to assert objections to assumption held by the contracting parties, who consent to assumption. Further, the Plan does not deprive preference shareholders of removal rights. |
| | Injunction and exculpation prohibits creditors from interfering with implementation or consummation of the plan and would prevent the movants from removing the Debtor as the CLO manager | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The plan impermissibly modifies the movants' rights under the CLO management agreements without their consent | The Plan does not modify CLO Holdco's rights under the PMAs |
| | Exculpation and indemnification provisions are third party releases in violation of applicable law under Pacific Lumber | The Plan does not contain an" indemnification provision." The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity |

009852

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 120 of 126

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 11 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | | of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | The Debtor amended Plan section III.J of the Plan to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | |
| | The exculpation and release provisions violate Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The Release is only a release of claims owned by the Debtor and its estate and does not implicate Pacific Lumber which had nothing to do with debtor released which are permitted under section 1123(b)(3). |
| Senior Employees | The Plan violates § 1123(a)(4) because it treats the Senior Employees differently than similarly situated employees by requiring the Senior Employees to sign a Senior Employee Stipulation and reduce a portion of their claim to obtain a release. | The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The potential Debtor release of its own claims against employees or ex-employees under the Plan does not constitute "treatment" of Class 7 or Class 8 claims. |

009853

| Objecting Party | Objection | Response |
|---|---|---|
| | The Senior Employee Stipulation was not approved by the Senior Employees and contains material problems. | Whether or not the Senior Employees voluntary elect to sign the Senior Employee Stipulation does not constitute a valid basis to object to Plan confirmation.  The voluntary decision to execute the Senior Employee Stipulation was at the option of the employee.  Moreover, the Debtor has settled this objection with respect to Mr. Surgent and Mr. Waterhouse. |
| | The Debtor has improperly prevented the Senior Employees from making the Convenience Class Election because, as reflected in the chart prepared by the Debtor, the Senior Employees have liquidated claims which are not in dispute. | Under applicable bankruptcy law, the Plan and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.<br><br>Each Senior Employee filed a single proof of claim and the Senior Employees have not cited any authority supporting the proposition that a claimant may split claims listed in a single proof of claim; to the contrary, courts have stated that claim splitting is impermissible when covered by a single proof of claim.  Further, the Plan and Disclosure Statement Order prohibit claim splitting for voting purposes.  Finally, as explicitly set forth on the ballots approved by the Disclosure Statement Order, even if a Senior Employee could split his claims in order to elect Convenience Class treatment, the Convenience Class Election only impacts *treatment*, and explicitly does not impact voting. |
| | The Plan provides that a Class 8 Creditor can make the Convenience Class Election for a liquidated claim.  Since a portion of each Senior Employee's claim is liquidated, the Senior Employees have a right to make the Convenience Class Election under the Plan.<br><br>The Debtor has contradicted the Plan in how in its conversations with the Senior Employees.  Each Senior Employee received two ballots (one Class 7 and one Class 8) and this confusion justifies the Senior Employees review of the Plan.<br><br>The fact that the Plan splits employee claims into PTO claims and other claims is evidence that the Plan allows Claim splitting.   The | As set forth directly above, each Senior Employee would have to split his claim in order to also retain the remainder of his Class 8 claim.  This is impermissible under applicable case law and the Plan.<br><br>The Debtor's statements have been consistent with the Plan.  In any event, the Plan governs.  The Senior Employee's receipt of two ballots was an administrative error and cannot override the express terms of the Plan and Disclosure Statement Order.<br><br>As to the PTO Claims, those were separately classified *by the Plan*.  The Senior Employees seek to split claims *within the same class*.  It is splitting claims within the same class that is prohibited by applicable case law and the Plan and Disclosure Statement Order. |

009854

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 122 of 126

Case 19-34054-sgj11 Doc 1807-2 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 13 of 14

| Objecting Party | Objection | Response |
|---|---|---|
| | exhibit is a representation that the Senior Employee claims have the right to a split claim because it discusses a Convenience Class claim. | |
| | The Plan identifies no basis for disparate and unfair treatment of the Senior Employees. | Debtors are not required to grant releases to anyone nor are their required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees. |
| | The Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the Claimant Trustee the unfettered power to "reclassify" any claim as a Subordinated Claim. | Section III.J of the Plan has been amended to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan allows the Debtor to make changes to the Plan without Court approval, including changes to the plan supplement documents. | To the contrary, Article XII of the Plan explicitly requires that modifications to the Plan be in compliance with section 1127. |

009855

13

009856

# **EXHIBIT C**

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 125
Case 3:25-cv-02072-S Document 15-12 Filed 06/06/25 Page 940 of 1017 PageID 10704
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 2 of 3

On the Effective Date, the Debtor will assume the agreements set forth on Appendix [_] hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[1] a cumulative amount of $525,000 (the "Cure Amount") as follows:

- $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

- $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and this Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

Effective as of the Effective Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the

---

[1] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.



Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 126
Case 3:25-cv-02072-S Document 15-12 Filed 06/06/25 Page 941 of 1017 PageID 10705
Case 19-34054-sgj11 Doc 1807-3 Filed 01/22/21 Entered 01/22/21 18:52:03 Page 3 of 3

"Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

Effective as of the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe, (xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "Issuer Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.

Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs [__] hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

009859

Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 942 of 1017 PageID 10706

**EXHIBIT 37**

009860

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 943 of 1017    PageID 10707
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 23

Docket #2308  Date Filed: 05/14/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Elissa A. Wagner (CA Bar No. 213589) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) **Re: Docket Nos. 2199, 2268, 2293,** |
| | ) **2295** |

### DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH UBS SECURITIES AND UBS AG LONDON BRANCH AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210514000000000006

009861

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 944 of 1017 PageID 10708
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 2 of 23

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") (a) in response to (i) the *Limited Preliminary Objection to the Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "Initial Dugaboy Objection"), (ii) the *Supplemental Opposition to Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "Supplemental Dugaboy Objection," and together with the Initial Dugaboy Objection, the "Dugaboy Objection"), and (iii) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "Dondero Objection," and together with the Dugaboy Objection, the "Objections") and (b) in support of its *Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "Motion").[2] In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.  As set forth in the Motion, the Settlement Agreement provides UBS with a Class 8 (General Unsecured Claim) of $65 million and a Class 9 (Subordinated Claim) of $60 million. The Settlement Agreement also provides that Multi-Strat will pay $18.5 million to UBS in satisfaction of UBS's claims against Multi-Strat. This is an extraordinary achievement that is supported by the Debtor's major creditors. It resolves over a decade of highly acrimonious litigation, including extensive litigation in this Court, and UBS's $1 billion plus claim against the Debtor as well as its claim against Multi-Strat. The settlement paves the way for the Debtor to

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

009862

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 945 of 1017 PageID 10709
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 23

begin making long-overdue distributions to creditors following the effective date of the Plan. It is opposed by no one except Mr. Dondero and the "family trust" – The Dugaboy Investment Trust ("Dugaboy") – that he controls (together, the "Dondero Objectors").[3]

2.       And, while the Debtor believed, and continues to believe, that it has defenses to UBS's claims, those defenses would be (i) subject to substantial factual disputes, (ii) require the cooperation of now-adverse parties whose credibility has already been questioned, and (iii) require expensive, time-consuming litigation that would likely be resolved only after a lengthy trial (and likely rounds of appeals) all while the Debtor (or its successor) assumes the risk that the defenses might fail.

3.       The Dondero Objectors do not (and cannot) dispute that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the principals and their counsel. The Debtor believes that the proposed settlement is fair and reasonable, results from the valid and proper exercise of its business judgment, and represents the successful resolution of an incredibly complicated and substantial claim.

4.       The facts underlying the Settlement Agreement are well known to this Court, but some bear repeating:

- In late 2008, CDO Fund and SOHC breached certain warehouse agreements;

- After years of litigation, in November 2019, UBS secured a judgment in the State Court against CDO Fund and SOHC on account of that breach of over $1 billion (inclusive of interest);

- As part of this litigation, UBS alleged that certain entities managed and/or controlled by the Debtor, including Multi-Strat, engaged in a series of orchestrated

---

[3] *See Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") ¶ 19. As this Court has previously found, and as set forth below, Mr. Dondero and Dugaboy have only the most tenuous economic interest in and connection to the Debtor's estate. *Id.* ¶¶ 17-18.

Appx. 05929
009863

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 946 of 1017 PageID 10710
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 23

fraudulent conveyances with the goal of moving assets away from the Funds and
outside the reach of UBS;

- UBS also alleged that the Debtor (then under Mr. Dondero's control) breached the
implied covenant of good faith and fair dealing by interfering with CDO Fund and
SOHC's payment of its obligations to UBS under the warehouse agreement;

- In December 2020, this Court entered an order estimating UBS's claim against the
Debtor at $94,761,076 (the "Estimated Claim"), which included an estimation that
UBS had a 90% chance of recovering $25,782,988 (plus interest) from Multi-Strat
(resulting in a risk-adjusted claim against Multi-Strat of approximately $23.2
million) on account of UBS's fraudulent conveyance claim against it;

- After reaching an agreement in principle with UBS, the Debtor uncovered a secret
scheme by the Debtor's former management (a) to transfer more than $300 million
in face amount of securities and cash from the Funds to Sentinel – a Cayman-based
reinsurance company owned and controlled by Mr. Dondero and Scott Ellington –
and (b) to hide that transfer from the Independent Directors, UBS, and this Court;
and

- But for that transfer, CDO Fund and SOHC could have used the value of such
fraudulently transferred securities and cash to satisfy UBS's judgment.

Despite the facts set forth above, Mr. Dondero – directly and through Dugaboy – has the audacity

to file the Objections and object to the UBS settlement.

5.     Dugaboy's objection also questions the Debtor's corporate authority and business

judgment and accuses the Debtor (now under the control of the Independent Directors) of having

breached its duties and obligations by settling with UBS.  As set forth below, there is absolutely

no basis for this contention.  Dugaboy is a limited partner in Multi-Strat and knows (or should

know) that Multi-Strat's governing documents provide the Debtor, as investment manager, and

indirect owner of Multi-Strat's general partner with complete authority to manage Multi-Strat's

property and to "***settle or compromise suits and administrative proceedings and other similar***

***matters***."

6.     Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy –

and to disenfranchise this Court by questioning its authority should be rebuffed, and the objections

Appx. 09521
009864

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 947 of 1017 PageID 10711
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 23

overruled.  The Debtor asks this Court to (once again) see through the pretense of the Dondero-controlled entities' objections to the USB settlement and approve it as a fair settlement and valid exercise of the Debtor's business judgment.

## **ADDITIONAL BACKGROUND ON MULTI-STRAT**

7.     Multi-Strat is a pooled investment fund that is structured as a "mini master."[4]  A "mini master" consists of an offshore feeder fund and onshore master fund.  Generally speaking, foreign investors and tax-exempt entities invest in the foreign feeder for tax reasons, and the foreign feeder fund in turn invests substantially all of its assets in the onshore master fund as a limited partner together with the other direct limited partners in the master fund.  The master fund is the dominant entity within the "mini master" structure (and the entity most commonly referenced in the structure) as it holds and invests all the assets, including those of the feeder fund.  Here, Multi-Strat's "master fund" is Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "Master Fund"),[5] and its offshore feeder fund is Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "Feeder Fund").  The Master Fund, the Feeder Fund, their direct and indirect subsidiaries, and their respective general partners are referred to in the Settlement Agreement, collectively, as "Multi-Strat."[6]  All of Multi-Strat's investment activity is conducted through the Master Fund and all of its investable assets are held by the Master Fund (either directly or indirectly).  Investors in the Master Fund and in the Feeder Fund generally have the same rights and liquidity.  *See* Feeder PPM at 5 ("Aside from the differences described

---

[4] Additional background on Multi-Strat is included in the *Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.*, dated November 2014 (the "Master PPM") and the *Confidential Private Offering Memorandum of Highland Multi Strategy Credit Fund, Ltd.*, dated November 2014 (the "Feeder PPM" and together with the Master PPM, the "PPMs").  Copies of the Master PPM and Feeder PPM are attached as Exhibits 1 and 2, respectively.

[5] Multi-Strat was originally called Highland Credit Opportunities CDO, L.P. but changed its name in 2014.

[6] Multi-Strat has a number of offshore and onshore wholly-owned direct and indirect subsidiaries.  An organizational chart showing Multi-Strat's corporate structure is attached hereto as Exhibit 3.

DOCS_NY:43138.5 36027/002

Amrx 05922
009865

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 948 of 1017 PageID 10712
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 23

in this Memorandum, an investment in the [Feeder] Fund will have substantially similar terms and risks to an investment in the [Master Fund], as described in the [Master PPM].")

8. Multi-Strat is managed by its investment manager – the Debtor – and its general partner – Highland Multi Strategy Credit Fund GP, L.P. (the "MSCF GP"). The MSCF GP is 100% owned – indirectly – by the Debtor, and the sole officer of MSCF GP is James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer. The Debtor's rights, duties, and obligations as investment manager are set forth in the *Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P.*, dated November 1, 2013 (the "IMA"), the *Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P.*, dated November 1, 2014 (the "LPA"), the PPMs, and the *Amended and Restated Memorandum and Articles of Association of Highland Multi Strategy Credit Fund, Ltd.*, as adopted on 1 November 2014 (the "Articles" and together with the IMA, the LPA, and the PPMs, the "Governing Documents").[7] MSCF GP's rights, duties, and obligations are set forth in the LPA, the Master PPM, and general Delaware partnership law.

9. Multi-Strat's investors include both the limited partners in the Master Fund and the shareholders of the Feeder Fund (which itself is a limited partner of the Master Fund). Nevertheless, for convenience of reference, the ultimate investors, whether direct or through the Feeder Fund, are commonly referred to as Multi-Strat's limited partners. Multi-Strat's current limited partners are:

---

[7] Copies of the IMA, LPA, and Articles are attached hereto as Exhibits 4, 5, and 6, respectively. These documents were created at Mr. Dondero's direction years before the Petition Date, severely undermining his challenge to the Debtor's authority and again calling into substantial question his credibility and motivations.

Appx. 05923
009866

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 949 of 1017 PageID 10713
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 23

| Limited Partner | Ownership %[8] |
|---|---|
| Debtor | 58.70% |
| CLO Holdco, Ltd. ("CLOH") | 4.06% |
| Dugaboy | 1.71% |
| Highland Capital Management Services, Inc. ("HCMS") | 35.10% |
| Mark Okada | 0.43% |

As this Court knows, CLOH, Dugaboy, and HCMS are all directly owned and/or controlled by Mr. Dondero. Mr. Okada, in turn, is Mr. Dondero's long-time business partner. As such, besides the Debtor, the *only* limited partners in Multi-Strat are (directly or indirectly) owned and/or controlled by Mr. Dondero. There are no third-party limited partners.

10.     In addition to the current limited partners, there are a number of former "redeemed" limited partners of Multi-Strat, which are referred to as the "redeemers." Under the terms of the LPA and Articles, limited partners are allowed to redeem their limited partnership interests under certain circumstances. Once redeemed, a limited partnership interest is extinguished and the balance of the amount owed to the redeemer is "crystallized," *i.e.*, reduced to a fixed dollar amount (based on the value of Multi-Strat's assets at the time of redemption) and is treated similar to a debt obligation of the fund, *i.e.*, the redeemer no longer participates in the appreciation of the fund's assets and only has a claim for its set dollar amount. Currently, Multi-Strat owes its redeemers approximately $90 million on account of their unpaid redemptions.

