**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  |  |
|---|---|
| | § |
| | §   Case No**. 19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** | |
| | § |
| vs. | § |
| | |
| **Highland Capital Management, L.P.** | |
| **Et al-** Appellee | |
| | §          **3:25-cv-02072-S** |
| | § |

**[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

## Volume 13

## APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

### APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

*Vol. 1*

*000001*

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*

2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*

3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru Vol. 5*

*Vol. 5*
*003493*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

| | | | |
|---|---|---|---|
| **Vol 5**<br>00 3504 | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| 00 3519 | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| 00 3521 | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| 00 3530 | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| **Vol 6**<br>00 3544 | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| 00 3909 | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru END of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
|---|---|---|---|
| | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

vol. 15

011855

011864

011869

011874

5

*Vol 15*

| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*011877*

*012039*

*N/A*
*NO PDF*
*AVAilAble*

*012047*

6

*Vol. 15*

*012050*

*012077*
*Vol. 16*
*012079*

*012357*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | | | |
|---|---|---|---|
| Vol 16 012361 | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| Vol 17 012363 | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| 0126411 | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| Vol 18 012697 Thru END of Vol.21 | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| Vol. 22 016732 | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| 016737 | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| 016773 | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| 016809 | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

*Vol. 22*

| | Date | Doc # | Description |
|---|---|---|---|
| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1, #2 Exhibit 2, #3 Exhibit 3, #4 Exhibit 4, #5 Exhibit 5, #6 Exhibit 6, #7 Exhibit 7, #8 Exhibit 8, #9 Exhibit 9, #10 Exhibit 10, #11 Exhibit 11, #12 Exhibit 12, #13 Exhibit 13, #14 Exhibit 14, #15 Exhibit 15, #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*vol. 26*

*019524*

*019527*

| | | | |
|---|---|---|---|
| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
| *Vol. 27* *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28* *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| VOL. 28 | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York; Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| 020266 | | | |
| VOL. 29 | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| 020267 | | | |
| | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| 020271 | | | |
| | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020282 | | | |
| | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| 020289 | | | |

| | | | |
|---|---|---|---|
| *Vol. 29* 020296 | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| 020298 | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| 020300 | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| 020309 | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 020311 | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* 020407 | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

*Vol. 31*

*020680*

*020696*

*020808*

*020830*

*020837*

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 7/21/2025 | 4333 | | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| 7/21/2025 | 4334 | | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| 8/4/2025 | 4353 | | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| 8/5/2025 | 4359 | | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| 8/15/2025 | 4372 | | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025              Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 18 of 1017 PageID 10799
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 53 of
76

governments, which has the effect of increasing the cost of such investment and reducing the realized gain or increasing the realized loss on such securities at the time of sale. Furthermore, a non-U.S. issuer of debt or the non-U.S. governmental authorities that control the repayment of the debt may be unable or unwilling to repay principal or interest when due, and the Fund may have limited recourse in the event of a default. Some of these risks do not apply equally to issuers in larger, more developed countries. These risks are more pronounced in investments in issuers in countries with emerging markets or if the Fund invests significantly in a particular country.

Investment in emerging market securities and underdeveloped markets involves a greater degree of risk than an investment in securities of issuers based in developed countries. Among other things, emerging market securities investments may carry the risks of less publicly available information, more volatile markets, less strict securities market regulation, less favorable tax provisions and a greater likelihood of severe inflation, unstable currency, war and expropriation of personal property than investments in securities of issuers based in developed countries. In addition, the Fund's investment opportunities in certain emerging markets may be restricted by legal limits on foreign investment in local securities.

Emerging markets generally are not as efficient as those in developed countries. In some cases, a market for the security may not exist locally, and transactions will need to be made on a neighboring exchange. Volume and liquidity levels in emerging markets are lower than in developed countries. When seeking to sell emerging market securities, little or no market may exist for the securities. In addition, issuers based in emerging markets are not generally subject to uniform accounting and financial reporting standards, practices and requirements comparable to those applicable to issuers based in developed countries, thereby potentially increasing the risk of fraud or other deceptive practices. Furthermore, the quality and reliability of official data published by the government or securities exchanges in emerging markets may not accurately reflect the actual circumstances being reported.

The issuers of some non-U.S. securities, such as banks and other financial institutions, may be subject to less stringent regulations in emerging markets than would be the case for issuers in developed countries and therefore potentially carry greater risk. Custodial expenses for a portfolio of emerging markets securities generally are higher than for a portfolio of securities of issuers based in developed countries.

While the General Partner will take these factors into consideration in making investment decisions for the Fund, no assurance can be given that they will be able to fully avoid these risks.

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

**Tax Related Risks**

*Tax Uncertainty*. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative


Amara 05993
009936

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 19 of 1017 PageID 10800
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 54 of
76

regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "***Service***"), or significantly modified by new legislation, changes in the Service's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the General Partner with respect to the federal income tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*. An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund. If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund. The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Tax Considerations Taken into Account*. The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax Liabilities Without Distributions*. If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its distributive share of the Fund's profits, whether or not such profits have been distributed. Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities. In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund. Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter. In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter. Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

*Delayed Schedules K-1*. The Fund will provide Schedules K-1 as soon as practical after receipt of all of the necessary information. However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year. The



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 79 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 20 of 1017 PageID 10801
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 55 of
76

General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income*. The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("*UBTI*"). Thus, an investment in the Fund may not be desirable for certain tax-exempt investors. The Fund may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes. Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI. Because of the Investment Manager's objective of maximizing the pre-tax returns of all the Limited Partners, the Investment Manager may be required to make certain decisions to maximize pre-tax returns that result in Tax-Exempt U.S. Investors (as defined below) recognizing more UBTI than might otherwise be the case. In some cases, the Investment Manager may forego actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes*. Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "*Code*") may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund. Many of the relevant tax considerations will vary depending on a prospective Limited Partner's individual circumstances. The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations. Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA and Other Regulatory Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

## Potential Conflicts of Interest

The scope of the activities of the Investment Manager, its affiliates, and the funds and clients managed or advised by the Investment Manager or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Fund in the future that cannot be foreseen



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 80 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 21 of 1017 PageID 10802
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 56 of
76

or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "**Highland Group**") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Manager is permitted to manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "**CDOs**") and other vehicles managed by members of the Highland Group ("**Highland Accounts**") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) Affiliated Investors may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Manager will devote to the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (vi) the need to re-size risk in the account's portfolio. The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 22 of 1017 PageID 10803
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 57 of
76

allocate the trades among different accounts on a basis it considers fair and equitable over time.   One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis.

The General Partner and/or its affiliates may open "average price" accounts with brokers.   In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Fund, the Highland Accounts or affiliates of the General Partner are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types.   The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities.   The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest.   In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be pari passu, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships.   Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund.   In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund.   The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund.   In addition, in managing the Fund's portfolio, the Investment Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest.   Furthermore, in connection with actions taken in the ordinary course of business of the Investment Manager in accordance with its fiduciary duties to its other clients, the Investment Manager may take, or be required to take, actions which adversely affect the interests of the Fund.

In connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Manager to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Manager's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Manager will devote as much time to the Fund as the Investment Manager deems appropriate to perform its duties in accordance with the Investment Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Manager's other accounts.

HMIT 009940

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 82 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 23 of 1017    PageID 10804
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 58 of
76

The directors, officers, personnel, employees and agents of the Investment Manager and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Fund or other entities that operate in the same or a related line of business as the Fund, for other clients managed by the Investment Manager or its affiliates, or for any obligor or issuer in respect of the CLOs, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Fund, such affiliated entities or any obligor or issuer in respect of any of the CLOs pursuant to their respective governing instruments, and the Fund shall have no right to any such fees.   In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund.

There is no limitation or restriction on the Investment Manager or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Manager and/or its affiliates may give rise to additional conflicts of interest.   Such conflicts may relate to obligations that the Investment Manager's investment committee, the Investment Manager or its affiliates have to other clients.

The Investment Manager and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CLOs and Highland Accounts purchased by the Fund.   Such transactions are on an arm's-length basis and shall be subject to fees that are no greater than arm's-length fees.   There is no expectation for preferential access to transactions involving CLOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Manager and/or its affiliates and the Fund shall not have any right to any such fees.

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates.   The Investment Manager may engage in a client cross-transaction involving the Fund any time that the Investment Manager believes such transaction to be fair to the Fund and such other client.   By purchasing an Interest in the Fund, a Limited Partner is deemed to have consented to such client cross-transactions between the Fund and another client of the Investment Manager or one of its affiliates.

As further described below, the Investment Manager may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Manager and/or its affiliates, in each case in accordance with applicable law, which may include the Investment Manager obtaining the consent and approval of the Advisory Committee prior to engaging in any such principal transaction between the Fund and the Investment Manager or its affiliates.   By subscribing for Interests, the Limited Partners are deemed to have consented to such procedures relating to principal transactions between the Fund and the Investment Manager or its affiliates.

The Investment Manager may direct the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements.   In addition, the Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Manager's own investments in such companies.   Moreover, the Fund may invest in assets originated by the Investment Manager or its affiliates.   In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the

009941

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 83 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 24 of 1017    PageID 10805
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 59 of
76

Fund and the other parties to such trade.   Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates.   In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law.   The Investment Manager may obtain the Fund's written consent through the Advisory Committee if any such transaction requires the consent of the Fund under Section 206(3) of the Advisers Act.

There are generally no ethical screens or information barriers among the Investment Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.   If the Investment Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Fund to acquire a particular CLO Security, the Investment Manager may be prevented from causing the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Manager. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Investment Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.   Inadvertent trading on material non-public information could have adverse effects on the Investment Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Manager's ability to perform its portfolio management services to the Fund.   In addition, while the Investment Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers.   In such event, the Investment Manager's ability to operate as an integrated platform could also be impaired, which would limit the Investment Manager's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") serves as counsel to the Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "*Clients*") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time.   Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund.   In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests.   No independent counsel has been retained to represent the Limited Partners.   In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the principal's biographical data, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

HMIT 009942

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 84 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 25 of 1017    PageID 10806
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 60 of
76

## BROKERAGE AND CUSTODY

**Portfolio Transactions**

Substantially all of the Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at The Bank of New York Mellon ("**BNY Mellon**").

BNY Mellon and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services).   In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including the broker-dealer's research capabilities and the success of prior research recommendations, ability to efficiently execute difficult trades (such as those in illiquid markets or trades of substantial size), the broker's risk in positioning a block of securities, commitment of capital, access to new issues, nature and frequency of sales coverage, depth of services provided, including economic or political coverage, arbitrage and option operations, back office and processing capabilities, financial strength, stability and responsibility, efficiency, reputation, access to markets, confidentiality, commission rate, responsiveness to the Investment Manager and the value of research and brokerage and research products and services provided by such brokers.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager.   However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Fund.

Broker-dealers may provide research that may include written or oral proprietary research. Broker-dealers may also provide research products that include software and related support services for use in research and trading, quotation boards, computer databases and quotation equipment, in each case to access research or which provide research directly.   Research services may include, among other things, research concerning market, economic and financial data, statistical information, data on pricing and availability of securities, financial publications, attendance at conferences and meetings, electronic market quotations, performance measurement services, analyses and/or due diligence concerning specific securities, companies or sectors, including due diligence on specific aspects of a company's operations or finances, analyses on issues raised in proxy statements and market, economic and financial studies and forecasts.   Research services may be in written or oral form or on-line and may be produced by broker-dealers or third parties such as attorneys, accountants or consultants.   Brokerage products and services may include certain order management system components and order routing.

The receipt of brokerage and research products from broker-dealers through client commission payments is commonly referred to as "soft dollars."   Broker-dealers may provide products and services paid for through soft dollars either directly or through credits deposited into an account that may be used for research developed by the broker-dealer, third-party research and brokerage services. Section 28(e) of the Exchange Act provides a safe harbor from liability for breach of fiduciary duties relating to the purchase of limited research or brokerage services using soft dollars so long as the products and services received constitute lawful and appropriate assistance and the amount indirectly paid for those products or services is reasonable.   If the Investment Manager uses research or

009943

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 85 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 26 of 1017    PageID 10807
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 61 of
76

brokerage products or services, it intends to limit research and brokerage to those services included in the safe harbor under Section 28(e) of the Exchange Act.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients.   The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be supplemental to the Investment Manager's own research efforts.   While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products.   As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.   In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.   The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources.   The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients.

The Investment Manager will be responsible for the placement of the portfolio transactions of the Fund and the negotiation of any commissions or spreads paid on such transactions.   Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments.   Portfolio transactions through brokers involve a commission to the broker.   Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion.

## Custody

Custody of the Fund's assets is maintained by brokers and banks selected by the Investment Manager in its sole discretion.   The custodian or custodians may be changed at any time and from time to time by the Investment Manager without the consent of the Fund.   Currently, the custodian is BNY Mellon.   The Fund is eligible for insurance coverage against loss with respect to assets held in the custody of BNY Mellon in the event of the bankruptcy or liquidation of BNY Mellon to the same extent BNY Mellon's other customers.

NV_R2 009944

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 27 of 1017 PageID 10808
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 62 of
76

# TAX CONSIDERATIONS

## Introduction

The following is a summary of certain aspects of the taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the Treasury regulations promulgated under the Code (the "***Treasury Regulations***"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code section 1221.

Further, this discussion assumes that all non-U.S. persons will invest in the Offshore Fund and will not invest in the Fund and, therefore, does not address the tax considerations relevant to an investment in the Fund by a non-U.S. person.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or non-U.S. tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("***AMT***") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

*The tax consequences of an investment in the Fund are particularly complex. Accordingly, prospective investors should not consider this discussion as a substitute for careful tax planning. Prospective investors should consult with their own tax advisors, attorneys or accountants on matters relating to an investment in the Fund with special references to such investor's particular situation.*

HCMLPHCMFA00009945

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 28 of 1017 PageID 10809
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 63 of
76

**Certain United States Taxation Matters**

Classification of the Fund

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, the Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). Depending on the number of Partners, the Fund may qualify for a safe harbor exemption for partnerships that are offered to investors in a private placement.

The remainder of this discussion assumes that the Fund will be treated, for U.S. federal income tax purposes, as a partnership and not as a publicly traded partnership treated as an association that is taxable as a corporation.

U.S. Federal Income Taxation of the Fund and Partners Generally

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner will be required to report separately on its income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's taxable income and gain regardless of whether it has received or will receive a distribution from the Fund. Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. An audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "***Tax Matters Partner***," will have the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

Amex 060983
009946

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 88 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 29 of 1017    PageID 10810
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 64 of
76

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest.   There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation.   If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or investor, and not as a dealer, with respect to its securities transactions.   Generally, the gains and losses realized by a trader or investor on the sale of securities are capital gains and losses.   Thus, in general, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses.   These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction.   Property held for more than 12 months generally will be eligible for long-term capital gain or loss treatment.   Long term capital gains may be eligible for favorable tax rates in the hands of non-corporate U.S. Limited Partners. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals who are U.S. persons with "modified adjusted gross income" that exceeds certain thresholds (for example, $250,000 for married individuals filing jointly, $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold.   The General Partner expects that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years will be subject to this tax.   This tax will be in addition to any U.S. federal income tax imposed on such Limited Partners with respect to their allocable share of income of the Fund.   Trusts and estates also may be subject to this additional tax.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments.   Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund.   For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands.   Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains.   These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund.   Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year.   Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities.   For instance, the Fund may hold debt obligations with "original issue discount."   In such case, the Fund will be required to include a portion of such discount in its taxable income on a current

009947

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 89 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 30 of 1017 PageID 10811
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 65 of
76

basis, and the Fund must allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund. The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market. The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities. The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment. Once a Code section 475(f) election is made, it can be revoked only with the consent of the Service. In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses. The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security. These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment. Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative. In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments. In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260. The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners. However, there can be no assurance that the Service or a court would agree with the Fund's position. Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable

HMIT 009285
009948

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 31 of 1017 PageID 10812
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 66 of
76

proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests. Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash non-liquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Partner's holding period (or holding periods) for its Interest. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

HMIT 006006
009949

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 91 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 32 of 1017 PageID 10813
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 67 of
76

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables). However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c). Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal. In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners. Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses and Deductions</u>

Limited Partners that are individuals or certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund. For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Code section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund) would be deductible only as itemized deductions, subject to the limitations of Code sections 67 and 68. In this regard, if all or a portion of the Performance Allocation to the General Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's alternative minimum taxable income and alternative minimum tax liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Code section 469. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 92 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 33 of 1017 PageID 10814
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 68 of
76

losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain and qualified dividend income is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources including the Fund. Any amount not deducted as a result of the application of the investment interest limitation may be carried forward to future years, subject to certain limitations. The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but may, by election of the Fund, be capitalized and amortized over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

Tax Consequences for Tax-Exempt U.S. Investors

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "**Tax-Exempt U.S. Investor**") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("**UBTI**") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. Therefore, in light of the Fund's investment program, a Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph).

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("**UDFI**"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 93 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 34 of 1017 PageID 10815
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 69 of
76

proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI will vary depending upon the degree of leverage utilized by the Fund and could be significant. In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

> *We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.*

<u>Investor Tax Filings and Record Retention.</u>

The U.S. Treasury Department has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, these Treasury Regulations require investors in specified transactions (including partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties (in addition to penalties that generally may be applicable as a result of a failure to comply with the applicable Treasury Regulations) may be imposed for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope, and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain investors to the special tax filing and record retention rules. Additionally, under these Treasury Regulations, an investor's recognition of loss upon its disposition of its Interest could cause the investor to become subject to special tax filing and record retention rules. The General Partner intends to use its reasonable efforts to provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund.

<u>Reporting under FATCA</u>

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the IRS (an "***FFI Agreement***"), and/or complies with an IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

Annex 009952

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 94 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 35 of 1017 PageID 10816
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 70 of
76

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. Additional guidance is forthcoming.

It is possible that a lower-tier non-U.S. entity in which the Fund invests may be considered an FFI. The Fund intends to assist lower-tier non-U.S. entities in complying with FATCA, but can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

Further, the Fund may be required to act as a withholding agent for the Service under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation (including the prescribed forms) to the Fund or its agents showing its exemption from such withholding or compliance with FATCA. The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations of income and gains made to investors.

The General Partner and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned. In this regard, the General Partner and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner and the Fund in complying with their obligations under FATCA. In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the General Partner, and the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

*__Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.__*

<u>State and Local Taxes</u>

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income. Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents. Each potential investor is urged to consult with its own tax advisor in this regard.



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 95 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 36 of 1017 PageID 10817
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 71 of
76

*__Each prospective Limited Partner should consult its own tax advisor with respect to its state
and local tax consequences and filing obligations as a result of an investment in the Fund.__*

<u>Other Taxes</u>

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

<u>Tax Returns; Tax Audits</u>

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner has the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. If the income tax returns of the Fund are audited by the Service, the tax treatment of the Fund's income and deductions is generally determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedural rights of all Limited Partners. In addition, the Tax Matters Partner has the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction. However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties. Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

009954

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 37 of 1017 PageID 10818
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 72 of
76

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund. In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding an Interest. The foregoing does not address tax considerations affecting investors that are not U.S. persons. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any foreign tax consequences of such an investment in its particular situation.*

009955

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 97 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 38 of 1017 PageID 10819
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 73 of
76

## ERISA AND OTHER REGULATORY CONSIDERATIONS

**ERISA Considerations**

General

    Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their capital or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

Plan Asset Regulations and Benefit Plan Investors

    The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "***Benefit Plan Investors***" means any employee benefit plan subject to part 4 of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

    In order to prevent the assets of the Fund from being considered Plan Assets under ERISA, it is the intention of the Fund to monitor the investments in the Fund and prohibit the acquisition, withdrawal or transfer of any Interests by any Limited Partner, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of Interests of any class owned by Benefit Plan Investors would be less than 25% of the aggregate value of the class of Interests (determined, as described above, by excluding certain Interests held by the General Partner, other fiduciaries and affiliates).

    Without limiting the generality of the foregoing, in order to limit equity participation in any class of Interests by Benefit Plan Investors to less than 25%, the Fund may require the compulsory withdrawal of Interests of any class. Each Limited Partner that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 98 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 39 of 1017 PageID 10820
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 74 of
76

Interests the maximum percentage of such general account or Plan Asset Entity that will constitute Plan Assets (the "**Maximum Percentage**") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the General Partner of that occurrence and shall, if and as directed by the General Partner, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Interests held in its general account or Plan Asset Entity by the end of the next following calendar month (or such earlier period directed by the General Partner).

If the Fund's assets were considered Plan Assets, then, under ERISA and the Code, the General Partner would be a fiduciary, and certain employees, partners and officers of the General Partner as well as certain affiliates would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties, the lending of money or other extensions of credit, the sale, exchange or leasing of property by the Fund or certain related parties or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in Interests by persons who are fiduciaries, and/or parties-in-interest and disqualified persons, to a Plan might be deemed to constitute prohibited transactions under such circumstances.

<u>Representation by Plans</u>

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

<u>Ineligible Purchasers</u>

Interests may not be purchased with Plan Assets if the General Partner, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

<u>Plans' Reporting Obligations</u>

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting obligation for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 99 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 40 of 1017 PageID 10821
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 75 of
76

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

**Other Regulatory Matters**

<u>Securities Act of 1933</u>

Interests are not registered under the U.S. Securities Act of 1933, as amended, or any other securities law, including state securities or blue sky laws. Interests are offered without registration in reliance upon the exemption contained in Regulation D of this act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering. Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

<u>Investment Company Act of 1940</u>

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended, in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act. "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million. Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

<u>Investment Adviser Registration</u>

The Investment Manager is registered as an investment adviser with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended (the "***Advisers Act***"). Each prospective investor will be required to make a representation to indicate that it is a "qualified client" as defined in the Advisers Act.

<u>Commodity Exchange Act</u>

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator or commodity trading adviser under the U.S. Commodity Exchange Act because the Fund is limiting participation to certain qualified investors, is restricting the Fund's commodity interest trading, and the Investment Manager only provides commodity trading advice to the Fund (or other pools for which it is an exempt commodity pool operator). Therefore, unlike a registered commodity pool operator, there is no requirement to deliver this Memorandum or other disclosure document or any certified annual report to the Fund's investors.



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 100
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 41 of 1017 PageID 10822
Case 19-34054-sgj11 Doc 2308-1 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 76 of
76

<u>Anti-Money Laundering Regulations</u>

All subscriptions for Interests will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the General Partner or its delegate may require verification of identity from all prospective investors. Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The General Partner reserves the right to request such information as is necessary to verify the identity of a prospective investor. The General Partner also reserves the right to request such identification evidence in respect of a transferee of Interests. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the General Partner may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The General Partner also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the General Partner suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the General Partner and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

009959

Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 49

# **EXHIBIT 2**

009960

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 102
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 43 of 1017 PageID 10824
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 2 of 49

Memorandum Number _____

# Confidential Private Offering Memorandum

*Series B, Series C and Series D Shares of*

## Highland Multi Strategy Credit Fund, Ltd.

*A Cayman Islands Exempted Company*

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

***This Confidential Private Offering Memorandum must be read in conjunction with the Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.***

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 103
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 44 of 1017   PageID 10825
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 3 of 49

## TABLE OF CONTENTS

Page

NOTICE ............................................................................................................... 1

DIRECTORY ....................................................................................................... 4

INTRODUCTION ................................................................................................ 5

MANAGEMENT ................................................................................................. 6

SUMMARY OF TERMS ..................................................................................... 9

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST ................ 22

SHARES OF THE FUND .................................................................................... 27

TAX CONSIDERATIONS ................................................................................... 31

ERISA CONSIDERATIONS ............................................................................... 39

CAYMAN ISLANDS MUTUAL FUND LAW .................................................. 42

ANTI-MONEY LAUNDERING COMPLIANCE .............................................. 43

ANNEX A ............................................................................................................ 45

Attachment:   Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.

009962

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 104
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 45 of 1017 PageID 10826
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 49

**NOTICE**

This Private Offering Memorandum (this "*Memorandum*") is confidential and intended solely for the use of the person to whom it has been delivered by Highland Multi Strategy Credit Fund, Ltd. (the "*Fund*") for the purpose of enabling the recipient to evaluate an investment in the Fund. The purpose of the Fund is to invest all of its assets in, and carry out its investment program through, Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "*Partnership*"). Accordingly, this Memorandum must be read in conjunction with the Partnership's Confidential Private Placement Memorandum, as amended and supplemented from time to time (the "*Partnership Memorandum*").

This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of the Fund (other than to professional advisors and employees of the investor receiving this Memorandum from the Fund or its authorized representative or such investor) and all recipients agree they will keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment and monitoring a subsequent investment in the Fund. Notwithstanding the foregoing, each investor (and each employee, representative or other agent of each investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment or tax structure. Acceptance of this Memorandum and the Partnership Memorandum by a recipient constitutes an agreement to be bound by the foregoing terms. No person is authorized to make any representations concerning the Fund which are inconsistent with those contained in this Memorandum.

Prospective investors are not to construe the contents of this Memorandum or the Partnership Memorandum as legal, tax, investment or other advice. Each prospective investor should consult its own advisors as to legal, financial, tax, ERISA and other related matters concerning an investment in the Fund.

In making an investment decision, investors must review both this Memorandum and the Partnership Memorandum and must rely on their own examination of the Fund and the Partnership and the terms of the offering, including the merits and risks involved. The shares in the Fund (the "*Shares*") have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities, and this Memorandum shall not constitute an offer to sell or a solicitation of an offer to buy nor shall there be any sale of Shares in any jurisdiction in which such offer, solicitation or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation or sale.

In each member state of the European Economic Area (each a "*Relevant Member State*") that has implemented EU Directive 2011/61/EU on Alternative Investment Fund Managers (the "*AIFM Directive*"), the Fund may only be offered to investors in accordance with local measures implementing



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 46 of 1017 PageID 10827
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 49

the AIFM Directive. Investors in a Relevant Member State where the Fund is not being offered pursuant to private placement rules implementing the AIFM Directive may invest in the Fund, but only in circumstances where they do so at their own initiative.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Shares other than the information contained in the Memorandum and the Partnership Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund.

The Shares have not been, and will not, be registered under the United States Securities Act of 1933, as amended, or the securities laws of any of the states of the United States, and the Fund has not been and will not be registered under the United States Investment Company Act of 1940, as amended. Direct or indirect acquisition or ownership of Shares by "*U.S. Persons*" (as defined herein) without compliance with applicable U.S. securities laws or in contravention of the relevant provisions of the constituent documents of the Fund is prohibited.

The Fund is not a recognized collective investment scheme for the purposes of Section 264 of the Financial Services and Markets Act 2000 of the United Kingdom (the "*Act*"). The promotion of the Fund and the distribution of this Memorandum in the United Kingdom are accordingly restricted by law. This Memorandum is directed at persons to whom it may lawfully be issued or directed at under the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001, including persons who are authorized under the Act, certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts and persons who qualify as certified sophisticated investors. The Shares are only available to such persons in the United Kingdom and this Memorandum must not be relied or acted upon by any other persons in the United Kingdom. In order to qualify as a certified sophisticated investor a person must (i) have a certificate in writing or other legible form signed by an authorized person to the effect that he or she is sufficiently knowledgeable to understand the risks associated with participating in unrecognized collective investment schemes and (ii) have signed, within the last 12 months, a statement in a prescribed form declaring, amongst other things, that he or she qualifies as a sophisticated investor in relation to such investments. This Memorandum is exempt from the general restriction in Section 21 of the Act on the communication of invitations or inducements to engage in investment activity on the grounds that it is being issued to and/or directed at only the types of persons referred to above. The content of this Memorandum has not been approved by an authorized person and such approval is, save where this Memorandum is directed at or issued to the types of persons referred to above, required by Section 21 of the Act.

The Shares described in this Memorandum are not the subject of a public offering in the Cayman Islands. No offer or invitation to subscribe for Shares may be made to the public in the Cayman Islands.

Any information forwarded to the Fund by any potential shareholder will be treated on a confidential basis except that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each shareholder upon subscribing for Shares shall be deemed to have consented to such release of such confidential information pursuant to the terms of the Confidential Relationships (Preservation) Law (as amended) of the Cayman Islands (or any amendment thereto).

HMIT_0002821
009964

An investment in the Shares involves significant risks.  Prospective investors should pay particular attention to the risk factors disclosed in this Memorandum and the Partnership Memorandum. Investment in the Fund is suitable only for sophisticated investors and requires the financial ability and willingness to accept the high risks inherent in an investment in the Fund.  No assurance can be given that the Fund's investment objective will be achieved.

Each prospective investor is invited to meet with representatives of the Fund and to discuss with, ask questions of and receive answers from such representatives concerning the terms and conditions of this offering and to obtain any additional information, to the extent that such representatives possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

The Fund is a registered mutual fund for the purposes of the Mutual Funds Law (2013 Revision) of the Cayman Islands. The Fund is registered with the Cayman Islands Monetary Authority pursuant to Section 4(3) of that law and the prescribed details in respect of this Memorandum have been filed with the Cayman Islands Monetary Authority.  Such registration does not imply that the Cayman Islands Monetary Authority has approved this Memorandum or the offering of Shares hereunder.

This Memorandum does not purport to be, and should not be construed as, a complete description of the memorandum of association and articles of association of the Fund (the "*Articles*") or the Partnership's limited partnership agreement, as amended and supplemented from time to time (the "*Partnership Agreement*"), copies of which will be provided to each prospective investor upon request. Each prospective investor in the Fund is encouraged to review the Articles and the Partnership Agreement carefully, in addition to consulting appropriate legal and tax counselors.  To the extent of any inconsistency between this Memorandum, the Articles and the Partnership Agreement, the terms of the Articles and the Partnership Agreement control.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "*CFTC*"), neither the General Partner nor the Investment Manager (each as defined herein) is registered with the CFTC as a commodity pool operator ("*CPO*") or as a commodity trading advisor and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool.  Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association.  It is also required that at all times either:  (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund since the date hereof.  An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Except as otherwise noted, all monetary amounts set forth herein are expressed in United States ("*U.S.*") dollars.

009965

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 107
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 48 of 1017 PageID 10829
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 49

# DIRECTORY

| | |
|---|---|
| **Registered Office** | **Highland Multi Strategy Credit Fund, Ltd.**<br>c/o Maples Corporate Services Limited<br>PO Box 309, Ugland House<br>Grand Cayman, KY-1109<br>Cayman Islands |
| **Investment Manager** | **Highland Capital Management, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Directors** | James D. Dondero<br>Mark K. Okada |
| **Administrator** | **SEI Global Services, Inc.**<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| **Auditors** | **PricewaterhouseCoopers LLP**<br>P.O. Box 258<br>Strathvale House, George Town<br>Grand Cayman KY1-1104<br>Cayman Islands |
| **Legal Counsel** | *In the United States*<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201<br><br>*In the Cayman Islands*<br>**Maples and Calder**<br>PO Box 309<br>Ugland House<br>Grand Cayman, KY-1104<br>Cayman Islands |



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 108
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 49 of 1017 PageID 10830
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 49

## INTRODUCTION

Highland Multi Strategy Credit Fund, Ltd. (the "***Fund***") is a Cayman Islands exempted company offering participating shares of the Fund ("***Shares***") for the purpose of enabling qualified non-U.S. investors and U.S. tax-exempt investors to participate in the investment program of Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Partnership***"), on a more tax efficient basis. The Partnership seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management.

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***"), serves as the general partner of the Partnership. Highland Capital Management, L.P., a Delaware partnership (the "***Investment Manager***"), serves as the investment manager of the Partnership and has responsibility for the Partnership's investment program. James D. Dondero ultimately controls the General Partner and the Investment Manager.

The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its operations through, the Partnership. Therefore, to be fully informed about an investment in the Fund, an investor must first understand the terms of an investment in the Partnership. Prospective investors are therefore urged to carefully review the current Confidential Private Placement Memorandum of the Partnership, as amended and supplemented from time to time (the "***Partnership Memorandum***"), the Limited Partnership Agreement of the Partnership, as amended and supplemented from time to time (the "***Partnership Agreement***") and the Investment Management Agreement by and among the Partnership, the General Partner, the Fund and the Investment Manager, as amended and supplemented from time to time (the "***Investment Management Agreement***"). A copy of the Partnership Memorandum is being provided to investors with this Memorandum. Copies of the Partnership Agreement and the Investment Management Agreement will be provided to investors upon request. The Partnership Memorandum, together with the Partnership Agreement and the Investment Management Agreement, describe the material terms of an investment in the Partnership. Aside from the differences described in this Memorandum, an investment in the Fund will have substantially similar terms and risks to an investment in the Partnership, as described in the Partnership Memorandum.

The Fund is seeking subscriptions from non-U.S. investors and U.S. tax-exempt investors that qualify as "accredited investors" and "qualified purchasers" (as defined in the Fund's subscription materials), generally in minimum amounts of at least $1,000,000. The Fund generally accepts subscriptions on the first business day of each calendar month.

Pursuant to recent amendments adopted by the Fund, as further explained in this Memorandum and the Partnership Memorandum, all outstanding Shares held as of the effective date of the amendments were, notwithstanding their designation prior to the amendments, re-designated as "Series A Shares." Additionally, under these amendments, the Fund created three additional series of Shares – "Series B Shares," "Series C Shares" and "Series D Shares." The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum. The terms applicable to the Series A Shares are set forth in a Supplement to this Memorandum.

This Memorandum describes the principal terms that apply to an investment in the Fund in Series B, Series C and Series D Shares and certain other information that relates specifically to the offering of Shares. **This is not an offering of limited partner interests in the Partnership, although an investor should be fully informed about the Partnership in making an investment decision.**



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 109
Case 3:25-cv-02072-S Document 15-13 Filed 06/30/06/25 Page 50 of 1017 PageID 10831
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 49

# MANAGEMENT

## Board of Directors

The Fund's board of directors (the "**Board of Directors**") consists of two (2) directors (collectively, the "**Directors**"). The members of the Board of Directors are James D. Dondero and Mark K. Okada. The biographies of the Directors are set forth in the Partnership Memorandum.

The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates.

The Board of Directors has the full authority of a board under Cayman law. The powers of the Board of Directors described in this Memorandum and the Articles are not exhaustive and are not limited to the specific authorities described therein. Thus, subject to applicable law, the Board of Directors may take certain decisions or actions even where those decisions or actions are not expressly granted in the Articles or described in this Memorandum.

It is anticipated that the Board of Directors will meet, in person or by conference telephone, at least once a year to review the investment and administrative affairs of the Fund. The Directors will delegate investment of the Fund's assets to the Investment Manager, and the Directors are not responsible for the day to day conduct of the Fund's trading program. The Directors will also delegate certain day to day administrative and clerical affairs of the Fund to the Administrator or others.

The Directors each serve in a non-executive capacity. Any Director may hold any other office in connection with the Fund (other than the office of the Fund's independent auditors) in conjunction with his office of Director on such terms as to tenure of office and otherwise as the Directors may determine. Any Director may also act in a professional capacity (other than as the Fund's independent auditors) and he or its firm will be entitled to remuneration for such services as if he were not a Director. A Director may contract with the Fund provided that the Director declares his or its interest or gives notice of his or its interest as soon as practicable after the Director obtains such interest.

Each of the Directors has been duly registered, as applicable, under the Cayman Islands Directors Registration and Licensing Law, 2014.

A Director may vote at, or be counted in the quorum of, any meeting of the Board of Directors to consider any contract in which the Director is interested other than as a shareholder, provided that such Director declares such interest prior to the taking of the vote at such meeting.

Independent, third-party Directors, if any, will be entitled to remuneration for their services at such rate not exceeding the customary rate for the provision of services of a director as may be approved by the Fund. The Directors will be reimbursed for all out of pocket costs and expenses properly incurred by them, including in connection with attending meetings of the Directors or any committee of the Directors or any general meeting or any meeting held in connection with the business of the Fund. The Fund will indemnify the Directors for all liabilities, costs or expenses of


AmBrix 009825
009968

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 110
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 51 of 1017 PageID 10832
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 10 of 49

whatsoever kind incurred or suffered by them (other than those arising by reason of fraud, willful neglect or willful default on the part of a Director or servant or agent thereof).

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management. For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions. SEI manages or administers $601.9 billion in funds and separately managed assets. SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC. SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Partnership (in such capacity, the "***Administrator***"). In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "***Administration Agreement***") with the Administrator. The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund. The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available. In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions. The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("***Standard of Care***"). The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control. The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine. The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel. The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission. Neither the



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 111
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 52 of 1017 PageID 10833
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 11 of 49

Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates. Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Partnership will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

Annex 06825
009970

## SUMMARY OF TERMS

*To understand this investment opportunity, a prospective investor should read both the Partnership Memorandum and the following summary. The information in the Partnership Memorandum is important to a prospective investor's investment decision because: (i) the purpose of the Fund is to invest in the Partnership and therefore the underlying investment opportunity is in the Partnership; (ii) an investment in the Fund will (aside from the differences described below) have substantially similar terms to those applicable to a direct investment in the Partnership; and (iii) many terms relevant to an investment in the Fund, including the information concerning compensation, expenses, distributions, risk factors and conflicts of interest, are set forth in the Partnership Memorandum and not in this Memorandum.*

*The following summary highlights certain differences from the terms that would apply were the investor to hold a limited partner interest in the Partnership directly, and does not purport to provide a summary of the investment terms or risks of an investment in the Partnership, which is provided in the Partnership Memorandum. The summary of differences does not purport to be, and should not be construed as, a complete description of the Fund's Articles. To the extent of any inconsistency between this Memorandum and the Articles, the terms of the Articles control. Moreover, this summary and the summary set forth in the Partnership Memorandum are subject to the detailed provisions of the Partnership Agreement and are qualified in their entirety by the terms of the Partnership Agreement.* **Capitalized terms used but not defined herein have the meanings ascribed to them in the Partnership Memorandum.**

| | |
|---|---|
| **The Fund** | Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company. |
| **The Partnership** | Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership. The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its investment activities through, the Partnership. As a limited partner of the Partnership, the Fund is subject to all of the terms and conditions of the Partnership applicable to limited partners of the Partnership. The Partnership will issue to the Fund an Interest in the Partnership and maintain capital sub-accounts that correspond to each Sub-Series of Shares (defined below). |
| **General Partner of the Partnership** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership. The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership. |
| **Recent Amendments; Series of Shares** | Effective November 1, 2014, the Board of Directors amended the terms of the Fund, whereby all outstanding Shares in the Fund were re-designated as "Series A Shares" and three new series of Shares were created – "Series B Shares," "Series C Shares" and "Series D Shares" (the "*Amendments*"). The General Partner and limited partners of the Partnership adopted similar amendments. |

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 113
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 54 of 1017 PageID 10835
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 13 of 49

As of the effective date of the Amendments (the "*Effective Date*"), all existing shareholders will hold Series A Shares, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum.

The Fund may issue additional series (each, a "*Series*") of Shares over time. Not all Series of Shares will be available for subscription at the same time and the terms among the Series of Shares will vary. New Series of Shares may be established by the Fund without notice to or approval of the shareholders.

Except with respect to management fees, performance-based profit allocations and redemption rights (each as discussed below), the rights and privileges attributable to Series A Shares, Series B Shares, Series C Shares and Series D Shares are identical.

References herein to "Shares" or "shareholders" shall include all Series of Shares and shareholders unless otherwise specified or context so requires.

**Eligible Investors**

Participating, redeemable, non-voting shares of the Fund (the "*Shares*") are being offered to investors that are not U.S. Persons and to selected U.S. investors that are tax-exempt persons who qualify both as "accredited investors" and as "qualified purchasers," as defined in the Fund's subscription application materials. The Fund reserves the right to reject any investor for any reason or for no reason in its discretion.

No Shares may be offered to the public in the Cayman Islands (which shall not include an exempted or ordinary non-resident company incorporated in the Cayman Islands). Shares of the Fund may be purchased only by eligible investors who are sophisticated individual or institutional investors. Each subscriber for Shares of the Fund must certify that the beneficial owner of such Shares will not be a "*U.S. Person*" as defined in Annex A attached to this Memorandum; provided, however, that subscriptions for Shares of the Fund may also be accepted from certain qualified U.S. tax-exempt organizations. The Fund reserves the right to reject subscriptions in its sole discretion.

Shares of the Fund will not be registered under the U.S. Securities Act of 1933, as amended, any state "blue sky" laws, or the securities laws of any other jurisdiction. Shares may be offered privately (i) outside the United States of America, its territories or possessions, or areas subject to its jurisdiction (the "*United States*"), or to or for the benefit of an investor that is not a U.S. Person, only in accordance with relevant laws of the jurisdiction where the offer is made, or (ii) within the United States or to a U.S. Person only in a transaction that does not require the registration of the Shares or the Fund under applicable U.S. federal or state securities laws.

Annex_06929
009972

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 114
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 55 of 1017 PageID 10836
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 14 of 49

More detailed information concerning the applicable suitability criteria is set forth in the Fund's subscription application materials (the "**Subscription Documents**").

The Fund or the Administrator reserves the right to request such information as is necessary to verify the identity and the source of funds of an applicant. To ensure compliance with statutory and other requirements relating to anti-money laundering, the Fund or the Administrator may require verification of identity and/or source of funds from any person submitting completed Subscription Documents. Pending the provision of evidence satisfactory to the Fund or the Administrator as to identity, the evidence of title in respect of Shares may be retained at the absolute discretion of the Fund or the Administrator. If within a reasonable period of time following a request for verification of identity, the Fund or the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event subscription monies will be returned without interest to the account from which such monies were originally debited. Subscription monies may be rejected by the Fund or the Administrator if the remitting bank or financial institution is unknown to the Fund or the Administrator.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum and the Partnership Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Subscriptions**

Subscriptions for Shares are accepted on the first Business Day of each calendar month and/or such other days as the Board of Directors may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. Each investor will be required to invest a minimum of US$1,000,000 in the Fund, although the Fund may accept investments of a lesser amount in its discretion, subject to compliance with the applicable Cayman Islands Mutual Funds Law (2013 Revision) ("**Mutual Funds Law**"). Subscription payments may be made in cash or, with the consent of the Fund, in securities or partly in cash and partly in securities. The Fund reserves the right to reject subscriptions in its sole discretion.

"**Business Day**" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed.

A subscriber admitted to the Fund (a "**shareholder**") receives, in exchange for the initial capital contribution and any subsequent capital

Amex_009973

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 115
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 56 of 1017 PageID 10837
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 15 of 49

contribution, Shares representing a proportionate share of the net assets of the Fund at that time.

Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date.

There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the Fund established any maximum aggregate amount of subscriptions that may be accepted.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents.

**Share Sub-Series**

The Fund may issue Shares as a separate sub-series of the relevant Series on each subscription date (each, a "*Sub-Series*") at $1,000 per Share. The Fund may issue Shares as a separate Sub-Series for purposes of, among others, accounting for any profits and losses attributable to each individual shareholder and for the purpose of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received at different times. Each separate Sub-Series will be identified and referrable to each shareholder and by its date of issue. In general, each Sub-Series will participate in the Fund's profits and losses in the same manner as all other Sub-Series of Shares, except that the Performance Allocation to be charged to each Sub-Series of Shares will be calculated separately on the basis of the performance of the Sub-Series.

The Partnership maintains capital sub-accounts that correspond to each Sub-Series of Shares issued to shareholders of the Fund and each such capital sub-account is treated separately for purposes of determining Management Fees, Performance Allocations and redemption rights and restrictions (each as described in the Partnership Memorandum).

**Alternative Investment Vehicles**

The Directors will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "*Alternative Investment Vehicle*"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the Directors, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory

CORP 000931

constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors** Shares held by the Investment Manager or its affiliates (collectively, "**Affiliated Investors**") may not be assessed the Management Fee or the Performance Allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Management Fee** Although the Fund will not pay an asset-based fee directly to the Investment Manager, it will, as a limited partner in the Partnership, bear its pro rata share of the Management Fee paid by the Partnership to the Investment Manager in its capacity as investment manager of the Partnership. Accordingly, the Management Fee will be paid at the Partnership level by assessing such fee to the appropriate capital sub-account. The Management Fee is calculated and payable quarterly in advance at an annual rate of (i) 1.5% of the net asset value of each Series B Share, (ii) 1.0% of the net asset value of each Series C Share and (iii) 2.0% of the net asset value of each Series D Share. The Management Fee may be waived or reduced by the Investment Manager in its sole discretion.

**Other Fees and Expenses** The Fund bears the reasonable, out-of-pocket expenses of the offering of the Shares contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments. To the extent the Directors deem appropriate, these expenses may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("**GAAP**"). Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements. In such instances, the Directors may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value. There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

Amex 009975

<u>Investment and Operational Expenses</u>. The Fund bears all reasonable costs and expenses directly related to its operations, including its pro rata share of all Partnership expenses, including the Management Fee paid by the Partnership to the Investment Manager. The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including accounting, audit and legal expenses, costs of any litigation or investigation involving the Fund's activities, and costs associated with reporting and providing information to existing and prospective investors. However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office. Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager.

**Restricted New Issues**

The Partnership may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***"). FINRA member firms are not permitted to sell certain new issues ("***Restricted New Issues***") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors of companies that are current, recent or prospective investment banking client of the relevant underwriters ("***Restricted Persons***"). In order to enable the Partnership to participate in Restricted New Issues, the Fund will require each shareholder to provide information to enable the Fund to determine whether the shareholder is a Restricted Person. When the Partnership invests in a Restricted New Issue, the profits and losses associated with the investment will be specially allocated exclusively to those shareholders who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a particular investment banking client to have up to 25% participation in Restricted New Issues. If the ownership of the Partnership by Restricted Persons exceeds the maximum percentage, the Investment Manager will allocate such excess amount pro rata among the shareholders and the Partners of the Partnership who are not Restricted Persons or on such other basis that the Investment Manager reasonably determines ensures compliance with the FINRA rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all shareholders and the Partners of the Partnership on a pro rata

HCMLPHMIT 00009976

basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

**Performance Allocation**

As further described in the Partnership Agreement, the Investment Manager, in its capacity as a special limited partner of the Partnership, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Partnership's net profits attributable to the Limited Partners of the Partnership, subject to a "high water mark" limitation.

The Performance Allocation is made at the Partnership level by deducting the Performance Allocation from the capital sub-account relating to each Sub-Series of Shares. The Performance Change (as defined in the Partnership Agreement) of each Sub-Series will not be netted against one another for purposes of determining the applicability of the "high water mark."

**Distributions**

Subject to the redemption privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a redemption described below, shareholders should not expect the Fund to make any distributions.

**Redemptions Generally**

Redemptions from the Fund are subject to the withdrawal restrictions contained in the Partnership Agreement, whereby the Series A Interests in the Partnership correspond to the Series A Shares of the Fund, Series B Interests in the Partnership correspond to the Series B Shares of the Fund, the Series C Interests in the Partnership correspond to the Series C Shares of the Fund and the Series D Interests in the Partnership correspond to the Series D Shares of the Fund.

**Series Redemption Dates**

Subject to certain redemption restrictions described below, shareholders have the following redemption rights:

Series B Shares: Annual Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series B Shares upon written notice to the Administrator at least 180 days prior to the applicable Series B Redemption Date. The "***Series B Redemption Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of date of the issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Redemption Date (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2015 and every one year thereafter on October 31st, or the last Business Day of that month).

Series C Shares: Two Year Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series C Shares upon written notice to the Administrator at least 180 days prior to the applicable Series C Redemption Date. The "***Series C Redemption Date***" means: (i) the end



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 119
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 60 of 1017 PageID 10841
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of 49

of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the date of issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Redemption Date (or the last Business Day of that month) (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

<u>Series D Shares: One Year Hard Lock-Up; Quarterly Liquidity</u>.  A shareholder is permitted to make complete or partial redemptions of Series D Shares as of the last Business Day of each calendar quarter (each, a "***Series D Redemption Date***") following the one-year anniversary of the date of issuance of the Shares being redeemed. Notice of any redemption of Series D Shares must be provided in writing to the Administrator at least 90 calendar days prior to the requested Series D Redemption Date.

The Board of Directors may, at any time and in its sole discretion, waive or modify the foregoing redemption and distribution restrictions with respect to any shareholder.

| | |
|---|---|
| **Settlement of Redemption Proceeds** | Redemption proceeds will be paid promptly following receipt by the Fund of the withdrawal proceeds from the Partnership in accordance with the Partnership Agreement. |
| **Redemption Conditions** | The Fund may refuse to accept a redemption request if it is not accompanied by such additional information as the Fund or the Administrator may reasonably require.  This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes.  In addition, where redemption proceeds are requested to be remitted to an account which is not in the name of the investor, each of the Fund and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the redemption proceeds will be paid.   The redemption proceeds will not be paid to a third-party account if the investor and/or owner of the account fails to provide such information. |
| **Compulsory Redemptions** | The Board of Directors reserves the right, in its sole discretion, to compel the redemption of any shareholder's Shares for any or no reason, in part or in their entirety, on not less than five days' prior written notice (or immediately if the Board of Directors determines in its sole discretion that such shareholder's continued participation in the Fund may cause the Fund, the Partnership, the General Partner or the Investment Manager to violate any applicable law).   Settlements are made in the same manner as voluntary redemptions. |

Annex 06935
009978

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 120
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 61 of 1017 PageID 10842
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 49

| | |
|---|---|
| **Suspension of Valuations, Redemption and Redemption Payments** | The Board of Directors may suspend the issuance of Shares, the shareholders' redemption privileges, the payment of redemption proceeds and the valuation of the Fund's net assets in the same circumstances as described in the Partnership Memorandum and set forth in the Partnership Agreement with respect to the suspension of valuations or of withdrawal privileges. |
| | Upon the reasonable determination by the Board of Directors that conditions leading to suspension no longer apply, redemption rights for all shareholders shall be promptly reinstated, and any pending redemption requests (or new, timely withdrawal requests) shall be honored as of the last Business Day of the calendar quarter in which redemptions have recommenced, subject to the application of the redemption limitations described herein. |
| **Soft Wind Down** | It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Redemptions and Redemption Payments" (each, a "***Suspension***") would ordinarily be temporary. However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the Board of Directors, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the Directors may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the Board of Directors that the Fund be managed with the objective of returning the Fund's assets to shareholders in an orderly manner (an "***Orderly Realisation***"). The Board of Directors may, in such circumstances, resolve to effect an Orderly Realisation should they determine that doing so is in the best interests of the shareholders. Such Orderly Realisation shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the shareholders. The Board of Directors shall promptly communicate to shareholders any resolution to proceed with an Orderly Realisation of the Fund. During an Orderly Realisation, the Investment Manager may, in consultation with the Board of Directors, take such steps as are considered appropriate in the best interests of the Fund's shareholders to effect the Orderly Realisation. The Board of Directors, in consultation with the Investment Manager shall establish what they consider to be a reasonable time by which the Orderly Realisation should be effected (the "***Realisation Period***"). Any resolution to undertake an Orderly Realisation and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under the |

ANNEX 06936
009979

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 121
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 62 of 1017 PageID 10843
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 21 of
49

Companies Law or any other applicable bankruptcy or insolvency regime. The Board of Directors, in consultation with the Investment Manager, may resolve to cease the Orderly Realisation within the Realisation Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall be made during an Orderly Realisation on the same basis as described herein.

**Transfers**

Shares may not be transferred without the prior written consent of the Board of Directors, which consent may be withheld in the sole discretion of the Board of Directors. Any transferee or assignee of any investor will be required to execute a subscription agreement in the same form as required to be completed and executed by a subscriber for Shares in the Fund.

**Duty of Care; Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Partnership and the Limited Partners (including the Fund) for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence (as construed in accordance with the laws of the state of Delaware) or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Partnership (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Partnership's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.

Neither the Board of Directors of the Fund nor the Administrator shall be liable to the Fund or its shareholders for any loss or damage occasioned by any acts or omissions in the performance of its services on behalf of the Fund, except under certain limited circumstances. In addition, the Board of Directors and the Administrator and their respective affiliates will be indemnified by the Fund (but not by the shareholders individually) against any liabilities arising in connection with the performance of their activities on behalf of the Fund to the extent permitted by the Articles.

18

Amex 009925
009980

| | |
|---|---|
| **Valuations** | The Fund's assets are valued based on the value of the Partnership's assets as set forth in the Partnership Memorandum. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Shares of the shareholders for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the Board of Directors in its sole discretion deems necessary or appropriate. At the sole discretion of the Board of Directors, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Shares of those investors who are shareholders at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were shareholders at the time of the act or omission giving rise to the contingent liability for which the reserve was established. |
| | If the Board of Directors determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were shareholders during any such prior period. |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Partners** | The Fund furnishes to its shareholders as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each shareholder to complete federal and state income tax or information returns, along with any other tax information required by law. The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month. The Board of Directors selects the Fund's independent accountants in its sole discretion. |
| **Dissolution and Liquidation** | In the event an Orderly Realization lasts longer than three years, shareholders holding Shares with a combined net asset value equal to at least 75% of the total net asset value of the Fund may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund. |
| | Wind down and liquidation of the Fund shall occur as set forth in the Articles. |
| **Placement Agents** | The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund. Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not |

Amex-00038

009981

be collected by or from the Fund. The placement agent may be reimbursed for its expenses and indemnified by the Fund.

Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Shares.

**Certain Tax Considerations**
The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has applied for and received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from July 10, 2012 (being the date of the undertaking), no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

The Investment Manager believes that the Fund will be treated as a non-U.S. corporation for U.S. federal income tax purposes. The Fund does not intend to be subject to U.S. federal income tax on its capital gains from securities trading. Dividends and certain interest received by the Fund may be subject to withholding at the source. See "*Tax Considerations*."

**ERISA**
The Fund intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"). See "*ERISA Considerations*."

009982

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 124
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 65 of 1017 PageID 10846
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 24 of 49

| | |
|---|---|
| **Voting** | Shares in the Fund are participating non-voting shares; provided that in the event the Partnership seeks the approval, vote or consent of the Fund with respect to any matter to which it would be entitled to vote as a Limited Partner of the Partnership under the Partnership Agreement, the Fund will: (i) submit such matter for the consent of the shareholders and (ii) shall cause the Fund to vote its Limited Partner interest proportionally for and against such matter in the same proportion that the shareholders voted for and against such matter. |
| **Variation of Terms** | The Board of Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a shareholder to waive or modify the terms applicable to such shareholder's subscription for Shares (including those relating to Management Fees, the Performance Allocation, transparency and redemptions) without obtaining the consent of any other shareholder; provided that such waiver or modification does not amount to a variation of the rights attaching to the Shares of such other shareholders. The Fund generally grants waivers of the Management Fees and Performance Allocation to the Affiliated Investors. |

Amex 009049
009983

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 125
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 66 of 1017 PageID 10847
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 25 of 49

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund, and in turn, the Partnership, is speculative and involves certain risks. There can be no assurance that the Partnership's investment objective will be achieved, or that an investor will receive a return of its Capital. Certain of these risks are summarized below. The Fund may not be suitable for all investors, and is intended for sophisticated investors who can accept the risks associated with its investments. Investors will not have recourse except with respect to the assets of the Fund. Prospective investors should consider, among others, the risk factors described in this section.*

***This discussion must be read in conjunction with the risk factors and potential conflicts of interest of the Partnership set forth in the Partnership Memorandum. The following is not meant to be an exhaustive listing of all potential risks associated with investing in the Fund. Investment-specific risks factors associated with the Partnership's investment strategy should be read in their entirety.***

*Illiquidity of Shares.* Shares are not transferable without the approval of the Board of Directors, and there will be no secondary market for Shares. Consequently, investors may not be able to dispose of their Shares prior to the liquidation of the Fund or as described in this Memorandum and the Partnership Memorandum, and may receive securities rather than cash in exchange for their Shares.

*Side Letters.* The Board of Directors may from time to time, with the consent of the Partnership, enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more investors which provide such investor(s) with additional and/or different rights than such investor(s) have pursuant to this Memorandum or the Partnership Memorandum. As a result of such Side Letters, certain investors may receive additional benefits (including, but not limited to, reduced fee/allocation obligations and/or expanded informational rights) which other investors will not receive. The Fund is not required to notify any or all of the other investors of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund be required to offer such additional and/or different rights and/or terms to any or all of the other investors. The Fund may enter into such Side Letters with any party as the Board of Directors may determine in its discretion at any time. The other investors will have no recourse against the Fund, the Board of Directors and/or any of their affiliates in the event that certain investors receive additional and/or different rights and/or terms as a result of such Side Letters.

*Authority.* Investors in the Fund have no right or power to take part in the management of the Fund. The Board of Directors control the Fund and the General Partner controls the Partnership. The Investment Manager is responsible for all investment decisions of the Partnership.

*Absence of Regulatory Oversight.* The Fund is not registered under the Cayman Islands Mutual Funds Law (as amended). Neither the Cayman Islands Monetary Authority nor any other governmental authority in the Cayman Islands has commented on or approved the terms or merits of this Memorandum. There is no financial obligation or compensation scheme imposed on or by the government of the Cayman Islands in favor of or available to the investors in the Fund.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

009984

*Performance Allocation.* The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Redemption Restrictions.* There are severe restrictions on redemptions from the Fund (which may be settled in securities rather than cash) and on transfers of Shares. Because of the restrictions on redemptions, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. There is no independent market for the purchase or sale of Shares and none is expected to develop. Shareholders must represent that they are purchasing Shares for investment. A subscription for Shares should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

*No Distributions.* Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income. Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*. The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.* Since the Partnership's portfolio will not necessarily be widely diversified, the investment portfolio of the Partnership (and thus the Fund) may be subject to more rapid changes in value than would be the case if the Partnership were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.* From time to time, certain situations affecting the valuation of the Partnership's (and thus the Fund's) investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Partnership) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. The Fund is not required to make retroactive adjustments to prior subscription or redemption transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Contagion*. The Fund has the power to issue Shares in different series. The Articles provide for the manner in which the liabilities are to be attributed across the various series (liabilities are to be attributed to the specific series in respect of which the liability was incurred). However, the Fund is a single legal entity and there is no limited recourse protection for any series. Accordingly, all of the assets of the Fund will be available to meet all of its liabilities regardless of the series to which such assets or liabilities are attributable. In practice, cross-series liability is only expected to arise where liabilities referable to one series are in excess of the assets referable to such series and it is unable to meet all liabilities attributed to it. In such a case, the assets of the Fund attributable to other series may be applied to cover such liability excess and the value of the contributing classes or series will be reduced as a result.

*Handling of mail*. Mail addressed to the Fund and received at its registered office will be forwarded unopened to the Investment Manager to be dealt with. None of the Fund, its Directors,

009985

officers, advisors or service providers (including the organization which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the Investment Manager. In particular the Directors will only receive, open or deal directly with mail addressed to them personally (as opposed to mail which is addressed to just the Fund).

*Recent Developments in the Financial Services Industry*. Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry. In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "***Service***") or other applicable taxing authority, or significantly modified by new legislation, changes in a taxing authority's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the U.S. federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the Investment Manager with respect to the U.S. federal income tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund.

*Tax Considerations Taken into Account*. The Fund will attempt to minimize the tax burden of the Fund over the long-term. However, the Investment Manager will not overlook short-term trading opportunities. Therefore, shareholders should not expect that the Fund will make tax-efficiency a



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 128
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 69 of 1017 PageID 10850
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 28 of 49

priority. However, the Investment Manager may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax-Exempt Entities*. Certain prospective investors that are tax-exempt for U.S. income tax purposes may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies that the Partnership may utilize from time-to-time (*e.g.,* short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification). While the Fund believes its investment program is generally appropriate for U.S. tax-exempt investors for which an investment in the Fund would otherwise be suitable, each type of tax-exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund. Investments in the Fund by entities subject to ERISA, and other tax-exempt entities, require special consideration. Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

*Non-U.S. Taxation*. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Changes*. Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or its shareholders. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund. Many of the relevant tax considerations will vary depending on a prospective shareholder's individual circumstances. The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations. Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

009987

**Potential Conflicts of Interest**

*No Independent Directors.* The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as the investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates. However, the Fund may establish an Advisory Committee with respect to matters in which it seeks to resolve certain conflicts of interest that may arise. See "*Management—Advisory Committee*" in the Partnership Memorandum.

*No Separate Counsel.* Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") serves as counsel to the Fund, the Partnership, the Investment Manager, the General Partner and certain of their affiliates (the "***Clients***") in connection with the operation of the Fund and certain other Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests. No independent counsel has been retained to represent the shareholders. In assisting in the preparation of the Partnership Memorandum and this Memorandum (as well as any supplements thereto), Akin Gump has relied on information provided by the Fund, the Partnership, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the biographical data of key investment personnel, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund. In connection with the Fund's offering of Shares and subsequent advice to the Fund, Maples and Calder will not be representing shareholders. No independent legal counsel has been retained to represent the shareholders. Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of shareholders may differ from those of the Fund. Maples and Calder does not represent the shareholders' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund.

*The Partnership Memorandum contains further disclosures concerning potential conflicts of interests. Such disclosures are incorporated herein by reference and should be read in their entirety prior to making a decision to invest in the Fund.*

*In view of the foregoing considerations, an investment in Shares is only suitable for investors who are capable of bearing the relevant risks and who understand the potential conflicts of interest.*



# SHARES OF THE FUND

## The Fund's Share Capital

The Fund has an authorized share capital of U.S.$50,000 divided into 100 management shares ("**Management Shares**") of a par value of U.S.$1.00 each and 4,990,000 participating non-voting shares (the "**Shares**") of a par value of U.S.$0.01. The Directors may by resolution divide the Shares into separate series (each, a "**Series**") which may be subject to different rights, restrictions, preferences, privileges and payment obligations as between the different Series and further into separate sub-series (each, a "**Sub-Series**") within such Series (for example, a Sub-Series of Shares which will participate in Restricted New Issues and a Sub-Series of Shares which will not participate in such Restricted New Issues). The different Series and Sub-Series thereof shall be established and designated, and the variations in the relative rights and preferences as between the different Series and Sub-Series thereof shall be fixed and determined by the Board of Directors. Sub-Series of Shares are issued for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately to reflect different returns achieved as a result of subscriptions received at different times.

The Fund previously issued Series A Shares and currently offers Series B Shares, Series C Shares and Series D Shares, all of which generally have identical rights and privileges except for purposes of calculating Management Fees and redemption rights. The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum. Certain terms that specifically apply to Series A Shares are set forth in a Supplement to this Memorandum.

Each separate Sub-Series of Shares is identified by the investor to whom it was issued and its date of issue. Shares are issued to shareholders in Sub-Series at $1,000 per Share. Immediately following the close of any fiscal year in which a Performance Allocation is charged at the Partnership level with respect to a Sub-Series of Shares of a Series, each such Sub-Series of Shares may be compulsorily redeemed and the proceeds immediately applied to the subscription for an earlier Sub-Series of Shares of such Series; provided that such earlier Sub-Series of Shares has also been assessed as having a Performance Allocation payable at the Partnership level.

The Management Shares will carry all the voting rights but will have no right to participate in the assets of the Fund (other than to a return of the par value on a winding up). The Management Shares will be held by the Investment Manager or an affiliate, and will be voted in accordance with the instructions of the Investment Manager.

The Articles provide that, subject to the Companies Law (2013 Revision) of the Cayman Islands and the other provisions of the Articles, all or any of the class rights or other terms of offer, whether set out in this Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of Shares) (collectively referred to as "**Share Rights**"), for the time being applicable to any class or Series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 131
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 72 of 1017   PageID 10853
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 31 of
49

such variation might not have a material adverse effect, to obtain consent from the holders of such Shares.   Each subscriber for Shares will be required to agree that the terms of offer set out in the Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles.

The Articles further provide that, in relation to any class or Series consent required pursuant to the "Variation of Share Rights" Article, the Directors in their discretion may invoke the following procedure (the "*Negative Consent Procedure*").   The Directors shall provide written notice in respect of the proposed variation (the "*Proposal*") to the shareholders of the affected class or Series and shall specify a deadline (the "*Redemption Request Date*"), which shall be no earlier than 30 days after the date of giving such notice, by which date such shareholders may submit a written request for redemption of some or all of their Shares of the affected class and/or Series on the Redemption Date (the "*Specified Redemption Date*") specified by the Directors in such notice.   The terms of the Proposal shall be such that its specified effective date (the "*Effective Date*") shall not be on or prior to the Specified Redemption Date.   Such notice shall further provide that the holders of any Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "*Affected Shares*") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "*Negative Consent Shares*").   In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under the "Variation of Share Rights" Article with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favor of the Proposal on the Effective Date.

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares, be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them, the redemption or purchase of any Shares or by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to the Shares or any modification of the fees payable to any service provider to the Fund.

In general, each Share will participate in the Fund's profits and losses attributable to the relevant class in the same manner, except that the Performance Allocation to be charged (at the Partnership level) to Shares of a Sub-Series held by each shareholder will be calculated separately on the basis of the performance of such Shares of a Sub-Series.   The Performance Allocation is calculated and charged at the Partnership level through the use of separate capital sub-accounts within the Fund's capital account in the Partnership that correspond to the Shares of a Sub-Series of each shareholder in the Fund.   Subject to the foregoing, each of the Shares will participate ratably with all other outstanding Shares in the Fund's assets and earnings and will have the redemption rights discussed above.

The Directors may impose such restrictions as they think necessary for the purpose of ensuring that no Shares in the Fund are held by (i) any person in breach of the laws or requirements of any country or governmental authority or (ii) any person or persons in circumstances which, in the opinion of the Directors, might result in the Fund incurring any liability of taxation or suffering any other pecuniary disadvantage which the Fund might not otherwise have incurred or suffered.   A person who becomes aware that he or she is holding or owning Shares in breach of any restriction mentioned in the Articles shall promptly either deliver to the Fund a written request for redemption of his or her Shares or deliver to the Fund a written request to transfer the same to a person who would not thereby be a non-qualified person.



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 132
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 73 of 1017 PageID 10854
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 32 of
49

**Management Shares**

General meetings of the holders of Management Shares may be held to vote on various matters including to elect the Directors, to select the Fund's auditors and to attend to such other business as may properly be placed before the meeting. At any such general meeting, the favorable vote of a majority of the Management Shares present generally is sufficient for the approval of any action, unless such action is a matter requiring a special resolution, in which case two-thirds of the Management Shares shall be required, in each case as further detailed in the Articles.

**Registration of Management Shares and Shares and Share Certificates**

Management Shares and Shares of the Fund are issued only in registered form. A current register of the names and addresses of the Fund's shareholders and their shareholdings is maintained at the office of the Administrator. No share certificates have been or will be issued.

**Other Rights and Liabilities**

Under the terms of the Articles, the liability of the shareholders of the Fund is limited, and shareholders will not be liable for any debt, obligation or default of the Fund in excess of the amounts unpaid on their Shares.

The Fund and the Investment Manager may agree with certain investors to a fee structure, redemption rights or other terms that differ from the fee structure, redemption rights and other terms that are set forth in this Memorandum. Such different rights may, subject to applicable law, be effected by issuance of a separate Series of Shares or any other permissible means. Such rights may not be offered to all investors.

**Calculation of Fund Net Asset Value**

The Directors have delegated to the Administrator the calculation of the net asset value of the Fund and the net asset value per Share of each Series and, if applicable, Sub-Series, subject to the overall supervision and direction of the Investment Manager and the Board of Directors. Net asset valuations of the Fund and each Series of Shares will be calculated as of the close of business on the last day of each fiscal period and any other date selected by the Board of Directors, in consultation with the Investment Manager, no less than quarterly, which shall, to avoid doubt, include each Redemption Date (each, a "**Valuation Date**").

The Fund's assets are valued based on the value of the Partnership's assets. The net asset value of the Fund is determined by taking the amount of all cash and credit balances plus the market value of all securities, commodities and other assets comprising the Fund's assets (including any interest and dividends receivable, but excluding any subscription amounts committed to the Fund from time to time to the extent such amounts are not held by or on behalf of the Fund), as calculated by the Administrator, minus all debit balances and other liabilities and obligations of the Fund. Net asset value in respect of any Series or Sub-Series of Shares is calculated by dividing the value of the account relating to that Series or Sub-Series of Shares by the number of Shares of that Series in issue. For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series which are to be redeemed on the relevant Valuation Date shall be deemed to be in issue until and including the close of business on the applicable Valuation Date. The principal amounts of the investments, cash balances and other assets of the Fund, the value of which is expressed in a currency other than that of the United States,



shall be valued after taking into account the market rate or rates of exchange in force on the Valuation Date in question.

App. 00949
009992

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 134
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 75 of 1017 PageID 10856
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 34 of 49

# TAX CONSIDERATIONS

**General**

The following is a general discussion of certain of the anticipated U.S. federal and Cayman Islands income tax considerations applicable to the Fund's activities and those relevant to non-U.S. persons (as defined below) and U.S. tax-exempt entities arising from the purchase, ownership and disposition of Shares. Prospective investors should consult their own tax advisors to determine the application and effect of tax laws with respect to their own particular circumstances. This discussion is based on laws and regulations currently in effect, which may change or be subject to differing interpretations (possibly on a retroactive basis). The Fund does not intend to seek a ruling from the Service, or any similar state or local authority, with respect to any of the tax issues affecting the Fund.

In view of the number of different jurisdictions where local laws may apply to shareholders, the discussion below does not address the local tax consequences to prospective investors of the purchase, ownership and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax, exchange control or other consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

The summary assumes that no U.S. taxable investors will invest in the Fund and, therefore, does not address the U.S. tax consequences to such investors. Potential U.S. taxable investors should be aware that the Fund does not intend to provide information to any U.S. Person for purposes of such person qualifying to make an election to treat the Fund as a "qualifying electing fund" for U.S. federal income tax purposes. Accordingly, potential U.S. shareholders are urged to consult their tax advisors in this regard.

**United States Taxation Matters**

The Fund will be treated as a corporation for U.S. federal income tax purposes. For U.S. federal income tax purposes, the Partnership is expected to be treated as a partnership. The Fund and the Partnership will make any necessary entity classification elections for U.S. tax purposes consistent with such respective treatment. Because the Fund is organized under the laws of the Cayman Islands, it will be considered a non-U.S. person for purposes of U.S. tax laws. As such, the U.S. federal income tax treatment of the Fund will vary depending on whether the Fund derives income or gains that are effectively connected with the conduct of a trade or business in the United States. The Fund intends to structure its operations (including those conducted through the Partnership) in order to minimize to the extent consistent with its investment strategy the possibility that the Fund will be treated as being engaged in a U.S. trade or business for U.S. federal income tax purposes, although there can be no certainty that the Fund will be successful minimizing such a possibility. It is also intended that the Fund's affairs will be conducted such that no income realized by the Fund will be effectively connected with the conduct of a U.S. trade or business or otherwise subject to regular U.S. federal income taxation on a net basis.

Pursuant to a safe harbor in the Code, trading in securities or commodities on an organized commodities exchange for the Fund's own account (including through the Partnership) is not considered a U.S. trade or business. It is not certain whether this safe harbor would apply to the trading of physical commodities. Although no assurances can be given that the Service will not successfully assert an



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 135
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 76 of 1017 PageID 10857
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of 49

alternative position, the Fund intends to take the position that the Partnership's trading of physical commodities is within the prescribed safe harbor and does not constitute a trade or business and as such the Fund anticipates generally that its income will not be subject to U.S. corporate income tax, except as described below. However, the Fund will be subject to a 30% U.S. withholding tax on its allocable share of certain types of the Partnership's non-effectively connected income. As described below, the types of income (to the extent not constituting effectively connected income) on which a U.S. withholding tax will be imposed generally consist of dividends, interest and certain types of investment income, but not capital gains derived from the sale of stock or other capital assets (unless such capital gains are derived from the sale of stock of a "United States Real Property Holding Company" within the meaning of Section 897 of the Code and certain other interests in real property).

In general, a non-U.S. partner, such as the Fund, that is a partner of a partnership, such as the Partnership, is subject to U.S. federal income taxation on a net basis on its allocable share of the partnership's "effectively connected income." The Fund's allocable share of the Partnership's income will constitute "effectively connected income," and thus will be subject to U.S. federal income taxation, to the extent such income is derived by the Partnership from a trade or business carried on in the United States by the Partnership. Although there can be no assurances, the Partnership does not itself expect to engage directly in activities that would constitute a U.S. trade or business.

If the Fund were treated as being engaged in a U.S. trade or business as a result of activities conducted by the Partnership, then all or a portion of the Fund's allocable share of the Partnership's income would be treated as effectively connected income subject to U.S. federal income tax on a net basis at corporate tax rates. In such a case, the Fund would be required to file a U.S. federal income tax return to report its share of such income and pay U.S. federal income tax at regular U.S. rates on this income. In addition, the Partnership would be required (and would be legally liable) to withhold and pay over to the Service on behalf of the Fund an amount equal to 35% percent of the Fund's share of the Partnership's effectively connected income. Any amount so withheld would be creditable against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that the amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year. Furthermore, in such event, the Fund's allocable share of any effectively connected income of the Partnership would also be subject to a 30% U.S. branch profits tax, and possibly could be subject to state and/or local taxation in the United States. Such taxation of the Fund's activities could have a material adverse effect on the Fund's returns. Prospective investors are advised to consult their tax advisors regarding the risk of the Fund being treated as engaged in a trade or business in the United States.

Because the Fund is organized under the laws of the Cayman Islands, it is considered a non-U.S. person for purposes of the U.S. tax laws. As a result, dividends received by the Fund through the Partnership from U.S. sources will be subjected to U.S. withholding tax at a 30% rate. U.S. source interest income received by the Fund through the Partnership generally will be exempt from U.S. federal income and withholding tax under the exemption for "portfolio interest" or under another statutory exemption. Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto) or the underlying obligations are not in "registered form" for U.S. tax purposes. In addition, interest on U.S. bank deposits, certificates of deposit and certain obligations with maturities of 183 days or less (from original issuance) will not be subject to

HMH 003994

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 136
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 77 of 1017 PageID 10858
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 36 of
49

withholding tax. Interest (including original issue discount) derived by the Fund or the Partnership from U.S. sources not qualifying as "portfolio interest" or not otherwise exempt under U.S. law will be subject to U.S. withholding tax at a rate of 30%. In addition, based on recent legislation, income from certain swaps directly or indirectly over certain stocks (e.g., U.S. stocks) are subject to U.S. withholding tax.

### Taxation of Non-U.S. shareholders

For U.S. federal income tax purposes, a shareholder of the Fund who is a non-U.S. person will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of the Shares or gains recognized on the sale, exchange or redemption of Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the shareholder in the United States. In limited circumstances, an individual shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of Shares in such year. Individual shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of Shares, to any U.S. federal gift or estate taxes.

For these purposes the term "***non-U.S. person***" means any person that is not a U.S. Person for U.S. federal income tax purposes. A "***U.S. Person***" means a citizen or resident of the United States, a partnership or corporation created or organized in the United States or under the laws of the United States or any state (other than a partnership that is not treated as a U.S. Person under any applicable Treasury Regulations), an estate whose income is includable in gross income for federal income tax purposes regardless of its source or a trust if a U.S. court is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in Treasury Regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, which elect to continue to be treated as U.S. Persons will also be U.S. Persons for these purposes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, passive foreign investment companies, foreign insurance companies that hold Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax. Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of Shares held by such shareholder unless such shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding. Back-up withholding is not an additional tax. Rather, the U.S. federal income tax liability of non-U.S. persons subject to back-up withholding will be reduced by the amount of tax withheld. If back-up withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are filed with the Service.

### Taxation of U.S. Tax-Exempt shareholders

In general, U.S. tax-exempt shareholders should not be subject to the tax on "unrelated business taxable income" ("***UBTI***"), as defined in Code section 512, in respect of income and gains from the



Shares. In general, UBTI is the excess of gross income from any unrelated trade or business conducted by a U.S. tax-exempt entity over the deductions attributable to such trade or business, with certain modifications. These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt-financed income" ("**UDFI**") within the meaning of Code section 514 and the Treasury Regulations. Income that a U.S. tax-exempt shareholder derives from an investment in Shares should not give rise to UBTI under Code section 511, except to the extent that such entity's acquisition of Shares is financed with acquisition indebtedness within the meaning of Code section 514. In addition to UBTI that may arise when a tax-exempt investor uses leverage to finance the acquisition of Shares, the United States Congress from time to time has considered legislation that could result in a tax-exempt investor realizing UBTI in respect of an investment in a foreign investment company that leverages its investments.

The Fund is expected to constitute a "passive foreign investment company" (a "**PFIC**") for U.S. federal income tax purposes. Under the Treasury Regulations, a U.S. tax-exempt shareholder is not considered to be a shareholder in a PFIC, and thus will not be subject to the PFIC tax rules, except to the extent that a "dividend" from the PFIC would be taxable under subchapter F of the Code, for example, as UDFI. Hence, under the Treasury Regulations, a U.S. tax-exempt shareholder would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of the shares of, a PFIC only under limited circumstances. Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts. Accordingly, potential U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of the Shares.**

**Information Reporting Requirements and FATCA**

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("**IGA**") and related statutes, regulations, rules and other guidance thereunder, "**FATCA**") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("**FFI**"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "**Cayman IGA**"), which came into force on April 14, 2014, and has issued the Tax Information Authority



(International Tax Compliance) (United States of America) Regulations 2014, as updated from time to time, and draft guidance notes thereunder. Additional guidance is forthcoming. In addition, the Cayman Islands have signed a similar inter-governmental agreement with the United Kingdom (the "*UK IGA*"). The UK IGA imposes similar requirements to the Cayman IGA, so that the Fund will be required to identify accounts held directly or indirectly by "Specified United Kingdom Persons" and report information on such Specified United Kingdom Persons to the Cayman Islands authorities, which will exchange such information annually with HM Revenue & Customs ("*HMRC*"), the United Kingdom tax authority. It is anticipated that further inter-governmental agreements ("*future IGAs*") similar to the Cayman IGA and the UK IGA may be entered into with other third countries by the Cayman Islands Government to introduce similar regimes for reporting to such third countries fiscal authorities ("*foreign fiscal authorities*").

The Fund is likely to be considered an FFI for FATCA purposes. In order to avoid U.S. withholding tax under FATCA on amounts paid to the Fund, the Fund is generally required to register with the Service and to comply with the Cayman IGA and any Cayman Islands legislation or guidance implementing the Cayman IGA. The Fund intends to register with the Service and, therefore, generally does not expect to become subject to U.S. withholding under FATCA. The Fund also expects that it will be required to identify and report on certain direct and indirect U.S. owners or investors in order to comply with the Cayman IGA in the future. An investor will be required to provide to the Fund information which identifies its direct and indirect ownership. Any such information provided to the Fund will ultimately be shared with the Cayman Islands government and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

Further, it is possible that a lower-tier non-U.S. entity in which the Partnership invests also may be considered an FFI. The Fund intends to assist lower-tier non-U.S. entities in which the Partnership invests in complying with FATCA, but the Fund can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

By investing (or continuing to invest) in the Fund (and indirectly investing in the Partnership), investors will be deemed to have acknowledged, and to have given their consent to, the following:

(i)   the Fund (or its agent) may be required to disclose to the Cayman Islands authorities and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, tax identification number (if any), social security number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

(ii)  the Cayman Islands authorities may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities should they have further inquiries, and the Fund (or its agent) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

(iii) in the event an investor's failure to comply with any FATCA related reporting requirements gives rise to any withholding tax, the Fund reserves the right to ensure that any such withholding tax and any related cost, interest, penalties and other losses or



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 139
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 80 of 1017 PageID 10861
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 39 of 49

liabilities suffered by the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator or any other investor, or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

(iv) in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Partnership's) satisfaction of its FATCA related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Partnership) or its investors being subject to withholding tax under the relevant FATCA regime, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of the investor's failure to comply with the requirements described above, including compulsory redemption of such investor; and

(v) no investor affected by any such action or remedy shall have any claim against the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

***Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.***

**Investor Tax Filings and Record Retention**

The United States Treasury Department has adopted regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, the regulations require investors in specified transactions (including certain shareholders in foreign corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be imposed (in addition to penalties that generally may be applicable as a result of a failure to comply with applicable Treasury regulations) for failure to comply with these tax filing and record retention rules.

The regulations are broad in scope and it is conceivable that the Fund or the Partnership may enter into transactions that will subject the Fund and certain investors in the Fund to the special tax filing and record retention rules. The Fund and the Investment Manager intend to use reasonable efforts to obtain and provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund or the Partnership.

**Transfer Reporting Requirements**

A U.S. Person (including in certain circumstances a U.S. tax-exempt entity) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service. In the event a U.S. shareholder fails to file any required form, such holder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.



**Cayman Islands Taxation**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or its shareholders. The Cayman Islands are not party to any double taxation treaties.

The Fund has applied for and expects to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the Shares, debentures or other obligations of the Fund or (ii) by way of the withholding, in whole or in part, of a payment of dividend or other distribution of income or capital by the Fund to its shareholders or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

**European Union Savings Directive**

Dividends and other distributions of income made by the Administrator on behalf of the Fund, together with payment of the proceeds of sale and/or redemption of Shares ("***Payments***") are not subject to any reporting or withholding requirements that may arise as a result of the applicable legislation which implements the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "***EUSD***") as the Administrator is not located in the European Union (or a country that has implemented measures similar or equivalent to the EUSD).

If an investor in the Fund is based in the European Union or certain states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) and is making investments on behalf of other underlying investors who are individuals or certain unincorporated entities resident in the European Union or certain of the states which have similar equivalent measures to the EUSD, then the provisions of the EUSD or similar or equivalent measures may apply. In such circumstances such an investor may become a "paying agent" and may be required to obtain all relevant documentation relating to its underlying investors and make returns to the appropriate tax authorities or withhold tax at applicable rates from any redemption proceeds in accordance with the applicable legislation that implements the EUSD or similar or equivalent measures.

Such investors to whom the EUSD may be relevant should also be aware that on 24 March 2014, the Council of the European Union adopted a directive amending the EUSD to extend its scope to cover additional types of savings income and products that generate interest or equivalent income (including certain types of life insurance contracts) as well as a broader range of investment funds. In addition, a "look through" procedure will be established to limit the opportunities for circumventing the application of the EUSD by the use of certain intermediaries. Member States of the European Union have until 1 January 2016 to adopt domestic legislation to give effect to these changes, which must be applied from 1 January 2017. It is not yet clear as to whether those states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) will adopt such changes and if so by what date.



**Future Changes in Applicable Law**

The foregoing description of United States and Cayman Islands income tax consequences of an investment in, and the operations of, the Fund are based on laws and regulations that are subject to change through legislative, judicial or administrative action. Other legislation could be enacted that would subject the Fund to income taxes or subject shareholders to increased income taxes.

**Other Taxation**

A portion of the Fund's investments may be made in non-U.S. jurisdictions. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Future Tax Legislation, Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Internal Revenue Service or judicial decisions may adversely affect the federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Internal Revenue Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on shareholders will vary with the particular circumstances of each shareholder and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares. Accordingly, each prospective shareholder should therefore seek their own separate tax advice in relation to their holding of Shares. In no event will the Fund, the Partnership, the Principals or the Investment Manager, or their affiliates, counsel or other professional advisers, be liable to any shareholder for any tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of the important tax rules and considerations affecting the shareholders, the Fund and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each shareholder, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Shares. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*



## ERISA CONSIDERATIONS

### CIRCULAR 230 NOTICE

**The tax discussion contained in this Memorandum is not in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the Treasury. Thus, we are required to inform you that you cannot rely upon the summary contained in this Memorandum for the purpose of avoiding U.S. federal tax penalties. The following summary was written to support the promotion or marketing of the transactions or matters described in this Memorandum. Each prospective investor should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### General

Fiduciaries and other persons who are proposing to invest in Shares on behalf of retirement plans, IRAs and other employee benefit plans ("*Plans*") covered by ERISA or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of shareholders to redeem all or any part of their capital or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

### Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("*DOL*") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("*Plan Assets*"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than twenty-five percent (25%) of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "*significant participation test*"). For purposes of this determination, the value of any equity interest held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "*Benefit Plan Investors*" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs) and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "*Plan Asset Entity*").

In order to prevent the assets of the Partnership from being considered Plan Assets under ERISA, it is the intention of the Partnership to monitor the investments in the Fund and prohibit the acquisition, redemption or transfer of any Shares by any investor, including a Benefit Plan Investor, unless, after


Appx. 00058

giving effect to such an acquisition, redemption or transfer, the total proportion of each class of equity interests of the Partnership owned by Benefit Plan Investors would be less 25% of the aggregate value of such class (determined, as described above, by excluding certain Shares held by the Investment Manager, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in each class of equity interests of the Partnership by Benefit Plan Investors to less than 25%, the Partnership may require the compulsory redemption of Shares of any Series. Each shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Shares or equity interests of the Partnership the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "**Maximum Percentage**") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Partnership. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares or equity interests of the Partnership, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Investment Manager of that occurrence and shall, if and as directed by the Investment Manager, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

If the Partnership's assets were considered Plan Assets, then, under ERISA and the Code, the Investment Manager would be a fiduciary, and certain employees, partners and officers of the Investment Manager, as well as certain affiliates, would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties or the lending of money or other extensions of credit, or the sale, exchange or leasing of property by the Partnership or certain related parties, or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in equity interests of the Partnership by persons who are fiduciaries and/or parties-in-interest and disqualified persons to a Plan might be deemed to constitute prohibited transactions under such circumstances.

It is anticipated that investment in the Fund by Benefit Plan Investors may be "significant" for purposes of the DOL regulations. In such event, the underlying assets of the Fund would be deemed to constitute Plan Assets. As a general rule, if the assets of the Fund were regarded as Plan Assets of a Benefit Plan Investor, the Investment Manager would be deemed to be a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciaries of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any Benefit Plan Investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciary of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, the fiduciary of each such Benefit Plan Investor has retained the fiduciary authority and responsibility with respect to the Benefit

Appx. 00059

010002

Plan Investor's initial and continuing investment in the Fund as though the Benefit Plan Investor is investing directly in the Partnership.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies, and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. In particular, exempt organizations should consider the applicability to them of the provisions relating to UBTI. By its purchase, each investor will be deemed to have represented that either (i) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (ii) it is not an entity whose assets include Plan Assets or (iii) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Shares may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (i) has investment discretion with respect to the investment of such Plan Assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*


Appx. 06069

010003

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 145
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 86 of 1017 PageID 10867
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 45 of 49

## CAYMAN ISLANDS MUTUAL FUND LAW

The Fund is regulated as a mutual fund under the Mutual Funds Law (2013 Revision) of the Cayman Islands ("**Mutual Funds Law**"). The Cayman Islands Monetary Authority (the "**Authority**") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the Directors and may result in the Authority applying to the court to have the Fund wound up.

The Fund will not, however, be subject to supervision in respect of its investment activities or the constitution of the Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Fund, or any directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2013 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2013 Revision) or Reporting of Savings Income information (European Union) Law (2007 Revision) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, director or agent, may be prohibited from disclosing that the request has been made.

Appx. 00061
010004

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 146
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 87 of 1017 PageID 10868
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 46 of
49

# ANTI-MONEY LAUNDERING COMPLIANCE

**Cayman Islands**

In order to comply with legislation or regulations aimed at the prevention of money laundering the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds. Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a shareholder (i.e. a subscriber or a transferee). Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required where an exemption applies under the Money Laundering Regulations (2013 Revision) of the Cayman Islands, as amended and revised from time to time or any other applicable law.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a shareholder if the Board of Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law, 2008 of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (2011 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**United States**

In response to increased regulatory concerns with respect to the identification of sources of funds used to make an investment in the Fund, the Investment Manager and/or its affiliates have implemented policies and procedures ("***AML Program***") designed to guard against and identify money laundering activities. Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will request prospective investors and, in some instances, existing shareholders to provide additional documentation verifying, among other things, such person's identity and the source of funds used to



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 147
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 88 of 1017 PageID 10869
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 47 of 49

purchase its Shares of the Fund. The Investment Manager may decline to accept a subscription based upon this information, or if this information is not provided.

Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will undertake enhanced due diligence procedures prior to accepting investors the Investment Manager believes present high risk factors with respect to money laundering activities. Examples, although not comprehensive, of persons posing high risk factors are persons resident in or organized under the laws of a "non-cooperative jurisdiction" or other jurisdictions designated by the Department of the Treasury as warranting special measures due to money laundering concerns, and any person whose capital contributions originate from or are routed through certain banking entities organized or chartered in a non-cooperative jurisdiction.

In addition, the Fund's AML Program prohibits the acceptance of subscriptions from or on behalf of:

      1. persons on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Asset Control;

      2. the Annex to Executive Order 13224;

      3. such other lists as may be promulgated by law or regulation; and

      4. foreign banks unregulated in the jurisdiction they are domiciled in or which have no physical presence.

Governmental regulators are continuing to consider appropriate measures to implement anti-money laundering laws as they apply to private investment funds such as the Fund. The Investment Manager and/or its affiliates will take such steps as it determines are necessary to comply with applicable law, regulations, orders, directives or special measures that may be required by governmental regulators. The specific policies and procedures that the Fund may be required to implement remain unclear, although such steps may include additional measures to confirm the identity of each investor, including the principal beneficial owners of the investor, if applicable, and/or reporting suspicious transactions to governmental regulators.

The requirements for the Investment Manager to guard against and identify money laundering activities in deciding whether to accept subscriptions are in addition to the discretion that the Investment Manager has in deciding whether to accept subscriptions.


Appx. 08983

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 148
Case 3:25-cv-02072-S    Document 15-13   Filed 10/06/25    Page 89 of 1017    PageID 10870
Case 19-34054-sgj11 Doc 2308-2 Filed 05/14/21  Entered 05/14/21 16:12:52  Page 48 of
49

## ANNEX A

**Definition of "U.S. Person"**

For purposes of the applicable prohibitions against ownership and transfer of Shares of the Fund, the term "U.S. Person" means:

(1)     a resident or citizen of the United States;

(2)     a partnership or corporation organized under the laws of the United States;

(3)     any entity not organized under the laws of the United States:

    (a)      that has its principal office or place of business in the United States; or

    (b)   (i)   in which citizens or residents of or entities organized under the laws of or existing in the United States directly or indirectly hold in the aggregate 50% or more of the beneficial interests; and

        (ii)   that will own directly or indirectly, either alone or together with affiliated persons, an aggregate of more than 9.9% of the Fund's outstanding Shares; or

    (c)   (i)   that is organized principally for passive investment (such as an investment company, a commodity pool or other similar vehicle); and

        (ii)   (A)   in which the amount of units of participation held by United States Persons (other than "qualified eligible participants" as defined in Rule 4.7(a)(2) under the United States Commodity Exchange Act) represents in the aggregate 10% or more of the beneficial interest in the entity;

            (B)   that was formed for the purpose of facilitating investment by United States Persons in the Fund, or in any other commodity pool with respect to which the operator is exempt from certain requirements of Part 4 of the regulations promulgated by the United States Commodity Futures Trading Commission by virtue of its participants being non-United States Persons; or

            (C)   that was formed by United States Persons principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended, unless it is formed and owned by "accredited investors" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) who are not natural persons, estates or trusts;

(4)     an estate or trust:

    (a)   of which an executor, administrator or trustee is a United States Person, unless:

        (i)   an executor, administrator or trustee who is not a United States Person has sole or shared investment discretion with respect to the assets of the estate or trust; and

        (ii)   (A)   in the case of an estate, it is governed by non-U.S. law; or

45



          (B)    in the case of a trust, no beneficiary (and no settlor if the trust is revocable) is a United States Person; or

      (b)    the income of which is subject to United States income tax regardless of source;

(5)    any agency or branch of a foreign entity located in the United States;

(6)    any non-discretionary account or similar account (other than an estate or trust) held for the benefit or account of one or more United States Persons; and

(7)    any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States, unless it is held by a dealer or other professional fiduciary exclusively for the benefit or account of one or more non-United States Persons.

For purposes of the foregoing, the term "***United States***" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia. Persons requiring details regarding other terms used in the foregoing definition (such as "qualified eligible participant" and "accredited investor") should contact the Administrator.

Appx. 00085

010008

Case 19-34054-sgj11 Doc 2308-3 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 1 of 2

# __EXHIBIT 3__

Appx 00086

010009

## HIGHLAND MULTI STRATEGY CREDIT FUND





Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 1 of 12

# **EXHIBIT 4**

Appx 06068

**THIRD AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT**

**by and among**

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

**and**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**November 1, 2013**

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 154
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 95 of 1017 PageID 10876
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 12

**THIS THIRD AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT** (this "*Agreement*"), is dated effective as of November 1, 2014, by and among:

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**, a Cayman Islands exempted company (the "*Offshore Fund*");

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**, a Delaware limited partnership (the "*Domestic Fund*," and together with the Offshore Fund, the "*Clients*") acting through its general partner, Highland Multi Strategy Credit Fund GP, L.P. a Delaware limited partnership (the "*General Partner*"); and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**, a Delaware limited partnership (the "*Investment Manager*").

## PRELIMINARY STATEMENTS

A.     The Domestic Fund previously retained the Investment Manager as its investment manager pursuant to an investment management agreement dated as of December 1, 2005, as amended and restated as of December 29, 2005 and as further amended and restated as of September 1, 2006 (the "*Original Agreement*").

B.     The Offshore Fund will invest all of its investable assets in the Domestic Fund. The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund and will serve merely as a steward thereof. The Investment Manager will conduct its investment activities at the Domestic Fund level as the investment manager to the Domestic Fund.

C.     The Domestic Fund desires to continue to retain the Investment Manager and the Offshore Fund desires to retain the Investment Manager to provide certain discretionary advisory services relating to the assets and liabilities of the Domestic Fund and the Investment Manager desires to accept such appointment, all subject to the terms and conditions hereinafter set forth.

## AGREEMENT

This Agreement amends and restates in its entirety the Original Agreement as set forth below. For good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Appointment.**

The Clients hereby appoint the Investment Manager as investment manager with respect to the assets and liabilities of the Domestic Fund and the Investment Manager hereby accepts such appointment and agrees to perform its obligations in accordance with the terms hereof and of the Fourth Amended and Restated Limited Partnership Agreement of the Domestic Fund, dated effective as of November 1, 2014, as amended from time to time (the "*Domestic Fund Partnership Agreement*"), and the investment objectives, policies,

Appx 06079
010013

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 155
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 96 of 1017 PageID 10877
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 12

guidelines and restrictions that from time to time are set forth in the Governing Documents of the Clients as applicable. "***Governing Documents***" mean, with respect to:

(a)    the Offshore Fund: the Memorandum and Articles of Association of the Offshore Fund, as amended from time to time, and the Confidential Private Offering Memorandum dated November 2014, as may be supplemented from time to time (the "***POM***");

(b)    the Domestic Fund: the Domestic Fund Partnership Agreement and the Private Placement Memorandum dated November 2014, as may be supplemented from time to time (the "***PPM***").

**2.    Authority and Duties of the Investment Manager.**

(a)    All of the investable assets of the Offshore Fund must be invested in, and the investment program of the Offshore Fund is to be conducted by the Investment Manager through, the Domestic Fund. The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund and the investment activities of the Investment Manager will be conducted at the Domestic Fund level as the investment manager to the Domestic Fund.

(b)    The Domestic Fund's investment program will be conducted by the Investment Manager in accordance with the PPM.

(c)    The Investment Manager serves as the investment manager to the Domestic Fund and in that capacity has full discretion and authority, without obtaining the prior approval of any officer or other agent of the Domestic Fund:

(i)    to continuously supervise the investment program of the Domestic Fund and the composition of its investment portfolio including, without limitation, determining from time to time what investments will be purchased, retained or sold, what contracts will be entered into by the Domestic Fund and what portion of its assets will be retained as cash, and to engage consultants and analysts in connection therewith; to cause the Domestic Fund to purchase or sell any asset, enter into any other investment-related transaction, including (directly or through subsidiaries or affiliates of the Domestic Fund) borrowing money, entering into swap transactions, lending securities, exercising control over a company, exercising voting or approval rights and selecting brokers and dealers for execution of portfolio transactions; and to undertake to do anything incidental to the foregoing to facilitate the performance of its obligations hereunder;

(ii)    to invest within or outside the United States of America in "Investments" (as defined in, and subject to the provisions of, the Domestic Fund Limited Partnership Agreement);

(iii)    to effect any and all transactions in Investments, including collateralized loan obligations, asset-backed securities, commodities, total return swaps,

Appx. 09607
010014

credit default swaps, synthetic securities and other financial instruments and assets (and options and other contracts thereon), and everything connected therewith in the broadest sense, including, without limitation, the full discretion and authority to make short sales, to purchase or write options (including uncovered options) and to trade on margin;

(iv)    to, on behalf of the Clients, exercise all rights, powers, privileges and other incidents of ownership or possession with respect to the Investments and other property and funds held or owned by the Domestic Fund, including without limitation the right to possess, lend, transfer, mortgage, pledge or otherwise deal in, and to secure the payment of obligations of the Domestic Fund by mortgage upon, or hypothecation or pledge of, all or part of the property of the Domestic Fund, whether at the time owned or thereafter acquired, and to vote Investments, participate in arrangements with creditors, institute and settle or compromise suits and administrative proceedings and other similar matters;

(v)    to select brokers, dealers, banks and other intermediaries by or through whom such transactions will be executed or carried out and to open, maintain and close accounts with brokers, which power shall include the authority to issue all instructions and authorizations to brokers regarding securities and money therein and to cause the Domestic Fund to pay, or authorize the payment and reimbursement of, brokerage commissions;

(vi)    to open, maintain and close bank accounts and authorize the drawing of checks or other orders for the payment of monies;

(vii)    to borrow or raise monies or utilize any other forms of leverage and to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non- negotiable instruments and evidences of indebtedness and otherwise to utilize any lines of credit, credit balances or overdraft privileges available to the Domestic Fund;

(viii)    to value the Client's assets as of the close of each fiscal period and any other date selected by the respective Client;

(ix)    to direct any administrator of the Clients, banks, brokers or other custodians to effect deliveries of funds or assets, but only in the course of effecting portfolio transactions for the account of the Clients;

(x)    to remove or replace any administrator of the Clients and/or any accountant of the Clients at any time; and

(xi)    to make and execute all such documents and to take all such other actions as the Investment Manager considers necessary or appropriate to carry out its investment management duties hereunder.

Appx. 06072

010015

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 157
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 98 of 1017 PageID 10879
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 12

(d)    In furtherance of the foregoing, the Board of Directors, on behalf of the Offshore Fund, and the General Partner, on behalf of the Domestic Fund, has delegated certain rights and responsibilities with respect to the operation of their respective partnerships and funds to the Investment Manager, as more fully set forth in the Governing Documents.

(e)    Each Client hereby designates the Investment Manager as the commodity pool operator (the "**CPO**") for such Client with complete authority and responsibility for compliance with the U.S. Commodity Exchange Act and the regulations promulgated thereunder, including to perform any and all duties required of a CPO (i) that is exempt from registration under the regulations of the U.S. Commodity Futures Trading Commission (the "**CFTC**") and (ii) that is in compliance with CFTC Rule 4.13(a)(3), including the filing of a notice of exemption under said Rule 4.13(a)(3) with the CFTC.

(f)    Additionally, each of the Clients hereby designates and appoints the Investment Manager as its agent and attorney-in-fact, with full power and authority and without the need for further approval of the Clients (except as may be required by law) to complete and execute all such documents and to take any and all actions that the Investment Manager, in its discretion, may deem advisable to carry out the foregoing with respect to the assets of the Clients; provided, however, that the Investment Manager is not intended to have actual or constructive custody of any assets of the Clients. In connection with any of the foregoing, the Investment Manager is further authorized to transfer or tender for cash or exchange such assets. In all such purchases, sales or trades the Clients authorize the Investment Manager to act for the Clients, and at their risk, and in their name and on their behalf, in the same manner and with the same force and effect as the Clients might or could do with respect to such purchases, sales or trades without prior consultation with the Clients. The Clients also appoint the Investment Manager as their agent and attorney-in-fact to vote, and to execute proxies, waivers, consents and other instruments with respect to, the assets of the Clients.

(g)    At the request of a Client, in any wind down of such Client, the Investment Manager will manage the realization of the Client's assets and the distribution thereof to investors.

(h)    In connection with the execution of transactions on behalf of the Domestic Fund, the Domestic Fund hereby acknowledges and agrees that in the course of selecting brokers, dealers, futures commission merchants, banks and financial intermediaries to effect transactions for the Domestic Fund's account, the Investment Manager may agree to such commissions, fees and other charges on behalf of the Domestic Fund's account as it may deem reasonable in the circumstances, taking into consideration all such factors as the Investment Manager deems relevant, including the following: the ability to effect prompt and reliable executions at favorable prices; the operational efficiency with which transactions are effected; the financial strength, integrity and stability of the broker; the quality, comprehensiveness and frequency of available research and other services considered to be of value; and

Appx 06073

010016

the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria. It is understood that the costs of such services will not necessarily represent the lowest costs available and that the Investment Manager is under no obligation to combine or arrange orders so as to obtain reduced charges.

3.      **Fees and Expenses.**

(a)     For its services to the Domestic Fund, the Domestic Fund will pay the Investment Manager the Management Fee (as defined in the Domestic Fund Partnership Agreement), calculated and payable monthly in advance. The Investment Manager may waive or reduce the management fees with respect to capital account and capital sub-accounts of the Domestic Fund in its discretion.

(b)     The Clients will pay, or will reimburse the Investment Manager, for all costs and expenses arising in connection with their operations, including without limitation, with respect to the Domestic Fund, all costs and expenses directly related to portfolio investments or prospective investments (whether or not consummated) of the Domestic Fund.

(c)     The Clients will not have their own separate employees or office, and they will not reimburse the Investment Manager for salaries, office rent and other general overhead costs of the Investment Manager. The Investment Manager will pay all of its own operating and overhead costs (except liability insurance) without reimbursement by the Clients. The Investment Manager is entitled to reimbursement from the Clients for any expenses paid by it on behalf of the Clients; provided that, the Investment Manager in its sole discretion may absorb any or all of such expenses incurred on behalf of the Clients. If the Investment Manager incurs any such expenses for the account of the Clients and any Customers (as defined below), the Investment Manager will allocate such expenses among the Clients and each such Customer in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the Investment Manager in its sole discretion considers fair and reasonable.

4.      **Other Activities and Investments.**

(a)     The Investment Manager is not required to devote its full time to the affairs of the Clients, but must devote such of its time to the business and affairs of the Clients as it may determine, in its discretion exercised in good faith, to be necessary to conduct the affairs of the Clients for the benefit of the Clients, the shareholders of the Offshore Fund and the partners of the Domestic Fund. Subject to this limitation, the Investment Manager, its partners and principals and their affiliates are not precluded from engaging in or owning an interest in other business ventures or investment activities of any kind. It is expressly understood that the Investment Manager and its affiliates may effect investment transactions for their own accounts and for the accounts of other customers (generally, "***Customers***"), and the Clients further understand and agree that nothing herein restricts the ability of the


Appx 06074

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 159
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 100 of 1017 PageID 10881
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 12

Investment Manager and its affiliates to engage in any such transactions notwithstanding the fact that the Clients may enter into or engage in such transactions so long as such transactions are in the best interests of the Clients.

(b)     The Investment Manager will act in a manner that it considers fair, reasonable and equitable in allocating investment opportunities to the Clients. It is understood that when the Investment Manager determines that it would be appropriate for the Clients and one or more of the Customers to participate in an investment opportunity, the Investment Manager will seek to execute orders for, or otherwise allocate such opportunities to, the Clients and such Customers on an equitable basis. In such situations, the Investment Manager may place orders for the Clients and each Customer simultaneously, and if all such orders are not filled at the same price, the Investment Manager may cause the Clients and each Customer to pay or receive the average of the prices at which such orders were filled for the Clients and all other Customers. If all such orders cannot be fully executed under prevailing market conditions, the Investment Manager may allocate among the Clients and the Customers the investments traded in a manner which the Investment Manager considers equitable, taking into account the size of the order placed for the Clients and each such Customer as well as any other factors which the Investment Manager deems relevant.

**5.     Account and Other Information.**

(a)     The Investment Manager must furnish such information concerning activities undertaken for the account of the Clients as the Clients may reasonably request.

(b)     The Clients agree to keep confidential and not to disclose to any person any information or matter relating to the Clients' investments (other than disclosure to the Clients' shareholders, partners, directors and employees, legal counsel, administrator, registrar and accountant in connection with the preparation and review of financial statements and with the filing of any tax returns or to any other person approved in writing by the Investment Manager (each such person being hereinafter referred to as an "***Authorized Representative***")); provided that the Clients and their Authorized Representatives may make such disclosure to the extent that (x) the information to be disclosed is publicly known at the time of proposed disclosure by the Clients or Authorized Representative, (y) the information otherwise is or becomes legally known to the Clients other than through disclosure by the Investment Manager or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities, provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed. Prior to making any disclosure required by law, the Clients will use their best efforts to notify the Investment Manager of such disclosure. Prior to any disclosure to any Authorized Representative, the Clients must advise such Authorized Representative of the obligations set forth in this Section 5(b) and are responsible for any breach of these obligations made by an Authorized Representative.

Appx. 06075

010018

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 160
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 101 of 1017 PageID 10882
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 12

(c)     The Investment Manager retains, or arranges for the retention of, for a period of at least 5 years, copies of any documents generated or received by the Investment Manager in the ordinary course of business pertaining to the financial condition of the account of the Clients or to the compensation payable to the Investment Manager.  At the request of the Clients, the Investment Manager will afford to the Clients' independent auditors reasonable access to such documents during customary business hours and will permit the Clients' auditors to make copies thereof or extracts therefrom at the expense of the Clients.

**6.     Custody.**

The assets of the Clients must be held in the custody of one or more custodians (or other independent institutions performing the functions of custodian, with respect to the assets which are held by such institutions) selected by the Investment Manager.  The Investment Manager will notify the Clients promptly of the proposed selection of any custodians.

**7.     Scope of Liability.**

The Clients agree that the Investment Manager is not liable to the Clients or any of their partners or shareholders for any losses, damages, expenses or claims occasioned by any act or omission of the Investment Manager in connection with the performance of its services hereunder, other than as a result of the Investment Manager's willful misconduct, fraud or gross negligence, or as otherwise prescribed by applicable law.  The Clients explicitly recognize that the investment advisory opinions, recommendations and actions of the Investment Manager will be based on advice and information deemed to be reliable but not guaranteed by or to the Investment Manager.

**8.     Indemnification.**

(a)     The Clients must indemnify and hold harmless the Investment Manager, each member, shareholder, partner, manager or director of, or any person who controls, the Investment Manager, each of the respective affiliates of the foregoing and each of the respective executors, heirs, assigns, successors or other legal representatives of the foregoing (each, an "***indemnitee***") from and against any expense, loss, liability or damage arising out of any claim asserted or threatened to be asserted against such indemnitee in connection with the Investment Manager's serving or having served as such pursuant to this Agreement; provided, however, that the indemnitee is not entitled to any such indemnification with respect to any expense, loss, liability or damage that was caused by the indemnitee's willful misconduct, fraud or gross negligence.

(b)     In the event that the Investment Manager or any other indemnitee entitled to indemnification pursuant to paragraph (a) above is or becomes a party to any action or proceeding in respect of which, or there otherwise exists a claim pursuant to which, it may be entitled to seek indemnification hereunder, the indemnitee must promptly notify the respective Client thereof.  The respective Client is entitled to participate in any such suit or proceeding and, to the extent that it may wish, to



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 161
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 102 of 1017 PageID 10883
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 10 of 12

assume the defense thereof with counsel reasonably satisfactory to the indemnitee. After notice of an election by the Client so to assume the defense thereof, the Client will not be liable to the indemnitee hereunder for any legal or other expenses subsequently incurred by the indemnitee in connection with the defense thereof other than reasonable costs of investigation or reasonable legal expenses incurred as a result of (i) potential conflicts of interest between the indemnitee and the Client or (ii) the protection of proprietary or privacy interests of other clients of or parties in interest with the indemnitee. The Client must advance to the indemnitee the reasonable costs and expenses of investigating and/or defending such claim, subject to receiving a written undertaking from the indemnitee to repay such amounts if and to the extent of any subsequent determination by a court or other tribunal of competent jurisdiction that the indemnitee was not entitled to indemnification hereunder.

(c)     A Client is not liable hereunder for any settlement of any action or claim effected without its written consent thereto.

**9.     Independent Contractor.**

For all purposes of this Agreement, the Investment Manager is an independent contractor and not an employee or dependent agent of any Client. Nothing herein is to be construed as making any Client a partner or co-venturer with the Investment Manager or any of its affiliates or Customers. Except as provided in this Agreement, the Investment Manager has no authority to bind, obligate or represent the Clients.

**10.     Term; Termination; Renewal.**

(a)     This Agreement will remain in full force and effect for a period commencing on the date first above written and ending on December 31, 2014, and thereafter will renew automatically for successive one-year periods. This Agreement may be terminated by any party hereto, without penalty, upon 75 days' prior written notice to the other parties.

(b)     The termination of this Agreement does not extinguish the obligations of the Clients for the payment of fees and expenses in respect of services rendered by the Investment Manager prior to the effective date of such termination.

**11.     Acknowledgement.**

Each of the Clients certifies and acknowledges to the Investment Manager that it:

(i)     has fully disclosed to potential investors the fee provisions and other arrangements relating to the Client's account with the Investment Manager and is satisfied that the potential investors have received sufficient information from the Investment Manager to enable them to evaluate the terms of this Agreement; and

(ii)     fully understands the method of compensation provided herein and its associated risks, including the risk that the performance compensation arrangements with


Appx. 06975

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 162
Case 3:25-cv-02072-S   Document 15-13   Filed 06/06/25   Page 103 of 1017   PageID 10884
Case 19-34054-sgj11 Doc 2308-4 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 11 of 12

affiliates of the Investment Manager may create an incentive for the Investment Manager to engage in transactions that are riskier or more speculative than would be the case in the absence of performance compensation and that such risk has been disclosed to potential investors.

12.     **Amendment; Modification; Waiver.**

Except as otherwise expressly provided herein, this Agreement may not be amended, nor may any provision of this Agreement be considered modified or waived, unless evidenced by a writing signed by the party to be charged with such amendment, waiver or modification.

13.     **Binding Effect; Assignment.**

This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors, but the rights and obligations hereunder are not, except as otherwise expressly provided herein, assignable, transferable or delegable without the written consent of the other parties hereto and any attempted assignment, transfer or delegation thereof without such consent is null and void, except that the Investment Manager may assign its rights and obligations hereunder to an entity that controls, is controlled by or is under common control with the Investment Manager; provided, however, that such entity assumes the obligations of the Investment Manager hereunder.

14.     **Governing Law.**

This Agreement is governed by and construed in accordance with the substantive laws of the State of Delaware which are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder.

[SIGNATURE PAGE FOLLOWS]

010021

The parties have executed this Agreement as of the day and year first above written.

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

By: _____
Name: James Dondero
Title:  Director

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By:  HIGHLAND MULTI STRATEGY CREDIT
     FUND GP, L.P
     attorney-in-fact for the Limited Partners

By:  HIGHLAND MULTI STRATEGY CREDIT
     GP, LLC
     its general partner

By:  HIGHLAND CAPITAL MANAGEMENT,
     L.P.
     its sole member

By:  STRAND ADVISORS, INC.
     its general partner
By: _____
Name: James Dondero
Title:  President

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:  STRAND ADVISORS, INC.

By: _____
Name: James Dondero
Title:  President

*Signature Page to Third Amended and Restated Investment Management Agreement*

010022

Appx. 06979

Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 55

# **EXHIBIT 5**

Appx 06989

010023

# Highland Multi Strategy Credit Fund, L.P.

A Delaware Limited Partnership

**Fourth Amended and Restated**

**Limited Partnership Agreement**

November 1, 2014

010024

Appx 06984

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 166
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 107 of 1017 PageID 10888
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 55

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ........................................................................................................1

Article II ORGANIZATION ................................................................................................10
    2.1     Continuation of Limited Partnership ...................................................10
    2.2     Name of Partnership ...........................................................................11
    2.3     Principal Office; Registered Office ......................................................11
    2.4     Term of Partnership.............................................................................11
    2.5     Object and Powers of Partnership ......................................................11
    2.6     Liability of Partners ............................................................................12
    2.7     Actions by Partnership ........................................................................12
    2.8     Reliance by Third Parties ....................................................................12
    2.9     UCC Status of Limited Partner Interests ...........................................12
    2.10    Series of Interests ...............................................................................12

Article III CAPITAL ...........................................................................................................13
    3.1     Contributions to Capital .....................................................................13
    3.2     Rights of Partners in Capital ...............................................................14
    3.3     Capital Accounts ................................................................................14
    3.4     Allocations of Net Profit and Net Loss ...............................................15
    3.5     Allocation of Management Fees, Withholding Taxes and Certain Other
            Expenditures ......................................................................................15
    3.6     Reserves; Adjustments for Certain Future Events ...............................16
    3.7     Performance Allocation .......................................................................17
    3.8     Limited Participation Investments and New Issues ............................17
    3.9     Allocation to Avoid Capital Account Deficits .....................................18
    3.10    Regulatory Allocations .......................................................................18
    3.11    Allocations for Income Tax Purposes .................................................19
    3.12    Individual Partner's Tax Treatment ....................................................21
    3.13    Distributions .......................................................................................21

Article IV MANAGEMENT .................................................................................................22
    4.1     Duties and Powers of the General Partner ...........................................22
    4.2     Expenses ............................................................................................23
    4.3     Rights of Limited Partners ..................................................................25
    4.4     Other Activities of Partners ................................................................25
    4.5     Exculpation; Indemnification..............................................................26
    4.6     Advisory Committee ...........................................................................28
    4.7     Alternative Investment Vehicles ........................................................29

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS .........................................29
    5.1     Admission of Limited Partners ............................................................29
    5.2     Admission of Additional General Partners ..........................................29
    5.3     Transfer of Interests of Limited Partners ............................................30
    5.4     Transfer of Interest of the General Partner ..........................................30
    5.5     Withdrawal of Interests of Partners .....................................................31

Appx. 06982
010025

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 167
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 108 of 1017 PageID 10889
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 55

Article VI SOFT WIND DOWN, DISSOLUTION AND LIQUIDATION ....................................35
    6.1     Soft Wind Down ............................................................................35
    6.2     Dissolution of Partnership..............................................................36
    6.3     Liquidation of Assets.....................................................................36

Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS .........................37
    7.1     Accounting and Reports..................................................................37
    7.2     Valuation of Partnership Assets and Interests ................................38
    7.3     Determinations by the General Partner ...........................................38
    7.4     Books and Records ........................................................................39
    7.5     Confidentiality ...............................................................................39

Article VIII GENERAL PROVISIONS......................................................................41
    8.1     Amendment of Partnership Agreement............................................41
    8.2     Special Power-of-Attorney .............................................................43
    8.3     Notices ...........................................................................................44
    8.4     Agreement Binding Upon Successors and Assigns; Delegation .......44
    8.5     Governing Law ..............................................................................44
    8.6     Not for Benefit of Creditors ...........................................................45
    8.7     Dispute Resolution.........................................................................45
    8.8     Consents and Voting.......................................................................47
    8.9     Merger and Consolidation...............................................................48
    8.10    Miscellaneous ...............................................................................48
    8.11    BHCA Subject Persons ..................................................................48
    8.12    RIC Limited Partners ....................................................................49
    8.13    Bad Actor Limited Partners ...........................................................50
    8.14    Entire Agreement ..........................................................................50

Appx 06983
010028

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 168
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 109 of 1017 PageID 10890
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 55

THIS FOURTH AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Highland Multi Strategy Credit Fund, L.P., dated effective as of November 1, 2014, is by and among Highland Multi Strategy Credit Fund GP, L.P., as General Partner, and certain Persons who were admitted as Limited Partners in accordance with the Prior Agreement and those Persons who are hereafter admitted as additional Limited Partners in accordance with this Agreement.   Capitalized terms have the meanings set forth in Article I below.

## PRELIMINARY STATEMENTS

(A)    The General Partner and certain of the Limited Partners have heretofore formed a limited partnership pursuant to the Act (as defined herein) by filing a Certificate of Limited Partnership with the office of the Secretary of State of the State of Delaware on December 1, 2005, and previously entered into a Limited Partnership Agreement, dated effective as of December 1, 2005, as last amended and restated by the Third Amended and Restated Limited Partnership Agreement dated as of December 31, 2007 (the "*Prior Agreement*").

(B)    The General Partner filed an amendment to the Certificate of Limited Partnership of the Fund on August 26, 2014, changing the name of the Fund to "Highland Multi Strategy Credit Fund, L.P."

(C)    The parties hereto desire to continue the Partnership as a limited partnership under the Act and to make certain modifications to the Prior Agreement, as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Prior Agreement is amended and restated in its entirety to read as follows:

## Article I
## DEFINITIONS

For purposes of this Agreement:

"*Act*" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"*Accounting Period*" means each period that starts on the day immediately following the last day of the preceding Accounting Period, and that ends on the earliest of the following dates:

(a)    the last day of a calendar month;

(b)    any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

Appx 06984
010027

(c) the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d) any other date which the General Partner selects.

"***Advisers Act***" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"***Advisory Committee***" has the meaning set forth in Section 4.6.

"***Affiliate***" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" (including "controlled by" and "under common control") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Affiliated Investor***" means any Limited Partner that is an Affiliate of the General Partner or the Investment Manager, including their respective employees, members or partners and their respective immediate family members.

"***Agreement***" means this Fourth Amended and Restated Limited Partnership Agreement of the Partnership, as amended from time to time.

"***Alternative Investment Vehicle***" has the meaning set forth in Section 4.7.

"***Arbitration Rules***" has the meaning set forth in Section 8.7(b)(i).

"***Authorized Representative***" has the meaning set forth in Section 7.5(a).

"***Bad Actor Limited Partner***" means a Limited Partner that (i) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interest of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (ii) the General Partner determines is likely to become subject to a conviction, order, judgment, finding or that would be likely to cause the disqualification described in clause (i).

"***BHCA***" means the U.S. Bank Holding Company Act of 1956, as amended.

"***BHCA Subject Person***" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"***Business Day***" means any day other than (a) Saturday and Sunday and (b) any other day on which banks located in New York, New York are required or authorized by law to be closed.

"***Calculation Period***" means, with respect to each Capital Account, the period commencing as of the date of the establishment of the Capital Account (in the case of the initial Calculation

Appx. 06985

010028

Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Account, and ending as of the close of business on the first to occur of the following:

      (a)     the last day of a calendar year;

      (b)     the withdrawal of all or a portion of the Interest attributable to such Capital Account (but only with respect to such withdrawn amount);

      (c)     the permitted Transfer of all or any portion of such Limited Partner's Interest; or

      (d)     the final distribution to such Limited Partner following the dissolution of the Partnership.

"**_Capital Account_**" means, with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 3.3.

"**_Carryforward Account_**" means a memorandum account to be recorded in the books and records of the Partnership with respect to each Capital Account that has an initial balance of zero and that is adjusted as follows:

      (a)     As of the first day after the close of each Calculation Period for such Capital Account, the balance of the Carryforward Account is (i) increased by the amount, if any, of such Negative Performance Change with respect to such Capital Account for such Calculation Period and (ii) reduced (but not below zero) by the amount, if any, of the Positive Performance Change with respect to such Capital Account for such Calculation Period.

      (b)     As of the close of the Calculation Period, any positive balance of the Carryforward Account is further adjusted if such Capital Account has been reduced during such Calculation Period as a result of a distribution or withdrawal, by reducing such positive balance (but not below zero) by an amount determined by multiplying (i) such positive balance by (ii) a fraction, of which (A) the numerator is equal to the amount so distributed or withdrawn, and (B) the denominator is equal to the balance of such Capital Account immediately before giving effect to such distribution or withdrawal.

The Carryforward Account attributable to each Series A Capital Account shall be reset to zero on the Effective Date. For the avoidance of doubt, any gains or losses allocated by the Partnership to any Capital Account of a Limited Partner prior to the Effective Date will be inapplicable in the calculation of the Carryforward Account following the Effective Date.

"**_Certificate_**" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

"**_Code_**" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

Appx. 06986

010029

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 171
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 112 of 1017 PageID 10893
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 55

"***Dispute***" has the meaning set forth in Section 8.7.

"***Effective Date***" means the date set forth above as the effective date of this Agreement.

"***Election Notice***" has the meaning set forth in Section 8.11(c).

"***FAA***" has the meaning set forth in Section 8.7(b)(ii)

"***FATCA***" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations thereof, including any successor Regulations or interpretations, and any intergovernmental agreement implementing the foregoing.

"***FINRA***" means the Financial Industry Regulatory Authority, Inc.

"***Fiscal Year***" means each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner elects another fiscal year; provided that any such other fiscal year is permissible for U.S. federal income tax purposes. In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "***Fiscal Year***" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"***GAAP***" means generally accepted accounting principles in the United States, as amended.

"***General Partner***" means Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"***Indemnified Person***" has the meaning set forth in Section 4.5(a).

"***Interest***" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"***Investment Company Act***" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

"***Investment Management Agreement***" means the investment management agreement between the Investment Manager, the General Partner, the Offshore Fund and the Partnership.

"***Investment Manager***" means Highland Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"***Investments***" means investment in securities, assets and other financial or intangible investment instruments, contracts or products made as described in the Partnership's offering memorandum.



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 172
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 113 of 1017 PageID 10894
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 55

"*Limited Partners*" means any Person who is a limited partner of the Partnership (which, except as otherwise indicated, will include a substituted Limited Partner) at the time of reference thereto, in such Person's capacity as a limited partner of the Partnership. For all purposes of the Act, the Limited Partners of the Partnership will constitute a single class or group of limited partners.

"*Majority-in-Interest of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners.

"*Management Fee*" means, with respect to each Capital Account, an amount equal to one fourth of (i) 1.5% of each Series A Capital Account balance; (ii) 1.5% of each Series B Capital Account balance; (iii) 1.0% of each Series C Capital Account balance; and (iv) 2.0% of each Series D Capital Account balance, which amounts are calculated on the first Business Day of each calendar quarter. Management Fees shall be appropriately adjusted for contributions during any partial quarter.

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"*Negative Basis Partner*" means any Partner who withdraws from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner shall cease to be a Negative Basis Partner at such time as it has received allocations pursuant to Section 3.11(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the General Partner or its delegate(s) in accordance with Section 7.2, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6,). Except as otherwise expressly provided herein, Net Assets as of the first day of any Accounting Period are determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Accounting Period, but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Accounting Period, and after giving effect to Management Fee charges, and Net Assets as of the last day of any Accounting Period are determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

      (a)    any Performance Allocation as of the date on which such determination is made;

Appx 06988
010031

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 173
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 114 of 1017 PageID 10895
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 10 of 55

(b)     any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)     withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of any Restricted New Issues pursuant to Section 3.8(b) and other amounts specially allocated pursuant to Section 3.8 during the Accounting Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Accounting Period.

"**Net Loss**" means any amount by which the Net Assets as of the first day of an Accounting Period exceed the Net Assets as of the last day of the same Accounting Period.

"**Net Profit**" means any amount by which the Net Assets as of the last day of an Accounting Period exceed the Net Assets as of the first day of the same Accounting Period.

"**New Issue Rules**" has the meaning set forth in Section 3.8(b).

"**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1) and (c).

"**Non-Voting Interest**" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including but not limited to mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

"**Offshore Fund**" means Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company and a Limited Partner of the Partnership.

"**Orderly Realization**" has the meaning set forth in Section 6.1.

"**Other Account**" means any assets or investments of the General Partner, or any assets managed by the General Partner or any Affiliate of the General Partner for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"**Partner**" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "**Partners**" means the General Partner and all of the Limited Partners.

"**Partnership**" means the limited partnership governed by this Agreement.

"**Partnership Minimum Gain**" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 174
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 115 of 1017 PageID 10896
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 11 of 55

"***Partnership Percentage***" means a percentage established for each Capital Account on the Partnership's books as of the first day of each Accounting Period. The Partnership Percentage of a Capital Account for an Accounting Period is determined by dividing the amount of such Capital Account as of the beginning of the Accounting Period by the sum of the Capital Accounts of all of the Partners as of the beginning of the Accounting Period. The numerator and denominator of the above shall be calculated after crediting all capital contributions to the Capital Account or Partnership, as appropriate, which are effective as of such date, net of all deductions, including Management Fees. The sum of the Partnership Percentages of all Capital Accounts for each Accounting Period shall equal 100%.

"***Performance Allocation***" means, for each Capital Account of a Limited Partner, 20% of the amount by which (a) the Positive Performance Change for such Calculation Period for such Capital Account, if any, exceeds (b) any positive balance in the Carryforward Account for such Capital Account as of the most recent prior date as of which any adjustment has been made thereto.

"***Performance Change***" means, with respect to each Capital Account of a Limited Partner for each Calculation Period, the difference between:

(a) the sum of (i) the balance of such Capital Account as of the close of the Calculation Period (after giving effect to Management Fees and all allocations to be made to such Capital Account as of such date, including such Capital Account's allocable share of any profits or losses pursuant to Section 3.8 and any credits or debits of any applicable carrying charge associated therewith other than any Performance Allocation to be debited against such Capital Account), plus (ii) any debits to such Capital Account during the Calculation Period to reflect any actual or deemed distributions or withdrawals with respect to such Capital Account, plus (iii) any debits to such Capital Account during the Calculation Period to reflect any items allocable to such Capital Account pursuant to Section 3.5(b) or (c); and

(b) the balance of such Capital Account as of the commencement of the Calculation Period.

If the amount specified in clause (a) exceeds the amount specified in clause (b) such difference is a "***Positive Performance Change***," and if the amount specified in clause (b) exceeds the amount specified in clause (a), such difference is a "***Negative Performance Change***."

The Performance Change will be computed separately for each Capital Account (and thus each separately maintained capital sub-account created to reflect an additional contribution to a Capital Account). Thus, if a Limited Partner has multiple Capital Accounts, the Performance Change will be calculated separately for each Capital Account and the resulting "Positive Performance Change" and "Negative Performance Change" shall be separately allocated to each such Capital Account and shall not be netted against each other.

"***Person***" means any individual, partnership, corporation, limited liability company, trust or other entity or any government (including a governmental agency or political subdivision thereof).

Appx 06999
010033

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 175
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 116 of 1017 PageID 10897
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 12 of 55

"***Positive Basis***" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest).

"***Positive Basis Partner***" means any Partner who withdraws from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner ceases to be a Positive Basis Partner at such time as it has received allocations pursuant to Section 3.11(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"***Prior Agreement***" has the meaning set forth in the Preliminary Statements to this Agreement.

"***Realization Period***" has the meaning set forth in Section 6.1.

"***Recent Amendments***" means the changes to the terms of an investment in the Partnership as contemplated in this Agreement and the constituent documents related thereto, including, but not limited to, the re-designation of all Interests held by Limited Partners on the Effective Date as Series A Interests.

"***Regulations***" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"***Regulatory Allocations***" has the meaning set forth in Section 3.10(d).

"***Restricted Capital Accounts***" has the meaning set forth in Section 3.8(b).

"***Restricted Issues***" has the meaning set forth in Section 3.8(b).

"***Revocation Notice***" has the meaning set forth in Section 8.11(c).

"***RIC Limited Partner***" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"***Schedule of Partners***" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"***Series***" means a designated series of Interests established in accordance with this Agreement and having such terms as the General Partner determines.

"***Series A Capital Account***" means the Capital Account attributable to a Limited Partner's Series A Interest.

Appx 06991
010034

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 176
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 117 of 1017 PageID 10898
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 13 of
55

"*Series A Interests*" means a Series of Interests having the rights and obligations applicable to Series A Interests as set forth in this Agreement.

"*Series A Lock-Up*" has the meaning set forth in Section 5.5(c)(i).

"*Series A Withdrawal Date*" has the meaning set forth in Section 5.5(c)(i).

"*Series B Capital Account*" means the Capital Account attributable to a Limited Partner's Series B Interest.

"*Series B Interests*" means a Series of Interests having the rights and obligations applicable to Series B Interests as set forth in this Agreement.

"*Series B Withdrawal Date*" has the meaning set forth in Section 5.5(c)(ii).

"*Series C Capital Account*" means the Capital Account attributable to a Limited Partner's Series C Interest.

"*Series C Interests*" means a Series of Interests having the rights and obligations applicable to Series C Interests as set forth in this Agreement.

"*Series C Withdrawal Date*" has the meaning set forth in Section 5.5(c)(iii).

"*Series D Capital Account*" means the Capital Account attributable to a Limited Partner's Series D Interest.

"*Series D Interests*" means a Series of Interests having the rights and obligations applicable to Series D Interests as set forth in this Agreement.

"*Series D Withdrawal Date*" has the meaning set forth in Section 5.5(c)(iv).

"*Sub-Series of Shares*" refers to sub-series of the shares of the Offshore Fund, as created from time to time, for purposes of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received from shareholders at different times.

"*Suspension*" has the meaning set forth in Section 5.5(l).

"*Super-Majority-in-Interest of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 75% of the aggregate Partnership Percentages of all Limited Partners.

"*Transfer*" means any direct, indirect or synthetic sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

9



010035
Appx 06092

"***Withdrawal Date***" means, as applicable, the Series A Withdrawal Date, the Series B Withdrawal Date, the Series C Withdrawal Date, and the Series D Withdrawal Date or any other effective date of withdrawal pursuant to Section 5.5.

## Article II
## ORGANIZATION

**2.1    Continuation of Limited Partnership**

(a)    The General Partner and the Limited Partners hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)    The General Partner has executed and filed with the Secretary of State of the State of Delaware a Certificate, and shall execute, acknowledge and file with the Secretary any amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.  The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment.  All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)    The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner are as provided in the Act, for limited partners and the general partner except as provided herein.

(d)    The parties hereto acknowledge and agree that the Partnership shall be classified as a "partnership" and not as an association taxable as a corporation for U.S. federal income tax purposes.  No election may be made by the Partners or the Partnership to treat the Partnership as other than a "partnership" for U.S. federal, state and/or local income tax purposes and, to the extent necessary, the Partners or Partnership shall make any election to treat the Partnership as a "partnership."  The Partners shall treat the Partnership consistently with its status as a "partnership" for U.S. federal income tax purposes and agree to undertake any further action which is necessary to treat the Partnership as such, and shall not undertake any action that is inconsistent with the Partnership's status as a "partnership" for U.S. federal, state and/or local income tax purposes.

(e)    The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other

10



considerations; <u>provided</u> that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

**2.2 Name of Partnership**

(a) The name of the Partnership is Highland Multi Strategy Credit Fund, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act. The General Partner shall send a notice of any change of name to the Limited Partners. All business of the Partnership shall be conducted under such name or under such other name as the General Partner deems appropriate.

(b) The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3 Principal Office; Registered Office**

(a) The Partnership's principal office shall be at such location as the General Partner may designate from time to time.

(b) The Partnership's registered office in the State of Delaware is at 1209 Orange Street, County of New Castle, Wilmington, Delaware 19801, and the registered agent of the Partnership in the State of Delaware is The Corporation Trust Company, unless a different registered office or agent is designated from time to time by the General Partner.

**2.4 Term of Partnership**

The term of the Partnership commenced on the date on which the Certificate was filed with the Secretary of State of the State of Delaware and continues until the Partnership is dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1). The legal existence of the Partnership as a separate legal entity continues until the cancellation of the Certificate.

**2.5 Object and Powers of Partnership**

(a) The object and business of the Partnership is (i) to purchase, sell (including short sales), invest and trade in Investments, (ii) to engage in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions relating thereto for the benefit of the Partnership, (iii) to engage in any lawful act or activity of which limited partnerships may be formed under the Act and (iv) to engage in any and all activities necessary or incidental to the foregoing.


Appx 06994

010037

(b)     The Partnership possesses and may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the object of the Partnership.

## 2.6     Liability of Partners

In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act.

## 2.7     Actions by Partnership

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects.

## 2.8     Reliance by Third Parties

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

## 2.9     UCC Status of Limited Partner Interests

(a)     For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests are deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)     Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve. Every certificate representing an Interest shall bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

## 2.10     Series of Interests

(a)     The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different Series of Interests in the Partnership with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, Management Fees, Performance Allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other


Appx. 06995
010038

differences) as the General Partner may determine upon the issuance of such Series; <u>provided</u> that such Series would not reasonably be expected to have a material adverse effect on the existing Limited Partners. The terms and rights of such Series may be set forth in a supplement to the Partnership's offering memorandum or a "side letter" or other agreement, which the General Partner may incorporate by reference.

(b)     All Interests in the Partnership held by Limited Partners (including Affiliated Investors) as of the Effective Date are hereby designated as Series A Interests.

**Article III**
**CAPITAL**

**3.1     Contributions to Capital**

(a)     The minimum required initial capital contribution of each Limited Partner is the amount determined by the General Partner. The General Partner may change the required minimum initial contribution amount at any time with respect to any, all or less than all Limited Partners.

(b)     The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner shall be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act. The minimum required additional capital contribution of any existing Limited Partner to the Partnership shall be the amount the General Partner may determine. The General Partner may change the required minimum additional contribution amount at any time with respect to any, all or less than all Limited Partners.

(c)     The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners. Except as required by the Act, the General Partner is not required to make any additional capital contributions to the Partnership. The General Partner may, however, make capital contributions to the Partnership in such amounts and at such times as it may determine. The General Partner or any of its Affiliates have the right at any time to make additional capital contributions as a Limited Partner or General Partner. If the General Partner or any of its Affiliates (including their associated Persons, such as officers, directors, partners, members or employees or any of their family members) makes a capital contribution as a Limited Partner, the General Partner or the Investment Manager shall have authority to waive the Management Fee and/or Performance Allocation with respect to such Limited Partner.

(d)     Except as otherwise permitted by the General Partner (i) initial or additional capital contributions by each Partner shall be paid in one installment with cash and/or Investments having an aggregate value as set forth in the Partnership's books and records, and (ii) initial contributions are due as of the date of admission of such Person as a Limited Partner of the Partnership. Whether Investments may be

13



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 181
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 122 of 1017 PageID 10903
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 18 of 55

accepted as a contribution to the capital of the Partnership is determined by the General Partner.

**3.2     Rights of Partners in Capital**

(a)     No Partner shall be entitled to interest on its capital contributions to the Partnership.  For the avoidance of doubt, interest income, if any, earned on subscription amounts remitted to the Partnership prior to the date that an Interest is issued to a Partner shall be payable to the Partnership and not applied toward the purchase of an Interest.

(b)     No Partner shall have the right to the return of any capital contribution to the Partnership except (i) upon withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1.  The entitlement to any such return is limited to the value of the Capital Account(s) of the Partner.  The General Partner shall not be liable for the return of any such amounts.

**3.3     Capital Accounts**

(a)     The Partnership shall maintain a separate Capital Account for each Partner.   In the event a Limited Partner invests in more than one Series of Interests, the Partnership will maintain a separate Capital Account with respect to each Series of Interests held by such Limited Partner, with each such Capital Account being treated as if it were the Capital Account of a separate Partner for purposes of computing the Performance Allocation, the Management Fee and the withdrawal rights attributable to the Series.

(b)     The General Partner may, in its discretion, maintain a separate sub-account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of this Agreement.  Each Capital Account shall reflect the aggregate sum of the balances in such Partner's Capital Account.

(c)     If a Partner makes an additional capital contribution to an existing Capital Account, the Capital Account will be sub-divided into separate capital sub-accounts attributable to each separate capital contribution, with each capital sub-account treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights and restrictions applicable to each capital sub-account.  References herein to a Partner's "Capital Account" include any such separately maintained capital sub-accounts.

(d)     The Partnership will issue to the Offshore Fund an Interest and maintain capital sub-accounts that correspond to each Sub-Series of Shares and each capital sub-account is treated separately for determining Management Fees, the Performance Allocations and withdrawal rights.

Appx. 06097
0T0040

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 182
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 123 of 1017 PageID 10904
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of 55

(e)    Each Capital Account has an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to such Capital Account.

(f)    Each Capital Account shall be increased by such Capital Account's allocable share of the Net Profits allocated by the Partnership to such Capital Account pursuant to Section 3.4.

(g)    Each Capital Account shall be reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.5 or 6.3, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(h), (ii) such Capital Account's allocable share of the Net Losses allocated by the Partnership to such Capital Account pursuant to Section 3.4, (iii) such Capital Account's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Capital Account's allocable share of the Performance Allocation allocable pursuant to Section 3.7, and (v) such Capital Account's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2(b).

(h)    The Capital Account of the Investment Manager, as a special Limited Partner of the Partnership, shall be increased by the amount of the Performance Allocation allocated to such Capital Account and the investment gains therein.

(i)    Each Capital Account shall also be adjusted to reflect all other allocations and other changes in the value of such Capital Account not otherwise described in this Section 3.3 in the manner specified in the remaining provisions of this Article III.

**3.4    Allocations of Net Profit and Net Loss**

Subject to Sections 3.5 through 3.10, as of the last day of each Accounting Period, any Net Profit or Net Loss of such Accounting Period shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for such Accounting Period.

**3.5    Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a)    As of the first Business Day of each calendar quarter, each Capital Account's Management Fee for such calendar quarter shall be debited against such Capital Account and paid by the Partnership to the Investment Manager. Capital contributions accepted after the commencement of the calendar quarter shall be subject to a prorated Management Fee reflecting the time remaining during that quarter. The Investment Manager may reduce or eliminate the Management Fee with respect to any Partner (or Capital Account) in its sole discretion; provided that such reduction or elimination shall not increase the Management Fee payable by any other Partner (or Capital Account).

(b)    To the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely

Appx. 06098
010041


Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 183
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 124 of 1017 PageID 10905
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 55

conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments on behalf of or with respect to any Partner or Partners (including backup withholding or withholding under FATCA), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required. If the Partnership pays or incurs any withholding tax or other tax obligation (including under FATCA) with respect to the income allocable or distributable to one or more Partners, then the amount of such withholding tax or tax obligation shall be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement. Such amount shall be debited against the Capital Account(s) of such Partner or Partners as of the close of the Accounting Period during which the Partnership so withholds, pays or incurs such obligation. If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors shall make a contribution to the capital of the Partnership, within 10 days following request by the General Partner, the amount of such excess. The General Partner is not obligated to apply for or obtain a reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such reduction or exemption, or be otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax.

(c) Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments. Such allocations shall be debited from the relevant Capital Accounts of such Partners as of the close of the Accounting Period during which any such items were accrued by the Partnership.

**3.6    Reserves; Adjustments for Certain Future Events**

(a) The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and proportionately against the Capital Accounts for contingent liabilities or probable losses, such reserves to be in the amounts which the General Partner deems necessary or appropriate. The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate. The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be debited or credited, as the General Partner deems appropriate, to the Capital Accounts of current Partners that (i) are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or (ii) were Partners, or are transferees from Persons who were Partners, at the time of the act or omission giving rise to the contingent liability for which the reserve has been established by the General Partner.

16

(b) If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately debited or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period.

**3.7 Performance Allocation**

(a) The Performance Allocation shall be debited against each Capital Account of each Limited Partner as of the last day of each Calculation Period with respect to such Capital Account, and the amount so debited shall simultaneously be credited to the Capital Account of the Investment Manager, as a special Limited Partner of the Partnership.

(b) The Investment Manager may waive or alter the Performance Allocation with respect to any Limited Partner.

**3.8 Limited Participation Investments and New Issues**

(a) If the General Partner determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Partner may agree such Partner should not participate (or should receive a reduced participation) in the Net Profit or Net Loss with respect to any Investment, the General Partner may allocate Net Profit or Net Loss, if any, with respect to such Investment only to Partners to whom the restrictions on participating in that Investment do not apply. In order to allocate Net Profit or Net Loss accordingly, the General Partner may establish and maintain a memorandum account in the accounting records of the Partnership on a Partner-by-Partner basis with respect to each such Investment. The Net Profit and Net Loss and expenses relating to such Investment will be separately calculated and allocated based on each participating Partner's balance in such memorandum account for such Investment divided by the sum of the balances of all memorandum accounts for all participating Partners. In order to compensate a Limited Partner who is not participating in an Investment pursuant to this Section 3.8 for the use of such Partner's share of Partnership capital to purchase the Investment, the General Partner may credit the non-participating Partner's Capital Account (and correspondingly debit the Capital Account of the participating Partners with a carrying charge). Any distributions from the memorandum account will be based on the participating Partner's respective percentage interest in such Investment.

(b) Pursuant to certain rules of FINRA ("*New Issue Rules*"), members of FINRA are permitted to sell to the Partnership certain publicly-offered securities ("*Restricted Issues*") only if the Capital Accounts of Partners connected with the securities industry or executive officers or directors of investment banking clients of underwriters ("*Restricted Capital Accounts*") are not restricted from sharing a beneficial interest in such Restricted Issues in accordance with the provisions of the New Issue Rules. Notwithstanding the provisions of Section 3.4, if the Partnership chooses to invest in Restricted Issues, the Partnership shall not allocate any items

Appx. 06409

010043

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 185
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 126 of 1017 PageID 10907
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 22 of 55

of income, gain, loss, deduction and credit that relate to investments in Restricted Issues to Restricted Capital Accounts except to the extent permitted by the New Issue Rules, and shall instead allocate such items among the other Capital Accounts on a *pro rata* basis. To the extent the New Issue Rules permit certain Persons with Restricted Capital Accounts to participate in profits and losses from Restricted Issues, the General Partner shall allocate such profits and losses from Restricted Issues among such Restricted Capital Accounts on a *pro rata* basis or on such other basis that the General Partner reasonably determines ensures compliance with the New Issue Rules. To the extent consistent with the New Issue Rules, the General Partner shall determine when all Capital Accounts may participate in the Net Profit and Net Loss from any Restricted Issue. The General Partner shall value any Restricted Issue at such time at the then-current price of the security in the secondary market.

**3.9    Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Accounting Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10    Regulatory Allocations**

Notwithstanding anything to the contrary in this Agreement:

(a)    <u>Qualified Income Offset</u>.  In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; <u>provided</u> that an allocation pursuant to this Section 3.10(a) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.10(a) were not in this Agreement. This Section 3.10(a) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and is to be interpreted consistently therewith.

(b)    <u>Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this Section 3.10, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an

0100044

amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Sections 1.704-2(f) and (g). This Section 3.10(b) is intended to comply with the minimum gain chargeback requirement in such Sections of the Regulations and shall be interpreted consistently therewith.

(c)     <u>Gross Income Allocation</u>.   In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner shall be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; <u>provided</u> that an allocation pursuant to this Section 3.10(c) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.10(a) and this Section 3.10(c) were not in this Agreement.

(d)     <u>Curative Allocations</u>.   The allocations set forth this Section 3.10 (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.10.   Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Partnership Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

(e)     <u>Nonrecourse Deductions</u>.   Any Nonrecourse Deductions for any Fiscal Year or other period shall be allocated to the Partners in accordance with their Partnership Percentages.

(f)     <u>Section 704(b) Compliance</u>.   The allocations provided in this Section 3.10 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

**3.11    Allocations for Income Tax Purposes**

(a)     <u>Income Tax Allocations</u>.   Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for U.S. federal

010045

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 187
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 128 of 1017 PageID 10909
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 24 of 55

income tax purposes in each Fiscal Year shall be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership shall establish and maintain records which shall show the extent to which the Capital Account of each Partner comprises amounts that have not been reflected in the taxable income of such Partner as of the last day of each Fiscal Year. To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Foreign tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement shall be determined by the General Partner.

(b)     Basis Adjustments.   To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations; provided that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, shall be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)     Positive Basis Allocations.  If the Partnership recognized gains or items of gross income (including short-term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect:   (i) to allocate such gains or items of gross income among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership recognizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the

Appx. 06108
010046

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 188
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 129 of 1017 PageID 10910
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 25 of 55

liquidating share of any Positive Basis Partner, that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), then such Positive Basis Partner may be allocated an amount of such gains or items of gross income equal to the amount, if any, by which its or its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.11(c).

(d)     <u>Negative Basis Allocations</u>.  If the Partnership recognizes net losses or items of gross loss or deduction (including short-term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect:  (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partner, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner has been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; <u>provided</u>, <u>however</u>, that if, following such Fiscal Year, the Partnership recognizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its or its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.11(d).

**3.12    Individual Partner's Tax Treatment**

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

**3.13    Distributions**

(a)     The Partnership shall make distributions in respect of withdrawals in accordance with Section 5.5 and liquidation in accordance with Section 6.3.  In addition, the General Partner may make other distributions at the times and in the amounts the

App. 06104
0T0047

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 189
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 130 of 1017 PageID 10911
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 26 of 55

General Partner determines. Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner on any account of its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

**Article IV**
**MANAGEMENT**

**4.1    Duties and Powers of the General Partner**

(a)    Subject to the terms and conditions of this Agreement, the General Partner has complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for (i) all investment and investment management decisions to be undertaken on behalf of the Partnership and (ii) managing and administering the affairs of the Partnership, and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership, whether or not such action or authority is expressly provided for in this Agreement. Without limiting the foregoing generality, the General Partner's powers include the power to borrow, obtain leverage or otherwise incur indebtedness with respect to the Partnership's capital.

(b)    Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner has full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1.

(c)    The General Partner may delegate to any other Person, including the Investment Manager, any power and authority vested in the General Partner pursuant to this Agreement.

(d)    The General Partner is the "tax matters partner" for purposes of Section 6231(a)(7) of the Code. The General Partner has the exclusive authority in its determination to make any elections required or permitted to be made by the Partnership under any provisions of the Code or any other revenue laws. The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and/or the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any

010048
Appx 06105

action brought against it in connection with any judgment in or settlement of any such proceeding.

(e) Every power vested in the General Partner pursuant to this Agreement and any decision or determination that it is permitted to make is to be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein, and the General Partner shall be entitled to consider in making such decisions or determinations only such interests and factors as it desires, including its own interests. No provision of this Agreement is to be construed to require the General Partner to violate the Act, the Advisers Act, or any other law, regulation or rule of any self-regulatory organization. Notwithstanding any other provision of this Agreement, whenever in this Agreement, the General Partner is permitted or required to make a decision in its "good faith" or under another expressed standard, the General Partner must act under such express standard and will not be subject to any other or different standards.

(f) Each Limited Partner shall deliver to the General Partner, upon a reasonable request, (i) an affidavit or certificate in form satisfactory to the General Partner that is sufficient to establish that the applicable Partner (and its partners, members, and/or beneficial owners, as the case may be) is not subject to withholding under the provisions of any U.S. federal, state, local, non-U.S. or other tax laws, or with respect to such Partner's tax status under such laws, and (ii) any information or documentation prescribed under FATCA or as may be necessary, as reasonably determined by the General Partner, for the Partnership to comply with its obligations under FATCA (including, but not limited to, information with respect to citizenship, residency, ownership or control of such Partner). Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership, or any existing or former Investment.

**4.2 Expenses**

(a) Except as otherwise provided herein, and in consideration of the Management Fee, the General Partner and the Investment Manager shall each pay all of its own operating and overhead costs, without reimbursement by the Partnership.

(b) The Partnership shall pay, or reimburse the General Partner and the Investment Manager for, all other reasonable costs, fees and expenses arising in connection with the Partnership's operations. Such expenses payable by the Partnership include the following:

(i) all costs, fees and expenses directly related to Investments or prospective Investments (whether or not consummated) of the Partnership, including research and due diligence costs related to an Investment; brokerage commissions and other execution and transaction costs, interest on, and commitment fees and expenses arising out of, debit balances or borrowings; exchange, clearing and settlement charges; fees and expenses of any third-party providers of "back office" and "middle office" services relating to

Appx 06406

010049

trade settlement; travel expenses; appraisal fees; investment banking fees and expenses; borrowing charges on Investments sold short; custody fees; and fees of consultants and finders relating to Investments or prospective Investments of the Partnership; the costs, fees and expenses of any appraisers, accountants or other experts engaged by the General Partner or the Investment Manager as well as other expenses directly related to the Partnership's Investments;

(ii) any withholding, transfer or other taxes imposed on the Partnership;

(iii) the reasonable, out-of-pocket fees, costs and expenses (including legal fees and expenses) incurred to comply with any applicable law, rule or regulation (including regulatory filings or other expenses of the Partnership and the pro rata portion of any regulatory and other expenses of the General Partner or the Investment Manager, which benefit or are attributable to the Partnership);

(iv) the reasonable, out-of-pocket costs, fees and expenses for financial and tax accounting, bookkeeping and reporting services, and administrative services performed by any Person on behalf of the Partnership (e.g., the administrator of the Partnership), including the cost of any audit of the Partnership's financial statements and the preparation of its tax returns (including with respect to FATCA compliance);

(v) Management Fees;

(vi) the reasonable, out-of-pocket costs, fees and expenses of legal counsel and any other litigation or investigation involving Partnership activities;

(vii) specific expenses incurred in obtaining, maintaining or performing systems, research and other information, including information service subscriptions, utilized with respect to the Partnership's Investments including without limitation for portfolio management, valuations and accounting purposes, including the costs of statistics and pricing services, service contracts for quotation equipment and related hardware, software, phone and internet charges;

(viii) the reasonable, out-of-pocket costs, fees and expenses associated with the Recent Amendments, including legal and accounting fees, printing costs, reporting and providing information to existing and prospective Partners, obtaining requisite consent from Limited Partners, travel fees and expenses related to the Partnership's offering, filing fees (including any "blue sky" filing fees) and other out-of-pocket expenses and compliance with any applicable federal and state laws;

(ix) the costs and expenses associated with meetings of Partners;

24


Appx. 08107
010050

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 192
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 133 of 1017 PageID 10914
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of 55

(x)    the expenses of the Advisory Committee and the members thereof, including any indemnification expenses;

(xi)    the costs associated with maintaining "directors and officers" or similar liability insurance for the benefit of the Partnership, the General Partner, the Investment Manager, or any other Indemnified Person; and

(xii)    any costs or expenses of winding up and liquidating the Partnership and

(xiii)    all costs, fees and expenses associated with the ongoing offering of Limited Partner Interests.

(c)    Expenses with respect to Section 4.2(b)(viii) above will be amortized by the Partnership over a period of 36 months from the Effective Date; however, the General Partner may limit the amount of expenses amortized so that the Partnership's audited financial statements do not contain qualification.

(d)    Except as otherwise provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8 and 5.5(i), expenses are generally borne *pro rata* by the Partners in accordance with their respective Partnership Percentages.

(e)    If the General Partner or the Investment Manager, as appropriate, incurs any Partnership expenses for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, shall allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)    The General Partner and the Investment Manager may, to the extent disclosed in the Partnership's offering memorandum or otherwise disclosed to the Limited Partners, use "soft dollars" generated by the Partnership. Use of "soft dollars" by the General Partner or the Investment Manager as disclosed herein shall not constitute a breach by either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

## 4.3    Rights of Limited Partners

The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.

## 4.4    Other Activities of Partners

(a)    The General Partner is not required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs


Appx. 09108

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 193
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 134 of 1017 PageID 10915
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 30 of 55

of the Partnership as it may determine to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b) Each Partner acknowledges and agrees that the General Partner, its Affiliates and their respective partners, managers, directors, officers, shareholders, members or employees may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, Investments, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other issuers, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, whether or not any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that none of the General Partner, its Affiliates or their respective partners, managers, directors, officers, shareholders, members or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the Partnership, but may refer the same to any other party or keep such opportunities for their own benefit.

(c) The General Partner and its Affiliates shall act in a manner that each considers fair, reasonable and equitable on an overall basis in allocating investment opportunities to the Partnership and any Other Account. The General Partner and its Affiliates shall allocate investment opportunities as set forth in their policies and procedures, as may be amended from time to time, and as communicated to Limited Partners through the Partnership's private offering memorandum for Interests or otherwise.

(d) Each of the Partners hereby waives and covenants not to sue on the basis of any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners *inter se* which is or may be inconsistent with this Section 4.4.

**4.5 Exculpation; Indemnification**

(a) The General Partner, the Investment Manager, any of their Affiliates, each direct or indirect member, manager, partner, director, officer, shareholder and employee of any of the foregoing and, with the approval of the General Partner, any agent of any of the foregoing (including their respective executors, heirs, assigns, successors or other legal representatives) (each an "***Indemnified Person***") shall not be liable to the Partnership or to any of the Limited Partners for any loss or damage occasioned by any acts or omissions in the performance of services under this Agreement or the Investment Management Agreement, or otherwise in connection with the Partnership, its Investments or operations, unless such loss or damage has occurred by reason of the willful misconduct, fraud or gross negligence of such Indemnified Person or as otherwise required by law; provided that nothing in this Agreement is to be construed as waiving any legal rights or remedies which the Partnership may have under state or federal securities laws.

Appx. 09109
010052

(b)     The Partnership (but not the Partners individually) shall indemnify each Indemnified Person to the fullest extent permitted by law against any cost, expense (including reasonable attorneys' fees), judgment or liability incurred by or imposed upon it in connection with any action, suit or proceeding (including any proceeding before any judicial, administrative or legislative body or agency) to which it may be made a party or otherwise be involved or with which it shall be threatened by reason of being or having been General Partner, having been the Investment Manager pursuant to the Investment Management Agreement or its having provided services to the Partnership; provided that the Indemnified Person is not so indemnified to the extent such cost, expense, judgment or liability has been finally determined (i) in a non-appealable decision on the merits in any such action, suit or proceeding, or (ii) on a plea of *nolo contendere*, to have been incurred or suffered by the Indemnified Person solely by reason of willful misconduct, fraud or gross negligence by the Indemnified Person.

(i)     The right to indemnification granted by this Section 4.5 shall be in addition to any rights to which the Indemnified Person may otherwise be entitled and shall inure to the benefit of the successors or assigns of such Indemnified Person.  The Partnership shall pay the expenses incurred by the Indemnified Person in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by the Indemnified Person to repay such payment if there is an adjudication or determination that it is not entitled to indemnification as provided herein; provided that no such advance shall be made in connection with any action brought by a Majority-in-Interest of the Limited Partners.

(ii)     In any suit in the name of the Partnership to recover expenses advanced pursuant to the terms of an undertaking, the Partnership shall be entitled to recover such expenses upon a final adjudication that the Indemnified Person or other Person claiming a right to indemnification hereunder has not met the applicable standard of conduct set forth in Section 4.5(a).  In any such suit brought to enforce a right to indemnification or to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnified Person or other Person claiming a right to indemnification shall not be entitled to be indemnified, or to an advancement of expenses, hereunder shall be on the Partnership (or any Limited Partner acting derivatively or otherwise on behalf of the Partnership or the Limited Partners) unless otherwise required by applicable law.

(iii)     Each Indemnified Person may not satisfy any right of indemnity or reimbursement granted in this Section 4.5 or to which it may be otherwise entitled except out of the assets of the Partnership, and no Partner shall be personally liable with respect to any such claim for indemnity or reimbursement.   The General Partner may obtain appropriate insurance on behalf, and at the expense, of the Partnership to secure the Partnership's obligations hereunder.

Appx. 06119

010053

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 195
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 136 of 1017 PageID 10917
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 32 of 55

(iv)   Nothing in this Agreement is to be construed as to provide for the indemnification of an Indemnified Person for any liability (including liability under U.S. federal securities laws) to the extent that such indemnification would be in violation of applicable law but is to be construed so as to effectuate this Section 4.5 to the fullest extent permitted by law.

(v)   Each Indemnified Person shall be deemed a third-party beneficiary (to the extent not a direct party hereto) of this Agreement and, in particular, the provisions of this Section 4.5. The General Partner and/or the Investment Manager may enter into agreements on behalf of the Partnership with an Indemnified Person to provide an indemnity to the same extent provided in this Section 4.5.

**4.6    Advisory Committee**

(a)   The General Partner and/or the Investment Manager may appoint a committee (the "***Advisory Committee***") composed of one or more individuals selected from time to time by the General Partner. No member of the Advisory Committee may be an Affiliate of the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in an Affiliate of the Partnership).

(b)   If established, the Advisory Committee will meet with the General Partner and/or the Investment Manager from time to time as requested by and deemed appropriate by the General Partner and/or the Investment Manager to consult with and advise the General Partner and/or the Investment Manager on any matter deemed appropriate by the General Partner and/or the Investment Manager, including any circumstances involving conflicts of interest between the General Partner and/or the Investment Manager (and their Affiliates), on the one hand, and the Limited Partners and the Partnership, on the other.

(c)   The General Partner and/or the Investment Manager may in its discretion seek the approval of the Advisory Committee or establish any other reasonable mechanism in connection with (i) approvals that are or would be required under the Investment Advisers Act (including Section 206(3)) or (ii) any other matter deemed appropriate by the General Partner and/or the Investment Manager. Each Limited Partner agrees that, except as otherwise specifically provided herein and to the extent permitted by applicable law, the approval of a majority of the members of the Advisory Committee at such time is binding upon the Partnership and each Partner with respect to any approval sought under this Section 4.6(c).

(d)   As determined by the General Partner and/or the Investment Manager, meetings of the Advisory Committee may be held in person or by telephone. Approval of the Advisory Committee is deemed to have been given if given by a majority of those members present at a meeting or by a majority of all members of the Advisory Committee if given pursuant to a written consent without a meeting.

Appx. 00054

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 196
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 137 of 1017 PageID 10918
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 33 of 55

(e)    The Partnership agrees to reimburse members of the Advisory Committee for their out-of-pocket expenses relating to their services as Advisory Committee members and to indemnify each Advisory Committee member to the maximum extent permitted by law

(f)    In the event an Advisory Committee is not appointed, the General Partner and/or the Investment Manager may obtain the approval of an unaffiliated third party, as is determined advisable by the General Partner and/or the Investment Manager, and any such approval by such third party shall, to the extent permitted under applicable law, serve as the approval of the Advisory Committee and shall be binding on the Partnership and the Limited Partners.

## 4.7    Alternative Investment Vehicles

The General Partner shall have the right in connection with any Investment to direct the capital contributions of some or all of the Partners to be made through one or more alternative investment vehicles ("*Alternative Investment Vehicles*") and to exchange a portion of the Interests of one or more Limited Partners for similar equity interests in one or more Alternative Investment Vehicles if, in the judgment of the General Partner, the use of such vehicle or vehicles would allow the Partnership to overcome legal or regulatory constraints or invest in a more tax efficient manner and/or would facilitate participation in certain types of Investments; provided that the General Partner shall not employ the use of an Alternative Investment Vehicle in any manner that would reasonably be expected to have a material adverse effect on the participating Limited Partners. Any Alternative Investment Vehicle shall contain terms and conditions substantially similar to those of the Partnership and shall be managed by the General Partner or an Affiliate thereof, and such controlling Person is required to comply with the provisions of this Agreement applicable to Alternative Investment Vehicles. Expenses related to an Alternative Investment Vehicle on behalf of less than all of the Partners shall not be borne by the Partners that do not participate in such Alternative Investment Vehicle.

### Article V
### ADMISSIONS, TRANSFERS AND WITHDRAWALS

## 5.1    Admission of Limited Partners

The General Partner may, at such times as the General Partner may determine, without advance notice to or consent from the Limited Partners, admit to the Partnership any Person who executes this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner. Such admission shall be effective when the General Partner enters the name of such Person on the books and records of the Partnership as a Partner and does not require the consent or approval of any other Partner. The General Partner has the authority to reject subscriptions for Interests in whole or in part.

## 5.2    Admission of Additional General Partners

(a)    Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership. No additional general

Appx. 08112
010055

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 197
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 138 of 1017 PageID 10919
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 34 of 55

partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement.

(b)     Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 shall be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners unless otherwise provided for in Section 5.4.

**5.3     Transfer of Interests of Limited Partners**

(a)     No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, shall be valid or effective, and no transferee may become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner. Any attempted Transfer not made in accordance with this Section 5.3, to the fullest extent permitted by law, shall be void *ab initio*.

(b)     Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.

(c)     In the event of a Transfer of a Partner's Interest or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code.

(d)     In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes shall be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder. To the extent the transferring parties have given the General Partner written notice prior to the consent by the General Partner pursuant to Section 5.3(a) of their agreement to apply a particular and reasonable method, then the General Partner may elect to use such method. The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(d).

**5.4     Transfer of Interest of the General Partner**

The General Partner may Transfer its Interest as a General Partner in the Partnership; <u>provided</u> that if any such proposed Transfer would result in an "assignment" (as such term is



Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 198
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 139 of 1017 PageID 10920
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of 55

defined under the Advisers Act), the General Partner shall obtain the consent of Limited Partners constituting a Majority-in-Interest of Limited Partners that are not Affiliated Investors.

**5.5    Withdrawal of Interests of Partners**

(a)    The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution except as provided in this Section 5.5.

(b)    Withdrawal rights are determined separately with respect to each Capital Account (and each capital sub-account, if applicable). Each capital contribution shall be accounted for using a separate capital sub-account, and, in the case of a Limited Partner for which more than one capital sub-account is maintained, the withdrawals from any such capital sub-accounts shall be processed on a "first-in, first-out" basis based upon the date on which each capital contribution was made, unless otherwise agreed between the General Partner and such Partner. Each capital sub-account relating to a contribution of capital from a Limited Partner will be treated as if it were the separate Capital Account of a separate Partner for the purposes of applying the withdrawal provisions of this Section 5.5.

(c)    Subject to a Suspension and the other provisions of this Section 5.5:

(i)    A Limited Partner may make a complete or partial withdrawal from its Series A Capital Account effective on the last Business Day of each calendar quarter occurring at least 36 calendar months after the contribution of the capital to be withdrawn (each, a "***Series A Withdrawal Date***") by providing written notice to the General Partner at least 90 days prior to the proposed Series A Withdrawal Date (such restriction, the "***Series A Lock-Up***"). For purposes of calculating the Series A Lock-Up, each Limited Partner holding Series A Interests on or of the Effective Date is deemed to have made its initial contribution for Series A Interests as of the Effective Date. Additional contributions for Series A Interests after the Effective Date will also be subject to the Series A Lock-Up, which lock-up period shall commence on the date of each such additional contribution.

(ii)    A Limited Partner may make a complete or partial withdrawal from its Series B Capital Account upon written notice to the General Partner at least 180 days prior to the applicable Series B Withdrawal Date. The "***Series B Withdrawal Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Withdrawal Date (or the last Business Day of such month).

(iii)    A Limited Partner may make a complete or partial withdrawal from its Series C Capital Account upon written notice to the General Partner at least 180 days prior to the applicable Series C Withdrawal Date. The "***Series C Withdrawal Date***" means: (i) the end of the day on the last Business Day of

Appx. 06114

010057

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 199
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 140 of 1017 PageID 10921
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 36 of 55

the calendar month that immediately precedes the two-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Withdrawal Date (or the last Business Day of such month).

(iv) A Limited Partner may make a complete or partial withdrawal from its Series D Capital Account effective on the last Business Day of each calendar quarter (each, a "**Series D Withdrawal Date**") occurring at least 12 calendar months after the contribution of the capital to be withdrawn by providing written notice to the General Partner at least 90 days prior to the proposed Series D Withdrawal Date.

(d) Any notice of withdrawal shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner. For the avoidance of doubt, if a Limited Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may be charged to such withdrawing Limited Partner. The General Partner may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner may reasonably require, including any information required to determine the "adjusted basis" for U.S. federal income tax purposes in the Limited Partner's Interest withdrawn.

(e) With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable Withdrawal Date, and withdrawn amounts will be fixed as of the applicable Withdrawal Date, except as provided in Section 3.6. For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager shall be liable to a Limited Partner for interest on the proceeds of any withdrawal.

(f) At least 90% of the estimated amount due with respect to the Partnership's marketable investments is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Partnership, within 30 Business Days after the Withdrawal Date, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership or the remaining Capital Accounts. The General Partner is entitled to deduct from such settlement payment an amount equal to the pro rata portion of any Performance Allocation (based on the portion of the withdrawal being settled) payable to the Investment Manager with respect to such withdrawn amount. Any balance will be held back and distributed, without interest thereon, promptly following completion of the audit of the Partnership's financial statements for such Fiscal Year, or sooner in the General Partner's discretion.

(g) In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Partnership's marketable

Appx. 06115
010058

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 200
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 141 of 1017 PageID 10922
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 37 of
55

investments, no settlements occur with respect to any of such Limited Partner's interest in the Partnership's non-marketable investments until the occurrence of liquidity events with respect to such non-marketable investments after the scheduled payment date for the withdrawal (without interest thereon). Notwithstanding the foregoing, the General Partner may, however, make settlements in such cases prior to the occurrence of a liquidity event if such settlement would, in the good faith opinion of the General Partner, not have a material adverse effect on the Partnership. Generally, a liquidity event will be a sale of the relevant investment for cash, in which case the settlement will be funded in cash within 90 days after the liquidity event (without interest). If the liquidity event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant investment or by distributing the net proceeds derived from a sale of such investment. The General Partner is entitled to withdraw from each such settlement an amount equal to the remaining portion of any Performance Allocation (pro rata based on the portion of such withdrawal being distributed) to be credited to the Investment Manager at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

(h)     The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments to the Limited Partner, the value of which, as determined in accordance with Section 7.2, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing.

(i)      The General Partner may deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual or estimated expenses, as determined by the General Partner, associated with processing the withdrawal. Any such withdrawal deduction shall be retained by the Partnership for the benefit of the remaining Limited Partners.

(j)      The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves and holdbacks for contingencies provided in Section 3.6.

(k)     The General Partner may suspend or limit, in whole or in part, (i) the right of the Partners to withdraw or receive distributions from the Partnership and/or (ii) the valuation of the Partnership's Net Assets:

(i)      during any period when any exchange or over-the-counter market on which the Partnership's Investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

Appx. 05116
010059

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 201
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 142 of 1017 PageID 10923
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 38 of 55

(ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of, or withdrawals or redemptions from, Investments by the Partnership, or the determination of the value of the assets of the Partnership, would not be reasonably practicable;

(iii) during any breakdown in the means of communication normally employed in determining the price or value of the Partnership's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Partnership cannot reasonably be accurately ascertained within a reasonable time frame;

(iv) during any period when the transfer of funds involved in the realization or acquisition of any Investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange;

(v) in other circumstances where the General Partner is unable to fairly value the Partnership's assets due to extreme market conditions; or

(vi) automatically upon liquidation of the Partnership.

(l) In the event of any such suspension or limitation described above in Section 5.5(k) (a "*Suspension*"), the General Partner shall promptly notify each Limited Partner. Any Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted is not given any priority with respect to the withdrawal of such Interests or portions thereof after the cause for such Suspension ceases to exist. The General Partner may, however, allow any such Partners to rescind their withdrawal requests to the extent of any portion thereof for which withdrawal proceeds have not yet been remitted. Upon the reasonable determination by the General Partner that conditions leading to Suspension no longer apply, withdrawal rights for all Limited Partners shall be promptly reinstated, and any pending withdrawal requests (or new, timely withdrawal requests) shall be honored as of the last Business Day of the calendar quarter in which withdrawals have recommenced, subject to the application of the withdrawal limitations described herein.

(m) The General Partner may, notwithstanding any Suspension, upon not less than five days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, the Investment Manager or the General Partner to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership (including, but not limited to, for reasons relating to FATCA) and for the Limited Partner to cease to be a Limited Partner of the Partnership (in the case of a withdrawal of a Limited Partner's Interest in its entirety) pursuant to this Section 5.5(m). Except as otherwise provided herein, settlements of withdrawals pursuant to this Section 5.5(m) are made in the same manner as voluntary withdrawals.



(n)     Notwithstanding the foregoing, the General Partner may waive any restrictions on any Limited Partner's ability to withdraw.

**Article VI**
**SOFT WIND DOWN, DISSOLUTION AND LIQUIDATION**

**6.1     Soft Wind Down**

(a)     The General Partner may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued (whether or not the General Partner has implemented a Suspension). Having made such determination, the Investment Manager may recommend to the General Partner to cause the Partnership to return the Partnership's assets to Limited Partners in an orderly manner (without proceeding with a liquidation of the Partnership) (an "***Orderly Realization***"). The General Partner may, in such circumstances, resolve to effect an Orderly Realization should it determine that doing so is in the best interests of the Partnership as a whole. Such Orderly Realization shall not constitute a dissolution or winding up of the Partnership for any purposes, but rather only the continued management of the Partnership's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Partnership to the Limited Partners.

(b)     The General Partner will notify the Limited Partners of any decision to proceed with an Orderly Realization of the Partnership. During an Orderly Realization, the Investment Manager may, in consultation with the General Partner, take such steps as are considered appropriate in the best interests of the Partnership as a whole to effect the Orderly Realization. The General Partner, in consultation with the Investment Manager, shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "***Realization Period***"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Partnership and may be carried out without recourse to a formal process of liquidation under Delaware law or any other applicable bankruptcy or insolvency regime.

(c)     The General Partner, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued.

(d)     Management Fees, and all other fees and expenses, shall be payable and Performance Allocations shall be made during an Orderly Realization on the same basis as provided herein.

Appx. 08118

010061

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 203
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 144 of 1017    PageID 10925
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 40 of
55

6.2    **Dissolution of Partnership**

(a)    The Partnership shall be dissolved upon the first to occur of the following dates:

(i)    any date on which the General Partner shall elect in writing to dissolve the Partnership; or

(ii)    the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act.

(b)    In the event an Orderly Realization lasts longer than three years, a Super-Majority-in-Interest of the Limited Partners may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Partnership.   The Limited Partners will not have any other right to bring an action in court to dissolve the Partnership.   The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.   Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.   Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

6.3    **Liquidation of Assets**

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority-in-Interest of Limited Partners shall liquidate the business and administrative affairs of the Partnership.   Net Profit and Net Loss during any Accounting Period, which includes the period of liquidation, shall be allocated pursuant to Article III.   The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)    such debts as are owing to the Partners as Partners are next paid; and

(iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the

Appx. 02119
010062

Accounting Period ending on the date of the distributions under this Section 6.1(a)(iii).

(b)     Notwithstanding this Section 6.3 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; provided, however, that if any in kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.2, and charged as so valued and distributed against amounts to be paid under Section 6.3(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit or Net Loss for the Accounting Period ending on the date of such distribution.

## Article VII
## ACCOUNTING AND VALUATION; BOOKS AND RECORDS

**7.1     Accounting and Reports**

(a)     The Partnership may adopt for tax accounting purposes any accounting method that the General Partner shall decide is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b)     As soon as practicable after the end of each Fiscal Year thereafter, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of each such period to be made by a firm of independent accountants selected by the General Partner. As soon as is practicable thereafter, but subject to Section 7.4, the General Partner shall furnish to each Limited Partner a copy of the set of financial statements prepared in accordance with GAAP, with such adjustments thereto as the General Partner determines appropriate, including the report of such independent accountants.

(c)     As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

(d)     As soon as practicable after the end of each calendar month, but subject to Section 7.5, the General Partner shall arrange for the preparation and delivery to each Limited Partner of an interim report containing such information concerning the affairs of the Partnership (which need not include any financial statements) as the General Partner considers appropriate.

Appx. 02129

010063

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 205
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 146 of 1017 PageID 10927
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 42 of
55

**7.2**     **Valuation of Partnership Assets and Interests**

(a)     The General Partner (or its delegate, including the Investment Manager or the administrator of the Partnership) shall value the assets of the Partnership as of the close of business on the last day of each Accounting Period. Such valuations will generally be in accordance with GAAP, with such adjustments thereto as the General Partner reasonably determines appropriate. In addition, the General Partner shall value the assets which are being distributed in kind as of the close of the Business Day immediately preceding the distribution date in accordance with Section 5.5(c) or Section 6.3(b). In determining the value of the assets of the Partnership, no value shall be placed on the goodwill or name of the Partnership, or the office records, files, statistical data or any similar intangible assets of the Partnership not normally reflected in the Partnership's accounting records, but there shall be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

(b)     To the extent readily available, valuations will be based on independent market quotations obtained by the General Partner from recognized pricing services, market participants or other sources. In the case of any Investment for which a quotation from an independent source is not available or is determined by the General Partner to be unreliable or inadequate, the General Partner (i) shall be authorized, to the extent permitted by applicable law, to value such positions at their fair value in such manner as the General Partner determines in good faith, or (ii) may (but shall not be required to) obtain an appraisal, at the expense of the Partnership, by an independent third party selected by the General Partner. Except as otherwise determined by or at the direction of the General Partner, investment and trading transactions shall be accounted for on the trade date.

(c)     Accounts shall be maintained in U.S. dollars, and except as otherwise determined by or at the direction of the General Partner: (i) assets and liabilities denominated in currencies other than U.S. dollars shall be translated at the rates of exchange quoted by an independent pricing service as in effect as of the close of business on the relevant valuation dates (and exchange adjustments shall be recorded in the results of operations); and (ii) investment and trading transactions and income and expenses shall be translated at the rates of exchange in effect at the time of each transaction.

**7.3**     **Determinations by the General Partner**

(a)     All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final

Appx 00121
010064

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 206
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 147 of 1017    PageID 10928
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 43 of
55

and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)     The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or sub-account as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.4     Books and Records**

(a)     The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership.  The General Partner shall afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and shall permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)     The General Partner shall establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the Partnership and shall not be obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

**7.5     Confidentiality**

(a)     Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "***Authorized Representative***")); provided that (i) such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in

Appx. 06122
010065

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 207
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 148 of 1017 PageID 10929
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 44 of
55

response to any governmental agency request or in connection with an examination by any regulatory authorities; <u>provided</u> that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and (iii) each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner. Prior to making any disclosure required by law, each Limited Partner shall use its best efforts to notify the General Partner of such disclosure. Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner shall advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.5(a) and each such Authorized Representative or beneficial owner shall agree to be bound by such obligations.

(b)     The General Partner may keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal and regulatory considerations, the General Partner shall use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests to be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.5, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership. For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction. For this purpose, the names of the Partnership, the Partners, their affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax structure.

(e)     The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit the Partnership and facilitate investment in the Partnership by such prospective investors.

Appx. 08123
010066

(f)    The Investment Manager and a Person acting as a service provider to the Partnership shall have the right to access all information belonging to the Partnership.

## Article VIII
## GENERAL PROVISIONS

**8.1    Amendment of Partnership Agreement**

(a)    Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) the consent of a Majority-in-Interest of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners at least 30 calendar days to object).

(b)    Any amendment that would:

(i)    increase the obligation of a Partner to make any contribution to the capital of the Partnership;

(ii)    reduce the Capital Account of a Partner other than in accordance with Article III;

(iii)    adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

(iv)    change the respective liabilities of the General Partner and the Limited Partners;

may only be made if the consent of each Partner adversely affected thereby is obtained (which consent may be obtained by negative consent affording the Partner at least 30 calendar days to object).

(c)    Notwithstanding paragraphs (a) and (b) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Partnership as of a date determined by the General Partner that is not less than 30 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment.   The admission and withdrawal of Limited Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(d)    The General Partner may at any time without the consent of the other Partners:

Appx 08124

010067

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 209
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 150 of 1017 PageID 10931
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 46 of 55

(i)     add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii)     cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

(iii)     change the name of the Partnership;

(iv)     make any changes required by a governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, <u>provided, however</u>, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

(v)     amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

(vi)     amend this Agreement (other than with respect to the matters set forth in Section 8.1(b)) to effect compliance with any applicable laws, regulations or administrative actions;

(vii)     subject to Section 8.1(b), amend this Agreement to reflect the creation, and terms, of any new Series of Interests;

(viii)     effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners; and

(ix)     restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(e)     Following the adoption of any amendments to this Agreement pursuant to 8.1(d), the General Partner shall promptly deliver a copy of such amendments to this Agreement to the Limited Partners.

(f)     The General Partner may agree with a Limited Partner to waive or modify the application of any provision of this Agreement with respect to such Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification). Any such waiver or modification may be evidenced by a "side letter" or other document which will govern with respect to the applicable Limited Partner and be incorporated as part of this Agreement.

App. 00125
010068

8.2    **Special Power-of-Attorney**

(a)    Each Limited Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Limited Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

(i)    an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

(ii)    the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

(iii)    any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

(iv)    all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, exchange a portion of a Limited Partner's Interest for similar equity interests in an Alternative Investment Vehicle, or to effect the dissolution or termination of the Partnership.

(b)    Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent.  If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner contemplated by this Agreement, each Limited Partner agrees that, notwithstanding any objection which such Limited Partner may assert with respect to such action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted.  Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership.  This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

(i)    is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney,


Appx 08126

010069

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 211
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 152 of 1017 PageID 10933
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 48 of 55

regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii) survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

**8.3    Notices**

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner. Notices will be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

**8.4    Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder are not assignable, transferable or delegable except as provided in Sections 4.1(c), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections will be null and void *ab initio*.

**8.5    Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in the courts located in Dallas County, Texas. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of Partners maintained by the General Partner.

Appx 06125
01007070

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 212
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 153 of 1017 PageID 10934
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 49 of 55

**8.6    Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership.   Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors and no rights are granted to non-Partner creditors under this Agreement.

**8.7    Dispute Resolution**

The following procedures shall be used to resolve any controversy or claim ("***Dispute***") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Indemnified Person.   If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    <u>Mediation</u>

(i)    Any Dispute shall be submitted to mediation by written notice to the other party or parties.   In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.    The mediator will be selected by agreement of the parties.   If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(ii)    The mediation will be conducted as specified by the mediator and agreed upon by the parties.   The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(iii)    The mediation will be treated as a settlement discussion and therefore will be confidential.   The mediator may not testify for either party in any later proceeding relating to the dispute.   No recording or transcript shall be made of the mediation proceedings.

(iv)    Each party will bear its own costs in the mediation.   The fees and expenses of the mediator will be shared equally by the parties.

(b)    <u>Arbitration</u>

(i)    If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.   A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the

45

App. 06128
010071

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 213
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 154 of 1017 PageID 10935
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 50 of 55

mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("***Arbitration Rules***"). In the event of a conflict, the provisions of this document will control.

(ii) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the U.S. Federal Arbitration Act ("***FAA***"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality, non-competition, non-solicitation or non-recruitment covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this Agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(iii) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(iv) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement.

(v) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes

010072
Appx 06429

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 214
Case 3:25-cv-02072-S Document 15-13 Filed 00/06/25 Page 155 of 1017 PageID 10936
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 51 of 55

it.  In any event, there shall be no more than (a) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (b) one non-party deposition of six hours; (c) twenty-five interrogatories; (d) twenty-five requests for admission; (e) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; and (f) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(vi)    All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.  Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.  In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered.  The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(vii)   The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

**8.8    Consents and Voting**

(a)    Except as provided in Section 5.4, Limited Partners do not have any right to vote for the admission or removal of any General Partner and, except for the right to vote on certain amendments proposed by the General Partner and as otherwise expressly set out herein, have no other voting rights.   Upon the request of any Limited Partner, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner shall not have the right to vote on any matter including amendments.

(b)    Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a copy thereof shall be filed and kept with the books of the Partnership.  For the avoidance of doubt, an amendment made pursuant to Section 8.1(c) or pursuant to negative consent under Section 8.1(a) or Section 8.1(b) shall not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.

(c)    In the event the Partnership seeks the approval, vote or consent of the Offshore Fund with respect to any matter to which it would be entitled to vote as a Limited

App. 06139
010073

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 215
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 156 of 1017 PageID 10937
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 52 of 55

Partner of the Partnership under this Agreement, the Offshore Fund will: (i) submit such matter for the consent of the shareholders and (ii) shall vote its Limited Partner interest proportionally for and against such matter in the same proportion that the shareholders voted for and against such matter.

**8.9    Merger and Consolidation**

(a)    The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b)    Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the limited partnership agreement of the surviving or resulting limited partnership.

**8.10    Miscellaneous**

(a)    The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.    Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)    This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c)    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.    Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

**8.11    BHCA Subject Persons**

Notwithstanding any other provision of this Agreement to the contrary:

(a)    Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has a Partnership Percentage in

Appx. 06431
010074

excess of 4.9% of the aggregate Partnership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold a Partnership Percentage of only 4.9% of the aggregate Partnership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.11 on all such Limited Partners), and such Partnership Percentage in excess of said 4.9% shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages; provided that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement up to the full amount of its Partnership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest. The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; provided, however, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)    Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice, and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages.

(c)    A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.11(a) and (b) shall notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to Section 8.11(a) and (b) until 10 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.11(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

## 8.12   RIC Limited Partners

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act. Except as provided in this Section 8.12, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

Appx 06132

010073

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 217
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 158 of 1017 PageID 10939
Case 19-34054-sgj11 Doc 2308-5 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 54 of 55

### 8.13   Bad Actor Limited Partners

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506.   Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interests to be, or convert any Bad Actor Limited Partner's Interests into, Non-Voting Interests (except for the purposes of voting on any amendment to this Agreement that would materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(c)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

### 8.14   Entire Agreement

The parties acknowledge and agree that, this Agreement, together with any other agreement with a Limited Partner pursuant to Section 8.1(e), constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

[Signature Page Follows]

010076
Appx 06123

The parties hereto have executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P.

By:   HIGHLAND MUTI STRATEGY CREDIT GP, LLC
      its general partner

By:   HIGHLAND CAPITAL MANAGEMENT, L.P.
      its sole member

By:   STRAND ADVISORS, INC.
      its general partner

By: _____

Name:   James Dondero

Title:   President


**LIMITED PARTNERS:**

By:   HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P
      attorney-in-fact for the Limited Partners

By:   HIGHLAND MULTI STRATEGY CREDIT GP, LLC
      its general partner

By:   HIGHLAND CAPITAL MANAGEMENT, L.P.
      its sole member

By:   STRAND ADVISORS, INC.
      its general partner

By: _____

Name:   James Dondero

Title:   President


*Signature Page to the Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P.*

Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 43

# **EXHIBIT 6**

010078

Appx 06435

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 220
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 161 of 1017   PageID 10942
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 2 of 43

THE COMPANIES LAW (2013 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES


AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF


HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.

(As Adopted by Special Resolution on 1 November 2014)



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

**Appx. 06126**

010079

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 221
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 162 of 1017   PageID 10943
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21   Entered 05/14/21 16:12:52   Page 3 of 43

**THE COMPANIES LAW (2013 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**


**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

**(As Adopted by Special Resolution on 1 November 2014)**


1    The name of the Company is **Highland Multi Strategy Credit Fund, Ltd.**

2    The Registered Office of the Company shall be at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, or at such other place within the Cayman Islands as the Directors may decide.

3    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the laws of the Cayman Islands.

4    The liability of each Member is limited to the amount unpaid on such Member's Shares.

5    The share capital of the Company is US$50,000 divided into 100 Management Shares of US$0.01 par value each and 49,999,000 Participating Shares of US$0.001 par value each.

6    The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7    Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

0'10080

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 222
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 163 of 1017 PageID 10944
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 43

**THE COMPANIES LAW (2013 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**OF**

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

**(As Adopted by Special Resolution on 1 November 2014)**

**1      Interpretation**

1.1      In these Articles, Table A in the First Schedule to the Statute does not apply and unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| **"Administrator"** | means the person, firm or corporation appointed and from time to time acting as administrator of the Company. |
| **"Articles"** | means these articles of association of the Company. |
| **"Auditor"** | means the person (if any) for the time being performing the duties of auditor of the Company. |
| **"Business Day"** | means any day normally treated as a business day in such places and/or on such markets as the Directors may from time to time determine. |
| **"Cayman Islands"** | means the British Overseas Territory of the Cayman Islands. |
| **"Class"** | means a separate class of Participating Share (and includes any sub-class of any such class). |
| **"Company"** | means the above-named Company. |
| **"Directors"** | means the directors for the time being of the Company. |
| **"Dollars"** or **"US$"** | refers to the currency of the United States. |
| **"Electronic Record"** | has the same meaning as in the Electronic Transactions Law. |



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

010081

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 223
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 164 of 1017    PageID 10945
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 5 of 43

| | |
|---|---|
| **"Electronic Transactions Law"** | means the Electronic Transactions Law (2003 Revision) of the Cayman Islands. |
| **"Eligible Investor"** | means a person eligible to hold Participating Shares, as determined from time to time by the Directors. |
| **"FATCA"** | means: |

(i) sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any associated legislation, regulations or guidance, or similar legislation, regulations or guidance enacted in any jurisdiction which seeks to implement similar tax reporting and/or withholding tax regimes;

(ii) any intergovernmental agreement, treaty, regulation, guidance or any other agreement between the Cayman Islands (or any Cayman Islands government body) and the US, the UK or any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in paragraph (i); and

(iii) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding paragraphs.

| | |
|---|---|
| **"Gross Negligence"** | shall have the meaning ascribed thereto under the laws of the State of Delaware, USA. |
| **"Investment Manager"** | means the person, firm or corporation appointed and for the time being acting as the investment manager of the Company. |
| **"Management Share"** | means a voting non participating Share in the capital of the Company of US$0.01 par value designated as a Management Share and having the rights provided for in these Articles. |
| **"Master Fund"** | means Highland Multi Strategy Credit Fund, L.P., or any other entity in which all, or substantially all, of the assets of the Company are invested. |
| **"Member"** | means each person whose name is, from time to time and for the time being, entered in the Register of Members as the holder of one or more Shares. |

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

Appx 00129

010082

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 224
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 165 of 1017 PageID 10946
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 43

| | |
|---|---|
| **"Memorandum"** | means the memorandum of association of the Company. |
| **"Net Asset Value"** | means the value of the assets less the liabilities of the Company, or of a Separate Account (as the context may require), calculated in accordance with these Articles. |
| **"Net Asset Value per Participating Share"** | means the amount determined in accordance with these Articles as being the Net Asset Value per Participating Share of a particular Class and/or Series. |
| **"New Issue"** | has the meaning ascribed thereto by Rule 2790 adopted by the National Association of Securities Dealers, Inc. |
| **"New Issue Investment"** | means any New Issue acquired by the Company. |
| **"New Issue Shares"** | means a class of Participating Shares issued and designated as "New Issue Shares" and which may be issued in any one or more Series having the rights and restrictions set out in these Articles |
| **"Offering Memorandum"** | means an offering memorandum relating to Participating Shares of any Class and/or Series as amended or supplemented from time to time subject to and in accordance with these Articles. |
| **"Ordinary Resolution"** | means a resolution passed by a simple majority of the votes of such Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting, and includes a unanimous written resolution. |
| **"Participating Share"** | means a participating redeemable Share in the capital of the Company of US$0.001 par value and having the rights provided for in these Articles. Participating Shares may be divided into Classes in the discretion of the Directors in accordance with the provisions of these Articles and each Class may be further divided into different Series of Participating Shares and the term "Participating Share" shall include all such Classes and Series of Participating Share. |
| **"Prohibited Person"** | means any person who is restricted from participating in a New Issue pursuant to the Free-Riding and Withholding Interpretation adopted by the Board of Governors of the National Association of Securities Dealers Inc. |
| **"Redemption Date"** | means, in relation to any Class and/or Series of Participating Shares, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time, upon which a Member is entitled to require the redemption of Participating Shares. |

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 225
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 166 of 1017 PageID 10947
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 43

of that Class and/or Series.

| | |
|---|---|
| **"Redemption Fee"** | means such fee (if any) payable by a Member to the Company on a redemption of Participating Shares, as the same may be determined by the Directors and disclosed to the Member at the time of its subscription for such Participating Shares. |
| **"Redemption Notice"** | means a notice in a form approved by the Directors by which a holder of Participating Shares is entitled to require the Company to redeem its Participating Shares. |
| **"Redemption Price"** | means the price determined in accordance with these Articles at which redeemable Participating Shares of the relevant Class and/or Series may be redeemed. |
| **"Register of Members** | means the register of Members, which shall be maintained in accordance with the Statute and includes (except where otherwise stated) any branch or duplicate Register of Members. |
| **"Registered Office"** | means the registered office for the time being of the Company. |
| **"Sales Charge"** | means such sales charge (if any) determined by the Directors as being payable by a subscriber on a subscription for Participating Shares of any Class and/or Series. |
| **"Seal"** | means the common seal of the Company and includes every duplicate seal. |
| **"Separate Account"** | means a separate internal account of the Company which the Directors may establish and cause to be maintained in accordance with these Articles. |
| **"Series"** | means a separate series of Participating Share (and includes any sub-series of any such series). |
| **"Share"** and **"Shares"** | means a share or shares of any class or series in the Company, including a Management Share, a Participating Share or a New Issue Share, as well as any fraction of a Share. |
| **"Share Rights"** | means, with respect to the Participating Shares of any Class or Series in issue, the class rights for the time being applicable to such Participating Shares or other terms of offer for the time being applicable to such Participating Shares whether set out in the Offering Memorandum, any subscription agreement or otherwise (including any representations, warranties or other disclosure relating |

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

0 1 0 0 8 4

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 226
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 167 of 1017 PageID 10948
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 43

to the offer or holding of such Participating Shares).

**"Special Resolution"**     has the same meaning as in the Statute and includes a unanimous written resolution.

**"Statute"**     means the Companies Law (2013 Revision) of the Cayman Islands.

**"Subscriber"**     means the subscriber to the Memorandum.

**"Subscription Date"**     means, in relation to Participating Shares of any Class and/or Series, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time upon which a person may subscribe for Participating Shares of that Class and/or Series.

**"Subscription Price"**     means the price determined in accordance with these Articles at which Participating Shares of the relevant Class and/or Series may be subscribed.

**"Suspension"**     means a determination by the Directors to postpone or suspend (i) the calculation of the Net Asset Value of Participating Shares of any one or more Classes and/or Series (and the applicable Valuation Date) (a **"Calculation Suspension"**); (ii) the issue of Participating Shares of any one or more Classes and/or Series (and the applicable Subscription Date) (an **"Issue Suspension"**); (iii) the redemption by Members (in whole or in part) of Participating Shares of any one or more Classes and/or Series (and the applicable Redemption Date) (a **"Redemption Suspension"**); and/or (iv) the payment (in whole or in part) of any redemption proceeds (even if Valuation Dates and Redemption Dates are not postponed) (a **"Payment Suspension"**).

**"Transfer"**     means, in respect of any Share, any sale, assignment, exchange, transfer, pledge, encumbrance or other disposition of that Share, and **"Transferred"** shall be construed accordingly.

**"Treasury Share"**     means a Share held in the name of the Company as a treasury share in accordance with the Statute.

**"Valuation Date"**     means, in relation to each Class and/or Series of Participating Shares, the day or days determined from time to time by the Directors to be the day or days on which the Net Asset Value per Participating Share of that Class and/or Series is calculated.

**"Valuation Point"**     means, with respect to any Class and/or Series, the time or times on the Valuation Date of such Class and/or Series at which the Directors

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Appx. 06142

010085

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 227
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 168 of 1017    PageID 10949
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 9 of 43

determine that the Net Asset Value per Participating Share of that Class and/or Series shall be calculated.

1.2    In these Articles:

(a)    the singular number includes the plural number and vice versa;

(b)    the masculine gender includes the feminine gender;

(c)    persons includes corporations;

(d)    "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)    "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)    references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

(g)    any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)    the term "and/or" is used herein to mean both "and" as well as "or."  The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others.  "Or" shall not be interpreted to be exclusive, and "and" shall not be interpreted to require the conjunctive — in each case, unless the context otherwise requires;

(i)    any reference to the powers of the Directors shall include, when the context admits, the service providers or any other person to whom the Directors may delegate their powers;

(j)    any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(k)    any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Law;

(l)    sections 8 and 19(3) of the Electronic Transactions Law shall not apply; and

(m)    headings are inserted for reference only and shall be ignored in construing these Articles.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX 001 68

010086

## 2 Commencement of Business

2.1 The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2 The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and operation of the Company, including the expenses of registration and the initial offering of Participating Shares.

## 3 Service Providers

3.1 The Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any Class and/or Series of Shares) and may entrust to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

3.2 Without prejudice to the generality of the preceding Article, the Directors may appoint any person, firm or corporation to act as the Investment Manager with respect to the assets of the Company (whether in general or in respect of any Class and/or Series of Shares). The Directors may entrust to and confer upon the Investment Manager any of the functions, duties, powers and discretions exercisable by them as Directors upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit.

## 4 Rights attaching to Shares

4.1 The Management Shares shall have the following rights:

(a) as to voting: the holder of a Management Share shall (in respect of such Management Share) have the right to receive notice of, attend at and vote as a Member at any general meeting of the Company; and

(b) as to capital: a Management Share shall confer upon the holder the right in a winding up to repayment of capital as provided in these Articles but shall confer no other right to participate in the profits or assets of the Company; and

(c) as to income: no dividends shall be payable on the Management Shares.

4.2 The Participating Shares shall have the following rights:

SFC/690420-000001/33202513v4



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

Appx 00144

010087

(a)     as to voting: the holder of a Participating Share shall not (in respect of such Participating Share) have the right to receive notice of, attend at or vote as a Member at any general meeting of the Company, but may vote at a separate Class meeting convened in accordance with these Articles; and

(b)     as to capital: a Participating Share shall confer upon the holder thereof the right in a winding up to participate in the surplus assets of the Company by reference to the Separate Account attributable to the relevant Class or Series of Participating Shares as provided in these Articles; and

(c)     as to income: the Participating Shares shall confer on the holders thereof the right to receive dividends as provided in these Articles.

4.3     Notwithstanding Articles 4.1(a) and 4.2(a), if the Company, in its capacity as a limited partner of the Master Fund, is called upon to approve, vote or consent to any matter to which it would be entitled to vote as a limited partner of the Master Fund and is required to seek the consent of the holders of Participating Shares in connection with any such approval, vote or consent pursuant to the constitutional documents of the Master Fund (a "**Master Fund Consent Transaction**"), each holder of a Participating Share shall have the right (in respect of such Participating Share), to the exclusion of the holders of the Management Shares (in respect of such Management Shares), to receive notice of, and vote on, the Master Fund Consent Transaction (the "**Special Voting Right**").  The voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.  For every Master Fund Consent Transaction, the Directors shall cause the Company to vote its limited partnership interest in the Master Fund proportionally for and against such matter in the same proportion that the Members holding Participating Shares voted for and against such matter pursuant to the Special Voting Right.

4.4     In relation to any Special Voting Right pursuant to Article 4.3, unless otherwise determined by the Directors in their sole discretion, the procedure in this Article 4.4 shall be invoked.  The Directors shall provide written notice of the proposed Master Fund Consent Transaction to the Members holding Participating Shares and shall specify a deadline (the "**Consent Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written refusal to consent to the proposed Master Fund Consent Transaction.  The holders of Participating Shares in respect of which an express written refusal to consent has not been received by the Consent Date shall be deemed to have consented in writing to the proposed Master Fund Consent Transaction.

**5     Share Capital**

5.1     Subject to these Articles, the Directors may allot, issue, grant options or warrants over, or otherwise dispose of Shares in separate classes and/or series with different terms, preferences, privileges or special rights including, without limitation, with respect to investment strategy and/or policy, participation in assets, profits and losses of the Company, voting, fees charged (including



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 00145

010088

management, performance and incentive fees), redemption privileges, allocation of costs and expenses (including, without limitation, the costs and expenses incurred in any hedging activities and any profits and losses arising therefrom) as they think proper.  Subject to the Statute, these Articles and any applicable subscription agreement, any Share Rights (other than those set out in these Articles or set out in a Special Resolution) may be varied by either the Directors or by Ordinary Resolution.  Notwithstanding the foregoing, the Subscriber shall have the power to:

(a)     issue one Share to itself;

(b)     transfer that Share by an instrument of transfer to any person; and

(c)     update the Register of Members in respect of the issue and transfer of that Share.

5.2     On or before the allotment of any Participating Share the Directors shall resolve the Class and/or Series to which such Participating Share shall be classified and may, prior to the issue of any Participating Share, reclassify such Participating Share.  Each Class and/or Series shall be specifically identified.  Subject to the Statute and these Articles, the Directors may at any time re-name any Participating Share.

5.3     Notwithstanding the currency in which the par value of the Participating Shares is denominated, the Directors may specify any currency as the currency in which the Subscription Price, Redemption Price and Net Asset Value of Participating Shares of a Class and/or Series is calculated.

5.4     The Company shall not issue Shares to bearer.

5.5     Fractional Shares may be issued.

5.6     Shares shall only be issued as fully paid-up.

5.7     No right of pre-emption or first refusal shall attach to any Shares.

5.8     New Issue Shares shall not be issued to a Prohibited Person.

**6       Allotment and Issue of Participating Shares**

6.1     The Directors may from time to time allot and issue Participating Shares of any Class and/or Series.  The Directors may, in their discretion, refuse to allot and issue any Participating Shares, and shall not issue any Participating Shares to or for the account of an investor who is not an Eligible Investor.  If the Directors have declared a Calculation Suspension or Issue Suspension, no Participating Shares of that Class or Series (as appropriate) shall be issued until the relevant Suspension has ended.

6.2     The Directors shall determine the Subscription Price at the time of issue of the first issue of Participating Shares of any Class and/or Series.  Thereafter, the Directors may allot and issue



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

5

010089

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 231
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 172 of 1017 PageID 10953
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 13 of 43

Participating Shares of the same Class and/or Series on any Subscription Date provided that such additional Participating Shares are issued at a Subscription Price equal to not less than the Net Asset Value per Participating Share of such Class and/or Series calculated on the relevant Subscription Date (or if the Subscription Date is not also a Valuation Date then on the immediately preceding Valuation Date).

6.3 The Directors may add to the Subscription Price per Participating Share (before making any rounding adjustment) an amount which they consider to be an appropriate allowance to reflect fiscal and purchase charges which would be incurred for the account of the Company in investing an amount equal to the Subscription Price. The Directors may also add, in their discretion, a Sales Charge and/or an amount equal to any stamp duty and any other governmental taxes or charges payable by the Company with respect to the issue of such Participating Shares.

6.4 An applicant for Participating Shares shall pay for such Participating Shares in such currencies, in such manner, at such time, in such place and to such person acting on behalf of the Company as the Directors may from time to time determine.

6.5 Subject to the terms of any subscription agreement, an application for Participating Shares shall be irrevocable by an applicant for Participating Shares once it has been received by the Company. Participating Shares shall be treated as having been issued with effect from the relevant Subscription Date notwithstanding that the subscriber for those Participating Shares may not be entered in the Register of Members until after the Subscription Date.

6.6 Participating Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; likewise the Directors may from time to time prescribe an amount as the minimum subscription amount.

6.7 The Directors may resolve to accept non-cash assets in satisfaction (in whole or in part) of the Subscription Price.

6.8 The Directors may require an applicant for Participating Shares to pay to the Company for the benefit of any selling agent such selling commissions or such organisational charges as may have been disclosed to such applicant. The Directors may differentiate between applicants as to the amount of such selling commissions or such organisational charges.

6.9 The Company may, in so far as the Statute permits, pay a commission to any person in consideration of that person subscribing or agreeing to subscribe whether absolutely or conditionally for any Participating Shares. Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Participating Shares. The Company may also on any issue of Participating Shares pay such brokerage as may be lawful.

## 7 Separate Accounts

7.1 The Directors shall have the power to establish and maintain, with respect to Participating Shares of any Class and/or Series, a Separate Account, to record (purely as an internal accounting



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APP_00165
010090

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 232
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 173 of 1017 PageID 10954
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 14 of
43

matter) the allocation, on a differentiated basis, of the assets and liabilities of the Company to the holders of Participating Shares of any such Class and/or a Series in a manner consistent with the methodology set forth in the Offering Memorandum and the rights otherwise attaching to the Participating Shares.

7.2 The proceeds from the issue of Participating Shares of any Class and/or Series shall be applied in the books of the Company to the Separate Account established for Participating Shares of that Class and/or Series. The assets and liabilities and income and expenditure attributable to that Separate Account shall be applied to such Separate Account and, subject to the provisions of these Articles, to no other Separate Account. In the event that the assets of a Separate Account referable to any Class and/or Series are exhausted, any and all unsatisfied claims which any Members or former Members referable to that Class and/or Series have against the Company shall be extinguished. The Members or former Members referable to a Class and/or Series shall have no recourse against the assets of any other Separate Account established by the Company.

7.3 Where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Separate Account as the asset from which it was derived, and on each revaluation of an asset the increase or diminution in value shall be applied to the same Separate Account and, subject to the provisions of these Articles, to no other Separate Account.

7.4 In the case of any asset or liability of the Company which the Directors do not consider is attributable to a particular Separate Account, the Directors shall have discretion to determine the basis upon which any such asset or liability shall be allocated between or among Separate Accounts.

7.5 The Directors may, in the books of the Company, allocate assets and liabilities to and from Separate Accounts if, as a result of a creditor proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne if applied under the foregoing Articles.

7.6 The Directors may from time to time transfer, allocate or exchange an asset or liability from one Separate Account to another Separate Account provided that at the time of such transfer, allocation or exchange the Directors form the opinion (in good faith) that the value in money or money's worth of each such asset or liability transferred, allocated or exchanged is not significantly less or more than the value in money or money's worth (referred to in these Articles as "proper value") received by the Separate Account from which such asset or liability is transferred, allocated or exchanged except only as is otherwise provided by these Articles.

**8 Determination of Net Asset Value**

8.1 The Net Asset Value and Net Asset Value per Participating Share of each Class and/or Series shall be determined by or on behalf of the Directors as at the relevant Valuation Point on each relevant Valuation Date.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 00148

010091

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 233
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 174 of 1017 PageID 10955
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 15 of 43

8.2     In calculating the Net Asset Value and the Net Asset Value per Participating Share, the Directors shall apply such generally accepted accounting principles as they may determine.

8.3     The assets and liabilities of the Company shall be valued in accordance with such policies as the Directors may determine. Absent bad faith or manifest error, any valuation made pursuant to these Articles shall be binding on all persons.

8.4     Unless otherwise determined by the Directors in any resolution creating a Class and/or Series of Participating Shares or as otherwise disclosed in any Offering Memorandum, the Net Asset Value per Participating Share of each Class (or Series) shall be determined by allocating *pro rata* the Net Asset Value, as at the relevant Valuation Point, of the Company and/or of the relevant Separate Account among each Class and/or Series, adjusting the amount so calculated to reflect any fees, costs, foreign exchange items or other assets or liabilities which are properly attributable to a specific Class and/or Series and then by dividing the resultant amount by the number of Participating Shares of such Class and/or Series then in issue.

8.5     The Directors may determine that the Net Asset Value of any Class and/or Series shall be definitively determined on the basis of estimates and that such determination shall not be modified to reflect final valuations.

8.6     Any expense or liability may be amortised over such period as the Directors may determine.

8.7     The Directors may establish such reserves as they deem reasonably necessary for Company expenses and any other contingent Company assets or liabilities, and may, upon the reversal or release of such reserves, apply any monies resulting therefrom in such manner as they may, in their absolute discretion, determine.

8.8     Net Asset Value per Participating Share shall be rounded to the nearest cent or such other amount as the Directors may determine and the benefit of any such roundings may be retained by the Company.

8.9     The Directors may cause the Company to issue new Participating Shares at par or to compulsorily redeem at par such number of Participating Shares as they consider necessary to address, in such manner as they consider equitable, any prior miscalculation of Net Asset Value or Net Asset Value per Participating Share. The Company shall not be required to pay to the holder the redemption proceeds of any such compulsorily redeemed Participating Shares, which proceeds shall be retained by the Company.

## 9     Suspensions

9.1     The Directors may, from time to time, in the circumstances disclosed in the Offering Memorandum, declare a Suspension with respect to any one or more Classes and/or Series of Participating Shares.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

010092

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 234
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 175 of 1017 PageID 10956
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of 43

9.2 The Directors shall promptly notify all affected Members of any such Suspension and shall promptly notify such Members upon termination of such Suspension.

## 10 Transfer of Shares

10.1 Subject to Article 5.1, Shares may not be Transferred without the prior written approval of the Directors (which may be withheld for any or no reason) provided that the Directors may waive this requirement to the extent that they deem appropriate in connection with the listing of any Class or Series of Share on a stock exchange.

10.2 The Directors shall not register any Transfer of any Share to any person who is, in the opinion of the Directors, not an Eligible Investor.

10.3 Any proposed transferee shall provide to the Directors such information and documents as the Directors may request, including, without limitation, such documents or information as the Directors deem necessary or desirable:

   (a)  to enable the Directors to determine that the proposed transferee is an Eligible Investor; and

   (b)  to enable the Company to comply with all applicable laws, including anti-money laundering laws.

10.4 The instrument of Transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and, if the Directors so require, signed by or on behalf of the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

## 11 Transmission of Shares

11.1 If a Member dies, the survivor or survivors (where the Member was a joint holder) or his or her legal personal representatives (where the Member was a sole holder) shall be the only persons recognised by the Company as having any title to the Member's interest in the Company. The death of any Member shall not operate to relieve, waive or reduce any liabilities attaching to the Member's Shares at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

11.2 Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is an Eligible Investor may, upon delivery to the Directors of such evidence as may from time to time be required by them of:

   (a)  such person's entitlement to such Shares; and/or

   (b)  such person's status as an Eligible Investor,



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App'x 00159

010093

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 235
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 176 of 1017 PageID 10957
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 17 of 43

elect, either to become the holder of such Share or to have such Share Transferred to another Eligible Investor nominated by such person. If such person elects to become the holder of such Share, such person shall give notice in writing to the Directors to that effect, but the Directors shall, in either case, have the same right to decline registration of such person as a holder of such Share as they would have had in the case of a Transfer of the Share by that Member before his or her death or bankruptcy, or liquidation or dissolution, as the case may be.

11.3 Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is not an Eligible Investor shall not be registered as the holder of such Share and shall promptly Transfer such Share to an Eligible Investor in accordance with these Articles.

11.4 A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by Transfer), and who is an Eligible Investor, shall be entitled to the same dividends and other advantages to which such person would be entitled if such person were the registered holder of such Share. However, the person shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## 12 Redemption of Shares

12.1 Subject to any provisions relating to a specific Class and/or Series as set out in the Offering Memorandum or these Articles or in any resolution constituting a Class and/or Series or otherwise forming part of the special rights of such Participating Shares, a Member may require the redemption of all or any of such Member's Participating Shares by serving a Redemption Notice on the Company. Unless timely receipt is waived by the Directors in a particular case, a Redemption Notice shall be required to be received on or before a Redemption Date with respect to such Participating Shares (or such number of days prior to such Redemption Date as may be determined by the Directors). Any Member redeeming Participating Shares shall submit to the Directors the share certificate (if any) issued in respect of those Participating Shares. The Company shall redeem such Participating Shares at the Redemption Price, being an amount equal to the Net Asset Value per Participating Share of the relevant Class and/or Series prevailing on the relevant Redemption Date (or if the Redemption Date is not a Valuation Date then on the immediately preceding Valuation Date) subject to any deductions, holdbacks or adjustments provided for in these Articles and/or the Offering Memorandum.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App_0051

010094

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 236
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 177 of 1017 PageID 10958
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 18 of 43

12.2    The Directors may deduct any Redemption Fee from the Redemption Price. The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.3    A Member may not withdraw a Redemption Notice once submitted to the Company unless (a) the Directors shall have declared a Calculation Suspension or Redemption Suspension or (b) the Directors determine (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part). If a relevant Suspension has been declared by the Directors, the right of a Member to have its Participating Shares redeemed shall be suspended and during the period of Suspension the Member may withdraw its Redemption Notice. Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Company before the termination of the period of the Redemption Suspension or Calculation Suspension, as applicable. If the Redemption Notice is not withdrawn, any Participating Shares the redemption of which has been suspended shall be redeemed once the relevant Suspension has ended at the Redemption Price for Participating Shares of the relevant Class and/or Series calculated on the next Redemption Date following the end of the relevant Suspension.

12.4    The Directors may impose a gate the effect of which is to limit the redemptions of Participating Shares of any Class and/or Series or to limit the redemptions of Participating Shares held by any Member or Members as of any Redemption Date to such extent and in such manner as is disclosed in the Offering Memorandum. If the Directors determine to limit redemptions, the Directors may determine the manner in which such gated redemption requests will be dealt with on any subsequent Redemption Date.

12.5    If the Company is required by the laws of any relevant jurisdiction to make a withholding from any redemption monies payable to the holder of Participating Shares the amount of such withholding shall be deducted from the redemption monies otherwise payable to such person.

12.6    No redemption of part of a Member's holding of Participating Shares of any one Class and/or Series may be made if, as a result thereof, such Member would hold fewer Participating Shares of such Class and/or Series than such minimum number or value of Participating Shares of such Class and/or Series as may from time to time be specified (either generally or in any particular case or cases) by the Directors. If such partial redemption would reduce such Member's holding of Participating Shares to less than such minimum holding, the Directors may, in their discretion, elect to compulsorily redeem all of such Member's Participating Shares.

12.7    The Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or if such refusal is necessary to ensure the compliance by the Company, its Directors, the Administrator or any other service provider of the Company with any anti-money laundering law in any relevant jurisdiction.



15

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 00152

010095

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 237
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 178 of 1017 PageID 10959
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of 43

12.8 Any amount payable to a Member for the redemption of Participating Shares shall be paid in such currency or currencies as the Directors may determine. Subject to any Payment Suspension, the Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period or periods as the Directors shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period or periods as the Directors shall determine. In the absence of directions as to payment the Company may remit redemption proceeds by cheque to the address of the Member appearing on the Register of Members or by wire transfer to such account as the Directors deem appropriate in the circumstances. The Company shall not be liable for any loss resulting from this procedure.

12.9 On any redemption of Participating Shares the Directors shall have the power to satisfy (in whole or in part) the Redemption Price (and any other sums payable on redemption as provided in these Articles) owing on the redemption of such Participating Shares by dividing *in specie* the whole or any part of the assets of the Company (including, without limitation, shares, debentures, or securities of any other company whether or not held by the Company on the Redemption Date in question) and either (i) distributing such assets directly to the redeeming shareholder, and/or (ii) distributing or allocating such assets to a liquidating account or other similar mechanism to be managed and/or liquidated at the discretion of the Directors.

12.10 Participating Shares shall be treated as having been redeemed with effect from the relevant Redemption Date irrespective of whether or not a Member has been removed from the Register of Members or the Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Date, Members in their capacity as such will not be entitled to or be capable of exercising any rights arising under these Articles with respect to Participating Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Company) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Date but not yet paid (in each case with respect to the Participating Shares being redeemed). Such Members will be treated as creditors of the Company with respect to the Redemption Price and will rank accordingly in the priority of the Company's creditors.

12.11 Once a Participating Share is redeemed it shall be available for re issue and, until re issue, shall form part of the authorised and unissued share capital of the Company.

12.12 Upon the written request of a Member or prospective Member in a form acceptable to the Directors, the Company may, in the discretion of the Directors, accept a standing redemption request from such Member or prospective Member pursuant to which the Company shall agree (without assuming any liability for failing to do so) to use its commercially reasonable efforts to redeem such Member's Participating Shares to the extent necessary to ensure that such Member does not own over a specified percentage of the outstanding Participating Shares of the Company or any Class and/or Series thereof; such percentage to be the percentage identified by such Member or prospective Member in such written request as being the percentage which such Member's or prospective Member's ownership cannot exceed without material risk of such



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

App_000153

010098

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 238
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 179 of 1017    PageID 10960
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 20 of
43

Member or prospective Member being in violation of applicable law or regulation.  Any such written request may be revoked by notice in writing to the Company from the affected Member.

12.13   No amendment to these Articles made after a Redemption Date shall affect a Member with respect to Participating Shares of that Member which have been redeemed, or are being treated as redeemed, on or prior to that Redemption Date.

12.14   Unless otherwise provided in the Offering Memorandum, unremitted redemption proceeds shall not bear interest against the Company and redeemed Participating Shares shall not participate in the profits and losses of the Company with effect from the relevant Redemption Date.

## 13    Compulsory Redemption

13.1    The Directors may cause the Company to redeem any or all of the Participating Shares held by any person at the appropriate Redemption Price in the circumstances disclosed in the Offering Memorandum.  If the Directors determine compulsorily to redeem any Participating Shares under this Article they shall give the holder of the Participating Shares such notice of the redemption as they shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period as the Directors shall determine.

13.2    The Directors may cause a compulsory redemption during any period for which a Redemption Suspension has been declared.

13.3    Without prejudice to the generality of the foregoing, the Company may (without notice) compulsorily redeem the Participating Shares of any Member and, on behalf of such Member, apply the proceeds of redemption in paying for new Participating Shares to give effect to any exchange, conversion or roll-up policy disclosed to Members pursuant to which Participating Shares of one Class or Series (the "**Old Shares**") may, at the option of the Company, be exchanged for Participating Shares of another Class or Series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription of the redemption proceeds in paying up the New Shares.

## 14    FATCA

14.1    Notwithstanding any other Article, in order to comply with FATCA, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by FATCA, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member.  Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

App. 00154

0100097

14.2 In order to comply with FATCA and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to FATCA or incur any costs or liabilities associated with FATCA, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to FATCA; or (ii) where there has otherwise been non-compliance by the Company with FATCA whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any requirement to apply and collect withholding tax pursuant to FATCA;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with FATCA;

(iii) ensure that any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs or liabilities;

(c) in order to give effect to the requirements imposed upon the Company by FATCA, including the actions contemplated by articles 14.2(a) and 14.2(b), the Directors may:

(i) create separate classes and/or series of Shares ("**FATCA Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of FATCA Shares as the Directors determine; and/or

(ii) may re-name any number of Shares (whether issued or unissued) as FATCA Shares, create a Separate Account with respect to such FATCA Shares and apply any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) to such Separate Account; and/or



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

18

**Appx. 00155**

010098

(iii) allocate any FATCA costs, debts, expenses, obligations, liabilities or withholding tax among Separate Accounts on a basis determined solely by the Directors; and/or

(iv) adjust the Net Asset Value per Share of any relevant Shares (including any FATCA Share).

## 15 Designated Investments

15.1 The Directors may, in their discretion, classify certain of the Company's investments which are deemed by the Directors or the Investment Manager to be illiquid or the value of which is not readily or reliably ascertainable or which may have a relatively long-term investment horizon as **"Designated Investments"**. Once so classified, Designated Investments may, in the discretion of the Directors, be represented by a separate Class and/or Series of Participating Shares which, unless otherwise determined by the Directors, shall be allotted only to those Members who are holders of Participating Shares at the time of such designation. The gains and losses attributable to Designated Investments may, in the discretion of the Directors, be segregated and separately calculated and attributed amongst Members holding Shares of the relevant Class or Series in such manner as is consistent with the relevant provisions of the Offering Memorandum. Participating Shares of any such separate Class and/or Series may be issued by way of bonus or by way of conversion or exchange of all or part of a Member's holding of Participating Shares of another Class and/or Series. Similarly, Shares of a Designated Investment Class and/or Series may be converted or exchanged back into Participating Shares of the original Class and/or Series upon the Directors making a determination that the relevant investment no longer qualifies as a Designated Investment. The power to convert or exchange Participating Shares of one Class and/or Series into Participating Shares of another Class and/or Series may be effected by the Directors in any manner permitted by the Statute and the Articles, including the compulsory redemption of Participating Shares of one Class and/or Series and the application of the proceeds of redemption in subscribing for Participating Shares of the other Class and/or Series or by redesignating a portion of the Participating Shares of any existing Class and/or Series as thereafter belonging to a new Class and/or Series. Shares of a Class or Series of Shares which represent Designated Investments shall not, unless the Directors otherwise determine, be redeemable at the option of the Members holding such Participating Shares. Where investments are classified as Designated Investments and Participating Shares of a separate Class and/or Series are issued by way of bonus, the requirement of these Articles to ensure proper value is transferred to the Separate Account of the Participating Shares of the original Class and/or Series to which such investments were originally allocated shall not apply.

## 16 Purchase and Surrender of Shares

16.1 Subject to the provisions of the Statute and without prejudice to these Articles, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Appx. 00166

010099

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 241
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 182 of 1017 PageID 10963
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 23 of 43

16.2  The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

16.3  The Directors may accept the surrender for no consideration of any fully paid Share.

## 17  Treasury Shares

17.1  The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

17.2  The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

## 18  Variation of Share Rights

18.1  Subject to the Statute, these Articles and any applicable subscription agreement, all or any of the Share Rights applicable to any Class or Series of Participating Shares in issue (unless otherwise provided by the terms of issue of those Participating Shares) may (whether or not the Company is being wound up) be varied without the consent of the holders of the issued Participating Shares of that Class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation may be made with the prior consent in writing of the holders of not less than two-thirds by Net Asset Value of such Participating Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Participating Shares.  For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Participating Shares.  To any such meeting all the provisions of these Articles as to general meetings shall *mutatis mutandis* apply, but so that any holder of a Participating Share present in person or by proxy may demand a poll, and the quorum for any such meeting shall be Members holding not less than twenty per cent. by Net Asset Value of the issued Participating Shares of the relevant Class or Series.  At any Class meeting, the voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.

18.2  For the purposes of a Class consent, the Directors may treat two or more or all the Classes or Series of Participating Shares as forming one Class or Series if the Directors consider that such Classes or Series would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes or Series.

18.3  Where the Shares of any Class or Series (the "**First Class**") rank, or will on issue rank, pari passu with the Shares of another Class or Series (the "**Second Class**") with respect to participation in the same pool of profits or assets of the Company on a winding up, the rights of the First Class shall be deemed to be varied by any variation of or creation of rights in the Second



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Class (including on initial issue) which gives the Second Class priority over the First Class on a winding up of the Company.

18.4   Subject to the foregoing Articles, the Share Rights applicable to any Class or Series of Shares in issue shall (unless otherwise expressly provided by the conditions of issue of such Shares) be deemed not to be varied by:

(a)    the creation, allotment or issue of further Shares ranking pari passu therewith and which may be issued with the benefit of the terms referred to below;

(b)    the purchase or redemption of any Shares;

(c)    the exercise of the powers to allocate assets and charge liabilities to the various Separate Accounts or any of them and to transfer the same to and from the various Separate Accounts or any of them, as provided for in these Articles;

(d)    any reduction or waiver of any fees (including early redemption, management or performance fees) chargeable or allocable to any Class or Series of Shares;

(e)    any reduction or waiver of any redemption notice, gate or lock-up period applicable to any Class or Series of Shares; or

(f)    any variation or waiver contemplated by or provided for in the Offering Memorandum applicable to the relevant Class and/or Series.

18.5   In relation to any Class or Series consent required pursuant to Article 18.1, the Directors in their discretion may invoke the following procedure (the "**Negative Consent Procedure**").   The Directors shall provide written notice of the proposed variation (the "**Proposal**") to the Members of the affected Class or Series and shall specify a deadline (the "**Redemption Request Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written request for redemption of some or all of their Participating Shares of the affected Class and/or Series on the Redemption Date (the "**Specified Redemption Date**") specified by the Directors in such notice.   The terms of the Proposal shall be such that its specified effective date (the "**Effective Date**") shall not be on or prior to the Specified Redemption Date.   Such notice shall further provide that the holders of any Participating Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "**Affected Shares**") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "**Negative Consent Shares**").   In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under Article 18.1 with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favour of the Proposal on the Effective Date.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

**Appx. 00158**

**010101**

**19      Variation of Terms**

The Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Member to waive or modify the terms applicable to such Member's subscription for Participating Shares (including those relating to management and performance fees and redemption terms) without obtaining the consent of any other Member; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Members.

**20      Certificates for Shares**

20.1    A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine.  Share certificates shall be signed by one or more Directors or another person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process.  All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate.  All certificates surrendered to the Company for transfer shall be cancelled and, subject to these Articles, no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

20.2    The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

20.3    If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) on delivery up of the old certificate.

**21      Register of Members**

21.1    The Company shall maintain or cause to be maintained the Register of Members.

21.2    The Directors may determine that the Company shall maintain one or more branch registers of Members in accordance with the Statute. The Directors may also determine which register of Members shall constitute the principal register and which shall constitute the branch register or registers, and to vary such determination from time to time.

**22      Closing Register of Members and Fixing Record Date**

22.1    For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed thirty days.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

App.00159

010102

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 244
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 185 of 1017 PageID 10966
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 26 of
43

22.2 In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any dividend or in order to make a determination of Members for any other proper purpose.

22.3 If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such dividend is passed, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 23 Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

23.1 if it is not paid all the provisions of these Articles shall apply as if that amount had become due and payable by virtue of a call.

23.2 The Directors may issue Shares with different terms as to the amount and times of payment of calls, or the interest to be paid.

23.3 The Directors may, if they think fit, receive an amount from any Member willing to advance all or any part of the monies uncalled and unpaid upon any Shares held by it, and may (until the amount would otherwise become payable) pay interest at such rate as may be agreed upon between the Directors and the Member paying such amount in advance.

23.4 No such amount paid in advance of calls shall entitle the Member paying such amount to any portion of a dividend declared in respect of any period prior to the date upon which such amount would, but for such payment, become payable.

## 24 Lien on Shares

24.1 The Company shall have a first and paramount lien on all Shares (whether fully paid-up or not) registered in the name of a Member (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Member or such Member's estate, either alone or jointly with any other person, whether a Member or not, but the Directors may at any time declare any Share to be wholly or in part exempt from the provisions of this Article. The registration of a Transfer of any such Share shall operate as a waiver of the Company's lien thereon. The Company's lien on a Share shall also extend to any amount payable in respect of that Share.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 06109

23

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 245
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 186 of 1017 PageID 10967
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of 43

24.2 The Company may sell, in such manner as the Directors think fit, any Shares on which the Company has a lien, if a sum in respect of which the lien exists is presently payable, and is not paid within fourteen clear days after notice has been given to the holder of the Shares, or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the Shares may be sold.

24.3 To give effect to any such sale the Directors may authorise any person to execute an instrument of Transfer of the Shares sold to, or in accordance with the directions of, the purchaser. The purchaser or such purchaser's nominee shall be registered as the holder of the Shares comprised in any such Transfer, and the purchaser shall not be bound to see to the application of the purchase money, nor shall the purchaser's title to the Shares be affected by any irregularity or invalidity in the sale or the exercise of the Company's power of sale under these Articles.

24.4 The net proceeds of such sale after payment of costs, shall be applied in payment of such part of the amount in respect of which the lien exists as is presently payable and any balance shall (subject to a like lien for sums not presently payable as existed upon the Shares before the sale) be paid to the person entitled to the Shares at the date of the sale.

**25 Amendments of Memorandum and Articles and Alteration of Capital**

25.1 The Company may, by Ordinary Resolution:

(a) increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b) consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c) by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d) cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

25.2 All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of these Articles with reference to liens, Transfer, transmission and otherwise as the Shares in the original share capital.

25.3 Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution the Company may, by Special Resolution:

(a) change its name;

(b) alter or add to these Articles;

SFC/690420-000001/33202513v4



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 00161
010104

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 246
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 187 of 1017    PageID 10968
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 28 of 43

(c)      alter or add to the Memorandum with respect to any objects, powers or other matters specified therein; and

(d)      reduce its share capital or any capital redemption reserve fund.

## 26    Registered Office

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.  The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine.

## 27    General Meetings

27.1    All general meetings other than annual general meetings shall be called extraordinary general meetings.  The Directors may call general meetings.

27.2    The Company may but shall not be obliged to hold a general meeting in each year as its annual general meeting, and shall specify the meeting as such in the notice calling it.  Any annual general meeting shall be held at such time and place as the Directors shall determine.

## 28    Notice of General Meetings

28.1    At least five Business Days' notice shall be given of any general meeting.  Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day on which the meeting is to be held and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)      in the case of an annual general meeting, by all the Members entitled to attend and vote thereat; and

(b)      in the case of an extraordinary general meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety five per cent. in par value of the Shares giving that right.

28.2    The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice thereof shall not invalidate the proceedings of that meeting.

## 29    Proceedings at General Meetings

29.1    No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be one or more Members (present in person, by proxy or authorised corporate



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Appx 010105

representative, as the case may be) entitled to attend and vote and representing not less than twenty per cent. in par value of all of the Shares in issue and carrying the right to vote at the meeting.

29.2 A person may, with the consent of the Directors, participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

29.3 A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

29.4 If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

29.5 The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if the chairman shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

29.6 If no Director is willing to act as chairman, or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

29.7 The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Otherwise it shall not be necessary to give any such notice.

29.8 A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman or any Member present in person or by proxy (or in the case of a non-natural person, by its duly authorised representative or by proxy) demands a poll.

29.9 Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority,



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

Appx. 00103

an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

29.10 The demand for a poll may be withdrawn.

29.11 Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

29.12 A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

29.13 In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall not be entitled to a second or casting vote.

## 30 Votes of Members

30.1 Subject to any rights or restrictions attached to any Shares, on a show of hands every Member holding Shares carrying the right to vote on the matter in question who (being an individual) is present in person or by proxy or (if a corporation or other non-natural person) is present by its duly authorised representative or by proxy, shall have one vote and on a poll every such Member shall have one vote for every Share of which he is the holder.

30.2 In the case of joint holders of record, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. Seniority among joint holders shall be determined by the order in which the names of the holders stand in the Register of Members.

30.3 A Member of unsound mind, or in respect of whom an order has been made by any court or authority having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by the Member's committee, receiver, curator bonis, or other similar person appointed on such Member's behalf by that court or authority and any such committee, receiver, curator bonis or other similar person may vote by proxy.

30.4 No person shall be entitled to vote at any general meeting unless such person is registered as a Member on the record date for such meeting, nor unless all calls or other monies then payable by such person in respect of such Shares have been paid.

30.5 No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is purported to be given or tendered and every vote not disallowed at the meeting shall be valid. Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

30.6 On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

30.7 A Member holding more than one Share need not cast the votes in respect of its Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain (any such abstentions to count neither for nor against the resolution) from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing it, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which such proxy is appointed either for or against a resolution and/or abstain from voting.

**31      Proxies**

31.1 The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of such appointor's attorney duly authorised in writing or, if the appointor is a corporation or other non-natural person, under the hand of an officer or other person duly authorised for that purpose. A proxy need not be a Member of the Company.

31.2 The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the place and the time (being not later than the time for holding the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited. In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting, the instrument appointing a proxy shall be deposited at the Registered Office not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

31.3 The chairman may in any event, at the chairman's discretion, declare that an instrument of proxy shall be deemed to have been duly deposited. An instrument of proxy that is not deposited in the manner permitted and which has not been declared to have been duly deposited by the chairman, shall be invalid.

31.4 The instrument appointing a proxy may be in any usual or common form and may be incorporated within any subscription agreement or other document signed by or on behalf of the Member. An instrument appointing a proxy may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked. An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

31.5 Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the Transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or Transfer was received by the



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

28

App. 010108

Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

**32    Corporate Members**

Any corporation or other non-natural person which is a Member of the Company may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any Class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as the corporation could exercise if it were an individual Member.

**33    Shares Beneficially Owned by the Company**

Shares of the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

**34    Directors**

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors.  The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Subscriber.

**35    Powers of Directors**

35.1   Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company.  No alteration of the Memorandum or these Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given.  A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

35.2   All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

35.3   The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.  Notwithstanding the foregoing, the Directors shall not exercise the powers specified in this Article in breach of any limits or restrictions specified in the Offering Memorandum.



25

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

Appx. 00106

010 109

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 251
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 192 of 1017 PageID 10973
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 33 of 43

## 36 Appointment and Removal of Directors

36.1 The Company may, by Ordinary Resolution, appoint any person to be a Director and may, by Ordinary Resolution, remove any Director.

36.2 The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these Articles as the maximum number of Directors.

## 37 Vacation of Office of Director

The office of a Director shall be vacated if:

(a) the Director gives notice in writing to the Company that such Director resigns the office of Director;

(b) the Director is absent (without being represented by proxy or an alternate Director appointed by such Director) from three consecutive meetings of the board of Directors without special leave of absence from the Directors, and they pass a resolution that such Director has by reason of such absence vacated office;

(c) the Director dies, becomes bankrupt or makes any arrangement or composition with such Director's creditors generally;

(d) the Director is or becomes of unsound mind;

(e) the Director ceases to be a Director by virtue of, or is prohibited from being a Director by, an order made pursuant to any law or regulation binding on the Company; or

(f) all the other Directors of the Company (being not less than two in number) resolve that such Director should be removed as a Director.

## 38 Proceedings of Directors

38.1 The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director. A person who holds office as an alternate Director shall, if such person's appointor is not present, be counted in the quorum. A Director who also acts as an alternate Director shall, if such Director's appointor is not present, count twice towards the quorum.

38.2 Subject to the provisions of these Articles, the Directors may regulate their proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In the case of an equality of votes, the chairman shall not have a second or casting vote. A Director who is also an alternate Director shall be entitled in the absence of such Director's appointor to a separate vote on behalf of such Director's appointor in addition to such Director's own vote.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Appx 061167

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 252
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 193 of 1017 PageID 10974
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 34 of 43

38.3 A person may participate in a meeting of the Directors or any committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting. Unless otherwise determined by the Directors, the meeting shall be deemed to be held at the place where the chairman is located at the start of the meeting.

38.4 A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of such alternate Director's appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

38.5 A Director or alternate Director may, or other officer of the Company at the direction of a Director or alternate Director may call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

38.6 The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

38.7 The Directors may elect a chairman of their board and determine the period for which the chairman is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

38.8 All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

38.9 A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by such Director. The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

## 39 Presumption of Assent

A Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Director's dissent shall be entered in the minutes of the meeting or unless the Director shall file such



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 253
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 194 of 1017 PageID 10975
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 35 of 43

Director's written dissent from such action with the person acting as the chairman or secretary of the meeting before the close or adjournment thereof or shall forward such dissent by personal delivery, courier or registered post to such person immediately after the close or adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

**40 Directors' Interests**

40.1 A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with such Director's office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

40.2 A Director may act alone or by such Director's firm in a professional capacity for the Company and the Director or such Director's firm shall be entitled to remuneration for professional services as if such Director were not a Director or alternate Director.

40.3 A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by such Director or alternate Director as a director or officer of, or from such Director or alternate Director's interest in, such other company.

40.4 No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relationship thereby established. A Director (or such Director's alternate Director in such Director's absence) shall be at liberty to vote in respect of any contract or transaction in which such Director is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by such Director at or prior to such Director's consideration and any vote thereon.

40.5 A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which such Director has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

**41 Minutes**

The Directors shall cause minutes to be made in books kept for the purpose of recording all appointments of officers made by the Directors, all proceedings at meetings of the Company or



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

010112

the holders of any Class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

## 42   Delegation of Directors' Powers

42.1   The Directors may delegate any of their powers to any committee consisting of one or more Directors or such other persons as the Directors may designate. They may also delegate to any managing director or any Director holding any other executive office such of their powers as they consider desirable to be exercised by such managing director or any Director provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if such managing director ceases to be a Director.  Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to the exclusion of their own powers, and may be revoked or altered.  Subject to any such conditions, the proceedings of a committee of Directors shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

42.2   The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards.  Any such appointment may be made either collaterally with or to the exclusion of the Directors' powers, shall be subject to any conditions the Directors may impose, and may be revoked or altered.  Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

42.3   The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised person to delegate all or any of the powers, authorities and discretions vested in such attorney or authorised person.

42.4   The Directors may appoint such officers as they consider necessary on such terms, at such remuneration (if any) and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit.  Unless otherwise specified in the terms of such officer's appointment an officer may be removed by resolution of the Directors or Members.

## 43   Alternate Directors

43.1   Any Director (other than an alternate Director) may by written notice to the Company appoint any other Director, or any other person willing to act, to be an alternate Director and by written notice to the Company may remove from office an alternate Director so appointed by the Director.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Appx 06179

010113

43.2    An alternate Director shall be entitled to receive notice of all meetings of Directors and of meetings of committees of Directors of which such alternate Director's appointor is a member, to attend and vote at every such meeting at which the Director appointing such alternate Director is not personally present, and generally to perform all the functions of such alternate Director's appointor as a Director in such Director's absence.

43.3    An alternate Director shall cease to be an alternate Director if such alternate Director's appointor ceases to be a Director.

43.4    Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

43.5    Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for such alternate Director's own acts and defaults and shall not be deemed to be the agent of the Director appointing such alternate Director.

## 44    No Minimum Shareholding for Directors

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director shall not be required to hold Shares.

## 45    Remuneration of Directors

45.1    The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine.  The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Company, or separate meetings of the holders of any Class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

45.2    The Directors may by resolution approve additional remuneration to any Director for any services other than such Director's ordinary routine work as a Director.  Any fees paid to a Director who is also counsel to the Company, or otherwise serves it in a professional capacity, shall be in addition to such Director's remuneration as a Director.

## 46    Seal

The Company may, if the Directors so determine, have a Seal, which shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors.  Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person authorised by the Directors for the purpose.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

Appx 06174

010114

## 47        Dividends, Distributions and Reserves

47.1    Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by law.

47.2    Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a particular Class and/or Series shall be declared and paid according to Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

47.3    The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

47.4    Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

47.5    The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

47.6    Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 0641
010115

47.7    Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member.  Any dividend or distribution which remains unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

47.8    No dividend or distribution shall bear interest against the Company.

## 48    Capitalisation

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid.  In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned).  The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

## 49    Books of Account

49.1    The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company.  Such books of account must be retained for a minimum period of five years from the date on which they are prepared.  Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

49.2    The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Appx. 06173

010116

49.3    The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

**50      Audit**

50.1    The Directors may appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

50.2    Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

50.3    Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

**51      Notices**

51.1    Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member).  Any notice, if posted from one country to another, is to be sent airmail.

51.2    Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier.  Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted.  Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted.  Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

SFC/690420-000001/33202513v4



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Appx 06117

010117

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 259
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 200 of 1017 PageID 10981
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 41 of 43

51.3    A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

51.4    Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.

## 52    Winding Up

52.1    If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit.  The liquidator shall in relation to the assets available for distribution among the Members make in the books of the Company such transfers thereof to and from Separate Accounts as may be necessary in order that the effective burden of such creditors' claims may be shared among the holders of Participating Shares of different Classes and/or Series in such proportions as the liquidator in such liquidator's absolute discretion may think equitable.

52.2    Subject to the special rights attaching to Participating Shares of any Class or Series, the balance shall then be applied in the following priority:

(a)     first, to the holders of Management Shares, an amount equal to the par value of such Management Shares; and

(b)     second, the balance shall be paid to the holders of Participating Shares in proportion to the Net Asset Value of Participating Shares held, subject to a deduction from those Participating Shares in respect of which there are monies due, of all monies due to the Company for unpaid calls, or otherwise.

52.3    If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution or resolutions passed by the holders of Participating Shares (whether as a whole or at separate Class meetings), divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of property of different kinds, and may for such purposes set such value as the liquidator deems fair upon any one or more class or classes of property, and may determine how such division shall be



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 260
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 201 of 1017 PageID 10982
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 42 of 43

carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares or other property in respect of which there is a liability.

## 53 Indemnity and Insurance

53.1 Every Director and officer of the Company (which for the avoidance of doubt, shall not include any Auditor), together with every former Director and former officer of the Company (each an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud, wilful default or Gross Negligence. No Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud, wilful default or Gross Negligence of such Indemnified Person. No person shall be found to have committed actual fraud, wilful default or Gross Negligence under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

53.2 The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defence of any action, suit, proceeding or investigation involving such Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

53.3 The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

53.4 Pursuant to the foregoing provisions, the Company may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Company to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Directors shall, in their absolute discretion, determine. Any such indemnification and exculpation provisions may be specified to a standard equal to or more favourable (but not less favourable) to the Company than any standard specified in these Articles.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

App. 06176

010119

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 261
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 202 of 1017 PageID 10983
Case 19-34054-sgj11 Doc 2308-6 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 43 of 43

**54  Disclosure**

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

**55  Financial Year**

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

**56  Transfer by way of Continuation**

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

**57  Mergers and Consolidations**

The Company shall, with the approval of a Special Resolution, have the power to merge or consolidate with one or more constituent companies (as defined in the Statute), upon such terms as the Directors may determine.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

APPX-06177

010120

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 37

# __EXHIBIT 7__

Appx. 06178

010121

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 263
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 204 of 1017 PageID 10985

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 2 of 37

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

### SUBSCRIBER INFORMATION FORM

**PART A** OF THIS SUBSCRIBER INFORMATION FORM IS DIVIDED INTO THREE SECTIONS. ALL SUBSCRIBERS ARE REQUIRED TO COMPLETE SECTION I. SUBSCRIBERS WHO ARE NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS (IRAs) OR GRANTOR TRUSTS MUST COMPLETE SECTION II. ALL OTHER SUBSCRIBERS MUST COMPLETE SECTION III.

ALL SUBSCRIBERS MUST COMPLETE THE SUBSCRIBER QUALIFICATION QUESTIONS IN **PART B**.

SUBSCRIBERS SUBSCRIBING AS A CUSTODIAN OR AN AGENT ON BEHALF OF A BENEFICIAL OWNER SHOULD COMPLETE THE QUESTIONS BELOW WITH REFERENCE TO THE BENEFICIAL OWNER OF THE SHARES.

*YOUR SUBSCRIPTION WILL NOT BE DEEMED COMPLETE UNTIL ALL OF THE REQUIRED DOCUMENTATION LISTED HEREIN AND ADDITIONALLY REQUESTED DOCUMENTATION IS RECEIVED BY THE ADMINISTRATOR.*

| PART A – SUBSCRIBER INFORMATION |
|---|

| SECTION 1. TO BE COMPLETED BY ALL SUBSCRIBERS |
|---|

1. **Identity of Subscriber**

   Name(s):  *THE DUGABOY*      Country of domicile/ Citizenship   *USA*

   *INVESTMENT TRUST*

   Please check *all* of the boxes that describe the beneficial owner(s) for whose account the Shares are being acquired.

   ☐ Individual                         ☐ Broker-dealer

   ☐ Joint (spouses)                    ☐ Insurance company

   ☐ Joint (other)                      ☐ Registered investment company

   ☒ Personal trust (taxable to grantor) ☐ Tax-exempt endowment

   ☐ Personal trust (other)             ☐ Other tax-exempt organization

   ☐ Individual retirement account      ☐ Employee benefit plan (self-directed)

Subscriber Information Form                          1

Appx 06179
010122

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 264
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 205 of 1017    PageID 10986

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 3 of 37

☐ Charitable trust

☐ Private tax-exempt foundation

☐ Other private fund

☐ Family partnership or LLC

☐ Business entity (other)

☐ Employee benefit plan (trustee directed)

☐ Fund of Funds

☐ Banking or thrift institution

☐ Sovereign wealth fund or foreign office institution

☐ Other

If "Other" or "Business entity (other)" was checked, please describe the entity or beneficial owner: _____

_____

**2.    Contact Information**

<u>Primary Contact for Notices and Communications</u>

Name:                   _JAMES DONDERO_

Mailing Address:    _300  CRESCENT CT STE 700_

                            _DALLAS, TX 76201_

Telephone:           _972-628-4100_

Fax:                     _____

E-mail:                 _JDONDERO@HCMLP.COM_

<u>Secondary Contact for Notices and Communications (optional)</u>

Name:                   _MELISSA SCHROTH_

Mailing Address:    _300  CRESCENT CT STE. 700_

                            _DALLAS, TX 75201_

Telephone:           _972-628-4100_

Fax:                     _____

E-mail:                 _MSCHROTH@HCMLP.COM_

Appx 06189

010123

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 265
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 206 of 1017 PageID 10987

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 37

<u>Send copy of Financial Statements and Tax Information Returns to (optional)</u>

Name: _MELISSA SCHROTH_

Mailing Address: _300 CRESCENT CT STE 700_

_DALLAS, TX 75201_

Telephone: _972-628-4100_

Fax: _____

E-mail: _M.SCHROTH@HCMLP.COM_

Please set forth below the names of persons authorized by the Subscriber to give and receive instructions between the Fund (or its Administrator) and the Subscriber together with their respective signatures. Such persons are the only persons so authorized until further written notice to the Administrator signed by one or more of such persons.

| <u>Name</u> | <u>Signature</u> |
|---|---|
| MELISSA SCHROTH | |
| JAMES DONDERO | |
| | |
| | |

3. **Remitting Bank or Financial Institution**

Except as otherwise agreed by the Fund, all subscriptions are payable in full by wire transfer of readily available funds to the account of the Fund **at least two business days prior to the proposed date of subscription**. Please identify the bank or other financial institution (the "*Wiring Institution*") from which the Subscriber's funds will be wired. Note that any amounts paid to the Subscriber will be paid to the same account from which its subscription funds were originally remitted, which shall be in the name of the Subscriber, unless the Fund agrees otherwise.

A. Name of Wiring Institution[1]: _NEXBANK_

Address[2]: _DALLAS TEXAS_

---

[1] Important notice: please instruct your bank to ensure that the originating account and bank information is available in the wire. **Your transaction may be delayed or rejected if this information is not provided.**

[2] If the Wiring Institution is not located in a jurisdiction that is member of the Financial Action Task Force on Money Laundering (the "*FATF*"), the Administrator may require additional information. For a current list of FATF members see: www.fatf-gafi.org.

Subscriber Information Form

3

Appx 10184
010124

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 266
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 207 of 1017 PageID 10988

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 37

ABA, Chips or SWIFT Number: ▮▮▮▮▮▮▮▮

Account Name: _THE DUGABOY INVESTMENT TRUST_

Account Number: ▮▮▮▮▮▮

For Benefit of: _[ Subscriber Name ]_ JAMES DONDERO
(TRUSTEE)

Account Representative: _____

Telephone: _____

B.  Is the Subscriber a customer of the Wiring Institution?

☑ Yes  ☐ No

**If you responded "No," please contact the Administrator for additional information that may be required.**

4.  **Electronic Delivery of Reports and Other Communications**

The Fund may make reports and other communications available in electronic form, such as e-mail or by posting on a web site (with notification of the posting by e-mail). Do you consent to receive deliveries of reports and other communications from the Fund (including annual and other updates of our consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

☑ Yes  ☐ No

5.  **Information Regarding Actual Ownership of the Shares**

Is the Subscriber subscribing for the Shares with the intent to sell, distribute or transfer the Shares to any other person or persons?

☐ Yes  ☑ No

Is the Subscriber subscribing for the Shares as agent, nominee, trustee, partner, or otherwise on behalf of, for the account of, or jointly with any other person or entity?

☐ Yes  ☑ No

Subscriber Information Form      4

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 267
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 208 of 1017 PageID 10989

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 37

Will any other person or persons have a beneficial interest in the Shares acquired or a right to receive payments through contract or otherwise relating to the increase or decrease in value of the Shares (other than as a shareholder, partner or other beneficial owner of equity interests in the Subscriber)?

☐ Yes    ☑ No

Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Fund?

☐ Yes    ☑ No

Note: If any of the above questions were answered "Yes," please provide identifying information or contact the Administrator:

_____

6.    **Government Entities**

(a)    Is the Subscriber a government entity or an officer, agent or employee thereof?

☐ Yes    ☑ No

Note: Government entities include all state and local governments, their agencies and instrumentalities, and any investment programs, defined benefit plans as defined in Section 414(j) of the Internal Revenue Code of 1986, as amended (the "*Code*"), state general funds, pools of assets or plans sponsored or established by state and local governments, including all public pension plans and any participant-directed plan or program of a government entity, such as "qualified tuition plans" authorized by section 529 of the Code and retirement plans authorized by section 403(b) or 457 of the Code.

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 7.

Is the Subscriber aware of any political contributions it or any of its employees has received from Highland Capital Management, L.P. (in its capacity as investment manager of the Fund, the "*Investment Manager*") or any of the Investment Manager's employees?

☐ Yes    ☐ No

If the answer is "Yes," please provide the date of the contribution:

_____

If the answer to either or both of the above questions is "Yes," please contact the Administrator.

Subscriber Information Form                    5

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 268
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 209 of 1017 PageID 10990

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 37

7. **Private Investment Fund Experience**

Has the Subscriber previously made an investment in a private investment fund such as a hedge fund, private equity or venture capital fund, commodity pool, real estate or energy partnership or fund of funds?

☑ Yes ☐ No

8. **Net Worth**

Is the Subscriber's net worth more than 10 times the amount of the subscription commitment?

☑ Yes ☐ No

9. **Ability to Bear Risk**

Does the Subscriber have the financial ability to bear the economic risk of this investment and have adequate means to provide for its current needs and contingencies?

☑ Yes ☐ No

Subscriber Information Form

6

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 269
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 210 of 1017 PageID 10991

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 37

| SECTION II. ADDITIONAL QUESTIONS FOR NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS OR GRANTOR TRUSTS |
|---|

**1.** **Please indicate desired type of ownership interest**

☐ Individual      ☐ Individual Retirement Account
☐ Joint           ☑ Grantor Trust

**2.** **Place of Residence**

(a)    Indicate the state where Subscriber has his or her principal residence:

_TEXAS_

Note: If you are married and live in a community property state, both you and your spouse must sign the signature page of the Subscription Agreement. Community property states are Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin. Property held by married persons resident in Alaska may also be subject to community property law if the married persons opted into the community property regime.

(b)    Is the Subscriber or trust grantor a United States citizen or permanent resident of the United States?

☑ Yes      ☐ No

**3.** **Social Security Number:** ████████████

**4.** **Joint Subscriptions**

If you are subscribing with another person, please answer the following questions:

(a)    Please indicate type of ownership interest:

☐ Joint tenants (rights of survivorship)
☐ Tenants in common (no rights of survivorship)

(b)    If you are purchasing Shares jointly with another person, please answer the following questions:

(i)    Is the other person a United States citizen or permanent resident of the United States?

☐ Yes      ☐ No

(ii)    If the answer to the above question is "Yes," please provide such other person's U.S. Social Security number: _____

Subscriber Information Form                    7

5. **Individual Retirement Account Investors**

   (a)  If the Subscriber is subscribing as a trustee or custodian for an individual retirement account, is the Subscriber a qualified IRA custodian or trustee?

   ☐ Yes ☐ No

   (b)  Name of qualified IRA trustee or custodian:

   _____

6. **Grantor Trust Investors**

   (a)  Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

   ☐ Yes ☑ No

   (b)  If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

   ☐ Yes ☑ No

Subscriber Information Form                    8

Appx 06186

| SECTION III. | ADDITIONAL QUESTIONS FOR ENTITIES AND NON-GRANTOR TRUSTS |
|---|---|

1. **Organizational Data**

    (a)   Legal form of entity: _____

    (b)   Jurisdiction of organization: _____

    (c)   Year of organization: _____

    (d)   Briefly identify the Subscriber's primary business: _____

_____

_____

    (e)   Identify the Subscriber's principal place of business:

_____

_____

    (f)   Total number of shareholders, partners or other holders of equity or beneficial interests or other securities (including any debt securities other than short term paper of the Subscriber) (If the number is more than 100, it is sufficient to respond "more than 100."):

_____

    (g)   Is the Subscriber a wholly owned or majority-owned subsidiary of another entity?

        ☐ Yes    ☐ No

If yes, please provide name and address:

_____

    (h)   Is the direct parent of the Subscriber a wholly owned or majority-owned subsidiary of another entity?

        ☐ Yes    ☐ No

If yes, please provide name and address:

_____

Appx 04185

010130

(i)    Was the Subscriber organized for the specific purpose of acquiring the Shares?

☐ Yes    ☐ No

(j)    Have shareholders, partners or other holders of equity or beneficial interests in the Subscriber been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Subscriber's investment in the Fund (*i.e.*, have investors in the Subscriber been permitted to determine whether their capital will form part of the specific capital invested by the Subscriber in the Fund)?

☐ Yes    ☐ No

(k)    Is the Subscriber an entity engaged primarily in investing or trading securities?

☐ Yes    ☐ No

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 2.

Does the current amount of the Subscriber's subscription to the Fund exceed 40% of the value of the Subscriber's total assets?

☐ Yes    ☐ No

**2.**    **Benefit Plan Accounts**

(a)    Is the Subscriber (1) an employee benefit plan subject to the fiduciary provisions of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), (2) a "plan" subject to Section 4975 of the Code, (3) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA, (a party described in (1), (2), or (3), a "***Plan***"), or (4) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "***Plan Asset Entity***")?

☐ Yes    ☐ No

(b)    Is the Subscriber a Plan that is both voluntary and contributory?

☐ Yes    ☐ No

Appx 06186

010131

(c) Have beneficiaries of the Plan been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Plan's investment in the Fund (*i.e.*, have beneficiaries of the Plan been permitted to determine whether their capital will form part of the specific capital invested by the Plan in the Fund)?

☐ Yes    ☐ No

(d) Is the Subscriber either (1) an insurance company general account the underlying assets of which include "plan assets" for purposes of ERISA or (2) a Plan Asset Entity?

☐ Yes    ☐ No

If the answer is "Yes", the maximum percentage of the Subscriber constituting "plan assets" will be:

_____

(Note that the Subscriber has an obligation under the Subscription Agreement to promptly notify the Fund if this percentage is exceeded in any calendar month).

3. **Regulated Institutions**

(a) Is the Subscriber a regulated institution that is subject to legal or regulatory restrictions or limitations on the nature of its investments (such as a bank or an insurance company)?

☐ Yes    ☐ No

(b) If the answer is "Yes," has the Subscriber verified that the proposed subscription is in compliance with applicable laws and regulations?

☐ Yes    ☐ No

4. **Tax Information**

(a) Employer identification number:

_____

(b) Indicate the annual date on which the Subscriber's taxable year ends for purposes of reporting federal income tax or filing information returns:

_____

Subscriber Information Form                    11

Appx 06189

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 274
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 215 of 1017 PageID 10996

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 13 of 37

(c) Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return, as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

☐ Yes ☐ No

If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

☐ Yes ☐ No

(d) Is the Subscriber exempt from federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax-exempt organization described in Section 501(c)(3) of the Code)?

☐ Yes ☐ No

5. **Bank Investors**

(a) Is the Subscriber an insured depository institution, as defined in the Federal Deposit Insurance Act or a company that controls directly or indirectly an insured depository institution?

☐ Yes ☐ No

(b) Is the Subscriber treated as a bank holding company for the purposes of Section 8 of the International Banking Act of 1978?

☐ Yes ☐ No

(c) Is the Subscriber a direct or indirect subsidiary of an entity described in (a) or (b) above?

☐ Yes ☐ No

Appx 010190
010133

## PART B – SUBSCRIBER QUALIFICATION

SUBSCRIPTIONS WILL BE ACCEPTED ONLY FROM PERSONS WHO QUALIFY AS ELIGIBLE INVESTORS WITHIN THE MEANING OF APPLICABLE FEDERAL AND STATE SECURITIES REGULATIONS. UNLESS OTHERWISE INDICATED, RESPONSES SHOULD BE GIVEN BY REFERENCE TO THE SPECIFIC PERSON FOR WHOSE ACCOUNT THE SHARES ARE BEING ACQUIRED. THE SUBSCRIBER MAY BE REQUIRED TO PROVIDE SUCH FURTHER INFORMATION AND EXECUTE AND DELIVER SUCH DOCUMENTS AS THE FUND OR THE ADMINISTRATOR MAY REASONABLY REQUEST TO VERIFY THAT THE SUBSCRIBER QUALIFIES AS AN ELIGIBLE INVESTOR.

## SECTION I. ACCREDITED INVESTOR STATUS

Each Subscriber must indicate whether the intended beneficial owner of the Shares qualifies as an "accredited investor" pursuant to *at least one* of the following tests. (Please check *all* that apply, or, if none applies, consult the Administrator.)

### FOR NATURAL PERSONS:

☐ The Subscriber is a *natural person* whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000, *excluding* the value of the Subscriber's primary residence.[3]

☐ The Subscriber is a *natural person* with individual income (without including any income of the Subscriber's spouse) in excess of $200,000 or joint income with that person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

☑ The Subscriber is an individual retirement account or a grantor trust and the owner of the individual retirement account or the grantor of the grantor trust is a *natural person* that meets the requirements described above.[4]

### FOR ENTITIES:

☐ The Subscriber is an *entity* with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and is one of the following:

    ☐ a corporation;

    ☐ a partnership;

    ☐ a limited liability company;

---

[3]. An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[4] Additional information may be required in connection with a grantor trust's investment.

App. 0194
010134

☐    a business trust; or

☐    a tax-exempt organization described in Section 501(c)(3) of the Code.

☐ The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and whose decision to invest in the Fund has been directed by a person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the investment.

☐ The Subscriber is an employee benefit plan within the meaning of Title I of ERISA, (including an individual retirement account), which satisfies at least one of the following conditions:

     ☐    it has total assets in excess of $5,000,000;

     ☐    the investment decision is being made by a plan fiduciary that is a bank, savings and loan association, insurance company or registered investment adviser; or

     ☐    it is a self-directed plan (*i.e.*, a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐ The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions that has total assets in excess of $5,000,000.

☐ The Subscriber is licensed, or subject to supervision, by federal or state examining authorities such as a "bank," "savings and loan association," "insurance company," or "small business investment company" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐ The Subscriber is registered with the Securities and Exchange Commission as a broker or dealer or an investment company; or has elected to be treated or qualifies as a "business development company" (within the meaning of Section 2(a)(48) of the Investment Company Act of 1940, as amended (the "*Investment Company Act*"), or Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "*Investment Advisers Act*")).

☐ The Subscriber is an entity in which *all* of the equity owners are persons described above.

010135

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 277
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 218 of 1017    PageID 10999
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 16 of 37

## SECTION II. QUALIFIED CLIENT STATUS

Each subscriber must indicate whether the intended beneficial owner of the Shares qualifies as a "qualified client." IRAs and revocable grantor trusts should complete the questions for natural persons.

**FOR NATURAL PERSONS:**

☑    The Subscriber (or the grantor, in the case of a grantor trust) is a natural person whose net worth (together, in the case of a natural person, with assets held jointly with that person's spouse), at the time of subscription exceeds $2,000,000, *excluding* the value of the Subscriber's primary residence.[5]

**FOR ENTITIES:**

☐    The Subscriber is an entity that has a net worth at the time of subscription in excess of $2,000,000

If the entity is an entity engaged primarily in investing or trading in securities, state whether each of the shareholders, partners or other holders of equity or beneficial interests in the Subscriber (please answer both (A) and (B)):

(A)    has a net worth of at least $2,000,000 *excluding* the value of the holder's primary residence:[6]

☐ Yes    ☐ No

(B)    is either an entity which is not engaged primarily in investing or trading in securities or a natural person:

☐ Yes    ☐ No

---

[5].  An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[6]  See footnote immediately above.

Appx 06198
010138

| SECTION III. | FUND INVESTMENTS IN FINRA-RESTRICTED ISSUES AND AFFILIATION WITH FINRA MEMBERS IN UNDERWRITTEN OFFERINGS |
|---|---|

The Fund may, from time to time, consider direct or indirect investing in certain publicly offered equity securities, more commonly known as "new issue" securities ("*New Issues*"), through member firms of the Financial Industry Regulatory Authority, Inc. ("FINRA") in accordance with Rules 5130 and 5131 adopted by FINRA. Also, FINRA requires any member that is participating in a public offering of securities to report any affiliation between a 5% shareholder of the company whose securities are being offered with a FINRA member. In order for the Fund to be able to determine the extent to which a Subscriber is eligible to participate in New Issues and to comply with any filings required in any underwritten public offering that is conducted by any company in which the Fund invests, the Subscriber must complete the questionnaire below. *Even if the Subscriber does not wish to participate in the profits related to New Issues, the Subscriber must complete Items A and B, as the tests in each Item are conducted separately.*

A.    **Determination of Restricted Person Status under Rule 5130:**

Section 1 (Restricted Persons)

The Subscriber is:

☐    a FINRA member or other securities broker-dealer;

☐    an affiliate of a broker-dealer.[7]

☐    an officer, director, general partner, associated person or employee of any member of FINRA or any other securities broker-dealer, in either case other than a limited business broker-dealer. [8]

If the Subscriber checked any of the preceding boxes, please describe the name and CRD number of the applicable FINRA member along with a description of the relationship between such broker-dealer or affiliate and the Subscriber including, if applicable, the percentage of the Subscriber that is owned by a FINRA member: _____

_____

_____

---

[7]    As used herein, an "*affiliate*" means an entity which controls, is controlled by or is under common control with such broker-dealer. "Control" means (i) beneficial ownership of 10% or more of the outstanding common equity of an entity, including any right to receive such securities within 60 days; (ii) the right to 10% or more of the distributable profits or losses of an entity that is a partnership, including any right to receive an interest in such distributable profits or losses within 60 days; (iii) beneficial ownership of 10% or more of the outstanding subordinated debt of an entity, including any right to receive such subordinated debt within 60 days; (iv) beneficial ownership of 10% or more of the outstanding preferred equity of an entity, including any right to receive such preferred equity within 60 days; or (v) the power to direct or cause the direction of the management or policies of an entity.

[8]    As used herein, a "*limited business broker-dealer*" means any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities or direct participation programs.

Appx 06194
010137

☐ an agent of any member of the FINRA or any other securities broker-dealer that is engaged in the investment banking or securities business.

☐ a person who, directly or indirectly, owns or has contributed capital to any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer), and the Subscriber:

(a) is listed, or required to be listed, in Schedule A of the Form BD for such FINRA member or other securities broker-dealer, and is identified by an ownership code of at least 10%;

(b) is listed, or required to be listed, in Schedule B of the Form BD for such FINRA member or other securities broker-dealer, and such listing relates to a direct owner of such FINRA member or other securities broker-dealer that is identified by an ownership code of at least 10%;

(c) is listed, or required to be listed, in Schedule C of the Form BD of the FINRA member or other securities broker-dealer that meets any of the criteria noted in paragraphs (a) or (b) above;

(d) owns 10% or more of a public reporting company listed, or required to be listed, as a direct owner in Schedule A of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange; or

(e) owns 25% or more of a public reporting company listed, or required to be listed, as an indirect owner in Schedule B of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange.

If the Subscriber checked the immediately preceding box, please describe the name and CRD number of the FINRA member on whose form the relationship is disclosed: _____

_____

_____

☐ a person who may act as a finder with respect to any public offering of securities.

☐ a person, such as an attorney, accountant or financial consultant, whose professional activities may include acting in a fiduciary capacity to any managing underwriter of any public offering of securities.

☐ a person who has the authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or other collective investment account (including any hedge fund, investment partnership, investment corporation or any other collective investment vehicle that

Appx 06195
010138

is engaged primarily in the purchase and/or sale of securities), other than a family investment account or investment club.

☐ a member of the immediate family of any person to whom any of the preceding paragraphs refer.[9]

If the Subscriber checked this box, please specify the identity and the nature of the relationship with the Restricted Person, the firm with which the Restricted Person is associated, and whether the Restricted Person either contributes directly or indirectly to the Subscriber's support or receives material support from the Subscriber.

_____

_____

☐ a domestic or foreign bank, bank branch, trust company, or other conduit for an undisclosed principal. The Fund may request additional information in order to determine the eligibility of the undisclosed principal.

☐ an employee benefit plan qualified under ERISA, that is sponsored by a FINRA member or other securities broker-dealer or an affiliate thereof.

☐ an entity (including a partnership, investment fund, limited liability company or other account) which either (i) knows that one or more of its beneficial owners is a Restricted Person described in any of the preceding categories, or (ii) has not affirmatively determined that there is no Restricted Person described in any of the preceding categories that has a beneficial interest in the entity.[10]

A Subscriber who has checked one of the boxes above may be able to participate in New Issues to the extent an exemption in Item C applies. See C below.

Section 2 (Unrestricted Persons)

☑ None of the Restricted Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

---

[9]  The term *"immediate family"* includes parents; mother-in-law or father-in-law; husband or wife; brother or sister; brother-in-law or sister-in-law; son-in-law or daughter-in-law; children; whether by birth or adoption; and any other person who is supported, directly or indirectly, to a material extent by such person. For this purpose, *"material support"* means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

[10]  The term *"beneficial interest"* means any economic interest such as the right to share in gains or losses. The receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account. However, for purposes of FINRA Rule 5130 and 5131, if such fee is subsequently invested into the account (as a deferred fee arrangement or otherwise), it would then be considered a beneficial interest in the account.

Subscriber Information Form                                          18

Appx 08186

010139

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 281
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 222 of 1017 PageID 11003
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 20 of 37

B. **Determination of Covered Person Status under Rule 5131:**

<u>Section 1 (Persons Covered by Rule 5131)</u>

The Subscriber is:

☐ an executive officer or director of a public company.[11]

☑ an executive officer or director of a covered non-public company.[12]

☐ a person materially supported by an executive officer or director of a public company or a covered non-public company.[13]

If any of the three preceding boxes are checked, please provide the name of the "public company" or "covered non-public company" in the space below.

NEXBANK, MGM, CORNERSTONE, CCS MEDICAL, AM. BANKNOTE

If the Subscriber is an entity in which any of the above persons have a direct or indirect beneficial interest, please specify the current beneficial interest of each such person (as a percentage) and each relevant "public company" or "covered non-public company" for which the relevant investor is an executive officer or director.

_____

_____

Note that Subscribers checking the boxes above may not be restricted in their participation in New Issues depending on such Subscriber's Interest in the Fund and the investment banking relationships of the companies they serve.

<u>Section 2 (Persons Not Covered by Rule 5131)</u>

☐ None of the Covered Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

---

[11] As used herein, a "*public company*" is any company that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), or any company that files periodic reports pursuant to Section 15(d) of the Exchange Act.

[12] As used herein, a "*covered non-public company*" means any non-public company satisfying any of the following three criteria:

  (a) income of at least $1 million in the previous fiscal year or in two of the three previous fiscal years *and* shareholders' equity of at least $15 million;

  (b) shareholders' equity of at least $30 million and an operating history of two years; or

  (c) total assets and total revenue of at least $75 million in the latest fiscal year *or* in two of the three most recent fiscal years.

[13] As used herein, "*material support*" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

Subscriber Information Form                     19

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 282
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 223 of 1017 PageID 11004
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 21 of 37

C.   **Determination of Exempted Entity Status under Rules 5130 and 5131:**

A Subscriber who has checked one of the boxes set forth in Item A, Section 1 or Item B, Section 1 above may be eligible to participate in New Issues if the Subscriber meets certain criteria for exempted entities. In order for the Fund to be able to determine the extent to which an exemption applies, please check all appropriate boxes that describe the Subscriber.

<u>Section 1 (Rules 5130 and 5131)</u>

The Subscriber is an entity that:

☐   is an investment company registered under the Investment Company Act;

☐   is a common trust fund or similar fund, as described in Section 3(a)(12)(A)(iii) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), and the fund (i) has investments from 1,000 or more accounts and (ii) does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐   is an insurance company general, separate or investment account, and (i) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders and (ii) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons;

☐   is a publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of New Issues either as a selling group or underwriter) that (i) is listed on a national securities exchange, or (ii) is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐   is an investment company organized under the laws of a foreign jurisdiction, (i) that is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and (ii) in which no person owning more than 5% of the shares of such investment company is a Restricted Person;

☐   is an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code, and such plan is not sponsored solely by a broker-dealer;

☐   is a state or municipal government benefit plan that is subject to state and/or municipal regulation;

☐   is a tax-exempt charitable organization under Section 501(c)(3) of the Code and has attached a copy of the IRS determination letter confirming the entity's qualification under Section 501(c)(3) of the Code, by virtue of which there are no "beneficial owners" as calculated based on the definition of "beneficial interest" under FINRA Rule 5130; or

Appx 06198
010141

☐    is a church plan under Section 414(e) of the Code.

☑    None of the preceding categories in this Item C apply to the Subscriber.

Section 2 (Rule 5130 only)

The Subscriber is:

☐    an entity that represents, based upon a representation from the beneficial account holders or a person authorized to represent the beneficial owners of the Subscriber (in either case, dated no earlier than 12 months prior to the date of the Subscription Agreement), that none of the beneficial owners of the Subscriber who participate in New Issues are persons who are not entitled to do so under FINRA Rule 5130, and the Subscriber is eligible to purchase New Issues in compliance with FINRA Rule 5130; or

☐    is an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (i) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity or (ii) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

     If the immediately preceding box is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons.

     _____

Appx 06499

010142

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 284
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 225 of 1017    PageID 11006

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 23 of 37

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

### SUBSCRIPTION AGREEMENT

Highland Credit Opportunities Fund, Ltd.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Ladies and Gentlemen:

1. **Documents Received**

(a)    The undersigned (the "*Subscriber*") hereby acknowledges having (i) received, read and understood the current Confidential Private Offering Memorandum, as supplemented and amended from time to time (the "*Private Offering Memorandum*"), of Highland Credit Opportunities Fund, Ltd., a Cayman Islands exempted company (the "*Fund*"), including but not limited to those sections dealing with risk factors, conflicts of interest, fees and tax consequences of an investment in the Fund, and the Memorandum and Articles of Association of the Fund, as amended to date (the "*Articles*"), (ii) received a copy of Form ADV Part 2A, the firm brochure, and Form ADV Part 2B, the brochure supplement, of Highland Capital Management, L.P. (in its capacity as the investment manager of the Fund, the "*Investment Manager*"), as amended to date (the "*Form ADV*"), prior to or simultaneously with delivery of this Subscription Agreement to the Fund and (iii) been given the opportunity to (A) ask questions of, and receive answers from the Investment Manager or one of its affiliates concerning the terms and conditions of the offering and other matters pertaining to an investment in the Fund and (B) obtain any additional information that the Investment Manager can acquire without unreasonable effort or expense that is necessary to evaluate the merits and risks of an investment in the Fund.

(b)    Appendix A hereto contains the definitions of certain capitalized terms used but not otherwise defined herein and should be read by the Subscriber prior to entering into this Subscription Agreement.

2. **Subscription Commitment**

(a)    The Subscriber hereby irrevocably subscribes for shares of the Fund (the "*Shares*"), subject to Articles, as may be amended from time to time, and the Private Offering Memorandum, and agrees to contribute in cash (unless otherwise agreed by the Fund) to the capital of the Fund, the amount set forth on the Signature Page of this Subscription Agreement. Such amount shall be payable in full in readily available funds by wire transfer to the bank account of the Fund at least two business days prior to the proposed date of subscription.

(b)    The Subscriber understands that this subscription is not binding on the Fund until accepted by the Fund, and it may be rejected, in whole or in part, by the Fund in its absolute discretion. If and to the extent rejected, the Fund shall, to the extent permitted by law, return to the Subscriber, without interest or deduction, any payment tendered by the Subscriber, and the Fund and the Subscriber shall have no further obligation to each other hereunder. The Subscriber acknowledges and accepts that none of the Fund, the Investment Manager, the Fund's

Subscription Agreement                                1

Appx. 06209

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 285
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 226 of 1017 PageID 11007
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 24 of 37

administrator (the "*Administrator*," which term shall be construed to include any sub-administrator of the Fund unless the context otherwise requires) nor their respective agents, affiliates or representatives shall be responsible for any lost profit, revenue or damages of any kind due to a delayed acceptance or a rejected subscription.

**3.      Representations, Warranties and Covenants – All Subscribers**

To induce the Fund to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Fund:

(a)      The information set forth in the subscriber information form attached hereto, which shall be considered an integral part of this Subscription Agreement (the "*Subscriber Information Form*"), is true, correct, accurate and complete, and will be relied upon by the Fund for the purpose of determining the eligibility of the Subscriber to purchase and own Shares.

(b)      The Subscriber hereby represents that the information set forth in the Subscriber Information Form is true, correct, accurate and complete as of the date hereof, and the Subscriber agrees to notify the Fund immediately if any representation or warranty contained in this Subscription Agreement, or any information provided pursuant to the Subscriber Information Form becomes untrue, misleading, or otherwise requires updating at any time. For so long as the Subscriber is a shareholder of the Fund, the Subscriber further agrees to provide any revised or updated information necessary to cause the Subscriber Information Form to remain true and correct as soon as practicable upon the Subscriber becoming aware that any such change or revision is necessary. The Subscriber agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Subscriber's status as an "accredited investor" or "qualified purchaser" or to otherwise determine the eligibility of the Subscriber to purchase Shares. The Subscriber agrees to provide any additional information and execute any additional documents as may reasonably be required in connection with any subscription, credit facility or other similar borrowing arrangement by the Fund or any lender named in the credit facility or similar lending arrangement.

(c)      The Subscriber consents to the disclosure of any such information, and any other information furnished to the Fund, to any governmental authority or self-regulatory organization or, to the extent required by law or deemed (subject to applicable law) by the Fund to be in the best interest of the Fund, to any other person.

(d)      Except as disclosed in the accompanying Subscriber Information Form, the Subscriber is acquiring the Shares for the Subscriber's own account; does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the Shares; and is not acquiring the Shares with a view to or for sale in connection with any distribution of the Shares.

(e)      The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Fund (including the risks set forth in the Private Offering Memorandum) and to make an informed investment decision with respect thereto and has made its own investment decision, including decisions regarding suitability based on its own judgment

Subscription Agreement

APP 06204
010144

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 286
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 227 of 1017 PageID 11008
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 25 of 37

or upon the advice from such advisers as it deemed necessary and not upon the views or advice of the Fund, the Investment Manager, or their affiliates or representatives.

(f)     The Subscriber understands that the Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "*Securities Act*"), or any state law and that the Fund is not registered under the Investment Company Act of 1940, as amended (the "*Investment Company Act*").  The Subscriber agrees to notify the Fund prior to any proposed sale, transfer, distribution or other disposition of the Shares or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of the Shares (including, without limitation, by pledge, option, swap or nominee or similar relationship, and further including, without limitation, the offering or listing of any Shares on or through any placement agent, intermediary, online service, site, agent or other similar person, service or entity) without the consent of the directors of the Fund (the "*Directors*") and the Investment Manager, which may be granted or withheld in their sole discretion, and unless the Shares are registered or such sale, transfer, distribution or other disposition is exempt from registration.  The Subscriber understands that any such transfers without the consent of the Directors and the Investment Manager are null and void.  The Subscriber also understands that the Fund has no intention to register the Fund or the Shares with the Securities and Exchange Commission or any state and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration.  The Fund may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor furnish a legal opinion satisfactory to the Fund and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws.  An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the Shares and appropriate stop-transfer instructions may be placed with respect to the Shares.

(g)     The Subscriber confirms that it has not been invited as a member of the public in the Cayman Islands to subscribe for Shares.

(h)     In formulating a decision to invest in the Fund, the Subscriber has not relied or acted on the basis of any representations or other information purported to be given on behalf of the Fund or the Investment Manager, except as set forth in the Private Offering Memorandum or the Articles or the Form ADV (it being understood that no person has been authorized by the Fund or the Investment Manager to furnish any such representations or other information).

(i)     The Subscriber recognizes that there is not now any secondary market for the Shares and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber readily to liquidate the Subscriber's investment in the Fund other than through a redemption of Shares as provided in the Articles and the Subscriber may be holding such Shares for an indefinite period of time.

(j)     The Subscriber understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Fund.  The Subscriber's investment is consistent with the investment purposes and objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

Subscription Agreement

3

(k)     The Subscriber can afford a complete loss of its investment in the Fund and can afford to hold its investment in the Fund for an indefinite period of time.

(l)     If the Subscriber is a natural person, the Subscriber is qualified to become a shareholder of the Fund and has the legal capacity to execute, deliver and perform this Subscription Agreement.

(m)     If the Subscriber is a corporation, partnership, limited liability company, trust or other entity, it is authorized and qualified to become a shareholder of, and authorized to make its subscription payment to, the Fund and otherwise to comply with its obligations as a shareholder of the Fund; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms.  In addition, such Subscriber will, upon request of the Fund or the Administrator, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in the Fund and the authority of the person executing this Subscription Agreement on behalf of the Subscriber.

(n)     The purchase of the Shares hereunder and the compliance by such Subscriber with all of the provisions of this Subscription Agreement applicable to such Subscriber and the consummation by such Subscriber of the transactions herein and therein contemplated will not (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Subscriber is a party or by which such Subscriber is bound or to which any of the property or assets of such Subscriber is subject, nor (b) will such action result in any violation of (i), if such Subscriber is an entity, the provisions of the organizational documents of such Subscriber or (ii) any statute applicable to such Subscriber or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Subscriber or the property of such Subscriber.

(o)     The Subscriber has carefully reviewed and understands the various risks of an investment in the Fund, as well as the fees and conflicts of interest to which the Fund is subject, as set forth in the Private Offering Memorandum.  The Subscriber hereby consents and agrees to the payment of the fees so described to the parties identified as the recipients thereof, and to such conflicts of interest.

(p)     The Subscriber believes that the compensation terms of the Fund represent an "arm's-length" arrangement and the Subscriber is satisfied that it has received adequate disclosure from the Fund and the Investment Manager to enable it to understand and evaluate the compensation and other terms of the Fund and the risks associated therewith.

(q)     The Subscriber represents and warrants that no holder of any beneficial interest in the Shares (each a "**_Beneficial Interest Holder_**") and, in the case of a Subscriber which is an entity, no Related Person is:

Subscription Agreement                                      4

APPX 06203

010148

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 288
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 229 of 1017 PageID 11010
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of 37

(1)    A person or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Asset Control from time to time;

(2)    A Foreign Shell Bank; or

(3)    A person or entity resident in or whose subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.

The Subscriber agrees promptly to notify the Fund or the person appointed to administer the Fund's anti-money laundering program, if applicable, of any change in information affecting this representation and covenant.

(r)    The Subscriber represents that (except as otherwise disclosed to the Fund in writing):

(1)    neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is a Senior Foreign Political Figure, any member of a Senior Foreign Political Figure's Immediate Family or any Close Associate of a Senior Foreign Political Figure;

(2)    neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is resident in, or organized or chartered under the laws of, a jurisdiction that has been designated by the Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;[14] and

(3)    its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a Non-Cooperative Jurisdiction.

(s)    The Subscriber acknowledges and agrees that any amounts paid to it will be paid to the same account from which its subscription funds were originally remitted, unless the Fund agrees otherwise.

(t)    If the Subscriber is purchasing the Shares as agent, representative or intermediary/nominee, or in any similar capacity for any other person, or is otherwise requested to do so by the Fund, it shall provide a copy of its anti-money laundering policies ("**AML Policies**") to the Fund. The Subscriber represents that (i) it is in compliance with its AML Policies, (ii) its AML Policies have been approved by counsel or internal compliance personnel who have been reasonably informed of the legal requirements and best practices for anti-money laundering policies and their implementation, and (iii) it has not received a deficiency letter, negative report or any similar determination regarding its AML Policies from independent

---

[14]   The Treasury Department's Financial Crimes Enforcement Network ("**FinCEN**") issues advisories regarding countries of primary money laundering concern. FinCEN's advisories are posted at http://www.fincen.gov/pub_main.html.

Subscription Agreement         5

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 289
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 230 of 1017 PageID 11011

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 28 of 37

accountants, internal auditors or some other person responsible for reviewing compliance with its AML Policies.

(u)     The Subscriber represents and warrants that as a result of its acquisition and holding of the Shares: (i) the assets of the Fund will not constitute the assets of any employee benefit plan subject to any federal, state, local or non-U.S. law, rule or regulations ("*Similar Law*") that is similar to (A) the U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or (B) Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*"); (ii) the Investment Manager will not be considered to be a fiduciary of the Subscriber under any Similar Law; and (iii) no activity of the Fund contemplated in the Private Offering Memorandum or the Articles will violate any Similar Law.

(v)     The Subscriber will promptly provide any additional documentation the Fund or the Administrator may request in the future to the extent that the Fund or the Administrator determines necessary in order to comply with applicable anti-money laundering laws or policies or any other applicable law.

(w)     The Subscriber acknowledges that due to anti-money laundering requirements operating within their respective jurisdictions, the Fund, the Investment Manager and/or the Administrator (as the case may be) may require additional documentation before a subscription application or redemption request can be processed.  Please be aware that your failure to provide or a delay in providing any such documentation may delay your acceptance to the Fund, cause your subscription to be rejected entirely or delay the satisfaction of your redemption request, as applicable.  The Fund, the Investment Manager and the Administrator shall be held harmless and indemnified against any loss arising as a result of any such delay or rejection due to the Subscriber's failure to provide or delay in providing any such requested information.

(x)     The Subscriber acknowledges and agrees that Shares of the Fund will not be issued until such time as the Fund and/or the Administrator has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity. Where at the sole discretion of the Fund, Shares are issued prior to the Fund and/or Administrator having received all the information and documentation required to verify the Subscriber's identity, the Subscriber will be prohibited from redeeming any Shares so issued, and the Fund and the Administrator on its behalf reserves the right to refuse to make any redemption payment or distribution to the Subscriber, until such time as the Fund and/or the Administrator, as applicable, has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity.

(y)     The Subscriber acknowledges and agrees that each of the Fund, the Administrator and the Investment Manager may disclose to each other, to any affiliate, to any other service provider to the Fund or to any regulatory body in any applicable jurisdiction copies of the Subscriber's subscription documents and any information concerning the Subscriber in their respective possession, whether provided by the Subscriber to the Fund, the Administrator or the Investment Manager or otherwise, including details of the Subscriber's Shares, historical and pending transactions in the Shares and the value thereof, and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on any such person by law or otherwise.

Subscription Agreement                          6

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 290
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 231 of 1017 PageID 11012
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of 37

(z)    The Subscriber agrees to provide the Fund and/or the Administrator any additional tax information or documentation that the Fund or the Administrator believes will enable it, the Fund or any subsidiary of the foregoing to comply with or mitigate any of their respective tax reporting, tax withholding, and/or tax compliance obligations, including any such obligations under the U.S. Hiring Incentives to Restore Employment Act (P.L. 111-147), or which may arise as a result of a change in law or in the interpretation thereof.

(aa)    The Subscriber understands that Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") acts as U.S. counsel to the Fund, the Investment Manager and their affiliates.    The Subscriber also understands that, in connection with this offering of Shares and ongoing advice to the Fund, the Investment Manager and their affiliates, Akin Gump will not be representing investors in the Fund, including the Subscriber, and no independent counsel has been retained to represent investors in the Fund.    In addition, Akin Gump does not undertake to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in the Private Offering Memorandum, nor does Akin Gump monitor compliance with applicable laws.    In preparing the Private Offering Memorandum, Akin Gump relied on information furnished to it by the Fund and/or the Investment Manager, and did not investigate or verify the accuracy or completeness of the information set forth therein concerning the Fund, the Investment Manager and their affiliates and personnel.

## 4.    Representations, Warranties and Covenants – ERISA Subscribers

If the Subscriber is, or is acting on behalf of, an employee benefit plan which is subject to ERISA or Section 4975 of the Code, to induce the Fund to accept this subscription, the Subscriber hereby makes the following additional representations, warranties and covenants to the Fund:

(a)    The person executing this Subscription Agreement on behalf of the Subscriber either is a "named fiduciary" (within the meaning of ERISA) of the Subscriber, or is acting on behalf of a named fiduciary of the Subscriber pursuant to a proper delegation of authority.

(b)    The person executing this Subscription Agreement on behalf of the Subscriber represents and warrants on behalf of such person or the Subscriber, as applicable, as follows:

(1)    The Subscriber is (w) an employee benefit plan subject to the fiduciary provisions of ERISA, (x) a "plan" subject to Section 4975 of the Code, (y) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA (a party described in (w), (x) or (y) a "*Plan*") or (z) any entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "*Plan Asset Entity*").

(2)    The execution and delivery of this Subscription Agreement and the consummation of the transactions contemplated hereunder, and in the Private Offering Memorandum and the Articles will not result in a breach or violation of any charter or organizational documents pursuant to which

Subscription Agreement                                                                    7

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 291
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 232 of 1017 PageID 11013

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 30 of 37

the Subscriber was formed, or any statute, rule, regulation or order of any court or governmental agency or body having jurisdiction over the Subscriber or any of its assets, or in any material respect, any mortgage, indenture, contract, agreement or instrument to which the Subscriber is a party or otherwise subject.

(3)     The investment in the Fund is permitted by the documents of the Subscriber and such documents permit the Subscriber to invest in private investment funds that will engage in the investment program described in the Private Offering Memorandum.

(c)     The Subscriber is not in any way affiliated with (*i.e.*, does not own or control, is not owned or controlled by, nor is under common ownership or control with) any person or entity which will receive compensation, directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum.

(d)     The Subscriber acknowledges and agrees that the decision to invest in the Fund and the review of the terms of the Fund must be made solely and independently by a fiduciary of the Subscriber who has no affiliation with the Investment Manager or any of its affiliates or employees, without relying on any recommendation of the Investment Manager or any of its affiliates or employees as a primary basis for its decision.

(e)     The appropriate fiduciaries of the Subscriber have considered the investment in light of the risks relating thereto and fiduciary responsibility provisions of ERISA applicable to the Subscriber and have determined that, in view of such considerations, the investment is appropriate for the Subscriber and is consistent with such fiduciaries' responsibilities under ERISA, and the appropriate fiduciaries: (i) are responsible for the Subscriber's decision to invest in the Fund, including the determination that such investment is consistent with the requirement imposed by Section 404 of ERISA that employee benefit plan investments be diversified so as to minimize the risk of large losses; (ii) are independent of the Investment Manager and any of its affiliates and employees and of any person or entity that will receive compensation, whether directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum; (iii) are qualified and authorized to make such investment decision; and (iv) in making such decision, have not relied on the recommendation of the Investment Manager or any of its affiliates or employees.

(f)     The Subscriber through the appropriate fiduciaries has been given the opportunity to discuss the Subscriber's investment in the Fund, and the structure and operation of the Fund with the Investment Manager and has been given all information that the Subscriber or the appropriate fiduciaries have requested and which the Subscriber or the appropriate fiduciaries deemed relevant to the Subscriber's decision to participate in the Fund.

**5.     Representations, Warranties and Covenants – Insurance Company General Account and Plan Asset Entity Subscribers**

(a)     If the Subscriber is acquiring the Shares with the assets of the general account of an insurance company (a "*General Account*"), the Subscriber represents, warrants and covenants that, on each day the Subscriber owns the Shares, either (i) the assets of such General Account

App. 08205
010150

are not considered to be plan assets within the meaning of Section 3(42) of ERISA, Department of Labor Regulations Section 2510.3-101 or Department of Labor regulations issued pursuant to Section 401(c)(1)(A) of ERISA, or (ii) the execution and delivery of this Subscription Agreement, and the acquisition and redemption of the Shares, is exempt from the prohibited transaction rules of Section 406(a) of ERISA and Section 4975(c)(1)(A) - (D) of the Code by virtue of Department of Labor Prohibited Transaction Class Exemption 95-60 or some other exemption of such rules.

(b)     By signing this Subscription Agreement, each Subscriber that is either a Plan Asset Entity or using the assets of a General Account hereby covenants that if, after its initial acquisition of the Shares, at any time during any calendar month the percentage of the assets of such General Account (as reasonably determined by the Subscriber) or Plan Asset Entity, as applicable, that constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code exceeds the maximum percentage limit specified by the Subscriber in Question 2(d) of Section III of the Subscriber Information Form, then such Subscriber shall promptly notify the Fund of such occurrence and the Fund may require the Subscriber to redeem or dispose of all or a portion of the Shares held in such General Account or by such Plan Asset Entity, as applicable, by the end of the next following calendar month or such other time as may be determined by the Investment Manager.

## 6.     Indemnification

(a)     The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby, if accepted by the Fund, will be accepted in reliance thereon. The Subscriber agrees to indemnify and hold harmless the Fund, the Directors, the Investment Manager and their affiliates, and the partners, members, managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (together, the "*Indemnified Persons*") from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber Information Form) not having been true, correct and complete when made, any misrepresentation made by the Subscriber or any failure by the Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Fund.

(b)     To the extent that any provisions of this Subscription Agreement, including, without limitation, Section 6 hereof, are not enforceable under applicable law by virtue of any person not being party to this Subscription Agreement (each such person, a "*Third Party*"), the Subscriber hereby agrees that the Fund may execute one or more deed polls and/or enter into one or more separate agreements with any such Third Party and take all further actions as may be necessary or desirable, in the sole opinion of the Fund, to give effect to such provisions.

(c)     The Subscriber expressly consents to the Investment Manager or the Administrator accepting and executing any instructions transmitted in written or facsimile form (or by other electronic means) in respect of an investment in the Fund to which this application relates (including, without limitation, withdrawal requests).  If instructions are given by the Subscriber in facsimile form (or by other electronic means), the Subscriber undertakes to send

9

Appx 08208
010151

the original letter of instructions to the Fund and the Administrator and hereby agrees to hold harmless and indemnify each of the Indemnified Persons, the Administrator and any of its employees and agents against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Person and each of the Administrator and any of its employees and agents may rely conclusively upon and shall incur no liability (i) for any loss arising from the non-receipt of any instructions relating to the Shares of the Subscriber delivered by facsimile or other electronic means or (ii) in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber. Each Indemnified Person and each of the Administrator and any of its employees and agents shall be allowed such amount of time to act on and implement any instructions as may be reasonable having regard to their systems and operations and any other circumstances then prevailing and shall not be liable for any loss arising from any delay in acting on any instruction.

7. **Miscellaneous**

(a) The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights, interest or obligations hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any Shares acquired pursuant hereto shall be made only in accordance with the provisions hereof and all applicable laws. Any assignment in violation of this Section 7(a) shall be null and void.

(b) The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement shall survive the death or legal disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(c) All of the representations, warranties, covenants, agreements, indemnities and confirmations set out above and in the Subscriber Information Form shall survive the acceptance of the subscription made herein and the issuance of any Shares.

(d) This Subscription Agreement together with the Subscriber Information Form constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(e) The Subscriber hereby agrees that any representation made hereunder will be deemed to be reaffirmed by the Subscriber at any time it makes an additional capital contribution to the Fund and the act of making such additional contribution will be evidence of such reaffirmation.

(f) Within 10 days after receipt of a written request therefor from the Fund, the Subscriber agrees to provide such information and to execute and deliver such documents as the Fund may deem reasonably necessary to comply with any and all laws, rules, regulations, orders and ordinances to which the Fund is or may be subject.

Appx 08209

010152

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 294
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 235 of 1017 PageID 11016

Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 33 of 37

(g)     The Subscriber agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its investment in the Fund) or disclose to any person, any information or matter relating to the Fund and its affairs and any information or matter related to any investment of the Fund (other than disclosure to the Subscriber's authorized representatives); provided that (i) the Subscriber may make such disclosure to the extent that (x) the information to be disclosed is publicly known at the time of proposed disclosure by the Subscriber, (y) the information otherwise is or becomes legally known to the Subscriber other than through disclosure by the Fund, or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) the Subscriber may make such disclosure to its Beneficial Interest Holders to the extent required under the terms of its arrangements with such persons; and (iii) the Subscriber will be permitted, after written notice to the Fund, to correct any false or misleading information that becomes public concerning the Subscriber's relationship to the Fund. Prior to making any disclosure required by law, the Subscriber shall use its best efforts to notify the Fund of such disclosure. Prior to any disclosure to any authorized representative or Beneficial Interest Holder, the Subscriber shall advise such persons of the confidentiality obligations set forth herein and each such person shall agree to be bound by such obligations. Notwithstanding the foregoing, the Subscriber may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided in connection with this Subscription Agreement to the Subscriber relating to such tax treatment or tax structure. The Subscriber acknowledges and agrees that the Fund and the Investment Manager would be damaged irreparably and would not have an adequate remedy at law if this Section (g) is not performed in accordance with its specific terms or is otherwise breached. Accordingly, in addition to any other remedy to which it may be entitled at law or in equity, each party will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Section 7(g) and to enforce specifically this Section 7(g), without bond or other security being required. The rights and remedies in this Section 7(g) are cumulative and in addition to any other rights and remedies otherwise available at law or in equity. Nothing will be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which party may be entitled.

(h)     The Subscriber acknowledges and understands that if any person who is resident in the Cayman Islands has a suspicion that a payment to the Fund (by way of subscription or otherwise) is the proceeds of criminal conduct, that person is required to report such suspicion to the relevant Cayman authorities pursuant to The Proceeds of Crime Law (as amended) of the Cayman Islands.

(i)     Except as otherwise indicated in PART A – SECTION I.4 of the Subscriber Information Form, the Subscriber has agreed to receive and accept reports and communications indefinitely from the Fund, the Administrator and the Investment Manager exclusively via e-mail to the e-mail address set forth in the Subscriber Information Form unless the Subscriber notifies the Investment Manager or the Administrator in writing that the Subscriber wishes to receive reports to either another e-mail address or alternatively, via regular mail in lieu of electronic mail. *If instructions are given by the Subscriber via e-mail, the Subscriber agrees to indemnify each Indemnified Person and each of the Administrator and any of its employees and agents*

Subscription Agreement

11

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 295
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 236 of 1017 PageID 11017
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 34 of 37

*against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Party and the Administrator may rely conclusively upon and shall incur no liability in respect of any loss arising from (i) the non-receipt of any instructions relating to the interests of the Subscriber delivered via e-mail or (ii) any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber.*

**8. Standing Proxy**

The Subscriber hereby designates and appoints the Administrator with power of substitution, as the Subscriber's true and lawful proxy for the purpose of voting any Shares issued pursuant to this Subscription Agreement (or such portion thereof from time to time owned by the Subscriber) as said proxy may determine on any and all matters arising at any annual or special general meeting of the Fund or any class meeting upon which such Shares could be voted by the Subscriber (or the person in whose name the Shares hereby subscribed are registered at the Subscriber's direction) if present in person at the meeting. This proxy may be revoked by the Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any annual or special general meeting or any class meeting of the Fund or by written notice to the Administrator received at the Fund's registered office prior to any such meeting.

**9. Notices**

Any notice required or permitted to be given to the Subscriber in relation to the Fund shall be sent to the address specified in Part A, Section I of the Subscriber Information Form or to such other address as the Subscriber designates by written notice received by the Fund. The Subscriber acknowledges and agrees that any consent that need be obtained from the Subscriber by the Fund may be obtained by the form of a negative consent following written notice. For purposes of clarity, the Fund may provide the Subscriber with reasonable advance notice of an issue requiring the Subscriber's consent, and if the Subscriber does not respond to such notice within a reasonable time as set forth in the notice, the Subscriber shall be deemed to have approved and consent to such issue.

**10. Arbitration and Mediation**

The Subscriber acknowledges and agrees that the following procedures shall be used to resolve any controversy or claim ("***Dispute***") arising out of, relating to or in connection with this Subscription Agreement, the Articles or otherwise involving the Fund and/or any Indemnified Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) <u>Mediation</u>.

(i) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a

APP 0834
010154

mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(ii) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(iii) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(iv) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b)    Arbitration.

(i) If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of this document will control.

(ii) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the U.S. Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Fund or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will another arbitration law or regulation preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(iii) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and

010155

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 297
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 238 of 1017 PageID 11019
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 36 of 37

conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(iv)   The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Subscription Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(v)   No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(vi)   All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(vii)   The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

**11.    Governing Law**

Except for Section 10 of this Subscription Agreement which shall be governed by the laws of the State of Texas, this Subscription Agreement shall be governed by, and construed in accordance with, the laws of the Cayman Islands, without giving effect to any conflict of law principles that would result in the application of the laws of any other jurisdiction.

[Signature Page Follows]

Appx 08213
010156

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 298
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 239 of 1017 PageID 11020
Case 19-34054-sgj11 Doc 2308-7 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 37 of 37

## SIGNATURE PAGE

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of the Subscription Agreement, the Private Offering Memorandum and the Articles and (3) requests that the records of the Fund reflect the Subscriber's admission as a shareholder.

Executed as a Deed:

Dated: _____, 20___

**AMOUNT OF SUBSCRIPTION**

$ _180,000.00_____

_THE DUGABOY INVESTMENT TRUST_

_____
Name of Other Subscriber
(*if a natural person and purchasing jointly*)

Name of Subscriber

_____
Signature

_____
Signature of Other Subscriber
(*if natural person and purchasing jointly*)

_MELISSA SCHROTH_____
Witness

_____
Witness

_EXECUTIVE ACCOUNTANT____
Name and title or representative
capacity, if applicable

If the Subscriber is an individual retirement account, Keogh Plan or other self-directed plan, the custodian or trustee of the Subscriber is also required to execute this Agreement below:

Dated:_____, 20___

_____
Name of custodian or trustee

_____
Signature
Title: _____

    The Subscriber's subscription is accepted, subject to the provisions of the Subscription Agreement, the Private Offering Memorandum and the Articles.

Highland Credit Opportunities Fund, Ltd.

By: _____
Name: _____
Title: _____

Dated: _____

Signature Page

Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 1 of 32

# **EXHIBIT 8**

Appx 08215

010158

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 300
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 241 of 1017 PageID 11022
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 2 of 32

*Execution Version*

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of May 11, 2020 between and among UBS Securities LLC and UBS AG, London Branch (collectively, "UBS"), on the one hand, and Highland Multi Strategy Credit Fund, L.P. (f/k/a Highland Credit Opportunities Fund, L.P.) ("MSCF"), Highland Credit Opportunities CDO, Ltd. ("Credit Opps"), and Highland Credit Opportunities CDO Asset Holdings, L.P. ("Asset Holdings," and together with MSCF and Credit Opps, the "Funds"), on the other. UBS and the Funds are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

A. **WHEREAS,** MSCF and Credit Opps are parties to that certain Loan Agreement, made by and between MSCF, Credit Opps, and NexBank, SSB ("NexBank," and together with MSCF and Credit Opps, the "Loan Parties"), dated as of May 1, 2018 (as amended, the "Loan Agreement");

B. **WHEREAS,** Asset Holdings, a wholly owned subsidiary of MSCF, holds life settlement policies with policy numbers ███████████████████████ ██████████ (collectively, the "Life Settlement Policies");

C. **WHEREAS,** on June 28, 2019, the Loan Parties entered into that certain Second Amendment to Loan Agreement pursuant to which it was agreed that the Life Settlement Policies with policy numbers ███████████████████ (the "NexBank Life Settlement Policies") would be pledged to secure the obligations under the Loan Agreement;

D. **WHEREAS,** on June 28, 2019, Asset Holdings executed that certain Collateral Assignment of Life Insurance in favor of NexBank pursuant to which Asset Holdings believes it assigned the NexBank Life Settlement Policies to NexBank to secure the obligations under the Loan Agreement ("Assignment");

E. **WHEREAS,** the Funds have determined that it is in their best interests to sell the Life Settlement Policies;

F. **WHEREAS,** UBS believes that it has a valid claim that the Life Settlement Policies were fraudulently conveyed to Asset Holdings in 2009 (the "Fraudulent Conveyance Claims");

G. **WHEREAS,** the Fraudulent Conveyance Claims, among other claims, are the subject of a lawsuit brought by UBS in the Supreme Court of the State of New York, captioned *UBS Securities LLC and UBS AG, London Branch v. Highland Capital Management, L.P., Highland Special Opportunity Holding Company, Highland CDO Opportunity Master Fund, L.P., Highland Financial Partners, L.P., Highland Credit Strategies Master Fund, L.P., Highland Crusader Offshore Partners, L.P., Highland Credit Opportunities CDO, L.P., Strand Advisors, Inc.*, No. 650097/2009, against Highland Credit Opportunities CDO, L.P., the predecessor of MSCF, amongst other parties (the "State Court Action");

010159
Appx. 00216

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 301
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 242 of 1017 PageID 11023
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 3 of 32

*Execution Version*

H.　　**WHEREAS,** UBS, in the State Court Action, has asserted, among other things, that the Life Settlement Policies or their value must be turned over to UBS;

I.　　**WHEREAS**, the Funds, among other defendants in the State Court Action, dispute UBS's claims to the Life Settlement Policies and the validity of the Fraudulent Conveyance Claims and UBS disputes the validity of the Assignment;

J.　　**WHEREAS,** because of the Fraudulent Conveyance Claims and the Assignment, the Funds' ability to sell the Life Settlement Policies has been compromised;

K.　　**WHEREAS**, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without either Party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the Fraudulent Conveyance Claims, the Parties desire to enter into this Agreement to allow the Life Settlement Policies to be sold and the proceeds to be distributed.

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.　　**Sale of Life Settlement Policies; Free and Clear**.

(a)　　The Funds will use commercially reasonable efforts to cause the Life Settlement Policies to be sold at an auction (the "Auction") conducted by Maple Life Analytics, LLC ("Maple") for $37,135,000.00 in addition to amounts sufficient to reimburse the Funds for any Life Settlement Policy premiums paid in or after May 2020.

(b)　　Subject to the terms of this Agreement, including Section 4 hereof, UBS agrees that, if all or some of the Life Settlement Policies are sold at the Auction, any such sale of the Life Settlement Policies will be free and clear of any and all claims (including the Fraudulent Conveyance Claims) against or interests in such Life Settlement Policies that have been, could have been, or could be asserted by UBS whether in the State Court Action or otherwise. For the avoidance of doubt, UBS shall retain any and all such claims against (i) any Life Settlement Policies that are not sold in the Auction and/or (ii) against the Funds for the full value of such claims as they otherwise existed at the time of the completion of the Auction, including without limitation, for the value of any Life Settlement Policies sold at auction, and for any prejudgment interest, attorneys' fees, punitive damages, or other economic claims. For the avoidance of doubt, the Parties' intent is that this Agreement shall neither diminish nor augment the recoverable value of any claims UBS has with respect to the Funds or the Life Settlement Policies.

2.　　**Distribution of Proceeds.**

(a)　　Subject to Section 2(b), the proceeds from the Auction will be distributed as soon as reasonably practicable as follows:

(i)　　*First*, $371,350.00 to Maple as payment for their fees;

Appx 00217
010160

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 302
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 243 of 1017 PageID 11024
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 4 of 32

*Execution Version*

(ii)     *Second*, $100,000.00 to MSCF to be used to pay other expenses associated with the Auction;

(iii)     *Third*, $15,840,000.000, representing the net proceeds from the sale of the NexBank Life Settlement Policies, to NexBank in satisfaction of its claimed security interest in the NexBank Life Settlement Policies and in repayment of a portion of the obligations owed by the Loan Parties to NexBank pursuant to the Loan Agreement;

(iv)     *Fourth,* $1,750,000 to Highland Capital Management, L.P. ("HCMLP"), in satisfaction of certain amounts previously loaned to MSCF for the payment of Life Settlement Policy premiums and certain other operating expenses;

(v)     *Fifth*, $8,969,000.00 to MSCF to be used to pay operating costs of the Funds (or to repay advances made to pay such costs), including, but not limited to, amounts due under the Loan Agreement and premiums due on any remaining life settlement policies, provided that none of the amounts in this Section 2(a)(v) shall be transferred to HCMLP as direct or indirect repayment of any amounts advanced by HCMLP to MSCF prior to the commencement of HCMLP's chapter 11 bankruptcy case; and

(vi)     *Sixth*, $10,104,650.00 to the Escrow Account (as defined below) on the terms set forth in Section 3 hereof;

(b)     In addition to the distributions set forth above:

(i)     HCMLP will be entitled to receive any premium repayments or refunds made by any buyer of a Life Settlement Policy prior to any distributions being made pursuant to Section 2; and

(ii)     Subject to Section 5 below, MSCF will retain any payments or proceeds received on the Life Settlement Policies that are not otherwise payable to the buyer of such Life Settlement Policy in the Auction.

(c)     Notwithstanding anything in this Agreement to the contrary:

(i)     if some, but not all, of the NexBank Life Settlement Policies are sold at the Auction, or if the NexBank Life Settlement Policies are sold for less than $15,840,000.00, the amount set forth in Section 2(a)(iii) will be reduced to reflect the net proceeds from the NexBank Life Settlement Policies actually sold and the amount set forth in Section 2(a)(i) will be adjusted to reflect the fee actually payable to Maple; and

(ii)     if the proceeds from the Auction are less than $37,135,000.00 for any reason, other than as set forth in Section 2(c)(i), the amount set forth in Section 2(a)(i) will be adjusted to reflect the fee actually payable to Maple and any decrease in the gross proceeds shall be apportioned equally (i.e., by 50%) to each of the amounts set forth in Section 2(a)(vi) and Section 2(a)(iv). If the proceeds from the Auction are greater than $37,135,000.00, then the additional gross proceeds shall be apportioned equally (i.e., by 50%) to each of the amounts set forth in Section 2(a)(v) and Section 2(a)(vi).

Appx. 08218
010161

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 303
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 244 of 1017 PageID 11025
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 5 of 32

*Execution Version*

3.    **Escrow Account.**  The proceeds from the Auction distributed pursuant to Section 2(a)(vi), will be deposited in an escrow account (the "Escrow Account") maintained at Citibank the terms and conditions set forth in the escrow agreement in the form attached hereto as **Exhibit A** (the "Escrow Agreement"). All costs associated with maintaining the Escrow Account will be paid by the Funds. As set forth in the Escrow Agreement, the Escrow Account will be maintained for a period of two years from the date proceeds are initially deposited therein, unless such date is extended by mutual agreement of the Parties or pursuant to an order from a court of applicable jurisdiction, and no amounts will be released from the Escrow Account during such two year period unless subject to court order or the agreement of the Parties. For the avoidance of doubt, it is expected that UBS will seek an extension of this two year period (upon a proper showing) if UBS's claims against HCMLP and/or the Funds have not been resolved. Any amounts remaining in the Escrow Account at the expiration of the two year period, as may be extended and subject to contrary court order or agreement of the Parties, will be distributed to MSCF.

4.    **No Release; No Waiver**. Except as set forth in Section 1(a) hereof, nothing contained herein is or will be construed as a waiver or release (i) by UBS of any claim, cause of action, or right of relief against any of the Funds or their predecessors, including the Fraudulent Conveyance Claims, whether in law, equity, or contract, including with respect to any proceeds from the sale of any of the Life Settlement Policies (the "Sale") held in the Escrow Account (the "Escrow Amount"), or (ii) by the Funds, their predecessors, or any other party of any defense whether in law, equity, or contract with respect to the Fraudulent Conveyance Claims or any other claims that UBS may assert. All such rights are expressly reserved. For the avoidance of doubt, notwithstanding the Sale of the Life Settlement Policies, (a) UBS's claims against the Life Settlement Policies are fully preserved against the proceeds of the Sale up to the Escrow Amount, and (b) all of UBS's claims, causes of action, and rights of relief, whether in law or equity, against the Funds and their predecessors, or any of them, and whether currently pending or not, are preserved as to (but not limited by) the total proceeds of the Sale as against any and all present and future assets held by, or interests in, the Funds (other than the Life Settlement Policies) and shall in no way be deemed altered, diminished, impaired, released, or waived in any respect by the Sale, this Agreement, or the execution of this Agreement. For the further avoidance of doubt, the payment of proceeds from the Sale to HCMLP shall not be deemed in any way to impair, release, or waive any claims, causes of action, or rights of relief held by UBS against HCMLP or the Funds and their predecessors, nor shall any such payments in any way impair, release, waive, alter, or diminish UBS's ability to recover such amounts on account of its claims against HCMLP in HCMLP's chapter 11 case or otherwise. For the further avoidance of doubt, any claims UBS currently has (if any) with respect to the Life Settlement Policies or otherwise against the Funds and their predecessors, including but not limited to, claims for the value of the Life Settlement Policies as of the date of the Auction, claims for prejudgment interest, claims for attorneys' fees and/or claims for punitive damages are intended to be preserved against the Funds, and shall not be diminished (or augmented) by the fact of the Sale of the Life Settlement Policies in the Auction.

5.    **No Additional Distributions**.

(a)    Except for the distributions set forth in Section 2 above, none of the Funds will make any distributions or redemption payments to any of MSCF's limited partners, general

Appx. 08319
010162

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 304
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 245 of 1017 PageID 11026
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 6 of 32

*Execution Version*

partners, shareholders, or other equity holders (collectively, the "Equity Parties") (regardless of whether an Equity Party has tendered its equity interest for redemption) for two years from the date of the closing of the Life Settlement Policy sales (the "Standstill Term") unless such payments are made with the mutual agreement of HCMLP and UBS or pursuant to an order from a court of applicable jurisdiction. It is agreed that the Funds shall provide UBS with no less than five (5) business days' advance written notice prior to seeking such an order. It is expressly recognized that, upon a proper showing (subject to proper objections by HCMLP), UBS may obtain a court-ordered extension of the Standstill Term. The Standstill Term may be extended by mutual agreement of the Parties or pursuant to an order from a court of applicable jurisdiction. Following the expiration of the Standstill Term, as may be extended, MSCF may make distributions or redemption payments to the Equity Parties, to the extent permissible and appropriate, in its sole discretion. For the avoidance of doubt, the expiration of the Standstill Term, in of itself, shall not have any impact on UBS's rights, if any, with respect to its claims against HCMLP and/or the Funds.

(b) During the Standstill Term (and any extension of that term pursuant to agreement or court order as set forth herein), the Funds agree to provide UBS with no less than five (5) business days' written notice of any proposed sale, transfer, or other disposition of any assets held by, or interest in, the Funds, including the proceeds from such transfer or disposition, and the proposed transferee with respect to such assets or interests.

6. **Representations and Warranties**. As of the date hereof, the Funds represent, warrant and covenant that the Funds' current assets and their most recent valuations are set forth in **Schedule 1** hereto in the following format:

| Asset | Value | Date of Valuation | Source of Valuation |
|-------|-------|-------------------|---------------------|
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |
|       |       |                   |                     |

For the avoidance of doubt, nothing in this Section 6 or **Schedule 1** constitutes a representation or warranty as to the actual value of the Funds' assets or the price that can or may be obtained from a sale, if any, of such assets.

7. **Successors In Interest**. Each of the Parties agrees that this Agreement will be binding upon the Parties, and, as applicable, upon their predecessors, successors, subsidiaries,

Appx. 06220
010163

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 305
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 246 of 1017 PageID 11027
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 7 of 32

*Execution Version*

divisions, alter egos, affiliated and related entities, and their past or present officers, directors, partners, employees, attorneys, assigns, agents, representatives, and any or all of them.

8. **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the Fraudulent Conveyance Claims. Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Funds or any other person. In particular, the execution of this Agreement will not constitute an admission of liability, fault, or wrongdoing on the part of the Funds or any other person

9. **Confidentiality**. The Parties agree that the information provided in **Schedule 1** shall be strictly confidential except as required by law or if necessary to disclose to enforce this Agreement (but in such case the Parties will take reasonable care to ensure confidentiality to the extent permitted by law). The Parties to this Agreement stipulate and covenant not to repeat, speak, display or disclose any of the information set forth in **Schedule 1** to anyone other than their attorneys and advisors; *provided however*, that such information may be provided to the unsecured creditor committee appointed in the bankruptcy of HCMLP.

10. **Notice**. Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**UBS**

UBS Legal Department – Americas Litigation
Attn: Patrick Shilling
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-3685
E-mail: patrick.shilling@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Jeffrey E. Bjork, Esq.
Telephone No.: 213-485-1234
Facsimile No.: 213-891-8763
E-mail: jeff.bjork@lw.com

**MSCF, Asset Holdings, or Credit Opps**

Highland Multi Strategy Credit Fund, L.P.
c/o Highland Capital Management, L.P.

Appx. 00321
010164

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 306
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 247 of 1017 PageID 11028
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 8 of 32

*Execution Version*

300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

11.    **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

12.    **Entire Agreement**.  This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

13.    **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

14.    **Severability**.  If any term or provision, or portion thereof, of this Agreement is declared to be illegal or invalid, the validity of the remaining provisions or portions thereof will

Appx 00222
010165

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 307
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 248 of 1017 PageID 11029
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 9 of 32

*Execution Version*

not be affected thereby, and the illegal or invalid provision or portions thereof will be deemed not a part of the Agreement.

15. **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

16. **Governing Law; Venue**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan with respect to any disputes arising from or out of this Agreement.

*[Remainder of Page Intentionally Blank]*

Appx 00223
010166

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____

Name: Patrick Shilling

Its: Authorized Signatory


By: _____

Name: _____

Its: _____


**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**


By: _____

Name: _____

Its: _____


**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**


By: _____

Name: _____

Its: _____


**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**


By: _____

Name: _____

Its: _____


*[Signature Page to Settlement Agreement]*

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____
Name: William W. Chandler
Its:    Authorized Signatory


By: _____
Name: _____
Its: _____


**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**


By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**


By: _____
Name: _____
Its: _____


**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**


By: _____
Name: _____
Its: _____


[*Signature Page to Settlement Agreement*]

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____
Name: _____
Its: _____

By: _____
Name: _____
Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____
Name: _____
Its: _____Authorized Signatory_____

**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**

By: _____
Name: _____
Its: _____Authorized Signatory_____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____
Name: _____James P. Seery, Jr._____
Its: _____Authorized Signatory_____

*[Signature Page to Settlement Agreement]*

Appx. 08226

010169

*Execution Version*

**Schedule 1**

**Fund Assets**

Appx. 06227

010170

**Highland Multi Strategy Credit Fund**
As of 4.30.20 [1][2]



Appx 06228

010171

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 313
of 330
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 254 of 1017    PageID 11035
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21    Entered 05/14/21 16:12:52    Page 15 of
32

*Execution Version*

**Exhibit A**

**Form of Escrow Agreement**

010172

Appx 06229

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 314
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 255 of 1017 PageID 11036
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 16 of 32

<u>ESCROW AGREEMENT</u>

THIS ESCROW AGREEMENT (this "<u>Agreement</u>") is made and entered into as of May ___, 2020, by and among (i) **UBS Securities LLC** ("<u>UBS</u>"), (ii) **Highland Multi Strategy Credit Fund, L.P.** ("<u>MSCF</u>") and **Highland Credit Opportunities CDO Asset Holdings, LP** ("<u>Asset Holdings</u>" and together with MSCF, sometimes referred to individually and collectively, the "<u>Funds</u>") and the Funds together with UBS, sometimes referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>"), and (iii) **CITIBANK, N.A.**, as escrow agent (the "<u>Escrow Agent</u>").

<u>RECITALS</u>

WHEREAS, the Parties, along with UBS AG, London Branch and Highland Credit Opportunities CDO, Ltd., entered into a Settlement Agreement dated May 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Settlement Agreement</u>") pursuant to which the Parties have agreed to place in escrow a portion of the proceeds from the sale of certain assets (the "<u>Sale Proceeds</u>").

WHEREAS, the Parties and the Escrow Agent desire to set forth their rights and obligations with respect to the Escrow Funds (as defined below) and the distribution and release thereof.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.     <u>Appointment</u>.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.     <u>Escrow Funds</u>.

(a)     Simultaneous with the execution and delivery of this Agreement, MSCF shall deposit or cause to be deposited with the Escrow Agent Sale Proceeds in the amount of $10,104,650.00 (or such other amount as may be agreed to by the Parties) (such amount, the "<u>Escrow Amount</u>") in immediately available funds.  The Escrow Agent hereby acknowledges receipt of the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income (collectively, the "<u>Escrow Earnings</u>") earned with respect thereto (collectively, the "<u>Escrow Funds</u>") in separate and distinct account (the "<u>Escrow Account</u>"), subject to the terms and conditions of this Agreement.

(b)     For greater certainty, all escrow earnings shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

3.     <u>Investment of Escrow Funds</u>.

Appx 06239
010173

(a)     Unless otherwise instructed in writing by the Parties, the Escrow Agent shall hold the Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits.  The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b)     The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c)     The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4.     Disposition and Termination of the Escrow Funds.

(a)     Escrow Funds.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this Section 4(a) as follows:

(i)     Upon receipt of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction.

(ii)     Upon receipt by the Escrow Agent of a copy of Final Determination from any Party, the Escrow Agent shall on the second (2nd) Business Day following receipt of such copy, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent funds are available in the Escrow Account) to the applicable Party or Parties, in accordance with such Final Determination.  The Escrow Agent will act on such Final Determination without further inquiry.

(iii)     If the Escrow Funds have not been released in accordance with clause (i) or (ii) of this Section 4(a) on or before May [ ] , 2022, or such later date as agreed, and notified to the Escrow Agent, in writing by the Parties or established pursuant to an order from a court of applicable jurisdiction (the "Escrow End Date"), then, upon receipt of written instruction from the Funds (the "Final Instruction") executed by an authorized signer of each of the Funds, unless the Parties deliver to the Escrow Agent a Joint Release Instruction or a contrary order from a court of applicable jurisdiction prior to the disbursement expressly superseding such Final Instruction, the Escrow Agent shall on the second (2nd) Business Day following receipt of such Final Instruction, disburse all remaining Escrow Funds in accordance with such Final Instruction. The Funds agree not to send the Final Instruction prior to the Escrow End Date.

(iv)     All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Joint Release Instruction, Final Determination or Final Instruction, as applicable.

2

Appx 06231

010174

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 316
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 257 of 1017 PageID 11038
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 18 of 32

(v)     Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2, and delivered to the Escrow Agent either (i) by confirmed facsimile only at the fax number set forth in Section 11 below or (ii) attached to an e-mail received on a Business Day from an e-mail address set forth in Section 11 below. In the event a Joint Release Instruction, Final Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in Exhibits A-1 and/or A-2 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of the applicable Party set forth on Exhibit A-1 or Exhibit A-2, actually received and acknowledged by the Escrow Agent.

(b)     Certain Definitions.

(i)     "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)     "Final Determination" means a final non-appealable order of any court of competent jurisdiction, including without limitation, any judgment, order or decree, that finally adjudicates ownership of, or entitlement to, the Sale Proceeds, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing Party to effectuate such order.

(iii)     "Joint Release Instruction" means the joint written instruction, substantially in the form of Exhibit B attached hereto, executed by an authorized signer of each of UBS and the Funds directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

(iv)     "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.     Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between

US-DOCS\115507286.12

Appx. 06232

010175

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 317
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 258 of 1017 PageID 11039
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 19 of 32

the Parties, in connection herewith, if any, including without limitation the Settlement Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction, Final Instruction or Final Determination furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction, Final Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to either Party. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

6. <u>Resignation and Removal of Escrow Agent</u>. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by the Parties acting jointly at any time by providing written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act (provided that the Escrow Agent will provide the Parties with reasonable notice of any such merger, conversion, consolidation or sale.) The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow

Appx. 06233
010176

agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7.      <u>Fees and Expenses</u>.  All fees and expenses of the Escrow Agent are described in <u>Schedule 1</u> attached hereto and shall be paid by the Funds.  The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8.      <u>Indemnity</u>.  UBS, on the one hand, and the Funds, on the other hand, hereby agree to, severally and not jointly, indemnify, defend, and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "<u>Indemnitees</u>") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Escrow Agent Losses</u>") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from UBS or the Funds. Notwithstanding anything to the contrary herein, the Parties agree, solely as between the Parties, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by UBS and one-half by the Funds. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9.      <u>Tax Matters.</u>

(a)      MSCF shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned.  The Escrow Agent shall report any interest or income earned on the Escrow Funds to the IRS or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

US-DOCS\115507286.12

Appx 06234

010177

(b)     The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)     The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.     Covenant of Escrow Agent. The Escrow Agent hereby agrees and covenants with the Parties that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.     Notices. All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Party/ Parties to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five Business Days after the date such notice is deposited with the United States Postal Service. If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to UBS, then to:

UBS Legal Department – Americas Litigation
Attn:  Patrick Shilling
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-3685
E-mail: patrick.shilling@ubs.com

6

Appx. 06235

010178

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Jeffrey E. Bjork, Esq.
Telephone No.: 213-485-1234
Facsimile No.: 213-891-8763
E-mail: jeff.bjork@lw.com

or, if to MSCF or Asset Holdings, then to:

Highland Multi Strategy Credit Fund, L.P.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Citi Private Bank
One Sansome Street, 24th Floor
San Francisco, CA 94144
Attn: Hamyd Mazrae
Telephone No.: 415-627-6044
Facsimile No.: 415-592-5584
E-mail: hamyd.mazrae@citi.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the

Appx 06236

010179

Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12. <u>Termination.</u> This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by the Parties after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13. <u>Miscellaneous.</u> The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior consent of the other parties. This Agreement shall be governed by and construed under the laws of the State of New York. Each party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and submits to the exclusive jurisdiction of the federal and state courts in the Borough of Manhattan in the City of New York. The parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in <u>Sections 7 and 8</u>, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14. <u>Compliance with Court Orders.</u> In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other

US-DOCS\115507286.12

Appx 06337

010180

Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15.    <u>Further Assurances</u>.  Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16.    <u>Assignment</u>.  No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld).  Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17.    <u>Force Majeure.</u>  The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18.    <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement.  For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19.    <u>Use of Citibank Name.</u>  No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

*    *    *    *    *

US-DOCS\115507286.12

Appx. 06238

010181

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**UBS SECURITIES LLC**

By: _____

Name: _____

Its: _____

By: _____

Name: _____

Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____

Name: _____

Its: _____

*Signature Page to Escrow Agreement*

Appx 06239

010182

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____

Name: _____

Its: _____

Appx 06349

010183

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 325
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 266 of 1017 PageID 11047
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 27 of 32

## Schedule 1

### ESCROW AGENT FEE SCHEDULE
### Citibank, N.A., Escrow Agent

**Acceptance Fee**

To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

      **Fee:**               **WAIVED**

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amount being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

      **Fee:**               **WAIVED**

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

      **Fee:**               **WAIVED**

**Transaction Fees**

To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

      **Fee:**               **WAIVED**

**Other Fees**

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

App. 00844

010184

<u>EXHIBIT A-1</u>

<u>Certificate as to UBS' Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of UBS and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of UBS.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

<u>Name / Title / Telephone</u>                    <u>Specimen Signature</u>

_____        _____
Name                                    Signature

_____
Title

_____        _____
Phone                                   Mobile Phone *(Required for DocuSign Capabilities)*


_____        _____
Name                                    Signature

_____
Title

_____        _____
Phone                                   Mobile Phone *(Required for DocuSign Capabilities)*


_____        _____
Name                                    Signature

_____
Title

_____        _____
Telephone                               Mobile Phone *(Required for DocuSign Capabilities)*

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 327
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 268 of 1017 PageID 11049
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 29 of 32

<u>EXHIBIT A-2</u>

<u>Certificate as to the Funds' Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Funds and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Funds. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s)..

| <u>Name / Title / Telephone</u> | <u>Specimen Signature</u> |
|---|---|
| _____ | _____ |
| Name | Signature |
| _____ | |
| Title | |
| _____ | _____ |
| Phone | Mobile Phone *(Required for DocuSign Capabilities)* |
| _____ | _____ |
| Name | Signature |
| _____ | |
| Title | |
| _____ | _____ |
| Phone | Mobile Phone *(Required for DocuSign Capabilities)* |
| _____ | _____ |
| Name | Signature |
| _____ | |
| Title | |
| _____ | _____ |
| Telephone | Mobile Phone *(Required for DocuSign Capabilities)* |

NOTE: Actual signatures are required above. Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

US-DOCS\115507286.12

**Appx 06343**

010186

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 328
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 269 of 1017 PageID 11050
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 30 of 32

EXHIBIT B

Form of Joint Release Instruction

[●], 202[●]

Citibank, N.A.
c/o Citi Private Bank
One Sansome Street
San Francisco, CA 94104
Attn: Hamyd Mazrae
E-mail: hamyd.mazrae@citi.com

**Re:    Joint Release Instruction**

Dear Mr. Mazrae,

Reference is made to that certain Escrow Agreement by and among (i) **UBS Securities LLC** ("UBS"), (ii) **Highland Multi Strategy Credit Fund, L.P.** ("MSCF") and **Highland Credit Opportunities CDO Asset Holdings, LP** ("Asset Holdings" and together with MSCF, the "Funds") and (iii) **CITIBANK, N.A.** (the "Escrow Agent"), dated as of [●], 2020 (the "Escrow Agreement"). Unless otherwise indicated, all capitalized terms used and not otherwise defined herein have the respective meanings given to them in the Escrow Agreement.

This notice constitutes a Joint Release Instruction signed jointly by UBS and the Funds pursuant to Exhibit A-1 and Exhibit A-2 to the Escrow Agreement.

UBS and the Funds hereby jointly instruct the Escrow Agent, in accordance with Section 4(a)i of the Escrow Agreement to release $[●] from the Escrow Account to [*recipient*], via wire transfer of immediately available funds to the following wire instructions:

| | |
|---|---|
| Name of Bank: | [●] |
| ABA #: | [●] |
| Beneficiary Account #: | [●] |
| Beneficiary Account Name: | [●] |

The Parties acknowledge that prior to the remittance of funds from the Escrow Account, the Escrow Agent will need to speak to an authorized representative of each of UBS and the Funds to confirm payment details.

**[SIGNATURE PAGES FOLLOW]**

*Exhibit to Escrow Agreement*

Appx 06344

010187

Very truly yours,


**UBS SECURITIES LLC**


By:    _____
Name:  _____
Its:     _____


By:    _____
Name:  _____
Its:     _____

*Exhibit to Escrow Agreement*

Appx 06345

010188

Case 19-34054-sgj11 Doc 3445-37 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 330
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 271 of 1017 PageID 11052
Case 19-34054-sgj11 Doc 2308-8 Filed 05/14/21 Entered 05/14/21 16:12:52 Page 32 of 32

Very truly yours,

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____

Name: _____

Its: _____

*Exhibit to Escrow Agreement*

Appx. 06346

010189

# EXHIBIT 38

Appx 00345
010190

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 273 of 1017    PageID 11054
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 1 of 11

Docket #2649  Date Filed: 08/02/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | **Re: Docket Nos. 2537, 2626** |

## DEBTOR'S REPLY IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE AND/OR FORFEITURE OF CERTAIN LIMITED PARTNERSHIP INTERESTS AND OTHER RIGHTS AND (II) GRANTING RELATED RELIEF

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



¹⁹³⁴⁰⁵⁴²¹⁰⁸⁰²⁰⁰⁰⁰⁰⁰⁰⁰⁰⁰¹¹

Appx. 00348

010191

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 274 of 1017 PageID 11055
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 2 of 11

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") (a) in response to the *Objection to the Motion for Entry of an Order (i) Authorizing the Sale and/or Forfeiture of Certain Limited Partnership Interests and Other Rights and (ii) Granting Related Relief* [Docket No. 2626] (the "Objection") filed by NexPoint Advisors, L.P. ("NexPoint") and (b) in support of the *Motion of the Debtor for Entry of an Order (I) Authorizing the Sale and/or Forfeiture of Certain Limited Partnership Interests and Other Rights and (II) Granting Related Relief* [Docket No. 2537] (the "Motion").[2]  In further support of the Motion, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      Through the Motion, the Debtor seeks authority to sell, transfer, or assign the Interests and to sell, transfer, assign, or forfeit and waive certain rights under the Subsequent Funds Agreement to PetroCap pursuant to the terms of the Purchase Agreement.  The Purchase Agreement was the product of arms-length negotiations with PetroCap and represents the highest and best offer available to the Debtor based on the nature of the Interests and their illiquidity and lack of marketability.  The Committee supports the transactions set forth in the Purchase Agreement – notwithstanding the competing "offer" presented by The Dugaboy Investment Trust ("Dugaboy") – and no true creditor or party-in-interest has objected.

2.      Not surprisingly, the only objecting party is NexPoint, an entity owned and controlled by James Dondero.  NexPoint bases its Objection on its expectation that the Debtor would refuse to consider an offer of approximately $2.95 million that was tendered by Dugaboy moments before the Objection was filed.  Leaving aside the issues raised by the timing of

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

App. 00349
010192

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 275 of 1017 PageID 11056
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 3 of 11

Dugaboy's offer,[3] the Debtor has reviewed Dugaboy's unsolicited offer and has determined that it is not in the Debtor's best interests to engage with Dugaboy (or any of Mr. Dondero's related entities) regarding a sale of the Interests and the rights under the Subsequent Funds Agreement for the reasons discussed below and in the *Motion of the Debtor for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2535] (the "Maple Sale Motion").[4]  Further, as discussed in the Motion, the sale, transfer, or assignment of the Interests requires the consent of the PetroCap III GP and the SLP GP, as applicable, and both of those parties have informed the Debtor that they will ***not*** consent to the transfer of those Interests to a litigious party and would have serious reservations allowing any other party to be admitted as a limited partner in PetroCap III or SLP.

3.  NexPoint, anticipating the Debtor's response, has presumptively challenged the Debtor's business judgment and alleged that the Debtor has violated its duties to maximize estate recoveries.  Objection ¶¶ 5-6.  According to NexPoint, because Dugaboy's offer is nominally higher than PetroCap's, the Debtor must agree to sell the Property to Dugaboy (despite such sale being impossible under the terms of the relevant agreements).  NexPoint is wrong.

4.  Preliminarily, and as discussed below, NexPoint lacks standing to object to the

---

[3] Dugaboy tendered its "offer" to Debtor's counsel at approximately 4:30 p.m. Central Time on Thursday, July 29, 2021.  Before the Debtor had an opportunity to review the offer, NexPoint filed the Objection less than thirty minutes later.  Obviously, these events were closely coordinated among Mr. Dondero and his related entities.

[4] As set forth in the Maple Sale Motion, the Debtor has determined it is not in the best interests of its estate to entertain any offers from Mr. Dondero or his related entities for a myriad of reasons, including (a) the unwillingness of other bidders to engage in an auction that includes Mr. Dondero for fear of reprisal and/or having the sale tied up in years of litigation, and (b) Mr. Dondero's (i) willful refusal to pay, or cause his related entities to pay, the amounts owed to the estate under a series of promissory and demand notes pursuant to which Mr. Dondero owes the estate in excess of $50 million; (ii) willingness to contort even the most unambiguous contractual provision in an effort to create litigation leverage in negotiations; (iii) continual efforts to "burn the Debtor" down through his and his related entities' serial and frivolous litigation since October 2020 in this Court, the United States District Court for the Northern District of Texas, the Fifth Circuit Court of Appeals, and the Texas state courts (a chart showing the litigation caused by Mr. Dondero is attached as Exhibit A); (iv) known propensity to re-trade and renege on deals; and (v) pattern of using litigation as a strategy to gain negotiating leverage and avoid paying his obligations when due.

Appx. 00259
010193

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 276 of 1017 PageID 11057
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 4 of 11

Motion.  To the extent NexPoint asserts standing based upon its post-confirmation acquisition of certain disputed employee claims, such standing is tenuous at best and should be viewed through that lens.  Even assuming NexPoint has standing, its objection to the Motion is frivolous.  NexPoint's overarching, although not articulated, argument that the Debtor may not take its prior interactions with Mr. Dondero and his related entities into account in determining whether to transact business with them is nonsensical and not supported by the case law.  Actions have consequences.  Mr. Dondero's repeated failure to abide by court orders and contractual obligations to the estate, unabashed willingness to assert frivolous positions and initiate baseless lawsuits,[5] and his documented history of litigiousness provide ample support for the Debtor's decision not to engage with Mr. Dondero or any of his related entities with respect to the transactions contemplated by the Purchase Agreement.

5.     As set forth in the Motion and as will be demonstrated in connection with the hearing on the Motion, the risks associated with transacting with Mr. Dondero or his related entities are not present in the transaction with PetroCap.  NexPoint's argument that both transactions are "apples to apples" ignores the impossibility of selling the Interests to Mr. Dondero, the closing

---

[5] In fact, in just the few weeks since the Debtor was last before this Court, Mr. Dondero has commenced two new actions against the Debtor that lack factual or legal support and that otherwise make no rational sense to pursue given Mr. Dondero's highly speculative and remote economic interest in the Debtor's estate.

*First*, on July 22, 2021, Mr. Dondero, again through his attorneys at Sbaiti & Co. ("Sbaiti"), filed an action in the Northern District of Texas using the Charitable Donor Advised Fund, L.P. (the "DAF Complaint").  *Original Complaint, The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Cause No. 3:21-cv-01710-N (N.D. Tex. July 22, 2021).  The DAF Complaint alleges that the DAF is a limited partner in the Highland Multi-Strategy Credit Fund ("Multi-Strat") and asserts claims against the Debtor for mismanagement of Multi-Strat during the pendency of this Bankruptcy Case.  The DAF Complaint is essentially verbatim the complaint filed in the Northern District of Texas by the Sbaiti firm on behalf of Mr. Dondero's family trust, the Dugaboy Investment Trust.  As this Court will remember, that complaint was duplicative of the proof of claim (Claim No. 177) filed by Dugaboy in this Court and was withdrawn within an hour after it was brought to this Court's attention.

*Second*, also on July 22, 2021, Sbaiti, again on behalf of the DAF, initiated an action in Texas state court for pre-suit discovery against the Redeemer Committee alleging, among other things, that the Redeemer Committee's transfer of its claim was in furtherance of a scheme concocted by James P. Seery, Jr., the Debtor's Court-approved chief executive officer and chief restructuring officer, to drain the estate of resources.  *Verified Petition to Take Deposition Before Suit and Seek Documents, In re James Dondero*, Cause No. DC-21-09534 (Tex. July 22, 2021).

Appx. 00351
010194

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 277 of 1017 PageID 11058
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 5 of 11

risk, and the risk of potential post-sale litigation if the Debtor transacts with Mr. Dondero. One need look no further than the years of litigation that caused the Debtor's chapter 11 filing and Mr. Dondero's conduct during the case to reach the conclusion that *any* commercial transaction with Mr. Dondero presents material risk. The Court should overrule the Objection and grant the Motion.

## THE COURT SHOULD AUTHORIZE THE CONSUMMATION OF THE PURCHASE AGREEMENT

### A.    NexPoint Lacks Standing to Object to the Motion.

6.    NexPoint filed two proofs claim in this case (Claim Nos. 104 and 108) which were later expunged [Docket No. 1233]. NexPoint, however, holds prepetition claims against the estate after acquiring them from five former Debtor employees (acquisitions done solely to manufacture standing to object to the Plan).[6]  The Debtor has objected to each of these claims and believes that they are frivolous [Docket No. 2059]. A hearing on those objections is scheduled for November 14, 2021.

7.    Consequently, NexPoint's standing to object to the Purchase Agreement as a prepetition creditor is extremely attenuated as its chances of recovery in this case are, at best, theoretical and speculative. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing).[7]

---

[6] One of NexPoint's "claims," acquired from Michael Beispiel, is not a claim at all. Mr. Beispiel did not file a proof of claim nor was Mr. Beispiel's claim scheduled. Any alleged prepetition claim that Mr. Beispiel might have had is therefore barred. *See Order Establishing Bar Dates for Filing Claims and (ii) Approving the Form and Manner of Notice Thereof* [Docket No. 488] ("Any entity that is required to file a Proof of Claim Form but fails to [do] so properly by the applicable Bar Date, shall not be treated as a creditor with respect to such claim for purposes of voting upon, or receiving distributions under, any chapter 11 plan in this case.").

[7] NexPoint also cannot create standing by arguing Dugaboy would have standing. First, Dugaboy can assert its own rights and NexPoint cannot prosecute Dugaboy's claims, if any, for it. Second, Dugaboy would not have standing to

App. 000352

010195

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 278 of 1017 PageID 11059
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 6 of 11

8.      Finally, the Debtor believes there is a reason why Dugaboy submitted the offer but NexPoint objected to the Motion. As set forth above, NexPoint's standing is tenuous and is based solely on claims it acquired post-confirmation. Dugaboy's standing is worse. Dugaboy filed two prepetition claims (Claim Nos. 113 and 131).[8] Claim No. 113 is a "claim" arising from Dugaboy's equity interest and is subject to subordination. Claim No. 131 seeks to pierce the veil and hold the Debtor liable for a subsidiary's debts. The only other prepetition claim held by Dugaboy is its 0.1866% subordinated limited partnership interest in the Debtor. These shell games highlight Mr. Dondero's coordination of the efforts amongst his related entities.

**B.      The Debtor's Good Faith Decision Not to Engage Mr. Dondero or His Related Entities in Connection with the Sale of the Property Was Justified and a Proper Exercise of the Debtor's Business Judgment.**

9.      As discussed in the Motion, section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). As set forth in Rule 6004(f)(1), sales under 11 U.S.C. § 363(b) can be conducted by "private sale or by public auction." Although the Bankruptcy Code does not include a statutory standard for determining when the use of sale of property should be authorized, it is well established that a debtor may use or sell property or the estate outside the ordinary course of business if there is a good business reason for doing so and the proposed course of action is advantageous to the estate. *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Pisces Energy, LLC*, 2009 Bankr.

---

object to the transactions contemplated by the Purchase Agreement as a potential bidder. *See In re VCR I, LLC*, 2017 Bankr. LEXIS 3341, at *12 (Bankr. S.D. Miss. Sept. 29, 2017) ("This Court has previously held that a prospective purchaser does not have standing to object to a sale motion."); *see also Squire v. Scher (In re Squire)*, 282 Fed. App'x 413, 416 (6th Cir. 2008) ("Frustrated Bidders do not have standing to object to the sale of a property"); 3 COLLIER ON BANKRUPTCY ¶363.02[c] (same).

[8] Dugaboy also filed a proof of claim arising from the Debtor's alleged mismanagement of the Highland Multi-Strategy Credit Fund (Claim No. 177). Dugaboy has admitted that the conduct that forms the basis of this alleged claim occurred post-petition, not prepetition.

Appx. 00253
010196

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 279 of 1017 PageID 11060
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 7 of 11

LEXIS 4709, at *18 (Bankr. S.D. Tex. Dec. 21, 2009).

10.     To challenge the Debtor's business judgment, NexPoint cites to case law for the unremarkable proposition that the goal of any sale is to maximize the proceeds to the estate. Objection ¶¶ 9-10 (citing *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007); *In re Walker County Hosp. Corp.*, 2021 U.S. App. LEXIS 20610 (5th Cir. July 12, 2021)).[9] The Debtor agrees and believes that the transactions in the Purchase Agreement did just that – maximized value. NexPoint cites no case – and the Debtor believes none exist – for the proposition that the Debtor must agree to include any party in a sale process and choose the nominally highest bid regardless of other circumstances that exist.

11.     Under section 363(b), a Debtor is tasked with finding the highest *and best* offer, not just accepting the offer that is nominally a higher dollar amount on paper. *See, e.g., Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)) (a trustee "must demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder can raise the cash necessary to complete the deal"); *In re Tresha-Mob, LLC*, 2019 Bankr. LEXIS 13333, at *4-6 (Bankr. W.D. Tex. 2019) ("Voltaire adopts a one-track value-maximization argument that ignores the mountains of precedent in which trustees, debtors-in-possession, and courts have rejected the highest bid when it was not the 'best bid'");[10] COLLIER ¶ 363.02[4]

---

[9] Although *Walker County* has general language in dicta concerning 11 U.S.C. § 363(b), that case does not address the requirements of section 363(b) at all. Instead, *Walker County* deals with whether an appeal is statutorily moot by reason of 11 U.S.C. § 363(m).

[10] In *Treshe-Mob* the bankruptcy court rejected NexPoint's premise that the highest bid is always the best bid:

Here, the objection that Voltaire seeks to pursue is not "colorable." In its *Limited Objection*, Voltaire adopts a one-track value-maximization argument that ignores mountains of precedent in which trustees, debtors-in possession, and courts have rejected the highest bid when it was not the "best bid." *See In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015)* ("a debtor must demonstrate that the proposed purchase price is not only the highest offer, *but the highest and best offer*") (emphasis added). While the bid that brings in the most cash often wins, it is "common knowledge" that the "highest bid is not always the best bid," especially if there are "conditions sufficient to overbalance the difference between

Appx. 00354
010197

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 280 of 1017 PageID 11061
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21 Entered 08/02/21 16:56:00 Page 8 of 11

("Although a trustee normally would be expected to sell to the highest bidder in an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale.")

12. *In re 160 Royal Palm*, a case from the District Court for the Southern District of Florida, which was affirmed by the 11th Circuit, presented a strikingly similar fact pattern to this case. 600 B.R. 119 (S.D. Fla. 2019) *aff'd* 785 Fed. App'x 829 (11th Cir. 2019). In *160 Royal Palm*, the Debtor attempted to sell an asset at public auction. That auction failed in substantial part because of the constant barrage of litigation brought by the property's former owner. *Id.* at 124. Ultimately, the Debtor entered into a private sale and sought bankruptcy court approval. The former owner objected arguing it was "an abuse of discretion to eliminate other potential bidders from the sale," which included, of course, the former owner. *Id.* at 127. The bankruptcy court rejected that argument, and the district court affirmed, stating "private sales are not unheard of in bankruptcy proceedings" and, in part because the offer was conditioned on a private sale, the Debtor was entitled to pursue a "bird in hand" approach and sell the asset without competing bids. *Id.* at 128.

13. In so ruling, the District Court also rejected the unsolicited bid made by the former owner on the property despite that bid being higher. The District Court found persuasive, among

---

the two." *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925). The Bankruptcy Code thus affords courts "broad flexibility in determining which of several bidders should be deemed the successful bidder at a *§ 363(b)* sale." *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993). As such, courts routinely reject the proposition that reviewing courts or fiduciaries are "duty-bound to mechanically accept a bid with the highest dollar amount." *Lawsky v. Condor Capital Corp.,* 2015 U.S Dist. LEXIS 96347, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015) (internal quotation marks and citations omitted); *see also After Six, 154 B.R.* at 882 ("The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary.").

In determining whether the highest bid is the "best bid," the fiduciary and reviewing court must consider factors such as "the risks associated with each bid and the probabilities that the proposed terms will come to fruition" as well as "contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Lawsky,* 2015 U.S. LEXIS 96347, 2015 WL 4470332, at *9 (quoting and citing *Family Christian,* 533 B.R. at 622).

*Treshe-Mob*, 2019 Bankr. LEXIS 1333, at *4-6 (emphasis in original).

Appx. 00255
010198

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 281 of 1017    PageID 11062
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 9 of 11

other things, the fact that the former owner had defaulted on a prior deal with the Debtor and his

documented history of litigiousness:

> While the KKPB offer ostensibly *could* provide the estate with an additional million
> dollars. . . the Court credits the Debtor's concerns about the uncertainty of that
> offer.  Indeed, the Debtor sought a settlement and sale with KKPB once in the past,
> which fell through, because KKPB defaulted.

> Appellant vigorously argued at oral argument on April 5 that the Debtor should
> have accepted its higher bid.  However, the Court notes that while a debtor has a
> duty to "maximize the return to a bankruptcy estate," which "often does require
> [the] recommendation of the highest monetary bid, *overemphasis of this usual
> outcome overlooks a fundamental truism, i.e., a 'highest' bid is not always the
> 'highest and best' bid.*  The inclusion of 'best' in that conjunction is not mere
> surplusage." . . . .

> Appellant also alleges that Debtor only rejected KKPB's higher offer out of
> personal animus towards KKPB's owner, Mr. Straub.  The Debtor provides a
> number of explanations for its rejection of the KKPB offer, including, among other
> things, Mr. Straub's litigiousness. . . .

>> Among other things, Mr. Glickstein testified that the potential for about a $1
>> million increase in the overall sale price was not worth the risk that KK-PB,
>> and its principal, Mr. Glenn Straub, would take action that would greatly
>> increase the costs to the estate.  Mr. Glickstein pointed to specific experience
>> with Mr. Straub in this very case to support [his] view that the potential
>> increase in recovery was fair outweighed by the risk of additional litigation.
>> Mr. Glickstein stressed the strength of the purchaser identified in the sale
>> motion. . . .

*** 

> On the record before this Court, the Debtor had real concerns about the viability of
> the KKPB offer for a variety of reasons — including the fear of additional litigation.
> Though Appellant may characterize this as "animus," the avoidance of litigation is
> a legitimate business objective.  And, Appellant could not provide the Court with a
> single case where a court disallowed a sale because the debtor had concerns about
> future litigation.

> The Debtor's duty is to maximize value to the creditors, and that maximization
> includes considerations such as finality, stability, and expeditious resolution of the
> bankruptcy proceeding.  The LR offer, although 2.5% lower than the KKPB offer,
> provided that finality and stability.  When asked by the Court at oral argument,
> Appellant could provide no other reasons why the KKPB offer constituted the
> highest and best offer *other than* the purported one-million-dollar additional benefit
> to the estate.  Thus, to force the Debtor to forego the LR offer and subject itself to

DOCS_NY:43788.4 36027/002

Appx. 00256
010199

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 282 of 1017   PageID 11063
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21   Entered 08/02/21 16:56:00   Page 10 of 11

> a public auction would require this Court to inappropriately use its own business
> judgment in place of the Debtor's, which this Court will not do.

*Id.* at 129-30 (emphasis in original).

14.     *160 Royal Palm* supports the Debtor's position in this case.   The Debtor has PetroCap who represents finality and stability and who is ready, willing, and able to close. PetroCap's Purchase Agreement also contemplates a private sale not subject to auction, and the Interests cannot be sold, transferred, or assigned without PetroCap III GP's or SLP GP's consent, as applicable.  Both PetroCap III GP and SLP GP have told the Debtor that they would be unwilling to have the Interests sold to a highly litigious party and that they would have serious reservations regarding having the Interests sold to any other party.  Consequently, not only is entertaining an offer from Mr. Dondero inadvisable per se, it is also impossible in this circumstance.  Despite this, NexPoint would have the Debtor renege on the commitment to PetroCap and agree to sell the Interests and the rights under the Subsequent Funds Agreement to Dugaboy by presumably (somehow) forcing PetroCap III GP and SLP GP to consent to Mr. Dondero becoming a limited partner.

15.     NexPoint also effectively insists that the Debtor ignore its prior dealings with Mr. Dondero and his related entities and disregard their failure to live up to their prior contractual obligations and documented history of litigation, including more than twenty pending litigation matters in this case alone.  And for what purpose?  So that the Debtor's estate can theoretically receive $268,488.60 more in sale proceeds?  The Debtor and the Committee have decided that any theoretical upside in engaging with Mr. Dondero or any of his related entities is not worth the risk. The evidence the Debtor will submit in connection with the hearing on the Motion will unequivocally demonstrate that the Debtor's position is justified.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43788.4 36027/002

Appx. 00257
010200

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 283 of 1017    PageID 11064
Case 19-34054-sgj11 Doc 2649 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 11 of 11

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated:  August 2, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:43788.4 36027/002

Appx. 00258
010201

Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 1 of 14

# **EXHIBIT A**

Appx 00259

010202

## SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

*In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

| | | | | |
|---|---|---|---|---|
| 9/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] | | | |
| | **Objectors**: | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal has been briefed and the decision is pending. |
| 11/18/20 | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements* [D.I. 1424] | | | |
| | **Objectors**: | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459] | N/A |
| 11/19/20 | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course* [D.I. 1439] | | | |
| | **Movant**: | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1522] | | | |
| | **Movants**: | Advisors Funds | Movants argued the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters. Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact. The Debtor reserves all rights that it may have whether in law or in equity.**

DOCS_NY:42718.12 36027/002

Appx. 08309
010203

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of 26

Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 3 of 14

| 12/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* **[D.I. 1625]** | | | |
|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal has been briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* **[D.I. 1752]** | | | |
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | *James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith* **[D.I. 1784]** | | | |
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

2

App. 00364

010204

| | | | | |
|---|---|---|---|---|
| 1/22/20 | **_Objections to Fifth Amended Plan of Reorganization_ [D.I. 1472]** | | | |
| | **Objectors:**[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | **_Application for Allowance of Administrative Expense Claim_ [D.I. 1826]** | | | |
| | **Movants:** | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | **_NexBank's Application for Allowance of Administrative Expense Claim_ [D.I. 1888]** | | | |
| | **Movant:** | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

APP. 00302
010203

| 2/8/21 | *James Dondero Motion for Status Conference* **[D.I. 1914]** | | | |
|---|---|---|---|---|
| **Movant:** | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |

| 2/28/21 | *Motions for Stay Pending Appeal* | | | |
|---|---|---|---|---|
| **Movants**: | | The only parties requesting a stay pending appeal were the Dondero Entities. They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| Dondero [D.I. 1973] | Advisors [D.I. 1955] | | | |
| Funds [D.I. 1967] | Trusts [D.I. 1971] | | | |

| 3/18/21 | *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455* **[D.I. 2060]** | | | |
|---|---|---|---|---|
| **Movants**: | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. The opening brief and the Debtor's response have been filed. |
| | Advisors | | | |
| | Trusts | | | |
| | HCRE | | | |

| 4/15/21 | *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* **[D.I. 2199]** | | | |
|---|---|---|---|---|
| **Movants**: | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "UBS") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008. The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310]. The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors appealed the settlement. |

4

Appx 00203

010203

| | | | | |
|---|---|---|---|---|
| 4/23/21 | *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* **[D.I. 2247]** | | | |
| | Movants: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |
| 4/23/21 | *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* **[D.I. 2242]** | | | |
| | Movants: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | DAF and CLOH have appealed. [D.I. 2513] |
| 4/20/21 | *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief* **[D.I. 2229]** | | | |
| | Movants: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |

Appx. 00301

010207

| 4/29/21 | *Motion to Compel Compliance with Bankruptcy Rule 2015.3* **[D.I. 2256]** | | | | |
|---|---|---|---|---|---|
| | **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

***Highland Capital Management, L.P. v. James D. Dondero*, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)**

| 12/7/20 | *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* **[D.I. 2]** | | | | |
|---|---|---|---|---|---|
| | **Movant:** | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

6

APPX 02385

010208

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of 26

Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 8 of 14

| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]** | | | |
|---|---|---|---|---|
| Movant: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd.***, Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* **[D.I. 2]** | | | |
|---|---|---|---|---|
| Movant: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor has reached an agreement in principle with the Funds and Advisors that settled this matter, and filed its 9019 motion. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

App. 00306

010209

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of 26

Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 9 of 14

**Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.**, Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the injunction was moot. The parties recently entered into a stipulation regarding discovery for the remaining breach of contract claim. This action was consolidated with the Advisors' admin claim since both matters arise from Shared Services Agreements. | N/A |

**Highland Capital Management, L.P. v. James Dondero**, Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | | |
| **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. Dondero filed a limited objection to the R&R. | N/A |

Appx 06987

010210

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of 26

Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 10 of 14

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.**, Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)*

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 20] | | | |
| | **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 52]. HCMFA filed a limited objection to the R&R. | N/A |

***Highland Capital Management, L.P. v. NexPoint Advisors, L.P.**, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)*

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note. NPA did not pay the note when and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | |
| | **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021. The Court transmitted a R&R on July 9 [D.I. 42]. NPA filed a limited objection to the R&R. The District Court adopted the R&R. [D. Ct. Dkt No. 10]. | N/A |

Appx 96268

010211

***Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.**, Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)*

| | | | | |
|---|---|---|---|---|
| 1/22/21 | <u>*Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate*</u> **[D.I. 1]** | | | |
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("<u>HCMS</u>"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 6/3/21 | <u>*Defendants Motion to Withdraw the Reference*</u> **[D.I. 19]** | | | |
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D. I. 52]. HCMS filed a limited objection to the R&R. the District Court adopted the R&R. [D. Ct. Docket No. 5]. HCMS filed a Motion for Reconsideration of the District Court's Order adopting R&R [D. Ct. Docket No. 8]. | |

***Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)**, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)*

| | | | | |
|---|---|---|---|---|
| 1/22/21 | <u>*Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate*</u> **[D.I. 1]** | | | |
| | **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |

Appx. 06209

010212

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
26
Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 12 of
14

| 6/3/21 | ***Defendants Motion to Withdraw the Reference* [D.I. 20]** | | | |
|---|---|---|---|---|
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D.I. 47]. HCRE filed a limited objection to the R&R [D. Ct. Docket No. 5]. |

***Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd.*, Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)**

| 4/12/21 | ***Original Complaint*** | | | |
|---|---|---|---|---|
| | **Movants**: | DAF CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22]. On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26]. Briefing is complete for both motions, and decisions are pending. | N/A |
| 4/19/21 | ***Plaintiff's Motion for Leave to File First Amended Complaint in the District Court*** | | | |
| | **Movants**: | DAF CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

Appx 96279
010213

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of 26

Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 13 of 14

***PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

4/12/21        <u>*Original Complaint*</u>

| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous. The Debtor will take all appropriate actions. | The Complaint was recently filed and the Debtor has not yet been served. The Debtor will respond appropriately. | N/A |

***The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

6/23/21        <u>*Original Complaint*</u>

| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

***The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Case No. 21-cv-01710-N (N.D. Tex. July 22, 2021)**

7/22/21        <u>*Original Complaint*</u>

| **Movants**: | Dugaboy | DAF alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. DAF's allegations in the complaint are duplicative of allegations Dugaboy made in proofs of claim filed in the Bankruptcy Court and in its complaint filed in the Northern District of Texas. | The Complaint has not yet been served. The Debtor will respond appropriately. | N/A |

Appx 06274
010274

Case 19-34054-sgj11 Doc 3445-38 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of 26

Case 19-34054-sgj11 Doc 2649-1 Filed 08/02/21    Entered 08/02/21 16:56:00    Page 14 of 14

**In re James Dondero, Petitioner,** Cause No. DC-21-09534 (Tex. July 22, 2021)

| 7/22/21 | *Original Complaint* | | | |
|---|---|---|---|---|
| **Movants**: | Dondero | Dondero seeks pre-suit discovery from Farallon Capital, a purchaser of certain claims in this case, and the Crusader Fund. Dondero alleges that Farallon breached certain U.S. Trustee requirements when it purchased those claims. Dondero also alleges that Farallon purchased those claims because of its relationship to Mr. Seery and that Mr. Seery was leveraging his relationship with Farallon to ensure that he remains in control of the Debtor. | The pre-suit discovery has not yet been served. The Debtor will respond appropriately. | N/A |

13

Appx. 06273

010273

# EXHIBIT 39

Appx 96273

010216

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 299 of 1017    PageID 11080
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 1 of 11

Docket #2656  Date Filed: 08/03/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket Nos. 2535, 2621, 2648** |
| | ) | |

**DEBTOR'S AMENDED REPLY IN SUPPORT OF ITS MOTION FOR ENTRY OF
AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN PROPERTY AND (II)
GRANTING RELATED RELIEF**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



Appx. 06277

010217

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 300 of 1017 PageID 11081
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 2 of 11

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this amended reply (the "Reply")[2] (a) in response to the *Objection to the Debtor's Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2621] (the "Objection") filed by NexPoint Advisors, L.P. ("NexPoint") and (b) in support of the *Motion of the Debtor for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2535] (the "Motion").[3]  In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.       Through the Motion, the Debtor seeks authority to exercise its Management Rights to cause Maple Holdings, its wholly owned subsidiary, to sell the Property to the Purchaser pursuant to the terms of the Purchase Agreement.  After a thorough marketing process, the Debtor determined that the Purchaser's offer for the Property was the highest and otherwise best offer and that conducting a private sale was in the best interests of its estate.  The Committee supports the Debtor's exercise of the Management Rights to cause a sale of the Property to the Purchaser – notwithstanding the competing "offer" presented by NexPoint – and no true creditor or party-in-interest has objected.

2.       Not surprisingly, the only objecting party is NexPoint, an entity owned and controlled by James Dondero.  During the marketing process, the Debtor received an unsolicited offer to purchase the Property from NPRE, another entity owned and controlled by Mr. Dondero. For the reasons discussed in the Motion, the Debtor determined not to engage with NPRE with

---

[2] The Debtor is filing this amended Reply to clarify an issue initially raised in the *Debtor's Reply in Support of Its Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2648] (the "Initial Reply").  For the convenience of the Court, a redline showing the changes to the Initial Reply is attached hereto as Exhibit B.

[3] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

DOCS_NY:43784.7 36027/002

Appx. 06275
010218

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 301 of 1017 PageID 11082
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 3 of 11

respect to the offer.  The Debtor has also reviewed NexPoint's unsolicited contingent offer and has determined, for the same reasons, that it is not in the Debtor's best interests to engage with NexPoint regarding a sale of the Property.

3.      NexPoint challenges the Debtor's business judgment, claiming that the Debtor's decision not to engage with it (1) lacks a "sound business justification," (2) "blatantly shows an unjustified prejudice toward NPA supported by conclusory statements and incomplete facts," and (3) is an "abuse of discretion" and "arbitrary."  Objection ¶¶ 1, 4, 6, 7.  According to NexPoint, because its offer is nominally higher than the Purchaser's offer, the Debtor must agree to sell the Property to it.  NexPoint is wrong.

4.      Preliminarily, and as discussed below, NexPoint – as a potential purchaser – lacks standing to object to the Motion.  To the extent NexPoint asserts standing based upon its post-confirmation acquisition of certain disputed employee claims, such standing is tenuous at best and should be viewed through that lens.

5.      Even assuming NexPoint has standing, its objection to the Motion is frivolous. First, NexPoint's "offer" is contingent and subject to a ten-day "Inspection Period" at the conclusion of which NexPoint would, in its sole discretion, have the option to terminate its agreement to purchase the Property and receive $990,000 of its $1 million earnest money deposit back in full.  NPA PSA, pg. 2; § 5.  That is not an offer; it is a free option.  Second, NexPoint's overarching argument that the Debtor may not take its prior interactions with Mr. Dondero and his related entities into account in determining whether to transact business with them is nonsensical and not supported by the case law.  Actions have consequences.  Mr. Dondero's repeated failure to abide by Court orders and contractual obligations to the estate, unabashed willingness to assert

Appx. 06276
010219

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 302 of 1017 PageID 11083
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 4 of 11

frivolous positions and initiate baseless lawsuits,[4] and his documented history of litigiousness[5] provide ample support for the Debtor's decision not to engage with Mr. Dondero or any of his related entities in the sale of the Property.

6. As set forth in the Motion and as will be demonstrated in connection with the hearing on the Motion, the risks associated with selling the Property to Mr. Dondero or his related entities are not present in the transaction with the Purchaser. NexPoint's argument that both transactions are "apples to apples" ignores (a) the fact that NexPoint's offer is contingent on NexPoint's inspection of the Property and (b)(i) the closing risk, (ii) the risk of potential post-sale litigation if the Debtor transacts with Mr. Dondero, and (iii) the risk that if – for whatever reason – NexPoint does not close, the Purchaser will no longer be willing to complete the transaction, let alone on the terms negotiated. One need look no further than the years of litigation that caused the Debtor's chapter 11 filing and Mr. Dondero's conduct during the case to conclude that *any* commercial transaction with Mr. Dondero presents material risk. The Court should overrule the Objection and grant the Motion.

---

[4] In fact, in just the few weeks since the Debtor was last before this Court, Mr. Dondero has commenced two new actions against the Debtor that lack factual or legal support and that otherwise make no rational sense to pursue given Mr. Dondero's highly speculative and remote economic interest in the Debtor's estate.

***First***, on July 22, 2021, Mr. Dondero, again through his attorneys at Sbaiti & Co. ("Sbaiti"), filed an action in the Northern District of Texas using the Charitable Donor Advised Fund, L.P. (the "DAF Complaint"). *Original Complaint*, *The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Cause No. 3:21-cv-01710-N (N.D. Tex. July 22, 2021). The DAF Complaint alleges that the DAF is a limited partner in the Highland Multi-Strategy Credit Fund ("Multi-Strat") and asserts claims against the Debtor for mismanagement of Multi-Strat during the pendency of this Bankruptcy Case. The DAF Complaint is essentially verbatim the complaint filed in the Northern District of Texas by the Sbaiti firm on behalf of Mr. Dondero's family trust, the Dugaboy Investment Trust. As this Court will remember, that complaint was duplicative of the proof of claim (Claim No. 177) filed by Dugaboy in this Court and was withdrawn within an hour after it was brought to this Court's attention.

***Second***, also on July 22, 2021, Sbaiti, again on behalf of the DAF, initiated an action in Texas state court for pre-suit discovery against the Redeemer Committee alleging, among other things, that the Redeemer Committee's transfer of its claim was in furtherance of a scheme concocted by James P. Seery, Jr., the Debtor's Court-approved chief executive officer and chief restructuring officer, to drain the estate of resources. *Verified Petition to Take Deposition Before Suit and Seek Documents, In re James Dondero*, Cause No. DC-21-09534 (Tex. July 22, 2021).

[5] A chart showing the litigation caused, directly and indirectly, by Mr. Dondero since October 2020 is attached hereto as Exhibit A.

DOCS_NY:43784.7 36027/002

Appx. 00377

010220

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 303 of 1017 PageID 11084
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 5 of 11

### THE COURT SHOULD AUTHORIZE THE DEBTOR TO EXERCISE ITS MANAGEMENT RIGHTS TO CAUSE MAPLES TO SELL THE PROPERTY TO THE PURCHASER

**A.      NexPoint Lacks Standing to Object to the Motion**

7.      NexPoint filed two proofs claim in this case (Claim Nos. 104 and 108) which were later expunged [Docket No. 1233]. NexPoint, however, holds prepetition claims against the estate after acquiring them from five former Debtor employees (acquisitions done solely to manufacture standing to object to the Plan).[6] The Debtor has objected to each of these claims and believes that they are frivolous [Docket No. 2059]. A hearing on those objections is scheduled for November 15, 2021.

8.      Consequently, NexPoint's standing to object to the Purchase Agreement as a prepetition creditor is extremely attenuated as its chances of recovery in this case are, at best, theoretical and speculative. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing).

9.      Further, any claim made by NexPoint that it has standing to object to the sale of the Property as a potential bidder also fails. *In re VCR I, LLC*, 2017 Bankr. LEXIS 3341, at *12 (Bankr. S.D. Miss. Sept. 29, 2017) ("This Court has previously held that a prospective purchaser does not have standing to object to a sale motion."); *see also Squire v. Scher (In re Squire)*, 282

---

[6] One of NexPoint's "claims," acquired from Michael Beispiel, is not a claim at all. Mr. Beispiel did not file a proof of claim nor was Mr. Beispiel's claim scheduled. Any alleged prepetition claim that Mr. Beispiel might have had is therefore barred. *See Order Establishing Bar Dates for Filing Claims and (ii) Approving the Form and Manner of Notice Thereof* [Docket No. 488] ("Any entity that is required to file a Proof of Claim Form but fails to [do] so properly by the applicable Bar Date, shall not be treated as a creditor with respect to such claim for purposes of voting upon, or receiving distributions under, any chapter 11 plan in this case.").

Appx. 00378
010221

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 7 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 304 of 1017   PageID 11085
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21   Entered 08/03/21 12:20:51   Page 6 of 11

Fed. Appx. 413, 416 (6th Cir. 2008) ("Frustrated Bidders do not have standing to object to the sale

of a property"); 3 COLLIER ON BANKRUPTCY ¶363.02[c] (same).

10.     Finally, Mr. Dondero initially offered to acquire the Property through NPRE,

another of his related entities.  NexPoint only submitted its "offer" after the Motion was filed.  The

Debtor believes that Mr. Dondero is causing NexPoint, rather than NPRE, to object because Mr.

Dondero recognizes that NPRE has no standing as a prepetition creditor[7] and that NexPoint's

standing arguments (although flimsy) are better.  These shell games highlight Mr. Dondero's

coordination of the efforts amongst his related entities.

**B.**     **The Debtor's Good Faith Decision Not to Engage Mr. Dondero or His Related Entities
in Connection with the Sale of the Property Was Justified and a Proper Exercise of
the Debtor's Business Judgment**

11.     As discussed in the Motion, section 363(b) of the Bankruptcy Code provides, in

relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  As set forth in Rule

6004(f)(1), sales under 11 U.S.C. § 363(b) can be conducted by "private sale or by public auction."

Although the Bankruptcy Code does not include a statutory standard for determining when the use

or sale of property should be authorized, it is well-established that a debtor may use or sell property

of the estate outside the ordinary course of business if there is a good business reason for doing so

and the proposed course of action is advantageous to the estate.  *See, e.g.*, *Black v. Shor (In re BNP*

*Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Pisces Energy, LLC*, 2009 Bankr.

LEXIS 4709, at *18 (Bankr. S.D. Tex. Dec. 21, 2009).

12.     To challenge the Debtor's business judgment, NexPoint cites to case law for the

---

[7] NPRE filed one proof of claim (Claim No. 146), which seeks to novate a limited liability corporation agreement
because NPRE believes that there was a mutual mistake in the drafting of such agreement.  The Debtor believes
NPRE's claim is frivolous and has objected [Docket No. 1673].

Appx. 00379
010222

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 305 of 1017 PageID 11086
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 7 of 11

unremarkable proposition that the goal of any sale is to maximize the proceeds to the estate.[8]
Objection ¶¶ 9-10 (citing *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764 (Bankr. D. Del.
Aug. 15, 2007); *In re Walker County Hosp. Corp.*, 2021 U.S. App. LEXIS 20610 (5th Cir. July
12, 2021)).[9]  The Debtor agrees and believes that the process overseen by the Debtor for the sale
of the Property did just that:  a sale of the Property to Purchaser has maximized value.  NexPoint
cites no cases – and the Debtor believes none exist – for the proposition that the Debtor must agree
to include any party in a sale process and choose the nominally highest bid regardless of other
circumstances that exist.

13. Under 11 U.S.C. § 363(b), a Debtor is tasked with finding the highest ***and best***
offer, not just accepting the offer that is nominally a higher dollar amount on paper.  *See, e.g.,*
*Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)) (a trustee "must demonstrate
that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a
lower bid in the presence of sound business reasons, such as substantial doubt that the higher bidder
can raise the cash necessary to complete the deal"); *In re Tresha-Mob, LLC*, 2019 Bankr. LEXIS
13333, at *4-6 (Bankr. W.D. Tex. 2019) ("Voltaire adopts a one-track value-maximization
argument that ignores the mountains of precedent in which trustees, debtors-in-possession, and
courts have rejected the highest bid when it was not the 'best bid'");[10] COLLIER ¶ 363.02[4]

---

[8] NexPoint also alleges, without factual support, that NexPoint's "participation in the sale process has resulted in incremental estate recoveries." Objection ¶ 5. This is not true.  Neither NPRE's nor NexPoint's "bids" were shown to any other bidder.  They were received after a deal had been reached with Purchaser and simply did not factor in to the agreed upon purchase price.

[9] Although *Walker County* has general language in *dicta* concerning 11 U.S.C. § 363(b), that case does not address the requirements of section 363(b) at all.  Instead, *Walker County* deals with whether an appeal is statutorily moot by reason of 11 U.S.C. § 363(m).

[10] In *Treshe-Mob* the bankruptcy court rejected NexPoint's premise that the highest bid is always the best bid:

Here, the objection that Voltaire seeks to pursue is not "colorable."  In its *Limited Objection*, Voltaire adopts a one-track value-maximization argument that ignores mountains of precedent in which trustees, debtors-in possession, and courts have rejected the highest bid when it was not the "best bid."  *See In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015)* ("a debtor must demonstrate that the proposed purchase price is not only the highest offer, ***but the highest and best offer***") (emphasis added).

DOCS_NY:43784.7 36027/002

Appx. 06589
010223

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 306 of 1017 PageID 11087
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 8 of 11

("Although a trustee normally would be expected to sell to the highest bidder in an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale.").

14. *In re 160 Royal Palm*, a case from the District Court for the Southern District of Florida which was affirmed by the 11th Circuit, presented a strikingly similar fact pattern to this case. 600 B.R. 119 (S.D. Fla. 2019), *aff'd* 785 Fed. App'x 829 (11th Cir. 2019). In *160 Royal Palm*, the Debtor attempted to sell an asset at public auction. That auction failed in substantial part because of the constant barrage of litigation brought by the property's former owner. *Id.* at 124. Ultimately, the Debtor entered into a private sale and sought bankruptcy court approval. The former owner objected arguing it was "an abuse of discretion to eliminate other potential bidders from the sale," which included, of course, the former owner. *Id.* at 127. The bankruptcy court rejected that argument, and the district court affirmed, stating "private sales are not unheard of in bankruptcy proceedings" and, in part because the offer was conditioned on a private sale, the Debtor was entitled to pursue a "bird in hand" approach and sell the asset without competing bids. *Id.* at 128.

15. In so ruling, the District Court also rejected the unsolicited bid made by the former

---

While the bid that brings in the most cash often wins, it is "common knowledge" that the "highest bid is not always the best bid," especially if there are "conditions sufficient to overbalance the difference between the two." *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925). The Bankruptcy Code thus affords courts "broad flexibility in determining which of several bidders should be deemed the successful bidder at a *§ 363(b)* sale." *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993). As such, courts routinely reject the proposition that reviewing courts or fiduciaries are "duty-bound to mechanically accept a bid with the highest dollar amount." *Lawsky v. Condor Capital Corp.,* 2015 U.S Dist. LEXIS 96347, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015) (internal quotation marks and citations omitted); *see also After Six, 154 B.R.* at 882 ("The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary.").

In determining whether the highest bid is the "best bid," the fiduciary and reviewing court must consider factors such as "the risks associated with each bid and the probabilities that the proposed terms will come to fruition" as well as "contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Lawsky,* 2015 U.S. LEXIS 96347, 2015 WL 4470332, at *9 (quoting and citing *Family Christian,* 533 B.R. at 622).

*Treshe-Mob*, 2019 Bankr. LEXIS 1333, at *4-6 (emphasis in original).

DOCS_NY:43784.7 36027/002

Appx. 06384

010224

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 307 of 1017    PageID 11088
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 9 of 11

owner on the property despite that bid being higher.  The District Court found persuasive, among other things, the fact that the former owner had defaulted on a prior deal with the Debtor and his documented history of litigiousness:

> While the KKPB offer ostensibly *could* provide the estate with an additional million dollars . . . the Court credits the Debtor's concerns about the uncertainty of that offer.  Indeed, the Debtor sought a settlement and sale with KKPB once in the past, which fell through, because KKPB defaulted.

> Appellant vigorously argued at oral argument on April 5 that the Debtor should have accepted its higher bid.  However, the Court notes that while a debtor has a duty to "maximize the return to a bankruptcy estate," which "often does require [the] recommendation of the highest monetary bid, *overemphasis of this usual outcome overlooks a fundamental truism, i.e., a 'highest' bid is not always the 'highest and best' bid.*  The inclusion of 'best' in that conjunction is not mere surplusage." . . . .

> Appellant also alleges that Debtor only rejected KKPB's higher offer out of personal animus towards KKPB's owner, Mr. Straub.  The Debtor provides a number of explanations for its rejection of the KKPB offer, including, among other things, Mr. Straub's litigiousness. . . .

>> Among other things, Mr. Glickstein testified that the potential for about a $1 million increase in the overall sale price was not worth the risk that KK-PB, and its principal, Mr. Glenn Straub, would take action that would greatly increase the costs to the estate.  Mr. Glickstein pointed to specific experience with Mr. Straub in this very case to support [his] view that the potential increase in recovery was fair outweighed by the risk of additional litigation.  Mr. Glickstein stressed the strength of the purchaser identified in the sale motion. . . .

***

> On the record before this Court, the Debtor had real concerns about the viability of the KKPB offer for a variety of reasons — including the fear of additional litigation.  Though Appellant may characterize this as "animus," the avoidance of litigation is a legitimate business objective.  And, Appellant could not provide the Court with a single case where a court disallowed a sale because the debtor had concerns about future litigation.

> The Debtor's duty is to maximize value to the creditors, and that maximization includes considerations such as finality, stability, and expeditious resolution of the bankruptcy proceeding.  The LR offer, although 2.5% lower than the KKPB offer, provided that finality and stability.  When asked by the Court at oral argument, Appellant could provide no other reasons why the KKPB offer constituted the

9

Appx 06382
010225

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 308 of 1017 PageID 11089
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 10 of 11

highest and best offer *other than* the purported one-million-dollar additional benefit to the estate. Thus, to force the Debtor to forego the LR offer and subject itself to a public auction would require this Court to inappropriately use its own business judgment in place of the Debtor's, which this Court will not do.

*Id.*, at 129-30 (emphasis in original).

16.    *160 Royal Palm* supports the Debtor's position in this case. On the one hand, the Debtor has the Purchaser who represents finality and stability. The Purchaser has conducted its diligence and, as its inspection period has expired, has no due diligence out, negotiated a purchase agreement that contemplated a private sale not subject to auction, and is ready, willing, and able to close. NexPoint would have the Debtor renege on the commitment to the Purchaser and enter into a contingent agreement with NexPoint that could be terminated (without material consequence) in NexPoint's sole discretion. No reasonable person would terminate an agreement with the Purchaser and enter into an "agreement" with NexPoint under these conditions.

17.    Moreover, even if the agreements were "apples to apples," NexPoint effectively insists that the Debtor ignore its prior dealings with Mr. Dondero and his related entities and disregard their failure to live up to their prior contractual obligations and documented history of litigation, including more than twenty pending litigation matters in this case alone. And for what purpose? So that the Debtor's estate can theoretically receive $350,000 more in sale proceeds? The Debtor and the Committee have decided that any theoretical upside in agreeing to sell the Property to Mr. Dondero or any of his related entities is not worth the risk. The evidence the Debtor will submit in connection with the hearing on the Motion will unequivocally demonstrate that the Debtor's position is justified.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43784.7 36027/002

Appx. 06383

010226

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 309 of 1017 PageID 11090
Case 19-34054-sgj11 Doc 2656 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 11 of 11

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated: August 3, 2021.                    **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_NY:43784.7 36027/002

Appx. 06384
010227

# **EXHIBIT A**

Appx 06385

010228

## SUMMARY OF DONDERO AND RELATED ENTITY LITIGATION*

### *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)

| 9/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] | | |
|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1121] | Acis filed a claim for at least $75 million. Acis claim was the result of an involuntary bankruptcy initiated when the Debtor refused to pay an arbitration award and instead transferred assets to become judgment proof. Debtor settled claim for an allowed Class 8 claim of $23 million and approximately $1 million in cash payments. Dondero objected to the settlement alleging that it was unreasonable and constituted vote buying. | The Acis Settlement Motion was approved and Dondero's objection was overruled [D.I. 1302]. | Dondero appealed [D.I. 1347]. The appeal has been briefed and the decision is pending. |
| 11/18/20 | *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements* [D.I. 1424] | | |
| | **Objectors**: | Dondero [D.I. 1447] | The Debtor filed a motion seeking to retain a sub-servicer to assist in its reorganization consistent with the proposed plan. Dondero alleged that the sub-servicer was not needed; was too expensive; and would not be subject to Bankruptcy Court jurisdiction [D.I. 1447]. | Dondero withdrew his objection [D.I. 1460] after forcing the Debtor to incur costs responding [D.I. 1459] | N/A |
| 11/19/20 | *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course* [D.I. 1439] | | |
| | **Movant**: | Dondero | Dondero alleged the Debtor sold significant assets in violation of 11 U.S.C. § 363 and without providing Dondero a chance to bid. Dondero requested an emergency hearing on this motion [D.I. 1443]. Dondero filed this motion despite having agreed to the Protocols governing such sales. | Dondero withdrew this motion [D.I. 1622] after the Debtor and the Committee were forced to incur costs responding and preparing for trial [D.I. 1546, 1551]. | N/A |
| 12/8/20 | *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1522] | | |
| | **Movants**: | Advisors Funds | Movants argued the Debtor should be precluded from causing the CLOs to sell assets without Movants' consent. Movants provided no support for this position which directly contradicted the terms of the CLO Agreements; and was filed notwithstanding the Protocols which governed such sales. Movants requested an emergency hearing on this motion [D.I. 1523]. | The motion was denied [D.I. 1605] and was characterized as "frivolous." | N/A |

**\* The following is by way of summary only and does not include discovery disputes or similar matters. Nothing herein shall be deemed or considered a waiver of any rights or an admission of fact. The Debtor reserves all rights that it may have whether in law or in equity.**

DOCS_NY:42718.12 36027/002

App. 00386
010229

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 15 of 40

Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 3 of 14

| 12/23/20 | *Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 150, 153, 154) and Authorizing Actions Consistent Therewith* **[D.I. 1625]** | | | |
|---|---|---|---|---|
| | **Objectors**: | Dondero [D.I. 1697] Trusts [D.I. 1706] CLOH [D.I. 1707] | The HarbourVest Entities asserted claims in excess of $300 million in connection with an investment in a fund indirectly managed by the Debtor for, among other things, fraud and fraudulent inducement, concealment, and misrepresentation. Debtor settled for an allowed Class 8 claim of $45 million and an allowed Class 9 claim of $35 million. Dondero and the Trusts alleged that the settlement was unreasonable; was a windfall to the HarbourVest Entities; and constituted vote buying. CLOH argued that the settlement could not be effectuated under the operative documents. | CLOH withdrew its objection at the hearing. The settlement was approved and the remaining objections were overruled [D.I. 1788]. | The Trusts appealed [D.I. 1870], and the appeal has been briefed. CLOH recently filed a complaint alleging, among other things, that the settlement was a breach of fiduciary duty and a RICO violation. |
| 1/14/21 | *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* **[D.I. 1752]** | | | |
| | **Movants**: | Trusts Dondero [D.I. 1756] | Movants sought the appointment of an examiner 14 months after the Petition Date and commencement of Plan solicitation to assess the legitimacy of the claims against the various Dondero Entities and to avoid litigation. Movants requested an emergency hearing on this motion [D.I. 1748]. | The motion was denied [D.I. 1960]. | N/A |
| 1/20/21 | *James Dondero's Objection to Debtor's Proposed Assumption of Executory Contracts and Cure Amounts Proposed in Connection Therewith* **[D.I. 1784]** | | | |
| | **Objector**: | Dondero | Dondero objected to the Debtor's proposed assumption of the limited partnership agreement governing the Debtor and MSCF [D.I. 1719]. | Dondero withdrew his objection [D.I. 1876] after forcing the Debtor to incur the expense of responding (which included a statement that the Debtor limited partnership agreement was not being assumed). | N/A |

2

App. 00285
010230

| | | | | |
|---|---|---|---|---|
| 1/22/20 | **_Objections to Fifth Amended Plan of Reorganization [D.I. 1472]_** | | | |
| | **Objectors:**[1] | | All objections to the Plan were consensually resolved prior to the confirmation hearing except for the objections of the Dondero Entities and the U.S. Trustee. The U.S. Trustee did not press its objection at confirmation. | All objections were overruled and the Confirmation Order was entered. The Confirmation Order specifically found that Mr. Dondero would "burn the place down" if his case resolution plan was not accepted. | Dondero, the Trusts, the Advisors, and the Funds appealed [D.I. 1957, 1966, 1970, 1972]. The appeal is being briefed. |
| | Dondero [D.I. 1661] | Trusts [D.I. 1667] | | | |
| | Advisors & Funds[2] [D.I. 1670] | Senior Employees [D.I. 1669] | | | |
| | HCRE [D.I. 1673] | CLOH [D.I. 1675] | | | |
| | NexBank Entities [D.I. 1676] | | | | |
| 1/24/21 | **_Application for Allowance of Administrative Expense Claim [D.I. 1826]_** | | | |
| | **Movants:** | Advisors | The Advisors seek an administrative expense claim for approximately $14 million they allege they overpaid to the Debtor during the bankruptcy case under the Shared Services Agreement. Notably, the Advisors have not paid $14 million to the Debtor during the bankruptcy. | This matter is currently being litigated. | N/A |
| 2/3/21 | **_NexBank's Application for Allowance of Administrative Expense Claim [D.I. 1888]_** | | | |
| | **Movant:** | NexBank | NexBank seeks an administrative expense claim for reimbursement of $2.5 million paid to the Debtor under its Shared Services Agreement and investment advisory agreement. NexBank alleges that it did not receive the services. | This matter is currently being litigated. | N/A |

---

[1] In addition to the Dondero Entities' objections, the following objections were filed: State Taxing Authorities [D.I. 1662]; Former Employees [D.I. 1666]; IRS [D.I. 1668]; US Trustee [D.I. 1671]; Daugherty [D.I. 1678]. These objections were either resolved prior to confirmation or not pressed at confirmation.

[2] In addition to the Funds, this objection was joined by: Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Healthcare Opportunities Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Real Estate Strategies Fund, NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., and NexPoint Real Estate Advisors VIII, L.P. [D.I. 1677].

APP.00288

010231

| 2/8/21 | _James Dondero Motion for Status Conference_ [D.I. 1914] | | | |
|---|---|---|---|---|
| **Movant**: | Dondero | Dondero requested a chambers conference to convince the Court to delay confirmation of the Plan to allow for continued negotiation of the "pot plan." | The request was denied [D.I. 1929] after the Debtor and Committee informally objected. | N/A. |

| 2/28/21 | _Motions for Stay Pending Appeal_ | | | |
|---|---|---|---|---|
| **Movants**: | | The only parties requesting a stay pending appeal were the Dondero Entities. They alleged a number of potential harms to the Dondero Entities if a stay was not granted and offered to post a $1 million bond. | Relief was denied [D.I. 2084, 2095] and a number of the Movants' arguments were found to be frivolous. | Movants sought a stay pending appeal from this Court. |
| Dondero [D.I. 1973] | Advisors [D.I. 1955] | | | |
| Funds [D.I. 1967] | Trusts [D.I. 1971] | | | |

| 3/18/21 | _James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Motion to Recuse Pursuant to 28 U.S.C. § 455_ [D.I. 2060] | | | |
|---|---|---|---|---|
| **Movants**: | Dondero | Dondero argued that Judge Jernigan should recuse herself as her rulings against him and his related entities were evidence of her bias. | Judge Jernigan denied the motion without briefing from any other party on March 23, 2021 [D.I. 2083]. | The Movants appealed [D.I. 2149]. The opening brief and the Debtor's response have been filed. |
| | Advisors | | | |
| | Trusts | | | |
| | HCRE | | | |

| 4/15/21 | _Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith_ [D.I. 2199] | | | |
|---|---|---|---|---|
| **Movants**: | Debtor | UBS Securities LLC and UBS AG London Branch (collectively, "<u>UBS</u>") asserted claims against the Debtor in excess of $1 billion arising from two Debtor-managed funds' breach of contract in 2008. The settlement resolved ten plus years of litigation but had to be renegotiated when the Debtor discovered that the Dondero-controlled Debtor had caused the funds to transfer cash and securities with a face amount of over $300 million to a Cayman-based Dondero controlled entity in 2017, presumably to thwart UBS's ability to collect on its judgment. | The only parties to object were Dondero [D.I. 2295] and Dugaboy [D.I. 2268, 2293]. The Debtor filed an omnibus reply on May 14, 2021 [D.I. 2308]. UBS also filed a reply [D.I. 2310]. The UBS settlement was approved on May 24, 2021 [D.I. 2389]. | The objectors appealed the settlement. |

4

Appx 06289

010232

**4/23/21**    *Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* **[D.I. 2247]**

| Movants: | Debtor | Debtor filed a motion seeking an order to show cause as to why Dondero, CLOH, DAF, and their counsel should not be held in contempt of court for willingly violating two final Bankruptcy Court orders. The Bankruptcy Court entered an order to show cause on April 29, 2021 [D.I. 2255] and set an in-person hearing for June 8, 2021. | Dondero, CLOH, the DAF, Mark Patrick (allegedly the person in control of the DAF), and their counsel filed responses to the order to show cause on May 14, 2021 [D.I. 2309, 2312, 2313]. The Debtor filed its reply on May 21, 2021 [D.I. 2350]. | A hearing was held on June 8, 2021. The Court stated that she would find contempt but no formal order has been entered. |
|---|---|---|---|---|

**4/23/21**    *Motion for Modification of Order Authorizing Appointment of James P. Seery, Jr. Due to Lack of Subject Matter Jurisdiction* **[D.I. 2242]**

| Movants: | Debtor | DAF and CLOH filed a motion asking the Bankruptcy Court to modify the July 16, 2020, order appointing Seery as the Debtor's CEO/CRO alleging the Bankruptcy Court lacked subject matter jurisdiction. | On May 14, 2021, the Debtor filed a response [D.I. 2311] stating that DAF and CLOH's motion was a collateral attack and barred by res judicata, among other things. The Committee joined in the Debtor's response [D.I. 2315]. DAF and CLOH filed their reply on May 21, 2021 [D.I. 2347]. The Motion was denied on June 25, 2021 [D.I. 2506] | DAF and CLOH have appealed. [D.I. 2513] |
|---|---|---|---|---|

**4/20/21**    *Debtor's Motion for Entry of an Order (i) Authorizing the Debtor to (a) Enter into Exit Financing Agreement in Aid of Confirmed Chapter 11 Plan and (b) Incur and Pay Related Fees and Expenses and (ii) Granting Related Relief* **[D.I. 2229]**

| Movants: | Debtor | The Debtor filed a motion seeking authority to enter into an exit financing facility. The facility was required, in part, to fund the increased costs to the estate from Dondero's litigiousness. Dugaboy filed two objections to the motion alleging, among other things, that there was no basis for the financing [D.I. 2403; 2467] | The motion was granted on June 30 [D.I. 2503] | N/A |
|---|---|---|---|---|

APP. 00299

010233

| 4/29/21 | *Motion to Compel Compliance with Bankruptcy Rule 2015.3* **[D.I. 2256]** | | | |
|---|---|---|---|---|
| **Movants:** | Trusts | The Trusts filed a motion on negative notice seeking to compel the Debtor to file certain reports under Rule 2015.3 [D.I. 2256]. The Debtor opposed that motion on May 20, 2021 [D.I. 2341], which was joined by the Committee [D.I. 2343]. The Trusts filed their reply on June 8, 2021 [D.I. 2424] | A hearing was held on June 10, 2021 [D.I. 2442] and the motion was adjourned. | N/A |

***Highland Capital Management, L.P. v. James D. Dondero*, Adv. Proc. No. 20-03190-sgj (Bankr. N.D. Tex.)**

| 12/7/20 | *Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* **[D.I. 2]** | | | |
|---|---|---|---|---|
| **Movant:** | Debtor | The Debtor commenced an adversary proceeding seeking an injunction against Dondero. Dondero actively interfered with the management of the estate. Seery had instructed Debtor employees to sell certain securities on behalf of the CLOs. Dondero disagreed with Seery's direction and intervened to prevent these sales from being executed. Dondero also threatened Seery via text message and sent threatening emails to other Debtor employees. | A TRO was entered on December 10 [D.I. 10], which prohibited Dondero from, among other things, interfering with the Debtor's estate and communicating with Debtor employees unless it related to the Shared Services Agreements. A preliminary injunction was entered on January 12 after an exhaustive evidentiary hearing [D.I. 59]. This matter was resolved consensually by order entered May 18, 2021 [D.I. 182], which enjoined Dondero from certain conduct until the close of the Bankruptcy Case. | Dondero appealed to the District Court, which declined to hear the interlocutory appeal. Dondero is seeking a writ of mandamus from the Fifth Circuit. The writ of mandamus was withdrawn as part of the settlement. |

Appx. 08294

010234

| 1/7/21 | *Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO* **[D.I. 48]** | | |
|---|---|---|---|
| Movant: | Debtor | In late December, the Debtor discovered that Dondero had violated the TRO in multiple ways, including by destroying his cell phone, his text messages, and conspiring with the Debtor's then general counsel and assistant general counsel[3] to coordinate offensive litigation against the Debtor. The hearing on this matter was delayed and there was litigation on evidentiary issues, among other things. An extensive evidentiary hearing was held on March 22. | The Court entered an order finding Mr. Dondero in contempt of court on June 7, 2021 [D.I. 190] | Mr. Dondero has appealed [D.I. 212] |

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc., and CLO Holdco, Ltd.**, Adv. Proc. No. 21-03000-sgj (Bankr. N.D. Tex.)*

| 1/6/21 | *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero* **[D.I. 2]** | | |
|---|---|---|---|
| Movant: | Debtor | In late December, the Debtor received a number of threatening letters from the Funds, the Advisors, and CLOH regarding the Debtor's management of the CLOs. These letters reiterated the arguments made by these parties in their motion filed on December 8, which the Court concluded were "frivolous." The relief requested by the Debtor was necessary to prevent the Funds, Advisors, and CLOH's improper interference in the Debtor's management of its estate. | The parties agreed to the entry of a temporary restraining order on January 13 [D.I. 20]. A hearing on a preliminary injunction began on January 26 and was continued to May 7. The TRO was further extended with the parties' consent [D.I. 64]. The Debtor reached an agreement with CLOH and dismissed CLOH from the adversary proceeding. The Debtor has reached an agreement in principle with the Funds and Advisors that settled this matter, and filed its 9019 motion. | N/A |

---

[3] As a result of this conduct, among other things, the Debtor terminated its general counsel and assistant general counsel for cause on January 5, 2021.

7

010233

### *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03010-sgj (Bankr. N.D. Tex.)

| 2/17/21 | *Debtor's Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [D.I. 2] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | The Debtor's Plan called for a substantial reduction in its work force. As part of this process, the Debtor terminated the Shared Services Agreements and began negotiating a transition plan with the Advisors that would enable them to continue providing services to the retail funds they managed without interruption. The Debtor was led to believe that without the Debtor's assistance the Advisors would not be able to provide services to their retail funds, and, although the Debtor had proceed appropriately, the Debtor was concerned it would be brought into any action brought by the SEC against the Advisors if they could not service the funds. The Debtor brought this action to force the Advisors to formulate a transition plan and to avoid exposure to the SEC, among others. | At a daylong hearing, the Advisors testified that they had a transition plan in place. An order was entered on February 24 [D.I. 25] making factual findings and ruling that the injunction was moot. The parties recently entered into a stipulation regarding discovery for the remaining breach of contract claim. This action was consolidated with the Advisors' admin claim since both matters arise from Shared Services Agreements. | N/A |

### *Highland Capital Management, L.P. v. James Dondero*, Adv. Proc. No. 21-03003-sgj (Bankr. N.D. Tex.)

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | Dondero borrowed $8.825 million from Debtor pursuant to a demand note. Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/15/21 | *James Dondero's Motion and Memorandum of Law in Support to Withdraw the Reference* [D.I. 21] | | | |
| | **Movant**: | Dondero | Three months after the complaint was filed Dondero filed a motion to withdraw the bankruptcy reference and a motion to stay the adversary pending resolution of his motion [D.I. 22]. | A hearing was held on May 25, 2021, and a stay was granted until mid-July 2021. The Court transmitted a report and recommendation on July 7 [D.I. 69]. Dondero filed a limited objection to the R&R. | N/A |

Appx 00283
010238

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of 40

Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 10 of 14

***Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Proc. No. 21-03004-sgj (Bankr. N.D. Tex.)***

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | HCMFA borrowed $7.4 million from Debtor pursuant to a demand note.  Dondero did not pay when the note was called and the Debtor was forced to file an adversary. | The parties are currently conducting discovery.  The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 20] | | | |
| **Movant**: | HCMFA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021.  The Court transmitted a R&R on July 9 [D.I. 52]. HCMFA filed a limited objection to the R&R. | N/A |

***Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Proc. No. 21-03005-sgj (Bankr. N.D. Tex.)***

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| **Movant**: | Debtor | NPA borrowed approximately $30.75 million under an installment note.  NPA did not pay the note when and the Debtor was forced to file an adversary. | The parties are currently conducting discovery.  The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 4/13/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | |
| **Movant**: | NPA | Three months after the complaint was filed HCMFA filed a motion to withdraw the bankruptcy reference. | A hearing was held on May 25, 2021.  The Court transmitted a R&R on July 9 [D.I. 42]. NPA filed a limited objection to the R&R.  The District Court adopted the R&R. [D. Ct. Dkt No. 10]. | N/A |

9

APP 00094

010237

***Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*, Adv. Proc. No. 21-03006-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | Highland Capital Management Services, Inc. ("HCMS"), borrowed $900,000 in demand notes and approximately $20.5 million in installment notes. HCMS did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |
| 6/3/21 | *Defendants Motion to Withdraw the Reference* [D.I. 19] | | | |
| | **Movant**: | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021. The Court issued its R&R on July 15, 2021 [D. I. 52]. HCMS filed a limited objection to the R&R, the District Court adopted the R&R. [D. Ct. Docket No. 5]. HCMS filed a Motion for Reconsideration of the District Court's Order adopting R&R [D. Ct. Docket No. 8]. | |

***Highland Capital Management, L.P. v. HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)*, Adv. Proc. No. 21-03007-sgj (Bankr. N.D. Tex.)**

| 1/22/21 | *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* [D.I. 1] | | | |
|---|---|---|---|---|
| | **Movant**: | Debtor | HCRE borrowed $4.25 million in demand notes and approximately $6.05 million in installment notes. HCRE did not pay the notes when due and the Debtor was forced to file an adversary. | The parties are currently conducting discovery. The parties entered into a global revised scheduling agreement for all five notes litigations, which is being finalized and pending filing. | N/A |

Appx. 06285

010238

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of 40

Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 12 of 14

| 6/3/21 | _Defendants Motion to Withdraw the Reference_ **[D.I. 20]** | | | |
|---|---|---|---|---|
| | **Movant** | HCMS | Five months after the complaint was filed HCMS filed a motion to withdraw the reference. | A hearing was held on July 8, 2021.  The Court issued its R&R on July 15, 2021 [D.I. 47]. HCRE filed a limited objection to the R&R [D. Ct. Docket No. 5]. |

***Charitable DAF Fund, L.P., and CLO Holdco, Ltd., v. Highland Capital Management, L.P., Highland HCF Advisor, Ltd., and Highland CLO Funding, Ltd., Case No. 21-cv-00842-B (N.D. Tex. April 12, 2021)***

| 4/12/21 | _Original Complaint_ | | | |
|---|---|---|---|---|
| | **Movants**: | DAF CLOH | Movants allege that the Debtor and Seery violated SEC rules, breached fiduciary duties, engaged in self-dealing, and violated RICO in connection with its settlement with the HarbourVest Entities. The Movants brought this complaint despite CLOH having objected to the HarbourVest settlement; never raised this issue; and withdrawn its objection. The Debtor believes the complaint is frivolous and represents a collateral attack on the order approving the HarbourVest settlement. The Debtor will take all appropriate actions. | On May 19, the Debtor filed a motion to enforce the order of reference seeking to have the case referred to the Bankruptcy Court [D.I. 22].  On May 27, 2019, the Debtor filed a motion to dismiss the complaint [D.I. 26].  Briefing is complete for both motions, and decisions are pending. | N/A |
| 4/19/21 | _Plaintiff's Motion for Leave to File First Amended Complaint in the District Court_ | | | |
| | **Movants**: | DAF CLOH | Movants filed a motion seeking leave from this Court to add Seery as a defendant and to seek, in this Court, a reconsideration of two final Bankruptcy Court orders. | This Court denied the motion but with leave to refile. | N/A |

11

APPX 00396

010239

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of 40

Case 19-34054-sgj11 Doc 2656-1 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 13 of 14

*PCMG Trading Partners XXIII, L.P. v. Highland Capital Management, L.P.*, **Case No. 21-cv-01169-N (N.D. Tex. May 21, 2021)**

4/12/21    *Original Complaint*

| **Movants**: | PCMG Trading Partners XXIII, L.P. | Movants allege that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. The Movant is an entity owned and controlled by Dondero, which had less than a 0.05% interest in the investment vehicle at issue and is no longer an investor. The Debtor believes the complaint is frivolous. The Debtor will take all appropriate actions. | The Complaint was recently filed and the Debtor has not yet been served. The Debtor will respond appropriately. | N/A |

*The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, **Case No. 21-cv-01479-S (N.D. Tex. June 23, 2021)**

6/23/21    *Original Complaint*

| **Movants**: | Dugaboy | Dugaboy alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. Dugaboy is Dondero's family trust with less than a 2% interest in the vehicle. Dugaboy's allegations in the complaint are duplicative of allegations it made in proofs of claim filed in the Bankruptcy Court. | The Complaint was withdrawn after the Debtor informed the Bankruptcy Court of the filing. | N/A |

*The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, **Case No. 21-cv-01710-N (N.D. Tex. July 22, 2021)**

7/22/21    *Original Complaint*

| **Movants**: | Dugaboy | DAF alleges that the Debtor violated SEC rules and breached fiduciary duties by causing one of its managed investment vehicles to sell certain assets. DAF's allegations in the complaint are duplicative of allegations Dugaboy made in proofs of claim filed in the Bankruptcy Court and in its complaint filed in the Northern District of Texas. | The Complaint has not yet been served. The Debtor will respond appropriately. | N/A |

Appx. 06225

010240

***In re James Dondero, Petitioner,* Cause No. DC-21-09534 (Tex. July 22, 2021)**

| 7/22/21 | _Original Complaint_ | | | |
| --- | --- | --- | --- | --- |
| **Movants**: | Dondero | Dondero seeks pre-suit discovery from Farallon Capital, a purchaser of certain claims in this case, and the Crusader Fund. Dondero alleges that Farallon breached certain U.S. Trustee requirements when it purchased those claims. Dondero also alleges that Farallon purchased those claims because of its relationship to Mr. Seery and that Mr. Seery was leveraging his relationship with Farallon to ensure that he remains in control of the Debtor. | The pre-suit discovery has not yet been served. The Debtor will respond appropriately. | N/A |

13

Appx. 96298

010241

Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21   Entered 08/03/21 12:20:51   Page 1 of 14

# **EXHIBIT B**

Appx 06299
010242

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 325 of 1017    PageID 11106
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 2 of 14

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | **Re: Docket Nos. 2535, 2621, 2648** |

**DEBTOR'S AMENDED REPLY IN SUPPORT OF ITS MOTION FOR ENTRY OF
AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN PROPERTY AND (II)
GRANTING RELATED RELIEF**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appx. 96809
010243

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 326 of 1017 PageID 11107
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 3 of 14

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this amended reply (the "Reply")[2] (a) in response to the *Objection to the Debtor's Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2621] (the "Objection") filed by NexPoint Advisors, L.P. ("NexPoint") and (b) in support of the *Motion of the Debtor for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2535] (the "Motion").[23]  In further support of the Motion, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    Through the Motion, the Debtor seeks authority to exercise its Management Rights to cause Maple Holdings, its wholly owned subsidiary, to sell the Property to the Purchaser pursuant to the terms of the Purchase Agreement.  After a thorough marketing process, the Debtor determined that the Purchaser's offer for the Property was the highest and otherwise best offer and that conducting a private sale was in the best interests of its estate.  The Committee supports the Debtor's exercise of the Management Rights to cause a sale of the Property to the Purchaser – notwithstanding the competing "offer" presented by NexPoint – and no true creditor or party-in-interest has objected.

2.    Not surprisingly, the only objecting party is NexPoint, an entity owned and controlled by James Dondero.  During the marketing process, the Debtor received an unsolicited offer to purchase the Property from NPRE, another entity owned and controlled by Mr. Dondero.

---

[2] The Debtor is filing this amended Reply to clarify an issue initially raised in the *Debtor's Reply in Support of Its Motion for Entry of an Order (i) Authorizing the Sale of Certain Property and (ii) Granting Related Relief* [Docket No. 2648] (the "Initial Reply").  For the convenience of the Court, a redline showing the changes to the Initial Reply is attached hereto as Exhibit B.

[23] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

Appx. 96801
010244

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 327 of 1017 PageID 11108
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 4 of 14

For the reasons discussed in the Motion, the Debtor determined not to engage with NPRE with respect to the offer. The Debtor has also reviewed NexPoint's unsolicited contingent offer and has determined, for the same reasons, that it is not in the Debtor's best interests to engage with NexPoint regarding a sale of the Property.

3.     NexPoint challenges the Debtor's business judgment, claiming that the Debtor's decision not to engage with it (1) lacks a "sound business justification," (2) "blatantly shows an unjustified prejudice toward NPA supported by conclusory statements and incomplete facts," and (3) is an "abuse of discretion" and "arbitrary." Objection ¶¶ 1, 4, 6, 7. According to NexPoint, because its offer is nominally higher than the Purchaser's offer, the Debtor must agree to sell the Property to it. NexPoint is wrong.

4.     Preliminarily, and as discussed below, NexPoint – as a potential purchaser – lacks standing to object to the Motion. To the extent NexPoint asserts standing based upon its post-confirmation acquisition of certain disputed employee claims, such standing is tenuous at best and should be viewed through that lens.

5.     Even assuming NexPoint has standing, its objection to the Motion is frivolous. First, NexPoint's "offer" is contingent and subject to a ten-day "Inspection Period" at the conclusion of which NexPoint would, in its sole discretion, have the option to terminate its agreement to purchase the Property and receive $990,000 of its $1 million earnest money deposit back in full. NPA PSA, pg. 2; § 5. That is not an offer; it is a free option. Second, NexPoint's overarching argument that the Debtor may not take its prior interactions with Mr. Dondero and his related entities into account in determining whether to transact business with them is nonsensical and not supported by the case law. Actions have consequences. Mr. Dondero's repeated failure to abide by Court orders and contractual obligations to the estate, unabashed

3



Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 328 of 1017 PageID 11109
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 5 of 14

willingness to assert frivolous positions and initiate baseless lawsuits,[34] and his documented history of litigiousness[45] provide ample support for the Debtor's decision not to engage with Mr. Dondero or any of his related entities in the sale of the Property.

6. As set forth in the Motion and as will be demonstrated in connection with the hearing on the Motion, the risks associated with selling the Property to Mr. Dondero or his related entities are not present in the transaction with the Purchaser. NexPoint's argument that both transactions are "apples to apples" ignores (a) the fact that NexPoint's offer is contingent on NexPoint's inspection of the Property and (b)(i) the closing risk, (ii) the risk of potential post-sale litigation if the Debtor transacts with Mr. Dondero, and (iii) the risk that if – for whatever reason – NexPoint does not close, the Purchaser will no longer be willing to complete the transaction, let alone on the terms negotiated. One need look no further than the years of litigation that caused the Debtor's chapter 11 filing and Mr. Dondero's conduct during the case to conclude that **any** commercial transaction with Mr. Dondero presents material risk. The Court should overrule the Objection and grant the Motion.

---

[34] In fact, in just the few weeks since the Debtor was last before this Court, Mr. Dondero has commenced two new actions against the Debtor that lack factual or legal support and that otherwise make no rational sense to pursue given Mr. Dondero's highly speculative and remote economic interest in the Debtor's estate.

**First**, on July 22, 2021, Mr. Dondero, again through his attorneys at Sbaiti & Co. ("Sbaiti"), filed an action in the Northern District of Texas using the Charitable Donor Advised Fund, L.P. (the "DAF Complaint"). *Original Complaint, The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Cause No. 3:21-cv-01710-N (N.D. Tex. July 22, 2021). The DAF Complaint alleges that the DAF is a limited partner in the Highland Multi-Strategy Credit Fund ("Multi-Strat") and asserts claims against the Debtor for mismanagement of Multi-Strat during the pendency of this Bankruptcy Case. The DAF Complaint is essentially verbatim the complaint filed in the Northern District of Texas by the Sbaiti firm on behalf of Mr. Dondero's family trust, the Dugaboy Investment Trust. As this Court will remember, that complaint was duplicative of the proof of claim (Claim No. 177) filed by Dugaboy in this Court and was withdrawn within an hour after it was brought to this Court's attention.

**Second**, also on July 22, 2021, Sbaiti, again on behalf of the DAF, initiated an action in Texas state court for pre-suit discovery against the Redeemer Committee alleging, among other things, that the Redeemer Committee's transfer of its claim was in furtherance of a scheme concocted by James P. Seery, Jr., the Debtor's Court-approved chief executive officer and chief restructuring officer, to drain the estate of resources. *Verified Petition to Take Deposition Before Suit and Seek Documents, In re James Dondero*, Cause No. DC-21-09534 (Tex. July 22, 2021).

[45] A chart showing the litigation caused, directly and indirectly, by Mr. Dondero since October 2020 is attached hereto as Exhibit A.

DOCS_NY:~~43784.6 36027/002~~43784.7 36027/002

Appx. 96893

010246

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 329 of 1017 PageID 11110
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 6 of 14

### THE COURT SHOULD AUTHORIZE THE DEBTOR TO EXERCISE ITS MANAGEMENT RIGHTS TO CAUSE MAPLES TO SELL THE PROPERTY TO THE PURCHASER

**A.**     **NexPoint Lacks Standing to Object to the Motion**

7.      NexPoint filed two proofs claim in this case (Claim Nos. 104 and 108) which were later expunged [Docket No. 1233]. NexPoint, however, holds prepetition claims against the estate after acquiring them from five former Debtor employees (acquisitions done solely to manufacture standing to object to the Plan).[56] The Debtor has objected to each of these claims and believes that they are frivolous [Docket No. 2059]. A hearing on those objections is scheduled for November 15, 2021.

8.      Consequently, NexPoint's standing to object to the Purchase Agreement as a prepetition creditor is extremely attenuated as its chances of recovery in this case are, at best, theoretical and speculative. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flintkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd*. 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing).

9.      Further, any claim made by NexPoint that it has standing to object to the sale of the Property as a potential bidder also fails. *In re VCR I, LLC*, 2017 Bankr. LEXIS 3341, at *12 (Bankr. S.D. Miss. Sept. 29, 2017) ("This Court has previously held that a prospective purchaser does not have standing to object to a sale motion."); *see also Squire v. Scher (In re Squire)*, 282

---

[56] One of NexPoint's "claims," acquired from Michael Beispiel, is not a claim at all. Mr. Beispiel did not file a proof of claim nor was Mr. Beispiel's claim scheduled. Any alleged prepetition claim that Mr. Beispiel might have had is therefore barred. *See Order Establishing Bar Dates for Filing Claims and (ii) Approving the Form and Manner of Notice Thereof* [Docket No. 488] ("Any entity that is required to file a Proof of Claim Form but fails to [do] so properly by the applicable Bar Date, shall not be treated as a creditor with respect to such claim for purposes of voting upon, or receiving distributions under, any chapter 11 plan in this case.").

Appx. 96804
0102247

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 330 of 1017    PageID 11111
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 7 of 14

Fed. Appx. 413, 416 (6th Cir. 2008) ("Frustrated Bidders do not have standing to object to the sale of a property"); 3 COLLIER ON BANKRUPTCY ¶363.02[c] (same).

10.      Finally, Mr. Dondero initially offered to acquire the Property through NPRE, another of his related entities.  NexPoint only submitted its "offer" after the Motion was filed. The Debtor believes that Mr. Dondero is causing NexPoint, rather than NPRE, to object because Mr. Dondero recognizes that NPRE has no standing as a prepetition creditor[67] and that NexPoint's standing arguments (although flimsy) are better.  These shell games highlight Mr. Dondero's coordination of the efforts amongst his related entities.

**B.      The Debtor's Good Faith Decision Not to Engage Mr. Dondero or His Related Entities in Connection with the Sale of the Property Was Justified and a Proper Exercise of the Debtor's Business Judgment**

11.      As discussed in the Motion, section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  As set forth in Rule 6004(f)(1), sales under 11 U.S.C. § 363(b) can be conducted by "private sale or by public auction."  Although the Bankruptcy Code does not include a statutory standard for determining when the use or sale of property should be authorized, it is well-established that a debtor may use or sell property of the estate outside the ordinary course of business if there is a good business reason for doing so and the proposed course of action is advantageous to the estate.  *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *In re Pisces Energy*, *LLC*, 2009 Bankr. LEXIS 4709, at *18 (Bankr. S.D. Tex. Dec. 21, 2009).

12.      To challenge the Debtor's business judgment, NexPoint cites to case law for the

---

[67] NPRE filed one proof of claim (Claim No. 146), which seeks to novate a limited liability corporation agreement because NPRE believes that there was a mutual mistake in the drafting of such agreement.  The Debtor believes NPRE's claim is frivolous and has objected [Docket No. 1673].

DOCS_NY:~~43784.6 36027/002~~43784.7 36027/002

Appx. 06805
010248

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 331 of 1017 PageID 11112
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 8 of 14

unremarkable proposition that the goal of any sale is to maximize the proceeds to the estate.[78]
Objection ¶¶ 9-10 (citing *In re Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764 (Bankr. D. Del.
Aug. 15, 2007); *In re Walker County Hosp. Corp.*, 2021 U.S. App. LEXIS 20610 (5th Cir. July
12, 2021)).[89]  The Debtor agrees and believes that the process overseen by the Debtor for the sale
of the Property did just that:  a sale of the Property to Purchaser has maximized value.  NexPoint
cites no cases – and the Debtor believes none exist – for the proposition that the Debtor must
agree to include any party in a sale process and choose the nominally highest bid regardless of
other circumstances that exist.

13.     Under 11 U.S.C. § 363(b), a Debtor is tasked with finding the highest **and best**
offer, not just accepting the offer that is nominally a higher dollar amount on paper.  *See, e.g.,
Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)) (a trustee "must
demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court
may accept a lower bid in the presence of sound business reasons, such as substantial doubt that
the higher bidder can raise the cash necessary to complete the deal"); *In re Tresha-Mob, LLC*,
2019 Bankr. LEXIS 13333, at *4-6 (Bankr. W.D. Tex. 2019) ("Voltaire adopts a one-track
value-maximization argument that ignores the mountains of precedent in which trustees,
debtors-in-possession, and courts have rejected the highest bid when it was not the 'best
bid'");[910] COLLIER ¶ 363.02[4] ("Although a trustee normally would be expected to sell to the

---

[78] NexPoint also alleges, without factual support, that NexPoint's "participation in the sale process has resulted in incremental estate recoveries." Objection ¶ 5.  This is not true.  Neither NPRE's nor NexPoint's "bids" were shown to any other bidder.  They were received after a deal had been reached with Purchaser and simply did not factor in to the agreed upon purchase price.

[89] Although *Walker County* has general language in *dicta* concerning 11 U.S.C. § 363(b), that case does not address the requirements of section 363(b) at all.  Instead, *Walker County* deals with whether an appeal is statutorily moot by reason of 11 U.S.C. § 363(m).

[910] In *Treshe-Mob* the bankruptcy court rejected NexPoint's premise that the highest bid is always the best bid:
    Here, the objection that Voltaire seeks to pursue is not "colorable."  In its *Limited Objection*, Voltaire adopts a one-track value-maximization argument that ignores mountains of precedent in which trustees,

Appx. 96806
010249

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 35 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 332 of 1017    PageID 11113
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 9 of 14

highest bidder in an auction, there may be sound business reasons to accept a lower bid, particularly in a negotiated sale.").

14.    *In re 160 Royal Palm*, a case from the District Court for the Southern District of Florida which was affirmed by the 11th Circuit, presented a strikingly similar fact pattern to this case.  600 B.R. 119 (S.D. Fla. 2019), *aff'd* 785 Fed. App'x 829 (11th Cir. 2019).  In *160 Royal Palm*, the Debtor attempted to sell an asset at public auction.  That auction failed in substantial part because of the constant barrage of litigation brought by the property's former owner.  *Id.* at 124.  Ultimately, the Debtor entered into a private sale and sought bankruptcy court approval.  The former owner objected arguing it was "an abuse of discretion to eliminate other potential bidders from the sale," which included, of course, the former owner.  *Id.* at 127.  The bankruptcy court rejected that argument, and the district court affirmed, stating "private sales are not unheard of in bankruptcy proceedings" and, in part because the offer was conditioned on a private sale, the Debtor was entitled to pursue a "bird in hand" approach and sell the asset

---

debtors-in-possession, and courts have rejected the highest bid when it was not the "best bid."  *See In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015)* ("a debtor must demonstrate that the proposed purchase price is not only the highest offer, ***but the highest and best offer***") (emphasis added).  While the bid that brings in the most cash often wins, it is "common knowledge" that the "highest bid is not always the best bid," especially if there are "conditions sufficient to overbalance the difference between the two."  *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925).  The Bankruptcy Code thus affords courts "broad flexibility in determining which of several bidders should be deemed the successful bidder at a *§ 363(b)* sale."  *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993).  As such, courts routinely reject the proposition that reviewing courts or fiduciaries are "duty-bound to mechanically accept a bid with the highest dollar amount."  *Lawsky v. Condor Capital Corp.,* 2015 U.S Dist. LEXIS 96347, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015) (internal quotation marks and citations omitted); *see also After Six, 154 B.R.* at 882 ("The Bankruptcy Code, like any law, must be read in its context as a tool of mankind, not a body of edicts to which mankind is a slave irrespective of its interests to the contrary.").

In determining whether the highest bid is the "best bid," the fiduciary and reviewing court must consider factors such as "the risks associated with each bid and the probabilities that the proposed terms will come to fruition" as well as "contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing."  *Lawsky,* 2015 U.S. Dist. LEXIS 96347, 2015 WL 4470332, at *9 (quoting and citing *Family Christian,* 533 B.R. at 622).

*Treshe-Mob*, 2019 Bankr. LEXIS 1333, at *4-6 (emphasis in original).

Appx. 00307
010250

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 333 of 1017 PageID 11114
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 10 of
14

without competing bids. *Id.* at 128.

15. In so ruling, the District Court also rejected the unsolicited bid made by the former owner on the property despite that bid being higher. The District Court found persuasive, among other things, the fact that the former owner had defaulted on a prior deal with the Debtor and his documented history of litigiousness:

> While the KKPB offer ostensibly *could* provide the estate with an additional million dollars . . . the Court credits the Debtor's concerns about the uncertainty of that offer. Indeed, the Debtor sought a settlement and sale with KKPB once in the past, which fell through, because KKPB defaulted.
>
> Appellant vigorously argued at oral argument on April 5 that the Debtor should have accepted its higher bid. However, the Court notes that while a debtor has a duty to "maximize the return to a bankruptcy estate," which "often does require [the] recommendation of the highest monetary bid, *overemphasis of this usual outcome overlooks a fundamental truism, i.e., a 'highest' bid is not always the 'highest and best' bid.* The inclusion of 'best' in that conjunction is not mere surplusage." . . . .
>
> Appellant also alleges that Debtor only rejected KKPB's higher offer out of personal animus towards KKPB's owner, Mr. Straub. The Debtor provides a number of explanations for its rejection of the KKPB offer, including, among other things, Mr. Straub's litigiousness. . . .
>
>> Among other things, Mr. Glickstein testified that the potential for about a $1 million increase in the overall sale price was not worth the risk that KK-PB, and its principal, Mr. Glenn Straub, would take action that would greatly increase the costs to the estate. Mr. Glickstein pointed to specific experience with Mr. Straub in this very case to support [his] view that the potential increase in recovery was fair outweighed by the risk of additional litigation. Mr. Glickstein stressed the strength of the purchaser identified in the sale motion. . . .
>
>                         ***
>
> On the record before this Court, the Debtor had real concerns about the viability of the KKPB offer for a variety of reasons — including the fear of additional litigation. Though Appellant may characterize this as "animus," the avoidance of litigation is a legitimate business objective. And, Appellant could not provide the Court with a single case where a court disallowed a sale because the debtor had concerns about future litigation.
>
> The Debtor's duty is to maximize value to the creditors, and that maximization

DOCS_NY:43784.6 36027/00243784.7 36027/002

Appx 003081
010251

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 334 of 1017 PageID 11115
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 11 of
14

includes considerations such as finality, stability, and expeditious resolution of the bankruptcy proceeding. The LR offer, although 2.5% lower than the KKPB offer, provided that finality and stability. When asked by the Court at oral argument, Appellant could provide no other reasons why the KKPB offer constituted the highest and best offer *other than* the purported one-million-dollar additional benefit to the estate. Thus, to force the Debtor to forego the LR offer and subject itself to a public auction would require this Court to inappropriately use its own business judgment in place of the Debtor's, which this Court will not do.

*Id.*, at 129-30 (emphasis in original).

16.     *160 Royal Palm* supports the Debtor's position in this case. On the one hand, the Debtor has the Purchaser who represents finality and stability. The Purchaser has conducted its diligence and, as its inspection period has expired, has no due diligence out, negotiated a purchase agreement that contemplated a private sale not subject to auction, and is ready, willing, and able to close. NexPoint would have the Debtor renege on the commitment to the Purchaser and ~~agree to sell the Property to NexPoint (subject to NexPoint's diligence)~~enter into a contingent agreement with NexPoint that could be terminated (without material consequence) in NexPoint's sole discretion. No reasonable person would terminate an agreement with the Purchaser and enter into an "agreement" with NexPoint under these conditions.

17.     Moreover, even if the agreements were "apples to apples," NexPoint ~~also~~ effectively insists that the Debtor ignore its prior dealings with Mr. Dondero and his related entities and disregard their failure to live up to their prior contractual obligations and documented history of litigation, including more than twenty pending litigation matters in this case alone. And for what purpose? So that the Debtor's estate can theoretically receive $350,000 more in sale proceeds? The Debtor and the Committee have decided that any theoretical upside in agreeing to sell the Property to Mr. Dondero or any of his related entities is not worth the risk. The evidence the Debtor will submit in connection with the hearing on the

DOCS_NY:~~43784.6 36027/002~~43784.7 36027/002

Appx. 00309

010252

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 335 of 1017    PageID 11116
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21    Entered 08/03/21 12:20:51    Page 12 of
14

Motion will unequivocally demonstrate that the Debtor's position is justified.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:~~43784.6 36027/002~~43784.7 36027/002

**Appx. 06310**

010253

Case 19-34054-sgj11 Doc 3445-39 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 336 of 1017 PageID 11117
Case 19-34054-sgj11 Doc 2656-2 Filed 08/03/21 Entered 08/03/21 12:20:51 Page 13 of
14

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully

requests that the Court grant the Motion.

Dated: August 2̶3̲, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

Appx. 09631

010254

Document comparison by Workshare Compare on Tuesday, August 03, 2021 1:02:29 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/43784/6 |
| Description | DOCS_NY-#43784-v6-Highland_-_Maple_Ave_Reply |
| Document 2 ID | PowerDocs://DOCS_NY/43784/7 |
| Description | DOCS_NY-#43784-v7-Highland_-_Maple_Ave_Reply |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 32 |
| Deletions | 21 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 53 |

# EXHIBIT 40

Appx 06313
010256

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 9
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 339 of 1017    PageID 11120
Case 19-34054-sgj11 Doc 2640 Filed 07/30/21    Entered 07/30/21 21:54:57    Page 1 of 8

Docket #2640  Date Filed: 07/30/2021

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054 (SGJ) |
| | ) |
| Debtor. | ) |
| | ) |

## CERTIFICATE OF SERVICE

I, Elliser Silla, depose and say that I am employed by Kurtzman Carson Consultants LLC ("KCC"), the claims and noticing agent for the Debtor in the above-captioned case.

On July 27, 2021, at my direction and under my supervision, employees of KCC caused the following documents to be served via Electronic Mail upon the service list attached hereto as **Exhibit A**; and via First Class Mail upon the service list attached hereto as **Exhibit B**:

- **Fifth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from January 1, 2021 Through January 31, 2021** [Docket No. 2609]

- **Sixth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from February 1, 2021 Through February 28, 2021** [Docket No. 2610]

- **Sixth Interim Fee Application of FTI Consulting, Inc. as Financial Advisor for the Official Committee of Unsecured Creditors, for Compensation and Reimbursement of Expenses for the Period from March 1, 2021 Through and Including May 31, 2021** [Docket No. 2611]

Furthermore, on July 27, 2021, at my direction and under my supervision, employees of KCC caused the following documents to be served via First Class Mail upon the service list attached hereto as **Exhibit C**:

- **Fifth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from January 1, 2021 Through January 31, 2021** [Docket No. 2609]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210730000000000020

App. 06311

0110257

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 9
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 340 of 1017   PageID 11121
Case 19-34054-sgj11 Doc 2640 Filed 07/30/21   Entered 07/30/21 21:54:57   Page 2 of 8

- **Sixth Monthly Fee Statement of Deloitte Tax LLP for Compensation for Services Rendered as Tax Services Provider to the Debtor for the Period from February 1, 2021 Through February 28, 2021** [Docket No. 2610]

Dated: July 29, 2021

/s/ Elliser Silla
Elliser Silla
KCC
222 N Pacific Coast Highway, Suite 300
El Segundo, CA 90245

2

010258

Case 19-34054-sgj11 Doc 2640 Filed 07/30/21 Entered 07/30/21 21:54:57 Page 3 of 8

# EXHIBIT A

Appx 00346
010259

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 9
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 342 of 1017    PageID 11123
Case 19-34054-sgj11 Doc 2640 Filed 07/30/21    Entered 07/30/21 21:54:57    Page 4 of 8

**Exhibit A**
Fee App Parties List
Served via Electronic Mail

| Description | CreditorName | CreditorNoticeName | Email |
|---|---|---|---|
| Debtor | Highland Capital Management | Attn: Thomas Surgent | TSurgent@highlandcapital.com |
| US Trustee for Northern District of TX | Office of the United States Trustee | Lisa L. Lambert, Esq | lisa.l.lambert@usdoj.gov |
| US Trustee for District of DE | Office of the United States Trustee Delaware | Jane M. Leamy | jane.m.leamy@usdoj.gov |
| Counsel for the Debtor | Pachulski Stang Ziehl & Jones LLP | Richard M. Pachulski, Jeffrey N. Pomerantz, Ira D. Kharasch, James E. O'Neill | rpachulski@pszjlaw.com; jpomerantz@pszjlaw.com; ikharasch@pszjlaw.com; joneill@pszjlaw.com |
| Counsel to Official Committee of Unsecured Creditors | Sidley Austin LLP | Matthew Clemente, Alyssa Russell, Elliot A. Bromagen | mclemente@sidley.com; alyssa.russell@sidley.com; ebromagen@sidley.com |

Appx. 96317
010260

# EXHIBIT B

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 9

Case 19-34054-sgj11 Doc 2640 Filed 07/30/21    Entered 07/30/21 21:54:57    Page 6 of 8

**Exhibit B**
Fee App Parties List
Served via First Class Mail

| Description | CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip |
|---|---|---|---|---|---|---|---|---|
| US Trustee for Northern District of TX | Office of the United States Trustee | Lisa L. Lambert, Esq | 1100 Commerce Street, Room 976 | Earle Cabell Federal Building | | Dallas | TX | 75242 |
| US Trustee for District of DE | Office of the United States Trustee Delaware | Jane M. Leamy | J. Caleb Boggs Federal Building | 844 King St Ste 2207 | Lockbox 35 | Wilmington | DE | 19801 |
| United States Bankruptcy Court | United States Bankruptcy Court | Honorable Stacey G. Jernigan | Northern District of Texas - Dallas Division | Earle Cabell Federal Building | 1100 Commerce St., Rm. 1254 | Dallas | TX | 75242-1496 |

Highland Capital Management, L.P.
Case No. 19-34054

Page 1 of 1

Appx. 08319

010262

# EXHIBIT C

Appx. 06329

010263

Case 19-34054-sgj11 Doc 3445-40 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 9

Case 19-34054-sgj11 Doc 2640 Filed 07/30/21    Entered 07/30/21 21:54:57    Page 8 of 8

**Exhibit C**
Fee App Party List
Served via First Class Mail

| Description | CreditorName | CreditorNoticeName | Address1 | City | State | Zip |
|---|---|---|---|---|---|---|
| Counsel to Official Committee of Unsecured Creditors | Sidley Austin LLP | Matthew Clemente, Alyssa Russell, Elliot A. Bromagen | One South Dearborn Street | Chicago | IL | 60603 |

Highland Capital Management, L.P.
Case No. 19-34054

Page 1 of 1

Appx. 08321
010264

# EXHIBIT 41

Appx. 06322
010265

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 348 of 1017 PageID 11129
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 1 of 10 PageID 22874

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Reorganized Debtor. | Chapter 11<br><br>Bankr. Ct. No. 19-34054-sgj-11 |
| NEXPOINT ADVISORS, L.P.,<br><br>    Appellant,<br><br>v.<br><br>PACHULSKI STANG ZIEHL & JONES LLP, WILMER CUTLER PICKERING HALE AND DORR LLP, SIDLEY AUSTIN LLP, FTI CONSULTING, INC., and TENEO CAPITAL, LLC,<br><br>    Appellees. | Civil Action No. 3:21-CV-03086-K<br><br>*consolidated with:*<br><br>Civil Action No. 3:21-CV-03088-K<br>Civil Action No. 3:21-CV-03094-K<br>Civil Action No. 3:21-CV-03096-K<br>Civil Action No. 3:21-CV-03104-K |

### APPEAL FROM THE
### UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS

## MEMORANDUM OPINION AND ORDER

Before the Court are Appellees' Joint Motion to Dismiss Appeals as Constitutionally Moot (the "Motion") (Doc. No. 14), Appellant NexPoint Advisors, L.P.'s Opposition to Appellees' Joint Motion to Dismiss Appeals as Constitutionally Moot (the "Response") (Doc. No. 24), and Appellees' Joint Reply to Appellant's

0110266

Appx 96323

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 349 of 1017 PageID 11130
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 2 of 10 PageID 22875

Opposition to Motion to Dismiss Appeals as Constitutionally Moot (the "Reply") (Doc. No. 26). Having carefully considered the Motion, the Response, the Reply, the applicable briefs and appendices, and the applicable law, the Court finds Appellant lacks standing to appeal under this circuit's "person aggrieved" test, and therefore **GRANTS** Appellees' Motion.

## I.     Background

NexPoint Advisors, L.P. ("NexPoint" or "Appellant") appeals five bankruptcy court orders approving final applications for compensation of fees and reimbursement expenses of various estate professionals (collectively, the "Fee Application Orders"). On January 11, 2022, the Court consolidated these appeals into this action. Doc. No. 8. Appellees now motion this Court to dismiss these consolidated appeals as constitutionally moot. Doc. No. 14.

## II.     Legal Standard

Appellees characterize the issue as one of constitutional standing and mootness, though they cite case law and present arguments primarily about the prudential standing requirement of the "person aggrieved" test. *E.g.*, Doc. No. 14 at 9-15; Doc. No. 26 at 5-9. A court-maintained prudential requirement for standing to appeal a bankruptcy court's order, the "'person aggrieved' test is an even more exacting standard than traditional constitutional standing." *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person

Appx 96324
010267

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 350 of 1017 PageID 11131
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 3 of 10 PageID 22876

aggrieved' by the bankruptcy court's order." (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))). In *Matter of Technicool Sys., Inc.*, the Fifth Circuit recently repeated the rationale for the additional standing requirement:

> . . . [D]isgruntled litigants may [not] appeal every bankruptcy court order willy-nilly. Quite the contrary. Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, quite limited.

896 F.3d 382, 385 (5th Cir. 2018). A cursory glance at the bankruptcy court's docket for this case offers an apt example of the doctrine's continued necessity. To be a "person aggrieved," appellant "must show that he was '*directly* and *adversely* affected pecuniarily by the order of the bankruptcy court . . .'" *In re Coho Energy Inc.*, 395 F.3d at 203 (emphasis added) (quoting *In re Fondiller*, 707 F.2d 441, 443 (9th Cir. 1983)).

While Appellant engages with Appellees' person aggrieved test arguments (*e.g.*, Doc. No. 24 at 6, 10-15), Appellant also urges this Court not to apply the test based on the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, which held in part that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates." 572 U.S. 118, 128 (2014); *but see In re Alpha Nat. Res., Inc.*, 763 Fed. App'x 412 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1601 (2019) (denying *certiorari* for question of whether Article III courts may apply person aggrieved test to determine standing to appeal bankruptcy court order). But regardless of whatever impact *Lexmark* was intended to have on standing in bankruptcy appeals—

Appx. 00325
010268

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 351 of 1017 PageID 11132
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 4 of 10 PageID 22877

if any—virtually every circuit still applies some form of the person aggrieved test. *E.g.*, John A. Peterson III & Joshua A. Esses, *The Future of Bankruptcy Appeals: Appellate Standing After Lexmark* Considered, 37 Emory Bankr. Dev. J. 285, 305-16 (2021). And, although some circuits have modified their approaches to the doctrine in the wake of *Lexmark*, that does not appear to be the case in this circuit. *Id.* at 309.

The Fifth Circuit has consistently stated, "Bankruptcy courts are not authorized by Article III of the Constitution, and as such are not presumptively bound by traditional rules of judicial standing." *In re Coho Energy Inc.*, 395 F.3d at 202; *see also Matter of Technicool Sys., Inc.*, 896 F.3d at 385 ("Bankruptcy courts are not Article III creatures bound by traditional standing requirements."). Just five months ago in *Matter of Dean*, the Fifth Circuit reaffirmed its use of the person aggrieved test in determining whether a party has standing to appeal a bankruptcy court order. 18 F.4th 842, 844 (5th Cir. 2021). Thus, the Court is bound by the doctrine; Appellant has standing to appeal the Fee Application Orders only if it can demonstrate that it is "directly, adversely, and financially impacted" by them. *Matter of Technicool Sys., Inc.*, 896 F.3d at 384.

## III. Analysis

### A. *Is Appellant a "person aggrieved?"*

#### 1. *Administrative Claim*

Appellant has a number of prepetition claims—all of which have been either expunged or withdrawn—and an administrative claim with a pending objection. *E.g.*,

Appx. 96326
010269

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 352 of 1017 PageID 11133
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 5 of 10 PageID 22878

Doc. No. 14 at 8-9. Appellant does not offer any substantive standing arguments related to its prepetition claims, and instead focuses on its supposed appellate standing based on its administrative expense claim. *See* Doc. No. 24 at 7, 15-18. The Court will address these arguments first.

Appellant maintains that its administrative claim independently confers it standing as a creditor to appeal the Fee Application Orders. *Id.* Appellees counterargue that the Bankruptcy Code affords high priority for administrative expense claims (*e.g.*, 11 U.S.C. §§ 507(a)(2)-(3), 1129(a)(9)) that the Confirmed Plan (Bankr. Doc. No. 1943 at 113) echoes that same priority scheme, and therefore "both the Bankruptcy Code and the Debtor's plan of reorganization . . . mandate the full payment of allowed administrative claims." Doc. No. 14 at 12-14; Doc. No. 26 at 9-26. In rebuttal, Appellant argues that neither the Bankruptcy Code nor the Confirmed Plan *guarantee* payment of its administrative expense claim. Doc. No. 24 at 15-18.

In their Motion, Appellees argue:

Appellees anticipate that Appellant will argue that it is potentially financially impacted by these appeals to the extent there are insufficient funds to satisfy its asserted $14 million administrative claim. This is false. In addition to the fact that Highland has already paid 100% of the amounts owed to the professionals under the Fee Application Orders, Highland's projections filed in connection with the confirmation of the Plan projected payment of approximately 71% of the estimated $273 million of general unsecured claims, which would result in an aggregate distribution of approximately $194 million to general unsecured creditors. *See* Bankruptcy Docket No. 1875-1. Because holders of administrative claims must be fully paid prior to any distributions to unsecured creditors and all professional fee claims have already been paid, there can be no credible argument that Highland would not be able to

5

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 353 of 1017 PageID 11134
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 6 of 10 PageID 22879

> pay NexPoint's $14 million administrative claim (to the extent it is even allowed) given the substantial projected distribution to the junior unsecured claims.

Doc. No. 14 at 14 n.29; *see also* Doc. No. 26 at 10-11. Regardless of whether the Bankruptcy Code and/or Confirmed Plan absolutely guarantee payment of the administrative claim, Appellant fails to meaningfully rebut Appellees' argument that the chances of Appellant's administrative claim not being paid (assuming it is allowed) are extremely remote. For that reason, Appellant fails to persuasively argue that it has been directly and adversely impacted by the Fee Application Orders. As the Fifth Circuit stated in *In re Coho Energy Inc.*, "A remote possibility does not constitute injury under *Rohm's* 'person aggrieved' test." 395 F.3d at 202 (citing *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205 (5th Cir. 1994)). Accordingly, Appellant's administrative expense claim does not afford it standing to appeal the Fee Application Orders.

### 2. *Adversary Proceeding*

Appellant's main argument involves an Adversary Proceeding in which Marc. S. Kirschner—the Litigation Trustee of the Litigation Sub-Trust formed under the Confirmed Plan—allegedly "seeks to hold NexPoint liable for hundreds of millions of dollars of Highland debt, including 'in excess of $40 million in professional fees in connection with the bankruptcy.'" Bankr. Doc. No. 2934 at 39, 77, 86-88; Doc. No. 24 at 9. According to Appellant, it has standing here to appeal the Fee Application

010271
Appx 06328

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 354 of 1017 PageID 11135
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 7 of 10 PageID 22880

Orders because, "As a defendant in the Adversary Proceeding, NexPoint is potentially on the hook for professional fees awarded to the Appellees." Doc. No. 24 at 12.

Appellees cite a number of cases that generally hold that "potential litigation in another proceeding does not make an appellant a 'person aggrieved' for standing purposes." Doc. No. 26 at 7 n.7. In this case, of course, there is no "specter of possible litigation" as Appellant is currently a defendant in the Adversary Proceeding. But the underlying principle—that Appellant must be "directly, adversely, and financially impacted" by the bankruptcy court orders for standing to appeal them—remains unchanged. *Matter of Technicool Sys., Inc.*, 896 F.3d at 384. Here, the Fee Application Orders do not directly impact Appellant. At most, Appellant *could* be *indirectly* impacted by the Fee Application Orders, but only if Appellant was to be found liable in the Adversary Proceeding. Any future liability from the Adversary Proceeding is speculative and, in this Court's opinion, not sufficient to confer standing on Appellant to appeal the Fee Application Orders under the person aggrieved standard.

**B.** *Bankruptcy Code Argument*

Last, Appellant argues, regardless of the "person aggrieved" test, the Bankruptcy Code specifically affords it standing to appeal the Fee Application Orders here as a party with interests protected by the Bankruptcy Code. Doc. No. 24 at 8, 14-15, 18-19. Cited by Appellant, §§ 330(a)(1)-(2) states:

> (a)(1) After notice to the *parties in interest* and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under

Appx 06329

010272

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 355 of 1017 PageID 11136
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 8 of 10 PageID 22881

section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—

> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

> (B) reimbursement for actual, necessary expenses.

(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other *party in interest*, award compensation that is less than the amount of compensation that is requested.

11 U.S.C. §§ 330(a)(1)-(2) (emphasis added). The Bankruptcy Code does not define

"party in interest," though § 1109(b) offers a non-exhaustive list of who may be

considered a party in interest:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or an indenture trustee, *may raise and may appear and be heard* on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added). Appellant maintains that it is a party in interest

as a creditor via its administrative expense claim. Doc. No. 24 at 18. Also, recognizing

that "litigant in an adversary proceeding" is not a category specifically enumerated in

§ 1109(b), Appellant argues that it separately qualifies as a party in interest because §

330 broadly refers to "parties in interest" in discussing who is entitled to notice of a

court's order granting professional fees, as well as who may motion a court to "award

compensation that is less than the amount of compensation that is requested." Doc.

No. 24 at 19. In other words, Appellant reasons that based on its potential liability for

8

Appx. 06339
010273

Case 19-34054-sgj11 Doc 3445-41 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 356 of 1017 PageID 11137
Case 3:21-cv-03086-K Document 37 Filed 05/09/22 Page 9 of 10 PageID 22882

the professional fees in the Adversary Proceeding, it is a party in interest that may object to the Bankruptcy Court's Fee Application Orders per § 330, and therefore has appellate standing here to appeal those Fee Application Orders. Doc. No. 24 at 18 (". . . NexPoint qualifies as a creditor and party in interest by virtue of its request for payment of expenses of administration under 11 U.S.C. § 503(b)(1), as well as a party in interest under 11 U.S.C. § 1109(b) by virtue of its status as a defendant in the Adversary Proceeding in which the damages claim is based, in part, on the professional fees at issue in these appeals.").

The Court disagrees. Broadly conferring appellate standing to any potential party in interest to a bankruptcy court order would likely result in exactly the type of "sclerotic litigation" this circuit seeks to avoid with its additional prudential standing requirement; a party in interest cannot also necessarily be a person aggrieved. According to Collier on Bankruptcy:

> Although section 1109 speaks broadly of the right of a party in interest to raise and to appear and be heard on any issue in a chapter 11 case, the section is silent on the subject of a party's standing to take an appeal from an adverse decision, other than to expressly prohibit the Securities and Exchange Commission from taking an appeal. In general, in order for a person to be a proper party to take an appeal, one must be a "person aggrieved" by the outcome of a particular proceeding. Consistent with the basic purpose of section 1109(b), a party qualifies as a "person aggrieved" if the decision in question adversely affects the party's pecuniary interest.

7 Collier on Bankruptcy, ¶ 1109.08 (16th ed. 2022). Appellant fails to cite to any Fifth Circuit precedent suggesting that § 1109(b) confers appellate standing for parties in interest. Similarly, even if Appellant is a "party in interest" that can "appear and be

9

heard" on its objections to the professional fees per § 330, that still does not mean that it has appellate standing as a person aggrieved. As discussed in Section III(A)(1) above, even a creditor with an administrative expense claim—a "party in interest" category included in § 1109(b)—can lack appellate standing to appeal a bankruptcy court order where it cannot demonstrate that the order directly and adversely impacts it pecuniarily.

## IV. Conclusion

For the reasons discussed above, Appellant lacks standing to appeal the Fee Application Orders under the person aggrieved standard. Appellant's appeal is therefore **DISMISSED**.

**SO ORDERED.**

Signed May 9th, 2022.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

010275

Appx 06332

# EXHIBIT 42

Appx 06333

010276

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 7
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 359 of 1017 PageID 11140
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 1 of 6 PageID 6930

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JAMES DONDERO, | § | |
| | § | |
| *Appellant*, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 3:20-CV-03390-X |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT LP; ACIS CAPITAL | § | |
| MANAGEMENT LP; and ACIS | § | |
| CAPITAL MANAGEMENT GP LLC, | § | |
| | § | |
| *Appellees*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is appellee Highland Capital Management's (Highland) motion to dismiss this bankruptcy appeal as constitutionally moot. [Doc. No. 18.] Because the appealed bankruptcy order no longer directly, adversely, and pecuniarily affects appellant James Dondero, the Court **GRANTS** the motion to dismiss. The Court **DISMISSES** this appeal for lack of jurisdiction.

## I.    Factual Background

Among the vast ashes of Highland Capital Management, we find this appeal. Highland filed for Chapter 11 bankruptcy in October 2019. Soon thereafter, appellee Acis Capital Management GP LLC (Acis) filed a proof of claim, and Highland and Acis later executed a settlement agreement. In October 2020, the bankruptcy court entered a written order approving the settlement pursuant to Bankruptcy Rule 9019 (the 9019 order). The 9019 order is the subject of this appeal.

Appx. 06334
010277

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 7
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 360 of 1017    PageID 11141
Case 3:20-cv-03390-X    Document 25    Filed 03/18/22    Page 2 of 6    PageID 6931

In January 2021, Highland filed the *Fifth Amended Plan of Organization of Highland Capital Management, L.P.*, and the bankruptcy court entered an order confirming the Plan in February 2021.[1]  Under the terms of the Plan, a Claimant Trust and a Litigation Sub-Trust were established to receive and administer Highland's assets for the benefit of creditors.  All "Estate Claims"—including, of note, all potential claims held by Highland against appellant Dondero—were transferred to the Trust.

In April 2021, Dondero filed his opening brief in this appeal of the 9019 order approving the settlement agreement between Highland and Acis.  At that time, Dondero had three live proofs of claim arguably affected by the 9019 order.

Marc Kirschner is the Trustee of the Trust.  In October 2021, Kirschner commenced an adversary proceeding in the bankruptcy court against Dondero (the Kirschner lawsuit).  Among other things, the Kirschner lawsuit seeks a declaratory judgment that Dondero is liable for Highland's debts in his alleged capacity as Highland's alter ego.  The Kirschner lawsuit specifically alleges that Dondero is liable for Highland's debts to Acis, as approved by the 9019 order.

On February 1, 2022, after the parties had completed their briefing of this appeal of the 9019 order, Dondero withdrew, and the bankruptcy court entered an

---

[1] Both parties asked the Court to take judicial notice of the existence of certain documents appearing on the dockets of related proceedings that the parties describe in their briefing on this motion.  The Court grants that request, as the existence of those documents and their contents "cannot reasonably be questioned" and because doing so is necessary to determine whether this appeal is moot. *In re Halo Wireless, Inc.*, 684 F.3d 581, 597 (5th Cir. 2012); *see also In re Manges*, 29 F.3d 1034, 1041 (5th Cir. 1994) ("Thus, this court may review evidence as to subsequent events . . . which bears upon the issue of mootness.").

Appx 96335
010278

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 7
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 361 of 1017 PageID 11142
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 3 of 6 PageID 6932

order approving of the withdrawal, of his remaining three proofs of claim affected by the 9019 order. Two days later, appellee Highland filed the instant motion to dismiss this bankruptcy appeal, alleging that this appeal is moot because appellant Dondero now lacks standing by virtue of his withdrawal of his remaining proofs of claim.

## II. Legal Standards

It is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution. While "[t]he 'case or controversy' limitation of Article III dictates that the alleged harm is fairly traceable to the act complained of," the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.[2] To have standing to appeal a bankruptcy order, the appellant must be a "person aggrieved."[3] A person aggrieved is someone who is "directly, adversely, and financially impacted" by the "exact order being appealed."[4] Being directly, adversely, and financially impacted by "the proceedings more generally" won't cut it.[5] "Appellants cannot demonstrate bankruptcy standing when the court order to which they are objecting does not directly affect their wallets."[6]

Standing must exist not only at the inception of the litigation but must also continue throughout litigation.[7] When at least one of the adverse parties to a suit

---

[2] *In re Coho Energy Inc.*, 395 F.3d 198, 202–03 (5th Cir. 2004) (cleaned up).

[3] *Id.* at 202 (cleaned up).

[4] *Matter of Dean*, 18 F.4th 842, 844 (5th Cir. 2021).

[5] *Id.*

[6] *Id.*

[7] *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (cleaned up).

Appx. 06336
010279

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 7
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 362 of 1017 PageID 11143
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 4 of 6 PageID 6933

loses standing, the case becomes moot.[8] And when a case becomes moot, a court loses its "constitutional jurisdiction to resolve the issues [the case] presents."[9]

### III.   Analysis

This appeal's procedural history is labyrinthine, but the parties' arguments are not.  Highland contends that Dondero has lost standing to maintain this appeal of the 9019 order.  Although no one disputes that Dondero had standing when he filed his opening brief, Highland argues that he lost it on February 1, 2021, when he withdrew his remaining proofs of claim.

In response, Dondero concedes that he no longer has any proofs of claim but argues that his being a defendant in the Kirschner lawsuit provides him standing to continue pursuing this appeal.  As Dondero explains, the Kirschner lawsuit "seeks to hold [him] directly liable for the amounts awarded under the 9019 Order," including the debts to Acis.  Because he could ultimately lose in the Kirschner lawsuit, Dondero argues that "his risk in the litigation and potential liability to [Highland] will be materially reduced to the tune of millions of dollars" if the 9019 order is overturned. Dondero also notes that he has already "been required to retain counsel to defend himself against the Kirschner Lawsuit and will be required to defend against the allegations regarding the millions awarded to Acis . . . under the 9019 Order."

---

[8] *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999).

[9] *Id.*

App. 000327
010280

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 7
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 363 of 1017 PageID 11144
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 5 of 6 PageID 6934

Dondero stresses that the "key question" for the Court is to consider Dondero's "interest" in the outcome of this appeal.[10]

Under Fifth Circuit precedent, the bankruptcy order at issue in this appeal no longer "directly, adversely, and financially impact[s]" Dondero.[11] Simply put, by withdrawing all of his remaining claims against Highland, Dondero is no longer a "person aggrieved" by the order. The order no longer directly affects Dondero because even a reversal of the order would put no money back in Dondero's pocket—because, again, he withdrew all of his claims.[12]

And Dondero does not dispute that reality. Instead, his argument, boiled down, is that he has standing because of the indirect, speculative connection between the Kirschner lawsuit and the debts determined by the order. But the Fifth Circuit has repeatedly stressed that speculative, indirect harm is not enough: "Th[e] speculative prospect of harm is far from a direct, adverse, pecuniary hit."[13] From another Fifth Circuit opinion: "A remote possibility does not constitute injury under [the] 'person aggrieved' test."[14] In another Fifth Circuit opinion, the "Court denied

---

[10] Doc. No. 22 at 11 ("'The key question for this Court to consider is whether Mr. Dondero is pecuniarily interested in the outcome of this appeal."); *see also id*. at 5 ("Mr. Dondero [is] financially interested in every single claim and every single dollar that is incurred or spent by [Highland's] estate."); *id*. at 6 ("Mr. Dondero [is] financially interested in the reasonableness and propriety of the settlement approved under 9019 Order.").

[11] *Matter of Technicool Sys., Inc.*, 896 F.3d 382, 384 (5th Cir. 2018) (cleaned up).

[12] *See id*. at 386 ("The order must burden [the appellant's] pocket before he burdens a docket.").

[13] *Id*.

[14] *In re Coho Energy, Inc*., 395 F.3d at 203.

Appx 96338
010281

Case 19-34054-sgj11 Doc 3445-42 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 7
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 364 of 1017 PageID 11145
Case 3:20-cv-03390-X Document 25 Filed 03/18/22 Page 6 of 6 PageID 6935

standing because the debtor was not a claimant to the fund and, as such, was only indirectly affected by the order establishing priority."[15]

The Court does not deny that Dondero has an interest in the outcome of this appeal, or even a direct interest and effect caused by the "proceedings more generally."[16] For example, Dondero notes that he has already taken a direct financial hit by having to defend against the Kirschner lawsuit. But, again, the Fifth Circuit's bankruptcy-standing test requires a direct, adverse, and pecuniary effect (not interest) tied to the specific order being appealed (not to the proceedings generally).[17]

Dondero is no longer a person aggrieved by the bankruptcy order at issue in this appeal. Accordingly, the appeal is moot.

## IV. Conclusion

The Court finds this appeal moot and **DISMISSES** it for lack of jurisdiction.

**IT IS SO ORDERED** this 18th day of March, 2022.

_____

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[15] *Id.* (describing the holding in *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 212 (5th Cir. 1994)).

[16] *Matter of Dean*, 18 F.4th at 844.

[17] *Id.*; *see also Technicool*, 896 F.3d at 385.

Appx 06329
010282

# EXHIBIT 43

Appx 96349
010283

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 9
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 366 of 1017 PageID 11147

Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 1 of 8 PageID 4635

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., et al., | § | |
| | § | Civil Action No. 3:21-CV-1895-D |
| Appellants, | § | (Bank. Ct. No. 19-34054-sgj-11) |
| | § | |
| VS. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Appellee. | § | |

APPEAL FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

FITZWATER, Senior Judge:

Three creditors of a reorganized chapter 11 debtor appeal a bankruptcy court order

approving the debtor's motion for entry of an order authorizing the creation of an indemnity

subtrust and entry into an indemnity trust agreement and granting related relief (the "Order").

The appellee-debtor moves to dismiss the appeal as equitably and constitutionally moot and

challenges appellants' standing. Concluding that two of the three appellants lack standing

and that the Order is not a plan modification—meaning that the bankruptcy court was not

required to comply with 11 U.S.C. § 1127(b) in approving the Order—the court DISMISSES

App. 00844
010284

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 9
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 367 of 1017 PageID 11148
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 2 of 8 PageID 4636

the appeal in part and AFFIRMS the bankruptcy court's Order.[1]

I

The court turns first to the question whether appellants have standing. Appellants are NexPoint Advisors, L.P. ("NexPoint"), Highland Capital Management Fund Advisors. L.P. ("HCMFA"), and The Dugaboy Investment Trust ("Dugaboy"). Although the parties frame this issue as one of constitutional standing and mootness, they cite case law and present arguments about the prudential standing requirement embodied in the "person aggrieved" test. *See In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004) ("To prevent unreasonable delay, courts have created an *additional* prudential standing requirement in bankruptcy cases: The appellant must be a 'person aggrieved' by the bankruptcy court's order." (emphasis in original) (quoting *In re P.R.T.C., Inc.*, 177 F.3d 774, 777 (9th Cir. 1999))); *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 508 (N.D. Tex. 2019) (Fitzwater, J.) ("[T]he person aggrieved doctrine is itself a creature of prudential standing."), *dism'd in part*, 850 Fed. Appx. 300 (5th Cir. 2021), and *aff'd in part and dism'd in part*, 850 Fed. Appx. 302 (5th Cir. 2021).[2]

_____

[1]Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this appeal, and not for publication in an official reporter, and should be understood accordingly.

[2]The court has an independent obligation to consider constitutional standing before reaching its prudential aspects. *See Harold H. Huggins Realty, Inc. v. FNC, Inc*., 634 F.3d 787, 795 n.2 (5th Cir. 2011). "[T]he plaintiffs must allege an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable ruling." *Id.*

Appx. 00342
010285

Applying the prudential "person aggrieved" test, the court holds that HCMFA lacks standing. HCMFA only has administrative claims. Appellants concede that these administrative claims will be paid under any circumstances. *See* Appellant Obj. to Mot. to Dis. Appeal 5 ("[U]nder the Plan, administrative claims are paid in full.").[3] Accordingly, HCMFA lacks standing. *See In re Coho Energy Inc.*, 395 F.3d at 203; *In re Technicool Sys., Inc.*, 896 F.3d 382, 386 (5th Cir. 2018).

NexPoint has standing because of the "Covitz claim."[4] Although this claim was disallowed by a recent bankruptcy order, *see* Appellee Reply App. in Support of Mot. to Dis. Appeal 3 ("The [Covitz] Claim is DISALLOWED with prejudice and expunged in its entirety." (bold font omitted)), the order is not final, *see In re Linn Energy, L.L.C.*, 927 F.3d 862, 866 (5th Cir. 2019) (describing final bankruptcy orders as "orders that are affirmed upon direct review, or, as in this case, not appealed or contested."). Accordingly, NexPoint's

---

(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Dugaboy and HCMFA lack constitutional standing because they have not identified any injury fairly traceable to the Order: the injuries identified are speculative at best and nonexistent at worst. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (holding that despite "reasonable likelihood" of injury, "respondents' theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'"). Alternatively, for the reasons discussed above, they lack prudential standing. NexPoint has constitutional standing, however, based on the Covitz claim.

[3]The estimated amount for distributions is $181,879,000. *See* R. 1244. And the administrative expenses total only $1,078,000. *Id.* Accordingly, even if $25 million is removed from the Claimant Trust, there will still be sufficient funds to pay NexPoint's and HCMFA's administrative claims.

[4]The parties dispute whether NexPoint owns this claim. Appellants have proved that NexPoint owned this claim beginning on March 24, 2021. Appellant Obj. App. in Support of Obj. to Mot. to Dis. Appeal 13-17.

App. 00343

010286

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 9
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 369 of 1017 PageID 11150
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 4 of 8 PageID 4638

Covitz claim has not been extinguished by final order, *see United States v. Stone*, 435 Fed.

Appx. 320, 321-22 (5th Cir. 2011) (per curiam) (holding that interest in property became

extinguished when order became final), and the claim remains as a basis to confer standing

on NexPoint to press this appeal, *see In re JFK Capital Holdings, L.L.C.*, 880 F.3d 747, 751

(5th Cir. 2018).[5]

Dugaboy lacks standing. It has a contingent interest that will only be paid if all other

creditors are paid in full. R. 434, 520, 1244 (providing that limited partnership interests,

which are included in Class 10 and 11 of classified claims and equity interests, expect "no

distribution."). Dugaboy's expected return is therefore $0 both before and after entry of the

Order.[6] Accordingly, it lacks standing. *See In re Coho Energy Inc.*, 395 F.3d at 203; *In re*

---

[5]Assuming *arguendo* that NexPoint lacks prudential standing, the outcome of this appeal is effectively the same: the bankruptcy court's Order remains undisturbed either because no appellant has standing or because, despite NexPoint's standing, the Order is affirmed on the merits.

[6]Appellants cannot rely on the possibility that the Litigation Sub-Trust *might* secure sufficient funds to pay contingent interests. This is speculative at best; Dugaboy will suffer an injury if and only if the Litigation Sub-Trust obtains a future windfall. *See* R. 2279-80 ("Theoretically, there's a circumstance, and that is if every other creditor in the case were to be paid in full . . . theoretically the junior interest holders could receive distributions. However, based upon our projections, that would be wholly dependent on a significant recovery in the Litigation -- by the Litigation Trustee."); *Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 211 (5th Cir. 1994) (addressing constitutional standing and holding that "Ortiz has failed utterly to demonstrate that any action by the IRS against company officers is a real or immediate likelihood or how such an action would adversely affect the company in the least"); *In re Acis Capital Mgmt.*, 604 B.R. at 510 (addressing prudential standing and holding that "although the orders for relief created the possibility that Neutra might suffer harm in the future, Neutra was not aggrieved by them for standing purposes because '[the] speculative prospect of harm is far from a direct, adverse, pecuniary hit'" (quoting *In re Technicool Sys.*, 896 F.3d at 386)).

Appx. 00344

010287

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 9
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 370 of 1017 PageID 11151
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 5 of 8 PageID 4639

*Technicool Sys.*, 896 F.3d at 386.[7]

Because HCMFA and Dugaboy lack standing, their appeals are dismissed.

II

Turning to the merits, the parties agree that this appeal turns on whether the Order is a plan modification. If it is, the bankruptcy court erred by failing to comply with 11 U.S.C. § 1127(b). But if it is not, the bankruptcy court did not err because it complied with 11 U.S.C. § 363(b). This court applies a *de novo* standard of review when deciding whether the bankruptcy court's order is a plan modification. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011).

A plan modification occurs when a proposed action "alter[s] the parties' rights, obligations, and expectations under the plan." *In re U.S. Brass Corp.*, 301 F.3d 296, 309 (5th Cir. 2002). In *U.S. Brass Corp.* the bankruptcy court denied a motion that would have replaced a term of the plan (requiring litigation) with another term (requiring arbitration), because it constituted a plan modification. *Id.* at 302. The Fifth Circuit affirmed, holding that "[t]o substitute arbitration for litigation at this point would alter the bargain the Insurers secured in exchange for their approval of the plan—in violation of § 1127(b)." *Id.* at 308.

The instant Order, however, does not alter the parties' "rights, obligations, and expectations under the plan." The first change appellants point to is that the plan created and

---

[7]Appellants' alternate theories of standing—including creating a counter-factual causal chain linking the Order to the confirmation plan—are too speculative to support standing.

App. 06345
0'1'0288

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 9
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 371 of 1017 PageID 11152
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 6 of 8 PageID 4640

contemplated two trusts, while the Order authorizes the creation of a third. But this is a complaint of form over substance. The plan authorizes the creation of reserves from which to satisfy indemnity claims. As such, the Indemnify Sub-Trust, which as an economic mechanism functions as a reserve for payment of indemnity claims, is likely at least "specifically contemplated" by the plan. *See id*. at 308.

Next, appellants complain that, because the plan contemplates D&O insurance (as a waivable condition) for payment of indemnification claims, the Order (creating an Indemnity Sub-Trust to pay indemnification claims) violates the spirit of the plan. But the insurance condition is waivable, and the payment of indemnification via a reserve is "specifically contemplated" by the plan. *See id.*

Appellants also challenge the movement of funds from the Claimant Trust to the Indemnity Sub-Trust. The plan provides, however, that the Claimant Trust may take money otherwise earmarked for creditors and set up a reserve. This movement of funds under the Order therefore does not violate the creditors' expectations of what will occur under the plan—indeed, it is specifically contemplated by the Plan. *See id.*

Finally, appellants contend that the Order alters the terms of the confirmed plan because it obligates the Claimant Trust to indemnify more parties; under the Order, the Claimant Trust transfers its assets to the Indemnity Sub-Trust, which are then used to pay indemnity claims for the Litigation Sub-Trust and reorganized debtor's indemnified parties.[8]

---

[8] Appellants' argument is not that more parties are being indemnified—they appear to concede this point in their reply brief. Appellants Reply Br. 7 ("It is true, however, that the

App.006366

010289

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 9
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 372 of 1017 PageID 11153
Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 7 of 8 PageID 4641

It should be noted at the outset that the Indemnity Sub-Trust is only a fallback source of funding if the Claimant Trust, Litigation Sub-Trust, and reorganized debtor cannot meet their indemnification obligations. Further, if funding is needed from the Indemnity Sub-Trust, the deposits in the Sub-Trust are intended "to satisfy the obligations of the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor, each of which will be jointly and severally liable under" the note for the deposits. Appellee App. in Support of Mot. to Dis. Appeal 254. Indeed, the terms state that "such deposits are intended to ensure proper allocation of the respective assets of the Claimant Trust, the Litigation Sub-Trust and the Reorganized Debtor." *Id.* In other words, although the Claimant Trust is depositing the money, the Litigation Sub-Trust and the reorganized debtor remain legally obligated for their portions of indemnified parties: nothing has changed.[9]

\* \* \*

Because two of the three appellants lack standing, the appeal is DISMISSED in part. Because the Order is not a plan modification and the bankruptcy court complied with 11 U.S.C. § 363(b), the bankruptcy court's July 21, 2021 order approving the debtor's motion for entry of an order (I) authorizing the (A) creation of an indemnity subtrust and (B) entry

_____

foregoing persons were entitled to indemnification under the Plan Implementation Documents . . . ."). Their argument is that the Claimant Trust is obligating itself to indemnify more parties.

[9]Because the court concludes that the Order did not modify the confirmed plan, it does not reach appellee's argument that this appeal is equitably moot. *See In re Blast Energy Servs., Inc.*, 593 F.3d 418, 424 (5th Cir. 2010) ("Unlike Article III mootness, equitable mootness is prudential, not jurisdictional.").

Appx 00347
010290

Case 19-34054-sgj11 Doc 3445-43 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of 9
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 373 of 1017 PageID 11154

Case 3:21-cv-01895-D Document 44 Filed 01/28/22 Page 8 of 8 PageID 4642

into an indemnity trust agreement and (II) granting related relief is AFFIRMED.

AFFIRMED in part; DISMISSED in part.

Appx 00848

010291

# EXHIBIT 44

Appx 08349

010292

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., et al., | § § § | |
| Appellants, | § § | Civil Action No. 3:21-CV-1895-D (Bank. Ct. No. 19-34054-sgj-11) |
| VS. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Appellee. | § § | |

_____

APPEAL FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

## JUDGMENT

This appeal came on for consideration on the briefs, with oral argument. For the reasons

stated in the court's opinion filed today, this appeal is DISMISSED in part, and the bankruptcy

court's July 21, 2021 Order Approving Debtor's Motion for Entry of an Order (I) Authorizing the

(A) Creation of an Indemnity Subtrust and (B) Entry into an Indemnity Trust Agreement and (II)

Granting Related Relief is AFFIRMED.

All pending motions filed in this appeal are terminated.

Case 19-34054-sgj11 Doc 3445-44 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 3
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 376 of 1017    PageID 11157
Case 3:21-cv-01895-D   Document 45   Filed 01/28/22   Page 2 of 2   PageID 4644

Costs of this appeal are taxed against appellants pursuant to Fed. R. Bankr. P. 8021(a)(1) or

(a)(2).

Entered:  January 28, 2022.


KAREN MITCHELL
Clerk of Court


By: P. Esquivel

Appx. 00851

010294

Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 377 of 1017    PageID 11158

# EXHIBIT 45

Appx 00352
010295

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 378 of 1017 PageID 11159
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 1 of 13

Docket #1439 Date Filed: 11/19/2020

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | Case No. 19-34054 |
| | § | |
| | § | |
| Debtor. | § | Chapter 11 |

---

### JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS

James Dondero ("<u>Movant</u>"), a creditor, indirect equity security holder, and party in interest

in the above-captioned bankruptcy case, pursuant to sections 1108, 363, and 105(a) of title 11 of

the United States Code (the "<u>Bankruptcy Code</u>"), hereby files this *Motion for Entry of an Order*

*Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary*

*Course of Business* (the "<u>Motion</u>"). In support thereof, Movant respectfully represents as follows:

### I.    SUMMARY OF ARGUMENT

1.      Since the Court's approval of the Debtor's settlement with the Committee in

January 2020, the Debtor has been operating under certain protocols governing its operations.

Under these protocols (the "<u>Protocols</u>") the Debtor has sold a number of significant assets

---

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS



1934054201119000000000012

Appx. 00353

010296

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02002-S Document 15-13 Filed 10/06/25 Page 379 of 1017 PageID 11160
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 2 of 13

providing notice only to the Committee. The Debtor, under these Protocols, has been selling significant assets of value to the estate outside the ordinary course of business without giving creditors, equity holders, parties in interest, and the U.S. trustee notice and opportunity to be heard. Doing so is inconsistent with the spirit, if not the letter, of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.      Until confirmation of a plan that provides otherwise, the sale of assets of the Debtor or its wholly-owned or controlled subsidiaries should occur only after notice and an opportunity for a hearing. While the Protocols may arguably have excused the Debtor from the Bankruptcy Code's requirement that transactions outside the ordinary course be subject to notice and a hearing, there is ample justification for the Court to require them for future transactions. Transparency is a key concept in chapter 11 under the Bankruptcy Code and Bankruptcy Rules, and notice and an opportunity for a hearing before a trustee or debtor in possession acts outside the ordinary course of business is essential to that transparency.

3.      Clearly, the sale of a substantial asset owned by a subsidiary of the Debtor is outside the ordinary course of a debtor's business and Bankruptcy Code § 363(b) requires notice and an opportunity for hearing before such an act. Indeed, requiring notice and an opportunity for a hearing increases transparency and provides disclosure to creditors and other parties in interest. Moreover, requiring notice and a hearing often results in competitive bidding, increasing the value received for the asset by the Debtor's estate.

4.      For these reasons, the Court should require that, at least until confirmation of a plan, transactions outside the ordinary course, including the disposition of assets held by Debtor's wholly-owned or controlled subsidiaries, only occur after notice and hearing.

Appx. 00354
010297

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 380 of 1017 PageID 11161
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 3 of 13

## II.    **BACKGROUND**

5.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

6.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. trustee in Delaware.

7.      On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].

8.      On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

9.      In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, for the Debtor's general partner, Strand Advisors, Inc. (the "Independent Board").  The members of the Independent Board are James P. Seery, Jr., John S. Dubel, and Russell F. Nelms. Mr. Seery was later retained as the Debtor's Chief Executive Officer.

10.     The Settlement Order also approved the Protocols governing the "Debtor's operation in the ordinary course of business."[1]

11.     Among other things, the Protocols provide that, for transactions involving the assets held directly on the Debtor's balance sheet or the balance sheet of a wholly-owned subsidiary, the

---

[1] Term Sheet, Docket No. 354-1, p. 5.

Appx. 00355
010298

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02002-S Document 15-13 Filed 10/06/25 Page 381 of 1017 PageID 11162
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 4 of 13

Debtor may (i) undertake Ordinary Course Transactions[2] without Court approval; and (ii) with respect to third party transactions in excess of $2,000,000, proceed so long as it receives no objection from the Committee after having provided three business days advance notice.[3]

12. While the Settlement Motion and the underlying Term Sheet appear to state that the Protocols govern the Debtor's operations in the ordinary course of business, the terms of the Protocols seemingly provide the Debtor with authority to conduct transactions outside the ordinary course of business without notice and hearing so long as the Committee (but only the Committee) does not object and the transactions are not with any Related Entity.

13. Pursuant to the authority arguably granted under the Protocols, the Debtor has conducted a number of substantial asset sales outside the ordinary course of business without notice other than to the Committee. Among these are the sale of certain assets held by Highland Multi Strategy Credit Fund, L.P. and Highland Restoration Capital Partners. Most recently, the Debtor, through its wholly-owned subsidiary Trussway, conducted a transaction in which it, on information and belief, sold a Trussway division, d/b/a SSP Holdings, for $50,000,000, netting proceeds to the Debtor's estate of $10,000,000. On information and belief, this transaction has already closed.

14. It is Movant's belief that there was no arm's length competitive process undertaken with respect to this sale. As a result, though certain metrics of SSP had improved materially since it was acquired in 2014, the price to be paid was markedly less than might have been produced through competitive bidding.

15. It is unclear whether the Court or other parties contemplated that the Debtor would

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet and incorporated Protocols.
[3] See Amended Operating Protocols, Docket No. 466-1, p. 4.


Appx. 06266
010299

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 382 of 1017 PageID 11163
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 5 of 13

dispose of such significant assets without an opportunity for this Court to review the transactions
to ensure that they satisfy the requirements of section 363(b) and for creditors and parties in interest
to be heard.

16.     This is significant in part because, in early October, Movant submitted a proposal
to the Debtor and the Committee for a consensual "Pot Plan," which would include a substantial
infusion of cash and notes by the Movant for the benefit of creditors and would continue the
Debtor's business in its current form, rather than the liquidating of the company under the pending
Third Amended Plan (Movant had previously made proposals that were rejected). Movant and the
Debtor have engaged in discussions and exchanged term sheets regarding the terms of a Pot Plan,
but no agreement has yet been reached. The Movant has also reached out to Committee counsel
and members of the Committee, but has not received any definitive response to his proposal. If the
Debtor continues to sell significant assets (at what Movant believes to be less than fair value), the
amount to be contributed by Movant under such a plan—and even the recoveries to be received
under Debtor's Third Amended Plan—may be significantly reduced, which will ultimately lower
the recovery to creditors.

17.     The Term Sheet governing the Protocols provides the Protocols may be modified
either with consent of the Committee or by order of this Court.[4]

## III.     RELIEF REQUESTED AND BASIS FOR RELIEF

18.     By this Motion, pursuant to sections 1108, 363, and 105(a) of the Bankruptcy Code,
Movant respectfully requests that the Court enter an order modifying the Protocols and requiring
that, at least until confirmation of a plan, all transactions outside the ordinary course of business,
including the disposition of substantial assets held by Debtor's wholly-owned or controlled

---

[4] See Term Sheet, Docket No. 354-1, p. 5.

Appx. 06357
010300

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 383 of 1017 PageID 11164
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 6 of 13

subsidiaries, only occur after notice and an opportunity for hearing.

19.     Section 1108 of the Bankruptcy Code provides authorization for the debtor in possession to operate the debtor's business unless the court, on a request of a party in interest and after notice and a hearing, limits that authority. 11 U.S.C. § 1108.

20.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. To sell property under section 363(b), the Trustee must demonstrate a legitimate business justification for the proposed transaction. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel*), 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). "In determining whether a good business reason exists to grant a motion to approve a sale pursuant to section 363(b), a court should consider all of the salient factors pertaining to the proceeding and act to further the diverse interests of the debtor, creditors, and equity holders." *In re GSC, Inc.*, 453 B.R. 132, 155 (Bankr. S.D.N.Y. 2011) (internal quotations omitted).

21.     Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code." *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 (5th Cir. 1995).

**A. The Court should require notice and hearing for all transactions occurring outside the ordinary course of business as required under section 363(b)**

22.     The Court should require that the sale of assets of the Debtor directly or through its wholly-owned subsidiaries be subject to notice and a hearing. While the Protocols may arguably have given the Debtor authority to sidestep the Bankruptcy Code's requirement that transactions


Appx 06858
010301

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 384 of 1017 PageID 11165
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 7 of 13

outside the ordinary course be subject to notice and a hearing, there is ample justification here for the Court to require them for future transactions. Further, it is unclear whether (i) the Protocols actually provide the Debtor with the authority to dispose of significant direct or indirect estate assets without an opportunity for this Court to review the transactions and for creditors and parties in interest to be heard; and (ii) in the event the Protocols do provide that authority, the Court and other parties contemplated such a result. Accordingly, and in the interest of transparency, the Court should require that all future transactions occurring outside the ordinary course of business be subject to notice and hearing.

i.  **Requiring notice and hearing ensures compliance with section 363(b) of the Bankruptcy Code, ensures due process, and increases transparency.**

23.     First, the Court should approve this request because it ensures compliance with the requirements of section 363(b)(1), ensures due process, and increases transparency.

24.     Under section 363(b), a debtor in possession is required not only to provide notice and hearing for a transaction outside the ordinary course, but also to articulate a sound business purpose for the transaction. *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

25.     The Protocols, as the Debtor and Committee have interpreted them, conflict with section 363(b) and deprive various parties of due process. Unlike the requirements of section 363(b), where all creditors, equity holders, parties in interest, and the Office of the United States trustee are entitled to notice, under the Protocols, as they have been construed, the Debtor is only required to provide notice to the Committee of the proposed transaction and it is only if the Committee objects that the matter is brought before the Court. Such notice is of doubtful value to others, especially given intra-Committee disputes.

26.     Without proper notice and hearing, there is the potential that the Debtor will dispose of significant assets without all constituents having an opportunity to be heard. Under the



Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 385 of 1017 PageID 11166
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 8 of 13

Bankruptcy Code and Bankruptcy Rules, creditors, equity holders, and parties in interest are entitled to notice and an opportunity to be heard before their rights are impacted. *In re Bombay Co.*, 2007 Bankr. LEXIS 3218, at *7 (Bankr. N.D. Tex. Sep. 26, 2007) ("[A] party in interest . . . is entitled to notice and an opportunity to be heard before its rights are affected."); *see also* 2 Collier on Bankruptcy P 102.02 (16th Ed. 2020) ("Notwithstanding section 102(1) and the desire for flexibility, an adversely affected party is entitled, consistent with the due process requirements of the Constitution, and with the wording of section 102(1), to notice reasonably calculated to apprise it of the proposed action and an opportunity to be heard.").

27.     This Court has stated many times on the record that this case is all about transparency. The Court has provided the Committee and other parties various forms of relief to ensure transparency is achieved. Movant believes the relief requested herein will only increase transparency and is asking for the same treatment here on behalf of himself and other creditors and equity holders.

28.     Finally, neither the Debtor nor any other party will be prejudiced by this request. The transactions undertaken by the Debtor and contemplated by this Motion generally take time to consummate. Allowing time for proper notice and a hearing is unlikely to significantly delay any transaction or prejudice any other party to a sale, and in the exceptional case, section 102(1) of the Bankruptcy Code gives the Court great flexibility in fixing notice periods.

**ii.     Consistent with section 363(b), requiring notice and hearing may produce competitive bidding and increase the value received by the Debtor's estate.**

29.     Second, requiring notice and hearing may elicit competitive bidding and therefore increase the value received by the Debtor's estate, consistent with one of the purposes of the Bankruptcy Code.

30.     The courts have long recognized the need for competitive bidding at hearings on


Appx. 96569
010303

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 386 of 1017 PageID 11167
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 9 of 13

private sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52 B.R.

353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H. 1984).

31.     "It is a well-established principle of bankruptcy law that the objective of bankruptcy

rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest

overall benefit possible for the estate." *In re Atlanta Packaging Prods.*, Inc., 99 B.R. 124, 130

(N.D. Ga. 1988). Competitive bidding yields higher offers and thus benefits the estate. Therefore,

the objective is "to maximize the bidding, not to restrict it." *In re The Ohio Corrugating*

*Company,* 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d

624, 637 (2d Cir. 1979)).

32.     In this case, the Debtor's actions under the Protocols have not always been

consistent with this fundamental bankruptcy purpose. The Debtor has conducted several

significant asset sales with advance notice only to the Committee. There has been no opportunity

for the other creditors, equity holders, the U.S. trustee, or the Court to scrutinize the transactions

or for a competitive bidding process to occur. Case law makes clear that the entirety of the *estate*,

not just a few creditors, has an interest in these sales and in ensuring value is maximized. *See In*

*re Fin. News Networks, Inc*., 126 B.R. 152, 157 (S.D.N.Y. 1991) (a trustee maximizes value for

creditors by selecting the "highest and best bid, and thereby protecting the interests of [the debtor],

its creditors, and its equity holders); *In re Lionel*, 722 F.2d at 1071 ("In fashioning its findings,

a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest

groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly,

act to further the diverse interests of the debtor, creditors and equity holders, alike."); *ASARCO,*

*Inc. v. Elliott Mgmt. (In re Asarco, L.L.C.),* 650 F.3d 593, 601 (5th Cir. 2011) (same).

33.     The U.S. Court of Appeals for the Second Circuit, in the case of *In re Lionel Corp.*,

JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER REQUIRING
NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURRING OUTSIDE THE ORDINARY COURSE OF BUSINESS                    PAGE 9

Appx. 06364
010304

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 387 of 1017 PageID 11168
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 10 of 13

722 F.2d. 1063 (2d Cir. 1983), affirmed the notion that, under section 363(b), the debtor in possession must articulate a good business reason to enter into a substantial sale outside the ordinary course and that a creditors' committee's insistence on such a transaction is, standing alone, not a sound business reason because it ignores the equity interests that are required to be considered. *See also In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business").

34. In *Lionel*, the Court stated that a bankruptcy judge should consider a number of factors in deciding whether a sale under section 363(b) furthers the "diverse interests of the debtor, creditors and equity holders, alike." *Lionel,* 722 F.2d. at 1071. Those factors may include "the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value." *Id.*

35. Here, in conflict with section 363(b), the Protocols arguably allow the Debtor to dispose of assets outside the ordinary course without notice, without any opportunity for a hearing, and without providing a sound business justification as mandated by section 363(b). That the Debtor may dispose of significant assets the value of which runs to the estate without notice, without the opportunity for court review as contemplated by section 363(b), and outside of a plan of reorganization may well disserve the estate. In addition, many of the factors articulated by the


Appx. 06302
010305

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 388 of 1017 PageID 11169
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 11 of 13

Second Circuit in *Lionel* might well, in, e.g., the SSP transaction, have weighed against undertaking the sale.

36. These concerns are particularly relevant in this case for at least two reasons.

37. First, because the Debtor's Third Amended Plan is essentially a liquidation plan that will provide for the "monetization" of the assets held by the Debtor and its subsidiaries, these preconfirmation transactions have the taint of being part of a "creeping" or *sub rosa* plan of reorganization that may fundamentally alter the rights of creditors and equity holders in this case. *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986) ("In *Braniff* we recognized that a debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization. Likewise, if a debtor were allowed to reorganize the estate in some fundamental fashion pursuant to § 363(b), creditors' rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might become meaningless."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan.").

38. Similarly, the disposition of significant assets outside of a plan and without notice raises a number of questions, including why the sale must proceed so quickly that adequate notice cannot be given, whether the asset is increasing or decreasing in value, what the proportionate value of the asset is to the estate as a whole, and other "salient factors pertaining to the proceeding." The constituents in this case (with the exception of the Committee and its few members) and this Court have largely been deprived of the chance to ask these questions.

39. Second, because equity may receive a recovery in this case, equity holders should receive notice and an opportunity to be heard on all significant transactions outside the ordinary


Appx. 06363
010306

Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 389 of 1017 PageID 11170
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 12 of 13

course of business. The Debtor, through the Independent Board, has represented on the record that it believes the Debtor is solvent and that there is a reasonable chance that equity may receive a recovery in this case. The possibility that equity may receive a recovery is all the more reason for the Court to scrutinize closely these transactions to ensure that they satisfy the requirements of section 363(b) and they "further the diverse interests of the debtor, creditors and equity holders."

### CONCLUSION

For the foregoing reasons, Movant respectfully requests that the Court enter an order (i) granting this Motion, (ii) requiring that, at least until confirmation of a plan, transactions outside the ordinary course, including the disposition of assets held by Debtor's wholly-owned or controlled subsidiaries, only be authorized after notice and an opportunity for hearing, and (iii) granting Movant such other and further relief to which he may be justly entitled.

Dated: November 19, 2020   Respectfully submitted,

       */s/ D. Michael Lynn*
       D. Michael Lynn
       State Bar I.D. No. 12736500
       John Y. Bonds, III
       State Bar I.D. No. 02589100
       Bryan C. Assink
       State Bar I.D. No. 24089009
       BONDS ELLIS EPPICH SCHAFER JONES LLP
       420 Throckmorton Street, Suite 1000
       Fort Worth, Texas 76102
       (817) 405-6900 telephone
       (817) 405-6902 facsimile
       Email: michael.lynn@bondsellis.com
       Email: john@bondsellis.com
       Email: bryan.assink@bondsellis.com

       **ATTORNEYS FOR JAMES DONDERO**



Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 390 of 1017 PageID 11171
Case 19-34054-sgj11 Doc 1439 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 13 of 13

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on November 19, 2020, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

*/s/ Bryan C. Assink*
Bryan C. Assink



Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 391 of 1017 PageID 11172
Case 19-34054-sgj11 Doc 1439-1 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 1 of 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| Debtor. | § | **Chapter 11** |

**ORDER GRANTING JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER
REQUIRING NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
<u>OCCURING OUTSIDE THE ORDINARY COURSE OF BUSINESS</u>**

Having considered the *Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* (the "<u>Motion</u>")[1] filed by James Dondero ("<u>Movant</u>"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

ORDER GRANTING JAMES DONDERO'S MOTION FOR ENTRY OF AN ORDER
REQUIRING NOTICE AND HEARING FOR FUTURE ESTATE TRANSACTIONS
OCCURING OUTSIDE THE ORDINARY COURSE OF BUSINESS

PAGE 1



Case 19-34054-sgj11 Doc 3445-45 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 392 of 1017 PageID 11173
Case 19-34054-sgj11 Doc 1439-1 Filed 11/19/20 Entered 11/19/20 18:48:06 Page 2 of 2

in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that

the notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and that no other notice need be provided; and this Court having reviewed the

Motion, any and all other documents filed in support of the Motion and any responses thereto; and

this Court having determined that the legal and factual bases set forth in the Motion establish good

cause for the relief granted herein; and upon all of the proceedings had before this Court; and after

due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. The Debtor is hereby required to provide notice and an opportunity for hearing to

   all creditors, equity security holders, and parties in interest, including Movant, in

   accordance with Bankruptcy Code § 363(b) and Bankruptcy Rule 2002 on any

   transactions outside the ordinary course of business, including the disposition of

   assets held by Debtor's wholly-owned or controlled subsidiaries.

3. The Court shall retain jurisdiction with respect to all matters arising from or relating

   to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

Respectfully submitted by:

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

---



# EXHIBIT 46

Case 19-34054-sgj11 Doc 3445-46 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 3
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 394 of 1017 PageID 11175
Case 19-34054-sgj11 Doc 1622 Filed 12/23/20 Entered 12/23/20 15:41:01 Page 1 of 2

Docket #1622 Date Filed: 12/23/2020

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | Chapter 11 |
| | § | |
| Debtor. | § | |

## <u>NOTICE OF WITHDRAWAL</u>

**PLEASE TAKE NOTICE THAT** James Dondero hereby **WITHDRAWS** the following documents:

1. *James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Outside the Ordinary Course of Business* [Docket No. 1439];

2. Notice of Subpoena of Jean Paul Sevilla [Docket No. 1559];

3. Notice of Subpoena of Russell Nelms [Docket No. 1560]; and

4. Notice of Subpoena of Fred Caruso [Docket No. 1561].

**NOTICE OF WITHDRAWAL**



1934054201223000000000008

Appx. 06369

010312

Case 19-34054-sgj11 Doc 3445-46 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 3
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 395 of 1017   PageID 11176
Case 19-34054-sgj11 Doc 1622 Filed 12/23/20   Entered 12/23/20 15:41:01   Page 2 of 2

Dated: December 23, 2020

Respectfully submitted,

*/s/ Bryan C. Assink*
D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
John T. Wilson, IV
State Bar I.D. No. 24033344
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: michael.lynn@bondsellis.com
Email: john@bondsellis.com
Email: john.wilson@bondsellis.com
Email: bryan.assink@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on December 23, 2020, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon all parties requesting or consenting to such service.

*/s/ Bryan C. Assink*
Bryan C. Assink

App. 06379
010313

Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 396 of 1017 PageID 11177

# EXHIBIT 47

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 397 of 1017    PageID 11178
Case 19-34054-sgj11 Doc 354 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 1 of 3

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § § | Related to Docket No. 281 |

## NOTICE OF FINAL TERM SHEET

TO:     (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) counsel to the Committee; (d) the Debtor's principal secured parties; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Appx. 06872

010315

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 398 of 1017 PageID 11179
Case 19-34054-sgj11 Doc 354 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 2 of 3

**PLEASE TAKE NOTICE** that on January 9, 2020, the Court held a hearing (the "Hearing") on that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 281] (the "Motion") filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (collectively, the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Case").

**PLEASE TAKE FURTHER NOTICE** that at the Hearing, the Debtor presented to the Court an amended and modified version of the Term Sheet (as defined in the Motion) and the exhibits thereto (collectively, the "Amended Term Sheet").

**PLEASE TAKE FURTHER NOTICE** that the Amended Term Sheet is attached hereto as **Exhibit A.**

> *[REMAINDER OF PAGE INTENTIONALLY BLANK]*

---

NOTICE OF FINAL TERM SHEET

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:25-cv-02072-S      Document 15-13      Filed 10/06/25      Page 399 of 1017      PageID 11180
Case 19-34054-sgj11 Doc 354 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 3 of 3

Dated:  January 14, 2020.                     PACHULSKI STANG ZIEHL & JONES LLP

                                              Jeffrey N. Pomerantz (CA Bar No. 143717)
                                              (*admitted pro hac vice*)
                                              Ira D. Kharasch (CA Bar No. 109084)
                                              (*admitted pro hac vice*)
                                              Maxim B. Litvak (Texas Bar No. 24002482)
                                              Gregory V. Demo (NY Bar No. 5371992)
                                              (*admitted pro hac vice*)
                                              10100 Santa Monica Blvd., 13th Floor
                                              Los Angeles, CA 90067
                                              Telephone: (310) 277-6910
                                              Facsimile: (310) 201-0760
                                              E-mail:    jpomerantz@pszjlaw.com
                                                         ikharasch@pcszjlaw.com
                                                         mlitvak@pszjlaw.com
                                                         gdemo@pszjlaw.com

                                              -and-

                                              HAYWARD & ASSOCIATES PLLC

                                              */s/ Zachery Z. Annable*
                                              Melissa S. Hayward
                                              Texas Bar No. 24044908
                                              MHayward@HaywardFirm.com
                                              Zachery Z. Annable
                                              Texas Bar No. 24053075
                                              ZAnnable@HaywardFirm.com
                                              10501 N. Central Expy, Ste. 106
                                              Dallas, Texas 75231
                                              Tel: (972) 755-7100
                                              Fax: (972) 755-7110

                                              *Counsel and Proposed Counsel for the Debtor and
                                              Debtor-in-Possession*

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 1 of 62

# EXHIBIT "A"

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 401 of 1017 PageID 11182

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 2 of 62

## Highland Capital Management, L.P.

### Preliminary Term Sheet

This term sheet ("_Term Sheet_") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "_Debtor_") and the Official Committee of Unsecured Creditors (the "_Committee_") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "_Chapter 11 Case_"), pending in the Bankruptcy Court for the Northern District of Texas (the "_Bankruptcy Court_"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125]. This Term Sheet shall be subject to approval by the Bankruptcy Court.

| Topic | Proposed Terms |
|---|---|
| Parties | Highland Capital Management, L.P. (the "Debtor"). |
| | The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "Committee"). |
| Independent Directors | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "Independent Directors"): James Seery, John Dubel, and Judge Russell Nelms. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement). |
| | The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 402 of 1017 PageID 11183

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 3 of 62

| | |
|---|---|
| | source of funding, whether directly or via reimbursement, will be the Debtor.

As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "CEO") should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.

The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as President and CEO of the Debtor, and (4) will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities. Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination. Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("CRO") to the |

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 403 of 1017 PageID 11184

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 4 of 62

|  | Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**.<br><br>DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
|---|---|
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor other than Mr. Dondero. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by |

Appx. 06378

010321

| | the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
|---|---|
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "<u>Reporting Requirements</u>"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |
| **Reservation of Rights** | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date. Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 6 of 62

**<u>Exhibit A</u>**

**Debtor's Corporate Governance Documents**

Appx. 06389

010323

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 406 of 1017    PageID 11187
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 7 of 62

**WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR**

**OF**

**STRAND ADVISORS, INC.**

**January 9, 2020**

―――――――――――――――

      Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

**I.     AMENDMENT OF BYLAWS**

      **WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

      **WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors, and to add certain provisions respecting director qualifications and the removal of directors; and

      **NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved, and the Board is increased from one (1) to three (3) directors;

      **RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

      **RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

**II.     ELECTION OF DIRECTORS**

      **WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and Russell Nelms to the Board and desires that such individuals constitute the whole Board;

      **NOW, THEREFORE, BE IT RESOLVED**, that James Seery, John Dubel, and Russell Nelms, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

      **RESOLVED FURTHER**, that any officer of the Company is authorized to take any such actions as

Appx. 00381
010324

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 407 of 1017 PageID 11188
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 8 of 62

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

 **RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

 **RESOLVED FURTHER**, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

 **RESOLVED FURTHER**, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

## III. STIPULATION WITH THE BANKRUPTCY COURT

 **WHEREAS**, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

 **WHEREAS**, the Company is the general partner for HCMLP;

 **WHEREAS**, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

 **WHEREAS**, the Company and the Stockholder wish to enter into a stipulation (the "Stipulation") with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such Stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by these resolutions to be re-elected upon the expiration of his or her term; (c) upon the death, disability, or resignation of a member of the Board, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and (i) acceptable to the Stockholder and the Committee or (ii) selected by the remaining members of the Board; and (d) not take any action or exercise the voting power of such shares in any way that is inconsistent with the term sheet agreed to by HCMLP and the Committee and any order of the Texas Court approving such agreement and compromise between HCMLP and the Committee;

 **WHEREAS**, for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

 **WHEREAS**, it is in the intent of the parties that the Stipulation will no longer be effective or bind the Company or the Stockholder following the termination of the Bankruptcy Case.

 **NOW, THEREFORE, BE IT RESOLVED**, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

Appx. 06382
010325

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 408 of 1017    PageID 11189
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 9 of 62

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 409 of 1017 PageID 11190
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 10 of 62

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**

_____
James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

Appx 06384

010327

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 410 of 1017 PageID 11191
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 11 of 62

### First Amendment to Bylaws of
### Strand Advisors, Inc.

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.** Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.** Article III, Section 5, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 5. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Debtor") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11 and reasonably acceptable to the stockholders; (y) nominated by the stockholders and acceptable to the Committee; or (z) selected by the duly appointed independent directors.

**3.** The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Removal of Directors. Once appointed, the independent directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the independent directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 411 of 1017 PageID 11192
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 12 of 62

IN WITNESS WHEREOF, the Company has caused this amendment to be signed this 9th day of January, 2020.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

Appx 06386

010329

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 412 of 1017 PageID 11193
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 13 of 62

# INSERT STRAND ADVISORS, INC. LETTERHEAD

[ _____ ]

[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

**Re:  Strand Advisors, Inc. – Director Agreement**

Dear [ _____ ]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

## 1.  APPOINTMENT TO THE BOARD OF DIRECTORS.

a.  <u>Title, Term and Responsibilities</u>.

i.  Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

ii.  You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

b.  <u>Mandatory Board Meeting Attendance</u>. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board.  You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

c.  <u>Independent Contractor</u>. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

d.  <u>Information Provided by the Company.</u> The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification,



Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 413 of 1017 PageID 11194
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 14 of 62

on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

## 2. COMPENSATION AND BENEFITS.

a. <u>Retainer</u>. The Company will pay you a retainer for each month you serve on the Board (the "<u>Retainer</u>") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months. The parties will re-visit the Retainer after the sixth month. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b. <u>Expense Reimbursement</u>. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c. <u>Invoices; Payment</u>.

i. In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided. Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii. You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d. <u>Indemnification; D&O Insurance</u>. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated [_____], a copy of which is attached hereto as **Appendix A** (the "<u>Indemnification Agreement</u>"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e. <u>Tax Indemnification</u>. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

## 3. PROPRIETARY INFORMATION OBLIGATIONS.

a. <u>Proprietary Information</u>. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

Appx. 06388

010331


Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 19 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 414 of 1017   PageID 11195
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 15 of 62

   b. <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

   c. <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

  **4.**  **OUTSIDE ACTIVITIES.**

   a. <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

   b. <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

   c. <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

  **5.**  **TERMINATION OF DIRECTORSHIP.**

   a. <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

   b. <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

   c. <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

  **6.**  **GENERAL PROVISIONS.**

   a. <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

Appx. 06389
010332

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 415 of 1017    PageID 11196
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 16 of 62

      b.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

      c.    <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

      d.    <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

Appx. 06399
010333

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 416 of 1017 PageID 11197
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 17 of 62

**ACCEPTED AND AGREED:**


_____
[NAME]
Date: _____

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:25-cv-02002-S    Document 15-13    Filed 10/06/25    Page 417 of 1017    PageID 11198
66

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 18 of 62

## INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of [
_____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the
"**Company**"), HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware partnership
(the "**Debtor**") (solely as to <u>Section 29</u> hereunder), and [_____] (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such
capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board
of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company,
on its own behalf and for the benefit of the Debtor, to retain and attract as directors the
most capable Persons is in the best interests of the Company and the Debtor and that the
Company and the Debtor therefore should seek to assure such Persons that
indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection
against personal liability, in order to procure Indemnitee's service as a director of the
Company, in order to enhance Indemnitee's ability to serve the Company in an effective
manner and in order to provide such protection pursuant to express contract rights
(intended to be enforceable irrespective of, among other things, any amendment to the
Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any
change in the composition of the Board or any change in control, business combination or
similar transaction relating to the Company), the Company wishes to provide in this
Agreement for the indemnification of, and the advancement of Expenses (as defined in
<u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of
Indemnitee under the Company's directors' and officers' liability or similar insurance
policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's
agreement to provide services to the Company, the parties (including the Debtor solely as
to <u>Section 29</u> hereunder) agree as follows:

1.      <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the
following meanings:

(a)      "**Change in Control**" means the occurrence of any of the following: (i)
the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a
series of related transactions (including any merger or consolidation or whether by
operation of law or otherwise), of all or substantially all of the properties or assets of the
Company and its subsidiaries, to a third party purchaser (or group of affiliated third party
purchasers) or (ii) the consummation of any transaction (including any merger or
consolidation or whether by operation of law or otherwise), the result of which is that a
third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

Appx. 06392

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 418 of 1017    PageID 11199
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 19 of 62

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

Appx. 96393
010336

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 419 of 1017 PageID 11200
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 20 of 62

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e) "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f) "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g) "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i) "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j) "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k) "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

Appx. 06394

010337

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 420 of 1017 PageID 11201
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 21 of 62

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)  "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)  "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)  "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)  References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.  <u>Indemnification</u>.

(a)  Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

Appx. 06395

010338

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 421 of 1017 PageID 11202
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 22 of 62

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b) For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3. <u>Contribution</u>.

(a) Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b) The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c) To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

Appx 00386
010339

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 422 of 1017 PageID 11203
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 23 of 62

amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.  <u>Advancement of Expenses</u>. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this <u>Section 4</u>, the final sentence of <u>Section 9(b)</u>, or <u>Section 11(b)</u> in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to <u>Section 9</u>, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.  <u>Indemnification for Expenses in Enforcing Rights</u>. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with <u>Section 4</u>, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.  <u>Partial Indemnity</u>. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim

Appx 96897
010340

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 423 of 1017    PageID 11204
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 24 of 62

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.    <u>Notification and Defense of Claims</u>.

    (a)    <u>Notification of Claims</u>. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

    (b)    <u>Defense of Claims</u>. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.    <u>Procedure upon Application for Indemnification</u>. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

Appx. 96898
010341

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 424 of 1017    PageID 11205
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 25 of 62

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with <u>Section 9</u> below.

9.    <u>Determination of Right to Indemnification</u>.

    (a)    <u>Mandatory Indemnification; Indemnification as a Witness</u>.

        (i)    To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with <u>Section 2</u>, and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

        (ii)    To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in <u>Section 9(b)</u>) shall be required.

    (b)    <u>Standard of Conduct</u>. To the extent that the provisions of <u>Section 9(a)</u> are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

        (i)    if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

        (ii)    if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

Appx. 96899
0105342

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 425 of 1017 PageID 11206
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 26 of 62

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c)     Making the Standard of Conduct Determination. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under Section 9(b) to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under Section 9(b) shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to Section 8 (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(d)     Payment of Indemnification. If, in regard to any Losses:

(i)     Indemnitee shall be entitled to indemnification pursuant to Section 9(a);

(ii)     no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii)     Indemnitee has been determined or deemed pursuant to Section 9(b) or Section 9(c) to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e)     Selection of Independent Counsel for Standard of Conduct Determination. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(i), the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to Section 9(b)(ii), the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in Section 1(k), and the objection shall

Appx 06409
010343

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 426 of 1017 PageID 11207
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 27 of 62

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this <u>Section 9(e)</u> to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this <u>Section 9(e)</u> or Indemnitee gives its initial notice pursuant to the second sentence of this <u>Section 9(e)</u>, as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

(f) <u>Presumptions and Defenses</u>.

(i) <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii) <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

Appx 96404
010344

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 427 of 1017 PageID 11208
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 28 of 62

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)    <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    <u>Remedies of Indemnitee</u>.

(a)    In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

App. 06402
010345

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 428 of 1017 PageID 11209
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 29 of 62

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 11(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)     In the event that Indemnitee, pursuant to this Section 11, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)     In the event that a determination shall have been made pursuant to Section 9 that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 11 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 9.

(d)     If a determination shall have been made pursuant to Section 9 that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 11, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.     Settlement of Claims. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this Section 12, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.     Duration. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

Appx 96403
010346

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 34 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 429 of 1017 PageID 11210
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 30 of 62

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.     <u>Other Indemnitors</u>. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this <u>Section 14</u>.

15.     <u>Non-Exclusivity</u>. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.     <u>Liability Insurance</u>. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

Appx. 06464
0110347

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 430 of 1017 PageID 11211
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 31 of 62

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17. <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18. <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19. <u>Indemnitee Consent.</u> The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20. <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

Appx 06405
010348

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 431 of 1017 PageID 11212
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 32 of 62

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.     Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.     Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

(a)     if to Indemnitee, to the address set forth on the signature page hereto.

(b)     if to the Company, to:

Strand Advisors, Inc.
Attention:     Isaac Leventon
Address:       300 Crescent Court, Suite 700
               Dallas, Texas 75201
Email:            ileventon@highlandcapital.com

Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.     Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.     Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

Appx 96406
010349

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 432 of 1017 PageID 11213
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 33 of 62

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26. <u>Enforcement</u>.

(a)     Without limiting <u>Section 15</u>, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(b)     The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27. <u>Headings and Captions</u>. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29. <u>Guaranty By Debtor</u>.  The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**").  If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee.  Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations.  This guaranty by the Debtor is for the full amount of the Guaranteed Obligations.  The Debtor's obligations under this Agreement are continuing.  Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full.  The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor.  The Debtor's liability under this <u>Section 29</u> is unconditional.  It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

Appx. 06407
010350

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 38 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 433 of 1017    PageID 11214
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 34 of 62

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.


By: _____
Name:
Title:



HIGHLAND CAPITAL MANAGEMENT, LP (solely as to Section 29 hereunder)


By: _____
Name:
Title:

Appx. 06406

010351

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 434 of 1017   PageID 11215
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 35 of 62

INDEMNITEE:

_____

Name:   [_____]
Address: _____
           _____
           _____
Email:

Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 435 of 1017    PageID 11216

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 36 of 62

**Exhibit B**

**Amended DSI Retention Letter**

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 436 of 1017 PageID 11217
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 37 of 62

January ___, 2020

Attn: Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX 75201

      Re:    Development Specialists, Inc. ("DSI")
                Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide
restructuring support services to Highland Capital Management, L.P. (the "Company"). This
Agreement replaces and supersedes in all respects the letter agreement between DSI and the
Company, dated October 7, 2019, as amended and revised by the letter agreement dated October
29, 2019. However, all fees and expenses incurred by DSI prior to the date hereof in accordance
with such prior letter agreements will be paid by the Company, subject to allowance of such fees
and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy
Court"). The Agreement will become effective upon execution by duly authorized
representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with
   other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent
   Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and
   will comply with the Company's corporate governance requirements.
3. Mr. Sharp will fulfill such duties as directed by the Independent Directors and/or CEO, if
   any, of the Company with respect to the Company's restructuring and bankruptcy filed on
   October 16, 2019 (the "Chapter 11 Case"), including implementation and prosecution of
   the Chapter 11 Case**.**
4. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support
   services as requested or required to the Company, which may include but are not limited
   to:
   a. assisting the Company in the preparation of financial disclosures required by the
      Bankruptcy Code, including the Schedules of Assets and Liabilities, the
      Statements of Financial Affairs and Monthly Operating Reports;

Appx. 00411
010354

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 437 of 1017 PageID 11218
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 38 of 62

Highland Capital Management, LP
December ___, 2019
Page 2

     b.  advising and assisting the Company, the Company's legal counsel, and other professionals in responding to third party requests;

     c.  attending meetings and assisting in communications with parties in interest and their professionals, including the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case;

     d.  providing litigation advisory services with respect to accounting matters, along with expert witness testimony on case related issues; and

     e.  rendering such other general business consulting services or other assistance as the Company may deem necessary and which are consistent with the role of a financial advisor and not duplicative of services provided by other professionals in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel. The individuals are:

Appx. 08412

010355

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 438 of 1017 PageID 11219
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 39 of 62

Highland Capital Management, LP
December ___, 2019
Page 3

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company. The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services. As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice. If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time. In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required. If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice. Notwithstanding anything to the contrary contained herein, the Company

Appx. 06413
010356

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 439 of 1017 PageID 11220
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 40 of 62

Highland Capital Management, LP
December ___, 2019
Page 4

shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication. DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company. DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law. Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies. Any such indemnity shall survive the expiration or termination by either party of this Agreement. Except as provided

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 440 of 1017 PageID 11221
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 41 of 62

Highland Capital Management, LP
December ___, 2019
Page 5

in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the
Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as
well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the
Company, or any party asserting claims on behalf of the Company, except for direct damages
found in a final determination (not subject to further appeal) by a court of competent jurisdiction
to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence
of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any
connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case.
Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's
professional staff, neither DSI nor its professionals have any known conflicts with the parties in
this case. DSI will separately provide its connections to parties in this case and/or their
professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business
planning and operations. DSI's engagement shall not constitute an audit, review or compilation,
or any other type of financial statement reporting engagement that is subject to the rules of
AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of
one year subsequent to the completion and/or termination of this Agreement; provided that the
Company shall not be prohibited from (x) making general advertisements for employment not
specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited
requests for employment.

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of
DSI employees, and all other provisions necessary to the enforcement of the intent of this
Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

Appx. 00415

010358

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 441 of 1017 PageID 11222
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 42 of 62

Highland Capital Management, LP
December ___, 2019
Page 6


This Agreement shall be governed by and construed in accordance with the laws of the State of
Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of
this Agreement and supersedes and is intended to nullify any other agreements, understandings
or representations relating to the subject of this Agreement. This Agreement may not be
amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance
by signing an original copy of this Agreement on the signature lines below, then returning one
fully-executed Agreement to DSI's office. The Agreement will become effective upon execution
by duly authorized representatives of the respective parties.


Very truly yours,

Bradley Sharp
Development Specialists, Inc.


AGREED AND ACKNOWLEDGED:

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner


_____
By: _____, Independent Director
Date: _____

010359

Appx. 00416

Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 43 of 62

**Exhibit C**

**Document Production Protocol**

Appx. 08417

010360

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 443 of 1017 PageID 11224
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 44 of 62

**A. Definitions**

    a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**

    a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**

    a. For email, Debtor uses Outlook Email on an Exchange server. Veritas Enterprise Vault is used to archive emails. Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email communications have been preserved and are not at risk of deletion due to normal document retention practices. Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b. The file server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c. The Sharepoint server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago. Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva. Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein.

    f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data. Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h. Bloomberg data is archived for five years. Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.



Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 49 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 444 of 1017    PageID 11225
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 45 of 62

i. Files may be saved locally on laptops/work computers used by employees of Debtor. This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere. Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees. Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

**D. Not Reasonably Accessible Documents**

a. Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

   i. Deleted, slack, fragmented, or other data only accessible by forensics;

   ii. Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and

   iii. On-line access data such as temporary internet files, history, cache, cookies, and the like.

b. To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

**E. Collection and Search Methodology**

a. Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than seven (7) days after the Committee requests ESI from the Debtor. DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates. Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs). Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

b. The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 50 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 445 of 1017    PageID 11226
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 46 of 62

c. A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above. Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

d. The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

e. Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

f. Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

g. Debtor shall propose a format for producing Sharepoint data.  The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

## F.  Format of Documents Produced

a. Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

b. The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

c. The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

d. The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

e. In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

ACTIVE 252191584


010363

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 446 of 1017 PageID 11227
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 47 of 62

f. For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g. For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h. For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i. The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

   i. Production Bates begin
   ii. Production Bates end
   iii. Production Bates begin attachment
   iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j. Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email

Appx. 06421
010364

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 52 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 447 of 1017    PageID 11228
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 48 of 62

thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k.  Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

l.  To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

**G.  Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status**

a.  No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b.  Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c.  Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d.  Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e.  Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

**Metadata List**

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the | 2 |

Appx. 06422
010365

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 448 of 1017 PageID 11229
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 49 of 62

| | | |
|---|---|---|
| | document | |
| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 449 of 1017 PageID 11230
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 50 of 62

| | | |
|---|---|---|
| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

ACTIVE 252191584

**<u>Exhibit D</u>**

**Reporting Requirements**

Appx 00425

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 451 of 1017 PageID 11232
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 52 of 62

I.   **Definitions**

A.   "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.   "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.   "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.   "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.   "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.   "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.   "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.   "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual



Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 452 of 1017 PageID 11233
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 53 of 62

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

    a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

    b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

    a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)  Stage 3:

        (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages)

    a)  Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

Appx. 06427

010370

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 453 of 1017 PageID 11234
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 54 of 62

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

III. **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A. **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

   a) Stage 1 and Stage 2: ordinary course determined by the CRO.

   b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

   a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b) Stage 3:

      (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 06428
010371

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 454 of 1017 PageID 11235
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 55 of 62

the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV. **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A. **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

a) Stage 1 and Stage 2: ordinary course determined by the CRO.

b) Stage 3: ordinary course determined by the Debtor.

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 06429
010372

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 455 of 1017 PageID 11236
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 56 of 62

2.    Related Entity Transactions

    a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    <u>Stage 3</u>:

        (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages):

    a)    Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Appx. 06439
010373

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 61 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 456 of 1017   PageID 11237
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 57 of 62

**V.**   **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.   Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.   Ordinary Course Transactions (All Stages): N/A

C.   Operating Requirements: N/A

D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.**   **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

A.   Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B.   Ordinary Course Transactions (All Stages): N/A

C.   Operating Requirements: N/A

D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.**   **Transactions involving Non-Discretionary Accounts**

A.   Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

B.   Ordinary Course Transactions (All Stages): N/A

C.   Operating Requirements: N/A

D.   Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 06434
010374

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 62 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 457 of 1017 PageID 11238
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20 Entered 01/14/20 09:59:10 Page 58 of 62

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.** **Representations and Warranties**

    A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Appx. 06432
010375

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 63 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 458 of 1017    PageID 11239
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 59 of 62

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD:  Schedule A is work in process and may be supplemented or amended.

Appx. 06423

010376

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 64 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 459 of 1017   PageID 11240
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20   Entered 01/14/20 09:59:10   Page 60 of 62

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

Appx. 06434

010377

## Schedule B

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

010378

Appx 06435

Case 19-34054-sgj11 Doc 3445-47 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 461 of 1017    PageID 11242
Case 19-34054-sgj11 Doc 354-1 Filed 01/14/20    Entered 01/14/20 09:59:10    Page 62 of 62

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

010379

Appx. 06426

# EXHIBIT 48

Appx 06427
010380

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 463 of 1017 PageID 11244
Case 19-34054-sgj11 Doc 466 Filed 02/21/20 Entered 02/21/20 11:08:22 Page 1 of 3

Docket #0466 Date Filed: 02/21/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| In re: | § |
|  | § Chapter 11 |
|  | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
|  | § |
| Debtor. | § Related to Docket No. 281 |

**NOTICE OF DEBTOR'S AMENDED OPERATING PROTOCOLS**

TO:     (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) counsel to the Committee; (d) the Debtor's principal secured parties; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002.

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

---

NOTICE OF DEBTOR'S AMENDED OPERATING PROTOCOLS



1934054200221000000000001

Appx. 06438

010381

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 464 of 1017 PageID 11245
Case 19-34054-sgj11 Doc 466 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 2 of 3

**PLEASE TAKE NOTICE** that on February 19, 2020, the Court held a hearing (the "Hearing") on (i) that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 281] (the "Motion") filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (collectively, the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Case"), and (ii) that certain *Limited Objection of the Issuers to Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Dkt. No. 324] (the "Limited Objection") filed by the Issuers[2] in response to the Debtor's Motion.

**PLEASE TAKE FURTHER NOTICE** that at the Hearing, the Debtor announced to the Court that the Issuers' Limited Objection had been resolved and that, as part of the resolution of the Limited Objection, the Debtor would present to the Court an amended and modified version of the protocols governing the Debtor's continued operations in the ordinary course of its business (the "Amended Operating Protocols").

**PLEASE TAKE FURTHER NOTICE** that the Amended Operating Protocols are attached hereto as **Exhibit A**. A redline copy identifying the specific amendments and modifications appearing in the Amended Operating Protocols is attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Left Blank]*

---

[2] The "Issuers" are a group of 25 separate Cayman issuers of collateralized loan and debt obligations are specifically identified in the Limited Objection.

---

010382

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 465 of 1017 PageID 11246
Case 19-34054-sgj11 Doc 466 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 3 of 3

Dated:  February 21, 2020.        PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pcszjlaw.com
             mlitvak@pszjlaw.com
             gdemo@pszjlaw.com

-and-

HAYWARD & ASSOCIATES PLLC

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**Counsel for the Debtor and
Debtor-in-Possession**

Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 1 of 13

# EXHIBIT "A"

010384

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 467 of 1017 PageID 11248
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 2 of 13

I.   **Definitions**

A.   "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.   "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.   "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.   "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.   "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.   "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.   "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.   "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Appx. 06442
010385

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 468 of 1017 PageID 11249
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 3 of 13

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I. "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J. "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K. "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A. **Covered Entities**: N/A (See entities above).

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

   a) Stage 1 and Stage 2: ordinary course determined by the CRO.

   b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

   a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b) Stage 3:

      (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

Appx. 06143
010386

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 469 of 1017 PageID 11250
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 4 of 13

> (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

> a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

> b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

> c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

### III.    Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

> a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

> b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 06144

010387

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 470 of 1017 PageID 11251
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 5 of 13

a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) <u>Stage 3</u>:

 (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

 (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

Appx. 06445

010388

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 10 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 471 of 1017    PageID 11252
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 6 of 13

**IV.** **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

A.  **Covered Entities**: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.  **Operating Requirements**

1.  Ordinary Course Transactions do not require Court approval (All Stages).

   a)  Stage 1 and Stage 2: ordinary course determined by the CRO.

   b)  Stage 3: ordinary course determined by the Debtor.

2.  Related Entity Transactions

   a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b)  Stage 3:

   (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   (2)  Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.  Third Party Transactions (All Stages):

   a)  Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 00146

010389

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 472 of 1017 PageID 11253
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 7 of 13

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V. **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 00467
010390

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 473 of 1017    PageID 11254
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 8 of 13

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.    Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.    Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.    Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.



Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 474 of 1017    PageID 11255
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 9 of 13

X.    **Representations and Warranties**

    A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

    C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Appx. 00449

010392

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 475 of 1017 PageID 11256
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 10 of 13

**Schedule A**[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

Appx. 09459
010393

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 476 of 1017 PageID 11257
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 11 of 13

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

App. 00151
010394

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 477 of 1017    PageID 11258
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 12 of 13

**<u>Schedule B</u>**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002



010395

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 478 of 1017    PageID 11259
Case 19-34054-sgj11 Doc 466-1 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 13 of 13

## Schedule C

**1.** James Dondero
**2.** Mark Okada
**3.** Grant Scott
**4.** John Honis
**5.** Nancy Dondero
**6.** Pamela Okada
**7.** Thomas Surgent
**8.** Scott Ellington
**9.** Frank Waterhouse
**10.** Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

010396

# EXHIBIT "B"

Appx 00154

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 480 of 1017 PageID 11261
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 2 of 14

I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

Appx. 00455
010398

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 481 of 1017 PageID 11262
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 3 of 14

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.    "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.    "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.    "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

**II.    Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.    **Covered Entities**: N/A (See entities above).

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    Stage 1 and Stage 2:  ordinary course determined by the CRO.

    b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

    a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    Stage 3:

        (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

Appx. 09456
010399

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 482 of 1017 PageID 11263
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 4 of 14

      (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages)

     a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     b)     The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

     c)     The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.     **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.     Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.     **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.     **Operating Requirements**

1.     Ordinary Course Transactions do not require Court approval (All Stages).

     a)     Stage 1 and Stage 2: ordinary course determined by the CRO.

     b)     Stage 3: ordinary course determined by the Debtor.

2.     Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 00457
010400

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 483 of 1017 PageID 11264
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 5 of 14

a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) <u>Stage 3</u>:

(1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**IV. Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

Appx. 00158
010401

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 484 of 1017 PageID 11265
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 6 of 14

A. **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

   a) <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

   b) <u>Stage 3</u>: ordinary course determined by the Debtor.

2. Related Entity Transactions

   a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   b) <u>Stage 3</u>:

   (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages):

   a) Except <u>(x)</u> as set forth in (b) and (c) below <u>and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party</u>, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 00159

010402

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 485 of 1017 PageID 11266
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 7 of 14

                    Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

   C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. <u>Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.</u>

**V.    Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

   A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

   B.    Ordinary Course Transactions (All Stages): N/A

   C.    Operating Requirements: N/A

   D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.    Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 00409
010403

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 25 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 486 of 1017    PageID 11267
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 8 of 14

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

## VII. Transactions involving Non-Discretionary Accounts

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

## VIII. Additional Reporting Requirements – All Stages (to the extent applicable)

A. DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B. The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

## IX. Shared Services

A. The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B. The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Appx. 00161
010404

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:25-cv-02072-S      Document 15-13      Filed 10/06/25      Page 487 of 1017      PageID 11268
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 9 of 14

**X.**    **Representations and Warranties**

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

Appx. 00402

010405

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 27 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 488 of 1017    PageID 11269
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 10 of 14

**Schedule A**[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD:  Schedule A is work in process and may be supplemented or amended.

9

Appx. 00403
010406

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 28 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 489 of 1017   PageID 11270
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 11 of 14

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

Appx. 06464

010407

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 490 of 1017    PageID 11271
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20    Entered 02/21/20 11:08:23    Page 12 of 14

## Schedule B

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

Appx. 00105

010408

Case 19-34054-sgj11 Doc 3445-48 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 30 of
Case 3:25-cv-02072-S     Document 15-13     Filed 10/06/25     Page 491 of 1017     PageID 11272
Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20   Entered 02/21/20 11:08:23   Page 13 of 14

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002

Appx. 06406

010409

Case 19-34054-sgj11 Doc 466-2 Filed 02/21/20 Entered 02/21/20 11:08:23 Page 14 of 14

| | |
|---|---|
| **Summary report:** | |
| **Litéra® Change-Pro TDC 10.1.0.300 Document comparison done on 2/3/2020 1:05:23 PM** | |
| **Style name:** Sidley Default | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** DOCS_NY-#39943-v15-Highland_- Discussion_Outline_for_Protocols.docx | |
| **Modified filename:** DOCS_NY-#39943-v15-Highland_- Discussion_Outline_for_Protocols_2.docx | |
| **Changes:** | |
| Add | 5 |
| Delete | 0 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 5 |

# EXHIBIT 49

Appx. 06468

010411

Case 19-34054-sgj11 Doc 3445-49 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 4
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 494 of 1017    PageID 11275
Case 20-03190-sgj Doc 10 Filed 12/10/20    Entered 12/10/20 13:31:53    Page 1 of 3



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 10, 2020**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding |
| | § | |
| vs. | § | |
| | § | No. 20-03190-sgj |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING DEBTOR'S MOTION
### FOR A TEMPORARY RESTRAINING ORDER AGAINST JAMES DONDERO

   Having considered the *Debtor's Motion for a Temporary Restraining Order and*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-49 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 4
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 495 of 1017    PageID 11276
Case 20-03190-sgj Doc 10 Filed 12/10/20    Entered 12/10/20 13:31:53    Page 2 of 3

*Preliminary Injunction against James Dondero* [Docket No. 6] (the "Motion"), the *Memorandum of Law* (the "Memorandum of Law")[2] in support of the Motion, and the *Declaration of James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order against James Dondero* [Docket No. 4] (the "Seery Declaration"), including the exhibits annexed thereto; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Motion and the Memorandum of Law establish good cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.    The Motion is **GRANTED** as set forth herein.

2.    James Dondero is temporarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents; (c) communicating with any of the Debtor's

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Memorandum of Law.

Appx. 06479
010413

Case 19-34054-sgj11 Doc 3445-49 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 4
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 496 of 1017    PageID 11277
Case 20-03190-sgj Doc 10 Filed 12/10/20    Entered 12/10/20 13:31:53    Page 3 of 3

employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned or controlled by the Debtor, and pursuit of the Plan or any alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[3]

3.      James Dondero is further temporarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct.

4.      All objections to the Motion are overruled in their entirety.

5.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

---

[3] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from seeking judicial relief upon proper notice or from objecting to any motion filed in the above-referenced bankruptcy case.

App. 0647
010414

# EXHIBIT 50

Appx. 06472

010415

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 6
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 498 of 1017 PageID 11279
Case 20-03190-sgj Doc 59 Filed 01/12/21 Entered 01/12/21 07:46:55 Page 1 of 5



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed January 11, 2021

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § No. 20-03190-sgj |
| | § |
| JAMES D. DONDERO, | § |
| | § |
| Defendant. | § |

### ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION
### AGAINST JAMES DONDERO

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 6
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 499 of 1017    PageID 11280
Case 20-03190-sgj Doc 59 Filed 01/12/21    Entered 01/12/21 07:46:55    Page 2 of 5

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "Motion"), filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"); and this Court having considered (a) the Motion, (b) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Pro. Docket No. 1] (the "Complaint"), (c) the arguments and law cited in the *Debtor's Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"), (d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction* [Adv. Pro. Docket No. 52] (the "Opposition") filed by James Dondero, (e) the testimonial and documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the "Hearing"), including assessing the credibility of Mr. James Dondero, (f) the arguments made during the Hearing, and (g) all prior proceedings relating to the Motion, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "TRO Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

DOCS_NY:41944.3 36027/002

Appx. 06471
010417

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 6
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 500 of 1017 PageID 11281
Case 20-03190-sgj Doc 59 Filed 01/12/21 Entered 01/12/21 07:46:55 Page 3 of 5

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

Appx. 06475
010418

Case 19-34054-sgj11 Doc 3445-50 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 6
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 501 of 1017 PageID 11282
Case 20-03190-sgj Doc 59 Filed 01/12/21 Entered 01/12/21 07:46:55 Page 4 of 5

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.      James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.      James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.      James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.      James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.      This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

DOCS_NY:41944.3 36027/002

Appx. 06476

010419

8.      All objections to the Motion are overruled in their entirety.

9.      The Court shall retain exclusive jurisdiction with respect to all matters arising

from or relating to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

DOCS_NY:41944.3 36027/002

Appx. 00477

010420

# EXHIBIT 51

Appx. 06478

010421

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 504 of 1017    PageID 11285
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 1 of 31



Docket #2660  Date Filed: 8/4/2021

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 3, 2021**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | §  Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |

### MEMORANDUM OPINION AND ORDER HOLDING CERTAIN PARTIES AND THEIR ATTORNEYS IN CIVIL CONTEMPT OF COURT FOR VIOLATION OF BANKRUPTCY COURT ORDERS[2]

### I.    Introduction.

This Memorandum Opinion and Order addresses the ***second*** civil contempt matter that this

bankruptcy court has been asked to address since confirmation of a Chapter 11 plan for Highland

Capital Management, L.P. (the "Debtor" or "Highland") on February 22, 2021.  In this instance,

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This ruling constitutes the court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. Pro. 7052, in connection with the Motion, Memorandum of Law, Declaration, and Show Cause Order found at DE ## 2235, 2236, 2237, 2247, and 2255 in the above-referenced Bankruptcy Case.



1934054210804000000000001

Appx. 06479

010422

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 505 of 1017 PageID 11286
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 2 of 31

Highland seeks to have at least two entities held in civil contempt of two bankruptcy court orders and imposed with sanctions: Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLO Holdco") (collectively, the "Alleged Contemnors"). Highland also seeks to have a law firm that has recently begun representing the Alleged Contemnors (Sbaiti & Company PLLC) held in civil contempt of the bankruptcy court, as well as any control-persons who authorized the Alleged Contemnors ("Authorizing Persons") to take the allegedly contemptuous actions.

<u>First, who are these Alleged Contemnors?</u> DAF[3] is alleged to be a charitable fund and a limited company that was formed in the Cayman Islands. DAF is the 100% owner of CLO Holdco, which is also a Cayman Islands entity. Thus, DAF controls CLO Holdco.[4] DAF was founded by Highland's former Chief Executive Officer ("CEO") and indirect beneficial equity owner—Mr. James Dondero ("Mr. Dondero"). DAF controls $200 million of assets, which asset base was derived from Highland, Mr. Dondero, Mr. Dondero's family trusts, or other donor trusts.[5] Mr. Dondero has historically been DAF's informal investment advisor (without an agreement), and he was DAF's managing member until 2012.[6] In 2012, an individual named Grant Scott (a patent lawyer with no experience in finance or running charitable organizations, who was Mr. Dondero's long-time friend, college housemate, and best man at his wedding) became DAF's managing member.[7] Then, Grant Scott resigned from that role, on or around January 31, 2021, after apparent

---

[3] The acronym "DAF" stands for donor advised fund.

[4] Debtor's Exh. 25 [DE # 2410]. CLO Holdco has sometimes been referred to as the "investment arm" of the DAF organizational structure. Transcript of 6/8/21 Hearing at 122:17-20.

[5] Transcript 6/8/21 Hearing at 98:3-99:15 (testimony that the donors "gave up complete dominion and control over the respective assets and at that time claimed a federal income tax donation for that").

[6] *Id.* at 149:16-150:2.

[7] *Id.* at 150:3-5; 154:11-24; 156:7-10. *See also* Debtor's Exh. 23 (Grant Scott Deposition 1/21/21) at 24-25; 28:21 ("I think he is my closest friend") [DE # 2410].

Appx. 06180
010423

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 506 of 1017 PageID 11287
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 3 of 31

disagreements with Mr. Dondero. After having no manager for a couple of months, an individual named Mark Patrick ("Mr. Patrick") became DAF's general manager on March 24, 2021 (just 19 days before the events occurred that are the subject of this contempt matter). It appears that Mr. Scott assigned his interests that undergirded his managing member role to Mr. Patrick at Mr. Patrick's direction.[8] Mr. Patrick was an employee of Highland (having had some sort of a "tax counsel" role—but not in Highland's legal department) from 2008 until early 2021, and he now is an employee of Highgate Consultants, d/b/a Skyview Group, which is an entity recently created by certain former Highland employees.[9] Mr. Patrick had no prior experience running a charitable organization prior to becoming DAF's manager on March 24, 2021 (just like Grant Scott).[10] He testified that he "hold[s] [him]self out as a tax professional versant on setting up offshore master fund structures."[11]

    <u>What were the allegedly contemptuous actions?</u> DAF and CLO Holdco filed: (a) on April 12, 2021, a Complaint[12] ("Complaint") in the United States District Court for the Northern District of Texas (the "District Court Action"), against the Debtor and two Debtor-controlled entities (*i.e.,* Highland HCF Advisor, Ltd. ("Highland HCFA") and Highland CLO Funding, Ltd. ""HCLOF"));[13] and then (b) one week later, on April 19, 2021, filed a motion for leave to amend

---

[8] Debtor's Exh. 24 at 90-93 [DE # 2410].

[9] Transcript from 6/8/21 Hearing, at 95:18-97:2 [DE # 2440].

[10] *Id.* at 100:2-103:9. For further clarity, above the Cayman Islands structure for DAF and CLO Holdco, there are various foundations that hold "participation shares." *Id.* Mr. Dondero is president and director of those foundations. Debtor's Exh. 23 at 57.

[11] *Id.* at 144:7-8.

[12] Debtor's Exh. 12 [DE # 2410].

[13] Highland HCFA is a Cayman Islands limited company 100% owned by the Debtor. HCLOF is a limited company incorporated under the laws of Guernsey. It is 49.02% owned by CLO Holdco and the remaining 50%+ is owned by the Debtor or Debtor's designee, as a result of the HarbourVest Settlement, as further explained herein.

Appx. 00181
010424

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 507 of 1017    PageID 11288
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 4 of 31

the Complaint to add the Debtor's current CEO, James P. Seery, Jr. ("Mr. Seery") as a defendant in the action (the "Seery Motion").[14] ***It is the Seery Motion that is primarily in controversy here***. Note that in the original Complaint, Mr. Seery is named as a "potential party"[15] and, while not nominally a party, he was mentioned approximately 50 times, by this court's count.  Mr. Seery's conduct is plastered throughout the Complaint, accusing him of deceitful, improper conduct. ***The original Complaint does not mention that Highland is still in bankruptcy, nor that the claims asserted in the Complaint are related to a bankruptcy case pursuant to 28 U.S.C. § 1334, but, rather, asserts that federal subject matter jurisdiction exists in the District Court pursuant to 28 U.S.C. §§ 1331 & 1367***.

As will be explained further below, the District Court Action—which in some ways reads like a minority shareholder suit[16]—is all about the alleged impropriety of a settlement (*i.e.,* the "HarbourVest Settlement") that was proposed by the Debtor to the bankruptcy court in December 2020[17] and approved by the bankruptcy court (with notice to all creditors and after an evidentiary hearing) on January 14, 2021.[18]  "HarbourVest" was a collective of investors that had invested approximately $80 million in the year 2017 into the defendant-entity herein known as HCLOF (acquiring a 49.98% interest in it), and filed six proofs of claim against the Debtor in the bankruptcy case, totaling $300 million, alleging that the Debtor had committed fraud back in 2017, in

---

[14] Debtor's Exh. 19 [DE # 2410].

[15] Debtor's Exh. 12 [DE # 2410], ¶ 6.

[16] Indeed, as alluded to in footnote 13 above, CLO Holdco is a minority shareholder (49.02%) of one of the Defendants, HCLOF, and HCLOF is now more than 50% owned by the Debtor or its designee as a result of the HarbourVest Settlement—a fact that CLO Holdco and DAF apparently do not like.

[17] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237].

[18] " HarbourVest" refers to the collective of HarbourVest Dover Street IX Investment, L.P., HarbourVest 2017 Global AIF, L.P., HarbourVest 2017 Global Fund, L.P., HV International VIII Secondary, L.P., and HarbourVest Skew Base AIF, L.P.

Appx. 06482
010423

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 508 of 1017 PageID 11289
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 5 of 31

connection with its encouraging HarbourVest to invest in and acquire the 49.98% interest in HCLOF. The Debtor and HarbourVest eventually negotiated a settlement of HarbourVest's proofs of claim which, in pertinent part, allowed HarbourVest a $45 million general unsecured claim in the bankruptcy case and involved HarbourVest transferring its 49.98% interest in defendant HCLOF to the Debtor or Debtor's designee.[19] The bankruptcy court approved this settlement as fair and equitable and in the best interests of the bankruptcy estate.[20]

Despite the full vetting in the bankruptcy court of the HarbourVest Settlement and an order approving the HarbourVest Settlement, which was not appealed by DAF or CLO Holdco,[21] various torts and other causes of action are now being alleged by DAF and CLO Holdco against the Debtor *relating entirely to the HarbourVest Settlement*, including: breach of fiduciary duties owed to DAF and CLO Holdco; breach of the HCLOF membership agreement, and an alleged right of first refusal provision therein; negligence; violations of RICO;[22] and tortious interference. In a nutshell, the gravamen of DAF's and CLO Holdco's Complaint is that the economics of the HarbourVest Settlement resulted in the Debtor obtaining HarbourVest's 49.98% in HCLOF for a value of $22.5 million, and DAF and CLO Holdco believe that the 49.98% interest was worth far more than this. DAF and CLO Holdco assert that they and HarbourVest were deceived. Somewhat shockingly to

---

[19] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237]. HarbourVest basically wanted to rescind its earlier acquisition of the 49.98% to extract itself from Highland.

[20] Declaration of John Morris (Exh. 11 attached thereto) [DE # 2237].

[21] *Id.* The court notes that certain family trusts of Mr. Dondero (known as the Dugaboy and Get Good Trusts) did appeal the bankruptcy court order approving the HarbourVest Settlement. However, there was no stay pending appeal and the settlement was implemented.

[22] Shockingly, DAF and CLO Holdco state that Highland's "actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D)." Debtor's Exh. 12, [DE # 2410], at ¶ 117.

010426
Appx. 06483

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 509 of 1017 PageID 11290
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 6 of 31

this court, the Complaint implies that information was withheld from DAF and CLO Holdco.[23]

DAF and CLO Holdco further argue that they should have been given the opportunity to purchase HarbourVest's 49.98% interest in HCLOF. Mr. Seery is alleged to be the chief perpetrator of wrongdoing. Subsequently, in the Seery Motion, in which DAF and CLO Holdco seek leave to amend the Complaint to add Mr. Seery to the District Court Action, DAF and CLO Holdco were clear for the first time that there is a "pending Chapter 11 proceeding" and disclosed to the District Court that they did not name Mr. Seery in the Complaint since the bankruptcy court "issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at [Highland], subject to certain prerequisites. In that order, the bankruptcy court also asserted 'sole jurisdiction' over all such causes of action."[24] DAF and CLO Holdco went on to state that the bankruptcy court's order "exceeds the bankruptcy court's powers and is unenforceable," but even if enforceable, in an abundance of caution, DAF and CLO Holdco are satisfying the bankruptcy court's mandates by asking the *District Court* for leave to sue Mr. Seery, since the bankruptcy court's powers are derivative from the District Court.[25]

Disturbingly, one of the Alleged Contemnors (CLO Holdco) objected to the HarbourVest Settlement during the bankruptcy case[26] and later withdrew its objection during the bankruptcy

---

[23] Mr. Dondero and CLO Holdco appeared at and examined the HarbourVest witness, Michael Pugatch, at a deposition before the hearing on the HarbourVest Settlement. Declaration of John Morris, Exhs. 7 & 8 thereto [DE # 2237]. Moreover, it is rather astounding to this court for anyone to suggest that any human being (Mr. Seery or anyone else) knew more, or withheld, any information that wasn't *well known* to Mr. Dondero and all principals/agents of DAF and CLO Holdco. Mr. Dondero and any personnel associated with DAF and CLO Holdco were as (or more) familiar with HCLOF's assets and their potential value than any human beings on the planet—having managed these assets for years. As one example, it has been represented to the court that HCLOF owns shares in MGM Holdings, Inc. ("MGM"). It is undisputed that Mr. Dondero sits on the MGM Board of Directors. *See* DE # 2236, n.14.

[24] Debtor's Exh. 17 [DE # 2410] at paragraph 2, p. 1.

[25] *Id.* at paragraph 3, pp. 1-2; & pp.5-8.

[26] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

Appx. 00484
010427

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 510 of 1017 PageID 11291
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 7 of 31

court hearing regarding the settlement,[27] and did not appeal the order approving the HarbourVest
Settlement. CLO Holdco, in its later-withdrawn objection, made the very same argument that it
now makes in Count 2 of the Complaint (in its breach of HCLOF membership agreement claim)—
*i.e.,* that the Debtor committed a breach of a "right of first refusal" in the HCLOF membership
agreement (in fact, this was the sole argument CLO Holdco made in its objection).[28] The Debtor
and CLO Holdco submitted briefing on the alleged "right of first refusal" prior to the hearing on
the HarbourVest Settlement, and the bankruptcy court spent a fair amount of time reviewing the
briefing—only to learn on the morning of the hearing that CLO Holdco was withdrawing its
objection.

In any event, the Debtor now alleges that the District Court Action is not only an improper
collateral attack on the bankruptcy court's order approving the HarbourVest Settlement, but—more
germane to this civil contempt matter—the motion to amend the District Court Action to add Mr.
Seery is a violation of *two* earlier bankruptcy court orders[29] that contained "*gatekeeper
provisions*"—*i.e.,* specific provisions *requiring parties to seek bankruptcy court approval before
filing lawsuits against the persons controlling the Debtor*. These gatekeeper provisions—which
the bankruptcy court considered to be both (a) a way to maintain control of potentially vexatious,
distracting litigation (which might interfere with the reorganization effort), and (b) consistent with
the United States Supreme Court case of *Barton v. Barbour*,[30] and some of its progeny (as well as

---

[27] Declaration of John Morris (Exh. 10 attached thereto), Transcript of 1/14/21 Hearing, at 7:20-8:6 [DE # 2237]. Note that two family trusts of Mr. Dondero had objected to the HarbourVest Settlement (in addition to Mr. Dondero personally), but they made clear at the January 14, 2021 Hearing on the HarbourVest Settlement that they were not asserting that the HCLOF membership agreement (or an alleged right of first refusal therein) was being violated by the HarbourVest Settlement. *Id.* at 22:5-20.

[28] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

[29] Debtor's Exh. 15 & 16 [DE # 2410].

[30] 104 U.S. 126 (1881).

Appx. 06485
010428

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 511 of 1017    PageID 11292
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 8 of 31

the second sentence of 28 U.S.C. § 959(a))—were heavily negotiated in the case and significant, since they were put in place against a backdrop of contentious litigation. ***No one appealed the two bankruptcy court orders with the gatekeeper provisions***. There were still more gatekeeping provisions in the Debtor's Chapter 11 plan that the bankruptcy court confirmed on February 22, 2021 (that plan is on appeal at the Fifth Circuit, although the Fifth Circuit has denied a stay pending appeal; at the time of the hearing on this civil contempt matter, the plan had not yet gone effective).

Objections to the Debtor's request to have the Alleged Contemnors, the Alleged Contemnors' lawyers, and Authorizing Persons held in civil contempt of court were filed by DAF, CLO Holdco, Sbaiti & Company, PLLC,[31] by Mr. Patrick,[32] and by Mr. Dondero.[33] They argue that the Alleged Contemnors have not violated the bankruptcy court's prior orders containing gatekeeper provisions because the Alleged Contemnors have ***not actually sued*** Mr. Seery but, rather, have sought permission from the District Court to sue him. They argue that, even though the January 2020 Corporate Governance Order and July 2020 Seery CEO Order required parties to seek bankruptcy court permission to sue Mr. Seery, that seeking ***District Court*** permission is appropriate, since district courts actually have bankruptcy subject matter jurisdiction and bankruptcy courts are mere units of the district courts. Moreover, the Alleged Contemnors suggest that the bankruptcy court's gatekeeper provisions in the two orders ***exceeded the reach of its powers***, and, again, their Seery Motion was simply about asking the court with original bankruptcy subject matter jurisdiction (*i.e.,* the District Court) for authority to sue Mr. Seery.

---

[31] DE # 2313.

[32] DE # 2309.

[33] DE # 2312.

010429

Appx. 06186

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 512 of 1017 PageID 11293
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 9 of 31

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8, 2021. For the reasons set forth below, the court finds and concludes that DAF, CLO Holdco, Sbaiti & Company, PLLC (and its lawyers Jonathan Bridges and Mazin Sbaiti), Mr. Patrick, and Mr. Dondero are all in civil contempt of at least two bankruptcy court orders of which they had knowledge and were well aware. They shall each be jointly and severally liable for the sum of **$239,655** as a compensatory sanction for their civil contempt, and they will be purged from their contempt if they pay this amount within 15 days of entry of this Order. Moreover, the court will add on a sanction of **$100,000** for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for *certiorari* are not successful.

## II. Background.

A brief summary of the above-referenced bankruptcy case can be found in this court's Memorandum and Opinion issued June 7, 2021, regarding an earlier contempt motion that involved Mr. Dondero and different allegedly contemptuous actions.[34] This court will not repeat that summary herein but will hit some of the most pertinent highlights.

<u>Bankruptcy Filing</u>. On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that manages billions of dollars of assets. Highland's assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO, Mr. Seery, was selected by the creditors and approved by the bankruptcy court during the Chapter 11 case.

---

[34] Adversary Proceeding No. 20-03190, [DE # 190].

Appx. 00487
010430

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:25-cv-02072-S    Document 15-13   Filed 10/06/25    Page 513 of 1017   PageID 11294
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21   Entered 08/04/21 08:56:33   Page 10 of 31

Corporate Governance Shake-Up.  Specifically, early in the case, the Official Unsecured

Creditors Committee (the "UCC")—whose members asserted well over $1 billion worth of claims

and whose members had been in litigation with Highland for many years in many courts—and the

U.S. Trustee ("UST") both desired to have a Chapter 11 Trustee appointed in Highland's

bankruptcy case—absent some major change in corporate governance—due to conflicts of interest

and the alleged self-serving, improper acts of Mr. Dondero and possibly other former officers.

Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC, which was

executed by Mr. Dondero and approved by a bankruptcy court order on January 9, 2020 (the

"January 2020 Corporate Governance Order").[35] The settlement and term sheet contemplated a

**complete overhaul of the corporate governance structure of the Debtor**.  Mr. Dondero resigned

from his role as an officer and director of the Debtor and of the Debtor's general partner. Three new

independent directors (the "Independent Board") were appointed to govern the Debtor's general

partner—Strand Advisors, Inc. ("Strand")—which, in turn, manages the Debtor. All of the new

Independent Board members were selected by the UCC and are very experienced within either the

industry in which the Debtor operates, restructuring, or both.  The three Independent Board

members are:  Retired Bankruptcy Judge Russell Nelms; John Dubel; and Mr. Seery.  As noted

above, one of the Independent Board members, Mr. Seery, was ultimately appointed as the Debtor's

new CEO and CRO on July 16, 2020 (the "July 2020 Seery CEO Order").[36]  To be clear,

Highland—during the bankruptcy case and still now—is governed by these wholly new,

---

[35] *See* Debtor's Exh. 15 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [DE # 339].

[36] *See* Debtor's Exh. 16 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [DE # 854].

Appx. 00188
010431

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 514 of 1017 PageID 11295
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 11 of 31

Independent Board members who had no prior connection to Highland. They were brought in to build trust with creditors and to hopefully put an end to a litigation culture that permeated Highland.

As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as a portfolio manager for certain separate **non-Debtor** investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board,[37] and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities.

Eventually, the Debtor's new Independent Board concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity because of conflicts and friction on many issues. Mr. Dondero's employment arrangement with the Debtor ceased in October 2020, but the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain of his related entities, on the one hand, and the Debtor on the other.

---

[37] "Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination." *See* Debtor's Exh. 15 (paragraph 8 therein). [DE # 2410].

Appx. 00489
010432

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 515 of 1017 PageID 11296
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 12 of 31

Plan Confirmation. The bankruptcy court confirmed a Chapter 11 plan on February 22, 2021. The plan was supported by the UCC and an overwhelming dollar amount of creditors. Mr. Dondero and certain entities related to him objected to the plan and have appealed the Confirmation Order. Mr. Seery remains as the executive of the Debtor, and will continue to serve in that role, under a specific structure established in the plan and accompanying documents (with oversight by the court and creditor representatives).

### III. **The Impetus for this Second Civil Contempt Matter**.

#### A. The Orders.

The subject of this second civil contempt matter is, primarily, two orders ***that were never appealed***: (a) the January 2020 Corporate Governance Order; and (b) the July 2020 Seery CEO Order—both referenced above.[38]

#### B. The Gatekeeper Provisions in the Two Orders.

As mentioned above, these orders contained certain provisions that are sometimes referred to as "gatekeeper" provisions. These "gatekeeper" protections require litigants to obtain the bankruptcy court's approval before suing certain protected parties in control of the Debtor for actions arising in the course of their duties, including Mr. Seery.

Paragraph 10 of the January 2020 Corporate Governance Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

---

[38] Debtor's Exhs. 15 & 16. The HarbourVest Settlement Order described above is likewise significant to this analysis (also not appealed by the Alleged Contemnors).

App. 06499
010433

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 516 of 1017    PageID 11297
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 13 of 31

Similarly, paragraph 5 of the July 2020 Seery CEO Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Despite these gatekeeper provisions, on April 12, 2021, the Alleged Contemnors, through new counsel (*i.e.,* different from the lawyers who represented them during the Bankruptcy Case previously) filed the District Court Action and promptly thereafter filed the Seery Motion asking the District Court for permission to add him as a defendant.

C.  A Few Words About Gatekeeper Provisions.

Gatekeeper provisions are not uncommon in the world of bankruptcy. There are multiple decisions from the Northern District of Texas[39] (as well as other districts)[40] approving gatekeeper

---

[39] *See, e.g., In re Pilgrim's Pride Corp.,* 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. Jan. 14, 2010) (bankruptcy court channeled to itself exclusive jurisdiction to hear claims against debtors' management (including their boards of directors and chief restructuring officer) and the professionals based upon their conduct in pursuit of their responsibilities during the chapter 11 cases.); *see also In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization [DE # 1671-1, attached to Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization], Section 10.8(b) at 57 (court retained *exclusive* jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added); *see also Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (bankruptcy court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (bankruptcy court acts as gatekeeper to determine whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust)); *In re Motors Liquidation Co.,* 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing bankruptcy court's gatekeeper function over GM ignition switch cases); *In re Motors Liquidation Co.,* 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same). The use of the gatekeeper structure in the General Motors cases is particularly noteworthy. The causes of action arising from defective ignition switches are based on state tort law – both product liability and personal injury – and are causes of action unquestionably outside the jurisdiction of a bankruptcy court to hear on the merits. Nevertheless, the General Motors bankruptcy court acted as the gatekeeper post-confirmation to determine whether such litigation should proceed against the estate of the old debtor or the asset purchaser under the confirmed plan.

Appx. 00191
010434

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 517 of 1017 PageID 11298
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 14 of 31

provisions that either: (a) granted exclusive jurisdiction in the bankruptcy court to hear matters challenging the actions of debtors' officers and directors arising from their conduct in the bankruptcy cases; or (b) at least granted power to a bankruptcy court to determine whether such matters could go forward.[41]

Bankruptcy courts frequently determine that the "Barton Doctrine" supports gatekeeper provisions and may, by analogy, sometimes be applied to executives and independent directors of debtors in possession. The "Barton Doctrine" originated from an old Supreme Court case[42] dealing with receivers. The "Barton Doctrine" was eventually expanded in bankruptcy jurisprudence to apply to bankruptcy trustees. As this court once noted regarding the "Barton Doctrine":

> [It] provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.,* the bankruptcy court) must be obtained. The Barton doctrine is not an immunity doctrine but—strange as this may sound— has been held to be a jurisdictional provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee unless and until the bankruptcy court has granted leave for the lawsuit to be filed).[43]

Courts have articulated numerous rationales for having this jurisdictional gatekeeping doctrine. One is that, because a "trustee in bankruptcy is an officer of the court that appoints him,"[44] the appointing court "has a strong interest in protecting him from unjustified personal liability for acts taken within the scope of his official duties."[45] Another rationale is that the leave requirement

---

[41] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (under "Barton Doctrine," litigant must still seek authority from the bankruptcy court that appointed the trustee before filing litigation even if the bankruptcy court may not have jurisdiction to adjudicate the underlying claim).

[42] *Barton v. Barbour*, 104 U.S. 126 (1881).

[43] *Baron v. Sherman (In re Ondova Ltd. Co.)*, 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, *Baron v. Sherman (In re Ondova Co.)*, 2018 U.S. Dist. LEXIS 13439 (N.D. Tex. Jan. 26, 2018), *aff'd, In re Ondova Ltd.*, 2019 U.S. App. LEXIS 3493 (5th Cir. 2019).

[44] *In re Lehal Realty Assocs.*, 101 F.3d 272, 276 (2d Cir. 1996).

[45] *Id.*

Appx. 00492
010435

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 518 of 1017    PageID 11299
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 15 of 31

"enables the bankruptcy court to maintain control over the estate and furthers the goal of centralizing all creditors' claims so they can be efficiently administered."[46]  Yet other courts have expressed an underlying reason for the doctrine is to maintain a panel of competent and qualified trustees and to ensure efficient administration of bankruptcy estates:   Without the leave requirement, "trusteeship w[ould] become a more irksome duty" and it would become "harder for courts to find competent people to appoint as trustees.  Trustees w[ould] have to pay higher malpractice premiums" and "this w[ould] make the administration of bankruptcy estates more expensive."[47] Finally, another policy concern underlying the doctrine is a concern for the overall integrity of the bankruptcy process and the threat of trustees being distracted from or intimidated from doing their jobs.  For example, losers in the bankruptcy process might turn to other courts to try to become winners there—by alleging the trustee did a negligent job.[48]  The Fifth Circuit has recently recognized the continuing vitality of the "Barton Doctrine"—even after *Stern v. Marshall*[49] (that is, even in a scenario in which the appointing bankruptcy court might not itself have Constitutional authority to **adjudicate** the claims asserted against the trustee pursuant to the *Stern* decision).[50]

To be clear, the "Barton Doctrine" originated as a protection for federal receivers, but courts expanded the concept to bankruptcy trustees, and eventually it has been applied to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including debtors in

---

[46] *In re Ridley Owens, Inc.*, 391 B.R. 867, 871 (Bankr. N.D. Fla. 2008).

[47] *McDaniel v. Blust*, 668 F.3d 153, 157 (4th Cir. 2012) (citing *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998)). *See also generally* 1 COLLIER ON BANKRUPTCY 10-4 & 10-5 (Alan R. Resnick and Henry J. Sommer, eds., 16th Ed. 2016).

[48] *Linton*, 136 F.3d at 545-546.

[49] *Stern v. Marshall*, 564 U.S. 462 (2011).

[50] *See Villegas v. Schmidt,* 788 F.3d 156, 58-59 (5th Cir. 2015).

Appx. 06493
010436

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 519 of 1017    PageID 11300
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 16 of 31

possession,[51] officers and directors of a debtor,[52] and the general partner of a debtor.[53] In the Highland case, since Mr. Seery and the Independent Directors were proposed by the UCC to avoid the appointment of a trustee, it seemed rather obvious to the bankruptcy court that they should have similar protections from suit—particularly against the backdrop of a litigation culture at Highland that had theretofore existed.

DAF and CLO Holdco argue that the gatekeeper provisions that are involved here run afoul of 28 USC § 959(a) and are an inappropriate extension of the "Barton Doctrine" and, more generally, they argue that the January 2020 Corporate Governance Order and July 2020 Seery CEO Order simply went too far by precluding claims being asserted against Mr. Seery that are lesser than gross negligence and willful misconduct—suggesting that precluding claims lesser than gross negligence and willful misconduct (such as a mere negligence claim) would violate federal law (the Investment Advisors Act) because Mr. Seery cannot contract away his fiduciary duties in this regard.

Putting aside for the moment the fact that the January 202 Corporate Governance Order and the July 2020 Seery CEO Order are final and nonappealable orders that have *res judicata* effect, DAF and CLO Holdco are simply wrong about 28 U.S.C. § 959(a) and the unavailability of the "Barton Doctrine" in a situation such as this.  28 U.S.C. § 959(a) states:

---

[51] *Helmer v. Pogue*, 2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also* 11 U.S.C §§ 1107(a) (providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity).

[52] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 & n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[53] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

010437
Appx. 06194

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 18 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 520 of 1017    PageID 11301
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 17 of 31

> Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. **Such actions shall be subject to the general equity of such court** so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury. (Emphasis added.)

To be sure, this statute has long been recognized as a limited exception to the "Barton Doctrine," so that trustees and debtors in possession can be sued for postpetition torts or other causes of action that happen to occur in the ***ordinary course of operating a business*** (as opposed to actions of the trustee while engaged in the general administration of the case)—the classic example being a "slip and fall" personal injury suit that might occur on the premises of a business that a trustee or debtor in possession is operating.[54]  However, DAF and CLO Holdco ignore the last sentence of the statute that gives the appointing court the equitable powers to control the litigation "as the same may be necessary to the ends of justice." This is precisely what a gatekeeper provision is all about.[55]

But as earlier noted, DAF and CLO Holdco are too late to argue about the legality or enforceability of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order. The Fifth Circuit has made clear that, if a party fails to object to or appeal a final order— even one that grants relief that may be outside of a bankruptcy court's jurisdiction—the order is *res judicata* as to parties who had the opportunity to object to it.  It becomes the law of the case and is

---

[54] *E.g., Muratore v. Darr*, 375 F.3d 140, 144 (1st Cir. 2004) (section 959(a) "is intended to 'permit actions redressing torts committed in furtherance of the debtor's business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store'") (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1254 (11th Cir. 2000)).  *See also Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272, 276 (2d Cir. 1996); *In re Am. Associated Sys., Inc.*, 373 F. Supp. 977, 979 (E.D. Ky. 1974).

[55] The court further notes anecdotally that DAF and CLO Holdco demanded a jury trial in their Complaint, and they have alluded to this as a reason why it was appropriate to bring their suit in the District Court. But it appears they contractually waived their jury trial rights in a prepetition agreement with Highland. *See* DE # 2495, Ex. A thereto, ¶14(f).

Appx. 06495
010438

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 521 of 1017 PageID 11302
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 18 of 31

not subject to collateral attack.[56] The Supreme Court has more recently stated this principle in the bankruptcy context in *United Student Aid Funds, Inc. v. Espinosa*.[57]

In summary, there can be no doubt that there are two binding, nonappealable final orders[58] that govern in the situation at bar. Not only were they wholly proper but parties are now bound by them regardless.

IV.     **The Evidence at the June 8, 2021 Hearing.**

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8, 2021. The court considered the Declaration of John Morris (with Exhibits 1-18 thereto), at DE # 2237; Debtor's Exhibits 12-55, at DE ## 2410 & 2421; Exhibits 1, 3-12, 15-28, 30-46 of DAF, CLO Holdco, and Mr. Patrick at DE ## 2411 & 2420; and the live witness testimony of Mr. Patrick and Mr. Dondero.

There really is very little, if anything, in dispute. No one disputes the existence of the January 2020 Corporate Governance Order or the July 2020 Seery CEO Order or the Harbourvest Settlement. No one disputes the existence of the District Court Action or the Seery Motion. Thus, all that the court heard at the June 8, 2021 hearing that was "new," beyond what was in the pleadings and documents, was the explanations/rationales given by those involved with filing the District Court Action and the Seery Motion.

---

[56] *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987).

[57] 130 S. Ct. 1367 (2010) (order confirming Chapter 13 plan, that improperly proposed to discharge a student loan without a hardship adversary proceeding, was not void where there had been no objection or appeal).

[58] DAF and CLO Holding presented a case at the June 8, 2021 hearing suggesting the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order might not have been final orders. The case dealt with an employment order under Section 327 of the Bankruptcy Code, and this court does not believe it was applicable here.

Appx. 06496
010439

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 522 of 1017 PageID 11303
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 19 of 31

Mr. Patrick testified that he became the manager/director of DAF and CLO Holdco on March 24, 2021,[59] and he earns no compensation for that role, although the prior manager/director, Mr. Grant Scott, earned $5,000 per month.[60] Mr. Patrick testified that he authorized the filing of the Complaint and the Seery Motion.[61] He testified that he retained the Sbaiti law firm 12 days before the District Court Action was filed, and the idea for filing the Complaint came from that firm,[62] although Mr. Dondero "brought certain information" to Mr. Patrick. Mr. Patrick then "engaged the Sbaiti firm to launch an investigation," and "also wanted Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts."[63] Mr. Patrick elaborated that he had no specific knowledge about the HarbourVest Settlement before taking charge of DAF and CLO Holdco,[64] but Mr. Dondero came to him with information about it.[65] Mr. Patrick did not talk to DAF's and CLO Holdco's prior managing member (Grant Scott) about the District Court Action, even though Grant Scott had been the managing member at the time of the HarbourVest Settlement that is the subject of the District Court Action.[66] Mr. Patrick hired the Sbaiti law firm at the unsolicited recommendation of D.C. Sauter,[67] the in-house general counsel of NexPoint

---

[59] Transcript 6/8/21 Hearing, at 97:3-21. [DE# 2440].

[60] *Id.* at 132:6-17. *See also* Debtor's Exh. 24 at 96:2-18 [DE # 2410].

[61] Transcript 6/8/21 Hearing, at 103:10-14; 104:3-13. [DE # 2440].

[62] *Id.* at 104:9-22.

[63] *Id.* at 105:1-5.

[64] *Id.* at 104:17-22.

[65] *Id.* at 105:13-106:16.

[66] Debtor's Exh. 24 at 101:10-102:20 [DE # 2410]; *see also* Transcript 6/8/21 Hearing, at 108:20-109:22. [DE # 2440].

[67] Transcript 6/8/21 Hearing, at 106:22-107:11. [DE # 2440].

App. 06497
010440

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 21 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 523 of 1017    PageID 11304
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21   Entered 08/04/21 08:56:33   Page 20 of 31

Advisors (a company of which Mr. Dondero is president and controls).[68] Mr. Patrick further testified that Mr. Dondero communicated directly with the Sbaiti firm in relation to the investigation that was being undertaken and he "did not participate in those conversations";[69] Mr. Patrick "considered Mr. Dondero as the investment advisor to the portfolio . . . I wanted him to participate in the investigation."[70] Mr. Patrick confirmed that there is no formal investment advisory agreement with Mr. Dondero, and DAF and CLO Holdco had previously been in an investment advisory agreement with Highland.[71] While Mr. Patrick's testimony was replete with comments that he deferred to the Sbaiti law firm quite a bit, he did confirm that he authorized the filing of the Seery Motion and he was aware of the July 2020 Seery CEO Order.[72]

As for Mr. Dondero, much of the testimony elicited from Mr. Dondero centered around whether he essentially controls DAF and CLO Holdco and the sequence of events that led to Mr. Grant Scott resigning as their managing member. Recall that Mr. Scott had been their managing member at the time of the HarbourVest Settlement—to which CLO Holdco objected and then

---

[68] NexPoint Advisors is 99% owned by Mr. Dondero's family trust, Dugaboy Investment Trust, and is 1% owned by NexPoint Advisors GP, LLC, which is 100% owned by Mr. Dondero. [DE # 2543].

[69] *Id.* at Transcript 6/8/21 Hearing, at 107:24-108:18. [DE # 2440].

[70] *Id.* at 107:18-23.

[71] The lawyers at Sbaiti & Company commented during opening statements that Mr. Dondero was the source of certain of the information in the Complaint and that they were asserting "work product privilege" and "attorney-client privilege" as to their communications with Mr. Dondero "because he's an agent of our client." *Id.* at 41:6-10. The court ultimately overruled this claim of privilege since, among other things, Mr. Patrick's own testimony confirmed that Mr. Dondero had no contractual arrangement of any sort with DAF and CLO Holdco, and he was not a board member and had no decision-making authority for them. *Id.* at 137:2-12; *See also id.* at 180:23-188:7. For purposes of privilege assertion, there was no evidence whatsoever that Mr. Dondero was an agent or representative of DAF and CLO Holdco.

[72] *Id.* at 111:5-112:9.

Appx. 06498

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 524 of 1017 PageID 11305
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 21 of 31

withdrew its objection.[73] Mr. Dondero testified that he believed Mr. Scott's decision to withdraw the objection to the HarbourVest Settlement was inappropriate.[74]

Mr. Dondero further confirmed that he was the founder and primary donor to DAF.[75] He expressed disapproval for Mr. Scott's various decisions on behalf of DAF and CLO Holdco during the bankruptcy case (such as withdrawing a proof of claim and settling a lawsuit with the Debtor).[76] He testified about general knowledge of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order.[77] He confirmed that he participated in discussions with Mr. Sbaiti regarding the filing of the Complaint—indicating he spoke with the firm a "[h]alf dozen times, maybe."[78] He testified that he was not involved with the Seery Motion itself.[79]

The totality of the evidence was clear that Mr. Dondero sparked this fire (*i.e.,* the idea of bringing the District Court Action to essentially re-visit the HarbourVest Settlement and to find a way to challenge Mr. Seery's and the Debtor's conduct), and Mr. Patrick and Sbaiti & Company, PLLC, were happy to take the idea and run with it. The court believes the evidence was clear and convincing that Mr. Dondero encouraged Mr. Patrick to do something wrong, and Mr. Patrick basically abdicated responsibility to Mr. Dondero with regard to dealing with Sbaiti and executing the litigation strategy.

### Conclusions of Law

---

[73] *Id.* at 163:10-165:18.

[74] *Id.*

[75] *Id.* at 165:19-24.

[76] *Id.* at 161:24-168:1; 169:1-170:9.

[77] *Id.* at 178:16-180:11.

[78] *Id.* at 180:12-22; 207:10-12.

[79] *Id.* at 210:7-14.

Appx. 06499
010442

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 525 of 1017    PageID 11306
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 22 of 31

A. <u>Jurisdiction and Authority</u>.

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b) in which this court may issue a final order.

The contempt motion currently before the court seeks for this court to hold DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who authorized their actions in civil contempt of court for violating two orders of this court.  Mr. Patrick and Mr. Dondero have both responded herein—neither, of course, admitting to any wrongdoing.

It is well established that bankruptcy courts have civil (as opposed to criminal) contempt powers.  "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts."[80]  A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties.[81]  Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory."[82]

---

[80] *In re SkyPort Global Comm's, Inc.,* No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013), *aff'd.,* 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley,* 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" that it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir.1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."); *Citizens Bank & Trust o. v. Case (In re Case),* 937 F.2d 1014, 1023 (5th Cir. 1991) (held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct).

[81] *SkyPort Global,* 2013 WL 4046397, at *1.

[82] *Id.* (internal quotations omitted); *see also Bradley,* 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the

Appx. 06500
010443

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 526 of 1017 PageID 11307
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 23 of 31

Contempt is characterized as either civil or criminal depending upon its "primary purpose."[83] If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.[84] It is clear that Highland's intent is to both seek compensation for the expenses incurred by Highland, due to the Alleged Contemnors' purported violations of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order (*i.e.,* the gatekeeper provisions therein), and to coerce compliance going forward.

B.  Type of Civil Contempt:  Alleged Violation of a Court Order.

There are different types of civil contempt, but the most common type is violation of a court order (such as is alleged here).  "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order."[85] Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence:[86] "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[87]

---

management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

[83] *Bradley*, 588 F.3d at 263.

[84] *Id.* (internal citations omitted).

[85] *Travelhost*, 68 F.3d at 961.

[86] *United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (per curiam) (internal citation omitted) ("[C]ivil contempt orders must satisfy the clear and convincing evidence standard, while criminal contempt orders must be established beyond a reasonable doubt.").

[87] *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir. 1992) (same); *Travelhost*, 68 F.3d at 961 (same).

Appx. 06501
0T0444

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 527 of 1017 PageID 11308
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 24 of 31

C. <u>Specificity of the Order</u>.

To support a contempt finding in the context of an order alleged to have been violated, the order must delineate 'definite and specific' mandates that the defendants violated."[88] The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated."[89]

D. <u>Possible Sanctions</u>.

To be clear, if the court ultimately determines that the Alleged Contemnors are in contempt of court, for not having complied with the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order, the court can order what is necessary to: (1) compel or coerce obedience of the order; and (2) to compensate the Debtor/estate for losses resulting from the Alleged Contemnors' non-compliance with the court orders.[90] The court must determine that the Debtor/movant showed by clear and convincing evidence that: (1) the orders were in effect; (2) the orders required or prohibited certain conduct; and (3) that the Alleged Contemnors failed to comply with the orders.[91] "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order."[92] "Compensatory civil contempt reimburses the injured party for

---

[88] *Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[89] *Id.*

[90] *In re Gervin*, 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers*, 330 U.S. 258 (1947)).

[91] *In re LATCL&F, Inc.,* 2001 WL 984912, at *3 (N.D. Tex. 2001) (citing to *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 400 (5th Cir. 1987)).

[92] *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir. 1990) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

Appx. 06502
010445

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 528 of 1017 PageID 11309
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 25 of 31

the losses and expenses incurred because of [their] adversary's noncompliance."[93] Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding."[94]

### E. Knowledge of the Order.

"An alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high. And intent or good faith is irrelevant."[95] To be clear, "intent is not an element in civil contempt matters. Instead, the basic rule is that all orders and judgments of courts must be complied with promptly."[96]

### F. Willfulness of Actions.

For civil contempt of a court order to be found, "[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order."[97] For a stay violation, the complaining party need not show that the contemnor intended to violate the stay. Rather, the complaining party must show that the contemnor intentionally committed the acts which violate the stay. Nevertheless, in determining whether damages should be awarded under the court's contempt powers, the court considers whether the contemnor's conduct constitutes a willful violation of the stay.[98]

---

[93] *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976); *see also Travelhost*, 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.*, 43 F.3d at 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).

[94] *Am. Airlines*, 228 F.3d at 585; *see also F.D.I.C.*, 43 F.3d at 168 (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]").

[95] *Kellogg v. Chester*, 71 B.R. at 38.

[96] *In re Unclaimed Freight of Monroe, Inc.*, 244 B.R. 358, 366 (Bankr. W.D. La. 1999); *see also In re Norris*, 192 B.R. 863, 873 (Bankr. W.D. La. 1995) ("Intent is not an element of civil contempt.")

[97] *Am. Airlines*, 228 F.3d at 581 (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir.1984)).

[98] *In re All Trac Transport, Inc.*, 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004) (internal citations omitted).

Appx. 06593
010446

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 529 of 1017    PageID 11310
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 26 of 31

G.  Applying the Evidence to the Literal Terms of the January 2020 Corporate Governance
Order and the July 2020 Seery CEO Order.

The court concludes that there is clear and convincing evidence that DAF, CLO Holdco,

Sbaiti & Company, PLLC (through attorneys Mazin Sbaiti and Jonathan Bridges), Mr. Patrick, and

Mr. Dondero—each and every one of them, with their collaborative actions—violated the specific

wording of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order,

and all are in contempt of the bankruptcy court.  The evidence was clear and convincing:  (1) that

two court orders were in effect (the January 2020 Corporate Governance Order and the July 2020

Seery CEO Order); (2) that the orders prohibited certain conduct (*i.e.,* "[n]o entity may commence

or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as

the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy

Court (i) first determining after notice that such claim or cause of action represents a colorable

claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing

such entity to bring such claim.");[99] and (3) that the all of the Alleged Contemnors (DAF, CLO

Holdco, Sbaiti & Company, PLLC, Mr. Mazin Sbaiti, Mr. Jonathan Bridges, Mr. Patrick, and Mr.

Dondero) knew about the orders and failed to comply with the court's orders.

As earlier noted, the District Court Action is all about Mr. Seery's allegedly deceitful

conduct in connection with a bankruptcy court-approved settlement (*i.e.,* the HarbourVest

Settlement), to which CLO Holdco objected, but then withdrew its objection the day of the hearing.

***The lawsuit is, from this court's estimation, wholly frivolous.***  This court is in a better position to

realize its frivolousness than any other—having spent hours reflecting on the merits of the

HarbourVest Settlement.  This court believes that it is clear and convincing that each of the Alleged

---

[99] This is quoting from the July 2020 Seery CEO Order.  The January 2020 Corporate Governance Order, of course,
had the same prohibitory language as to all three of the Independent Directors.

Appx. 06594

0101447

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 530 of 1017 PageID 11311
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 27 of 31

Contemnors knew that it would be a "hard sell" to convince this bankruptcy court that the District

Court Action and the claims against Mr. Seery should be allowed to go forward. That's why they

tried their luck with the District Court—concocting a rationale that their methods were proper since

the bankruptcy court's power to exercise bankruptcy subject matter is derivative, by statute, from

the District Court. This rationale is nothing more than thinly veiled forum shopping. But worse, it

is, in this instance, contempt of court. The Alleged Contemnors argue that they should not be held

in contempt because, in filing the Complaint (which mentions Mr. Seery 50 times—but merely

names him as a "potential party"), they did not "commence or pursue" a claim against Mr. Seery.

Likewise, they argue that, in filing the Seery Motion, they did not actually "commence or pursue"

a claim against Mr. Seery. They argue that a request for leave from the District Court, to add him

to the District Court Action, cannot possibly meet the definition of "pursue"—and that one can only

"pursue" litigation against a party *after* "commencing" an action against the party. This is linguistic

gymnastics that does not fly. The Alleged Contemnors were pursuing litigation when they filed the

Seery Motion in the District Court (and maybe even as early as when they filed the Complaint

mentioning Mr. Seery 50 times and describing him as a "potential party"). These were all sharp

litigation tactics, to be sure, but more problematic, were contemptuous of this court's orders.

**V. Damages**.

The Contempt Motion requests that the court: (a) find and hold each of the Alleged

Contemnors (directed at DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who

actually authorized their acts—*i.e.,* "Authorizing Persons") in contempt of court; (b) direct the

Alleged Contemnors, jointly and severally, to pay the Debtor's estate an amount of money equal to

two times the Debtor's actual expenses incurred in bringing this contempt matter, payable within

three calendar days of presentment of an itemized list of expenses; (c) impose a penalty of three

Appx. 06595
010448

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 531 of 1017    PageID 11312
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 28 of 31

times the Debtor's actual expenses incurred in connection with any future violation of any order of this court; and (d) grant the Debtor such other and further relief as the court deems just and proper under the circumstances.[100]

As indicated earlier, the court can order what is necessary to: (1) compel or coerce obedience of an order; and (2) to compensate the Debtor/estate for losses resulting from non-compliance with a court order. Here, the court believes compensatory damages are more appropriate than a remedy to compel or coerce future compliance. Compensatory damages are supposed to reimburse the injured party for the losses and expenses incurred because of their adversary's noncompliance. Courts have broad discretion but may consider such factors as: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order.

As far as the harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to this matter. The invoices were Exhibits 54 & 55 [DE # 2421]. The invoices reflect fees of the Debtor's primary bankruptcy counsel, Pachulski Stang, relating to this contempt matter, during the time period of April 18–April 30, 2021, of $38,796.50,[101] and another $148,998.50,[102] during the time period of May 1–June 7, 2021. These total **$187,795**, and the court determines these to have been reasonable and necessary fees incurred in having to respond and react to the contemptuous conduct set forth herein. Moreover, the court considers it to likely be a

---

[100] Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders. [DE # 2247].

[101] The total fees and expenses for this time period were $1,295,070.58, but the court has calculated the fees related to this contempt matter.

[102] The total fees and expenses for this time period were $1,465,010 but the court has calculated the fees related to this contempt matter.

Appx. 06506
010449

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 532 of 1017 PageID 11313
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21 Entered 08/04/21 08:56:33 Page 29 of 31

conservative number because: (a) it does not reflect the fees and expenses incurred at the June 8, 2021 Hearing (which went 4+ hours); (b) it does not include any expenses the firm incurred (the court notes from the time entries that there were depositions taken—thus, there must have been expenses); (c) it does not include any fees and expenses that the UCC may have incurred monitoring this contested matter; and (d) it does not include any fees for Pachulski's local counsel (Hayward & Associates). As for the June 8, 2021 Hearing, the court is aware that at least three professionals from Pachulski Stang participated (Jeff Pomeranz at $1,295/hour; John Morris at $1,245/hour; and paralegal Asia Canty at $425/hour, for a total of $2,965/hour; multiplied by 4 hours equals $11,860)—thus, the court will add on another $11,860 of fees that should be reimbursed. The expenses the Pachulski firm incurred during this time period were $22,271.14, but they are not itemized. Thus, the court will assume $10,000 of this related to the contempt matter. The court will conservatively assume the UCC incurred $20,000 in fees monitoring this matter—as this matter could impact their constituency's recovery (the court is aware that the UCC's lawyer Matthew Clemente attended the June 8, 2021 Hearing). The court will conservatively assume that Hayward and Associates incurred $10,000 in fees assisting Pachulski. Thus, all totaled, this amounts to **$239,655** of fees and expenses that this court is imposing upon the Alleged Contemnors, jointly and severally, to reimburse the bankruptcy estate for the fees and expenses it has incurred relating to their contemptuous acts.

The Debtor has asked for the court to impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this bankruptcy court. The court declines to do this. However, the court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take

Appx. 00507

010450

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 533 of 1017    PageID 11314
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21    Entered 08/04/21 08:56:33    Page 30 of 31

with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for certiorari are not successful.

Accordingly, it is hereby ORDERED that:

(i)     DAF, CLO Holdco, Sbaiti & Company, PLLC (including Mazin Sbaiti and Jonathan Bridges), Mark Patrick, and James Dondero (collectively, now the "Contemnors") are each in civil contempt of court in having violated the court's January 2020 Corporate Governance Order and July 2020 Seery CEO Order—the court having found by clear and convincing evidence that: (1) these orders were in effect and each of the Contemnors knew about them; (2) the orders prohibited certain conduct; and (3) the Contemnors failed to comply with the orders;

(ii)    In order to compensate the Debtor's estate for loss and expense resulting from the Contemnors' non-compliance with the orders, the Contemnors are jointly and severally liable for the compensatory sum of **$239,655** and are directed to pay the Debtor (on the 15th day after entry of this order) an amount of money equal to **$239,655;**

(iii)   The court will add on a monetary sanction of **$100,000** for each level of rehearing, appeal, or petition for *certiorari* that the Contemnors may choose to take with regard to this Order, to the extent that any such motions for rehearing, appeals, or petitions for *certiorari* are pursued by any of them and are not successful;

(iv)    Other sanctions (such as further deterrence sanctions) are denied at this time but, ***should any of these Contemnors be subject to another contempt motion in this court in the future and be found to have committed contempt,*** the court anticipates imposing significant deterrence sanctions (the court duly notes that this is the second

Appx. 00508

010451

Case 19-34054-sgj11 Doc 3445-51 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 534 of 1017   PageID 11315
Case 19-34054-sgj11 Doc 2660 Filed 08/04/21   Entered 08/04/21 08:56:33   Page 31 of 31

time in the last several weeks that the court has found Mr. Dondero to be in contempt

of court); and

(v)     The court reserves jurisdiction to interpret and enforce this Order.

### End of Memorandum Opinion and Order ###

Appx. 06509

010452

Case 3:25-cv-02072-S     Document 15-13     Filed 10/06/25     Page 535 of 1017     PageID 11316

# EXHIBIT 52

Appx. 06519
010453

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                  )    Case No. 19-34054-sgj-11
 3   In Re:                       )    Chapter 11
                                  )
 4   HIGHLAND CAPITAL             )    Dallas, Texas
     MANAGEMENT, L.P.,            )    Tuesday, June 8, 2021
 5                                )    9:30 a.m. Docket
               Debtor.           )
 6                                )    - SHOW CAUSE HEARING (2255)
                                  )    - MOTION TO MODIFY ORDER
 7                                )      AUTHORIZING RETENTION OF
                                  )      JAMES SEERY (2248)
 8                                )    - MOTION FOR ORDER FURTHER
                                  )      EXTENDING THE PERIOD WITHIN
 9                                )      WHICH DEBTOR MAY REMOVE
                                  )      ACTIONS (2304)
10                                )
     _____
11                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
12              UNITED STATES BANKRUPTCY JUDGE.

13   APPEARANCES:

14   For the Debtor:           Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
15                             10100 Santa Monica Blvd.,
                                 13th Floor
16                             Los Angeles, CA  90067-4003
                               (310) 277-6910
17
     For the Debtor:           John A. Morris
18                             Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
19                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
20                             (212) 561-7700

21   For the Debtor:           Zachery Z. Annable
                               HAYWARD & ASSOCIATES, PLLC
22                             10501 N. Central Expressway,
                                 Suite 106
23                             Dallas, TX  75231
                               (972) 755-7104
24

25
```

2

```
 1   APPEARANCES, cont'd.:

 2   For the Charitable DAF,      Mazin A. Sbaiti
     CLO Holdco, Show Cause       Jonathan E. Bridges
 3   Respondents, Movants,        SBAITI & COMPANY, PLLC
     and Sbaiti & Company:        Chase Tower
 4                                2200 Ross Avenue, Suite 4900W
                                  Dallas, TX  75201
 5                                (214) 432-2899

 6   For Mark Patrick:            Louis M. Phillips
                                  KELLY, HART & HALLMAN, LLP
 7                                301 Main Street, Suite 1600
                                  Baton Rouge, LA 70801
 8                                (225) 338-5308

 9   For Mark Patrick:            Michael D. Anderson
                                  KELLY, HART & HALLMAN, LLP
10                                201 Main Street, Suite 2500
                                  Fort Worth, TX  76102
11                                (817) 332-2500

12   For James Dondero:           Clay M. Taylor
                                  Will Howell
13                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
14                                420 Throckmorton Street,
                                    Suite 1000
15                                Fort Worth, TX  76102
                                  (817) 405-6900
16
     For the Official Committee   Matthew A. Clemente
17   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
18                                Chicago, IL  60603
                                  (312) 853-7539
19
     For the Official Committee   Paige Holden Montgomery
20   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
21                                Dallas, TX  75201
                                  (214) 981-3300
22
     Recorded by:                 Michael F. Edmond, Sr.
23                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
24                                Dallas, TX  75242
                                  (214) 753-2062
25
```

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25

4

1        <u>DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M.</u>

2            THE COURT:  All right.  We have settings in Highland

3    this morning.  We have three settings.  We have the show cause

4    hearing with regard to a lawsuit filed in the District Court.

5    We have a couple of more, I would say, ministerial matters,

6    although I think we do have objections.  I know we have

7    objections.  We have a motion to extend the removal period in

8    this case as well as a motion to modify the order authorizing

9    Mr. Seery's retention.

10        So let's go ahead and start out by getting appearances

11   from the lawyers who are participating today.  I'll get those

12   now.

13           MR. MORRIS:  Good morning, Your Honor.

14           THE COURT:  Good morning.

15           MR. MORRIS:  John Morris from Pachulski, Stang, Ziehl

16   & Jones for the Debtor.  I'm joined with me this morning by my

17   colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

18           THE COURT:  Okay.

19           MR. MORRIS:  We do have a proposal on how to proceed

20   today, a substantial portion of which is in agreement with the

21   Respondents.

22           THE COURT:  Okay.

23           MR. MORRIS:  So, at the appropriate time, I'd be

24   happy to present that to the Court.

25           THE COURT:  All right.  Well, let's get all the

5

 1  appearances and then I'll hear from you on that.

 2          MR. SBAITI:  Your Honor, my name is -- would you like

 3  me to approach, Your Honor?

 4          THE COURT:  Yes, please.

 5          MR. SBAITI:  It's my first time appearing in

 6  Bankruptcy Court, Your Honor.  My name is Mazin Sbaiti.  I'm

 7  here on behalf of the charitable DAF Fund, CLO Holdco, and the

 8  Respondents to the show cause hearing.  We are also

 9  representing them as the Movants on the motion to modify the

10  Court's order appointing Mr. Seery.

11          THE COURT:  All right.  Thank you.

12          MR. BRIDGES:  Jonathan Bridges, Your Honor, with Mr.

13  Sbaiti, also representing the Charitable DAF and CLO Holdco,

14  as well as our firm that is named in the show cause order.

15          THE COURT:  Okay.

16          MR. BRIDGES:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. PHILLIPS:  Good morning, Your Honor.  Louis M.

19  Phillips from Kelly Hart Hallman here on behalf of Mark

20  Patrick in the show cause matter.  I'm joined with my

21  colleague Michael Anderson from the Kelly Hart firm here in

22  Fort Worth.  And that's the matter that we're involved in, the

23  show cause auction.

24          THE COURT:  All right.  Thank you, Mr. Phillips.

25          MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

6

 1   of Bonds Ellis Eppich Schafer Jones here on behalf of Jim

 2   Dondero.  I have Mr. Will Howell here with me from my firm.

 3            THE COURT:  All right.  Thank you.

 4            MR. CLEMENTE:  Good morning, Your Honor.  Matthew

 5   Clemente from Sidley Austin on behalf of the Committee.  I'm

 6   here with my partner, Paige Montgomery.

 7            THE COURT:  Okay.  Thank you.

 8            MR. CLEMENTE:  Good morning.

 9            THE COURT:  All right.  Just to remind people, we do

10   have participants on the WebEx, but in setting the hearing I

11   made clear that participants today needed to be here live in

12   the courtroom.  So the WebEx participants are going to be only

13   observers.

14       We have a camera on the screen here that is poised to

15   capture both the lawyer podium as well as the witness box, and

16   then another camera on the bench.

17       So, please be mindful.  We want the lawyers to speak from

18   the podium so that they are captured and heard by the WebEx.

19   And so hopefully we don't have any cords you will trip over.

20   We've worked hard to make it easy to maneuver around the

21   courtroom.

22       All right.  So, Mr. Morris, you had a proposal on how we

23   would approach this today?

24            MR. MORRIS:  I do, Your Honor.  And it's rather

25   brief, but I think it makes a lot of sense.

7

 1          There are three motions on the calendar for today, --

 2               THE COURT:  Uh-huh.

 3               MR. MORRIS:  -- only one of which required the

 4     personal appearance of certain parties.

 5               THE COURT:  Uh-huh.

 6               MR. MORRIS:  And for that reason, and because,

 7     frankly, it was the first of the three motions filed, we

 8     believe that that ought to go first.

 9               THE COURT:  Okay.

10               MR. MORRIS:  And then it can be followed by the

11     motion for reconsideration of the July order, assuming time

12     permits, and then the motion to extend the removal deadline.

13          And with respect to the contempt motion, Your Honor, the

14     parties have agreed that each side shall have a maximum of

15     three hours to make opening statements, closing arguments,

16     direct and cross-examination of witnesses.

17          You know, I did point out to them that from time to time

18     Your Honor has used the Court's discretion to adjust the time

19     --

20               THE COURT:  Uh-huh.

21               MR. MORRIS:  -- if the Court is making inquiries, and

22     I guess we'll deal with that matter as it comes.  But as a

23     general matter, that is what we've agreed to.  And I would

24     propose that, unless anybody has any objections, that we just

25     proceed on that basis.

8

1          THE COURT:  Okay.

2          MR. MORRIS:  And I could -- I could go right forward.

3          THE COURT:  So, three hours in the aggregate?

4          MR. MORRIS:  Uh-huh.

5          THE COURT:  It doesn't matter how people spend it --

6    with argument, examination, cross -- three hours in the

7    aggregate?

8          MR. MORRIS:  Correct.

9          THE COURT:  Okay.  So, Nate, you'll be the timer on

10   that.

11         MR. MORRIS:  Yeah.  We thought it was very important

12   to get this done today, with people coming in from out of

13   town.

14         THE COURT:  Okay.  Sounds fine.

15         MR. MORRIS:  So does the Court want to inquire if

16   anybody has any questions or comments?

17         THE COURT:  I do.  Well, I see Mr. Bridges getting

18   up.  You confirm that that's agreeable?

19         MR. BRIDGES:  Thank you, Your Honor.  Yes, that's

20   agreeable.  We have one slight difference in our proposal.  We

21   would suggest to Your Honor that the motion for modification,

22   if Your Honor decides our way, would moot the entire motion

23   for contempt.  And we'd suggest, if that possibility is

24   realistic, that we would go first with that motion, perhaps

25   obviate having to have the evidence presented and the lengthy

Appx. 00518
010461

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 544 of 1017 PageID 11325

9

1  hearing.

2      The motion for modification, Your Honor, asks the Court to

3  reconsider -- to modify that order because of jurisdictional

4  and other shortcomings in it that make the order

5  unenforceable.  And because that's the order that is the

6  subject of the contempt motion, we'd ask Your Honor to

7  consider putting that motion first.

8          THE COURT:  Okay.  Or second?  Ahead of the contempt

9  matter?

10          MR. BRIDGES:  Ahead of the contempt matter, --

11          THE COURT:  Uh-huh.

12          MR. BRIDGES:  -- because it has a possibility --

13          THE COURT:  We have the removal matter, which I think

14  is the shortest.  All right.

15          MR. BRIDGES:  No objection to that, Your Honor.

16  That's correct.

17          THE COURT:  Okay.  So, Mr. Morris, that's fine by

18  you?

19          MR. MORRIS:  Your Honor, that doesn't make a lot of

20  sense to us.  We don't believe there's any basis for the Court

21  to reconsider, modify, or amend in any way the July order.

22  But even if we were wrong about that, that would not

23  retroactively validate conduct which was otherwise wrongful at

24  the time it was committed.

25      The contempt motion needs to go first.  The other motion

10

1   will have no impact on whether or not there is a finding of

2   contempt of court.

3          THE COURT:  All right.  And update me on this.  There

4   was something filed yesterday, a notice of a proposed form of

5   order that the Debtor had proposed, that I think was not

6   agreed to, where there would be a change about any action that

7   goes forward, the cause of action would be in the sole

8   jurisdiction of the Court, and you all agreed to change that

9   part of the order, correct?

10         MR. MORRIS:  So, just as a division of labor for Your

11  Honor, I'm doing the contempt motion.

12         THE COURT:  Okay.  That's Mr. Pomerantz's?

13         MR. MORRIS:  Mr. Pomerantz is going to take care of

14  that.

15         MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Good

16  to see you again.

17         THE COURT:  Good to see you.

18         MR. POMERANTZ:  Yes, Your Honor, that's correct.  If

19  Your Honor recalls, there's really three aspects of the

20  January 9th and the July 16th order.  First, requiring people

21  to come to Bankruptcy Court before commencing or pursuing an

22  action.  Second, for the Bankruptcy Court to have the sole and

23  exclusive authority to determine whether the claim is a

24  colorable claim of willful negligence or gross misconduct.

25  And then third, if Your Honor passed the claim through the

11

```
 1    gate, whether you would have jurisdiction.

 2        In Your Honor's January 9th and July 16th orders, you said

 3    you would have exclusive jurisdiction.  In the motion for

 4    reconsideration, and particularly the reply, Movants said, if

 5    you just change that and say that if passes through the gate

 6    that you'd have jurisdiction only to the extent you would

 7    otherwise have it, that would resolve the motion, in the same

 8    way that the plan of reorganization was amended.

 9        We proposed that.  They rejected it.  We put it before

10    Your Honor.  So we believe that it moots out a good portion --

11    actually, we think it should moot out the entire motion.  They

12    obviously disagree.  But we definitely agree it moots out the

13    most significant portion of their motion, which is that Your

14    Honor would take jurisdiction to adjudicate a matter on an

15    exclusive basis when you might not otherwise have jurisdiction

16    on an exclusive basis.

17            THE COURT:  Okay.  Well, --

18            MR. BRIDGES:  Your Honor, may I respond to that?

19            THE COURT:  You may.  And --

20            MR. BRIDGES:  Thank you, Your Honor.

21            THE COURT:  -- why -- could you clarify why you think

22    it would moot out the entire show cause matter?  I wouldn't be

23    retroactively changing my order.  Is that what you're

24    proposing?

25            MR. BRIDGES:  Your Honor, with all respect, we
```

12

```
1    believe the order is defective and unenforceable and has to be

2    modified in order to fix it.  And because of the defects,

3    we're -- we're actually arguing, Your Honor, that it is

4    unenforceable in a contempt proceeding.  That is exactly what

5    our argument is.

6              THE COURT:  Okay.  I think I'm getting way farther

7    down this road than maybe I want to right now.  But I guess

8    here's the elephant in the room, I feel like:  Republic Supply

9    versus Shoaf.

10             MR. BRIDGES:  Uh-huh.

11             THE COURT:  The U.S. Supreme Court Espinosa case, for

12   that matter.  If I accept your argument that maybe there was a

13   flaw in those orders, that maybe they went too far, don't you

14   have a problem with those two cases?

15             MR. BRIDGES:  Your --

16             THE COURT:  The orders weren't appealed.

17             MR. BRIDGES:  I understand completely, Your Honor.

18             THE COURT:  Uh-huh.

19             MR. BRIDGES:  And I think the answer is no because of

20   the Applewood case from the Fifth Circuit.  The Applewood case

21   cited in our reply brief explains that in order for an order,

22   a final order of the Bankruptcy Court to have exculpatory

23   effect, in order for it to release claims, for example, that

24   the claims at issue must be enumerated in the order.  It's not

25   enough to have a blanket statement like the order, the July
```

13

1  order has, like the January order has, saying that Mr. Seery's

2  claims -- claims cannot be brought against him for ordinary

3  negligence at all.  The -- Your Honor, we're delving into my

4  argument.

5           THE COURT:  Okay.

6           MR. BRIDGES:  And I was hoping to do this on a

7  preliminary basis.

8           THE COURT:  Right.

9           MR. BRIDGES:  I don't mean to bog you down with that.

10  But Your Honor, no, mandatory authority from the Fifth Circuit

11  after *Shoaf* limits *Shoaf's* application and says that it does

12  not extinguish the claims that are not specifically enumerated

13  in the order.  And the reason for that is because it doesn't

14  give the kind of notice to the parties that they would need to

15  make an appearance and object to those orders at the time.  It

16  actually helps to stem the amount of litigation at the time

17  rather than to encourage it.

18           THE COURT:  All right.  Well, you'll get your

19  opportunity to make your full argument on this.  But I'm not

20  convinced, preliminarily, at least, to affect my decision on

21  the sequence, okay?  So even if it potentially wastes time

22  under your view of the law, I am going to do the removal

23  matter first -- the extension of time request, I should say --

24  and then the show cause and then the motion to modify.  And I

25  realize, those last two matters, everything is kind of

14

1   interrelated.  All right?

2            MR. BRIDGES:  Yes, Your Honor.

3            THE COURT:  All right.  So, with that decided, is

4   there a desire on the part of the lawyers to make opening

5   statements, or shall we just go to the motions?  And, of

6   course, people can use their three hours for oral argument,

7   however much they want to use for oral argument.

8            MR. MORRIS:  Your Honor, the -- to be clear, the six-

9   hour time limit only applies to the contempt proceeding.

10           THE COURT:  Oh, yes.  Yes.  Uh-huh.

11           MR. MORRIS:  And I do want to make an opening

12  statement.

13           THE COURT:  Okay.

14           MR. MORRIS:  So, as the Movant, I'd like to go first.

15           THE COURT:  You want to make opening statements?

16           MR. BRIDGES:  Yes.  Yes, Your Honor.

17           THE COURT:  Okay.  Okay.

18           MR. BRIDGES:  I believe we've got a PowerPoint

19  prepared that I think can lay out our side of it.

20           THE COURT:  Okay.

21           MR. BRIDGES:  I don't think we're participating in

22  the motion to extend the removal time.

23           THE COURT:  Okay.

24           MR. BRIDGES:  That's going first.

25           THE COURT:  All right.

Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 550 of 1017    PageID 11331

15

```
1            MR. BRIDGES:  So we'll wait until that is --

2            THE COURT:  Well, so we don't get confused on the

3    timing, let's just do the motion to extend right now.  And I

4    think we only had one objection.  As Mr. Sbaiti just pointed

5    out, they're not objecting on that one.  We have a Dondero

6    objection.  So let's, without starting the timer, hear that

7    one.  Okay?

8            MR. DEMO:  Good morning, Your Honor.  Greg Demo;

9    Pachulski, Stang, Ziehl & Jones.

10           THE COURT:  Good morning.

11           MR. DEMO:  I'll be arguing the removal motion and

12   then turn it over.

13       It's fairly basic and straightforward, Your Honor.  We're

14   asking for a further extension of the statutory deadline to

15   remove cases until December 14th, 2021.  The deadline is

16   procedural only.  As Your Honor is well aware, there's a lot

17   of moving parts in this case.  You know, we don't know to this

18   date, really, the full universe of what could actually be out

19   there.  So we're just asking for a short extension of the

20   removal period to cover through December.

21       I know that there was an objection from Mr. Dondero.  I

22   know that he argues that 9006 does not allow us to extend that

23   deadline past the effective date of the plan, and he cites one

24   case for that purpose, which is *Health Support*.  I think it's

25   out of Florida.  That case dealt with the extension of the
```

16

```
 1   two-year extension of the statute of limitations and was very

 2   clear that you can't use 9 --

 3           THE COURT:  You mean the 546 deadline?

 4           MR. BRIDGES:  Yes.  Yes.

 5           THE COURT:  Okay.

 6           MR. BRIDGES:  That you can't use 9006 to extend non-

 7   bankruptcy deadlines.  That's not what we're doing here, Your

 8   Honor.  We're using 9006 to extend the bankruptcy deadline to

 9   remove the cases.

10           THE COURT:  Uh-huh.

11           MR. DEMO:  And we'd just ask Your Honor for the

12   extension through December.

13           THE COURT:  Okay.  I'll hear Mr. Dondero's counsel.

14           MR. HOWELL:  Good morning, Judge.  Will Howell for

15   Mr. Dondero.

16       So, the argument here is not that the Court can't do this.

17   I was just pointing that there is an outside limit to what

18   we're doing.  And so if you look at the cases that the Debtor

19   cites in support of this motion, the one that is most apt was

20   when Judge Nelms did a fourth extension of time.  But those

21   were all 90-day extensions.  Here, we're in a situation where

22   the Debtor is asking for a fourth 180-day extension of time,

23   and this is really where the, you know, objection came -- or,

24   the response in opposition came from.  They specifically asked

25   that it be without prejudice to further extensions.
```

010469

1     And so, at some point, you know, does 9006 have an outside

2 limit? You know, do we need to see some sort of a light at

3 the end of the tunnel here?

4     So we would ask that the motion, at a minimum, be denied

5 in part with respect to this open-ended request for extension

6 beyond two years for a 90-day period. The other cases that

7 they cite, they have one extension here, one extension there,

8 120 days here, but not 180 days after 180 days after 180 days,

9 and then asking specifically for without prejudice to further

10 extensions beyond two years. So that's -- that's where this

11 comes from.

12        THE COURT: All right. Do you think it matters that

13 this is a very complex case?

14        MR. BRIDGES: I --

15        THE COURT: There's litigation here, there, and

16 everywhere.

17        MR. HOWELL: I also think, you know, *Mirant* was

18 complex. I think *Pilgrim's Pride* was complex. I think, you

19 know, it is not out of bounds for the Court to grant a fourth

20 extension.

21        THE COURT: Uh-huh.

22        MR. BRIDGES: But to -- you know, at some point --

23 you know, maybe the Court could grant a 90-day extension and

24 make them come back a little more frequently to kind of corral

25 this thing, rather than just saying "This grant of 180 days,

Appx. 06527

18

 1  the fourth time, is going to be without prejudice to further

 2  extensions."  It just gets kind of large.

 3          THE COURT:  Okay.  Mr. Demo, your motion.  You get

 4  the last word.

 5          MR. DEMO:  Your Honor, I mean, it is without

 6  prejudice for further extensions, but that doesn't mean that

 7  Your Honor is granting the further extensions now.  It means

 8  we'll have to come back.  We'll have to make our case for why

 9  an extension is necessary.  And, you know, if Your Honor

10  doesn't want to give us another extension past December 2021,

11  Your Honor doesn't have to.  This is not an order saying that

12  it's a limitless grant.

13      You know, I'd also ask, you know, quite honestly, why Mr.

14  Dondero has such an issue with this.  He hasn't said that any

15  of these cases involve him.  He hasn't given any reasons why

16  this affects him.  He hasn't given any reason why this damages

17  him at all.  So I do, I guess, wonder as an initial matter

18  kind of why we're here, you know, why we're responding to Mr.

19  Dondero's request, when that request really has no impact on

20  him.

21      And then, Your Honor, to the extent that you are inclined

22  to limit this, I would say, you know, we would ask for a

23  reasonable extension of time.  We do think an extension of

24  time, because of the complexity of this case, through December

25  is warranted.  But if Your Honor for some reason does agree

1  that a shorter extension is necessary under 9006 -- I don't

2  think it is -- we'd just ask that Your Honor grant us leave to

3  come back for further extensions of time.

4          THE COURT:  Okay.  All right.  I will -- I'll grant a

5  90-day extension, without prejudice for further extensions.

6          MR. DEMO:  Thank you, Your Honor.

7          THE COURT:  Maybe in 90 days we'll be farther down

8  the road and we won't need any more extensions, but you'll

9  have the ability to argue for more if you think it's really

10 necessary.  All right.  So that will bring us to around

11 September 14th, I guess.

12    All right.  Well, let's go ahead and hear opening

13 statements with regard to the show cause matter.  And again,

14 if you want to roll in arguments about the -- well, no, you

15 said the six hours only applies to show cause, so we'll not

16 hear opening statements with regard to the Seery retention

17 modification, just show cause.

18         MR. MORRIS:  All right.  Before I begin, Your Honor,

19 I have a small deck to guide --

20         THE COURT:  Okay.

21         MR. MORRIS:  -- to guide my opening statement.

22         THE COURT:  All right.

23         MR. MORRIS:  Can I approach the bench?

24         THE COURT:  You may.  And is your legal assistant

25 going to share her content --

20

1          MR. MORRIS:  Yes.

2          THE COURT:  -- so people on the WebEx will see?

3  Okay.

4          MR. MORRIS:  That's the intention, Your Honor.

5          THE COURT:  Okay.

6          MR. MORRIS:  All right.  Are you ready for me to

7  proceed?

8          THE COURT:  I am.  And obviously, everyone has a

9  copy?

10          MR. MORRIS:  Yes.

11          THE COURT:  Your opponents have a copy of this?

12          MR. MORRIS:  Yep.

13          THE COURT:  Okay.  Although we hope to see it on the

14  screen.

15             OPENING STATEMENT ON BEHALF OF THE DEBTOR

16          MR. MORRIS:  Good morning, Your Honor.  John Morris;

17  Pachulski, Stang, Ziehl & Jones; for the Debtor.

18       We're here today on the Debtor's motion to hold certain

19  entities and individuals in contempt of court for violating a

20  very clear and specific court order.  I hope to be relatively

21  brief in my opening here, Your Honor, and I'd like to begin

22  where I think we must, and that is, how do we -- how do we

23  prove this and what do we have to prove?

24       The elements of a claim for contempt of court are really

25  rather straightforward.  The Movant must establish by clear

21

 1   and convincing evidence three things.

 2          THE COURT:  Let me stop you and stop the clock.

 3   We're not seeing the shared content.

 4          MR. MORRIS:  Uh-huh.

 5          THE COURT:  Did you want her to go ahead and share

 6   her content?

 7          MR. MORRIS:  I did.

 8          THE COURT:  Okay.

 9          MR. MORRIS:  I was hoping that she'd do that.

10          THE COURT:  All right.  It says it's receiving

11   content.

12          MR. MORRIS:  There we go.  It's on my screen, anyway.

13          THE COURT:  Oh, here it is.  I don't know why it's

14   not on my Polycom.  Can you all see it out there?

15       (Chorus of affirmative replies.)

16          THE COURT:  Okay.  Very good.

17          MR. MORRIS:  Okay.

18          THE COURT:  You may proceed.

19          MR. MORRIS:  Thank you, Your Honor.

20       So, there's three elements to the cause of action for

21   contempt, for civil contempt.  We have to prove by clear and

22   convincing evidence that a court order was in effect; that the

23   order required certain conduct by the Respondents; and that

24   the Respondent failed to comply with the Court's order.

25       We've cited in the footnote the applicable case law from

22

1    the Fifth Circuit, and I don't believe that there's any

2    dispute that is indeed the legal standard.

3        The intent of the Respondents as to liability is

4    completely irrelevant.  It doesn't matter if they thought they

5    were doing the right thing.  It doesn't matter if they

6    believed in their heart of hearts that the court order was

7    invalid.  These are the three elements, and we will be able to

8    establish these elements not by clear and convincing evidence,

9    but if we ever had to, beyond reasonable doubt.

10       If we can go to the next slide, please.

11       We begin with the Court's order, the Court's July 9 order.

12   And that order states very clearly what conduct was required.

13   And the conduct that was required was that no entity could

14   commence or pursue -- those are really the magic words --

15   commence or pursue a claim against Mr. Seery without the

16   Bankruptcy Court doing certain things.  And we've referred to

17   this as the gatekeeper.  And the only question I believe the

18   Court has to ask today is whether the Respondents commenced or

19   pursued a claim against Mr. Seery without seeking Bankruptcy

20   Court approval, as set forth in this order.

21       I'll dispute that there's anything ambiguous about this.

22   I'll dispute that it could not be clearer what conduct was

23   prohibited.  It could not be clearer.  The only question is

24   whether the conduct constitutes the pursuit of a claim.

25       Let's see what they did.  If we could go to the next

23

 1   slide.  There will be no dispute about what they did.  And

 2   what they did is, a week after filing a lawsuit against the

 3   Debtor and two others arising out of the HarbourVest

 4   settlement, a settlement that this Court approved, after

 5   notice and a hearing and participation by the Respondents,

 6   after they had the opportunity to take discovery, after they

 7   had the opportunity to examine Mr. Seery about the value of

 8   HarbourVest's interest in HCLOF, after all of that, they

 9   brought a lawsuit after Mr. Patrick took control of the DAF

10   and CLO Holdco.  And that lawsuit related to nothing but the

11   HarbourVest suit, and it named in Paragraph 2, right up above,

12   Mr. Seery as a potential party.  And a week later, Your Honor,

13   they filed what we call the Seery Motion, and it was a motion

14   for leave to amend their complaint to add Mr. Seery as a

15   defendant.

16       We believe that that clearly violates the Court's July 7

17   order.  And indeed, again, these are facts.  They're not --

18   they're not in dispute.  Just look at the first sentence of

19   their motion.  The purpose of the motion was to name James

20   Seery as a defendant.  That was the purpose of the motion.

21   And the way that they made the motion, Your Honor -- and these

22   are undisputed facts -- the way they made the motion, Your

23   Honor, shows contemptuous intent.  We don't have to prove

24   intent, but I think it might be relevant when you get to

25   remedies.  Okay?

24

1       And so how do I -- why do I say that?  Because they made

2   this motion, Your Honor, and they didn't have to.  Everybody

3   knows that under Rule 15 they could have amended the complaint

4   if they wanted to.  If they wanted to, they didn't need the

5   Court's permission.  What they wanted to do was try to get the

6   District Court to do what they knew they couldn't.  And that's

7   contemptuous.

8       And they did it, Your Honor, without notice to the Debtor.

9   Even after the Debtor had accepted service of the complaint,

10  even after we told them, if you go down this path, we're going

11  to file a motion for contempt, they did it anyway.  They

12  didn't serve the Debtor.  They didn't give the Debtor a

13  courtesy copy.  They didn't notify the Debtor.  The only thing

14  that happened was the next day, when the District Court

15  dismissed it without prejudice, they sent us a copy of that

16  notice.  And within three days, we were here.

17      A court order was in effect.  Mr. Patrick is going to

18  admit to that.  There's not going to be any dispute about

19  that.  The order required that the Respondents come to this

20  Court before they pursue a claim against Mr. Seery, and they

21  failed to comply with that order.  The facts, again -- if we

22  can go to the next slide.  We can look at some of the detail,

23  because the timeline is mindboggling.

24      Mr. Patrick became the Plaintiffs' authorized

25  representative on March 24th.  And folks, when I took their

1   depositions, weren't specific about dates, and that's why some

2   of the entries here refer to sometime after, but there's no

3   question that the order of events is as presented here and as

4   the evidence will show today.

5       The evidence will show that sometime after Patrick became

6   the Plaintiffs' authorized representative, Mr. Dondero

7   informed Mr. Patrick that Highland had usurped an investment

8   opportunity from the Plaintiffs.  Mr. Patrick is going to

9   testify to that.  Mr. Patrick is also going to testify that,

10  without prompting, without making a request, D.C. Sauter, the

11  general counsel of NexPoint Advisors, recommended the Sbaiti

12  firm to Mr. Patrick.  Mr. Patrick considered nobody else.

13      Mr. Patrick retained the Sbaiti firm in April.  In other

14  words, within 12 days of the filing of the complaint.  They're

15  retained and they conduct an investigation.  You're going to

16  hear the assertion of the attorney-client and the common

17  interest privilege every time I ask Mr. Dondero what he and

18  Mr. Sbaiti talked about and whether they talked about naming

19  Jim Seery as a defendant.  But with Patrick's authorization,

20  the Sbaiti firm filed the complaint on April 12th, just days

21  after they were retained.

22      It's like a -- it's an enormous complaint.  I don't know

23  how they did that so quickly.  But in any event, the important

24  point is that they all worked together.  None of this happened

25  until Mr. Patrick became the authorized representative.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 561 of 1017 PageID 11342

26

1       Mr. Patrick is going to tell you, Your Honor, he's going

2    to tell you that he had no knowledge of any wrongdoing by Mr.

3    Seery prior to the time he assumed the rein of the DAF and the

4    CLO Holdco.  He had no knowledge, Your Honor, of any claims

5    that the DAF and CLO Holdco had against the Debtor until he

6    became the Plaintiffs' authorized representative and Mr.

7    Dondero spoke to him.

8       If we can flip to the next page.  Mr. Dondero has

9    effective control of the DAF.  He has effective control of CLO

10   Holdco. You're going to be bombarded with corporate documents

11   today, because they're going to show you -- and they want you

12   to respect the corporate form, they really want you to follow

13   the rules and respect the corporate form, because only Mr.

14   Scott was responsible for the DAF and CLO Holdco until he

15   handed the reins on March 24th to Mr. Patrick.  Mr. Dondero

16   has nothing to do with this.  He's going to tell you.  He's

17   going to tell you he had nothing to do with the selection of

18   Mr. Patrick as Mr. Scott's replacement.

19      The facts are going to show otherwise, Your Honor.  The

20   DAF is a $200 million charitable organization that is funded

21   almost exclusively with assets derived from Highland or Mr.

22   Dondero or the Get Good Trust or the Dugaboy Trust.  The

23   evidence is going to show that at all times these entities had

24   shared services agreements and investment advisory agreements

25   with HCMLP.  The evidence will show that HCMLP at all times

27

1  was controlled by Mr. Dondero.

2      And it made sense.  The guy put in an awful lot of money

3  for charitable usage.  Is he really just going to say, I don't

4  really care who runs it?  The evidence is going to show that

5  between October 2020 and January 2021, Grant Scott actually

6  exercised independence.  Grant Scott was Mr. Dondero's

7  childhood friend.  They went to UVA together.  They were

8  roommates.  Mr. Scott was the best man at Mr. Dondero's

9  wedding.  But we were now in bankruptcy court.  We're now in

10  the fishbowl.  And I will -- this may be a little argument,

11  but there's no disputing the facts that Mr. Scott acted

12  independently, and he paid the price for it.  Mr. Scott did it

13  three times.

14      He did it when he amended CLO Holdco's proof of claim to

15  take it down to zero.  He did it again after he withdrew the

16  objection to the HarbourVest settlement motion.  And he did it

17  again when he settled the lawsuit that the Debtors had brought

18  against CLO Holdco.  And that -- and on each of those three

19  occasions, the evidence will show that Mr. Scott did not

20  communicate with Mr. Dondero in advance, that Mr. Dondero

21  found out about these acts of independence after the fact, and

22  that each time he found out about it he had a little

23  conversation with Mr. Scott.

24      Mr. Dondero is going to tell you about it, and he's going

25  to tell you that he told Mr. Scott each act was inappropriate.

28

1  You may have heard that word before.  Each act was not in the

2  best interests of the DAF.

3      The last of those conversations happened either on or just

4  after January 26th.  And by January 31st, Mr. Scott gave

5  notice of his resignation.  And you're going to see that

6  notice of resignation.  And he asks for releases.

7      Mr. Patrick becomes, almost two months later, the

8  successor to Mr. Scott.  Mr. Dondero is going to say he has no

9  idea how that happened.  He was just told after the fact that

10  Mr. Patrick and Mr. Scott had an agreement.  He's going to

11  tell you they had an agreement and he just heard about it

12  afterwards.  He didn't really -- for two months, I guess, he

13  sat there after Mr. Scott told him that he wanted out and did

14  nothing to try to find out who's going to take control of my

15  charitable foundation with $200 million.  He wasn't

16  interested.

17      But here's the thing, Your Honor.  If we go to the next

18  slide.  Let's see what Mr. Scott said at his deposition last

19  week.  Question, "Do you know who selected Mark?"  Answer, "I

20  do not."  Question, "Do you know how Mark was selected?"  Mark

21  is a reference to Mark Patrick.  "I do not."  "Did you ever

22  ask Mark how he was selected?"  "I did not."  "Did you ever

23  ask Mark who selected him?"  "I did not."  "Did you ever ask

24  anybody at any time how Mr. Patrick was selected to succeed

25  you?"  "No, I did not."  "Did you ever ask anybody at any time

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 564 of 1017 PageID 11345

29

1   as to who made the decision to select Mr. Patrick to succeed

2   you?"  "No, I did not."

3      So I don't know what happened between Mr. Patrick and Mr.

4   Dondero when Mr. Patrick supposedly told Mr. Dondero that

5   there was an agreement with Mr. Scott, but that is news to Mr.

6   Scott.  He had no idea.

7      Your Honor, we are going to prove by clear and convincing

8   evidence that each of the Respondents violated a very clear

9   and specific court order.  And unless the Court has any other

10   questions, I'll stop for now.

11          THE COURT:  No questions.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  All right.  Who is making the argument

14   for the Respondents?

15          MR. SBAITI:  Your Honor, I am.  I'm just trying to

16   put the PowerPoint up on the WebEx.

17          THE COURT:  Okay.

18          MR. SBAITI:  Sorry about that.

19          MR. MORRIS:  Your Honor, I'll try not to make this a

20   practice, but can I inquire as to how much time I used?

21          THE COURT:  Oh.  Nate?

22          THE CLERK:  About thirteen minutes.

23          THE COURT:  Thirteen minutes?

24          MR. MORRIS:  Thank you very much.

25          THE COURT:  Okay.  All right.

30

1            MR. SBAITI:  Your Honor, our PowerPoint is a little

2    bit longer than that one.  May I approach with a copy?

3            THE COURT:  You may.  Uh-huh.

4        (Pause.)

5            MR. SBAITI:  Your Honor, it does feel good to be back

6    in the courtroom.

7            THE COURT:  Okay.

8            MR. SBAITI:  It's been a long time.

9            THE COURT:  Yes.  For us, too.

10           MR. SBAITI:  Jut wish it wasn't under a circumstance

11   where someone is trying to sanction me.

12      But we're going to be dividing up this oral argument a

13   little bit.  Also, to just kind of break up a little bit of

14   the monotony, because I think we have a lot to cover at the

15   opening stage of this.  And I'll try to be as expeditious as I

16   can be.

17     OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

18           MR. SBAITI:  Your Honor, the thing we -- the thing we

19   open with is the due process issue that we raised in our

20   brief.  And where this really arises from is the Court's show

21   cause order calls us violators before we've had a chance to

22   respond to the allegations and before we've obviously been

23   able to approach this hearing.  And the word violators means

24   something to us, Your Honor, because I've been a lawyer for a

25   long time, my partner has been a lawyer for a long time, our

010483

31

1   clients have never been sanctioned, we've never been

2   sanctioned, and for us to be labeled violators first by

3   counsel and then in a court order makes us wonder whether or

4   not this process is already prejudged or predetermined.

5           THE COURT:  I actually want to address that.  Turn

6   off the clock.

7       Just so you know, I looked this up a while back, because

8   we gave a bankruptcy judges panel at some CLE.  The average

9   bankruptcy judge in our district, back when I looked, signs

10  over 200 orders a week.

11          MR. SBAITI:  Sure.

12          THE COURT:  Many of those -- in fact, most of them --

13  are submitted by lawyers.  So, you know, a big chunk of my

14  week is signing orders.  And I obviously give more scrutiny to

15  those that are substantive in nature.  Okay?  If someone

16  submits to me a 50-page debtor-in-possession financing order,

17  I will look at that much more carefully than what I consider a

18  mere procedural order setting a hearing.

19      So I regret that that word was used, but I can assure you

20  I fairly quickly set that -- signed that, I should say --

21  regarding it as a merely procedural order setting a hearing.

22  Okay?  So it's as simple as that.  There was no hmm, I like

23  that word, violator.  I had a stack, if you will, an

24  electronic stack of probably 200 orders in front of me the day

25  I signed that.  Okay?

1      So, if that makes anyone feel any better, I don't know,

2   but that's the reality.

3      Okay.  You can start the clock again.

4          MR. SBAITI:  And I appreciate Your Honor saying that.

5   It does make us feel better, both about where the -- the

6   genesis of the order and the impact and its reflection on what

7   Your Honor thinks in terms of going into this.

8      The other thing that obviously raised concerns, and I

9   assume this comes from the same place, was four days ahead of

10  that order counsel told us the Court was going to order

11  everyone to be in person, and they had advance notice of that,

12  and we weren't sure how they had advance notice of that.  I

13  guess they assumed --

14          THE COURT:  I can assure you right here on the record

15  I never had ex parte communications with any lawyer in this

16  case, on this matter or any other matter.  Okay?  Again, those

17  are pretty strong words to venture out there with, which your

18  pleading did venture out there with those words.

19     My courtroom deputy, Traci, I think answers her phone 24

20  hours a day.  So I'm quite sure she had communications with

21  the lawyers about this, just like she probably had

22  communications with you and your firm and every other firm in

23  this case.  Okay?

24          MR. SBAITI:  Like I said, Your Honor, we appreciated

25  what Your Honor -- appreciate what Your Honor said, but that

33

 1   issue obviously stuck out -- stuck out to us, in combination.

 2   So I'll move on from that issue.

 3       This has to do with the lawsuit that was filed, and the

 4   lawsuit, the genesis of the lawsuit, I think it's important to

 5   say, because the argument has been raised in the briefing and

 6   we wanted to address it upfront, why the lawsuit comes about.

 7   And it comes about because of the Advisers Act and the

 8   responsibilities that the Debtor has to the assets of the

 9   funds that it manages.  And the Advisers Act imposes a duty

10   not only on Highland but obviously on its control people and

11   its supervised people.  And the lawsuit has to do with HCLOF,

12   which is what HarbourVest owned a piece of.  And Highland, as

13   the advisor to HCLOF and the advisor to the DAF, owed

14   fiduciary duties to CLO Holdco, which is the DAF's holding

15   entity of its assets in HCLOF, but Highland Capital was also

16   an advisor, a registered investment advisor to the DAF

17   directly at the time.  And so those federally-imposed

18   fiduciary duties lie at the crux of that lawsuit.

19       Moving on, Mr. Seery testified at the hearing that was in

20   this Court to be -- to get him appointed, and this was Exhibit

21   2 that was presented by the Debtor, and on Page 16 at the

22   bottom he says -- of the transcript, he says, I think, from a

23   high level, the best way to think about the Debtor is that

24   it's a registered investment advisor.  As a registered

25   investment advisor, which is really any advisor of third-party

34

1    money over $25 million, it has to register with the SEC, and

2    it manages funds in many different ways.

3       In the middle of the next page he says, In addition, the

4    Debtor manages about $2 billion, $2 billion in total managed

5    assets, around $2 billion in CLO assets, and then other

6    securities, which are hedge funds -- other entities, rather,

7    which are hedge funds or PE style.  Private equity style.

8       On Page 23 towards the bottom he says, As I said, the

9    Investment Advisers Act puts a fiduciary duty on Highland

10    Capital to discharge its duty to the investors.  So while we

11    have duties to the estate, we also have duties, as I mentioned

12    in my last testimony, to each of the investors in the funds.

13    CLO Holdco would be an investor in one of those funds, HCLOF.

14       He goes on to say, Some of them are related parties, and

15    those are a little bit easier.  Some of them are owned by

16    Highland.  HCLOF was not owned by Highland.  But there are

17    third-party investors in these funds who have no relation

18    whatsoever to Highland, and we owe them a fiduciary duty both

19    to manage their assets prudently but also to seek to maximize

20    value.

21       Now, the lawsuit alleges that Seery testified that the

22    HarbourVest portion of Highland CLO Funding was worth $22-1/2

23    million.  Now, Mr. Morris wants the Court to hinge on the fact

24    that, well, no one asked him whether he was lying.  But that's

25    not really the standard, and it certainly isn't the standard

35

1  when someone's an investment advisor and owes fiduciary

2  duties, which include fiduciary duties to be transparent with

3  your investors.

4      It also includes fiduciary duties not to self-deal.

5      The lawsuit also alleges that, in reality, those assets

6  were worth double that -- double that amount at the time. We

7  found out just, you know, in late March/early April that a

8  third -- from a third party who had access to the underlying

9  valuations at the time that those values were actually double

10  and that there was a misrepresentation, giving rise to the

11  lawsuit. That change in circumstance is the key issue behind

12  the lawsuit.

13      We allege that Mr. Seery and the Debtor, as RIAs, had a

14  duty to not self-deal and be fully transparent with that

15  information, and we think both of those things were violated

16  under the Advisers Act.

17      We don't allege that the HarbourVest settlement should be

18  undone or unwound. We can't unscramble that egg. We do seek

19  damages, as I believe is our right, arising out of the

20  wrongdoing and the process of pushing forth the settlement.

21      I think one of the allegations in the actual motion for

22  the show cause order was that this was going to undo all of

23  the hard work that Court had done and basically unwind and try

24  to re-piece Humpty Dumpty back together again. But that's

25  simply not the case. Nowhere in our allegations or in the

36

1    relief that we request are we trying to undo the HarbourVest

2    settlement as such.

3        Now, whether the lawsuit should be dismissed under the

4    affirmative defenses that they bring up -- res judicata,

5    waiver, release -- all of those are questionable under the

6    Advisers Act, given the change of circumstance, and therefore

7    are also questions on the merits.  They don't go to the

8    colorability of the underlying claims in and of themselves,

9    which I think is important.

10       So we asked for leave to amend from the Court.  And what

11   they want us to do, Your Honor, is they want to sanction us

12   for asking.  They're saying asking for leave to amend is the

13   same thing as pursuing a claim.  And I'll get to the specifics

14   on that in a little bit.  But that's the frame.  Can we be

15   sanctioned for asking a court, any court, even if it's the

16   wrong court, for permission to bring the lawsuit?  They don't

17   cite a single case that says that that, in and of itself, is

18   sanctionable conduct, us asking.

19       So I'd like to introduce some of the Respondents.

20       Your Honor, may I have one of these waters?

21           THE COURT:  Certainly.

22           MR. SBAITI:  Thank you.

23           THE COURT:  That's why they're there, by the way.

24           MR. SBAITI:  I didn't know if they belonged to

25   somebody else.

37

1          THE COURT:  We've scattered water bottles around for

2     people.

3          MR. SBAITI:  I appreciate it.  Thank you, Your Honor.

4          THE COURT:  So if you see these little ones, that's

5     for anyone.

6          MR. SBAITI:  So, this is an org chart, and you'll see

7     it as -- the exhibits that the Debtor's going to bring up.

8     And when we talk about the DAF, Your Honor -- I don't know if

9     that's visible to you.  We're on Slide 19, if you're looking

10    at it on paper.  There's a little number at the lower right-

11    hand corner.  The charitable DAF GP, LLP and then the

12    Charitable DAF Holdco, Ltd. together are the principles of the

13    Charitable DAF Fund, LP.  And so when we refer to the DAF or

14    the Charitable DAF, that's really the entity structure that

15    we're referring to.  And then the GP and Holdco Ltd. have a

16    managing member.  It used to be Grant Scott at the time this

17    was done.  Today, it's Mr. Mark Patrick, who's in the room,

18    sitting next to Mr. Bridges.

19       The DAF is a charitable fund.  It's funded over $32

20    million, as the evidence will show, including Dallas-Fort

21    Worth organizations, The Family Place, Dallas Children's

22    Advocacy, Center for Brain Health, the Crystal Ray Initiative,

23    Friends of the Dallas Police, Snowball Express, various

24    community and education initiatives, Dallas Arts, museums, the

25    Perot Museum, Dallas Zoo.  That evidence is undisputed, Your

38

1   Honor.  The DAF is a real fund.  It is a real charitable fund.

2   It does real good in the community.

3       Now, Respondents -- Holdco, which you will see at the

4   bottom of that chart, is essentially the investment arm.

5   There are assets that the DAF owns in various pots, and Holdco

6   is the actual business engine that generates the money from

7   those assets that then -- that then gets passed up to the

8   charitable -- the four charitable foundations at the top.

9       I'll go back to Slide 21.  And if you look at the top,

10  Your Honor, the Dallas Foundation, Greater Kansas City

11  Community, Santa Barbara Foundation, The Community Foundation

12  of North Texas:  Those are the charities that then themselves

13  bestow the funds onto the actual recipients.  So the money

14  flows up as dividends or distributions, and then gets

15  contributed.

16      CLO Holdco invests those assets, and it's an important

17  part of the business model, so that you're not sending out

18  principal.  It's the money that CLO makes, the profits, if you

19  will, that it is able to generate that gets donated and makes

20  its way into the community.

21      So there's an important feature to the structure in that

22  it has to be able to generate money.  It's not just money that

23  sits there and waits to be distributed.  There's active

24  investing going on.

25      Mr. Mark Patrick owns the control shares of the entities

Appx. 00548

39

 1   comprising the DAF and CLO Holdco, as I showed you, and the

 2   beneficiary charitable foundations hold what we call

 3   beneficial interests, where they just get money.  They don't

 4   have a vote.

 5       Mr. Patrick cares about the public service the DAF engages

 6   in.  He's been an advisor to the DAF, CLO Holdco, and its

 7   predecessor, Mr. Scott, since its inception.  He receives no

 8   compensation for the job he's doing today.  And you'll hear

 9   how he became -- how he inured to the control position of the

10   DAF and CLO Holdco from him, but it doesn't involve Mr.

11   Dondero, and the absence of someone saying that it did, I

12   think, is going to be striking by the end of the presentation

13   of evidence.

14       Their only argument against you, Your Honor, is going to

15   be you just can't believe them.  But not believing witnesses

16   is not a substitute for the lack of affirmative evidence.

17       Mr. Patrick has said all along he authorized the filing of

18   the motion for leave to add Mr. Seery to the lawsuit in

19   District Court.  He doesn't believe the motion to amend

20   violated this Court's orders, for the reasons stated in our

21   responsive filings to the motions for contempt and show cause

22   order.  That's why he authorized it.

23       My firm, Sbaiti & Company, we're a small Dallas litigation

24   boutique retained by the DAF and CLO Holdco to file the

25   lawsuit.  We did an investigation.  I'm tickled to death that

40

1    Mr. Morris loved our complaint so much and gave us the

2    compliment that we got it done in a short amount of time, but

3    we did get it done in a short amount of time, because, in the

4    end, it's a rather simple issue, as I was able to lay it out

5    in about three or four bullet points in a previous slide.

6        The written aspect of that doesn't take that long, as Your

7    Honor knows, but the idea that there's a suspicion that we

8    didn't write it or someone else wrote it and ghost-wrote it

9    and gave it to us, which I think is the insinuation he was

10   making, is completely unfounded.  There's no evidence of that.

11       We carefully read Your Honor's orders.  We developed a

12   good-faith basis, as required by Rule 11, that the lawsuit and

13   the motion to add Mr. Seery were not filed in bad faith or for

14   an improper purpose.  We don't think they're frivolous.  We

15   don't think they're in violation of Your Honor's orders, given

16   the current state of the law.

17       Mr. Dondero is one of the settlors of the CRT, of the

18   Charitable Remainder Trust that ultimately provided assets to

19   CLO Holdco and the DAF.  He does care about the DAF's mission.

20   I think Mr. Morris hit the nail on the head.  Of course Mr.

21   Dondero cares about what happens to it.  He's one of the

22   settlors, and it was his funds that initially were put into

23   it, so he's allowed to care.  And I don't think him caring is

24   insidious, and him caring doesn't mean he has control and

25   doesn't mean he's the driving force behind some insidious

Appx. 08559
010493

41

```
1    conspiracy that they're trying to insinuate exists.

2         He is an advisor to the DAF and CLO Holdco.  It is a lot

3    of money and it needs advice, and he's an advisor to Mr.

4    Patrick.  We don't run away from any of those facts, Your

5    Honor.

6         We also don't run away from the fact that he was the

7    source of some of the information that came in to that

8    complaint and that he relayed some of that information.  The

9    content, we do claim work product privilege and attorney-

10   client privilege, because he's an agent of our client, and as

11   lawyers doing an investigation, the content of our

12   communications is protected under the attorney-client and work

13   product privileges, as well as the joint interest privilege.

14   But the fact that we admit that those communications happened,

15   we're not running away from that fact.

16        So, what does he have to do with this?  It's interesting

17   that that opening argument you just heard spent about three

18   minutes on contempt and the other fourteen or fifteen minutes

19   or so on Mr. Dondero.  And only on Mr. Dondero.  There's a

20   negative halo effect, I believe, that they're trying to get

21   this Court to abide by.  They want to inflame Your Honor and

22   hopefully capture -- cultivate and then capitalize on whatever

23   antipathy you might have for Mr. Dondero, and then sweep us

24   all in under that umbrella and sanction everybody just because

25   he had some involvement.
```

42

1    But whatever involvement he has, which we admit he had

2    some involvement in helping us marshal the facts, that's not a

3    basis for us to be sanctioned if there isn't an actual

4    sanctionable conduct that -- as we say there isn't.

5    We think there's an ulterior motive. That's why Mr.

6    Morris just announced to Your Honor, Mr. Dondero controls it

7    all. The ulterior motive, I believe, is, down the line, when

8    they want to argue some kind of alter ego theory, they want to

9    lay that foundation here. I don't think this is the

10   appropriate time for that foundation, and I don't think any of

11   the information and the evidence they're trying to marshal in

12   front of you is really going to be relevant to the very

13   specific question that's before Your Honor: Does our motion

14   asking the District Court to add Mr. Seery violate your order,

15   or violate it in a way that can be -- that we can be

16   sanctioned for? We don't believe it violates it.

17   So, the three core standards that have to be met. First

18   of all, civil contempt requires a valid, enforceable order.

19   It's not debatable and it's not -- I don't think that's a

20   shocking statement. Then they have to have clear and

21   convincing evidence of a violation of a specific unambiguous

22   term therein. Mr. Morris wants his version of the word pursue

23   to be unambiguous, and I think the word pursue is unambiguous.

24   But the way he wants you to construe it makes it completely

25   ambiguous, and we'll -- I'll get to that in a moment.

Appx. 00552
010495

43

1          Now, for sanctioning counsel, the Fifth Circuit has held

2     you have to find bad faith.  We're adjudged under a slightly

3     separate standard under the Fifth Circuit law.  So the

4     contempt motion, though, to the extent it seeks to impose

5     double and treble attorney's fees, those are in punitive

6     fines.  They are not compensatory.  So criminal contempt

7     standards are raised, and so they have to show a violation in

8     bad faith.  In other words, our arguments that we're making

9     have to be bad faith, not simply that we're wrong, and they

10    have to show beyond a reasonable doubt, usually in front of a

11    jury.  The U.S. Supreme Court explained the difference and the

12    different procedural protections that have to be involved if

13    they're really going to seek double and treble compensatory

14    damages.

15         Now, he's right.  Saying we intended -- saying that we

16    didn't mean to violate it isn't necessarily a defense.  But

17    what you're actually going to hear from him is the opposite

18    argument, that even though we didn't violate it, we wanted to.

19    That's what he says.  That's why he quoted you the opening

20    section of our motion asking for permission to sue Mr. Seery,

21    because that's a statement of purpose.  And he says you should

22    sanction them right there.  That's literally what he said.

23    It's right there, their purpose.  If intent is irrelevant to

24    them, it's irrelevant as to us.  The fact that we wanted to

25    sue Seery is fully admitted.  We don't deny the fact that we

Appx_00553

010496

44

1  believe Mr. Seery should be a defendant in this lawsuit. But

2  the fact that we didn't sue him is why we didn't violate the

3  order. And they can't say that the fact that we eventually

4  wanted to sue him means we did violate the order. That door

5  swings both ways, Your Honor.

6      We don't think any element is met. The order, while writ

7  large, prohibits suing Mr. Seery without permission, and we

8  did not sue James Seery, pure and simple. The July 12 --

9  14th, 2020 order purports to reserve exclusively to this Court

10 that which, according to the statutes and the case law, we

11 believe the Court can't exclusively reserve to itself. And

12 Your Honor, the order prohibits commencing and pursuing a

13 claim against Jim Seery without coming here first to decide

14 the colorability of such a claim.

15     They, I believe, admit that we didn't commence a claim

16 against Jim Seery. I think they've admitted that now. So now

17 we're talking about what does pursue mean? We didn't pursue a

18 claim against Jim Seery. Is asking for leave to bring suit

19 the same thing as pursuing a claim? That's the question

20 that's really before Your Honor. Lawyers never talk of

21 pursuing a claim that hasn't been filed. We don't say, I'm

22 pursuing a claim and I'm going to file it next week or next

23 year. Usually, that type of language is in an order, because

24 when the order happens, there may already be claims against

25 Mr. Seery. And so the pursuit of claim is supposed to attack

45

1    those cases, to come here and show colorability, presumably,

2    before they continue on with those lawsuits.  It doesn't mean

3    asking for permission.

4        If it did mean asking for permission, then complying with

5    Your Honor's order would be a violation.  If the motion for

6    leave is a violation because it is pursuing a claim, if I had

7    filed that motion in this Court, it would still be pursuing a

8    claim without Your Honor's permission.  I'd have to get

9    permission just to ask for permission.  It puts us in this

10   endless loop of, well, if asking for permission is pursuing a

11   claim, and pursuing a claim is without permission violates the

12   Court's order, we'd always be in violation of the Court's

13   order just for asking, just for following Your Honor's edict.

14           THE COURT:  I'm just, I'm going to interject.  You

15   were supposed to, under the order, file a motion in this

16   Court.

17           MR. SBAITI:  I understand that, Your Honor, and I

18   think that we can get to the specifics on why we disagree with

19   how the motion went, Your Honor.  We hadn't sued Mr. Seery.

20   So as long as we dealt with the order, which is what our

21   position is, then we don't believe we violated the order.

22           THE COURT:  You think the order was ambiguous,

23   requiring a motion to be filed in the Bankruptcy Court?

24           MR. SBAITI:  Your Honor, what we believe is that the

25   order was ambiguous in terms of whether us asking for

46

 1  permission in the District Court was in and of itself a

 2  violation of the order.  We don't think it was.  Actually, we

 3  don't think the order's ambiguous to that extent.  The second

 4  we file a suit against Mr. Seery and we don't have some

 5  resolution of the issue, then I think the question of

 6  sanctionability comes in.  But we never filed suit, Your

 7  Honor.

 8      The Court doesn't say I can't seek permission in the

 9  District Court or that we can't go to the District Court with

10  -- which has general jurisdiction over this case, and has

11  jurisdiction, we believe, over the actual case and controversy

12  that's being raised.  But the idea of pursuit being a

13  violation of the order, of the letter of that order, is

14  nonsensical under that, it leads to an absurd result, and it's

15  plainly vague and ambiguous, Your Honor.

16      Asking Judge Boyle or asking a District Court for

17  permission is not a violation of this Court's order, not the

18  way it was written and not -- and I don't even believe it was

19  a violation necessarily of the Court's -- of the language that

20  the Court has.  We -- it doesn't unambiguously prevent us from

21  asking the District Court for leave.

22      The Court's order yesterday, Your Honor, applied this very

23  rule.  The TRO -- you said the TRO did not specifically state,

24  Turn your cell phone over.  And you denied motion for

25  sanctions on that.  That's basically the argument we're making

47

1   here, Your Honor.  We think that was the correct ruling, and

2   we think the same type of ruling applies here.

3       Your order yesterday also determined that the Court

4   ultimately believes that hiring lawyers to file motions should

5   not be viewed as having crossed the line into contemptuous

6   behavior.  That's essentially the argument they want you to

7   buy, that there's somehow a vindictiveness behind this and an

8   insidious plan to violate court orders, Your Honor.  We don't

9   have any evidence of that.

10          THE COURT:  Okay.  Take the words vindictiveness and

11  insidious out of the equation.  That's making things personal,

12  and I don't like that.  The key is the literal wording of the

13  order, is it not?

14          MR. SBAITI:  Your Honor, the key, I believe, is the

15  --

16          THE COURT:  No entity may commence or pursue a cause

17  of action of any kind against Mr. Seery relating in any way to

18  his role as the chief executive officer and chief

19  restructuring officer of the Debtor without the Bankruptcy

20  Court first determining, after notice, that such claim or

21  cause of action represents a colorable claim of willful

22  misconduct or gross negligence against Mr. Seery and

23  specifically authorizing such entity to bring such a claim.

24  So I'm trying to understand why you argue that filing a motion

25  asking the District Court for permission is not inconsistent

48

 1   with this order.

 2        MR. SBAITI:  Because it's not commencing a claim,

 3   Your Honor.  It's not commencing a claim against him.

 4        THE COURT:  Okay.  So is your argument that if Judge

 5   Boyle authorizes amendment of the pleading to add Mr. Seery

 6   and then you do it, at that point they may have grounds for a

 7   motion for contempt, but not yet, because she has not actually

 8   granted your motion?

 9        MR. SBAITI:  Correct, Your Honor.  I mean, in a

10   nutshell.  In fact, that's one of -- I think that's probably

11   our next argument.  We think, in a sense, this argument is

12   incredibly premature.  There is three ways that this -- well,

13   I'd like to address this, so I've got -- I've got a diagram

14   that I think will actually help elucidate what our thought

15   process was.

16      There's three things she could have done.  She could have

17   referred -- referred it to Your Honor, which is what we

18   expected was likely to happen.

19        THE COURT:  But you didn't file a motion for referral

20   of the motion before her.

21        MR. SBAITI:  Well, no, I don't mean in respect of

22   enforcing the reference.  The referral we thought was most

23   likely going to happen because it's an associated case, and we

24   actually put those orders in front of her, so we expected that

25   those orders would end up -- that the question would

Appx 00558
010501

49

1   ultimately end up in front of Your Honor on that basis.

2        She could have denied our motion outright, in which case

3   we haven't filed a claim, we haven't violated it, or she could

4   have granted our motion and done one of two things.  She could

5   have granted it to the extent that she thought leave would be

6   proper but then referred it down, or she could have decided --

7   taken the decision as the court with general jurisdiction and

8   simply decided it all on her own.  She had all of those

9   options, Your Honor, and none of them results in a claim being

10  commenced or pursued without the leave of this Court, if leave

11  is absolutely necessary, Your Honor.  And that's the point

12  that we were trying to make.

13       Your Honor, the -- there's -- you know, there's no

14  evidence that, absent an order from a court with jurisdiction,

15  that we were going to file a claim against Mr. Seery, that we

16  were going to commence or pursue a claim against Mr. Seery.

17  We were cognizant of Your Honor's order.  We considered that.

18  And the reason we filed them the way we did is because,

19  according to the statutes and the case law, this is the type

20  of case that would be subject to a mandatory withdrawal of the

21  reference.

22       And so there's this paradox that arises, Your Honor.  And

23  the paradox that arises is that we show up and immediately go,

24  well, we need to be back in the District Court.  So we filed

25  our motion there, and I don't think that was contemptuous, it

50

```
 1   wasn't intended to be contemptuous of the Court, but we showed

 2   the orders to the Court, made the same arguments that we have

 3   been making here, that we believe that there's problems with

 4   the order, we believe the order oversteps its jurisdiction and

 5   maybe is unenforceable, and it's up to that District Court, as

 6   it has been in almost all of these other gatekeeper order

 7   cases that get filed.  None of them result in sanctions, Your

 8   Honor.  What they result in is a District Court deciding,

 9   well, either they refer it or they decide I don't need to

10   refer it.  But I don't think that that is the same thing as

11   commencing or pursuing a claim in the end, Your Honor, because

12   all we did was ask for permission, and permission could have

13   been denied or granted or granted in part.

14        Your Honor, they haven't cited an injury.  You've heard

15   the testimony, Your Honor, that they -- the first time they

16   knew we had filed a motion -- which I don't understand why

17   that's the first time they knew we had filed a motion; we told

18   them we were going to file the motion -- was when I forwarded

19   an email saying that it's been denied without prejudice, Your

20   Honor.  Well, that means they didn't have to do any work to

21   respond to the motion.  They didn't have to do any work to do

22   any of the other things.

23        And one hundred percent of the damages that they're going

24   to say they incurred is the litigation of this contempt

25   hearing or this sanction motion, as opposed to some other
```

51

1   simpler remedy, like going in to Judge Boyle and saying, Your

2   Honor, all that needs to go, which is what they eventually

3   did.  But they would have had to incur those costs anyway

4   because they're now moving to enforce the reference.  They

5   filed a 12(b)(6).  That briefing would have existed regardless

6   of whether or not we had filed our motion, regardless of

7   whether the sanctions hearing had commenced.

8        Your Honor, I'm going to let my partner, Mr. Bridges,

9   address this part of it, if I could.  I think that gets into

10  more of the questions that you asked, and I think he can

11  answer them a lot better than I can.

12            THE COURT:  Okay.

13            MR. SBAITI:  Thank you.

14            THE COURT:  That's fine.

15            MR. BRIDGES:  Thank you, Your Honor.  And I do want

16  to address pointedly the questions that you're asking.  First,

17  though, I was hoping to back up to some preliminary remarks

18  that you made and say that I find the 200 orders a week just

19  mindboggling.  It amazes me, and puts the entire hearing in a

20  different perspective for me.  I'm grateful that you shared

21  that with us.

22       Your expression of regret about naming us violators was

23  very meaningful to me.  It causes me -- well, the strong words

24  in our brief were mine.  I wrote them.  And your expression of

25  regret causes me to regret some of those words.  I'm hopeful

52

 1   that you can understand, at least in part, our reaction out of

 2   concern.

 3        And Your Honor, it's awkward for me to talk about problems

 4   with your order, and that's the task that's come to me, to

 5   list and talk through four of them and why we think they put

 6   us in a really awkward position in deciding what to do in this

 7   case, in the filing of it, in where we filed it, and in how we

 8   sought leave to go forward against Mr. Seery.  That was

 9   awkward and difficult for us, and I'm hopeful that I can

10   explain that and that you'll understand, if I'm blunt about

11   problems with the order, that I mean it very respectfully.

12   Two hundred orders a week is still very difficult for me to

13   get my mind around.

14        The four issues in the order start with the gatekeeping.

15   Then, secondly, in the preliminary remarks, I made mention of

16   the *Applewood* case and the notice that the order releases some

17   claims.  Its effect of --

18             THE COURT:  And by the way, I mean, you might

19   elaborate on the facts and holding of *Applewood*, because I

20   came into this thinking *Republic Supply v. Shoaf*, and for that

21   matter, as I said, *Espinosa*, were much more germane.  And so,

22   you know, you'll have to elaborate on *Applewood*.  I remember

23   that case, but it's just not one people cite as frequently as

24   those two.

25             MR. BRIDGES:  Yes, Your Honor.  And our reply brief

53

1   devotes a page to the case, and I'm hopeful that I can

2   remember it well enough to give you what you're looking for

3   about it, but I would point you to our reply brief on that

4   topic as well.

5       The *Shoaf* case that *Applewood* quotes from and

6   distinguishes and expressly limits, the *Shoaf* case actually

7   has been cautioned and limited and distinguished numerous

8   times, if you Shepardize it, and the *Applewood* case is the

9   leading case, and it also is from the Fifth Circuit, that

10  describes and cabins the effects of *Shoaf*.  And in *Applewood*,

11  what happened is a bankruptcy confirmation order became final

12  with releases in it, and the court held that exculpatory

13  orders in a final order from the Bankruptcy Court do not have

14  res judicata effect and do not release claims unless those

15  claims are enumerated in the exculpatory order.  And --

16          THE COURT:  Okay.  So it was about specificity more

17  than anything else, right?

18          MR. BRIDGES:  Yes, Your Honor. It was a --

19          THE COURT:  Okay.

20          MR. BRIDGES:  -- a blanket release, a blanket --

21          THE COURT:  Okay.

22          MR. BRIDGES:  -- exculpatory order that didn't

23  specify what claims were released by what parties, and

24  therefore the parties didn't have the requisite notice.

25      In my mind, Your Honor, it's comparable to the Texas

54

1    Supreme Court's holdings on what's required in a settlement

2    release in terms of a disclaimer of reliance, --

3              THE COURT:  Okay.  But, again, --

4              MR. BRIDGES:  -- that if you aren't --

5              THE COURT:  -- it's about specificity --

6              MR. BRIDGES:  Yes, Your Honor.

7              THE COURT:  -- more than anything else?  And then

8    we've got the U.S. Supreme Court *Espinosa* case subsequent.

9              MR. BRIDGES:  Okay.  Your Honor, I'm not sure what

10   *Espinosa* you're referring to.  Can you tell me why that

11   applies?

12             THE COURT:  Well, it was a confirmation order.  It

13   was in a Chapter 13 context.  And there were provisions that

14   operated to discharge student loan debt, --

15             MR. BRIDGES:  Uh-huh.

16             THE COURT:  -- which, of course, cannot be discharged

17   without a 523 action, a separate adversary proceeding.

18   Nevertheless, the confirmation order operated to do what 523

19   suggests you cannot do, discharge student loan debt through a

20   plan confirmation order.

21        The U.S. Supreme Court says, well, that's unfortunate that

22   the confirmation order did something which it doesn't look

23   like you can do, but no one ever objected or appealed.  That's

24   my recollection of *Espinosa*.  So it seems to be the same

25   holding as *Republic Supply v. Shoaf*.  And what I -- why I

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 590 of 1017 PageID 11371

55

1    asked you to elaborate on *Applewood* is because it does seem to

2    deal with the specificity of the order versus the

3    enforceability, no?

4            MR. BRIDGES:  Your Honor, if it's not obvious

5    already, I'm not prepared to argue *Espinosa*.  And your

6    explanation of it is very helpful to me.  I think you're right

7    that the specificity issue from *Applewood* is what we're

8    relying on.  And it sounds like --

9            THE COURT:  Okay.  So, that being the case, how was

10   this order not specific?  Okay?

11           MR. BRIDGES:  That's easy, Your Honor, because it

12   doesn't say which parties are releasing which claims.  And

13   what we're talking specifically about there -- as we go

14   through the order, I can show you the language -- but what

15   we're talking about specifically are the ordinary negligence

16   and breach of fiduciary duty claims that your order doesn't

17   provide for at all.  Rather, it says colorability of gross

18   negligence or willful wrongdoing, if I remember the words

19   precisely, that's what must be shown to pursue a case -- a

20   cause of action against Mr. Seery, thereby -- thereby

21   indicating that claims for mere negligence, not gross

22   negligence, or breach of fiduciary duty, which is an even

23   lesser standard, that those claims are prohibited entirely.

24       And by having that kind of general all-encompassing

25   release or exculpation for potential liability involving

56

```
 1   negligence, and most importantly, fiduciary duty breach under

 2   the Advisers Act, that that kind of exculpation under

 3   Applewood is not enforceable and has no res judicata effect

 4   because it wasn't -- those claims weren't enumerated in the

 5   order.

 6      That for it to have the intended exculpatory effect, if

 7   that was what was intended, that the fiduciary duty claims and

 8   the parties who those claims may belong to would have to have

 9   been enumerated.

10      And indeed, that kind of specificity, what was required in

11   Applewood, isn't even possible for a claim that hasn't yet

12   occurred for future conduct.  It's not possible to enumerate

13   the details, any details, of a future claim, because the

14   underlying act -- if the underlying basis, facts for that

15   claim, haven't yet happened.  It's something to happen in the

16   future.

17      And here, that's what we're dealing with.  We're dealing

18   with conduct that took place well after the January and July

19   2020 orders that had that exculpatory effect.  Is -- is that

20   clear?

21           THE COURT:  Understood.

22           MR. BRIDGES:  Thank you, Your Honor.  So, the four

23   areas of the order, the four functions that the order does

24   that are problematic to us that led us to do what we have done

25   are the gatekeeping function; the release; the fact that by
```

010509

57

 1   stating sole jurisdiction, that it had a jurisdiction-

 2   stripping effect; and then, finally, jurisdiction asserting,

 3   where, respectfully, Your Honor, we think to some extent the

 4   order goes beyond what this Court's jurisdiction is.  And so

 5   that not only claiming exclusive jurisdiction, but claiming

 6   jurisdiction over all actions against Mr. Seery, as described

 7   in the order, is going too far.

 8       And those are the four issues I want to talk about one at

 9   a time, and here -- I went two screens instead of one.  There

10   we go.  And here's the order.  I have numbered the highlights

11   here out of sequence because this is the sequence that I wish

12   to talk about them and that I think their significance to our

13   decision applies.

14       Before we get into the words of this July 16, 2020 order,

15   I want to mention the January order as well.  Although the

16   motion for contempt recites both orders, we don't actually

17   think the January order applies to us, because our lawsuit

18   against Mr. Seery is not about his role as a director at

19   Strand in any way.  We didn't make an issue of that, other

20   than in a footnote in our brief, because we don't think that

21   distinction matters much since the orders essentially say the

22   same things.

23       I'm not sure that it matters whether we have potentially

24   violated one order or two.  If Your Honor finds we've violated

25   one, I think we're on the hook regardless.  If Your Honor

58

1    finds that we didn't violate the July order, I don't think you

2    will find that we violated the January order, either.  So my

3    focus is on the July order.

4         The gatekeeping function comes from the preliminary

5    language about commencing or pursuing a claim or cause of

6    action against Mr. Seery.  And it says what you want us to do

7    first before bringing such a claim.

8         The second issue of the release comes a little bit later.

9    It's the colorable claim of willful misconduct or gross

10   negligence language.  In other words, because only claims of

11   willful misconduct or gross negligence can pass the bar, can

12   pass muster under this order, that lesser claims -- ordinary

13   negligence and breach of fiduciary duty -- that those claims

14   are released by this order.  That's the second argument.

15        Third is your reference to sole jurisdiction and the

16   effect that that has of attempting to say that other courts,

17   courts of original jurisdiction, do not have jurisdiction

18   because it solely resides here.  That's the third thing I want

19   to address.

20        And then the fourth is the notion that we have to come to

21   this Court first for any action that fits the description of

22   an action against Mr. Seery, when some actions are, through

23   acts of Congress, removed from what this Court has the power

24   to address.  Under 157(d) of Title 28, Your Honor, there are

25   some kinds of actions which withdrawal of the reference is

1  mandatory, and therefore this court lacks jurisdiction to

2  address those.

3      And so those are the four issues I want to tackle,

4  starting with the first, the gatekeeping.  Your Honor, Section

5  28 -- Section 959 of Title 28 appears to be precisely on

6  point.  It calls -- it is called by some courts an exception

7  to the Barton Doctrine, which we believe is the only basis,

8  the Barton Doctrine, for this Court to claim that it has

9  jurisdiction or sole jurisdiction and can require us to come

10  here first.  We think the Barton Doctrine is the only basis

11  for that.  We haven't seen anything in the briefing from

12  opposing counsel indicating there was another basis for it.

13  We think we're talking about the Barton Doctrine here as the

14  basis for that.

15      959 is exception to the Barton Doctrine, and we think it

16  explicitly authorizes what we have done.

17      Secondly, Your Honor, the order, the gatekeeping functions

18  of the order are too broad because of its incorporation of the

19  jurisdictional problems and the release problem that we'll

20  talk about later.  But for problem number one, the key issue

21  that we're talking about is 959 as an exception to the Barton

22  Doctrine.  And I went the wrong way.

23          THE COURT:  So, we could go down a lot of rabbit

24  trails today, and I'm going to try not to do that, but are you

25  saying the very common practice of having gatekeeping

Appx 06509

1   provisions in Chapter 11 cases is just defective law under 28

2   U.S.C. § 959(a)?

3           MR. BRIDGES:  Can I say yes and no?

4           THE COURT:  Okay.

5           MR. BRIDGES:  Yes, to some extent, for some claims.

6   No as to other claims to another extent.  We are not saying

7   gatekeeping orders are altogether wrong, --

8           THE COURT:  Okay.

9           MR. BRIDGES:  -- no.

10          THE COURT:  Okay.

11          MR. BRIDGES:  There are problems with gatekeeping

12  orders that do more than what the law, Section 959 in

13  particular, allows them to do.

14          THE COURT:  Okay.  Be more explicit.  I'm not -- I

15  think you're saying, no, except when certain situations exist,

16  but I don't know what the certain situations are.

17          MR. BRIDGES:  And Your Honor, you're exactly right.

18  It's complicated, and it takes a long explanation.  Let me

19  start --

20          THE COURT:  Okay.  I really want to know, --

21          MR. BRIDGES:  Yeah, me, too.

22          THE COURT:  -- since I do these all the time, and

23  most of my colleagues do.

24          MR. BRIDGES:  Thank you, Your Honor.  And 959 is on

25  the screen.  Managers of any property --

61

1          THE COURT:  Uh-huh.

2          MR. BRIDGES:  -- is what we're talking about,

3   including debtors in possession.  Now, it starts off by saying

4   trustees, receivers.  I mean, this is exactly what the Barton

5   Doctrine is about, right?  We're talking about trustees and

6   receivers, but not just them.  We're also talking about

7   managers of any property, including debtors in possession, --

8          THE COURT:  Uh-huh.

9          MR. BRIDGES:  -- may be sued without leave of the

10  court appointing that.  That's contrary to the Barton Doctrine

11  so far.

12     With respect to what I've numbered five here -- these

13  numbers are mine -- the quote is directly verbatim out of the

14  U.S. Code, but the numbering one through five is mine.  With

15  respect to what acts or transactions in carrying on business

16  connected with such property.

17     And so, Your Honor, what we're talking about isn't Barton

18  Doctrine is inapplicable, or you can't have a gatekeeping

19  order for any claims, but it's about managers of property.

20  And one of the hornbook examples of this is the grocery store

21  that files for bankruptcy and then, when --

22          THE COURT:  Slip-and-fall.

23          MR. BRIDGES:  You've got it, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. BRIDGES:  And because they're managing property,

62

```
 1    --
 2              THE COURT:  So your cause of action, if it went
 3    forward, is the equivalent of a slip-and-fall --
 4              MR. BRIDGES:  Yes, Your Honor.
 5              THE COURT:  -- in a grocery store?
 6              MR. BRIDGES:  Yes, Your Honor.
 7              THE COURT:  Okay.  Let me skip ahead.  What about the
 8    last sentence of 959(a)?
 9              MR. BRIDGES:  959(b)?  Or 959(a)?
10              THE COURT:  No, of 959(a).
11              MR. BRIDGES:  What we're looking at here?
12              THE COURT:  That's the sentence that I have always
13    thought was one justification for a gatekeeper provision.  And
14    I know, you know, a lot of others feel the same.
15              MR. BRIDGES:  Are we talking about what I have listed
16    in number five here?
17              THE COURT:  No.  I'm talking about the last sentence
18    of 959(a).  Such actions, okay, shall be subject to the
19    general equity power of such court, you know, meaning the
20    Bankruptcy Court, so far as the same may be necessary to the
21    ends of justice, but this shall not deprive a litigant of his
22    right to a trial by jury.
23        Isn't that one of the provisions that lawyers sometimes
24    rely on in arguing a gatekeeper provision is appropriate?
25              MR. BRIDGES:  Certain --
```

010515

63

```
1            THE COURT:  You, Bankruptcy Judge, have the power,

2    the general equity power, so far as the same may be necessary

3    to the ends of justice?

4            MR. BRIDGES:  Your Honor, you bet.  Absolutely, there

5    is equitable power to do more.  There's no doubt that there

6    are reliance -- there is reliance on that in many instances.

7    So I'm not sure -- I'm not sure I'm responding to your point.

8            THE COURT:  Well, again, I think this is the third or

9    fourth argument down the line that really you start with in

10   the analytical framework here, but I guess I'm just saying I

11   always thought a gatekeeping provision was consistent,

12   entirely consistent with 28 U.S.C. § 959(a), the last

13   sentence.

14           MR. BRIDGES:  When you're dealing --

15           THE COURT:  You disagree with that?

16           MR. BRIDGES:  I do, Your Honor.

17           THE COURT:  Okay.

18           MR. BRIDGES:  And it's not that the Court lacks

19   equitable powers to do more.  It's that those equitable powers

20   are affected by when management of other parties, third

21   parties' property is at issue.

22       What we're talking about is similar to yesterday's

23   contempt order.  When you set the basis of describing what it

24   is that Highland's business is, that they're a registered

25   investment advisor in the business of buying, selling, and
```

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 65 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 599 of 1017 PageID 11380

64

1  managing assets -- assets, of course, are property, and that

2  property is not just Highland's, but it's third-party

3  property, as if a railroad loses luggage belonging to its

4  customers.  Rather than the railroad with a trustee appointed

5  having mismanaged railroad property, we're talking about

6  third-party property here, third-party property that belongs

7  to the CLOs, about a billion dollars of assets in these CLO

8  SPEs that Highland manages.

9      And again, the slide that Mr. Sbaiti showed you showing

10  Highland, yes, they manage their own assets, the assets of the

11  Debtor, but also of the third parties, including the

12  Charitable DAF and CLO Holdco, and that the Advisers Act

13  imposes fiduciary duties on them that are unwaivable when

14  they're doing that.

15      In *Anderson*, the Fifth Circuit called 959 an exception to

16  the rule requiring court's permission for leave to sue.  In

17  *Hoffman v. City of San Diego* much more recently, relying on

18  this statute again, the court rejected a *Barton* challenge and

19  called it a statutory exception.  And in *Barton* itself, from a

20  century ago, the U.S. Supreme Court even acknowledged there

21  that where a receiver misappropriated the property of another

22  -- not the debtor's property, the property of another -- that

23  the receiver could still be sued personally, without leave of

24  court.

25      Absent *Barton*, absent applicability of the Barton

65

1  Doctrine, Your Honor, the gatekeeper order is problematic.

2      *Barton* applies where a court has appointed a trustee, and

3  I don't think, Your Honor, under the circumstances in this

4  case, that it is fair to say Mr. Seery was appointed, as

5  opposed to approved by this Court.  And it involves a

6  trustee's actions under the powers conferred on him.  The

7  Barton Doctrine is not about a broader exculpation of the

8  trustee.

9      Here, what the Debtor asked for in its motion for

10  approval, approval of hiring Mr. Seery, what it asked for

11  specifically in the motion was that the Court not interfere

12  with corporate decisions absent a showing of bad faith, self-

13  interest, or gross negligence, and asking the Court to uphold

14  the board's decision to appoint Mr. Seery as the CEO as long

15  as they are attributable to any rationale business purpose.

16      At the hearing, Your Honor, at the hearing, we've quoted

17  your comments saying that the evidence amply shows a sound

18  business justification and reasonable business judgment on the

19  part of the Debtor in proposing that Mr. Seery be CEO and CRO.

20  Your Honor, respectfully, those words don't sound like the

21  judge using its discretion to choose -- appoint a trustee.

22  They sound like the Court exercising deference to the business

23  judgment of a business.  And appropriately so.  We don't have

24  trouble with application of the business judgment rule.  Our

25  problem is with application of it and the Barton Doctrine.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 601 of 1017 PageID 11382

66

```
 1   Those two do not go together.  A trustee has protection
 2   because it's acting under color of the court that appointed
 3   it.  A court that merely deferred to someone else's
 4   appointment, that's not what the Barton Doctrine is about.
 5   The Barton Doctrine is about the court's function that the
 6   trustee takes on, not deference to the business judgment of
 7   the debtor in possession or the other fiduciary appointed by
 8   the court.
 9       Problem one was the gatekeeping.  Problem two is about the
10   release and the Applewood case.  Your Honor, again, ordinary
11   negligence and ordinary fiduciary duty breaches do not rise to
12   the level of gross negligence and willful misconduct.  And
13   because of that, the language of this order appears to be
14   barring them entirely.  No entity may bring a lawsuit against
15   Mr. Seery in certain circumstances without the Bankruptcy
16   Court doing what?  Determining that the cause of action
17   represents a colorable claim of willful misconduct or gross
18   negligence against Mr. Seery.
19       A breach of fiduciary duty under the Advisers Act can be
20   unintentional, it can fall short of gross negligence by miles,
21   and to exculpate Mr. Seery from those kinds of claims entirely
22   is to make him no longer a fiduciary.  A fiduciary duty that
23   is unenforceable makes someone not a fiduciary.  That's
24   plainly not what Mr. Seery thinks his role is.  It's
25   inconsistent with the Advisers Act.  And Your Honor, the
```

Appx. 06576

1    notion that he would not owe his clients fiduciary duties as

2    he manages their assets would require disclosures under the

3    SEC regulations. It creates all kinds of problems to state

4    that a fiduciary under the Advisers Act does not have

5    enforceable fiduciary duties. The order appears to be

6    releasing all of those. But for *Applewood's* specificity

7    requirement, it would be doing that.

8        As an asset manager under the Advisers Act, Mr. Seery is

9    managing assets belonging to CLO Holdco and The Charitable

10   DAF. That's precisely what the District Court action is

11   about, those fiduciary duties. And Mr. Seery, in describing

12   these recently in testimony here -- forgive me for reading

13   through this, Your Honor, but it is pretty short -- Mr. Seery

14   testifies, I think, from a high level, the best way to think

15   about the Debtor is that it's a registered investment advisor.

16   As a registered investment advisor, which is really any

17   advisor of third-party money over $25 million, it has to

18   register with the SEC and it manages funds in many different

19   ways. The Debtor manages approximately $200 million current

20   values -- it was more than that of the start of the case -- of

21   its own assets.

22       I'm pausing there, Your Honor. $200 million of its own

23   assets, but we're about to talk about third-party assets.

24       It doesn't have to be a registered investment advisor for

25   those assets, but it does manage its own assets, which include

1  directly-owned securities, loans, from mostly related entities

2  but not all, and investments in certain funds, which it also

3  manages.

4     And then here it comes:  In addition, the manager -- the

5  Debtor manages about roughly $2 billion, $2 billion in total

6  managed assets, around $2 billion in CLO assets, and then

7  other entities, which are hedge funds or PE style.

8     We also had to get a very good understanding of each of

9  the funds that we manage.  And as I said, the Investment

10 Advisers Act puts a fiduciary duty on Highland Capital to

11 discharge its duty to the investors.  So while we have duties

12 to the estate, we also have duties, as I mentioned in my last

13 testimony, to each of the investors in the funds.

14    Now, some of them are related parties, and those are a

15 little bit easier.  Some of them are owned by Highland.  But

16 there are third-party investors in these funds who have no

17 relation whatsoever to Highland, and we owe them a fiduciary

18 duty both to manage their assets prudently but also to seek to

19 manage -- maximize value.

20    Those duties do not require -- requires the opposite of

21 what I mean.  They don't merely require avoiding gross

22 negligence or willful wrongdoing.  When you're managing assets

23 of others, the fiduciary duties that you owe are far stricter

24 than that.  The highest duty known to law is a fiduciary duty.

25    The order is inconsistent with that testimony,

1    acknowledging the fiduciary duties owed to The Charitable DAF

2    and to CLO Holdco.  It appears to release the Debtor -- maybe

3    not the Debtor.  My slide may be wrong about that.  It appears

4    to release Seery from having to uphold these duties.

5        In addition to problems with the gatekeeping under the

6    Barton Doctrine, in addition to the release problem and

7    *Applewood* and the unwaivable fiduciary duties under the

8    Advisers Act, there's also a problem with telling other courts

9    that they lack jurisdiction.  Your Honor knows bankruptcy

10   court law -- bankruptcy -- and the Bankruptcy Code far better

11   than I do, I'm certain.  But a first principle, I believe, of

12   bankruptcy law is that this Court's jurisdiction is derivative

13   of the District Court's.  And the only doctrine I've heard of

14   that can allow this Court to exercise exclusive jurisdiction

15   of the District Court that it sits in is the Barton Doctrine,

16   which, again, is very problematic to apply in this case, for

17   the reasons we've discussed already.

18       By claiming to have -- by stating in the order that this

19   Court has sole jurisdiction, it appears to either be inclusive

20   of the District Court, which I understand Your Honor doesn't

21   think her order can be read that way, but if it's not read

22   that way, then it results in telling the District Court that

23   it doesn't have the original jurisdiction that Congress has

24   given it.  And that's problematic in the order as well.

25            THE COURT:  Let me ask you.  If you think the word

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 71 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 605 of 1017    PageID 11386
290

70

 1    "power" had been used, or "authority," versus "jurisdiction,"

 2    that would have cured it?

 3             MR. BRIDGES:  I think there would still have been

 4    other problems.  Would it have cured this?  I don't think so,

 5    Your Honor, because, again, I think the only basis for that

 6    power is the Barton Doctrine.

 7             THE COURT:  Okay.

 8             MR. BRIDGES:  To listen to opposing counsel, you'd

 9    think that our jurisdictional argument was entirely about the

10    jurisdiction stripping.  It's not.  Frankly, Your Honor,

11    that's maybe even a lesser point.  A key problem here to is

12    the assertion of jurisdiction, not over any of the claims, but

13    over all of the claims, because of 157(d), Your Honor, because

14    some claims, some causes of action, have been put outside the

15    reach of bankruptcy, the Bankruptcy Court, and those actions

16    may in some instances fit within your description of the cases

17    that are precluded here.

18        That's a problem jurisdictionally with this Court's

19    ability to say it retains jurisdiction or that it has, that it

20    asserts jurisdiction.  Over what?  Any kind of claim or cause

21    of action against Mr. Seery relating in any way to his role as

22    the chief executive officer and chief restructuring officer of

23    the Debtor.

24        Some claims that fit into that bucket also fit into the

25    description in 157(d) of cases that require both consideration

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 72 of
Case 3:25-cv-02072-S    Document 15-13    Filed 06/06/25    Page 606 of 1017    PageID 11387
290

71

1  of bankruptcy law and federal laws affecting interstate

2  commerce or regulating it.  Right?  Some cases must fall into

3  -- under 157(d), despite having something to do with Mr.

4  Seery's role as a chief executive officer.  And Your Honor,

5  the Advisers Act fiduciary duty claims asserted by Respondents

6  in the District Court are such claims.  They cannot be decided

7  without considering the Advisers Act.

8      There are also RICO claims that, of course, require

9  consideration of the RICO statute.  But the Advisers Act

10  claims absolutely require consideration of both bankruptcy law

11  and this Court's order exonerating -- exculpating Mr. Seery

12  from some liability, in addition to the unwaivable fiduciary

13  duties imposed by the Advisers Act.

14      The assertion of jurisdiction here blanketed, in a blanket

15  manner, over all claims against Mr. Seery in any way related

16  to his CEO role is a 157(d) problem that the order has no --

17  has no solution for and we see no way around.  157(d) requires

18  withdrawal of the reference, makes it mandatory, when a case

19  requires considerations of federal law implicating interstate

20  commerce.

21      Your Honor, we think we had to do it the way we did,

22  filing in the District Court instead of filing here, in order

23  to preserve our jurisdictional arguments.  To come to this

24  Court with a motion and then what?  Immediately file a motion

25  to withdraw the reference on our own motion here?  To come

Appx 06584
010524

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 607 of 1017    PageID 11388
299

72

1   here and ask for a decision on colorability, when first

2   colorability would exclude the claims that we're trying to

3   bring, at least some of them, the mere negligence, mere

4   fiduciary duty breaches, because they don't rise to the level

5   necessarily of gross negligence or willful wrongdoing.

6       Your Honor, coming here and asking this Court to rule on

7   that may well have waived our jurisdictional objections.

8   Coming here to this Court and doing that and immediately

9   filing a motion --

10          THE COURT:  I don't get it.

11          MR. BRIDGES:  The ordinary --

12          THE COURT:  Subject matter jurisdiction, if it's a

13  problem, it's not waivable.

14          MR. BRIDGES:  The ordinary issue -- the ordinary

15  waiver rule, Your Honor, is that when you come and ask for a

16  court to rule on something, that you waive your right to -- to

17  later -- you're estopped judicially from taking the contrary

18  position.

19          THE COURT:  Okay.  Well, again, I don't get it.  If

20  you filed your motion and I ruled in a way you didn't like,

21  you would appeal to the District Court.

22          MR. BRIDGES:  Yes, Your Honor.  An appeal to the

23  District Court, we would be entitled to do.  I understand, no

24  matter what happens here, we can appeal to the District Court.

25  That's different from whether or not, by coming here first,

Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 608 of 1017 PageID 11389

73

1  have we waived or have we created an estoppel situation, in

2  terms of arguing jurisdiction.

3          THE COURT:  Okay.

4          MR. BRIDGES:  Because of the problems with the order,

5  we thought we were in a situation where coming here would

6  waive rights that we could avoid waiving by asking in the

7  District Court.

8      In other words, there was a jurisdictional paradox:  How

9  does a party ask a court to do something it believes the court

10 lacks the power to do?  That's the spot we found ourselves in.

11 What were we supposed to do?

12     Your Honor, it is definitely a complex case.  And coming

13 into this matter with over 2,000 filings on the docket before

14 I had ever heard of Highland was a very daunting thing, coming

15 into this case.  And whether or not there's something that we

16 missed is certainly possible, but these orders that are the

17 subject of the contempt motion, these orders are not things

18 that we overlooked.  These are things that we studied

19 carefully, that we did not ignore or have disdain for, but

20 that affected and changed our actions.

21     And in the Slide #3 from Mr. Morris's -- from Mr. Morris's

22 presentation, in his third slide, he quotes from the first

23 page of our motion for leave, the motion that he says exhibits

24 our contemptuous behavior.

25     The second paragraph is kind of tiny print there, Your

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 609 of 1017 PageID 11390
299

74

1  Honor, and it's not highlighted, but I'd like to read it.

2  Seery is not named in the original complaint, but this is only

3  out of an abundance of caution due to the Bankruptcy Court in

4  HCM's pending Chapter 11 proceeding having issued an order

5  prohibiting the filing of any causes of action against Seery

6  in any way related to his role at HCM, subject to certain

7  prerequisites.  In that order, the Bankruptcy Court also

8  asserts sole jurisdiction over all such causes of action.

9       Your Honor, our intent was not to violate the order.  Our

10  intent was to be cautious about how we proceeded, to fully

11  disclose what we were doing, and to do it in a District Court

12  that absolutely could refer the matter here to this Court for

13  a decision, but to do it in a way that didn't waive our

14  jurisdictional arguments, that didn't waive our arguments

15  regarding the release of the very claims we were trying to

16  bring, by first having to prove that they were colorful claims

17  of willful misconduct or gross negligence, when we were trying

18  to assert claims that weren't willful negligence or gross --

19  gross negligence or willful misconduct.  That was what I was

20  trying to say.

21       Your Honor, this was not disregard of your order.  If

22  we're wrong on the law, we're wrong on the law, but it's not

23  that we disregarded your order or lacked respect for it.  We

24  disclosed it.

25       Mr. Morris has argued in the briefs that we attempted to

1   do this on an ex parte basis.  Your Honor, we did not attempt

2   to do this on an ex parte basis.  And if there are errors,

3   they probably are mine.  I know one error is mine.  On the

4   civil cover sheet in the filing in the District Court, I noted

5   and passed on that we should check the box for related case

6   and list this case on there.  I did not follow up to make sure

7   that it happened, and administratively, it didn't happen.  We

8   did not check the box on the civil cover sheet.  Mr. Morris is

9   correct that we failed to do that.  He's incorrect that that

10  was sneaky or intentional.  It was my error, having noticed it

11  but not followed up.

12      Your Honor, similarly, the argument that we didn't serve

13  them with the motion I think is disingenuous.  What happened,

14  Your Honor, is that counsel for the Debtor had agreed to

15  accept service of the complaint itself against the Debtor

16  before the motion for leave, and after accepting service, I

17  was under the impression that they'd be monitoring the docket,

18  especially when I emailed them, informed them that we were

19  filing the motion for leave to amend, because I was required

20  to submit a certificate of conference on that motion.  I

21  informed them in a polite email.  The polite email is not

22  quoted in their brief.  It is included in the record, and it's

23  quoted in full in our brief.

24      The email exchange indicates to them, Thank you for

25  pointing out the Court's orders.  We've carefully studied them

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 77 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 611 of 1017    PageID 11392
290

76

 1   and we don't think what we're doing is a violation of those

 2   orders.

 3       That we didn't serve them is because we thought they

 4   already knew that the motion was coming and would be

 5   monitoring the docket, and we didn't know which lawyers they

 6   were going to have make an appearance in that case, so we

 7   wouldn't have known who to serve.  But if not serving them --

 8   first, the Rules do not require that service.  But if not

 9   serving them out of politeness --

10           THE COURT:  Mr. Morris is standing up.  Did --

11           MR. MORRIS:  I move to strike all of this, Your

12   Honor.  If Counsel wants to take the stand and raise his hand,

13   he should testify under oath.  I'm just going to leave it at

14   that.  He's not on their witness list.

15           THE COURT:  All right.  I overrule.  You can

16   continue.

17           MR. BRIDGES:  Thank you, Your Honor.

18       If failure to serve them was an error, it was mine.  I

19   know of no rule that requires it.

20           THE COURT:  Can I ask you, you were talking about the

21   cover sheet mistake in not checking the box.  What about your

22   jurisdictional statement in the actual complaint not

23   mentioning 28 U.S.C. § 1334 as a possible basis for subject

24   matter jurisdiction?  Do you think that was a mistake as well,

25   or was that purposeful, not necessary?

010529

77

1           MR. BRIDGES:  Candidly, Your Honor, standing here

2    right now, I have no recollection whatsoever of it.

3           THE COURT:  You mention 28 U.S.C. § 1331, and then

4    1367 supplemental jurisdiction, but you don't mention 1334.

5           MR. BRIDGES:  I suspect it's true, but Mr. Sbaiti

6    would have written that.

7           THE COURT:  Okay.

8           MR. BRIDGES:  I have no recollection of --

9           THE COURT:  Okay.

10          MR. BRIDGES:  -- making any decision at all --

11          THE COURT:  All right.

12          MR. BRIDGES:  -- with regards to that.

13          THE COURT:  Okay.

14          MR. BRIDGES:  Your Honor, you've been very patient

15   with a very long opening argument, and I'm very grateful for

16   that.  Please know that we take this Court's order seriously.

17   We voluntarily appeared here before the Court ordered us to do

18   so by filing our motion asking for a modification of the order

19   we're accused now of having been in violation of.

20       And the last thing I'd like to say, Your Honor, Mr.

21   Morris's brief claims that the first he knew of the motion,

22   the motion seeking leave to add Mr. Seery to the District

23   Court claim, the first he knew of that was when Mr. Sbaiti

24   forwarded him the District Court's order dismissing that

25   motion, denying that motion without prejudice.

78

1    Your Honor, in a civil contempt proceeding, where the

2    issue is compensating, not punishing, if the aggrieved party

3    didn't even know about the action until it had been denied by

4    the District Court, we submit that there can be no harm from

5    that having taken place.

6        That's all I have for opening.  Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8        Before we give you a time check, do we have other opening

9    statements?

10           MR. ANDERSON:  Yes.  Yes, Your Honor.  Michael

11   Anderson on behalf of Mr. Patrick.  If we need to take a

12   break, that's fine, too.

13           THE COURT:  Well, how long do you plan to use?

14           MR. ANDERSON:  No more than ten minutes, for sure.

15           THE COURT:  Let's go ahead and do that, and then

16   we'll take a break.

17           MR. POMERANTZ:  Your Honor, after, I would ask the

18   opportunity to respond to Mr. Bridges' argument.  Probably

19   another ten minutes.

20           THE COURT:  All right.  Let's go ahead and take a

21   ten-minute break.  And Mr. Taylor, you're going to have

22   something, because you --

23           MR. TAYLOR:  Five.

24           THE COURT:  Okay.  We'll take a ten-minute break.

25   And Nate, can you give them a time?

Appx 06588
010531

79

```
 1          THE CLERK:  I'm showing it was about 59-1/2 minutes.

 2          THE COURT:  Fifty-nine and a half?  And is that

 3   subtracting some for my questioning?

 4          THE CLERK:  I stopped whenever you talked, maybe a

 5   little over --

 6          THE COURT:   Okay.  So he stopped it whenever I asked

 7   questions and you answered, so 59 minutes has been used by the

 8   Respondents.

 9      All right.  We'll take a ten-minute break.  We'll come

10   back at 11:35.

11          THE CLERK:  All rise.

12      (A recess ensued from 11:25 a.m. to 11:37 a.m.)

13          THE COURT:  All right.  We're going back on the

14   record in the Highland matter.  We have further opening

15   statements.  Counsel, you may proceed.

16      OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

17          MR. ANDERSON:  Thank you.  May it please the Court,

18   Counsel.  Michael Anderson on behalf of Respondent, Mark

19   Patrick.

20      Your Honor, after listening to this and looking at the

21   filings in this case, this issue of whether there's contempt

22   -- and I would argue there's not -- is ripe for decision.  We

23   have no real undisputed facts for purposes of the contempt

24   issue.  We have your Court's July order, the subject of Mr.

25   Bridge's arguments.  We have the Plaintiffs in the underlying
```

Appx 06589

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 615 of 1017 PageID 11396

80

 1  lawsuit at issue.  They commenced the lawsuit in April of this
 2  year.  There's absolutely nothing improper about that filing.
 3  It's not subject to the contempt.  A week later, there is a
 4  motion for leave to add Mr. Seery.  That's the issue.  There's
 5  no dispute over that.  There's no dispute that Mr. Patrick
 6  authorized the filing of the motion for leave.
 7       And so then the question becomes we look at the Court's
 8  July order, did a motion for leave, did that violate the terms
 9  of the order?  The motion for leave is not commencing a
10  lawsuit.  It's also not pursuing a claim, because whether or
11  not the Court grants the motion, denies the motion, or
12  whatever the Court does, nothing happened, because the day
13  after the motion for leave was filed it was dismissed *sua*
14  *sponte* without prejudice because not all parties had been
15  served in the case.
16       It was permission asked one day.  The matter was mooted
17  the following day by the District Court.  And so that is
18  completely undisputed.
19       And so the question is, is asking permission, is that
20  commence?  I think everybody says there's no way that's
21  commencing a lawsuit because you have asked permission.  The
22  question, then, is it pursuing a claim?  And the argument,
23  well, no, that's not pursuing a claim; it's asking permission.
24       And I think it's also important to note that when the
25  motion for leave was filed, there were no secrets there.  I

81

 1  mean, I'm coming in this after the fact, representing Mr.

 2  Patrick.  You look at a motion for leave, and right there on

 3  Page 1 it talks about Your Honor's order.  Page 2, it quotes

 4  the order and it gives the reasons, there's arguments being

 5  made as to why that order doesn't bar adding Mr. Seery as a

 6  defendant in the lawsuit, many of the arguments that Mr.

 7  Bridges made.

 8      So that's where we are.  And so when I hear, hey, we've

 9  got six hours, three hours and three hours, and we're going to

10  split this up, you know, maybe too simplistic from Fort Worth,

11  but I'm like, wait a second, this is all undisputed.  It's

12  totally undisputed.  The -- whether or not the prior order is

13  enforceable or not enforceable, those are all legal arguments.

14  You know, no witnesses are necessary for that.  And as I

15  understood, right before we broke, counsel stood up and he's

16  going to do what generally doesn't happen in opening

17  statements, which is respond to opening statements, which

18  shows that that's a legal issue.

19      And so it really does come down to undisputed facts.

20  There's no testimony.  No -- nothing is necessary.  And a lot

21  of what this comes down to is the old statement, you know, is

22  it better to ask forgiveness or permission?  And usually that

23  statement comes up when somebody has already done something:

24  Hey, I'm going to go do it anyway and I'll ask for forgiveness

25  later.  Well, what the Plaintiffs in the underlying case did

82

```
 1    was ask permission.  Motion for leave.  That is not

 2    contemptuous.  And there's literally no damages.  As was

 3    pointed out, by the time counsel found out, it had already

 4    been dismissed.

 5        The last thing I want to point out, Your Honor, is that

 6    the argument from opposing counsel was, well, under Rule 15 of

 7    the Federal Rules of Civil Procedure, since parties hadn't

 8    answered yet, the Plaintiffs in the underlying case could have

 9    just simply added Mr. Seery as a defendant and moved on that

10    way, but then that would be another ball of wax and then we

11    would be addressing issues as far as whether or not there is a

12    violation of the Court's order, notwithstanding Mr. Bridge's

13    arguments.  But then we would have those issues.  But that's

14    not what happened.  Everybody knows that's not what happened.

15    It was a motion for leave that was resolved the following day.

16        And so, Your Honor, for those reasons, and those

17    undisputed reasons, we would request that the Court at the end

18    of this hearing deny the request for sanctions and a contempt

19    finding against our client, Mr. Patrick.

20        Mr. Phillips is going to address one brief issue

21    bankruptcy-wise I believe that was raised earlier.

22            THE COURT:  Okay.  Mr. Phillips?

23            MR. PHILLIPS:  Your Honor, thank you very much.

24    Louis M. Phillips on behalf of Mark Patrick.

25        The only thing that I would point out, Your Honor, and I'm
```

83

1   going to do -- try to simplistically, because that's about the

2   level at which I operate, boil down the questions about the

3   order.

4       This order was an employment order.  The problem that Mr.

5   Bridges has elucidated to Your Honor is that the precise

6   effect, one of the precise effects of that order is to bar the

7   claims of third parties that arise into the future on the

8   basis of the employment of Mr. Seery, because the order

9   required that all claims asserting gross negligence or willful

10  misconduct need to be brought before you to determine that

11  they're colorable.

12      One question I have is, does it apply to the lawsuit that

13  was filed?  Doesn't apply unless the effect of the order was

14  to release those claims and preclude any party from bringing

15  those claims at all.  And while you can say correctly that

16  this Court issues gatekeeper orders all of the time, one thing

17  I cannot imagine that you would say is that in employment

18  orders you release claims of third parties existing and as may

19  arise in the future that could be brought against the party

20  employed to be a CRO of a debtor, who, by his own testimony,

21  says we do all kinds of stuff in the billions of dollars for

22  third parties that we owe fiduciary duties to.

23      There's no way, Your Honor, that you were considering your

24  July order to bar third-party claims arising from breach of

25  fiduciary duties by Mr. Seery to third parties who held third-

84

1   party claims that did not involve some assertion that, in his

2   capacity as CRO, he was in some way acting within the scope of

3   his authority as CRO for the Debtor and yet committed

4   negligence against the Debtor.

5       Now, if the order was asserting that you know what a lot

6   of people in this courtroom know, that the standard of

7   liability for a CRO doing work for a debtor, just like the

8   standard of liability for the president of a corporation or an

9   officer of the corporation, is as long as you're within the

10  course and scope of your employment, your actions for the

11  corporation have -- can -- the corporation takes care of you

12  because there's no personal claim unless you're outside the

13  scope, and you're outside the scope if you commit gross

14  negligence or willful misconduct.

15      That, if you're restating the standard of care and

16  standard of liability for a CRO, we have no problem with that,

17  because Mr. Patrick did not authorize a cause of action

18  arising against Mr. Seery against the Debtors for damage to

19  the Debtors.  He authorized the filing of a complaint in the

20  District Court with jurisdiction for a third-party claim for

21  breach of a fiduciary duty to a third party that Mr. Seery

22  admits he owes, and then sought leave because they didn't

23  understand the order that Your Honor issued.  It couldn't have

24  been to release the breach of fiduciary duty claims that

25  wouldn't rise to gross negligence or willful misconduct, it

Appx. 00594

010537

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 86 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 620 of 1017    PageID 11401

85

1  couldn't be that, but it might be.  But if it did, under an

2  employment order?  That's very different from *Espinosa*, that's

3  very different from *Shoaf*, when you're at the end of a case in

4  a confirmation of a plan and you're talking about matters

5  arising in the past.

6      This order, if it has the effect it could be read to have,

7  precludes any third party from asserting a breach of fiduciary

8  duty against Seery for actions that violate the duty to that

9  third party, when Seery's biggest job, it looks to us like, is

10 running third-party money.  That could not have been what Your

11 Honor was thinking.

12     And so all I'm pointing out is I'm trying to distill down.

13 The lawsuit doesn't involve gross negligence or willful

14 misconduct allegations.  It involves breach of fiduciary duty,

15 breach of the Advisers Act, et cetera, et cetera.  Mr. Patrick

16 authorized that lawsuit.

17     Now, what we're here for today is to determine whether the

18 complaint, which was not against the Debtor -- which was not

19 against Seery, the motion for leave, which did not -- all they

20 did was ask for permission, not forgiveness.  And we can't

21 understand how the Debtor should be saying, all they had to do

22 was amend.  Well, if they amended, would we be in hotter water

23 than we are today for asking for permission to sue?  I think

24 we would have been, that should have been the prescribed

25 course, when we are more concerned and we are more risk-averse

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 621 of 1017 PageID 11402

86

1    by asking for leave rather than just amending by right.

2    Absolutely, that makes no sense. We can't be held to be more

3    contemptuous because we asked for permission, when we could

4    have just sued him, because they're saying asking for

5    permission was wrong. Certainly, suing him would have been

6    wrong. That would have been easier.

7            THE COURT: But Mr. Phillips, the issue is you all

8    didn't come to the Bankruptcy Court and ask permission.

9            MR. PHILLIPS: Look at your order, Your Honor.

10           THE COURT: It's right in front of me.

11           MR. PHILLIPS: Right. That order either doesn't

12   apply to the claims that were brought or it released the

13   claims that were brought. That's our point. It couldn't have

14   released them. Does it apply to them? Thank you.

15           THE COURT: Okay. Mr. Taylor?

16           MR. TAYLOR: Good morning.

17           THE COURT: Good morning.

18           OPENING STATEMENT ON BEHALF OF JAMES DONDERO

19           MR. TAYLOR: Your Honor, Clay Taylor on behalf of Jim

20   Dondero. I'll be very brief because I know we've already

21   spent a lot of time on opening argument. But I do think it is

22   appropriate to, one, first look at who brought the lawsuit,

23   CLO Holdco & DAF. That was authorized -- it's undisputed it

24   was authorized by Mr. Patrick. There is no dispute about

25   that. There's no dispute who the Plaintiffs are. But yet my

87

1  client is up here as an alleged violator.

2     I think it's very clear, as all the parties have said,

3  there's no dispute as to there's an order, there was a

4  complaint, and there was a motion for leave.

5     It seems to me that the rest of the evidentiary hearing

6  that you may be about to go through is going to be about pin

7  the blame on Mr. Dondero. It is undisputed that he is not a

8  control person for the DAF or CLO Holdco. The only type of

9  evidence you will hear is going to be insinuation that he

10  somehow controls Mr. Patrick and used to control Mr. Scott.

11  There will be no direct evidence that he authorized this or

12  that he's the control person and the proper corporate

13  authorized representative that signed off on the --

14     It seems to me, Your Honor, first of all, that's a

15  discrete issue that should be able to be decided separately

16  from this, and the first gating issue is, was there indeed a

17  violation of this Court's order? It would seem to me that

18  there is no disputes about those facts and that we should

19  bifurcate that, and if you then find that there is a violation

20  and find that there is any even need to move into who the

21  alleged violators are, that then we could have that

22  evidentiary portion. But there is no reason to do that now

23  before there's even been found to be a violation.

24          THE COURT: All right. Thank you.

25     All right. Well, someone made the point rebuttals in

Appx 06687
010540

88

```
 1   opening statements are not very common, --

 2          MR. POMERANTZ:  Your -- Your --

 3          THE COURT:  -- but you can use your three hours

 4   however you want.

 5             OPENING STATEMENT ON BEHALF OF THE DEBTOR

 6          MR. POMERANTZ:  Your Honor, I didn't intend to stand

 7   up.

 8          THE COURT:  Okay.

 9          MR. POMERANTZ:  I also didn't intend to have the

10   motion to modify the sealing order presented to Your Honor,

11   which it was in the course of that opening argument.  And

12   despite your comments at the beginning of the hearing, the

13   Movants have taken Your Honor down a series of rabbit holes

14   that have really no relevance to the contempt motion.  And

15   notwithstanding, as I said, your ruling that basically the

16   contempt would go first and the modification would go second,

17   there they were, persistent in making all the arguments why

18   this Court should modify the order.

19      They're just really trying to obfuscate the simple issue

20   that Mr. Morris presented and raised at the beginning of the

21   hearing:  Did they violate the order by pursuing a claim?  We

22   think the answer is undoubtedly yes.

23      I'm not going to try to address each of the issues they

24   raised in connection with the modification motion in detail.

25   I have a lengthy presentation.  I'll do it at the appropriate
```

Appx. 06598

010541

89

 1    time.  But there are a few issues I want to address.  I want

 2    to address one of the last points Mr. Bridges raised first.

 3    If they thought that the order was a problem, they could have

 4    filed their motion to modify that order before Your Honor.

 5    They could have had that heard first.  There was no statute of

 6    limitations issue in connection with the HarbourVest matter.

 7    They could have come to Your Honor to do that.  But no, they

 8    didn't.  They went to the District Court first, and it was

 9    only after we filed our contempt motion that they came back

10    and said, well, Your Honor, you should modify the order.

11    Their argument that if they did that there would have been

12    waiver and estoppel is just an after-the-fact justification

13    for what they did and what they tried to do, which was

14    unsuccessful.  They tried to have the District Court make the

15    decision.

16        And why?  Your Honor, they've filed motions to recuse

17    before Your Honor.  They -- they -- it's no secret the disdain

18    they have for Your Honor's rulings as it relates to them.

19    They wanted to be out of this courtroom and in another

20    courtroom.

21        And their belated argument, Mr. Bridges falling on the

22    sword, that they failed to check the box, inadvertent, it's on

23    me, it's very curious.  Because if they had done so and had

24    referred to the correct 1334 jurisdictional predicate, as Your

25    Honor had mentioned, the complaint would have been referred to

90

1    this Court and the entire trajectory of the proceedings would

2    have been different.  They would have had the opportunity to

3    take their shot to go to District Court and argue that your

4    order didn't apply.

5        Your Honor, they say the January 9th order is not

6    relevant.  It is entirely relevant.  It covered the

7    independent directors and their agents.  Yes, Mr. Seery is an

8    independent director, but he was also an agent of the

9    independent directors and carried out the duties.  You heard

10   argument at the July 16th hearing that Mr. Seery had been

11   acting as the chief executive officer for several months.  And

12   why is it important?  Mr. Bridges said, well, if we violated

13   one order, we violated the other.  It's important because,

14   Your Honor, number one, Mr. Dondero supported that order.  We

15   would never have had an independent board in this case if Mr.

16   Dondero, the decision-making -- of the Debtor at that time,

17   supported that order and supported the exculpations that are

18   now claimed to have been invalid.

19       And also Your Honor heard testimony at the confirmation

20   hearing that the independent directors would never have taken

21   this job, would never have taken this job because of the

22   potential for litigation, litigation that we've now had to

23   endure for several months.  So to come back 16 months later

24   and say, well, you know, you couldn't really exculpate them,

25   it's really an employment order:  It was an employment order.

1   They know it.  We know it.  Your Honor knows it.  It was a

2   resolution of corporate governance issues that changed the

3   whole trajectory of the case, and luckily it -- luckily, Your

4   Honor approved it.

5       The question just is whether they violated the order,

6   period.  And I'll have a lot to say about res judicata, but I

7   won't go in too much in detail, but I will just briefly

8   address their arguments.  They're correct and the Court is

9   correct that there's a difference between *Applewood* and *Shoaf*.

10  And Your Honor got the exact difference.  In one case, a

11  release was not specific, *Applewood*.  In one case it was.

12  *Shoaf* hasn't been discredited by *Applewood*.  It was different

13  facts.  In fact, *Shoaf* relied on two Supreme Court cases, the

14  *Stoll* case and the *Chicot* case, both for the propositions that

15  a court that enters an order, a clear order, even if it didn't

16  have jurisdiction, that cannot be attacked in res judicata.

17  So here what we have is clear, unambiguous, you come to this

18  Court before commencing or pursuing a claim.  That's the

19  clarity.  The focus on the releases, that's not what we're

20  here for today, that's not what we're here for on a contempt

21  motion, on whether the release covered them or it didn't cover

22  them.  We're here on the clear issue of did they violate the

23  language, and we submit that they did.

24      And similarly, *Espinosa* applies.  Your Honor, just to

25  quote some language, "Appellees could have moved to remand the

92

1    action to state court after it improperly -- after its

2    improper removal to the federal court or challenge the

3    district court's exercise in jurisdiction on direct appeal.

4    Because they did neither, they are now barred by principles of

5    res judicata."

6        Res judicata actually does apply, and I will speak about

7    it in much more detail in the modification motion.

8        With respect to *Barton*, Your Honor, we disagree with their

9    argument that Mr. Seery is not a court-appointed agent.  We've

10   briefed it extensively in our motion to modify.  *Barton*

11   applies to debtors in possession.  *Barton* applies to general

12   partners of the debtor.  *Barton* applies to chief restructuring

13   orders -- officers who are approved by the debtor.  And it

14   applies to general counsel who are appointed by the chief

15   restructuring order.  Officer.

16       So the argument that *Barton* is somehow inapplicable is

17   just wrong.  Your Honor knows that.  Your Honor has written

18   extensively on *Barton* in connection with your *Ondova* opinion.

19       Some of the argument about 959 is all wrong, as well.

20   Your Honor got it right that 959 applies to slip-and-fall

21   cases or torts, injuries to parties that are strangers to this

22   process.  There is a legion of cases that I will cite to Your

23   Honor in connection with argument.  959 does not apply here.

24   There's nothing more core to this case than the transactions

25   surrounding the resolution of the HarbourVest claims.

93

1    We also disagree, Your Honor, that the complaint is

2  subject to mandatory withdrawal of the reference.  We've --

3  one of our exhibits in the motion to modify is our motion to

4  enforce the reference.  We think Movants have it completely

5  wrong.  This is not the type of case that will be subject to

6  withdrawal -- mandatory withdrawal of the reference, and in

7  any event, for this contempt motion, it's irrelevant.

8    And they argue -- one of the other points Mr. Bridges

9  raises is that, because this Court would not have had

10  jurisdiction under 157 because of the mandatory withdrawal,

11  then Your Honor could not legally act as a gatekeeper.  But

12  they haven't addressed *Villegas v. Schmidt*.  We've raised it

13  throughout this case.  And again, in these series of

14  pleadings, they don't even address it.  And *Villegas v.*

15  *Schmidt* was a *Barton* case.  It was a *Barton* case where the --

16  where the argument was that *Barton* does not apply because it's

17  a *Stern* claim and the Bankruptcy Court would not have

18  jurisdiction.  And *Villegas* said no, it does apply.  And Your

19  Honor even cited that in your *Ondova* case.  And why does it

20  apply?  Because there's nothing inconsistent with a Bankruptcy

21  Court having exclusive decision to make a *Barton*

22  determination.

23    In fact, in that case *Villegas* said, you can't go to the

24  District Court for that decision, it is the Bankruptcy Court's

25  decision.

Appx 06693
010546

94

1      So, again, it's a red herring, Your Honor.  Your Honor had

2   the ability to act as an exclusive gatekeeper for these types

3   of actions.

4      With that, Your Honor, I'll leave the rest of my argument

5   for the next motion.

6          THE COURT:  All right.  Thanks.

7      All right.  Nate, let's give everyone their time.

8          THE CLERK:  That was just about eight and a half

9   additional from the Debtor, and then altogether the other ones

10  were just shy of fourteen minutes.  Thirteen minutes and fifty

11  seconds for the other three combined.  Do you want me to --

12         THE COURT:  Yes, I meant for Debtor combined versus

13  --

14         THE CLERK:  Oh.  Oh.

15         THE COURT:  Respondents combined.

16         THE CLERK:  So that would be twenty one and a half

17  the Debtor.  Let me do the math on the other one.  Be an hour

18  twelve minutes and fifty seconds for --

19         THE COURT:  Okay.  All right.  Got that?  Debtors

20  used a total of twenty one and a half minutes; Responders have

21  used an hour twelve minutes and fifty seconds.

22     All right.  Mr. Morris, you may call your first witness.

23         MR. MORRIS:  Thank you very much, Your Honor.  The

24  Debtor calls Mark Patrick.

25         THE COURT:  All right.  Mr. Patrick?  Please approach

Patrick - Direct                    95

1   our witness stand and I'll swear you in.  Please raise your

2   right hand.

3        (The witness is sworn.)

4            THE COURT:  All right.  Please take a seat.

5            MARK PATRICK, DEBTOR'S WITNESS, SWORN

6                    DIRECT EXAMINATION

7   BY MR. MORRIS:

8   Q    Good afternoon, Mr. Patrick.

9   A    Good afternoon.

10  Q    Can you hear me okay?

11  A    Yes, I can.

12  Q    Okay.  You have before you several sets of binders.

13  They're rather large.  But when I deposed you on Friday, we

14  did that virtually.  Now, I may direct you specifically to one

15  of the binders or one of the documents from time to time, so I

16  just wanted you to know that those were in front of you and

17  that I may be doing that.

18       Mr. Patrick, since March 1st, 2001 [sic], you've been

19  employed by Highland Consultants, right?

20  A    I believe the name is Highgate Consultants doing business

21  as Skyview Group.

22  Q    Okay.  And that's an entity that was created by certain

23  former Highland employees, correct?

24  A    That is my understanding, correct.

25  Q    And your understanding is that Mr. Dondero doesn't have an

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 97 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 631 of 1017    PageID 11412
299

Patrick - Direct                          96

1   ownership interest in that entity, correct?

2   A    That he does not.  That is correct.

3   Q    And your understanding is that he's not an employee of

4   that -- of Skyview, correct?

5   A    That is correct.

6   Q    Prior to joining Skyview on March 1st, you had worked at

7   Highland Capital Management, LP for about 13 years, correct?

8   A    Correct.

9   Q    Joining in, I believe, early 2008?

10  A    Correct.

11  Q    Okay.  I'm going to refer to Highland Capital Management,

12  LP from time to time as HCMLP.  Is that okay?

13  A    Yes.

14  Q    While at HCMLP, you served as a tax counselor, correct?

15  A    No, I would like to distinguish that.  I did have the

16  title tax counsel.  However, essentially all my activities

17  were in a non-lawyer capacity, being the client

18  representative.  I would engage other outside law firms to

19  provide legal advice.

20  Q    Okay.  So you are an attorney, correct?

21  A    Yes, I am.

22  Q    But essentially everything you did at Highland during your

23  13 years was in a non-lawyer capacity, correct?

24  A    Correct.

25  Q    In fact, you didn't even work in the legal department; is

Patrick - Direct                    97

1  that right?

2  A    That is correct.  I worked for the tax department.

3  Q    Okay.  Let's talk about how you became the authorized

4  representative of the Plaintiffs.  You are, in fact,

5  authorized representative today of CLO Holdco, Ltd. and

6  Charitable DAF, LP, correct?

7  A    Charitable DAF Fund, LP.  Correct.

8  Q    And those are the two entities that filed the complaint in

9  the United States District Court against the Debtor and two

10 other entities, correct?

11 A    Correct.

12 Q    And may I refer to those two entities going forward as the

13 Plaintiffs?

14 A    Yes.

15 Q    You became the authorized representative of the Plaintiffs

16 on March 24th, 2021, the day you and Mr. Scott executed

17 certain transfer documents, correct?

18 A    Correct.

19 Q    And you had no authority to act on behalf of either of the

20 Plaintiffs before March 24th, correct?

21 A    Correct.

22 Q    The DAF controls about $200 million in assets, correct?

23 A    The Plaintiffs, you mean?  CLO Holdco and Charitable DAF

24 Fund, LP.

25 Q    Yes.

Patrick - Direct                               98

1  A    Around there.

2  Q    Okay.  Let me try and just ask that again, and thank you

3  for correcting me.  To the best of your knowledge, the

4  Plaintiffs control about $200 million in assets, correct?

5  A    Net assets, correct.

6  Q    Okay.  And that asset base is derived largely from HCMLP,

7  Mr. Dondero, or Mr. Dondero's trusts, correct?

8  A    Can you restate that question again, Mr. Morris?

9  Q    Sure.  The asset base that you just referred to is derived

10 largely from HCMLP, Mr. Dondero, or donor trusts?

11 A    The way I would characterize it -- you're using the word

12 derived.  I would characterize it with respect to certain

13 charitable donations --

14 Q    Uh-huh.

15 A    -- that were -- that were made at certain time periods,

16 where the donors gave up complete dominion and control over

17 the respective assets and at that time claimed a federal

18 income tax deduction for that.

19     I do -- I do believe that, as far as the donor group, as

20 you specified, Highland Capital Management, I recall, provided

21 a donation to a Charitable Remainder Trust that eventually had

22 expired and that eventually such assets went into the

23 supporting organizations.  And then I do believe Mr. Dondero

24 also contributed to the Charitable Remainder Trust No. 2,

25 which seeded substantial amounts of the original assets that

Patrick - Direct                          99

1    were eventually composed of the $200 million.  And then from

2    time to time I do believe that Mr. Dondero's trusts made

3    charitable donations to their respective supporting

4    organizations.

5    Q    Okay.  Thank you.

6    A    Is that responsive?

7    Q    It is.  It's very responsive.  Thank you very much.  So,

8    to the best of your knowledge, the charitable donations that

9    were made that form the bases of the assets came from those

10   three -- primarily from those three sources, correct?

11   A    Well, you know, there's two different trusts.  There's the

12   Dugaboy Trust and the Get Good Trust.

13   Q    Okay.

14   A    Then you have Mr. Dondero and Highland Capital Management.

15   So I would say four sources.

16   Q    Okay.  All right.  Thank you.  Prior to assuming your role

17   as the authorized representative of the Plaintiff, you had

18   never had meaningful responsibility for making investment

19   decisions, correct?

20   A    I'm sorry.  You kind of talk a little bit fast.  Please

21   slow it down --

22   Q    That's okay.

23   A    -- and restate it.  Thank you.

24   Q    And I appreciate that.  And any time you don't understand

25   what I'm saying or I speak too fast, please do exactly what

Patrick - Direct                    100

1    you're doing.  You're doing fine.

2       Prior to assuming your role as the authorized

3    representative of the Plaintiffs, you never had any meaningful

4    responsibility making investment decisions.  Is that correct?

5    A    To whom?

6    Q    For anybody.

7    A    Well, during my deposition, I believe I testified that I

8    make investment decisions with respect to my family.  Family

9    and friends come to me and they ask me for investment

10   decisions.  I was -- in my deposition, I indicated to you that

11   I was a board member of a nonprofit called the 500, Inc.  They

12   had received a donation of stock in Yahoo!, and the members

13   there looked to me for financial guidance.  As an undergrad at

14   the University of Miami, I was a -- I was a finance major, and

15   so I do have a variety of background with respect to

16   investments.

17   Q    Okay.  So you told me that from time to time friends and

18   family members come to you for investing advice.  Is that

19   right?

20   A    That is correct.

21   Q    And when you were a young lawyer you were on the board of

22   a nonprofit that received a donation of Yahoo! stock and the

23   board looked to you for guidance.  Is that correct?

24           THE COURT:  Just a moment.  I think there's an

25   objection.

Patrick - Direct                              101

1              MR. MORRIS:  Uh-huh.

2              THE COURT:  Go ahead.

3              MR. ANDERSON:  So far -- relevance, Your Honor.  This

4    is way out of the bounds of the contempt proceeding.  You

5    know, what he did as a young person with Yahoo! stock.  We're

6    here to -- he authorized the lawsuit.  They filed the lawsuit.

7    That's it.  Getting into all this peripheral stuff is

8    completely irrelevant.

9              THE COURT:  Your response?

10             MR. MORRIS:  My response, Your Honor, is very simple.

11   Mr. Patrick assumed responsibility, and you're going to be

12   told that he exercised full and complete authority over a $200

13   million fund that was created by Mr. Dondero, --

14             THE COURT:  Okay.

15             MR. MORRIS:  -- that funds -- that is funded

16   virtually by Mr. Dondero, and for which -- Mr. Patrick is a

17   lovely man, and I don't mean to disparage him at all -- but he

18   has no meaningful experience in investing at all.

19             THE COURT:  All right.  Counsel, I overrule.  I think

20   there's potential relevance.

21        And may I remind people that when you're back at counsel

22   table, please make sure you speak your objections into the

23   microphone.  Thank you.

24   BY MR. MORRIS:

25   Q    When you were a young lawyer, sir, you were on the board

Patrick - Direct                                102

1  of a nonprofit that received a donation of Yahoo! stock and

2  the board looked to you for guidance, correct?

3  A    Yes, correct.

4  Q    And -- but during your 13 years at Highland, you never had

5  formal responsibility for making investment decisions,

6  correct?

7  A    That is correct.

8  Q    Yeah.  In fact, other than investment opportunities that

9  you personally presented where you served as a co-decider, you

10  never had any responsibility or authority to make investment

11  decisions on behalf of HCMLP or any of its affiliated

12  entities, correct?

13  A    That is correct.

14  Q    And at least during your deposition, you couldn't identify

15  a single opportunity where you actually had the authority and

16  did authorize the execution of a transaction on behalf of

17  HCMLP or any of its affiliates, correct?

18  A    Correct.

19  Q    And yet today you are now solely responsible for making

20  all investment decisions with respect to a $200 million

21  charitable fund, correct?

22  A    Yes, but I get some help.  I've engaged an outside third

23  party called ValueScope, and they have been as -- effectively

24  working as a "gatekeeper" for me, and I look to them for

25  investment guidance and advice, and I informally look to Mr.

Patrick - Direct                                    103

1    Dondero since the time period of when I took control on March

2    24th for any questions I may have with respect to the

3    portfolio.  So I don't feel like I'm all by myself in making

4    decisions.

5    Q    Okay.  I didn't mean to suggest that you were, sir, and I

6    apologize if you took it that way.  I was just asking the

7    question, you are the person now solely responsible for making

8    the investment decisions, correct?

9    A    Yes.

10   Q    Okay.  Let's talk about the circumstances that led to the

11   filing of the complaint for a bit.  On April 12, 2021, you

12   caused the Plaintiffs to commence an action against HCMLP and

13   two other entities, correct?

14   A    Correct.

15   Q    Okay.  One of the binders -- you've got a couple of

16   binders in front of you.  If you look at the bottom, one of

17   them says Volume 1 of 2, Exhibits 1 through 18.  And if you

18   could grab that one and turn to Exhibit 12.  Do you have that,

19   sir?

20   A    It says -- it says the original complaint.  Is that the

21   right one?

22   Q    That is the right one.  And just as I said when we were

23   doing this virtually last Friday, if I ask you a question

24   about a particular document, you should always feel free to

25   review as much of the document as you think you need to

Patrick - Direct                                    104

1   competently and fully answer the question.  Okay?

2   A    Okay.  Thank you.

3   Q    All right.  You instructed the Sbaiti firm to file that

4   complaint on behalf of the Plaintiffs, correct?

5   A    Correct.

6   Q    And to the best of your recollection, the Plaintiffs

7   returned -- retained the Sbaiti firm in April, correct?

8   A    Correct.

9   Q    So the Sbaiti firm was retained no more than twelve days

10  before the complaint was filed, correct?

11  A    Correct.

12  Q    You personally retained the Sbaiti firm, correct?

13  A    Correct.

14  Q    And the idea of filing this complaint originated with the

15  Sbaiti firm, correct?

16  A    Correct.

17  Q    Before filing -- withdrawn.  Before becoming the

18  Plaintiffs' authorized representative, you hadn't had any

19  communications with anyone about potential claims that might

20  be brought against the Debtor arising out of the HarbourVest

21  settlement, correct?

22  A    That is correct.

23  Q    Now, after you became the Plaintiffs' authorized

24  representative, Mr. Dondero communicated with the Sbaiti firm

25  about the complaint that's marked as Exhibit 12, correct?

Patrick - Direct                         105

1    A    Yes.  After he brought certain information to myself and

2    then that I engaged the Sbaiti firm to launch an

3    investigation, I also wanted Mr. Dondero to work with the

4    Sbaiti firm with respect to their investigation of the

5    underlying facts.

6    Q    Okay.  Mr. Dondero did not discuss the complaint with you,

7    but he did communicate with the Sbaiti firm about the

8    complaint, correct?

9    A    I believe -- yeah.  I heard you slip in at the end "the

10   complaint."  I know he communicated with the Sbaiti firm.  I

11   can't -- I can't say what he said or didn't say with respect

12   to the -- the actual complaint.

13   Q    Okay.  But Mr. Dondero got involved in the process

14   initially when he brought some information to your attention

15   concerning the HarbourVest transaction, correct?

16   A    Correct.

17   Q    And he came to you with the HarbourVest information after

18   you assumed your role as the authorized representative of the

19   Plaintiffs on March 24th, correct?

20   A    That is correct.

21   Q    At the time he came to you, you did not have any specific

22   knowledge about the HarbourVest transaction, correct?

23   A    I did not have specific knowledge with respect to the

24   allegations that were laid out and the facts with respect to

25   the original complaint.  I think I had just had a general

Patrick - Direct                    106

1  awareness that there was a HarbourVest something or other, but

2  the specific aspects of it, I was unaware.

3  Q    Okay.  And you had no reason to believe that Mr. Seery had

4  done anything wrong with respect to the HarbourVest

5  transaction at the time you became the Plaintiffs' authorized

6  representative, correct?

7  A    That is correct.

8  Q    But you recall very specifically that some time after

9  March 24th Mr. Dondero told you that an investment opportunity

10  was essentially usurped or taken away, to the Plaintiffs' harm

11  and for the benefit of HCMLP, correct?

12  A    That is correct.

13  Q    And after Mr. Dondero brought this information to your

14  attention, you hired the Sbaiti firm to launch an

15  investigation into the facts, correct?

16  A    Correct.

17  Q    You had never worked with the Sbaiti firm before, correct?

18  A    That is correct.

19  Q    And you had hired many firms as a tax counselor at HCMLP,

20  but not the Sbaiti firm until now.  Correct?

21  A    That is correct.

22  Q    You got to the Sbaiti firm through a recommendation from

23  D.C. Sauter, correct?

24  A    Correct.

25  Q    Mr. Sauter is the in-house counsel, the in-house general

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 108
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 642 of 1017 PageID 11423

Patrick - Direct                                    107

 1  counsel at NexPoint Advisors, correct?

 2  A    Correct.

 3  Q    You didn't ask Mr. Sauter for a recommendation for a

 4  lawyer; he just volunteered that you should use the Sbaiti

 5  firm.  Correct?

 6  A    That is correct.

 7  Q    And you never used -- considered using another firm, did

 8  you?

 9  A    When they were presented to me, they appeared to have all

10  the sufficient skills necessary to undertake this action, and

11  so I don't recall interviewing any other firms.

12  Q    Okay.  Now, after bringing the matter to your action, Mr.

13  Dondero communicated directly with the Sbaiti firm in relation

14  to the investigation that was being undertaken.  Correct?

15  A    That is correct.

16  Q    But you weren't privy to the communications between Mr.

17  Dondero and the Sbaiti firm, correct?

18  A    I did not participate in those conversations as the --

19  what I, again, considered Mr. Dondero as the investment

20  advisor to the portfolio, and he was very versant in the

21  assets.  I wanted him to participate in the investigation that

22  the Sbaiti firm was undertaking prior to the filing of this

23  complaint.

24  Q    Let's talk for a minute about the notion of Mr. Dondero

25  being the investment advisor.  Until recently, the entity

Patrick - Direct                                  108

1   known as the DAF had an investment advisory committee with HC

2   -- an investment advisory agreement with HCMLP.  Correct?

3   A   It's my understanding that the investment advisory

4   agreement existed with the Plaintiffs, CLO Holdco, as well as

5   Charitable DAF Fund, LP, up and to the end of February,

6   throughout the HarbourVest transaction.

7   Q   Okay.  And since February, the Plaintiffs do not have an

8   investment advisory agreement with anybody, correct?

9   A   That is correct.

10  Q   Okay.  So Mr. Dondero, if he serves as an investment

11  advisor, it's on an informal basis.  Is that fair?

12  A   After I took control, he serves as an informal investment

13  advisor.

14  Q   Okay.  So there's no contract that you're aware of between

15  either of the Plaintiffs and Mr. Dondero pursuant to which he

16  is authorized to act as the investment advisor for the

17  Plaintiffs, correct?

18  A   That is correct.

19  Q   Okay.  When you communicated with Grant Scott --

20  withdrawn.  You know who Grant Scott is, right?

21  A   Yes, I do.

22  Q   He's the gentleman who preceded you as the authorized

23  representative of the Plaintiffs, correct?

24  A   Yes.

25  Q   Okay.  You communicated with Mr. Scott from time to time

Patrick - Direct                                    109

1   during February and March 2021, correct?

2   A    February and March are the dates?  Yes.

3   Q    Yeah.  And from February 1st until March 21st -- well,

4   withdrawn.  Prior to March 24th, 2021, Mr. Scott was the

5   Plaintiffs' authorized representative, correct?

6   A    Correct.

7   Q    And you have no recollection of discussing with Mr. Scott

8   at any time prior to March 24th any aspect of the HarbourVest

9   settlement with Mr. Scott.  Correct?

10  A    Correct.

11  Q    And you have no recollection of discussing whether the

12  Plaintiffs had potential claims that might be brought against

13  the Debtor.  Correct?  Withdrawn.  Let me ask a better

14  question.

15       You have no recollection of discussing with Mr. Scott at

16  any time prior to March 24th whether the Plaintiffs had

17  potential claims against the Debtor.  Correct?

18  A    That is correct.

19  Q    You and Mr. Scott never discussed whether either of --

20  either of the Plaintiffs had potential claims against Mr.

21  Seery.  Correct?

22  A    Correct.

23  Q    Okay.  At the time that you became their authorized

24  representative, you had no knowledge that the Plaintiffs would

25  be filing a complaint against the Debtors relating to the

Patrick - Direct                                    110

1   HarbourVest settlement less than three weeks later, correct?

2   A    That is correct.

3   Q    Okay.  Now, if you look at Page 2 of the complaint, you'll

4   see at the top it refers to Mr. Seery as a potential party.

5   Do you see that?

6   A    Yes, I do.

7   Q    Okay.  You don't know why Mr. Seery was named --

8   withdrawn.  You don't know why Mr. Seery was not named as a

9   defendant in the complaint, correct?

10  A    No, I -- that's correct.  I do not know why he was not

11  named.  That's in the purview of the Sbaiti firm.

12  Q    Okay.  And the Sbaiti firm also made the decision to name

13  Mr. Seery on Page 2 there as a potential party when drafting

14  the complaint, correct?

15  A    That's what the document says.

16  Q    And you weren't involved in the decision to identify Mr.

17  Seery as a potential party, correct?

18  A    That is correct.  Again, I rely on the law firm to decide

19  what parties to bring a suit to -- against.

20  Q    Okay.  Okay.  Do you recall the other day we talked about

21  a document called the July order?

22  A    Yes.

23  Q    Okay.  That's in -- that's in Tab 16 in your binder, if

24  you can turn to that.  And take a moment to look at it, if

25  you'd like.  And my first question is simply whether this is

Patrick - Direct                            111

1   the July order, as you understand it.

2       (Pause.)

3   A   Yes, it is.  I was just looking for the gatekeeper

4   provision.  It looks like it's Paragraph 5.  So, --

5   Q   Okay.  Thank you for that.  About a week after the

6   complaint was filed, you authorized the Plaintiffs to file a

7   motion in the District Court for leave to amend the

8   Plaintiffs' complaint to add Mr. Seery as a defendant.

9   Correct?

10  A   I authorized the filing of a motion in Federal District

11  Court that would ask the Federal District Court whether or not

12  Jim Seery could be named in the original complaint with

13  respect to the gatekeeper provision cited in that motion and

14  with respect to the arguments that were made in that motion.

15  Q   Okay.  Just to be clear, if you turn to Exhibit 17, the

16  next tab, --

17  A   I'm here.

18  Q   -- do you see that document is called Plaintiffs' Motion

19  for Leave to File First Amended Complaint?

20  A   Yes.

21  Q   And that's the document that you authorized the Plaintiffs

22  to file on or about April 19th, correct?

23  A   Correct.

24  Q   Okay.  And can we refer to that document as the motion to

25  amend?

Patrick - Direct                    112

1  A    Yes.

2  Q    Okay.  You were aware of the July order at Tab 16 before

3  you authorized the filing of the motion to amend.  Correct?

4  A    Yes, because it's cited in the motion itself.

5  Q    Okay.  And at the time that you authorized the filing of

6  the motion to amend, you understood that the July order was

7  still in effect.  Correct?

8  A    Yes, because it was referenced in the motion, so my

9  assumption would be it would still be in effect.

10  Q    Okay.  Before the motion to amend was filed, you're -- you

11  are aware that my firm and the Sbaiti firm communicated by

12  email about the propriety of filing the motion to amend?

13  A    Before it was filed?  Communications between your firm and

14  the Sbaiti firm?  I would have to have my recollection

15  refreshed.

16  Q    I'll just ask the question a different way.  Did you know

17  before you authorized the filing of the motion to amend that

18  my firm and the Sbaiti firm had engaged in an email exchange

19  about the propriety of filing the motion to amend in the

20  District Court?

21  A    It's my recollection -- and again, I could be wrong here

22  -- but I thought the email exchange occurred after the fact,

23  not before.  But again, I -- I just --

24  Q    Okay.  In any event, on April 19th, the motion to amend

25  was filed.  Correct?

Patrick - Direct                              113

1    A    Correct.

2    Q    That's the document that is Exhibit 17.  And you

3    personally authorized the Sbaiti firm to file the motion to

4    amend on behalf of the Plaintiffs, correct?

5    A    Correct.

6    Q    And you authorized the filing of the motion to amend with

7    knowledge -- withdrawn.

8         Can you read the first sentence of the motion to amend out

9    loud, please?

10   A    Yeah.  (reading)  Plaintiffs submit this motion under Rule

11   15 of the Federal Rules of Civil Procedure for one purpose:

12   to name as defendant one James P. Seery, Jr., the CEO of

13   defendant Highland Capital Management, LP (HCM) and the chief

14   perpetrator of the wrongdoing that forms the basis of the

15   Plaintiffs' causes of action.

16   Q    And does that fairly state the purpose of the motion?

17        MR. SBAITI:  Objection, Your Honor.  Asks him to make

18   a legal conclusion about the purpose of the legal motion filed

19   in court that he didn't draft.

20        THE COURT:  Okay.  I overrule.  You can answer if you

21   have an answer.

22        THE WITNESS:  It's always been my general

23   understanding that the purpose of filing this motion was to go

24   to the Federal District Court and ask that Court of reference

25   to this Court whether or not Mr. Seery could be named with

Patrick - Direct                           114

1  respect to the original complaint, citing again the gatekeeper

2  provisions and citing the various arguments that we've heard

3  much earlier.

4  BY MR. MORRIS:

5  Q   Okay.  You personally didn't learn anything between April

6  9th, when the complaint was filed, and April 19th, when the

7  motion to amend was filed, that caused you to authorize the

8  filing of the motion to amend, correct?

9  A   That is correct.

10 Q   In fact, you relied on the Sbaiti firm with respect to

11 decisions concerning the timing of the motion to amend.

12 Correct?

13 A    Correct.

14 Q   And you had no knowledge of whether anyone acting on

15 behalf of the Plaintiffs ever served the Debtor with a copy of

16 the motion to amend.  Correct?

17 A   Yes.  I have no knowledge.

18 Q   Okay.  And you have no knowledge that the Sbaiti firm ever

19 provided my firm with a copy of the motion to amend.  Correct?

20 A   I cannot recall one way or another.

21 Q   Okay.  You never instructed anyone on behalf -- acting on

22 behalf of the Plaintiffs to inform the Debtor that the motion

23 to amend had been filed, correct?

24 A   That is correct.

25 Q   And that's because you relied on the Sbaiti firm on

Appx. 00624

Patrick - Direct                        115

```
 1   procedural issues, correct?
 2   A    That is correct.
 3   Q    You didn't consider waiting until the Debtor --
 4        (Interruption.)
 5   Q    -- had appeared in the action before authorizing the
 6   filing of the motion --
 7   A    Yeah, --
 8            THE COURT:  Yes.  Y'all are being a little bit loud.
 9   Okay.
10            A VOICE:  Sorry.
11            MR. MORRIS:  No problem.
12            MR. PHILLIPS:  I've heard that before, Your Honor,
13   and I apologize.
14            THE COURT:  I bet you have.  Thank you.
15            MR. MORRIS:  Admonish Mr. Phillips, please.
16            THE COURT:  Okay.
17            MR. MORRIS:  He's always the wild card.
18            MR. PHILLIPS:  I admonish --
19            MR. MORRIS:  He's always the wild card.
20            MR. PHILLIPS:  I admonish myself.
21            THE COURT:  All right.  I think he got the message.
22   Continue.
23   BY MR. MORRIS:
24   Q    You didn't consider waiting until the Debtor had appeared
25   in the action before filing the motion to amend, correct?
```

Patrick - Direct                                116

1  A    Again, I am the client and I rely upon the law firm that's

2  engaged with respect to making legal decisions as to the

3  timing and notice and appearance and what have you.  I'm a tax

4  lawyer.

5  Q    Okay.  You wanted the District Court to grant the relief

6  that the Plaintiffs were seeking.  Correct?

7  A    I wanted the District Court to consider, under the

8  gatekeeper provisions of this Court, whether or not Mr. Seery

9  could be named in the original complaint.  That's -- that,

10 from my perspective, is what was desired.

11 Q    All right.  You wanted the District Court to grant the

12 relief that the Plaintiffs were seeking, correct?

13        MR. SBAITI:  Objection, Your Honor.  Asked and

14 answered.

15        THE COURT:  Overruled.

16        THE WITNESS:  Again, I would characterize this motion

17 as not necessarily asking for specific relief, but asking the

18 Federal District Court whether or not, under the gatekeeper

19 provision, that Mr. Seery could be named on there.  What

20 happens after that would be a second step.  So I kind of -- I

21 dispute that characterization.

22 BY MR. MORRIS:

23 Q    All right.  I'm going to cross my fingers and hope that

24 Ms. Canty is on the line, and I would ask her to put up Page

25 57 from Mr. Patrick's deposition transcript.

Patrick - Direct                    117

1            THE COURT:  There it is.

2            MR. MORRIS:  There it is.  It's like magic.  Can we

3   go down to Lines 18 through 20?

4   BY MR. MORRIS:

5   Q   Mr. Patrick, during the deposition on Friday, did I ask

6   you this question and did you give me this answer?  Question,

7   "Did you want the Court to grant the relief you were seeking?"

8   Answer, "Yes."

9   A   I -- and it was qualified with respect to Lines 12 through

10  17.  In my view, when I answered yes, I was simply restating

11  what I stated in Line 12.  I wanted the District Court to

12  consider this motion as to whether or not Mr. Seery could be

13  named in the original complaint or the amended complaint

14  pursuant to the existing gatekeeper rules and the arguments

15  that were made in that motion.  That's -- that's what I

16  wanted.  And so then when I was asked, did you want the Court

17  to grant the relief that you were seeking, when I answered

18  yes, it was from that perspective.

19  Q   Okay.  Thank you very much.  If the District Court had

20  granted the relief that you were seeking, you would have

21  authorized the Sbaiti firm to file the amended complaint

22  naming Mr. Seery as a defendant if the Sbaiti firm recommended

23  that you do so.  Correct?

24  A   If the Sbaiti firm recommended that I do so.  That is

25  correct.

Patrick - Direct                    118

1    Q    Okay.  Let's talk for a little bit about the line of

2    succession for the DAF and CLO Holdco.  Can we please go to

3    Exhibit 25, which is in the other binder?  It's in the other

4    binder, sir.

5         (Pause.)

6    Q    I guess you could look on the screen or you can look in

7    the binder, whatever's easier for you.

8    A    Yeah.  I prefer the screen.  I prefer the screen.

9    Q    Okay.

10   A    It's much easier.

11   Q    All right.  We've got it in both spots.  But do you have

12   Exhibit 25 in front of you, sir?

13   A    Yes, I do.

14   Q    All right.  Do you know what it is?

15   A    This is the organizational chart depicting a variety of

16   charitable entities as well as entities that are commonly

17   referred to the DAF.  However, when I look at this chart, I do

18   not look at and see just boxes, what I see is the humanitarian

19   effort that these boxes represent.

20            MR. MORRIS:  Your Honor, may I interrupt?

21            THE COURT:  You may.

22            MR. MORRIS:  Okay.

23   BY MR. MORRIS:

24   Q    I appreciate that, and when your lawyers get up to ask you

25   questions, I bet they'll want to know just what you were about

Patrick - Direct                    119

1    to tell me.  But I just want to understand what this chart is.

2    This chart is the DAF, CLO Holdco, structure chart.  Correct?

3    A    Correct.

4    Q    Okay.  And you were personally involved in creating this

5    organizational structure, correct?

6    A    I -- yes.

7    Q    Okay.  And from time to time, the Charitable DAF Holdco

8    Limited distributes cash to the foundations that are above it.

9    Correct?

10   A    Correct.

11   Q    All right.  I want to talk a little bit more specifically

12   about how this happens.  The source of the cash distributed by

13   Charitable DAF Holdco Limited is CLO Holdco, Ltd., that

14   entity, the Cayman Islands entity near the bottom.  Correct?

15        MR. ANDERSON:  Your Honor, I have an objection.

16   Completely irrelevant.  I'm objecting on relevance grounds.

17   This has nothing to do with the contempt proceeding.  We've

18   already gone over that he authorized the filing of the

19   complaint, that he authorized the filing of the motion to

20   amend.  It's all in the record.  This is completely irrelevant

21   at this point.

22        THE COURT:  Okay.  Relevance objection.  Your

23   response?

24        MR. MORRIS:  I believe that it's relevant to the

25   Debtor's motion to hold Mr. Dondero in contempt for pursuing

Patrick - Direct                    120

1    claims against Mr. Seery, in violation of the July 7 order.  I

2    think an understanding of what the Plaintiffs are, how they're

3    funded, and Mr. Dondero's interest in pursuing claims on

4    behalf of those entities is relevant to the -- to the -- just

5    -- it's just against him.  It's not against their clients,

6    frankly.  It's just against Mr. Dondero.

7            THE COURT:  I overrule.

8            MR. MORRIS:  I'll try and -- I'll try and make this

9    quick, though.

10   BY MR. MORRIS:

11   Q    CLO Holdco had two primary sources of capital.  Is that

12   right?

13   A    Two primary sources of capital?

14   Q    Let me ask it differently.  There was a Charitable

15   Remainder Trust that was going to expire in 2011, correct?

16   A    That is correct.

17   Q    And that Charitable Remainder Trust had certain CLO equity

18   assets, correct?

19   A    Correct.

20   Q    And the donor to that Charitable Remainder Trust was

21   Highland Capital Management, LP.  Correct?

22   A    Not correct.  After my deposition, I refreshed my memory.

23   There were two Charitable Remainder Trusts that existed, which

24   I think in my mind caused a little bit of confusion.  The

25   Charitable Remainder Trust No. 2, which is the one that

Patrick - Direct                    121

1    expired in 2011, was originally funded by Mr. Dondero.

2    Q    Okay.  So, so the Charitable Remainder Trust that we were

3    talking about on Friday wasn't seeded with capital from

4    Highland Capital Management, it came from Mr. Dondero

5    personally?

6    A    That is correct.

7    Q    Okay.  Thank you.  And the other primary source of capital

8    was the Dallas Foundation, the entity that's in the upper

9    left-hand corner of the chart.  Is that correct?

10   A    No.

11   Q    The -- you didn't tell me that the other day?

12   A    You said -- you're pointing to the Dallas Foundation.

13   That's a 501(c)(3) organization.

14   Q    I apologize.  Did you tell me the other day that the

15   Dallas Foundation was the second source of capital for HCLO

16   Hold Company?

17   A    No, I did not.  You --

18        (Pause.)

19   Q    Maybe I know the source of the confusion.  Is the Highland

20   Dallas Foundation something different?

21   A    Yes.  On this organizational chart, you'll see that it has

22   an indication, it's a supporting organization.

23   Q    Ah, okay.  So, so let me restate the question, then.  The

24   second primary source of capital for CLO Holdco, Ltd. is the

25   Highland Dallas Foundation.  Do I have that right?

Patrick - Direct                                122

1  A    Yes.

2  Q    Okay.  And the sources of that entity's capital were

3  grantor trusts and possibly Mr. Dondero personally.  Correct?

4  A    In addition -- per my refreshing my recollection from our

5  deposition, the other Charitable Remainder Trust, I believe

6  Charitable Remainder Trust No. 1, which expired later, also

7  sent a donation, if you will, or assets to -- and I cannot

8  recall specifically whether it was just the Highland Dallas

9  Foundation or the other supporting organizations that you see

10 on this chart.

11 Q    But the source of that -- the source of the assets that

12 became the second Charitable Remainder Trust was Highland

13 Capital Management, LP.  Is that right?

14 A    I think that is accurate from my recollection.  And again,

15 I'm talking about Charitable Remainder Trust No. 1.

16 Q    Okay.  So is it fair to say -- I'm just going to try and

17 summarize, if I can.  Is it fair to say that CLO Holdco, Ltd.

18 is the investment arm of the organizational structure on this

19 page?

20 A    Yes.

21 Q    And is it fair to say that nearly all of the assets that

22 are in there derived from either Mr. Dondero, one of his

23 trusts, or Highland Capital Management, LP?

24 A    Yes.  It's like the Bill Gates Foundation or the

25 Rockefeller Foundation.  These come from the folks that make

Patrick - Direct                    123

1   their donations and put their name on it.

2   Q   Okay.

3           MR. MORRIS:  Now, now, Your Honor, I'm going to go

4   back just for a few minutes to how Mr. Scott got appointed,

5   because I think that lays kind of the groundwork for his

6   replacement.  It won't take long.

7           THE COURT:  Okay.  I have a question either --

8           MR. MORRIS:  Sure.

9           THE COURT:  -- for you or the witness.  I'm sorry,

10  but --

11          MR. MORRIS:  Sure.  Yeah.

12          THE COURT:  -- the organizational chart, it's not

13  meant to show everything that might be connected to this

14  substructure, right?  Because doesn't CLO Holdco, Ltd. own

15  49.02 percent of HCLOF, --

16          MR. MORRIS:  That --

17          THE COURT:  -- which gets us into the whole

18  HarbourVest transaction issue?

19          MR. MORRIS:  You're exactly right, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  But that's just an investment that HCLO

22  Holdco made.

23          THE COURT:  Right.

24          MR. MORRIS:  Right?  And so I -- let me ask the

25  witness, actually.

Appx 06623

Patrick - Direct                          124

1          THE COURT:  Okay.  Thank you.  Thank you.

2          MR. MORRIS:  Let me ask the witness.  Yeah.

3          THE COURT:  I just want my brain --

4          MR. MORRIS:  Right.

5          THE COURT:  -- to be complete on this chart.

6    BY MR. MORRIS:

7    Q    Mr. Patrick, there are three entities under CLO Holdco,

8    Ltd.  Do you see that?

9    A    Yes.

10   Q    And does CLO Holdco, Ltd. own one hundred percent of the

11   interests in each of those three entities?

12   A    Yes.

13   Q    Do you know why those three entities are depicted on this

14   particular chart?  Is it because they're wholly-owned

15   subsidiaries?

16   A    Correct.

17   Q    Okay.  And CLO Holdco, Ltd. has interests in other

18   companies.  Isn't that right?

19   A    It has other investments.  That is correct.

20   Q    And the reason that they're not depicted on here is

21   because they're not wholly-owned subsidiaries, they're just

22   investments; is that fair?

23   A    That is fair.

24          MR. MORRIS:  Does that--?

25          THE COURT:  Yes.

Appx. 06694

Patrick - Direct                          125

1              MR. MORRIS:  Okay.

2              THE COURT:  Uh-huh.

3    BY MR. MORRIS:

4    Q    So, so let's go back to Mr. Grant for a moment.  Mr.

5    Scott, rather.  Mr. Dondero was actually the original general

6    partner.  If you look at this chart, while it's still up here,

7    you see on the left there's Charitable DAF GP, LLC?

8    A    Yes.

9    Q    And the Charitable DAF GP, LLC is the general partner of

10   the Charitable DAF Fund, LP.  Correct?

11   A    Correct.

12   Q    And on this chart, Grant Scott was the managing member of

13   Charitable DAF GP, LLC.  Right?

14   A    Correct.

15   Q    Okay.  But Mr. Dondero was the original general partner of

16   that entity, correct?

17   A    That is correct.  But I do want to point out, I just note

18   that the GP interest is indicating a one percent interest and

19   the 99 interest to Charitable DAF Holdco.  I believe that's

20   incorrect.  It's a hundred percent by Charitable DAF Holdco,

21   Ltd., and the Charitable DAF GP interest is a noneconomic

22   interest.  So that should actually reflect a zero percent to

23   the extent it may indicate some sort of profits or otherwise.

24   Q    Okay.  Thank you for the clarification.  Can you turn to

25   Exhibit 26, please, in your binder?  And is it your

Appx. 06635

Patrick - Direct                    126

1   understanding that that is the amended and restated LLC

2   agreement for the DAF GP, LLC?

3   A    Yes.

4   Q    Okay.  And this was amended and restated effective as of

5   January 1st, 2012, correct?

6   A    Yes.

7   Q    And if you go to the last page, you'll see there are

8   signatures for Mr. Scott and Mr. Dondero, correct?

9   A    Yes.

10  Q    And Mr. Dondero is identified as the forming -- former

11  managing member and Mr. Scott is identified as the new

12  managing member.   Correct?

13  A    Correct.  That's what the document says.

14  Q    And it's your understanding that Mr. Dondero had the

15  authority to select his successor.  Correct?

16  A    Correct.

17  Q    In fact, it's based on your understanding of documents and

18  your recollection that Mr. Dondero personally selected Mr.

19  Scott as the person he was going to transfer control to,

20  correct?

21  A    Upon advice of Highland Capital Management's tax

22  compliance officer, Mr. Tom Surgent.

23  Q    What advice did Mr. Surgent give?

24  A    He gave advice that, because Mr. Dondero -- and this is

25  what I came to an understanding after the fact of this

Patrick - Direct                    127

1    transaction, because I was not a part of it -- that by Mr.

2    Dondero holding that GP interest, that it would be -- the

3    Plaintiffs, if you will, would be an affiliate entity for

4    regulatory purposes, and so he advised that if he -- if Mr.

5    Dondero transferred his GP interest to Mr. Scott, it would no

6    longer be an affiliate, is my recollection.

7    Q    Okay.  You didn't appoint Mr. Scott, did you?

8    A    No.

9    Q    That was Mr. Dondero.  Is that right?

10   A    Yes.

11   Q    Okay.  Let's go to 2021.  Let's come back to the current

12   time.  Sometime in February, Mr. Scott called you to ask about

13   the mechanics of how he could resign.  Correct?

14   A    That is correct.

15   Q    But the decision to have you replace Mr. Scott was not

16   made until March 24th, the day you sent an email to Mr. Scott

17   with the transfer documents.  Correct?

18   A    That is correct.

19   Q    And it's your understanding that he could have transferred

20   the management shares and control of the DAF to anyone in the

21   world.  Correct?

22   A    Correct.

23   Q    That's what the docu... that he had the authority under

24   the documentation, as you understood it, to freely trade or

25   transfer the management shares.  Correct?

Patrick - Direct                    128

1  A    Wait.  Now, let's be precise here.

2  Q    Okay.

3  A    Are you talking about the GP interests or the management

4  shares held by Charitable DAF Holdco, Ltd.?

5  Q    Let's start with the management shares.  Can you explain

6  to the Court what the management shares are?

7          MR. ANDERSON:  Your Honor?  Hang on one second.  Your

8  Honor, I want to object again on relevance.  We're going way

9  beyond the scope of the contempt issue, whether or not --

10         MR. MORRIS:  This is about control.

11         MR. ANDERSON:  -- the motion to amend somehow

12 violated the prior order of this Court.  Getting into the

13 management structure, transfer of shares, that's way outside

14 the bounds.  I object on relevance.

15         THE COURT:  Okay.  Relevance objection?

16         MR. MORRIS:  Your Honor, they have probably 30

17 documents, maybe 20 documents, on their exhibit list that

18 relate to management and control.  I'm asking questions about

19 management and control.  Okay?  This is important, again, to

20 (a) establish his authority, but (b) the circumstances under

21 which he came to be the purported control person.

22         THE COURT:  Okay.  Overruled.  Go ahead.

23         THE WITNESS:  It might be helpful to look at the

24 organizational chart, but if not -- but I'll describe it to

25 you again.  With respect to the entity called --

Patrick - Direct                    129

1          MR. MORRIS:  Hold on one second.  Can we put up the

2     organizational chart again, Ms. Canty, if you can?  There you

3     go.

4          THE WITNESS:  Okay.  So with respect to the

5     Charitable DAF Holdco, Ltd., it is my understanding that Mr.

6     Scott, he organized that entity when he was the independent

7     director of the Charitable Remainder Trust, and he caused the

8     issuance of the management shares to be issued to himself.

9     And then those are, again, noneconomic shares, but they are

10    control shares over that entity.

11         And I think, to answer your question, is -- it -- he alone

12    decides who he can transfer those shares to.

13    BY MR. MORRIS:

14    Q    Do I have this right, that whoever holds the noneconomic

15    management shares has the sole authority to appoint the

16    representatives for each of the Charitable DAF entities and

17    CLO Holdco?  It's kind of a magic ticket, if you will?

18    A    It -- I think there's a -- the answer really is no from a

19    legal standpoint, because Charitable DAF Holdco is a limited

20    partner in Charitable DAF Fund, LP, so it does not have

21    authority -- authority under all -- the respective entities

22    underneath that.  It could cause a redemption, if you will, of

23    Charitable DAF Fund.  And so, really, the authority -- the

24    trickle-down authority that you're referencing is with respect

25    to his holding of the Charitable DAF GP, LLC interest.  It's a

Patrick - Direct                    130

1   member-managed Delaware limited liability company.  And from

2   that, he -- that authority kind of trickles down to where he

3   can appoint directorships.

4   Q   All right.  I think I want to just follow up on that a

5   bit.  Which entity is the issuer of the manager shares, the

6   management shares?

7   A   Yeah, the -- per the organizational chart, it is accurate,

8   it's the Charitable DAF Holdco, Ltd. which issued the

9   management shares to Mr. Scott.

10  Q   Okay.  And that's why you have the arrow from Mr. Scott

11  into that entity?

12  A   Correct.

13  Q   And do those -- does the holder of the management shares

14  have the authority to control the Charitable DAF Holdco, Ltd.?

15  A   Yes.

16  Q   Okay.  And as the control person for the Charitable DAF

17  Holdco, Ltd., they own a hundred -- withdrawn.  Charitable DAF

18  Holdco Limited owns a hundred percent of the limited

19  partnership interests of the Charitable DAF Fund, LP.

20  Correct?

21  A   Correct.

22  Q   And so does the holder of that hundred percent limited

23  partnership interest have the authority to decide who acts on

24  behalf of the Charitable DAF Fund, LP?

25  A   I would say no.  I mean, you know, just -- I would love to

Patrick - Direct                           131

1   read the partnership agreement again.  But I, conceptually,

2   what I know with partnerships, I would say the limited partner

3   would not.  It would be through the Charitable DAF GP, LLC

4   interest.

5   Q    The one on the left, the general partner?

6   A    The general partner.

7   Q    I see.  So when Mr. Scott transferred to you the one

8   hundred percent of the management shares as well as the title

9   of the managing member of the Charitable DAF GP, LLC, did

10  those two events give you the authority to control the

11  entities below it?

12  A    Yes.

13  Q    Thank you.  And so prior to the time that he transferred

14  those interests to you, is it your understanding that Mr.

15  Scott had the unilateral right to transfer those interests to

16  anybody in the world?

17  A    Yes.

18  Q    Okay.  And you have that right today, don't you?

19  A    Yes, I do.

20  Q    If you wanted, you could transfer it to me, right?

21  A    Yes, I could.

22  Q    Okay.  But of all the people in the world, Mr. Scott

23  decided to transfer the management shares and the managing

24  member title of the DAF GP to you, correct?

25  A    Restate that question again?

010584

Patrick - Direct                            132

1  Q    Of all the people in the world, Mr. Scott decided to

2  transfer it to you, correct?

3  A    Yeah.  Mr. Scott transferred those interests to me.

4  Q    Okay.  And you accepted them, right?

5  A    Yes.

6  Q    You're not getting paid anything for taking on this

7  responsibility, correct?

8  A    I am not paid by any of the entities depicted on this

9  chart.

10 Q    And Mr. Scott used to get $5,000 a month, didn't he?

11 A    I believe that's what he testified to.

12 Q    Yeah.  But you don't get anything, right?

13 A    Correct.

14 Q    In fact, you get the exact same salary and compensation

15 from Skyview that you had before you became the authorized

16 representative of the DAF entities and CLO Holdco.  Correct?

17 A    Correct.

18         MR. MORRIS:  Okay.  Your Honor, if I may just take a

19 moment, I may be done.

20         THE COURT:  Okay.

21     (Pause.)

22         MR. MORRIS:  Your Honor, I have no further questions.

23         THE COURT:  All right.  Pass the witness.  Any

24 examination of the witness?

25                    CROSS-EXAMINATION

Patrick - Cross                          133

1  BY MR. ANDERSON:

2  Q    Mr. Patrick, I just had a few follow-up questions.  When

3  you authorized the filing of the lawsuit against Highland

4  Capital Management, LP, Highland HCF Advisor Limited, and

5  Highland CLO Funding, Limited, when that lawsuit was filed in

6  April of this year, was Mr. Seery included as a defendant?

7  A    No.

8  Q    Have the two Plaintiffs in that lawsuit, have they

9  commenced any lawsuit against Mr. Seery?

10 A    No.

11 Q    Have they pursued any lawsuit against Mr. Seery?

12 A    No.

13 Q    Have they pursued a claim or cause of action against Mr.

14 Seery?

15 A    No.

16 Q    At most, did the Plaintiffs file a motion for leave to add

17 Mr. Seery as a defendant?

18            MR. MORRIS:  Objection, Your Honor.  To the extent

19 that any of these questions are legal conclusions, I object.

20 He's using the word pursue.  If he's trying -- if he's then

21 going to argue that, But the witness testified that he didn't

22 pursue and that's somehow a finding of fact, I object.

23            THE COURT:  Okay.  I understand.

24            MR. MORRIS:  Yeah.

25            THE COURT:  But I overrule.  He can answer.

Patrick - Cross                    134

 1          MR. MORRIS:  That's fine.

 2          THE WITNESS:  Can you restate the question again?

 3   BY MR. ANDERSON:

 4   Q    Sure.  On behalf of the Plaintiffs -- well, strike that.

 5   Did the Plaintiffs pursue a claim or cause of action against

 6   Mr. Seery?

 7   A    No.

 8   Q    At most, did the Plaintiffs file a motion for leave to

 9   file an amended complaint regarding Mr. Seery?

10   A    Yes.  But, again, I viewed the motion as simply asking the

11   Federal District Court whether Mr. Seery could or could not be

12   named in a complaint, and then the next step might be how the

13   Federal District Court might rule with respect to that.

14   Q    And we have -- it's Tab 17 in the binders in front of you.

15   That is Plaintiffs' motion for leave.  If you could turn to

16   that, please.

17   A    Yes.  I've got it open.

18   Q    Is the Court's July order, the Bankruptcy Court's July

19   order, is it mentioned on the first page and then throughout

20   the motion for leave to amend?

21   A    Yes, it is.  I see it quoted verbatim on Page 2 under

22   Background.

23   Q    Was the Court's order hidden at all from the District

24   Court?

25   A    The document speaks for itself.  It's very transparent.

010587

Patrick - Cross                                    135

1   Q    Was there any effort whatsoever to hide the prior order of

2   the Bankruptcy Court?

3   A    No.

4            MR. ANDERSON:  Pass the witness.

5            THE COURT:  Okay.  Other examination?

6            MR. SBAITI:  Yes, Your Honor.  Just a couple of

7   questions.

8                    CROSS-EXAMINATION

9   BY MR. SBAITI:

10  Q    Do you mind flipping to Exhibit 25, which I believe is the

11  org chart, the one that you were looking at before?

12  A    Okay.

13  Q    It'll still be in --

14  A    Okay.  Yeah.

15  Q    -- the defense binder.  No reason to swap out right now.

16  A    I've got the right binders.  Some of them are repeatable

17  exhibits, so --

18  Q    Yeah.

19  A    -- I have to grab the right binder.  Yes.

20  Q    As this org chart would sit today, is the only difference

21  that Grant Scott's name would instead be Mark Patrick?

22  A    Yes.

23  Q    Was there ever a period of time where Jim Dondero's name

24  would sit instead of Grant Scott's name prior?

25  A    Yes, originally, when this -- yes.

Appx 00645

Patrick - Cross                                    136

1    Q    So did Mr. Dondero both have the control shares of the GP,

2    LLC and DAF Holdco Limited?

3    A    No, I believe not.  I believe he only held the Charitable

4    DAF GP interest and that Mr. Scott at all times held the

5    Charitable DAF Holdco, LTD interest, until he decided to

6    transfer it to me.

7    Q    Can you just tell us how Mr. Scott came to hold the

8    control shares of the Charitable DAF Holdco, LTD?

9    A    When he was the independent trustee of the Charitable

10   Remainder Trust, he caused that -- the creation of that

11   entity, and that's how he became in receipt of those

12   management shares.

13   Q    And does the Charitable DAF GP, LLC have any control over

14   Charitable DAF Fund, LP's actions or activities?

15   A    Yes, it does.

16   Q    What kind of control is that?

17   A    I would describe complete control.  It's the managing

18   member of that entity and can -- and effectively owns, you

19   know, the hundred percent interest in the respective

20   subsidiaries, and so the control follows down.

21   Q    And when did Mr. Scott replace Mr. Dondero as the GP --

22   managing member of the GP?

23   A    Well, I think as the -- and Mr. Morris had shown me with

24   respect to that transfer occurring on March 2012.

25   Q    So nine years ago?

Appx 06646
010589

Patrick - Cross                    137

1   A    Yes.

2   Q    Does Mr. Dondero today exercise any control over the

3   activities of the DAF Charitable -- the Charitable DAF, GP or

4   the Charitable DAF Holdco, LTD?

5   A    No.

6   Q    Is he a board member of sorts for either of those

7   entities?

8   A    No.

9   Q    Is he a board members of CLO Holdco?

10  A    No.

11  Q    Does he have any decision-making authority at CLO Holdco?

12  A    None.

13  Q    The decision to authorize the lawsuit and the decision to

14  authorize the motion that you've been asked about, who made

15  that authorization?

16  A    I did.

17  Q    Did you have to ask for anyone's permission?

18  A    No.

19          MR. SBAITI:  No more questions, Your Honor.

20          THE COURT:  Okay.  Any -- I guess Mr. Taylor, no.

21      All right.  Any redirect?

22                    REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q    Since becoming the authorized representative of the

25  Plaintiffs, have you ever made a decision on behalf of those

Patrick - Cross                                138

1   entities that Mr. Dondero disagreed with?

2   A    I have made decisions that were adverse to Mr. Dondero's

3   financial -- financial decision.  I mean, financial interests.

4   Whether he disagreed with them or not, I don't -- he has not

5   communicated them to me.  But they have been adverse, at least

6   two very strong instances.

7   Q    Have you ever -- have you ever talked to him about making

8   a decision that would be adverse to his interests?  Did he

9   tell -- did --

10  A    I didn't -- I don't -- I did not discuss with him prior to

11  making the decisions that I made that were adverse to his

12  economic interests.

13          MR. MORRIS:  Okay.  No further questions, Your Honor.

14          THE COURT:  Any further examination?  Recross on that

15  redirect?

16          MR. ANDERSON:  No further questions.

17          MR. SBAITI:  No further questions, Your Honor.

18          MR. ANDERSON:  Sorry.

19          THE COURT:  Nothing?

20          MR. ANDERSON:  I think we're good.

21          THE COURT:  Okay.  I have one question, Mr. Patrick.

22  My brain sometimes goes in weird directions.

23                  EXAMINATION BY THE COURT

24          THE COURT:  I'm just curious.  What are these Cayman

25  Island entities, charitable organizations formed in the Cayman

Patrick - Examination by the Court        139

1    Islands?

2         THE WITNESS:  Yeah.  I'll keep it as simple as I can,

3    even though I'm a tax lawyer, so I won't get into the tax

4    rules, but the Cayman structure is modeled after what you

5    typically see in the investment management industry, and so I

6    -- and I won't reference specific entities here with respect

7    to the Highland case, but I think you'll note some

8    similarities, if you think about it.  They're -- it's

9    described as an offshore master fund structure where you have

10   a -- and that would be the Charitable DAF Fund that's

11   organized offshore, usually in the Cayman or Bermuda Islands,

12   where the general partner, typically, in the industry, holds

13   the management --

14        THE COURT:  Yeah.  Let --

15        THE WITNESS:  Okay.

16        THE COURT:  -- me just stop you.  I've seen this

17   enough --

18        THE WITNESS:  Yeah, it's

19        THE COURT:  -- to know that it happens in the

20   investment world.  But in --

21        THE WITNESS:  Yeah.

22        THE COURT:  You know, usually, I see 501(c)(3), you

23   know, domestically-created entities for charitable purposes,

24   so I'm just curious.

25        THE WITNESS:  Yes.

Patrick - Examination by the Court          140

1      THE COURT:  Uh-huh.

2      THE WITNESS:  The offshore master fund structure

3  typically will have two different types of -- they call it

4  foreign feeder funds.  One foreign feeder fund is meant to

5  accommodate foreign investors; the other foreign feeder fund

6  is meant to accommodate U.S. tax-exempt investors.

7      Why, why is it structured that way?  In order to avoid

8  something called -- I was trying not to be wonkish -- UBTI.

9  That's, let's see, Un -- Unrelated Trader Business Income.  I

10  probably have that slightly wrong.  But it's essentially,

11  it's a means to avoid active business income, which includes

12  debt finance income, which is what these CLOs tend to be, that

13  would throw off income that would be taxable normally if the

14  exempts did not go through this foreign blocker, and it

15  converts that UBTI income -- it's called (inaudible) income --

16  into passive income that flows -- that flows up to the

17  charities.

18      And so it's very typical that you'll have a U.S. tax-

19  exempt investor, when they make an investment in a fund,

20  prefer to go through an offshore feeder fund, which is

21  actually Charitable DAF Holdco, LTD.  That's essentially what,

22  from a tax perspective, represents as a UBTI blocker entity.

23  And then you have the offshore investments being held offshore

24  because there's a variety of safe harbors where the receipt of

25  interest, the portfolio interest exception, is not taxable.

Patrick - Examination by the Court        141

1   The creation of capital gains or losses under the -- they call

2   it the trading, 864(b) trading safe harbor, is not taxable.

3   So that's why you'll find these structures operating offshore

4   to rely on those safe harbor provisions as well as -- as well

5   as what I indicated with respect to the two type blocker

6   entities.  It's very typical and industry practice to organize

7   these way.  And so when this was set --

8          THE COURT:  It's very typical in the charitable world

9   to --

10         THE WITNESS:  In the investment management --

11         THE COURT:  -- form this way?

12         THE WITNESS:  In the investment management world,

13  when you have charitable entities that are taking some

14  exposure to assets that are levered, to set this structure up

15  in this way.  It was modeled after -- they just call them

16  offshore master fund structures.  They're known as Mickey

17  Mouse structures, where you'll have U.S. investors --

18         THE COURT:  Yes.  I -- yes, I --

19         THE WITNESS:  -- enter through a U.S. partnership,

20  and the foreign investors enter through a blocker.

21         THE COURT:  It was really just the charitable aspect

22  of this that I was --

23         THE WITNESS:  Yeah.  Yeah.

24         THE COURT:  -- getting at.

25         THE WITNESS:  Yeah.  No, but I'm just trying to

                        Patrick - Recross                    142

1    emphasize if --

2              THE COURT:  All right.  It's --

3              THE WITNESS:  Yeah.

4              THE COURT:  -- neither here nor there.  All right.

5              MR. SBAITI:  Your Honor, may I ask a slightly

6    clarifying leading question on that, because I think I

7    understand what he was trying to say, just for the record?

8              THE COURT:  Well, --

9              MR. MORRIS:  I object.

10             THE COURT:  -- I tell you what.  Anyone who wants to

11   ask one follow-up question on the judge's question can do so.

12   Okay?  You can go first.

13             MR. SBAITI:  I'll approach, Your Honor.

14             THE COURT:  Okay.

15                       RECROSS-EXAMINATION

16   BY MR. SBAITI:

17   Q    Would it be a fair summary of what you were saying a

18   minute ago that the reason the bottom end of that structure is

19   offshore is so that it doesn't get taxed before the money

20   reaches the charities on the U.S. side?

21   A    Tax -- it converts the nature of the income that is being

22   thrown off by the investments so that it becomes a tax

23   friendly income to the tax-exempt entity.  Passive income.

24   That's --

25   Q    So, essentially, --

Patrick - Recross                        143

 1            THE COURT:  Okay.  Okay.

 2            MR. SBAITI:  -- so it doesn't get taxed before it

 3    hits the --

 4            THE COURT:  I said one question.

 5            MR. SBAITI:  Sorry, Your Honor.

 6            THE COURT:  Okay.  He answered it.

 7            MR. PHILLIPS:  And I have one question, Your Honor

 8            THE COURT:  Okay.

 9            MR. PHILLIPS:  I don't know if I need to ask this

10    question, but I'd rather not ask you if I need to ask it.

11            THE COURT:  Go ahead.

12            MR. PHILLIPS:  But if I do, you know, I could --

13            THE COURT:  Go ahead.

14            MR. PHILLIPS:  Well, okay.

15                        RECROSS-EXAMINATION

16    BY MR. PHILLIPS:

17    Q    We've talked about the offshore structure.  Are the

18    foundations in the top two tiers of the organizational chart

19    offshore entities?

20    A    No.

21    Q    They're --

22    A    They're onshore entities.  They're tax-exempt entities.

23    Q    Thank you.

24    A    The investments are offshore.

25    Q    Thank you.

Patrick - Further Redirect                    144

 1          THE COURT:  Mr. Morris?  One question.
 2                 FURTHER REDIRECT EXAMINATION
 3   BY MR. MORRIS:
 4   Q    Do you hold yourself out as an expert on the
 5   organizational structures in the Caribbean for charitable
 6   organizations?
 7   A    I hold myself out as a tax professional versant on setting
 8   up offshore master fund structures.  It's sort of a bread-and-
 9   butter thing.  But there are plenty of people that can testify
10   that this is very typical.
11   Q    Uh-huh.  Okay.
12          THE COURT:  Okay.  Thank you.
13      All right.  You are excused, Mr. Patrick.  I suppose
14   you'll want to stay around.  I don't know if you'll
15   potentially be recalled today.
16      (The witness steps down.)
17          THE COURT:  All right.  We should take a lunch break.
18   I'm going to put this out for a democratic vote.  Forty-five
19   minutes?  Is that good with everyone?
20          MR. SBAITI:  Do we have to leave the building to eat,
21   Your Honor, or is there food in the building?
22          THE COURT:  I think --
23          MR. SBAITI:  I'm sorry to ask that question, but --
24          THE COURT:  Yes.  You know what, there used to be a
25   very bad cafeteria, but I think it closed.  Right, Mike?  So,

145

 1    you know, --

 2             MR. SBAITI:  Sorry I asked that.

 3             A VOICE:  Hate to miss that one.

 4             THE COURT:  Is 45 minutes not enough since you have

 5    to go off campus?  I'll give you an hour.  It just means we

 6    stay later tonight.

 7             A VOICE:  Can we just say 2:00 o'clock?

 8             MR. SBAITI:  That's fine with us, Your Honor.

 9             THE COURT:  2:00 o'clock.  That's 50 minutes.  See

10    you then.

11             MR. SBAITI:  Thank you.

12             A VOICE:  Your Honor, can we just get a time check?

13             THE COURT:  Okay.

14             THE CLERK:  Yeah.  The Debtors are at an hour and

15    eleven minutes.  Respondents at an hour nineteen.

16             THE COURT:  And hour and eleven and an hour and

17    nineteen.

18             A VOICE:  Wait, that's not right.

19             A VOICE:  That can't be right.

20             A VOICE:  Two hours?  We started at --

21             THE COURT:  Okay.  So, again, their side, the

22    collective Respondents?

23             THE CLERK:  An hour and eleven, responding to your

24    questions, --

25             A VOICE:  Yeah, he's not recording --

Appx. 00655

010598

146

```
 1            THE CLERK:  So an hour and eleven and an hour and
 2   nineteen.
 3            THE COURT:  But they were already over an hour --
 4            A VOICE:  Yeah.  It's been over three hours.
 5            THE COURT:  -- with opening statements.
 6            THE CLERK:  An hour and twelve.  Yes.  They were very
 7   short with the questioning.  It was only like --
 8            THE COURT:  Okay.  We'll double-check that over the
 9   break with the court reporter.
10            A VOICE:  All right.  Thank you, Your Honor.
11            THE COURT:  We'll double-check and let you know.
12            THE COURT:  All rise.
13       (A luncheon recess ensued from 1:09 p.m. until 2:03 p.m.)
14            THE COURT:  All right.  Please be seated.  We're
15   going back on the record in Highland after our lunch break.
16   I'm going to confirm time.  We've had the Debtor an aggregate
17   of an hour and eleven minutes.  The Respondents, an aggregate
18   of an hour and twenty minutes.  Okay?  So we've gone two hours
19   and thirty-one minutes.
20       If it seems like we've been going longer, it's because we
21   did not do the clock on the opening matters regarding removal,
22   extension of time.  And then when I interjected with
23   questions, we stopped the clock.  All right?  So let's go.
24       You may call your next witness, Mr. Morris.
25            MR. MORRIS:  Thank you, Your Honor.  The Debtor calls
```

Appx. 00586
010599

Dondero - Direct                    147

1    James Dondero.

2              THE COURT:  All right.

3              A VOICE:  He had to step down the hall.  We had a

4    little trouble getting through security.  Let me --

5              THE COURT:  All right.  Mr. Dondero, you've been

6    called as the next witness.  So if you'll approach our witness

7    stand, please.  All right.  Please raise your right hand.

8         (The witness is sworn.)

9              THE COURT:  All right.  Please be seated.

10             JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

11                   DIRECT EXAMINATION

12   BY MR. MORRIS:

13   Q    Good afternoon, Mr. Dondero.

14   A    Good afternoon.

15   Q    Can you hear me?

16   A    Yes.

17   Q    Okay.  So, you were here this morning, correct?

18   A    Yes.

19   Q    All right.  So, we're going to put up -- we'll put it up

20   on the screen, but if you'd prefer to look at a hard copy in

21   the binder that's marked Volume 1 of -- 2 of 2, I'd ask you to

22   turn to Exhibit 25.  Or you could just follow on the screen.

23   And this is a one-page document, so maybe that's easier.

24   A    Sure.

25   Q    Do you have it?  All right.

Appx. 00657
010600

Dondero - Direct                    148

1   A    Yes.

2   Q    This is the organizational chart for what's known as the

3   DAF, correct?

4   A    Yes.

5   Q    And Mark Patrick set up this structure, correct?

6   A    I believe he coordinated.  I believe it was set up by

7   third-party law firms.  I believe it was Hutton or a firm like

8   that.

9   Q    Mr. Patrick participated in the creation of this structure

10  because you gave him the task of setting up a charitable

11  entity for Highland at that time, correct?

12  A    Yes.

13  Q    And you approved of this organizational structure,

14  correct?

15  A    Yes.

16  Q    And Grant Scott was the Trustee of the DAF for a number of

17  years, correct?

18  A    I often use that word, trustee, but technically I think

19  it's managing member.

20  Q    That's right.  I appreciate that.  I was using your word

21  from the deposition.  But is it fair to say that, to the best

22  of your knowledge, Grant Scott was the sole authorized

23  representative of the entity known as the DAF from 2011 until

24  just recently?

25  A    Sole -- I would describe it more he was in a trustee

Dondero - Direct                        149

1   function.

2   Q    Uh-huh.

3   A    Advice was being provided by Highland on the investment

4   side.  He wasn't expected to be a financial or an investment

5   expert.  And then accounting, tax, portfolio, tracking, you

6   know, compliance with all the offshore formation documents,

7   that was all done by Highland as part of a shared services

8   agreement.

9   Q    Okay.  I appreciate that, but listen carefully to my

10  question.  All I asked you was whether he was the authorized

11  representative, the sole authorized representative for the

12  ten-year period from 2011 until recently.

13  A    Yes.

14  Q    Okay.

15  A    I believe so.

16  Q    Thank you.  You served as the managing member of the DAF

17  GP, LLC before Mr. Scott, correct?

18  A    Yes.

19  Q    Okay.  And if you turn to Exhibit 26 in your binder,

20  that's the amended and restated limited liability company

21  agreement for the DAF GP, LLC, correct?

22  A    Yes.

23  Q    And on the last page, that's your signature line, right?

24  A    Yes.

25  Q    And you stepped down as the managing member on March 12,

Dondero - Direct                    150

 1  2012, and were replaced by Mr. Scott, correct?

 2  A    Yes.

 3  Q    And as you recall it, Mr. Scott came to be appointed the

 4  trustee of the DAF based on your recommendation, right?

 5  A    Based on my recommendation?  Yes, I would say that's fair.

 6  Q    And you made that recommendation to Mr. Patrick, right?

 7  A    I -- I don't remember who I made the recommendation to.

 8  But I would echo the testimony of Mark Patrick earlier that

 9  the purpose of stepping down was to make the DAF unaffiliated

10  or independent versus being in any way affiliated.

11         MR. MORRIS:  I move to strike.

12  BY MR. MORRIS:

13  Q    And I'd ask you to listen carefully to my question.

14         THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q    You made the recommendation to Mr. Patrick, correct?

17  A    I would give the same answer again.

18  Q    Okay.

19         MR. MORRIS:  Can we please put up Mr. Dondero's

20  deposition transcript from last Friday at Page 297?

21     I believe, Your Honor, that the court reporter thought

22  that this was a continuation of a prior deposition, and that's

23  why the pages begin in the, you know, high in the 200s and not

24  at Page 1.  Just to avoid any confusion.

25  BY MR. MORRIS:

Dondero - Direct                          151

1   Q    Mr. Dondero, do you see the transcript in front of you?

2   A    Yes.

3   Q    Okay.  Were you asked this question and did you give this

4   answer?  "Who did you make the" -- question, "Who did you make

5   the recommendation to?"  Answer, "It would have been Mark

6   Patrick."

7   A    I don't recall right now as I sit here, and it seems like

8   I was speculating when I answered, but it -- it probably would

9   have been Mark Patrick.  I just don't have a specific

10  recollection.

11  Q    You made the recommendation to Mr. Patrick because he was

12  responsible for setting up the overall structure, correct?

13  A    I -- I can't testify to why I did something I don't

14  remember.  I think that would be --

15  Q    Can we --

16  A    -- speculative.

17  Q    Are you finished, sir?

18  A    Yeah.

19  Q    Okay.

20       MR. MORRIS:  Can we go to Page 299, please?

21  BY MR. MORRIS:

22  Q    Lines 6 through 10.  Did I ask this question and did you

23  give me this answer?  Question, "But why did you select Mr.

24  Patrick as the person to whom to make your recommendation?"

25  Answer, "Because he was responsible for setting up the overall

Dondero - Direct                          152

1   structure."

2        Were you asked that question and did you give that answer

3   last Friday?

4   A    Yes.

5   Q    Thank you.  But it's your testimony that you don't really

6   know what process led to Mr. Scott's appointment, correct?

7   A    No, I -- I said I was refreshed by Mark Patrick's

8   testimony earlier.

9   Q    Yeah.  Were you refreshed that, in fact, you specifically

10  had the authority to and did appoint Grant Scott as the

11  managing member of the DAF GP, LLC?

12  A    I -- I don't know.

13  Q    Well, you're referring to Mr. Patrick's testimony and I'm

14  asking you a very specific question.  Did you agree -- is your

15  memory refreshed now that you're the person who put Grant

16  Scott in the position in the DAF?

17  A    I -- I don't know if I owned those secret shares that --

18  well, they're not secret, but shares that could appoint

19  anybody on the planet.  I guess if I was in that box at that

20  time before Grant, then I would have had that ability.  I'm

21  not denying at all that I recommended Grant.  I'm just saying

22  I don't -- I don't remember if I went specifically to him or

23  if it was Thomas Surgent that was orchestrating it at the

24  time.  I don't remember.

25  Q    Do you deny that you had the authority to and that you did

Dondero - Direct                      153

    1    appoint Grant Scott as your successor?

    2              MR. TAYLOR:  Your Honor, objection to the extent it

    3    calls for a legal conclusion.  I can't get close to a mic, so

    4    --

    5              THE COURT:  I overrule the objection.

    6              THE WITNESS:  Can you repeat the question for me?

    7    BY MR. MORRIS:

    8    Q   Do you deny that you had the authority to and that you

    9    did, in fact, appoint Grant Scott as your successor?

   10    A    It'd be better to say I don't -- I don't -- no, I don't

   11    remember or I didn't know the details at the time.  But,

   12    again, I -- I assume I owned those shares.  And, again, I do

   13    remember recommending Grant and -- but exactly how it

   14    happened, I don't remember.

   15    Q   Did you hear Mark Patrick say just an hour ago that you

   16    appointed Grant Scott as your successor?

   17              MR. SBAITI:  Objection, Your Honor.  Misstates

   18    testimony.  The witness testified he transferred shares.

   19    That's different than an appointment power.

   20              THE COURT:  Response?  I can't remember the exact way

   21    you worded it, to be honest.

   22              MR. MORRIS:  Neither can I, but I'll even take it

   23    that way.

   24              THE COURT:  Okay.

   25              MR. MORRIS:  I think he's wrong, but I'll even take

Dondero - Direct                                       154

1    it that way.

2              THE COURT:  Okay.

3    BY MR. MORRIS:

4    Q   Mr. Dondero, did you listen to Mark Patrick say that you

5    are the person who made the decision to transfer the shares to

6    Mr. Scott in 2012?

7    A   Yes, I heard him say that.

8    Q   Okay.  So, do you -- do you dispute that testimony?

9    A   I -- I don't have any better knowledge to dispute or

10   confirm.

11   Q   You and Mr. Scott have known each other since high school,

12   correct?

13   A   Yes.

14   Q   You spent a couple of years at UVA together, correct?

15   A   Yes.

16   Q   You were housemates together, correct?

17   A   Yes.

18   Q   He was the best man at your wedding, correct?

19   A   Yes.

20   Q   He's a patent lawyer, correct?

21   A   Yes.

22   Q   He had no expertise in finance when -- when he was

23   appointed as your successor to the DAF, correct?

24   A   Correct.

25   Q   To the best of your knowledge, at the time Mr. Scott

Appx. 00604

010607

Dondero - Direct                    155

1    assumed his position, he had never made any decisions

2    concerning collateralized loan obligations, correct?

3    A    Correct, but he wasn't hired for that.  That wasn't his

4    position.

5    Q    Was he the person who was going to make the decisions with

6    respect to the DAF's investments?

7    A    My understanding on how it was structured was the DAF was

8    paying a significant investment advisory fee to Highland.

9    Highland was doing portfolio construction and the investment

10   selection of -- or the investment recommendations for the

11   portfolio.  There is an independent trustee protocol that I

12   believe was adhered to, but it was never my direct

13   involvement.  It was always the portfolio managers or the

14   traders.

15        You have to provide three similar or at least two other

16   alternatives, and then with a rationale for each of them, but

17   a rationale for why you think one in particular is better.

18   And the trustee looks at the three, evaluates them.  And the

19   way I understand it always worked, that it works at pretty

20   much every charitable trust or trust that I'm aware of, they

21   generally, if not always, pick alongside the -- or, pick the

22   recommendation of their highly-paid investment advisory firm.

23   Q    And are you the highly-paid investment advisory firm?

24   A    Highland was at the time, yes.

25   Q    And you controlled Highland, right?

Appx. 00605
010608

Dondero - Direct                     156

1   A    Yes.

2   Q    Okay.  But at the end of the day, is it your understanding

3   that Mr. Scott had the exclusive responsibility for making

4   actual decisions on behalf of the charitable trust that you

5   had created?

6   A    Yeah, I mean, subject to the protocol I just described.

7   Q    Yeah, okay, so let's keep going.  Mr. Scott had no

8   experience or expertise running charitable organizations at

9   the time you decided to transfer the shares to him, correct?

10  A    Yes, I believe that's correct.

11  Q    Okay.  You didn't recommend Mr. Scott to serve as the

12  DAF's investment advisor, did you?

13  A    No.

14  Q    And until early 2021, as you testified, I believe,

15  already, HCMLP served as the DAF's investment advisor,

16  correct?

17  A    Yes.

18  Q    And until early 2021, all of the DAF's day-to-day

19  operations were conducted by HCMLP pursuant to a shared

20  services agreement, correct?

21  A    Yes.

22  Q    And from the time the DAF was formed until January 9,

23  2020, you controlled HCMLP, correct?

24  A    Yes.

25  Q    You can't think of one investment decision that HCMLP

Dondero - Direct                    157

1    recommended that Mr. Scott ever rejected in the ten-year

2    period, correct?

3            MR. SBAITI:  Objection, Your Honor.  Lacks

4    foundation.

5            THE COURT:  Response?

6            MR. MORRIS:  I'm not quite sure what to say, Your

7    Honor.  The witness has already testified that HCMLP was the

8    investment advisor, made recommendations to Mr. Scott, and

9    that Mr. Scott was the one who had to make the investment

10   decisions at the end of the day.

11           MR. SBAITI:  He's not here as a witness for HCMLP.

12   He's here in his personal capacity.  There's no foundation

13   he'd have personal knowledge of which specific investments

14   were proposed, which ones were rejected or accepted.  He said

15   it was done by the portfolio manager.

16           THE COURT:  Okay.  I overrule.  He can answer if he

17   has an answer.

18   BY MR. MORRIS:

19   Q   Sir, you can't think of one investment decision that HCMLP

20   ever recommended to Mr. Scott that he rejected, correct?

21   A   I can't think of one, but I would caveat with I wouldn't

22   have expected there to be any.

23   Q   So you expected him to just do exactly what HCMLP

24   recommended, correct?

25   A   No.  I would expect him to sort through the various

Dondero - Direct                    158

1    investments when he was given three or four to choose from and

2    be able to discern that, just as we had with our expertise,

3    which was much greater than his, discern which one was the

4    best and most suitable investment, the best risk-adjusted

5    investment, that he would come to the same conclusion.

6    Q    Okay.  You can't think of an investment that Mr. Scott

7    ever made on behalf of the DAF that didn't originate with

8    HCMLP, correct?

9    A    Again, no, but I wouldn't expect there to be.

10   Q    Okay.  And that's because you expected all of the

11   investments to originate with the company that you were

12   controlling, correct?

13   A    We were the hired investment advisor with fiduciary

14   responsibility --

15   Q    Uh-huh.

16   A    -- and with a vested interest in making sure the DAF

17   performance was the best it could be.

18   Q    Okay.  Let --

19   A    He was, as you said, a patent attorney.  It would have

20   been unusual for him to second-guess.  I'm sure, in any

21   private investment or any investment that was one off or

22   didn't have comps, you know, he probably sought third-party

23   valuations.  But you would have to talk to him about that, or

24   the people at Highland that did that.

25            MR. MORRIS:  I move to strike.  It's a very simple

Dondero - Direct                                    159

 1  question.

 2          THE COURT:  Sustained.

 3  BY MR. MORRIS:

 4  Q   Sir, you can't think of one investment that Mr. Scott made

 5  on behalf of the DAF that did not originate with HCMLP,

 6  correct?

 7  A   I'm going to give the same answer.

 8  Q   Okay.  Let's go to Page 371 of the transcript, please.

 9  Lines 7 through 11.

10      Oh, I apologize.  I think I might -- I think I meant 317.

11  I think I got that inverted.  Yeah.

12      Did I ask this question and did you give this answer:

13  "Can you think of any investment that Mr. Scott made on behalf

14  of the DAF that didn't original with HCMLP?"  Answer, "He

15  wasn't the investment advisor, but no, I don't -- I don't

16  recall."

17      Is that the answer you gave on Friday?

18  A   Yes.

19  Q   Thank you.  Let's --

20          MR. SBAITI:  Just for clarification, Your Honor, --

21          THE COURT:   Pardon?

22          MR. SBAITI:  -- the deposition was last Tuesday, not

23  on Friday.

24          MR. MORRIS:  I stand corrected, Your Honor.

25          THE COURT:  Okay.

Dondero - Direct                         160

1          MR. MORRIS:  I apologize.

2          THE COURT:  Okay.

3          MR. MORRIS:  I apologize if the Court thinks I misled

4     it.

5     BY MR. MORRIS:

6     Q   Let's talk about Mr. Scott's decision during the

7     bankruptcy case that preceded his resignation.  After HCMLP

8     filed for bankruptcy, CLO Holdco, Ltd. filed a proof of claim,

9     correct?

10          MR. ANDERSON:  Your Honor, I haven't objected yet,

11    but we literally haven't covered anything that deals with

12    commencing or pursuing a claim or cause of action.  I'm going

13    to object.  This is way outside, again, the bounds of the

14    contempt hearing.  It's -- otherwise, it's other discovery for

15    something else.  It literally has nothing to do with pursue a

16    claim or cause of action.

17          THE COURT:  We have another relevance objection.

18    Your response?

19          MR. MORRIS:  Your Honor, the evidence is going to

20    show that Mr. Dondero told Mr. Scott on three separate

21    occasions that his conduct, which were acts of independence,

22    were inappropriate and were not in the best interests of the

23    DAF.  Within days of the third strike, he resigned.  Okay?

24       I think it's relevant to Mr. Dondero's control of the DAF.

25    I think that the moment that Mr. -- this is the argument I'm

Dondero - Direct                   161

1   going to make.  I'll make it right now.  You want me to make

2   it now, I'll make it now.  The moment that Mr. Scott exercised

3   independence, Mr. Dondero was all over him, and Mr. Scott

4   left.  That's what happened.  The evidence is going to be

5   crystal clear.

6      And I think that that control of the DAF is exactly what

7   led to this lawsuit.  And what led -- and I'm allowed to make

8   my argument.  So that's why it's relevant, Your Honor, because

9   I think it shows that Mr. Scott -- Mr. Scott, after exercising

10  independence, was forced out.

11           MR. ANDERSON:  That doesn't move the needle one bit

12  as to whether a lawsuit was commenced or a claim or cause of

13  action was pursued, which is the subject of the contempt

14  motion.  It doesn't move the needle one bit as to those two

15  issues, as to whether that has any bearing on was it commenced

16  or was it pursued.

17           MR. MORRIS:  Your Honor, I appreciate the very narrow

18  focus that counsel for a different party is trying to put on

19  this, but it is absolutely relevant to the question of whether

20  Mr. Dondero was involved in the pursuit of these claims.  All

21  right?  That's what the order says.  Pursue.

22           THE COURT:  All right.  Overruled.

23  BY MR. MORRIS:

24  Q   After HCMLP filed for bankruptcy, CLO Holdco filed a proof

25  of claim, correct?

Dondero - Direct                          162

1    A    I believe so.

2    Q    And in the fall of 2020, Mr. Scott amended the proof of

3    claim to effectively reduce it to zero, correct?

4    A    I -- I guess.

5    Q    And Mr. Scott made that decision without discussing it

6    with you in advance, correct?

7    A    Yes.

8    Q    But you did discuss it with him after you learned of that

9    decision, correct?

10   A    I don't -- I don't recall.  I'm willing to be refreshed,

11   but I don't remember.

12   Q    Well, you told him specifically that he had given up bona

13   fide claims against the Debtor, correct?

14   A    Let me state or clarify my testimony this way.  Um, --

15        MR. MORRIS:  Your Honor, it's really just a yes or no

16   question.  His counsel can ask him if he wants to clarify, but

17   it's really just a yes or no question.

18   BY MR. MORRIS:

19   Q    You told Mr. Scott that he gave up bona fide claims

20   against the Debtor, correct?

21        THE COURT:  Okay.

22        THE WITNESS:  I don't know if I told him then with

23   regard to those claims.

24   BY MR. MORRIS:

25   Q    Okay.  Can we go to Page 321 of the transcript?  At the

Dondero - Direct                    163

1  bottom, Line 21?  22, I apologize.

2      Did I ask this question and did you give this answer?

3  "And what do you" -- Question, "And what do you recall about

4  your discussion with Mr. Scott afterwards?"  Answer, "That he

5  had given up bona fide claims against the Debtor and I didn't

6  understand why."

7      Did I ask that question and did you give that answer last

8  Tuesday?

9  A    Yes.

10 Q    Okay.  A short time later, in December, the Debtor filed

11 notice of their intention to enter into a settlement with

12 HarbourVest, correct?

13 A    Yes.

14 Q    And CLO Holdco, under Mr. Scott's direction, filed an

15 objection to that settlement, correct?

16 A    Yes.

17 Q    And that settlement, the substance of that settlement was

18 that the Debtor did not have the right to receive

19 HarbourVest's interests in HCLOF at the time, correct?

20 A    I don't remember the exact substance of it.

21 Q    Okay.  But you do remember that you learned that Mr. Scott

22 caused CLO Holdco to withdraw the objection, correct?

23 A    Yes, ultimately.

24 Q    Okay.  And again, Mr. Scott did not give you advance

25 notice that he was going to withdraw the HarbourVest

Dondero - Direct                              164

1   objection, correct?

2   A    No, he -- he did it an hour before the hearing.  He didn't

3   give anybody notice.

4   Q    You learned that Mr. Scott caused CLO Holdco to withdraw

5   its objection to the HarbourVest settlement at the hearing,

6   correct?

7   A    Yes.

8   Q    And you were surprised by that, weren't you?

9   A    I believe everybody was.

10  Q    You were sur... you were surprised by that, weren't you,

11  sir?

12  A    Yes.

13  Q    And you were surprised by that because you believed Mr.

14  Scott's decision was inappropriate, right?

15  A    Partly inappropriate, and partly because 8:00 o'clock the

16  night before he confirmed that he was going forward with the

17  objection.  And I think the DAF's objection was scheduled to

18  be first, I think.

19  Q    After you learned that Mr. Scott instructed his attorneys

20  to withdraw the CLO Holdco objection to the HarbourVest

21  settlement, you again spoke with Mr. Scott, correct?

22  A    Yes.

23  Q    And that conversation took place the day of the hearing or

24  shortly thereafter, correct?

25  A    Yes.

Dondero - Direct                              165

1    Q    And during that conversation, you told Mr. Scott that it
2    was inappropriate to withdraw the objection, correct?
3    A    Yes.
4    Q    And in response, Mr. Scott told you that he followed the
5    advice of his lawyers, correct?
6    A    Yes.
7    Q    But that didn't -- that explanation didn't make sense to
8    you, right?
9    A    Yes.
10   Q    In fact, you believed that Mr. Scott failed to act in the
11   best interests of the DAF and CLO Holdco by withdrawing its
12   objection to the HarbourVest settlement, correct?
13   A    Yes.
14   Q    And while you didn't specifically use the words fiduciary
15   duty, you reminded Mr. Scott in your communications with him
16   that he needed to do what was in the best interests of the
17   DAF, correct?
18   A    Yes.
19   Q    You're the founder of the DAF, correct?
20   A    I put it -- I put it in motion.  Yeah.  I tasked Mark
21   Patrick and third-party law firms to do it, but if that boils
22   down to founder, I guess yes.
23   Q    Uh-huh.  And you're the primary donor to the DAF, correct?
24   A    Yes.
25   Q    You're the investment advisor to the DAF, or at least you

010618

Dondero - Direct                    166

1   were at that time?

2   A    Yes.

3   Q    And because you served in these roles, you expected Mr.

4   Scott to discuss his decision to withdraw the HarbourVest

5   objection in advance, correct?

6   A    Yes, I -- I think it was even broader than that.  I mean,

7   he was having health and anxiety issues, and to the extent he

8   felt overwhelmed, I -- you know, yeah, you should do what's in

9   the best interests at all times, but -- but yes, I thought it

10  would be helpful if he conferred with me or Mark Patrick or

11  whoever he was comfortable with.

12  Q    Mr. Dondero, you specifically believed that Mr. Scott's

13  failure to tell you that he was going to withdraw the

14  HarbourVest objection in advance was inappropriate, right?

15  A    Yes.

16  Q    Even though he was the sole authorized representative, you

17  believed that, because you were the founder of the DAF, the

18  primary donor of the DAF, and the investment advisor to the

19  DAF, he should have discussed that before he actually made the

20  decision, correct?

21  A    No.  What I'm saying is at 8:00 o'clock at night, when he

22  confirms to numerous people he's ready to go first thing with

23  his objection, and then he or counsel or some combination of

24  them change their mind and don't tell anybody before the

25  hearing, that's odd and inappropriate behavior.

                    Dondero - Direct                    167

 1          MR. MORRIS:  Can we go to Page 330 of the transcript,

 2   please?

 3      And Your Honor, before I read the testimony, there is an

 4   objection there.  So I'd like you to rule --

 5          THE COURT:  Okay.

 6          MR. MORRIS:  -- before I do that.  It can be found at

 7   -- on Page 330 at Line 21.

 8      (Pause.)

 9          MR. MORRIS:  Here we go.  Page 30, beginning at Line

10   19.  330, rather.

11          THE COURT:  Okay.

12      (Pause.)

13          THE COURT:  Okay.  I overrule that objection.

14   BY MR. MORRIS:

15   Q   Mr. Dondero, were you asked this question and did you give

16   this answer last Tuesday?  Question, "Do you believe that he

17   had an obligation to inform you in advance?"  Answer, "I don't

18   know if I would use the word obligation, but, again, as the

19   founder or the primary donor and continued donor to the DAF,

20   and as the investment advisor fighting for above-average

21   returns on a daily basis for the fund, significant decisions

22   that affect the finances of the fund would be something I

23   would expect typically a trustee to discuss with the primary

24   donor."

25      Did you give that answer the other day, sir?

Appx 06677
010620

Dondero - Direct                    168

1    A    Yes.

2    Q    If Mr. Patrick decides tomorrow to withdraw the lawsuit

3    that's in District Court, does he have an the obligation to

4    tell you in advance?

5    A    Again, I wouldn't use the word obligation.  But something

6    that I think ultimately is going to be a $20 or $30 million,

7    if not more, benefit to the DAF, to the detriment of Highland,

8    if you were to give that up, I would expect him to have a

9    rationale and I would expect him to get other people's

10   thoughts and opinions before he did that.

11   Q    Okay.  But does he have to get your opinion before he

12   acts?

13   A    No, he does not.

14   Q    Okay.  So he -- Mr. Patrick could do that tomorrow, he

15   could settle the case, and if he doesn't come to you to

16   discuss it in advance, you won't be critical of him, right?

17   A    He doesn't have the obligation, but there's -- there's a

18   reasonableness in alignment of interests.  I -- a growing

19   entrepreneur sets up a trust, a lot of times they'll put their

20   wife in charge of it, and she hires investment advisers and

21   whatever, but they've got the best interests at mind for the

22   charity or the children or whatever.

23       You know, people who go rogue and move in their own self-

24   interest or panic, that stuff can happen all the time.  It

25   doesn't make it appropriate, though.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 170
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 704 of 1017 PageID 11485

Dondero - Direct                    169

1    Q    A couple of weeks after Mr. Scott withdraw the objection

2    to the HarbourVest settlement, he entered into a settlement

3    agreement with the Debtor pursuant to which he settled the

4    dispute between the Debtor and CLO Holdco, correct?

5    A    Yes.

6    Q    Okay.  You didn't get advance notice of that third

7    decision, correct?

8    A    No.

9    Q    Can we go to Page -- Exhibit 32 in your binder?  And this

10   is the settlement agreement between CLO Holdco and the Debtor,

11   correct?  Attached as the exhibit.  I apologize.

12   A    Yes.

13   Q    And do you understand that that's Mr. Scott's signature on

14   the last page?

15   A    Yep.

16   Q    And you learned about this settlement only after it had

17   been reached, correct?

18   A    Yep.

19   Q    And you believed Mr. Scott's decision not to pursue

20   certain claims against the Debtor or to remove HCMLP as the

21   manager of the CLOs was not in the best interests of the DAF,

22   correct?

23   A    Correct.

24   Q    And you let Mr. Scott know that, correct?

25   A    Yes.

Dondero - Direct                    170

1  Q    After learning about the settlement agreement on January
2  26th, you had one or two conversations with Mr. Scott on this
3  topic, correct?
4  A    Yes.
5  Q    And your message to Mr. Scott was that the compromise or
6  settlement wasn't in the DAF's best interest, correct?
7  A    It was horrible for the DAF.
8  Q    Uh-huh.  And you told him that, right?
9  A    Yes.
10 Q    Okay.  From your perspective, any time a trustee doesn't
11 do what you believe is in the trust's best interest, you leave
12 yourself open to getting sued, correct?
13 A    Who is "you" in that question?
14 Q    You.  Mr. Dondero.
15 A    Can you repeat the question, then, please?
16 Q    Sure.  From your perspective, any time you're a trustee
17 and you don't believe that the trustee is doing what's in the
18 best interests of the fund, the trustee leaves himself open to
19 getting sued, correct?
20 A    I don't know who the trustee leaves himself open to, but
21 as soon as you go down a path of self-interest or panic, you
22 -- you potentially create a bad situation.  But I don't know
23 who holds who liable.
24 Q    Did you believe that Mr. Scott was acting out of self-
25 interest or panic when he decided to settle the dispute with

Appx 06689
010623

 1   the Debtor on behalf of CLO Holdco?

 2   A    Yes.

 3   Q    Did you tell him that?

 4   A    He told me that.

 5   Q    He told you that he was acting out of panic or

 6   desperation?  With self-int... withdrawn.  Withdrawn.  Did he

 7   tell you that he was acting out of self-interest?

 8   A    He was having health problems, anxiety problems, and he

 9   didn't want to deal with the conflict.  He didn't want to

10   testify.  He didn't want to come to court.  He didn't want to

11   do those things.  And I told him I didn't think the settlement

12   was going to get him out of that stuff.  I think, you know, it

13   got him out of some issues, but I think you guys are going to

14   go after him for other stuff.  But he -- he panicked.

15            MR. MORRIS:  I move to strike the latter remark.

16            THE COURT:    Sustained.

17   BY MR. MORRIS:

18   Q    Shortly after you had the conversation with Mr. Scott, he

19   sent you notice of his intent to resign from his positions at

20   the DAF and CLO Holdco, correct?

21   A    Yes.

22   Q    Okay.  Let's take a look at that, please.  Exhibit 29.

23   This is Mr. Scott's notice of resignation, correct?

24   A    Yes.

25   Q    He sent it only to you, correct?

Dondero - Direct                          172

1    A    Yes.

2    Q    A couple of days before he sent this, he told you he was

3    considering resigning; isn't that right?

4    A    Yes.

5    Q    Okay.  And he told you he was considering resigning

6    because he was suffering from health and anxiety issues

7    regarding the confrontation and the challenges of

8    administering the DAF given the bankruptcy, correct?

9    A    Yes.

10   Q    He didn't tell you that he made the decision -- withdrawn.

11   Did you tell him in this same conversation -- withdrawn.  Is

12   this the same conversation where you conveyed the message that

13   the compromise or settlement wasn't in the best interests of

14   the DAF?

15   A    You mean the conversation -- or the resignation? Is that

16   -- can you rephrase the question, please?

17   Q    Yeah, I apologize.  It's my fault, sir.  You testified

18   that after the January 26th hearing you had a conversation

19   with Mr. Scott where you told him that the compromise or

20   settlement was not in the best interests of the DAF, correct?

21   A    Yes.

22   Q    Okay.  Did Mr. Scott share with you his concerns about

23   anxiety and health issues in that same conversation, or was it

24   in a subsequent conversation?

25   A    It was at or around that time.  I -- I don't remember

Dondero - Direct                          173

1  which conversation.

2  Q    Okay.

3  A    But it was right at or around that time.

4  Q    All right.  You never asked Mr. Scott to reconsider, did

5  you?

6  A    No.

7  Q    You don't recall sending this notice of resignation to

8  anyone, do you?

9  A    No.

10  Q    You don't remember notifying anyone that you'd received

11  notice of Mr. Scott's intent to resign from the DAF, do you?

12  A    It was -- yeah, no, I -- I don't remember.  It was a busy

13  time around that time and this was a secondary issue.

14  Q    Okay.  So the fact that the person who has been running

15  the DAF for a decade gives you and only you notice of his

16  intent to resign was a secondary issue in your mind?

17  A    Yes, because when I talked to him at about that time, I

18  said, okay, well, it's going to take a while.  I don't even

19  know how the mechanism works.  But don't do anything adverse

20  to the DAF, don't do anything else until, you know, you've

21  figured out transition.

22  Q    Uh-huh.

23  A    And so once he had confirmed he wouldn't do anything

24  outside normal course until he transitioned, I didn't worry

25  about this.  I had bigger issues to worry about at the time.

Dondero - Direct                    174

1  Q   In the third paragraph of his email to you, he wrote that

2  his resignation will not be effective until he approves of the

3  indemnification provisions and obtains any and all necessary

4  releases.  Do you see that?

5  A   Yes.

6  Q   And that was the condition that on January 31st Mr. Scott

7  placed on the effectiveness of his resignation, correct?

8  A   Condition?  Yeah, I -- I think he's trying to state the

9  timing will happen after that.

10  Q   After he gets the release, right?

11  A   Yes.

12  Q   And he wanted the release because you'd told him three

13  different times that he wasn't acting in the best of the DAF,

14  correct?

15         MR. TAYLOR:  Objection, Your Honor.

16         MR. SBAITI:  Objection.  Calls for --

17         MR. TAYLOR:  Objection.  Calls for speculation.

18         THE WITNESS:  Yeah, I --

19         THE COURT:  Sustained.

20         THE WITNESS:  I can't take that jump.  Yeah.

21  BY MR. MORRIS:

22   Q   In response to this email from your lifelong friend, you

23  responded, if we could scroll up, about whether divest was a

24  synonym -- if we can look at the first one -- whether divest

25  is a synonym for resigned.  Do I have that right?

010627

Dondero - Direct                    175

1    A    (no immediate response)

2    Q    If you will look at your response on Monday morning at

3    9:50.

4    A    Yes.

5    Q    Okay.  And then after Mr. Scott responds, you respond

6    further, if we can scroll up, and you specifically told him,

7    "You need to tell me ASAP that you have no intent to divest

8    assets."  Correct?

9    A    Yes.

10   Q    And you wrote that because you believed some of his

11   behavior was unpredictable, right?

12   A    I think I wrote that because the term divest in investment

13   terms means sale or liquidate, but I guess it had a different

14   legal term in the way he was looking at it.  I wasn't aware at

15   that time of the shares that could be bequeathed to anybody,

16   and I think the divest refers to that, but I wasn't aware that

17   that's how the structure worked at that time, and I was

18   worried that divest could be the investment term and I -- it

19   wouldn't have been appropriate for him to liquidate the

20   portfolio.

21   Q    So, and you wanted to make sure he wasn't liquidating or

22   intending to liquidate any of the CLOs, correct?

23   A    Correct.

24   Q    Okay.  So he's still the authorized, the sole authorized

25   representative, but you wanted to make sure that he didn't do

Appx 06685

010628

Dondero - Direct                        176

1   anything that you thought was inappropriate.  Fair?

2   A    It's because I had talked to him before this and he said

3   he wasn't going to do anything outside normal course, and then

4   the word divest scared me, but I didn't realize it was a legal

5   term in this parlance here.

6   Q    And so after he explained, you still wanted to make sure

7   that he wasn't divesting any assets, correct?

8   A    Yes.

9   Q    Okay.  Since February 1st, you've exchanged exactly one

10  text messages with Mr. Scott; is that right?

11  A    I think there've been several, several text messages.  But

12  one on his birthday.

13  Q    Yeah.  And you haven't spoken to him in months, correct?

14  A    In a couple months, yes.

15  Q    All right.  Let's talk about the replacement of Mr. Scott.

16  With -- with Mr. Scott's notice, someone needed to find a

17  replacement, correct?

18  A    Yes.

19  Q    And the replacement was going to be responsible for

20  managing a charitable organization with approximately $200

21  million of assets, most of which was seeded directly or

22  indirectly through you, correct?

23  A    Yes.

24  Q    And the replacement was going to get his and her -- his or

25  her investment advice from you and NexPoint Advisors; do I

Appx 06686

010629

Dondero - Direct                        177

1    have that right?

2    A    That was the plan.

3    Q    Okay.  Ultimately, Mr. Patrick replaced Mr. Scott,

4    correct?

5    A    Yes.

6    Q    But it's your testimony that you had no knowledge that Mr.

7    Patrick was going to replace Mr. Scott until after it happened

8    on March 24, 2021.  Correct?

9    A    That's correct.  I believe it happened suddenly.

10   Q    So, for nearly two months after you had received notice of

11   Mr. Scott's intent to resign, you were uninvolved in the

12   process of selecting his replacement, correct?

13   A    I was uninvolved.  I'd say the process was dormant for an

14   extended period of time until Mark Patrick came on board, and

15   then Mark Patrick ran the process of interviewing multiple

16   potential candidates.

17   Q    Mark Patrick didn't have any authority prior to March

18   24th, correct?

19   A    Is March 24th the date that he transitioned the shares to

20   himself from Grant Scott?

21   Q    Yep.

22   A    That's when he then became the trustee of the DAF, yes.

23   Q    Do you know -- do you know who was instructing Mr. Patrick

24   on who to interview or how to carry the process out?

25   A    He was doing that on his own with, I think,

Appx 06587

Dondero - Direct                    178

1   recommendations from third-party tax firms.

2   Q    So Mr. Patrick was trying to find a successor to Mr.

3   Scott, even though he had no authority to do that, and you

4   were completely uninvolved in the whole process?  Do I have

5   that right?

6   A    I was uninvolved, yes.  He was trying to facilitate it for

7   the benefit of his friendship with Grant Scott and knowing

8   that it -- it -- with his resignation, it had to transition to

9   somebody.  And he enjoys working on the DAF, he enjoys the

10  charitable stuff in the community, and he was the most

11  appropriate person to work on helping Grant transition.

12          MR. MORRIS:  All right.  I move to strike, Your

13  Honor.  It's hearsay.

14          THE COURT:  Sustained.

15  BY MR. MORRIS:

16  Q    You're aware that Mr. Seery was appointed the Debtor's CEO

17  and CRO last summer, correct?

18  A    Yes.

19  Q    And you're aware that Mr. Seery's appointment was approved

20  by the Bankruptcy Court, correct?

21  A    Yes.

22  Q    And you were aware of that at the time it happened,

23  correct?

24  A    Yes.

25  Q    And even before that, in January of 2020, you consented to

Dondero - Direct                               179

1  a settlement where you gave up control of the Debtor.

2  Correct?

3  A    To the independent board for a consensual Chapter 11

4  restructuring that would leave Highland intact.

5  Q    And do you understand that the gatekeeper provision in the

6  July order is exactly like the one that you agreed to in

7  January except that it applies to Mr. Seery instead of the

8  independent directors?

9  A    I -- I learned a lot about that today, but I don't think

10  it's appropriate to move what applied to the board to the CEO

11  of a registered investment advisor.

12  Q    Okay.  I'm just asking you, sir.  Listen carefully to my

13  question.  Were you aware in January 2020 that you agreed to a

14  gatekeeper provision on behalf of the independent board?

15  A    Generally, but not specifically.

16  Q    Okay.

17  A    Not -- not like what we've been going over today.

18  Q    Okay.  And you knew that Mr. Seery had applied to be

19  appointed CEO subject to the Court's approval, correct?

20  A    Wasn't it backdated to March?  I -- I think the hearing

21  was in June, but it was backdated for -- for money and other

22  purposes, right?  I -- that's my recollection.  I don't

23  remember otherwise.

24  Q    You do remember that Mr. Seery got -- he got -- his

25  appointment got approved by the Court, right?

010632

Dondero - Direct                    180

1    A    Yes.  But, as far as the dates are concerned, I thought it

2    was either in March or retroactive to March.  Maybe it was

3    June or July.

4    Q    And you --

5    A    But I don't remember.

6    Q    Did you have your lawyers review the motion that was filed

7    on behalf of the Debtor?

8    A    I'm -- I assume they do their job.  I -- if they didn't, I

9    don't know.

10   Q    Okay.  That's what you hired them to do; is that fair?

11   A    Yes.

12   Q    Okay.  Can we go to Exhibit 12, please?  I think it's in

13   Binder 1.  You've seen this document before, correct?

14   A    Yes.

15   Q    In fact, you saw versions of this complaint before it was

16   filed, correct?

17   A    Yes, I saw one or two versions towards the end.  I don't

18   know if I saw the final version, but --

19   Q    Sir, you participated in discussions with Mr. Sbaiti

20   concerning the substance of this complaint before it was

21   filed, correct?

22   A    Some.  I would just use the word some.

23   Q    Okay.  Can you describe for me all of your conversations

24   with Mr. Sbaiti concerning the substance of this complaint?

25          MR. SBAITI:  Your Honor, I would object on the basis

Dondero - Direct                    181

1   of work product privilege and attorney-client communications.

2   He was an agent for my client, the DAF, at the time he was

3   having these discussions with us, and our discussions with him

4   were work product.  So to the extent he can reveal the

5   conversations without discussing the actual content, we would

6   raise privilege objection, Your Honor.

7           THE COURT:  Mr. Morris?

8           MR. MORRIS:  Your Honor, there is no privilege here.

9   That's exactly why I asked Mr. Patrick the questions earlier

10  today.  Mr. Dondero is not party to any agreement with the DAF

11  today.  It's an informal agreement, perhaps, but there is no

12  contractual relationship, there is no privity any longer

13  between Mr. Dondero or any entity that owns and controls in

14  the DAF, as far as I know.  If they have evidence of it, I'm

15  happy to listen, but that -- that's exactly why I asked those

16  questions of Mr. Patrick earlier today.

17          THE COURT:  All right.

18          MR. SBAITI:  Your --

19          THE COURT:  That was the testimony.  There's an

20  informal arrangement, at best.

21          MR. SBAITI:  Well, Your Honor, I would suggest that

22  that doesn't necessarily mean that he isn't an agent of the

23  DAF.  It doesn't have to be a formal agreement for him to be

24  an agent of the DAF.

25      Everyone's agreed he was an advisor.  Everyone's agreed he

Dondero - Direct                    182

1    was helping out.  That is an agency relationship.  It doesn't

2    have to be written down.  It doesn't have to be a formal

3    investment advisory relationship.  He's still an agent of the

4    DAF.  He was requested to do something and agreed to do it

5    under the expectation that all of us had that those would be

6    privileged, Your Honor.  That is -- that is sufficient -- that

7    is sufficient, I would argue, to get us where we need to be.

8    The privilege should apply, Your Honor, and they don't have a

9    basis for, I would say, invading the privilege, Your Honor.

10           THE COURT:  Well, do you have any authority?  Because

11   it just sounds wrong.  He's not an employee of your client.

12   He doesn't have any contractual arrangement with your client.

13           MR. SBAITI:  Your Honor, I would dispute the idea

14   that he has no contractual arrangement with my client.  The

15   question was asked, do you have a -- do you have a written

16   agreement, and then the question was, so you don't have a

17   contract, and the answer was no, I don't have a contract,

18   building upon that first -- that first question.  But the

19   testimony as he just recounted is that there is an agreement

20   that he would advise Mr. Patrick and he would advise the DAF.

21           THE COURT:  Okay.

22           MR. SBAITI:  That's -- that's a contract.

23           THE COURT:  Okay.  My question was, do you have any

24   legal authority?  That's what I meant when I said authority.

25   Any legal authority to support the privilege applying in this

Appx 06692
010635

Dondero - Direct                      183

1   kind of --

2           MR. SBAITI:  In an informal arrangement, Your Honor?

3   I don't have one at my fingertips at the moment, Your Honor,

4   but I don't know that that should be a reason to invade the

5   privilege.

6       And I would just add, Your Honor, I would just add, we've

7   already -- because of the purpose of these questions, you've

8   heard Mr. Morris state several times that the purpose is to

9   show that Mr. -- that Mr. Dondero had some role in advising

10  and participating in the creation of this complaint.  That's

11  been conceded by myself.  I believe it was conceded by Mr.

12  Dondero.

13      The actual specific facts, the actual specific

14  conversations, Your Honor, shouldn't be relevant at this point

15  and they shouldn't be admissible, given -- given the

16  relevancy, given the perspective of the privilege.

17          THE COURT:  Okay.

18          MR. MORRIS:  If I might --

19          THE COURT:  I overrule your objection.  I don't think

20  a privilege has been shown here --

21          MR. SBAITI:  And Your Honor, --

22          THE COURT:  -- and I think it's relevant.

23          MR. SBAITI:  -- I would ask if we could *voir dire* the

24  witness on the basis of the privilege, if that's --

25          THE COURT:  All right.  You may do so.

010636

Dondero - Voir Dire                    184

1                    VOIR DIRE EXAMINATION

2  BY MR. SBAITI:

3  Q    Mr. Dondero, do you have a relationship with the DAF?

4  A    Yes.

5  Q    How would you describe that relationship?

6  A    I view myself and my firm as the investment advisor.  I

7  was actually surprised by the testimony today that there

8  wasn't a contract in place, but there should be one.  There

9  should be one soon, in my opinion.

10 Q    Have you -- did you hear Mr. Patrick testify earlier that

11 he comes to you for advice?

12 A    Yes.

13 Q    Is that --

14 A    As he should.  Yeah.

15 Q    Is that true?

16 A    Yes.

17 Q    When you render that advice, do you render that advice

18 with some expectation about him following or listening to that

19 advice?

20 A    Okay, I think there's only been one investment or one

21 change in the DAF portfolio since Mark Patrick's been

22 involved, only one, and it was a real estate investment that I

23 wasn't directly involved in.  And so the people who put that

24 investment forward worked with Mark without my involvement,

25 and then I think Mark got third-party appraisal firms and

Dondero - Voir Dire                    185

1  third-party valuation firms involved to make sure he was

2  comfortable, which was a good process.

3  Q   When you supplied information to Mr. Patrick, do you do so

4  under the belief that there is a contractual, informal or

5  formal, relationship?

6            MR. MORRIS:  Objection to the form of the question.

7            THE COURT:  Overruled.

8            MR. SBAITI:  What specific form?

9            THE COURT:  Overruled.

10           MR. SBAITI:  Thank you.

11           THE WITNESS:  Yes.  I believe it -- it's a

12  relationship that can and should be papered as -- soon.

13  That's my -- I mean, unless I get some reason from counsel not

14  to, I think it's something that should be memorialized.

15  BY MR. SBAITI:

16  Q   And when you have that -- in that relationship, when you

17  communicate with Mr. Patrick about matters, investment or

18  otherwise, is there an expectation of privacy?

19  A   Yes.

20  Q   When Mr. Patrick -- did Mr. Patrick request that you

21  interface with my firm and myself, as he testified earlier?

22  A   Yes.

23  Q   And when he did so, did he ask you to do so in an

24  investigatory manner?

25           MR. MORRIS:  Objection to the form of the question.

1              THE COURT:  Sustained.  Rephrase.

2    BY MR. SBAITI:

3    Q    Did he tell you why he wanted you to talk to us?

4    A    Yeah.  At that point, he had started an investigation into

5    the HarbourVest transaction.

6    Q    And -- and when he -- when you were providing information

7    to us, did he tell you whether he wanted you to help the

8    Sbaiti firm conduct the investigation?

9    A    The -- overall, the financial numbers and tables in there

10   were prepared by not myself, but I -- I did -- I did help on

11   -- on the -- some of the registered investment advisor issues

12   as I understood them.

13   Q    Okay.  And the communications that you had with us, was

14   that part of our investigation?

15             MR. MORRIS:  Objection to the form of the question.

16             THE COURT:  Overruled.

17             THE WITNESS:  Yes.

18   BY MR. SBAITI:

19   Q    And did you understand that we had been retained by Mr.

20   Patrick on behalf of the DAF and CLO Holdco?

21   A    Yes.

22   Q    And did you appreciate or have any understanding of

23   whether or not you were helping the law firm perform its legal

24   function on behalf of the DAF and CLO Holdco?

25   A    Perform its legal function?  I was just helping with

Dondero - Voir Dire                    187

1   regard to the registered investment advisor aspects of the

2   overall, you know, like that.

3   Q   Let me ask a more simple question.  Did you -- did you

4   appreciate that you were assisting a law firm in its

5   representation of the DAF?

6   A   Yes.

7   Q   And you were helping the law -- and were you helping the

8   law firm develop the facts for a complaint?

9   A   Yes.  I would almost say, more importantly, I wanted to

10  make sure that there weren't errors in terms of understanding

11  either how CLOs worked or how the Investment Advisers Act

12  worked.  So I was -- it was almost more of a proofing.

13          MR. SBAITI:  Your Honor, based upon that, I mean,

14  he's helping a law firm perform its function for the client.

15  That's an agency relationship that gets cloaked.  You can call

16  him a consulting expert.  You can call him, to a certain

17  extent, a fact witness, Your Honor.  If we want to take a

18  break, I'm sure we could find authority on that basis for a

19  work product privilege pretty easily.

20      But he's an agent of the DAF.  Even if it's an informal

21  agency relationship, that's still agency.  He's in some

22  respects, I guess, an agent of the law firm, to the extent

23  he's helping us perform our legal work.  And it seems like

24  invading that privilege at this juncture is (a) unnecessary,

25  because we've already conceded that there's been

Dondero - Voir Dire                    188

1    conversations, which I think is the relationship they wanted

2    to establish.  And it's not unusual for a law firm to use

3    someone with specialized knowledge to understand some of the

4    intricacies of the actual issues that they're -- that they're

5    getting ready to litigate.

6           THE COURT:  Okay.  I find no privilege.  All right.

7    That's the ruling.

8           MR. BRIDGES:  Your Honor, may I add one thing to the

9    objection for the record?

10          THE COURT:  Okay, we have a rule, one lawyer per

11   witness.  Okay?  So, thank you.  A District Court rule, by the

12   way, not mine.

13          MR. SBAITI:  Your Honor, may we take a short recess,

14   given the Court's ruling?

15          THE COURT:  Well, I'd really like to finish this

16   witness.  How much longer do you have?

17          MR. MORRIS:  About eight more questions.

18          THE COURT:  All right.  We'll take a break after the

19   direct, okay?

20          MR. SBAITI:  Your Honor, I would ask that we -- if

21   he's going to ask him more questions about the content of the

22   communications, I ask respectfully for a recess so we can

23   figure out what to do about that.  Because, right now, there's

24   a ruling that he's going to have to reveal privileged

25   information, and we don't have a way to go around and figure

                    Dondero - Voir Dire                    189

1  out how to resolve that issue if we needed to.

2          THE COURT:  Okay.  I've ruled it's not privilege.

3  Okay?

4          MR. SBAITI:  I understand that, Your Honor, but --

5          THE COURT:  Your client is CLO Holdco and the DAF.

6          MR. SBAITI:  Yes, Your Honor.

7          THE COURT:  Representative, Mark Patrick.  No

8  contract with Mr. Dondero.  The fact that he may be very

9  involved I don't think gives rise to a privilege.  That's my

10 ruling.

11         MR. SBAITI:  I understand, Your Honor.  I understand,

12 Your Honor, but I'm asking for a recess so that we can at

13 least undertake to provide Your Honor with some case law on a

14 reconsideration before we go there, because that bell can't be

15 unrung.

16         MR. MORRIS:  Your Honor, if I may?

17         MR. SBAITI:  And it's --

18         THE COURT:  Uh-huh.

19         MR. MORRIS:  I'm happy to give them ten minutes, Your

20 Honor, as long as they don't talk to the witness.

21         THE COURT:  Okay.

22         MR. MORRIS:  I want to give them the opportunity.  Go

23 right ahead.

24         THE COURT:  All right.  We'll take a ten-minute

25 break.

Dondero - Voir Dire                    190

1              MR. SBAITI:  Thank you.

2              THE COURT:  It's 3:05.

3              THE CLERK:  All rise.

4        (A recess ensued from 3:03 p.m. until 3:17 p.m.)

5              THE CLERK:  All rise.

6              THE COURT:  Okay.  Please be seated.  Going back on

7    the record in Highland.  Mr. Sbaiti?

8              MR. SBAITI:  Yes, Your Honor.  May I approach?

9              THE COURT:  You may.

10             MR. SBAITI:  Your Honor, we have some authority to

11   support the position we'd taken.  We'd ask the Court to

12   reconsider your ruling on the privilege.

13       The first bit of authority is Section 70 of the

14   Restatement (Third) of Law Governing Lawyers.  Privileged

15   persons within the meaning of Section 68, which governs the

16   privilege, says that those persons include either agents of

17   either the lawyer or the client who facilitate communications

18   between the two in order for the lawyers to perform their

19   function.

20       Another case that we found is 232 F.R.D. 103 from the

21   Southern District of New York, 2005.  It's *Express Imperial*

22   *Bank of U.S. v. Asia Pulp Company*.  And in that case, Your

23   Honor, the consultant was a -- had a close working

24   relationship with the company and performed a similar role to

25   that of the employee and was assisting the law firm in

Dondero - Voir Dire                                    191

1    performing their functions, and the court there found that the

2    work product privilege -- actually, the attorney-client

3    privilege -- attached in what they called a Functional

4    Equivalents Doctrine, Your Honor.

5         And here we have pretty much the same set of facts that's

6    pretty much undisputed.  The fact that there -- and the fact

7    that there isn't a written agreement doesn't mean there isn't

8    a contractual arrangement for him to have rendered services

9    and advice.  And the fact that he's, you know, recruited by us

10   to help us perform our functions puts him in the realm, as I

11   said, of something of a consulting expert.

12        Either way, the work product privilege, Your Honor, should

13   apply, and we'd ask Your Honor not to invade that privilege at

14   this point, Your Honor.  And I'll ask you to reconsider your

15   prior ruling.

16        Furthermore, I believe Mr. Morris, you know, in making his

17   argument, is trying to create separation.  The fact that he

18   has no relationship, that the privilege can be invaded, seems

19   to defeat the whole premise of his whole line of questioning.

20        So, once again, Your Honor, I just -- it's a tit for a tat

21   there, and it seems to kind of eat itself.  Either he is

22   working with us, which we've admitted he is working with us,

23   us being the law firm, and helping us do our jobs, or he's

24   not.  And if he's not, then this should be done.

25             THE COURT:  Okay.

Dondero - Voir Dire                    192

1          MR. MORRIS:  Your Honor, briefly?

2          THE COURT:  Well, among other things, what do you

3     want me to do?  Take a break and read your one sentence from

4     the Restatements and your one case?  And could you not have

5     anticipated this beforehand?

6          MR. SBAITI:  Your Honor, --

7          THE COURT:  This is not the way we work in the

8     bankruptcy courts, okay?  We're business courts.  We have

9     thousands of cases.  We expect briefing ahead of time.

10          MR. SBAITI:  Your Honor, this has been a rather

11     rushed process anyway.  And to be honest, --

12          THE COURT:  When was the motion filed?

13          MR. SBAITI:  Your Honor, --

14          THE COURT:  More than a month ago.

15          MR. SBAITI:  -- his deposition was a week ago.

16          THE COURT:  Well, okay.  So you could not have

17     anticipated this issue until his deposition one week ago?

18          MR. SBAITI:  Your Honor, this issue arose at the

19     deposition, obviously, because that's what he's quoting from.

20     However, at least to us, this is such a well-settled area, and

21     to be honest, --

22          THE COURT:  Such a well-settled area that you have

23     one sentence from the Restatement and one case from the

24     Southern District of New York?

25          MR. SBAITI:  No, Your Honor.  I think the work

Dondero - Voir Dire                    193

1    product privilege lexicon -- we had ten minutes to try to find

2    something more on point than the general case law that applies

3    the work product privilege to people that work with lawyers,

4    consultants who work with lawyers, employees who work with

5    lawyers, even low-down employees who normally wouldn't enjoy

6    the privileges that attach to the corporation, when they work

7    with the company for -- when they work with the company

8    lawyers, it typically attaches.

9              THE COURT:  You know, obviously, I know a few things

10   about work product privilege, but he doesn't check any of the

11   boxes you just listed out.

12             MR. SBAITI:  I disagree, Your Honor.

13             THE COURT:  He's not an employee.  He's not a low-

14   level employee.

15             MR. SBAITI:  He's a consultant.

16             THE COURT:  With no agreement.

17             MR. SBAITI:  With a verbal agreement.  He's an

18   advisor.  And he was recruited by us, and at the request of

19   the DAF, of the head of the DAF, Mr. Patrick, to help us do

20   our job for the DAF.  I don't --

21             THE COURT:  Okay.  Mr. Morris, what do you want to

22   say?

23             MR. MORRIS:  Just briefly, Your Honor.  This issue

24   has been ripe since last Tuesday.  They directed him not to

25   answer a whole host of questions about his involvement at the

Dondero - Voir Dire                    194

 1  deposition last Tuesday, so they've actually had six days to

 2  deal with this.  That's number one.

 3      Number two, there's absolutely nothing inconsistent with

 4  the Debtor's position that Mr. Dondero is participating in the

 5  pursuit of claims and at the same time saying that his

 6  communications with the Sbaiti firm are not privileged.

 7  There's nothing inconsistent about that.

 8      So the argument that he just made, that somehow because

 9  we're trying to create separation, that that's inconsistent

10  with our overall arching theme that Mr. Dondero is precisely

11  engaged in the pursuit of claims against Mr. Seery, I think

12  that takes care of that argument.

13      Finally, your Honor, with respect to this consultancy

14  arrangement, not only isn't there anything in writing, but

15  either you or Mr. Sbaiti or I, I think, should ask Mr. Dondero

16  the terms of the agreement.  Is he getting paid?  Is he doing

17  it for free?  Who retained him?  Was it Mr. -- because the --

18  there's no such thing.  There's no such thing.

19      The fact of the matter is what happened is akin to I have

20  a slip-and-fall case and I go to a personal injury lawyer and

21  I bring my brother with me because I trust my brother with

22  everything.  It's not privileged.  Any time you bring in

23  somebody who is not the attorney or the client, the privilege

24  is broken.  It's really quite simple.  Unless there's a common

25  interest.  They can't assert that here.  There is no common

Dondero - Voir Dire                           195

1   interest.  So --

2           THE COURT:  Okay.  Mr. Sbaiti, I'll give you up to

3   three more minutes to *voir dire* Mr. Dondero to try to

4   establish some sort of agency relationship or other evidence

5   that you think might be relevant.

6                   VOIR DIRE, RESUMED

7   BY MR. SBAITI:

8   Q   Mr. Dondero, when you provided information to the law

9   firm, were you doing so under an agency relationship?  Do you

10  know what an agency relationship is?

11  A   Generally.  When you're working on the -- or why don't you

12  tell me?

13  Q   Tell me your understanding, so we can use --

14  A   That you're working for the benefit or as a proxy for the

15  other entity or the other firm or the other person.

16  Q   Right.  So you're working for the DAF?

17  A   Yes.

18  Q   Do you do work for the DAF?

19  A   Yes.  As I stated, I'm surprised there isn't -- when we

20  reconstituted after leaving Highland, we put in shared

21  services agreements in place and asset management agreements

22  in place and tasked people with doing that for most of the

23  entities.  There might be still a few contracts that are being

24  negotiated, but I thought most of them were in place.

25          So I would imagine that there'll be an asset management

Dondero - Voir Dire                          196

 1   agreement with the DAF back to NexPoint sometime soon, so it

 2   -- it's --

 3   Q    Let me ask you this question.  When you were providing

 4   information to us and having conversations with us, were you

 5   doing that as an agent of the DAF, the way you described it,

 6   --

 7   A    Yes.

 8   Q    -- on their behalf?

 9   A    Yes.

10   Q    Were you also doing it to help us do our jobs for the DAF?

11   A    Yes.

12   Q    Did you respond to requests for information from myself?

13   A    Yes.

14   Q    Did you help coordinate other -- finding other witnesses

15   or sources of information at my request?

16   A    Yes.

17   Q    Did you do so based upon any understanding that I was

18   working on behalf of the DAF for that?

19   A    Yes.  I knew -- I knew you were working for the DAF.  No

20   one else, yeah.

21   Q    And so -- and so did you provide any expertise or any in-

22   depth understanding to myself in helping me prepare that

23   complaint?

24   A    I think so, but I give a lot of credit to your firm for

25   researching things that I -- I knew reasonably well but then

Dondero - Voir Dire                    197

1    you guys researched in even more depth.

2            MR. MORRIS:  I'd move to strike the answer as

3    nonresponsive.

4            THE COURT:  Sustained.

5    BY MR. SBAITI:

6    Q    Let me ask the question again.  When you were providing us

7    information and expertise, were you doing so knowing you were

8    working -- helping us work for the DAF?

9    A    Yes.

10   Q    Now, did you demand any compensation for that?

11   A    No.

12   Q    Do you require compensation necessarily to help the DAF?

13   A    No.

14   Q    Do you do other things for the DAF sometimes without

15   compensation?

16   A    Right.  We do the right thing, whether we get paid for it

17   or not.  Yes.

18   Q    Had you known that our communications were not necessarily

19   part of an agency relationship with the DAF, as you understood

20   it, that you were just some guy out on the street, would you

21   have had the same conversations with us?

22   A    (sighs)

23   Q    Let me ask a better question.  If I had come to you

24   working for someone that wasn't the DAF, you didn't already

25   have a relationship with, would you have given us the same

010650

Dondero - Voir Dire                    198

1  help?

2  A   I wouldn't have been involved if it was somebody else.

3  Q   Is the reason you got involved because we were the lawyers

4  for the DAF?

5  A   Correct.

6          MR. MORRIS:  Objection.  It's just leading.  This is

7  all leading.

8          THE WITNESS:  Correct.

9          THE COURT:  Sustained.

10         MR. SBAITI:  Can --

11         THE WITNESS:  Yeah.  Sorry.

12 BY MR. SBAITI:

13 Q   Do you get -- do -- did you -- did you do work for the --

14 did you provide the help for the DAF laboring under the

15 understanding that there was an agreement?

16         MR. MORRIS:  Objection; leading.

17         THE COURT:  Sustained.

18 BY MR. SBAITI:

19 Q   Earlier you testified you believed there was an agreement?

20 A   I thought that was an agreement, and I thought there will

21 be one shortly if there isn't one, yes.

22 Q   Okay.

23 A   And so we -- I've been operating in a bona fide way in the

24 best interests of the DAF throughout -- assuming there was an

25 agreement, but even if there wasn't a formal one, I would

Dondero - Voir Dire                          199

1  still be moving in the best interests of the DAF and helping

2  your firm out or --

3  Q   And you did that because you believed there was an

4  agreement or soon would be?

5  A   Yes.

6        MR. SBAITI:  Your Honor, I mean, I believe we've

7  established a dual role here, both as an agent of the DAF and

8  as an agent of the law firm, Your Honor.

9        THE COURT:  Okay.  Just a minute.  I'm looking at

10  Texas authority on common interest privilege to see if there's

11  anything that --

12      (Pause.)

13        THE COURT:  All right.  Again, it would have been

14  very nice to get briefing ahead of time.  I think this

15  absolutely could have been anticipated.

16    I do not find the evidence supports any sort of protection

17  of this testimony under work product privilege, common

18  interest privilege.  I just haven't been given authority or

19  evidence that supports that conclusion.  So the objections are

20  overruled.

21    Mr. Morris, go ahead.

22              DIRECT EXAMINATION, RESUMED

23  BY MR. MORRIS:

24  Q   Can you describe for the Court the substance of your

25  communications with Mr. Sbaiti concerning the complaint?

Dondero - Direct                            200

1   A   As I've stated, directing him toward the Advisers Act and

2   then largely in a proofing function regarding CLO nomenclature

3   and some of the other fund nomenclature that sometimes gets

4   chaotic in legal briefs.

5   Q   Did you communicate in writing at any time with anybody at

6   the Sbaiti firm regarding any of the matters that are the

7   subject of the complaint?

8   A   I can't remember anything in writing.  Almost everything

9   was verbal, on the phone.

10  Q   You don't tend to write much, right?

11  A   Periodically.

12  Q   Did you communicate with Mr. Patrick?  Did you communicate

13  with anybody in the world in writing regarding the substance

14  of anything having to do with the complaint?

15          MR. SBAITI:  Objection, Your Honor.  Argumentative.

16          THE COURT:  Overruled.

17          THE WITNESS:  I --

18          MR. SBAITI:  Your Honor, may I just -- one

19  housekeeping.  Rather than raise the same objection, may we

20  have a standing objection, just so we're not disruptive, as to

21  the privilege, just for preservation purposes, on the content

22  of these communications?  Otherwise, I'll just make the same

23  objections and we can go through it.

24          THE COURT:  Well, disruptive as it may be, I think

25  you need to object to every --

Dondero - Direct                    201

1          MR. SBAITI:  Okay.

2          THE COURT:  -- question you think the privilege

3    applies to.

4          MR. SBAITI:  I will do so.  Thank you, Your Honor.

5    Uh-huh.

6    BY MR. MORRIS:

7    Q    Mr. Dondero, the question was whether you've ever

8    communicated with anybody in the world in writing concerning

9    anything having to do with the complaint?

10   A    Not that I remember.

11   Q    Okay.

12         MR. MORRIS:  I will point out, Your Honor, that last

13   week, when the privilege was asserted, I had requested the

14   production of a privilege log.  I was told -- I forget exactly

15   what I was told, but we never received one.  I'll just point

16   that out as well.

17         THE COURT:  Okay.

18   BY MR. MORRIS:

19   Q    You provided comments to the drafts of the complaint

20   before it was filed, correct?

21   A    Yes, a few.

22   Q    Can you describe for the Court all of the comments that

23   you provided to earlier drafts of the complaint?

24         MR. SBAITI:  Your Honor, we object on the basis of

25   privilege and work product and joint -- joint interest

Dondero - Direct                                    202

1   privilege.

2          THE COURT:  Overruled.

3          THE WITNESS:  It's along the lines of things I've

4   said in this court several times.  The obligations under the

5   Advisers Act cannot be negotiated away and they cannot be

6   waived by the people involved, full stop.  I remember giving

7   the -- Mazin the example of the only reason why we're in a

8   bankruptcy is from an arbitration award that, even though we

9   did what was in the best interests of the investors, we got

10  the investors out more than whole over an extended period of

11  time, they got an arbitration award that said when we

12  purchased some of the secondary interests we should have

13  offered them up to the other 800 members in the committee

14  besides the -- the 800 investors in the fund besides the eight

15  people on the committee who had approved it and that the

16  committee couldn't approve a settlement that went against the

17  Advisers Act and the Advisers Act stipulates specifically that

18  you have to offer it up to other investors before you take an

19  opportunity for yourself.  And someday, hell or high water, in

20  this court or some other, we will get justice on that.  And

21  that was the primary point that I reminded Mazin about.

22  BY MR. MORRIS:

23  Q   And that's exactly the conversation you had with Mark

24  Patrick that started this whole thing, correct?

25  A     No.

Dondero - Direct                            203

1    Q    You told Mark Patrick that you believe the Debtor had

2    usurped a corporate opportunity that should have gone to the

3    DAF, didn't you?

4    A    That was not our conversation.

5    Q    So when Mr. Patrick testified to that earlier today, he

6    just got it wrong, right?

7    A    Well, maybe later on, but it wasn't that in the beginning.

8    The beginning, any conversation I had with Mark Patrick in the

9    beginning was smelling a rat in the way that the Debtor had

10   priced the portfolio for HarbourVest.

11   Q    Hmm.  So you're the one, again, who started that piece of

12   the discussion as well, correct?

13   A    Started the -- I -- I guess I smelled a rat, but I put the

14   person who could do all the numbers in touch with the Sbaiti

15   firm.

16   Q    And was the rat Mr. Seery?

17   A    Was the rat Mr. Seery?  Or the independent board.  Or a

18   combination thereof.  I believe the independent board knew

19   exactly what Seery was doing with --

20   Q    Do you have any idea --

21   A    -- HarbourVest.

22   Q    Do you have any idea why, why the Sbaiti firm didn't name

23   the whole independent board in the -- in the motion for leave

24   to amend?

25   A    I don't know.  Maybe they will at some point.

Dondero - Direct                    204

1    Q    Yeah.

2    A    I don't know.

3    Q    But did you tell the Sbaiti firm that you thought the

4    whole independent board was acting in bad faith and was a rat?

5         MR. SBAITI:  Your Honor, I object on the basis of

6    privilege.

7         THE COURT:  Overruled.

8         MR. SBAITI:  All three.

9         THE WITNESS:  I knew Jim Seery was and I knew Jim

10   Seery had weekly meetings with the other independent board

11   members, so the HarbourVest settlement was significant enough

12   that it would have been approved, but I don't have direct

13   knowledge of their involvement.

14   BY MR. MORRIS:

15   Q    And so you -- but you believed Jim Seery was certainly a

16   rat, right?

17   A    Oh, I -- there was a defrauding of third-party investors

18   to the tune of not insignificant 30, 40, 50 million bucks, and

19   it was obfuscated, it was -- it was highly obfuscated in the

20   9019.

21   Q    Did you think Mr. Seery was a rat, sir?  Yes or no?

22   A    I believe he had monthly financials.  He knew that the

23   numbers presented in the 9019 were wrong.  And if that makes

24   him a rat, that makes him a rat.  Or maybe he's just being

25   aggressive for the benefit of his incentive or for the estate.

Dondero - Direct                                  205

 1   But I -- I believe those things wholeheartedly.

 2   Q   Did you tell the Sbaiti firm you thought Jim Seery was a

 3   rat?

 4          MR. SBAITI:  Objection, Your Honor.  Privilege.

 5          THE COURT:  Overruled.

 6          THE WITNESS:  I -- I don't remember using those

 7   words.

 8   BY MR. MORRIS:

 9   Q   Did you tell the Sbaiti Firm that you thought Jim Seery

10   had engaged in wrongful conduct?

11          MR. SBAITI:  Your Honor, objection.  Privilege.

12          THE COURT:  Overruled.

13          THE WITNESS:  I believe he violated the Advisers Act,

14   and I was clear on that throughout.

15   BY MR. MORRIS:

16   Q   Listen carefully to my question.  Did you tell the Sbaiti

17   firm that you believed that Jim Seery engaged in wrongful

18   conduct?

19          MR. SBAITI:  Objection, Your Honor.  Calls for

20   privileged communications.

21          THE COURT:  Overruled.

22          THE WITNESS:  I think I gave the answer.  I'll give

23   the same answer.  I believe he violated the Advisers Act.

24   BY MR. MORRIS:

25   Q   What other wrongful conduct did you tell the Sbaiti firm

Appx. 00715
010658

Dondero - Direct                              206

1    you thought Mr. Seery had engaged in?

2            MR. SBAITI:  Same objection, Your Honor.

3            THE COURT:  Overruled.

4            MR. SBAITI:  Calls for privileged communications.

5            THE COURT:  Overruled.

6            THE WITNESS:  I -- I just remember the obfuscating

7    and mispricing portfolio violations of the Advisers Act was

8    all I discussed with the Sbaiti firm regarding Seery's

9    behavior.

10   BY MR. MORRIS:

11   Q   Did you talk to them about coming to this Court under the

12   gatekeeper order to see if you could get permission to sue Mr.

13   Seery?

14   A   I --

15           MR. SBAITI:  Objection, Your Honor.  Calls for

16   privileged communication.

17           THE COURT:  Overruled.

18           THE WITNESS:  I wasn't involved in any of the --

19   BY MR. MORRIS:

20   Q   Did you --

21   A   -- tactical stuff on who to sell or -- who to sue or when

22   or whatever.

23   Q   Did you tell the Sbaiti firm that you thought they should

24   sue Mr. Seery?

25           MR. SBAITI:  Objection, Your Honor.  Calls for

Dondero - Direct                              207

1  privileged communication.

2           THE COURT:  Overruled.

3           MR. SBAITI:  I'll also say, Your Honor, the question

4  is getting a little argumentative.

5           THE WITNESS:  I didn't get directly --

6           THE COURT:  Overruled.

7           THE WITNESS:  I didn't get directly involved in who

8  was -- who was specifically liable.

9  BY MR. MORRIS:

10 Q    How many times did you speak with the Sbaiti firm

11 concerning the complaint?

12 A    Half a dozen times, maybe.

13 Q    Did you ever meet with them in person?

14 A    I've only met with them in person a couple, three times.

15 And I don't think any of them -- no, it was, excuse me, it was

16 on deposition or other stuff.  It wasn't regarding this.

17 Q    Did you send them any information that was related to the

18 complaint?

19 A    I did not.

20 Q    Did you ask anybody to send the Sbaiti firm information

21 that related to the complaint?

22 A    I did not.  I -- I was aware that Hunter Covitz was

23 providing the historic detailed knowledge to the firm, but it

24 -- it wasn't -- I don't believe it was me who orchestrated

25 that.

Dondero - Direct                    208

1  Q    Did you talk to anybody at Skyview about the allegations

2  that are contained in the complaint before it was filed?

3  A    I don't -- I don't remember.

4  Q    Have you ever talked to Isaac Leventon or Scott Ellington

5  about the allegations in the complaint?

6  A    No.  They weren't involved.

7  Q    How about -- how about D.C. Sauter?  You ever speak to him

8  about it?

9  A    I don't --

10          MR. TAYLOR:  Objection, Your Honor.

11          THE WITNESS:  I don't remember.

12          MR. TAYLOR:  At this point, D.C. Sauter is indeed an

13  employee of Skybridge and is a general counsel for some of the

14  entities which he worked for.  And to the extent he's trying

15  to ask for those communications, that would be invasion of the

16  privilege.

17          MR. MORRIS:  I'll withdraw it, Your Honor.  That's

18  fair.

19          THE COURT:  Okay

20          MR. MORRIS:  That's fair.

21          THE COURT:  Question withdrawn.

22          THE WITNESS:  I thought you only had eight more

23  questions.

24          MR. MORRIS:  Opened the door.

25  BY MR. MORRIS:

Dondero - Direct                                    209

1   Q   Can you describe the general fact -- withdrawn.  You

2   provided facts and ideas to the Sbaiti firm in connection with

3   your review of the draft complaint, correct?

4   A   Ideas and proofreading.

5   Q   Anything beyond what you haven't described already?

6   A   Nope.

7   Q   Okay.  Who is your primary contact at the Sbaiti firm, if

8   you had one?

9   A   Mazin.

10  Q   Okay.  Did you suggest to Mr. Sbaiti that Mr. Seery should

11  be named as a defendant in the lawsuit before it was filed?

12          MR. SBAITI:  Your Honor, calls for privileged

13  communication.  We object --

14          THE COURT:  Overruled.

15          MR. SBAITI:  -- to that answer.

16          MR. SBAITI:  Okay.

17          THE WITNESS:  Again, no.  I wasn't involved with the

18  tactics on who would be defendants and when or if other people

19  would be added.

20  BY MR. MORRIS:

21  Q   Did you -- are familiar with the motion to amend that was

22  filed by the Sbaiti firm?

23  A   I'm more familiar with it after today --

24  Q   Right.

25  A   -- than I was before.

Dondero - Direct                          210

1  Q    And were you aware that that motion was going to be filed

2  prior to the time that it actually was filed?

3  A    I -- I don't remember.  Probably.

4  Q    And who would have been the source of that information?

5  Would that have been Mr. Sbaiti?

6  A    Yes.

7  Q    Okay.  And did you express any support for the decision to

8  file the motion for leave to amend in the District Court?

9  A    I -- I wasn't involved.  It was very complicated legal

10 preservation conver... -- I wasn't involved.  I knew the

11 conversations were going on between different lawyers, but I

12 wasn't involved in the ultimate decision.  I didn't encourage,

13 applaud, or even know exactly what court it was going to be

14 filed in.

15         MR. MORRIS:  All right.  I have no further questions,

16 Your Honor.

17         THE COURT:   All right.  Pass the witness.

18         MR.

19 ANDERSON:  We have no questions, Your Honor.

20         THE COURT:  Okay.  Any questions from Respondents?

21         MR. SBAITI:  No questions.

22         THE COURT:  Okay.  Mr. Taylor?

23                    CROSS-EXAMINATION

24 BY MR. TAYLOR:

25 Q    Mr. Dondero, --

Dondero - Cross                                    211

1   A    Yes, sir.

2   Q    -- you are not the authorized representative of CLO

3   Holdco, are you?

4   A    No.

5   Q    You're not the authorized representative for the DAF, are

6   you?

7   A    No.

8   Q    Do you know who that person is as we sit here today?

9   A    Yes.

10  Q    Who is that?

11  A    Mark Patrick.

12  Q    Thank you.

13          MR. TAYLOR:  No further questions.

14          THE COURT:  Any redirect on that cross?

15          MR. MORRIS:  I do not, Your Honor.  I would just like

16  to finish up the Debtor's case in chief by moving my exhibits

17  into evidence.

18          THE COURT:  Okay.  Mr. Dondero, you're excused.

19      (The witness steps down.)

20          THE COURT:  All right.  So you have no more

21  witnesses; you're just going to offer exhibits?

22          MR. MORRIS:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. MORRIS:  So, at Docket #2410, --

25          THE COURT:  Uh-huh.

212

1          MR. MORRIS:  -- the Court will find Exhibits 1

2    through 53.

3          THE COURT:  Uh-huh.

4          MR. MORRIS:  In advance, Your Honor, I've conferred

5    with the Respondents' counsel.  They had previously objected

6    to Exhibits 15 and 16, which I believe were the Grant Scott

7    deposition transcripts.  They objected to them on the grounds

8    of lack of completeness because I had taken the time to make

9    deposition designations, but I'm happy to put the entirety of

10   both transcripts into evidence, and I hope that that will

11   remove the objections to Exhibits 15 and 16.

12         THE COURT:  All right.  Before we confirm, let's just

13   make sure we have the right one.

14         MR. MORRIS:  Oh, I apologize.

15         THE COURT:  I have 16 as the July order.

16         MR. MORRIS:  I apologize.  You're absolutely right,

17   Your Honor.  What I was referring to was -- oh, goodness.  One

18   second.  (Pause.)  I was referring to Exhibits 23 and 24.

19   Those are Mr. Scott's deposition designations.  They had

20   lodged an informal objection with me on grounds of

21   completeness.  And in order to resolve that objection, we're

22   happy to put the entirety of both transcripts in.

23         THE COURT:  All right.  So if our Respondents could

24   confirm with the agreement to put in the entire depos at 23

25   and 24, you stipulate to 1 through 53?

213

```
 1            MR. PHILLIPS:  We also -- Your Honor, --
 2            MR. MORRIS:  Yeah, I was going to take them one at a
 3   time.  Just take those two.
 4            MR. PHILLIPS:  Yeah, can we just take those two?
 5   Confirmed?
 6            MR. MORRIS:  Okay.
 7            THE COURT:  Oh, okay.
 8            MR. PHILLIPS:  Because there are other -- there are
 9   other -- we exchanged objections to each other's witness and
10   exhibit lists.  And so I think you can handle the rest of them
11   kind of in a bunch, right?
12            MR. MORRIS:  Yeah.  Yeah, there's two bunches,
13   actually.
14            MR. PHILLIPS:  Yeah.
15            THE COURT:  Okay.  So you have just now stipulated to
16   23 and 24 being admitted --
17            MR. MORRIS:  Correct.
18            THE COURT:  -- with the full depos?  Okay.
19            MR. PHILLIPS:  Yes, ma'am.  Thank you.
20            THE COURT:  All right.
21        (Debtor's Exhibits 23 and 24 are received into evidence.)
22            MR. MORRIS:  And then the next two that they objected
23   to are Exhibits 15 and 16.  15 is the January order and 16 is
24   the July order.  They objected on relevance grounds.  I think
25   16 -- these are the two orders that the Debtors contend the
```

214

1    Respondents have violated, so I don't understand the relevance

2    objection, but that's what it was and that's my response.

3              MR. PHILLIPS:  Resolved, Your Honor.

4              THE COURT:  Okay.  15 and 16 are admitted.

5         (Debtor's Exhibits 15 and 16 are received into evidence.)

6              MR. MORRIS:  Okay.  And then the last objection

7    relates to a group of exhibits.  They're Exhibits 1 through

8    11.  Those exhibits I think either come in together or stay

9    out together.  They are exhibits that relate to the

10   HarbourVest proceedings, including deposition notices,

11   including I think the transcript from the hearing, the Court's

12   order, the motion that was filed.

13        The Debtor believes that those documents are relevant

14   because they go right to the issue of the gatekeeper order and

15   had they filed, had the Respondents followed the gatekeeper

16   order, this is -- this is why they didn't do it.  You know

17   what I mean?  That's the argument, is that the Respondents,

18   one of the reasons the Respondents -- argument -- one of the

19   reasons the Respondents didn't come to this Court is because

20   they knew this Court had that kind of record before it.  And I

21   think that's very relevant.

22             THE COURT:  All right.  Response?

23             MR. PHILLIPS:  Your Honor, we think that these

24   exhibits are not relevant.  We have a very focused, we think,

25   -- we have the Court's order.  Those objections are withdrawn.

215

1   We have the complaint.  We have the motion to amend.  And the

2   issue is whether the motion to amend, which was dismissed one

3   day, or the next day after it was filed, constitutes criminal

4   -- constitutes contempt.

5       So we think the prior proceedings go to their underlying

6   argument, which is the lawsuit or the complaint is no good,

7   and that has nothing to do with -- there's been no foundation

8   laid and it's not relevant what happened in connection with

9   the HarbourVest settlement.  It is what it is, and there's no

10  dispute that it is what it is, but it's not relevant to

11  establish any type of -- they've even said intent is not even

12  relevant here.  So we -- that's -- we think all of that goes

13  out and simplifies the record, because it has nothing to do

14  with whether or not there was a contempt.

15          THE COURT:  Response?

16          MR. MORRIS:  We withdraw the exhibits, Your Honor.

17  I'm just going to make it simple for the Court.

18          THE COURT:  Okay.

19          MR. MORRIS:  I'm just going to make it simple for the

20  Court.

21          THE COURT:  1 through 11 are withdrawn.

22      (Debtor's Exhibits 1 through 11 are withdrawn.)

23          MR. MORRIS:  So, the balance, there was no objection.

24  So all of the Debtor's exhibits on Docket #2410 -- let me

25  restate that.  Exhibits 12 through 53 no longer have an

010668

216

1  objection.  Is that correct?

2          MR. PHILLIPS:  Yes.

3          MR. MORRIS:  Okay.  And then --

4          MR. PHILLIPS:  Confirmed.

5          THE COURT:   Okay.

6      (Debtor's Exhibits 12 through 53 are received into

7  evidence.)

8          MR. MORRIS:  Okay.  Thank you.  And then we filed an

9  amended list, I believe, yesterday --

10         THE COURT:  Uh-huh.

11         MR. MORRIS:  -- to add Exhibits 40 -- 54 and 55.

12         THE COURT:  Uh-huh.

13         MR. MORRIS:  And those exhibits are simply my firm's

14  billing records.

15         THE COURT:  Okay.

16         MR. MORRIS:  You know, we added Mr. Demo to the

17  witness list in case there was a need to establish a

18  foundation.  That's the only thing he would testify to.  I

19  don't know if there's an objection to those two exhibits,

20  because we hadn't had an opportunity to confer.

21         THE COURT:  Any objection?

22         MR. PHILLIPS:  Your Honor, we're not going to require

23  authenticity and foundation for -- we have the right, we

24  think, to say that they're not a ground -- we're not going to

25  challenge that they are the bills, and the bills say what they

217

 1   say.  We don't need Mr. -- we don't need a witness to

 2   authenticate those exhibits.  But we reserve all substantive

 3   rights with respect to the effect of those exhibits.

 4             THE COURT:  All right.  54 and 55 are admitted.

 5        (Debtor's Exhibits 54 and 55 are received into evidence.)

 6             MR. MORRIS:  And with that, Your Honor, the Debtor

 7   rests.

 8             THE COURT:  Okay.  All right.  Respondents?

 9        (Counsel confer.)

10             MR. PHILLIPS:  If I could have a second?

11             THE COURT:  Okay.

12             A VOICE:  Sorry, Your Honor.

13        (Pause.)

14             MR. PHILLIPS:  Your Honor, we have filed in our

15   witness and exhibit list, and I have to say I don't have the

16   number, but we'll get the docket entry number, but we have 44

17   exhibits.  There's an objection to Exhibit #2, which is --

18   thank you -- it's Document 2411, Your Honor.  Thank you.

19             THE COURT:  Uh-huh.

20             MR. PHILLIPS:  There is a pending objection to

21   Exhibit #2 which we have not resolved.  There's no objection

22   to any other exhibit.  But in reviewing our exhibit list, I

23   found that we had some -- some mistakes and duplications.

24        So, with respect to 2411, we would withdraw Exhibit 13,

25   14, and 29, and we would offer Exhibit 1, and then 30 through

218

 1   44, with 13, 14, and 29 deleted.

 2           THE COURT:  Okay.  So 1, 3 through 12, --

 3           MR. PHILLIPS:  Yes.

 4           THE COURT:  -- 15 through 28, and then 30 --

 5           MR. PHILLIPS:  And then 30 through 44.

 6           THE COURT: -- through 44?  Do you confirm, Mr.

 7   Morris?

 8           MR. MORRIS:  Yes, Your Honor.  The only objection we

 9   have is to Exhibit #2.

10           THE COURT:  And that's -- he's not offering that?

11           MR. MORRIS:  Yeah.

12           MR. PHILLIPS:  Not at this time, Your Honor.

13           THE COURT:  Okay.

14           MR. PHILLIPS:  We would have to have testimony about

15   that.

16           THE COURT:  Okay.  All right.  So those are admitted.

17           MR. PHILLIPS:  Okay.

18       (Mark Patrick's Exhibits 1, 3 through 12, 15 through 28,

19   and 30 through 44 are received into evidence.)

20           THE COURT:  By the way, it looks like Exhibit 44 is

21   at a different docket number, Docket 2420.  Correct?  You have

22   --

23           MR. SBAITI:  Your Honor, I believe Exhibit 44 is the

24   hearing transcript from the July approval hearing.  At least

25   that's what it's supposed to be.

219

1           THE COURT:  Okay.

2           MR. SBAITI:  It was Exhibit 2 on the Debtor's list,

3    and then I think they took it off, so we had to add it.

4           MR. PHILLIPS:  Oh, okay.  I was looking -- oh, that's

5    right.  They -- that's correct, Your Honor.

6           THE COURT:  Okay.

7           MR. PHILLIPS:  Exhibit 44 was added --

8           THE COURT:  Okay.

9           MR. PHILLIPS:  -- because the Debtor's withdrew it,

10   and so it was added in the second -- in the supplemental and

11   amended list.  The -- the one that I was talking about was the

12   prior list.

13          THE COURT:  Okay.  So that's at Docket 2420?

14          MR. PHILLIPS:  Yes.

15          THE COURT:  You're not offering 45 or 46?

16          MR. PHILLIPS:  No, I think we'd offer 45 and 46 as

17   well.  I'm sorry.

18          THE COURT:  Okay.  Any objections, Mr. Morris?

19          MR. MORRIS:  No, Your Honor.

20          THE COURT:  Okay.  So 45 and 46 are admitted as well.

21   They're at Docket Entry 2420.

22      (Mark Patrick's Exhibits 45 and 46 are received into

23   evidence.)

24          THE COURT:  All right.  Your witnesses?

25          MR. PHILLIPS:  Your Honor, could we have five minutes

220

1    to just see what we're -- our plan is, and then we'll be back

2    at 4:00?

3             THE COURT:  Okay.  We'll be back at 4:00.

4             MR. PHILLIPS:  Thank you.

5             THE CLERK:  All rise.

6        (A recess ensued from 3:55 p.m. until 4:04 p.m.)

7             THE CLERK:  All rise.

8             THE COURT:  Please be seated.  All right.  Back on

9    the record in Highland.  Mr. Phillips?

10            MR. PHILLIPS:  Your Honor, with the introduction of

11   the Respondents -- CLO Holdco, DAF Fund, LP, and Mark Patrick,

12   those Respondents, and we consider Mark Patrick a Respondent

13   although not formally named as a Respondent because he is the

14   party who authorized the filing of the Seery motion -- we

15   rest.

16            THE COURT:  You rest?  Okay.  Well, Mr. Morris,

17   closing arguments?

18            MR. MORRIS:  How much time do I have?

19            THE COURT:  You've got a lot more time than you

20   probably thought you were going to.  You're under an hour.

21            MR. MORRIS:  42 minutes?

22            THE COURT:  How much?

23            THE CLERK:  42 minutes.

24            THE COURT:  42 minutes?  Feel free not to use it all.

25            MR. SBAITI:  Out of curiosity, how long do we have?

221

```
 1        THE COURT:  You have a lot of time, which I hope you
 2   won't use.
 3        THE CLERK:  Hour and twenty-five minutes or so.
 4        MR. SBAITI:  I was afraid it was going to be an hour
 5   and twenty, so --
 6        MR. PHILLIPS:  No, not either.
 7        MR. MORRIS:  I don't suspect I'll use all the time.
 8        THE COURT:  Okay.  Thank you.
 9        MR. MORRIS:  May I proceed?
10        THE COURT:  You may.
11         CLOSING ARGUMENT ON BEHALF OF THE DEBTOR
12        MR. MORRIS:  Good afternoon, Your Honor.  John
13   Morris; Pachulski Stang Ziehl & Jones; for the Debtor.  I'd
14   like to just make some closing remarks after the evidence has
15   closed.
16       This is a very, very important motion, Your Honor.  I take
17   this stuff seriously.  It's only the second contempt motion
18   I've ever brought in my life.  I've never gone after another
19   law firm.  But these facts and circumstances require it,
20   because my client is under attack, and these orders were
21   entered to prevent that.
22       It is serious stuff.  There's no question in my mind,
23   there's no question the evidence showed, clear and
24   convincingly, beyond reasonable doubt, that they violated this
25   Court's order.
```

222

1      I started off with three very simple prongs.  So simple

2   you'd think I'd remember them.  Number one, was a court order

3   in effect?  There is no dispute.  The court order was in

4   effect.

5      Number two, did the order require certain conduct by the

6   Respondent?  We believe it did.  We heard an hour-long

7   argument styled as an opening statement, but it was really

8   argument and not an opening statement, about all the defects

9   in the order.  But the one thing that is crystal clear in the

10  order are the words commence or pursue.  You've been told many

11  times by the Respondent that nobody has commenced an action

12  against Mr. Seery.  That is true.  We all know what the word

13  commence means.  We all know what the word pursue means.

14     I heard argument this morning that pursue means after a

15  claim is filed you pursue a case.  That's the way lawyers talk

16  about it.  But that doesn't make any sense, Your Honor,

17  because once you've commenced the action you've violated the

18  order.  It's commence or pursue, it's in the disjunctive, and

19  you can't read out of the order the concept of pursuit by

20  making it an event that happens after the commencement,

21  because that's exactly what they're trying to do.  They're

22  trying to read out of the order the word pursuit.

23     And I ask you to use very simple common sense.  If filing

24  a motion for leave to amend a complaint to add Mr. Seery as a

25  defendant is not pursuit, what is?  What is?  There's nothing

Appx 06732
010675

223

 1   left.  You commence an action or you do something less than

 2   commencing an action when you're going after the man.  That's

 3   what pursuit means.  They're going after the man.  And they

 4   asked the District Court to do what they knew they couldn't.

 5       Mr. Phillips is exactly right.  I made the point about

 6   Rule 15 because they knew they couldn't do it.  I'm not

 7   suggesting that they should have.  I'm suggesting that the

 8   reason that they didn't is because they knew they were -- they

 9   were in a bad place.  Because if they really just wanted to

10   name Mr. Seery as a defendant, they wouldn't have done it.

11   They knew commence was crystal clear.

12       What they're trying to do is claim that somehow there's an

13   ambiguity around the word pursuit.  Does that make any sense

14   at all?  Filing a motion for leave to amend the complaint.

15   And Mr. Patrick, to his credit, candidly admitted that if the

16   motion was granted, they were suing, yeah, as long -- as long

17   as the Sbaiti firm, you know, recommended it.  That's what

18   would have happened.

19       Those orders that you signed, nothing, absolutely

20   meaningless from their point of view.  They believed they were

21   wrong.  They believed that they were overbroad.  They believed

22   they were too narrow.  They believed they were vague.  They

23   believed they were without authority.  They don't get to be

24   the gatekeeper.  They want to be the gate -- that's this

25   Court's decision.  That's why we went through all of the

224

1   processes that we did.  And they just flagrantly said, I don't

2   agree.  I don't agree because it's wrong this way and it's

3   wrong that way and it's wrong the other way, and therefore let

4   me go find a higher authority to validate my thinking.  That's

5   not the way this process is supposed to work.

6        The independent directors and Mr. Seery relied on the

7   gatekeeper in accepting their positions.  It was a quid pro

8   quo.  Mr. Dondero agreed to the exact same provision, the

9   exact same gatekeeper provision in the January order that he

10  now complains about today, that the DAF complains about today.

11  Where were these people?

12       As the Court knows, nobody appealed either order.  The

13  Debtor, the independent board, Mr. Seery expected that the

14  plain and unambiguous words would be honored and enforced.  I

15  think that's fair.  I think that's the way the process is

16  supposed to work.

17       Instead, we have games.  We have these linguistic

18  gymnastics.  We have statements that are too cute by half.

19  Mr. Dondero won't even admit that he appointed Mr. Scott back

20  in 2012.  I couldn't even get him to do that, really, even

21  though the documents say it, even though Mr. Patrick says it.

22       I'll take the Respondents one at a time in a moment, but I

23  just want to deal with some of the more interesting arguments

24  they make.  The order was vague because it didn't say you

25  can't seek leave from the District Court to amend your

225

1    complaint to add Mr. Seery.  They said that that's what makes

2    the order vague.

3        Your Honor, if you had thought to put that language in,

4    you know what they would have done?  They would have sued Mr.

5    Seery in New York State Supreme Court, where he lives, and

6    said, the order didn't say I couldn't do that.  Where does it

7    end?

8        There's a reason why the order was crafted broadly to say

9    no commencement or pursuit without Bankruptcy Court  approval.

10   You have to bring a colorable claim.

11       We heard an argument this morning that they couldn't

12   possibly have brought that motion for reconsideration first.

13   You know, the one they filed about eight hours after we filed

14   the contempt motion.  They couldn't possibly have brought that

15   motion before the motion for leave to amend because somehow

16   they would have been estopped or they would have been found to

17   have waived some right.

18       How could it be that anybody reasonably believes that

19   complying with a court order results in a waiver of some

20   right?  It just -- these are games.  These are not good

21   arguments.  And they certainly don't carry the day on a

22   contempt motion.

23       We've heard repeatedly, the District Court denied the

24   motion without prejudice, how have you been harmed?  They

25   shouldn't be able to rely on the District Court's prudence to

226

1   protect themselves.  The question shouldn't be, have you been

2   harmed since the District Court didn't grant the motion?  No.

3   The question should be, were we harmed by the attempt to name

4   Mr. Seery a defendant, in violation of court orders, without

5   notice?  Without notice.

6       I'm told they assumed that I'd be checking the dockets.  I

7   wasn't checking the docket, Your Honor.  I hadn't filed an

8   appearance in the case.  And, in fact, if you look at the

9   exhibits, because I could pull it out, but we put in the

10  communications between the lawyers.  The last communication

11  was from Mr. Pomerantz, and the last communication from Mr.

12  Pomerantz said, Don't do it or we're going to file a motion

13  for contempt.  That's now in the evidence.

14      So, having sent that message, I wasn't going to check the

15  docket to see if they really were going to go ahead and do it.

16  I didn't think they would.  And if they did, I certainly

17  thought I'd get notice of it.  Nothing.

18      And, again, I don't really need to establish intent at all

19  in order to meet my burden of clear and convincing evidence of

20  a contempt of court, but I think it is relevant when the Court

21  hopefully finds liability and is considering damages, because

22  that's really the most important point I have to make right

23  now, is the Court needs to enforce its own orders, because if

24  the Court doesn't, or doesn't impose a penalty that's

25  meaningful, this is just going to continue.  And Your Honor,

227

1    it's all in the record.  Your Honor knows this.  Mr. Daugherty

2    has gone through it.  Right?  Mr. Terry went through it.  UBS

3    went through it.  You've seen litigation now for a year and a

4    half.  It's happening in New York, right, the Sbaiti firm is

5    reopening the Acis case.  we've got this other lawsuit that's

6    filed by an entity with like a five-tenths of one percent

7    interest who's complaining about the SSP transaction that Mr.

8    -- that the Debtor engaged in.  There's no end here.

9        We need the Court to pump the brakes.  We need the Court

10   to exercise its authority.  We need the Court to protect the

11   estate fiduciary that it approved.

12       It is true, Mr. Seery is not a trustee.  But it is also

13   true that he is a third-party outsider who came into this case

14   with the expectation and the promise in an order that he

15   wouldn't be subjected to frivolous litigation, that this Court

16   would be the arbiter of whether claims could be pursued

17   against him.  That was the code of conduct.  That was the quid

18   pro quo.  That was the deal that Mr. Seery made.  It's the

19   deal that the board members made.

20       What gives these people the right to just say, your order

21   is wrong, and because I think your order is wrong I'm going to

22   go to the District Court, and if the District Court agrees,

23   too bad, and if the District Court doesn't agree, we'll be

24   back before Your Honor, and no harm, no foul?  No.  It can't

25   be.  It can't be that that's the way this process works.  It

228

1    just can't.

2        So, Your Honor, let me take the Defendants one at a time,

3    the Respondents one at a time.  CLO Holdco and the DAF are

4    corporate entities.  They've done what they've done.  Mr.

5    Patrick, bless him, I think he's a lovely man.  I don't think

6    he quite bargained for what he's getting right now, but

7    nevertheless he is where he is and he's willing to stand up

8    and be counted, and for that, at least, I admire his courage.

9    He's willing to say, I authorized those.  But you know what?

10   It's a violation of the law, it's a violation of this Court's

11   order to file that motion, and so he has -- and he was very

12   candid today.  He knew of the order.  Right?  He knew it was

13   in effect.  He pointed out that it was in their papers.

14   Right?

15       They're trying to be cute, they're trying to thread this

16   needle, but it has no hole in it.  They keep -- they keep

17   doing this.  Well, maybe if we do it this way, maybe if we do

18   it -- no.  The order was crystal clear.

19       The Sbaiti firm.  They're probably fathers and husbands

20   and good people and I wish them no ill will, but this is

21   wrong.  This is wrong.  To come into a court you've never been

22   in before and in less than twelve days to jump the shark like

23   this in twelve -- in less than twelve days, because Mr.

24   Patrick said they weren't hired until April, and the complaint

25   was filed on the 12th.

229

1    We're told that they understood this was an overwhelming

2 case with two -- why don't you take your time?  What was the

3 rush?  Why not wait until the Defendant -- the Debtor appeared

4 in the action before rushing to do this?

5    It's bad conduct, Your Honor, and that's really a very

6 important point that I have to make, is that there's lots of

7 lawyers who are engaging in highly-questionable conduct here

8 that, from my perspective, goes well beyond the bounds of

9 zealous advocacy.

10    It's not aggressive lawyering.  I love aggressive

11 lawyering.  I really do.  Respectful, honest -- and I don't,

12 you know, I don't want to say that they're dishonest people.

13 I don't mean to do that.  But I think, I think they made a

14 gross error in judgment, and there's no question that they

15 violated this Court's order.

16    And then that leaves Mr. Dondero.  I don't even know what

17 to say about his testimony, Your Honor.  He pursued claims

18 against Mr. Seery.  He thinks he's a rat.  He's the one who

19 started the whole process.  He's the one who put the bug in

20 Mark Patrick's ear.  All of this is uncontested.  Right?

21 Uncontested.

22    I don't have to go back in time.  We can talk about what

23 happened to Grant Scott.  It's a very sad story.  Mr. Scott, I

24 think, did his honest best to do what he believed, on the

25 advice of counsel, was in the best interest of the DAF.  And

230

1  Mr. Dondero, as you hear time and time again when he speaks

2  about Mr. Seery, it was inappropriate.  He's the arbiter of

3  what's in the best interest of entities that other people

4  control.  And they pay a price.  And they pay a price.  And so

5  Mr. Dondero felt it was his job, even though he tries to

6  distance himself from the DAF -- I have no responsibility, I

7  don't -- I'm not involved -- until, until somebody wants to

8  sue Seery and the Debtor.  Then he'll go all in on that, no

9  matter how specious the claim may be.

10      The Debtor's not going to fold its tent because a motion

11  for leave to amend was denied without prejudice.  That's not

12  the point.  The point is that people need to respect this

13  Court, people need to respect the Court's orders, and those

14  that aid and abet or otherwise support the violation of court

15  orders ought to be held to account, Your Honor.

16      I have nothing further.

17          THE COURT:  All right.  Thank you.  Respondents?

18          CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

19          MR. SBAITI:  Your Honor, the fact that we're here on

20  a motion for leave, and the motion for leave is what they're

21  saying is pursuing a claim under the Court's order, and then

22  you hear that the mere act of investigating a claim against

23  Mr. Seery is also pursuing a claim, this goes to the infinite

24  regression problem with this word pursue the way they want to

25  construe it, Your Honor.  Asking for permission is not

231

1    pursuing a claim and can't be the definition of pursuing a

2    claim because it's not doing anything other than asking for

3    permission.

4        We didn't file a suit. We didn't commence a suit. I

5    think that's established. We did not pursue a claim. Mr.

6    Morris ignores, I think, the very commonsensical aspect that

7    we put out in the opening, which is that the reason pursue --

8    and sometimes the language in these types of orders is,

9    instead of pursue, it's maintain -- but the reason that word

10   is there is because sometimes the case has already been

11   started when the order is entered. And so to pursue a claim,

12   *i.e.*, one that's already been filed as of the date of the

13   order, that would be lost if the commencement of that claim

14   hadn't happened until after the -- until the -- if the

15   commencement happened before the order was filed. That's the

16   --

17              THE COURT: Okay. So are you saying it's a

18   sequential thing?

19              MR. SBAITI: I'm not sure I understood your question,

20   Your Honor. I'm sorry.

21              THE COURT: Well, I'm trying to understand what it is

22   you're saying about how pursue should be interpreted.

23              MR. SBAITI: Sure.

24              THE COURT: I think you're saying you have to -- you

25   can either have -- well, we've got a prohibition on commencing

010684

232

1  an action.

2          MR. SBAITI:  Yes.

3          THE COURT:  And then the separate word pursue, I

4  think you're saying that must refer to you already have an

5  action that's been commenced and you're continuing on with it.

6  Is that what you're saying?

7          MR. SBAITI:  Yes, Your Honor.

8          THE COURT:  Then why not use the word continue?

9          MR. SBAITI:  Well, Your Honor, the choice of --

10         THE COURT:  Kind of like 362(a) of the Bankruptcy

11  Code, you know, is worded.

12         MR. SBAITI:  Well, Your Honor, the choice of the

13  wording of pursue at that point, Your Honor, I believe ends up

14  being ambiguous, because by filing the motion here that would

15  be pursuing a claim under that definition.  So before I got

16  permission to pursue a claim, I've got to pursue a claim.

17  That's the problem that they have with the words that they're

18  trying to get you to adopt, or the meaning of the words

19  they're trying to get you to adopt.

20     If I came to this Court and said, Judge, I need

21  permission, I need leave to file suit against Mr. Seery, and

22  then the question is, well, you're not allowed to seek leave

23  because that's pursuing the claim, it's infinitely regressive.

24  And in fact, his closing argument just proved how it's

25  infinitely regressive.

1          THE COURT:  Okay.  Let me -- I'm not following this

2    infinitely regressive or whatever the term was.

3          MR. SBAITI:  Yes.

4          THE COURT:  Just answer this very direct question.

5    Why did you not file a motion for leave in the Bankruptcy

6    Court?  That would have clearly, clearly complied with the

7    July order.

8          MR. SBAITI:  Your Honor, I believe we explained this

9    in the opening.  I took a stab at it.  Mr. Bridges took a stab

10   at it.  We did not believe coming here and asking for leave

11   and asking for -- for Your Honor to do what we don't believe

12   Your Honor can do, would effectuate an estoppel or a waiver,

13   which we didn't think was in the best interest of our client

14   to have.  Your Honor, this happens -- I don't believe this is

15   the --

16         THE COURT:  Okay.  Connect the dots.  Make that clear

17   as clear can be for me.  You file a motion for leave --

18         MR. SBAITI:  Yes.

19         THE COURT:  -- to file this District Court action

20   against the Debtor and Seery, and if I say yes, everything is

21   fine and dandy from your perspective.  If I say no, tell me

22   again what your estoppel argument is.

23         MR. SBAITI:  Your Honor, the key question is whether

24   us putting the Court's ability to decide colorability and the

25   Court's gatekeeper functions, for us to invoke those functions

234

1  concerned us because there's case law that says that that

2  effectuates an estoppel.  And so we don't get our chance in

3  front of an Article III judge to make that in the first

4  instance.

5         THE COURT:  Okay.  Tell me what cases you're talking

6  about and the exact context of those cases.

7         MR. SBAITI:  Your Honor, I would have to defer to my

8  partner on this one, Your Honor.

9         THE COURT:  Okay.

10        MR. SBAITI:  So, --

11        THE COURT:  Because I'm just letting you know --

12        MR. SBAITI:  Yes.

13        THE COURT:  -- I am at a complete loss.  I'm at a

14  complete loss understanding what you're saying.  I am.

15        MR. SBAITI:  Well, Your Honor, the --

16        THE COURT:  I don't understand.  If you have followed

17  the order to the letter and I tell you no, --

18        MR. SBAITI:  Then --

19        THE COURT:  -- what, you're saying you were worried

20  you'd be estopped from appealing my order to the District

21  Court and saying abuse of discretion or invalid order in the

22  first place?  You'd be estopped from taking an appeal?

23        MR. SBAITI:  No, Your Honor.  We wouldn't be estopped

24  from taking an appeal.

25        THE COURT:  Then why didn't you follow the letter of

Appx 00744

010687

235

1   the order?

2           MR. SBAITI:  For one thing, Your Honor, asking the

3   District Court made sense to us, given the order and given our

4   understanding of the law.  Certainly, we had other options, as

5   Your Honor is pointing out.  We could have come here.  Our

6   read of the law, our understanding of what we were doing, made

7   it -- put us in, like I said, put us in the sort of

8   jurisdictional and paradoxical position.

9           THE COURT:  This is your chance to tell me exactly

10  which law you think applies here.  What case?  What statute?

11          MR. SBAITI:  Your Honor, like I said, I don't have

12  those at the moment.

13          THE COURT:  Why not?  Your whole argument rides on

14  this, apparently.

15          MR. SBAITI:  Well, Your Honor, I don't know that our

16  whole argument rides on that.

17          THE COURT:  Okay.

18          MR. SBAITI:  I mean, our argument rides on we don't

19  think we violated the letter of the order.  I think that's

20  really what I'm -- what we're here to say, is that we didn't

21  commence a lawsuit and we didn't pursue a claim by filing for

22  leave in the District Court, just like filing for leave in

23  this Court would not be pursuing a claim.  It would be filing

24  for leave.

25          THE COURT:  I agree.  Filing a motion for leave in

236

 1   this Court would be exactly what the order contemplated.

 2          MR. SBAITI:  I understand, Your Honor.

 3          THE COURT:  What you did is not exactly what the

 4   order contemplated.

 5          MR. SBAITI:  Your Honor, but we're -- we're moving

 6   back and forth between two concepts.  One, your question is

 7   why didn't we file for leave?

 8          THE COURT:  Uh-huh.

 9          MR. SBAITI:  And the answer to that, I've tried to

10   explain.  And if we -- if you'd like us to bring up the case

11   law or to give you a better articulation of our concern, I'm

12   happy to defer to my partner.

13       What I'm really here to say, Your Honor, is a very simple

14   point, though.  Just because we didn't file for leave here and

15   we filed for leave in the District Court doesn't mean we

16   violated your order, and that's the point I'm trying to make,

17   Your Honor.  And I think that's the simplest point I can make.

18   Asking the Article III judge for leave to amend, for leave to

19   amend to add Mr. Seery, doesn't violate, facially, at least as

20   we read it, Your Honor's order.  It's not commencing a suit

21   and it's not -- it's not pursuing a claim against him.  It's

22   all preliminary to pursuing a claim against him, because a

23   claim hasn't even been filed.

24       The judge could have -- the judge could have -- the

25   District Court could have denied it, the District Court could

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 238
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 772 of 1017 PageID 11553

237

1    have referred it down here, the District Court could have

2    decided part of it and then asked Your Honor to rule on some

3    portion of it.  There are innumerable ways that could have

4    gone.  That fork -- those forks in the road is precisely why

5    we say this is not pursuing the claim.  Otherwise, where does

6    it stop?

7        Does pursuing a claim happen just when we file the motion

8    for leave?  Why didn't it happen when we started the

9    investigation?  If pursuing a claim means having the intent

10   and taking steps towards eventually filing a lawsuit, that's

11   the point that I'm making that it is infinitely regressive,

12   and that's exactly what Mr. Morris argued to you.

13       He said Mr. Dondero, by merely speaking to me, is pursuing

14   a claim and that violates your order.  Speaking to me.  Even

15   if we had never filed it.  Speaking is pursuing a claim.

16           THE COURT:  I don't agree with that, for what it's

17   worth.

18           MR. SBAITI:  Okay.  But that was his argument.  I'm

19   just responding to it.

20           THE COURT:  Okay.

21           MR. SBAITI:  And if that's not pursuing a claim,

22   filing a motion for leave likewise wouldn't be pursuing a

23   claim.  I understand it's an official act in a court, but we

24   did it in a Court that is an adjutant to this Court.  This

25   Court is an adjutant to that Court.  It's the Court with

238

1    original jurisdiction over the matter.  So we didn't go to New

2    York.  We didn't go to the state court in New York where I

3    learned Mr. Seery lives.  We came to the Northern District of

4    Texas, understanding that this Court and this Court's orders

5    had to be -- had to be addressed.  And that's the very first

6    thing we did.  We asked the Court to address it.

7        That judge could either decide to send it down here, which

8    is normally what I think -- what we understood would happen.

9    So it's not like we were avoiding it.  But we wanted to invoke

10   the jurisdiction which we, as the Plaintiff, we believe we had

11   the right to invoke.  We're allowed to choose our forum.  So

12   that's the forum we chose for the primary case, which there's

13   not a problem, no one's raised an issue with us filing the

14   underlying lawsuit.

15       Adding Mr. Seery to that lawsuit and filing a motion for

16   leave in the same court where we actually had the lawsuit,

17   knowing that it might get -- that might get decided or

18   referred in some way, doesn't strike me as being anything

19   improper, because he didn't get sued and we don't know what

20   Judge Boyle would have said had the motion gone forward.  And

21   for them to speculate and to say that, well, this is exactly

22   the type of thing you have to protect against, I completely

23   disagree.

24       The case law that they cited for you on these -- on most

25   of these orders really do discuss the fact that you have

239

somebody who is actually protecting the underlying property of
the Debtor.  This claim comes from a complete third party that
Mr. Seery himself has admitted under oath he owes a fiduciary
duty to.  Two third parties.  One is an investor of a fund
that he manages, and one to a fund that the Debtor, with Mr.
Seery as the head of it, was an advisor for up until recently.

Those fiduciary duties exist.  We felt like there was a
valid claim to be brought against Mr. Seery.  And the only
reason -- and he says this like it's a negative; I view it as
a positive -- the reason he wasn't named is because of Your
Honor's orders.  And so we asked a Court, the Court with
general jurisdiction, to address it for us or to tell us what
to do.  And I don't see how that is a violation of this
Court's order, nor is it contemptuous of this Court's order.

If every time one of these issues came up it was a
contempt of the court that appointed a trustee, we'd see a lot
more contempt orders.

Interestingly, the cases that were thrown out to you in
the opening argument by the other side, for example, *Villages*
[sic] *v. Schmidt*, was a trustee case, but not one that
involved a sanction.  And the trustee case specifically in
that case held that the Barton Doctrine didn't have an
exception for *Stern* cases, whereas the cases we cited to you,
*Anderson*, for example, in the Fifth Circuit, which is 520 F.2d
1027, expressly held that Section 959 is an exception to the

240

1  Barton Doctrine.

2      And my partner, Mr. Bridges, can walk through the issues

3  that we had on the enforceability of the order, but all -- to

4  me, all of that is sort of a secondary issue because, *prima*

5  *facie*, we didn't violate this order.  I understand it may

6  irritate the Debtor and may raise questions about why the

7  motion wasn't filed here versus the District Court.  But it

8  was a motion for leave.  In order to sanction us, Your Honor

9  would have to find that asking for permission is sanctionable

10  conduct in the gatekeeper order.  Even if we ask the wrong

11  court.  Simply asking the wrong court is sanctionable, not

12  knowing what that court would have done, not knowing what that

13  court's mindset was, not even having the benefit of the

14  argument.  And that's, I guess, where this bottom -- the

15  bottom line is for me.

16      The evidence that they put on for you, Your Honor.

17  Everything you heard was evidence in the negative.  You know,

18  they talk about the transition from Mr. Dondero to Mr. Scott

19  and Mr. Scott to Mr. Patrick, but if you actually look at the

20  evidence he wants you to see and he wants you to rule on, it's

21  the evidence that wasn't there.  It's the evidence that Mr.

22  Dondero had no control.  In fact, I believe that was the basis

23  he argued for why there should be no privilege.  And all he

24  said is that he was promoting it.

25      But the fact of the matter is, like I said, all of that is

Appx 00759
010693

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 242
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 776 of 1017 PageID 11557

241

1    secondary to the core issue that we didn't violate the order.

2    We didn't take steps to violate the order.  We took steps to

3    try to not violate the order.  And they want you to punish us

4    to send a message.  Even used words like the Court needs to

5    enforce its own orders.  And he did that as a transition away

6    from the idea that there were no damages, Your Honor, and I

7    think that has implications.

8        And then he said you have to enforce a meaningful penalty.

9    Well, Your Honor, I don't think that is the purpose of these

10   sanctions.  These sanctions are supposed to be remedial,

11   according to the case law, according to the case law that they

12   cite.  So a meaningful --

13            THE COURT:  Coercive or remedial.

14            MR. SBAITI:  Sorry?

15            THE COURT:  Coercive or remedial.  Civil contempt.

16            MR. SBAITI:  Sure, Your Honor.  But usually coercive

17   sanctions require someone to do something or they are

18   sanctioned until they do it.

19            THE COURT:  Coerced compliance.  Coerced compliance

20   --

21            MR. SBAITI:  Yes.

22            THE COURT:  -- with an existing order.

23            MR. SBAITI:  Yes.

24            THE COURT:  Uh-huh.

25            MR. SBAITI:  The last thing, he says you have to

242

1    protect the estate of the fiduciary and his expectation -- I

2    believe he's talking about Mr. Seery -- his expectation that

3    the Court would be the gatekeeper.  And Your Honor, that

4    argument rings a little bit hollow here, given that what

5    they're really saying is that we should have come here first

6    and asked for permission.  But that insinuates that, by coming

7    here, the case is dead on arrival, which I don't think is the

8    right argument.

9         I think the issue for us has been, who do we have to ask

10   and who can we ask to deal with the Court's gatekeeper order?

11   I believe we chose a court, a proper court, a court with

12   jurisdiction, to hear the issue and decide the issue.  Your

13   Court's -- Your Honor's indication of the jurisdiction of this

14   Court we believed invoked the District Court's jurisdiction at

15   the same time.

16        And so the last thing is he said -- the last thing, and

17   getting back to the core issue, is Mr. Morris wants you to

18   believe that we intended to violate the order, and now, as an

19   afterthought, we're using linguistic gymnastics to get around

20   all of that.  But it's not linguistic gymnastics.  Linguistic

21   gymnastics is saying that pursue means doing anything in

22   pursuit of a claim.  That's a little -- I believe that's

23   almost a direct quote.  They're chasing the man.  Well, that's

24   the infinite regression that I talked about, Your Honor, that

25   it's going to be impossible in any principled way to reconcile

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 244
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 778 of 1017 PageID 11559

243

1    Mr. Morris's or the Debtor's definition of pursue with any

2    logical, reasonable limitation that is readable into the

3    order, Your Honor.

4         And I'm going to defer to my partner, Mr. Bridges -- oh,

5    go ahead.

6              THE COURT:  I'm going to stop you.  I mean, we have

7    the linguistic argument.  But how do you respond to this?

8              MR. SBAITI:  Sure.

9              THE COURT:  What if I tell you, in my gut, this

10   appears to be an end run?  An end run.  I mean, I'm stating

11   something that should be obvious, right?  An end run around

12   this Court.  This Court spent hours, probably, reading a

13   motion to compromise issues with HarbourVest, issues between

14   the Debtor and HarbourVest.  I had objections.  An objection

15   from CLO Holdco that was very document-oriented, as I recall.

16   Right of first refusal.  HarbourVest can't transfer its 49.98

17   percent interest in HCLOF, right?  Talk about alphabet soup.

18   We definitely have it.

19              MR. SBAITI:  Yes.

20              THE COURT:  Without giving CLO Holdco the first right

21   to buy those assets.  Read pleadings.  Law clerk and I stay up

22   late.  And then, you know, we get to the hearing and there's

23   the withdrawal -- we heard a little bit about that today --

24   withdrawal of the objection.  We kind of confirmed that two or

25   three different ways on the record.  And then I remember going

1   to Mr. Draper, who represents the Dugaboy and Get Good Trusts.

2   You know, are you challenging the legal propriety of doing

3   this?  And he backed off any objection.

4       So the Court ended up having a hearing where we went

5   through what I would call the standard 9019 prove-up, where we

6   looked at was it in the best interest, was it fair and

7   equitable given all the risks, rewards, dah, dah, dah, dah.

8   You know, HarbourVest had initially, you know, started at a

9   $300 million proof of claim, eye-popping, but this all put to

10  bed a very complicated claim.

11              MR. SBAITI:  Yeah.

12              THE COURT:  Tell me something that would make me feel

13  better about what is, in my core, in my gut, that this is just

14  a big, giant end run around the Bankruptcy Court approval of

15  the HarbourVest settlement, which is not on appeal, right?

16  There are a gazillion appeals in this case, but I don't think

17  the HarbourVest --

18              A VOICE:  It is on -- it is on appeal, Your Honor.

19              THE COURT:  Is it?  Oh, it is on appeal?  Okay.  So I

20  may be told --

21              MR. SBAITI:  I didn't know.

22              THE COURT:  I may be told, gosh, you got it wrong,

23  Judge.  You know, that happens sometimes.

24      So, this feels like an end run.  You know, the appeal is

25  either going to prevail or not.  If it's successful, then, you

245

1  know, do you really need this lawsuit?  You know, I don't --

2  okay.  Your chance.

3          MR. SBAITI:  Thank you, Your Honor.

4          THE COURT:  Uh-huh.

5          MS. SBAITI:  Your Honor, this wouldn't be the first

6  case where finality or where there was a settlement -- I'm not

7  familiar as well with bankruptcy, but certainly in litigation

8  -- where the settlement then reveals -- well, after a

9  settlement is done, after everyone thinks it's done, some new

10  facts come to light that change people's views about what

11  happened before the settlement or before the resolution.  And

12  that's what happened here, Your Honor.  This is what we've

13  pled.  And this is what we understand.

14      There were the instances of Mr. Seery's testimony where he

15  testified to the value of the HarbourVest assets.  I believe,

16  as I recall, he testified in I believe it's the approval

17  hearing that Your Honor is talking about that the settlement

18  gave HarbourVest a certain amount of claims of I think it's,

19  Series 8 and then Series 9 claims, and that those were

20  discounted to a certain dollar value that he quantified as

21  about $30, $31 million.  And the way he ratified and justified

22  the actual settlement value, the actual money or value he was

23  conferring on HarbourVest, given the critique of HarbourVest

24  claims that he was settling, is he explained it this way.  He

25  said $22-1/2 million of this whole pot that I'm giving them

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 247
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 781 of 1017 PageID 11562

246

1    pays for the HarbourVest -- HarbourVest's interests in HCLOF

2    -- it's alphabet soup again -- and Highland CLO Funding,

3    Limited.  And so it's the other $9 million that's really

4    settling their claims.  And given the amount of expense it's

5    going to take, so on and so forth, $9 million seems like a

6    reasonable amount to settle them with, especially since we're

7    just giving them claims.

8        So that $22-1/2 million everyone apparently took to the

9    bank as being the value, including CLO Holdco at the time,

10   because they didn't have the underlying valuations.  Highland

11   was supposed to give the updated valuations.

12       So, fast-forward a couple of months -- and this is what

13   we've played in our lawsuit, Your Honor; this is why I don't

14   think it's an end run -- we pled in our lawsuit just a couple

15   months later Highland -- I believe some of the people that

16   worked at Highland started leaving, according to some

17   mechanisms that I saw where Highland didn't want to keep all

18   the staff and so the staff was migrated to other places.  And

19   one of those gentlemen, I believe Mr. Dondero referred to him

20   as a gentleman named Hunter Covitz, and Hunter Covitz, who's

21   also an investor in HCLOF, he owns a small piece of HCLOF, he

22   had the data, he had some of the information that showed that,

23   actually, in January, when Mr. Seery said that the HarbourVest

24   settlement was worth 22 -- excuse me, the HarbourVest

25   interests in HCLOF were worth $22-1/2 million, that they're

247

1    actually worth upwards of $45 million.

2        And so that information, Your Honor, we believe gives us a

3    different -- a different take on what happened and what was

4    supposed to happen.  This is strictly about the lack of

5    transparency.

6            THE COURT:  Okay.  Assuming --

7            MR. SBAITI:  Yeah.

8            THE COURT:  -- I buy into your argument that this is

9    newly-discovered evidence --

10           MR. SBAITI:  Yes.

11           THE COURT:  -- CLO Holdco would not have had reason

12   to know -- I guess that's what you're saying, right?

13           MR. SBAITI:  I'm saying they -- they didn't know.

14           THE COURT:  That they didn't know.

15           MR. SBAITI:  Uh-huh.

16           THE COURT:  And didn't have reason to know.  I'm

17   trying to figure out who's damaged here.

18           MR. SBAITI:  Well, CLO Holdco, my client, is damaged,

19   Your Honor.

20           THE COURT:  How?

21           MR. SBAITI:  Because one of the aspects of the -- of

22   Highland, one of the issues under, excuse me, of Highland's

23   advisory, is that it has a fiduciary duty.  And that fiduciary

24   duty, at least here, entails two, if not, three prongs.  The

25   first prong is they have to be transparent.  You can't say --

248

1          THE COURT:  How is -- you know, I know a lot about

2   fiduciary duties, believe it or not.  How is CLO Holdco harmed

3   and the DAF harmed?

4          MR. SBAITI:  Because, Your Honor, they lost out on an

5   investment opportunity to buy the piece of -- the HarbourVest

6   piece.  They would have been able to go out and raise the

7   money.  They had the opportunity --

8          THE COURT:  Okay.

9          MR. SBAITI:  They would have had the opportunity to

10  make a different argument.

11         THE COURT:  What you're saying, you're saying, if

12  they had known what they didn't have reason to know, that it

13  was worth, let's say, $45 million, that they would have gone

14  out and raised money and said, oh, we do want to exercise this

15  right of first refusal that we decided we didn't have and gave

16  in on, we're going to press the issue and then outbid the $22

17  million, because we know it's worth more?  Is that where

18  you're going? I'm trying to figure out where the heck you're

19  going, to be honest.

20         MR. SBAITI:  That's -- Your Honor, I'd push back on a

21  little of the phrasing, only because the way these duties --

22  the way we understand the SEC's duties work when you're an

23  investment advisor is you have a transparency obligation and

24  an obligation --

25         THE COURT:  Yes.  Yes.

Appx. 36758

010701

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 250
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 784 of 1017 PageID 11565

249

1    MR. SBAITI:  -- not to divert these.  So, yes, CLO

2  Holdco would have at least had the opportunity and been

3  offered the opportunity, which it could have taken advantage

4  of, to, if the assets were really on the block for $22-1/2

5  million, they should have been able to buy their percentage

6  pro rata share of that $22-1/2 million deal.  I mean, in a

7  nutshell, that's -- that's where we believe we've been harmed.

8  And we believe that the obfuscation of those values and, to a

9  certain extent, the misrepresentation of those values in the

10  settlement is not cleansable by the argument, well, you should

11  have asked.

12    Well, you should have asked is fine in normal litigation,

13  but when the person you should have asked actually owes you a

14  positive duty to inform, we believe that the should-have-asked

15  piece doesn't really apply and there's -- and that's, that's

16  the basis of our case.

17    So it's not an end run around the settlement, Your Honor.

18  I think I opened with we're not trying to undo the settlement.

19  We're not saying HarbourVest has to take its interest back.

20  We're not saying the settlement has to go on.  We're not even

21  saying any of the things that happened in Bankruptcy Court

22  need to change.  But Section 959 is pretty clear that this is

23  management of third-party property --

24    THE COURT:  I guess -- okay.  Again, rabbit trail,

25  maybe.  But CLO Holdco still owns its same 49.02 percent

250

1    interest that it did before this transaction.  So if there's

2    value galore in HCLOF, it still has its 49.02 percent

3    interest.  What am I missing?

4            MR. SBAITI:  Oh, I think Your Honor's assuming that

5    HCLOF bought the piece back from HarbourVest.  It didn't.

6            THE COURT:  No, I'm not.

7            MR. SBAITI:  Oh.

8            THE COURT:  I'm not assuming that.

9            MR. SBAITI:  Well, --

10           THE COURT:  I know that now the Debtor has, what,

11   fifty point, you know, five percent of HCLOF, whereas it only

12   had, you know, a fraction.

13           MR. SBAITI:  Point six-ish.  Yeah.

14           THE COURT:  Point six-ish, and HarbourVest had 49.98.

15           MR. SBAITI:  Right.

16           THE COURT:  So, again, please educate me.  I'm really

17   trying to figure out how this lawsuit isn't just some crazy

18   end run around a settlement I approved.  And moreover, what's

19   the damages?

20           MR. SBAITI:  Well, Your Honor, --

21           THE COURT:  What's the damages?  CLO Holdco still has

22   its 49.02 percent interest in HCLOF.

23           MR. SBAITI:  Your Honor, again, --

24           THE COURT:  What am I missing?  I must be missing

25   something.

251

1          MR. SBAITI:  I think so, Your Honor.

2          THE COURT:  What?

3          MR. SBAITI:  The damages is the lost opportunity, the

4    lost opportunity to own more of HCLOF.

5          THE COURT:  Oh, it could have owned the whole darn

6    thing?

7          MR. SBAITI:  I could have owned 90 -- whatever 49

8    plus 49.98, 98.98 percent.

9          THE COURT:  But --

10          MS. SBAITI:  Or some pro rata portion.

11          THE COURT:  But Mr. Seery had some information that

12    you think he was holding back from CLO Holdco that CLO Holdco

13    had no reason to know?

14          MR. SBAITI:  Yes, Your Honor.  The -- the -- what he

15    testified to that the value of those assets, excuse me, the

16    value of the HarbourVest interests in HCLOF or its share of

17    the underlying assets being $22-1/2 million was either, one,

18    intentionally obfuscated, or, two, and I don't think this

19    excuses it at all, he simply used ancient data and simply

20    never updated himself, not for the Court and not for any

21    representations to the investors, who he himself testified

22    under oath in this Court that he has a fiduciary duty to under

23    the Investment Advisers Act.

24          THE COURT:  This could get very --

25          MR. SBAITI:  So that's injury to my client, Your

1   Honor.

2            THE COURT:  This could get really dangerous.  Maybe

3   --

4            MR. SBAITI:  I'm sorry.

5            THE COURT:  This could get really dangerous.  Maybe I

6   should cut off where I'm going on this.

7            MR. SBAITI:  Okay.

8            THE COURT:  Of course, someone dangled it out there

9   in a pleading.  You know where I'm going, right?

10            MR. SBAITI:  I'm not sure I do, Your Honor.

11            THE COURT:  Hmm.  I do read the newspaper, but

12   someone put it in a pleading.  HCLOF owns MGM stock, right?

13   Is that what this is all about?  Is that what this is all

14   about?  Or shall we not do this on the record?

15            MR. SBAITI:  Well, Your Honor, this has nothing -- I

16   don't -- I don't think this has anything to do with the MGM

17   stock one way or the other.

18            THE COURT:  You don't?  OH?

19            MR. SBAITI:  Your Honor, my charge as a counsel for

20   the DAF is pretty straightforward.  We looked at the claims.

21   We looked at the newly-discovered information.  We talked to

22   the people who had it, Your Honor.  That was our

23   investigation.  We put together a complaint.  We believed that

24   we had a good basis to file suit, despite Your Honor's -- the

25   settlement approval.  We expressly, because we understand how

1   finality is so critical in a bankruptcy context, we expressly

2   didn't ask for rescission.  We expressly didn't ask for

3   anything that would undo the settlement.

4       Asking for damages because of how the settlement happened,

5   through no fault of the Court's, of course, but asking for

6   damages is not, at least not as I see it, an end run around

7   the Court's settlement, and it's a legitimate claim.  And I

8   don't think this is far from the first time that new evidence

9   has come up that's allowed someone to question how something

10  was done that actually -- that actually damaged them.

11          THE COURT:  Usually, they come in for a motion to

12  reopen evidence to the court who issued the order approving

13  the settlement.

14          MR. SBAITI:  Well, Your Honor, I mean, that's --

15          THE COURT:  Newly-discovered evidence.

16          MR. SBAITI:  That would be the case in a final

17  judgment, Your Honor.  But, you know, our understanding of the

18  way the settlement worked was that that was not necessarily

19  going to be -- not the direction anybody wanted to go, but

20  seeking damages on a straight claim for damages, which we're

21  allowed to seek, which I think is our prerogative to seek, we

22  went that direction.

23          THE COURT:  Okay.  Okay.

24          MR. SBAITI:  But this --

25          THE COURT:  My last question.

254

1          MR. SBAITI:  Yes, Your Honor.

2          THE COURT:  Again, I have to know.  You have filed

3     some sort of pleading to reopen litigation against Acis in New

4     York?  I'm only asking this because it's part of what's going

5     on here.  What is going on here?

6          MR. SBAITI:  Your Honor, that's a -- that's a

7     separate lawsuit, and it's not to reopen litigation against

8     Acis.  It deals with post-plan confirmation mismanagement by

9     Acis.

10         THE COURT:  Oh, okay.  Okay.

11         MR. SBAITI:  Yeah.

12         THE COURT:  All right.

13         MR. SBAITI:  But I believe there's a motion in front

14    of Your Honor, just to -- that gave notice that the suit was

15    filed, but I believe Mr. -- well, a bankruptcy lawyer filed

16    it.  I don't know.

17         THE COURT:  A motion or a notice?  I don't know.

18         MR. SBAITI:  I don't know, Your Honor.  That's above

19    my paygrade.

20         THE COURT:  I have not seen it.  Okay?

21         MR. SBAITI:  Okay.

22         THE COURT:  Maybe it's there, but no one has called

23    it to my attention.

24         MR. SBAITI:  With the Court's permission, I'm going

25    to yield time to Mr. Bridges.

255

1          THE COURT:  Okay.  Mr. Bridges?

2          CLOSING ARGUMENT ON BEHALF OF THE RESPONDENTS

3          MR. BRIDGES:  Thank you, Your Honor.  I'm grateful

4    that you asked most of those questions to Mr. Sbaiti.  I would

5    not have been able to answer them.  The one I can answer is

6    the one about judicial estoppel.  Apparently, I did a pretty

7    lousy job earlier.  I think I'm prepared to do a better job

8    now.

9       The case law I'd like to refer you to is the Texas Supreme

10   Court's 2009 decision in *Ferguson v. Building Materials*, 295

11   S.W.3d 642.  And this was my concern and my issue, perhaps

12   because I used to teach it and so it was at the front of my

13   mind.  But contrary to what you would think and what you said

14   earlier, it's not your ruling against us that would create a

15   judicial estoppel problem.  It's if you ruled in our favor.

16   And I know that seems weird.  Let me explain.

17      The two things that have to take place for there to be

18   judicial estoppel are, first, successfully maintaining a

19   position in one proceeding, and then taking an inconsistent

20   position in another.  And Your Honor, what we talked about

21   earlier is the notion that your July order forecloses the key

22   claim that Mr. Sbaiti was just describing, that Mr. Seery

23   should have known.  Not that he was grossly negligent or did

24   intentional wrong, but that he breached fiduciary duties

25   because he should have known and should have disclosed.

256

1    And if your order forecloses that and we come and convince

2    you that we nonetheless have colorable claims, colorable

3    claims of gross negligence or willful wrongdoing, that we

4    ultimately are unable to prove, our lawsuit could fail, even

5    though we had proved -- in the lawsuit we had proved he should

6    have known and that he breached fiduciary duties, but we would

7    be estopped, having succeeded from coming here and asking in

8    compliance with the order and its colorability rule, that we

9    would be estopped from then saying that this Court lacked the

10   authority to have issued that order in the first place, to

11   have released the claim on the mere breach of fiduciary duty

12   or ordinary negligence.  That's the inconsistency that I was

13   concerned about.

14   By coming here rather than trying to make our objection

15   and our position known without submitting to the foreclosure

16   of that claim that is, in many ways, the most important, the

17   headliner from our District Court complaint, is the concern,

18   Your Honor.  And frankly, if Your Honor's order does foreclose

19   that, then we're in serious trouble.  That's the claim that

20   we're trying to preserve.

21   But Your Honor, I don't think it was in anyone's

22   contemplation in July of 2000 that what that order would do is

23   terminate -- 2020; sorry, Your Honor -- in July of 2020, that

24   that order would terminate future claims that might arise

25   based on future conduct that had not yet happened in Mr.

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 258
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 792 of 1017 PageID 11573

257

1   Seery's role. Not in his role as a manager of the Debtor's

2   property, but in his role as a registered investment advisor

3   on behalf of his clients and their property. And that is the

4   concern that the judicial estoppel argument is about.

5        THE COURT: I still don't understand. I'm very well

6   aware of judicial estoppel, the old expression, you can't play

7   fast and loose with the court. Take one position in one

8   court, you're successful, and then take another position in

9   another court. That's the concept.

10       MR. BRIDGES: Coming here --

11       THE COURT: How is this judicial estoppel if you had

12  done what I think the order required and asked this Court for

13  leave? What -- and I said fine, you have leave. Where's the

14  judicial estoppel problem?

15       MR. BRIDGES: If you say fine, you have leave, but

16  that leave is only, as the order states, because we have

17  colorable claims of gross negligence, colorable claims of

18  intentional wrongdoing, what happens to our mere negligence

19  and mere breach of fiduciary duty claims? Are they

20  foreclosed? The order on its face --

21       THE COURT: Well, I would interpret the order to be

22  yes, and then you could appeal me, and the Court would either

23  say it's too late to appeal that because you didn't appeal it

24  in July 2020, or fine, I'll hear your appeal. Where's the

25  estoppel?

258

```
 1         MR. BRIDGES:  Your Honor, our claims that this Court

 2   lacks the authority either to have made that order in the

 3   first place or the jurisdiction to rule on colorability now

 4   because of Section -- the mandatory abstention provision,

 5   whose section number I've now lost.  That if we come to you

 6   and ask you to rule on those things, have we not thereby

 7   waived on appeal our claim that you couldn't rule in the first

 8   place on those things?

 9       That is what our motion for leave in the District Court

10   argues, is that there's -- there are jurisdictional

11   shortcomings with your ability to decide what we're asking

12   that Court to decide.  And Your Honor, by coming here first

13   and then appealing, that's what we fear we would have lost.

14   And instead of coming here and appealing, what we -- what we

15   would have done, in the alternative, I guess, would be to come

16   here and ask you not to rule but move to withdraw the

17   reference of our own motion.

18       That two-step, filing here and filing a motion to withdraw

19   the reference on the thing we filed here, we didn't think was

20   required, nor could we find any case law or rule saying that

21   that was appropriate.

22         THE COURT:  Okay.

23         MR. BRIDGES:  These are not games, Your Honor.  We

24   were not trying to play games.  We aren't bankruptcy court

25   lawyers.  We're not regularly in front of the Bankruptcy
```

259

1  Court.  So the notion why didn't we come here first isn't

2  exactly at the top of our mind.  The question for trial

3  lawyers typically is, where can we file this, what are the

4  permissible venues, not why don't we come to Bankruptcy Court?

5  Especially when your order appears to say that causes of

6  action that don't rise to the level of gross negligence or

7  intentional wrongdoing are already foreclosed.

8      Your Honor, the January order, I think I have to just

9  briefly address again, even though I don't understand why it

10 makes a difference.  Apparently, counsel thinks it makes a

11 difference because Mr. Dondero apparently supported it in some

12 way.  Our position is, for whatever difference it makes, the

13 January versus the July, we don't believe there's anything in

14 the District Court complaint putting at issue Mr. Seery's role

15 as a director, so we don't understand how that order is

16 implicated.

17     Again, I'm not sure that matters at all.  I'm not raising

18 it as a defense.  I'm just telling Your Honor this is all

19 about the July order, from our perspective.  Certainly, the

20 July order puts his role as a CEO -- certainly, the District

21 Court case puts his role as a CEO at issue, and that's what

22 the July order is about.

23     Your Honor, the *Applewood* case requires specifics in order

24 to terminate our rights to sue and to bring certain causes of

25 action, and without that kind of specificity, Your Honor, we

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 261
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 795 of 1017 PageID 11576

260

1    believe that that order fails to preclude, fails to have

2    preclusive effect as to these later-arising claims. And we

3    would submit not only that it was not contemplated, but that

4    it was not intended to have that effect, and that even Mr.

5    Seery's testimony suggests that that's not how he understood

6    that order to be effective.

7        Counsel argued that the Barton Doctrine does apply here

8    and rattled off the names of cases that don't -- to my

9    knowledge, no case, no case that I can find deals with this

10   type of deferential order where someone is asked -- where a

11   court is asked to defer to the business judgment of an entity

12   in approving an appointment, and nonetheless deciding that the

13   Barton Doctrine applies. That's not what *Villegas* holds.

14   That's not what *Espinosa* holds. I don't think *Barton* is

15   applicable in a situation like that. Certainly, it's outside

16   of the context of what *Barton* anticipated itself over a

17   century ago when it was decided.

18       Your Honor, if we're wrong, please know we're wrong in

19   earnest. These are not games. These are not sneakiness. No

20   such motivation is at issue here. I was hopeful that that

21   would be plain from the text of the motion for leave itself.

22   If it's not, I'd offer this in addition. The docket at the

23   District Court shows that immediately upon filing the motion

24   for leave, a proposed order was filed with it asking to have

25   the proposed complaint deemed filed, which as soon as I saw I

1  asked us to immediately retract it and to substitute a new

2  proposed order that does not ask for the amended complaint to

3  be deemed filed.  That is not what we wanted.

4      And the fear was what if our motion is granted because the

5  District Court says you have the right, you don't even need

6  leave, but as to the Bankruptcy Court, you're on your own,

7  this is at your own risk, I'm not going to rule on any of the

8  jurisdictional questions that you attempt to raise?  We did

9  not want our complaint deemed filed for that reason.  What we

10  did want was for a court where we did not risk judicial

11  estoppel to decide whether or not our key claim under the

12  Advisers Act had been foreclosed by your July order, and that

13  was the key and motivating factor.

14      On top of that, Your Honor, instead of arguing the meaning

15  of the word pursue, let me just say this.  We understood

16  pursue in that context to refer to claims or causes of action,

17  not potential, unfiled, unasserted, contemplated claims or

18  causes of action.  That until a claim or cause of action is

19  actually asserted in some way, that it can't be pursued, and

20  that the reference here was to two kinds of action, those that

21  had not yet been commenced -- and your order foreclosed the

22  commencing of them without permission -- and those that had

23  been commenced.  And your order couldn't foreclose the

24  commencing of them because they hadn't been commenced yet, but

25  your order did foreclose pursuing them.

010714

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 263
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 797 of 1017 PageID 11578

262

 1   And that was my reading of what that order said.  And it

 2   fits with this notion that a claim or cause of action isn't

 3   something you're considering or even researching.  It didn't

 4   dawn on us that researching or talking to a client about a

 5   potential claim could violate the order because in some

 6   respect that conversation could be in pursuit of the claim.

 7   By the same notion, we didn't think asking a court with

 8   original jurisdiction according to Congress, asking a court to

 9   decide whether or not we were foreclosed from bringing our

10   claims in a motion for leave was violating your order.

11   We don't have much else, Your Honor.  In terms of the need

12   to enforce compliance with your orders, if we understand them,

13   we sure as heck are going to follow them.  And if we've

14   misconstrued the term pursue, I'm certainly very sorry about

15   that.

16   I appreciate counsel saying he thinks we're probably good

17   people.  I did not think what we did was any kind of gross

18   error in judgment.  I thought that what we were doing was

19   preserving our clients' rights, going to a court of competent

20   jurisdiction, and asking the question, can we do what we think

21   we ought to be able to do, but is -- frankly, Your Honor,

22   we're a bit confused about because of the order that seems on

23   its face to foreclose the very lawsuit that we think we should

24   be bringing on behalf on this charitable organization that

25   foreclosed it months before the conduct at issue that gave

010715

263

1  rise to the complaint.  And with that conundrum, knowing what

2  to do was not obvious or easy for the lawyers or for the

3  client who was dependent on his lawyers to give him good,

4  sound advice.

5      I'm very grateful for you giving us the time and for your

6  very pointed questions.  Thank you, Your Honor.

7              THE COURT:  Thank you.  All right.  Who's next?

8              CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

9              MR. ANDERSON:  May it please the Court, Michael

10  Anderson on behalf of Mr. Patrick, Mark Patrick.

11      You know, this is a contempt proceeding.  It's very

12  serious.  And, you know, my stomach aches for the people here.

13              THE COURT:  Mine does, too, by the way.

14              MR. ANDERSON:  It truly aches.

15              THE COURT:  Uh-huh.

16              MR. ANDERSON:  And I mean what I said when I did

17  opening, when I said we don't need a hearing, an evidentiary

18  hearing.  And I still don't believe we did, because it comes

19  down to what does the word pursue mean, because there's

20  already been an acknowledgement --

21              THE COURT:  Do you all want to withdraw all your

22  exhibits?  I've got a lot of exhibits that I now need to go

23  through.  If I admit them into evidence, I'm going to read

24  them.

25              MR. ANDERSON:  No, I understand.

264

1          THE COURT: Uh-huh.

2          MR. ANDERSON: But it does come down to the word

3     pursue. Counsel has already said commence doesn't do it, and

4     so then it's pursue.

5          And I could ask Your Honor, what did you mean when you

6     said pursue in the July order, but I'm not going to say that.

7     And I asked my client on the stand, you know, did you pursue a

8     claim or cause of action? And then it was very telling. What

9     happened with counsel? He stood up and objected to me even

10    asking if it was pursued. And it dawned on me, if he's going

11    to object, does pursue have some sort of legal -- that was his

12    objection. It was he objected on legal grounds. Does that

13    have some sort of legal meaning?

14         This is contempt. You can't be held in contempt unless it

15    is bright-line clear that you have deviated from a standard of

16    conduct and there's no ambiguity. Well, clearly, there is

17    ambiguity, because over on this side of the room we say filing

18    a motion for leave can't be pursue. We can look at the order

19    and we know it doesn't mean pursue because I just heard Your

20    Honor say you should have filed a motion for leave in this

21    Court before doing anything. All right? So if that -- if

22    that is what without the Bankruptcy Court first determining,

23    if that's what the motion for leave is, well, then if we go up

24    to the first sentence, No entity may commence or pursue a

25    claim or cause of action, then it has this, without the

265

1    Bankruptcy Court first determining, that means -- if pursue

2    means a motion for leave, if that's what that means, then that

3    order says you can't commence or file a motion for leave

4    before you file a motion for leave. Because that's what it

5    means. If pursue means motion for leave and you've said you

6    should have come here and filed a motion for leave because it

7    says, Debtor, without the Bankruptcy Court first determining

8    that notice that such claim or cause of action represents a

9    colorable claim, and specifically authorizing. The vehicle to

10   do that would be a motion for leave, right? And you can't

11   pursue anything until a motion for leave has been filed.

12       Now, where was the motion for leave? And I understand,

13   Your Honor, you know, no expert at reading the room,

14   obviously, you're frustrated that the motion for leave was

15   filed in the District Court and not in this Court. But it

16   doesn't change the fact, and neither did any of the evidence,

17   change anything, is what does pursue mean?

18       And if someone says, well, it's obviously clear it means

19   $x$, well, is it really obviously clear it means filing a motion

20   for leave? Because nobody on my side, when you read it, when

21   you say pursue, can read it that way. And if we're going to

22   have contempt sanctions being posed, and there has to be clear

23   and convincing evidence or beyond reasonable doubt, depending

24   upon, you know, I don't think you have to get to that part,

25   but clear --

266

 1          THE COURT:  This is not criminal contempt.

 2          MR. ANDERSON:  Clear and convincing is the civil

 3   standard for contempt.

 4          THE COURT:  Right.

 5          MR. ANDERSON:  And if pursue is open to that much

 6   interpretation, it's not the kind of thing that can be held in

 7   contempt on.  And I understand the frustration.  I hear the

 8   frustration.  I hear counsel talk about that was not their

 9   intent when they filed it.  You know, I heard Mr. Patrick get

10   up there.  I heard counsel say, hey, Mr. Patrick's doing his

11   job, he's a good guy, seems like a good guy.  Well, Mr.

12   Patrick's up there.  Look, they filed the underlying lawsuit.

13   Nobody -- there's no motion for that in this Court about the

14   underlying lawsuit.  It's only about the motion for leave.

15   That's all we're here about.

16       And so you go to that, and we've heard all these arguments

17   about it, and we've been here almost as long as the motion for

18   leave was actually on file before it was sua sponte dismissed

19   without prejudice.

20       And so I go back to that and I say that, if pursue means

21   filing a motion for leave, then that order would require an

22   order for anyone to violate -- it would be violated upon the

23   filing of a motion for leave, because you can't pursue

24   something until the Bankruptcy Court has already first

25   determined, after notice, that such claim or cause of action

010719

267

```
 1   represents a colorable claim and specifically authorizing the

 2   entity to bring such a claim.  Because that -- we already know

 3   that's a motion for leave in and of itself.  Therefore,

 4   pursue, just simply filing a motion for leave will put you in

 5   that.

 6       But that gets into all these -- we don't need to be having

 7   this discussion about, you know, is a motion for leave pursue?

 8   Is pursue a motion for leave?  I've heard both arguments here.

 9   It doesn't justify contempt.  And I know -- and so certainly

10   with respect to my side, I, you know -- given that, I would

11   request that the Court deny the request for contempt.

12       And again, I want to say, too, look, we hear you.

13   Absolutely hear you.  Understand the frustration.  Totally

14   hear you on that.

15       I'm going to turn over the balance of my time to Mr.

16   Phillips, --

17           THE COURT:  Okay.

18           MR. ANDERSON:  -- unless you have any questions, Your

19   Honor.  I appreciate it.

20           THE COURT:  Okay.  I do not.

21            CLOSING ARGUMENT ON BEHALF OF MARK PATRICK

22           MR. PHILLIPS:  Your Honor, Louis M. Phillips, and

23   I'll be brief.  I'm going to try to bring it down to -- I was

24   not involved.  We are -- we are here because of the

25   indemnification provisions of CLO Holdco representing Mr.
```

268

1  Patrick individually.  My firm was not involved in the

2  litigation.  We were hired to represent CLO Holdco and some of

3  the defendants in the UCC litigation, and our role has

4  expanded to do some other stuff, particularly represent Mr.

5  Patrick because of the indemnification provisions of the

6  Holdco entity documents.  He's entitled to indemnification and

7  we're providing a defense for him.  That's why we're here.

8      So I come way after the order.  We have not been involved

9  in anything.  But I think I'm just going to try to distill

10  everything about the order and about the concern and about the

11  litigation, because the Court is asking about is this an end

12  run on the settlement?  The Court is also saying, all you had

13  to do was come here first.

14      But let's look.  We're here about one thing, the motion

15  for leave.  And as Mr. Anderson pointed out, the commence or

16  pursue a claim, according to the order, commence or pursue can

17  only occur after the Court has authorized the litigation.

18  Okay.  So that's what the order says.  You can't commence or

19  pursue.

20      Counsel for the Debtors says, well, it can't be after

21  commencement because you've already commenced the action.  So

22  pursue has to mean something before the commencement of the

23  action.  It would mean something before the commencement of

24  the action under this order.

25      But it doesn't mean something before the Court approves

269

1  the commencement of the action, because commence or pursue

2  under this order does not occur before the Court has acted.

3  That's the language of the order. It only occurs after the

4  Court has authorized it. That's the context in which commence

5  or pursue exists, after this Court has authorized.

6      Okay. So it can't be pursuit before the Court has

7  authorized without commencement because it only is triggered

8  by the Court's authorization of the action, which means,

9  before you commence it, actions in time take time, before you

10  commence the action, you have to pursue the action to commence

11  it. But you can't do that until you've approved it. All

12  right?

13      That's the temporal concern and why we say the motion for

14  leave can't be pursuit of an action under this order. It

15  might be pursuit under another definition or another order.

16  In other words, maybe an order could be issued saying, you

17  can't file a motion for leave in any other court but this one.

18  I don't know whether it'd be a good order, but the order could

19  say that. But when you say all you had to do was file a

20  motion for leave in this Court and everything would be okay,

21  no. The motion for leave is not, under this order, pursuit.

22  Pursuit only occurs under this order after you've done

23  something, after Your Honor has done something.

24      So if a motion for leave is violative at the District

25  Court, the motion for leave would be violative here, because

Appx. 06579
010722

Case 19-34054-sgj11 Doc 3445-52 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 271
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 805 of 1017 PageID 11586

270

1    it occurs before Your Honor has taken action.

2        Now, clearly, you want people to ask, but just as clearly,

3    and this was the point of my remarks earlier at the tail-end

4    of opening, just as clearly, I have a question, because

5    frankly, I understand what these guys are saying.  These guys

6    haven't really said it.  They're a little shame-faced at what

7    these guys are asking.  Because what these guys are asking is

8    whether or not an employee Seery, as the CRO -- and we heard,

9    oh, he bargained for it, he wouldn't have done it without

10   getting the order and the protections because -- did he

11   bargain for not having to comply with the Investor Advisory

12   Act?  Did he bargain for not having a fiduciary duty to third

13   parties?  Because the one thing that Mr. Bridges has been

14   trying to tell you is that, under this order, if it's

15   interpreted one way, you would never authorize a violation of

16   the Investment Advisory Act because it wouldn't necessarily be

17   gross negligence or willful misconduct.

18       In other words, in employing Seery, did the Debtor go out

19   in this disclosure statement and say, we are advisor to $1.2

20   billion of third-party money, and guess what, our CRO has no

21   fiduciary duty to you?  We have forestalled any claim under

22   the Investment Advisory Act in our employment order.  Did that

23   happen?

24       Because if that happened, I don't know if the Court was

25   really thinking that way, because that -- that can't happen in

271

 1  a confirmation order before, under the Fifth Circuit

 2  authority, after disclosure statement, plan, et cetera, et

 3  cetera, because that's a third party release of claims that

 4  may -- that haven't occurred yet.  You would be releasing

 5  because you would be saying you have no right.  You have no

 6  right.  This is not temporal.  This is saying you have no

 7  right, if it's saying that, to bring an Investment Advisory --

 8  Investment Advisory Act or a Breach of Fiduciary Duty Act

 9  that's not gross negligence or willful misconduct forever upon

10  an employment order.

11      Now, if that's not what it means, then we have another

12  conundrum.  The other conundrum -- and I'm new to this, maybe

13  this has been thought out by everybody, but I don't think so.

14  The other conundrum is this order doesn't apply to actions

15  that don't involve willful -- gross negligence or willful

16  misconduct.  It only applies to those types of actions.  So,

17  frankly, I don't know what the order does.

18      I think the problem -- I probably shouldn't be the

19  purviewer of who ought to know because my standard's probably

20  really low, given my capacity here.  But I'm a guy off the

21  street.  Seery gets hired to run the Debtor.  Seery testifies

22  and he admits, we've got Investment Advisory  Act all over the

23  place.  We're making lots of fees out of administering all

24  this third-party money.  Do they know?  Do they know he's

25  immune?  Do the third parties know?

272

1          Now, a standard about managing the Debtor?  Absolutely.

2     That's just pure D Chapter 11, pure D corporate, pure D

3     standard liability if you're operating an entity.  You're not

4     liable for gross negligence or willful misconduct.  You're

5     not.  And so any claim for damage to the Debtor or to the

6     estate by actions taken in the CRO capacity, absolutely.

7     Absolutely.  You don't want a bunch of yoyos suing, you did

8     something against the Debtor and the Debtor is now worth $147

9     less than it was because you did something, you were negligent

10    and you forgot to put the dog out.  No.  It's got to be gross

11    negligence or willful misconduct if you are talking about

12    running the Debtor and running the estate.

13         But that's not what we have here.  And you can ask all the

14    questions you want about whether the lawsuit's any good, but

15    that's not what's up before the Court.  What's up before the

16    Court is whether filing a motion for leave is contempt.  And

17    under this order, you're saying, all you had to do is come

18    here.  Well, in one reading of it, you'd have never got relief

19    because you can't bring the kind of action.  I foreclosed it

20    by employing Seery.  He no longer has a fiduciary duty and is

21    no longer bound by the Investment Advisory Act.  Case closed.

22    Get out of here.  Unless you can formulate something around so

23    that you can establish gross negligence or willful misconduct,

24    I've done away with all those causes of action.

25         I don't think that's what happened.  And if that's not

273

1   what happened, this doesn't apply because it shouldn't apply

2   to third-party actions.  It should apply to actions for damage

3   to the estate by creditors of the estate for whom Seery is

4   acting as CRO of the Debtor, who is the -- in possession of

5   the estate.  That makes perfect sense.  Perfect sense.  And

6   nobody would say that you shouldn't have sole authority to

7   determine whether a CRO who's acting for the estate and

8   damages the estate -- because that'd be a claim against the

9   estate.  That would be an administrative claim against the

10  estate.  That is just hornbook law.

11      That's the way I see this order.  And I admit I didn't

12  write it.  I admit I didn't submit it.  I admit I didn't

13  litigate it.  I admit I'm coming in late.  But sometimes maybe

14  a fresh pair of elderly, trifocal-assisted eyes doesn't hurt.

15  Because I will tell you, Judge, on one read this Court says

16  don't bother coming here because you don't have the kind of

17  claim that can be brought, even if you're a third party.  And

18  the only way that happens is if Seery's released from any

19  obligation under the Investment Advisory Act, and I think

20  everybody would like to know that.  And he can't be sued for

21  breach of fiduciary duty to third parties that he admits he

22  owes.  I think people would like to know that.

23      And if it doesn't, then this is not -- this order is not

24  about that.  But the fact -- I've been at this 40 years, and I

25  usually don't want to talk about myself.  There's really not a

274

1    lot to talk about.  But I hear Mr. Morris how he's never done

2    this, he's never done that.  I hear this, I'm a good -- you

3    know, whatever.  I'm confused.  I've been doing this 41 years.

4    Bankruptcy, 39.7.  I must be crazy, but that's what I've been

5    doing.  And I'm confused because I don't even know if they

6    needed to come here.  I don't even know if, had they come

7    here, if they could have even presented an action for gross --

8    for negligence or breach of fiduciary duty, could have --

9    gross negligence or willful misconduct?  I don't know whether

10   this order just applies to Seery's duties as CRO vis-a-vis

11   creditors of the estate and property of the estate and damage

12   to the estate.  Because that's not what we're dealing with

13   here.

14        The point is, Judge, this is contempt.  And I understand

15   Your Honor knows all about contempt.  Your Honor knows about

16   *Matter of Hipp*.  Your Honor knows about civil contempt

17   authorization for bankruptcy courts.  Your Honor knows that

18   you can't operate without the right to impose civil contempt

19   sanctions.  And Your Honor knows, and I agree with Your Honor,

20   that civil contempt is both remedial and coercive.

21        But how do you coerce around my questions?  Maybe I am all

22   wet, but if I am, I don't think I am, and I don't understand

23   that I am, and that's why I'm concerned about going off into

24   this contempt wilderness and millions in fees, when the motion

25   for leave was dismissed and when the lawsuit doesn't ask for

275

1  or includes most of its claims. I don't even -- I have not

2  studied the lawsuit. I wasn't involved in it. But if it's a

3  breach of fiduciary duty and Advisory Act and it says what

4  you've been told it says, that he should have pulled up

5  different stuff, that the valuation metrics were different,

6  that he shouldn't have used it, I don't know that they're

7  saying fraud. I don't know that they're saying he knew he was

8  doing -- I think they're saying he breached the Investment

9  Advisory Act. And that's not gross negligence or willful

10 misconduct. Then does this order apply or this order -- does

11 this order foreclose that?

12     The fact is, I think we could have decided this on the

13 pleadings and on the order. We didn't. The fact that Mr.

14 Dondero did A, B, C. And I will tell you this. Mr. Patrick

15 has stood up. He's going to get a harpoon, he's going to get

16 a harpoon, subject to his right to appeal. But he has told

17 this Court. We represent him. We're not trying to get him

18 out of having authorized the order. It's very important for

19 this Court to understand. Mr. Patrick is one of these

20 entities. Mr. Dondero can holler and scream all he wants to.

21 Mr. -- and look, did he terminate Grant Scott? If I'm Grant

22 Scott, and this is my best friend and I was in his wedding and

23 I was his roommate and I was his best friend and I'm doing

24 this stuff for $5,000 and I do something and $5,000 a month

25 and I do something and I get hollered at and I've got a full a

276

 1   law practice, I'm an IP lawyer, why don't I just tell him to

 2   go jump in a lake, which is the other way you could look at

 3   Grant Scott leaving.  I want you to jump in a lake.  I'm out

 4   of here.  I don't need this.

 5       Thank you.

 6               THE COURT:  All right.  Thank you.

 7               MR. DEMO:  Your Honor, how much time do they have

 8   left, --

 9               THE COURT:  Um, --

10               MR. DEMO:  -- to be honest?

11               THE COURT:  Nate, are you -- 26 minutes?  All right.

12               MR. TAYLOR:  I'll go way under, Your Honor.

13               THE COURT:  Okay.

14               CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

15               MR. TAYLOR:  Your Honor, Clay Taylor.  I'm here on

16   behalf of Mr. Dondero.  He was named as an individual alleged

17   violator within the order.

18               THE COURT:  Okay.  I'm getting lawyers mixed up.  Mr.

19   Anderson, who did you represent?

20               MR. ANDERSON:  Mr. Patrick.  Mr. Phillips and I

21   represent --

22               THE COURT:  You're Mr. Patrick?

23               MR. PHILLIPS:  We're Mr. Patrick.

24               THE COURT:  You're both --

25               MR. PHILLIPS:  Mr. Patrick.

010729

1          THE COURT:  Okay.  I'm sorry.  I'm getting my Fort

2   Worth law firms mixed up.  Okay.

3          MR. TAYLOR:  That's quite all right.  Clay Taylor

4   from Bonds Ellis here on behalf of Mr. Dondero.  And we're

5   here because he was named in the alleged violator motion

6   within the order as an alleged violator.  We don't think that

7   he is, for the reasons that we're about to explain, but we

8   were ordered to appear --

9          A VOICE:  No.

10         MR. TAYLOR:  -- and so therefore we are appearing and

11  telling you why we're not an alleged violator.

12      First of all, for all the reasons that Mr. Sbaiti and Mr.

13  Bridges and Mr. Phillips and Mr. Anderson said, the court

14  order was in effect.  We agree with that.  It required certain

15  conduct to be done.  Yes, it did.  It said you couldn't

16  commence something.  It said you couldn't pursue it.  I think

17  we have gone through what the pursuit and commence.  Nobody is

18  arguing that anything was commenced.  It comes down to

19  pursuit.

20      But let's talk about what the evidence shows about Mr.

21  Dondero.  It shows that Mr. Dondero believes that there have

22  been breaches of fiduciary duty.  He thinks that there has

23  been negligence committed.  He believes that actions should be

24  taken.  We don't run away from that.  He, frankly, told you

25  that.

278

 1    But here, he didn't take any action to pursue it.  The DAF

 2  did.  CLO Holdco did.  It's undisputed that he's not an

 3  officer, director, or control person for either of those

 4  entities.  The act we're here on is a motion for leave to file

 5  an amended complaint to include Mr. Seery.  That's -- Mr.

 6  Dondero didn't take any of those acts.  He believes it should

 7  have been done, but he's not the authorizing person.

 8    He might have -- let's just pretend that he thought he was

 9  authorizing something.  It doesn't matter that he thought he

10  could authorize something or that he was trying to push for

11  it.  The fact remains he can't authorize it.  You know, he can

12  say, I declare war on Afghanistan.  Well, he can't.  Congress

13  can't.  He can write a letter to his Congressman.  He already

14  wrote a letter to his Congressman.  He talked.  He talked with

15  the head of the acting CLO -- CLO Holdco and he said, I think

16  there's something wrong here.  I think you should be looking

17  into it.  You know what, he goes, you might be right.  Go talk

18  with Mazin about it.  Give him some data.  Conduct an

19  investigation.  They did.  And then they went to the

20  authorizing person and they filed a motion for leave to

21  include Mr. Seery.  Mr. Dondero did nothing wrong in that.

22    Now, there is some personal animosity.  I think that Your

23  Honor has probably seen there seems to be some personal

24  animosity between Mr. Seery and Mr. Dondero, and that's

25  unfortunate.  But just because there's some personal animosity

279

1    doesn't mean that maybe something wasn't done wrong.  Maybe

2    that Mr. Dondero -- he's certainly allowed to at least tell

3    people, well, I think there was something done wrong.  And if

4    there is an action to be had, then those appropriate entities

5    can take it.  But he didn't do those things.

6        And so even if he says, just like Michael Scott, "I

7    declare bankruptcy," it doesn't matter.  You have to take the

8    certain actions.

9            THE COURT:  I got it.  I don't know if everyone did.

10           MR. TAYLOR:  Yes, well, yeah, you have to be a *The*

11   *Office* fan.

12       But so that's where we stand.  And for all the reasons the

13   prior people have discussed, I don't think that there was any

14   violation of this Court's order.  But even if there was, Mr.

15   Dondero in this situation was not the one.  We're going to

16   have to deal with the other order that came out yesterday in

17   due course, but for this discrete issue that is before this

18   Court today, Mr. Dondero didn't violate anything.

19       Thank you.

20           THE COURT:  All right.  Mr. Morris, you get the last

21   word.

22       REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. MORRIS:  Thank you, Your Honor.  These are going

24   to be discrete points because it's truly rebuttal.  I'm going

25   to try to respond to certain points.

1        Mr. Bridges and Mr. Phillips made extensive arguments

2    about why they believe the order is wrong, why it's

3    overreaching.  They tried to get into your head to think about

4    what you intended or what you thought.  The fact of the matter

5    is, the answer to all of those questions -- first of all, none

6    of it's relevant to this motion because we've got the order --

7    but the answer is very simple.  Forget about coming here to

8    seek leave to amend to add Mr. Seery.  We can avoid Mr.

9    Sbaiti's concerns about judicial estoppel or something.  Why

10   didn't they just file the motion for reconsideration?  They

11   filed that after they filed the motion for leave to amend,

12   after we filed the motion for contempt.  Only then did they

13   file the motion for reconsideration.

14       Now, we think it's ill-thought-out.  We think it's

15   problematic.  Probably not today, is my guess, we'll argue to

16   you as to why we think that motion ought to be denied.  But if

17   they truly believed that the order was infirm in any way,

18   wouldn't the proper thing to have been to come here and tell

19   you that?  Wouldn't the proper thing to be to come to the

20   court that issued the order that you have a problem with and

21   ask the court to review it again?  And if Your Honor overruled

22   the motion, to appeal it.

23       Why are we even doing this?  Why did they do it?  It's not

24   we.  Why did they do it?  Right?  And that solves almost

25   everything they've said.  That's point one.

281

1       Point two, the January order.  The January order is very

2   important.  It's important not just because it applies to

3   directors, but it's important because Mr. Dondero agreed to

4   it, and it also applies -- I want to get it -- Paragraph 10.

5   It's Exhibit 15.  It applies to the independent directors and

6   the independents directors' agents.  If a CEO is not an agent

7   of an independent director, I'm not sure what is.  The

8   independent directors are the body that appointed the CEO.

9   The CEO, Mr. Seery, is acting on behalf of the board.  This is

10  the order that Mr. Dondero agreed to.  It's the order -- take

11  out the word independent director; put in Mr. Seery -- it's

12  the order everybody's complaining about.  But even the January

13  order certainly applied to Mr. Seery.  That's point two.

14      Point three.  I've heard a lot of concerns about the

15  slippery slope and what does pursuit mean and does talking to

16  a lawyer mean pursuit and doing an investigation being

17  pursuit.  I don't know, Your Honor, and I don't care, because

18  that's not what we're here to talk about.  We're here to talk

19  about a specific act -- not a hypothetical, not a slippery

20  slope.  We're talking about the filing of a motion for leave

21  to amend a complaint to add Mr. Seery as a defendant.  That's

22  all we're talking about.  So, you know, the rest of it, it's

23  just noise.  And the only question is whether, and I think

24  it's pretty clear, that means pursuit.

25      Another version on the theme of was there any alternative

282

1  to filing the motion in the District Court, I think there was.

2  The Sbaiti firm did file that suit against Acis in New York.

3  And if Your Honor checks the docket in the Acis bankruptcy, I

4  think you'll find that there's a motion from Mr. Rukavina, for

5  a comfort order, basically, saying that -- asking the court to

6  declare that the filing of the complaint in New York against

7  Acis didn't violate the plan injunction.  I think I have that

8  right.

9      But I point that out, Your Honor -- it's not evidence in

10  the record, but the Court can certainly take judicial notice

11  of what's on its docket -- I point that out because there's

12  another example of a lawyer who is very active in this case

13  who actually -- now, he already commenced the suit, so he did

14  -- they did both simultaneously, so I don't want to suggest

15  that that's the perfect thing to have done, but at least he's

16  here asking for -- he's bringing it to your attention, he's

17  telling you it's happened, he's asking for a comfort order,

18  and someday Your Honor may rule on it.  I don't know.

19      Number six, what's with the pursuit of Mr. Seery?  What is

20  with the pursuit of Mr. Seery?  Is there any doubt in

21  anybody's mind that the Debtor is going to have to indemnify

22  Mr. Seery and will bring in another law firm?  And while I

23  don't think it will ever happen in a hundred billion years, if

24  there is a judgment against Mr. Seery, isn't that going to be

25  the Debtor's responsibility?  Why are they even bothering to

283

1   do this?  I think it's a fair question for the Court to ask.

2       I think Mr. Taylor came up and talked about animosity.

3   How do you explain going after Jim Seery?  How do you do it?

4   He's going to be indemnified.  It's in -- it's in like three

5   different orders.  It's in the confirmation order.  It's in

6   the CEO order.  It's -- it's probably as a matter of law.

7   It's in the Strand partnership agreement.  It's -- he's been

8   indemnified like 12 different times.  What is the purpose,

9   other than to make Mr. Seery's life miserable?  There is none.

10  You'll never hear a rational explanation for why they're doing

11  this.

12          THE COURT:  Just so you know, I've not looked at any

13  of the pleadings in the District Court --

14          MR. MORRIS:  And I'm not asking you to.

15          THE COURT:  -- other than what has been presented to

16  me today.

17          MR. MORRIS:  Yeah.  That's fine, Your Honor.

18          THE COURT:  But I'm very flipped out about the causes

19  of action against the Debtor, --

20          MR. MORRIS:  Yeah.

21          THE COURT:  -- who hasn't reached an effective date.

22          MR. MORRIS:  Well, --

23          THE COURT:  And I'm most interested to know what the

24  defenses, motions --

25          MR. MORRIS:  We'll get to that.

284

1           THE COURT:  -- are going to be raised in that regard.

2           MR. MORRIS:  We will get to that in due course.

3       I do want to point out, just to be clear, because we keep

4   hearing that they learned about, you know, all of these

5   horrible things after the fact.  In the complaint, which I

6   think is Exhibit 12, --

7           THE COURT:  I'm there.

8           MR. MORRIS:  -- at Paragraph 127, the Plaintiffs

9   allege, "Mr. Seery was informed in late December 2020 at an

10  in-person meeting in Dallas, to which Mr. Seery had to fly,

11  that HCO" -- excuse me "HCLF and HCM had to suspend trading in

12  MGM Studios' securities because Seery had learned from James

13  Dondero, who was on the board, of a potential purchase of the

14  company.  The news of the MGM purchase should have caused

15  Seery to revalue."

16      I cannot begin to tell you the problems with that

17  paragraph.  We're not going to discuss them today.  I made a

18  promise to these folks that we wouldn't get into the merits of

19  the complaint.  But Your Honor was onto something before, and

20  those issues, you know, may see the light of day one day.  And

21  if they do, folks are going to have to deal with it.  But I

22  will point out that at the time the communication was made,

23  the other TRO was in effect.  We didn't bring that one to the

24  Court's attention.  But the important point there, Your Honor,

25  is December 2020.  It is December 2020.  That is the

285

1  allegation that's being made against Mr. Seery. And the fact

2  of the matter is, because I've done the research myself, the

3  Court will find that on December 23rd, the day the HarbourVest

4  settlement motion was filed, it was fully public knowledge

5  that Amazon and Apple, I think, had shut down negotiations

6  with MGM at that time. Right? So the big secret information,

7  it was in the public domain on December 23rd.

8      There will also never be any evidence ever that Mr. Seery

9  got on a plane and flew to Dallas in December 2020, but that's

10 a minor point.

11     I'd like to just conclude, Your Honor, by saying I've

12 heard pleas that they understand. They understand, Your

13 Honor, now they understand. It would be good if they promised

14 the Court that they won't seek to assert claims against Mr.

15 Seery anywhere but in this Court and comply with the order as

16 it's written. That, that, that would be taking a little bit

17 of responsibility.

18     I have nothing further, Your Honor.

19         THE COURT: Okay. Thank you.

20     All right. Let me give you some clue of when I'm going to

21 be able to rule. I've been glancing at my email in hopes that

22 something set tomorrow would go away, but that's not

23 happening. I've got a hearing that I've been told will take

24 all day tomorrow on a case involving a half-built hotel,

25 luxury hotel in Palm Springs, California. So I have to spend

286

1    the next I don't know how long getting ready for that hearing

2    tomorrow, and then I have what looks like a full day of

3    hearings Thursday, including you people coming back on

4    something.

5           MR. POMERANTZ:  Your Honor, I was going to address

6    that.  We have Dugaboy's motion to enforce compliance on the

7    2015(3) reports.

8           THE COURT:  That's what it was.

9           MR. POMERANTZ:  Since we haven't gotten to the motion

10   to modify the Seery order, my suggestion would be we use that

11   time -- of course, Dugaboy, I'm not sure if they're on the

12   phone.  They're not here.  I'm not sure that's time sensitive.

13   But if Your Honor wanted to have a hearing on that motion,

14   which was contemplated to take place today, the Debtor would

15   be okay having that motion heard on Thursday, perhaps by

16   WebEx, unless Your Honor wants us to stay here, which we would

17   if you do, and then reschedule the 2015(3) motion.

18     But again, that wasn't my motion.  It's Dugaboy's.  I'm

19   not sure Mr. Draper is on.  But we obviously have some

20   calendar issues.

21          MR. MORRIS:  And Your Honor, just to complete it, I

22   think also on Thursday the Court is supposed to hear HCRE and

23   Highland Capital Management Services motions for leave to

24   amend their complaint in the promissory note litigation

25   against each of them.  I think that's also on the calendar for

287

1   Thursday.  I don't expect that -- I hope that doesn't take

2   very long, but that's also, I believe, on the calendar.

3           THE COURT:  Okay.  Mr. Draper, are you out there?

4           MR. PHILLIPS:  I didn't see him on the list, Your

5   Honor.  I was just looking.  But --

6           THE COURT:  Okay.  All right.  Well, --

7           MR. PHILLIPS:  What is the question?  I can send him

8   a text real quick.

9           THE COURT:  Well, just have -- if you all could

10  follow up with Traci Ellison, my courtroom deputy, tomorrow, I

11  am perfectly happy to continue the motion to modify the Seery

12  order to Thursday morning at 9:30 if Draper is willing to

13  continue the 2015 motion.

14          MR. POMERANTZ:  I know, if I was him, my first

15  question would be is what times does the Court have available?

16  We could work that through Ms. Ellison.

17          THE COURT:  Yes.  And I'm just letting you know --

18  talk to her.  Okay.  Number one, I'll do these by video, okay?

19  WebEx.  But I know I don't have any time Wednesday, and

20  Thursday's a busy day.

21      We have court Friday morning at 9:30 in--?

22          THE CLERK:  Cici's Pizza.

23          THE COURT:  Cici's Pizza?  That's not going to take

24  very long, right?

25          THE CLERK:  I don't think so.

288

 1          THE COURT:  I can potentially do something, you know,

 2   10:00 o'clock Friday morning.  Other than that, then you've

 3   got to wait a while, because I have a seven-day trial, live

 4   human beings in the courtroom starting next Monday.  And so my

 5   point is mainly to tell you, as much as I would like to rule

 6   very, very fast, it's going to be, it looks like, a couple of

 7   weeks or so before I can give you a ruling on this.

 8          MR. BRIDGES:  Your Honor?

 9          THE COURT:  Yes?

10          MR. BRIDGES:  May I?  It's our motion.  I would

11   propose, if counsel would agree, that we just submit it on the

12   papers.

13          THE COURT:  Everybody good with that?  I'm certainly

14   good with that.

15          MR. POMERANTZ:  Your Honor, I'd like there to be

16   argument.  I have a lengthy argument.  I think I'd like to

17   address a number of the things that -- Mr. Bridges made his

18   argument today.  Okay?

19          THE COURT:  Okay.

20          MR. POMERANTZ:  His deck, it was entitled, Motion to

21   Modify.

22          THE COURT:  Okay.

23          MR. POMERANTZ:  So that's very nice of him, but I

24   would like to make my argument.

25          THE COURT:  Okay.  Let's try to nail this down right

289

1   now.  Friday at 10:00 o'clock, can we do the oral argument

2   WebEx?

3            MR. POMERANTZ:  On that one, yes, Your Honor.

4            THE COURT:  On that one?  Everybody good?  Okay.  So

5   we'll come back Friday, 10:00 o'clock, WebEx, for that motion.

6       You know, I'm going to say a couple of things where --

7   I've leaned toward thinking this is a pretty simple motion

8   before me, the motion for contempt, but when people offer into

9   evidence documents, I read your documents.  Okay?  That's my

10  duty.  And so I have however many exhibits I admitted today

11  that I am going to look at and see how they sway me one way or

12  another on this issue.  But I will tell you that my gut is

13  there has been contempt of court.  Okay?  I don't see anything

14  ambiguous at all about Paragraph 5 of my July 16th, 2020

15  order.  Somebody may think I overreached, but if that was the

16  case, someone should have argued at the time I was

17  overreaching.  Someone should have appealed the order.  And I

18  think it's a *Shoaf/Espinosa* problem at this point for anyone

19  to argue about the enforceability of that order.

20      I think there's nothing ambiguous in the wording. Pursue

21  is not ambiguous.  There's nothing confusing about the

22  requirement that any entity who wanted to sue or pursue a

23  claim, you know, commence claim, pursue a claim against Mr.

24  Seery, had to come to the Bankruptcy Court.  Standard-fare

25  gatekeeping order.

290

1    So what I'm going to be looking at is, do these documents

2  I admitted into evidence change my view on that, and then the

3  harder question is who of the alleged contemnors am I going to

4  think it's clear and convincing committed contempt and -- who

5  are the contemnors, and then, of course, what are the damages?

6  Coercive or compensatory damages?

7    So, again, you know how I feel, to the extent that's

8  helpful in your planning purposes.  I'm pretty convinced

9  contempt of court has occurred.  It's just a matter of who's a

10 contemnor and what are the damages.

11   I'll say a couple of remaining things.  I continue to be

12 frustrated, I think was the word people used, about

13 unproductive ways we all spend our time.  I am going to spend

14 I don't know how many more hours drafting another ruling on a

15 contempt motion, and attorneys' fees are through the roof.

16 And, you know, I dangled out there a question I couldn't

17 resist about MGM.

18   And I will tell you, I mean, someone mentioned about their

19 stomach aching.  Personal story, I could hardly sleep the

20 night it became public about the Amazon purchase, because,

21 silly me, maybe, I'm thinking game-changer.  This is such

22 potentially a windfall, an economic windfall.  Maybe this

23 could be the impetus to make everyone get in a room and say

24 look, we've got this wonderful windfall of money.  I don't

25 know how much is owned directly or indirectly by the Debtor of

291

1   MGM stock.  I don't know how much the Debtor  manages.  I

2   don't know how much, you know, some other entity.  I know it's

3   probably spread out in many different entities.  But I know, I

4   know because I listen, that one or more of the Highland-

5   managed CLOs has some of this, and I think I read -- remember

6   that HCLOF, which now Highland owns more than 50 percent of,

7   has some of this stock.  Right?

8           MR. DONDERO:  Do you want to know what happened?

9           THE COURT:  Oh.

10          A VOICE:  No.

11          THE COURT:  Well, okay.  So, you know, I can

12  understand I'm getting into maybe uncomfortable territory in a

13  public proceeding, so I'll stop.

14      But, you know, do we need to set up a status conference?

15  Do you all need to like talk about this?  Am I just being

16  naïve?  Couldn't this be a game-changer, where maybe it would

17  give new incentive to --

18          MR. POMERANTZ:  Your Honor, I would -- he's been

19  pretty quiet through the whole hearing, Mr. Clemente.  He has

20  the Committee, that a couple of people you've heard have sold

21  claims.  They're now held by other parties.

22      You know, the door is always open.  I don't think this is

23  going to be game-changer, unfortunately.  We would like

24  nothing more, as Debtor's counsel.  We don't enjoy coming to

25  Your Honor for contempt hearings.

292

1     Mr. Clemente said that it was productive.  We would sure

2  participate.  But right now, we have creditors who are very

3  angry that millions and millions of dollars have been spent on

4  really a waste of time and a waste of the Court's time and a

5  waste of everyone's time and eating into the creditors' money.

6  So I would ask Mr. Clemente to address that.

7          MR. CLEMENTE:  I'm here.

8          THE COURT:  Yes, he's way in the back, hoping to be

9  ignored.

10         MR. CLEMENTE:  It's too cold, Your Honor, where I was

11 sitting.  For the record, Your Honor, --

12         THE COURT:  I noticed some entity called Muck

13 Holdings bought HarbourVest, according to the docket.

14         MR. CLEMENTE:  That's correct.  Muck Holdings bought

15 HarbourVest, and I believe also the Acis claim, and then

16 there's a different entity that bought the Redeemer claim.

17         THE COURT:  Uh-huh.

18         MR. CLEMENTE:  So, as we mentioned in our -- one of

19 our pleadings, I think it was the retention pleading for

20 Teneo, the Committee consists of two members currently, Meta-e

21 and UBS.

22         THE COURT:  Uh-huh.

23         MR. CLEMENTE:  Obviously, Your Honor just approved

24 the UBS settlement recently.  The U.S. Trustee is aware of the

25 make-up of the Committee, and is currently comfortable with

293

1    the Committee maintaining a two-person membership at this

2    point.

3         In terms of whether the MGM transaction is a game-changer,

4    we've not yet seen, to Your Honor's point, how all of that

5    rolls up through the various interests that the Debtor may or

6    -- you know, may have --

7              THE COURT:  Okay.

8              MR. CLEMENTE:  -- that would be implicated by the MGM

9    transaction.  If ultimately the MGM transaction has to

10   actually occur, right?  I mean, so, you know, just based on

11   what I read in the public documents, we're not sure when that

12   transaction may actually happen.  But obviously it's a good

13   thing for the Debtor's estate because it's going to recognize

14   value for the estate.

15        In terms of whether it ultimately changes how Mr. Dondero,

16   you know, wishes to proceed, that's entirely up to him, Your

17   Honor.  But we don't see it as something at this point that

18   would suggest that there's an overall back to let's talk about

19   a pot plan because of where the MGM transaction might

20   ultimately come out.

21        So I don't know if that's helpful to Your Honor, but those

22   are -- that's my perspective.

23             THE COURT:  Well, and I'm not trying to, you know,

24   push a pot plan on anyone.

25             MR. CLEMENTE:  No, I understand.

294

1          THE COURT:  I'm just saying it looked like an

2     economic windfall.  I just -- I don't know how much is

3     Highland versus other entities in the so-called byzantine

4     complex, but, gosh, I just hoped that there might be something

5     there to change the dynamic of, you know, lawsuit, lawsuit,

6     lawsuit, lawsuit, motion for contempt, motion for contempt.

7          MR. CLEMENTE:  Agreed, Your Honor.

8          THE COURT:  Uh-huh.

9          MR. CLEMENTE:  And like I said, it was a very

10    positive development obviously for the creditors for the

11    Debtor.  But whether it's the game-changer that Your Honor

12    would envision, I'm not sure that I can suggest at this point

13    that it is.

14        I think that, you know, obviously, we don't like to see

15    these lawsuits continue to be filed.  That's the whole point

16    of the gatekeeper order, Your Honor.

17          THE COURT:  Uh-huh.

18          MR. CLEMENTE:  I didn't say anything during the

19    hearing, but obviously the January 9th order, as Your Honor

20    has said many times, was in the context of a trustee being

21    appointed.

22          THE COURT:  Right.  Right.

23          MR. CLEMENTE:  Right?  So, and the July 16th order,

24    very similar vein, it's an outshoot of that.  In fact, it was

25    contemplated in the January 9th settlement that a CEO could be

295

 1   appointed.

 2       So I think, again, it's just -- it's important, the

 3   context in which that January 9th order came into play, for

 4   this very reason, so we could avoid this type of litigation,

 5   Your Honor.

 6              THE COURT:  Uh-huh.

 7              MR. CLEMENTE:  And so again, I didn't -- I obviously

 8   didn't rise to mention that during the hearing, but Your Honor

 9   is already aware of that.  I didn't need to remind Your Honor

10   of that.

11              THE COURT:  Uh-huh.  Okay.

12              MR. CLEMENTE:  Anything else for me, Your Honor?

13              THE COURT:  No.  Thank you.

14              MR. CLEMENTE:  Okay, then, Your Honor.

15              THE COURT:  Sorry I picked on you.  But, all right.

16   Well, again, I hope the message has landed in the way I hope

17   will matter, and that is I'm going to look at your documents

18   but I feel very strongly that, unless there's something in

19   there that, whoa, is somehow eye-opening, I'm going to find

20   contempt of court.  It's just a matter of who and what the

21   damages are.  There's just not a thing in the world ambiguous

22   about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23   it as soon as we humanly can get to it.

24       Mr. Morris, anything else?

25              MR. MORRIS:  Nothing.  No, thank you.

296

1          THE COURT:  I guess I'll see you Thursday on the

2   WebEx.  Thank you.

3          THE CLERK:  All rise.

4      (Proceedings concluded at 6:00 p.m.)

5                          --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                        **06/09/2021**

24   _____    _____
    Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

010749

297

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS (Show Cause)
- Mr. Morris                                                  21
- Mr. Sbaiti                                                  31
- Mr. Bridges                                                 52
- Mr. Anderson                                               80
- Mr. Phillips                                                83
- By Mr. Taylor                                               87
- By Mr. Pomerantz                                            88

WITNESSES

Debtor's Witnesses

Mark Patrick
- Direct Examination by Mr. Morris                           95
- Cross-Examination by Mr. Anderson                         132
- Cross-Examination by Mr. Sbaiti                           135
- Redirect Examination by Mr. Morris                        137
- Examination by the Court                                  138
- Recross-Examination by Mr. Sbaiti                         142
- Recross-Examination by Mr. Phillips                       143
- Further Redirect Examination by Mr. Morris               144

James D. Dondero
- Direct Examination by Mr. Morris                          147
- *Voir Dire* Examination by Mr. Sbaiti                     184
- Direct Examination (Resumed) by Mr. Morris               199
- Cross-Examination by Mr. Taylor                           210

EXHIBITS

Debtor's Exhibits 1 through 11                  Withdrawn 215
Debtor's Exhibits 12 through 53                  Received 216
Debtor's Exhibits 15 and 16                      Received 214
Debtor's Exhibits 23 and 24                      Received 213
Debtor's Exhibits 54 and 55                      Received 217

Mark Patrick's Exhibits 1, 3 through 12,         Received 218
15 through 28, and 30 through 44

Mark Patrick's Exhibits 45 and 46                Received 219

298

INDEX
Page 2

CLOSING ARGUMENTS

- Mr. Morris                                             221
- Mr. Sbaiti                                             230
- Mr. Bridges                                            255
- Mr. Anderson                                           263
- Mr. Phillips                                           267
- Mr. Taylor                                             276
- Mr. Morris                                             279

RULINGS

Motion for Entry of an Order Further Extending the Period    19
Within Which It May Remove Actions Pursuant to 28 U.S.C.
§ 1452 and Rule 9027 of the Federal Rules of Bankruptcy
Procedure filed by Debtor (2304)

Show Cause Hearing (2255) - *Taken Under Advisement*        285

Motion to Modify Order Authorizing Retention of James       285
Seery filed by Plaintiffs CLO Holdco, Ltd., The
Charitable DAF Fund, L.P. (2248) - *Taken Under Advisement*

END OF PROCEEDINGS                                          296

INDEX                                                   297-298

010751

Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 834 of 1017    PageID 11615

# EXHIBIT 53

Docket #2454 Date Filed: 06/16/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

### DEBTOR'S SECOND AMENDED WITNESS AND EXHIBIT LIST WITH
### RESPECT TO EVIDENTIARY HEARING TO BE HELD ON JUNE 8, 2021

Highland Capital Management, L.P. (the "<u>Debtor</u>") submits the following second

amended witness and exhibit list with respect to the *Order Requiring the Violators to Show*

*Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

---

**SECOND AMENDED WITNESS AND EXHIBIT LIST FOR HEARING ON JUNE**
DOCS_NY:43337.3 36027/002



1934054210616000000000004

Appx. 06819

010753

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 836 of 1017 PageID 11617
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 2 of 8

No. 2255] (the "Show Cause Order"), which the Court set for hearing at 9:30 a.m. (Central

Time) on June 8, 2021 (the "Hearing") in the above-styled bankruptcy case (the "Bankruptcy

Case").

A.    **Witnesses:**

    1.    James Dondero;

    2.    Mark Patrick;

    3.    Grant Scott (by deposition designation);

    4.    Gregory V. Demo;[2]

    5.    Any witness identified by or called by any other party; and

    6.    Any witness necessary for rebuttal.

B.    **Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| 1. | Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-1] | | |
| 2. | Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-2] | | |
| 3. | Exhibit A, the [Proposed] Order on the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-3] | | |
| 4. | James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest [Docket No. 2237-4] | | |

---

[2] If needed, Mr. Demo will be called as a witness for the sole purpose of authenticating Exhibits 54 and 55, time records from Pachulski Stang Ziehl & Jones, LLP relating to the Show Cause Order.

Appx. 00814
010754

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 837 of 1017 PageID 11618
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 3 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 5. | Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-5] | | |
| 6. | CLO Holdco's Objection to HarbourVest Settlement. [Docket No. 2237-6] | | |
| 7. | Notice of Deposition to James Dondero [Docket No. 2237-7] | | |
| 8. | Transcript of January 11, 2021 Deposition of Michael Pugatch [Docket No. 2237-8] | | |
| 9. | Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-9] | | |
| 10. | Transcript of January 14, 2021 Hearing [Docket No. 2237-10] | | |
| 11. | Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-11] | | |
| 12. | Original Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) (GScott000389) [Dondero June 1, 2021 Deposition Exhibit 7] [Docket No. 2237-12] | | |
| 13. | Email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-13] | | |
| 14. | Second email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-14] | | |
| 15. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 2237-15] | | |
| 16. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring | | |

Appx. 00812

010755

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 838 of 1017   PageID 11619
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 4 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
|  | Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 2237-16] |  |  |
| 17. | Plaintiff's Motion for Leave to File First Amended Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) [Docket No. 2237-17] |  |  |
| 18. | CM/ECF Notice dated April 20, 2020 and lodged as Docket No. 8 in the DAF Action [Docket No. 2237-18] |  |  |
| 19. | Transcript of March 22, 2021 Hearing [Docket 2351-1] |  |  |
| 20. | Email from DAF counsel to Debtor's counsel dated April 20, 2021 [Docket 2351-2] |  |  |
| 21. | All communications between Debtor's counsel and the Bankruptcy Court courtroom deputy [Docket 2355-3] |  |  |
| 22. | Debtor's Motion for an Order to Enforce the Order of Reference [Docket 2351-4] |  |  |
| 23. | Grant Scott January 21, 2021 Deposition Transcript |  |  |
| 24. | Grant Scott June 1, 2021 Deposition Transcript |  |  |
| 25. | DAF/CLO Holdco Structure Chart (GScott000007) [Dondero June 1, 2021 Deposition Exhibit 1] |  |  |
| 26. | Amended and Restated Limited Liability Company Agreement of Charitable DAF GP, LLC, effective as of January 1, 2012 (PATRICK_000031) [Dondero June 1, 2021 Deposition Exhibit 2] |  |  |
| 27. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (GScott000325) [Dondero June 1, 2021 Deposition Exhibit 3] |  |  |
| 28. | January 31, 2021 Meeting Appointment (GScott000011) [Dondero June 1, 2021 Deposition Exhibit 4] |  |  |
| 29. | Email chain re Grant Scott's notice of intent to resign (GScott000018) [Dondero June 1, 2021 Deposition Exhibit 5] |  |  |

010756

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 839 of 1017 PageID 11620
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 5 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 30. | Email chain re Highland Adherence Agreement in connection with HarbourVest shares (GScott000085) [Dondero June 1, 2021 Deposition Exhibit 6] | | |
| 31. | Email and attached A&R Service and Advisory Agreements and GP Resolutions (GScott000312) [Scott June 1, 2021 Deposition Exhibit 8] | | |
| 32. | Notice of CLO Holdco Settlement Agreement [Scott June 1, 2021 Deposition Exhibit 9] | | |
| 33. | Email between Grant Scott and Mark Patrick re Complaint (GScott000080) [Scott June 1, 2021 Deposition Exhibit 10] | | |
| 34. | Email chain re TerreStar Corporation Equity Investment and Residual Assets held by HOCF (GScott000138) [Scott June 1, 2021 Deposition Exhibit 11] | | |
| 35. | Email chain re request for information from Elysium Fund Management, Ltd. (GScott000361) [Scott June 1, 2021 Deposition Exhibit 12] | | |
| 36. | Assignment and Assumption of Membership Interest Agreement between Grant J. Scott and Mark E. Patrick dated March 24, 2021 (PATRICK_000006) [Scott June 1, 2021 Deposition Exhibit 13] | | |
| 37. | Written Resolutions of the Sole Director of the Company Dated March 25, 2021 (PATRICK_000003) [Scott June 1, 2021 Deposition Exhibit 14] | | |
| 38. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 24, 2021 (PATRICK_000012) [Scott June 1, 2021 Deposition Exhibit 15] | | |
| 39. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 31, 2021 (PATRICK_000001) [Scott June 1, 2021 Deposition Exhibit 16] | | |
| 40. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on April 2, 2021 (PATRICK_000002) [Scott June 1, 2021 Deposition Exhibit 17] | | |
| 41. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (PATRICK_000923) | | |

Appx. 06814

010757

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 840 of 1017 PageID 11621
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 6 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Amended and Restated Service Agreement by and among HCMLP, Charitable DAF Fund, L.P., and Charitable DAF GP, LLC , effective July 1, 2014 (PATRICK_000938) | | |
| 43. | Email from Mark Patrick to Grant Scott dated April 6, 2021 re Urgent Questions (PATRICK_001129) | | |
| 44. | Original Complaint (Docket No. 1, PCMG Trading Partners XXIII, LP v. Highland Capital Management, L.P., Case No. 21-cv-01169, U.S. District Court Northern District of TX) | | |
| 45. | Defendant's Motion For Leave to Amend Answer (Docket No. 32, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., Adv. Pro. No. 21-03004) | | |
| 46. | Email chain re NDA for D&O Insurance Quote (GScott000172) | | |
| 47. | Check Request dated April 7, 2021 (D1 Landscape & Irrigation) (GScott000354) | | |
| 48. | Check Request dated April 7, 2021 (Sanders Lawn & Maintenance) (GScott000355) | | |
| 49. | Check Request dated April 7, 2021 (BB Services) (GScott000358) | | |
| 50. | Highland Capital Management, L.P.'S Notice of Amended Subpoena to Grant Scott [Docket No. 2366] | | |
| 51. | Certificate of Service for Notice of Deposition of Grant Scott (Docket No. 41, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al., Adv. Pro. No. 21-03000) | | |
| 52. | Email re Zoom Instructions for June 1, 2021 Deposition of Grant Scott | | |
| 53. | Email re Zoom Instructions for January 21, 2021 Deposition of Grant Scott | | |
| 54. | Pachulski Stang Billing Detail (April 18 – April 30, 2021) | | |
| 55. | Pachulski Stang Billing Detail (May 1 – June 7, 2021) | | |

Appx. 06815
010758

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 8 of
Case 3:25-cv-02072-S  Document 15-13  Filed 10/06/25  Page 841 of 1017  PageID 11622
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21  Entered 06/16/21 16:18:26  Page 7 of 8

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 56. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| 57. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 58. | All exhibits identified by or offered by any other party at the Hearing | | |

*[Remainder of Page Intentionally Blank]*

Appx. 00816

010759

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 842 of 1017    PageID 11623
Case 19-34054-sgj11 Doc 2454 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 8 of 8

Dated:  June 16, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

App. 00817
010760

# EXHIBIT 23

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 844 of 1017   PageID 11625
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 2 of
110

Page 1

1         GRANT SCOTT - 1/21/2021

2        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3               DALLAS DIVISION

4    IN RE:                    )
                               )   Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT,   )
     L.P.                      )     Case No.
6                              )  19-34054-sgj11
            Debtor.           )
7    ---------------------------   )
     HIGHLAND CAPITAL MANAGEMENT,   )
8    L.P.,                     )
            Plaintiff,        )
9                              )     Adversary
       vs.                    )  Proceeding No.
10                            )    21-03000-sgj
     HIGHLAND CAPITAL MANAGEMENT    )
11    FUND ADVISORS, L.P.; NEXPOINT  )
     ADVISORS, L.P.; HIGHLAND       )
12    INCOME FUND; NEXPOINT         )
     STRATEGIC OPPORTUNITIES FUND;  )
13    NEXPOINT CAPITAL, INC.; and   )
     CLO HoldCo, LTD.,             )
14                             )
            Defendants.   )
15   -------------------------------

16

17      VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18        Thursday, 21st of January, 2021

19

20

21

22

23  Reported by: Lisa A. Wheeler, RPR, CRR

24  Job No: 188910

25

Appx. 00819

010762

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 845 of 1017    PageID 11626
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 3 of
110

Page 2

1        GRANT SCOTT - 1/21/2021

2              January 21, 2021

3              2:02 p.m.

4

5

6        Videoconference deposition of Grant

7    SCOTT, pursuant to the Federal Rules of

8    Civil Procedure before Lisa A. Wheeler,

9    RPR, CRR, a Notary Public of the State of

10    North Carolina.  The court reporter

11    reported the proceeding remotely and the

12    witness was present via videoconference.

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx. 36829
010763

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 846 of 1017    PageID 11627
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 4 of
110

Page 3

1           GRANT SCOTT - 1/21/2021

2    REMOTE APPEARANCES:

3        PACHULSKI STANG ZIEHL & JONES

4        Attorneys for Debtor

5           780 Third Avenue

6           New York, NY 10017

7        BY:   JOHN MORRIS, ESQ.

8

9        LATHAM & WATKINS

10        Attorneys for UBS

11           885 Third Avenue

12           New York, NY 10022

13        BY:   SHANNON McLAUGHLIN, ESQ.

14

15        SIDLEY AUSTIN

16        Attorneys for the Creditors Committee

17           2021 McKinney Avenue

18           Dallas, TX 75201

19        BY:   PENNY REID, ESQ.

20           ALYSSA RUSSELL, ESQ.

21           PAIGE MONTGOMERY, ESQ.

22

23

24

25

010764
Appx. 00821

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 14 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 847 of 1017    PageID 11628
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 5 of
110

Page 4

1          GRANT SCOTT - 1/21/2021

2   REMOTE APPEARANCES:  (Continued)

3       KING & SPALDING

4       Attorneys for Highland CLO Funding, Ltd.

5          500 West 2nd Street

6          Austin, TX 78701

7       BY:  REBECCA MATSUMURA, ESQ.

8

9       K&L GATES

10      Attorneys for Highland Capital Management

11      Fund Advisors, L.P., et al.

12         4350 Lassiter at North Hills Avenue

13         Raleigh, NC 27609

14      BY:   A. LEE HOGEWOOD, III, ESQ.

15          EMILY MATHER, ESQ.

16

17      HELLER DRAPER & HORN

18      Attorneys for The Dugaboy Investment Trust

19      and The Get Good Trust

20         650 Poydras Street

21         New Orleans, LA 70130

22      BY:  MICHAEL LANDIS, ESQ.

23

24

25

010765

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 848 of 1017 PageID 11629
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 6 of
110

```
 1        GRANT SCOTT - 1/21/2021

 2   REMOTE APPEARANCES:  (Continued)

 3     KANE RUSSELL COLEMAN & LOGAN

 4     Attorneys for Defendant CLO HoldCo Limited

 5        Bank of America Plaza

 6        901 Main Street

 7        Dallas, TX 75202

 8   BY:   BRIAN CLARK, ESQ.

 9        JOHN KANE, ESQ.

10

11   ALSO PRESENT:  La Asia Canty

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S     Document 15-13     Filed 10/06/25     Page 849 of 1017     PageID 11630
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 7 of
110

Page 6

1          GRANT SCOTT - 1/21/2021

2    G R A N T   S C O T T,

3       called as a witness, having been duly sworn

4       by a Notary Public, was examined and

5       testified as follows:

6          MR. MORRIS:  Good afternoon.  My

7       name is John Morris.  I'm an attorney with

8       Pachulski Stang Ziehl & Jones, a law firm

9       who represents the debtor in the bankruptcy

10      known as In Re: Highland Capital

11      Management, L.P., and we're here today for

12      the deposition of Grant Scott.

13         Before I begin, I would just like to

14      have confirmation on the record that

15      everybody here who's representing their

16      respective parties agrees that this

17      deposition can be used in evidence in any

18      subsequent hearing, notwithstanding the

19      fact that it's being conducted remotely,

20      and that the witness is not in the same

21      room as the court reporter.

22         Does anybody have an objection to

23      the admissibility of the transcript subject

24      to any reservation of -- of actual

25      objections on the record to using this

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 850 of 1017    PageID 11631
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 8 of
110

Page 7

1          GRANT SCOTT - 1/21/2021

2     transcript going forward?

3          Okay.  Nobody's spoken up, so I --

4     I'd like to begin.

5               EXAMINATION

6   BY MR. MORRIS:

7     Q.    Good afternoon, Mr. Scott.  As I

8   mentioned, my name is John Morris, and we're

9   here for your deposition today.  Have you ever

10   been deposed before?

11    A.    On two occasions.

12    Q.    And -- and when did the -- when did

13   those depositions take place?

14    A.    This past October and maybe six to

15   eight years ago.

16    Q.    Okay.  Can you just tell me

17   generally what the subject matter was of the

18   deposition this past October.

19    A.    It was relating to Jim Dondero's --

20   it was a family law issue in -- in -- with

21   respect to Jim Dondero.

22    Q.    Okay.  And did you testify in a

23   courtroom, or was it a deposition like this?

24    A.    I -- right here, actually.

25    Q.    Okay.  Super.  And -- and what about

010768

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 851 of 1017 PageID 11632
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 9 of
110

Page 8

1          GRANT SCOTT - 1/21/2021

2    the -- the deposition six to eight years ago,

3    do you have a recollection as to what that was

4    about?

5        A.    Yeah.  It was a -- it was a patent I

6    wrote for Samsung Electronics.

7        Q.    Okay.

8        A.    And as being the person that I --

9    that wrote it and the patent was in litigation,

10   not -- not being handled by me, but by virtue

11   of having written the patent, I was -- I was

12   deposed --

13       Q.    Okay.  So you --

14       A.    -- on the -- on the patent.

15       Q.    Okay.  So you've had a little bit of

16   experience with depositions.  But just

17   generally speaking, I'm going to ask you a

18   series of questions.  It's very important that

19   you allow me to finish my question before you

20   begin your answer.

21           Is that fair?

22       A.    Absolutely.

23       Q.    And I will certainly try to extend

24   the same courtesy to you, but if I -- if I step

25   on your words, will you let me know that?

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 852 of 1017 PageID 11633
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 10 of
110

1          GRANT SCOTT - 1/21/2021

2     A.    Okay.

3     Q.    And if there's anything that I ask

4   that you don't understand, will you let me know

5   that as well?

6     A.    Yes.  I'll try -- I'll do my best.

7     Q.    Okay.  So this is a virtual

8   deposition.  We're not in the same room.  I am

9   going to be showing you documents today.  The

10  documents will be put up on the screen.  This

11  isn't a -- a trick of any kind.  If at any time

12  you see a document up on the screen and either

13  you believe or you have any reason to want to

14  read other portions of the document, will you

15  let me know that?

16    A.    Yes, I -- yes, I will.  Uh-huh.

17    Q.    With respect to the Dondero family

18  matter, I really don't want to go into the

19  substance of that, but I do want to know

20  whether you testified voluntarily in that

21  matter or whether you -- whether you testified

22  pursuant to subpoena.

23    A.    I would have done that, but the

24  first time I found out about it was a -- was a

25  subpoena that I received.  I wasn't given the

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 20 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 853 of 1017    PageID 11634
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 11 of
110

1          GRANT SCOTT - 1/21/2021

2    choice.

3        Q.    Okay.  And do you recall who served

4    the subpoena on you?  Actually, let me ask a

5    different question because I'm really not

6    interested in the -- in the details.

7          Did Mr. Dondero serve that subpoena

8    on you or did somebody else?

9      A.    His counsel for his ex-wife.

10       Q.    Mr. -- so -- so the lawyer acting on

11   behalf of Mr. Dondero's ex-wife served you with

12   the subpoena?

13     A.    Correct.

14       Q.    Okay.  You're familiar with an

15   entity called CLO HoldCo Limited; is that

16   right?

17     A.    Yes.

18       Q.    Do you know what that entity is?

19     A.    Yes.

20       Q.    What -- what -- can you describe for

21   me what CLO HoldCo Limited is.

22       A.    It's a holding company of assets

23   including collateralized loan obligation-type

24   assets.  That's a portion of the overall

25   portfolio.  It's an organization that is

Page 11

1          GRANT SCOTT - 1/21/2021

2     integrated with other entities as part of a

3     charitable -- loosely what we -- what we refer

4     to as a charitable foundation equivalent.

5     Yeah.

6          Q.    All right.  We'll -- we'll get into

7     some detail about the corporate structure in a

8     moment.  Do you personally play any role at CLO

9     HoldCo Limited?

10         A.    Yes.  My technical title is

11    director, but I -- I don't necessarily know

12    specifically what that title means other than I

13    act, as I understand it, as -- as a trustee for

14    those -- for those assets.

15         Q.    And where did you get that

16    understanding?

17         A.    Approximately ten years ago from the

18    group that -- that set up the hierarchy.

19         Q.    And which group set up the

20    hierarchy?

21         A.    Employees at Jim Don- -- as I

22    understand it, employees of Highland along with

23    outside counsel, as I understand it, and also,

24    I guess, input from -- from Jim Dondero.

25         Q.    At the time that you assumed the

Appx. 06829

010772

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 855 of 1017    PageID 11636
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 13 of
110

Page 12

1          GRANT SCOTT - 1/21/2021

2    role of director of CLO HoldCo Limited, was

3    that entity already in existence?

4        A.    I believe so.  I'm not certain.  I'm

5    not certain.

6        Q.    What are your duties and

7    responsibilities as a director of CLO HoldCo

8    Limited?

9        A.    Well, my day-to-day responsibilities

10   are to interface with -- with the manager of

11   the -- of the assets of CLO.  I do have some

12   role in -- with respect to some of the entities

13   that are -- I -- I have a limited role with

14   respect to a subset of the charitable

15   foundations that receive money from the CLO

16   HoldCo structure, which is commonly referred to

17   as the DAF.  There's -- sometimes those are

18   used interchangeably.

19       Q.    What terms are used interchangeably?

20       A.    Well, the DAF and CLO HoldCo are

21   frequently -- by -- by other people they're --

22   it's the short -- it's the -- I guess it's

23   easier to use the acronym DAF than CLO HoldCo

24   Limited, so I'm frequently having to -- there

25   is a DAF entity so -- that's above -- above CLO

010773

Page 13

        GRANT SCOTT - 1/21/2021

1    in terms of the management, and so it's

2    frequently confusing and I'm having to clarify

3    at times which entity we're talking about,

4    but -- but other parties frequently use those

5    terms interchangeably.

6

7        Q.    Okay.

8            MR. MORRIS:  Lisa, when we use the

9        phrase DAF, because you'll hear that a lot,

10       it's all caps, D-A-F.

11   BY MR. MORRIS:

12       Q.    You mentioned that you interface

13   with the manager of assets of CLOs.  Do I have

14   that right?

15       A.    Well, of all the assets.

16       Q.    Okay.  Who is the manager of the

17   assets that you're referring to?

18       A.    Highland Capital Management.

19       Q.    Highland Capital Management manages

20   all of the assets -- withdrawn.

21           Is it your understanding that

22   Highland Capital Management manages all the

23   assets that are owned by CLO HoldCo Limited?

24       A.    Yes.

25       Q.    Who makes the investment decisions

010774

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 857 of 1017   PageID 11638
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 15 of
110

Page 14

1          GRANT SCOTT - 1/21/2021

2    on behalf of CLO HoldCo Limited?

3        A.    Highland -- those managers that you

4    mentioned.

5        Q.    Okay.  I didn't mention anybody in

6    particular.

7        A.    Oh, I'm sorry.  The -- the -- the

8    money manager -- could you repeat that

9    question?  I'm sorry.  I'm so sorry.

10        Q.    Can you just -- can you just

11   identify for me the person who makes investment

12   decisions on behalf of CLO HoldCo Limited.

13        A.    It's -- well, it's -- it's persons

14   as I understand it.  I inter- -- interface with

15   a -- with a group, but it's -- it's Highland

16   Capital employee -- Highland Capital Management

17   employees.

18        Q.    Okay.  Can you just name any of

19   them, please.

20        A.    Hunter Covitz, Jim Dondero.  Mark

21   Okada's no longer there, but I believe he was

22   involved, and there are others that I interface

23   with.

24        Q.    Can you -- can you recall the name

25   of anybody other than Mr. Okada and Mr. Dondero

010773
Appx. 06832

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-13 Filed 06/10/06/25 Page 858 of 1017 PageID 11639
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 16 of
110

Page 15

1          GRANT SCOTT - 1/21/2021

2    and Mr. Covitz?

3        A.    Yeah.  Over the years I've worked

4    with Tim Cournoyer, Thomas Surgent, but I

5    think -- I think that's the core -- the core

6    group.

7        Q.    All right.  And is there anybody

8    within that core group who has the final

9    decision-making authority concerning the

10   investments in CLO HoldCo Limited?

11       A.    I don't -- I don't know.  I'm sorry.

12   Say that again.  I just want to -- I'm sorry.

13   I'm trying to be -- I'm not trying to -- I'm

14   trying to be --

15       Q.    I understand.  And --

16       A.    Sorry.  If you could just repeat it.

17       Q.    Sure.  Is there any particular

18   person who has the final decision-making

19   authority for investments that are being made

20   on behalf of CLO HoldCo Limited?

21       A.    Amongst that group I am -- I am not

22   sure.

23       Q.    Okay.  So are there any other

24   directors of CLO HoldCo besides yourself?

25       A.    No.

010776

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 859 of 1017    PageID 11640
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 17 of
110

Page 16

1          GRANT SCOTT - 1/21/2021

2     Q.    Is it fair to say that you do not

3    make decisions, investment decisions, on behalf

4    of CLO HoldCo Limited?

5     A.    Yes.

6     Q.    Does CLO HoldCo Limited have any

7    employees that you know of?

8     A.    No.

9     Q.    Does CLO HoldCo have any --

10   withdrawn.

11         Does CLO HoldCo Limited have any

12   officers that you know of?

13    A.    No.

14    Q.    So am I correct that you're the only

15   representative in the world of CLO HoldCo in

16   terms of being a director, officer, or

17   employee?

18    A.    Yes.

19    Q.    Do you receive any compensation from

20   CLO HoldCo for your services as the director?

21    A.    I do now.

22    Q.    When did that begin?

23    A.    I believe in the middle of 2012.

24    Q.    Okay.  And had you served as a

25   director prior to that time without

010777
Appx 36834

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 860 of 1017    PageID 11641
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 18 of
110

Page 17

GRANT SCOTT - 1/21/2021

1    compensation?

2        A.    Yes.

3        Q.    And have you been the sole director

4    of CLO HoldCo Limited since the time of your

5    appointment approximately ten years ago?

6

7        A.    Yes.

8        Q.    Nobody else has served in that

9    capacity; is that right?

10       A.    That is correct.

11       Q.    There have been no employees or

12   officers of that entity during the time that

13   you've served as director, correct?

14       A.    Yes.

15       Q.    Do you know who formed CLO HoldCo

16   Limited?

17       A.    I do not.

18       Q.    Do you know why CLO HoldCo Limited

19   was formed?

20       A.    I believe so.

21       Q.    Can you explain to me why -- your

22   understanding as to why CLO HoldCo was formed.

23       A.    So as I understand things, Jim

24   Dondero wanted to create a charitable

25   foundation-like entity or entities, and tax

Appx. 96835

010778

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 861 of 1017    PageID 11642
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 19 of
110

Page 18

1          GRANT SCOTT - 1/21/2021

2    people particularly, I guess, finance people,

3    lawyers, they created this network of entities

4    to carry out that charitable goal.  At one

5    point, I thought it was a novel type of

6    institution, if you want to call it, or a

7    novel -- novel type of group of entities, but

8    over time, I came to understand that although

9    not cookie cutter, it -- it follows a general

10   arrangement of entities for legal and tax

11   purposes, compliance purposes, IRS purposes,

12   various insulating purposes to maintain -- or

13   to meet the necessary requisites to carry out

14   that charitable function.

15       Q.   When did you come to that

16   understanding?

17       A.   Over the last couple of years.  I

18   periodically have to refresh my recollection.

19   It's -- it's fairly complex.

20       Q.   Okay.  In your capacity as the sole

21   director of CLO HoldCo Limited, do you report

22   to anybody?

23       A.   No.

24       Q.   Other than interfacing with the

25   manager of the assets of the CLO, do you have

010779
Appx. 36836

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 862 of 1017 PageID 11643
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 20 of
110

Page 19

GRANT SCOTT - 1/21/2021

1

2  any other duties and responsibilities as a

3  director of CLO HoldCo Limited?

4      A.   Yes.  Sorry.  My mouth is a little

5  dry.

6      Q.   By the way, if you ever need to take

7  a break, just let me know.

8      A.   Okay.  Thank you.  Now I forgot your

9  question.  The -- the -- the --

10     Q.   I understand.

11     A.   The answer -- the -- the answer is

12 yes.  I -- why don't you ask -- ask your

13 question again.  I'm sorry.

14     Q.   Sure.  Other than interfacing with

15 the manager of the assets of the CLO, do you

16 have any other duties and responsibilities as

17 the sole director of CLO HoldCo Limited?

18     A.   Yes.  So Highland Capital because of

19 its -- the way it's set up to manage or service

20 CLO HoldCo and the DAF, it has a relatively

21 large group of people that I have to interface

22 with to do everything from -- everything from

23 soup to nuts.  Finances and the money

24 management is one aspect, but most of my

25 time -- on a day-to-day or week-to-week basis,

010780

Page 20

1          GRANT SCOTT - 1/21/2021

2   most of my time is spent working with the

3   various compliance and other people for

4   addressing issues of get- -- you know, getting

5   taxes filed.  It runs -- it runs the gamut of

6   every aspect of the organization being -- being

7   handled by Highland.

8       Q.    Okay.

9       A.    You know, unlike -- unlike my

10  financial -- unlike a financial planner that

11  might, you know, manage assets, they -- they do

12  it all, and I interface with them regularly to

13  maintain -- mostly to deal with compliance

14  issues.

15      Q.    Who's the com- -- is there a person

16  who's in charge of compliance?

17      A.    I believe Thomas Surgent.  I

18  mentioned him.  I believe he also has that

19  role, but it's -- you know, they do have

20  turnover, I guess, in that.  It's -- I guess

21  they refer to it as the back office.  I've

22  heard that term be used, but -- basically, it's

23  a large number of people that have changed over

24  time, but it's -- it's more -- I believe it's

25  more than one collectively.

010781

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 31 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 864 of 1017   PageID 11645
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 22 of
110

Page 21

1        GRANT SCOTT - 1/21/2021

2        Q.    How much time do you devote -- you

3    know, can you estimate either on a weekly or a

4    monthly basis how many -- how much time do you

5    devote to serving as the director of CLO HoldCo

6    Limited?

7        A.    I thought about that.  Well, let --

8    let's put it this way:  There was the

9    prebankruptcy time I spent per day, and then

10   there was the postbankruptcy time I've spent

11   per -- per -- or per week -- excuse me, or

12   per -- I've estimated it as probably a day --

13   it's so intermittent it's -- it's hard, okay?

14   It's -- I don't dedicate my Mondays to only

15   doing that and then Tuesday through Friday I

16   don't, right?  I -- it's -- I have to piece

17   together everything that occurs during the

18   week.  There might be some weeks where I don't

19   have any contact.  There might be every day of

20   the week I have multiple contact.  There may be

21   days where from morning to night there is so

22   much contact, it precludes me from doing

23   anything else meaningfully.  So -- but I would

24   estimate it's probably three or four -- maybe

25   three days, four days a month when things are

Appx. 06839

010782

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 865 of 1017 PageID 11646
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 23 of
110

Page 22

GRANT SCOTT - 1/21/2021

1

2    going well.

3        Q.    And -- and I think you -- you

4    testified just now that there was kind of a

5    difference between prebankruptcy and

6    postbankruptcy.  Do I have that right?

7        A.    Yes.

8        Q.    And can you tell me -- is it fair to

9    say that before the bankruptcy, you didn't

10    devote much time to CLO HoldCo, or do I have

11    that wrong?

12        A.    Well, I -- just the time that --

13    that I mentioned just -- I'm sorry.  The -- the

14    time I just mentioned now when you asked me,

15    that was the pre period.  Excuse me.  I haven't

16    talked about the postbankruptcy period.

17        Q.    So are you -- are you -- are you

18    devoting more time or less time since the

19    bankruptcy?

20        A.    Much more.

21        Q.    Much more since the bankruptcy

22    filing?

23        A.    Yes.

24        Q.    And so why did the bankruptcy filing

25    cause you to spend more time as a director of

Appx. 96849
010783

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 866 of 1017 PageID 11647
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 24 of
110

Page 23

1        GRANT SCOTT - 1/21/2021

2    CLO HoldCo Limited?

3        A.    Well, initially, and this would

4    be -- this would be late 2019, it was --

5    aft- -- after the bankruptcy was -- was filed

6    and I obtained counsel, who are on the phone

7    now -- or in this deposition now, excuse me,

8    that was -- that transition occurred because

9    CLO was a debtor -- excuse me, a creditor to --

10   to the debtor and had to take steps to

11   establish its -- its claim.  So if I understand

12   the -- things correctly, the -- the debtor

13   identified as part of the filing -- I don't

14   know how bankruptcy works, but if I under- --

15   if my recollection is correct, there's a

16   hierarchy from biggest to smallest, and we were

17   relatively high up.  And when I say we or I,

18   I -- I just mean CLO was relatively high up.

19   And so initially, for the first period of so

20   many months, the -- the exclusive focus was on

21   our position as a creditor -- a creditor having

22   a certain claim against a debtor.

23       Q.    Can you describe for me your

24   understanding of the nature of the claim

25   against the debtor.

010784

Page 24

1                    GRANT SCOTT - 1/21/2021

2        A.    It was various obligations that were

3    owed to -- to CLO, things that had been

4    previously donated or -- or agreements that had

5    been set up that transferred certain assets,

6    and it was basically the -- the -- the amounts

7    were derived from those sorts of transactions.

8        Q.    Okay.  You're a patent lawyer; is

9    that right?

10       A.    I -- I'm exclusively a patent

11   attorney, yes.

12       Q.    Have you been a patent lawyer on an

13   exclusive basis since the time you graduated

14   from law school?

15       A.    From law school, yes.

16       Q.    Can you just describe for me

17   generally your educational background.

18       A.    So I'm an electrical engineer by

19   training.  I graduated from the University of

20   Virginia in 1984.  I then went to graduate

21   school at the University of Illinois.  I

22   received my master's degree in 1986, and then I

23   immediately joined IBM Research at the Thomas

24   Watson Institute in New York where I was a --

25   my title was research scientist, but I was -- I

Appx. 00842

010785

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 868 of 1017 PageID 11649
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 26 of
110

Page 25

1      GRANT SCOTT - 1/21/2021

2   guess I was more of a research engineer, if

3   that matters.  And I did that until I

4   transitioned -- or I began law school in the

5   fall of 1988, and then I graduated law school

6   in May of 1991.

7      Q.    And where did you go to law school?

8      A.    University of North Carolina.

9      Q.    Do you have any formal training in

10   investing or finance?

11      A.    I do not.

12      Q.    Do you hold yourself out as an

13   expert in any field of investment?

14      A.    None -- none at all.

15      Q.    Have you had any formal training

16   with respect to compliance issues?  You

17   mentioned compliance issues earlier.

18      A.    No.

19      Q.    Now, do you have any knowledge about

20   compliance rules or regulations?

21      A.    Minimal that I've -- that have

22   occurred organically but -- but generally, no.

23      Q.    You don't hold yourself out as an

24   expert in com- -- in the area of compliance,

25   correct?

010786

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 869 of 1017    PageID 11650
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 27 of
110

Page 26

1          GRANT SCOTT - 1/21/2021

2     A.    No.  No.  I'm -- no.

3     Q.    Do you have any particular

4  investment philosophy or strategy?

5          MR. CLARK:  I'm going to object to

6     the form of the question.  And, John,

7     can -- can we get an agreement that -- I

8     know you were objecting just simply on the

9     form basis yesterday -- that objection to

10     form is sufficient today?

11          MR. MORRIS:  Sure.

12          MR. CLARK:  Okay.  And I object to

13     form.  Grant, you can answer to the extent

14     you can.

15          THE WITNESS:  I forget the question

16     now that you interrupted.  I'm sorry.

17  BY MR. MORRIS:

18     Q.    So -- so -- and I'm going to ask a

19  different question because in hindsight, that's

20  a good objection.

21          In your capacity as the director

22  of -- withdrawn.

23          Do the employees of Highland that

24  you identified earlier, do they make investment

25  decisions on behalf of CLO HoldCo Limited

Appx. 36844
010787

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 870 of 1017 PageID 11651
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 28 of
110

Page 27

1      GRANT SCOTT - 1/21/2021

2   without your prior knowledge on occasion?

3      A.    On occasion, they do.

4      Q.    So there's no rule that your prior

5   approval is needed before investments are made,

6   right?

7      A.    I don't know whether they have an

8   internal guideline as to the amount that

9   triggers when they get in touch with me or

10  whether it's a new -- a change, something new,

11  or -- versus recurring.  So I don't -- I don't

12  know what they use internally for that metric.

13     Q.    Okay.  Are you aware of any

14  guideline that was ever used by the Highland

15  employees whereby they were required to obtain

16  your consent prior to effectuating transactions

17  on behalf of CLO HoldCo Limited?

18     A.    I understand there was one or more,

19  but I do not know that.

20     Q.    Okay.  Did you ever see such a

21  policy or list of rules that would require your

22  prior consent before the Highland employees

23  effectuated transactions on behalf of CLO

24  HoldCo Limited?

25     A.    Possibly some time ago, but I -- I

010788

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 871 of 1017 PageID 11652
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 29 of
110

Page 28

GRANT SCOTT - 1/21/2021

1    don't recall.

2        Q.    Okay.  So -- withdrawn.  I'll --

3    I'll go on.

4            How did you come to be the director

5    of CLO HoldCo?

6        A.    I was asked either by Jim Dondero

7    or -- directly or indirectly by -- by Jim

8    Dondero.

9        Q.    And who is Jim Dondero?

10       A.    Well, at the time, he was the head

11   or one of the heads of Highland Capital

12   Management, a friend of mine.

13       Q.    How long have you known Mr. Dondero?

14       A.    Since high school so that -- 1976.

15       Q.    Where did you and Mr. Dondero grow

16   up?

17       A.    In northern New Jersey.

18       Q.    Do you consider him among the

19   closest friends you have?

20       A.    I think he is my closest friend.

21       Q.    Did you two go to college together?

22       A.    We actually -- for the last -- last

23   two years I was at UVA, University of Virginia,

24   excuse me, he and I were -- were at UVA.  So we

010789

GRANT SCOTT - 1/21/2021

1

2 did not start out at UVA initially, but -- but

3 we both transferred -- I transferred my

4 sophomore year. I was actually a chemical

5 engineer at the University of Delaware when I

6 transferred in, and then he transferred in his

7 junior year. So we were there at college for

8 two years.

9    Q.   And -- and based on your

10 relationship with him, is it your understanding

11 that one of the reasons he chose to transfer to

12 UVA is -- is to -- because you were there?

13    A.   Oh, no. He transferred -- he --

14 he -- he transferred there because of the -- so

15 he went to the University of -- he -- he went

16 to Virginia Tech University, which is more

17 known as being an engineering school, which I

18 might have wanted to go to, and less a finance

19 business school. And if I understand things

20 correctly, and I believe I do, he transferred

21 to UVA because of the well-known

22 business/finance program, accounting program.

23    Q.   And did you -- did you and

24 Mr. Dondero become roommates at UVA?

25    A.   We weren't roommates, but we lived

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 873 of 1017 PageID 11654
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 31 of
110

Page 30

GRANT SCOTT - 1/21/2021

1      in the -- we were housemates.  I'm sorry.  We

2      were housemates.

3         Q.   So you shared a house together.  How

4      would you describe your relationship with

5      Mr. Dondero today?

6         A.   It's -- it's been strained a while,

7      for some time, but -- but generally, very good.

8      Good to very good.

9         Q.   Without -- without getting personal

10    here, can you just generally identify the

11    source of the strain that you described.

12      A.   This -- I think it would be fair to

13    say that this bankruptcy, particularly events

14    in 2020 so some months after the bankruptcy was

15    declared, things have become -- we -- we still

16    have a close friendship, but -- but things

17    are -- are a bit -- are a bit more difficult.

18      Q.   Were you ever married?

19      A.   I've never been married.

20      Q.   Did you serve as Mr. Dondero's best

21    man at his wedding?

22      A.   I did.

23      Q.   Is it fair to say that -- that

24    Mr. Dondero trusts you?

010791

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 41 of
Case 3:25-cv-02072-S    Document 15-13    Filed 06/10/06/25    Page 874 of 1017    PageID 11655
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 32 of
110

Page 31

1        GRANT SCOTT - 1/21/2021

2        MR. CLARK:  Objection, form.

3   BY MR. MORRIS:

4     Q.    Withdrawn.

5        Do you believe that Mr. Dondero

6   trusts you?

7     A.    I do.

8     Q.    Over the years, is it fair to say

9   that Mr. Dondero has confided in you?

10        MR. CLARK:  Objection, form.

11   BY MR. MORRIS:

12     Q.    You can answer if you understand it.

13     A.    I think so.

14     Q.    I -- I -- what's your answer?  You

15   think so?

16     A.    Maybe you can de- -- I think of

17   confide as -- could you define confide, please.

18     Q.    Sure.  Is it -- is it fair to say

19   that over the -- let me -- you've known

20   Mr. Dondero for almost 45 years, right?

21     A.    Yes.

22     Q.    And you consider him to be your

23   closest friend in the world, right?

24     A.    Yes.

25     Q.    And is it fair to say over the

Appx. 00849
010792

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 875 of 1017 PageID 11656
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 33 of
110

Page 32

1        GRANT SCOTT - 1/21/2021

2    course of those 45 years, Mr. Dondero has

3    shared confidential information with you that

4    he didn't want you to reveal publicly to other

5    people?

6        A.    Yes.

7        Q.    And is it your understanding that

8    because of the nature of your relationship with

9    him, he asked you to serve as the director of

10   CLO HoldCo Limited?

11       A.    Yes.  I believe it's because he --

12   he trusted -- trusted me with -- with assets

13   relating to his charitable vision.  I -- I --

14   yeah.  Yes.

15       Q.    And is it your understanding that he

16   thought you would help him execute his

17   charitable vision?

18       A.    That was the point of attraction

19   initially.  It wasn't for money.  I wasn't

20   being paid.  That was -- the charitable mission

21   was the attraction.

22       Q.    Does Mr. Dondero play any role in

23   the management of the CLO HoldCo Limited asset

24   pool?

25             MR. CLARK:  Objection, form.

Appx. 06859
010793

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 876 of 1017 PageID 11657
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 34 of
110

Page 33

1          GRANT SCOTT - 1/21/2021

2     A.    I'm sorry.  Could you repeat that?

3  My -- my screen went small and then big again.

4  I was distracted.

5     Q.    What role does Mr. Dondero play with

6  respect to the management of the CLO HoldCo

7  Limited asset pool?

8          MR. CLARK:  Objection, form.

9     A.    He is with the company that manages

10  that asset pool.  He's one of the people I

11  named previously as managing those assets.

12     Q.    He is -- he -- he is the -- do you

13  understand that he has the final

14  decision-making power with respect to the

15  management of the assets that are held by CLO

16  HoldCo Limited?

17          MR. CLARK:  Objection, form.

18     A.    I believe I ansel -- answered that

19  previously.  I -- I don't know who has -- for

20  certainty I do not know who has that within

21  that company.  I don't.  If -- if -- I -- I

22  don't know, consistent with my prior answer.

23     Q.    Did you ever ask anybody who had the

24  final decision-making authority for investments

25  on behalf of CLO HoldCo Limited?

010794
Appx. 30851

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 877 of 1017 PageID 11658
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 35 of
110

Page 34

1          GRANT SCOTT - 1/21/2021

2     A.    I -- I did not.

3     Q.    Did you ever make a decision on

4   behalf of -- withdrawn.

5          In your capacity as a director --

6   withdrawn.

7          In your capacity as the sole

8   director of CLO HoldCo Limited, can you think

9   of any decision that you've ever made that

10   Mr. Dondero disagreed with?

11    A.    Since -- prior to the bankruptcy,

12   no, not that I'm aware of.

13    Q.    And since the bankruptcy?

14    A.    There are decisions that I've made

15   that he's disagreed with.

16    Q.    Can you identify them?

17    A.    Yes.

18    Q.    Please do so.

19    A.    Okay.  So the reason I'm pausing is

20   I'm trying to put these in chronological order

21   and, at the same time, identify maybe some of

22   the more important ones versus the lesser

23   important ones.  One of the decisions I made

24   related to a request that I received from the

25   independent board of Highland.  I don't know

Appx. 06852

010795

Page 35

1          GRANT SCOTT - 1/21/2021

2    how the request was transmitted to me, but I

3    believe the way it played out is as follows:  I

4    believe I was asked to call Jim Seery, and the

5    other -- and Russell Nelms, and the third

6    independent director, I believe his name is

7    John.  I -- I forget right now what his last

8    name is.  They were in New York, said they were

9    in a conference room.  I called in.  They were

10   very pleasant.  They identified who they were,

11   and they had a request, and the request was

12   that I agree to a transfer -- or that I -- that

13   I agree to allow certain assets that were not

14   Highland's assets but they were CLO's as- --

15   assets -- apparently, there was no dispute

16   about that at any point in time, but that I

17   agree to allow certain assets that were due CLO

18   to be transferred to the registry of the

19   bankruptcy court.  And either on that call I

20   immediately agreed or ended the call, called my

21   attorney, and then immediately agreed.  It was

22   a very -- I accommodated the request quickly.

23        Q.    Okay.  And can you just tell me at

24   what point in time you spoke with Mr. Dondero,

25   and what did he say that you recall?

010796
Appx. 00853

Page 36

GRANT SCOTT - 1/21/2021

1

2    A.    I don't know when he became aware of

3    that decision.  I'm not sure I ever volunteered

4    that the decision was even made, but at some

5    point, it became an issue because he found out

6    through -- if I understand the sequence of

7    events correctly, he found out possibly through

8    his counsel because there was ultimately

9    litigation about that issue.  It became known

10   to everyone at some point what I had done, I --

11   I think.  And subsequent to that, it became an

12   issue because of CLO HoldCo having fairly

13   significant cash flow issues with respect to

14   its expenses and obligations, including payment

15   of management fees as well as some of the

16   scheduled charitable giving that was -- that

17   was by contract already predefined.  My

18   decision to tuck that money -- or to agree

19   to -- my agreement to let that money be tucked

20   away created some -- created some -- created

21   some problems --

22   Q.    And -- and --

23   A.    -- for CLO HoldCo.

24   Q.    Okay.  And I just want you to focus

25   specifically on my question, and that is, what

Appx 06854

010797

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 880 of 1017 PageID 11661
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 38 of
110

Page 37

1          GRANT SCOTT - 1/21/2021

2    did Mr. Dondero say to you that -- that causes

3    you to testify as you did, that this is one

4    issue that he didn't agree with?

5          A.    I believe his concern was that

6    because it was money that was undisputably to

7    flow to CLO HoldCo that -- which had many, many

8    other nonliquid assets -- this was a form of a

9    liquid asset.  It was cash in effect, proceeds.

10    -- that the money should have been allowed to

11    flow to be available for obligations.  He

12    didn't under- -- I -- I -- I don't know what he

13    was thinking, but the -- the issue was that the

14    decision to put it into escrow was -- was --

15    was in- -- incorrect, that there was no basis

16    for it.

17          Q.    That -- that's an issue where after

18    learning of your decision, he didn't agree with

19    it; is that fair?

20          A.    That's right.

21          Q.    Okay.  Can you think of any decision

22    that you've ever made on behalf of CLO HoldCo

23    Limited where Mr. Dondero had advance knowledge

24    of what you were going to do and he objected to

25    it, but you nevertheless overruled his

Appx. 90855
010798

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 48 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 881 of 1017    PageID 11662
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 39 of
110

Page 38

                    GRANT SCOTT - 1/21/2021

1

2    objection and went ahead and did what -- did

3    what you thought was right?

4        A.    Okay.  Let me -- let me -- I have --

5    I'm sorry.

6        Q.    We're here.

7        A.    Oh, I'm sorry.  I'm having some

8    issues with my screen.  So that may have

9    occurred with respect to the original proof of

10   claim.  Then there was a subsequent amendment

11   to the proof of claim, and I -- I believe it --

12   I believe that he might have been aware of both

13   of those and was in disagreement with -- with

14   those.  But after working with my attorney, we

15   just -- you know, we did what we thought was

16   right, and I still think what we did was right.

17   There was an issue with respect to Har- --

18   HarbourVest that occurred relatively recently

19   where he objected to a decision that I had

20   made.  As I understand it, I could have

21   contacted my attorney and changed the decision,

22   but I didn't, and I still think that was the

23   right decision.

24            We have filed plan objections.  I

25   can't say if he has any -- in that regard, I --

Appx. 00856
010799

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 882 of 1017 PageID 11663
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 40 of
110

Page 39

1          GRANT SCOTT - 1/21/2021

2   I -- I don't know what his thoughts are on

3   objections.  They would not have been

4   communicated with -- by me to him, but my

5   attorney might have consulted with his

6   attorney, and there -- they may know what that

7   difference is, but I -- that was just another

8   big decision.  I -- I -- maybe that --

9       Q.    All right.  Let me see if I can --

10  let me see if I can summarize this.  So two

11  proofs of claim.  Is it fair to say that

12  Mr. Dondero saw those proofs of claim before

13  they were filed?

14          MR. CLARK:  Objection, form.

15  BY MR. MORRIS:

16      Q.    Withdrawn.

17      A.    It --

18      Q.    Do -- do you know whether

19  Mr. Dondero saw the proofs of claim before they

20  were filed?

21      A.    I don't believe he did.

22      Q.    What -- what steps in filing the

23  proofs of claim did he object to that you

24  overruled?  Did he think there was -- something

25  should be different about them?

Appx 00857
010800

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 883 of 1017 PageID 11664
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 41 of
110

Page 40

1          GRANT SCOTT - 1/21/2021

2      A.    So we had to interface with Highland

3   employees at some point to get information to

4   support our proof of claim, and my guess, and

5   it's just a guess, is that he was aware of

6   those inquiries.  I -- I'm sorry.  I shouldn't

7   speculate.  I don't know.  But he -- with

8   respect to the original proof of claim, I'm --

9   I'm not aware of what specifically he was

10  objecting to or was -- thought should have been

11  different, but the -- with respect to the

12  amended proof of claim, which reduced the

13  original proof of claim to zero, I think that's

14  where he had a -- an issue.

15     Q.    And did you speak with him about

16  that topic prior to the time the amended claim

17  was filed, or did you only speak with him after

18  it was filed?

19     A.    I'm not sure the timing of that.

20     Q.    And with respect to HarbourVest, did

21  he ask you to object to the settlement on

22  behalf of CLO HoldCo Limited, and is that

23  something that you declined to do?

24        MR. CLARK:  Objection, form.

25     A.    I'm -- I'm sorry.  I was confused

Appx 00858
010801

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 51 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 884 of 1017 PageID 11665
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 42 of
110

Page 41

1          GRANT SCOTT - 1/21/2021

2    with the word.  Could you please repeat that?

3         Q.    Yes.  You mentioned HarbourVest

4    before, right?

5         A.    Yes.

6         Q.    And you mentioned that there was an

7    issue with Mr. Dondero and you concerning

8    HarbourVest; is that right?

9         A.    Yes.

10        Q.    And did that have to do with whether

11   or not CLO HoldCo Limited would -- would object

12   to the debtor's motion to get the HarbourVest

13   settlement approved?

14        A.    Would -- would get the

15   HarbourVest --

16        Q.    Settlement approved by the court.

17        A.    I'm not trying to be difficult.

18   I'm -- I'm -- could you just repeat that one

19   more time?  I'm --

20        Q.    What was -- what was --

21        A.    There was --

22        Q.    Let me try again.

23        A.    Okay.

24        Q.    What was the issue with respect to

25   HarbourVest that he objected to and -- and you

Appx. 00859
010802

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 885 of 1017 PageID 11666
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 43 of
110

Page 42

1        GRANT SCOTT - 1/21/2021

2    overrode his objection and did what you thought

3    was right anyway?

4        A.    Okay.  Okay.  That's -- that's

5    easier for me to understand.  I'm sorry.  So I

6    had worked with my attorney or he did the work

7    and consulted with -- we consulted, but we had

8    filed an objection, motion objecting to the

9    settlement, if I understand the terminology and

10   nomenclature correctly.  Okay.  He had -- we

11   had come to an agreement that we had a very

12   valid argument.  That argument was evidenced

13   by, I guess it was, our motion that was

14   submitted to the court.  On the day of the

15   hearing to resolve this issue, we pulled our

16   request, and that was because I believed it did

17   not have a good-faith basis in law to move

18   forward on.

19       Q.    And did you discuss that issue with

20   Mr. Dondero before informing the court that CLO

21   HoldCo Limited was withdrawing its objection,

22   or did he learn about that for the first time

23   during the hearing --

24            MR. CLARK:  Objection, form.

25   BY MR. MORRIS:

010803

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 886 of 1017 PageID 11667
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 44 of
110

Page 43

GRANT SCOTT - 1/21/2021

1

2      Q.    -- if you know?

3      A.    I -- I understand that he learned it

4    during the hearing.  I don't know the -- I -- I

5    don't know the -- whether there was any -- I --

6    I don't know for certain on the second half of

7    your question.

8      Q.    Let me -- let me try it -- let me

9    try it this way:  Did you speak with

10   Mr. Dondero about your decision to withdraw the

11   objection to the HarbourVest settlement prior

12   to the time your counsel made the announcement

13   in court?

14     A.    I don't -- I don't believe so.  No.

15   No.  No.  I'm sorry.  No.

16     Q.    And did --

17     A.    Okay.  No.  Here -- here's where

18   I'm -- I can clarify, okay?  I'm sorry.  I can

19   clarify.

20     Q.    That's all right.

21     A.    I gave the decision to my

22   attorney -- I -- I agreed with the

23   recommendation of my attorney, okay?  It wasn't

24   my --

25     Q.    Did you have a good --

0'10804

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 887 of 1017 PageID 11668
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 45 of
110

Page 44

1          GRANT SCOTT - 1/21/2021

2     A.    -- thought, okay?

3           THE REPORTER:  I didn't --

4     A.    Okay.  So he --

5     Q.    It was a recommendation.

6     A.    Yeah.  So he -- he called me with a

7     recommendation.  It was highly urgent.  You

8     know, I was coming out of the men's room, had

9     my phone with me.  I got the call.

10          MR. CLARK:  Hey, Grant, I -- Grant,

11          I just want to caution you not to -- to --

12          and I don't think counsel is looking for

13          this but not to disclose the -- the

14          substance of any of your communications

15          with counsel, okay?

16          THE WITNESS:  Thank you.

17    A.    So --

18          THE WITNESS:  Thank you.  I'm -- I'm

19    sorry.

20    BY MR. MORRIS:

21    Q.    It's -- it's really a very simple

22    question.  Do you recall --

23    A.    He made a recommendation.  I -- I --

24    I think I can answer your question without

25    going off tangent.  I'm sorry.  So he -- my

Appx. 00882
010805

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 888 of 1017 PageID 11669
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 46 of
110

Page 45

1          GRANT SCOTT - 1/21/2021

2  attorney made a recommendation.  I agreed with

3  it.  We with- -- I -- I told him to withdraw --

4  or I authorized him to withdraw.

5      Q.    Okay.

6      A.    Then I received a communication, and

7  I -- I guess the most likely scenario is the

8  motion had been withdrawn by the time Jim

9  Dondero found out.

10     Q.    And -- and did he write to you, or

11  did he call you?  Did he send you a text?

12     A.    He called me.

13     Q.    What did he say?

14     A.    He was asking why, and I explained,

15  and I said I agreed with the decision and I was

16  sticking with the decision.

17     Q.    Let's just -- let's just move on to

18  a new topic, and let's talk about the structure

19  of -- of CLO HoldCo.  Are you generally

20  familiar with the ownership structure of CLO

21  HoldCo?

22     A.    Yeah.  I mean, in terms --

23     Q.    Are -- are you -- are you generally

24  familiar with it?  It's not a test.  I'm just

25  asking do you have a general familiarity --

Appx 06683

010806

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 889 of 1017 PageID 11670
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 47 of
110

Page 46

1          GRANT SCOTT - 1/21/2021

2     A.    With CLO HoldCo or the entities

3    associated with CLO HoldCo?

4     Q.    The latter.

5     A.    Yes, I believe so.

6     Q.    All right.  I've prepared what's

7    called a demonstrative exhibit.  It's just --

8     A.    Yes.

9     Q.    -- just -- it's a document that, I

10   think, reflects facts, but I want to ask you

11   about it.

12          MR. MORRIS:  La Asia, can we please

13       put up Exhibit 1.

14          (SCOTT EXHIBIT 1, Organizational

15       Structure:  CLO HoldCo, Ltd., was marked

16       for identification.)

17   BY MR. MORRIS:

18    Q.    Okay.  Can you see that, Mr. Scott?

19    A.    Yes, I can.

20    Q.    Okay.  So I think I took the

21   information from resolutions that were attached

22   to the CLO HoldCo proof of claim, and that's

23   why you got that little footnote there at the

24   bottom of the page.  But let's start in the

25   lower right-hand corner and see if this chart

Appx. 06864

010807

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 57 of
Case 3:25-cv-02072-S   Document 15-13   Filed 10/06/25   Page 890 of 1017   PageID 11671
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 48 of
110

Page 47

1          GRANT SCOTT - 1/21/2021

2    comports with your understanding of the facts.

3          Do you know that CLO HoldCo Limited

4    was formed in the Cayman Islands?

5      A.   Yes.

6      Q.   And to the best of your knowledge,

7    is CLO HoldCo Limited 100 percent owned by the

8    Charitable DAF Fund, L.P.?  If you're not sure,

9    just say you're not sure if you don't know.

10   It's not a test.

11     A.   So the -- the -- the familiarity

12   I -- I'm -- I'm familiar with the different --

13   I'm confused with the arrangement of the boxes

14   and the ownership interest versus managerial

15   interest.  I believe that's -- that's right.

16     Q.   Okay.  And -- and you're the sole

17   director of CLO HoldCo Limited, right?

18     A.   Yes.

19     Q.   And this whole structure was -- the

20   idea for this structure, to the best of your

21   knowledge, was to implement Mr. Dondero's plan

22   for charitable giving; is that fair?

23     A.   Yes.  Ultimately, yes.

24     Q.   And is it fair to say then that

25   he -- he made the decision to establish this

Appx. 00805
010808

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 58 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 891 of 1017    PageID 11672
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 49 of
110

Page 48

1          GRANT SCOTT - 1/21/2021

2    particular structure, to the best of your

3    knowledge?

4        A.    I -- I didn't -- I'm sorry.  I

5    didn't hear you very well.

6        Q.    To the best of your knowledge, did

7    Mr. Dondero make the decisions to establish the

8    structure that's reflected on this page?

9        A.    Oh, I don't know if he made the

10   decision to establish this structure, although

11   it's -- it's -- I'm sorry.  Strike that.  I --

12   if -- if what you're saying is did he approve

13   of this structure, to my knowledge, yes.

14       Q.    Okay.  Do you hold any position with

15   respect to Charitable DAF Fund, L.P.?

16       A.    I -- I -- your chart says no.  I --

17   I -- I thought I had a role there, too.

18       Q.    I don't know.  I don't have

19   information on that.  That's why I'm asking the

20   question.

21       A.    I -- I -- I believe -- yes, I

22   believe I have the same role as I do in -- in

23   CLO HoldCo.

24       Q.    And that would be director?

25       A.    Yes.

Appx. 00806
010809

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 892 of 1017 PageID 11673
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 50 of
110

Page 49

1          GRANT SCOTT - 1/21/2021

2      Q.    And to the best of your knowledge,

3   is the Charitable DAF GP, LLC, the general

4   partner of Charitable DAF Fund, L.P.?

5      A.    Yes.

6      Q.    And is it your understanding that

7   you are the managing member of Charitable DAF

8   GP, LLC?

9      A.    Yes.

10      Q.    Does Charitable DAF GP, LLC, have

11   any employees?

12      A.    No.

13      Q.    Does Charitable DAF GP, LLC, have

14   any officers or directors?

15      A.    No.

16      Q.    Are you the only person affiliated

17   with Charitable DAF GP, LLC, to the best of

18   your --

19      A.    I believe so.

20      Q.    Do you receive any compensation for

21   serving as the managing member of Charitable

22   DAF GP, LLC?

23      A.    No.  The -- I don't interact with it

24   very often.  It's -- no, I don't receive any

25   compensation.

Appx 06807
010810

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 60 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 893 of 1017    PageID 11674
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 51 of
110

Page 50

1          GRANT SCOTT - 1/21/2021

2      Q.    Can you tell me in your capacity as

3    the managing member of Charitable DAF GP, LLC,

4    what's the nature of that entity's business?

5      A.    It -- it doesn't perform any

6    day-to-day operations.  My understanding is --

7    is that it's -- it's there for purposes of

8    compliance.  I can't recall the last time I had

9    any activity with respect to that.

10      Q.    How about the Charitable DAF Fund,

11    L.P.?  I apologize if I've asked you these

12    questions.

13      A.    It -- it's the same.  I -- I -- my

14    activity is almost exclusively CLO HoldCo.

15      Q.    All right.  Let me just ask the

16    questions nevertheless.  Does Charitable DAF

17    Fund, L.P., have any employees?

18      A.    Employees?  No.

19      Q.    Does it have any officers and

20    directors?

21      A.    No.

22      Q.    Are you the sole director of

23    Charitable DAF Fund, L.P.?

24      A.    Yes, I believe so.

25      Q.    So if we -- if we put under

Appx 96868

010811

Page 51

1      GRANT SCOTT - 1/21/2021

2   Charitable DAF Fund, L.P., Grant Scott,

3   director, and we put under CLO HoldCo Limited

4   Grant Scott, director, would everything on the

5   right side of that page be accurate, to the

6   best of your --

7      A.   I believe so.

8      Q.   Well, let's move to the left side of

9   the page.  Have you heard of the entity

10   Charitable DAF HoldCo Limited?

11      A.   Yes.

12      Q.   Are you the sole director of

13   Charitable DAF HoldCo Limited?

14      A.   Yes.

15      Q.   How did you become -- how did you

16   come to be the char- -- the sole director of

17   Charitable DAF HoldCo Limited?

18      A.   That was when it was established.

19      Q.   And did Mr. Dondero ask you to serve

20   in that capacity?

21      A.   Yes.

22      Q.   And did Mr. Dondero ask you to serve

23   as the managing member of Charitable DA- -- DAF

24   GP, LLC?

25      A.   Yes.

Appx 06809

010812

Page 52

1          GRANT SCOTT - 1/21/2021

2      Q.    And did Mr. Dondero ask you to serve

3    as the director of Charitable DAF, L.P. --

4    withdrawn.

5          Did Mr. Dondero ask you to serve as

6    director of Charitable DAF Fund, L.P.?

7      A.    Yes.

8      Q.    To the best of your knowledge, does

9    Charitable DAF HoldCo Limited own 99 percent of

10   the limited partnership interests in Charitable

11   DAF Fund, L.P.?

12      A.    Yes.  The -- the feed -- the -- the

13   feeds -- the -- the three horizontal blocks

14   there that identify Highland Dallas Foundation,

15   Kansas City, Santa Barbara -- there's a fourth

16   of -- relatively de minimus in terms of

17   participation.  There's a fourth entity that's

18   missing.  It's Dallas -- I forget the name.

19   That -- that -- that structure is -- is a bit

20   dated --

21      Q.    Okay.

22      A.    -- as it -- as is shown.

23      Q.    Okay.  So I will tell you and we can

24   look the documents if you want, but attached to

25   CLO HoldCo Limited's claim are a number of

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 63 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 896 of 1017 PageID 11677
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 54 of
110

Page 53

GRANT SCOTT - 1/21/2021

1

2    resolutions, and there's one that I have in

3    mind that shows Charitable DAF HoldCo Limited

4    holding 99 percent of the limited partnership

5    interests of Charitable DAF Fund, L.P., and

6    there's another that shows it being a hundred

7    percent.  Do you -- do you know which is

8    accurate at least at this time?

9        A.    There's a 1 percent/99 percent

10   division, and I am -- I believe it's the 99

11   percent, but I'm -- I'm getting confused by

12   the -- by the arrangement.  I'm so used to

13   another arrangement.  I -- I believe the 99

14   percent is correct.

15       Q.    Okay.  Do you have any understanding

16   as to who owns the other 1 percent of the

17   limited partnership interests of Charitable DAF

18   Fund, L.P.?

19       A.    No.  This -- this is confusing to

20   me.  No.

21       Q.    Okay.  There are, at least on this

22   page, three foundations that I think you've

23   identified.  Are those three foundations

24   together with the fourth that you mentioned the

25   owners of the Charitable DAF HoldCo Limited?

Appx. 06871
010814

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 64 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 897 of 1017 PageID 11678
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 55 of
110

Page 54

1          GRANT SCOTT - 1/21/2021

2     A.    Owners?

3     Q.    Yes.

4          MR. CLARK:  Objection, form.

5     A.    They -- they only participate in the

6    money that flows up to them.

7     Q.    And what does that mean exactly?

8     A.    What's that?

9     Q.    What does that -- what do you mean

10   by that?  Do the foundations fund Charitable

11   DAF Fund HoldCo Limited?

12    A.    Initially.  Initially, as I

13   understand it, the money flows downward into

14   the Charitable DAF HoldCo Limited before it

15   ultimately makes its way to CLO HoldCo, and

16   then each of those three entities, the various

17   foundations, obtain participation interest in

18   the money that flows back to them.

19    Q.    And -- and is that par- -- are those

20   participation interests in Charitable -- you

21   know what, let -- let me just pull up one

22   document and see if that helps.

23          MR. MORRIS:  Can we put up -- I

24      think it's Exhibit Number 5.

25          (SCOTT EXHIBIT 2, Unanimous Written

Appx 06872

010815

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 65 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 898 of 1017 PageID 11679
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 56 of
110

Page 55

1          GRANT SCOTT - 1/21/2021

2     Consent of Directors In Lieu of Meeting,

3     was marked for identification.)

4          MR. MORRIS:  I apologize.  Let's go

5     to --

6          MS. CANTY:  I'm sorry, John.  I

7     can't hear you.  Was that not the exhibit?

8          MR. MORRIS:  4.

9          MS. CANTY:  Okay.

10          THE REPORTER:  And Mr. Morris, you

11      are -- Mr. Morris, you are breaking up just

12       a little bit at the end of your questions.

13    BY MR. MORRIS:

14     Q.    Okay.  Do you see the document on

15    the screen, sir?

16     A.    Yes, I do.

17     Q.    Okay.  And so this is a unanimous

18    written consent of the directors of the

19    Highland Dallas Foundation.  That's one of the

20    entities that was on the chart.

21          MR. MORRIS:  Can we scroll down to

22       the -- the bottom of the document where the

23       signature lines are.  Right there.

24    BY MR. MORRIS:

25     Q.    Are you a director of the Highland

Appx 06873
010816

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 66 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 899 of 1017 PageID 11680
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 57 of
110

Page 56

1          GRANT SCOTT - 1/21/2021

2    Dallas Foundation?

3        A.   Yes, selected by them.

4        Q.   Selected by whom?

5        A.   By that foundation.

6        Q.   Are you -- are you a director of all

7    of the four foundations that feed into the

8    Charitable DAF HoldCo Limited entities that --

9        A.   No.

10       Q.   Which of the four foundations are

11   you a director of?

12       A.   This and the Santa Barbara -- I'm

13   sorry, Santa Barbara and Kansas City.

14       Q.   So is -- there's one that you're not

15   a director of; is that right?

16       A.   Yes.

17       Q.   And which one is that?

18       A.   The -- could you go back to the --

19       Q.   Yeah.

20          MR. MORRIS:  Go back to the

21   demonstrative.

22       A.   It's the Highland Dallas Foundation

23   and Santa Barbara Foundation.

24       Q.   Those are the two that you're a

25   director of?

Appx 06874

010817

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 67 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 900 of 1017 PageID 11681
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 58 of
110

Page 57

1          GRANT SCOTT - 1/21/2021

2     A.    Yes.

3     Q.    To the best of your knowledge, does

4  Mr. Dondero serve as the president for each of

5  the foundations that we're talking about?

6     A.    Yes.

7     Q.    To the best of your knowledge, is

8  Mr. Dondero a director of each of the

9  foundations that we're talking about?

10    A.    Say that again.  I'm sorry.

11    Q.    Is he also a director of each of the

12  foundations?

13    A.    Yes.

14    Q.    Do you know whether any of the

15  foundations has any employees?

16    A.    I believe they do, but I -- I -- I

17  can't say for certain.

18    Q.    Does -- withdrawn.

19          Do you know if there are any

20  officers of any of the four foundations other

21  than Mr. Dondero's service as president?

22    A.    I'm sorry.  Say that one more time,

23  please.

24    Q.    Yes.  Do you know whether any of the

25  four foundations has any officers other than

Appx 06875
010818

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 901 of 1017    PageID 11682
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 59 of
110

Page 58

GRANT SCOTT - 1/21/2021

1    Mr. Dondero's service as president?

2    A.    No.

3    Q.    You don't know, or they do not?

4    A.    I -- I don't believe anyone else

5    has.  I -- actually, I should say I don't -- I

6    don't recall.  I -- I don't know.  I don't -- I

7    don't know.

8    Q.    As a director of the Dallas and

9    Santa Barbara foundations, are you aware of any

10   officers serving for either of those

11   foundations other than Mr. Dondero?

12   A.    No.

13   Q.    Do you know who the beneficial owner

14   of the Charitable DAF HoldCo Limited entity is?

15   A.    The beneficial owner?

16   Q.    Correct.

17   A.    The various -- various trusts that

18   were used to -- that were the vehicles by which

19   the money originally was established within --

20   within -- within CLO HoldCo.

21   Q.    Would that be -- would one of them

22   be the Get Good Nonexempt Trust?

23   A.    Yes.

24   Q.    And you're a trustee of the Get Good

Appx 06876

010819

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 69 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 902 of 1017 PageID 11683
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 60 of
110

Page 59

GRANT SCOTT - 1/21/2021

1    Nonexempt Trust, right?

2        A.    Yes.

3        Q.    When did you become a trustee of the

4    Get Good Nonexempt Trust?

5        A.    Many years ago.  I -- I don't

6    remember.

7        Q.    Are there any other trustees of the

8    Get Good Nonexempt Trust?

9        A.    No.

10       Q.    Does the Get Good Nonexempt Trust

11   have any officers, directors, or employees?

12       A.    No.

13            MR. CLARK:  Objection, form.  Sorry.

14   BY MR. MORRIS:

15       Q.    Withdrawn.

16            Do you know whether the Get Good

17   Nonexempt Trust has any officers, directors, or

18   employees?

19       A.    It does not.

20       Q.    And I apologize if I asked this, but

21   are you the only trustee of the Get Good

22   Nonexempt Trust?

23       A.    Yes.

24       Q.    Is the Dugaboy Investment Trust also

Appx. 06877
010820

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 70 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 903 of 1017    PageID 11684
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 61 of
110

Page 60

GRANT SCOTT - 1/21/2021

1

2    one of the trusts that has an interest in

3    Charitable DAF HoldCo Limited?

4        A.    Yes.

5        Q.    Are you a trustee of the Dugaboy

6    Investment Trust?

7        A.    I am not.

8        Q.    Do you know who is?

9        A.    I believe it's his sister.

10        Q.    And is that -- you're referring to

11    Mr. Dondero's sister?

12        A.    I'm sorry.  Yes.

13        Q.    And what's the basis for your

14    understanding that Mr. Dondero's siv- -- sister

15    serves as the trustee of the Dugaboy Investment

16    Trust?

17        A.    Many years ago there was a -- there

18    was a clerical error that identified me as the

19    trustee of the Dugaboy.  That error was present

20    for approximately two weeks or a week and a

21    half before it was detected and corrected, and

22    so I know from that correction that it's Nancy

23    Dondero.

24        Q.    Are there any other trusts that have

25    an interest in Charitable DAF HoldCo Limited

Appx 06878

010821

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 71 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 904 of 1017 PageID 11685
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 62 of
110

Page 61

1          GRANT SCOTT - 1/21/2021

2    besides those trusts, to the best of your

3    knowledge?

4        A.    No.

5        Q.    Is it your understanding based on

6    what we've just talked about that the Get Good

7    Nonexempt Trust and the Dugaboy Investment

8    Trust are the indirect beneficiaries of CLO

9    HoldCo Limited?

10       A.    Yes.

11       Q.    Can you tell me who the

12   beneficiaries are of the Get Good trust?

13       A.    I mean, Jim Dondero.

14       Q.    And -- and what is that -- is that

15   based on the trust agreement -- your knowledge

16   of the trust agreement?

17       A.    Yes.

18       Q.    Do you have an understanding of who

19   the beneficiary is of the Dugaboy Investment

20   Trust?

21       A.    I don't know anything about that

22   trust.

23          MR. MORRIS:  Okay.  All right.

24   Let's take a short break and reconvene at

25   3:30 Eastern Time.  We've been going for a

Appx 06879
010822

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 72 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 905 of 1017    PageID 11686
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 63 of
110

Page 62

1           GRANT SCOTT - 1/21/2021

2      while.

3           MR. CLARK:  Thank you.

4           MR. MORRIS:  Okay.  Thank you.

5           (Whereupon, there was a recess in

6      the proceedings from 3:20 p.m. to

7      3:31 p.m.)

8    BY MR. MORRIS:

9      Q.    Mr. Scott, earlier I think you

10   testified that you interfaced with the folks at

11   Highland in connection with your duties as the

12   director of CLO HoldCo Limited, right?

13     A.    Yes.

14     Q.    Are you aware of any written

15   agreement between Highland Capital Management

16   and CLO HoldCo Limited?

17     A.    Yes, the various servicer

18   agreements.

19     Q.    Okay.  Are you aware that

20   Mr. Dondero resigned from his position at

21   Highland Capital Management sometime in

22   October?

23     A.    No.

24     Q.    Have you communicated with anybody

25   at Highland Capital Management about the

010823

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 906 of 1017    PageID 11687
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 64 of
110

Page 63

1          GRANT SCOTT - 1/21/2021

2    affairs of CLO HoldCo Limited at any time since

3    October?

4        A.    Yes.

5        Q.    Anybody other than Jim Seery?

6        A.    Yes.

7        Q.    Okay.  Let's start with Mr. Seery.

8    You've spoken with him before, right?

9        A.    Yes.

10       Q.    Do you have his phone number?

11       A.    Yes.

12       Q.    How many times have you spoken with

13   Mr. Seery, to the best of your recollection,

14   just generally?  It's not a test.

15       A.    Three, maybe four times.

16       Q.    Okay.  Can you identify by name

17   anybody else at Highland that you've spoken

18   with since -- in the last two or three months?

19       A.    I spoke to Jim Dondero.  I've spoken

20   with Mike Throckmorton.  The usual suspects, so

21   to speak.  Mark Patrick, Mel- -- Melissa

22   Schroth.

23       Q.    Can you recall anybody else?

24       A.    No.  No.  Sorry.

25       Q.    Did you -- did you -- withdrawn.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 907 of 1017 PageID 11688
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 65 of
110

Page 64

1           GRANT SCOTT - 1/21/2021

2         Do you recall the subject matter of

3 your discussions with Mr. Throckmorton?

4         MR. CLARK: Objection, form.

5 BY MR. MORRIS:

6    Q.   Withdrawn.

7         Do you recall your -- the subject

8 matter of your communications with

9 Mr. Throckmorton?

10         MR. CLARK: Objection, form.

11 BY MR. MORRIS:

12    Q.   You can answer.

13    A.   I -- I regularly interface with

14 Mr. Throckmorton regarding approvals of

15 expenses, and he's my sort of -- he's my point

16 person for approving wire transfers and things

17 of that nature.

18    Q.   How about Mr. Patrick, what -- what

19 area of responsibility does he have with

20 respect to CLO HoldCo Limited?

21    A.   He -- he doesn't, to my knowledge.

22    Q.   Do you recall the nature of the

23 substance of any communications that you've had

24 with Mr. Patrick since -- you know, the last

25 two or three months?

010825

Appx 06882

Page 65

1          GRANT SCOTT - 1/21/2021

2     A.    Yes.  Or -- yes.

3     Q.    And what -- what are the nature of

4   those conversations or the substance?

5     A.    He was -- he was one of the

6   individuals that helped to establish the

7   hierarchy for the -- what I keep referring to

8   as the charitable foundation.

9     Q.    And -- and do you recall why you

10  spoke to him in the last -- or -- withdrawn.

11         Do you recall the nature of your

12  communications in the last two or three months

13  with Mr. Patrick?

14    A.    I --

15         MR. CLARK:  And hold on, Grant.  I'm

16         going to caution -- my understanding -- I

17         believe Mr. Patrick's an attorney, and so

18         I'm going to caution you that you shouldn't

19         disclose the substance of -- of those

20         communications based on the attorney-client

21         privilege.

22         MR. MORRIS:  Well, I'm -- I -- I am

23         the lawyer for the company so -- I guess

24         there are other people on the phone and I

25         appreciate that, but let's see if we can --

Appx 06583

010826

Page 66

GRANT SCOTT - 1/21/2021

1

2    I don't mean to be contentious here, so it

3    wouldn't -- I -- I'd be part of the

4    privilege anyway.

5  BY MR. MORRIS:

6    Q.    But in any event, can you tell me

7  generally -- I'm just looking for general

8  subject matter of your conversations with

9  Mr. Patrick.

10    A.    I asked him how I would go about

11  re- -- resigning my position.

12    Q.    And when did that conversation take

13  place?

14    A.    Within the last two weeks.

15    Q.    Have you made a decision to resign?

16    A.    No.

17    Q.    I think you mentioned Melissa

18  Schroth.  Do I have that right?

19    A.    Yes.

20    Q.    Can you describe generally the

21  communications you had with Ms. Schroth in the

22  last few months.

23    A.    They -- she has e-mailed me certain

24  documents that I needed to sign.  I had a

25  conversation with her about -- about some

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 910 of 1017 PageID 11691
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 68 of
110

Page 67

1        GRANT SCOTT - 1/21/2021

2   home -- home improvements, home construction

3   with respect to Jim Dondero's home in Colorado,

4   and that's -- I -- I think that's -- that's it.

5      Q.   Okay.  Do you recall communicating

6   with anybody at Highland in the last three

7   months other than Mr. Dondero,

8   Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?

9      A.   I -- I spoke with Jim Seery this

10  week.

11      Q.   Anybody else?

12      A.   I don't -- I don't know.

13      Q.   Okay.

14      A.   I don't think so.

15      Q.   In your communications with

16  Mr. Seery, did you two ever discuss his reasons

17  for making any trade on behalf of any CLO?

18      A.   No.

19      Q.   In your discussions with Mr. Seery,

20  did you ever tell him that you believed that

21  Highland Capital Management had breached any

22  agreement in relation to any CLO?

23      A.   Have I had that discussion with Jim

24  Seery?

25      Q.   Yes.

Appx. 06885

010828

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 78 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 911 of 1017    PageID 11692
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 69 of
110

Page 68

1          GRANT SCOTT - 1/21/2021

2     A.   No.

3     Q.    In your discussions with Mr. Seery,

4   did you ever tell him that you thought Highland

5   Capital Management was in default under any

6   agreement in relation to the CLOs?

7     A.   No.

8     Q.    I want to focus in particular on the

9   shared services agreement.  In -- in your

10   discussions with Mr. Seery, did you ever tell

11   him that you believed that Highland Capital

12   Management was in default or in breach of its

13   shared services agreement with CLO HoldCo

14   Limited?

15     A.   No.

16     Q.    In your communications with

17   Mr. Seery, did you ever indicate any concern on

18   the part of CLO HoldCo Limited with respect to

19   Highland Capital's Man- -- Highland Capital

20   Management's performance under the shared

21   services agreement?

22     A.   No.

23     Q.    As you sit here today, do you have

24   any reason to believe that Highland Capital

25   Management has done anything wrong in

010829

Appx. 06886

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 79 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 912 of 1017 PageID 11693
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 70 of
110

Page 69

1          GRANT SCOTT - 1/21/2021

2   connection with its performance as the

3   portfolio manager of the CLOs in which CLO

4   HoldCo Limited has invested?

5          MR. CLARK:  Object to form.

6      A.    In terms of the -- are you saying --

7   please say that again.  I'm sorry.

8      Q.    That's okay.  I ask long questions

9   sometimes so forgive me, but I'm trying to

10  get -- I'm trying to be precise so that's why

11  it's difficult sometimes.  But let me try

12  again.

13         Does CLO HoldCo Limited contend that

14  Highland Capital Management has done anything

15  wrong in the performance of its duties as

16  portfolio manager of the CLOs in which CLO

17  HoldCo has invested?

18         MR. CLARK:  Objection, form.

19     A.    Yes.  It's -- it's outlined in our

20  objections to -- to the plan.

21     Q.    Okay.  Any -- are you aware of

22  anything that's not contained within CLO Holdco

23  Limited's objection to the plan?

24         MR. CLARK:  Objection, form.

25     A.    I don't know if this is responsive

Appx 06887

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 80 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 913 of 1017 PageID 11694
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 71 of
110

Page 70

GRANT SCOTT - 1/21/2021

1

2  to your quest -- request, but two -- two

3  issues, I believe, also pose an in- -- a

4  problem for CLO HoldCo.  One is we are paying

5  for services.  I think I referred to the

6  services as being soup to nuts, but we are not

7  getting the full services.  We haven't been for

8  some time.  So we're likely overpaying.  There

9  was a Highland Select Equity issue, 11-month

10  payment that was delayed which I was unaware of

11  was due.  Normally, I would have interfaced

12  with someone at Highland about that, but my

13  attorney -- but my -- my attorney had to make a

14  request for payment, and that payment was

15  ultimately made.  I -- other than that, I -- I

16  don't -- I don't know.  I don't believe so.

17       Q.    I want to distinguish between the

18  shared services agreement between Highland

19  Capital Management and CLO HoldCo Limited on

20  the one hand and on the other hand the

21  management agreements pursuant to which

22  Highland Capital Management manages certain

23  CLOs that CLO HoldCo invests in.

24            You understand the distinction that

25  I'm making?

Page 71

GRANT SCOTT - 1/21/2021

1

2       A.    Now I do.  I'm sorry.  I didn't

3    appreciate that.

4       Q.    Okay.  So let's just take each of

5    those pieces one at a time.  You mentioned your

6    concern about services.  That's a concern that

7    arises under the shared services agreement,

8    right?

9       A.    Yes.

10      Q.    And you mentioned something about a

11   delayed payment having to do with Highland

12   Select.  Do I have that generally right?

13      A.    Correct.

14      Q.    And is that a concern that you have

15   that arises under the shared services

16   agreement?

17      A.    It's not the agreement with respect

18   to the CLOs as I understand it.

19      Q.    Okay.  So then let's turn to that

20   second bucket.  You were aware -- you are

21   aware, are you not, that Highland Capital

22   Management has certain agreements with CLOs

23   pursuant to which it manages the assets that

24   are owned by the CLOs?

25      A.    I'm so sorry.  Could you please --

Appx 06889

010832

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 82 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 915 of 1017 PageID 11696
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 73 of
110

Page 72

1      GRANT SCOTT - 1/21/2021

2    Q.   I'll try again.

3    A.   I'm just -- I'm sorry.  I was

4  distracted and -- and I -- I'm sorry for asking

5  you to repeat it again.  Please --

6    Q.   Okay.

7    A.   Please re- --

8    Q.   Are you aware that CLO HoldCo

9  Limited has made investments in certain CLOs?

10    A.   Oh, yes, certainly.

11    Q.    And are you aware that those CLOs

12  are managed by Highland Capital Management?

13    A.   Yes.  As the -- as the servicer,

14  yes.

15    Q.    Okay.  Have you ever seen any of the

16  agreements pursuant to which Highland Capital

17  Management acts as a servicer?

18    A.   I've seen a few, yes.

19    Q.    Does CLO HoldCo Limited contend that

20  it is a party to any agreement between Highland

21  Capital Management and the CLOs?

22      MR. CLARK:  Object to form.  And I

23      just want to note for the record that

24      Mr. Scott is here testifying in his

25      individual capacity, I believe, not as a

010833

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 916 of 1017 PageID 11697
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 74 of
110

Page 73

GRANT SCOTT - 1/21/2021

1

2    corporate representative.

3         MR. MORRIS:  Fair enough.  But he is

4    the only representative so...

5         MR. CLARK:  Fair enough.  I just

6    want that made -- stated for the record,

7    but I also object as to form.

8         MR. MORRIS:  Got it.

9    A.    It's a third-party beneficiary under

10   the agreements.

11        Q.    And is that because of something you

12   read in the document, or is that just your

13   belief and understanding?

14        A.    My belief and understanding.

15        Q.    And is that belief and understanding

16   based on anything other than conversations with

17   counsel?

18        A.    In -- in -- recently it has, but I

19   don't recall from previous interactions over

20   the years how we discussed that or how I came

21   to -- to understand that.

22        Q.    Does HCLO [sic] HoldCo -- did -- in

23   your capacity as the sole director of HCLO

24   HoldCo Limited, are you aware of anything that

25   Highland Capital Management has done wrong in

Appx 96891
010834

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 84 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 917 of 1017    PageID 11698
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 75 of
110

1        GRANT SCOTT - 1/21/2021

2   connection with the services provided under the

3   CLO management agreements?

4        MR. CLARK:  Objection, form.

5    A.   I -- I don't -- I don't -- I

6   don't -- your answer's no.

7    Q.    In your capacity as the director of

8   CLO HoldCo Limited, are you aware of any

9   default or breach under the CLO management

10   agreements that -- that Highland Capital

11   Management has caused?

12        MR. CLARK:  Objection, form.

13    A.    We have raised the issue about

14   ongoing sales in various -- I'm not sure

15   whether they represent a technical breach,

16   though.

17    Q.    Okay.  Are you aware of any

18   technical breach?

19        MR. CLARK:  Objection, form.

20    A.    No.

21    Q.    I'm sorry.  You said, no, sir?

22    A.    My answer's no.

23    Q.    Thank you.  Do you know who made the

24   decision to cause the CLO HoldCo Limited entity

25   to invest in the CLOs that are managed by

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 918 of 1017    PageID 11699
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 76 of
110

Page 75

                GRANT SCOTT - 1/21/2021

1    Highland Capital?

2    A.    The select -- ultimately, I had to.

3    Q.    I thought you testified earlier that

4    you didn't make decisions as to investment.  Do

5    I have that wrong?

6    A.    The selection.

7    Q.    Okay.

8    A.    I -- I'm --

9    Q.    So -- so explain to me --

10   A.    I have to approve -- I have to

11   approve the selection.  I'm sorry.  But the

12   people making -- I was putting that in the camp

13   of the people that make the selection.

14   Q.    Okay.  Do you know if -- do you know

15   if there are CLOs in the world that exist that

16   aren't managed by Highland Capital Management?

17        MR. CLARK:  Objection, form.

18   A.    Are there CLOs in the -- in the

19   world that are not --

20   Q.    Yes.

21   A.    Yes.  It's -- it's a well-known --

22   it's a well-known --

23   Q.    In your capacity as the director of

24   CLO HoldCo Limited, did you ever consider

Page 76

GRANT SCOTT - 1/21/2021

1

2 making an investment in a CLO that wasn't

3 managed by Highland?

4     A.   No.

5     Q.   Is there any particular reason why

6 you haven't given that any consideration?

7     A.   That hasn't been my role. That's

8 not my expertise. That's been something

9 Highland has done and, quite frankly, over the

10 years brilliantly so, no.

11     Q.   You're aware that HCM, L.P., has

12 filed for bankruptcy, right?

13     A.   Yes.

14     Q.   When did you learn that Highland had

15 filed for bankruptcy?

16     A.   After the fact sometime in late --

17 late 2019.

18     Q.   Since the bankruptcy filing, have

19 you made any attempt to sell CLO HoldCo

20 Limited's position in any of the CLOs that are

21 managed by Highland?

22     A.   No.

23     Q.   So notwithstanding the bankruptcy

24 filing, you as the director haven't made any

25 attempt to transfer out of the CLOs that are

Appx 06894

010837

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 920 of 1017    PageID 11701
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 78 of
110

Page 77

1          GRANT SCOTT - 1/21/2021

2    managed by Highland, correct?

3      A.    Correct.

4      Q.    Did you ever give any thought to

5    exiting the CLO vehicles that were managed by

6    Highland in light of its bankruptcy filing?

7      A.    No.

8      Q.    Have you ever discussed with

9    Mr. Seery anything having to do with the

10   management -- withdrawn.

11          Have you ever discussed with

12   Mr. Seery any aspect of the debtor's management

13   of the CLOs in which CLO HoldCo Limited is

14   invested?

15     A.    No.

16     Q.    You mentioned earlier a request to

17   stop trading.  Do I have that right?

18     A.    Yes.

19     Q.    Okay.  And are you aware that a

20   letter was written purportedly on behalf of CLO

21   HoldCo Limited in which a request to stop

22   trading was made?

23     A.    As a cos- --- yeah.  Yes.

24     Q.    Okay.  Have you ever seen that

25   letter before?

Appx 06895

010838

Page 78

1          GRANT SCOTT - 1/21/2021

2     A.    Yes.

3          MR. MORRIS:  Can we put up on the

4     screen -- I think it's now Exhibit 6.  It's

5     Exhibit DDDD.

6          (SCOTT EXHIBIT 3, Letter to James A.

7     Wright, III, et al., from Gregory Demo,

8     December 24, 2020, with Exhibit A

9     Attachment, was marked for identification.)

10         MR. MORRIS:  Can we scroll down to,

11     I guess, what's Exhibit A.  Ri- -- right

12      there.

13   BY MR. MORRIS:

14     Q.    You see this is a letter Dece- --

15   dated December 22nd?

16     A.    Yes.

17     Q.    In the first paragraph there there's

18   a reference to the entities on whose behalf

19   this letter is being sent.

20         Do you see that?

21     A.    Yes.

22     Q.    Okay.  So this letter was sent on

23   December 22nd.  Did you see a copy of it before

24   it was sent?

25     A.    A -- a draft -- an earlier draft of

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 89 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 922 of 1017 PageID 11703
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 80 of
110

Page 79

GRANT SCOTT - 1/21/2021

1    this I did.

3      Q.    Okay.  Did you provide any comments

4    to it?

5      A.   I did.

6       MR. CLARK:  Well, hold on.  Grant,

7    let me caution you.  To the extent you

8    provided comments to counsel, we're going

9    to assert the attorney-client privilege on

10    those comments.

11       MR. MORRIS:  It's just a yes-or-no

12    question.  I'm not looking for the

13    specifics.

14       MR. CLARK:  Thank you.

15      A.    Yes.

16      Q.    Are you aware that earlier letters

17    were -- withdrawn.

18       Are you aware that prior to December

19    22nd, the entities other than CLO HoldCo

20    Limited that are listed in this pers- -- first

21    paragraph had sent a letter making the same

22    request?

23      A.    With respect to a letter, no.  No,

24    I -- I did not.

25      Q.    Are you aware as you sit here now

Appx 06897
010840

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 923 of 1017 PageID 11704
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 81 of
110

Page 80

1      GRANT SCOTT - 1/21/2021

2   that the entities other than CLO HoldCo Limited

3   that are listed in the first paragraph made a

4   motion in the court asking the court for an

5   order that would have prevented Highland from

6   making any transactions for a limited period of

7   time?

8      A.   Yes.

9      Q.   Did you know that motion was being

10  made prior to the time that it was made?

11     A.   I'm not sure.

12     Q.   Did you ever think about whether CLO

13  HoldCo Limited should join that particular

14  motion?

15     A.   I believe we were -- my attorney was

16  aware of it.  I don't recall our discussion

17  about it.  We were aware -- when I say we, I

18  mean collectively -- and did not join it.

19     Q.   Okay.  Can you tell me why you did

20  not join it.

21        MR. CLARK:  And, again, Grant, to --

22        to the extent it's based on communications

23        with counsel, you're free to say that

24        but -- but not to disclose any substance of

25        communications with counsel.

Page 81

1      GRANT SCOTT - 1/21/2021

2      A.    The subject of this letter on the

3    22nd which yielded the original letter you

4    briefly showed me on the 24th as well as an

5    additional letter on the 28th identified two

6    points as I understand it.  The first point is

7    what I believe is the somewhat innocuous

8    request to halt sales, not a demand in any way.

9    And the second more substantive issue has to do

10   with steps to remove Highland or a subsequent

11   derived entity from Highland from the various

12   services agreements that you had previously --

13   we had previously discussed.  Neither of those

14   issues met the require- -- neither of those

15   issues led us to believe that a motion such as

16   what you've just mentioned was -- was right --

17      Q.    Okay.

18      A.    -- because no -- no decision has

19   been made on that.

20      Q.    Okay.

21         MR. MORRIS:  So I want to go back to

22      my question and move to strike as

23      nonresponsive, and I'll just ask my

24      question again.

25   BY MR. MORRIS:

Appx 06899

010842

Page 82

1          GRANT SCOTT - 1/21/2021

2      Q.    Why did CLO HoldCo Limited decide

3    not to participate in the earlier motion that

4    was brought by the other entities that are

5    identified in Paragraph 1 that asked the court

6    to stop Highland from engaging in trades?

7      A.    John, I'm so sorry.  There was a

8    feedback loop that came up when you started to

9    re- -- re- -- recite -- restate your question.

10    I'm sorry.

11      Q.    That's okay.  Why did CLO HoldCo

12    Limited decide not to join in the earlier

13    motion where the entities listed in Paragraph 1

14    asked the court to order Highland not to make

15    any further trades?  Why did they not join that

16    motion?

17      A.    The -- the issue didn't rise to

18    the -- I don't believe we had formulated a

19    legal basis sufficient to justify such steps.

20    We hadn't laid the foundation necessary to --

21    to do that.

22      Q.    Are you aware of what the court

23    decided?

24      A.    By virtue of the original letter you

25    sent me dated the -- or show -- showed

010843

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 93 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 926 of 1017 PageID 11707
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 84 of
110

Page 83

1          GRANT SCOTT - 1/21/2021

2    initially dated the 24th, I have a general

3    understanding of what they decided.

4        Q.    Did you -- did you ever review the

5    transcript of the hearing where the other

6    parties asked the court to stop Highland from

7    engaging in any further trades on the CLOs?

8        A.    I did not.

9        Q.    Is there anything different about

10   the request in this letter, to the best of your

11   knowledge, from the request that was made of

12   the court just six days earlier?

13          MR. CLARK:  Objection, form.

14       A.    Yes.  There's a -- in -- in my -- my

15   view there's a substantial difference between

16   filing an action converting a request into

17   essentially a demand versus a gentle request

18   with multiple caveats, that that request is not

19   a demand.

20       Q.    Okay.  Let me ask you this:  Are you

21   aware -- what -- when did you first learn that

22   Highland was making trades in its capacity as

23   the servicer of the CLOs?  When -- when did you

24   first learn that Highland was doing that?  Ten

25   years ago, right?  I mean --

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 94 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 927 of 1017 PageID 11708
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 85 of
110

Page 84

1        GRANT SCOTT - 1/21/2021

2    A.    Oh.  Oh.  Oh, I'm -- yeah.  Yeah.

3    Oh, yes.  I'm sorry.  Of course.

4    Q.    Right?  I mean, Highland has been

5    making trades on behalf of CLOs for years,

6    right?

7    A.    Yes.

8    Q.    And Highland was making trades on

9    behalf of CLOs throughout 2020, to the best of

10   your knowledge, right?

11   A.    Yes.

12   Q.    And you know when Jim Dondero was

13   still with Highland, he was making trades on

14   behalf of CLO -- on behalf of the CLOs, right?

15   A.    Yes.

16   Q.    And you never objected when Jim

17   Dondero was doing it; is that right?

18   A.    That is correct.

19   Q.    Okay.  So what changed that caused

20   you in your capacity as the director of CLO

21   HoldCo to request a full stoppage of trading?

22   A.    It was my understanding that because

23   of the bankruptcy and the removal of Jim

24   Dondero that the replacement decision-makers

25   did not have the expertise where I felt

Appx 96002
010845

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 95 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 928 of 1017 PageID 11709
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 86 of
110

Page 85

1              GRANT SCOTT - 1/21/2021

2    comfortable with them making those decisions,

3    but...

4        Q.    I thought you testified earlier that

5    you weren't aware that Mr. Dondero left

6    Highland.  Am I mistaken in my recollection?

7        A.    I think you said in October, and

8    I -- as I -- there's some con- -- I have

9    confusion about when he left versus when he was

10   still there but other -- but he was not making

11   those trades.

12       Q.    Okay.  Fair enough.  The bankruptcy

13   has nothing to do with your desire to stop

14   trading, right, because Highland traded for a

15   year after the bankruptcy and never took any

16   action to try to stop Highland from trading on

17   behalf of the CLOs, fair?

18       A.    The -- Highland as of right now

19   isn't the same entity it was -- well, the

20   decision-making team -- the -- the financial

21   decision-making team for CLO Holdco's is no

22   longer the team I have worked with, and upon

23   discussion with counsel, we agreed -- I agreed

24   to this letter, which I did, to just maintain

25   the status quo.

Appx 06003
010846

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 929 of 1017 PageID 11710
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 87 of
110

Page 86

```
1        GRANT SCOTT - 1/21/2021

2     Q.    How did you form your opinion that

3  the debtor doesn't have the expertise to

4  execute trades on behalf of the CLOs today?

5  What's the basis for that belief?

6     A.    I -- as I understood it, the -- the

7  people historically making that decision were

8  no longer making that decision.

9     Q.    Who besides Mr. Dondero --

10  withdrawn.

11        Who are you referring to?

12     A.    Well, Mr. Dondero is one.  I don't

13  know the names, but I -- I understood it to

14  mean that the group previously responsible, for

15  exam- -- for example, Hunter Covitz, including

16  Hun- -- him, were no longer involved in the

17  decision-making process, but...

18     Q.    How did you -- how -- how -- who

19  gave you the information that led you to

20  conclude that Hunter Covitz was no longer

21  involved in the decision-making process?

22     A.    Specifically him and that name being

23  mentioned, I -- I -- I wasn't informed of his

24  speci- -- him -- him being removed.  I was

25  under the impression that the team that had
```

Appx 96004
010847

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 97 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 930 of 1017 PageID 11711
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 88 of
110

Page 87

1          GRANT SCOTT - 1/21/2021

2     previously been doing that was no longer doing

3     it.

4          Q.    And what gave you that impression?

5          A.    Was communications I had with my

6     attorney.

7          Q.    Okay.  Is there any source for your

8     information that led you to conclude that the

9     team was no longer there that was able to

10    engage in the trades on behalf of the CLOs

11    other than your attorneys?

12         A.    Well, this -- this letter -- I -- I

13    think the answer is no.

14         Q.    Thank you.  Do you know if Jim -- do

15    you have an opinion or a view as to whether Jim

16    Seery is qualified to make trades?

17         A.    This --

18              MR. CLARK:  Objection, form.

19         A.    I don't know -- I spoke to Jim Seery

20    earlier this week.  You -- you asked me whether

21    I had his number.  I said I did.  That's only

22    because he called me.  My phone rang with his

23    number.  It was a number I did not recognize,

24    it was not in my contacts, but he left me a

25    voice mail so I called him back.  Then I

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 98 of
Case 3:25-cv-02072-S Document 15-13 Filed 10/06/25 Page 931 of 1017 PageID 11712
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 89 of
110

1          GRANT SCOTT - 1/21/2021

2    updated my contacts to -- to add his name so

3    now I have his name.  And during that

4    conversation he informed me that he did have

5    that expertise --

6       Q.    And --

7       A.    -- without me making any inquiry.

8    He volunteered that.

9       Q.    But you hadn't made any inquiry

10   prior to the time that you authorized the

11   sending of this letter; is that fair?

12      A.    That's correct.

13      Q.    Do you know whether Mr. Seery, in

14   fact, engaged in transactions on behalf of the

15   debtor since he was appointed back in January?

16      A.    I do not.

17      Q.    Did you ask that question prior to

18   the time you authorized the sending of this

19   letter?

20      A.    I did not.

21      Q.    Can you identify a single

22   transaction that Jim Seery has ever made that

23   you disagree with?

24      A.    No.

25      Q.    Can you identify any transaction

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 99 of
Case 3:25-cv-02072-S    Document 15-13    Filed 10/06/25    Page 932 of 1017    PageID 11713
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21    Entered 06/16/21 16:18:26    Page 90 of
110

1        GRANT SCOTT - 1/21/2021

2    that the debtor made on behalf of any of the

3    CLOs since the time that you understand

4    Mr. Dondero left Highland that you disagree

5    with?

6        A.    No.

7        Q.    Did you have any discussion with any

8    representative of any of the entities listed on

9    this document where they told you they believe

10   Jim Seery didn't have the expertise to engage

11   in transactions on behalf of the whole -- of

12   the CLOs?

13       A.    You -- your question -- I'm -- I'm

14   sorry.  I'm trying to be -- I'm trying to be a

15   hundred perc- -- I'm trying to be accurate

16   here.

17       Q.    Let me interrupt you and just say,

18   I'm very grateful for your testimony.  I know

19   this is not easy, and I do believe that you're

20   earnestly and honestly trying to answer the

21   questions the best you can.  So no apologies

22   necessary anymore.  If you need me to repeat

23   the question or rephrase it, just say that,

24   okay?

25       A.    Please -- yes.

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 100
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 933 of 1017 PageID 11714
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 91 of
110

Page 90

1          GRANT SCOTT - 1/21/2021

2     Q.    Okay.

3     A.    Please -- please repeat that.

4     Q.    Did you ever communicate with any

5 employee, officer, director, representative of

6 any of the entities that are on this page

7 concerning the debtor's ability to service the

8 CLOs?

9     A.    I believe so.

10    Q.    And can you identify the person or

11 persons?

12    A.    I think it's Jim Dondero.

13    Q.    Anybody else other than Mr. Dondero?

14    A.    No.

15    Q.    When did you have that conversation

16 or those conversations with Mr. Dondero?

17    A.    This letter is dated the 22nd --

18    Q.    Correct.

19    A.    -- right?

20    Q.    Yes.

21    A.    I believe that's the Tuesday before

22 Christmas, and this would have been on the

23 21st, the Monday.

24    Q.    What do you recall about your

25 conversation on the 21st regarding the

Appx 06906

010851

Page 91

1          GRANT SCOTT - 1/21/2021

2  substance of this particular letter?

3     A.   Jim Dondero described why he

4  believed sales being made on an ongoing basis

5  after a request was made to stop was im- --

6  improper.

7     Q.   Do you -- do you rely on what

8  Mr. Dondero said to you during that phone call

9  on December 21st in -- in deciding to join in

10  this particular letter?

11    A.   No.

12    Q.   Did you only then rely on the

13  information you obtained from counsel?

14    A.   Yes.  I -- I -- I -- I considered

15  this letter to be nearly the most gentle

16  request imaginable amongst lawyers to maintain

17  the status quo.

18    Q.   And the request that's made in this

19  letter is perfectly consistent with what

20  Mr. Dondero told you on the 21st of December,

21  correct?

22    A.   I don't -- no.

23    Q.   How --

24       MR. MORRIS:  Can we go to the end of

25  this letter, please.  All right.  Right

Appx. 00909

010852

Page 92

1          GRANT SCOTT - 1/21/2021

2      there.

3   BY MR. MORRIS:

4      Q.   Do you see the request that's in the

5   last sentence?

6      A.   Yes.

7      Q.   Is that the same thing that

8   Mr. Dondero told you should happen, that --

9   that there should be no further CLO

10   transactions at least until the issues raised

11   and addressed by the debtor's plan were

12   resolved substantively?

13      A.   Yes.

14      Q.    Is there anything that he said

15   that's inconsistent with the request that's

16   made here?

17          MR. CLARK:  Objection, form.

18      A.   This -- and can you -- can you show

19   me earlier parts?

20      Q.   Of course.  You know what, I'll

21   withdraw the question.

22          And let me see if I can do it this

23   way:  In your discussion with Mr. Dondero, did

24   he indicate that he had seen a draft of this

25   letter?

010853

Page 93

1          GRANT SCOTT - 1/21/2021

2     A.    No.  And I didn't -- I didn't have a

3    discussion with him.  I -- I merely listened to

4    him.  There was no -- I -- I had no input to

5    the conversation.

6     Q.    Okay.  I -- I did -- I didn't --

7    I -- I appreciate that.  So he called you; is

8    that right?

9     A.    We -- we called in.

10    Q.    Oh, was it --

11    A.    I --

12    Q.    Was it --

13    A.    I don't know --

14    Q.    Was it --

15    A.    I don't know the sequence of the

16   calls.  I'm sorry.

17    Q.    Was there anybody on the call other

18   than you and Mr. Dondero, the call that you're

19   describing on December 21st?

20    A.    Yes, my attorney and an attorney --

21   I believe the attorney that signed this letter.

22    Q.    Okay.  And I just want to focus on

23   what Mr. Dondero said.  Did he -- did he say

24   during the call that Highland should not be

25   engaging in any further CLO transactions?

Appx 00811

010854

1      GRANT SCOTT - 1/21/2021

2      A.    He took a more -- if I can

3    characterize his mental -- I looked at the

4    issue of maintaining the status quo since there

5    was somebody that was complaining about it,

6    that that -- because it -- it isn't assets of

7    Highland, it doesn't adversely affect Highland.

8    If -- if stopping the sales -- you know, my --

9    my thought was -- is if stopping the sales

10   reduces the likelihood of litigation

11   disputes -- you already saw that there was the

12   one from middle of December.  I -- I thought

13   that would be the more appropriate way to go.

14   I didn't think there'd be any harm.

15      Q.    And was that your --

16      A.    I think -- I think Jim Dondero had a

17   more legalistic view of its impro- -- im- --

18   improper nature.

19      Q.    And did he share that view with you?

20      A.    On Monday, yes.

21      Q.    Can you describe for me your

22   recollection of what he said about the

23   legalistic view?

24      A.    Just the mention of -- all I recall

25   is in terms of -- the law associated with it

Appx 06312

010855

Page 95

GRANT SCOTT - 1/21/2021

1

2  was -- the Advisers Act was mentioned --

3      Q.    Did you have --

4      A.    -- but I don't -- I don't know what

5  that is.  You know, I don't know what that is.

6      Q.    And you -- and -- and you never --

7  it never occurred to you to pick up the phone

8  and -- and to speak with Mr. Seery to see why

9  it was he thought he should be engaging in

10  transactions?

11     A.    No.  And -- but I -- my lack of

12  volunteering a phone call to Jim Seery isn't --

13  it's -- it's because of -- I -- I thought any

14  phone call by me to Jim Seery would be

15  inappropriate because he's represented by

16  counsel.  I mean, we were working on claims

17  against him --

18     Q.    Okay.

19     A.    -- right, so...

20     Q.    Did you -- did you -- did you think

21  to instruct your lawyers to reach out to

22  Mr. Seery to actually speak to him instead of

23  just sending a letter like this and to -- and

24  to ask -- and to maybe inquire as to why he

25  thought it was appropriate to engage in

Appx 06913

010856

Page 96

1          GRANT SCOTT - 1/21/2021

2    transactions before they made a request six

3    days after the court threw out their suit as

4    frivolous?  I'll withdraw that.  That's too

5    much.

6          A few days later did you authorize

7    the sending of another letter to the debtor in

8    which you suggested that the -- the entities on

9    behoove -- on -- on whose behalf the letter was

10   sent might take steps to terminate the CLO

11   management agreements?

12      A.   I did not see -- so there is a --

13   there is a December 28th letter.

14         MR. MORRIS:  Let's just go to the

15      next letter, and -- and let's just call

16      that up.

17   BY MR. MORRIS:

18      Q.   I think it's -- I think it's

19   actually dated December 23rd.  It was the next

20   day.

21      A.   Yes.

22         (SCOTT EXHIBIT 4, Letter to James A.

23      Wright, III, et al., from Gregory Demo,

24      December 24, 2020, with Exhibit A

25      Attachment, was marked for identification.)

010857

Page 97

1          GRANT SCOTT - 1/21/2021

2    BY MR. MORRIS:

3        Q.    And do you recall that the next day

4    CLO HoldCo Limited joined in another letter to

5    the debtors?  Do you have that recollection?

6        A.    Yes.  Not -- not be- -- yes, I do,

7    but -- yes, I do.

8        Q.    Did you see this letter before it

9    was sent?

10       A.    I don't believe so.

11       Q.    Did you authorize the sending of

12   this letter?

13       A.    I gave -- I relied on my attorney to

14   guide me through this process.

15       Q.    I appreciate that.

16       A.    I let him make that call on this

17   letter, which is -- copies most of the prior

18   letter and then adds another issue.

19       Q.    Okay.  Do you have an understanding

20   of what that issue is?

21       A.    Yes.

22       Q.    And what is your understanding of

23   what that additional issue is?

24       A.    Somewhere in this letter of the 23rd

25   there's an -- there's an -- an inclusion of

Appx. 00915

010858

GRANT SCOTT - 1/21/2021

1  a -- a statement of an -- a future intent.

2      Q.    A future intent to do what?

3      A.    To remove Highland as the servicer

4  of the agreements you talked to me about

5  previously.

6

7      Q.    Can you tell me whether there's a

8  factual basis on which CLO HoldCo Limited

9  believes that the debtor should be removed as

10  the servicer of the portfolio manager of the

11  CLOs?

12      A.    Yes.  There are -- there are

13  multiple bases to consider subject to all the

14  other conditional language in the request of

15  these letters to consider that going forward

16  but no decision.  That intent is an intent to

17  evaluate, not an intent to take any action.  I

18  haven't authorized any action.  I don't feel

19  comfortable with my knowledge base at this

20  time, but it's something being explored.

21      Q.    So knowing everything that you know

22  as of today, you have not yet formed a decision

23  as to whether CLO HoldCo Limited will take any

24  steps to terminate Highland's portfolio

25  management agreements, correct?

Appx 06816

010859

1          GRANT SCOTT - 1/21/2021

2      A.    I don't -- I don't want to be

3  difficult, but I'm -- I'm confused yet again

4  with your question.  But I have not -- there --

5  there are a number of cr- -- a number of issues

6  that with my nonfinance background would

7  suggest to me that they -- they may be bases

8  for -- for cause, to -- to assert a cause.  And

9  I've been conferring with my attorney about

10  that, but it's very preliminary and no -- no

11  decision has been made.  I -- no decision is

12  being made.

13      Q.    So what -- what are the factors that

14  are causing you to consider possibly seeking to

15  begin the process of terminating the CLO

16  management agreements?

17      A.    Well, I guess I would break them

18  down into maybe two categories, maybe more.

19  The one that resonates most with me -- I don't

20  know -- maybe because even though I'm a patent

21  attorney, I guess at one point I was an

22  attorney.  But the thing that resonates most

23  with me --

24      Q.    You are an attorney.

25      A.    -- at the moment -- well, now you

Page 100

GRANT SCOTT - 1/21/2021

1  know why I'm a patent attorney and not one of

2  you guys.  But the thing that resonates with me

3  the most from a legal substantive, black letter

4  law sort of issue is the plan for

5  reorganization, which we've objected to.  I've

6  re- -- I've reviewed the objection, and that

7  sets forth our -- that sets forth my position,

8  and I consider that to be quite material.  The

9  others are issues of practical effects of

10  what's happened thus far with the bankruptcy,

11  the termination of the experts with a long

12  track record of success, the soon-to-be

13  termination of all employees, the cancellation

14  of various representation agreements, things of

15  that nature looked at from an additive sort of

16  perspective.

17     Q.  You know that -- can we refer to the

18  counterparties under the CLO management

19  agreements as the issuers?  Are you familiar

20  with that term?

21     A.  I -- I am familiar with the term

22  issuers, yes.

23     Q.  Okay.  And do you understand --

24     A.  There's an agreement between the --

Appx 06818

010861

GRANT SCOTT - 1/21/2021

1

2 I'm sorry.

3    Q.    There's an agreement between the

4 issuers and Highland pursuant to which Highland

5 manages the CLO assets, right?

6    A.    With res- -- yes.

7    Q.    Okay.  And do you understand what's

8 going to happen to those management contracts

9 in connection with the plan of reorganization?

10    A.    Partially.

11    Q.    What's your partial understanding?

12    A.    Well, I -- I wouldn't want to

13 characterize it as a partial understanding.  I

14 mean, with respect to part of the agreement.

15    Q.    Okay.

16    A.    Okay.  Our plan objection lays out

17 our basis for objecting to steps that Highland

18 is actively taking to preclude us from the full

19 rights that we have as third-party

20 beneficiaries under that agreement, and they're

21 not de minimus.  They're quite material.  They

22 relate to cause issues and no-cause issues, for

23 example, as out- -- as outlined in our --

24 our -- our objections.

25    Q.    Okay.  Did you ever make any attempt

Page 102

1        GRANT SCOTT - 1/21/2021

2   to speak with any issuer concerning Highland's

3   performance under the CLO management

4   agreements?

5        A.    No.

6        Q.    Why not?

7        A.    I -- I don't have any facts --

8   understand I -- I get all of the reports

9   periodically from Highland -- from Highland.

10   I -- I don't have a basis that I'm aware of to

11   complain about performance issues.  This is a

12   legal issue that I'm talking about.

13        Q.    So you have no basis to suggest that

14   Highland hasn't performed under the CLO

15   management agreements, correct?

16        A.    Well, Highland as of right now,

17   the -- the issue really is as -- as to what's

18   next, not -- not -- I -- I don't -- I don't

19   believe I have facts that support a com- --

20   a -- an issue right now.  It's -- it's --

21   it's -- it's going forward that is the problem.

22        Q.    I --

23        A.    That's -- you know, that's --

24        Q.    Have you given any thought to

25   speaking with the issuers to try to get their

Appx. 06920

010863

Page 103

1              GRANT SCOTT - 1/21/2021

2    views as to what they think is going to happen

3    in the future?

4         A.    No.

5         Q.    They're the -- they're the actual

6    direct beneficiaries under the CLO management

7    agreements, to the best of your understanding,

8    right?

9         A.    Yes.  Their rights may not be

10   impacted; it's CLO Holdco's rights that are

11   going to be adversely impacted.  So it's -- I

12   don't know that our view is in alignment with

13   their view.  But to answer your question, no,

14   we did not contact them.

15        Q.    Do you have any knowledge or

16   information as to any assertion by the issuers

17   that Highland is in breach of any of the CLO

18   management agreements?

19        A.    No.

20        Q.    Do you have any knowledge or

21   information as to whether or not any of the

22   issuers believe that Highland is in default

23   under the CLO management agreements?

24        A.    No, I don't have any of those facts.

25        Q.    Are you aware that the issuers are

Appx 96921
010864

Page 104

1          GRANT SCOTT - 1/21/2021

2    negotiating with Highland to permit Highland to

3    assume the CLO management agreements and to

4    continue operating under them?

5        A.    I believe so --

6        Q.    Is that --

7        A.    -- but they're --

8        Q.    Go ahead. I'm sorry.

9        A.    As I understand it, Highland

10   wants -- Highland or its subsidiary -- or

11   its -- its -- its postbankruptcy relative --

12   post- -- excuse me, that Highland

13   postbankruptcy -- or postplan confirmation

14   wants to move forward, substitute itself for

15   the prior issuer -- no, sorry, substitute

16   itself for the prior servicer under those

17   agreements to assume those agreements but in

18   the process of assuming those agreements,

19   carving out a bunch of provisions that from a

20   legal standpoint and a potentially future

21   practical and monetary standpoint are quite

22   substantial, and that has to relate to the

23   removal rights based on cause and without

24   cause. As I understand it, that's all set

25   forth in our plan objection.

Appx 00922

010865

Page 105

1          GRANT SCOTT - 1/21/2021

2     Q.    Okay.  Are you aware of a third

3     letter that was sent to Highland on behalf of

4     CLO HoldCo and the other entities that are

5     listed in this document?

6     A.    The December 28th letter, is that

7     what you mean?

8     Q.    It's actually December 31st, if I

9     can refresh your recollection.

10          MR. MORRIS:  Can we put up Exhibit

11          F?

12          (SCOTT EXHIBIT 5, Letter to Jeffrey

13          N. Pomerantz from R. Charles Miller,

14          December 31, 2020, was marked for

15          identification.)

16    BY MR. MORRIS:

17    Q.    You remember that there was a letter

18    dated on or about December 31st that was

19    sent -- oh, actually, you know, I apologize.

20    If we scroll down to the -- to the next -- to

21    the first box, there actually is no mention of

22    CLO HoldCo.

23          Are you aware that Mr. Dondero was

24    evicted from Highland's offices as of the end

25    of the year?

010866

```
                                                          Page 106
 1            GRANT SCOTT - 1/21/2021

 2     A.   I -- I didn't know the time, but I

 3   understand he's no longer there.

 4     Q.    Does CLO HoldCo Limited contend that

 5   it was damaged in any way by Mr. Dondero's

 6   eviction from the Highland suite of offices?

 7          MR. CLARK:  Objection, form.

 8     A.   I -- I don't have any information to

 9   support that as of this time.

10     Q.    It's not -- it's not a belief that

11    you hold today?

12     A.    I don't have a belief of that, yes.

13          MR. MORRIS:  All right.  Let's take

14       a short break.  I may be done.  I -- I'm

15       grateful, Mr. Scott, and don't want to

16       abuse your time.  Give me -- let -- just

17       let -- let's come back at 4:50, just eight

18       minutes, and if I have anything further, it

19       will be brief.

20          (Whereupon, there was a recess in

21       the proceedings from 4:42 p.m. to

22       4:49 p.m.)

23          MR. MORRIS:  Okay.  Mr. Scott, thank

24       you very much for your time.  I have no

25       further questions.
```

Appx. 09924

010867

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 117
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 950 of 1017 PageID 11731
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 108 of 110

Page 107

1          GRANT SCOTT - 1/21/2021

2          THE WITNESS:  Thank you.

3          MR. CLARK:  We will reserve our

4     questions.

5          THE WITNESS:  I appreciate it, John.

6          MR. MORRIS:  Take care.  Thanks for

7     your time and your -- and your diligence.

8     I do appreciate it.  Take care, guys.

9          THE REPORTER:  Okay.

10          MR. CLARK:  Thank you.

11          MR. HOGEWOOD:  No questions from us.

12          (Time Noted:  4:50 p.m.)

13

14

15               ---------------------

16               GRANT SCOTT

17

18     Subscribed and sworn to before me

19     this      day of              2021.

20

21     --------------------------------------

22

23

24

25

010868

Appx. 00925

Page 108

GRANT SCOTT - 1/21/2021

1

2          C E R T I F I C A T E

3    STATE OF NORTH CAROLINA  )

4                    ) ss.:

5    COUNTY OF WAKE          )

6

7          I, LISA A. WHEELER, RPR, CRR, a

8    Notary Public within and for the State of New

9    York, do hereby certify:

10         That GRANT SCOTT, the witness whose

11   deposition is hereinbefore set forth, having

12   produced satisfactory evidence of

13   identification and having been first duly sworn

14   by me, according to the emergency video

15   notarization requirements contained in G.S.

16   10B-25, and that such deposition is a true

17   record of the testimony given by such witness.

18         I further certify that I am not

19   related to any of the parties to this action by

20   blood or marriage; and that I am in no way

21   interested in the outcome of this matter.

22         IN WITNESS WHEREOF, I have hereunto

23   set my hand this 21st day of January, 2021.

24         -------------------------

25         LISA A. WHEELER, RPR, CRR

Appx 06926

010869

Page 109

1    GRANT SCOTT - 1/21/2021

2    --------------------I N D E X------------------

3                                PAGE

4    EXAMINATION BY MR. MORRIS                    7

5

6
     --------------------EXHIBITS------------------
7
                                PAGE
8
     EXHIBIT 1  Organizational Structure:      46
9             CLO HoldCo, Ltd.

10   EXHIBIT 2  Unanimous Written Consent of    54
              Directors In Lieu of Meeting
11
     EXHIBIT 3  Letter to James A. Wright,      78
12           III, et al., from Gregory
             Demo, December 24, 2020, with
13           Exhibit A Attachment

14   EXHIBIT 4  Letter to James A. Wright,      96
             III, et al. From Gregory
15            Demo, December 24, 2020, with
             Exhibit A Attachment
16
     EXHIBIT 5  Letter to Jeffrey N.           105
17            Pomerantz from R. Charles
             Miller, December 31, 2020
18

19

20

21

22

23

24

25

Appx 06925

010870

# EXHIBIT 24

Appx. 06926

Page 1

```
 1                           Grant Scott

 2            IN THE UNITED STATES BANKRUPTCY COURT

 3              FOR THE NORTHERN DISTRICT OF TEXAS

 4                         DALLAS DIVISION

 5    In Re:                            Case No.

 6    HIGHLAND CAPITAL MANAGEMENT L.P.,   19-34054

 7                  Debtor,              Chapter 11

 8    _____

 9    HIGHLAND CAPITAL MANAGEMENT,      Adversary No.

10    L.P.,                             21-03003-sgi

11                  Plaintiff,

12    Vs.

13    JAMES D. DONDERO,

14                  Defendant.

15

16         Virtual Zoom Deposition of Grant Scott

17                  Tuesday, June 1, 2021

18                     At 2:00 p.m.

19

20

21

22

23    Reported by LeShaunda Cass-Byrd, CSR, RPR

24    TSG Job No. 194692

25
```

Appx 06929

010872

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 122
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 955 of 1017 PageID 11736
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 3 of 116

```
                                                        Page 2
 1                       Grant Scott

 2        Videoconference Deposition of Grant Scott,

 3   pursuant to Federal Rules of Civil Procedure, before

 4   LeShaunda Cass Byrd, CSR, RPR, a Notary of the State

 5   of North Carolina.  The Court Reporter reported the

 6   proceeding remotely and the witness was present via

 7   videoconference

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx 06930

010873

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 123
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 956 of 1017 PageID 11737
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 4 of 116

```
                                                                  Page 3
 1                      Grant Scott

 2    APPEARANCES OF COUNSEL:

 3    On behalf of Debtor:

 4         BY: GREGORY DEMO, Esq.
               JOHN MORRIS, Esq.
 5         Pachulski Stang Ziehl & Jones
           780 Third Avenue
 6         New York, New York 10017

 7         BY: SHANNON McLAUGHLIN, Esq.
           Latham & Watkins
 8         885 Third Avenue
           New York, New York 10022.

 9
      On behalf of the Creditors Committee:
10
           BY: PAIGE MONTGOMERY, Esq.
11         Sidley Austin
           2021 McKinney Avenue
12         Dallas, Texas 75201.

13    On behalf of the Witness:

14         BY: JOHN KANE, Esq.
           Kane Russell Coleman & Logan
15         901 Main Street
           Dallas, Texas 75202

16

17    On behalf of CLO HoldCo & the DAF:

18         BY: JONATHAN BRIDGES, Esq.
           Sbaiti & Company
19         1201 Elm Street
           Dallas, Texas 75270

20

21    Also Present:

22         Mark Patrick
           Amelia Hurt
23         La Asia Canty, Paralegal

24

25
```

Appx. 06931

010874

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 124
Case 3:25-cv-02072-S Document 15-13 Filed 05/06/25 Page 957 of 1017 PageID 11738
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 5 of
116

Page 4

```
 1                          Grant Scott

 2                 EXAMINATION OF GRANT SCOTT

 3   By Mr. Morris                                    6

 4   By Mr. Kane                                    103

 5   By Mr. Morris                                  105

 6                  DEPOSITION EXHIBITS

 7   EXHIBIT    DESCRIPTION                        PAGE

 8   Exhibit 1  DAF CLO HoldCo Structure Chart       8

 9   Exhibit 8  E-mail Exchange, Bates GScott000312  19

10   Exhibit 9  Notice of Settlement                 44

11   Exhibit 10 E-mail Exchange, Bates GScott000080  75

12   Exhibit 11 E-mail Exchange, Bates GScott000138  80

13   Exhibit 12 E-mail Exchange, Bates GScott000361  88

14   Exhibit 13 Assignment and Assumption of

15              Membership Interest Agreement

16   Exhibit 14 Written Resolutions of the Sole

17              Director of the Company, Dated

18              March 25, 2021                       94

19   Exhibit 15 Written Resolutions of the Sole

20              Shareholder of the Company, Dated

21              March 24, 2021                       97

22   Exhibit 16 Written Resolutions of the Sole

23              Shareholder of the Company, Dated

24              March 31, 2021                       97

25
```

Appx 06932

010875

```
                                                      Page 5
 1                   Grant Scott

 2
      Exhibit 17 Written Resolutions of the Sole
 3
                 Shareholder of the Company, Dated
 4
                 April 2, 2021                         98
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx 06923

010876

Page 6

```
 1                      Grant Scott

 2                      GRANT SCOTT,

 3     having been first duly sworn, was examined and

 4     testified as follows:

 5                      EXAMINATION

 6     BY MR. MORRIS:

 7         Q.    Good afternoon, Mr. Scott.

 8         A.    Good afternoon, John.

 9         Q.    Okay.  As you recall, my name is John

10     Morris.  I'm an attorney with Pachulski Stang Ziehl &

11     Jones.  We represent Highland Capital Management LP, a

12     debtor in a bankruptcy case that is pending in the

13     Northern District of Texas.

14              Do you recall any of that?

15         A.    Yes.

16         Q.    Okay.  And we are here today for your

17     deposition, and I appreciate your compliance with the

18     subpoena.  Just a few ground rules to remind you, I'm

19     going to ask you a series of questions, and it's

20     important that you allow me to finish my question

21     before you begin your answer; is that fair?

22         A.    Yes.

23         Q.    And I will attempt to give you the same

24     courtesy, but if for some reason I step on your words,

25     just let me know that because I don't mean to cut you
```

Appx. 06934

010877

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 127
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 960 of 1017 PageID 11741
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 8 of 116

Page 7

Grant Scott

1

2  off.  Okay?

3      A.      Okay.

4      Q.      If there's anything that I ask you that you

5  do not understand, will you let me know?

6      A.      Yes, sir.

7      Q.      If you need a break at any time, will you

8  let me know?

9      A.      Yes.

10      Q.      Okay.  Because this deposition is being

11  conducted remotely, we are going to be putting

12  documents on the screen.  I'm not attempting to trick

13  you in any way.  If you believe there is any of

14  portion of a document that you need to see, either to

15  put something in context or to refresh your

16  recollection, I encourage to let me know that, and I

17  will be happy to accommodate you.  Okay?

18      A.      Okay.

19      Q.      Okay.  Have you seen the subpoena that the

20  debtors served on your lawyer in this case?

21      A.      The one relating to my deposition?

22      Q.      Correct.

23      A.      Yes.

24      Q.      And are you here today pursuant to that

25  subpoena?

Appx 06935
010878

Page 8

1                        Grant Scott

2      A.    Yes.

3      Q.    So today's deposition concerns a particular

4  motion that the debtor filed recently where the debtor

5  is seeking to hold certain individuals and entities in

6  contempt of court.  Have you seen or reviewed the

7  debtor's motion that was filed?

8      A.    I have seen the e-mails which I kept, but I

9  have not read them.

10     Q.    Okay.  I want to just begin with some

11 background.

12           MR. MORRIS:  And then I would ask Ms.

13      Canty to put up what we will mark as

14      Exhibit -- you know, let's pick up the

15      numbering from this morning, La Asia.  Did

16      we use 7 this morning?

17           Actually, this is going to be Exhibit

18      1.  It's the same document that we had this

19      morning.

20           MS. CANTY:  Yes.

21           MR. MORRIS:  We will call it Exhibit

22      1, and it's an organizational chart.  If we

23      can just put that on the screen.

24           (Deposition Exhibit 1 was marked for

25      identification.)

Appx 06936
010879

Page 9

                            Grant Scott

1

2    BY MR. MORRIS:

3         Q.     Okay.  Have you seen this before,

4    Mr. Scott?

5         A.     Yes.

6         Q.     Do you know what it is?

7         A.     It's the -- yes.  The DAF CLO HoldCo

8    structure chart.

9         Q.     And this is structure chart that you

10   produced in response to the subpoena; is that right?

11        A.     Correct.

12        Q.     You are familiar with the gentleman named

13   Mark Patrick; is that right?

14        A.     Yes.

15        Q.     Is it your understanding that Mr. Patrick

16   was one of the individuals that helped establish the

17   hierarchy that is depicted on Exhibit 1?

18        A.     Yes.

19        Q.     And what is the basis for that

20   understanding?

21        A.     That goes back many years to the

22   origination of my role.

23        Q.     Okay.  And do you recall that you assumed

24   your role in or around 2012?

25        A.     Yes.

Appx 06927

010880

Page 10

```
1                           Grant Scott

2       Q.      Okay.  Did you know Mr. Patrick prior to

3    the time that you assumed your role?

4       A.      I did not.

5       Q.      Okay.  Do you know -- withdrawn.

6               Do you have any knowledge as to whether

7    anybody other than Mr. Patrick helped establish the

8    hierarchy that is depicted on Exhibit 1?

9       A.      There was a law firm name that came to

10   mind, and there was an expert, I gather, a lawyer that

11   was familiar with charitable entities that I believe

12   was involved.

13      Q.      Can you identify any -- withdrawn.

14              At the time that you understood Mr. Patrick

15   had helped to create this hierarchy, did you

16   understand who employed Mr. Patrick?

17      A.      Yes.  I believe so.

18      Q.      Who did you believe Mr. Patrick worked for

19   at that time?

20      A.      Highland Capital Management.

21      Q.      Can you identify any other person at

22   Highland Capital Management who was involved in the

23   creation of this hierarchy?

24      A.      No.

25      Q.      Okay.  Now for looking at the hierarchy
```

Appx 00938

010881

Page 11

```
 1                    Grant Scott

 2   here, for the period for approximately 10 years prior

 3   to March 24th, 2021, you served as the managing member

 4   of the charitable DAF GP, LLC, correct?

 5        A.      Correct.

 6        Q.      And for approximately 10 years prior to

 7   March 30 -- 20 -- withdrawn.

 8                For approximately 10 years prior to March

 9   24th, 2021, you were the sole director of charitable

10   DAF HoldCo, LTD, correct?

11        A.      Correct.

12        Q.      And for approximately 10 years prior to

13   March 24th, 2021, you were the sole director of

14   charitable DAF Fund LP, correct?

15        A.      I believe that is correct.

16        Q.      And for approximately 10 years prior to

17   March 24, 2021, you served as the sole director of CLO

18   HoldCo Limited, correct?

19        A.      Yes.  That is correct.

20        Q.      Did you serve in any capacity for any other

21   entity that is depicted on this sheet at any time

22   prior to March 24th, 2021?

23        A.      If you go -- if you look at the top of that

24   chart where it's directed at the charitable giving

25   components, I had some involvement with various
```

010882

Page 12

```
 1                        Grant Scott

 2     members of some of those organizations.

 3          Q.      And would they be the ones that are

 4     labelled as third parties or as supporting

 5     organizations?

 6          A.      The -- the third party organizations.

 7     And -- and possibly the supporting organizations.

 8          Q.      Do you know what the difference is between

 9     a third party and a supporting organization as those

10     phrases are used on Exhibit 1?

11          A.      I don't recall anymore what the delineation

12     is between those two.

13          Q.      Okay.  Do you hold any position today with

14     any of the entities that are depicted on Exhibit 1?

15          A.      I do not -- I do not believe so.  Well, I

16     believe technically, I'm still -- I may still be a

17     director of CLO HoldCo, but I -- I'm not certain of

18     the status as of today.

19          Q.      Is there a particular reason why you may

20     remain today as a director of CLO HoldCo Limited?

21          A.      I don't know if the -- I don't know if the

22     transfer after my resignation has been completely

23     finalized, and I haven't -- yeah.  I don't know how

24     close it is to being completely finalized.  I'm not --

25     I'm not sure.
```

Appx 06949

010883

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 133
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 966 of 1017 PageID 11747
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 14 of
116

1                        Grant Scott

2      Q.      But your intent is to resign as the

3  director of CLO HoldCo Limited; is that right?

4      A.      Yes.

5      Q.      And the only reason that that hasn't

6  happened yet, is it fair to say, is for administrative

7  reasons?

8              MR. BRIDGES:  Objection.  Assumes

9      facts not in evidence.

10  BY MR. MORRIS:

11     Q.      You can answer.

12     A.      I --

13     Q.      Withdrawn.  I will ask a different

14  question.

15             Do you know why your intended resignation

16  from CLO HoldCo Limited has not yet become effective?

17             MR. BRIDGES:  The same objection.

18      Facts not in evidence.

19  BY MR. MORRIS:

20     Q.      You can go ahead.

21             MR. KANE:  I object to form, also.

22             Grant, go ahead.

23             THE WITNESS:  I do not.

24  BY MR. MORRIS:

25     Q.      Okay.  Do you hold any positions of any

Page 14

1                          Grant Scott

2     kind today with any entity that you believe is either

3     directly or indirectly owned or controlled by

4     Mr. Dondero?

5          A.     I don't believe so.

6          Q.     Do you have -- I'm just going to explore

7     that for a little bit.

8               Do you know have -- do you know whether you

9     continue to HoldCo any position with any NexBank

10    entity?

11         A.     I'm not in -- no, I don't have any

12    involvement with NexBank.

13         Q.     Okay.

14              MR. KANE:  Hey, John, can you shed a

15         little light on why that is relevant?

16              MR. MORRIS:  I'm just trying to find

17         connections between Mr. Scott and

18         Mr. Dondero because I -- I just -- I

19         think -- I think the purpose of the

20         deposition is to try to -- to try to deduce

21         facts that are related to whether or not

22         Mr. Dondero is going to be a responsible

23         party under the contempt motion.  So I'm

24         just looking for --

25              MR. KANE:  I understand.  I'm just

Appx 06942

010885

Page 15

```
 1                     Grant Scott
 2        trying to figure out Grant's -- you know,
 3        whether he has a --
 4             MR. MORRIS:  That is all right.  I'm
 5        moving on anyway.
 6             MR. KANE:  Appreciate it.
 7   BY MR. MORRIS:
 8        Q.    Now looking at the chart, Mr. Scott, I
 9   believe you testified that you were either the
10   managing member or a director of each of the DAF
11   entities and CLO HoldCo Limited.
12             Do I have that right?
13        A.    I believe that is correct.
14        Q.    All right.  Is it your understanding that
15   Mr. --
16        A.    Excuse me.  I am sorry.  Currently or was?
17        Q.    Was.  Up until March 24th.
18        A.    Okay.  Correct.
19        Q.    All right.  Let me ask the question again
20   so it's clean.
21             Did you serve as either the managing member
22   or the director for each of the charitable DAF
23   entities and the CLO HoldCo Limited entity for
24   approximately 10 years prior to March 24th, 2021?
25             MR. KANE:  Objection.  Form.  Go
```

Appx. 00943

010886

Page 16

```
                              Grant Scott

 1

 2        ahead, Grant.

 3              (Reporter clarification.)

 4              THE WITNESS:  I believe so.

 5   BY MR. MORRIS:

 6        Q.     And is it your understanding that Mr. Mark

 7   Patrick replaced you in those capacities on or about

 8   March 24th, 2021?

 9        A.     It's my understanding that on March 24th,

10   the management shares that I had previously -- that

11   had been in my name were transferred to him.  I am not

12   sure how that impacts the current status in the

13   various other entities.

14        Q.     Okay.  During the time that you served as

15   the managing member of the charitable DAF GP LLC, that

16   entity had no officers or employees, correct?

17        A.     I believe that is correct.

18              MR. KANE:  Object to the form.

19   BY MR. MORRIS:

20        Q.     And you served as the sole director of that

21   entity during the time that you served as the

22   director, correct?

23        A.     I believe that is correct.

24        Q.     And during the period of time that you

25   served as a director of charitable DAF HoldCo Limited,
```

Appx 00944

010887

Page 17

1                          Grant Scott

2     you were the only person to serve in that capacity; is

3     that correct?

4          A.    I believe so.

5          Q.    And during the period that you served as

6     director of charitable DAF HoldCo Limited, that entity

7     had no officers or employees, correct?

8          A.    I believe that is correct.

9          Q.    During the time that you served as a

10    director of charitable DAF Fund LP, you were the sole

11    director of that entity, correct?

12         A.    Correct.

13         Q.    And during the time that you served as the

14    sole director of charitable DAF Fund LP, that entity

15    had no officers or employees, correct?

16         A.    I believe that is correct.

17         Q.    You served as the sole director of CLO

18    HoldCo Limited; is that right?

19         A.    Yes.  That is correct.

20         Q.    And during the period that you served as

21    the sole director of CLO HoldCo Limited, that entity

22    had no officers or employees, correct?

23         A.    That is correct.

24         Q.    Is that why the DAF had certain agreements

25    with Highland Capital Management LP pursuant to which

Page 18

```
 1                     Grant Scott
 2   HCMLP provided back office and advisory and investment
 3   services?
 4              MR. KANE:  Objection.  Form.
 5              THE WITNESS:  I think that is
 6      correct.
 7   BY MR. MORRIS:
 8      Q.    Do you recall that that DAF had agreements
 9   with Highland Capital Management that were amended and
10   restated in 2014?
11              MR. KANE:  Objection.  Form.
12              THE WITNESS:  I understand there were
13      various agreements over the years that had
14      been restated.  I'm not entirely sure
15      anymore of the dates that we received
16      that --
17              MR. MORRIS:  Okay.  Let's mark --
18              THE WITNESS:  I'm sorry?
19              MR. MORRIS:  Let's mark as Exhibit
20      8 --
21              MR. BRIDGES:  Objection.  Objection.
22      Please let the witness answer his question.
23              MR. MORRIS:  Let's mark this --
24              MR. BRIDGES:  No.  Please allow the
25      witness to continue his answer.
```

010889

```
                                                      Page 19
 1                       Grant Scott

 2   BY MR. MORRIS:

 3       Q.    Grant, do you have anything else to add?

 4       A.    You had asked me -- you asked about a

 5   specific date, I think, 2014.  I just -- I don't know

 6   what the dates are or were.

 7       Q.    That is what I heard you say.  Is there

 8   anything else that you have to add?

 9       A.    No, I don't -- I don't think so.

10       Q.    I didn't think so either.

11            MR. MORRIS:  Let's go to Exhibit 8,

12       please, the next document.

13            (Deposition Exhibit 8 was marked for

14       identification.)

15            MR. MORRIS:  Okay.  If we could just

16       scroll down a little bit.  Just to the

17       e-mail.

18   BY MR. MORRIS:

19       Q.    All right.  Were you familiar with Caitlin

20   Nelson and Helen Kim and Thomas Surgent and David Klos

21   in and around August 2004?

22       A.    I believe they were all Highland employees.

23       Q.    Okay.

24            MR. MORRIS:  Can we just scroll up to

25       the next e-mail, please?
```

Appx 00947

010890

Page 20

                              Grant Scott

1

2    BY MR. MORRIS:

3        Q.      Okay.  Do you see that Mrs. Kim sends you

4    an e-mail on August 26th, 2014?

5        A.      Yes.  I see that.

6        Q.      And do you see that she had attached for

7    your review and execution, drafts of an amended and

8    restated service agreement and amended and restated

9    advisory agreement and GP resolutions?

10       A.      I do see that.

11       Q.      Okay.  Do you have any recollection as to

12   whose idea it was to amend and restate those

13   agreements at that moment in time?

14       A.      I do not.

15       Q.      Do you have any recollection as to why

16   those agreements were amended and restated at that

17   time?

18       A.      No, I do not.

19       Q.      Okay.  Let's just scroll down and just show

20   Mr. Scott the agreements.  I'm not going to ask

21   anything substantive about it.  But do you see here is

22   the -- if we can stop right there -- the Amended and

23   Restated Service Agreement that is dated from the

24   first day of July, 2014, and it's between the DAF

25   Fund -- the charitable DAF Fund LP, the charitable DAF

Appx 06648

010891

Page 21

```
 1                    Grant Scott

 2   GP LLC, as well as Highland Capital Management LP.

 3            Do you see that?

 4       A.    I do see that.

 5       Q.    Do you recall that the entity that is

 6   commonly referred to as the DAF had a service

 7   agreement with Highland Capital Management LP?

 8       A.    I believe that is correct.  Yes.

 9       Q.    Do you recall whether -- whether the

10   service agreement was ever the subject of any

11   negotiations?

12       A.    I don't know.

13       Q.    Did you participate in any negotiations

14   concerning the service agreement that was entered --

15   entered in between the entity known as the DAF and

16   Highland Capital Management LP?

17            MR. KANE:  Objection to form.

18            John, will you clarify the time

19       period?

20   BY MR. MORRIS:

21       Q.    Right here.  2014.

22       A.    Sir, I don't recall anything about this

23   with respect to 2014.

24       Q.    Do you know if -- if the agreement was ever

25   amended at any time after 2014?  And when I use the
```

Appx. 00949

010892

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 142
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 975 of 1017 PageID 11756
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 23 of 116

1                              Grant Scott

2      phrase "agreement," I'm specifically referring to the

3      Amended and Restated Service Agreement that we are

4      looking at.

5          A.     I believe -- I think there was a further

6      amended and restated agreement.

7          Q.     Okay.  Did you participate in any

8      negotiations concerning that further amended and

9      restated agreement?

10         A.     I don't remember.

11         Q.     Do you remember offering any comments

12     concerning any subsequent amendment or restatement?

13         A.     I don't -- I don't remember.

14         Q.     Did you ever hire outside counsel to assist

15     you in the negotiation of any service agreements with

16     Highland Capital Management LP?

17         A.     I did not.

18         Q.     Do you -- do you recall who prepared each

19     of the service agreements to which the DAF was a

20     party?

21         A.     I don't remember.

22         Q.     To the best of your recollection, would it

23     have been inhouse counsel at Highland Capital

24     Management?

25                    MR. KANE:  Objection.  Form.

010893

Page 23

1                        Grant Scott

2              THE WITNESS:  I don't -- I don't

3      know.

4   BY MR. MORRIS:

5      Q.    Can you recall the name of any law firm

6   that was involved in the drafting or the negotiation

7   of any service agreement between the entity known as

8   the DAF and Highland Capital Management LP?

9              MR. KANE:  Objection.  Form.

10             THE WITNESS:  I don't remember any.

11  BY MR. MORRIS:

12     Q.    Can you recall during your tenure as the

13  managing member of the DAF GP LLC, whether there was

14  any particular term or provision in any service

15  agreement that was the subject of negotiation or even

16  discussion?

17     A.    I don't remember those -- any of those

18  discussions.

19     Q.    Do you know if they took place or you just

20  can't remember them?

21     A.    I just can't remember them.

22     Q.    Do you recall ever seeing multiple drafts

23  of any service agreement that you -- withdrawn.

24             Did you personally sign service agreements

25  on behalf of the entity known as the DAF?

010894

Page 24

1                            Grant Scott

2        A.      I believe so.

3        Q.      And the agreements that you signed on

4    behalf of that entity, were any of them -- were there

5    multiple drafts of any such agreement?

6        A.      There were frequently multiple drafts or

7    agreements.  But I just don't remember them.

8        Q.      Do you remember whether you personally ever

9    provided any comments to any particular draft?

10        A.      I do not.

11        Q.      Let me ask you this:  Are you familiar with

12    the phrase "arm's length negotiations"?

13        A.      Yes.

14        Q.      And can you tell me what your understanding

15    is of an arm's length negotiation?

16        A.      Well, it would depend on the nature of the

17    parties.  For example, a -- two strangers would

18    have -- arm's length would differ from the nature of

19    an agreement between parties maybe having fiduciary or

20    related obligations.

21        Q.      Let me ask you this --

22        A.      I don't know what the black -- I don't know

23    what the blackball definition is to that term.

24        Q.      Would you agree that arm's length

25    negotiations take place between two parties that are

Appx. 00952

010895

Page 25

                        Grant Scott

1

2    acting out of their own self interest?

3              MR. KANE:  Objection.

4              MR. BRIDGES:  Objection to form and

5         foundation.

6    BY MR. MORRIS:

7         Q.    Withdrawn.  Withdrawn.

8              MR. BRIDGES:  Calls for a legal

9         opinion.

10   BY MR. MORRIS:

11        Q.    Mr. Scott, do you believe that the service

12   agreements between the entity known as the DAF and

13   the -- and Highland Capital Management LP were arm's

14   length agreements?

15             MR. BRIDGES:  Objection.  Again, lack

16        of foundation, calls for a legal opinion.

17             MR. MORRIS:  Okay.  I'm not asking

18        for a legal opinion.  I'm asking for

19        Mr. Scott's view of it, so I will try one

20        more time.

21   BY MR. MORRIS:

22        Q.    Mr. Scott, do you believe that the service

23   agreements between the DAF and HCMLP were the subject

24   and result of arm's length negotiations?

25             MR. BRIDGES:  Objection.  Foundation,

Appx 00953

010896

Page 26

```
 1                          Grant Scott

 2        calls for legal opinion.

 3   BY MR. MORRIS:

 4        Q.     You can answer, sir.

 5        A.     I don't have any reason to believe they

 6   weren't.  But I --

 7        Q.     Well --

 8        A.     I don't recall them.  I -- I can't give --

 9   I mean, I don't know.

10        Q.     Did get any advice from anybody at any time

11   before entering into the agreement on behalf of the

12   DAF?

13             MR. BRIDGES:  Objection to form.

14             THE WITNESS:  With respect to

15        agreements generally, I often received

16        advice, sometimes in writing, sometimes by

17        telephone.  I just -- with respect to this

18        agreement and -- I just don't recall.

19   BY MR. MORRIS:

20        Q.     Yeah, okay.  Maybe I asked a bad question,

21   so let me try again, Mr. Scott.

22             Do you recall whether you ever got any

23   advice from anybody at any time with respect to any

24   service agreement that you entered into on behalf of

25   the entity known as the DAF and HCMLP?
```

Appx. 00954

010897

Page 27

1                           Grant Scott

2               MR. BRIDGES:  Objection, asked and

3         answered.

4               MR. KANE:  Form.

5    BY MR. MORRIS:

6         Q.    You can answer sir.

7         A.    Yes, I just -- I don't recall.

8         Q.    Okay.  How about with respect to the

9    advisory agreement?  Can we scroll down to page -- I

10   think it's 341?  Oh, no, those are the resolutions.

11              Did Highland Capital Management take

12   responsibility for preparing the corporate resolutions

13   for the DAF entities and CLO HoldCo Limited?

14              MR. BRIDGES:  Objection, foundation.

15              MR. KANE:  Object to the form.

16   BY MR. MORRIS:

17        Q.    You can answer, sir.

18        A.    Do I know who prepared those documents?

19        Q.    Yeah.

20        A.    I don't.

21        Q.    Did you prepare -- have you ever prepared

22   any corporate resolutions for any of the DAF entities

23   or CLO HoldCo Limited?

24        A.    I have not.

25        Q.    To the best of your knowledge, have all of

Appx. 00955

010898

Page 28

1                          Grant Scott

2    the corporate resolutions for each of the DAF entities

3    and CLO HoldCo Limited been prepared by inhouse

4    counsel at HCMLP?

5               MR. BRIDGES:  Objection.  Form.

6               THE WITNESS:  I don't know the

7         division of labor within HCMLP, whether it

8         was inhouse and/or outside counsel.  I

9         just -- I just don't know.

10   BY MR. MORRIS:

11        Q.    Are you aware that inhouse counsel prepared

12   resolutions on behalf of the DAF entities and CLO

13   HoldCo Limited?

14              MR. BRIDGES:  Objection.  Form.

15              THE WITNESS:  Yes.

16   BY MR. MORRIS:

17        Q.    You are aware of that, right?

18        A.    I believe inhouse counsel was -- no,

19   that's -- I've frequently worked with inhouse counsel.

20   I -- but I just don't know with respect to these

21   agreements whether I worked with them on -- on these

22   agreements.  I just don't have a present recollection

23   of any of this.

24        Q.    And I'm just asking if you have a present

25   recollection of anybody other than inhouse counsel

Appx. 00956

010899

Page 29

1                          Grant Scott

2    ever preparing any resolutions for any of the DAF

3    entities or CLO HoldCo Limited?

4              MR. BRIDGES:  Objection.  Asked and

5         answered.

6              MR. KANE:  Objection.  Form.

7    BY MR. MORRIS:

8         Q.    You can answer, Mr. Scott.

9         A.    It's -- it's conceivable that documents

10   were forwarded to me exclusively, but who prepared

11   them in the background?  I don't know.

12        Q.    Okay.  I don't want to know what's

13   conceivable.  I'm again, asking you to focus on what

14   you know or what you don't know or what you recall.

15             Do you have any recollection in your mind

16   of anybody other than Highland inhouse counsel

17   preparing any resolutions on behalf of any DAF entity

18   or CLO HoldCo, Limited?

19             MR. KANE:  Objection to form.

20             He has answered that question three

21        times.

22             MR. MORRIS:  He has not.  But thank

23        you.  He told me --

24   BY MR. MORRIS:

25        Q.    Just ask it again -- answer again, please.

Appx. 00957

010900

Page 30

                            Grant Scott

1

2      A.      Sir, inhouse counsel can -- let's say

3   inhouse counsel exclusively provided me with all of

4   the agreements.  I don't necessarily know who prepared

5   them.  I thought that's what you were asking me.  I'm

6   sorry.

7      Q.      From the time you assumed the role of sole

8   authorized representative of the DAF and CLO HoldCo

9   through January 1st, 2021, can you think of any

10  resolution or consent or corporate document that was

11  not prepared by HCMLP?

12             MR. KANE:  Objection.  Form.

13             THE WITNESS:  If "prepared" means it

14        was forwarded to me by them, then I am -- I

15        don't recall receiving any documents

16        outside them as -- outside of that conduit

17        of -- of information flow, I guess.

18  BY MR. MORRIS:

19     Q.      Okay.  And during that same period of time,

20  can you think of any resolution or consent or

21  corporate document that you signed after you

22  personally had provided substantive comments or asked

23  for changes?

24             MR. BRIDGES:  Objection.  Asked and

25        answered.

Appx 08958

010901

Page 31

1                        Grant Scott

2              THE WITNESS:  I don't -- I don't

3       recall.

4    BY MR. MORRIS:

5       Q.    Okay.  From the time you assumed your role

6    as the sole authorized representative of the DAF and

7    CLO HoldCo through the beginning of this year, can you

8    think of any resolution or consent or other corporate

9    document that you signed where you or the DAF or

10   CLO HoldCo obtained independent counsel?

11             MR. BRIDGES:  Objection.  Asked and

12        answered.

13             MR. KANE:  Objection to form.

14             THE WITNESS:  Since January 1st of

15        this year?

16   BY MR. MORRIS:

17      Q.    Prior to January 1st of this year.

18             MR. BRIDGES:  Same objection.  Asked

19        and answered.

20             THE WITNESS:  Yeah, I don't recall.

21   BY MR. MORRIS:

22      Q.    Okay.  Do you recall that I took your

23   deposition back in January; is that right, sir?

24      A.    Correct.

25      Q.    And do you recall that you testified that

Appx 08959
010902

Page 32

```
 1                        Grant Scott
 2    during the two-week period leading up to the
 3    deposition you discussed the possibility of resigning
 4    from your positions with Mr. Patrick?
 5        A.    Yes.  I'm not sure -- I'm not sure of the
 6    exact timing.  We had -- we had multiple conversations
 7    about it.
 8        Q.    When was the first time you thought about
 9    resigning?
10        A.    The -- I don't know the exact date.  I know
11    the event.  It was the day I -- I had a conversation
12    with my -- my attorney, John Kane, about.
13            MR. KANE:  Grant, hold on.  You don't
14        need to have any discussions about
15        conversations between you and counsel.
16        That's attorney client privileged.
17            THE WITNESS:  Understood.  I'm sorry.
18            It's when I became aware of the
19        outcome of the escrow hearing sometime in I
20        guess early or mid 2020.
21    BY MR. MORRIS:
22        Q.    And can you describe for me your
23    understanding of what the escrow hearing was about?
24        A.    So I had agreed to allow certain CLO HoldCo
25    and calculated assets to be put in the court registry,
```

Appx. 00909
010903

```
                                                          Page 33
 1                        Grant Scott

 2    and there was a motion that was made to have those

 3    released.  There was an evidentiary hearing that my

 4    attorney attended -- or rather CLO HoldCo's attorney

 5    attended, John Kane, and based on our discussions of

 6    the outcome, I began contemplating my -- my

 7    resignation.

 8        Q.    And what about the outcome that prompted

 9    you to consider resigning?

10        A.    It -- it was the first time, I guess, where

11    I thought my friendship with Jim Dondero would likely

12    adverse or could adversely affect CLO HoldCo from the

13    standpoint of demonstrating independence.  I thought

14    maybe I -- yeah.

15        Q.    Did -- did you and Mr. Dondero have a

16    conversation at around the time of the escrow hearing

17    that caused you concern about your relationship with

18    Mr. Dondero?

19        A.    It wasn't with respect to concern over my

20    relationship with Mr. Dondero.  It -- it was my

21    concern about CLO HoldCo.  I'm sorry, I didn't

22    understand your question.

23        Q.    I may have misunderstood.  So what was your

24    concern about CLO HoldCo?

25               MR. KANE:  Objection.  Asked and
```

Page 34

                              Grant Scott

1

2        answered.

3    BY MR. MORRIS:

4        Q.     You can answer, sir.

5        A.     My concern was that my friendship with

6    Jim Dondero would eventually provide a presumption

7    that anything that I did in my role was in some way

8    influenced by my friendship and not independence.

9              And so I -- that's when I started thinking

10   about resigning.  That was one of the reasons why I

11   was thinking about resigning, but that's -- that's

12   when it began, to my recollection.

13       Q.     And what were the other reasons that you

14   can recall that caused him to consider resigning at

15   around the time of the escrow hearing?

16       A.     Around the escrow hearing that was at -- it

17   was later.

18       Q.     When was the next time that you recall

19   thinking again about the possibility of resigning?

20       A.     Well, there was a -- I mean, it was as 2020

21   went on, I guess maybe over the course of about six

22   months, there were certain developments during that

23   time that led me to have other reasons for thinking --

24   resigning was something I should -- I should do.

25       Q.     Were you -- were you ever concerned prior

010905

Page 35

```
 1                      Grant Scott

 2    to the date that you gave notice of your intent to

 3    resign, that you didn't have the ability to act

 4    independently from what Mr. Dondero wanted you to do?

 5        A.      No.

 6                MR. KANE:  Object to form.

 7                THE WITNESS:  If I understand your

 8         question -- well, actually could you repeat

 9          that question.

10    BY MR. MORRIS:

11        Q.      You know, I'll try and get to specific

12    conversations.  That might be the better way to deal

13    with this.

14                Do you recall that there came a point in

15    time when CLO HoldCo filed an objection to a proposed

16    settlement with the group of entities known as

17    HarbourVest?

18        A.      Yes.  CLO HoldCo filed an objection.  Yes.

19        Q.      And -- and do you recall that prior to the

20    hearing where the Court was going to consider whether

21    or not to approve the HarbourVest settlement, you

22    caused CLO HoldCo to withdraw the objection?

23        A.      I authorized the withdraw.

24        Q.      And did you believe that you were acting in

25    CLO HoldCo's best interest when you made the decision
```

010906

Page 36

1                           Grant Scott

2    to withdraw CLO HoldCo's objection to the HarbourVest

3    settlement?

4         A.    I was following counsels' advice,

5    CLO HoldCo's counsel's advise.  So...

6               MR. KANE:  Be careful, Grant.

7    BY MR. MORRIS:

8         Q.    I'm just asking you if you believed at the

9    time that you made the decision you were acting in

10   CLO HoldCo's best interest?

11              MR. BRIDGES:  Objection.  Foundation.

12              THE WITNESS:  I believe --

13   BY MR. MORRIS:

14        Q.    What is your answer, sir?

15        A.    Yes, I believe I was acting in CLO HoldCo's

16   best interest.

17        Q.    Did you have any motivation to withdraw

18   CLO HoldCo's objection to the HarbourVest settlement

19   other than your belief that you thought that was the

20   right thing to do, based on the advice of counsel that

21   you received and your own assessment of the situation?

22              MR. BRIDGES:  Objection.  Form,

23         foundation, compound.

24              MR. KANE:  Objection, form.

25   BY MR. MORRIS:

Appx 08904
010907

Page 37

1                                Grant Scott

2        Q.       You can answer, sir.

3        A.       Yes.  I was following advice of counsel,

4    and I thought that was the best thing to do.

5        Q.       You thought you were doing the right thing,

6    right?

7        A.       At that time, yes.

8        Q.       Did you ever discuss your decision to

9    withdraw CLO HoldCo's objection to the HarbourVest

10   settlement with Mr. Dondero?

11       A.       Decision?  No.

12       Q.       Did you discuss with Mr. Dondero the fact

13   that the objection had been withdrawn at your

14   direction?

15       A.       Yes.

16       Q.       Can you tell me everything you remember

17   about your communications with Mr. Dondero on that

18   topic?

19       A.       He just asked whether I had indeed

20   authorized it.  That's it.

21       Q.       That's the only question that he asked?

22       A.       Yes.  And I said yes.

23       Q.       Did he -- did he suggest that you had acted

24   inappropriately in any way?

25       A.       He didn't make any suggestion.

Appx 00905
010908

Page 38

1                            Grant Scott

2        Q.      Did he say that you had acted

3    inappropriately?

4        A.      No.

5        Q.      Did he suggest that you had breached your

6    fiduciary duties to anybody?

7                MR. BRIDGES:  Objection.  Asked and

8        answered.

9    BY MR. MORRIS:

10       Q.      You can answer, sir.

11       A.      He just wanted to know if I had in fact

12   authorized it, and I said yes.  And then the

13   conversation was over.

14       Q.      Okay.  Do you recall that there came a

15   subsequent time -- actually withdrawn.

16               Before that, do you recall that you

17   authorized CLO HoldCo to amend its proof of claim?

18       A.      Yes.

19       Q.      And do you remember that pursuant to the

20   amended proof of claim, the value of the claim was

21   reduced to zero?

22       A.      That is correct.

23       Q.      Did you ever discuss with Mr. Dondero the

24   amended proof of claim?

25       A.      No.

Appx 08986

010909

Page 39

                          Grant Scott

1

2      Q.    You never had a conversation with him about

3  the decision to amend the proof of claim?

4      A.    No, I don't think so.

5      Q.    And you never discussed with him your

6  decision to reduce the proof of claim to zero dollars?

7            MR. BRIDGES:  Objection to form.

8            THE WITNESS:  I don't believe so.

9  BY MR. MORRIS:

10     Q.    Okay.  Do you recall that in late January,

11 CLO HoldCo was a defendant in a lawsuit that was

12 commenced by the debtor?

13     A.    Yes.

14     Q.    And do you recall that you authorized

15 CLO HoldCo to enter into a settlement agreement with

16 the debtor?

17     A.    Correct.

18     Q.    Did you ever discuss that settlement

19 agreement with Mr. Dondero?

20     A.    I was on a phone call where the agreement

21 was discussed.

22     Q.    And what do you recall about the

23 discussions?

24            MR. BRIDGES:  Objection to the

25       extent -- to the extent that lawyers were

Appx 06005

```
                                                    Page 40
 1                      Grant Scott

 2         privy to those discussions.  We haven't

 3         made that clear yet.

 4              THE WITNESS:  I'm sorry.  I had a

 5         conversation -- well, actually, I

 6         participated in a call.  I was on the call.

 7         A number of the attorneys were on the call.

 8              MR. BRIDGES:  Objection.  Objection.

 9         Privileged.  On behalf of CLO HoldCo and

10         the DAF, I'm instructing the witness not to

11         answer that question.

12              MR. MORRIS:  He is not your client,

13         number 1.  Number 2, he hasn't identified

14         who was on the call.  How are you doing

15         this?  How are you doing this?  He hasn't

16         even told you who was on the call.

17              MR. BRIDGES:  I'm happy to answer

18         your question if you don't shout over my

19         answer.

20              The privilege belongs to the

21         entities, not to him, and those entities

22         are my clients, I'm asserting a privilege.

23              MR. MORRIS:  You don't --

24    BY MR. MORRIS:

25         Q.    Mr. -- Mr. Scott, can you please tell me
```

Appx 06968

010911

```
                          Grant Scott
1
2    who was on the call?
3              THE WITNESS:  Am I allowed to answer?
4              MR. BRIDGES:  Yes, you are.  You can
5        answer that question, who was on the call.
6              THE WITNESS:  Oh.  John Kane was on
7        the call.  Jim Dondero was on the call.  I
8        was on the call, and there were at least
9        two other attorneys on the call, but I'm
10       not -- I'm not sure who -- I'm not sure who
11       they were -- I mean, their names.
12   BY MR. MORRIS:
13       Q.    What was the subject matter of the call?
14       A.    The call was to give clarification of a --
15   on how a lack of communication had occurred, and that
16   communication related to --
17             MR. BRIDGES:  Objection.  Objection.
18       Just the subject matter is all that you can
19       answer without violating privilege here,
20       the general subject matter.
21             THE WITNESS:  The general subject
22       matter related to the flow of information
23       between the time I settled, signed off on
24       the --
25             MR. KANE:  I think -- Grant, you're
```

Appx. 06009

010912

Page 42

```
 1                      Grant Scott

 2         going -- you're going too specific.

 3         Talking about the general subject matter of

 4         the call, so you avoid privilege issues.

 5         Just big picture.

 6             MR. BRIDGES:  Flow of information

 7         sounds like a big picture.  Mr. Morris, I

 8         think we're done on this line of

 9         questioning.

10    BY MR. MORRIS:

11         Q.    Mr. Scott, at the time of this

12    conversation, had CLO HoldCo already settled with the

13    debtor?

14         A.    Yes.

15         Q.    So CLO HoldCo was no longer a defendant in

16    the litigation; is that right?

17         A.    Correct.

18         Q.    Okay.  Can you tell me what was discussed

19    during the conversation?

20             MR. BRIDGES:  Objection.  Privileged

21         for the same reasons we just discussed.  I

22         am instructing the witness not to answer

23         because the privilege belongs to CLO HoldCo

24         and the DAF.

25    BY MR. MORRIS:
```

Appx 06079

010913

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 163
Case 3:25-cv-02072-S Document 15-13 Filed 06/06/25 Page 996 of 1017 PageID 11777
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 44 of
116

Page 43

```
 1                        Grant Scott

 2       Q.     Are you going to follow that instruction,

 3   Mr. Scott?

 4       A.     Yes.

 5       Q.     Did you ever have a discussion other than

 6   the one that counsel is preventing you from describing

 7   with Mr. Dondero on the subject of CLO HoldCo's

 8   settlement with the debtor?

 9              MR. BRIDGES:  Objection to the set

10        up, to the lack of foundation to that

11        question.

12              Sir, if you've got an issue with my

13        privilege objection, please feel free to

14        explain.  If there's a factual mistake you

15        think I'm making, please feel free to

16        explain.

17              But -- but using pejoratives to

18        describe the objection to the witness is

19        improper.  I object to it.

20              MR. MORRIS:  Okay.  That's fine.  I

21        don't see what -- you prevented him from

22        answering the question, right?  So I don't

23        know what's pejorative.  Your sense of

24        pejorative is very different from mine.

25   BY MR. MORRIS:
```

Appx 09607
010914

```
                                                         Page 44
1                         Grant Scott

2       Q.      Mr. -- Mr. Scott, did you have any other

3   conversation with Mr. Dondero besides the one that I'm

4   not being allowed to inquire about?

5       A.      I'm sorry, is there any objection to my

6   answer?

7       Q.      No.

8       A.      No, I do not.

9       Q.      Did you resign -- did you give notice of

10  your intent to resign at around the same time that you

11  had this conversation with all of the lawyers?

12      A.      No.  It was beforehand.

13      Q.      Okay.  Let's -- let's put up the settlement

14  agreement first.  I think it's the next exhibit,

15  Exhibit 9?

16          (Deposition Exhibit 9 was marked for

17  identification.)

18  BY MR. MORRIS:

19      Q.      Okay.  Just to refresh your recollection,

20  sir, do you see that this is -- if we can just scroll

21  down a little bit, it's dated January 26th.

22          And do you see it's signed by your lawyer

23  and my law firm?

24      A.      Correct.

25      Q.      And if we can scroll down to the agreement
```

Appx 06072

010915

Page 45

1                          Grant Scott

2    itself, is that the agreement that you entered into on

3    behalf of CLO HoldCo, on or around January 26th, 2021?

4         A.      I believe so.

5         Q.      And did you tell Mr. Dondero of your

6    intention to enter into this agreement before you did

7    so?

8         A.      No.

9         Q.      And Mr. Dondero never told you that he

10   disagreed with your decision to enter into this

11   agreement; is that right?

12              MR. KANE:  Objection to form.

13              THE WITNESS:  It's correct that he

14        never did.

15              MR. MORRIS:  Yeah.  Okay.  Can we go,

16        please, to the document that is marked

17        Scott Bates stamp 18.  It's at the bottom

18        of page 5 of the exhibit, La Asia.

19              If we can start at the bottom.

20   BY MR. MORRIS:

21        Q.      Do you know what this e-mail is, sir?

22        A.      Yes.  This is my resignation e-mail, for

23   lack of a better word.

24        Q.      And why did you send your resignation

25   e-mail at that moment in time?

010916

Page 46

```
 1                         Grant Scott

 2      A.      Why did I send it at the end of January?

 3      Q.      What caused you to send this e-mail at that

 4  moment in time?

 5      A.      Well, I mean, there are a couple of

 6  reasons.  It was -- it was necessary that I do it, and

 7  the time seemed right in view of the events in

 8  January.  It was like a good transition point from my

 9  perspective.

10      Q.      And why was it necessary at that time?

11      A.      Well, there was --

12              MR. BRIDGES:  Objection.  Assumes

13       facts not in evidence.

14  BY MR. MORRIS:

15      Q.      You can answer.

16      A.      I previously testified during this

17  deposition that throughout 2020, the desire -- or,

18  rather, the appropriateness of my wanting to resign

19  was expanding, and based on what had happened in

20  January and December as well, but mostly January, I

21  basically just did a critical mass on whether I could

22  sustain my role, given my commitments to my existing

23  firm and given my discussions with the managing

24  members of my existing firm.

25              And it -- there was just no way I could
```

Appx 06974

010917

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 167
Case 3:25-cv-02072-S Document 15-13 Filed 06/25/25 Page 1000 of 1017 PageID 11781
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 48 of 116

Page 47

1                          Grant Scott

2    continue with the time commitment required.  I had

3    made various promises and representations to my firm

4    throughout 2020 that the bankruptcy would be handled

5    relatively efficiently and wouldn't require a great

6    deal of time commitment.  And then I guess the straw

7    that broke the camel's back was the second lawsuit,

8    meaning me personally, and it just -- from a personal

9    standpoint, the most significant factor was just my --

10   my being overwhelmed, trying to sustain my career and

11   engage in what seem like the 2021 that was going to

12   involve my having to defend two lawsuits.  And I felt

13   like I got CLO HoldCo through the bankruptcy and then

14   that was a good jumping off point.

15       Q.    What -- why did you send this e-mail to

16   Mr. Dondero?

17       A.    I knew, or at least I reasonably believed

18   he would know where to who to send it to because I

19   wasn't exactly sure.

20       Q.    So you were the managing member of the

21   general partnership and the director of the other DAF

22   entities and CLO HoldCo Limited, and you were not sure

23   who to send your notice of resignation to.

24             Do I have that right?

25             MR. KANE:  Objection.  Form.  That's

Appx 06075
010918

Page 48

1                      Grant Scott

2        John Kane.

3                THE WITNESS:  Yes.  I didn't know who

4        best to inform my decision.

5    BY MR. MORRIS:

6        Q.    And why did you think that Mr. Dondero

7    would know?

8                MR. BRIDGES:  Objection.  Asked and

9        answered.

10               THE WITNESS:  He knows a lot more

11       about the workings of -- I mean, it was --

12       CLO HoldCo and the charitable admission was

13       something that he worked to develop with

14       others 10 years ago, and he was committed

15       to the charity and he knew all of the

16       players and I just -- I guess I just

17       assumed he would know where to direct it.

18   BY MR. MORRIS:

19       Q.    Did you ever ask?

20       A.    He knew how to effectuate -- he knew how to

21   effectuate -- or I thought he knew how to effectuate

22   my resignation by directing it to the appropriate

23   personnel.

24       Q.    Did you ever ask him who it should be

25   directed to?

Appx 06976
010919

Page 49

```
1                         Grant Scott

2       A.      No.

3       Q.      Looking at the third paragraph, it says,

4    quote, my resignation will not be effective until I

5    approve of the indemnification provisions and obtain

6    any and all releases.

7               Do you see that?

8       A.      Yes.

9       Q.      Why did you condition the effectiveness of

10   your resignation on those things?

11      A.      Well, although I'm a patent attorney and

12   basically just a technical writer that doesn't deal

13   with legal issues all of the time, it seemed like

14   appropriate language.

15              I have a number of outstanding litigations

16   where I am named personally, and the actions that I

17   took which resulted in my being sued were actions I

18   took on behalf of CLO HoldCo solely in that position,

19   and so I thought just to have the appropriate notice

20   that I would like indemnification to help -- to help

21   deal with those litigation matters.  That is all.

22      Q.      Did anybody suggest to you at any time

23   prior to the time that you sent this e-mail, that any

24   of the DAF entities or CLO HoldCo Limited might have

25   claims against you?
```

Appx 06977

010920

Page 50

1                          Grant Scott

2        A.      No.  No.

3        Q.      Were you concerned that Mr. Dondero or

4   anyone acting on his behalf might sue you?

5        A.      No.

6        Q.      Did Mr. Dondero ever threaten to sue you?

7        A.      No.

8        Q.      Did you ever obtain the Indemnity provision

9   and any and all necessary releases that you asked for

10  in this e-mail?

11       A.      Not yet.

12       Q.      And what does that mean?

13       A.      I understand that those provisions are --

14  indemnification proposals are in the works, I think.

15       Q.      And do you know who is negotiating --

16  withdrawn.

17               Is somebody negotiating those

18  indemnification and release provisions on your behalf?

19       A.      My -- my attorney would be.

20       Q.      And do you know if your attorney is

21  negotiating with anybody concerning potential

22  indemnification and release provisions for you?

23       A.      I don't know specifically, no.

24       Q.      Do you know if he is -- if -- from whom do

25  you want to obtain releases?

010921

Page 51

1                         Grant Scott

2              MR. BRIDGES:  Objection.  Facts not

3        in evidence.

4    BY MR. MORRIS:

5        Q.     Withdrawn.

6              When you refer to any and all necessary

7    releases, who did you want to obtain releases from?

8        A.     CLO HoldCo.

9        Q.     Anybody else?

10       A.     Well, I mean, and -- and the related

11   entities in that structure chart that you showed.

12   I'm -- I'm -- understand that to me, that is just

13   boilerplate legal language to put in a resignation,

14   you know, just to cross the T's, dot the I's, so to

15   speak.  I'm not anticipating that will be -- that will

16   be a problem.  I am sorry.

17       Q.     You asked for this more than three months

18   ago now, right?

19       A.     Correct.

20       Q.     Do you know why you haven't gotten what you

21   asked for more than three months ago?

22             MR. BRIDGES:  Objection.  Form.

23             THE WITNESS:  I -- I don't.

24   BY MR. MORRIS:

25       Q.     But you still want the releases, right?

010922

Page 52

                              Grant Scott

1

2      A.     I would like to, yes.

3      Q.     Did you ever have any discussion with

4   Mr. Dondero about the releases that you wanted?

5      A.     No.

6      Q.     Have you communicated with Mr. Dondero

7   since -- since you sent this e-mail?

8      A.     Yes.

9      Q.     Other than the birth date text that he sent

10  to you, have you spoken with him?

11     A.     In February.

12     Q.     So you haven't spoken to him since then?

13     A.     That is correct.

14     Q.     What did you speak to him about in

15  February?

16     A.     He called me to ask me if I knew anything

17  about in particular -- I think it might have been an

18  asset of CLO HoldCo, if I was aware of whether it had

19  been purchased or sold, and I just told them I didn't

20  know what he was -- I didn't know what -- I didn't

21  know what he was referring to.  That was the last

22  conversation that we had.

23     Q.     Can I refer to the period from the date of

24  this --

25            MR. MORRIS:  Actually, let's look

Appx 06989
010923

Page 53

```
 1                    Grant Scott
 2       at -- let's scroll up a little bit, please.
 3   BY MR. MORRIS:
 4       Q.    Did Mr. Dondero ever try to talk you out of
 5   resigning?
 6       A.    No.
 7             MR. MORRIS:  Can you scroll up?
 8             THE WITNESS:  I -- I am sorry.  I
 9       need to correct that.  I had conversations
10       with him where I had expressed, not so much
11       a desire to resign, but a belief that it --
12       it made strategic sense or was appropriate.
13       And it had to do with this issue of my
14       independence, and he suggested that family
15       members and friends are not precluded from
16       occupying positions of trust like trustees
17       and things like that, and that there was
18       nothing per se wrong with my -- my activity
19       with CLO HoldCo by virtue of being a friend
20       of his.  So in that sense, he was trying to
21       talk me out of that, I guess.
22   BY MR. MORRIS:
23       Q.    When did that conversation take place?
24       A.    We had a number of those in 2020 and
25   January of 2021.
```

Appx 06984

010924

Page 54

```
 1                      Grant Scott

 2              MR. MORRIS:  Can we scroll up just a

 3         little bit on this e-mail, please?

 4              MR. BRIDGES:  May I ask what exhibit

 5         number this is?  I've lost track.  I am

 6         sorry.

 7              MS. CANTY:  This is Exhibit 5 from

 8         earlier.  We are continuing the numbers.

 9         So this was marked as Exhibit 5 in this

10         morning's deposition.

11              MR. BRIDGES:  Thank you so much.

12    BY MR. MORRIS:

13         Q.    Do you see where Mr. Dondero wrote to

14    you -- it's just of above the yellow highlighting

15    at -- 9:57 a.m.  This is the next day.  Quote, you

16    need to tell me ASAP that you have no intent to divest

17    assets.

18              Do you see that?

19         A.    Yes.

20         Q.    Did Mr. -- do you have any understanding as

21    to why he said that to you?

22         A.    I know that he was mistaken in that

23    statement.

24         Q.    Right.  Do you have any understanding as to

25    whether Mr. Dondero had the ability to stop you from
```

Appx. 06982

010925

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 175
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 1008 of 1017 PageID 11789
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 56 of 116

Page 55

```
1                    Grant Scott
2    selling assets?
3        A.    No.  It wasn't -- it was a misunderstanding
4    about what the word "divest" meant in the subject
5    line.
6        Q.    And did you understand that until you
7    corrected him, he was concerned and he expressed the
8    concern to you not to sell any assets?
9            MR. KANE:  Objection to form.
10           THE WITNESS:  No.  It had -- I am
11       sorry.  There -- the term "divest" was
12       maybe not a term I should have used.
13       However, my understanding was that my -- my
14       status at CLO HoldCo had a property related
15       aspect to it.  And I used that term to
16       emphasize that I would need to -- that that
17       property aspect would need to be
18       transferred, meaning to the next entity or
19       person.  He mistook it as something being
20       sold.  It had nothing to do with that.
21       That is all.
22   BY MR. MORRIS:
23       Q.    I understand that.  But did you
24   understand -- did you have any understanding as to
25   what interest he had and whether or not assets were
```

Appx 06983
010926

Page 56

```
 1                        Grant Scott

 2   being sold?

 3              MR. BRIDGES:  Object to form.

 4              MR. KANE:  Objection.  Asked and

 5        answered.

 6   BY MR. MORRIS:

 7        Q.    You can answer.

 8        A.    No.  I had -- I had no idea what he was --

 9        Q.    Okay.  Let's -- let's -- can we -- can we

10   call the period of time between the time you sent this

11   notice of your intent to resign in March 24, 2021 as

12   the interim period?

13        A.    Sure.

14        Q.    And that's the period during which you had

15   expressed your intent to resign, but your resignation

16   had not yet become effective; is that fair?

17        A.    I guess it was the period of time when --

18   yes.  I guess that is correct.

19        Q.    Okay.  Is it fair to say that there were

20   certain things you needed to do during the interim

21   period on behalf of CLO HoldCo and the DAF entities

22   before -- even before your resignation became

23   effective?

24        A.    Yes.

25        Q.    Okay.  Was someone designated to act as
```

Appx 06984

010927

1                           Grant Scott

2    your liaison with respect to matters concerning the --

3    the DAF entities and the CLO HoldCo during the interim

4    period?

5                MR. KANE:  Objection.  Form.

6                THE WITNESS:  I had conversations

7         with Mark Patrick in February when I came

8         to -- to believe he -- he would be director

9         elect, so to speak, in terms -- in terms of

10        moving forward.

11   BY MR. MORRIS:

12        Q.    During the interim period, did you have any

13   understanding as to whether Mr. Patrick had any

14   authority to act on behalf of any of the DAF entities

15   or CLO HoldCo?

16               MR. KANE:  Objection.  Form.

17               THE WITNESS:  I came to believe he

18        did, upon signing the management shared

19        transfer agreement.

20   BY MR. MORRIS:

21        Q.    Okay.  So that was -- that was on or about

22   March 24th, 2021, right?

23        A.    Correct.

24        Q.    So I'm asking just about the interim period

25   between January 31st, 2021 when you sent your notice

Appx 06985

010928

Page 58

```
 1                        Grant Scott

 2    of intent to resign, and March 24th.  That is what I

 3    am defining as the interim period.

 4                So with that understanding, did you have

 5    any reason to believe that Mr. Patrick had any

 6    authority to act on behalf of any of the DAF entities

 7    or CLO HoldCo during the interim period?

 8    A.      Well, it was -- he was part of a group of

 9    entity -- a group of individuals that were with an

10    entity that had taken over from -- from Highland, and

11    so in -- certainly in that capacity, he -- as -- as

12    occurred for 10 years or more prior, that -- in that

13    role, you certainly had rights to -- to perform or to

14    act on CLO's behalf here.

15    Q.      And what entity are you referring to?

16    A.      I think it's the Highgate Consulting Group,

17    the Highland employees that took over -- or that

18    created that entity.

19    Q.      And did the -- do you have an understanding

20    as to whether the Highgate Employment Group succeeded

21    to Highland Capital Management LP in the shared

22    services capacity or in the investment advisory

23    capacity or something else?

24                MR. BRIDGES:  Object to form.

25                (Reporter clarification.)
```

Appx 06986

010929

Page 59

```
 1                     Grant Scott
 2            THE WITNESS:  I'm not entirely sure
 3      of that.
 4  BY MR. MORRIS:
 5      Q.    So is --
 6      A.    But he -- but --
 7      Q.    I am sorry.  Did you finish your answer?
 8      A.    I'm not -- I'm not sure of the delineation
 9  between the two.
10      Q.    So on what basis did you believe that
11  Mr. Patrick had the authority to act on behalf of the
12  DAF entities and CLO HoldCo during the interim period?
13            MR. BRIDGES:  Objection.  Asked and
14       answered.
15            THE WITNESS:  We had -- we had had a
16       number of conversations.  And over the
17       course of a number of weeks, I came to -- I
18       came to understand that he would be the
19       director going forward.  So...
20  BY MR. MORRIS:
21      Q.    How did you come to that understanding?
22      A.    Through the conversations that we had had,
23  I guess.
24      Q.    What conversations did you have with Mr. --
25  were these conversations with Mr. Patrick?
```

010930

Page 60

```
 1                         Grant Scott

 2       A.     They were conversations about the workings

 3  with outside counsel to arrange the -- to arrange the

 4  transfer of my responsibilities to another person or

 5  entity at first, and then I came to learn that that

 6  person was -- was -- would be Mark.

 7       Q.     Do you know who selected mark?

 8       A.     I do not.

 9       Q.     Do you know how Mark was selected?

10       A.     I -- I do not.

11       Q.     Did you ever ask Mark how he was selected?

12       A.     I did not.

13       Q.     Did you ever ask Mark who selected him?

14       A.     I did not.

15       Q.     Did you ever ask anybody at any time how

16  Mr. Patrick was selected to succeed you?

17       A.     No, I did not.

18       Q.     Did you ask anybody at any time as to who

19  made the decision to select Mr. Patrick to succeed

20  you?

21       A.     No, I did not.

22              MR. BRIDGES:  Objection.  Facts not

23       in evidence and foundation.

24  BY MR. MORRIS:

25       Q.     Okay.  Do you have any understanding today,
```

Appx 06988
010931

Page 61

Grant Scott

1

2    as to who has the authority to select your --

3    withdrawn.

4            Do you have any understanding today, as to

5    who had the authority to select your replacement?

6    A.    I do not.

7            MR. MORRIS:  All right.  Let's take a

8        short break.  And I am certainly -- I'm

9        closer to the end than the beginning.  It's

10       3:22 Eastern Time.  Let's come back at

11       3:35, please, and hopefully I will be

12       finished by about 4, 4:15.

13           (Recess taken.)

14   BY MR. MORRIS:

15   Q.    I want to go back, Mr. Scott, to the time

16   that you became appointed the managing member of the

17   general partnership and to the director of the other

18   DAF entities and CLO HoldCo.  Do you remember how that

19   came to be?

20   A.    My recollection is that various law firms

21   and Mark Patrick had a role in its creation and

22   configuration following some -- it's -- I believe it's

23   modeled after some expert -- expert in the field.  I

24   am sorry.  I don't know if I answered your question.

25   Q.    You did not.  So let me try it again.  Do

Page 62

1                          Grant Scott

2      you recall how it came to be that you assumed those

3      positions?

4          A.      Ten years ago I accepted that role.

5          Q.      And who offered the role to you?

6          A.      Jim Dondero.

7          Q.      Did -- did you communicate with anybody

8      other than Mr. Dondero concerning the opportunity that

9      he presented to you to assume these roles prior to the

10     time you accepted the position?

11                 MR. KANE:  Objection.  Form.

12     BY MR. MORRIS:

13         Q.      Withdrawn.

14         A.      Possibly or --

15         Q.      Withdrawn.  Let me ask -- let me ask --

16     it's a good objection.

17                 Mr. Scott, prior to the time that you

18     assumed your positions with the DAF entities and

19     CLO HoldCo, did you speak with anybody other than

20     Mr. Dondero, about the duties and responsibilities of

21     those positions?

22                 MR. KANE:  Objection to form.

23                 THE WITNESS:  The only thing that

24         comes to mind is Hunton & Williams.  But

25         I -- I'm not sure.  I don't know.

010933

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 183
Case 3:25-cv-02072-S Document 15-13 Filed 06/25 Page 1016 of 1017 PageID 11797
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 64 of 116

```
                                                            Page 63
 1                        Grant Scott

 2   BY MR. MORRIS:

 3       Q.     Do you have any memory of interviewing with

 4   anybody?

 5       A.     I don't have any recollection of that, no.

 6       Q.     Did you submit a resume of any kind?

 7       A.     Possibly a CV.  But I -- I just don't

 8   remember anymore.

 9       Q.     Do you know who made the decision to select

10   you to serve in those capacities?

11              MR. KANE:  Objection.  Form.

12              THE WITNESS:  I don't know.

13   BY MR. MORRIS:

14       Q.     Did anybody -- withdrawn.

15              Did you meet with Patrick before or after

16   you assumed these roles?

17       A.     It's going back 10 years.  I -- I'm not

18   sure.

19              MR. MORRIS:  Can we put up on the

20       screen a document that we marked this

21       morning.  I believe it's Exhibit 2.

22   BY MR. MORRIS:

23       Q.     And this is a document titled An Amended

24   and Restated Limited Liability Company Agreement of

25   Charitable DAF GP LLC.
```

010934

Page 64

```
 1                        Grant Scott

 2               Do you see that?

 3       A.      Yes.

 4       Q.      And do you see that it's effective January

 5   1, 2012?

 6               And if we could go to the last page.  And

 7   is that your signature, sir?

 8       A.      That is correct.

 9       Q.      And is this the document that you signed on

10   March 12th, 2012, pursuant to which you became the

11   general partner of the DAF GP?

12               MR. KANE:  Objection.  Form.

13               THE WITNESS:  It's not March 12th.

14        It's dated as March 21st, just to clarify,

15        but I believe so.

16   BY MR. MORRIS:

17       Q.      I appreciate that.  I'm going to ask the

18   question again, just because I was wrong and I want to

19   get it right.

20               Is this the document you signed on or about

21   March 21, 2012, pursuant to which you became the

22   managing member of the DAF GP, LLC?

23       A.      I believe so.

24       Q.      Okay.  And you replaced Mr. Dondero in that

25   capacity; is that right?
```

Appx 06992
010935