**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

§

§   Case No. **19-34054-sgj11**

**The Dugaboy Investment Trust et al- Appellant**

§

vs.      §

**Highland Capital Management, L.P.**
**Et al-** Appellee

§         **3:25-cv-02072-S**

§

  **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 14

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1. **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2. **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3. **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4. **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5. **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6. **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001*  1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023*  2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039*  3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru vol. 5*

*Vol 5*
*003493*

2

| | | | |
|---|---|---|---|
| *Vol. 5* <br> *003504* | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| *003519* | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| *003521* | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| *003530* | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6* <br> *003544* | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| *003909* | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| Vol 6<br><br>003912 | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit  A (Annable, Zachery) |
| Vol. 7<br><br>003936<br>Thru END of Vol 14 | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| Vol 15<br><br>011840 | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

Vol. 15

011855

011864

011869

011874

5

*Vol 15*

| | | | |
|---|---|---|---|
| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3406 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *N/A* *NO PDF AVAILABLE* | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

*012050*

*012077*
*Vol. 16*
*012079*

*012357*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
|---|---|---|---|
| | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

Handwritten annotations in left margin:
Vol 16  O12361
Vol. 17  O12363
O126411
Vol 18  O12697  Thru END of Vol.21
Vol. 22  O16732
O16737
O16773
O16809

*Vol. 22*

| | | | |
|---|---|---|---|
| | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| | 6/20/2025 | 4255 *(to be submitted to Clerk on flash drive)* | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

016827

016830

016855

016863

016865

*Vol. 23*

016867

*Thru end of Vol. 25*

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 26*  *019524* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| *019527* | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
|---|---|---|---|
| *Vol. 27* *019847* | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Professional Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| *019871* | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| *019998* | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| *Vol. 28* *020013* | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| *020230* | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 Deitsch-Perez, Deborah) |
| *020241* | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28*<br>*020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29*<br>*020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* *020296* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* *020407* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |

*Vol. 31*

*020686*

*020696*

*020808*

*020830*

*020837*

| | | | |
|---|---|---|---|
| | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| 7/21/2025 | 4333 | | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| 7/21/2025 | 4334 | | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| 8/4/2025 | 4353 | | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| 8/5/2025 | 4359 | | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| 8/15/2025 | 4372 | | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025

Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**Crawford, Wishnew & Lang PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Appellant The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

```
                                                    Page 65
1                      Grant Scott

2       A.      Yes.

3       Q.      And your recollection is that Mr. Dondero

4   presented the opportunity to you; is that right?

5               MR. KANE:  Objection.  Form.

6               THE WITNESS:  Yes.  I guess you could

7        call it an opportunity.

8   BY MR. MORRIS:

9       Q.      And do you have any recollection as to

10  whether or not anybody else was involved in the

11  decision to offer the opportunity to you?

12      A.      I -- I don't recall.

13      Q.      Okay.  We can take that down, please.

14              Do you recall whether Mr. Patrick was

15  involved in your selection as the replacement

16  management member of the DAF GP, LLC in 2012?

17      A.      I have no recollection.

18              MR. KANE:  Objection to form.

19              Yes.  Okay.

20  BY MR. MORRIS:

21      Q.      I want to go back to what we had defined

22  earlier as the interim period, and that was the period

23  between January 31st, 2021, when you sent in that

24  notice and March 24, 2021, when you transferred the

25  shares.  That is what we were calling the interim
```

Appx 06993
010936

Page 66

                              Grant Scott

1
2    period, right?

3        A.    Yes.

4        Q.    Okay.  Is it fair to say that Mr. Patrick

5    served as your primary contact with respect to matters

6    concerning CLO HoldCo and the DAF during the interim

7    period?

8        A.    Yes.

9        Q.    Okay.  And, in fact, Mr. Patrick gave you

10   instructions on what to do for the DAF and the

11   CLO HoldCo on certain matters during the interim

12   period, correct?

13             MR. KANE:  Objection to form.

14             THE WITNESS:  Periodically, yes.

15   BY MR. MORRIS:

16       Q.    I am sorry.  What is the answer?

17       A.    Periodically, yes.

18       Q.    Okay.  Did somebody ever tell you that you

19   should follow Mr. Patrick's instructions?

20       A.    No, I don't believe so.

21       Q.    And, Mr. Patrick, to the best of your

22   knowledge, didn't HoldCo any positions with any of the

23   DAF entities or CLO HoldCo Limited, correct?

24             MR. KANE:  Objection to form.

25             MR. BRIDGES:  Object to foundation.

010937

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 187
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 20 of 921 PageID 11818
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 68 of
116

```
                                              Page 67
 1                    Grant Scott

 2   BY MR. MORRIS:

 3        Q.     You can answer.

 4        A.     During the interim period?

 5        Q.     Correct.

 6        A.     I do not believe so.

 7        Q.     If Mr. Patrick didn't hold any positions,

 8   why did you follow his instructions?

 9               MR. BRIDGES:  Objection.

10               MR. KANE:  Objection.  Go ahead,

11      sorry.

12               MR. BRIDGES:  Facts not in evidence.

13               MR. KANE:  And objection to form.

14   BY MR. MORRIS:

15        Q.     You can answer, sir.

16        A.     Yes.  Well, there -- I mean, there was a

17   lot of activity that was required to transfer over

18   from how things had been handled under Highland, to

19   how they would now be handled under -- with the

20   services being provided by Highgate, and he was a

21   member, and he was the point person, I guess, and he

22   was my main interface to get those large numbers of

23   issues resolved.

24               There was -- you know, it was a very busy,

25   challenging time.
```

Appx. 06995
010938

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 188
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 21 of 921 PageID 11819
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 69 of 116

Page 68

1                              Grant Scott

2        Q.      Did you sign any agreement on behalf of any

3    of the DAF entities or CLO HoldCo with the entity that

4    you are referring to as Highgate?

5        A.      I'm not sure.

6        Q.      Do you have any recollection at all of ever

7    signing any agreements in your capacity as the

8    authorized representative of any of the DAF entities

9    or CLO HoldCo and Highgate?

10              MR. KANE:  Objection.  Form.

11              THE WITNESS:  I -- I don't recall.

12   BY MR. MORRIS:

13       Q.      And I may have asked you this already.  If

14   I have, I'm sure there will be an objection.  But do

15   you recall if Highgate was providing services

16   equivalent to the shared services that Highland

17   previously provided, or was it providing investment

18   advisory services of the type Highland previously

19   provided?

20              MR. KANE:  Objection to form.

21              MR. BRIDGES:  Objection.

22   BY MR. MORRIS:

23       Q.      You can answer.

24       A.      I don't know the delineation of the

25   services they were providing.

010939

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 189
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 22 of 921 PageID 11820
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 70 of
116

Page 69

1                            Grant Scott

2      Q.    Do you know whether during the interim

3  period, any entity other than Highgate was providing

4  services on behalf of any of the DAF entities or

5  CLO HoldCo?

6      A.    Well, I knew from various wires that were

7  approved, that various entities were providing

8  services.  Law firms, for example.

9      Q.    But was there any -- any entity other than

10  Highgate that was providing any of the services that

11  had previously been provided by Highland?

12     A.    Well, Highland provided a lot of legal

13  services.  I don't know that Highgate had the same

14  capability.  So I don't know how to answer that.

15     Q.    All right.  I'm going to try a different

16  way.

17            Before -- before 2021, the DAF entities had

18  both a shared services arrangement and an investment

19  advisory arrangement with Highland.

20            Do I have that right?

21     A.    Yes.

22     Q.    During the interim period, Highland was no

23  longer providing any of those services, correct?

24     A.    That's what I understand, yes.

25     Q.    Did anybody replace Highland in the

Appx 06097
010940

Page 70

1                           Grant Scott

2    provision of those services during the interim period?

3              MR. BRIDGES:  Objection, asked and

4       answered.

5    BY MR. MORRIS:

6       Q.      You can answer, sir.

7       A.      I mean, besides the services Highgate

8    were -- was -- were providing, I'm not sure.

9       Q.      And -- and I do know that I've asked this

10   before, but now with that context:  Do you know

11   whether Highgate was providing services of the shared

12   services type, or the investment advisory type, or you

13   just don't know?

14             MR. BRIDGES:  Objection to the form.

15             THE WITNESS:  At least I would think

16      mostly the shared services type.

17   BY MR. MORRIS:

18      Q.      Okay.  Is it your understanding that under

19   the shared services agreement, that Highgate had the

20   ability to make decisions on behalf of any of the DAF

21   entities or CLO HoldCo?

22             MR. BRIDGES:  Objection.

23             MR. KANE:  Objection to form.

24             MR. BRIDGES:  Misstates testimony.

25             THE WITNESS:  Yeah, my prior

Appx 96098
01U941

```
                                                        Page 71
 1                      Grant Scott

 2        testimony was I didn't see the agreements,

 3        so I don't know.

 4   BY MR. MORRIS:

 5        Q.    You haven't seen any agreement with

 6   Highgate; is that right?

 7        A.    I don't recall that I have.

 8        Q.    Do you have any understanding as to whether

 9   Highgate had the authority to bind any of the DAF

10   entities or CLO HoldCo during the interim period?

11             MR. BRIDGES:  Objection.  Calls for a

12        legal conclusion.

13             THE WITNESS:  I don't know.

14   BY MR. MORRIS:

15        Q.    Do you have any understanding as to whether

16   Mark Patrick had the ability as an individual to bind

17   any of the DAF entities or CLO HoldCo during the

18   interim period?

19             MR. BRIDGES:  Objection.  Calls for a

20        legal conclusion.

21             MR. KANE:  Objection.  Calls for a

22        legal conclusion.

23             THE WITNESS:  I don't know.

24   BY MR. MORRIS:

25        Q.    Okay.  And I'm just asking as a matter of
```

Page 72

                        Grant Scott

 1

 2    fact, to be clear.  I'm not asking for any legal

 3    conclusions.  I'm asking for your understanding as the

 4    authorized representative of the DAF entities and

 5    CLO HoldCo during the interim period.

 6            So with that -- with that background as the

 7    authorized entity, that -- withdrawn.

 8            As the authorized representative during the

 9    interim period, did you have any understanding as to

10    whether Mr. Patrick had the authority to bind any of

11    the DAF entities or CLO HoldCo during that time?

12            MR. KANE:  Objection.

13            MR. BRIDGES:  Objection.  Calls for

14       legal conclusion.  Also, objection as to

15       vagueness of the question.

16    BY MR. MORRIS:

17       Q.    I'm sorry, Mr. Scott, did you answer?

18       A.    I did not.  No, I have not.  I --

19       Q.    I apologize.

20       A.    I don't know what the status of his legal

21    authorization was.

22       Q.    Do you recall that in early March, you

23    bought a couple of events to Mr. Patrick's attention?

24       A.    I know that I forwarded documents to his

25    attention, yes.

Appx 07009
010943

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 193
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 26 of 921 PageID 11824
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 74 of 116

Page 73

1                          Grant Scott

2      Q.     And why did you forward documents to

3   Mr. Patrick's attention during the interim period?

4      A.     Because I was resigning, and I understood

5   that he was essentially going to be, or was the

6   director elect, and I just thought it appropriate to

7   bring such things to his attention.

8      Q.     And when did you -- when did you learn that

9   he was doing to be the director elect?

10     A.     I -- I believe it was February.  Sometime

11  in February.

12     Q.     Do you recall how you learned that he was

13  going to become the director elect?

14     A.     I can't point to a specific conversation.

15  I can't -- I can't point to the specific conversation.

16  At some point, it went from being some future third

17  party, and I came to believe it would be him.  I'm

18  not -- I'm not sure of the timing.

19     Q.     Okay.  Do you know from whom you learned

20  that he was going to be the director elect?

21     A.     I believe it was him.

22     Q.     Okay.  So he told you that he was going to

23  replace you; is that right?

24     A.     I don't know that he said it specifically.

25  I don't remember our conversations.

Appx 97201
010944

Page 74

1                              Grant Scott

2       Q.      Did you ever do anything to confirm with

3   anybody that Mark Patrick was going to be the director

4   elect, or did you just take his word for it?

5       A.      I did not independently confirm it, no.

6       Q.      Did you ever ask Mr. Dondero if -- if he

7   approved of the selection of Mr. Patrick as your

8   successor?

9       A.      I did not.

10      Q.      Did you ever discuss with Mr. Dondero, the

11  topic of who would be your successor?

12      A.      Going back.  Prior to the interim period, I

13  had recommended him, Mark.

14      Q.      Did you -- did you discuss Mr. Patrick's

15  selection as your successor with anybody in the world

16  at any time other than Mr. Patrick?

17      A.      I talked with my attorney about it.  But I

18  don't think so.  No.

19      Q.      Did you talk with anybody that you believed

20  was authorized to make the decision on behalf of the

21  DAF entities and CLO HoldCo about your successor?

22      A.      No, I did not.

23              MR. MORRIS:  Can we put up the

24       document that was marked, La Asia, on Page

25       7, as Bates number 80.

Appx. 07092
010945

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 195
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 28 of 921    PageID 11826
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 76 of
116

Page 75

1                          Grant Scott

2              (Deposition Exhibit 10 was marked for

3     identification.)

4     BY MR. MORRIS:

5         Q.    Do you see that -- if you scroll just down

6     a little bit.  I guess not.

7              Mr. Patrick wrote an e-mail to you and

8     said, "The successor will respond to this complaint,"

9     and at the top you wrote "understood" --

10        A.    Yes.

11        Q.    -- or the top of the e-mail.

12             Do you recall that in early March, you

13    received a new complaint in which CLO HoldCo was named

14    the defendant?

15        A.    I believe this -- this was the unsecured

16    creditors' committee complaint; is that correct?

17        Q.    I think so, but it's your testimony.  I'm

18    just asking you if you recall that in early March,

19    CLO HoldCo was sued?

20        A.    Yes.  I think this was the second lawsuit

21    that I was referring to personally.

22        Q.    Okay.  And so this -- this actually

23    occurred after the time you had already given notice,

24    right?

25        A.    Yes.

Appx 97093
010946

```
                                               Page 76
 1                        Grant Scott

 2      Q.      Yeah.   And was the first lawsuit, the one

 3  that you settled, before you gave notice?

 4      A.      No.  The -- no, both lawsuits are pending.

 5      Q.      Okay.  Do you know when the -- who's the

 6  plaintiff in the first one?

 7      A.      Acis.

 8              (Reporter clarification.)

 9              THE WITNESS:  Acis, A-C-I-S.

10  BY MR. MORRIS:

11      Q.      So the debtor never sued you personally; is

12  that right?

13      A.      Not yet.

14      Q.      And is it right that Mr. Patrick told you

15  that -- that the successor will respond to the

16  complaint?

17      A.      Yes.

18      Q.      Now, he's not referring to himself yet, is

19  he?

20      A.      That appears correct, yes.

21      Q.      Does that refresh your recollection that

22  you had not known yet as of March 2nd who the

23  successor would be?

24      A.      I guess it does.

25              MR. MORRIS:  Can we put up the next
```

Appx. 07004

010947

Page 77

1                           Grant Scott

2          exhibit, please, the one ending in -- the

3          one Bates number 85.  And please remind us,

4          La Asia, what exhibit number are we up to?

5                MS. CANTY:  We're up to 10, but the

6          one I'm about to put up is Exhibit 6 from

7          earlier today.

8                MR. MORRIS:  Thank you very much.

9    BY MR. MORRIS:

10        Q.     Now, if we can just scroll down a little

11   bit.  Do you remember something called an Adherence

12   Agreement being discussed in March of 2021?

13        A.     A what agreement?

14        Q.     Adherence Agreement.

15        A.     I see that.  Was it directed to me?

16        Q.     Yeah.  If we can just scroll up.

17               Okay.  So right there, do you see that

18   Thomas Surgent sends it to Mr. Kane?  The subject is

19   'Adherence Agreement."

20        A.     Yes.

21        Q.     And you do see that you forwarded that

22   e-mail to Mr. Patrick on the same day, March 2nd?

23        A.     Yes.

24        Q.     And it says "This relates to the second

25   issue from the debtor."

Page 78

1                          Grant Scott

2              Do you see that?

3        A.    Yes.

4        Q.    And the first issue was the complaint that

5    we just looked at; is that right?

6        A.    I believe that's correct.

7        Q.    And the Adherence Agreement is the second

8    issue that you wanted to bring to Mr. Patrick's

9    attention on March 2nd, correct?

10       A.    Yes.

11       Q.    And did you understand that the debtor had

12   requested that CLO HoldCo sign the Adherence Agreement

13   in connection with the consummation -- or in

14   connection with the HarbourVest settlement?

15       A.    I don't know that I formed an opinion of

16   what was being requested.  I just forwarded it to the

17   person the best to be able to handle going forward.

18       Q.    Okay.  And can we just scroll up a little

19   bit on this e-mail.

20              Do you see that Mr. Patrick gave you

21   instructions, quote, "Do not sign the Adherence

22   Agreement from the debtor," close quote.

23       A.    Yes.

24       Q.    Okay.  And you followed Mr. Patrick's

25   instructions, right?

Appx 97006

010949

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 199
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 32 of 921 PageID 11830
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 80 of
116

Page 79

                          Grant Scott

1

2       A.    Yes.  I resigned.  I wasn't going to do

3   anything to -- yes.  Yes.

4       Q.    You actually hadn't resigned yet.  Well,

5   withdrawn.

6             Your resignation had not become effective

7   yet, correct?

8       A.    Yes.  I guess I gave a March 1st date, but

9   it dragged on, so technically, I was still in that

10  role, but quite frankly, any issue that could be

11  pushed to the future for the -- I was going to push it

12  to the future.

13      Q.    Did -- did Mr. Patrick ever tell you that

14  he had spoken with Mr. Dondero about any of the issues

15  that you were communicating with him about?

16      A.    No.

17      Q.    Do you recall also on March 2nd --

18  March 2nd seems like it was a busy day.  Do you recall

19  also, on March 2nd, that you were informed of an

20  opportunity, whereby, CLO HoldCo Limited could

21  purchase certain equity in a company called TerreStar?

22            MR. KANE:  Objection.  Form.

23            THE WITNESS:  I'm familiar with the

24      name TerreStar.

25  BY MR. MORRIS:

Appx. 07807
010950

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 200
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 33 of 921   PageID 11831
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 81 of
116

Page 80

1                        Grant Scott

2        Q.      And do you remember communicating with

3    Mr. Patrick about an opportunity that had been

4    presented to CLO HoldCo in early March about the

5    opportunity to purchase certain equity in TerreStar?

6        A.      Vaguely.

7        Q.      Okay.

8             MR. MORRIS:   Can we put up the next

9        exhibit, please?

10            (Deposition Exhibit 11 was marked for

11   identification.)

12   BY MR. MORRIS:

13       Q.      And if we can just scroll down, there's Joe

14   Sowin.  Do you know who Joe Sowin is?

15       A.      I've worked with him over the years.

16       Q.      And do you see that Joe Sowin is the next

17   point?

18       A.      I see that.

19            MR. KANE:   Objection.   Form.

20   BY MR. MORRIS:

21       Q.      And does this refresh your recollection

22   that on or about March 2nd, 2021, Mr. Sowin wrote to

23   you about an opportunity to purchase from HOCF

24   approximately 5,000 shares issued by TerreStar?

25       A.      I see that.

Appx 97808
010951

Page 81

1                          Grant Scott

2      Q.     Okay.  Did you communicate with Mr. Sowin

3   from time to time?

4      A.     Yes.

5      Q.     Did you ever tell Mr. Sowin that he should

6   direct all communications to Mr. Patrick?

7      A.     I don't know if I did or not.  Who -- who

8   did I get this -- did this come through Highgate?

9      Q.     I can only look at what you see.

10             Can we scroll up to the next e-mail.

11             And you forwarded it to Mr. Patrick; is

12   that right?

13     A.     Yes.  It appears so.

14     Q.     And -- and you asked him for his thoughts,

15   right?

16     A.     Yeah.  I didn't -- yeah.

17     Q.     Okay.  And if we can scroll up and just

18   take a look at Mr. Patrick's response.  It says --

19     A.     Okay.  I see that.

20     Q.     Yeah.  It's at the top.  "Please --"

21     A.     I see that.

22     Q.     Okay.  And did you act -- withdrawn.

23             Did you follow Mr. Patrick's instructions,

24   as set forth in this e-mail?

25     A.     I think I responded favorably to Joe's

Appx 07809

010952

Page 82

1                          Grant Scott

2    recommendation.

3         Q.     Well, Mr. Patrick told you to act on the

4    request below.  Do you see that?

5                MR. BRIDGES:  Objection.  Form.

6          Objection.  Misstates the exhibit.

7    BY MR. MORRIS:

8         Q.     Okay.  I will quote the exhibit.  Do you

9    see that Mr. Patrick said, quote, "Please act on the

10   request below"?

11        A.     I do see that, yes.

12        Q.     And did you act on the request below?

13                MR. KANE:  Objection to form.  Asked

14        and answered.

15                THE WITNESS:  I did.

16   BY MR. MORRIS:

17        Q.     Thank you.

18                Do you recall any issues coming up

19   concerning directors' and officers' insurance for the

20   DAF entities or CLO HoldCo Limited?  And I'm

21   specifically referring to the interim period.

22        A.     Relating to --

23                MR. BRIDGES:  Objection.  Vague.

24   BY MR. MORRIS:

25        Q.     Directors' and officers' insurance.  Let me

Appx. 07819

010953

Page 83

1                              Grant Scott

2    ask the question again, Mr. Scott.

3              During the interim period, do you remember

4    any issues arising with respect to directors' and

5    officers' insurance for any of the DAF entities or

6    CLO HoldCo?

7         A.    I don't -- I don't recall.

8         Q.    Do you know who Chris Rice is?

9         A.    Yes.

10        Q.    Who is Chris Rice?

11        A.    He is an employee at Highgate.

12        Q.    Are you familiar with an entity called

13   Elysium?

14        A.    The name sounds familiar.

15        Q.    All right.

16              MR. MORRIS:  La Asia, can we mark the

17        next exhibit?  It's in the middle of page

18        9, Bates number 361.

19              MS. CANTY:  This is going to be 12.

20              MR. MORRIS:  Thank you.  And if we

21        can scroll towards the bottom.

22              (Deposition Exhibit 12 was marked for

23   identification.)

24   BY MR. MORRIS:

25        Q.    Do you remember that there was this firm

Appx. 781

010954

Page 84

                          Grant Scott

1

2    called Elysium?

3        A.    Yes.  Now I remember.

4        Q.    And they were asking you for information?

5        A.    That is correct.

6        Q.    Did you ever provide the information to

7    Elysium that had been requested back in February?

8        A.    No, I did not.

9        Q.    Is there a reason why you didn't respond to

10   Elysium's request for information?

11       A.    Because of the transition, I thought much

12   of the information that they were requesting was going

13   to be changing, so I -- I -- I didn't know that it was

14   particularly urgent.  But I -- I figured it would be a

15   waste of time to give him information which would be

16   changed in any -- at any moment.

17       Q.    Okay.  Can we just scroll up a little bit

18   and see what happened with this request.

19             So you actually responded the same day and

20   told Mr. -- Mr. Robins that you were working on it.

21   Do I have that right?

22       A.    Yes.  That's correct.

23       Q.    Is that a true statement at the time you

24   wrote it?

25       A.    Yes.  I'm working on this, meaning not me

Appx 07812

010955

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 205
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 38 of 921 PageID 11836
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 86 of 116

Page 85

                           Grant Scott

1

2    personally.  I mean, I'm work- -- I wanted to let him

3    know that I'd received the e-mail, and then I

4    forwarded it to Highgate, thinking that at any moment,

5    they would be able to provide the information, so I

6    just wanted, as a courtesy, to let them know that I'd

7    received it and was aware of this request.  That's --

8    that's all.

9         Q.    Okay.  You didn't let him know that there

10   was a transition in the works, right?

11        A.    No.  No, I -- I may have.

12        Q.    Yeah, you may have.  Let's see what happens

13   next.

14             So in early March, he asked -- he follows

15   up; is that fair?

16        A.    Yes.

17        Q.    Okay.  Let's go to the next e-mail.

18             And you forwarded to Mark Patrick, a month

19   later; is that right?

20        A.    Yes.  I'm -- there may have been an interim

21   e-mail where I --

22        Q.    Okay.  But the long and the short of it is

23   you never -- you -- you didn't respond to these

24   inquiries from Elysium; is that right?

25             MR. KANE:  Objection.

Appx 07813
010956

```
                                                          Page 86
1                        Grant Scott

2              MR. BRIDGES:  Objection.

3              MR. MORRIS:  Withdrawn.  Withdrawn.

4    BY MR. MORRIS:

5        Q.    You didn't provide a substantive response

6    to Elysium; is that right?

7              MR. KANE:  Objection.  Assumes facts

8        not in evidence.

9              MR. MORRIS:  That is why I'm asking

10       the question.

11   BY MR. MORRIS:

12       Q.    Go ahead, Mr. Scott.  You can answer.

13       A.    I did not provide a substantive response to

14   their inquiry.

15       Q.    Okay.  Thank you.

16             Can we go to the top.  In fact -- in fact,

17   you were instructed by Mr. Patrick to do nothing,

18   correct?

19             MR. BRIDGES:  Objection.  Misstates

20       the testimony.

21             THE WITNESS:  No.

22   BY MR. MORRIS?

23       Q.    Sir, the e-mail says "Do nothing," correct?

24       A.    That is correct, and they were handling it,

25   not me.
```

Appx 07814
010957

Page 87

Grant Scott

 1

 2      Q.      Okay.  Now, did you resign on or about

 3   March 24th, 2021?

 4      A.      Yes.  That's -- that's when the transfer --

 5   share of transfer.

 6      Q.      Okay.

 7              MR. MORRIS:  Can we put the next

 8      exhibit up, please.  It's the one at the

 9      top at page 10.  It's file 3, document 5.

10              MR. BRIDGES:  Mr. Morris, can I ask

11      you how it is for time because you told us

12      earlier -- you teased us with a 4:15 end

13      time, potentially.

14              MR. MORRIS:  Yeah, I'm just on the

15      last couple of documents.

16              MR. BRIDGES:  Thank you.

17              MR. MORRIS:  You bet.

18   BY MR. MORRIS:

19      Q.      Do you see this is a document called an

20   Assignment and Assumption of Membership Interest

21   Agreement?

22      A.      Yes.

23              MR. MORRIS:  And if we can scroll

24      down.

25   BY MR. MORRIS:

Appx. 07815

010958

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 208
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 41 of 921 PageID 11839
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 89 of
116

Page 88

```
 1                        Grant Scott

 2       Q.    Did you sign this document?

 3       A.    Yes, sir.

 4       Q.    Okay.  Do you know what this document is?

 5       A.    I believe it's the Management Share

 6   Transfer Agreement.

 7       Q.    Okay.  And do you know who prepared it?

 8       A.    I do not.

 9       Q.    Did you assign something pursuant to this

10   document?

11       A.    Yes.  The -- the -- the management shares.

12             MR. MORRIS:  Okay.  Can we go to the

13        first page, please?

14   BY MR. MORRIS:

15       Q.    And do you see in paragraph 1, there is a

16   description of the assignment and assumption of the

17   signed interest?

18       A.    Yes, I see that.

19       Q.    Okay.  Does that paragraph describe

20   everything that you assigned to Mr. Patrick?

21       A.    In this agreement.  Yes.

22             MR. BRIDGES:  Objection.  Calls --

23        objection.  Calls for a legal conclusion.

24             MR. KANE:  I join the objection.

25   BY MR. MORRIS:
```

Appx 07816
010959

Page 89

                          Grant Scott

1

2      Q.     You can answer, sir.

3      A.     Yes.  I mean, it says what it says.  But

4  yes, that is what I was transferring.

5      Q.     And can you identify for me anything that

6  you know that you ever assigned to Mr. Patrick that is

7  not set forth in paragraph 1?

8             MR. BRIDGES:  Objection.  Form.

9             THE WITNESS:  I'm unaware of

10      anything.

11  BY MR. MORRIS:

12      Q.     Do you know if -- if the items and assets

13  that are set forth in paragraph 1 had any value?

14             MR. KANE:  Objection.  Form.

15             THE WITNESS:  They had value, maybe

16      not monetary.

17  BY MR. MORRIS:

18      Q.     And what value did they have?

19      A.     I believe they had the property interest

20  that I referred to previously.

21      Q.     And what property interest are you

22  referring to?

23             MR. KANE:  Objection.  Form.  Calls

24      for a legal conclusion.

25  BY MR. MORRIS:

010960

Page 90

1                              Grant Scott

2        Q.      You can answer.  Sir, it's your words we

3    need.

4        A.      The shares were the -- these management

5    shares were the -- I was treating as property.

6        Q.      Do you have any understanding as to what

7    the value of the management shares was at the time you

8    entered into this agreement?

9        A.      I did not.

10       Q.      Did you have any understanding as to

11   whether those management shares held any particular

12   rights at the time you entered into this agreement?

13              MR. KANE:  Objection to form.

14              THE WITNESS:  My understanding was

15       they had my rights previously.  Ultimately.

16   BY MR. MORRIS:

17       Q.      And what rights did you believe flowed from

18   the management shares?

19       A.      The controlling rights that flowed down to

20   the various entities.

21       Q.      Did you receive anything in return in

22   exchange for your assignment of these property

23   interests and the other assets set forth in paragraph

24   1?

25       A.      It allowed me to finally resign.  That is

Appx. 07848

010961

Page 91

1                    Grant Scott

2   what I received.  I mean, it ended my -- it ended my

3   role as a -- maybe as an agent, or an employee or

4   whatever.  Those are my substantive rights, as I

5   understood it.

6       Q.    Okay.  So you -- you surrendered the

7   substantive rights in an exchange -- you no longer had

8   your substantive rights?

9             MR. BRIDGES:  Objection.  Asked and

10      answered.

11            MR. KANE:  Objection.  Form.

12  BY MR. MORRIS:

13      Q.    You can answer, sir.  Did you get anything

14  other than -- withdrawn.

15            Did you get anything other than what you

16  already described?

17      A.    Relief.  Yes.

18      Q.    Excellent.  Did you ever consider assigning

19  these interests or assets to anybody other than

20  Mr. Patrick?

21      A.    I did not.

22      Q.    Did you ever consider -- did you have any

23  belief as to whether the interests that were assigned

24  were freely tradeable?

25            MR. BRIDGES:  Objection.  Calls for a

010962

Page 92

```
1                      Grant Scott

2      legal conclusion.

3              MR. KANE:  I join the objection.

4              THE WITNESS:  I didn't make -- I did

5      not make an assessment of that.

6  BY MR. MORRIS:

7      Q.    Do you know -- withdrawn.

8              Do you have any understanding as to whether

9  there were any restrictions on the transferability of

10 the interests that you assigned pursuant to this

11 agreement?

12             MR. KANE:  Objection.  Calls for a

13     legal conclusion.

14             THE WITNESS:  I did not.

15 BY MR. MORRIS:

16     Q.    Did you let anybody know that you were

17 willing to assign the interests that are described in

18 paragraph 1 other than Mr. Patrick?

19     A.    Anyone that I -- conceivably, anyone that I

20 let know that was at all familiar with the structure,

21 anyone that was informed of my desire to resign would

22 have arguably have known that.

23     Q.    Okay.  I'm not asking you to put yourself

24 in the shoes of anybody else.  I'm asking for what you

25 recall telling people.
```

Appx 07029

010963

Page 93

                            Grant Scott

1

2               Did you ever tell anybody at any time that

3   you were ready, willing and able to transfer and

4   assign the interests that are in this document other

5   than Mr. Patrick and your lawyers?

6       A.    I am sorry.  I misunderstood your question.

7   The answer is no.

8       Q.    Did you ever think to try to assign these

9   interests for a profit?

10      A.    Good grief, no.

11            (Reporter clarification.)

12      A.    No.

13      Q.    Did you -- was anybody, other than

14  Mr. Patrick, ever identified as a potential assignee

15  of the interests that are described in paragraph 1?

16            MR. KANE:  Objection to form.

17            THE WITNESS:  I was unaware of any.

18  BY MR. MORRIS:

19      Q.    Okay.  Did you make any effort to identify

20  anybody other than Mr. Patrick as a potential assignee

21  for the interests that are set forth in paragraph 1?

22      A.    No, I did not.

23      Q.    Did any -- did anybody acting on your

24  behalf, to the best of your knowledge, ever make any

25  efforts to identify any potential assignee other than

010964

Page 94

1                    Grant Scott

2    Mr. Patrick for the interests set forth in paragraph

3    1?

4              MR. BRIDGES:  Objection.  Foundation.

5              THE WITNESS:  I don't have that

6        knowledge.  No.

7              MR. MORRIS:  Can we go to the next

8        exhibit, please?

9              (Deposition Exhibit 14 was marked for

10   identification.)

11   BY MR. MORRIS:

12       Q.    Okay.  And do you see that these are

13   written resolutions dated the next day, March 25th?

14       A.    Yes.

15       Q.    And these resolutions provide for the

16   shared transfer described in the document?

17       A.    It appears so, yes.

18       Q.    And are these the management shares that

19   you were referring to earlier?

20       A.    I believe so.

21       Q.    Did you believe at the time that you owned

22   all of the management shares of charitable DAF HoldCo

23   Limited?

24       A.    That was my understanding.

25       Q.    How did you acquire those shares?

Appx. 07822
010965

Page 95

                          Grant Scott

1

2      A.      I'm not sure the exact timing, but I

3   believe that was all established when I became

4   involved.

5      Q.      Did you pay anything of value for the

6   shares at the time that you acquired them?

7      A.      I am -- I don't believe so, no.

8      Q.      Did you need to obtain anybody's approval

9   before you could transfer the shares?

10     A.      No.  I don't believe so.

11     Q.      Did you make any effort to obtain anybody's

12  approval before you transferred the shares?

13     A.      I did not.

14     Q.      Did you have any reason to believe that

15  Mr. Dondero approved of the transfer of the management

16  shares to Mr. Patrick?

17     A.      I -- I don't know that.

18     Q.      Did you testify earlier, that you had

19  discussed with Mr. Dondero in January, Mark Patrick

20  succeeding you?

21             MR. BRIDGES:  Objection.  Misstates

22      prior testimony.

23  BY MR. MORRIS:

24     Q.      You can answer, sir.

25     A.      I believe it was prior to that.

Appx 07923
010966

Page 96

                           Grant Scott

1

2       Q.     Were you paid anything of value for your

3   services as the, either the managing member of the DAF

4   GP, or as a director of any of the other DAF or

5   CLO HoldCo Limited entities at any time?

6       A.     For a majority of the years, yes, I

7   received a monthly statement.

8       Q.     And is that -- how much was the monthly

9   statement?

10      A.     I believe it was $5,000.

11      Q.     Did it ever increase to an amount more than

12  $5,000?

13      A.     No.

14      Q.     Did you receive anything else of value for

15  your service to the DAF entities and CLO HoldCo

16  Limited other than the $5,000 monthly stipend that you

17  just described?

18      A.     I did not.

19      Q.     Do you recall that after you resigned, you

20  got reappointed, and then subsequently replaced again

21  by Mr. Patrick?

22             MR. KANE:  Objection to form.

23             (Reporter clarification.)

24             THE WITNESS:  Can you repeat -- did

25       you say -- it went away, and then it came

010967

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 217
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 50 of 921   PageID 11848
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 98 of 116

Page 97

```
1                          Grant Scott

2        back.  I don't understand the question.  I

3        am sorry.

4   BY MR. MORRIS:

5        Q.     That is okay.  I just saw this in the

6   documents, and I thought it was odd.  But let me put

7   the documents up and see if you can shed any light.

8                MR. MORRIS:  Let's start with the

9        next exhibit, Patrick File 3, Document 9.

10               (Deposition Exhibit 15 was marked for

11       identification.)

12  BY MR. MORRIS:

13       Q.     And do you see in the resolutions, if we

14  can go up just a bit, dated March 24th, and it was

15  resolved that you were removed as a director of the

16  company and Mr. Patrick was appointed as your

17  replacement, if that is a fair characterization?

18               Do you see that?

19       A.     I see that.

20               MR. MORRIS:  And now if we can put up

21       the next document.

22               (Deposition Exhibit 16 was marked for

23       identification.)

24  BY MR. MORRIS:

25       Q.     So this is a week later.  It's March 31st.
```

010968

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 218
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 51 of 921 PageID 11849
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 99 of
116

Page 98

                              Grant Scott

1

2           MR. MORRIS:  And if we can just

3       scroll down and see if it's signed.

4  BY MR. MORRIS:

5       Q.    Do you see that Mr. Patrick was removed as

6  the director and you were reappointed?

7       A.    Yes, I do see that.

8       Q.    Do you have any understanding as to why

9  Mr. Patrick resigned and reappointed you as the

10  director a week later?

11       A.    I don't have -- I don't -- I don't know.

12       Q.    Did you even know this happened?

13       A.    Is my signature on that agreement?

14       Q.    No.

15       A.    I'm not sure.

16       Q.    Do you have any -- do you have any

17  recollection as -- as to whether or not you were ever

18  reappointed as the director of the company on or about

19  March 31st, 2021?

20       A.    I don't know if I have received any

21  communication about this or not.

22       Q.    Okay.

23           MR. MORRIS:  Can we go to the next

24       document, please?

25           (Deposition Exhibit 17 was marked for

Appx. 07826
010969

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 219
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 52 of 921 PageID 11850
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 100 of 116

Page 99

                    Grant Scott

 1

 2    identification.)

 3              MR. KANE:  Mr. Morris, can you help

 4        me with the exhibit numbers?  Was that 16,

 5        or are we still on 15, additional portions

 6        of it?

 7              MS. CANTY:  That was 16 but not going

 8        to 17.

 9              MR. KANE:  Thank you.  I apologize.

10              MR. MORRIS:  That is okay, Jonathan.

11        We will get to everything and clear up any

12          confusion.

13    BY MR. MORRIS:

14        Q.    So if you go to the bottom of that

15    document, can you see that it was signed?

16              All right.  Do you see Mr. Patrick signed

17    this document?

18        A.    Yes, I see that.

19        Q.    Do you see that it's dated -- if we can go

20    back up to the top.  It's April 2nd, and do you see

21    that you are -- pursuant to these resolutions, you

22    were removed as the director again and replaced by

23    Mr. Patrick?

24        A.    Yes, I see that.  And they seem to be

25    correcting an error of some sort.

010970

Page 100

                          Grant Scott

 1

 2      Q.      Did anybody ever describe for you or

 3  explain to you what error had been made?

 4      A.      I am sorry.  I'm not familiar with these

 5  documents.

 6      Q.      Okay.  Is it fair to say that -- well, I

 7  will just leave it at that.

 8              So nobody ever informed you that there was

 9  a mistake that had to be corrected; is that right?

10              MR. BRIDGES:  Objection.  Asked and

11      answered.

12  BY MR. MORRIS:

13      Q.      You can answer.

14      A.      I don't know that there was this -- this

15  may have -- I don't know that there was a mistake.

16      Q.      You have no knowledge of --

17      A.      I have no knowledge of this.  I was in a

18  very complex process.  I think there...

19      Q.      And nobody ever asked -- nobody ever asked

20  your consent to be reappointed as the director of the

21  company, correct?

22              MR. BRIDGES:  Objection.  Asked and

23      answered.

24              THE WITNESS:  I didn't receive any

25      communications about this.

Appx 07928

010971

```
 1                        Grant Scott

 2   BY MR. MORRIS:

 3       Q.     And so you didn't provide your consent to

 4   be reappointed as the director of the company,

 5   correct?

 6              MR. BRIDGES:  Objection.  Asked and

 7         answered.

 8              THE WITNESS:  That's correct.

 9   BY MR. MORRIS:

10       Q.     Okay.  Did you become aware that after you

11   resigned, that DAF and CLO HoldCo started a lawsuit

12   against the debtor and some other defendants related

13   to the HarbourVest settlement?

14       A.     I did become aware of it, yes.

15       Q.     And were you aware of the lawsuit -- were

16   you aware that DAF and CLO HoldCo were considering

17   filing the lawsuit before it was actually commenced?

18       A.     No.

19       Q.     Did you have any communications with

20   anybody at any time about the possibility that the DAF

21   and CLO HoldCo would commence a lawsuit against the

22   debtor and others relating to the HarbourVest

23   settlement prior to the time that the lawsuit was

24   commenced?

25       A.     I did not.
```

Appx. 07929

010972

Page 102

1                           Grant Scott

2       Q.      So is it fair to say that you did not

3    provide any information to anybody at any time to

4    support the claim -- the complaint that was filed

5    against the debtor and the other defendants in the

6    lawsuit that was brought by the DAF and CLO HoldCo?

7               MR. BRIDGES:  Objection.  Foundation.

8               THE WITNESS:  I didn't provide

9         anything with respect to the litigation

10          that was filed.

11   BY MR. MORRIS:

12      Q.      And did anybody ever ask you for

13   information relating to potential claims against the

14   debtor and others?

15      A.      No.

16      Q.      Did you ever have any discussions with

17   anybody at any time as to whether Jim Seery should be

18   named as a defendant in the lawsuit that was bought by

19   the DAF and CLO HoldCo against the debtor and others?

20      A.      No.

21              MR. MORRIS:  I have no further

22       questions.  Thank you, Mr. Scott.

23              MR. BRIDGES:  I don't have any

24       questions.

25              MR. KANE:  Can I -- I've got a couple

010973

Page 103

1                        Grant Scott

2        just follow-up for clarification purposes.

3                        EXAMINATION

4    BY MR. KANE:

5        Q.    Grant, earlier you were testifying about

6    resigning and noted -- I believe your testimony was

7    one of the reasons was an issue of independence.  Can

8    you clarify what you meant by issue of independence?

9        A.    I came to believe that there was a

10   perception, and my friendship with Jim Dondero

11   precluded my -- my independence.

12       Q.    Perception by whom?

13       A.    The judge in the case.

14             (Reporter clarification.)

15       A.    The judge in the bankruptcy case.

16       Q.    Was there a specific reason or instance

17   that caused you to have that belief?

18       A.    Yes.  When I spoke with you about the --

19       Q.    Well, I don't want to go into any

20   attorney-client communications.

21       A.    I am sorry.

22       Q.    So let me ask you a different question.

23   Were you provided a transcript of the Court's ruling

24   on the escrow hearing for the registry dispute?

25       A.    I believe so.

010974

Page 104

1                        Grant Scott

2       Q.    And did you read that transcript?

3       A.    I believe we discussed it.  I'm not -- I'm

4    not sure.

5       Q.    Did you have a recollection that Judge

6    Jernigan made a comment or comments about you and

7    Jim Dondero during her ruling?

8       A.    Yes.

9       Q.    Do you believe that Judge Jernigan's

10   comments were inaccurate?

11             MR. MORRIS:  Objection to the form of

12       the question.  No foundation.  Leading.

13   BY MR. KANE:

14       Q.    I will rephrase.  I will rephrase.

15             I will ask it -- a different question.

16             Mr. Scott, do you believe that you acted

17   independently during the bankruptcy case?

18       A.    Yes.

19       Q.    Do you believe you acted in the best

20   interests of CLO HoldCo?

21       A.    Yes, I do.

22             MR. KANE:  I'm done.

23             MR. MORRIS:  Just some follow-up

24       questions, Mr. Scott.

25

010975

1                      Grant Scott

2                      EXAMINATION

3    BY MR. MORRIS:

4         Q.     Did you ever testify before Judge Jernigan?

5         A.     I have not.

6         Q.     So is it fair to say that you had no reason

7    to believe that she could ever access your credibility

8    as a witness?

9              MR. BRIDGES:  I'm going to object.

10         That calls for a legal conclusion.

11   BY MR. MORRIS:

12        Q.     You can answer.

13        A.     From -- from what I understand from the

14   transcript of that hearing, a number of comments were

15   made by the judge regarding my independence, that sort

16   of thing, that made me -- that made me think that

17   maybe I could just remove that as an issue in the case

18   by resigning.  That is essentially, what my conclusion

19   was from that hearing.

20        Q.     But you didn't resign at the time that the

21   judge made those statements, did you?

22             MR. BRIDGES:  Objection.

23         Argumentative.

24   BY MR. MORRIS:

25        Q.     You can answer.

010976

Page 106

                          Grant Scott

1

2      A.      I did not at that time.

3      Q.      In fact, you didn't resign for probably

4   seven months after, correct?

5             MR. BRIDGES:  Objection.  Asked and

6       answered.  Really?

7             THE WITNESS:  Yes.

8   BY MR. MORRIS:

9      Q.      And you continued to actively participate

10  in the bankruptcy case, correct?

11     A.      That is correct.

12     Q.      And months later, you made the decision to

13  amend CLO HoldCo's proof of claim, correct?

14     A.      Correct.

15     Q.      And months later, you made the decision to

16  file an objection to the HarbourVest settlement,

17  correct?

18     A.      Correct.

19     Q.      And months after this hearing, you made the

20  decision to withdraw that objection, correct?

21             MR. BRIDGES:  Objection to repeating

22       the same questions from the last two hours

23       over and over again.  Are we going to keep

24       going all the way to the end.

25  BY MR. MORRIS:

Appx. 07934

010977

Page 107

1                          Grant Scott

2        Q.      Only -- only if people keep opening the

3    door.

4                Can you please answer my question?

5        A.      Yes, I removed the objection.

6        Q.      And -- and you remained in the case, and

7    you remained active in the case, and you filed on

8    behalf of your -- withdrawn.

9                You stayed in the case even after

10   CLO HoldCo was sued by the debtor, correct?

11       A.      Yes.

12       Q.      And you stayed in the case long enough to

13   negotiate a settlement on behalf of CLO HoldCo with

14   the debtor, correct?

15       A.      Correct.

16       Q.      And you can't identify anything that the

17   judge said following the escrow hearing that had

18   anything to do with you personally, correct?

19                MR. KANE:  Objection.  Form.

20                MR. MORRIS:  Withdrawn.

21   BY MR. MORRIS:

22       Q.      Can you identify anything that the judge

23   said following the escrow hearing that had to do with

24   your independence?

25       A.      I don't remember -- I'm -- what I'm telling

Appx 07935

010978

                              Grant Scott

1
2    you is -- let's just be clear here since I think the
3    point is -- is being missed.  The issue of when I
4    wanted to resign or when I first thought about
5    resigning has been raised.  It was raised during my
6    first deposition with you as well.  And what I'm
7    saying is -- is that after I heard about the hearing,
8    and what was said, I don't remember the exact
9    language.  My first reflection was, hey, maybe that
10   is -- maybe that is -- if I'm going to be in this
11   court having to make a claim, maybe it would be best
12   if it wasn't being made by me.  That is all.
13       Q.     And I appreciate that.  And I am just
14   trying to test the credibility of that statement.
15   Okay?
16           MR. BRIDGES:  Objection to the
17       sidebar.
18   BY MR. MORRIS:
19       Q.     Did Judge Jernigan ever issue a ruling
20   against you personally?
21           MR. BRIDGES:  Asked and answered.
22       Objection.
23           MR. MORRIS:  It is not asked and
24       answered.
25   BY MR. MORRIS:

Page 109

1                     Grant Scott

2        Q.    But go ahead, sir.

3        A.    Not against me personally.

4        Q.    Did Judge Jernigan ever issue a ruling

5    against CLO HoldCo Limited?

6        A.    Well, to my --

7              MR. BRIDGES:  Objection.  Objection.

8         Calls for legal conclusion as to the

9         meaning of "against."

10             (Reporter clarification.)

11             THE WITNESS:  The denial of the

12        escrow motion created a fairly big headache

13        for CLO HoldCo in the remainder of 2020.

14             So I believe that was a ruling

15        against CLO HoldCo, to answer your

16        question.

17   BY MR. MORRIS:

18       Q.    Okay.  Are you aware of any others?

19             MR. BRIDGES:  Objection.  Calls for a

20        legal conclusion as to the meaning of

21        "against."

22   BY MR. MORRIS:

23       Q.    You can answer.

24       A.    I don't know that she's made any other

25   rulings except to approve the settlement.

Appx 07937

010980

Page 110

1                         Grant Scott

2       Q.      Which settlement are you referring to?

3       A.      The -- the TRO settlement.

4       Q.      And were you on the -- did you listen in to

5   the hearing during that hearing when -- when the judge

6   approved the settlement?

7       A.      I did not.

8       Q.      Did you read the transcript?

9       A.      I did not.

10      Q.      Did anybody ever tell you that the judge

11   said anything during that hearing to question your

12   independence?

13          MR. KANE:  Objection to the extent it

14      calls for attorney/client privileged

15      information.

16          THE WITNESS:  No.  No, I think you

17      misunderstand.  I had one data point to go

18      on, and that's what made me start the

19      process of thinking of resigning.  That's

20      all.

21   BY MR. MORRIS:

22      Q.      I appreciate that.

23      A.      The issue -- the issue has been raised

24   repeatedly, whether it was my idea or somebody else's

25   idea, that's all I'm saying.  If you can, it was my

Appx. 07038

010981

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 231
Case 3:25-cv-02072-S    Document 15-14   Filed 10/06/25    Page 64 of 921    PageID 11862
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 112 of
116

Page 111

                              Grant Scott

1

2     idea.

3         Q.     Okay.  And I'm asking you if you have any

4     other data points after that hearing to support the

5     notion that Judge Jernigan questioned your

6     independence?

7         A.     No.

8               MR. MORRIS:  I have no further

9         questions.

10               MR. BRIDGES:  Me either.

11               MR. KANE:  I'm done.  Thank you.

12         Mr. Scott.

13               (Deposition adjourned at 4:42 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

010982

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 232
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 65 of 921 PageID 11863
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 113 of 116

```
                                                  Page 112
 1                    Grant Scott

 2              REPORTER'S CERTIFICATE

 3       I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,

 4   Registered Professional Reporter, certify that the

 5   foregoing proceedings were taken before me at the time

 6   and place therein set forth, at which time the witness

 7   was put under oath by me;

 8       That the testimony of the witness, the questions

 9   propounded, and all objections and statements made at

10   the time of the examination were recorded

11   stenographically by me and were thereafter

12   transcribed;

13       That the foregoing is a true and correct

14   transcript of my shorthand notes to taken.

15   I further certify that I am not a relative or employee

16   of any attorney or the parties, nor financially

17   interested in the action.

18       I declare under penalty of perjury under the laws

19   of North Carolina that the foregoing is true and

20   correct.

21       Dated this June 1, 2021.

22

23              _Leshaunda Byrd_
                _____
24              LESHAUNDA CASS-BYRD, CCR-B-2291, RPR

25
```

010983

Page 113

```
 1                      ERRATA SHEET

 2   Case Name:

 3   Deposition Date:

 4   Deponent:

 5   Pg.  No. Now Reads        Should Read  Reason

 6   ____ ____ _____      _____   _____

 7   ____ ____ _____      _____   _____

 8   ____ ____ _____      _____   _____

 9   ____ ____ _____      _____   _____

10   ____ ____ _____      _____   _____

11   ____ ____ _____      _____   _____

12   ____ ____ _____      _____   _____

13   ____ ____ _____      _____   _____

14   ____ ____ _____      _____   _____

15   ____ ____ _____      _____   _____

16   ____ ____ _____      _____   _____

17   ____ ____ _____      _____   _____

18   ____ ____ _____      _____   _____

19   ____ ____ _____      _____   _____

20

                             _____

21                            Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS _____ DAY OF _____, 2021.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

010984

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 234
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 67 of 921 PageID 11865
Case 19-34054-sgj11 Doc 2454-2 Filed 06/16/21 Entered 06/16/21 16:18:26 Page 115 of 116

```
                                                              Page 114
 1

 2   WITNESS SIGNATURE:_____

 3              * * * * * * * * * * * * * * *

 4   State of _____

 5   County of _____

 6   Subscribed and sworn to before me this _____ day of

 7   _____, 2021.

 8

 9              _____

10              Notary Public

11   My Commission expires_____

12   (Seal)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

010985

Page 115

1                         Grant Scott

2    J U R A T

3    I,              , do hereby certify under penalty of

4    perjury that I have read the foregoing transcript of

5    my deposition taken on;_____that I have made

6    such corrections as appear noted herein in ink,

7    initialed by me; that my testimony as contained

8    herein, as corrected, is true and correct.

9    Dated this ____ day of _____, 2021, at

10   _____,

11

12

13   _____

14   SIGNATURE OF WITNESS

15

16

17

18

19

20

21

22

23

24

25

Appx 07943

010986

# EXHIBIT 54

Appx 07044
010987

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 70 of 921   PageID 11868
Case 19-34054-sgj11 Doc 2518 Filed 07/02/21   Entered 07/02/21 16:02:39   Page 1 of 2

Docket #2518 Date Filed: 07/02/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

**DECLARATION OF JOHN A. MORRIS
IN SUPPORT OF DEBTOR'S MOTION TO SUPPLEMENT
THE RECORD IN THE CONTEMPT HEARING HELD ON JUNE 8, 2021**

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as

follows:

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054210702000000000007

Appx 01988

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 71 of 921 PageID 11869
Case 19-34054-sgj11 Doc 2518 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 2 of 2

1.      I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP (the

"Firm"), counsel to the above-referenced Debtor, and I submit this Declaration in support of the

*Debtor's Motion to Supplement the Record in the Contempt Hearing Held on June 8, 2021* (the

"Motion").  Unless stated otherwise, this Declaration is based on my personal knowledge and

review of the documents listed below.

2.      On June 8, 2021, this Court held an evidentiary hearing (the "Hearing") on the

*Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be*

*Held in Civil Contempt for Violating Two Court Orders* [Docket No. 2247] (the "Contempt

Motion").

3.      During the Hearing, the Court admitted into evidence without objection Debtor's

Exhibits 54 and 55 (together, the "Applicable Exhibits").

4.      The Applicable Exhibits were time records maintained in the ordinary course of

business by my Firm in connection with the Contempt Motion for the periods (a) April 18 through

April 30, 2021 (Exhibit 54), and (b) as labelled, May 1 through June 7, 2021 (Exhibit 55),

respectively.

5.      Exhibit 55 contained very few time entries for the month of June for the simple

reason that they had not yet been uploaded into my Firm's accounting records.

6.      Attached as proposed **Exhibit 56** is a true and correct copy of my Firm's time

records for the period June 1 through June 8, 2021, in connection with the Contempt Hearing,

exclusive of any time captured in Exhibit 55.

7.      The Debtor is requesting that the Court permit the Debtor to supplement the record

in the Hearing on the Contempt Motion to admit Exhibit 56 under the doctrine of completeness.

Dated: July 2, 2021.                    */s/ John A. Morris*
                                        John A. Morris



# EXHIBIT 56

Appx. 07045

010990

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21   Entered 07/02/21 16:02:39   Page 2 of 13

# Pachulski Stang Ziehl & Jones LLP

10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Board of Directors
Highland Capital Management LP
300 Crescent Court ste. 700
Dallas, TX  75201

June 28, 2021
Invoice   0
Client    36027
Matter    00002
**JNP**

RE:  Postpetition

### STATEMENT OF PROFESSIONAL SERVICES RENDERED THROUGH   06/28/2021



Appx. 07948

010991

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 74 of 921    PageID 11872

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21    Entered 07/02/21 16:02:39    Page 3 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

Page:    65
Prebill#283721
June 28, 2021

### DAF

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| JAM Bill | 06/01/2021 | | DAF | 8.70 | 8.70 | 1,245.00 | 10,831.50 |
| 06/01/2021 | JAM | DAF | Prepare for Dondero deposition (2.2); Dondero deposition (2.6); tel c. w/ J. Pomerantz re: Dondero deposition (0.2); prepare for Scott deposition (0.3); Scott deposition (2.8); tel c. w/ G. Demo re: Scott deposition (0.1); tel c. w/ J. Pomerantz re: Scott deposition (0.2); tel c. w/ J. Seeley re: depositions (0.3) | | 8.70 | 1245.00 | $10,831.50 |
| LSC Bill | 06/01/2021 | | DAF | 5.50 | 5.50 | 460.00 | 2,530.00 |
| 06/01/2021 | LSC | DAF | Preparation for and assist at deposition of Jim Dondero (contempt motion) | | 5.50 | 460.00 | $2,530.00 |
| LSC Bill | 06/01/2021 | | DAF | 2.70 | 2.70 | 460.00 | 1,242.00 |
| 06/01/2021 | LSC | DAF | Assist at deposition of Grant Scott (contempt motion) | | 2.70 | 460.00 | $1,242.00 |

Pachulski Stang Ziehl & Jones LLP          Page:  66
Highland Capital Management LP             Prebill#283721
36027  -00002                              June 28, 2021

| | | | Hours | Rate | Amount |
|---|---|---|---|---|---|

| JAM Bill | 06/02/2021 | DAF | 1.80 | 1.80 | 1,245.00 | | 2,241.00 |
|---|---|---|---|---|---|---|---|

| 06/02/2021 | JAM | DAF | Tel c. w/ J. Dubel re: depositions in contempt proceeding (0.4); | 1.80 | 1245.00 | $2,241.00 |
|---|---|---|---|---|---|---|
| | | | tel c. w/ T. Surgent, D. Klos, G. Demo re: DAF issues (0.9); | | | |
| | | | e-mail to L. Canty, G. Demo, H. Winograd re: Witness & Exhibit List for contempt hearing (0.3); e-mail to L. Canty, G. Demo, H. Winograd re: hearing binders for contempt hearing (0.2) | | | |

| LSC Bill | 06/02/2021 | DAF | 1.00 | 1.00 | 460.00 | | 460.00 |
|---|---|---|---|---|---|---|---|

| 06/02/2021 | LSC | DAF | Begin preparation of exhibit and witness list for DAF contempt hearing. | 1.00 | 460.00 | $460.00 |
|---|---|---|---|---|---|---|

| LSC Bill | 06/02/2021 | DAF | 2.40 | 2.40 | 460.00 | | 1,104.00 |
|---|---|---|---|---|---|---|---|

| 06/02/2021 | LSC | DAF | Begin retrieval and compilation of exhibits in connection with DAF contempt hearing. | 2.40 | 460.00 | $1,104.00 |
|---|---|---|---|---|---|---|

Pachulski Stang Ziehl & Jones LLP                                    Page:    67
Highland Capital Management LP                                       Prebill#283721
36027    -00002                                                     June 28, 2021

|  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|

| JAM Bill | 06/03/2021 | DAF | 4.80 | 4.80 | 1,245.00 | 5,976.00 |
|---|---|---|---|---|---|---|

| 06/03/2021 | JAM | DAF | Document review (latest production from Patrick) (2.5); tel c. w/ G. Demo re: document review (0.1); e-mail to counsel for respondents re: logistics and trial matters (0.6); tel c. w/ L. Phillips re: logistics and trial matters (0.2); prepare for Patrick deposition (1.4) | 4.80 | 1245.00 | $5,976.00 |
|---|---|---|---|---|---|---|

| J E Bill | 06/03/2021 | DAF | 0.40 | 0.40 | 1,195.00 | 478.00 |
|---|---|---|---|---|---|---|

| 06/03/2021 | JE | DAF | Review Reply brief; correspondence with Mr. Morris regarding same. | 0.40 | 1195.00 | $478.00 |
|---|---|---|---|---|---|

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027    -00002

Page:     68
Prebill#283721
June 28, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|

(content redacted)

| | | | Bill | | | | |
|---|---|---|---|---|---|---|---|
| 06/04/2021 | J N P | DAF | | Emails with John A.Morris and Gregory V. Demo regarding DAF response. | 0.20 | 1295.00 | $259.00 |
| JAM Bill | 06/04/2021 | | DAF | 7.80 | 7.80 | 1,245.00 | | 9,711.00 |
| 06/04/2021 | JAM | DAF | | Prepare for Patrick deposition (4.4); Patrick deposition (including calls w/ G. Demo at breaks) (3.1); tel c.  w/ Seery re: Patrick deposition (0.3) | 7.80 | 1245.00 | $9,711.00 |
| LSC Bill | 06/04/2021 | | DAF | 4.10 | 4.10 | 460.00 | | 1,886.00 |
| 06/04/2021 | LSC | DAF | | Prepare for and assist at  deposition of Mark Patrick. | 4.10 | 460.00 | $1,886.00 |
| LSC Bill | 06/04/2021 | | DAF | 4.70 | 4.70 | 460.00 | | 2.162.00 |
| 06/04/2021 | LSC | DAF | | Continued preparation o f exhibits in connection with contempt hearing. | 4.70 | 460.00 | $2,162.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 78 of 921 PageID 11876

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 7 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 -00002

Page:   69
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JNP Bill | 06/05/2021 | | DAF | 0.60 | 0.60 | 1,295.00 | | 777.00 |
| 06/05/2021 | JNP | DAF | Emails regarding witness and exhibit list; Conference with Gregory V. Demo and John A. Morris regarding same. | 0.60 | 1295.00 | $777.00 |
| JNP Bill | 06/05/2021 | | DAF | 0.50 | 0.50 | 1,295.00 | | 647.50 |
| 06/05/2021 | JNP | DAF | Conference with John A. Morris regarding upcoming evidentiary hearing on contempt and motion for reconsideration. | 0.50 | 1295.00 | $647.50 |
| JAM Bill | 06/05/2021 | | DAF | 7.30 | 7.30 | 1,245.00 | | 9,088.50 |
| 06/05/2021 | JAM | DAF | Review/analyze Scott deposition transcript (2.9); e-mail to L. Canty, H. Winograd re: deposition designations (0.2); tel c. w/ G. Demo re: contempt hearing (0.2); review documents (1.1); communications w/ L. Canty, G. Demo, Z. Annable re: W&E list (0.4); prepare for hearing (1.4); tel c. w/ J. Pomerantz re: trial matters (0.5); tel c. w/ J. Pomerantz, G. Demo re: exhibits, trial matters (0.5); e-mails w/ L. Phillips re: trial matters (0.1) | 7.30 | 1245.00 | $9,088.50 |
| LSC Bill | 06/05/2021 | | DAF | 2.90 | 2.90 | 460.00 | | 1,334.00 |
| 06/05/2021 | LSC | DAF | Further revise witness and exhibit list for contempt motion and prepare additional exhibits (2.9); ███ | 2.90 | 460.00 | $1,334.00 |
| GVD Bill | 06/05/2021 | | DAF | 0.30 | 0.30 | 950.00 | | 285.00 |
| 06/05/2021 | GVD | DAF | Multiple conferences with J. Morris re preparation for contempt hearing | 0.30 | 950.00 | $285.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 79 of 921 PageID 11877
Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 8 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 70
Prebill#283721
June 28, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| GVD Bill | 06/05/2021 | | DAF | 0.40 | 0.40 | 950.00 | 380.00 |
| 06/05/2021 | GVD | DAF | Conference with J. Morris and J. Pomerantz re preparation for June 8 hearing | | 0.40 | 950.00 | $380.00 |
| GVD Bill | 06/05/2021 | | DAF | 0.90 | 0.90 | 950.00 | 855.00 |
| 06/05/2021 | GVD | DAF | Compile and file witness and exhibit list for June 8 hearing | | 0.90 | 950.00 | $855.00 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 80 of 921 PageID 11878

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 9 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027  -00002

Page:    71
Prebill#283721
June 28, 2021

| | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| Bill | | | | | | |
| 06/06/2021 | JAM | DAF | Prepare for trial (4.4); review respondents' documents (0.4); e-mails w/ respondents' counsel re: objections to exhibits (0.3); tel c. w/ J. Seery re: DAF hearing and evidence (0.4) | 5.50 | 1245.00 | $6,847.50 |

[black redacted area]

[black redacted area]

| GVD Bill | 06/06/2021 | | DAF | 0.30 | 0.30 | 950.00 | | 285.00 |
|---|---|---|---|---|---|---|---|---|
| 06/06/2021 | GVD | DAF | Review demonstratives for June 8 hearing | 0.30 | 950.00 | $285.00 |
| GVD Bill | 06/06/2021 | | DAF | 0.40 | 0.40 | 950.00 | | 380.00 |
| 06/06/2021 | GVD | DAF | Conference with J. Morris and J. Pomerantz re preparation for June 8 hearing | 0.40 | 950.00 | $380.00 |
| GVD Bill | 06/06/2021 | | DAF | 1.60 | 1.60 | 950.00 | | 1,520.00 |
| 06/06/2021 | GVD | DAF | Review transcripts re evidence for June 8 hearing | 1.60 | 950.00 | $1,520.00 |
| GVD Bill | 06/06/2021 | | DAF | 0.60 | 0.60 | 950.00 | | 570.00 |
| 06/06/2021 | GVD | DAF | Compile witness and exhibit lists for June 8 hearing | 0.60 | 950.00 | $570.00 |

[black redacted area]

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 81 of 921    PageID 11879

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21    Entered 07/02/21 16:02:39    Page 10 of
13

Pachulski Stang Ziehl & Jones LLP                                    Page:    72
Highland Capital Management LP                                      Prebill#283721
36027    - 00002                                                    June 28, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| JNP Bill | 06/07/2021 | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 06/07/2021 | JNP | DAF | Conference with J. Dubel regarding DAF hearing. | 0.10 | 1295.00 | $129.50 |

| JNP Bill | 06/07/2021 | DAF | 1.00 | 1.00 | 1,295.00 | 1,295.00 |
|---|---|---|---|---|---|---|
| 06/07/2021 | JNP | DAF | Working dinner with John A. Morris and Gregory V. Demo preparing for DAF hearing. | 1.00 | 1295.00 | $1,295.00 |
| JAM Bill | 06/07/2021 | DAF | 11.20 | 11.20 | 1,245.00 | 13,944.00 |
| 06/07/2021 | JAM | DAF | Prepare for contempt hearing (9.8); communications with L. Canty, H. Winograd re: exhibits/time records (0.4); working dinner with J. Pomerantz, G. Demo re: prepare for hearing (1.0). | 11.20 | 1245.00 | $13,944.00 |
| LSC Bill | 06/07/2021 | DAF | 4.60 | 4.60 | 460.00 | 2,116.00 |
| 06/07/2021 | LSC | DAF | Review, retrieve, and prepare additional exhibits in connection with contempt hearing and correspondence with J. Morris and G. Demo regarding the same. | 4.60 | 460.00 | $2,116.00 |
| GVD Bill | 06/07/2021 | DAF | 1.00 | 1.00 | 950.00 | 950.00 |
| 06/07/2021 | GVD | DAF | Working dinner in preparation for DAF/CLOH contempt hearing | 1.00 | 950.00 | $950.00 |
| GVD Bill | 06/07/2021 | DAF | 0.20 | 0.20 | 950.00 | 190.00 |
| 06/07/2021 | GVD | DAF | Review discovery re DAF action | 0.20 | 950.00 | $190.00 |

010999

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of 16
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 82 of 921 PageID 11880

Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21 Entered 07/02/21 16:02:39 Page 11 of 13

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027 - 00002

Page: 73
Prebill#283721
June 28, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| GVD Bill | 06/07/2021 | | DAF | 0.50 | 0.50 | 950.00 | 475.00 |
| 06/07/2021 | GVD | DAF | Review demonstratives and trial exhibits | | 0.50 | 950.00 | $475.00 |
| HRW Bill | 06/07/2021 | | DAF | 0.50 | 0.50 | 695.00 | 347.50 |
| 06/07/2021 | HRW | DAF | Prepare exhibit for hearing on DAF contempt motion (0.5) | | 0.50 | 695.00 | $347.50 |
| JNP Bill | 06/08/2021 | | DAF | 10.80 | 10.80 | 1,295.00 | 13,986.00 |
| 06/08/2021 | JNP | DAF | Participate in hearing on contempt motion. | | 10.80 | 1295.00 | $13,986.00 |
| JNP Bill | 06/08/2021 | | DAF | 0.10 | 0.10 | 1,295.00 | 129.50 |
| 06/08/2021 | JNP | DAF | Conference with Ira D. Kharasch regarding results of hearing. | | 0.10 | 1295.00 | $129.50 |

Appx 07957

Pachulski Stang Ziehl & Jones LLP
Highland Capital Management LP
36027   -00002

Page:   74
Prebill#283721
June 28, 2021

| | | | | | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| JAM Bill | 06/08/2021 | | DAF | 10.80 | 10.80 | 1,245.00 | 13,446.00 |
| 06/08/2021 | JAM | DAF | Participate in hearing on contempt motion (10.80). | | 10.80 | 1245.00 | $13,446.00 |
| LSC Bill | 06/08/2021 | | DAF | 9.50 | 9.50 | 460.00 | 4,370.00 |
| 06/08/2021 | LSC | DAF | Prepare for and assist at contempt hearing against DAF, et al. | | 9.50 | 460.00 | $4,370.00 |
| | | | | | | | |
| GVD Bill | 06/08/2021 | | DAF | 10.80 | 10.80 | 950.00 | 10,260.00 |
| 06/08/2021 | GVD | DAF | Prepare for and attend contempt hearing | | 10.80 | 950.00 | $10,260.00 |
| | | | | | | | |
| HRW Bill | 06/08/2021 | | DAF | 6.50 | 6.50 | 695.00 | 4,517.50 |
| 06/08/2021 | HRW | DAF | Attend hearing on DAF contempt motion (partial) (6.5) | | 6.50 | 695.00 | $4,517.50 |
| | | | | | | | |
| JNP | 06/09/2021 | | DAF | 0.30 | 0.30 | 1,295.00 | 388.50 |

Case 19-34054-sgj11 Doc 3445-54 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 84 of 921    PageID 11882
Case 19-34054-sgj11 Doc 2518-1 Filed 07/02/21    Entered 07/02/21 16:02:39    Page 13 of
13

Pachulski Stang Ziehl & Jones LLP                                    Page:    75
Highland Capital Management LP                                       Prebill#283721
36027    - 00002                                                    June 28, 2021

|  |  |  |  | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| **Bill** |  |  |  |  |  |  |
| 06/09/2021 | JNP | DAF | Conference with Robert J. Feinstein regarding hearing on contempt and related issues. | 0.30 | 1295.00 | $388.50 |

**TOTAL FEES: $128,783.00**

Appx. 07959

011002

# EXHIBIT 55

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 86 of 921    PageID 11884
Case 19-34054-sgj11 Doc 1875 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 1 of 4

Docket #1875 Date Filed: 02/01/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DEBTOR'S NOTICE OF FILING OF PLAN SUPPLEMENT TO THE FIFTH
## AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
## MANAGEMENT, L.P. (AS MODIFIED)

**PLEASE TAKE NOTICE** that on January 22, 2021, the Debtor filed the *Fifth Amended*

*Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808]

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210201000000000009

Appx. 07991

011004

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 87 of 921    PageID 11885
Case 19-34054-sgj11 Doc 1875 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 2 of 4

(as subsequently amended and/or modified, the "Plan").[2]

 **PLEASE TAKE FURTHER NOTICE** that Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor"), filed the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* on November 24, 2020 [Docket No. 1473] (the "Disclosure Statement").

 **PLEASE TAKE FURTHER NOTICE** that attached as Exhibit C to the Disclosure Statement was the Debtor's Liquidation Analysis/Financial Projections.

 **PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** are the Debtor's amended Liquidation Analysis/Financial Projections (the "Amended Liquidation Analysis/Financial Projections"), which supersede the Liquidation Analysis/Financial Projections filed on November 24, 2020, with the Disclosure Statement.

 **PLEASE TAKE FURTHER NOTICE** that a prior version of the Amended Liquidation Analysis/Financial Projections was provided to parties in interests on January 28, 2021, in advance of the deposition of James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer, and that the Amended Liquidation Analysis/Financial Projections differ from such version in two respects:

- The Amended Liquidation Analysis/Financial Projections include the settlement in principle between UBS and the Debtor, which provides for UBS receiving a Class 8 (General Unsecured Claim) of $50,000,000 and a Class 9 (Subordinated Claim) of $25,000,000.  The prior Liquidation Analysis/Financial Projections included a Class 8 (General Unsecured Claim) in the amount of $94,761,076 pursuant to the Court's order temporarily allowing the UBS claim in that amount for voting purposes; and

- The Debtor inadvertently understated the aggregate amount of Class 8 (General Unsecured Claims) by $4,392,937, which error is corrected in the Amended Liquidation Analysis/Financial Projections.

 **PLEASE TAKE NOTICE** that the Debtor hereby files the documents included herewith

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Plan.

DOCS_NY:42174.4 36027/002

Appx. 07002
01T005

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 88 of 921 PageID 11886
Case 19-34054-sgj11 Doc 1875 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 3 of 4

as **Exhibits DD-FF** (collectively, the "Fifth Plan Supplement") as Exhibits DD-FF to the Plan:

**Exhibit DD**: Schedule of Retained Causes of Action (supersedes Exhibits E, L, and Q);

**Exhibit EE**: Revisions to Form of Claimant Trust Agreement (amends Exhibit R); and

**Exhibit FF**: Schedule of Contracts and Leases to Be Assumed (supersedes Exhibit H, I, and X).[3]

**PLEASE TAKE NOTICE** that the Debtor hereby gives notice of supplemental amendments (the "Plan Amendments") to the Plan, which are set forth in the redlined excerpts of the Plan attached hereto as **Exhibit B**.

*[Remainder of Page Intentionally Blank]*

---

[3] The Schedule of Contracts and Leases includes an agreement with Bloomberg Finance, L.P. ("Bloomberg"). The Debtor is currently in discussions with Bloomberg regarding the assumption of such agreement.

DOCS_NY:42174.4 36027/002

APPX 07983

Dated: February 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email:  jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

Appx. 07864

011007

Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 1 of 8

# **EXHIBIT A**

011008

*Highland Capital Management, L.P.*
*Disclaimer For Financial Projections*

   This document includes financial projections for July 2020 through December 2022 (the "Projections") for Highland Capital Management, L.P. "Company"). These Projections have been prepared by DSI with input from management at the Company. The historical information utilized in these Projections has not been audited or reviewed for accuracy by DSI.

   This document includes certain statements, estimates and forecasts provided by the Company with respect to the Company's anticipated future performance. These estimates and forecasts contain significant elements of subjective judgment and analysis that may or may not prove to be accurate or correct. There can be no assurance that these statements, estimates and forecasts will be attained and actual outcomes and results may differ materially from what is estimated or forecast herein.

   These Projections should not be regarded as a representation of DSI that the projected results will be achieved.

   Management may update or supplement these Projections in the future, however, DSI expressly disclaims any obligation to update its report.

   These Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding historical financial statements, projections or forecasts.

2/1/2021
Appx. 07985
011009

**Highland Capital Management, L.P.**
**Statement of Assumptions**

A.  Plan effective date is March 1, 2021

B.  All investment assets are sold by December 31, 2022.

C.  All demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021

D.  Dugaboy term note with maturity date beyond 12/31/2022 are sold in Q1 2022; in the
interim interest income and principal payments are not collected due to prepayment on note

E.  Fixed assets currently used in daily operations are sold in June 2021 for $0

F.  Highland bonus plan has been terminated in accordance with its terms. Accrual for employee bonuses as of January 2021 are reversed and not paid.

G.  All Management advisory or shared service contracts are terminated on their terms by the effective date or shortly thereafter

H.  Post-effective date, the reorganized Debtor would retain up to ten HCMLP employees (or hire similar employees) to help monetize the remaining assets.

I.  Litigation Trustee budget is $6,500,000.

J.  Unrealized gains or losses are not recorded on a monthly basis; all gains or losses are recorded as realized gains or losses upon sale of asset.

K.  Plan does not provide for payment of interest to Class 8 holders of general unsecured claims, as set forth in the Plan. If holders of general unsecured claims receive 100% of their allowed claims, they would then be entitled to receive interest at the federal judgement rate, prior to any funds being available for claims or interest of junior priority.

L.  Plan assumes zero allowed claims for IFA and Hunter Mountain Investment Trust ("HM").

M.  Claim amounts listed in Plan vs. Liquidation schedule are subject to change; claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV. Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

N.  With the exception of Class 2 - Frontier, Classes 1-7 will be paid in full within 30 days of effective date.

O.  Class 7  payout limited to 85% of each individual creditor claim or in the aggregate $13.15 million. Plan currently projects Class 7 payout of $10.3 million.

P.  See below for Class 8 estimated payout schedule; payout is subject to certain assets being monetized by payout date (no Plan requirement to do so):

    o  By September 30, 2021 - $50,000,000

    o  By March 31, 2022 – additional $50,000,000

    o  By June 30, 2022 – additional $25,000,000

    o  All remaining proceeds are assumed to be paid out on or soon after all remaining assets are monetized.

Q.  Assumptions subject to revision based on business decision and performance of the business

2/1/2021

**Highland Capital Management, L.P.**
*Plan Analysis Vs. Liquidation Analysis*
*(US $000's)*

| | Plan Analysis | Liquidation Analysis |
|---|---:|---:|
| Estimated cash on hand at 1/31/2020 | $ 24,290 | $ 24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution[1][3] | (59,573) | (41,488) |
| Total estimated $ available for distribution | 222,658 | 174,748 |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 - Jefferies Secured Claim | - | - |
| Class 2 - Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 - Other Secured Claims | (62) | (62) |
| Class 4 - Priority Non-Tax Claims | (16) | (16) |
| Class 5 - Retained Employee Claims | - | - |
| Class 6 - PTO Claims [5] | - | - |
| Class 7 – Convenience Claims [7][8] | (10,280) | - |
| Subtotal | (27,793) | (17,514) |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims included in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General Unsecured Claims [8][10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated Claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C Limited Partnership Interests | *no distribution* | *no distribution* |
| Class 11 – Class A Limited Partnership Interest | *no distribution* | *no distribution* |

*Footnotes:*
*[1] Assumes chapter 7 Trustee will not be able to achieve same sales proceeds as Claimant Trustee*
*   Assumes Chapter 7 Trustee engages new professionals to help liquidate assets and terminates any management agreements with funds or CLOS*
*[2] Sale of investment assets, sale of fixed assets, collection of accounts receivable and interest receivable; Plan includes revenue from managing CLOs*
*[3] Estimated expenses through final distribution exclude non-cash expenses:*
*   Depreciation of $462 thousand in 2021; Bad debt of $124K in 2021*
*[4] Unclassified claims include payments for priority tax claims and settlements with previously approved by the Bankruptcy Court*
*[5] Represents $4.7 million in unpaid professional fees, $4.5 million in timing of payments to vendors and $1.2 million to pay PTO*
*[6] Debtor will pay all unpaid interest estimated at $253 thousand of Frontier on effective date and continue to pay interest quarterly at 5.25% until Frontier's collateral is sold*
*[7] Claims payout limited to 85% of each individual creditor claim or limited to a total class payout of $13.15 million*
*[8] Plan: Class 7 includes $1.2 million estimate for aggregate contract rejections damage; Liquidation Class 8 includes $2.0 million for estimated rejection damages*
*[10] Class estimates $0 allowed claim for the following creditors: IFA and HM; assumes RCP claims offset against HCMLP interest in RCP fund*
*   UBS claim included at $50.0 million.*

*Notes:*
*All claim amounts are estimated as of February 1, 2020 and subject to change*

2/1/2021

Appx. 7068
011011

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 10 of 49

Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 5 of 8

*Highland Capital Management, L.P.*
*Balance Sheet*
*(US $000's)*

| | Actual Jun-20 | Actual Sep-20 | Forecast ---> Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | |
| Cash and Cash Equivalents | $ 14,994 | $ 5,888 | $ 31,047 | $ 10,328 | $ 40,063 | $ 42,833 | $ 135,137 | $ 80,733 | $ 72,238 | $ 69,368 | $ - |
| Other Current Assets | 13,182 | 13,651 | 13,784 | 15,172 | 14,671 | 14,220 | 9,943 | 8,268 | 8,417 | 8,567 | - |
| Investment Assets | 320,912 | 305,961 | 283,812 | 280,946 | 233,234 | 171,174 | 47,503 | 47,503 | 25,888 | 25,888 | - |
| Net Fixed Assets | 3,055 | 2,823 | 2,592 | 1,348 | - | - | - | - | - | - | - |
| **TOTAL ASSETS** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,542 | $ 103,823 | $ - |
| | | | | | | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Post-petition Liabilities | $ 142,730 | $ 135,597 | $ 131,230 | $ 12,891 | $ 10,249 | $ 10,503 | $ - | $ - | $ - | $ - | $ - |
| Pre-petition Liabilities | 9,861 | 9,884 | 10,000 | - | - | - | - | - | - | - | - |
| Claims | | | | | | | | | | | |
| Unclassified | - | - | - | - | - | - | - | - | - | - | - |
| Class 1 – Jefferies Secured Claim | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Frontier Secured Claim | - | - | - | 5,528 | - | - | - | - | - | - | - |
| Class 3 - Other Secured Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 – Priority Non-Tax Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 – Retained Employee Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 - PTO Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 7 – Convenience Claims | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 – General Unsecured Claims | - | - | - | 273,219 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| Class 9 – Subordinated Claims [1] | - | - | - | - | - | - | - | - | - | - | - |
| Class 10 – Class B/C Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Class 11 – Class A Limited Partnership Interests | - | - | - | - | - | - | - | - | - | - | - |
| Claim Payable | 9,861 | 9,884 | 10,000 | 278,747 | 273,219 | 223,219 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| **TOTAL LIABILITIES** | $ 152,591 | $ 145,481 | $ 141,230 | 291,639 | 283,468 | 233,723 | 223,219 | 173,219 | 148,219 | 148,219 | 78,354 |
| | | | | | | | | | | | |
| Partners' Capital | 199,551 | 182,842 | 190,005 | 16,154 | 4,500 | (5,495) | (30,636) | (36,715) | (41,677) | (44,396) | (78,354) |
| **TOTAL LIABILITIES AND PARTNERS' CAPITAL** | $ 352,142 | $ 328,323 | $ 331,235 | $ 307,793 | $ 287,968 | $ 228,227 | $ 192,583 | $ 136,504 | $ 106,543 | $ 103,823 | $ - |

*[1] Class 9 has $60 million of subordinated claims; Debtor anticipates no distributions to Class 9*

2/1/2021

Appx. 07089

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

| | Actual Jan 2020 to June 2020 Total | Actual 3 month ended Sept 2020 | Forecast ---> 3 month ended Dec 2020 | Total 2020 | 3 month ended Mar 2021 | 3 month ended Jun 2021 | 3 month ended Sept 2021 | 3 month ended Dec 2021 | Total 2021 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Management Fees | $ 6,572 | $ 1,949 | $ 2,804 | $ 11,325 | $ 1,329 | $ 856 | $ 856 | $ 856 | $ 3,897 |
| Shared Service Fees | 7,672 | 3,765 | 3,788 | 15,225 | 1,373 | 45 | 45 | - | 1,463 |
| Other Income | 3,126 | 538 | 340 | 4,004 | 316 | 274 | - | - | 591 |
| Total revenue | $ 17,370 | $ 6,252 | $ 6,931 | $ 30,554 | $ 3,018 | $ 1,176 | $ 901 | $ 856 | $ 5,951 |
| Operating Expenses [1] | 13,328 | 9,171 | 9,399 | 31,899 | 12,168 | 4,897 | 3,973 | 3,333 | 24,371 |
| Income/(loss) From Operations | $ 4,042 | $ (2,918) | $ (2,468) | $ (1,345) | $ (9,149) | $ (3,722) | $ (3,072) | $ (2,477) | $ (18,420) |
| Professional Fees | 17,522 | 7,707 | 8,351 | 33,581 | 7,478 | 6,583 | 2,268 | 1,810 | 18,138 |
| Other Income/(Expenses) [2] | 2,302 | 1,518 | 1,059 | 4,879 | (156,042) | 326 | (93) | 29 | (155,781) |
| Operating Gain/(Loss) | $ (11,178) | $ (9,107) | $ (9,761) | $ (30,046) | $ (172,669) | $ (9,978) | $ (5,433) | $ (4,259) | $ (192,339) |
| **Realized and Unrealized Gain/(Loss)** | | | | | | | | | |
| Other Realized Gains/(Loss) | - | - | - | - | (1,013) | 522 | - | - | (491) |
| Net Realized Gain/(Loss) on Sale of Investment | (28,418) | 1,549 | (8,850) | (35,719) | (168) | (2,198) | (4,563) | (7,581) | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | (29,929) | (7,450) | 4,523 | (32,857) | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | (364) | (364) | - | - | - | (13,301) | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | (80,782) | (1,700) | - | (82,482) | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ (139,129) | $ (7,601) | $ (4,692) | $ (151,422) | $ (1,182) | $ (1,675) | $ (4,563) | $ (20,882) | $ (28,302) |
| Net Income | $ (150,307) | $ (16,708) | $ (14,453) | $ (181,468) | $ (173,851) | $ (11,654) | $ (9,996) | $ (25,141) | $ (220,641) |

*Footnotes:*
*[1] Operating expenses include an adjustment in January 2021 to account*
*  for expenses that have not been accrued or paid prior to effective date.*
*[2] Other income and expenses of $197.3 million in Q1 2021 includes:*
*  [a] $209.7 million was expensed to record for the increase of*
*    allowed claims.*
*  [b] Income of $11.7 million for the accrued, but unpaid payroll liability related to*
*    the Debtor's deferred bonus programs amount written-off.*

*Highland Capital Management, L.P.*
*Profit/Loss*
*(US $000's)*

|  | Forecast ---> | | | | | |
|  | 3 month ended Mar 2022 | 3 month ended Jun 2022 | 3 month ended Sept 2022 | 3 month ended Dec 2022 | Total 2022 | Plan |
| Revenue |  |  |  |  |  |  |
| Management Fees | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 6,215 |
| Shared Service Fees | - | - | - | - | - | 1,463 |
| Other Income | - | - | - | - | - | 591 |
| Total revenue | $ 580 | $ 580 | $ 580 | $ 580 | $ 2,318 | $ 8,269 |
| Operating Expenses | 3,635 | 2,679 | 1,739 | 6,425 | 14,478 | 38,849 |
| Income/(loss) From Operations | $ (3,056) | $ (2,099) | $ (1,159) | $ (5,846) | $ (12,160) | $ (30,580) |
| Professional Fees | 2,921 | 2,761 | 1,461 | 2,176 | 9,318 | 27,455 |
| Other Income/(Expenses) | (103) | (101) | (100) | (350) | (654) | (156,434) |
| Operating Gain/(Loss) | $ (6,079) | $ (4,961) | $ (2,719) | $ (8,371) | $ (22,131) | $ (214,470) |
| Realized and Unrealized Gain/(Loss) |  |  |  |  |  |  |
| Other Realized Gains/(Loss) | - | - | - | (25,587) | (25,587) | (26,078) |
| Net Realized Gain/(Loss) on Sale of Investment | - | - | - | - | - | (14,510) |
| Net Change in Unrealized Gain/(Loss) of Investments | - | - | - | - | - | - |
| Net Realized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | (13,301) |
| Net Change in Unrealized Gain /(Loss) from Equity Method Investees | - | - | - | - | - | - |
| Total Realized and Unrealized Gain/(Loss) | $ - | $ - | $ - | $ (25,587) | $ (25,587) | $ (53,889) |
| Net Income | $ (6,079) | $ (4,961) | $ (2,719) | $ (33,958) | $ (47,718) | $ (268,359) |

2/1/2021

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of 49

Case 19-34054-sgj11 Doc 1875-1 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 8 of 8

**Highland Capital Management, L.P.**
**Cash Flow Indirect**
**(US $000's)**

| | Sep-20 | Dec-20 | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Forecast ----> | | | | | | | | | |
| Net (Loss) Income | $ (16,708) $ | (14,453) | $ (173,851) $ | (11,654) $ | (9,996) $ | (25,141) | $ (6,079) $ | (4,961) $ | (2,719) $ | (33,958) |
| **Cash Flow from Operating Activity** | | | | | | | | | | |
| (Increase) / Decrease in Cash | | | | | | | | | | |
| Depreciation and amortization | 231 | 231 | 231 | 231 | - | - | - | - | - | - |
| Other realized (gain)/ loss | - | - | 1,013 | (522) | - | - | - | - | - | 25,587 |
| Investment realized (gain)/ loss | (1,549) | 9,214 | 168 | 2,198 | 4,563 | 20,882 | - | - | - | - |
| Unrealized (gain) / loss | (9,150) | 4,523 | - | - | - | - | - | - | - | - |
| (Increase) Decrease in Current Assets | (470) | (133) | (1,388) | 501 | 450 | 4,277 | 1,675 | (149) | (150) | 908 |
| Increase (Decrease) in Current Liabilities | (7,110) | (4,251) | (44,172) | (2,643) | 255 | (10,503) | - | - | - | - |
| Net Cash Increase / (Decrease) - Operating Activities | (34,757) | (4,868) | (217,998) | (11,889) | (4,727) | (10,485) | (4,404) | (5,110) | (2,870) | (7,463) |
| | | | | | | | | | | |
| **Cash Flow From Investing Activities** | | | | | | | | | | |
| Proceeds from Sale of Fixed Assets | - | - | | | | | - | - | - | - |
| Proceeds from Investment Assets | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| Net Cash Increase / (Decrease) - Investing Activities | 25,650 | 30,027 | 2,698 | 47,152 | 57,498 | 102,788 | - | 21,616 | - | 7,960 |
| | | | | | | | | | | |
| **Cash Flow from Financing Activities** | | | | | | | | | | |
| Claims payable | - | - | (73,997) | - | | | - | - | - | - |
| Claim reclasses/(paid) | - | - | 278,747 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
| Maple Avenue Holdings | - | - | (4,975) | - | | | - | - | - | - |
| Frontier Note | - | - | (5,195) | | | | - | - | - | - |
| Net Cash Increase / (Decrease) - Financing Activities | - | - | 194,580 | (5,528) | (50,000) | - | (50,000) | (25,000) | - | (69,865) |
| | | | | | | | | | | |
| Net Change in Cash | $ (9,107) $ | 25,159 | $ (20,719) $ | 29,735 $ | 2,770 $ | 92,303 | $ (54,404) $ | (8,495) $ | (2,870) $ | (69,368) |
| Beginning Cash | 14,994 | 5,888 | 31,047 | 10,328 | 40,063 | 42,833 | 135,137 | 80,733 | 72,238 | 69,368 |
| Ending Cash | $ 5,888 $ | 31,047 | $ 10,328 $ | 40,063 $ | 42,833 $ | 135,137 | $ 80,733 $ | 72,238 $ | 69,368 $ | - |

2/1/2021

APP 01075

Case 19-34054-sgj11 Doc 1875-2 Filed 02/01/21   Entered 02/01/21 16:22:31   Page 1 of 7

# **EXHIBIT B**

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

Appx 07074

126.    "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127.    "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128.    "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129.    "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to ~~11 U.S.C. § 510 or~~an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130.    "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.    "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.    "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.    "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.    "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.    "*Voting Record Date*" means November 23, 2020.

APPX 07075

Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

**C.    Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed Priority Tax Claim (b) in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.    Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within

18

Appx 07076

Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 102 of 921    PageID 11900

**I.**    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J.**    **Subordinated Claims**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. ~~Under section 510 of the Bankruptcy Code, upon~~Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

**A.**    **Summary**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

APPX 07973
011020

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the ~~Effective~~Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts

APPX 07978

forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.    Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee) ~~and any applicable parties in Section VII.A of this Plan~~, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or

47

Appx. 07979

Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 1 of 18

# **EXHIBIT DD**

Schedule of Causes of Action

The Causes of Action shall include, *without limitation*, any cause of action based on the following:

breach of fiduciary duties, breach of duty of care, breach of duty of loyalty, usurpation of corporate opportunities, breach of implied covenant of good faith and fair dealing, conversion, misappropriation of assets, misappropriation of trade secrets, unfair competition, breach of contract, breach of warranty, fraud, constructive fraud, negligence, gross negligence, fraudulent conveyance, fraudulent transfer, fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, fraudulent inducement, tortious interference, *quantum meruit*, unjust enrichment, abuse of process, alter ego, substantive consolidation, recharacterization, business disparagement, indemnity, claims for recovery of distributions or dividends, claims for indemnification, promissory estoppel, quasi-contract claims, any counterclaims, equitable subordination, avoidance actions provided for under sections 544 or 547 of the Bankruptcy Code, claims brought under state law, claims brought under federal law, claims under any common-law theory of tort or law or equity, and any claims similar in nature to the foregoing claims.

The Causes of Action shall include, *without limitation*, any cause of action against the following persons and entities:

James Dondero, Mark Okada, Grant Scott, John Honis, any current or former insider of the Debtor, the Dugaboy Investment Trust, Charitable DAF Holdco, Ltd, Hunter Mountain Investment Trust, Nexbank Capital, Inc. Highland Capital Management Services, Inc., NexPoint Advisors GP, LLC, NexPoint Advisors, L.P., Strand Advisors XVI, Inc., Highland Capital Management Fund Advisors, L.P., NexAnnuity Holdings, Inc., the entities listed on the attached **Annex 1** hereto, any current or former employee of the Debtor, and any entity directly or indirectly owned, controlled, or operated for the benefit of the foregoing persons or entities.

The Causes of Action shall include, *without limitation*, any cause of action arising from the following transactions:

The transfer of ownership interests in the Debtor to Hunter Mountain Investment Trust, the creation or transfer of any notes receivable from the Debtor or from any entity related to the Debtor, the creation or transfer of assets to or from any charitable foundation or trust, the formation, performance, or breach of any contract for the Debtor to provide investment management, support services, or any other services, and the distribution of assets or cash from the Debtor to partners of the Debtor.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 107 of 921 PageID 11905
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 3 of 18

## Annex 1

11 Estates Lane, LLC

1110 Waters, LLC

140 Albany, LLC

1525 Dragon, LLC

17720 Dickerson, LLC

1905 Wylie LLC

2006 Milam East Partners GP, LLC

2006 Milam East Partners, L.P.

201 Tarrant Partners, LLC

2014 Corpus Weber Road LLC

2325 Stemmons HoldCo, LLC

2325 Stemmons Hotel Partners, LLC

2325 Stemmons TRS, Inc.

300 Lamar, LLC

3409 Rosedale, LLC

3801 Maplewood, LLC

3801 Shenandoah, L.P.

3820 Goar Park LLC

400 Seaman, LLC

401 Ame, L.P.

4201 Locust, L.P.

4312 Belclaire, LLC

5833 Woodland, L.P.

5906 DeLoache, LLC

5950 DeLoache, LLC

7758 Ronnie, LLC

7759 Ronnie, LLC

AA Shotguns, LLC

Aberdeen Loan Funding, Ltd.

Acis CLO 2017-7 Ltd

Acis CLO Management GP, LLC

Acis CLO Management GP, LLC *(fka Acis CLO Opportunity Funds GP, LLC)*

Acis CLO Management Holdings, L.P.

Acis CLO Management Intermediate Holdings I, LLC

Acis CLO Management Intermediate Holdings II, LLC

Acis CLO Management, LLC *(fka Acis CLO Opportunity Funds SLP, LLC)*

Acis CLO Trust

Acis CLO Value Fund II Charitable DAF Ltd.

Acis CMOA Trust

Advisors Equity Group LLC

Alamo Manhattan Hotel I, LLC (Third Party)

Allenby, LLC

Allisonville RE Holdings, LLC

AM Uptown Hotel, LLC

Apex Care, L.P

Asbury Holdings, LLC *(fka HCSLR Camelback Investors (Delaware), LLC)*

Ascendant Advisors

Atlas IDF GP, LLC

Atlas IDF, LP

BB Votorantim Highland Infrastructure, LLC

BDC Toys Holdco, LLC

Beacon Mountain, LLC

Bedell Trust Ireland Limited (Charitable trust account)

Ben Roby (third party)

BH Equities, LLC

BH Heron Pointe, LLC

BH Hollister, LLC

BH Willowdale Manager, LLC

Big Spring Partners, LLC

Blair Investment Partners, LLC

Bloomdale, LLC

Brave Holdings III Inc.

Brentwood CLO, Ltd.

Brentwood Investors Corp.

Brian Mitts

Bristol Bay Funding Ltd.

Bristol Bay Funding, Ltd.

BVP Property, LLC

C-1 Arbors, Inc.

C-1 Cutter's Point, Inc.

C-1 Eaglecrest, Inc.

C-1 Silverbrook, Inc.

Cabi Holdco GP, LLC

Cabi Holdco I, Ltd

Cabi Holdco I, Ltd.

Cabi Holdco, L.P.

California Public Employees' Retirement System

Camelback Residential Investors, LLC

Camelback Residential Investors, LLC *(fka Sevilla Residential Partners, LLC)*

Camelback Residential Partners, LLC

Capital Real Estate - Latitude, LLC

Castle Bio Manager, LLC

Castle Bio, LLC

Cayco Admin Ltd.

Cayco Insolvency Ltd.

CG Works, Inc.

CG Works, Inc. (fka Common Grace Ventures, Inc.)

Charitable DAF Fund, L.P.

Charitable DAF GP, LLC

Charitable DAF HoldCo, Ltd

Charitable DAF HoldCo, Ltd.

Claymore Holdings, LLC

CLO HoldCo, Ltd

CLO Holdco, Ltd.

Corbusier, Ltd.

Cornerstone Healthcare Group Holding, Inc.

Corpus Weber Road Member LLC

CP Equity Hotel Owner, LLC

CP Equity Land Owner, LLC

CP Equity Owner, LLC

CP Hotel TRS, LLC

CP Land Owner, LLC

CP Tower Owner, LLC

CRE - Lat, LLC

Credit Suisse, Cayman Islands Branch

Crossings 2017 LLC

Crown Global Insurance Company (third party)

Dallas Cityplace MF SPE Owner LLC

Dallas Lease and Finance, L.P.

Dana Scott Breault
James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Dana Sprong (Third Party)

David c. Hopson

De Kooning, Ltd.

deKooning, Ltd.

DFA/BH Autumn Ridge, LLC

Dolomiti, LLC

DrugCrafters, L.P.

Dugaboy Investment Trust

Dugaboy Management, LLC

Dugaboy Project Management GP, LLC

Eagle Equity Advisors, LLC

Eames, Ltd.

Eastland CLO, Ltd.

Eastland Investors Corp.

EDS Legacy Heliport, LLC

EDS Legacy Partners Owner, LLC

EDS Legacy Partners, LLC

Empower Dallas Foundation, Inc.

ENA 41, LLC

Entegra Strat Superholdco, LLC

Entegra-FRO Holdco, LLC

Entegra-FRO Superholdco, LLC

Entegra-HOCF Holdco, LLC

Entegra-NHF Holdco, LLC

Entegra-NHF Superholdco, LLC

Entegra-RCP Holdco, LLC

Estates on Maryland Holdco, LLC

Estates on Maryland Owners SM, Inc.

Estates on Maryland Owners, LLC

Estates on Maryland, LLC

Falcon E&P Four Holdings, LLC

Falcon E&P One, LLC

Falcon E&P Opportunities Fund, L.P.

Falcon E&P Opportunities GP, LLC

Falcon E&P Royalty Holdings, LLC

Falcon E&P Six, LLC

Falcon E&P Two, LLC

Falcon Four Midstream, LLC

Falcon Four Upstream, LLC

Falcon Incentive Partners GP, LLC

Falcon Incentive Partners, LP

Falcon Six Midstream, LLC

Flamingo Vegas Holdco, LLC *(fka Cabi Holdco, LLC)*

Appx. 07983

011026

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 109 of 921 PageID 11907
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 5 of 18

Four Rivers Co-Invest GP, LLC
Four Rivers Co-Invest, L.P.
FRBH Abbington SM, Inc.
FRBH Abbington, LLC
FRBH Arbors, LLC
FRBH Beechwood SM, Inc.
FRBH Beechwood, LLC
FRBH C1 Residential, LLC
FRBH Courtney Cove SM, Inc.
FRBH Courtney Cove, LLC
FRBH CP, LLC
FRBH Duck Creek, LLC
FRBH Eaglecrest, LLC
FRBH Edgewater JV, LLC
FRBH Edgewater Owner, LLC
FRBH Edgewater SM, Inc.
FRBH JAX-TPA, LLC
FRBH Nashville Residential, LLC
FRBH Regatta Bay, LLC
FRBH Sabal Park SM, Inc.
FRBH Sabal Park, LLC
FRBH Silverbrook, LLC
FRBH Timberglen, LLC
FRBH Willow Grove SM, Inc.
FRBH Willow Grove, LLC
FRBH Woodbridge SM, Inc.
FRBH Woodbridge, LLC
Freedom C1 Residential, LLC
Freedom Duck Creek, LLC
Freedom Edgewater, LLC
Freedom JAX-TPA Residential, LLC
Freedom La Mirage, LLC
Freedom LHV LLC
Freedom Lubbock LLC
Freedom Miramar Apartments, LLC
Freedom Sandstone, LLC
Freedom Willowdale, LLC
Fundo de Investimento em Direitos Creditorios
BB Votorantim Highland Infraestrutura
G&E Apartment REIT The Heights at Olde
Towne, LLC
G&E Apartment REIT The Myrtles at Olde
Towne, LLC

GAF REIT, LLC
GAF Toys Holdco, LLC
Gardens of Denton II, L.P.
Gardens of Denton III, L.P.
Gleneagles CLO, Ltd.
Goverannce RE, Ltd.
Governance Re, Ltd.
Governance, Ltd.
Grant Scott
Grant Scott, Trustee of The SLHC Trust
Grayson CLO, Ltd.
Grayson Investors Corp.
Greater Kansas City Community Foundation
(third party)
Greenbriar CLO, Ltd.
Greg Busseyt
Gunwale LLC
Gunwale, LLC
Hakusan, LLC
Hammark Holdings LLC
Hampton Ridge Partners, LLC
Harko, LLC
Harry Bookey/Pam Bookey (third party)
Haverhill Acquisition Co., LLC
Haygood, LLC
HB 2015 Family LP (third party)
HCBH 11611 Ferguson, LLC
HCBH Buffalo Pointe II, LLC
HCBH Buffalo Pointe III, LLC
HCBH Buffalo Pointe, LLC
HCBH Hampton Woods SM, Inc.
HCBH Hampton Woods, LLC
HCBH Overlook SM, Inc.
HCBH Overlook, LLC
HCBH Rent Investors, LLC
HCMS Falcon GP, LLC
HCMS Falcon, L.P.
HCO Holdings, LLC
HCOF Preferred Holdings, L.P.
HCOF Preferred Holdings, LP
HCOF Preferred Holdings, Ltd.
HCRE 1775 James Ave, LLC
HCRE Addison TRS, LLC

Appx. 07984
011027

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 110 of 921    PageID 11908
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 6 of 18

HCRE Addison, LLC *(fka HWS Addison, LLC)*

HCRE Hotel Partner, LLC *(fka HCRE HWS Partner, LLC)*

HCRE Las Colinas TRS, LLC

HCRE Las Colinas, LLC *(fka HWS Las Colinas, LLC)*

HCRE Plano TRS, LLC

HCRE Plano, LLC *(fka HWS Plano, LLC)*

HCREF-I Holding Corp.

HCREF-II Holding Corp.

HCREF-III Holding Corp.

HCREF-IV Holding Corp.

HCREF-IX Holding Corp.

HCREF-V Holding Corp.

HCREF-VI Holding Corp.

HCREF-VII Holding Corp.

HCREF-VIII Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

HCREF-XIII Holding Corp.

HCREF-XIV Holding Corp.

HCREF-XV Holding Corp.

HCSLR Camelback Investors (Cayman), Ltd.

HCSLR Camelback, LLC

HCT Holdco 2 Ltd.

HCT Holdco 2, Ltd.

HE 41, LLC

HE Capital 232 Phase I Property, LLC

HE Capital 232 Phase I, LLC

HE Capital Asante, LLC

HE Capital Fox Trails, LLC

HE Capital KR, LLC

HE Capital, LLC

HE CLO Holdco, LLC

HE Mezz Fox Trails, LLC

HE Mezz KR, LLC

HE Peoria Place Property, LLC

HE Peoria Place, LLC

Heron Pointe Investors, LLC

Hewett's Island CLO I-R, Ltd.

HFP Asset Funding II, Ltd.

HFP Asset Funding III, Ltd.

HFP CDO Construction Corp.

HFP GP, LLC

HFRO Sub, LLC

Hibiscus HoldCo, LLC

Highland - First Foundation Income Fund

Highland 401(k) Plan

Highland 401K Plan

Highland Argentina Regional Opportunity Fund GP, LLC

Highland Argentina Regional Opportunity Fund, L.P.

Highland Argentina Regional Opportunity Fund, Ltd.

Highland Argentina Regional Opportunity Master Fund, L.P.

Highland Brasil, LLC

Highland Capital Brasil Gestora de Recursos *(fka Highland Brasilinvest Gestora de Recursos, LTDA; fka HBI Consultoria Empresarial, LTDA)*

Highland Capital Management (Singapore) Pte Ltd

Highland Capital Management AG

Highland Capital Management AG (Highland Capital Management SA) (Highland Capital Management Ltd)

Highland Capital Management Fund Advisors, L.P.

Highland Capital Management Fund Advisors, L.P. *(fka Pyxis Capital, L.P.)*

Highland Capital Management Korea Limited

Highland Capital Management Latin America, L.P.

Highland Capital Management LP Retirement Plan and Trust

Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.

Highland Capital Management Real Estate Holdings I, LLC

Highland Capital Management Real Estate Holdings II, LLC

Highland Capital Management Services, Inc.

Highland Capital Management, L.P.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 111 of 921    PageID 11909

Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 7 of 18

Highland Capital Management, L.P. Charitable Fund

Highland Capital Management, L.P. Retirement Plan and Trust

Highland Capital Management, L.P., as trustee of Acis CMOA Trust and nominiee for and on behalf of Highland CLO Assets Holdings Limited

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, L.P., as trustee of Highland Latin America Trust and nominiee for and on behalf of Highland Latin America LP, Ltd.

Highland Capital Management, LP

Highland Capital Management, LP Charitable Fund

Highland Capital Multi-Strategy Fund, LP

Highland Capital of New York, Inc.

Highland Capital Special Allocation, LLC

Highland CDO Holding Company

Highland CDO Opportunity Fund GP, L.P.

Highland CDO Opportunity Fund, L.P.

Highland CDO Opportunity Fund, Ltd.

Highland CDO Opportunity GP, LLC

Highland CDO Opportunity Master Fund, L.P.

Highland CDO Trust

Highland CLO 2018-1, Ltd.

Highland CLO Assets Holdings Limited

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd.

Highland CLO Funding, Ltd. *(fka Acis Loan Funding, Ltd.)*

Highland CLO Gaming Holdings, LLC

Highland CLO Holdings Ltd.

Highland CLO Holdings, Ltd. (as of 12.19.17)

Highland CLO Management Ltd.

Highland CLO Trust

Highland Credit Opportunities CDO Asset Holdings GP, Ltd.

Highland Credit Opportunities CDO Asset Holdings, L.P.

Highland Credit Opportunities CDO Financing, LLC

Highland Credit Opportunities CDO, Ltd.

Highland Credit Opportunities Holding Corporation

Highland Credit Opportunities Japanese Feeder Sub-Trust

Highland Credit Opportunities Japanese Unit Trust (Third Party)

Highland Credit Strategies Fund, L.P.

Highland Credit Strategies Fund, Ltd.

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Holding Corporation

Highland Credit Strategies Master Fund, L.P.

Highland Dallas Foundation, Inc.

Highland Dynamic Income Fund GP, LLC

Highland Dynamic Income Fund GP, LLC *(fka Highland Capital Loan GP, LLC)*

Highland Dynamic Income Fund, L.P.

Highland Dynamic Income Fund, L.P. *(fka Highland Capital Loan Fund, L.P.)*

Highland Dynamic Income Fund, Ltd.

Highland Dynamic Income Fund, Ltd. *(fka Highland Loan Fund, Ltd.)*

Highland Dynamic Income Master Fund, L.P.

Highland Dynamic Income Master Fund, L.P. *(fka Highland Loan Master Fund, L.P.)*

Highland Employee Retention Assets LLC

Highland Energy Holdings, LLC

Highland Energy MLP Fund *(fka Highland Energy and Materials Fund)*

Highland Equity Focus Fund, L.P.

Highland ERA Management, LLC

Highland eSports Private Equity Fund

Highland Financial Corp.

Highland Financial Partners, L.P.

Highland Fixed Income Fund

Highland Flexible Income UCITS Fund

Highland Floating Rate Fund

Appx. 07986

011029

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 112 of 921 PageID 11910
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 8 of 18

Highland Floating Rate Opportunites Fund

Highland Floating Rate Opportunities Fund

Highland Fund Holdings, LLC

Highland Funds I

Highland Funds II

Highland Funds III

Highland GAF Chemical Holdings, LLC

Highland General Partner, LP

Highland Global Allocation Fund

Highland Global Allocation Fund
*(fka Highland Global Allocation Fund II)*

Highland GP Holdings, LLC

Highland HCF Advisor Ltd.

Highland HCF Advisor, Ltd., as Trustee for
and on behalf of Acis CLO Trust, as nominee
for and on behalf of Highland CLO Funding,
Ltd. (as of 3.29.18)

Highland Healthcare Equity Income and
Growth Fund

Highland iBoxx Senior Loan ETF

Highland Income Fund

Highland Income Fund  *(fka Highland
Floating Rate Opportunities Fund)*

Highland Kansas City Foundation, Inc.

Highland Latin America Consulting, Ltd.

Highland Latin America GP, Ltd.

Highland Latin America LP, Ltd.

Highland Latin America Trust

Highland Legacy Limited

Highland LF Chemical Holdings, LLC

Highland Loan Funding V, LLC

Highland Loan Funding V, Ltd.

Highland Long/Short Equity Fund

Highland Long/Short Healthcare Fund

Highland Marcal Holding, Inc.

Highland Merger Arbitrage Fund

Highland Multi Strategy Credit Fund GP, L.P.

Highland Multi Strategy Credit Fund GP, L.P.
*(fka Highland Credit Opportunities CDO GP,
L.P.)*

Highland Multi Strategy Credit Fund, L.P.

Highland Multi Strategy Credit Fund, L.P. *(fka
Highland Credit Opportunities Fund, L.P., fka
Highland Credit Opportunities CDO, L.P.)*

Highland Multi Strategy Credit Fund, Ltd.

Highland Multi Strategy Credit Fund, Ltd. *(fka
Highland Credit Opportunities Fund, Ltd.)*

Highland Multi Strategy Credit GP, LLC

Highland Multi Strategy Credit GP, LLC *(fka
Highland Credit Opportunities CDO GP, LLC)*

Highland Multi-Strategy Fund GP, LLC

Highland Multi-Strategy Fund GP, LP

Highland Multi-Strategy IDF GP, LLC

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Master Fund, LP

Highland Multi-Strategy Onshore Master
SubFund II, LLC

Highland Multi-Strategy Onshore Master
Subfund, LLC

Highland Opportunistic Credit Fund

Highland Park CDO 1, Ltd.

Highland Park CDO I, Ltd.

Highland Premier Growth Equity Fund

Highland Premium Energy & Materials Fund

Highland Prometheus Feeder Fund I, L.P.

Highland Prometheus Feeder Fund I, LP

Highland Prometheus Feeder Fund II, L.P.

Highland Prometheus Feeder Fund II, LP

Highland Prometheus Master Fund, L.P.

Highland Receivables Finance I, LLC

Highland Restoration Capital Partners GP,
LLC

Highland Restoration Capital Partners Master,
L.P.

Highland Restoration Capital Partners
Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Santa Barbara Foundation, Inc.

Highland Select Equity Fund GP, L.P.

Highland Select Equity Fund, L.P.

Highland Select Equity GP, LLC

Highland Select Equity Master Fund, L.P.

011030

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 113 of 921 PageID 11911
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 9 of 18

Highland Small-Cap Equity Fund

Highland Socially Responsible Equity Fund

Highland Socially Responsible Equity Fund
*(fka Highland Premier Growth Equity Fund)*

Highland Special Opportunities Holding Company

Highland SunBridge GP, LLC

Highland Tax-Exempt Fund

Highland TCI Holding Company, LLC

Highland Total Return Fund

Highland's Roads Land Holding Company, LLC

Hinduja Bank (Switzerland) Ltd

Hirst, Ltd.

HMCF PB Investors, LLC

HMx2 Investment Trust
(Matt McGraner)

Hockney, Ltd.

HRT North Atlanta, LLC

HRT Timber Creek, LLC

HRTBH North Atlanta, LLC

HRTBH Timber Creek, LLC

Huber Funding LLC

Hunter Mountain Investment Trust

HWS Investors Holdco, LLC

Internal Investors

Intertrust

James D. Dondero
Reese Avry Dondero
Jameson Drue Dondero

James Dondero

James Dondero and Mark Okada

James Dondero
Reese Avry Dondero
Jameson Drue Dondero

Japan Trustee Services Bank, Ltd.

Jasper CLO, Ltd.

Jewelry Ventures I, LLC

JMIJM, LLC

Joanna E. Milne Irrevocable Trust dated Nov 25 1998 (third party)

John Honis

John L. Holt, Jr.

John R. Sears, Jr.

Karisopolis, LLC

Keelhaul LLC

KHM Interests, LLC (third party)

Kuilima Montalban Holdings, LLC

Kuilima Resort Holdco, LLC

KV Cameron Creek Owner, LLC

Lakes at Renaissance Park Apartments Investors, L.P.

Lakeside Lane, LLC

Landmark Battleground Park II, LLC

Lane Britain

Larry K. Anders

LAT Battleground Park, LLC

LAT Briley Parkway, LLC

Lautner, Ltd.

Leawood RE Holdings, LLC

Liberty Cayman Holdings, Ltd.

Liberty CLO Holdco, Ltd.

Liberty CLO, Ltd.

Liberty Sub, Ltd.

Long Short Equity Sub, LLC

Longhorn Credit Funding LLC

Longhorn Credit Funding LLC - A

Longhorn Credit Funding LLC - B

Longhorn Credit Funding LLC (LHB)

Longhorn Credit Funding, LLC

Lurin Real Estate Holdings V, LLC

Maple Avenue Holdings, LLC

MaplesFS Limited

Marc C. Manzo

Mark and Pam Okada Family Trust - Exempt Descendants' Trust

Mark and Pam Okada Family Trust - Exempt Trust #2

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust

Mark and Pamela Okada Family Trust - Exempt Descendants' Trust #2

Mark and Pamela Okada Family Trust - Exempt Trust #2

Mark K. Okada

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 114 of 921    PageID 11912
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 10 of
18

Mark Okada

Mark Okada and Pam Okada

Mark Okada and Pam Okada, as joint owners

Mark Okada/Pamela Okada

Markham Fine Jewelers, L.P.

Markham Fine Jewelers, LP

Matt McGraner

Meritage Residential Partners, LLC

MGM Studios HoldCo, Ltd.

Michael Rossi

ML CLO XIX Sterling (Cayman), Ltd.

N/A

Nancy Dondero

NCI Apache Trail LLC

NCI Assets Holding Company LLC

NCI Country Club LLC

NCI Fort Worth Land LLC

NCI Front Beach Road LLC

NCI Minerals LLC

NCI Royse City Land LLC

NCI Stewart Creek LLC

NCI Storage, LLC

Neil Labatte

Neutra, Ltd.

New Jersey Tissue Company Holdco, LLC
*(fka Marcal Paper Mills Holding Company, LLC)*

NexAnnuity Holdings, Inc.

NexBank Capital Trust I

NexBank Capital, Inc.

NexBank Land Advisors, Inc.

NexBank Securities Inc.

NexBank Securities, Inc.

NexBank SSB

NexBank Title, Inc.
(dba NexVantage Title Services)

NexBank, SSB

NexPoint Advisors GP, LLC

NexPoint Advisors, L.P.

NexPoint Capital REIT, LLC

NexPoint Capital, Inc.

NexPoint Capital, Inc. *(fka NexPoint Capital, LLC)*

NexPoint CR F/H DST, LLC

NexPoint Credit Strategies Fund

NexPoint Discount Strategies Fund
*(fka NexPoint Discount Yield Fund)*

NexPoint DRIP

NexPoint Energy and Materials Opportunities Fund *(fka NexPoint Energy Opportunities Fund)*

NexPoint Event-Driven Fund
*(fkaNexPoint Merger Arbitrage Fund)*

NexPoint Flamingo DST

NexPoint Flamingo Investment Co, LLC

NexPoint Flamingo Leaseco, LLC

NexPoint Flamingo Manager, LlC

NexPoint Flamingo Property Manager, LlC

NexPoint Healthcare Opportunities Fund

NexPoint Hospitality Trust

NexPoint Hospitality, Inc.

NexPoint Hospitality, LLC

NexPoint Insurance Distributors, LLC

NexPoint Insurance Solutions GP, LLC

NexPoint Insurance Solutions GP, LLC
*(fka Highland Capital Insurance Solutions GP, LLC)*

NexPoint Insurance Solutions, L.P.
*(fka Highland Capital Insurance Solutions, L.P.)*

NexPoint Latin American Opportunities Fund

NexPoint Legacy 22, LLC

NexPoint Lincoln Porte Equity, LLC

NexPoint Lincoln Porte Manager, LLC

NexPoint Lincoln Porte, LLC
*(fka NREA Lincoln Porte, LLC)*

NexPoint Multifamily Capital Trust, Inc.

NexPoint Multifamily Capital Trust, Inc.
*(fka NexPoint Multifamily Realty Trust, Inc., fka Highland Capital Realty Trust, Inc.)*

NexPoint Multifamily Operating Partnership, L.P.

NexPoint Peoria, LLC

NexPoint Polo Glen DST

Appx. 07989
01T032

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 115 of 921 PageID 11913
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 11 of
18

NexPoint Polo Glen Holdings, LLC

NexPoint Polo Glen Investment Co, LLC

NexPoint Polo Glen Leaseco, LLC

NexPoint Polo Glen Manager, LLC

NexPoint RE Finance Advisor GP, LLC

NexPoint RE Finance Advisor, L.P.

NexPoint Real Estate Advisors GP, LLC

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors II, L.P.

NexPoint Real Estate Advisors III, L.P.

NexPoint Real Estate Advisors IV, L.P.

NexPoint Real Estate Advisors V, L.P.

NexPoint Real Estate Advisors VI, L.P.

NexPoint Real Estate Advisors VII GP, LLC

NexPoint Real Estate Advisors VII, L.P.

NexPoint Real Estate Advisors VIII, L.P.

NexPoint Real Estate Advisors, L.P.

NexPoint Real Estate Capital, LLC

NexPoint Real Estate Capital, LLC *(fka Highland Real Estate Capital, LLC, fka Highland Multifamily Credit Fund, LLC)*

NexPoint Real Estate Finance OP GP, LLC

NexPoint Real Estate Finance Operating Partnership, L.P.

NexPoint Real Estate Finance, Inc.

NexPoint Real Estate Opportunities, LLC

NexPoint Real Estate Opportunities, LLC *(fka Freedom REIT LLC)*

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC)

NexPoint Real Estate Strategies Fund

NexPoint Residential Trust Inc.

NexPoint Residential Trust Operating Partnership GP, LLC

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust Operating Partnership, L.P.

NexPoint Residential Trust, Inc.

NexPoint Securities, Inc.
*(fka Highland Capital Funds Distributor, Inc.)*
*(fka Pyxis Distributors, Inc.)*

NexPoint Strategic Income Fund
*(fka NexPoint Opportunistic Credit Fund, fka NexPoint Distressed Strategies Fund)*

NexPoint Strategic Opportunities Fund

NexPoint Strategic Opportunities Fund
*(fka NexPoint Credit Strategies Fund)*

NexPoint Texas Multifamily Portfolio DST
*(fka NREA Southeast Portfolio Two, DST)*

NexPoint WLIF I Borrower, LLC

NexPoint WLIF I, LLC

NexPoint WLIF II Borrower, LLC

NexPoint WLIF II, LLC

NexPoint WLIF III Borrower, LLC

NexPoint WLIF III, LLC

NexPoint WLIF, LLC (Series I)

NexPoint WLIF, LLC (Series II)

NexPoint WLIF, LLC (Series III)

NexStrat LLC

NexVest, LLC

NexWash LLC

NFRO REIT Sub, LLC

NFRO TRS, LLC

NHF CCD, Inc.

NHT 2325 Stemmons, LLC

NHT Beaverton TRS, LLC
*(fka NREA Hotel TRS, Inc.)*

NHT Beaverton, LLC

NHT Bend TRS, LLC

NHT Bend, LLC

NHT Destin TRS, LLC

NHT Destin, LLC

NHT DFW Portfolio, LLC

NHT Holdco, LLC

NHT Holdings, LLC

NHT Intermediary, LLC

NHT Nashville TRS, LLC

NHT Nashville, LLC

NHT Olympia TRS, LLC

NHT Olympia, LLC

NHT Operating Partnership GP, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 32 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 116 of 921    PageID 11914
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 12 of
18

NHT Operating Partnership II, LLC
NHT Operating Partnership, LLC
NHT Salem, LLC
NHT SP Parent, LLC
NHT SP TRS, LLC
NHT SP, LLC
NHT Tigard TRS, LLC
NHT Tigard, LLC
NHT TRS, Inc.
NHT Uptown, LLC
NHT Vancouver TRS, LLC
NHT Vancouver, LLC
NLA Assets LLC
NMRT TRS, Inc.
NREA Adair DST Manager, LLC
NREA Adair Investment Co, LLC
NREA Adair Joint Venture, LLC
NREA Adair Leaseco Manager, LLC
NREA Adair Leaseco, LLC
NREA Adair Property Manager LLC
NREA Adair, DST
NREA Ashley Village Investors, LLC
NREA Cameron Creek Investors, LLC
NREA Cityplace Hue Investors, LLC
NREA Crossing Investors LLC
NREA Crossings Investors, LLC
NREA Crossings Ridgewood Coinvestment,
LLC *(fka NREA Crossings Ridgewood
Investors, LLC)*
NREA DST Holdings, LLC
NREA El Camino Investors, LLC
NREA Estates Inc.
NREA Estates Investment Co, LLC
NREA Estates Leaseco, LLC
NREA Estates Manager, LLC
NREA Estates Property Manager, LLC
NREA Estates, DST
NREA Gardens DST Manager LLC
NREA Gardens DST Manager, LLC
NREA Gardens Investment Co, LLC
NREA Gardens Leaseco Manager, LLC
NREA Gardens Leaseco, LLC
NREA Gardens Property Manager, LLC

NREA Gardens Springing LLC
NREA Gardens Springing Manager, LLC
NREA Gardens, DST
NREA Hidden Lake Investment Co, LLC
NREA Hue Investors, LLC
NREA Keystone Investors, LLC
NREA Meritage Inc.
NREA Meritage Investment Co, LLC
NREA Meritage Leaseco, LLC
NREA Meritage Manager, LLC
NREA Meritage Property Manager, LLC
NREA Meritage, DST
NREA Oaks Investors, LLC
NREA Retreat Investment Co, LLC
NREA Retreat Leaseco, LLC
NREA Retreat Manager, LLC
NREA Retreat Property Manager, LLC
NREA Retreat, DST
NREA SE MF Holdings LLC
NREA SE MF Holdings, LLC
NREA SE MF Investment Co, LLC
NREA SE MF Investment Co, LLC
NREA SE Multifamily LLC
NREA SE Multifamily LLC
NREA SE One Property Manager, LLC
NREA SE Three Property Manager, LLC
NREA SE Two  Property Manager, LLC
NREA SE1 Andros Isles Leaseco, LLC
NREA SE1 Andros Isles Manager, LLC
NREA SE1 Andros Isles, DST
(Converted from DK Gateway Andros, LLC)
NREA SE1 Arborwalk Leaseco, LLC
NREA SE1 Arborwalk Manager, LLC
NREA SE1 Arborwalk, DST
(Converted from MAR Arborwalk, LLC)
NREA SE1 Towne Crossing Leaseco, LLC
NREA SE1 Towne Crossing Manager, LLC
NREA SE1 Towne Crossing, DST
(Converted from Apartment REIT Towne
Crossing, LP)
NREA SE1 Walker Ranch Leaseco, LLC
NREA SE1 Walker Ranch Manager, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 117 of 921 PageID 11915

Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 13 of
18

NREA SE1 Walker Ranch, DST
(Converted from SOF Walker Ranch Owner,
L.P.)

NREA SE2 Hidden Lake Leaseco, LLC

NREA SE2 Hidden Lake Manager, LLC

NREA SE2 Hidden Lake, DST

NREA SE2 Hidden Lake, DST
(Converted from SOF Hidden Lake SA Owner,
L.P.)

NREA SE2 Vista Ridge Leaseco, LLC

NREA SE2 Vista Ridge Manager, LLC

NREA SE2 Vista Ridge, DST

NREA SE2 Vista Ridge, DST
(Converted from MAR Vista Ridge, L.P.)

NREA SE2 West Place Leaseco, LLC

NREA SE2 West Place Manager, LLC

NREA SE2 West Place, DST
(Converted from Landmark at West Place,
LLC)

NREA SE3 Arboleda Leaseco, LLC

NREA SE3 Arboleda Manager, LLC

NREA SE3 Arboleda, DST
(Converted from G&E Apartment REIT
Arboleda, LLC)

NREA SE3 Fairways Leaseco, LLC

NREA SE3 Fairways Manager, LLC

NREA SE3 Fairways, DST
(Converted from MAR Fairways, LLC)

NREA SE3 Grand Oasis Leaseco, LLC

NREA SE3 Grand Oasis Manager, LLC

NREA SE3 Grand Oasis, DST
(Converted from Landmark at Grand Oasis,
LP)

NREA Southeast Portfolio One Manager, LLC

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio One, DST

NREA Southeast Portfolio Three Manager,
LLC

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Three, DST

NREA Southeast Portfolio Two Manager, LLC

NREA Southeast Portfolio Two, DST

NREA Southeast Portfolio Two, LLC

NREA SOV Investors, LLC

NREA Uptown TRS, LLC

NREA VB I LLC

NREA VB II LLC

NREA VB III LLC

NREA VB IV LLC

NREA VB Pledgor I LLC

NREA VB Pledgor I, LLC

NREA VB Pledgor II LLC

NREA VB Pledgor II, LLC

NREA VB Pledgor III LLC

NREA VB Pledgor III, LLC

NREA VB Pledgor IV LLC

NREA VB Pledgor IV, LLC

NREA VB Pledgor V LLC

NREA VB Pledgor V, LLC

NREA VB Pledgor VI LLC

NREA VB Pledgor VI, LLC

NREA VB Pledgor VII LLC

NREA VB Pledgor VII, LLC

NREA VB SM, Inc.

NREA VB V LLC

NREA VB VI LLC

NREA VB VII LLC

NREA Vista Ridge Investment Co, LLC

NREC AR Investors, LLC

NREC BM Investors, LLC

NREC BP Investors, LLC

NREC Latitude Investors, LLC

NREC REIT Sub, Inc.

NREC TRS, Inc.

NREC WW Investors, LLC

NREF OP I Holdco, LLC

NREF OP I SubHoldco, LLC

NREF OP I, L.P.

NREF OP II Holdco, LLC

NREF OP II SubHoldco, LLC

NREF OP II, L.P.

NREF OP IV REIT Sub TRS, LLC

NREF OP IV REIT Sub, LLC

NREF OP IV, L.P.

NREO NW Hospitality Mezz, LLC

NREO NW Hospitality, LLC

011035

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 118 of 921    PageID 11916
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 14 of
18

NREO Perilune, LLC

NREO SAFStor Investors, LLC

NREO TRS, Inc.

NRESF REIT Sub, LLC

NXRT Abbington, LLC

NXRT Atera II, LLC

NXRT Atera, LLC

NXRT AZ2, LLC

NXRT Barrington Mill, LLC

NXRT Bayberry, LLC

NXRT Bella Solara, LLC

NXRT Bella Vista, LLC

NXRT Bloom, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP I, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine GP II, LLC

NXRT Brandywine LP, LLC

NXRT Brandywine LP, LLC

NXRT Brentwood Owner, LLC

NXRT Brentwood, LLC

NXRT Cedar Pointe Tenant, LLC

NXRT Cedar Pointe, LLC

NXRT Cityview, LLC

NXRT Cornerstone, LLC

NXRT Crestmont, LLC

NXRT Crestmont, LLC

NXRT Enclave, LLC

NXRT Glenview, LLC

NXRT H2 TRS, LLC

NXRT Heritage, LLC

NXRT Hollister TRS LLC

NXRT Hollister, LLC

NXRT LAS 3, LLC

NXRT Master Tenant, LLC

NXRT Nashville Residential, LLC

NXRT Nashville Residential, LLC *(fka Freedom Nashville Residential, LLC)*

NXRT North Dallas 3, LLC

NXRT Old Farm, LLC

NXRT Pembroke Owner, LLC

NXRT Pembroke, LLC

NXRT PHX 3, LLC

NXRT Radbourne Lake, LLC

NXRT Rockledge, LLC

NXRT Sabal Palms, LLC

NXRT SM, Inc.

NXRT Steeplechase, LLC

NXRT Stone Creek, LLC

NXRT Summers Landing GP, LLC

NXRT Summers Landing LP, LLC

NXRT Torreyana, LLC

NXRT Vanderbilt, LLC

NXRT West Place, LLC

NXRTBH AZ2, LLC

NXRTBH Barrington Mill Owner, LLC

NXRTBH Barrington Mill SM, Inc.

NXRTBH Barrington Mill, LLC

NXRTBH Bayberry, LLC

NXRTBH Cityview, LLC

NXRTBH Colonnade, LLC

NXRTBH Cornerstone Owner, LLC

NXRTBH Cornerstone SM, Inc.

NXRTBH Cornerstone, LLC

NXRTBH Dana Point SM, Inc.

NXRTBH Dana Point, LLC

NXRTBH Foothill SM, Inc.

NXRTBH Foothill, LLC

NXRTBH Heatherstone SM, Inc.

NXRTBH Heatherstone, LLC

NXRTBH Hollister Tenant, LLC

NXRTBH Hollister, LLC

NXRTBH Madera SM, Inc.

NXRTBH Madera, LLC

NXRTBH McMillan, LLC

NXRTBH North Dallas 3, LLC

NXRTBH Old Farm II, LLC

NXRTBH Old Farm Tenant, LLC

NXRTBH Old Farm, LLC

NXRTBH Radbourne Lake, LLC

NXRTBH Rockledge, LLC

NXRTBH Sabal Palms, LLC

NXRTBH Steeplechase, LLC (dba Southpoint Reserve at Stoney Creek)-VA

NXRTBH Stone Creek, LLC

NXRTBH Vanderbilt, LLC

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 119 of 921 PageID 11917
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 15 of
18

NXRTBH Versailles SM, Inc.
NXRTBH Versailles, LLC
Oak Holdco, LLC
Oaks CGC, LLC
Okada Family Revocable Trust
Oldenburg, Ltd.
Pam Capital Funding GP Co. Ltd.
Pam Capital Funding, L.P.
PamCo Cayman Ltd.
Park West 1700 Valley View Holdco, LLC
Park West 2021 Valley View Holdco, LLC
Park West Holdco, LLC
Park West Portfolio Holdco, LLC
Participants of Highland 401K Plan
Patrick Willoughby-McCabe
PCMG Trading Partners XXIII, L.P.
PCMG Trading Partners XXIII, LP
PDK Toys Holdco, LLC
Pear Ridge Partners, LLC
Penant Management GP, LLC
Penant Management LP
PensionDanmark Holding A/S
PensionDanmark
Pensionsforsikringsaktieselskab
Peoria Place Development, LLC
(30% cash contributions - profit participation
only)
Perilune Aero Equity Holdings One, LLC
Perilune Aviation LLC
PetroCap Incentive Holdings III. L.P.
PetroCap Incentive Partners II GP, LLC
PetroCap Incentive Partners II, L.P.
PetroCap Incentive Partners III GP, LLC
PetroCap Incentive Partners III, LP
PetroCap Management Company LLC
PetroCap Partners II GP, LLC
PetroCap Partners II, L.P.
PetroCap Partners III GP, LLC
PetroCap Partners III, L.P.
Pharmacy Ventures I, LLC
Pharmacy Ventures II, LLC
Pollack, Ltd.
Powderhorn, LLC

PWM1 Holdings, LLC
PWM1, LLC
RADCO - Bay Meadows, LLLP
RADCO - Bay Park, LLLP
RADCO NREC Bay Meadows Holdings, LLC
RADCO NREC Bay Park Holdings, LLC
Ramarim, LLC
Rand Advisors Series I Insurance Fund
Rand Advisors Series II Insurance Fund
Rand Advisors, LLC
Rand PE Fund I, L.P.
Rand PE Fund I, L.P. - Series 1
Rand PE Fund Management, LLC
Rand PE Holdco, LLC
Realdania
Red River CLO, Ltd.
Red River Investors Corp.
Riverview Partners SC, LLC
Rockwall CDO II Ltd.
Rockwall CDO II, Ltd.
Rockwall CDO, Ltd.
Rockwall Investors Corp.
Rothko, Ltd.
RTT Bella Solara, LLC
RTT Bloom, LLC
RTT Financial, Inc.
RTT Hollister, LLC
RTT Rockledge, LLC
RTT Torreyana, LLC
SALI Fund Partners, LLC
SAS Management
SAS Asset Recovery Ltd.

San Diego County Employees Retirement
Association
Sandstone Pasadena Apartments, LLC
Sandstone Pasadena, LLC
Santa Barbara Foundation (third party)
Saturn Oil & Gas LLC
SBC Master Pension Trust
Scott Matthew Siekielski
SE Battleground Park, LLC
SE Battleground Park, LLC

SE Glenview, LLC
SE Governors Green Holdings, L.L.C.
SE Governors Green Holdings, L.L.C. *(fka SCG Atlas Governors Green Holdings, L.L.C.)*

SE Governors Green I, LLC
SE Governors Green II, LLC
SE Governors Green II, LLC
SE Governors Green REIT, L.L.C.
SE Governors Green REIT, L.L.C. *(fka SCG Atlas Governors Green REIT, L.L.C.)*

SE Governors Green, LLC *(fka SCG Atlas Governors Green, L.L.C.)*
SE Gulfstream Isles GP, LLC
SE Gulfstream Isles GP, LLC
SE Gulfstream Isles LP, LLC
SE Gulfstream Isles LP, LLC
SE Heights at Olde Towne, LLC
SE Heights at Olde Towne, LLC
SE Lakes at Renaissance Park GP I, LLC
SE Lakes at Renaissance Park GP II, LLC
SE Lakes at Renaissance Park GP II, LLC
SE Lakes at Renaissance Park LP, LLC
SE Lakes at Renaissance Park LP, LLC
SE Multifamily Holdings LLC
SE Multifamily Holdings, LLC
SE Multifamily REIT Holdings LLC
SE Myrtles at Olde Towne, LLC
SE Myrtles at Olde Towne, LLC
SE Oak Mill I Holdings, LLC
SE Oak Mill I Holdings, LLC *(fka SCG Atlas Oak Mill I Holdings, L.L.C.)*

SE Oak Mill I Owner, LLC *(fka SCG Atlas Oak Mill I, L.L.C.)*

SE Oak Mill I REIT, LLC
SE Oak Mill I REIT, LLC *(fka SCG Atlas Oak Mill I REIT, L.L.C.)*

SE Oak Mill I, LLC
SE Oak Mill I, LLC
SE Oak Mill II Holdings, LLC
SE Oak Mill II Holdings, LLC *(fka SCG Atlas Oak Mill II Holdings, L.L.C.)*

SE Oak Mill II Owner, LLC *(fka SCG Atlas Oak Mill II, L.L.C.)*

SE Oak Mill II REIT, LLC
SE Oak Mill II REIT, LLC *(fka SCG Atlas Oak Mill II REIT, L.L.C.)*

SE Oak Mill II, LLC
SE Oak Mill II, LLC
SE Quail Landing, LLC
SE River Walk, LLC
SE Riverwalk, LLC
SE SM, Inc.
SE Stoney Ridge Holdings, L.L.C. *(fka SCG Atlas Stoney Ridge Holdings, L.L.C.)*

SE Stoney Ridge Holdings, LLC
SE Stoney Ridge I, LLC
SE Stoney Ridge I, LLC
SE Stoney Ridge II, LLC
SE Stoney Ridge II, LLC
SE Stoney Ridge REIT, L.L.C. *(fka SCG Atlas Stoney Ridge REIT, L.L.C.)*

SE Stoney Ridge REIT, LLC
SE Stoney Ridge, LLC *(fka SCG Atlas Stoney Ridge, L.L.C.)*

SE Victoria Park, LLC
SE Victoria Park, LLC
Sentinel Re Holdings, Ltd.
Sentinel Reinsurance Ltd.
Sentinel Reinsurance Limited
SFH1, LLC
SFR WLIF I, LLC
*(fka NexPoint WLIF I, LLC)*

SFR WLIF II, LLC
*(NexPoint WLIF II, LLC)*

SFR WLIF III, LLC
*(NexPoint WLIF III, LLC)*

SFR WLIF Manager, LLC
*(NexPoint WLIF Manager, LLC)*

SFR WLIF, LLC
*(NexPoint WLIF, LLC)*

SFR WLIF, LLC Series I
SFR WLIF, LLC Series II
SFR WLIF, LLC Series III
SH Castle BioSciences, LLC

011038

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 37 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 121 of 921    PageID 11919
Case 19-34054-sgj11 Doc 1875-3 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 17 of
18

Small Cap Equity Sub, LLC

Socially Responsible Equity Sub, LLC

SOF Brandywine I Owner, L.P.

SOF Brandywine II Owner, L.P.

SOF-X GS Owner, L.P.

Southfork Cayman Holdings, Ltd.

Southfork CLO, Ltd.

Specialty Financial Products Designated
Activity Company *(fka Specialty Financial
Products Limited)*

Spiritus Life, Inc.

SRL Sponsor LLC

SRL Whisperwod LLC

SRL Whisperwood Member LLC

SRL Whisperwood Venture LLC

SSB Assets LLC

Starck, Ltd.

Stemmons Hospitality, LLC

Steve Shin

Stonebridge Capital, Inc.

Stonebridge-Highland Healthcare Private
Equity Fund

Strand Advisors III, Inc.

Strand Advisors IV, LLC

Strand Advisors IX, LLC

Strand Advisors V, LLC

Strand Advisors XIII, LLC

Strand Advisors XVI, Inc.

Strand Advisors, Inc.

Stratford CLO, Ltd.

Summers Landing Apartment Investors, L.P.

Term Loan B
(10% cash contributions - profit participation
only)

The Dallas Foundation

The Dallas Foundation (third party)

The Dondero Insurance Rabbi Trust

The Dugaboy Investment Trust

The Dugaboy Investment Trust U/T/A Dated
Nov 15, 2010

The Get Good Non-Exempt Trust No. 1

The Get Good Non-Exempt Trust No. 2

The Get Good Trust

The Mark and Pamela Okada Family Trust -
Exempt Descendants' Trust

The Mark and Pamela Okada Family Trust -
Exempt Trust #2

The Ohio State Life Insurance Company

The Okada Family Foundation, Inc.

The Okada Insurance Rabbi Trust

The SLHC Trust

The Trustees of Columbia University in the
City of New York

The Twentysix Investment Trust
(Third Party Investor)

Thomas A. Neville

Thread 55, LLC

Tihany, Ltd.

Todd Travers

Tranquility Lake Apartments Investors, L.P.

Tuscany Acquisition, LLC

Uptown at Cityplace Condominium
Association, Inc.

US Gaming OpCo, LLC

US Gaming SPV, LLC

US Gaming, LLC

Valhalla CLO, Ltd.

VB GP LLC

VB Holding, LLC

VB One, LLC

VB OP Holdings LLC

VBAnnex C GP, LLC

VBAnnex C Ohio, LLC

VBAnnex C, LP

Ventoux Capital, LLC
(Matt Goetz)

VineBrook Annex B, L.P.

VineBrook Annex I, L.P.

VineBrook Homes Merger Sub II LLC

VineBrook Homes Merger Sub LLC

VineBrook Homes OP GP, LLC

VineBrook Homes Operating Partnership, L.P.

VineBrook Homes Trust, Inc.

VineBrook Partners I, L.P.

VineBrook Partners II, L.P.

VineBrook Properties, LLC

Virginia Retirement System

Vizcaya Investment, LLC

Wake LV Holdings II, Ltd.

Wake LV Holdings, Ltd.

Walter Holdco GP, LLC

Walter Holdco I, Ltd.

Walter Holdco, L.P.

Warhol, Ltd.

Warren Chang

Westchester CLO, Ltd.

William L. Britain

Wright Ltd.

Wright, Ltd.

Yellow Metal Merchants, Inc.

# **EXHIBIT EE**

Appx 07098

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 124 of 921    PageID 11922
Case 19-34054-sgj11 Doc 1875-4 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 2 of 2

accounting or seek approval of any court with respect to the administration of the Claimant Trust, or as a condition for managing any payment or distribution out of the Claimant Trust Assets.

(b)    The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

(c)    The Claimant Trustee may dispose some or all of the books and records maintained by the Claimant Trustee at the later of (i) such time as the Claimant Trustee determines, with the unanimous consent of the Oversight Board, that the continued possession or maintenance of such books and records is no longer necessary for the benefit of the Claimant Trust, or (ii) upon the termination and winding up of the Claimant Trust under Article IX of this Agreement; provided, however, the Claimant Trustee shall not dispose of any books and records related to the Estate Claims or Employee Claims without the consent of the Litigation Trustee. Notwithstanding the foregoing, the Claimant Trustee shall cause the Reorganized Debtor and its subsidiaries to retain such books and records, and for such periods, as are required to be retained pursuant to Section 204-2 of the Investment Advisers Act or any other applicable laws, rules, or regulations.

3.13    Compensation and Reimbursement; Engagement of Professionals.

(a)    Compensation and Expenses.

(i)    Compensation.  As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary").  Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary a base salary, (b) a success fee, and (c) severance.

(ii)    Expense Reimbursements.  All reasonable out-of-pocket expenses of the Claimant Trustee in the performance of his or her duties hereunder, shall be reimbursed as Claimant Trust Expenses paid by the Claimant Trust.

19

Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 1 of 9

# **EXHIBIT FF**

Appx 07409
01T043

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 126 of 921 PageID 11924
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 2 of 9

## Schedule of Contracts and Leases to Be Assumed

1. Advisory Services Agreement, dated November 21, 2011, effective June 20, 2011, by and between Carey International, Inc., and Highland Capital Management, L.P.

2. Amended and Restated Advisory Services Agreement, dated March 4, 2013, by and between Trussway Holdings, Inc., and Highland Capital Management, L.P.

3. Reference Portfolio Management Agreement, dated March 4, 2004, by and between Highland Capital Management, L.P., and Citibank N.A.

4. Advisory Services Agreement, dated May 25, 2011, by and between CCS Medical, Inc., and Highland Capital Management, L.P.

5. Amended and Restated Advisory Services Agreement, dated February 28, 2013, by and between Cornerstone Healthcare Group Holding, Inc., and Highland Capital Management, L.P.

6. Prime Brokerage Agreement by and between Jefferies LLC and Highland Capital Management, L.P., dated May 24, 2013.

7. Amended and Restated Shared Services Agreement, dated August 21, 2015, by and between Highland Capital Management, L.P., and Falcon E&P Opportunities GP, LLC.

8. Amended and Restated Administrative Services Agreement, effective as of August 21, 2015, by and between Highland Capital Management, L.P., and Petrocap Partners II GP, LLC.

9. Office Lease, between Crescent Investors, L.P., and Highland Capital Management, L.P.

10. Paylocity Corporation Services Agreement, between Highland Capital Management, L.P., and Paylocity Corporation, dated November 19, 2012.

11. Electronic Trading Services Agreement, between SunTrust Robinson Humphrey Inc., and Highland Capital Management, L.P., dated February 6, 2019.

12. Letter Agreement, between FTI Consulting, Inc., and Highland Capital Management, L.P., dated November 19, 2018.

13. Administrative Services Agreement, dated January 1, 2018, between Highland Capital Management, L.P., and Liberty Life Assurance Company of Boston.

14. Electronic Communications: Customer Authorization & Indemnification, between Highland Capital Management, L.P., and The Bank of New York Mellon Corporation, dated August 9, 2016.

15. Letter Agreement, dated August 9, 2016, Electronic Access Terms and Conditions, by and between The Bank of New York Mellon Trust Company, N.A., and Highland Capital Management, L.P.

16. Shared Services Agreement by and between Highland HCF Advisor, Ltd., and Highland Capital Management, L.P., dated effective October 27, 2017.

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 127 of 921    PageID 11925
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21    Entered 02/01/21 16:22:31    Page 3 of 9

17. Sub-Advisory Agreement, by and between Highland HCF Advisors, Ltd., and Highland Capital Management, dated effective October 27, 2017.

18. Collateral Management Agreement, dated November 2, 2006, by and between Highland Credit Opportunities CDO Ltd. and Highland Capital Management, L.P.

19. Management Agreement, dated November 15, 2007, between Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Partners Master L.P., Highland Restoration Capital Partners GP, LLC, and Highland Capital Management, L.P.

20. Investment Management Agreement, between Highland Capital Multi-Strategy Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

21. Investment Management Agreement, between Highland Capital Multi-Strategy Master Fund, L.P., and Highland Capital Management, L.P., dated July 31, 2006.

22. Management Agreement, dated August 22, 2007, between and among Highland Capital Management, L.P., and Walkers Fund Services Limited, as trustee of Highland Credit Opportunities Japanese Unit Trust.

23. Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P., dated November 1, 2013.

24. Investment Management Agreement, dated March 31, 2015, by and among Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., and Highland Capital Management, L.P.

25. Amended and Restated Investment Management Agreement, dated February 27, 2017, by and among Highland Prometheus Master Fund L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland SunBridge GP, LLC, and Highland Capital Management, L.P.

26. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

27. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

28. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

29. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

30. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

31. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

32. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

Appx. 07192
011045

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 128 of 921 PageID 11926
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 4 of 9

33. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

34. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

35. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

36. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

37. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

38. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

39. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

40. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

41. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

42. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

43. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

44. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

45. AT&T Managed Internet Service, between Highland Capital Management, L.P. and AT&T Corp., dated February 24, 2015.

46. ViaWest, Master Service Agreement, dated October 3, 2011, between Highland Capital Management, L.P. and ViaWest

47. Stockholders' Agreement, dated April 15, 2005, by and between American Banknote Corporation and Highland Capital Management, L.P.

48. Stockholders' Agreement and Amendment No. 1, dated January 25, 2011, by and between Carey Holdings, Inc. and Highland Capital Management, L.P.

49. Stockholders' Agreement and Amendment, dated March 24, 2010, by and between Cornerstone Healthcare Group Holding, Inc. and Highland Capital Management, L.P.

50. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

51. Stock Purchase and Sale Agreement and Amendment, dated January 16, 2013, by and between Progenics Pharmaceuticals, Inc. and Highland Capital Management, L.P.

Appx 07408
011046

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 129 of 921 PageID 11927
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 5 of 9

52. Stockholders' Agreement and Amendments, dated October 24, 2008, by and between JHT Holdings, Inc. and Highland Capital Management, L.P.

53. Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., dated February 25, 2013, by and between Highland Dynamic Income Fund GP, LLC and Highland Capital Management, L.P.

54. Highland Multi-Strategy Fund, L.P. Limited Partnership Agreement, dated July 6, 2006, by and between Highland Multi-Strategy Fund GP, L.P. and Highland Capital Management, L.P.

55. Operating Agreement of HE Capital, LLC (as amended), dated September 27, 2007, by and between ENA Capital, LLC Ellman Management Group, Inc. and Highland Capital Management, L.P.

56. Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund II, LLC, dated February 27, 2007, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

57. Limited Liability Company Agreement of Highland Multi-Strategy Onshore Master SubFund, LLC, dated July 19, 2006, by and between Highland Multi-Strategy Master Fund, L.P. and Highland Capital Management, L.P.

58. Highland Capital Management, L.P., Limited Liability Company Agreement of Highland Receivables Finance 1, LLC, by and between Highland Capital Management, L.P. and Highland Capital Management, L.P.

59. Agreement of Limited Partnership of Highland Restoration Capital Partners, L.P. and Amendments, dated November 6, 2007, by and between Highland Restoration Capital Partners GP, LLC and Highland Capital Management, L.P.

60. Agreement of Limited Partnership of Highland Select Equity Fund GP, L.P., dated October 2005, by and between Highland Select Equity Fund GP, LLC and Highland Capital Management, L.P.

61. Agreement of Limited Partnership of Penant Management LP, dated December 12, 2012, by and between Penant Management GP, LLC and Highland Capital Management, L.P.

62. Agreement of Limited Partnership of Petrocap Incentive Partners III, LP, dated April 12, 2018, by and between Petrocap Incentive Partners III GP, LLC, Petrocap Incentive Holdings III, LP and Highland Capital Management, L.P.

63. Amended and Restated Agreement of Limited Partnership of Petrocap Partners II, LP, dated October 30, 2014, by and between Petrocap Partners II GP, LLC, Petrocap Incentive Partners II, LP and Highland Capital Management, L.P.

64. Agreement of Limited Partnership of Highland Credit Opportunities CDO GP, L.P., dated December 29, 2005, by and between Highland Credit Opportunities CDO GP, LLC and Highland Capital Management, L.P.

65. Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P., dated November 1, 2014, by and between Highland Multi Strategy Credit Fund GP, L.P. and Highland Capital Management, L.P.

Appx 07404
011047

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 130 of 921 PageID 11928
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 6 of 9

66. DUO Security, 2 factor authentication, by and between DUO Security and Highland Capital Management, L.P.

67. GoDaddy Domain Registrations, by and between GoDaddy and Highland Capital Management, L.P.

68. Highland Loan Fund, Ltd. et al, Investment Management Agreement, dated July 31, 2001, by and between Highland Loan Fund, Ltd. et al and Highland Capital Management, L.P.

69. E Mailflow Monitoring, by and between Mxtoolbox and Highland Capital Management, L.P.

70. Cloud single sign on for HR related employee login, by and between Onelogin and Highland Capital Management, L.P.

71. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

72. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

73. Order Addenda, dated January 28, 2020, by and between CenturyLink Communications, LLC and Highland Capital Management, L.P.

74. Service Agreement (as amended), dated April 1, 2005, by and between Intex Solutions, Inc. and Highland Capital Management, L.P.

75. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

76. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

77. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

78. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

79. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

80. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

81. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

82. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

App. 07185
011048

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 131 of 921 PageID 11929
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 7 of 9

83.    Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

84.    Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

85.    Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

86.    Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

87.    Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

88.    Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

89.    Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

90.    Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

91.    Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

92.    Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

93.    Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

94.    Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

95.    Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

96.    Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

97.    Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

Appx. 07106
0T1049

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 132 of 921 PageID 11930
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 8 of 9

98.     A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

99.     A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

100.     Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

101.     Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

102.     Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

103.     Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

104.     Securities Account Control Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Highland CDO Opportunity Fund, Ltd.; JPMorgan Chase Bank, National Association

105.     Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

106.     Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

107.     Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

108.     Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

109.     Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

110.     Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

111.     Extension/Buy-Out Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Citigroup Financial Products Inc.; Citigroup Global Markets Inc.

112.     Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

113.     Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

114.     Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

Appx 07105

Case 19-34054-sgj11 Doc 3445-55 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 133 of 921 PageID 11931
Case 19-34054-sgj11 Doc 1875-5 Filed 02/01/21 Entered 02/01/21 16:22:31 Page 9 of 9

115.    Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery

116.    Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel

117.    Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms

118.    Colocation Service Order dated October 14, 2019 between Highland Capital Management and Dawn US Holdings, LLC d/b/a Evoque Date Center Solutions

119.    Tradesuite Web Module Services/Agreement between Highland Capital Management and DTCC ITP LLC

120.    Bloomberg (Terminal) Agreement No. 306371 between Highland Capital Management and Bloomberg Finance, L.P.[1]

121.    Master Service Agreement between Highland Capital Management and Via West

122.    Amendment to Bloomberg Order Management System Addendum and Bloomberg Order Management System Schedule of Services Account No. 167969 between Highland Capital Management and Bloomberg Finance, L.P.

123.    Fourth Amendment to Software License and Services Agreement between Highland Capital Management and Markit WSO Corporation

124.    Master Services Agreement, First Amendment to Master Services Agreement, Second Amendment and Restatement of Master Services Agreement between Highland Capital Management and Siepe Services, LLC

125.    Internet Agreement Account No. 831-000-7888-651 between Highland Capital Management and AT&T

126.    Landline Fax Agreement Account No. 831-000-2532-176 between Highland Capital Management and AT&T

127.    Amazon Web Services Account No. 353534426569 between Highland Capital Management and Amazon Web Service, Inc.

128.    Website Hosting Agreement Account No. 325667 between Highland Capital Management and WP Engine

---

[1] The Debtor is currently in discussions with Bloomberg regarding the assumption of this agreement.

Appx. 07108

**EXHIBIT 56**

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 135 of 921   PageID 11933
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21   Entered 01/05/21 14:24:09   Page 1 of 8

Docket #1661  Date Filed: 01/05/2021

D. Michael Lynn
State Bar I.D. No. 12736500
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
J. Robertson Clarke
State Bar I.D. No. 24108098
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | |
| | § | |
| **Debtor.** | § | **Chapter 11** |

## JAMES DONDERO'S OBJECTION TO FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

James Dondero ("<u>Respondent</u>"), a creditor, indirect equity security holder, and party in interest in the above-captioned bankruptcy case, hereby files this objection (the "<u>Objection</u>") to the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "<u>Plan</u>").[1] In support thereof, Respondent respectfully represents as follows:

### PRELIMINARY STATEMENT

1.     On October 16, 2019, Highland Capital Management, L.P. ("<u>Highland</u>" or the "<u>Debtor</u>") initiated a Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Case was subsequently transferred to this Court. The case was

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

JAMES DONDERO'S OBJECTION TO PLAN CONFIRMATION



Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 136 of 921 PageID 11934
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 2 of 8

commenced with the expectation that Highland would emerge from Chapter 11 as a going concern. However, during the case and leading up to the confirmation hearing on the Plan, Highland's assets have been liquidated at below value prices. Under the Plan, Highland's assets will continue to be liquidated for less than optimal prices, with a view to ultimately terminating Highland's existence.

2.      Confirmation of the Plan should be denied due to numerous deficiencies and improprieties. The problems with the Plan as drafted include, but are not limited to, exculpation and injunction provisions that extend far beyond permissible limits, a lack of transparency following confirmation, inappropriate post-confirmation jurisdictional terms, and the wrongfully obtained votes of certain affiliates of HarbourVest Partners, LLC (collectively, "HarbourVest"). The Plan severs Respondent's rights and fails to comply with the Bankruptcy Code and applicable case law. Therefore, confirmation of the Plan should be denied.

## OBJECTION

## I.      Both the Exculpation and Injunction Sections Violate Fifth Circuit Precedent.

3.      The proposed exculpatory and injunction provisions are simply impermissible. Both contravene established case law in the Fifth Circuit regarding the proper boundaries of such provisions and merit denial of Plan confirmation.

4.      First, Article IX.D proposes to exculpate each and every "Exculpated Party" for all post-petition liability relating to the Debtor's bankruptcy case. The term "Exculpated Party" includes not just the Debtor but also, among others, the Debtor's Employees, the Independent Directors, the CEO/CRO, and the Related Persons of such parties. These exculpations in favor of the Exculpated Parties are prohibited under Fifth Circuit precedent. *See, e.g., In re Pacific Lumber, Co.*, 584 F.3d 229 (5th Cir. 2009); *Dropbox Inc. v. Thru Inc.*, Case No. 17-1958-G, 2018 U.S. Dist.

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 137 of 921 PageID 11935
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 3 of 8

LEXIS 179769 * 66-68 (N.D. Tex. Oct. 19, 2018) (finding that the scope of an exculpation clause provided insulation to nondebtor third parties in contravention of Fifth Circuit law).

5. In *Pacific Lumber*, the Fifth Circuit made clear that section 524(e) prohibits the exoneration of nondebtors such as a debtor's management and professionals, but excluding official committees and their members acting within the scope of their official duties, from negligence during the course of their participation in the bankruptcy. The Fifth Circuit in *Pacific Lumber* stated: "[T]he essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Pacific Lumber*, 584 F.2d at 252. Despite these clear limits, the exculpation provisions in the Plan go far beyond what is permissible through the Bankruptcy Code's intended "fresh start" to encompass virtually all acts or omissions taken in connection with the Debtor's bankruptcy case by a wide range of parties, thus effectively exculpating an unknown number of individuals.

6. Second, Article IX.F creates a channeling injunction with respect to certain "Protected Parties." The injunction requires Bankruptcy Court approval to pursue any claims related to the Debtor brought by any entity, including claims arising from a Protected Party's post-confirmation conduct. Much like the overbroad definition of "Exculpated Parties", the definition for "Protected Parties" includes a wide swath of individuals and entities beyond simply the Debtor. As a result, the channeling injunction would bring into the Bankruptcy Court all claims against such Exculpated Parties by any party who happens to have a claim or interest in the Debtor. The proposed injunction is effectively a non-consensual third-party release, which is expressly prohibited. *See Dropbox*, 2018 U.S. Dist. LEXIS 179769 * at 65 (disallowing similar injunction). Moreover, the Fifth Circuit has held that a permanent injunction cannot be justified under the broad

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 138 of 921    PageID 11936
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 4 of 8

equity powers of Bankruptcy Code section 105 "if it effectively discharges a nondebtor." *Feld v. Zale Corporation (In re Zale Corporation)*, 62 F.3d 746, 760 (5th Cir. 1995) (overturning permanent injunction effectively discharging a nondebtor because such an injunction violates section 524 of the Bankruptcy Code, which was designed only to discharge the debtor, not nondebtor parties).

7.      Furthermore, the channeling injunction in Article IX.F limits the jurisdiction to hear claims against Protected Parties to only the Bankruptcy Court. In doing so, the Plan would improperly disregard parties' rights to bring claims even in courts with exclusive jurisdiction and would ignore those courts with specialized jurisdiction to hear certain types of cases. Respondent therefore objects to isolating (and potentially even providing) jurisdiction of any and all claims against Protected Parties in the Bankruptcy Court through this channeling injunction.

8.      In addition, the proposed injunction in Article IX.F is impermissibly vague and broad and, as noted, applies to post-confirmation conduct and claims.

9.      FED. R. BANKR. P. 3016(c) requires that, "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." The Debtor fails to provide such "specific and conspicuous language" about the proposed injunction here. The Plan instead issues a blanket prohibition on entities from:

> (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 139 of 921 PageID 11937
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 5 of 8

Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, . . . ; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

Plan at IX.F. Much like the overbroad exculpation and channeling injunction provisions, this vague and potentially limitless injunction is improper. As a result, the Plan should not be confirmed.

## II.   The Plan Fails to Meet Section 1129(a)(7) due to Lack of Appropriate Sale Procedures for Post-Confirmation Operations.

10.     The Plan envisions the liquidation of the Debtor's assets by the Reorganized Debtor and the Claimant Trust. This wind down, however, is subject to no oversight or predetermined procedures to ensure that the process is both value-maximizing and transparent. This is critically important because, during the course of the Debtor's bankruptcy case, Respondent would allege on information and belief that the Debtor has sold a number of assets of significant value outside the ordinary course of the Debtor's business as it was conducted prepetition without notice to parties in interest or a complete marketing plan.

11.     The proposed Plan's lack of appropriate marketing and the resulting dampening of competitive bidding requirements for the Reorganized Debtor's assets indicates that the Debtor's creditors and equity holders could receive a higher recovery from the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code in which sales procedures are governed by the Bankruptcy Court to ensure maximization of value through auction or other market-testing means. As it is, for the Debtor to meet its burden to establish all elements of 11 U.S.C. § 1129, specifically including the best interest test of section 1129(a)(7), the Debtor must detail why the proposed liquidation process will test the market as fully as would be the case in Chapter 7.

12.     Moreover, Respondent believes that notice and an opportunity for other potential bidders to come forward will not only provide transparency to the process but also will result in

0110057

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 140 of 921 PageID 11938
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 6 of 8

competitive bidding, increasing the value received by the beneficiaries of the Debtor's liquidation. An asset sale without transparency, on the other hand, will presumptively be done without comprehensive market exposure. Courts have long recognized the need for competitive bidding when approving sales. *In re Muscongus Bay Company,* 597 F.2d 11 (1st Cir. 1979); *In re Alves,* 52 B.R. 353 (Bankr. D. R.I. 1985); *In re Dartmouth Audio Inc.,* 42 B.R. 871, 874 (Bankr. D. N.H. 1984). Competitive bidding yields higher offers and thus benefits the estate. The objective is "to maximize the bidding, not to restrict it." *In re The Ohio Corrugating Company,* 59 B.R. 11, 13 (Bankr. N.D. Ohio 1985) (quoting *In re Beck Industries Inc.,* 605 F.2d 624, 637 (2d Cir. 1979)). Additionally, because the Plan states that equity will receive some recovery under the Plan— Article III.F states that there are no Classes deemed to reject the Plan or being excluded from recovery—equity holders as well as all creditors should receive, *inter alia*, notice and an opportunity to be heard on all significant liquidations and other transactions performed by the Reorganized Debtor.

### III.     **Post-Confirmation Jurisdiction under the Plan is Improper.**

13.     The various jurisdictional provisions of the Plan are overbroad and mandate that the Bankruptcy Court hear any matter involving the Debtor or its operations post-Effective Date. First, as noted above, the injunction with respect to "Protected Parties" requires that "the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted." Plan at Art. IX.F. There is no legal basis for barring recourse to other courts with exclusive jurisdiction—possibly providing the Bankruptcy Court with jurisdiction it does not legally have, especially post-confirmation. *See, e.g., Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and

---

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 141 of 921    PageID 11939
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21    Entered 01/05/21 14:24:09    Page 7 of 8

thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."). Second, the Bankruptcy Court's jurisdiction should not encompass claims and causes of action arising from the Reorganized Debtor's post-confirmation operations.

## IV.    The Subordination Provisions are Improper.

14.    The elimination of vacant Classes pursuant to Article IV.I would potentially eliminate certain Classes on the Effective Date and any recovery for such Classes, including Class 9 for Subordinated Claims (assuming the HarbourVest claim in Class 9 is disallowed), despite the later re-allocation of claims into such eliminated Classes.

15.    The Plan contemplates subordination of Claims and Equity Interests yet provides no mechanism, hearing requirement, or deadlines for such subordination. Instead, the Debtor reserves in Article III.J the right to subordinate any Claim and the Claimant's resulting Plan treatment apparently without hearing.

## V.    Any Acceptance of the Plan by HarbourVest Should be Disallowed.

16.    HarbourVest agreed to accept the Plan pursuant to the settlement with the Debtor submitted to the Court pursuant to FED. R. BANK. P. 9019. If that settlement is approved by the Court, HarbourVest will have, under the Plan, a Class 8 claim of $45 million and a Class 9 claim of $35 million. Respondent would allege on information and belief that the Debtor's CEO/CRO has stated on multiple occasions that HarbourVest has no valid claim against the Debtor and that its dispute with the Debtor could be settled for $5 million or less.

17.    By including in the settlement agreement the requirement that HarbourVest vote both its Class 8 and Class 9 claim to accept the Plan, the settlement agreement, on its face, reflects the exchange of HarbourVest's acceptance of the Plan for the vastly inflated claims agreed to by

Case 19-34054-sgj11 Doc 3445-56 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 142 of 921 PageID 11940
Case 19-34054-sgj11 Doc 1661 Filed 01/05/21 Entered 01/05/21 14:24:09 Page 8 of 8

the Debtor. In other words, the Debtor *purchased* HarbourVest's acceptance. This constitutes a violation of Bankruptcy Code section 1129(a)(3) in that HarbourVest's acceptance and the payment for it were not in good faith.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the Bankruptcy Court enter an order (i) denying confirmation of the Plan, and (ii) granting Respondent such other and further relief to which he may be justly entitled.

Dated: January 5, 2021                         Respectfully submitted,

                                               */s/ D. Michael Lynn*
                                               D. Michael Lynn
                                               State Bar I.D. No. 12736500
                                               John Y. Bonds, III
                                               State Bar I.D. No. 02589100
                                               Joshua N. Eppich
                                               State Bar I.D. No. 24050567
                                               J. Robertson Clarke
                                               State Bar I.D. No. 24108098
                                               BONDS ELLIS EPPICH SCHAFER JONES LLP
                                               420 Throckmorton Street, Suite 1000
                                               Fort Worth, Texas 76102
                                               (817) 405-6900 telephone
                                               (817) 405-6902 facsimile
                                               Email: michael.lynn@bondsellis.com
                                               Email: john@bondsellis.com
                                               Email: joshua@bondsellis.com
                                               Email: robbie.clarke@bondsellis.com

                                               **ATTORNEYS FOR JAMES DONDERO**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 5, 2021, a true and correct copy of the foregoing document was served via the Bankruptcy Court's CM/ECF system on counsel for the Debtor and on all other parties requesting or consenting to such service in this case.

                                               */s/ J. Robertson Clarke*
                                               J. Robertson Clarke

---

JAMES DONDERO'S OBJECTION TO PLAN CONFIRMATION                    PAGE 8

# EXHIBIT 57

Appx 07118
011061

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 144 of 921    PageID 11942
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21    Entered 01/05/21 15:34:33    Page 1 of 7

Docket #1662 Date Filed: 01/05/2021

Laurie A. Spindler
Linebarger Goggan Blair & Sampson, LLP
2777 N Stemmons Fwy, Suite 1000
Dallas, Texas 75207
(214) 880-0089 Telephone
(469) 221-5003 Facsimile
Attorneys for Dallas County,
City of Allen, Allen ISD, City
of Richardson and Kaufman
County

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054-SGJ** |
| **LP,** | § | |
| **Debtor.** | § | |

## OBJECTION OF DALLAS COUNTY, CITY OF ALLEN, ALLEN ISD, CITY OF RICHARDSON AND KAUFMAN COUNTY TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Come now Dallas County, City of Allen, Allen ISD, City of Richardson and Kaufman County (collectively, the "Tax Authorities"), creditors and parties-in-interest, and file this, their objection to confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (the "Plan") and would respectfully show the Court as follows:

### Background

1.    Dallas County, City of Allen, Allen ISD and the City of Richardson, duly organized governmental units of the State of Texas, are the holders of secured claims against the Debtor for unpaid ad valorem business personal property taxes for tax year 2019 in the aggregate amount of $65,181.49.

2.    The Tax Authorities are the holders of administrative expense claims against the

1934054210105000000000008

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 145 of 921    PageID 11943
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21    Entered 01/05/21 15:34:33    Page 2 of 7

Debtor for year 2020 and estimated 2021 ad valorem real and business personal property taxes.

3.      The prepetition claims and the administrative expense claims are secured by unavoidable, first priority, perfected liens on all property of the Debtor's estate pursuant to sections 32.01 and 32.05 of the Texas Property Tax Code and 11 U.S.C. Section 362(b)(18).  *In re Winn's Stores, Inc.*, 177 B.R. 253 (Bankr. W.D. Tex. 1995); *Central Appraisal District of Taylor County v. Dixie-Rose Jewels, Inc.*, 894 S.W.2d 841 (Tex. App.-Eastland 1995).  These liens are *in solido* and attach on January 1 of each year to all business personal property of the property owner and to property subsequently acquired.  *In re Universal Seismic Associates, Inc.*, 288 F.3d 205 (5th Cir. 2002); *City of Dallas v. Cornerstone Bank, N.A.*, 879 S.W.2d 264 (Tex. App.-Dallas 1994).

4.      Texas Tax Code Section 32.01 provides:

(a)      On January 1 of each year, a tax lien attaches to property to secure the payment of all taxes, penalties, and interest ultimately imposed for the year on the property, whether or not the taxes are imposed in the year the lien attaches.  The lien exists in favor of each taxing unit having power to tax the property.

(b)      A tax lien on inventory, furniture, equipment, or other personal property is a lien in solido and attaches to all inventory, furniture, equipment, and other personal property that the property owner owns on January 1 of the year the lien attaches or that the property owner subsequently acquires.

…

(d)      The lien under this section is perfected on attachment and … perfection requires no further action by the taxing unit.

Tex. Tax Code § 32.01.  Texas Tax Code Section 32.05(b) provides:

(b)      . . . a tax lien provided by this chapter takes priority over the claim of any creditor of a person whose property is encumbered by the lien and over the claim of any holder of a lien on property encumbered by the tax lien, whether or not the debt or lien existed before attachment of the tax lien.

Tex. Tax Code § 32.05(b).

**Objection to Confirmation**

Appx. 07120
011063

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 146 of 921    PageID 11944
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21    Entered 01/05/21 15:34:33    Page 3 of 7

The Tax Authorities object to confirmation of the plan for numerous reasons.

5.      The Tax Authorities object to confirmation of the Plan because it defines the "Disputed Claims Reserve Amount" as the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions . . . are made to the Holders of Allowed Claims." (Plan, Art. I. Sec. B. 50 at 7). The Tax Authorities object to the failure to pay all postpetition and posteffective date interest that they are entitled to receive on their prepetition claims pursuant to 11 U.S.C. Sections 506(b), 511 and 1129 as well as all penalties and interest that may accrue on their administrative expense claims, which are fully collectible, if the administrative claims are not paid before the state law delinquency date.

6.      The Tax Authorities object to confirmation of the Plan because it fails to provide for payment of postpetition ad valorem property taxes in the ordinary course of business prior to the state law delinquency date.

7.      The Tax Authorities object to confirmation of the Plan because it fails to provide that they shall receive all penalties and interest that accrue on postpetition ad valorem property taxes if the taxes are not paid prior to the state law delinquency date.

8.      The Tax Authorities object to confirmation of the Plan because it violates the provisions of 11 U.S.C. Section 503(b)(1)(D) which very specifically states that a governmental unit is not required to file a request for payment of an administrative expense as a condition of allowance.

9.      The Tax Authorities object to confirmation of the Plan because it fails to specifically provide for the retention of the liens that secure postpetition ad valorem property taxes plus all penalties and interest that may accrue.

Appx. 07121
011064

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 147 of 921 PageID 11945
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21 Entered 01/05/21 15:34:33 Page 4 of 7

10.    The Tax Authorities object to confirmation of the plan because it fails to provide for the retention of the liens that secure the prepetition claims until they receive payment in full of their claims in violation of 11 U.S.C. Section 1129.

11.    The Tax Authorities object to confirmation of the Plan because it provides that all Reorganized Debtor Assets[1] will vest in the Reorganized Debtor free and clear of all liens except those that are specifically preserved in the plan.  (Plan, Art. IV. Sec. C.5 at 33.)

12.    The Tax Authorities object to confirmation of the Plan because it fails to specifically provide for the payment of postpetition preeffective date interest at the state statutory rate of 1% per month, which the Tax Authorities are entitled to pursuant to 11 U.S.C. Sections 506(b) and 511.

13.    The Tax Authorities object to confirmation of the Plan because it fails to specifically provide for the payment of posteffective date interest at the state statutory rate of 12% per annum, which the Tax Authorities are entitled to pursuant to 11 U.S.C. Sections 511 and 1129.

14.    The Tax Authorities object to confirmation of the Plan because it provides that except as otherwise provided in the Plan the Holders of Claims shall not be entitled to interest in violation of 11 U.S.C. Sections 506(b), 511 and 1129.  (Plan, Art. VI, Sec. A. at 39.)  The Tax Authorities also object to this provision because it could result in the nonpayment of penalties and interest that accrues on postpetition taxes, which are fully secured and collectible.  *See U.S. v. Noland*, 571 U.S. 535 (1996).

15.    The Tax Authorities object to confirmation because the Plan provides that distributions to disputed claims that become allowed claims shall be made in the amount that the

---

[1]    All capitalized terms that are not defined herein shall have the same meaning as provided in the Plan.

Appx. 07122
011065

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 148 of 921    PageID 11946
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21    Entered 01/05/21 15:34:33    Page 5 of 7

holder would have received if it been an allowed claim on the Effective Date. (Plan, Art. VI. Sec. E. at 40.)  This provision violates 11 U.S.C. Sections 506(b), 511 and 1129.  The Tax Authorities also object to this provision because it could result in the nonpayment of penalties and interest that accrues on postpetition taxes, which are fully secured and collectible.  *See U.S. v. Noland*, 571 U.S. 535 (1996).

16.     The Tax Authorities object to confirmation of the Plan because it does not provide that failure to timely pay postpetition taxes is an event of default under the Plan and because the Plan does not provide a remedy in the event of such a default.  The Plan should be amended to provide that in the event of default the Tax Authorities shall send written notice of the default to counsel for the Debtor/Reorganized Debtor via electronic mail, the Debtor/Reorganized Debtor will have 10 days from the date of the notice to cure its default and if the default is not cured, the Tax Authorities shall be entitled to pursue all state law remedies available to them without the need for recourse to the Bankruptcy Court.  The Plan should further provide that the Tax Authorities are only required to give the Debtor/Reorganized Debtor two notices of default and if the Debtor defaults a third time, the Tax Authorities will be entitled to pursue collection of all amounts owed pursuant to state law outside the Bankruptcy Court without further notice to the Debtor.  An event of default shall include the Debtor's failure to make a payment to one or both of the Tax Authorities under the plan and the Debtor's failure to pay post-petition ad valorem taxes prior to the state law delinquency date.ih38SW!615.00

17.     The Tax Authorities object to the definition of "Other Unsecured Claim," which the Plan defines as "any Secured Claim other than the Jeffries Secured Claim and the Frontier Secured Claim."  (Plan Art. I, Sec. B. 88 at 17.)  Defining a secured claim as an "Other

Appx 07123
011066

Unsecured Claim" is not sufficient to reclassify a secured claim or to avoid a creditor's lien or security interest.

Based on the foregoing, the Tax Authorities request that the Court enter an order denying confirmation of the Debtor's plan.

WHEREFORE, PREMISES CONSIDERED, the Tax Authorities request that the Court enter an order denying confirmation of the Debtor's Fifth Amended Plan of Reorganization.

Dated:  January 5, 2021.

<div style="margin-left:40%">

Respectfully submitted,

Linebarger Goggan Blair & Sampson, LLP
2777 N Stemmons Fwy, Suite 1000
Dallas, TX 75207
Ph. No.  (214) 880-0089
Dir. No. (469) 221-5125
Fax No. (469) 221-5003
dallas.bankruptcy@publicans.com

By:    /s/Laurie A. Spindler_____
Laurie A. Spindler SBN 24028720
Laurie.Spindler@lgbs.com

ATTORNEYS FOR DALLAS COUNTY,
CITY OF ALLEN, ALLEN ISD, CITY OF
RICHARDSON AND KAUFMAN
COUNTY

</div>


Appx. 07124
011067

Case 19-34054-sgj11 Doc 3445-57 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 150 of 921    PageID 11948
Case 19-34054-sgj11 Doc 1662 Filed 01/05/21    Entered 01/05/21 15:34:33    Page 7 of 7

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 5, 2021, a true and correct copy of the foregoing was served electronically through the Court's electronic case filing system or *via* electronic mail upon: Jeffrey N. Pomerantz, email: jpomerantz@pszjlaw.com ; Ira D. Kharasch, email: jkharasch@pszjlaw.com; Gregory V. Demo, email: gdemopszjlaw.com; Melissa S. Hayward, email: mhayward@haywardfirm.com; Zachery Z. Annable, email: zannable@haywardfirm.com; Matthew A. Clemente, email: mclemente@sidley.com; Alyssa Russell, email: alyssa.russell@sidley.com and Lisa L . Lambert, email: Lisa.L.Lambert@usdoj.gov.

/s/Laurie A. Spindler
Laurie A. Spindler

Appx 07125
011068

# EXHIBIT 58

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 6
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 152 of 921 PageID 11950
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21 Entered 01/05/21 16:14:15 Page 1 of 5

Docket #1666 Date Filed: 01/05/2021

Daniel P. Winikka (TX 00794873)
**LOEWINSOHN FLEGLE DEARY SIMON LLP**
12377 Merit Drive, Suite 900
Dallas, TX 75251
Telephone: (214) 572-1700
Facsimile: (214) 572-1717
danw@lfdslaw.com

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE : | § | CHAPTER 11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **CASE NO. 19-34054-SGJ** |
| **L.P.,** [1] | § | |
| | § | |
| **Debtors.** | § | |

### LIMITED OBJECTION OF JACK YANG AND BRAD BORUD TO FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

Jack Yang ("Yang") and Brad Borud ("Borud"), by and through undersigned counsel, file

this limited objection to the Fifth Amended Plan of Reorganization of Highland Capital

Management, L.P. pursuant to Chapter 11 of the Bankruptcy Code [ECF No. 1472] (the "Plan")

and, in support hereof, respectfully represent as follows:

### Limited Objection

Borud and Yang are former employees and limited partners of the Debtor. They both

timely filed proofs of claim for contingent and unliquidated amounts in respect of, among other

things, the Debtor's obligation to make them whole on certain compensation promised to them

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1


1934054210105000000000012

Appx. 07125
0TI070

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 6
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 153 of 921    PageID 11951
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21    Entered 01/05/21 16:14:15    Page 2 of 5

for their performance in 2008.  In particular, as a form of compensation for their performance, the Debtor promised to make them whole if certain tax refunds they received turned out to be less than what was estimated at the time.  This is an obligation in respect of compensation they were awarded and promised for their efforts as employees in 2008.  The IRS subsequently challenged the Debtor's 2008 tax elections and that audit/dispute is still ongoing.  Accordingly, Borud and Yang's claims in respect of this promised compensation if their tax refunds turn out to be less than the estimate remain unliquidated and contingent.

The Debtor has indicated that it believes the claims of Borud and Yang should be "Subordinated Claims" under the Plan and therefore constitute Class 9 claims to the extent such claims are ultimately liquidated and allowed.  Borud and Yang disagree that there is any basis to subordinate their claims under section 510 of the Bankruptcy Code.  Whether their claims could be subordinated under section 510 of the Bankruptcy Code, however, is not an issue that needs to be addressed at this time and can and should be addressed when and if the Debtor objects to those claims and seeks to have such claims subordinated.

Borud and Yang are concerned, however, that the Plan attempts to achieve a subordination of their claims beyond what would be permissible under section 510 of the Bankruptcy Code.  Specifically, "Subordinated Claim" under the Plan is defined as not only a claim that is determined to be subordinated under section 510 of the Bankruptcy Code but also any claim that "arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest."  This language goes beyond the language of section 510(b) of the Bankruptcy Code, which is limited to claims "arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement of contribution allowed under section 502 on

2

Appx 07428
011071

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 6
Case 3:25-cv-02072-S     Document 15-14     Filed 10/06/25     Page 154 of 921     PageID 11952
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21   Entered 01/05/21 16:14:15   Page 3 of 5

account of such a claim." Indeed, this language is potentially so broad as to encompass any claims of any person that was or is a limited partner, no matter what the nature of the claim is, including claims solely in respect of compensation owed to such person for their services as an employee.

The Debtor should not be permitted to achieve subordination beyond the bounds of section 510 of the Bankruptcy Code.

For all the foregoing reasons, Yang and Borud request that the Court (a) either require that the Plan be clarified to provide that claims in Class 9 are limited to claims that are subordinated under section 510 of the Bankruptcy Code or deny confirmation of the Plan and (b) grant them such other and further relief as is appropriate.

DATED: January 5, 2021                    Respectfully submitted,

                                          */s/ Daniel P. Winikka*
                                          Daniel P. Winikka (TX 00794873)
                                          **LOEWINSOHN FLEGLE DEARY
                                          SIMON LLP**
                                          12377 Merit Drive, Suite 900
                                          Dallas, TX 75251
                                          Telephone: (214) 572-1700
                                          Facsimile: (214) 572-1717
                                          danw@lfdslaw.com

                                          **COUNSEL FOR JACK YANG
                                          AND BRAD BORUD**

3

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 6
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 155 of 921    PageID 11953
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21    Entered 01/05/21 16:14:15    Page 4 of 5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies, that on this 5th day of January, 2021, he caused to be served a true and correct copy of this Limited Objection to Fifth Amended Plan of Reorganization, by electronically filing it with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system and to the following Notice Parties:

Pachulski Stang Ziehl & Jones LLP
101000 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Jeffrey N. Pomerantz
Ira D. Kharasch
Gregory V. Demo
jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

Hayward & Associates PLLC
10501 N. Central Expressway, Suite 106
Dallas, TX  75231
Melissa S. Hayward
Zachery Z. Annable
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

**COUNSEL FOR DEBTOR**

Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603
Matthew A. Clemente
Alyssa Russell
mclemente@sidley.com
Alyssa.Russell@sidley.com

**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Appx. 07139
011073

Case 19-34054-sgj11 Doc 3445-58 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 6
Case 3:25-cv-02072-S      Document 15-14      Filed 10/06/25      Page 156 of 921      PageID 11954
Case 19-34054-sgj11 Doc 1666 Filed 01/05/21    Entered 01/05/21 16:14:15    Page 5 of 5

U.S. Department of Justice, Region 6
Northern District of Texas
Office of the United States Trustee
Earle Cabell Federal Building
1100 Commerce Street, Room 976
Dallas, TX  75242
Lisa L. Lambert
Lisa.L.Lambert@usdoj.gov

**COUNSEL FOR THE OFFICE OF THE UNITED STATES TRUSTEE**

*/s/ Daniel P. Winikka*
Daniel P. Winikka

Appx. 0743
011074

# EXHIBIT 59

Appx 07132

011073

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 158 of 921    PageID 11956
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 1 of 34

Docket #1667  Date Filed: 01/05/2021

Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

## OBJECTION TO CONFIRMATION OF THE
## DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The Dugaboy Investment Trust and Get Good Trust (jointly, "Movants"), submit this

Objection for the purpose of objecting to the *Fifth Amended Plan of Reorganization of Highland*

*Capital Management, L.P.* [Dkt. 1472] (the "Plan") submitted by Highland Capital Management,

L.P. ("Debtor").  The Dugaboy Investment Trust is an equity owner of the Debtor and has filed

proofs of claim.  See Claim Numbers 131 and 177. The Get Good Trust has filed proofs of claim

in this case.  See Claim Numbers 120, 128 and 129.  If the Claims[1] filed by Movants are allowed,

---

[1] Capitalized terms not defined in this Objection are taken from the Plan and shall have the meanings given to them in the Plan.

{00374857-13}                                        1



Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 159 of 921 PageID 11957
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 2 of 34

Claimants possess claims in Class 7 or 8. The Dugaboy Investment Trust is a member of Class 11 of the Plan.

Movants assert that the Plan does not meet the requirements contained in the Bankruptcy Code, Rules, and applicable case law to be confirmed.

**The Plan Violates 11 U.S.C. § 1129(a)(1)**

In order to confirm a plan, the plan must meet the requirements set forth in 11 U.S.C. §§ 1122, 1123 and 1129. The Plan proposed by the Debtor fails to meet the requirements set forth in the Bankruptcy Code and, as such, confirmation of the Plan must be denied. 11 USC § 1129(a) (1) requires that the Plan comply with the applicable provisions of this title. The cases interpreting this section have held that a plan must meet the requirements of 11 U.S.C. §§ 1122 and 1123. See *In re Star Ambulance Service*, 540 B.R. 251, 260 (N.D.Tex. 2015); *In re Save Our Springs,* 632 F.3d 168 174 5th Cir. 2011); *In Re Counsel of Unit Owners of 100 Harborview Drive Condo*, 572 B.R. 131, 137-139 (Bankr.D.Md. 2017).

**The Plan Contains an Impermissible Claim Subordination Provision**

Article III.J of the Plan contains the following provision:

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or seek to subordinate, any Claim. . . .

The section gives the named parties the discretion upon "notice" to either subordinate a Claim or re-characterize a Claim whether or not a legal basis exists to either re-characterize the Claim or subordinate it. The term "notice" is nowhere defined, and any time the Bankruptcy Code uses the term notice, it is always accompanied by the words "and a hearing". 11 U.S.C. §§ 1112, 707 and 554 are examples of Bankruptcy Code sections that require both notice and a hearing prior to a party obtaining the relief sought in a pleading. Nowhere in the Bankruptcy

Appx 07434
011077

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 160 of 921 PageID 11958
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 3 of 34

Code can a debtor obtain relief without affording the parties affected by the requested relief an opportunity for a hearing.

Under Bankruptcy Rule 7001(8), the subordination of a claim, as a general rule, requires the filing of an adversary proceeding. However, an exception to the rule is that a subordination of a claim can occur through a Plan. The Plan provision, as written, allows the designated parties the ability to subordinate a claim or re-characterize a claim merely by sending a letter.

The Plan, Plan Supplements and Disclosure Statement do not identify any specific Claim for which subordination is sought. Rather, in the recent Plan Supplement that was filed on January 4th (Dkt. No. 1656), retained claims are lumped in with all other possible claims and a laundry list of possible targets. (See Plan Supplement Dkt. No. 1656-1 Exhibit L.) Notwithstanding the conflicting 5th circuit case law concerning the necessary designation for the retention of claims (See *In re SI Restructuring*, 714 F.3d 860 (5th Cir. 2013) and *In re Texas Wyoming Drilling,* 647 F.3d 547, 549 and 551 (5th Cir 2011) and *In re United Operating,* LLC, 540 F.3d 351 (5th Cir. 2008), the cases do require some notice to the creditor of the potential for the subordination of such creditor's claim. Bankruptcy Rule 7001 (8) cannot be read to allow a complex "equitable subordination claim" that requires evidence and findings consistent with *In Re Mobile Steel*, 563 F.2d 692 (5th Cir. 1977) to occur with only written notice immediately prior to a confirmation hearing. The provision, as written, does not provide any party subject to the so-called notice with due process and violates 11 U.S.C. § 1129(a)(1).

**The Plan is Not Final and Contains an Impermissible Plan Modification Provision**

In addition to the Plan, the Debtor must file a Plan Supplement which will include various documents that will 1) govern the operations of the Highland Claimant Trust and the

Appx. 07125
011078

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 161 of 921 PageID 11959
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 4 of 34

Litigation Trust, 2) identify retained causes of action; and 3) list the executory contracts and leases that will be assumed by the Debtor and Plan Documents.

The problem with the Plan Supplement is that, as of the writing of this Objection and possibly even after the hearing on the confirmation of the Debtor's Plan, parties in interest will not have seen the documents that will become an essential part of the Plan. Article IV.J on page 36 of the Plan states:

> The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the Order Directing Mediation entered on August 3, 2020 [D.I. 912].

It is clear that no requirement exists in the Plan that the Plan Documents be finalized prior to hearing on the confirmation of the Debtor's Plan so that creditors can object if any terms of the Plan Documents filed in the Plan Supplement adversely impact a creditor's rights or are inconsistent with the Bankruptcy Code and Rules.

The Plan contains a provision allowing modification of the Plan. It is not clear from the language of the modification section the extent of judicial oversight that exists with respect to a Plan modification and whether this Court will have the ability to determine if the proposed plan modification is material or an immaterial. Article XII.B (p. 55) of the Plan provides that the Debtor reserves the right in accordance with the Bankruptcy Code and Rules to amend or modify the Plan prior to the entry of the Confirmation Order with the "consent" of the Committee. The provision does not require compliance with 11 U.S.C. § 1127(a) which specifically provides that the proposed modification prior to confirmation must meet the requirements of 11 U.S.C. §1122 and 11 U.S.C. §1123. In contrast to the Plan provision concerning modification prior the entry of the Confirmation Order, Article XII.B of the Plan does recognize that any modification after the entry of the Confirmation Order must meet the requirements set forth in 11 U.S.C. §§

Appx. 07426
011079

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 162 of 921 PageID 11960
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 5 of 34

1127(b). From a textual point of view, modifications of the Plan both before and after the entry

of the Confirmation Order must meet the requirements of 11 U.S.C. §§ 1122 and 1123.

**The Plan violates 11 U.S.C. § 1129(a)(7)**

Under 11 U.S.C. § 1129(a)(7), in order for a plan to be confirmed, each creditor as of the

effective date of the plan will receive or retain under the plan on account of claim or interest an

amount that is not less than the amount such holder would receive or retain if the debtor were

liquidated under chapter 7.

While the Debtor's Plan is a liquidation plan, creditors from a valuation point of view are

receiving an amount less than they would receive if the Debtor were liquidated under chapter 7.

The amount received by creditors under the Debtor's Plan cannot be viewed solely in the dollars

they receive but, rather, the amount actually received must be discounted by two provisions in

the Debtor's Plan that reduce the present value of the creditors' recovery under the Plan. The

two discounting factors are the following provisions in the Highland Claimant Trust:

a) The Reorganized Debtor has no affirmative obligation to report any activity or
results to the holders of beneficial interests in the Claimant Trust or potential holders
of beneficial interests; and

b) The holders of beneficial interests in the Claimant Trust are required to agree to a
standard of liability for the Claimant Trustee that only allows claims against the
Claimant Trustee for acts that constitute "fraud, willful misconduct or gross
negligence" (See Article 8 of the Highland Claimant Trust). A notable omission
from the standard of liability is a breach of fiduciary duty. This omission is contrary
to the statement contained in the Plan "In all circumstances, the Claimant Trustee
shall act in the best interests of the Claimant Trust Beneficiaries and with the same
fiduciary duty as a Chapter 7 trustee." (See Plan Page 28)

Appx. 07127
011080

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 163 of 921 PageID 11961
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 6 of 34

c) A Chapter 7 trustee, if it attempted to sell assets, would have to obtain Court authority for the sale and would provide Notice to creditors of the sale. Under the Plan no such requirement exists.

**The Plan And Related Documentation Provide For Impermissible Non-debtor Exculpation, Releases and Injunctions That Are Not Allowed Under Applicable 5th Circuit Case Law**

### A. Exculpation and Releases

Article IX of the Plan contains extensive exculpation and release provisions that far exceed those allowed in the Fifth Circuit.

Article IX.C (the "Exculpation Clause") exculpates each "Exculpated Party" from, *inter alia*, any liability for conduct occurring **on** or after the Petition Date in connection with or arising out of the filing and administration of the case, the funding, consummation and implementation of the Plan, and any negotiations, transactions and documents pertaining to same that could be asserted in their own name or on behalf of any holder of a claim or interest excluding acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.

The term "Exculpated Parties" is defined[2] in Article I.B.61 of the Plan to include:

1. The Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the "Managed Funds," which is defined in Article I.B.83 of the Plan to include Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to the executory contracts assumed under the Plan;

2. Strand Advisors, Inc., the Debtor's general partner ("Strand");

---

[2] The definition of "Exculpated Parties" includes references to numerous other defined terms that also are defined in Article I.B, some of which are summarized here. For the sake of brevity, the definition of each defined term contained in the definition of Exculpated Parties is not reproduced here *verbatim*.

Appx 07138
011081

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 164 of 921 PageID 11962
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 7 of 34

3. John S. Dubel, James P. Seery, Jr. and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors appointed between then and the effective date of the Plan (collectively, the "Independent Directors");

4. The Official Committee of Unsecured Creditors appointed in the case (the "Committee");

5. The members of the Committee in their official capacities;

6. Professionals retained by the Debtor and the Committee in the case (the "Professionals");

7. James P. Seery, Jr., the Debtor's chief executive office and chief restructuring officer (the "CEO/CRO"); and

8. "Related Persons" of the Independent Directors, the Committee, the members of the Committee, the Professionals and the CEO/CRO, which is defined to include, *inter alia*, predecessors, successors, assigns, officers, directors, employees, managers, attorneys, consultants, subsidiaries thereof.

The definition does expressly exclude from the definition certain named individuals and entities.

In addition to Article IX of the Plan, the Claimant Trust Agreement [Dkt. 1656-2, Exhibit M] for which approval is sought as part of the Plan confirmation, also provides in Section 8.1 for a reduced standard of care by the parties described therein as the Claimant Trustee, the Delaware Trustee, and the Oversight Board, any individual member thereof, by limiting their liability to that for fraud, willful misconduct, or gross negligence.[3]

---

[3] With respect to the Claimant Trustee, this appears to contradict Plan Article IV.B.5 (p. 28), which provides: "In all circumstances, the Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee."

Appx. 07139
011082

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 165 of 921 PageID 11963
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 8 of 34

The scope of the Exculpation Clause is ambiguous because it does not specify a time frame to which the exculpation applies. Rather than stating that it applies for actions during a definite time period, such as occurring between the petition date and the effective date of the plan, it runs from the petition date through "implementation of the Plan." The word "implementation" is not defined, which leaves the term subject to interpretation. Does it mean the execution of documents to be executed pursuant to the Plan or the actual implementation of the Plan through administration of assets and payment of claims? The ambiguity is exacerbated by the introduction to the Exculpation Clause, which provides for its effect "to the maximum extent permitted by applicable law". Thus, one could expect that Debtor intends the Exculpation Clause to apply to actions of exculpated parties for actions taken far into the future.

Article IX.D (the "Release Clause") provides that each Released Party is deemed released by the Debtor and the Estate, including the trusts created by the Plan (the Claimant Trust and Litigation Sub-Trust) release each Released Party from, *inter alia*, any and all Causes of Action that the Debtor or its estate could legally assert, except for obligations of the party under the Plan certain other agreements, confidentiality and noncompetition agreements, avoidance actions, or acts constituting bad faith, fraud, gross negligence, criminal misconduct or willful misconduct.[4]

The term "Released Parties" is defined in Article I.B.111 of the Plan to include:

1. The Independent Directors

2. Strand, solely from the date of the appointment of the Independent Directors through the effective date of the Plan;

3. The CEO/CRO;

4. The Committee;

5. The members of the Committee;

---

[4] There are some additional limitations specific to "Senior Employees."

Appx. 02149
011083

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 166 of 921 PageID 11964
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 9 of 34

6.   The Professionals; and

7.   The "Employees," which is defined as the employees of the Debtor set forth in the

     plan supplement.

The term "Causes of Action" is an 18 line definition in Article I.B.19 to include just

about any type of cause of action, whether arising before or after the commencement of the

bankruptcy case.

The Release Clause applies to causes of action having no relationship to the case. The

Release Clause also waives claims of the newly created Claimant Trust and Litigation Sub-Trust

"existing or hereafter arising," which means that these entities, which have conducted no

business as of the confirmation of the Plan, are releasing future, unknown claims against the

Released Parties, such as a future negligent breach of fiduciary duty claim.

The Exculpation Clause, the Release Clause and the Claimant Trust Agreement clearly

bestow protection from liability upon numerous non-debtor parties.  Some of the parties covered

by the Exculpation Clause as Exculpated Parties, namely Managed Funds Highland Multi-

Strategy Credit Fund, L.P. and Highland Restoration Capital Partners, L.P., and possibly by the

use of "catch-all phrasing, SSPI Holdings, Inc., recently were argued to be outside the scope of

this Court's oversight but for an agreement reached by the Debtor with the Committee allowing

for some notice protocols.  *See Debtor's Response to Mr. James Dondero's Motion For Entry of*

*An Order Requiring Notice And Hearing For Future Estate Transactions Occurring Outside The*

*Ordinary Course Of Business* [Dkt. 1546]¶ 12

The Fifth Circuit decision in *In re Pacific Lumber Co.* 584 F.3d 229 (5th Cir. 2009) is

dispositive.   In that case, the plan proposed to release the plan proponents and post-

reorganization owners of the reorganized debtor, the two new entities created by the plan, and

APPX 07841
011084

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 167 of 921 PageID 11965
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 10 of 34

the creditor's committee (and their personnel) from liability—other than for willfulness and gross negligence—related to proposing, implementing and administering the plan. *Pacific*, 584 F.3d at 251. This language is similar to the language of the Exculpation Clause. The *Pacific* court cited the principle of 11 U.S.C. § 524(e), which states that "discharge of a debt of the debtor does not affect the liability of any other entity on . . . such debt." *Id.* The court noted that: "We see little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization." Pacific, 584 F.3d at 252. It went on to cite other Fifth Circuit authority establishing that 11 U.S.C. 524(e) only releases the debtor, not co-liable third parties, and that the cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions. *Pacific*, 584 F.3d at 252, citing *In re Coho Resources, Inc.¸* 345 F.3d 338, 342 (5th Cir. 2003); *Hall v. National Gypsum Co.,* 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993), *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir. 1995). Finally, the court stated:

> There are no allegations in this record that either [plan proponents/owners of reorganized debtors] or their or the Debtors' officers or directors were jointly liable for any of [debtors'] pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause proposed here is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose.

*Pacific,* 584 F.3d at 252-253.

The *Pacific* court struck down all of the non-debtor releases except those in favor of the creditor's committee and its members. The rationale for allowing the exculpation of the creditor's committee and its members is that the law effectively grants them qualified immunity for actions within the scope of their duties. *Pacific*, 584 F.3d at 253. The court also noted that the creditor's committee and its members were the only disinterested volunteers among those among the parties sought to be released, and reasoned that it would be extremely difficult to find

Appx 07142
011085

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 168 of 921    PageID 11966
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 11 of 34

members to serve on the committee if they can be sued by persons unhappy with the committee's performance or the outcome of the case.  *Id.*

The Fifth Circuit noted the continuing viability of the rule of *Pacific* in *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1059 (5th Cir. 2012) (". . . a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief," citing *Pacific.)*  Lower courts from within the Fifth Circuit have strictly followed the precedent and struck down various plan clauses dealing with releases and exculpation.  *See In re Thru, Inc.*, 2018 WL 5113124, *22 (D.C.N.D.Tex 2018), affirmed 782 Fed.Appx. 339 (5th Cir. 2019) (exculpation provision and injunction); *In re CJ Holding Co.*, 597 B.R. 597, 608 (S.D. Tex. 2019) ("The Fifth Circuit has concluded that a bankruptcy court may not confirm a plan that provides "non-consensual non-debtor releases."); *In re National Truck Funding LLC*, 588 B.R. 175, 177 (Bankr. S.D. Miss. 2018) ("At hearing, the parties agreed that the Release and Exculpation . . . of the Plan . . . will be further amended by language protecting only the Official Committee of Unsecured Creditors and its representatives, as the Court has previously approved."); *In re LMCHH PCP LLC*, 2017 WL 4408162, at *16 (Bankr. E.D. La. Oct. 2, 2017) ("The modification [to the plan] filed was done to ensure that the exculpation provision complied with [*Pacific*] which held that a plan could not exculpate outside of the Debtors, the Official Unsecured Creditors Committee, and those who act for them, where 'the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy.'"); *In re Patriot Place, Ltd.*, 486 B.R. 773, 823–24 (Bankr. W.D. Tex. 2013) (Non-debtor releases and exculpation clauses struck down as violative of Fifth Circuit precedent and render the plan unconfirmable.).

Appx 07143
011086

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 169 of 921 PageID 11967
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 12 of 34

All parties exculpated and released other than the Debtor, the Reorganized Debtor, the Committee and its members should be removed from the Plan and the Claimant Trust Agreement, or the Plan is not confirmable.

### B. Injunction Provisions

Article IX.F of the Plan contains extensive injunction provisions (the "<u>Injunction Provisions</u>") that far exceed those allowed in the Fifth Circuit. Although not broken down into sections, the Article contains multiple separate and distinct provisions, as follows:

1. The first paragraph enjoins claimants and equity holders from interfering with plan implementation of consummation;

2. The second paragraph **permanently** enjoins entities with claims or equity interests and their related persons from, with respect to such interests, *inter alia*, commencing actions, enforcing judgments, creating or enforcing encumbrances, setting off against or affecting the Debtor, the Independent Directors, the Reorganized Debtor created by the Plan or the Claimant Trust created by the Plan, except as otherwise provided by the Plan or other order of this Court;

3. The third paragraph extends the injunctions of the Article to any successors of the Debtor, the Reorganized Debtor and the Claimant Trust and their respective property and interests in property; and

4. The fourth paragraph provides that no "Entity[5]" may commence or pursue a claim or cause of action against a "Protected Party"[6] that arose from or is related to the

---

[5] Defined as any "entity" as defined in 11 U.S.C. § 101(15) and also includes any "Person" or any other entity.
[6] The Plan does not define the term "Protected Party." It defines "Protected Parties" as follows:
"*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the

Appx 01087

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 170 of 921 PageID 11968
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 13 of 34

bankruptcy case, the negotiation of the Plan, the administration of the Plan, the wind down of the business, the administration of the Claimant Trust, or transactions in furtherance of the foregoing, without this Court first finding that the claim or cause of action represents a colorable claim of bad faith, criminal misconduct, fraud or gross negligence against the Protected Party, and specifically authorizes such Entity to bring a claim against the Protected Party.[7] It further provides that this Court has the sole jurisdiction to adjudicate any such claim for which approval to pursue the claim has been granted.

Even the most cursory reading of the language of Article IX.F, especially the fourth paragraph, reveals that it goes farther than the exculpation and release provisions in terms of the parties protected by the permanent injunctions.

Although the Court in *Pacific* did not appear to expressly deal with an injunction, as noted above the court concluded that its own cases ". . . seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Pacific*, 584 F.3d at 252. In addition, the Fifth Circuit in *Vitro*, *supra*, construed *Pacific* as denying a non-debtor permanent injunction, wherein it cited *Pacific* and added: "(discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction.)" *Vitro*, 701 F.3d at 1059. The logic for applying the same principle to both releases/exculpations and injunctions is simple to understand—if a non-debtor cannot be released from claims but

---

Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

[7] The provision is expressly limited as to Strand and Employees to the period from the date of appointment to the effective date of the Plan.

Appx. 02145

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 15 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 171 of 921    PageID 11969
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21   Entered 01/05/21 16:22:08   Page 14 of 34

claimants can be enjoined by the bankruptcy court from prosecuting them against the non-debtor,

the exclusion of a release *ab initio* or the striking of a release from a plan is meaningless. For

example, the fourth paragraph effectively releases from negligence claims a broad category of

persons and entities not entitled to exculpation or releases under *Pacific,* because the paragraph

only allows an aggrieved party to proceed after this court has determined that their allegations

represent a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud or gross

negligence. As noted by the Fifth Circuit in *Zale, supra*, "Accordingly, we must overturn a § 105

injunction if it effectively discharges a nondebtor." *Zale*, 62 F.3d at 760, citing *In re Vitek*, 51

F.3d 530, 536, n. 27, as follows: "('[N]on-debtor property thus should not ordinarily be shielded

by the powers of the bankruptcy court.')" *Id. See also In re Thru, Inc.*, 2018 WL 5113124, *21-

22 (striking down a plan injunction that "would effectively discharge numerous non-debtor third

parties").

   All parties protected by the Injunction Provisions other than the Debtor, the Reorganized

Debtor, the Committee and its members should be removed or the Plan is not confirmable.

### C. The Claims Released Do Not Meet the Few Exceptions Allowing Release or Injunctions in Favor of Third Parties

   There are a few situations where it may be *possible* to argue that third party releases are

permissible within the Fifth Circuit, but none are applicable here.   The *Pacific* court

distinguished one set of cases cited by the plan proponents by saying that they concerned global

settlements of mass claims.   *Pacific*, 584 F.3d at 252.   Another has cited *Pacific* for the

proposition that, absent a **meaningful** contribution by the released party, the release would

probably be invalid under *Pacific. In re Texas Rangers Baseball Partners*, 431 B.R. 706, 717

FN 29 (Bankr. N.D. Tex. 2010); *See also Zale*, 62 F.3d at 762 (holding that one plan provision

temporarily enjoining certain contract claims was valid as an unusual circumstance because it

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 16 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 172 of 921 PageID 11970
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 15 of 34

involved a settlement providing substantial consideration being paid into to the estate). Another referred to a narrowly tailored release of the type found in § 363(f) sales of property free and clear of liens. *In re Patriot Place, Ltd.,* 486 B.R. 773, 821-822 (Bankr. W.D. Tex. 2013). Such releases and injunctions are entered to ensure that the purchaser of the debtor's property (as well as the debtor's property being sold) is insulated from claims that creditors might have against the debtor and the property being sold by the debtor to the purchaser. *Id.*

The court in *Zale* indicated that a **temporary** injunction **may** be proper when unusual circumstances exist. *Zale*, 62 F.3d at 761. These conditions are when the non-debtor and the debtor party enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor and when the-third party action will have an adverse impact upon the debtor's ability to accomplish reorganization. *Id.* Even in such cases, neither of which is applicable here, an injunction would not be permanent, but would only delay the actions.

None of the foregoing exceptions are applicable in the instant case.

### D. Jurisdiction

Even if the Bankruptcy Code were to permit some exculpation, releases and injunctions protecting non-debtor parties, this Court does not have the power to retain exclusive, indefinite, post-confirmation jurisdiction to determine whether actions against Protected Parties may proceed or, thereafter, to adjudicate claims pertaining thereto.

The fourth paragraph of the Injunction Provisions prohibits the commencement of certain actions against any Protected Party with respect to claims or causes of action that arose from or are related to the case, administration of the case, the wind down of the business of the Debtor or Reorganized Debtor, and the administration of the Claimant Trust. It also channels claims by requiring that any such claims or causes of action be first brought to this Court to determine that

APPX 02147
011090

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 173 of 921    PageID 11971
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 16 of 34

the claims are outside the scope of protection granted a Protected Party, and to obtain an express authorization from this Court allowing the action to proceed.  It then provides that this Court has sole jurisdiction to adjudicate the claim. Because the Reorganized Debtor and the Claimant Trust have engaged in no activity as of the confirmation of the Plan, this provision clearly is intended to extend to unknown, future conduct by Protected Parties in addition to pre-confirmation Protected Parties.

As noted by the Fifth Circuit in *Bank of Louisiana v. Craig's Stores of Texas, Inc. (In re Craig's Stores)*, 266 F.3d 388, 389 (5th Cir. 2001), bankruptcy court jurisdiction does not last forever.  Under 28 U.S.C. § 1334, a federal district court has original jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."  *In re Superior Air Parts, Inc.*, 516 B.R. 85, 92 (Bankr.N.D.Tex. 2014). The district court is authorized under 28 U.S.C. § 157 to refer to the bankruptcy court "any or all proceedings arising under title 11 or arising in or related to a case under title 11." *Id.*  By virtue of an order adopted on August 3, 1984, this Court has jurisdiction over any or all proceedings arising under title 11 or arising in or related to a case under title 11. *Id.*

"Arising Under" jurisdiction involves causes of action "created or determined by a statutory provision of title 11."  *Wood v. Wood (Matter of Wood)*, 825 F.2d 90, 96 (5th Cir. 1987); *Superior*, 516 B.R. at 93.  Nothing involved in the exculpations, releases or injunctions on non-debtor parties involves such a cause of action.  By their nature, negligence claims and intentional tort claims arise by operation of law generally applicable to all persons and entities regardless of whether or not they are in bankruptcy.  They could exist totally outside a bankruptcy context.

Appx. 07148

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 174 of 921 PageID 11972
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 17 of 34

"Arising in" jurisdiction involves those actions "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood*, 825 F.2d at 97; *Faulkner v. Eagle View Capital Mgmt. (In re Heritage Org., LLC)*, 454 B.R. 353, 360 (Bankr.N.D.Tex. 2011); *Superior*, 516 B.R. at 94-95. The example given the by the *Wood* court is "'administrative' matters that arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 97 (emphasis supplied by the court). Again, negligence claims and intentional torts against non-debtors obviously do not meet these criteria.

The final category, "related to" jurisdiction, involves the issue of "'whether the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy.'" *Wood*, 825 F.2d at 93, citing *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (emphasis supplied by the court). Because it is obvious that the non-debtor claims being released, exculpated and enjoined do not "arise under" or "arise in" a bankruptcy case, the only possibly arguable basis for jurisdiction is "related to" jurisdiction. The fourth paragraph of the Injunction Provisions contemplates application to any claim or cause of action "that arose from or is related" to the case.

Initially, it should be noted that there simply is no way that even a massive judgment against the non-debtors could have any impact whatsoever on the estate. Considering that there will be no **estate** being administered **in bankruptcy** post-confirmation, it is inconceivable how releases of non-debtor parties could possibly impact the administration of a now defunct bankruptcy estate of the Debtor. The court in *Craig's* appeared to recognize this principle when it adopted the view that confirmation of a plan changes bankruptcy court jurisdiction. *Craig's*, 266 F.3d at 390. Expansive bankruptcy court jurisdiction is no longer "required to facilitate 'administration' of the debtor's estate, for there is no estate left to reorganize." *Id.*

Appx. 0149

011092

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 175 of 921    PageID 11973
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 18 of 34

In *Craig's*, the Fifth Circuit was dealing with a fact pattern that differs from the instant case in two ways.  First, the case involved a dispute between the aggrieved party and the reorganized debtor, not totally non-debtor parties.  Second, it only partially involved the fact pattern of the instant case, because it only dealt with claims characterized as post-confirmation rather than the mix of pre- and post-confirmation claims against the non-debtor parties protected by the Exculpation Clause, Release Clause and Injunction Provisions.  The case involved a pre-confirmation contract that had been assumed, and a post-confirmation dispute involving state law for damages that at least partially arose post-confirmation.[8]  The court held that there was no jurisdiction over a claim that "principally dealt with post-confirmation relations between the parties." *Craig's*, 266 F.3d at 390.

The later Fifth Circuit case of *Newby v. Enron Corp. (In re Enron Corp. Securities)*, 535 F.3d 325 (5th Cir. 2008) also involved the issue of post-confirmation jurisdiction.[9]  The court summarized the *Craig's* decision as one dealing with the post-confirmation relations between the parties, where there was no antagonism between the parties as of the date of the reorganization, and no facts or law deriving from the plan were necessary to the claim. *Enron*, 535 F.3d at 335.

Under the general principles of *Craig's*, there should be not "related to" jurisdiction involving the claims involved in this case, which purely involve non-debtor parties and non-bankruptcy related claims with no potential impact upon the pre- or post-confirmation estates.

---

[8] The facts are not totally clear.  They indicate that the plan was confirmed in December 1994, and that the claims for damages arose in 1994 and 1995.  *Craig's*, 266 F.3d at 389.  Therefore, at least the 1995 claims arose post-confirmation.

[9] The *Enron* case involved lawsuits against non-debtors that had been removed prior to the commencement of the case, that were dismissed with prejudice after the confirmation of the plan. *Enron*, 535 F.3d at 333.  The plaintiffs alleged that there was no jurisdiction to dismiss the case because "related to" jurisdiction had ceased after the plan was confirmed.  535 F.3d at 334.  However, the parties did not dispute whether the federal courts had "related to" bankruptcy jurisdiction over the cases at the time of removal, so the court framed the question as whether the court, after confirming Enron's plan, maintained "related to" jurisdiction.  535 F.3d at 334-335.  Therefore, the case stands for the proposition of whether "related to" jurisdiction, once conferred, continues post-confirmation.  535 F.3d at 335-336.

Appx 01159
011093

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 176 of 921 PageID 11974
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 19 of 34

This is especially true with respect to post-confirmation future releases of non-debtor parties involved with as yet uncreated entities.

The case of *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594 (2011), decided after *Wood*, *Craig's* and *Enron*, adds additional jurisdictional barriers to confirmation of a Plan containing the language of Article IX.(C), (D) and (F). In *Stern*, Pierce had filed a proof of claim in Marshall's bankruptcy proceedings, alleging a right to recover damages as a result of alleged defamation on the part of Marshall. *Stern*, 131 S.Ct. at 2601. Marshall filed a counterclaim against Pierce alleging tortious interference with a gift that Marshall had expected to receive from her husband, who was Pierce's father. *Id.* The claim was classified by the Supreme Court as a common law tort claim. *Id.* The Supreme Court found that Pierce had consented to resolution of the counterclaim by the Bankruptcy Court. 131 S.Ct. at 2606. After being cast in judgment by the Bankruptcy Court in the amount of over $425 Million, Pierce argued that the Bankruptcy Court did not have jurisdiction over the counterclaim. 131 S.Ct. at 2601. The Supreme Court agreed with Pierce, holding that Article III of the U.S. Constitution did not permit the Bankruptcy Court to enter a final judgement on Marshall's counterclaim. 131 S.Ct. at 2608.

Some claims involved in the instant case are simple tort claims against non-debtors. They occupy the same category as the defamation suit in *Stern*. Movants are entitled to an actual adjudication of their claims, which would mean an adjudication by a state court or an Article III federal court of competent jurisdiction and venue. This Court's submission of a report and recommendation on confirmation to the District Court would not constitute an actual adjudication. Because the Plan provision at issue provides that this Court will **actually adjudicate** the claims, it runs afoul of *Stern* on its face. Similarly, the provision literally would

App. 0151
011094

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 21 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 177 of 921    PageID 11975
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 20 of 34

preclude Movants from seeking to withdraw the reference to have the case actually decided by an Article III court.  Because this Court could not adjudicate the case, the Plan's attempt to grant to this Court sole jurisdiction to adjudicate the claims renders the Plan nonconfirmable.

Even if jurisdiction *could* exist for the purpose of determining whether a claim could go forward against a Protected Party, it does not follow that this Court would have jurisdiction to adjudicate the claim.  At the point at which this Court determines that a claim could proceed, the action no longer involves any interpretation of either bankruptcy law or the Plan, nor could it have any impact upon the pre- or post-confirmation estate.[10]

**The Plan Prohibits Claimants From Asserting Rights Under The Plan Rendering the Plan Not Confirmable**

Aside from protecting parties not entitled to protection, the Exculpation, Release Injunction Provisions contain provisions that far exceed the scope permitted by bankruptcy law.

The second paragraph of the Injunction Provisions is broad enough to permanently preclude claimants from pursing their rights under the Plan against the Reorganized Debtor and the Claimant Trust because it precludes any attempt to enforce rights, many of which are created pursuant to the Plan, and the third paragraph of the Injunction Provisions goes even farther by extending the injunctions to any successors of the Reorganized Debtor and the Claimant Trust. Under the Plan, the Class 2 claimant is to be given a new promissory in treatment for its claim, the Class 3 claimants have the option to retain collateral, and Class 5 claims are reinstated.  If the Reorganized Debtor defaults under any of its obligations, the Injunction Provisions literally prevent any attempt to enforce their rights under the Plan.

---

[10] Movants are aware of *In re Pilgrim's Pride*, 2010 WL 200000 (Bankr.,N.D.Tex 2010) and *In re Camp Arrowhead, Ltd.*, (Bankr.W.D.Tex 2011).  Movants believe that these cases blatantly disregard the letter and spirit of *Pacific* and are, therefore, wrongfully decided.  In addition, they were decided before *Stern v. Marshall*.

Appx. 07152
011095

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 178 of 921 PageID 11976
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 21 of 34

The best way to demonstrate this issue is to cite a different plan. Although the injunction in *In re Thru, Inc.*, *supra*, was struck down on the basis that it impermissibly released third parties, the injunction contained language that the second paragraph in the instant case is missing. It starts out:

> Except as otherwise expressly provided in this Plan or in the Confirmation Order **and except in connection with the enforcement of the terms of this Plan (including the payment of Distributions hereunder) or any documents provided for or contemplated in this Plan**, all entities . . . are permanently enjoined from. . . .

> *Thru*, 2018 WL 5113124, *21

Compare this language to the second paragraph of the Injunction Provisions, which provides:

> Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities . . . are permanently enjoined. . . .

The Plan literally would require a claimant to come back to this Court for an order if the Reorganized Debtor or the Plan-created trusts default. This goes against the concept espoused by the Fifth Circuit in *Craig's*, indicating that confirmation allows the debtor to go about its business without further supervision or approval, but also without the protection of the bankruptcy court. *Craig's*, 266 F.3d at 390, citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991).

**The Plan Contains a DeFacto Channeling Injunction**

As noted earlier, paragraph 4 of the Injunction Provisions in the Plan provide that no Entity may commence or pursue a claim or cause of action against a Protected Party without this Court:

> (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such Protected Party; . . . .

Appx 07153
011096

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 179 of 921 PageID 11977
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 22 of 34

Plan, Article IX.F, fourth unnumbered paragraph.

Thereafter, the Plan provides that this Court retains sole jurisdiction to adjudicate the claim. *Id.*

The above provisions have the effect of channeling all post-petition claims against the Reorganized Debtor, the Creditor Trust and others into the Bankruptcy Court to determine whether a claim can be asserted and then as the forum with the "exclusive jurisdiction" to adjudicate the claim. The provisions are not authorized under the Bankruptcy Code.

Congress, when it enacted 11 U.S.C. § 524(g), provided a limited channeling injunction for asbestos and in some mass tort cases. Section 524(g) was not created to shield parties that are liquidating a debtor and its reach does not extend to garden variety unsecured creditors or serve as a barrier to claims that arose after the Effective Date of the Plan. The impact of Section 524(g) is to address pre-petition claims and future claims arising out of pre-petition activity where the claims have yet to manifest.

In addition, 11 USC 524 § (g) is only applicable to a Debtor that obtains a discharge pursuant to 11 USC § 1141. The Debtor in its approved Disclosure Statement [See DKT 1473, pp. 8-9] classifies the Debtor's post confirmation activities as one of "wind down" of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. In addition, the Claimant Trust formed pursuant to the Plan is a "liquidation trust" [See DKT 1656-2 section 2.2], which makes the Plan a Plan that " liquidates all or substantially all of the property of the estate". Pursuant to 11 U.S.C. § 1141(d)(3), a Debtor whose Plan is none that liquidates all or substantially all of the property of the estate is not eligible for a discharge. 11 U.S.C. § 524(g) cannot authorize any channeling injunction for the Debtor in its Plan.

**Conclusion**

For the reasons set forth herein, confirmation of the Plan must be denied.

Appx. 07154
011097

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 180 of 921 PageID 11978
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 23 of 34

January 5, 2021

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, LA Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust
and Get Good Trust*

## CERTIFICATE OF SERVICE

I do hereby certify that on the 5th day of January, 2021, a copy of the above and foregoing *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com,kjohnson@joneswalker.com,sbuchanan@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com

Appx. 02155
011098

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 181 of 921 PageID 11979
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 24 of 34

- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, gpronske@spencerfane.com;jkathman@spencerfane.com;lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com, dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@dentons.com
- Douglas S. Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com


Appx 01156

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 182 of 921 PageID 11980
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 25 of 34

- A. Lee Hogewood     lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;m
  ary-beth.pearson@klgates.com
- John J. Kane     jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman     jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer     pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman     kurtzman@kurtzmansteady.com
- Phillip L. Lamberson     plamberson@winstead.com
- Lisa L. Lambert     lisa.l.lambert@usdoj.gov
- Paul M. Lopez     bankruptcy@abernathy-law.com
- Faheem A. Mahmooth     mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns     ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer     tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery     pmontgomery@sidley.com,
  txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com
- J. Seth Moore     smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris     jmorris@pszjlaw.com
- Edmon L. Morton     emorton@ycst.com
- David Neier     dneier@winston.com, dcunsolo@winston.com;david-neier-
  0903@ecf.pacerpro.com
- Holland N. O'Neil     honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel     rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons     cpersons@sidley.com
- Mark A. Platt     mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz     jpomerantz@pszjlaw.com
- Kimberly A. Posin     kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece     lreece@pbfcm.com
- Penny Packard Reid     preid@sidley.com, txefilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Amanda Melanie Rush     asrush@jonesday.com
- Alyssa Russell     alyssa.russell@sidley.com
- Douglas J. Schneller     douglas.schneller@rimonlaw.com
- Brian Patrick Shaw     shaw@roggedunngroup.com,
  cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro     mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich     nskolnekovich@hunton.com,
  plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade     jared.slade@alston.com
- Frances Anne Smith     frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund     eric.soderlund@judithwross.com



Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 183 of 921 PageID 11981
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 26 of 34

- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com,
  craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

I also caused same to be served on January 5, 2021, by Docusource via U.S. First Class Mail, postage prepaid upon the following parties who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service):

Paul N. Adkins
11 Mount Emily Road #07-27
Singapore, 228493

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern, PA 19355-0701

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

James T. Bentley
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Jeffrey E. Bjork
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100

APPX 07158

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 184 of 921 PageID 11982
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 27 of 34

Los Angeles, CA 90071

Jessica Boelter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019

Matthew G. Bouslog
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612

William P. Bowden
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

Candace C. Carlyon
CARLYON CICA CHTD.
265 e. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Joseph L. Christensen
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Louis J. Cisz
Nixon Peabody LLP
One Embarcadero Center, 32nd Fl
San Francisco, CA 94111

Kevin M. Coen
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Debra A. Dandeneau
Baker & McKenzie LLP
425 5th Ave.
New York, NY 10018

Deloitte Tax LLP
1111 Bagby Street, Ste. 4500

Appx 07159
0TT102

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 185 of 921 PageID 11983
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 28 of 34

Houston, TX 77002

Mark. L. Desgrosseilliers
Chipman, Brown, Cicero & Cole, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE 19801

Development Specialists, Inc.
333 South Grand Ave., Ste. 4070
Los Angeles, CA 90071

Fair Harbor Capital, LLC
Ansonia Finance Station
PO Box 237037
New York, NY 10023

Bojan Guzina
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Emily M. Hahn
Abernathy, Roeder, Boyd & Hullett, P.C.
1700 Redbud Blvd. Ste. 300
McKinney, TX 75069

Hain Capital Group, LLC
301 Route 17, 6th Floor
Rutherford, NJ 07070

Marc B. Hankin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Michelle Hartman
Baker & McKenzie LLP
1900 N. Pearl, Ste. 1500
Dallas, TX 75201

Hayward & Associates PLLC
10501 N. Central Expwy., Ste 106
Dallas, TX 75231

William A. Hazeltine

Appx. 07109
011103

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 186 of 921 PageID 11984
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 29 of 34

Sullivan Hazeltine Allinson LLC
901 North Market Street
Suite 1300
Wilmington, DE 19801

Kuan Huang
Latham & Watkins LLP
855 Third Avenue
New York, NY 10022

Ira D Kharasch
10100 Santa Monica Boulevard
13th Floor
Los Angeles, CA 90067

Marshall R. King
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
Suite 1400
New York, NY 10066

Alan J. Kornfeld
Pachulski Stang Ziehl & Jones LLPL
10100 Santa Monica Blvd., 13 Fl
Los Angeles, CA 90067

Kurtzman Carson Consultants LLC
Attn: Drake Foster
222 N. Pacific Coast Highway, 3rd Floor
El Segundo, CA 90245

Kurtzman Carson Consultants, LLC
222 N. Pacific Coast Highway, Ste. 300
El Segundo, CA 90245

M. Natasha Labovitz
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Richard B. Levin
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3098

Maxim B Litvak

App. 0761

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 31 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 187 of 921    PageID 11985
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 30 of 34

Pachulski Stang Ziehl & Jones LLP
150 California Street
15th Floor
San Francisco, CA 94111

John E. Lucian
Blank Rome LLP
1201 N. Market Street, Sutie 800
1000 North King Street
Wilmington, DE 19801

Lauren Macksoud
1221 Avenue of the Americas
New York, NY 10020-1089

Mark M. Maloney
King & Spalding LLP
191 Peachtree St.
Suite 4900
Atlanta, GA 30303-1763
mmaloney@kslaw.com, pwhite@kslaw.com

Mark M. Maloney
King & Spalding LLP
1180 Peachtree Steet, NE
Atlanta, GA 30309

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

Patrick C. Maxcy
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

R. Stephen McNeill
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Mercer (US) Inc.
155 N. Wacker Drive, Ste. 1500
Chicago, IL 60606

Appx 07102

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 188 of 921 PageID 11986
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 31 of 34

Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
one Rodney Square
920 North King Street
Wilmington, DE 19801

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, Suite 1600
1000 North King Street
Wilmington, DE 19801

Josef W. Mintz
Blank Rome LLP
1201 Market Street, Suite 800
1000 North King Street
Wilmington, DE 19801

Joseph T. Moldovan
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Alan A. Moskowitz
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Michael R. Nestor
YOUNG CONAWAY STARGATT & TAYLOR, LL
Rodney Square
1000 North King Street
Wilmington, DE 19801

James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Fl.
Wilmington, DE 19801

Tracy M. O'Steen
CARLYON CICA CHTD.
265 E. Warm Springs Road., Ste 107
Las Vegas, NV 89119

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP

Appx. 07103

10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Kathleen Preston
Winston & Strawn LLP
800 Capitol Street, Ste. 2400
Houston, TX 77002

Michael A. Rosenthal - DO NOT USE
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10066

Jeremy W. Ryan
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

James P. Seery
795 Columbus Ave., 12A
New York, NY 10025

Sally T. Siconolfi
MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022

Sarah E. Silveira
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

D. Ryan Slaugh
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Fl
Wilmington, DE 19801

Tracy K. Stratford
Jones Day
North Point

APPX 07104

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 190 of 921    PageID 11988
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21    Entered 01/05/21 16:22:08    Page 33 of 34

901 Lakeside Ave.
Cleveland, OH 44114

Daniel E. Stroik
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Sarah A. Tomkowiak
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304

Stephen G. Topetzes
K&L Gates LLP
1601 King St., N.W.
Washington, DC 20006

Thomas A. Uebler
McCollom D'Emilio Smith Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Michael L. Vild
CROSS & SIMON, LLC
1105 N. Market Street, Suite 901
1000 North King Street
Wilmington, DE 19801

Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003

Erica S. Weisgerber
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109

James A. Wright
K&L Gates LLP

Appx 07105
01П108

Case 19-34054-sgj11 Doc 3445-59 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 191 of 921 PageID 11989
Case 19-34054-sgj11 Doc 1667 Filed 01/05/21 Entered 01/05/21 16:22:08 Page 34 of 34

State Street Financial Center
One Lincoln St.
Boston, MA 02111

Sean M. Young Conway Stargatt & Taylor, LLP
Young Conway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801

*/s/Douglas S. Draper*
Douglas S. Draper, LA Bar No. 5073

Appx. 07106
011109

# EXHIBIT 60

Appx 07107

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 7
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 193 of 921   PageID 11991
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21   Entered 01/05/21 16:25:54   Page 1 of 6

DAVID G. ADAMS
State Bar No. 00793227
U.S. Department of Justice, Tax Div.
717 N. Harwood St., Suite 400
Dallas, Texas 75201
Ph: (214) 880-9737
Fax: (214) 880-9742
david.g.adams@usdoj.gov
ATTORNEY FOR THE UNITED STATES (IRS)

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No.:  19-34054-sgj-11** |
| | § | **Chapter 11** |
| Debtor. | § | |

### UNITED STATES' (IRS) LIMITED OBJECTION TO
### DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

The United States of America, on behalf of its agency the Internal Revenue Service, a

creditor and governmental unit, files this limited objection to Highland Capital Management,

L.P.'s Fifth Amended Plan of Reorganization as the Debtor has failed to comply with its

prepetition tax obligations under the Internal Revenue Code, and the Plan contains provisions

that violate the Bankruptcy Code and other applicable law.  In support of this limited objection,

the United States states as follows:

### Objections

1.      The United States objects to the Debtor's Plan because the Plan at Article II,

Paragraph C. fails to state that the IRS' priority tax claim will be paid in accordance with

Bankruptcy Code section 1129(a)(9)(C), which requires that the total value of the priority taxes,

as of the effective date, must be paid over a period ending not later than five years after the

petition date.  11 U.S.C. § 1120(a)(9)(C).  In addition, the Debtor's Plan fails to specifically state

1



Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 194 of 921    PageID 11992
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 2 of 6

that the Debtor will pay the value of the IRS' priority tax claim as of the Effective Date, as the

Debtor's Plan contemplates payments on the IRS' priority tax claim on a date other than, *i.e.*,

subsequent to, the Plan's Effective Date, thus allowing the Debtor to avoid its obligation to pay

the total value of the IRS' priority tax claim as of the Effective Date.  The Debtor's Plan at

Article VI, Paragraph A.  *Dates of Distributions* provides that "Except as otherwise provided in

this Plan, Holders of Claims … shall not be entitled to interest, dividends or accruals on the

distributions provided for therein, regardless of whether distributions are delivered on or at any

time after the Effective Date."  In order to comply with the provisions of 1129(a)(9)C), the

Debtor must pay an applicable interest rate on the IRS' priority claim as outlined in Section 511

of the Bankruptcy Code.

      2.     The United States objects to the Debtor's Plan on the grounds that the Debtor has

outstanding prepetition tax obligations, including the filing of certain tax returns with the IRS,

and thus the Debtor is not in compliance with its federal tax reporting requirements under the

Internal Revenue Code.  In particular, under 26 U.S.C. § 4376, the Debtor is obligated to file

Quarterly Federal Excise Tax Returns (Form 720) with respect to its self-insured health plan.

However, as shown on the IRS' latest filed proof of claim (filed April 14, 2020), the IRS does

not have a record of the Debtor filing its Form 720 for the June 30, 2014, June 30, 2016 or the

June 30, 2017 tax periods.

      As a result of the Debtor's non-compliance with its required tax return filings and tax

payments, the United States requests that the Debtor's Plan be amended to include the following

default language as to the Internal Revenue Service:

<u>Default Provision - IRS</u>.  Notwithstanding any other provision or term of this Plan or
Confirmation Order, the following Default Provision shall control as to the United States of
America, Internal Revenue Service ("IRS") and all of its claims, including any administrative
claim (the IRS Claim):

Appx. 07169

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 195 of 921    PageID 11993
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 3 of 6

(1)  Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS:

(A)  The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(B)  The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C)  The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2)  If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest.  Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3)  If full payment is not made within fourteen (14) days of such demand, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code.  The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel.  The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan.

Appx 07173

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 196 of 921    PageID 11994
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 4 of 6

(4)  The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS.  The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5)  The term "any payment required to be made on federal taxes," as used herein above, is defined as:  any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.  The term "any required tax return," as used herein above, is defined as:  any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

3.    The United States objects to the Debtor's Plan and specifically Article VI, Paragraph A, which states that "Upon the Effective Date, all Claims … against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims … except as set forth in this Plan and in the Confirmation Order."  Because the Debtor has failed to comply with its tax return filing requirements under the Internal Revenue Code as shown on the IRS' proof of claim listing unfiled tax returns and estimates of taxes for the unfiled tax periods, the IRS is unable to fully ascertain the Debtor's tax liability until all the Debtor's tax returns are filed, processed and the tax liabilities assessed by the IRS against the Debtor.  The Debtor should be required to amend or modify its Plan – as to the Internal Revenue Service – to provide that until all required tax returns are filed with the Internal Revenue Service, the IRS' proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest after the Debtor has filed all unfiled tax returns.

APPX 0714

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 197 of 921    PageID 11995
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 5 of 6

4.      All checks are to be made payable to:  Department of the Treasury, and mailed to

Internal Revenue Service, 1100 Commerce Street, M/S MC 5027DAL, Dallas, Texas 75242.

Reference the Debtor's bankruptcy case number on the memo line on the check.

The United States respectfully request that the Court sustain the United States' objections

to the Debtor's Fifth Amended Chapter 11 Plan as set forth above.  The United States request

such further relief to which it is entitled.

Date:  January 5, 2021.                          RICHARD E. ZUCKERMAN
                                                 Principal Deputy Assistant Attorney General

                                                  /s/ David G. Adams
                                                 DAVID G. ADAMS
                                                 State Bar No. 00793227
                                                 Attorney, Tax Division
                                                 U.S. Department of Justice
                                                 717 N. Harwood St., Suite 400
                                                 Dallas, Texas 75201
                                                 Phone: (214) 880-9737
                                                 Fax: (214) 880-9742
                                                 david.g.adams@usdoj.gov
                                                 ATTORNEY FOR THE UNITED STATES (IRS)


## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2020, I electronically filed the foregoing document
with the Clerk of the Court using the ECF system, which will send notification of such filing to
counsel requesting notice, including:

Jeffrey N. Pomerantz  (jpomerantz@pszjlaw.com)
Ira Kharasch  (ikharasch@pszjlaw.com)
Gregory Demo  (gdemo@pszjlaw.com)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd. 13th Floor
Los Angeles, California 90067

Melissa Hayward  (mhayward@haywardfirm.com)
Zachery Annable  (zannable@haywardfirm.com)
Hayward & Associates PLLC
10501 N. Central Expressway, Suite 106
Dallas, Texas 75231

APPX 07173
011115

Case 19-34054-sgj11 Doc 3445-60 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 198 of 921    PageID 11996
Case 19-34054-sgj11 Doc 1668 Filed 01/05/21    Entered 01/05/21 16:25:54    Page 6 of 6

Matthew Clemente  (mclemente@sidley.com)
Alyssa Russell  (alyssa.russell@sidley.com)
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603

Lisa L. Lambert  (lisa.l.lambert@usdoj.gov)
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, Texas 75242

/s/ David G. Adams
DAVID G. ADAMS

Appx 07173

011116

Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 199 of 921    PageID 11997

**EXHIBIT 61**

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 200 of 921   PageID 11998
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21   Entered 01/05/21 16:37:19   Page 1 of 16

Docket #1669 Date Filed: 01/05/2021

| | |
|---|---|
| Judith W. Ross | Michelle Hartmann |
| State Bar No. 21010670 | State Bar No. 24032402 |
| Frances A. Smith | **BAKER & McKENZIE LLP** |
| State Bar No. 24033084 | 1900 North Pearl |
| Eric Soderlund | Suite 1500 |
| State Bar No. 24037525 | Dallas, TX 75201 |
| **Ross & Smith, PC** | Telephone: 214-978-3000 |
| 700 N. Pearl Street, Suite 1610 | Facsimile: 214-978-3099 |
| Dallas, Texas 75201 | Email: michelle.hartmann@bakermckenzie.com |
| Telephone: 214-377-7879 | |
| Facsimile: 214-377-9409 | Debra A. Dandeneau |
| Email: judith.ross@judithwross.com | **BAKER & McKENZIE LLP** |
|       frances.smith@judithwross.com | 452 Fifth Ave |
|       eric.soderlund@judithwross.com | New York, NY 10018 |
| | Telephone: 212-626-4875 |
| | Email: debra.dandeneau@bakermckenzie.com |
| | (*Pro hac vice motion pending*) |

**COUNSEL FOR SCOTT ELLINGTON, THOMAS SURGENT,
FRANK WATERHOUSE, AND ISAAC LEVENTON**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re: Highland Capital Management, L.P.,** | § § § | **Case No. 19-34054-sgj-11** |
| **Debtor.** | § § § | **Chapter 11** |

### SENIOR EMPLOYEES' LIMITED OBJECTION TO DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

Scott Ellington, Frank Waterhouse, Isaac Leventon, and Thomas Surgent

(collectively, the "**Senior Employees**") file this limited objection to the Debtor's Fifth

Amended Plan of Reorganization (Dkt. No. 1472) (the "**Plan**") and in support thereof

respectfully state as follows:

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
1934054210105000000000015

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 201 of 921 PageID 11999
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 2 of 16

## I. THE SENIOR EMPLOYEES' CLAIMS FOR COMPENSATION ARE ENTITLED TO ADMINISTRATIVE PRIORITY.

As a threshold matter, the Senior Employees' compensation-related claims against the Debtor's estate are entitled to administrative priority, as the Debtor has previously argued to the Court and the Debtor's independent directors repeatedly have represented to the Senior Employees. The Senior Employees will be filing a motion seeking payment of claims as administrative expenses and are not seeking to argue the merits of such claims in the context of the confirmation hearing except as the Debtor's disparate treatment of the Senior Employees is reflected in the terms of the Plan. To the extent, however, that any portion of the Senior Employees' claims are found to be pre-petition claims, the deficiencies in the Plan identified in this objection would apply to such claims. The Senior Employees do not waive any of their rights by filing this limited objection, casting (or not casting) ballots, or making elections for treatment under the Plan. The Senior Employees reserve all their rights with respect to their claims, including without limitation their rights to insurance coverage and indemnification.

## II. THE PLAN AS CURRENTLY DRAFTED IS NOT CONFIRMABLE.

The Debtor's Plan is not confirmable because (A) it violates Bankruptcy Code § 1123(a)(4)'s requirement that claims in the same class be treated the same by (1) unfairly imposing conditions on the Senior Employees that are not imposed on all other employees, (2) arbitrarily providing some members of Class 8 but not others the option to elect treatment under Class 7, and (3) not allowing the Senior Employees to make the Convenience Class Election, resulting in disparate treatment of holders of Class 8 Claims; (B) the Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the

APPX 07119

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 202 of 921 PageID 12000
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 3 of 16

Claimant Trustee the unfettered power to "re-classify" any claim as a Subordinated Claim; and (C) the Plan violates Bankruptcy Code § 1127 by failing to provide creditors with all material information required to make an informed decision in voting on the Plan.

### A. The Plan Violates Bankruptcy Code § 1123(A)(4).

The Plan violates the Bankruptcy Code's requirement that the contents of a confirmable plan of reorganization must "provide the same treatment for each claim or interest of a particular class" unless an affected claimant agrees to the less favorable treatment proposed by the Debtor. 11 U.S.C. § 1123(a)(4).

**1. The Plan Provides Senior Employees with Less Favorable Treatment than Other Employees in the Same Class by Requiring them to Sign a "Stipulation" to Obtain Releases and Exculpations.**

Under the Plan, the Debtor proposes to treat the great majority of its employees the same while singling out the similarly situated Senior Employees (whose claims are classified in the same class as the other employees) for disparate—and less favorable—treatment without their consent. Specifically, the Plan grants broad releases to "Employees," but impermissibly conditions the release of four "Senior Employees"—and only these four Employees—on the Senior Employees agreeing to take less favorable treatment on their claims than what other creditors (including Employees) are receiving. *See* Plan Art. IX.D. No other Employees are required to sign a stipulation to be included as a Released or Exculpated Party. And no other Employees in the same class are provided different and lesser treatment with respect to the Plan's treatment of their claims. This violates § 1123(a)(4) because the Plan is providing less favorable treatment to creditors (Employees vs Senior Employees) whose claims are classified in the same class.

Appx. 0717

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 203 of 921 PageID 12001
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 4 of 16

2.    **The Stipulation Suffers from Numerous Defects.**

The form of the stipulation the Debtor drafted has not been approved or accepted by any "Senior Employee," for good reason. The form itself suffers from a number of substantial defects. The following are just some of the examples of defects in the Debtor's proposed stipulation.

- The draft stipulation wrongly states that "the Committee objected to the Senior Employee receiving the Earned Amounts during the Chapter 11 Case and the Earned Amounts, although earned, was [sic] not paid" (with no reference to the record of any such alleged objection).

- It fails to explain why the supposed Committee objection is relevant, given that the Debtor obtained Court authority to pay ***all*** Employees (other than James Dondero and Mark Okada) their bonus amounts. That authority to pay all Employees their bonus payments in the ordinary course of business was not conditioned on Committee approval (or made subject to a Committee veto);

- The draft stipulation contains a vague standard for what constitutes "Confidential Information" that the Senior Employee is required to keep confidential, including "discussions, information, and observations" and undefined "business sensitive information."

- It vests sole authority in the Claimant Trustee and the "Independent Member" of the Claimant Trust Oversight Committee ("CTOC") (who is only "independent" because they do not hold a claim, but otherwise is selected exclusively by the CTOC) to determine whether the Senior Employee has complied with the conditions for a release, with no right of the Senior Employee to dispute such determination and seek a court decision on whether that determination was justified.

- With respect to the "Earned Amount" of a Senior Employee's compensation, the stipulation requires the Senior Employee to reduce his claims to Convenience Claims and then further reduce such claims by 40% in exchange for the possibility that the Senior Employee will be released on the date at some point in the distant future when the Claimant Trust is dissolved. The stipulation provides no mechanism, however, for the Senior Employee to recover claims and distributions that he forfeited, or even to preserve such rights as defenses or offsets against any claims that might be asserted.

Senior Employees' Limited Objection to Fifth Amended Plan                                   4

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 204 of 921 PageID 12002
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 5 of 16

In addition to the defects listed above, the stipulation also is rife with vague standards with which the Senior Employee has to comply if the Senior Employee ultimately wants to be released from claims. Moreover, the stipulation provides no requirement that the Claimant Trustee provide notice to the Senior Employee of any purported violation of the Stipulation and ability to cure. The vague requirements include the following: (1) The Senior Employee "works with or assists any person to sue, attempt to sue, or threaten" a number of parties, including any "Released Party" "in connection with any claim or cause of action arising prior to the Effective Date." (What does it mean to "work with or assist"? What if the Senior Employee is compelled to provide information by means of a subpoena or other requirement under applicable law? Read literally, the "causes of action" (which are not defined) do not even have to relate to the Debtor); (2) The Senior Employee "has taken any action that, [sic] impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets" (This language, read literally, could apply even to actions taken prepetition. The draft stipulation provides no specifics about what kinds of action could "impair" the value and does not even require a material impairment as a basis for taking away the Senior Employee's release.); (3) The Senior Employee "has violated the confidentiality provision" (Again, this is not defined by any time frame, could include any discussions that occurred prior to execution of the stipulation, and fails to carve out any disclosure required by a subpoena or otherwise in accordance with applicable law); (4) The Senior Employee, "upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith … or has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor." (The stipulation should set forth what

App. 07179
0177122

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 205 of 921 PageID 12003
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 6 of 16

actions will be required of the Senior Employee to comply with this standard and should provide for reimbursement to the Senior Employee if compliance with the provision would require the Senior Employee to incur any expenses; otherwise, the Senior Employee should be relieved from any obligation to comply with such provision.).

3. **The Debtor Improperly Has Attempted to Prevent the Senior Employees from Making the Convenience Class Election.**

Each of the Senior Employees has filed a proof of claim in these cases. That proof of claim asserts PTO Claims under the Plan, claims for compensation amounts that have been earned and not paid (the "*Liquidated Awards*"), and other claims that might arise in the future, including contingent indemnification claims and claims for future compensation amounts (the "*Other Claims*"). As reflected in a chart prepared by the Debtor summarizing the Liquidated Awards, attached hereto as **Exhibit A** (the "*Liquidated Awards Spreadsheet*"), the Debtor does not dispute the amount of the Liquidated Awards. The Debtor also does not dispute that the Senior Employees' PTO Claims, which were part of the Senior Employees' proofs of claim, will be paid under Class 6 of the Plan. As of the date hereof, no objection has been filed to any of the claims asserted by the Senior Employees. As such, the PTO Claims, the Liquidated Awards, and the Other Claims all constitute allowed claims within the meaning of § 502(a) of the Bankruptcy Code.[1]

What is in dispute is the priority of the Liquidated Awards and the Other Claims—the Senior Employees assert that the Liquidated Awards and Other Claims are entitled to administrative expense priority, while the Debtor disagrees. The Senior Employees will file

---

[1] Section 502(a) provides, in relevant part, that a "claim ..., proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects."

Appx. 07189
011123

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 206 of 921 PageID 12004
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 7 of 16

a motion requesting payment of such claims as administrative expenses, and the Senior

Employees are not asking the Court to address that issue in connection with confirmation.

Without prejudice to such such issue, however, the Senior Employees seek to protect their

rights under the Plan to elect to have the Liquidated Awards, which otherwise would be

General Unsecured Claims within the scope of Class 8 of the Plan, be treated as

Convenience Claims under Class 7 the Plan if it is determined that the Liquidated Awards

are prepetition claims.

### a) *The Plan Gives Class 8 Creditors the Right to Make the Convenience Class Election.*

Article I.B.43 of the Plan defines a "Convenience Claim" as "any prepetition,

liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less

than or equal to $1,000,000 or ***any General Unsecured claim*** that makes the Convenience

Class Election. For the avoidance of doubt, the Reduced Employee Claims will be

Convenience Claims" (emphasis added). With respect to holders of General Unsecured

Claims in Class 8, Article III.H.8 of the Plan allows any holder of an "Allowed Class 8 Claim"

to "make[] a valid Convenience Class Election." The "Convenience Class Election" is "the

option provided to each Holder of ***a General Unsecured Claim that is a liquidated***

***Claim*** as of the Confirmation Date on their Ballot to elect to reduce their claim to

$1,000,000 and receive the treatment provided to Convenience Claims." Plan Art. I.A.43

(emphasis added). Nowhere does the Plan define what is meant by requiring that a claim

be "liquidated," as opposed to "Allowed." In addition, nowhere does the Plan purport to

require that a creditor aggregate all their claims within a Class for the purposes of making

the Convenience Class Election.

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 207 of 921 PageID 12005
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 8 of 16

Moreover, nowhere does the Plan condition the right of the Senior Employees to make the Convenience Class Election on their execution of the Senior Employee Stipulation. Although the definition of "Convenience Claim" makes it clear that execution of the Senior Employee Stipulation gives rise to a "Reduced Employee Claim" that will be treated as a Convenience Claim, nowhere does the Plan provide for the converse -- that the failure to sign the Senior Employee Stipulation would deprive the Senior Employees of their right to make the Convenience Class Election. Indeed, the only consequence of failing to sign the Senior Employee Stipulation is set forth in Article IX.D. of the Plan, which conditions the release of Senior Employees under Article IX.D. upon execution of the Senior Employee Stipulation. This is consistent with the representations made by the Debtor and its counsel (as reflected in the Liquidated Awards Spreadsheet) -- the Senior Employees could elect not to be released but to have their Liquidated Awards treated as Convenience Claims in the same manner as other holders in Class 7, or the Senior Employees could sign the Senior Employee Stipulation, receive a release, and limit their recovery to the Reduced Employee Claim amount.

> **b)** ***The Debtor Has Contradicted the Plan in Answering Questions Raised by the Senior Employees Concerning the Convenience Class Election.***

Although the Senior Employees had not signed the Senior Employee Stipulation as of the distribution of the solicitation packages, each of the Senior Employees received two ballots -- a Class 7 (Convenience Class) ballot in the Reduced Employee Claim amount and a Class 8 (General Unsecured Claims) ballot in the amount of $1.00 (for voting purposes only).

Appx. 07182
01T125

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 208 of 921 PageID 12006
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 9 of 16

Because of the confusion created by the ballots and given the Debtor's failure to define "liquidated" in the Plan, the Senior Employees, through their counsel, sought to clarify that their understanding of the Convenience Class Election was consistent with how the Plan had been described to them by the Debtor's advisers—the Liquidated Awards would be "dropped down" to Class 7, but the Other Claims would remain as Class 8. The text of the ensuing email exchange with the Debtor's counsel is attached hereto as **Exhibit B**. In short, the Debtor, for the first time has taken the position that (1) a Class 8 Creditor may only make the Convenience Class Election for all of its Class 8 Claims, and (2) a Class 8 Creditor may only make the Convenience Class Election if all of its Class 8 Claims are liquidated as of the Confirmation Date. As a result, the Debtor's counsel has stated that the Senior Employees have no right to make the Convenient Class Election. This is inconsistent with numerous other representations of the Debtor and its counsel to the Senior Employees.

> **c)** ***The Debtor's Interpretation of the Convenience Class Election Is Inaccurate and Inconsistent with its Prior Positions.***

The Senior Employees object to this interpretation because (1) it is not supported by the text of the provisions relating to the Convenience Class Election, (2) is inconsistent with the other terms in the Plan, (3) is inconsistent with the Debtor's statements about the Plan in its discussions with the Senior Employees, (4) seemingly ignores that that a creditor may hold multiple claims within a class, and (5), if applied to exclude Class 8 creditors having Claims that also are unliquidated, violates § 1123(a)(4) of the Bankruptcy Code.

Appx. 07188
011126

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 209 of 921 PageID 12007
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 10 of 16

As set forth above, the plain language of the Plan regarding the Convenience Class Election provides that the Convenience Class Election may be exercised with respect to ***any*** General Unsecured Claim that is liquidated. It does not require that ***all*** of a holder's General Unsecured Claims be liquidated. Nor does it require that a holder of a General Unsecured Claim make the election with respect to all its claims. The text clearly states that the election is available to ***a*** General Unsecured Claim that is ***a*** "liquidated claim."

Moreover, the "all or nothing" approach to the Convenience Class Election ignores that the Plan otherwise generally recognizes that a proof of claim may comprise multiple claims. That is why, for example, the Senior Employees' PTO Claims (which are asserted in the same proofs of claim that cover the Liquidated Awards and the Other Claims) are being classified and treated in Class 6. The approach also ignores that the Plan specifically recognizes in the form of Senior Employee Stipulation that ***only*** the Liquidated Awards (defined in the Senior Employee Stipulation as the "Earned Amounts") would be subject to the Convenience Class Election. Nothing in the form of the Senior Employee Stipulation even purports to characterize allowing only the Senior Employees to opt into the Convenience Class only for the Liquidated Awards as a modification of an "all or nothing" requirement in the Plan.

The Debtor's last-minute interpretation also flies in the face of statements that the Debtor and its counsel made to the Senior Employees about the Convenience Class Election. The Liquidated Awards Spreadsheet, ***which was prepared by the Debtor's counsel***, makes this clear -- it shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it

Senior Employees' Limited Objection to Fifth Amended Plan                                           10

011127

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 210 of 921 PageID 12008
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 11 of 16

separately shows the reduced recovery for the Senior Employees if they elect to be released and sign the Senior Employee Stipulation.

In the absence of specific aggregation language in the Plan, a holder of a Class 8 General Unsecured Claim should be allowed to make the Convenience Class Election with respect to all, some, or none of its claims within Class 8. The Debtor seemingly ignores the well-supported principle that a single creditor may hold multiple claims, even within the same class.[2]

Finally, the Plan may not impose a condition to eligibility for the Convenience Class Election that provides some General Unsecured Claims in Class 8 with more favorable treatment than other General Unsecured Claims in Class 8. Putting aside whether the requirement that a particular claim be "liquidated" is itself a valid condition to making the Convenience Class Election, arbitrarily excluding the claims of creditors such as the Senior Employees from making the election with respect to their admittedly liquidated General Unsecured Claims because such creditors also have other claims that have not been liquidated violates § 1123(a)(4)'s proscription against unequal treatment of claims within the same class under a plan.

---

[2] *See, e.g., Figter Ltd. v. Teachers Ins. Annuity Ass'n* (*In re Figter Ltd.*), 118 F.3d 635, 640-641 (9th Cir. 1997) (allowing claims purchaser to vote separately each purchased claim within the same class); *In re Vicor Techs., Inc.*, No. 12-39329-EPK, 2013 WL 1397460, at *9 (Bankr. S.D. Fla. Apr. 5, 2013) ("a single creditor may hold multiple claims against an alleged debtor."); *In re Cohn-Phillips, Ltd.*, 193 B.R. 757, 763 n.8 (Bankr. E.D. Va. 1996) (In applying section 303(b) of the Bankruptcy Code,"The claims of a holder of multiple claims are not dismissed merely because one of them is subject to a bona fide dispute.")*Concord Square Apartments of Wood Cty, Ltd. v. Ottawa Properties, Inc.* (*In re Concord Square Apartments of Wood Cty., Ltd.*), 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) (creditor with "multiple claims has a voting right for each claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) ("[Creditor with two unsecured claims] is entitled to one vote for each of his unsecured Class X claims").

Appx. 07185

011128

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 211 of 921    PageID 12009
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 12 of 16

    **4.**    **The Plan Identifies No Basis for its Disparate and Unfair Treatment of Senior Employees.**

With respect to the draft stipulation, the Debtor has not provided any justification for why it is singling out certain "Senior Employees" for disparate treatment, or explained how the Debtor even selected which employees were placed into the "Senior Employees" category. The Debtor has not disclosed why the four apparently arbitrarily selected Senior Employees are not entitled to be released and protected from third party claims under the Plan in the same manner as other similarly situated and classified employees. The Plan identifies no claims or causes of action against any of the Senior Employees. Nor does the Plan identify any reason why the Senior Employees have not been paid their promised bonus payments, which were approved by the Court over a year ago and for which the Debtor has reserved and reported cash being held to pay. Nothing in the Plan or the Debtor's prior representations to the Court and to the Senior Employees throughout the pendency of the bankruptcy case provides any justification for providing disparate and less favorable treatment of the Senior Employees than what all other Employees are receiving.

What the Debtor is offering the Senior Employees is essentially a Hobson's choice: either accept the lesser treatment imposed on them by the terms of the non-negotiable stipulation the Debtor seeks to force on them as a condition for being included as a Released or Exculpated Party (along with treatment of their Class 8 claims that is less favorable treatment than what their fellow employees receive or have received) or receive the same treatment but without the benefit of the Plan's releases and exculpations that are made available to all other Employees who are not required to sign the "stipulation." This is the illusion of choice, and is impermissible under Bankruptcy Code § 1123(a)(4).

Appx 07186

011129

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 212 of 921 PageID 12010
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 13 of 16

Likewise, concerning the Convenience Class Election, the Debtor has provided no justification for arbitrarily permitting Class 8 holders of fully liquidated claims the choice to have their claims treated as Class 7 Convenience Claims while not permitting holders of claims that have not been liquidated or holders of multiple claims (some of which have been liquidated and others not) to do the same. Again, the Debtor has singled out the Senior Employees for disparate and less favorable treatment without explanation and without legal basis, in violation of § 1123(a)(4) of the Bankruptcy Code.

### B. Under the Plan any Claim Can Be Re-Classified and Subordinated.

The Debtor's Plan provides that claims classified as Subordinated Claims are placed in Class 9, which is subordinate in treatment to Convenience and General Unsecured Claims. This is typical for plans of reorganization. But the Plan also provides the Debtor— and after confirmation, the Claimant Trustee—with apparently unfettered discretion and power to "re-classify" as a Subordinated Claim any claim that had previously been classified differently. This is neither typical nor legally permissible.

Plan Article 3.J provides that "the Debtor the Reorganized Debtor, and the Claimant Trustee **reserve the right to re-classify**, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination." (Emphasis added).

Under the Plan as drafted, then, the Debtor is classifying claims and soliciting votes from claim holders based on those classifications, but at any time and, apparently, for any reason (or no reason at all), the Debtor, the Reorganized Debtor, or Claimant Trustee

Appx 07185
0TP130

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 213 of 921 PageID 12011
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 14 of 16

"reserve the right" to change the classification of and re-classify it as a Subordinated Claim. There is no basis in law to support such a sweeping power.

### C. The Plan Violates Bankruptcy Code §§ 1125 and 1127.

Section 1127(a) of the Bankruptcy Code allows the Debtor to modify the Plan at any time before confirmation, and § 1127(b) allows the Debtor to modify the Plan after confirmation but before the Plan is substantially consummated. Such modifications, however, are subject to a number of conditions, including the requirement under §1127(c) that the Debtor comply with § 1125 with respect to the Plan, as modified. By reserving the right to make changes without Court approval, failing to provide final versions of the Plan Documents (which are expressly part of the Plan), and asking the Court to approve the Plan in what is essentially draft form, the Debtor is asking the Court to ignore the express requirements of §§ 1125 and 1127.

The Plan provides that, to the extent that the Committee and the Debtor cannot agree upon the terms of any particular document, the issue will be submitted to non-binding mediation. The Plan also provides that finalizing the Plan Documents is a condition to the Effective Date, but the Committee and the Debtor have the right to waive that condition in their sole discretion. And the Plan does not require the Debtor to demonstrate that, upon a document that is part of the Plan being finalized, the Plan as modified complies with the applicable provisions of the Bankruptcy Code. The Debtor and the Committee simply can agree upon terms, and those terms apparently are binding on all creditors without any further Court approval.

Appx 07188

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 214 of 921    PageID 12012
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21   Entered 01/05/21 16:37:19   Page 15 of 16

Essentially, the Debtors are asking creditors and the Court to consider and approve the Plan before the Plan is even finalized, and the Plan impermissibly grants the Debtor and the Committee carte blanche to make amendments to the Plan post-confirmation without complying with § 1127 of the Bankruptcy Code.

### III.   CONCLUSION

The Plan should not be confirmed unless the defects identified in this limited objection are corrected, and the Court should allow the Senior Employees to make the Class 7 Convenience Class Election if they so choose.

*Remainder of Page Intentionally Left Blank*

Appx. 07189

0TT132

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 215 of 921 PageID 12013
Case 19-34054-sgj11 Doc 1669 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 16 of 16

Respectfully submitted January 5, 2021

By: _/s/ Frances A. Smith_

Judith W. Ross
State Bar No. 21010670
Frances A. Smith
State Bar No. 24033084
Eric Soderlund
State Bar No. 24037525
**ROSS & SMITH, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: judith.ross@judithwross.com
frances.smith@judithwross.com
eric.soderlund@judithwross.com

Michelle Hartmann
State Bar No. 24032402
**BAKER & McKENZIE LLP**
1900 North Pearl
Suite 1500
Dallas, TX 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

Debra A. Dandeneau
**BAKER & McKENZIE LLP**
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4875
Email: debra.dandeneau@bakermckenzie.com
(_Pro hac vice motion pending_)

**COUNSEL FOR SCOTT ELLINGTON, THOMAS SURGENT, FRANK WATERHOUSE, AND ISAAC LEVENTON**

Appx 07199

011133

# Exhibit A

Appx 07191

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of 27

Case 19-34054-sgj11 Doc 1669-1 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 2 of 2

| Employee | Earned Bonus | Convenience Class Reduction | Total Convenience Class Claim | Convenience Class Treatment (85%) | Add'l Reduction (40%) | Total Payment | % of Earned Bonus |
|---|---|---|---|---|---|---|---|
| Scott Ellington | $ 1,367,197.00 | $      367,197.00 | $ 1,000,000.00 | $ 850,000.00 | $ 340,000.00 | $ 510,000.00 | 37% |
| Frank Waterhouse | $  791,579.00 | $              - | $  791,579.00 | $ 672,842.15 | $ 269,136.86 | $ 403,705.29 | 51% |
| Thomas Surgent | $ 1,191,748.00 | $      191,748.00 | $ 1,000,000.00 | $ 850,000.00 | $ 340,000.00 | $ 510,000.00 | 43% |
| Isaac Leventon | $  589,198.00 | $              - | $  589,198.00 | $ 500,818.30 | $ 200,327.32 | $ 300,490.98 | 51% |

Appx. 7382
0TT133

# Exhibit B

Appx 07193

011136

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 21 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 219 of 921   PageID 12017
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21   Entered 01/05/21 16:37:19   Page 2 of 8

**Dandeneau, Debra A.**

| | |
|---|---|
| **From:** | Jeff Pomerantz <jpomerantz@pszjlaw.com> |
| **Sent:** | Monday, January 4, 2021 9:19 PM |
| **To:** | Dandeneau, Debra A. |
| **Cc:** | Gregory V. Demo; Ira Kharasch; Frances A. Smith; Eric Soderlund; Hartmann, Michelle; Jeff Pomerantz |
| **Subject:** | Re: [EXTERNAL] RE: HIGHLAND:  Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S CORRECT EMAIL |

Raise your concerns with the Judge Debra.

Jeff

From: "Dandeneau, Debra A." <Debra.Dandeneau@bakermckenzie.com>
Date: Monday, January 4, 2021 at 9:17 PM
To: Jeffrey Pomerantz <jpomerantz@pszjlaw.com>
Cc: Greg Demo <GDemo@pszjlaw.com>, Ira Kharasch <ikharasch@pszjlaw.com>, "Frances A. Smith" <Frances.Smith@judithwross.com>, Eric Soderlund <Eric.Soderlund@judithwross.com>, "Hartmann, Michelle" <Michelle.Hartmann@bakermckenzie.com>
Subject: Re: [EXTERNAL] RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S CORRECT EMAIL

Dear Jeff,

A claim is a right to payment, and a claimant may hold multiple claims.  Nowhere in the plan does it state that a claimant must make the Convenience Class Election with respect to all of its claims.  To the contrary, the definition of "Convenience Class Election" refers to a "claim" in the singular:  "the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims." (Emphasis added)

There are ways for a plan to provide that a creditor's claims must be aggregated for the purposes of the convenience claim election (and I am sure that Pachulski has come across numerous examples in its practice).  Your plan, however, is not one of these examples.

Best,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Ave<x-apple-data-detectors://0/1>
New York, NY  10018<x-apple-data-detectors://0/1>
Tel: +1 212 626 4875<tel:+1%20212%20626%204875>
Mobile: +1 973 477 6220<tel:+1%20212%20626%204875>

RESTRUCTURING
& INSOLVENCY


Baker's Global Restructuring & Insolvency Blog:
http://restructuring.bakermckenzie.com<http://restructuring.bakermckenzie.com>


On Jan 4, 2021, at 8:39 PM, Jeff Pomerantz <jpomerantz@pszjlaw.com> wrote:
Debra –

Appx. 07194
01T137

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 220 of 921 PageID 12018
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 3 of 8

Greg responded below that the term liquidated, as that term is used in the plan, means a claim in a sum certain. Your clients do not have a liquidated claim as their claims include amounts which are not in a sum certain. Accordingly, the convenience class treatment is not available to them

Best,
Jeff

From: "Dandeneau, Debra A." <Debra.Dandeneau@bakermckenzie.com>
Date: Monday, January 4, 2021 at 7:53 PM
To: Greg Demo <GDemo@pszjlaw.com>
Cc: Jeffrey Pomerantz <jpomerantz@pszjlaw.com>, Ira Kharasch <ikharasch@pszjlaw.com>, "Frances A. Smith" <Frances.Smith@judithwross.com>, Eric Soderlund <Eric.Soderlund@judithwross.com>, "Hartmann, Michelle" <Michelle.Hartmann@bakermckenzie.com>
Subject: Re: [EXTERNAL] RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S CORRECT EMAIL

Dear Greg,

Thank you for your response.  I think you are conflating the term "Allowed" (which actually is defined in the plan) with the term "liquidated" (which nowhere is defined in the plan).  It would be helpful to understand how a claim becomes "liquidated" in your view if it means something other than allowance.  Moreover, I would note that, pursuant to section 502(a) of the Bankruptcy Code, a claim, proof of which is properly filed, is deemed allowed unless and until a party in interest objects.  I am not aware of any pending objections to our clients' claims, proofs of which were properly filed. If you interpret "liquidated" to mean something more stringent than "allowed," please let me know what that definition is.

In any event, it is helpful to understand that your position is that claimants who do not have allowed claims as of the confirmation date cannot receive the same treatment under the plan as claimants who have "liquidated" claims.

If your view changes, please let me know.

Best,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Ave<x-apple-data-detectors://0/1>
New York, NY  10018<x-apple-data-detectors://0/1>
Tel: +1 212 626 4875<tel:+1%20212%20626%204875>
Mobile: +1 973 477 6220<tel:+1%20212%20626%204875>

RESTRUCTURING
& INSOLVENCY


Baker's Global Restructuring & Insolvency Blog:
http://restructuring.bakermckenzie.com<http://restructuring.bakermckenzie.com><http://restructuring.bakermckenzie.com <http://restructuring.bakermckenzie.com>>


On Jan 4, 2021, at 7:42 PM, Gregory V. Demo <GDemo@pszjlaw.com> wrote:
Your clients' claims are not entitled to make the convenience class election because they are not fully liquidated, which for purposes of the plan provisions means a claim in a sum certain. The component parts of your clients' claims do not matter for purposes of this analysis.  They are not entitled to make the convenience class election because their claims are not liquidated.

Your clients had the opportunity to sign the Senior Employee Stipulation, which would have given them a reduced convenience claim amount with respect to three parts of their claim with the balance of their claims being treated as GUCs.  That stipulation and the resulting convenience claim provided the consideration for the release.  As your clients'

Appx 07195
01138

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 221 of 921    PageID 12019
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 4 of 8

have rejected the Senior Employee Stipulation, there is no pathway to any portion of their claims receiving convenience class treatment.

Gregory V. Demo
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Fax: 212.561.7777
GDemo@pszjlaw.com<mailto:GDemo@pszjlaw.com>
vCard<https://urldefense.com/v3/__http://www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZFyOyEpA
$<https://urldefense.com/v3/__http://www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZFyOyEpA
$>> | Bio<https://urldefense.com/v3/__http://www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZ8MhLG
A$<https://urldefense.com/v3/__http://www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZ8MhLG
A$>> | LinkedIn<https://urldefense.com/v3/__https://www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcarZZ_Yp
w$<https://urldefense.com/v3/__https://www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcarZZ_Yp
w$>>

<https://urldefense.com/v3/__http://www.pszjlaw.com/__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c
8d1Q14y7xeCHFwYFqNBPJlpkbcZJsiDugQ$<https://urldefense.com/v3/__http://www.pszjlaw.com/__;!!Hj9Y_P0nvg!A1iO
3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZJsiDugQ$>>
<image002.jpg><https://urldefense.com/v3/__http://www.pszjlaw.com/__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRB
vvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZJsiDugQ$<https://urldefense.com/v3/__http://www.pszjlaw.com/__;!!Hj
9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJlpkbcZJsiDugQ$>>


Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

From: Dandeneau, Debra A. [mailto:Debra.Dandeneau@bakermckenzie.com]
Sent: Monday, January 04, 2021 8:34 PM
To: Gregory V. Demo; Jeff Pomerantz; Ira Kharasch
Cc: 'Frances A. Smith'; 'Eric Soderlund'; Hartmann, Michelle
Subject: RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S CORRECT EMAIL

Thanks, Greg.  I don't mean to be dense about this, but I want to make sure that we are all on the same page in terms of what you mean by "liquidated," especially as I have never seen this kind of qualification in a plan before.  I am not trying to box anyone into anything in terms of the debtor's ability to object to our clients' claims, but I would like to make sure it is clear what claims will not be subject to the dropdown election and what claims are permitted to make the dropdown election.  The three categories below are what comprise the "Earned Amounts" category in the draft stipulation.  The draft stipulation provides that all rights are reserved with respect to other claims.  I know that our clients have not signed the stipulation, but we would like to make sure that any future awards or other claims will be part of Class 8 and not subject to Class 7 treatment if our clients make the Class 7 election.  Conversely, we also want to make sure that, subject to whatever rights the debtor has to object to our clients' claims, if our clients do not prevail in asserting their administrative expenses, the categories of claims that I listed below are subject to treatment under Class 7.

I think these are fair questions to ask, and I did not see any explanation of your use of the term "liquidated" in the disclosure statement that would help me understand how the debtor intends for the provision to work.

Finally, in case you are concerned about duplication of effort, I first checked with David Neier to see if he had clarified this issue, and he confirmed that he has not clarified this outside of the context of the draft stipulation.

Best,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018


Appx 07186

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 222 of 921 PageID 12020
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 5 of 8

United States
Tel: +1 212 626 4875
Mobile: +1 973 477 6220
debra.dandeneau@bakermckenzie.com<mailto:debra.dandeneau@bakermckenzie.com>

<image003.png>

bakermckenzie.com<http://www.bakermckenzie.com/en<http://www.bakermckenzie.com/en>> |
Facebook<https://urldefense.com/v3/__https://www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTd
Kzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcZrv5Yaog$<https://urldefense.com/v3/__https://ww
w.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeC
HFwYFqNBPJIpkbcZrv5Yaog$>> | LinkedIn<https://urldefense.com/v3/__https://www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcZ6Rgef1g
$<https://urldefense.com/v3/__https://www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcZ6Rgef1g
$>> |
Twitter<https://urldefense.com/v3/__https://twitter.com/bakermckenzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRB
vvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcYyoyVXcw$<https://urldefense.com/v3/__https://twitter.com/bakermcke
nzie__;!!Hj9Y_P0nvg!A1iO3LDyMTdKzb_4zPQEZYLRBvvdL1zjinidbq3c8d1Q14y7xeCHFwYFqNBPJIpkbcYyoyVXcw$>>


From: Gregory V. Demo <GDemo@pszjlaw.com>
Sent: Monday, January 4, 2021 5:17 PM
To: Dandeneau, Debra A. <Debra.Dandeneau@bakermckenzie.com>; Jeff Pomerantz <jpomerantz@pszjlaw.com>; Ira
Kharasch <ikharasch@pszjlaw.com>
Cc: 'Frances A. Smith' <Frances.Smith@judithwross.com>; 'Eric Soderlund' <Eric.Soderlund@judithwross.com>;
Hartman, Michelle <Michelle.Hartmann@bakermckenzie.com>
Subject: [EXTERNAL] RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN
WITH GREG'S CORRECT EMAIL


Ms. Dandeneau,

As we conveyed to Mr. Neier, only fully liquidated claims are allowed to elect convenience class treatment. Art. I.B.43;
Art. III.H.8. Assuming that any portion of your clients' claim is allowed and/or liquidated, partially liquidated claims, like
your clients', are not eligible for conversion.

Best,
Greg
Gregory V. Demo
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7730 | Fax: 212.561.7777
GDemo@pszjlaw.com<mailto:GDemo@pszjlaw.com>
vCard<https://urldefense.com/v3/__http:/www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcTKa1-
_Sw$<https://urldefense.com/v3/__http:/www.pszjlaw.com/vcard-
130.vcf__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcTKa1-
_Sw$>> | Bio<https://urldefense.com/v3/__http:/www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcSqMu
P9BA$<https://urldefense.com/v3/__http:/www.pszjlaw.com/attorneys-
130.html__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcSqMu
P9BA$>> | LinkedIn<https://urldefense.com/v3/__https:/www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcT-
iwCu7Q$<https://urldefense.com/v3/__https:/www.linkedin.com/in/gregory-demo-
482aa112__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcT-
iwCu7Q$>>
<https://urldefense.com/v3/__http:/www.pszjlaw.com/__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8
UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$<https://urldefense.com/v3/__http:/www.pszjlaw.com/__;!!Hj9Y_P0nvg!
AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$>>
<image002.jpg><https://urldefense.com/v3/__http:/www.pszjlaw.com/__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUm
e92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$<https://urldefense.com/v3/__http:/www.pszjlaw.com/_
_;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcS61sTc0A$>>

Appx 07487

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 223 of 921 PageID 12021
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21 Entered 01/05/21 16:37:19 Page 6 of 8

Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

From: Dandeneau, Debra A. [mailto:Debra.Dandeneau@bakermckenzie.com]
Sent: Monday, January 04, 2021 7:43 PM
To: Jeff Pomerantz; Ira Kharasch; Gregory V. Demo
Cc: 'Frances A. Smith'; 'Eric Soderlund'; Hartmann, Michelle
Subject: RE: HIGHLAND: Question re Convenience Class Election under the Plan -- SENDING AGAIN WITH GREG'S
CORRECT EMAIL


Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
United States
Tel: +1 212 626 4875
Mobile: +1 973 477 6220
debra.dandeneau@bakermckenzie.com<mailto:debra.dandeneau@bakermckenzie.com>

<image003.png>

bakermckenzie.com<http://www.bakermckenzie.com/en<http://www.bakermckenzie.com/en>> |
Facebook<https://urldefense.com/v3/__https:/www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrP
R4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQM8vZt-
w$<https://urldefense.com/v3/__https:/www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88
B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQM8vZt-w$>> |
LinkedIn<https://urldefense.com/v3/__https:/www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$<https://urldefense.com/v3/__https:/www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$>> |
Twitter<https://urldefense.com/v3/__https:/twitter.com/bakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUm
e92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0g$<https://urldefense.com/v3/__https:/twitter.com/bakermc
kenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0
g$>>


This message may contain confidential and privileged information. If it has been sent to you in error, please reply to
advise the sender of the error and then immediately delete this message. Please visit
www.bakermckenzie.com/disclaimers<http://www.bakermckenzie.com/disclaimers><http://www.bakermckenzie.com/discl
aimers<http://www.bakermckenzie.com/disclaimers>> for other important information concerning this message.


From: Dandeneau, Debra A.
Sent: Monday, January 4, 2021 4:33 PM
To: 'jpomerantz@pszjlaw.com' <jpomerantz@pszjlaw.com<mailto:jpomerantz@pszjlaw.com>>; 'ikharasch@pszjlaw.com'
<ikharasch@pszjlaw.com<mailto:ikharasch@pszjlaw.com>>; 'gdemo@pszjlaw.com'
<gdemo@pszjlaw.com<mailto:gdemo@pszjlaw.com>>
Cc: 'Frances A. Smith' <Frances.Smith@judithwross.com<mailto:Frances.Smith@judithwross.com>>; Eric Soderlund
<Eric.Soderlund@judithwross.com<mailto:Eric.Soderlund@judithwross.com>>; Hartmann, Michelle
<Michelle.Hartmann@bakermckenzie.com<mailto:Michelle.Hartmann@bakermckenzie.com>>
Subject: HIGHLAND: Question re Convenience Class Election under the Plan

Dear Pachulski friends,

As you know, Baker McKenzie and the Ross & Smith firm have been retained by Scott Ellington, Frank Waterhouse, Isaac
Leventon, and Thomas Surgent (the "Senior Employees") to represent them in connection with the Highland Capital
Management case.

Appx 07198
OTT1141

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 26 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 224 of 921    PageID 12022
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 7 of 8

As you also know, the Senior Employees also assert that they have a right to payment in full of all their compensation-related claims as administrative expenses. I acknowledge that the debtor disagrees. Therefore, reserving all of our respective rights with respect to the administrative expense issue, I want to clarify how the plan works with respect to the election by Class 8 to drop down to Class 7 assuming that the debtor prevails in treating such claims as General Unsecured Claims.

The definition of "Convenience Class Election" in the plan references "a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date." With respect to the Senior Employees, it is our understanding that what is meant by "a liquidated Claim as of the Confirmation Date" only refers to the PY 2018 Bonus Installment 3 2/28/2020, the 2017 Deferred Award 3 Year Cliff Vest 5/31/2020, and the PY 2018 Bonus Installment 4 8/31/2020 and that all other claims that might be characterized as General Unsecured Claims will remain in Class 8 notwithstanding the Class 7 election.

Is this consistent with the debtor's understanding?  If not, could you please explain what the debtor's understanding is and what "a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date" means?

As the deadline for returning ballots is tomorrow, I would appreciate a quick response on this.

Thanks and best regards,

Deb

Debra A. Dandeneau
Chair, Global Restructuring & Insolvency
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
United States
Tel: +1 212 626 4875
Mobile: +1 973 477 6220
debra.dandeneau@bakermckenzie.com<mailto:debra.dandeneau@bakermckenzie.com>

<image003.png>

bakermckenzie.com<http://www.bakermckenzie.com/en/<http://www.bakermckenzie.com/en/>> |
Facebook<https://urldefense.com/v3/__https:www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwr
PR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcSnkZ_cBA$<https://urldefense.com/v3/__https:/
www.facebook.com/officialbakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXb
ycpJ08D0ubpNEqelUnLjLcSnkZ_cBA$>> |
LinkedIn<https://urldefense.com/v3/__https:www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$<https://urldefense.com/v3/__https:www.linkedin.com/company/baker-&-
mckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcRuO
N0gQw$>> |
Twitter<https://urldefense.com/v3/__https:twitter.com/bakermckenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUm
e92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0g$<https://urldefense.com/v3/__https:/twitter.com/bakermc
kenzie__;!!Hj9Y_P0nvg!AeuXWQZthwrPR4C88B9yDpUme92tHjUNNmu8UENohmXbycpJ08D0ubpNEqelUnLjLcQkfs4q0
g$>>


This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers<http://www.bakermckenzie.com/disclaimers> for other important information concerning this message.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is

Appx. 07499
OTT142

Case 19-34054-sgj11 Doc 3445-61 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 225 of 921    PageID 12023
Case 19-34054-sgj11 Doc 1669-2 Filed 01/05/21    Entered 01/05/21 16:37:19    Page 8 of 8

strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.

Appx. 07200
01T1143

**EXHIBIT 62**

OTT1144

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 227 of 921 PageID 12025
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 1 of 42

| | |
|---|---|
| K&L GATES LLP<br>Artoush Varshosaz (TX Bar No. 24066234)<br>1717 Main Street, Suite 2800<br>Dallas, TX 75201<br>Tel: (214) 939-5659<br>artoush.varshosaz@klgates.com<br><br>Stephen G. Topetzes (*pro hac vice*)<br>1601 K Street, NW<br>Washington, DC 20006-1600<br>Tel: (202) 778-9328<br>stephen.topetzes@klgates.com<br><br>A. Lee Hogewood, III (*pro hac vice*)<br>4350 Lassiter at North Hills Ave., Suite 300<br>Raleigh, NC 27609<br>Tel: (919) 743-7306<br>Lee.hogewood@klgates.com<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* | Davor Rukavina, Esq.<br>Texas Bar No. 24030781<br>Julian P. Vasek, Esq.<br>Texas Bar No. 24070790<br>MUNSCH HARDT KOPF & HARR, P.C.<br>3800 Ross Tower<br>500 N. Akard Street<br>Dallas, Texas 75202-2790<br>Telephone: (214) 855-7500<br>Facsimile: (214) 978-4375<br><br>*Counsel for Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund* |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF
## REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.


1934054210105000000000016

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 228 of 921 PageID 12026
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 2 of 42

Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"), Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund (each, a "**Fund**," and collectively, the "**Funds**," and together with the Advisors, the "**Funds and Advisors**" or "**Objectors**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1472], together with that certain Plan Supplement [Dkt. No. 1648] filed December 30, 2020 (the "**Fifth Amended Plan**").[1] In support of the Objection, the Funds[2] and Advisors respectfully submit to the Court as follows:

## SUMMARY OF OBJECTION

The Debtor owes strict statutory and contractual fiduciary obligations to manage the billions of dollars of other peoples' money that it manages. No actual or hypothetical conflict of interest is allowed. Yet, the Fifth Amended Plan, by purporting to assume various agreements pursuant to which the Debtor manages portfolios of assets, places the interests of the Debtor's creditors ahead of the interests of the beneficial interest holders in those portfolios,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The Funds are investment companies and a business development company registered under the Investment Company Act of 1940 as open-end or "mutual" funds, closed end funds or a business development company. None of the Funds are private or hedge funds.

Appx. 07293
01T146

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 229 of 921    PageID 12027
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 3 of 42

thereby representing a clear conflict of interest and breach of fiduciary duty in violation of the Advisers Act (defined below) and the 1940 Act (defined below).

This is because the Plan provides for the assumption of numerous management agreements in connection with, among other investments, interests in collateralized loan obligations ("**CLOs**") owned in part by the Funds and/or Advisors, together with other investors. In some cases, either the Funds, the Advisors or these entities in conjunction with other objecting creditor(s) own or manage a majority of the remaining beneficial interests in such CLOs. To be clear, the CLO -- not the Funds nor the Advisors nor the Debtor -- is the issuer of these interests. Nevertheless, it is the Funds and Advisors who hold the beneficial and economic interests and who, pursuant to the underlying agreements, in many instances have the ability to control who the servicer or manager of the portfolios is. However, the Plan reveals that the Debtor intends to dismiss its investment management employees by the end of January 2021 and to employ a subagent to perform its current portfolio manager/servicer role. The Debtor intends to effectively wind-down and liquidate the CLOs' assets within two years—an arbitrary proposition having nothing to do with what is in the best interests of the CLOs. The Debtor also intends to strip the Funds and the Advisors of their contractual and statutory rights, and to improperly insulate itself from potential future liabilities that it may incur on account of its portfolio management.

The Plan cannot be confirmed so long as it provides for the assumption of these agreements. First, these agreements cannot be assigned under the Advisers Act or the 1940 Act, meaning that they cannot be assumed pursuant to section 365(c) of the Bankruptcy Code. Second, these agreements cannot be assumed under section 365(b) of the Bankruptcy Code because the Debtor cannot adequately assure its future performance under the agreements.

Appx 07204
01T147

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 230 of 921 PageID 12028
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 4 of 42

Third, these agreements cannot be assumed if the Plan purports to change their provisions or relieve the Debtor from its fiduciary obligations and resulting potential liabilities. Fourth, the Plan is not feasible and is illusory so long as it depends on future income from these non-assumable agreements. Fifth, the Plan fails to comply with applicable law by seeking to relieve the Debtor of the strict duties imposed on it by the Advisers Act and 1940 Act. Indeed, the Plan is an invitation for future litigation against the Debtor for future breaches by the Debtor of its contractual obligations and violations by the Debtor of federal law.

The Plan is not merely a disagreement between the Debtor, on the one hand, and the Funds and Advisers, on the other hand, as to how to manage the CLOs. The Plan instead represents an attempt by the Debtor to strip beneficial interest holders of their contractual and statutory rights, to improperly insulate itself against its future actions and liabilities, to avoid the dictates of the Advisers Act, and to use assets that it manages—assets that do not belong to the Debtor—to benefit the Debtor's creditors at the expense of the actual owners of those assets. It is one thing for the Debtor to liquidate and to seek to repay its creditors, but it is another thing entirely for the Debtor to do this on the backs, and at the expense, of those investors whose interests the Debtor is charged with serving first.

For these and other reasons argued below, the Objectors object to the confirmation of the Plan.

The purported contract assumption is also illusory in that the Debtor's plan is premised upon the liquidation of assets in which the Debtor has no interest and which a majority of the beneficial owners has expressed, and continue to express, a desire for a different portfolio management strategy than the one the Debtor intends to continue to employ. The contracts the Debtor proposes to assume contain provisions requiring the maximization of the return to or

Appx 07295
01T1148

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 231 of 921 PageID 12029
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 5 of 42

preservation of the value of the collateral for the preference shareholders; these parties prefer

that the assets not be liquidated, but maximized or preserved. Moreover, the Advisers Act[3]

requires the Debtor to comply with the portfolio management contracts for the protection of the

investors in the Funds, CLOs and other products. The Debtor's purported assumption of these

agreements, while other provisions of the Fifth Amended Plan make clear key provisions of the

assumed contracts will be ignored and rejected in this context, is a similar form of "cherry

picking" that section 365 does not countenance.[4]

### **BACKGROUND**

*A.* ***General Background on Funds and Advisors***

1.      Each Advisor is registered with the U.S. Securities and Exchange Commission

("**SEC**") as an investment adviser under the Investment Advisers Act of 1940, as amended, 15

U.S.C. § 80b-1 *et. seq.* (the "**Advisers Act**").

2.      Each of the Funds is a registered investment company or business development

company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.*

(the "**1940 Act**") and is advised by one of the Advisors.

3.      As an investment company or business development company, each Fund is

managed by an independent board of trustees subject to 1940 Act requirements. That board

determines and contracts with one of the Advisors for each Fund. As is typical for nearly all

---

[3] The Advisers Act and the 1940 Act (defined in numbered paragraph 2 below) are two separate acts, both adopted in 1940, and provide the essential statutory and regulatory structure for the Debtor's business, as well as the Advisors and the Funds, to operate legally and transparently for the benefit of the public.

[4] The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis.

Appx. 07206
0TT149

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 232 of 921 PageID 12030
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 6 of 42

investment companies, the Funds do not have employees. Instead, pursuant to the 1940 Act, each Fund's board oversees the Advisor and the Advisor, acting pursuant to the advisory agreements, provides the services necessary to the Fund's operations.[5] The Funds are each managed by one of the two Advisors. The Advisors have some employees, but they also rely heavily on the Debtor to provide a variety of services. Further, certain individuals employed or affiliated with the Debtor also hold roles for the Advisors and/or the Funds, and some of these roles are fiduciary in nature (the "**Fiduciaries**"). The Fiduciaries are privy to confidential commercial information about the Funds and Advisors, including data relating to the Funds' investment holdings and investment strategies.

### B. *Shared Services and Payroll Reimbursement Agreements with the Debtor*

4.      Each Advisor is party with the Debtor to a shared services agreement. Specifically, NexPoint Advisors, L.P. ("**NexPoint**") and the Debtor are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (as amended, the "**NexPoint SSA**"), and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and the Debtor are parties to a Second Amended and Restated Shared Services Agreement dated February 8, 2013 (as amended, the "**HCMFA SSA**," and collectively with the NexPoint SSA, the "**Shared Services Agreements**").[6]

5.      Under the Shared Services Agreements, the Debtor provides a variety of services, including operational, financial and accounting, human resources, information technology, legal, tax, and compliance services, to the Advisors. As part of its provision of

---

[5] Each of the Funds' respective boards meets quarterly and, consistent with statutory requirements, each is advised by independent counsel.

[6] Copies of the Shared Services Agreements and the Payroll Reimbursement Agreements (as defined below) are attached to the proofs of claim filed by the Advisors at Claim Nos. 95, 104, 108 and 119.

App. 07207
0TT150

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 233 of 921 PageID 12031
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 7 of 42

services, the Debtor maintains books and records (the "**Books and Records**") on behalf of the Advisors.

6.    Under the HCMFA SSA, the costs of the Debtor's services are allocated on a percentage of use basis. The Debtor submits quarterly expense statements to HCMFA to reconcile amounts due to the Debtor. In addition, with respect to certain taxes related to the Shared Services, the Debtor collects those taxes from HCMFA on the same basis as with the Debtor's other customers. To the extent of a related tax refund, the Debtor is obligated to submit the refund to HCMFA.

7.    Under the NexPoint SSA, NexPoint pays the Debtor a fixed monthly fee for the provision of services.

8.    The Advisors and the Debtor are also parties to separate payroll reimbursement agreements (as amended, the "**Payroll Reimbursement Agreements**"). The Payroll Reimbursement Agreements address the splitting of costs for certain employees that are "dual employees" of the Debtor and an Advisor and who provide advice to funds, such as the Funds, advised by the Advisors. The Payroll Reimbursement Agreements provide for the subject Advisor to reimburse the Debtor at a set cost.

9.    The Advisors also participate in the Debtor's self-insured healthcare plan (the "**Self-Insured Plan**"), which provides employee healthcare coverage. Depending on the contributions made and the claims submitted to the Self-Insured Plan at any given time, an Advisor may be owed money by, or owe additional contributions to, the Self-Insured Plan.

10.   The Plan proposes to reject those executory contracts [Fifth Am. Plan, Dkt. No. 1472 at p. 37] that are not otherwise listed for assumption in a plan supplement. The Debtor has filed its Plan Supplement listing executory contracts to be assumed [Dkt. No. 1648], which

Appx. 07208
01P1151

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 234 of 921 PageID 12032
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 8 of 42

Plan Supplement does not include the foregoing executory contracts. Accordingly, it appears that the Plan proposes to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan. The Advisors will therefore have potentially sizable rejection damages claims, on account of which they are preparing to file corresponding proofs of claim.

### C. *The CLOs*

11. The Funds also have economic interests in certain collateralized loan obligations (the "**CLOs**") (the Fifth Amended Plan refers to the CLOs as "Issuers"), for which the Debtor serves as portfolio manager.

12. The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC,[7] and Westchester CLO, Ltd.

13. The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual priority of payments, or waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preferred shares.

14. The CLOs were created many years ago. Most of the CLOs have, at this point, paid off all the tranches of notes or all but the last tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preferred

---

[7] The portfolio management agreements with Loan Funding VII, LLC is not proposed to be assumed.

Appx 07209
01T1152

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 235 of 921 PageID 12033
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 9 of 42

shares.

15. Further, such ownerships represent in many cases the total remaining outstanding interests in such CLOs, the noteholders otherwise having been paid. In others, the remaining noteholders represent a small percentage only of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco represent a majority of the investors in the CLOs as follows:

a. CLOs in which NexPoint or HCMFA manage owners of a majority of the preference shares: Stratford CLO, Ltd. 69.05%, Grayson CLO, Ltd. 60.47% and Greenbriar CLO, Ltd. 53.44%.

b. CLOs in which a combination of NexPoint and HCMFA managed funds and CLO Holdco hold all, a supermajority or majority of preference shares: Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%*[8], Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%*

16. The issuer of each CLO has separately contracted with the Debtor for the Debtor to serve as the CLO's portfolio manager or servicer (the "**Servicing Agreements**").[9] In this capacity, the Debtor is responsible for, among other things, making decisions to buy or sell the CLOs' assets in accordance with the indenture and its obligations under the Servicing Agreements. Although the Servicing Agreements vary, they generally impose a duty on the

---

[8] CLOs marked with an asterisk (*) appear in the foregoing list as well.

[9] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Objection, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 236 of 921    PageID 12034
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 10 of 42

Debtor when acting as portfolio manager to maximize the value of the CLOs' assets for the

benefit of the CLOs' noteholders and preferred shareholders.    In particular, the Servicing

Agreements contain language providing for the maximization or preservation of value for the

benefit of the preference shares as shown in the following examples:

> In performing its duties hereunder, the Portfolio Manager shall seek to maximize the value of the Collateral for the benefit of the Noteholders and the Holders of the Preference Shares taking into account the investment criteria and limitations set forth herein and in the Indenture and the Portfolio Manager shall use reasonable efforts to manage the Collateral in such a way that will (i) permit a timely performance of all payment obligations by the Issuer under the Indenture and (ii) subject to such objective, maximize the return to the Holders of the Preference Shares; provided, that the Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Portfolio Manager performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Portfolio Manager with respect to the Notes or the Preference Shares.

Liberty Portfolio Management Agreement, Sec. 2(b) containing language above.

> In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

Aberdeen Servicing Agreement, Sec. 2(b).

APPX 0731

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 237 of 921    PageID 12035
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 11 of 42

17.     Moreover, each of the Servicing Agreements contain express language that the portfolio manager's obligations thereunder are for the benefit of and "shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture of the Preference Share Paying Agency Agreement, as applicable."  Servicing Agreement Sec. 9.

18.     The Servicing Agreements also generally allow the holders of preference shares to remove the portfolio manager for cause, while their affirmative consent is required to an assignment of the agreements.  Cause includes the anticipated "ipso facto" provisions related to insolvency and bankruptcy, but cause is not so limited and includes material breach of the Servicing Agreement which would clearly include the failure to maximize value or the failure to preserve collateral. Servicing Agreement, Sec. 14.  However, certain Servicing Agreements provide for a certain percentage of holders of preference shares to remove the portfolio manager without cause. *See, e.g.*, Gleneagles CLO , Ltd., Portfolio Management Agreement, Sec. 12(c).

> **E.**     ***The Fifth Amended Plan and Disclosure Statement***

19.     On November 24, 2020, the Debtor filed the Fifth Amended Plan and the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1473] (the "**Disclosure Statement**").

11

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 238 of 921    PageID 12036
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 12 of 42

20.     The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries.  The Debtor's rights to manage investment vehicles managed by the Debtor pursuant to executory contracts that are assumed pursuant to the Fifth Amended Plan, defined as the "Managed Funds," are to remain with the Reorganized Debtor, which, in turn, is to be managed by New GP LLC, a wholly-owned subsidiary of the Claimant Trust.  The Disclosure Statement states that "[t]his structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets." Dkt. No. 1473 at 11.  Ultimately, however, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *Id.*  More specifically, the Reorganized Debtor will manage the wind down of the Managed Funds in addition to any other remaining Assets.  Moreover, the Financial Projections attached as Exhibit C to the Disclosure Statement make clear that, assuming confirmation of the Plan in its current form, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

21.     The Disclosure Statement further states that the Debtor does not anticipate either the Reorganized Debtor or the Claimant Trust assuming or assuming and assigning the contracts between the Debtor and certain of its Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services relating to such Related Entities.  Dkt. No. 1473 at 42.  Accordingly, it appears that the Debtor's intent is to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan.

---

[10] Footnote 10 to the Disclosure Statement clarifies that the Debtor does not consider any of the Issuers to be a Related Entity.

Appx. 07213
01T1156

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 239 of 921 PageID 12037
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 13 of 42

22. With respect to the Shared Services Agreements, the Disclosure Statement provides that the cost of staffing to fulfil the agreements has historically resulted in a net loss to the Debtor and is not beneficial to the estate. The Disclosure Statement further states that the agreements contain anti-assignment provisions which it believes to be enforceable under section 365(c) of the Bankruptcy Code, and moreover, are terminable at will by either party. In light of these considerations, the Debtor apparently does not believe that the agreements may be assumed or assumed and assigned, and even if they could, there would not be any corresponding benefit to the estate. Notwithstanding the foregoing, the Disclosure Statement indicates that the Debtor is still assessing whether to assume and assign the agreements with a Related Entity. Dkt. No. 1473 at 42.

23. The Disclosure Statement also discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

> The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

24. The Debtor's Supplement to the Plan, filed on December 30, 2020 at Dkt. No. 1648, indicates that the Debtor intends to assume the Servicing Agreements with all of the CLOs except Loan Funding VII, LLC. *See* Dkt. No. 1648, Sched. A.

13

Appx 07214
0TT157

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 240 of 921 PageID 12038
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 14 of 42

## OBJECTION

**A.** ***The Debtor Cannot Assume the Servicing Agreements Pursuant to Section 365(c)(1) of the Bankruptcy Code***

25.     The Objectors object to the assumption of the Servicing Agreements for the fundamental reason that the Debtor will not manage the CLOs' assets appropriately in order to maximize value for the CLOs and the Objectors, but will instead breach its fiduciary duties by managing a winding-down those CLOs and assets in order to provide a recovery for its creditors, in what is an obvious and irreconcilable conflict of interest.

26.     As explained below, the Debtor and the Servicing Agreements which it seeks to assume are subject to the Advisers Act. As the Supreme Court has repeatedly held, it is a fundamental purpose of the Advisers Act to impose strict fiduciary duties on investment advisors and to "eliminate conflicts of interest between the investment adviser and the clients." *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963). This extends to any "conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Id*. "[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations." *Transamerica Mort. Advisors v. Lewis*, 444 U.S. 11, 17 (1979).

27.     Under the Plan, the Debtor would be owned by its creditors. The Debtor and the Claimant Trust would be managed by a person holding fiduciary duties to the Debtor's creditors. The Debtor would manage and presumably wind-down and liquidate the assets of the CLOs within a span of two years, not for the benefit of the CLOs and their beneficial interest holders, but for the benefit of the Debtor's creditors. And, it would do this without employees or resources, or by impermissibly delegating its duties to yet a different party—something that it is not permitted to do under applicable law and the governing contracts. In sum, the Debtor

Appx. 07215
011158

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 16 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 241 of 921    PageID 12039
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 15 of 42

would manage the CLOs and their assets for the benefit of the Debtor's creditors, which it is fundamentally impossible to do without simultaneously violating the Debtor's strict fiduciary duties to others and which represents a clear conflict of interest under the Advisers Act.

28.     This inescapable conclusion is precisely why the Bankruptcy Code prohibits an assumption of personal service contracts like the Servicing Agreements.  The Bankruptcy Code provides that:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

29.     The first question is whether "applicable law" excuses the counterparties to the Servicing Agreements from accepting performance from the Debtor.  In this respect, both the Advisers Act and the 1940 Act represent "applicable law" that provides for precisely that.

30.     The Advisers Act governs "investment advisors."  The Advisers Act defines an investment advisor as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

31.     There is no question that the Debtor receives compensation under the Servicing Agreements.  The only question is whether, under the Servicing Agreements, and in connection

Appx. 07316
011159

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 242 of 921 PageID 12040
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 16 of 42

with managing the investments and securities of the CLOs, the Debtor satisfies the remaining

element(s). Case law confirms that, in providing investment services and investment

management under the Servicing Agreements, is acting as an "investment advisor" under the

Advisers Act. The Second Circuit authoritatively considered and decided the issue of whether

a portfolio manager is an investment advisor in *Abrahamson v. Fleschner*, 568 F.2d 862 (2d

Cir. 1977). The case concerned general partners who managed various investments on behalf

of limited partners. *See id*. at 866. Regarding whether the general partners were investment

advisors on account of managing the investments, the court concluded that they were "on two

independent grounds":

> First, the monthly reports which contained the alleged fraudulent representations
> were reports which provided investment advice to the limited partners. The
> general partners' compensation depended in part upon the firm's net profits and
> capital gains. These in turn were affected by the size of the total funds under
> their control. The monthly reports were an integral part of the general partners'
> business of managing the limited partners' funds. In deciding whether or not to
> withdraw their funds from the pool, the limited partners necessarily relied
> heavily on the reports they received from the general partners.
>
> Second, wholly aside from the monthly reports, we believe that the general
> partners as persons who managed the funds of others for compensation are
> 'investment advisers' within the meaning of the statute. This is borne out by the
> plain language of Section 202(a)(11) and its related provisions, by evidence of
> legislative intent and by the broad remedial purposes of the Act.

*Id*. at 870. Thus, by virtue of managing the underlying investments and related activities, the

general partners were providing investment advice and were therefore investment advisors

subject to the Advisers Act.

32. The court in *SEC v. Smith*, 1995 U.S. Dist. LEXIS 22352 (E.D. Mich. 1995),

considered a similar issue. In that case, the SEC sought summary judgment that the defendant

was an investment adviser under the Advisers Act. The defendant argued that he was not an

investment adviser merely by virtue of managing a portfolio of accounts on behalf of third

Appx 07317
01160

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 243 of 921 PageID 12041
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 17 of 42

parties. *See id.* at *12-*13. Specifically, the defendant argued that he was not giving investment advice, but that he was instead "a professional trustee who exercises sole discretionary control over trust investments. . . I am the trustee. I have absolute full power and authority to make all buy, hold and sell decisions. And, therefore, I am the one that receives information and research and I make the decisions." *Id.* at *13. In other words, because he had sole discretion and control over how to manage the invested assets, he was not giving "advice" within the meaning of the Advisers Act. The court rejected this argument: "Smith is clearly an investment advisor under the Advisers Act." *Id.* at *15.

33.     The court in *SEC v. Saltzman*, 127 F. Supp. 2d 660 (E.D. Pa. 2000) reached the same conclusion with respect to a portfolio manager:

> Saltzman maintained exclusive control over the investment portfolio, brokerage accounts, and bank account of Saltzman Partners, L.P. He made all investment decisions for the portfolio. As the Act intended to embrace those who wield power over their clients' money, as Saltzman did over the investments of the limited partners, the facts alleged qualify Saltzman as an investment adviser.

*Id.* at 669. Therefore, the Debtor, by virtue of managing the CLO assets, and even though it has the sole control and authority over that management, is providing investment advice and is therefore an investment advisor with respect to the Servicing Agreement.

34.     More particularly, the Servicing Agreements, because they provide for investment advice, are "Investment Advisory Contracts" under the Advisers Act. This is further confirmed by the language of the Advisers Act with respect to the definition of Investment Advisory Contract:

> any contract or agreement whereby a person agrees to act as investment adviser to <u>or to manage any investment</u> or trading account <u>of another person</u> other than an investment company registered under title I of this Act.

15 U.S.C. § 80b-5(d) (emphasis added). Managing the investments of others is of course

Appx. 07318
0111161

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 19 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 244 of 921    PageID 12042
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 18 of 42

precisely what the Debtor does under the Servicing Agreements.

35.    There should therefore be no question that the Servicing Agreements are "investment advisory contracts" subject to the Advisers Act.  Should there be any doubt, the Servicing Agreements in multiple places reference the Advisers Act and subject the agreements to the requirements of the Advisers Act.

36.    The Advisers Act prohibits an assignment of an investment advisory contract without consent.  The Advisers Act defines "assignment" as including "any direct or indirect transfer or hypothecation of an investment advisory contract."  15 U.S.C. § 80b-2(a)(1).  With respect to an assignment, the Advisers Act provides as follows:

> No investment adviser registered or required to be registered with the Commission shall enter into, extend, or renew any investment advisory contract, or in any way perform any investment advisory contract entered into, extended, or renewed on or after the effective date of this title, if such contract—
>
> (2) fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract.

15 U.S.C. § 80b-5(a)(2).

37.    Each of the Servicing Agreements contain substantially similar provisions related to any assignment:

> any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares.

38.    Accordingly, the Advisers Act represents "applicable law" under section 365(c)(1) that excuses the counterparty to an investment advisory contract from accepting performance from an assignee.  As such, because the agreement cannot be assigned, it cannot

App. 07319
011162

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 245 of 921 PageID 12043
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 19 of 42

be assumed by the Debtor without consent.

39.    It is true that courts in this District construe section 365(c)(1) such that, where the applicable law is merely a general prohibition on assignment, the section does not prevent an assumption. *See, e.g., In re Lil' Things*, 220 B.R. 583, 590-91 (Bankr. N.D. Tex. 1998). Here, however, the Advisers Act is not a general law that would prohibit an assignment; it is a very specific law, applicable to a very narrow set of persons, and one which prohibits only the assignment of an investment advisory agreement.

40.    Even so, this District recognizes that section 365(c)(1) becomes paramount "where the identity of the party rendering performance under the contract is material to the contract, and the contract is non-delegable under applicable non-bankruptcy law." *Id*. at 591. This is certainly true where, as here, a party has contracted with someone to manage that party's property and investments: that is a fiduciary relationship of the highest trust where the identity of the person providing the services is absolutely paramount.  The Fifth Circuit recognized this fundamental principle the highly analogous situation of an attorney retention agreement: the contract was not assumable under otherwise applicable law because the contract was a highly personal one involving elements of trust, legal, and ethical considerations. *See In re Tonry*, 724 F.2d 467, 468-69 (5th Cir. 1984).

41.    In *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), this Court concluded that the debtor-in-possession may assume a contract even if section 365(c) would prevent a trustee from being able to assume the contract.  In large part, the Court construed the addition, in 1984, of the term "debtor-in-possession" into the statute as evidence that Congress intended for a debtor-in-possession to be able to assume its contracts even if section 365(c) would otherwise prohibit a trustee from assuming the contract. *See id*. at 333.  "The specific

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 21 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 246 of 921    PageID 12044
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 20 of 42

use of the words 'the debtor or the debtor in possession' leads the court to conclude that a contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject to assumption whether or not applicable law limits its assignability. *Id.* However, the Fifth Circuit has not adopted this view and the logic of *In re Mirant Corp.* is not correct.

42.     The statute begins by providing that the "trustee may not assume or assign any executory contract . . ." 11 U.S.C. § 365(c)(1). That "trustee" must include a debtor-in-possession, for it is the same "trustee" as in section 365(a) which provides that a "trustee . . . may assume or reject any executory contract." *Id.* at § 365(a). Thus, the section 365(c)(1) prohibition on a trustee must also extend to a "debtor-in-possession," unless the Court concludes that the use of the word "trustee" in the same statute means two different things. Rather, what *In re Mirant Corp.* was referring to was the following language in section 365(c)(1):

> applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession.

*Id.* at § 365(c)(1).

43.     The addition of the term "debtor-in-possession" to this statute does not change the result; *i.e.* it does not mean that a debtor-in-possession, unlike a trustee, may assume, but not assign, its own contracts. The question is whether applicable law excuses a party from accepting performance from an entity other than the debtor-in-possession. The Debtor is a debtor-in-possession and, if the counterparty is excused by applicable law from accepting performance from anyone else, then the contract may not be assumed by the Debtor. *In re Mirant Corp.* was simply wrong in concluding that the 1984 amendment somehow excepted a debtor-in-possession's assumption of its own contracts from the operation of section 365(c)(1).

44.     The Fifth Circuit's opinion in *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392

APPX 07321
017164

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 247 of 921 PageID 12045
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 21 of 42

(5th Cir. 2001) is on point. That opinion was rendered after the 1984 amendment at issue in *Mirant*, and that opinion concerned a Chapter 11 debtor. The question was whether a non-assignable partnership agreement could be assumed under section 365(c)(1). The Fifth Circuit held that "the agreement was *not* assumable under § 365(c)(1)." *Id*. at 402 (emphasis in original). And, as here, the confirmed plan provided for a postconfirmation liquidating trust. *See id*. at 396. The only difference was that, in *In re O'Connor*, a Chapter 11 trustee proposed the confirmed plan. This difference does not matter because the Fifth Circuit held that the agreement itself was not assumable; not that one person may assume it while a second not. *See id*. at 402 and 404 (twice holding that the "agreement is *not* assumable" (emphasis in original)).[11] Only one person may assume an executory contract, and that person is the trustee, even if the debtor-in-possession is exercising the powers of a trustee. Thus, if the contract itself is not assumable, then it is not assumable period. This difference also does not matter because the identity of the plan proponent is immaterial: the question is still whether it is the debtor-in-possession, or the estate, that can assume the executory contract.

45. The Debtor will respond that the Fifth Circuit, in *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006), rejected the so-called "hypothetical test" and adopted instead the "actual test" regarding the assignment of an executory contract or lease. In *Mirant*, the issue concerned section 365(e)(2) of the Bankruptcy Code and whether an *ipso facto* clause was enforceable against a debtor-in-possession because the executory contract was not assignable. The

---

[11] In *Strumpf*, the Fifth Circuit held that, because the agreement was not assumable, it passed through the Chapter 11 unaffected. However, *Strumpf* itself concluded that this "pass-through" principle does not apply in a liquidating plan, as further confirmed by *In re Tex. Rangers Baseball Partners*, 521 B.R. 134,183 (Bankr. N.D. Tex. 2014). Even if the agreements could pass through unaffected to the reorganized debtor, even though it is liquidating, the Plan cannot limit the ability to terminate the agreements in the future based on the change in control and other facts that are present. Otherwise, the agreements would be affected by the Plan, meaning that they would have to first be assumed, as recognized in *Strumpf* by holding that a plan effect on the executory contract means that it cannot pass through bankruptcy unaffected. *Strumpf*, 258 F.3d at 405.

Appx. 07332
011165

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 23 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 248 of 921    PageID 12046
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 22 of 42

"hypothetical test" required a court to review whether a hypothetical assignment was prohibited by applicable law; if it was, then the *ipso facto* clause could be enforced even though no assignment was proposed. *See id*. at 246-47. The Fifth Circuit rejected this approach and instead applied the "actual test," which looked at whether an assignment was actually being proposed. *See id*. at 249-50. The Debtor will argue that this same logic should apply to section 365(c)(1) such that, when no actual assignment is being proposed, the section is not implicated.

46.      *Mirant* and its logic, however, do not apply to section 365(c)(1). First, and most obviously, the Fifth Circuit stated that "[a]lthough this Circuit has addressed § 365(c)(1), we have yet to address § 365(e)," and then it cited to its *In re O'Connor* and *In re Braniff Airways* precedent. *See id*. at 248-49. The circuit, in analysing this prior precedent, noted that it was the contract itself that was not assumable ("declaring the contract unassumable," *id*.) and reaffirmed the holdings of both prior opinions notwithstanding the change in the language of section 365(c)(1). Thus, and having been afforded the opportunity to revisit its prior precedent or to find that the added "debtor-in-possession" language to section 365(c)(1) compelled a different result, the circuit instead reaffirmed its prior precedent holding that the contract itself was not assumable. More precisely, the "actual test" cannot apply to section 365(c)(1) because that section provides that a trustee may not "assume <u>or</u> assign" an executory contract. If the test were an actual one, *i.e.* whether an actual assignment was being proposed, then the section would simply provide that the trustee may not "assume and assign" the executory contract. But, in preventing an assumption even without a proposed assignment, section 365(c)(1) necessarily applies the "hypothetical test" such that, even though no assignment is proposed, if an assignment is prohibited then so is an assumption.

47.      Thus, were the Fifth Circuit presented with the precise issue with respect to

Appx. 07323
0TT166

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 249 of 921 PageID 12047
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 23 of 42

section 365(c)(1), to the extent it was not in *In re O'Connor*, the Objectors submit that the Fifth Circuit would join its sister circuits in concluding that, so long as even a hypothetical assignment would be prohibited, so too is an assumption, whether by a trustee, debtor, or debtor-in-possession. *See In re Catapult Entertainment*, 165 F.3d 747, 750 (9th Cir. 1999) ("a debtor in possession may not assume an executory contract . . . if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party"); *In re James Cable Partners L.P.)*, 27 F.3d 534, 537 (11th Cir. 1994); (holding that debtor-in-possession may not assume executory contract under section 365(c)(1) notwithstanding that no assignment was proposed); *In re Catron*, 1994 U.S. App. LEXIS 14585 (4th Cir. 1994) (affirming holding that "agreement was the type of executory contract that could not be assumed by Catron, a debtor-in-possession, absent consent of the nondebtor parties as required by § 365(c)(1)(B)"); *In re West Electronics Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) ("the relevant inquiry is not whether [applicable law] would preclude an assignment from West as a debtor to West as a debtor in possession, but whether it would foreclose an assignment by West to another defense contractor");[12] *but see Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997).

48. The result may not be to the liking of the Debtor and, in other circumstances, the result may be harsh on a debtor-in-possession. But this case aptly demonstrates why the section

---

[12] In fact, as recognized in *West*, the addition of the term "debtor-in-possession" into section 365(c)(1) demonstrates Congress's intent to prevent a debtor-in-possession from assuming its own personal services contracts:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1) Congress anticipated an argument like the one here made and wanted that section to reflect its judgment that in the context of the assumption and assignment of executory contracts, a solvent contractor and an insolvent debtor in possession going through bankruptcy are materially distinct entities.

*In re West Electronics*, 852 F.2d at 83.

Appx. 07334
01T167

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 250 of 921 PageID 12048
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 24 of 42

exists and why the result is fair. Many innocent parties have entrusted billions of dollars of
their property to the Debtor to manage, for their benefit. Now, the Debtor wants to manage that
property for the benefit of its creditors, and with insufficient experience, resources, and
employees at that. This is not a case where the debtor is a person, who holds investment
management contracts. That person is the same before, during, and after a Chapter 11 case.
But here the Debtor is the same entity in name only: no reasonable fund would contract with
the postconfirmation Debtor here to manage a penny, let alone life savings and the investments
of many. That is the whole point of why personal services contracts cannot be assumed without
consent.

49.     Moreover, the Court should not permit the Debtor to place form over substance,
especially when the rights of innocent, third party funds and investors are concerned. While
technically the post-confirmation Debtor will still be the same corporate shell, it will have been
gutted of everything that made the Debtor the Debtor. It is in substance and in every real and
practical consideration an assignment of the contracts. Indeed, it appears that the only reason
why the Debtor will even maintain a corporate existence after confirmation is an attempt to
obviate the prohibition on assumption under section 365(c)(1), as all other property of the
Debtor is transferred to the Claimant Trust. On this point, the Plan expressly provides that the
"Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu
of the retention of officers and employees." Plan at p. 32-33. If the intent of this provision is
to provide services required by the Servicing Agreements, then this is a blatant violation of the
Servicing Agreements' and the Advisers Act's anti-assignment and anti-delegation provisions.
In other words, this admission in the Plan may well be precisely the type of assignment, or
subsequent assignment, that would be prohibited by section 365(c)(1) regardless of any

Appx. 07325
01T168

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 251 of 921 PageID 12049
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 25 of 42

discussion between the "hypothetical test" and the "actual test."

50.    Separate and apart from the above discussion, and understand that there is uncertainty in the law as to the interplay between sections 365(f) and 365(c)(1), it is clear that a "personal services contract" falls squarely within the protection of section 365(c)(1).  As the Fifth Circuit has held, a personal services contract is subject to section 365(c)(1): "Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy."  *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).  A personal services contract is one which "involves a matter of personal trust and confidence between the original contracting parties."  *In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996).  "A personal services contract has been defined as a contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability."  *In re Wofford*, 608 B.R. 494, 496 (Bankr. E.D. Tex. 2019) (internal quotation omitted).

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, <u>the debtor-in-possession or trustee</u> is unable to assume or assign the rights of the bankrupt in such contract.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (emphasis added).

51.    The Service Agreements are clearly personal service contracts: the Debtor's position is one of trust and that of a fiduciary, the Debtor's performance requires personal confidence and high skill and knowledge, the agreements provide that the Debtor's duties are not delegable, and no person entrusting another with managing billions of dollars in assets would want the underlying contract to be assumable by a trustee or a liquidating debtor.  Indeed, the Supreme Court has recognized the "personalized character of the services of investment advisors."  *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963).  This Court

APPX 07326
01T169

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 27 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 252 of 921    PageID 12050
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 26 of 42

has characterized financial advisory and brokerage contracts as personal services contracts.  *See*
*In re Consolidated Capital Equities Corp.*, 157 B.R. 280, 283 (Bankr. N.D. Tex. 1993).  Other
courts have held that the Investors Act imposes a trust relationship.  *See e.g. In re Peterson*, 96
B.R. 314, 323 (Bankr. D. Colo. 1988).  The strict fiduciary and anti-assignment provisions of
the Advisor Act and the 1940 Act further confirm Congress' strong view that these contracts
are in the nature of personal service contracts.

52.    Even if the Court is inclined to adopt the "actual test" under section 365(c)(1)
such that an assumption is possible where there is no assignment, and recognizing that section
365(c)(1) is broader in application than to only personal services contracts, the law
overwhelmingly confirms that a personal services contract is not assumable in the first instance.
*See, e.g., In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

53.    The final issue concerning section 365(c)(1) is consent.  Assuming that the CLOs
do not object to the assumption of the Servicing Agreements, the statute requires affirmative
consent to the assumption.  The statute prohibits the assumption if "such party does not consent
to such assumption."  11 U.S.C. § 365(c)(1)(B).  The plain meaning of this language is that
consent is required, as opposed to merely the absence of an objection.  In *Strumpf v. McGee (In
re O'Connor)*, 258 F.3d 392 (5th Cir. 2001), the issue concerned an executory contract that was
neither expressly assumed nor assigned under a Chapter 11 plan.  The Fifth Circuit held that the
contract was not assumable under section 365(c)(1) and concluded that the counterparty "did
not consent" to an assumption.  *See id*. at 402.  If the absence of an objection was all that was
required, then the Fifth Circuit would not have so held.  In fact, the Fifth Circuit expressly
rejected the argument that the "Appellees consented to the assumption by failing to object to
the Plan."  *Id*. at 400.  This is in line with the case law, which requires affirmative, or actual,

Appx. 07227

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 28 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 253 of 921 PageID 12051
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 27 of 42

consent to the assumption.  *See In re Allentown Ambassadors Inc.*, 361 B.R. 422, 448 n. 60 (Bankr. E.D. Pa. 2007).

54.     Finally, there is the issue of the Objectors' standing to make the foregoing arguments.  The Objectors have standing for at least four reasons.  First, as creditors and parties in interest,[13] they have the right to object to the Plan.  11 U.S.C. § 1109(b).  Insofar as it is the Fifth Amended Plan that provides for assumption of the Servicing Agreements, the Objectors may object to said assumption, especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole.  Second, the Objectors have standing and the right to object to confirmation of the Fifth Amended Plan under sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code.  Insofar as the Fifth Amended Plan and the Debtor propose to impermissibly assume the Servicing Agreements in violation of the law, the Objectors may object to such assumption on those bases.  Third, in several of the Servicing Agreements, the Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the Objectors have standing to object to their rights being limited or eliminated.  Likewise, under the 1940 Act, an investment adviser must be approved by a majority of the voting securities, and the Servicing Agreements cannot continue in effect for more than two years without the consent of either the CLOs' boards of directors or a majority of the outstanding voting securities--i.e., the Objectors.  15 U.S.C. § 80a-15(a)(2).  Insofar as the Fifth Amended Plan purports to limit the

---

[13] "The term 'party in interest' is not defined in the Bankruptcy Code." *Khan v. Xenon Health, LLC (In re Xenon Anesthesia of Tex., PLLC)*, 698 Fed. Appx. 793, 794 (5th Cir. 2017) (quoting *In re Megrelis*, No. 13-35704-H3-7, 2014 Bankr. LEXIS 3905, at *2 (Bankr. S.D. Tex. Sept. 12, 2014)).  "It generally 'means anyone who has a legally protected interest that could be affected by the bankruptcy case.'" *Id.*

Appx. 07228

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 254 of 921 PageID 12052
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 28 of 42

Objectors' right to withhold their consent or influence the CLOs' boards of directors, the Objectors have standing to challenge any modification of those rights. Fourth, in several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the Objectors. The Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the Objectors.

55.     The Fifth Amended Plan does not comply with section 1129(a)(1) of the Bankruptcy Code because it violates a fundamental principal of contract assumption under section 365 of the Bankruptcy Code. Contracts must be assumed or rejected; there is no such thing as a partial assumption. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*--the debtor accepts both the obligations and the benefits of the executory contract."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("An executory contract cannot be rejected in part and assumed in part; the debtor must assume both the benefits and the burdens on the contract.").

56.     The Fifth Amended Plan contravenes established law with respect to the proposed treatment of the CLOs and the Debtor's obligations under the portfolio management agreements.

57.     First, the Fifth Amended Plan reveals that the Debtor, while claiming to assume the various Servicing Agreements, also intends to deprive the counterparties to those agreements from exercising their rights to change management.

Appx. 07229

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 30 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 255 of 921   PageID 12053
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 29 of 42

58.     Under the Servicing Agreements at issue, either a majority, or in some cases, a supermajority of owners may initiate a change in management.  See attached Exhibit A.

59.     The Debtor's Plan makes clear, however, that it intends to engage a subagent to perform the management and servicing function and, implicitly to deprive the CLOs as issuers from exercising contractual rights with respect to making a change in management.

60.     Second, the Debtor's duties under the Servicing Agreements, which themselves have been adopted under the Advisers Act, subject to Rule 206(4)-8 thereunder as noted below, are owed to, and provide the rights of, the preference shareholders under the portfolio management agreements.  The Debtor's proposed liquidation of Managed Assets (which it does not own) is contrary to the performance of its contractual and statutory duties under the portfolio management agreements.

61.     The preference shareholders, as the only remaining owners of the Managed Assets of many of the CLOs, contend that the Debtor's (i) sales of  Managed Assets and  (ii) continued management of the Managed Assets, notwithstanding the Debtor's stated intention to wind down and liquidate all assets, violates the provisions of Section 2(b) of the portfolio management agreements.

62.     These violations are detrimental to the counterparties to the assumed contracts because:

      a.  liquidation sales of Managed Assets the Debtor does not own are unlikely to maximize the value of the Managed Assets when compared to the long term investment horizon of the beneficial owners of the Managed Assets;

      b.   liquidation sales of Managed Assets are likely to subtract value when duress sales occur based on the short term horizon and liquidation

Appx. 07239
01113

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 31 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 256 of 921   PageID 12054
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 30 of 42

strategy of the Debtor;

   c.  the Debtor has announced the termination of its personnel, resulting in loss of knowledgeable portfolio managers; and

   d.  any potential consultant engaged by the Debtor in the absence of its terminated personnel will be subservient to the Debtor's short-term objective of liquidation in violation of the assumed contracts and applicable securities law.

63.   Manifestly, where the investors in a pooled vehicle state to the manager both that their objectives and desires differ from those of the portfolio manager, and that the portfolio manager's actions are contrary to the manager's duties to maximize returns for the benefit of the investors established under the agreement, that portfolio manager is not acting reasonably under or in accordance with its agreement. The owners of the Managed Assets, in requisite majority or supermajority,[14] have expressly requested that the Managed Assets not be liquidated as contemplated by the Debtor's business plan. In that context, the Debtor is unreasonably acting contrary to the required contractual objective and therefore statutory obligation to maximize value for the preference shareholders. In implementing the Fifth Amended Plan, the Debtor is likely to violate its duty of reasonableness under Section 2(b) under these circumstances, because the Debtor is not "perform[ing] its duties under [the] Agreement in the manner provided for" in the Agreement.

64.   As the Debtor is an investment management firm familiar with established securities laws, the Fifth Amended Plan's violations of such laws is blatant and should not be permitted.

---

[14] Objectors acknowledge that they do not hold a majority in all of the CLOs, for example, Jasper.

011174

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 257 of 921 PageID 12055
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 31 of 42

65.     Based upon the Fifth Amended Plan's attempt to assume contracts partially, and not fully, the Court should find that the Fifth Amended Plan fails to satisfy section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed

66.     Moreover, as discussed below, with respect to the injunction and release provisions of the Fifth Amended Plan, the Plan purports to release the Debtor from its contractual and statutory obligations with respect to the Servicing Agreements.  As explained above, those agreements require the Debtor to preserve and to maximize the value of the CLOs assets, for the benefit of the CLOs and the holders of beneficial interests in them.  The Advisers Act requires the same.  The Fifth Amended Plan purports to enjoin parties from "taking any actions to interfere with the implementation or consummation of this Plan."  Plan at p. 50.  This is an unprecedented, overbroad injunction that does not comport with fundamental due process, as what "interference," "implementation," or "consummation" mean is not specified.  Are the Objectors to be enjoined from enforcing future rights under the Servicing Agreements even if the Debtor commits future malfeasance?

67.     The Fifth Amended Plan likewise enjoins all creditors and other parties, and their "Related Persons" (who may not even have notice of the injunction) from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor."  Plan at p. 51.  Read literally, this means that the Objectors and the CLOs will not be able to assert any claims, or seek any relief, against the Debtor or Reorganized Debtor for any present or future actionable wrongs under the Servicing Agreements and the Advisers Act.  Again, so broad an injunction, not limited in time, is unprecedented, legally impermissible, violates due

Appx 07232
011173

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 33 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 258 of 921    PageID 12056
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 32 of 42

process, and seeks to strip parties of their contractual and Advisers Act rights—even as the Debtor purports to assume the Servicing Agreements which, as is black letter law, means that the Debtor is requiring to provide full future performance (and suffer potential future obligations and liabilities).

68.    The balance of the Plan injunction is equally fatally defective. If there are future obligations and defaults, and even if there are present ones, under the Servicing Agreements and applicable law, affected parties have to have the right to seek legal redress, enforce awards and injunctions, and assert setoff rights. On this last basis in particular, if there are setoff rights under the CLOs or other agreements, those rights cannot be permanently enjoined. And, the same injunction applies to any "successors" of the Debtor and its property interests, meaning that, if the Debtor assigns or delegates its duties under the Servicing Agreements, some future and unknown party may claim protections under these injunctions without any protection to the Objectors or the CLOs.

69.    The Plan's channeling injunction is similarly improper and defective, at least with respect to post-confirmation actions. *See* Plan at p. 51. That injunction requires *anyone* with any complaint against a "Protected Party" that is "related to the Chapter 11 Case," or to the "wind down of the business of the Debtor or the Reorganized Debtor," to first seek relief from this Court, including by proving that a colourable claim exists and obtaining leave. The same section then purports to grant "sole jurisdiction" to this Court to "adjudicate" any such dispute. Read literally, this means that the Objectors and the CLOs will have to first seek leave from this Court before enforcing any right under the Servicing Agreements and the Advisers Act, which is unprecedented and is incompatible with respect to the assumption of those agreements for post-assumption claims, and then this Court would adjudicate the claims. This

Appx 07233
011176

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 34 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 259 of 921    PageID 12057
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 33 of 42

Court will have no jurisdiction to adjudicate such post-confirmation claims, however, and the channeling injunction is am impermissible attempt to confer such jurisdiction where none exists.

70.    All of the foregoing affects, limits, and eviscerates future rights under the assumed Servicing Agreements—something that defeats the whole purpose of an assumption of an executory contract and that contradicts the established law that an executory contract, and its future obligations, must be assumed *in toto*.

### B.    *Other objections to the Fifth Amended Plan*

The Debtor's Fifth Amended Plan is objectionable for other reasons as well.  Those Objections are discussed briefly below.  The Funds and Advisors reserve the right to object upon any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. The Funds and Advisors also reserve the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### *Section 1129(a)(5)*

71.    In order to be confirmed, the Debtor must satisfy the following non-waiveable requirements:

> (i) the proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

11 U.S.C. § 1129(a)(5).

72.    This is of particular importance here, where the Debtor proposes to manage billions of dollars of other entities' assets, and ties in as well to section 362(b)'s requirement of

33

011177

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 260 of 921 PageID 12058
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 34 of 42

demonstrating adequate assurance of future performance. Yet, the Debtor fails completely with

respect to even an attempt to satisfy these requirements.

73. In this respect, the sole disclosure in the Plan and Disclosure Statement with

respect to who will manage these billions of dollars in assets is as follows:

> Subject to and consistent with the terms of the Reorganized Limited Partnership
> Agreement, the Reorganized Debtor shall be managed by its general partner,
> New GP LLC. The initial officers and employees of the Reorganized Debtor
> shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its
> discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of
> officers and employees.

Plan at p. 32-33.

74. Neither the identity nor the compensation of the people who will control and

manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer. While

Mr. Seery is disclosed as the Claimant Trustee who will be responsible for "winding down the

Reorganized Debtor's business operations," this is insufficient. All the more so because,

without additional disclosures and facts, not only can adequate assurance of future performance

not be proven, but the Debtor cannot prove that the employment and compensation of these

unnamed officers and managers of the Reorganized Debtor is "is consistent with the interests

of creditors and equity security holders and with public policy." Public policy in particular,

given the dictates of the Advisers Act, is implicated.

Accordingly, the Plan is fatally defective with respect to section 1129(a)(5) and cannot be

confirmed on that basis alone.

### *The Fifth Amended Plan is not feasible*

75. Section 1129(a)(11) requires that confirmation of a plan not be likely to be

followed by liquidation or the need for further reorganization. "Establishing a likelihood that a

plan itself will be successful is a question of feasibility." *In re Dernick*, Case No. 18-32417,

Appx. 07235
011178

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 261 of 921 PageID 12059
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 35 of 42

2020 WL 6833833, at *17 (Bankr. S.D. Tex. Nov. 20, 2020). Feasibility contemplates whether the plan is workable and offers a reasonable assurance of success. *Id.*; *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007). "An obvious illegality . . . exposes the plan on feasibility grounds." *In re Food City*, 110 B.R. at 813 n. 12; *see also In re McGinnis*, 453 B.R. at 773 (chapter 13 plan premised on illegal activity could not be confirmed); *In re Frascella*, 360 B.R. at 445, 456 (citing *Food City*, 110 B.R. at 812 n. 10) (debtor failed to establish plan was feasible where it rested on questionable legal basis).

76.     As discussed above, the proposed treatment with respect to the portfolio management agreements and the CLOs contravenes section 365 of the Bankruptcy Code and the Adviser Act. This illegality hampers the feasibility of the Fifth Amended Plan, and accordingly, the Court should find that it is not feasible and deny confirmation.

### ***The Debtor's proposed assumption of the Servicing Agreements is improper under section 365 because there is no adequate assurance of future performance***

77.     Under section 365(b) of the Bankruptcy Code, an executory contract may only be assumed if the Debtor "provides adequate assurance of future performance under such contract[.]" 11 U.S.C. § 365(b)(1)(C).

78.     Although the Fifth Amended Plan provides for the assumption of the Servicing Agreements with many of the CLOs, it does not offer any assurance with respect to the Debtor's ability to perform under such agreements. Indeed, given the Debtor's plan to wind down and liquidate its remaining assets, and in light of the contractual and statutory breaches discussed above, the Debtor cannot possibly provide such assurance. Furthermore, it is uncertain whether sufficient employees will be retained by the Debtor to fulfil its obligations under the portfolio management agreements, even its most significant duties are delegated to a Sub-Advisor. Accordingly, assumption is improper and must be disallowed under section 365(b).

Appx. 07236
011179

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 262 of 921 PageID 12060
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 36 of 42

79.     Equally important, the Debtor's failure to offer or provide adequate assurance is intensified because the purported assumption is, in reality, a *sub rosa* assumption *and assignment* to an as yet unnamed third party.  This unidentified third party has also not offered adequate assurance of future performance as required in the context of such assignments.

### *The Release and Exculpation Provisions of the Fifth Amended Plan are overly broad and extend beyond the Effective Date*

80.     In the Fifth Circuit, permanent injunctions against nondebtors are not permissible.  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995).  In fact, and quite to the contrary, the case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions."  *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009).  Such permanent injunctions would "improperly insulate nondebtors in violation of section 524(e)," and "without any countervailing justification of debtor protection."  *Id.* at 760 (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990)); *see also In re Pac. Lumber*, 584 F.2d at 252 (noting that costs that the released parties might incur defending against suits are unlikely to swamp such parties or the reorganization).

81.     Indeed, courts within this District have found that injunctions and release provisions substantively identical to that proposed in Fifth Amended Plan, and which purport to release causes of action against non-debtor third parties, violate Fifth Circuit precedent and are impermissible.  *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018) (finding that bankruptcy court erred by approving injunction that would have effectively discharged non-debtor third parties); *In re Pac. Lumber*, 584 F.3d at 251-53 (striking release provision purporting to release non-

Appx. 07337
071180

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 263 of 921 PageID 12061
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 37 of 42

debtor third parties from liability relating to the proposal, implementation, and administration of the plan).

82. The injunction contained in Article XI.F of the Fifth Amended Plan is almost identical to that struck down in *In re Thru*. Like the injunction provision in *In re Thru*, the Debtor's proposed injunction would bar the Debtor's creditors "from pursuing causes of action against a number of non-debtor third parties, if those causes of action relate to the creditors' claims against the debtor." 2018 WL 5113124, at *21. The Fifth Amended Plan purports to release creditors' claims against not only the Debtor, but also the Independent Directors. Dkt. No. 1472 at 56-57. Not only that, but the Fifth Amended Plan purports to release creditors' claims stemming from the bankruptcy case, as well as the negotiation, administration and implementation of the Plan, as against many of the specific third parties that the courts in this Circuit have found to be impermissible, including, but not limited to, employees, officers and directors, and professionals retained by the Debtor, among others. *Id.*; *In re Thru*, 2018 WL 5113124, at *21 (concluding it was "clearly erroneous" for the bankruptcy court to approve an injunction covering causes of action against such parties); *In re Pac. Lumber*, 584 F.3d at 252-53.

83. Furthermore, the exculpation provision contained in Article XI.C of the Fifth Amended Plan is incompatible with Fifth Circuit precedent, as explained by the court in *In re Thru*. The court in *In re Thru* found that it was clear error for the bankruptcy court to approve an exculpation provision that exculpated non-debtor third parties, including the debtor's employees, officers, directors, advisors, affiliates and professionals, from liability in connection with formulating, implementing, and consummating the plan of reorganization. 2018 WL 5113124, at *22. The exculpation provision in the Fifth Amended Plan provides the "same

Appx. 07338
011181

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 39 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 264 of 921    PageID 12062
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 38 of 42

insulation" as the impermissible provision in the *In re Thru* plan, and as such, it cannot be approved. *See also In re Pac. Lumber*, 584 F.3d at 252 ("We see little equitable [sic] about protecting the released non-debtors from negligence suits arising out of the reorganization.").

84.    In sum, the Fifth Amended Plan impermissibly seeks to exculpate certain non-debtor third parties from a broad array of claims relating to such entities' pre- and post-petition conduct.  The Funds and Advisors submit there is no authority that would permit such broad exculpatory and/or injunctive language in favor of third parties.

### *The Fifth Amended Plan appears to eliminate the right of setoff*

85.    The Funds and Advisors object to the extent that the Plan purports to divest them of their rights of setoff against the Debtor.

### *The Fifth Amended Plan violates section 365(d)(2) by impermissibly allowing the Debtor to assume or reject executory contracts and unexpired leases after confirmation*

86.    Section 365(d)(2) of the Bankruptcy Code provides that, in a case under chapter 11, the debtor may assume or reject an executory contract or unexpired lease "at any time *before confirmation of a plan* . . . ."  11 U.S.C. § 365(d)(2) (emphasis added).

87.    Notwithstanding this clear language, the Fifth Amended Plan authorizes the Debtor to amend the Plan Supplement by adding or removing a contract or lease from the list of contracts to be assumed, or assign an Executory Contract or Unexpired Lease, at any time up until the Effective Date.  Dkt. No. 1472 at 43.  Further, the Disclosure Statement indicates that the Debtor is still evaluating whether to assume and assign the Shared Services Agreements. This is contrary to the explicit language of the Bankruptcy Code.

88.    Accordingly, the Advisors object to the Fifth Amended Plan to the extent that it purports to reserve the Debtor's right and ability to assume or assume and assign the Shared

Appx. 07339
011182

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 265 of 921 PageID 12063
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 39 of 42

Services Agreements or the Payroll Reimbursement Agreements post-confirmation. Furthermore, the Funds object to the Fifth Amended Plan to the extent it purports to reserve the Debtor's right and ability to alter the proposed treatment of the Servicing Agreements.

### *The Debtor is not entitled to a discharge*

89.     Although section 1141(d) of the Bankruptcy Code discharges a debtor from most pre-confirmation debt, it expressly <u>does not</u> discharge a debtor if:

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;
(B) the debtor does not engage in business after consummation of the plan; and
(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

90.     Here, the Plan provides for liquidation of all of the Debtor's property over a period of time. Although the Debtor may technically continue business for a brief period of time, its ultimate goal is liquidation. Further, the Debtor would be denied a discharge under section 727(a)(1) because it is not an individual. Accordingly, the Court should find that the Debtor is not entitled to a discharge under section 1141 of the Bankruptcy Code.

### *The Fifth Amended Plan may violate the absolute priority rule*

91.     Section 1129(b)(2)(B)(ii) provides that the holder of any claim or interest that is junior to the claims of unsecured creditors may not retain any property unless general unsecured creditors are paid in full. 11 U.S.C. § 1129(b)(2)(B)(ii). The "absolute priority rule is a bedrock principle of chapter 11 practice." *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013). "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009) (comparing subordination

Appx. 07349
01183

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 41 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 266 of 921    PageID 12064
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 40 of 42

under section 510 to absolute priority rule) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002)).

92.    In the event the unsecured creditor classes (Class 7 and 8) vote against the Fifth Amended Plan, the absolute priority rule prohibits the retention of equity in the Reorganized Debtor by existing equity holders in the absence of a new investment and opportunity for competitive bidding for that investment opportunity.

## CONCLUSION

93.    For the reasons set forth above, the Funds and Advisors respectfully request that the Court deny confirmation of the Fifth Amended Plan and grant such other and further relief as the Court deems just and proper.

Dated:    January 5, 2020

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email:      drukavina@munsch.com

    - and -

    K&L GATES LLP

    Artoush Varshosaz (TX Bar No. 24066234)
    1717 Main Street, Suite 2800
    Dallas, TX 75201
    Tel: (214) 939-5659
    artoush.varshosaz@klgates.com

    Stephen G. Topetzes (*pro hac vice*)
    1601 K Street, NW
    Washington, DC 20006-1600

APPX 07341
0TT184

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 267 of 921    PageID 12065
Case 19-34054-sgj11 Doc 1670 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 41 of 42

Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management
Fund Advisors, L.P., NexPoint Advisors,
L.P., Highland Funds I and its series
Highland Healthcare Opportunities Fund,
Highland/iBoxx Senior Loan ETF,
Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund,
Highland Funds II and its series Highland
Small-Cap Equity Fund, Highland Socially
Responsible Equity Fund, Highland Fixed
Income Fund, and Highland Total Return
Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland
Income Fund, Highland Global Allocation
Fund, and NexPoint Real Estate Strategies
Fund, and NexPoint Latin America
Opportunities Fund*

Appx. 07342
011185

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 268 of 921 PageID 12066

Case 19-34054-sgj11 Doc 1670 Filed 01/05/21 Entered 01/05/21 16:42:55 Page 42 of 42

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 5th day of January, 2021, and in addition to electronic service on parties entitled to notice thereon through the Court's ECF system, the undersigned caused the foregoing document to be served, by U.S. first class mail, postage prepaid, on the following:

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Hayward & Associates PLLC
Attn: Melissa S. Hayward and Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Sidley Austin LLP
Attn: Matthew A. Clemente and Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603

Office of the United States Trustee
U.S. Department of Justice, Region 6: Northern District of Texas
1100 Commerce Street, Room 976
Dallas, TX 75242

and, on the same day, by e-mail, on the following:

jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
mclemente@sidley.com
Alyssa.russell@sidley.com
Lisa.L.Lambert@usdoj.gov

*/s/ Davor Rukavina*
Davor Rukavina

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 44 of 51

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 1 of 8

**Highland Capital Management Fund Advisors, L.P.**

**CLOs Review**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Aberdeen Loan Funding, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Shares Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Brentwood CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

1



Exhibit A

APPX 07844

0TT187

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 2 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|-----|-------------------|--------------------------------|----------------|----------------------------------------|
| **Eastland CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Gleneagles CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement.  PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders.  PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).  The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).  For cause removal may be effected in connection with the Portfolio Manager | 66 2/3% of Preference Shares Holders. PMA § 12(c). |

308393059.4

APPX 07345

011188

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Grayson CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Greenbriar CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture.  SA § 9.  The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
51

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 4 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | | |
| **Jasper CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(a). The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 15% IRR since the Closing Date). PMA § 12(a). For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | 66 2/3% of Preference Shares Holders. PMA § 12(a). |
| **Liberty CLO, Ltd.** | Requisite percentage of Class E Certificates Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Class E | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Class E Certificates holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Class E Certificates Holders (excluding Class E Certificates held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c). | 66 2/3% of Class E Certificates Holders. PMA § 12(c). |

4

APPX 7365
OTT190

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Certificates Paying Agency Agreement. PMA § 9. | | The Portfolio Manager may avoid removal by purchasing all Class E Certificates voting for removal (and Class E Certificates not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).  For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | |
| **Red River CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

Appx. 07348

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Rockwall CDO Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |
| **Rockwall CDO II Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |

6

APPX 7349
0ʎ1192

Case 19-34054-sgj11 Doc 3445-62 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 50 of 51

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21   Entered 01/05/21 16:42:55   Page 7 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | | |
| **Southfork CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 63% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date). PMA § 12(c).<br><br>For cause removal may be effected upon the Portfolio Manager authorizing or filing a voluntary petition in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | 63% of Preference Shares Holders. PMA § 12(c). |
| **Stratford CLO Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Servicer | 66 2/3% of Preference Shares Holders. SA § 14. |

7

308393059.4

011193

Case 19-34054-sgj11 Doc 1670-1 Filed 01/05/21    Entered 01/05/21 16:42:55    Page 8 of 8

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Servicer, as provided in the Indenture.  SA § 9. The Indenture references a Preference Shares Paying Agency Agreement.  Indenture § 1.1 (Definitions-- Preference Share Documents). | | and affiliates, or for which they have discretionary voting authority, but HFP may vote Preference Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | |
| **Valhalla CLO, Ltd.** | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | |
| **Westchester CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement.  SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice.  SA § 14.  For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral.  SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

APPX 7354

# EXHIBIT 63

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 7
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 278 of 921 PageID 12076
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 1 of 6

United States Department of Justice
Office of the United States Trustee
1100 Commerce St. Room 976
Dallas, Texas 75242
(202) 834-4233

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No. 19-34054** |
| | § | |
| | § | |
| | § | |
| **Debtors-in-Possession.** | § | |

---

### United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization (Docket Entry No. 1472)

---

**To the Honorable Stacey J. Jernigan,**
**United States Bankruptcy Judge:**

The United States Trustee for Region 6 files this Limited Objection (the "**Objection**") to the Debtor's Fifth Amended Plan of Reorganization (the "Plan" -- docket entry [D.E.] 1472, filed 11/24/2020). In support of the relief requested, the United States Trustee respectfully submits as follows:

#### <u>Summary</u>

The United States Trustee objects to confirmation of the Plan because the releases exceed the scope permitted by Fifth Circuit precedent. The United States Trustee has resolved other objections with the Debtors, and these resolutions will be announced and incorporated in the confirmation order.

**United States Trustee's Confirmation Objection**



Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 279 of 921    PageID 12077
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 2 of 6

## Facts: Relevant Plan Provisions

**Salient Definitions:**

1.    The Plan defines exculpated and released parties as follows:

a.    "Exculpated Parties" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

b.    "Released Parties" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

Plan, D.E. 1472; definitions 61, 111, p. 16.

**Releasing Third Parties:**

2.    The Plan releases third parties who would share liability with the Debtor:

Appx. 07354

011197

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 280 of 921    PageID 12078
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 3 of 6

"[E]ach Released Party is deemed to be, hereby conclusively, absolutely, unconditionally,

irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on

behalf of themselves and their respective successors, assigns, and representatives, including,

but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of

Action, including any derivative claims, asserted on behalf of the Debtor, whether known or

unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law,

equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally

entitled to assert in their own right (whether individually or collectively) or on behalf of the

holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, D.E. 1472, p. 48.

3.      The releases for Released Parties exclude "any Causes of Action arising from

willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released

Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction."

Plan, D.E. 1472, pp. 48-49.

4.      The Plan releases do not contemplate any type of channeling injunction.

**Exculpating Third Parties:**

5.      The exculpation provisions broadly cover third parties:

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted

by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is

hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt,

right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the

Petition Date in connection with or arising out of (i) the filing and administration of the

Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or

the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or

consummation of the Plan (including the Plan Supplement) or any related agreements,

Appx. 07355
011198

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 281 of 921    PageID 12079
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 4 of 6

instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); provided, however, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

## **Argument and Authority**

**Plan Contains Non-Consensual Third-Party Releases and Exculpation in Contravention of Fifth Circuit Precedent.**

6.      The Plan contains non-consensual third-party releases that should be stricken under Fifth Circuit precedent.

7.      The Plan's exculpation provisions are similarly overbroad.

8.      While the Plan specifies that the releases and exculpation are allowed to "the maximum extent allowed by law," the law in the Fifth Circuit is that they are not allowed.

9.      Like the Highland Capital Plan, the *Pacific Lumber* plan contained exculpation and release provisions that carved out willful or intentional conduct. *Scotia Pacific Co., LLC v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.),* 584 F.3d 229

**United States Trustee's Confirmation Objection**                         **Page 4 of 6**

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 7
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 282 of 921 PageID 12080
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21 Entered 01/05/21 16:46:20 Page 5 of 6

(5th Cir. 2009). Reviewing four prior Fifth Circuit bankruptcy cases, the *Pacific Lumber* court concluded these cases "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252 (citations omitted). The Fifth Circuit struck these non-consensual provisions as to parties who were co-liable with the debtor but noted that committee members and committee professionals received qualified immunity. *Id.*

10.     The *Pacific Lumber* court disallowed the exculpation and releases of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt. They are not guarantors or sureties, nor are they insurers. Instead, the essential function of the exculpation clause . . . is to absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy. The fresh start § 524(e) provides to debtors is not intended to serve this purpose." *Id.* at 252-53.

11.     Bankruptcy Courts in the Northern District of Texas have resolved objections to exculpation or release provisions by replacing such provisions with channeling injunctions. *See* Memorandum Opinion and Order, Docket Entry No. 4614, *In re Pilgrim's Pride Corporation, et al.*, Case No. 08-45664-DML-11 (January 14, 2010); Fourth Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors (Section 10.8), Docket Entry No. 1701, *In re CHC Group, Ltd.*, Case No. 16-31854-BJH-11, United States Bankruptcy Court for the Northern District of Texas, Dallas Division (February 16, 2017).

12.     The Plan release and exculpation provisions should be limited. Unless they exclude the Debtors' professionals, the Debtors' officers and directors, and others not protected by quasi-immunity, confirmation should be denied.

Appx. 07357
0TT200

Case 19-34054-sgj11 Doc 3445-63 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 283 of 921    PageID 12081
Case 19-34054-sgj11 Doc 1671 Filed 01/05/21    Entered 01/05/21 16:46:20    Page 6 of 6

## Conclusion

Wherefore, the United States Trustee requests that the Court deny approval of the Plan and grant to the United States Trustee such other and further relief as is just and proper.

DATED: January 5, 2021                Respectfully submitted,

                                      WILLIAM T. NEARY
                                      UNITED STATES TRUSTEE

                                      */s/ Lisa L. Lambert*
                                      Lisa L. Lambert
                                      Asst. U.S. Trustee, TX 11844250
                                      Office of the United States Trustee
                                      1100 Commerce Street, Room 976
                                      Dallas, Texas  75242
                                      (202) 834-4233

## Certificate of Service

There undersigned hereby certifies that on January 5, 2020, a copy of the foregoing pleading was served via ECF to parties requesting notice via ECF.

                                      */s/  Lisa L. Lambert*
                                      Lisa L. Lambert

App. 07358
011201

# EXHIBIT 64

Appx 97359
011202

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 285 of 921 PageID 12083
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 1 of 7

Docket #1673 Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC
F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

## NEXPOINT REAL ESTATE PARTNERS LLC'S OBJECTION
## TO DEBTOR'S FIFTH AMENDED PLAN OF REORGANIZATION

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.    On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

---

**NREP'S OBJECTION TO DEBTOR'S FIFTH AMENDED PLAN**



1934054210105000000000020

Appx. 97209

0 1 1 2 0 3

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 286 of 921    PageID 12084
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "Fifth Amended Plan").

2.      The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "Confirmation Hearing") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.      The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.      NREP filed a proof of claim in this case. *See* Claim Number 146. The Debtor has objected to NREP's claim. If NREP's claim is allowed, NREP possesses a claim in Class 7 or Class 8 under the Fifth Amended Plan.

5.      The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NREP respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

6.      A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its

APPX 07361

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 287 of 921    PageID 12085
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 3 of 7

plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160 (5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty to determine whether a plan has met all the requirements for confirmation, whether specifically raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253 (5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.    The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

7.    The Fifth Amended Plan provides for a class of subordinated claims, which claims may be subordinated to the general unsecured claims or both the general unsecured claims and convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor, the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

8.    In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121 (5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the harm which the creditors have suffered as a result of the inequitable conduct. *Id.*

9.    However, section 510 of the Bankruptcy Code only allows equitable subordination of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally

Appx. 07302
011205

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 288 of 921 PageID 12086
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 4 of 7

requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor must at least satisfy its burden of demonstrating such claim should be subordinated under equitable subordination principles. Fed. R. Bankr. P. 7001(8).

10.     Here, the Fifth Amended Plan does not provide for the subordination of any specific claims but, instead, provides for a procedure to subordinate claims that fails to comply with the statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth Amended Plan provides no notice of the potential targets of such subordination, the basis upon which such subordination of claims may be justified, or any evidence supporting equitable subordination principles. Nor does the Fifth Amended Plan provide any means for due process, adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**B.      The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

11.     Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides that:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim…. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

Appx. 07383
0'1'1'206

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 289 of 921 PageID 12087
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21 Entered 01/05/21 16:48:48 Page 5 of 7

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise providing notice to the Holder of such Allowed Claim and without providing any support for or evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution Agent.

12. However, setoff is only available in bankruptcy when the opposing obligations arise on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*, 973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right should be preserved in bankruptcy under section 553. *Id.*

13. Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 290 of 921    PageID 12088
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 6 of 7

comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**C.      The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

14.      In addition, the Fifth Amended Plan provides for broad releases and permanent injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would "improperly insulate nondebtors in violation of section 524(e)…without any countervailing justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from a broad array of claims relating to such entities' post-petition conduct and would bar creditors from pursing claims against various non-debtor parties if such claims relate to their claims against the Debtor. In addition, the language purports to release creditors' claims arising not only from the bankruptcy case but also the administration and implementation of the Fifth Amended Plan and the period of time covered by the release and exculpation provisions extend beyond the effective date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release, and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the Bankruptcy Code or applicable case law and the Court should deny confirmation.

Appx. 07285
011208

Case 19-34054-sgj11 Doc 3445-64 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 291 of 921    PageID 12089
Case 19-34054-sgj11 Doc 1673 Filed 01/05/21    Entered 01/05/21 16:48:48    Page 7 of 7

**D.    Reservation of Rights**

15.    NREP reserves the right to amend or supplement this Objection to add any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. In addition, NREP reserves the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### III.  CONCLUSION

For these reasons, the NREP respectfully requests that the Court deny confirmation of the Fifth Amended Plan and grant NREP such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

### CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

Appx. 07305
011209

# EXHIBIT 65

Appx 07207

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 293 of 921    PageID 12091
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 1 of 12

Docket #1675  Date Filed: 01/05/2021

Joseph M. Coleman (State Bar No. 04566100)
John J. Kane (State Bar No. 24066794)
**KANE RUSSELL COLEMAN LOGAN PC**
Bank of America Plaza
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-SGJ |
| | § | |
| Debtor. | § | Chapter 11 |
| | § | |

---

## CLO HOLDCO, LTD.'S JOINDER TO OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. [DKT NO 1670] AND SUPPLEMENTAL OBJECTIONS TO PLAN CONFIRMATION

---

**TO THE HONORABLE STACEY G. JERNIGAN, U.S. BANKRUPTCY JUDGE:**

CLO Holdco, Ltd. ("**CLO Holdco**") respectfully files this *Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1670] and Supplemental Objection to Plan Confirmation* (the "**CLO Holdco Objection**") which seeks entry of an order from this Court denying confirmation of the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "**Plan**") [Dkt. No. 1472] for the reasons stated in that certain *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* filed by the entities defined therein as the "Funds and Advisors" on January 5, 2020 [Dkt. No. 1670] (the

---

**CLO HOLDCO, LTD.'S JOINDER AND OBJECTION TO PLAN CONFIRMATI**

1934054210105000000000022

Appx. 07268

011211

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 294 of 921 PageID 12092
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 2 of 12

"**F&A Objection**"), and the additional reasons set forth below. In support of the CLO Holdco Objection, CLO Holdco respectfully states as follows:

<div align="center">

I.
**PRELIMINARY STATEMENT**

</div>

1.      CLO Holdco owns interests in certain funds managed by the Debtor pursuant to portfolio management and servicing agreements, including the following funds ("**Managed CLOs**"): Aberdeen Loan Funding, Ltd.; Acis CLO 2017-7; Brentwood CLO, Ltd.; Grayson CLO, Ltd.; Liberty CLO, Ltd.; Red River CLO, Ltd.; Rockwall CDO, Ltd.; Loan Funding II, LLC (Valhalla); and Westchester CLO, Ltd. As evidenced by the Debtor's *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor pursuant to the Fifth Amended Plan, (II) Cure Amounts, if any, and (III) Related Procedures in Connection Therewith* (the "**Plan Assumption Notice**") [Dkt. No. 1648], the Debtor intends to assume management contracts for substantially all of the aforementioned Managed CLOs (the "**CLO Management Contracts**").

2.      In many instances, CLO Holdco, the Funds, and Advisors, collectively own or manage a majority or even super-majority of the remaining beneficial interests in the Managed CLOs. Accordingly, CLO Holdco and the Funds and Advisors have a vested interest in the successful management of the Managed CLOs on a going-forward basis. That interest is real, and many millions of dollars are at stake. Astonishingly, though the Debtor intends to assume the CLO Management Contracts, the Debtor discloses in its Plan and *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "**Disclosure Statement**") [Dkt. No. 1473] that it may terminate its investment management employees by the end of January 2021 and that the Reorganized Debtor may employ a Sub-Servicer to perform the Debtor's current portfolio management duties and obligations.

3.      Moreover, the Debtor intends to wind down all "Managed Funds" under the Plan. The term Managed Funds is defined in the Plan to include "any other investment vehicle managed

Appx. 07209
011212

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 295 of 921 PageID 12093
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 3 of 12

by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan." PLAN, Art. I.B.83. The CLOs subject to assumed CLO Management Contracts are therefore "Managed Funds" under the Plan, and will be wound down by the Reorganized Debtor regardless of the will of the financial interest holders in those Managed Funds. The Plan lacks flexibility for the appropriate management of Managed Funds, enjoins fund interest owners like CLO Holdco from challenging the appropriateness of a fund wind down, and effectively strips fund interest owners of their contractual rights to seek alternative management for the funds under the agreements assumed by the Debtor.

4.      In its most distilled essence, the Plan would allow the Debtor to assume only select Debtor-favorable provisions of the CLO Management Contracts, while effectively discarding potentially adverse governance provisions. The Debtor's proposed assumption of the CLO Management Contracts under the Plan is so illusory that it would empower the Debtor—or a designated Sub-Servicer—to liquidate funds in which the Debtor has no interest for the purported benefit of the Debtor's creditors: (i) in direct contravention of the expressed interests of a majority of the beneficial owners of those funds; and (ii) with no recourse despite express provisions of the CLO Management Contracts that entitle interest holders to replace the Debtor as manager.

5.      In conjunction with the Debtor's proposed "cherry picking" of provisions of assumed contracts, the Plan's excessively broad injunction, exculpation, and release provisions render it unconfirmable under applicable United States Supreme Court and Fifth Circuit precedent.

## II.
## BACKGROUND

6.      CLO Holdco is a Cayman limited partnership that owns interests in various funds and serves as part of a greater philanthropic endowment generally referred to as the DAF, or Donor Advised Fund. While often painted as a pernicious bad actor before this Court, CLO Holdco facilitates the annual donation of millions of dollars to charitable organizations, and has paid tens of

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 296 of 921 PageID 12094
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 4 of 12

millions of dollars to the Debtor in recent years pursuant to a Second Amended and Restated Investment Advisory Agreement, dated January 1, 2017, and a Second Amended and Restated Service Agreement dated January 1, 2017, both of which the Debtor is terminating in Q1, 2021.

7.      While CLO Holdco willingly complied with a Debtor request that it amend its claim from more than $11 million to $0 following this Court's approval of the Debtor's settlement with the Redeemer Committee [Dkt. No. 1273], it still has interests affected by the Debtor's proposed Plan.  As described above, CLO Holdco owns interests in certain collateralized loan obligations referred to herein as the Managed CLOs.  The Managed CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations.  The Managed CLOs also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject Managed CLO's pool of debt obligations.  The notes issued by the Managed CLOs are paid according to a contractual waterfall, and after the notes are paid in full all remaining value in the Managed CLOs flows to holders of the preferred shares.

8.      Most of the Managed CLOs have paid off all the tranches of notes or all but the last tranche.  Accordingly, most of the economic value remaining in the Managed CLOs, and all of the upside, belongs to the holders of the preferred shares, like CLO Holdco.  As detailed in the F&A Objection, CLO Holdco, "the registered investment companies, [and] business development company…represent a majority of the investors in the CLOs as follows: … Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%, Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%." F&A OBJECTION, ¶ 15.

9.      As more fully set forth in the F&A Objection, each of the aforementioned CLOs entered into contracts pursuant to which the Debtor would serve as the fund's portfolio manager. While the contracts vary to some degree, each imposes a duty on the Debtor to maximize the value

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 297 of 921 PageID 12095
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 5 of 12

of the CLO's assets for the benefit of the CLO's noteholders and preference shareholders. Each also allows a majority or supermajority of the CLO's noteholders to replace the Debtor as portfolio manager either for cause or, in some instances, without cause.

10. Correspondence with Debtor's counsel, in addition to language found in the Plan and Disclosure Statement, makes it abundantly clear that the Debtor intends to assume the CLO Management Contracts, but preclude CLO Holdco and other similarly situated preference shareholders from exercising their contractual rights to remove the Debtor as portfolio manager under those agreements either upon a finding of cause, where required, or requisite majority or super majority vote where no cause is required.

## JOINDER

11. CLO Holdco hereby joins the objections to plan confirmation set forth in the F&A Objection.

## SUPPLEMENTAL OBJECTIONS

### A. PARTIAL ASSUMPTION – THE PLAN VIOLATES CONTROLLING SUPREME COURT PRECEDENT

12. As detailed above, the CLO Management Contracts provide preference shareholders an opportunity to replace the CLO manager, in this case the Debtor, for cause and, in some instances, even without cause upon satisfaction of a requisite vote. The Debtor's Plan would allow the Debtor to assume the CLO Management Contracts, while precluding preference shareholders from exercising their contractual rights under the assumed agreements. The result is de facto "cherry picking" in which the Debtor assumes only favorable provisions of the CLO Management Contracts to the detriment of contract parties. Such "cherry picking" violates controlling Supreme Court and Fifth Circuit precedent, and precludes confirmation of the Plan.

### (i) The Plan Deprives Preference Shareholders Their Remedies Under Assumed CLO Management Contracts

Appx 07272

011215

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 298 of 921 PageID 12096
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 6 of 12

13.     In its Disclosure Statement, the Debtor explains that under the Plan "The Reorganized Debtor will manage the <u>wind down</u> of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets."  DISCLOSURE STATEMENT, Art. I.C.1 (emphasis added).  The Debtor further states that "The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds."  *Id.* at Art. III.F.1. Rather, "[t]he Reorganized Debtor may, in its discretion…utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees" post confirmation to effectuate the wind down of the Managed Funds.  *Id.* at Art. III.F.3.d.

14.     In other words, while the Plan guarantees that the Managed Funds, including the Managed CLOs, will be wound down, the Reorganized Debtor may terminate its employee-advisors and delegate the wind down to an unidentified third party sub-servicer.  Should the Reorganized Debtor and Sub-Servicer's conduct constitute cause for removal under the assumed CLO Management Contracts, the CLO preference shareholders must be entitled to effectuate their contractual rights and remedies.  Alternatively, where the CLO Management Contracts do not require cause for removal of the portfolio manager, the preference shareholders must remain entitled to effectuate their contractual rights and remedies.  For instance if the preference shareholders determine that an expedited liquidation is not in their best interests and desire a longer investment horizon, or if they have reason to believe that the Reorganized Debtor or Sub-Servicer is negligently managing their investments, they should be able to seek the replacement of the portfolio manager.  It is important to remember, after all, that it is the preference shareholders' money that is at stake, and that the portfolio manager operates for the benefit of the investors, not vice versa.

15.     Unfortunately, the injunction found in Article IX.F. of the Plan precludes parties in interest—like preference shareholders of CLO Managed Funds—from "taking any actions to

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 299 of 921    PageID 12097
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 7 of 12

interfere with the implementation or consummation of the Plan." Under this egregious injunction, preference shareholders appear barred from "taking any actions" that would in any way interfere with the Reorganized Debtor's efforts to "wind down…the Managed Funds." *See* PLAN, Art. IX.F.

16.    By assuming the CLO Management Contracts through the Plan, defining them as Managed Funds, and subjecting parties-in-interest under the agreements to the Plan's staggeringly expansive injunction, the Debtor has effectively carved out the preference shareholders' rights and remedies under the CLO Management Contracts in contravention of section 365 of the Bankruptcy Code. The preference shareholders are left without recourse—despite their contractual rights— even if the Reorganized Debtor's winding up of the Managed Funds is negligent, a breach of its duties under the CLO Management Contracts, or cause for removal as portfolio manager.

### (ii)    Controlling Case Authority Precludes the Debtor's Proposed Partial Assumption of the CLO Management Contracts

17.    A debtor seeking to assume an executory contract under section 365 of the Bankruptcy Code must assume the contract in its entirety, *cum onere*. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531-32 (1984) (citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 996 (3d Cir. 1951)). As explained by the Third Circuit in a ruling adopted by the United States Supreme Court, a debtor-in-possession seeking to assume an executory contract "may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other." *Italian Cook Oil*, 190 F.2d at 996. This Court recently adopted and cited the Supreme Court's *Bildisco* holding in the *Senior Care* bankruptcy cases, ruling that "If a debtor chooses to assume an unexpired lease, it must assume the lease *in its entirety*." *In re Senior Care Centers*, 607 B.R. 580, 587 (Bankr. N.D. Tex. 2019) (emphasis added).

18.    Like this Court, the Fifth Circuit also agreed with the Third Circuit and Supreme Court's reasoning in *In re National Gypsum Co. See In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000). In that case the Fifth Circuit ruled that "Where the debtor assumes an executory contract, it

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 300 of 921 PageID 12098
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 8 of 12

must assume the entire contract, *cum onere*—the debtor accepts both the obligations and the benefits of the executory contract." *Id.*

19. Importantly, the Fifth Circuit also recognizes that a court cannot, through orders or otherwise, effectively modify an executory contract over the objection of parties to the contract. *In re Escarent Entities, L.P.*, 423 Fed.Appx, 462, 466 (5th Cir. 2011). In that case, the Fifth Circuit noted that "The court, moreover, effectively rewrote the parties' contract by adding" certain terms disadvantageous to the counterparty, and that the "un-agreed-to modification betokened more than a mere assumption of the parties' contract." *Id.* The Fifth Circuit condemned the lower court's actions, ruling that they "violated its obligation to ensure that [the debtor] assumed the contract *in toto.*" *Id.* Other courts have similarly ruled that a debtor cannot modify an executory contract through assumption without the agreement of parties to the contract. *See, e.g., In re Network Access Solutions, Corp.*, 330 B.R. 67, 74 (Bankr. D. Del. 2005) (citing *In re Fleming Cos.*, No. 03–10945, 2004 WL 385517 at *3 (Bankr. D. Del. Feb. 27, 2004) ("[A] debtor's assumption ... cannot modify an agreement's express terms[.]").

20. Courts should scrutinize whether a debtor is using a proposed plan of reorganization to effectively modify assumed executory contracts. *See Nat'l Gypsum Co.*, 208 F.3d at 506-07. As the Fifth Circuit ruled in *National Gypsum*, payment obligations due under an assumed executory contract could not be nullified by discharge provisions of the debtor's plan. *Id.* Similarly, the court in *In re Cajun Electric Power Co-Op, Inc.* ruled that the debtor's plan of reorganization was improper where the "natural effect" of the plan was the nonconsensual modification of an assumed executory contract. *In re Cajun Elec. Power Co-Op., Inc.*, 230 B.R. 693, 712-14 (M.D. La. 1999). The court's decision in *Cajun Electric* is pertinent here. As ruled by that court:

> The court finds that the natural effect of the Trustee's Plan results in an improper modification of the Supply Contracts. The court has determined that the Trustee may assume and assign the Supply Contracts; however, in designing a plan which *inter alia* binds the Members for 25 years to treatment which they do not want and

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 301 of 921 PageID 12099
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 9 of 12

for which they did not contract, the Trustee has, in effect, achieved a result inconsistent with those jurisprudential directives denying the ability to modify such contracts.

*Id.* at 713-14. A debtor cannot construct a plan that would, in effect, alter the terms and conditions of the very executory contracts the debtor seeks to assume. *Id.*

21.     Other courts have similarly ruled that a debtor cannot modify its contracts through its plan of reorganization without consent, including the consent of *third-party beneficiaries*, regardless of whether the contract was executory. *In re Texas Rangers Baseball Partners*, 498 B.R. 679, 704-05 (Bankr. N.D. Tex. 2013); *In re Coates*, No. 17-00481, 2017 WL 6520456, at *1 (Bankr. M.D. Pa. 2017); *In re Exide Technologies*, 378 B.R. 762, 765 (Bankr. D. Del. 2007) (Noting that purported assumption of executory contracts under plan must comply with the express requirements of section 365 of the Bankruptcy Code).

22.     In *Texas Rangers*, the debtor sought to assume and amend a contract through its plan of reorganization. *Texas Rangers*, 498 B.R. at 704-05. The debtor then used certain language in the plan to effectuate an amendment to the contract that reduced the remaining term of the contract from seven years to three months, without the express consent of third-party beneficiaries to the agreement. *Id.* When the amendment was later challenged, the court ruled that the amendment was invalid and unenforceable "since done without the consent of the third-party beneficiary," and that the debtor's efforts to amend the contract through the plan assumption process without the consent of the third-party beneficiaries "circumvented proper procedures under section 365 of the Bankruptcy Code." *Id.* at 705.

23.     In this case, the Debtor, through its injunction and exculpation provisions, would effectively preclude parties to the CLO Management Contracts, including CLO Holdco, from taking any actions that could, in any way, affect the Reorganized Debtor's efforts to wind down the Managed CLOs. Approving the Plan, as written, would therefore affect the nature of the CLO

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 11 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 302 of 921 PageID 12100
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21 Entered 01/05/21 16:53:55 Page 10 of 12

Management Contracts and result in a non-consensual modification of those agreements in violation of *Bildisco*, *Escarant*, *National Gypsum*, and *Texas Rangers*. As ruled by the Supreme Court in *Bildisco*, should the Debtor seek to assume the CLO Management Contracts, it must assume them in their entirety, taking benefits with risks. *Bildisco*, 465 U.S. at 531-32.

**B. THE PLAN'S EXCULPATION AND INDEMNIFICATION PROVISIONS OPERATE AS THIRD PARTY RELEASES AND VIOLATE CONTROLLING CASE PRECEDENT**

24. The exculpation and release clauses found in Article IX of the Plan are excessive, and violate controlling Fifth Circuit precedent. The Plan defines "Exculpated Parties" to include, among others, all of the Debtor's majority-owned subsidiaries, all Managed Funds, the Independent Directors, and all of the aforementioned parties' "Related Persons," a term itself staggeringly expansive. PLAN, Art. I.B.61., 110. The Plan similarly defines "Protected Parties", which also includes all Managed Funds and their Related Persons. *Id.* at Art. 1.B.104.

25. Under the Plan, all Exculpated Parties are absolved of potential liability associated with any claims or causes of action that may arise related to the implementation of the Plan. *Id.* at Art. IX.C. That would inherently include all actions related to the wind down of the Managed Funds, including any breaches of contract, duties, or even the Advisers Act of 1940. While not expressly worded as a release, the Plan's exculpation clause effectively releases the Exculpated Parties from all such claims or causes of action.

26. Similarly, Protected Parties are effectively released from all claims in any way related to "the administration of the Plan…the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing…" other than those arising from "bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence…." *Id.* at Art. IX.F.

27. The Fifth Circuit has addressed the issue of release and exculpation clauses that applied to non-debtor third parties and held that such releases are overly broad. *See, e.g., In re Pacific*

Appx. 07275

0TT220

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 303 of 921    PageID 12101
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 11 of 12

*Lumber Co.*, 584 F.3d 229, 251 (5th Cir. 2009) (citing 11 U.S.C. § 524(e)). Section 524(e) releases only the debtor, not co-liable third parties, and certainly not the Debtor's contract counterparties like the Managed Funds. *See id.* at 252 (citing *See, e.g., In re Coho Resources, Inc.*, 345 F.3d 338, 342 (5th Cir.2003); *Hall v. National Gypsum Co.*, 105 F.3d 225, 229 (5th Cir.1997); *Matter of Edgeworth*, 993 F.2d 51, 53–54 (5th Cir.1993); *Feld v. Zale Corporation*, 62 F.3d 746 (5th Cir.1995)).

28.    The Bankruptcy Court for the Northern District of Texas has also ruled that exculpation clauses must be so narrow that they cannot extend to employees and officers and directors of a debtor. *In re ReoStar Energy Corp.*, 2012 WL 1945801 (Bankr. N.D. Tex. May 30, 2012). Even, post-confirmation permanent injunctions that *effectively* release non-debtors from liability are prohibited. *In re Zale Corp.*, 62 F.3d at 761; 11 U.S.C. § 524(e). In line with this holding, the District Court for the Northern District of Texas recently found clear error where a bankruptcy court confirmed a debtor's plan that provided for injunctions shielding various non-debtor third parties. *In re Thru, Inc.* 2018 WL 5113124, at *21 (N.D. Tex. 2018).

29.    The Plan injunction and exculpation provisions, which effectively release the Managed Funds and non-debtor parties from liability for post-confirmation activities, therefore violate well established and controlling Fifth Circuit and Northern District case precedent and preclude confirmation.

## IV.
## PRAYER FOR RELIEF

WHEREFORE, CLO Holdco requests that this Court grant the CLO Holdco Objection and enter an order denying confirmation of the Debtor's Plan.

Case 19-34054-sgj11 Doc 3445-65 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 304 of 921    PageID 12102
Case 19-34054-sgj11 Doc 1675 Filed 01/05/21    Entered 01/05/21 16:53:55    Page 12 of 12

DATED: January 5, 2020

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**

By:      /s/ John J. Kane
         Joseph M. Coleman
         State Bar No. 04566100
         John J. Kane
         State Bar No. 24066794

901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone - (214) 777-4200
Telecopier - (214) 777-4299
Email: jcoleman@krcl.com
Email: jkane@krcl.com

**ATTORNEYS FOR CLO HOLDCO, LTD.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 5, 2020, a true and correct copy of the foregoing CLO Holdco Objection was served via the Court's electronic case filing (ECF) system upon all parties receiving such service in this bankruptcy case; and via e-mail upon the United States Trustee at Lisa.L.Lambert@usdoj.gov and upon the following parties:

Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue, Suite 2000
Dallas, Texas 74201
Email: pmontgomery@sidley.com
      preid@sidley.com
      jhoffman@sidley.com

Bojan Guzina
Matthew A. Clemente
Dennis M. Twomey
Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603
Email: bguzina@sidley.com
      mclemente@sidley.com
      dtwomey@sidley.com
      alyssa.russell@sidley.com

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com
      ikharasch@pszjlaw.com
      jmorris@pszjlaw.com
      gdemo@pszjlaw.com

Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Email: MHayward@HaywardFirm.com
      ZAnnable@HaywardFirm.com

         /s/ John J. Kane
         John J. Kane

Appx. 07379
0TT222

# EXHIBIT 66

Appx 07389

011223

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 306 of 921    PageID 12104
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21    Entered 01/05/21 16:54:33    Page 1 of 7

Docket #1676 Date Filed: 01/05/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXBANK CAPITAL, INC.,
NEXBANK SECURITIES, INC. NEXBANK TITLE, INC.,
AND NEXBANK**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |

## NEXBANK'S OBJECTION TO DEBTOR'S
## FIFTH AMENDED PLAN OF REORGANIZATION

NexBank Capital Inc., NexBank Securities, Inc., NexBank Title, Inc. and NexBank (collectively, "NexBank") files this Objection to the Debtor's Fifth Amended Plan of Reorganization (the "Objection") and respectfully states as follows:

### I. INTRODUCTION

1.    On November 24, 2020, the Debtor filed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1472] and Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Docket No. 1473] (the "Disclosure Statement"). On November 13, 2020, the Debtor filed its Initial Plan Supplement [Docket No. 1389], on December 18, 2020, the Debtor filed its Second Plan Supplement [Docket No. 1606] and on January 4, 2021, the Debtor filed its Third Plan Supplement [Docket No. 1656]

1934054210105000000000023

App. 0781

011224

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 307 of 921    PageID 12105
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21    Entered 01/05/21 16:54:33    Page 2 of 7

(together with the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., the "Fifth Amended Plan").

2.      The hearing on confirmation of the Fifth Amended Plan is scheduled for January 13, 2021 at 9:30 a.m. (the "Confirmation Hearing") and the deadline to file any objections to confirmation of the Fifth Amended Plan is January 5, 2021. *See* Docket No. 1476.

3.      The Fifth Amended Plan provides for the transfer of the majority of the Debtor's assets to a Claimant Trust that will be established for the benefit of the Claimant Trust Beneficiaries. However, ultimately, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets." *See* Disclosure Statement, p. 11. Based on the Financial Projections attached as Exhibit C to the Disclosure Statement, the Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over the next two years, concluding in December 2022.

4.      The Fifth Amended Plan also contains provisions to subordinate unidentified claims, a seemingly unfettered ability to set-off claims, and extremely broad exculpation, injunction, and release provisions, all of which fail to comply with the Bankruptcy Code. For the reasons set forth in detail below, NexBank respectfully requests the Court deny confirmation of the Fifth Amended Plan.

## II. OBJECTIONS

5.      A debtor in bankruptcy bears the burden of proving every element of Bankruptcy Code Section 1129(a) by a preponderance of the evidence in order to attain confirmation of its plan. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160 (5th Cir. 1993); *In re Barnes*, 309 B.R. 888, 895 (Bankr. N.D. Tex. 2004) (citing *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997)). In addition, a court has a mandatory duty

011225

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 308 of 921    PageID 12106
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21    Entered 01/05/21 16:54:33    Page 3 of 7

to determine whether a plan has met all the requirements for confirmation, whether specifically raised by dissenting parties in interest or not. *Williams v. Hibernia Nat'l Bank*, 850 F.2d 250, 253 (5th Cir. 1988). The Debtor in this case is unable to meet its burden for confirmation.

**A.    The Fifth Amended Plan provides for the improper subordination of unidentified claims.**

6.    The Fifth Amended Plan provides for a class of subordinated claims, which claims may be subordinated to the general unsecured claims or both the general unsecured claims and convenience class. The Fifth Amended Plan then provides that

> Under section 510 of the Bankruptcy Code, upon written notice, the Debtor, the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

*See* Fifth Amended Plan, Article III(J).

7.    In the Fifth Circuit, equitable subordination is appropriate when (i) the claimant engaged in inequitable conduct; (ii) the misconduct resulted in harm to the debtor's other creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *See In re Life Partners Holdings, Inc.*, 926 F.3d 103, 121 (5th Cir. 2019). Further, a claim should only be subordinated to the extent necessary to offset the harm which the creditors have suffered as a result of the inequitable conduct. *Id*.

8.    However, section 510 of the Bankruptcy Code only allows equitable subordination of claims "after notice and a hearing." 11 U.S.C. § 510(c). Equitable subordination generally requires an adversary proceeding and while it may be satisfied through a chapter 11 plan, the debtor must at least satisfy its burden of demonstrating such claim should be subordinated under equitable subordination principles. Fed. R. Bankr. P. 7001(8).

Appx. 07385
011226

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 309 of 921 PageID 12107
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21 Entered 01/05/21 16:54:33 Page 4 of 7

9.      Here, the Fifth Amended Plan does not provide for the subordination of any specific claims but, instead, provides for a procedure to subordinate claims that fails to comply with the statutory requirements under section 510 of the Bankruptcy Code or applicable case law. The Fifth Amended Plan provides no notice of the potential targets of such subordination, the basis upon which such subordination of claims may be justified, or any evidence supporting equitable subordination principles. Nor does the Fifth Amended Plan provide any means for due process, adequate notice, or opportunity to oppose such unidentified subordinations. Instead, the Fifth Amended Plan attempts to provide a means by which the Debtor, Reorganized Debtor, and Claimant Trustee can escape the "notice and hearing" requirements of section 510. This does not comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

**B.      The Fifth Amended Plan provides for the improper set-off of unidentified claims against the Debtor.**

10.      Similarly, the Fifth Amended Plan also provides the Distribution Agent unfettered set-off rights in violation of section 553 of the Bankruptcy Code. The Fifth Amended Plan provides that:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim…. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

*See* Fifth Amended Plan, Article VI(M). Thus, under the Fifth Amended Plan, the Distribution Agent may setoff the distribution amount on account of any Allowed Claim, without otherwise providing notice to the Holder of such Allowed Claim and without providing any support for or

Appx. 07384
011227

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 310 of 921    PageID 12108
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21    Entered 01/05/21 16:54:33    Page 5 of 7

evidence that such setoff is justified. Instead, after the Distribution Agent arbitrarily determines a setoff is appropriate, the Holder of the Allowed Claim must initiate a proceeding challenging such setoff and seeking its full distribution under the Fifth Amended Plan. In addition, under the Fifth Amended Plan, the Distribution may setoff a pre-petition Allowed Claim on account of not only pre-petition claims but also post-petition claims of the Reorganized Debtor and/or Distribution Agent.

11.    However, setoff is only available in bankruptcy when the opposing obligations arise on the same side of the bankruptcy date—*i.e.,* both had arisen prior to the petition date or both subsequent to the petition date. *In re Thomas*, 529 B.R. 628, 637 n.2 (Bankr. W.D. Pa. 2015); *In re Univ. Med. Center*, 973 F.2d 1065, 1079 (3d Cir. 1992). A creditor's pre-petition claims against the debtor cannot be set off against post-petition debts owed to the debtor. *In re Univ. Med. Center*, 973 F.2d at 1079. In addition, the burden of proof is on the party asserting the right to setoff. *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). The party seeking to enforce a setoff right must establish (i) it has a right to setoff under nonbankruptcy law; and (ii) this right should be preserved in bankruptcy under section 553. *Id.*

12.    Here, contrary to the provisions in section 553 of the Bankruptcy Code, the Fifth Amended Plan attempts to both expand the right to setoff by allowing post-petition claims be setoff against pre-petition Allowed Claims and transfer the burden of proof to the Holder of such Allowed Claim, requiring such Holder disprove the Distribution Agent's right to setoff. This does not comply with the provisions of the Bankruptcy Code. As a result, the Fifth Amended Plan fails to satisfy 1129(a)(1) and confirmation should be denied.

Appx 07385

011228

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 311 of 921 PageID 12109
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21 Entered 01/05/21 16:54:33 Page 6 of 7

**C.** **The Fifth Amended Plan provides for improper and overly broad injunctions, releases and exculpation.**

13.     In addition, the Fifth Amended Plan provides for broad releases and permanent injunctions against nondebtors. *See* Article IX(F). However, permanent injunctions against nondebtors are not permissible in the Fifth Circuit because such a permanent injunction would "improperly insulate nondebtors in violation of section 524(e)…without any countervailing justification of debtor protection." *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760-61 (5th Cir. 1995) (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*), 922 F.2d 592, 601-02 (10th Cir. 1990)). Contrary to such prohibition, the Fifth Amended Plan seeks to exculpate certain "Exculpated Parties" and "Protected Parties" from a broad array of claims relating to such entities' post-petition conduct and would bar creditors from pursing claims against various non-debtor parties if such claims relate to their claims against the Debtor. In addition, the language purports to release creditors' claims arising not only from the bankruptcy case but also the administration and implementation of the Fifth Amended Plan and the period of time covered by the release and exculpation provisions extend beyond the effective date and purport to cover post-effective date conduct. Neither the Bankruptcy Code nor applicable case law permits such broad exculpatory and/or injunctive language in favor of third parties. *See In re Zale Corp.*, 62 F.3d at 761, *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252-253 (5th Cir. 2009). The injunction, release, and exculpation provisions in the Fifth Amended Plan do not comply with section 524(e) of the Bankruptcy Code or applicable case law and the Court should deny confirmation.

**D.     Reservation of Rights**

14.     NexBank reserves the right to amend or supplement this Objection to add any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy

Appx. 07386

011229

Case 19-34054-sgj11 Doc 3445-66 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 8 of 8
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 312 of 921   PageID 12110
Case 19-34054-sgj11 Doc 1676 Filed 01/05/21   Entered 01/05/21 16:54:33   Page 7 of 7

Code. In addition, NexBank reserves the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### III. CONCLUSION

For these reasons, the NexBank respectfully requests that the Court deny confirmation of the Fifth Amended Plan and grant NexBank such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXBANK CAPITAL, INC.,
NEXBANK SECURITIES, INC., NEXBANK TITLE,
INC., AND NEXBANK**

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

APPX 07385
0TT230

# EXHIBIT 67

Docket #1678 Date Filed: 01/05/2021

Jason P. Kathman
State Bar No. 24070036
Spencer Fane LLP
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300 – Telephone
(972) 324-0301 – Facsimile
Email: jkathman@spencerfane.com

**COUNSEL FOR
PATRICK HAGAMAN DAUGHERTY**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **CASE NO. 19-34054-SGJ-11** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P** | § | **CHAPTER 11** |
| | § | |
| **Debtor.** | § | |

### PATRICK HAGAMAN DAUGHERTY'S OBJECTION TO
### CONFIRMATION OF FIFTH AMENDED PLAN OF REORGANIZATION

Patrick Hagaman Daugherty ("**Daugherty**") a creditor and party-in-interest in the above-captioned bankruptcy case, files this Objection to Confirmation of Fifth Amended Plan of Reorganization (the "**Objection**") and represents as follows:

1.      The Plan does not "provide the same treatment for each claim or interest of a particular class," as required by section 1123(a)(4). *See* 11 U.S.C. § 1123(a)(4). Bankruptcy Code Section 1129(a)(1) requires that a chapter 11 plan comply with the applicable provisions of the Bankruptcy Code before it may be confirmed. 11 U.S.C. § 1129(a)(1); *In re Schwarzmann*, 203 B.R. 919 (Bankr. E.D. Va. 1995). A principal objective of Section 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization. *In re Mirant Corp.*, 2007 WL 1258932

**PATRICK HAGAMAN DAUGHERTY'S OBJECTION TO CONFIR**

1934054210105000000000025

Appx. 07289

011232

Case 19-34054-sgj11 Doc 3445-67 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 5
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 315 of 921 PageID 12113
Case 19-34054-sgj11 Doc 1678 Filed 01/05/21 Entered 01/05/21 17:00:20 Page 2 of 4

(Bankr. N.D. Tex. Apr. 27, 2007). Because the Plan provides different treatment for "disputed" claims and "allowed" claims, the Plan does not comply with section 1123(a)(4).

2.      The Debtor's Plan provides that the Claimant Trust[1] may make Trust Distributions to the Claimant Trust Beneficiaries "at any time and/or use Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law."[2] Further, the Plan and Claimant Trust Agreement provide that there will be no distributions on account of "Disputed Claims" while it is pending allowance.[3] A "Disputed Claim" is one that is not yet allowed.[4] For "Disputed Claims," the Debtor proposes to create a "Disputed Claim Reserve."[5] However, the amount placed in the "Disputed Claim Reserve" shall be:

> (a) The amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim or (d) as otherwise ordered by the Bankruptcy Court, *including an order estimating the Disputed Claim*.[6]

Upon a claim being allowed, the Plan provides:

> To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date.[7]

A serious problem with this construct arises if the Debtor under-estimates the amount of the

---

[1] Capitalize terms not expressly defined herein, shall have the meanings ascribed to them in the Plan.
[2] *See* Plan at 31.
[3] *See* Plan at 44; Claimant Trust Agreement at § 6.4.
[4] *See* Plan at 7.
[5] *See* Plan at 40.
[6] *See* Definition of "Disputed Claims Reserve Amount" Plan at 7 (emphasis added).
[7] *See* Plan at 40.

**PATRICK HAGAMAN DAUGHERTY'S OBJECTION TO CONFIRMATION – Page 2**

Case 19-34054-sgj11 Doc 3445-67 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 5
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 316 of 921 PageID 12114
Case 19-34054-sgj11 Doc 1678 Filed 01/05/21 Entered 01/05/21 17:00:20 Page 3 of 4

Disputed Claim Reserve, which is a major risk considering (1) the significant amount of "Disputed Claims" and the ability of the Debtor to utilize an order estimating a claim to determine how much to reserve. If any one of the "Disputed Claims" is adjudicated in an amount great than what was reserved (or estimated), then holders of "Disputed Claims" will receive disparate treatment from other creditors in the same case. By way of an example, in Daugherty's case, if his claim is ultimately allowed in an amount in excess of $9,134,019.00, then any amounts paid over and above the amount reserved and estimated will come at the expense of other holders of "Disputed Claims." Because holders of "disputed" claims in Class 8 will very likely receive a different percentage recovery from holders of "allowed" claims in Class 8, the Plan does not comply with section 1123(a)(4), and confirmation should accordingly be denied.

WHEREFORE, Daugherty respectfully requests that the Court enter an order (i) denying confirmation of the Plan, and (ii) granting Daugherty such other and further relief, legal or equitable, special or general, to which he may show himself justly entitled.

Dated: January 5, 2021.                 Respectfully submitted,

                                        */s/ Jason P. Kathman*
                                        Jason P. Kathman
                                        State Bar No. 24070036
                                        SPENCER FANE LLP
                                        5700 Granite Parkway, Suite 650
                                        Plano, Texas 75024
                                        (972) 324-0300- Telephone
                                        (972) 324-0301 – Facsimile
                                        Email: jkathman@spencerfane.com

                                        **COUNSEL FOR
                                        PATRICK HAGAMAN DAUGHERTY**

                        **CERTIFICATE OF SERVICE**

        The undersigned hereby certifies that on January 5, 2021 a copy of the attached Objection
was served via the Court's electronic transmission facilities upon all parties receiving notice via
the Court's ECF system, and has been served via email upon counsel for the Debtor and the
Committee via e-mail.


                                        */s/ Jason P. Kathman*
                                        Jason P. Kathman

DA 1995072.1

Appx 07392

011235

# EXHIBIT 68

Appx 97393
011236

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                       )   Case No. 19-34054-sgj-11
 3   In Re:                            )   Chapter 11
                                       )
 4   HIGHLAND CAPITAL                  )   Dallas, Texas
     MANAGEMENT, L.P.,                 )   Friday, January 8, 2021
 5                                     )   9:30 a.m. Docket
                                       )
 6          Debtor.                    )
     ——————————————————————————————————)
                                       )
 7   HIGHLAND CAPITAL                  )   Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,                 )
 8                                     )
                                       )
 9          Plaintiff,                 )   PRELIMINARY INJUNCTION
                                       )   HEARING [#2]
10   v.                                )
                                       )
11   JAMES D. DONDERO,                 )
                                       )
12          Defendant.                 )
     ——————————————————————————————————)

13                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                    UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX/TELEPHONIC APPEARANCES:

16   For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
17                               10100 Santa Monica Blvd.,
                                  13th Floor
18                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
19
     For the Debtor/Plaintiff:   John A. Morris
20                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
21                               New York, NY  10017-2024
                                 (212) 561-7700
22

23

24

25
```

2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero,          D. Michael Lynn
     Defendant:                  John Y. Bonds, III
 3                               Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
 4                                 JONES, LLP
                                 420 Throckmorton Street,
 5                                 Suite 1000
                                 Fort Worth, TX  76102
 6                               (817) 405-6900

 7   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 8                               One South Dearborn Street
                                 Chicago, IL  60603
 9                               (312) 853-7539

10   For the Funds and           Davor Rukavina
     Advisors:                   MUNSCH HARDT KOPF & HARR, P.C.
11                               500 N. Akard Street, Suite 3800
                                 Dallas, TX  75201-6659
12                               (214) 855-7554

13   For Certain Employees:      Frances A. Smith
                                 ROSS & SMITH, P.C.
14                               Plaza of the Americas
                                 700 N. Pearl Street, Suite 1610
15                               Dallas, TX  75201
                                 (214) 593-4976
16
     Recorded by:                Michael F. Edmond, Sr.
17                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
18                               Dallas, TX  75242
                                 (214) 753-2062
19
     Transcribed by:             Kathy Rehling
20                               311 Paradise Cove
                                 Shady Shores, TX  76208
21                               (972) 786-3063

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
```

Appx 07395
011238

3

1          <u>DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.</u>

2          THE COURT:  All right.  We are here for Highland

3    Capital Management, L.P. versus James Dondero, a preliminary

4    injunction hearing.  This is Adversary 20-3190.

5      All right.  Let's start out by getting appearances from

6    counsel.  First, for the Plaintiff/Debtor, who do we have

7    appearing?

8          MR. MORRIS:  Your Honor, John Morris; Pachulski Stang

9    Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and

10   others.

11         THE COURT:  All right.  Good morning.  All right.

12   For Mr. Dondero, who do we have appearing?

13         MR. LYNN:  Michael Lynn, together with John Bonds,

14   for Mr. Dondero.

15         THE COURT:  Good morning.

16     All right.  I know we have a lot of parties in interest

17   represented on the video or phone today.  I'm not going to go

18   through a roll call, other than I'll see if we have the

19   Committee, the Unsecured Creditors' Committee counsel on the

20   line.  Do we have anyone appearing for them?

21         MR. CLEMENTE:  Yes, good morning, Your Honor.

22   Matthew Clemente from Sidley Austin on behalf of the

23   Committee.

24         THE COURT:  Okay.  Thank you.  All right.

25         MR. CLEMENTE:  Thank you, Your Honor.

4

```
 1          THE COURT:  Well, as I said, I'm not going to do a
 2   roll call.  I don't think we had any specific parties in
 3   interest, you know, file a pleading, or any other parties
 4   other than the Debtor and Mr. Dondero in this adversary.  So
 5   I'll just let the others kind of listen in without appearing.
 6      All right.  Mr. Morris, are you going to start us off this
 7   morning with, I don't know, an opening statement or any
 8   housekeeping matters?
 9          MR. MORRIS:  I have both an opening statement and
10   housekeeping matters.  I just wanted to see if Mr. Pomerantz
11   has anything he wants to convey to the Court before I begin.
12          MR. POMERANTZ:  (garbled)
13          THE COURT:  Mr. Pomerantz, if you could take your
14   device off mute, please.
15          THE CLERK:  He's off mute.  I don't know what --
16          THE COURT:  Okay.  Well, we're showing you're not on
17   mute, but we can't hear you.  What now?
18          THE CLERK:  He's not on mute now.  He's --
19          THE COURT:  Okay.  Go ahead, Mr. Pomerantz.
20      (Pause.)
21          THE CLERK:  He's not coming through.
22          THE COURT:  We're -- you're not coming through, and
23   we're not sure what the problem is.  We're not showing you on
24   mute.
25      (Pause.)
```

5

1          THE COURT:  All right.  Should we have him call back

2     in on his phone?  All right.  If you could, if you have a

3     phone, maybe you can try calling in on your phone and speak

4     through your phone, not your computer.

5          MR. MORRIS:  You know what, Your Honor?  I'm going to

6     proceed, and Mr. Pomerantz will address the Court at the

7     conclusion of the hearing on the motion.

8          THE COURT:  Okay.  Very good.  We usually hear him

9     loud and clear, so I don't know what's going on this morning.

10    Go ahead, Mr. Morris.

11          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12          MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13    John Morris; Pachulski Stang; for the Debtor.

14      We are here this morning, Your Honor, on the Debtor's

15    motion for preliminary injunction against Mr. Dondero.  We

16    filed last night also an emergency motion for an order to show

17    cause as to why this Court should not hold Mr. Dondero in

18    contempt of court --

19          THE COURT:  All right.

20          MR. MORRIS:  -- for violating a previously-issued

21    TRO.

22          THE COURT:  Yes.  Let me just interject, in case

23    there's any confusion by anyone.  I am not going to hear the

24    motion for show cause order this morning.  While I understand

25    you think there might be some efficiency and overlap in

6

1   evidence, it's not enough notice.  So we'll talk about

2   scheduling that at the end of the presentations this morning.

3   All right?

4               MR. MORRIS:  Thank you for addressing that, Your

5   Honor.

6               THE COURT:  Okay.

7               MR. MORRIS:  Your Honor, then let's just proceed

8   right to the preliminary injunction motion.  There is ample

9   evidence to support the Debtor's motion for a preliminary

10  injunction.  There would have been substantial evidence to

11  support it based on the conduct that occurred prior to the

12  issuance of the TRO, but the conduct that did occur following

13  the TRO only emphasizes the urgent need for an injunction in

14  this case.

15      I want to begin by just telling Your Honor what evidence

16  we intend to introduce here today.  We filed at Docket 46 in

17  the adversary proceeding our witness and exhibit list.  The

18  exhibit list contains Exhibits A through Y.  And at the

19  appropriate time, I will move for the admission into evidence

20  of those exhibits.

21      The exhibit list and the witness list also identifies

22  three witnesses for today.  Mr. Dondero.  Mr. Dondero is here

23  today.  Notwithstanding Your Honor's comments on December 10th

24  and on December 16th, when I deposed him on Tuesday he was

25  unsure whether he was going to come here today to testify.

7

1    And he will inform Your Honor of that on cross-examination.

2    And so the Debtor was forced to prepare and serve a subpoena

3    to make sure that he was here today.  But Mr. Dondero is here

4    today.

5        Following the conclusion of Mr. Dondero's deposition on

6    Tuesday, and based in part on the evidence adduced during that

7    deposition, the Debtor terminated for cause Scott Ellington

8    and Isaac Leventon.  We had asked counsel for those former

9    employees to accept service of a trial subpoena so that they

10    would appear today.  We were told that they would do so if we

11    gave them a copy of the transcript of Mr. Dondero's

12    deposition.

13        We thought that was inappropriate and we declined to do

14    so, and they declined to accept service of the subpoenas.  We

15    have spent two days with a professional process server

16    attempting to effectuate service of the trial subpoenas for

17    Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18    doing that.  So we'll only have one witness today, unless we

19    have cause to call anybody on rebuttal, and that witness will

20    be Mr. Dondero.

21        I want to talk for a few moments as to what Mr. Dondero

22    will testify to and what the evidence will show.  Mr. Dondero

23    will testify that he never read the TRO, Your Honor.  He will

24    testify that he didn't participate in the motion on the

25    hearing for the TRO, that he never read Mr. Seery's

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 326 of 921 PageID 12124

8

1    declaration in support of the Debtor's motion for the TRO,

2    that he never bothered to read the transcript of the

3    proceedings on December 10th so that he could understand the

4    evidence that was being used against him.  He had no knowledge

5    of the terms of the TRO when he was deposed on Tuesday.

6         And that's the backdrop of what we're doing here today,

7    because he didn't know what he was enjoined from doing, other

8    than speaking to employees.  He actually did testify and he

9    will testify that he knew he wasn't supposed to speak with the

10   Debtor's employees, but he spoke with the Debtor's employees

11   in all kinds of ways, as the evidence will show.

12        The evidence will also show that Mr. Dondero violated the

13   TRO by throwing away the cell phone that the company bought

14   and paid for after the TRO was entered into.  He's going to be

15   unable to tell you who threw it away.  He's going to be unable

16   to tell you who gave the order to throw it away.  He's going

17   to be unable to tell you when after the TRO was entered the

18   phone was thrown away.

19        But we do have as one fact and as I believe one violation

20   of the TRO --

21             MR. POMERANTZ:  So, I'm on a WebEx.

22             MR. MORRIS:  Jeff, --

23             THE COURT:  Mr. Pomerantz, we heard you.  We heard

24   you say something.  So, apparently, you got your audio

25   working.

9

1      All right.  Mr. Morris, continue.

2          MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3  you, Your Honor, is that it's really Mr. Seery's fault that

4  the phone got thrown away, because Mr. Seery announced that

5  all of the employees were going to be terminated at the end of

6  January, and because Mr. Seery did that, he and I believe Mr.

7  Ellington thought it was appropriate to just throw their

8  phones away, without getting the Debtor's consent, without

9  informing the Debtor, and switching the phone numbers that

10  were in the Debtor's account to their own personal names.  So

11  that's Item No. 1.

12      Item No. 2 -- and this is in no particular order, Your

13  Honor.  I don't want you to think that I'm bringing these

14  things up in terms of priority.  But they're just the order in

15  which they came up in the deposition, and so I'm just

16  following it as well.

17      Item No. 2 is trespass.  On December 22nd, you will hear

18  evidence that Mr. Dondero personally intervened to yet again

19  stop trades that Mr. Seery was trying to effectuate in his

20  capacity as portfolio managers of the CLOs.  He did that just

21  six days after Your Honor dismissed as frivolous a motion

22  brought by the very Advisors and Funds that he owns and

23  controls.

24      Therefore, the very next day, the Debtor sent him a

25  letter, sent through counsel a letter, evicting him from the

10

1  premises, demanding the return of the phone, and telling him

2  that he had to be out by December 30th.

3       I was stunned, Your Honor, stunned, when I took his

4  deposition on Tuesday and he was sitting in Highland's

5  offices.  He hadn't asked for permission to be there.  He

6  hadn't obtained consent to be there.  But he just doesn't care

7  what the Debtor has to say here.  He just doesn't.

8       I don't know when he got there or when he left.  I don't

9  know if he spoke to anybody while he was there.  But he just

10 took it upon himself to show up in the Debtor's office,

11 notwithstanding the very explicit eviction notice that he got

12 on December 23rd.

13      Mr. Dondero, as I mentioned, clearly violated the TRO by

14 knowingly and intentionally and purposely interfering with the

15 Debtor's trading as the portfolio manager of the CLOs.  This

16 has just gone on too long.  There have been multiple hearings

17 on this matter, but he doesn't care.  So he gave the order to

18 stop trades that Mr. Seery had effectuated.  That's a clear

19 violation of the TRO, and it certainly supports the imposition

20 of a preliminary injunction.

21      Mr. Seery -- Mr. Dondero is going to testify that multiple

22 letters -- that I'm going to refer to them, Your Honor, as the

23 K&L Gates Parties, and those are the two Advisors and the

24 three investment funds and CLO Holdco that are all owned and/

25 or controlled by Mr. Dondero -- after that hearing on the

11

1    16th, K&L Gates, the K&L Gates Parties sent not one, not two,

2    but three separate letters.  They said they may take steps to

3    terminate the CLO management agreements.  After we evicted Mr.

4    Dondero, sent a letter suggesting that we would be held liable

5    for damages because we were interfering with their business.

6        And Mr. Dondero is going to tell you, Your Honor, that he

7    encouraged the sending of those letters, that he approved of

8    those letters, that he thought those letters were the right

9    things to send to the Debtor, even after -- even with the

10   knowledge of what happened on December 16th.

11       He's going to tell you he knew about that hearing and he

12   still, he still approves of those letters, and never bothered

13   to exercise his control to have those letters withdrawn upon

14   the Debtor's request.  We asked them to withdraw it, and when

15   they wouldn't do it, Your Honor, that's what prompted the

16   filing of yet another adversary proceeding.  And we're going

17   to have another TRO hearing next Wednesday because they won't

18   stop.

19       Next, a preliminary injunction should issue because Mr.

20   Dondero violated the TRO by communicating with the Debtor's

21   employees to coordinate their legal strategy against the

22   Debtor.  The evidence will show, in documents and in

23   testimony, that on December 12th, while he was prohibited from

24   speaking to any employee except in the context of shared

25   services, you're going to see the documents and you're going

12

1    to hear the evidence that on December 12th Scott Ellington was

2    actively involved in identifying a witness to support Mr.

3    Dondero's interests at the December 16th hearing.

4        You will receive evidence that on December 15th Mr.

5    Ellington and Mr. Leventon collaborated with Mr. Dondero's

6    lawyers to prepare a common interest agreement.

7        You will hear evidence that on the next day, December

8    16th, the day of that hearing, that Mr. Dondero solicited Mr.

9    Ellington's help to coordinate all of the lawyers representing

10   Mr. Dondero's interests, telling Mr. Ellington that he needed

11   to show leadership, and Mr. Ellington readily agreed to do

12   just that.

13       You will hear evidence that on December 23rd Mr. Ellington

14   and Grant Scott communicated in connection with calls that

15   were being scheduled with Mr. Dondero and with K&L Gates, the

16   very K&L Gates Clients who filed the frivolous motion that was

17   heard on December 16th and that persisted in sending multiple

18   letters threatening the Debtor thereafter.

19       You will hear evidence that late in December Mr. Dondero

20   sought contact information for Mr. Ellington and Mr.

21   Leventon's lawyer, and he will tell you that he did it for the

22   explicit purpose of advancing their mutual shared interest

23   agreement, while they were employed by the Debtor. While they

24   were employed by the Debtor.

25       Finally, you will hear evidence, and it will not be

13

 1    disputed, you will see the evidence, it's on the documents,

 2    that Mr. Dondero personally intervened to stop the Debtor from

 3    producing the financial statements of Get Good and Dugaboy,

 4    two entities that he controls, that the U.C.C. had been asking

 5    for for some time, that the Debtor had been asking of its

 6    employees for some time to produce.  And it was only when we

 7    got, frankly, the discovery from Mr. Dondero when there's a

 8    text message that says, Not without a subpoena.

 9        The documents are on the Debtor's system.  We just don't

10    know where they are because they're hidden someplace.  But Mr.

11    Dondero knows where they are.  He can certainly force -- he

12    can certainly get them produced.  And one of the things we'll

13    be asking for when we seek the contempt motion is the

14    production of those very documents.

15        So, Your Honor, that's what the evidence is going to show.

16    I don't think there's going to be any question that a

17    preliminary injunction ought to issue.  But I do want to spend

18    just a few minutes rebutting some of the assertions made in

19    the filing by Mr. Dondero last night.

20        Of course, they offer no evidence.  There is no

21    declaration.  There is no document.  There is merely argument.

22    It's been that way throughout this case.  For a year, Mr.

23    Dondero has never stood before Your Honor to tell you why

24    something was wrong being done to him, why -- he hasn't

25    offered to be here at all, and he's here today, again, only

14

1   because he got a subpoena.  That's the only reason we know

2   he's here today.

3       So let's just spend a few minutes talking about the

4   assertions made in the document last night.  Mr. Dondero

5   complains about the scope of the injunction, and I say to

6   myself, in all seriousness, Are you kidding me?  You didn't

7   even read the TRO and you're going to be concerned about what

8   the scope of the injunction is?  You didn't even have enough

9   respect for the Court to read the TRO and we're going to worry

10  about the scope of some future injunction?  Doesn't make any

11  sense to me.

12      But let's talk about the specific arguments that they

13  make.

14      Third parties.  They're concerned that somehow third

15  parties don't have notice of the injunction.  Your Honor,

16  third parties are not impacted by the injunction.  The only

17  third parties that are impacted by the injunction are those

18  that are owned and/or controlled by Mr. Dondero.  If he

19  doesn't tell them, that's his breach of duty.  He created the

20  Byzantine empire of over 2,000 entities, and he wants the

21  Debtor to have the burden of notifying all of them so that

22  they can all come in here and make 2,000 arguments as to why

23  they shouldn't be enjoined?

24      He owns and controls them.  They are the only third

25  parties who are impacted by this proposed preliminary

15

1 injunction, and he has the responsibility, he has the duty to

2 inform them, because he owns and controls them.

3     We know of the K&L Gates Parties. We know Get Good and

4 Dugaboy are in this courtroom. We know CLO Holdco. So many

5 of these parties have been so -- they're on the phone now.

6 They don't have notice? It is insulting, frankly, to suggest

7 that the Debtor somehow has some obligation to figure out who

8 Mr. Dondero owns and controls. He should know that. That's

9 number one.

10     Number two, there is a statement in there about employees

11 and how he should be able to speak with them about personal

12 and routine matters. As to that, Your Honor, he has forfeited

13 that opportunity. He cannot be trusted. There cannot be any

14 communication because nobody can police it. And so we think a

15 complete bar to any discussion with any employee, except as it

16 relates to shared services -- because we do have a contractual

17 obligation; that's what was in it -- ought to be barred.

18 That's number one.

19     Number two, there's a reference in the objection to Mr.

20 Dondero's personal assistant. I'd like to know who that is,

21 Your Honor. I wasn't aware that he still was using a personal

22 assistant at the Debtor. I want to know specifically who that

23 is. I don't know that they -- you know, I just -- we need to

24 cut that off. And he should not be communicating with any

25 employee. The Debtor should not be paying for his personal

011251

16

 1   assistant.

 2       It's offensive to think that he's still doing that,

 3   particularly after he was terminated or his resignation was

 4   requested back in October precisely because his interests were

 5   adverse to the Debtor.

 6       Number three, he's concerned that the Debtor is somehow

 7   preventing him from speaking to former employees.  We now

 8   know, Your Honor, that that's a, I'm sure, a very specific

 9   reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10   a green light to be able to do that.  And you know, I'll leave

11   it to Your Honor as to whether that's appropriate.  I'll leave

12   it to their counsel as to whether, going forward, colluding

13   together against the Debtor at this point in time is in

14   anybody's best interest.  But I will -- what I will demand in

15   the preliminary injunction is a very explicit statement that

16   Mr. Ellington and Mr. Leventon are not to share any

17   confidential or privileged information that they received in

18   their capacity as general counsel and assistant general

19   counsel of the Debtor.

20       The pot plan.  He's afraid somehow the order is going to

21   prevent him from pursuing the pot plan.  He's had over a year

22   to pursue this pot plan, Your Honor.  Frankly, I don't, you

23   know, I don't know what to say.  He has never made a proposal

24   that has gotten any traction with the only people who matter.

25   And it's not the Debtor.  It's the creditors.  It's the

17

1   Creditors' Committee.

2       If you want to put in an exception that he can call Matt

3   Clemente, I don't mean to put this on Mr. Clemente, he can

4   decide whether or not that's appropriate, but the creditors

5   are the only ones who matter here.  Your Honor, it's not the

6   Debtor.

7       And I'll let Mr. Dondero's counsel explain to Your Honor

8   why he thinks he still needs to pursue a pot plan, and Your

9   Honor can decide.  I trust Your Honor to decide what

10  boundaries and what guardrails might be appropriate for him to

11  continue to pursue his pot plan.

12      That's all I have, Your Honor.  Not much.

13          THE COURT:  All right.

14          MR. MORRIS:  But I think there's going to be --

15  there's going to be an awful lot of evidence.  This is going

16  to be a lengthy examination.  I ask the Court for your

17  patience.

18          THE COURT:  I've got --

19          MR. MORRIS:  But that's all I have.

20          THE COURT:  I've got all day, if we need it.

21          MR. MORRIS:  Okay.

22          THE COURT:  I hope we don't, but I've got all day if

23  we need it.  All right.

24          MR. MORRIS:  That's what I have, Your Honor.

25          THE COURT:  All right.  Mr. Dondero's counsel, your

18

 1   opening statement?

 2         MR. BONDS:  Your Honor, I would reserve my opening

 3   statement to the end of the hearing.

 4      I would also point out that anything that Mr. Morris just

 5   said was not evidence, and we think that the evidence will

 6   show completely differently than argued or articulated by Mr.

 7   Morris.

 8         THE COURT:  All right.

 9         MR. BONDS:  That's all.

10         THE COURT:  Thank you, Mr. Bonds.

11      Mr. Morris, you may call your witness.

12         MR. MORRIS:  The Debtor calls James Dondero.

13         THE COURT:  All right.  Mr. Dondero, this is Judge

14   Jernigan.  I would ask you to say, "Testing, one, two," so we

15   pick up your video so I can swear you in.

16      All right.  Mr. Dondero, if you're speaking up, we're not

17   hearing you, so please make sure you're unmuted and have your

18   video --

19      (Echoing.)

20         MR. DONDERO:  Hello.  One, two.

21         THE COURT:  Okay.  We got you.

22         MR. DONDERO:  One, two three.

23         THE COURT:  We got you now.

24         JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25         THE COURT:  All right.  Thank you.

Dondero - Direct                    19

1      Mr. Morris, go ahead.

2           MR. MORRIS:  Thank you, Your Honor.

3      (Echoing.)

4           THE COURT:  I'm going to ask everyone except Mr.

5  Dondero and Mr. Morris to put your device on mute.  We're

6  getting a little distortion.

7      All right.  Go ahead.

8                    DIRECT EXAMINATION

9  BY MR. MORRIS:

10 Q   Good morning, Mr. Dondero.  Can you hear me?

11 A   Yes.

12     (Echoing.)

13          THE COURT:  Ooh.  Okay.  We're having a little echo

14 when you speak, Mr. Dondero.  Do you have -- well, first, you

15 have headphones.  That always helps.

16     (Echoing.)

17          THE COURT:  Okay.  That may help as well.

18     (Pause.)

19          THE COURT:  Okay.  Let's try again.  If you could

20 say, "Testing, one, two."

21          THE WITNESS:  Is that better?

22          THE COURT:  That is better, yes.

23     All right.  Go ahead.

24          THE WITNESS:  Okay.  Great.

25          MR. MORRIS:  Thank you.

Dondero - Direct                    20

BY MR. MORRIS:

Q   Can you hear me, Mr. Dondero?

A   You're a bit faint.  Give me one second.  Okay.  Got you.

Q   Okay.  Thank you.  Who is in the room with you right now?

A   Bonds, Lynn, and a tech.

          A VOICE:  Bryan Assink.

          THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm
sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

BY MR. MORRIS:

Q   Okay.  You're testifying today pursuant to a subpoena,
correct?

A   Yes.

Q   Okay.

          MR. MORRIS:  And Your Honor, that subpoena can be
found at Docket No. 44 in the adversary proceeding.

          THE COURT:  All right.

BY MR. MORRIS:

Q   In the absence of a subpoena, in the absence of a
subpoena, you didn't know if you would show up to testify at
this hearing; is that right?

A   I -- I do what my counsel directs me to do, and I didn't
know at that time whether they would direct me to come or not.

Q   Okay.  And when I -- when I deposed you earlier this week,
you agreed that you may or may not testify; is that right?

A   It depends on what counsel instructs me to do, correct.  I

Dondero - Direct                    21

1  didn't know at the time.

2  Q   Okay.  And you didn't mention anything about counsel when

3  I asked you the questions earlier this week, correct?

4  A   That was the undertone in almost all my answers, that I

5  relied on counsel.

6         MR. MORRIS:  Your Honor, I move to strike.  I'm

7  asking very specific questions.  And if I need to go to the

8  deposition transcript, I'm happy to do that.

9         THE COURT:  All --

10        MR. MORRIS:  Just going forward, Your Honor, this is

11 cross-examination.  It's really yes or no at this point.

12 That's what I would request, anyway.

13        THE COURT:  All right.  Mr. Dondero, do you

14 understand --

15    (Echoing.)

16        THE COURT:  Do you understand what Mr. Morris was

17 raising there?  We really need you to give specific answers --

18 and usually they're going to be yes or no answers -- to Mr.

19 Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20 go ahead.

21        THE WITNESS:  Yeah.

22 BY MR. MORRIS:

23 Q   Mr. Dondero, you're aware that Judge Jernigan granted the

24 Debtor's request for a TRO against you on December 10th,

25 correct?

Dondero - Direct                    22

1   A    Yes.

2   Q    But you never reviewed the declaration that Mr. Seery

3   filed in support of the Debtor's motion for a TRO, correct?

4   A    I relied on counsel.

5   Q    Sir, you never reviewed the declaration that Mr. Seery

6   filed in support of the Debtor's motion for a TRO, correct?

7   A    Correct.

8   Q    You didn't even know the substance of what Mr. Seery

9   alleged in his declaration at the time that I deposed you on

10  Tuesday, correct?

11  A    Correct.

12  Q    And that's because you didn't even think about the fact

13  that the Debtor was seeking a TRO against you; isn't that

14  right?

15  A    No.

16  Q    That's not right?

17  A    No.

18  Q    All right.

19       MR. MORRIS:  Your Honor, could I ask my assistant,

20  Ms. Canty, to put up on the screen what had been designated as

21  the Debtor's Exhibit Z in connection with the motion for

22  contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23       THE COURT:  All right.

24       MR. MORRIS:  And I would like to -- I'd like to

25  cross-examine Mr. Dondero on his testimony on Tuesday.

Dondero - Direct                          23

```
 1        THE COURT:  All right.  You may.

 2        MR. MORRIS:  Can we put up Page 15, please?  And go

 3  to Lines 15 through 17.

 4  BY MR. MORRIS:

 5  Q    Sir, you recall being deposed on Tuesday by my -- by me,

 6  correct?

 7  A    Yes.

 8  Q    Okay.  Did you hear this question and did you hear this

 9  answer?

10        "Q   Did you care that the Debtor was seeking a TRO

11        against you?

12        "A   I didn't think about it."

13  Q    Is that -- is that your testimony from the other day?

14  A    Yes.

15  Q    You didn't dial in to the hearing when the Court

16  considered the Debtor's motion for a TRO against you, did you?

17  A    I -- I don't recall.  I don't think so.

18  Q    You never read the transcript in order to understand what

19  took place in this courtroom when Judge Jernigan decided to

20  enter a TRO against you; isn't that right?

21  A    I relied on counsel, which has been my testimony all

22  along.

23        MR. MORRIS:  Can we go to Page 13 of the transcript,

24  please?  Beginning at Line 24.

25  BY MR. MORRIS:
```

Dondero - Direct                     24

```
 1   Q    (reading)
 2        "Q   Did you read a transcript of the hearing?
 3        "A   No."
 4   Q    Did you testify on Tuesday that you did not read a
 5   transcript of the hearing?
 6   A    Yes.
 7   Q    In fact, as of at least last Tuesday, you hadn't even
 8   bothered to read the TRO that this Court entered against you.
 9   Isn't that right?
10        MR. BONDS:  Your Honor, I'm going to object.
11        (Echoing.)
12        THE COURT:  Okay.  We're getting that echo from you
13   now, Mr. Bonds.  So maybe you need to turn your volume down a
14   little.  But what is the basis for your objection?
15        (Echoing.)
16        MR. BONDS:  Leading and rhetorical.
17        MR. MORRIS:  I think it's because they're in the same
18   room.
19        THE COURT:  Okay.  Do you have -- I don't know what
20   you're doing.  I guess you're moving to a different room?
21        MR. BONDS:  I am, Your Honor.
22        THE COURT:  Okay.
23        (Echoing.)
24        THE COURT:  Okay.  I'm waiting for the objection
25   basis.
```

Dondero - Direct                     25

 1          MR. BONDS:  The basis of the objection, Your Honor,

 2   is that --

 3      (Echoing.)

 4          THE COURT:  Okay.  We're going to have to do

 5   something different here.  We can't have this issue for the

 6   entire hearing.  Do you need to get a tech person in there, or

 7   maybe call in on your phone?  I don't know.

 8          MR. BONDS:  Your Honor, I'm going into the conference

 9   room.

10      (Pause.)

11          THE COURT:  Okay.  Are we going to try again here?

12          MR. BONDS:  Yes.  Is this working?

13          THE COURT:  Yes.

14          MR. BONDS:  Perfect.  Your Honor, my objection is

15   that Mr. Dondero has already testified that he relied on his

16   lawyers.  I don't know where Mr. Morris is going with this,

17   but it's pretty clear that Mr. Dondero simply relies on his

18   lawyers to tell him what happened.  I don't know that that's

19   that different than any other layperson.

20          MR. MORRIS:  Your Honor, if this is --

21          THE COURT:  Well, --

22          MR. MORRIS:  If I may?

23          THE COURT:  Yes.

24          MR. MORRIS:  I believe it's terribly relevant to know

25   how seriously Mr. Dondero takes this Court and this Court's

Dondero - Direct                        26

 1   proceedings and this Court's orders.  If the Court decides

 2   that it doesn't matter whether or not he read the transcript,

 3   you're the fact-finder and you'll make that decision.  But I

 4   believe it's at least relevant.

 5           THE COURT:  Okay.  I agree and I overrule the

 6   objection.

 7       Go ahead.

 8   BY MR. MORRIS:

 9   Q   Mr. Dondero, as of at least Tuesday, you never bothered to

10   read the TRO that was entered against you, correct?

11   A   I'm sorry.  We're dealing with some tech stuff here for a

12   second.  Can you repeat the question?

13   Q   Yes.

14       (Echoing.)

15   Q   As of Tuesday, you had not bothered to read the TRO that

16   was entered against you?

17       (Echoing.)

18           MR. MORRIS:  Your Honor, can we take a break?  I

19   can't do this.  I just --

20           THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21   do we need to do to fix these technical problems?  Do I need

22   to get my IT guy in here and help you?  This is terrible.

23   This connection is terrible.  And I understand people have

24   technical problems sometimes, but we've been doing these video

25   hearings since March, so --

Dondero - Direct                    27

1          MR. BONDS:  Your Honor, I have simply gone to another

2     conference room.  The Debtor (garbled) I think that Mr.

3     Dondero should be fine.

4          THE COURT:  Okay.  I don't know what you said except

5     that you think Mr. Dondero should be fine.  I --

6          MR. MORRIS:  Is there anybody in that room with a

7     cell phone on, Mr. Dondero?

8          THE WITNESS:  No.

9          MR. BONDS:  And I'm completely over in --

10         THE COURT:  Okay.

11         MR. MORRIS:  Can I try and proceed?

12         THE COURT:  Try to proceed.

13         MR. MORRIS:  Okay.

14      (Echoing.)

15   BY MR. MORRIS:

16   Q    Mr. Dondero, as of Tuesday you only had a general view of

17   what this Court restrained you from doing; is that correct?

18      (Echoing.)

19         MR. MORRIS:  I'd still -- I -- there's too much

20   noise, Your Honor.  I can't do it.

21         THE COURT:  Okay.  We're going to take a five-minute

22   break.  Mr. Bonds, can you get a technical person there to

23   work through these problems?

24      And Mike, let's get Bruce up here to --

25         THE CLERK:  It's because they're in the same room.

Dondero - Direct                    28

1   That's the problem.

2               THE COURT:  They're -- they're --

3               THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

4   on his way up there.

5               THE COURT:  Thank you.

6        Mike, explain it to me, because I don't understand.

7   You're saying if they have two devices on in the same room?

8               THE CLERK:  The same -- that's the problem.  They're

9   so close.  And they're trying to use the same device, give it

10  back to you.

11              A VOICE:  He has a phone on in the room.

12              MR. MORRIS:  I asked that question.

13              THE COURT:  Okay.

14              MR. MORRIS:  Please instruct the witness to exclude

15  everybody from the room, to turn off all electronic devices

16  except the device that's being used for this (garbled).  At

17  least have --

18              THE COURT:  All right.  So, the consensus of more

19  technical people than me is you've got two devices on in the

20  same room and that's what's causing the distortion and echo.

21  So I don't know if it's somebody's phone that needs to be

22  turned off or if you have two iPads or laptops.

23       (Court confers with Clerk.)

24       (Pause.)

25              MR. BONDS:  I think I'm unmuted.  Can people hear me?

Dondero - Direct                    29

 1          THE WITNESS:  Yes.

 2       (Pause.)

 3          THE COURT:  Okay.  Bruce, can you walk their office

 4    through?  They have, I think, two devices in the same room.

 5    It's a horrible echo.  So, Mr. Bonds or some --

 6          MR. BONDS:  Yes, Your Honor.

 7          THE COURT:  We have a lawyer and the lawyer's client

 8    who is testifying right now in the same room.

 9          I.T. STAFF:  Uh-huh.

10          THE COURT:  And --

11          I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-

12    in user on a telephone?

13          THE COURT:  I don't know.  I don't --

14          I.T. STAFF:  Yeah.  Whatever's coming -- the audio is

15    feeding back in.  They need to separate if they're both on.

16    Or just use one and the attorney can slide over and the client

17    can --

18          THE COURT:  Okay.

19          I.T. STAFF:  -- go in his place.  Just use one --

20          THE COURT:  Our IT person is confirming what everyone

21    else has been saying, that you really can only have one device

22    in the same room.  It's just unavoidable, the echoing.

23          I.T. STAFF:  Unless everybody has --

24          THE COURT:  Unless everyone has headphones on.

25          I.T. STAFF:  Right.

Dondero - Direct                    30

1           THE COURT:  So we either need everyone to have

2   headphones on, or one device in the room.  And you all,

3   awkward as it is, just have to share.  Or I guess you could

4   have two laptops, but one person has to --

5           I.T. STAFF:  Has to have a headset.

6           THE COURT:  Has to --

7           I.T. STAFF:  Because the other one, the audio is

8   going to be feeing into the microphone of the other one.

9           THE COURT:  Okay.  So, Mr. Bonds, I don't know if

10  you've heard any of that, but --

11          THE CLERK:  He needs to unmute himself.

12          THE COURT:  You're on mute, Mr. Bonds.

13          MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit

14  next to Mr. Dondero and answer any questions that may come up.

15          THE COURT:  Okay.

16          MR. BONDS:  If any objections --

17          THE COURT:  Okay.  So we're going to have one device?

18          MR. BONDS:  Yes.

19          THE COURT:  Okay.  Let's try again.

20      Okay.  Go ahead, Mr. Morris.

21  BY MR. MORRIS:

22  Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

23          THE COURT:  I didn't hear you, Mr. Morris.  What?

24  BY MR. MORRIS:

25  Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

Dondero - Direct                        31

1   A    I have no idea.

2   Q    Is Mr. Leventon listening to this hearing?

3   A    I have no idea.  I haven't spoken with him.

4   Q    Okay.  So let's try again.  At least as of today, you

5   never bothered to read the TRO that was entered against you,

6   correct?

7   A    Correct.

8   Q    As of Tuesday, you only had a general understanding of

9   what the Court restrained you from doing, correct?

10      (Echoing.)

11  A    I had an adequate understanding.

12  Q    You had a what?

13  A    Adequate understanding.

14  Q    Your understanding --

15          A VOICE:  Your Honor?

16  BY MR. MORRIS:

17  Q    -- was that you were prohibited from speaking to the

18  Debtor's board without counsel and from speaking to the

19  Debtor's employees; is that right?

20  A    No.

21  Q    Okay.

22          MR. MORRIS:  Can we go to Page 13, Line 8, please?

23  BY MR. MORRIS:

24  Q    Were you asked this question and did you give this answer?

25      "Q   Tell me your understanding of what the temporary

Dondero - Direct                    32

1     restraining order restrains you from doing.

2     "A   To talk to Independent Board directly or talking

3     directly with employees.

4     "Q   Is there any other aspect of the temporary

5     restraining order that you're aware of that would

6     otherwise constrain or restrain your conduct?

7     "A   Those are the points I (garbled)."

8  Q   Did you give those answers to the questions that I asked?

9  A   Yes.

10 Q   And even with that general understanding, you went ahead

11 and communicated directly (garbled) employees many, many, many

12 times after the TRO was entered?

13 A   Only with regard to shared services, pot plan, and

14 Ellington, the settlement counsel.

15 Q   Does the restraining order permit you to speak with

16 Debtor's employees about the pot plan?

17     (Echoing.)

18          THE COURT:  Mr. Morris, let me stop.

19          MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20          THE COURT:  Even --

21          MR. MORRIS:  It's not working.

22          THE COURT:  Even your sound is not coming through

23 clearly.  And I think it's the echo coming out of their

24 speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25 conclude that, would you turn off your video and ask your

Dondero - Direct                          33

1  question again and see if it's any better, just to confirm

2  it's not a bandwidth issue on your end?  I doubt it is, but --

3  okay.  So, try asking your question again, and I'm going to

4  see if it's still distorted.

5  BY MR. MORRIS:

6  Q    There's nothing in the TRO that permitted you to speak

7  with Debtor employees about the pot plan, correct?

8            THE COURT:  Okay.  Mr. Morris, it's not at your end.

9  It's -- it's their end.  Okay.  So you can turn your video

10 back on.

11     Mr. Bonds?

12           MR. BONDS:  Yes, ma'am.

13           THE COURT:  You all are going to have to use earbuds,

14 apparently.  We're getting -- we're getting a feedback loop,

15 okay?  Whenever Mr. Morris talks or I talk, we're hearing

16 ourselves echo through your speakers.

17           MR. BONDS:  Can you check right now to see if it's

18 true, if we're experiencing the same problem?

19           THE WITNESS:  In other words, is this better?  We

20 unplugged the cord here.

21           THE COURT:  Well, when you all speak, it's -- it's

22 better now.  But when --

23           MR. MORRIS:  It is better.

24           THE COURT:  But when Mr. Morris asks a question, it's

25 echoing through your speakers.  But I don't hear myself

Dondero - Direct                    34

1  echoing through your speakers.

2          I.T. STAFF:  Can Mr. Morris say something, please?

3          THE COURT:  Mr. Morris, say something.

4          MR. MORRIS:  They may have solved the problem.  They

5  may have solved the problem.  How's that?

6          THE COURT:  Okay.  I think the problem is solved,

7  whatever you did, so let's try once again.

8      Go ahead, Mr. Morris.  Repeat your last question.  I

9  didn't hear it.

10 BY MR. MORRIS:

11 Q   Mr. Dondero, the temporary restraining order doesn't

12 permit you to speak with the Debtor's employees about a pot

13 plan; isn't that right?

14 A   There was a presentation on the pot plan given to the

15 Independent Board after the restraining order was put in

16 place.  What are you implying, that that wasn't proper?

17         MR. MORRIS:  Your Honor, I move to strike.  It's a

18 very simple question.

19         THE COURT:  Okay.  Sustained.  If you could just

20 answer the specific question, Mr. Dondero.

21         THE WITNESS:  I don't know.

22 BY MR. MORRIS:

23 Q   Fair enough.  Sir, let's talk about some of the events

24 that led up to the imposition of the TRO.  I appreciate the

25 fact that you hadn't read Mr. Seery's declaration or any of

Dondero - Direct                    35

1  the evidence that was submitted in connection with the TRO, so

2  let's spend some time talking about that now.  CLO stands for

3  Collateralized Loan Obligation, correct?

4  A    Yes.

5  Q    And the Debtor is party to certain contracts that give it

6  the exclusive right and responsibility to manage certain CLOs,

7  correct?

8  A    Yes.

9  Q    NexPoint Advisors, LP is an advisory firm.  Do I have that

10 right?

11 A    Yes.

12 Q    And we can refer to that, that firm, as NexPoint; is that

13 fair?

14 A    Yes.

15 Q    You have a direct or indirect ownership interest in

16 NexPoint, correct?

17 A    Yes.

18 Q    You're the president of NexPoint; isn't that right?

19 A    Yes.

20 Q    And as the president of NexPoint, it's fair to say that

21 you control that entity, correct?

22 A    To a certain extent.

23 Q    Sir, as the president of NexPoint, it's fair to say that

24 you control that entity, correct?

25 A    To a certain extent.

Dondero - Direct                          36

1       MR. MORRIS:  Can we go to Page 18 of the transcript,

2    please?  Lines 19 and 21.

3    BY MR. MORRIS:

4    Q    Were you asked this question and did you give this answer?

5        "Q    As the president of NexPoint, it's fair to say

6        that you control that entity?

7        "A    Generally."

8    Q    Is that the right answer that you gave the other day?

9    A    I think it's similar to what I just said, yeah, yeah.

10   Q    Sir, you're familiar with Highland Capital Management Fund

11   Advisors, LP; is that right?

12   A    Yes.

13   Q    And we'll call that Fund Advisors; is that fair?

14   A    Yes.

15   Q    And we'll refer to Fund Advisors and NexPoint together as

16   the Advisors; is that okay?

17   A    Yes.

18   Q    Fund Advisors is also an advisory firm, correct?

19   A    Yes.

20   Q    You have a direct or indirect ownership interest in Fund

21   Advisors, correct?

22   A    Yes.

23   Q    You're the president of Fund Advisors, correct?

24   A    Yes.

25   Q    And you also have an ownership interest in the general

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 355 of 921 PageID 12153

Dondero - Direct                    37

1  partner of Fund Advisors; isn't that right?

2  A    I believe so.

3  Q    It's fair to say that you control Fund Advisors, correct?

4  A    Generally.

5  Q    NexPoint and Fund Advisors manage certain investments

6  funds; is that right?

7  A    Yes.

8  Q    Among the funds that they manage are High Point Income

9  Fund; is that right?

10 A    I don't think that's a name that we manage.

11 Q    Let's put it this way.  There are three funds that are

12 represented by K&L Gates that are managed by the Advisors,

13 correct?

14 A    I don't know.

15 Q    Okay.  You're the portfolio manager of the investment

16 funds advised by NexPoint and Fund Advisors, correct?

17 A    Largely.

18 Q    And NexPoint and Fund Advisors caused the investment funds

19 that they manage to invest in CLOs that are managed by the

20 Debtors, correct?

21 A    Years ago, they bought the equity interests, if that -- if

22 that's what you're asking me, in various CLOs.

23 Q    The two Advisors that you own and control caused the

24 investment funds to purchase interests in CLOs that are

25 managed by the Debtor, correct?

Dondero - Direct                        38

1   A    Not recently.  Not recently.  Years ago.  Yes.

2   Q    And they still hold those interests today, correct?

3   A    Yes.

4   Q    And K&L Gates represents all of those entities, correct?

5   A    Yes.

6   Q    And we'll call those the K&L Gates Clients; is that fair?

7   A    Yes.

8   Q    Before the TRO was entered, the K&L Gates Clients sent two

9   letters to the Debtor concerning the Debtor's management of

10  certain CLOs, right?

11  A    Yes.

12  Q    Okay.

13       MR. MORRIS:  Your Honor, I just want to take a moment

14  now, because we're going to start to look at some documents.

15  The Debtor would respectfully move into evidence Exhibits A

16  through Y that are on their exhibit list.

17       THE COURT:  All right.

18       MR. BONDS:  Your Honor, we have no objection.

19       THE COURT:  A through Y are admitted.  And for the

20  record, these appear at Docket No. 46 in this adversary.

21    (Plaintiff's Exhibits A through Y are received into

22  evidence.)

23       MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24  in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25  us know.

Dondero - Direct                        39

1          MS. CANTY:  Yeah.  I'm pulling it up right now.

2          MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3   down just a bit?

4   BY MR. MORRIS:

5   Q    All right.  Can you see this letter was sent on October

6   16th?

7   A    Yes.

8   Q    And we see the entities that are reflected on this letter.

9   We've got Highland Capital Management, LP.  That's the

10  question that they're asking.  And the questions and the

11  statements are being asserted on behalf of NexPoint Advisors,

12  LP.  Do you see that?

13  A    Yes.

14  Q    And Highland Capital Management Fund Advisors, LP.  Those

15  are the two Advisors that you own and control, correct?

16  A    Control to a large extent.

17  Q    Okay.

18          MR. MORRIS:  And can we put up Exhibit C, please?

19  BY MR. MORRIS:

20  Q    This is a second letter sent by NexPoint on November 24th.

21  Do you see that?

22  A    Yes.

23  Q    Okay.  And you're familiar with the substance of these

24  letters, correct?

25  A    Yes.

Dondero - Direct                    40

1    Q    And you were familiar -- you were aware of these letters

2    before they were sent.  Is that correct?

3    A    Yes.

4    Q    And you generally discussed the substance of these letters

5    with NexPoint; is that right?

6    A    Generally, yes.

7    Q    And you discussed the substance of the letters with the

8    Advisors' internal counsel; is that right?

9    A    Yes.

10   Q    That's D.C. Sauter?

11   A    Yes.

12   Q    And you have been on some calls with K&L Gates about these

13   letters, right?

14   A    I believe so.

15   Q    And you knew these letters were being sent, correct?

16   A    Yeah, they're -- they're reported.

17   Q    You knew these letters for being sent; isn't that right,

18   sir?

19   A    Yes.

20   Q    And you didn't object to the sending of these letters,

21   correct?

22   A    No.

23   Q    In fact, you supported the sending of these letters.  Is

24   that right?

25   A    Yes.

Dondero - Direct                          41

1  Q    And you have never directed NexPoint to withdraw these

2  letters, correct?

3  A    No.

4  Q    Around Thanksgiving, you learned that Mr. Seery had given

5  a direction to sell certain securities owned by the CLOs

6  managed by the Debtors, correct?

7  A    Yes.

8  Q    And when you learned that, you personally intervened to

9  stop the trades, correct?

10 A    Yes.  I believe they were inappropriate.

11         MR. MORRIS:  I move to strike the latter part of the

12 answer, Your Honor.

13         THE COURT:  It's stricken.

14         MR. MORRIS:  Can we put up Exhibit D, please?

15 BY MR. MORRIS:

16 Q    We looked at this email string the other day.  Do you

17 recall that?

18 A    Yes.

19         MR. MORRIS:  Can we start at the bottom, please?

20 BY MR. MORRIS:

21 Q    There's an email from Hunter Covitz.  Do you see that?

22 A    Yes.

23 Q    Now, this is November 24th.  It's before the TRO.  Is that

24 fair?

25 A    Yes.

Dondero - Direct                          42

1   Q    Mr. Covitz is an employee of the Debtor, right?

2   A    I believe so.

3   Q    And Mr. Covitz helps manage the CLOs on behalf of the

4   Debtor.  Is that your understanding?

5   A    Yes.

6   Q    And Mr. Covitz in this email is giving directions to Matt

7   Pearson and Joe Sowin to sell certain securities held by the

8   CLOs.  Is that correct?

9   A    No.  He's giving Jim Seery's direction.

10            MR. BONDS:  And Your Honor, I'm going to object.

11  This is all before the TRO was ever entered.  It doesn't have

12  anything to do with today's hearing.

13            THE COURT:  Overruled.

14            MR. MORRIS:  May I respond, Your Honor?

15            THE COURT:  I --

16            MR. MORRIS:  Okay.  Thank you.

17            THE COURT:  I think it's relevant.  Go ahead.

18            MR. MORRIS:  Thank you.  Okay.

19  BY MR. MORRIS:

20  Q    Mr. Seery is the CEO of the Debtor; is that right?

21  A    Yes.

22  Q    And the Debtor is the contractual party with the CLOs

23  charged with the exclusive responsibility of managing the

24  CLOs, correct?

25  A    I don't believe so.  The Debtor is in default of the

                          Dondero - Direct                    43

1    agreements.

2              MR. MORRIS:  I move to strike, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. MORRIS:

5    Q    Sir, the Debtor has the exclusive contractual right and

6    obligation to manage the CLOs, correct?

7    A    I don't agree with that.

8    Q    Okay.

9              MR. MORRIS:  Can we scroll up to the -- just --

10   BY MR. MORRIS:

11   Q    Do you see that Mr. Pearson acknowledges receipt of Mr.

12   Covitz's email?

13   A    Yes.

14   Q    And you received a copy of Mr. Covitz's email, did you --

15   did you not?

16   A    Yes.

17             MR. MORRIS:  Can you scroll up a little bit, please?

18   BY MR. MORRIS:

19   Q    And can you just read for Judge Jernigan your response

20   that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21   November 24th?

22   A    (reading)  No, do not.

23   Q    You instructed the recipients of Mr. Covitz's email not to

24   sell the SKY securities as had been specifically instructed by

25   Mr. Seery, correct?

                            Dondero - Direct                44

1  A    Yes.

2  Q    And you understood when you gave that instruction that the

3  people on the email were trying to execute trades that Mr.

4  Seery had authorized, correct?

5  A    No.  I -- no, that isn't how I would describe it.

6           MR. MORRIS:  A second, Your Honor?

7           THE COURT:  Okay.

8       (Pause.)

9  BY MR. MORRIS:

10 Q    Sir, when you gave the instruction reflected in this

11 email, you knew that you were stopping trades that were

12 authorized and directed by Mr. Seery, correct?

13 A    I don't think -- I -- I wasn't -- I wasn't sure at the

14 moment I did that.  I didn't find out until later that it was

15 Seery who directed it.

16          MR. MORRIS:  Can we please go back to the deposition

17 transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18 BY MR. MORRIS:

19 Q    Were you asked this question and did you give this answer?

20      "Q   At the time that you gave the instruction, "No, do

21      not," you knew that you were stopping trades that had

22      been authorized and directed by Mr. Seery, correct?

23      "A   Yes."

24 Q    Did you give that answer to my question on Tuesday?

25 A    I'd like to clarify it, but yes, I did give that answer.

Dondero - Direct                45

1  Q    Okay.  You didn't speak with Mr. Seery before sending your

2  instructions interfering with his trade, the trades that he

3  had authorized, correct?

4  A    No, I did not.

5  Q    And you took no steps to seek the Debtor's consent before

6  instructing the recipients of your email to stop executing the

7  SKY transactions that had been authorized by Mr. Seery,

8  correct?

9  A    I'm sorry.  Can you repeat the question?

10 Q    You took no steps to seek the Debtor's consent before

11 stepping in to stop the trades that Mr. Seery had authorized,

12 correct?

13 A    I took other actions instead.

14 Q    Okay.  But you didn't seek the Debtor's consent?  That's

15 not one of the actions you took, right?

16 A    No, I educated the traders as to why it was inappropriate.

17         MR. MORRIS:  I move to strike, Your Honor.

18         THE COURT:  Sustained.

19 BY MR. MORRIS:

20 Q    Sir, did you seek the Debtor's consent before stepping in

21 to stop the trades that Mr. Seery had authorized?

22 A    No, I did not seek consent.

23 Q    In response to your instruction, Mr. Pearson canceled all

24 of the trades that Mr. Seery had authorized, correct?

25 A    Yes.

Dondero - Direct                          46

1        MR. MORRIS:  Can we go back to the exhibit, please?

2    And if we could just scroll -- stop right there.

3    BY MR. MORRIS:

4    Q    That's -- that's Mr. Pearson's response to your email,

5    confirming that he had canceled both the SKY and the AVAYA

6    trades that had not yet been executed, correct?

7    A    Yes.

8        MR. MORRIS:  Can we scroll to the response to that?

9    BY MR. MORRIS:

10   Q    Is this your response?

11   A    Yes.

12   Q    Can you read that aloud, please?

13   A    (reading)  HFAM and DAF have instructed Highland in

14   writing not to sell any CLO underlying assets.  There is

15   potential liability.  Don't do it again, please.

16   Q    The writings that you're referring to are the two letters

17   from NexPoint, Exhibits B and C that we just looked at,

18   correct?

19   A    Yeah.  There might have been a third letter.  I don't

20   know.  But, yes, generally, those letters.

21   Q    Okay.  And at this juncture, the reference to potential

22   liability was a statement intended for Mr. Pearson.  Is that

23   correct?

24   A    Um, I -- no.  Pearson wouldn't have had any personal

25   liability.  It was -- it was meant for the -- there was

Dondero - Direct                    47

1   potential liability to the Debtor or to the compliance

2   officers at the Debtor.

3           MR. MORRIS:  Can we go to Page 45 of the deposition

4   transcript, please?  Line -- beginning at Line 11, through 18.

5   BY MR. MORRIS:

6   Q    Did I ask these questions and did you give these answers?

7        "Q   Do you see the reference there in the latter

8        portion of your email, 'There is potential liability.

9        Don't do it again'?

10       "A   Yes.

11       "Q   Who was the intended recipient of that message?

12       "A   At this juncture, it's Matt Pearson, I believe."

13  Q    Did you give those answers to my questions on Tuesday?

14  A    Yeah.  That's not inconsistent.

15          MR. MORRIS:  Let's go back to the email, please.

16  BY MR. MORRIS:

17  Q    Mr. Sowin responded to your email; is that right?

18          MR. MORRIS:  Can we scroll up?

19  BY MR. MORRIS:

20  Q    Okay.  Who's Mr. Sowin?

21  A    He's the head trader.

22  Q    Who's he employed by?

23  A    I believe he's employed by HFAM but not the Debtor.

24  Q    Okay.  So he's -- he's somebody who's employed by one of

25  the Advisors; is that right?

Dondero - Direct                    48

1   A    I believe so.

2   Q    And Mr. Sowin responded to your email and he indicated

3   that he would follow your instructions.  Is that right?

4   A    Yeah.  He understands that it's inappropriate.  That's

5   what he's reflecting.  Yes.

6            MR. MORRIS:  I move to strike, Your Honor.

7            THE COURT:  Sustained.

8   BY MR. MORRIS:

9   Q    Sir, Mr. Sowin responded and indicated that he would

10  follow your instructions, correct?

11  A    (no audible response)

12  Q    Did you answer?  I'm sorry.

13  A    No, I didn't answer.  It's -- I don't know if you could

14  expressly say that from that email.  Maybe we should read the

15  email.

16           MR. MORRIS:  Let's just move on, Your Honor.

17           THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q    A few days later, you learned -- you learned that Mr.

20  Seery was trying a workaround to effectuate the trades anyway,

21  correct?

22  A    I believe so.

23  Q    Uh-huh.  And when you learned that, you wrote to Thomas

24  Surgent; is that right?

25  A    I -- I believe so.

Dondero - Direct                    49

1    Q   I don't -- I don't mean to -- this is not a test here.

2             MR. MORRIS:  Can we just scroll up to the next email,

3    please?  Okay.  Stop right there.

4    BY MR. MORRIS:

5    Q   When you -- when you learned that Mr. Seery was trying a

6    workaround, you wrote to Mr. Surgent when you learned that,

7    right?

8    A   Yes.

9    Q   And Mr. Surgent is an employee of the Debtor; is that

10   correct?

11   A   I believe he's still the chief compliance officer of the

12   Debtor.

13   Q   Okay.  Now, as a factual matter, you never asked Mr. Seery

14   why he wanted to make these trades; isn't that right?

15   A   I -- I did not.

16   Q   Okay.  And before the TRO was entered, there was nothing

17   that prevented you from picking up the phone and asking Mr.

18   Seery why he wanted to make these trades, correct?

19   A   That's not true.

20            MR. MORRIS:  One second, please, Your Honor.

21            THE COURT:  Okay.

22        (Pause.)

23            MR. MORRIS:  Can we go to Page 60 of the transcript?

24   Mr. Bonds says -- beginning at Line 14.  There is an objection

25   there, Your Honor, and I would ask that the Court rule on the

Dondero - Direct                    50

1  objection before I read from the transcript.

2              THE COURT:  Okay.

3              MR. MORRIS:  There you go.

4              THE COURT:  (sotto voce)  (reading)  Is there

5  anything that you're aware of that prevented you from picking

6  up the phone and asking Mr. Seery for his business

7  justification for these trades prior to December 10.

8  Objection, form.

9      I overrule the objection to the form of that question.

10             MR. MORRIS:  Okay.

11 BY MR. MORRIS:

12 Q   Mr. Dondero, were you asked this question and did you give

13 this answer?

14     "Q   Is  there  anything  that  you're  aware  of  that

15     prevented you from picking up the phone and asking Mr.

16     Seery  for  his  business  justification  for  these  trades

17     prior to December 10, 2010?

18     "A   No.  I expressed my disapproval via email."

19 Q   Is that right?

20 A   I'd like to adjust that answer to the answer I just gave.

21 Q   Okay.

22             MR. MORRIS:  And I move to strike.

23 BY MR. MORRIS:

24 Q   I'm just asking you if that's the answer you gave on

25 Tuesday.

                         Dondero - Direct                    51

 1              THE COURT:  Sustained.

 2              THE WITNESS:  Yes.

 3    BY MR. MORRIS:

 4    Q    Thank you.  Now, you wrote to Mr. Surgent because you

 5    wanted to remind him of his personal liability for regulatory

 6    breaches and for doing things that aren't in the best interest

 7    of investors, correct?

 8    A    Yes.

 9    Q    And you actually thought about this and you -- because you

10    didn't believe that Mr. Surgent had extra insurance and

11    indemnities like Mr. Seery, right?

12    A    No.

13    Q    Didn't you testify to that the other day?

14    A    I don't remember, but that isn't the only reason.

15    Q    I didn't ask you if it was the only reason.  Listen

16    carefully to my question.  Did you send this email because you

17    -- because you wanted to remind him of his personal liability

18    for regulatory breaches and for doing things that aren't in

19    the -- I apologize.  Withdrawn.

20         You did not believe at the time that you sent this email

21    that he, Mr. Surgent, had insurance and indemnities like Mr.

22    Seery, correct?

23    A    Yes.

24    Q    Okay.

25              MR. MORRIS:  Can we go back to the email, please?

Dondero - Direct                          52

BY MR. MORRIS:

1    Q    Can you just read the entirety of your email to Mr.

3    Surgent out loud?

4    A    (reading)  I understand Seery is working on a workaround

5    to trade these securities anyway, trades that contradict

6    investor desires and have no business purpose or investment

7    rationale.  You might want to remind him and yourself that the

8    chief compliance officer has personal liability.

9    Q    Okay.  That's -- that's the message you wanted to convey

10   to Mr. Surgent, right?

11   A    Yes.

12   Q    And, again, you never bothered to ask Mr. Seery what his

13   businessperson -- purpose or investment rationale was,

14   correct?

15   A    I -- I didn't believe I could talk to him directly.

16   Q    This is before the --

17   A    That's why I never picked up the phone.

18   Q    Okay.  You intended to convey the message to Mr. Surgent

19   that, by following Mr. Seery's orders to execute the trades,

20   that Mr. Surgent faced personal liability, correct?

21   A    Yes, he does.

22   Q    And that's the message you wanted to send to him, right?

23   A    It's a true and accurate message, yes.

24   Q    Okay.  Just a few days earlier, you also threatened Mr.

25   Seery, right?

Dondero - Direct                    53

1  A    I wouldn't use the word "threatened."

2  Q    Okay.  Let's let -- let's let it speak for itself.

3         MR. MORRIS:  Can we go to Exhibit E, please?  Keep

4  scrolling down just a bit.

5  BY MR. MORRIS:

6  Q    This is an email that you sent to Mr. Seery on November

7  24th.  And as always, Mr. Dondero -- this is the third time

8  we're meeting -- if there's something in the document that you

9  need to see, please just let me know, because I don't -- I

10 don't mean to test your memory if the document can help

11 refresh your recollection.

12        MR. MORRIS:  Can we just scroll up a little bit

13 further to the top to see the date?

14 BY MR. MORRIS:

15 Q    Okay.  So, Jim, there, JD, who is that?

16 A    That's me.

17 Q    Okay.  And can you tell by the substance of the email, of

18 the text messages, this is communications between you and Mr.

19 Seery, right?

20 A    Yes.

21 Q    Okay.  And you see that it's dated November 24th there?

22 A    Yes.  Right after we were discussing the pipeline.  Or

23 right when we were working on the pipeline.

24 Q    Okay.

25        MR. MORRIS:  Can you scroll down a little bit,

Dondero - Direct                    54

1  please?

2  BY MR. MORRIS:

3  Q   At 5:26 p.m., you sent Mr. Seery a text, correct?

4  A   Yes.

5  Q   Can you read that, please?

6  A   (reading)  Be careful what you do.  Last warning.

7  Q   Okay.  This was a warning telling Mr. Seery to stop

8  selling assets out of the CLOs or the beneficial owners would

9  take more significant action against him, correct?

10 A   It was a general statement that what he was doing was

11 regulatorily inappropriate and ethically inappropriate and he

12 was in breach of the contracts he was operating.

13 Q   Neither you nor any entity owned or controlled by you are

14 parties to the contracts you just referred to; isn't that

15 correct?

16 A   I believe they're indirectly parties to those contracts,

17 especially when they're in default.

18 Q   Neither you nor any entity owned or controlled by you is a

19 signatory to any CLO management contract pursuant to which the

20 Debtor is a party, correct?

21 A   I -- I don't know and I don't want to make legal

22 conclusions on that.

23 Q   Okay.  At the deposition the other day, some of the things

24 that you suggested the beneficial owners of the CLO interests

25 might do against Mr. Seery and the Debtor are class action

Dondero - Direct                    55

1   lawsuits.  Is that right?

2   A    I -- I did not suggest the entities I control would do

3   that.  If anybody on this call were to call a class action

4   lawsuit -- a class action law firm and tell them what's been

5   going on with the CLOs, I think a class action law firm would

6   file it on their own regard, not on the behalf of my entities.

7              MR. MORRIS:  I move to strike, Your Honor.

8              THE COURT:  Sustained.

9   BY MR. MORRIS:

10  Q    Let's talk about that cell phone.  Okay?  Until at least

11  December 10th, the day the TRO was entered, you had a cell

12  phone that was bought and paid by the Debtor, right?

13  A    Yes.

14  Q    But sometime after December 10th, your phone was disposed

15  of or thrown in the garbage; is that right?

16  A    Yes.

17  Q    And you don't know when after December 10th the cell phone

18  that was the Debtor's property was disposed of, right?

19  A    I don't believe at that point it was the Debtor's

20  property.  I think I paid it off in full and the Debtor had

21  announced that they were canceling everybody's cell phones so

22  it was appropriate for me to get another one.

23             MR. MORRIS:  I move to strike, Your Honor.

24             THE COURT:  Sustained.

25             MR. BONDS:  Your Honor, at some point, I mean, Mr.

Dondero - Direct                              56

1   Morris just ought to go on and testify.

2            MR. MORRIS:  No, this is Mr. Dondero's testimony,

3   Your Honor.  He gave it the other day.  I'm just asking him to

4   confirm it, basically.

5            THE COURT:  Okay.  I overrule the objection, if any

6   there was, on the part of Mr. Bonds.

7   BY MR. MORRIS:

8   Q    Sometime after December 10th, the cell phone that prior to

9   that time had been owned and paid for by the Debtor was thrown

10  in the garbage or otherwise disposed of, correct?

11  A    Yes.

12  Q    And you don't know when after December 10th that was --

13  the phone was disposed of, correct?

14  A    It was on or about that date, I'm sure.

15  Q    Well, we know it was after December 10th, right?

16  A    Okay.  Or about that date.

17  Q    You testified the other day that you just don't know who

18  made the decision to throw your phone away, right?

19  A    I could find out, but I don't know.  I would have to talk

20  to employees.

21  Q    Did you make any request of the Debtor since your

22  deposition to try to find out the answer as to who made the

23  decision to throw your phone away?

24  A    No.

25  Q    How did you learn that your phone was thrown away?

Dondero - Direct                    57

1    A    As I testified, it's standard operating procedures every

2    time a senior executive gets a new phone.

3    Q    Hmm.  You don't know exactly who threw the phone away; is

4    that right?

5    A    No, but I can find out.

6    Q    Okay.  I'm just asking -- I'm not asking you to find out.

7    I'm just asking you if you know.  Do you know who threw your

8    phone away?

9    A    No.

10   Q    Do you know who made the decision to throw your phone

11   away?

12   A    It -- there wasn't a decision.  It was standard operating

13   procedure.

14        MR. MORRIS:  I move to strike.

15        THE COURT:  Sustained.

16   BY MR. MORRIS:

17   Q    You and Mr. Ellington disposed of your phones at the same

18   time, correct?

19   A    I don't have specific awareness regarding what Mr.

20   Ellington did with his phone.

21   Q    It never occurred to you to get the Debtor's consent

22   before throwing the phone that they had purchased away, right?

23   A    I'm not permitted to talk to the Debtor.

24   Q    Sir, it never occurred to you to get the Debtor's consent

25   before throwing the phone away, correct?

Dondero - Direct                    58

1  A    I'm going to stick with the answer I just gave.

2         MR. MORRIS:  Can we go to Page 75 of the transcript?

3  Lines 12 through 15.  There is an objection there, Your Honor.

4  I would respectfully request that the Court rule on the

5  objection before I read the testimony.

6         THE COURT:  Okay.  Starting at Line 12?

7         MR. MORRIS:  12.

8         THE COURT:  (sotto voce)  (reading)  Did it ever

9  occur to you to get the Debtor's consent before doing this?

10 Objection, form.

11     That objection is overruled.

12 BY MR. MORRIS:

13 Q    All right.  Mr. Dondero, did you give this answer to my

14 question on Tuesday?

15     "Q   Did it ever occur to you to get the Debtor's

16     consent before doing this?

17     "A   No."

18 A    Yes, I gave that testimony.

19 Q    Okay.  And you also had the phone number changed from the

20 Debtor's account to your own personal account; is that right?

21 A    The phone number changed?  The phone number stayed the

22 same.

23 Q    But you had the number changed from the Debtor's account

24 to your own personal account, correct?

25 A    The Debtor said they wouldn't pay for it anymore.  Who

Dondero - Direct                              59

1  else could I change it to?

2         MR. MORRIS:  Your Honor, I move to strike.  It's a

3  very simple question.

4         THE COURT:  Sustained.

5  BY MR. MORRIS:

6  Q   I'll ask it one more time, Mr. Dondero.  You had the phone

7  number changed from the Debtor's account to your personal

8  account, correct?

9  A   I didn't change the number.  I had the billing changed to

10 my personal account versus the company account.

11 Q   And you never asked the Debtor for permission to do that,

12 correct?

13 A   No.

14 Q   And you never told Debtor you were doing that, correct?

15 A   No.

16 Q   And nobody ever told Mr. Seery or anybody at my firm that

17 the phone was being thrown in the garbage, correct?

18 A   Well, --

19        MR. BONDS:  To the extent he knows.

20        THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21 BY MR. MORRIS:

22 Q   You didn't believe it was necessary to give the Debtor

23 notice that you were taking the phone number for your own

24 personal account and throwing the phone in the garbage,

25 correct?

                        Dondero - Direct                    60

1  A    Correct.

2  Q    The phone --

3            MR. BONDS:  Your Honor, I'm going to object.  He --

4  Mr. Dondero did not testify he personally threw the phone in

5  the garbage.

6            MR. MORRIS:  Withdrawn.

7            THE COURT:  Okay.

8  BY MR. MORRIS:

9  Q    Mr. Dondero, the phone was in Highland's offices on

10 December 10th, the date the TRO was in effect, correct?

11 A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12 know.  It's -- I remember going over to -- well, anyway, I --

13 I don't know.  We'll leave it at that.

14           MR. MORRIS:  Can we go to Exhibit G, please?

15 BY MR. MORRIS:

16 Q    Who's Jason Rothstein, while we wait?

17 A    Jason, Jason is our -- is the Highland head of technology.

18 Q    Okay.  And did you text with him from time to time?  On or

19 about December 10th?

20 A    Yes.

21 Q    Okay.

22           MR. MORRIS:  Can we just scroll up a little bit?

23 BY MR. MORRIS:

24 Q    Is that Mr. Rothstein there?

25 A    Yes.  Yeah.

Dondero - Direct                61

1    Q    Okay.  And do you see that there's a text message that you

2    sent to him on December 10th, right at the top?  Can you read

3    -- can you read the text message Mr. Rothstein --

4    A    He sent that to me.  At the top.

5    Q    I apologize.  Thank you for the correction.  Can you read

6    what Mr. Rothstein told you on December 10th?

7    A    That my old phone is in the top drawer of Tara's desk.

8    Q    And who's Tara?

9    A    My assistant.

10   Q    Is she still your assistant today?

11   A    Yes.

12   Q    And has she been serving as your assistant since the TRO

13   was entered into on December 10th?

14   A    Yes.

15   Q    Okay.  Is it fair to say that you were informed on

16   December 10th that the phone was not thrown in the garbage,

17   had not been disposed of, but was instead sitting in Tara's

18   desk?

19   A    As of that moment, yes.

20   Q    Okay.  And it's also fair to say that, as of December

21   10th, Mr. Rothstein didn't take it upon himself to throw your

22   old phone in the garbage, right?

23   A    Not as of that moment.  But like I said, I can find out

24   how it was disposed of.

25   Q    If you were curious to do that, would you have done that

Appx 09354
011297

Dondero - Direct                           62

1  before today?

2  A    I haven't been curious.

3  Q    Thank you very much.  Someone you can't identify made the

4  decision after December 10th to throw the phone in the garbage

5  without asking the Debtor for permission or seeking the

6  Debtor's consent, correct?

7            MR. BONDS:  I'm going to object, Your Honor.  To the

8  extent that the witness knows, he can answer.

9            THE COURT:  I -- I didn't hear --

10           THE WITNESS:  I don't know.

11           THE COURT:  I didn't hear what your objection was,

12 Mr. Bonds.  Repeat.

13           MR. BONDS:  Your Honor, my objection was along the

14 lines of to the extent that the witness knows, he could

15 testify, but if he doesn't know, he doesn't need to speculate.

16           THE COURT:  All right.  Well, I don't hear an

17 objection there, but go ahead, Mr. Dondero, if you have

18 knowledge and can answer the question.

19           THE WITNESS:  I don't know.

20 BY MR. MORRIS:

21 Q    Do you recall that the Debtor subsequently gave notice to

22 you to vacate its offices and to return its cell phone?

23 A    I don't know.

24 Q    Did you ever --

25 A    I know I -- I know I was told to vacate the offices.  I

Dondero - Direct                    63

1   didn't see the specific --

2   Q    Uh-huh.  Your lawyer -- your lawyers never told that

3   Debtor that the cell phone had been disposed of or thrown in

4   the garbage, consistent with company practice, right?

5   A    I don't know.

6          MR. MORRIS:  Can we put up Exhibit K, please?

7   BY MR. MORRIS:

8   Q    This is the letter that my firm sent to your lawyer on

9   December 23rd.  Do you see that?

10  A    Yeah, I see it.

11  Q    Okay.

12         MR. MORRIS:  Can we scroll down a little bit?  Keep

13  going.  Okay.  Stop right there.

14  BY MR. MORRIS:

15  Q    Do you see that it says that, as a result of the conduct

16  described above, that the Debtor "has concluded that Mr.

17  Dondero's presence at the HCMLP office suite and his access to

18  all telephonic and information services provided by HCMLP are

19  too disruptive"?

20  A    Yeah, I see it.

21  Q    And this is the letter that gave you notice that you had

22  to vacate the premises by December 30th, correct?

23  A    I believe so.

24         MR. MORRIS:  Can we scroll down a little bit?

25  BY MR. MORRIS:

Dondero - Direct                    64

1  Q    You see at the bottom there's a reference to a defined

2  term of "cell phones"?

3  A    Yes.

4  Q    And it says that the Debtor "will also terminate Mr.

5  Dondero's cell phone plan and those cell phone plans

6  associated with parties providing personal services to Mr.

7  Dondero."  Do you see that?

8  A    Yes.  Yeah.

9  Q    Have I read that accurately?

10 A    Yes.

11 Q    And then my colleagues went on to write, "HCMLP demands

12 that Mr. Dondero immediately turn over the cell phones to

13 HCMLP by delivering them to you, Mr. Lynn."  Do you see that?

14 A    Yes.

15 Q    Have I read that accurately?

16 A    Yes.

17 Q    The last sentence on the page begins, "The cell phones

18 and."

19           MR. MORRIS:  And let's scroll down further.

20 BY MR. MORRIS:

21 Q    "The cell phones and the accounts are property of HCMLP.

22 HCMLP further demands that Mr. Dondero refrain from deleting

23 or wiping any information or messages on the cell phone.

24 HCMLP, as the owner of the account and cell phones, intends to

25 recover all information related to the cell phones and

Dondero - Direct                65

1   accounts, and reserves the right to use the business-related

2   information."  Have I read that accurately?

3   A    Yes.

4   Q    Okay.  We were a couple of weeks too late, huh?

5   A    It sounds like it.

6   Q    Yeah.  Because the phones were already in the garbage,

7   right?

8   A    Yes.

9   Q    Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10  your behalf, right?

11  A    I don't know.

12  Q    Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13  said.

14          MR. MORRIS:  Can we go to Exhibit U, please?

15  BY MR. MORRIS:

16  Q    It took Mr. Lynn six days to write a one-paragraph letter

17  in response, right?  December 29th, he responded?

18          MR. MORRIS:  Can we scroll down a bit?

19  BY MR. MORRIS:

20  Q    Let me read beginning with the second sentence of the

21  first substantive paragraph.  "We are at present not sure of

22  the location of the cell phone issued to Mr. Dondero by the

23  Debtor, but we are not prepared to turn it over without

24  ensuring the privacy of the attorney-client communications."

25  And then he goes on.

Dondero - Direct                        66

1      Have I read that correctly?
2   A   Yes.
3   Q   Okay.  So Mr. Lynn didn't say anything about the phone
4   being thrown in the garbage, right?
5   A   No.
6   Q   He didn't say that it was disposed of, did he?
7   A   No.
8   Q   He didn't refer to any company practice or policy, right?
9   A   No.
10  Q   Mr. Lynn's not a liar, is he?
11  A   No, he's not.
12  Q   He's a decent and honest professional.  Wouldn't you agree
13  with that?
14  A   Yes.
15  Q   And is it fair to say that he conveyed only the
16  information that he had at the time?
17  A   I don't know.
18  Q   Do you have any reason to believe that Mr. Lynn would
19  withhold from the Debtor the information that the cell phone
20  had been thrown in the garbage, consistent with company
21  practice?
22  A   No, I don't believe he would withhold whatever he knew.
23  Q   All right.  Let's talk about -- let's talk about other
24  matters.  You do know, sir, do you not, that the Debtor is
25  subject to the Bankruptcy Court's jurisdiction?

Dondero - Direct                    67

1  A    Yes.

2  Q    Okay.  And we just saw in the December 23rd letter that

3  the Debtor demanded that you vacate their offices a week

4  later, right?

5  A    Yes.

6  Q    And you knew that at or around the time the letter was

7  sent on December 23rd, correct?

8  A    I -- I don't remember when I knew.

9  Q    Well, in fact, in fact, you or through counsel asked for

10 an accommodation and asked for an extension of time to

11 December 31st; isn't that right?

12 A    I had to pack up 30 years of stuff in three days.  I -- I

13 know we asked for some forbearance.  I don't think we got any.

14 I don't remember the details.  I don't understand why it's

15 important.

16 Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17 gave you seven days' notice, right?  They sent the letter on

18 December 23rd and asked you to vacate on December 30th,

19 correct?

20 A    I don't -- I don't remember.  But, again, I think the

21 initial response was it was inconsistent with shared services

22 agreement.  No Highland employees are coming into the office

23 anyway.  So kicking me out of my office was -- seemed

24 vindictive and overreaching.  And we tried to get some, you

25 know, forbearance.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 69 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 386 of 921   PageID 12184
206

                          Dondero - Direct                    68

1    Q    Okay.

2             MR. MORRIS:  I move to strike, Your Honor.

3             THE COURT:  Sustained.

4    BY MR. MORRIS:

5    Q    Mr. Dondero, you were given seven days' notice before --

6    before you were going to be barred from the Debtor's office,

7    correct?

8    A    I don't know.

9    Q    Okay.

10            MR. MORRIS:  Can we go back to Exhibit K, please?

11   Oh, actually, it's okay.

12   BY MR. MORRIS:

13   Q    We just read, actually, the piece from the Debtor's letter

14   of December 23rd barring you from the Debtor's office.  Do you

15   remember that?  And we can go back and look at it if you want.

16   A    Yes.

17   Q    Was there anything ambiguous that you recall about the

18   Debtor's demand that you not enter their offices after

19   December 30th?

20   A    Ambiguous?  I can tell you what my understanding was or I

21   can tell you what the letter says.  What would you like to

22   know?

23   Q    I'd just like to know if, as you sit here right now, you

24   believe there was anything ambiguous about the Debtor's demand

25   that you vacate the offices as of December 30th?

Dondero - Direct                          69

1    A    I mean, I did vacate the offices as of December 30th.

2    Q    Correct.  And you knew that -- and you were complying with

3    the Debtor's demand you do that, right?

4    A    Well, with the Court's demand, I guess.

5    Q    Okay.  And it's your understanding that you would not be

6    permitted in the Debtor's offices after that time, correct?

7    A    Um, (pause), uh, I don't know how to answer that question.

8    I knew I wouldn't be residing in the offices anymore.  But for

9    legitimate business purposes, to visit the people at NexPoint

10   who were in the office, since there are no Highland people in

11   the office, or to handle a deposition, you know, there was

12   nothing I thought inappropriate about that.

13   Q    Did the Debtor tell you that they would allow you to enter

14   the offices any time you just believed that it would be

15   appropriate to do that?

16   A    I used my business judgment.

17           MR. MORRIS:  I move to strike.

18   BY MR. MORRIS:

19   Q    I'm asking you a very --

20           THE COURT:  Sustained.

21   BY MR. MORRIS:

22   Q    -- specific question, sir.  Did the Debtor ever tell you

23   that they -- that you would be permitted to enter their

24   offices after December 30th if you, in your own personal

25   discretion, believed it to be appropriate?

Dondero - Direct                    70

1   A    No.

2   Q    Did the Debtor provide you any exception to their demand

3   that you vacate the offices, without access, by and after

4   December 30th?

5   A    I always do what I think is appropriate and in the best

6   interests.  I don't know.  I didn't know the specifics of the

7   Debtor's -- okay, yeah, what the specifics of the Debtor was.

8   Q    Despite the unambiguous nature of the Debtor's demands

9   letter, on Tuesday you just walked right into the Debtor's

10  office and sat for the deposition, correct?

11  A    I believe that was reasonable, yes.

12  Q    Okay.  But you didn't -- you didn't have the Debtor's

13  approval to do that, correct?

14  A    We didn't have technology to do it anywhere else, so if

15  the deposition was going to occur, it had to occur there.

16  Q    Sir, --

17          MR. MORRIS:  Move to strike.

18          THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    And I ask you to just listen very carefully.  And if it's

21  not clear to you, please let me know.  You did not have the

22  Debtor's approval to enter their offices on Tuesday to give

23  your deposition, correct?

24  A    No.

25  Q    And you did not even bother to ask the Debtor for

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 72 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 389 of 921    PageID 12187
206

Dondero - Direct                          71

1   permission, correct?

2   A    I'm prohibited from contacting them, so no, I did not.

3   Q    Okay.  Let's talk about other events that occurred after

4   the entry of the TRO.  We talked earlier about how you

5   interfered with Mr. Seery's trading activities on behalf of

6   the CLOs around Thanksgiving.  Do you remember that?

7   A    Yes.

8   Q    But after the TRO was entered, the K&L Gates Clients also

9   interfered with the Debtor's trading activities, correct?

10  A    No.

11          MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12  start at the first page?  And scroll down just a bit.

13  BY MR. MORRIS:

14  Q    Do you see there's an explanation there about the Debtor's

15  management of CLOs?

16  A    Yes.

17  Q    And there's a recitation of the history that we talked

18  about earlier, where around Thanksgiving you intervened to

19  block those trades?

20  A    Yes.

21  Q    And then the next paragraph refers to the prior motion

22  that was brought by the CLO entities?  I mean, the K&L Gates

23  entities, right?

24  A    Yes.

25  Q    And you were aware of that motion at the time it was made,

Dondero - Direct                          72

1  right?

2  A    Yes.

3  Q    And you were supportive of the making of that motion,

4  right?

5  A    Supportive?  Yes.

6         MR. MORRIS:  And scroll down to the next paragraph,

7  please.

8  BY MR. MORRIS:

9  Q    Okay.  So, my colleague wrote that, "On December 22nd,

10 2020, employees of NPA and HCMFA notified the Debtor that they

11 would not settle the CLO sale of the AVAYA and SKY

12 securities."  Have I read that right?

13 A    Yes.

14 Q    And that took place six days after the motion that the

15 Court characterized as frivolous was denied on December 16th?

16 A    Yes.  I wasn't aware of that, for what that's worth.

17 Q    Okay.  You personally instructed the employees --

18 withdrawn.  NPA -- that refers to NexPoint, correct?

19 A    Yes.

20 Q    That's an entity you own and control, right?

21 A    I -- largely.

22 Q    And that's one of the Advisors we defined earlier, right?

23 A    Yes.

24 Q    And HCMFA, that's Fund Advisors, another advisory firm

25 that you own and control, correct?

Dondero - Direct                73

1   A    Yes.

2   Q    And you personally instructed, on or about December 22nd,

3   2020, employees of those Advisors to stop doing the trades

4   that Mr. Seery had authorized with respect SKY and AVAYA,

5   right?

6   A    Yeah.  Maybe we're splitting hairs here, but I instructed

7   them not to trade them.  I never gave instructions not to

8   settle trades that occurred.  But that's a different ball of

9   wax.

10  Q    Okay.  But you did instruct them not to execute trades

11  that had not been made yet, right?

12  A    Yeah.  Trades that I thought were inappropriate, for no

13  business purpose, I -- I told them not to execute.

14  Q    Okay.  You actually learned that Mr. Seery wanted to

15  effectuate these trades the Friday before, right?

16  A    I don't know, but what did I do?  When did I know it?

17  What did I do?  When I knew things are inappropriate, I

18  reacted immediately.  I don't -- I don't -- whenever --

19  whenever I found out about inappropriate things, I reacted to

20  the best of my ability.

21  Q    Okay.

22          MR. MORRIS:  I move to strike, Your Honor.

23          THE COURT:  Sustained.

24      Mr. Dondero, I'm going to -- I'm going to interject some

25  instructions once again here.  Remember we talked about early

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 392 of 921 PageID 12190
206

Dondero - Direct                           74

 1  on, and I know you've testified before, but I'll repeat it:

 2  You need to just give direct yes or no answers.

 3      And let me just say that we see witnesses all the time do

 4  what you're doing here, and that is they feel they need to say

 5  more than yes or no.  They feel the need to clarify or

 6  supplement the yes or no answer they give.  And just to remind

 7  you how this works, your lawyer, Mr. Bonds, is going to be

 8  given the opportunity when Mr. Morris is through to ask you

 9  all the questions he wants, and that will be your chance to

10  clarify yes and no answers to the extent he asks you to

11  revisit certain of these questions and answers.  Okay?

12      So I'm going to remind you once again:  yes or no or

13  direct -- you know, other appropriate direct answers.  Mr.

14  Bonds can let you clarify later.  All right?

15      Mr. Morris, continue.

16          MR. MORRIS:  Okay.  Thank you, Your Honor.

17      Can we please put up on the screen Exhibit L?  And at the,

18  I guess, the bottom of Page 1.

19  BY MR. MORRIS:

20  Q   This is an email string.  And --

21          MR. MORRIS:  Go to the email below that, please.

22  Yeah.  Okay.  Right there.

23  BY MR. MORRIS:

24  Q   This is an email from Mr. Seery dated December 18th at

25  (garbled) :30 p.m.  Do you see that?

Dondero - Direct                    75

1   A    Yes.

2   Q    And in the substantive portion of his email, continuing on

3   to the next page, he's giving instructions to sell certain SKY

4   and AVAYA securities that are held by CLOs, correct?

5   A    Yes.

6   Q    And Mr. Sowin forwarded this email to you, right?

7   A    Yes.

8        MR. MORRIS:  If we can scroll up.

9   BY MR. MORRIS:

10  Q    And you forwarded it to Mr. Ellington, right?  I'm sorry.

11  Let's just give Ms. Canty a chance.

12       MR. MORRIS:  Keep scrolling up.

13  BY MR. MORRIS:

14  Q    So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15  that?

16  A    Yes.

17  Q    And if we scroll up, you turn around and give it to Mr.

18  Ellington a few minutes later, right?

19  A    Yes.

20  Q    So that you and Mr. Ellington and Mr. Sowin are all aware

21  that Mr. Seery wants to sell AVAYA and SKY securities on

22  behalf of the CLOs, right?

23  A    Yes.

24  Q    Why did you decide to forward this email to Mr. Ellington?

25  A    Ellington's role has been of settlement counsel that

Dondero - Direct                    76

1    supposedly everybody is able to talk to to try and bridge some

2    kind of settlement.  Ellington, I thought, should be aware of

3    things that would make settlement more difficult or create

4    liabilities for the Debtor.  And so I thought it was

5    appropriate for him to know.

6    Q    Okay.  This is the email that caused you to put a stop to

7    the trades that Mr. Seery wanted to effectuate, correct?

8    A    This is the -- I'm sorry.  Ask the question again.  This

9    is the email that what?

10   Q    This is -- this is how you learned that Mr. Seery wanted

11   to effectuate rates in AVAYA and SKY securities, right?

12   A    I -- I learned about it pretty early on of him trading it.

13   I don't know if it was this email or -- or one of the others.

14   But yes, it was from -- it was from Joe Sowin.

15   Q    And you would agree with me, would you not, that you

16   personally instructed the employees of the Advisors not to

17   execute the very trades that Mr. Seery identifies in this

18   email, correct?

19   A    Yes.

20   Q    At no time after December 10th, when the TRO was entered

21   into, did you instruct the employees of the Funds that you own

22   and control not to interfere or impede the Debtor's management

23   of the CLOs, correct?

24        MR. BONDS:  Can you repeat the question?  I'm sorry.

25   BY MR. MORRIS:

Dondero - Direct                          77

1    Q    At no time after December 10th, when the TRO was entered,

2    did Mr. Dondero instruct any employee of either of the

3    Advisors that he owns and controls not to interfere or impede

4    with the Debtor's business and management of the CLOs,

5    correct?

6    A    I did not.

7    Q    Okay.  Neither you nor anybody that you know of ever

8    provided a copy of the TRO to the employees of the Advisors

9    that you own and control, correct?

10   A    I don't know.

11   Q    Okay.  After the TRO was entered, the K -- after the TRO

12   was entered, and after the hearing on December 16th, the K&L

13   Gates Clients sent three more letters to the Debtor, right?

14   A    Yes.

15   Q    Okay.

16         MR. MORRIS:  Your Honor, those are Exhibits M as in

17   Mary, N as in Nancy, and X as in x-ray.

18         THE COURT:  Okay.

19         MR. MORRIS:  Unless the witness thinks there is a

20   need to look at them specifically -- oh, let me just ask a

21   couple of questions.

22   BY MR. MORRIS:

23   Q    Mr. Dondero, in those letters, it's your understanding

24   that the K&L Gates Clients again requested that the Debtor not

25   trade any securities on behalf of the CLOs, right?

Dondero - Direct                                78

1    A    Yes.

2    Q    And it's your understanding that in those letters the K&L

3    Gates Clients suggested that they might seek to terminate the

4    CLO management agreements to which the Debtor was a party,

5    correct?

6    A    I don't know specifically, but that wouldn't surprise me.

7    Q    Okay.

8    A    So, --

9    Q    Is it your understanding that the K&L Gates Clients also

10   sent the letter a Debtor -- the Debtor a letter in which they

11   asserted that your eviction from the offices might cause them

12   damages and harm?

13   A    I know there was objections to me -- I assume so.  I don't

14   know specifically.

15   Q    And you were aware of these letters at the time that they

16   were being sent, right?

17   A    I'm sorry, what?

18   Q    You were aware of these letters at the time they were

19   being sent by the K&L Gates Clients, right?

20   A    Generally, yes.

21   Q    And you were generally supportive of the sending of those

22   letters, right?

23   A    I'm always supportive of doing what we believe is the

24   right thing, yes.

25   Q    And in this case, you were supportive of the sending of

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 80 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 397 of 921 PageID 12195
206

Dondero - Direct                          79

1  these three letters, correct?

2  A   I -- yes.

3  Q   In fact, you pushed and encouraged the chief compliance

4  officer and the general counsel to send these letters, right?

5  A   I push them to do the right thing.  I didn't push them

6  specifically.

7  Q   Okay.  At the time the letters were sent, you were aware

8  that the K&L Gates Clients had filed that motion that was

9  heard on the 16th of December, correct?

10 A   Yes.

11 Q   And you were aware that they advanced the very same --

12 withdrawn.  You're aware that in the letters they advance some

13 of the very same arguments that Judge Jernigan had dismissed

14 as frivolous just six days earlier, right?

15 A   I wasn't at the hearing.  I don't know if it was the same

16 arguments or similar arguments.  I -- I can't -- I can't

17 corroborate the similarity or contrast the differences between

18 the two.

19 Q   All right.  So it's fair to say, then, that you were

20 supportive of the sending of these letters, you were aware of

21 the December 16 argument, but you didn't take the time to see

22 whether or not any of the arguments being advanced in the

23 letters were consistent or any different from the arguments

24 that were made at the December 16th hearing, correct?

25 A   Correct.  I wasn't directly involved, but still believed

Dondero - Direct                              80

1    that fundamentally Seery's behavior was wrong.

2    Q    You never instructed the K&L Gates Clients to withdraw the

3    three letters that were sent after December 10th, correct?

4    A    No.

5    Q    And you're aware that the Debtor had demanded that those

6    letters be withdrawn or it would seek a temporary restraining

7    order against the K&L Gates Clients, correct?

8    A    I'm not aware of the back and forth.

9    Q    Okay.  Let's talk about your communications with Mr.

10   Ellington and Mr. Leventon.  You communicated with them on

11   numerous occasions after December 16th, correct?

12   A    No.

13   Q    No, you didn't communicate with them many times after

14   December 10th?

15   A    You're lumping in Ellington and Isaac, and numerous times

16   is a bad clarifier, so the answer is no.

17   Q    I appreciate that.  You communicated many times with Mr.

18   Ellington after December 10th, right?

19   A    Not -- not outside shared services, pot plan, and him

20   being the go-between between me and Seery.  I would say

21   virtually none.

22   Q    Okay.  On Saturday, December 12th, two days after the

23   temporary restraining order was entered against you, Mr.

24   Ellington was involved in discussions with your personal

25   counsel about who would serve as a witness at the upcoming

                            Dondero - Direct                    81

1   December 16th hearing, correct?

2   A    I don't -- I don't remember.

3   Q    Let's see if we can refresh your recollection.

4           MR. MORRIS:  Can we please put up Exhibit P?  Can we

5   scroll down?  Okay.

6   BY MR. MORRIS:

7   Q    Do you see where Mr. Lynn writes you an email on Saturday,

8   December 12th, and he says, among other things, it looks like

9   trial?

10  A    Yes.

11  Q    And then if we scroll up a little bit, he wrote further,

12  "That said, we must have a witness now."  Have I read that

13  accurately?

14  A    Yes.

15  Q    Okay.

16          MR. MORRIS:  Can we scroll back up?

17  BY MR. MORRIS:

18  Q    And this is Mr. Ellington's response, right?

19  A    Yes.

20  Q    Can you read Mr. Ellington's response for Judge Jernigan?

21  A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22  needs to contact you first thing in the morning.

23  Q    Is it your testimony that this email relates to --

24  withdrawn.  Mr. Ellington is not your personal lawyer, right?

25  A    No.  Mr. Ellington has been functioning as settlement

Dondero - Direct                              82

1  counsel, trying to bridge settlement, --

2  Q    Okay.

3  A    -- which is what this email looks like to me.

4  Q    Okay.  I'll let -- I'll let the judge --

5        MR. MORRIS:  I move to strike, Your Honor.

6        THE COURT:  Sustained.

7  BY MR. MORRIS:

8  Q    So, after the TRO was entered, you and Mr. Ellington not

9  only communicated but Mr. Ellington was actively involved in

10  identifying witnesses to testify on behalf of your interests

11  at the December 16th hearing, correct?

12  A    I -- I don't know what the witness was for, but I believe

13  Ellington was doing his job as settlement counsel, trying to

14  facilitate settlement.  I don't -- I have no reason to think

15  this was anything more nefarious.

16  Q    Okay.  You looked to Mr. Ellington for leadership in

17  coordinating with all of the lawyers who were working for you

18  and your personal interests, right?

19  A    I'm not agreeing with that.

20  Q    No?  All right.

21        MR. MORRIS:  Let's look at the next exhibit.  I think

22  it's Exhibit Q.  And if we could stop right there.

23  BY MR. MORRIS:

24  Q    There's an email from Douglas Draper, do you see that, on

25  December 16th?

Dondero - Direct                          83

1   A    Yes.

2   Q    So this is after the TRO was entered into, right?

3   A    I believe so.

4   Q    And Mr. Draper represents Get Good and Dugaboy; is that

5   right?

6   A    I believe so.

7   Q    And he was new to the case at that moment in time, right?

8   A    On or about, I believe so.

9   Q    And he was looking to -- he was looking for a joint

10  meeting among all of the lawyers representing your personal

11  interests, right?

12  A    No.  I think he was trying to coordinate -- coordinate or

13  understand whatever.  But not everybody -- he doesn't just

14  talk to lawyers around my interests.  I mean, and he hasn't

15  sought agreements with just lawyers reflecting my interests.

16  Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17  A    Yes.

18  Q    But you can't remember why you did that, right, or at

19  least -- withdrawn.  You couldn't remember as of Tuesday's

20  deposition why you forwarded this email to Mr. Ellington,

21  right?

22  A    Not specifically.  But, again, Ellington is settlement

23  counsel.

24        MR. MORRIS:  I move to strike, Your Honor, after the

25  initial phrase "Not specifically."

Dondero - Direct                84

1              THE COURT:  Sustained.

2              MR. MORRIS:  Can we scroll up a little bit, please?

3    BY MR. MORRIS:

4    Q    Mr. Lynn responded initially with a reference to the

5    assumption that a particular lawyer was with K&L Gates, right?

6    A    Yes.

7              MR. MORRIS:  And if we could scroll up a little bit.

8    BY MR. MORRIS:

9    Q    That's where you forward this email to Mr. Ellington,

10   right?

11   A    Yes.

12   Q    And can you read to Judge Jernigan what you wrote at 1:33

13   p.m.?

14   A    (reading)  I'm going to need you to provide leadership

15   here.

16   Q    But at least as of Tuesday's deposition, you couldn't

17   remember why you needed Mr. Ellington to provide leadership,

18   right?

19   A    Correct.  Nor if he did.

20             MR. MORRIS:  I move to strike the latter portion of

21   the answer, Your Honor.

22             THE COURT:  Sustained.

23   BY MR. MORRIS:

24   Q    So you have no --

25        (Echoing.)

                        Dondero - Direct                    85

1              MR. MORRIS:  We're getting --

2              THE WITNESS:  Can I -- can I hold -- can I hold on

3    for one second here?  Can I just put you guys on mute, please?

4              MR. MORRIS:  Sure.

5         (Pause.)

6              THE COURT:  All right.

7              THE CLERK:  John, there's some feedback again.  I'm

8    sorry.

9              MR. MORRIS:  That's okay.

10             THE COURT:  Mr. Bonds, --

11             MR. MORRIS:  We lost Mr. --

12             THE COURT:  Mr. Bonds, what's going on?

13             MR. MORRIS:  We've lost -- the screen --

14             THE COURT:  You know you can't counsel your client in

15   the middle of court testimony.  I thought maybe Mr. Dondero

16   had some non-legal thing going on in the background.  Mr.

17   Bonds?

18             MR. BONDS:  Your Honor, I -- I did not in any way

19   counsel Mr. Dondero.

20             THE COURT:  Okay.  Well, I'll take your

21   representation on that.  Are we ready to go forward?

22             MR. MORRIS:  I'll readily accept Mr. Bonds'

23   representation as well, Your Honor.

24             THE COURT:  Okay.

25             MR. MORRIS:  But I'd ask that it not happen again.

Dondero - Direct                              86

1          THE COURT:  Well, fair enough.  I think Mr. Bonds

2    understands.

3    BY MR. MORRIS:

4    Q   Mr. Dondero, you have no recollection of why you forwarded

5    this email to Mr. Ellington and why you told him you needed

6    him to provide leadership, correct?

7    A   Correct.

8          MR. MORRIS:  And if we can scroll up, can we just see

9    how Mr. Ellington responded?

10   BY MR. MORRIS:

11   Q   All right.  And can you just read for Judge Jernigan what

12   Mr. Ellington said on December 16th in response to your

13   statement that you're going to need him to provide leadership

14   here?

15   A   (reading)  On it.

16   Q   Thank you.  In your deposition, you testified without

17   qualification that Scott Ellington and Isaac Leventon did not

18   participate in the drafting of a joint interest or mutual

19   defense agreement.  Do you recall that testimony?

20   A   Yes, as far as I knew.

21   Q   And you also testified that you never discussed with

22   either of them the topic of a joint defense or mutual defense

23   agreement; is that right?

24   A   Correct.  That was Draper.

25   Q   Okay.

                              Dondero - Direct                      87

1              MR. MORRIS:  Can we put up Exhibit 11, please?  I

2    apologize.  It's Exhibit W.  Okay.  Can we stop right there?

3    BY MR. MORRIS:

4    Q    This is an email between some of your counsel and Mr.

5    Ellington.  Do you see that?

6    A    Yes.

7    Q    And a common interest agreement is attached to the

8    communication.  Is that a fair reading of the portion of the

9    exhibit that's on the screen?

10   A    Yes.

11             MR. MORRIS:  And can we scroll to the top of the

12   exhibit, please?

13   BY MR. MORRIS:

14   Q    And do you see that there is an email exchange between Mr.

15   Ellington and Mr. Leventon concerning the common interest

16   agreement?

17   A    Yes.

18   Q    Okay.  So it's your testimony that this email may exist

19   but you had no idea that Mr. Ellington and Mr. Leventon were

20   working with your lawyers to draft a common interest

21   agreement?  Is that your testimony?

22   A    I wasn't part of this.  It looks to me like they were just

23   included in a -- a final draft.  And, again, Ellington is

24   settlement counsel.  I -- but I don't want to speculate why or

25   what they were doing.

Dondero - Direct                         88

1   Q    Do you remember that I asked you a few questions the other

2   day about Multi-Strat financial statements and whether or not

3   you'd ever given -- you'd ever received any of those documents

4   from Mr. Ellington and Mr. Leventon?

5   A    Yes.

6   Q    Okay.  And you testified under oath that you never got any

7   financial information, including balance sheets, concerning

8   Multi-Strat from either of those lawyers, correct?

9   A    I -- hmm.  I -- I don't remember.  Yeah, I don't remember.

10  I may have to clarify that, but I don't remember.

11  Q    You testified under oath the other day that you wouldn't

12  even think to ask them for financial information relating to

13  Multi-Strat because it's not natural for them to have it,

14  right?

15  A    I -- I'm sorry.

16          THE WITNESS:  Your Honor, do I just have to answer

17  these questions yes or no, or is that the -- can I clarify at

18  all, or can I --

19          THE COURT:  Well, I mean, if the question simply

20  directs a yes or no answer, that's correct, you just answer

21  yes or no.  And I think this one did.

22      Again, your lawyer is going to have the chance to do

23  follow-up examination later.

24  BY MR. MORRIS:

25  Q    So let me try again.  During your deposition, you

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 90 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 407 of 921   PageID 12205
206

Dondero - Direct                     89

1   testified under oath without qualification that you never got

2   any financial information, including balance sheets,

3   concerning Multi-Strat from Scott Ellington or Isaac Leventon,

4   correct?

5   A    I believe I might have misspoken there.

6   Q    Okay.  But that was your testimony the other day, right?

7   A    Yes.

8   Q    And today, you believe you might have gotten that

9   information from them, right?

10  A    Only because Ellington was supposed to be the go-between

11  and I couldn't go directly to somebody.  But he wouldn't

12  normally have that information, which is what I was saying.

13         MR. MORRIS:  Your Honor, I have an exhibit that's not

14  on the Debtor's exhibit list, and I was going to use it for

15  impeachment purposes to establish the fact that Mr. Ellington

16  and Mr. Leventon in fact gave to Mr. Dondero, after December

17  10th, financial information concerning Multi-Strat, which Mr.

18  Dondero had previously denied receiving.  May I -- may I use

19  that document to impeach Mr. Dondero?

20         THE COURT:  You may.

21         MR. BONDS:  Your Honor, I'm going to object.  This is

22  pretty clearly something that should have been disclosed and

23  it wasn't.

24         THE COURT:  Well, he says it's purely to impeach the

25  testimony that Mr. Dondero just now gave.  So we'll -- we'll

011325

Dondero - Direct                    90

 1   see the document and, you know, I'll either agree with that

 2   being impeachment or not.  So, he may proceed.

 3         MR. BONDS:  Your Honor, I think that the testimony

 4   -- Your Honor, I'm sorry.  I think that the testimony that was

 5   (inaudible) given was that he thought that he may have talked

 6   to Scott or Isaac, not that he did not.

 7         MR. MORRIS:  Your Honor, if I may, the testimony the

 8   other day was unequivocal and unambiguous that not only didn't

 9   he get this information from the two lawyers, but that he had

10   no reason to believe he would ever get the information from

11   those two lawyers.

12      I appreciate the fact that Mr. Dondero today is suggesting

13   that he may have, but I -- I would still like to use this

14   document to refresh his recollection and to impeach even the

15   possibility that he's giving this qualified testimony that he

16   may have.

17         THE COURT:  All right.

18         MR. MORRIS:  There's no doubt that he did.

19         THE COURT:  I overrule the objection.  You can go

20   forward.

21         MR. MORRIS:  Can we please put up on the screen -- I

22   believe it's Debtor's Exhibit AA.  And if we can scroll down,

23   please.  And just stop, yeah, towards the top.  All right.

24   Stop right there.

25   BY MR. MORRIS:

Dondero - Direct                    91

1   Q    Do you see in the first email Mr. Klos -- he's an employee

2   of the Debtor, right?

3   A    Yes.

4   Q    And he provides Multi-Strat balance sheet and financial

5   information to Mr. Leventon, Mr. Ellington, and Mr.

6   Waterhouse.  Do you see that?

7   A    Yes.  He's the person I would normally go to.

8   Q    Okay.  And they're all Debtor employees, right?

9   A    Yes.

10  Q    Okay.  And then Mr. Leventon sends it to you and Mr.

11  Ellington on February 4th, 2020; is that correct?

12  A    Yes.

13  Q    And this is confidential information; is that fair?

14  A    No.

15  Q    Okay.  Let's -- let's talk about the next --

16  A    No, it's not -- wait, wait, hold on a second.  Judge, I

17  need to clarify this.  I -- it's not confidential information.

18  It's available to every investor, of which I was one of them.

19  Okay?  So, let's -- let's not mischaracterize this as some

20  corporate secret.

21  Q    Okay.  You interfered with the Debtor's production of

22  documents; isn't that right?

23  A    No.

24  Q    Several times in the last year, various entities have

25  requested that Dugaboy produce its financial statements,

Dondero - Direct                            92

1   correct?

2   A    Dugaboy is my personal trust.  It's not an entity of the

3   Debtor in any form or fashion.

4   Q    Sir, you're aware that several times in the last year

5   various entities requested that the Debtor produce Dugaboy

6   financial information, correct?

7   A    The Debtor is not in a position to do it.  I -- I don't

8   know if it's been several times or whatever, but it's not

9   appropriate.

10         MR. MORRIS:  I move to strike, Your Honor.

11         THE COURT:  Sustained.

12  BY MR. MORRIS:

13  Q    I'll try one more time.  If we need to go to the

14  transcript, we can.  It's a very simple question.  You knew

15  and you know that several times in the last year various

16  entities have requested that the Debtor produce Dugaboy

17  financial statements, correct?

18  A    Yes.

19  Q    Do you recall at the deposition the other day I asked you

20  whether you had ever discussed with Mr. Ellington and Mr.

21  Leventon whether or not the Dugaboy financial statements

22  needed to be produced, and you were directed not to answer the

23  question by counsel and you followed those directions?

24  A    Yes.

25  Q    But you communicated with at least one employee concerning

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 94 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 411 of 921 PageID 12209
206

Dondero - Direct                    93

1   the production of the Dugaboy financial statements, correct?

2   A    Yes.

3   Q    And that's Melissa Schroth; is that right?

4   A    Yes.

5   Q    She's an executive accountant employed by the Debtor,

6   right?

7   A    Yes.

8   Q    And on December 16th, after the TRO was entered into, you

9   instructed Ms. Schroth not to produce the Dugaboy financials

10  without a subpoena, correct?

11  A    That was the advice I had gotten from counsel, yes.

12  Q    Okay.  The Dugaboy and Get Good financial statements are

13  on the Debtor's platform, correct?

14  A    I do not know.

15  Q    There is no shared services agreement between Dugaboy or

16  Get Good and the Debtor, correct?

17  A    I don't know.

18  Q    You're not aware of any; is that fair?

19  A    Yes.

20  Q    Okay.

21        MR. MORRIS:  Can we put on the screen Exhibit R?  And

22  can you scroll down a bit?

23  BY MR. MORRIS:

24  Q    Okay.  That's Melissa Schroth at the top there; is that

25  right?

Dondero - Direct                    94

1   A    Yes.

2   Q    And these are texts that you exchanged with her after the

3   TRO was entered into, correct?

4   A    Yes.

5           MR. MORRIS:  Can we scroll down a little bit?

6   BY MR. MORRIS:

7   Q    And do you see on December 16th you sent Ms. Schroth an

8   email -- I apologize -- a text that says, "No Dugaboy details

9   without subpoena"?

10  A    Yeah.

11  Q    But you can't remember why you sent this text, correct?

12  At least you couldn't as of Tuesday?

13  A    I believe it was on advice of counsel.

14  Q    But that's not what you said on Tuesday, correct?

15  A    I don't remember.

16  Q    You sent this text even though you knew that various

17  entities had requested the Dugaboy financials, but you have no

18  recollection of ever talking to anyone at any time about the

19  production of those documents, right?

20  A    Can you repeat the question?

21  Q    I'll move on.  Let me just -- last topic, and then I'm

22  going to respectfully request that we just take a short break.

23  You're familiar with the law firm of Baker & McKenzie; is that

24  right?

25          (Echoing.)

Dondero - Direct                    95

 1  A    I'm sorry.  You broke up on us there.

 2  Q    No problem.  You're familiar with the law firm Baker &

 3  McKenzie, correct?

 4  A    Yes.

 5  Q    That firm has never -- never represented you or any entity

 6  in which you have an ownership interest, correct?

 7  A    Correct.

 8  Q    But in December, the Employee Group, of which Mr. Leventon

 9  and Mr. Ellington was a part, was considering changing counsel

10  from Winston & Strawn to Baker & McKenzie, right?

11  A    I believe so.

12  Q    And you asked -- and because of that, you specifically

13  asked Mr. Leventon for the contact information for the lawyers

14  at Baker & McKenzie, right?

15  A    I believe so.

16  Q    Okay.

17        MR. MORRIS:  Can we put up Exhibit S, please?

18  BY MR. MORRIS:

19  Q    And who is that email sent from?  I apologize.  Withdrawn.

20  Who is that text message exchange with?

21  A    Isaac Leventon.

22  Q    Okay.  And Mr. Leventon was an employee of the Debtor

23  after December 10th, correct?

24  A    Yes.

25        MR. MORRIS:  Can we scroll down a little bit?

Dondero - Direct                                    96

1   BY MR. MORRIS:

2   Q    And on December 22nd, you asked Mr. Leventon for the

3   contact information at Baker & McKenzie, correct?

4   A    Yes.

5   Q    And the reason you asked Mr. Leventon for the contact

6   information, that was in connection with the shared defense or

7   mutual defense agreement, right?

8   A    I -- I don't remember why.  It might have just been for my

9   records.  I don't know.

10  Q    The only reason that you could think of for asking for

11  this information was for the shared defense or mutual defense

12  agreement, correct?

13  A    I -- no, it -- I don't know and I don't want to speculate.

14  I don't want to -- I don't want to speculate.  I -- did -- I

15  don't think I ever got -- I don't know what your point is.

16        MR. MORRIS:  May we please go back to the transcript

17  at Page 136?  At the bottom, Line 23.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20       "Q    Do  you  recall  asking  Isaac  Leventon  for  the

21       contact  information  for  the  --  for  the  lawyers  at

22       Bakers & McKenzie?

23       "A    I -- I don't -- I don't -- it might have been for

24       part  of  the  shared  defense,  mutual  defense  whatever

25       agreement, but that's -- that's the only reason I would

Dondero - Direct                    97

1        have asked for it."

2    Q   Did you give that answer to my question?

3    A   Yeah.  I shouldn't have speculated.

4    Q   Okay.  But that's the answer you gave the other day; is

5    that right?

6    A   I shouldn't have speculated.  That's my answer today.

7    Q   And today -- withdrawn.  In fact, you wanted the Baker

8    contact information in order to help Mr. Draper coordinate the

9    mutual defense agreement, correct?

10   A   I don't want to speculate.

11           MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12   to 5.

13   BY MR. MORRIS:

14   Q   Did you -- did you hear this question and did you give

15   this answer on Tuesday?

16       "Q   Why did you want the Baker & McKenzie contact

17       information?

18       "A   I was trying to help Draper coordinate the mutual

19       shared defense agreement, period."

20   Q   Did you give that answer to my question on Tuesday?

21   A   Yes.

22           MR. MORRIS:  Your Honor, I'd respectfully request a

23   short break to see if I've got anything more.

24           THE COURT:  All right.  Well, I was going to ask you

25   how much more do you think you have.  We've been going almost

011333

Dondero - Direct                                98

1 two hours.

2     So we'll take a break.  Let's make it a ten-minute break.

3 And then, depending on how much more you have and how much Mr.

4 Bonds is going to have, we'll figure out are we going to need

5 a lunch break in just a bit.

6     All right.  So it's 12:00 noon Central.  We'll come back

7 at 12:10.  Ten minutes.

8         MR. MORRIS:  Your Honor, may I have an instruction of

9 the witness not to check his phone for any purposes, not to

10 make -- not to communicate with anybody until -- until his

11 testimony is completed?

12        THE COURT:  All right.  Any -- any --

13        MR. BONDS:  Your Honor, he's going to speak with me.

14        THE COURT:  Pardon?

15        MR. BONDS:  I assumed he will speak to me about just

16 general events.  I mean, I don't want to be in breach of some

17 order.

18        MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19 for -- you know, it's not -- he's on the stand.  He's still on

20 the stand.

21        THE COURT:  Yeah.  He --

22        MR. MORRIS:  He shouldn't be conferring with counsel,

23 either.  No disrespect to Mr. Bonds at all.

24        THE COURT:  Exactly.  I mean, you all can talk about,

25 you know, the national champion football game or whatever, but

011334

Dondero - Direct                              99

1   it would be counseling your client in the middle of testimony

2   if you -- if you talk about this case at the moment.  So, you

3   know, --

4          MR. BONDS:  I understand, Your Honor.

5          THE COURT:  All right.

6          MR. BONDS:  I just didn't want to be --

7          THE COURT:  All right.  So now we'll come back at

8   12:11.

9          THE CLERK:  All rise.

10         MR. MORRIS:  Thank you, Your Honor.

11      (A recess ensued from 12:01 p.m. until 12:12 p.m.

12         THE CLERK:  All rise.

13         THE COURT:  Please be seated.  This is Judge

14  Jernigan.  We're going back on the record in Highland Capital

15  versus Dondero.  We have taken an 11-minute break.  It looks

16  like we have Mr. Dondero and counsel back.  And Mr. Morris,

17  are you out there, ready to proceed?

18         MR. MORRIS:  I am, Your Honor.  And I do have just a

19  few more questions.

20         THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21  there in the room with Mr. Dondero.  Now, did you want to --

22         MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23  the restroom.

24         THE COURT:  Okay.  All right.  Everyone ready to

25  proceed?

Dondero - Direct                    100

1            MR. MORRIS:  Yes, Your Honor.

2            THE COURT:  Okay.  Mr. Morris, go ahead.

3            MR. MORRIS:  Thank you, Your Honor.

4                    DIRECT EXAMINATION, RESUMED

5    BY MR. MORRIS:

6    Q    Can you hear me, Mr. Dondero?

7    A    Yes.

8    Q    Did you ever discuss the request of any party to produce

9    the financial statements of Get Good and Dugaboy with Scott

10   Ellington?

11   A    Not that I recall.

12   Q    Did you ever communicate with Mr. Leventon on the subject

13   matter of whether or not the financial statements for Get Good

14   and Dugaboy needed to be produced by the Debtor?

15   A    No.

16   Q    Those are the two questions that you were directed not to

17   answer the other day, right?

18   A    I don't remember.

19   Q    Okay.  You mentioned that Mr. Ellington serves in some

20   capacity as settlement counsel.  Do I have that right?

21   A    Yes.

22   Q    Do you know if there's any exception in the TRO that

23   permits you to communicate directly with Mr. Ellington in his

24   so-called capacity as settlement counsel?

25   A    There was no change in his status in the TRO.  It's -- and

Dondero - Direct                          101

1   I think he was still used by both the Debtor and by me in that

2   function.

3   Q   You said that -- you testified earlier that you understood

4   that you were prohibited from speaking with the Debtor's

5   employees, correct?

6   A   Except for -- except for with regard to the pot plan,

7   shared services, and Ellington as settlement counsel.  But I

8   continued to talk to employees about the pot plan as recently

9   as the end of the year, and I continued to talk to employees

10  about shared services based on the shared services proposal

11  that was sent to Ellington and forwarded to me as recently as

12  two days ago.

13  Q   You never -- you never read the TRO, right?

14  A   No.

15            MR. MORRIS:  Can we have it put up on the screen?  I

16  don't know the exhibit number, Ms. Canty, but hopefully it's

17  clear on the exhibit list.

18            MS. CANTY:  I'm sorry, John.  Can you repeat what

19  you're looking for?

20            MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21  to Paragraph 2, please?  Okay.

22  BY MR. MORRIS:

23  Q   I appreciate the fact that you've never seen this before,

24  Mr. Dondero, but let me know if I'm reading Section 2(c)

25  correctly.  "James Dondero is temporarily enjoined and

Dondero - Direct                          102

1   refrained from" -- subparagraph (c) -- "communicating with any

2   of the Debtor's employees, except for specifically -- except

3   as it specifically relates to shared services currently

4   provided to affiliates owned or controlled by Mr. Dondero."

5       Have I read that correctly?

6   A    Yes.

7   Q    Does that provide for any exceptions concerning the pot

8   plan?

9   A    The Independent Board requested a meeting on the pot plan.

10  Q    Okay.  But does it -- I appreciate that, and we'll talk

11  about that in a moment, but my question is very specifically

12  looking at the order.  And I, again, appreciate that you've

13  never seen it before.  But looking at the order now, is there

14  any exception for you to communicate with the Debtor's

15  employees concerning the pot plan?

16  A    I would think the pot plan would fall under that, since

17  some of the pot plan value is coming from affiliated entities

18  that are subject to the shared services agreement.  I would

19  think that would be reasonable, again, plus the -- well, it

20  was the subject of a meeting with the Independent Board at the

21  end of the month.

22  Q    Okay.

23  A    I still think it's the best alternative for this estate.

24  Q    Okay.  Did you -- did you ever -- did you ever ask

25  anybody, on your behalf, have asked the Debtors whether they

Dondero - Direct                        103

1   agreed with what you believed was a reasonable interpretation

2   of the restraining order?

3   A   I did not.

4   Q   Okay.  And let's just deal with the notion of settlement

5   counsel.  Do you see anywhere in this TRO -- and if you want

6   to read anything more, please let me know -- do you see

7   anything in this TRO that would permit you to speak with Mr.

8   Ellington in his so-called role as settlement counsel?

9   A   Well, I would say, more importantly, I don't see anything

10  that takes away his role as settlement counsel, which was

11  formally done six months ago.

12  Q   Okay.  I did read Section 2(c) correctly, right?

13  A   Yes.

14  Q   And the only exception that's in Judge Jernigan's

15  restraining order that she entered against you relates to

16  shared services.  Have I read that correctly?

17  A   Yes.

18  Q   Okay.  Let's talk about the pot plan for a moment.  After

19  the TRO was entered, you were interested in continuing to

20  pursue the pot plan; is that right?

21  A   I still believe it's the best possible result for this

22  estate.

23  Q   And you sought a forum with the Debtor's board, correct?

24  A   Yes.

25  Q   And you knew that you couldn't speak directly with any

011339

Dondero - Direct                    104

1   member of the Debtor's board unless your counsel and the

2   Debtor's counsel was -- was present at the same time.

3   Correct?

4   A    Yeah.  As a matter of fact, I didn't go.  I just had

5   counsel go.

6   Q    And the Debtor's board gave Mr. Lynn a forum for him to

7   present your pot plan after the TRO was entered.  Isn't that

8   right?

9   A    I believe so.

10  Q    And are you aware that the Debtor's board spent more than

11  an hour and a half with Mr. Lynn talking about your pot plan

12  after the TRO was entered?

13  A    Yes.

14  Q    And is it fair to say that, notwithstanding Mr. Lynn's

15  goodwill and Mr. Lynn's efforts to try to get to a successful

16  resolution here, the terms on which the pot plan were offered

17  were unacceptable to the Debtor?

18  A    I wasn't there.  I -- I don't know.

19  Q    The Debtor never made a counteroffer, did it?

20  A    Not that I heard.

21  Q    You'll admit, will you not, that over the last year you or

22  others acting on behalf -- on your behalf have made various

23  pot plan proposals to the Official Committee of Unsecured

24  Creditors?

25  A    Quite generous pot plans that I think will exceed any

Dondero - Direct                          105

1    other recoveries.

2    Q    Okay.  So you're aware that your pot plan was delivered

3    either by you or on your behalf to the U.C.C., correct?

4    A    I -- some were.  Some, I don't know.

5    Q    Okay.  Has the U.C.C. ever made a counterproposal to you?

6    A    Nope.

7              MR. MORRIS:  I have no further questions, Your Honor.

8              THE COURT:  All right.  Pass the witness.

9         Mr. Bonds, do you have any time estimate for me,

10   guesstimate?

11             MR. BONDS:  My guess is, Your Honor, it'll be about

12   an hour.  I would hope that we could take some type of a

13   break, just because I'm a diabetic and need to have some --

14             THE COURT:  All right.  Well, --

15             MR. MORRIS:  I have no objection, Your Honor.

16   Whatever suits the Court.  I'm willing to accommodate Mr.

17   Bonds always.

18             THE COURT:  Okay.  Let's take a 45-minute break.

19   Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20   minutes after 1:00 Central time.

21        All right.  We're in recess.

22             THE CLERK:  All rise.

23        (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24             THE CLERK:  All rise.

25             THE COURT:  Please be seated.  This is Judge

Dondero - Cross                    106

1  Jernigan.  We are going back on the record in Highland Capital

2  Management versus Dondero.  We took a lunch break.  And when

3  we broke, Mr. Bonds was going to have the chance to examine

4  Mr. Dondero.

5      Let me just make sure we have, first, Mr. Dondero and Mr.

6  Bonds.  Are you there?

7           MR. BONDS:  Yes, we are.

8           THE COURT:  All right.  Very good.  I don't see your

9  video yet, but -- there you are.  All right.  Mr. Morris, are

10 you there?

11          MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12          THE COURT:  I can.  All right.

13          MR. MORRIS:  Thank you.

14          THE COURT:  Well, we've got lots of other people, but

15 that's all I'll make sure we have at this moment.  All right.

16 Mr. Bonds, you may proceed.

17     And, Mr. Dondero, I know you know this, but I'm required

18 to remind you you're still under oath.

19     Okay, go ahead.

20                    CROSS-EXAMINATION

21 BY MR. BONDS:

22 Q   Before you resigned as portfolio manager, how long had you

23 had with Highland Capital Management?

24 A   Since inception in 1994.

25 Q   Okay.  And how long have your offices been at the

Dondero - Cross                                    107

1    Crescent?

2    A    Eight years.

3    Q    Okay.  Before you resigned as portfolio manager, did you

4    spend a lot of time in the office?

5    A    Yes.  I spent every business day this -- or 2020,

6    including COVID, in the office.

7    Q    Okay.  And this is the first time that you are not in the

8    office, is that right, in decades?

9    A    Yes.

10   Q    Can you tell us about the shared services agreement that

11   exists between the Debtor and the other entities in which you

12   have an interest?

13   A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14   what other entities paid.  Shared services, which is typical

15   in finance, for centralized tax, accounting, RICO function, so

16   that we don't have to have redundant, multiple high-paid

17   people in different entities.  We'd have them centralized and

18   with collective experience and collective functionality.  And

19   so, historically and recently, they pay Highland for those --

20   fees for those services.  And I, as a non-paid employee, or a

21   non-employee of Highland but a paid employee of NexBank -- of

22   NexPoint, was -- and my occupancy and support were part of

23   those shared services agreement.

24   Q    What do those agreements allow those entities to do?

25   A    Would it allow those entities to do?  Well, to access the

011343

Dondero - Cross                    108

1   Highland functionality as appropriate, because most of those

2   entities, as is typical in finance, did not have their own

3   functionality, legal, tax, and -- legal, tax, and accounting,

4   but although they've been -- they've been building it lately

5   in anticipation of the pot plan not going through at Highland.

6   Q   Okay.  Do those agreements allow you to share office space

7   with --

8           MR. MORRIS:  Objection --

9           THE WITNESS:  Yes.

10          MR. MORRIS:  -- to the form of the question, Your

11  Honor.  I think the exhibits and the agreements themselves

12  would be the best evidence.  They're not in evidence.  They

13  haven't been offered in evidence.  I have no way to challenge

14  the witness on anything he's saying.  And on that basis, I'd

15  -- it's not fair to the Plaintiff.

16          THE COURT:  All right.  Mr. Bonds, can I ask you to

17  repeat your question?  It was muffled and I was about to ask

18  you to repeat it before I got the objection.  So, repeat the

19  question so I can --

20          MR. BONDS:  Okay.  I'm going to repeat it and amend

21  it.

22          THE COURT:  Okay.

23  BY MR. BONDS:

24  Q   Is it your understanding that those agreements allow you

25  to share office space with the Debtor?

Dondero - Cross                                    109

1  A    Yes.  Virtually all of NexPoint's employees share the

2  Highland office space as part of a shared services agreement.

3  Q    Do those agreements allow you to share -- I'm sorry,

4  excuse me.  Strike that.  What else do they allow?

5  A    Typically is used in coordination of systems, servers,

6  software, cloud software, Internet software, office software,

7  tax, accounting, and legal functionality are all part of the

8  shared services agreement, although, you know, much of -- much

9  of that was stripped, you know, four or five months ago,

10 especially legal functionality and the accounting

11 functionality, without the concurrent adjustment in the

12 building.

13 Q    Okay.  And you previously testified that you generally

14 control NexPoint; is that correct?

15 A    Generally.  And the distinction I was trying to make is,

16 you know, following the financial crisis in '08, compliance

17 and the chief compliance officer has personal liability. along

18 with the rest of the C Suite, and operates independently, with

19 primary loyalty to the regulatory bodies.  And they're --

20 they're not controlled, bamboozled, or segued away from their

21 responsibility.  And at all times, they're supposed to be

22 doing what they believe is right, regulatorily-compliant, and

23 in the best interest of investors.

24     So that was the distinction I was drawing between, A, what

25 I was trying to remind Thomas of, that he should be

Dondero - Cross                        110

1  independent of Seery, in terms of following what he believes

2  is correct and regulatory-compliant.  And I don't have to push

3  the NexPoint compliance people and general counsel to do

4  anything specific, nor could I.  They are supposed to do what

5  is right from a regulatory investor standpoint, and I believe

6  that's what they've done.

7  Q   All right.  And what do you mean by the term or the usage

8  of the word "generally"?

9  A   Well, that's the distinction I was just drawing.  I mean,

10  generally, on regular business strategy, you know, major

11  investments, you know, other business items, I'm in control of

12  those entities.  But in terms of the content and allegations,

13  regulatory opinions that come from compliance and the general

14  counsel, that is their best views on their own, knowing they

15  have compliance obligations and personal liability.

16  Q   Do you believe that NexPoint and its other owners and

17  interest holders have rights independent from your own in this

18  case?

19  A   Right, yes, and obligations, and responsibilities to

20  investors.  I believe the attempt by the Debtor or Seery to

21  hide behind contracts that the Debtor has with the CLOs are --

22  are a spurious, incomplete argument.  You know, they're not in

23  compliance with those contracts.  Bankruptcy alone is an event

24  of default.  Not having the key man -- the key men, the

25  required requisite professionals that they're obligated to

Dondero - Cross                      111

1   contractually have working at the Debtor is a clear breach, in

2   violation of those CLO contracts.  Not having adequate staff

3   or investment professionals to analyze, evaluate, or follow

4   the investments in the portfolio is a clear violation.  And

5   specifically telling investors in the marketplace that you

6   plan to terminate all employees, a date certain January 24th,

7   is a proclamation that you're not going to be in any form able

8   to be a qualified registered investment advisor or qualified

9   in any which way to manage the portfolio or be in compliance

10  with the CLO contracts.

11      I would -- I would further add that the selling of the

12  securities, and the SKY securities, represent incomplete

13  intentional incurring of loss against the investors.  You have

14  securities that are less liquid with, you know, restructured

15  securities that have been owned for ten years, and they were

16  sold during the most illiquid weeks of the year, the couple

17  days before and after Thanksgiving, couple days before and

18  after Christmas, where the investors could have gotten 10 or

19  15 percent more on their monies if they were just sold in a

20  normal week.  It's -- it's preposterous to me.  It's

21  consistent with Seery not being an investment (garbled).

22      But it's preposterous to me that -- that this treatment of

23  investors is allowed or being camouflaged as some kind of

24  contractual obligation, when the investors have said these

25  funds are clearly in transition and the manager clearly is

Dondero - Cross                                    112

1    incapable of managing them.  You know, please don't transact

2    until the transition is complete.  But Jim Seery has traded

3    every day, including -- I don't know about today, but every

4    day this week, selling securities for no investment rationale

5    and no business purpose.

6    Q    Are you also portfolio manager for NexPoint?

7    A    Yeah, I'm a portfolio manager for the closed-end retail

8    funds, which do have a higher fiduciary obligation than

9    anything on the institutional side.  I'm a portfolio manager

10   for those '40 Act funds that are the primary owners of the

11   CLOs that Seery is selling securities in for some unknown

12   reason.

13   Q    And what shared service agreements exist between NexPoint

14   and the Debtor?

15   A    Those are the shared service agreements I spoke of.  I

16   don't want to repeat myself.

17   Q    And I'm going to call Highland Capital Management Fund

18   Advisors, LP just Fund Advisors.  Is that okay with you?

19   A    Yes.

20   Q    Okay.  And you testified generally -- that you generally

21   control Fund Advisors; is that correct?

22   A    Yes.

23   Q    Do you believe that Fund Advisors and its owners and

24   interest holders have rights independent from your own in this

25   case?

Dondero - Cross                                    113

1  A    Yes.

2  Q    Are you the portfolio manager for Fund Advisors?

3  A    Yes.

4  Q    What shared services agreements exist between Fund

5  Advisors and the Debtor?

6          MR. MORRIS:  Objection, Your Honor.  The agreements

7  themselves are the best evidence of the existence in terms of

8  any agreement between the Debtor and these entities.

9          MR. BONDS:  Your Honor, I can fix that.

10          THE COURT:  Okay.

11 BY MR. BONDS:

12 Q    I'm just asking:  What is your understanding, Mr. Dondero,

13 of the shared service agreements between the Debtor and Fund

14 Advisors?

15 A    It's similar to the agreement I mentioned earlier.  It

16 covers a broad range of centralized services historically

17 provided by Highland, but now those, while still paying

18 smaller than historic fees, those entities now have been

19 required to incur the expenses of duplicating those functions.

20 Q    Okay.  Do you recall the email string dated November 24th

21 regarding SKY equity that the Debtor talked about?

22 A    Yes.

23 Q    What did you mean when you sent that email about the

24 trade?  What did you mean, I'm sorry?

25 A    I was trying to inform the traders, and once they knew --

Dondero - Cross                    114

1  they weren't willing to do the trades anymore once they knew

2  that the underlying investors had requested that their

3  accounts not being traded until the transition be -- until the

4  transition of the CLOs was effectuated.

5      It's -- it's standard by, you know, statute or

6  understanding, in the money and management business, when

7  you're moving accounts from one asset manager to another, and

8  someone requests that you don't do anything to their account,

9  you don't trade it whimsically.  And so I was -- I was making

10 sure the traders knew that the underlying investors had

11 requested that no trades occur in their accounts.

12     And then I believed it was a clear violation of the

13 Registered Investment Adviser's Act.  I believe that people

14 involved at a senior level or at a compliance level could have

15 material liability, and could create material liability for

16 the Debtor.  And I think if, as I said before, I think if

17 anybody on this call were to call the SEC, they would start on

18 audit on this.

19         MR. MORRIS:  Your Honor, I move to strike the first

20 portion of the answer prior to when he started to describe

21 what he believes and what he thinks.  The first portion of the

22 answer was devoted to testifying about what is in the

23 knowledge of the people who he was communicating with.

24 There's no evidence.  Mr. Dondero, of course, was free to call

25 any witness he wanted.  He could have called the chief

Dondero - Cross                               115

1   compliance officer.  He could have called the general counsel.

2   He could have called all the people he's now testifying on

3   behalf of, and he did not.

4       So I move to strike anything in the record that purports

5   to reflect or suggest the knowledge on behalf of any party

6   other than Mr. Dondero.

7               THE COURT:  Okay.  I'm --

8               MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9   to rephrase the question.

10              THE COURT:  Okay.  Very well.

11              MR. BONDS:  I'm sorry.

12              THE COURT:  So the motion to strike is granted.  If

13  you're going to rephrase, go ahead.

14              MR. BONDS:  Okay.

15  BY MR. BONDS:

16  Q   Mr. Dondero, what did you mean when you said -- that the

17  emails about the trade?

18  A   Okay.  I'll give my intention by sending emails to stop

19  the trade and my basis for those emails.  My intentions were

20  to inform the traders and to inform the compliance people that

21  I believe there was a trade that wasn't in the best interest

22  of the employees that had no business purpose for its

23  occurring.  And the people involved weren't aware that the

24  investors had sent over requests not to trade their accounts

25  while they were in transition.

Dondero - Cross                116

1      So I made the traders aware of that.  I made compliance

2   aware of that also.  And it's my belief, based on 30 years'

3   experience in the industry, that it is entirely inappropriate

4   to trade the accounts of investors that are in transition, and

5   especially when you're not -- you're not contractually -- you

6   are contractually in default with that client, to trade their

7   account whimsically, for no business purpose.  And I thought

8   it was a clear breach of both regulatory, ethical, and

9   fairness with regard to the investors.

10      So I -- what did you know, when did you know it, what did

11   you do?  I did what I felt was the right thing, which I try

12   and do every day, and made all the relevant parties aware of

13   what was going on.

14   Q   Mr. Dondero, do you recall the text message you sent to

15   Mr. Seery in which you said, "Be careful what you do"?

16   A   Yes.

17   Q   What did you mean by that message?

18   A   It's -- I even said, Last warning.  I mean, I -- he's

19   doing things against the interests of investors.  He's

20   purposely incurring losses by trading in days and weeks and

21   time of the year, the day before and after Thanksgiving, where

22   any novice knows the markets are illiquid and anybody who can

23   read a computer screen can see you get ten percent less --

24   five or ten percent less than you would the week before or the

25   week after.  And with as much professional umbrage as

Dondero - Cross                          117

1   possible, I was recommending that he stop.

2   Q    Did you intend to personally threaten Mr. Seery in any

3   way?

4   A    No.  It was bad -- bad intentional professional acts

5   against the interests of investors that flow through to '40

6   Act retail mom-and-pop investors.  I was trying to prevent

7   those losses and those bad acts from occurring.  And I believe

8   everybody who's -- everybody around that issue should be

9   ashamed of themselves, in my opinion.

10  Q    Do you now regret sending the text?

11  A    No.  No, I mean, I could have worded it differently.  I

12  was angry on behalf of the investors.

13  Q    And Mr. Dondero, you have management ownership interest in

14  that entity; is that right?

15  A    Yes.

16  Q    Do you believe the interests or other entities in which

17  you are involved are independent from your personal rights in

18  this case?

19  A    Yes.

20  Q    And do you believe you caused anyone to violate the TRO?

21  A    No.  I've been -- I've been very conscious to just try and

22  champion the thing that -- things that I think are important

23  and the things that I've been tasked to do, like an attractive

24  pot plan to help resolve this case.  I spend time on that.

25  But every once in a while, do I have to access, let's say,

Dondero - Cross                    118

1  David Klos, who is the person who put the model together, who

2  has been working on it for six or nine months, and no one else

3  S has a copy of?  Yes.  Yeah, I have to -- I have to access

4  him.  I don't believe that's the -- inappropriate or in any

5  way violating the spirit of the TRO.

6     I believe settlement in this case is only going to happen

7  with somebody fostering communication.  And Ellington's role,

8  which I thought was a good one and I thought he was performing

9  well as settlement counsel, was an important role.  And I used

10  him for things like -- and Seery also used him for things.  As

11  recently as two days before Ellington was fired, Seery gave

12  him a shared services proposal to negotiate with me.

13  Ellington has always been the go-between from a settlement and

14  a legal standpoint.  I think his role there was -- it was

15  valued.  To try to honor the TRO was things like Multi-Strat,

16  that I didn't remember correctly.  Ninety percent of the time

17  or for the last 20 years I would have gone directly to

18  Accounting and Dave Klos for it, but I purposely went to

19  settlement counsel in terms of Ellington in order to get the

20  Multi-Strat information which we needed in order to put the

21  pot plan together that we went to the Independent Board with

22  at the end of December.

23  Q   (faintly)  And do you recall the questions that Debtor's

24  counsel had regarding the letters sent by K&L Gates to clients

25  of the Debtor?

Dondero - Cross                    119

1           MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2     hearing that question.

3           THE COURT:  Please repeat.

4           MR. BONDS:  Sure.

5     BY MR. BONDS:

6     Q   Do you recall the questions Debtor's counsel had regarding

7     the letters sent by K&L Gates to the clients of the Debtor --

8     to the Debtor?

9     A   Yes.

10    Q   You testified on direct that the letters were sent to do

11    the right thing; is that correct?

12    A   Yes.

13    Q   What did you mean by that?

14    A   I don't want to repeat too much of what I just said, but

15    the Debtor has a contract to manage the CLOs, which in no way

16    is it not in default of.  It doesn't have the staff.  It

17    doesn't have the expertise.  Seery has no historic knowledge

18    on the investments.  The investment staff of Highland has been

19    gutted, with me being gone, with Mark Okada being gone, with

20    Trey Parker being gone, with John Poglitsch being gone.

21         And there's -- there's a couple analysts that are a year

22    or two out of school.  The overall portfolio is in no way

23    being understood, managed, or monitored.  And for it to be

24    amateur hour, incurring losses for no business purpose, when

25    the investors have requested numerous times for their account

Dondero - Cross                     120

1    not to be traded, is crazy to me.  Where the investors say, We

2    just want our account left alone.  We just want to keep the

3    exposure.  And Jim Seery decides no, there's -- I'm going to

4    turn it into cash for no reason.  I'm just going to sell your

5    assets and turn them to cash and incur losses by doing it the

6    week of Thanksgiving and the week of Christmas.  I think it's

7    -- it's shameful.  I'm glad the compliance people and the

8    general counsel at HFAM and NexPoint saw it the same way.  I

9    didn't edit their letters, proof their letters, tell them how

10   to craft their letters.  They did that themselves, with

11   regulatory counsel and personal liability.  They put forward

12   those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14   Mr. Dondero just gave about these people saw it.  They're not

15   here to testify how they saw it.  We know that Mr. Dondero

16   personally saw and approved the letters before they went out.

17   He can testify what he thinks, what he believes.  I have no

18   problem with that.  But there should be no evidence in the

19   record of what the compliance people thought, believed,

20   understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24   lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25   response?

Dondero - Cross                      121

1          MR. BONDS:  Your Honor, my response would be that

2    there are several exhibits the Debtor introduced today that

3    stand for the proposition that the compliance officers were

4    concerned.  So I think there is ample evidence of that in the

5    record.

6          THE COURT:  I didn't --

7          MR. MORRIS:  Your Honor, the letter --

8          THE COURT:  I did not understand what you said is in

9    the record.  Say again.

10         MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11   -- there are references that are replete in the record that

12   have to do with the compliance officers' understanding of the

13   transactions.

14         THE COURT:  I don't know what you're referring to.

15         THE WITNESS:  Your Honor?

16         THE COURT:  I've got a lot of exhibits.  You're going

17   to have to point out what you think --

18         THE WITNESS:  Can I -- can I -- can I -- can I answer

19   for -- that for a second?  The letters that were signed by the

20   compliance people or by the businesspeople at NexPoint and

21   HFAM objecting to the transactions, those letters were their

22   beliefs, their researched beliefs.  They weren't --

23         THE COURT:  Okay.

24         THE WITNESS:  -- micromanaged by me.  You know, they

25   weren't -- I agree with them, but those weren't my beliefs

                        Dondero - Cross                    122

 1   that they've stated.  Those were their own beliefs and their

 2   own research, --

 3                THE COURT:  All right.

 4                THE WITNESS:  -- and the record should reflect --

 5                THE COURT:  This is clearly hearsay.  I mean, it's

 6   one thing to have a letter, but to go behind the letter and

 7   say, you know, what the beliefs inherent in the words were is

 8   inadmissible.  All right?  So I strike that.

 9                THE WITNESS:  Maybe ask your question again.

10   BY MR. BONDS:

11   Q    Yeah.  What is your understanding of the rights that these

12   parties had and what do you believe that was intended to be

13   conveyed by the compliance officers?

14                MR. MORRIS:  Objection.  Calls -- calls for Mr.

15   Dondero to divine the intent of third parties.  Hearsay.

16                THE COURT:  I sustain.

17                MR. BONDS:  Your Honor, --

18                MR. MORRIS:  No foundation.

19                MR. BONDS:  -- I don't agree.  I think that this is

20   asking Mr. Dondero what he thinks.

21                MR. MORRIS:  The letters speak for themselves, Your

22   Honor.

23                THE COURT:  Okay.  I sustain --

24                MR. MORRIS:  And Mr. --

25                THE COURT:  I sustain the objection.

Dondero - Cross                                  123

1              MR. MORRIS:  All right.  Thank you.

2              THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14        The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

Dondero - Cross                                124

1   standing.  Okay?  Number one.

2        Number two, when the investors know that it's in

3   transition, you're not in compliance as a manager, you're not

4   going to be an RIA in three weeks, the accounts are going to

5   have to transition to somebody else in three weeks, and the

6   investors ask you, Please don't trade my accounts between now

7   and then, that is -- that is a -- if it's not a *per se*, it's

8   an ethical and a spirit violation of any relationship between

9   an investor and an asset manager.

10       To then sell assets -- not replace assets, just sell

11  assets for cash -- and purposely do it on the least liquid

12  days of the year -- the day before Thanksgiving, the day after

13  Thanksgiving, the week of Christmas, this past week, whatever

14  -- to purposely incur losses so that the investors suffer ten

15  or fifteen percent losses that other -- on each of those sales

16  that they wouldn't otherwise have to incur, and for no stated

17  business purpose, for no investment rationale, with no staff

18  to even say whether the investment is potentially going up or

19  down, is -- is -- is -- I've never seen anything else like it.

20       And I will stand up and say it every day:  I'm glad the

21  letters went out from HFAM and from NexPoint.  I would never

22  recommend they get retracted.  And I believe everybody who

23  signed those letters meant everything in those letters.  And I

24  believe the letters are correct.  And I believe the whole

25  selling of CLO assets is a travesty.

Dondero - Cross                    125

1      My personal opinion, we need an examiner or somebody here

2   to look at this junk and look at some of the junk that

3   occurred earlier this year.  This -- this stuff is

4   unbelievable to me.

5   Q    Generally, who holds interests in the CLOs?

6   A    A vast majority of the CLOs that we're speaking of that

7   Seery has been selling the assets of are owned by the two

8   mutual funds, the two '40 Act -- the two '40 Act mutual funds

9   and the DAF.  Between them, I think out of -- eleven out of

10  the sixteen CLOs, they own a vast majority, and then I think,

11  whatever, two or three they own a hundred percent, and I think

12  two or three they own a significant minority.

13      And just because they don't own a hundred percent doesn't

14  somehow allow a registered investment advisor to take

15  advantage of an investor.  And I -- I've never understood that

16  defense.  I wouldn't be able -- in my role of 30 years, I

17  wouldn't be able to tell that to an investor, that, hey, you

18  had a contract with us, we did something that wasn't in your

19  best interest, but we got away with it because you didn't own

20  a hundred percent, you only owned eighty percent.

21          MR. MORRIS:  Your Honor, I move to strike.  There's

22  no contract between the Debtor and Mr. Dondero's -- and the

23  entities that he owns and controls for purposes of the CLO.

24  The only contract is between the Debtor and the CLOs

25  themselves.

Dondero - Cross                        126

1          THE COURT:  All right.  Well, I overrule whatever

2     objection that is.  Again, if you want to bring something out

3     on cross-examination or through Mr. Seery, you know, you're

4     entitled to do that.

5          All right.  Please continue.

6     BY MR. BONDS:

7     Q    Do you believe these letters were sent by the Funds to the

8     Advisors because they are trying to protect the independent

9     entities?

10    A    They're trying to protect their investors.  They were

11    trying to protect their regulatory liability for activities

12    they see that are not in the best interests of investors.

13          MR. MORRIS:  Objection, Your Honor.  I move to

14    strike.  He's again testifying as to the intent of the people

15    who sent the letters who are not here to testify today.

16          THE COURT:  Sustained.

17    BY MR. BONDS:

18    Q    Mr. Dondero, what is your belief as to the letters that

19    were sent by the Funds and Advisor?  Is -- are they trying to

20    protect their independent interests?

21          MR. MORRIS:  Objection, Your Honor.  Asked and

22    answered.

23          THE COURT:  Sustained.

24          THE WITNESS:  Ask me --

25    BY MR. BONDS:

Dondero - Cross                                127

1   Q    What is your understanding of why the letters were sent?

2            MR. MORRIS:  Objection, Your Honor.  Asked and

3   answered.

4            THE COURT:  Sustained.

5   BY MR. BONDS:

6   Q    Mr. Dondero, would you have sent the letters?

7   A    I would have sent the letters exactly or very similar or

8   probably even more strongly than the letters were stated, for

9   the purposes of protecting investors, to protecting mom-and-

10  pop mutual fund investors from incurring unnecessary losses by

11  an entity that was no longer in compliance with their -- with

12  their asset management contract and because the investors had

13  requested that their account just be frozen until it was

14  transitioned.

15       That's why I would have sent the letter.  That's why I

16  believe the letter should be sent.  That's why I'm happy they

17  were sent.  That's why we've never retracted.

18  Q    Mr. Dondero, who is Jason Rothstein?

19           THE COURT:  I did not hear the question.

20           THE WITNESS:  Jason -- Jason --

21           MR. BONDS:  Who --

22           THE COURT:  Please repeat.

23           MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24  Rothstein was.

25           THE WITNESS:  Jason Rothstein heads up our systems

Dondero - Cross                              128

1  department at Highland Capital.

2  BY MR. BONDS:

3  Q    Can you explain what your text message to Mr. Rothstein

4  was about?

5  A    Which text message?  The one where it was in the drawer?

6  Q    Yeah.

7  A    Uh, --

8  Q    And that was actually from him, not you.

9  A    Yeah.  That was from him.  I think he transferred icons or

10 set up personal stuff to the new phone, and he was just saying

11 that the old phone was in Tara's drawer.

12 Q    And you don't know whether -- what's happened to the

13 phones, do you?

14 A    No.  Like I said, I believe they've been destroyed, but I

15 -- I can find out.  I mean, I can query and find out who

16 destroyed it, if that's important.

17 Q    And you understood that you were not supposed to talk to

18 the Debtor's employees; is that correct?

19 A    Like I said, except for my roles regarding shared

20 services, the pot plan, and trying to reach some type of

21 settlement, I've had painfully few conversations with the

22 Debtor's employees.

23 Q    When you talked to certain employees, did you think it was

24 an -- under an exception to the TRO, like shared services,

25 related to the pot plan, or settlement communications?

Dondero - Cross                          129

1  A    Yes.

2          MR. MORRIS:  Your Honor, I move to strike.  Mr.

3  Dondero never read the TRO.  He's got no basis to say what the

4  TRO required and didn't require.

5          MR. BONDS:  That wasn't the -- that wasn't the

6  question.

7          THE COURT:  Okay.

8          MR. BONDS:  I'm sorry.

9          THE COURT:  Okay.  Rephrase the question, please.

10         MR. BONDS:  Okay.  I'm sorry.

11 BY MR. BONDS:

12 Q    When you talked to these -- to certain employees, did you

13 think it was under an exception to the TRO, like shared

14 services, relating to the pot plan, or settlement

15 communications?

16 A    Yes.  Absolutely.

17         MR. MORRIS:  I object.  No foundation.

18         THE COURT:  Sustained.

19 BY MR. BONDS:

20 Q    Mr. Dondero, do you understand -- did your lawyers explain

21 to you the TRO?

22 A    Yes.

23 Q    And who was the lawyer that explained the TRO to you?

24         MR. MORRIS:  Your Honor, I don't know if we're

25 getting into a waiver of privilege, but I just want to tell

Dondero - Cross                         130

1    you that my antenna are up very high.

2            THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3    you about to waive the privilege?

4            MR. BONDS:  No, Your Honor, I am not.

5            THE COURT:  Okay.  Well, it sounded like perhaps we

6    were about to have the witness testify about conversations he

7    had with lawyers.

8            MR. BONDS:  I'm sorry, Your Honor.  That was not my

9    intention.  Again, I'm asking Mr. Dondero to explain for us

10   his contact with -- or, his impression of the TRO.

11   BY MR. BONDS:

12   Q    What did the TRO mean to you?

13   A    The TRO meant to me that I was precluded from talking to

14   Highland employees -- which, again, very few, if any, were

15   coming into the office.  I was not talking to Highland

16   employees with any regularity anyway.  But there was an

17   exception with regard to Scott Ellington regard -- Scott

18   Ellington in terms of him functioning as settlement attorney

19   to try and bridge the U.C.C., the Independent Board, Jim

20   Seery, other people, and things that impacted me or other

21   entities.

22        I also viewed that there was an exception for the pot

23   plan, which had been presented and gone over as recently as

24   December 18th and 20th.  And -- or December 18th, I think, was

25   the date.

011366

Dondero - Cross                                    131

1      And you know what, I want to clarify a characterization of

2    the pot plan.  I still believe it's the best and most likely

3    alternative for this estate in the long run.  I think what

4    we've proposed numerous times is more generous than what

5    anyone will receive in a liquidation and in a more timely

6    fashion.

7      And the last time we presented it to the Independent

8    Board, the Independent Board thought it was attractive and

9    thought we should go forward with it to the U.C.C. and other

10   parties.

11          MR. MORRIS:  Your Honor, I move to strike the last

12   portion of the answer that purports to describe what the

13   Independent Board thought.

14          THE COURT:  Well, --

15          MR. MORRIS:  No foundation.  Hearsay.

16          THE COURT:  What is your response to the hearsay

17   objection, Mr. Bonds?

18          MR. BONDS:  Your Honor, I don't have one.

19          THE COURT:  Okay.  I sustain.

20   BY MR. BONDS:

21   Q   What exceptions did you believe there were for

22   communications with employees?

23   A   Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24   Ellington and settlement counsel.  I covered the pot plan.

25   Q   Okay.

Dondero - Cross                                              132

1    A    My -- my view of the pot plan as -- my view of the pot
2    plan was that it was very attractive, and I had received
3    encouragement to go forward with it as something that should
4    be workable.  That's my testimony on that.
5        And then -- and we talk about negotiating shared services.
6    So, there's shared services in terms of overlap in
7    functionality, but there's also, in terms of negotiating the
8    shared services agreement, which, as I said, was something
9    that Ellington was put in charge of three or four days ago by
10   Jim Seery to negotiate with us.  And he reached out to me to
11   negotiate it.  And I think the Pachulski deadline on it was
12   three days later.  That whole process was something that I
13   viewed as separate from the TRO, especially since it was
14   initiated by Jim Seery, DSI, et cetera, and consistent with
15   what Scott Ellington's role had been for the last six, nine
16   months.
17   Q    As to the Debtor's request that you vacate the office
18   space, did you comply with this request?
19   A    Yes.
20   Q    What did you think that vacating meant?
21   A    I moved out all my -- my personal items to a new office at
22   NexBank.
23   Q    (faintly)  And, in fact, did you work on the last day over
24   to 3:00 a.m.?
25   A    Yes.  4:00.

Dondero - Cross                    133

1          THE COURT:  Mr. Bonds, I didn't hear your question.

2   I didn't hear your question.

3          MR. BONDS:  Okay.  I'm sorry.

4   BY MR. BONDS:

5   Q    Did -- isn't it true that you worked through the night, to

6   3:00 or 4:00 a.m., to vacate the premises?

7   A    Yes.  Until 4:00 a.m. on the last day, to organize and

8   pack up all my stuff, yes.

9   Q    Did you think your presence in the office, with no other

10  employees there, violated the spirit of the TRO?

11  A    No.  I thought it was over the top and meant to tweak me,

12  but, yeah, there's no -- there's not Debtor employees coming

13  in since COVID.

14  Q    (faintly)  Okay.  And you thought you could talk to Mr.

15  Ellington and -- as settlement counsel; is that correct?

16         MR. MORRIS:  I'm having trouble hearing it, Your

17  Honor.

18         THE WITNESS:  Yes.

19         THE COURT:  Yeah.  We're -- Mr. Bonds, please make

20  sure you speak into the device.

21         MR. BONDS:  I'm sorry.  I'll try to get closer.

22  Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.

23  Dondero if he thought he could talk to Ellington as a go-

24  between or settlement counsel.  And I asked him if that was

25  correct.

Dondero - Cross                        134

1          THE WITNESS:  Yes.  For settlement, shared services,

2     the pot plan.  Nothing that interrupts or affects the Debtor,

3     but for those purposes, as has consistently occurred for the

4     last six months.

5     BY MR. BONDS:

6     Q    Okay.  And you saw the texts and emails presented by the

7     Debtor between you and Mr. Leventon; is that correct?

8     A    The one regarding Multi-Strat?

9     Q    Yes.

10    A    Yes.

11    Q    In your understanding, did you believe those

12    communications were allowed under the TRO?

13    A    Well, yes.  And, again, to clarify my -- my contrasting

14    testimony, I would never typically have gone to them for that

15    kind of information, but to be compliant with the TRO, for

16    Multi-Strat information, which I needed in order to put

17    together the pot plan that the Independent Board audienced on

18    December 18, I needed the information on Multi-Strat, and I

19    requested it as appropriate through settlement counsel

20    Ellington.  And I think Ellington requested it from Isaac, who

21    requested it from David Klos.

22         The whole purpose, I believe -- my belief is the whole

23    purpose of this TRO is to make it impossible for us to get

24    information to come up with alternatives other than a -- the

25    plan proposed by Jim Seery.  It's our -- if -- if -- without

Dondero - Cross                                    135

1    Ellington in the go-between, which he's now no longer an

2    employee, I assume the only way we get any information,

3    balance sheet or anything from Highland Capital, is with a

4    subpoena.

5        And as much as I've tried to engage or make an attractive

6    pot plan for everybody, each one of them has been a complete

7    shot in the dark, without even knowing the assets and

8    liabilities of Highland, but just estimating where they were

9    or were likely to be.

10   Q    Do you believe your text message with Leventon caused any

11   harm to the Debtor's business?

12   A    No.  It potentially fostered a pot plan, because, you have

13   to know, the pot plan needed -- one of the aspects of the pot

14   plan was the --

15   Q    Do you still want to advocate for your pot plan?

16   A    I think that's eventually where we ultimately end up.  Or

17   -- or should end up.  Otherwise, I fear it's going to be an

18   extended, drawn-out process.

19   Q    And how much did you initially propose to pay creditors in

20   this case?

21   A    The most recent -- the most recent pot plan?

22   Q    No.  The -- initially.

23   A    The initial pot plan, I believe, was $160 million.

24   Q    And what about the notes?

25   A    There was $90 [million] of cash and I believe $70

Dondero - Cross                               136

1    [million] of notes.

2    Q    And what is Multi-Strat?

3    A    Multi-Strat is a fund that's managed by Highland.  They

4    used to have $40 or $50 million in value.  It used to contain

5    a lot of life settlement policies.  And I believe now has $5

6    or $6 million of value, after assets have been sold.

7    Q    Do you recall the email Debtor's counsel presented

8    regarding the balance sheet today?

9    A    The balance sheet of Multi-Strat?

10   Q    Correct.

11   A    Yes.

12   Q    Do you believe you were entitled to see that document?

13   A    Yes.  It's just -- again, for the pot plan, I needed it.

14   But also I'm an investor in that fund and I'm entitled to it.

15   It's -- there was nothing in there that was improper or

16   untoward or in any way damaged the Debtor.

17   Q    And you recall the request for documents sent by the

18   Debtor; is that correct?

19   A    On my -- my personal estate plan?

20   Q    No, on Multi-Strat.

21   A    The Debtor's request on -- I'm sorry.  What was that?

22   Q    The Debtor sent you a request for Multi-Strat.  For Duga

23   -- I'm sorry.

24   A    For Dugaboy?  Okay.

25   Q    Dugaboy.

011372

Dondero - Cross                    137

A    Yeah.  There's -- there's personal estate planning trusts.

Some are active.  Some are inactive.  Some have been around

for 15 years.  But they're -- they're not assets or anything

that's related to the estate.  And that was -- that was my

text to Melissa that said, you know, Not without a subpoena.

Q    Mr. Dondero, if you remember back on Exhibit K, there was

some request that you terminate your offices at the Crescent,

and I think you were given seven days' notice to do that.  Do

you know if Christmas occurred during that time?

A    I believe it did.

Q    So, if Christmas and Christmas Eve are both holidays, how

many days, business days, did they give you to terminate or to

get out of the space?

A    There would have been three business days.  It was Monday

through Wednesday that I moved out.

         MR. BONDS:  Your Honor, I'll pass the witness.

         THE COURT:  All right.  Mr. Morris?

         THE WITNESS:  Take a break.  I hope.

         MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

minute break?  I think that I'm going to be through, but I

don't know.

         THE COURT:  All right.  I'll give you a ten-minute

break.

         MR. BONDS:  All right.  Thank you, Your Honor.

         THE COURT:  We're coming back at 2:15.

Dondero - Cross                        138

1           THE CLERK:  All rise.

2        (A recess ensued from 2:06 p.m. until 2:16 p.m.)

3           THE CLERK:  All rise.

4           THE COURT:  All right.  Please be seated.  We're back

5     on the record in Highland versus Dondero.  Mr. Bonds, do you

6     have more examination?

7           MR. BONDS:  Your Honor, I have one question.

8           THE COURT:  Okay.

9           MR. BONDS:  And that's --

10          MR. LYNN:  And one more witness.

11          MR. BONDS:  And one more witness.

12                  CROSS-EXAMINATION, RESUMED

13    BY MR. BONDS:

14    Q    Do you think that Scott Ellington and Isaac Leventon were

15    treated appropriately by the Debtor?

16    A    No, I do not.  I don't think they've been treated fairly,

17    nor do I think other senior employees have been treated

18    fairly.  I've never seen a bankruptcy like this where, during

19    complex unwinding of 20 years of various different entities

20    and structures, relying on the staff, working them hard,

21    working overtime, a lot of investment professionals like

22    lawyers and DSI just putting their name on the work of stuff

23    that was done by internal employees, getting to the end of the

24    year, trying to pay people zero bonuses and retract prior

25    years' bonuses, and try and come up with legal charges against

Dondero - Cross                    139

1  those people is unusual to this case and my experience, in the

2  bankruptcies we've been involved in, where typically

3  management teams get paid multiples of current salary to stay

4  on and be the experts.

5      I also think they were put in difficult spots from the

6  very beginning.  It was Jim Seery that made Scott Ellington

7  the settlement counsel six, seven months ago.  It was a

8  broadly-defined role that was never retracted, never adjusted,

9  never modified, yet somehow he and Isaac violated it.  I don't

10 know.  I haven't spoken to them since they've been terminated.

11 They aren't allowed to speak to me, from what I hear.  But I

12 wish them luck in their claims.

13         THE COURT:  Okay.  You pass the witness?

14         MR. BONDS:  Yes, Your Honor.

15         THE COURT:  All right.  Mr. Morris, do you have

16 further examination?

17         MR. MORRIS:  Just a few questions.

18                REDIRECT EXAMINATION

19 BY MR. BONDS:

20 Q   Mr. Dondero, you knew about this hearing for some time,

21 right?

22 A   No.

23 Q   When did you first learn this hearing was going to take

24 place?

25 A   Two days ago.

Dondero - Redirect                    140

1   Q    Two days ago?

2   A    When was the depo, three days ago?  Whatever.

3   Q    And you didn't know prior to the deposition that we would

4   be having a hearing today on the Debtor's motion for a

5   preliminary injunction?

6   A    No.  I thought it was going to be postponed or canceled.

7   I was waiting for the text last night.

8   Q    You had an opportunity to call any witness in the world

9   you wanted to today, right?

10  A    I guess.

11  Q    You could have called -- you could have called the chief

12  compliance officer at the Advisors if you thought the Court

13  should hear from him as to the compliance issues that you've

14  testified to, right?

15  A    I think their letters stand on their own.

16  Q    Okay.  So you didn't think that it was important for the

17  Court to hear from Mr. Sowin directly, correct?

18  A    Sowin is a trader.

19  Q    I'm sorry.  Who's the chief compliance officer of the

20  Advisors?

21  A    Jason Post, as far as NexPoint is concerned.  He's the one

22  that would have been behind the K&L -- K&L letters.

23  Q    And he is not here today to testify, right?

24  A    I think his letters stand on their own and I think

25  everybody should read them, make sure they read them.

Dondero - Redirect                 141

1  Q   Okay.  But Mr. Post is not here to answer any questions;
2  is that right?
3  A   I don't know if there are any questions beyond what's
4  obviously stated in the letters.  You should read the letters
5  carefully.  They're -- they're -- they talk about clear
6  violations.
7           MR. MORRIS:  Your Honor, I move to strike.  It's a
8  very simple question.
9           THE COURT:  Sustained.  That was another yes or no
10  answer, Mr. Dondero.  Go ahead.
11           THE WITNESS:  I'm sorry.
12  BY MR. MORRIS:
13  Q   Mr. Dondero, Mr. Post is not here to testify in order to
14  explain to the Court what he thinks the regulatory issues are,
15  correct?
16  A   He's not here today.
17  Q   And you could have called him as a witness, correct?
18  A   Yes.
19  Q   And you thought Mr. Ellington and Mr. Leventon were
20  treated unfairly, right?
21  A   Yes.
22  Q   And there's no reason why they couldn't have come today to
23  testify, correct?
24  A   I guess they could have.
25  Q   And there's no reason why anybody on behalf of the K&L

Dondero - Redirect                    142

1   Gates clients couldn't have been here to testify, correct?

2   A    I didn't deem it necessary, I guess.

3   Q    Okay.  You could have offered into evidence, at least

4   offered into evidence, any document you wanted, right?

5   A    Yes.

6   Q    And you could have offered the judge, for example, the

7   shared services agreement, the shared services agreements for

8   which you gave the Court your understanding, right?

9   A    Which shared services, the one that Seery gave Ellington

10  three days ago or the original one from years ago?

11  Q    Any of the ones -- any of the ones that you have referred

12  to today.  You could have given any of them to the judge,

13  right?

14  A    Correct.

15  Q    And you didn't, right?

16  A    I did not.

17  Q    In fact, there's not a single piece of evidence in the

18  record that corroborates anything you say; isn't that right?

19  A    I -- I believe all those documents are in the record.

20  They're just not in the record of this TRO.  But they're all

21  --

22  Q    Oh.

23  A    They're all in the record.

24  Q    Do you remember that there was a hearing on December 16th?

25  I think you -- you testified that you're fully aware of that

Dondero - Redirect                               143

1   hearing that was brought by the K&L Gates Clients.  Do you

2   remember that?

3   A    Yes.

4   Q    Who testified at that hearing on behalf of the K&L Gates

5   Clients?  Dustin Norris?

6   A    I believe -- I believe Dustin Norris testified.

7   Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?

8   A    He's one of the senior managers.

9   Q    Is he a compliance officer?

10  A    No.

11  Q    Is he a trader?

12  A    No.  But he's one of the senior managers.

13  Q    Okay.  They could have called anybody they wanted, to the

14  best of your understanding, right?

15  A    I don't think they got a chance to.  Wasn't it an

16  abbreviated hearing?

17  Q    They offered Mr. Norris as a witness.  Do you understand

18  that?

19  A    I -- all I -- I wasn't there.  I didn't attend virtually.

20  I -- but I did know that Norris testified.  But I don't know

21  who else was called, wasn't called, was going to be called,

22  was on the witness list.  I have no awareness.

23  Q    Okay.  You were pretty critical of the trades that Mr.

24  Seery wanted to make that you interfered to stop, right?

25  A    I think he's subsequently done most of those trades.

Dondero - Redirect                144

1  Q   And you called them preposterous because he wanted to do

2  it around Thanksgiving or around Christmas, at least based on

3  your testimony, correct?

4  A   That's when it did occur.

5  Q   And is it your testimony -- is it your testimony that

6  every single person in the world who trades securities near a

7  holiday is making a preposterous trade?

8  A   I think it's amateur and not what an investment

9  professional would do.

10 Q   So you never trade on holidays; is that your testimony?

11 You've never done it once in your life?

12 A   Very rarely, unless there's another overriding reason.

13 And there was no overriding reasons, period.

14 Q   How would you know that when you didn't even ask Mr. Seery

15 why he wanted to make the trades?

16 A   I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin

17 said that Jim Seery just said for risk reduction.

18         MR. MORRIS:  I move to strike on the grounds that

19 it's hearsay, Your Honor.

20         THE COURT:  Sustained.

21 BY MR. MORRIS:

22 Q   You never asked Mr. Seery why he wanted to make the

23 trades, correct?

24 A   I'm not allowed to talk to Mr. Seery.

25 Q   You certainly were around Thanksgiving; isn't that right?

Dondero - Redirect                    145

1   A    I don't know.

2   Q    There was no TRO in place at that time, correct?

3   A    That's true.

4   Q    You're pretty critical of Mr. Seery and his capabilities;

5   is that right?

6   A    He's a lawyer.  He's not an investment professional.

7   Q    Did you object to his appointment as the CEO of the

8   Debtor?

9   A    No.

10  Q    Have you made any motion to the Court to have him removed

11  as unqualified?

12  A    Not yet.

13  Q    Okay.  But with all the knowledge of all the preposterous

14  things that he's been doing for months now, you haven't done

15  it, right?

16  A    No.

17  Q    When you -- when -- before you threw the phone in the

18  garbage, did you back it up?

19  A    No.

20  Q    Did it occur to you that maybe you should save the data?

21  A    No.

22  Q    You said that the only way you think you might be able to

23  get information going forward is through a subpoena.  Do I

24  have that right?

25  A    I mean, that's how it seems.  I mean, it seems at every

Dondero - Redirect                          146

1    turn -- and now with Scott Ellington being gone and Isaac

2    being gone -- I have no idea how the Debtor is ever going to

3    defend against UBS.

4            THE COURT:  I did not --

5            THE WITNESS:  I have no idea how --

6            THE COURT:  I didn't hear the answer after with

7    Ellington and Leventon being gone.  I didn't hear the rest of

8    the answer.  Could you repeat?

9            THE WITNESS:  I said I have no idea how the Debtor is

10   ever going to defend itself against UBS.  But I also have no

11   idea how we're ever going to get any information or ever push

12   forward any kind of settlement without having any access to

13   information or anybody to talk to.

14   BY MR. MORRIS:

15   Q    Do you trust Judge Lynn?

16        (Echoing.)

17   A    Yes.

18   Q    Is he a good advocate?

19   A    Yes.  If anybody returns his phone calls.

20   Q    Do you recall that on October 24th Judge Lynn specifically

21   asked my law firm to provide information on your behalf in

22   connection with the Debtor's financial information, their

23   assets and their liabilities?

24   A    Yes.

25   Q    Do you recall that the Debtor simply asked that you

Dondero - Redirect                        147

1    acknowledge in an email between and among counsel that you

2    would abide by the confidentiality agreement that was entered

3    by the Court?

4    A    I wasn't involved in those details.

5    Q    Didn't you send an email in which you agreed to receive

6    the financial information subject to the protective order that

7    this Court entered?

8    A    I'm sure I would.  I just don't remember.

9    Q    That was a condition that the Debtors made.  That doesn't

10   refresh your recollection?

11   A    I'm not denying it.  I just don't remember, and --

12   Q    Okay.  And --

13   A    (overspoken)

14   Q    I'm sorry, I don't mean to cut you off.  And in fact, on

15   December 30th, the day you were supposed to vacate the office,

16   the Debtor voluntarily provided to Judge Lynn all of the

17   information that had been requested on your behalf without the

18   need for a subpoena, right?

19   A    Yeah.  It took a week.  It's 40,000 pages of mixed

20   gobbledygook that we're -- we're going through.  But it should

21   provide enough information for us to negotiate a pot plan if

22   anybody so chose.

23   Q    So you didn't need to (echoing) the 40,000 pages of

24   financial information from the Debtor; all you needed was an

25   agreement that you would abide by the protective order.

Dondero - Redirect                               148

1    Correct?

2    A    I think that was the first thing that was ever produced on

3    request that I can remember.  But yes.

4    Q    And it was just a week ago, right?

5    A    Yes.

6              MR. MORRIS:  I have no further questions, Your Honor.

7              THE COURT:  All right.  Mr. Bonds, do you have

8    anything else?

9              MR. BONDS:  I do not, Your Honor, as to this witness.

10   I have one other witness.

11             THE COURT:  All right.

12             MR. MORRIS:  Your Honor, I don't know who they plan

13   on calling, but he's not on the witness list.

14             THE COURT:  All right.  Well, --

15             MR. BONDS:  Your Honor, this other witness --

16             THE COURT:  Just a moment.  This concludes, for the

17   record, Mr. Dondero's testimony.  But, obviously, stick

18   around, because we're going to have a lot to talk about when

19   this is finished as far as the evidence.

20       All right.  Now, who are you wanting to call that you did

21   not identify?

22             MR. BONDS:  I'd like to call Mike Lynn for the

23   purpose -- or, to -- as a rebuttal witness.

24             THE COURT:  Lawyer as witness?

25             MR. MORRIS:  Your Honor?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 150
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 467 of 921 PageID 12265

149

1          THE COURT: Well, you know, first off, rebuttal of

2     what? Rebuttal --

3          MR. MORRIS: Exactly. He's going to rebut his own

4     client, Your Honor? He's going to rebut his own client?

5     There's only been one witness to testify here. He was on

6     their exhibit list. How do they call a witness to rebut their

7     own client?

8          THE COURT: Yes. What -- I don't --

9          MR. BONDS: Your Honor?

10         THE COURT: Go ahead.

11         MR. BONDS: Mr. Morris testified or attempted to

12    testify that the pot plan didn't gain any traction. We will

13    submit Mike Lynn on that issue.

14         THE COURT: No.

15         MR. MORRIS: Your Honor?

16         THE COURT: I'm not going to allow a lawyer to

17    testify to rebut lawyer argument. That's very inappropriate,

18    in my view. So, not going to happen.

19         MR. LYNN: (garbled)

20         MR. BONDS: Your Honor, he would be a fact witness to

21    discussions with the other side.

22         MR. MORRIS: Your Honor, I strenuously object.

23    They're -- he's only rebutting -- my questions are not

24    evidence. The only evidence in the record is Mr. Dondero's

25    testimony. Mr. Dondero is their client. Mr. Dondero was on

150

1    their witness list.  They should not be permitted to call any

2    witness, with all due respect to Mr. Lynn, to rebut their own

3    witness.

4              THE COURT:  All right.

5              MR. BONDS:  Your Honor, we're not rebutting our

6    witness.  We are rebutting the testimony that Mr. Morris gave.

7              THE COURT:  Mr. Morris is a lawyer.  He makes

8    argument.  He asks questions.  He was not a witness today.

9    Okay?

10       So if you want to say whatever you want to say as lawyers

11   in closing arguments, then obviously you can do that.  But I'm

12   not going to allow a lawyer to be a witness to rebut something

13   another lawyer said in argument or in a question.  I -- it's

14   -- so, I disallow that.

15       Anything else, then?

16             MR. BONDS:  No.

17             THE COURT:  Okay.  And while we're talking about

18   procedure, actually, Mr. Morris, it's the Debtor's motion, and

19   I'm not even sure that's all of your evidence.  So, do you

20   have any more evidence as Movant?

21             MR. MORRIS:  No, Your Honor.  The Plaintiff and the

22   Debtor rest.

23             THE COURT:  All right.  So, at the risk of repeating,

24   now that the Movant has rested, it would be Mr. Dondero's

25   chance to put on supplemental evidence.  But what I'm hearing

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 152
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 469 of 921 PageID 12267

151

1    from Mr. Morris is there were no witnesses identified on your

2    witness list?

3              MR. BONDS:  Other than Mr. Dondero, Your Honor.

4              THE COURT:  Okay.  All right.  Well, was there any

5    stipulated documentary evidence that -- that you had --

6              MR. BONDS:  No, Your Honor.

7              THE COURT:  All right.  Well, I guess we're done with

8    evidence.

9         Mr. Morris, your closing argument?

10             MR. MORRIS:  All right.  Before I get to that, Your

11   Honor, I just want to make a very brief statement.  When the

12   Debtor objected to Mr. Dondero's emergency motion for a

13   protective order, the Debtor stated that it sought discovery

14   from Mr. Dondero to determine whether Mr. Dondero may have

15   violated the TRO by interfering and impeding the Debtor's

16   business, including by potentially colluding with UBS.  After

17   that motion was decided, both Mr. Dondero and UBS produced

18   documents to the Debtor.

19        Based on the review of that information, the Debtor found

20   no evidence that Mr. Dondero and UBS colluded to purchase

21   redeemed limited partnership interests of Multi-Strat, nor any

22   inappropriate conduct by UBS or its counsel.

23        The Debtor appreciates the opportunity to clear that part

24   of the record.

25             THE COURT:  All right.

152

CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

1

2    MR. MORRIS:  Now, with respect to the motion at hand

3  today, Your Honor, I want to take you back just about a month

4  ago to December 10th, 2020.  At that time, we had a hearing on

5  the Debtor's motion for a TRO.  The motion had been filed in

6  advance.  Mr. Dondero had filed an objection.  He had concerns

7  about the scope and the language of the terms of the proposed

8  TRO.

9     And at that hearing, Your Honor, if you'll recall, you

10  listened carefully to the arguments that were made on behalf

11  of Mr. Dondero.  You heard carefully -- you listened carefully

12  to the proposed changes that he sought to make.  And you went

13  through that proposed TRO word by word, Paragraph 2 and 3, and

14  you read them out loud, and you made decisions at that time as

15  to whether the Court believed any portion of that was

16  ambiguous or whether it was clear.  You made determinations at

17  that time whether or not the provisions were reasonable.

18     Mr. Dondero wasn't there.  He didn't read the transcript.

19  He has no idea what you said.  But his lawyers were there, and

20  they had an opportunity to object and they had an opportunity

21  to make comments, and the order is what the order is.  And for

22  whatever reason, Mr. Dondero chose not to read it, or,

23  frankly, even understand it, based on his testimony.

24     The fact is, Your Honor, the one thing that the evidence

25  shows very clearly here is that Mr. Dondero thinks that he is

153

1    the judge.  He believes that he is the decider.  He believes

2    that he decides what the TRO means, even though he never read

3    it.  He believes that he decides what exceptions exist in the

4    TRO, even though he never read it.

5        He believes that he decides that it's okay to ditch the

6    Debtor's cell phone without even seeking, let alone obtaining,

7    the Debtor's consent.  I guess he decides that he can ditch

8    the phone and trash it without seeking to back it up or

9    informing the Debtor.

10       Mr. Dondero believes that he gets to decide that it's okay

11   to take a deposition from the Debtor's office, even when the

12   Debtor specifically says you're evicted and you're not allowed

13   to have access.

14       Mr. Dondero believes that he gets to decide that Mr. Seery

15   has no justification for making trades, even though he

16   couldn't take the time to pick up the phone or otherwise

17   inquire as to why Mr. Seery wanted to do that.

18       Mr. Seery -- Mr. Dondero believes that he is the arbiter

19   and the decision-maker and gets to decide to stop trades,

20   notwithstanding the TRO, notwithstanding the CLO agreements

21   that he is not a party to, that his entities are not a party

22   to.

23       Mr. Dondero thinks that he gets to decide that the Debtor

24   has breached the agreements with the CLOs.  He gets to decide

25   that the Debtor is in default under those agreements.  He gets

154

1    to decide that it's perfectly fine for Ellington and Leventon

2    to support his interests while they have obvious duties of

3    loyalty to the Debtor.

4        It is not right, Your Honor. It is not right. I stood

5    here, I sat here, about four hours ago, five hours ago, and

6    told the Court what the evidence was going to show, and it

7    showed every single thing that I expected it to show and

8    everything I just described for the Court about Mr. Dondero's

9    belief that he's the decider.

10       He's not the decider, Your Honor. You are. And you made

11   a decision on June -- on December 10th that he ignored.

12       There is ample evidence in the record to support the

13   imposition of a preliminary injunction. And Your Honor, I'm

14   putting everybody on notice now that we're amending our

15   complaint momentarily to add all of the post-petition parties,

16   because this has to stop. The threats have to stop. The

17   interference has to stop. Mr. Dondero can always make a

18   proposal if he thinks that there's something that will capture

19   the imagination and the approval -- more importantly, the

20   approval -- of the Debtor's creditors. We have no interest in

21   stopping him from doing that. He's got very able and

22   honorable counsel, and he can go to them and through them any

23   time he wants.

24       But the record is crystal clear here that, notwithstanding

25   Your Honor's order, one entered after serious deliberation, is

155

1    of no meaning to him.  And we'll be back at the Court's

2    convenience on the Debtor's motion to hold him in contempt.

3    It'll just be a repeat of what we've heard today, because,

4    frankly, the evidence is exactly the same.

5        With that, Your Honor, unless you have any questions, the

6    Debtor rests.

7            THE COURT:  All right.  I do not.

8        Mr. Bonds?

9            MR. BONDS:  Your Honor, we would like to divide our

10   time between Mike Lynn and myself.  Is that a problem?

11           THE COURT:  That's fine.  Go ahead.

12           MR. LYNN:  Are we on mute?

13           MR. BONDS:  No.

14            CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15           MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16   Phelan's book.  I happened to read the confirmation hearing in

17   the *Acis* case regarding what was referred to as Clients A, B,

18   and C.  And Mr. Phelan, who testified, really gave an oral

19   argument to the Court which was very persuasive and very

20   thorough.  So I'm going to sort of do the reverse, because I

21   hope that the Court would find useful some information

22   regarding the pot plan about which you've heard many words

23   spoken but very little to do with what that plan was or how it

24   came about.

25       The pot plan was proposed by Mr. Dondero for the first

156

1   time in September of 2020, shortly after the conclusion of the

2   first round of mediations.  Though there had been versions of

3   it before, and lesser versions, the pot plan was finally in

4   the form that would more or less survive it in September.

5   Under the pot plan, Mr. Dondero proposed to come up with $90

6   million of cash and $70 million in promissory notes, and that

7   was to form a pot which creditors would share in.

8       The proposal was provided to the Debtor and then shared

9   with the Committee.  Mr. Seery responded with a degree, a

10  degree only, of enthusiasm to the pot plan, and indeed

11  provided a counter-term sheet to the pot plan.  He also, so he

12  said, and I believe him, approached the Committee and said

13  this is a proposal to be taken seriously.

14      He proposed some improvements in his view to the pot plan.

15  No response was received from the Creditors' Committee at that

16  time.

17      After going back and forth with the Debtor -- and Mr.

18  Seery, not unreasonably, was unwilling to propose the pot plan

19  without some support on the Creditors' Committee -- I

20  contacted Matt Clemente.  We had a nice conversation.  And at

21  that time, Mr. Clemente raised two particular concerns.  The

22  $160 million, which creditors did not think was enough, was

23  not enough, in part, because that included no consideration

24  for the acquisition of promissory notes executed some by Mr.

25  Dondero and some by entities controlled by Mr. Dondero, which

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 158
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 475 of 921 PageID 12273

157

1  notes total approximately $90 million.

2      The second concern was that Mr. Dondero would get a

3  release under the plan.  During that call, I said the issue of

4  the notes is subject to negotiation and might well result in a

5  transfer of those notes, possibly with some amendments, to the

6  pot, and that Mr. Dondero was prepared, in all likelihood, to

7  forego a release.

8      Mr. Clemente agreed to get back to me.  He did.  And he

9  said to me, I have talked to the Committee about this and they

10 would like you to go to or they want you to go first to Mr.

11 Seery, work off of his revised timesheet -- or term sheet,

12 sorry -- and after you have reached an agreement with him,

13 come to us, come to the Committee, and we'll negotiate with

14 you.

15     Now, I might have agreed that that was a reasonable

16 approach if there were a possibility that Mr. Seery would

17 propose a plan without the agreement of creditors.  But the

18 way I took it was that the Committee was saying go make a deal

19 with Seery and then we'll start negotiating, and we know,

20 correctly, that Mr. Seery will not propose a plan that does

21 not have our support.

22     So, effectively, we get to go through two rounds of

23 negotiations, even though effectively everything that is in

24 the estate, everything -- causes of action against Mr.

25 Dondero, promissory notes from Mr. Dondero -- everything that

158

1   they would get under a plan or under a liquidation, they would

2   get under the pot plan.

3        Now, I wanted you to know that, Your Honor, not because

4   I'm now trying to get you or anyone else to sell the pot plan.

5   But I think it's important that Your Honor know that Mr.

6   Dondero's approach in this case has not been a hostile

7   approach.

8        I know the Court had what it found to be an unsatisfactory

9   experience with Mr. Dondero in the *Acis* case.  But from the

10  time I became involved in this case and Mr. Bonds became

11  involved, we have been quiet, we have said nothing, and we've

12  done virtually nothing in the case, up until the time after

13  the mediation, when negotiations regarding a pot plan broke

14  down.

15       Since that time, regrettably, there has been a good deal

16  of hostility, and it's spreading.  I would like to see it stop

17  spreading.  I will do what I can to make it stop spreading.

18  But I need others to help me on that.  And it's my hope that I

19  can count on the Pachulski law firm, the Sidley law firm, and

20  the firms representing the major creditors to help make that

21  happen.

22       I do not think, and I would submit that it is not to the

23  benefit of the estate, it is not to the likely workout of this

24  case, that it would be best served by entering a preliminary

25  injunction, which it appears to me prevents Mr. Dondero from

159

1  saying good morning to one of the employees of the Debtor that

2  he knows.

3      It seems to me, Your Honor, that the injunction, by its

4  terms, as Mr. Morris would have it, is an injunction that

5  would prevent Mr. Dondero from discussing politics with Mr.

6  Ellington. And it seems to me that an injunction that broad,

7  that extensive, and one which lasts, as far as I can tell,

8  until infinity, that such an injunction is not the right thing

9  to do, given, if nothing else, the First Amendment to the

10  United States Constitution.

11      That will conclude my presentation, and I will turn it

12  over to the wiser and better-spoken colleague, John Bonds.

13  Thank you, Your Honor.

14          THE COURT: Thank you. Mr. Bonds, what else do you

15  have to say?

16          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17          MR. BONDS: Your Honor, has the Debtor met the

18  requirements for the issuance of a preliminary injunction? We

19  submit that they have not. And the Fifth Circuit's rules are

20  fairly clear as to the awarding of a preliminary injunction.

21      First, let's look at the type of preliminary injunction

22  that the Debtor would like you to enter today. It provides

23  that Mr. Dondero cannot talk to any employee, regardless of

24  what is being communicated. Mr. Dondero can pass an employee

25  on the street, but he can't acknowledge the employee, with

160

1  whom he may have worked for years. Nor can he talk to his

2  personal assistants, again, which he has worked with for

3  years. Does that violate the First Amendment of the

4  Constitution?

5     What about the shared services agreement? What about the

6  pot plan which he is advocating as a means of reorganizing the

7  Debtor? Not the liquidation proposed by the Debtor. Can Mr.

8  Dondero communicate with creditors about the pot plan and the

9  other proposals without violating the TRO or the preliminary

10  injunction which deals with interfering with the Debtor's

11  business?

12     Your Honor, I think it's important to note that a

13  preliminary injunction is an extraordinary remedy that may

14  only be awarded upon a clear showing that the Plaintiff is

15  entitled to such relief. Plaintiffs are entitled to a

16  preliminary injunction if they show, one, a substantial

17  likelihood that they will prevail on the merits of their

18  claims; two, a substantial threat that they will suffer an

19  irreparable injury if the injunction is not granted; three,

20  their threatened injury outweighs the harm to the estate or

21  the other party; and four, the public interest will not be

22  disserved, misserved, if the preliminary injunction is

23  granted.

24     The party seeking the preliminary injunction bears the

25  burden of persuasion on all four requirements. We believe

1    that the Debtor today has failed to carry its burden of

2    persuasion of proof with regard to the second element, which

3    I'm going to refer to as the irreparable injury requirement.

4    In order to show irreparable harm to the Court, the Plaintiff

5    must prove that if the District Court denied the grant of a

6    preliminary injunction, irreparable harm would be the result.

7    Injuries are irreparable only when they cannot be undone

8    through monetary remedies.  There is no evidence before the

9    Court today that Mr. Dondero cannot respond to any judgment

10   that is rendered against him by this Court.

11       Your Honor, this preliminary injunction does not involve

12   real property.  Unlike the *Saldana* case, this request for the

13   issuance of a preliminary injunction involves personal

14   property only.  The request that Mr. Dondero cease and desist

15   all contact with employees is just wrong and may violate the

16   First Amendment of the Constitution, as I previously stated.

17       We have other concerns regarding the issuance of a

18   preliminary injunction.  We feel that the preliminary

19   injunction is too broad.  It lacks a beginning and an end.

20   When does the preliminary injunction terminate?  What about

21   the former employees?  Once they are terminated, can Mr.

22   Dondero speak to them?  What about the pot plan?  Is it gone

23   forever?  Can Mr. Dondero talk with the mediators about the

24   pot plan?  Can Mr. Dondero speak with the members of the

25   U.C.C.?

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 163
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 480 of 921 PageID 12278

162

1        It is easy to criticize Mr. Dondero.  Did he violate the

2    TRO?  We submit that he didn't and the Debtor says that he

3    did.  What matters going forward is the lack of evidence of

4    irreparable harm.

5        Mr. Seery sure wants to keep Mr. Dondero from talking to

6    anyone in this case.  Why is that?  Does Mr. Seery believe

7    that the only way to get his liquidation plan confirmed is to

8    keep Mr. Dondero from talking to anyone?  How will the

9    preliminary injunction help the Debtor's creditors?  Does

10   keeping Mr. Dondero from talking with anyone mean that there

11   will be a greater return to the creditor body?  Does

12   precluding Mr. Dondero from talking about his pot plan mean

13   that the creditors will take home more money on their claims,

14   or does it eliminate the possibility that they may take home

15   more money on their claims?

16       Your Honor, what we are seeing here today is an attempt by

17   a group to destroy what Mr. Dondero has built over the last

18   few years.  That isn't the way Chapter 11 should work.

19       Just one last thing to keep in mind, Your Honor.  Mr.

20   Seery's plan is a liquidation of the Debtor.  Mr. Dondero's

21   pot plan is a reorganization of the Debtor.

22       Thank you, Your Honor.

23            THE COURT:  All right.  Mr. Morris, you get the last

24   word.  Anything in rebuttal?

25            MR. MORRIS:  I would just point out, Your Honor, that

163

1  nobody here has objected to the Debtor's motion for the entry

2  of a preliminary injunction except Mr. Dondero.  While I

3  appreciate that this is an adversary proceeding, anybody who

4  felt strongly about the matter certainly could have moved to

5  intervene.  The Creditors' Committee could have moved to

6  intervene.  Mr. Clemente could have stood at the podium and

7  begged Your Honor not to impose the injunction because he

8  thought it was in the best interest of creditors to allow Mr.

9  Dondero to interfere with the Debtor's business and to speak

10  with their employees.  Nobody has done that, Your Honor.

11  Nobody's here speaking on behalf of Mr. Dondero.  Nobody's

12  here to testify on his behalf.  Nobody's -- there's no

13  evidence in the record that supports or corroborates anything

14  that he said at all, Your Honor.

15      Unless Your Honor has any specific questions, the Debtor

16  is prepared to rest.

17          THE COURT:  All right.  I do not have any follow-up

18  questions.

19      All right.  I have a lot to say.  I'm sorry, I apologize

20  in advance, but I've got a heck of a lot to say right now.

21  I'm going to give you a ruling on the motion before me, but

22  I've got a lot to add onto that, so I hope all the key parties

23  in interest are listening carefully.  Mr. Bonds, in the video,

24  I can only see you.  I hope Mr. Dondero is just right there

25  out of the video camera view.  Okay, there you are.  I wanted

164

1  to make sure you didn't wander off to take a bathroom break or

2  anything. So, again, I have a whole lot to say here today.

3      First, I'm going to rule on the motion. The Court does

4  find there is sufficient compelling evidence to grant a

5  preliminary injunction that is completely consistent with the

6  prior TRO. Okay? So, specifically, the Court today is going

7  to continue to prevent Mr. Dondero from (a) communicating in

8  any way, directly or indirectly, with any of the Debtor's

9  board members -- I think that's really Strand board members --

10 unless Mr. Dondero's counsel and counsel for the Debtor are

11 included. Okay. I'm saying those words slowly and carefully.

12 There is no bar on Mr. Dondero talking to the board about a

13 pot plan or anything else in the universe Mr. Dondero wants to

14 talk to them about. There's just a preclusion from him doing

15 it without his counsel and the Debtor's counsel present.

16 Okay?

17     I did that before and I'm doing it now because I've seen

18 concerning evidence that some communications to Mr. Seery and

19 others had an intimidating tone, a threatening tone one or two

20 times, an interfering tone. So, guess what, we're just going

21 to have lawyers involved if any more conversations happen.

22 Okay.

23     So (b) the preliminary injunction, just as the TRO did, is

24 going to prevent Mr. Dondero from making any threats of any

25 nature against the Debtor or any of its directors, officers,

165

1    employees, professionals, or agents.  Okay.  It's almost

2    embarrassing having to say that or order that with regard to

3    such an accomplished and sophisticated person, but, you know,

4    I saw the evidence.  I've got to do what I've got to do.  You

5    know, words in a text like, Don't do it, this is your last

6    warning, and some of the other things, that has a threatening

7    tone, so I'm going to order this.

8        Third, the preliminary injunction will prevent Mr. Dondero

9    from communicating with any of the Debtor's employees except

10   as it specifically relates to shared services provided to

11   affiliates owned or controlled by Mr. Dondero.

12       Now, I'm going to elaborate in a couple of ways here.  I

13   think in closing argument there was a suggestion that he can't

14   even talk to his friend, Mr. Ellington, about anything.  Well,

15   I heard today that Mr. Ellington and Mr. Leventon are no

16   longer employees of the Debtor, so actually that's not an

17   issue.  But while this is very restrictive, while this

18   prevents Mr. Dondero from engaging in small talk with Debtor

19   employees about the weather or the football game or whatever,

20   it's regrettable, but I feel like I'm forced to order this

21   now, because, again, the communications that were put in the

22   record.  Okay?  We just can't take any chances, as far as I'm

23   concerned, with regard to there being potential interference

24   with the Debtor's operations that might be harmful or contrary

25   to creditors' interests.

011401

166

1      Fourth, the preliminary injunction, just like the TRO,

2  will prevent Mr. Dondero from interfering with or otherwise

3  impeding the Debtor's business, including but not limited to

4  the Debtor's decisions concerning its operations, management,

5  treatment of claims, disposition of assets owned or controlled

6  by the Debtor, and pursuit of any plan or alternative to the

7  plan.

8      Now, I understand the argument that this is pretty broad

9  and might be, I don't know, subject to some disputes regarding

10  was it interference, did it impede the Debtor's business or

11  not?  You know what, if you follow the other prongs of the

12  preliminary injunction, that you don't talk to the board

13  without your counsel, Mr. Dondero, and the Debtor's counsel,

14  and you don't talk to Debtor's employees except with regard to

15  matters pertaining to the shared services agreement, and,

16  bottom line, if you just run everything by your attorneys,

17  you'll be okay.  We won't have this ambiguous, vague,

18  problematic territory.

19      Fifth, I will go ahead and, for good measure, belts and

20  suspenders, whatever you want to call it, prevent Mr. Dondero

21  from otherwise violating Section 362(a) of the Bankruptcy

22  Code.

23      Now, I read the response filed at 9:30 last night by Mr.

24  Dondero's counsel.  It's a good response.  It makes legal

25  arguments about that being, you know, it just being too vague.

167

1    Well, to the contrary, it just restates what's already in the

2    Bankruptcy Code, right?  Persons are prohibited from violating

3    Section 362(a) of the Bankruptcy Code.  If anything, it's the

4    sky is blue, right, just stating what is true.  But I

5    understand Debtor wanting some clarity in an order, because we

6    want you to take this seriously, Mr. Dondero, and not just do

7    something and then say, well, you didn't know what was in the

8    Code.  You know, you need to consult with your lawyer.  That's

9    going to be in there.

10       Bottom line, I want that language in there because, Mr.

11   Dondero, I want you to see an order that this Court expects

12   you to comply with the Bankruptcy Code.  And again, if you

13   don't understand, if you're unsure whether you can take action

14   *x* or *y*, consult with your very capable lawyers.

15       I note that if you listened carefully to these words,

16   there was nothing in here that stopped Mr. Dondero from

17   talking to the Creditors' Committee about a pot plan.  Nothing

18   in this injunction, nothing in the previous TRO, ever

19   prohibited that.

20       Last, with regard to the ruling -- and again, I've got a

21   lot more to say when I'm done -- I am going to further enjoin

22   Mr. Dondero from what we said in the TRO:  causing,

23   encouraging, or conspiring with any entity controlled by him

24   and/or any person or entity acting on his behalf from directly

25   or indirectly engaging in any of the aforementioned items.

011403

168

1   This is not an injunction as to nonparties to the adversary

2   proceeding.  It is an injunction as to Mr. Dondero from doing

3   the various enjoined acts that I previously listed under the

4   guise of another entity or a person that he controls.

5       Again, if you're dealing with and through your attorneys,

6   Mr. Dondero, I don't think this will be hard to maneuver.

7       I guess I'm actually not through with my ruling yet.  I do

8   want to add that the Court rules that the injunction shall

9   last through the time of confirmation of a plan in this case

10  unless otherwise ordered by this Court.

11      And as to the legal standards, I want to be clear for the

12  record that the Court believes this injunction is necessary to

13  avoid immediate and irreparable harm to the Debtor's estate

14  and to its reorganization prospects.  I believe that there's a

15  strong likelihood the Debtor will succeed in a trial on the

16  merits of this adversary proceeding.  I believe the public

17  interest strongly favors this injunction.  And I believe the

18  balance of harms weighs in favor of the Debtor on all of these

19  various issues.

20      Again, I want to reiterate, the intimidation and

21  interference that came through in some of these email and text

22  communications was concerning to the Court and is a motivation

23  for this preliminary injunction.

24      Now, I'm going to add on a couple of things today.  The

25  first thing I'm going to add on -- and I want this, Mr.

169

1    Morris, in the order you submit.  You didn't ask me for this,

2    but I'm going to do it.  I'm going to order you, Mr. Dondero,

3    to attend all future hearings in this bankruptcy case unless

4    and until this Court orders otherwise.  And I'm doing this --

5    it's not really that unusual a thing for me to do.  I

6    sometimes order this in cases when I'm concerned about, you

7    know, is the businessperson paying attention to what's going

8    on in the case and is he engaged, is he invested, is he

9    available when we need him?

10        In this case in particular, the evidence was that you

11   didn't read the TRO.  You were not aware of its basic terms

12   and you didn't read it.  Okay?  So that was what sent me over

13   the edge as far as requiring this new element that you're

14   going to attend every hearing.  Obviously, we're doing video

15   court, so that's not that much of a burden or imposition.  You

16   can pretty much be anywhere in the world and patch in by

17   video, since we're in the pandemic and not doing live court.

18   But I think it's necessary so I know you hear what I rule and

19   what goes on in this case.

20        I will tell you that I was having a real hard time during

21   your testimony deciding if I believe you didn't read the TRO

22   or know about the different things that were prohibited.  You

23   know, I was thinking maybe you're not being candid to help

24   yourself in a future contempt hearing, or actually maybe

25   you're being a hundred percent honest and candid but you're

011405

170

 1  kind of hiding behind your lawyers so that you can argue the

 2  old plausible deniability when it suits you.

 3      But no more.  No more.  I'm not going to risk this

 4  situation again of you not knowing what's in an order that

 5  affects you.  So you must be in court by video until I order

 6  otherwise.

 7      Second, and I regret having to do this, but I want it

 8  explicit in the preliminary injunction that Mr. Dondero shall

 9  not enter Highland Capital Management's offices, regardless of

10  whether there are subleases or agreements of Highland

11  affiliates or Dondero-controlled entities to occupy the

12  office, unless Mr. Dondero has explicit written permission

13  that comes from Highland's bankruptcy counsel to Dondero's

14  bankruptcy counsel.  Okay?  If he does, it will be regarded as

15  trespassing.

16      And, I don't know, are there security guards on the

17  premises?  I mean, gosh, I hate to be getting into this

18  minutia, but -- well, I just want it explicit in the order

19  that Mr. Dondero, I'm sorry, but you can't go to these offices

20  without written permission.  And again, that can only be given

21  from Debtor's counsel to Mr. Dondero's counsel.  Okay?  So

22  it's going to be trespassing.  You know, someone can call the

23  Dallas Police Department and have you escorted out.  Again, I

24  hate having to do that.  It's just, it's embarrassing for me.

25  I think it's embarrassing for everyone.  But I'm backed up in

171

1  that corner.

2      Next, I am going to ask that it be clear that Mr. Dondero

3  can deal with the Unsecured Creditors' Committee and its

4  professionals with regard to talking about a pot plan.

5      And next, I'm going to add -- and I think, Mr. Morris, you

6  requested this at some point today in oral argument -- Mr.

7  Ellington and Mr. Leventon shall not share any confidential

8  information that they received as general counsel, assistant

9  general counsel for the Debtor, without Debtor's counsel's

10 explicit written permission.  Okay?  So we've got that in

11 writing.

12     And, you know, that's a little awkward because they're not

13 here, they weren't parties to the injunction, but they were

14 Debtor employees until recently.  If they want to risk

15 violating that and come back to the Court and argue about

16 whether they got notice and whatnot of that, they can argue

17 that, but I want it in the order regardless.

18     So that is the ruling.  And now I want to kind of talk

19 about a few other things.  And before we're done here, Mr.

20 Morris, I'll ask do you have questions, does Mr. Bonds have

21 questions, does anyone have questions about the ruling.  But I

22 want to talk about a couple of things.  And again, I hope that

23 I'm coming through loud and clear, Mr. Bonds, in your office

24 for Mr. Dondero to hear this.  It's really, really important

25 that he heard what I'm about to say.  I'm going to say some

172

1    kind of unpleasant things and then I'm going to say some

2    hopeful things, okay?

3        Mr. Dondero?  Okay.  Mr. Dondero, I'm going to -- Mr.

4    Morris, you've got your hands on your head.  Did I miss

5    something?

6            MR. MORRIS:  No.  I was just surprised to see Mr.

7    Dondero on his phone.  I apologize, Your Honor.

8            THE COURT:  Oh, my goodness.  Were you on your phone,

9    Mr. Dondero?

10           MR. DONDERO:  No, I was not.

11           THE COURT:  Okay.  I want you to listen to this

12   really closely, and then I promise I'm going to have something

13   hopeful to say after this very unpleasant stuff.  You know, I

14   keep a whiteboard up at my bench.  I don't know if you can

15   read it.  But sometimes I hear something in a hearing and I

16   think, okay, this is one of my major takeaways from what I

17   heard today.  And I've got two, I've got two big takeaways

18   here.  Number one on my whiteboard is Dondero's spoliated

19   evidence.  Game-changer for all future litigation.  Okay.

20           MR. DONDERO:  I'm sorry.  I didn't hear that.  I

21   didn't hear that.  Could you repeat that, please?

22           THE COURT:  Mr. Dondero, spoliated evidence, game-

23   changer in future litigation.

24       Okay.  Let me tell you, the throwing away of the phone,

25   that was the worst thing I heard all day.  That was far and

173

1    away the worst thing I heard all today.  I don't know what I'm

2    going to hear down the road to fix this, but if it's really

3    gone, let me tell you how bad this is.  We have all sorts of

4    Federal Rules of Civil Procedure that talk about this being a

5    bad thing, but I wrote an opinion a couple years ago dealing

6    with spoliation of electronic evidence, and I think it might

7    be helpful for everyone to read.  It was called *In re Correra*,

8    C-O-R-R-E-R-A.  I have no idea what the cite on it is.  But in

9    this case, *Correra*, we had a debtor who had a laptop, and he

10   gave the laptop to his personal assistant, who took it away to

11   another state.  And at some point during the case, parties

12   discovered, oh, there's a laptop that may have a treasure

13   trove of information.  Who knows?  Maybe it does; maybe it

14   doesn't.  But there's a laptop that we just now learned about

15   that the personal assistant has.

16       And so I issued an order that she turn it over, and there

17   were subpoenas and depositions, blah, blah, blah.  Long story

18   short, the evidence ended up being that she deleted everything

19   on the laptop, and then -- this would almost be funny if it

20   wasn't so serious -- she downloaded thousands of pictures of

21   cats onto the laptop.  I kid you not, cats.  Meow, meow, cats.

22   And she downloaded a hundred-something full-length movies.

23   And we had two days of forensic experts come in and take the

24   witness stand and tell me about how, okay, this is like an

25   amateurish -- you've talked about amateur hour today -- this

011409

174

 1  is kind of an amateurish way of deleting data, right.  You

 2  first delete all the files on the laptop and then you cover

 3  over all the space to make sure the information is not

 4  retrievable.  You know, this genius ended up retrieving some

 5  of the information.

 6      But the long story short is I sanctioned the debtor and

 7  his assistant jointly and severally.  You'll have to go back

 8  and look at the opinion.  I'm pretty sure it was over a

 9  million dollars.  And I can't remember if that was attorneys'

10  fee-shifting only, or monetary, like penalty on top of the

11  attorneys' fees-shifting.  I just can't remember.  But maybe

12  poor Tara needs to be advised of that opinion, too.  I mean,

13  --

14      But the other reason I put game-changer in future

15  litigation is, in my *Correra* case, it wasn't just the monetary

16  million-dollar sanction or whatever it was; it was a game-

17  changer in future litigation because the adverse party to the

18  debtor ended up arguing -- and it was the state of New Mexico,

19  by the way -- they ended up saying, in all future litigation,

20  we want you -- some adversaries, we want you to make an

21  adverse inference.  In other words, for all of these elements

22  that we're trying to prove in our fraudulent transfer

23  litigation and whatever else was going on, we want you to make

24  an adverse inference that there would have been evidence there

25  on that laptop that would have supported some of our causes of

175

1  action and it was destroyed to keep us from having that

2  evidence.

3      And they brought forth all kinds of case law. It's a hard

4  area. It's a really, really hard area. But I ended up --

5  again, it's not in the main opinion. It was in subsequent

6  orders. I ended up saying, yeah, I think you've met the

7  standard here to draw adverse inferences.

8      So, again, this is a very unpleasant message for me to

9  deliver today. But the destruction of the phone is my biggest

10  takeaway of concern today, how that might have ramifications.

11  You know, there are other bad things, too, about that. I'm

12  not even going to go there right now. But the, you know,

13  Title 18, you can ask your lawyer what that means, but okay.

14      My second big takeaway before we get to the hopeful stuff

15  is -- and this is kind of harsh, what I'm about to say -- but

16  Ellington and Leventon maybe care more about you, Mr. Dondero,

17  than their law license. You know, I guess it's great to have

18  people in your life who are very, very loyal to you. I mean,

19  loyalty is a wonderful thing. But I am just so worried about

20  things I've heard. Again, the phone and in-house lawyers.

21  The biggest concerns in my brains right now. I have worried

22  about them for a while.

23      You all will -- well, Mr. Dondero, you might not know

24  this. But we had a hearing a few months ago, maybe September,

25  October, where the Creditors' Committee was trying to get

176

1    discovery of documents.  And we had some sort of hearing,

2    maybe a motion to compel production.  And we had many, many

3    entities that you control file objections:  NexPoint, NexBank.

4    I can't even remember.  We just had a whole slew.  CLO Holdco.

5    Many, many of these entities objected.  And I was trying to

6    figure out that day who was instructing them.  And oh my

7    goodness, I hope the in-house layers are not involved in this

8    document discovery dispute, because, you know, they have

9    fiduciary duties.  And are -- you know, is it -- it feels like

10   it's breaching a duty to the bankruptcy estate when it's in

11   the bankruptcy estate's best interest to get these documents

12   if you're meanwhile hiring lawyers for these other entities,

13   Holdco, et cetera, and saying, Fight this.

14       I never really pressed it very hard back then, but I

15   raised the issue and I said, I'm really, really concerned

16   about this.  And I continue to be concerned about it.  I had

17   experiences with Mr. Ellington in the *Acis* case where he

18   testified on the witness stand, and later it looked a heck of

19   a lot like he might have committed perjury.  I hate to use

20   such blunt terms.  But I let it go.  I'm just like, you know,

21   I'm not going to -- you know, I'm going to just hope for the

22   best that he misspoke.

23       But I'm getting a really bad taste in my mouth about

24   Ellington and Leventon, and I hope that they will be careful

25   and you will be careful, Mr. Dondero, in future actions.

177

1        Is Mr. -- I can't see Mr. Dondero.  I want to make sure

2   he's not on the phone.  Okay.  Okay.  Thank you.

3        So where was I going to head next?  I guess I want to say

4   a couple of things now that I would describe as a little bit

5   more hopeful, and that is pertaining to this whole pot plan

6   thing.

7        You know, I tend to think, without knowing what's being

8   said outside the courtroom, that a pot plan would be the best

9   of all worlds, okay, because the plan that we have set for

10  confirmation next week, I understand we have a lot of

11  objections, and if I approve it, if I confirm the plan, we're

12  going to have a lot of appeals and motions for stay pending

13  appeal, and no matter how that turns out, we're going to have

14  a lot of litigation.  Okay?  You know, we're going to have

15  adversaries.  And we have a not-very-workable situation here

16  where we have these Dondero-controlled affiliates questioning

17  Mr. Seery's every move.

18       I would love to have a pot plan that would involve, Mr.

19  Dondero, you getting to keep your baby, okay?  I acknowledge,

20  everyone here acknowledges, you are the founder of this

21  company.  This is your baby.  You created a multi-billion-

22  dollar empire, okay?  I would be shocked if you didn't want to

23  keep your baby.  Okay?  If there was a reasonable pot plan, I

24  would love it.

25       But I'm telling you, the numbers I heard didn't impress me

011413

178

1    a heck of a lot.  I'm not an economic stakeholder.  It's not

2    my claim that would be getting paid.  But I can see where

3    these Creditor Committee members, they're not going to think

4    $160 million -- $90 million in cash, $70 million in notes, or

5    vive-versa -- is nearly enough.  Okay?

6        So I am going -- what just happened?  What just happened?

7    I lost Mr. Dondero.  Okay.  This is getting kind of humorous,

8    almost.

9        Okay.  I am going to order that between now and the end of

10   the day Tuesday there be good-faith, and I'll say face-to-face

11   -- Zoom, WebEx, whatever -- negotiations between Mr. Dondero

12   and his counsel and at least the Committee and its

13   professionals regarding this pot plan.

14       Now, the train is leaving the station next Wednesday,

15   okay?  If we don't have Creditors' Committee and Debtor and

16   Dondero rushing in here saying, Please continue the

17   confirmation hearing next Wednesday, if we don't have like

18   unanimous sentiment to do that, you know, this is a 15-month-

19   old case, I'm going to go forward with the plan that's on

20   file.

21       And it's been a long, expensive case.  I had great

22   mediators try to give it their best shot to get a grand

23   compromise.  I just, I'm not going to drag this out unless you

24   all tell me Wednesday morning, We want you to continue this a

25   week or two.

179

1      And let me tell you -- this may be the stars lining up, or

2   it may not be -- I was supposed to have a seven-day trial

3   starting the week after next, and then I was supposed to have

4   a four- or five-day day trial starting immediately after that.

5   And all of those lawyers came in and asked for a continuance

6   because of COVID.  They wanted a face-to-face trial, and so

7   I've put them off until April.

8      So if you wanted to postpone the confirmation hearing to

9   the following week or even the following week, I have the gift

10  of time to give you.  But I'm not going to do it lightly.

11  I'm, again, I'm just going to order face-to-face meetings.

12  And I said Dondero and his counsel and the Committee and its

13  professionals.  You know, if -- I'm not slighting the Debtor

14  here or Mr. Seery, but I'm kind of taking a cue from what Mr.

15  Morris, I think I heard you say, that at this point it's the

16  Committee, it's the Committee's money, and I think that's the

17  starting place.  And if they want to join the Debtor in at the

18  beginning or midway through, you know, wonderful, but I think

19  it needs --

20         MR. POMERANTZ:  Your Honor, this is Jeff -- this is

21  Jeff Pomerantz.  I hate to interrupt, and I never do that to a

22  judge, but I did have something to say in my comments about a

23  continuance that we've talked about with the Committee and

24  some other developments in the case.

25         THE COURT:  Oh.

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 181
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 498 of 921 PageID 12296

180

1       MR. POMERANTZ:  I'm happy to wait.  But it has -- it

2  has nothing to do with the comments you said, although, as I

3  think you've heard from me before, the Debtor has been a

4  supporter, a supporter of a pot plan.  Mr. Seery has done a

5  tremendous amount of work working with Mr. Dondero, working

6  with Mr. Lynn, to try to make that happen.  And if the

7  Committee is willing to engage in a pot plan, we would

8  definitely support that.  Because we do agree with Your Honor

9  that, absent a pot plan, we are looking at a lot of

10 litigation.

11      Some of the issues you're going to have to deal with at

12 the confirmation hearing if we do not have a peace-in-the-

13 valley settlement is exculpations, releases, moratoriums on

14 litigation, extensions of your January 9th order --

15      THE COURT:  Uh-huh.

16      MR. POMERANTZ:  -- with respect to pursuing certain

17 people.

18      So, we get it, and we've gotten it from the beginning.

19 And Mr. Seery, sometimes even at a fault, has been

20 singlehandedly focused on trying to get that done.  It's just

21 unfortunate where we are here.

22      But having said that, I wanted to first apprise the Court

23 of a recent major development in the case.  I'm pleased to

24 report that the Debtor and UBS have reached a settlement in

25 principle which will resolve all of UBS's claims against the

181

1    estate, all of UBS's claims against Multi-Strat. The parties

2    are working on documentation. The settlement is subject to

3    internal approvals from UBS, but we've been led to believe

4    those approvals will occur, and we would hope to file a Rule

5    9019 motion in the near future.

6        I'm sure Your Honor is quite pleased to hear that. The

7    UBS matters have taken a substantial amount of time. And with

8    the settlement of UBS's claims, the only material unresolved

9    claim, unrelated to Mr. Dondero or the employees, are Mr.

10   Daugherty. And Mr. Seery will continue to work with Mr.

11   Daugherty to try to settle that.

12            THE COURT: Okay.

13            MR. POMERANTZ: With respect to the scheduling, with

14   respect to the scheduling, Your Honor, there are three

15   significant matters on for hearing on the 13th. The first is

16   the Debtor's motion to approve a settlement with HarbourVest,

17   which Mr. Dondero is contesting. Depositions are being

18   conducted on Monday, and we anticipate an evidentiary hearing

19   in connection therewith.

20       The Debtors, as Mr. Morris indicated earlier on in the

21   hearing, have also filed a complaint and a motion for a

22   temporary restraining order against certain of the Advisors

23   and Funds owned and controlled by Mr. Dondero which relate to

24   the CLO management agreements for which Your Honor has heard a

25   lot of testimony today. We also expect that TRO to be

182

1   contested and for the Court to have an evidentiary hearing.

2       And as Your Honor mentioned, the confirmation of the plan

3   was scheduled for Wednesday, and there were 15 objections.  I

4   would point out, Your Honor, all but four of which were Mr.

5   Dondero, his related entities that he owns or controls, and

6   employees or former employees.

7       The Court previously gave us time on the 13th and the

8   14th, I think anticipating that we would have a lot and it may

9   be necessary to go into two days.  However, Your Honor, those

10  two days are not going to be enough to deal with all the

11  issues that we have before Your Honor.

12      So what we suggest, and we've spoken to the Committee and

13  the Committee is supportive, that we continue confirmation to

14  a day around January 27th.  This will enable the Debtor to not

15  only -- and the Committee -- not only to take Your Honor up on

16  what you'd like to see accomplished in the next few days.  I'm

17  sure the Debtor is supportive and will be supportive, and we

18  hope the Committee will engage in good-faith negotiations, and

19  if there's a way to do a pot plan, we are all for it.  It'll

20  give time for that to happen.

21      But at the same time, and I think what you'll hear from

22  Mr. Clemente, that we're willing to give a continuance, we all

23  know that if there is not a settlement to be had, if there is

24  not a pot plan to be had, this case has to confirm, it has to

25  exit bankruptcy, and at least from the Debtor's perspective, a

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 184
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 501 of 921 PageID 12299

183

1  lot of protections will have to be in place that basically

2  this has not just been a pit stop in Bankruptcy Court and we

3  return to the litigation ways that Highland is involved in.

4      So, Your Honor, we believe that the two evidentiary

5  hearings on for next week probably will fill up both days.  We

6  would suggest that the first day be the complaint and the TRO

7  against the Advisors and the Funds for the 13th, and the 14th

8  be the HarbourVest.

9      We also recognized as we were preparing for today, Your

10 Honor, looking ahead, that we thought it was not fair for us,

11 although we know Your Honor works tirelessly and as hard as

12 anyone on this hearing and that Your Honor would be prepared

13 for confirmation and would be prepared for each of those

14 trials, given the gravity of these issues, the extensive

15 pleadings, pleadings that you would get in confirmation on

16 Monday from the Debtor, that it made sense to continue the

17 hearing.

18     So, again, fully supportive of Your Honor's mandate to try

19 to see if we could work things out, fully supportive of a

20 continuance until the 27th, if that date works for Your Honor,

21 but we believe we do need to go ahead with the two matters

22 that are on for calendar next week.

23         MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

24 May I be heard briefly?

25         THE COURT:  Oh my goodness.  Who do you represent,

184

1   Mr. Rukavina?

2          MR. RUKAVINA:  And I apologize -- Your Honor, I am

3   the new counsel who will be representing the Funds and

4   Advisors.  I will probably be taking the laboring oar at

5   confirmation.

6       I apologize I'm not wearing a suit and tie.  I did not

7   anticipate speaking right now.

8       I support -- to the extent that that's an oral motion for

9   continuance by Mr. Pomerantz, I certainly support that.  I

10  would suggest that the Court give us an understanding of that

11  today, because we do have depositions and discovery lined up

12  which we can then push if the hearing on confirmation is

13  pushed to the 27th.  And we have no problem going forward on

14  the other matters on the 13th.

15      So, I am co-counsel to K&L Gates, Your Honor, so whoever

16  the K&L Clients are, they're now my clients as well.  I just

17  wanted to be heard briefly that we support the recommendation

18  by Mr. Pomerantz and just urge that the Court give us finality

19  on that issue today so that we're not burning the midnight

20  oil, many sets of lawyers preparing for confirmation on the

21  13th.

22      Thank you for hearing me, Your Honor.

23          THE COURT:  All right.  So, just to be clear, the

24  proposal is that we go forward next Wednesday on the newest

25  request for a TRO with regard to -- is -- the CLO Funds and

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 186
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 503 of 921 PageID 12301

185

1     the Advisors.  I'm forgetting the exact names.  And then that

2     would take likely the whole day, but whether it does or does

3     not, we would roll over to Wednesday of next week -- that'd be

4     the 14th -- to do the HarbourVest.  It's a compromise motion,

5     right?  Is there anything else?

6              MR. POMERANTZ:  No, correct, it's the compromise

7     motion, Your Honor.  There are two pending objections on this

8     and discovery scheduled for Monday.

9              THE COURT:  All right.  Well, as far as --

10             MR. CLEMENTE:  Your Honor?

11             THE COURT:  Yes, who is that?

12             MR. CLEMENTE:  Oh, Your Honor, it's Matt Clemente at

13    Sidley on behalf of the Committee.  I'm here, and I thought

14    maybe I'd offer just a couple of comments at this point, but

15    I'm happy to hold them.

16             THE COURT:  Well, --

17             MS. SMITH:  And Your Honor, this is Frances Smith.  I

18    would also like to be heard before you wrap up.

19             THE COURT:  Okay.  Well, I guess generally I want to

20    know, does anyone have any objection -- I can't imagine they

21    would -- but any objection to pushing confirmation out to

22    around the 27th?  I'm going to say that because I have an

23    issue middle of the day the 28th.  If we do it the 27th, I

24    could only go a day and a half, okay?  I have to go out of

25    town the evening of the 28th, and I would be out the 29th as

186

1   well.  That's Thursday and Friday.  So we'll talk about that.

2   But anyone, Mr. Clemente or anyone else, want to say anything

3   about continuing the confirmation?

4            MR. CLEMENTE:  Your Honor, it's Matt Clemente at

5   Sidley.  No, Your Honor, we're supportive of that schedule.

6       And Your Honor, just briefly, I heard my name discussed

7   quite a bit at this hearing as well as the Committee.  I'm not

8   going to get into it unless Your Honor would like me to, but

9   let me be very clear:  The committee has taken very seriously

10  the pot plan proposals that Mr. Dondero has presented, and

11  there's much more to the discussion other than what Mr. Lynn

12  suggested in his remarks.

13      So I'm not going to get into all that unless Your Honor

14  thinks it's necessary.  I think it's of no moment here.  But I

15  did want Your Honor to know that we have carefully considered

16  the pot plan proposals and have communicated a variety of

17  issues about that to Mr. Lynn and will continue to take the

18  direction of Your Honor and engage on a pot plan, Your Honor.

19  But I did not want there to be any suggestion that we did not

20  take it seriously and that there was much, much more

21  consideration and discussion about it than what was suggested.

22           THE COURT:  Uh-huh.

23           MR. CLEMENTE:  Thank you, Your Honor.

24           THE COURT:  All right.

25           MS. SMITH:  Your Honor, this is Frances Smith.

187

1          THE COURT:  Who do you represent, Ms. Smith?

2          MS. SMITH:  Your Honor, we were recently retained by

3     the four senior employees:  Tom Surgent, Frank Waterhouse,

4     Scott Ellington, Isaac Leventon, along with Baker & McKenzie,

5     and I believe we have the Baker & McKenzie lawyers Deb

6     Dandeneau and Michelle Hartmann on the line.

7        Your Honor, we have listened to the whole hearing.  And I

8     was not going to make an appearance.  I was following your

9     instructions and listening carefully.  But Your Honor, I --

10    first of all, we hate to be before you for the first time in a

11    discovery dispute.  We did file a very limited objection to

12    the plan because of the disparate treatment of our clients,

13    which we are not arguing today, of course.  We received -- it

14    is our usual practice, Your Honor -- you've known me for a

15    long time -- to cooperate on having witnesses appear.  We got

16    -- we were notified very late Tuesday that the Debtor's

17    counsel would like two of our clients to appear.  We made what

18    we thought was a reasonable request for a copy of the

19    transcript from the deposition.  We were invited to the

20    deposition and then told we could not attend, or our clients

21    could not attend.  When we offered to make it lawyers-only,

22    they said no.  So we did not produce our clients without a

23    subpoena.

24       Our clients have not been evading service.  As far as we

25    know, they were each attempted service one time, late

011423

188

1  Wednesday, when they were -- around dinnertime.  Mr. Leventon

2  was home all day today.  Didn't go any -- or yesterday.

3  Didn't go anywhere.  Was not served.  Wasn't served this

4  morning.  The same, as far as we know, with Mr. Ellenton.

5      Your Honor, on the order that you just entered, I am a

6  little unclear of where your findings of fact stopped.  First

7  of all, I do not think that you can enjoin Mr. Ellenton and

8  Mr. Leventon.  They are not parties to the adversary

9  proceeding.

10     You know, we did some very quick research.  There's a

11 Seventh Circuit case, a district court may not enjoin

12 nonparties who are not either acting in concert with an

13 enjoined party nor in the capacity of agents, employees,

14 officers of the enjoined party.  Mr. Ellington and Mr.

15 Leventon are not agents, employees, officers of Mr. Dondero.

16 So I think that, Your Honor, you cannot make that ruling.

17     Of course, you can rule that Mr. Dondero cannot talk to

18 Mr. Leventon and Mr. Ellington.  That might be a way to fix

19 that one part.  But as nonparties, I don't believe that you

20 can enjoin them.

21     Also, Your Honor, there was just no evidence against them

22 to support that.  Out of more than two dozen exhibits, there

23 was one mention of Mr. Leventon, where all he did was give Mr.

24 Dondero Matt Clemente's phone number.  And you yourself ruled,

25 Your Honor, that Mr. Dondero could speak with the Committee,

189

1  so that wouldn't even have been a violation of your orders.

2  There's three related to Mr. Ellington, but no evidence of

3  confidential information.

4      And, Your Honor, I'm very concerned about the comments

5  that you made about Mr. Ellington and perjury. I just want to

6  make sure that it's clear on the record that those were not

7  findings of fact. That did not -- there was no evidence about

8  that today. And I understand Your Honor's frustration. I was

9  -- but I just want to be very clear on the record that those

10  were not findings of fact that you were making during that

11  part of your comments. I was a little unclear about where the

12  ruling exactly stopped when you said you wanted to add onto

13  the order and then you were going to make a few more comments.

14      So that's all I have, Your Honor.

15          THE COURT: Okay.

16          MS. SMITH: Thank you for listening and --

17          THE COURT: Thank you. Fair comments, one and all.

18  I'm first going to tweak. I was concerned. You heard me

19  express concern about, you know, Ellington and Leventon aren't

20  parties to this adversary. Not here. So here's -- Mr.

21  Morris, I assume you're the scrivener. Let's change what I

22  said earlier and have the injunction read that Mr. Dondero

23  shall not request that Mr. Ellington or Mr. Leventon share any

24  confidential information they received as general counsel or

25  assistant general counsel for the Debtor without Debtor's

190

```
 1   counsel's explicit written permission, nor accept any
 2   confidential information that the two of them may have
 3   received as general counsel or assistant general counsel for
 4   the Debtor.  Okay?  So the injunction is --
 5            MR. MORRIS:  Your Honor, if I may, --
 6            THE COURT:  Who?
 7            MR. MORRIS:  Your Honor, if I may, that is not
 8   sufficient for us, because that means that they can actually
 9   share it with him as long as he doesn't request it.  I'm a
10   little surprised --
11            THE COURT:  No.  You didn't hear the accept -- the
12   last part.
13            MR. MORRIS:  Okay.
14            THE COURT:  I added on at the end, nor shall Mr.
15   Dondero accept any confidential information.  They -- he shall
16   not request that they share it, nor shall he accept it.  Okay?
17   I --
18            MR. MORRIS:  So, but that -- my concern is that that
19   makes Mr. Dondero the arbiter of what's confidential and
20   what's privileged.  And I think that's improper.  I think it's
21   really reasonable, and I'm surprised -- you know, we're all
22   advocates here, so I take no issue with counsel, but the order
23   was going to be pretty simple:  Don't disclose privileged or
24   confidential information.  If they don't like that, that's
25   fine.  Just bar Mr. Dondero from speaking to either one of
```

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 192
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 509 of 921 PageID 12307

191

1  them, period, full stop.  Because we should not be in a

2  position where he doesn't request it but somehow they send it

3  to him.  It is confidential.

4     I mean, who's deciding what's confidential here?  Mr.

5  Ellington?  Mr. Leventon?  Mr. Dondero?  Just stop their

6  communication.  Mr. Dondero is subject to the Court's order.

7  He's the one who's subject to this motion.  Bar him from

8  speaking to either one of them.  It's a very -- very simple

9  solution.

10     MR. BONDS:  Your Honor, I agree that it's a simple

11  solution.  It's, I mean, not correct to assume that Mr.

12  Dondero is in any way going to breach his obligations to the

13  Court or to Mr. Ellington and Mr. Leventon.  I don't see where

14  -- what we're talking about.

15     MS. SMITH:  Also, Your Honor, I have to object to him

16  disparaging my clients that way.  There's been no evidence

17  that they improperly shared any information.  They are

18  licensed lawyers and they know the Rules of Professional --

19  they know the rules of professionalism, so --

20     THE COURT:  Okay.  I, you know, I didn't make a

21  finding earlier when I held out my two giant takeaways, to get

22  to your later question, no findings.  But I really hope you

23  share with them everything I said, the concerns I expressed.

24  Maybe get the transcript.

25     MS. SMITH:  Absolutely, Your Honor.

011427

192

1        THE COURT: Because I have huge concerns about

2   conflicts of interest here. Okay? Huge, huge concerns. I

3   had them back when we had the discovery fight, Committee

4   wanting documents, and, you know, and I still have them. You

5   know, did Ellington know about the TRO?

6        MS. SMITH: Understood, Your Honor.

7        THE COURT: Okay. So let me backtrack. We already

8   had a TRO that prevented Mr. Dondero from talking to any

9   employees of the Debtor unless it was about shared services

10   agreement.

11    So, Mr. Bonds, I'm going to flip it back to you on this

12   one. Why shouldn't I at this point just say, okay, guess

13   what, no talking to Mr. Leventon or Ellington for the time

14   being? Why --

15        MR. BONDS: First of all, --

16        MS. SMITH: Your Honor, that's acceptable to us.

17        THE COURT: Okay. What's wrong with that, Mr. Bonds?

18        MR. BONDS: Your Honor, we don't believe that Mr.

19   Dondero has violated the TRO.

20    And secondly and more importantly, we don't believe that

21   there's any way that you can enter an order that singles out

22   two former employees. I mean, that's bizarre.

23        THE COURT: If I'm concerned that it's thwarting the

24   reorganization efforts and there are conflicts of interest

25   here, why can't I?

011428

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 194
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 511 of 921 PageID 12309

193

1      You know, this is -- I hate to say it, but I feel like
2  I've been in the role of a divorce judge today.  We have very
3  much a corporate divorce that has been in the works, unless we
4  get this pot plan on track, okay, and I'm a judge having to
5  enter interim orders keeping one spouse away from the other,
6  keeping one spouse out of the house, keeping one spouse away
7  from the kids.  It's not pleasant at all.  But I don't -- the
8  more I think about it, the more I have authority to do it just
9  to protect, to protect the nest egg here.

10      MS. SMITH:  Your Honor, we are perfectly fine with
11  you enjoining Mr. Dondero from speaking to our clients, and we
12  will convey that to our clients.

13      THE COURT:  Okay.  Mr. Bonds, I can't hear you.

14      MR. BONDS:  I'm sorry, Your Honor.  What evidence is
15  there of irreparable harm as to Mr. Dondero talking with
16  either Mr. Leventon or Mr. Ellington?

17      THE COURT:  Okay.  Do I need to parse through the
18  communications I saw?  Do I need to parse-

19      MR. BONDS:  Yeah, I think so.  I mean, I don't
20  understand.

21      THE COURT:  Okay.  I never authorized Mr. Ellington
22  to be the settlement lawyer or whatever, okay?  I never would
23  have, okay?  And maybe Mr. Seery, you know, said something to
24  -- early on in the case to make him think he had that
25  authority, but no, we're done.  Okay?  And I feel like it's

011429

194

1    causing more harm than good right now.  Okay?

2        I don't know who instructed all of these Dondero-

3    controlled entities to hire lawyers.  I don't know if

4    Ellington and Leventon have been giving instructions to these

5    entities.  But we've got conflicts everywhere now.  Okay?

6    We've got -- and by the way, I'm just going to list them now.

7    We have, of course, Bonds Ellis representing Dondero.  We have

8    Doug Draper, Heller Draper, now representing these trusts, Get

9    Good Trust, Dugaboy Investment Trust.  We have K&L Gates and

10   now Munsch Hardt also representing the Advisors, NexPoint and

11   the various CLO or other Funds.  We have CLO Holdco

12   represented by Kane Russell Coleman Logan.  We have NexPoint

13   Real Estate represented by Wick Phillips.  Who have I left --

14   and, of course, the employees, Baker & McKenzie and Ms. Smith.

15   We have Spencer Fane in there for other current or former

16   employees.  We have Loewinsohn Flegle in there for certain

17   former or current employees.

18       I mean, the proliferation of lawyers.  And again, I don't

19   know if Mr. Ellington and Mr. Leventon have had a role in

20   hiring counsel, wearing their hat for these other entities or

21   not.  Can anyone tell me?  Maybe I'm worried about something I

22   shouldn't be worried about.

23           MR. DONDERO:  You're worried about something you

24   shouldn't worry about, Your Honor.

25           THE COURT:  Okay.  So Ellington --

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 196
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 513 of 921 PageID 12311

195

1        MR. MORRIS:  Your Honor, I would just point to the

2   evidence that's in the record, Your Honor.  You have Mr.

3   Dondero asking Mr. Ellington to show leadership in

4   coordinating all of the lawyers you just mentioned.  It's in

5   the record.

6        THE COURT:  Yes.  I'm just going to, until otherwise

7   ordered, no conversations between Dondero and Ellington and

8   Leventon, and that's just going to be my ruling until further

9   order.  That's what I feel best about.

10       Now, let me ask you, knowing that I could only give you a

11   half a day on the 28th of January, if we start the

12   confirmation hearing on whatever the plan looks like on

13   January 27th, I mean, do people want to go with that, --

14       MR. POMERANTZ:  Your --

15       THE COURT:  -- even knowing we might not finish that

16   day, or no?

17       MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

18   Maybe if we could start on the 26th, have the 26th, 27th, and

19   then maybe half of the 28th.  I would think two and a half

20   days should be enough, notwithstanding the volume of

21   objections, because I think you'll find that, while there may

22   be some evidence, I think the majority of the objections are

23   really legal in nature.

24       THE COURT:  All right.  Traci, are you out there in

25   video-land?

196

1          THE CLERK:  Yes, I'm here.

2          THE COURT:  Okay.  Have I overcommitted the 26th?  If

3    we start the 26th at 9:30 in the morning, can we do that?  Or

4    --

5          MR. BONDS:  Your Honor?

6          THE CLERK:  That'd be fine.

7          THE COURT:  Okay.

8          THE CLERK:  Just remember that you have an

9    appointment at lunchtime that day at noon on the 26th.

10         THE COURT:  Okay.  I --

11         THE CLERK:  You don't have any court hearings.

12         THE COURT:  Okay.

13         MR. BONDS:  Your Honor, I'm sorry.

14         THE COURT:  Go ahead.

15         MR. BONDS:  Your Honor, I'm sorry.  This is John

16   Bonds.  I have a hearing on the 26th that I can't miss.

17         THE COURT:  Well, can someone else --

18         MR. POMERANTZ:  Your Honor, we would request, right,

19   that Mr. Lynn lead the confirmation hearing.  There's a lot of

20   lawyers.  If we try to look at everyone's calendar, we're

21   never going to be able --

22         THE COURT:  Yes.

23         MR. POMERANTZ:  -- to get something that's good for

24   everyone.

25         THE COURT:  Okay.  Yes.  Well, Mr. Lynn or Mr. Assink

011432

197

1   can handle it, Mr. Bonds.

2       So we're going to start the 26th at 9:30.  We'll go all

3   day, except I have something at lunchtime, apparently.  And

4   then we'll go all day on the 27th, and then I can give you

5   half a day on the 28th.

6       So you'll upload immediately a notice to that effect, Mr.

7   Pomerantz.

8           MR. POMERANTZ:  Yes, we would.

9       Your Honor, in terms of our documents in support of

10  confirmation, we want to make it convenient with the Court.

11  We know your Court would at least need one business day, so we

12  would prefer to file, say, by 2:00 Central on the 24th, on a

13  Sunday.  Everyone will have it, and have one business day.  I

14  mean, the old order only had one business day in advance as

15  well.  So that's what we would propose for our confirmation

16  documents to be filed.

17          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

18  An important issue here is how the creditors have voted, and I

19  have no idea how they have voted.  The voting deadline has

20  expired.  So I have no problem with what Mr. Pomerantz

21  suggests, but I do think that the Debtor should file its

22  tabulation of votes sooner rather than later so we all know

23  one of the central elements for the hearing that we'll have.

24          THE COURT:  Okay.

25          MR. POMERANTZ:  That's fair, Your Honor.  We're

198

1   prepared to file the summary of voting and tabulation by the

2   15th of January.

3           THE COURT:  Okay.  Very good.

4       So, backing up, Mr. Pomerantz, you asked that I approve

5   you filing any plan modifications by noon on Sunday, the 24th?

6   Is that what you said?

7           MR. POMERANTZ:  Yeah.  So, there's a couple of

8   things.  There's our confirmation brief.

9           THE COURT:  Uh-huh.

10          MR. POMERANTZ:  There is our -- any evidence we would

11  submit, although I suspect we are likely to provide live

12  testimony, as opposed to a declaration.  There was our summary

13  of ballots, which we will now do on the 15th.  And to the

14  extent we have any modifications, we would provide them on

15  Sunday by 12:00 noon Central time as well.  Yes.

16          THE COURT:  All right.

17          MR. RUKAVINA:  Well, Your Honor, this is Davor

18  Rukavina.  Does that mean the witness and exhibit lists also

19  will not be due until Sunday at noon?  Because I would request

20  that we have the normal period of time to exchange exhibits

21  and witnesses.

22          MR. BONDS:  Your Honor, I think that the normal time

23  period is also important in this case.

24          THE COURT:  Okay.  I'm going to --

25          MR. POMERANTZ:  Your Honor, we could -- if everyone

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 200
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 517 of 921 PageID 12315

199

1   agrees on witness lists, we could do those by 5:00 p.m.

2   Central on the 22nd.

3           THE COURT:  Okay.  Let's do that.  Okay.

4           MR. POMERANTZ:  But that -- but that needs to be for

5   everybody.

6           THE COURT:  Oh, it will be for everyone.

7           MR. RUKAVINA:  Your Honor, no problem.

8           THE COURT:  Okay.  Let's --

9           MR. POMERANTZ:  5:00 p.m. Central Standard Time.

10          THE COURT:  No more discussions.  That'll be the

11  ruling, okay?  Everything is going to be due by 5:00 p.m.

12  Central time on Friday, the 22nd.  All right.

13          MR. POMERANTZ:  Your Honor, is that our brief as

14  well, or --

15          THE COURT:  Yes.

16          MR. POMERANTZ:  -- was that just the witness list?

17          THE COURT:  Everything.  Brief, witness list, and --

18          MR. POMERANTZ:  Okay.

19          THE COURT:  -- plan mods.

20      Let me look through my notes and see if there's anything

21  else I want to say.  You know, let me do some quick math here.

22  I know there was one other thing I wanted to say that involves

23  math.  Okay.  I think my math is right here.  Okay.  You know,

24  I mentioned the proliferation of lawyers.  And let me just say

25  this.  We had -- we've had about 90 people on the -- showing

1   up on the video screen today -- 89, 90, 91, 92.  A few, a

2   little over 90.  Okay?  So let's say 90.  It's been up to 95

3   earlier.  But let's pretend that 60 of those are lawyers

4   billing by the hour.  That's very conservative.  Probably many

5   more than 60.  And let's assume conservatively that the

6   average billing rate is $700 an hour.  That's probably very

7   low, right?  We probably don't have many baby lawyers on the

8   phone.  So that's a very low average.  So, 60 lawyers times

9   $700 an hour, $42,000 an hour this hearing has cost.  And then

10  we've been going over seven hours.  So let's say seven,

11  conservatively, times $42,000.  This hearing has cost $294,000

12  today.  A preliminary injunction hearing.  I mean, no one

13  thinks that's chump change.  I don't know, maybe some people

14  do.  This just seems like a ridiculous way to spend resources.

15  No offense to all the wonderful lawyers, but this is just --

16  it's crazy-town, right?  It is crazy-town.  So I implore you,

17  okay, how about I use that word, I implore you to have these

18  good-faith discussions on a pot plan.

19      Please, Mr. Dondero, I mean, don't waste people's time.

20  $160 million, I know that's not going to cut it.  Okay?  So

21  it's going to have to be more meaningful.  I just know that in

22  my gut.

23      But having said that, I mean, I honestly mean I think a

24  pot plan -- I think you getting your baby back is the best

25  thing for everyone.  Okay?  I think it's the best thing for

201

1   everyone.  So I want you all to --

2          MR. DONDERO:  Judge, I -- Judge, I just need to

3   interject for a second, because no one follows the big

4   picture.  We filed for bankruptcy with $450 million of assets.

5   $360 million of third-party net assets, $90 million of

6   affiliated notes.  The third-party assets are down to $130

7   million and falling fast.

8          MR. POMERANTZ:  Your Honor, I hate to interrupt Mr.

9   Dondero, but that is not the purpose of this hearing.

10          THE COURT:  Well, --

11          MR. POMERANTZ:  Mr. Dondero's statement of the assets

12   and value is just not something that the Debtors would agree

13   and support.  I'm sure it's not something the creditors -- I

14   think we understand what Your Honor is saying.  I think the

15   Committee understands.  And Your Honor knows that the Debtor

16   and the Committee are close to the asset values.  And Mr.

17   Dondero should be making his argument to the Debtor and the

18   Committee, not Your Honor, in this open forum.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  It's just not appropriate.

21          THE COURT:  And I understand where you're both coming

22   from.  And he's saying that because I made the comment I made

23   about $160 million not being enough.

24      I've seen the evidence.  I've heard the evidence at prior

25   hearings, Mr. Dondero.  We've had a lot of hearings.  And I

202

1   remember writing that down.  Wow, why did that happen?  Seeing

2   the dissipation of value.  I couldn't remember the exact

3   numbers, but I thought it was like $500 million something and

4   then $300 million or whatever.  And I remember Multi-Strat,

5   that being sold, and blah, blah, blah, blah.

6       But having said that, there are a lot of causes of action

7   that have been hinted at by the Creditors' Committee and

8   others.  So, causes of action is one of the things they are

9   looking at when they start thinking about what's appropriate

10  value.

11      So I just, I get where everyone is coming from.  I get

12  where everyone is coming from.  But, again, let's take one

13  more stab at this, please.  Okay?

14          MR. POMERANTZ:  Yeah.  And Your Honor, my last

15  comment.  We're commercial people.  The creditors are

16  commercial people.  I think we've done a tremendous job in

17  being able to resolve most every one of the significant

18  claims.  I think the Court should trust the process.  Mr.

19  Dondero should trust the process.

20      And again, if there's a commercial deal to be worked out,

21  I don't think there's anyone more than of course the Debtor

22  and the people on the Committee, who have been litigating in

23  many cases with Mr. Dondero and Highland for ten years, I

24  don't think it's anyone's desire.  So if there's a reasonable,

25  rational proposal that the creditors can get behind and want

011438

Case 19-34054-sgj11 Doc 3445-68 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 204
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 521 of 921 PageID 12319

203

1   to engage, then there'll be a discussion.  If they don't

2   believe it's a reasonable, rational proposal, they won't.

3          THE COURT:  Yes.  All right.  Well, I do feel very

4   good about what I've heard about the UBS issues being worked

5   out.  I mean, we have come a long way in 15 months, even

6   though it's frustrating to me and others.  But, again, I know

7   you all are going to do what you need to do.  And I'll look

8   for the form of order.  I'm going to see you all, Mr. Dondero,

9   including you, next Wednesday.  And if there's nothing else,

10  we stand adjourned.

11         MS. SMITH:  Your Honor, I'd like to review the form

12  of order as it regards my clients before it's submitted.

13         THE COURT:  Okay.

14         MS. SMITH:  If I could have a courtesy copy, please.

15         THE COURT:  Yes.  Well, yes.  I'm not going to

16  require 90 lawyers to get the order, but I will ask Mr.

17  Pomerantz, Mr. Morris, make sure Ms. Smith gets it and

18  obviously Mr. Dondero's counsel gets it.  And I probably won't

19  get it until Monday, it sounds like, but --

20         MR. POMERANTZ:  That's likely.

21         THE COURT:  But I'll be on the lookout for it.  Okay.

22  Thank you.  We stand adjourned.

23         MS. SMITH:  Thank you, Your Honor.

24         THE CLERK:  All rise.

25         MR. MORRIS:  Thank you, Your Honor.

204

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 4:09 p.m.)

3                         --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                      CERTIFICATE

19       I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
20  above-entitled matter.

21    **/s/ Kathy Rehling**                    **01/11/2021**

22  _____          _____
    Kathy Rehling, CETD-444                        Date
23  Certified Electronic Court Transcriber

24

25

011440

205

INDEX

PROCEEDINGS                                                        3

OPENING STATEMENTS

- By Mr. Morris                                                    5

WITNESSES

Plaintiff's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris                               19
- Cross-Examination by Mr. Bonds                                106
- Redirect Examination by Mr. Morris                            139

EXHIBITS

Plaintiff's Exhibits A through Y                      Received 38

CLOSING ARGUMENTS

- By Mr. Morris                                                 152
- By Mr. Lynn                                                   155
- By Mr. Bonds                                                  159

RULINGS                                                    163/189

END OF PROCEEDINGS                                              204

INDEX                                                          205

0TT441

# EXHIBIT 69

Appx. 07499
011442

Docket #2362 Date Filed: 05/24/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed May 21, 2021

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **Highland Capital Management, L.P.** | § | CASE NO. 19-34054-SGJ-11 |
| | § | |
| Debtor. | § | |

### ORDER REQUIRING JAMES DONDERO TO APPEAR AT ALL HEARINGS IN THE BANKRUPTCY CASE

The above-referenced bankruptcy case was commenced in the District of Delaware on October 16, 2019, by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Case was transferred to this court on December 4, 2019. James Dondero is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020 as part of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in*

1

Case 19-34054-sgj11 Doc 3445-69 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 3
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 526 of 921    PageID 12324
Case 19-34054-sgj11 Doc 2362 Filed 05/24/21   Entered 05/24/21 11:20:14   Page 2 of 2

*the Ordinary Course* [DE # 339]. Mr. Dondero was retained as an unpaid employee of the Debtor until his resignation in October 2020.

Previously, on December 10, 2020, in Adversary No. 21-03003 *Highland v. Dondero*, a temporary restraining order ("TRO") was entered against Mr. Dondero restricting him from taking certain actions against the Debtor and its business. On January 8, 2021, a hearing was conducted on a preliminary injunction. At the Preliminary Injunction Hearing, Mr. Dondero claimed to be unaware of the provisions of the TRO. Due to this testimony, the court found it necessary to include in the Preliminary Injunction [DE # 59 in the AP] a provision requiring Mr. Dondero to appear in all hearings in the Bankruptcy Case moving forward.

The court enters this Order to have a directive in the main bankruptcy case similar to the provision that was included in the Preliminary Injunction. The court enters this Order to ensure Mr. Dondero is aware of orders affecting his rights and that he remains engaged in a case where his attorneys continue to take positions in numerous proceedings on his behalf.  Mr. Dondero is ordered to attend all future hearings in this Bankruptcy Case, unless otherwise ordered by the court. This directive does not apply only to evidentiary hearings or "substantive" hearings, and it applies to the underlying bankruptcy case as well as related adversary proceedings in which Mr. Dondero is a party or takes a position. Therefore, it is

**ORDERED** that James Dondero appear in all future hearings in this Bankruptcy Case, as well as all adversary proceedings where James Dondero is a party or takes a position, unless otherwise ordered by the court.

### END OF ORDER ###

Appx. 07591

01T444

# EXHIBIT 70

Case 19-34054-sgj11 Doc 3445-70 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 4
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 528 of 921 PageID 12326
Case 19-34054-sgj11 Doc 2458 Filed 06/17/21 Entered 06/17/21 12:17:26 Page 1 of 3

Docket #2458 Date Filed: 06/17/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 16, 2021**

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Highland Capital Management, L.P. | § | CASE NO. 19-34054-SGJ-11 |
| | § | |
| Debtor. | § | |

### ORDER REQUIRING A TRUSTEE OF THE DUGABOY INVESTMENT TRUST AND THE GET GOOD TRUST TO APPEAR AT ALL HEARINGS IN THE BANKRUPTCY CASE IN WHICH THEY TAKE POSITIONS

The above-referenced bankruptcy case was commenced in the District of Delaware on

October 16, 2019, by Highland Capital Management, L.P. filing its voluntary petition for relief

under Chapter 11 of the Bankruptcy Code. The Bankruptcy Case was transferred to this court on

December 4, 2019. James Dondero is the co-founder of the Debtor and was the Debtor's President



1934054210617000000000001

Appx. 07503

01T446

and Chief Executive Officer until his resignation on January 9, 2020, as part of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [DE # 339]. Mr. Dondero was retained as an unpaid employee of the Debtor until his resignation on or around October 9, 2020.

The Dugaboy Investment Trust and the Get Good Trust (together, the "Trusts")—which are the two entities that are the subject of this Order—are two of Mr. Dondero's family trusts. The court has previously noted that the standing of these Trusts in the bankruptcy case seems very tenuous. It is a little difficult to discern if their interests are truly those that the Bankruptcy Code is designed to protect.  Specifically, it has been represented that the Dugaboy Trust owns a mere 0.1866% of the junior equity in the Debtor. There is an infinitesimal chance of this interest being entitled to any recovery in this bankruptcy case, under any reasonable estimation.  And while the Get Good Trust has filed a proof of claim against the Debtor, and the Dugaboy Trust has filed several proofs of claim, these claims have been objected to and not yet allowed, and the court is very unclear regarding the nature or amount of these claims, except that the court has been apprised that: (a) one Dugaboy proof of claim alleges that Highland is obligated on a debt owed to Dugaboy by an entity known as Highland Select, allegedly because Highland is Highland Select's general partner and might also be its alter ego; and (b) another proof of claim asserts **postpetition mismanagement** by the Debtor of assets of one or more Debtor subsidiaries. While the court knows nothing about the Get Good proof of claim, it does know that the Get Good Trust (along with others) has been sued for alleged fraudulent transfers in an adversary proceeding in this case (Adv. Proc. # 20-3195)—which may affect the allowability of its proof of claim.

The Trusts have filed numerous substantive motions and objections in the Bankruptcy Case. The objections include those to the *Debtor's Motion for Entry of an Order Approving*

Case 19-34054-sgj11 Doc 3445-70 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 4
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 530 of 921 PageID 12328

Case 19-34054-sgj11 Doc 2458 Filed 06/17/21 Entered 06/17/21 12:17:26 Page 3 of 3

*Settlement with HarbourVest* [DE # 1625], *Debtor's Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch* [DE # 2199], and the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [DE # 1808]. Further, the Trusts have filed appeals to all three of the orders approving the above-mentioned motions and plan, and those appeals remain pending before the United States District Court for the Northern District of Texas and the United States Court of Appeals for the Fifth Circuit.

In addition to having concerns about the tenuousness of the Trusts' party-in-interest status, the court also has concerns whether these Trusts are simply acting at the direction of Mr. Dondero and are not independent parties. Accordingly, the court enters this Order to ensure that the trustees of the Trusts are fully engaged in this case, considering that the Trusts continue to take numerous positions requiring extensive attention and time of the court. The Trusts are ordered to have a trustee acting on their behalf attend all future hearings in this Bankruptcy Case in which the Trusts have taken or are taking a position, unless otherwise ordered by the court. This directive does not apply merely to evidentiary hearings or "substantive" hearings, and it applies to the underlying bankruptcy case as well as related adversary proceedings in which the Trusts are parties or take positions. Therefore, it is

**ORDERED** that the Dugaboy Investment Trust and the Get Good Trust must have a trustee appear in all future hearings in this Bankruptcy Case, as well as all adversary proceedings where either of the Trusts are a party or take a position, unless otherwise ordered by the court.

### END OF ORDER ###

# EXHIBIT 71

Appx. 07506
011449

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 532 of 921 PageID 12330
Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 1 of 12

Docket #0854 Date Filed: 07/16/2020



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 16, 2020**

_____
**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § | Case No. 19-34054 Chapter 11 |
| Debtor. | § § | Re: Docket No. 774 |

**ORDER APPROVING DEBTOR'S MOTION UNDER**
**BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)**
**AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS**
**CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND**
**FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020**

Upon the *Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* (the "Motion"),[1] and the

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.



1934054200716000000000007

Appx. 07507

01T450

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 533 of 921 PageID 12331
Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 2 of 12

Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, and DECREED** that:

1.      The Motion is **GRANTED**.

2.      Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as **<u>Exhibit 1</u>** and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.      The Debtor is hereby authorized to enter into and perform under the Agreement.

4.      The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement.  Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.  The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph. For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

Appx. 07508

01T451

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 534 of 921 PageID 12332
Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 3 of 12

5.      No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

6.      Notwithstanding anything in the Motion, the Agreement or the Order to the contrary, the Agreement shall be deemed terminated upon the effective date of a confirmed plan of reorganization unless such plan provides otherwise.

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.      This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

9.      The Foreign Representative Order is hereby amended to substitute James P. Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative. All other provisions of the Foreign Representative Order shall remain in full force and effect.

### ###END OF ORDER###

DOCS_SF:103156.19 36027/002

Appx. 07509

011452

Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 4 of 12

**<u>EXHIBIT 1</u>**

**Engagement Agreement**

011453



June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Re:     Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the
undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and
Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date
"), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you
for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the "
Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern
District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in
Chapter 11 including, directing the reorganization and restructuring of the Company,
monetization of assets, resolution of claims, development and negotiation of a plan of
reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board
of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the
Company as I determine should report to directly to me.  In the event that the Board determines
to restructure the reporting lines or functions of the Company, my direct reports will be amended
in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than
those on which I am conflicted.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 537 of 921    PageID 12335
Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 6 of 12

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO.  I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services.  For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees.  The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company.  I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1. Compensation for Services:
    a. Base Compensation:  As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation").  Base Compensation shall be due and payable at the start of each calendar month.  Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt. Payment of the Base Compensation will be retroactive to March 15, 2020.
    b. Bonus Compensation/Restructuring Fee:
        i. The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
        ii. Case Resolution Restructuring Plan
            1. On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
                a. $1,000,000 on confirmation of the Case Resolution Plan;
                b. $500,000 on the effective date of the Case Resolution Plan; and
                c. $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 538 of 921 PageID 12336

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 7 of 12

    iii.  Debtor/Creditor Monetization Vehicle Restructuring Fee:

        1.  On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):

           a.  $500,000 on confirmation of the Monetization Vehicle Plan;

           b.  $250,000 on the effective date of the Monetization Vehicle Plan; and

           c.  A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

2.  <u>Out-of-Pocket Expenses</u>:  In addition to the Base and Bonus Compensation, I shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses ("Expenses") incurred in connection with the provision of services hereunder.  Expenses will be billed along with Base Compensation and shall be paid by the Company at the same time. Expenses will be generally consistent with expenses incurred to date as a member of the Board.

<u>Bankruptcy Court Approval</u>

Notwithstanding anything herein to the contrary, I understand that this Agreement is contingent, in all respects, on the approval of the Bankruptcy Court.  I also understand that the Company will seek approval of this Agreement in stages and that the Company will first seek approval of my retention as CEO and CRO and the payment of the Base Compensation and will defer seeking Bankruptcy Court approval of the Restructuring Fee until there have been further developments in the Bankruptcy Case.

<u>Conflicts and Other Engagements</u>

I am not aware of any potential conflicts of interest based on my understanding of the various parties involved in this matter to date.

The Company is aware that this engagement is not an exclusive engagement of my time, and that I have and will continue to have other business engagements and investments unrelated to the Company.  Nothing in this Agreement or otherwise precludes me from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Company under this Agreement.  However, I will not take on any engagements directly adverse to the Company during the term of this engagement.

<u>Privilege</u>

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 539 of 921 PageID 12337

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 8 of 12

I understand that in the course of this engagement, I may become party to or my services may become part of work product of legal counsel to the Company (the Company's in-house and outside counsel are collectively referred to as "Counsel"), and all communications between Counsel and me relating to this engagement shall be protected from disclosure to third parties under the attorney work product doctrine and/or the attorney-client privilege, and, therefore, shall be treated by me as privileged and confidential. I further understand that the Company has the exclusive right to waive the attorney-client privilege, and Counsel has the exclusive right to waive the protections afforded under the attorney work-product doctrine.

Termination of Engagement

This Agreement may be terminated at any time by either the Company or by me upon two weeks advance written notice given to the other party. The termination of this Agreement shall not affect my right to receive, and the Company's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of the termination notice; provided, however, that (i) if this Agreement is terminated by me, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and I will return any Base Compensation received in excess of such amount and (ii) if this Agreement is terminated by the Company, Base Compensation shall be deemed fully earned as of the first day of any month. Bonus Compensation shall be earned by me immediately upon termination of me by the Company; provided, however, I shall not be entitled to Bonus Compensation if (a) the Bankruptcy Case is converted to chapter 7 or dismissed; (b) a chapter 11 trustee is appointed in the Bankruptcy Case; (c) I am terminated by the Company for Cause; or (d) I resign prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section hereof. For purposes of this Agreement, "Cause" means any of the following grounds for termination of my engagement, in each case as reasonably determined by the Board within 60 days of the Board becoming aware of the existence of the event or circumstance: (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on my part; (B) conviction of or the entry of a plea of nolo contendere by me for any felony; (C) the willful breach by me of any material term of this Agreement; or (D) the willful failure or refusal by me to perform my duties to the Company, which, if capable of being cured, is not cured on or before fifteen (15) days after my receipt of written notice from the Company.

Conditional Requirement to Seek Further Bankruptcy Court Approval of Agreement

The official committee of unsecured creditors in the Bankruptcy Case (the "Committee") may, upon two weeks advance written notice to the Company, require the Company to file a motion with the Bankruptcy Court on normal notice seeking a continuation of this Agreement and if such motion is not filed, this Agreement will terminate at the expiration of such two week period. If the Company files such motion, I will be entitled to my Base Compensation through and including the date on which a final order is entered on such motion by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Company until a date which is more than ninety days following the date the Bankruptcy Court enters an order approving this Agreement.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 540 of 921 PageID 12338

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 9 of 12

Indemnification

As a material part of the consideration to me under this Agreement, the Company agrees (i) to indemnify and hold harmless me and any of my affiliates (the "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, my engagement under this Agreement, or any actions taken or omitted to be taken by me or the Company in connection with this Agreement and (ii) to reimburse the Indemnified Party for all expenses ( including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to this Agreement, or such engagement, or actions. However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The indemnification and insurance currently covering my role as a director shall be extended to me and fully cover me as provided therein in my roles as CEO and CRO.

Miscellaneous

This Agreement (a) constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements among the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement among all the parties hereto.

This Agreement is subject to approval by the Bankruptcy Court. As part of such approval the Company shall request that any such order approving this Agreement contain a provision extending the protections afforded to me as a Board Member pursuant to Paragraph 10 of the Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered by the Bankruptcy Court on January 9, 2020 [Docket No. 339] to my role as CEO and CRO, which Order prohibits the commencement of any action against me without first obtaining Bankruptcy Court approval to initiate such action.

This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York. The parties hereby submit to the jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 541 of 921    PageID 12339

Case 19-34054-sgj11 Doc 854 Filed 07/16/20    Entered 07/16/20 14:00:44    Page 10 of 12

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

HIGHLAND CAPITAL MANAGEMENT L.P.

By: Strand Advisors, Inc., its general partner

_____          _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner

_____          _____
John Dubel                                    Russell Nelms
Director                                      Director
Strand Advisors, Inc.                         Strand Advisors, Inc.

Appx. 07517
01T460

Case 19-34054-sgj11 Doc 3445-71 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 543 of 921 PageID 12341

Case 19-34054-sgj11 Doc 854 Filed 07/16/20 Entered 07/16/20 14:00:44 Page 12 of 12

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner

_____          _____
John Dubel                                          Russell Nelms
Director                                               Director
Strand Advisors, Inc.                          Strand Advisors, Inc.

# EXHIBIT 72

Appx. 07519

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 545 of 921    PageID 12343
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 1 of 161



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

### ORDER (I) CONFIRMING THE FIFTH AMENDED
### PLAN OF REORGANIZATION OF HIGHLAND CAPITAL
### MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF

_____

The Bankruptcy Court[2] having:

a.  entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "<u>Disclosure Statement Order</u>"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.



1934054210222000000000018

Appx. 07529

011463

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 546 of 921    PageID 12344
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 2 of 161

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "<u>Disclosure Statement</u>") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b.     set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "<u>Objection Deadline</u>"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "<u>Plan</u>");

c.     set January 5, 2021, at 5:00 p.m. prevailing Central Time,  as the deadline for voting on the Plan (the "<u>Voting Deadline</u>") in accordance with the Disclosure Statement Order;

d.     initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e.     reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "<u>Confirmation Hearing Notice</u>"), the form of which is attached as <u>Exhibit 1-B</u> to the Disclosure Statement Order;

f.     reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "<u>Plan Supplements</u>");

g.     reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

Appx. 07521
011464

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 547 of 921 PageID 12345
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 3 of 161

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h.    reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications");

i.    reviewed: (i) *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

DOCS_SF:104487.21 36027/002

Appx. 07522
011465

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 548 of 921 PageID 12346
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 4 of 161

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j. reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k. conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l. heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m. considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor,

the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of

law:

---

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

DOCS_SF:104487.21 36027/002

Appx. 07523
011466

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 549 of 921 PageID 12347
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 5 of 161

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2. **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case. Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021. The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board. The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders. The Claimant Trustee is responsible

DOCS_SF:104487.21 36027/002



Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 550 of 921 PageID 12348
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 6 of 161

for this process, among other duties specified in the Plan's Claimant Trust Agreement. There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3. **Confirmation Requirements Satisfied.** The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7. Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code. The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4. **Not Your Garden Variety Debtor**. The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940. It was founded in 1993 by James Dondero and Mark Okada. Mark Okada resigned from his role with Highland prior to the

Appx. 07525

011468

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 551 of 921 PageID 12349
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 7 of 161

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020, pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for and/or control numerous non-debtor entities in the complex Highland enterprise.

5. **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned: (a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general partner.

6. **The Highland Enterprise.** Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for billions of dollars of assets, including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these assets are managed by the Debtor pursuant to shared services agreements with certain affiliated entities, including other affiliated registered investment advisors. In fact, there are approximately 2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

Appx. 07526
011469

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 552 of 921 PageID 12350
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 8 of 161

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7. **Debtor's Operational History.** The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business. The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits." The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8. **Not Your Garden Variety Creditor's Committee**. The Debtor and this chapter 11 case are not garden variety for so many reasons. One of the most obvious standouts in this case is the creditor constituency. The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11. For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. The Debtor also did not have problems with its trade vendors or landlords.

Appx. 07527
011470

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 553 of 921    PageID 12351
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 9 of 161

The Debtor also did not suffer any type of catastrophic business calamity.  In fact, the Debtor filed

for Chapter 11 protection six months before the onset of the COVID-19 pandemic.  Rather, the

Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation

claims that it faced—many of which had finally become liquidated (or were about to become

liquidated) after a decade or more of contentious litigation in multiple forums all over the world.

The Committee in this case has referred to the Debtor—under its former chief executive, Mr.

Dondero—as a "serial litigator."  The Bankruptcy Court agrees with that description. By way of

example, the members of the Committee (and their history of litigation with the Debtor and others

in the Highland complex) are as follows:

a.    **The Redeemer Committee of the Highland Crusader Fund (the "<u>Redeemer</u>
      <u>Committee</u>")**.  This Committee member obtained an arbitration award against the
      Debtor in the amount of $190,824,557, inclusive of interest, approximately five
      months before the Petition Date, from a panel of the American Arbitration
      Association. It was on the verge of having that award confirmed by the Delaware
      Chancery Court immediately prior to the Petition Date, after years of disputes that
      started in late 2008 (and included legal proceedings in Bermuda).  This creditor's
      claim was settled during this Chapter 11 Case in the amount of approximately
      $137,696,610 (subject to other adjustments and details not relevant for this
      purpose).

b.    **Acis Capital Management, L.P., and Acis Capital Management GP, LLC
      ("<u>Acis</u>")**.  Acis was formerly in the Highland complex of companies, but was not
      affiliated with Highland as of the Petition Date.  This Committee member and its
      now-owner, Joshua Terry, were involved in litigation with the Debtor dating back
      to 2016.  Acis was forced by Mr. Terry (who was a former Highland portfolio
      manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for
      the Northern District of Texas, Dallas Division before the Bankruptcy Court in
      2018, after Mr. Terry obtained an approximately $8 million arbitration award and
      judgment against Acis.  Mr. Terry ultimately was awarded the equity ownership of
      Acis by the Bankruptcy Court in the Acis bankruptcy case.  Acis subsequently
      asserted a multi-million dollar claim against Highland in the Bankruptcy Court for
      Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry.
      The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

Appx. 07528
011471

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 11 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 554 of 921   PageID 12352
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 10 of 161

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals.  There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York.  The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c.   **UBS Securities LLC and UBS AG London Branch ("UBS").**  UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case.  The UBS Claim was based on a judgment that UBS received from a New York state court in 2020.  The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex.  The UBS litigation related to activities that occurred in 2008 and 2009.  The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history).  The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d.   **Meta-E Discovery ("Meta-E").**  Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years.  It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel.  They fought hard before and during this Chapter 11 Case.  The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them.  They have represented their constituency in this case as fiduciaries extremely well.

9.   **Other Key Creditor Constituents.**  In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts.  Mr. Daugherty filed an amended

App. 07529
011472

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 555 of 921 PageID 12353
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 11 of 161

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure**. Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

Appx. 07539
011473

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 556 of 921    PageID 12354
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 12 of 161

Delaware to Dallas.  Second, the Committee (and later, the United States Trustee) expressed its

then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr.

Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and

perhaps worse).

12.    **Post-Petition Corporate Governance Settlement with Committee.**  After

spending many weeks under the threat of the potential appointment of a trustee, the Debtor and

Committee engaged in substantial and lengthy negotiations resulting in a corporate governance

settlement approved by the Bankruptcy Court on January 9, 2020.[5]  As a result of this settlement,

among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as

an officer or director of the Debtor and its general partner, Strand.  As noted above, Mr. Dondero

agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any

Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor.

The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the

commencement of any litigation against the three independent board members appointed to

oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the

exculpation of those board members by limiting claims subject to the "gatekeeper" provision to

those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

DOCS_SF:104487.21 36027/002

Appx. 07531
011474

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 14 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 557 of 921 PageID 12355
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 13 of 161

13.     **Appointment of Independent Directors.**   As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case.  They are:  James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms.  These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor).  The three independent board members' resumes are in evidence.  The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative.  Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee.  The Bankruptcy Court and the Committee each trusted the independent directors.  They were the right solution at the right time.  Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee.  Each of the independent directors brought unique qualities to the table.  Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business.  Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context.  And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries.  By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

DOCS_SF:104487.21 36027/002

Appx. 07532
011473

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 15 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 558 of 921 PageID 12356
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 14 of 161

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a

chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was

a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience.

While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland

complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis

trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the

case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the

Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.** Given the experiences

in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified

persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer,

as it would be in an ordinary chapter 11 case. The independent board members were stepping into

a morass of problems. Naturally, they were worried about getting sued no matter how defensible

their efforts—given the litigation culture that enveloped Highland historically. Based on the

record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything

always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none

of the independent directors would have taken on the role of independent director without (1) an

adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification

from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims;

and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent

directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

DOCS_SF:104487.21 36027/002

Appx. 07523

011476

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 16 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 559 of 921   PageID 12357
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 15 of 161

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's

Chief Restructuring Officer, Chief Restructuring Officer, and Foreign Representative entered on

July 16, 2020.[7]  The gatekeeper provisions in both the January 9 Order and July 16 Order are

precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine"

(first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)).

The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16

Order, and no one appealed either of those orders.  As noted above, Mr. Dondero signed the

Stipulation that led to the settlement that was approved by the January 9 Order.  The Bankruptcy

Court finds that, like the Committee, the independent board members have been resilient and

unwavering in their efforts to get the enormous problems in this case solved.  They seem to have

at all times negotiated hard and in good faith, which culminated in the proposal of the Plan

currently before the Bankruptcy Court.  As noted previously, they completely changed the

trajectory of this case.

15. **Not Your Garden Variety Mediators.**  And still another reason why this

was not your garden variety case was the mediation effort.  In the summer of 2020, roughly nine

months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis,

UBS, the Redeemer Committee, and Mr. Dondero.  The Bankruptcy Court selected co-mediators

because mediation among these parties seemed like such a Herculean task—especially during

COVID-19 where people could not all be in the same room.  Those co-mediators were:  Retired

---

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

DOCS_SF:104487.21 36027/002

Appx. 07591
011477

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 17 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 560 of 921 PageID 12358
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 16 of 161

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

Appx. 07535
011478

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 561 of 921 PageID 12359
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 17 of 161

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned

and/or controlled by him and that filed the following objections:

a.  *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b.  *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c.  A *Joinder to the Objection filed at 1670 by:  NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d.  *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e.  *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17.  **Questionability of Good Faith as to Outstanding Confirmation**

**Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to

the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 562 of 921 PageID 12360
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 18 of 161

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18.     **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

Appx. 02527
011480

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 563 of 921 PageID 12361
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 19 of 161

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which

the Debtor believes arise from Get Good's equity security interests and are subject to subordination

as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an

administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat

Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to

pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation

Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor

asserts should be subordinated. Another group of objectors that has joined together in one

objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See*

Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense

claims against the estate that were filed shortly before the Confirmation Hearing on January 23,

2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No.

1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and

Funds that the Funds have independent board members that run the Funds, but the Bankruptcy

Court was not convinced of their independence from Mr. Dondero because none of the so-called

independent board members have ever testified before the Bankruptcy Court and all have been

engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's

credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in

October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request,

and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior

proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

App. 07538
0TT481

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 564 of 921 PageID 12362
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 20 of 161

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19.    **Background Regarding Dondero Objecting Parties.**  To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith.  Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero.  In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence.  Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing.  The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20.    **Other Confirmation Objections.**  Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

Appx. 02539
011482

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 22 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 565 of 921    PageID 12363
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 21 of 161

Debtor release provisions.  In juxtaposition, to these pending objections, the Bankruptcy Court

notes that the Debtor resolved the following objections to the Plan:

a.    *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b.    *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c.    *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d.    *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679].  This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e.    *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668].  This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f.    *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].  This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21.    **Capitalized Terms.**  Capitalized terms used herein, but not defined herein,

shall have the respective meanings attributed to such terms in the Plan and the Disclosure

Statement, as applicable.

DOCS_SF:104487.21 36027/002

011483

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 566 of 921 PageID 12364
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 22 of 161

22. **Jurisdiction and Venue.** The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23. **Chapter 11 Petition.** On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019. The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case. The Office of the United States Trustee appointed the Committee on October 29, 2019.

24. **Judicial Notice.** The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

Appx. 07541
011484

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 24 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 567 of 921    PageID 12365
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 23 of 161

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25.    **Plan Supplement Documents.**    Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements.    The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26.    **Retained Causes of Action Adequately Preserved.**    The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27.    **Plan Modifications Are Non-Material.**    In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

Appx. 07542
011485

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 568 of 921 PageID 12366
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 24 of 161

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's*

*Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital*

*Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the

"Plan Modifications"). Section 1127(a) of the Bankruptcy Code provides that a plan proponent

may modify its plan at any time before confirmation so long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code. None of the modifications set

forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant

to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because,

among other things, they do not materially adversely change the treatment of the claims of any

creditors or interest holders who have not accepted, in writing, such supplements and

modifications. Among other things, there were changes to the projections that the Debtor filed

shortly before the Confirmation Hearing (which included projected distributions to creditors and

a comparison of projected distributions under the Plan to potential distributions under a

hypothetical chapter 7 liquidation). The Plan Supplements and Plan Modifications did not mislead

or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity

Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.

Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021

[Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors

or interest holders but, rather, simply update the estimated distributions based on Claims that were

settled in the interim and provide updated financial data. The filing and notice of the Plan

Supplements and Plan Modifications were appropriate and complied with the requirements of

DOCS_SF:104487.21 36027/002

Appx. 07543

011486

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 569 of 921 PageID 12367
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 25 of 161

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28. **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29. **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

Appx. 07544
011487

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 27 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 570 of 921 PageID 12368
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 26 of 161

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30.     **Bankruptcy Rule 3016(a).**  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31.     **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**  As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32.     **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.  The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33.     **Classification of Secured Claims.**  Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors.  Class 3 (Other

Appx. 02545
011T488

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 571 of 921    PageID 12369
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 27 of 161

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34.    **Classification of Priority Claims.**  Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims.  Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35.    **Classification of Unsecured Claims.**  Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8.  Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims).  The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor.  Class 8 Creditors

DOCS_SF:104487.21 36027/002

App. 07546
011489

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 29 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 572 of 921 PageID 12370
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 28 of 161

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

Appx. 07547

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 30 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 573 of 921    PageID 12371
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 29 of 161

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.  The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan.  Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees).  As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown.  Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code.  Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class.  However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan.  The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38.    **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).**  Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code.  In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

Appx. 07548
011491

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 574 of 921 PageID 12372
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 30 of 161

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39. **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40. **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41. **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

Appx. 07549

011492

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 32 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 575 of 921 PageID 12373
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 31 of 161

42.     **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).**  Article IV of the

Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the

establishment of: (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor;

and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are

included in the Plan Supplements.

a.      **The Claimant Trust.**  The Claimant Trust Agreement provides for the
management of the Claimant Trust, as well as the Reorganized Debtor with the
Claimant Trust serving as the managing member of New GP LLC (a wholly-owned
subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its
general partner).  The Claimant Trust, the Claimant Trustee, the management and
monetization of the Claimant Trust Assets, and the management of the Reorganized
Debtor (through the Claimant Trust's role as managing member of New GP LLC)
and the Litigation Sub-Trust will all be managed and overseen by the Claimant
Trust Oversight Committee.  Additionally, the Plan provides for the transfer to the
Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the
Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and
for the Claimant Trust Assets to automatically vest in the Claimant Trust free and
clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant
Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant
Trust Agreement.  The Claimant Trust will administer the Claimant Trust Assets as
provided under the Plan and the Claimant Trust Agreement contained in the Plan
Supplements.

b.      **The Litigation Sub-Trust.**  The Plan and the Litigation Sub-Trust Agreement
provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights,
title, and interest in and to all of the Estate Claims (as transferred to the Claimant
Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and
for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear
of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-
Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the
Litigation Sub-Trust Agreement.  The Litigation Trustee is charged with
investigating, pursuing, and otherwise resolving any Estate Claims (including those
with respect to which the Committee has standing to pursue prior to the Effective
Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-
Trust Agreement and the Plan, regardless of whether any litigation with respect to
any Estate Claim was commenced by the Debtor or the Committee prior to the
Effective Date.

DOCS_SF:104487.21 36027/002

Appx. 07559
011493

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 33 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 576 of 921 PageID 12374
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 32 of 161

c. **The Reorganized Debtor**. The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

43. **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

Appx. 02551

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 34 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 577 of 921    PageID 12375
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 33 of 161

44. **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Article IV
of the Plan provides for the Claimant Trust to be governed and administered by the Claimant
Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management
and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by
the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric
Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis;
(3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E
Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight
Committee are the holders of several of the largest Claims against the Debtor and/or are current
members of the Committee. Each of these creditors has actively participated in the Debtor's case,
both through their fiduciary roles as Committee members and in their individual capacities as
creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The
fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested
restructuring advisor and turnaround manager with more than 25 years of experience advising
public and private companies and their investors, and he has substantial experience overseeing,
advising or investigating troubled companies in the financial services industry and has advised or
managed such companies on behalf of boards or directors, court-appointed trustees, examiners and
special masters, government agencies, and private investor parties. The members of the Claimant
Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive
payment of $250,000 for his first year of service, and $150,000 for subsequent years.

DOCS_SF:104487.21 36027/002



Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 578 of 921 PageID 12376
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 34 of 161

45. **Selection of Trustees.** The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee. As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record. The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee. Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks. Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally. Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date. The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae. Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

DOCS_SF:104487.21 36027/002

Appx. 07553
011496

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 579 of 921 PageID 12377
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 35 of 161

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46. **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47. **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

DOCS_SF:104487.21 36027/002

Appx. 07551
011497

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 580 of 921 PageID 12378
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 36 of 161

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not

entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement

Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity

Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan,

and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied

with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying

sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and

Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides

that the same disclosure statement must be transmitted to each holder of a claim or interest in a

particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders

of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects

with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure

Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain

Dondero Related Entities that the changes made to certain assumptions and projections from the

Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation

Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the

Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to

the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections.

Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the

changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial

Projections do not constitute materially adverse change to the treatment of Claims or Equity


Appx. 07555
011498

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 581 of 921 PageID 12379
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 37 of 161

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48.     **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

   a.     The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

Appx. 07556
011499

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 39 of
Case 3:25-cv-02072-S    Document 15-14   Filed 10/06/25    Page 582 of 921    PageID 12380
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 38 of 161

b.      The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c.      Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d.      While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e.      On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation.  As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f.      On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P.* [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero.  The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g.      The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020.  The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h.      Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i.      Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful.  This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

DOCS_SF:104487.21 36027/002



Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 40 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 583 of 921    PageID 12381
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 39 of 161

49.    **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).**

Article II.B of the Plan provides that Professionals will file all final requests for payment of

Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an

adequate period of time for interested parties to review such claims.  The procedures set forth in

the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in

connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter

11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy

Code.

50.    **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).**  Article IV.B

of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the

Claimant Trust Oversight Committee and the members thereto.  For the reasons more fully

explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of

section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation

of any insider to be employed or retained by the Reorganized Debtor, if applicable, and

compensation for any such insider.  The appointment of such individuals is consistent with the

interests of Claims and Equity Interests and with public policy.  Thus, the Plan satisfies section

1129(a)(5) of the Bankruptcy Code.

51.    **No Rate Changes (11 U.S.C. § 1129(a)(6)).**  The Plan does not provide for

any rate change that requires regulatory approval.  Section 1129(a)(6) of the Bankruptcy Code is

thus not applicable.

DOCS_SF:104487.21 36027/002

Appx. 07558
011301

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 41 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 584 of 921 PageID 12382
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 40 of 161

52. **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).** The "best interests"
test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity
Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date
of the Plan, that is not less than the amount that such Holder would so receive or retain if the
Debtor were liquidated under chapter 7 of the Bankruptcy Code. On October 15, 2020, the Debtor
filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its
advisors and which was attached as Exhibit C to the Disclosure Statement. On January 29, 2021,
in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor
provided an updated version of the Liquidation Analysis to the then-objectors of the Plan,
including Mr. Dondero and the Dondero Related Entities. On February 1, 2021, the Debtor filed
the Amended Liquidation Analysis/Financial Projections. The Amended Liquidation
Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues,
and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the
Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued
at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in
market conditions and other factors; (3) expected revenues and expenses arising in connection with
the Debtor's continued management of the CLOs pursuant to management agreements that the
Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding
two or three employees to assist in the management of the CLOs, the Debtor also increased
modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and
professional fees; and (5) an increase in projected recoveries on notes resulting from the

DOCS_SF:104487.21 36027/002

Appx. 07559
011302

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 42 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 585 of 921    PageID 12383
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 41 of 161

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

a.    The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

b.    Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

c.    A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

DOCS_SF:104487.21 36027/002

Appx. 07509
0TT503

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 43 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 586 of 921    PageID 12384
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 42 of 161

    d.       The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

    e.       The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation.  Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53.      **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).**  Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan.  Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes.  However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan.  Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied.  The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54.      **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).**  The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

DOCS_SF:104487.21 36027/002

Appx. 07561
011304

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 587 of 921 PageID 12385
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 43 of 161

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55. **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).** Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider. Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56. **Feasibility (11 U.S.C. § 1129(a)(11)).** Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor. The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets. The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan. The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors. Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note. The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date. Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

Appx. 07582
011305

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 588 of 921 PageID 12386
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 44 of 161

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

DOCS_SF:104487.21 36027/002

Appx. 07503

011306

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 46 of
Case 3:25-cv-02072-S      Document 15-14    Filed 10/06/25    Page 589 of 921    PageID 12387
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 45 of 161

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy

Code.

a.  <u>Class 8</u>.  The Plan is fair and equitable with respect to Class 8 General Unsecured Claims.  While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "<u>Contingent Interests</u>"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement.  Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

b.  <u>Class 10 and Class 11</u>.  There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11.  Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement.  Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C).  The Plan does not discriminate unfairly as to Equity Interests.  As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly,

and is fair and equitable with respect to each Class that has rejected the Plan.  Thus, the Plan

satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10,

and 11.

Appx. 07564
011507

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 47 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 590 of 921 PageID 12388
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 46 of 161

61. **Only One Plan (11 U.S.C. § 1129(c)).** The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62. **Principal Purpose (11 U.S.C. § 1129(d)).** Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63. **Satisfaction of Confirmation Requirements.** Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64. **Good Faith Solicitation (11 U.S.C. § 1125(e)).** The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65. **Discharge (11 U.S.C. § 1141(d)(3)).** The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code. Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

Appx. 07505
011308

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 48 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 591 of 921 PageID 12389
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 47 of 161

in the same manner as the Debtor did prior to Plan confirmation, which includes the management

of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund. Although the

Plan projects that it will take approximately two years to monetize the Debtor's assets for fair

value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be

monetizing their assets, there is no specified time frame by which this process must conclude. Mr.

Seery's credible testimony demonstrates that the Debtor will continue to engage in business after

consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is

entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66. **Retention of Jurisdiction.** The Bankruptcy Court may properly retain

jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the

Bankruptcy Code to the maximum extent under applicable law.

67. **Additional Plan Provisions (11 U.S.C. § 1123(b)).** The Plan's provisions

are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable

provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68. **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).**

The Debtor has exercised reasonable business judgment with respect to the rejection of the

Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation

Order, and such rejections are justified and appropriate in this Chapter 11 Case. The Debtor also

filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the

contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No.

1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

Appx 07586

011309

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 592 of 921 PageID 12390
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 48 of 161

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69.     **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70.     **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

DOCS_SF:104487.21 36027/002

Appx 07587

011510

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 50 of
Case 3:25-cv-02072-S      Document 15-14    Filed 10/06/25    Page 593 of 921    PageID 12391
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 49 of 161

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71. **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties.  Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties.  The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties.  The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases.  The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

DOCS_SF:104487.21 36027/002

Appx. 07568
011311

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 51 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 594 of 921    PageID 12392
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 50 of 161

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.  The Debtor Release also contains

conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the

"Release Conditions").  Until the an employee satisfies the Release Conditions or the Release

Conditions otherwise terminate, any claims against such employee will be tolled so that if the

Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a

later date.  The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's

testimony, demonstrates that the Debtor is not aware of any claims against any of the Released

Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward

confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released

Parties' significant contributions to a highly complex and contentious restructuring.  The

Committee, whose members hold approximately $200 million in claims against the Estate, is

highly sophisticated and is represented by highly sophisticated professionals, and has actively and

vigorously negotiated the terms of the Debtor Release, which was the subject of significant

controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October

27, 2020.

    72.    **Exculpation.**  Section IX.C of the Plan provides for the exculpation of the

certain Exculpated Parties to the extent provided therein (the "Exculpation Provision").  As

explained below, the Exculpation Provision is appropriate under the unique circumstances of this

litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent.  First, with respect

to the Independent Directors, their agents, and their advisors, including any employees acting at

App. 07509
011512

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 595 of 921 PageID 12393
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 51 of 161

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these

parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order.

The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor

up until entry of the January 9 Order. The January 9 Order was not appealed. In addition to the

appointment of the Independent Directors in an already contentious and litigious case, the January

9 Order set the standard of care for the Independent Directors and specifically exculpated them for

negligence. Mr. Seery and Mr. Dubel each testified that they had input into the contents of the

January 9 Order and would not have agreed to their appointment as Independent Directors if the

January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order.

Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent

Directors or their agents and advisors must first seek approval from the Bankruptcy Court before

doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case

and exculpated the Independent Directors for acts other than willful misconduct or gross

negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims

of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not

expire by its terms.

73. **Existing Exculpation of Independent Directors.** The Bankruptcy Court

also finds and concludes that it has already exculpated Mr. Seery acting in the capacity as Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order. The Bankruptcy

Court concludes its previous approval of the exculpation of the Independent Directors, their agents,

advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

011513

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 53 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 596 of 921    PageID 12394
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 52 of 161

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the

law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046

(5th Cir.1987).  The January 9 Order and July 16 Order cannot be collaterally attacked based on

the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors,

including any employees acting at their direction, as well as the Chief Executive Officer and Chief

Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order

and the July 16 Order.

74.    **The Exculpation Provision Complies with Applicable Law.**  Separate

and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy

Court also finds and concludes that the Exculpation Provision is consistent with applicable law,

including *In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009), for several reasons:

a.    First, the statutory basis for *Pacific Lumber'*s denial of exculpation for certain
parties other than a creditors' committee and its members is that section 524(e) of
the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific
Lumber*, 253 F.3d. at 253.  However, *Pacific Lumber* does not prohibit all
exculpations under the Bankruptcy Code and the court in such case specifically
approved the exculpations of a creditors' committee and its members on the
grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers,
implies committee members have qualified immunity for actions within the scope
of their duties…. [I]f members of the committee can be sued by persons unhappy
with the committee's performance during the case or unhappy with the outcome of
the case, it will be extremely difficult to find members to serve on an official
committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al,
Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008)).  *Pacific Lumber'*s
rationale for permitted exculpation of creditors' committees and their members
(which was clearly policy-based and based on a creditors' committee qualified
immunity flowing from their duties under section 1103(c) of the Bankruptcy Code
and their disinterestedness and importance in chapter 11 cases) does not preclude
exculpation to other parties in a particular chapter 11 case that perform similar roles
to a creditors' committee and its members.  The Independent Directors, and by
extension the Chief Executive Officer and Chief Restructuring Officer, were not

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 54 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 597 of 921 PageID 12395
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 53 of 161

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b.   Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumber*, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

---

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

Appx. 07572
011315

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 598 of 921 PageID 12396
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 54 of 161

75.    **Injunction.**  Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision").  The Injunction Provision is necessary to implement the provisions in the Plan.  Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value.  In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities.  Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero,  it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors.  The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142.  The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release."  The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law.   The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76.    **Gatekeeper Provision**.  Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision").   The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties.  Thereafter, if the Bankruptcy Court determines that the action is

App. 07573
0113116

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 599 of 921 PageID 12397
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 55 of 161

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to



Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 57 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 600 of 921    PageID 12398
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 56 of 161

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by

the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the

Dondero Related Entities be able to continue their litigation against the Debtor and its successors

post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to

the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the

Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and

(vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them

from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc.

No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

        78.    **Findings Regarding Dondero Post-Petition Litigation.**  The Bankruptcy

Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain

creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's

credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down

the place." The Bankruptcy Court concludes that without appropriate protections in place, in the

form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence

litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than

the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more

hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that

the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date

will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

DOCS_SF:104487.21 36027/002

Appx 07675

011518

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 601 of 921 PageID 12399
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 57 of 161

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79. **Necessity of Gatekeeper Provision.** The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles. The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision. Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll)* 850 F.3d 811 (5th Cir. 2017). Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

DOCS_SF:104487.21 36027/002



Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 602 of 921 PageID 12400
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 58 of 161

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective

Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between

Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such

agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gatekeeper Provision.** The

Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under

sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also

within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126

(1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to

deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue*

*Moon Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir.

2017).

81. **Jurisdiction to Implement Gatekeeper Provision.** The Bankruptcy Court

finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision

as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under

*United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.),* 301 F.3d

296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge*

*Techs., Inc.),* 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *Villegas*

*v. Schmidt,* 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a

gatekeeper does not violate *Stern v. Marshall.* The Bankruptcy Court's determination of whether

Appx. 07577
011520

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 60 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 603 of 921    PageID 12401
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 59 of 161

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82.    **Resolution of Objections of Scott Ellington and Isaac Leventon**.  Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a.    Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00.  Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection.  If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b.    Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan.  Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c.    The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims.  The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

---

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Appx 07578
01T1321

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 61 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 604 of 921    PageID 12402
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 60 of 161

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d.     The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims.  As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e.     Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant.  Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan.  Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan.  If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims).  In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims.  Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f.     Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7).  If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Appx. 07579
011522

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 62 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 605 of 921    PageID 12403
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 61 of 161

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g.    The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date.  If the Debtor does not make an election, then Option A will apply.

h.    Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i.    Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j.    The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k.    For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

    **A.    Confirmation of the Plan.**  The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, including the

Appx. 07589

011323

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 63 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 606 of 921    PageID 12404
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 62 of 161

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

     **B.**    **Findings of Fact and Conclusions of Law**.  The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order.  To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

     **C.**    **Objections**.  Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference.  All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

     **D.**    **Plan Supplements and Plan Modifications.**    The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

---

[11] The Plan is attached hereto as **Exhibit A**.

Appx. 07584

011324

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 64 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 607 of 921 PageID 12405
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 63 of 161

sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code. Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

**E. Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications. No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

**F. Vesting of Assets in the Reorganized Debtor.** Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date. The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

Appx 07582
011T325

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 65 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 608 of 921    PageID 12406
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 64 of 161

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

G.    **Effectiveness of All Actions.**    All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

H.    **Restructuring Transactions.**    The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

DOCS_SF:104487.21 36027/002

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 66 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 609 of 921    PageID 12407
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 65 of 161

**I.    Preservation of Causes of Action.**  Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order).  In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**J.    Independent Board of Directors of Strand.**  The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors.  For avoidance of doubt, the Assumed Contracts

Appx. 07584

011327

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 67 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 610 of 921    PageID 12408
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 66 of 161

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K.    Cancellation of Equity Interests and Issuance of New Partnership Interests.**  On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.  As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC.  The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner.  The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

DOCS_SF:104487.21 36027/002

Appx 07585

011328

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 611 of 921 PageID 12409
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 67 of 161

Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

      **L.**    **Transfer of Assets to Claimant Trust.** On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax. Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

      **M.**    **Transfer of Estate Claims to Litigation Sub-Trust**. On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses. The Litigation Trustee will

DOCS_SF:104487.21 36027/002

Appx. 07586

0TT329

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 69 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 612 of 921   PageID 12410
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 68 of 161

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms

of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor

or Committee, as applicable, in any litigation commenced prior to the Effective Date in which

Estate Claims are asserted.

   **N.**  **Compromise of Controversies.**  In consideration for the distributions and

other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a

good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved

under the Plan and the entry of this Confirmation Order constitutes approval of such compromise

and settlement under Bankruptcy Rule 9019.

   **O.**  **Objections to Claims**.  The Claims Objection Deadline shall be the date

that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline

may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise

provided under the Plan.

   **P.**  **Assumption of Contracts and Leases.**  Effective as of the date of this

Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the

need for any further notice to or action, order, or approval of the Bankruptcy Court, under section

365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the

Plan.  Each Assumed Contract shall include all modifications, amendments, supplements,

restatements, or other agreements related thereto, and all rights related thereto, if any, including

all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and

any other interests.  Modifications, amendments, supplements, and restatements to any of the

DOCS_SF:104487.21 36027/002

Appx. 07587
011530

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 70 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 613 of 921 PageID 12411
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 69 of 161

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

Q. **Rejection of Contracts and Leases.** Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan. To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

R. **Assumption of Issuer Executory Contracts.** On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

Appx. 07588
011531

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 71 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 614 of 921 PageID 12412
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 70 of 161

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a

cumulative amount of $525,000 (the "Cure Amount") as follows:

a. $200,000 in cash on the date that is five business days from the Effective Date, with
such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of
$85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples
Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the
amount of $41,904.76 as reimbursement for the attorney's fees and other legal
expenses incurred by the Issuers in connection with the Debtor's bankruptcy case;
and

b. $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"),
which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount
of $29,404.76, and Maples in the amount of $17,023.81 as additional
reimbursement for the attorney's fees and other legal expenses incurred by the
Issuers in connection with the Debtor's bankruptcy case (i) from any management
fees actually paid to the Portfolio Manager under the Issuer Executory Contracts
(the "Management Fees"), and (ii) on the date(s) Management Fees are required to
be paid under the Issuer Executory Contracts (the "Payment Dates"), and such
obligation shall be considered an irrevocable direction from the Debtor and the
Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the
Payment to Issuers' Counsel, allocated in the proportion set forth in such
agreement; *provided, however,* that (x) if the Management Fees are insufficient to
make any Payment in full on a Payment Date, such shortfall, in addition to any
other amounts due hereunder, shall be paid out of the Management Fees owed on
the following Payment Date, and (y) nothing herein shall limit either Debtor's
liability to pay the amounts set forth herein, nor the recourse of the Issuers or
Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

**S.** **Release of Issuer Claims.** Effective as of the Confirmation Date, and to

the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and

former advisors, trustees, directors, officers, managers, members, partners, employees,

beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

---

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1,
Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding
LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd.,
Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd.,
Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

Appx. 07589
011332

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 72 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 615 of 921   PageID 12413
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 71 of 161

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

  **T.**  **Release of Debtor Claims against Issuer Released Parties.**  Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

Appx. 07599
011533

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 73 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 616 of 921 PageID 12414
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 72 of 161

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

U. **Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

V. **Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

Appx. 07591
011534

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 617 of 921 PageID 12415
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 73 of 161

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall

determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity

for hearing in accordance with the procedures established by the Bankruptcy Code and the

Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan.

The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy

Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all

ordinary course professionals in the ordinary course of business without the need for further

Bankruptcy Court order or approval. From and after the Effective Date, any requirement that

Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy

Code in seeking retention or compensation for services rendered after such date shall terminate,

and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any

Professional or Entity employed in the ordinary course of the Debtor's business without any further

notice to or action, order, or approval of the Bankruptcy Court.

     **W.** **Release, Exculpation, Discharge, and Injunction Provisions. The**
**following release, exculpation, discharge, and injunction provisions set forth in the Plan are**
**approved and authorized in their entirety, and such provisions are effective and binding on**
**all parties and Entities to the extent provided therein.**

     **X.** **Discharge of Claims and Termination of Interests.** To the fullest extent

provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code,

except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration

distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

DOCS_SF:104487.21 36027/002

Appx. 07592
011535

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 75 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 618 of 921 PageID 12416
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 74 of 161

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

Y. **Exculpation.** Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

Appx 07593
011536

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 619 of 921    PageID 12417
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 75 of 161

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date.  The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

     **Z.**    **Releases by the Debtor.**  On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

DOCS_SF:104487.21 36027/002



Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 77 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 620 of 921 PageID 12418
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 76 of 161

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance

Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the

Bankruptcy Court or any other court of competent jurisdiction.

**AA.  Injunction.  Upon entry of this Confirmation Order, all Enjoined
Parties are and shall be permanently enjoined, on and after the Effective Date, from taking
any actions to interfere with the implementation or consummation of the Plan.  Except as
expressly provided in the Plan, this Confirmation Order, or a separate order of the
Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after
the Effective Date, with respect to any Claims and Equity Interests, from directly or
indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or
other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative
or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing,
levying, attaching (including any prejudgment attachment), collecting, or otherwise
recovering, enforcing, or attempting to recover or enforce, by any manner or means, any
judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii)
creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or
encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any
right of setoff, directly or indirectly, against any obligation due to the Debtor or against
property or interests in property of the Debtor, except to the limited extent permitted under
Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

Appx. 07595
011538

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 78 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 621 of 921 PageID 12419
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 77 of 161

in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property. Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in

Appx. 07586

011539

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 79 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 622 of 921   PageID 12420
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 78 of 161

Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or
cause of action.

       **BB.**    **Duration of Injunction and Stays.**  **Unless otherwise provided in the
Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all
injunctions and stays entered during the Chapter 11 Case and in existence on the
Confirmation Date, shall remain in full force and effect in accordance with their terms; and
(ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full
force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary
if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent
order under Section 105.**

       **CC.**    **Continuance of January 9 Order and July 16 Order.**  Unless otherwise
provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each
of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding
Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the
Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion
Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr.,
as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro
Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020  shall remain in full force and
effect from the Confirmation Date and following the Effective Date.

       **DD.**    **No Governmental Releases.**  Nothing in this Confirmation Order or the
Plan shall effect a release of any claim by the United States Government or any of its agencies or

DOCS_SF:104487.21 36027/002

Appx. 07597

01130

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 80 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 623 of 921 PageID 12421
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 79 of 161

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

EE.     **Exemption from Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

DOCS_SF:104487.21 36027/002

Appx. 07598
01T1341

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 81 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 624 of 921 PageID 12422
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 80 of 161

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

FF. **Cancellation of Notes, Certificates and Instruments.** Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

DOCS_SF:104487.21 36027/002

Appx. 07599
011342

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 82 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 625 of 921    PageID 12423
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 81 of 161

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**GG.    Documents, Mortgages, and Instruments.**    Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

**HH.    Post-Confirmation Modifications.**    Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

**II.    Applicable Nonbankruptcy Law.**  The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**JJ.    Governmental Approvals Not Required.**  This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

DOCS_SF:104487.21 36027/002

Appx. 07600

011343

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 626 of 921 PageID 12424
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 82 of 161

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

KK.    **Notice of Effective Date.**    As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c).  Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

LL.    **Substantial Consummation.**    On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

MM.    **Waiver of Stay.**    For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

DOCS_SF:104487.21 36027/002

Appx. 07594

011344

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 84 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 627 of 921   PageID 12425
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 83 of 161

**NN.**     **References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

**OO.**     **Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

**PP.**     **Effect of Conflict.** This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control. If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

**QQ.**     **Resolution of Objection of Texas Taxing Authorities.** Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes. The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

Appx. 07692
011345

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 85 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 628 of 921    PageID 12426
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 84 of 161

applicable nonbankruptcy law.  In the event the 2020 taxes are paid after February 1, 2021, the

Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties

and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor

reserve any all rights and defenses in connection therewith.

a.    The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law.  The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan.  The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b.    The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full.  In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default.  Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default.  If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith.  The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 86 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 629 of 921 PageID 12427
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 85 of 161

**RR. Resolution of Objections of Scott Ellington and Isaac Leventon.**

Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects. The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date. If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

a. Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b. The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c. Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan. Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d. The Senior Employees' Objection is deemed withdrawn.

**SS. No Release of Claims Against Senior Employee Claimants.** For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

Appx. 07604

011347

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 87 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 630 of 921    PageID 12428
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 86 of 161

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released

Party" under the Plan.

      **TT.**   **Resolution of Objection of Internal Revenue Service.** Notwithstanding

any other provision or term of the Plan or Confirmation Order, the following Default Provision

shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its

claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

    (1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

    (2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

    (3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

DOCS_SF:104487.21 36027/002

Appx. 07605

011348

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 88 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 631 of 921 PageID 12429
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 87 of 161

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

UU. **IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

Appx. 07606
011T349

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 89 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 632 of 921    PageID 12430
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 88 of 161

**VV.    CLO Holdco, Ltd. Settlement**    Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25, 2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement").  In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW.    Retention of Jurisdiction.**  The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX.    Payment of Statutory Fees; Filing of Quarterly Reports.**    All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date.   The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY.    Dissolution of the Committee.**  On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

Appx. 07607
011350

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 633 of 921 PageID 12431
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 89 of 161

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

**ZZ. Miscellaneous.** After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

Appx 07606
011351

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 91 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 634 of 921 PageID 12432
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 90 of 161

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post

confirmation reporting requirements.

<p align="center">**###END OF ORDER###**</p>

DOCS_SF:104487.21 36027/002

Appx 07609

011352

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 92 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 635 of 921    PageID 12433
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 91 of 161

**Exhibit A**

**Fifth Amended Plan (as Modified)**

Appx. 07619
011353

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 93 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 636 of 921 PageID 12434
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 92 of 161

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | ) )  Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | )  Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) |
| | ) |

## FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND
## CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 94 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 637 of 921    PageID 12435
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 93 of 161

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
    GOVERNING LAW AND DEFINED TERMS ................................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law....................1

    B.    Defined Terms ....................................................................................2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS................16

    A.    Administrative Expense Claims...................................................16

    B.    Professional Fee Claims.............................................................17

    C.    Priority Tax Claims....................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
    AND EQUITY INTERESTS ......................................................................18

    A.    Summary.....................................................................................18

    B.    Summary of Classification and Treatment of Classified Claims and
    Equity Interests .........................................................................18

    C.    Elimination of Vacant Classes...................................................19

    D.    Impaired/Voting Classes............................................................19

    E.    Unimpaired/Non-Voting Classes...............................................19

    F.    Impaired/Non-Voting Classes....................................................19

    G.    Cramdown..................................................................................19

    H.    Classification and Treatment of Claims and Equity Interests...........................19

    I.    Special Provision Governing Unimpaired Claims................................................24

    J.    Subordinated Claims..................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ....................................24

    A.    Summary....................................................................................24

    B.    The Claimant Trust ...................................................................25

            1.    Creation and Governance of the Claimant Trust and Litigation
        Sub-Trust........................................................................25

            2.    Claimant Trust Oversight Committee.....................................26

Appx. 07812

011355

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 95 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 638 of 921 PageID 12436
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 94 of 161

**Page**

3. Purpose of the Claimant Trust. ..................................................27

4. Purpose of the Litigation Sub-Trust. .........................................27

5. Claimant Trust Agreement and Litigation Sub-Trust Agreement. .........27

6. Compensation and Duties of Trustees. .....................................29

7. Cooperation of Debtor and Reorganized Debtor. ....................29

8. United States Federal Income Tax Treatment of the Claimant Trust. ....................................................................................29

9. Tax Reporting. ...........................................................................30

10. Claimant Trust Assets. ..............................................................30

11. Claimant Trust Expenses. ..........................................................31

12. Trust Distributions to Claimant Trust Beneficiaries. .................31

13. Cash Investments. .....................................................................31

14. Dissolution of the Claimant Trust and Litigation Sub-Trust. .................31

C. The Reorganized Debtor ...................................................................32

1. Corporate Existence .................................................................32

2. Cancellation of Equity Interests and Release. ..........................32

3. Issuance of New Partnership Interests .....................................32

4. Management of the Reorganized Debtor ..................................33

5. Vesting of Assets in the Reorganized Debtor ..........................33

6. Purpose of the Reorganized Debtor ........................................33

7. Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ...................................33

D. Company Action ...............................................................................34

E. Release of Liens, Claims and Equity Interests....................................35

F. Cancellation of Notes, Certificates and Instruments...........................35

- ii -

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 639 of 921 PageID 12437
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 95 of 161

**Page**

G.  Cancellation of Existing Instruments Governing Security Interests...................35

H.  Control Provisions ..........................................................................................35

I.  Treatment of Vacant Classes ...........................................................................36

J.  Plan Documents ..............................................................................................36

K.  Highland Capital Management, L.P. Retirement Plan and Trust .......................36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ........................................................................................................37

A.  Assumption, Assignment, or Rejection of Executory Contracts and
    Unexpired Leases............................................................................................37

B.  Claims Based on Rejection of Executory Contracts or Unexpired
    Leases..............................................................................................................38

C.  Cure of Defaults for Assumed or Assigned Executory Contracts and
    Unexpired Leases............................................................................................38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................39

A.  Dates of Distributions .....................................................................................39

B.  Distribution Agent ..........................................................................................39

C.  Cash Distributions ..........................................................................................40

D.  Disputed Claims Reserve ................................................................................40

E.  Distributions from the Disputed Claims Reserve .............................................40

F.  Rounding of Payments.....................................................................................40

G.  *De Minimis* Distribution ..................................................................................41

H.  Distributions on Account of Allowed Claims...................................................41

I.  General Distribution Procedures......................................................................41

J.  Address for Delivery of Distributions..............................................................41

K.  Undeliverable Distributions and Unclaimed Property ......................................41

L.  Withholding Taxes...........................................................................................42

Appx. 07614
011557

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 97 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 640 of 921    PageID 12438
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 96 of 161

**Page**

M.    Setoffs ................................................................................................42

N.    Surrender of Cancelled Instruments or Securities ...............................42

O.    Lost, Stolen, Mutilated or Destroyed Securities .................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
          UNLIQUIDATED AND DISPUTED CLAIMS ...........................................43

A.    Filing of Proofs of Claim ....................................................................43

B.    Disputed Claims ..................................................................................43

C.    Procedures Regarding Disputed Claims or Disputed Equity Interests ..............43

D.    Allowance of Claims and Equity Interests............................................44

        1.    Allowance of Claims...................................................................44

        2.    Estimation ..................................................................................44

        3.    Disallowance of Claims ..............................................................44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ................................................45

A.    Conditions Precedent to the Effective Date ........................................45

B.    Waiver of Conditions ..........................................................................46

C.    Dissolution of the Committee ..............................................................46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ................47

A.    General ................................................................................................47

B.    Discharge of Claims............................................................................47

C.    Exculpation ........................................................................................47

D.    Releases by the Debtor........................................................................48

E.    Preservation of Rights of Action........................................................49

        1.    Maintenance of Causes of Action ..............................................49

        2.    Preservation of All Causes of Action Not Expressly Settled or
              Released ..................................................................................49

- iv -

011358

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 98 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 641 of 921    PageID 12439
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 97 of 161

**Page**

F.    Injunction .................................................................................................. 50

G.    Duration of Injunctions and Stays ............................................................. 51

H.    Continuance of January 9 Order ................................................................ 51

ARTICLE X. BINDING NATURE OF PLAN ..................................................... 51

ARTICLE XI. RETENTION OF JURISDICTION ................................................ 52

ARTICLE XII. MISCELLANEOUS PROVISIONS .............................................. 54

A.    Payment of Statutory Fees and Filing of Reports ...................................... 54

B.    Modification of Plan .................................................................................. 54

C.    Revocation of Plan ..................................................................................... 54

D.    Obligations Not Changed ........................................................................... 55

E.    Entire Agreement ........................................................................................ 55

F.    Closing of Chapter 11 Case ........................................................................ 55

G.    Successors and Assigns .............................................................................. 55

H.    Reservation of Rights ................................................................................. 55

I.    Further Assurances ...................................................................................... 56

J.    Severability ................................................................................................. 56

K.    Service of Documents ................................................................................. 56

L.    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of
the Bankruptcy Code ................................................................................... 57

M.    Governing Law ........................................................................................... 58

N.    Tax Reporting and Compliance .................................................................. 58

O.    Exhibits and Schedules ............................................................................... 58

P.    Controlling Document ................................................................................. 58

Appx. 07616

011559

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 99 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 642 of 921    PageID 12440
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 98 of 161

---

## DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

---

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan.  The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents.  All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. <u>Defined Terms</u>

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Appx. 07618

01T361

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

Appx. 07619

011362

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

Appx. 07629

011363

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

Appx. 07621

011364

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

Appx. 07622

011365

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 105
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 648 of 921 PageID 12446
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 104 of 161

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests*" means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. "*Delaware Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Appx. 07623
011366

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51.    "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52.    "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53.    "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54.    "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55.    "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56.    "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57.    "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58.    "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.    "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61.    "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

Appx. 07621

011567

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

9

011568

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 108
Case 3:25-cv-02072-S     Document 15-14     Filed 06/06/25     Page 651 of 921     PageID 12449
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 107 of 161

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

Appx. 07626
011369

81. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. "*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "Petition *Date*" means October 16, 2019.

92. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

Appx. 07827

011370

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 110
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 653 of 921 PageID 12451
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 109 of 161

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

Appx. 07628
011571

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 111
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 654 of 921 PageID 12452
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 110 of
161

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

Appx. 07629
011572

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 112
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 655 of 921 PageID 12453
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 111 of 161

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

Appx 07630
011573

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

15

011574

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 114
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 657 of 921    PageID 12455
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 113 of
161

130.   "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131.   "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132.   "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133.   "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134.   "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135.   "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136.   "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137.   "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A.    Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

Appx. 07632

011575

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 115
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 658 of 921 PageID 12456
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 114 of 161

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

### B. Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

### C. Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Appx. 07623
011576

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 116
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 659 of 921 PageID 12457
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 115 of 161

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

<div align="center">

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF**
**CLASSIFIED CLAIMS AND EQUITY INTERESTS**

</div>

**A.**     **Summary**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B.**     **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

Appx. 07834
011577

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 117
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 660 of 921 PageID 12458
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 116 of 161

**C.** **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D.** **Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E.** **Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F.** **Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G.** **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H.** **Classification and Treatment of Claims and Equity Interests**

    1.    *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

Appx. 07835

011578

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 118
Case 3:25-cv-02072-S    Document 15-14   Filed 06/06/25    Page 661 of 921   PageID 12459
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 117 of 161

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2.    *Class 2 – Frontier Secured Claim*

- *Classification*:  Class 2 consists of the Frontier Secured Claim.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:  (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note.  The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*:  Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3.    *Class 3 – Other Secured Claims*

- *Classification*:  Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*:  Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

Appx. 07836
011579

4.    *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 6

Appx. 07637

011580

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7.    *Class 7 – Convenience Claims*

- *Classification*:  Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*:  Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8.    *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

Appx. 07638

011581

9.      *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10.    *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11.    *Class 11 – Class A Limited Partnership Interests*

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

Appx. 07639

011582

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

## I. <u>Special Provision Governing Unimpaired Claims</u>

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## J. <u>Subordinated Claims</u>

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## <u>MEANS FOR IMPLEMENTATION OF THIS PLAN</u>

## A. <u>Summary</u>

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

Appx 07649

011583

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B.    The Claimant Trust**[2]

1.    _Creation and Governance of the Claimant Trust and Litigation Sub-Trust._

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

---

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

Appx. 07641

011584

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 124
Case 3:25-cv-02072-S    Document 15-14    Filed 06/06/25    Page 667 of 921    PageID 12465
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 123 of 161

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2.    _Claimant Trust Oversight Committee_

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

Appx. 07542
011585

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 125
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 668 of 921 PageID 12466
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 124 of 161

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3.     *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4.     *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5.     *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

Appx. 07543
011586

(i)  the payment of the Claimant Trust Expenses;

(ii)  the payment of other reasonable expenses of the Claimant Trust;

(iii)  the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv)  the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v)  the orderly monetization of the Claimant Trust Assets;

(vi)  litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii)  the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii)  the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix)  the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i)  the payment of other reasonable expenses of the Litigation Sub-Trust;

Appx. 07644

011587

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 127
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 670 of 921 PageID 12468
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 126 of 161

(ii)     the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii)     the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6.     *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7.     *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8.     *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

29

Appx. 07645
011588

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. _Tax Reporting._

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. _Claimant Trust Assets._

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

Appx. 07565

011589

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 129
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 672 of 921    PageID 12470
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 128 of
161

11.    _Claimant Trust Expenses._

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12.    _Trust Distributions to Claimant Trust Beneficiaries._

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, _provided_ that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13.    _Cash Investments._

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; _provided, however,_ that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14.    _Dissolution of the Claimant Trust and Litigation Sub-Trust._

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Claimant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; _provided, however,_ that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and


App. 07647
0T1590

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C.     **The Reorganized Debtor**

### 1.     *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2.     *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3.     *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

Appx. 07648

011591

4.    _Management of the Reorganized Debtor_

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC.  The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee.  The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor.  Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes.  Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5.    _Vesting of Assets in the Reorganized Debtor_

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6.    _Purpose of the Reorganized Debtor_

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7.    _Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets_

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement.  As set forth in the Reorganized Limited Partnership Agreement,

33

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

## D. **Company Action**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

E. **Release of Liens, Claims and Equity Interests**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

F. **Cancellation of Notes, Certificates and Instruments**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

G. **Cancellation of Existing Instruments Governing Security Interests**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

H. **Control Provisions**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

Appx. 07651

0T1394

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 134
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 677 of 921 PageID 12475
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 133 of
161

**I.**      <u>Treatment of Vacant Classes</u>

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**J.**      <u>Plan Documents</u>

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

**K.**      <u>Highland Capital Management, L.P. Retirement Plan and Trust</u>

The Highland Capital Management, L.P. Retirement Plan And Trust ("<u>Pension Plan</u>") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "<u>IRC</u>"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

Appx. 07652
011395

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

Appx 07653

011596

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

### B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order.  Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred.  If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

### C.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment.  Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

Appx. 07654

011597

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 137
Case 3:25-cv-02072-S   Document 15-14   Filed 06/06/25   Page 680 of 921   PageID 12478
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 136 of 161

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     **Dates of Distributions**

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein.  If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan.  Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order.  All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests.  The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

**B.**     **Distribution Agent**

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter.  The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

Appx. 07655
011598

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 138
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 681 of 921 PageID 12479
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 137 of 161

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

C.    **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

D.    **Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

E.    **Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

F.    **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

Appx. 07656



Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 139
Case 3:25-cv-02072-S    Document 15-14    Filed 06/06/25    Page 682 of 921    PageID 12480
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 138 of
161

G.    *De Minimis* **Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

H.    **Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

I.    **General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

J.    **Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

K.    **Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

41



Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

**L.**    **Withholding Taxes**

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**M.**    **Setoffs**

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**N.**    **Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

Appx. 07658
011601

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 141
Case 3:25-cv-02072-S    Document 15-14   Filed 10/06/25    Page 684 of 921    PageID 12482
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 140 of 161

**O.      Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent:  (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

<div align="center">

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

</div>

**A.      Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B.      Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C.      Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

Appx. 07659
011602

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 142
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 685 of 921    PageID 12483
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 141 of 161

**D.** **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1.    *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2.    *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3.    *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

Appx. 07609
0TT603

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 143
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 686 of 921    PageID 12484
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 142 of
161

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

## ARTICLE VIII.
## EFFECTIVENESS OF THIS PLAN

**A.**     **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee.  The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

Appx. 07661
011604

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B.  Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

**C.  Dissolution of the Committee**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on


Appx. 07662

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 145
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 688 of 921    PageID 12486
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21    Entered 02/22/21 16:48:16    Page 144 of
161

the Effective Date or filed and served after the Effective Date pursuant to the Plan.  Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B.    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C.    Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however, the* foregoing


Appx. 07608

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 146
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 689 of 921 PageID 12487
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 145 of
161

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D.**     **Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Appx. 07604
011607

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 147
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 690 of 921   PageID 12488
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 146 of 161

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

**E.**     **Preservation of Rights of Action**

1.     *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

2.     *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,


Appx 07685
011608

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F.**    **Injunction**

     **Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

     **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

     **The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

     **Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

Appx. 07606

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 149
Case 3:25-cv-02072-S  Document 15-14  Filed 10/06/25  Page 692 of 921  PageID 12490
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21  Entered 02/22/21 16:48:16  Page 148 of
161

**(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party;** *provided, however,* **the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

### G.  Duration of Injunctions and Stays

**ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

### H.  Continuance of January 9 Order

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.


### ARTICLE X.
### BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

Appx. 07687

## ARTICLE XI.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided, however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

Appx 07668

0116I1

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

Appx 07689

011612

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A. Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B. Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C. Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

Appx. 07679

011613

**D.**      <u>Obligations Not Changed</u>

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E.**      <u>Entire Agreement</u>

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F.**      <u>Closing of Chapter 11 Case</u>

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**G.**      <u>Successors and Assigns</u>

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H.**      <u>Reservation of Rights</u>

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Appx. 07671

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 154
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 697 of 921 PageID 12495
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 153 of 161

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I.      Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**J.      Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.      Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

> **If to the Claimant Trust:**
>
> Highland Claimant Trust
> c/o Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700

Appx. 07672
011615

Dallas, Texas 75201
Attention: James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Attn: Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz, Esq.
         Ira D. Kharasch, Esq.
         Gregory V. Demo, Esq.

## L. Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

Appx. 07673
011616

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M. Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N. Tax Reporting and Compliance**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O. Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P. Controlling Document**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however,* that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Appx. 07674

011617

Dated:  January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____
    James P. Seery, Jr.
    Chief Executive Officer and Chief Restructuring
    Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Email: jpomerantz@pszjlaw.com
       ikharasch@pszjlaw.com
       gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

Appx. 07675

011618

Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 157 of 161

**Exhibit B**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 159
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 702 of 921 PageID 12500
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 158 of 161

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.

2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)

3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.

4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.

5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.

6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.

7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.

8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)

9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.

10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.

11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.

12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.

13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.

14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)

15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.

16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)

17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.

18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

Appx. 07677
011620

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 160
Case 3:25-cv-02072-S Document 15-14 Filed 06/06/25 Page 703 of 921 PageID 12501
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21 Entered 02/22/21 16:48:16 Page 159 of 161

19.  Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20.  Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21.  Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22.  Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23.  Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24.  Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25.  Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26.  Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27.  Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28.  Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29.  Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30.  Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31.  Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32.  Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33.  Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34.  Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35.  Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

DOCS_NY:42355.1 36027/002

Appx 07678
011621

36.     Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37.     Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38.     Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39.     Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40.     Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41.     Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42.     Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43.     Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44.     Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45.     Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46.     A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47.     A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48.     Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49.     Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50.     Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

DOCS_NY:42355.1 36027/002

Appx. 07679

011622

Case 19-34054-sgj11 Doc 3445-72 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 162
Case 3:25-cv-02072-S    Document 15-14   Filed 10/06/25    Page 705 of 921    PageID 12503
Case 19-34054-sgj11 Doc 1943 Filed 02/22/21   Entered 02/22/21 16:48:16   Page 161 of 161

51.   Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52.   Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53.   Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54.   Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55.   Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56.   Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57.   Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58.   Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59.   Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60.   Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

DOCS_NY:42355.1 36027/002

Appx. 07689

011623

# EXHIBIT 73

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 707 of 921    PageID 12505
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21    Entered 07/09/21 14:46:33    Page 1 of 8

Docket #2541  Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Dugaboy Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**RESPONSE OF DUGABOY INVESTMENT TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Dugaboy Investment Trust ("Dugaboy") and files this response of

Dugaboy Investment Trust to *Order Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered

by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the

"Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating

as follows:

**I.    RESPONSE**

1.    The Court has entered an order requiring Dugaboy to make certain disclosures

relative to its standing in connection with the above captioned matter. The Court has already

1934054210709000000000009

Appx. 07682

011625

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 708 of 921 PageID 12506
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21 Entered 07/09/21 14:46:33 Page 2 of 8

ruled on a number of matters before this Court that Dugaboy has possessed the requisite standing on matters that it has taken a position or filed a support pleading.

2.      Dugaboy is named as a "Related Entity" and is enjoined by the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). *See* Dkt. No. 1811-9 at p. 19. As an enjoined party, Dugaboy has standing to seek relief from the Plan. *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3.      The numerous adversary proceedings in which Dugaboy has been named a party give it standing to participate not just in the adversary proceedings, but in the bankruptcy case itself.

4.      Further, Dugaboy has standing based upon the proofs of claim that it filed in this bankruptcy case. Although the Debtor has challenged Dugaboy's claims, it has the right to assert the claims and participate in these bankruptcy proceedings as a party in interest.

## II.    DISCLOSURES

5.      Dugaboy is a Delaware Trust. As a Trust, it has no owners, rather, beneficiaries and a trustee. Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents. The Trust Agreement is dated October 2010 and it is styled "Trust Agreement between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees."

6.      The Trust has three (3) trustees each with a different function. The Trust creates an Administrative Trustee, a Family Trustee and an Independent Trustee. The initial Trustees were Commonwealth Trust Company as Administrative Trustee, James D. Dondero as Family

Appx. 07583
011626

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 9
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 709 of 921   PageID 12507
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21   Entered 07/09/21 14:46:33   Page 3 of 8

Trustee and Grant Scott as Independent Trust.   The present Independent Trustee is Nancy Dondero, the sister of James D. Dondero.

7.      The Trust Agreement creates three (3) separate trusts under the Dugaboy Investment Trust.  The first is for the benefit of James D. Dondero, the second is for children and the third is for descendants.

8.      The Trust owns an 0.1866% Class A interest in the Debtor and has filed proofs claim numbered 113, 131, and 177.

9.      Proof of Claim No. 177 is an administrative proof of claim for the mismanagement of certain funds by the Debtor.

10.     Proof of Claim No. 113 relates to the Debtor's 2008 tax return, which is currently being audited, which audit may result in the Debtor being liable to its limited partners, including Dugaboy.   Proof of Claim No. 113 also relates to the Debtor's failure to make certain tax distributions to the limited partners, including Dugaboy, from 2004 through 2018. The amount of this claim is uncertain, but Dugaboy has requested certain information from the Debtor in order to calculate a precise amount.   Dugaboy obtained its status as a limited partner in the Debtor through its status as successor-in-interest to the Canis Major Trust.

11.     Lastly, Proof of Claim 131 relates to two Master Securities Lending Agreements that Dugaboy entered into with Highland Select Equity Master Fund in 2014 and 2015. Dugaboy made various loans to Highland Select in the form of 2,015,000 shares of NexPoint Credit Strategies Fund valued at $20,270,900.  Dugaboy made various other loans in 2015.  The Master Securities Lending Agreements were mostly terminated in July 2019.  Pursuant to the Termination of Loan, Select and Dugaboy agreed to terminate the 2015 MSLA and partially

Appx. 07584
011627

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of 9
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 710 of 921   PageID 12508
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21   Entered 07/09/21 14:46:33   Page 4 of 8

terminate the 2014 MSLA such that a large number of the loaned securities remained due and owing to Dugaboy under the Loan Agreements.

12.   From 2015 until the termination of the Loan Agreements in 2019, Select and/or the Debtor made numerous repayments of the securities loaned by Dugaboy. However, a substantial number of the loaned securities have not been repaid and remain outstanding.

13.   As of the Petition Date, Dugaboy has not been repaid the outstanding shares and is owed repayment of the loaned securities or the cash value of the loaned securities, plus accrued interest, in the amount of $12,041,438. A summary of the loan account is attached as Exhibit B to the *Response of the Dugaboy Investment Trust to the Debtor's First Omnibus Objection to Certain Proofs of Claim* [Dkt. No. 1153].

14.   The gist of Dugaboy's claim is premised on the fact that the Debtor was general partner or *de facto* general partner of Highland Select and directed that the loaned funds be used for the sole benefit of the Debtor, thereby obligating the Debtor on the loans.

15.   Objections are pending to each of the proofs of claim that have been filed.

16.   In addition, Dugaboy is the maker of a note held by the Debtor that is the subject of the Creditors' Committee Adversary Proceeding.

July 9, 2021.

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

{00376095-9}                    4

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 711 of 921 PageID 12509
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21 Entered 07/09/21 14:46:33 Page 5 of 8

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*

## **CERTIFICATE OF SERVICE**

I, Douglas S. Draper, counsel for The Dugaboy Investment Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification System as follows:

- David G. Adams     david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen     michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson     aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable     zannable@haywardfirm.com
- Bryan C. Assink     bryan.assink@bondsellis.com
- Asif Attarwala     asif.attarwala@lw.com
- Joseph E. Bain     JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird     baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach     bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette     pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds     john@bondsellis.com
- Matthew Glenn Bouslog     mbouslog@gibsondunn.com
- Larry R. Boyd     lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner     jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy     gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant     dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson     Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello     achiarello@winstead.com
- Shawn M. Christianson     schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke     robbie.clarke@bondsellis.com
- Matthew A. Clemente     mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz     mclontz@spencerfane.com, lvargas@spencerfane.com

Appx. 07686

011629

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 712 of 921    PageID 12510
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21    Entered 07/09/21 14:46:33    Page 6 of 8

- Andrew Clubok    andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Deborah Rose Deitsch-Perez    deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo    gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com, dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com
- Douglas S. Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com

Appx 07587
011630

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 713 of 921    PageID 12511
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21    Entered 07/09/21 14:46:33    Page 7 of 8

- Jeffrey Kurtzman     kurtzman@kurtzmansteady.com
- Phillip L. Lamberson     plamberson@winstead.com
- Lisa L. Lambert     lisa.l.lambert@usdoj.gov
- Michael Justin Lang     mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen     eleen@mkbllp.com
- Paul M. Lopez     bankruptcy@abernathy-law.com
- Faheem A. Mahmooth     mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns     ryan.manns@nortonrosefulbright.com
- Brant C. Martin     brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain     brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer     tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery     pmontgomery@sidley.com,
  txfilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sid
  ley.com
- J. Seth Moore     smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris     jmorris@pszjlaw.com
- Edmon L. Morton     emorton@ycst.com
- Holland N. O'Neil     honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel     rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons     cpersons@sidley.com, txfilingnotice@sidley.com;charles-
  persons-5722@ecf.pacerpro.com
- Louis M. Phillips     louis.phillips@kellyhart.com, june.alcantara-
  davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt     mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz     jpomerantz@pszjlaw.com
- Kimberly A. Posin     kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok     jprostok@forsheyprostok.com,
  jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.co
  m;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece     lreece@pbfcm.com
- Penny Packard Reid     preid@sidley.com, txfilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen     srosen@forsheyprostok.com,
  jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.c
  om;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina     drukavina@munsch.com
- Amanda Melanie Rush     asrush@jonesday.com
- Alyssa Russell     alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti     mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller     douglas.schneller@rimonlaw.com

Appx 07688
011631

Case 19-34054-sgj11 Doc 3445-73 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of 9
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 714 of 921   PageID 12512
Case 19-34054-sgj11 Doc 2541 Filed 07/09/21   Entered 07/09/21 14:46:33   Page 8 of 8

- Michelle E. Shriro     mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich     nskolnekovich@hunton.com,
  astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith     frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund     eric.soderlund@judithwross.com
- Martin A. Sosland     martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler     Laurie.Spindler@lgbs.com, Dora.Casiano-
  Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer     jsundhimer@btlaw.com
- Kesha Tanabe     kesha@tanabelaw.com
- Clay M. Taylor     clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons     bankruptcy@abernathy-law.com
- Dennis M. Twomey     dtwomey@sidley.com
- Basil A. Umari     BUmari@dykema.com, pelliott@dykema.com
- United States Trustee     ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz     artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek     jvasek@munsch.com
- Donna K. Webb     donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber     bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller     dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka     danw@ldsrlaw.com,
  craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com
- Hayley R. Winograd     hwinograd@pszjlaw.com
- Megan Young-John     myoung-john@porterhedges.com


*/s/Douglas S. Draper.*

Appx. 07689

011632

# EXHIBIT 74

Appx 07599

011633

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 716 of 921    PageID 12514
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21    Entered 07/09/21 16:30:37    Page 1 of 9

Docket #2545  Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Dugaboy Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**AMENDED RESPONSE OF DUGABOY INVESTMENT TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Dugaboy Investment Trust ("Dugaboy") and files this response of Dugaboy Investment Trust to *Order Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

## I.    RESPONSE

1.    The Court has entered an order requiring Dugaboy to make certain disclosures relative to its standing in connection with the above captioned matter. The Court has already



1934054210709000000000013

Appx. 07591

011634

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 717 of 921 PageID 12515
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 2 of 9

ruled on a number of matters before this Court that Dugaboy has possessed the requisite standing on matters that it has taken a position or filed a support pleading.

2. Dugaboy is named as a "Related Entity" and is enjoined by the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). *See* Dkt. No. 1811-9 at p. 19. As an enjoined party, Dugaboy has standing to seek relief from the Plan. *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3. Dugaboy is a named defendant in the matter styled *Official Committee of Unsecured Creditors vs. CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., The Dugaboy Investment Trust, Grant James Scott III in his individual capacity, as Trustee of The Dugaboy Investment Trust, and as Trustee of The Get Good Nonexempt Trust, and James D. Dondero* (Case No. 20-03195) and has been advised that it will be added as a defendant in an additional adversary proceeding to be filed going forward. In the adversary proceeding where Dugaboy is named as a defendant the standing of Dugaboy is not at issue. What will be at issue in those cases is whether Dugaboy should be a named party and whether the Plaintiff in those cases has asserted a recognizable cause of action against Dugaboy.

4. Further, Dugaboy has standing based upon the proofs of claim that it filed in this bankruptcy case. Although the Debtor has challenged Dugaboy's claims, it has the right to assert the claims and participate in these bankruptcy proceedings as a party in interest.

Appx. 07692
011635

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 718 of 921 PageID 12516
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 3 of 9

## II. DISCLOSURES

5. Dugaboy is a Delaware Trust. As a Trust, it has no owners, rather, beneficiaries and a trustee. Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents. The Trust Agreement is dated October 2010 and it is styled "Trust Agreement between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees."

6. The Trust has three (3) trustees each with a different function. The Trust creates an Administrative Trustee, a Family Trustee and an Independent Trustee. The initial Trustees were Commonwealth Trust Company as Administrative Trustee, James D. Dondero as Family Trustee and Grant Scott as Independent Trust. The present Independent Trustee is Nancy Dondero, the sister of James D. Dondero.

7. The Trust Agreement creates three (3) separate trusts under the Dugaboy Investment Trust. The first is for the benefit of James D. Dondero, the second is for children and the third is for descendants.

8. The Trust owns an 0.1866% Class A interest in the Debtor and has filed proofs claim numbered 113, 131, and 177.

9. Proof of Claim No. 177 is an administrative proof of claim for the mismanagement of certain funds by the Debtor.

10. Proof of Claim No. 113 relates to the Debtor's 2008 tax return, which is currently being audited, which audit may result in the Debtor being liable to its limited partners, including Dugaboy. Proof of Claim No. 113 also relates to the Debtor's failure to make certain tax distributions to the limited partners, including Dugaboy, from 2004 through 2018. The amount of this claim is uncertain, but Dugaboy has requested certain information from the Debtor in order

Appx. 07593
011636

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 5 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 719 of 921    PageID 12517
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21   Entered 07/09/21 16:30:37   Page 4 of 9

to calculate a precise amount.  Dugaboy obtained its status as a limited partner in the Debtor through its status as successor-in-interest to the Canis Major Trust.

11.     Lastly, Proof of Claim 131 relates to two Master Securities Lending Agreements that Dugaboy entered into with Highland Select Equity Master Fund in 2014 and 2015. Dugaboy made various loans to Highland Select in the form of 2,015,000 shares of NexPoint Credit Strategies Fund valued at $20,270,900.  Dugaboy made various other loans in 2015.  The Master Securities Lending Agreements were mostly terminated in July 2019.  Pursuant to the Termination of Loan, Select and Dugaboy agreed to terminate the 2015 MSLA and partially terminate the 2014 MSLA such that a large number of the loaned securities remained due and owing to Dugaboy under the Loan Agreements.

12.     From 2015 until the termination of the Loan Agreements in 2019, Select and/or the Debtor made numerous repayments of the securities loaned by Dugaboy. However, a substantial number of the loaned securities have not been repaid and remain outstanding.

13.     As of the Petition Date, Dugaboy has not been repaid the outstanding shares and is owed repayment of the loaned securities or the cash value of the loaned securities, plus accrued interest, in the amount of $12,041,438. A summary of the loan account is attached as Exhibit B to the *Response of the Dugaboy Investment Trust to the Debtor's First Omnibus Objection to Certain Proofs of Claim* [Dkt. No. 1153].

14.     The gist of Dugaboy's claim is premised on the fact that the Debtor was general partner or *de facto* general partner of Highland Select and directed that the loaned funds be used for the sole benefit of the Debtor, thereby obligating the Debtor on the loans.

15.     Objections are pending to each of the proofs of claim that have been filed.

Appx. 07594
011637

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 720 of 921 PageID 12518
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 5 of 9

16. In addition, Dugaboy is the maker of a note held by the Debtor that is the subject of the Creditors' Committee Adversary Proceeding.

July 9, 2021.

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for The Dugaboy Investment Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification System as follows:

- David G. Adams     david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen     michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson     aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable     zannable@haywardfirm.com
- Bryan C. Assink     bryan.assink@bondsellis.com
- Asif Attarwala     asif.attarwala@lw.com
- Joseph E. Bain     JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird     baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach     bankfilings@ycst.com, sbeach@ycst.com

Appx. 07695

011638

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 721 of 921    PageID 12519
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21    Entered 07/09/21 16:30:37    Page 6 of 9

- Paul Richard Bessette      pbessette@KSLAW.com,
  ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com
  ;rmatsumura@kslaw.com
- John Y. Bonds      john@bondsellis.com
- Matthew Glenn Bouslog      mbouslog@gibsondunn.com
- Larry R. Boyd      lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner      jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy      gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant      dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson      Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello      achiarello@winstead.com
- Shawn M. Christianson      schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke      robbie.clarke@bondsellis.com
- Matthew A. Clemente      mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz      mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok      andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com;ny-
  courtmail@lw.com
- Leslie A. Collins      lcollins@hellerdraper.com
- David Grant Crooks      dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Deborah Rose Deitsch-Perez      deborah.deitschperez@stinson.com,
  patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo      gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com;lsc@pszjlaw.com
- Casey William Doherty      casey.doherty@dentons.com,
  dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dento
  ns.com
- Douglas S. Draper      ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbro
  uphy@hellerdraper.com
- Lauren Kessler Drawhorn      lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver      Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright      jenright@winstead.com
- Robert Joel Feinstein      rfeinstein@pszjlaw.com
- Matthew Gold      courts@argopartners.net
- Bojan Guzina      bguzina@sidley.com

Appx 07586

011639

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 722 of 921 PageID 12520
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21 Entered 07/09/21 16:30:37 Page 7 of 9

- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;mary-
  beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.co
  m;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Michael Justin Lang    mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txefilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sid
  ley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txefilingnotice@sidley.com;charles-
  persons-5722@ecf.pacerpro.com

Appx 07687
011640

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 9 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 723 of 921   PageID 12521
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21   Entered 07/09/21 16:30:37   Page 8 of 9

- Louis M. Phillips    louis.phillips@kellyhart.com, june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com, jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com, jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti    mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Clay M. Taylor    clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek    jvasek@munsch.com
- Donna K. Webb    donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@ldsrlaw.com, craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com

Appx. 07698

011641

Case 19-34054-sgj11 Doc 3445-74 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 724 of 921    PageID 12522
Case 19-34054-sgj11 Doc 2545 Filed 07/09/21    Entered 07/09/21 16:30:37    Page 9 of 9

- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

Appx 07699
011642

# EXHIBIT 75

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 726 of 921    PageID 12524
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 1 of 7

Docket #2542  Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Get Good Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**RESPONSE OF GET GOOD TRUST**
**TO ORDER REQUIRING DISCLOSURES**

COMES NOW Get Good Trust and files this response of Get Good Trust to *Order*

*Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above

styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital

Management, L.P. (the "Debtor"), respectfully stating as follows:

**I.    RESPONSE**

1.    The Court has entered an order requiring Get Good Trust to make certain

disclosures relative to its standing in connection with the above captioned matter.  The Court has

already ruled on a number of matters before this Court that Get Good Trust has possessed the

requisite standing on matters that it has taken a position or filed a support pleading.

1934054210709000000000010

Appx. 0771

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 727 of 921    PageID 12525
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 2 of 7

2.      The Get Good Trust is actually three different trust, the Get Good Trust, The Get Good Non Exempt Trust No. 1, and the Get Good Non Exempt Trust No. 2 (together, the "Trusts"). The Trusts are all named as "Related Entities" which are enjoined by Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). *See* Dkt. No. 1811-9 at p. 19. As enjoined parties, the Trusts have standing to seek relief from the Plan. *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3.      The numerous adversary proceedings in which Get Good Trust has been named a party give it standing to participate not just in the adversary proceedings, but in the bankruptcy case itself.

4.      Further, Trusts have standing based upon the proofs of claim that they have filed in this bankruptcy case. Although the Debtor has challenged the Trusts' claims, they have the right to assert the claims and participate in these bankruptcy proceedings as parties in interest.

## II.      DISCLOSURES

5.      Get Good Trust is a **Delaware** Trust. As a Trust, it has no owners, rather, beneficiaries and a trustee. Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents. The inception of the Trust was in 2001 and Jim Dondero is the settlor of the Trust and Grant Scott is the Trustee. Grant Scott is the current Trustee. The Trust has two parts within the Trust which are designated as Part A and Part B. One part is designated as exempt and the other non exempt. Both Part A and Part B were created under the 2001 Trust Document executed by Scott as Trustee and Dondero as Settlor.

Appx. 07702
011645

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 728 of 921 PageID 12526
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21 Entered 07/09/21 14:48:13 Page 3 of 7

6.      Ultimate beneficiaries of the Get Good Trust are the Children and Descendants of Jim Dondero.

7.      A search of the KCC site for proofs of claim in this case reveals that Get Good and Get Good Non Exempt Trusts 1 and 2 have filed proofs of claim. The claims are numbered 120 (the Get Good Trust), 128 (Get Good Non Exempt Trust 1) and 129 (Get Good Non Exempt Trust 2).  The claims are based upon and audit of the Debtor's 2008 tax return, which audit may result in the Debtor being liable to its limited partners, including the three Get Good Trusts.  The Claims also relate to the Debtor's failure to make tax distributions for the period 2004 through 2018.

.

July 9, 2021.

                                        Respectfully submitted,

                                        /s/Douglas S. Draper.
                                        Douglas S. Draper, La. Bar No. 5073
                                        ddraper@hellerdraper.com
                                        Leslie A. Collins, La. Bar No. 14891
                                        lcollins@hellerdraper.com
                                        Greta M. Brouphy, La. Bar No. 26216
                                        gbrouphy@hellerdraper.com
                                        Michael E. Landis, La. Bar No. 36542
                                        mlandis@hellerdraper.com

                                        Heller, Draper & Horn, L.L.C.
                                        650 Poydras Street, Suite 2500
                                        New Orleans, LA  70130
                                        Telephone: (504) 299-3300
                                        Fax: (504) 299-3399
                                        *Attorneys for Get Good Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for Get Good Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification

Appx. 07703
011646

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 729 of 921    PageID 12527
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 4 of 7

System as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com
- Matthew Glenn Bouslog    mbouslog@gibsondunn.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-courtmail@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Deborah Rose Deitsch-Perez    deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo    gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com;lsc@pszjlaw.com

Appx 07704

011647

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of 8
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 730 of 921   PageID 12528
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21   Entered 07/09/21 14:48:13   Page 5 of 7

- Casey William Doherty    casey.doherty@dentons.com, dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dentons.com
- Douglas S. Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Michael Justin Lang    mlang@cwl.law, nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com, robert.jones@hklaw.com;brian.smith@hklaw.com

Appx. 07705
011648

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 731 of 921    PageID 12529
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21    Entered 07/09/21 14:48:13    Page 6 of 7

- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txefilingnotice@sidley.com;charles-persons-5722@ecf.pacerpro.com
- Louis M. Phillips    louis.phillips@kellyhart.com, june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com, jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com, jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti    mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com

Appx. 07706
011649

Case 19-34054-sgj11 Doc 3445-75 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 732 of 921 PageID 12530
Case 19-34054-sgj11 Doc 2542 Filed 07/09/21 Entered 07/09/21 14:48:13 Page 7 of 7

- Kesha Tanabe     kesha@tanabelaw.com
- Clay M. Taylor     clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons     bankruptcy@abernathy-law.com
- Dennis M. Twomey     dtwomey@sidley.com
- Basil A. Umari     BUmari@dykema.com, pelliott@dykema.com
- United States Trustee     ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz     artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek     jvasek@munsch.com
- Donna K. Webb     donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber     bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller     dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka     danw@ldsrlaw.com,
  craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com
- Hayley R. Winograd     hwinograd@pszjlaw.com
- Megan Young-John     myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

Appx 07767

011650

# EXHIBIT 76

Appx 07708

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 2 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 734 of 921    PageID 12532
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21   Entered 07/09/21 16:31:32   Page 1 of 7

Docket #2546 Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Get Good Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**AMENDED RESPONSE OF GET GOOD TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Get Good Trust and files this response of Get Good Trust to *Order
Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above
styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital
Management, L.P. (the "Debtor"), respectfully stating as follows:

## I.      RESPONSE

1.      The Court has entered an order requiring Get Good Trust to make certain
disclosures relative to its standing in connection with the above captioned matter.  The Court has
already ruled on a number of matters before this Court that Get Good Trust has possessed the
requisite standing on matters that it has taken a position or filed a support pleading.

1934054210709000000000014
Appx. 07709
011652

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 735 of 921 PageID 12533
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21 Entered 07/09/21 16:31:32 Page 2 of 7

2. The Get Good Trust is actually three different trust, the Get Good Trust, The Get Good Non Exempt Trust No. 1, and the Get Good Non Exempt Trust No. 2 (together, the "Trusts"). The Trusts are all named as "Related Entities" which are enjoined by Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). *See* Dkt. No. 1811-9 at p. 19. As enjoined parties, the Trusts have standing to seek relief from the Plan. *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3. Get Good Trust is a named defendant in the matter styled *Official Committee of Unsecured Creditors vs. CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., The Dugaboy Investment Trust, Grant James Scott III in his individual capacity, as Trustee of The Dugaboy Investment Trust, and as Trustee of The Get Good Nonexempt Trust, and James D. Dondero* (Case No. 20-03195). In the adversary proceeding where Get Good Trust is named as a defendant, the standing of Get Good Trust is not at issue. The suit challenges a transfer of a note by Get Good to the Debtor for certain assets and then the transfer of the acquired assets to other parties.

4. Further, Trusts have standing based upon the proofs of claim that they have filed in this bankruptcy case. Although the Debtor has challenged the Trusts' claims, they have the right to assert the claims and participate in these bankruptcy proceedings as parties in interest.

## II. DISCLOSURES

5. Get Good Trust is a **Delaware** Trust. As a Trust, it has no owners, rather, beneficiaries and a trustee. Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents. The inception of the Trust was in 2001 and Jim

Appx 07719
011653

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 8
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 736 of 921   PageID 12534
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21   Entered 07/09/21 16:31:32   Page 3 of 7

Dondero is the settlor of the Trust and Grant Scott is the Trustee.   Grant Scott is the current Trustee.   The Trust has two parts within the Trust which are designated as Part A and Part B. One part is designated as exempt and the other non exempt.  Both Part A and Part B were created under the 2001 Trust Document executed by Scott as Trustee and Dondero as Settlor.

6.      Ultimate beneficiaries of the Get Good Trust are the Children and Descendants of Jim Dondero.

7.      A search of the KCC site for proofs of claim in this case reveals that Get Good and Get Good Non Exempt Trusts 1 and 2 have filed proofs of claim. The claims are numbered 120 (the Get Good Trust), 128 (Get Good Non Exempt Trust 1) and 129 (Get Good Non Exempt Trust 2).  The claims are based upon and audit of the Debtor's 2008 tax return, which audit may result in the Debtor being liable to its limited partners, including the three Get Good Trusts.  The Claims also relate to the Debtor's failure to make tax distributions for the period 2004 through 2018.

July 9, 2021.

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300

Appx. 9754

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 737 of 921    PageID 12535
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21    Entered 07/09/21 16:31:32    Page 4 of 7

Fax: (504) 299-3399
*Attorneys for Get Good Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for Get Good Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification System as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com
- Matthew Glenn Bouslog    mbouslog@gibsondunn.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com;ny-courtmail@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com

Appx. 07712
011655

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 738 of 921    PageID 12536
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21    Entered 07/09/21 16:31:32    Page 5 of 7

- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Deborah Rose Deitsch-Perez    deborah.deitschperez@stinson.com,
  patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com;lsc@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dento
  ns.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbro
  uphy@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;mary-
  beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.co
  m;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov

Appx. 07713
011656

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 8
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 739 of 921    PageID 12537
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21    Entered 07/09/21 16:31:32    Page 6 of 7

- Michael Justin Lang    mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txfilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txfilingnotice@sidley.com;charles-
  persons-5722@ecf.pacerpro.com
- Louis M. Phillips    louis.phillips@kellyhart.com, june.alcantara-
  davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com,
  jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txfilingnotice@sidley.com;penny-reid-
  4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com,
  jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti    mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Michelle E. Shriro    mshriro@singerlevick.com,
  scotton@singerlevick.com;tguillory@singerlevick.com

Appx. 07714
011657

Case 19-34054-sgj11 Doc 3445-76 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 8
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 740 of 921 PageID 12538
Case 19-34054-sgj11 Doc 2546 Filed 07/09/21 Entered 07/09/21 16:31:32 Page 7 of 7

- Nicole Skolnekovich    nskolnekovich@hunton.com,
  astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith    frances.smith@judithwross.com,
  michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com,
  ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-
  Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Clay M. Taylor    clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek    jvasek@munsch.com
- Donna K. Webb    donna.webb@usdoj.gov,
  brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-
  perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@ldsrlaw.com,
  craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

Appx. 07715
011658

# EXHIBIT 77

011659

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 742 of 921 PageID 12540
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21 Entered 07/09/21 15:40:59 Page 1 of 8

Docket #2543 Date Filed: 07/09/2021

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR NEXPOINT ADVISORS, L.P. AND
HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

### RESPONSE OF THE ADVISORS TO ORDER REQUIRING DISCLOSURES

COME NOW NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA," with NexPoint, the "Advisors"), and file this their *Response to Order Requiring Disclosures* (the "Order"), entered by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

### I. THE ADVISORS HAVE CLEAR STANDING

1.       The Court appears to question the standing of the Advisors with respect to past, present, and potentially future actions.  The Court also appears to believe that the Advisors "frequently file lengthy and contentious pleadings," while the mere fact of the Order implies that the Advisors have been opaque regarding their ownership and control.  Respectfully, any concerns along these lines are not warranted.

RESPONSE OF THE ADVISORS TO ORDER REQUIRING DISCLOSU



1934054210709000000000011

Appx. 07715
011660

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 743 of 921 PageID 12541
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21 Entered 07/09/21 15:40:59 Page 2 of 8

2.      First, the Advisors are expressly named as parties enjoined by the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan"). "Enjoined Parties" under the Plan is defined as including any "Related Entity." Plan at p. 8. "Related Entity" includes "affiliates" of the Debtor and any entity on the "Related Entity List." Plan at p. 14. This list is filed as a Plan Supplement, *see* Plan at p. 14, and it includes both Advisors. *See* Docket No. 1811-9 at pp. 9 and 12.

3.      As the Advisors are both subject to the Plan's injunctions, the Advisors have unquestionable standing to seek relief from the Plan, including objecting to the Plan, appealing the Plan, and seeking to stay the Plan. *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party ha[s] standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation"). Thus, even if the Advisors did not have a direct economic interest under the Plan—a point on which the Court focused—the fact that the Plan enjoined them and took from them the rights they otherwise had conferred standing. As the Advisors informed the Court, if they were not being enjoined under the Plan from advising their clients to take certain actions, or causing their clients to take certain actions, which they believed to be necessary and proper pursuant to their own fiduciary duties, and if the Plan was not exculpating various persons, including of their fiduciary duties to the Advisors and their clients, then the Advisors would not have contested the Plan. The Plan need not have enjoined the Advisors or provided broad exculpations, but it did, and the Advisors should not be faulted for contesting and continuing to contest the Plan.

4.      Next, the Debtor has filed four adversary proceedings against the Advisors. It was the Debtor who filed these, and sought preliminary injunctive relief and mandatory final injunctions. The Advisors have reasonably and lawfully *defended* themselves against the Debtor's claims and causes of action. That is not vexatiousness of any kind.

---

011661

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 744 of 921 PageID 12542
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21 Entered 07/09/21 15:40:59 Page 3 of 8

5.      On January 6, 2021, the Debtor filed a complaint against the Advisors and others, thereby initiating Adversary Proceeding No. 21-03000.  The Debtor alleged that the Advisors and others tortiously interfered with contracts and violated the automatic stay, and the Debtor sought a preliminary injunction preventing the Advisors and others from seeking to remove the Debtor as the manager of various third-party CLOs.  The Advisors agreed to a continuing temporary restraining order and the matter has been settled, subject to an imminent 9019, with the Debtor dismissing with prejudice all of its claims against the Advisors and the Advisors agreeing that they are controlled by Mr. Dondero—something they have always admitted.  That the Debtor is dismissing these claims without any settlement payment demonstrates that these claims were always baseless.  The Advisors had the right and standing to defend themselves and the interests of their clients, and they acted reasonably throughout.

6.      Next, the Debtor filed separate adversary proceedings against each of the Advisors, seeking monetary damages for amounts allegedly owing under promissory notes.  On January 22, 2021, the Debtor filed its complaint against HCMFA, thereby initiating Adversary Proceeding No. 21-03004, seeking damages of at least $7,687,653.07 under alleged promissory notes.  Also on January 22, 2021, the Debtor filed its complaint against NexPoint, thereby initiating Adversary Proceeding No. 21-03005, seeking damages of at least $23,071,195.03.  The Advisors deny any liability and have asserted various affirmative defenses.  The Advisors have the right and standing to defend themselves, and have been so doing.  The Court recently agreed that the reference for these adversary proceedings will have to be withdrawn, over the Debtor's objection.  The Advisors will note that the Debtor argued that this Court could try these promissory note suits under section 542 of the Bankruptcy Code, a proposition rejected by this Court on multiple occasions before and by most of the case law.  It was the Debtor that forced a contested hearing on what should have been, respectfully, an obvious issue and an obvious conclusion.

RESPONSE OF THE ADVISORS TO ORDER REQUIRING DISCLOSURES—Page 3

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 745 of 921    PageID 12543
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21    Entered 07/09/21 15:40:59    Page 4 of 8

7.      Next, the Debtor filed a fourth adversary proceeding against the Advisors, seeking unspecified contract damages but, more importantly, seeking an exotic, if not unprecedented, mandatory injunction.  The Debtor filed this Complaint on February 17, 2021, thereby initiating Adversary Proceeding No. 21-03010.  The Debtor convinced the Court of an emergency, and an emergency, all-day trial was held on the mandatory injunction action on six days' notice.  Even though it was reasonably clear to the Debtor that there was no issue and any issue was moot, the Debtor proceeded with its case, at the conclusion of which the Court denied the injunction as moot.  The Advisors had every right and standing to contest this action, and they were proven right.  It was the Debtor that chose to force an all-day hearing on an issue that never existed, never was an emergency, and was moot even under the Debtor's allegations.

8.      Separately, as the Court noted in the Order, the Advisors have filed an application for allowance of administrative claims of approximately $14 million, resulting from postpetition overpayments under shared service agreements between the Advisors and the Debtor.  *See* Docket No. 1826.  The Advisors' points and arguments are simple: the Debtor billed the Advisors for many employees under shared services agreements, who were actually no longer employed by the Debtor and could not have been providing the Advisors with any services, while the Advisors paid for these services without return value and in violation of the contracts.  The Debtor contests the allowance of these claims and the Court will decide the claims in due course.  The Advisors have the right and standing to prosecute these administrative claims, which claims are neither absurd, baseless, nor without *prima facie* evidence.

9.      Finally, NexPoint has acquired the prepetition (and potentially postpetition) claims of various former employees of the Debtor, who are now employed by NexPoint or by a staffing company engaged by NexPoint.  These employees are: Bhawika Jain, Michael Beispiel, Sang Kook (Michael) Jeong, Phoebe Stewart, and Sahan Abayaratha.  *See* Docket Nos. 2044, 2045,

Appx. 07720
011663

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 746 of 921 PageID 12544
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21 Entered 07/09/21 15:40:59 Page 5 of 8

2046, 2047, and 2266. The amount of these employees' claims is not yet known, and remains subject to ongoing discovery. While the Debtor has objected to these employee claims, *see* Docket No. 2059, that objection has yet to be sustained. And, while the details are not clear to NexPoint, at least for Plan voting purposes the Court estimated the claims of these employees at $1 each. In any event, as the holder of prepetition claims, which have yet to be disallowed, NexPoint has full standing in the Bankruptcy Case the same as any creditor. And, since even the Court estimated these claims at *some* amount, the claims are neither absurd, baseless, nor without *prima facie* evidence.

10.     As defendants in four lawsuits, it cannot be suggested that the Advisors lacked standing to defend themselves. As parties subject to this Court's permanent injunctions, they have the standing to contest those injunctions. As counterparties to executory contracts with the Debtor, which were only terminated at the end of February, 2021, the Advisors were also "parties-in-interest" in the Bankruptcy Case, separate and apart from being creditors. *See, e.g., In re Suffolk Reg'l Off-Track Betting Corp.*, 426 B.R. 397 (Bankr. E.D.N.Y. 2011). As a "party-in-interest," the Advisors "may raise and may appear and be heard on any issue in a case under this chapter," at least until the rejection of the shared services agreements. 11 U.S.C. § 1109(b). As unsecured and as postpetition administrative creditors—with claims that have not been disallowed or paid— the Advisors have full standing for all matters in the Bankruptcy Case due to their unsatisfied pecuniary interests. *See, e.g., In re Mandel*, 2016 U.S. App. LEXIS 4274 (5th Cir. 2016) (holding that pecuniary interest confers bankruptcy standing); *In re Gulley*, 436 B.R. 878, 892 (Bankr. N.D. Tex. 2010) ("a mortgage servicer has standing to participate in a debtor's bankruptcy case by virtue of its pecuniary interest in collecting payments under the terms of a note").

11.     The Court was correct in previously holding that the Advisors had standing, and there is no legal or factual ground to reconsider that ruling. Furthermore, the interests of the

Appx. 07521
011664

Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 747 of 921    PageID 12545
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21    Entered 07/09/21 15:40:59    Page 6 of 8

Advisors are different from various of the other entities affiliated with Mr. Dondero. As the Court knows, the Advisors are fiduciaries to many third-party clients. The injunctions on the Advisors place the Advisors in a difficult position that other entities affiliated with Mr. Dondero do not have. The Advisors' postpetition claims are based on executory contracts under which they paid tens of millions of dollars to the Debtor—something that other entities affiliated with Mr. Dondero did not do. The Advisors' prepetition claims are based on claims acquired from former employees, something that is categorically different from the claims of other entitles affiliated with Mr. Dondero. Other than on plan related matters, the Advisors do not believe that there are at present, or are likely to be in the future, contested matters and motion practice that would be suitable for combined pleadings with other entities affiliated with Mr. Dondero, and the Advisors would object to any such proposal or requirement.[1]

## II.    **DISCLOSURES**

HCMFA is owned by the following:

(i)  Strand Advisors XVI, Inc., general partner with a 1% interest;
(ii)  Highland Capital Management Services, Inc., limited partner with a 89.6667% interest; and
(iii) Okada Family Revocable Trust, limited partner with a 9.3333% interest.

HCMFA is managed by its general partner, Strand Advisors XVI, Inc., which is managed by the following:

(i)  James Dondero, Director
(ii)  Dustin Norris, Executive Vice President
(iii) Frank Waterhouse, Treasurer
(iv)  Will Mabry, Assistant Treasurer
(v)  Stephanie Vitiello, Secretary
(vi) Jason Post, Chief Compliance Officer/Anti-Money Laundering Officer

---

[1]    Finally, and respectfully, the Advisors would note the seeming inequity in requiring detailed disclosures from the Advisors, implying that the Advisors had acted inappropriately, while apparently relieving the Debtor of its obligations (or not enforcing those obligations) under Bankruptcy Rule 2015.3 regarding tens or hundreds of millions of dollars of indirect value in the estate at the same hearing. Just as the Debtor forced contested hearings against the Advisors (losing several), yet labeled the Advisors "vexatious" and "Dondero Tentacles," so too the Court appears to be applying a different standard of disclosure to the Advisors than to the Debtor



Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 748 of 921 PageID 12546
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21 Entered 07/09/21 15:40:59 Page 7 of 8

Strand Advisors XVI, Inc. is owned 100% by James Dondero.

Highland Capital Management Services, Inc. is owned 75% by James Dondero and 25% by Mark Okada.

Highland Capital Management Services, Inc. is managed by the following:

(i) James Dondero, Director
(ii) James Dondero, President
(iii) Scott Ellington, Secretary
(iv) Frank Waterhouse, Treasurer

It is not known who is interested in the Okada Family Revocable Trust, but it is not believed to be James Dondero or any of his family and is believed instead to me Mr. Mark Okada and his family members.

HCMFA is a postpetition creditor of the Debtor, holding an administrative claim together with NexPoint in the combined amount of approximately $14 million, which amount has not been broken down between HCHFA and NexPoint, pending discovery. The claim has been objected to and neither allowed nor disallowed as of this filing.

HCMFA is not a prepetition creditor of the Debtor.

NexPoint is owned by the following:

(i) NexPoint Advisors GP, LLC, general partner with 1% ownership; and
(ii) The Dugaboy Investment Trust, limited partner with 99% ownership.

NexPoint is managed by its general partner, NexPoint Advisors GP, LLC, which is managed by the following:

(i) James Dondero, Member
(ii) James Dondero, President
(iii) Dustin Norris, Executive Vice President
(iv) Frank Waterhouse, Treasurer
(v) Will Mabry, Assistant Treasurer
(vi) Stephanie Vitello, Secretary
(vii) D.C. Sauter, General Counsel
(viii) Jason Post, Chief Compliance Officer/Anti-Money Laundering Officer

NexPoint Advisors GP, LLC is owned 100% by James Dondero.

The Dugaboy Investment Trust is affiliated with Mr. Dondero and, as it will be filing its own disclosure pursuant to the Order, the Advisors would respectfully refer the Court to said disclosure.

NexPoint is a postpetition creditor of the Debtor, holding an administrative claim together with HCMFA in the combined amount of approximately $14 million, which amount has not been



Case 19-34054-sgj11 Doc 3445-77 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 749 of 921 PageID 12547
Case 19-34054-sgj11 Doc 2543 Filed 07/09/21 Entered 07/09/21 15:40:59 Page 8 of 8

broken down between HCHFA and NexPoint, pending discovery. The claim has been objected to and neither allowed nor disallowed as of this filing.

NexPoint is a prepetition creditor of the Debtor by virtue of having acquired five (5) former employee claims, as identified above. The amount of these claims is not known, as this depends, in part, on certain "award letters" issued by the Debtor that have not been produced in discovery yet, pending confirmation from the employees that the same may be released to NexPoint. The claims have been objected to and neither allowed nor disallowed as of this filing.

RESPECTFULLY SUBMITTED this 9th day of July, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
   Davor Rukavina, Esq.
   Texas Bar No. 24030781
   Julian P. Vasek, Esq.
   Texas Bar No. 24070790
   3800 Ross Tower
   500 N. Akard Street
   Dallas, Texas 75201-6659
   Telephone: (214) 855-7500
   Facsimile: (214) 855-7584
   Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. AND NEXPOINT ADVISORS, L.P.**

Appx 07721
011667

# EXHIBIT 78

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 751 of 921 PageID 12549
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21 Entered 07/09/21 15:54:20 Page 1 of 7

Docket #2544 Date Filed: 07/09/2021

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NREP, HCMS, NREC,**
**THE REAL ESTATE ADVISORS, NMCT,**
**NREF, NXRT, NHT, AND VB (AS DEFINED BELOW)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |

## NOTICE AND DISCLOSURE OF NEXPOINT RE
## ENTITIES AND HIGHLAND CAPITAL MANAGEMENT SERVICES INC.
## IN RESPONSE TO COURT'S SUA SPONTE ORDER REQUIRING DISCLOSURES

NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP"), NexPoint Real Estate Capital, LLC ("NREC"), NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P. (collectively, the "Real Estate Advisors"), NexPoint Real Estate Finance Inc. ("NREF"), NexPoint Residential Trust, Inc. ("NXRT"), NexPoint Hospitality Trust ("NHT"), NexPoint Multifamily Capital Trust, Inc. ("NMCT"), VineBrook Homes, Trust, Inc. ("VB"), and Highland Capital Management Services, Inc. ("HCMS"), by and through their undersigned counsel, make the following disclosures (the

---

**NOTICE AND DISCLOSURE UNDER COURT'S SUA SPONTE ORDER REQUIR**

1934054210709000000000012

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 752 of 921 PageID 12550
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21 Entered 07/09/21 15:54:20 Page 2 of 7

"Disclosures") as required by this Court's June 18, 2021 *Order Requiring Disclosures* [Dkt. No.

2460] (the "Order").

## I. DISCLOSURES

**A.** **NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC.**

    **1.** **NREP ownership, officers, directors, managers, and/or trustees.**

| Owners | Type | % | Manager | Officers |
|---|---|---|---|---|
| The Dugaboy Investment Trust | Member | 70 | James Dondero | Matt McGraner – Vice President  Scott Ellington – Secretary |
| Highland Capital Management Real Estate Holdings I, LLC | Member | 25 | | |
| Highland Capital Management Real Estate Holdings II, LLC | Member | 5 | | |

    **2.** **NREP ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

The Dugaboy Investment Trust owns a 70% interest in NREP.

    **3.** **NREP's status as creditor of the Debtor.**

NREP timely filed a proof of claim against the Debtor's estate on April 8, 2020. [Proof of

Claim No. 146]. The Debtor objected to the NREP Proof of Claim through its First Omnibus

Objection [Dkt. No. 906]. On October 19, 2020, NREP filed its Response, asserting a claim against

the Debtor because the SE Multifamily Holdings LLC company agreement improperly allocates

the ownership percentages of the members due to mutual mistake, lack of consideration, and/or

failure of consideration and seeking to reform, rescind, and/or modify the company agreements

(the "Contested Matter"). [Dkt. No. 1212]. The Contested Matter is not yet resolved; however, the

result of a finding in favor of NREP will result in the modification of the SE Multifamily Holdings,

LLC company agreement, not a setoff against the Debtor's estate. [1]

---

[1]   The Debtor filed a Motion to Compel Disqualify Wick Phillips Gould & Martin ("WPGM") from representing NREP in the contested matter only. [Dkt. No. 2196]. Wick Phillips disputes the Debtor's allegations in the Motion for the reasons set forth in Wick Phillips' Response and Brief in Opposition [Dkt. Nos. 2278, 2279]. The hearing on the Debtor's Motion is currently set for October 25, 2021. [Dkt. No. 2361].

---

Appx. 07737

011670

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 753 of 921 PageID 12551
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21 Entered 07/09/21 15:54:20 Page 3 of 7

The Debtor also initiated an adversary proceeding, Adversary No. 21-03007, against NREP based on certain demand and promissory notes. NREP filed its First Amended Answer to the Debtor's Complaint on June 11, 2021. [Dkt. No. 34]. In addition, NREP filed a Motion to Withdraw the Reference and Brief in Support on June 3, 2021. [Dkt. Nos. 20, 21]. A status conference on the Motion to Withdraw the Reference was held on July 8, 2021. [Dkt. No. 30].

**B.     Highland Capital Management Services, Inc.**

**1.     HCMS ownership, officers, directors, managers, and/or trustees.**

| Owners | Type | % | Director | Officers |
|--------|------|---|----------|----------|
| James Dondero | Shareholder | 75 | James Dondero | James Dondero – President |
| Mark Okada | Shareholder | 25 | | Scott Ellington – Secretary <br> Frank Waterhouse – Treasurer |

**2.     HCMS ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

Mr. Dondero owns 75% of the direct ownership interest in HCMS.

**3.     HCMS' Status as creditor of the Debtor.**

HCMS timely filed two proofs of claim against the Debtor's estate on April 23, 2020 [Proofs of Claim Nos. 175, 176]; however, such claims were expunged on October 20, 2020. [Dkt. No. 1233].

The Debtor initiated an adversary proceeding, Adversary No. 21-03006, against HCMS based on certain demand and promissory notes. HCMS filed its First Amended Answer to the Debtor's Complaint on June 11, 2021. [Dkt. No. 34]. In addition, NREP filed a Motion to Withdraw the Reference and Brief in Support on June 3, 2021. [Dkt. Nos. 19, 20]. A status conference on the Motion to Withdraw the Reference was held on July 8, 2021. [Dkt. No. 29].

Appx. 07726

011671

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 754 of 921 PageID 12552
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21 Entered 07/09/21 15:54:20 Page 4 of 7

**C.** **NexPoint Real Estate Capital, LLC.**

    **1.** **NREC ownership, directors, officers, managers, and/or trustees.**

| Owner | Type | % | Manager |
|---|---|---|---|
| NexPoint Strategic Opportunities Fund | Member | 100 | NexPoint Strategic Opportunities Fund |

    **2.** **HCMS ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

Mr. Dondero and/or his family trusts have an indirect ownership interest in NREC through their ownership of 7.43% of shares of NREC's sole member, NexPoint Strategic Opportunities Fund.

**D.** **NexPoint Real Estate Advisors, LP; NexPoint Real Estate Advisors II, LP; NexPoint Real Estate Advisors III, LP; NexPoint Real Estate Advisors IV, LP; NexPoint Real Estate Advisors V, LP; NexPoint Real Estate Advisors VI, LP; NexPoint Real Estate Advisors VII, LP; and NexPoint Real Estate Advisors VIII, LP.**

    **1.** **The Real Estate Advisors' ownership, directors, officers, managers, and/or trustees.[2]**

| Owners | Type | % | Manager | Officers |
|---|---|---|---|---|
| NexPoint Real Estate Advisors GP, LLC | General Partner | 0.1 | NexPoint Real Estate Advisors GP, LLC, the General Partner | James Dondero – President Scott Ellington – GC/Secretary Brian Mitts – EVP Matt McGraner – EVP Frank Waterhouse – Treasurer Dustin Norris – Asst. Treasurer |
| NexPoint Advisors, LP | Limited Partner | 99.9 | | |

    **2.** **The Real Estate Advisors ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

Mr. Dondero has a .01% indirect ownership interest in the Real Estate Advisors through their General Partner, NexPoint Advisors GP, LLC, of which Mr. Dondero is the sole member (100%). Mr. Dondero's family trusts have a 99.9% indirect ownership interest in the Real Estate Advisors through their Limited Partner, NexPoint Advisors, LP.

---

[2]   The ownership, directors, and officers are the same for each of the Real Estate Advisors entities.

Appx. 07729

011672

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 6 of 9
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 755 of 921 PageID 12553
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21 Entered 07/09/21 15:54:20 Page 5 of 7

E.    **NexPoint Multifamily Capital Trust Inc.**

1.    **NMCT ownership, directors, officers, managers, and/or trustees.**

| Owner | Type | % | Manager | Officers |
|---|---|---|---|---|
| NHT Operating Partnership, LLC | Member | 100 | N/A | James Dondero – President<br>Scott Ellington – GC/Secretary<br>Brian Mitts – CFO/EVP-Finance/Treasurer<br>Matt McGraner – CIO/EVP<br>Matt Goetz – VP-Investment & Asset Mgmt. |

2.    **NMCT ownership interest (direct or indirect) held by Mr. Dondero and/or his family trusts and percentage of such ownership.**

NMCT is wholly owned by NHT Operating Partnership, LLC, the operating partnership of NHT (defined below). Any indirect ownership of Mr. Dondero and his family trusts are set forth in Exhibit A next to NHT.

F.    **NexPoint Real Estate Finance Inc, NexPoint Residential Trust Inc., NexPoint Hospitality Trust, and VineBrook Homes Trust, Inc.**

NexPoint Real Estate Finance, Inc. ("NREF"), NexPoint Residential Trust Inc. ("NXRT"), NexPoint Hospitality Trust ("NHT"), and VineBrook Homes Trust, Inc. ("VB" and together with NREF, NXRT, and NHT, the "Public Entities") are all governed by a Board of Trustees or Directors (depending on its form of organization). Shares of NXRT and NREF are publicly held by investors and are traded on the New York Stock Exchange. Shares of NHT are publicly held by investors and are traded on the TSX Venture Exchange. As such, each of NREF, NXRT, and NHT are owned by "retail" investors, meaning public shareholders that trade interests daily on the public markets. Because many of the shares of NREF, NXRT, and NHT are held in omnibus accounts or "street names," the actual number of shareholders is greater than the total number of account holders. Accordingly, it is not possible to list all the owners of the Public Entities publicly or by name. Shares of VB are not publicly traded but are owned by over 2,000 individual shareholders. Additionally, VB is conducting a continuous placement of its Class A common stock and, as a

011673

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 756 of 921    PageID 12554
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21    Entered 07/09/21 15:54:20    Page 6 of 7

result, the number of shareholders continues to increase on an ongoing basis. As such, while possible, it is not practicable to list the owners of VB publicly or by name.

The directors/trustee, officers, directors, and Mr. Dondero's and/or his family trusts' interest in the Public Entities are set forth in the chart attached to these Disclosures as **Exhibit A**.

**G.      The Public Entities, NREC, NMCT, and the Real Estate Advisors' status as creditors of the Debtor.**

The Public Entities, NREC, NMCT and the Real Estate Advisors are not creditors of the Debtor.[3] Other than the filing an Objection to Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor and Request for Protective Order [Dkt. 847] and a Joinder to Highland Capital Management Fund Advisors, LP, NexPoint Advisors, LP, and Related Funds' Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization [Dkt. No. 1677], the Public Entities, NREC, NMCT, and the Real Estate Advisors have not otherwise been involved in the Bankruptcy Case.

---

[3]    The Public Entities, NREC, NMCT, and the Real Estate Advisors objected to the Official Committee of Unsecured Creditors' Emergency Motion to Compel Production by the Debtor [Dkt. No. 808] based on the fact that it required disclosure of data and information belonging to the Public Entities, NREC, NMCT and the Real Estate Advisors were housed on the Debtor's servers pursuant to various shared services agreements.

Appx. 01731

011674

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of 9
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 757 of 921    PageID 12555
Case 19-34054-sgj11 Doc 2544 Filed 07/09/21    Entered 07/09/21 15:54:20    Page 7 of 7

Respectfully submitted,

*/s/ Lauren K. Drawhorn*

Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
       lauren.drawhorn@wickphillips.com

**COUNSEL FOR NREP, HCMS, NREC, THE REAL
ESTATE ADVISORS, NMCT, NREF, NXRT, NHT,
AND VB**

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2021, a true and correct copy of the foregoing Joinder was served via the Court's CM/ECF system upon counsel for the Debtor and all other parties requesting or consenting to such service in this bankruptcy case.

*/s/ Lauren K. Drawhorn*

Lauren K. Drawhorn

Appx. 07732

011673

Case 19-34054-sgj11 Doc 3445-78 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 9 of 9

Case 19-34054-sgj11 Doc 2544-1 Filed 07/09/21    Entered 07/09/21 15:54:20    Page 1 of 1

EXHIBIT A

Disclosures

| Name | Ticker | Owners | Ownership Type | Ownership % | Dondero or Family Trust Ownership % | Director/Manager/Trustee | Officers |
|---|---|---|---|---|---|---|---|
| NexPoint Real Estate Finance Inc. | NREF | Various retail investors. | Shareholders | Varies | James Dondero owns approx. .3323% of the total shares. The Dugaboy Trust owns approx. 3.013% of the total shares. | Directors James Dondero (Chairman) Brian Mitts Edward Constantino (Ind. Dir) Scott Kavanaugh (Lead Ind. Dir) Arthur Laffer (Ind. Dir) Catherine Wood (Ind. Dir) | James Dondero-President Brian Mitts-CFO/EVP-Finance/Secretary/Treasurer Matt McGraner-CIO/EVP Matt Goetz-SVP-Investments & Asset Mgmt Paul Richards-VP-Originations & Investments David Willmore-VP-Finance |
| NexPoint Residential Trust Inc. | NRXT | Various retail investors. | Shareholders | Varies | James Dondero directly or indirectly owns approx. 8.23% of the total shares. | James Dondero Brian Mitts Edward Constantino Scott Kavanaugh Arthur Laffer Catherine Wood | James Dondero-President Brian Mitts-CFO/EVP-Finance/Secretary/Treasurer Matt McGraner-EVP/CIO Matt Goetz-SVP-Investment & Asset Mgmt DC Sauter-General Counsel |
| NexPoint Hospitality Trust | NHT-U.V | Various retail investors NexPoint Strategic Opportunities Fund (45.91%) Liberty CLO Holdco, Inc. (7.13%) Highland Dallas Foundation (5.15%) NHT Holdco, LLC (5.87%) The Debtor (5.03%) Governance RE Ltd. (3.62%) | Shareholders | Varies | James Dondero and his family trusts own approx. 18.56% of the total shares. | Trustees Neil Labatte (independent) Graham Senst (Indepent) James Dondero | James Dondero - CEO Brian Mitts - CFO, EVP-Finance, Treasurer, Corporate Secretary Matt McGraner - CIO, EVP Jessie Blair III - EVP, Head of Lodging Paul Richards - VP, Asset Management |
| VineBrook Homes Trust, Inc. | N/A | Various. | Shareholders | Varies | James Dondero owns approx. .09% of the total shares. | Directors James Dondero Brian Mitts Ed Constantino Scott Kavanaugh Art Laffer Dana Sprong | James Dondero-CEO/President Matt McGraner-EVP/CIO/Secretary Brian Mitts-CFO/Treasurer/Asst Secretary Dana Sprong-SVP-Acquisition & Disposition Ryan McGarry-SVP-Asset Mgmt |

Appx. 07733

011678

# EXHIBIT 79

# RESERVED

Appx 07794
011677

# EXHIBIT 80

Appx 07735

011678

Case 19-34054-sgj11 Doc 3445-80 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of 3
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 761 of 921    PageID 12559
Case 21-03003-sgj Doc 49 Filed 05/24/21    Entered 05/24/21 14:07:13    Page 1 of 2



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 24, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| v. | § | **Adversary No. 21-03003-sgj** |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

### ORDER DENYING MOTION TO COMPEL DEPOSITION TESTIMONY
### FROM JAMES P. SEERY, JR.

On this date, the Court considered the *Motion to Compel Deposition Testimony from James P. Seery, Jr.* filed by James D. Dondero, the Defendant in the above-captioned adversary proceeding, on May 13, 2021 (the "Motion").

Upon consideration of the Motion, the Plaintiff's objection thereto, and the arguments of counsel made during the hearing on the Motion, the Court finds that the Motion should be DENIED in its entirety for the reasons stated on the record during the hearing.

IT IS SO ORDERED.

### # # # END OF ORDER # # #

John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

-and-

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

App. 01680

# EXHIBIT 81

Appx 07738

011681

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 764 of 921    PageID 12562
Case 22-03003-sgj Doc 1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 1 of 9

Jason S. Brookner
Texas Bar No. 24033684
Andrew K. York
Texas Bar No. 24051554
Drake M. Rayshell
Texas Bar No. 24118507
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
          dyork@grayreed.com
          drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| SCOTT BYRON ELLINGTON. | Adv. No. _____ |
| | *Removed from the 101st Judicial District Court of Dallas County, Texas Cause No. DC-22-00304* |
| Petitioner, | |
| v. | |
| PATRICK DAUGHERTY, | |
| Respondent. | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

-1-

Appx. 07739

011682

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 765 of 921 PageID 12563
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 2 of 9

## NOTICE OF REMOVAL

Patrick Daugherty ("Daugherty") files this Notice of Removal ("Notice") of Cause No. DC-22-00304 ("State Court Action") from the 101st Judicial District Court of Dallas County, Texas to the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

As the Court is well aware, Daugherty is a creditor of the Debtor, asserting the fourth largest claim of all creditors in this bankruptcy proceeding. The dispute between Daugherty and the Debtor began a decade ago when the Debtor filed suit against Daugherty in Texas state court (the "Texas Action"). After a three-week trial, the jury in the Texas Action found for Daugherty against Debtor and James Dondero ("Dondero") for defamation with malice, and on Daugherty's claim for breach of good faith and fair dealing against Debtor's affiliate Highland Employee Retention Assets LLC ("HERA") for $2.6 million plus interest that has been accruing since May 2012.

After being unable to collect on the HERA judgment, Daugherty commenced an action against Debtor, Dondero, HERA and ERA Management, LLC ("ERA") in Delaware Chancery Court. The Delaware court found that the Dondero-related defendants wrongfully withheld dozens of documents in discovery based on improper assertions of privilege and that there was a reasonable basis to believe that a fraud had been perpetrated such that the crime-fraud exception applied to any attorney-client privilege assertion.

Two days into trial in the Delaware case, Debtor filed its chapter 11 petition. Daugherty subsequently filed a second lawsuit in Delaware Chancery Court against Dondero, HERA, ERA, Debtor's former general counsel Scott Byron Ellington ("Ellington"), the Debtor's former in-house counsel Isaac Leventon ("Leventon") and the Debtor's outside counsel, Hunton Andrews Kurth LLP ("HAK"), Marc Katz ("Katz"), and Michael Hurst ("Hurst") for conspiracy to commit fraud, among other claims.

App. 0749
011683

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 766 of 921 PageID 12564
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 3 of 9

Daugherty and the Reorganized Debtor have entered into a settlement agreement that is awaiting Court approval, and a hearing is set with respect to the same on March 1, 2022. The settlement agreement contains releases of claims against certain parties, but notably, it expressly excludes Dondero, Ellington, Leventon, HAK, Katz and Hurst from the definition of the "HCMLP Released Parties," meaning Daugherty will retain his claims against those parties in the Delaware litigation.

On January 12, 2022, a month after the proposed settlement was filed with the Court, Ellington initiated the State Court Action against Daugherty. Hurst is listed as one of Ellington's attorneys in the State Court Action. The petition in the State Court Action asserts that the State Court Action "arises out of the same transaction or occurrence which is the subject of" the Texas Action, and requests transfer of the State Court Action to the 68th Judicial District Court of Dallas County, Texas that is presiding over the Texas Action. Ellington's counsel also informed the undersigned that Ellington intends to file such a transfer motion.

Ellington and Daugherty are both interested parties in Debtor's bankruptcy. Removal is appropriate, and this Court has jurisdiction, pursuant to 28 U.S.C. § 1452(a) and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), because the State Court Action relates to Debtor's bankruptcy in several respects: (i) Daugherty is a creditor; (ii) Ellington is a Defendant to claims asserted by the Trustee in the bankruptcy; (iii) Daugherty and the Reorganized Debtor have entered into, and requested Court approval of, a proposed settlement that disfavors Ellington; and (iv) the State Court Action offends this Court's gatekeeper orders, which essentially forbid pursuing legal action involving parties related to the bankruptcy—specifically Debtor's principals—without this Court's approval, requiring any such action to be adjudicated in this Court. *See* Docket No. 2660 at 12-13, 26-27. The State Court Action is an attempt to: (1)

4857-9065-1402.7

App. 01684

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 767 of 921 PageID 12565
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 4 of 9

improperly evade this Court's clear gatekeeping orders; (2) derail this Court's pending consideration of a proposed settlement; and (3) pursue the Reorganized Debtor through otherwise impermissible discovery in the State Court Action.

## BACKGROUND

1.    The Debtor filed for bankruptcy on October 16, 2019 in the U.S. Bankruptcy Court for the District of Delaware. The Debtor's chapter 11 case was transferred to this Court on December 4, 2019, and is pending as captioned above, under Case No. 19-34054. Docket No. 1.

2.    Ellington is a named defendant in action filed by the Litigation Trustee on October 15, 2021. *See generally* Adversary No. 21-03076. He is also a former principal of the Debtor, having served as the Debtor's Chief Legal Officer and General Counsel until his termination for cause in January 2021. Docket No. 2934 at 8, ¶ 19.

3.    Daugherty is a former employee and limited partner of the Debtor and previously served in other positions with current and former affiliates of the Debtor. At the time of his resignation from the Debtor, Daugherty owned 19.1% of the preferred units of HERA. Since that time, his ownership interest in HERA increased to 100%.

4.    Shortly after Daugherty's resignation, Debtor commenced the Texas Action against Daugherty. Daugherty obtained a $2.6 million award plus interest which continues to accrue against HERA (the "HERA Judgment"), which was upheld on appeal in December 2016.

5.    In July 2017, unable to collect on the HERA Judgment, Daugherty commenced an action against the Debtor and several of its principals, in their individual capacities, in the Delaware Chancery Court in the case captioned *Daugherty v. Highland Capital Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for, *inter alia*, fraudulent transfer, promissory estoppel, unjust enrichment, indemnification, and "fees on fees" (the "Highland Chancery Case").

Appx. 03742
011685

6.    Prior to trial, the Delaware Chancery Court ruled that the defendants wrongfully withheld dozens of documents in discovery based on improper assertions of privilege. Specifically, the Delaware Chancery Court ruled there was a reasonable basis to believe that a fraud had been perpetrated on Daugherty, resulting in the crime-fraud exception precluding any attorney-client privilege to the withheld documents.

7.    The Highland Chancery Case, however, was automatically stayed when the Debtor filed its chapter 11 petition in the middle of trial on October 16, 2019.

8.    On December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Chancery court captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against various principals, agents, and attorneys affiliated with Debtor—including Ellington—for conspiracy to commit fraud, along with other claims (the "Ellington Chancery Case," and together with the Highland Chancery Case, the "Chancery Cases").

9.    Daugherty and the Reorganized Debtor engaged in settlement negotiations in an attempt to resolve Daugherty's claim in the chapter 11 case. The parties' negotiations ultimately resulted in the filing of the Reorganized Debtor's *Motion for Entry of an Order Approving Settlement with Patrick Hagaman Daugherty (Claim No. 205) and Authorizing Actions Consistent Therewith* on December 8, 2021, at Docket No. 3088 ("Settlement Approval Motion").

10.    The Settlement Approval Motion requests approval of a proposed settlement agreement ("Proposed Settlement"), executed in late November 2021. Pursuant to the Proposed Settlement, Daugherty will release his claims against the Reorganized Debtor's estate and many of the Reorganized Debtor's agents, representatives, and subsidiaries. Exhibit 6, ¶ 6. However, the Proposed Settlement expressly and specifically retains Daugherty's claims against Ellington and select other individuals and entities. Exhibit 6, ¶ 7.

4857-9065-1402.7

Appx 07743

011686

11. On January 12, 2022, a little over a month after submission of the Settlement Approval Motion, Ellington filed the State Court Action against Daugherty.

12. On the first page of the petition, Ellington's counsel asserts that "this case, in part, arises out of the same transaction or occurrence which is the subject of *Highland Capital Management, L.P. v. Patrick Daugherty*, Cause No. 12-04005, in the 68th Judicial District Court of Dallas County, Texas. Hence, the undersigned believes that this case is subject to transfer . . ." Exhibit 1 at 1.

13. On January 14, 2022, Ellington's lead counsel doubled down on the relationship between the State Court Action and the Texas Action in an email to the undersigned:

> We believe this case is a related case and should be transferred to Judge Hoffman's court. We do not know yet if the transfer will be automatic. If it is not automatically transferred, we intend to file a Motion to Transfer. Please let us know today if we can mark you as unopposed on our motion to transfer.

Exhibit 5.

## BASIS FOR REMOVAL

14. "A party may remove any claim or cause of action in a civil action… to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under 1334[.]" 28 U.S.C. § 1452(a). According to 28 U.S.C. § 1334(b), "the district courts shall have original but not exclusive jurisdiction of all civil proceedings… related to cases under title 11." A matter is "related to" a bankruptcy if its outcome "could 'conceivably have an effect on the estate being administered in the bankruptcy.'" *In re Brooks Mays Music Co.*, 363 B.R. 801, 808 (Bankr. N.D. Tex. 2007) (Jernigan, J.) (quoting *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987)). "Conceivably" is the watchword—neither certainty, nor even probability, is required. *See Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 587 (5th Cir. 1999); *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991). Thus,

Appx. 07744

011687

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 770 of 921 PageID 12568
Case 22-03003-sgj Doc 1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 7 of 9

bankruptcy jurisdiction exists and a matter is "'related to' bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *In re TXNB Internal Case*, 483 F.3d 292, 298 (5th Cir. 2007).

15.     Removal directly to this Court is appropriate pursuant to the Northern District of Texas's Standing Order of Reference of Bankruptcy Cases and Proceedings. Misc. Order No. 33 (Aug. 3, 1984). This Standing Order provides that "any or all cases … related to a case under Title 11 … are referred to the Bankruptcy Judges of this district for consideration and resolution consistent with law." *Id.* Removal directly to the Bankruptcy Court is a regular and accepted practice. *See, e.g.,* Local Bankr. R. 9027-1(a); *TNT Quadrangle Partners, LP v. SPRF B/Quadrangle Prop., LLC*, No. 3:20-AP-03103, Dkt. 1, 59 (Bankr. N.D. Tex. Feb. 26, 2021) (Jernigan, J.) (granting summary judgment in adversary proceeding removed directly from Texas state court); *Lycoming Engines v. Superior Air Parts, Inc.*, No. 3:12-AP-03035, Dkt. 1, 38 (Bankr. N.D. Tex. July 6, 2012) (Houser, J.) (denying motion to remand in action removed directly from Texas state court).

16.     This Notice is filed within (30) days of the date the State Court Action was commenced and is therefore timely pursuant to 28 U.S.C. § 1446(b) and Bankruptcy Rule 9027(a)(2). A copy of this Notice is also being filed with the Court Clerk in the State Court Action. Moreover, Daugherty consents to entry of final orders and judgments by this Court. *See* Fed. R. Bankr. P. 9027.

17.     As discussed above, the State Court Action is "related to" the Debtor's bankruptcy, and Ellington admits as much on the face of the state court petition. The Proposed Settlement between Daugherty and the Reorganized Debtor addresses both the Texas Action and portions of

the Chancery Cases, and expressly excludes Ellington as a released party. This is more than

sufficient to vest this Court with jurisdiction over Ellington's new lawsuit.

18. Moreover, Ellington appears to seek discovery in the State Court Action to use in

defending against the Litigation Trustee's action. On January 13, 2022, Ellington's counsel sent

the undersigned counsel a litigation hold letter. *See* Exhibit 7. Among the categories of documents

and materials that Ellington requested be retained were "[a]ll documents and communications with

any other party, person, or entity regarding . . . the observation, surveillance, or investigation of

any Ellington Party or Ellington Location." *Id.* at 2. Combined with the fact that Ellington wants

to immediately seek written discovery in the State Court Action, *see* Exhibit 5, it is clear that

Ellington's lawsuit attempts to circumvent this Court's gate-keeping orders by seeking information

concerning Daugherty's communications with the Official Committee of Unsecured Creditors, the

Reorganized Debtor, and Jim Seery concerning Ellington's attempts to conceal his assets to keep

them out of the reach of his creditors. The timing of the State Court Action is indicative of its

retaliatory nature because Daugherty expressly retained his claims against Ellington in the

Proposed Settlement.

19. Ellington's State Court Petition is attached as Exhibit "1." Attached hereto as

Exhibit "2" is a copy of the docket sheet for the State Court Action (last visited January 17, 2022).

Attached hereto as Exhibit "3" are all process and other pleadings regarding the State Court Action.

Additionally, attached hereto as Exhibit "4" is a listing of counsel involved in the State Court

Action, along with their contact information.

4857-9065-1402.7

Appx. 0746

011689

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 772 of 921    PageID 12570
Case 22-03003-sgj Doc 1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 9 of 9

<div align="center">

**NOTICE**

</div>

20.    Pursuant to Bankruptcy Rule 9027, Daugherty will file a copy of this Notice of

Removal with the Clerk of the Court for the 101st Judicial District Court in Dallas County, and

will serve a copy on all parties to the removed action.

Respectfully submitted this 18th day of January, 2022.

<div align="center">

**GRAY REED**

</div>

By:  /s/ *Jason S. Brookner*
　　　　　　Jason S. Brookner
　　　　　　Texas Bar No. 24033684
　　　　　　Andrew K. York
　　　　　　Texas Bar No. 24051554
　　　　　　Drake M. Rayshell
　　　　　　Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:　　　jbrookner@grayreed.com
　　　　　　dyork@grayreed.com
　　　　　　drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

The undersigned hereby certifies that on the 18th day of January, 2022, he caused a true
and correct copy of the foregoing pleading to be served via the Court's electronic case filing system
(ECF) on all parties to this proceeding who have so-subscribed.

/s/ *Jason S. Brookner*
Jason S. Brookner



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 773 of 921    PageID 12571
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 1 of 106

JASON S. BROOKNER
Texas Bar No. 24033684
ANDREW K. YORK
Texas Bar No. 24051554
DRAKE M. RAYSHELL
Texas Bar No. 24118507
**GRAY REED**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone:  (214) 954-4135
Facsimile:  (214) 953-1332
Email:  jbrookner@grayreed.com
        dyork@grayreed.com
        drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.[1] | Case No. 19-34054 (SGJ) |
| Reorganized Debtor. | |
| SCOTT BYRON ELLINGTON. | |
| Petitioner, | Adv. No. _____ |
| | *Removed from the 101st Judicial District* |
| | *Court of Dallas County, Texas* |
| v. | *Cause No. DC-22-00304* |
| PATRICK DAUGHERTY, | |
| Respondent. | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Appx. 01748
011691

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 12 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 774 of 921 PageID 12572
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 2 of 106

## <u>APPENDIX TO NOTICE OF REMOVAL</u>

Pursuant to N.D. Tex. Local Bankruptcy Rule 9027-1(c), Respondent Patrick Daugherty

submits this appendix of the docket sheet and all pleadings from the court from which this action

is being removed.

- **Exhibit 1** is the Petition filed to initiate Cause No. DC-22-00304 in the 101st Judicial District of Dallas County, Texas ("State Court Action").
- **Exhibit 2** is a copy of the docket sheet for the State Court Action (last visited January 17, 2022).
- **Exhibit 3** contains copies of the remaining documents filed on the docket in the State Court Action.
- **Exhibit 4** is a listing of counsel involved in the State Court Action along with their contact information.
- **Exhibit 5** is a true and correct copy of January 14, 2022, email correspondence from Julie Pettit, The Pettit Law Firm, to Drew York and Ruth Ann Daniels, Gray Reed.
- **Exhibit 6** is a true and correct copy of the Proposed Settlement Agreement between Reorganized Debtor and Daugherty.
- **Exhibit 7** is a true and correct copy of the January 13, 2022, Litigation Hold letter from Ellington's counsel to Daugherty.

Respectfully submitted this 18th day of January, 2022.

**GRAY REED**

By: /s/ *Jason S. Brookner*
        JASON S. BROOKNER
        Texas Bar No. 24033684
        ANDREW K. YORK
        Texas Bar No. 24051554
        DRAKE M. RAYSHELL
        Texas Bar No. 24118507

1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email:    jbrookner@grayreed.com
        dyork@grayreed.com
        drayshell@grayreed.com

**ATTORNEYS FOR PATRICK DAUGHERTY**

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 13 of
Case 3:25-cv-02072-S       Document 15-14    Filed 10/06/25    Page 775 of 921    PageID 12573
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 3 of 106

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of January, 2022, he caused a true and correct copy of the foregoing pleading to be served via the Court's electronic case filing system (ECF) on all parties to this proceeding who have so-subscribed.

*/s/ Jason S. Brookner*
JASON S. BROOKNER

011693

Appx 07759

# EXHIBIT 1

Appx 02751

011694

FILED
4/11/2022 6:09 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Kayla Buckley DEPUTY

DC-22-00304

NO. _____

| | | |
|---|---|---|
| **SCOTT BYRON ELLINGTON** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | 101st |
| **v.** | § | _____ **JUDICIAL DISTRICT** |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| *Defendant.* | § | **DALLAS COUNTY, TEXAS** |

---

### PLAINTIFF'S ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

---

Comes Now, Scott Byron Ellington, Plaintiff herein, and files this *Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* against Defendant Patrick Daugherty, and in support thereof, would respectfully show the Court the following:

#### Dallas County LR 1.08 Disclosure

Dallas County Local Rule 1.08 provides that the attorneys of record for the parties in any case within the categories of Local Rule 1.07 must notify the judges of the respective courts in which the earlier and later cases are assigned of the pendency of the latter case. The attorney filing a case that is so related to another previously filed case shall disclose in the original pleading or in a separate simultaneous filing that the case is so related and identify by style, cause number, and court of the related case. Accordingly, and pursuant to L.R. 1.08, the undersigned hereby notifies the Court that this case, in part, arises out of the same transaction or occurrence which is the subject of *Highland Capital Management, L.P. v. Patrick Daugherty*, Cause No. 12-04005, in the 68th Judicial District Court of Dallas County, Texas. Hence, the undersigned believes that this case is subject to transfer under L.R. 1.07(a) or otherwise pursuant to L.R. 106 because the transfer would "facilitate orderly and efficient disposition of the litigation."

---



## I.  Discovery Control Plan

1.      Pursuant to TEXAS RULE OF CIVIL PROCEDURE 190.3, Plaintiff requests a Level 2 discovery control plan.

## II.  Parties & Service

2.      Plaintiff Scott Byron Ellington, an individual, is a resident of the state of Texas.

3.      Defendant Patrick Daugherty is an individual and resident of Dallas County, Texas. Defendant may be served at his residence located at 3621 Cornell Ave, Dallas, Texas 75205, or wherever he may be found.

## III. Rule 47(c) Disclosure

4.      Plaintiff seeks damages within the jurisdictional limits of the Court. Specifically, Plaintiff seeks monetary relief over $1,000,000 and non-monetary relief.

## IV. Jurisdiction & Venue

5.      The Court has jurisdiction over Defendant because he resides in Texas, has done business in Texas, committed torts, in whole or in part, in Texas, has continuing contacts with Texas, and is amenable to service by a Texas Court.

6.      Venue in Dallas County is proper in this case under Sections 15.002(a)(1) and (a)(3) of the TEXAS CIVIL PRACTICE AND REMEDIES CODE because this is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred and it is the county where Defendant resides.

## V.  Facts

7.      Plaintiff Scott Ellington ("Plaintiff" or "Ellington") was, until January of 2021, the general counsel of Highland Capital Management ("Highland").

Appx. 00758

011696


Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 17 of
Case 3:25-cv-02072-S     Document 15-14     Filed 10/06/25     Page 779 of 921     PageID 12577
Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 7 of 106

8.      Defendant Daugherty ("Defendant" or "Daugherty") previously worked for Highland.

9.      In 2012, Highland sued Daugherty. In response, Daugherty filed counterclaims against Highland then sued its affiliate, Highland Employee Retention Assets LLC ("HERA"), and three Highland executives. A jury ultimately determined that Daugherty breached his employment agreement and fiduciary duties. It also found that HERA breached the implied duty of good faith and fair dealing, but also found that the executives subject to the counter-claim were not liable to Daugherty. The jury awarded Highland $2,800,000 in attorney's fees and injunctive relief; and awarded Daugherty $2,600,000 in damages against HERA.

10.      Since the 2012 lawsuit's filing, Daugherty and Highland—or Highland related entities and individuals—engaged in protracted litigation in several different forums across the country. Daugherty's expressed goal is to "get" the founder and former CEO of Highland, Jim Dondero, and its former general counsel, Ellington. As part of this campaign, Daugherty personally sued Ellington in December 2019 in Delaware Chancery Court. Ellington's motion to dismiss currently pends in that matter.

11.      While Daugherty's previously limited his vendetta to the courtroom, he began a campaign of harassment against Ellington and his family starting in January 2021 that continues to this day. *See* **Exhibit A** (Declaration of Gregory Allen Brandstatter, the personal security guard of Scott Ellington) (detailing Daugherty's harassment and stalking of Ellington, his family, and loved ones); **Exhibit B** (Declaration of Scott Byron Ellington).

12.      Specifically, Daugherty has been observed outside Ellington's office, his residence, the residence of his long-time girlfriend, Stephanie Archer, his sister's residence, and his father's residence no less than **143 times**, often taking photographs and video recordings while either

---

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary
Injunction, and Permanent Injunction                                         Page 3



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 18 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 780 of 921 PageID 12578
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 8 of 106

parked or driving slowly by. Indeed, on April 21, 2021, Daugherty was observed driving by Ellington's office nine (9) times that day alone.

13.     Daugherty most recently was confirmed taking video or photo recordings outside of Ellington's residence on December 11, 2021. For reasons set forth in the Brandstatter Declaration, attached herein at **Exhibit A**, Daugherty likely stalked Ellington and his loved ones more recently than the latest confirmed date.

14.     Daugherty's harassing conduct is "textbook" behavior that precedes a physical attack that a reasonable person would consider a threat to their safety as well as that of their family and property. Indeed, Ellington has been forced to hire personal security, and his family are in fear for their personal and physical safety.

15.     As evidenced by the over 143 times Daugherty has been observed stalking Ellington and his family, he has the apparent ability to carry out this threat of continued harassment and violence.

16.     Both Mr. Ellington's sister and girlfriend have both demanded to Mr. Daugherty that he stop his harassment. Despite this clear demand for Daugherty to stop engaging in this harassing behavior, he refuses to stop and continues to harass Ellington and his family.

17.     Daugherty's constant stalking and harassment of Ellington and his family reasonably cause them to fear for their safety.

18.     Ellington reported Daugherty's harassing and disturbing behavior to the police.

### VI. Causes of Action

#### A.  Count One: Stalking.

19.     All facts alleged above, herein, and below are hereby incorporated by reference.

Appx. 07755


Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 19 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 781 of 921 PageID 12579
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 9 of 106

20. Pursuant to Texas Civil Practice & Remedies Code § 85.002, a defendant is liable to a claimant for damages arising from stalking of the claimant by the defendant.

21. A claimant proves stalking against a defendant by showing:

(1) on more than one occasion the defendant engaged in harassing behavior;
(2) as a result of the harassing behavior, the claimant reasonably feared for the claimant's safety or the safety of a member of the claimant's family; and
(3) the defendant violated a restraining order prohibiting harassing behavior or:
  (A) the defendant, while engaged in harassing behavior, by acts or words threatened to inflict bodily injury on the claimant or to commit an offense against the claimant, a member of the claimant's family, or the claimant's property;
  (B) the defendant had the apparent ability to carry out the threat;
  (C) the defendant's apparent ability to carry out the threat caused the claimant to reasonably fear for the claimant's safety or the safety of a family member;
  (D) the claimant at least once clearly demanded that the defendant stop the defendant's harassing behavior;
  (E) after the demand to stop by the claimant, the defendant continued the harassing behavior; and
  (F) the harassing behavior has been reported to the police as a stalking offense.

22. "Harassing behavior" is defined by the statute as "conduct by the defendant directed specifically toward the claimant, including following the claimant, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the claimant." Tex. Civ. Prac. & Rem. Code § 85.001(4).

23. First, Defendant has engaged in harassing behavior toward the Plaintiff and his family in the above-described manner. Second, because of the harassing behavior, Plaintiff reasonably feared for his safety and the safety of his family. Third, Defendant, while engaging in the harassing behavior, by acts or words threatened to inflict bodily injury on the Plaintiff or to commit an offense against the Plaintiff, his family, or his property. Specifically, Defendant's

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction                                  Page 5

Appx. 0755
011699

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 20 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 782 of 921 PageID 12580
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 10 of 106

conduct is consistent with behavior leading up to a physical attack and is, therefore, an inherent threat of physical violence. Defendant had the apparent ability to carry out the threat, the Defendant's apparent ability to carry out the threat caused Plaintiff to reasonably fear for his safety or the safety of a family member, the Plaintiff (or his representative) at least once clearly demanded that the Defendant stop his harassing behavior, after the demand to stop by the Plaintiff, the Defendant continued the harassing behavior, and the harassing behavior has been reported to the police as a stalking offense.

24.     Plaintiff seeks recovery of his actual damages caused by Defendant's stalking, exemplary damages, and injunctive relief.

**B. Count Two: Invasion of Privacy by Intrusion.**

25.     All facts alleged above, herein, and below are hereby incorporated by reference.

26.     A claim of invasion of privacy by intrusion has the following elements: (1) an intentional intrusion, (2) upon the seclusion, solitude, or private affairs of another, (3) that would be highly offensive to a reasonable person.

27.     Here, Defendant has intentionally intruded upon the seclusion, solitude, and private affairs of Plaintiff by regularly appearing at his office, his residence, his girlfriend's residence, his father's residence, and his sister's residence, and taking photographs and other recordings of Ellington and his loved ones at these residences. The appearances are unsolicited, uninvited, and constant. These unwanted "visits" by Defendant are highly offensive to a reasonable person.

28.     Plaintiff seeks recovery of his actual damages caused by Defendant's conduct alleged herein, exemplary damages, and injunctive relief.

Appx. 27757
011700

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 21 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 783 of 921 PageID 12581
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 11 of 106

### VII. Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction

### A. Elements for Injunctive Relief.

29.     All facts alleged above, herein, and below are hereby incorporated by reference.

30.     In light of the above-described facts, Plaintiff seeks recovery from Defendant.

31.     Plaintiff is likely to succeed on the merits of this lawsuit because Defendant has been stalking Plaintiff and his family and has been engaged in otherwise harassing conduct.

32.     Unless this Honorable Court immediately restrains the Defendant and his agents the Plaintiff and his family will suffer immediate and irreparable injury, for which there is no adequate remedy at law to give Plaintiff complete, final and equal relief. More specifically, Plaintiff will show the court the following:

a.  The harm to Plaintiff and his family is imminent and ongoing as Defendant has harassed and stalked Plaintiff and his family, including his father, his sister, and girlfriend, almost constantly this entire year.

b.  The imminent harm will cause Plaintiff irreparable injury as the harassment will continue if not restrained. Further, Plaintiff reasonably fears that Defendant may cause him or his family bodily harm, and the accompanying anxiety interferes with his ability to conduct his normal, daily activities. *See, e.g., Quinn v. Harris*, 03-98-00117-CV, 1999 WL 125470, at *11 (Tex. App.—Austin Mar. 11, 1999, pet. denied) ("[I]njunctions designed to prevent harassment are permissible."); *Kramer v. Downey*, 680 S.W.2d 524, 525 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) ("Further, this right to be left alone from unwanted attention may be protected, in a proper case, by injunctive relief."); and

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction                                    Page 7

Appx. 9758

01T701

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 22 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 784 of 921 PageID 12582
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 12 of 106

     c.   There is no adequate remedy at law which will give Plaintiff complete, final and equal relief because the imminent harm is irreparable. *See e.g., Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.) ("Issues one (no evidence of inadequate remedy at law) and two (no evidence of irreparable injury) are intertwined under Texas case law.").

**B. Bond.**

33.    Plaintiff is willing to post a reasonable temporary restraining order and temporary injunction bond and requests the Court to set such bond.

**C. Remedy.**

34.    Plaintiff met his burden by establishing each element which must be present before injunctive relief can be granted by this Court. Thus, Plaintiff is entitled to the requested temporary injunction, and upon a successful trial on the merits, for the temporary injunction to be made permanent.

35.    Plaintiff requests that, while the temporary injunction is in effect, the Court to restrain Defendant and his agents from:

     a.   Being within 500 feet of Ellington;

     b.   Being within 500 feet of Ellington's office located at 120 Cole Street, Dallas, Texas 75207;

     c.   Being within 500 feet of Ellington's residence located at 3825 Potomac Ave, Dallas, Texas 75205;

     d.   Being within 500 feet of Stephanie Archer;

     e.   Being within 500 feet of Stephanie Archer's residence located at 4432 Potomac, Dallas, Texas 75025;



Appx. 97759

011702

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 23 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 785 of 921 PageID 12583
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 13 of 106

f. Being within 500 feet of Marcia Maslow;

g. Being within 500 feet of Marcia's residence located at 430 Glenbrook Dr., Murphy, Texas 75094;

h. Being within 500 feet of Byron Ellington;

i. Being within 500 feet of Byron Ellington's residence located at 5101 Creekside Ct., Parker, Texas 75094;

j. Photographing, videorecording, or audio recording Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington;

k. Photographing or videorecording the residences or places of business of Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington; and

l. Directing any communications toward Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington.

## VIII. Exemplary Damages

36. The conduct of Defendant described above constitutes malice and, therefore, Plaintiff is entitled to, and hereby seeks, an award of exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.003(1).

## IX. Conditions Precedent

37. All conditions precedent to Plaintiff's suit have occurred or have been performed.

## X. Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that:

a. Defendant be cited to appear and answer;

b. The Court determine any issue of fact and, upon final hearing of this cause, the Court award to Plaintiff:

Plaintiff's Original Petition, Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction
Page 9

Appx. 07709

011703

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 24 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 786 of 921 PageID 12584
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 14 of 106

    i.   Actual damages;

   ii.   Exemplary damages;

  iii.   A temporary restraining order;

  iv.   A temporary injunction;

   v.   A permanent injunction; and

  vi.   Court costs;

c.  The Court grant any other relief to which Plaintiff may be entitled.

Appx. 2761
011704

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 25 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 787 of 921 PageID 12585
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 15 of 106

Respectfully submitted,


/s/ Julie Pettit
Julie Pettit
State Bar No. 24065971
jpettit@pettitfirm.com
David B. Urteago
State Bar No. 24079493
durteago@pettitfirm.com
**THE PETTIT LAW FIRM**
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076


Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Mary Goodrich Nix
State Bar No. 24002694
mnix@lynnllp.com
Nathaniel A. Plemons
State Bar No. 24121059
nplemons@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN,
LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839


**ATTORNEYS FOR PLAINTIFF**

Appx. 07702

011705

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 26 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 788 of 921 PageID 12586
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 16 of 106



EXHIBIT

A

---

## DECLARATION OF GREGORY ALLEN BRANDSTATTER

---

STATE OF TEXAS § 
§
COUNTY OF DALLAS §

Gregory Allen Brandstatter declares as follows:

1.   My name is Gregory Allen Brandstatter. I am over 21 years of age, have never been convicted of a felony or other crime involving moral turpitude, and suffer from no mental or physical disability that would render me incompetent to make this declaration.

2.   I am able to swear, and hereby do swear under penalty of perjury, that the facts stated in this declaration are true and correct and within my personal knowledge.

3.   I am a Licensed Texas Master Peace Officer with fifteen (15) years of experience, a U.S. Government Contractor with over twelve (12) years of experience in the areas of high threat protection, counterterrorism, and counternarcotics, and I am also a licensed private investigator and security consultant.

4.   On Feb 3, 2021, Scott Ellington ("Scott") called, advising me that he believed someone was stalking himself and his girlfriend Stephanie Archer ("Stephanie"). The day prior to his calling me (Feb 2, 2021), Stephanie had been followed to 120 Cole Street, Dallas, Texas, where Scott has an office. Stephanie stated that for the past month or so she had noticed a large Black SUV possibly following her. On Feb 2, 2021, she noticed that the person in the Black SUV was actively taking pictures of her, and she attempted to confront the individual while she simultaneously took pictures of the Black SUV and its driver. Her picture shows the vehicle Make and License Number, BX9K764. In Stephanie's photo you can also see the person driving holding

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 27 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 789 of 921    PageID 12587
Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 17 of 106

up a cell phone as if taking pictures. A true and correct copy of this photograph is attached hereto

as **<u>Exhibit A-1</u>**.

     5.    The following day Scott was in his office on Cole Street, when he noticed a vehicle

resembling a "Toyota 4 Runner, Tan in color, stop in front of his office. He observed the driver of

the taking pictures and or video of his officer and the vehicles parked in front. Scott was able to

obtain the License Number of the Vehicle, GPF9512, he also noted that vehicle had a "WMR

sticker on the rear window. Scott stated the driver of the vehicle looked like Pat Daugherty

("<u>Daugherty</u>"). Scott and Daugherty both previously worked at an investment firm in Dallas and

are currently opponents in financial litigation. Scott believes that Daugherty is attempting to harass

him, his friends and coworkers due to the litigation. It should be noted that Daugherty has a history

of anger issues and he believes Daugherty may be trying to intimidate him.

     6.    Scott asked if I could assist him in determining who the person(s) were taking the

photos/videos. I advised Scott that I could check some open sources intelligence ("<u>OSINT</u>") sites

and see what I could come up with in reference to the vehicle registrations. I also suggested that

we set up a counter surveillance program to determine if these were random acts or an organized

surveillance effort.

     7.    On Feb 4, 2021, an investigation was opened along with a counter surveillance

operation. OSINT sources showed Daugherty to be the registered owner of the Black SUV

BX9K764 and that Daugherty currently is listed on the vehicle registration of the Infiniti QX4

GPF9512. The Infiniti QX4 closely resembles a Toyota 4 Runner (as observed by Scott above).

We believe that Daugherty sold the Infiniti to one of his domestic employees and "borrowed" the

vehicle to avoid detection.

<span style="font-variant: small-caps;">Declaration of Gregory Allen Brandstatter</span>

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 28 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 790 of 921    PageID 12588
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 18 of 106

8.      On February 4, 2021, at approximately 11:20 A.M., I observed the Infiniti GPF9512 driven by a while male with sandy blonde hair drive by west bound on Cole slow when passing Scott's office (120 Cole St.) and then proceed west on Cole, south on Levee, east on Alley (rear of 120 Cole), U-turn, south on Levee and east on Leslie. I viewed the driver of this vehicle as he was exiting Alley and can verify, after comparing photos, that Daugherty was the driver of the Infiniti.

9.      At approximately 1:22 P.M. on Feb 4, 2021, Scott advised that Daugherty had followed him to 120 Cole, I was parked on Cole and Levee. As Scott parked, I observed the Infiniti driving west on Cole towards me. I observed Daugherty driving Infiniti GPF9512. Daugherty turned south on Levee, U-turn, north on Levee then east on Cole. I kept my distance as the Infiniti slowed and then stopped in front of Scott's office. While stopped in front of Scott's office, Daugherty verbally engaged Stephanie and Joe (friend of Scott). Daugherty proceeds east on Cole, I followed, Daugherty turned left on Rivers Edge, I am unable to follow due to traffic conditions. Stephanie and Joe identified the driver as Daugherty after comparing to photos. A true and correct copy of a photograph of the back of the Infiniti taken on February 4, 2021, on Cole St. is attached hereto as **Exhibit A-2**.

10.     At approximately 5:15 P.M. on February 4, 2021, Reese Morgan ("Reese"), a private investigator with whom I regularly work, drove by Daugherty's residence and confirmed two vehicles parked in the carport. One is a white Lincoln Navigator LPG9001 and the other is a Black GMC Yukon BX9K764, which is the same vehicle that followed Stephanie on February 3, 2021. The Infiniti GPF9512 (with a "WMR" sticker on the back window) is parked on the street across the street from Daugherty's carport. Attached as **Exhibit A-3** is a true and correct copy of a photograph of the Yukon parked at Daugherty's residence, attached as **Exhibit A-4** is a true and

Appx. 27705
011708

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 29 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 791 of 921    PageID 12589
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 19 of 106

correct copy of a photograph of the Navigator parked at Daugherty's residence, and attached as **Exhibit A-5** is a true and correct coy of a photograph of the Infiniti parked across the street from Daugherty's residence.

11.    February 5, 2021, approximately 1:40 P.M., Reese drove by Daugherty's Residence and verified the Infiniti GPF9512 parked across street from carport.

12.    February 8, 2021, at approximately 10:10 A.M., I drove by Daugherty's Residence and verified that the Infiniti GPF9512 was parked across street from carport.

13.    Additional screen captures clearly identify Daugherty as the driver videoing and/or photographing Scott's office.  *See* **Exhibit A-6** (March 29, 21, three passes by Daugherty in the Infiniti), **Exhibit A-7** (April 16, 2021, Daugherty in the Yukon); **Exhibit A-8** (April 23, 2021, Daugherty in the Yukon).  Daugherty also is clearly identifiable outside of Scott's sister's home. *See* **Exhibit A-9** (April 25, 2021, Daugherty in the Infiniti).  It is clear that he is recording Scott, his family, and friends.  *See* **Exhibit A-10** (May 3, 2021, Daugherty in the Navigator).

14.    Attached hereto as **Exhibit A-11** is a true and correct copy of a report that I wrote that contains my counter-surveillance log. As documented by the report, following verification that Daugherty was the individual in the Black Yukon with license plate BX9K764 and the Infiniti QX4 with license plate GPF9512, Daugherty was observed an additional 143 times outside Scott's office or the homes of his family or girlfriend between February 19, 2021, and November 23, 2021. In fact, there were many instances where Daugherty would drive by Scott's office several times in a single day. For example, Daugherty was observed driving by Scott's office at least nine (9) times on April 21, 2021. During many of these visits, Daugherty was observed taking photographs or video recordings from the inside of his vehicle.

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 30 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 792 of 921 PageID 12590
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 20 of 106

15.     Additionally, Daugherty was observed at least eight (8) times outside of the home of Marcia Maslow, Scott's sister.  Mrs. Maslow resides with her husband and two minor daughters. Mrs. Maslow resides in Murphy, Texas, approximately a thirty minute drive (without traffic) from the residences of both Scott and Daugherty.  Mrs. Maslow sent me a written message after she observed Daugherty at her residence in which she describes the emotional trauma experienced by both her and her family.

16.     Finally, Daugherty has been observed at least seven (7) times outside the home of Scott's widower father Byron Ellington.   Mr. Byron Ellington lives in Parker, Texas, approximately a thirty-five minute drive (without traffic) from the residences of both Scott and Daugherty.

17.     While the verified instances whereby Daugherty was visited Scott's office or the home of his friends and family are extensive, Daugherty's harassment is almost certainly more extensive. The following factors lead to this conclusion:

a.  Daugherty was only first spotted because of Stephanie's lay person observations, so the stalking likely started earlier;

b.  Each photograph and video clip must be manually extracted from manual review of hours of raw video taken during daytime hours, so there is likely to be more encounters unidentified or unrecorded;

c.  It is difficult to record Daugherty when his vehicle is following Scott's or those of his family;

d.  There may be other locations associated with Scott that Daugherty stalked where I did not conduct counter-surveillance.

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 31 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 793 of 921 PageID 12591
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 21 of 106

18.    In my experience on the United States Department of State High Threat Protection Team, the sort of conduct exhibited by Daugherty is a precursor to a physical attack. I therefore called the Dallas Police Department to report the stalking, but could not find anyone to take the report. I was told that Scott needed to call 911 instead and report situation.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 32 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 794 of 921    PageID 12592

Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 22 of 106

FURTHER DECLARANT SAYETH NOT.

My name is Gregory Allen Brandstatter. My date of birth is ██████ 1954. My address is 1001 County Road 26100, Roxton, Texas 75477. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 28th day of December, 2021.

Gregory Allen Brandstatter

DECLARATION OF GREGORY ALLEN BRANDSTATTER

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 33 of
Case 3:25-cv-02072-S     Document 15-14    Filed 10/06/25     Page 795 of 921   PageID 12593

Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 23 of 106



EXHIBIT

A-1

Appx. 07779
011713

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 34 of
Case 3:25-cv-02072-S     Document 15-14     Filed 10/06/25     Page 796 of 921   PageID 12594

Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 24 of 106



**EXHIBIT**

**A-2**

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 35 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 797 of 921 PageID 12595

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 25 of 106



EXHIBIT

A-3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 36 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 798 of 921 PageID 12596

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 26 of 106



EXHIBIT

A-4

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 37 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 799 of 921 PageID 12597
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 27 of 106



EXHIBIT

A-5

Appx. 27574

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 38 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 800 of 921 PageID 12598

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 28 of 106





EXHIBIT

A-6

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 39 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 801 of 921 PageID 12599

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 29 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 40 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 802 of 921 PageID 12600

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 30 of 106





Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 42 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 804 of 921 PageID 12602

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 32 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 43 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 805 of 921 PageID 12603

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 33 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 44 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 806 of 921 PageID 12604
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 34 of 106





Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 45 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 807 of 921 PageID 12605

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 35 of 106



011725

Appx 07382

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 46 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 808 of 921 PageID 12606

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 36 of 106



Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 47 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 809 of 921    PageID 12607

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 37 of 106

111521

Greg Brandstatter, Pat D Investigation / Counter Surveillance log

On Feb 3 2021, Scott Ellington (Scott) called, advising me that he believed someone was stalking himself and his girlfriend Stephanie Archer (Stephanie). The day prior, Feb 2 2021 to his calling me Stephanie had been followed to 120 Cole Street, Dallas, Texas, where Scott has an office. Stephanie stated that she had noticed that for the past month or so she had noticed a large Black SUV possibly following her. On Feb 2 2021 she noticed that the person in a Black SUV actively taking pictures, she had, had enough and attempted to confront the individual while taking a picture of the vehicle. Her picture shows the vehicle Make and License Number, BX9K764. In Stephanie's photo you can also see the person driving holding up a cell phone as if taking pictures. See Stephanie's photo.

The following day Scott was in his office on Cole Street, when he noticed a vehicle resembling a "Toyota 4 Runner, Tan in color, stop in front of his office. He observed the driver of the taking pictures and or video of his officer and the vehicles parked in front. Scott was able to obtain the License Number of the Vehicle, GPF9512, he also noted that vehicle had a "WMR sticker on the rear window. Scott stated the driver of the vehicle looked like Pat Daugherty (Pat). Scott and Pat both previously worked at an investment firm in Dallas, and are currently opponents in financial litigation. Scott believes that Pat is attempting to harass him, his friends and coworkers due to the litigation. It should be noted that Pat has a history of anger issues and he believes Pat may be trying to intimidate him.

Scott asked if I could assist him in determining who the person(s) were taking the photos/videos. I advised Scott that I could check some Open Sources Intelligence sites and see what I could come up with in reference to the vehicle registrations. I also suggested that we set up a counter surveillance program to determine if these were random acts of an organized surveillance effort.

On Feb 4 2021 an investigation was opened along with a counter surveillance operation. OSINT sources showed Pat to be the registered owner of the Black SUV BX9K764 and that Pat was the previous owner of the Infinity QX4 GPF9512. The Infinity QX4 closely resembles a Toyota 4 Runner ( as observed by Scott above). We believe that Pat sold the Infinity to one of his domestic employees and "borrowed" the vehicle to avoid detection.

At approx. 1120 on Feb 4th the Infinity GPF9512 driven by a W/M Sandy Blonde hair drives by WB on Cole slows when passing 120 proceeds W on Cole, S on Levee, E on Alley (rear of 120 Cole), U-turn, S on Levee and E on Leslie. I viewed the driver of this vehicle as he was exiting alley and can verify after comparing Photos, that Pat was the driver of the infinity.

At approx 1322 on Feb 4th Scott advises that the Pat had followed him to 120 Cole, I was parked on at Cole and Levee as Scott parked I observe the Infinity drives W on Cole towards me, I observe Pat driving infinity GPF9512. Pat turns south on Levee, U-turn, N on Levee then E on Cole. I keep my distance as Infinity slows and then stops in front of 120, While stopped in front of 120, Pat verbally engages Stephanie and Joe (friend of Scott). Pat proceeds E on Cole, I follow, Pat turns left on Rivers Edge, I am

EXHIBIT

A-11

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 48 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 810 of 921    PageID 12608
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 38 of 106

unable to follow due to traffic conditions. Stephanie and Joe are able to Identify the Driver as Pat after comparing to photos. See photos for rear of Infinity, on Cole Street, Note Sticker (WMR).

At Approx 1715 on Feb 4, Reese Morgan (Reese) PI drives by Pat's residence and is able to confirm two vehicles parked in carport, White Lincoln Navigator LPG9001 and Black GMC Yukon BX9L764, same vehicle that followed Stephanie on Feb 3, The Infinity GPF9512 is parked on the street across the street from Pat's carport, see photos

Feb 5 2021, approx 1340, Reese drive by Pat's Residence verify Infinity GPF9512 parked across street from carport.

Feb 8 2021, approx. 1010, Drive by Pats Residence verify Infinity GPF9512 parked across street from carport

Feb 19 2021 approx 1700 Sarah Goldsmith, moving files to 120 Cole St, confronted my W/M Sandy Blonde, Graying hair, driving a "Silver Toyota 4 Runner" (Infinity). Driver ask "Do you know if Scott is back in town?" She ignored him and went into office space until he left. She did not feel safe, she departed and had her husband accompany her back to Cole St. After viewing a picture of Pat, Sarah was able to verify the driver who confronted her was Pat.

Feb 23 2021 approx 1707 Black GMC Yukon BX9K764, Driven by Pat (visual), business attire blue shirt, E-W on Cole, slows at 120, proceeds N on Levee, E on Oaklawn. (Day in Court)

March 4 2021 approx 1113, Black GMC Yukon BX9K764, drives by E-W on Cole slows when passing 120, S on Levee, pulls over appears to be taking notes, continues S on Levee, turns E on Leslie at.

March 9 2021 approx 1110, Black GMC Yukon BX9K764, drives by E-W on Cole, slows, then N on Levee.

approx 1340, Black GMC Yukon BX9K764, drives by E-W on Cole, slows, then N on Levee.

March 23 2021 approx 1450, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, (note Scott's Vic out front with door open), S on Levee, U-turn, N on Levee. Visually confirm Pat driving.

approx 1700, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, Scott is in office and observes Pat taking pictures or video of building and vehicles, Pat proceeds W on Cole , N on Levee

March 25 2021 approx 1414, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole Stops short of 120, I observed Pat, dressed in business attire, exit vehicle and put trash in trash container, then proceed W on Cole where he stopped in front of 120 for an extend period of time, before proceeding W on Cole

Approx. 1417, Black GMC Yukon BX9K764, driven by Pat, drives by E-W on Cole, Stops in front of 120, another extended stop at 120 before proceeding W on Cole.

March 26 2021, approx 1414, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole. I pass in opposite direction. Pat is wearing business attire, talking on cell phone

March 29 2021, approx 1430, Infinity QX4 GPF9512, with "WMR sticker on the rear window, driven by Pat, drives by E-W Stops front of 120, peers into building.

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 49 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 811 of 921 PageID 12609
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 39 of 106

Approx 1433, Infinity QX4 GPF9512, driven by Pat, drives by E-W Stops front of 120, appears to be taking pictures of building and vehicles.

Approx 1450, Infinity QX4 GPF9512, driven by Pat, drives by E-W Slows front of 120

March 31 2021, approx 1508, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, opens door slightly

Approx 1511, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes pictures

Approx 1518, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes video

Approx 1522, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole stops front of 120, takes extensive video of inside garage door and vehicles out front

April 13 2021, approx 1428, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole

Approx 1430, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, slows at 120, takes video of building and vehicles

Approx 1433, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole

April 14 2021  Scott's Sister Marcia Reports, Black GMC Yukon Denali, stopped in front of her house and was taking pictures of her home, family and vehicles, she reports this is the second instance. First instance was 3 25 2021, She provides Video of second instance, See Marcia's report. Stealthcam deployed.

April 16 2021, approx 1453, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, slows takes pics/video of vehicles

Approx 1455, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole,I nterested in Scott' new assistant Charleigh.

Approx 1456, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole, Passenger in vehicle, New Player

April 19 2021, approx 1423, Black GMC Yukon BX9K764, driven by Pat, driving E-W on Cole, Stops takes Video

Approx 1426, Black GMC Yukon BX9K764, driven by Pat, driving W-E on Cole

April 20 2021, approx 1335, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1338, Black GMC Yukon BX9K764, driven by Pat drives by, E-W on Cole slows takes pictures

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 50 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 812 of 921 PageID 12610
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 40 of 106

Approx 1340, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 21 2021, approx 1028, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1038, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1040, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1043, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, stops for extended period looking inside garage door, car behind him honks

Approx 1055, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, fast

Approx 1058, Black GMC Yukon BX9K764, driven by Pat drives by W-E on Cole

Approx 1215, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, stops and takes pictures of vehicles

Approx 1217, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, slows at 120 and takes video

Approx 1448, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Stops and takes video of vehicles, Scott confirms he saw, Black GMC Yukon

April 22 2021, approx 1010, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, talking on phone or into voice recorder

Approx 1013, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, talking on phone or into voice recorder

Approx 1220, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, takes picture of Charleigh Vehicle

Approx 1325, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1547, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 23 2021, approx 1027, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1321, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Pics of Ryan's and Trevor Vehicles

Approx 1324, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

Approx 1457, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole, Good Facial Picture

Approx 1500, Black GMC Yukon BX9K764, driven by Pat drives by W-E on Cole

Infinity QX4 GPF9512, driven by Pat, drives by E-W, E-W on Cole

Approx 1432, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

April 24 2021, (Sat) approx 1158, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

approx 1432, Black GMC Yukon BX9K764, driven by Pat drives by E-W on Cole

approx 1605 Black GMC Yukon, driven by Pat drives by Marcia's House

April 25 2021, (Sun) approx 1608, Infinity QX4 GPF9512, driven by Pat drives by Marcia's House

April 26 2021, approx 1533, Infinity QX4 GPF9512, driven by Pat drives by Byron's House

approx 1534, Infinity QX4 GPF9512, driven by Pat drives by Byron's House


April 27 2021 Infinity QX4 GPF9512, drives by E-W on Cole, Video only, Not typical behavior, cannot confirm.

April 28 2021, approx 1030, Infinity QX4 GPF9512, driven by Pat, drives by E-W, slows takes Video, Faster than normal, visual only

approx 1510, Infinity QX4 GPF9512, driven by Pat, drives by E-W, slows but behavior atypical

approx. 1650, Infinity QX4 GPF9512, driven by Pat, drives by E-W, Video confirmation

approx 1745, Black Yukon drives by, Cam Only no Confirmation, (note change vehicle)

April 30 2021, approx. 1634 Infinity QX4 GPF9512, driven by Pat, drives by E-W, Cam only **Atypical**

May 3 2021,  approx. 1506 Lincoln Navigator XXXXXX, driven by Pat, drives by E-W, note vehicle change

approx. 1546 Lincoln Navigator XXXXXX, driven by Pat, drives by W-E

May 4 20212  approx 1642 Infinity QX4 GPF9512, driven by Pat, drives by E-W

approx 1651 Infinity QX4 GPF9512, driven by Pat, drives by W-E, License Plate

approx 1652 Infinity QX4 GPF9512, driven by Pat, drives by E-W

May 5 2021  approx 1123 Infinity QX4 GPF9512, driven by Pat, drives by E-W, Video on site

approx 1254 Infinity QX4 GPF9512, driven by Pat, drives by E-W

approx 1040 Infinity QX4 GPF9512, driven by Pat, drives by Marcia's house

May 12 2021  Approx 0955 Infinity QX4 GPF9512, drives by E-W, License Plate

approx 1308 Infinity QX4 GPF9512, driven by Pat, drives by E-W, takes video, sticker

approx 1311 Infinity QX4 GPF9512, drives by E-W, License Plate, sticker

May 13 2021  approx 1055 Infinity QX4, drives by, E-W

approx  1213 Infinity QX4, drives by, E-W, License Plate

May 14 2021  approx 1523 Infinity QX4, drives by, E-W

May 18 2021  approx  1416 Infinity QW4, drives by E-W

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 52 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 814 of 921 PageID 12612
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 42 of 106

| May 19 2021 | approx | 1411 Infinity QW4, drives by E-W, License Plate |
| May 18 2021 | approx | 1436 Infinity QW4, drives by 4432 Potomac |
| May 21 2021 | approx | 1147 Infinity QW4, drives by E-W, License Plate |
| May 22 2021 | approx | 1345 Infinity QW4, drives by E-W, License plate |
| May 24 2021 | approx | 1132 Infinity QW4, drives by E-W |
| | approx | 1436 Infinity QW4, drives by W-E, License Plate |
| | approx | 1526 Infinity QW4, drives by Marcia's house |
| May 26 2021 | approx | 1035 Infinity QW4, drives by E-W |
| | approx | 1329 Infinity QW4, drives by E-W |
| | approx | 1330 Infinity QW4, drives by W-E |
| | approx | 1333 Infinity QW4, drives by E-W, License Plate |
| | approx | 1334 Infinity QW4, drives by W-E, License Plate, Sticker |
| | approx | 1428 Infinity QW4, drives by Byron's house |
| | approx | 1430 Infinity QW4, drives by Byron's house, Sticker |
| May 27 2021 | approx | 1336 Infinity QW4, drives by E-W |
| May 28 2021 | approx | 1043 Black GMC Yukon, drives by E-W, reverts to GMC, Baseball cap |
| May 29 2021 | approx | 1126 Black GMC Yukon, drives by E-W, License Plate |
| | approx | 1430 Black GMC Yukon, drives by E-W, License Plate |
| | approx | 1432 Black GMC Yukon, drives by W-E |
| | approx | 1432 Black GMC Yukon, drives by E-W, License Plate |
| | approx | 1433 Black GMC Yukon, drives by W-E, License Plate |
| | approx | 1506 Black GMC Yukon, drives by W-E, License Plate |
| June 1 2021 | approx | 1325 Black GMC Yukon, drives by W-E, License Plate |
| June 2 2021 | approx | 1012 Black GMC Yukon, drives by W-E, License Plate, Stop |
| | approx | 1012 Black GMC Yukon, drives by W-E, License Plate, Stop |
| June 4 2021 | approx | 1406 Black GMC Yukon, drives by E-W, License Plate |
| | approx | 1411 Black GMC Yukon, drives by W-E, License Plate |
| June 5 2021 | approx | 0959 Black GMC Yukon, drives by E-W, driven by Pat Blue Shirt |
| | approx | 1007 Black GMC Yukon, drives by E-W, License Plate |

Appx. 07789
011732

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 53 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 815 of 921 PageID 12613

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 43 of 106

June 7 2021        approx 1504 Black GMC Yukon, drives by E-W gb Visual from office BX9

June 9 2021        approx 1022 Black GMC Yukon, drives by E-W taking Pics, Trevor

                   approx 1023 Black GMC Yukon, drives by W-E, stopped

                   approx 1023 Black GMC Yukon, drives by W-E, stopped

                   approx 1024 Black GMC Yukon, drives by E-W,  License Plate, Video

                   approx 1423 Black GMC Yukon, drives by E-W License Plate Red Shirt

                   approx 1524 Black GMC Yukon, drives by E-W, License Plate + Visual Red Shirt


July 7 2021        approx 1037 Black GMC Yukon, drives by E-W, License Plate, visual id

Aug 9 2021         approx 1017 Black GMC Yukon, drives by E-W, License Plate

Aug 11 2021        approx 1141  Black GMC Yukon, drives by E-W, License Plate

Aug  21 2021       approx  1658 Black GMC Yukon, drives by Byron house in

Aug  21 2021       approx  1500 Black GMC Yukon , drives by Byron house out

Aug  21 2021       approx  1509 Black GMC Yukon, drives by Byron house out

Aug  22 2021       approx  1230 Black GMC Yukon, drives by Cole E-W

Aug  22 2021       approx  1316 Black GMC Yukon, drives by Marcia house L-R

Aug  24 2021       approx  1331 Infinity, drives by Cole E-W

Aug  26 2021       approx  1458 Black GMC Yukon, drives by Cole W-E

Sept 18 2021       approx  1720 Black GMC Yukon, drives by Cole E-W

Sept 21 2021       approx  1419 Black GMC Yukon, drives by Cole E-W

Oct 16 2021        approx 1235 Black GMC Yukon, drives by Cole E-W ?? enhance LP

Oct 23 2021        approx 1245 Black GMC Yukon, drives by 3825 Potomac W-E, ID by LP

                   approx 1635 Black GMC Yukon, drives by 3825 Potomac W-E, ?? enhance LP

                   approx 1635 Black GMC Yukon, drives by 3825 Potomac E-W, ?? enhance LP

Oct 30 2021        approx 0953 Black GMC Yukon, drives by 3825 Potomac E-W

                   approx 0956 Black GMC Yukon, drives by 3825 Potomac E-W

Nov 3 2021         approx 1555 Black GMC Yukon, drives by 3825 Marcia' house W-E Profile ID

                   approx 1557 Black GMC Yukon, drives by 3825 Marcia' house W-E Profile ID, either
                   stopped for 2 mins or returned after 2 mins

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 44 of 106

Nov 6 2021      approx  1004 Black GMC Yukon, drives by Cole E-W, D clearly visible – driver

Nov 8 2021      approx 1027 Black GMC Yukon, drives by Cole E-W, got in behind PI visual on LP and
                Driver, Nest Cam Confirm

Nov 10 2021     approx  0747 Black GMC Yukon, drives by Cole W-E, lengthy stop Nest cam confirm

Nov 20 2021     approx 1128 Black GMC Yukon, drives by Cole W-E, Driver Visual

Nov 21 2021     approx 1410 Black GMC Yukon, drives by 3825 W-E, Passenger female? LP

Nov 22 2021     approx 1109 Black GMC Yukon, drives by Cole E-W, Driver visual

Nov 23 2021     approx 1803 Black GMC Yukon, drives by Cole E-W, Driver visual, taking pictures

                Note SE on Cole earlier

                approx 1806 Black GMC Yukon, drives by Cole W-E

                approx 1810 Black GMC Yukon, drives by Cole E-W, Driver visual, taking pictures

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 55 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 817 of 921 PageID 12615
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 45 of 108



**EXHIBIT**

**B**

### DECLARATION OF SCOTT BYRON ELLINGTON

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

Scott Byron Ellington declares as follows:

1.      My name is Scott Byron Ellington. I am over 21 years of age, have never been convicted of a felony or other crime involving moral turpitude, and suffer from no mental or physical disability that would render me incompetent to make this declaration.

2.      I am able to swear, and hereby do swear under penalty of perjury, that the facts stated in this declaration are true and correct and within my personal knowledge.

3.      Starting in January of 2021, my longtime girlfriend, Stephanie Archer ("Stephanie"), noticed a large, Black SUV possibly following her. On February 2, 2021, she was followed by the SUV to my office located at 120 Cole Street, Dallas, Texas. She noticed that the driver in the SUV was taking pictures from inside the vehicle. She confronted the individual while simultaneously taking pictures of the SUV and the driver. The license plate number of the black SUV was BX9K764.

4.      The next day, on February 3, 2021, I was at my office when I noticed a vehicle resembling a tan Toyota 4 Runner stopped in front of my office with the driver either taking photographs or making a videorecording, or both. The license plate number of the vehicle was GPF9512. The driver of the vehicle appeared to be Patrick Daugherty ("Daugherty").

5.      Until January of 2021, I was the general counsel for Highland Capital Management, L.P. ("Highland"). Daugherty is a former employee of Highland. In 2012, Highland sued Daugherty and Daugherty counterclaimed. The lawsuit was ultimately resolved by a jury trial, with

DECLARATION OF SCOTT BYRON ELLINGTON

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 56 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 818 of 921 PageID 12616
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 46 of 106

a jury determining that Daugherty breached his employment agreement and his fiduciary duties and awarding Highland $2,800,000 in attorney's fees and injunctive relief. The jury likewise found that a Highland affiliate, Highland Employee Retention Assets LLC ("HERA") breached the implied duty of good faith and fair dealing and awarded Daugherty $2,600,000 in damages.

6. Since the filing of the original lawsuit in 2012, Daugherty and Highland—or Highland related entities and individuals—have engaged in protracted litigation in several different forums across the country. Daugherty's expressed goal in his campaign is to "get" me and the founder and former CEO of Highland, Jim Dondero.

7. Daugherty has a history of anger issues and I believed that his "drive by" of my office and following Stephanie was his attempt to intimidate me.

8. I hired a private investigator, Greg Brandstatter ("Brandstatter"), to assist in confirming the identity of the driver of the black SUV with license plate BX9K764 and the tan SUV with the license plate GPF9512.

9. Brandstatter's investigation found that Daugherty was the individual following Stephanie and driving by my office. Further, I have reviewed photographs and video recordings of Daugherty outside my home located at 3825 Potomac Ave, Dallas, Texas 75205, my office, the house of my sister, Marcia, and the house of my father, Byron Ellington.

10. Daugherty has been documented outside my office, my home, and the homes of my family 143 times since January of 2021. Both Marcia and Stephanie have confronted Daugherty at times and demanded that he stop his harassment, but he has continued to visit my office and home, and the homes of my family members, despite these demands.

11. I have moved residences three times from January 2021 to today. Daugherty has been recorded outside of the second and third residences to which I moved. The second residence

DECLARATION OF SCOTT BYRON ELLINGTON

was Stephanie's house and was not under my name. For the third residence, my address was not searchable under my name on the Dallas County Central Appraisal District website. Nonetheless, Daugherty was recorded outside of that address within two months of me moving. On information and belief, Daugherty could not have located me at either residence without physically following me or others to those locations.

12.     I believe that Daugherty's actions are leading up to a physical attack by him on either myself, Stephanie, or members of my family. I understand that Brandstatter has reported Daugherty's harassment and stalking to the Dallas Police Department. I also called the Dallas Police Department to report the harassment and stalking. The harassment has caused me fear and anxiety and will continue to cause me fear and anxiety.

13.     Daugherty's harassment further interferes with my daily activities. I am constantly looking out for him when I am at my home or at my office. I had to hire Brandstatter to confirm that Daugherty was the individual stalking me and my family and then document the extent of the harassment. I have had security devices, such as cameras, installed at my personal home and office in response to the harassment. I have had to hire personal security. I have also had to change my daily routine to try and avoid being followed by Daugherty.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 58 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 820 of 921 PageID 12618
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 48 of 106

FURTHER DECLARANT SAYETH NOT.

My name is Scott Byron Ellington. My date of birth is ██████ 1971 ████████. My address is

3825 Potomac Ave., Dallas, Texas 75205. I declare under penalty of perjury that the foregoing is

true and correct.

Executed in Dallas County, State of Texas, on the 11th Day of January, 2022.

_____
Scott Ellington

DECLARATION OF SCOTT BYRON ELLINGTON

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 59 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 821 of 921 PageID 12619
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 49 of 106

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Patricia Perkins Mayes on behalf of Julie Pettit
Bar No. 24065971
pperkins@pettitfirm.com
Envelope ID: 60728974
Status as of 1/12/2022 8:55 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Julie Pettit | | jpettit@pettitfirm.com | 1/11/2022 6:09:57 PM | SENT |
| Beverly Congdon | | bcongdon@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Patricia Perkins Mayes | | pperkins@pettitfirm.com | 1/11/2022 6:09:57 PM | SENT |
| Michael K.Hurst | | mhurst@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Mary GoodrichNix | | mnix@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |
| Nathaniel A.Plemons | | nplemons@lynnllp.com | 1/11/2022 6:09:57 PM | SENT |

# EXHIBIT 2

## Case Information

DC-22-00304 | SCOTT BYRON ELLINGTON vs. PATRICK DAUGHERTY

| Case Number | Court | Judicial Officer |
|---|---|---|
| DC-22-00304 | 101st District Court | WILLIAMS, STACI |
| File Date | Case Type | Case Status |
| 01/11/2022 | OTHER (CIVIL) | OPEN |

## Party

PLAINTIFF
ELLINGTON, SCOTT BYRON

Active Attorneys ▾
Lead Attorney
PETTIT, JULIE A
Retained

DEFENDANT
DAUGHERTY, PATRICK

Address
3621 CORNELL AVE.
DALLAS TX 75205

## Bond

| Bond Type | Bond Number | Bond Amount | Current Bond Status |
|---|---|---|---|

Appx. 07798

011741

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 62 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 824 of 921 PageID 12622

1/17/22, 5:20 Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 52 of 106

| | | |
|---|---|---|
| TRO CASH BOND | $2,500.00 | POSTED |

## Events and Hearings

01/11/2022 NEW CASE FILED (OCA) - CIVIL

01/11/2022 ORIGINAL PETITION ▾

ORIGINAL PETITION

01/11/2022 ISSUE CITATION

01/11/2022 ISSUE TRO AND NOTICE

01/12/2022 TRO HEARING ▾

ORIGINAL PETITION

Judicial Officer
WILLIAMS, STACI

Hearing Time
3:30 PM

Comment
JULIE PETTIT * AD HOC PER JUDGE WILLIAMS

01/12/2022 ORDER - TEMPORARY RESTRAINING ORDER ▾

ORDER - TEMPORARY RESTRAINING ORDER

01/12/2022 NON-SIGNED PROPOSED ORDER/JUDGMENT ▾

(PROPOSED) TEMPORARY RESTRAINING ORDER

Comment
(PROPOSED) TEMPORARY RESTRAINING ORDER

01/14/2022 BOND FILED

01/14/2022 CORRESPONDENCE - LETTER TO FILE ▾

CORRESONDENCE LETTER

Appx. 07799
011742

01/26/2022 Temporary Injunction ▾

Judicial Officer
WILLIAMS, STACI

Hearing Time
9:30 AM

## Financial

ELLINGTON, SCOTT BYRON

| | Total Financial Assessment | | | $379.00 |
|---|---|---|---|---|
| | Total Payments and Credits | | | $379.00 |
| 1/12/2022 | Transaction Assessment | | | $366.00 |
| 1/12/2022 | CREDIT CARD - TEXFILE (DC) | Receipt # 1565-2022-DCLK | ELLINGTON, SCOTT BYRON | ($229.00) |
| 1/12/2022 | STATE CREDIT | | | ($137.00) |
| 1/14/2022 | Transaction Assessment | | | $5.00 |
| 1/14/2022 | PAYMENT (CASE FEES) | Receipt # 2349-2022-DCLK | ELLINGTON, SCOTT BYRON | ($5.00) |
| 1/14/2022 | Transaction Assessment | | | $8.00 |
| 1/14/2022 | CREDIT CARD - TEXFILE (DC) | Receipt # 2553-2022-DCLK | ELLINGTON, SCOTT BYRON | ($8.00) |

## Documents

Appx. 07800

011743

ORIGINAL PETITION

ORDER - TEMPORARY RESTRAINING ORDER

(PROPOSED) TEMPORARY RESTRAINING ORDER

CORRESONDENCE LETTER

Appx. 97801

0TT744

# EXHIBIT 3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 66 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 828 of 921 PageID 12626

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 56 of 106

**CAUSE NO. DC 22-00304**

| | | |
|---|---|---|
| **SCOTT ELLINGTON** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | **JUDICIAL DISTRICT** |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| *Defendant.* | § | **DALLAS COUNTY, TEXAS** |

## TEMPORARY RESTRAINING ORDER

On this day, the Application for a Temporary Restraining Order of Scott Ellington, Plaintiff herein, was heard before this Court.

Based upon the pleadings, records, documents filed by counsel, and the arguments of counsel at the hearing, IT CLEARLY APPEARS:

1. That unless restrained Defendant Patrick Daugherty ("<u>Defendant</u>") will continue to harass Plaintiff Scott Ellington, his girlfriend (Stephanie Archer), his sister (Marcia Maslow), and his father (Byron Ellington) before notice and a hearing on Plaintiff's Application for Temporary Injunction, including committing the following acts:

  a. Traveling, on a near daily basis, to the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington without invitation and parking outside or drivingly slowly past the residences;

  b. Taking pictures and video recordings of the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington;

  c. Traveling, on a near daily basis, to Scott Ellington's office without invitation and parking outside or drivingly slowly past the building where the office is located;

Appx. 7303
0111746

and

d. Taking pictures and video recordings of the office of Scott Ellington.

2. Plaintiff will suffer irreparable harm if Defendant is not restrained immediately from continuing to harass Plaintiff and his family. Specifically, Plaintiff reasonably fears that Defendant may cause him or his family bodily harm, and the accompanying anxiety interferes with his ability to conduct his normal, daily activities.

3. Given the foregoing, there is no adequate remedy at law to grant Plaintiff complete, final and equal relief.

4. IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Patrick Daugherty and his agents, servants, and employees are ORDERED to immediately cease and desist from the following acts from the date of this Order until fourteen (14) days thereafter, or until further order of this Court:

a. Being within 500 feet of Ellington;

b. Being within 500 feet of Ellington's office located at 120 Cole Street, Dallas, Texas 75207;

c. Being within 500 feet of Ellington's residence located at 3825 Potomac Ave, Dallas, Texas 75205;

d. Being within 500 feet of Stephanie Archer;

e. Being within 500 feet of Stephanie Archer's residence located at 4432 Potomac, Dallas, Texas 75025;

f. Being within 500 feet of Marcia Maslow;

g. Being within 500 feet of Marcia's residence located at 430 Glenbrook Dr., Murphy, Texas 75094;

Temporary Restraining Order                                                              Page 2 of 3

011747

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 68 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 830 of 921 PageID 12628

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 58 of 106

    h.  Being within 500 feet of Byron Ellington;

    i.  Being within 500 feet of Byron Ellington's residence located at 5101 Creekside Ct.,
Parker, Texas 75094;

    j.  Photographing, videorecording, or audio recording Ellington, Stephanie Archer,
Marcia Maslow, or Byron Ellington;

    k.  Photographing or videorecording the residences or places of business of Ellington,
Stephanie Archer, Marcia Maslow, or Byron Ellington; and

    l.  Directing any communications toward Ellington, Stephanie Archer, Marcia
Maslow, or Byron Ellington.

5.    IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff's
Application for Temporary Injunction be heard on _Jen. 26th_ at _9(2)_ .M.
Defendant is commanded to appear at that time and show cause, if any exist, why a temporary
injunction should not be issued against said Defendant.

6.    The clerk of the above-entitled court shall issue a temporary restraining order in
conformity with the law and the terms of this order upon the filing by Plaintiff of the bond
hereinafter set.

7.    This order shall not be effective until Plaintiff deposits with the Clerk, a bond in
the amount of $ _2,500.00_ in conformity with the law.

SIGNED and ENTERED on _4:10_ at _P_ . M.

_January 12, 2022_

PRESIDING JUDGE

Appx. 27805
011748

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 69 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 831 of 921 PageID 12629
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 59 of 106

PAID TRO

FILED
1/14/2022 2:00 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Alicia Mata DEPUTY



**2101 Cedar Springs, Suite 1540 | Dallas, Texas 75201**
**Phone: 214-329-0151 | Fax: 214-329-4076**

January 14, 2022

*Via Email*
Chief Clerk
101ˢᵗ Civil District Court
600 Commerce Street
6th Floor West
Dallas, TX 75202

      RE:    Cause Number DC-22-00304; *Scott Byron Ellington v. Dr. Patrick Daugherty*; in
              the 101ˢᵗ Civil District Court, Dallas County, Texas.

Dear Clerk:

      Plaintiff hereby pays the fee of $8.00 for the Temporary Restraining Order along with this
filing. Thank you for your attention to this matter.

                    Sincerely,

                    /s/ Julie Pettit

                    Julie Pettit

JP/ppm

Appx. 37806

011749

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 70 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 832 of 921 PageID 12630
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 60 of 106

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Patricia Perkins Mayes on behalf of Julie Pettit
Bar No. 24065971
pperkins@pettitfirm.com
Envelope ID: 60838852
Status as of 1/14/2022 4:21 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Julie Pettit | | jpettit@pettitfirm.com | 1/14/2022 2:00:21 PM | SENT |
| Beverly Congdon | | bcongdon@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |
| Patricia Perkins Mayes | | pperkins@pettitfirm.com | 1/14/2022 2:00:21 PM | SENT |
| Michael K.Hurst | | mhurst@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |
| Mary GoodrichNix | | mnix@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |
| Nathaniel A.Plemons | | nplemons@lynnllp.com | 1/14/2022 2:00:21 PM | SENT |

CAUSE NO. DC 22-00304

| | | |
|---|---|---|
| **SCOTT ELLINGTON** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **PATRICK DAUGHERTY,** | § | |
| | § | |
| *Defendant.* | § | **DALLAS COUNTY, TEXAS** |

## TEMPORARY RESTRAINING ORDER

On this day, the Application for a Temporary Restraining Order of Scott Ellington, Plaintiff herein, was heard before this Court.

Based upon the pleadings, records, documents filed by counsel, and the arguments of counsel at the hearing, IT CLEARLY APPEARS:

1.     That unless restrained Defendant Patrick Daugherty ("Defendant") will continue to harass Plaintiff Scott Ellington, his girlfriend (Stephanie Archer), his sister (Marcia Maslow), and his father (Byron Ellington) before notice and a hearing on Plaintiff's Application for Temporary Injunction, including committing the following acts:

   a.   Traveling, on a near daily basis, to the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington without invitation and parking outside or drivingly slowly past the residences;

   b.   Taking pictures and video recordings of the personal residences of Scott Ellington, Stephanie Archer, Marcia Maslow, and Byron Ellington;

   c.   Traveling, on a near daily basis, to Scott Ellington's office without invitation and parking outside or drivingly slowly past the building where the office is located;

Appx. 97808

011751

and

    d.  Taking pictures and video recordings of the office of Scott Ellington.

    2.    Plaintiff will suffer irreparable harm if Defendant is not restrained immediately from continuing to harass Plaintiff and his family. Specifically, Plaintiff reasonably fears that Defendant may cause him or his family bodily harm, and the accompanying anxiety interferes with his ability to conduct his normal, daily activities.

    3.    Given the foregoing, there is no adequate remedy at law to grant Plaintiff complete, final and equal relief.

    4.    IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Patrick Daugherty and his agents, servants, and employees are ORDERED to immediately cease and desist from the following acts from the date of this Order until fourteen (14) days thereafter, or until further order of this Court:

    a.  Being within 500 feet of Ellington;

    b.  Being within 500 feet of Ellington's office located at 120 Cole Street, Dallas, Texas 75207;

    c.  Being within 500 feet of Ellington's residence located at 3825 Potomac Ave, Dallas, Texas 75205;

    d.  Being within 500 feet of Stephanie Archer;

    e.  Being within 500 feet of Stephanie Archer's residence located at 4432 Potomac, Dallas, Texas 75025;

    f.  Being within 500 feet of Marcia Maslow;

    g.  Being within 500 feet of Marcia's residence located at 430 Glenbrook Dr., Murphy, Texas 75094;

---

Appx. 07809

011752

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 73 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 835 of 921    PageID 12633
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 63 of 106

h.  Being within 500 feet of Byron Ellington;

i.  Being within 500 feet of Byron Ellington's residence located at 5101 Creekside Ct., Parker, Texas 75094;

j.  Photographing, videorecording, or audio recording Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington;

k.  Photographing or videorecording the residences or places of business of Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington; and

l.  Directing any communications toward Ellington, Stephanie Archer, Marcia Maslow, or Byron Ellington.

5.      IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff's Application for Temporary Injunction be heard on _____ at _____M. Defendant is commanded to appear at that time and show cause, if any exist, why a temporary injunction should not be issued against said Defendant.

6.      The clerk of the above-entitled court shall issue a temporary restraining order in conformity with the law and the terms of this order upon the filing by Plaintiff of the bond hereinafter set.

7.      This order shall not be effective until Plaintiff deposits with the Clerk, a bond in the amount of $_____ in conformity with the law.

SIGNED and ENTERED on _____ at _____ M.

_____
PRESIDING JUDGE

Temporary Restraining Order                                        Page 3 of 3

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 74 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 836 of 921 PageID 12634
Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 64 of 106

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Beverly Congdon on behalf of Michael K. Hurst
Bar No. 10316310
bcongdon@lynnllp.com
Envelope ID: 60766800
Status as of 1/13/2022 8:43 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Julie Pettit | | jpettit@pettitfirm.com | 1/12/2022 4:06:06 PM | SENT |
| Beverly Congdon | | bcongdon@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |
| Patricia Perkins Mayes | | pperkins@pettitfirm.com | 1/12/2022 4:06:06 PM | SENT |
| Michael K.Hurst | | mhurst@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |
| Mary GoodrichNix | | mnix@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |
| Nathaniel A.Plemons | | nplemons@lynnllp.com | 1/12/2022 4:06:06 PM | SENT |

# EXHIBIT 4

Appx 07812

011755

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 76 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 838 of 921    PageID 12636
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 66 of 106

**Exhibit 4:** Counsel of Record in the State
Court Action

### GRAY REED

Ruth Ann Daniels
State Bar No. 15109200
rdaniels@grayreed.com
Andrew K. York
State Bar No. 24051554
dyork@grayreed.com
Drake M. Rayshell
State Bar No. 24118507
drayshell@grayreed.com
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332


**ATTORNEYS FOR PATRICK
DAUGHERTY**

### THE PETTIT LAW FIRM

Julie Pettit
State Bar No. 24065971
jpettit@pettitfirm.com
David B. Urteago
State Bar No. 24079493
durteago@pettitfirm.com
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076

### LYNN PINKER HURST &
### SCHWEGMANN, LLP

Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Mary Goodrich Nix
State Bar No. 24002694
mnix@lynnllp.com
Nathaniel A. Plemons
State Bar No. 24121059
nplemons@lynnllp.com
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839


**ATTORNEYS FOR SCOTT BYRON
ELLINGTON**

# EXHIBIT 5

011757

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 78 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 840 of 921    PageID 12638
Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 68 of 106

## Drew K. York

| | |
|---|---|
| **From:** | Julie Pettit <jpettit@pettitfirm.com> |
| **Sent:** | Friday, January 14, 2022 11:21 AM |
| **To:** | Drew K. York; Ruth Ann Daniels |
| **Cc:** | Michael K. Hurst; Mary Nix; Nathaniel Plemons |
| **Subject:** | [EXTERNAL] DC-22-00304 Ellington v. Daugherty |
| **Attachments:** | 2022-01-11 Plaintiff's Original Petition and Appl for TRO.pdf; 2022-01-12 Temporary Restraining Order.pdf |

Ruth Ann and Drew,

We have several pressing issues we would like to address with you regarding the upcoming injunction hearing.

 1.   Attached is the TRO signed by Judge Williams and the file-stamped petition. You all have already made an appearance in the case, so please let this email serve as service of the petition on you. Will you likewise accept service of the TRO, or would you like us to serve Mr. Daugherty?

 2.   We believe this case is a related case and should be transferred to Judge Hoffman's court.  We do not yet know if the transfer will be automatic.  If it is not automatically transferred, we intend to file a Motion to Transfer. Please let us know today if we can mark you as unopposed on our motion to transfer.

 3.   We would like to exchange written discovery on an expedited basis prior to the injunction hearing. Would you all agree that the parties will exchange a maximum of 8 RFPs with responses and documents to be produced at least 4 days prior to the hearing? Please let us know today, as we will be filing a motion for expedited discovery if we do not have an agreement on this.

 4.   We will agree to accept a subpoena for Mr. Ellington's appearance at the injunction. Are you authorized to do the same for Mr. Daugherty?

Please let us know your position on these issues. If you would prefer to talk by phone, let me know a time today that works for you and I will give you a call.

Best Regards,

Julie Pettit Greeson
The Pettit Law Firm
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Direct: 214-329-1846
Fax: 214-329-4076
jpettit@pettitfirm.com

THE **PETTIT**
**LAW** FIRM

Appx. 97815
011758

Case 22-03003-sgj Doc 1-1 Filed 01/18/22   Entered 01/18/22 09:25:21   Page 69 of 106

# EXHIBIT 6

Appx. 07816

011759

Case 19-34054-sgj11 Doc 3089 Filed 01/18/22 Entered 01/18/22 09:25:01 Page 70 of 163

# **EXHIBIT 1**

Final Execution Copy

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Settlement") is made and entered into by and between (i) Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), and (ii) Patrick Hagaman Daugherty ("Daugherty" and together with HCMLP, the "Parties," and individually as a "Party"). This Settlement provides for the treatment of certain claims asserted by Daugherty against the Debtor, and for the Parties to take certain other specified actions in settlement thereof.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Debtor's chapter 11 case (the "Bankruptcy") is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, on February 2 and 3, 2021, the Court conducted a confirmation hearing with respect to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Docket No. 1808] (the "Plan");

WHEREAS, on February 8, 2021, the Court rendered an opinion from the bench in which it confirmed the Plan [Docket No. 1924];

WHEREAS, on February 22, 2021, the Court issued an order confirming the Plan [Docket No. 1943];

WHEREAS, on August 11, 2021, the Effective Date (as defined in the Plan) occurred [Docket No. 2700];

WHEREAS, Daugherty is a former employee and limited partner of the Debtor and has

DOCS_NY:42669.9 36027/002

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 82 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 844 of 921   PageID 12642
Case 19-34054-sgj11 Doc 3089-1 Filed 08/22/21 Entered 08/22/21 15:27:01 Page 79 of 130

served in other positions with affiliates and former affiliates of the Debtor;

WHEREAS, at the time of his resignation, Daugherty owned 19.1% of the preferred units of

Highland Employee Retention Assets LLC ("HERA"), an employee deferred compensation vehicle

managed by the Debtor and Highland ERA Management, LLC ("ERA") and contends that he owned

or had the right to own all of the preferred units of HERA;

WHEREAS, prior to his resignation from HCMLP, Daugherty was awarded units of

HERA, which vehicle owned interests in Restoration Capital Partners, LP ("RCP"), an HCMLP

managed private equity fund, and other investments;

WHEREAS, in April 2012, the Debtor commenced an action against Daugherty in Texas

state court (the "Texas Action"), and Daugherty subsequently asserted counterclaims for breach of

contract and defamation, and third-party claims against HERA and others;

WHEREAS, after a three-week trial, the jury returned a verdict partially in favor of the

Debtor, but Daugherty prevailed on his claims against the Debtor and James Dondero ("Dondero")

for defamation with malice and a third-party claim against HERA and was awarded damages of

$2.6 million against HERA, plus prejudgment and post-judgment interest at 5% (the "HERA

Judgment");[1]

WHEREAS, in July 2017, after being unable to collect on the HERA Judgment, Daugherty

commenced an action against the Debtor, Dondero, HERA, and ERA Management in the Delaware

Chancery Court (the "Delaware Court"), in a case captioned *Daugherty v. Highland Capital

Management, L.P., et al.*, C.A. No. 2017-0488-MTZ, for fraudulent transfer, promissory estoppel,

unjust enrichment, indemnification, and fees on fees (the "Highland Delaware Case");

---

[1] The Debtor prevailed on its claims against Mr. Daugherty for breach of contract and breach of fiduciary duty for non-monetary damages and obtained an award of $2.8 million in attorney's fees. The HERA Judgment was affirmed on appeal on December 1, 2016.

App. 07819
0TT762

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 83 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 845 of 921 PageID 12643
Case 19-34054-sgj11 Doc 3089-1 Filed 01/18/22 Entered 01/18/22 15:20:11 Page 83 of 160

WHEREAS, the Delaware Court in the Highland Delaware Case (i) found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds, and (ii) ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Delaware Court applied the "crime-fraud exception" to the attorney-client privilege assertion, and such rulings have not been overturned;

WHEREAS, Daugherty asserts that such withholding of documents and the failure to search defendants' and their employees personal electronic devices for stored documents and texts as well as other emails and domain names such as sasmgt.com and gmail.com which were in their possession and control and to provide required discovery injured him by undermining his attempts to build an evidentiary record to support his claims against the Debtor and the other defendants in the Highland Delaware Case;

WHEREAS, on October 14, 2019, the Highland Delaware Case proceeded to trial and two days later, on October 16, 2019, before the completion of the trial and before the Delaware Court ruled on Daugherty's and the Debtor's cross-motions for summary judgment regarding indemnification and fees on fees, the Debtor filed for bankruptcy;

WHEREAS, on December 1, 2019, Daugherty filed a separate lawsuit in the Delaware Court, captioned *Daugherty v. Dondero, et al.*, C.A. No. 2019-0956-MTZ, against Dondero, HERA, ERA, Hunton Andrews Kurth LLP ("Andrews Kurth"), Marc Katz ("Katz"), Michael Hurst ("Hurst"), the Debtor's Chief Compliance Officer, the Debtor's then in-house counsel (Isaac Leventon ("Leventon")), and the Debtor's then general counsel (Scott Ellington ("Ellington")), for conspiracy to commit fraud, among other claims (the "HERA Delaware Case" and together with the Highland Delaware Case, the "Delaware Cases");

WHEREAS, on April 1, 2020, Daugherty filed a general, unsecured, non-priority claim

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 84 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 846 of 921 PageID 12644
Case 19-34054-sgj11 Doc 3089-4 Filed 01/12/23 Entered 01/12/23 15:12:01 Page 7 of 10

against the Debtor in the amount of at "least $37,483,876.59," and such claim was denoted by the Debtor's claims agent as Proof of Claim No. 67 ("Proof of Claim No. 67");

WHEREAS, on April 6, 2020, Daugherty filed a general, unsecured, non-priority claim against the Debtor in the amount of at "least $37,482,876.62" that superseded Proof of Claim No. 67 and that was denoted by the Debtor's claims agent as Proof of Claim No. 77 ("Proof of Claim No. 77");

WHEREAS, on August 31, 2020, the Debtor commenced an adversary proceeding against Daugherty by filing a complaint (the "Complaint") in which the Debtor: (1) objected to Proof of Claim No. 77 on various grounds (the "Claim Objection"), and (2) asserted a cause of action for the subordination of part of Daugherty's claim pursuant to section 510(b) of the Bankruptcy Code. Adv. Proc. No. 20-03107 (the "Adv. Proc.") [Adv. Docket No. 1] (the "Adversary Proceeding");

WHEREAS, on September 29, 2020, Daugherty filed his answer to the Complaint [Adv. Docket No. 8] (the "Answer");

WHEREAS, on September 24, 2020, Daugherty filed his *Motion to Confirm Status of Automatic Stay, or Alternatively to Modify Automatic Stay* [Docket No. 1099] (the "Stay Motion") pursuant to which he sought to sever the Debtor from the Highland Delaware Case and then consolidate the remaining claims in the Highland Delaware Case into the HERA Delaware Case and proceed with one case against the non-Debtor parties;[2]

WHEREAS, on October 23, 2020, Daugherty filed a motion seeking leave to amend his Proof of Claim No. 77 [Docket No. 1280] (the "POC Amendment Motion"). The amended proof

---

[2] On October 8, 2020, the Debtor commenced a second adversary proceeding against Daugherty (the "Second Adversary Proceeding"), seeking to enjoin him from prosecuting the Delaware Cases. Adv. Proc. 20-03128 ("2d Adv. Proc.") [2d Adv. Proc. Docket No. 1]. On January 29, 2021, the parties filed a Settlement that resolved the Second Adversary Proceeding, and the Second Adversary Proceeding was subsequently dismissed with prejudice. [2d Adv. Proc. Docket No. 12].

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 85 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 847 of 921 PageID 12645
Case 19-34054-sgj11 Doc 1309 Filed 11/22/20 Entered 11/22/20 15:12:01 Page 5 of 30

of claim attached to the POC Amendment Motion increased Daugherty's general, unsecured, non-priority claim against the Debtor to the amount of at "least $40,410,819.42" and sought to supersede Proof of Claim No. 67 and Proof of Claim No. 77;

WHEREAS, on October 23, 2020, Daugherty filed his *Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018 Motion*, seeking for his Claim to be temporarily allowed for voting purposes in this amount of $40,410,819.42 [Docket No. 1281] (the "3018 Motion");

WHEREAS, on November 3, 2020, the Court granted the Stay Motion [Docket No. 1327];

WHEREAS, the Debtor opposed the 3018 Motion, and after conducting an evidentiary hearing for the limited purpose of determining the 3018 Motion, the Court entered an order temporarily allowing Daugherty's Claim only for voting purposes in the amount of $9,134,019 [Docket No. 1474];

WHEREAS, on December 10, 2020, the Court entered an order [Docket No. 1533] granting the POC Amendment Motion, and Daugherty was permitted to file an amendment to his proof of claim. On December 23, 2020, Daugherty filed an amended proof of claim, designated by the Debtor's claim agent as Proof of Claim No. 205 ("Proof of Claim No. 205" or the "Daugherty Claim"). Proof of Claim No. 205 superseded Proof of Claim No. 77 and increased the amount of the Daugherty's Claim to $40,710,819.42;

WHEREAS, on November 30, 2020, Daugherty filed his Motion to Lift the Automatic Stay (the "Lift Stay Motion") [Docket No. 1491] seeking to lift the automatic stay to allow him to finish his trial in the Delaware Court and liquidate his claims. The Debtor opposed the Lift Stay Motion, and after a hearing was held on December 17, 2020, the Court denied the relief requested in the Lift Stay Motion [Docket No. 1612];

5

WHEREAS, except with respect to the Reserved Claim (as defined below), the Parties have agreed to settle and resolve all claims and disputes between them and their respective current affiliates, managed entities, and employees, including the Daugherty Claim, on the terms set forth in this Settlement:

## AGREEMENT

**NOW, THEREFORE**, after good-faith, arms-length negotiations, and in consideration of the foregoing, it is hereby stipulated and agreed that:

1. <u>Allowed Claims</u>: In full satisfaction of the entirety of the Daugherty Claim against the Debtor and HCMLP Released Parties (defined below), excluding the Reserved Claim, Daugherty shall receive (a) an allowed general unsecured Class 8 claim in the amount of $8,250,000; (b) an allowed subordinated general unsecured Class 9 claim in the amount of $3,750,000; and (c) a one-time lump sum cash payment in the amount of $750,000 to be paid within 5 business days of Bankruptcy Court approval of this Settlement Agreement.

2. <u>Recovery</u>: The Debtor makes no representation or warranty as to the recovery on Class 8 or Class 9 claims under the Plan.

3. <u>Observation Access</u>: As soon as practicable following entry of an order of the Bankruptcy Court approving this Settlement, HCMLP shall use reasonable efforts to petition the Claimant Trust Oversight Board[3] to permit Daugherty to have access as an observer to meetings of the Claimant Trust Oversight Board, subject to policies, procedures, and agreements applicable to other observers of the Claimant Trust Oversight Board, including policies, procedures, and agreements related to confidentiality and common interest. Whether Daugherty will be granted observer access and any continuing observer access is and will remain at the sole discretion of the

---

[3] The Claimant Trust Oversight Board refers to the Oversight Board as defined in the August 11, 2021 Highland Claimant Trust Agreement establishing the Claimant Trust, as defined therein.

Appx. 27823

011766

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 87 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 849 of 921 PageID 12647
Case 19-34054-sgj11 Doc 3089-14 Filed 06/18/22 Entered 06/18/22 09:25:01 Page 7 of 30

Claimant Trust Oversight Board.

     4.   <u>RCP Track Record</u>:  HCMLP shall use reasonable efforts to provide Daugherty with data constituting the investment performance track record of RCP during Daugherty's tenure at HCMLP.  Daugherty shall not be entitled to any compensation with respect to the performance of RCP.  HCMLP makes no representations or warranties regarding such data and takes no responsibility with respect to the use of such data for any purposes.

     5.   <u>Daugherty Releases</u>:  Except as specifically provided in this paragraph 5, and to the maximum extent permitted by applicable law, the Debtor, on behalf of itself and each of the HCMLP Entities and HCMLP Parties (as those terms are defined in paragraph 6 below), hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue Daugherty, his successors, affiliates, and assigns, (and in each such category to include their respective advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, and designees) (collectively, the "<u>Daugherty Additional Release Parties</u>" and together with Daugherty, the "<u>Daugherty Released Parties</u>"), in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, or the Delaware Cases, all existing as of the date hereof (collectively, the "<u>HCMLP Released Claims</u>"); <u>provided</u>, <u>however</u>, that such release shall not

App. 07821
011767

apply with respect to any and all defenses that HCMLP or the HCMLP Entities may have to the Reserved Claim or the Reserve Motion (as those terms are defined herein) or Daugherty's obligations under this Settlement. For the avoidance of doubt, the HCMLP Released Claims include all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

6. <u>HCMLP Releases</u>: Except as specifically provided in this paragraph 6, and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Released Parties, hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (a)(i) HCMLP; (ii) Strand Advisors Inc.; (iii) the Claimant Trust; (iv) the Claimant Trust Oversight Board; (v) the Highland Litigation Sub-Trust; (vi) the Highland Indemnity Trust; (vii) any entity of which greater than fifty percent of the voting ownership is held directly or indirectly by HCMLP as of the date hereof and any entity otherwise directly or indirectly controlled by HCMLP as of the date hereof,; and (viii) any entity managed by either HCMLP or a direct or indirect subsidiary of HCMLP, including Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Master, L.P. (and all of their respective general partners, feeder funds, managers, and affiliates) (the foregoing (a)(i) through (a)(viii) the "<u>HCMLP Entities</u>"), and (b) with respect to each such HCMLP Entity, such HCMLP Entity's respective current (meaning employed in their respective roles as of the date hereof) advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders (but not the shareholders of Strand Advisors Inc.), agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "<u>HCMLP Parties</u>," and together with the

8

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 89 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 851 of 921    PageID 12649
Case 19-34054-sgj11 Doc 3085 Filed 08/12/08/22 Entered 08/12/08/22 17:01:25 Page 75 of 106 of
30

HCMLP Entities, the "HCMLP Released Parties"),[4] in each case acting in such capacity, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, or the Highland Delaware Case (collectively, the "Daugherty Released Claims"); provided, however, that such release shall not apply with respect to the Reserved Claim or the Reserve Motion (as those terms are defined in paragraph 9 below) or HCMLP's obligations under this Settlement.  This release expressly applies to all current employees of HCMLP as the Reorganized Debtor (as defined in the Plan), in their capacities as such.  For the avoidance of doubt, the Daugherty Released Claims includes all claims or causes of action and facts, known or unknown, that exist as of the date hereof but do not include or apply to claims or causes of action based on facts occurring after the date hereof.

7.    Reservation of Daugherty Rights:  Notwithstanding anything contained herein to the contrary, the term HCMLP Released Parties shall not include (a) NexPoint Advisors, L.P. (or any of its subsidiaries and employees, advisors, or agents), (b) the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and any of their respective employees, advisors, or agents), (c) NexBank, SSB (or any of its subsidiaries, employees, advisors, or agents), (d) James Dondero or any trust in which Dondero or any of his family members are a trustee or beneficiary (or any trustee acting for such trust), including but not limited to Hunter

---

[4] The Daugherty Additional Released Parties and the HCMLP Released Parties are collectively referred to as the "Additional Released Parties."

APPX 7826
011769

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 90 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 852 of 921 PageID 12650
Case 19-34054-sgj11 Doc 3445 Filed 08/12/22 Entered 08/12/22 15:17:01 Page 106 of
30

Mountain Investment Trust, The Get Good Trust, Dugaboy Investment Trust, SLHC Investment Trust, (e) HERA (subject to paragraph 8 below), (f) ERA (subject to paragraph 8 below), (g) Grant Scott, (h) Mark Okada and any trust in which Mark Okada or any of his family members are a beneficiary (or any trustee acting for such trust in their respective capacities), (i) Ellington, (j) Leventon, (k) Katz, (l) Hurst, (m) Andrews Kurth, or (m) any other former employee (as of the date hereof) of the HCMLP Released Parties.

8. <u>HERA and ERA</u>: The Parties acknowledge and agree that as of the date hereof, HERA and ERA have no material assets other than potential claims that may exist against persons or entities not released at or prior to the date hereof, and no claims against the HCMLP Released Parties. The allowed claims provided in paragraph 1 hereof are expressly agreed to in order to satisfy any liability the Debtor may have in connection with the HERA Judgment. To facilitate recovery of such potential claims – which expressly excludes any and all claims by or in the name of HERA and ERA against any of the HCMLP Released Parties -- HCMLP will transfer its interests in HERA and ERA to Daugherty. Such transfer will include the HERA and ERA books and records (spreadsheet) maintained on HCMLP's system. Such transfer will be without representation or warranty of any type; including, for the avoidance of doubt, without any representation or warranty as to the merits of the potential claims or the efficacy of the transfer of the potential claims. Such transfer will be without any liability or material cost to HCMLP or its affiliates or the other HCMLP Released Parties, including any liability in respect of any assets that HERA or ERA ever actually or allegedly owned, possessed, or controlled and that were actually or allegedly transferred, conveyed, sold, written off or otherwise disposed of (in any such case, a "<u>Disposition</u>"). In connection with the transfer, HERA and ERA have expressly released the HCMLP Released Parties from any and all claims, including any claims actions or remedies related

APPX 07827

to any Disposition, either of them may have against any HCMLP Released Party now or in the future (the "HERA and ERA Release"). Daugherty on behalf of himself and each of the Daugherty Released Parties acknowledges, accepts, and agrees not to challenge the HERA and ERA Release or support any challenge thereto. A copy of the HERA and ERA Release is annexed hereto as **Exhibit A**. Daugherty acknowledges and agrees that even though HERA and ERA are not HCMLP Released Parties under this Agreement, Daugherty and all Daugherty Released Parties shall (a) not seek to hold any HCMLP Released Party liable for any action or inaction taken by or on behalf of HERA or ERA, including through any derivative, veil-piercing or similar cause of action or remedy; and (b) not seek to recover damages or obtain any form of relief against any HCMLP Released Party on account of any action or inaction taken by or on behalf of HERA or ERA, including through any veil piercing or similar cause of action or remedy. If, for any reason, HERA or ERA, or any person or entity acting on their behalf, recovers anything from any HCMLP Released Party, Daugherty shall promptly turnover to HCMLP or its successors and assigns any amounts actually recovered by Daugherty or any Daugherty Released Party, from HERA or ERA arising from, related to, or derived from any claim that HERA or ERA or any person or entity acting on their behalf has or may have against any HCMLP Released Party. HCMLP will provide reasonable assistance to Daugherty to assist with the preparation of any required HERA K-1s for 2021, but any requirement to provide such K-1s will be the obligation, if any, of HERA.

9. IRS Compensation Claim: In section 4(ii) of the Addendum to Proof of Claim No. 205, Daugherty contends that he has a contingent, unliquidated claim against the Debtor arising out of a 2008/2009 compensation letter (the "Reserved Claim"), which claim is also related to an audit/dispute between the Debtor and the Internal Revenue Service (the "IRS") (the dispute between the Debtor and IRS being referred to herein as the "IRS Audit Dispute"). The Debtor

Appx. 07828

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 92 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 854 of 921 PageID 12652
Case 19-34054-sgj11 Doc 3089 Filed 08/12/08 Entered 08/12/08 15:17:01 Page 12 of
30

disputes the validity and amount of the Reserved Claim. Daugherty shall retain the Reserved

Claim solely against the Debtor and not against any other HCMLP Released Party, and the Debtor

reserves the right to assert any and all defenses thereto. Any litigation by and between the Debtor

and Daugherty concerning the validity and amount of the Reserved Claim shall be stayed until the

IRS makes a final determination with respect to the IRS Audit Dispute; provided, however, that

Daugherty may file a motion with the Bankruptcy Court to have the Reserved Claim estimated for

purposes of establishing a reserve as a "Disputed Claim" under the Debtor's Plan (the "Reserve

Motion"), and the Debtor (and any successor) reserves the right to assert any and all defenses

thereto. Notwithstanding the foregoing, Daugherty may address any personal claim or personal

liability to the IRS as a result of the IRS Audit Dispute, including settlement of any such claims;

provided, however, Daugherty agrees to forego settling or addressing any claims with the IRS

without the written consent of the Debtor until March 31, 2022.

      10.    Current HCMLP Employees: The HCMLP Parties set forth on **Appendix A** hereto

are currently employed by the Debtor are HCMLP Released Parties. By executing a copy of this

Settlement and delivering it to Daugherty, each of the persons on Appendix A agrees not to sue,

attempt to sue, or threaten or work with or assist any entity or person to sue, attempt to sue, or

threaten any Daugherty Released Party on or in connection with any claim or cause of action

arising prior to the date of this Settlement.

      11.    Dismissal and Motions in Other Actions. Within ten business days after approval

of this Settlement by the Bankruptcy Court, the Parties shall take all steps necessary (a) to dismiss

with prejudice (i) the Highland Delaware Case, as against the Debtor and any HCMLP Released

Party, and (ii) the HERA Delaware Case, as against every HCMLP Released Party, (b) to file an

agreed motion and proposed order to partially vacate the final judgment entered against Daugherty

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 93 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 855 of 921    PageID 12653
Case 19-34054-sgj11 Doc 3008 Filed 08/12/22 Entered 08/12/22 15:17:01 Page Page 14 of
30

in the Texas Action, (c) withdraw HCMLP's objection to the Daugherty motion to recuse in the

Texas Action, and (d) to dismiss the Adversary Proceeding with prejudice. The parties shall file

the foregoing motions and withdrawals substantially in the form of the documents annexed hereto

as **Exhibit B**.

12.     Additional Third Party Claims Discovery:  The Debtor (a) shall accept service of

any subpoenas via email served by Daugherty in connection with the Delaware Cases on behalf of

itself, the HCMLP Entities, the HCMLP Parties (but only in their capacity as employees of

HCMLP); and (b) acknowledge and consent to the jurisdiction of the Delaware Chancery Court

for purposes of enforcing any such subpoenas, subject in all respects to the rights that the HCMLP

Entities and HCMLP Parties to defend the requested production, if any.

13.     Settlement of Third Party Claims:  Daugherty shall not settle any claims or causes

of action against any current or former director, officer, employee, agent or representative of

HCMLP or Strand Advisors Inc. (collectively, the "Potentially Indemnified Parties") to the extent

such claims have been brought or could have been brought against any Potentially Indemnified

Parties, if any such settlement designates, defines or describes the settled claims as arising out of

or relating to simple negligence or as having otherwise been within the scope of employment of

the Potentially Indemnified Party.

14.     Claims Register:  As soon as practicable after the Settlement Effective Date,

HCMLP shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register

in accordance with this Settlement.

15.     Daugherty Representations:  Daugherty represents and warrants to each of the

HCMLP Released Parties that (a) he has full authority to release the Daugherty Released Claims

and has not sold, transferred, or assigned any Daugherty Released Claim to any other person or

Appx. 07830
011773

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 94 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 856 of 921 PageID 12654
Case 19-34054-sgj11 Doc 3080 Filed 08/12/20 Entered 08/12/20 15:17:01 Page 14 of
30

entity and that (b) no person or entity other than Daugherty has been, is, or will be authorized to bring, pursue, or enforce any Daugherty Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) Daugherty.

16.    <u>HCMLP Representations</u>:  Each of HCMLP and each HCMLP Released Party who has signed this Settlement represents and warrants to Daugherty that (a) he, she or it has not sold, transferred, pledged, assigned or hypothecated any HCMLP Released Claim to any other person or entity and (b) he, she, or it has full authority to release any HCMLP Released Claims that such HCMLP Released Party personally has against Daugherty.

17.    <u>Additional HCMLP Representations</u>:  HCMLP represents and warrants that it is releasing the HCMLP Released Claims on behalf of the HCMLP Entities to the maximum extent permitted by any contractual or other legal rights HCMLP possesses.  To the extent any of the HCMLP Entities dispute HCMLP's right to release the HCMLP Released Claims on behalf of any of the HCMLP Entities, HCMLP shall use commercially reasonable efforts to support Daugherty's position, if any, that such claims were released herein.  For the avoidance of doubt, HCMLP will have no obligations to assist Daugherty under this paragraph if HCMLP has been advised by external counsel that such assistance could subject HCMLP to liability to any third party or if such assistance would require HCMLP to expend material amounts of time or money.  HCMLP shall not argue in any forum that the non-signatory status of any of the HCMLP Entities to this Settlement shall in any way affect the enforceability of this Settlement vis-à-vis any of the HCMLP Entities.  The Parties agree that all of the HCMLP Entities are intended third-party beneficiaries of this Release.

18.    <u>HCMLP Covenant</u>:  HCMLP and the HCMLP Entities covenant and agree that they will not pursue or seek to enforce any injunctions entered in the Texas Action against

Appx. 27831
0T1774

Daugherty.

19. <u>Entire Agreement; Modification</u>: This Settlement contains the entire agreement between the Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between the Parties. This Settlement may not be modified other than by a signed writing executed by the Parties.

20. <u>Bankruptcy Court Approval</u>: Notwithstanding anything to the contrary contained herein, the effectiveness of HCMLP and the Claimant Trust's execution of this Settlement shall be subject to entry of an order of the Bankruptcy Court approving this Settlement. HCMLP shall take all steps necessary to file with the Bankruptcy Court a motion for an order approving this Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code (the "<u>Motion</u>"). The parties agree to cooperate in the preparation and prosecution of the Motion which shall be filed no later than 5 business day after execution of this Settlement, unless such time is extended by mutual agreement.

21. <u>Counterparts</u>: This Settlement may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument and shall be effective against a Party or Additional Released Party upon approval of the Settlement by the Bankruptcy Court.

22. <u>Governing Law; Jurisdiction</u>: This Settlement will be exclusively governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflicts of law principles, and all claims relating to or arising out of this Settlement, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of Delaware, excluding Delaware's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Settlement.

Appx. 07832

011775

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 858 of 921 PageID 12656
Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 96 of
30

23.    <u>Headings</u>:  Paragraph headings included herein are for convenience and shall have

no impact whatsoever on the meaning or interpretation of any part of this Settlement.

[Remainder of page intentionally left blank]

Appx 97333
011776

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 97 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 859 of 921    PageID 12657
Case 19-34054-sgj11 Doc 3088 Filed 08/12/20/21 Entered 08/12/08/21/21 01:25 Page 7 of 186 of
30

In witness whereof, the parties hereto, intending to be legally bound, have executed this

Settlement as of the day and year set forth below:

Dated:  *11-21-21*

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name:  James P. Seery, Jr.

Title:    Chief Executive Officer

**HIGHLAND CLAIMANT TRUST**

By: _____

Name:  James P. Seery, Jr.

Title:  Claimant Trustee

**PATRICK HAGAMAN DAUGHERTY**

Dated:  *11/22/21*

By: _____

Name:  Patrick Hagaman Daugherty

**EXHIBIT A**

Appx 07535

011778

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 99 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 861 of 921 PageID 12659
Case 19-34054-sgj11 Doc 3083 Filed 08/12/22 Entered 08/12/22 15:10:25 Page 206 of
30

HERA RELEASE AGREEMENT

This HERA Release Agreement ("HERA Release Agreement") is entered into as of November 21, 2021 by and among Highland Capital Management, L.P., as reorganized debtor ("HCMLP" or the "Debtor"), Patrick Hagaman Daugherty ("Daugherty"), Highland Employee Retention Assets, LLC ("HERA") and Highland ERA Management, LLC ("ERA" and together with HCMLP, and HERA, the "Parties," and individually as a "Party").

WHEREAS, reference is hereby made to the Settlement Agreement (the "Settlement") of even date herewith and attached hereto made and entered into by and between the Debtor, the Highland Claimant Trust, and Daugherty.

WHEREAS, the Settlement settles all of Daugherty's claims against the HCMLP Released Parties, including all claims against the HCMLP Released Parties relating to transfers of assets from HERA.

WHEREAS, the Settlement includes, among other things, the transfer by HCMLP to Daugherty of HCMLP's interests in HERA and ERA.

WHEREAS, under the Settlement such transfer is being made without any liability to any of the HCMLP Released Parties of any type and is conditional on the full release of, and covenant not to sue, each of the HCMLP Released Parties, by and from HERA, ERA, Daugherty and the Daugherty Released Parties.

WHEREAS, neither HERA nor ERA filed proofs of claim in the Bankrupty and have no claims against HCMLP.

WHEREAS, out of an abundance of caution to confirm that HERA, ERA, Daugherty, and the Daugherty Released Parties have no claims against the HCMLP Released Parties, this HERA Release Agreement is being entered into contemporaneously with the Settlement and constitutes an

essential part thereof.

WHEREAS, capitalized terms used herein but not otherwise defined herein have the respective meanings set forth in the Settlement.

NOW, THEREFORE, in consideration of the entry into of the Settlement, the transfer of the equity interests in HERA and ERA to Daugherty in accordance with the Settlement, and for other good and valuable consideration, including the provisions set forth herein, the parties hereto further agree as follows:

1.    Upon entry of an order of the Bankruptcy Court approving this Settlement and to the maximum extent permitted by law, Daugherty, on behalf of himself and each of the Daugherty Additional Release Parties, together with each of HERA and ERA (Daugherty, the Daugherty Additional Release Parties, HERA and ERA shall be collectively referred to herein as the "HERA Releasing Parties"), each hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, any of the HCMLP Released Parties for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including without limitation those which were or could have been asserted in the Bankruptcy, including the Adversary Proceeding, the Texas Action, the Daugherty Claim, Highland Delaware Case, or the HERA Delaware Case (collectively, "Claims"), in each case that in any way arise from or otherwise in any way relate to HERA or ERA, including, without limitation, any actual or potential claims, whether known or unknown, in any way related to or

arising out of the formation, management, operation or assets of HERA, ERA or any of their respective predecessors or successors, including the transfer of any assets to or from HERA or ERA, it being understood that all remaining assets of HERA have been transferred to HCMLP prior to the date hereof, and in addition to the releases set forth above, each of the HERA Releasing Parties irrevocably waives and releases and covenants not to sue with respect to any Claims against any of the HCMLP Released Parties in any way related to any such transfers or assets, whether *in personam* with respect to the HCMLP Released Parties or *in rem* with respect to any of their assets (collectively, the "HERA Released Claims") or any other Disposition.

2.      This Release constitutes a part of, and is supplemental to, the provisions of the Settlement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

In witness whereof, the parties hereto, intending to be legally bound, have executed this

HERA Release Agreement as of the date set forth above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: _____
Name:  James P. Seery, Jr.
Title:   Chief Executive Officer

PATRICK HAGAMAN DAUGHERTY

By: _____
Name:  Patrick Hagaman Daugherty

HIGHLAND EMPLOYEE RETENTION ASSETS, LLC

By: Highland ERA Management, LLC, its manager

By: Highland Capital Management. LP

By: _____
Name:  James P. Seery, Jr.
Title:   Chief Executive Officer

HIGHLAND ERA MANAGEMENT, LLC

By: _____
Name:  James P. Seery, Jr.
Title:   Authorized Signatory

**EXHIBIT B**

Appx 07849

011783

**CAUSE NO. 12-04005**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § § | |
| v. | § § | |
| PATRICK DAUGHERTY, | § § § | |
| Defendant and Counter-Plaintiff, | § § | DALLAS COUNTY, TEXAS |
| v. | § § § | |
| SIERRA VERDE, LLC, HIGHLAND EMPLOYEE RETENTION ASSETS LLC, JAMES DONDERO, PATRICK BOYCE, AND WILLIAM L. BRITAIN, | § § § § § | |
| Third-Party Defendants. | § § § | |
| | § | 68th JUDICIAL DISTRICT |

## AGREED MOTION TO PARTIALLY VACATE THE FINAL JUDGMENT DATED JULY 14, 2014

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Highland Capital Management, LP ("Highland") and Defendant Patrick Daugherty ("Daugherty" and together with Highland, the "Parties") file this *Agreed Motion to Partially Vacate the Final Judgment dated July 14, 2014* (the "Motion"), and respectfully show the following:

1.  On July 14, 2014, this Court entered a *Final Judgment* (the "Judgment") that, among other things, granted Highland's motion for injunctive relief against Daugherty.

2.  The Judgment was amended on March 23, and June 23, 2017.

3.  On October 16, 2019, filed a petition under chapter 11 in the United States Bankruptcy Court for the District of Delaware ("Highland's Bankruptcy Case"). On October 24,

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 1 OF 5**
4851-6473-6986.4

2019, as a result of the commencement of Highland's Bankruptcy Case, the Supreme Court of Texas issued an order abating a related case that Daugherty had brought in that court, Case No. 19-0758. Highland's Bankruptcy Case was subsequently transferred to the United States Bankruptcy Court for the Northern District of Texas.

4.      Daugherty asserted certain claims against Highland in Highland's Bankruptcy Case. The Parties have fully and finally resolved their disputes pursuant to a settlement agreement (the "Settlement Agreement") reached in the Highland Bankruptcy Case pursuant to which, among other things, (a) all of Daugherty's known and unknown claims against each of the Highland Released Parties (as those terms are defined in the Settlement Agreement) are resolved, and (b) this Motion seeking the *vacatur* of certain provisions of the Judgment specifically set forth below is being filed.

5.      Highland and Daugherty hereby agree and stipulate that the Court has plenary power to issue an order granting this Motion because the Court retained authority to enforce the permanent injunction rendered in the Judgment, and that changed circumstances have now arisen such that the Court should dissolve the permanent injunction. Highland and Daugherty further agree and stipulate that this Motion shall be treated as an agreement of the Parties pursuant to Texas Rule of Civil Procedure 11, and is fully enforceable. *See Coale v. Scott*, 331 S.W.3d 829, 831-32 (Tex. App.—Amarillo 2011, no pet.) ("Irrespective of whether a trial court lost its plenary jurisdiction over its judgment, the trial court's authority to approve a Rule 11 agreement does not depend on whether it has such jurisdiction.").

6.      Highland and Daugherty agree that the following portions of the Judgment shall be vacated pursuant to their settlement in the Highland Bankruptcy:

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 2 OF 5**
4851-6473-6986.4

    a. The second full paragraph on Page 2 of the Judgment, which begins "The Court, after considering the jury's findings regarding Daugherty's breaches of contract and breaches of fiduciary duty . . .";

    b. The permanent injunction rendered against Daugherty in the third full paragraph on Page 2 of the Judgment, which begins "It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from . . .";

    c. The fourth and fifth full paragraphs on Page 2 of the Judgment awarding Highland a monetary judgment against Daugherty for reasonable and necessary attorney's fees, as well as post-judgment interest on that award[1]; and

    d. The jury's answers to Questions 1, 2, 5, 6, 9 and 12 in the Verdict, which was attached as Exhibit 1 to the Judgment.

7.    Highland and Daugherty further agree that, as a result of the vacation of the permanent injunction in the Judgment, Highland hereby withdraws any pending motions to show cause or motions for contempt against Daugherty that allege Daugherty violated or is violating the permanent injunction. Highland also agrees not to seek to enforce the permanent injunction in any manner in the future.

---

[1] Daugherty previously satisfied the monetary judgment awarded to Highland, and Highland filed a release of the monetary judgment. Although Highland and Daugherty have agreed to vacate the monetary judgment awarded to Highland, Daugherty waives and relinquishes any right or claim to recover any amount previously paid in satisfaction of the Judgment and Highland shall not be required to reimburse Daugherty for his prior satisfaction of the monetary judgment. To the extent Daugherty is entitled to indemnification for any liabilities, losses, and damages allegedly incurred by him for actions taken in connection with Highland's business, including the liabilities Daugherty allegedly incurred in connection with this action and the Judgment, such indemnification claims have been fully and finally satisfied and resolved under the Settlement Agreement.

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 3 OF 5**
4851-6473-6986.4

8.      Concurrent with the filing of this Motion, Daugherty will file a motion to dismiss his as-yet unfiled petition for review pending before the Supreme Court of Texas under Case No. 19-0758.

9.      Highland and Daugherty further agree that any portions of the Judgment that are not specifically vacated pursuant to this Motion shall remain in full force and effect.

WHEREFORE, Highland and Daugherty pray that the Court grant this Motion in its entirety, and for all further relief, at law or in equity, the Court deems necessary.

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 4 OF 5**
4851-6473-6986.4

011787

Respectfully submitted,

GRAY REED & McGRAW LLP

By:   /s/ Sonya D. Reddy
      ANDREW K. YORK
      State Bar No. 24051554
      E-mail: dyork@grayreed.com
      SONYA D. REDDY
      State Bar No. 24079188
      E-mail: sreddy@grayreed.com

1601 Elm Street, Suite 4600
Dallas, Texas 75201
(214) 954-4135
(214) 953-1332 (Fax)

**ATTORNEYS FOR PATRICK DAUGHERTY**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been transmitted by electronic transmission to all counsel of record on February ___, 2021, as follows:

Marc D. Katz
Crystal J. Woods
DLA PIPER LLP (US)
1717 Main St., Suite 3700
Dallas, Texas 75201
214-743-4545 (Fax)
marc.katz@dlapiper.com
crystal.woods@dlapiper.com

Attorneys for Highland Capital
Management, L.P.

Michael K. Hurst
A. Shonn Brown
Jonathan Childers
LYNN PINKER COX HURST, LLP
2100 Ross Ave., Suite 2700
Dallas, Texas 75201
(214) 981-3839 (Fax)
mhurst@lynnllp.com
sbrown@ lynnllp.com
jchilders@ lynnllp.com

Attorneys for Third-Party Defendants HERA,
Patrick Boyce, and William Britain

/s/ Sonya D. Reddy
SONYA D. REDDY

**AGREED MOTION TO PARTIALLY VACATE FINAL JUDGMENT - PAGE 5 OF 5**
4851-6473-6986.4

**APPENDIX A** (signatures to follow)

1. James P. Seery, Jr.
2. Cameron Baynard
3. Nathan Burns
4. Timothy Cournoyer
5. Naomi Chisum
6. Stetson Clark
7. Sean Fox
8. Matthew Gray
9. Kristin Hendrix
10. David Klos
11. Vishal Patel
12. Thomas Surgent
13. Michael Throckmorton

Appx. 0746

011789

Case 22-03003-sgj Doc 1-1 Filed 01/18/22    Entered 01/18/22 09:25:21    Page 100 of 106

# EXHIBIT 7

# LYNN PINKER HURST SCHWEGMANN

MICHAEL K. HURST
*Partner*
*Board Certified – Civil Trial Law*
*Texas Board of Legal Specialization*

D 214 981 3838
F 214 981 3839
mhurst@lynnllp.com

Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201
lynnllp.com

January 13, 2022

### *Via FedEx and E-Mail*
Patrick Daugherty,
c/o Ruth Ann Daniels & Drew York
rdaniels@grayreed.com
dyork@grayreed.com
GRAY REED & MCGRAW, LLP
1601 Elm Street, Suite 4600
Dallas, Texas 75201

Re:     ***Litigation Hold: Preservation of Information. Scott Byron
        Ellington v. Patrick Daugherty Cause No. DC-22-00304, in the
        101st Judicial District, Dallas County (the "Lawsuit").***

Dear Counsel:

Our Firm represents Scott Byron Ellington in the above-referenced Lawsuit. Texas law requires Defendant Patrick Daugherty to preserve, maintain, and not destroy or delete documents and communications (whether in hard copy or electronic form) that are relevant or could be relevant to this litigation.

Please accept this letter as Mr. Ellington's formal written request that Mr. Daugherty, and any affiliated entities, employees, agents, or representatives of Mr. Daugherty, preserve documents and other evidence, including that stored in magnetic and/or electronic form ("Hold Notice").

The following definitions shall apply in this letter:

- "You" and "your" refers to Mr. Daugherty, your agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions, and their predecessors, successors or affiliates, and their respective agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

- "Ellington Party" refers to Plaintiff Scott Ellington, Byron Ellington, Marcia Maslow, Adam Maslow, the two minor children of Marcia and Adam Maslow, Stephanie Archer and her minor child, and any person who was then accompanying any of the aforementioned individuals.

011791

Ruth Ann Daniels
Drew York
January 13, 2022
Page 2

- "Ellington Location" refers 120 Cole Street, Dallas, Texas 75207, 3825 Potomac Ave, Dallas, Texas 75205, 4432 Potomac, Dallas, Texas 75025, 430 Glenbrook Dr., Murphy, Texas 75094, 5101 Creekside Ct., Parker, Texas 75094, any other residence or place of business of any Ellington Party, and any other location Mr. Daugherty believed to be associated with any Ellington Party.

- "Ellington Recordings" shall mean all electronic recordings of any Ellington Party or Ellington Location, including any persons or vehicles at such Ellington Locations.

## Litigation Hold: Preservation of Information

You are directed to immediately initiate a litigation hold for potentially relevant evidence comprised of (without limitation), documents, communications, tangible things, and as more fully defined below, electronically stored information (hereinafter "ESI") relating to:

(1) All claims and allegations contained within the Original Petition in this case;

(2) All factual, legal, affirmative, or other defenses Mr. Daugherty may assert in the Lawsuit;

(3) All counter-claims or third-party claims Mr. Daugherty may assert in the Lawsuit;

(4) All Ellington Recordings;

(5) All documents and communications evidencing the transmission of any Ellington Recording to any other party, person, or entity;

(6) All documents and communications with any other party, person, or entity regarding the Ellington Recordings and/or the observation, surveillance, or investigation of any Ellington Party or Ellington Location;

(7) All electronic or hand-written notes, memoranda, or other documents related to or evidencing Mr. Daugherty's recordation, observation, surveillance, or investigation of any Ellington Party or Ellington Location; and

(8) All documents and communications regarding any Ellington Party or Ellington Location from 1/1/2021 – present (or from the date Mr. Daugherty began his observation, surveillance, or investigation of any Ellington Party, if earlier than 1/1/2021).

Ruth Ann Daniels
Drew York
January 13, 2022
Page 3


You must act diligently and in good faith to secure compliance with such litigation hold and thereby preserve the aforementioned documents, tangible things, and ESI (hereinafter, the "Evidence").

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is likely stored on current and former computer systems and other media and devices (including but not limited to personal digital assistants, voice-messaging systems, online repositories, e-mail servers, computer servers, and cellular telephones/smart phones) that belong to you or are in your possession, custody, or control. For the avoidance of doubt, this includes any documents, communications, and information exchanged with your attorneys or otherwise subject to the attorney-client, work product, or other applicable claims of privilege as such information may be the subject of a privilege log or related motion practice.

"ESI" should be afforded the broadest possible definition and includes (by way of example, only, and not as an exclusive list) potentially relevant information electronically, magnetically, or optically stored (whether in final or draft form) as:

- Digital communications (e.g., e-mail, voice mail, text messages, instant messaging, messaging apps);
- Word-processed documents (e.g., Google Docs and Word documents);
- Email, Calendar and Diary Application Data (e.g., Outlook, Yahoo, blog tools);
- Spreadsheets and tables (e.g., Excel or Google Sheets);
- Social media communications (e.g., Facebook, Snapchat, Instagram, LinkedIn)
- Image and Facsimile Files (e.g., .pdf, .tiff, .jpg, .gif images);
- Sound Recordings (e.g., .wav and .mp3 files);
- Video and Animation (e.g., .avi, .mpg, .mpeg, .mp4, .flv, .mov files);
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations);
- Network Access and Server Activity Logs;
- Project Management Application Data;
- Computer Aided Design/Drawing Files; and
- Back Up and Archival Files (e.g., Zip, .GHO).

Ruth Ann Daniels
Drew York
January 13, 2022
Page 4

## Suspension of Routine Destruction

You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

- Purging the contents of e-mail repositories by age, capacity, or other criteria;
- Using data or media wiping, disposal, erasure, or encryption utilities or devices;
- Overwriting, erasing, destroying, or discarding back up media;
- Re-assigning, re-imaging, or disposing of systems, servers, devices, or media;
- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server or IM logging; and
- Executing drive or file defragmentation or compression programs.

Adequate preservation of potentially relevant evidence requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of the Evidence. *Be advised that sources of ESI are altered and erased by continued use of your computers and other devices.* Booting a drive, examining its contents, or running any application will irretrievably alter the information it contains and may constitute unlawful spoliation of the Evidence.

## Guard Against Deletion

You should take affirmative steps to prevent anyone with access to your data, systems, and archives from seeking to modify, destroy, or hide ESI on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography, or the like). One way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bit stream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

Ruth Ann Daniels
Drew York
January 13, 2022
Page 5


**Preservation in Native Form**

You should anticipate that certain Evidence, including but not limited to spreadsheets and databases, may be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve such Evidence in such native forms, and you should not select methods to preserve the Evidence that remove or degrade the ability to search it by electronic means or make it difficult or burdensome to access or use the information efficiently in a lawsuit. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make it not reasonably accessible and/or illegible.

**Metadata**

You should further anticipate that the need to disclose and produce system and application metadata will arise, and you should immediately act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location, and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including: deleted content, draft language, commentary, collaboration and distribution data, and dates of creation and printing. All electronically stored documents will contain metadata. You should preserve all metadata associated with any Evidence or other preserved information.

**Servers**

With respect to servers like those used to manage electronic mail (e.g., Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved.

**Paper Preservation of ESI is Inadequate**

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically stored versions. If information exists in both electronic and paper forms, you must preserve both forms.

**Agents, Attorneys and Third Parties**

Your preservation obligation extends beyond Evidence in your care, possession, or custody and includes Evidence in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian, or contractor in possession of Evidence and instruct same to preserve such

Case 19-34054-sgj11 Doc 3445-81 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 116
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 878 of 921 PageID 12676

Case 22-03003-sgj Doc 1-1 Filed 01/18/22 Entered 01/18/22 09:25:21 Page 106 of 106

Ruth Ann Daniels
Drew York
January 13, 2022
Page 6

Evidence to the full extent of their obligation to do so, and you must take reasonable steps to secure their compliance.

**<u>Failure to Comply – Sanctions</u>**

Failure to preserve potentially relevant evidence resulting in the corruption, loss, or delay in production of evidence to which we are entitled would constitute spoliation of evidence and could subject you to severe court-imposed sanctions.

This preservation demand is continuing in nature and requires Mr. Daugherty's preservation of potentially relevant documents and materials that come into his possession, custody, or control after the date of this Hold Notice.

Please acknowledge receipt of this Hold Notice and promptly confirm that Mr. Daugherty will comply with this preservation demand. Please have your legal counsel contact me at the first opportunity so that we may discuss this matter.

Respectfully,

Michael K. Hurst

cc: Mary Goodrich Nix (*of the Firm*)
    Nathaniel A. Plemons (*of the Firm*)
    Julie Pettit Greeson (*Co-counsel*)

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br> Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br> 19-34054 (SGJ) | |
| DISTRICT IN WHICH CASE IS PENDING<br> Northern District of Dallas | DIVISION OFFICE<br> Dallas Division | NAME OF JUDGE<br> Stacey G. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br> */s/ Jason S. Brookner* | | |
| DATE<br><br> January 18, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br> Jason S. Brookner<br> Gray Reed<br> Attorney for Patrick Daugherty | |

### INSTRUCTIONS

      The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

      A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

      The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 82

Appx. 9756

011799

Case 19-34054-sgj11 Doc 3445-82 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 4
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 882 of 921 PageID 12680

Case 22-03003-sgj Doc 33 Filed 04/11/22 Entered 04/11/22 16:00:32 Page 1 of 3



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 11, 2022**

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| SCOTT BYRON ELLINGTON,<br><br>Petitioner,<br><br>v.<br><br>PATRICK DAUGHERTY,<br><br>Respondent. | Adv. Pro. No. 22-03003-sgj<br>*Removed from the 101st Judicial*<br>*District Court of Dallas County,*<br>*Texas Cause No. DC-22-0304* |

### ORDER GRANTING SCOTT ELLINGTON'S
### <u>EMERGENCY MOTION TO ABSTAIN AND TO REMAND</u>

This matter having come before the court on *Scott Ellington's Emergency Motion to Abstain and to Remand* in the above-captioned case; and this Court having considered all papers filed in support of or in opposition to the Motion, the oral argument of counsel, if any, and all other pleadings and papers on file herein, the Court finds as follows:

Appx. 07857
011800

Case 19-34054-sgj11 Doc 3445-82 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 3 of 4
Case 3:25-cv-02072-S     Document 15-14     Filed 10/06/25     Page 883 of 921     PageID 12681
Case 22-03003-sgj Doc 33 Filed 04/11/22   Entered 04/11/22 16:00:32   Page 2 of 3

Scott Ellington's Emergency Motion to Abstain and to Remand is GRANTED; the Court

abstains from hearing and trying this proceeding; and this action is remanded immediately to the

101st Judicial District Court in Dallas County, Texas.

IT IS SO ORDERED

# # # **End of Order** # # #

Case 19-34054-sgj11 Doc 3445-82 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 4
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 884 of 921    PageID 12682
Case 22-03003-sgj Doc 33 Filed 04/11/22    Entered 04/11/22 16:00:32    Page 3 of 3

Proposed form of order prepared by:

Frances A. Smith
State Bar No. 24033084
Eric Soderlund
State Bar No. 24037525
**ROSS & SMITH, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: frances.smith@judithwross.com
eric.soderlund@judithwross.com

Michelle Hartmann
State Bar No. 24032402
**BAKER & MCKENZIE LLP**
1900 North Pearl, Suite 1500
Dallas, Texas 75201
Telephone: 214-978-3000
Facsimile: 214-978-3099
Email: michelle.hartmann@bakermckenzie.com

Debra A. Dandeneau
Blaire Cahn
**BAKER & MCKENZIE LLP**
452 Fifth Ave
New York, NY 10018
Telephone: 212-626-4875
Email: debra.dandeneau@bakermckenzie.com
Email: frank.grese@bakermckenzie.com
(*Admitted pro hac vice*)

*Co-Counsel for Scott Ellington*

**ORDER GRANTING SCOTT ELLINGTON'S**
**EMERGENCY MOTION TO ABSTAIN AND TO REMAND - Page 3**

# EXHIBIT 83

Appx 07809
011803



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 3, 2020**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

### ORDER DIRECTING MEDIATION

      The Court has determined that mediation would aid and assist in the resolution of

numerous issues in the above-captioned case.  Accordingly, pursuant to 11 U.S.C. § 105 and this

Court's inherent authority to regulate its docket, **IS HEREBY ORDERED THAT:**

_____

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200803000000000004

Appx. 07861

011804

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 887 of 921    PageID 12685
Case 19-34054-sgj11 Doc 912 Filed 08/03/20    Entered 08/03/20 12:52:52    Page 2 of 6

1.      The following parties are ordered to mediate as set forth below:  (i) Highland Capital Management, L.P. (the "Debtor"); (ii) the official committee of unsecured creditors appointed in the Debtor's bankruptcy case (the "Committee"); (iii) Acis Capital Management, L.P. and Acis Capital Management GP, LLC; (iv) UBS Securities LLC and UBS AG, London Branch; (v) the Redeemer Committee of the Highland Crusader Fund; and (vi) James Dondero.  The foregoing are collectively referred to herein as the "Parties" and individually as a "Party."

2.      One or more mediation sessions may be scheduled.  Such sessions are referred to herein collectively as the "Mediation" regardless of the number of days.  While exact date(s) have not yet been determined, it is currently anticipated that the Mediation will be held between August 21, 2020 and September 2, 2020.  The Mediation will be conducted via video conference.

3.      The Mediation will be administered by the American Arbitration Association ("AAA").  Retired Judge Allan Gropper and Sylvia Mayer are appointed to serve as co-mediators (the "Mediators").  The Mediators will confer and determine, in their discretion, whether one or both Mediators will participate in all or part of each mediation session.  The Mediators' fee will be $5,000 per Mediator per mediation session.  (For the avoidance of doubt, to the extent a Mediator does not participate in a particular mediation session, that Mediator will not bill for that session.)  A mediation session is one day of mediation.  There will not be an overtime charge if any of the mediation sessions go into the evening.  In addition to the daily fee per mediation session, Judge Gropper bills at an hourly rate of $600 and Ms. Mayer bills at an

DOCS_NY:40872.7 36027/002

Appx. 07882

011805

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 4 of 7
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 888 of 921   PageID 12686
Case 19-34054-sgj11 Doc 912 Filed 08/03/20   Entered 08/03/20 12:52:52   Page 3 of 6

hourly rate of $425 for time spent preparing for mediation sessions, including study time and communications with the Parties and/or between the Mediators. The Mediators will each maintain time records provided that they may redact or exclude any confidential information. In addition, the Mediators will submit invoices to AAA for their hourly fees for preparation and daily fees for mediation sessions. At a minimum, the Mediators will respectively submit to AAA their first invoice prior to the start of the first mediation session and their final invoice within five (5) business days following conclusion of the last mediation session. In their discretion, the Mediators may submit additional invoices. The Mediators will provide the Parties with a copy of any invoices submitted to AAA.

4.      On or as soon as reasonably practicable following the date of this Order, the Debtor will deposit with AAA the sum of $90,000 (the "Deposit"). To the extent requested by AAA, the Debtor will supplement the Deposit as needed. The Deposit will be credited against any fees or expenses incurred by AAA or invoiced by the Mediators. Following conclusion of the Mediation and payment of AAA's fees and the Mediators' respective fees, any remaining funds on deposit shall be refunded to the Debtors.

5.      The Debtor will bear the costs of the Mediators' and AAA's fees and their reasonable and necessary expenses; *provided, however,* that, for the avoidance of doubt, with the exception of the Committee, each Party will bear its own legal and professional fees and expenses. Payment will be tendered to the Mediators and AAA on the day of the Mediation. Neither the Mediators nor AAA will be required to file a fee application or seek further approval from this Court for payment of the foregoing fees and expenses.

DOCS_NY:40872.7 36027/002

Appx 07863

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 889 of 921    PageID 12687
Case 19-34054-sgj11 Doc 912 Filed 08/03/20    Entered 08/03/20 12:52:52    Page 4 of 6

6.      Each Party will attend the Mediation and must continue participating in the Mediation as requested by the Mediators.  Each Party will designate a client representative with authority to settle on behalf of the respective Party any and all matters, subject to Bankruptcy Court approval in the case of any settlement(s) affecting the administration of the Debtor's bankruptcy estate; provided that, with respect to the Committee, the client representatives shall be the designated representatives of each of the members of the Committee, and the authority to settle on behalf of the Committee remains subject to the vote of such Committee member representatives in accordance with the Committee by-laws; and provided further that, it is understood that any final settlement, depending on its terms, magnitude and scope, may be subject to additional internal approvals such as Board approval.  The client representative of each Party will personally attend the Mediation as requested by the Mediators.

7.      The Mediators have the authority to require each Party and their client representatives and lawyers to attend additional days of Mediation, in their sole discretion, if the Mediators believe it may be fruitful.

8.      Each Party shall submit a written mediation statement to the Mediators. Each Party may share some or all of their mediation statement with other parties.  Any Party will, if requested to do so by the Mediators, provide written or oral proposals or counter-proposals, that can be circulated to a Party or the Parties pursuant to the Mediators' direction, during the course of Mediation.

9.      The Parties acknowledge that the Mediators may have *ex parte* communications with one or more Parties prior to or during the course of the Mediation.

DOCS_NY:40872.7 36027/002

Appx. 07861
011807

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 890 of 921    PageID 12688
Case 19-34054-sgj11 Doc 912 Filed 08/03/20    Entered 08/03/20 12:52:52    Page 5 of 6

10.    Each of the Parties and their client representatives will participate in the Mediation in good faith.  The Mediators have the authority (but not the obligation) to report to this Court if they believe that any of the respective Parties is not participating in the Mediation in good faith.  The Court may sanction any of the respective Parties for failure to participate in the Mediation in good faith.

11.    Within five (5) business days after the conclusion of the Mediation, the Mediators will file a report with the Court stating only whether a settlement, in whole or in part, has been reached (the "Report").  Alternatively, in lieu of the Mediators filing the Report, the Mediators may provide the Parties with such a Report to be filed by the Debtors.

12.    Regardless of the outcome of the Mediation, it is the order of this Court that the contents of the Mediation, including any statements or representations made by the Mediators, any Party, or any client representative (or attorney or agent of a client representative), agent, or attorney of a Party during the course of the Mediation, are confidential and privileged. None of the Parties, their client representatives (or attorney or agent of a client representative), agents, or attorneys, or the Mediators may reveal such information to any non-party or to the Court, including, without limitation, in any pleadings or submissions, and none may be examined in any judicial or administrative proceeding (or any discovery relating to such a proceeding) regarding anything they may have said, seen, or heard during the course of the Mediation.  No term sheet or other document or draft thereof prepared in the course of the Mediation will ever be the subject of discovery nor will such documents ever be admissible at any trial. "In the course of the mediation" includes the Mediation sessions themselves, as well as materials

DOCS_NY:40872.7 36027/002

Appx. 07905

011808

Case 19-34054-sgj11 Doc 3445-83 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 7 of 7
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 891 of 921    PageID 12689
Case 19-34054-sgj11 Doc 912 Filed 08/03/20    Entered 08/03/20 12:52:52    Page 6 of 6

submitted to the Mediators in advance of or during the Mediation, telephone conversations with one or both of the Mediators (or including the Mediators) before or after the Mediation sessions, and communications among the Parties specifically denominated as "in the course of mediation" and memorialized as such via electronic mail or otherwise among the Parties contemporaneously or in advance of that communication. Without limiting any provision of this Order, all communications occurring, and information exchanged, in the course of the Mediation will be entitled to all protections applicable under Federal Rule of Evidence 408, or any other protections afforded to settlement and compromise communications under other applicable law.

13.    Notwithstanding anything to the contrary herein, it will be the responsibility of the Mediators to determine the structure of the Mediation and which Parties should be invited or required to participate in any particular Mediation session depending upon the content of such session.

### ###END OF ORDER###

DOCS_NY:40872.7 36027/002

Appx. 07806

011809

# EXHIBIT 84

Appx 07807

011810

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 2 of 6
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 893 of 921 PageID 12691
Case 19-34054-sgj11 Doc 339 Filed 01/09/20 Entered 01/09/20 10:01:25 Page 1 of 5

Docket #0339 Date Filed: 01/09/2020



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 9, 2020**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

### ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* (the "<u>Motion</u>"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

DOCS_NY:39973.13 36027/002



1934054200109000000000008

Appx. 07868

011811

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of 6
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 894 of 921    PageID 12692
Case 19-34054-sgj11 Doc 339 Filed 01/09/20    Entered 01/09/20 19:01:35    Page 2 of 5

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under the circumstances and no other or further notice is required; and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and having determined that the relief sought in the Motion is in the best interests of the Debtor and its estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.       The Motion is GRANTED on the terms and conditions set forth herein, and the United States Trustee's objection to the Motion is OVERRULED.

2.       The Term Sheet is approved and the Debtor is authorized to take such steps as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not limited to: (i) implementing the Document Production Protocol; and (ii) implementing the Protocols.

3.       The Debtor is authorized (A) to compensate the Independent Directors for their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of the following six months, provided that the parties will re-visit the director compensation after the sixth month and (B) to reimburse each Independent Director for all reasonable travel or other expenses, including expenses of counsel, incurred by such Independent Director in connection with its service as an Independent Director in accordance with the Debtor's expense reimbursement policy as in effect from time to time.

2

Appx. 07809
011812

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 4 of 6
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 895 of 921    PageID 12693
Case 19-34054-sgj11 Doc 339 Filed 01/09/20    Entered 01/09/20 19:01:35    Page 3 of 5

4.      The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.      The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.      All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.      Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.      Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.      Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.     No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

Appx. 07870

0118T3

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 5 of 6
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 896 of 921 PageID 12694
Case 19-34054-sgj11 Doc 339 Filed 01/09/20 Entered 01/09/20 19:01:35 Page 4 of 5

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

11. Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

12. Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

4

Appx. 07871
0118174

Case 19-34054-sgj11 Doc 3445-84 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of 6
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 897 of 921    PageID 12695
Case 19-34054-sgj11 Doc 339 Filed 01/09/20    Entered 01/09/20 19:01:35    Page 5 of 5

13.    The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

**## END OF ORDER ##**

DOCS_NY:39973.13 36027/002

Appx. 07872

011815

# EXHIBIT 85

Appx 07873
011816

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 899 of 921    PageID 12697
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21    Entered 07/09/21 19:03:22    Page 1 of 9

Docket #2549  Date Filed: 07/09/2021

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for Dugaboy Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**SECOND AMENDED RESPONSE OF DUGABOY INVESTMENT TRUST
TO ORDER REQUIRING DISCLOSURES**

COMES NOW Dugaboy Investment Trust ("Dugaboy") and files this response of Dugaboy Investment Trust to *Order Requiring Disclosures* [Dkt. # 2460] (the "Order"), entered by the Court *sua sponte* in the above styled and numbered Chapter 11 bankruptcy case (the "Bankruptcy Case") of Highland Capital Management, L.P. (the "Debtor"), respectfully stating as follows:

**I.     RESPONSE**

1.     The Court has entered an order requiring Dugaboy to make certain disclosures relative to its standing in connection with the above captioned matter.  The Court has already

{00376120-1}                                      1



Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 3 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 900 of 921 PageID 12698
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 2 of 9

ruled on a number of matters before this Court that Dugaboy has possessed the requisite standing on matters that it has taken a position or filed a support pleading.

2.     Dugaboy is named as a "Related Entity" and is enjoined by the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified)* (the "Plan").  *See* Dkt. No. 1811-9 at p. 19.  As an enjoined party, Dugaboy has standing to seek relief from the Plan.  *See, e.g., Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 265 (5th Cir. 2008) ("a third party had standing to appeal an injunction which adversely affects its interest, even when it was not a party to the litigation").

3.     Dugaboy is a named defendant in the matter styled *Official Committee of Unsecured Creditors vs. CLO Holdco, Ltd., Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Highland Dallas Foundation, Inc., The Dugaboy Investment Trust, Grant James Scott III in his individual capacity, as Trustee of The Dugaboy Investment Trust, and as Trustee of The Get Good Nonexempt Trust, and James D. Dondero* (Case No. 20-03195) and has been advised that it will be added as a defendant in an additional adversary proceeding to be filed going forward.  In the adversary proceeding where Dugaboy is named as a defendant the standing of Dugaboy is not at issue.  What will be at issue in those cases is whether Dugaboy should be a named party and whether the Plaintiff in those cases has asserted a recognizable cause of action against Dugaboy.

4.     Further, Dugaboy has standing based upon the proofs of claim that it filed in this bankruptcy case.  Although the Debtor has challenged Dugaboy's claims, it has the right to assert the claims and participate in these bankruptcy proceedings as a party in interest.

Appx 07875
011818

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 901 of 921 PageID 12699
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 3 of 9

## II. DISCLOSURES

5.    Dugaboy is a Delaware Trust. As a Trust, it has no owners, rather, beneficiaries and a trustee. Distributions out of the Trust and the decisions made on behalf of the Trust are governed by the Trust documents. The Trust Agreement is dated October 2010 and it is styled "Trust Agreement between Dana Scott Breault, Settlor and James D. Dondero and Commonwealth Trust Company, Trustees."

6.    The Trust has three (3) trustees each with a different function. The Trust creates an Administrative Trustee, a Family Trustee and an Independent Trustee. The initial Trustees were Commonwealth Trust Company as Administrative Trustee, James D. Dondero as Family Trustee and Grant Scott as Independent Trust. The current Family Trustee is Nancy Dondero, the sister of James D. Dondero.

7.    The Trust Agreement creates three (3) separate trusts under the Dugaboy Investment Trust. The first is for the benefit of James D. Dondero, the second is for children and the third is for descendants.

8.    The Trust owns an 0.1866% Class A interest in the Debtor and has filed proofs claim numbered 113, 131, and 177.

9.    Proof of Claim No. 177 is an administrative proof of claim for the mismanagement of certain funds by the Debtor.

10.   Proof of Claim No. 113 relates to the Debtor's 2008 tax return, which is currently being audited, which audit may result in the Debtor being liable to its limited partners, including Dugaboy. Proof of Claim No. 113 also relates to the Debtor's failure to make certain tax distributions to the limited partners, including Dugaboy, from 2004 through 2018. The amount of this claim is uncertain, but Dugaboy has requested certain information from the Debtor in order

Appx. 07876
011819

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 902 of 921    PageID 12700
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21    Entered 07/09/21 19:02:22    Page 4 of 9

to calculate a precise amount.  Dugaboy obtained its status as a limited partner in the Debtor

through its status as successor-in-interest to the Canis Major Trust.

11.    Lastly, Proof of Claim 131 relates to two Master Securities Lending Agreements

that Dugaboy entered into with Highland Select Equity Master Fund in 2014 and 2015.

Dugaboy made various loans to Highland Select in the form of 2,015,000 shares of NexPoint

Credit Strategies Fund valued at $20,270,900.  Dugaboy made various other loans in 2015.  The

Master Securities Lending Agreements were mostly terminated in July 2019.  Pursuant to the

Termination of Loan, Select and Dugaboy agreed to terminate the 2015 MSLA and partially

terminate the 2014 MSLA such that a large number of the loaned securities remained due and

owing to Dugaboy under the Loan Agreements.

12.    From 2015 until the termination of the Loan Agreements in 2019, Select and/or

the Debtor made numerous repayments of the securities loaned by Dugaboy. However, a

substantial number of the loaned securities have not been repaid and remain outstanding.

13.    As of the Petition Date, Dugaboy has not been repaid the outstanding shares and

is owed repayment of the loaned securities or the cash value of the loaned securities, plus

accrued interest, in the amount of $12,041,438. A summary of the loan account is attached as

Exhibit B to the *Response of the Dugaboy Investment Trust to the Debtor's First Omnibus*

*Objection to Certain Proofs of Claim* [Dkt. No. 1153].

14.    The gist of Dugaboy's claim is premised on the fact that the Debtor was general

partner or *de facto* general partner of Highland Select and directed that the loaned funds be used

for the sole benefit of the Debtor, thereby obligating the Debtor on the loans.

15.    Objections are pending to each of the proofs of claim that have been filed.

Appx. 07877
011820

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 6 of
Case 3:25-cv-02072-S   Document 15-14   Filed 10/06/25   Page 903 of 921   PageID 12701
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21   Entered 07/09/21 19:02:22   Page 5 of 9

16.   In addition, Dugaboy is the maker of a note held by the Debtor that is the subject

of the Creditors' Committee Adversary Proceeding.

July 9, 2021.

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La. Bar No. 36542
mlandis@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I, Douglas S. Draper, counsel for The Dugaboy Investment Trust, do hereby certify that I caused a copy of the above and foregoing to be served on **July 9, 2021**, via the Court's ECF Notification System as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Michael P. Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com

Appx. 07878
011821

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 904 of 921 PageID 12702
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 6 of 9

- Paul Richard Bessette    pbessette@KSLAW.com,
  ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com
  ;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com
- Matthew Glenn Bouslog    mbouslog@gibsondunn.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com,
  lwebb@grayreed.com;acarson@grayreed.com;cpatterson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com
- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-
  8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russel
  l@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com, andrew-clubok-9012@ecf.pacerpro.com,ny-
  courtmail@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com,
  etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfr
  ey@foxrothschild.com
- Deborah Rose Deitsch-Perez    deborah.deitschperez@stinson.com,
  patricia.tomasky@stinson.com;kinga.mccoy@stinson.com
- Gregory V. Demo    gdemo@pszjlaw.com,
  jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com
  ;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjla
  w.com;lsc@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com,
  dawn.brown@dentons.com;Melinda.sanchez@dentons.com;docket.general.lit.dal@dento
  ns.com
- Douglas S. Draper    ddraper@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbro
  uphy@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com,
  samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com,
  crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@cr
  owedunlevy.com;ecf@crowedunlevy.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com

Appx. 07879
011822

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 8 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 905 of 921    PageID 12703
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21    Entered 07/09/21 19:02:22    Page 7 of 9

- Margaret Michelle Hartmann    michelle.hartmann@bakermckenzie.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com,
  astowe@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-
  hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com,
  haley.fields@klgates.com;matthew.houston@klgates.com;mary-
  beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.co
  m;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com,
  dhepting@hellerdraper.com;vgamble@hellerdraper.com
- William R. Howell    william.howell@bondsellis.com, williamhowell@utexas.edu
- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com,
  gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Michael Justin Lang    mlang@cwl.law,
  nvazquez@cwl.law;aohlinger@cwl.law;jgonzales@cwl.law;vpatterson@cwl.law
- Edward J. Leen    eleen@mkbllp.com
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Brant C. Martin    brant.martin@wickphillips.com, samantha.tandy@wickphillips.com
- Brent Ryan McIlwain    brent.mcilwain@hklaw.com,
  robert.jones@hklaw.com;brian.smith@hklaw.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-
  7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com,
  txefilingnotice@sidley.com;paige-montgomery-
  7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sid
  ley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- Holland N. O'Neil    honeil@foley.com,
  jcharrison@foley.com;acordero@foley.com;holly-holland-oneil-3540@ecf.pacerpro.com
- Rakhee V. Patel    rpatel@winstead.com,
  dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com, txefilingnotice@sidley.com;charles-
  persons-5722@ecf.pacerpro.com



Appx 07889

011823

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 906 of 921 PageID 12704
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 8 of 9

- Louis M. Phillips    louis.phillips@kellyhart.com, june.alcantara-davis@kellyhart.com;Amelia.Hurt@kellyhart.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Jeff P. Prostok    jprostok@forsheyprostok.com, jjones@forsheyprostok.com;tlevario@forsheyprostok.com;calendar@forsheyprostok.com;calendar_0573@ecf.courtdrive.com;jprostok@ecf.courtdrive.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txefilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Suzanne K. Rosen    srosen@forsheyprostok.com, jjones@forsheyprostok.com;lbreedlove@forsheyprostok.com;calendar@forsheyprostok.com;srosen@ecf.courtdrive.com;calendar_0573@ecf.courtdrive.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Mazin Ahmad Sbaiti    mas@sbaitilaw.com, krj@sbaitilaw.com;jeb@sbaitilaw.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, astowe@huntonak.com;creeves@huntonak.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com
- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com;dallas.bankruptcy@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Clay M. Taylor    clay.taylor@bondsellis.com, krista.hillman@bondsellis.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Julian Preston Vasek    jvasek@munsch.com
- Donna K. Webb    donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@ldsrlaw.com, craigs@ldsrlaw.com,dawnw@ldsrlaw.com,ivys@ldsrlaw.com

Appx 07581
011824

Case 19-34054-sgj11 Doc 3445-85 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 10 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 907 of 921 PageID 12705
Case 19-34054-sgj11 Doc 2549 Filed 07/09/21 Entered 07/09/21 19:02:22 Page 9 of 9

- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

Appx. 07882

011825

# EXHIBIT 86

Appx 07383

011826

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 909 of 921    PageID 12707
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 1 of 13

Docket #2460  Date Filed: 06/18/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed June 17, 2021

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

## ORDER REQUIRING DISCLOSURES

### I.    Introduction.

This Order is issued by the court *sua sponte* pursuant to Section 105 of the Bankruptcy Code

and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties

who ask for relief in the above-referenced case. More specifically, the Order is directed at clarifying

the party-in-interest status or standing of numerous parties who are regularly filing pleadings in the

above-referenced 20-month-old Chapter 11 bankruptcy case. The court has determined that there is

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address
for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210618000000000001

Appx. 07884

011827

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 3 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 910 of 921    PageID 12708
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 2 of 13

a need to: (a) fully understand whether such parties (defined below) have statutory or constitutional standing with regard to recurring matters on which they frequently file lengthy and contentious pleadings and, if so, (b) ascertain whether their interests are sufficiently aligned such that the parties might be required to file joint pleadings hence forth, rather than each file pleadings that are similar in content. The court has commented many times that certain active parties (*i.e.,* Mr. James Dondero and numerous non-debtor entities that he controls—hereinafter the "Non-Debtor Dondero-Related Entities") seem to have tenuous standing.  Mr. Dondero is, of course, the Debtor's co-founder, former President, Chief Executive Officer ("CEO"), and indirect beneficial equity owner.[2]  Since standing is a subject matter jurisdiction concern, the court has determined that it is in the interests of judicial economy to gain some clarity with regard to the standing of the various Non-Debtor Dondero-Related Entities.  It is also in the interests of judicial economy, the interests of other parties in this case, and in the interest of reducing administrative expenses of this estate that there be consolidation of pleadings, wherever possible, of the Non-Debtor Dondero-Related Entities.

---

[2] In addition to being the former CEO, Mr. Dondero represents that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy.  This court has stated on various occasions that this assertion is ostensibly true, but somewhat tenuous. Mr. Dondero filed five proofs of claim in the Debtor's bankruptcy case. Two of those proofs of claim were withdrawn with prejudice on November 23, 2020 [DE # 1460].  The other three are unliquidated, contingent claims, each of which stated that Mr. Dondero would "update his claim in the next ninety days."  Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge. With regard to Mr. Dondero's assertion that he is an "indirect equity security holder," the details have been represented to the court many times to be as follows (undisputed): Mr. Dondero holds no direct equity interest in the Debtor.  Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests.  The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor.  Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself.  Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

2

Appx. 07885

011828

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 4 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 911 of 921 PageID 12709
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 3 of 13

## II.     Background: The Chapter 11 Case.[3]

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that is in the business of buying, selling, and managing assets on behalf of its managed investment vehicles. It manages billions of dollars of assets—to be clear, the assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO is an individual selected by the creditors named James P. Seery.

Specifically, early in the case, the Official Unsecured Creditors Committee ("UCC") and the U.S. Trustee ("UST") desired to have a Chapter 11 Trustee appointed—absent some major change in corporate governance[4]—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other officers (for example, allegedly engaging, for years, in fraudulent schemes to put Highland's assets out of the reach of creditors). Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC (the "January 2020 Corporate Governance Settlement"), which was executed by Mr. Dondero and approved by a court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[5] The settlement and term sheet contemplated a complete overhaul of the corporate governance structure of the Debtor. Mr. Dondero resigned from his role as an officer and director of the Debtor and of its general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's

---

[3] For a more detailed factual description of some of the disputed issues in this case, see the Memorandum of Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO, entered June 7, 2021, DE # 190, in AP # 20-3190.

[4] The UST was steadfast in wanting a Trustee.

[5] *See* DE ## 281 & 339.

Appx. 07886
01T829

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 5 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 912 of 921    PageID 12710
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 4 of 13

general partner Strand Advisors, Inc.—which, in turn, managed the Debtor. All of the new Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both (Retired Bankruptcy Judge Russell Nelms, John Dubel, and James P. Seery).  As noted above, one of the Independent Board members, James P. Seery ("Mr. Seery"), was ultimately appointed as the Debtor's new CEO and CRO.[6]  As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as and retain the title of a portfolio manager for certain separate ***non-Debtor*** investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it.  Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board, and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities. Significant to the court and the UCC was a provision in the order, at paragraph 9, stating that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."

To be sure, this was a complex arrangement. Apparently, there were well-meaning professionals in the case that thought that having the founder and "face" behind the Highland brand still involved with the business might be value-enhancing for the Debtor and its creditors (even though Mr. Dondero was perceived as not being the type of fiduciary needed to steer the ship through bankruptcy). For sake of clarity, it should be understood that there are at least hundreds of

---

[6] "CRO" means Chief Restructuring Officer.  *See* DE # 854, entered July 16, 2020.

Appx. 07887
011830

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 6 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 913 of 921    PageID 12711
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 5 of 13

entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are ***not*** subsidiaries of the Debtor, nor otherwise owned by Highland.  And only Highland itself is in bankruptcy.  However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. Through these agreements Highland (***through its own employees***) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead. Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision making power and are not the mere "puppets" of Mr. Dondero. This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities, but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands.

Eventually, the Debtor's new Independent Board and management concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity.  Various events occurred that led to the termination of his employment with the Debtor.  For one thing, Mr. Dondero prominently opposed certain actions taken by the Debtor through its CEO and Independent Board including:  (a) objecting to a significant settlement that the Debtor had reached in court-ordered mediation[7] with creditors Acis Capital Management and Josh and Jennifer Terry (the "Acis

---

[7] The court appointed Retired Bankruptcy Judge Allan Gropper, S.D.N.Y., and Attorney Sylvia Mayer, Houston, Texas (both with the American Arbitration Association), to be co-mediators over multiple disputes in the Bankruptcy Case, including the Acis dispute. The co-mediators, among other things, attempted to mediate disputes/issues with Mr. Dondero.

App. 07888
011831

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 7 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 914 of 921 PageID 12712
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 6 of 13

Settlement")—which settlement helped pave the way toward a consensual Chapter 11 plan, and (b) pursuing, through one of his family trusts (the Dugaboy Investment Trust), a proof of claim alleging that the Debtor (including Mr. Seery) had mismanaged one of the Debtor's subsidiaries, Highland Multi Strategy Credit Fund, L.P. ("MSCF") with respect to the sale of certain of its assets during the bankruptcy case (in May of 2020).[8] The Debtor's Independent Board and management considered these two actions to create a conflict of interest— if Mr. Dondero was going to litigate significant issues against the Debtor in court, that was his right, but he could not continue to work for the Debtor (among other things, having access to its computers and office space) while litigating these issues with the Debtor in court.

But the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, literally a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain Non-Debtor Dondero-Related Entities, on the one hand, and the Debtor on the other.

At the present time, 11 adversary proceedings have been filed related to this bankruptcy case involving Non-Debtor Dondero-Related Entities. Additionally, Non-Debtor Dondero-Related entities have filed 11 appeals of bankruptcy court orders. Non-Debtor Dondero-Related entities have begun filing lawsuits relating to the bankruptcy case in other *fora* that are the subject of contempt motions.

III.     **The Non-Debtor Dondero-Related Entities**.

The following are the Non-Debtor Dondero-Related Entities encompassed by this Order and their known counsel[9]:

---

[8] *See, e.g.,* Proof of Claim No. 177 and DE # 1154.
[9] There are three other entities that the court is not including in this Order at this time, since, although they have appeared in the past, they are no longer active in the case because of either resolving issues with the Debtor or other reasons: (a) Highland CLO Funding Ltd. (previously represented by the law firm of King and Spaulding); (b) Hunter

Appx. 07389
011832

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 8 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 915 of 921 PageID 12713
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 7 of 13

### A.  *James D. Dondero*

Mr. Dondero has had three law firms representing him in the bankruptcy proceedings:  Bonds Ellis Eppich Schafer Jones LLP; Stinson L.L.P.; and Crawford Wishnew Lang.

As earlier mentioned, Mr. Dondero has three pending proofs of claim that are unliquidated, contingent claims. Each of these claims state that Mr. Dondero would "update his claim in the next ninety days."  Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge.  While this court is unclear what the alleged amount of Mr. Dondero's three unliquidated, contingent proofs of claim might be, the court takes judicial notice that the Debtor has filed an adversary proceeding (Adv. Proc. # 21-3003) alleging that Mr. Dondero is liable to three bankruptcy estate on three demand notes, on which the total amount due and owing is $9,004,013.07. Mr. Dondero has also been sued along with CLO Holdco, Grant Scott, Charitable DAF Holdco, Charitable DAF Fund, Highland Dallas Foundation, and the Get Good Trust for alleged fraudulent transfers in Adv. Proc. # 20-3195.

As far as equity interests in the Debtor, the Debtor is a Delaware limited partnership. The general partner is named Strand Advisors, Inc. ("Strand"). Mr. Dondero owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner, but gave up control of Strand pursuant to a court-approved corporate governance agreement reached in this case in January 2020, to which Mr. Dondero agreed. As of the Petition Date, the Debtor's limited partnership interests were held: (a) 99.5% by an entity called Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust (Mr. Dondero's family trust—described below), (c) 0.0627% by the retired co-founder of the Debtor, Mark Okada, personally and through family trusts, and (d) 0.25% by Strand. These limited partnership interests were in three classes (Class A, Class B, and Class C).  The

---

Mountain Trust (previously represented by Sullivan Hazeltine Allinson and Rochelle McCullough); and (c) NexBank (previously represented by Alston & Bird).

Appx. 07899
011833

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 9 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 916 of 921 PageID 12714
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 8 of 13

Class A interests were held by The Dugaboy Investment Trust, Mark Okada, and Strand. The Class B and C interests were held by Hunter Mountain Investment Trust and Hunter Mountain. The significance of this is that the Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. And, of course, Mr. Dondero's recovery on his equity interest in Strand is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

B. *The Dugaboy Investment Trust ("Dugaboy") and Get Good Nonexempt Trust ("Get Good")*

The Dugaboy and Get Good Trusts are represented by the law firm Heller Draper & Horn.

Mr. Dondero is the beneficiary of Dugaboy and the settlor of Get Good (and family members are the beneficiaries). It has been represented in pleadings that Get Good is a trust established under the laws of the State of Texas. It has been represented in pleadings that Dugaboy is a trust established under the laws of the State of Delaware. At least as of the Petition Date, an individual named Grant Scott (a long-time friend of Mr. Dondero's, who is a patent lawyer and resides in Colorado) is the trustee of both. Mr. Dondero's sister may also be a trustee of Dugaboy.

As mentioned above, Dugaboy owns a 0.1866% of the Class A junior limited partnership interest in the Debtor.

Get Good has filed a proof of claim in this Bankruptcy Proceeding (submitted by Grant Scott). Dugaboy has filed several proofs of claim in this Bankruptcy Proceeding (all were submitted by Grant Scott). The court is not aware of the nature or amount of these claims, except the court has been apprised that: (a) one Dugaboy proof of claim alleges that Highland is obligated on a debt

Appx. 07891
011834

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 10 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 917 of 921    PageID 12715
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 9 of 13

owed to Dugaboy by an entity known as Highland Select, allegedly because Highland is Highland Select's general partner and might also be its alter ego; and (b) another proof of claim asserts postpetition mismanagement by the Debtor of assets of one or more Debtor subsidiaries. While the court knows nothing about the Get Good proof of claim, it does know that the Get Good Trust (along with others, including Grant Scott) has been sued for alleged fraudulent transfers in an adversary proceeding in this case (Adv. Proc. # 20-3195)—which may affect the allowability of its proof of claim.

C. _Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA") (sometimes collectively referred to as the "Advisors")_

These entities have been represented by the K&L Gates law firm at times and currently are represented by the law firm of Munsch Hardt Kopf & Harr. The entities are registered investment advisors that previously had shared services agreements with the Debtor.

It has been represented that Mr. Dondero directly or indirectly owns and/or effectively controls each of the Advisors. He is the President of each of them.

It is the court's understanding that both of these entities withdrew their original proofs of claim. However, the Advisors filed an application for an administrative expense claim on January 24, 2021, relating to services the Advisors allege the Debtor did not perform under a shared services agreement. The Debtor has since filed an objection to the claim and the matter is set for trial on September 28, 2021. Further, the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3004) alleging that HCMFA owes the Debtor an aggregate of $7,687,653.07 pursuant to two promissory notes and the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3005) alleging that NPA owes the Debtor $23,071,195.03 pursuant to a promissory note.

Appx. 07892
0TT835

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 11 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 918 of 921    PageID 12716
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 10 of 13

D. *Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund*

These entities are represented by the K&L Gates law firm. They are apparently each managed by the Advisors and these funds are specifically managed by Mr. Dondero as portfolio manager.

The court has no idea who owns these companies (assuming they should be regarded as separate companies). The court does not know which, if any of them, have filed proofs of claims.

E. *Charitable DAF Holdco, Ltd. ("DAF Holdco"), Charitable DAF Fund, LP ("DAF"), Highland Dallas Foundation, Inc., ("Highland Dallas Foundation")*

These entities are represented by the law firms of Kelly Hart Pitre and Sbaiti & Company PLCC.

It has been represented to the court that the DAF is managed by DAF Holdco, which is the managing member of the DAF. It has further been represented to the court that DAF Holdco is owned by three different purported charitable foundations: Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (collectively, the "Highland Foundations"). DAF Holdco is an exempted company incorporated in the Cayman Islands. Grant Scott has apparently, until recently, served as its managing member. The DAF is an exempted company incorporated in the Cayman Islands. Highland Dallas Foundation is a Delaware nonprofit, nonstock corporation.

Mr. Dondero is the president and one of the three directors of each of the Highland Foundations. Apparently, Grant Scott was recently replaced by a former Highland employee named Mark Patrick (who is now an employee of Skyview Group, an entity created by former Highland employees). Although the Debtor is the non-discretionary investment advisor to the

Appx. 07893
011836

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 12 of
Case 3:25-cv-02072-S    Document 15-14    Filed 10/06/25    Page 919 of 921    PageID 12717
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 11 of 13

DAF, the Debtor does not have the right or ability to control or direct the DAF or CLO Holdco. Instead, the DAF takes and considers investment and payment advice from the Debtor, but ultimate decisions are in the control of Mr. Patrick, presumably at Mr. Dondero's direction.

The court is not aware whether these entities have filed proofs of claim. However, they, along with Messrs. Dondero and Scott, CLO Holdco and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

F. *CLO Holdco, Ltd.*

This entity was previously represented by the law firm of Kane Russell Coleman & Logan and more recently is represented by the law firm of Sbaiti & Company PLLC.

CLO Holdco is a wholly owned and controlled subsidiary of the DAF. CLO Holdco is an exempted company incorporated in the Cayman Islands. CLO Holdco has filed two proofs of claim in this Bankruptcy Proceeding. Both proofs of claim were submitted by Grant Scott in his capacity as Director of CLO Holdco.

CLO Holdco, along with Messrs. Dondero and Scott, DAF Holdco, DAF Fund, Highland Dallas Foundation, and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

G. *NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes, Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by any of the foregoing and any of their subsidiaries (sometimes collectively referred to as "NPRE")*

These entities are represented by the law firm of Wick Phillips Gould & Martin, LLP.

The entity known as HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) is alleged to owe the Debtor over $11 million pursuant to five promissory notes (as asserted in Adv.

Appx. 07894
011837

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22 Entered 08/15/22 16:45:41 Page 13 of
Case 3:25-cv-02072-S Document 15-14 Filed 10/06/25 Page 920 of 921 PageID 12718
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 12 of 13

Pro. # 21-3007). The court understands this same entity has filed a proof of claim relating to its alleged interest in "SE Multifamily Holdings, LLC," which has been objected to and has not been resolved.

The court has no idea who owns or manages these companies or what exact function they play in the Highland complex of companies. The court does not know anything about the substance of the proof of claims.

H.  *Highland Capital Management Services, Inc.*

This entity appears to be represented by both Wick Phillips Gould & Martin, LLP (which also represents NPRE) and Stinson L.L.P. (which also sometimes represents Mr. Dondero personally).

This entity earlier filed two proofs of claim that were objected to and disallowed. Also, this entity is alleged to owe the Debtor approximately $7.7 million pursuant to five different promissory notes (as asserted in Adv. Pro. # 21-3006). The court has no idea who owns or manages this company or what exact function it plays in the Highland complex of companies.

### IV.  **Disclosure Requirement**

Accordingly, in furtherance of this court's desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings (rather than have a proliferation of similar pleadings) it is hereby **ORDERED** that:

Within 21 days of the entry of this Order, the Non-Debtor Dondero-Related Entities named in this Order shall file a Notice in this case disclosing thereon: (a) who owns the entity (showing percentages);[10] (b) whether Mr. Dondero or his family trusts have either a direct or indirect

---

[10] With regard to any minor children who may be beneficiaries of trusts, actual names should not be used (Child 1, Child 2, *etc.* would be sufficient).

Appx. 07895
011838

Case 19-34054-sgj11 Doc 3445-86 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 14 of
Case 3:25-cv-02072-S      Document 15-14    Filed 10/06/25    Page 921 of 921    PageID 12719
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15   Page 13 of 13

ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the

officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity; and (d)

whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and

substance of its claims).

### End of Order ###

Appx. 07886

011839