**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re: Highland Capital Management, L.P.**

|  | § |  |
|---|---|---|
|  | § | Case No. **19-34054-sgj11** |
| **The Dugaboy Investment Trust et al- Appellant** |  |  |
|  | § |  |
| vs. | § |  |
|  |  |  |
| **Highland Capital Management, L.P.** |  |  |
| **Et al-** Appellee |  |  |
|  | § | **3:25-cv-02072-S** |
|  | § |  |

   **[4333]  Memorandum of Opinion and Order Regarding Stay Requests (Addressing DE #4326 and 4308) entered on 7/21/25**

# Volume 17

# APPELLANT RECORD

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

*INDEX*

## APPELLANT THE DUGABOY INVESTMENT TRUST'S STATEMENT OF ISSUES TO BE PRESENTED AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL FROM THE BANKRUPTCY COURT'S ORDER REGARDING STAY REQUESTS [ADDRESSING DE ## 4326 & 4308]

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant"), having filed a Notice of Appeal [Docket No. 4353] on August 4, 2025 in the above-captioned case from the Bankruptcy Court's July 21, 2025 *Memorandum Order and Opinion Regarding Stay Requests [Addressing DE ## 4326 & 4308]*[Docket No. 4333], hereby submits this *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal*, and respectfully requests that the Clerk prepare and forward the items listed herein to the District Court for inclusion in the record in connection with this appeal.[1]

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL

1.  **Did the Bankruptcy Court err in faulting Dugaboy's Stay Request because Dugaboy did not make a "standard" request for a stay pending appeal pursuant to Federal Bankruptcy Rule 8007?**

2.  **Did the Bankruptcy Court err in determining that the Bankruptcy Rule 9019 settlement proceeding was not "a proceeding involving a charitable trust"?**

3.  **Did the Bankruptcy Court err in concluding there was insufficient evidence connecting Mark Patrick's involvement in this Court's Rule 9019 settlement proceedings to the allegations of wrongdoing against Patrick in the Cayman Islands proceeding?**

4.  **Did the Bankruptcy Court err in failing to recognize that the new evidence of Mark Patrick's misconduct exposed in the Cayman Islands proceeding fatally undermines the 9019 settlement by establishing that Patrick lacked authority to enter into the settlement?**

5.  **Did the Bankruptcy Court err in concluding that a stay was unnecessary because Dugaboy could still pursue remedies against Mark Patrick in the Cayman Islands proceeding?**

6.  **Did the Bankruptcy Court err in failing to recuse itself under 28 U.S.C. § 455 due to the appearance of partiality created by the presiding judge's authorship of novels that bear striking factual and thematic similarities to the Highland Capital Management bankruptcy proceedings and portray hedge fund principals in an overtly negative**

---

[1] Because of its voluminous nature, Docket #4255 will be delivered to the Clerk on a flash drive which will arrive tomorrow.

1

light, thereby depriving Dugaboy of an impartial judge with respect to the stay motion?

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

*Vol. 1*

*000001* 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4353] filed by Appellant;

*000023* 2. Bankruptcy Court's *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ## 4236 & 4308* [Docket No. 4333];

*000039* 3. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

4. Any opinion, findings of fact and conclusions of law of the bankruptcy court relating to the issues on appeal, including transcripts of all oral rulings: Transcript of hearing held June 25, 2025 before Judge Stacey C.G. Jernigan [Docket No. 4296] re: Motion for Entry of an Order Approving Settlement with HMIT Entities (4216) [Docket No. 4297]; and

5. Each of the additional documents and items designated below:

*Vol. 2*

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 2/22/2021 | 1943 | Order confirming the fifth amended chapter 11 plan, as modified and granting related relief (RE: related document(s)1472 Chapter 11 plan filed by Debtor Highland Capital Management, L.P., 1808 Chapter 11 plan filed by Debtor Highland Capital Management, L.P.). Entered on 2/22/2021 (Okafor, M.) |
| 3/18/2021 | 2060 | Motion to recuse Judge Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| 3/18/2021 | 2061 | Brief in support filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/18/2021 | 2062 | Support/supplemental document Appendix to Motion to Recuse filed by Interested Party James Dondero (RE: related document(s)2060 Motion to recuse Judge Jernigan). (Lang, Michael) |
| 3/23/2021 | 2083 | Order denying motion to recuse (related document #2060) Entered on 3/23/2021. (Okafor, M.) |

*000569*

*000730*

*000734*

*Vol. 3*

*000771*
*Thru vol. 5*

*Vol 5*
*003493*

| | | | |
|---|---|---|---|
| *Vol. 5*<br>*00 3504* | 4/6/2021 | 2169 | Amended notice of appeal filed by Interested Party James Dondero (RE: related document(s)2149 Notice of appeal). (Lang, Michael) |
| *00 3519* | 4/15/2022 | 2205 | Statement of issues on appeal, filed by Interested Party James Dondero (RE: related document(s)2083 Order on motion to recuse Judge). (Lang, Michael) |
| *00 3521* | 4/15/2021 | 2206 | Appellant designation of contents for inclusion in record on appeal filed by Interested Party James Dondero (RE: related document(s)2169 Amended notice of appeal). Appellee designation due by 04/29/2021. (Lang, Michael) |
| *00 3530* | 2/9/2022 | 3264 | DISTRICT COURT MEMORANDUM OPINION AND ORDER - The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292 (a) and the Court is without jurisdiction over this appeal of the Bankruptcy Court's Recusal Order. The Court further denies Appellants leave to appeal the Recusal Order under § 1292 (b), denies Appellants' request to withdraw the reference of their motion to recuse, and denies Appellants' request to construe their appeal as a petition for writ of mandamus. Accordingly, the Court dismisses this appeal for lack of jurisdiction. (Ordered by Judge Ed Kinkeade on 2/9/2022). Civil Action number:3:21-cv-00879-K, DISMISSED for lack of jurisdiction (RE: related document(s)2083 Order on motion to recuse Judge). Entered on 2/9/2022 (Whitaker, Sheniqua) Modified on 2/25/2022 (Whitaker, Sheniqua). (Entered: 02/25/2022) |
| *Vol 6*<br>*00 3544* | 7/20/2022 | 3406 | Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: #1 Appendix Appendix (Lang, Michael) Modified text on 7/21/2022 (Ecker, C.). |
| *00 3909* | 8/1/2022 | 3422 | Notice of hearing on Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.).). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3406, (Lang, Michael) |

| | | | |
|---|---|---|---|
| *Vol 6*<br><br>*003912* | 8/15/2022 | 3444 | Response opposed to (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Attachments: #1 Exhibit A (Annable, Zachery) |
| *Vol. 7*<br><br>*003936*<br>*Thru END of Vol 14* | 8/15/2022 | 3445 | Exhibit List (Appendix in Support of Highland Capital Management, L.P.'s Objection to Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 USC 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3444 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Index 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 (Annable, Zachery) |
| *Vol 15*<br><br>*011840* | 8/15/2022 | 3446 | Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

| | | | |
|---|---|---|---|
| *Vol. 15* | | | Depositions) Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) |
| *011855* | 8/15/2022 | 3447 | Declaration re: (Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi). (Annable, Zachery) |
| *011864* | 8/17/2022 | 3456 | Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.)). Hearing to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga for 3446 and for 3449, (Annable, Zachery) |
| *011869* | 8/22/2022 | 3463 | Reply to (related document(s): 3444 Response filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. (Lang, Michael) |
| *011874* | 8/24/2022 | 3466 | Amended Notice of hearing filed by Interested Party James Dondero (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support Filed by Interested Party James Dondero (Attachments: # 1 Appendix Appendix) (Lang, Michael) Modified text on 7/21/2022(Ecker, C.)., 3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capital Management, L.P.'s Motion to (A) Strike Letters Attached to Appendix in Support of the Dondero Parties' Supplemental Recusal Motion [Docket No. 3406], or, (B) Alternatively, to Compel the Lawyers' |

*Vol 15*

| | | | Depositions) Filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel Lawyers' Depositions. Filed by Debtor Highland Capital Management, L.P. (Ecker, C.), 3462 Order converting the August 31, 2022 at 9:30 AM Hearing on (A) The motion for final appealable order and supplement to motion to recuse and (B) related motions to strike and compel to a preliminary status/scheduling conference (RE: related document(s)3406 Motion for leave filed by Interested Party James Dondero, 3446 Motion to strike document filed by Debtor Highland Capital Management, L.P., 3449 Motion to compel filed by Debtor Highland Capital Management, L.P.). Entered on 8/19/2022 (Ecker, C.)). Status Conference to be held on 8/31/2022 at 09:30 AM at https://us-courts.webex.com/meet/jerniga. (Lang, Michael) |
| --- | --- | --- | --- |
| *011877* | 8/26/2022 | 3470 | Amended motion for final appealable order and proposed supplement to the record filed by Interested Party James Dondero (RE: related document(s)3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support). (Attachments: #1 Appendix (Lang, Michael) MODIFIED text to match PDF on 9/1/2022 (Ecker, C.). |
| *012039* | 8/26/2022 | 3471 | Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)3446 Motion to strike (related document(s): 3406 Motion for leave Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support filed by Interested Party James Dondero) (Highland Capi, 3449 Motion to compel Lawyers' Depositions.). (Lang, Michael) |
| *012047* *N/A* *NO PDF AVAiLABle* | 8/31/2022 | 3478 | 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.) (Edmond, Michael) |
| *012047* | 9/1/2022 | 3479 | Order denying amended motion of James Dondero, Highland Capital Management Fund Advisors, L.P., Nexpoint Advisors, |

*Vol. 15*

*012050*

*012077*
*Vol. 16*
*012079*

*012357*

| | | | |
|---|---|---|---|
| | | | L.P. The Dugaboy Investment Trust Get Good Trust and, Nexpoint Real Estate Partners, LLC, F/K/A HCRE Partners, A Delaware Limited Liability Company for final appealable order and supplement to motion to recuse pursuant to 28 U.S.C. Section 455 (RE: related document(s)3470 Brief filed by Interested Party James Dondero). Entered on 9/1/2022 (Okafor, Marcey) |
| | 9/1/2022 | 3480 | Transcript regarding Hearing Held 08/31/2022 (27 pages) RE: Status Conference Re: Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 (#3406). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 11/30/2022. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber Kathy Rehling, kathyrehlingtranscripts@gmail.com, Telephone number 972-786-3063. (RE: related document(s) 3478 Hearing held on 8/31/2022. (RE: related document(s)3406 Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support, filed by Interested Party James Dondero.) (Appearances: M. Lang for Movants; J. Pomeranz for Reorganized Debtor. Nonevidentiary status conference. Based on discussions with counsel at status conference as to what actual relief is being sought, the motion (even as currently amended) will be denied as procedurally defective. This is without prejudice to movants filing a new motion pursuant to Rule 54 seeking the simple relief of having the last sentence of this courts 3/23/21 order deleted, or a new motion to recuse, if Movants have any desire to supplement the record. Court to issue order.)). Transcript to be made available to the public on 11/30/2022. (Rehling, Kathy) |
| | 9/27/2022 | 3541 | Motion to recuse Judge Stacey G. C. Jernigan Filed by Interested Party James Dondero (Lang, Michael) |
| | 9/72/2022 | 3542 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3541 Motion to recuse Judge Stacey G. C. Jernigan). (Attachments: #1 Appendix (Lang, Michael) |
| | 10/14/2022 | 3567 | Agreed Scheduling Order on renewed motion to recuse (related document #3541) Entered on 10/14/2022. (Okafor, Marcey) |

| | | | |
|---|---|---|---|
| *Vol. 16* *012361* | 10/17/2022 | 3570 | Motion to recuse Judge Stacey G. C. Jernigan - AMENDED Filed by Interested Party James Dondero (Lang, Michael) |
| *Vol. 17* *012363* | 10/17/2022 | 3571 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Attachments: #1 Appendix (Lang, Michael) |
| *012641* | 10/31/2022 | 3595 | Response opposed to (related document(s): 3541 Motion to recuse Judge Stacey G. C. Jernigan filed by Interested Party James Dondero, 3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED filed by Interested Party James Dondero) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| *Vol. 18* *012697* *Thru End of Vol. 21* | 10/31/2022 | 3596 | Support/supplemental document (Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. 455 and Brief in Support) filed by Debtor Highland Capital Management, L.P. (RE: related document(s)3595 Response). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 (Annable, Zachery) |
| *Vol. 22* *016732* | 3/3/2023 | 3673 | Brief in support filed by Interested Party James Dondero (RE: related document(s)3570 Motion to recuse Judge Stacey G. C. Jernigan - AMENDED). (Lang, Michael) |
| *016737* | 3/6/2023 | 3675 | Memorandum of Opinion and Order Denying Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. Section 455 (RE: related document(s)3570 Motion to recuse Judge filed by Interested Party James Dondero). Entered on 3/6/2023 (Okafor, Marcey) |
| *016773* | 3/6/2023 | 3676 | Order Denying Amended Renewed Motion to Recuse Pursuant to U.S.C. Section 455 (related document #3570) Entered on 3/6/2023. (Okafor, Marcey) |
| *016809* | 5/19/2025 | 4216 | Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland |

| | | | |
|---|---|---|---|
| *Vol. 22* | | | Claimant Trust, Interested Party Highland Litigation Sub-Trust (Attachments: #1 Exhibit A--Proposed Order (Annable, Zachery) |
| *016827* | 5/19/2025 | 4217 | Declaration re: (Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 (Annable, Zachery) |
| *016830* | 5/19/2025 | 4217-1 | Proposed Settlement Agreement |
| *016855* | 6/9/2025 | 4230 | Objection to (related document(s): 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Hesse, Gregory) |
| *016863* | 6/20/2025 | 4251 | Exhibit List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *016865* | 6/20/2025 | 4252 | Witness List for the June 25, 2025 Hearing filed by Partner Dugaboy Investment Trust (RE: related document(s)4230 Objection). (Lang, Michael) |
| *Vol. 23* *016867* *Thru end of Vol. 25* | 6/20/2025 | 4255 **(to be submitted to Clerk on flash drive)** | Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Attachments: #1 Exhibit 1 , #2 Exhibit 2 , #3 Exhibit 3 , #4 Exhibit 4 , #5 Exhibit 5 , #6 Exhibit 6 , #7 Exhibit 7 , #8 Exhibit 8 , #9 Exhibit 9 , #10 Exhibit 10 , #11 Exhibit 11 , #12 Exhibit 12 , #13 Exhibit 13 , #14 Exhibit 14 , #15 Exhibit 15 , #16 |

| | | | |
|---|---|---|---|
| | | | Exhibit 16 , #17 Exhibit 17 , #18 Exhibit 18 , #19 Exhibit 19 , #20 Exhibit 20 , #21 Exhibit 21 , #22 Exhibit 22 , #23 Exhibit 23 , #24 Exhibit 24 , #25 Exhibit 25 , #26 Exhibit 26 , #27 Exhibit 27 , #28 Exhibit 28 , #29 Exhibit 29 , #30 Exhibit 30 , #31 Exhibit 31 , #32 Exhibit 32 , #33 Exhibit 33 , #34 Exhibit 34 , #35 Exhibit 35 , #36 Exhibit 36 , #37 Exhibit 37 , #38 Exhibit 38 , #39 Exhibit 39 , #40 Exhibit 40 , #41 Exhibit 41 , #42 Exhibit 42 , #43 Exhibit 43 , #44 Exhibit 44 , #45 Exhibit 45 , #46 Exhibit 46 , #47 Exhibit 47 , #48 Exhibit 48 , #49 Exhibit 49 , #50 Exhibit 50 , #51 Exhibit 51 , #52 Exhibit 52 , #53 Exhibit 53 , #54 Exhibit 54 , #55 Exhibit 55 , #56 Exhibit 56 , #57 Exhibit 57 , #58 Exhibit 58 , #59 Exhibit 59 , #60 Exhibit 60 , #61 Exhibit 61 , #62 Exhibit 62 , #63 Exhibit 63 , #64 Exhibit 64 , #65 Exhibit 65 , #66 Exhibit 66 , #67 Exhibit 67 , #68 Exhibit 68 , #69 Exhibit 69 , #70 Exhibit 70 , #71 Exhibit 71 , #72 Exhibit 72 , #73 Exhibit 73 , #74 Exhibit 74 , #75 Exhibit 75 , #76 Exhibit 76 , #77 Exhibit 77 , #78 Exhibit 78 , #79 Exhibit 79 , #80 Exhibit 80 , #81 Exhibit 81 , #82 Exhibit 82 , #83 Exhibit 83 , #84 Exhibit 84 , #85 Exhibit 85 , #86 Exhibit 86 , #87 Exhibit 87 , #88 Exhibit 88 , #89 Exhibit 89 , #90 Exhibit 90 , #91 Exhibit 91 , #92 Exhibit 92 , #93 Exhibit 93 , #94 Exhibit 94 , #95 Exhibit 95 , #96 Exhibit 96 , #97 Exhibit 97 , #98 Exhibit 98 , #99 Exhibit 99 , #100 Exhibit 100 , #101 Exhibit 101 , #102 Exhibit 102 , #103 Exhibit 103 , #104 Exhibit 104 , #105 Exhibit 105 , #106 Exhibit 106 , #107 Exhibit 107 , #108 Exhibit 108 , #109 Exhibit 109 , #110 Exhibit 110 , #111 Exhibit 111 , #112 Exhibit 112 , #113 Exhibit 113 , #114 Exhibit 114 , #115 Exhibit 115 , #116 Exhibit 116 , #117 Exhibit 117 , #118 Exhibit 118 , #119 Exhibit 119 , #120 Exhibit 120 , #121 Exhibit 121 , #122 Exhibit 122 , #123 Exhibit 123 (Annable, Zachery) |
| *Vol. 26* | 6/20/2025 | 4256 | Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith)). (Phillips, Louis) |
| | 6/20/2025 | 4257 | Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent |

*019524*

*019527*

| | | | Therewith)). (Attachments: #1 Exhibit 1 - Charitable DAF/CLO HoldCo Organization Chart, #2 Exhibit 2 - Rand Structure Chart, #3 Exhibit 3 - July 9, 2021 Memo on DAFs and Sponsoring Orgs, #4 Exhibit 4 - Charitable Respondents Response and Disclosures (Okin, Matthew) |
|---|---|---|---|
| Vol. 27  019847 | 6/23/2025 | 4271 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4253 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 66, #2 Exhibit 67 (Annable, Zachery) |
| 019871 | 6/23/2025 | 4272 | Amended Witness and Exhibit List filed by Interested Parties Crown Global Life Insurance, Ltd, The Dallas Foundation (RE: related document(s)4257 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 5, #2 Exhibit 66, #3 Exhibit 7 7,4 Exhibit 8 ,8, Exhibit 9 (Curry, David) |
| 019998 | 6/23/2025 | 4273 | Objection to (related document(s)): 4255 List (witness/exhibit/generic) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust) filed by Partner Dugaboy Investment Trust. (Ohlinger, Ali) |
| Vol. 28  020013 | 6/23/2025 | 4277 | Amended Witness and Exhibit List filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4255 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 124 , #2 Exhibit 125 (Annable, Zachery) |
| 020230 | 6/24/2025 | 4279 | Witness and Exhibit List with Respect to Hearing to be Held on June 25, 2025 filed by Partner Dugaboy Investment Trust (RE: related document(s)4213 Motion to extend time to (Motion for an Order Further Extending Duration of Trusts) (RE: related document(s)4144 Order on motion to extend/shorten time)). (Attachments: #1 Exhibit 1 Deitsch-Perez, Deborah) |
| 020241 | 6/24/2025 | 4280 | Amended Witness and Exhibit List (Highland Capital Management, L.P., Highland Claimant Trust, and Litigation Sub-Trust Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on June 25, 2025) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s) 4255 List (witness/exhibit/generic), 4277 List (witness/exhibit/generic)). (Attachments: #1 Exhibit 126 (Annable, Zachery) |

| | | | |
|---|---|---|---|
| *Vol. 28*<br><br>*020266* | 6/25/2025 | 4293 | Court admitted exhibits date of hearing June 25, 2025 (RE: related document(s) 4216 Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) Filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Court Admitted Debtors Exhibits #1 through #9; #11 through #56 & #58 through #123 & #126 offered by attorney John Morris; Court Also Admitted Patrick Daugherty Exhibits #1 through #42 offered by attorney Drew K. York: Court also admitted Dugaboy Investment Trust Exhibit #3, which was a letter offered by attorney Michael J. Lang.) (Edmond, Michael) Modified on 6/30/2025 (emi).Modified on 6/30/2025 (emi). (Entered: 06/27/2025) |
| *Vol. 29*<br><br>*020267* | 6/27/2025 | 4290 | Stipulation by Highland Claimant Trust, Highland Litigation Sub-Trust and The Dugaboy Investment Trust. filed by Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (RE: related document(s)4223 Objection). (Annable, Zachery) |
| *020271* | 6/27/2025 | 4291 | Stipulation withdrawing objection of The Dallas Foundation and Crown Global Life Insurance, LTD to Motion for Entry of an order pursuant to Bankruptcy Rule 9019 and 11 U.S.C. Section 363 approving settlement with the HMIT Entities and authorizing actions consistent therewith (RE: related document(s) 4232 Response filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust, 4282 Stipulation filed by Creditor Hunter Mountain Investment Trust. Entered on 6/27/2025 (Okafor, M.) |
| *020282* | 7/1/2025 | 4299 | Motion to withdraw document Consent Motion to Dismiss HMIT Remand Proceedings with Prejudice (related document(s) 3699 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |
| *020289* | 7/1/2025 | 4300 | Motion to withdraw document Consent Motion to Dismiss Delaware Action Proceedings with Prejudice (related document(s) 4000 Motion for leave) Filed by Creditor Hunter Mountain Investment Trust, Interested Party Hunter Mountain Trust (Attachments: #1 Proposed Order (Salzer, Ian) |

| | | | |
|---|---|---|---|
| *Vol. 29* | 7/7/2025 | 4304 | Order withdrawing Emergency Motion for Leave to File Adversary Proceeding [Dkt. 3699] with prejudice (RE: related document(s)4299 Motion to withdraw document filed by Interested Party Hunter Mountain Trust, Creditor Hunter Mountain Investment Trust). IT IS THEREFORE ORDERED that the proceedings defined in the Dismissal Motion as: Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P., Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including Hunter Mountain Investment Trusts Emergency Motion for Leave to File Adversary Proceeding filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating thereto), are dismissed with prejudice. Entered on 7/7/2025 (Okafor, M.) |
| *020296* | | | |
| *020298* | 7/10/2025 | 4308 | Notice Letter from the Office of the Texas Attorney General Requesting a Stay filed by Interested Party State of Texas. (Stone, Johnathan) |
| *020300* | 7/14/2025 | 4311 | Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025. (Lang, Michael) |
| *020309* | 7/16/2025 | 4323 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020311* | 7/17/2025 | 4326 | Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust. Objections due by 8/7/2025. (Lang, Michael) Modified text on 7/21/2025 (mdo). |
| *Vol. 30* | 7/17/2025 | 4329 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-01876-K. (RE: related document(s)4311 Notice of appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith. filed by Creditor The Dugaboy Investment Trust (RE: related |
| *020407* | | | |

| | | | |
|---|---|---|---|
| *vol. 31* | | | document(s)4297 Order on motion to compromise controversy). Appellant Designation due by 07/28/2025.) (Whitaker, Sheniqua) |
| *020686* | 7/21/2025 | 4333 | Memorandum of opinion (RE: related document(s)4308 Notice (generic) filed by Interested Party State of Texas, 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order filed by Creditor The Dugaboy Investment Trust). Entered on 7/21/2025 (Okafor, M.) |
| *020696* | 7/21/2025 | 4334 | Order denying stay requests (related document 4326 The Dugaboy Investment Trust's Motion to Stay 9019 Order and 4308 Notice). Entered on 7/21/2025. (Okafor, M.) Additional attachment(s) added on 7/21/2025 (Okafor, M.) |
| *020808* | 8/4/2025 | 4353 | Notice of appeal. Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). Appellant Designation due by 08/18/2025. (Attachments: #1 Exhibit A) (Harper, Geoffrey) |
| *020830* | 8/5/2025 | 4359 | Notice of docketing notice of appeal. Civil Action Number: 3:25-cv-02072-S. (RE: related document(s)4353 Notice of appeal filed by Partner Dugaboy Investment Trust (RE: related document(s) 4333 Memorandum of opinion). (Almaraz, Jeanette) |
| *020837* | 8/15/2025 | 4372 | Motion to recuse Judge Filed by Interested Parties James Dondero, NexPoint Advisors, L.P., NexPoint Asset Management, L.P., NexPoint Real Estate Advisors, L.P., The Dugaboy Investment Trust, The Get Good Non Exempt Trust No 2 (Attachments: #1 Proposed Order (Harper, Geoffrey) |

Dated: August 18, 2025    Respectfully submitted,

**WINSTON & STRAWN LLP**

By: */s/ Geoffrey S. Harper*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@winston.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

14

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
**CRAWFORD, WISHNEW & LANG PLLC**
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Appellant The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Case 19-34054-sgj11   Doc 3571   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S      Document 1 Document   Filed 10/06/25   Page 18 of 351      PageID 13294
Main Document   Page 15 of 29   Page 18 of 351

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 |

**MOVANTS' AMENDED MEMORANDUM OF LAW IN SUPPORT OF**
**AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**

012363

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

I.  INTRODUCTION .............................................................................................. 1

II.  PROCEDURAL HISTORY ............................................................................... 1

III.  RELEVANT BACKGROUND AND EVIDENCE OF BIAS............................ 3

    A.  Mr. Dondero Ran A Successful And Profitable Business For More Than Two Decades Prior to Bankruptcy.............................................................................. 3

    B.  The Court Formed An Animus Against Mr. Dondero During The Acis Bankruptcy Case That Infected This Bankruptcy Case From The Outset ....................... 4

    C.  The Court's Animus Continued To Infect It Decision-Making And Treatment Of Movants............................................................................................................ 6

        1.  The February 19, 2020 Motion to Retain Hearing ..................................... 6

        2.  The June 30, 2020 CLO Fund Release Hearing ........................................ 8

        3.  The July 8, 2020 Exclusivity Hearing ........................................................ 8

        4.  The December 16, 2020 And January 26, 2021 CLO Hearings .................. 9

        5.  The Court's Ruling On Movants' Motion For An Examiner ....................... 10

    D.  The Court Confirms A "Monetization Plan" Over Movants' Objections.................. 11

    E.  The Court's Post-Confirmation Decisions Have Continued To Give The Appearance Of Bias ......................................................................................... 13

        1.  The Court's August 2021 Sanctions Order ................................................ 14

        2.  The Court's Order To Appear .................................................................... 16

        3.  The Court's September 12, 2022 Withdrawal of Claim Hearing ............... 16

IV.  THE COURT SHOULD IMMEDIATELY RECUSE ITSELF ...................... 19

V.  CONCLUSION ................................................................................................. 24

012364

# TABLE OF AUTHORITIES

**Cases**

*Andrade v. Chojnacki,*
  338 F.3d 448 (5th Cir. 2003) ........................................................................... 19, 21

*Bell v. Johnson,*
  404 F.3d 997 (6th Cir. 2005) ................................................................................... 20

*Burke v. Regolado,*
  935 F.3d 960 (10th Cir. 2019) ................................................................................ 20

*Davies v. C.I.R.,*
  68 F.3d 1129 (9th Cir. 1995) ................................................................................... 23

*In re Carroll,*
  850 F.3d 811 (5th Cir. 2017) (per curiam) ............................................................. 12

*In re Chevron U.S.A., Inc.,*
  121 F.3d 163 (5th Cir. 1997) ................................................................................... 21

*In re Drexel Burnham Lambert Inc.,*
  861 F.2d 1307 (2d Cir. 1988) .................................................................................. 20

*In re Kansas Pub. Employees Retirement Sys.,*
  85 F.3d 1353 (8th Cir. 1996) ................................................................................... 20

*In re U.S.,*
  572 F.3d 301 (7th Cir. 1999) ................................................................................ 9, 22

*In the Matter of Highland Capital Mgmt., L.P.,*
  48 F.4th 419 (5th Cir. 2022) ................................................................................... 12

*Johnson v. Sawyer,*
  120 F.3d 1307 (5th Cir. 1997) ......................................................................... 9, 22, 24

*Liljeberg v. Health Servs. Acquisition Corp.,*
  486 U.S. 847 (2001) ...................................................................................... 19, 20, 21

*Liteky v. U.S.,*
  510 U.S. 540 (1994) ...................................................................................... 20, 21, 22

*Miller v. Sam Houston State Univ.,*
  986 F.3d 880 (5th Cir. 2021) ................................................................................... 21

*Offutt v. United States,*
  348 U.S. 11 (1954) ................................................................................................... 21

*Sentis Group, Inc. v. Coral Group, Inc.,*
  559 F.3d 888 (8th Cir. 2009) ........................................................................ 7, 8, 21, 24

012365

*The Cadle Co. v. Moore,*
   739 F.3d 724 (5th Cir. 2014) .................................................................. 14

*U.S. v. Kennedy,*
   682 F.2d 244 (3d Cir. 2012)........................................................... 9, 22, 24

*U.S. v. Microsoft Corp.,*
   56 F.3d 1448 (D.C. Cir. 1995) ...................................................... 7, 20, 22

*United States v. Jordan,*
   49 F.3d 152 (5th Cir. 1995) .................................................................. 21

*United States v. Torkington,*
   874 F.2d 1441 (11th Cir.1989) ............................................................. 20

## Statutes

28 U.S.C. § 455 ........................................................................................ 19

## Other Authorities

H. Rep. No. 1453, 93rd Cong., 2d Sess. 1 (1974),
   reprinted in 1974 U.S. Code Cong. & Admin. News 6351 ...................... 20

012366

## I.    INTRODUCTION

This Renewed Motion to Recuse is necessary because the Court denied a prior motion by James Dondero, Highland Capital Management Fund Advisors, L.P., The Dugaboy Investment Trust, Get Good Trust, and NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC (collectively, "Movants") to supplement the record in support of their original motion to recuse, making it impossible for Movants to have all evidence of the Court's bias considered on appeal. As set forth herein, the Court's animus toward Movants is so evident, persistent, and severe that Movants cannot receive fair treatment or justice in this Court.  And while the Court previously suggested that Movants sought recusal too late, that suggestion rings hollow, because the Court continues to preside over several proceedings involving Movants, and because the Court's bias continues to pervade all proceedings before it.  This Motion should be granted.

## II.    PROCEDURAL HISTORY

The Movants filed their original motion to recuse ("Original Recusal Motion") on March 18, 2021.[1]  The Court denied the Motion less than a week later.[2]  In doing so, the Court acknowledged "that the applicable statute and rule do not expressly address timeliness" but nonetheless concluded that the motion was untimely.[3]  Moreover, despite recognizing that an objective standard should be applied to a recusal determination, the Court instead applied a subjective standard, based entirely on a self-assessment: "The Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants."[4]

The Movants appealed the Bankruptcy Court's order denying their Original Recusal

---

[1] *In re: Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, Bankr. Dkt. No. 2061.

[2] Bankr. Dkt. No. 2083.

[3] *Id.* at 5.

[4] *Id.* at 10.

012367

Motion to the United States District Court for the Northern District of Texas on April 6, 2021.[5]
On February 9, 2022, the District Court denied the appeal for lack of jurisdiction.[6]

Thereafter, this Court continued to preside over the bankruptcy proceedings as well as at
least nine adversary proceedings involving the Movants.  Further, the Court has since held
additional hearings and made additional rulings and other statements that demonstrate clearly the
Court's ongoing animus toward Movants.  As a result, on August 26, 2022, Movants filed an
Amended Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to
28 U.S.C. § 455 ("Motion to Supplement"), in which Movants sought: (1) to remove the
"reservation language" in the Original Recusal Order; (2) an order stating that Original Recusal
Order is final; and (3) to supplement the record on the Original Recusal Motion.[7]  The Court held
a hearing on the Motion to Supplement on August 31, 2022.  At that hearing, the Movants
informed the Court that Highland was *unopposed* to the relief requested in the Motion to
Supplement.  Nevertheless, the Court accused Mr. Dondero and his counsel of "carpet-bombing
us with paper and causing us to expend resources," chastised Mr. Dondero's counsel at length
for the size of the record submitted in support of the Motion, and asked counsel to "help me to
understand why this is not wasting resources in your view and why this isn't just some strategy."[8]

Following the hearing, the Court issued an order denying the Motion to Supplement as
procedurally improper.[9]  In its order, the Court invited Movants to do one of two things: (1) file
a "simple motion" (without attaching additional evidence) seeking the removal of the language

---

[5] *See Dondero v. Hon. Stacey G. C. Jernigan*, Civ. Action No. 3-21-CV-0879-K.

[6] *Id.*, Dkt. No. 39 at 1-2 (noting that the Bankruptcy Court "reserve[d] the right to amend or supplement" its ruling).

[7] Bankr. Dkt. No. 3470.

[8] Ex. U, August 31, 2022 Hr'g Tr. at 20:13-25.  Based on the Court's comments, Movants have attached only relevant excerpts of transcripts to this Motion to minimize the volume of exhibits in the record.  However, Movants can file an appendix attaching full transcripts at the Court's request.

[9] Bankr. Dkt. No. 3479 at 3.

012368

in the Court's original order denying recusal that hindered immediate appeal, or (2) file a new motion to recuse based on "any alleged new evidence or grounds for recusal."[10]  By invoking the first option, Movants would be free to seek mandamus of the Court's denial of the Original Recusal Motion, but would not have the benefit of a full and complete record.  Consequently, Movants have elected to file a new Motion containing all evidence of record that supports recusal.

## III.    RELEVANT BACKGROUND AND EVIDENCE OF BIAS[11]

Many disparaging remarks have been made about Mr. Dondero, his employees, and his businesses during the course of these bankruptcy proceedings, few of which are tethered to facts or evidence adduced in this case.  Among other things, Mr. Dondero has repeatedly been labeled "vexatious," "litigious," and a bad actor.  HCMLP has, in turn, been described as a "Byzantine empire" and "ruinous web."[12]  These accusations—which, to be clear, is all they are—have no basis in the realities of HCMLP's business or Mr. Dondero's management of it.

### A.    Mr. Dondero Ran A Successful And Profitable Business For More Than Two Decades Prior to Bankruptcy

HCMLP is an SEC-registered investment advisor founded in 1993 by Mr. Dondero and Mark A. Okada.[13]  Although this Court has adopted various advocates' description of HCMLP and its affiliates as a complex "web" of entities operated at the whim and for the sole benefit of Mr. Dondero, for 26 years prior to filing a chapter 11 petition, HCMLP operated as a legitimate (and heavily regulated) investment advisor for the benefit of its managed funds and investors.  As of the Petition Date, HCMLP continued to employ 76 employees, including executive-level

---

[10] *Id.*

[11] Movants have truncated the discussion of the relevant background that previously was discussed in Movants' Original Recusal Motion.  Movants hereby incorporate the Original Recusal Motion by reference and, where appropriate, Movants specifically reference sections of that Motion to support their renewed arguments here.

[12] Ex. D, June 30, 2020 Hr'g Tr. at 22:18, 68:24.

[13] Order (I) Confirming Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief ("Confirmation Order"), Bankr. Dkt. No. 1943, ¶ 4.

012369

managers.[14]  Thus, while the Court has described Mr. Dondero as HCMLP's solitary decision-maker on all matters concerning the company's operation and management, that description makes no sense.  At its high-water mark, HCMLP had assets under management exceeding $40 billion.

Following the financial crisis in 2008, HCMLP and some of its managed funds and affiliates, like many other financial institutions and advisors across the globe, faced several lawsuits.  Notably, although the Court has repeatedly characterized Mr. Dondero as "litigious" and "vexatious," in virtually all of the lawsuits involving HCMLP before its bankruptcy filing, HCMLP was *the defendant*.[15]  What is more, between 2008 and HCMLP's bankruptcy filing in 2019, virtually none of the lawsuits filed against HCMLP resulted in any sizeable liability *against HCMLP*, and certainly none that would render HCMLP insolvent.[16]  Indeed, the only significant award issued against HCMLP at any time between 2008 and 2019 is an arbitration award in favor of the Redeemer Committee.  It also bears mentioning that at no time prior to HCMLP's bankruptcy filing had Mr. Dondero ever personally been held liable for *any* misconduct in relation to his management of HCMLP's business.

## B.    The Court Formed An Animus Against Mr. Dondero During The Acis Bankruptcy Case That Infected This Bankruptcy Case From The Outset

The Court's animus toward Movants stems from its earlier involvement in the bankruptcy case of Acis Capital Management, L.P., a Delaware limited partnership formed in 2010.  In January 2018, Joshua Terry, filed an involuntary petition in bankruptcy against Acis and its general partner,

---

[14] *Id.*, ¶ 5.

[15] *See, e.g.*, *UBS Securities, LLC v. Highland Capital Mgmt., L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.); *Citibank, N.A. v. Highland CDO Opportunity Master Fund, L.P., et al.*, Case No. 1:12-cv-02827-NRB (S.D.N.Y.); *HYMF, Inc. v. Highland Capital Mgmt., L.P., et al.*, Index No. 601027/2009 (N.Y. Sup. Ct.); *Daugherty v. Highland Capital Mgmt., et al.*, Case No. 2017-0488-SG (Del. Ch. Ct.).

[16] Although this Court has suggested that HCMLP owes "$1 billion" to UBS, the UBS judgment was not against HCMLP but two of its managed funds.  *See* Bankr. Dkt. 177-4.  The Debtor itself objected to UBS's $1 billion proof of claim on this basis.  *See* Bankr. Dkt. No. 906.

012370

Acis Capital Management GP, L.L.C. (collectively, "Acis").[17]  This Court presided over the Acis

Bankruptcy.  Prior to its bankruptcy, Acis served as portfolio manager for "hundreds of millions

of dollars' worth" of collateralized loan obligations ("CLOs").[18]  Mr. Dondero served as Acis's

Chief Executive Officer, and HCMLP provided certain services to Acis pursuant to shared services

agreements.  The Court's Bench Ruling confirming Acis's Chapter 11 plan makes abundantly clear

that the Court formed negative opinions of Mr. Dondero during that bankruptcy case.  The ruling

is replete with negative remarks about Mr. Dondero, his management decisions, and the structure

of his businesses.

HCMLP, a separately owned entity, filed its Chapter 11 petition in bankruptcy for entirely

different reasons in Delaware on October 16, 2019.[19]  At the time, Debtor's counsel—Pachulski,

Stang, Ziehl & Jones, LLP ("Pachulski")—explained that it filed the bankruptcy in Delaware to

give HCMLP and its then-existing management (including Mr. Dondero), a "fresh start."[20]  The

Official Committee of Unsecured Creditors (the "UCC") moved to transfer the proceedings to

this Court, arguing that transfer was appropriate because the Court had the benefit of a "learning

curve" because of the Acis Bankruptcy.[21]  At the time, Pachulski resisted the transfer, arguing that

the UCC only wanted to take advantage of the Court's preexisting negative views of HCMLP's

management.[22]  Thus, it was Pachulski that initially questioned the Court's impartiality.  The

---

[17] *In re Acis Capital Mgmt., L.P.*, Case No. 3:18-bk-30264 (N.D. Tex.) ("Acis Bankruptcy"), Dkt. No. 1; *see also* Bench Ruling and Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement; and (B) Confirmation of Chapter 11 Trustee's Third Amended Joint Plan ("Bench Ruling), Acis Bankr. Dkt. No. 287 at 10-11.

[18] Bench Ruling, Acis Bankr. Dkt. No. 827 at 4.

[19] Bankr. Dkt. No. 3.

[20] Ex. A, December 3, 2019 Hr'g Tr. at 78:21-23.

[21] *Id.*

[22] *Id.* at 78:3-8; *see also id.* at 79:14-20 (referring to the opinions the Court formed in the Acis bankruptcy as "baggage").

012371

Delaware Bankruptcy nonetheless granted the UCC's motion to transfer.[23]

Following transfer, this Court foreshadowed that it would rely on the negative opinions it formed during the Acis Bankruptcy in dealing with Mr. Dondero, his former employees, and his affiliated entities.[24] Indeed, *at the very first hearing* before this Court on January 9, 2020, the Court reiterated its many negative opinions.[25] And the Court pointed to actions purportedly taken by Mr. Dondero in the Acis Bankruptcy as "evidence" of a presumed propensity of Mr. Dondero to engage in similar actions in the HCMLP bankruptcy. For that reason, the Court insisted on including language in its order allowing it to hold Mr. Dondero (but no other party) in contempt of court.[26] Notably, at the time of this first hearing, *Mr. Dondero had not filed a single motion or objection to any motion.* Consequently, there was nothing in the record before the Court to justify its specific rulings and comments relating to Mr. Dondero.

### C. The Court's Animus Continued To Infect It Decision-Making And Treatment Of Movants

#### 1. The February 19, 2020 Motion to Retain Hearing

Just over a month after the Court's initial hearing in the bankruptcy case, on February 19, 2020, the Court held a hearing on HCMLP's application to retain the law firm Foley Gardere to pursue appeals relating to the Acis Bankruptcy on behalf of Neutra Ltd., a company owned by Mr. Dondero that succeeded to the ownership of Acis. Importantly, during the hearing, former Bankruptcy Judge Russell Nelms—one of the three independent directors appointed to Debtor's Independent Board—testified that, in the Board's business judgment, employment of Foley

---

[23] *Id.* at 90:15-24.

[24] Shortly after the case was transferred, the United States Trustee likewise relied on the Court's comments and conclusions in the Acis Bankruptcy as the basis for its motion to appoint a Chapter 11 trustee. *See* Bankr. Dkt. No. 271. None of the evidence cited in the Trustee's motion had yet been adduced in HCMLP's bankruptcy proceeding.

[25] Ex. B, January 9, 2020 Hr'g Tr. at 78:23-79:16 (stating, "I can't extract what I learned during the Acis case, it's in my brain," and explaining its opinion that Mr. Dondero acted in a "bad way" in the Acis case).

[26] *Id.* at 80:3-6; *see also id.* at 52:10-25.

012372

Gardere and payment of its legal fees was in the Debtor's best interest.[27]  Despite that testimony,

the Court *sua sponte* expressed a belief (untethered to evidence) that Mr. Dondero may have

somehow used his "powers of persuasion" to unduly influence the Independent Board's business

judgment.[28]  The Court did not stop there.  It went on to comment: "Highland is in bankruptcy

because of litigation, litigation, litigation.  The past officers and directors and controls' propensity

to fight about everything . . . It's about years of litigation coming home to roost.  And this appears

to be more of the same, potentially."[29]  That unsolicited commentary is surprising for two reasons.

*First*, again, Mr. Dondero had not yet "fought" anything in the context of the HCMLP proceedings

(and indeed, was not even present at the hearing on the Debtor's motion to retain Foley Gardere).

*Second*, HCMLP was the *defendant* in the various lawsuits spawning "years of litigation," which

the Court nonetheless blamed on "past officers and directors" of HCMLP.[30]  Where, as here, the

Court has manifested an early distrust of one party and made unsolicited negative comments about

the party's practices and intent, federal appellate courts have required recusal.[31]

---

[27] Ex. C, February 19, 2020 Hr'g Tr. at 62:6-17.

[28] *Id.* at 177:7-178:3 (emphasizing the Court's "long history" with Mr. Dondero—a history that came entirely from the Acis Bankruptcy).  In the same hearing, the Court also suggested that Mr. Dondero could not be "trusted" to "keep his word." *Id.* at 174:11-175:13.  When applying the reasonable business judgment standard to Mr. Seery and Debtor management, by contrast, the Court has said it is a very low standard requiring judicial deference.  *See* Ex. W, August 4, 2021 Hr'g. Tr. at 77:4-78:20.

[29] Ex. C, Feb. 19, 2020 Hr'g Tr. at 178:4-12.

[30] *See id.* at 177:7-178:17.  Again, the *only* pre-petition lawsuit that ended in any sizeable judgment *against HCMLP* was the arbitration award issued against HCMLP in favor of the Redeemer Committee.  Further, the Debtor *objected* to proofs of claim filed by the parties litigating or attempting to litigate against HCMLP—including those filed by Acis, UBS, Pat Daugherty, and HarbourVest—arguing that their proofs of claim were unmeritorious.  *See* Bankr. Dkt. Nos. 771 (Acis and Terry), 1008 (Daugherty), 906 (HarbourVest), 928 (UBS).

[31] *See Sentis Group, Inc. v. Coral Group, Inc.*, 559 F.3d 888, 904-05 (8th Cir. 2009) (judge's "apparent distrust of Plaintiffs as manifested early in the litigation" were among the reasons that reassignment on remand was appropriate); *U.S. v. Microsoft Corp.*, 56 F.3d 1448, 1464-65 (D.C. Cir. 1995) (district judge made "several comments during proceedings which evidenced his distrust of Microsoft's lawyers and his generally poor view of Microsoft's practices" arising out of "other alleged misdeeds," none of which were at issue in the actual case before it).

012373

From that point on, unsurprisingly, HCMLP and its counsel began to leverage the Court's predisposition against Mr. Dondero (*i.e.*, what the Debtor had previously described as the Court's "baggage") for the Debtor's own benefit.[32]

### 2.    The June 30, 2020 CLO Fund Release Hearing

The Court's animus against Movants persisted, and if anything, got worse, from there.  In April 2020, CLO Holdco—a non-debtor wholly-owned subsidiary of a charitable Donor-Advised Fund (the "DAF") established by Mr. Dondero, moved to have $2.5 million in funds that indisputably belonged to CLO Holdco released from the registry of the Court.[33]  The UCC objected.  At a June 2020 hearing, CLO Holdco introduced 16 exhibits supporting its claim to the funds, and the Court admitted that CLO Holdco's lawyer made "perfect arguments" regarding the potential legal ramifications of refusing to release the funds, including that "holding the money in the registry of the Court that a non-debtor asserts is its property" is "tantamount to a prejudgment remedy."[34]  Nonetheless, based entirely on arguments made by counsel for the UCC, the Court again concluded that Mr. Dondero was behind the CLO Holdco filing and, therefore, questioned whether it was filed in "good faith," despite the absence of evidence in the record supporting this belief.[35]  The Court therefore denied the motion.

### 3.    The July 8, 2020 Exclusivity Hearing

Just over one week later, at a hearing on HCMLP's motion to extend the exclusivity period,

---

[32] This is similar in kind to what happened in *Sentis Group, Inc.*, in which the U.S. Court of Appeals for the Eighth Circuit reversed and remanded for reconsideration by a different judge a district court's order dismissing the case as a sanction for perceived discovery misconduct by the plaintiffs.  In a case marred by contentious discovery disputes, the Eight Circuit first noted that "defense counsel's goal shifted from conducting effective discovery to fanning the flames of the court's frustration and building a case for sanctions." *Id.* at 891.  Ultimately, the Eighth Circuit reversed the sanctions order and held that the district court's statements, in combination with its misconstruction of a prior order and "its apparent distrust of Plaintiffs as manifested early in the litigation" showed a "sufficiently high degree of antagonism to require reassignment of the case on remand." *Id.* at 904-05.

[33] Bankr. Dkt. No. 590.

[34] *See* Ex. D, June 30, 2020 Hr'g Tr. at 85:17-22.

[35] *Id.* at 82:3-11, 85:4-16.

8

the Court, acting *sua sponte*, directed HCMLP's counsel to investigate Mr. Dondero and certain "Highland affiliates" after allegedly seeing a news article (that was not part of the record) that referenced "Mr. Dondero or Highland affiliates" receiving PPP loans.[36]  Notably, neither Mr. Dondero nor the "Highland affiliates" referred to in the article were the property of or controlled by HCMLP.  In fact, as HCMLP would later confirm, the PPP loans at issue had nothing whatsoever to do with the HCMLP.[37]

**4.**    **The December 16, 2020 And January 26, 2021 CLO Hearings**

In keeping with its habit of accusing entities that the Court perceives to be affiliated with Mr. Dondero of acting "bad faith," the Court did so again in December 2020.[38]  On December 16, 2020, the Court held a hearing on a motion by various third-party financial advisors and retail funds to prevent HCMLP's liquidation of certain CLO assets (the "<u>Restriction Motion</u>").[39]  During the hearing, the Court chastised counsel for the advisors and retail funds for filing the Restriction Motion (*i.e.*, for advocating a good faith position on behalf of their clients), stating that it was "dumbfounded" by the motion, and opining that Mr. Dondero was behind it, notwithstanding that it was filed by separate and distinct legal entities represented by independent counsel.[40]  The Court concluded, without any evidentiary basis, that the Restriction Motion was brought for an improper purpose.[41]    The Court further declared the Restriction Motion frivolous, "almost Rule 11

---

[36] *See* Ex. E, July 8, 2020 Hr'g Tr. at 42:10-24.

[37]  Ex. F, July 14, 2020 Hr'g Tr. at 53:17-59:3.

[38] The federal courts have repeatedly required recusal or reassignment to a different judge where the sitting judge questions the integrity of one party or their counsel or suggests that their actions constitute "bad faith."  *See, e.g.*, *Johnson v. Sawyer*, 120 F.3d 1307, 1334-37 (5th Cir. 1997); *In re U.S.*, 572 F.3d 301, 311-12 (7th Cir. 1999); *U.S. v. Kennedy*, 682 F.2d 244, 258-60 (3d Cir. 2012).

[39] Bankr. Dkt. No. 1522.  The basis and context for the motion is described in detail in Movants' Original Recusal Motion, Bankr. Dkt. No. 2061, at pp. 8-16.  Notably, the retail funds are registered investment advisors that owe independent fiduciary duties to their investors pursuant to the Investment Advisors Act of 1940.

[40] Ex. J, December 16, 2020 Hr'g Tr. at 63:14-25.

[41] *Id.*

9

012375

frivolous," notwithstanding that the motion was filed in good faith.[42]  The Court then used the hearing to condemn Mr. Dondero on the record.

Yet another display of the Court's bias toward Movants came in the context of this same dispute, several weeks later.  On January 26, 2021, the Court held a preliminary injunction hearing in which it considered whether the advisors and retail funds had tortiously interfered with agreements relating to management of the CLOs.[43]  It was abundantly clear at the hearing that HCMLP could not make the requisite showing to justify injunctive relief.[44]  And the evidence was undisputed that Mr. Dondero did not influence or cause the advisors or retail funds to take any action.  Nevertheless, the Court once again turned its focus to Mr. Dondero, warning him that the Court had prohibited him from taking action to interfere with the CLOs.  Incredibly, the Court then made the implied finding that Mr. Dondero had caused counsel for the retail funds to take certain actions.[45]  The Court further stated that it was "leaning" toward finding Mr. Dondero in contempt of court and threatening to shift the "whole bundle of attorney's fees" to Mr. Dondero in connection with a motion for injunctive relief filed by HCMLP that had nothing to do with him.[46]

### 5. The Court's Ruling On Movants' Motion For An Examiner

Another concerning thing that has happened at the hands of this Court is the repeated disenfranchisement of Movants from judicial process.  For example, the Court has repeatedly wielded its scheduling powers as a sword against Movants, often preventing any real consideration

---

[42] *See id.* at 64:1-7.  The statutory basis for the requested relief was section 363(c)(1) or section 1108 of the Bankruptcy Code, which provide that the debtor-in-possession may engage in ordinary course business "unless the court orders otherwise."  That was all that the Advisors and Retail Funds asked the Court to do.

[43] *See* Adv. Proc. No. 21-03000-sgj, Dkt. 1; Ex. L, January 26, 2021 Hr'g Tr.

[44] HCMLP's failures in this regard are detailed in Movants' Original Recusal Motion, Bankr. Dkt. No. 2016, at pp. 13-16.

[45] This finding was in direct contravention of the Court's statements just one week earlier, where it implied that Mr. Dondero lacked such control and prohibited Mr. Dondero from testifying that he exercised no control of the advisors, the retail funds, or their counsel.  Ex. K, January 8, 2021 Hr'g Tr. at 119:6-122:25.

[46] Ex. L, Jan. 26, 2021 Hr'g Tr. at 251:24-252:5.

012376

of legitimate motions filed by Movants by ensuring that hearings on those motions happen too late. In one such instance, on January 14, 2021, Dugaboy and Get Good (the "Trusts") requested the Court direct the appointment of a neutral third-party examiner pursuant to 11 U.S.C. § 1104(c) as a less costly means to resolve various issues that had arisen in the HCMLP bankruptcy (the "Examiner Motion").[47]  The Trusts sought the appointment of an examiner to address, among other things (i) the issues raised by the advisors and the retail funds in the Restriction Motion, (ii) various objections to the proposed plan of reorganization raised by the advisors, the retail funds, and the United States Trustee (discussed below), and (iii) concerns expressed by the Court about costs and expenses incurred in the context of the bankruptcy proceedings.[48]

Given the timing of the Examiner Motion relative to the expected date of the hearing on Debtor's Fifth Amended Plan of Reorganization (as Modified) (the "Plan"), the Trusts asked the Court to consider the Motion on an "emergency" basis to avoid interference with the Plan.[49] Despite this request (and despite the Court's willingness to hear motions filed by HCMLP on an emergency basis), the Court set the hearing on a date long after the expected hearing on Plan confirmation, thereby ensuring that the Motion would be rendered moot.

### D.    The Court Confirms A "Monetization Plan" Over Movants' Objections

The Court's biased decision-making tethered to its preexisting negative views of Mr. Dondero persisted through Plan confirmation.

On February 8, 2021, the Court announced its oral ruling regarding the Plan, in which the Court referred inexplicably and extensively to proceedings in the Acis Bankruptcy.[50]  In its ruling,

---

[47] Bankr. Dkt. No. 1752.

[48] *Id.*

[49] *Id.*

[50] Ex. M, February 8, 2021 Hr'g Tr. at 15:15-16:5.

012377

the Court summarily rejected all of the Plan objections lodged by Movants, decreeing them as filed

in bad faith.[51]  Next, even though it had "not been asked to declare Mr. Dondero and his affiliated

entities as vexatious litigants per se," the Court deemed Mr. Dondero and other Movants

"vexatious litigants."[52]  The Court's ruling failed to comport with its own iteration of the

prerequisites to declaring a litigant vexatious.[53]  Indeed, the Fifth Circuit recently explained that

the Bankruptcy Court failed to follow proper procedures to designate Mr. Dondero vexatious.[54]

On February 22, 2021, the Court issued its Confirmation Order.  Against the backdrop

discussed herein, it is perhaps not surprising that the Court again took the opportunity to criticize

and accuse Mr. Dondero and Movants:

- "Naturally, [the independent board members] were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically.  Based on the record of this case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland."[55]

- "The Debtor's Chief Executive Officer, James P. Seery, credibly testified at the Confirmation Hearing that the Debtor was 'run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits.'  The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation . . . ."[56]

- "[T]he Bankruptcy Court questions the good faith of Mr. Dondero's and the Dondero Related Parties' objections.  In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors."[57]

- "Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds

---

[51] *Id.* at 20:17-20.

[52] *Id.* at 46:20-25, 45:12-14.

[53] *See id.* at 46:6-15 (describing factors to be considered prior to deeming a litigant vexatious).

[54] *See In the Matter of Highland Capital Mgmt., L.P.*, 48 F.4th 419 n.19 (5th Cir. 2022) (citing *In re Carroll*, 850 F.3d 811, 815 (5th Cir. 2017) (per curiam)).  The problems with the Court's ruling regarding vexatiousness are further described in detail in Movants' Original Recusal Motion, Bankr. Dkt. No. 2061 at pp. 21-27.

[55] Confirmation Order, Bankr. Dkt. No. 1943, ¶ 14.

[56] *Id.*, ¶ 7.

[57] *Id.*, ¶ 17.

012378

have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero."[58]

- In discrediting the objections of various NexBank entities, the Court likewise surmised that "Mr. Dondero appears to be in control of these entities as well."[59]

- "[T]he Bankruptcy Court has allowed . . . these objectors to fully present arguments and evidence in opposition to confirmation, even though . . . the Bankruptcy Court questions their good faith. Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero."[60]

Again, the Bankruptcy Court offered up no specific evidence of any bad faith on behalf of Mr. Dondero or the other "objectors." Nor did the Court offer any evidence (or explanation) of why it had "good reason to believe" that Mr. Dondero and the other objectors were seeking to do anything other than protect their legitimate economic interests.[61] In short, an objective observer reading the language of the Confirmation Order would have reason to question this Court's impartiality.

### E.   The Court's Post-Confirmation Decisions Have Continued To Give The Appearance Of Bias

Since confirmation, the Court has continued to act in a biased manner.

---

[58] *Id.*, ¶ 18. Notably, at the time of these comments, there was no evidence of record even suggesting that the Funds were managed by anything other than independent boards, and there was no evidence—other than the Court's own conjecture—that Mr. Post's resignation from his position at HCMLP had anything to do with Mr. Dondero. Nor is it clear how Mr. Post's mere association with Mr. Dondero could possibly impact his competency or credibility to testify about the management of various Funds that he personally came into contact with during "12 years of service" for the Debtor.

[59] *Id.*

[60] *Id.*, ¶ 19.

[61] Notably, the Fifth Circuit previously has admonished this Court for making findings and decisions based on mere "suspicion" and "indirect inference" rather than evidence. In *The Cadle Co. v. Moore*, the Fifth Circuit reversed an order of dismissal issued by this court as a sanction for "abuse of judicial process," finding that the "bankruptcy court's mere suspicions do not add up to clear and convincing evidence." 739 F.3d 724, 731 (5th Cir. 2014). In addition, the Fifth Circuit emphasized that it was "troubled by the bankruptcy court's use of indirect inferences" to support its decision. *Id.* at 731 n.11.

012379

1.    **The Court's August 2021 Sanctions Order**

Perhaps one of the most telling orders issued by the Court since the Original Recusal Motion was filed is the Court's order sanctioning various entities and individuals because two entities—the DAF and CLO Holdco—in consultation with legal counsel, decided to file a lawsuit against HCMLP in the Northern District of Texas.  Specifically, on April 12, 2021, a complaint was filed against HCMLP and two HCMLP-controlled entities (Highland HCF Advisor, Ltd. ("HCFA") and Highland CLO Funding, Ltd. ("HCLOF")) alleging, *inter alia*, impropriety by the Debtor, HCFA, and HCLOF in brokering the sale of CLO interests held by HarbourVest[62] to the Debtor, without prior notice to other CLO investors and without respecting those investors' right of first refusal.[63]  Shortly after filing the complaint, the DAF and CLO Holdco filed a motion for leave to amend the complaint to add Mr. Seery as a defendant, based on his role brokering the HarbourVest transaction.[64]  Within days of these filings, HCMLP filed a motion seeking an order holding the DAF, CLO Holdco, and "the persons who authorized the DAF and CLO Holdco . . . to file the Seery motion," including their attorneys, Sbaiti & Company, PLLC, in civil contempt.[65]

The Court held an evidentiary hearing on HCLMP's sanctions motion on June 8, 2021.  At that hearing, Mark Patrick, who was then serving as the DAF's general manager, testified that he hired Sbaiti & Co. and that he authorized the DAF to file the lawsuit and the motion to add Mr.

---

[62] "HarbourVest" refers to HarbourVest Dover Street IX Investment, L.P., HarbourVest 2017 Global AIF, L.P., HarbourVest 2017 Global Fund, L.P., HV International VIII Secondary, L.P., and HarbourVest Skew Base AIF, L.P.

[63] *Charitable DAF Fund, L.P. v. Highland Capital Management, L.P.*, Case No. 21-cv-00842 (N.D. Tex.) ("DAF Action").

[64] DAF Action, Dkt. No. 6.

[65] Bankr. Dkt. No. 2247.  Specifically, HCMLP argued that the lawsuit and the motion seeking to add Mr. Seery as a defendant violated the Court's Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Dkt. 339] and as well as its Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [Dkt. 854].  *Id.* at 2.

012380

Seery as a defendant.[66]  Mr. Dondero testified that, while he provided certain information to the

DAF and Sbaiti & Co. in relation to the lawsuit, he was not involved at all in authorizing or

preparing the motion to add Mr. Seery (the main reason for the motion for civil contempt).[67]

Despite this testimony and the absence of any contravening testimony, the Court concluded

that "Mr. Dondero sparked this fire" and that the evidence "was clear and convincing that Mr.

Dondero encouraged Mr. Patrick to do something wrong, and Mr. Patrick basically abdicated

responsibility to Mr. Dondero."[68]  The Court then concluded that the lawsuit filed by the DAF and

CLO Holdco was, "*from this Court's estimation, wholly frivolous.*"[69]  In fashioning its sanctions

award, the Court took into consideration the invoices submitted by HCMLP's counsel reflecting

what the firm actually incurred in connection with the civil contempt motion ($38,796.50), and

then compounded the sanction by nearly *seven times* that amount.  In the end, the Court ordered

the DAF, CLO Holdco, Sbaiti & Co. (including Mazin Sbaiti and Jonathan Bridges individually),

Mark Patrick, and Mr. Dondero to pay $239,655 in sanctions to HCMLP.[70]  Worse still, the Court

tacked on a monetary sanction of $100,000 to be paid by anyone that filed any appeal.[71]

In short, the Court ignored the undisputed testimony of record to find "clear and convincing

evidence" of Mr. Dondero's responsibility for the motion to name Mr. Seery as a defendant,

concocted a way to saddle Mr. Dondero and others with a multi-hundred thousand dollar liability,

and prophylactically sanctioned any effort to invoke a legal appellate process.[72]

---

[66] Bankr. Dkt. No. 2660 at 19.

[67] *Id.* at 21.

[68] *Id.*

[69] *Id.* at 26 (emphasis added).

[70] *See id.* at 28-30.

[71] *Id.* at 30.  The District Court subsequently confirmed the sanctions award.  Mr. Dondero intends to appeal.

[72] The District Court recently found that the claims against the Debtor with respect to the Debtor's dealings with HarbourVest *had merit*—despite the Bankruptcy Court's lengthy and opinionated vocalizations to the contrary. *Compare The Charitable DAF Fund, L.P. v. Highland Capital Mgmt., L.P.*, Adv. Proc. No. 3:21-cv-3129-B, Dkt. No. 28, *with* Bankr. Dkt. 2247.  Judge Boyle reversed the Bankruptcy Court's dismissal of the claims against the Debtor

012381

## 2.   The Court's Order To Appear

The Court has further targeted Mr. Dondero (as well as his sister Nancy Dondero) by requiring their presence at all hearings, regardless of whether their presence is needed.  In ordering Mr. Dondero's presence, the Court explained that Mr. Dondero's participation in the bankruptcy and related proceedings was "taking up time."[73]  By the Court's own admission, this is a departure from its usual approach, where a party would be expected to attend hearings only if they are "taking a position" on the issue at hand.[74]

At the same hearing (which was to decide a motion to compel the Debtor's deposition testimony), the Court openly speculated that there was an ulterior motive of "antagonism" behind Mr. Dondero's good-faith litigation conduct.[75]  The Court's statements indicate that, when Mr. Dondero engages in routine litigation steps, like making discovery motions, the Court will treat such actions as nefarious "antagonistic move[s]" rather than ordinary invocation of legal process.

## 3.   The Court's September 12, 2022 Withdrawal of Claim Hearing

And in the most recent example of the Court's biased decision-making, on September 12, 2022, the Court held a hearing on several motions, including a motion by Movant NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC ("HCRE") to withdraw its proof of claim.[76]  In that hearing, HCRE sought the Court's approval to withdraw a disputed proof of claim relating to HCRE's asserted interest in a fund called SE Multifamily Holdings.[77]  Counsel for HCMLP

---

on the basis of collateral estoppel, noting that the Bankruptcy Court had raised collateral estoppel *sua sponte*—neither party had raised collateral estoppel below, nor even briefed the issue—and holding that the elements of collateral estoppel *could not be met* under the circumstances.  *See* Adv. Proc. No. 3:21-cv-3129-B, Dkt. 28 at 7-13.

[73] Ex. P, May 20, 2021 Hr'g Tr. at 20:19-21:14.

[74] *Id.*; *see also id.* at 21:1-8.

[75] *Id.* at 34:3-9 (criticizing Mr. Dondero for engaging in "a fight with Mr. Seery" and commenting that "the motion to compel names him by name. It just — it feels like another antagonistic move").

[76] Ex. V, Sept. 12, 2022 Hr'g Tr.

[77] Bankr. Dkt. No. 3443 at 3.

012382

objected to HCRE's withdrawal in the absence of certain concessions by HCRE, including a stipulation that HCRE would not contest HCMLP's 46.6% interest in SE Multifamily Holdings and that HCRE would waive any right to appeal a final order on its withdrawn proof of claim.[78] In what can only be described as an incredible exchange, the Court first asked HCRE's counsel, Bill Gameros ("Mr. Gameros"), if HCRE would consent to those conditions. Mr. Gameros agreed to both.[79]  But that did not satisfy the Court.  The Court instead demanded that a "client representative" of HCRE appear and testify that the conditions were acceptable.  At that point, DC Sauter, in-house counsel for Mr. Dondero, appeared and confirmed that HCRE would agree to the conditions for withdrawal of its proof of claim.[80]  Still, the Court was not satisfied:

> THE COURT:       All right.  Well, it sounds like hearsay to me.  I don't know –
> Counsel, let me have you both respond.  You know, *I worry about
> this will fall apart the minute Mr. Dondero is instructing a lawyer*,
> I never agreed to that.  I mean I just don't know.  This is highly
> unusual.[81]

When Mr. Sauter explained that Mr. Dondero felt more comfortable having a lawyer make legal representations on the record, the Court responded: "I mean I'm not sure I care what you say, no offense.  I don't think I have a person with clear authority here."[82]  The Court then rebuffed Mr. Gameros's suggestion he could make binding representations on behalf of his client: "Mr. Gameros, come on.  You know this is the client's decision to make.  Okay.  I don't have a client representative."[83]

At that point, Mr. Gameros offered to get Mr. Dondero on the phone to give the exact same

---

[78] Ex. V, Sept. 12, 2022 Hr'g Tr. at 32:22-34:2.

[79] *Id.*

[80] *Id.* at 34:3-20, 35:36.

[81] *Id.* at 36:4-8 (emphasis added).

[82] *Id.* at 36:12-37:9.

[83] *Id.* at 37:7-22.

012383

representation that Mr. Gameros and Mr. Sauter had already given.  Before taking Mr. Dondero's sworn testimony, the Court rebuffed him for failing to have access to video, even though he no previous notice he would have to give testimony at the hearing.[84]  Mr. Dondero testified that HCRE would agree to all of the Debtor's conditions to withdrawal of the proof of claim.[85]  Even then, the Court told Mr. Gameros:  "*I mean he needs to be asked every which way from Sunday whether he's waiving the right* to challenge Highland's 46.06 interest *from now until eternity, okay*.  That's basically, you know, we either have that agreement or we'll just have a trial.[86]  Mr. Dondero then again agreed to the entry of an order denying HCRE's proof of claim with prejudice and agreed not to challenge HCMLP's equity ownership in SE Multifamily Holdings.[87]

After all of that, the Court stated: "[I]t feels like we had a little bit of reluctance to say it as forcefully as we would need to have it said to avoid relitigation" and then denied HCRE's motion to withdraw its proof of claim.[88]  In doing so, the Court found that HCRE had acted with "undue vexatiousness" in pursuing the proof of claim merely because HCMLP opposed the claim and had spent "hundreds of thousands of dollars" doing so.[89]  The Court therefore ordered additional depositions to take place and the parties to attend trial.  And as a parting shot, the Court asked the U.S. Trustee to investigate HCRE and Mr. Dondero (who signed the proof of claim):

> I don't mean to be alarming, but I want it run by the U.S. Trustee because, you know, I've heard some things that have troubled me about the, you know, lack of good faith with regard to the proof of claim and, you know alleged gamesmanship.  And, you know, I talked earlier about this goes to the integrity of the system, you know, filing a proof of claim under penalty of perjury. . . . It's just something uncomfortable going on in my brain about, you know, again a proof of claim being on file two, almost two and a half years and then, you know, okay, never mind, okay, I agree to never mind as long as you agree to

---

[84] *Id.* at 38:24-39:3, 39:8-24.

[85] *Id.* at 40:9-17, 41:10-22, 42:13-25.

[86] *Id.* at 42:21-25 (emphasis added).

[87] *Id.* at 43:23-44:6.

[88] *Id.* at 54:6-15.

[89] *Id.* at 52:4-53:14.

012384

XYZ. . . . I just know if there are quid pro quos I feel like, you know, maybe I need to have the U.S. Trustee, not per se signing off on any agreed order but at least kind of looking at it . . . .[90]

The suggestion that the U.S. Trustee investigate supposed "gamesmanship" by HCRE and Mr. Dondero and whether *they* had given quid pro quos is particularly concerning, where the entire record of the hearing makes clear that it was *HCMLP and its counsel* asking for quid pro quos in return for agreeing to the withdrawal of HCRE's proof of claim.

## IV.    THE COURT SHOULD IMMEDIATELY RECUSE ITSELF

Application of the appropriate standard for recusal leaves little doubt that recusal is required in this case.  Under Section 28 U.S.C. § 455, a judge "*shall* disqualify [her]self in any proceeding in which h[er] impartiality may reasonably be questioned."[91]   A judge "*shall* also disqualify [her]self" if one of several enumerated circumstances exist, including if the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."[92]   The provisions of section 455 are mandatory and afford separate, though overlapping, grounds for recusal.[93]

Under section 455(a), recusal is required whenever a judge's partiality might reasonably be questioned, even if the judge does not have actual personal bias or prejudice.[94]   The test is not whether the judge believes he or she is capable of impartiality and not whether the judge possesses actual bias.[95]   Instead, the test is whether the "'average person on the street who knows all the relevant facts of a case'" might reasonably question the judge's impartiality.[96]   As Congress

---

[90] *Id.* at 57:18-59:4.

[91] 28 U.S.C. § 455(a) (emphasis added).

[92] 28 U.S.C. § 455(b)(1) (emphasis added).

[93] *Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003).

[94] *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850 (2001); *Andrade*, 338 F.3d at 454.

[95] *See Burke v. Regolado*, 935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted); *Liljeberg*, 486 U.S. at 805.

[96] *In re Kansas Pub. Employees Retirement Sys.*, 85 F.3d 1353, 1358 (8th Cir. 1996).

012385

explained when enacting section 455, litigants "ought not have to face a judge where there is a reasonable question of impartiality."[97]  Thus, this statutory provision was "designed to promote public confidence in the impartiality of the judicial process."[98]  Accordingly, recusal is warranted where a judge's comments during proceedings would "cause a reasonable observer to question whether [the judge] 'would have difficulty putting h[er] previous views and findings aside.'"[99]

With respect to 28 U.S.C. § 455(b), although "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," the Supreme Court has recognized that predispositions developed during the course of a trial can suffice to demonstrate the requisite bias or prejudice.[100] In this regard, the words "bias" and "prejudice" mean a disposition or opinion that is somehow wrongful or inappropriate, either because: (a) it is undeserved; (b) it rests upon knowledge that the holder of the opinion ought not to possess; or (c) it is excessive in degree.[101]  Notably, a court's consideration of an extrajudicial source of information is a factor in favor of finding either an appearance of partiality under section 455(a) or bias or prejudice under section 455(b)(1).[102] Moreover, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings," may evidence bias if the opinions reveal that they "derive from an extrajudicial source; and *they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible*."[103]

In short, the Movants, like all other litigants, are entitled to a full and fair opportunity to

---

[97] H. Rep. No. 1453, 93rd Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 6351, 6355.

[98] *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R. Rep. No. 1453); *Liljeberg*, 486 U.S. at 859-60.

[99] *Microsoft Corp.*, 56 F.3d at 1465 (quoting *United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir.1989)).

[100] *Liteky v. U.S.*, 510 U.S. 540, 555 (1994).

[101] *Id.* at 554.

[102] *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005) (citations omitted).  Importantly, consideration of an extrajudicial source is not necessary to a finding of bias or prejudice.  *Liteky*, 510 U.S. at 551, 554-55.

[103] *Liteky*, 510 U.S. at 555(citation omitted) (emphasis added).

012386

make their case in an impartial forum—regardless of their history with that forum.[104]  Indeed,
"fundamental to the judiciary is the public's confidence in the impartiality of [its] judges and the
proceedings over which they preside."[105]  Thus, "justice must satisfy the appearance of justice."[106]
For this reason, the Fifth Circuit has held that "[i]f the question of whether § 455(a) requires
disqualification is a close one, the balance tips in favor of recusal."[107]

In this case, the balance can tip only in one direction because recusal is appropriate under
both prongs of 28 U.S.C. § 455.  At a minimum, the Court's statements and actions in this case
would cause any objective observer to question the Court's impartiality, which mandates
recusal.[108]  As set forth above, the Court has made antagonistic statements to and about Movants
and has manifested an "apparent distrust" of Movants since "early in the litigation."[109]  Indeed, the
Court deemed Mr. Dondero a bad actor at the very first hearing it held in the case, based entirely
on opinions formed during the Acis Bankruptcy.[110]  At that first hearing, the Court singled Mr.
Dondero out for potential future sanctions before he had taken any action in this case.  Just one
month later, the Court accused Mr. Dondero of misconduct at a hearing that he did not attend in
connection with a motion that he did not file.[111]  The Court's subsequently repeatedly accused
Movants and their counsel of acting in "bad faith," repeatedly called Mr. Dondero "vexatious" or
"litigious" when he acted in a legally justifiable manner, and generally manifested a distrust of

---

[104] *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021) (citing *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995)).

[105] *Id.*

[106] *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).

[107] *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir. 1997).

[108] *Liljeberg*, 486 U.S. at 850; *Andrade*, 338 F.3d at 454.

[109] *Sentis Group, Inc.*, 559 F.3d at 904-05 (reassigning case to a new judge on remand for engaging in similar behavior).

[110] *See* Section III.B, *supra* at pp. 6-7; *see also* Original Recusal Motion, Bankr. Dkt. No. 2061 at pp. 5-6.

[111] *See* Section III.C.1, *supra* at pp. 7-8.

012387

Movants and their counsel. Courts repeatedly have found recusal appropriate in circumstances that mirror these.[112]

But in addition to *appearing* biased, which itself would mandate recusal, the Court in this case has *acted* in a manner that demonstrates such a "high degree of favoritism or antagonism as to make fair judgment impossible."[113] Although the record is replete with examples, by way of summary, the Court has (1) admitted that the negative opinions about Mr. Dondero formed during the Acis Bankruptcy cannot be excised from the Court's mind;[114] (2) made repeated negative statements about Mr. Dondero and entities that the Court perceives be affiliated with him in connection with the Court's rulings;[115] (3) repeatedly targeted Mr. Dondero with threats of contempt or sanctions, singled Mr. Dondero out for disparate treatment, and and questioned the good faith of Movants and their counsel for defending lawsuits and motions and/or asserting valid

---

[112] *See, e.g.*, *In re U.S.*, 572 F.3d at 311-12 (reversing district judge's order denying motion to recuse and ordering that "all orders entered by the Judge after the motion for recusal was filed . . . be vacated" where judge questioned one party's decision to pursue a course of action and made comments that were critical of the party's position ); *Kennedy*, 682 F.2d at 258-60 (ordering reassignment of the case to a different judge on remand where judge openly questioned the integrity of one party's counsel, suggested he was proceeding in "bad faith," and called certain decisions made by him "suspicious"); *Johnson*, 120 F.3d at 1334-37 (ordering reassignment of the case to a different judge on remand where judge questioned in open court "the conduct of the lawyers" for one party, and the judge questioned one party's "good faith"); *Microsoft Corp.*, 56 F.3d at 1465 (where judge's comments "evidenced his distrust of [one party's] lawyers and his generally poor view of [one party's] practices," a reasonable observer could question whether judge "would have difficulty putting his previous views and findings aside," requiring recusal on remand).

[113] *Liteky*, 510 U.S. at 555.

[114] *See* Section III.C., *supra* at pp. 6-7 & n.25.

[115] *See* Sections III.B, *supra* at pp. 6-8; Section III.C.4, *supra* at p. 11; Section III.E.1, *supra* at pp. 16-17; Section III.E.2, *supra* at pp. 17-18; Section III.E.3, *supra* at pp. 19-20. In addition, the Court has repeatedly described Mr. Dondero as "vexatious" and "litigious" as a justification for its actions. *See* Ex. G, Sept. 23, 2020 Hr'g Tr. at 51:14; Ex. M, Feb. 8, 2021 Hr'g Tr. at 17:15, 37:18, 40:21, 45:13, 46:21; Ex. N, Feb. 23, 2021 Hr'g Tr. at 232:18; Ex. S, June 25, 2021 Hr'g Tr. at 109:21. The Court also has repeatedly surmised that the actions of Mr. Dondero, Movants, and their attorneys are in "bad faith" or "frivolous." *See* Ex. J, Dec. 16, 2020 Hr'g Tr. at 64:1-5; Ex. L, Jan. 26, 2021 Hr'g Tr. at 254:4; Ex. N, Feb. 23, 2021 Hr'g Tr. at 233:18; Ex. O, May 10, 2021 Hr'g Tr. at 43:3; Ex. R, June 10, 2021 Hr'g Tr. at 87:6. And the Court has repeatedly referred to Mr. Dondero and his companies, including Movants, in a pejorative manner, as a "Byzantine complex," "Byzantine empire" and "web." *See* Confirmation Order, ¶ 6; Ex. D, June 30, 2020 Hr'g Tr. at 80:17-18, 86:19, 87:5-8; Ex. E, July 8, 2020 Hr'g Tr. at 46:11; Ex. M, Feb. 8, 2021 Hr'g Tr. at 7:15; Ex. Q, June 8, 2021 Hr'g Tr. at 294:3. And the Court has singled out Mr. Dondero, his affiliates (including Movants), and his attorneys for disparate treatment at every possible opportunity. *See* Ex. H, Oct. 21, 2020 Hr'g Tr. at 10:21-24, 34:1-5, 36:1-14; Ex. I, Dec. 10, 2020 Hr'g Tr. at 24:19-25; Ex. N, Feb. 23, 2021 Hr'g Tr. at 232:7-234:19; Ex. T, Mar. 1, 2022 Hr'g Tr. at 83:12-23.

012388

legal positions;[116] (5) sanctioned Mr. Dondero in connection with a motion that he and others testified he had no role in filing or responsibility for authorizing;[117] (6) prophylactically sanctioned Mr. Dondero for asserting his lawful appellate rights;[118] (7) concluded, without supporting evidence, that any entity the Court deems connected to Mr. Dondero is essentially no more than a tool of Mr. Dondero;[119] (8) disregarded the testimony of any witness with a connection to Mr. Dondero as per se less credible, which includes attorneys and persons who owe fiduciary duties and ethical obligations;[120] and (9) ruled against Mr. Dondero and the Movants at every possible opportunity, regardless of the evidence and the testimony before the Court.  Each of these examples alone would mandate recusal, but cumulatively they leave no doubt that the Court's antagonism for Movants goes far beyond is acceptable and makes fair judgment impossible.

Moreover, contrary to the Court's prior suggestion that any motion to recuse filed by Movants is untimely, there is a very real and present reason to seek recusal even now.[121]  As explained above, the Court continues to preside over the bankruptcy proceedings, acted in a manner that was very clearly partial less than two weeks ago, and continues to preside over no less than nine adversary proceedings.  Where, as here, the Court will be called upon to issue future rulings affecting Movants, a motion to recuse is timely.[122]

---

[116] See, e.g., Section III.C.2, supra at p. 9; Section III.C.4, supra at pp. 10-11; Section III.D., supra at p. 14 & nn.59, 62; Section III.E.2, supra at pp. 17-18.

[117] See Section III.E.1, supra at pp. 15-17.

[118] See id.

[119] See Section III.C.4, supra at pp. 10-11.

[120] See, e.g., Section III.D, supra at pp. 13-14; Section III.E.3 at pp. 19-20.

[121] The sole case cited by the Court for this proposition—Davies v. C.I.R., 68 F.3d 1129 (9th Cir. 1995)—is inapposite because the basis for the recusal motion was one event—a pretrial disclosure by the judge—which occurred eight months prior to the petitioners' motion to recuse.  In stark contrast, the Court's bias in this case has been pervasive and consistent throughout the ongoing proceedings and continues to this day.

[122] Indeed, various courts have ordered recusal even on remand, after the district judge has presided over the action through pre-trial proceedings and trial.  See, e.g., Johnson, 120 F.3d at 1334 (recusal after trial and explaining that "the loss of efficiency and economy pales in comparison" to "the necessity to preserve the appearance of impartiality, fairness, and justice" on remand); Kennedy, 682 F.2d 259-60; Sentis Group. 559 F.3d at 905.

23

012389

## V.      CONCLUSION

Litigants before the federal bankruptcy courts should be able to expect fair treatment, such that they may obtain justice, exercise remedies, and freely appeal adverse decisions, whatever the judge's personal opinions of the litigants.  That is not what has happened in the proceedings before this Court, which is precisely why federal statute affords litigants the tool of recusal.  This Court is evidently biased, cannot act in a just manner with respect to the Movants, and should recuse itself and allow all parties the fair day in court that the Constitution requires.  Movants respectfully request that their Motion be granted.  In the alternative, Movants hereby request that the Court make clear that any order denying recusal is final so that Movants may appeal the Court's order to the Northern District of Texas.

012390

Dated: October 17, 2022

Respectfully submitted,

**CRAWFORD, WISHNEW & LANG PLLC**

*/s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Attorney for Movants James Dondero, The Dugaboy Investment Trust, Get Good Trust, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 17, 2022, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/ Michael J. Lang*
Michael J. Lang

012391

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ) |
| Debtor. | JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 |

**APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF**
**AMENDED RENEWED MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**

James Dondero, Highland Capital Management Fund Advisors, L.P., The Dugaboy Investment Trust, Get Good Trust, and NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC (collectively, "Movants") file this Appendix to Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C § 455:

| Exhibit | Description | Appendix Page No. |
|:---:|:---:|:---|
| **A** | December 3, 2019, Hearing Transcript | APP. 0001 – APP. 0010 |
| **B** | January 9, 2020, Hearing Transcript | APP. 0011 – APP. 0021 |
| **C** | February 19, 2020, Hearing Transcript | APP. 0022 – APP. 0034 |
| **D** | June 30, 2020, Hearing Transcript | APP. 0035 – APP. 0053 |

| E | July 8, 2020, Hearing Transcript | APP. 0054 – APP. 0062 |
|---|---|---|
| F | July 14, 2020, Hearing Transcript | APP. 0063 – APP. 0074 |
| G | September 23, 2020, Hearing Transcript | APP. 0075 – APP. 0080 |
| H | October 21, 2020, Hearing Transcript | APP. 0081 – APP. 0091 |
| I | December 10, 2020, Hearing Transcript | APP. 0092 – APP. 0097 |
| J | December 16, 2020, Hearing Transcript | APP. 0098 – APP. 0103 |
| K | January 8, 2021, Hearing Transcript | APP. 0104 – APP. 0112 |
| L | January 26, 2021, Hearing Transcript | APP. 0113 – APP. 0121 |
| M | February 8, 2021, Hearing Transcript | APP. 0122 – APP. 0147 |
| N | February 23, 2021, Hearing Transcript | APP. 0148 – APP. 0155 |
| O | May 10, 2021, Hearing Transcript | APP. 0156 – APP. 0161 |
| P | May 20, 2021, Hearing Transcript | APP. 0162 – APP. 0171 |
| Q | June 8, 2021, Hearing Transcript | APP. 0172 – APP. 0177 |
| R | June 10, 2021, Hearing Transcript | APP. 0178 – APP. 0183 |
| S | June 25, 2021, Hearing Transcript | APP. 0184 – APP. 0189 |
| T | March 1, 2022, Hearing Transcript | APP. 0190 – APP. 0195 |
| U | August 31, 2022, Hearing Transcript | APP. 0196 – APP. 0212 |
| V | September 12, 2022, Hearing Transcript | APP. 0213 – APP. 0239 |

| W | August 4, 2021, Hearing Transcript | APP. 0240 – APP. 0246 |

Dated: October 17, 2022

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

/s/ Michael J. Lang
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Attorneys for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 17, 2022, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

/s/ Michael J. Lang
Michael J. Lang

# EXHIBIT A

012395   APP 0005

1

1

2    UNITED STATES BANKRUPTCY COURT

3    DISTRICT OF DELAWARE

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6    HIGHLAND CAPITAL MANAGEMENT, L.P.,        Case No.

7             Debtor.                          19-12239(CSS)

8    - - - - - - - - - - - - - - - - - - - -x

9

10

11             United States Bankruptcy Court

12             824 North Market Street

13             Wilmington, Delaware

14

15             December 2, 2019

16             10:07 AM

17

18

19    B E F O R E :

20    HON. CHRISTOPHER S. SONTCHI

21    CHIEF U.S. BANKRUPTCY JUDGE

22

23    ECR OPERATOR:  LESLIE MURIN

24

25

                  eScribers, LLC  |  (973) 406-2250
             operations@escribers.net | www.escribers.net

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Appendix   Filed 06/06/25   Page 52 of 351   PageID 13328   Page 52 of 351

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 77 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    77

1   Acis, learned all about Acis' relationship to Highland.  But

2   the real issue before Your Honor is what does that have to do

3   with this debtor, this debtor's assets and liabilities, and

4   this debtor's operations.  And as my comments will show, we

5   think that's a significantly overblown argument.

6          Your Honor, during their presentation, Counsel really

7   strayed a little bit from what the motion and the joinders sort

8   of said.  There they went through a painstaking analysis of the

9   various factors supporting venue.  I know Your Honor said that

10  over three factors, you don't find that helpful, but the courts

11  have relied on a series of factors.

12         And I think the reason why they have strayed away from

13  that and focused on the committee being the one to support the

14  transfer-of-venue motion and the facts of the Acis case is

15  because when you pare it down, the actual factors demonstrate

16  that there is no way the committee can carry its burden to

17  demonstrate that venue should be transferred.

18         However -- Your Honor pointed to this at the

19  beginning, in mentioning comments about forum-shopping -- the

20  committee and Acis are really being disingenuous, and they have

21  not told you the real reason that they want the case before

22  Judge Jernigan.

23         At the first-day hearing, Your Honor, Acis said they

24  intended to file a motion for an appointed trustee.  The

25  committee has told the debtor it intends to file a motion to

012397   APP 0003

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Appendix Filed 07/06/25   Page 53 of 351   PageID 13329
Page 706 of 349

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 78 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    78

 1   appoint a trustee after this hearing.  The motion has not yet
 2   been filed, Your Honor, because they want Judge Jernigan to
 3   rule on that motion.  And it's not because she's familiar with
 4   this debtor's business, this debtor's assets, or this debtor's
 5   liabilities, because she generally is not.  It is because she
 6   formed negative views regarding certain members of the debtor's
 7   management that the committee and Acis hope will carry over to
 8   this case.

 9        The convenience of the parties and the interests of
10   justice and how this case is so unique are just a pretext.
11   They want a trustee to run the debtor, and they want Judge
12   Jernigan and not Your Honor to rule on that motion.  That, Your
13   Honor, is not a proper reason to transfer venue, but rather a
14   transparent litigation ploy.

15        Similarly, Acis also wants the case to proceed in its
16   home court where it has enjoyed success in litigating against
17   the debtor.  Your Honor mentioned the conflicts-of-interest
18   theories.  They're not just conflicts of interest between two
19   jointly administered debtors.  These go to the crux of what the
20   Acis case is about and significant claims against the debtor.

21        The Court may ask, appropriately -- and the Court
22   did -- why would the debtor file the case in Delaware?  Chapter
23   11 is all about a fresh start.  The debtor recognized concerns
24   that the creditors had with certain aspects of its pre-petition
25   conduct, and proactively appointed Brad Sharp as chief

012398
APP 0094

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 17    Appendix    Filed 08/06/25    Page 54 of 351    Page 54 of 351    PageID 13330

Case 19-12239-CSS    Doc 181    Filed 12/03/19    Page 79 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                        79

1    restructuring officer with expanded powers, to oversee the

2    debtor's operations.

3         Mr. Sharp worked with the debtor and Counsel to craft

4    a protocol for transactions that would be subject to increased

5    transparency.  The debtor didn't have to do that.  As Your

6    Honor mentioned at the first-day hearing, the debtor operates

7    its business in the ordinary course.  But given the

8    circumstances surrounding this case, given the history, we

9    felt, and the CRO, importantly, felt it was important to get on

10   the table what the debtor, through the CRO, believed was

11   ordinary and what was not, so we could have a transparent

12   discussion, discussion that, while we've made headway with the

13   committee, we have not yet been able to come to an agreement.

14        The debtor filed the case in this district because it

15   wanted a judge to preside over this case that would look at

16   what's going on with this debtor, with this debtor's

17   management, this debtor's post-petition conduct, without the

18   baggage of what happened in a previous case, which contrary to

19   what Acis and the committee says, has very little to do with

20   this debtor.

21        These form insufficient grounds, Your Honor, to

22   overturn the debtor's choice of venue, and the motion should be

23   denied.

24        I would like to now walk through the statutory

25   analysis, something that Counsel avoided, because again, I

012399
APP 0005

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Appendix   Filed 03/06/25   Page 55 of 351   PageID 13331   Page 55 of 351

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 80 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    80

1   think it highlights the weakness of their argument.

2          It is clear that the Delaware venue is proper, and

3   1408 says the places where a Chapter 11 debtor can file the

4   case.  As the vast majority of debtors who file cases in this

5   district, the debtor filed here because it was domiciled in

6   Delaware.  It is a Delaware LP.  But it goes further than that.

7   99.94 percent of its LP interests are owned by Delaware

8   entities.  And the general partner, Strand Advisors, is a

9   Delaware general partner.

10         While many cases, Your Honor, before this court, rely

11  on the domicile of one affiliate to bring other non-Delaware

12  related affiliates before the court, that's not the case here.

13  All you have, virtually, are Delaware entities, through the

14  ownership structure.

15         As I will also discuss in a few moments, Your Honor,

16  domicile is not the only connection that this debtor has to

17  this district, as significant litigation matters involving the

18  debtor, including those commenced by committee members, that

19  was the catalyst to the filing, are pending in Delaware.

20  Accordingly, the committee acknowledges, as they must, that

21  Delaware is, of course, a proper venue.

22         However, they rely on 1412 which sets forth the

23  standard -- test that the movant has to meet in order to

24  transfer venue, either for the convenience of the parties or

25  the interest of the justice.

012400   APP 0006

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 61-17   Filed 06/06/25   Page 56 of 351   PageID 13332
Appendix   Page 106 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 89 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    89

1   willingness to hire Delaware Counsel.

2          The last argument --

3          THE COURT:  Even when you do have mom and -- again, to

4   comment on reality, even when you do have mom-and-pop creditors

5   in businesses that are very locally focused, general practice

6   today is to make their claims irrelevant, in that to the extent

7   they have avoidance claims, they're paid on the first day.

8   Their real concern is whether the business will continue or

9   not.

10         Now, it's certainly true that pension claims are

11  important, and proofs of claim are important.  But we have

12  many -- all courts have many procedures in place to ensure that

13  those types of creditors can participate without having to go

14  to the courthouse.

15         MR. POMERANTZ:  Yes.  So, Your Honor, Judge Gross also

16  mentioned that in the Restaurants Acquisition case, which was a

17  Texas-based --

18         THE COURT:  He's a smart guy.

19         MR. POMERANTZ:  We'll be sorry to see him go, Your

20  Honor.

21         THE COURT:  Yeah, absolutely.

22         MR. POMERANTZ:  Which was a Texas-based restaurant

23  chain that had more of a local flair.  But he made the comments

24  Your Honor made.

25         The last argument the committee makes is that Texas is

012407
APP 0097

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 61-7   Filed 01/06/25   Page 57 of 351   PageID 13333
Appendix   Page 106 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 90 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    90

1   more convenient.  And this is really the crux, which I'll spend
2   some time over the next few minutes.

3        Texas is more convenient -- convenient -- because the
4   Texas bankruptcy court, where Acis is pending has, in their
5   words, already expended great time and effort familiarizing
6   itself with the debtor and its operations.  You've heard
7   statements like "learning curve".  You heard statements about
8   everything that the debtor -- that Judge Jernigan has found out
9   about this debtor, and how important and how helpful it is, and
10  how Your Honor will be behind the learning curve.  We just
11  don't buy that, Your Honor.

12       And aside from that argument, the arguments that the
13  committee makes for transfer are arguments that could be made
14  in any case before Your Honor.

15       THE COURT:  Yeah, I was going to say that's kind of an
16  interesting argument, because actually it assumes Judge
17  Jernigan's going to ignore the rules of evidence in making
18  factual findings, because you're limited to the record before
19  you on a specific motion.  And what fact you may have learned
20  with regard to something a person has done, maybe that goes
21  into questions of credibility on cross-examination or direct
22  testimony, but to actually base your decision on a fact that's
23  not in the record for the specific proceeding would be
24  improper.

25       MR. POMERANTZ:  Look, I agree, Your Honor.  And the

012402

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 16-17   Filed 11/06/25   Page 58 of 351   PageID 13334
Appendix Page 12 of 249

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 91 of 137

HIGHLAND CAPITAL MANAGEMENT, L.P.                    91

1   familiarity with the type of business -- if I wasn't speaking

2   to Your Honor or your brethren or many other judges around the

3   country, I'd say well, maybe there are certain judges who

4   haven't dealt with large financial services company, may not

5   know what a CLO, may not know what a hedge fund is or private

6   equity fund is.  I'm very confident that Your Honor has had

7   many cases with sophisticated financial instruments, likely CLO

8   obligations, so that Your Honor not only has a good base of

9   knowledge that would give you the same base of knowledge that

10  Judge Jernigan has, but as we've also found, you are a fairly

11  quick study and that I have no doubt that you could come up-to-

12  speed without very little effort.

13          So their argument is a grossly overstated

14  interpretation of what the Acis case was about and that what

15  was learned in that case has any relevance.  As a part -- as a

16  result of the Acis plan confirmation, Acis is no longer part of

17  the debtor's organizational structure.  The debtor owns no

18  equity in Acis.  And the debtor no longer provides any advisory

19  services to Acis.

20          We admit that Judge Jernigan conducted many hearings,

21  and she issued several lengthy opinions, and she heard from a

22  variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23  has not -- Your Honor might read the opinions that she wrote

24  that are attached to the exhibits, the plan confirmation

25  opinion, the arbitration opinion, the involuntary opinion; and

012403
APP 0009

116

1

2                          C E R T I F I C A T I O N

3

4    I, Clara Rubin, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10                                              December 3, 2019

11   _____        _____

12   CLARA RUBIN                             DATE

13

14   eScribers, LLC

15   352 Seventh Avenue, Suite #604

16   New York, NY 10001

17   (973) 406-2250

18   operations@escribers.net

19

20

21

22

23

24

25

012404

# EXHIBIT B

012405
APP 0015

```
                 IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION

                            )   Case No. 19-34054-sgj-11
 In Re:                     )   Chapter 11
                            )
 HIGHLAND CAPITAL           )   Dallas, Texas
 MANAGEMENT, L.P.,          )   January 9, 2020
                            )   9:30 a.m. Docket
          Debtor.           )
                            )   DEBTOR'S MOTION TO COMPROMISE
                            )   CONTROVERSY WITH OFFICIAL
                            )   COMMITTEE OF UNSECURED
                            )   CREDITORS [281]
 _____)

                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.

 APPEARANCES:

 For the Debtor:            Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

 For the Debtors:           Ira D. Kharasch
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

 For the Debtor:            John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

 For the Debtors:           Melissa S. Hayward
                            Zachery Z. Annable
                            HAYWARD & ASSOCIATES, PLLC
                            10501 N. Central Expressway,
                             Suite 106
                            Dallas, TX  75231
                            (972) 755-7104
```

51

 1          MS. LAMBERT:  Well, I mean, either that or we need to

 2     clear the room.

 3          THE COURT:  I've read the arbitration award.

 4          MS. LAMBERT:  Right.

 5          THE COURT:  It's in my brain.

 6          MS. LAMBERT:  Right.  Okay.

 7          THE COURT:  Uh-huh.

 8          MS. LAMBERT:  And so one of the arguments here today

 9     is that the U.S. Trustee is representing the SEC and

10     representing other Government agencies and things.  No.

11     Obviously, that is not the U.S. Trustee --

12          THE COURT:  I didn't hear that.

13          MS. LAMBERT:  Okay.  The -- one of the positions has

14     been, in the papers, is, well, that we don't have standing to

15     raise their issues.  And that's true.

16          THE COURT:  Okay.

17          MS. LAMBERT:  But the problem is that the U.S.

18     Trustee has been constrained from discussing those issues with

19     the SEC.  The arbitration award is very relevant to the SEC's

20     oversight.  I anticipate the evidence today will be that the

21     SEC, after the financial crisis of 2008, imposed restrictions

22     on this Debtor on breach of fiduciary duty issues.  I

23     anticipate that the arbitration findings would be very

24     relevant to whether those issues are ongoing or not.

25          THE COURT:  Okay.  Let me weigh in.  I view the legal

52

1    standard that this Court has to weigh today as being:  Is the

2    Debtor proposing something that is reflective of sound

3    business judgment, reasonable business judgment?  And to the

4    extent this is a compromise of controversies with the

5    Committee, is this fair and equitable and in the best interest

6    of the estate?

7        And as Mr. Pomerantz has said, you know, a lot of this

8    maybe doesn't even need Court approval.  But to the extent

9    there are aspects of this that are appropriate to seek Court

10   approval on, you know, this is my task.  I have to look at

11   what's presented, and is this reflective of sound business

12   judgment?  Is this fair and equitable?  Is it in the best

13   interest?

14       So, assuming there are tons of bad facts here reflected in

15   the arbitration award, reflected in other evidence, bad facts

16   that might justify a trustee, a Chapter 11 trustee, is this

17   nevertheless, what's proposed today, a reasonable compromise

18   of, you know, the trustee arguments the Committee could make

19   or, you know, is this a reasonable framework for going

20   forward?  Okay?

21       So I guess what I'm saying is I'm confused about, you

22   know, do I need to look at the arbitration award?  Do we need

23   to have evidence of all of that?  I can assume that there are

24   terrible facts out there that might justify a trustee, but I'm

25   looking at what's proposed.  Is this a fair and equitable way

53

1    to resolve the disputes?  Is it sound business judgment?

2    Frankly, is it a pragmatic solution here to preserve value?

3    So that's the legal standard I have in my mind here.

4            MS. LAMBERT:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MS. LAMBERT:  The standard is whether it is fair and

7    equitable to resolve the issues in the Chapter 11 trustee

8    motion, and it is the U.S. Trustee's position that they are

9    not resolved by this.  And how are they not resolved?  Number

10   one, they're not resolved because the problems that led to the

11   breach of fiduciary duty issues and findings are more

12   pervasive, both based on this Court' finding in the *Acis* case

13   and in the arbitration court's finding in Mr. Dondero.  Other

14   officers are implicated.

15           THE COURT:  But how --

16           MS. LAMBERT:  Other employees are implicated.

17           THE COURT:  Okay.  I feel like maybe we're talking at

18   each other, not getting each other.  I've got a proposed

19   solution here to totally change the playing field, if you

20   will.  Bring in incredibly qualified people to --

21           MS. LAMBERT:  Those people --

22           THE COURT:  -- to change out the, you know, the

23   person that you say breached fiduciary duties, the, you know,

24   mismanagement, whatever bad labels we have here, but bring in

25   a clean slate.

APP. 00015
012409

77

1   very compelling appeal.  Among them, certainly, the Committee

2   that's negotiated this term sheet retains the right at any

3   time to move for a Chapter 11 trustee if it believes there are

4   grounds.  The Committee is granted standing to pursue estate

5   claims, certain estate claims right off the bat, without

6   having to come back and ask the Court, without having to rely

7   on the Debtor to pursue that.  There are document production

8   provisions, document preservation provisions, a shared

9   privilege negotiated, that are very powerful tools for the

10  Committee, and certainly operating protocols that have been

11  negotiated regarding the Debtor's operations that are very

12  powerful tools for the Committee.

13      I said many times during the *Acis* case -- those who were

14  here will remember -- that the company, *Acis*, was not a great

15  fit for Chapter 11.  Lots of companies aren't great fits for

16  Chapter 11, I suppose, but the kind of business it was was

17  kind of tough to maneuver in Chapter 11.  Human beings and

18  their expertise create value.  And while we had a Chapter 11

19  trustee, a stranger come in and take control over Acis, you

20  know, there's great uncertainty whether that stranger is going

21  to be able to preserve value and have the smooth transition

22  into Chapter 11 that's really going to be the best fit.

23      Here, as I've said earlier, the legal standard I view as

24  controlling here is 363 and whether what has been proposed

25  reflects reasonable business judgment.  Is there a sound

78

 1   business justification for proposing the independent slate of

 2   directors at the GP level for the Debtor, the protocols, the

 3   negotiation with the Committee, the document sharing, the

 4   standing given to them?  Does all of this reflect reasonable

 5   business judgment?  And I find, quite clearly, it does.  I

 6   find it to be a pragmatic solution to the Committee's concerns

 7   about existing management and control.

 8       And I think I used the words "fair and equitable," not

 9   just Ms. Lambert, because it is also presented to the Court as

10   a 9019 compromise of disputes with the Committee, and we

11   traditionally use a fair and equitable and best interest of

12   the estate analysis in this context.  So, to the extent that

13   applies, I do find this a fair and equitable way of resolving

14   the disputes with the Committee, and I find this to be in the

15   best interest of the estate.  So I do approve this.

16       And by approving this motion, I'm approving the term sheet

17   as it's been presented, the various terms therein, the

18   exhibits thereto.  I'm specifically approving the new

19   independent directors, the document management and

20   preservation process, the standing to the Committee over

21   certain of the estate claims, the reporting requirements, the

22   operating protocols, the whole bundle of provisions.

23       Now, there is one specific thing I want to say about the

24   role of Mr. Dondero.  When Ms. Patel got up and talked about

25   the newest language that has been added to the term sheet, she

1  highlighted in particular the very last sentence on Page 2 of

2  the term sheet, the sentence reading, "Mr. Dondero shall not

3  cause any related entity to terminate any agreements with the

4  Debtor."  Her statement that that was important, it really

5  resonated with me, because, you know, as I said earlier, I

6  can't extract what I learned during the *Acis* case, it's in my

7  brain, and we did have many moments during the *Acis* case where

8  the Chapter 11 trustee came in and credibly testified that,

9  whether it was Mr. Dondero personally or others at Highland,

10  they were surreptitiously liquidating funds, they were

11  changing agreements, assigning agreements to others.  They

12  were doing things behind the scenes that were impacting the

13  value of the Debtor in a bad way.

14      So not only do I think that language is very important,

15  but I am going to require that language to be put in the

16  order.  Okay?  So we're not just going to have an order

17  approving the term sheet that has that language.  I want

18  language specifically in the order.  You know, you can figure

19  out where the appropriate place to stick it in the order is,

20  but I want specific language in here regarding Mr. Dondero's

21  role.  I also -- the language in there that his role as an

22  employee of the Debtor will be subject at all times to the

23  supervision, direction, and authority of the Debtors, I want

24  that language in there as well.  Let's go ahead and put the

25  language in there that at any time, in any event, the

 1  independent directors can determine he's no longer going to be

 2  retained.  I want that in the order.

 3      And I'm sure most of you can read my mind why, but I want

 4  it crystal clear that if he violates these terms, he's

 5  violated a federal court order, and contempt will be one of

 6  the tools available to the Court.  He needs to understand

 7  that.  Mr. Ellington needs to understand that.  You know, if

 8  there are any games behind the scene, not only do I expect the

 9  Committee  is going to come in and highlight that to the Court

10  and file a motion for a trustee or whatever, but we're going

11  to have a contempt of court issue.

12      So, anybody want to respond to that?

13          MR. POMERANTZ:  Your Honor, Jeff Pomerantz; Pachulski

14  Stang Ziehl & Jones.

15      We hear Your Honor.  What I thought I'd do now is I have a

16  clean redline of the order, of course not including the

17  provision you just requested, --

18          THE COURT:  Uh-huh.

19          MR. POMERANTZ:  -- which we will go back and upload

20  and hope to get an order signed by Your Honor today, if you're

21  around.  But to go over the other changes, the changes to

22  Jefferies, the other language changes I discussed before.  I

23  gave a copy to Ms. Lambert and to the Committee.  May I

24  approach with a --

25          THE COURT:  You may.

81

    1              MR. POMERANTZ:  Thank you.

    2              THE COURT:  Okay.  All right.  (Pause.)  All right.

    3     The form of order looks fine to me.  Obviously, you'll add the

    4     Dondero-related language, and we may have further wording

    5     tweaks negotiated with the CLO Issuers.  But, again, I approve

    6     all of this.  I didn't say on the record the compensation, but

    7     certainly I am approving that as reasonable.  I expect these

    8     three directors are going to be working very, very hard.  And

    9     so, as you said, not 50,000-foot level monitoring, actually

   10     rolling up sleeves on-site, so I think the compensation is

   11     reasonable.

   12              MR. POMERANTZ:  Thank you, Your Honor.  We will

   13     submit an order shortly that includes Your Honor's language

   14     requested.

   15              THE COURT:  Okay.

   16              MR. POMERANTZ:  Are you around this afternoon?

   17              THE COURT:  I am around, --

   18              MR. POMERANTZ:  Okay.

   19              THE COURT:  -- so just pick up the phone or send an

   20     email to Traci, my courtroom deputy, --

   21              MR. POMERANTZ:  Yes.

   22              THE COURT:  -- so she can tell me, "It's in your

   23     queue to sign."

   24              MR. POMERANTZ:  She has been extremely helpful and

   25     responsive.

90

1         THE COURT:  All right.  Very good.  I'll sign your

2    order on the CRO, then.

3         MR. DEMO:  Okay.  Thank you, Your Honor.

4         THE COURT:  All right.  Well, if there's nothing

5    else, I'll be on the lookout for your orders.  And, again, if

6    you could coordinate with Traci to make sure she's clear on

7    everything you need set on the 21st.

8         MR. POMERANTZ:  Thank you very much, Your Honor.

9         THE COURT:  All right.

10        MR. CLEMENTE:  Thank you, Your Honor.

11        MR. DEMO:  Thank you, Your Honor.

12        THE CLERK:  All rise.

13     (Proceedings concluded at 11:54 a.m.)

14                        --oOo--

15

16

17

18

19

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                    **12/10/2020**

24   _____    _____
     Kathy Rehling, CETD-444                     Date
25   Certified Electronic Court Transcriber

# EXHIBIT C

012416   APP 0073

```
1              IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION

3   In Re:                     )    Case No. 19-34054-sgj-11
                               )
4   HIGHLAND CAPITAL           )    Dallas, Texas
    MANAGEMENT, L.P.,          )    February 19, 2020
5                              )    9:30 a.m.
          Debtor.             )
6                              )    MOTIONS
    _____)
7
                    TRANSCRIPT OF PROCEEDINGS
8          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.
9
    APPEARANCES:
10
    For the Debtor:          Greg Demo
11                           John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
12                           780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
13                           (212) 561-7700

14  For the Debtor:          Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
15                           10100 Santa Monica Blvd., 13th
                               Floor
16                           Los Angeles, CA  90067
                             (310) 277-6910
17
    For the Debtor:          Melissa S. Hayward
18                           Zachery Z. Annable
                             HAYWARD & ASSOCIATES, PLLC
19                           10501 N. Central Expressway,
                               Suite 106
20                           Dallas, TX  75231
                             (972) 755-7104
21
    For the Official Committee  Matthew A. Clemente
22  of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                One South Dearborn Street
23                              Chicago, IL  60603
                                (312) 853-7539
24

25
```

012417

APP 0073

Nelms - Direct                          61

1  the original motion but which the Debtor no longer seeks to

2  pursue?

3  A    One of the matters that was pending when we took office

4  was an appeal, and I believe it was still in the District

5  Court, and that related to an alleged conflict of interest by

6  the Winstead firm.  And so there was an objection to their

7  fees and an appeal concerning payment of Winstead fees.  And

8  the Board has decided not to go forward with that appeal.

9  Q    Okay.  So the Board -- did you hear the opening from

10  Acis's counsel that charged that the Debtor was just doing

11  more scorched-earth litigation tactics?  Did you hear that

12  charge?

13  A    I heard that, yes.

14  Q    Okay.  But yet the Board has instructed Foley not to

15  pursue the Winstead matter; is that right?

16  A    That's correct.

17  Q    And just again, for the record, why did the Board make

18  that decision?

19  A    The Board made that decision because we just thought it

20  was in the best interest of the Debtor and this estate not to

21  do that.

22  Q    And did the Debtor see any benefit to pursuing that

23  particular litigation?

24  A    You know, there -- a benefit could be articulated, but we

25  decided not to pursue it.

Nelms - Direct                                       62

1   Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2   mean, I apologize, withdrawn.  That, plus the DAF matter, are

3   two examples where the Board exercised its judgment not to

4   pursue pending litigation; is that fair?

5   A    That's correct.

6   Q    Okay.  Is the Board supportive of the Debtor's application

7   to retain Foley for the three matters you have described?

8   A    It is.

9   Q    And without revealing privileged communications, can you

10  describe generally the diligence that the Board conducted to

11  reach that decision?

12  A    Well, we met with some of the people that work at

13  Highland.  We met with the Debtor's attorneys, the Pachulski

14  firm.  We did have a couple of meetings with Ms. Patel and Mr.

15  Terry.  Some of us have reviewed the pleadings, some more than

16  others.  And, well, we may have done other things, but those

17  are the ones that come to mind right now.

18  Q    I don't know if you mentioned it, but did you confer with

19  Ms. O'Neil?

20  A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21  Q    Okay.  And what was the purpose of the diligence that you

22  just described for the Court?

23  A    Well, ultimately, what we as a board were trying to do was

24  to conduct kind of a cost-benefit analysis to the estate:  How

25  much will this potentially cost us?  What's the potential

APP 00 75

Nelms - Direct                              63

1  upside of pursuing it?  And based upon that cost-benefit

2  analysis, we thought that this was the best thing to do.

3  Q   Okay.  Let's just focus on a couple of very narrow 327(e)

4  issues.  Is the Debtor seeking to retain Foley to act as

5  general bankruptcy counsel?

6  A   No.

7  Q   And which firm serves as general bankruptcy counsel?

8  A   That would be the Pachulski firm.

9  Q   Okay.  And do you know whether Foley Gardere represented

10 the Debtor's interest in each of the three matters that you've

11 described?

12 A   It has been representing the Debtor previously.

13 Q   Okay.  So let's talk about those three matters.  The first

14 one I believe you said was with respect to the representation

15 of the Debtor in connection with an $8 million claim that it

16 has against Acis; is that right?

17 A   That's correct.

18 Q   And is that the claim -- is that the subject of a formal

19 proof of claim?

20 A   Yes.

21 Q   Okay.

22 A   It is a claim filed in the Acis case.

23 Q   I've placed before you an exhibit binder, and I would ask

24 you to turn first to Exhibit 4.

25 A   Okay.

173

1   that benefits everybody.

2       So I guess, Your Honor, I mean, I don't know what else to

3   say about the benefits of the Neutra appeal except that the

4   testimony, I think, speaks for itself.  But, you know, I --

5   and in terms of --

6           THE COURT:  Again, fight the claim of a creditor.

7   Foley can represent Highland in the adversary proceeding,

8   wherever that goes forward.

9           MR. DEMO:  Yeah.

10          THE COURT:  Probably District Court, not this Court.

11  At least some of it, if not all of it.  But anyway, I'm

12  digressing.  They can object to Acis's proof of claim.  They

13  can object to Terry's proof of claim.  I mean, --

14          MR. DEMO:  And conversely, Your Honor, if -- if --

15          THE COURT:  -- this has nothing to do with -- I mean,

16  I don't get the appeal.  I mean, I --

17          MR. DEMO:  Right.

18          THE COURT:  Neutra can appeal, HCLOF can appeal, but

19  I'm not seeing the benefit to Highland.

20          MR. DEMO:  And I guess the only thing I would say,

21  Your Honor, is if there is an improper benefit, we are not

22  saying that the fee applications are sacrosanct.  People can

23  challenge the improper benefit there.

24      And again, the settlement gave broad discretion to the

25  Committee to pursue insider claims.  So if an insider is

174

1    receiving a benefit from this, the Committee has standing to

2    pursue that.

3         So it's not a null set, Your Honor, whereas cutting off

4    the appeal now does take away that possibility.

5              THE COURT:  How would I be cutting off the appeal?

6    I'm not cutting off the appeal.  King & Spalding can go in

7    there and fight hard.  Foley can go in there and fight hard

8    for Neutra.  So, --

9              MR. DEMO:  One second, Your Honor.

10        (Counsel confer.)

11             MR. DEMO:  And I guess, you know, Your Honor, and I

12   do want to reiterate that there is no other party with an

13   economic incentive to fight the Neutra appeal the way that the

14   Debtor has an economic incentive.

15             THE COURT:  That makes no sense to me.  HCLOF is the

16   one who hated this injunction.

17             MR. DEMO:  That's not the Neutra appeal, Your Honor.

18   That's the confirmation order.

19             THE COURT:  Well, okay.  Neutra gets its company back

20   if they win.

21             MR. DEMO:  And we would get our contracts back.

22             THE COURT:  And arguably, it can control Acis, maybe,

23   okay, and it can assign management contracts to whoever it

24   wants.  That just -- and it says it'll assign them to

25   Highland.  If you can trust Jim Dondero, then Highland's going

175

1   to benefit if Neutra wins that appeal.  Right?

2           MR. DEMO:  Yes.  Yes, Your Honor.

3           THE COURT:  Okay.  So that --

4           MR. DEMO:  Highland would benefit greatly --

5           THE COURT:  Okay.

6           MR. DEMO:  -- if Neutra were to win that appeal.

7           THE COURT:  Okay.  Okay.  Well, but first Neutra

8   benefits, right?  And then --

9           MR. DEMO:  No.

10          THE COURT:  -- Highland only secondarily benefits --

11          MR. DEMO:  I -- I --

12          THE COURT:  -- if Jim Dondero keeps his word and

13  gives the management contracts back to Highland.

14          MR. DEMO:  Jim Dondero would also have to repay the

15  $8 million in claim, even if he didn't reinstate those

16  contracts.  And that $8 million would be hundred-cent dollars.

17          THE COURT:  Okay.

18          MR. DEMO:  So, worst case, --

19          THE COURT:  It would have been nice to have him

20  testify as to all of this.

21          MR. DEMO:  Worst --

22          THE COURT:  It would be more compelling if I had him.

23          MR. DEMO:  Well, --

24          THE COURT:  Okay?  But I don't think --

25          MR. DEMO:  -- I can only do so much, Your Honor.

176

 1          THE COURT:  -- that's going to happen anytime soon.

 2          MR. DEMO:  But I guess worst-case scenario is that

 3   it's $8 million in hundred-cent dollars.

 4          THE COURT:  Okay.

 5          MR. DEMO:  And that's not nothing for $500,000.  And

 6   only a portion of that $500,000.

 7          THE COURT:  Okay.

 8          MR. DEMO:  Thank you, Your Honor.

 9          THE COURT:  Okay.  Mr. Lamberson?

10          MR. LAMBERSON:  Your Honor, do you want a closing

11   from me?  Or no?

12          THE COURT:  I don't really need it.  Thank you.

13          MR. LAMBERSON:  Okay.

14          THE COURT:  Okay.

15          MR. LAMBERSON:  Because I know your hearing starts in

16   about two minutes.

17          THE COURT:  All right.  So, I just hate it that we

18   spent so much time on this.  I hate it that we spent so much

19   time, but, I mean, I understand.  I understand.  You know, I

20   think the employment application was filed pretty early in the

21   case, right, and -- October 29th.  And it was continued,

22   continued, continued, because we were getting objections from

23   the Committee, or they wanted time to look at it, I guess.

24   And now you're kind of up against the wire, right, because

25   oral arguments are set at the Fifth Circuit next month.  So I,

177

 1   you know, I hate it that we were here, but I understand it.

 2       But I'm concerned.  I'm concerned -- well, here's the

 3   deal.  We have a great board, and I totally get that

 4   Bankruptcy Courts should defer heavily to the reasonable

 5   exercise of business judgment by a board.  And we've got great

 6   professionals.  And we've got this case, I think, on a good

 7   track as a general matter now.  But I'm concerned that Dondero

 8   or certain in-house counsel has -- you know, they're smart,

 9   they're persuasive -- that -- what are the words I want to

10   look for -- they have exercised their powers of persuasion or

11   whatever to make the Board and the professionals think that

12   there is some valid prospect of benefit to Highland with these

13   appeals, when it's really all about Neutra, HCLOF, and Mr.

14   Dondero.  That's what I believe.

15       I mean, this is awkward, right, because you want to defer

16   to the debtor-in-possession, but I have this long history, and

17   I can think through the scenarios.  If this is reversed, here

18   is how it will play out.  If this is reversed, here is how it

19   might play out.  And I know, you know, there are multiple ways

20   it might play out, but I cannot believe there is a chance in

21   the world there is economic benefit to Highland if these

22   things get reversed.  Economic benefit to Neutra:  Yeah,

23   maybe.  Economic benefit to HCLOF:  Well, they'll get what

24   they want.  You know, whether it's an economic benefit, I

25   don't know.  But benefit to Highland?  I just don't think the

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 05/07/25   Page 81 of 351   PageID 13357
Appendix   Page 356 of 2349

178

1   evidence has been there to convince me it's reasonable

2   business judgment for Highland to pay the legal fees

3   associated with the appeal.

4       And even more concerning to me is a valid point was made

5   that Highland is in bankruptcy because of litigation,

6   litigation, litigation.  The past officers and directors and

7   controls' propensity to fight about everything.  This isn't a

8   balance sheet restructuring, okay?  It's not a Chapter 11

9   caused by operational problems or revenue disruption or who

10  knows what kind of disruption.  It's about years of litigation

11  finally coming home to roost.  And this just appears to be

12  more of the same, potentially.

13      Okay.  Parties have a right to appeal.  I respect that.

14  Neutra, go for it.  HCLOF, go for it.  But this estate and its

15  creditors should not bear the burden of having Highland pay

16  for that, when, again, I don't think there's any evidence to

17  suggest they could benefit at the end of the day.

18      So what I'm going to do is I'm going to approve the

19  retention of Foley to represent Highland in the Acis case.  We

20  all know the adversary is stayed right now.  It may or may not

21  ever be un-stayed, depending on what strategies people want to

22  pursue.  But Highland, I think a meritorious case has been

23  presented, and under 327(e) I will approve Foley representing

24  Highland in all Acis matters.  Okay?  The Acis bankruptcy

25  case.  The adversary proceeding, if it goes forward.  And so

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 15-17   Filed 06/06/2349   Page 82 of 351   PageID 13358

Appendix   Page 30 of 249

179

1  that's my ruling.

2      I will additionally rule, for the avoidance of doubt, that

3  if Foley wants to represent Neutra in the appeals and get paid

4  by Neutra, I don't have any problem with that.  In other

5  words, I'm not going to find something like there's a conflict

6  with the estate, you know, because of its simultaneous

7  representation of Neutra.  That's fine.  But I'm not going to

8  approve Highland paying anything in connection with either of

9  those appeals.  So that is the ruling of the Court.

10     Have I left any gaps here?

11          MR. DEMO:  Your Honor, just one clarification.

12          THE COURT:  Uh-huh.

13          MR. DEMO:  Foley is representing Highland Capital

14 Management in the appeal of the confirmation order to the

15 Fifth Circuit.  I just want to clarify that your ruling that

16 Highland can represent -- I'm sorry -- Foley can represent

17 Highland in all Acis matters extends to their representation

18 of Highland Capital Management in the appeal of the

19 confirmation order that's set for March 30th.

20          THE COURT:  Okay.  Let me think through that.

21          MR. DEMO:  And again, Your Honor, there's been no

22 objection to that.

23          THE COURT:  King & Spalding is in there representing

24 HCLOF.  Foley would be representing both Neutra and Highland

25 in connection with the confirmation order?

186

1          THE COURT:  Okay.  Thank you all.

2      (Proceedings concluded at 1:44 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                 CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/20/2020**

24  _____        _____
   Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

# EXHIBIT D

012429

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3                               )   Case No. 19-34054-sgj11
      In Re:                     )
 4                               )
      HIGHLAND CAPITAL           )   Dallas, Texas
 5    MANAGEMENT, L.P.,          )   June 30, 2020
                                 )   9:30 a.m. Docket
 6            Debtor.            )
                                 )   MOTION FOR REMITTANCE OF FUNDS
 7                               )   HELD IN REGISTRY OF COURT
                                 )   FILED BY CLO HOLDCO, LTD.
 8    _____)   (590)

 9                       TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10               UNITED STATES BANKRUPTCY JUDGE.

11    WEBEX/TELEPHONIC APPEARANCES:

12    For the Debtor:            Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
13                               10100 Santa Monica Blvd.,
                                  13th Floor
14                               Los Angeles, CA  90067
                                 (310) 277-6910
15
      For the Debtor:            John A. Morris
16                               Greg Demo
                                 PACHULSKI STANG ZIEHL & JONES, LLP
17                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
18                               (212) 561-7700

19    For CLO Holdco, Ltd.,      John J. Kane
      Movant:                    Brian W. Clark
20                               KANE RUSSELL COLEMAN LOGAN, P.C.
                                 901 Main Street, Suite 5200
21                               Dallas, TX  75202
                                 (214) 777-4261
22
      For the Official Committee Matthew A. Clemente
23    of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
24                               Chicago, IL  60603
                                 (312) 853-7539
25
```

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 16-17   Filed 04/06/25   Page 86 of 351   PageID 13362
Appendix   Page 406 of 2249

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 21 of 100

21

 1 | the argument that you can't look at the Bankruptcy Code to

 2 | determine whether the money should come out of the registry or

 3 | not, and then be back in front of you, you know, three or four

 4 | weeks later to relitigate any of those issues.

 5 |     So that was absolutely my recollection and understanding,

 6 | Your Honor, and I think from your comments I intuit that it

 7 | was your understanding as well, that this was not something

 8 | that we were going to deal with again very quickly, but was

 9 | something to preserve the status quo, a reasonable solution,

10 | an equitable solution under Section 105.  And I believe that's

11 | what Your Honor ordered.

12 |         THE COURT:  All right.  Well, I'll let you go ahead

13 | and make your opening statement.  I think Mr. Kane was

14 | finished before I started asking my questions.

15 |         MR. CLEMENTE:  Okay.

16 |         THE COURT:  Mr. Clemente, you may proceed.

17 |         MR. CLEMENTE:  Thank you, Your Honor.  I appreciate

18 | that.  So, and I'll try and be brief on the opening.

19 |     OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20 |                     UNSECURED CREDITORS

21 |         MR. CLEMENTE:  Your Honor, like it or not, CLO Holdco

22 | is not an independent, unrelated, third-party investor merely

23 | seeking distributions on account of its own arm's-length

24 | independent investments.  Instead, CLO is a related party in

25 | literally every sense of the word.  That's not in dispute.

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 16-17    Filed 04/06/22    Page 87 of 351    PageID 13363
Appendix    Page 4406 of 2349

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 22 of 100

22

 1   That is part of the Jim Dondero or Mr. Dondero web of

 2   entities.

 3       CLO Holdco is effectively controlled by Mr. Dondero.  It

 4   was seeded and received assets transferred from the Debtor,

 5   including the assets giving rise to the distribution that's in

 6   the registry.  None of that is in dispute.  All of this at a

 7   time when Mr. Dondero controlled the Debtor as well as the

 8   parties through the various intermediate transactions that

 9   ultimately resulted in the assets arriving in CLO Holdco.

10   That is not in dispute.

11       Mr. Dondero's past fraudulent conduct, including

12   fraudulent transfers, is also not in dispute.  He was on all

13   sides of this transaction.  And therefore this transaction,

14   along with many of the others, must be viewed with skepticism

15   and scrutinized very closely by the Committee and by this

16   Court.

17       The Committee has only just begun such work, Your Honor.

18   And given the Byzantine empire created by Mr. Dondero, it will

19   take time and significant resources to fully and properly

20   conduct an investigation.

21       And Mr. Kane referred to, did we do discovery?  We did

22   not.  Our reaction to this motion was the same as Your Honor.

23   And as you can see by the stipulations that we have agreed to

24   for purposes of this hearing, we didn't want this to be a

25   situation where the estate would spend a tremendous amount of

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 11-17    Filed 04/26/25    Page 88 of 351    PageID 13364

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 23 of 100

23

1   resources to deal with something that we thought that was

2   dealt with on March 4th.

3       But aside from that, given the web that's been created

4   here, we can't just isolate one piece of it.  We can't just be

5   like, I'm going to look at the CLO Holdco documents and be

6   able to develop a full theory.  This is a tapestry of

7   interrelated entities that is opaque and vague and purposely

8   so.  So you can't just focus on one piece and then try and

9   say, well, I know what this piece is, because that piece has

10  many interrelated complex ramifications and relationships

11  where, frankly, you can't just say, okay, let's focus on this

12  one issue, because you're going to miss the entire tapestry.

13      We still need to examine, as I mentioned, the whole thing,

14  and this takes time and it takes an investment.  So while I

15  understand CLO Holdco wants to receive its distribution, I

16  also understand that my constituency wants to be paid, some of

17  whom have been waiting for over a decade.

18      To be clear, Your Honor, my constituency didn't choose to

19  be here in the bankruptcy.  But CLO Holdco chose to associate

20  itself with Mr. Dondero and to take assets from Highland in

21  convoluted related-party transactions and reap the benefits of

22  those transactions.  CLO Holdco can't now step away from that

23  and try and suggest to Your Honor that this is about taking

24  time under 28 U.S.C. 2042.  That was never what it was about

25  on March 4th, and it's not what it's about today.

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 04/30/25   Page 89 of 351   PageID 13365
Appendix   Page 4367 2349

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 67 of 100

67

1   Holdco has or doesn't have, we have no idea.  And it's

2   controlled, ultimately, let us not lose sight of the fact, by

3   Mr. Dondero.

4        So, allowing CLO Holdco to take distributions will place

5   them with an offshore entity, potentially outside the

6   jurisdiction of this Court, or at the very least, placed in

7   five or six entities removed or who knows where, including

8   potentially other foreign entities.

9        Therefore, exercising authority under Section 105 is

10   consistent with preserving, protecting, and maximizing the

11   value of the Debtor's estate, which estate includes claims,

12   causes of action, and avoidance actions.

13        As you know, 105 is the means and -- circumstances (audio

14   gap) preserve and protect the estate.

15        And to be sure, this is not inconsistent with any other

16   provision of the Bankruptcy Code, and it's, in fact, from our

17   perspective, in furtherance of the goals of the Code.

18        Your Honor, regarding the payments that Mr. Kane (audio

19   gap), the fact that a few payments were made on the note

20   doesn't change the fact that Section 105 applies and the Court

21   should deny the motion.

22        As with all that is Highland, nothing is simple or easy.

23   First, CLO Holdco received millions more in assets and

24   transfers, aside from the interests giving rise to the

25   distributions at issue.  So the fact that there were payments

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S    Document 15-17    Filed 04/06/23    Page 90 of 351    PageID 13366
Appendix    Page 44 of 349

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 68 of 100

68

1   on the notes really speak nothing to the fact of whether the

2   overall transaction was for reasonably equivalent value or

3   otherwise problematic, especially when there is nothing in the

4   record regarding the Dugaboy Trust, its wherewithal to pay, or

5   the fairness of the terms of the note, or any of that.  Or why

6   the note was structured this way or, you know, what the Get

7   Good Trust and the Dugaboy Trust do, how they interact, who

8   makes decision on what gets paid and doesn't get paid.

9        The few payments, while interesting, Your Honor, again, do

10  not establish reasonably equivalent value or the propriety, in

11  our view, of the transfers.

12       Finally, as this Court knows, reasonably equivalent value

13  is not determinative of whether the transfer was intentionally

14  fraudulent or otherwise potentially avoidable or problematic.

15  So, while deeds are interesting, Your Honor, I would submit

16  that they don't move the needle in changing the fact that the

17  motion should be denied.

18       Now, Your Honor, to the point that you raised with me

19  before I started my remarks here.  Much has been made about

20  inappropriate prejudgment remedy or attachment or similar

21  arguments.  I submit this case is moot, Your Honor.  Again, at

22  the risk of repeating myself, I will emphasize that CLO Holdco

23  is not an independent third party.  Like it or not, it is tied

24  up in a ruinous web with Mr. Dondero, and that in and of

25  itself makes this case unique and distinguishes it from the

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 17    Appendix    Filed 04/06/23    Page 91 of 351    PageID 13367

Case 19-34054-sgj11  Doc 802  Filed 07/02/20    Entered 07/02/20 18:59:24    Page 69 of 100

69

```
 1   other cases cited by CLO Holdco.

 2        Additionally, Your Honor, the current circumstances are

 3   distinguishable because the Debtor had control over these

 4   funds.  That's why we were in front of you on March 4th.  I

 5   agree, and I'm not arguing, that the Debtor did not own these

 6   funds.  But it clearly had control over them at the time that

 7   it sought to make the distributions on March 4th.  So, in my

 8   humble opinion, Your Honor, that means the Court had control

 9   over that.

10        Having them held in a registry while an investigation

11   occurs is not akin to slapping a lien on someone's house or

12   taking possession of an automobile, like the cases cited by

13   Mr. Kane where they require there's some -- an adversary

14   proceeding or some type of complaint.

15        The situation here, again, Your Honor, matters.  The

16   Debtor was before you seeking your authority to make this

17   distribution.  That is entirely different than if I were to

18   walk in here and say my colleague, Mr. Twomey, I think that,

19   you know what, I don't like him and so I have a claim against

20   him, and I want Your Honor to enjoin him from being able to

21   sell his automobile.  That is entirely different, and in my

22   view completely distinguishes it from any of the cases that

23   Mr. Kane cited, including, of course, I have much respect for

24   Judge Houser, but including the case authored by Judge Houser.

25        So, Your Honor, again, having them held in the registry is
```

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 16-17   Filed 04/06/23   Page 92 of 351   PageID 13368
Appendix Page 406 of 549

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 79 of 100

79

1   attachment.  Bankruptcy Rules aren't structured like that.

2       But importantly, Mr. Clemente presented no facts to

3   support his balancing of harms argument and presented no facts

4   to establish that he has any viable claims against CLO Holdco.

5   Arguments that James Dondero participated in frauds does not

6   mean that there's a claim or cause of action that the

7   Committee can assert against CLO Holdco, which is what would

8   be required to obtain an injunction.

9       This is a big if.  If the Committee is seeking to obtain

10  an injunction, it must satisfy its burden of proving under

11  7065 and the four-factor test established by *Janvey v. Alguire*

12  in the Fifth Circuit in 2011 and the many cases before that.

13  And it just can't do it.

14      So I want to leave the Court with one case citation,

15  because if the Court is considering some means of entering a

16  preliminary injunction outside of an adversary proceeding, I

17  was able to find a grand total of one case that address that

18  in the Fifth Circuit.  And that is the 1995 decision of *In re*

19  *Zale* in which the Fifth Circuit noted that the only way a

20  105(a) preliminary injunction could be issued, after a finding

21  of these unusual circumstances and the like, was if all of the

22  protections of an adversary proceeding had been afforded to

23  the non-movant and if the party that was requesting the

24  injunction satisfied the four-factor test that's found in

25  7065.

012437
APP 00942

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 17    Filed 04/06/2249    Page 93 of 351    PageID 13369
Appendix    Page 4 of 2349

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 80 of 100

80

1    There are no extraordinary circumstances or unusual

2    circumstances here.  And if this Court believes that the

3    context of this case warrants that, then the Committee would

4    still have to satisfy that four-factor test for a preliminary

5    injunction.  And it has the burden of proof on those four

6    factors.  It hasn't presented any evidence whatsoever to

7    support that it can meet the first, let alone the second,

8    third, and fourth factors of that test.

9        So, Your Honor, with that, I'll close our case, unless you

10   have additional questions, and request that the Court grant

11   CLO Holdco's motion.

12        THE COURT:  A couple of follow-up questions.  I have

13   certain facts in my brain, and I can't remember if they're in

14   evidence or stipulated to or I read them in a pleading.  So, I

15   just want to ask:  Somewhere I remember seeing that CLO

16   Holdco, or, you know, maybe it's its parent, I think -- Mr.

17   Clemente said we have a Byzantine structure here and we have a

18   sub-web within a bigger web with regard to CLO Holdco.  But,

19   anyway, CLO Holdco or its parent has assets of approximately

20   $225 million?  Is that evidence or undisputed?

21        MR. KANE:  Your Honor, that was contained in one of

22   the pleadings asserted, I believe, by the Committee, and that

23   was the Charitable DAF entities, not necessarily CLO Holdco.

24   There hasn't been any evidence presented by the Committee of

25   the assets held by CLO Holdco other than what we have before

Case 19-34054-sgj11 Doc 3571-1 Filed 10/17/22 Entered 10/17/22 11:28:53 Desc
Case 3:25-cv-02072-S Document 16-17 Filed 04/30/2549 Page 94 of 351 PageID 13370

Case 19-34054-sgj11 Doc 802 Filed 07/02/20 Entered 07/02/20 18:59:24 Page 81 of 100

81

1    the Court.

2        THE COURT:  Okay.  So it's not something you would

3    stipulate or offer one way or another?

4        MR. KANE:  No, Your Honor, I think that's factually

5    incorrect and I don't stipulate to that.

6        THE COURT:  Okay.  I think my notes show that that

7    was the alleged amount of assets as of September 30, 2019.

8    But, again, that may have just been a pleading, not anything

9    in evidence.

10       All right.  And are Mr. Scott or Mr. Dondero on the phone

11   today or on the video?  I'm just curious.

12       MR. KANE:  Your Honor, I lost you on the video a

13   little bit, but assuming you can hear me, though, Mr. Scott is

14   not.  We had conversations with the Committee about various

15   exhibits and whether or not Mr. Scott would be here to testify

16   to prove up exhibits.  Once the exhibits were all stipulated

17   as admissible, then there was no need for Mr. Scott to

18   participate.

19       THE COURT:  Okay.  I was not going to ask him

20   anything.  I just was curious if he was listening in.  Or Mr.

21   Dondero, for that matter.  I guess Mr. Dondero is not on the

22   line, correct?  (Pause.)  All right.  I'll --

23       MR. KANE:  Your Honor, I -- I think -- I'm sorry.

24   I've had no conversations with Mr. Dondero.  I have no idea

25   whether he's on the line.

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 15-17    Filed 04/06/23    Page 95 of 351    PageID 13371
Appendix    Page 490 of 2349

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 82 of 100

82

```
 1            THE COURT:  Okay.  I'll take silence to mean he's
 2   probably not, but --
 3        All right.  I asked that question for, I guess, a couple
 4   of reasons.  But the main reason I asked is -- and I'm going
 5   to say this as kindly as I can.  They're not here to hear it
 6   anyway.  But I feel like perhaps they are a little tone deaf,
 7   for lack of a better term, on how this all looks to the Court
 8   today.  And what I mean by that is, obviously, I assume it was
 9   their decision to bring this motion, at least Mr. Scott's, and
10   likely Mr. Dondero as well had some involvement in that
11   decision.  And the reason I say that it feels like they're a
12   little tone deaf about how this looks is that we just had an
13   extensive hearing and some very thorough pleadings, a lot of
14   evidence uploaded, on a $2.5 million issue.  And I don't --
15   you know, I appreciate that that is a significant sum of
16   money, but we've used the word context a lot this morning:  In
17   the context of this reorganization, it seems like a very big
18   deal was raised here, at the choice of Mr. Scott and Mr.
19   Dondero, over a $2.5 million issue, in the context of a
20   reorganization that involves at least hundreds of millions of
21   dollars of debt, if not over a billion.  UBS says they're owed
22   a billion.
23        And I just asked my question a minute ago about the value
24   of assets that the DAF or CLO Holdco or that sub-structure has
25   managed, because while no one will commit, is it $225 million
```

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 15-17   Filed 05/06/25   Page 96 of 351   PageID 13372
Appendix   Page 5 of 349

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 83 of 100

83

```
 1   or not, you know, I take it that the Committee had a good

 2   faith basis for saying that, and if it's not that, it's

 3   probably a quite sizable number.

 4       Again, so I'm kind of thinking out loud about the

 5   proportionality of this issue.  $2.5 million, not anything to

 6   sneeze at, but we're talking about a Charitable DAF that

 7   probably has many, many, many more times that of assets.  And

 8   so there was certainly no equitable argument of hardship or,

 9   you know, significant detriment that's befalling CLO Holdco by

10   the tying up of this money in the registry of the Court for

11   this relatively short time period.  So, again, it feels a

12   little tone deaf to be bringing this argument, occupying so

13   much time from the parties, the lawyers, the Court, over this

14   issue.

15       And just to further elaborate on that, it matters to me,

16   and I say this about the tone-deafness, partly because I

17   thought -- I said this at the beginning of the hearing, and I

18   still say it -- we already put this issue to rest, albeit

19   temporarily, in March.  And in April, we get this new motion.

20   Again, I recognize the language of the March order reserved

21   everyone's rights to come back and argue about this, but,

22   again, the buzzwords for this hearing are going to be context

23   matters, I guess.  Mr. Clemente, you get credit for that buzz

24   phrase, those buzzwords.

25       Again, I issued the order with regard to putting these
```

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 16-17   Filed 05/06/25   Page 97 of 351   PageID 13373

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 84 of 100

84

1   monies in the registry of the Court at the suggestion of Mr.

2   Dondero's very wonderful lawyer, retired Judge Lynn.  And,

3   again, the context was we had a protocol order early in this

4   case that the Committee negotiated heavily with regard to

5   monies being disbursed out under the control of the Debtor,

6   and heavily negotiated.  I remember the CLO Issuers, I think,

7   had some pause and concerns and got their language into that

8   order.

9       So we had this protocol order.  Debtor was worried about

10  violating the protocol order, so Debtor files the motion

11  February 24th, wanting the blessing of a court order before it

12  transferred these monies to CLO Holdco and some other

13  Highland-affiliated entities.  There were vehement objections,

14  and the Court issued the order saying, Let's put these monies

15  into the registry of the Court, at the suggestion of very able

16  counsel as to how we could resolve that contested matter we

17  were there on on March 4th.

18      So, you know, a month later, April, we have this new

19  motion of CLO Holdco reviving the dispute, the $2.5 million

20  dispute that we had just put to rest temporarily in March at

21  the suggestion of lawyers.  I didn't issue a 105 injunction

22  outside the context of an adversary proceeding just on my own,

23  *sua sponte*.  It was suggested to me that this was a good

24  solution.  People embraced it.  That's what we did.  And I

25  sure didn't have in my brain that a month later we'd have a

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 15-17   Filed 05/26/23   Page 98 of 351   PageID 13374

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 85 of 100

85

1   brand new motion regarding whether these monies should be

2   disbursed to CLO Holdco all over again, when that was the

3   issue that was already before the Court in March.

4       I, again, fully recognize that everybody reserved their

5   rights, but I focus on this context because, again, I wish Mr.

6   Dondero and Mr. Scott were on the call to hear this:  This

7   almost feels like a good faith issue to me.  You know, maybe I

8   would feel slightly different if there had been a broad

9   emphasis, heavy emphasis, CLO Holdco standing up through a

10  lawyer that day saying, We're just letting you know, we're

11  going to get together a motion in very short order and tee

12  this up again.  Because I would have probably said no.  You

13  know, if -- let's just hear it right now today, if this is

14  only a three-week mandate or whatever.  So, good faith is

15  something that I can't help but scratch my head and be

16  troubled by.

17      So, I want to emphasize that CLO Holdco's lawyer has made

18  perfect arguments regarding the potential legal issues here.

19  There are some valid arguments here about is this tantamount,

20  holding the money in the registry of the Court that a non-

21  debtor asserts is its property, is that tantamount to a

22  prejudgment remedy?  You know, did it require an adversary

23  proceeding?  Did it require the traditional four-prong prove-

24  up for a preliminary injunction?  And did the Court just give

25  short shrift to those legal technicalities?

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 05/30/25   Page 99 of 351   PageID 13375

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 86 of 100

86

1     Again, these are compelling arguments, but I'm overruling

2     the arguments because, again, I believe it ignores the context

3     that CLO Holdco essentially consented, acquiesced, in this

4     placeholder keep-the-status-quo solution.  And I question its

5     good faith in, so quickly after consenting, bringing this

6     motion.

7     But moreover, I do find that in the unique context of the

8     disputes before the Court on March 4th, I did have authority

9     to issue a 105 injunction.  105, as we all know, at Subsection

10    (a) gives a bankruptcy court authority to issue orders

11    necessary or appropriate to carry out provisions of Title 11,

12    and the last sentence even provides a mechanism for the Court

13    to *sua sponte* take action to, among other things, prevent an

14    abuse of process or just do what's necessary or appropriate to

15    implement court orders or rules.

16    So I think, again, in the context before the Court, it was

17    not only a consensual thing, but the Court had authority.  And

18    the backdrop of this, again, cannot be overstated.  Again, to

19    use Mr. Clemente's word, we have this Byzantine structure

20    here.  It's a lot for the Committee to get its arms around.

21    And even the CLO Holdco structure -- again, I'm looking at my

22    notes, my fancy chart -- we have CLO Holdco, a Cayman Island

23    entity.  Its parent is Charitable DAF Fund, LP, another Cayman

24    Island entity.  It, in turn, is owned by Charitable DAF

25    Holdco, Ltd., yet another Cayman Island entity.  Its general

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document Appendix    Filed 05/06/25 Page 100 of 351    PageID 13376

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 87 of 100

87

 1    partner happens to be a Delaware entity, Charitable DAF GP,

 2    LLC, but the beneficial owners of it are the three Highland

 3    Foundations, of which Dondero is president and director, and

 4    Mr. Scott the treasurer and director.

 5         So, I'm not saying the Byzantine structure is in and of

 6    itself problematic, although one might wonder why a charitable

 7    organization needs to have three offshore entities as part of

 8    its structure.  I digress.  But we all know a Byzantine

 9    structure and ties to Dondero do not mean something is

10    attackable in and of itself, but we have had issues raised

11    about the Dynamic Fund and the various transfers with regard

12    to Dugaboy, the Dondero Family Trust, and Get Good Trust and

13    the note.  All of that is worthy of examination, and the

14    Committee has not had all that long in this case to

15    investigate it.

16         So, I'm going to say a couple of more things.  First, the

17    motion is denied, but I'm going to put more strings on it than

18    that.  I'm denying the motion, but as part of this ruling I'm

19    going to order that the Committee has 90 days, unless the

20    Court happens to extend that on motion or agreement of the

21    parties, to file an adversary proceeding against CLO Holdco or

22    the money shall be released.  Okay?

23         So, again, I intended it, as I think everybody did, to be

24    a placeholder, to keep the status quo little bit.  Again, Mr.

25    Kane has raised good arguments that maybe an adversary

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document Appendix    Filed 05/30/25    Page 101 of 351    PageID 13377

Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 88 of 100

88

 1   conceivably was necessary or might become necessary.  So here

 2   we have a requirement of an adversary within 90 days or the

 3   money shall be released to Holdco -- again, unless someone

 4   moves to extend that or I get an agreement to extend that and

 5   I happen to decide to issue an order extending that.

 6       I presume that if an adversary is filed, then if the

 7   Committee wants that money to continue to be held in the

 8   registry of the Court, then they would have to file an

 9   application for injunctive relief, essentially, to keep the

10   money in the registry of the Court pending the resolution of

11   the adversary proceeding.

12       So that is the ruling of the Court.  Mr. Clemente, I'll

13   ask you to draft up the order.  And I reserve the right to

14   supplement this oral ruling in that form of order.  And please

15   run it by Mr. Kane before electronically submitting it to the

16   Court.

17       Now, I'm going to say a couple of other things, and then

18   I'll, before closing, I'll ask if there are questions or other

19   announcements.  I have told the parties and the lawyers to

20   focus on a plan and problem-solving how we're going to pay

21   creditors.  And I think I expressed my strong hope that people

22   would stop litigating everything.  I think I'm remembering

23   saying this most recently at the UBS hearing a few weeks ago

24   on a motion to lift stay.  Once again, we had a very lengthy

25   hearing that day.  I denied the motion.  And here we are

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S     Document 15-1   Filed 05/06/25   Appendix   Page 102 of 351     PageID 13378

Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 99 of 100

1   as I can to distance CLO Holdco from that taint, because

2   understanding that it's in what has been alleged as a

3   Byzantine web, we think it's important to separate CLO Holdco

4   and its operations to ensure that things are done in an

5   appropriate fashion with square corners.

6       That's all I have, Your Honor.  We have no objection to

7   the additional funds being pled into the registry of the

8   Court.  We can agree those funds would be adjudicated as part

9   of this dispute.  We understand that we did not prevail, and

10  we appreciate your Court hearing our argument.

11      (Proceedings concluded at 12:06 p.m.)

12                          --oOo--

13

14

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
21  the proceedings in the above-entitled matter.

22   **/s/ Kathy Rehling**                        **07/02/2020**

23  _____   _____

24  Kathy Rehling, CETD-444                        Date
    Certified Electronic Court Transcriber

25

APP 0052

# EXHIBIT E

012448   APP 0054

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                             DALLAS DIVISION

 3                                   )    Case No. 19-34054-sgj11
     In Re:                          )
 4                                   )
     HIGHLAND CAPITAL                 )    Dallas, Texas
 5   MANAGEMENT, L.P.,                )    July 8, 2020
                                     )    1:30 p.m. Docket
 6            Debtor.                 )
                                     )    - MOTION TO EXTEND EXCLUSIVITY
 7                                   )      PERIOD (737)
                                     )    - MOTION TO EXTEND TIME TO
 8   _____)      REMOVE ACTIONS (747)

 9                       TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                 UNITED STATES BANKRUPTCY JUDGE.

11   WEBEX/TELEPHONIC APPEARANCES:

12   For the Debtor:              Jeffrey N. Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
13                                10100 Santa Monica Blvd.,
                                   13th Floor
14                                Los Angeles, CA  90067
                                  (310) 277-6910
15
     For the Official Committee   Matthew A. Clemente
16   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
17                                Chicago, IL  60603
                                  (312) 853-7539
18
     For the Debtor:              Zachery Z. Annable
19                                Melissa S. Hayward
                                  HAYWARD & ASSOCIATES, PLLC
20                                10501 N. Central Expressway,
                                   Suite 106
21                                Dallas, TX  75231
                                  (972) 755-7104
22
     For Acis Capital             Rakhee V. Patel
23   Management GP, LLC:          Annmarie Antoinette Chiarello
                                  WINSTEAD, P.C.
24                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
25                                (214) 745-5250
```

41

 1   been working very cooperatively with our creditors over the

 2   last few months and we're just seeking to do it the best way.

 3       So nothing I've said today, nothing, you know, should come

 4   as and will come as a surprise to the Committee, but we're

 5   working better, recognizing that ultimately the creditors want

 6   to be paid, and doing that in an appropriate manner and a

 7   thoughtful manner is what the Debtor is committed to do with

 8   its partner, the Committee, in this process.

 9           THE COURT:  Okay.  Sort of jumping back, I forgot to

10   ask earlier when we were talking about Acis:  Has the Fifth

11   Circuit rescheduled oral argument on the appeal of the Acis

12   confirmation order and order for relief?

13           MR. POMERANTZ:  I believe -- Your Honor, maybe Ms.

14   Patel would know off the top of her head.

15           THE COURT:  Ms. Patel?

16           MS. PATEL:  Your Honor, it was -- it was briefly -- I

17   -- and I say briefly, it was briefly we had -- we got a notice

18   at some point, I believe in early June, that the Fifth Circuit

19   had reset oral argument.  And then approximately, I can't

20   remember exactly, but it was like, I don't know, a week or

21   maybe ten days later, we got a notice that it was cancelled

22   again.  We have not received notice that it is rescheduled, so

23   it is still pending.  But it has not been taken off oral -- it

24   has not been taken off oral argument at some juncture.

25           THE COURT:  Okay.  Well, I acknowledge that that is a

42

1   pandemic disruption for sure.  It would have been nice to have

2   that resolved one way or another by now.

3        MS. PATEL:  Agreed, Your Honor.  We were trying to

4   figure out, frankly, in the week to ten days that it took from

5   the scheduling to how it was cancelled, exactly how our team

6   was going to get down to New Orleans.  And the -- I think the

7   leading contender was to rent an RV and drive down so we could

8   safely get there.  So it certainly has been a casualty of the

9   pandemic.

10        THE COURT:  Okay.  All right.  Two more questions.

11   And this one has been a bit of a tough one for me to decide

12   whether I should broach this topic or not.  You know, I read

13   the newspapers, the financial papers, just like everyone else,

14   and I saw a headline that I wished almost I wouldn't have

15   seen, and it was a headline about Dondero or Highland

16   affiliates getting three PPP loans.  And, you know, I'm only

17   supposed to consider evidence I hear in the courtroom, right,

18   or things I hear in the courtroom, but I've got this

19   extrajudicial knowledge right now thanks to just keeping up on

20   current events.  I decided I needed to ask about this.

21      What can you tell me about this, Mr. Pomerantz?  I mean, I

22   assumed, from less-than-clear reporting, that it wasn't

23   Highland Capital Management, LP, but I'd like to hear anything

24   you can report about this.

25        MR. POMERANTZ:  So, look, Your Honor, the first I

43

 1   could say is that, to my knowledge, Highland Capital, the

 2   Debtor, has not obtained a PPP loan.  I know there have been

 3   discussions with certain funds that basically have certain

 4   assets, private operating companies, about obtaining PPP

 5   loans.  I don't have the specifics for Your Honor.  I'm happy

 6   to provide that.

 7       Of course, to the extent Mr. Dondero, on any of his

 8   affiliated funds that are under the control of the Debtor, I

 9   would have no way of answering that, but I'm happy to follow

10   up with that with the Board and report back to Your Honor in

11   whatever appropriate manner you felt to obtain that

12   information.

13           THE COURT:  Okay.  Well, let's have a report on that

14   on the 14th when we come in.  You know, maybe Mr. Seery or Mr.

15   Sharp or some other person.  But you can probably imagine the

16   different things going through my brain.  You know, well,

17   first, let's see if it was -- you know, I don't -- again, I'm

18   not expecting it to be Highland Capital Management, LP.  I

19   would be beyond shocked if, you know, that somehow happened

20   when they're in bankruptcy.  And, you know, I think it would

21   require a 364 motion, just like any other borrowing, although

22   I know it's kind of a forgivable loan.  Strange bird.

23       But then if it's some affiliate of Highland, I still feel

24   like we need some transparency and disclosure on that.  I

25   mean, I -- and who were the human beings behind it.  It just

45

1   busiest judges in the country right now.  I'm wondering when

2   were they contacted.  Was it really recently, or a week or two

3   ago?  Because they've probably gotten ten new mega-cases in

4   the past two weeks.

5          MR. POMERANTZ:  So, Your Honor, the last -- the last

6   two weeks, again, probably since June 15th, we had been

7   discussing the structure of a mediation.  We, the Debtor,

8   proposed perhaps a combination of Judge Isgur and Jones.  We

9   initially had that conversation with Mr. Clemente, and then we

10  socialized it with the rest of the Committee members.  As of

11  last Thursday, I believe it was, we had consensus that Judge

12  Jones, and if available, also Judge Isgur, would make sense.

13      I sent an email to Judge Jones' clerk, indicating that we

14  had a hearing today, that it would be helpful if we got a

15  response, and this morning, two hours before the hearing,

16  Judge Jones' clerk responded and told Mr. Clemente and I that

17  he is available and ready and suggested that we have a

18  conference with -- again, I'm not sure if it'll be him or his

19  clerk, to talk about availability.  Of course, we didn't want

20  to go ahead and have that discussion until, you know, we got

21  Your Honor's input on it.

22         THE COURT:  Okay.  I mean, a couple of things come to

23  mind.  One is I am just flabbergasted that they would have any

24  availability.  I know they're -- I'm aware of Judge Jones

25  doing hearings on weekends.

46

1    But second, I'm also concerned what is their idea of

2    availability.  Because in order for a mediator to meaningfully

3    help you on this, I mean, it's going to take not just hours

4    but days of time, unless you want the mediator to just have a

5    30,000-foot view.  And I mean, I just cannot imagine, --

6            MR. POMERANTZ:  So, --

7            THE COURT:  -- once again, that they would have days

8    and days to come up to speed with, you know, 11 years of

9    litigation or however long it was, not that long, with UBS,

10   you know the years with Acis, you know, the various alleged

11   claims and causes of action, and, you know, the Byzantine

12   structure here.  I mean, you know, not that they have to be,

13   you know, as educated as a judge presiding over litigated

14   matters, but I just cannot imagine they could meaningfully

15   spend time on this.

16       So what are you all envisioning?  Because I know what I'm

17   envisioning, and maybe we're not seeing it the same way.  I

18   mean, what are you thinking?  That you'll go in and spend a

19   day with, you know, maybe just each of you doing a 25-page

20   white paper, and you'll either settle it by the end of the day

21   or not, or what?

22           MR. POMERANTZ:  So, let me start by saying that when

23   everyone raised the issue of Judge Jones and Isgur, everyone

24   had the same potential concern that Your Honor has mentioned.

25   You know, my firm and me personally, I'm involved in a couple

47

 1  of cases before Judge Jones now, significant cases.  So there

 2  was a concern.

 3      I think people also generally thought that if they

 4  accepted and they knew what they were getting into, they would

 5  want to do a good job and they'd have the time.

 6      We have not had the ability to have an extensive

 7  discussion.  That discussion could either occur with Mr.

 8  Clemente and myself speaking to the clerk or the judge, or if

 9  Your Honor -- nothing stops Your Honor from picking up the

10  phone, speaking to Judge Jones and asking him as well.

11      But I expect it to be a very intensive mediation process.

12  I do understand that Judge Jones only does mediations in

13  person, so this would require people getting to Houston,

14  which, in my experience, while I have participated in

15  mediations virtually on the phone, it's a lot more effective

16  to be in person.  We would anticipate detailed mediation

17  briefs.  We would envision each of the parties speaking to

18  Judge Jones to give him their perspective.  But it would be --

19  it would be a significant assignment.

20      Again, whether we would conclude at the end of August, I

21  don't know, but I would contemplate a good two, three days of

22  in-person mediation at the end of August, and then probably,

23  if necessary, to set up for something else, which, again,

24  there are several different things.  And I mentioned in my

25  opening remarks why I think people like Judge Jones -- and

57

1  nothing else, we'll go ahead and adjourn for today.  And I'll

2  keep -- if there's anything worthwhile to report on the

3  mediation front before we have our hearing on the 14th, I'll

4  have my courtroom deputy reach out to all counsel by email and

5  let you know.  Okay?  All right.

6          MR. POMERANTZ:  Thank you very much, Your Honor.

7          MS. PATEL:  Thank you, Your Honor.

8          THE COURT:  Thank you.  We stand adjourned.

9          THE CLERK:  All rise.

10     (Proceedings concluded at 3:00 p.m.)

11                      --oOo--

12

13

14

15

16

17

18

19                      CERTIFICATE

20     I certify that the foregoing is a correct transcript to
   the best of my ability from the electronic sound recording of
21  the proceedings in the above-entitled matter.

22  **/s/ Kathy Rehling**                      07/09/2020

23  _____      _____

24  Kathy Rehling, CETD-444                      Date
   Certified Electronic Court Transcriber

25

012456

# EXHIBIT F

012457

APP 0052

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document Appendix   Filed 06/06/25   Page 113 of 351   PageID 13389

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 1 of 134

1

            IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                     DALLAS DIVISION

2

3                                   )   **Case No. 19-34054-sgj11**
     In Re:                         )
                                    )
4    HIGHLAND CAPITAL               )   Dallas, Texas
     MANAGEMENT, L.P.,              )   July 14, 2020
5                                   )   1:30 p.m. Docket
                                    )
6            Debtor.                )
                                    )   APPLICATIONS TO EMPLOY JAMES
7                                   )   P. SEERY AND DEVELOPMENT
                                    )   SPECIALISTS, INC. (774, 775)
8    _____)

                     TRANSCRIPT OF PROCEEDINGS
9          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.

10

     WEBEX/TELEPHONIC APPEARANCES:

11

     For the Debtors:          Jeffrey N. Pomerantz
12                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
13                               13th Floor
                               Los Angeles, CA  90067
14                             (310) 277-6910

15   For the Debtors:          John A. Morris
                               Greg Demo
16                             PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
17                             New York, NY  10017-2024
                               (212) 561-7700

18

     For the Debtors:          Ira D. Kharasch
19                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
20                               13th Floor
                               Los Angeles, CA  90067-4003
21                             (310) 277-6910

22   For the Debtors:          Zachery Z. Annable
                               Melissa S. Hayward
23                             HAYWARD & ASSOCIATES, PLLC
                               10501 N. Central Expressway,
24                               Suite 106
                               Dallas, TX  75231
25                             (972) 755-7104

Seery - Direct                                52

 1  file Multi-Strat as a bankruptcy, it was hard to get folks to
 2  really come to the table and think about how to settle that
 3  issue.
 4      These issues in regard to the total case are much more
 5  complicated.  We're going to file a plan.  We believe that
 6  will set a bit of a crucible to folks to think about how to
 7  move forward with their claims.  We are, as Jeff Pomerantz
 8  mentioned last time, agreed in principle, but we have some
 9  issues to work through with Redeemer that we hope to be able
10  to resolve by this week.  And so that's my internal goal, but
11  I expect to be able to do it.
12      The reason that's complex is not that it's simply a -- the
13  arbitration award is not simply a money award; it actually
14  requires certain offsets, it requires certain assets be sold
15  and paid for.  And we're trying to carve our way around some
16  of those, because they (inaudible) agreement, because they're
17  -- they're more difficult than simply exchanging cash for
18  assets, because we don't have the ability to do that right
19  now.  We don't have the cash, and we're in bankruptcy.
20      So I do believe that we can get these done.  And then if
21  mediation is something that would work, great.  We're going to
22  try to do it without mediation as well.  Going to try to do it
23  before we get to mediation and resolve claims.  And if we're
24  unable to do that, hopefully mediation will push it forward or
25  we have to have a fallback, which will be dispositive motions

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 6-27    Filed 09/05/25    Page 115 of 351    PageID 13391
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 53 of 134

Seery - Direct                          53

1    with respect to certain of the claims.

2        But we expect to have and I think we have a number of

3    claims objections that have (inaudible).  We've resolved

4    those.  We're really down to three claims.  And one of them is

5    almost done.

6    Q    All right.  At the last hearing, --

7            MR. MORRIS:  Your Honor, that really does finish the

8    substance of the testimony with respect to this motion, but at

9    the last hearing Your Honor raised some questions about PPP

10   loans.

11           THE COURT:  Yes.

12           MR. MORRIS:  Would you like me to just take a moment

13   with Mr. Seery to address that?

14           THE COURT:  Yes, please.

15           MR. MORRIS:  Okay.

16   BY MR. MORRIS:

17   Q    Mr. Seery, you're aware that the Judge raised some

18   questions about whether and to what extent the Debtor may have

19   been involved in any of the PPP loans?

20   A    Yes.

21   Q    And have you done any work to try to figure out the

22   answers to the questions the Judge posed?

23   A    Well, work in response to the question, but also work

24   previously.  So, just a -- quickly, as I think we all know,

25   the PPP program was put forth to try to give companies cash

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document Appendix   Filed 07/06/25   Page 116 of 351   PageID 13392
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 54 of 134

1    that they had to use for employee payments, to continue to

2    keep payroll supported and to continue to have folks hold

3    their jobs.

4        We have -- and I think the *Business Insider* article, which

5    I'm not familiar, I know the publication is not something I

6    seen much, but I'm not familiar with the specifics of that

7    article, and -- but any PPP, away from the assets that HCMLP

8    actually owns or controls.  And we've got -- we've got three

9    -- and I think there's some substance to the article.  But

10   we've got three businesses.  And these are -- this is public,

11   but I'll go into the -- sort of the obvious reasons without

12   going into the specifics of the business around the ones that

13   I know of well.

14       Carey Limousine is a business that transports folks in

15   high-quality cars from airports or from events or between

16   businesses.  It was hit severely by the COVID-19 pandemic.,

17   particularly with respect to the air transportation, which was

18   really one of its biggest areas.  The business,

19   notwithstanding Uber and the other type of shared ride

20   services, had actually done quite well, and Highland was an

21   owner of a significant portion of that business related to

22   some loans that it held in various funds.

23       That business's management, with its own outside counsel,

24   sought a PPP loan.  Then our director came to us and discussed

25   with the Board the propriety of that loan.  We engaged outside

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document Appendix   Filed 07/06/25   Page 117 of 351   PageID 13393

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 55 of 134

Seery - Direct                               55

 1   counsel, not bankruptcy counsel but counsel that had
 2   particularized expertise in PPP, and spent a ton of time
 3   really understanding both the law as well as the specific
 4   regs.  Carey did get a PPP loan.  It is potentially
 5   forgivable, depending on how it's used.
 6       The second entity that was similar but didn't come to the
 7   Board, we have a business called SSP, which is an excellent
 8   highway business that provides equip -- materials for a lot of
 9   different road construction, but primarily highway road
10   construction.  Very well run business.  That entity got a PPP
11   loan as well, primarily worried about whether the construction
12   on the highways would shut down.
13       So it's been -- I don't believe that's really happened in
14   Texas, which is where most of their business is, but they
15   qualified for that loan.  They did not come to the Board.  A
16   very specific carve-out, because one of the interest holders
17   that we share that position with is a Small Business
18   Administration fund and, so it was very clear that it was
19   entitled to that loan.
20       Then there's a third entity called Roma that got a very
21   small PPP loan.  We don't control the entity and we were not
22   involved in its acquisition of that loan.  Again, it would
23   have to be used as required.
24       One of the things I want to make sure that is in the
25   record and for Your Honor with respect to Carey, we spent a

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 5ery-Dix    Filed 07/26/25249    Page 118 of 351    PageID 13394

Case 19-34054-sgj11  Doc 864  Filed 07/17/20    Entered 07/17/20 10:53:51    Page 56 of 134

Seery - Direct                              56

1  lot of time as a Board focused on, one, whether it was legal

2  to get that loan, first.  We're doing everything right, by the

3  book.  We're not going to play in the gray.  There is no gray.

4  There's black and white in these areas.

5       Number two, was it ethical, was it appropriate that we

6  went and got this loan or that Carey went and got this loan?

7  Management, with the outside counsel, was sure that we could

8  do it, but we didn't want to take their word for it, so we

9  went out and got our own counsel, third-party counsel for the

10  Board to make sure that this was appropriate.

11       Three, the requirements around these loans are significant

12  and the penalties for violating them are severe.  So if you

13  get a loan by mistake, are you really required to pay it back?

14  And if you're mistaken, that will be expensive, but it won't

15  be a real penalty.  But if you get a loan that's really

16  inappropriate, that you shouldn't have gotten, that was a

17  material misstatement of any of the facts around it, the

18  penalties are significant.  And not only in terms of the

19  opprobrium that you'd suffer in the press, because that's

20  coming, but in terms of how you use the funds.

21       So they can only be used in very specific ways, and we

22  were exceptionally careful around this program.

23       The basis of the program is to keep people employed.  And

24  with a business like Carey Limousine in particular, where

25  there's a significant amount of debt, where the business is

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document Appendix   Filed 07/30/25   Page 119 of 351   PageID 13395

Case 19-34054-sgj11   Doc 864   Filed 07/17/20   Entered 07/17/20 10:53:51   Page 57 of 134

Seery - Examination by the Court          57

1   shut down by COVID, where we didn't have the funds to put into

2   Carey, nor even if we wanted to, we might not have been able

3   to do it without the Committee's approval because of the

4   protocol, a PPP loan was not only legal but it was

5   appropriate.  And it's being used in that fashion, meaning to

6   keep employees employed.

7   Q    Thank you very much, Mr. Seery.

8        MR. MORRIS:  Your Honor, I have no further questions

9   of Mr. Seery.  Does the Court have any questions?

10       THE COURT:  I actually have a follow-up question

11  regarding the PPP, just to kind of put a bow on this.

12                    EXAMINATION BY THE COURT

13       THE COURT:  I'm looking at the demonstrative aide.  I

14  don't know if you, Mr. Seery, have it there handy.

15       THE WITNESS:  I do, Your Honor.

16       THE COURT:  Okay.  So I'm turning to Page 6, the

17  chart, the subchart, Investments and Subsidiaries.  The third

18  column, Privately-Held Equity, Various Companies.  I mean,

19  that would be the type of investment entity we're talking

20  about here that got the PPP loan:  Carey Limousine, SSP, Roma?

21  Nothing that was -- well, I'm going to say Highland affiliate.

22  Affiliate, that's a dicey term, but that's the type of entity

23  in the organizational structure we're talking about, correct?

24       THE WITNESS:  Those are the ones -- I want to be very

25  careful, because I know what I know and I know I won't

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 5-1   Filed 07/06/25   Page 120 of 351   PageID 13396
Appendix   Page 706 of 1249

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 58 of 134

Seery - Examination by the Court                58

1   represent anything that I don't know.

2       So, with respect to the entities that HCMLP, the Debtor,

3   controls, that's absolutely the case.  I don't know, and I can

4   try to find out, but they are not HCMLP-controlled entities.

5   Whether other entities in the related-party complex received

6   loans -- so, obviously, HCMLP did not receive a loan.  And the

7   only entities that we were involved with is the ones I

8   mentioned to you.

9       And I should mention, there are other entities in the

10  privately-held equity that got other government money, in the

11  medical space, that they didn't even ask for.  HHS pushed

12  forward payments to folks in the business, medical healthcare-

13  providing businesses, to assure that they had liquidity to

14  provide.  And so -- and this has been described to me exactly

15  this way, that they woke up in the morning and found money in

16  their account.  And with one of the companies, they actually

17  returned a bunch of the money because it was from a dormant

18  provider number and they didn't believe it was appropriate to

19  keep that money.  So that was one of the entities that we

20  control with other investors.

21      But with respect to our HCMLP entities, these are the only

22  ones I know.  With respect to other related entities that

23  might be in the family of businesses, for lack of a better

24  term, that were alluded to in the *Business Insider* article, I

25  don't know that answer.  So, I -- if I -- I can try to find

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document Appendix    Filed 07/16/25 249    Page 121 of 351    PageID 13397

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 59 of 134

Seery - Examination by the Court                 59

1    out.  I just don't know the answer, Your Honor.

2          THE COURT:  All right.  Thank you.  Well, this has

3    been extremely helpful.

4      I should ask does anyone have any questions of Mr. Seery?

5    The Committee counsel, perhaps?  Anyone else?

6          MR. CLUBOK:  Your Honor, this is Andrew Clubok.  In

7    light of the testimony, I do have some questions on behalf of

8    UBS.

9          THE COURT:  All right.  Briefly.  Go ahead.

10          MR. CLUBOK:  Okay.

11          MR. MORRIS:  Your Honor?  Your Honor, I'm sorry to

12   interrupt, but there's no objection lodged here.  If Your

13   Honor wants to permit it, that's obviously the Court's

14   prerogative.  But as just a point of order, having not lodged

15   an objection, I don't know what right anybody has to cross-

16   examine the witness.

17          THE COURT:  All right.  Well, that's why I said

18   briefly.  I think that Mr. Morris makes a good point, Mr.

19   Clubok.  You could have filed a written objection, response,

20   comment, or something.  So, you're a party in interest.  I'll

21   give you a little bit of leeway here.  But please keep it

22   brief.

23          MR. CLUBOK:  Yeah.  Thank you, Your Honor.  It's just

24   some of the things that Mr. Seery said which we didn't expect

25   to hear that has raised a few questions that I just very

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document Appendix    Filed 07/06/25 Page 122 of 351    PageID 13398

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 60 of 134

Seery - Cross                              60

1   briefly will try to address.

2                        CROSS-EXAMINATION

3   BY MR. CLUBOK:

4   Q    Mr. Seery, good afternoon.  I'm Andrew Clubok, Latham &

5   Watkins, on behalf of UBS.

6        Mr. Seery, you talked about the fiduciary duties you've

7   understood yourself to have with respect to certain parties,

8   and my question to you is:  Have you understood, since the

9   beginning of your service as an Independent Director of

10  Strand, that you had fiduciary duties to the unsecured

11  creditors of the Debtor?

12  A    It's a -- it's a -- the answer is I understand the

13  fiduciary duties very well.  I think we have fiduciary duties

14  to the estate.  So Highland -- what I tried to explain is that

15  Highland, as an asset manager, has very specific fiduciary

16  duties that are set forth in (inaudible) in the cases and the

17  rules that have interpreted it.  We, as directors of Strand,

18  have a duty to the estate.

19       I don't think it's -- I don't think it's fair, and I'd

20  have to subject myself to some education from counsel, I don't

21  think it's fair to say we had a specific fiduciary duty to a

22  particular creditor.

23       So, for example, if I had a fiduciary duty to UBS, it

24  would be very difficult for me to object to UBS's claim.  It

25  would be -- I don't know how I could do that as a fiduciary.

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document Appendix   Filed 07/06/25   Page 123 of 351   PageID 13399

Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 133 of 134

133

1   yesterday counsel for Mr. Dondero filed a joinder in the

2   Debtors' objection to Acis's claim.  So, again, just thinking

3   about this in the context of mediation, I think, with that

4   joinder, they will be a necessary party.  So, going back to

5   Mr. Seery's point, this is not just --

6           THE COURT:  Oh, absolutely.  Mr. Dondero is --

7           MS. PATEL:  -- a two-party --

8           THE COURT:  -- going to be a required party in

9   mediation.  Absolutely.  So, --

10          MS. PATEL:  Thank you, Your Honor.

11          THE COURT:  All right.  Well, if there's nothing

12  further, we'll see you on the 21st.  And, again, my courtroom

13  deputy may be reaching out before then if we've got things

14  nailed down on mediation.

15      (Proceedings concluded at 4:54 p.m.)

16                          --oOo--

17

18

19

20

                         CERTIFICATE
21

22      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
23  the proceedings in the above-entitled matter.

     **/s/ Kathy Rehling**                      **07/16/2020**
24
    _____        _____
25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

# EXHIBIT G

012469
APP 00175

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document Appendix   Filed 07/09/25   Page 125 of 351   PageID 13401
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 1 of 53

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re:<br><br>ACIS CAPITAL MANAGEMENT, L.P.<br>and ACIS CAPITAL MANAGEMENT GP,<br>LLC,<br><br>                    Debtors. | ) Case No. 18-30264-SGJ-11<br>) Case No. 18-30265-SGJ-11<br>) (Jointly administered under<br>)  Case No. 18-30264-SGJ-11)<br>)<br>) <u>DEBTORS' MOTION to FILE</u><br>) <u>REDACTED QUARTERLY REPORTS</u><br>)<br>) September 23, 2020<br>) Dallas, Texas |

<u>Appearances via video and/or telephone</u>:

| | |
|---|---|
| For the Reorganized<br>Debtors: | Annemarie Chiarello<br>Rahkee V. Patel<br>Winstead PC<br>500 Winstead Building<br>2728 North Harwood Street<br>Dallas, Texas  75201 |
| For James Dondero: | D. Michael Lynn, of Counsel<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton Street, Suite 1000<br>Forth Worth, Texas  76102 |
| For William T. Neary,<br>United States Trustee: | Lisa L. Lambert, Assistant U.S. Trustee<br>Office of the U.S. Trustee, Region 6<br>1100 Commerce Street, Room 976<br>Dallas, Texas  75242-1496 |
| Digital Court<br>Reporter: | United States Bankruptcy Court<br>Northern District of Texas<br>Michael F. Edmond, Judicial<br> Support Specialist<br>Earle Cabell Building, U.S. Courthouse<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242<br>(214) 753-2062, direct; 753-2072, fax |
| Certified Electronic<br>Transcriber: | Palmer Reporting Services<br>1948 Diamond Oak Way<br>Manteca, California  95336-9124 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

APP 0276
012470

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 5-1   Filed 08/01/25   Appendix   Page 126 of 351   PageID 13402
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 50 of 53

*The Ruling of the Court* 50

1    thing that it might be is commercial information, but I really

2    don't think there's been a showing that it is of the nature that

3    107(b) is intended to address.

4            Now don't get me wrong, I am very troubled by some of

5    what I've heard today.  I doubt Mr. Dondero is listening in

6    personally, but I'm going to say, and maybe it will get back to

7    him, maybe it won't, but that I'm very troubled by hearing that

8    Dondero-controlled entities, and I believe the DAF, based on

9    what I've heard in the past, is Dondero controlled, I'm very

10   troubled that Dondero-controlled entities are suing Acis and

11   parties that have dealt with Acis, U.S. Bank, Brigade, and the

12   Moody's one is really mind-boggling, but I'm very troubled that

13   this could be hampering Acis' ability to do a reset and it's

14   driving up expenses.

15           And if these lawsuits were brought before me through a

16   removal or any other mechanism, you know, first, I would have to

17   look at subject matter jurisdiction of the Bankruptcy Court.

18   Yes, we're way past the effective date of Acis' plan, but the

19   Fifth Circuit case authority provides that if there is a dispute

20   postconfirmation that bears on the interpretation,

21   implementation, or execution of a confirmed plan, then the

22   Bankruptcy Court has subject matter jurisdiction in that

23   context.  And it sure sounds like, hearing Mr. Terry's version

24   of things today, which sounded very credible, that this is

25   potentially impinging on the reorganization and plan of Acis.

APP 0977
012477

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 30-1 Filed 05/06/25   Appendix   Page 127 of 351   PageID 13403
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 51 of 53

*The Ruling of the Court*                                              51

1          So it's very troubling to me that — well, I've said it

2    before in Highland hearings, that these battles just continue

3    on, but if it's impairing with a plan I confirmed, it's

4    impairing a plan I confirmed, it's impairing the ability to

5    perform under that plan, then that is a problem for the

6    plaintiffs.

7          Now I've heard there is no pending litigation in that

8    regard, but I'm troubled by the April 2020 letter I saw that is

9    essentially a suggestion we may start this up again, the

10   litigation that we dismissed.  It's just ridiculous, for lack of

11   a better term, that Dondero and his entities would be doing some

12   of the things it sounds like they're doing:  Suing Moody's, for

13   crying out loud, for not downgrading the Acis CLOs.  If Mr.

14   Dondero doesn't think that is so transparently vexatious

15   litigation, yeah, I'm going out there and saying that.  I

16   haven't seen it, but, come on.

17         So, bottom line, I don't find the 107 standard here is

18   met today, so I am denying entirely the motion.  I haven't been

19   convinced that this is commercial information that 107(b)

20   justifies redacting or sealing.  But, again, I am most troubled

21   by what I've heard today.

22         I have found Mr. Terry to be a very credible witness

23   today on these points.  He's testified in this Court many times

24   and I continue to find him a very credible witness.

25         And so to the extent Mr. Dondero is listening or gets

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S    Document 5-1    Filed 08/26/25    Page 128 of 351    PageID 13404
Appendix    Page 002602149
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20   Entered 09/28/20 00:18:35   Page 52 of 53

*The Ruling of the Court*                                                52

1   a transcript, I hope it's loud and clear to him that to the

2   extent you are engaging in efforts surreptitious or overt to

3   derail Acis in its reorganization, there is going to be a price

4   to pay for that.  So I hope that message gets to him.

5           Very troubled, very troubled by what I've heard today.

6           All right.  Well, I think that concludes our business

7   here today.  Is there anything else anyone wants to raise?

8           MS. LAMBERT:  Judge Jernigan, Ms. Lambert for the U.S.

9   Trustee.  Would you like me to prepare an order just as for the

10  reasons stated?

11          THE COURT:  I would like you to do that.  Thank you

12  very much.  All right.

13          MS. LAMBERT:  And I think I will order the — I think I

14  will order the transcript and have it sent to Mr. Lynn.

15          THE COURT:  All right.  Thank you.

16      (The hearing was adjourned at 5:21 o'clock p.m.)

17                          —o0o—

18

19

20

21

22

23

24

25

Case 19-34054-sgj11 Doc 3571-1 Filed 10/17/22 Entered 10/17/22 11:28:53 Desc
Case 3:25-cv-02072-S Document 5-11 Filed 08/06/25 Appendix Page 129 of 351 PageID 13405
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20 Entered 09/28/20 00:18:35 Page 53 of 53

State of California        )
                           )     SS.
County of San Joaquin      )


          I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of Texas, Office of
the Clerk, of the proceedings taken on the date and time
previously stated in the above matter.

          I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

          I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate Nos. CER-124 and CET-124. Palmer
Reporting Services is approved by the Administrative Office of
the United States Courts to officially prepare transcripts for
the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services

                              Dated September 26, 2020

# EXHIBIT H

012475

APP 0785

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1               FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION
 2
                               )    Case No. 19-34054-sgj-11
 3    In Re:                   )    Chapter 11
                               )
 4    HIGHLAND CAPITAL         )    Dallas, Texas
      MANAGEMENT, L.P.,        )    Wednesday, October 21, 2020
 5                             )    10:00 a.m. Docket
                               )
 6            Debtor.          )
                               )    MOTION TO COMPROMISE
 7                             )    CONTROVERSY WITH ACIS CAPITAL
                               )    MANAGEMENT [1087]
 8    _____ )    Continued from 10/20/2020

 9                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                UNITED STATES BANKRUPTCY JUDGE.

11    WEBEX/TELEPHONIC APPEARANCES:

12    For the Debtor:              Ira D. Kharasch
                                   Jeffrey N. Pomerantz
13                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
14                                    13th Floor
                                   Los Angeles, CA  90067
15                                 (310) 277-6910

16    For the Debtor:              John A. Morris
                                   Gregory V. Demo
17                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
18                                 New York, NY  10017-2024
                                   (212) 561-7700

19
      For Acis Capital            Annmarie Antoinette Chiarello
20    Management GP, LLC:         WINSTEAD, P.C.
                                   2728 N. Harwood Street, Suite 500
21                                 Dallas, TX  75201
                                   (214) 745-5250
22
      For Acis Capital            Brian Patrick Shaw
23    Management GP, LLC:         ROGGE DUNN GROUP, P.C.
                                   500 N. Akard Street, Suite 1900
24                                 Dallas, TX  75201
                                   (214) 239-2707
25
```

9

1   motion that ever comes before it.

2        I daresay that Mr. Terry and Ms. Patel and Mr. Shaw firmly

3   believe that their client has been wronged and that they're

4   entitled to $75 million or more.  Thankfully, they were able

5   to check their egos at the door and come to an agreement, I

6   guess, that they believe represents a fair and reasonable

7   compromise.

8        So I understand that while -- that Mr. Dondero embraced

9   and appreciated the arguments that the Debtor made in its

10  pleading, but the fact of the matter is the Debtor came to a

11  position when it had the choice of either going forward with

12  that litigation, with all of the costs and risks and

13  uncertainty that were described, or taking this settlement.

14  And it came to the -- I believe the record shows -- the very

15  considered and reasonable decision to end all of the

16  litigation with Acis on the terms set forth in the agreement.

17       And I just wanted to kind of -- that doesn't go to any of

18  the particular -- necessarily go to any of the particular

19  elements of the legal standard, but so much time was spent

20  trying to tie Mr. Seery and the Debtor to the objection, and I

21  think -- I think it's important for the Court to look at this

22  in context.

23       And frankly, there are other very substantial claims out

24  there.  And Mr. Seery was very clear that each case is going

25  to be judged on its own merits.  And just because we've

10

1   settled a case where we put forth a strong legal position

2   here, it's only because we got to terms that the Debtor felt

3   were fair and reasonable.  We've taken -- and parties do this

4   all the time.  They take their litigation position and we're

5   going to take our litigation position.  But when it comes to

6   settlement, you have to view:  What are the alternatives?  And

7   that's all Mr. Seery did.  That's what the board did, servant

8   of their fiduciary duties.

9       And I'm going to talk in a few minutes about the benefits

10  to the estate that this settlement entails, but I just -- I

11  was a little surprised that anybody would try to say that

12  because we took a position in litigation we're not allowed to

13  compromise that position.  Because if that were the standard,

14  Your Honor, no 9019 would ever be approved, because, by

15  definition, 9019s are compromises.

16      So let me turn for a moment now to the actual elements of

17  the standard under 9019.  The first one is the probability of

18  success on the merits.  As I said, Mr. Seery felt strongly

19  about the position, but he also articulated some very, very

20  specific concerns, from *Mirant* to the Court's views on

21  equities that may not be -- the Court may not share our views

22  on equities.  The Court may not share.  The Court has a lot of

23  experience with these particular litigants.  The Court has

24  already assessed the credibility of certain witnesses in

25  relation to the claims at issue in this matter.  The Court has

11

1    already rendered decisions with respect to certain aspects of

2    this matter.  And so the Debtor took all of those things into

3    account in assessing the probability of success on the merits,

4    and that's all very much in the record.

5        But I did want to point to one other piece of evidence

6    that hasn't been discussed yet, and that is Professor

7    Rapoport's expert report that has now been admitted into

8    evidence.  You know, I question the weight that the Court

9    should give, but never -- only because I'm not sure how -- the

10   depth of the opinion.  But nevertheless, Professor Rapoport

11   specifically says at the top of Page 5, on Page 13, at the

12   very end of her opinion as to Question 1, she says, in

13   substance, if the Court follows *Mirant* and otherwise finds

14   that damages would benefit the Acis estate, then the Acis

15   claim, valued by Acis at least $75 million, could have

16   significant value.  Still, that value would depend on how the

17   Court found -- how the facts fall after the Court hears

18   testimony and is able to weigh the evidence.

19       That's kind of what Mr. Seery did.  So I'm not even sure

20   that there's a dispute, frankly, over the probability of

21   success.  Nobody has quantified it.  Nobody asked Mr. Seery to

22   quantify it.  We haven't gone down that path.

23       But Professor Rapoport, in her very first opinion, said:

24   Could be zero, could be $75 million or more.  It depends on

25   where the Court comes out.

1  consistent with the Bankruptcy Rules.  The notice was given on

2  September 23rd, so we're certainly good from notice and

3  opportunity to be heard, from that standpoint.

4      As we all know and as I went through yesterday in ruling

5  on the Redeemer Committee settlement, I am consulting

6  Bankruptcy Rule 9019 as well as the abundance of jurisprudence

7  that tells bankruptcy courts how they are to evaluate

8  compromises and settlements:  Cases such as *AWECO*, *Jackson*

9  *Brewing*, *TMT Trailer*, *Cajun Electric*, and *Foster Mortgage*,

10  significantly, among the cases.

11      I am to look at, obviously, whether the proposed

12  compromise is fair and equitable and in the best interest of

13  creditors when considering probability of success in future

14  litigation, with due consideration for the uncertainty of law

15  and fact; when considering the complexity and likely duration

16  of future litigation and any attendant inconvenience and

17  delay; and all other factors bearing on the wisdom of the

18  compromise.

19      Case law also talks about the Court probing into whether a

20  settlement is within the range of reasonableness, and

21  obviously the Court should consider the paramount interests of

22  creditors.

23      So, here, giving all due consideration of the record

24  before me and the very eloquent arguments, I am going to

25  approve the compromise today.

34

1     I'm going to turn for a moment to Mr. Seery's testimony.

2  Just as I found his testimony to be very credible with regard

3  to the Redeemer Committee settlement, I once again found it to

4  be very credible and compelling in connection with the Acis

5  and Terry settlements.

6     Among other things, I believe his testimony reflected a

7  deep understanding of the risks and rewards of further

8  litigation and the uncertainty that there was in both the law

9  and the fact.  He mentioned his understanding of the *Mirant*

10 holding and how that absolutely posed some risks for the

11 estate in challenging the claims of the reorganized Acis.  He

12 mentioned what I consider significant due diligence that he

13 performed.  He mentioned not only reading many of the rulings

14 of this Court throughout the tortured history of the Acis

15 bankruptcy, but he mentioned meeting with the board members.

16 In fact, meeting with Mr. Terry and Acis's professionals.  He

17 picked out certain of the issues, the fact issues, the $10

18 million note transfer that was argued to be a fraudulent

19 transfer.  He described the disputes regarding the changing of

20 the fee structure imposed by Highland or Highland entities on

21 Acis, and he expressed concerns regarding the cost of

22 litigating all of that.

23    He spoke in depth about Mr. Terry's claims regarding his

24 retirement funds, and said he thought it was a pretty

25 straightforward win for the Terrys that he thought should have

35

1    been settled years ago for full value.

2        He mentioned his knowledge about the Guernsey litigation,

3    that being a jurisdiction where loser pays.  So that was sort

4    of an open-shut one as far as he was concerned.  And he talked

5    about the Acis GP proof of claim in some depth, regarding the

6    lawsuits in New York.

7        So, again, I find that he was very compelling and his

8    testimony reflected significant due diligence.

9        Now, the next thing I want to highlight that is very

10    compelling to me in deciding I should approve this settlement

11    is -- and I probably should have mentioned this first and

12    foremost -- this was a mediated settlement.  This is certainly

13    some indication of its good faith and arm's-length nature, and

14    certainly is a point in favor of the wisdom of the settlement,

15    given that we had two very respected co-mediators, retired

16    Judge Gropper from the Bankruptcy Court of the Seventh

17    District of New York.  Ms. Mayer was a partner at Weil Gotshal

18    with a very impressive career background.  And so it, again,

19    it is a point very much in favor of the *bona fides* of this

20    settlement.  So I cannot overstate that one.

21        A few other points I will make.  In looking at the risks

22    and rewards and likely expense and inconvenience of further

23    litigation, while Professor Rapoport estimated maybe $350,000

24    to $1.1 million of fees might be incurred for future

25    litigation of the issues between Highland and Acis, and while

36

 1  I respect her views tremendously -- I know she's been a fee

 2  examiner in many, many cases and really has some *bona fides* in

 3  speaking about fees in bankruptcy cases -- I tend to think

 4  that is an extremely low estimate.  And I can't separate from

 5  this analysis my own experience and knowledge with how

 6  litigious and expensive things have historically been between

 7  Acis and Highland.

 8      I cannot remember the final fee application amounts of the

 9  Chapter 11 Trustee and his professionals, but I know that in a

10  year-plus of the Acis case, the fees were much, much larger

11  than this amount, and I seem to remember that at least Foley

12  Lardner had a very, very large unsecured claim in this case

13  related to its fees representing *Highland v. Acis*, millions of

14  dollars.

15      So, with complete respect to Professor Rapoport, I believe

16  with all my heart that that number is way, way low as far as

17  future fees and expenses.

18      And as Ms. Chiarello pointed out and I think Mr. Morris

19  pointed out, we don't actually have evidence of Mr. Dondero's

20  willingness to pay legal fees for fights of *Highland v. Acis*.

21  While certainly I believe one hundred percent that Mr. Lynn

22  was told that Dondero would pay those fees and he has every

23  reason to believe him, I just don't have the equivalent of

24  evidence there that I can point to, evidence being Mr. Dondero

25  testifying that he would do that and maybe putting something

37

1   else in front of me to show a commitment.

2       So I again will turn to Ms. Rapoport's report.  While she

3   used words to the effect of, you know, she thought challenging

4   this would be a reasonable endeavor, I think that, all in all,

5   Mr. Seery was just very credible in his evaluation of things

6   and his strong feeling from the beginning that we're going to

7   fight this, it should be zero, and then as he did his due

8   diligence, as he looked at some of the issues -- and I will

9   point out that Professor Rapoport identified 16 issues of law

10  this Court would have to determine, in her estimation, and

11  then there could be potentially 12 fact issues the Court might

12  have to rule on, depending on how I ruled on the 16 issues of

13  law.  I don't think I could do that as swiftly as maybe this

14  case needs and deserves to get on its way to reorganization,

15  and I do think the settlement enhances the likelihood of

16  confirmation of a plan in the near future.  While we may have

17  miles to go before we get there, I think this settlement is a

18  step in the right direction, just like the settlement with the

19  Redeemer Committee is a step in the right direction.  And

20  that's a big factor in my mind.  I'm supposed to look at all

21  factors bearing on the wisdom of the compromise, and I think

22  the compromise enhances the prospect of a reorganization

23  sooner rather than later.

24      All right.  I reserve the right to supplement in more

25  detailed findings and conclusions, but Mr. Morris, I'm going

47

1           THE COURT:  All right.

2           MR. KHARASCH:  If we need more time, obviously, we

3    will be letting you know.

4           THE COURT:  All right.  So, rescheduled for 10:30

5    tomorrow morning.  And if there's nothing further, we're

6    adjourned.  Thank you.

7           MR. KHARASCH:  Thank you, Your Honor.  Appreciate it.

8           THE CLERK:  All rise.

9        (Proceedings concluded at 11:26 a.m.)

10                          --oOo--

11

12

13

14

15

16

17

18

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
22    the proceedings in the above-entitled matter.

23    **/s/ Kathy Rehling**                        **10/24/2020**

24   _____        _____
     Kathy Rehling, CETD-444                       Date
25    Certified Electronic Court Transcriber

# EXHIBIT I

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3                                   )  Case No. 19-34054-sgj-11
       In Re:                        )  Chapter 11
 4                                   )
       HIGHLAND CAPITAL              )  Dallas, Texas
 5     MANAGEMENT, L.P.,             )  December 10, 2020
                                     )  9:30 a.m. Docket
 6            Debtor.                )
       _____)
 7                                   )
       HIGHLAND CAPITAL              )  Adversary Proceeding 20-3190-sgj
       MANAGEMENT, L.P.,             )
 8                                   )
                                     )
 9            Plaintiff,             )  - MOTION FOR PRELIMINARY
                                     )    INJUNCTION
10     v.                            )  - MOTION FOR TEMPORARY
                                     )    RESTRAINING ORDER
11     JAMES D. DONDERO,             )
                                     )
12            Defendant.             )
       _____)

13                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                 UNITED STATES BANKRUPTCY JUDGE.

15     WEBEX/TELEPHONIC APPEARANCES:

16     For the Plaintiff:        Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
17                               10100 Santa Monica Blvd.,
                                  13th Floor
18                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
19
       For the Plaintiff:        John A. Morris
20                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
21                               New York, NY  10017-2024
                                 (212) 561-7700
22
       For the Official Committee Matthew A. Clemente
23     of Unsecured Creditors:   SIDLEY AUSTIN, LLP
                                 One South Dearborn
24                               Chicago, IL  60603
                                 (312) 853-7539
25
```

23

 1        THE COURT:  Yes.

 2        MR. BONDS:  Can I have a second?  Mr. Dondero did

 3   apologize to counsel and to Mr. Seery as well, and so the idea

 4   that Mr. Dondero has not apologized is not entirely correct.

 5        THE COURT:  Okay.  Well, if I misunderstood, I

 6   apologize.  But I guess what I was really trying to convey is,

 7   in a situation like this, I think coming into court and taking

 8   his lumps and saying things under oath might have been a

 9   better way to proceed.

10      I guess the second thing I want to say is I wish Mr.

11   Dondero was here, because maybe I'm reading this wrong, but I

12   think he needs to hear and know he is not in charge anymore of

13   Highland.  It may have been his baby.  He may have created its

14   wealth.  But when he and the board made the decision to file

15   Chapter 11, number one, that changed everything.  And then

16   number two, when the Committee was formed and was threatening

17   "We think we need a Chapter 11 trustee because of conflicts of

18   interest of Mr. Dondero and others," and when the Committee

19   negotiated something short of that with the Debtor in January

20   2020, you know, a settlement that involved Mr. Dondero no

21   longer being in charge, no longer being CEO, no longer having

22   any role except portfolio manager with the Debtor, and when

23   various protocols were negotiated, heavily negotiated, for

24   weeks, detailed, complex protocols, life changed even further.

25   It changed when he filed Chapter 11, when he put his baby,

24

1  Highland, in Chapter 11, and then it changed further in

2  January 2020 when this global corporate governance settlement

3  was reached.  As we know, it involved independent new board

4  members coming in and eventually a new CEO.  He's not in

5  charge.

6     Now, that doesn't mean he's not a party in interest, and

7  he can certainly weigh in with pleadings in the bankruptcy

8  court.  But these communications that I've admitted into

9  evidence, and the declaration, the sworn declaration of Mr.

10  Seery, suggest to me that he's not fully appreciating that,

11  sorry, you're not in charge.  And when you chose to put the

12  company in bankruptcy because of the overwhelming debt, it

13  started a cascade of events, so that now I'm depending on a

14  debtor-in-possession with a new board and a new CEO and a

15  Committee of very sophisticated members and professionals who

16  are working in tandem with the Debtor to be in charge,

17  basically.  All right?  So that's another thing I just feel

18  compelled to say for Mr. Dondero's benefit.

19     I guess another thing is there was a little bit of a

20  theme, Mr. Bonds, in your comments that Mr. Dondero is just

21  concerned, more than anything else, about the way employees

22  are being treated, or at least that's a major concern.  And I

23  don't find that to be especially compelling.  I mean, maybe if

24  he was sworn under oath and testified, I would believe that,

25  but it doesn't feel like what's really going on here.  Again,

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S    Document Appendix  Filed 09/06/25  249  Page 145 of 351    PageID 13421

25

1   he took the step of deciding that the company should file

2   Chapter 11.  We had the change in corporate governance in

3   January.  And he has the ability -- everyone, I think, would

4   very much be interested in a plan that he supports.  You know,

5   he wants to get the company back.  That has been made clear in

6   hearings from time to time, and I believe, from Seery's

7   declaration and Highland's lawyers, that they've been and will

8   remain receptive to Mr. Dondero's ideas for a different type

9   of plan that might allow him to get back into control of

10  Highland, if he puts in adequate consideration that makes the

11  Committee and others happy.

12      But we're in a proverbial the-train-is-leaving-the-station

13  posture right now.  Okay?  We've got confirmation coming up

14  the second week of January or something like that.  Okay.  So

15  the train is leaving the station, so we're running out of time

16  to hear what Dondero might want to do as far as an alternative

17  plan.

18      So, as far as the requested TRO, I appreciate that Mr.

19  Dondero and his counsel are worried about some ambiguity, but

20  I'm looking through the literal wording that has been

21  proposed, and the wording proposed is that Dondero is

22  temporarily enjoined and restrained for communicating, whether

23  orally, in writing, or otherwise, directly or indirectly, with

24  any board member, unless Mr. Dondero's counsel and counsel for

25  the Debtor are included in such communications.  Not ambiguous

57

1    Court next Wednesday, he needs to testify.  And if NexPoint,

2    through whoever their decision-maker is, is wanting to urge a

3    position to the Court, they need a human being to testify.

4    And I'll hear Seery and I'll hear Dondero and I'll hear

5    whoever that person is, and that's what's going to matter, you

6    know, most to me.  Yeah, we have some legal issues, certainly,

7    but I like to hear business people explain things, no offense

8    to the lawyers.  But it's always very helpful to hear the

9    business people in addition to the lawyers.  All right.  So,

10   Mr. Morris, you're going to upload that TRO for me.

11           MR. MORRIS:  Yes, Your Honor.

12           THE COURT:  Mr. Wright, you can upload your order

13   setting your motion for hearing next Wednesday at 1:30.  And I

14   think we have our game plan for now.  Anything else?  All

15   right.  We're adjourned.

16           THE CLERK:  All rise.

17       (Proceedings concluded at 11:33 a.m.)

18                       --oOo--

19

20                     CERTIFICATE

21       I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
22   the proceedings in the above-entitled matter.

23    **/s/ Kathy Rehling**                    **12/11/2020**

24   _____    _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

# EXHIBIT J

012492

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                     )   Case No. 19-34054-sgj-11
 3    In Re:                         )   Chapter 11
                                     )
 4    HIGHLAND CAPITAL               )   Dallas, Texas
      MANAGEMENT, L.P.,              )   Wednesday, December 16, 2020
 5                                   )   1:30 p.m. Docket
               Debtor.              )
 6                                   )   - MOTION FOR ORDER IMPOSING
                                     )   TEMPORARY RESTRICTIONS [1528]
 7                                   )   - DEBTOR'S EMERGENCY MOTION TO
                                     )   QUASH SUBPOENA AND FOR ENTRY
 8                                   )   OF PROTECTIVE ORDER [1564,
                                     )   1565]
 9                                   )   - JAMES DONDERO'S MOTION FOR
                                     )   ENTRY OF ORDER REQUIRING
10                                   )   NOTICE AND HEARING [1439]
                                     )
11    _____
                          TRANSCRIPT OF PROCEEDINGS
12           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
13
      WEBEX APPEARANCES:
14
      For the Debtor:              Jeffrey N. Pomerantz
15                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
16                                    13th Floor
                                   Los Angeles, CA  90067-4003
17                                 (310) 277-6910

18    For the Debtor:              John A. Morris
                                   Gregory V. Demo
19                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
20                                 New York, NY  10017-2024
                                   (212) 561-7700
21
      For the Official Committee   Matthew A. Clemente
22    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                   One South Dearborn Street
23                                 Chicago, IL  60603
                                   (312) 853-7539
24

25
```

62

1      The Movants are not parties to those agreements.  The

2  testimony is undisputed that there are many holders of

3  preferred shares and notes that have had no notice of this

4  proceeding that will undoubtedly be impacted by the tying of

5  the hands of the portfolio manager.  The chart that was

6  attached as Exhibit B expressly shows just what a large

7  portion of interested parties and people who would be affected

8  by this motion are not -- they didn't get notice.  There was

9  no attempt to get notice.  There was no attempt to get their

10 consent.  All of that testimony is now in the record, and I

11 think due process alone would prevent the entry or even the

12 consideration of an order of this type.

13      There is nothing improper that's been alleged.  There is

14 no -- there is no allegation of fraud.  There is no allegation

15 of breach of contract of any kind.  There's not even a

16 question of business judgment.  The Movants didn't even do

17 their diligence to ask the Debtor why they made these

18 transactions.  There is nothing in the record that shows that

19 the Debtor, as the portfolio manager of the CLOs, did anything

20 improper.

21      The only thing that the Movants care about is that they

22 don't like the results in two particular trades.  I don't

23 think that that meets their burden of persuasion that the

24 Court should enter an order of this type, and I would like to

25 relieve Mr. Seery of the burden, frankly, and the Court, of

63

 1   having to put on testimony to justify transactions that really

 2   aren't even being questioned, Your Honor.

 3       So the Debtor would respectfully move for the denial of

 4   the motion and the relief sought therein.

 5       THE COURT:  All right.  Your request for a directed

 6   verdict, something equivalent to a directed verdict here, is

 7   granted.  I agree that the Movant has wholly failed to meet

 8   its burden of proof here today to show the Court, persuade the

 9   Court that, as Mr. Morris said, I should essentially tie the

10   hands of the Debtor as a portfolio manager here, as stated.

11   Nothing improper has been alleged.  There has been no showing

12   of a statutory right here, or a contractual right here, on the

13   part of the Movants.

14       I am -- I'm utterly dumbfounded, really.  I agree with the

15   -- I was going to say innuendo; not really innuendo -- I agree

16   with part of the theme, I think, asserted by the Debtor here

17   today that this is Mr. Dondero, through different entities,

18   through a different motion.  I feel like he sidestepped the

19   requirement that I stated last week that if we had a contested

20   hearing on his motion, Dondero's motion, that I was going to

21   require Mr. Dondero to testify.  He apparently worked out an

22   eleventh hour agreement with the Debtor on his motion to avoid

23   that.  But, again, these so-called CLO Motions very clearly,

24   very clearly, in this Court's view, were pursued at his sole

25   direction here.

64

1       This is almost Rule 11 frivolous to me.  You know, we're

2   -- we didn't have a Rule 11 motion filed, and, you know, I

3   guess, frankly, I'm glad that a week before the holidays begin

4   we don't have that, but that's how bad I think it was, Mr.

5   Wright and Mr. Norris.  This is a very, very frivolous motion.

6   Again, no statutory basis for it.  No contractual basis.  You

7   know, you didn't even walk me through the provisions of the

8   contracts.  I guess that would have been fruitless.  But you

9   haven't even shown something equitable, some lack of

10  reasonable business judgment.

11      Bluntly, don't waste my time with this kind of thing

12  again.  You wasted my time.  We have 70 people on the video.

13  Utter waste of time.

14      All right.  So, motion is denied.  Mr. Morris, please

15  upload an order.

16          MR. MORRIS:  Thank you, Your Honor.

17          THE COURT:  All right.  Do we have any other business

18  to accomplish today?

19          MR. POMERANTZ:  I don't think so, Your Honor.  I know

20  we will see you tomorrow in connection with Mr. Daugherty's

21  relief from stay motion.

22          THE COURT:  Well, yeah, we do have that.  Okay.  We

23  will see you tomorrow.  We stand adjourned.

24          MR. CLEMENTE:  Thank you, Your Honor.

25          MR. MORRIS:  Thank you, Your Honor.

65

1           THE CLERK:  All rise.

2           (Proceedings concluded at 3:05 p.m.)

3                       --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                    CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                        **12/17/2020**

23  _____        _____
    Kathy Rehling, CETD-444                         Date
24  Certified Electronic Court Transcriber

25

# EXHIBIT K

012498   APP 0104

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
In Re:                              )    Chapter 11
                                    )
HIGHLAND CAPITAL                    )    Dallas, Texas
MANAGEMENT, L.P.,                   )    Friday, January 8, 2021
                                    )    9:30 a.m. Docket
          Debtor.                   )
                                    )
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,                   )
                                    )
          Plaintiff,                )    PRELIMINARY INJUNCTION
                                    )    HEARING [#2]
v.                                  )
                                    )
JAMES D. DONDERO,                   )
                                    )
          Defendant.                )
                                    )

                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For the Debtor/Plaintiff:   John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700
```

Dondero - Cross                          118

 1   David Klos, who is the person who put the model together, who
 2   has been working on it for six or nine months, and no one else
 3   S has a copy of?  Yes.  Yeah, I have to -- I have to access
 4   him.  I don't believe that's the -- inappropriate or in any
 5   way violating the spirit of the TRO.
 6       I believe settlement in this case is only going to happen
 7   with somebody fostering communication.  And Ellington's role,
 8   which I thought was a good one and I thought he was performing
 9   well as settlement counsel, was an important role.  And I used
10   him for things like -- and Seery also used him for things.  As
11   recently as two days before Ellington was fired, Seery gave
12   him a shared services proposal to negotiate with me.
13   Ellington has always been the go-between from a settlement and
14   a legal standpoint.  I think his role there was -- it was
15   valued.  To try to honor the TRO was things like Multi-Strat,
16   that I didn't remember correctly.  Ninety percent of the time
17   or for the last 20 years I would have gone directly to
18   Accounting and Dave Klos for it, but I purposely went to
19   settlement counsel in terms of Ellington in order to get the
20   Multi-Strat information which we needed in order to put the
21   pot plan together that we went to the Independent Board with
22   at the end of December.
23   Q    (faintly)  And do you recall the questions that Debtor's
24   counsel had regarding the letters sent by K&L Gates to clients
25   of the Debtor?

Dondero - Cross                              119

1          MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2     hearing that question.

3          THE COURT:  Please repeat.

4          MR. BONDS:  Sure.

5     BY MR. BONDS:

6     Q    Do you recall the questions Debtor's counsel had regarding

7     the letters sent by K&L Gates to the clients of the Debtor --

8     to the Debtor?

9     A    Yes.

10    Q    You testified on direct that the letters were sent to do

11    the right thing; is that correct?

12    A    Yes.

13    Q    What did you mean by that?

14    A    I don't want to repeat too much of what I just said, but

15    the Debtor has a contract to manage the CLOs, which in no way

16    is it not in default of.  It doesn't have the staff.  It

17    doesn't have the expertise.  Seery has no historic knowledge

18    on the investments.  The investment staff of Highland has been

19    gutted, with me being gone, with Mark Okada being gone, with

20    Trey Parker being gone, with John Poglitsch being gone.

21         And there's -- there's a couple analysts that are a year

22    or two out of school.  The overall portfolio is in no way

23    being understood, managed, or monitored.  And for it to be

24    amateur hour, incurring losses for no business purpose, when

25    the investors have requested numerous times for their account

1  not to be traded, is crazy to me.  Where the investors say, We

2  just want our account left alone.  We just want to keep the

3  exposure.  And Jim Seery decides no, there's -- I'm going to

4  turn it into cash for no reason.  I'm just going to sell your

5  assets and turn them to cash and incur losses by doing it the

6  week of Thanksgiving and the week of Christmas.  I think it's

7  -- it's shameful.  I'm glad the compliance people and the

8  general counsel at HFAM and NexPoint saw it the same way.  I

9  didn't edit their letters, proof their letters, tell them how

10  to craft their letters.  They did that themselves, with

11  regulatory counsel and personal liability.  They put forward

12  those letters.

13            MR. MORRIS:  Your Honor (garbled) the testimony that

14  Mr. Dondero just gave about these people saw it.  They're not

15  here to testify how they saw it.  We know that Mr. Dondero

16  personally saw and approved the letters before they went out.

17  He can testify what he thinks, what he believes.  I have no

18  problem with that.  But there should be no evidence in the

19  record of what the compliance people thought, believed,

20  understood, anything like that.  It's not right.

21            THE COURT:  All right.  That's essentially a --

22            MR. BONDS:  Your Honor?

23            THE COURT:  -- a hearsay objection, I would say, or

24  lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25  response?

Dondero - Cross                          121

1              MR. BONDS:  Your Honor, my response would be that

2    there are several exhibits the Debtor introduced today that

3    stand for the proposition that the compliance officers were

4    concerned.  So I think there is ample evidence of that in the

5    record.

6              THE COURT:  I didn't --

7              MR. MORRIS:  Your Honor, the letter --

8              THE COURT:  I did not understand what you said is in

9    the record.  Say again.

10             MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11   -- there are references that are replete in the record that

12   have to do with the compliance officers' understanding of the

13   transactions.

14             THE COURT:  I don't know what you're referring to.

15             THE WITNESS:  Your Honor?

16             THE COURT:  I've got a lot of exhibits.  You're going

17   to have to point out what you think --

18             THE WITNESS:  Can I -- can I -- can I -- can I answer

19   for -- that for a second?  The letters that were signed by the

20   compliance people or by the businesspeople at NexPoint and

21   HFAM objecting to the transactions, those letters were their

22   beliefs, their researched beliefs.  They weren't --

23             THE COURT:  Okay.

24             THE WITNESS:  -- micromanaged by me.  You know, they

25   weren't -- I agree with them, but those weren't my beliefs

Dondero - Cross                        122

1   that they've stated.  Those were their own beliefs and their

2   own research, --

3              THE COURT:  All right.

4              THE WITNESS:  -- and the record should reflect --

5              THE COURT:  This is clearly hearsay.  I mean, it's

6   one thing to have a letter, but to go behind the letter and

7   say, you know, what the beliefs inherent in the words were is

8   inadmissible.  All right?  So I strike that.

9              THE WITNESS:  Maybe ask your question again.

10  BY MR. BONDS:

11  Q   Yeah.  What is your understanding of the rights that these

12  parties had and what do you believe that was intended to be

13  conveyed by the compliance officers?

14             MR. MORRIS:  Objection.  Calls -- calls for Mr.

15  Dondero to divine the intent of third parties.  Hearsay.

16             THE COURT:  I sustain.

17             MR. BONDS:  Your Honor, --

18             MR. MORRIS:  No foundation.

19             MR. BONDS:  -- I don't agree.  I think that this is

20  asking Mr. Dondero what he thinks.

21             MR. MORRIS:  The letters speak for themselves, Your

22  Honor.

23             THE COURT:  Okay.  I sustain --

24             MR. MORRIS:  And Mr. --

25             THE COURT:  I sustain the objection.

Dondero - Cross                    123

 1          MR. MORRIS:  All right.  Thank you.

 2          THE WITNESS:  Ask me what I know.  Or ask me what my

 3  concerns --

 4  BY MR. BONDS:

 5  Q    Let me ask you this.  What were your concerns relating to

 6  the compliance officers' exhibit?

 7  A    My concerns regarding the transaction, the transactions,

 8  which may repeat what I've said before, but I do want to make

 9  sure it gets in the record.  So if we have to make a -- these

10  were my concerns, whether or not they were the compliance

11  people's concerns.  I believe they were, and I believe they

12  were similar, but I'm just going to say these are -- these

13  were my concerns.

14      The Debtor, with its contractual -- with its contract with

15  the CLOs, were in no way -- was in no way compliant with that

16  contract or not in default of that contract.  Bankruptcy is a

17  reason for default.  Not having the key men specified in the

18  contract currently employed by the Advisor is a violation.

19  Not having adequate investment staff to manage the portfolio

20  is a violation of that contract.  Announcing that you're

21  laying off everybody and will no longer be a registered

22  investment advisor is proclaiming that you, if you even have

23  any -- any -- pretend that you're qualified or in compliance

24  with the contract now, you're broadcasting that you won't be

25  in three weeks, are -- are all mean that you're not in good

204

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 4:09 p.m.)

3                       --oOo--

18                       CERTIFICATE

19       I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
20   above-entitled matter.

21    **/s/ Kathy Rehling**                    **01/11/2021**

22   _____      _____
Kathy Rehling, CETD-444                      Date
23   Certified Electronic Court Transcriber

# EXHIBIT L

012507
APP 0012

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                           DALLAS DIVISION

 3                                  )   Case No. 19-34054-sgj-11
      In Re:                        )   Chapter 11
 4                                  )
      HIGHLAND CAPITAL              )   Dallas, Texas
 5    MANAGEMENT, L.P.,             )   Tuesday, January 26, 2021
                                    )   9:30 a.m. Docket
 6            Debtor.               )
                                    )   MOTION FOR ENTRY OF ORDER
 7                                  )   AUTHORIZING DEBTOR TO
                                    )   IMPLEMENT KEY EMPLOYEE
 8                                  )   PLAN [1777]
      _____)
 9                                  )
      HIGHLAND CAPITAL              )   Adversary Proceeding 21-3000-sjg
10    MANAGEMENT, L.P.,             )
                                    )
11                                  )
              Plaintiff,            )
12                                  )
      v.                            )   PLAINTIFF'S MOTION FOR A
13                                  )   PRELIMINARY INJUNCTION AGAINST
      HIGHLAND CAPITAL              )   CERTAIN ENTITIES OWNED AND/OR
14    MANAGEMENT FUND ADVISORS,     )   CONTROLLED BY MR. JAMES
      L.P., et al.                  )   DONDERO [5]
15                                  )
              Defendants.           )
16    _____)

17                        TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18                    UNITED STATES BANKRUPTCY JUDGE.

19    WEBEX APPEARANCES:

20    For the Debtor:            Jeffrey Nathan Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
21                               10100 Santa Monica Blvd.,
                                  13th Floor
22                               Los Angeles, CA  90067-4003
                                 (310) 277-6910

23    For the Debtor:            John A. Morris
                                 PACHULSKI STANG ZIEHL & JONES, LLP
24                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
25                               (212) 561-7700
```

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 01/08/25   Page 164 of 351   PageID 13440

Appendix   Page 108 of 249

250

1   can't talk them about specifically, but they're at least 20

2   percent better than what the Debtor has put forward as far as

3   a plan.  And what we put forward is elegant, it's simpler, it

4   treats the employees fairly, it gives the business continuity,

5   it gives investors continuity, and it's not just a harsh,

6   punitive liquidation that's going to end up in a myriad of

7   litigation.

8       We're paying a premium, it's a capitulation price, to try

9   and get to some kind of settlement.  And I encourage you to

10  look at it.  It's elegant.  It's straightforward.  It's

11  simple.  And now that you've encouraged and gotten us up to a

12  number that's well in excess of the Debtor, maybe a little

13  pressure on other people to treat employees fairly, maybe not

14  liquidate a business that's important in Dallas, that has been

15  a big business for a number of years, doing enormous good

16  things for a lot of people.

17      You know, we went into bankruptcy with $450 million of

18  assets and almost no debt.  And we've been driven into the

19  ground by the process.  And then the plan is to just harshly

20  liquidate going forward.  I -- I -- it's crazy.  I don't know

21  what else to do to stop the train other than what we've

22  offered.

23          THE COURT:  All right.  Well, I hear what you're

24  saying, and I do, just because -- I don't know if you left the

25  room or not, but we did have discussion of Section 206 of the

251

1   Investment Advisers Act today.  It was put on the screen.  Mr.

2   Post was asked what was unlawful as far as what had happened

3   here, what was going on here, what was fraudulent, deceptive,

4   or manipulative, in parsing through the words of the statute.

5   And he said Mr. Seery engaged in deceptive acts because he

6   wasn't trying to maximize value.  Okay?  I'm not an expert on

7   the Investment Advisers Act, but I know that that was not a

8   deceptive act.

9        And so I'll allow the plan to be filed under seal, but

10   it's not going to be unsealed absent an order of the Court.

11   Okay?  So we'll just leave it at that for now.  And while I

12   still encourage good-faith negotiations here, I've said it

13   umpteen times, where you're tired of the cliché, probably:

14   The train is leaving the station.  And if you want the Court

15   to have patience in the process and if you want the parties to

16   cooperate in good faith, it might help if we didn't have

17   things like Dugaboy and Get Good Trust filing a motion for an

18   examiner 15 months into the case.

19        I mean, it feels to me, Mr. Dondero, whether I'm right or

20   wrong, that it's like you've got a twofold approach here:  I

21   either get the company back or I burn the house down.  And I'm

22   telling you right now, if we don't have agreements, --

23            MR. DONDERO:  That's not true.

24            THE COURT:  -- if we don't have agreements and we

25   come back on the 5th for a continuation of this hearing and a

252

motion to hold you in contempt, you know, I'm leaning right

now, based on what I've heard so far, and I know I haven't

heard everything, but I'm leaning right now towards finding

contempt and shifting a whole bundle of attorneys' fees.

That, to me, seems like the likely place we're heading.

    I mean, I commented at the December hearing on the

preliminary injunction against you personally that it had been

like a $250,000 hearing, I figured, okay, just guesstimating

everybody's billable rate times the hours we spent.  Well,

here we were again, and I know we've got all this time outside

the courtroom preparing, taking depositions.  I mean, what

else is a judge to think except, by God, let's drive up

administrative expenses as much as we can; if we can't win,

we're going to go down fighting?  That's what this looks like.

Okay?  So if it's not really what's going on, then you've got

to work hard to change my perceptions at this point.

      MR. RUKAVINA:  Your Honor, I hear everything what

you're saying, and I'm going to discuss it very bluntly with

my clients.  But we're being asked not to exercise contract

rights in the future.  This is not a contempt hearing.  And

Your Honor, we did ask and offered the estate a million

dollars, found money, plus to waive almost all our plan

objections, if they would just put this case on pause for 30

days.

    So we are trying.  We are trying creative solutions here.

253

1   We know that the train is leaving.  We've put our money where

2   our mouth is.  We will continue trying.  But Your Honor, this

3   is not a contempt proceeding, and my clients are not Mr.

4   Dondero.  You've heard they're independent boards.

5          MR. POMERANTZ:  I can't leave that last comment

6   without a response.  Yes, there was an offer of a million

7   dollars, by an entity that owes the estate multiples of that.

8   So they are offering to pay us something that they already owe

9   us.  So Mr. Rukavina continues try to do this.  We will not

10  stand for it.

11         MR. RUKAVINA:  That is not a fair statement, sir.  I

12  misrepresented nothing.  We were offering you a million

13  dollars, with no conditions, earned upon receipt, with no

14  credit, no deduction for any of our liability.  So you're free

15  to say no, sir, but you're not going to tell the judge that I

16  misrepresented something.

17         THE COURT:  All right.

18         MR. POMERANTZ:  Should tell the Court --

19         THE COURT:  You know what?

20         MR. POMERANTZ:  -- that that entity owed the Debtor.

21         THE COURT:  You know what?  You know what?  I am more

22  focused on, Mr. Rukavina, your comment that this Court can't

23  enjoin your clients from exercising contractual rights when,

24  again, in January of 2020, the representation was made and it

25  was ordered, "Mr. Dondero shall not cause any related entity

254

1   to terminate any agreements with the Debtor." Okay? That was

2   -- go back and look at the transcript. That was so meaningful

3   to me.

4      We were facing a possible trustee. And that's what I did

5   in the *Acis* case. Okay? I had a Chapter 11 trustee. And it

6   was not a perfect fit, to be sure. But it is where we were

7   heading in this case, had the lawyers and parties not

8   negotiated what they did. That was a very important

9   provision, convincing me that, you know what, I think the

10   structure they've got will be better than a trustee. And it

11   has, for the most part. But the fees have gone out the roof,

12   and I lay that at the feet of Mr. Dondero, for the most part.

13   Okay? We have a bomb thrown every five minutes by either him

14   personally or the Dugaboy or the Get Good Trust or the Funds

15   or the Advisors or I don't know who else. Okay?

16      So the train is leaving the station, unless you all come

17   to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18   -- grand solution here. Okay? If you get there in the next

19   few days, wonderful. Okay? But I don't know what else to say

20   except I'm tired of the carpet-bombing, and if I had to rule

21   this minute, there would be a huge amount of fee-shifting for

22   what we went through today, for what we went through in

23   December, for the restriction motion that, after I called it

24   frivolous, the lawyers were sending letters pretty much

25   regurgitating the same arguments. All right. So, not a happy

012513

255

1    camper.

2        But upload your order on the motion to seal the plan.

3    And, again, it's not going to be unsealed absent a further

4    order of the Court.  And if you all come to me next week and

5    say, hey, we've got something in the works here, okay, I'll

6    consider unsealing it and letting you go down a different

7    path.  But I'm not naïve.  I feel like this is just more

8    burning the house down, maybe.  I don't know.  I hope I'm

9    wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10   see you next week.

11            MR. POMERANTZ:  Thank you, Your Honor.

12            MR. MORRIS:  Thank you, Your Honor.

13            THE COURT:  All right.  We're adjourned.

14            MR. RUKAVINA:  Thank you, Your Honor.

15            THE CLERK:  All rise.

16       (Proceedings concluded at 6:08 p.m.)

17                        --oOo--

18

19

20                     CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                      **01/28/2021**

24   _____     _____

25   Kathy Rehling, CETD-444                    Date
     Certified Electronic Court Transcriber

012514

255

1  camper.

2      But upload your order on the motion to seal the plan.

3  And, again, it's not going to be unsealed absent a further

4  order of the Court.  And if you all come to me next week and

5  say, hey, we've got something in the works here, okay, I'll

6  consider unsealing it and letting you go down a different

7  path.  But I'm not naïve.  I feel like this is just more

8  burning the house down, maybe.  I don't know.  I hope I'm

9  wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11          MR. POMERANTZ:  Thank you, Your Honor.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  All right.  We're adjourned.

14          MR. RUKAVINA:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 6:08 p.m.)

17                    --oOo--

18

19

20                 CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **01/28/2021**

24  _____    _____

25  Kathy Rehling, CETD-444                       Date
    Certified Electronic Court Transcriber

012515

# EXHIBIT M

012516

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                              )    Case No. 19-34054-sgj-11
  In Re:                      )    Chapter 11
                              )
  HIGHLAND CAPITAL            )    Dallas, Texas
  MANAGEMENT, L.P.,           )    Monday, February 8, 2021
                              )    9:00 a.m. Docket
          Debtor.            )
                              )    BENCH RULING ON CONFIRMATION
                              )    HEARING [1808] AND AGREED
                              )    MOTION TO ASSUME [1624]
  _____    )

                      TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

  WEBEX APPEARANCES:

  For the Debtor:            Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

  For the Official Committee Matthew A. Clemente
  of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539

  For James Dondero:         D. Michael Lynn
                             John Y. Bonds, III
                             Bryan C. Assink
                             BONDS ELLIS EPPICH SCHAFER
                              JONES, LLP
                             420 Throckmorton Street,
                              Suite 1000
                             Fort Worth, TX  76102
                             (817) 405-6900

  For Get Good Trust and     Douglas S. Draper
  Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
                             650 Poydras Street, Suite 2500
                             New Orleans, LA  70130
                             (504) 299-3300
```

6

1    of evidence, considering testimony from five witnesses and

2    thousands of pages of documentary evidence, in considering

3    whether to confirm the Plan pursuant to Sections 1129(a) and

4    (b) of the Bankruptcy Code.

5         The Court finds and concludes that the Plan meets all of

6    the relevant requirements of Sections 1123, 1124, and 1129 of

7    the Code, and other applicable provisions of the Bankruptcy

8    Code, but is issuing this detailed ruling to address certain

9    pending objections to the Plan, including but not limited to

10   objections regarding certain Exculpations, Releases, Plan

11   Injunctions, and Gatekeeping Provisions of the Plan.

12        The Court reserves the right to amend or supplement this

13   oral ruling in more detailed findings of fact, conclusions of

14   law, and an Order.

15        First, by way of introduction, this case is not your

16   garden-variety Chapter 11 case.  Highland Capital Management,

17   LP is a multibillion dollar global investment advisor,

18   registered with the SEC pursuant to the Investment Advisers

19   Act of 1940.  It was founded in 1993 by James Dondero and Mark

20   Okada.  Mr. Okada resigned from his role with Highland prior

21   to the bankruptcy case being filed.  Mr. Dondero was in

22   control of the Debtor as of the day it filed bankruptcy, but

23   agreed to relinquish control of it on or about January 9,

24   2020, pursuant to an agreement reached with the Official

25   Unsecured Creditors' Committee, which will be described later.

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 01/28/25   Appendix   Page 00135249   Page 174 of 351   PageID 13450

7

1      Although Mr. Dondero remained on as an unpaid employee and

2  portfolio manager with the Debtor after January 9, 2020, his

3  employment with the Debtor terminated on October 9, 2020.  Mr.

4  Dondero continues to work for and essentially control numerous

5  nondebtor companies in the Highland complex of companies.

6      The Debtor is headquartered in Dallas, Texas.  As of the

7  October 2019 petition date, the Debtor employed approximately

8  76 employees.

9      Pursuant to various contractual arrangements, the Debtor

10  provides money management and advisory services for billions

11  of dollars of assets, including CLOs and other investments.

12  Some of these assets are managed pursuant to shared services

13  agreements with a variety of affiliated entities, including

14  other affiliated registered investment advisors.  In fact,

15  there are approximately 2,000 entities in the Byzantine

16  complex of companies under the Highland umbrella.

17      None of these affiliates of Highland filed for Chapter 11

18  protection.  Most, but not all, of these entities are not

19  subsidiaries, direct or indirect, of Highland.  And certain

20  parties in the case preferred not to use the term "affiliates"

21  when referring to them.  Thus, the Court will frequently refer

22  loosely to the so-called, in air quotes, "Highland complex of

23  companies" when referring to the Highland enterprise.  That's

24  a term many of the lawyers in the case use.

25      Many of the companies are offshore entities, organized in

8

1   such faraway jurisdictions as the Cayman Islands and Guernsey.

2       The Debtor is privately owned 99.5 percent by an entity

3   called Hunter Mountain Investment Trust; 0.1866 percent by the

4   Dugaboy Investment Trust, a trust created to manage the assets

5   of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6   personally and through family trusts; and 0.25 percent by

7   Strand Advisors, Inc., the general partner.

8       The Debtor's primary means of generating revenue has

9   historically been from fees collected for the management and

10  advisory services provided to funds that it manages, plus fees

11  generated for services provided to its affiliates.

12      For additional liquidity, the Debtor, prior to the

13  petition date, would sell liquid securities in the ordinary

14  course, primarily through a brokerage account at Jefferies,

15  LLC.  The Debtor would also, from time to time, sell assets at

16  nondebtor subsidiaries and distribute those proceeds to the

17  Debtor in the ordinary course of business.

18      The Debtor's current CEO, James Seery, credibly testified

19  that the Debtor was "run at a deficient for a long time and

20  then would sell assets or defer employee compensation to cover

21  its deficits."  This Court cannot help but wonder if that was

22  necessitated because of enormous litigation fees and expenses

23  that Highland was constantly incurring due to its culture of

24  litigation, as further addressed hereafter.

25      Highland and this case are not garden-variety for so many

14

1  11 case is its postpetition corporate governance structure.

2  Highland filed bankruptcy October 16, 2019.  Contentiousness

3  with the Creditors' Committee began immediately, with first

4  the Committee's request for a change of venue from Delaware to

5  Dallas, and then a desire by the Committee and the U.S.

6  Trustee for a Chapter 11 or 7 trustee to be appointed due to

7  concerns over and distrust of Mr. Dondero and his numerous

8  conflicts of interest and alleged mismanagement or worse.

9      After many weeks of the threat of a trustee lingering, the

10 Debtor and the Creditors' Committee negotiated and the Court

11 approved a corporate governance settlement on January 9, 2020

12 that resulted in Mr. Dondero no longer being an officer or

13 director of the Debtor or of its general partner, Strand.

14     As part of the court-approved settlement, three eminently-

15 qualified Independent Directors were chosen by the Creditors'

16 Committee and engaged to lead Highland through its Chapter 11

17 case.  They were James Seery, John Dubel, and Retired

18 Bankruptcy Judge Russell Nelms.  They were technically the

19 Independent Directors of Strand, the general partner of the

20 Debtor.  Mr. Dondero had previously been the sole director of

21 Strand, and thus the sole person in ultimate control of the

22 Debtor.

23     The three independent board members' resumes are in

24 evidence.  James Seery eventually was named CEO of the Debtor.

25 Suffice it to say that this changed the entire trajectory of

15

1  the case.  This saved the Debtor from a trustee.  The Court

2  trusted the new directors.  The Creditors' Committee trusted

3  them.  They were the right solution at the right time.

4       Because of the unique character of the Debtor's business,

5  the Court believed this solution was far better than a

6  conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7  particular, knew and had vast experience at prominent firms

8  with high-yield and distressed investing similar to the

9  Debtor's business.  Mr. Dubel had 40 years of experience

10  restructuring large, complex businesses and serving on their

11  boards of directors in this context.  And Retired Judge Nelms

12  had not only vast bankruptcy experience but seemed

13  particularly well-suited to help the Debtor maneuver through

14  conflicts and ethical quandaries.

15       By way of comparison, in the Chapter 11 case of Acis, the

16  former affiliate of Highland that this Court presided over two

17  or three years ago, which company was much smaller in size and

18  scope than Highland, managing only five or six CLOs, a Chapter

19  11 trustee was elected by the creditors that was not on the

20  normal rotation panel for trustees in this district, but

21  rather was a nationally-known bankruptcy attorney with more

22  than 45 years of large Chapter 11 case experience.  This

23  Chapter 11 trustee performed valiantly, but was sued by

24  entities in the Highland complex shortly after he was

25  appointed, which this Court had to address.  The Acis trustee

16

1    could not get Highland and its affiliates to agree to any

2    actions taken in the case, and he finally obtained

3    confirmation of a plan over Highland and its affiliates'

4    objections in his fourth attempted plan, which confirmation

5    then was promptly appealed by Highland and its affiliates.

6        Suffice it to say it was not easy to get such highly-

7    qualified persons to serve as independent board members and

8    CEO of this Debtor.  They were stepping into a morass of

9    problems.  Naturally, they were worried about getting sued, no

10   matter how defensible their efforts might be, given the

11   litigation culture that enveloped Highland historically.  It

12   seemed as though everything always ended in litigation at

13   Highland.

14       The Court heard credible testimony that none of them would

15   have taken on the role of Independent Director without a good

16   D&O insurance policy protecting them, without indemnification

17   from Strand, guaranteed by the Debtor; without exculpation for

18   mere negligence claims; and without a gatekeeper provision,

19   such that the Independent Directors could not be sued without

20   the bankruptcy court, as a gatekeeper, giving a potential

21   plaintiff permission to sue.

22       With regard to the gatekeeper provision, this was

23   precisely analogous to what bankruptcy trustees have pursuant

24   to the so-called "Barton Doctrine," which was first

25   articulated in an old U.S. Supreme Court case.

17

1    The Bankruptcy Court approved all of these protections in

2  a January 9, 2020 order.  No one appealed that order.  And Mr.

3  Dondero signed the settlement agreement that was approved by

4  that order.

5    An interesting fact about the D&O policy came out in

6  credible testimony at the confirmation hearing.  Mr. Dubel and

7  an insurance broker from Aon, named Marc Tauber, both credibly

8  testified that the gatekeeper provision was needed because of

9  the so-called, and I quote, "Dondero Exclusion" in the

10  insurance marketplace.

11    Specifically, the D&O insurers in the marketplace did not

12  want to cover litigation claims that might be brought against

13  the Independent Directors by Mr. Dondero because the

14  marketplace of D&O insurers are aware of Mr. Dondero's

15  litigiousness.  The insurers would not have issued a D&O

16  policy to the Independent Directors without either the

17  gatekeeping provision or a "Dondero Exclusion" being in the

18  policy.

19    Thus, the gatekeeper provision was part of the January 9,

20  2020 settlement.  There was a sound business justification for

21  it.  It was reasonable and necessary.  It was consistent with

22  the Barton Doctrine in an extremely analogous situation --

23  *i.e.*, the independent board members were analogous to a three-

24  headed trustee in this case, if you will.  Mr. Dondero signed

25  off on it.  And, again, no one ever appealed the order

18

1   approving it.

2       The Court finds that, like the Creditors' Committee, the

3   independent board members here have been resilient and

4   unwavering in their efforts to get the enormous problems in

5   this case solved.  They seem to have at all times negotiated

6   hard and with good faith.  As noted previously, they changed

7   the entire trajectory of this case.

8       Still another reason why this was not your garden-variety

9   case was the mediation effort.  In summer of 2020, roughly

10   nine months into the Chapter 11 case, this Court ordered

11   mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12   and Mr. Dondero.  The Court selected co-mediators, since this

13   seemed like such a Herculean task, especially during COVID-19,

14   where people could not all be in the same room.  Those co-

15   mediators were Retired Bankruptcy Judge Allan Gropper from the

16   Southern District of New York, who had a distinguished career

17   presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18   who likewise has had a distinguished career, first as a

19   partner in a preeminent law firm working on complex Chapter 11

20   cases, and subsequently as a mediator and arbitrator in

21   Houston, Texas.

22       As noted earlier, the Acis claim was settled during the

23   mediation, which seemed nothing short of a miracle to this

24   Court, and the UBS claim was settled many months later, and

25   this Court believes the groundwork for that ultimate

19

1  settlement was laid, or at least helped, through the

2  mediation.  And as earlier noted, other enormous claims have

3  been settled during this case, including that of the Redeemer

4  Committee, who, again, had asserted approximately or close to

5  a $200 million claim; HarbourVest, who asserted a $300 million

6  claim; and Patrick Daugherty, who asserted close to a $40

7  million claim.

8      This Court cannot stress strongly enough that the

9  resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

20

1    that the Debtor filed shortly before the confirmation hearing

2    that, among other things, show the estimated distribution to

3    creditors and compare plan treatment to a likely disbursement

4    in a Chapter 7.

5         These do not constitute a materially adverse change to the

6    treatment of any creditors or interest holders.  They merely

7    update likely distributions based on claims that have now been

8    settled, and they've otherwise incorporated more recent

9    financial data.  This happens often before confirmation

10   hearings.  The Court finds that it did not mislead or

11   prejudice any creditors or interest holders, and certainly

12   there was no need to resolicit the Plan.

13        The only Objectors to the Plan left at this time were Mr.

14   Dondero and entities that the Court finds are controlled by

15   him.  The standing of these entities to object to the Plan

16   exists, but the remoteness of their economic interest is

17   noteworthy, and the Court questions the good faith of the

18   Objectors.  In fact, the Court has good reason to believe that

19   these parties are not objecting to protect economic interests

20   they have in the Debtor, but to be disruptors.

21        Mr. Dondero wants his company back.  This is

22   understandable.  But it's not a good faith basis to lob

23   objections to the Plan.  The Court has slowed down

24   confirmation multiple times on the current Plan and urged the

25   parties to talk to Mr. Dondero.  The parties represent that

21

1   they have, and the Court believes that they have.

2       Now, to be specific about the remoteness of the objectors'

3   interests, the Court will address them each separately.

4   First, Mr. Dondero has a pending objection. Mr. Dondero's

5   only economic interest with regard to the Debtor at this point

6   is an unliquidated indemnification claim. And based on

7   everything this Court has heard, his indemnification claim

8   will be highly questionable at this juncture.

9       Second, a joint objection has been filed by the Dugaboy

10   Trust and the Get Good Trust. As for the Dugaboy Trust, it

11   was created to manage the assets of Mr. Dondero and his

12   family, and it owns a 0.1866 percent limited partnership

13   interest in the Debtor. The Court is not clear what economic

14   interest the Get Good Trust has, but it likewise seems to be

15   related to Mr. Dondero, and it has been represented to the

16   Court numerous times that the trustee is Mr. Dondero's college

17   roommate.

18       Another group of Objectors that has joined together in one

19   objection is what the Court will refer to as the Highland and

20   NexPoint Advisors and Funds. The Court understands they

21   assert disputed administrative expense claims against the

22   estate. While the evidence presented was that they have

23   independent board members that run these companies, the Court

24   was not convinced of their independence from Mr. Dondero.

25   None of the so-called independent board members of these

22

1    entities have ever testified before the Court.  Moreover, they

2    have all been engaged with the Highland complex for many

3    years.

4        The witness who testified on these Objectors' behalves at

5    confirmation, Mr. Jason Post, their chief compliance officer,

6    resigned from Highland after more than twelve years in October

7    2020, at the same time that Mr. Dondero resigned or was

8    terminated by Highland.  And a prior witness recently for

9    these entities whose testimony was made part of the record at

10    the confirmation hearing essentially testified that Mr.

11    Dondero controlled these entities.

12        Finally, various NexBank entities objected to the Plan.

13    The Court does not believe they have liquidated claims.  Mr.

14    Dondero appears to be in control of these entities as well.

15        To be clear, the Court has allowed all of these objectors

16    to fully present arguments and evidence in opposition to

17    confirmation, even though their economic interests in the

18    Debtor appear to be extremely remote and the Court questions

19    their good faith.  Specifically on that latter point, the

20    Court considers them all to be marching pursuant to the orders

21    of Mr. Dondero.

22        In the recent past, Mr. Dondero has been subject to a TRO

23    and preliminary injunction by the Bankruptcy Court for

24    interfering with the current CEO's management of the Debtor in

25    specific ways that were supported by evidence.  Around the

23

1   time that this all came to light and the Court began setting

2   hearings on the alleged interference, Mr. Dondero's company

3   phone supplied to him by Highland, which he had been asked to

4   turn in, mysteriously went missing.  The Court merely mentions

5   this in this context as one of many reasons that the Court has

6   to question the good faith of Mr. Dondero and his affiliated

7   objectors.

8       The only other pending objection besides these objections

9   of the Dondero and Dondero-controlled entities is an objection

10  of the United States Trustee pertaining to the release,

11  exculpation, and injunction provisions in the Plan.

12      In juxtaposition to these pending objections, the Court

13  notes that the Debtor has resolved earlier-filed objections to

14  the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15  Ltd., numerous local taxing authorities, and certain current

16  and former senior-level employees of the Debtor.

17      With that rather detailed factual background addressed,

18  because certainly context matters here, the Court now

19  addresses what it considers the only serious objections raised

20  in connection with confirmation.  Specifically, the Plan

21  contain certain releases, exculpation, plan injunctions, and a

22  gatekeeper provision which are obviously not fully consensual,

23  since there are objections.  Certainly, these provisions are

24  mostly consensual when you consider that parties with hundreds

25  of millions of dollars' worth of legitimate claims have not

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 10-7   Filed 10/06/25   Appendix   Page 186 of 351   PageID 13462

36

1    Now, after all of that, this Court believes the following

2    can be gleaned from *Pacific Lumber*.  First, the Fifth Circuit

3    hinted that consensual exculpations and/or consensual

4    nondebtor third-party releases are permissible.  The Court

5    was, of course, dealing with nonconsensual exculpations in

6    *Pacific Lumber*.  In this regard, I note Page 252, where the

7    Court cited various prior Fifth Circuit authority and then

8    stated, "These cases seem broadly to foreclose nonconsensual

9    nondebtor releases and permanent injunctions."

10    The second thing that can be gleaned from *Pacific Lumber*:

11    The Fifth Circuit hinted that nondebtor releases may be

12    permissible in cases involving global settlements of mass

13    claims against the debtors and co-liable parties.  The Court,

14    of course, referred to 524(g), but various other cases which

15    approved nondebtor releases where mass claims were channeled

16    to a specific pool of assets.

17    Third, the Fifth Circuit outright held that exculpations

18    from negligence for a Creditors' Committee and its members are

19    permissible because the concept is both consistent with

20    1103(c), "which implies Committee members have qualified

21    immunity for actions within the scope of their duties," and a

22    good policy result, since "if members of the Committee can be

23    sued by persons unhappy with the outcome of the case, it will

24    be extremely difficult to find members to serve on an official

25    committee."

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 01/06/25   Appendix Page 1406 of 5249   Page 187 of 351   PageID 13463

37

1    Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2  that *res judicata* may bar complaints regarding an

3  impermissible plan release, citing to its earlier *Republic*

4  *Supply v. Shoaf* opinion.

5    Now, being ever-mindful of the Fifth Circuit's words in

6  *Pacific Lumber*, this Court cannot help but wonder about at

7  least three things.

8    First, did the Fifth Circuit leave open the door that

9  facts/equities might sometimes justify approval of an

10  exculpation for a person other than a Creditors' Committee and

11  its members?  For example, the Fifth Circuit stated, in

12  referring to the plan proponents Marathon and MRC, that "Any

13  costs the released parties might incur defending against suits

14  alleging such negligence are unlikely to swamp either of these

15  parties or the consummated reorganization."  Here, this Court

16  can easily expect the proposed exculpated parties to incur

17  costs that could swamp them and the reorganization based on

18  the past litigious conduct of Mr. Dondero and his controlled

19  entities.  Do these words of the Fifth Circuit hint that

20  equities/economics might sometimes justify an exculpation?

21    Second, did the Fifth Circuit's rationale for permitted

22  exculpations to Creditors' Committee and their members, which

23  was clearly policy-based, based on their implied qualified

24  immunity flowing from their duties in Section 1103 and their

25  disinterestedness, and the importance of their role in a

38

 1   Chapter 11 case, did this rationale leave open the door to

 2   sometimes permitting exculpations to other parties in a

 3   particular Chapter 11 case besides Creditors' Committees and

 4   their members?  For example, in a situation such as the

 5   Highland case, in which Independent Directors, brought in to

 6   avoid a trustee, are more like a Creditors' Committee than an

 7   incumbent board of directors.

 8        Third, the Fifth Circuit's sole statutory basis was

 9   Section 524(e).  This Court would humbly submit that this is a

10   statute dealing with prepetition liability in which some

11   nondebtor is liable with the Debtor.  Exculpation is a concept

12   dealing with postpetition liability.

13        The Ninth Circuit recently, in a case called *Blixseth v.*

14   *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15   validity of an exculpation clause incorporated into a

16   confirmed Chapter 11 plan that purported to absolve certain

17   nondebtor parties that were "closely involved" in drafting the

18   plan.  They were the largest secured creditor, a purchaser,

19   and an individual who was an indirect owner of certain of the

20   debtor companies.  The exculpation was from any negligence,

21   liability, for "any act or omission in connection with,

22   related to, or arising out of the Chapter 11 cases."

23        By the time the appeal was before the Ninth Circuit, the

24   only issue was the propriety of the exculpation clause as to

25   the large secured creditor, which was also a plan proponent,

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 10-7   Filed 04/08/25   Page 189 of 351   PageID 13465
Appendix   Page 1083 of 1249

39

1  since all the other exculpated parties had settled with the

2  appellant.

3      The Court, in determining that the exculpation clause was

4  permissible as to the secured lender, concluded that Section

5  524(e) "does not bar a narrow exculpation clause of the kind

6  here at issue -- that is, one focused on actions of various

7  participants in the plan approval process and relating only to

8  that process," Page 1082.  Why?  Because "Section 524(e)

9  establishes that discharge of a debt of the debtor does not

10  affect the liability of any other entity on such debt."  In

11  other words, the discharge in no way affects the liability of

12  any other entity for the discharged debt.  By its terms,

13  524(e) prevents a bankruptcy court from extinguishing claims

14  of creditors against nondebtors over the very discharged debt

15  through the bankruptcy proceedings.

16      The Court went on to explicitly disagree with *Pacific*

17  *Lumber* in its analysis of 524(e), reiterating that an

18  exculpation clause covers only liabilities arising from the

19  bankruptcy proceedings and not of any of the debtor's

20  discharged debt.  Footnote 7, Page 1085.

21      Ultimately, the Court held that under Section 105(a),

22  which empowers a bankruptcy court to issue any order, process,

23  or judgment that is necessary or appropriate to carry out the

24  provisions of Chapter 11 and Section 1123, which establishes

25  the appropriate content of the bankruptcy plan, under these

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 7   Filed 01/46/25   Page 190 of 351   PageID 13466
Appendix   Page 14 of 249

40

1    sections, the bankruptcy court had authority to approve an

2    exculpation clause intended to trim subsequent litigation over

3    acts taken during the bankruptcy proceedings and so render the

4    plan viable.

5        This Court concludes that, just as the Fifth Circuit left

6    open the door for consensual exculpations and releases in

7    *Pacific Lumber*, just as it left open the door for consensual

8    exculpations and releases in *Pacific Lumber*, its dicta

9    suggests that an exculpation might be permissible if there is

10   a showing that "costs that the released parties might incur

11   defending against suits alleging such negligence are likely to

12   swamp either the Exculpated Parties or the reorganization."

13   Again, that was a quote from the Fifth Circuit.

14       If ever there were a risk of that happening in a Chapter

15   11 reorganization, it is this one.  The Debtor's current CEO

16   credibly testified that Mr. Dondero has said outside the

17   courtroom that if Mr. Dondero's own pot plan does not get

18   approved, that he will "burn the place down."  Here, this

19   Court can easily expect the proposed exculpated parties might

20   expect to incur costs that could swamp them and the

21   reorganization process based on the past litigious conduct of

22   Mr. Dondero and his controlled entities.

23       Additionally, this Court concludes that the Fifth

24   Circuit's rationale in *Pacific Lumber* for permitted

25   exculpations to Creditors' Committees and their members, which

41

1  was clearly policy-based based on their implied qualified

2  immunity flowing from Section 1103 and their importance in a

3  Chapter 11 case, leaves the door open to sometimes permitting

4  exculpations to other parties in a particular Chapter 11 case

5  besides a UCC and its members.

6      Again, if there was ever such a case, the Court believes

7  it is this one, in which Independent Directors were brought in

8  to avoid a trustee and are much more like a Creditors'

9  Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14      The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22      Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

44

```
 1   appropriate.  They are entirely consistent with and

 2   permissible under Bankruptcy Code Sections 1123(a)(5),

 3   1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

 4   Rule 3016(c), which articulates the form that a plan

 5   injunction must be set forth in a plan.

 6        The Court finds the objections to the Plan Injunctions to

 7   be unfounded, and they are thus overruled without much

 8   discussion here.

 9        Now, lastly, the Gatekeeper Provision.  It appears at

10   Paragraph 4 of Article IX.F of the Plan and provides, in

11   pertinent part, "Subject in all respects to Article XII.D, no

12   Enjoined Party may commence or pursue a claim or cause of

13   action of any kind against any Protected Party that arose or

14   arises from or is related to the Chapter 11 case, the

15   negotiation of the Plan, the administration of the Plan, or

16   property to be distributed under the Plan, the wind-down of

17   the business of the Debtor or Reorganized Debtor, the

18   administration of the Claimant Trust or the Litigation Sub-

19   Trust, or the transactions in furtherance of the foregoing,

20   without the Bankruptcy Court (1) first determining, after

21   notice and a hearing, that such claim or cause of action

22   represents a colorable claim of any kind, including but not

23   limited to negligence, bad faith, criminal misconduct and

24   willful misconduct, fraud, or gross negligence against a

25   Protected Party; and (2) specifically authorizing such
```

45

1   Enjoined Party to bring such claim or cause of action against

2   such Protected Party, provided, however, that the foregoing

3   will not apply to a claim or cause of action against Strand or

4   against any employee other than with respect to actions taken,

5   respectively, by Strand or any such employee from the date of

6   appointment of the Independent Directors through the effective

7   date.  The Bankruptcy Court will have sole and exclusive

8   jurisdiction to determine whether a claim or cause of action

9   is colorable and, only to the extent legally permissible and

10   as provided for in Article XI, shall have jurisdiction to

11   adjudicate the underlying colorable claim or cause of action."

12       This gatekeeper provision appears necessary and reasonable

13   in light of the litigiousness of Mr. Dondero and his

14   controlled entities that has been described at length herein.

15   Provisions similar to this have been approved in this district

16   in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17   provision is within the spirit of the Supreme Court's Barton

18   Doctrine.  And it appears consistent with the notion of a pre-

19   filing injunction to deter vexatious litigants that has been

20   approved by the Fifth Circuit in such cases as *Baum v. Blue*

21   *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22   850 F.3d 811, which arose out of a bankruptcy pre-filing

23   injunction.

24       The Fifth Circuit, in fact, noted in the *Carroll* case that

25   federal courts have authority to enjoin vexatious litigants

46

1  under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2  under the Bankruptcy Code, a bankruptcy court can issue any

3  order, including a civil contempt order, necessary or

4  appropriate to carry out the provisions of the Code, citing,

5  of course, 105 of the Bankruptcy Code.

6      The Fifth Circuit stated that, when considering whether to

7  enjoin future filings against a vexatious litigant, a

8  bankruptcy court must consider the circumstances of the case,

9  including four factors:  (1)  the party's history of

10  litigation; in particular, whether he has filed vexatious,

11  harassing, or duplicative lawsuits; (2) whether the party had

12  a good faith basis for pursuing the litigation, or perhaps

13  intended to harass; (3) the extent of the burden on the courts

14  and other parties resulting from the party's filings; and (4)

15  the adequacy of alternatives.

16      In the *Baum* case, the Fifth Circuit stated that the

17  traditional standards for injunctive relief -- *i.e.*,

18  irreparable harm and inadequate remedy at law -- do not apply

19  to the issuance of an injunction against a vexatious litigant.

20      Here, although I have not been asked to declare Mr.

21  Dondero and his affiliated entities as vexatious litigants *per*

22  *se*, it is certainly not beyond the pale to find that his long

23  history with regard to the major creditors in this case has

24  strayed into that possible realm, and thus this Court is

25  justified in approving this provision.

47

1    One of the Objectors' lawyers stated very eloquently in

2    closing argument, in opposing the plan injunction and

3    gatekeeping provisions, that "Even a serial killer has

4    constitutional rights," suggesting that these provisions would

5    deprive Mr. Dondero and his controlled entities of fundamental

6    rights or due process somehow.  But to paraphrase the district

7    court in the *Carroll* case, no one, rich or poor, is entitled

8    to abuse the judicial process.  There exists no constitutional

9    right of access to the courts to prosecute actions that are

10   frivolous or malicious.  The Plan injunction and gatekeeper

11   provisions in Highland's plan simply set forth a way for this

12   Court to use its tools, its inherent powers, to avoid abuse of

13   the court system, protect the implementation of the Plan, and

14   preempt the use of judicial time that properly could be used

15   to consider the meritorious claims of other litigants.

16   Accordingly, the Objectors' objections to this provision

17   are overruled.

18   As earlier stated, this Court reserves the right to alter

19   or supplement this ruling in a written order.  In this regard,

20   the Court directs Debtor's counsel -- I hope you are still

21   awake; it's been a long time -- the Court directs Debtor's

22   counsel to submit a form of order.  And specifically, I assume

23   that you've already prepared or have been in the process of

24   preparing a set of findings of fact, conclusions of law, and

25   confirmation order that tracks the confirmation evidence and

50

1   to win, I turned it off.

2       I'm sorry.  That's terrible.  You know, my law clerk, my

3   law clerk that you can't see, Nate, he is from Ann Arbor,

4   Michigan, University of Michigan, and he almost cried when I

5   said I didn't like Tom Brady the other day.  So, I apologize.

6           MR. POMERANTZ:  Your Honor, one other comment.  We

7   had our motion to assume our nonresidential real property

8   lease that was also on.  It got missed in all the fanfare, but

9   it was -- it has been unopposed and essentially done pursuant

10  to stipulation.  So we'd like to submit an order on that as

11  well.

12          THE COURT:  Okay.  I have seen that, and I approve it

13  under 365.  You may submit the order.  Okay.  Thank you.

14          MR. POMERANTZ:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16       (Proceedings concluded at 10:35 a.m.)

17                          --oOo--

18

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/09/2021**

24  _____      _____

25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

# EXHIBIT N

012542

```
                      IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                  )    Case No. 19-34054-sgj-11
 3    In Re:                      )    Chapter 11
                                  )
 4    HIGHLAND CAPITAL            )    Dallas, Texas
      MANAGEMENT, L.P.,           )    Tuesday, February 23, 2021
 5                                )    9:00 a.m. Docket
              Debtor.            )
 6    _____)
                                  )
 7    HIGHLAND CAPITAL            )    Adversary Proceeding 20-3190-sgj
      MANAGEMENT, L.P.,           )
 8                                )
              Plaintiff,          )    PLAINTIFF'S MOTION FOR ORDER
 9                                )    REQUIRING JAMES DONDERO TO
      v.                          )    SHOW CAUSE WHY HE SHOULD NOT
10                                )    BE HELD IN CIVIL CONTEMPT FOR
      JAMES D. DONDERO,           )    VIOLATING THE TRO [48]
11                                )
              Defendant.          )
12    _____)
                                  )
13    HIGHLAND CAPITAL            )    Adversary Proceeding 21-3010-sgj
      MANAGEMENT, L.P.,           )
14                                )
              Plaintiff,          )    DEBTOR'S EMERGENCY MOTION FOR
15                                )    MANDATORY INJUNCTION REQUIRING
      v.                          )    THE ADVISORS TO ADOPT AND
16                                )    IMPLEMENT A PLAN FOR THE
      HIGHLAND CAPITAL MANAGEMENT )    TRANSITION OF SERVICES BY
17    FUND ADVISORS, L.P.,        )    FEBRUARY 28, 2021 [2]
      et al.,                     )
18                                )
              Defendants.         )
19    _____)

20                      TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
21                 UNITED STATES BANKRUPTCY JUDGE.

22    WEBEX/TELEPHONIC APPEARANCES:

23    For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
24                                10100 Santa Monica Blvd.,
                                   13th Floor
25                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
```

231

1  really was just a termination of the agreement, in accordance

2  with the terms.  And I had put the provisions up before the

3  Court during my opening and walked Mr. Seery through.  That's

4  the basis for the --

5          THE COURT:  Okay.

6          MR. MORRIS:  -- termination of the agreement.  It's

7  not rejection at all.

8          THE COURT:  Fair point.

9          MR. RUKAVINA:  And Your Honor, there's no -- there's

10  no -- yeah, there's no problem.  There's no problem on that.

11  We do not disagree.  We do not disagree with Mr. Morris.

12          THE COURT:  Fair point.  I made the mistake of belts

13  and suspenders, trying to fill in any hole there might be.

14  But yes, I had the evidence that there was a termination of

15  both agreements on November 30th.  One of them had a 60-day

16  window before it became effective, the other a 30-day.  So

17  they are terminated.

18      All right.  Mr. Morris, anything else from you?

19          MR. MORRIS:  No.  We'll prepare a form of order.

20          THE COURT:  All right.  Mr. Rukavina, anything

21  further from you?

22          MR. RUKAVINA:  Your Honor, obviously, I have

23  questions.  I have reservations.  I need to look at whether

24  the Court's findings are going to be binding in this adversary

25  proceeding.  So, at this point in time, I'm just not prepared

232

1    to really say anything lest I get myself in trouble.  But I

2    thank you for your time today.

3            THE COURT:  All right.  Well, they are what they are,

4    and I hope we're not in an argument about that down the road.

5    But it seems like my hopes are always dashed when I want

6    things to be worked out.

7        I don't want you to think my calm demeanor means I am a

8    happy camper.  I am not.  I am beyond annoyed.  I mean, I

9    can't even begin to guesstimate how many wasted hours were

10   spent on the drafting Option A, Option B.  Wait.  Let me pull

11   up the exact words.  Mr. Norris confirming, We withdrew Option

12   B after the Debtor accepted it.

13       I mentioned fee-shifting once before in a different

14   context, and, of course, we haven't even gotten to the motion

15   for a show cause order declaring Mr. Dondero in contempt.  I

16   don't know if the lawyers fully appreciate how this looks.

17   Mr. Rukavina, you said that I have formed opinions that you

18   don't think are fair and made comments about vexatious

19   litigation and whatnot.  But while I continue, I promise you,

20   to have an open mind, it is days like this that make me come

21   out with statements that Mr. Dondero, repeating his own words,

22   apparently, he's going to burn the house down if he doesn't

23   get his baby back.

24       I mean, it seems so obviously transparent that he's just

25   driving the legal fees up.  It's as though he doesn't want the

233

 1  creditors to get anything, is the way this looks.  If he wants
 2  me to have a different impression, then he needs to start
 3  behaving differently.  I mean, I can't even imagine how many
 4  hundreds of thousands of dollars of legal fees were probably
 5  spent the past two weeks on Option A, Option B, and all the
 6  different sub-agreements and whatnot.  And as recently as
 7  Friday afternoon, the K&L Gates lawyer saying we have a deal,
 8  and then, oh, wait, maybe not, maybe we do, maybe we don't.
 9  And then Mr. Dondero acting like he had no clue what the K&L
10  Gates lawyers were saying as far as we have a deal.  And Mr.
11  Norris distancing himself from having seen any of that, and I
12  didn't have power.  You know, I'm sure he had a cell phone,
13  like the rest of us, that gets emails.  I'm making a
14  supposition.  I shouldn't make that.  But it just feels like
15  sickening games.
16      And again, if this keeps on, if this keeps on, one day,
17  one day, there may be an enormous attorney fee-shifting order.
18  And, of course, I would have to find bad faith, and I wouldn't
19  be surprised at all if I get there.
20      So I don't know if Mr. Dondero is listening.  I suspect,
21  if he is, he doesn't care much.  But I am --
22          MR. DONDERO:  I'm on the line, Judge.
23          THE COURT:  Okay.
24          MR. DONDERO:  I'm on the line.
25          THE COURT:  I'm glad you're on the line.  I cannot

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 06/05/25   Appendix   Page 202 of 351   PageID 13478

234

1   overstate how very annoyed I am by hearing all these hours of

2   testimony and to feel like none of it was necessary.  None of

3   it was necessary.  Okay?  There could have been a consensual

4   deal --

5        MR. DONDERO:  Judge, you have to pay attention --

6   Judge, you have to pay attention to what's going on, okay?

7        THE COURT:  I am --

8        MR. DONDERO:  When I was president of Highland, --

9        THE COURT:  -- razor-sharp focused on what is going

10  on.  Okay?  I read every piece of paper.  I listen to every

11  sentence of testimony.  And what is going on --

12       MR. DONDERO:  Okay.  How about this, Your Honor?

13       THE COURT:  -- is an enormous waste of parties and

14  lawyer time and resources.  People need to get their eye on

15  the ball.  Well, certain people do have their eye on the ball,

16  but certain people do not.  Okay?  So we're done.  You've got

17  your divorce now.  Okay?  And if the operating plan is all

18  shored up, as Mr. Norris testified, it sounds like you're in

19  good shape.  All right?

20     Mr. Morris, I'll look for the order from you.

21       MR. MORRIS:  Thank you, Your Honor.

22       THE CLERK:  All rise.

23     (Pause.)

24       THE COURT:  Oh, Michael?

25     (Court confers with Clerk.)

235

1            THE CLERK:  Hello?  Hang on.  Mr. Morris?

2            THE COURT:  Is anyone still there?

3            THE CLERK:  Mr. Rukavina is still there.  Mr.

4     Rukavina, Mr. Morris, are you all still there?

5            MR. RUKAVINA:  Judge, this is Davor.

6            THE COURT:  All right.

7            MR. RUKAVINA:  I think we're all wondering whether

8     we're going to have the contempt hearing.

9            THE COURT:  Well, yes, that's why I came back in.

10           MR. RUKAVINA:  I can't hear you, Judge.  We can't

11    hear you.

12           THE COURT:  I realized I -- it's 4:19 Central time.

13    We are not starting the contempt hearing.

14        Mr. Morris, are you there now?

15           MR. MORRIS:  I am.  I did have one suggestion.

16           THE COURT:  All right.  I neglected to mention our

17    other setting, but we are not going to start at 4:19 Central

18    time.  Do we want to talk about scheduling on that?

19           MR. MORRIS:  I did, Your Honor.  And it's just an

20    idea, and I understand we've had a long day.  But I was going

21    to suggest if there was any way to just get their motion *in*

22    *limine* out of the way today, so that when we come back for the

23    evidentiary hearing parties are fully prepared.  If you don't

24    want to do it, that's fine.  Otherwise, I'm available at Your

25    Honor's convenience.

238

1          THE CLERK:  All rise.

2       (Proceedings concluded at 4:23 p.m.)

3                     --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                 CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/24/2021**

24   _____      _____

     Kathy Rehling, CETD-444                     Date
25   Certified Electronic Court Transcriber

# EXHIBIT O

012550

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                   )    Case No. 19-34054-sgj-11
In Re:                             )    Chapter 11
                                   )
HIGHLAND CAPITAL                   )    Dallas, Texas
MANAGEMENT, L.P.,                  )    Monday, May 10, 2021
                                   )    1:30 p.m. Docket
          Debtor.                  )
_____    )
                                   )
HIGHLAND CAPITAL                   )    Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,                  )
                                   )
          Plaintiff,               )    - TRIAL DOCKET CALL
                                   )    - DEFENDANT'S EMERGENCY MOTION
v.                                 )      TO STAY PROCEEDINGS PENDING
                                   )      RESOLUTION OF DEFENDANT'S
JAMES D. DONDERO,                  )      PETITION FOR WRIT OF
                                   )      MANDAMUS [154]
          Defendant.               )
_____    )


                       TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Plaintiff:          John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Plaintiff:          Jeffrey Nathan Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910
```

42

 1   permanent.  I mean, I understand the -- well, right, I mean,

 2   with respect to the relief being sought, but with respect to

 3   preliminary (garbled) in attendance at the preliminary

 4   injunction hearing.

 5          THE COURT:  Okay.  Unfortunately, you have

 6   connectivity issues suddenly.

 7          MR. WILSON:  You know, I've got -- I've got a

 8   different view on those things.  I mean, the contempt hearing

 9   has some things --

10          THE COURT:  Mr. Wilson, I don't know if --

11          MR. WILSON:  And I think we lost Mr. Morris on the

12   screen.  Can you hear --

13          THE COURT:  -- you can hear me, but we suddenly have

14   very bad connectivity.

15          MR. WILSON:  Can you hear me?

16          THE COURT:  Your screen is frozen, your video is

17   frozen, and I really didn't get any of the last two minutes.

18          MR. WILSON:  Is it better now, Your Honor?

19          THE COURT:  Well, I heard you say, "Is it better

20   now?"

21          MR. WILSON:  I'm going to log off and log back on.

22          THE COURT:  Okay.  We're going to have to -- we're

23   going to have to cut this --

24          MR. WILSON:  I'm going to try to log off and log on.

25          THE COURT:  No.  I'm ready to be finished with this

1   hearing.  You need to go back and look at this, because I am

2   leaning towards what Mr. Morris is arguing, and that is that

3   this is really bad faith.  Okay?  There is no change of

4   issues.  It's been the same issue at the TRO hearing, at the

5   preliminary injunction hearing.  Okay.  The motion for

6   contempt, we were looking backwards a little at behavior.  But

7   the issues are not expanded.  Okay?  It's just duration of the

8   injunction.  And now a slightly skinnied-down injunction.

9       So, of course, I am willing to consider evidence I've

10  heard at the TRO hearing and the preliminary injunction

11  hearing.  And I would note that on many, many, many of these

12  exhibits, you didn't object.  Or if you did, you argued it and

13  I overruled it.

14      So you need to go back and look at this and think hard

15  whether you're really going to press these issues at the

16  trial.  Okay?  This is -- again, *Dondi*, we require counsel to

17  work in good faith to streamline trials and work with people.

18  If you can agree, if you can stipulate to evidence, that's

19  what you need to do.  And this looks like -- I don't know what

20  it looks like.  But if this is any guidance to you, it should

21  be, if I admitted it at the TRO hearing, if I admitted it at

22  the preliminary injunction hearing, it's fair game to consider

23  it now.

24      Here's the last thing I want to say, and this is very big-

25  picture, not unique to this adversary proceeding.

44

1      Can everyone hear me okay?  I don't know if we're having

2   connectivity issues.  Can everyone hear me?

3            MR. MORRIS:  Yes, Your Honor.

4            THE COURT:  Can you hear me, Mr. Wilson?

5            MR. MORRIS:  Yes, Your Honor.

6            MR. WILSON:  Yes, Your Honor.

7            THE COURT:  Okay.  I have been pondering something

8   the past few days.  And I haven't figured out how I want to

9   address it, but maybe Mr. Dondero's counsel and counsel from

10  some of the Dondero-controlled entities, maybe they can listen

11  to what I'm about to say and figure out a solution.

12      As you all know, there are so many law firms, so many

13  lawyers involved now that are basically singing the same tune

14  at a lot of these hearings as far as objections, me too, me

15  too, me too.  And so just quickly eyeballing what we have, we

16  obviously have Mr. Dondero represented by Bonds Ellis.  There

17  is another firm that represents Mr. Dondero that filed a

18  motion asking that I recuse myself.  I can't remember the name

19  of that firm, but I think they appealed my denial of that

20  motion.  So, I can't remember who that was.  Then we have the

21  various affiliates.  We have -- well, I'll just start

22  chronologically.  Highland CLO Funding, Ltd. has historically

23  been represented by King & Spalding.  I don't know if that's

24  -- I know there were some changes there with the ownership of

25  that entity, so maybe they're gone.  But then we have NexPoint

54

1   Can we just have an hoc committee each time?

2      I don't even think I listed all the law firms.  I know a

3   new law firm filed a lawsuit in front of Judge Jane Boyle

4   recently.  We've got a hearing on that coming up in June.  I

5   mean, and now you're -- I'm hearing there are going to be

6   more.  Well, if you don't figure out a way to rein it in, then

7   I'm just going to have to get that list of who are the

8   stakeholders in these entities, under oath, because I don't

9   understand it.  I don't understand why we need these many

10  lawyers filing position papers.

11     So, all right.  Well, we're going to adjourn, and I guess

12  I'll see you next Monday, right?

13            MR. MORRIS:  Thank you, Your Honor.  Yes.

14            THE COURT:  Okay.  Thank you.

15            THE CLERK:  All rise.

16     (Proceedings concluded at 3:07 p.m.)

17                      --oOo--

18

19

20                   CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23  **/s/ Kathy Rehling**                    **05/11/2021**

24  _____    _____
    Kathy Rehling, CETD-444                     Date
25  Certified Electronic Court Transcriber

# EXHIBIT P

012556

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | | |
|---|---|---|
| In Re: | ) | Case No. 19-34054-sgj11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | Adv. Proc. No. 20-03195-sgj |
| CREDITORS, | ) | |
| | ) | PLAINTIFF'S MOTION for |
| Plaintiff, | ) | CONTINUANCE |
| | ) | |
| v. | ) | |
| | ) | |
| CLO HOLDCO, LTD., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Adv. Proc. No. 21-03003-sgj |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT DONDERO'S MOTION |
| v. | ) | to COMPEL DISCOVERY, the |
| | ) | TESTIMONY of JAMES P. |
| JAMES DONDERO, | ) | SEERY, JR. |
| | ) | |
| Defendant. | ) | May 20, 2021 |
| | ) | Dallas, Texas (Via WebEx) |
| _____ | ) | |

Appearances in 21-03003:

For Plaintiff Highland       John A. Morris
Capital Management,          Pachulski Stang Ziehl & Jones LLP
                             10100 Santa Monica Boulevard, 13th Floor
                             Los Angeles, California  90067

For Defendant-Movant         Michael P. Aigen
James Dondero:               Stinson, L.L.P.
                             3102 Oak Lawn Avenue, Suite 777
                             Dallas, Texas  75219

                             Bryan C. Assink
                             Bonds Ellis Eppich Schafer Jones LLP
                             420 Throckmorton Street, Suite 1000
                             Forth Worth, Texas  76102

                  Appearances continued on next page.

*Adversary 21-3003, Motion to Compel Discovery*                    19

1    We — it was more just a coordination thing.  We intend that he

2    will be at all hearings before, Your Honor, you know, Friday's

3    hearing and substantive hearings.  I just — I think this is more

4    of a coordination issue, Your Honor, and I apologize.

5              THE COURT:  Okay.

6              MR. ASSINK:  There has been a lot going on.

7              THE COURT:  Oh, don't I know.  There's two of us, me

8    and my Law Clerk working on this, and there are a bunch of

9    y'all.  So, yes, I feel — I feel absolutely what you feel and

10   more as far as a lot going on.

11             So let me clarify.  My language that ordered Mr.

12   Dondero to be at every hearing was in the preliminary injunction

13   that's now superseded by the agreed order y'all announced

14   Tuesday.  So are you telling me you thought now that mandate

15   didn't apply?  Is that one of the things —

16             MR. ASSINK:  Not — not specifically, Your Honor, —

17             THE COURT:  — I'm hearing?

18             MR. ASSINK:  Not specifically, Your Honor.  We thought

19   perhaps the formal mandate in the order was no longer applying,

20   but our understanding was you would want Mr. Dondero at

21   substantive hearings going forward, and that has been our

22   understanding.  And we would expect him to be before Your Honor

23   at all such hearings.  Part of the basis, the reasoning he's not

24   here today was perhaps as an oversight on my part due to the

25   scheduling, and I had a lot of deadlines yesterday and I think

APP 0164
012558

*Adversary 21-3003, Motion to Compel Discovery*                    20

1  it just maybe fell through the cracks, and I apologize, Your

2  Honor.

3          THE COURT:  All right.

4          MR. ASSINK:  You know, we — Your Honor, —

5          THE COURT:  Well, I'm going to say a couple of things.

6  You know this could have been raised Tuesday, when we were here

7  on the adversary proceeding, in which the preliminary injunction

8  was issued, okay, it would have been — it would have been wise,

9  it would have been very wise to raise the issue.

10          Second, it screams irony, if nothing else, that at a

11 time when I have under advisement a motion to hold Mr. Dondero

12 in contempt of Court that there would be a trip-up, the

13 second-recent trip-up, by the way, where he didn't appear at a

14 hearing.  There was a time a few weeks ago, two or three weeks

15 ago, can't remember what hearing it was then, but he wasn't

16 here.

17          Okay.  The —

18          MR. ASSINK:  Well, Your Honor, I just want to say —

19          THE COURT:  — the third thing I'm going to say — the

20 third thing I'm going to say is I guess I'll issue an order in

21 the main case now, you know, a one- or two-sentence order in the

22 main case saying repeating the sentence that was in the

23 preliminary injunction, that he's going to show up at every

24 hearing.  I never said only at substantive hearings.  The only

25 thing I hesitated on at all, because I've done this in other

1  cases, is sometimes I'll say any hearing at which, you know, the

2  person is taking a position, okay, an opposition, an objection,

3  you know, even if you file a pleading taking a neutral stand, if

4  he's going to file a pleading that requires the Court and all

5  the lawyers' attention to some extent, he's going to need to be

6  in court.  So that's something I thought about doing, but then I

7  was reminded, that I said, no, he's just going to be at all

8  hearings in the future.

9          And procedural, substantive, I never made that

10  distinction and I never would because — because it's taking up

11  time, it's taking up time of the Court, lawyers, parties.  And

12  if he is going to use the offices of this Court or, you know,

13  take up the time of any lawyers, then he needs to be a part of

14  it, okay?

15          MR. ASSINK:  Your Honor, yes, I —

16          THE COURT:  So I thought I made that very clear the

17  last time he didn't show up, but I think —

18          MR. ASSINK:  Your Honor, I apologize.  You know that's

19  certainly not our intention here.  We've been rushing around.  I

20  think this is more — this is more on — on me and just the fast

21  pace with everything.  We would intend that he would be here at

22  all hearings.  We're not trying to make any exception.  We're

23  not trying to say that the preliminary injunction got rid of his

24  obligation to be before, Your Honor.  You know, we weren't clear

25  exactly what the directive was for these kinds of hearings, or

*Adversary 21-3003, Motion to Compel Discovery*                    22

1    at least perhaps I wasn't fully, and — but, nevertheless, Your

2    Honor, we would — we would have had him be here.  I think the

3    fast pace with the hearing settings and just everything going

4    on, it might have slipped through the cracks.  It's not — there

5    was no ill will with him not being here, Your Honor.  I

6    apologize.  It's just an oversight on our part.  We would

7    anticipate that he will be here for all future hearings.  You

8    know it's no disrespect to the Court.  It was not an intentional

9    thing.  We apologize, Your Honor.  So I understand the Court's

10   comments.  It's — but I just want to make clear it's we're not

11   trying to be cute, we're not trying to say that, oh, the

12   preliminary injunction is gone, he doesn't have to be here.

13   That's not our intention, Your Honor.  It was I think just an

14   oversight and a scheduling issue this time, but Mr. Dondero will

15   of course appear before Your Honor in all matters going forward,

16   so I apologize.

17           THE COURT:  All right.  Well, again, you're

18   scheduling.  You sought the scheduling, you sought the emergency

19   hearing, and this is the second time we've had this discussion

20   in less than a month.

21           All right.  So, Mr. Morris, back to you.  I think —

22           MR. MORRIS:  Yeah.

23           THE COURT:  — you were about to answer the question of

24   if Mr. Seery is going to be produced and talk about 13 different

25   topics, why is it a big deal to talk about these other seven

1    that condition subsequent was, it was the liquidation of certain

2    assets.  Since the liquidation of those assets has not been

3    completed, by definition, no other maker could have had a note

4    or an oral agreement or an agreement of any kind of the type

5    that Mr. Dondero has.  So yet another reason why it fails to

6    meet the burden, they fail to meet the burden under Rule 26.

7    Nobody could have ever had the same note forgiven or agreement,

8    because the condition subsequent hasn't been met yet.

9                    THE COURT'S RULING ON THE MOTION TO COMPEL

10              THE COURT:  All right.  Well, I'm going to deny the

11   motion to compel.  I don't think that the burden has been met to

12   establish the relevance of these, I guess it's — one, two,

13   three, four, five — six topics that are now at issue, topics 9,

14   14 through 17, or 20, and, you know, I don't think the

15   proportionality standard is met here.

16              I do think it would be not proportionate to the needs

17   of the case for the CEO, who came in place in 2020,

18   postpetition, two years after these notes were executed, to have

19   to go do research about any loans made by Highland to any

20   officers and employees over the years and, you know, I don't

21   know who he's going to question, what policy he is going to look

22   into that might be some substance or evidence as to oral

23   agreements or forgiveness.  I don't think he should have any

24   obligation to search files and interview people to figure out

25   what the affirmative defenses and Mr. Dondero are all about or

*The Court's Ruling on the Motion to Compel*                    34

1    based in.  And, again, no one would have better information

2    about his own compensation than Mr. Dondero himself.

3         I mean I want to stress that this comes against a

4    backdrop of — well, it seems like some antagonism, to say the

5    least, on the part of Mr. Dondero where Mr. Seery's concerned.

6    It seems like it's always a fight with Mr. Seery.  And you say,

7    well, we didn't handpick him as the 30(b)(6) witness, but, you

8    know, the motion to compel names him by name.  It just — it

9    feels like another antagonistic move.

10        You've got him for a deposition next Monday on 13 or

11   so different topics.  I think it is appropriate to draw the line

12   on these six or so topics that again just don't seem relevant or

13   proportional to the needs of the case.

14        All right.  So, Mr. Morris, would you please upload

15   just a simple order reflecting the Court's ruling?

16        MR. MORRIS:  I would be happy to, Your Honor.

17        THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18   to do it.  I'm sorry.  I need to be thinking about attorney's

19   fees and who should bear the costs of what.

20        So, Mr. Aigen, would you please electronically submit

21   an order?

22        MR. AIGEN:  Yes.

23        THE COURT:  All right.  Thank you.

24        All right.  Well, if there's nothing else on this

25   particular adversary, let me just double check.  Any

 1   housekeeping matters before I move onto the other adversary?

 2          MR. AIGEN:  Not from the debtor, Your Honor.

 3          MR. CLUBOK:  Your Honor, —

 4          THE COURT:  All right.

 5          MR. CLUBOK:  I don't know if you're about to move on.

 6   Your Honor, can you hear me?

 7          THE COURT:  I'm sorry, Mr. Clubok?

 8          MR. CLUBOK:  Your Honor, —

 9          THE COURT:  Were you weighing in on —

10          MR. CLUBOK:  Yeah, I'm — I'm sorry.  It's not about

11   that proceeding, but are you about to move on beyond — beyond

12   the Highland matters?

13          THE COURT:  No, no, no.

14          MR. CLUBOK:  There was another Highland matter —

15          THE COURT:  I was next — I was next going to go to the

16   other adversary, the dispute between the committee and seven or

17   so defendants.  And, yes, I know we have UBS I guess all day

18   tomorrow unless anything has changed.  So we'll — we'll hear

19   before we're done any previews about tomorrow.

20          All right, so moving on —

21          MR. CLUBOK:  Thank you.

22          THE COURT:  — the Committee versus CLO Holdco,

23   20-3195.  We have a committee motion to basically stay the

24   adversary proceeding for 90 days.  So I will get lawyer

25   appearances on that.

```
State of California           )
                              )    SS.
County of San Joaquin         )
```

     I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

     I further certify that I am not a party to nor in any way interested in the outcome of this matter.

     I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

Susan Palmer
Palmer Reporting Services

Dated May 22, 2021

# EXHIBIT Q

012566
APP_0172

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                  )    Case No. 19-34054-sgj-11
    In Re:                        )    Chapter 11
                                  )
    HIGHLAND CAPITAL              )    Dallas, Texas
    MANAGEMENT, L.P.,             )    Tuesday, June 8, 2021
                                  )    9:30 a.m. Docket
          Debtor.                 )
                                  )    - SHOW CAUSE HEARING (2255)
                                  )    - MOTION TO MODIFY ORDER
                                  )      AUTHORIZING RETENTION OF
                                  )      JAMES SEERY (2248)
                                  )    - MOTION FOR ORDER FURTHER
                                  )      EXTENDING THE PERIOD WITHIN
                                  )      WHICH DEBTOR MAY REMOVE
                                  )      ACTIONS (2304)
    _____)

                        TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                   UNITED STATES BANKRUPTCY JUDGE.

    APPEARANCES:

    For the Debtor:             Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd.,
                                 13th Floor
                                Los Angeles, CA  90067-4003
                                (310) 277-6910

    For the Debtor:             John A. Morris
                                Gregory V. Demo
                                PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
                                (212) 561-7700

    For the Debtor:             Zachery Z. Annable
                                HAYWARD & ASSOCIATES, PLLC
                                10501 N. Central Expressway,
                                 Suite 106
                                Dallas, TX  75231
                                (972) 755-7104
```

293

 1    the Committee maintaining a two-person membership at this

 2    point.

 3         In terms of whether the MGM transaction is a game-changer,

 4    we've not yet seen, to Your Honor's point, how all of that

 5    rolls up through the various interests that the Debtor may or

 6    -- you know, may have --

 7              THE COURT:  Okay.

 8              MR. CLEMENTE:  -- that would be implicated by the MGM

 9    transaction.  If ultimately the MGM transaction has to

10    actually occur, right?  I mean, so, you know, just based on

11    what I read in the public documents, we're not sure when that

12    transaction may actually happen.  But obviously it's a good

13    thing for the Debtor's estate because it's going to recognize

14    value for the estate.

15         In terms of whether it ultimately changes how Mr. Dondero,

16    you know, wishes to proceed, that's entirely up to him, Your

17    Honor.  But we don't see it as something at this point that

18    would suggest that there's an overall back to let's talk about

19    a pot plan because of where the MGM transaction might

20    ultimately come out.

21         So I don't know if that's helpful to Your Honor, but those

22    are -- that's my perspective.

23              THE COURT:  Well, and I'm not trying to, you know,

24    push a pot plan on anyone.

25              MR. CLEMENTE:  No, I understand.

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 17    Filed 07/08/25    Page 224 of 351    PageID 13500
Appendix    Page 178 of 249

294

1              THE COURT:  I'm just saying it looked like an

2     economic windfall.  I just -- I don't know how much is

3     Highland versus other entities in the so-called byzantine

4     complex, but, gosh, I just hoped that there might be something

5     there to change the dynamic of, you know, lawsuit, lawsuit,

6     lawsuit, lawsuit, motion for contempt, motion for contempt.

7              MR. CLEMENTE:  Agreed, Your Honor.

8              THE COURT:  Uh-huh.

9              MR. CLEMENTE:  And like I said, it was a very

10    positive development obviously for the creditors for the

11    Debtor.  But whether it's the game-changer that Your Honor

12    would envision, I'm not sure that I can suggest at this point

13    that it is.

14         I think that, you know, obviously, we don't like to see

15    these lawsuits continue to be filed.  That's the whole point

16    of the gatekeeper order, Your Honor.

17             THE COURT:  Uh-huh.

18             MR. CLEMENTE:  I didn't say anything during the

19    hearing, but obviously the January 9th order, as Your Honor

20    has said many times, was in the context of a trustee being

21    appointed.

22             THE COURT:  Right.  Right.

23             MR. CLEMENTE:  Right?  So, and the July 16th order,

24    very similar vein, it's an outshoot of that.  In fact, it was

25    contemplated in the January 9th settlement that a CEO could be

295

1   appointed.

2       So I think, again, it's just -- it's important, the

3   context in which that January 9th order came into play, for

4   this very reason, so we could avoid this type of litigation,

5   Your Honor.

6               THE COURT:  Uh-huh.

7               MR. CLEMENTE:  And so again, I didn't -- I obviously

8   didn't rise to mention that during the hearing, but Your Honor

9   is already aware of that.  I didn't need to remind Your Honor

10  of that.

11              THE COURT:  Uh-huh.  Okay.

12              MR. CLEMENTE:  Anything else for me, Your Honor?

13              THE COURT:  No.  Thank you.

14              MR. CLEMENTE:  Okay, then, Your Honor.

15              THE COURT:  Sorry I picked on you.  But, all right.

16  Well, again, I hope the message has landed in the way I hope

17  will matter, and that is I'm going to look at your documents

18  but I feel very strongly that, unless there's something in

19  there that, whoa, is somehow eye-opening, I'm going to find

20  contempt of court.  It's just a matter of who and what the

21  damages are.  There's just not a thing in the world ambiguous

22  about Paragraph 5 of the July 9th, 2020 order.  So I'll get to

23  it as soon as we humanly can get to it.

24      Mr. Morris, anything else?

25              MR. MORRIS:  Nothing.  No, thank you.

296

```
 1            THE COURT:  I guess I'll see you Thursday on the
 2    WebEx.  Thank you.
 3            THE CLERK:  All rise.
 4        (Proceedings concluded at 6:00 p.m.)
 5                        --oOo--
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20                      CERTIFICATE
21        I certify that the foregoing is a correct transcript from
      the electronic sound recording of the proceedings in the
22    above-entitled matter.
23     /s/ Kathy Rehling                      06/09/2021
24    _____     _____
      Kathy Rehling, CETD-444                        Date
25    Certified Electronic Court Transcriber
```

# EXHIBIT R

012572

APP 0773

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                               )    Case No. 19-34054-sgj-11
In Re:                         )    Chapter 11
                               )
HIGHLAND CAPITAL               )    Dallas, Texas
MANAGEMENT, L.P.,              )    Thursday, June 10, 2021
                               )    9:30 a.m. Docket
        Debtor.                )
                               )    MOTION TO COMPEL COMPLIANCE
                               )    WITH BANKRUPTCY RULE 2015.3
                               )    FILED BY GET GOOD TRUST AND
                               )    THE DUGABOY INVESTMENT TRUST
                               )    (2256)
_____)
                               )
HIGHLAND CAPITAL               )    Adversary Proceeding 21-3006-sgj
MANAGEMENT, L.P.,              )
                               )
        Plaintiff,             )    DEFENDANT'S MOTION FOR LEAVE
                               )    TO FILE AMENDED ANSWER AND
v.                             )    BRIEF IN SUPPORT [15]
                               )
HIGHLAND CAPITAL               )
MANAGEMENT SERVICES, INC.,     )
                               )
        Defendant.             )
_____)
                               )
HIGHLAND CAPITAL               )    Adversary Proceeding 21-3007-sgj
MANAGEMENT, L.P.,              )
                               )
        Plaintiff,             )    DEFENDANT'S MOTION FOR LEAVE
                               )    TO AMEND ANSWER TO PLAINTIFF'S
TO                             )    COMPLAINT [16]
v.                             )
                               )
HCRE PARTNERS, LLC             )
N/K/A NEXPOINT REAL            )
ESTATE PARTNERS, LLC,          )
                               )
        Defendant.             )
_____)

                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
```

86

1          MS. DRAWHORN:  Uh-huh.  Yes.  And I understand that,

2    Your Honor.  And the issue, I think, with you -- we need to

3    have this motion resolved, because it -- unless the Court is

4    going to continue discovery or stay.  You know, one of the

5    reasons why we had initially requested the expedited hearing

6    was because of the discovery is continued -- continuing to --

7    discovery deadlines are continuing to move.  And obviously

8    whatever the Court decides on this motion for leave to amend

9    will determine what the scope of that discovery is.

10      Similarly, if the Debtor decides to amend, that could

11   change the scope of discovery as well.

12      So we are open to continuing deadlines, and I think, you

13   know, might end up filing a motion to continue.  I haven't

14   conferred with Mr. Morris yet.  I suspect he's opposed, based

15   on our prior conversations.  But that's something that might

16   be helpful, especially if the Court is concerned on how it

17   will affect the motion to withdraw the reference, to -- maybe

18   we continue some of these upcoming deadlines, and that might

19   appease, you know, solve some of your concerns.

20          THE COURT:  All right.  Well, Rule 15(a), of course,

21   is the governing rule here, and the case law is abundant that

22   courts "should freely give leave when justice so requires."

23   And the law is also abundantly clear that the rule "evinces a

24   bias in favor of granting leave to amend."  And again and

25   again, cases say that leave should be granted unless there's

87

 1   substantial reason to deny leave, and courts may consider

 2   factors such as delay or prejudice to the non-movant, bad

 3   faith or dilatory motives on the part of the movant, repeated

 4   failure to cure deficiencies, or futility of the amendment.

 5       While the Debtor has presented arguments that there might

 6   be bad faith here on the part of the Movants and there might

 7   be futility in allowing the amendments because of various

 8   strong arguments and defenses the Debtor believes it has to

 9   this issue of agreements with regard to the notes that

10   allegedly provide affirmative defenses, the Court believes the

11   rule requires me to allow leave to amend the answer.

12       Now, a couple of things.  I am going to require, though,

13   that the amended answer be more specific than has been

14   suggested.  I am going to agree that if new affirmative

15   defenses are made that there was this agreement to forgive

16   when certain conditions happened, then there does need to be

17   identification of who the human beings were that were involved

18   in making the agreement, the date of any agreement or

19   agreements, and disclose what documents substantiate the

20   agreement or reflect the agreement.  All right?  So if that

21   could --

22           MR. MORRIS:  Your Honor?

23           THE COURT:  Yes?

24           MR. MORRIS:  John Morris.  I apologize for

25   interrupting, but just a fourth thing is what is the

APP_0785

88

 1   agreement?  I mean, what is the agreement?

 2            THE COURT:  Well, okay.  That's fair enough.  What is

 3   the agreement?  I guess --

 4            MR. MORRIS:  And -- and --

 5            THE COURT:  -- that needs to be spelled out.  I mean,

 6   I guess I was assuming that that would be spelled out in --

 7   but maybe it's not.  So we'll go ahead and add that.

 8       As far as extension of the discovery, Ms. Drawhorn has

 9   offered that.  I think it would be reasonable if the Debtor or

10   Plaintiff wants that.  Do you want an extension of discovery?

11            MR. MORRIS:  What I really want, Your Honor, is a

12   direction for them to serve this amended answer within 24 or

13   48 hours and grant leave to the Debtor to promptly file

14   written discovery.  We've got Nancy Dondero -- if it turns out

15   -- and maybe Ms. Drawhorn can just answer the question right

16   now.  Who entered the agreement on behalf of the Debtor?

17   Because I'm already taking Nancy Dondero's deposition on the

18   28th.  And it seems to me, if they would just answer the

19   question of whether Ms. Dondero is the person who did that, I

20   could just add a notice of deposition and take the deposition

21   on that date, too, and it would be, really, more efficient for

22   everybody.

23            THE COURT:  Ms. Drawhorn, who was the human being?

24            MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25   entered into the -- the subsequent agreement.

90

```
 1          THE COURT:  Please upload an order, Ms. Drawhorn,

 2   granting your motion with these specific requirements that

 3   I've orally worked in.

 4       I think clients need to be careful what they ask for.  I'm

 5   very concerned.  And I know it was just argument and I'll hear

 6   evidence, but of all of the things that I guess -- well, I'm

 7   concerned about a lot of things, but do we have audited

 8   financial statements that didn't disclose these agreements

 9   with regard to --

10          MR. MORRIS:  Yes, Your Honor.

11          THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15          THE CLERK:  All rise.

16       (Proceedings concluded at 11:58 a.m.)

17                        --oOo--

18

19                       CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    /s/ Kathy Rehling                       06/12/2021

23   _____   _____
     Kathy Rehling, CETD-444                         Date
24   Certified Electronic Court Transcriber

25
```

# EXHIBIT S

012578
APP 0784

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                )    Case No. 19-34054-sgj-11
In Re:                          )    Chapter 11
                                )
HIGHLAND CAPITAL                )    Dallas, Texas
MANAGEMENT, L.P.,               )    Friday, June 25, 2021
                                )    9:30 a.m. Docket
        Debtor.                 )
                                )    EXCERPT:  MOTION FOR
                                )    MODIFICATION OF ORDER
                                )    AUTHORIZING RETENTION OF JAMES
                                )    P. SEERY, JR. DUE TO LACK OF
                                )    SUBJECT MATTER JURISDICTION
                                )    (2248)
_____)


                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For the Debtor:              John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For CLO Holdco, Ltd. and     Jonathan E. Bridges
The Charitable DAF Fund,     Mazin Ahmad Sbaiti
LP:                          SBAITI & COMPANY, PLLC
                            JP Morgan Chase Tower
                            2200 Ross Avenue, Suite 4900 W
                            Dallas, TX  75201
                            (214) 432-2899

For Get Good Trust and       Douglas S. Draper
Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
                            650 Poydras Street, Suite 2500
                            New Orleans, LA  70130
                            (504) 299-3300
```

108

 1  any exceptional circumstances to declare the order or any of

 2  its provisions void.  The Movants have put on no evidence that

 3  constitutes surprise or constitutes newly-disputed evidence.

 4  So why are there no exceptional circumstances here such that

 5  the Court might find, you know, a void order or void

 6  provisions of an order?

 7      First, this Court concludes that there's no credible

 8  argument that the Court overreached its jurisdiction with the

 9  gatekeeping provisions in the order.  Gatekeeping provisions

10  are not only very common in the bankruptcy world -- in

11  retention orders and in plan confirmation orders, for example

12  -- but they are wholly consistent with the *Barton* case, the

13  U.S. Supreme Court's *Barton's* case, and its progeny that has

14  become known collectively as the *Barton* doctrine.  Gatekeeping

15  provisions are wholly consistent with 28 U.S.C. Section

16  959(a)'s complete language.

17      The Fifth Circuit has blessed gatekeeping provisions in

18  all sorts of contexts.  It has blessed them in the situation

19  of when *Stern* claims are involved in the *Villegas* case.  It

20  even blessed Bankruptcy Courts' gatekeeping functions a long

21  time ago, in 1988, in a case that I don't think anyone

22  mentioned in the briefing, but as I've said, my brain

23  sometimes goes down trails, and I'm thinking of the *Louisiana*

24  *World Exposition* case in 1988, when the Fifth Circuit blessed

25  there a procedure where an unsecured creditors' committee can

109

 1  bring causes of action against persons, such as officers and

 2  directors or other third parties, if they first come to the

 3  Bankruptcy Court and show a colorable claim.  They have to

 4  come to the Bankruptcy Court, show they have a colorable claim

 5  and they're the ones that should be able to pursue them.  Not

 6  exactly on point, but it's just one of many cases that one

 7  could cite that certainly approve gatekeeper functions of

 8  various sorts of Bankruptcy Courts.

 9      It doesn't matter which court might ultimately adjudicate

10  the claims; the Bankruptcy Court can be the gatekeeper.

11      And the Court agrees with the many cases cited from

12  outside this circuit, such as the case in Alabama, in the

13  Eleventh Circuit, and there was another circuit-level case, at

14  least one other, that have held that the *Barton* doctrine

15  should be extended to other types of case fiduciaries, such as

16  debtor-in-possession management, among others.

17      Finally, as I pointed out in my confirmation ruling in

18  this case, gatekeeping provisions are commonplace for all

19  types of courts, not just Bankruptcy Courts, when vexatious

20  litigants are involved.  I have commented before that we seem

21  to have vexatious litigation behavior with regard to Mr.

22  Dondero and his many controlled entities.

23      Now, as far as the Movants' argument that there was not

24  just improper gatekeeping provisions but actually an improper

25  discharge in the Seery retention order of negligence claims or

110

 1   other claims that don't rise to the level of gross negligence

 2   or willful misconduct, again, I reiterate there's nothing

 3   exceptional in the bankruptcy world about exculpation

 4   provisions like this.  They absolutely are a term of

 5   employment very often.  Just like compensation, they're

 6   frequently requested, negotiated, and approved.  They are

 7   normal in the corporate governance world, generally.  They are

 8   normal in corporate contracts between sophisticated parties.

 9   And most importantly of all, even if this Court overreached

10   with the exculpation provisions in the Seery retention order,

11   even if it did, res judicata bars the attack of these

12   provisions at this late stage, under cases such as *Shoaf,*

13   *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14   case from the U.S. Supreme Court, and even *Applewood*, since

15   the Court finds the language in this order was clear,

16   specific, and unambiguous with regard to the gatekeeping

17   provisions and the exculpation provisions.

18       Last, and this is the part where I said I'm going to get

19   to this agreement that has been submitted, the Second Amended

20   and Restated Investment Advisor Agreement or whatever the

21   title is.  I am more than a little disturbed that so much of

22   the theme of the Movants' pleadings and arguments, and I think

23   even representations to the District Court, have been they

24   have these sacred jury trial rights, these inviolate jury

25   trial rights, and an Article I Court like this Court should

121

1    annoyance or anything like that.  I guess what I'm trying to

2    do is I don't want anyone to mistake the delay in ruling on

3    the contempt motion to mean I'm just not that -- you know, I'm

4    not prioritizing it, other things are more serious to me or

5    important to me, or I'm going to take two months to get to it.

6    It's literally been I've been in trial almost all day long

7    every day since you were here.  But trust me, I'm about as

8    upset as upset can be about what I heard on June 8th, and I'm

9    going to get to that ruling, and I know what I'm going to do.

10   And, well, like I said, it's just a matter of figuring out

11   dollars and whom, okay?  There's going to be contempt.  I just

12   haven't put it on paper because I've been in court all day and

13   I haven't come up with a dollar figure.  Okay?

14       So I hope -- I don't know if that matters very much, but

15   it should.

16       All right.  We stand adjourned.

17       (Proceedings concluded at 3:35 p.m.)

18                          --oOo--

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                        **06/29/2021**

24   _____     _____

25   Kathy Rehling, CETD-444                         Date
     Certified Electronic Court Transcriber

# EXHIBIT T

APP 0190
012584

```
 1                  IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                           DALLAS DIVISION

 3                                  )    Case No. 19-34054-sgj-11
      In Re:                        )    Chapter 11
 4                                  )
      HIGHLAND CAPITAL              )    Dallas, Texas
 5    MANAGEMENT, L.P.,             )    March 1, 2022
                                    )    1:30 p.m. Docket
 6         Reorganized Debtor.     )
                                    )    - REORGANIZED DEBTOR'S MOTION
 7                                  )      FOR ENTRY OF AN ORDER
                                    )      APPROVING SETTLEMENT WITH
 8                                  )      PATRICK DAUGHERTY [3088]
                                    )    - REORGANIZED DEBTOR'S MOTION
 9                                  )      FOR ENTRY OF AN ORDER
                                    )      FURTHER EXTENDING THE PERIOD
10                                  )      WITHIN WHICH IT MAY REMOVE
                                    )      ACTIONS [3199]
11   _____)
                                    )
12    ELLINGTON,                    )    Adversary Proceeding 22-3003-sgj
                                    )
13           Plaintiff,             )
                                    )    STATUS CONFERENCE
14    v.                            )    (NOTICE OF REMOVAL)
                                    )
15    DAUGHERTY,                    )
                                    )
16           Defendant.             )
     _____)

17                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18               UNITED STATES BANKRUPTCY JUDGE.

19   APPEARANCES:

20   For the Debtor:          John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
21                            780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
22                            (212) 561-7700

23   For Scott Ellington:     Debra A. Dandeneau
                              Laura R. Zimmerman
24                            BAKER & MCKENZIE, LLP
                              452 Fifth Avenue
25                            New York, NY  10018
                              (212) 626-4875
```

82

1    consent to Bankruptcy Court adjudication or are we going to

2    have a motion for remand.

3        So I don't know what we're going to attempt to accomplish

4    here because later in this month we have set a hearing on Mr.

5    Ellington's motion for remand and abstention.  So I'll ask

6    counsel, did you all view this setting as something that, you

7    know, we needed to address issues on, or is it premature

8    before we have the hearing on the motion for remand and

9    abstention?

10            MR. YORK:  Your Honor, this is Drew York from Gray

11   Reed.  I represent Mr. Daugherty in the adversary action.  And

12   I agree with the Court that it is, based upon the motion to

13   abstain and remand that was filed, it's premature.  We set the

14   status conference at the Court's request immediately after we

15   filed the removal notice.  I think we can address all of the

16   issues at the hearing at the end of the month.

17            THE COURT:  All right.  Ms. --

18            MS. DANDENEAU:  Your Honor?

19            THE COURT:  Go ahead.

20            MS. DANDENEAU:  We agree with Mr. York and the Court,

21   Your Honor.

22            THE COURT:  Okay.  Well, so I guess we will see you

23   at the end of the month.  I think, what is it, maybe March

24   28th, something like that?  March 29th?

25            MS. DANDENEAU:  I believe it's March 29th.

83

```
 1              THE COURT:  Okay.  And you know that I tend to
 2     sometimes share my views just to see if it will spur a fit of
 3     reasonableness or encourage people to settle or walk away.
 4     I'm pretty exasperated with that attempt in this case.  But
 5     this litigation is -- I'm going to call it the stalking
 6     lawsuit.  Okay?  Every time -- I don't know how much longer it
 7     will be in my court, but as long as it's in my court I'm going
 8     to call it what it is, a stalking lawsuit.  It is one grown
 9     man accusing another grown man of stalking.  You know, it's
10     just embarrassing to me, and it should be embarrassing to
11     those involved.
12          Now, I have read the lawsuit and I have read that Mr.
13     Ellington accuses Mr. Daugherty of driving by his house,
14     driving by his father's house, driving by his sister's house,
15     driving by his office, 143 sightings, he's taking pictures.
16     And you know, if that's true, again, that's embarrassing.  If
17     -- I don't even know what to say except this is embarrassing.
18     One grown man accusing another grown man of stalking.  Okay?
19     A statute, by the way, that was designed to protect, you know,
20     ex-wives, girlfriends, battered women, from abusive men.  You
21     know, gender doesn't matter, but wow.  It's just -- I don't
22     know what to say except people should be embarrassed, and so
23     that's what I'm going to say.
24          I don't know if it's going to make a whit of difference in
25     anyone's litigation posture.  But we'll come back on March
```

84

1    29th and we'll do what we need to do on the motions before the

2    Court.

3         (Proceedings concluded at 3:41 p.m.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                      **03/07/2022**

23   _____    _____

     Kathy Rehling, CETD-444                         Date
24   Certified Electronic Court Transcriber

25

84

1   29th and we'll do what we need to do on the motions before the

2   Court.

3        (Proceedings concluded at 3:41 p.m.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                     **03/07/2022**

23   _____     _____
     Kathy Rehling, CETD-444                       Date
24   Certified Electronic Court Transcriber

25

# EXHIBIT U

012590

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3                           )    Case No. 19-34054-sgj-11
     In Re:                  )    Chapter 11
 4                           )
     HIGHLAND CAPITAL        )    Dallas, Texas
 5   MANAGEMENT, L.P.,       )    August 31, 2022
                             )    9:30 a.m. Docket
 6        Reorganized Debtor.)
                             )    STATUS CONFERENCE RE: MOTION
 7                           )    FOR FINAL APPEALABLE ORDER
                             )    FILED BY JAMES DONDERO
 8   _____)    [3406]

 9                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10              UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Reorganized      Jeffrey Nathan Pomerantz
     Debtor:                  PACHULSKI STANG ZIEHL & JONES, LLP
13                            10100 Santa Monica Blvd.,
                               11th Floor
14                            Los Angeles, CA  90067
                              (310) 277-6910
15
     For the Reorganized      Melissa S. Hayward
16   Debtor:                  HAYWARD, PLLC
                              10501 N. Central Expressway,
17                             Suite 106
                              Dallas, TX  75231
18                            (972) 755-7104

19   For James Dondero,       Michael Justin Lang
     Movant:                  CRAWFORD WISHNEW & LANG, PLLC
20                            1700 Pacific Avenue, Suite 2390
                              Dallas, TX  75201
21                            (214) 817-4500

22   Recorded by:             Michael F. Edmond, Sr.
                              UNITED STATES BANKRUPTCY COURT
23                            1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
24                            (214) 753-2062

25
```

12

 1   And when he, being Judge Kinkeade, after the briefs were

 2   filed, he obviously was looking at it, he questioned his

 3   jurisdiction, he requested briefing on the jurisdiction,

 4   because in that order that he sent out requesting the

 5   briefing, he pointed out -- you know, one of the issues he

 6   pointed out was the Court's language, the reservation language

 7   in the order.  And, again, Highland argued that because of

 8   that language, among other things, that language made the

 9   order not final.

10       So all we're saying, all we're asking is just remove that

11   language so when we file the writ of mandamus that argument

12   isn't there.  The Court is done dealing with the issue.

13   Nobody can disagree with it.

14       You know, nobody -- Highland is not agreeing that we, you

15   know, can seek mandamus, so I'm not saying that.  And I'm not

16   asking the Court to agree to that.  Mandamus is a -- we

17   believe is an option.  It's still on the table.  And we're

18   just dealing with one issue that came up before and just

19   trying to head it off before -- so that we don't have to come

20   back down and ask the Court to remove it later.

21           THE COURT:  All right.  Mr. Pomerantz, what do you

22   want to say about this?

23           MR. POMERANTZ:  So, Your Honor, this is extremely

24   frustrating.  I know Your Honor had said you didn't want to

25   waste Court time.  There has already been a tremendous amount

13

1   of Court time that's wasted.

2       When we got this motion, it was a head-scratcher.  We read

3   it as seeking way more things than what Mr. Lang is saying

4   now.  If he had called up and asked us if we had any issue,

5   subject to Your Honor's agreement, to remove that last

6   sentence, we would have said we don't, because the briefing

7   before the District Court and the District Court's decision

8   have really nothing to do with that last sentence.  Maybe the

9   -- Judge Kinkeade mentioned it in his December order, but it's

10  clear, as Your Honor mentions, from the reading of the

11  District Court opinion that it is irrelevant.

12      And the argument that the Court, the District Court which

13  denied interlocutory appeal is somehow, once that sentence is

14  eliminated, going to entertain and grant a writ of mandamus is

15  farcical.  It's just not going to happen.  And unfortunately,

16  what's going to happen is we're going to have to spend more

17  time, more money, and more effort.

18      And Your Honor, I know the motion to strike has been

19  resolved, but I'd just like to mention it, because this is --

20  continues to be frustrating from the Highland side.  They

21  filed an appendix that sought to slip in three letters written

22  by attorneys for various Dondero entities that were

23  essentially a smear campaign, a smear campaign on Mr. Seery, a

24  smear campaign on the Independent Directors, incidentally,

25  which may be actionable in its own right.

14

1      That had nothing to do with bias.  They wanted to slip

2   that in, somehow it would get into the appellate record, if

3   and when they ever got to an appeals court.

4      So what do we do, Your Honor?  We called them up, called

5   Mr. Lang up and said, will you withdraw the letters?  There's

6   no basis for those to be included in the appendix.  He said

7   no.  Said, okay, will you make the deponents -- the people who

8   wrote the letters available for deposition?  Wouldn't agree to

9   that, either.

10      And then we go to the time and the money, we file our

11   motion to strike, and lo and behold, which has become a

12   considerable pattern in this case, Your Honor, what does Mr.

13   Lang do?  He calls up and says, I will withdraw the letters.

14   Okay?  That's aside.  We got what we wanted.  There's nothing

15   we can do.  But it is kind of frustrating, how that -- how

16   that played out.

17      Your Honor, this motion, to the extent it asks for that

18   sentence to be removed, that's fine.  Again, we think it's a

19   legal nullity.  What Mr. Lang asked for in his motion is for

20   Your Honor to issue a final order.  Your Honor can't determine

21   whether your order is final.  We've made that point in our

22   opposition.  It seems maybe now Mr. Lang is walking back on

23   that.  There's nothing you can do.  Your Honor can issue an

24   order; it'll be up to the District Court.

25      With respect to the supplement, Your Honor, as we put in

15

1   the record, we think all the quote/unquote evidence that was

2   submitted just is a severe mischaracterization of the record.

3   And it's important, Your Honor, that not only does the -- we

4   agree that the evidence can come in, but we think Your Honor

5   has to make a determination whether those additional

6   allegations of bias and evidence do in fact demonstrate bias.

7   What we think Mr. Lang wanted to do, or the Appellants wanted

8   to do, or the Movants, they wanted to have that information

9   come in and argue at first blush to the Appellate Court that

10  that is bias, without having had Your Honor make the initial

11  determination, as you would have if there was a motion to

12  reconsider, as you would have if there was a new motion.

13      And so we think it's very important that Your Honor

14  consider those additional allegations.  We think categorically

15  they do not demonstrate any bias, and our Exhibit A goes

16  through each item and points out the severe

17  mischaracterizations.

18      So, Your Honor, we've wasted a lot of time.  We've wasted

19  a lot of money.  But if all they want is to remove that

20  sentence, supplement the record, have Your Honor deny the

21  motion yet again after considering the additional evidence, we

22  do not have an opposition to that.  But it was -- kind of took

23  a long time and a lot of money to get to this place.

24      Thank you, Your Honor.

25          THE COURT:  All right.  And Mr. Lang, on the subject

16

1  of it took a lot of time and a lot of money, estate resources,

2  to get to this place, I just want to note a couple of things.

3  And I guess I'm happy to hear any response to these things

4  that I feel very frustrated about.

5      Again, my focus at this point is judicial resources as

6  well as estate resources.  And no judge, no judge looks

7  lightly on a motion to recuse.  Okay?  Any judge, I would

8  think, is going to have some self-introspection.  Like, oh my

9  goodness, what would motivate someone to think this needs to

10  be urged?

11      But, so on the topic of -- again, I want you to respond to

12  this, Mr. Lang -- my concern about judicial resources and

13  estate resources.

14      The timeline here -- and I always talk about timelines, I

15  know -- but this Court signed the confirmation order in this

16  case February 22, 2021, and your motion to recuse was filed

17  about a month later, March 18, 2021.  Now, here's the first

18  thing I'll mention about judicial resources and estate

19  resources.  Your motion and brief to recuse included an

20  appendix that was 200 -- no, excuse me, 2,722 pages long.

21  Okay?

22      So any judge, again, has to take it seriously when a

23  motion to recuse is filed.  And the standard is I have to

24  stand back and look at would a reasonable person have concerns

25  here.  So I can't just say, I know I'm not biased, I don't

Case 19-34054-sgj11   Doc 3571-1   Filed 10/17/22   Entered 10/17/22 11:28:53   Desc
Case 3:25-cv-02072-S   Document 17   Filed 06/05/25   Page 252 of 351   PageID 13528
Appendix   Page 206 of 249

17

 1  think I'm biased; I have to look at what a reasonable person

 2  might think.

 3     So you presented to me a 2,722-page appendix for me to do

 4  my job and look at what would a reasonable person think.  So,

 5  then would it raise a doubt in the mind of a reasonable

 6  observer as to the judge's impartiality?

 7     So I think here's another point that goes to judicial

 8  resources.  I had my law clerk, just out of curiosity, count

 9  up for me how many orders that I had signed as of the day that

10  the motion to recuse was filed, March 18, 2021, and I had

11  presided over the bankruptcy case for 15 months at that point,

12  but it had been in Delaware for two months before Dallas.  On

13  the day you had filed your motion to recuse, March 18, 2021, I

14  had signed 263 orders in the Highland bankruptcy case and the

15  adversary proceedings.  It's a lot more now, of course.  But

16  so I suppose, if I was really to do my job thoroughly, I might

17  look not merely at your 2,722 pages of appendix attached to

18  your motion to recuse, but all 263 orders I had entered to

19  see, hmm, would a reasonable observer question my

20  impartiality?

21     So, anyway, this is all about judicial resources and

22  estate resources.  So, going down the timeline, March 23,

23  2021, five days after you filed the motion to recuse -- after,

24  I will tell you, I won't say I dropped everything to pore

25  through this, but spent a lot of time -- I issued an order

18

1   denying the motion to recuse.

2       Now, here's inside baseball, okay, if there ever was:  The

3   last sentence, reserving the right to supplement or amend,

4   here's why I did it.  I didn't know it would cause a brouhaha.

5   Maybe I didn't give it enough thought.  But in reading the

6   case law during those many days and hours I spent focusing on

7   your motion to recuse, I realized that most of the case law

8   says you don't have to have a hearing, okay, the statute

9   doesn't require a hearing, the case law says you don't have to

10  have a hearing.  And I cited some of that my order.  But I

11  thought, these Movants, after seeing this order, they may come

12  back and say, you didn't give us our day in court.  We wanted

13  a hearing.  We weren't just going to rely on our 2,722-page

14  appendix.  We wanted to put on witnesses.

15      So I didn't have to stick that sentence in there, but I

16  was just sort of anticipating what the Movants might do.

17      Okay.  So, live and learn.  I guess I won't, if I'm ever

18  confronted with the situation again, do that.  But that's what

19  that was about.

20      So, my law clerk went and looked at the appellate record

21  in the past few days, because, I mean, again, head-scratcher.

22  We were trying to get a feel for how big a deal was this

23  sentence, okay, to the District Court, if at all.  But anyway,

24  we happened to note that in July, July 20, 2021, the District

25  Court record on appeal was supplemented with 1,001 more pages

19

1   of record.  So I guess, goodness gracious, poor Judge Kinkeade

2   and his staff, they had 3,723 pages of appendix.  I don't even

3   know if that's all.  You know, I don't know.

4        But so Judge Kinkeade dismissed the appeal because he said

5   my order was interlocutory on February 9, 2022, and then we

6   didn't see a motion for rehearing or an appeal to the Fifth

7   Circuit or a petition for writ of mandamus to the Fifth

8   Circuit.  Five and half months later, this new motion for

9   final appealable order and supplement to the motion to recuse

10  is filed, containing 365 more pages.  And then I see that, Mr.

11  Lang, you filed an amended motion to take out certain of the

12  items, with the agreement, the stipulation that was reached

13  with Debtor's counsel, so it's now a 154-page appendix.

14       But I should add that, in Highland's objection to your

15  latest motion, they attached 86 exhibits, and I couldn't count

16  all those exhibits, but it was more than 5,500 pages.  And it

17  was, as I understood it, sort of almost like a rule of

18  optional completeness.  If you're going to submit these 154

19  pages to supplement the record, we think you need to attach

20  more than snippets of a transcript here and there.  You need

21  to have the whole context.

22       So, anyway, I -- you know, look at what you're doing.  I'm

23  just -- and I guess I could totally appreciate and understand

24  if there had been a brief order from Judge Kinkeade saying,

25  because of that one sentence, this is an interlocutory order,

1   no leave to appeal an interlocutory order is warranted, end of

2   order. And, frankly, when you filed your motion, this latest

3   motion, having not seen Judge Kinkeade's order, I thought

4   that's what it was going to say.

5       So, from the tone of your motion, it sounded like that's

6   all his order was about, just: I have a problem with this

7   last sentence, it makes the whole order interlocutory. And

8   then I go back and read it and he gives four or five different

9   reasons why an order denying a motion to recuse is

10  interlocutory until the end of the case. I know that's a

11  bizarre concept in the world of bankruptcy, but he considered

12  this is even the rule in the world of bankruptcy.

13      So, anyway, help me to understand why this isn't

14  unnecessary carpet-bombing the Court, me and whoever might

15  hear your petition for writ of mandamus, and the Debtor

16  estate, carpet-bombing us with paper and causing us to expend

17  resources. And, again, we've got this backdrop of the

18  original motion to recuse being filed 15 months after I

19  started presiding over the case and after I had signed 263

20  orders.

21      Please, Mr. Lang, please help me to understand if this is

22  warranted. Why, I mean, help me to understand why this is not

23  wasting resources in your view and why this isn't just some

24  strategy. Again, I'm trying to not play psychologist, I'm

25  really trying to understand why you think this is fine.

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 17    Filed 08/05/25    Page 256 of 351    PageID 13532
Appendix    Page 206 of 249

21

1          MR. LANG:  Well, Your Honor, we've moved to recuse,

2    and we've stated the grounds, and we have put in documents

3    from the record that we think support those grounds.  We have

4    not unnecessarily carpet-bombed.  We've cited to the various

5    transcripts.  The length of the record is directly related to

6    the length of the transcripts mostly, the various transcripts

7    throughout the proceeding.  And so, you know, with respect to

8    the 2,722 pages of appendix, most of those are just complete

9    copies of transcripts.

10        But again, we're just creating our record to support our

11   position on our motion.  And the current motion is eight

12   pages.  It's got reference to the additional grounds that

13   we've set forth that we think support our motion.  And we

14   attached the various documents and transcripts that, again,

15   support -- we think support our position.  And we're making

16   our record for appeal.

17        And as far as Mr. Pomerantz and the withdrawing of the

18   letters, you know, I was getting ready for trial when Mr.

19   Morris called.  And he said, they're hearsay.  We had a brief

20   conversation.  I disagreed.  They filed their motion.  When I

21   got the time to look at it, I read through it, and Mr. Morris

22   and I had a conversation, and we decided, you know what, we

23   don't need them, we'll pull them out.  Let's just do away with

24   this issue.  It's not worth the time to deal with it.

25        I'm sorry they had to file their motion.  But, you know, I

22

```
 1   couldn't drop everything at that moment to look through.  And
 2   again, the reason that he gave was hearsay.  So, you know,
 3   it's not gamesmanship.  It was just, look, you know, when we
 4   got down to looking at it, when I looked at it, I decided it
 5   wasn't worth the effort and the hassle, and we agreed to pull
 6   them down and withdraw them.  And that's why I filed the
 7   amended motion.
 8        As far as the current appendix, Your Honor, we're just
 9   making a record.  You know, we're trying to get this thing
10   reviewed.  We're making sure the Court is aware of all the
11   grounds and having considered all the grounds and all the
12   actions that we think support our motion.  We're giving the
13   Court the opportunity to look at it, and then just enter the
14   order without that language and we'll deal with the mandamus.
15        Again, the issue is ultimately going to be reviewed.
16   We're trying to get it reviewed.  And you're right, you know,
17   we don't have to, you know, you didn't have to have a hearing
18   on the first deal, you don't have to have a hearing on this
19   one.
20             THE COURT:  Okay.
21             MR. POMERANTZ:  Your Honor, this is -- this is just
22   one more match in furtherance of Mr. Dondero's stated desire,
23   as you've heard many times, to burn the place down.  We would
24   have hoped, and I guess it would have been naïve to hope, as I
25   know Your Honor has hoped throughout the case, that at some
```

23

1  point in time the Dondero side would stop blaming Your Honor,

2  blaming Mr. Seery, blaming the estate, and actually look at

3  what he can do to put an end to this.  Pay his notes, stop

4  raising frivolous claims, so everyone can go on with his life.

5  That's what the estate wanted to do and wants to do.  That's

6  what Mr. Seery wants to do.  Unfortunately, Mr. Dondero

7  doesn't seem capable of it, and this is just one more match on

8  the flames.  And Mr. Lang, doing his job, following his

9  client's wishes, is just one more player in that.  But it is

10  extremely frustrating.

11          THE COURT:  Okay.  All right.  Here's what I'm going

12  to do.  First, I'm simply going to deny the pending amended

13  motion for final appealable order and supplement to motion to

14  recuse, as it is procedurally improper as framed.  Okay?  It

15  was kind of like a Rule 54 motion.  It was kind of like a new

16  motion to recuse.  It was kind of like a Rule 59 motion for,

17  you know, new -- to put in new evidence, have a new trial, but

18  way untimely for that.

19      So I'm just denying the motion that's before me.  Okay?

20  And by doing that, I mean, I guess, I guess the stipulation

21  and order that's before me on the motion to strike and the

22  motion to compel, I guess I'll -- it's in my queue, I'll sign

23  it, unless someone tells me there is a reason it doesn't make

24  sense to sign it.

25      But I'm denying the motion before me.  But just so it's

24

1   clear, Mr. Lang, it's without prejudice to you either filing a

2   simple Rule 54 motion, without attachments, that simply asks

3   me to strike the last sentence of my original order denying

4   your motion to recuse from March 2021.

5       If you give me a simple Rule 54-based motion simply asking

6   me to strike that sentence, I'll sign it.  Without a waiting

7   period.  Without a hearing.  And I assume Mr. Pomerantz

8   doesn't have a problem with that.

9           MR. POMERANTZ:  That is correct, Your Honor.  If all

10  that motion asks for, we would not oppose that.

11          THE COURT:  Okay.  It's also, my ruling today denying

12  your motion, is without prejudice to you filing a new motion

13  to recuse, if that's what you want to do, to start this over

14  and supplement the record.

15      But, you know, proceed as you will.  This Court is going

16  to do its duty.  And, well, if you want to do that, you do

17  that, but I'll have a more elaborate order if I have to rule

18  on a new motion to recuse.  Among other things, I'm going to

19  point out to the Court above, whoever hears this, that because

20  I think timeliness was always an issue I raised in your

21  original order, you know, filing a motion to recuse after

22  confirmation, 15 months after this judge was assigned to the

23  case, and after the judge had signed 263 orders.

24      You know, we have case authority, as I'm sure you

25  researched and know, that talk about timeliness.  Even though

25

1   it's not baked into the statute, 28 U.S.C. Section 455, it is

2   a factor.  And so this is not *A v. B* litigation.  This is a

3   case affecting many, many people.  And at some point, don't we

4   have to wonder why a motion would be filed after 263 orders?

5   If your clients legitimately think there was bias, I don't

6   know why they didn't raise the issue way, way earlier in the

7   case.

8       And that's why these appendices are so huge, right?  It

9   dovetails with the timeliness.  Okay?  Fifteen months.

10  There's a huge, huge, huge, huge record.

11      So, anyway, do you have any questions, Mr. Lang?

12      Again, I  will say it for at least the third time this

13  morning:  I'm worried about judicial resources and estate

14  resources.  Okay?  And, you know, I have to worry about I'll

15  loosely call my bosses, okay, you know, the courts that grade

16  my papers.  The District Court who hears appeals and hears

17  petitions for writ of mandamus.  The Fifth Circuit.  They're

18  going to get frustrated with me if -- well, you know, if, for

19  example, I had ruled on this motion before me today, a clearly

20  procedurally defective motion.  And if I just willy-nilly let

21  people put things in the record without a procedurally proper

22  basis, it just makes more work for the Court of Appeals,

23  right?

24      So it's not just about the lawyers here.  It's not just

25  about me and my staff.  It's about the people who grade my

26

1    papers.  If I granted your motion as it's pending here before

2    me today, I have every reason to think, whether it's Judge

3    Kinkeade or the Fifth Circuit, they would think, what is this

4    judge doing?  Okay?  So it's just procedurally defective, what

5    you filed.  Okay?  But, again, you've got the ruling.  Do you

6    have any questions?

7              MR. LANG:  I don't.

8              THE COURT:  We're adjourned.

9              THE CLERK:  All rise.

10        (Proceedings concluded at 10:25 a.m.)

11                          --oOo--

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                          08/31/2022

24   _____      _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

012606

# EXHIBIT V

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

IN RE:                        .   Case No. 19-34054-11(SGJ)
                              .
HIGHLAND CAPITAL             .   Earle Cabell Federal Building
MANAGEMENT, L.P.,           .   1100 Commerce Street
                              .   Dallas, TX  75242-1496
                              .
         Debtor.             .   Monday, September 12, 2022
. . . . . . . . . . . . . .   9:40 a.m.


TRANSCRIPT OF HEARING ON MOTION TO WITHDRAW PROOF OF CLAIM #146
           BY HCRE PARTNERS, LLC (3443) AND
 REORGANIZED DEBTOR'S (A) OBJECTION TO MOTION TO QUASH AND FOR
           PROTECTION [DOCKET NO. 3464] AND
 (B) CROSS-MOTION TO ENFORCE SUBPOENAS TO ENFORCE SUBPOENAS AND
           TO COMPEL A DEPOSITION (3484)

           BEFORE HONORABLE STACEY G. JERNIGAN
         UNITED STATES BANKRUPTCY COURT CHIEF JUDGE




TELEPHONIC APPEARANCES:

For Highland Capital      Pachulski Stang Ziehl & Jones LLP
Management, L.P.:         BY:  JOHN MORRIS, ESQ.
                          780 3rd Avenue, 34th Floor
                          New York, New York 10017


For NexPoint Real         Hoge & Gameros, L.L.P.
Estate Partners LLC       BY:  CHARLES W. GAMEROS, JR., ESQ.
f/k/a HCRE Partners       6116 North Central Expressway
LLC:                      Suite 1400
                          Dallas, Texas 75206


Audio Operator:           Michael F. Edmond

 Proceedings recorded by electronic sound recording, transcript
           produced by a transcript service.

_____

**LIBERTY TRANSCRIPTS**
**7306 Danwood Drive**
**Austin, Texas 78759**
**E-mail:  DBPATEL1180@GMAIL.COM**
**(847) 848-4907**

31

1  we've already said the Court should allow us to withdraw the

2  proof of claim and condition it with prejudice.

3         There is no other lawsuit out there.  There is no

4  other position being taken anywhere.  Frankly, Your Honor, the

5  reason why I said admit the exhibits and I question their

6  relevance is because none of them go to actual legal prejudice.

7  Can't show it, hasn't shown it, hasn't demonstrated it.  It

8  says they did a lot of work, gave you the greatest hits of some

9  email, but quite frankly, Your Honor, that goes to merit, not

10 legal prejudice.  That goes to, I believe, part of their story

11 as to what happened.

12        The story that matters to me is we think things were

13 going to happen during the estate, he's right.  We didn't move

14 for them.  We looked back at it and said we don't need the

15 proof of claim anymore, we should withdraw it.  That's the only

16 thing that's happened, and that's why we're here.  We don't

17 think he's entitled to discovery as to why we withdrew the

18 proof of claim.

19        It's his burden to show legal prejudice.  He can show

20 it or he can't.  He hasn't.

21        THE COURT:  Okay.

22        MR. GAMEROS:  The estate hasn't.

23        THE COURT:  Mr. Gameros?

24        MR. GAMEROS:  (Indiscernible) Mr. Dondero.

25        THE COURT:  I have a question.  I mean I'm looking at

32

1  your pleading, your motion to withdraw the proof of claim, and

2  I'm looking at this wonderful chart you have on Page 7 saying

3  here are the standards under Bankruptcy Rule 3006, you, Court,

4  should consider.  They were articulated in the Manchester case.

5        And it's not merely about is there any prejudice to

6  the estate.  I mean you set forth five factors.  One is "reason

7  for dismissal."  One is diligence in bringing the motion to

8  withdraw.  One is undue vexatiousness.  One is the matter's

9  progression including trial preparation.  One is duplication of

10  expense of relitigation.

11        This is your own authority, which I believe actually

12  is correctly articulating the standards.  It's not just about

13  prejudice.  Yes, I agree that some of the case law has zeroed

14  in on that one in particular.  But I mean you say yourself

15  reason for dismissal is a factor the Court must consider.

16        MR. GAMEROS:  That's correct, Your Honor.  Those are

17  the factors, and I think our analysis on them is correct.

18        If we go all the way to trial and the result is that

19  our proof of claim is denied, we're in the same position we are

20  right now.  So why should the parties, the estate, and the

21  Court go through that exercise?

22        THE COURT:  Okay.  Well, that's another issue, I

23  think, other than the reason for dismissal.  But a follow-up

24  question to what you just said is this.

25        Would you agree to a condition on the withdrawal of

012610

33

1  your proof of claim that your client agrees that Highland has a

2  46-point whatever it was percent interest in SE Multifamily

3  Holdings and your client waives any right in the future to

4  challenge that interest?

5          MR. GAMEROS:  Your Honor, if that's what the Court

6  wants to put in an order and I have a chance to confer with my

7  client on it, I'm pretty sure that would be agreeable.

8          THE COURT:  Today's the day.  I'm not going to

9  continue.  I've got, you know, the whole day booked if I needed

10 it because I wasn't sure what you all were going to want to put

11 on.

12         MR. GAMEROS:  Your Honor, we'd agree with that.

13         MR. MORRIS:  Your Honor, I'm sorry to interrupt, but

14 a waiver of any appeal, too.  I just hard that if that's what

15 you want to put in the order, that's okay.  But this case has

16 to end, and that's what we're looking for.

17         We're a post-confirmation estate that will not go

18 forward with the possibility hanging over its head that it may

19 be divested of this asset.  That is what this proof of claim

20 and this dispute is about.

21         And what the debtor needs in order to avoid legal

22 prejudice is the complete elimination of any uncertainty that

23 it owns 46.06 percent of SE Multifamily.  And if HCRE is not

24 willing to give that comfort today, we again renew our request

25 for a direction that the three HCRE witnesses appear for

0126117

34

1  substantive depositions and we get this on the trial calendar.

2          MR. GAMEROS:  Your Honor, we'll agree to it.

3          THE COURT:  Well, you know what, this is such a big

4  deal I really need a client representative to say that.  It

5  would be that --

6          MR. GAMEROS:  I don't have one here today, but I can

7  get you one.

8          THE COURT:  How soon --

9          MR. GAMEROS:  Do you want me to file a stipulation or

10 an affidavit?

11         THE COURT:  Pardon?

12         MR. GAMEROS:  Do you want me to file an affidavit?

13         THE COURT:  Well, let's be a hundred percent clear.

14 Your client would state that with the granting of the motion to

15 withdraw proof of claim number 146, HCRE is irrevocably waiving

16 the right to ever challenge Highland Capital Management's 46

17 percent interest -- and I know it's 46-point something -- 46

18 percent interest in SE Multifamily Holdings, LLC and is,

19 likewise, waiving the right to appeal or challenge the order to

20 this effect.

21         MR. MORRIS:  Your Honor, if I may, perhaps we can

22 take a ten-minute recess and allow him to consult with his

23 client and perhaps get a client representative on the phone who

24 can make that representation?

25         THE COURT:  All right.  Mr. Gameros, you think you

012612

35

1  can get a client rep on the WebEx?

2          MR. GAMEROS:  I'm pretty sure I can, Your Honor.

3          THE COURT:  All right.  Well, how about we take a 15-

4  minute recess.  Does that sound a reasonable amount of time?

5  We've got, you know, two dozen people --

6          MR. GAMEROS:  It does, Your Honor.

7          THE COURT:  Two dozen people on the WebEx.  I don't

8  know if maybe one is a client representative, but we'll take a

9  15-minute break and I'll come back.  Okay.

10          THE CLERK:  All rise.

11      (Recess at 10:33 a.m./Reconvened at 10:50 a.m.)

12          THE CLERK:  All rise.

13          THE COURT:  Please be seated.

14          We're back on the record in Highland.

15          Mr. Gameros, how did you want to proceed now?

16          MR. GAMEROS:  Your Honor wanted me to get a

17  representative of NexPoint Real Estate Partners to state that

18  they agree that the estate has its 46 percent interest in the

19  company agreement subject to the company agreement.  And I've

20  got Mr. Sauter here who has authority to speak on behalf of

21  NexPoint Real Estate Partners.

22          THE COURT:  All right.  Well, so what is his position

23  with HCRE?

24          MR. SAUTER:  Your Honor, I don't have -- this is DC

25  Sauter.  I don't have an official position with HCRE, but I

012613
APP 0219

36

 1  have spoken with Mr. Dondero and he has authorized me to appear

 2  here today and agree to the conditions that Mr. Gameros just

 3  outlined.

 4          THE COURT:  All right.  Well, it sounds like hearsay

 5  to me.  I don't know -- Counsel, let me have you both respond.

 6  You know, I worry about this will fall apart the minute Mr.

 7  Dondero is instructing a lawyer, I never agreed to that.  I

 8  mean I just don't know.  This is highly unusual.

 9          First --

10          MR. GAMEROS:  Your Honor, if I might?

11          THE COURT:  Please.

12          MR. GAMEROS:  Mr. Sauter is an officer of the Court.

13  He works, you know, with Mr. Dondero at his business at

14  NexPoint; certainly an authorized agent on behalf of NexPoint

15  Real Estate Partners to make this agreement on behalf of

16  NexPoint Real Estate Partners.

17          To the extent that the condition that you originally

18  described as a conclusory matter, in other words, how to end

19  the withdrawal, we already agreed to that, that we also can

20  agree on the record to waive any appeal.  Mr. Sauter is

21  authorized to agree to that, as well.

22          So I think as an agent and a lawyer on behalf of

23  NexPoint Real Estate Partners, he's fully able to do that.

24          THE COURT:  How do I know he's able to do that?

25          And, by the way, if Mr. Dondero is in I guess the

**WWW.LIBERTYTRANSCRIPTS.COM**

37

1   last 15 minutes given him authority to testify before the

2   Court, why couldn't Dondero just get on the WebEx himself?

3           MR. SAUTER:  Your Honor, I think he felt more

4   comfortable with me being a lawyer agreeing to those terms so

5   that he wouldn't misstate something.  He has been listening.  I

6   believe he's still on, although I'm not certain.

7           THE COURT:  Mr. Morris, do you want to respond?  I

8   mean I'm not sure, frankly, I care what you say, no offense.  I

9   don't think I have a person with clear authority here.

10          MR. MORRIS:  I'll just be quick and say I agree.

11          THE COURT:  Okay.  Mr. Gameros --

12          MR. GAMEROS:  As an attorney for NexPoint Real Estate

13  Partners, I have the authority to make that agreement on the

14  record and it be binding.  Mr. Sauter is confirming that

15  authority having spoken with Mr. Dondero about it.

16          I think that the Court is fully --

17          THE COURT:  Mr. Gameros --

18          MR. GAMEROS:  -- capable of doing that --

19          THE COURT:  Mr. Gameros, come on.  You know this is

20  the client's decision to make.  Okay.  I don't have a client

21  representative.  I don't have an officer or controlling

22  equityholder as evidence here of --

23          MR. MORRIS:  Mr. Dondero --

24          THE COURT:  -- the willingness to make the agreement.

25          Pardon?

**WWW.LIBERTYTRANSCRIPTS.COM**

38

1        MR. MORRIS:  Can Mr. Dondero make the representation

2   on the record to the Court that he is authorizing Mr. Sauter to

3   waive any claim that HCRE has to Highland's 46.06 percent

4   interest in SE Multifamily along with any appeal?  This is just

5   step one.  But if Mr. Dondero was on the phone, let him speak

6   up and make it crystal clear that he is delegating the full

7   authority to Mr. Sauter to negotiate and enter into this

8   consensual order on behalf of HCRE.

9        THE COURT:  All right.  Mr. Gameros, do you want to

10  give your client authority to speak up?  Your client

11  representative, someone who's actually an officer or a

12  controller or equity owner?

13        MR. GAMEROS:  Your Honor, if Mr. Dondero can do that,

14  that would be great.  I don't know if he's in a place where he

15  can do that.

16        THE COURT:  All right.  Mr. Dondero, if you can hear

17  us, are you willing to give some quick testimony in that

18  regard?

19     (No audible response)

20        MR. DONDERO:  I can't see the box --

21        UNIDENTIFIED SPEAKER:  Surprising that -- surprising

22  he was on the phone before, but now he's not after delegating.

23  Just I'm not --

24        MR. SAUTER:  Your Honor, he's on the phone.  I'm just

25  -- if you will give me a minute, I got to run around the corner

**WWW.LIBERTYTRANSCRIPTS.COM**

39

1  and try to make sure he knows how to unmute himself.

2          THE COURT:  Star 6.  If he's on a phone, star 6 is

3  the way to unmute himself.  But I want to see video, too.

4          THE OPERATOR:  There we go.  Try again.

5          MR. DONDERO:  Hello?

6          THE COURT:  All right.

7          MR. DONDERO:  Hello?

8          THE COURT:  Mr. Dondero, is that you?

9          MR. DONDERO:  It's me.  I've been on the entire time.

10          THE COURT:  All right.  Can you turn your video on,

11  please?

12          MR. DONDERO:  I am on my cell phone.

13          THE COURT:  Okay.  Well, so I guess you just called

14  in on your cell phone, you don't have a WebEx connection on

15  your cell phone?

16          MR. DONDERO:  I don't have a WebEx.

17          THE COURT:  Okay.  Well -- yeah, it sounded like you

18  were in the same office as Mr. Sauter.  Is that -- did I

19  misunderstand?

20          MR. DONDERO:  We work in the same office.  I'm in my

21  car.  I just stepped out of my car.

22          THE COURT:  All right.  Well, this is not ideal, you

23  know, without us seeing you.  But I'll go ahead and swear you

24  in.  All right.  Can you hear me okay?  I need to swear you in.

25          MR. DONDERO:  Yes.

Dondero - Direct                    40

1          THE COURT:  All right.

2               JAMES DONDERO, HCRE'S WITNESS, SWORN

3          THE COURT:  All right.

4          Mr. Gameros, do you want to ask him the questions we

5    need to hear answers on, please?

6          MR. GAMEROS:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8    BY MR. GAMEROS:

9    Q    Mr. Dondero, on behalf of HCRE, do you agree as a

10   condition for withdrawing the proof of claim that HCRE will not

11   challenge the estate's ownership or equity interest in SE

12   Multifamily subject to the company agreement?

13   A    Yes.

14   Q    Do you agree that you will not appeal and that, therefore,

15   HCRE is waiving any appeal right to that determination as a

16   condition of withdrawing the proof of claim?

17   A    Yes.

18          MR. GAMEROS:  Those are the questions for Mr.

19   Dondero.

20          MR. MORRIS:  Your Honor, if I may?

21          THE COURT:  Mr. Morris, you may.

22          MR. MORRIS:  I'm very uncomfortable.  I'm very

23   uncomfortable with the inclusion of the language subject to the

24   company agreement.  It sounds like a very conditional waiver.

25   We need an irrevocable unconditional admission by HCRE that

**WWW.LIBERTYTRANSCRIPTS.COM**

41

1  Highland owns 46.06 percent of SE Multifamily, period, full

2  stop.  If they want to keep conditions in there and make it

3  conditional and make it subject to other things, let's please

4  deny the motion and proceed to trial.

5          THE COURT:  All right.  Well, Mr. --

6          MR. GAMEROS:  The equity that they own is part of the

7  company agreement.  It's not modifying the company agreement by

8  saying.

9          THE COURT:  Well --

10         MR. MORRIS:  Our ownership is not subject to the

11 agreement.  We either have an ownership interest or we don't.

12 Our rights and obligations as a member of SE Multifamily are

13 subject to the agreement, but our ownership interest is not.

14 And that's the ambiguity that we need to remove.

15         THE COURT:  Okay.  Well, Mr. Gameros, do you want to

16 rephrase the question or are you not willing to make the

17 agreement as specific as Mr. Morris says he needs it?

18         MR. GAMEROS:  That's what I'm -- I guess I don't

19 understand what his complaint is.  If the estate owns 46

20 percent of the equity of SE Multifamily, it owns that subject

21 to the company agreement.  It's not a separate ownership

22 interest.  So I don't know what the problem is.

23         THE COURT:  Okay.  Let me try to phrase it as I

24 understand it.

25         What I understand has been asserted in the proof of

APPX 0265

0126 19

42

1  claim is that what was set forth in the agreement was a

2  mistake, okay.  A mistake.  And it sounds like you're using

3  language that says we'll agree the agreement, you know, they

4  have a 46 percent interest pursuant to the agreement.  But that

5  doesn't change -- that does not really zero in on the argument

6  made in the proof of claim that there was a mistake in the

7  agreement, right?

8          So you'd have to go broader to completely resolve the

9  issues raised in your proof of claim and say we agree, Highland

10  has a 46.06 interest in SE Multifamily and we agree that is

11  correct and we waive any right to challenge it in the future

12  and we waive any right to appeal this order.

13          MR. GAMEROS:  And, Your Honor, if that's the

14  condition, I guess my concern is that the 46 percent is still

15  part of the company agreement.  We agree not to challenge it on

16  the basis of anything asserted in the proof of claim, that

17  being mistake, lack of consideration, or failure of

18  consideration.  Their 46 percent is their ownership interest in

19  SE Multifamily and HCRE won't challenge that.

20          Is that sufficient?

21          THE COURT:  Well, I need to hear from your client.  I

22  mean he needs to be asked every which way from Sunday whether

23  he is waiving the right to challenge Highland's 46.06 interest

24  from now until eternity, okay.  That's basically, you know, we

25  either have that agreement or we'll just have a trial.

012620

                          Dondero - Direct                    43
1                    CONTINUED DIRECT EXAMINATION
2    BY MR. GAMEROS:
3    Q    Mr. Dondero, do you agree that NexPoint Real Estate
4    Partners will not challenge in any way the estate's interest in
5    SE Multifamily, its 46-point whatever percent interest that is?
6    A    I think the nuance is that agreement is okay in current as
7    of today.  But it's part of an operating agreement, and that
8    percentage ownership can change due to capital calls and other
9    things.  And it could change over time.  It's never in a
10   partnership agreement fixed into perpetuity.  And so no
11   businessman can agree to that.
12        If the Court wants it fixed into perpetuity, that would be
13   very odd.
14             MR. MORRIS:  Can we go to trial, Your Honor?  Can we
15   just deny the motion and go to trial?  Let me have my
16   depositions and go to trial.  This is -- if Mr. Dondero wants
17   to take that position, he's welcome to do that.  But I'm
18   entitled to finality, and I'd like to get there.
19             THE COURT:  All right.  Well, Mr. Gameros, anything
20   else you want to ask your client that you think might be
21   helpful?
22   BY MR. GAMEROS:
23   Q    Mr. Dondero, you desire to withdraw the proof of claim.
24   Correct?
25   A    Yes.

012627
APP 0227

44

1  Q    And you agree to an order denying the proof of claim with

2  prejudice.  Correct?

3  A    Yes.

4  Q    And can you agree that HCRE will not challenge the equity

5  ownership of its member in SE Multifamily of the estate?

6  A    Yes.

7          MR. GAMEROS:  Your Honor, I think there it is.

8          THE COURT:  Mr. Morris, do you have any --

9          MR. GAMEROS:  He agrees.

10          THE COURT:  -- do you have any follow-up questions --

11          MR. MORRIS:  The waiver of the right to --

12          THE COURT:  -- Mr. Dondero?

13          MR. MORRIS:  The waiver of the right to any appeal

14  whatsoever.  And I do have -- you know, there are the other

15  conditions that we mentioned earlier, right?  Either they have

16  to also agree that Mr. Seery's deposition transcript shall

17  never be used for any purpose at any time or they need to level

18  the playing field and submit their witnesses to examination.

19          The playing field needs to be level here.  Either if

20  they want to use that deposition transcript for some purpose, I

21  have no problem with that.  Just let me take my depositions.

22  If they don't want to submit their witnesses to depositions,

23  then they also have to agree that that transcript will never be

24  used for any other purpose.  It's as if this proof of claim has

25  never been filed, right, for that purpose, right.  Because

012622

45

1  that's just not fair.  That's the legal prejudice.

2          How do you take my client's deposition on Wednesday

3  and file this motion on Friday knowing your client's supposed

4  to be deposed on Tuesday?  Level the playing field.  That's

5  conditional number two.

6          And condition number three, frankly, Your Honor, this

7  proof of claim was fraudulent.  I mean my client has been

8  damaged.  My client has spent an enormous amount of money on

9  this, and I'd like them to agree to if not make us whole, you

10 know, do something because it's wrong.  It's just wrong that

11 Mr. Dondero files proofs of claim under penalty of perjury that

12 have absolutely no basis in fact.

13         It's distressing.  I'd like those two last issues

14 addressed, as well.

15         MR. GAMEROS:  Your Honor, in terms of the Court's

16 questions in terms of finality with respect to the membership

17 interest in SE Multifamily, Mr. Dondero agrees with the Court.

18 He's already said that he won't waive -- that he waives, rather

19 -- I'm sorry, let me start again.

20         He has said very clearly that he has waived appeal of

21 this order allowing the withdrawal of the proof of claim with

22 the conditions that you asked for.  I think you should grant

23 the motion to withdraw and we can put an end to all of this.

24         THE COURT:  Okay.

25         MR. MORRIS:  Here's the thing, Your Honor.  We know

51

1  but it's also a big deal because we want to make sure only

2  parties with legitimate claims are given a seat at the table,

3  so to speak, in bankruptcy as far as, you know, their right to

4  a distribution, their right to be heard in a case.

5          So, you know, that's the reason for the rule.  We

6  don't see it come into play very often, but it's there because

7  we want to make sure that we protect the integrity of the

8  bankruptcy process.  And if someone files a proof of claim and

9  it's pending and, you know, activity happens in the bankruptcy

10  case as a result of it, that we don't just let a party say

11  never mind.

12          So the Manchester case, which you both cited in your

13  pleadings, has set forth fact-intensive factors -- fact-

14  intensive inquiry.  And, again, I'm just looking at HCRE's

15  motion, Page 7.  There was a chart and it sets forth the

16  Manchester factors.  Factor number one, diligence in bringing

17  the motion to withdraw the proof of claim.

18          In Mr. Gameros' chart, his response to that factor is

19  that HCRE brought its motion to withdraw immediately after

20  conferring with debtor's counsel.  I don't even know what that

21  means, okay.  But what I do know is in looking at diligence of

22  bringing the motion, the proof of claim was filed April 8th,

23  2020.  It was objected to, the proof of claim, July 30th, 2020.

24  And then on August 12th, 2022, this motion to withdraw the

25  proof of claim was filed.

52

1          So two years and one month after the objection was

2   filed to the proof of claim HCRE withdraws it.  So that doesn't

3   seem very diligent.  It's not diligent at all, to be honest.

4          Your second factor, you cited, Mr. Gameros, undue

5   vexatiousness, and you say HCRE has not been vexatious in

6   pursuing its proof of claim.  And outside the motion to

7   disqualify previous counsel, which is not substantive,

8   everything in the matter has proceeded by agreement and there

9   have been no hearings set or held.

10          Okay.  Well, debtor has represented in its pleadings

11  and today through counsel on the record that it has spent

12  hundreds of thousands of dollars litigating this.  It has

13  mentioned that four depositions have been taken.  It was Mr.

14  Mark Patrick.  It was the tax accounting firm.  We had the B --

15  the entity -- BH Equities, LLC, their representative.  And then

16  Mr. Seery.  So four depositions, and I'm told a lot of written

17  discovery.

18          And on the day before the -- well, the day after, day

19  or two after the Seery deposition, the motion to withdraw the

20  proof of claim was filed after 5:00 in the evening on a Friday,

21  August 12th, and I guess a couple of business days before the

22  depositions were to occur of Mr. Dondero and the fellow, Mr.

23  McGraner, and I feel like there was one other deposition.  I'm

24  losing track of those.

25          But --

012625

53

1          THE CLERK:  The 30(b)(6).

2          THE COURT:  Oh, the 30(b)(6).  The 30(b)(6)

3    representative.

4          So on top of all of that, you know, Highland argues

5    there was just simply no good-faith basis for the proof of

6    claim.  Proof of claim asserted the membership interest,

7    Highland's 46.06 interest, set forth in the Multifamily LLC

8    agreement were the result of mistake.

9          Mr. Dondero signed the agreement for both parties,

10   HCRE and Highland.  And then now the motion to withdraw says

11   something to the effect of the anticipated issues have not

12   materialized.  So anyway, the undue vexatiousness factor I

13   think weighs -- because of these factors I've mentioned, weighs

14   in favor of there has been undue vexatiousness.

15         Factor number three, according to HCRE's motion to

16   withdraw the proof of claim, is matter's progression including

17   trial preparation.  Again, four depositions, thousands of pages

18   of written discovery.  We were days away from the last

19   depositions occurring, those of HCRE's potential witnesses and

20   we have trials set.  We have a trial set in November.  So that

21   factor, again, seems to weigh heavily in favor of Highland's

22   objection here.

23         Duplication of expense of relitigation, here's why we

24   got Mr. Dondero on the phone or wanted to have a witness with

25   authority.  Highland is saying we are concerned about

**WWW.LIBERTYTRANSCRIPTS.COM**

54

1  relitigation of this ownership interest issue.  And as part of

2  its argument, Highland has said we've got claims, we've got our

3  own claims for breach of agreement and different things that

4  are going to cause us to have to drill down on terms of the LLC

5  agreement.

6          And we can't -- we don't want to face exposure on

7  this issue of, well, you don't have the ownership interest or

8  the rights you say you do, Highland.  So, you know, if we could

9  get ironclad language here of, you know, we waive the right, we

10 agree that Highland has the 46.06 interest and we waive the

11 right to challenge that, then I don't think we'd have to worry

12 about relitigation of the issues in the proof of claim.  But it

13 feels like we had a little bit of reluctance to say it as

14 forcefully as we would need to have it said to avoid

15 relitigation.

16         Reason for dismissal, I don't know.  I don't know

17 what the reason for dismissal.  Again, to quote HCRE's pleading

18 on Page 7, the reason for dismissal is, "The operation of the

19 company" -- I think that means SE Multifamily -- "during the

20 case and the anticipated issues therewith have not materialized

21 and NREP no longer desires to proceed in the matters raised in

22 the proof of claim."

23         I mean that's just not in sync with the theory

24 espoused in the proof of claim that we think there was a

25 mistake made in the LLC agreement.  So, again, looking at these

012627

55

 1  legal factors, I do not think that the correct result is to

 2  grant the motion to withdraw the proof of claim under Rule 3006

 3  under the <u>Manchester</u> factors.  I will throw in that I think

 4  there is potential for prejudice here of the debtor.

 5          I mean not even considering that hundreds of

 6  thousands of dollars have been spent over two-plus years on

 7  this issue, you know, I remember very well the disqualifying

 8  motion.  And I said Wick Phillips should be disqualified.  I

 9  didn't shift fees because I just wasn't sure at the time that,

10  frankly, HCRE should be imposed with the fees attributable to

11  its lawyers, not recognizing the conflict of interest when they

12  saw one.  It was just a little fuzzy in my mind.

13          But I'm just letting you know that now that we are

14  here many years later, many months later and we have all the

15  sudden, okay, never mind, this is just a situation where I have

16  some regrets I didn't shift fees, to be honest.  But -- so the

17  motion is denied.  The depositions shall go forward.  I'm not

18  sure, you know, if the dates that have been proposed are still

19  workable, but if someone wants to speak up now about those

20  deposition dates to avoid an emergency hearing, I'm willing to

21  hear that.

22          I think what I heard was, well, I don't know what --

23  have you talked about dates at all?  Probably not, Mr. Morris,

24  in light of this hearing today.

25          MR. MORRIS:  We have not, Your Honor.  But I do think

012628

56

1  that Counsel and I can work that out.  I'm not available until

2  the week of the 26th.  So it won't be early that week but

3  sometime between let's say the 28th of September and the 7th of

4  October, I'll be prepared to take these depositions.  And I

5  would respectfully request, and we can work with Ms. Ellison to

6  try to find a trial date sometime the last week of October,

7  first week of November so we can get this finished.

8          THE COURT:  Okay.  Did I dream up that there was a

9  trial set already in November?

10         MR. MORRIS:  You know what?

11         You know what, let's just keep that date, Your Honor.

12 Let's just keep that date.

13         THE COURT:  All right.  Traci, are you still on the

14 line?  Can you confirm my memory?  I thought we had a two-day

15 trial set aside for this in November.

16         MS. ELLISON:  Is this on the merits of HCRE's claims,

17 Judge Jernigan?  I have a note holding November 1 and 2.

18         THE COURT:  Okay.

19         MR. MORRIS:  Yeah.

20         THE COURT:  So we'll go ahead and mark that down.

21         Now the last -- so you'll work on an a mutually

22 agreeable date for these three remaining depositions sometime,

23 you know, late September, early October.  And I trust you will

24 --

25         MR. MORRIS:  Yeah.  I would respectfully request that

012629
APP 0285

57

1  Counsel just propose dates for the depositions.  I'll wait to

2  hear from him.  But I think -- I'm representing to the Court

3  that any time between September 28th and let's just give it two

4  full weeks, October 12th.  That's plenty of time in advance of

5  the trial.

6          THE COURT:  All right.  Mr. Gameros, anything you

7  want to add on that?

8          MR. GAMEROS:  No, Your Honor.  I'm sure we can work

9  with Mr. Morris to get those scheduled.

10          THE COURT:  All right.  And here's actually the last

11  thing I wanted to say.

12          You know, I had thought about, you know, waiting 24

13  hours to give you a ruling on this motion to withdraw the proof

14  of claim and directing you all to kind of talk and see if maybe

15  you could work out language, you know, without the pressure of

16  the Court hovering over you that could make both of your

17  clients satisfied.

18          I still encourage you to do that, but I'm going to

19  pick on our U.S. Trustee.  I see she's observing today, and I'm

20  not going to ask you to say anything, Ms. Lambert.  But if you

21  all do agree, if you all in the next, you know, 24 hours come

22  to some sort of agreement, I don't mean to be alarming, but I

23  want it run by the U.S. Trustee because, you know, I've heard

24  some things that have troubled me about the, you know, lack of

25  good faith with regard to the proof of claim and, you know,

012630

58

1  alleged gamesmanship.

2          And, you know, I talked earlier about this goes to

3  the integrity of the system, you know, filing a proof of claim

4  under penalty of perjury.  Anyway, I'm feeling a little bit

5  uncomfortable about signing off on an agreed order where there

6  may be quid pro quos that went back and forth in connection

7  with withdrawing a proof of claim.  I mean at some point --

8  well, that's why we have scrutiny of these things under Rule

9  3006, right?

10          Again, there are integrity issues.  And so I just --

11 you know, if you were to work out language, I want you to run

12 it by Ms. Lambert and I want to hear that either she was okay

13 with it or she wasn't okay with it or maybe she declines to

14 comment.  You know, I'm not going to tell her how to do her

15 job, but I feel like that needs to happen, okay?

16          It's just something uncomfortable going on in my

17 brain about, you know, again a proof of claim being on file

18 two, almost two and a half years and then, you know, okay,

19 never mind, okay, I agree to never mind as long as you agree to

20 XYZ.

21          And I have no idea what's in the Seery transcript.  I

22 don't have it before me.  But, you know, I don't even know what

23 that's all about.  I don't even know if I care what that's all

24 about.  I just know if there are quid pro quos I feel like, you

25 know, maybe I need to have the U.S. Trustee, you know, not per

012631

59

1 se signing off on any agreed order but at least kind of looking

2 at it and telling me either U.S. Trustee's fine with it, U.S.

3 Trustee is not fine with it, or U.S. Trustee declines to

4 comment. Just I know that I've gone through the drill, okay?

5         So just letting you know I am still, you know, all

6 open to an agreed resolution of this, okay. But we're going

7 forward as if you can't get there, okay?

8         All right. I'll look for -- what am I going to look

9 for? I'm going to look for an order denying the motion to

10 withdraw proof of claim. I'm going to look for an order

11 granting the -- well, an order resolving the objection to

12 motion to quash and cross-motion for subpoenas saying that

13 these three witnesses are going to appear at a mutually

14 agreeable time either late September or early October.

15         All right. We're adjourned.

16         THE CLERK: All rise.

17         MR. MORRIS: Thank you, Your Honor.

18     (Proceedings concluded at 11:35 a.m.)

19                 * * * * *

20

21

22

23

24

25

**WWW.LIBERTYTRANSCRIPTS.COM**

60

# **C E R T I F I C A T I O N**

      I, DIPTI PATEL, court-approved transcriber, certify
that the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter, and to the best of my ability.


/s/ Dipti Patel
DIPTI PATEL, CET-997

LIBERTY TRANSCRIPTS          DATE: September 13, 2022

012633

# EXHIBIT W

012634

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                 )    Case No. 19-34054-sgj-11
 3   In Re:                      )    Chapter 11
                                 )
 4   HIGHLAND CAPITAL            )    Dallas, Texas
     MANAGEMENT, L.P.,           )    Wednesday, August 4, 2021
 5                               )    9:30 a.m. Docket
                                 )
 6          Debtor.             )
                                 )    - STATUS CONFERENCE RE:
 7                               )      APPLICATION FOR
                                 )      ADMINISTRATIVE EXPENSES
                                 )      (1888)
 8                               )    - MOTION FOR ORDER AUTHORIZING
                                 )      SALE OF CERTAIN PROPERTY
 9                               )      (2535)
                                 )    - MOTION FOR ORDER AUTHORIZING
10                               )      SALE OF CERTAIN LIMITED
                                 )      PARTNERSHIP INTERESTS (2537)
11   _____)

12                      TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
13                UNITED STATES BANKRUPTCY JUDGE.

14   WEBEX APPEARANCES:

15   For the Debtor:            Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
16                              10100 Santa Monica Blvd.,
                                 13th Floor
17                              Los Angeles, CA  90067-4003
                                (310) 277-6910
18
19   For the Debtor:            John A. Morris
                                Gregory V. Demo
20                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
21                              New York, NY  10017-2024
                                (212) 561-7700
22
     For the NexBank           Lauren K. Drawhorn
     Entities:                 WICK PHILLIPS
23                             3131 McKinney Avenue, Suite 100
                               Dallas, TX  75204
24                             (214) 692-6200

25
```

76

1   motions.

2           THE COURT:  All right.  Anything else before I give a

3   ruling?

4       All right.  Well, the Court, of course, has jurisdiction

5   over these two motions.  I'll call them the Maple Avenue

6   Motion and the PetroCap III Motion.  The Court will

7   specifically note for the record that notice has been proper

8   under the Rules and sufficient.  I'd note that July 8th these

9   motions were filed.

10      The Court will also note for the record that the only

11  objections that were lodged to these motions were withdrawn

12  during the hearing before the evidence, as were separate bids

13  that had been submitted.  Thus, there are no pending

14  objections, no pending bids at this juncture.

15      363(b) of the Bankruptcy Code applies to these proposed

16  transactions.

17      With regard to Maple Holdings, this is, of course,

18  technically a motion under 363(b) for approval for the Debtor

19  to exercise its management rights in Maple Avenue Holdings,

20  LLC to cause Maple Avenue Holdings, LLC to sell the real

21  property at 2817 Maple Avenue, Dallas, Texas.  So it's a

22  usage, I guess you could say, of property outside the ordinary

23  course of business.

24      And then with regard to the PetroCap III transaction, once

25  again, 363(b) is the governing authority.  The transaction is

77

 1   either in the nature of a sale or usage in the form of a

 2   forfeiture of certain of the limited partnership interests and

 3   other rights in the agreements described in the motion.

 4       The Court finds that the evidence very well demonstrated a

 5   sound business justification for both of these transactions

 6   and a reasonable business judgment has been exercised and

 7   these transactions are in the best interests of the estate.

 8       First, with regard to the Maple Avenue transaction, the

 9   evidence showed that the purchase price, $9.75 million, is

10   certainly within the range of market values that expert

11   brokers and the Debtor's informal marketing process revealed.

12   The Court believes that the Debtor and its professionals

13   marketed the property appropriately, and this appears to be a

14   sale process that has been undertaken in good faith without

15   conclusion -- without collusion, I should say.  The purchaser,

16   Stonelake Capital Holdings, LP, is not an insider, and again

17   appears to be a participant in an arm's length, good faith,

18   and fair transaction.

19       The Court is not in the least troubled that we didn't have

20   an auction.  While auctions in the universe of Chapter 11 are

21   a very common protocol, there's nothing in the Bankruptcy Code

22   or Bankruptcy Rules that requires a public auction.  And when

23   we're talking about real estate, it's very common not to have

24   an auction.

25       But in any event, the Court reiterates that the marketing

Case 19-34054-sgj11    Doc 3571-1    Filed 10/17/22    Entered 10/17/22 11:28:53    Desc
Case 3:25-cv-02072-S    Document 10-7    Filed 04/25/25 Appendix    Page 247 of 249    Page 293 of 351    PageID 13569

78

1   of this property and the sale process appear to be in all ways

2   adequate and in good faith and have yielded fair value for the

3   property.  In any event, this is the highest and best offer

4   the Debtor received.

5       So the Court approves the Maple Avenue Holdings, LLC

6   transaction.  The Court reserves the right to supplement this

7   ruling in a written form of order.

8       Turning now specifically to PetroCap III, the Court

9   likewise believes that there has been a reasonable effort on

10  the part of the Debtor to maximize the value of these

11  interests and rights.  The Court believes that this

12  transaction is the highest and best transaction that can be

13  achieved by the estate.  The Court believes this was arm's

14  length and that all parties, including PetroCap, have acted in

15  good faith.  And so I should add both of these transactions

16  are going to be free and clear of any interests, with those

17  interests to attach to the proceeds.

18      The Court once again reserves the right to supplement in a

19  more fulsome written ruling, but the Court hereby approves the

20  PetroCap transaction.

21      To the extent these parties have asked for waiver of the

22  14 days under 6004, I can't remember if that request was made

23  on both transactions or just the real estate transaction.  Is

24  that a request for both transactions, Mr. --

25          MR. POMERANTZ:  Your Honor, I'm not sure it's even a

79

 1   request for the Maple, because I think the closing is not

 2   expected to occur until after that 14-day period.

 3          THE COURT:  Okay.

 4          MR. POMERANTZ:  With respect to PetroCap, I'll ask

 5   Mr. Demo.  Since he was going to present the specific facts,

 6   he may know the answer to whether we asked for the 14-day stay

 7   waiver there.

 8          MR. DEMO:  We did ask, Your Honor.  Again, this is

 9   Greg Demo from Pachulski Stand Ziehl & Jones.  So if we could

10   have the 14-day waiver, that would be wonderful.

11          THE COURT:  All right.  Well, given that we have no

12   objection and so no concern for an appeal, and otherwise given

13   the circumstances of this transaction, I think that it is a

14   reasonable request -- I see it right now -- to waive 6004(h).

15   And so that request is granted.  All right.

16          MR. DEMO:  Thank you.

17          THE COURT:  Well, is there any more business before

18   we adjourn?

19          MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

20          THE COURT:  All right.  Well, I thank you all.  You

21   know, I'm --

22          MR. POMERANTZ:  Your Honor, I just may point out that

23   we do expect to be going effective either the end of this week

24   or sometime beginning to middle of next week.  So there'll

25   obviously be a watershed event in the case that has been --

81

1   pretty much gone with these contempt motions.

2       And, again, read my last paragraph.  I can understand

3   getting bored reading that thing, but please read the last

4   paragraph to know that it's going to get worse if we have

5   another one of these hearings and I do find contempt.

6       So, all right.  Well, we will see you all I guess on the

7   19th is my next -- I think that's where we have our next

8   hearing.

9       (Proceedings concluded at 11:31 a.m.)

10                          --oOo--

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    /s/ Kathy Rehling                    08/05/2021

23   _____     _____
    Kathy Rehling, CETD-444                        Date
24   Certified Electronic Court Transcriber

25

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Reorganized Debtor. | ) |
| | ) |

## HIGHLAND'S OBJECTION TO RENEWED MOTION TO
## <u>RECUSE PURSUANT TO 28 U.S.C. § 455 AND BRIEF IN SUPPORT</u>

---

[1] Highland's last four digits of its taxpayer identification number are (8357).  The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

012641

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

PROCEDURAL BACKGROUND ........................................................... 4

I.  GENERAL BACKGROUND TO THE BANKRUPTCY CASE .................... 4

II.  MOVANTS' INITIAL MOTION IS DENIED ................................. 5

III.  MOVANTS' APPEAL OF THE RECUSAL ORDER IS DISMISSED .......... 6

IV.  MOVANTS FILE THE SUPPLEMENTAL MOTION .......................... 7

V.  THE COURT HOLDS A STATUS CONFERENCE .......................... 8

VI.  MOVANTS FILE THE RENEWED MOTION ............................. 9

ADDITIONAL BACKGROUND ..................................................... 11

I.  MULTIPLE COURTS HAVE QUESTIONED MR. DONDERO'S CONDUCT
OR SANCTIONED HIM AND HIS CONTROLLED ENTITIES ............... 11

II.  HIGHLAND FILES BANKRUPTCY; THE CASE IS TRANSFERRED TO
THIS COURT ....................................................... 13

III.  THE BASIS FOR RECUSAL ASSERTED IN THE RENEWED MOTION ......... 14

    A.  The December 2019 Transfer Motion ................................ 14

    B.  The January 2020 Settlement Hearing ............................... 15

    C.  The February 19, 2020 Application-to-Employ Hearing ............... 16

    D.  The June 2020 CLO HoldCo, Ltd., Hearing .......................... 18

    E.  The July 2020 Exclusivity Hearing ................................ 20

    F.  The December 2020 Restriction Motion ............................. 20

        i  Highland Had the Exclusive Contractual Right to Buy and Sell
           CLO Assets .................................................. 21

        ii  The Dondero Parties Did Not Accuse Highland of Any
            Wrongdoing ................................................ 21

        iii  Mr. Dondero Controls the Dondero Parties and Caused the
             Restriction Motion to Be Filed ........................... 22

        iv  Mr. Norris Was Not a Competent Witness and Had No Credibility ....... 22

        v  Movants Did Not Notify Any Other CLO Investors of the
           Restriction Motion ......................................... 22

    G.  The January 2021 Hearing on Highland's Motion for Injunctive Relief ......... 24

    H.  January 2021 Examiner Motion .................................... 26

    I.  February 2021 Confirmation Hearing .............................. 27

012642

J.      January and July 2021 Orders Requiring Mr. Dondero's Appearance ............... 29

K.      May 2021 Denial of Mr. Dondero's Motion to Compel Testimony.................... 30

L.      August 2021 Order Finding Certain Movants in Contempt of this Court ........... 31

M.      September 2022 Denial of HCRE's Motion to Withdraw Its Proof of Claim. ................................................................................................................... 34

ARGUMENT ........................................................................................................................... 39

I.      THE RENEWED MOTION MUST BE DENIED AS UNTIMELY .............................. 41

II.     THE RENEWED MOTION MUST BE DENIED ON THE MERITS .......................... 45

A.      There Is No Extrajudicial Bias Present Here ...................................................... 45

B.      This Court Does Not Have Deep-Seated Antagonism Toward Movants ........... 47

III.    THIS COURT LACKS THE AUTHORITY TO GRANT MOVANTS' ALTERNATIVE RELIEF ................................................................................................ 49

CONCLUSION ........................................................................................................................ 50

DOCS_NY:46569.9 36027/003

012643

## TABLE OF AUTHORITIES

### CASES

*Andrade v. Chojnacki,*
    338 F.3d 448 (5th Cir. 2003) .................................................................. 41, 45, 46, 48

*Brown v. Oil States Skagit Smatco,*
    664 F.3d 71 (5th Cir. 2011) ............................................................................. 45

*Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.,*
    2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022) ........................................ 31, 34

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
    Mgmt., L.P.)*
    2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022) ..................................... 32

*Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap.
    Mgmt., L.P.)*
    643 B.R. 162 (N.D. Tex.2022) ............................................................................ 32

*Conkling v. Turner,*
    138 F.3d 577 (5th Cir. 1998) .......................................................................... 45, 46

*Da Silva Moore v. Publicis Groupe,*
    868 F. Supp. 2d 137 (S.D.N.Y. 2012) ................................................................ 43, 44

*Delesdernier v. Porterie,*
    666 F.2d 116 (5th Cir. 1982) ............................................................................. 40

*Friendly Fin. Serv.-Eastgate, Inc. v. Dorsey (In re Dorsey),*
    489 Fed. Appx. 763, 764 (5th Cir. 2012) ............................................................. 49

*Garcia v. Woman's Hosp. of Tex.,*
    143 F.3d 227 (5th Cir. 1998) ............................................................................. 48

*Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for La. System,*
    286 Fed. App'x 864 (5th Cir. 2008) .................................................................. 40, 43

*Henderson v. Dep't of Pub. Safety and Corrs.,*
    901 F.2d 1288 (5th Cir. 1990) ......................................................................... 46, 48

*Highland Cap. Mgmt, L.P. v. Dondero (In re Highland Cap. Mgmt, L.P.),*
    2021 Bankr. LEXIS 1533 (Bankr. N.D. Tex. Jun. 7, 2021) ........................................ 5

*Hill v. Breazeale,*
    197 Fed. App'x 331 (5th Cir. 2006) .................................................................. 40, 42

*Hill v. Schilling,*
    495 Fed. App'x 480 (5th Cir. 2012) ............................................................... 40, 43, 44

*In re Chevron U.S.A., Inc.,*
    121 F.3d 163 (5th Cir. 1997) ............................................................................. 47

*Liteky v. United States,*
    510 U.S. 540 (1994) ......................................................................... 45, 46, 47, 48

*Manchester, Inc. v. Lyle (In re Manchester, Inc.)*
    2008 Bankr. LEXIS (Bankr. N.D. Tex. Dec. 19, 2008) ........................................ 36, 37, 39

*Martin v. Monumental Life Ins. Co.,*
    240 F.3d 223 (3d Cir. 2001) ............................................................................. 44

012644

*Miller v. Sam Houston State Univ.,*
   986 F.3d 880 (5th Cir. 2021) ................................................................... 47

*NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.,*
   2022 U.S. App. LEXIS 25107 (5th Cir. Sept. 7, 2022) ....................... 4, 5, 28

*Nix v. Major League Baseball,*
   2022 U.S. Dist. LEXIS 104770 (S.D. Tex. Jun. 13, 2022) .......................... 25

*Travelers Ins. Co. v. Liljeberg Enters., Inc.,*
   38 F.3d 1404 (5th Cir. 1994) ................................................................... 40

*United States v. Bremers,*
   195 F.3d 221 (5th Cir. 1999) ................................................................... 41

*United States v. Jordan,*
   49 F.3d 152 (5th Cir. 1995) ..................................................................... 41

*United States v. Landerman,*
   109 F.3d 1053 (5th Cir. 1997) ................................................................. 48

*United States v. Olis,*
   571 F. Supp. 2d 777 (5th Cir. 2008) ........................................................ 44

*United States v. Sanford,*
   157 F.3d 987 (5th Cir. 1998) ............................................................. 40, 43

*United States v. Williams,*
   127 Fed. App'x 736 (5th Cir. 2005) ........................................................ 48

*United States v. York,*
   888 F.2d 1050 (5th Cir. 1989) ................................................................. 44

*Vieux Carre Prop. Owners, Residents & Assocs. v. Brown,*
   948 F.2d 1436 (5th Cir. 1991) ................................................................. 41

*Weisshaus v. Fagan,*
   456 Fed. App'x 23 (2d Cir. 2012) ...................................................... 43, 44

**STATUTES**

11 U.S.C. § 330 .......................................................................................... 17

18 U.S.C. § 3057(a) .................................................................................... 39

28 U.S.C. § 158(a) .................................................................................. 7, 49

28 U.S.C. § 158(a)(1) ................................................................................. 49

28 U.S.C. § 455(a) ..................................................................................... 40

28 U.S.C. § 455(b)(1) ................................................................................. 40

**RULES**

FRBP 3006 ................................................................................................ 36

FRBP 5004(a) ............................................................................................ 40

DOCS_NY:46569.9 36027/003

012645

Highland Capital Management, L.P. ("Highland"), by and through its undersigned counsel, hereby files this objection (the "Objection")[1] to *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Renewed Motion to Recuse* [Docket Nos. 3541, 3542] (the "First Renewed Motion"),[2] as amended by Docket Nos. 3570 and 3571  (as amended, the "Renewed Motion").[3]  In support of its Objection, Highland states as follows:

## PRELIMINARY STATEMENT[4]

1.      Under Mr. Dondero's direction, Highland was forced to file bankruptcy in October 2019 to protect itself from an avalanche of adverse rulings that had either been entered against it and its Dondero-controlled affiliates or were about to be entered.  For nearly a decade, courts and arbitration panels in Texas, Delaware, New York, and in foreign jurisdictions such as the Cayman Islands, Bermuda, and Guernsey, have issued a series of rulings against Mr. Dondero and his enterprise, some with stinging rebukes.

2.      Now, Mr. Dondero has filed the Renewed Motion to recuse this Court in the misguided belief that he might have more success with a different judge.  But the lengthy record proves that Mr. Dondero's problem is not judicial bias.  It is the never-ending, meritless, vindictive, and vexatious litigation strategy that Mr. Dondero stubbornly clings to regardless of the burdens

---

[1] Concurrently herewith, Highland is filing its *Appendix in Support of Highland's Objection to Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support* (the "Appendix").  Citations to the Appendix are annotated as follows:  Ex. #, Appx. #.

[2] Citations to the First Renewed Motion refer to *Movants' Memorandum of Law in Support of Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455* [Docket No. 3542].

[3] Citations to the Renewed Motion refer to *Movants' Amended Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455* [Docket No. 3571].

[4] All capitalized terms used but not defined in this Preliminary Statement have the meanings given to them below.

DOCS_NY:46569.9 36027/003

012646

imposed on the judicial system, the havoc wrought, and the damage inflicted on himself, Highland's creditors, and even his own steadfast loyalists.

3.      The Renewed Motion is Movants'[5] third attempt to recuse this Court from all matters relating to Highland's bankruptcy.  Like Movants' Initial and Supplemental Motions to recuse, it is untimely, replete with factual misstatements and omissions, premised on final orders or orders upheld on appeal, and must be denied.

4.      The Initial Motion was filed on March 18, 2021—(a) sixteen months after the Petition Date, (b) fourteen months after venue was transferred to this Court, (c) one month after entry of the Confirmation Order, (d) just before the first contempt hearing, and (e) after more than 2,000 documents were filed on the main docket.[6]  The Supplemental Motion was filed on July 19, 2022—(a) twenty-two months after the Petition Date, (b) twenty months after venue was transferred, (c) eleven months after entry of the Confirmation Order, (d) five months after the District Court denied Movants' appeal of the Initial Motion, and (e) after more than 3,400 documents were filed on the main docket, all in an effort to prevent this Court from adjudicating the Kirschner Adversary.  Now, nearly three years after Highland's bankruptcy proceeding was transferred to this Court, Movants—for the third time—complain that this Court is biased against Mr. Dondero—as if no other judge or fact-finder had previously ruled against him and the entities he controls.

5.      Movants' Renewed Motion largely regurgitates the "evidence" in the untimely Initial Motion; namely, snippets of out-of-context quotes and eight rulings out of the hundreds

---

[5] "Movants" means, collectively, James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. ("NexPoint"), The Dugaboy Investment Trust ("Dugaboy"), Get Good Trust ("Get Good"), and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("HCRE").

[6] This does not include hundreds of docket entries in adversary proceedings in which Mr. Dondero and/or his affiliates were parties.

012647

entered by this Court (some of which have now been affirmed by the appellate courts). However, Movants do cite to five additional orders as "new" evidence of this Court's alleged bias. Like the old evidence, the "new" evidence is untimely[7] and fails to support any credible claim of bias or prejudice.

6.    Movants thus failed to seek disqualification "at the earliest possible moment." They instead sat on their hands for almost a year and a half before filing the Initial Motion (and substantially longer before filing the Supplemental and Renewed Motions) after supposedly concluding that this Court was biased. As this Court previously ruled, Movants' indefensible delay in seeking recusal is fatal, and the Renewed Motion, like the Initial Motion, must be denied as untimely. The Renewed Motion also fails on the merits—largely for the same reasons the Initial Motion did. Movants have not, and cannot, meet their heavy burden of proving this Court is biased or somehow prejudiced against Movants. Seen in context, the record demonstrates that (a) numerous courts and tribunals have consistently ruled against Mr. Dondero and his enterprise, thereby demonstrating that this Court does not stand alone, (b) this Court's rulings and orders are sound (and have largely been upheld on appeal), (c) there is no evidence presented of extrajudicial bias or prejudice, and (d) no objective person would find that Mr. Dondero and his enterprise are the victims of improper judicial conduct rising to the extraordinary remedy of recusal. Mr. Dondero's desire to re-litigate the record using the Renewed Motion is both unavailing and procedurally improper.

7.    Further, this Court, respectfully, cannot grant Movants' alternative request to "make clear that any order denying recusal is final so that Movants may appeal the Court's order to the Northern District of Texas." This request is precluded by the District Court's February

---

[7] One order was entered before the Initial Motion was filed and three were entered in mid-2021, over a year ago.

012648

Order dismissing Movants' appeal of the denial of the Initial Motion; as Movants concede, this Court simply lacks the authority to unilaterally determine that its orders are final and appealable. And, while this Court could remove the reservation of rights from its Recusal Order, it cannot force the District Court to hear an appeal of that interlocutory order.

## **PROCEDURAL BACKGROUND**

### I.   **General Background to the Bankruptcy Case**

8.      On October 16, 2019 (the "Petition Date"), Mr. Dondero caused Highland to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").  The Delaware Court entered an order transferring venue of Highland's bankruptcy case to this Court [Docket No. 186][8] on December 4, 2019.

9.      On February 22, 2021, this Court, over the objections of Mr. Dondero and his controlled affiliates, entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order"), which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1808] (the "Plan").  The Plan became effective on August 11, 2021 [Docket No. 2700].

10.     On September 8, 2022, the U.S. Court of Appeals for the Fifth Circuit (the "Fifth Circuit") affirmed, in material part, the Confirmation Order's factual findings and legal conclusions.  *NexPoint Advisors, L.P., et al. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. App. LEXIS 25107 (5th Cir. Sept. 7, 2022).

---

[8] Unless otherwise indicated, all docket numbers refer to the main docket maintained by this Court.

012649

## II.    **Movants' Initial Motion Is Denied**

11.    On March 18, 2021, Movants—Mr. Dondero and entities he controls[9]—filed their motion to recuse this Court [Docket Nos. 2060, 2061, 2062] (the "Initial Motion").[10]  The Initial Motion asked this Court to recuse itself from any adversary proceedings and future contested matters involving Movants or any entity connected to Mr. Dondero.

12.    On March 23, 2021, this Court denied the Initial Motion [Docket No. 2083] (the "Recusal Order") finding that "the timing does not seem to pass muster."  The Initial Motion (a) "was filed more than 15 months after" this case was transferred to this Court; (b) "comes after many dozens of orders have been issued by the [Bankruptcy] Court," and (c) "comes on the eve of a contempt hearing."[11]  Recusal Order at 7.  This Court further found that, even if the Initial Motion had been timely, recusal was not warranted on the merits.[12]  Accordingly, this Court determined, in an exercise of its discretion, that Movants' assertions did not "rise to the threshold standard of

---

[9] Confirmation Order ¶ 19; *see also NexPoint Advisors, L.P.*, 2022 U.S. App. LEXIS 25107, at *24-26.

[10] Citations to the Initial Motion refer to *James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC, a Delaware Limited Liability Company's Brief in Support of Their Motion to Recuse 28 U.S.C. § 455* [Docket No. 2061].

[11] On June 7, 2021, Mr. Dondero was held in contempt for violating this Court's injunction.  *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2021 Bankr. LEXIS 1533 (Bankr. N.D. Tex. Jun. 7, 2021).  Mr. Dondero subsequently appealed this Court's ruling.  On August 17, 2022, the District Court affirmed this Court's findings in all material respects.  *Order*, Case No. 3:21-cv-01590-N, Docket No. 42 (N.D. Tex. Aug. 17, 2021). Ex. 1, Appx. 1-14. Notably, Movants do not contend that this Court's contempt order is evidence of its bias.

[12] This Court noted that Movants' allegations of "extrajudicial" bias resulting from the Acis Bankruptcy (defined below) were "at the heart of the" Initial Motion (Recusal Order at 7) but explained it did not form any animus or bias toward Movants during the Acis Bankruptcy and concluded that any knowledge learned from the Acis Bankruptcy did not constitute "extrajudicial" knowledge warranting recusal.  *Id.*  This Court also found that "more generally," it did not harbor, and has not shown, any "personal bias or prejudice" against Movants.  Recusal Order at 10.  This Court explained that it "has merely addressed motions, objections and other pleadings as they have been presented," and "has issued and enforced orders where requested and warranted."  *Id.*  "This court and all courts sometimes use strong words as part of managing a complex and contentious case.  None of this should be interpreted as 'bias" or 'prejudice … clashes between a court and counsel for a party [are] an insufficient basis for disqualification under Section 455."  *Id.* (citations omitted).  This Court stated it has "the utmost respect for [Movants]" and has "no disrespect for Mr. Dondero on a personal level or any of the [Movants]."  *Id.*

DOCS_NY:46569.9 36027/003

raising a doubt in the mind of a reasonable observer as to" this Court's impartiality.[13]  (*Id.* at 10).

## III.   Movants' Appeal of the Recusal Order Is Dismissed

13.     Movants appealed the Recusal Order to the U.S. District Court for the Northern District of Texas (the "District Court") on April 1, 2021.[14]  On June 28, 2021, Movants filed their appellate brief[15] (a) arguing the Initial Motion was "timely" and (b) otherwise restating their baseless arguments that this Court is prejudiced and biased and exhibits antagonism towards Movants.  On July 28, 2021, Highland filed its appellate brief (the "Highland Brief").[16]  Exs. 5-6, Appx. 184-2048.

14.     On December 10, 2021, the District Court, *sua sponte*, issued an order questioning the finality of the Recusal Order, directing supplemental briefing, and observing that this Court "expressly 'reserve[d] the right to supplement or amend'" the Recusal Order.  Ex. 9, Appx. 2069-2073.  On December 15, 2021, Movants filed their supplemental brief.  Ex. 10, Appx. 2074-2084. Highland filed its supplemental brief on December 20, 2021.  Ex. 11, Appx. 2085-2097).

15.     On February 9, 2022, the District Court denied Movants' appeal finding that under clear Fifth Circuit precedent, the Recusal Order was *per se* interlocutory, could only be reviewed upon final judgment, and was not subject to the collateral order doctrine (the "February Order").[17]

---

[13] Movants contend that "the Court … applied a subjective standard [in the Recusal Order], based entirely on self-assessment."  Renewed Motion at 1.  This contention is spurious and belied by this Court's explicit statements to the contrary.  *See, e.g.,* Ex. 2, Appx. 31-32 ("And the standard is I have to stand back and look at would a reasonable person have concerns here.  So I can't just say, I know I'm not biased, I don't think I'm biased; I have to look at what a reasonable person might think. So you presented to me a 2,722-page appendix for me to do my job and look at what a reasonable person would think.  So, then would it raise a doubt in the mind of a reasonable observer as to the judge's impartiality?").

[14] Case No. 3:21-cv-00879-K (N.D. Tex.).

[15] Case No. 3:21-cv-00879-K, Docket Nos. 16, 17 (N.D. Tex.).

[16] The District Court granted Highland's motion to intervene over Movants' objection.  Exs. 7-8, Appx. 2049-2064.

[17] The February Order did not rely on this Court's reservation of rights in its analysis but simply held that the Recusal Order, like all orders denying recusal, was interlocutory and could not be appealed until a final judgment in this case, which the record reflected had not—and still has not—occurred.  *See* Ex. 36, Appx. 4165-4169.

The District Court also rejected Movants' arguments that (a) a different standard of finality applied in bankruptcy proceedings and (b) the Recusal Order was appealable under the "collateral order doctrine." *Id.* Appx. 2105-2106.[18]

16.     Movants did not appeal the February Order or file a petition for rehearing.

## IV.   **Movants File the Supplemental Motion**

17.     On July 20, 2022, more than five months after the District Court entered the February Order, Movants filed their supplemental motion to recuse this Court [Docket No. 3406] (the "Supplemental Motion") asking this Court to enter a final, appealable version of the Recusal Order (implying this Court could dictate to the District Court that its orders are appealable and could do so by deleting the reservation of rights from the Recusal Order).[19]  Movants also sought to introduce new "examples" of this Court's bias "to preserve their record for appeal and to ensure that all potential grounds for recusal may be considered by an appellate court."  Supplemental Motion ¶ 8.

18.     On August 15, 2022, Highland objected [Docket No. 3444] (the "Highland Objection") arguing that (a) this Court lacked the authority to determine whether the Recusal Order was final; (b) the Supplemental Motion was procedurally improper as it required (i) a motion under Federal Rule of Civil Procedure ("FRCP") 54(b) or (ii) an entirely new motion predicated solely on Movants' "new" examples of bias; and (c) Movants' new "examples" of bias were meritless. The Highland Objection included an extensive, annotated chart [Docket No. 3444-1] proving that Movants' new "examples" (a) were premised on material distortions or omissions of (i) fact, (ii)

---

[18] The District Court also ruled on Movants' request for leave to appeal an interlocutory order (*i.e.*, the Recusal Order) under 28 U.S.C. § 158(a)(3).  After a lengthy analysis, the District Court held that Movants "failed to satisfy any of the three § 1292(b) criteria" and denied Movants' request to appeal the Recusal Order. Ex. 12, Appx. 2106-2110.

[19] Supplemental Motion ¶ 6 ("On appeal of the [Recusal Order] … Judge Kinkeade dismissed the appeal, holding that the [Recusal Order] was non-final and non-appealable.  In doing so, Judge Kinkeade pointed to language in the [Recusal Order] in which the Court expressly 'reserve[d] the right to amend or supplement' its ruling.")

012652

this Court's rulings, and/or (iii) statements on the record and (b) viewed fairly, were not the product of bias, prejudice, or lack of impartiality.

19.    On August 22, 2022, Movants filed their reply seeking to have their Supplemental Motion treated as a motion to supplement the record pursuant to FRCP 54 and, again, reiterating their procedurally and substantively improper request that this Court "amend the [Recusal Order] to make it final." [Docket No. 3463].

## V.    **The Court Holds a Status Conference**

20.    On August 31, 2022, this Court held a status conference on the Supplemental Motion during which it asked Movants to clarify their position, the relief requested, and the procedural basis for that relief.[20]  Movants responded that, notwithstanding the confusion caused by their procedurally and substantively deficient Supplemental Motion, they were seeking two things: (a) removal of the reservation of rights from the Recusal Order and (b) supplementation of the appellate record.  At the Status Conference, Highland stated that it was not opposed to Movants' requested relief *per se* but would *not* consent to Movants' procedurally improper request to have this Court designate the Recusal Order "final."  Ex. 2, Appx. 29.

21.    Ultimately, on September 1, 2022, this Court denied the Supplemental Motion as "procedurally improper" but allowed Movants to file "(1) a simple motion … seeking only a revised and amended Recusal Order that removes" the reservation of rights or "(2) a new motion to recuse … based on any alleged new evidence or grounds for recusal that were not considered … at the time of [this Court's] consideration of the original Recusal Order" [Docket No. 3479] (the "September Order").

---

[20] On August 19, 2022, this Court entered an order [Docket No. 3462] converting the hearing on the Supplemental Motion to a status conference and requiring Movants to clarify the legal and procedural basis for the Supplemental Motion.

DOCS_NY:46569.9 36027/003

## VI.    Movants File the Renewed Motion

22.    On September 27, 2022, Movants filed the First Renewed Motion—their third motion to recuse—and amended it on October 17, 2022.  In the Renewed Motion, Movants incorporate the entirety of the Initial Motion by reference (Renewed Motion at n. 11)[21] and ask this Court to recuse itself.  In the alternative, Movants reiterate their improper request that this Court "make clear that any order denying recusal is final so that Movants may appeal the Court's order to the Northern District of Texas."  *Id.* at 24.

23.    The Renewed Motion, and the relief it requests, thus violates this Court's September Order.[22]

24.    Moreover, like the Initial and Supplemental Motions, the Renewed Motion is untimely and is, again, premised on material distortions or omissions of fact, this Court's rulings, and/or statements on the record.  In the Renewed Motion, Movants argue the following are a basis to recuse this Court:

- This Court's knowledge gained during the 2019 Acis Bankruptcy (defined below);

- The February 2020 hearing on Highland's retention of Foley Gardere, Foley & Lardner LLP ("Foley");

- The June 2020 hearing regarding the release of approximately $2.5 million from the court registry;

---

[21] In contrast, the Renewed Motion does *not* incorporate the Supplemental Motion or cite to the "examples" of this Court's bias included therein nor does it include certain of the "examples" of bias raised in the appeal of the Recusal Order.  Consequently, Movants have waived their right to rely on those un-cited "examples" of alleged bias and Highland will not address them here.  Movants' First Renewed Motion also referenced an Appendix A which allegedly "list[ed] many other, similar examples" of this Court's bias.  First Renewed Motion at 6 n.27.  However, Movants amended the First Renewed Motion to eliminate footnote 27 and the reference to Appendix A.  Docket No. 3571.  Highland reserves all rights to object if Movants ever seek to rely on any alleged "examples" of bias not specifically identified or incorporated in the Renewed Motion.

[22] On August 31, 2022, this Court stated from the bench that Movants could file (a) a simple motion to remove the reservation of rights under FRCP 54 or (b) "a new motion to recuse … to start this over and supplement the record."  Ex. 2, Appx. 39.  Based on the entirety of the August 31, 2022, transcript and the clear language of the September Order, however, it is clear that this Court did not intend Movants to re-argue the entirety of the Initial Motion.

012654

- The July 2020 hearing at which this Court inquired as to whether Highland had received PPP loans;

- The December 2020 hearing on the Dondero Parties' (defined below) attempt to halt Highland's trading in the CLOs;

- The January 2021 injunction prohibiting the Dondero Parties from interfering with Highland's management of the CLOs;

- The January 2021 motion to appoint an examiner filed by Dugaboy and Get Good, Mr. Dondero's family trusts, and joined by Mr. Dondero;

- The February 2021 confirmation hearing and Confirmation Order;

- The January 2021, May 2021, and July 2021 orders requiring Mr. Dondero and Dugaboy, respectively, to appear at certain hearings;

- The May 2021 denial, in part, of Mr. Dondero's motion to compel the deposition testimony of James P. Seery, Jr.;

- The August 2021 order finding certain Movants and others in contempt for violation of this Court's orders; and

- The September 2022 hearing denying HCRE's motion to withdraw its proof of claim.

Of the foregoing "examples," twelve are orders entered by this Court. Movants appealed only two of those orders; the appellate courts denied both appeals and affirmed this Court's orders. All Movants' "examples" (other than the August 2021 contempt order and the September 2022 denial of claim withdrawal) were previously asserted by Movants in either the Initial Motion or Supplemental Motion and debunked as false by Highland at great expense.[23] Yet, Movants double down on these "examples" as if they were true and ignore Highland's detailed factual corrections.

25.    Ultimately, the Renewed Motion, like Movants' prior attempts to recuse, provides no credible evidence of this Court's bias, prejudice, or lack of impartiality and, like the Initial Motion which it largely duplicates, should be summarily denied.

---

[23] Highland Objection, Exhibit A; Highland Brief, Ex. 5, Appx. 196-219.

012655

## ADDITIONAL BACKGROUND

### I.   Multiple Courts Have Questioned Mr. Dondero's Conduct or Sanctioned Him and His Controlled Entities

26.     Between 2008 and the Petition Date, courts and arbitration panels in multiple domestic and foreign jurisdictions issued a plethora of judgments and orders against Mr. Dondero, Highland, and other entities then under Mr. Dondero's control.[24]

27.     For example, in March 2019, a blue-ribbon arbitration panel issued a 56-page decision in which it (a) rejected nearly every argument advanced by Highland and made highly critical assessments of the credibility of Highland's witnesses; (b) found Highland had breached its fiduciary duties to its investors, breached certain agreements, and engaged in other wrongful conduct; and (c) rendered an award against Highland in excess of $150 million.[25]  Just two months later, in an unrelated case, the Delaware Chancery Court found that the Dondero-related defendants improperly withheld dozens of documents in discovery on privilege grounds and ruled that there was "a reasonable basis to believe that a fraud has been perpetrated" such that the Chancery Court applied the "crime-fraud exception" to the attorney-client privilege.[26]

---

[24] An overview of some of the prepetition litigation involving Highland and other Dondero-related parties is set forth in the *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, Docket No. 1473 at 20-24.

[25] *See Partial Final Award* rendered in the arbitration captioned *Redeemer Comm. of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Case No. 01-16-0002-6927. Ex. 13, Appx. 2113-2175.  The Partial Final Award was incorporated into the arbitration panel's final award (Ex. 14, Appx. 2176-2199), and a hearing in the Delaware Chancery Court to have the award confirmed was about to begin when Mr. Dondero caused Highland to file for bankruptcy protection for the purpose of gaining the protection of the automatic stay.

[26] *Daugherty v. Highland Cap. Mgmt., L.P.*, C.A. No. 2018-0488-MTZ, May 17, 2019 transcript (bench ruling on motion to compel production of documents) at 10-15. Ex. 15, Appx. 2210-2215.  The Dondero-related defendants made three desperate but unsuccessful attempts to overturn or stay the Chancery Court's rulings. *See Order Denying Application to Certify Interlocutory Appeal*, entered in C.A. No. 2018-0488-MTZ on July 8, 2019 ¶ K-L. Ex. 16, Appx. 2303-2304.

DOCS_NY:46569.9 36027/003

012656

28.     The adverse rulings against Mr. Dondero and his controlled entities are legion[27]—

and have resulted in the imposition of judgments and awards totaling more than $1 billion

(inclusive of interest).  This Court had no involvement in any of these cases (except, in certain

cases, to adjudicate proposed claim settlements under Bankruptcy Rule 9019).

29.     This Court's experience with Mr. Dondero and Highland began in January 2018,

when it was assigned a case captioned *In re Acis Capital Management, L.P.* (the "Acis

Bankruptcy").[28]  The Acis Bankruptcy was involuntarily commenced by Joshua Terry, a former

Highland executive who had obtained an $8 million arbitration award against the Acis entities then

under Mr. Dondero's control, but who could not collect on the judgment because Mr. Dondero

allegedly orchestrated a fraudulent transfer of assets that left the Acis debtors judgment proof.  Mr.

Dondero and Mr. Terry were the chief antagonists in the highly contested Acis Bankruptcy, and

this Court made numerous credibility findings against Mr. Dondero and his associates before

confirming a plan of reorganization that effectively transferred control of a valuable business from

Mr. Dondero and Highland to Mr. Terry.[29]  Mr. Dondero and entities controlled by him appealed

---

[27] Movants argue that, prior to the bankruptcy, Mr. Dondero and his controlled entities were merely defendants in litigation (Renewed Motion at 2) and that Mr. Dondero had never been held personally "liable for any misconduct in relation to his management of [Highland's] business" (*Id.*).  Movants ignore that each Movant is controlled by Mr. Dondero and Mr. Dondero's controlled entities have incurred significant liability to third parties at Mr. Dondero's direction and under his oversight.  In any event, as relevant here, there is no dispute that—regardless of whether he or an entity he controlled was the plaintiff or the defendant—numerous tribunals entered a string of adverse orders and judgments just as this Court has.  Again, the problem is not this Court; it is that Mr. Dondero and his loyalists advance meritless positions and therefore lack credibility.

[28] Case No. 18-30264-sgj11 (Bankr. N.D. Tex.).

[29] *See, e.g.*, (a) *Order Denying Alleged Debtors' Joint Motion to Dismiss the Involuntary Petitions Filed by Joshua N. Terry for Lack of Subject Matter Jurisdiction or, Alternatively, to Compel Arbitration*, Case No. 18-30264-sgj11, Docket No. 75 (Bankr. N.D. Tex. Mar. 20, 2018) (Ex. 17, Appx. 2312-2316); and (b) *Findings of Fact, Conclusions of Law, and Order Granting Final Approval of Disclosure Statement and Confirming the Third Amended Joint Plan for Acis Capital* Management*, L.P. and Acis Capital Management GP, LLC, as Modified,* Case No. 18-30264-sgj11, Docket No. 829 (Bankr. N.D. Tex. Jan. 31, 2019) (Ex. 18, Appx. 2317-2546).

the Acis confirmation order, but the appeals were denied by the District Court and the Fifth

Circuit.[30]

## II.   **Highland Files Bankruptcy; the Case Is Transferred to this Court**

30.    With various judgment creditors bearing down, on October 16, 2019, Mr. Dondero

caused Highland to file this case in the Delaware Court hoping it would be a more hospitable

forum.  Less than two weeks later, on November 1, 2019, the Committee sought to transfer the

case to this Court [Docket No. 86] (the "Transfer Motion").  Ex. 21, Appx. 2637-2796.  The

Committee set out its intentions in filing the Transfer Motion:

> [T]he Dallas Bankruptcy Court is already intimately familiar with the Debtor's
> principals and complex organizational structure [because the Acis Bankruptcy is
> pending in that Court].  Specifically, the Dallas Bankruptcy Court has (a) heard
> multiple days' worth of material testimony from the Debtor's principal owner
> (James Dondero), the Debtor's minority owner (Mark Okada), the Debtor's general
> counsel, at least two assistant general counsels, and numerous other employees of
> the Debtor and other witnesses; and (b) issued at least six published opinions . . .
> [This Court is] intimately familiar with the Debtor's business, principal owner, and
> key executives.  For these reasons, the Dallas Bankruptcy Court is uniquely
> positioned to oversee this chapter 11 case.

*Id.* Appx. 2639.

31.    The Delaware Court agreed.  At a December 2, 2019 hearing, the Delaware Court

stated that it would grant the Transfer Motion, reasoning:

> This is a unique case … [T]his case is very focused on responding to existing [Acis]
> litigation. And that existing litigation of a former affiliate, as of a few months ago,
> and a pending appeal that could make it a current affiliate, is located in the Northern
> District of Texas.  The [Bankruptcy Court] has done a tremendous amount of work
> and has … issued a number of opinions, had a number of trials.  That work creates
> a familiarity with the facts, issues, and players in a case ….

---

[30] *See* (a) *Opinion* affirming Confirmation Order Case, No. 3:19-cv-00291-D, Docket No. 75 (N.D. Tex. July 18,
2019), Ex. 19, Appx. 2547-2631; (b) *Opinion* affirming Confirmation Order, Case No. 19-10847 (5th Cir. June 17,
2021), Ex. 20, Appx. 2632-2636.

DOCS_NY:46569.9 36027/003

012658

*See* Ex. 22, Appx. 2905-2906.  Mr. Dondero and Movants knew *on December 2, 2019* they were
being sent back to the very Court that took a serious and informed view of Mr. Dondero and his
associates.  Indeed, that is exactly why Highland (then under Mr. Dondero's control) opposed the
Transfer Motion.  [Docket No. 122].

32.     Fully cognizant that he would soon face this Court, which had substantial
knowledge of (some of) his business practices, Mr. Dondero never caused Highland to appeal the
Delaware Court's order granting the Transfer Motion or seek this Court's recusal on the basis of
bias or prejudice (at least not until March 2021, more than fourteen months after he was forced to
relinquish control of Highland).

III.    **The Basis for Recusal Asserted in the Renewed Motion**

33.     As set forth above, on September 27, 2022—nearly three years after this case was
transferred to this Court and seven months after the District Court entered the February Order—
Movants filed the Renewed Motion restating the request that this Court recuse itself relying on
much of the same "evidence" set forth in the Initial Motion.  Like the Initial Motion, the Renewed
Motion is untimely and premised on a mischaracterization of facts, cherry-picked and out-of-
context quotations, and a willful ignorance of the considerable evidence supporting each of the
orders at issue.

A.      **The December 2019 Transfer Motion**

34.     Movants argue that the risk of prejudice to Mr. Dondero was first noted when this
case was filed in the Delaware Court, citing comments made during the hearing on the Transfer
Motion by Highland's counsel about this Court's pre-existing, negative view of Mr. Dondero from
the Acis Bankruptcy and resulting "baggage."  Renewed Motion at 5-6; Initial Motion ¶¶ 4-5.  As
noted *supra*, Mr. Dondero controlled Highland and directed its counsel to oppose the Transfer
Motion on this basis during the December 2, 2019 hearing.  The Delaware Court rejected this

012659

argument and in fact relied on this Court's extensive familiarity with the parties as one of the bases for transferring venue of this case to this Court.  Ex. 22, Appx. 2905.

35.     No party appealed the order transferring venue to this Court.

**B.     The January 2020 Settlement Hearing**

36.     Movants cite to this Court's comments made during a January 9, 2020, hearing as evidence of this Court's alleged bias toward Mr. Dondero resulting from the Acis Bankruptcy. Renewed Motion at 6; Initial Motion ¶¶ 9-13.  This hearing occurred fourteen months prior to the Initial Motion and thirty-three months prior to the Renewed Motion.

37.     On January 9, 2020, this Court held an evidentiary hearing on a motion to approve a settlement [Docket No. 281] (the "<u>Settlement Motion</u>") between Highland and its Official Committee of Unsecured Creditors (the "<u>Committee</u>"), which was necessitated by (a) the Committee's and the Office of the U.S. Trustee's (the "<u>UST</u>") concerns about the integrity of Highland's management (under Mr. Dondero's stewardship) due to its history of self-dealing, creditor-avoidance asset transfers, and other breaches of fiduciary duty and (b) the possibility that the Committee and the UST might seek the appointment of a trustee.

38.     Following the hearing, this Court entered an order granting the Settlement Motion [Docket No. 339] (the "<u>Settlement Order</u>").[31]  Pursuant to the Settlement Order, Mr. Dondero, Highland's founder and former Chief Executive Officer, voluntarily surrendered control of Highland to an independent board of three directors, Russell Nelms, John Dubel, and James P. Seery, Jr. (the "<u>Independent Board</u>").  The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor."  *Id*. at ¶ 9.  In finding that this "language is very important" to protect Highland, this Court noted that in the Acis Bankruptcy,

---

[31] Notwithstanding the Settlement Order, the UST still sought to appoint a chapter 11 trustee [Docket No. 271].

DOCS_NY:46569.9 36027/003

Mr. Dondero was "surreptitiously liquidating funds" and "doing things behind the scenes that were impacting the value of Highland in a bad way."  Ex. 23, Appx. 3015.  Notwithstanding Movants' implications that this language unfairly targeted Mr. Dondero, Mr. Dondero did not object to the inclusion of this language in the Settlement Order and, in fact, affirmatively approved and signed off on the Settlement Order and the documents which effectuated it.

39.     No party appealed the Settlement Order.

**C.     The February 19, 2020 Application-to-Employ Hearing**

40.     Movants cite to the February 19, 2020 hearing on Highland's application to retain Foley as special Texas counsel [Docket No. 68] (the "<u>Foley Application</u>") as another manifestation of this Court's "early distrust" of and "predisposition against" Mr. Dondero.  Renewed Motion at 6-8; Initial Motion ¶¶ 14-15.  This hearing occurred thirteen months prior to filing the Initial Motion and thirty-one months prior to filing the Renewed Motion.

41.     Movants argue that this Court discounted the testimony of Russell Nelms—an Independent Board member—concerning Highland's business judgment and the need to retain Foley and "*sua sponte* expressed a belief (untethered to evidence) that Mr. Dondero may have used his 'powers of persuasion' to unduly influence the Independent Board's business judgment."  Renewed Motion at 7; *see also* Initial Motion ¶¶ 14-16.  Movants' further note this Court's "unsolicited commentary" regarding Highland's litigiousness—not Mr. Dondero's—and that of its past officers and directors as further evidence of this Court's predisposition against Mr. Dondero.  Renewed Motion at 7.  Movants mischaracterize the facts of this hearing.

012661

42.     ***First***, as set forth above, Highland had a history and culture of litigiousness while under Mr. Dondero's control.[32]  That culture was necessarily propagated by human beings, not corporate entities, and the suggestion that Mr. Dondero—the person with sole authority over Highland and its employees—can shift the blame for Highland's litigiousness from himself to those employees is extremely disingenuous.  This Court's observations were accurate.

43.     ***Second***, Movants are wrong about the Foley Application.  Through the Foley Application, Highland sought to retain Foley on behalf of both Highland ***and*** a non-Debtor entity, Neutra Ltd. ("Neutra"), in the appeal of the Acis confirmation order and related matters (the "Acis Appeal").  In support of the Foley Application, Highland disclosed that: (a) Neutra was owned by Mr. Dondero and his partner, Mark Okada, and (b) Highland intended to pay for Foley's representation of Neutra in the Acis Appeal.[33]  The Committee and Acis objected to the Foley Application on the ground that Highland should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity.  [Docket No. 120]

44.     Mr. Nelms testified in support of the Foley Application but was subject to a lengthy cross-examination which undermined Highland's arguments.  Ex. 24, Appx. 3086-3142.  This Court approved Highland's retention of Foley but determined that the evidence was insufficient to justify expending estate assets to pay Neutra's legal fees, a non-Debtor entity in which Highland

---

[32] In light of the substantial orders and judgments entered against Highland and other entities controlled by Mr. Dondero in other forums, Movants' attempt "to play the victim" is absurd.  Renewed Motion at 7 n.30.  Movants also imply that Highland, while under the control of the Independent Board, was equally litigious as it had objected to proofs of claim filed in this bankruptcy.  Again, Movants ignore the facts, including that, postpetition, Highland *actually settled* the claims against its estate.

[33] Highland justified its payment of Neutra's fees under 11 U.S.C. § 330 (which does not allow the payment of non-debtor legal fees) by arguing, *inter alia*, that if Neutra were successful in its appeal of the involuntary petition entered in the Acis Bankruptcy (a) the Acis Bankruptcy would be unwound, (b) the equity in Acis would return to Highland, (c) Highland would regain the benefit of certain management fees that were otherwise being paid to Acis for the benefit of its new owner, Mr. Terry, and (d) Highland would have negotiating leverage with respect to Acis' $75 million claim against Highland's estate.  Ex. 24, Appx. 3180-3181; Docket Nos. 69, 165.

012662

held no interest. *Id.* Appx. 3204-3209.  This Court's ruling on the Foley Application was not, as Movants contend, a magnification of this Court's "early distrust" of Mr. Dondero or evidence of bias towards him.  Renewed Motion at 7.  Rather, it was based on its determination that Highland failed to prove that the estate would benefit by paying a non-Debtor's legal fees, as required by applicable law.

45.    No party appealed this Court's denial of the Foley Application.

**D.    The June 2020 CLO HoldCo, Ltd., Hearing**

46.    Movants argue this Court's animus towards Mr. Dondero is evidenced by its rulings with respect to CLO HoldCo, Ltd. ("CLOH"), a wholly owned subsidiary of the "Charitable Donor Advised Fund, Ltd. (the "DAF"), and its questioning CLOH's good faith in filing its motion in April 2020 [Docket No. 590] seeking release of $2.5 million from the court registry.  Again, Movants' arguments are premised on factual inaccuracies.[34]

47.    ***First***, neither CLOH nor the DAF are Movants, and Movants make no effort to explain how alleged bias towards CLOH or the DAF constitutes bias towards Movants.  This is perplexing.  Movants argue at length (*see* ¶¶ 81-87 *infra*) that this Court's factual findings regarding Mr. Dondero's control over CLOH and the DAF are baseless and are themselves examples of bias.  Movants cannot have it both ways.  Either CLOH and the DAF are controlled by Mr. Dondero or they are not.[35]

48.    ***Second***, Movants ignore that the $2.5 million was deposited into the court registry *at CLOH's request*.  The Settlement Order implemented certain operating protocols [Docket Nos.

---

[34] Movants had initially argued that this Court was biased because it "has not released [the $2.5 million] to CLO HoldCo."  First Renewed Motion at 8.  That statement is not true.  Movants amended the First Renewed Motion to correct this error but elected not to correct any of the myriad other factual errors.

[35] This statement is rhetorical; there is clear evidence that Mr. Dondero controls the DAF and CLOH.  Movants' attempt to hide behind corporate forms is a further example of Mr. Dondero's misuse of his controlled entities and abuse of the judicial process.

012663

354, 466], which prohibited distributions (a) from Highland or entities managed by Highland (b) to certain "Related Entities," such as CLOH.  On February 24, 2020, Highland filed a motion seeking authority to cause two of its managed funds to make distributions to CLOH and Mark Okada—both "Related Entities."  The Committee objected, arguing, among other things, the distributions to CLOH should be offset against amounts CLOH owed to Highland.  [Docket No. 624]  At the March 4, 2020, hearing on the motion, *CLOH's counsel* asked this Court to resolve Highland's motion by depositing the funds directly into the court's registry.[36]  This Court, with the consent of the Committee, adopted CLOH's proposal and entered an order requiring the $2.5 million be deposited into the court's registry.  Despite its conduct in March, CLOH filed a motion with this Court seeking the release of the $2.5 million from the registry in April 2020—less than one month later.  [Docket No. 590]  CLOH's April motion to release the funds was vigorously opposed by the Committee.  [Docket No. 624]

49.    Consequently, there was evidence of CLOH's bad faith—CLOH entered into a settlement in open court and then attempted to unwind that settlement a month later.  But despite CLOH's conduct, this Court, again, did not leave it without a remedy or deny its motion outright.  Instead, this Court entered an order that provided for the release of the $2.5 million to CLOH

---

[36] Ex. 25, Appx. 3260-3261:

We'd like to suggest the following should the Court determine that the motion should be denied. And that is that instead of the debtor retaining the funds, that the debtor distribute the funds into the registry of the Court. That way, they lose control over the funds and they can say that they've distributed them in accordance with their agreements and applicable law.

The funds would remain there until either a recipient or prospective recipient posts a bond or other suitable collateral or the Creditors Committee agrees to the distribution to the insider or there is a Court entered for another reason after a showing made before Your Honor. The debtor and the Creditors Committee would, of course, retain all rights to seek the funds they would have had, which rights they would have had immediately before the distribution to the registry, plus any rights that would be gained by reason of the distribution itself.

The debtor thus distributes, the Creditors Committee retains its rights, the Court retains control, and this can all be done, we believe, by a Court order and we hope this may give the Court a suitable alternative.

*See also id.* Appx. 3262.

012664

*unless* the Committee fixed the procedural deficiencies in its objection by filing an adversary proceeding to enjoin the release of the money from the registry.  [Docket No. 825]  CLOH and the Committee subsequently resolved the Committee's objection,[37] and the $2.5 million was released to CLOH pursuant to this Court's order in October 2021.  [Docket No. 2946]

### E.    The July 2020 Exclusivity Hearing

50.    Movants bizarrely contend that this Court's inquiries into COVID-related "PPP loans" at a July 8, 2020, hearing was evidence of bias against Mr. Dondero.  Renewed Motion at 8-9; Initial Motion ¶ 52.  That hearing occurred nine months prior to the Initial Motion and twenty-eight months prior to the Renewed Motion.  As fully disclosed by this Court, the inquiries were prompted by an extrajudicial source (a newspaper article) that purportedly noted that "Mr. Dondero or affiliates" received PPP loans.  Because of the vagueness of the article, this Court sought information about *Highland*—not Movants—and ordered Highland to disclose any PPP loans it had received.  Highland responded to the Court at a subsequent hearing that Highland had not obtained any PPP loans.  Neither Mr. Dondero nor any of his affiliated entities were directed to provide any information, no action was taken against them, and the issue was never raised again.  Movants' attempt to falsely recast this event is emblematic of the lack of merit—and candor—in the Renewed Motion.

### F.    The December 2020 Restriction Motion

51.    Movants cite this Court's comments and rulings at the conclusion of an evidentiary hearing held on December 16, 2020 (the "December Hearing") on Movants' motion to restrict Highland's contractual right to manage its CLOs [Docket No. 1522] (the "Restriction Motion") as evidence of bias.  Movants argue this Court improperly (a) denied their Restriction Motion as

---

[37] *Stipulation and [Proposed] Order Regarding Registry Funds and Dismissal of Motion for Preliminary Injunction*, Adv. Pro. No. 20-03195-sgj, Docket No. 89.

DOCS_NY:46569.9 36027/003

012665

"frivolous," despite it being filed in "good faith" and (b) found that Mr. Dondero was behind the filing of the Restriction Motion.  Renewed Motion at 9-10; Initial Motion ¶¶ 18-26.

52.    The December Hearing occurred four months prior to the Initial Motion and twenty-two months prior to the Renewed Motion.

53.    In their Restriction Motion, the movants (*i.e.*, the Advisors and certain investment funds managed by the Advisors (the "Retail Funds," and with the Advisors, the ("Dondero Parties")) asked this Court to "impose a temporary restriction on Highland's ability, as portfolio manager, to cause CLOs to sell assets."  Restriction Motion ¶ 17.  The Dondero Parties called as their only witness Dustin Norris, the Executive Vice President of each of the Dondero Parties.  During the December Hearing, Mr. Norris made the following admissions:

**i**    **Highland Had the Exclusive Contractual Right to Buy and Sell CLO Assets**

- Highland is the portfolio manager for each of the CLOs in which the Advisors caused the Retail Funds to invest (Ex. 26, Appx. 3380);

- Highland's management of the CLOs is governed by written agreements (*id.* Appx. 3380-3381);

- None of the Dondero Parties is a party to Highland's CLO management agreements (*id.* Appx. 3381);

- Highland, as the CLO Portfolio Manager, has the responsibility to buy and sell assets on behalf of the CLOs (*id.* Appx. 3381);

- Nobody other than Highland has any right or authority to buy and sell assets in the CLOs in which the Retails Funds invested (*id.* Appx. 3381-3382); and

- Holders of preferred CLO shares, such as the Retail Funds, "do not make investment decisions on behalf of the CLOs" and the Advisors knew that when they caused the Retail Funds to make their investments (*id.* Appx. 3382).

**ii**    **The Dondero Parties Did Not Accuse Highland of Any Wrongdoing**

- The Dondero Parties did not allege or contend that Highland (a) engaged in fraudulent conduct; (b) breached any agreement by effectuating any transactions; or (c) violated any CLO management agreement (*id.* Appx. 3388-3389); and

012666

- The Dondero Parties did not question Highland's business judgment nor could they since they did not know why Highland executed the transactions and never even asked (*id.* Appx. 3389-3390).

### iii    Mr. Dondero Controls the Dondero Parties and Caused the Restriction Motion to Be Filed

- Mr. Dondero owns and controls the Advisors (*id.* Appx. 3367; Appx. 3374-3375);

- The Advisors manage the Retail Funds; Mr. Dondero serves as the Portfolio Manager of each of the Retail Funds and caused the Retail Funds to invest in the CLOs managed by Highland (*id.* Appx. 3367-3368; Appx. 3375);

- The "whole idea" for the Restriction Motion began with Mr. Dondero (*id.* Appx. 3368; Appx. 3380); and

- The Retail Funds' Boards did not authorize the filing of the Restriction Motion (*id.* Appx. 3376-3377).

### iv    Mr. Norris Was Not a Competent Witness and Had No Credibility

- Mr. Norris admitted that he does not make investment decisions, is not an investment manager, and has never worked for a CLO (*id.* Appx. 3378);

- Mr. Norris (a) did not write his Declaration filed in support of the Restriction Motion, (b) did not provide any substantive comments to his Declaration, and (c) relied on the Advisors' "management" (including Mr. Dondero) for all "key information" in his Declaration (*id.* Appx. 3379); and

- Mr. Norris did not bother to review the very CLO management agreements the Dondero Parties were seeking to interfere with (*id.* Appx. 3381).

### v    Movants Did Not Notify Any Other CLO Investors of the Restriction Motion

- The Dondero Parties hold (a) less than 50% of the preferred interests in 12 of the 15 CLOs at issue, and (b) less than 70% of the preferred interests in the other three CLOs at issue (*id.* Appx. 3383-3384);

- Yet, the Restriction Motion was pursued solely on behalf of the Dondero Parties and no other holder of interests in the CLOs (*id.* Appx. 3385);

- The Dondero Parties did not notify any other holder of CLO interests of the Restriction Motion and made no attempt to do so (*id.* Appx. 3386);

- The Dondero Parties made no attempt to obtain the consent of all of the holders of the preferred shares to seek the relief sought in the Restriction Motion (*id.* Appx. 3386);

012667

- Mr. Norris did not know whether any other holder of CLO preferred shares wanted the relief sought in the Restriction Motion (*id.* Appx. 3386);

- Mr. Norris did not know whether Highland's counterparties in the CLO management agreements (*i.e.*, the CLOs) wanted the relief sought in the Restriction Motion (*id.* Appx. 3386-3387); and

- Mr. Norris had no personal knowledge of the two transactions described in his Declaration; he testified that he was "very remote" and he didn't have "much knowledge." (*id.* Appx. 3392-3394).

54.     Based considerably on Mr. Norris's testimony, this Court (a) found that there was no factual or legal basis for the Restriction Motion, (b) declared the Restriction Motion "frivolous," and (c) granted Highland's motion for a directed verdict. *Id.* Appx. 3403. While Movants contend this Court improperly "opined that Mr. Dondero was behind the [Restriction Motion] notwithstanding that it was filed by separate and distinct legal entities represented by independent counsel (Renewed Motion at 9), Mr. Norris provided all the evidence the Court needed to reach its conclusion:

Q:     The whole idea for this motion initiated with Mr. Dondero; isn't that right?

A:     The concern, yes, the concern originated, and his concern was voiced to our legal and compliance team.

*Id.* Appx. 3380.[38]

55.     The Restriction Motion was a misguided effort by Mr. Dondero and his associates to exert control over Highland and its estate and was frivolous.[39]

56.     No party appealed the denial of the Restriction Motion.

---

[38] *See also id.* Appx. 3368 ("the initial cause for concern was raised by Mr. Dondero himself"); Appx. 3367 (Mr. Dondero has a control relationship with the Advisors); Appx. 3365 (responsibility for the Retail Funds' portfolio management and investment decisions are delegated to the Advisors); Appx. 3374-3375 (Mr. Dondero owns and controls the Advisors); Appx. 3376-3377 (the Retail Funds' Boards did not authorize the filing of the Restriction Motion).

[39] The Restriction Motion largely focused on Mr. Dondero's efforts to prevent Highland's managed entities from selling certain securities, including Avaya Holdings Corp. common equity (TICKER: AVYA).  Ultimately, and notwithstanding Mr. Dondero's efforts, more than 2 million shares of AVYA were sold at an average price of $23.26. Since then, AVYA has traded as low as $0.61 and closed on October 28, 2022 at $1.46.

012668

G.     **The January 2021 Hearing on Highland's Motion for Injunctive Relief**

57.     Not chastened by the debacle of the December Hearing, Mr. Dondero caused the Advisors and Retails Funds to continue interfering with, and unjustifiably threatening, Highland. Consequently, on January 6, 2021, Highland filed its *Verified Original Complaint for Declaratory and Injunctive Relief* against the Advisors and Retail Funds (Adv. Pro. No. 21-03000-sgj, Docket No. 1) seeking injunctive relief after they interfered with Highland's trading activities and sent Highland a flurry of written correspondence (the "K&L Gates Letters") (Exs. 27-28, Appx. 3406-3413) threatening to terminate Highland's CLO management agreements and asserting spurious claims.  This Court held an exhaustive evidentiary hearing on the TRO Motion on January 26, 2021 (the "TRO Hearing"), during which it admitted voluminous documentary evidence and assessed the credibility of multiple witnesses, including that of Mr. Dondero.  Ex. 29, Appx. 3430-3433; 3456-3613.  At the conclusion of the TRO Hearing, this Court determined that the TRO was necessary to protect Highland's interests pending a hearing on the preliminary injunction.  *See generally id.*

58.     The TRO Hearing occurred two months prior to the Initial Motion and twenty-one months prior to the Renewed Motion.

59.     Movants cite to two aspects of the TRO Hearing as evidence of this Court's alleged bias against Mr. Dondero, while ignoring their own misconduct:  (a) singling Mr. Dondero out for criticism when, according to Movants, the "evidence was undisputed that Mr. Dondero did not influence or cause the advisors or retail funds to take any action" and (b) approving the TRO when "[i]t was abundantly clear … that [Highland] could not make the requisite showing for injunctive relief."  Renewed Motion at 10; Initial Motion ¶¶ 27-35.  Consistent with much of the Renewed Motion, Movants misrepresent the record by failing to disclose keys facts.

60.    ***First***, Movants now admit the K&L Gates Letters were sent for an improper purpose—to procure the same relief sought in the Restriction Motion, relief this Court denied less than a month earlier.[40]  That conduct—seeking previously denied relief through alternative means—is quintessentially vexatious and sanctionable conduct.  *See, e.g., Nix v. Major League Baseball*, 2022 U.S. Dist. LEXIS 104770, at *58-65 (S.D. Tex. Jun. 13, 2022).

61.    ***Second***, the Settlement Order, which Mr. Dondero agreed to, expressly prohibited Mr. Dondero from "caus[ing] any Related Entity to terminate any agreements with the Debtor." Settlement Order ¶ 9.  The evidence established that the Dondero Entities were "Related Entities" for purposes of the Settlement Order,[41] yet the K&L Gates Letters improperly threatened to seek to terminate Highland's CLO management agreements.

62.    ***Third***, Mr. Dondero's TRO enjoined him from, among other things, "causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting on his behalf, from, directly or indirectly" making express or implied threats against Highland or interfering with Highland's business.  *See Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero*, Adversary Pro. No. 20-03190-sgj, Docket No. 10.  Yet, that is precisely what the evidence showed he did.  Ex. 29, Appx. 3456-3521.

63.    Given the evidence and the clear and unambiguous orders in effect, it would have been shocking if this Court ignored Mr. Dondero and instead treated the Dondero Parties as if they

---

[40] Initial Motion ¶ 27 ("In December of 2020, due to the Court's denial of the Restriction Motion, K&L Gates … exchanged correspondence with counsel for Debtor … for the following reasons: to reiterate the Advisors' and the Retail Funds' objection to the Debtor's handing of the Retail Funds' investments; to request, again, that Debtor not liquidate the CLOs; to reserve any rights that the Advisors and the Retail Funds might have against Debtor for failure to maximize the value of the investment as required under the [CLO] Portfolio Management Agreements; and to notify Debtor that the Retail Funds … intended to initiate the procedure to remove Debtor as fund manager of the CLOs.")

[41] This fact was (a) first established during the December Hearing (*see* ¶¶ 53-54 *supra*), (b) was confirmed at the TRO Hearing, and (c) was subsequently admitted to by the Advisors as part of the resolution of the adversary proceeding. *See* Docket No. 2590, Ex. A ¶ 2(c) (settlement agreement in which each of the Advisors represents and warrants that it (a) is controlled by Mr. Dondero and (b) is a "Related Party" for purposes of paragraph 9 of the Settlement Order).

012670

were independent third-party actors.  Mr. Dondero controlled (and controls) the Dondero Parties.
He clearly "caused" or "encouraged" or "conspired" with them to improperly attempt to re-assert
control over Highland.  The Court's focus on Mr. Dondero was entirely justified—particularly
when seen in the context of this Court's pertinent orders which Movants pretend did not exist.

64.     No party appealed the TRO.

**H.     January 2021 Examiner Motion**

65.     Movants allege this Court's bias is manifested in its "repeated disenfranchisement
of Movants from [sic] judicial process" and how it has "wielded its scheduling powers … often
preventing any real consideration of legitimate motions filed by Movants."  Renewed Motion at
10-11.  Despite Movants' extremely strong language about the consistency with which this Court
has disenfranchised them and abused its powers, Movants only cite to a single alleged example of
that conduct:  Dugaboy and Get Good's motion to appoint an examiner [Docket No. 1752] (the
"Examiner Motion") filed on January 14, 2021.  Renewed Motion at 10-11.  This, again, misstates
the facts and is belied by Movants' own admissions.

66.     *First*, Movants' allegations about disenfranchisement are false.  Movants have been
heard multiple times by this Court and appealed a significant number of this Court's orders.  This
Court has never prohibited them from doing so or prevented them from being heard
notwithstanding their tenuous standing.  Confirmation Order ¶¶ 18-19.

67.     *Second*, Movants admit the Examiner Motion, which was not supported by any
non-Dondero party,[42] was filed for improper purposes—to force a delay of the long-scheduled
Confirmation Hearing (defined below), to collaterally attack this Court's final orders, and to have
Movants' Plan objections adjudicated away from this Court in a forum deemed more hospitable to

---

[42] The only party to support the Examiner Motion was Mr. Dondero.  [Docket No. 1756].

012671

Movants.  Initial Motion ¶ 37 ("[W]hen the Trusts made the Examiner Motion, they believed that

the motion would cause delay or a continuance of the confirmation hearing on the Plan ….");

Renewed Motion at 11 ("The Trustees sought the appointment of an examiner to address … (i) the

issues raised … in the Restriction Motion [*i.e.*, a motion this Court had denied a month earlier],

[and] (ii) various objections to the proposed [Plan] raised by the advisors, the retail funds, and the

[UST].")  Again, quintessentially vexatious.

68.    Accordingly, Movants' claim of prejudice because this Court did not accede to their

demands to delay confirmation (contrary to the interests of creditors), collaterally attack its orders,

and forum shop is ridiculous, particularly in light of Movants' unequivocal admission of their

actual intent.

69.    No party appealed the denial of the Examiner Motion.

## I.    February 2021 Confirmation Hearing

70.    Movants cite to the February 2021 confirmation hearing on the Plan (the

"Confirmation Hearing") to support their argument that this Court was biased. Renewed Motion

at 11-13; Initial Motion ¶¶ 38-50.  Movants principally contend that during the Confirmation

Hearing, this Court: (a) "summarily rejected all of the Plan objections lodged by Movants,

decreeing them as filed in bad faith" (Renewed Motion at 12) when such objections were no

different than those raised by the UST whose good faith was "not questioned;" (b) found the

objections were not asserted in good faith; (c) concluded, "without basis," that the entity Movants

were "controlled by Mr. Dondero"; (d) disregarded witness testimony of Mr. Jason Post on the

ground that the witness had left Highland's employ to work for one of the Advisors; and (e)

wrongfully accused of Movants of being "vexatious litigants."  *See* Initial Motion ¶¶ 38-50.

71.    As a threshold matter, Movants simply ignore the Fifth Circuit's opinion affirming

the Confirmation Order in relevant part.  In its opinion, the Fifth Circuit expressly upheld this

Court's factual findings, including some of the very findings Movants' complain of here, *e.g.*, Mr. Dondero's control of the Funds and Advisors, Mr. Post's credibility, and Mr. Dondero's penchant for litigation. *NexPoint Advisors, L.P.,* 2022 U.S. App. LEXIS 25107 at *20-24, 27-37.[43]

72.    Substantively, and contrary to Movants' suggestion, this Court provided Movants with a full and fair opportunity to present and pursue their objections, notwithstanding their tenuous standing.  Confirmation Order ¶¶ 18-19.  Rather than being "summarily" overruled, this Court conducted a two-day evidentiary hearing during which Movants' counsel made their arguments and cross-examined witnesses unimpeded. The Court subsequently made detailed findings of fact and conclusions of law in the Confirmation Order supporting the overruling of all the objections, including those of Movants.  Movants are obviously unhappy with the Court's findings and conclusions—which were, again, upheld in material part by the Fifth Circuit—but fail to present any evidence of bias or prejudice arising in connection with confirmation.

73.    Finally, Movants' contention that they were treated differently than the UST disingenuously equates the objectors and is also meritless.  Movants asserted spurious objections to (a) plan provisions that had no impact on them as they held no claims in the subject classes (the absolute priority rule); (b) the assumption of certain executory contracts to which they were not party (the actual contract counterparties had consented to assumption of the contracts); and (c) common plan provisions like debtor releases, plan supplements, and a plan injunction.  In contrast,

---

[43] Movants' allegation that this Court found them to be "vexatious litigants" is contrary to the record.  This Court did *not* find or conclude that Movants are "vexatious litigants."   Rather, this Court determined that Mr. Dondero's litigation history supported the inclusion of a gatekeeper provision in the Plan.  *See* Confirmation Order ¶¶ 80-81; Ex. 30, Appx. 3717-3719.  Significantly, the Fifth Circuit affirmed this Court's findings and concluded that the gatekeeper provision was justified and "sound."  *NexPoint Advisors, L.P.,* 2022 U.S. App. LEXIS 25107 at *5-6.

012673

the UST filed a six-page "limited objection" that addressed only the scope of the Plan's exculpation clause—ironically, the only issue reversed on appeal.[44]

74.     In sum, Movants' stubborn instance that this Court's findings or conduct of the confirmation hearing reflect bias and prejudice ***after*** those same issues have been affirmed by the Fifth Circuit demonstrates the bad-faith nature of the Renewed Motion.

**J.     January and July 2021 Orders Requiring Mr. Dondero's Appearance**

75.     In the Renewed Motion, Movants assert a new "example" of this Court's bias:  Its orders—entered in January 2021, May 2021, and June 2021—"target[ing] Mr. Dondero (as well as his sister Nancy Dondero) by requiring their presence at all hearings, regardless of whether their presence is needed."  Renewed Motion at 16.  Again, Movants misstate the facts.

76.     During the January 8, 2021, proceeding to determine whether to grant a preliminary injunction against Mr. Dondero, Mr. Dondero admitted that he had not attended the earlier TRO hearing or read the transcript and had "never bothered to read the TRO."[45]  Concerned that his failure to fully participate would create an opportunity for "plausible deniability," this Court ordered Mr. Dondero—*two months before the Initial Motion was filed*—to appear at all hearings to ensure his compliance with this Court's orders.[46]  Incredibly, Mr. Dondero subsequently failed to appear at a hearing thereby validating the Court's concerns.  Consequently, this Court entered an order on May 24, 2021—sixteen months before the Renewed Motion—clarifying that Mr.

---

[44] *Compare* Docket Nos. 1661 (Dondero), 1667 (Trusts), 1670 (Funds and Advisors), and 1673 (HCRE) *with Limited Objection of the U.S. Trustee* [Docket No. 1671].

[45] Ex. 31, Appx. 3755 ("Q … At least as of today, you never bothered to read the TRO that was entered against you, correct?  A  Correct.").

[46] *Order Granting Debtor's Motion for a Preliminary Injunction Against James Dondero*, Adv. Proc. No. 20-03190-sgj, Docket No. 59.  Members of the Independent Board and/or Highland's Chief Executive Officer have been present at virtually every hearing in this case.

DOCS_NY:46569.9 36027/003

012674

Dondero was required to appear at all hearings in the bankruptcy case. [Docket No. 2362] Mr. Dondero did not appeal the preliminary injunction or the May 2021 order.

77.     This Court has *never* ordered Nancy Dondero to appear at any hearings. Instead, on June 17, 2021—fifteen months before the Initial Motion—the Court ordered the trustee of Dugaboy and Get Good to appear at all hearings and proceedings but only "where either of the Trusts are a party or take a position." [Docket No. 2458] The Court provided a detailed rationale for its order and it was never appealed. Nevertheless, Movants now falsely assert that Ms. Dondero was required to appear at all hearings "regardless of whether [her] presence [was] needed."

**K.     May 2021 Denial of Mr. Dondero's Motion to Compel Testimony**

78.     In the Renewed Motion, Movants assert as another "new" example of bias this Court's denial of a "routine litigation step[]" to compel Mr. Seery's deposition testimony and thereby indicating that it "will treat such [routine actions] as nefarious 'antagonistic move[s]' rather than ordinary invocation of legal process." Renewed Motion at 16. This is not what happened.

79.     On May 24, 2021—sixteen months before the Renewed Motion—this Court denied Mr. Dondero's motion to compel deposition testimony[47] concerning six (out of twenty) Rule 30(b)(6) topics on the grounds that the topics were either irrelevant or sought information in Mr. Dondero's possession. Ex. 32, Appx. 3963-3964. Despite referencing the "antagonism" between Mr. Dondero and Mr. Seery, this Court did not prevent Mr. Dondero from deposing Mr. Seery on fourteen other deposition topics.

80.     Mr. Dondero did not appeal this ruling.

---

[47] Adv. Proc. No. 21-03003, Docket No. 49.

012675

### L.    August 2021 Order Finding Certain Movants in Contempt of this Court

81.    In the Renewed Motion, Movants cite an order entered on August 4, 2021—thirteen months before the Renewed Motion—holding Mr. Dondero and various non-Movants in civil contempt [Docket No. 2660] (the "Contempt Order")[48] as "[p]erhaps one of the most telling" examples of this Court's bias.  Renewed Motion at 14-15.  Movants, again, misstate the facts and the record and—most importantly—ignore the District Court's order affirming this Court's factual and legal findings in the Contempt Order in all material respects.[49]

82.    *First*, Movants materially misstate the facts of the April 12, 2021, complaint (the "HV Complaint").[50]  Movants allege the HV Complaint addressed Highland's "brokering the sale of CLO interests held by HarbourVest … without prior notice to other CLO investors and without respecting those investors' right of first refusal" in violation of some undisclosed duty.  Renewed Motion at 14.  That is wrong, and Movants should know that.  They drafted the HV Complaint.

83.    As this Court knows, the facts are as follows:  Prior to Highland's bankruptcy, HarbourVest[51] purchased certain of CLOH's interests in Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey-based investment vehicle,[52] for approximately $80 million ultimately owning 49.98% of HCLOF's interests.  After Highland's bankruptcy, HarbourVest filed claims against Highland in excess of $300 million and sought rescission of its investment in HCLOF

---

[48] The Contempt Order is the second time that Mr. Dondero has been held in contempt for violating this Court's orders. *See* n.11 *supra*.

[49] *Charitable DAF Fund L.P. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022).  The only finding not affirmed was the payment of $100,000 if an appeal was filed.  Movants only mention of the District Court order is a one line footnote.  Renewed Motion at 15 n.72.

[50] Adv. Proc. No. 21-03067-sgj, Docket No. 1.

[51] "HarbourVest" means, collectively, HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P.

[52] HCLOF is managed by its Guernsey-based board of directors and is not controlled by Highland.

012676

alleging it was fraudulently induced by factual misrepresentations and omissions made by Mr. Dondero and certain of Highland's employees prior to the bankruptcy.

84.    Highland and HarbourVest settled HarbourVest's claims, and Highland filed a motion [Docket No. 1625] seeking Court approval. Under the settlement, HarbourVest received allowed claims totaling $80 million in aggregate and transferred its interests in HCLOF to a Highland subsidiary, effectively rescinding HarbourVest's investment in HCLOF. All aspects of the settlement were publicly disclosed in Highland's motion. Mr. Dondero, Dugaboy, Get Good, and CLOH all objected. CLOH argued it had a right of first refusal to HarbourVest's HCLOF interests. However, after reviewing Highland's pleadings, HCLOF's governing documents, and applicable law, CLOH determined it had no such right and knowingly and intentionally withdrew its objection. This Court approved the settlement, including the transfer of HarbourVest's interests in HCLOF.

85.    Three months later, CLOH, among others (collectively, the "Dondero Plaintiffs"), filed the HV Complaint seeking, among other things, to enforce their alleged right of first refusal—a right CLOH had conceded did not exist.[53] Shortly thereafter, the Dondero Plaintiffs sought to add Mr. Seery as a defendant in clear violation of the Settlement Order and the order appointing Mr. Seery as Highland's chief executive officer and chief restructuring officer [Docket No. 854].

---

[53] The District Court referred the HV Complaint to this Court for adjudication under the standing order reference, and, on March 11, 2022, this Court dismissed the HV Complaint on the basis of collateral and judicial estoppel. *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2022 Bankr. LEXIS 659 (Bankr. N.D. Tex. Mar. 11, 2022). The Dondero Plaintiffs appealed, and the District Court reversed and remanded. Ex. 33, Appx. 4017-4038. Contrary to Movants' statements, the District Court did not find, in any way, that the HV Complaint "had merit." Renewed Motion at 15 n.72. Instead, it found that this Court appropriately applied collateral estoppel *sua sponte* and that all of the elements of collateral estoppel were met except one—"actually litigated"—because a settlement under Rule 9019 has a different legal standard. *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 643 B.R. 162, 173 (N.D. Tex. 2022). The District Court also found that the first two elements of judicial estoppel—"inconsistency" and "court's acceptance"—were met but that this Court failed to assess the third element—"inadvertence." *Id.* at 175. The District Court remanded to this Court to determine if CLOH's withdrawal of its objection was "inadvertent." On October 14, 2022, Highland filed a renewed motion to dismiss the HV Complaint. Adv. Proc. No. 21-03067-sgj, Docket No. 122 (Bankr. N.D. Tex. Oct. 14, 2022).

012677

Accordingly, this Court, after an evidentiary hearing, issued the Contempt Order finding Mr.

Dondero and others in contempt.

86.   **Second,** Movants falsely allege Mr. Dondero credibly testified "he was not

involved at all in authorizing or preparing the motion to add Mr. Seery" and there was no evidence

to the contrary.  Renewed Motion at 15.  This is directly contradicted by the actual record.  As the

District Court explained:

> Ample evidence supports the bankruptcy court's factual findings.  Dondero has had
> a significant role in DAF for over a decade.  DAF's assets come in part from
> Dondero and his "family trusts."  Dondero "was DAF's managing member until
> 2012," and he remains "DAF's informal investment advisor."  After Dondero
> stepped down as managing member, that role went to Grant Scott, "Dondero's long-
> time friend, college housemate, and best man at his wedding."  Scott ultimately
> resigned due to "disagreements with … Dondero."
>
> Patrick replaced Scott as "DAF's general manager on March 24, 2021"—19 days
> before the Seery Motion.  Patrick initially had "no reason to believe that Mr. Seery
> had done anything wrong with respect to the HarbourVest transaction."  Only once
> "Dondero told [him] that an investment opportunity was essentially usurped" did
> Patrick "engage[] the Sbaiti firm to launch an investigation" and ask "Mr. Dondero
> to work with the Sbaiti firm with respect to their investigation of the underlying
> facts."  After that, Dondero "communicated directly with the Sbaiti firm"—Patrick
> did not.  Dondero "saw versions of the complaint before it was filed" and had
> "conversations with attorneys" about the complaint pre-filing.  That complaint
> focused on "Seery's allegedly deceitful conduct" and "mention[ed] Mr. Seery 50
> times."  Further, when listing the parties, the complaint listed each party named in
> the caption along with "[p]otential party James P. Seery, Jr.," providing his
> citizenship and domicile.
>
> Further, although Dondero averred that he did not direct the Sbaiti firm to add Seery
> to the complaint, Dondero also contradicted himself, first claiming that he did not
> know that "the Sbaiti firm intended to file a motion for leave to amend their
> complaint to add Mr. Seery," but then agreeing during the hearing that he
> "[p]robably" was "aware that that motion was going to be filed prior to the time
> that it actually was filed."  He also testified to conversations about the Seery
> Motion, noting that it involved a "very complicated legal preservation" issue.
>
> Based on all that evidence, the Court is not left with a definite and firm conviction
> that the bankruptcy court erred.  After being stymied in the bankruptcy court,
> Dondero manufactured the exigency for the lawsuit that challenged Seery's
> conduct.  Dondero's claim that he "did not suggest that Mr. Seery should be added
> as a defendant" is not credible.  Dondero gave Patrick the idea of challenging

Seery's conduct, and he worked with the Sbaiti firm to bring that idea to fruition in the complaint—a complaint that clearly contemplated adding Seery to the lawsuit. Likewise, his plea that he "had no involvement with the Seery Motion" is not credible. Dondero himself testified to the contents of attorney communications concerning the Seery Motion, eventually admitting that he "probably" had knowledge of the Motion before it was filed. In short, the bankruptcy court did not err, after considering the "totality of the evidence," in finding that Dondero had "the idea of" suing to "challenge Mr. Seery's … conduct," that he "encouraged Mr. Patrick to do something wrong," and that Patrick "abdicated responsibility to Mr. Dondero with regard to . . . executing the litigation strategy."

*Charitable DAF Fund, L.P.*, 2022 U.S. Dist. LEXIS 175778, at *18-21. The District Court, like this Court, included ample citations to the record, including the direct testimony of both Mr. Dondero and Mr. Patrick, to support its factual findings.[54] It is inconceivable this Court and the District Court both erred in assessing the evidence concerning Mr. Dondero's direct involvement in violating this Court's orders, yet Movants ignore the District Court.

87.     ***Third,*** Movants allegations about this Court's sanctions are false. Movants falsely allege Highland submitted invoices showing it had incurred just $38,796.50 defending against Mr. Dondero's contemptuous actions. Not true. Highland submitted invoices for $187,795. [Docket Nos. 2421-1, 2421-2; Ex. 34, Appx. 4048-4102]. Although this Court added to that amount to compensate for additional costs, this Court's sanction of $239,655 was affirmed by the District Court. *Charitable DAF Fund, L.P.*, 2022 U.S. Dist. LEXIS 175778, at *13-17. Again, Movants ignore the facts and the District Court.

## M.     September 2022 Denial of HCRE's Motion to Withdraw Its Proof of Claim.

88.     Finally, Movants cite to the September 12, 2022, hearing on the withdrawal of HCRE's proof of claim as an example of this Court's bias. Renewed Motion at 16-19. This

---

[54] Mr. Patrick was a long-time employee of Highland and, on information and belief, works for Skyview—an entity created to service Mr. Dondero and his controlled entities. Mr. Patrick has exclusively worked for Mr. Dondero and/or his controlled entities as a tax attorney for almost fifteen years.

012679

example, like the others, is premised on a material distortion of the record and requires a complete factual reset before Movants' baseless allegations can be addressed.

89.     On April 8, 2020, HCRE filed a proof of claim with this Court (Claim No. 146) (the "HCRE Claim") that was signed by Mr. Dondero, HCRE's manager, and filed under penalty of perjury.  The HCRE Claim challenged Highland's interest in SE Multifamily Holdings, LLC ("SEMF"):

> HCRE … contends that all or a portion of Debtor's equity, ownership, economic rights, equitable or beneficial interests in SE Multifamily does [not] belong to the Debtor or may be the property of [HCRE]. Accordingly, [HCRE] may have a claim against the Debtor.

HCRE Claim, Ex. A.  On July 30, 2020, Highland objected to the HCRE Claim [Docket No. 906].

90.     On October 16, 2020, HCRE responded [Docket No. 1197] (the "HCRE Response") asserting, among other things, that it believed the SEMF governing documents "improperly allocate[] the ownership percentages of the members thereto due to mutual mistake, lack of consideration, and/or failure of consideration."  HCRE Response ¶ 5.  The HCRE Response was filed by the law firm of Wick Phillips Gould & Martin LLP ("Wick Phillips").

91.     During initial discovery, Highland discovered that Wick Phillips had represented Highland with respect to SEMF.  Wick Phillips refused to withdraw despite the conflict, and Highland moved to disqualify them on April 14, 2021 (the "Motion to Disqualify").[55]  The Motion to Disqualify was fully briefed[56] and heavily contested with significant pre-trial discovery.  On November 30, 2021, this Court held a lengthy hearing on the Motion to Disqualify and ultimately disqualified Wick Phillips from representing HCRE in connection with the HCRE Claim.

---

[55] Docket Nos. 2196, 2197, 2198.

[56] Docket Nos. 2278, 2279, 2294, 2893, 2894, 2895, 2927, 2928, 2952.

012680

92.     In January 2022, HCRE retained replacement counsel.  After six months of HCRE's silence, the parties agreed to an amended scheduling order on June 9, 2022 [Docket Nos. 3356, 3368] and restarted discovery.   Discovery included significant document production and depositions of Mark Patrick, BH Equities (a third-party investor in HCRE), Barker Viggato LLP (HCRE's accountant), and James P. Seery, Jr., as Highland's 30(b)(6) witness.

93.     Mr. Dondero and Matthew McGraner (a SEMF equity holder) were scheduled to be deposed, and trial was set for early November 2022.

94.     However, on August 12, 2022, two days after Mr. Seery's deposition, HCRE filed its motion to withdraw the HCRE Claim [Docket No. 3443] (the "Motion to Withdraw") pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 3006 and unilaterally canceled the previously scheduled depositions of Mr. Dondero and Mr. McGraner.

95.     The Motion to Withdraw (correctly) cited *Manchester, Inc. v. Lyle (In re Manchester, Inc.)* for the test to determine whether a claim could be withdrawn under FRBP 3006. 2008 Bankr. LEXIS, at *11-12 (Bankr. N.D. Tex. Dec. 19, 2008) (weighing (1) movant's diligence in bringing the motion; (2) movant's "undue vexatiousness;" (3) extent to which the suit has progressed and the costs and expenses incurred by the non-party in preparing for trial; (4) duplicative expense of re-litigation; and (5) adequacy of movant's explanation for withdrawal).

96.     On September 2, 2022, Highland filed its opposition to the Motion to Withdraw [Docket No. 3487] (the "Objection to Withdraw") asking this Court to deny the Motion to Withdraw and require Mr. Dondero and Mr. McGraner to sit for the previously agreed depositions or, in the alternative, to condition the withdrawal of the HCRE Claim pursuant to FRBP 3006. Objection to Withdraw ¶¶ 4, 76-80.

012681

97.    On September 12, 2022, this Court held a hearing on the Motion to Withdraw.

Contrary to Movants' allegations, this Court did not show bias towards Movants at that hearing.

Instead, the following is clear from the record:

- HCRE presented *no* evidence regarding the *Manchester* factors and only addressed one *Manchester* factor—legal prejudice—in argument.[57]

- HCRE's only explanation for withdrawing the HCRE Claim was that HCRE "[didn't] need the proof of claim anymore."[58]  HCRE did not address why it believed there was a mutual mistake when it filed the HCRE Claim in April 2020 or provide any other explanation for the withdrawal of the HCRE Claim on the eve of trial.

- Highland, in distinction, introduced significant evidence with respect to each of the *Manchester* factors.  Specifically, Highland showed that:

    1) HCRE was not diligent in filing the Motion to Withdraw having filed it twenty-eight months after filing the HCRE Claim;

    2) HCRE was "unduly vexatious" as it (a) had no good faith basis for filing the HCRE Claim in the first instance, (b) forced Highland to spend hundreds of thousands of dollars on discovery, depositions, and the Motion to Disqualify, and (c) withdrew the HCRE Claim only after it had completed its discovery while denying Highland the opportunity to depose Messrs. Dondero and McGraner;

    3) The HCRE Claim had been litigated for two years and was, with the exception of the depositions of Mr. Dondero and Mr. McGraner, trial-ready;

    4) There was a material risk of duplicative litigation.  HCRE (and Mr. Dondero) consistently declined to answer whether withdrawal of the HCRE Claim would preclude future challenges to Highland's ownership interest in SEMF—the subject matter of the HCRE Claim; and

    5) HCRE had no adequate explanation for withdrawing the HCRE Claim.  HCRE provided no evidence justifying its concern about Highland's interference in SEMF's management and no articulated basis for no longer asserting mutual mistake.

Ex. 35, Appx. 4112-4132.

98.    Notwithstanding HCRE's complete lack of evidence, at the hearing, Highland

stated, on the record, it would consent to the withdrawal of the HCRE Claim if HCRE (a) made

---

[57] Ex. 35, Appx. 4109-4110.

[58] *Id.* Appx. 4109-4110; Appx. 4134.

012682

"an ironclad commitment that HCRE is irrevocably waiving its right to challenge Highland's

interest in [SEMF];" (b) waived its right to appeal; (c) agreed not to rely on its deposition of Mr.

Seery for any purpose; and (d) reimbursed Highland's costs incurred in the two years of litigation

on the HCRE Claim.  *Id.* Appx. 4114-4115; Appx. 4129; Appx. 4136-4137.

99.     HCRE, however, was unable to satisfy even the first requested condition—waiver

of its right to challenge Highland's interest in SEMF.

- First, HCRE's counsel, Bill Gameros,[59] attempted to enter into an agreement on behalf of his client; however, it was clear from the record that Mr. Gameros had not spoken with his client about the proposed resolution, that he needed "to confer with [his] client" before he could agree, and he had no authority to bind his client.

- Second, after a fifteen minute recess to allow Mr. Gameros to produce a client representative, D.C. Sauter appeared before this Court.  This Court asked Mr. Gameros "what is [Mr. Sauter's] position with HCRE."  Mr. Sauter replied:  "I don't have an official position with HCRE" but alleged, without evidence or support, that Mr. Dondero had authorized him to speak on HCRE's behalf despite his not being an officer, director, employee, interest holder, or even counsel of HCRE.  Mr. Sauter clearly had no legal capacity to bind HCRE.[60]

- Third, Mr. Dondero, HCRE's manager, appeared before this Court by telephone.[61]  Mr. Dondero, however, refused to give an unconditional response to his counsel's question: "Mr. Dondero, do you agree that [HCRE] will not challenge in any way the estate's interest in [SEMF], its 46-point whatever percent interest it is"  Instead, Mr. Dondero stated Highland's ownership interest in SEMF "could change over time" and that "no business man can agree" to Mr. Gameros' question.

---

[59] Highland and this Court were both justifiably concerned about Mr. Gameros' ability to make a binding deal based on their experience with, among other things, the HV Complaint.  In early 2021, CLOH, through counsel, conceded on the record that it had no right of first refusal to HarbourVest's interests in HCLOF.  Three months later, CLOH, through new counsel, filed the HV Complaint arguing it did have a right of first refusal.  *See* ¶ 84 *infra*.

[60] Movants allege this Court chastised Mr. Sauter.  Renewed Motion at 17 ("[T]he Court responded [to Mr. Sauter]: 'I mean I'm not sure I care what you say, no offense.  I don't think I have a person with clear authority here.'")  The Court directed that statement at John Morris, Highland's counsel, not Mr. Sauter.  Ex. 35, Appx. 4140 ("Mr. Morris, do you want to respond?  I mean I'm not sure, frankly, I care what you say….")

[61] Movants allege this Court "rebuffed [Mr. Dondero] for failing to have access to video, even though he [had] no previous notice he would have to give testimony at the hearing."  Renewed Motion at 18.  This Court was justifiably confused by Mr. Dondero's lack of access to video.  Moments before Mr. Dondero's appearance, Mr. Sauter said he had "to run around the corner and try to make sure [Mr. Dondero] knows how to unmute himself."  *Id.* Appx. 4141-4142.  The logical inference from that statement is that Mr. Dondero was in the office with Mr. Sauter, not in his car as he claimed.  Regardless, all this Court said about Mr. Dondero's lack of video was "this is not ideal, you know, without us seeing you."  *Id.* Appx. 4142.  That is no "rebuff."

012683

*Id.* Appx. 4135-4146. Consequently, because of HCRE's (a) inability to satisfy the condition to withdraw and (b) failure to satisfy any of the *Manchester* factors, this Court denied HCRE's request to withdraw the HCRE Claim.

100. Notwithstanding the allegations in the Renewed Motion:

- This Court did not find that HCRE "had acted with 'undue vexatiousness' … merely because [Highland] opposed the claim and had spent 'hundreds of thousands of dollars' doing so." Renewed Motion at 18. As set forth above, "undue vexatiousness" is a *Manchester* factor which this Court had to assess. After reviewing Highland's voluminous evidence and the lack of evidence from HCRE, this Court simply found "the undue vexatiousness factor … weigh[ed] in favor of there has been undue vexatiousness." *Id.* Appx. 4156.

- This Court did not "order[] additional depositions to take place and the parties to attend trial." Renewed Motion at 18. The Motion to Withdraw was denied, and, accordingly, the hearing on the HCRE Claim and Highland's previously scheduled depositions of Mr. Dondero and Mr. McGraner would naturally proceed. *Id.* Appx. 4158.

- This Court did not, "as a parting shot," direct the UST to investigate HCRE and Mr. Dondero. Renewed Motion at 18. Significant evidence had been produced at the hearing on the lack of good faith of the HCRE Claim (and Mr. Dondero's potential perjury) (*Id.* Appx. 4117-4123), and this Court was obligated by law to report the matter to the UST pursuant to 18 U.S.C. § 3057(a).[62]

## ARGUMENT

101. Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

---

[62] *See* 18 U.S.C. § 3057(a) ("Any judge, receiver, or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed.")

012684

28 U.S.C. § 455(a), (b)(1).  "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FRBP 5004(a).

102.    Recusal motions brought under Section 455(a) must be "timely."  *Hill v. Schilling*, 495 Fed. App'x 480, 483 (5th Cir. 2012); *see also Grambling Univ. Nat'l Alumni Ass'n v. Bd. of Supervisors for La. System*, 286 Fed. App'x 864, 867 (5th Cir. 2008) (noting that while "[s]ection 455 does not contain an explicit timeliness requirement … this Court has consistently inferred such a requirement") (citing *United States v. Sanford*, 157 F.3d 987, 988 (5th Cir. 1998)).  "The timeliness rule requires that 'one seeking disqualification must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification.'" *Sanford*, 157 F.3d at 988–89 (quoting *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994)).  "The most egregious delay—the closest thing to *per se* untimeliness—occurs when a party already knows the facts purportedly showing an appearance of impropriety but waits until after an adverse decision has been made by the judge before raising the issue of recusal."  *Sanford*, 157 F.3d at 988–89; *see also Delesdernier v. Porterie*, 666 F.2d 116, 122 (5th Cir. 1982) ("Congress did not enact § 455(a) to allow counsel to make a game of the federal judiciary's ethical obligations; we should seek to preserve the integrity of the statute by discouraging bad faith manipulation of its rules for litigious advantage.")

103.    Even if a motion is timely, whether to grant it is committed to the sound discretion of the targeted court. *See Hill v. Breazeale*, 197 Fed. App'x 331, 335 (5th Cir. 2006).  "The judge abuses [his or her] discretion in denying recusal where a reasonable [person], cognizant of the relevant circumstances surrounding [the] judge's failure to recuse, would harbor legitimate doubts

012685

about that judge's impartiality." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge).   "The standard for bias is not 'subjective' … but, rather, 'objective.'" *Andrade v. Chojnacki*, 338 F.3d 448, 454-55 (5th Cir. 2003) (citing *Vieux Carre Prop. Owners, Residents & Assocs. v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991)).   In other words, it "is with reference to the 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person' that the objective standard is currently established." *Id.* (quoting *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995)). "Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents." *Id.* at 455.   Finally, the common-law doctrine called the "extrajudicial source rule" under Section 455 "divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal." *Id.*   The movant must: (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard.   The movant must also demonstrate the "court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion." *Id.* at 456-62.

104.     Here, it is indisputable that (a) the Renewed Motion, which largely restates the Initial Motion, is "untimely;" (b) "bias" does not exist; (c) there is no "deep seated antagonism;" and (d) there is no evidence of "extrajudicial knowledge."   The exceptional and rare remedy of recusal is not warranted and the Renewed Motion, like the Initial Motion, must be denied.

## I.     <u>The Renewed Motion Must Be Denied as Untimely</u>

105.     This Court denied the Initial Motion on the basis that it was untimely and should deny the Renewed Motion on the same grounds.

012686

106.    This Court determined the Initial Motion was "untimely" because it was filed: (a) "more than 15 months after the case was transferred to this Court" and after Movants learned about the facts purportedly showing an "appearance of impropriety," (b) "after many dozens of orders" were issued by this Court, and (c) "on the eve of a contempt hearing." Recusal Order at 7.  Yet, Movants did not seek recusal until March 2021 and allowed this Court to expend significant judicial resources overseeing this case and Movants' litigation.  Movants offered no credible explanation for the delay in bringing the Initial Motion.

107.    The Renewed Motion suffers from the same infirmities but is even less "timely" than the Initial Motion.  *First*, the Renewed Motion incorporates the Initial Motion and its "examples" of bias.  Those examples were untimely when the Initial Motion was filed in March 2021 and are even more so now.  *Second*, the Renewed Motion was filed (a) thirty-four months after this case was transferred to this Court, (b) seven months after the District Court denied the appeal of the Recusal Order, and (c) after this Court entered many hundreds more orders.  The "new" examples of bias in the Renewed Motion are also untimely.  With one meritless exception, all "new" examples occurred on or before August 4, 2021—over a year ago—with one actually occurring before the Initial Motion was filed.  Like the Initial Motion, the Renewed Motion was also filed to prevent this Court from entering orders adverse to Movants—denying the dispositive motions to dismiss filed in the Kirschner Adversary.[63]  Supplemental Motion ¶¶ 7, 9.

108.    This, alone, constitutes "*per se* untimeless."  *See Hill*, 197 Fed. App'x at 335 (holding district court did not abuse its discretion in denying motion to recuse as untimely where party "waited, for no given reason, to raise the issue until after the district court ruled against

---

[63] "Kirschner Adversary" means *Marc S. Kirschner, as Litigation Trustee for the Litigation Sub-Trust v. James D. Dondero, et al.*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.).

012687

him"); *Sanford*, 157 F.3d at 989 (affirming district court's denial of recusal motion as untimely where party "knew of the facts purportedly causing an appearance of impropriety," but waited until after an adverse decision to raise the recusal issue); *Grambling*, 286 Fed. App'x at 867-88 (affirming denial of recusal motion as "*per se*" untimely where "despite having knowledge of the facts underlying its recusal argument," party "did not immediately move to have this case assigned to a judge from another division or district and instead allowed the case to linger … for nearly ten months. When the [party] finally acted, it did so only after [the judge] had dismissed its claims"); *Hill v. Schilling*, 2014 WL 1516193, at *3 (N.D. Tex. Apr. 17, 2014) (affirming judge's finding that motion to recuse was untimely where it was brought "some eleven months after [plaintiff] and his counsel first became aware of the" facts giving rise to alleged perception of bias); *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 155 (S.D.N.Y. 2012) ("Plaintiffs here had the requisite knowledge no later than January 4, 2012, but the recusal request did not come until nearly three months later," noting "I have made no efforts to hide my views, relationships or affiliations. If plaintiffs truly believed that any of these issues, individually or collectively, created a bias or the appearance of partiality, they should have promptly moved for my recusal.")

109.    This Court also appropriately considered the fact that the Initial Motion came on the "eve of the contempt hearing."  Recusal Order at 7.  Similarly, Movants seek recusal now, after Mr. Dondero has been twice found in contempt, to prevent this Court from ruling in the Kirschner Adversary.  Supplemental Motion ¶ 7.  That is, in itself, grounds for denial.  *See Weisshaus v. Fagan,* 456 Fed. App'x 23, 34 (2d Cir. 2012) (noting that "[a]lthough there was no dispositive ruling as to [defendant] at the time [plaintiff] brought her recusal motion, the district court aptly noted that the motion came on the heels of its direction that [plaintiff] submit to a deposition, thus strongly   suggesting   that   the   motion   was   a   mere   fall-back   position   in   response   to

012688

an adverse ruling."); *Da Silva*, 868 F. Supp. 2d at 154 (denying recusal motion where "[i]t appears that plaintiffs are improperly using the recusal motion as a 'fall-back position' to an unfavorable ruling.")

110.    In light of the expansive nature of this case and this Court's extensive knowledge of the proceedings that it has overseen throughout the last thirty-four months, interests of judicial economy also support this Court's denial of the Renewed Motion. *See United States v. Olis*, 571 F. Supp. 2d 777 (5th Cir. 2008) (affirming denial of recusal motion as untimely where party was aware of facts stated in recusal motion "well before he filed" the motion, noting that party "had duty to file [ ] motion for recusal before the court's judicial resources were spent on resolution of motions" and party "neither argues nor explains why his delay" was reasonable); *Hill*, 495 Fed. App'x at 484 ("Particularly in light of the expansive nature of these proceedings, considerations of judicial economy likewise countenance our conclusion that the district court did not abuse its discretion"); *United States v. York*, 888 F.2d 1050, 1055 (5th Cir. 1989) ("The motivation behind a timeliness requirement [for Section 455] is [] to a large extent one of judicial economy"); *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001) ("After a massive proceeding such as this, when the court has invested substantial judicial resources and there is indisputably no evidence of prejudice, a motion for recusal of a trial judge should be supported by substantial justification, not fanciful illusion"); *Weisshaus*, 456 Fed. App'x at 34 (affirming district court's denial of recusal motion as untimely where party "waited almost nineteen months" to file the recusal motion, at which point the district court had already expended substantial judicial resources overseeing and adjudicating" the parties' claims).

111.    Accordingly, this Court is well within its discretion to deny the Renewed Motion—like the Initial Motion—as untimely.

012689

## II.   **The Renewed Motion Must Be Denied on the Merits**

112.    Even if the Renewed Motion had been timely, it must be denied on the merits.  The Renewed Motion fails to prove that any of the circumstances that would require disqualification under Section 455 are present here.

### A.    **There Is No Extrajudicial Bias Present Here**

113.    The core of Movants' argument in the Renewed Motion is, as in the Initial Motion, that this Court's "extrajudicial" bias toward Movants stemmed from opinions formed during the Acis Bankruptcy.  Renewed Motion at 4-5; Initial Motion ¶¶ 4-13.  That argument is still frivolous.

114.    As articulated by the Supreme Court, "[o]pinions formed by the judge on the basis of facts of prior proceedings do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Conkling v. Turner*, 138 F.3d 577, 592 (5th Cir. 1998) ("As a general rule, for purposes of recusal, a judge's 'personal' knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her judicial capacity regarding the parties before the court, whether learned in the same or a related proceeding, cannot be the basis for disqualification") (internal quotations omitted).  Rather, opinions or beliefs formed from events on the record or from prior proceedings, or "intrajudicial" opinions, are subject to a "deferential" review, and are the "type of opinions/expressions that *Liteky* holds nearly exempt from causing recusal." *Andrade*, 338 F.3d at 460-62.

115.    Any opinion allegedly formed by this Court from the Acis Bankruptcy, a prior proceeding, is thus not an "extrajudicial" source and is precisely the type of opinion exempt from warranting recusal.  *See Liteky*, 510 U.S. at 555; *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 81 (5th Cir. 2011) (affirming denial of motion for recusal where "the only facts the [judge] learned about [party's] conduct were learned from judicial proceedings in the instant case and in previous

cases"); *Conkling*, 138 F.3d at 592 ("As a general rule, for purposes of recusal, a judge's 'personal'
knowledge of evidentiary facts means 'extrajudicial,' so facts learned by a judge in his or her
judicial capacity regarding the parties before the court, whether learned in the same or a related
proceeding, cannot be the basis for disqualification") (internal quotations omitted).[64]

116.    For these same reasons, Movants' reliance on this Court's rulings as evidence of
"antagonism" is equally deficient.  "[J]udicial rulings alone almost never constitute a valid basis
for a bias or partiality motion … and can only in the rarest circumstances evidence the degree of
favoritism or antagonism required … when no extrajudicial source is involved." *Liteky*, 510 U.S.
at 555.  Here, and as set forth above, Movants rely on various rulings issued by this Court to
demonstrate "bias."  These rulings, none of which involve an extrajudicial source, simply do not
rise to the rare circumstance of evidencing the degree of antagonism warranted for recusal.  *See
Liteky*, 510 U.S. at 555 ("Almost invariably, judicial rulings are proper grounds for appeal, not for
recusal"); *Andrade*, 338 F.3d at 456 (denying recusal based on judicial rulings where events cited
"are embodied in judicial actions that Movants could have, but did not, appeal").  Simply put,
Movants offer no credible legal or factual basis for recusal. *See Henderson v. Dep't of Pub. Safety
and Corrs.*, 901 F.2d 1288, 1296 (5th Cir. 1990) ("[E]ven the most superficial research would have
put [the party] on notice that the factual circumstances he alleged were not grounds for recusal"
under *Liteky*, noting "there is absolutely no case authority cited by [party] to the contrary.")

117.    Movants' "due process" argument that they "are entitled to a full and fair
opportunity to make their case in an impartial forum—regardless of their history with that forum"
(Renewed Motion at 19-20) is frivolous and should be summarily rejected.  Movants fail to support

---

[64] Movants rely on only one allegedly "extrajudicial" source relating to this Court's inquiries into COVID-related
"PPP loans."  Renewed Motion at 8-9; Initial Motion ¶ 52.  However, as noted *supra*, this Court took no action against
Mr. Dondero or any of the other Movants and did not even ask them to respond.

DOCS_NY:46569.9 36027/003

012691

any notion of a "due process" violation. Nor could they. The record of this case shows the great lengths this Court has gone through to respect Movants' due process rights, notwithstanding their limited, if any, skin in the game. The cases cited by Movants in support of their contention are entirely inapplicable. *Miller v. Sam Houston State Univ.,* 986 F.3d 880, 893 (5th Cir. 2021) does not address the standard for "recusal" under Section 455 or the "extrajudicial" source rule. Rather, *Miller* deals with whether a case should be reassigned to a different district court judge on remand after the original judge did not give plaintiff the opportunity for discovery and *sua sponte* dismissed a plaintiff's claim of sex discrimination and retaliation under the Fair Labor Standards Act. Movants' other case on this point is equally irrelevant.[65] The types of exceptional circumstances warranting recusal in those cases are not present here. Movants otherwise offer no legal basis in support of their argument. Accordingly, this Court properly exercised its discretion in finding that there was no "extrajudicial" source warranting recusal.

### B.    This Court Does Not Have Deep-Seated Antagonism Toward Movants

118.    Similarly, there is no basis to find that this Court has "demonstrate[d] such a 'high degree of favoritism or antagonism as make fair judgment impossible.'" Renewed Motion at 22. Movants contend the "record is replete with examples" of this Court's "antagonism" such that a reasonable observer would doubt this Court's impartiality. *Id.* Movants' arguments are without merit.

119.    "Judicial remarks that are critical or disapproving of, or even hostile to, counsel for the parties or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. In support of their argument that this Court harbored "bias" toward Movants, Movants

---

[65] The Court in *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 167 (5th Cir. 1997), denied a petition for a writ of mandamus challenging denial of recusal premised on racist remarks, where, although a "reasonable person might indeed harbor doubts about the trial judge's impartiality" in a "racially-charged case such as the instant one," the judge had already presided over the case for so long such that recusal at that stage "would be unprecedented."

refer to a number of this Court's statements regarding Mr. Dondero and his conduct. *See generally* ¶¶ 29-32, 34-100 *supra*. In relying on such statements, Movants disregard the law on recusal. *See Andrade*, 338 F.3d at 459 (affirming denial of recusal motion premised on judge's negative comments made on the record—including describing a witness as a "crazy, murdering son-of-a-bitch" and referring to parties' attempt to introduce certain evidence as "bullcrap") (citing *Liteky*, 510, U.S. at 555)). As this Court previously found, Movants' cited remarks are, at best, "clashes between a court and counsel," and such remarks are "simply insufficient" for recusal. Recusal Order at 10; *see also United States v. Landerman*, 109 F.3d 1053, 1066 (5th Cir. 1997) (affirming denial of motion to recuse where district judge allowed "the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning"); *Garcia v. Woman's Hosp. of Tex.*, 143 F.3d 227, 230 (5th Cir. 1998) (affirming denial of motion to recuse where district judge had made unflattering comments about plaintiff's ability to prove her case).

120.    Based on the entirety of the proceedings before this Court, in which all events raised by Movants relate to either this Court's knowledge of prior proceedings or this Court's remarks during these proceedings, the exceptional remedy of recusal is not warranted. *See United States v. Williams*, 127 Fed. App'x 736, 737-38 (5th Cir. 2005) ("As our review of the entire context of the judicial proceedings in which the events challenged in this case arose reveals no disqualifying judicial bias, we conclude that there was no abuse of discretion in the district court's denial of [the] recusal motion"); *Henderson*, 901 F.2d at 1296 (affirming court's denial of recusal motion, where "none of the circumstances requiring disqualification under § 455 are present here" and "the trial judge was well within his discretion in finding that the motion for recusal was not well founded, either in fact or in law.")

012693

121.     This Court, respectfully, should again find that that Movants' assertions do not "rise to the threshold standard of raising doubt in the mind of a reasonable observer as to the judge's impartiality" (Recusal Order at 10) and deny the Renewed Motion.

## III.     This Court Lacks the Authority to Grant Movants' Alternative Relief

122.     Pursuant to 28 U.S.C. § 158(a), the District Court sits as a court of appeals over this Court and reviews (a) this Court's final orders and (b), if leave is granted by the District Court, its interlocutory orders.  28 U.S.C. § 158(a)(1), (3).  In its February Order, the District Court held that, as a matter of law, an order denying a motion to recuse is "an interlocutory order from which no appeal lies prior to this Court entering a final judgment" and is not an appealable collateral order.  *See, e.g.*, Ex. 12, Appx. 2106.  And, as set forth on Exhibit 36 (Appx. 4165-4169), there is still no final judgment; multiple matters are currently pending before this Court or are on appeal to the District Court or the Fifth Circuit.[66]  Yet, Movants, again, ask this Court to "make clear that any order denying recusal is final so that Movants may appeal this Court's order to the Northern District of Texas."  Renewed Motion at 24.

123.     As discussed above, in the Highland Objection, and at the August 31, 2022 status conference, it is not for this Court to determine whether its orders are final and appealable. Movants' therefore request this Court to take actions that, respectfully, it has no authority to take: (a) enter an order declaring any interlocutory order it enters denying the Renewed Motion "final" and (b) dictate to the District Court that it has jurisdiction to hear an appeal of that interlocutory order.  Movants' request should be denied as a matter of law.

---

[66] *See Friendly Fin. Serv.-Eastgate, Inc. v. Dorsey (In re Dorsey)*, 489 Fed. Appx. 763, 764 (5th Cir. 2012) ("Here, there is a final judgment from the bankruptcy court, but the appeal of that judgment has not been fully resolved. … [W]e lack jurisdiction to review the motion to recuse.  Friendly Finance must await the final resolution of its appeal.")

012694

## **CONCLUSION**

124.    For the foregoing reasons, Highland respectfully requests that this Court deny the

Renewed Motion and grant such other relief the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

012695

Dated: October 31, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA  90067
Tel: (310) 277-6910
Fax:  (310) 201-0760
Email:      jpomerantz@pszjlaw.com
                 jmorris@pszjlaw.com
                 gdemo@pszjlaw.com
                 hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

012696