11.     Prior to 2021, the Debtor believed – because that is what it was told by certain of the Debtor's then-employees – that *all* the redeemers were third party investors unaffiliated with the Debtor. As the Debtor recently discovered, however, that is not true. In fact, the largest redeemer is Sentinel – the entity owned by Mr. Dondero and Mr. Ellington – which is purportedly

---

[8] Ownership is provided on a consolidated basis without regard to whether a party is invested in the Master Fund or the Feeder Fund. The Debtor reserves the right to challenge the purported Dondero and/or Okada controlled limited partnership interests.

DOCS_NY:43138.5 36027/002

Appx. 05924
009867

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 950 of 1017 PageID 10714
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 23

owed approximately $33 million, or one-third of the total redeemed interests. The majority of Sentinel's interest in Multi-Strat was originally owned by CDO Fund but was fraudulently taken from CDO Fund and moved to Sentinel in August 2017. Sentinel purportedly redeemed its Multi-Strat interest in November 2019 as the State Court was entering its judgment against the Funds. Sentinel's redeemed interest is referred to as the "MSCF Interests" in the Settlement Agreement. On information and belief, the other redeemers are unaffiliated third party investors.

<div align="center">

**REPLY**

</div>

**A.     Standing**

12.     In the Dondero Objection, Mr. Dondero goes to great lengths to prove that he has standing to object to the UBS settlement asserting that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. Dondero Obj. ¶¶4-13. This Court has already made substantial findings of fact concerning Mr. Dondero and Dugaboy's interests in the estate, finding that "the remoteness of their interests is noteworthy." Confirmation Order ¶¶ 17-18. In light of Mr. Dondero's misleading statements, the Debtor must again address Mr. Dondero and Dugaboy's purported "standing."[9]

13.     **James Dondero.** On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[10] Over a year later, Mr.

---

[9] The following analysis should look familiar as it is nearly verbatim the analysis included in *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "HarbourVest Motion"). Mr. Dondero – directly and through his proxies – was also the only person to object to the Debtor's settlement with HarbourVest (as defined in the HarbourVest Motion). Dugaboy and Mr. Dondero's other family trust – The Get Good Trust – are currently appealing the settlement with HarbourVest. Two of Mr. Dondero's other entities – The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. – recently filed a complaint in the District Court for the Northern District of Texas, which seeks to have the District Court undertake a reconsideration or *de facto* appeal of the settlement with HarbourVest. *See Original Complaint*, Case No. 21-00842-B, Docket No. 1 (N.D. Tex. Apr. 12, 2001).

[10] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice. *See* Docket No. 1460.

Appx. 05925
009868

Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[11]

Mr. Dondero's claim as an "indirect equity security holder" is also a stretch. Mr. Dondero holds

no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc.

("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited

partnership interests in the Debtor through its ownership of Class A limited partnership interests.

The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class

B and Class C limited partnership interests. The Class A interests are also junior to all other claims

filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior

to any claims against Strand itself, including any indemnification claims asserted against Strand

by the Independent Directors or their agents. Consequently, before Mr. Dondero can recover on

his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B

and Class C creditors must be satisfied, and all claims against Strand must be satisfied. And, if all

of that occurred, Mr. Dondero would recover 0.25% of the net distributions from the estate.

      14.    **Dugaboy.** Dugaboy is a sham Dondero "trust" with only the most attenuated

standing. Dugaboy filed three proofs of claim (Claim Nos. 113; 131; 177). In two of these claims,

Dugaboy argues that (a) the Debtor is liable to Dugaboy for its postpetition mismanagement of

Multi-Strat, and (b) this Court should pierce the corporate veil and allow Dugaboy to sue the

Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a

Debtor-managed investment vehicle. These claims are frivolous, and the Debtor has objected to

them. [Docket No. 906]. In its third claim, Dugaboy asserts a claim against the Debtor arising

from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the

total limited partnership interests in the Debtor). Like Mr. Dondero, Dugaboy can recover on its

---

[11] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

Appx. 05926

009869

Case 19-34054-sgj11 Doc 3445-37   Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 952 of 1017    PageID 10716
Case 19-34054-sgj11 Doc 2308   Filed 05/14/21   Entered 05/14/21 16:12:52   Page 10 of 23

equity interest only if the Debtor is solvent and all priority distributions to Class B and Class C creditors and all claims against Strand are satisfied. Then, and only then, would Dugaboy recover 0.1866% of the net distributions from the estate. Dugaboy also claims to own 1.71% of the limited partnership interests in Multi-Strat (as discussed above).

15. Consequently, the Dondero Objectors' standing to object to the UBS settlement is extremely attenuated and their chances of recovery in this case are, at best, theoretical and speculative thereby calling into question the Dondero Objectors' motivation. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing). Mr. Dondero and Dugaboy's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

## B.    The Objections Fail on the Merits

16. As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

009870

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 953 of 1017 PageID 10717
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 11 of 23

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted); *see also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

## 1. <u>The Dugaboy Objection Is Without Merit</u>

17. In its Objection, Dugaboy presses various arguments and makes various factual assertions but neglects to disclose its affiliation with Mr. Dondero and its interest in Multi-Strat. Those neglected facts undermine the majority of the Dugaboy Objection.

### a. **Dugaboy is a Limited Partner in Multi-Strat**

18. Pursuant to a subscription agreement (the "<u>Subscription</u>"), Dugaboy subscribed for shares in the Feeder Fund by investing $180,000. A copy of the Subscription is attached as Exhibit 7. Because Dugaboy is a "revocable grantor trust," the Subscription required that it be signed by Dugaboy's beneficiary as if the beneficiary was the one subscribing to Multi Strat in his individual capacity. Mr. Dondero is Dugaboy's beneficiary and therefore signed the Subscription on behalf of Dugaboy. By signing the Subscription, Mr. Dondero represented that he had received a copy of the Governing Documents on behalf of Dugaboy. Consequently, Dugaboy has no excuse not to know how Multi-Strat is governed.

19. As Mr. Dondero knows and intended, Multi-Strat's Governing Documents vest in the Debtor (as investment manager) and MSCF GP (as general partner) the exclusive authority (and obligation) to manage and bind Multi-Strat, including the authority to settle claims against

Appx. 05928
009871

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 13 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 954 of 1017   PageID 10718
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 12 of 23

Multi-Strat.  For example, in the section titled "Risk Factors and Potential Conflicts of Interest," the Master PPM states that "[s]ubstantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager.  Limited Partners have no right or power to take part in the management of the Fund."  Master PPM at 25; *see also* Feeder PPM at 6 ("[T]he [Feeder] Fund's management, as well as investment decisions at the [Master Fund] level, are effectively controlled by the Investment Manager or its affiliates.").

20.     Further, among other things:

- Section 2(a) of the IMA requires that the Feeder Fund invest all of its assets in the Master Fund to be managed by the Debtor as investment manager.[12]  IMA, § 2(a)

- Section 2(c)(i) of the IMA grants the Debtor, as investment manager, full discretion and authority on behalf of both the Master Fund and the Feeder Fund to "exercise all rights, powers, privileges and other incidents of ownership or possession" with respect to Multi-Strat's investments and "other property and funds held or owned by the Master Fund."  *Id.* § 2(c).

- Section 2(c)(i) of the IMA also expressly and explicitly grants the Debtor, as investment manager, the authority to "***institute and settle or compromise suits and administrative proceedings and other similar matters***."  *Id.* (emphasis added).

- Under Section 4.1 of the LPA, the MSCF GP:

  o     has "complete and exclusive power and responsibility, to the fullest extent permitted" by Delaware law to manage and administer the affairs of the Partnership, and "to do all things that the General Partner considers necessary or desirable to carry out its duties" under the LPA "whether or not such action or authority is expressly provided for in [the LPA]."

  o     has full power and authority "to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1."

  o     may delegate "to any other Person, including the Investment Manager," any power and authority vested in the MSCF GP pursuant to the LPA.

---

[12] IMA, § 2(a) ("All of the investable assets of the [Feeder] Fund must be invested in, and the investment program of the [Feeder] Fund is to be conducted by the Investment Manager through the [Master] Fund.  The Investment Manager will exercise no discretion with respect to the investment of the assets of the [Feeder] Fund and the investment activities of the Investment Manager will be conducted at the [Master] Fund level as the investment manager to the [Master] Fund.").

DOCS_NY:43138.5 36027/002

009872

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 955 of 1017 PageID 10719
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 13 of 23

The LPA also provides that Multi-Strat's limited partners, such as Dugaboy (and the Feeder Fund), have **no** right to manage, control, or operate Multi-Strat or to act on its behalf until expressly stated otherwise. *See* LPA, § 4.3 ("The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.").

### b. UBS Has Direct Claims Against Multi-Strat

21.     Dugaboy alleges that the Debtor used Multi-Strat to decrease the Debtor's liability to UBS. This ignores (a) UBS's substantial, direct claims against Multi-Strat arising from an alleged fraudulent conveyance of assets to Multi-Strat – a fraudulent conveyance that was done to frustrate UBS's ability to recover on its claims against the Funds – and (b) the extensive arguments and judicial findings concerning UBS's direct claims against Multi-Strat in connection with the 3018 Motion.[13]

22.     The assets conveyed to Multi-Strat did not belong to the Debtor, and they were not conveyed to Multi-Strat by the Debtor. These claims have not yet been litigated and would have been addressed in "Phase II" of the UBS litigation if the Debtor had not filed bankruptcy. Consequently, UBS has a claim against the Debtor, under various theories, for $1 billion **and** a separate and distinct claim against Multi-Strat for approximately $26 million (plus interest). Notably, Dugaboy admits that UBS has separate and distinct claims against Multi-Strat. Dugaboy Obj. ¶12.

---

[13] Dugaboy attempts to paint this fraudulent transfer as somehow benefiting the Debtor. "What the Debtor received for the transfer of its interest in Multi-Strat is unknown, however, and in assessing the value the Debtor received for its interest in Multi-Strat it is safe to assume that in some measure the Debtor received the benefit of the so-called fraudulently transferred assets." Dugaboy Obj. ¶9. This misrepresents the facts. The Debtor did not transfer its interests in Multi-Strat (although it did sell a small amount of its interest to Sentinel prior to the 2017 fraudulent conveyance).

Amended 05939
009873

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 956 of 1017 PageID 10720
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 14 of 23

23. Indeed, this Court previously estimated the value of UBS's claim against Multi-Strat at approximately $23 million, excluding interest. As such, Multi-Strat would be required to either settle or litigate to conclusion UBS's claims against it – regardless of whether the Debtor settled UBS's claims against the Debtor. Mr. Dondero knows this. In fact, Mr. Dondero approached the Debtor and certain of its creditors in late 2020 with the hope of effectuating his "pot plan." As part of his "pot plan," Mr. Dondero required that the "UBS settlement . . . be global and inclusive of all affiliated entities, including offshore entities and the Multi Strat Credit Fund" to avoid this exact result.

### c. The Debtor Satisfied Its Fiduciary Duty

24. Dugaboy alleges that the Debtor breached its fiduciary duties to Multi-Strat under the Investment Advisers Act of 1940 (the "Advisers Act") by, among other things, causing Multi-Strat to settle with UBS. These allegations are false, but as importantly, they are a smokescreen.

25. Multi-Strat's redeemers have approximately $90 million in redemption claims (including Sentinel's putative redemption claim), but they will not be affected by Multi-Strat's settlement with UBS. Multi-Strat has approximately $120 million in assets. The redeemers' claims therefore will be paid in full even if Multi-Strat pays UBS $18.5 million to satisfy UBS's claims. In terms of Multi-Strat's remaining limited partners, as set forth above, there are functionally only two: (a) the Debtor (59%) and (b) Mr. Dondero's controlled entities (41%).[14] The Settlement Agreement – as evidenced by the lack of objection by the Debtor's creditors – is in the best interests of Multi-Strat as a whole, Mr. Dondero's objections notwithstanding. There is simply no point in continuing to engage in costly, time-consuming litigation with UBS that Multi-Strat might well lose.

---

[14] As evidenced by Mr. Dondero's objection to the UBS settlement, each of the investors in Multi-Strat had notice of the Settlement Agreement and the chance to object.

009874

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 957 of 1017 PageID 10721
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 15 of 23

26.     Because the Debtor – as investment manager – settled UBS's claims against Multi-Strat in the best interests of Multi-Strat, there can be no breach of fiduciary duty (particularly since the settlement value ($18.5 million) is materially less than the Court's estimated value of the claim ($23 million plus interest)).  Moreover, it is black-letter law that the Debtor's fiduciary duties under the Advisers Act run to Multi-Strat only, not to any individual investor in Multi-Strat such as Dugaboy.[15]  Further, even if an adviser has a conflict of interest, such conflict does not constitute a breach of the adviser's duty to its client if it is either eliminated **or** fully and fairly disclosed.[16]  Here, the required disclosures concerning the Debtor's potential conflicts of interests were made.[17]

27.     Finally, Dugaboy alleges that the Settlement Agreement puts the Debtor in direct conflict with Multi-Strat because (a) the Debtor is not releasing claims against Multi-Strat for the assets fraudulently transferred to Multi-Strat, (b) the Settlement Agreement obligates the Debtor to investigate and participate in the prosecution of claims against Multi-Strat, and (c) the Settlement Agreement is unclear if UBS is releasing all claims against Multi-Strat.  These can be quickly dispatched.

28.     *First*, the Debtor is not releasing claims against Multi-Strat arising from Multi-

---

[15] *See Goldstein v. SEC*, 451 F.3d 873, 879 (D.C. Cir. 2006) ("An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice directly.  He invests a portion of his assets in the fund.  The fund manager – the adviser – controls the disposition of the pool of capital in the fund.  The adviser does not tell the investor how to spend his money; the investor made that decision when he invested in the fund.  Having bought into the fund, the investor fades into the background; his role is completely passive.  If the person or entity controlling the fund is not an "investment adviser" to each individual investor, then a fortiori each investor cannot be a "client" of that person or entity.").

[16] *Commission Interpretation Regarding Standard of Conduct for Investment Advisers* (the "Release"), Release No. IA-5248; File No. S7-07-18, effective July 12, 2019 at 8 ("Under its duty of loyalty, an investment adviser must eliminate **or** make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict.") (emphasis added).

[17] Each of the PPMs includes pages of disclosures on potential conflicts of interests.  None of these disclosures were even acknowledged by Dugaboy in its objection.  *See generally* Master PPM "Risk Factors and Potential Conflicts of Interest" at 49-53; Feeder PPM "Risk Factors and Potential Conflicts of Interest" at 26.  The Feeder PPM cross references to and incorporates the disclosures contained in the Master PPM.  "The [Master PPM] contains further disclosures concerning potential conflicts of interests.  Such disclosures are incorporated herein by reference and should be read in their entirety prior to making a decision to invest in the [Feeder] Fund."  Feeder PPM at 26.

DOCS_NY:43138.5 36027/002

Annex 05932
009873

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 958 of 1017 PageID 10722
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of 23

Strat's receipt of fraudulently conveyed assets because the Debtor has no claim to the fraudulently conveyed assets (unlike UBS) and therefore has no claim against Multi-Strat as the recipient of such assets.[18] *Second*, Dugaboy is confused by the language of the Settlement Agreement. The Settlement Agreement provides that the Debtor will cooperate with respect to claims relating to the MSCF Interests and any injunctive relief necessary to ensure that additional money and assets are not transferred to Sentinel, among others. Settlement Agreement at § 1(c). Similarly, UBS has released all claims against Multi-Strat but has preserved its claims with respect to the MSCF Interests. *Id.* at § 3(a). As discussed above, the MSCF Interests are the interests in Multi-Strat that were fraudulently conveyed to Sentinel from CDO Fund in 2017. By preserving its claims with respect to the MSCF Interest, UBS has preserved its right to seek recovery of the MSCF Interests from Sentinel, not to sue Multi-Strat.

### d. This Court Has Jurisdiction to Approve All Aspects of the Settlement

29. Dugaboy also objects to the settlement between UBS and Multi-Strat "on the ground that the Bankruptcy Court lacks jurisdiction to approve a settlement between non-debtors." Dugaboy Obj. ¶12.[19] As support for this objection, Dugaboy states that (a) linking UBS's separate settlements with Multi-Strat and the Debtor does not create "arising in, under, or related to" jurisdiction;[20] (b) the automatic stay does not apply to co-defendants, and (c) the Debtor has

---

[18] Dugaboy makes the nonsensical argument that the Debtor could settle its claims against Multi-Strat for "$18,000,000 [sic]" in lieu of Multi-Strat settling its claim against UBS. In Dugaboy's mind, this settlement would provide a cash inflow to the estate of $18 million and the failure to do this settlement somehow constitutes an impermissible plan modification under 11 U.S.C. § 1127. Dugaboy Obj. ¶ 11. For the reasons set forth above, this makes no sense. The Debtor does not have a claim against Multi-Strat on account of the fraudulently conveyed assets. The Debtor did not convey those assets to Multi-Strat nor were those assets fraudulently transferred out of an entity that the Debtor had a claim against.

[19] This position is ironic. Mr. Dondero has consistently argued to this Court that the Debtor has violated, among other statutes, 11 U.S.C. § 363 by *not* seeking this Court's authority before causing its managed funds and CLOs to sell assets. *See, e.g., James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1439].

[20] Because Multi-Strat's settlement with UBS could conceivably have an impact on the estate, at a minimum, "related to" jurisdiction exists. *See, e.g., Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 Fed. Appx. 741, 748 (5th Cir.

009876

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 959 of 1017 PageID 10723
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 17 of 23

admitted to this Court's lack of jurisdiction. Each of these arguments evinces a clear misunderstanding of the facts and the relief sought.

30.     The Debtor does not contend that this Court has jurisdiction over Multi-Strat's assets. Multi-Strat's assets are not "property of the estate" under 11 U.S.C. § 541 or for purposes of 11 U.S.C. § 363(b). *See, e.g., In re Guyana Dev. Corp.*, 68 B.R. 892, 905 (Bankr. S.D. Tex. 1994) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary."). However, the Motion recognizes that 11 U.S.C. § 363(b) might still apply to the Debtor's exercise of its contractual rights under the IMA to manage and govern Multi-Strat (Motion ¶53), as those rights *do* constitute property of the estate. *See In re Thomas*, 2020 Bankr. LEXIS 1364 at *31 (Bankr. W.D. Tenn. 2020) (a debtor's membership interest in an LLC, including both its economic rights and governance rights, became property of the estate on the petition date, but the assets of the LLC remain separate and the debtor must manage them consistent with the terms of the operating agreement and applicable law); *In re Cardinal Indus.*, 105 B.R. 834, 849 (Bankr. S.D. Ohio 1989).

31.     This is consistent with the Debtor's position throughout this case that: (a) assets of non-debtor subsidiaries and funds are not "property of the estate;" (b) the Debtor's contractual right to manage and control the disposition of those assets is "property of the estate;" and (c) the Debtor generally does not need Court approval to exercise those rights because causing the managed funds to sell assets is in the "ordinary course of [the Debtor's] business" and exempt from approval under 11 U.S.C. § 363(c).[21]  *See generally Debtor's Response to Mr. James*

---

2021) (finding that a proceeding "relates to" a case under Title 11 if "the outcome of [the non-bankruptcy] proceeding could conceivably have any effect on the estate being administered in bankruptcy.").

[21] Dugaboy cites to the "May 20, 2020 settlement between UBS, the Debtor and Multi-Strat" as an example of an agreement that was not brought to this Court for approval under 11 U.S.C. § 363. A true and correct copy of the May 20, 2020 settlement agreement (the "May Agreement") is attached hereto as Exhibit 8. As an initial matter, the Debtor was not party to that agreement; it was executed solely by UBS, Multi-Strat, and certain of Multi-Strat's wholly-

Appx. 05934
009877

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 960 of 1017    PageID 10724
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 18 of 23

*Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1546].

32.    The difference here is that the Debtor is exercising its management and control rights to cause Multi-Strat to settle a material litigation claim against it.  That does not involve the sale of an asset or an investment and is arguably outside the ordinary course of the Debtor's business, necessitating this Court's approval under 11 U.S.C. § 363(b).  *See, e.g., In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013) (finding that a transaction is "ordinary course" if it does not "subject[] a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit" and is "of the sort commonly undertaken in the industry.").  The Debtor respectfully submits that the settlement between UBS and Multi-Strat as negotiated by the Debtor in an exercise of its management rights should be approved pursuant to 11 U.S.C. § 363(b) for the reasons set forth herein and in the Motion.

### 2.    The Dondero Objection Is Without Merit

33.    Mr. Dondero generally objects to the UBS settlement on two purported grounds: (a) the settlement impermissibly inflates UBS's claim, and (b) Multi-Strat's settlement of UBS's claims against Multi-Strat potentially violate the Bankruptcy Code and are contrary to investor interests.  Mr. Dondero's objections are without merit.

### a.    The Settlement Does Not Inflate UBS's Claims

34.    Mr. Dondero argues that the Motion "lacks a sufficient foundation to demonstrate

---

owned subsidiaries.  Further, the May Agreement was entered into to allow Multi-Strat to sell certain assets that were the subject of UBS's claim against Multi-Strat.  Consequently, the May Agreement was not brought to this Court because it involved Multi-Strat executing an agreement with a non-debtor that would allow Multi-Strat to sell assets. The May Agreement was thus executed in the ordinary course of business and did not require this Court's approval pursuant to 11 U.S.C. § 363(c).

Dugaboy cannot assert that it did not have notice of the May Agreement.  Dugaboy filed a proof of claim (Claim No. 177) alleging that the transactions effectuated through the May Agreement constituted a breach of the Debtor's duty to Dugaboy.  Dugaboy, therefore, cannot *not* have had notice of the May Agreement.

Appx. 05935
009878

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 961 of 1017 PageID 10725
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of 23

that UBS is entitled to the inflated claim proposed under the settlement." Dondero Obj. ¶27. In other words, Mr. Dondero does *not* object to the proposed settlement with UBS that was announced at the hearing on the Debtor's Plan, which included a $50 million general unsecured claim and a $25 million subordinated claim being provided to UBS. Instead, Mr. Dondero objects, without irony, to the additional $15 million general unsecured claim and $35 million subordinated claim. Mr. Dondero clearly misunderstands the relevant facts and law.

35. UBS has asserted claims against the Debtor alleging, among other things, that the Debtor caused the Funds *not* to pay the amounts they owed to UBS. Recently, the Debtor discovered that Dondero and the Dondero-controlled Debtor actually and intentionally caused the Funds to transfer over $300 million in face amount of the Funds' assets to an offshore entity owned and controlled by Mr. Dondero and Mr. Ellington. The Dondero and Dondero-controlled Debtor then covered up that transaction during this Bankruptcy Case. These facts are undeniable and damning; substantially undercut the Debtor's defense that it did not impede the Funds' ability to pay UBS's judgment; and caused the Debtor to agree to increase the consideration under the proposed settlement.

36. Mr. Dondero also argues that the August 2017 transfer to Sentinel cannot relate to UBS's claim because that claim arose out of actions taken in 2008 and 2009. Mr. Dondero, however, misunderstands UBS's claim, which includes a broad reservation of rights "to assert any additional claims, defenses, remedies, and causes of action, including without limitation, claims for fraudulent inducement, breach of contract, tortious interference with contractual relations, fraudulent conveyances, or alter ego recovery." *See* Claim Nos. 190, 191, Annex ¶28. Just because the Sentinel fraud occurred *after* 2009 and potentially included assets not held by the Funds in 2009 does not mean that the Debtor escapes all potential liability for those transfers (especially

App. 05936
009879

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 962 of 1017 PageID 10726
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 23

when they were hidden from UBS, the Independent Directors, and this Court).

37.     Mr. Dondero next argues that the settlement is "vastly inflated from the Debtor's contention that the maximum amount should be $35,742,978.978 [sic] and exceeds even the Court's determination as to the amount to be allowed for voting purposes." Dondero Obj. ¶34. Mr. Dondero again ignores the facts. This Court estimated UBS's claim at approximately $95 million, which included approximately $23 million (exclusive of interest) from Multi-Strat. The proposed settlement provides for (a) an $18.5 million payment from Multi-Strat and (b) a $65 million general unsecured claim and a $60 million subordinated claim against the estate. As such, Mr. Dondero ignores the fact that Multi-Strat will pay substantially less under the settlement than was estimated by this Court. Mr. Dondero also assumes that the $65 million general unsecured claim and the $60 million subordinated claim will obtain the same rate of recovery under the Plan; they may not. As such, the Settlement Agreement is substantially in line with the Court's Estimated Claim (even after subtracting amounts allocable to Multi-Strat).

> ### b.      The Settlement Does Not Contravene the Plan's Classification of Claims and Interests

38.     Mr. Dondero states – without case law or support – that because the UBS settlement provides a "direct payment from Multi-Strat, one of its managed funds which the Debtor asserts it owns 59% and controls" it may violate the "fair and equitable" standard and the Plan's classification scheme. Dondero Obj. ¶38. Admittedly, the Debtor does not fully understand this argument. Nevertheless, Mr. Dondero plainly ignores UBS's substantial and direct claims against Multi-Strat. There is nothing improper about Multi-Strat – a non-debtor – paying cash to one of its creditors outside of the Plan, and there is no need to classify UBS's claim against Multi-Strat under the Debtor's Plan. *See Guyana.*, 168 B.R. at 905.

Appx. 09937
009880

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 963 of 1017 PageID 10727
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 21 of 23

### c. "Investor Desires" Are Irrelevant

39. Mr. Dondero next argues that the "Multi-Strat payment also may conflict with investor desires and the Debtor's management agreement with Multi-Strat." Dondero Obj. ¶39. In light of the fraud discussed above, this argument is absurd.

40. *First*, and as discussed above, the only limited partners in Multi-Strat are the Debtor and entities controlled by Mr. Dondero. Moreover, the Debtor and MSCF GP have the sole and exclusive right to manage and control Multi-Strat, including to settle litigation. The fact that the settlement may reduce the value of Mr. Dondero's indirect, minority interests in Multi-Strat does not give Mr. Dondero the authority to block Multi-Strat's settlement of claims against it. *Second*, the Multi-Strat settlement with UBS is well in line with this Court's estimation of Multi-Strat's liability to UBS. *Third*, Mr. Dondero has no direct interest in Multi-Strat, and, unless he is finally ready to admit that there is no distinction between him and CLOH, Dugaboy, and HCMS (which is clear notwithstanding a formal admission), he has no standing to object on behalf of Multi-Strat's investors. *Fourth*, if Mr. Dondero is implying that the Debtor's creditors do not support the settlement, he should note that he is the **only** (purported) creditor objecting. The foregoing applies equally to Mr. Dondero's claim that the releases under the Settlement Agreement with respect to Multi-Strat are vague.

### C. Mr. Dondero and Dugaboy Ignore the "Paramount Interest of Creditors"

41. Despite spending considerable time and expense objecting to the UBS settlement, neither Mr. Dondero nor Dugaboy even address the third factor analyzed by the Fifth Circuit when approving settlements – all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." *Cajun Elec.*, 119 F.3d at 356. This omission is telling. Except for Mr. Dondero and Dugaboy – one of Mr. Dondero's proxies – no creditor or party in interest has objected to the settlement. And Mr.

21

Appx. 05938
009881

Case 19-34138-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 964 of 1017 PageID 10728
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 22 of 23

Dondero and Dugaboy can barely be classified as creditors as they have no cognizable pecuniary interest in the estate. Mr. Dondero's desire to re-assert control over the estate or to "burn the place down" should not, in any circumstance, outweigh the preferences of the Debtor and its legitimate creditors. Those creditors have not objected to the settlement, and their preference for a reasonable and expeditious settlement of UBS's claims and the start of distributions under the Plan is clear.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43138.5 36027/002



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 965 of 1017    PageID 10729
Case 19-34054-sgj11 Doc 2308 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 23 of 23

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  May 14, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Elissa A. Wagner (CA Bar No. 213589)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          rfeinstein@pszjlaw.com
          jmorris@pszjlaw.com
          ewagner@pszjlaw.com
          gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:43138.5 36027/002

009883

Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 966 of 1017 PageID 10730

# EXHIBIT 1

App. 0594
009884

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 967 of 1017    PageID 10731
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 2 of 76

**Memorandum Number _____**

# Confidential Private Placement Memorandum

*Series B, Series C and Series D Limited Partner Interests in*

## Highland Multi Strategy Credit Fund, L.P.

*General Partner*

Highland Multi Strategy Credit Fund GP, L.P.

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 968 of 1017 PageID 10732
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 76

**TABLE OF CONTENTS**

Page

NOTICE ................................................................................................................................ ii

DIRECTORY ........................................................................................................................ iv

EXECUTIVE SUMMARY OF PRINCIPAL TERMS ......................................................... 1

INVESTMENT PROGRAM ................................................................................................. 2

MANAGEMENT ................................................................................................................... 4

SUMMARY OF TERMS ...................................................................................................... 8

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST .................................. 25

BROKERAGE AND CUSTODY ......................................................................................... 54

TAX CONSIDERATIONS .................................................................................................... 56

ERISA AND OTHER REGULATORY CONSIDERATIONS ............................................. 67

PARTNERSHIP AGREEMENT - APPENDIX A

009886

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 969 of 1017 PageID 10733
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 76

## NOTICE

This Confidential Private Placement Memorandum (this "*Memorandum*") is being furnished on a confidential basis solely to selected qualified investors (or their respective authorized representatives) considering the purchase of limited partner interests (the "*Interests*") in Highland Multi Strategy Credit Fund, L.P. (the "*Fund*"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Multi Strategy Credit Fund GP, L.P. (the "*General Partner*") (other than to professional advisors and employees of the prospective investor receiving this Memorandum from the General Partner or its authorized representative or such prospective investor).

Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner. Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other related matters relevant to the suitability of an investment in the Fund for such investor. In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized. The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws. The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended. Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a

HMIT 005941
009887

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 970 of 1017    PageID 10734
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 5 of 76

substantial degree of risk.   See "*Risk Factors and Potential Conflicts of Interest*" beginning at page 25. No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom.   The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund.   Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not purport to be, and should not be construed as, a complete description of the limited partnership agreement of the Fund or the investment management agreement by and among the Fund's investment manager, the General Partner and the Fund.   Each prospective investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Fund's limited partnership agreement, the terms of the Fund's limited partnership agreement control.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology.   Due to various risks and uncertainties, including those described in "Risk Factors and Potential Conflicts of Interest," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

Pursuant to an exemption from the Commodity Futures Trading Commission, neither the General Partner nor the Investment Manager is registered with as a commodity pool operator and therefore, unlike a registered commodity pool operator, is not required to deliver a disclosure document or a certified annual report to participants in this pool.   Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association.   It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

All references herein to "$" refer to U.S. dollars.

This Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

<div align="center">iii</div>

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 971 of 1017 PageID 10735
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 76

<div align="center">

**DIRECTORY**

</div>

| | |
|---|---|
| **General Partner** | **Highland Multi Strategy Credit Fund GP, L.P.** |
| | 300 Crescent Court |
| | Suite 700 |
| | Dallas, Texas 75201 |
| | |
| **Investment Manager** | **Highland Capital Management, L.P.** |
| | 300 Crescent Court |
| | Suite 700 |
| | Dallas, Texas 75201 |
| | |
| **Prime Broker** | **BNY Mellon Trust Company N.A.** |
| | 601 Travis Street, 16th FL (775-1700) |
| | Houston, Texas 77002 |
| | |
| **Administrator** | **SEI Global Services, Inc.** |
| | One Freedom Valley Drive |
| | Oaks, Pennsylvania 19456 |
| | |
| **Auditors** | **PricewaterhouseCoopers LLP** |
| | 2001 Ross Avenue, Suite 1800 |
| | Dallas, Texas 75201 |
| | |
| **Legal Counsel** | **Akin Gump Strauss Hauer & Feld LLP** |
| | 1700 Pacific Avenue, Suite 4100 |
| | Dallas, Texas 75201 |

<div align="center">

\*   \*   \*   \*   \*

</div>

*This Memorandum does not purport to be and should not be construed as a complete description of the Fund's limited partnership agreement, a copy of which is attached hereto as Appendix A. Any potential investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax counselors.*

iv

009889

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 972 of 1017 PageID 10736
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 76

## EXECUTIVE SUMMARY OF PRINCIPAL TERMS

**The Fund**  Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Fund***").

**General Partner**  Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***").

**Investment Manager**  Highland Capital Management, L.P., a Delaware limited partnership (the "***Investment Manager***").

**Investor Eligibility**  Investors must be both "accredited investors" and "qualified purchasers."

**Offshore Feeder Fund**  In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***"). The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund.

**Investment Objective**  The Fund seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management.

**Series of Interests**  The Fund has four series of Interests and is offering Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum.

**Minimum Investment**  The initial minimum investment is $1,000,000.00, although the General Partner has the right to accept lesser amounts.

**Management Fee**  Annual rate of 1.5% for Series B Interests, 1.0% for Series C Interests, and 2.0% for Series D Interests, calculated and payable quarterly in advance.

**Performance Allocation**  Highland Capital Management, L.P., as a special limited partner of the Fund, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Fund's net profits, subject to a "high water mark."

**Withdrawals**  Withdrawal rights vary by Series and are subject to timing restrictions, reserves for contingencies, partial hold-back pending completion of an annual audit and suspension restrictions as further described in "*Summary of Terms*."

**Variation of Terms**  The General Partner and/or the Investment Manager (as applicable) may agree with certain limited partners to a variation of the terms set forth in this Memorandum or establish additional classes or series of limited partner interests that have terms that differ from those described herein, including different management fees, performance allocations and withdrawal rights.

1

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 973 of 1017 PageID 10737
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 76

# INVESTMENT PROGRAM

## Investment Objective

The Fund's investment objective is to seek attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management. No assurance can be given, however that the Fund will achieve this objective.

## Investment Strategy

### Investment Asset Classes

The following is a description of the principal types of securities in which the Fund may invest and certain trading techniques the Fund may employ. The following description is merely a summary and the Investment Manager has discretion to cause the Fund to invest in other types of securities and to follow other investment criteria and guidelines. However, consistent with the investment strategy of the Fund, all new investments made by the Fund must, at the time of purchase, (i) trade over-the-counter or on an exchange, (ii) have a third-party quote or valuation available, and (iii) be considered a marketable investment in the reasonable opinion of the Investment Manager. An investment is a marketable investment if in the reasonable opinion of the Investment Manager it can be sold at the mark within 30 calendar days. Notwithstanding the foregoing, the Fund may invest up to 20% of its net asset value in non-marketable investments if and when the Fund's net asset value reaches $1 billion.

*Debt and Debt-Like Securities.* The Investment Manager intends for debt securities to be the Fund's primary focus, with a target allocation of 40-60% of net asset value of the Fund, although this may vary depending on market conditions. The Fund may invest (both long and short) in debt securities of any kind, including debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, inflation-indexed bonds, structured notes, loan assignments, loan participations, asset-backed securities, collateralized loan obligation ("*CLO*") securities (including, rated and unrated, debt, equity and preference share instruments relating to collateralized loan obligations ("*CLO Securities*")), debt securities convertible into equity securities, and securities issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies or supranational entities or by domestic or private issuers.

The Fund may invest in debt securities of any credit quality, including below investment grade securities (also known as "high yield securities" or "junk securities"). Such securities are rated below investment grade by a nationally recognized statistical rating organization ("*NRSRO*") or are unrated but deemed by the Investment Manager to be of comparable quality. The Fund may invest without limitation in below investment grade or unrated securities, including in insolvent borrowers or borrowers in default.

*Equity and Equity-Like Securities.* The Fund may invest (both long and short) in common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock. Although the equity securities in which the Fund invests may have any capitalization, may be dominated in any currency, and may be located in emerging markets without limit, the Fund will primarily invest in equity securities of large capitalization companies that are located in developed markets. Additionally, the Fund may invest in equity or subordinated tranches of asset-backed securities, including CLOs, and may also invest in life settlement

Annex 05946
00989 1

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 974 of 1017    PageID 10738
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 9 of 76

policies and other instruments that have equity-like characteristics that meet the investment objective of the Fund.

*Investment Themes*

The Investment Manager's investment philosophy is based on the belief that thorough, fundamental research and a disciplined research methodology increase the likelihood of producing attractive long-term results.   The Investment Manager uses this research in an attempt to anticipate long-term secular trends and identify those investments that have the highest relative value characteristics across four primary investment themes.

1)  Convergence – Investments in market sectors in which the Investment Manager believes are mispriced and will converge to historic norms over time.

2)  Deep Value – Investments in companies that the Investment Manager believes the market has undervalued.  Through thorough research the Investment Manager believes the current market value does not correspond with the company's long-term fundamentals.

3)  Event Driven – The Investment Manager will generally focus on equity and debt investments with catalysts that could include, but are not limited to, asset sales, covenant violations, liability management, amend/extend, refinancing, tenders and mergers/acquisitions.

4)  Activism – Material holdings or controlling interests in companies, including the potential to obtain representation on the company's board, with the goal of affecting a change in the company in order to drive future profitability and value realization.

The Investment Manager may also manage interest rate, default, currency and other risks through a variety of trading methods and market tools, including security shorting and derivative hedging instruments, as it deems appropriate.

Although the Investment Manager expects to maintain a diversified portfolio of investments, it does not intend to limit itself to any one particular investment theme or asset class.  Rather, the Investment Manager intends to follow a flexible approach in order to place itself in the best position to capitalize on opportunities in the financial markets.

*The investment objectives and methods summarized above represent the General Partner's and Investment Manager's current intentions.   Depending on conditions and trends in the securities markets and the economy in general, the General Partner and the Investment Manager may pursue any objectives, employ any investment techniques or purchase any type of security that they consider appropriate and in the best interests of the Fund whether or not described in this section.   The foregoing discussion includes and is based upon numerous assumptions and opinions of the General Partner and Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.  **There can be no assurance that the Fund's investment strategy will achieve profitable results.***

009892

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 975 of 1017 PageID 10739
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 10 of
76

# MANAGEMENT

## The General Partner and the Investment Manager

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "*General Partner*"), serves as the general partner of the Fund. Highland Capital Management, L.P., a Delaware partnership (the "*Investment Manager*" or "*Highland*"), serves as the investment manager of the Fund and has responsibility for the Fund's investment program. James D. Dondero ultimately controls the General Partner and the Investment Manager.

The General Partner has the full authority of a general partner under Delaware law. The powers of the General Partner described in this Memorandum and the Partnership Agreement are not exhaustive and are not limited to the specific authorities described therein. Thus, subject to applicable law, the General Partner may make certain decisions or take certain actions even where those decisions or actions are not expressly granted in the Partnership Agreement or described in this Memorandum.

## The Investment Management Agreement

The Investment Manager serves pursuant to an investment management agreement with the Fund, the Offshore Fund and the General Partner (the "*Investment Management Agreement*"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Fund in pursuit of the investment objective and strategy described in this Memorandum.

The Investment Management Agreement provides that, in the absence of willful misconduct, fraud or gross negligence, each of the Investment Manager, its principals, shareholders, managers, employees and affiliates will be indemnified by the Fund and/or the Offshore Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement. For its services the Investment Manager is entitled to the Management Fee and reimbursement of any expenses incurred on behalf of the Fund or the Offshore Fund.

## Investment Personnel

The key investment professionals of the Investment Manager who will be responsible for the Fund's investments are described below.

## James Dondero, CFA, Co-Founder, President

James Dondero is Co-founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments). Jim has over 30 years of experience in the credit markets. Prior to founding Highland in 1993, Jim served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, high-yield bonds, emerging market debt, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Prior to American Express, he completed the financial training program at JP Morgan. Jim received a BS in Commerce (Accounting and Finance) from the University of Virginia. Jim is a Certified Public Accountant, a Certified Managerial Accountant, and a Chartered Financial Analyst. He currently serves as Chairman for CCS Medical and NexBank and serves on the



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 976 of 1017 PageID 10740
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 11 of
76

Board of Directors of American Banknote Corporation, Cornerstone Healthcare Group and Metro-Goldwyn-Mayer.

**Mark Okada, CFA, Co-Founder, Chief Investment Officer**

Mr. Okada is Chief Investment Officer of Highland Capital Management, L.P. and is responsible for overseeing Highland's investment activities for its various strategies. Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund Advisory board.

**Josh Terry, CFA, Head of Structured Products and Trading**

Mr. Terry is Head of Structured Products and Trading at Highland Capital Management, L.P. He leads the trading desk, structured products and CLO fund management teams. Since joining Highland in July 2005, Mr. Terry has served in various roles, including Senior Portfolio Analyst on the Distressed & Special Situations investment team, trading loans, bonds and equities on Highland's trading desk, and leading the sector rotation and fund management process for Highland's par credit funds. Prior to joining Highland in July 2005, Mr. Terry worked as an Investment Banking Analyst at Stephens Inc., where he focused on M&A transactions and equity financings for public and private middle-market companies. Mr. Terry serves as Chairman of the Finance Committee on the Board of Governors of Uplift Education, a network of charter schools in the Dallas-Fort Worth area. He received a BBA in Finance and Economics, summa cum laude, from Baylor University. Mr. Terry has earned the right to use the Chartered Financial Analyst designation.

**Trey Parker, Managing Director**

Mr. Parker is Managing Director and Head of Credit Research at Highland Capital Management, L.P. Mr. Parker is responsible for managing the Credit Research Team/Platform. Prior to his current role, Mr. Parker was a Portfolio Manager covering a number of the industrial verticals, as well as parts of Tech, Media and Telecom; he also worked as a Senior Portfolio Analyst on the Distressed & Special Situations investment team. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt in 2004, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Euramax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

0009894

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 977 of 1017 PageID 10741
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 12 of
76

**Advisory Committee**

The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "***Advisory Committee***") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other. Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates). The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management. For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions. SEI manages or administers $601.9 billion in funds and separately managed assets. SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC. SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Offshore Fund (in such capacity, the "***Administrator***"). In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "***Administration Agreement***") with the Administrator. The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund. The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available. In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions. The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 37 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 978 of 1017   PageID 10742
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 13 of
76

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("***Standard of Care***"). The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control. The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine. The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel. The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission. Neither the Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates. Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Offshore Fund will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

Amrx_05553
009896

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 979 of 1017 PageID 10743
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 14 of
76

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms of an investment in the Fund, and is subject, and qualified in its entirety by reference, to the limited partnership agreement of the Fund, as amended (the "**Partnership Agreement**") and the subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | The Fund is a limited partnership formed on December 1, 2005 under the laws of the State of Delaware with the name "Highland Credit Opportunities CDO, L.P." The General Partner filed an amendment to the Certificate of Limited Partnership of the Fund on August 26, 2014, changing the name of the Fund to "Highland Multi Strategy Credit Fund, L.P." |
| **Recent Amendments; Series of Interests** | The General Partner and the existing Limited Partners of the Fund adopted the Fourth Amended and Restated Limited Partnership Agreement of the Fund, effective November 1, 2014 (the "***Effective Date***"), whereby all existing limited partner interests were re-designated as "Series A Interests" and three new series of limited partner interests were created – "Series B Interests," "Series C Interests" and "Series D Interests" (the "***Amendments***"). |
| | As of the Effective Date, all existing Limited Partners will hold Series A Interests, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum. |
| | The Fund may issue additional series of Interests over time (each, a "***Series***"). Not all Series of Interests will be available for subscription at the same time and the terms among the Series of Interests will vary. New Series of Interests may be established by the General Partner without notice to or approval of the Limited Partners. |
| | Except with respect to management fees, performance-based profit allocations and withdrawal rights (each as discussed below), the rights and privileges attributable to Series A Interests, Series B Interests, Series C Interests and Series D Interests are identical. |
| | References herein to "Interests" or "Limited Partners" shall include all Series of Interests and Limited Partners unless otherwise specified or context so requires. |

Amtx_05854
009897

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 980 of 1017    PageID 10744
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 15 of
76

| | |
|---|---|
| **General Partner** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership.  The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership. |
| **Eligible Investors** | Limited partner interests ("***Interests***") may be purchased by investors who are "accredited investors" and "qualified purchasers," as defined in the Fund's Subscription Documents.  Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility.  The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion. |
| | An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments.  An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund. |
| **Subscriptions** | Subscriptions for Interests may be accepted as of the first Business Day of each calendar month and/or such other days as the General Partner may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date.  The initial minimum investment is $1,000,000, although the General Partner may accept investments in a lesser amount.  Capital contributions may be made in cash or, with the consent of the General Partner, in securities or partly in cash and partly in securities. |
| | "***Business Day***" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed. |
| | A subscriber admitted to the Fund (a "***Limited Partner***") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time. |
| | There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the General Partner established any maximum aggregate amount of subscriptions that may be accepted. |
| | All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and |



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 981 of 1017 PageID 10745
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of
76

Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents.

|                          |                                                                                                                                                                                                                                                                                                                              |
|--------------------------|--------------------------|

**Offshore Feeder Fund**

In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***"). The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund.

Investors in the Offshore Fund will be issued participating non-voting shares of the Offshore Fund; provided that in the event that the Fund seeks the approval, vote or consent of the Offshore Fund with respect to any matter to which it would be entitled to vote as a limited partner of the Fund under the Partnership Agreement, the Offshore Fund: (i) shall submit such matter for the consent of the holders of shares in the Offshore Fund and (ii) shall cause the Offshore Fund to vote its Interest proportionally for and against such matter in the same proportion that the shareholders in the Offshore Fund voted for and against such matter.

The Investment Manager may establish one or more additional feeder vehicles to invest in the Fund.

**Capital Accounts**

The Fund will maintain a book capital account (a "***Capital Account***") for the General Partner and each Limited Partner (each, a "***Partner***" and collectively, the "***Partners***") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss. The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner.

If a Partner invests in more than one Series of Interests, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each Series Capital Account.

If a Partner makes an additional capital contribution to an existing Capital Account, the Capital Account will be sub-divided into separate sub-accounts attributable to each separate capital contribution, with each capital sub-account treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each capital sub-account. References herein to a Partner's "Capital Account" include any such separately maintained capital sub-accounts.

Annex 05856
009899

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 982 of 1017 PageID 10746
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 17 of
76

The Fund will issue to the Offshore Fund an Interest and maintain capital sub-accounts that correspond to each Sub-Series of Shares (as defined in the Partnership Agreement) and each capital sub-account is treated separately for determining Management Fees, the Performance Allocations and withdrawal rights.

**Alternative Investment Vehicles**

The General Partner will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "***Alternative Investment Vehicle***"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the General Partner, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund (including Management Fees and the Performance Allocation defined below) and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors**

Interests in the Fund held by the Investment Manager or its affiliates (collectively, "***Affiliated Investors***") may not be assessed the management fees or the performance allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Borrowing and Leverage**

The Fund may buy securities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities in order to employ leverage when the Investment Manager deems such action appropriate.

**Management Fee**

For its services to the Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***"), calculated and payable quarterly in advance, equal to: (i) 1.5% (per annum) of each Capital Account attributable to a Series B Interest, (ii) 1.0% (per annum) of each Capital Account attributable to a Series C Interest and (iii) 2.0% (per annum) of each Capital Account attributable to a Series D Interest.

Management Fees will be appropriately adjusted for any partial quarter. The Investment Manager may reduce or eliminate the Management Fee with respect to any Limited Partner (or Capital Account) in its sole discretion.

**Other Fees and Expenses**

The Fund bears the reasonable, out-of-pocket expenses of the offering of the Interests contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments. To the extent the General Partner deems appropriate, expenses related to the

11



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 983 of 1017 PageID 10747
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 18 of
76

Amendments may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("*GAAP*"). Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements. In such instances, the General Partner may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value. There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

<u>Investment and Operational Expenses</u>. The Fund bears all reasonable costs and expenses directly related to its investment program, including expenses related to research, due diligence, proxies, underwriting and private placements, brokerage commissions, interest on debt balances or borrowings, custody fees, travel fees and expenses related to the Fund's offering and any withholding or transfer taxes imposed on the Fund. The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including (i) accounting, audit and legal expenses (including those incurred for the Fund, the General Partner or the Investment Manager to comply with applicable law, rule or regulation), (ii) costs of any litigation or investigation involving the Fund's activities, (iii) the costs, fees and expenses of any appraisers, accountants or other experts engaged by the General Partner or the Investment Manager as well as other expenses directly related to the Fund's investments and (iv) costs associated with reporting and providing information to existing and prospective Limited Partners. However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office. Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager. However, a portion of the commissions generated on the Fund's brokerage transactions may generate "soft dollar" credits that the General Partner and the Investment Manager are authorized to use to pay for research and research-related services and products used by the General Partner or the Investment Manager. In the event that the Investment Manager elects to use soft dollars, it intends to limit such use to services that fall



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 984 of 1017 PageID 10748
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of
76

|  | within the safe harbor afforded by Section 28(e) of the United States Securities Exchange Act of 1934, as amended. See "*Brokerage and Custody*." |
|---|---|
| **Allocation of Net Profit and Loss** | Net profit or net loss of the Fund (including unrealized gains or losses and Fund expenses) is allocated among the Capital Accounts of the General Partner and the Limited Partners (collectively, the "***Partners***") as of the close of each calendar month, at such times as the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine. |
|  | Profit and loss attributable and any Restricted New Issues (as described below) and are determined and allocated among the Partners separately and are not reflected in the determinations and allocations of net profit or net loss attributable to the remainder of the Fund's net assets. |
|  | As of the close of each accounting period, the net profit or net loss (other than any profit or loss attributable to Restricted New Issues, which are allocated as per below) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period. Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the Partner's Capital Account at such time (excluding any amount attributable to such Partner's share of Restricted New Issues), in relation to the total value of the Fund's net assets at such time (excluding the aggregate amount of net assets attributable to Restricted New Issues). |
|  | If the General Partner determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Limited Partner may agree such Limited Partner should not participate (or should receive a reduced participation) in the net profit or net loss with respect to any investment, the General Partner may allocate net profit or net loss, if any, with respect to the investment to Limited Partners to the extent to which the above restrictions do not apply. |
|  | The Management Fee is calculated based on the Capital Account balance of each Limited Partner and is debited from each Limited Partner's Capital Account. Allocations to each Partner of net profit or net loss of the Fund will be subject to periodic adjustment to give effect to the Performance Allocation, as described below. |
| **Restricted New Issues** | The Fund may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***"). FINRA member firms are not permitted to sell certain new issues ("***Restricted New Issues***") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors |

Annex 05959
009902

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 985 of 1017 PageID 10749
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of
76

of companies that are current, recent, or prospective investment banking clients of the relevant underwriters ("**Restricted Persons**"). In order to enable the Fund to participate in Restricted New Issues, the Fund will require each Limited Partner to provide information to enable the Fund to determine whether the Limited Partner is a Restricted Person. When the Fund invests in a Restricted New Issue, the profits and losses associated with the investment will specifically be allocated to those Partners who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a FINRA member's investment banking clients to have up to 25% participation in Restricted New Issues. If the ownership of the Fund by Restricted Persons exceeds the maximum percentage, the General Partner will allocate such excess amount *pro rata* among the Capital Accounts of Partners who are not Restricted Persons or on such other basis that the General Partner reasonably determines ensures compliance with the FINRA Rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all Partners on a *pro rata* basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

**Performance Allocation**    The Investment Manager, in its capacity as a special limited partner in the Fund, is entitled to a performance allocation at the end of each calendar year (the "**Performance Allocation**"), which is calculated and charged separately with respect to each Capital Account of each Limited Partner, equal to 20% of the amount by which the Capital Account's "Performance Change Amount" (if positive) for the current calendar year exceeds the Capital Account's "Loss Carryforward Amount."

A Capital Account's "**Performance Change Amount**" for any calendar year equals such Capital Account's *pro rata* allocation of net profit or net loss (including Management Fees, Restricted New Issues and/or other items of income or expense specially allocable to the Capital Account).

The "**Loss Carryforward Amount**" for any calendar year equals the aggregate Performance Change Amounts, if negative, allocated to a Capital Account during any preceding calendar year, minus any subsequent positive Performance Change Amounts on which no Performance Allocation was charged. If a Limited Partner makes a withdrawal from its Capital Account at a time when there is a Loss Carryforward Amount, such Loss Carryforward Amount will be reduced in the same proportion that the withdrawal amount bears to the

14



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 986 of 1017 PageID 10750
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 21 of
76

Limited Partner's total Capital Account balance immediately prior to the withdrawal.

The Performance Allocation is calculated and charged to each Capital Account as of the last day of each calendar year. The Performance Allocation is also calculated and charged with respect to any Capital Account from which there is a permitted or required withdrawal as of any time other than the last day of a calendar year on the basis of net profits allocated to such Capital Account through the applicable date of withdrawal. In the case of a partial withdrawal, the Performance Allocation is calculated and charged only with respect to the portion of the Capital Account being withdrawn.

The Performance Allocation and Loss Carryforward Amount will be computed separately for each Capital Account (and each separately maintained capital sub-account reflecting additional contributions by a Limited Partner). Thus, if a Limited Partner has multiple Capital Accounts, the Performance Allocation and Loss Carryforward will be computed separately for each Capital Account, and the Capital Accounts will not be netted against one another for purposes of calculating the Performance Allocation. Accordingly, Limited Partners with multiple Capital Accounts may be charged a Performance Allocation in respect of one or more Capital Accounts for a year in which the aggregate net profits allocated to all of such Limited Partner's Capital Accounts do not exceed the aggregate Loss Carryforward Amount allocated to all of such Limited Partner's Capital Accounts.

The Performance Allocation with respect to any Limited Partner may be waived or altered by the Investment Manager in its sole discretion.

**Distributions**

Subject to the withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a withdrawal described below, Limited Partners should not expect the Fund to make any distributions.

**Withdrawals Generally**

Withdrawal rights vary by Series. For the purposes of establishing the withdrawal privileges below, withdrawal rights are determined separately with respect to each Capital Account (and each capital sub-account, if applicable) of a Limited Partner.

**Series Withdrawal Dates**

Subject to certain withdrawal restrictions described below, Limited Partners have the following withdrawal rights:

Series B Interests: Annual Liquidity. A Limited Partner is permitted to make complete or partial withdrawals of its Series B Interests upon written notice to the General Partner at least 180 days prior to the applicable Series B Withdrawal Date. The "**Series B Withdrawal Date**" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of

009904

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 987 of 1017 PageID 10751
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 22 of
76

the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2015 and every year thereafter on October 31st, or the last Business Day of that month).

<u>Series C Interests: Two Year Liquidity</u>.   A Limited Partner is permitted to make complete or partial withdrawals of its Series C Interests upon written notice to the General Partner at least 180 days prior to the applicable Series C Withdrawal Date. The "***Series C Withdrawal Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

<u>Series D Interests: One Year Hard Lock-Up; Quarterly Liquidity</u>.   A Limited Partner is permitted to make complete or partial withdrawals of its Series D Interest as of the last Business Day of each calendar quarter (and/or such other days as the General Partner may determine in its sole discretion) (each, a "***Series D Withdrawal Date***") following the one-year anniversary of the contribution of the capital to be withdrawn. Notice of any withdrawal of Series D Interests must be provided in writing to the General Partner at least 90 calendar days prior to the requested Series D Withdrawal Date.

The General Partner may, at any time and in its sole discretion, waive or modify the foregoing withdrawal and distribution restrictions with respect to any Limited Partner.

**Settlement of Withdrawal Proceeds**

With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Fund or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable date of withdrawal, and withdrawn amounts will be fixed as of the effective date of withdrawal, except as otherwise provided in the Partnership Agreement with respect to reserves for contingencies.

At least 90% of the estimated amount due with respect to the Fund's marketable investments is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund, within 30 Business Days after the date of withdrawal, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund or the remaining Capital Accounts.   The General Partner is entitled to deduct from such



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 988 of 1017    PageID 10752
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 23 of
76

settlement an amount equal to the pro rata portion of any Performance Allocation (based on the portion of the withdrawal being settled) payable to the Investment Manager with respect to such withdrawn amount. Any balance will be held back and distributed, without interest thereon, promptly following completion of the audit of the Fund's financial statements for such fiscal year, or sooner in the General Partner's discretion.

In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Fund's marketable investments, no settlements occur with respect to any of such Limited Partner's interest in the Fund's non-marketable investments until the occurrence of liquidity events with respect to such non-marketable investments after the scheduled payment date for the withdrawal (without interest thereon). Notwithstanding the foregoing, the General Partner may, in its sole discretion, make settlements in such cases prior to the occurrence of a liquidity event if such settlement would, in the good faith opinion of the General Partner, not have a material adverse effect on the Fund. Generally, a liquidity event will be a sale of the relevant investment for cash, in which case the settlement will be funded in cash within 90 days after the liquidity event (without interest). If the liquidity event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant investment or by distributing the net proceeds derived from a sale of such investment. The General Partner is entitled to withdraw from each such settlement an amount equal to the remaining portion of any Performance Allocation (pro rata based on the portion of such withdrawal being distributed) to be credited to the Investment Manager at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal.

**Withdrawal Conditions**    The General Partner may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the investor, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the withdrawal proceeds will be paid. The withdrawal proceeds will not



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 989 of 1017 PageID 10753
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 24 of
76

be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

| | |
|---|---|
| **Compulsory Withdrawals** | The General Partner reserves the right, in its sole discretion, to compel the withdrawal of any Limited Partner's Interest, in part or in its entirety, on not less than five days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Fund may cause the Fund, the Investment Manager or the General Partner to violate any applicable law). Settlements are made in the same manner as voluntary withdrawals. |
| **Suspension of Valuations, Withdrawals and Withdrawal Payments** | The General Partner may suspend the issuance of Interests, the Partners' withdrawal privileges, the payment of withdrawal proceeds and the valuation of the Fund's net assets: |

(i) during any period when any stock exchange or over-the-counter market on which the Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

(ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of investments by the Fund, or the determination of the value of the assets of the Fund, would not be reasonably practicable;

(iii) during any breakdown in the means of communication normally employed in determining the price or value of the Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Fund cannot reasonably be accurately ascertained within a reasonable time frame;

(iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange;

(v) in other circumstances where the General Partner is unable to fairly value the Fund's assets due to extreme market conditions; or

(vi) automatically upon liquidation of the Fund.

Upon the reasonable determination by the General Partner that conditions leading to suspension no longer apply, withdrawal rights for all Limited Partners shall be promptly reinstated, and any pending withdrawal requests (or new, timely withdrawal requests) shall be


Amer. 05904
009907

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 49 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 990 of 1017   PageID 10754
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 25 of
76

honored as of the last Business Day of the calendar quarter in which withdrawals have recommenced, subject to the application of the withdrawal limitations described herein.

**Soft Wind Down**

It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Withdrawals and Withdrawal Payments" (each, a "***Suspension***") would ordinarily be temporary (other than in connection with a decision to proceed with the liquidation of the Fund). However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the General Partner, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the General Partner may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the General Partner to cause the Fund to return the Fund's assets to Limited Partners in an orderly manner (without proceeding with a liquidation of the Fund) (an "***Orderly Realization***"). The General Partner may, in such circumstances, resolve to effect an Orderly Realization should it determine that doing so is in the best interests of the Fund as a whole. Such Orderly Realization shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the Limited Partners. The General Partner will notify Limited Partners of any decision to proceed with an Orderly Realization of the Fund. During an Orderly Realization, the Investment Manager may, in consultation with the General Partner, take such steps as are considered appropriate in the best interests of the Fund as a whole to effect the Orderly Realization. The General Partner, in consultation with the Investment Manager, shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "***Realization Period***"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under Delaware law or any other applicable bankruptcy or insolvency regime. The General Partner, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 991 of 1017 PageID 10755
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 26 of
76

be made during an Orderly Realization on the same basis as described herein.

**Transfers**

Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion. The General Partner in its sole discretion may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Interests of any Affiliated Investors may be transferred to other affiliates thereof without restriction.

**Duty of Care; Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Fund or the Limited Partners for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Fund's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.

**Valuations**

In general, the Fund's financial statements will be prepared in accordance with GAAP. The General Partner has delegated the valuation of the Fund's assets to the Investment Manager who values the Fund's assets as of the close of each accounting period in accordance with its valuation policies and procedures. Valuations may be suspended as set forth above in "Suspension of Valuations, Withdrawals and Withdrawal Payments."

**Reserves**

Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate. In the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 992 of 1017 PageID 10756
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of
76

Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Partners during any such prior period.

| | |
|---|---|
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Partners** | The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each Partner to complete federal and state income tax or information returns, along with any other tax information required by law. The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month. The General Partner selects the Fund's independent accountants in its sole discretion. |
| **Advisory Committee** | The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "***Advisory Committee***") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other. Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates). The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law. |

ANDA 05967
009910

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 993 of 1017    PageID 10757
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 28 of
76

**Dissolution and Liquidation**

In the event an Orderly Realization lasts longer than three years, Limited Partners with a combined percentage interest in the Fund of at least 75% may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund.   The Limited Partners will not have any other right to bring an action in court to dissolve the Fund.

Dissolution of the Fund may also occur upon the General Partner's election, in its sole discretion, to dissolve the Fund or upon the occurrence of any event which results in the General Partner (or a successor to its business) ceasing to be the general partner of the Fund. Upon the occurrence of any such event, the General Partner (or a liquidator elected by a majority in interest of the Limited Partners, if the General Partner is unable to perform this function) is charged with winding up the affairs of the Fund, liquidating its assets to the extent feasible and making liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with each Partner's Capital Account balance.

**Placement Agents**

The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund.   Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not be collected by or from the Fund.   The placement agent may be reimbursed for its expenses and indemnified by the Fund.

Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

**Tax Status**

The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and that it should not itself be subject to U.S. federal income taxation.   Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions.   Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period may differ from its financial or economic results.   The



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 994 of 1017    PageID 10758
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of
76

deductibility of a Limited Partner's share of any Fund losses or deductions may be limited. See "*Tax Considerations*."

**ERISA**

The General Partner intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). See "*ERISA and Other Regulatory Considerations*."

**Amendment of the Limited Partnership Agreement**

The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent. However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund without the consent of each Limited Partner adversely affected thereby. The above consent may be obtained by negative consent (affording the Limited Partners notice and opportunity to object).

Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment.

**Variation of Terms**

The General Partner, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of the Partnership Agreement or the Subscription Documents (including those relating to Management Fees, the Performance Allocation, transparency, and withdrawals) with respect to such Limited Partner. The General Partner generally grants waivers of the Management Fees, Performance Allocation and withdrawal restrictions to principals and employees of the Investment Manager and its affiliates, as well as their related family members and affiliates.

**Dispute Resolution**

Any controversy or claim ("**Dispute**") out of or relating to or in connection with the Partnership Agreement or otherwise involving the Fund, its Partners and/or any Indemnified Party (as defined in the Partnership Agreement) shall be submitted to mediation in accordance

009912

with the Partnership Agreement and if such dispute has not been resolved within 90 days, will be resolved by binding arbitration in accordance with the Partnership Agreement. Mediation and arbitration shall be held in Dallas, Texas and Delaware law shall apply to any dispute, except as otherwise provided in the Partnership Agreement.

009913

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 996 of 1017 PageID 10760
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 31 of
76

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves certain risks. Certain of these risks are summarized below. The Fund may not be suitable for all investors and is intended for sophisticated investors who can accept the risks associated with its investments. An investment in the Fund does not constitute a complete investment program. Investors will not have recourse except with respect to the assets of the Fund. Prospective investors should consider, among others, the risk factors and potential conflicts of interest described in this section. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

**Fund Risks**

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

*Reliance on Key Persons.* The Fund will be substantially dependent on the services of James Dondero, Mark Okada and Joshua Terry (the "**Key Man Group**"). In the event of the death, disability, departure or insolvency of a member of the Key Man Group, or the complete transfer of a member's interest in the Investment Manager, the business of the Fund may be adversely affected. Each member of the Key Man Group will devote such time and effort as he deems necessary for the management and administration of the Fund's business. However, the members of the Key Man Group may engage in various other business activities in addition to managing the Fund, and consequently may not devote all time to Fund business.

*Investment Authority.* Substantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager. Limited Partners have no right or power to take part in the management of the Fund. The Investment Manager also makes all of the trading and investment decisions of the Fund. In the event of the withdrawal or bankruptcy of the General Partner, generally the Fund will be liquidated.

*Performance Allocation.* The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Withdrawal Restrictions.* There are severe restrictions on withdrawals from the Fund (which may be settled in securities rather than cash) and on transfers of Interests. The prior written consent of the General Partner is required for a transfer of the Interest of any Limited Partner and the General Partner, in its sole discretion, may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Because of the restrictions on withdrawals and transfers, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. There is no independent market for the purchase or sale of Interests and none is expected to develop. Limited Partners must represent that they are purchasing Interests for investment. A subscription for Interests should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

NexPoint 009974

*No Distributions.*   Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income.   Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*.   The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash.   In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.*   Since the Fund's portfolio will not necessarily be widely diversified, the investment portfolio of the Fund may be subject to more rapid changes in value than would be the case if the Fund were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.*   From time to time, certain situations affecting the valuation of the Fund's investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Fund) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed.   The Fund is not required to make retroactive adjustments to prior subscription or withdrawal transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Non-Public Information.*   From time to time, the Investment Manager may come into possession of non-public information concerning specific companies.   Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies.   The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*Soft Dollars.*   The Investment Manager may enter into "soft dollar" arrangements with one or more broker-dealers whereby the Investment Manager will direct securities transactions to the broker-dealer in return for research products and services from the broker-dealer.   Although the Investment Manager will use the research and services in making investment decisions for the Fund, the Investment Manager may use such research or services for other accounts and the Fund will generally pay more than the lowest available commissions for execution of these transactions.   The Investment Manager may also enter into "soft dollar" arrangements to cover Fund expenses or costs and expenses of the Investment Manager to the extent such arrangements are permitted by law and described in this Memorandum.   See "*Brokerage and Custody*."

*Absence of Registration*.   The Fund has not and will not register under the Investment Company Act.   Accordingly, the provisions of the Investment Company Act which, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of the fund's activities and contractual relationships, prohibit certain trading and investment activities and prohibit the fund from engaging in certain transactions with its affiliates, will not be applicable.   Neither the General Partner nor the Investment Manager is registered as a CPO or a CTA with the NFA in reliance on an exemption from registration pursuant to CFTC Regulation 4.13(a)(3).   Accordingly, the provisions of the Commodity Exchange Act and the regulations promulgated thereunder applicable to registered persons will not be applicable to the General Partner or the Investment Manager.

NexPoint 095072

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 57 of
Case 3:25-cv-02072-S   Document 15-12   Filed 10/06/25   Page 998 of 1017   PageID 10762
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 33 of
76

*Recent Developments in the Financial Services Industry*.   Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry.   In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel.   The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear.   The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

**Investment Strategy Risks**

<u>Risks Associated With Investing in CLOs</u>

*Risks of Investment Focus*.   The Fund's portfolio may consist of CLO Securities.   A cash flow CLO is generally analogous to a special purpose finance company.   The CLO owns a portfolio consisting of corporate loans and other investments typically from which it receives interest income, together with capital gains and losses.   The CLO is often financed with equity, which may be in the form of preference shares or income notes ("***CLO Equity***") and several levels of long-term debt ("***CLO Debt***").   CLO Debt is typically rated by the rating agencies based on the deal structure as well as outstanding principal amount of portfolio securities and, in most cases, is not contingent on the market value of the underlying portfolio.   CLO Equity is almost always unrated.

CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.   The CLO Equity that the Fund may purchase may be unrated or non-investment grade.   In addition, as a holder of CLO Equity, the Fund may have limited remedies available upon the default of the CLO.

The value of the CLO Securities that the Fund may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("***CLO Collateral***"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates.   CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof.   If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation.   The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Collateral may consist of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality).   Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof.   The lower ratings of below



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 999 of 1017    PageID 10763
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 34 of
76

investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest.   Such investments may be speculative.

*Dependence Upon Other Unrelated Managers*.   The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Fund as an investor in such CLO.   Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Fund's investments in such CLOs will depend on the performance of unrelated managers.

*Investments in CLOs Managed by the Investment Manager or its Affiliates*.   The Fund may invest a significant portion of its capital in structured investments, including CLO tranches originated and managed by third parties and CLO tranches managed by the Investment Manager or its affiliates (the "***Affiliated CLOs***").   If the Fund invests in Affiliated CLOs, the Limited Partners will indirectly pay the fees (senior and subordinated) (but only if such investment is in the equity tranche of such Affiliated CLO), expenses and any carried interest at primary issuance.   The Investment Manager or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Affiliated CLOs.   If the Fund provides all of the equity for an Affiliated CLO, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis.   The Investment Manager will have conflicting division of loyalties and responsibilities regarding the Fund and an Affiliated CLO, and certain other conflicts of interest would be inherent in the situation.   There can be no assurance that the interests of the Fund would not be subordinated to those of an Affiliated CLO or to other interests of the Investment Manager.

*Multiple Levels of Fees*.   The Fund and the CLOs (including Affiliated CLOs) are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income.   This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments.   Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees.   The general partner or manager of a CLO (including a member of the Highland Group (defined below)) may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).   Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs.   In such case, additional management costs and other administrative expenses may be incurred.

*Limited Diversification*.   CLOs may invest in concentrated portfolios of assets.   The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities (the related CLO Equity in particular) to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs (the related CLO Equity in particular) to a greater degree of risk with respect to economic downturns relating to such industry.   The Fund may have a concentrated exposure to CLOs of a particular type of CLO.

*CLO Embedded Leverage Risk*.   The Fund's participation in CLOs involves varying amounts of leverage.   Leverage is embedded in all classes of a CLO other than the most senior tranche.   If the Fund retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO.   While leverage presents opportunities for increasing the Fund's total return, it has the effect of potentially increasing losses as well.   Accordingly, any event which

009917

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 59 of
Case 3:25-cv-02072-S     Document 15-12     Filed 10/06/25     Page 1000 of 1017     PageID 10764
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 35 of
76

adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged.   The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged.   The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations.   In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments.   Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities.   When the Fund invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Fund to a greater risk of loss.

*Interest Rate Mismatch.*   CLOs may be subject to interest rate risk.   The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate.   As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("***Fixed Rate Assets***"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("***Floating Rate Assets***").   In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt.   As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity.   Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities.   In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

*Lower Credit Quality Securities.*   There are no restrictions on the credit quality of the investments of the Fund.   CLO Securities in which the Fund will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings.   The Fund may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading.   Lower rated and unrated securities in which the Fund may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons.   Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities.   The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies. Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications. Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities.   In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Amergy5075
009918

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 60 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 1001 of 1017    PageID 10765
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 36 of
76

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities.   There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate.   Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities.   Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities.   Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets.   It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

*Defaulted Assets Underlying CLO Securities.*   If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset.   In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset.   The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon.   Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security.   Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Fund's interest in the CLO security, the Fund may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities as a result of the current liquidity crisis.   Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security.   These additional risks may affect the returns on the investments in the Fund's portfolio.

*Subordination of CLO Debt and CLO Equity.*  The Fund's portfolio may consist of CLO Equity and subordinate CLO Debt.   Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches.   CLO Equity generally is fully subordinated to any related CLO Debt.   Thus, some of the investments of the Fund in a CLO may rank behind other creditors of the CLO and an investment by the Fund in the equity tranche of a CLO may rank behind all creditors of the CLO.   To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches.   In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO.   Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt and/or the holders of the related CLO Equity, as applicable.   Investments of the Fund may be the first to absorb any losses by the

Anx02 05076
009919

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 61 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1002 of 1017 PageID 10766
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 37 of
76

CLO on its underlying portfolio. This may result in losses on the invested proceeds of the Fund and could result in the complete loss of invested proceeds.

*Mandatory Redemption of CLO Senior Tranches and CLO Debt.* Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt and the related CLO Equity will be used to redeem the related CLO senior tranches. This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt or such CLO Equity, which could adversely impact the returns to the holders of such CLO Debt or such CLO Equity.

*Optional Redemption of CLO Senior Tranches and CLO Debt.* An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Fund). As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Fund) could lose all or a substantial portion of its investment in such CLO securities.

*Insolvency Risks*. Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "***Insolvent Company***"). The information in this paragraph and the following paragraph is applicable with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Fund) or from subsequent transferees of such payments (such as the Limited Partners).

Annex A-5977
009920

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 1003 of 1017    PageID 10767
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 38 of
76

However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets.   Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable.   Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States Federal and state laws. Insofar as the Fund's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

*"Widening" Risk*.   For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Fund invests may decline substantially.   In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale.   It may not be possible to predict, or to hedge against, such "spread widening" risk.

*There Is Limited Disclosure About the CLO Securities and the Underlying CLO Collateral in this Memorandum.* The Investment Manager will not be required to provide the investors in the Fund with financial or other information (which may include material non-public information) it receives related to the CLO Securities.   The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Fund to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor.   In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any CLO Securities.

*Impact of the Volcker Rule on the Liquidity of the Notes*.   Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions.   The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions.   The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs.   Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities.   This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Fund's ability to liquidate these positions on a timely basis.

HMIT 95978
009921

<u>Investment Strategy and Investment Risks</u>

*General Economic and Market Conditions*. The success of the Fund's activities will be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Fund's investments), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations). These factors may affect the level and volatility of securities prices and the liquidity of the Fund's investments. Volatility or illiquidity could impair the Fund's profitability or result in losses. The Fund may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets; the larger the positions, the greater the potential for loss.

Unpredictable or unstable market conditions may result in reduced opportunities to find suitable investments to deploy capital or make it more difficult to exit and realize value (or avoid significant losses) from the Fund's existing investments. It is important to understand that the Fund can incur material losses even if it reacts quickly to difficult market conditions and there can be no assurance that the Fund will not suffer material adverse effects from broad and rapid changes in market conditions.

*Recent Developments in Global Credit Markets*. Recently, declines in the market value of asset-backed securities, especially securities backed by subprime mortgages, have been concomitant with significant market events. Increasing credit and valuation problems in the subprime mortgage market have generated extreme volatility and illiquidity in the markets for securities directly or indirectly exposed to subprime mortgage loans. This volatility and illiquidity has extended to the global credit and equity markets generally, and, in particular, to the high-yield bond and loan markets, exacerbated by, among other things, growing uncertainty regarding the extent of the problems in the mortgage industry and the degree of exposure of financial institutions and others, decreased risk tolerance by investors and significantly tightened availability of credit. The duration and ultimate effect of current market conditions cannot be predicted, nor is it known whether or the degree to which such conditions may worsen. However, the continuation of current market conditions, uncertainty or further deterioration could result in further declines in the market values of potential Fund investments or declines in the market values of subsequently purchased Fund investments. Such declines could lead to diminished investment opportunities for the Fund, prevent the Fund from successfully executing its investment strategies or require the Fund to dispose of investments at a loss while such adverse market conditions prevail.

*Illiquidity*. The investments made by the Fund may be or become very illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Manager's assessment of their value or the amount paid for such investments by the Fund. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Fund and other factors. Furthermore, the nature of the Fund's investments, especially those in financially distressed companies, may require a long holding period prior to profitability. The Partnership Agreement authorizes the General Partner to make distributions in kind (including interests in affiliated liquidating vehicles) of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Short Sales*. The Fund may enter into transactions, known as "short sales," in which it sells a security it does not own in anticipation of a decline in the market value of the security. Short sales by the Fund that are not made "against the box" theoretically involve unlimited loss potential since the

Amaizy 005979

009922

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 64 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 1005 of 1017    PageID 10769
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 40 of
76

market price of securities sold short may continuously increase.    The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly.    Under adverse market conditions, the Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales.

*Derivatives*.    Derivative instruments, or "derivatives," include futures, options, swaps, structured securities and other instruments and contracts that are derived from, or the value of which is related to, one or more underlying securities, financial benchmarks, currencies or indices.    Derivatives allow an investor to hedge or speculate upon the price movements of a particular security, financial benchmark currency or index at a fraction of the cost of investing in the underlying asset.    The value of a derivative depends largely upon price movements in the underlying asset.    Therefore, many of the risks applicable to trading the underlying asset are also applicable to derivatives of such asset. However, there are a number of other risks associated with derivatives trading.    For example, because many derivatives are "leveraged," and thus provide significantly more market exposure than the money paid or deposited when the transaction is entered into, a relatively small adverse market movement can not only result in the loss of the entire investment, but may also expose the Fund to the possibility of a loss exceeding the original amount invested.    Derivatives may also expose investors to liquidity risk, as there may not be a liquid market within which to close or dispose of outstanding derivatives contracts, and to counterparty risk.    The counterparty risk lies with each party with whom the Fund contracts for the purpose of making derivative investments (the "***Counterparty***").    In the event of the Counterparty's default, the Fund will only rank as an unsecured creditor and risks the loss of all or a portion of the amounts it is contractually entitled to receive.

*Life Settlement Investments*.    The Fund may invest in life settlements or own companies that may invest in life settlements, which are the transfers of the beneficial interest in a life insurance policy by the underlying insured person to a third party.    The Fund will generally purchase the beneficial interest in a life insurance policy for more than its cash surrender value but at a discount to its face value (i.e., the payment amount set forth in the life insurance policy that is payable on the death of the insured or upon maturity of the life insurance policy).    After purchase the Fund will be responsible for premiums payable on the life insurance policy and will be entitled to receive the full face value from the insurance company upon maturation (i.e., upon the death of the insured).    Accordingly, if the Fund is unable to make premium payments on a purchased life insurance policy due to liquidity issues or for any other reason, the policy will lapse, and the Fund will lose its ownership interest in the policy.    In addition, the Fund's investments in life settlement policies involve certain additional risks, including inaccurate estimations of life expectancy of the insured individuals, liquidity risk, credit risk of the insurance company, risks of any policies purchased being unenforceable and risks of adverse regulatory and legal changes.

The actual rate of return on a life settlement policy cannot be calculated before the insured dies and the longer the insured lives, the lower the rate of return on the related life settlement policy will be. Current privacy laws may limit the information available to the Fund about insureds and may cause the Fund to inaccurately estimate the value of particular policies.    The Fund's inability to predict with certainty the life expectancies of the pool of underlying insured persons tied to purchased life settlement policies may cause unanticipated delays in the collection of a substantial number of life settlement policies.    Life settlements are also generally considered illiquid because there is a limited secondary market for such policies to be bought and sold.    Accordingly, the Fund may be limited in its ability to sell policies in its portfolio in a timely fashion and/or at a favorable price.    In addition, if a life insurance company declares bankruptcy or otherwise is insolvent, there may not be sufficient funds for it to pay

Amergis 05989
009923

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 65 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1006 of 1017 PageID 10770
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 41 of
76

its liability, and while many states have an insurance guarantee fund to provide payments to beneficiaries of insurance companies that declare bankruptcy, the collection process can be prolonged and complicated, and collection may not be possible in all circumstances.

Life settlement policies may also be subject to contest by the issuing life insurance company. If the insurance company successfully contests a policy, the policy will be rescinded and declared void. For example, insurers may refuse to pay benefits on certain life insurance policies on the basis that there was no "insurable interest" on the part of the purchaser of a life insurance policy at the time such policy was issued. Recently the issue of a lack of insurable interest has been raised by insurers and beneficiaries of irrevocable life insurance trusts, in the context of so-called "stranger originated life insurance" policies. It is possible that courts may void certain life settlement policies for these or other reasons. The market for life settlement policies may also be subject to new government regulation that may impact the ability of the Fund to obtain life settlement policies. Insurance companies may seek regulation or changes of law restricting or otherwise encumbering the transfer of life insurance policies in life settlement policy transactions. No assurance can be made that insurance companies will not be successful in limiting the supply of life insurance policies available for purchase in life settlement policy transactions.

Any or all of the risks described above could have a material adverse effect on the Fund's investment returns and, therefore, on its ability to make distributions to its shareholders. In addition, it is unclear under a variety of federal income tax principles whether the income from life settlements or the Fund's ownership in a non-U.S. company that makes distributions resulting from such life settlement investments is qualifying income for purposes of the IRS 90% gross income test the Fund must satisfy each year to qualify as a regulated investment company ("*RIC*"). Further, the Fund's ownership in a non-U.S. company that invests in life settlements, it is unclear whether the U.S. will respect the non-U.S. company reliance on the applicable U.S. tax treaty for purposes of the avoidance of certain withholding tax or whether the non-U.S. company is deemed to be engaged in a U.S. trade or business within the U.S. If any such was the case, the Fund could be materially adversely effected by such determination on the non-U.S. company with respect to the Fund's investments returns and its ability to make distributions to its shareholders. The Fund intends to monitor its investments to ensure that the Fund remains qualified as a RIC.

*Foreign Securities*. Investments in foreign securities involve certain factors not typically associated with investing in U.S. securities, such as risks relating to (i) currency exchange matters, including fluctuations in the rate of exchange between the U.S. dollar (the currency in which the books of the Fund are maintained) and the various foreign currencies in which the Fund's portfolio securities will be denominated and costs associated with conversion of investment principal and income from one currency into another; (ii) differences between the U.S. and foreign securities markets, including the absence of uniform accounting, auditing and financial reporting standards and practices and disclosure requirements, and less government supervision and regulation; (iii) political, social or economic instability; (iv) imposition of foreign income, withholding or other taxes; and (v) the extension of credit, especially in the case of sovereign debt.

*Commodities and Futures.* The Fund may trade on a limited basis in commodities and futures. Such trading activity is regulated by the Commodity Futures Trading Commission (the "*CFTC*"). Pursuant to an exemption from registration under CFTC regulations, neither the General Partner nor the Investment Manager is required to register, and neither is registered, with the CFTC or the National Futures Association ("*NFA*") as a commodity pool operator (a "*CPO*") or as a commodity trading advisor ("*CTA*"). To comply with the exemption, the Investment Manager is subject to specific

Annex 05591
009924

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 66 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1007 of 1017 PageID 10771
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 42 of
76

limitations on the amount of commodities and futures that it can trade on behalf of the Fund. Should the Fund's investments in commodities or futures instruments exceed the limits provided by the applicable exemption from registration, the Investment Manager will either have to register with the NFA or cease providing commodity interest trading advice to the Fund and liquidate the Fund's holdings of commodities and futures which could result in losses and additional costs to the Fund.

*Leverage.* Subject to applicable margin and other limitations, the Fund may borrow funds in order to make additional investments and thereby increase both the possibility of gain and risk of loss. Consequently, the effect of fluctuations in the market value of the Fund's portfolio would be amplified. Interest on borrowings will be a portfolio expense of the Fund and will affect the operating results of the Fund. Also, the Fund could potentially create leverage via the use of instruments such as options and other derivative instruments.

*Options.* Investing in options can provide a greater potential for profit or loss than an equivalent investment in the underlying asset. The value of an option may decline because of a change in the value of the underlying asset relative to the strike price, the passage of time, changes in the market's perception as to the future price behavior of the underlying asset, or any combination thereof. In the case of the purchase of an option, the risk of loss of an investor's entire investment (*i.e.*, the premium paid plus transaction charges) reflects the nature of an option as a wasting asset that may become worthless when the option expires. Where an option is written or granted (*i.e.*, sold) uncovered, the seller may be liable to pay substantial additional margin, and the risk of loss is unlimited, as the seller will be obligated to deliver, or take delivery of, an asset at a predetermined price which may, upon exercise of the option, be significantly different from the market value.

*Currency Exposure.* The Interests will be issued and generally withdrawal proceeds will be paid in U.S. Dollars. A limited amount of the assets of the Fund may, however, be invested in securities and other investments which are denominated in currencies other than U.S. Dollars. Accordingly, the value of such assets may be affected favorably or unfavorably by fluctuations in currency rates. The Investment Manager may hedge the non-U.S. currency exposure of the Fund using Currency Hedging Instruments, as described in "Investment Program" above. However, the assets of the Fund will necessarily be subject to foreign exchange risks. In addition, prospective investors whose assets and liabilities are predominately in other currencies should take into account the potential risk of loss arising from fluctuations in value between the U.S. Dollar and other currencies.

To the extent unhedged, the value of the Fund's positions in non-U.S. investments will fluctuate with U.S. Dollar exchange rates as well as with the price changes of the investments in the various local markets and currencies. In such cases, an increase in the value of the U.S. Dollar compared to the other currencies in which the Fund makes investments will reduce the effect of any increases and magnify the effect of any decreases in the prices of the Fund's financial instruments in their local markets and may result in a loss to the Fund. Conversely, a decrease in the value of the U.S. Dollar will have the opposite effect on the Fund's non-U.S. Dollar investments.

*Concentration of the Fund's Portfolio.* The Fund may be highly concentrated in CLO Securities. The concentration of the Fund's portfolio in CLO Securities subjects the Fund to a greater degree of risk than if the Fund's portfolio was diversified with respect to several investment strategies. Also, the concentration of the Fund's portfolio in any one obligor would subject the Fund to a greater degree of risk with respect to defaults by such obligor.

Amergy 05982
009925

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1008 of 1017 PageID 10772
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 43 of
76

*Volatility Risk.* The Fund's investment program may involve the purchase and sale of relatively volatile instruments such as derivatives, which are frequently valued based on implied volatilities of such derivatives compared to the historical volatility of underlying financial instruments. Fluctuations or prolonged changes in the volatility of such instruments, therefore, can adversely affect the value of investments held by the Fund. In addition, many non-U.S. financial markets are not as developed or as efficient as those in the U.S., and as a result, price volatility may be higher for the Fund's investments.

*Long-Biased Investment Program.* The Fund expects that its strategy will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Fund's assets.

*Leverage.* Leverage may take a variety of forms, including but not limited to the following: long-term loans, convertible notes and repurchase arrangements. Leverage arrangements used by the Fund when financing is contingent on the market value of the financed assets may include those which may be subject to mark to market collateral or margin calls.

While leverage presents the opportunity for increasing the total return on investments, it has the effect of potentially increasing losses as well. Accordingly, any event that adversely affects the value of an investment could be magnified to the extent leverage is utilized. The cumulative effect of the use of leverage with respect to investments in a market that moves adversely to such investments could result in a substantial loss, which would be greater than if the investments were not leveraged.

In the futures markets, margin deposits are typically low relative to the value of the futures contracts purchased or sold. Such low margin deposits are indicative of the fact that any commodity futures contract trading is typically accompanied by a high degree of leverage. Low margin deposits mean that a relatively small price movement in a futures contract may result in immediate and substantial losses to the investor. For example, if at the time of purchase 10 percent of the price of a futures contract is deposited as margin, a 10 percent decrease in the price of the futures contract would, if the contract is then closed out, result in a total loss of the margin deposit before any deduction for the brokerage commission. Thus, like other leveraged investments, any purchase or sale of a commodity contract may result in losses in excess of the amount invested.

The use of short-term margin borrowings results in certain additional risks to the Fund. For example, should the securities pledged to brokers to secure the Fund's margin accounts decline in value, the Fund could be subject to a "margin call," pursuant to which the Fund must either deposit additional funds or securities with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. In the event of a sudden drop in the value of the Fund's assets, the Fund might not be able to liquidate assets quickly enough to satisfy its margin requirements.

The Fund may borrow by entering into reverse repurchase agreements. Under a reverse repurchase agreement, the Fund sells securities and agrees to repurchase them at a mutually agreed date and price. Reverse repurchase agreements may involve the risk that the market value of the securities retained in lieu of sale by the Fund may decline below the price of the securities the Fund has sold but is obligated to repurchase. In the event the buyer of securities under a reverse repurchase agreement files for bankruptcy or becomes insolvent, such buyer or its trustee or receiver may receive an extension of time to determine whether to enforce the Fund's obligation to repurchase the securities and the Fund's use of the proceeds of the reverse repurchase agreement may effectively be restricted pending such decision. To the extent that, in the meantime, the value of the securities that the Fund has purchased has decreased, the Fund could experience a loss.

Amex 05983
009926

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1009 of 1017 PageID 10773
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 44 of
76

The financing used by the Fund to leverage its portfolio include those extended by securities brokers and dealers in the marketplace in which the Fund will invest. While the Fund attempts to negotiate the terms of these financing arrangements with such brokers and dealers, its ability to do so is limited. The Fund is therefore subject to changes in the value that the broker-dealer ascribes to a given security or position, the amount of margin required to support such security or position, the borrowing rate to finance such security or position and/or such broker-dealer's willingness to continue to provide any such credit to the Fund. In addition, the Fund could be forced to liquidate its portfolio on short notice to meet its financing obligations. The forced liquidation of all or a portion of the Fund's portfolio at distressed prices could result in significant losses to the Fund.

*Market Liquidity and Leverage*. The Fund may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Fund's ability to adjust its positions. The size of the Fund's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in overall market leverage, deleveraging as a consequence of a decision by the prime brokers and custodians, or other counterparties with which the Fund enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Fund's portfolio.

*Risks Associated with Bankruptcies*. Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors. While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Fund. Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated. The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court. This process can involve substantial legal, professional and administrative costs to the company and the Fund; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately. In some cases, the company may not be able to reorganize and may be required to liquidate assets. Although the Fund intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value. Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Fund's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class. In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor. In those cases where the Fund, by virtue of such action, is found to exercise "domination and control" of a debtor, the Fund may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Fund.

Amended 95984
009927

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 69 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1010 of 1017 PageID 10774
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 45 of
76

The Fund may invest in companies based outside the United States. Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims. In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The General Partner, on behalf of the Fund, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or enhancement of the Fund position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents. If the General Partner concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Fund, it will resign from that committee or group, and the Fund may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Fund is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Fund may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

*Equitable Subordination*. Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "**equitable subordination**"). The Fund does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Fund may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

*Fraud*. Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Fund to perfect or effectuate a lien on the collateral securing the loan. The Fund will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

*Interest Rate Risk*. The value of the fixed rate securities in which the Fund may invest generally will have an inverse relationship with interest rates. Accordingly, if interest rates rise the value of such securities may decline. In addition, to the extent that the receivables or loans underlying specific

Amur 05985
009928

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 70 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1011 of 1017 PageID 10775
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 46 of
76

securities are prepayable without penalty or premium, the value of such securities may be negatively affected by increasing prepayments, which generally occur when interest rates decline.

*Reinvestment Risk*. The Fund reinvests the cash flows received from a security. The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment. There is a risk that the interest rate at which interim cash flows can be reinvested will fall. Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds. Reinvestment risk also applies generally to the reinvestment of the proceeds the Fund receives upon the maturity or sale of a portfolio security.

The amount and timing of the addition of investments will affect the cash flows available to make payments on the Interests. Reduced liquidity and lower volumes of trading in certain investments, in addition to restrictions on investment represented by the Fund's investment criteria, could result in periods of time during which the Fund has not been able to maximize its exposure to investments. The longer the period before reinvestment of cash in investments, the greater the adverse impact may be on aggregate interest collected and distributed by the Fund, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Interests were immediately reinvested. In addition, the timing of the addition of investments, the scheduled interest payment dates of the investments and the amount of the net proceeds associated with the offering of the Interests invested in lower-yielding alternate short-term investments until applied to the addition of investments, may have a material impact on the amount of interest payments collected during any accrual period, which could affect payments on the Interests.

Further, obligors of investments may be more likely to exercise any rights they may have to prepay such obligations when interest rates or credit spreads are declining. Any decrease in the yield on the investments will have the effect of reducing the amounts available to make payments on the Interests.

*Timing Risk*. Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Fund is exposed to reinvestment rate risk, *i.e.*, the Fund will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

*Maturity Risk*. In certain situations, the Fund may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, the Fund will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

*Inflation Risk*. Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Fund purchases a five

Anex_005986
009929

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 71 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1012 of 1017 PageID 10776
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 47 of
76

(5) year bond in which it can realize a coupon rate of five percent (5%), but the rate of inflation is six percent (6%), then the purchasing power of the cash flow has declined. For all but adjustable bonds or floating rate bonds, the Fund is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Over-the-Counter-Trading*. Financial instruments that may be purchased or sold by the Fund may include instruments not traded on an exchange, including, but not limited to, swap transactions, and forward foreign currency transactions. Over-the-counter options, unlike exchange-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Fund can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Fund engages in these transactions, the Fund must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Fund may trade in the forward foreign currency market through money center banks and leading brokerage firms.

*Position Limits*. "Position limits" imposed by various regulators or regulations may also limit the Fund's ability to effect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Fund does not intend to exceed applicable position limits, it is possible that different accounts managed by the General Partner or its affiliates may be aggregated. If at any time positions managed by the General Partner were to exceed applicable position limits, the General Partner would be required to liquidate positions, which might include positions of the Fund, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Fund might have to forego or modify certain of its contemplated trades.

*Material, Nonpublic Information*. From time to time, certain personnel of the Investment Manager may come into possession of material, nonpublic information (including in connection with other investments or proposed investments not intended to benefit the Fund) that would limit the Investment Manager's ability to buy and sell investments. The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to take certain actions because of such information. The Fund may experience losses if it is unable to sell an investment that it holds because certain personnel of the Investment Manager have obtained material, nonpublic information about such investment.

*Co-Investments with Third Parties*. The Fund may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third-party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 72 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 1013 of 1017    PageID 10777
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 48 of
76

inconsistent with those of the Fund or be in a position to take (or block) action in a manner contrary to the Fund's investment objectives.   In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements.   Such compensation arrangements will reduce the returns to participants in the investments.

*Other Investment Vehicles.*   The Investment Manager may allocate a portion of the Fund's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers.   Since the Fund may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region.   Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist).   Even in the event that such information may be available to the Fund, the Fund's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

The managers of pooled investment vehicles with which the Fund may invest may be subject to asset-based fees and performance-based compensation.   Such fees or compensation may be higher than the fees or compensation of comparable investment vehicles.

Performance-based compensation is typically paid or allocated at the investment vehicle level on the basis of the performance of each individual investment vehicle, not on the basis of the overall performance of the Fund.   Consequently, performance-based compensation could be payable to a particular investment vehicle in respect of its performance during periods when the Fund as a whole incurs losses.   The existence of performance-based compensation also could cause the manager of such investment vehicle to trade in a more aggressive manner than it otherwise might.

*Futures Contracts*.   The value of futures depends upon the price of the financial instruments, such as commodities, underlying them.   The prices of futures are highly volatile, and price movements of futures contracts can be influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies.   In addition, investments in futures are also subject to the risk of the failure of any of the exchanges on which the Fund's positions trade or of its clearing houses or counterparties.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits."   Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits.   Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit.   This could prevent the Fund from promptly liquidating unfavorable positions and subject the Fund to substantial losses or prevent it from entering into desired trades.   In extraordinary circumstances, a futures exchange or the Commodities Futures Trading Commission could suspend trading in a particular futures contract, or order liquidation or settlement of all open positions in such contract.


Annex 05988
009931

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1014 of 1017 PageID 10778
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 49 of
76

*Forward Trading*. Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in any market traded by the Fund due to unusual trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward trading to less than that which the General Partner would otherwise recommend, to the possible detriment of the Fund. Market illiquidity or disruption could result in major losses to the Fund.

*Hedging Transactions*. The Fund may (but is not required to) utilize financial instruments both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of the Fund's investment portfolios resulting from fluctuations in the markets and changes in interest rates; (ii) protect the Fund's unrealized gains in the value of its investment portfolio; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in the Fund's portfolios; (v) hedge against a directional trade; (vi) hedge the interest rate, credit or currency exchange rate on any of the Fund's financial instruments; (vii) protect against any increase in the price of any financial instruments the Fund anticipates purchasing at a later date; or (viii) act for any other reason that the Investment Manager deems appropriate. The Fund will not be required to hedge any particular risk in connection with a particular transaction or its portfolios generally.

The success of the Fund's hedging strategy will be subject to the Investment Manager's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged. Since the characteristics of many securities change as markets change or time passes, the success of the Fund's hedging strategy will also be subject to the Investment Manager's ability to continually recalculate, readjust, and execute hedges in an efficient and timely manner. While the Fund may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Fund than if it had not engaged in any such hedging transactions. For a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss. The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Fund's portfolio holdings. Moreover, it should be noted that the portfolio will always be exposed to certain risks that cannot be hedged.

*Use of Derivatives and Other Specialized Techniques*. The Fund may engage in a variety of swaps and related derivative transactions including, but not limited to, total return swaps, interest rate swaps, credit derivative swaps, the use of forward contracts, put and call options, floors, collars or other similar arrangements and derivative transactions. While some swaps will be required to be cleared and entered into through exchanges once the U.S. Commodity Futures Trading Commission (the "**CFTC**") makes its final clearing determination, swap contracts excluded from the clearing determination will not be traded on exchanges and will not be subject to margin and clearing requirements or the same type of

ANDER 05989
009932

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1015 of 1017 PageID 10779
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 50 of
76

government regulation as exchange markets. As a result, many of the protections afforded to participants on organized exchanges and in a regulated environment are not available in connection with these transactions. The swap markets with respect to noncleared swaps are "principals' markets", in which performance with respect to a swap contract is the responsibility only of the counterparty to the contract, and not of any exchange or clearinghouse. As a result, the Fund will be subject to the risk of the inability or refusal to perform with respect to non-cleared swap contracts on the part of the counterparties with whom the Fund will trade.

There are no limitations on daily price movements in swap transactions. Speculative position limits are not currently applicable to swap transactions, although the Fund's swap counterparties may limit the size or duration of positions available to the Fund as a consequence of credit considerations. In addition, the CFTC has sought to impose federal speculative position limits on futures, swaps that reference those futures and contracts on non-U.S. boards of trade that settle against those contracts. While the CFTC adopted final position limits, the rulemaking was vacated due to the CFTC's failure to perform proper cost benefit analysis. If the CFTC re-adopts rules or the above referenced discussion is overturned on appeal, the Fund may be limited in its ability to concentrate its positions in certain swaps. Furthermore, the Fund may also be subject to position limits pursuant to current or pending non-U.S. regulations.

Participants in the swap markets are not required to make continuous markets in the swap contracts in which they trade. Participants could refuse to quote prices for swap contracts or quote prices with an unusually wide spread between the price at which they are prepared to buy and the price at which they are prepared to sell. If an event of default or an additional termination event were to occur with respect to the Fund under an ISDA master agreement governing the Fund's swap transactions, the relevant swap counterparty and other swap counterparties may terminate all transactions with the Fund at significant losses to the Fund.

In addition to the foregoing, the investment techniques related to derivative instruments are highly specialized and may be considered speculative. Such techniques often involve forecasts and complex judgments regarding relative price movements and other economic developments. The success or failure of these investment techniques may turn on small changes in exogenous factors not within the control of any of the Investment Manager. For all the foregoing reasons, the use of derivatives and related techniques can expose the Fund to significant risk of loss.

Moreover, trading in swaps and other derivative instruments offers scope for a high degree of synthetic leverage. Accordingly, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Fund. Thus, like other leveraged investments, a derivatives trade may result in losses in excess of the amount invested. Any increase in the amount of leverage applied will increase the risk of loss due to the amount of additional leverage applied. Also, swap agreements tend to shift the investment exposure from one type of investment to another. Depending on how they are used, swap agreements may increase or decrease the overall volatility of the Fund. The most significant factor in the performance of swap agreements is the change in the specific factors that determine the amounts of payments due to and from the Fund. If a swap agreement calls for payments by the Fund, the Fund must be prepared to make such payments when due. In addition, if a counterparty's creditworthiness declines, the value of swap agreements with such counterparty can be expected to decline, potentially resulting in losses to the Fund.

Amir 005999
009933

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:25-cv-02072-S Document 15-12 Filed 10/06/25 Page 1016 of 1017 PageID 10780
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 51 of
76

Finally, counterparties to the Fund may be subject to capital and other requirements as a "swap dealer" or "major swap participant" which may increase their costs of doing of business, a portion of which increase may be passed on to the Fund. If a person is deemed to (i) enter into swaps as its ordinary course of business, (ii) be a market maker for any type of swaps, (iii) maintain a "substantial position" in any type of swap for speculative purposes, (iv) otherwise create counterparty risk that could have serious adverse consequences on the financial stability of the United States, or (v) be a financial entity that is highly leveraged relevant to its capital, the person may be deemed to be a swap dealer (in the case of (i) or (ii)) or a major swap participant (in the case of (iii), (iv) or (v)). Persons deemed to be swap dealers or major swap participants are required to register with the CFTC as such and would be subject to a number of regulatory requirements, such as specific recordkeeping, back-office and reporting requirements, margin collection requirements for swaps that are not cleared, capital requirements, disclosure obligations, specific compliance obligations and special obligations to governmental entities. While it is unlikely that the Fund would be subject to these requirements, the requirements will likely apply to many of the Fund's counterparties which may increase the cost of trading swaps through increased fees to offset the counterparties' trading and compliance costs.

*Counterparty Insolvency.* The Fund's assets may be held in one or more accounts maintained for the Fund by counterparties, including its prime brokers. There is a risk that any of such counterparties could become insolvent. In September 2008, Lehman Brothers Holdings Inc., a major investment bank based in the United States, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. While none of its U.S. broker-dealer subsidiaries was included in the Chapter 11 filing and all of its U.S. registered broker-dealer subsidiaries currently continue to operate, certain of Lehman Brothers subsidiaries, including Lehman Brothers International (Europe) ("*LBIE*") have been placed under the administration chartered to wind down their respective business. To date, it is uncertain what percentage of the assets custodied with LBIE by its trading counterparties (including hedge funds) will ultimately be recovered and when. The insolvency of the Fund's counterparties is likely to impair the operational capabilities or the assets of the Fund. Although the Investment Manager regularly monitors the financial condition of the counterparties it uses, if one or more of the Fund's counterparties were to become insolvent or the subject of liquidation proceedings in the United States (either under the Securities Investor Protection Act or the United States Bankruptcy Code), there exists the risk that the recovery of the Fund's securities and other assets from such prime broker or broker-dealer will be delayed or be of a value less than the value of the securities or assets originally entrusted to such prime broker or broker-dealer.

In addition, the Fund may use counterparties located in various jurisdictions outside the United States like LBIE. Such local counterparties are subject to various laws and regulations in various jurisdictions that are designed to protect their customers in the event of their insolvency. However, the practical effect of these laws and their application to the Fund's assets are subject to substantial limitations and uncertainties. Because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a counterparty, it is impossible to generalize about the effect of their insolvency on the Fund and its assets. Investors should assume that the insolvency of any counterparty would result in a loss to the Fund and the Fund, which could be material.

*Counterparty Risk.* Some of the markets in which the Fund may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange-based" markets. This exposes the Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not *bona fide*) or because of a

HMIT 005591
009934

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:25-cv-02072-S    Document 15-12    Filed 10/06/25    Page 1017 of 1017    PageID 10781
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 52 of
76

credit or liquidity problem, thus causing the Fund to suffer a loss.  Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small group of counterparties.  The Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty.  Moreover, the Fund's internal credit function which evaluates the creditworthiness of its counterparties may prove insufficient.  The lack of a complete and "foolproof" evaluation of the financial capabilities of the Fund's counterparties and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Fund.

*Exchange-Traded Funds.*  The Fund may invest in exchange-traded funds ("***ETFs***"), which are shares of publicly-traded unit investment trusts, open-end funds, or depository receipts that seek to track the performance and dividend yield of specific indices or companies in related industries.  These indices may be either broad-based, sector, or international.  ETF shareholders are generally subject to the same risk as holders of the underlying securities they are designed to track.  ETFs are also subject to certain additional risks, including, without limitation, the risk that their prices may not correlate perfectly with changes in the prices of the underlying securities they are designed to track, and the risk of trading in an ETF halting due to market conditions or other reasons, based on the policies of the exchange upon which the ETF trades.  In addition, the Fund may bear, along with other shareholders of an ETF, its *pro rata* portion of the ETF's expenses, including management fees.  Accordingly, in addition to bearing their proportionate share of the Fund's expenses (e.g., Management Fees and operating expenses), Partners may also indirectly bear similar expenses of an ETF, which may have a material adverse effect on the performance of the Fund.

*Non-U.S. Investments and Emerging Markets*.  Investing in the securities of companies located outside the U.S. (including, western countries, "emerging market" countries and underdeveloped countries) involves certain considerations not usually associated with investing in securities of U.S. companies, including political and economic considerations, such as greater risks of expropriation and nationalization, confiscatory taxation, the potential difficulty of repatriating funds, general social, political and economic instability and adverse diplomatic developments; the possibility of imposition of withholding or other taxes on dividends, interest, capital gain or other income; the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; and certain government policies that may restrict the Fund's investment opportunities.

In addition, accounting and financial reporting standards that prevail in non-U.S. countries generally are not equivalent to U.S. standards and, consequently, less information is available to shareholders of companies located in such countries than is available to shareholders of companies located in the U.S.  Moreover, an issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associate risks, are not expected to be highly correlated with each other and may behave in unpredictable ways.  There is also less regulation, generally, of the securities markets in non-U.S. countries.

The Fund may be subject to additional risks which include possible adverse political and economic developments, possible seizure or nationalization of non-U.S. deposits and possible adoption of governmental restrictions which might adversely affect the payment of principal and interest to investors located outside the country of the issuer, whether from currency blockage or otherwise. Furthermore, some of the securities may be subject to brokerage, stamp or other taxes levied by

Amex 05592
009935